Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchishom@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*
[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **FIRST DECLARATION OF DANIELLE LEONARD IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL PRELIMINARY INJUNCTION BRIEFING** |

**DECLARATION**

I, Danielle Leonard, declare as follows:

1.      I am a member in good standing of the State Bar of California and the bar of this Court.  I represent all Union and Non-Profit Organization Plaintiffs in this action. This declaration is based on my personal knowledge, information, and belief.

2.      On March 31, 2026, Plaintiffs deposed Karen Evans, who at the time was FEMA's Senior Official Performing the Duties of Administrator ("SOPDA").  A true and correct copy of the transcript of that deposition is attached as **Exhibit A**, including the parties confidentiality designations.

3.      On April 2, 2026, Plaintiffs deposed DHS's Chief Human Capital Officer, Roland Edwards.  A true and correct copy of the transcript of that deposition is attached as **Exhibit B.** Defendants confirmed they have no confidentiality designations for Mr. Edwards deposition transcript.

4.      On April 3, 2026, Plaintiffs deposed FEMA's Chief Human Capital Officer, La'Toya Prieur.  A true and correct copy of the transcript of that deposition is attached as **Exhibit C**.  Exhibit C is the final transcript reflecting Confidentiality designations made by Defendants on pages 215, 225, 231, and 232.  To be consistent with those redactions, although not specifically identified by Defendants, Plaintiffs have redacted those same names from pages 214, 216, and 233.  Those are the only confidentiality designations made by any party for this deposition transcript.

5.      On May 4, 2026, Plaintiffs deposed former DHS Deputy Chief of Staff ("DCOS"), Joseph Guy.  A true and correct copy of the transcript of that deposition is attached as **Exhibit D**. In agreement with Defendants and Joseph Guy's personal lawyer, Plaintiffs have redacted his phone number, address, and current employment information.  Those are the only confidentiality designations made by any party for this deposition transcript.

6.      On May 11, 2026, Plaintiffs deposed former Senior Advisor to the Secretary of Homeland Security and government subcontractor Kara Voorhies.  A true and correct copy of the transcript of that deposition is attached as **Exhibit E,** including the parties confidentiality

designations.

7.    On May 15, 2026, Plaintiffs deposed Joseph Guy for a second time.  A true and correct copy of the transcript of that deposition is attached as **Exhibit F.**  In agreement with Defendants and Joseph Guy's personal lawyer, Plaintiffs have redacted information about his current employment.  That is the only confidentiality designations made by any party for this deposition transcript.

8.    On May 26, 2026, Plaintiffs deposed Karen Evans for a second time.  A true and correct copy of the transcript of that deposition is attached as **Exhibit G.**  No party has made any confidentiality designations for this transcript.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed May 29, 2026, in San Francisco, California.

_____
Danielle Leonard

FIRST LEONARD DECLARATION, No. 3:25-CV-03698-SI

# Exhibit A

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

-------------------------------x
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,

      Plaintiffs,

                             Case No.

   vs.

                      3:25-cv-03698-SI

DONALD J. TRUMP, in his official
capacity as President of the
United States, et al.,

      Defendants.
-------------------------------x

VIDEOTAPED DEPOSITION OF

KAREN STREHLE EVANS

Tuesday, March 31, 2026

Reported By:  SUSAN ASHE, CER

Job No.:  11973

Tuesday, March 31, 2026

8:59 a.m. Eastern Daylight Time

Videotaped deposition of KAREN STREHLE EVANS, taken on behalf of the Plaintiffs, beginning at 8:59 a.m., on Tuesday, March~31, 2026, at the offices of Democracy Forward Foundation, 1445 New York Avenue, Northwest, Washington, D.C., before Susan Ashe, Certified Electronic Reporter and a Notary Public of the District of Columbia.

APPEARANCE OF COUNSEL:

On behalf of All Union and Non-Profit

Organization Plaintiffs

ALTSHULER BERZON LLP

BY:  DANIELLE E. LEONARD, ESQ.

BY:  ELIZABETH ESHLEMAN, ESQ.

177 Post Street, Suite 300

San Francisco, California  94108

(415) 421-7151

dleonard@altshulerberzon.com

eeshleman@altshulerberzon.com


On behalf of All Union and Non-Profit

Organization Plaintiffs (except NRDC) and for

Plaintiffs City of Chicago, IL; Martin Luther,

Jr. County, WA; Harris County, TX; and City of

Baltimore, MD

DEMOCRACY FORWARD FOUNDATION

BY:  TSUKI HOSHIJIMA (pro hac vice)

Senior Counsel

P.O. Box 34553

Washington, D.C.  20043

(202) 448-9090

thoshijima@democracyforward.org

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

UNITED STATES DEPARTMENT OF JUSTICE

BY:  MARIANNE F. KIES

BY:  JEREMY NEWMAN

BY:  CHRISTOPHER R. HALL

Trial Attorneys

Civil Division, Federal Programs

Branch

1101 L Street, Northwest

Washington, D.C.  20005

(202) 305-0693

marianne.f.kies@usdoj.gov

jeremy.s.newman@usdoj.gov

christopher.r.hall@usdoj.gov

- and -

FEDERAL EMERGENCY MANAGEMENT AGENCY

BY:  KEVIN YUSMAN

BY:  ASHLEY DARBO

BY:  JAMES EVANS, Chief Counsel

500 C Street, Southwest

Suite 840

Washington, D.C.  20472

kevin.yusman@fema.dhs.gov

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

(Continued)

DEPARTMENT OF HOMELAND SECURITY

BY:  MATTHEW FLEISCHMAN

2700 Martin Luther King, Jr., Southeast

Washington, D.C.  20032

matthew.fleischman@hq.dhs.gov

On behalf of the Witness in Her Personal

Capacity

BINNALL LAW GROUP

BY:  JASON GREAVES, ESQ.

717 King Street, Suite 200

Alexandria, Virginia  22314

(703) 888-1943

jason@binnall.com

ALSO PRESENT:

Jessica Levy, Esq.

Altshuler Berzon LLP

Olivia King, Legal Assistant

Democracy Forward Foundation

Sana Sinha, Legal Assistant

Democracy Defenders Fund

Jonathan Perry, Videographer

CONTENTS

THE WITNESS

Karen Strehle Evans

BY MS. LEONARD                                          16

EXHIBITS

PLAINTIFFS

Exhibit No.                                        Marked

Exhibit 1    Linked-In Printout

             Karen S. Evans

             Four Pages                                30

Exhibit 2    Organizational Chart - DHS            49

Exhibit 3    POLITICO PRO

             "Top CISA appointee Karen Evans

             moves to FEMA"                            67

Exhibit 4    US DHS FEMA Review Council

             Open Meeting Minutes

             May 20, 2025                              72

Exhibit 5    US DHS FEMA Review Council

             Open Meeting Minutes

             July 9, 2025                              78

Exhibit 6    "Exhibit 4"

             DHS Record of Clearance and

             Approval                                 82

Page 8

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Marked

Exhibit 7   "ICYMI:  SULLIVAN BRINGS SENIOR

            FEDERAL OFFICIALS TO STORM-

            RAVAGED WESTERN ALASKA

            VILLAGES"                          120

Exhibit 8   Press Release

            Office of U.S. Senator

            Dan Sullivan                       122

Exhibit 9   Email Correspondence

            "Reminder from Chief

            Information Officer Antoine

            McCord on Electronic Message

            Federal Records Preservation"      162

Exhibit 10  Redacted Handwritten Notes

            USA-AFGE-Exp-0033527

            through -544                       165

Exhibit 11  The Washington Post

            "FEMA head resigns.  Richardson

            had been hard to reach during

            Texas floods."                     177

Exhibit 12  The New York Times

            "In a Reversal, FEMA Won't

            Reinstate Suspended Workers"       183

                   EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Marked

Exhibit 13  Draft Final Report

            "The President's Council to

            Assess the Federal Emergency

            Management Agency"

            December 11, 2025                  193

Exhibit 14  Email Correspondence

            USA-AFGE-Exp.-0007239

            through -241                       199

Exhibit 15  Executive Order 14356

            October 15, 2025                   205

Exhibit 16  Email Correspondence

            USA-AFGE-Exp.-0002353

            through -357                       207

Exhibit 17  Organization Information

            Chart

            USA-AFGE-Exp.-0006542              218

Exhibit 18  Email Correspondence

            USA-AFGE-Exp.-0007333

            through -343                       228

Exhibit 19  Email Correspondence

            USA-AFGE-Exp.-0006535

            through -538                       237

                        EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Marked

Exhibit 20  Email Correspondence

            USA-AFGE-Exp.-0006686

            through -688                          254

Exhibit 21  May 14, 2025 Correspondence

            USA-AFGE-Exp.-0000405

            and -406                              265

Exhibit 22  Email Correspondence

            USA-AFGE-Exp.-0004575

            through -582                          268

Exhibit 23  Email Correspondence

            USA-AFGE-Exp.-0010683

            through -688                          271

Exhibit 24  Email Correspondence

            USA-AFGE-Exp.-0006997

            and -998                              278

Exhibit 25  "Talking Points for FY26

            Staffing Strategy"

            USA-AFGE-Exp.-0034341

            and -342                              287

Exhibit 26  Email Correspondence

            USA-AFGE-Exp.-0014520

            and -521                              297

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                          Marked

Exhibit 27  Email Correspondence

            USA-AFGE-Exp.-0007258

            through -260                             305

Exhibit 28  Email Correspondence

            USA-AFGE-Exp.-0007219

            and -720                                 326

Exhibit 29  Email Correspondence

            USA-AFGE-Exp.-0004518

            through -520                             334

Exhibit 30  Email Correspondence

            USA-AFGE-Exp.-0000363

            through -367                             340

Exhibit 31  Email Correspondence

            USA-AFGE-Exp.-0005054

            through -059                             346

Exhibit 32  Email Correspondence

            USA-AFGE-Exp.-0009465

            and -466                                 349

Exhibit 33  Email Correspondence

            USA-AFGE-Exp.-0000576                    359

Page 12

                          EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                          Marked

Exhibit 34   "Declaration of Karen S. Evans

             in Support of Defendants'

             Opposition to Plaintiffs'

             Motion for a Preliminary

             Injunction"                             360


                     REQUEST FOR PRODUCTION

Page/Line                 Page/Line                 Page/Line

  27/21                     175/19


(REPORTER'S NOTE:  All quotations from exhibits are

reflected in the manner in which they were read into

the record and do not necessarily denote an exact

quote from the document.)

Page 13

TUESDAY, MARCH 31, 2026;

8:59 A.M. EASTERN DAYLIGHT TIME

--o0o--

VIDEOGRAPHER:  We are now on the record.  This begins the video deposition of Karen Evans, taken in the matter of the American Federation of Government Employees, AFL-CIO, et al., versus Donald J. Trump, in his Official Capacity as President of the United States, et al. Case filed in the U.S. District Court for the Northern District of California, San Francisco Division, Case No. 3:25-cv-03698-SI.

We are at the offices of Democracy Forward, 1445 New York Avenue, Northwest, in Washington, D.C.  The date is March 31, 2026, and the time is approximately 8:59 a.m.

My name is Jonathan Perry.  I am a videographer representing TransPerfect. The court reporter is Susan Ashe, also with TransPerfect.

And would counsel present please introduce themselves and state whom they

represent.

MS. LEONARD:  Good morning, everyone.  Danielle Leonard, from Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MR. HOSHIJIMA:  Good morning. Tsuki Hoshijima, representing all Union and Nonprofit Organization Plaintiffs except NRDC and Plaintiffs City of Chicago, Illinois; Martin Luther King, Jr. County, Washington; Harris County, Texas; and City of Baltimore, Maryland.

MS. ESHLEMAN:  Good morning. Elizabeth Eshleman, also from Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. LEVY:  Good morning. Jessica Levy, from Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. SINHA:  Good morning.  Sana Sinha with Democracy Defenders Fund, representing all Union and Organizational Plaintiffs.

MS. KING:  Good morning.  Olivia

King with Democracy Forward.

MS. LEONARD:  The last two are not attorneys making --

MS. KING:  Yeah.

MS. LEONARD:  -- their appearance.

MS. KING:  We're just legal assistants.

MS. LEONARD:  Sorry.

MS. KIES:  Good morning. Marianne Kies with the Department of Justice, on behalf of the Defendants in this case.  I'm here today for the witness.

MR. NEWMAN:  Jeremy Newman, Department of Justice, representing the Defendants.

MR. GREAVES:  Jason Greaves, from the Binnall Law Group, representing Karen Evans in her personal capacity.

MR. HALL:  Hi.  Christopher Hall, Department of Justice.

MR. YUSMAN:  Hello.  Kevin Yusman, FEMA Office of Chief Counsel.

MS. DARBO:  Good morning.

Page 16

Ashley Darbo for FEMA.

MR. EVANS:  James Evans, Chief Counsel for FEMA.

MR. FLEISCHMAN:  Matthew Fleischman from the Department of Homeland Security.

VIDEOGRAPHER:  And would the reporter please swear in the witness.

Whereupon,

KAREN STREHLE EVANS,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. LEONARD:

Q.   Good morning, Ms. Evans.  I introduced myself before, but let me do it again.  Danielle Leonard.

You understand that I represent the Plaintiffs in this lawsuit?

A.   Yes.

Q.   And could you state your full name for the record, please.

A.   My full name is Karen Strehle Evans.

Q.   And your -- the city and state where you currently reside?

A.   Martinsburg, West Virginia.

Q.   And are you currently employed?

A.   Yes.

Q.   And what is your position?

A.   My position of record is the chief of staff at FEMA, but I am delegated the authorities as the Senior Official Performing the Duties of the Administrator at FEMA.

Q.   The Senior Official Performing the Duties of the FEMA Administrator, also known as the "SOPDA."  Is that --

A.   Yes, ma'am.

Q.   -- right?

Okay.  I'll get to the deposition rules, but we're going to try really hard not to talk over each other today, because it becomes extraordinarily difficult for the court reporter to create a clean record.

So I would ask that you wait for me to finish my question before giving your answer.

It also allows your attorney to interpose any objections for the record that they intend to make.

And I will do the same by waiting for you to complete your answer.

Does that make sense?

A. Yes, ma'am.

Q. Okay. What's your current business address?

A. The current business address of FEMA is 500 C Street, Southwest.

Q. And have you resided in West Virginia the entirety of the time you've worked for FEMA?

A. Yes.

Q. And do you commute or work remotely, or both?

MS. KIES: Object to form.

A. I commute into D.C. every day.

Q. Every workday.

A. Um-hum.

Q. For the past year -- so does that mean, on average, that you commute in every day from West Virginia for five days a week?

A. Yes, ma'am.

Q. Have you ever been deposed?

A. No, ma'am.

Q. So this is the first time.

All right. I'll quickly go over some of the procedures, as we understand them, and you let me know if there's anything that you have questions

about.  Okay?

First one, in addition to the not talking over each other, I want to make sure that your answers are verbal, rather than shaking your head and nodding, because the court reporter can't write that down.

So -- does that make sense?

A.  Yes, ma'am.

Q.  Okay.  So I'll ask yes or no, not um-hum or a nod.

You understand that everything that we say is being recorded by the court reporter?

A.  Yes, ma'am.

Q.  Okay.  And if you don't understand a question, please do let me know.  I'm happy to clarify.  Okay?

A.  Yes, ma'am.

Q.  Okay.  And your attorney, Ms. Kies, may occasionally make objections, for the record, to the format of some of my questions.

Do you understand that?

A.  Yes, ma'am.

Q.  And you understand that even if your attorney makes an objection for the record, you are required to give a response?

A.    Yes, ma'am.

MS. KIES:   Object to form.

Q.    And the DOJ attorney defending your deposition may also invoke privilege on behalf of her clients.  If you have any questions regarding privilege, you may communicate with your counsel about that.

Do you understand that?

A.    Yes, ma'am.

Q.    Okay.  There is -- generally, you need to answer the question, if there's a question pending, unless there's an issue of privilege.

Do you understand?

A.    Yes, ma'am.

Q.    Okay.  Let me know if you need a break. We're going to take breaks -- I'll ask my colleagues to help me keep track of time.  We're going to take breaks probably every 45 minutes or so.  But you can take a break if you need one.

The only rule is you can't take a break if there's a question pending.

Does that make sense?

A.    Yes, ma'am.

Q.    And you understand that -- also that this is being videotaped?

A.   Yes, ma'am.

Q.   Okay.  And you're aware that there is a possibility that the written transcript or the videotape may be used later in court?

A.   Yes, ma'am.

Q.   Okay.  So even though we're in a conference room filled with lawyers and not a courtroom, the testimony that you give here today should be as complete and accurate as if the judge were sitting at the head of the table.

Does that make sense?

A.   Yes, ma'am.

Q.   Okay.  And I'll ask you to explain things fully, as if the judge were sitting here.  Okay?

A.   Yes, ma'am.

Q.   Okay.  And things will go a lot faster if you directly answer the questions that I ask, so I'm going to ask you to do that.

And I'm going to be asking you some questions about documents today.  And the way that it works, since you haven't been deposed before, is the court reporter has these stickers, and they mark the number of the exhibit, and those become the official record that get attached to the transcript.

So I have the documents.  I'm going to

hand her a copy.  She's going to put the number on, and then that one goes to you.

At the same time, I'm going to hand copies to your counsel so they get to look at the document and know what I'm showing you as well.

Does that make sense?

A.   Yes, ma'am.

Q.   Okay.  Are you taking any medication or other substances that would impair your ability to give full, complete, and accurate testimony here today?

A.   No.

Q.   Is there any other reason you can't give your full, complete, and accurate testimony here today?

A.   No.

Q.   Okay.  Do you have any questions about the rules that I've given you for the deposition?

A.   No.

Q.   What did you do to prepare for this deposition?

A.   I had sessions with the attorneys.

Q.   Which attorneys?

A.   Everybody who's sitting here at the table.

Q.   Including your personal counsel?

A.   Yes.

Q.   Okay.  Mr. Greaves.  Is that right?

A.   Yes, ma'am.

Q.   Okay.  And how many sessions did you have?

A.   Three sessions.

Q.   And how long were each of those sessions?

A.   Two sessions were two hours.  And one session was probably -- I'm not a hundred percent sure.

Q.   Longer or shorter than the others?

A.   Shorter.

Q.   Was there anyone, other than your attorneys, present at -- sorry -- at -- I will rephrase that.

Was there anyone, other than the attorneys you have identified, present at any of these sessions?

A.   No, ma'am.

Q.   No one from any of the agencies who's not an attorney?

A.   No, ma'am.

Q.   Okay.  Did you talk to anyone, other than attorneys, about this deposition?

A.   Yes, I did, because I had to let my management know I'm at the deposition.

Q.   Okay.  So who did you speak to, other than your attorneys, about the deposition?

A.   I spoke to the new counselor for the Secretary of Homeland Security so that they would know where I was today.

Q.   And who is the new counselor for the Secretary of Homeland Security that you spoke to?

A.   His name is Brian Cavanaugh.

Q.   And this is for Department of Homeland Security Secretary Mullin?

A.   Yes, ma'am.

Q.   Okay.  And when you say "new," that's because he was recently confirmed for that position.  Correct?

            MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   Okay.  And did you speak with Mr. Cavanaugh about the substance of this deposition?

A.   No, ma'am.

Q.   Okay.  Did you tell him what case it was about?

A.   I don't recall.

Q.   Do you recall anything else you told him about the deposition?

A.   No.

Q.   Did you review any documents that helped refresh your recollection to prepare for this deposition?

A.   Yes, ma'am, I did.

Q.   And were those all documents provided by your lawyers, or did you review any on your own?

A.   I reviewed the documents that were provided by the lawyers.

Q.   Okay.  And did you participate in helping collect documents to produce to Plaintiffs in this litigation?

MS. KIES:  Object to form.

A.   I kept my own records.  And based on the, I guess -- I don't know what the legal term is called, but I produced my own records to the chief counsel of FEMA.

Q.   Can you describe for me the records that you used to refresh your recollection for this deposition?

A.   I read my -- I reread my declaration.  And I had to provide my notes, so I looked at my notes that I gave to the chief counsel.

Q.   Notes of what?

A.   Based on the information that you were

requesting, I keep, like, personal notes.

And so, anything that had a reference to CORE, I made sure I turned over to the chief counsel.

Q.   And were those handwritten notes or typed?

A.   My personal notes are handwritten notes.

Q.   And is this a practice that you've had since you began working for FEMA?

MS. KIES:   Object to form.

A.   This is a practice that I've had ever since I've worked.

Q.   So when -- before -- we'll get to your background and the trajectory at the Department of Homeland Security, but you also had handwritten notes while you worked for CISA?  Is it CISA or CISA?

A.   It's CISA.

And, yes, I have handwritten notes.

Q.   Okay.  Did you review any documents that were prior to your tenure at FEMA?  Meaning before -- sometime in 2025.

A.   I'm sorry.  I don't really understand the question when you're asking me, did I review documents.  Like -- I don't understand what you're talking about.

Q.   Sure.  To prepare -- you mentioned documents that you reviewed to prepare for this deposition that --

A.   Uh-huh.

Q.   -- refresh your recollection.

And I'm wondering if you reviewed any that were from before 2025.

A.   No, ma'am.

Q.   Okay.  Did you review the 2024 force structure review that FEMA prepared?

MS. KIES:  Object to form.

A.   In preparation for this here, this deposition?  No, ma'am.

Q.   Have you -- do you know what that document is?

A.   I'm aware of the title.

Q.   And have you ever reviewed that document?

A.   I really can't recall specifically reviewing that document.

Q.   Okay.

MS. LEONARD:  We'll ask that Ms. Evans' personal notes be produced. We'll discuss that during a break.

They have not been produced to counsel in this deposition -- in this

proceeding.  And we're going to ask you officially to produce those documents today.

MS. KIES:  I believe they were --

MS. LEONARD:  So --

MS. KIES:  I'm sorry.

MS. LEONARD:  Okay.  Do you believe that they have been produced?

MS. KIES:  In Production 11, if you could check, please.

MS. LEONARD:  Okay.  Thank you.

Q.   Did you review anything to prepare for this deposition that you know your attorneys have withheld as privileged?

MS. KIES:  Object to form.

A.   I wouldn't know the answer to that question.

Q.   Let's start with some general questions regarding your educational and professional background.

Can you describe for me your post-high school education, naming the institutions and years?

A.   I went to West Virginia University for my undergraduate.  I don't have -- I can't recall

specifically all the due -- all the specific dates right now on my resume.

But I got my chemistry degree, I got my master's degree, and I was awarded an honorary doctorate degree.

I also have a certificate in public history that I got while I was attending West Virginia University as well. And that is related to -- because I was an undergraduate, and it was a new master's program that was going in place.

And I also had additional education through Shepherd University as it relates to accounting.

Q. Let's start with your B.A. That was in chemistry. Right?

A. Yes, ma'am.

Q. Okay. And then you had -- you mentioned a certificate, a master's certificate, in public history. Is that right?

A. Yes, ma'am.

Q. And then, you have an MBA?

A. Yes, ma'am.

MS. LEONARD: Okay. I'm going to mark -- we'll do this as the first exhibit. I'm going to mark, as Exhibit 1,

a LinkedIn profile.

And I do not have copies for everyone at the table, but I will give you two copies to your counsel.

(Whereupon, Plaintiffs Exhibit 1 was marked for identification.)

Q.   So, Ms. Evans, you've been handed what's been marked as Exhibit 1.  I'll represent to you that this is something we printed from what we believe is your LinkedIn profile.

If you could take a look and let me know when you're ready.

A.   May I put my reading glasses on?

Q.   Of course.  I've got mine on.

(Witness reading.)

Q.   Are you ready?

A.   Yes, ma'am.

Q.   Ms. Evans, am I correct in understanding that this is a partial recounting of your educational and professional history?

A.   Yes, ma'am.

Q.   Okay.  And did you create your LinkedIn profile?

A.   Yes, ma'am.

Q.   And you intended for what was included to

be accurate?

A.   Yes, ma'am.

Q.   Okay.  And if you flip to the back, it refers to your MBA in business administration and then a doctor's degree in business from West Virginia University, John Chambers College of Business and Economics.

You've told us about those?

A.   Yes.

Q.   Okay.  This profile generally describes, if you go to the first page, 30 years of executive level management experience focused on cybersecurity, national security, technology innovation, service delivery, and supply chain risk management.

That's generally accurate.  Correct?

A.   Yes, ma'am.

Q.   Okay.  And as you said, this summarizes only some of the jobs you've held over your lifetime.  Correct?

A.   Yes, ma'am.

Q.   Okay.  In addition to the jobs listed here, I'm going to list some that I believe that you've held.  Could you -- and if you could confirm whether that's accurate or not.

So you have held the position of the Director of Information Resources Management, Management Division of the Office of Justice Programs?

A.   Yes, ma'am.

Q.   Okay.  You were the chief information officer for the Department of Energy?

A.   Yes, ma'am.

Q.   You were the administrator of the Office of Electronic Government and Information Technology at OMB?

A.   Yes, ma'am.

Q.   And "OMB," you understand I mean Office of Management and Budget?

A.   Yes, ma'am.

Q.   Okay.  And after that position, you went back to private practice.  Is that right?

A.   After that position, I retired.

Q.   You retired from federal government service?

A.   Yes, ma'am.

Q.   Okay.  And then you were engaged in some cybersecurity and technology consulting?

A.   Yes, ma'am.

Q.   Okay.  And you came back out of retirement

Page 33

from federal service to the Department of Energy in 2018.  Is that right?

A.   Yes, ma'am.

Q.   Okay.  And you were the assistant secretary for cybersecurity there?

A.   I was the assistant secretary for Cybersecurity, Energy Security, and Emergency Response.

Q.   And then in approximately June 2020, you moved from the Department of Energy over to the Department of Homeland Security.  Is that correct?

A.   Yes, ma'am.

Q.   And you were the chief information officer at DHS?

A.   Yes, ma'am.

Q.   Okay.  That was your first position at the Department of Homeland Security.  Correct?

A.   Yes.

Q.   Okay.  You had the role of chief information officer for DHS until the end of the first Trump Administration in January 2020 -- '21. Is that correct?

A.   Yes.

Q.   Okay.  And then after January 2021, you returned to the private sector when President Trump

left office?

A.   Yes.  I retired again.

Q.   And you returned to your consulting firm, KE&T Partners, for approximately the next four years.  Is that right?

A.   Yes, ma'am.

Q.   Okay.  And that's focused, again, on cybersecurity and technology consulting?

A.   Yes, ma'am.

Q.   Okay.  You were also managing director of something called the Cyber Readiness Institute?

A.   Yes, ma'am.

Q.   What is that?

A.   It's a global nonprofit focused on small business supply chain risk management as it relates to security, cybersecurity, and those types of issues.

Q.   Okay.  And after President Trump was elected the second time, you returned to DHS in January of 2025.  Right?

A.   Yes.

Q.   Okay.  Into another cybersecurity role. Correct?

A.   Yes.

Q.   Okay.  You were senior advisor to the

Page 35

Cybersecurity and Infrastructure Agency [sic] within DHS. Is that right?

A. I was the senior advisor to the -- he was the executive assistant director for cybersecurity.

Q. And was that within CISA or within --

A. It's within CISA.

Q. Okay. I'm going to ask for you --

A. I'm sorry.

Q. Yeah, no, it's really hard. In normal conversation, we do this all the time. But this is not a normal conversation, Ms. Evans, so I'm going to ask that you let me complete my question.

So we'll do that one again.

Was that position you just described within CISA or was it within the DHS front office?

A. That position was within CISA.

Q. Okay. How did you come to have the position of senior advisor at CISA?

MS. KIES: Object to form.

A. I don't understand the question about how did I -- I don't understand that. I was hired as part of the landing team to go in for this administration.

Q. Did someone appoint you to the position of senior advisor?

A.    I interviewed for the position, and, yes, it goes through an appointment process with presidential personnel.

Q.    Do you recall that DHS -- former DHS Secretary Noem was confirmed on, I believe, January 25, 2025?  Does that sound about right?

A.    Yes, ma'am.

Q.    Was former Secretary Noem involved in your appointment to the position of senior advisor at CISA?

MS. KIES:  Object to foundation.

A.    Secretary Noem interviewed me.

Q.    And did you discuss workforce reduction during that interview with Secretary Noem?

A.    I don't recall.

Q.    You quickly became the executive assistant director for cybersecurity at CISA.  Is that right?

MS. KIES:  Object to form.

A.    I was appointed by the President to take that position, yes, ma'am.

Q.    And that was sometime in February 2025?

A.    I don't recall the exact date, but I believe that that's the case.

Q.    And that is a political appointment.  That is a non-career position at DHS.  Correct?

A.   Yes, ma'am.  That's a presidentially appointed position.

Q.   Okay.  But not Senate confirmed?

A.   Yes, ma'am.  It's not Senate confirmed.

Q.   Okay.  And again, was former Secretary Noem involved in your appointment to that position?

MS. KIES:  Object to form.

A.   I don't know.

Q.   Did you interview with her for that position?

A.   No, ma'am.

Q.   Okay.  And then at some point in 2025, you moved within DHS, from CISA to FEMA.  Correct?

A.   Yes, ma'am.

Q.   And that was roughly in May or June of 2025?

A.   It was, as I recall, around the May time period.

Q.   Do you remember the date that you moved over?

A.   No, I do not.

Q.   Beginning of the month?  End of the month?

A.   I really can't recall.  I know it was May.

Q.   And that position was your first time working for FEMA.  Correct?

A.    Yes, ma'am.

Q.    Okay.  So your time at CISA totaled roughly four months?

A.    Yes, ma'am.

Q.    Okay.  In your approximately four months at CISA in early 2025, were you involved in efforts to implement the President's directives pertaining to workforce reduction?

MS. KIES:  Object to form.

A.    Yes.

Q.    And you had an understanding that President Trump had issued some executive orders pertaining to workforce reduction early in his second term?

MS. KIES:  Object to form.

A.    Yes.

Q.    And OMB and OPM provided agencies with further direction with respect to those workforce reduction efforts?

MS. KIES:  Object to form.

A.    Yes.

Q.    And generally speaking, reducing the size of the federal workforce was one of the President's priorities?

MS. KIES:  Object to form.

A.   That's what's outlined in the executive order.

Q.   And you understood that at the time you were in those positions at CISA.  Correct?

MS. KIES:  Object to form.

A.   I understand that I was to analyze the workforce based on those executive orders.

Q.   Okay.  So please explain your understanding of the President's directives that pertained to workforce reduction at the time that you were working for CISA.

MS. KIES:  Object to form.

A.   I was to look at the guidance of the executive orders and then to look at the work that the current workforce was conducting.

Q.   And do what with that information?

A.   And then I was to take a look at that and then make recommendations as it related to, "Was it on mission?" and related to statutory authorities.

Q.   And did you make such recommendations at CISA?

A.   Yes, I did.

Q.   And "fraud, waste, and abuse" -- were those some of the words used to describe by the adminis- -- the administration's goals?

MS. KIES:  Object to form.

A.  Those are all in the executive orders, that are outlined, that we are to follow in the executive branch.

Q.  And you also understood that you were to be working with individuals from a new entity called DOGE?

MS. KIES:  Object to form.

A.  Yes.

Q.  And you did work with individuals affiliated with the entity called DOGE?

MS. KIES:  Object to form.

A.  Yes.

Q.  You also understood that DHS Secretary Noem, at the time, shared these goals for workforce reduction for CISA.  Correct?

MS. KIES:  Object to form, foundation.

A.  Yes.

Q.  Did you have any discussions with her, since you joined CISA, regarding workforce reduction?

MS. KIES:  Object to form.

A.  I did not have specific discussions with the secretary as it related to workforce reductions.

I did have discussions with the secretary as it related to the workforce and their focus on statutory mission assignments.

Q.   And were the recommendations you were making at CISA with respect to workforce reductions -- were those recommendations to Secretary Noem?

MR. GREAVES:  Object to form.

MS. LEONARD:  I'm going to ask the witness to answer the question, then we'll address the issue of multiple attorneys interposing objections.

Q.   But go ahead.  You can answer the question.

A.   Can you restate the question again?

Q.   Sure.

MS. LEONARD:  Can the court reporter read that one back.

COURT REPORTER:  Sure.

(Whereupon, the court reporter read back from the record as follows:

"Q   And were the recommendations you were making at CISA with respect to workforce reductions -- were

those recommendations to

Secretary Noem?")

A.   So in the time period that you're discussing, there were directions that came from OMB and OPM that, in this case, the Office of Management and Budget and the Office of Personnel Management, that gave guidance to components.

And we were to send our analysis up to the departmental chief -- I want to make sure I get the right -- I don't want to use acronyms -- chief human capital officer of where recommendations would be sent.

So those were sent to the chief human capital officer, based on the policies that were in place at that time.

Q.   The DHS Chief Human Capital Officer?

A.   Yes, ma'am.

Q.   Who was Roland Edwards?

A.   Yes, ma'am.

MS. LEONARD:  Okay.  Just a pause in the questioning.  Only one attorney is going to interpose objections during this deposition.  Okay?

MS. KIES:  So Mr. Greaves is here, and -- well, I mean, you can speak

Page 43

for yourself.

But Mr. Greaves is here as Ms. Evans's personal attorney.  And if there is an objection that he needs to interpose that I have not, he'll interpose it.

But I think it's clear we're not obstructing or delaying the day by having that opportunity.

MS. LEONARD:  We're going to take a break, and we're going to address this off the record.

Can we go off the record.

VIDEOGRAPHER:  Off the record at 9:27.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 9:28.

BY MS. LEONARD:

Q.   Okay.  Ms. Evans, we were talking about your time at CISA and the efforts to implement the President's directives with respect to workforce reduction when we took a break.

Ms. Evans, you're aware that from approximately January to May of 2025, CISA lost

approximately a thousand employees?

MS. KIES:  Object to form.

A.    I'm not aware of the specific number.

Q.    But you know that CISA had a substantial workforce reduction during the time that you were at CISA.  Correct?

MS. KIES:  Object to form.

A.    I know that they were offered tools that were being offered across the entire federal government, like the deferred retirement program.

Q.    And did you consider your efforts to implement the President's workforce reduction goals at CISA to be successful?

MS. KIES:  Object to form.

A.    I would say that the objectives that I was sent there for, I did achieve.

Q.    And can you explain to me why.

A.    Because I believe that CISA is now back on mission and is focused on its statutory missions, versus some other activities that the previous administration viewed as priority but weren't necessarily tied in statute.

Q.    And one of the effects of that -- those efforts was a reduction in the number of staff at CISA?

Page 45

MS. KIES:  Object to form.

A.   That was not the objective.  The objective was to get CISA back focused on its statutory missions and get it so that the entity, especially after I became the executive assistant director for cybersecurity, focused on what resources did that particular group need in order to ensure that it was focused on its statutory missions.

Q.   But you understood that the President's priority was in actually reducing the size of the federal government.  Right?

MS. KIES:  Objection; asked and answer.

A.   I understand that that was the executive order, and that was how we were to analyze the workforce.

Q.   And that is what you did at CISA.  Right?

A.   I analyzed --

MS. KIES:  Object to form.

A.   -- the statutory missions associated with CISA.

Q.   Let's talk about the move from CISA to FEMA.

Your new position at FEMA was initially as a senior advisor to the person running FEMA at the

time, who was David Richardson?

A.   Yes, ma'am.

Q.   Okay.  And he was the SOPDA at the time.
Correct?

A.   Yes, ma'am.

Q.   And that position, senior advisor to the
SOPDA, that was another non-career political
appointment.  Correct?

A.   Yes, ma'am.

Q.   And you were appointed to this new
position by former Secretary Noem.  Is that right?

A.   Yeah --

MS. KIES:  Object to form.

A.   Yes, ma'am.

COURT REPORTER:  Did you say
something?

MS. KIES:  Object to form.

COURT REPORTER:  Please keep
your voice up --

MS. KIES:  Sure.

COURT REPORTER:  -- for
accuracy.  Thank you.

Q.   SOPDA Richardson had replaced SOPDA
Hamilton after he was fired by Secretary Noem?

MS. KIES:  Object to form,

foundation.

A.   I understand that Mr. Richardson went in, in May, as the SOPDA.

Q.   And you understand that, prior to that, there was a SOPDA named Cam Hamilton?

A.   Yes, ma'am.

Q.   And you are aware that Secretary Noem fired Mr. Hamilton after he testified to Congress that FEMA should not be abolished?

MS. KIES:  Objection; foundation.

A.   I'm not aware of the specific discussions that they had.  I read that in the newspaper, just like everybody else.

Q.   But the question about the timing is accurate?  Mr. Hamilton testified to Congress and then he was fired.  Correct?

MS. KIES:  Objection; foundation.

A.   I know Mr. Hamilton testified.  And then I know Mr. Hamilton was not in the position anymore.

Q.   Now, at some point during the first six months of 2025, you had actually hoped to have a different position at DHS as Under Secretary for Management.  Is that correct?

Page 48

MS. KIES:  Objection;

foundation.

A.   Yes, ma'am.

Q.   And in March 2025, you were actually nominated by the President to the Senate to be confirmed as Under Secretary for Management for all of DHS.  Correct?

A.   Yes, ma'am.

Q.   Okay.  Can you please explain where the Under Secretary of Management falls within the DHS organizational structure.

MS. KIES:  Object to form.

A.   According to statute, it is the S3, the second -- the third in the line of succession.

Q.   To the secretary?

A.   Yes, ma'am.

Q.   And at the Department of Homeland Security, S1 stands for the secretary.  Correct?

A.   Yes, ma'am.

Q.   So when something says "S1," they're talking about the Secretary of Homeland Security?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   And who is "S2"?

A.   "S2" is the deputy secretary.

Q.   And then "S3" is...?

A.   The Under Secretary for Management.

MS. LEONARD:  Okay.  Let's mark this as Exhibit No. 2.

(Whereupon, Plaintiffs Exhibit 2 was marked for identification.)

Q.   What you see before you as Exhibit No. 2, I will represent that we printed from the Department of Homeland Security website.  And it appears to be an organizational chart for the Department of Homeland Security.

Does this look familiar to you, Ms. Evans?

A.   Yes, it does.

Q.   Okay.  And can you point out where the management directorate is on this.

A.   On this chart, it's over here to the left.

Q.   So the left column.

And below that, it lists the chief financial officer and chief information officer. Those report to the Under Secretary for Management. Correct?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   And then if you follow the line from the management directorate, there's a direct report to

the secretary and deputy secretary.  Is that correct?

MS. KIES:  Object to form.

A.    Yes, ma'am.

Q.    Okay.  Is the office of the chief human capital officer within the management directorate?

A.    Yes, ma'am.

Q.    And the office of the chief human capital officer is also known as the OCHCO?

A.    Yes.  I call it CHCO.

Q.    So when you say "CHCO," are you referring to the person or the office, or both sometimes?

A.    It will depend on the circumstance of the question.

Q.    Okay.  This chart also shows CISA and FEMA.  Correct?

A.    Yes, ma'am.

Q.    And those also are direct reports to the secretary and deputy secretary.  Correct?

MS. KIES:  Object to form.

A.    Yes, ma'am.

Q.    Okay.  You were nom- -- you can set that aside.

You were nominated to the U.S. Senate in March of 2025.  Is that correct?

A.    Yes, ma'am.

Q.    And did former Secretary Noem recommend you for that position?

MS. KIES:  Object to form, foundation.

A.    I do not know if she specifically recommended me.

Q.    And did you ever discuss with former Secretary Noem your potential role in that position?

A.    I don't recall a specific discussion with Secretary Noem about the Under Secretary for Management position.

Q.    And did you discuss your nomination for the Under Secretary of Management with Corey Lewandowski?

A.    I don't recall having a discussion with Corey Lewandowski about the Under Secretary for Management position.

Q.    Did you discuss that position with anyone else in the DHS Office of the Secretary?

A.    I have discussed, and did discuss, that position with the deputy secretary at that time.

Q.    And who was that?

A.    The deputy secretary of DHS is Troy Edgar.

Q.    Is it possible that you discussed the

Page 52

position with Secretary Noem or Corey Lewandowski?

MS. KIES:  Object to form.

A.   I don't recall having a specific discussion with either one of them about the under secretary -- specifically about the under secretary position.

Q.   And when you discussed the under secretary position with the deputy, or S2, did you discuss workforce reduction efforts?

MS. KIES:  Object to form.

A.   There are a lot of discussions that happened in that time period, based on the executive orders.  So I can't recall if it was specific, the way that you're asking the question today.

Q.   But it's possible that as part of your discussions about this potential position that you would hold, if confirmed, at the Department of Homeland Security, that you discussed the President's priorities for workforce reduction?

MS. KIES:  Object to form.

A.   Yes.  It's possible that we had discussions of the implementation of the executive orders.

Q.   But you never held the position of under secretary.  Correct?

A.   Yes, that's correct.

Q.   And the President withdrew your nomination to the U.S. Senate in June of 2025?

MS. KIES:  Object to form.

A.   I thought the withdrawal was in July, so I'm not a hundred percent sure.

Q.   Okay.  I stand corrected, if it was -- you believe the withdrawal was in July of 2025?

A.   Yes, ma'am.

Q.   Did you ask for your nomination to be withdrawn?

MS. KIES:  Object to form.

A.   I did not ask for the nomination to be withdrawn.

Q.   And was that disappointing?

MS. KIES:  Object to form.

A.   Yes, it's disappointing.

Q.   And can you tell me why you wanted to hold that position?

MS. KIES:  Object to form.

A.   I believe that I was qualified for the position and could assist the department in achieving its goals and its mission as it related to homeland security.

Q.   When you began discussing a new position

Page 54

at FEMA with the DHS leadership, did you know your nomination for the under secretary position was going to be withdrawn?

MS. KIES:  Object to form.

A.  I don't really understand the question, the way that you're asking it, because the way that you're asking it makes it sound like there was a discussion about me being at FEMA full time with senior leadership at the department.

So I don't understand the question, the way that you're asking it.

Q.  Okay.  I can clarify.

So you moved over to FEMA, you said, sometime in May of 2025?

A.  Yes.

Q.  And did you know, at the time that you moved over, that your nomination for under secretary was going to be withdrawn?

A.  At the time of the move, I did not know that.

Q.  So was it your intention, at the time of the move, to only be at FEMA for a short period of time?

MS. KIES:  Object to form.

A.  It was my intention to do the assignment

that I was asked to do, and I did not know my nomination was being withdrawn at the time.

Q. Was it your hope that you would only be at FEMA for a short period of time?

MS. KIES: Object to form.

A. It -- it was my hope that I would be confirmed for the position of under secretary.

Q. And you said do the position you were assigned.

Who assigned you to move over to FEMA?

A. I received a phone call from the deputy chief of staff that asked me to move to FEMA.

Q. And who was the deputy chief of staff who made that phone call?

A. It was made by Troup Hemenway.

Q. And was Troup Hemenway the deputy chief of staff who was responsible for CISA or FEMA?

MS. KIES: Objection; foundation.

A. I'm not sure of all their portfolios, because when you are asking about the time period, that was all when we first came in to the administration.

And so, I worked with Troup and the other deputy chief of staff, which was Joe Guy.

Q.   And you don't recall whether Troup or Joe were responsible for CISA, FEMA, or both?

A.   Right.  I do not recall that, because when we first came on board, they both met with the operational components.

Q.   And the operational components include CISA and FEMA?

A.   Yes.

Q.   If I use the term "front office," does that -- at the Department of Homeland Security, is that a term that you sometimes use?

            MS. KIES:  Object to form.

A.   Actually, I don't use that term.  And the reason being is because I'm at a component.  And so, "front office" means front office of the component.

            And so, depending on who I'm talking to, I am cognizant of using that terminology of "front office."

Q.   So "front office" could refer to the FEMA front office, meaning the office of the administrator?

A.   Yes, ma'am, it could.

Q.   And at times, some people do use the term "front office" to refer to the Office of the Homeland Security Secretary.  Is that fair?

MS. KIES:  Object to form.

A.    I think that that is true, that some people use the "front office" terminology and could be referring to the front office at headquarters.

Q.    And do you have a term that you prefer to use, rather than "front office," for the Office of the Secretary?

A.    What I -- the terminology that I use is "headquarters."

Q.    "HQ"?

A.    Well, normally, I would say "headquarters."

Q.    Okay.  But you have sometimes said "HQ," referring to the Office of the Secretary at Homeland Security.  Correct?

MS. KIES:  Object to form.

A.    In my emails, I would refer to it as "HQ."

Q.    Okay.  And that is also sometimes referred to as "the office of S1."  Is that correct?

MS. KIES:  Object to form.

A.    I would have to say it would depend on who's actually using it.

Q.    And that office includes the individuals who report to S1, including the chief of staff, the deputy chiefs of staff, and senior advisors.

Is that correct?

MS. KIES:  Objection; foundation.

A.    That is my understanding.

Q.    Who in the front office did you talk to about your new role at FEMA prior to moving over?

MS. KIES:  Object to form.

A.    As I mentioned, it was Troup Hemenway.

Q.    Was that the only person in the front office that you talked to about that role?

MS. KIES:  Object to form.

A.    About moving to FEMA?

Q.    Um-hum.

A.    Yes, ma'am.

Q.    And, I'm sorry, I just did it.  I said "um-hum."  I will do my best -- we all do it.  I will do my best to ask a verbal question.

And what do you recall about the conversation with Troup when he asked you to move over to FEMA?

MS. KIES:  Object to form.

A.    I recall that he called me and asked me if I was aware of the situation at FEMA.  And I said no.

And then he asked me to -- would I be

Page 59

willing to go over and help out at FEMA.  And I said yes.

Q.   What did you understand he to be -- what did you understand Mr. Hemenway to be referring to regarding the situation at FEMA?

MS. KIES:  Object to form.

A.   At that time, when I had the conversation with him, I knew, because of the operational meetings, that Mr. Hamilton was working on several different initiatives, as all of us were when we came in on transition.

So I thought that that's what he meant.

Q.   And what types of initiatives do you have -- did you have an understanding that he was referring to?

MS. KIES:  Foundation.

A.   All of us were looking at the executive orders.  Each component had specific issues.

And as we previously discussed, I was specifically looking at statutory mission and making sure resources were aligned to statutory mission.

Q.   Including staffing resources.  Correct?

MS. KIES:  Object to form.

A.   I looked at all resources.

Q.   Including staffing resources.  Correct?

A.   Yes, ma'am.

Q.   Okay.  And you referred to "operational" -- "operations" meetings.  Is that what you -- how you described them?

A.   I described it as "operational components."

Q.   And those were meetings with the Office of the Secretary regarding -- and the operational components.  Is that correct?

MS. KIES:  Object to form.

A.   There were a few meetings in the beginning of the administration with the two chiefs of staff -- deputy chiefs of staff -- excuse me, I'm correcting myself -- the two deputy chiefs of staff at that time with the operational components.

Q.   And you participated in those meetings as a representative of CISA?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   But there were discussions of FEMA at those meetings?

MS. KIES:  Object to form.

A.   FEMA was present at those meetings.

Q.   And you said that you were aware of the leadership of FEMA because -- and it was because of

Page 61

who was present at those meetings?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   And was there a meeting in May in which Mr. Richardson appeared instead of Mr. Hamilton?

A.   Those meetings did not continue beyond the first -- I want to say first few weeks, that I recall.

So those operational component meetings with the two deputy chiefs of staff did not continue.

Q.   So those operational component meetings with the deputy chiefs of staff were -- when you say beyond the "first few weeks," you're talking about the first few weeks of the administration?

A.   Yes, ma'am.

Q.   Okay.  So in approximately January or February of 2025?

A.   Yes, ma'am.

Q.   And those meetings were focused on the President's priorities for workforce reduction.  Is that correct?

MS. KIES:  Object to form.

A.   No, that's not correct.

Q.   Did they include discussions of the

Page 62

President's priorities for workforce reduction?

A.   They included the executive orders.  They were high-level meetings, and they only lasted for 30 minutes.

Q.   Were there representatives of DOGE present at those meetings?

MS. KIES:  Objection; foundation.

A.   No.

Q.   When you moved over after this conversation -- well, strike that.  Let me ask a different question.

You accepted Troup's invitation to move over to FEMA.  Is that correct?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   You agreed to take on this new role?

A.   Yes, ma'am.

Q.   Okay.  You understood, at the time, that one of the reasons you were being transferred to FEMA was to implement the President and Secretary Noem's workforce reduction efforts at FEMA. Correct?

MS. KIES:  Object to form.

A.   No, that's incorrect.

Page 63

I was asked to go over to FEMA to help support and look at grant programs.

Q.   Grant programs that Secretary Noem intended to cut?

MS. KIES:  Object to form.

A.   No, ma'am.  I was asked to look at grant programs.

Q.   Those grant programs that you were looking at eventually were cut.  Correct?

MS. KIES:  Object to form.

A.   That is not correct.

And so -- yeah, that's not correct.

Q.   There were a substantial number of grant programs that were terminated after you came to hold a role at FEMA.  Correct?

MS. KIES:  Object to form.

A.   There were grant programs that were evaluated.  And my assignment was to look at the process of how awardees were vetted.

Q.   There were a substantial number of grant programs that were terminated at FEMA after you came into your role at FEMA.  Correct?

MS. KIES:  Object to form.

A.   I don't recall that that's specifically the case.

Page 64

Q.   You know that the BRIC program was terminated?

A.   The BRIC --

MS. KIES:  Object to form.

WITNESS:  Excuse me.  I'm sorry.

I'm sorry.  I apologize.  I apologize.

A.   Okay.  So could you repeat the question again?

Q.   Sure.  You're familiar with the BRIC grant program?

A.   Yes, ma'am, I am.

Q.   And you understand that that was terminated after you came over to FEMA?

MS. KIES:  Object to form.

A.   I understand that that program was suspended.

Q.   And it was recently reinstated because of court orders that that was unlawful.  Correct?

MS. KIES:  Objection; foundation, form.

A.   It was recently reinstated.

There were court actions, but the analysis associated with the program was also completed.

Q.   Okay.  Can you describe for me your goals, your personal goals, in coming over into this new

Page 65

role at FEMA?

MS. KIES:  Object to form.

A.  Can you state that again?

Q.  Sorry.  I have spilled my water, so I was a little distracted.

I believe the question was:  Could you describe for me your personal goals in coming into this new position at FEMA?

MS. KIES:  Object to form.

A.  My personal goals are always to do a good job and to achieve the outcomes -- program -- to evaluate a program and to achieve the outcomes that the program is intended to achieve.

Q.  And you understood that, ultimately, you reported to the Secretary of Homeland Security?

MS. KIES:  Object to form.

A.  Yes.  FEMA is a component of DHS.

Q.  And you measured your goals against the secretary's priorities for the program.  Correct?

MS. KIES:  Object to form.

A.  I measured my goals against the secretary's priorities, as well as the President's priorities.

Q.  And were you aware that when you moved from CISA to FEMA, the DHS spokesperson stated that

you had been, quote, instrumental in cutting waste, fraud, and abuse at CISA?

MS. KIES:  Object to form.

A.   Yes.

Q.   That was a statement that was put out by the Department of Homeland Security through the spokesperson when you were transferred?

MS. KIES:  Objection; foundation.

A.   Yes, it was.

Q.   Did you vet that statement before it was put to the press?

MS. KIES:  Object to form.

A.   No, I did not.

Q.   Did you see it before it was released to the press?

A.   No, I did not.

Q.   Okay.  Sometimes you do participate in reviewing statements that are put out to the press at FEMA.  Correct?

MS. KIES:  Object to form.

A.   Yes, ma'am, I do.

Q.   But the one that was describing you personally, you had not seen before that went out?

A.   I don't recall seeing it.

Page 67

Q.   Is it possible that you saw it?

A.   No.  I mean, I really don't recall seeing it.

Q.   Okay.

MS. LEONARD:  Well, let's mark this as No. -- I believe Exhibit No. 3.

(Whereupon, Plaintiffs Exhibit 3 was marked for identification.)

Q.   You've been handed what's been marked as Exhibit No. 3.  I'll represent that it's an article that we printed from POLITICO Pro -- press organization.

And there's a reference to a statement from the spokesperson for DHS approximately halfway down the article.

Let me know when you are ready to proceed.

(Witness reading.)

A.   Okay.

Q.   Do you see the quote there from the Department of Homeland Security spokesperson?

A.   Yes, ma'am.

Q.   Okay.  And it is referring to you.  And it says:

She was instrumental in helping cut waste, fraud, and

Page 68

abuse at CISA, and her skill set is perfectly suited for the future of the Federal Emergency Management Agency.

You understood that that was the statement that DHS was putting out to the press about you?

MS. KIES:  Object to form.

A.    I understand that that's the statement that DHS put out.

Q.    And do you agree that you were instrumental in cutting waste -- fraud, waste, and abuse at CISA?

MS. KIES:  Object to form.

A.    I -- yes.  I believe that I focused the resources at CISA back on their statutory mission.

Q.    And you understood your role at FEMA was also going to involve cutting fraud, waste, and abuse?

MS. KIES:  Object to form.

A.    I believe that my role at CISA -- I mean, at FEMA was also to be focused on getting them looking at their statutory responsibilities.

Q.    And you understood, at the time, that the future of the Federal Emergency Management Agency was going to involve downsizing that agency?

MS. KIES:  Object to form.

A.   I understand, at the time, that there were discussions associated with what the future of FEMA was going to be and what it was going to look like.

That was specifically talked about by the President.

Q.   And at the time, you understood that the discussions "including" making FEMA into a smaller agency.  Correct?

MS. KIES:  Object to form, foundation.

A.   I understand that the discussions were to look at FEMA, its resources associated with it doing its statutory mission, and making recommendations so that it would be aligned with the outcomes that the President had articulated for FEMA.

Q.   And you understood that that included a discussion of making FEMA into a smaller agency. Right, Ms. Evans?

MS. KIES:  Objection; asked and answered.

A.   I understand that that is what people had discussed.

My job was to actually analyze it and look at the resources and provide data so that the

decisions could be made based on data.

Q.   And when you said "people had discussed," you understood that the President and DHS Secretary Noem had discussed making FEMA into a smaller agency at the time that you moved over.  Right?

MS. KIES:  Objection; foundation.

A.   They had discussed that publicly, yes.

Q.   And you supported that agenda?

MS. KIES:  Objection; form.

A.   I support President Trump's agenda as part of the executive branch.

Q.   You agreed with the agenda for making FEMA into a smaller agency, Ms. Evans.  Correct?

MS. KIES:  Objection; form.

A.   I agree that I was to look at FEMA and look at the resources that they had, and then look at its statutory missions and to make recommendations as to what were the right resources that they needed to accomplish the outcomes that the President had outlined.

Q.   And again, those resources including -- include staffing.  Correct?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Page 71

Q.   You attended a meeting of the FEMA Review Council on May 20, 2025?

A.   Yes.  That's the meeting in New Orleans.

Q.   I actually don't know where this meeting was, but I would take your word for it.

And the FEMA -- you understand what the FEMA Review Council was?

MS. KIES:  Object to form.

A.   Okay.  The FEMA Review Council is a FACA-based council that the President put in place through executive order to also look at the future of FEMA and the resources associated with FEMA.

Q.   And in particular, the President had ordered this council to evaluate whether FEMA's bureaucracy in disaster response ultimately harms the agency's ability to successfully respond.

Do you recall that language?

MS. KIES:  Object to form.

A.   Yes.

Q.   Okay.  And by "bureaucracy," you understand that the President was referring to the size of FEMA's staff.  Correct?

MS. KIES:  Objection; foundation.

A.   So I would disagree that that's -- I would

Page 72

disagree with that.  I would just -- I viewed it as bureaucracy also involves processes.

And is there a -- you know, unnecessary processes that would get in the way of delivering emergency response to people affected by disasters.

Q.  And you also understood, at the time, that the President had specifically stated his priority for reducing the size of the federal government.  Right?

MS. KIES:  Object to form.

A.  I understand that those are the intentions of the executive order.

Q.  And in addition to the FEMA Review Council order, you understood your role was to implement the President's executive orders, including the executive orders addressing reducing the size of the federal government.  Correct?

MS. KIES:  Object to form.

A.  Yes, if -- if -- it was appropriate to do that as it relates to the statutory missions for that agency.

MS. LEONARD:  I'm going to mark the next as Exhibit 4.

(Whereupon, Plaintiffs Exhibit 4 was marked for identification.)

Q. And I'll represent --

A. Oh. Okay.

Q. -- yeah -- these are the minutes from the May 20th FEMA Review Council meeting.

And I believe it shows the location at the top. So we --

A. Yes.

Q. We will talk about this. Let me know when you're ready.

(Witness reading.)

A. Okay.

Q. Okay. So this, I will represent, is a document that we printed from the Department of Homeland Security webpage that contains the minutes for the FEMA Review Council meetings.

And if you look to the top, the date is given as May 20, 2025.

Do you see that?

A. Yes, ma'am.

Q. And the "Open Meeting Minutes," I assume that means the public -- public portion of the meeting?

MS. KIES: Object to form.

A. Yes, ma'am.

Q. And the location is listed as the

Page 74

"Eisenhower Executive Office Building - Indian Treaty Room."

Do you see that?

A.   Yes, ma'am.

Q.   And does that refresh your recollection that this meeting happened in Washington, D.C., rather than New Orleans?

A.   Yes.  But I was also at the New Orleans meeting.

So I apologize for the confusion.

Q.   No -- understandable.

You are listed as a participant.  Correct?  On the second page?

A.   Yes.

Q.   And it's listed -- your position is listed as "Senior Advisor to the Administrator, FEMA."

Do you see that?

A.   Yes, ma'am.

Q.   And that is the position you held as of May 20, 2025?

A.   Yes, ma'am.

Q.   So you moved from CISA to FEMA at some point on or prior to May 20, 2025?

A.   Yes.

Q.   And you don't recall exactly the day?

A.   No, I don't.

Q.   Okay.  But it was before this meeting.  Is that right?

MS. KIES:  Object to form.

A.   Yes.

Q.   And what is your understanding of why you were present at this meeting?

MS. KIES:  Object to form.

A.   I was at this meeting because I was the senior advisor to Mr. Richardson.

Q.   Did someone ask you to attend?

A.   Yes.  Mr. Richardson.

Q.   Did anyone else ask you to attend?

A.   No.

Q.   At that May meeting, you heard Secretary Noem say that:

...President Trump has

said many times that FEMA

should be eliminated as it

exists today, and that we need

to reimagine the agency.

Do you recall her saying something like that?

A.   Yes, I do.

Q.   And former Secretary Noem also said at the

Page 76

meeting that:

...President Trump

believes FEMA should no longer

exist as it is today, and he

wants a new agency that

understands its role in

emergency response.

Do you recall that?

MS. KIES:  Object to form.

A.  Yes, I do.

Q.  And you understood that former Secretary Noem was referring to reducing the size of FEMA. Correct?

MS. KIES:  Object to form, foundation.

A.  I understood that we were -- I was to be focused and help Mr. Richardson focus on the statutory missions that FEMA has as it relates to all the statutory responsibilities of FEMA.

Q.  What did you understand Secretary Noem to mean when she was referring to "eliminating FEMA as it exists"?

MS. KIES:  Object to form.

A.  I understood that she meant it to mean, similar to what is in the executive order to

Page 77

establish the FEMA Review Council, is to look at current processes, such as the bureaucracy, and how we could, like, streamline those processes.

Q. And "streamlining" could have the effect of eliminating staff. Correct?

MS. KIES: Object to form.

A. It could.

Q. Since you returned to DHS in 2025, other than this FEMA Review Council meeting, have you ever heard former Secretary Noem talk about eliminating FEMA?

MS. KIES: Object to form.

A. I read the newspapers and see the comments, and her comments have been consistent with what is in the minutes of this meeting.

Q. Have you ever personally communicated with Secretary Noem and heard her talk about eliminating FEMA?

MS. KIES: Object to form.

A. I don't recall specific discussions with the secretary where she specifically said, "Eliminate FEMA."

Q. Have you -- do you recall communications involving Secretary Noem in which she talked about reducing the size of FEMA?

Page 78

MS. KIES:  Object to form.

A.   I don't recall having specific conversations with the secretary as it relates to reducing the size of FEMA.

Q.   You attended another FEMA advisory coun- -- Review Council meeting in July of 2025. Correct?

A.   Yes, ma'am.  That's the one that's in New Orleans.

MS. LEONARD:  Okay.  Well, let's mark this as No. 5.

(Whereupon, Plaintiffs Exhibit 5 was marked for identification.)

Q.   Okay.  So you've been handed Exhibit 5, which is the July 9, 2025 minutes of the meeting of the FEMA Review Council.

And the location listed at the top is New Orleans.

Do you see that?

A.   Yes, ma'am.

Q.   And you are listed here on July 9th also as "Senior Advisor to the Administrator" of FEMA.

Do you see that on the first page?

A.   Yes, I do.

Q.   If you look to the last page, actually, it

appears that Secretary Noem signed off on these minutes.

Do you see that?

MS. KIES:  Object to form.

A.   Yes, I do.

Q.   And you had an understanding, at the time you attended these FEMA Review Council meetings, that Secretary Noem was the co-chair of the Review Council?

MS. KIES:  Object to form.

A.   Yes.

Q.   And at this July meeting, second page, second-to-last sentence of Secretary Noem's comments there, she reiterated that:

...federal emergency management should be state and locally led, which is why FEMA must be eliminated as it exists today and remade into a responsive agency.

Do you recall her saying something like that?

A.   Yes, ma'am.

Q.   And you understood, at the time, that by moving emergency management to the state and local

governments, Secretary -- former Secretary Noem intended to reduce the size of FEMA as an agency. Correct?

MS. KIES:  Objection; foundation, form.

A.   I understood that we were to look at the programs because it was to be locally led, state managed, and federally supported.

Q.   And "federally supported" meant that FEMA would have fewer staff than it currently did. Correct?

MS. KIES:  Objection; foundation.

A.   That had not been determined at that time.

It depends on where you sit, that you could interpret it that way.

Q.   And from where you sat, did you interpret it that way?

MS. KIES:  Object to form.

A.   I have it at -- where I sit and where I sat at that time, I hadn't completed my analysis.

Q.   As of the summer of 2025, Corey Lewandowski held the position of chief advisor to former Secretary Noem.  Is that correct?

MS. KIES:  Object to form.

A.    I understand that that is his position, or was his position.

Q.    And what was your understanding at the time, in the summer of 2025, of Mr. Lewandowski's role in the front office -- sorry, headquarters?

A.    I understood that Mr. Lewandowski was an advisor to the secretary.

Q.    And did you have an understanding that Mr. Lewandowski played a role in the approval process for FEMA-related decisions?

MS. KIES:  Object to form, foundation.

A.    I have no knowledge or -- that he was providing a role in decisions as it related to FEMA.

MS. LEONARD:  Okay.  I think we've been going for over an hour.  I think this might be a good time to take a short break.

MS. KIES:  Sure.

MS. LEONARD:  I would love to keep the breaks relatively short.  Is five minutes enough time?

MS. KIES:  Is that enough time for you, Ms. Evans?

MS. LEONARD:  Or we can do 10,

is also fine.

WITNESS:  I would appreciate 10.

MS. LEONARD:  Let's take a 10-minute break, and we'll come back at -- sorry.  By Susan's phone, it is 10:10. We'll come back at 10:20.

VIDEOGRAPHER:  Off the record at 10:10.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 10:25.

BY MS. LEONARD:

Q.   Okay.  Ms. Evans, when we took a break, we were talking about Mr. Lewandowski's role in the DHS Office of the Secretary.

Do you recall that?

A.   Yes, ma'am.

Q.   Okay.

MS. LEONARD:  I'm going to show you an exhibit that we're going to mark as No. 6.

(Whereupon, Plaintiffs Exhibit 6 was marked for identification.)

Q.   And I will represent to you that this is a document that was introduced in different litigation

Page 83

as a ExecSec routing sheet from the Department of Homeland Security.

Let me know when you are ready.

A.    Yes, ma'am.

Q.    You're familiar with ExecSec?

MS. KIES:  Object to form.

A.    I am familiar with the department's ExecSec.  FEMA also has an ExecSec.

Q.    And that stands for "Executive Secretary"?

A.    Yes, I believe that's the case.

Q.    And the executive -- please describe to me, at a high level, what your understanding is of the role of the Department of Homeland Security Executive Secretary in processing papers for the secretary.

MS. KIES:  Object to form.

A.    It's my understanding that what the executive secretary, the ExecSec, at headquarters does is they task out assignments to components, they accumulate the information from the components, and then they prepare the packages for review for DHS headquarters personnel.

Q.    And is what appears in front of you -- this appears, to me, to be a routing slip for an approval package.

Is that a fair description?

MS. KIES:  Objection;
foundation.

A.   That's what it says.  It says it's a "record of clearance and approval."

Q.   And ExecSec use something called STORM? Are you familiar with that system?

MS. KIES:  Object to form.

A.   I am familiar with the STORM system.

Q.   And is that a document system used by the DHS ExecSec?

MS. KIES:  Object to form, foundation.

A.   It's a system that the headquarters executive secretary uses with the component executive secretariats to track documents and assignments.

Q.   And on this document, it says "date submitted to FO."

Do you understand that that refers to "front office"?

MS. KIES:  Object to form.

A.   I'm sorry.  I'm looking --

Q.   The box at the top, right under the STORM number, it says "date submitted to FO."

Page 85

A.   Oh, I see it now.

Yes, ma'am.

Q.   And do you have an understanding of whether that would mean the DHS front office?

A.   I would understand, based on this form, that that's the DHS front office.

Q.   Okay.  And DHS Executive Secretary uses documents similar to this for matters involving FEMA as well.  Correct?

MS. KIES:  Object to form, foundation.

A.   They would use -- it's my understanding they would use a form similar to this, if FEMA was sending something directly to the secretary for review.

Q.   And the list of names in order here, do you have an understanding of what that means in terms of order of review?

MS. KIES:  Object to form, foundation.

A.   It is my understanding that the department executive secretariat makes the determination of who does the review based on the subject matter.

Q.   And is this a review in order, moving from one person to the next?  Is that typically how it's

done?

MS. KIES:  Object to form,
foundation.

A.   I am not sure how they actually run their process.  It depends on the subject matter.

And like I said, I'm not really sure how they actually run the process up there for clearances.

Q.   And on this form, Chief Advisor Corey Lewandowski is the last in line before S1.

Do you see that?

A.   Yes, I see that.

Q.   And....

Okay.  Did you have any prior experience working with Mr. Lewandowski before coming back to DHS in 2025?

MS. KIES:  Object to form.

A.   No, I did not.

Q.   When was the first time you met him?

A.   I met Mr. Lewandowski during the transition period.

Q.   "Transition period" meaning the period before President Trump took office for the second time?

A.   Yes.

Q.   Okay.  And when was the first time you interacted with Mr. Lewandowski in his role at DHS?

MS. KIES:  Object to form.

A.   I don't recall specifically when I first started interacting with Mr. Lewandowski.

Q.   Was it early on in your tenure at DHS?

A.   It -- I believe my first interaction is when I was working on some management issues.

Q.   When you say "some management issues," what do you mean?

A.   I mean some issues associated with the management directorate.

Q.   When you were a nominee for the under secretary position?

A.   I had -- I don't recall the exact timing of when that interaction occurred.

But I did work as -- on some management issues when I was going to be nominated as the Under Secretary for Management.

Q.   Did those issues involve FEMA?

MS. KIES:  Object to form.

A.   As it relates to the question that you asked, which I believe is my interactions with Mr. Lewandowski, that interaction, my first interaction, was not related to FEMA.

Q.   The issues you were working on at the time, the management issues, did those relate to FEMA?

MS. KIES:  Object to form.

A.   They did not.

Q.   And what was your understanding of Mr. Lewandowski's role and reason for interacting with you at the time?

MS. KIES:  Object to form.

A.   Mr. Lewandowski was asking some specific questions as it related to management issues.

Q.   And did you have any understanding as to the reason why he was doing that?

MS. KIES:  Objection; form.

A.   I understand that he was asking some issues as it related to space.

Q.   Office space or outer space?

A.   Office space.

Q.   Sorry.  I -- that was a legitimate question.  I didn't understand.

A.   Okay.

Q.   Office space, because Mr. Lewandowski was involved in shutting down parts of the Department of Homeland Security?

MS. KIES:  Objection;

foundation, form.

A.   I don't understand -- I don't know the basis of why he was asking some of the questions as it related to space.

In this particular case, it was related to a new building that was potentially going to be built on the St. Elizabeth campus.

Q.   Was Mr. Lewandowski present at the meetings for the operations components that you described having with Mr. Hemenway and Mr. Guy?

MS. KIES:   Object to form.

A.   No, he was not.

Q.   Prior to moving over from CISA to FEMA, did you have any discussions with Mr. Lewandowski about your new role at FEMA?

A.   No, I did not.

Q.   Did you ever hear or see Mr. Lewandowski talk about eliminating FEMA?

MS. KIES:   Object to form.

A.   I don't recall any discussions with him about eliminating FEMA.

Q.   Do you recall any statements that he has made about the size of FEMA?

MS. KIES:   Object to form.

A.   I don't recall him making any statements

Page 90

to me about the size of FEMA.

Q.   Were you present when he made such statements, whether or not they were directed at you?

MS. KIES:  Object to form.

A.   I don't recall being in meetings with him where he discussed the size of FEMA.

Q.   You have been in meetings with Mr. Lewandowski, though, since you returned to the Department of Homeland Security.  Correct?

A.   Yes, I have been in meetings with him.

Q.   Approximately how many meetings have you been in with Mr. Lewandowski since you returned to the Department of Homeland Security in 2025?

MS. KIES:  Object to form.

A.   I really don't know a number.

Q.   Can you give me an estimate?

A.   I know that we had -- we had regular component head meetings.  And if I were -- I was attending the component head meetings, Mr. Lewandowski would be in those.

And those were regular meetings, but I always wasn't representing a component head.

Q.   Prior to becoming SOPDA, did you ever attend any of these component head meetings that you

just referenced where Mr. Lewandowski was present?

A.   Yes.

Q.   And did you attend in your role as chief of staff of FEMA?

A.   Yes.

Q.   And were there any meetings, other than the component head meetings that you just described, where Mr. Lewandowski was present, since you've returned to the Department of Homeland Security in 2025?

MS. KIES:  Object to form.

A.   Yes.

Q.   What type of meetings were those?

A.   The one specific meeting that I can recall was about CISA and the secretary participating in the RSA Conference.

Q.   Any other meetings, other than that meeting about CISA and the meetings for the component heads, that you can recall where you were present and Mr. Lewandowski was present, since you returned to DHS?

MS. KIES:  Object to form.

WITNESS:  I'm sorry.

COURT REPORTER:  Did you say anything?

Page 92

MS. KIES:  We talked over each other accidentally.  But I said "object to form."

COURT REPORTER:  Thank you.

WITNESS:  I apologize.

A.   Yes, I have been in some meetings, for example, where we had to do the pre-brief for the secretary as it related to emergency declarations for FEMA.

And, also, I've been in meetings where we did pre-briefs for the secretary for her hearings as it related to budget.

Q.   Any other meetings that you haven't described today, since you returned to DHS, where Mr. Lewandowski was present?

A.   I can't recall any other meetings.  Those are the general types of meetings that he would be in.

Q.   Did you ever hear Mr. Lewandowski say, "What part of 'we are eliminating FEMA' don't you understand?"

MS. KIES:  Object to form.

A.   I don't recall him saying that to me.

Q.   Would it surprise you to hear that he said that in the summer of 2025?

Page 93

MS. KIES:  Object to form.

A.  I'm not going to speculate on whether I would be surprised or not if he said a statement such as that.

Q.  Well, based on your understanding of the priorities of the agency, would it surprise you to hear that Mr. Lewandowski said that in the summer of 2025?

MS. KIES:  Object to form.

A.  I would -- I would not be surprised.

Q.  Because you had an understanding that that was Mr. Lewandowski's goal for FEMA.  Right?

MS. KIES:  Objection; foundation, speculation.

A.  I --

MS. KIES:  You can answer.

WITNESS:  Okay.  Thank you.

A.  I'm not going to speculate on what Mr. Lewandowski's goals are for FEMA.

Q.  And if it was Mr. Lewandowski's goal, it was also Secretary Noem's goal.  Right?

MS. KIES:  Objection; foundation, speculation.

A.  I'm not going to speculate on Secretary Noem's goals as it relates to Mr. Lewandowski's

goals.

Q.   At some point in time after July 2025, you moved from being a senior advisor, to the FEMA SOPDA, to the FEMA Chief of Staff.  Correct?

A.   Yes.

Q.   When was that?

A.   When did I get assigned the chief of staff position?

Q.   Yes.

A.   That was -- I don't have the exact date, but it was toward the end of September, first of October, in that time period.

Q.   Was there a prior chief of staff, or was that -- before you took over the role, or was that position vacant?

A.   There was a prior chief of staff.

Q.   Okay.  And then you held the position of FEMA Chief of Staff from approximately the end of September, beginning of October, until you were appointed as SOPDA.  Correct?

A.   As I stated in the beginning of this, that is still my position of record.

Q.   Who appointed you as FEMA Chief of Staff?

A.   It went through presidential personnel and -- yeah, it went through presidential personnel.

I don't have firsthand knowledge.  When you say who, like, I don't know the specific person.

But I know that the action was approved through presidential personnel.

Q.   Let's stay within the Department of Homeland Security.

Who approved your appointment as the FEMA Chief of Staff within the Department of Homeland Security?

MS. KIES:  Object to form.

A.   It's my understanding, the way that the process works is that "PPO," Presidential Personnel Office, there's a White House liaison person at headquarters -- and in this case, I mean DHS headquarters -- that they work with the secretary's office, as well as the deputy secretary's Office, on personnel selections, that then those recommendations go to the White House.

Q.   Do you have an understanding that DHS former Secretary Noem signed off and approved on your appointment as FEMA Chief of Staff?

MS. KIES:  Object to form.

A.   I would believe that, knowing the process, that that's the process that would have taken place.

Q.   And do you know whether senior -- Chief

Page 96

Advisor Lewandowski signed off and approved on your appointment as FEMA Chief of Staff?

A.    I would not know that.

Q.    And do you think it would have taken -- the approval process for the secretary would have taken the form of this record of clearance and approval from the DHS ExecSec that we looked at in Exhibit 6?  Would it have looked something like that?

MS. KIES:  Objection; foundation.

A.    I'm not going to speculate on what the front office process is for clearances between presidential personnel and the secretary.

Q.    You're aware that former Secretary Noem has been involved in other personnel decisions for FEMA since you returned to the Department of Homeland Security.  Correct?

MS. KIES:  Object to form.

A.    Yes, I am.

Q.    You worked for SOPDA Richardson when you were the FEMA Chief of Staff, before assuming the position also of SOPDA.  Correct?

A.    Yes, I did.

Q.    And when he was appointed SOPDA,

Page 97

Mr. Richardson was also an Assistant Secretary at DHS's Office for Countering Weapons of Mass Destruction.  Correct?

MS. KIES:  Objection; foundation.

A.   That's my understanding, yes.

Q.   And Mr. Richardson kept both jobs when he was the SOPDA of FEMA.  Correct?

MS. KIES:  Objection; foundation.

A.   That's my understanding, yes.

Q.   Ms. Evans, during the time that Mr. Richardson was SOPDA and you were chief of staff, was it fair to say you played a very significant role in running this agency?

MS. KIES:  Objection; form.

A.   I think it depends on what you mean by "significant."

I was his senior advisor, so I helped Mr. Richardson.

Q.   And you attended the component head meetings that you described earlier?

A.   Not during Mr. Richardson's tenure, no, unless he couldn't go.

And then he would then have me go in his

place, or he would have his chief of staff go in his place.

Q.   Do you remember how many times you went in his place because Mr. Richardson could not go to the component head meetings?

MS. KIES:  Object to form.

A.   I believe, in my case, it was only once.

Q.   Since moving to FEMA in May 2025, you also worked with someone named Kara Voorhies.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's correct.

Q.   Who is Kara Voorhies?

MS. KIES:  Object to form.

A.   Okay.  I call her "Kara."

Q.   Sorry.  Okay.  "Kara," I will use that.

Who is --

A.   Kara --

Q.   Let me ask it again.

Who is Kara Voorhies?

A.   She's the senior advisor to the Secretary on FEMA issues.

Q.   Did you know Kara Voorhies prior to working at DHS in 2025?

A.   No, I did not.

Q.   And Ms. Voorhies was already working for

DHS when you moved from CISA to FEMA in May of 2025?

MS. KIES:  Object to form.

A.  Yes, she was there.

Q.  And what was Ms. Voorhies' role at DHS, exactly?

MS. KIES:  Object to form.

A.  She was the senior advisor to the Secretary on FEMA.

Q.  Ms. Voorhies was not a federal employee. Correct?

MS. KIES:  Object to form, foundation.

A.  That is not my understanding, initially.

Q.  You had an understanding, initially, that she was an employee?

A.  Yes.

Q.  And what was the basis for that understanding?

A.  I asked her.

Q.  And what did she say?

A.  She said that she was on a government appointment.

Q.  Were those her precise words?

A.  I can't attest to that that was her precise words.  But I asked her what position she

held.

Q.   Why did you ask her that?

MS. KIES:  Object to form.

A.   Because she was at FEMA and I was at FEMA. And so, I was trying to understand the people in the organization, because we all came over at the same time when Mr. Richardson was put in as the senior official performing the duties.

So there were several people that came with Mr. Richardson from "Counter" Weapons of Mass Destruction.

Q.   And did you have an understanding that Ms. Voorhies came with Mr. Richardson from Weapons of Mass Destruction?

A.   No, I didn't have an understanding. That's why I asked her.

Q.   And did you ask her who gave her the appointment?

A.   No, I didn't ask her.  I asked her what type of appointment she had.

Q.   And did she -- did you understand -- what was your understanding of -- let me ask this again.

Did you understand that she was representing that she had a "special employee" appointment?

Page 101

MS. KIES:  Object to form.

A.   She didn't know what type of appointment she had.  So I figured that she was a special government employee.

Q.   Because she wasn't familiar with all the standard positions that are held by federal employees?

MS. KIES:  Object to form, foundation.

A.   She didn't understand -- like, she definitely was not coming as a detailee from Counter Weapons of Mass Destruction.

So that's why I figured she was a special government employee.

Q.   And did you have any understanding of who appointed her?

A.   She told me that she came as requested by Mr. Lewandowski.

Q.   And when was this conversation that you're recalling?

A.   I don't know the exact timing of the conversation.  Because, as you said, and I've said, I got there in like the May time period, and there were a lot of staff that were coming in to work with Mr. Richardson.

Page 102

So I was trying to understand how Mr. Richardson would want to use me as a senior advisor to him on different issues associated with FEMA.

Q.   Did she say anything -- did Ms. Voorhies, at this time, say anything else about her background with Mr. Lewandowski?

MS. KIES:  Object to form.

A.   No, she did not.

Q.   Did you ask?

A.   No, I did not.

Q.   Did you have any understanding of his authority to appoint individuals to such positions?

MS. KIES:  Object to form, legal conclusion.

COURT REPORTER:  What was that last part?

MS. KIES:  Legal conclusion.

COURT REPORTER:  Thank you.

A.   I don't -- in the way that you've asked the question, I have no knowledge that Mr. Lewandowski appointed Kara Voorhies.

Q.   That's just what she said?

MS. KIES:  Object to form.

A.   She told me she knew Corey Lewandowski.

She didn't say he appointed her, the way that you're asking the question.

Q.   But that she came over at his request?

MS. KIES:  Object to form.

A.   She said that she came because he had asked her to.

Q.   You -- at some point in time, you came to understand that Ms. Voorhies was actually a government contractor.  Correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   When did you under- -- when did you learn that?

A.   I initially heard by one of the employees that stated that she was a contractor.

I don't know the exact time period of when that was, but an employee stated that she was a contractor.

Q.   A FEMA employee?

A.   Yes.

Q.   Okay.  Can you give me a rough estimate of when you came to have this understanding?

A.   Actually, I really can't recall it.  I really cannot recall it.

But I do know that the FEMA employee did

state and -- to other FEMA employees, and it was raised to me that this employee stated that she was a contractor.

Q. And were you surprised to hear that?

MS. KIES: Object to form.

A. So it depends on what you mean by "surprised," but, yes, I -- it was different than what I thought she was.

Q. Did you do any investigation into the nature of Ms. Voorhies' contract?

MS. KIES: Object to form.

A. I did not do investigation, but I did specifically ask her if she was a contractor.

Q. And what did she say?

A. She said yes.

Q. Did you ask her any -- anything about that contract?

A. I did not ask her about the contract, because she said that she was still the senior advisor to the secretary.

Q. And the senior advisor to the secretary is a position within HQ?

MS. KIES: Object to form.

Q. Correct?

A. The senior advisor to the secretary is at

Page 105

DHS headquarters.  Yes.

Q.   And you understood that Ms. Voorhies was someone that you reported to.

MS. KIES:  Object to --

Q.   Correct?

MS. KIES:  Object to form.

A.   I would not state it that way.

I would state that she was the senior advisor to the secretary, and that I report to the deputy secretary to the secretary's office as a component head as -- starting at December 1st.

In the chief of staff role, I report to the administrator of FEMA.

And so, I didn't report to Ms. Voorhies at the time that you're bringing this up.  I reported to Mr. Richardson, as the senior advisor at FEMA.

Q.   But Ms. Voorhies was -- being in the front office and a senior advisor to the secretary, was above Mr. Richardson in the hierarchy at DHS. Correct?

MS. KIES:  Object to form.

A.   That is not correctly stated.

Mr. Richardson is a component head at that time, and component heads report to the secretary.

Ms. Voorhies was a senior advisor to the

secretary on FEMA issues.

Q.   Mr. Richardson was actually not a component head.  Correct?  He was a SOPDA.

MS. KIES:  Object to form.

A.   Correct.  He was acting as the Senior Official Performing the Duties of the Administrator.

Q.   Appointed by the DHS Secretary.  Correct?

A.   Yes.

Q.   Removable by the DHS Secretary?

A.   Yes.

Q.   And reporting to the DHS Secretary?

A.   Yes.

Q.   And the people in her office?

MS. KIES:  Object to form.

A.   It's my understanding that they're advisors to the secretary.

But as the Senior Official Performing the Duties of the Administrator, you do report to the secretary because you are performing the duties of a component head.

Q.   Did you have an understanding of whether Ms. Voorhies was working in person in Washington, D.C., or remotely?

MS. KIES:  Object to form.

A.   I'm not sure of all her living

arrangements.  I did become aware that she had, I believe, an apartment here in Washington, D.C.

Q.   Did you have an understanding that she was from Houston, Texas?

MS. KIES:  Object to form.

A.   Yes.  She told me she was from Houston, Texas.

Q.   And that she did, at times, work remotely on her contract for FEMA?

MS. KIES:  Object to form.

A.   I'm not sure of all her working arrangements, because we could do virtual meetings.

So I'm not necessarily sure of where she was specifically located, because she would, you know, go home or she would be up at DHS headquarters.

Q.   And did you have Zoom meetings with Ms. Voorhies at times?

A.   We would actually have Microsoft Team meetings.

Q.   No offense to Microsoft.  I should have said videoconferencing.

Did you ever see her in person at any FEMA office?

A.   Yes.

Q.   Did she have a FEMA office?

MS. KIES:  Object to form.

A.   Yes, she did.

Q.   And Ms. Voorhies was given a FEMA email account.  Correct?

A.   She had a FEMA email account, yes.

Q.   Kara.Voorhies@FEMA.dhs.gov.  Correct?

A.   Yes.

Q.   Are you the person who authorized Ms. Voorhies to have a FEMA email account?

MS. KIES:  Object to form.

A.   No, I am not.

Q.   Do you know who authorized Ms. Voorhies to have a FEMA.dhs.gov email account?

MS. KIES:  Object to form.

A.   No, I do not.

Q.   Was that prior to your transferring from CISA to FEMA, that she had that FEMA email account?

MS. KIES:  Object to form.

A.   I have no knowledge when she got the FEMA email account.

Q.   Do you have any understanding as to the reason that a senior advisor to the DHS Secretary would be given a FEMA employee email address?

MS. KIES:  Object to form.

A.    I really don't know the basis of why they gave her a FEMA employee email address.

Q.    And you don't know who the "they" is?

A.    I have no idea.

Q.    No idea, or do you suspect it was someone in the DHS front office?

MS. KIES:  Object to form, foundation.

A.    I would -- I don't know the process of how her email address got established, but there is a process for email addresses to be established, both at headquarters as well as component organizations.

For example, I had emails at CISA.  Then I also had an email account at headquarters.  And now I have an email account at FEMA.

Q.    When did you have an email account at DHS headquarters?

A.    When I was in transition.  And they thought -- "they," meaning headquarters and employees, right, the management directorate -- that I was going to be the Under Secretary for Management.

Q.    Did you ever use the headquarters email account for anything related to FEMA?

MS. KIES:  Object to form.

A.    I would have to go back and look, because I'm not sure about the emails that are associated with the headquarters' accounts.

Q.    FEMA's contractors are not typically given a FEMA.dhs.gov email address.  Correct?

MS. KIES:  Objection; foundation, form.

A.    Contractors, in general, are not given government employees' email addresses.

Q.    You have an extensive background in cybersecurity.  Correct?

MS. KIES:  Object to form.

A.    Yes, I do.

Q.    Did you have any concerns with a government contractor being given a FEMA email address, Ms. Evans?

MS. KIES:  Object to form.

A.    I had concerns as it related to her contractor status.

And so, in the different roles that I had at FEMA, I ensured that the activities that I was involved in, I took proper precautions as it related to DHS policies and contractors.

Q.    Let's break that down.

Can you explain what the concerns were

that you had with respect to her being a government contractor?

MS. KIES: Object to form.

A. Government contractors have specific roles and responsibilities.

And in this case, depending on what role I was in as a -- as it related to the chief of staff, or now as the Senior Official Performing the Duties of the Administrator, I made sure, in particular, that Ms. Voorhies was not involved in any personnel decisions.

Q. You made sure that Ms. Voorhies was not involved in personnel decisions at FEMA, Ms. Evans?

A. Yes.

Q. And what steps did you take to make sure that Ms. Voorhies was not involved in personnel decisions at FEMA?

A. Meetings that we had specifically that were related to personnel decisions.

I have a weekly meeting with the FEMA Chief Human Capital Officer -- I'm making sure I'm not using acronyms, ma'am -- our legal counsel, the chief counsel, and the Office of Professional Responsibility.

And she did not participate in any of

those meetings.

Q.    In-person meetings?

A.    Or virtually.  She did not participate in any of those meetings.

Q.    Is that the step you took to ensure that Ms. Voorhies was not involved in personnel decisions?

MS. KIES:  Object to form.

A.    Yes.

Q.    Any other steps?

A.    I also, when I took over as chief of staff -- because part of the discussion that we had was making sure processes were put in place appropriately at FEMA -- that the FEMA leadership signed off on the documents before they went up to headquarters.

And then anything that headquarters, and in this case, DHS headquarters -- if she was on any signing sheet, she signed after FEMA employees.

Q.    Previous to that time, was Ms. Voorhies signing off before FEMA leadership on anything at FEMA?

MS. KIES:  Objection; foundation, form.

A.    I am not aware of the -- that process or

the clearance process.  I can attest to the processes that I put in place.

Q.   But there was a reason that you felt it necessary to make sure that Ms. Voorhies was signing off after FEMA leadership.  Correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   And that's because you were concerned that previously she was making decisions before FEMA leadership?

MS. KIES:  Objection;
foundation, form.

A.   I don't know what decisions that she was making directly, but I wanted to make sure that, when I took over as chief of staff for Mr. Richardson and when I took over as the Senior Official Performing the Duties, that there was a clear delineation between DHS headquarters and FEMA.

Q.   You are aware that Ms. Voorhies was making decisions with respect to FEMA contracts prior to your taking over as chief of staff.  Correct?

MS. KIES:  Objection;
foundation, form.

A.   I'm aware that Ms. Voorhies was involved in reviewing contracts as a senior advisor to the

Page 114

secretary.

Q.   Did Ms. Voorhies have a security clearance?

MS. KIES:  Objection; foundation.

A.   Ms. Voorhies did get a security clearance late in her tenure.

Q.   When was that?

A.   I do not have the exact date of when she obtained her security clearance.

Q.   In 2026?

A.   I believe that that's the case, that it was 2026.  It's -- it is recently.  It was recently.

Q.   Was the contract that Ms. Voorhies had with DHS or with FEMA?

MS. KIES:  Objection; foundation.

A.   The contract was with DHS headquarters.

Q.   So you are aware that it was not a contract with FEMA.  Correct?

A.   I am aware that FEMA did not have a contract for Ms. Voorhies's services.

Q.   And do you know whether the DHS contract with -- was with Ms. Voorhies or a company she was affiliated with?

MS. KIES:  Object to form.

A.   I do not know the details of her headquarters contract.

Q.   Do you know how much she was paid for her work?

MS. KIES:  Object to form.

A.   I do not know her compensation on that contract.

Q.   Did you ever talk to her about it?

A.   I did not discuss with her her compensation.

Q.   Did you discuss with her what services the contract was for?

MS. KIES:  Object to form.

A.   I did not discuss the terms and conditions of her contract.  She was the senior advisor to the secretary.

Q.   But she played a specific role with respect to FEMA.  You've said that already.  Right?

MS. KIES:  Object to form.

A.   She played -- the role that she did was she was the senior advisor to the secretary for FEMA issues.

Q.   And what was your understanding of Ms. Voorhies' qualifications providing any advice to

the Secretary of Homeland Security on FEMA?

MS. KIES:  Object to form.

A.   Could you restate that?

Q.   Sure.

What was your understanding of Ms. Voorhies' qualifications for being the senior advisor to the "Department of Homeland" Secretary for FEMA?

A.   Ms. Voorhies expressed to me that she was a CFO for a global company.

Q.   Did Ms. Voorhies, to your understanding, have any background in disaster relief?

MS. KIES:  Object to form.

A.   To my understanding, what Ms. Voorhies said to me was that she was the CFO for a global company and that she led large, transformational projects.

Q.   So that's a no, that you don't have an understanding that she had any background in disaster relief.  Correct?

MS. KIES:  Object to form.

A.   We never discussed her background as it relates to disaster relief.

Q.   So you do not have an understanding that she had any background in disaster relief.  Right?

MS. KIES:  Object to form.

A.   I do not have an understanding if her background includes disaster relief.

Q.   Or emergency management.  Correct?

MS. KIES:  Object to form.

A.   I do not have any understanding of her background, including emergency management.

Q.   And you said "transformational projects"?

A.   Yes.  That's what she said.

Q.   Okay.  And that -- by that, you understood her to mean downsizing of companies?

MS. KIES:  Objection; foundation.

A.   I do not understand that.

The context of which we were talking about that is the financial management modernization system that's happening at FEMA.

Q.   And was Ms. Voorhies involved in the financial management modernization system that's happening at FEMA?

MS. KIES:  Objection; foundation.

A.   I am not -- I do not know the extent that she went into understanding the financial management modernization.

That project come -- came up and comes up through the contract review, which we've already discussed that she did review contracts.

Q.   Let's start with the time period where you were the chief of staff, September through -- sorry. I'm going to correct my questions.

Because I understand you are still the chief of staff, but where you were playing the role only of chief of staff; how about that?

From September through the beginning of December 2025, what work was Kara Voorhies performing with respect to FEMA?

MS. KIES:   Object to form.

A.   So that time period was actually the end of September.  Okay?  So I would actually say it's like October, in the time period of October.

It's my understanding, and based on as the chief of staff, that she was working directly with the Office of Response and Recovery as it related to -- and I'm trying not to use acronyms -- as it's related to like individual assistance, disaster declarations, as it relates to the reimbursements that would go out to states after presidential declarations have been made; that she was involved in a lot of that analysis.

Q. And you're familiar with DHS Secretary Noem's policy of requiring S1 approval for any amounts spent over $100,000?

MS. KIES: Object to form.

A. Yes, I am.

Q. And Kara Voorhies was involved in implementing that policy. Is that correct?

MS. KIES: Object to form.

A. Yes.

Q. Okay. You traveled with Ms. Voorhies to Alaska in October 2025. Correct?

A. Yes.

Q. To tour the impacts of Typhoon Halong. Is that correct?

A. It was the typhoons in Alaska.

I will not venture how to say all the cities that we went to, I guess.

Q. Okay. But there was a big typhoon in Alaska, and you and Ms. Voorhies were sent as representatives of the Department of Homeland Security on this trip. Right?

MS. KIES: Object to form.

A. Yes. We were sent to go with Senator Sullivan.

Q. So Alaska Senator Sullivan.

MS. LEONARD:  I'm going to mark as the next, which I believe is 7, the press release from Senator Sullivan regarding that trip.

(Whereupon, Plaintiffs Exhibit 7 was marked for identification.)

Q.  You've been handed what's been marked as Exhibit 7.  It is, I will represent to you, a press release from Alaska Senator Sullivan.

And in the first paragraph here, you see your name and Ms. Voorhies' name?

A.  Yes.

Q.  Okay.  So it's accurate that you and Ms. Voorhies were -- attended this trip to Alaska?

A.  Yes.

Q.  And do you see that Mr. Sullivan -- I'm sorry -- Senator Sullivan refers to a group of senior federal officials?

Do you see that?

A.  Yes.

Q.  Was Ms. Voorhies a senior federal official?

MS. KIES:  Object to form.

A.  She, at this time, was the senior advisor to the Secretary of Homeland Security, as it states.

So that's why it says senior officials.

Q.   How does a government contractor end up coming along on a trip to Alaska for senior federal officials, touring a disaster zone, Ms. Evans?

MS. KIES:  Object to form, foundation.

A.   I am not aware of the decisions that were made as to the attendance.  I know I was asked to attend.

Q.   And do you have an understanding that someone else asked Ms. Voorhies to attend as well?

MS. KIES:  Object to form.

A.   Yes, that's my understanding.

Q.   And what's your understanding of who asked Ms. Voorhies to attend?

MS. KIES:  Object to form.

A.   For the genesis of this trip, Mr. Lewandowski asked me to get this trip ready for us to go to FEMA -- to go to Alaska to support Senator Sullivan.

Q.   And you were aware, at the time, that he was also asking Ms. Voorhies to do that?

MS. KIES:  Object to form.

A.   I know that -- yes, that she was part of the team to go to Alaska.

Q.   Okay.  I've got some photos that are from the link on this press release --

A.   Okay.

Q.   -- from Senator Sullivan.  We printed them in color.

MS. LEONARD:  Let's mark the three together as Exhibit 7.

MS. KIES:  8.

MS. LEONARD:  Sorry.  8.  Thank you.  That won't be the first time.

(Whereupon, Plaintiffs Exhibit 8 was marked for identification.)

MS. LEONARD:  And we're compiling them together, so we'll hand them to you.

Did you have one set?  Sorry.  I should have done that before.

Okay.  Counsel, here they are.

(Witness reading.)

BY MS. LEONARD:

Q.   Okay.  Have you looked at the photos?

A.   Yes, ma'am.

Q.   Are you depicted in these photos?

A.   Yes, I am.

Q.   Is Ms. Voorhies in these photos?

A.   Yes, she is.

Q.   Which photo shows Ms. Voorhies?

A.   How do you want me to reference these?

Q.   Well, let's -- I think there are different times at the bottom of each page.

A.   Okay.

Q.   It's okay.  We can do it this way.

So there's a 604, a 602, and a 603.

A.   Okay.  So I have 602.  I do not see her in this photo.

In the photo of 603, I do see her in this photo.

And in the one that's 604, she is also in that photo.

Q.   Okay.  Let's -- 604 is a little closer in.

You're depicted -- you're in the center of that photo, 604.  Right?

A.   I'm in the photo.  I don't know that I'm in the center.

But I'm in the photo, yes, ma'am.

Q.   Okay.  And where is Ms. Voorhies?

A.   She is -- if you're looking at it this way from me, she is to the right of me in the photo.  So it would be -- yeah.

Q.   She's seated to the left of you at the

table?

A.   Yes.

Q.   And is she wearing a FEMA Office of the Administrator fleece?

            MS. KIES:  Object to form.

Q.   Can you tell?

A.   Yes, I believe that is the case.

Q.   Did you give that to her?

A.   No, I did not.

Q.   How did you get to Alaska?

A.   We flew on a government plane.

Q.   So you didn't fly commercial?

A.   No, we did not.

Q.   And did Ms. Voorhies fly with you?

A.   Yes, she did.

Q.   It took awhile, didn't it?

            MS. KIES:  Object to form.

A.   It's a long flight to Alaska.

Q.   And did you talk to Ms. Voorhies along the way?

A.   Actually, I did not.

Q.   You weren't seated near her?

A.   No, I did not.  I sat with Mr. Ueland and talked with Mr. Ueland on the flight.

Q.   And what about during the trip; did you

have any conversations with Ms. Voorhies during this trip?

A.   Yes, I did.

Q.   And how many days were you there for?

A.   I'd have to -- I think it was less than 48 hours that we were up there.

Q.   Did you have any conversations during this trip about Ms. Voorhies' background before coming to do work at FEMA?

MS. KIES:  Object to form.

A.   I do not recall us having that kind of conversation.

Q.   And did you have any conversations during this trip about her relationship with Mr. Lewandowski?

MS. KIES:  Object to form.

A.   I did not have conversations with her about her relationships with Mr. Lewandowski.

Q.   Did you know how Ms. Voorhies knew -- did she ever -- strike that.

Did Ms. Voorhies ever say anything to you about how she knew Mr. Lewandowski before coming to work at DHS?

MS. KIES:  Object to form.

A.   No, she did not.

Q.   Did you ever ask?

A.   No, I did not.

Q.   Did you ever hear anything about that from anyone else?

MS. KIES:  Object to form.

A.   I don't recall having discussions about her relationship with Mr. Lewandowski with anyone else.

Q.   But you knew that they knew each other before she came to DHS?

MS. KIES:  Object to form.

A.   Yes.

Q.   And -- but that's all you knew?

MS. KIES:  Object to form.

A.   Yes.  That's all I recall, yes.

Q.   Did you know that they had business relationships before her coming to DHS?

MS. KIES:  Object to form.

A.   I did not know that.

Q.   After you became the SOPDA, did Ms. Voorhies continue to perform the same type of work related to FEMA that you've previously described?

MS. KIES:  Object to form.

A.   Yeah.  I would say yes.  And she also did

other types of assignments.

Q. What other types of assignments, beyond what you've already described?

MS. KIES: Object to form, foundation.

A. She was also working with DHS headquarters, and working directly with the Office of Management and Budget.

Q. With respect to FEMA staffing?

MS. KIES: Object to form.

A. Not that I'm aware of.

Q. You did not involve Ms. Voorhies in conversations about FEMA staffing, Ms. Evans?

MS. KIES: Object to form.

A. It depends on what you mean about the FEMA staffing and involving her in conversations.

There are discussions that I had with DHS headquarters after I took over as chief of staff about looking at FEMA resources again and what would be the result of any types of recommendations that would come from the FEMA Review Council.

So there were discussions, but -- but they were general and deliberative in nature.

Q. And government contractor Kara Voorhies was involved in those conversations?

A.   Not all of them, no.

Q.   But some of them?

A.   She would participate in meetings at DHS headquarters on FEMA issues.  And if some of the discussion would go that way, then she was there.  Yes.

Q.   And you copied her on emails about FEMA staffing, did you not, Ms. Evans?

        MS. KIES:  Object to form, foundation?

A.   I CC'd her on FEMA issues, yes.

Q.   On all FEMA issues?

        MS. KIES:  Object to form.

A.   It was a practice for me, for headquarters, DHS headquarters, that I would include her, as the senior advisor to the secretary.

Q.   You were directed to do that by someone at DHS headquarters?

        MS. KIES:  Object to form.

A.   I was not directed.  I did it as a practice because she was a senior advisor.

And I did it so that a senior advisor would be aware of FEMA issues, so that if the secretary asked her questions, she would have answers.

Q.   And you were not privy to all of the communications that Ms. Voorhies had with either Secretary Noem or Chief Advisor Lewandowski about FEMA.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's correct.

Q.   But you did understand that she was talking to Secretary Noem and Corey Lewandowski about FEMA?

MS. KIES:  Object to form, foundation.

A.   Her job is the senior advisor to the secretary for FEMA issues.  So she would talk to the secretary and Mr. Lewandowski about FEMA issues.

Q.   Including things that you were copying her on.  Correct?

A.   I --

MS. KIES:  Object to form.

A.   I am not privy to those discussions, so I would not know the details of the discussions that she had with them.

Q.   But you did personally communicate with Ms. Voorhies regarding FEMA personnel matters, didn't you, Ms. Evans?

MS. KIES:  Object to form.

A.    I would give her high-level information and direction that I was going with the analysis of the workforce.

Q.    Only high-level information, Ms. Evans? Are you sure?

MS. KIES:    Object to form.

A.    As you can see by the email, she was CC'd on a lot of the emails as it relates to clarification of the processes that we were putting in place as it related to personnel decisions.

Q.    You also talked to her about personnel matters at FEMA.  Correct?

MS. KIES:    Object to form.

A.    I would talk to her about a whole host of issues at FEMA.

Q.    And you talked to her on the phone?

A.    We would talk on the phone, yes.

Q.    You communicated with Ms. Voorhies regarding FEMA's authority to extend CORE appointments, for example?

MS. KIES:    Object to form.

A.    Yes, I would.

Q.    And you communicated with Ms. Voorhies about the non-renewals of COREs by NTE date. Correct?

MS. KIES:  Object to form.

A.   Yes, I did.

Q.   And you communicated with Ms. Voorhies about the approvals for 90-day renewals for some CORE appointments.  Correct?

MS. KIES:  Object to form.

A.   I communicated, not just with her, but also with DCOS Guy, because he was in charge of my portfolio.

So I specifically told them the decisions that I was making as it related to the delegated authority that FEMA did have, which expired on December 31st.

And then also communicated with DCOS Guy about the processes that I was putting in place for CORE renewals and then CORE nonrenewals.

Q.   We'll get to DCOS Guy, but I'm focused on Ms. Voorhies for right now.

Who gave Ms. Voorhies the authority to be involved in FEMA personnel and policy matters?

MS. KIES:  Object to form, foundation.

A.   I am unaware who gave her the authorities.

Q.   You didn't ask?

MS. KIES:  Object to form.

A.   I talked specifically with Joe Guy, as my chief of staff -- my deputy chief of staff for my portfolio.

Q.   But you understood that Secretary Noem and Corey Lewandowski wanted you to communicate with Ms. Voorhies about these matters.  Correct?

MS. KIES:  Object to form, foundation.

A.   I understand that she was to be informed about the issues there and then decisions that I was making in the role from December 1st as the Senior Official Performing the Duties of the Administrator.

Q.   Who told you that?

MS. KIES:  Object to form.

A.   I'm sorry.  Who told me what?

Q.   What you just said, that you understood that she was to be informed.

Who in the front office of DHS told you that Ms. Voorhies was to be informed on these matters?

MS. KIES:  Object to form.

A.   Mr. Guy.

Q.   When was that?

A.   I don't have a specific date.

Q.   Was it before you became the SOPDA or

after?

A.   I would -- I really don't recall a specific conversation that said this.

She was involved -- I had weekly meetings -- when I took over the chief of staff position at FEMA, I had weekly meetings with DCOS Guy.

Q.   And did Ms. Voorhies participate in those meetings?

A.   Yes, she did.

Q.   Did Ms. Voorhies have the authority to see FEMA personnel documents, Ms. Evans?

MS. KIES:  Object to form, legal conclusion.

A.   I am unaware if she had the authority to see personnel documents.

Q.   You did not give her that authority. Correct?

MS. KIES:  Object to form.

A.   I did not give her authority to see personnel documents at FEMA.

Q.   And did Ms. Voorhies have the authority to make decisions regarding FEMA personnel matters, Ms. Evans?

MS. KIES:  Object to form, legal

conclusion.

A.   I did not give her authority in my role as the Senior Official Performing the Duties of the Administrator.

Q.   Did Ms. Voorhies have authority to make decisions regarding FEMA personnel matters, to your knowledge?

MS. KIES:  Object to form, legal conclusion.

A.   It is my understanding she did not.

Q.   But she was involved, wasn't she?

MS. KIES:  Object to form, asked and answered.

A.   She would be informed through these various meetings.

Q.   And email communications as well.  Right?

A.   Yes.

Q.   You did not personally make the decision to permit a government contractor with no experience in disaster relief or manage -- emergency management to perform work at FEMA.  Correct?

MS. KIES:  Objection; legal conclusion, facts not in evidence.

You can answer.

A.   I was not involved in that decision.

MS. KIES:  We've been going for about an hour.  Maybe another five or 10-minute break?  Or what do you -- do you want to take lunch?  What do you think?

MS. LEONARD:  What time is it now?  We're not going to take lunch this early, but I am happy to take a short break right now.  That's fine.

MS. KIES:  Okay.

MS. LEONARD:  Why don't we take another 10-minute break.  And then maybe we'll aim for lunch after the next session, if that's all right.

VIDEOGRAPHER:  Off the record at 11:24.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 11:41.

BY MS. LEONARD:

Q.   Ms. Evans, going back to the trip to Alaska in October of 2025, did you or Ms. Voorhies, to your knowledge, have any communications with either former Secretary Noem or Corey Lewandowski during that trip?

A.   I can only speak about my communications,

and I did not, as I recall, have specific communications with Mr. Lewandowski or the secretary during the trip.

Q.   And when you say "specific communications," what do you mean?

A.   I would say like a telephone call or any types of email, but primarily would be like a telephone call or anything.  I didn't -- I did not have discussions with them.

Q.   You're not aware of whether there were communications on which you and Ms. Noem or Mr. Lewandowski were all copied during that time?

A.   I do not recall, on that trip, of us having communications where we were all to -- all on, like -- yeah.  No, I don't recall that.

Q.   Did Ms. Voorhies ever communicate to you decisions related to FEMA that had been made by Secretary Noem or Corey Lewandowski?

MS. KIES:  Object to form.

A.   She would convey, to me and other FEMA leadership, decisions that were made by the secretary or she would represent them as decisions made by the secretary.

Q.   And let's start with the period during which you were chief of staff only.

What decisions related to FEMA did Ms. Voorhies -- Voorhies convey to you that had been made by the secretary?

MS. KIES:  Object to form.

A.    It would depend on the circumstance, but the majority of those decisions would be related to contracts that were going up or disaster declarations that would go through the process.

And it went through a pre-established email process.

Q.    For the disaster declarations?

A.    Yes, ma'am.

Q.    Okay.  But those are decisions from the secretary that Ms. Voorhies informed you, as the FEMA leadership, of?

A.    Well --

MS. KIES:  Object to form.

WITNESS:  I apologize.

A.    She would make recommendations and then -- through different clearance processes, and then we would get decisions back.

For example, on the disaster declarations, there was a process that FEMA sent through on emails, which then would go through the clearance process.

And it's the process that we discussed earlier with the ExecSec, and it would go into the ExecSec process and it would get a STORM number.

And then from there, the secretary would sign those, and they would proceed over to the White House.

Q.   After you became the SOPDA, did Ms. Voorhies ever convey decisions that had been made by secretary Noem or Corey Lewandowski regarding FEMA?

MS. KIES:  Object to form.

A.   It depends on the topic area of what you're talking about.

But there were decisions that would come down from DHS headquarters as it relates to, for example, the reimbursements that would go out as it related to disasters.

Q.   And the $100,000 policy?

MS. KIES:  Object to form.

A.   Those would go up through the process that we have described earlier, where it would then go -- there's a clearance form within FEMA.

And then I would sign it.  Then she would sign it.  There's a STORM number, the system that we talked about for ExecSec to manage documents between

the components and headquarters.  And it had a number on it.

It would go up to DHS headquarters.  It would go through a review process up there.  And then we would get a signed document back that said that the secretary has approved it.

Q.   So there was this established system through the ExecSec for routing decision-making documents that included the contracting and disaster declarations that you've described.  Is that right?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   And that system was also used for decisions related to FEMA staffing?

MS. KIES:  Object to form.

A.   It would depend on the assignment that was given to FEMA, as well as other components.

And as we have discussed earlier, there were executive orders and there were other assignments that would come from the Office of Management and Budget and the Office of Personnel Management.

We would be tasked through the DHS ExecSec process, and then we would send information up there, because that's how they tracked component

submissions.

And it would go through that process and then go to headquarters.

Q.    And Ms. Voorhies was also involved in the staffing-related decisions that were being sent to the DHS front office.  Right?

MS. KIES:  Object to form.

A.    Ms. Voorhies, depending on -- since you're only talking about from when I was the chief of staff time period.

So that's the period that we're talking about, from chief of staff to then taking over as the "Senior Official Performing the Duties of."

Those decisions, or those recommendations, that would go up for hiring did not go through the executive staff secretary process, because there was a different process -- it's my understanding there was a different process that was established by the department's chief human capital officer and how they worked with the component chief human capital officers.

Q.    So I was actually asking about after you became SOPDA.  And let me just ask a different question.

After you became SOPDA, did Ms. Voorhies

ever convey to you any decisions that had been made by the secretary with respect to FEMA staffing?

MS. KIES:  Object to form.

A.   No, she did not.

Q.   Did Ms. Voorhies have a telephone?

MS. KIES:  Object to form.

A.   Yes.

Q.   Did she have a Department of Homeland Security issued telephone?

MS. KIES:  Object to form, foundation.

A.   I do not know if she had a Department of Homeland Security telephone.

Q.   Did she have a FEMA business telephone?

MS. KIES:  Object to form.

A.   I do not know if she had a FEMA business telephone.

Q.   Did she have a personal telephone?

MS. KIES:  Object to form.

A.   Yes.

Q.   Did you communicate with Ms. Voorhies on her personal telephone?

MS. KIES:  Object to form.

A.   Yes, I did.

Q.   And did you have her personal telephone

number saved in your phone?

MS. KIES:  Object to form.

A.  Yes, I did.

Q.  And was that saved in your personal phone or your business phone?

A.  It was saved in both phones.

Q.  And do you have your personal telephone here with you today?

MS. KIES:  Object to form.

A.  Yes.

Q.  Can you please get your phone and tell me what Kara Voorhies' personal telephone number is?

A.  Am I allowed to do that?

Q.  Yes.

A.  I have to leave the room.

Q.  Okay.  We can --

A.  I guess.  I don't know.

Q.  We can take --

A.  I don't know who has my phone.  I gave -- I gave my phone --

MS. KIES:  Let's go off the record.  I'm not sure if we're able to do that, but let's go off the record.

MS. LEONARD:  Okay.

WITNESS:  Can we go off the

Page 143

record?  Because I don't have my phone.

MS. LEONARD:  I needed -- okay.
That's a fine answer.

Let's go off the record.

VIDEOGRAPHER:  Off the record at
11:49.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record it
12:01.

BY MS. LEONARD:

Q.   Ms. Evans, before we took the break, I asked you if you could tell me, from your personal phone, Ms. Voorhies' personal phone number.

Can you do that, please?

MS. KIES:  So -- and I can also provide this to you now on the record.

And I would actually like to make this an exhibit, please.

MS. LEONARD:  I'm sorry.  Is this an objection to the question --

MS. KIES:  This is --

MS. LEONARD:  -- that I just asked?

MS. KIES:  I'm providing you the evidence that you're asking for.  And it

is -- it isn't -- it is, in a sense, an objection as well.  So I'm happy to explain why I am providing this, if you'd like me to.

MS. LEONARD:  Do you have an objection to the question that I just asked?

MS. KIES:  Yes.  So my objection -- our objection to the question asked is that, obviously, the witness is here in her official capacity, not in her personal capacity.  We do not have possession, custody, and control of the witness's personal phone.

And that is our objection to the question, notwithstanding, as I was referring to, we do have the telephone number that your question asked for.  I wanted to provide it to you on the record.

And I also wanted to make it very clear that this portion of the deposition, for the court reporter and videographer, should be sealed, because we do not know whether this telephone number is personal or governmental.  And

regardless, it is, of course, PII.

MS. LEONARD:  So no speaking objections, first of all.  You can make your objections for the record.

And the questions are for the witness, not for counsel.  And the witness will be giving the testimony.

So we'll proceed with the deposition.

She is also here with her personal lawyer.  So I understand you are making an objection about the information that is on her personal phone, but her personal lawyer is here as well.

And do you have an objection to the question?

MR. GREAVES:  I join in the objection that she is here in her professional capacity, not in her personal capacity.

So you can continue with your question, but the objection stands.

BY MS. LEONARD:

Q.  Okay.  So do you have an answer to my question, Ms. Evans?

A.    Yes.

Q.    And is that your phone that is sitting next to your -- to counsel?

A.    No, it is not.

Q.    Okay.  And when we broke, did you go into the other room to look at your phone?

A.    Yes, I did.

Q.    Okay.  And did you retrieve the phone number for Ms. Voorhies that you have on that phone?

A.    Yes, I did.

Q.    And did you write that phone number down on the piece of paper in front of you?

A.    Yes, I did.

Q.    Okay.  Counsel didn't write that down?

A.    No, they did not.

Q.    Okay.  Can you tell us, on the record, what that phone number is for Ms. Voorhies' personal phone that you use to communicate with Ms. Voorhies about FEMA business.

                    MS. KIES:  Object to form,
          foundation.

A.    The telephone number that I have to use to communicate with Ms. Voorhies was (XXX) XXX-XXXX.

Q.    And I believe you testified previously that you used your personal phone to communicate

with Ms. Voorhies on that telephone number.
Correct?

MS. KIES:  Object to form.

A.   We would talk on this -- on that -- on my
personal telephone, on this number.

Q.   Did you ever text her at that number from
that -- from your personal phone?

MS. KIES:  Object to form.

A.   Yes.  There were text messages.

Q.   Did you ever communicate, using your
personal phone, with anyone else in the DHS Office
of the secretary?

MS. KIES:  Object to form.

A.   Yes.

Q.   Did you have the phone numbers saved on
your personal phone for others in the DHS Office of
the Secretary?

MS. KIES:  Object to form.

A.   I don't know all the numbers that I have
saved.

Q.   Because you didn't bring the phone back in
the room.  You went to the break room and looked at
the phone to get this one phone number and brought
it back.  Is that right?

MS. KIES:  Object to form.

Page 148

A.    I don't recall all the numbers that I save on my personal cell phone.

But I did look at my personal cell phone, as you requested, to get this telephone number.

Q.    But you also, I believe, just testified that you used that personal cell phone to communicate with others in the DHS Office of the Secretary.  Is that correct?

MS. KIES:  Object to form.

A.    Periodically, yes, ma'am.

Q.    Did you have DHS Secretary Noem's phone number saved in your personal cell phone?

A.    No, I do not.

Q.    Did you have Corey Lewandowski's phone number saved in your personal cell phone?

A.    I have a phone number that he would use to contact me periodically, yes.

Q.    And do you know whether that was his personal or business phone?

A.    I do not.

Q.    Okay.

MS. LEONARD:  We're going to ask for that phone number as well.  You can take a break.  We're going to continue with the conversation.  But we'll store up

the number of phone numbers.

MR. GREAVES:  And I'm just going to lodge an objection that she's here in her professional capacity, official capacity, not in her personal capacity.

There's a process for, you know, subpoenaing records from her personal devices.  If you want to go through that process, we're happy to do that.  But we're not here to root around on her personal phone.

Q.   Did you have any personal relationship with Mr. Lewandowski outside of the work that you were doing at the Department of Homeland Security?

A.   No, I --

MS. KIES:  Object to form.

A.   -- do not.

Q.   Do you have the Signal app stored on any of your phones?

A.   Yes, I do.

Q.   Which phones do you have the Signal app on?

A.   I have the Signal app on my personal cell phone.

Q.   And did you use Signal to communicate with

Ms. Voorhies about FEMA?

MS. KIES:  Object to form.

A.   Periodically, yes.

Q.   Did you use the Signal app to communicate with Mr. Lewandowski about FEMA?

MS. KIES:  Object to form.

A.   Periodically.

Q.   Did you use the Signal app to communicate with former Secretary Noem about FEMA?

MS. KIES:  Object to form.

A.   Periodically.

Q.   Who else did you use the Signal app to communicate with about FEMA?

MS. KIES:  Object to form.

A.   So there were headquarters -- DHS headquarters employees that were working with FEMA during the storm, the ice storm that happened in January.

Q.   I believe it was Winter Storm Fern.  Is that the right name?

A.   Yes, ma'am.  That's what -- it's not -- that is not the official name, but that's what people called it.  Winter storms don't get an official name.

Q.   Other than with respect to the winter

storm in January of 2026, were you using the Signal app to communicate with anyone at DHS headquarters, other than Ms. Voorhies, Mr. Lewandowski, or Ms. Noem, at any time?

MS. KIES:  Object to form.

A.    I would use it with the DHS ExecSec.

Q.    Anyone else?

A.    And I would also use it periodically with DCOS Guy.

Q.    "DCOS" stands for "Deputy Chief of Staff"?

A.    Yes, ma'am.

Q.    Okay.

MS. LEONARD:  So for the court reporter, DCOS, all caps.

Q.    Guy, Jos- -- Joseph?

A.    Yes.  Joseph Guy, G-u-y.

Q.    And do you have his phone number saved on your phone?

MS. KIES:  Object to form.

A.    I believe so, yes.

Q.    In addition to having his contact information saved through the Signal app?

MS. KIES:  Object to form.

A.    The -- it's -- so the way it works is -- yeah, like the contact information is that way.

Page 152

And so -- yeah, he's on the Signal app, but he would also call me, because we worked together during transition.

So I know Mr. Guy from my time with the America First Policy Institute.  So that's why it's saved.

Q.   And when was your time with the America First Policy Institute?

A.   I was a volunteer.  So I don't have the exact dates associated with it, but I worked on transition documents for the America First Policy Institute.

Q.   Transition documents related to the second Trump term?

MS. KIES:  Object to form.

A.   Yes.

Q.   Were you involved in a Signal group that includes political appointees at DHS and FEMA?

MS. KIES:  Object to form.

A.   Can -- I -- I'm not sure exactly what you're asking about when you say "political appointees" in FEMA.

Q.   Tell me all of the group chats that you were involved with on your Signal app that involved FEMA business, please.

MS. KIES:  Object to form.

A.    There was one, as we previously mentioned, specifically for the winter storm.

There is one specifically for communications, to be able to respond to communications.

And then there's one for the ExecSec to make sure that we had the STORM numbers so that we could move disaster decs through.

Q.    And there was a Signal group chat that you were involved with that involved DHS Secretary Noem, Corey Lewandowski, Kara Voorhies, and yourself, and others.  Correct?

MS. KIES:  Object to form.

A.    That was related to the winter storm.

Q.    And it's your testimony that that group chat existed only for the winter storm?

MS. KIES:  Object to form.

A.    That is my understanding and my participation, that it was related to the winter storm.

Q.    You did not have a Signal group chat with Secretary Noem, Corey Lewandowski, Kara Voorhies prior to the winter storm in 2026?

A.    I did --

MS. KIES:  Object to form.

A.    -- not.

Q.    Did you have any Signal communications with Corey Lewandowski prior to the winter storm 2026?

MS. KIES:  Object to form.

A.    Not that I recall, no.  I did not.

Q.    What about Secretary Noem, prior to the winter storm 2026?

MS. KIES:  Object to form.

A.    I did not.

Q.    What about Kara Voorhies, prior to the winter storm 2026?

MS. KIES:  Object to form.

A.    I did have some Signal chats with her prior to the storm.

Q.    And were those Signal chats with Kara Voorhies that you had prior to the winter storm with others on a group, or individually, or both?

A.    It would be both.

Q.    So you had individual communications with Kara Voorhies about FEMA on Signal in 2025?

MS. KIES:  Object to form.

A.    Yes, but it depends on what you mean about FEMA.  Like, in -- if it's specific, probably not.

Page 155

These are Signal chats.  They were just like general chats, like not "specific, specific."

That's why I'm saying, depends on what you mean by the question.

Q.   You were discussing FEMA business.  Correct?

MS. KIES:  Object to form.

A.   Not necessarily on all the chats.  No, ma'am.

Q.   But on some of them.  Correct?

A.   Yes, ma'am.

Q.   Okay.  Are you familiar with the obligations of government employees to retain records under the Federal Records Act?

A.   Yes, I am.

MS. KIES:  Objection; calls for a legal conclusion.

Just give me one second to answer -- object, please.

WITNESS:  Go ahead.  I'm sorry.

MS. KIES:  No -- no problem.  You could --

MS. LEONARD:  Question was:  Was she familiar?

A.   Yes, I am.

Q. And did you always print out and save the content of the Signal chats that you've just described regarding FEMA?

MS. KIES: Object to form.

A. I took pictures, because that was also the guidance underneath that.

I took pictures of what I determined were appropriate records. And I sent those pictures into my email account so that they would be saved as part of DHS records.

Q. Are you certain that you screenshot -- you took a screenshot of every communication you had with Kara Voorhies regarding FEMA on your Signal chat?

MS. KIES: Object to form.

A. As I stated, I looked at those because I am familiar, and I made a determination of what were appropriate records.

I took the pictures, and I sent the records in so that they would be captured as records.

Q. Who did you send them to?

A. I sent them to my email account, because my email account is automatically backed up and, therefore, is part of the DHS records.

Q.   You did not forward them from your email account to anyone else, these screenshots?

A.   No, I did not.

Q.   Was there any other method that you used to preserve the content of any of the Signal chats you've talked about today?

A.   No.  I followed the guidance that was given out to us.

And I took the pictures, and then I sent them in so that they would be captured as records.

Q.   Were you instructed by someone to use Signal on your personal phone for communications regarding FEMA?

MS. KIES:  Object to form.

A.   I don't recall being instructed to use my personal phone and Signal chat.

Q.   Are you aware of whether others in your Signal chat group were instructed to use their personal phones?

MS. KIES:  Object to form.

A.   I am unaware of any guidance that people were given as it relates to their personal phone use.

Q.   The messages that were sent on the Signal application were set to disappear.  Correct?

Page 158

MS. KIES:  Object to form.

A.    I am not sure of all the different disappearing messages, as those can be sent -- that feature can be determined by the users.

Q.    Was the Signal group chat that you participated in involving Secretary Noem, Corey Lewandowski, and at least Kara Voorhies -- were any of the messages set to disappear in that group chat?

MS. KIES:  Object to form, foundation.

A.    I am unsure of that question, the answer to that question.

Q.    If we were to look at your personal phone here today and the Signal application, do you believe that it would contain a record of the group chat?

MS. KIES:  Object to form, foundation.

MR. GREAVES:  I'm just going to object to her being here in her official, not in her personal capacity.

Q.    You can answer the question.

A.    I'm unsure.

Q.    And why are you unsure?

MS. KIES:  Object to form.

Page 159

A.   Because I am not sure of the settings for the disappearing messages.

Q.   Have you ever noticed any of the messages disappearing when you look at it?

MS. KIES:  Object to form.

A.   Are you asking me about disappearing messages when I look at Signal chat?  Can you clarify --

Q.   Yes.

A.   -- that?

Q.   Yes.

A.   Okay.  That's how it -- people set it up.

So I am -- I am aware, because I don't use Signal just for work.

And so, there are disappearing messages.

Q.   Did you set up the communications with -- directly with Kara Voorhies to disappear?

MS. KIES:  Object to form.

A.   I don't recall.

MS. LEONARD:  Okay.  Why don't we take a five-minute break?  And then we'll come right back onto the record.

VIDEOGRAPHER:  Off the record at 12:18.

(Whereupon, a recess was taken.)

Page 160

VIDEOGRAPHER:  On the record at 12:35.

BY MS. LEONARD:

Q.   Ms. Evans, you previously testified that you had Mr. Lewandowski's phone number in your personal phone.

Can you provide that phone number to us, please.

A.   Yes.  Do you want me to read the number?

Q.   Sure.

And you have, in front of you, a piece of paper on which some phone numbers are written.

Is this information that you retrieved from your personal cell phone?

A.   Yes, ma'am.

Q.   And can you read the phone number for Mr. Lewandowski that you have written there?

A.   (XXX) XXX-XXXX.

Q.   And is that the only phone number that you had for Mr. Lewandowski in your phone?

A.   Yes, ma'am.

Q.   And you previously testified you had a number for DCOS Joseph Guy in your phone.

Do you have his phone number there with you as well?

A.    Yes, I do.

Q.    Can you read it, please.

A.    It is (XXX) XXX-XXXX.

Q.    And are you aware of whether either of those phone numbers is a personal phone?

A.    I'm only aware of Mr. Guy's because we had a preexisting relationship through our work at the America First Policy Institute.

Q.    And you believe that is his personal phone number?

A.    I believe that is his personal cell phone number.

Q.    Because that's the phone number you used to communicate with him prior to his coming to the Department of Homeland Security?

A.    That's the phone number that I used to communicate with him prior to both of us being at DHS, yes.

Q.    And apologies if I just asked this.

Is that the only phone number for DCOS Guy that you have saved in your personal phone?

A.    Yes, it is.

Q.    Okay.  As the SOPDA, did you personally instruct employees who report to you that they are required to download and save their Signal

communications under federal law?

MS. KIES:  Object to form.

A.  I did not personally communicate.  We received guidance as a reminder that we needed to do proper records management.

Q.  And guidance from the Department of Homeland Security?

A.  We received guidance from the Department's Chief Information Officer.

MS. LEONARD:  Okay.  Let's just mark this one as Exhibit 9.

Here you go.

(Whereupon, Plaintiffs Exhibit 9 was marked for identification.)

Q.  Exhibit 9 is a -- sorry.  Thanks.

Exhibit 9 is a March 11, 2026 communication from DHS Management Communications that is titled "Reminder from Chief Information Officer."

Do you see that?

A.  Yes, ma'am.

Q.  Prior to March 10, 2026, when was the last reminder, if any, that you recall receiving regarding records preservation from the chief information officer at DHS?

Page 163

MS. KIES:  Object to form.

A.   I don't recall receiving something directly from the chief information officer at DHS on records preservation.

Q.   Prior to this message?

A.   Yes, ma'am.

Q.   Do you recall receiving something on records preservation from someone other than the chief information officer prior to this?

A.   When you come on board at FEMA as a senior executive, there's a whole series of training that they go through that every senior executive takes.

And so, I -- records management -- not to this level of specificity, but records management, cybersecurity, privacy, all those are part of the orientation when you come aboard FEMA.

Q.   Between the orientation for any person, including yourselves, and this March 10th communication from the chief information officer, are you aware of any communication from DHS which instructed employees to save Signal chats?

MS. KIES:  Object to form, foundation.

A.   I'm unaware of any specific guidance.

Q.   You don't recall receiving any

Page 164

instructions from the chief information officer or anyone else at DHS regarding saving Signal chats, prior to this March 10th communication?

MS. KIES:  Object to form.

A.   I specified that we get training when we come on board at FEMA.  And then this came out.

I do not recall anything else specifically coming out from the Department headquarters.

Q.   And are you aware that March 10th is the day after the court, in this case, ordered discovery?

MS. KIES:  Object to form.

A.   I'm aware that there are several pending court cases.  I'm not aware of the specific dates associated with the discovery order.

MS. LEONARD:  Okay.  I think now is a good time to take a break for lunch.

So we can go off the record.

VIDEOGRAPHER:  Off the record at 12:41.

(Whereupon, a recess was taken for lunch at 12:41 p.m.)

- - -

Page 165

A F T E R N O O N   S E S S I O N

(Time noted:  1:32 p.m.)

VIDEOGRAPHER:  On the record at 1:32.

MS. LEONARD:  Ms. Evans, I'm going to mark, as the next exhibit, which I believe is Exhibit 10, some notes that you produced.

(Whereupon, Plaintiffs Exhibit 10 was marked for identification.)

BY MS. LEONARD:

Q.   And I will represent that these are -- this is Bates number -33527 through -33544 in the form that they were produced to us by opposing counsel.

Ms. Evans, do you recognize these documents?

A.   Yes.

Q.   And what -- generally speaking, what is this?

A.   This -- these are notes from my day planner.

Q.   And that's a physical -- a physical day planner?

A.   Yes, ma'am.

Q.   Okay.  Not on a computer?

A.   No, it's not on a computer.

Q.   Okay.  And do you have two day planners or just one? -- at a time.

Are you using one?

A.   I use one day planner, but I also have a briefing book.

Q.   What's the -- what is a "briefing book"?

A.   So a "briefing book" -- the way that they're designed is they give you the background information for meetings that are planned for the day, and there are read-ahead documents associated with that.

Q.   And does this compilation include pages from both your day planner and some of your briefing books?

A.   No, this compilation includes only notes from my day planner.

Q.   Okay.  And on some of the pages, the -- I will tell you, there's a date and calendar.  And on other pages, there is a -- like if you flip to the last page, the back --

A.   Yes.

Q.   -- there's a handwritten date.  Is this all from the same planner?

A.   Yes.   These are from the same planner.

These are supplemental sheets that get added in if your day has a lot of notes.

Q.   Okay.   And I will tell you, this is the order in which we got it.

If you look at that back page, the date at the top is October 16, 2025.

Do you see that?

A.   Yes, ma'am.

Q.   And then if you flip to the front page, there is October 17th.

Do you see that?

A.   Yes.

Q.   Okay.   So I'm going to start on the 16th.

A.   Okay.

Q.   This is when you were acting only as the FEMA Chief of Staff.   Correct?

A.   Yes.

Q.   And the notes here indicate that you -- you have notes here related to the COREs.   Correct?

A.   Yes.

Q.   Does this reflect a meeting at which COREs were discussed?

A.   Yes.

Q.   Are the notes that you're taking in your

day planner generally reflecting notes from meetings?

MS. KIES:  Object to form.

A.  Notes that would be in my day planner would be reminders of me for activities or things that did occur in meetings.

Q.  And do you have any recollection as to what was being discussed with respect to COREs on October 16, 2025?

A.  I recall that this is during the time period when we had received specific tasking assignments from DHS headquarters that came from the Office of Personnel Management and the Office of Management and Budget as it related to potential staffing issues because we were in lapsed activities.

Q.  You believe that these notes reflect issues related to the appropriations lapse?

A.  Yes.  I know that in that time period, we were working under tasking that was given to DHS, the departments and the agencies, as it related to lapse of funding, staffing issues related to lapse of funding.

Q.  And if you look at the front page on October 17th, there are some notes related to COREs

at the bottom, it looks like.

And can you tell me -- can you explain for me what you were referencing here?

A.   In these particular notes, it was -- what we were referencing, or what I was referencing, was getting specifics as it related to demobilization.

Q.   And then the reference to "'something,' CHCO COREs in the field" at the bottom.

Do you see that, "more information"?

A.   Yes.

Q.   What was that referencing?

A.   It's related to COREs in the field as far as it relates to demobilization, which also relates to local hires as it relates to demobilization.

Q.   Okay.  And then at some point in October, you began talking about the expiration of CORE authority at FEMA.  Correct?

                    MS. KIES:  Object to form.

A.   I am not sure the exact timing that the issue was raised about the expiration of the waiver on delegation of authority that Mr. Richardson had.

Q.   If you look at October 20th -- it's the one, two -- third physical page of this document.  There's a "star" --

A.   Yes.

Q.   -- "summary expiration of COREs" notation there?

A.   Yes.

Q.   Does that refresh your recollection that you were talking about the expiration of COREs on October 20th?

MS. KIES:  Could you give the Bates number?  I'm just having a hard time following.

MS. LEONARD:  -33529.

A.   So what was happening at this particular point is still related to the funding, overall funding of FEMA, and what the COREs expiration dates are associated with the funding source that they are funded from.

They're funded -- they are -- these are all terms of art, so let me try to explain it.

They are funded as exempted employees. They are not excepted employees.  And so, their funding source is different.

And so, in looking at the activities that we were working on from the Department about looking at overall plans, that's what this is about, is looking at the actual explanation of the COREs and the disasters, if they were working active

disasters.

Q.   So the COREs are funded through the Disaster Relief Fund under the Stafford Act. Correct?

A.   Yes, ma'am.

Q.   And that was not going to expire at the end of 2025.  Correct?

MS. KIES:  Object to form.

A.   The Disaster Relief Fund is funded differently, and it doesn't expire.

But there are rules that are associated with it, when we go into lapsed funding, about what total funding is available to be used in a disaster.

So if you're under a continuing resolution or you're under full funding, the funding levels change on what is available through the Disaster Relief Fund.

Q.   If you turn to the next page, October 29th, there's a reference at the bottom that says, I believe:

Expire in December.  CORE has to -- potentially -- come to S1 for approval.

Do you see that?

A.   Yes, I do.

Page 172

Q.   And that is a reference to the delegation of authority that you were referencing with respect to SOPDA Richardson of the authority to extend certain CORE positions.  Correct?

MS. KIES:  Object to form.

A.   Yes.  This is referencing the delegation of authority that he had that would expire December 31st.

Q.   If you look on the next page, there's -- it's -33531.

A.   Yes.

Q.   The date is October 29th.  There's a notation at the top that says "Principals" and then something in parentheses.

Do you know what that says?

A.   It says "Principals (continued)."

Q.   "Continued."

What is the "Principals" referring to?

A.   The principals is a standing weekly meeting with FEMA leadership.

Q.   Does that involve anyone from DHS headquarters?

A.   It could involve people from DHS headquarters, if they chose to participate in the meeting.

Q.   Right.  Did Kara Voorhies ever participate in that principals meeting?

A.   I don't know if she participated in this particular principals meeting, but Ms. Voorhies would participate in principals meetings.

Q.   Okay.  And this note on October 29th says:

            Extend CORE employees, may

         not be able extend.

         Is that what that says?

A.   Yes.

Q.   And what did you mean by that?

A.   We were looking at the funding sources associated with where we were in the lapse, and we were looking to see how many would be affected by the extensions.

Q.   How many CORE employees would be affected by the extensions of what?

A.   In looking at their assignments and looking at -- because there's a regular process that -- they go through a review process.

         And so, this was all coming up now through these meetings about what we were going to do, based on the expiration of the delegation of authority.

Q.   How is that related to the lapse in appropriations, Ms. Evans?

Page 174

A.   They're all related.

So when you're asking me about the lapse of the appropriations, those were activities -- because at that particular time, if you go over 30 days, then you have to run certain activities.

And that was the guidance that was being given by OMB and OPM.

And what we were doing was also looking at the extension of those types of activities, the rules of how it would apply, if it would apply, to the CORE appointments.

Q.   Okay.  We'll come back to that.

This document looks like it's -- certain things have been crossed out with a marker.

Do you see that?

A.   Yes.

Q.   Did you do that?

A.   Yes.

Q.   Did you do that before giving this document to your counsel?

A.   Yes.

Q.   Why did you do that?

A.   Because the guidance was to --

Q.   I'm going to stop you there and ask that you don't reveal attorney-client communications in

answering my questions, which I think your --

A.   Okay.

Q.   -- counsel for Defendants was about to interject.

So I can ask the question again.

A.   Okay.

Q.   I'm going to ask you why you did that.

A.   Okay.

Q.   And if you can tell me without revealing communications that you received from any of the many counsel sitting at this table, you may do so.

Can you answer that question without revealing communications from any counsel?

A.   I did the redactions based on the information that I redacted is deliberative, and there are other meetings that I attend.

And so, from my perspective, that information wasn't relative to the COREs.

MS. LEONARD:  We'll ask that the complete document be produced.

We can address that later.

Q.   Okay.  You can set that aside.

Okay.  You believe -- I believe you previously testified that Mr. Richardson resigned as SOPDA sometime towards the end of 2025.  Is that

correct?

MS. KIES:  Object to form.

A.  I didn't testify that he resigned.

Q.  At some point, Mr. Richardson was no longer the SOPDA of FEMA.  Correct?

A.  Yes.

Q.  And that occurred approximately sometime in late November 2025.  Is that right?

A.  He gave his notification in the November time frame.

Q.  Okay.  And I believe there -- the press reported, and DHS confirmed as of November 17th, that he would be leaving.

Does that sound about right?

A.  That sounds about right, yes, ma'am.

Q.  And at the same time that it was announced -- or, sorry.

At the same time that it was confirmed by DHS that SOPDA Richardson was leaving, DHS also announced that you would be taking over that position.  Correct?

MS. KIES:  Object to form.

A.  Yes.

MS. LEONARD:  Okay.  Let's mark this as the next, which I think is --

thank you -- 11.

(Whereupon, Plaintiffs Exhibit 11 was marked for identification.)

Q.   Okay.  And this is an article that we printed from The Washington Post that was dated November -- it says it was updated November 17, 2025.

Do you see that on the first page?

A.   Yes.

Q.   Do you remember reading this article around this time?

MS. KIES:  Object to form.

A.   I don't remember actually reading this particular article, but I know the article was out there.

Q.   Okay.  And if you look on the second page, there is a confirmation from the Department of Homeland Security Assistant Secretary for Public Affairs Tricia McLaughlin that FEMA's current chief of staff, Karen Evans, will step "'into this important role' at the beginning of December."

Do you see that?

A.   Yes.

Q.   Okay.  Did someone from DHS leadership ask you whether you wanted to accept the role of FEMA

SOPDA?

MS. KIES:  Object to form.

A.    Yes.

Q.    And who was that?

A.    Deputy Chief of Staff Guy.

Q.    And, presumably, you said yes?

A.    Yes.

Q.    Did you have any conversations directly with former Secretary Noem about taking over as the FEMA SOPDA before you stepped into that role?

MS. KIES:  Object to form.

A.    No, I did not have direct conversations with her.

Q.    But Secretary Noem is the person who appointed you to that position.  Correct?

MS. KIES:  Object to form.

A.    Yes.

Q.    Okay.  And do you remember what day you began as the SOPDA?

A.    December 1st.

Q.    Okay.  You understand that as SOPDA, you can be removed at any time by the DHS Secretary?

MS. KIES:  Object to form, legal conclusion.

A.    I serve at the pleasure of the President.

I can be removed at any time.

Q.    But you also can be removed by the DHS Secretary.  Correct?

MS. KIES:  Object to form, legal conclusion.

A.    I can be removed at any time, as a political appointee.

Q.    You believe that the DHS Secretary has ultimate decision-making authority for FEMA because it's a component of DHS.  Correct?

MS. KIES:  Object to form.

A.    I believe that the secretary is involved in decisions as it relates to FEMA, but there are other decisions.

And, ultimately, the President of the United States is responsible for decisions for the executive branch.

Q.    As the SOPDA, you report to the -- you report directly to the DHS Secretary.  Correct?

A.    That is correct.

Q.    And in your view, decisions made by FEMA regarding staffing are ultimately subject to DHS decision-making.  Correct?

MS. KIES:  Object to form, misstates facts.

You can answer.

A.    I think it depends on the way that you're asking that question.  Based on the ways that, yes, FEMA is a component of DHS.

But the way that you're asking that specific question, there are some decisions that the head of FEMA, the -- I don't say SOPDA, I apologize -- that in that role, that you're allowed -- that you make.

And -- but there are some decisions that the secretary, through policy, had asked to also make, and those are sent up to DHS headquarters.

Q.    And DHS, the secretary, can also make policy decisions that you implement as the SOPDA of FEMA.  Correct?

MS. KIES:  Object to form, foundation.

A.    As a component of DHS, the secretary has the authority over components of DHS and their resources.

Q.    Including FEMA?

MS. KIES:  Object to form.

A.    FEMA is a component of DHS.

Q.    And in your experience, the DHS -- individuals in the DHS Office of the secretary did

make personnel decisions related to FEMA?

MS. KIES:  Object to form.

A.    I think you need to clarify that question for me, because DHS makes decisions as it relates -- it was specific to hiring recommendations, just like any other department or agency.  For example, senior executives goes through an executive review board.

And so, those policies were updated, and those types of decisions do go to DHS headquarters.

Q.    But they -- the DHS front office made personnel decisions for FEMA in 2025 that went beyond hiring, didn't they?

MS. KIES:  Object to form, foundation.

A.    I am not sure exactly what hiring decisions you are referencing.

Q.    So I was using the term "personnel decisions."  So that -- personnel decisions, I'm using that to include far more than hiring.

Let me ask a different thing.

On December 1st, it was announced by DHS that the political appointees at DHS had made certain decisions with respect to individuals who had signed something called the Katrina petition.

Are you familiar with that?

Page 182

MS. KIES:  Object to form.

A.   Yes.

Q.   So that's the very day that you started in the role of SOPDA.

There was confirmation that the DHS front office had been making personnel decisions for FEMA. Correct?

MS. KIES:  Object to form.

A.   I am aware that those employees that have signed the Katrina letter were placed on administrative leave, but that was prior to me assuming the role of the SOPDA.

Q.   And then they -- but you were the FEMA Chief of Staff, correct, at the time?

A.   Yes.  But those decisions were also made prior to me being the FEMA Chief of Staff as well.

Q.   And then -- but the decision to reinstate those individual employees and notify them of that, that was made while you were the FEMA Chief of Staff.  Right?

MS. KIES:  Object to form.

A.   That decision was made, not in conjunction with me as the Chief of Staff.

Q.   And then the political appointees in the DHS headquarters overruled FEMA's decision to

reinstate those employees.  Correct?

MS. KIES:  Object to form, foundation.

A.    That particular circumstance is -- my understanding is, is that the decision that was made there was made by a person within the FEMA CHCO office, and it did not clear through the office of the administrator.

MS. LEONARD:  Let's take a look at the next -- Exhibit 12, which is a New York Times article about those actions.

(Whereupon, Plaintiffs Exhibit 12 was marked for identification.)

Q.    Ms. Evans, you've been handed Exhibit 12, which is a article from the New York Times dated December 1, 2025, entitled "In a Reversal, FEMA Won't Reinstate Suspended Workers."

Did you read this article at the time?

MS. KIES:  Object to form.

A.    No, I did not.

Q.    If you look on the first page, there is a reference to Tricia McLaughlin, who we know is the spokesperson for DHS, and an email to the Times in which Ms. McLaughlin said:

...rogue "bureaucrats" had

sent those notices without the approval of senior department leaders.  After those leaders, who are political appointees, read news articles about the reinstatement, they reversed course....

Is that an accurate description?

MS. KIES:  Object to form, foundation.

A.    I think it depends on your point of reference when you use some of these words.

But the process that she's talking about in this particular case, as I previously stated, it was an employee in the FEMA CHCO office that did send out these letters to reinstate them.

Q.    But you also are aware that the DHS political appointees reversed that decision?

MS. KIES:  Object to form, foundation.

A.    Yes, I am aware of that.

Q.    And who made that decision?

MS. KIES:  Foundation.

A.    It's -- the way that this particular thing went down is I talked to DCOS Guy, and the guidance

was to reverse the decisions.

Q.    Do you know whether DCOS Guy, in fact, made that decision?

MS. KIES:  Object to form.

A.    I do not know if he made the decision on his own.

Q.    Because you're not aware of everyone that DCOS Guy discussed that personnel decision with within the Office of the Secretary.  Correct?

MS. KIES:  Object to form.

A.    Correct.

Q.    And you don't know whether DCOS Guy discussed it with Secretary Noem?

A.    I do not know the particulars of the discussions that happened at headquarters.

Q.    Or you don't know whether DCOS Guy discussed it with Corey Lewandowski either.  Right?

A.    I do not know who DCOS Guy discussed the decisions with at DHS headquarters.

Q.    If you look at the next page of the article, there's a quote from Ms. McLaughlin at the top paragraph.  And it says:

...adding that, quote,

this administration will not

tolerate rogue conduct,

unauthorized actions, or

entrenched bureaucrats

resisting change.

Do you have an understanding as to what change she was referring to there?

MS. KIES:  Object to form.

A.  I do not know what resistance to change that she is referencing in this quote.

Q.  You are familiar with the Katrina letter that was involved in this issue.  Right?

MS. KIES:  Object to form.

A.  Yes.

Q.  And the Katrina letter expressed concerns regarding the administration's efforts at downsizing the FEMA workforce, did it not?

MS. KIES:  Object to form.

A.  Yes, it did.

Q.  And so did you understand this reference by the DHS spokesperson to "bureaucrats resisting change" to be referencing changes to the workforce?

MS. KIES:  Objection; asked and answered.

A.  I understand that, the way that this was worked, is the change is about changes to happen to FEMA overall.

Q.    And what do you mean by that?

A.    What is happening, as we have previously discussed, is the FEMA Review Council was commissioned by the President.

And they're looking at potential changes and recommendations that would then go to the President, as it relates to changes for FEMA.

Q.    And you understood that Secretary Noem co-chaired that council.  Correct?

MS. KIES:  Object to form.

A.    Yes.

Q.    And that there was a draft report prepared for that council that was being edited by Ms. Noem around this time at the beginning of December 2025?

MS. KIES:  Object to form, foundation.

A.    I know that the FEMA Review Council was working on a draft report that -- because they had specific timelines that were outlined in the executive order, and that they were to then deliver the draft report and have a meeting, a public meeting, and then the report would go out for public comment.

Q.    Did you work on the draft report, Ms. Evans?

A.   No, I --

MS. KIES:  Object to form.

A.   No, I did not.

Q.   Did you ever see it?

MS. KIES:  Object to form.

A.   I have seen different versions of the draft report.

Q.   And when did you first see a version of the draft report?

A.   I cannot recall the specific dates of when I had seen the draft report.

Q.   Do you think it was before or after you took the position -- that you assumed the position of SOPDA?

A.   I saw a draft version of the report before I assumed the position of SOPDA.

Q.   And was it a draft report that had been edited by Ms. Noem?

MS. KIES:  Object to form.

And just caution the witness not to discuss deliberative process privilege, to the extent your answer --

A.   I don't know --

MS. KIES:  -- would divulge that.

A.    -- the answer to that question.

MS. LEONARD:  Do you represent the FEMA Review Council, Counsel?

MS. KIES:  I don't understand your question.

MS. LEONARD:  Do you represent the FEMA Review Council?

MS. KIES:  I represent the Department of Homeland Security, which has been sued as a Defendant, as well as FEMA and Ms. Evans, in her official capacity.

And if your question calls for deliberative process privilege, I'm just reminding the witness not to provide that.

MS. LEONARD:  On whose behalf are you asserting the deliberative process privilege?

MS. KIES:  The witness, in her official capacity.

BY MS. LEONARD:

Q.    Did you discuss the content of the report with anyone at DHS prior to December 12th?

A.    I participated in some meetings, because DCOS Guy, Deputy Chief of Staff Guy -- this was also in his -- the FEMA Review Council was also in his

portfolio, since he had FEMA.

Q.   You participated in some meetings that -- in which -- at which the draft report was discussed?

A.   In general, yes, ma'am.

Q.   And when did those meetings occur?

A.   I don't know the specific ones.

As I previously stated, I had weekly meetings with the DCOS.

And I know that he also had weekly meetings with the team that was working on the FEMA Review Council report.

Q.   And what do you recall DCOS Guy saying about the draft report?

MS. KIES:  Same instruction with respect to deliberative process privilege.

MS. LEONARD:  The --

MS. KIES:  You can answer, otherwise.

MS. LEONARD:  The question does not call for privilege, Counsel.

Q.   You can answer the question.

A.   Okay.  I don't really recall specific comments about the report.

Q.   At some point, you became aware of the content of the draft report.  Right?

A.   At some point.  But the version that I had -- like, there were changing versions.  I was not actively engaged in the FEMA Review Council process.

Q.   And you don't know what Secretary Noem edited in that draft report and what she did not. Correct?

MS. KIES:  Object to form.

A.   Yes.  I do not know.

Q.   At some point in time, you became aware that someone inserted a proposed 50% cut to the overall FEMA staff into that draft report.  Correct?

MS. KIES:  Object to form.

A.   Yes.  I became aware when that report was leaked to the press.

Q.   And how did you become aware that it was leaked to the press?

A.   Because the CNN article said it was leaked to the press.

Q.   Prior to that, did you know that there was a 50% cut in that draft report?

MS. KIES:  Object to form.

A.   Prior to that, I don't recall.  I would have to say no, I did not know that there was a 50% cut in that report.

Q.   And as of the time you became SOPDA, FEMA had approximately 23,000 employees.  Is that right?

MS. KIES:  Object to form.

Q.   Roughly?

A.   It depends on what you call "employees" as well, but, roughly, yes.

Q.   So a 50% cut would be approximately 11,500 employees.  Is that right?

MS. KIES:  Object to form.

A.   So again, I'm going to go back to it depends on what you categorize as employees, because they are done -- the financing and the way that employees are categorized in FEMA is a little bit different.

And so, it depends on what you mean by "employees."

Q.   Well, FEMA considers its employees to include the civil service and the Stafford Act employees, including CORE and reservists.  Correct?

MS. KIES:  Object to form.

A.   So reservists, it depends.  They report the number -- the number that you have, they do report those numbers as the FEMA numbers.

Q.   So if the FEMA number was around 23,000 as of the time that you became SOPDA, a 50% cut would

be roughly 11,500 employees.  Correct?

MS. KIES:  Object to form.

A.    If I just go on the straight numbers the way that you're presenting them, yes.

MS. LEONARD:  Mark this as Exhibit 13.

(Whereupon, Plaintiffs Exhibit 13 was marked for identification.)

Q.    Ms. Evans --

MS. LEONARD:  This is the last page.

Q.    -- you've been handed what's been marked as Exhibit 13.  It's a document entitled "Draft Final Report, The President's Council to Assess the Federal Emergency Management Agency."  The date on the cover is December 11, 2025.

I'm not going to ask you questions about this entire report.  But let me know when you're ready.

A.    Okay.

Q.    This report has never been published in final form.  Correct?

MS. KIES:  Object to form, foundation.

A.    Yes, that's my understanding.

Q.   And there was a scheduled December 12th meeting that was canceled.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's correct.

Q.   And you have referenced earlier that you became aware through a CNN article that the report was leaked to the press.  Is that right?

A.   Yes, that there was a report that was leaked to the press.

Q.   And do you know who leaked the FEMA Review Council report to the press, Ms. Evans?

A.   No, I do not.

Q.   Do you know whether former Secretary Noem leaked the report to the press?

MS. KIES:  Object to form.

A.   No, I do not.

Q.   Have you ever heard anything about that?

MS. KIES:  Object to form.

A.   No.

Q.   What about Mr. Lewandowski; have you ever heard anything about his leaking the report to the press?

MS. KIES:  Object to form.

A.   No.

Q.   What about Ms. Voorhies; do you know

whether Ms. Voorhies had access to the draft DHS FEMA Council report?

MS. KIES:  Objection; form and foundation.

A.   I do not know what versions of the reports that Ms. Voorhies would have access to.

Q.   Are you aware that she had access to some version of the reports?

MS. KIES:  Object to form.

A.   I am aware that she participated in those meetings that I previously mentioned that were with the FEMA Review Council team.

But I don't know specifically what versions of the reports that she would have access to.

Q.   Do you know whether Ms. Voorhies edited the Review Council report?

MS. KIES:  Object to form.

A.   I do not know if she specifically edited the reports.

Q.   Do you know whether anyone in the DHS front office edited the report?

MS. KIES:  Object to form.

A.   I am not aware.  I do not know of anyone editing the report.

Q.   Other than Ms. Noem?

MS. KIES:  Object to form.

A.   I do not know if Ms. Noem specifically edited the report.

Q.   Okay.  So if you turn to Page 7 of this draft that's in front of you, in the second paragraph, there's a sentence that says:

FEMA 2.0 should reduce overall staffing by approximately 50%....

Do you see that?

A.   Yes, I do.

Q.   Do you know who wrote that language?

A.   No, I do not.

Q.   You did not write that language.  Correct?

A.   I did not write that language, yes, ma'am.

Q.   And when did you first become aware that the draft council report contained this 50% staffing cut?

MS. KIES:  Object to form, asked and answered.

A.   When the report was leaked.

Q.   What is your understanding of the reason that the December 12th meeting of the FEMA Review Council was canceled?

MS. KIES:  Objection;
foundation.

A.   I don't know the reason why the meeting was canceled.

Q.   Do you have any understanding as to why it was canceled?

MS. KIES:  Object to form.

A.   I do not.  And I don't -- I wouldn't speculate on any reasons of why the White House would cancel a meeting, or DHS would cancel a meeting, as it relates to the FEMA Review Council.

Q.   Do you believe the White House canceled the meeting?

MS. KIES:  Object to form.

A.   I don't know.  That's why I'm saying I'm not speculating on who canceled the meeting.

Q.   Was someone named Stephanie Dobitsch involved in providing information to the White House that led to the cancellation of this meeting?

MS. KIES:  Object to form, foundation.

A.   I would have no knowledge of her providing information to the White House that would lead to the cancellation of the meeting.

Q.   Do you know who -- how do you pronounce

her name?

A.   You pronounced it correctly.

Q.   Okay.  Stephanie Dobitsch, who is -- who, at the time, was Stephanie Dobitsch?

A.   Stephanie Dobitsch was a principal, as we talked about previously.  She was a leader, career leader, within FEMA, working for Mr. Richardson.

Q.   And in -- at some point in December, you formed the belief that Ms. Dobitsch had provided information to the White House that was contrary to DHS leadership instructions.  Correct?

MS. KIES:  Object to form.

A.   I have no knowledge of Ms. Dobitsch providing information to the White House that's contrary to FEMA leadership or to DHS leadership.

Q.   And as a result of that belief, you asked the DHS management directorate to give her an MDR out of FEMA.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.   That is not correct.  And that is not the basis for the management directed reassignment.

Q.   Please explain what a "MDR" is.

A.   A management directed reassignment is the ability to take SESs and move them to other SES

positions within the department or within the federal government as a whole.

Q.   And you did that -- you asked for Ms. Dobitsch to be MDR'd out of FEMA because you believed she was not sufficiently implementing the secretary's priorities and plans for FEMA.  Correct?

MS. KIES:  Object to form.

A.   That's incorrect.  That is not the basis of my request for her management directed reassignment.

Q.   And you talked about that action with Kara Voorhies before you requested that MDR.  Correct?

MS. KIES:  Object to form.

A.   I discussed that I requested the MDR, the management directed reassignment, for Stephanie Dobitsch with Kara Voorhies.

MS. LEONARD:  Let's take a look at Exhibit 14.

(Whereupon, Plaintiffs Exhibit 14 was marked for identification.)

Q.   Ms. Evans, you've been handed what's been marked as Exhibit 14.  And it is an email from you, on December 17th, to someone named Greyson McGill. And you copy Kara Voorhies.

And the email reads:

I need to have Stephanie Dobitsch MDR out of FEMA.

Do you see that?

A.    Yes, ma'am.

Q.    And you say:

Additionally, she bypassed DHS guidance and sent information directly to the White House which was incorrect.  These are just the issues this week.

Do you see that?

A.    Yes.  But that is not specifically related to the FEMA Review Council report, as you previously stated.

Q.    My question was generally whether you thought that she should be MDR'd because she passed information to the White House that was contrary to DHS priorities.

MS. KIES:  Object to form.

Q.    Did you agree with that?

MS. KIES:  Object to form.

A.    Okay.  The -- this email specifically says that she sent information directly to the White House which was incorrect.  Yes.

Q.   What information was that?

A.   I believe, and I have to go back and look, that it was specifically related to -- she -- her portfolio included the different policies that are associated like with the Defense Production Act and NATO and a couple other areas.

And so, there was some information that she passed on directly that did not clear through DHS policy.

Q.   And DHS did issue an MDR to move Ms. Dobitsch out of FEMA.  Correct?

MS. KIES:  Object to form.

A.   Yes, they did.

Q.   And they put her in the Office of Inspector General.  Is that right?

MS. KIES:  Object to foundation.

A.   That is not correct.  So Ms. Dobitsch had applied for a job at the Office of Inspector General, and that coincided at the same time that the MDR request was put in.

Q.   Do you know where she ended up?

A.   It's my understanding that she is at the inspector general's office.

Q.   Okay.  And you say here:

I have discussed the MDR

with Kara, and she agrees.

Please let me know what else

you may need.

Do you see that?

A.   Yes, I do.

Q.   Is that true, that you had discussed this MDR with Kara Voorhies?

MS. KIES:  Object to form, asked and answered.

A.   Yes.

Q.   And when you testified earlier that you made sure that Kara Voorhies was not involved in any personnel decisions at FEMA, that testimony was not accurate.  Correct?

MS. KIES:  Object to form.

A.   She didn't make this decision.  Ms. Voorhies didn't make this decision.

I made the decision, and I informed her of the decision.

Q.   It says here that you "discussed the MDR with Kara, and she agrees."

Was that -- that's the discussion that you had.  Right?

MS. KIES:  Object to form.

A.   Yes.  But I made the decision and had

already contacted and talked to Greyson, and then followed up with this email.

And so, I did make the decision, contacted headquarters, and requested the MDR. And then I did discuss it with her, and she agreed.

Q. And you testified earlier that you made sure that Kara Voorhies was not involved in any personal decisions at FEMA.

And so, when you testified that way, you didn't mean that she wasn't involved in the discussions of personnel decisions?

MS. KIES: Object to form.

Q. Is that what you meant?

MS. KIES: Object to form.

A. What I meant was, I make the decisions. And as the senior advisor to the secretary, I inform her and discuss different decisions so that she's informed of actions that are happening at FEMA so that she's aware of issues as the advisor.

Q. I understood your testimony that you took precautions so that she wouldn't be involved, including not having her at any meetings.

Wasn't that your testimony earlier?

MS. KIES: Object to form.

A. Yes, that is true.

Q.   But there's an exception for talking to her on the phone?

MS. KIES:  Object to form, misstates testimony.

A.   This is not a meeting.  And this was me informing Ms. Voorhies that I made the decision to MDR Stephanie Dobitsch.

And I was discussing it with her and -- so that she would be aware of the issue.

Q.   And why did you feel the need to tell Greyson McGill that you had Kara's approval for this MDR?

MS. KIES:  Object to form, misstates evidence.

A.   Okay.  This doesn't say that I have her approval.  It says that she agrees.

Because she's the secretary's advisor for FEMA issues and since this affects FEMA, Greyson would check with her, or double-check with her, or check in with her -- I'm not sure of all the processes up there -- to make sure that she was aware of the actions that we were taking at FEMA.

Q.   And who is Greyson McGill?

A.   Greyson McGill is the Chief of Staff for the management directorate.

Q.   Okay.  You can set that aside for now.

You understand that in October of 2025, the President issued an executive order called "Ensuring Continued Accountability in Federal Hiring" that required agencies to submit something called "annual staffing plans"?

MS. KIES:  Object to form.

A.   Yes.

Q.   Okay.  Let's -- I'm just going to show you -- this is the executive order.

MS. LEONARD:  We can mark it next line, which is 15.

There you go.  Okay.

(Whereupon, Plaintiffs Exhibit 15 was marked for identification.)

Q.   Okay.  And this is Executive Order 14356, dated October 15, 2025.

So you understand that this is the executive order that refers to annual staffing plans.  You see that reference at the bottom. Right?

A.   Yes, ma'am.

Q.   And you see that the President ordered agencies to submit final annual staffing plans to OPM and OMB.

Do you see that?

A.    Yes.

Q.    Okay.  And that, I believe, the President gave a 60-day deadline in here for the submission of those final plans.

"Within 60 days of the date of the order."

Do you see that?

Sorry.  It's Section 2(c)(i).

A.    Oh.  Yes, I do.

Q.    Okay.  And you also understand that OMB and OPM subsequently issued implementing memorandum -- an implementing memorandum instructing agencies that they had a deadline of December 1st?

MS. KIES:  Object to form.

A.    We had guidance from them, yes.  I don't recall the due date.

Q.    Do you recall that it was around December 1st?

A.    I recall that we had an assignment in October to do this activity.

Q.    But -- and you were aware that there was a deadline for OPM and OMB?

MS. KIES:  Object to form.

A.    Yes.  There's a deadline for them, yes, based on this executive order.

Page 207

Q.    And do you recall that in November, the DHS Chief Human Capital Officer, Roland Edwards, asked the various components of DHS to submit information to contribute to the DHS final agency -- annual staffing plan?

MS. KIES:  Object to form.

A.    Yes.

MS. LEONARD:  Okay.  And -- all right.  We'll mark this next, Exhibit 15 -- 16.  Sorry.

(Whereupon, Plaintiffs Exhibit 16 was marked for identification.)

Q.    Okay.  This is an email chain that was produced to us by Defendants.  I'm going to direct your attention to the email that is, I think, the first in line, actually.

So on the very last page of this, there is a November 21st email from Roland Edwards.

Let me know when you're ready.

(Witness reading.)

A.    Okay.

Q.    So this November 21st email from Roland Edwards, is this the instructions from the DHS CHCO that you recall being sent out about the President's executive order?

Page 208

MS. KIES:  Object to form.

A.   I don't recall seeing this, but that is the -- what this email states.

Q.   And do you see here that he says:

> To facilitate this process, we have attached a standardized template that aligns with the OMB -- OPM/OMB reporting requirements.

In the second paragraph.

> To facilitate this process, we have attached....

A.   Oh, yes.  I see it.

Q.   And then he explains that:

> The staffing plan takes a bottoms-up approach to determine the appropriate staffing levels needed to support the president's priorities, mission-critical areas, and statutory obligations.

Do you see that?

A.   Yes.

Q.   So you understood that that -- at the

time, that that was the instruction being given to the FEMA components, that they were -- I'm sorry.

Let me just restate that one.

You understood, at the time, that the various DHS components were being asked to conduct a bottoms-up approach to determining appropriate staffing levels and providing data to the DHS CHCO to support that?

MS. KIES:  Object to form.

A.  I understand we received the guidance, yes.

Q.  And it also says:

Components should distribute the template to their lowest level offices, as designated in the template.

A.  Yes.

Q.  Do you see that?  Okay.

And he gives a deadline of December 3rd. Right?

A.  Yes.

Q.  And that deadline was after you started performing the duties of FEMA administrator.  Right?

A.  Yes.

Q.  Okay.  And you complied with this request

from the DHS CHCO, on behalf of FEMA, by sending FEMA's contribution to the staff -- annual staffing plan?

MS. KIES:  Object to form.

A.   We worked to meet the assignment, yes.

Q.   And you personally sent FEMA's contribution to the annual staffing plan.  Isn't that correct?

MS. KIES:  Object to form.

A.   I don't recall sending it personally, because of the way that this went out.  I do not recall personally transmitting it.

Q.   Do you recall working on this?

MS. KIES:  Object to form.

A.   So in looking at this correspondence, yes, because, in different roles within FEMA, as I previously stated, we have worked on different levels of staffing.

Q.   Do you recall approving the FEMA submission as SOPDA?

MS. KIES:  Object to form.

A.   Yes.  I mean, no, I don't recall it, but, yes, I would have had to approve it.

Q.   And if you look on the second page, it's Bates No. -2354, there's a reference to the staffing

plan that was submitted by FEMA on December 4th.

Do you see that?

A.    I see the references to the email here, yes.

Q.    It's from someone named Puneet?

A.    Yes.

Q.    Puneet works in the Office of the Administrator.  Correct?

A.    Yes, she does.

Q.    And Puneet says:

Attached is the staffing plan that was submitted 12/4.

Do you see that?

A.    Yes.

Q.    Do you have any reason to believe that the FEMA contribution to the DHS annual staffing plan was submitted on any day other than December 4th?

MS. KIES:  Object to form.

A.    I do not have any knowledge of it being submitted any other date but than what's in this email.

Q.    Okay.  And you understood, at the time, that FEMA was submitting the plan for S1 approval. Correct?

MS. KIES:  Object to form.

A.    I know that we were doing the assignment that was given to us as it related to the annual staffing plan and the second quarter updates.

Q.    And you also know that the FEMA staffing plan that you submitted on December 4th was, in fact, approved by S1 and included in what was sent to OMB and OPM.  Correct?

MS. KIES:  Object to form, foundation.

A.    I do not know the actual process after we submitted it up to DHS headquarters.

Q.    You know that the content of what FEMA included in that plan was submitted to OMB and OPM. Correct?

MS. KIES:  Object to form, foundation.

A.    I do not know if it was specifically submitted to OMB and OPM, but I know we completed the assignment.

Q.    It's your testimony, Ms. Evans, that you do not know what was submitted to OMB and OPM for the FEMA annual staffing plan?

MS. KIES:  Object to form.

A.    That's not my testimony.  My testimony is I do not know what DHS headquarters transmitted.

I do know that we transmitted our staffing plan and the quarterly updates to DHS headquarters.

Q.    Did you transmit anything directly to OPM and OMB?

MS. KIES:  Object to form.

A.    I personally did not.  I do not know if the process included the FEMA CHCO to submit things concurrently to OMB and OPM.

Q.    You didn't receive a rejected FEMA staffing plan back from DHS Secretary Noem in December of 2025.  Correct?

MS. KIES:  Object to form.

A.    I did not receive any other information back, that I recall, related to this deliverable.

Q.    Did you participate in conversations with anyone in the DHS headquarters regarding the FEMA staffing plan in December of 2025?

MS. KIES:  Object to form.

A.    I do not recall having specific discussions with anyone at DHS headquarters about this deliverable.

Q.    It's possible that you did have those conversations, though?

MS. KIES:  Object to form.

A.    I do not recall any conversations about

this specific deliverable.

Q. You are aware that FEMA's OCHCO worked with the various FEMA component offices to compile program and office-level information as part of the FEMA plan, and provided that to you for approval?

MS. KIES: Object to form.

A. I'm aware that that's the process, yes.

Q. And you're aware that that actually happened. Correct?

MS. KIES: Object to form.

A. So at this time, I am aware that that's what they said that they did.

And I'm talking about the FEMA CHCO office, that that's what they said that they did.

Q. The FEMA CHCO compiled the program and office-level information and provided it to you for review and approval as the FEMA annual staffing plan. Correct?

MS. KIES: Object to form.

A. The FEMA CHCO office would -- provided this deliverable through the process that FEMA has established for review.

And then I did the final review and approved it for submission.

Q. You reviewed what the FEMA CHCO office

recommended to you to include in that plan.
Correct?

MS. KIES:  Object to form.

A.    I reviewed what the FEMA CHCO Officer sent to the FEMA leadership, because it runs through a process that includes offices to review it before it comes to me for final submission.

Q.    And you did not submit the FEMA CHCO's recommended annual staffing plan to DHS, did you?

MS. KIES:  Object to form.

A.    I did not submit the plan personally.

I know that we worked on due dates to submit information as the department tasked it to us.

Q.    FEMA did not submit the plan and the data that the FEMA CHCO office had provided to you as the annual staffing plan to DHS.  Correct?

MS. LEONARD:  Object to form, foundation.

A.    I cannot definitively answer that question.

Q.    You altered the recommendations of the FEMA CHCO by cutting the staff numbers for FEMA in that plan in half, did you not, Ms. Evans?

MS. KIES:  Object to form.

A.    I do not recall the specific activities associated with this deliverable.

Q.    You don't recall cutting the number of FEMA staff in half in the plan that you submitted to the Department of Homeland Security?

MS. KIES:  Object to form.

A.    I know that at that time, to be consistent with other deliverables, there were numbers that we looked at, based on mission essential task analysis.

But for this specific deliverable, I do not recall modifying this deliverable.

Q.    Do you recall that the FEMA components projected a need for approximately 24.8 thousand FEMA staff for fiscal year 2026 in what they provided to you?

MS. KIES:  Object to form.

A.    I do not recall that specific number.

Q.    And that you sent a staffing plan to the Department of Homeland Security that included roughly 11,500 total FEMA employees for fiscal year 2026?

MS. KIES:  Object to form.

A.    I know I submitted information that was consistent with previous information that was submitted under these similar exercises that match

those numbers.

So I do not know the specific number that you're recalling.  And I do not recall, in particular, modifying this specific deliverable to those numbers.

Q.  You don't recall sending a staffing plan that cut FEMA in half days after you took over as the SOPDA of FEMA?

MS. KIES:  Objection; asked and answered.

A.  I know that I worked on multiple staffing plans.  And so, I do not recall the specific date of the deliverable.

Q.  But you know you cut the staff in half in what you gave to DHS, don't you, Ms. Evans?

MS. KIES:  Object to form; asked and answered.

A.  I know that on multiple staffing plans that we projected out the ability to reduce the staffing of FEMA.

Q.  In early December, Ms. Evans, you provided to DHS a FEMA annual staffing plan that cut the FEMA staffing in half, did you not?

MS. KIES:  Objection; asked and answered.

Page 218

A.   I do not recall that specific date.

Q.   Do you recall submitting a FEMA staffing plan that cut the staff in half?

MS. KIES:  Object to form.

A.   I recall submitting various staffing plans that had various scenarios that would cut the FEMA's staff.

Q.   And one of them cut it in half.  Right?

MS. KIES:  Object to form.

A.   That was one of the options that was sent forward.

MS. LEONARD:  Let's mark this as the next, which is 17.

(Whereupon, Plaintiffs Exhibit 17 was marked for identification.)

Q.   This is a document that was produced to us by counsel for Defendants.

MS. KIES:  Can I just ask, Danielle, did we include the, paren, employee plan with the Bates number?

MS. LEONARD:  No.  This was produced as a native spreadsheet in Excel format.

MS. KIES:  Right.

MS. LEONARD:  It was an

attachment to an email.  And the employee plan was the worksheet title of this page of the spreadsheet.

MS. KIES:  Okay.

MS. LEONARD:  Does that make sense?

MS. KIES:  Do you have the email, by any chance?

It does make sense.

MS. LEONARD:  We do have the email, which I can get to you in a moment.

But this was -- it was -- the Bates number is next in line for the attachment, and you submit -- you produced a "produced in native format" for that Bates number.  And that's the Bates number that appears on this document.

Does that make sense?

MS. KIES:  Okay.

BY MS. LEONARD:

Q.   Does this look familiar to you, Ms. Evans?

A.   Yes, it does.

Q.   And if you look at the bottom, what's the total projected 2026 staffing for FEMA that's listed on this document?

A.    The number is 11,383.

Q.    And 11,383 represents a more than 50% cut in the then current numbers of FEMA staff, does it not?

MS. KIES:  Object to form.

A.    Well, I don't have the exact percentage, but it's a cut.

Q.    It's a -- it's approximately 50%. Correct?

MS. KIES:  Object to form.

A.    Yes.

Q.    And do you have any reason to believe this is not the document that you sent to DHS leadership to -- as the FEMA annual staffing plan?

MS. KIES:  Object to form.

A.    I have no reason to believe this is not the document.

Q.    And does this document refresh your recollection that this is what you sent to DHS leadership on December 4th as the FEMA annual staffing plan?

MS. KIES:  Object to form.

A.    Yes, because it's consistent with previous documents that we sent forward to OPM and OMB.

Q.    When did you first send forward to OPM and

OMB a document that showed a 50% staffing cut for FEMA?

MS. KIES:  Object to form.

A.  I don't recall specifically, but as I previously stated, there were multiple exercises where we had to look at the staffing.

And so, it was based on guidance that came from OPM and OMB.  And then we would send forward the numbers to the DHS CHCO, and then looked at the staffing according to those guidance.

So I do recall seeing that -- I recall these numbers, yes.

Q.  Can you tell me how the 11,383 number was calculated for the fiscal year 2026 projection of staff at FEMA?

MS. KIES:  Object to form.

A.  I can tell you that this was based on analysis that was previously done by the group that was working specifically with Mr. Richardson that was called -- it's OPPA, which is Office of Policy -- Policy, Planning and Analysis -- based on mission essential functions and the analysis that Mr. Richardson did based on mission essential functions.

Q.  And you approved this as the plan to be

Page 222

sent to DHS?

MS. KIES:  Object to form.

A.   Yes.

Q.   And you knew, at the time, that this was a roughly 50% cut from what the FEMA components and programs were telling you that they needed for fiscal year 2026.  Correct?

MS. KIES:  Object to form.

A.   Yes.

MS. LEONARD:  I think now is a good time for -- I was just looking at the clock.  I think now is a good time for a break.  So let's do 10 minutes and resume at approximately 2- -- 2:47.

VIDEOGRAPHER:  Off the record at 2:37.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 2:49.

BY MS. LEONARD:

Q.   Ms. Evans, before we took the break, we were talking about the FEMA annual staffing plan numbers that were sent over to the Department of Homeland Security in Exhibit 17.

Do you recall that testimony?

A.   Yes, ma'am.

Q.   Can you look at Exhibit 10 --

MS. LEONARD:  Is it 10 or 16?

Q.   Sorry.  Your notes from your planner, which I think is Exhibit 10.

MS. LEONARD:  Thanks.

A.   Okay.

Q.   Do you have it?

A.   Yes.

Q.   And if you turn internally, using the Bates numbers at the bottom, to Page -- the page that ends in -34.  So it's -33534.

The date at the top is Thursday, December 4, 2025.

A.   Okay.

Q.   You have that page in front of you?

A.   Yes.

Q.   And you see there's a notation here -- the last one at the bottom of the page.

Can you read that, please.  Out loud.

A.   The last number -- the last thing says:

Talked to Kara.

"RE" means subject.

The number is 11,383 and the top line.

I can't read my own writing, and then it says:

CC her.

Q.  "Will CC her," potentially?

A.  That's probably what it says.

Q.  Does this refresh your recollection that you are the person who sent the FEMA annual staffing plan with the number 11,383 to DHS on December 4th, and you copied Kara Voorhies?

MS. KIES:  Object to form.

A.  Yes, that's what this indicates.

Q.  And this -- you did that.  Correct, Ms. Evans?

MS. KIES:  Object to form.

A.  I don't recall the exact email, but my notes say that I did that.

Q.  And you generally tried to take accurate notes.  Correct?

MS. KIES:  Object to form.

A.  Yes, ma'am.

Q.  You did not provide a copy of the FEMA annual staffing plan that you sent to DHS to FEMA leadership in December 2025, did you, Ms. Evans?

MS. KIES:  Object to form.

A.  I don't recall distributing this staffing

plan, yes, because it was still pre-decisional at that point.  So I did not widely distribute this staffing plan.

Q.   But you know that this staffing plan and that number was sent to OMB and OPM in the final DHS staffing plan, don't you?

MS. KIES:  Objection; foundation, misstates testimony.

A.   I do not know for a fact if this was the final number that was sent forward by DHS CHCO in the staffing plans that went to -- if they went to OMB and OPM.

Q.   But you do know that OMB and OPM were told of a 11,500, approximate, staffing number for fiscal year 2026 at some point.  Correct?

MS. KIES:  Object to form.

A.   I do know that we sent this number forward as a proposed number for fiscal year 2026.

Q.   To OMB and OPM?

MS. KIES:  Object to form.

A.   To DHS CHCO.

Q.   And that number was provided -- you know that that number was provided to OMB and OPM, don't you, Ms. Evans?

MS. KIES:  Object to form, asked

and answered, foundation.

A.    You're specifically asking me if I know that they transmitted this number directly to OPM and OMB, and I do not have knowledge of the transmission of this number by the DHS CHCO to OPM and OMB.

I know we transmitted the number to DHS CHCO.

Q.    And you know that S1 gave her approval for the staffing plan that included the FEMA staffing plan that cut FEMA in half in what was sent to OMB and OPM, don't you?

MS. KIES:  Objection; foundation, asked and answered.

A.    I do not know the process that DHS headquarters did as it relates to the secretary's approval on all the component staffing plans that were submitted to DHS CHCO.

MS. LEONARD:  Can you read that back to me, please.

(Whereupon, the court reporter read back from the record as follows:

"A    I do not know the process that DHS headquarters did as it relates to the

secretary's approval on all the component staffing plans that were submitted to DHS 'OCHCO.'")

Q.    Ms. Evans, you know that DHS submitted the staffing plan for FEMA to OMB and OPM that cut FEMA's numbers in half, don't you?

MS. KIES:  Objection; foundation, asked and answered several times.

A.    I do not know for a fact that DHS CHCO submitted this staffing plan directly to OMB and OPM.

Q.    That is not my question.

You know that DHS gave the number of roughly 11,500 to OMB and OPM for the FEMA annual staffing plan for fiscal year 2026, don't you?

MS. KIES:  Objection; foundation.

A.    You are specifically asking me if I know that DHS gave this number, 11,383, specifically to OMB and OPM for FEMA.

And I do not know for a fact that this number, 11,383, was transmitted to OMB and OPM.

Q.    Do you know that the approximate number of

11,500 was transmitted to OMB and OPM for the FEMA staffing for fiscal year 2026?

MS. KIES:  Object to form, foundation.

A.    I know that we submitted this number.  I submitted this number.

And I do not know what the final submission looks like that the DHS CHCO submitted to OPM and OMB.

MS. LEONARD:  Okay.  Let's mark this as the next.

COURT REPORTER:  18.

MS. LEONARD:  18.

(Whereupon, Plaintiffs Exhibit 18 was marked for identification.)

Q.    Ms. Evans, you've been handed a email chain that was produced to us by Defendants.  The top email is dated December 23rd, but I am going to direct your attention to an email in the middle of the chain on the one, two, three, four -- fourth internal page that is numbered -7336 at the bottom.

It is an email from you, on December 17th. Let me know when you're there.

MS. KIES:  And, of course, if the witness wants to review the whole

document, she can.

(Witness reading.)

A.   Okay.

Q.   So I'm going to direct your attention to the email that you sent on December 17, 2025 at approximately 9:51 p.m.

Do you see that, on Page -7336?

A.   -7336?

Q.   It is to Micah Bock.

A.   Okay.  Hold on a second.

(Pause.)

Okay.

Q.   And in this -- Ms. Evans, do you recall writing this email?

A.   Yes.

Q.   And in this email, you say:

The number of 11,500 is also what we have provided to OMB -- to OPM/OMB at a high level but we haven't made that public.

Do you see that?

A.   Yes, I do.

Q.   Does that refresh your recollection that the number of FEMA staff for the fiscal year 2026

was provided to OPM/OMB as the FEMA final staffing plan?

A.   As I --

MS. KIES:  Object to form.

A.   As I previously stated, I submitted these numbers through the exercise that was directed by the department CHCO, and that those are the numbers.

And I -- you asked me specifically if I know that they actually transmitted them, and I do not know.

That's why I said these are the numbers that we provided.  And it was for that exercise.

Q.   But here on December 17th, you were saying, "We have provided to OPM and OMB at a high level," that number.  Right?

A.   Because it was part of the exercise.  Yes, ma'am.

Q.   But you believed this to be true on December 17th, that that number had been provided to OPM and OMB.  Correct?

MS. KIES:  Object to form.

A.   That's what my email states, yes.

Q.   And you believed that that was true, correct, when you wrote it?

MS. KIES:  Object to form.

A.    I believed that that was true when I wrote the email, yes.

Q.    And the rest of the email is true as well, that 50%, referring to a 50% cut of the FEMA staff, was used internally.  Correct?

A.    Yes.

Q.    And the 50% was also in the "leaked report."  Correct?

A.    Yes.

Q.    And the "leaked report" refers to the FEMA Review Council report -- draft report that we've been discussing?

A.    Yes.

Q.    And the "high level" reference here, when you say, "We've provided that to OPM and OMB at a high level, but we haven't made that public," Exhibit 17 is the high level that you're talking about.  Right?

MS. KIES:  Object to form, foundation.

A.    That could be, because -- but these numbers don't specifically match because there were -- as I previously stated in my testimony, there have been multiple exercises as it relates to different staffing within FEMA that we were working

on in different -- in my different roles.

And so, that's why it's an internal number. And that number is not public because it was delivered to....

Q. Ms. Evans, is it a coincidence that the 50% cut in the leaked draft report was the same as the 50% cut that you put in the FEMA staffing plan?

MS. KIES: Object to form.

A. I can't speak to the 50% cut that's in the FEMA Review Council report.

Q. You were implementing the DHS Secretary's priorities and plans for FEMA, as you understood them, when you put the 50% cut in the FEMA annual staffing plan, were you not?

MS. KIES: Object to form.

A. I was following through to make sure that our numbers were consistent, because my first role there was as the senior advisor to Mr. Richardson, and Mr. Richardson's analysis was projected to cut FEMA by 50%.

And so, the documents that were done through -- which I previously mentioned the mission essential tasks.

And looking at that, Mr. Richardson projected that he could cut the staff by 50%.

Q.   That was DHS direction, was it not, Ms. Evans?

MS. KIES:  Object to form, foundation.

A.   I'm not sure of Mr. Richardson's direction to cut the staff by 50%.

Q.   So when you approved the FEMA annual staffing plan, it's your testimony you were simply relying on whatever Mr. Richardson had done before you?

MS. KIES:  Object to form.

A.   No.  It's my testimony that I was making sure that the data that we had submitted was consistent, because these exercises were all internal and were deliberative.

And so, I wanted to make sure that data was consistent with previous submissions that we had sent up to the department.

Q.   Ms. Evans, you understood, as we've talked about from the outset, that DHS was to provide a final annual staffing plan to OMB and OPM, per the President's executive order.  Correct?

MS. KIES:  Object to form.

A.   Yes, ma'am.

Q.   And you are contributing these numbers for

inclusion in the final annual staffing plan that was to go to OPM and OMB.  Correct?

MS. KIES:  Object to form.

A.    Yes, ma'am.

Q.    And you did not do any independent analysis yourself that resulted in a 50% cut to FEMA's staff based on FEMA functions or FEMA needs. Correct?

MS. KIES:  Object to form.

A.    That is not a correct statement.  I did the analysis based on the data that was provided to Mr. Richardson, based on analysis that was done by Stephanie Dobitsch in OPPA; and did that analysis to come up with these numbers, based on the functions that they said were aligned to the statutory responsibilities of FEMA.

Q.    Were those documents that you reviewed before cutting the FEMA numbers in half?

MS. KIES:  Object to form, misstates evidence.

A.    Those were internal documents that were produced, based on analysis of staffing that was currently there at FEMA.

And then -- also, then, the analysis of what functions, based on what was statutorily

required; also based on overall statements that were made of locally led, you know, state managed, federally supported.

Q.   Is it your testimony that you were not provided direction from the DHS headquarters to include a 50% cut in the FEMA annual staffing plan, Ms. Evans?

MS. KIES:   Object to form.

A.   Can you restate that one more time?

Q.   Sure.

Are you testifying that you were, in fact, not told by the DHS leadership to include a 50% cut in the annual staffing plan?

MS. KIES:   Object to form.

A.   I was told to include an option that would include a 50% cut.

Q.   And who told you that?

A.   Again, those discussions happened with the deputy chief of staff, Joe Guy.

Q.   And Kara Voorhies was aware of these conversations because, as we saw in your notes, you talked to her about the 11,383 number that was being submitted as the final number on December 4th. Correct?

A.   Yes.

Page 236

MS. KIES:  Object to form.

Q.    And she is also DHS front office. Correct?

MS. KIES:  Object to form.

A.    She -- as I previously stated, she's the senior advisor to the counselor for FEMA issues.

Q.    And you are not aware of who was directing DCS -- DCOS Joe Guy to tell you to include that 50% option.  Correct?

MS. KIES:  Object to form.

A.    I did not participate in specific discussions, other than the one that I mentioned with DCOS Guy.

Q.    And you're not aware of who was telling DCOS Guy to tell you to include a 50% cut in the FEMA annual staffing plan.  Correct?

MS. KIES:  Object to form.

A.    Yes, that is correct.

Q.    And you know that DCOS Guy reports to Secretary Noem.  Correct?

A.    Yes.

MS. KIES:  Object to form.

Q.    You also were aware, at the time that you submitted this 11,383 number, that the component -- FEMA component programs and offices were projecting

a much higher number as needed for fiscal year 2026. Correct?

MS. KIES:  Object to form.

A.   Yes.  And that was based on their current understanding of the work that they were doing.

Q.   And that would -- they would need to do in 2026.  Correct?

MS. KIES:  Object to form.

A.   The work that they -- that was based on the work that they believed that they would be doing in 2026, as we had not received the final recommendations, as approved by the President, for the future of the FEMA Review Council.

MS. LEONARD:  Let's mark this as the next, 19.

(Whereupon, Plaintiffs Exhibit 19 was marked for identification.)

Q.   So, Ms. Evans, you're being handed an email that was sent on January 5th from someone named Jeffrey Neurauter.

My first question is going to be:  Do you know who Jeffrey Neurauter is?

A.   No, I do not.

Q.   Okay.  His signature says that he is the director of Policy, Planning and Accountability

Page 238

Division in the FEMA, OCHCO Office.

Do you see that?

A.   Yes, I do.

Q.   Okay.  So Mr. Neurauter, in this email, is recounting a history of the annual staffing plan. And I'm going to point out -- and he has attached some of the spreadsheets and documents that we have been discussing.

And I'm going to ask you about a few of his statements here.

So he -- at the top, he's referring to the November 21, 2025 DHS OCHCO email.  We've already looked at that.

You're familiar with that.  Correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   And then it says here:

Following the instructions
provided, FEMA OCHCO sent the
data call template to
program/regional offices to
collect information showing
hiring and reduction
estimates....

And a number of other things.

Do you see that sentence?

A.   Yes.

Q.   Do you have any reason to believe that that was not true?

MS. KIES:  Object to form, foundation.

A.   No.  I have no reason to believe that's not true.

Q.   And then it says that:

Three versions of an Annual Staffing Plan were created and forwarded to the Office of the Administrator for consideration and approval.

Do you see that?

A.   Yes.

Q.   Do you have any reason to believe that's not true?

MS. KIES:  Object to form, foundation.

A.   No.

Q.   No reason to believe it's not true?

A.   I have no reason to believe that that statement's not true.

Q.   And then one of those plans provided by

Page 240

the FEMA OCHCO'S office included hiring and reduction estimates, and two excluded any hiring estimates.

Do you have any reason to believe that's not true?

MS. KIES:  Object to form.

A.  I have no reason to believe that statement's not true.

Q.  If you go further down in the discussion, there's a sentence -- there's a -- the first paragraph is discussing "The Annual Staffing Plan created by FEMA OCHCO."

And you see that?

A.  The next paragraph?

Q.  The paragraph that starts:

The Annual Staffing Plan

created by --

A.  Oh, okay.

Q.  (Continued reading:)

-- FEMA OCHCO....

A.  I see it, yes.

Q.  And it says:

This plan showed a

staffing level of 24,812 by the

end of fiscal year 2026.

Do you have any reason to believe that wasn't true?

MS. KIES:  Object to form.

A.   I have no reason to believe that's not true.

Q.   And then the next paragraph -- the next paragraph says:

            The Annual Staffing Plan
         submitted to DHS by the Office
         of the Administrator contained
         FEMA Leadership's staffing
         goals at Organization Level 2,
         showing a staffing level of
         11,383....

Do you see that?

A.   Yes.

Q.   And that is consistent with the document we've just been looking at in Exhibit 17.  Correct?

A.   Yes.

Q.   And if you go back up to the first paragraph, it says:

            On December 4, 2025, SOPDA
         Evans forwarded FEMA's Annual
         Staffing Plan directly to DHS.

Do you see that?

A.    Yes.

Q.    And that was correct?

MS. KIES:  Object to form.

A.    It must be correct, because it's in here. I have no reason to believe I didn't do that.

Q.    And there's a paragraph that starts:

On January 5, 2025, FEMA
OCHCO received a copy of the
Annual Staffing Plan submitted
to DHS on December 4.  FEMA
OCHCO had not previously
received a copy of this
submission.

Do you see that?

A.    Yes, I do.

Q.    Do you have any reason to believe that's not correct?

MS. KIES:  Object to form.

A.    No.  I have no reason to believe that statement's not correct.

Q.    So at the time that you submitted the FEMA annual staffing plan with numbers of 11,383, you were aware that the program offices had shown a staffing level needed, based on a bottoms-up approach, of 24,812 individuals.  Correct?

MS. KIES:  Object to form.

A.   That's what this says, yes.

Q.   Imposing a 50% cut in FEMA's annual staffing plan was not your idea, was it?

MS. KIES:  Object to form.

A.   I would say, to answer that question, that there were different options that were placed on the table in order to do the analysis associated with the staffing.

And the 50% cut was one of the options that I was to analyze.

Q.   And that's the one you chose to give to DHS.  Correct?

A.   Yes.

MS. KIES:  Object to form.

Q.   But it wasn't your idea to impose a 50% cut on FEMA's staff for fiscal year 2026, was it?

MS. KIES:  Object to form.

A.   It was my -- I'm trying to think of the right word here.

It was my analysis, and it was my decision to send forward a staffing plan that showed the 50% cut.

Q.   But you had -- you previously testified you had been told to include 50% as one of the

options by the DHS front office.  Correct?

MS. KIES:  Object to form.

A.    That is what I testified to, yes.

Q.    And you were told that before you did any of the analysis you just referred to.  Correct?

MS. KIES:  Object to form.

A.    As I have previously mentioned, there have been several exercises, all the way up to this one, that looked at different staffing options associated with FEMA.  50% was one of the staffing options.

And then based on positions that I was in and also supporting Mr. Richardson, those different staffing options and different staffing levels were analyzed.  And that's what we did.

Q.    But when you made the decision to submit that number and picked the 50% cut as the FEMA annual staffing plan that you gave to DHS, you didn't conduct any new analysis.  Correct?

MS. KIES:  Object to form.

A.    I went back and looked at the analysis that we have previously done under the other different scenarios and made sure that the analysis was consistent.

Q.    Was that a written document that you looked at?

MS. KIES:  Object to form.

A.   No.  They were documents that I previously mentioned, that the analysis was done about the mission essential tasks and the staffing levels that Mr. Richardson was also looking at, and then current staffing levels that the FEMA CHCO -- I'm making sure I'm using the right CHCOs here -- the FEMA CHCO have provided data for the current staffing levels in the different program offices.

Q.   The analysis that you were talking about, what document was the analysis that you looked at in order to make the decision to send over -- to comply with the request from DHS to give a 50% cut?

MS. KIES:  Object to form.

A.   So there were different documents, which I've previously mentioned, which was the mission essential task analysis, which also looked at staffing levels under these other exercises that we have done and then looked at these doc- -- this particular document, which was the staffing plan. That's what it says.

So I have no reason to believe that this email is incorrect.  And then I submitted the option with the 50% cut.

Q.   And you did not analyze -- or -- review or

Page 246

analyze FEMA's own 2024 force structure review, because you testified earlier that you had not reviewed that document.  Correct?

MS. KIES:  Object to form.

A.    That's true, yes.

Q.    So FEMA had conducted a force structure review in 2024 to analyze its staffing needs, and you didn't look at it before giving a 50% cut plan to DHS?

MS. KIES:  Object to form.

A.    I did not look at that document because that document was based on work that they were previously doing.

And I looked at the documents that were associated with the new analysis that was looking at the statutory responsibilities of FEMA and the staffing associated with those functions and those offices.

Q.    And you didn't look at the 2024 -- 2024 force structure review because it was done by the Biden administration.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.    I did not look at that document because it was done based on work that they were currently

doing and previously doing.

I looked at the new documents that were done based on the analysis, that was done based on the statutory requirements and the mission essential functions that were being conducted under Mr. Richardson's leadership.

Q.   And who created that analysis?

MS. KIES:   Object to form, foundation.

A.   As I previously stated, that analysis was being supported -- he was being supported by OPPA, which is the Office of Policy, Planning and Analysis -- OPPA.   Yes.   Office of Policy, Planning and Analysis.

Q.   And did one of the things that that analysis include -- description of the cost associated with the various parts -- staff at FEMA?

MS. KIES:   Object to form, foundation.

A.   I don't recall the specific dollars.

I know what I looked at was the funding sources associated with, for example, those positions that were funded under the Disaster Relief Fund, those positions that were funded under the National Flood Insurance Plan, and those positions

that are funded under regular appropriations.

Q.   And what cut, percentage cut, to the CORE does this 11,383 total number for FEMA staffing represent?

A.   In the specific chart that you're looking at, those projected proposed cuts were based on the mission essential task analysis that was done by OPPA, suggesting how they could do those functions for those offices.  That's why it's at a high level.

And this email -- also, the previous email says that it was at a high level.  It didn't go specifically down into PFTs versus COREs at that point.

Q.   But these numbers do include the CORE?

A.   Those numbers include all of what is considered FEMA employees at the time.

As we have previously discussed, and as I previously testified, there are permanent full-time employees, there are CORE employees, and there are reservists.

Q.   And you were aware, at the time, that there was no way to reach this 11,383 number without doing a very substantial elimination of CORE positions.  Correct?

MS. KIES:  Object to form.

A.   I know that we had to really look at the CORE positions in order to be able to achieve a 50% cut.

Q.   That would mean reducing thousands of CORE positions, in order to achieve a 50% cut.  Correct?

MS. KIES:  Object to form.

A.   That means that it could lead to not renewing or relooking at the functions that the COREs were doing at the time that this analysis was happening.

Q.   In order to hit 11,383 in fiscal year 2026, you knew, at the time, that that meant eliminating thousands of CORE positions.  Correct?

MS. KIES:  Object to form.

A.   It meant that we would have to analyze the existing CORE population and not necessarily reviewing -- renewing those positions, because COREs are temporary.  They are term appointments.  They're not permanent employee -- appointments.

So to reach that number, we were going to have to do extensive analysis based on what the President would say are the approved recommendations coming from the FEMA Review Council, in order to really look at the functions according to the statutory requirements of what FEMA should be doing

Page 250

after the President then approved that report.

Q.   My question was slightly different.

In order to achieve an 11,383 total number of FEMA employees for fiscal year 2026, you knew, at the time, that you would have to eliminate thousands of CORE positions, did you not?

MS. KIES:   Object to form, asked and answered.

A.   I know, at that time, that we were going to have to do extensive analysis as it related to CORE appointments and the work that they were doing, and then to make sure that that analysis and those positions were aligned to the recommendations that the President would approve coming from the FEMA Review Council.

Q.   It's a yes-or-no question, Ms. Evans, and I'd like a yes-or-no answer.

You knew, at the time, in order to achieve a number of 11,383 for fiscal year 2026, that you were going to have to eliminate thousands of CORE positions.  Correct?

MS. KIES:   Object to form, asked and answered.

Q.   Yes or no?

MS. KIES:   She should give

Page 251

honest and complete testimony.  You can't tell her how to answer a question.

MS. LEONARD:  That's not an objection.  No more speaking objections and no coaching of your witness.

Q.  Please -- it's a yes-or-no question, Ms. Evans.  Please give me a yes-or-no answer.

A.  Can you restate the question again?

Q.  Sure.

You knew, at the time of this annual staffing plan, that to get to a total staffing number of 11,383 for FEMA in fiscal year 2026, you were going to have to eliminate thousands of CORE positions.  Correct?

MS. KIES:  Object to form, asked and answered.

A.  I knew we were going to have to do extensive analysis, and it definitely was going to affect the CORE population.

Q.  And you would have to eliminate thousands of CORE positions to get to 11,383.  Correct?  Yes or no?

MS. KIES:  Object to form, asked and answered.

A.  The answer is yes, because the majority of

the positions at FEMA are CORE positions, not full-time employees.

MS. LEONARD:  Okay.  Let's take another -- what time is it?  Let's take another break.  All right.  Now's a good time for another break.

VIDEOGRAPHER:  Off the record at 3:24.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 3:37.

BY MS. LEONARD:

Q.  Okay.  Ms. Evans, let's talk about what else you inherited with respect to FEMA's staffing when you took over the position as SOPDA from the former SOPDA, Mr. Richardson.

Is it fair to say that there were some pending decisions with respect to CORE staffing that you inherited when you took over from SOPDA Richardson?

MS. KIES:  Object to form.

A.  When I took over in December as the SOPDA, all personnel actions would then become my responsibility.

Q.  And there was a draft memo that was

prepared, that had not been finalized at the time, for S1 approval to renew the FEMA authority to extend certain CORE positions.  Is that right?

MS. KIES:  Object to form.

A.   There was a draft memo, I believe, that was requesting the extension of the delegated authorities.

Q.   And if I refer to "MCO" and "nonMCO" CORE positions, will you know what I'm talking about?

A.   Yes, I would.

Q.   "MCO" means what?

A.   Mission critical occupations.

Q.   And "nonMCO" is everything else?

A.   Is nonmission critical occupations.

Q.   And there were specific occupation codes that were identified as mission critical that applied to FEMA.  Is that correct?

MS. KIES:  Object to form.

A.   There are mission critical occupation codes that apply to the federal government as a whole.

And then it's my understanding there is one specific for FEMA.

Q.   And your understanding of that memo that I just referenced extending the delegation of

authority back to FEMA to extend CORE positions applied to nonMCO positions.  Correct?

MS. KIES:  Object to form.

A.   I don't recall the specific text of the draft memo.  I know that the delegated authority for CORE positions was expiring on December 31st.

Q.   And you also knew that there were CORE NTE dates that were coming up in January of 2026.  Correct?

MS. KIES:  Object to form.

A.   Yes.

Q.   And there were requests for renewal of those CORE positions that had not yet been approved.  Correct?

MS. KIES:  Object to form.

A.   Yes.

MS. LEONARD:  Okay.  Let's look -- let me just make sure I have the right one.  Okay.

We're going to mark this as the next.  There you go.

(Whereupon, Plaintiffs Exhibit 20 was marked for identification.)

Q.   I'm going to hand you another email exchange -- 20, Exhibit 20.

Page 255

MS. LEONARD:  Thank you.

Q.    You've been handed an email chain that we were provided by Defendants that appears to be an exchange between you and Ms. Dobitsch in -- on December 4th and 5th of 2025.

Let me know when you are ready.

(Witness reading.)

A.    Okay.

Q.    Starting with the December 4th email, the first in line from Ms. Dobitsch, she is referencing the draft extension memo for the delegated authority with respect to certain CORE renewals.  Is that right?

MS. LEONARD:  Object to form.

A.    She -- yes, she is referencing the term appointments for CORE employees.

Q.    Well, it says:

...term extension memo
that is with you for approval
to push to the Secretary.

Do you see that?

A.    Yes.  "The term extension memo."

Q.    Okay.  And then she's also talking, in this email, about decisions on the CORE terms and their extensions that will be coming due in the

Page 256

coming months.  Correct?

A.   That's what her email states.

Q.   Okay.  And do you recall that you had a meeting with Ms. Dobitsch on December 4th at which you talked about these issues?

MS. KIES:  Object to form.

A.   I don't know specifically if we had an email -- a meeting.  I'm sure it's in my notes that you have.

Or it should be in the notes that you have.

Q.   If you can look at Exhibit 10, on December 4th, there is a -- on Page -33534 --

A.   Yes.

Q.   -- there is an entry that's above the one we previously discussed about the staffing plan and the number 11,383.

Do you see the entry above that?

A.   Well --

Q.   Looking --

A.   -- my notes on --

Q.   Yes.

A.   -- the one that's ended -33534?

Q.   Yes.  No. 1, "Looking at all CORE dates."

A.   Yes.

Q.   Is that -- are those notes from your meeting with Ms. Dobitsch?

MS. KIES:  Object to form.

A.   That's what it looks like, yes, that that would be the meeting.  Those are my notes.

Q.   Okay.  And on the first email -- and you can set that aside and look back at Exhibit 20.

And there's an email on -- the first email on -- sorry.  I'm tired.

The last email in the chain, which is the first one on the first page, on December 5th.

Do you see that?

From Stephanie to you.

A.   Okay.  You want me to look at --

Q.   The top page.

A.   -- December 5th --

Q.   Yes.

A.   -- the top page, which is marked -6686?

Q.   Yes.  Sorry.

A.   Okay.

Q.   You're doing a better job than I am.

-6686, there's a December 5th email from Stephanie Dobitsch to you, sent at 3:32 p.m.

Do you see that?

A.   Yes, I do.

Page 258

Q.    And she says:

We're planning several meetings next week to dig into this as part of the plan you and I discussed for CORE rightsizing.

Do you see that?

A.    Yes, I do.

Q.    So one of the things you were discussing, as you became the SOPDA, was rightsizing the CORE at FEMA?

MS. KIES:  Object to form.

A.    Yes.

Q.    And this was -- that reference is the day after you sent the annual staffing plan to DHS that included a 50% cut to all of FEMA employees. Correct?

MS. KIES:  Object to form.

A.    Based on the emails that you've provided today, yes.  That's -- that looks like the dates.

Q.    And so, rightsizing the CORE, that was part of the plan of implementing the 50% cut?

MS. KIES:  Object to form.

A.    The rightsizing of the COREs was to really look at the CORE functions.  It wasn't necessarily

to implement the 50% cut.

It was to analyze the CORE positions, what disasters they were working on.  That's specifically what this email talks about.

Because I asked -- if you look at the next page, which is marked -6687, I specifically asked for what disasters they're assigned to.

And then -- and I asked for the breakout so that we would know exactly what disasters the COREs were working on.

Q.    You discussed a plan to release all COREs by NTE date with Ms. Dobitsch on December 4th, did you not?

MS. KIES:  Object to form, foundation.

A.    I discussed with Ms. Dobitsch the way to look at the CORE positions and analyze the CORE positions.

Again, if you look at this, it is based on what disaster that they were working on.  And that's why I was asking the specific question about including the disasters that the COREs are assigned to.

Q.    But you also discussed a plan to release CORE positions by NTE date, did you not?

MS. KIES:  Object to form, foundation.

A.   We discussed what would be the process and what was the process that was ongoing within FEMA as it related to CORE renewals.

Q.   And you were, according to your notes:

Looking at all CORE dates

Propose plan reductions

Do you see that in your notes?

A.   Yes.

Q.   You were discussing with Ms. Dobitsch a plan to hit the 50% target by releasing CORE positions on their NTE dates, were you not?

MS. KIES:  Object to form, foundation.

A.   No.  My notes specifically talk about looking at all CORE dates.

And again, it says a -- propose plan for reductions, because, as I previously stated, these are options that were going forward.

And then also looking specifically -- because, if you notice, there's an A, B and an A -- 1A and a 1B that we were specifically looking at CORE dates as it related to Katrina as well.

Q.   The "Katrina" reference there is for the

CORE dates of the people who were involved in the Katrina letter, is it not?

A.   No, that's not correct.

The CORE dates here are related to the people that are working the Katrina disaster.

Q.   Whose idea was it to reduce the size of the CORE by letting CORE appointments expire by NTE date?

MS. KIES:  Object to form, assumes facts not in evidence.

A.   Again, in looking at proposed options, what I was requesting -- and again, the same email that you're looking at was specific about the CORE dates and looking at the plans, and then what disasters COREs were assigned to, and then looking at the expiration dates, and then understanding the process associated with CORE renewals.

Q.   So when you refer to "options," you did not give the DHS front office any options when you sent over the final FEMA staffing plan that included a 50% cut.  Right?

MS. KIES:  Object to form.

A.   I, as I previously testified, submitted that number of 11,883 [sic].

Q.   There wasn't a plan B or an option B that

you submitted.  Correct?

MS. KIES:  Object to form.

A.  Not at that time.

Q.  Not at any time after that as well.
Correct?

MS. KIES:  Object to form.

A.  No, because right now we're in the process
of doing that analysis.

Q.  No, you have not submitted another number
for the final FEMA staffing plan to either DHS or
OMB and OPM.  Correct?

MS. KIES:  Object to form.

A.  No, because -- I have not submitted an
updated number because, based on the previous
document that you had, these were pre-decisional
information about potential options that we could
execute.

Q.  And at some point, you began discussing a
plan to release CORE positions by NTE date with
Ms. Dobitsch.  Correct?

MS. KIES:  Objection;
foundation, asked and answered.

A.  What I discussed with Ms. Dobitsch is what
is the impact of the CORE renewal dates and what
would be an appropriate plan to actually analyze

those positions.

Because, as we previously discussed, there have been several exercises that FEMA had been looking at that would, in essence, do a bottoms-up or a zero-based type of approach for staffing.

Q.   And one of the things you -- you tasked Ms. Dobitsch with is coming up with a plan to get the CORE at the right number to hit that 50% cut to FEMA's staff, did you not?

MS. KIES:  Objection; foundation --

A.   Um --

MS. KIES:  -- form.

COURT REPORTER:  What was the last one?

MS. KIES:  Form.

A.   So what I asked Ms. Dobitsch to do was to look at those options associated with that.

And one option was, as we previously discussed, a 50% cut.

Q.   And one of the ways that you asked her to look at to get there was by nonrenewals of the CORE on their NTE dates.  Correct?

MS. KIES:  Object to form.

A.   That's incorrect, because I did not ask

Page 264

her to specifically look at nonrenewals.

What we were discussing here, again, by this email, is that there are non -- there are extensions, there's renewal dates, that were coming up for COREs.

What this email is specifically talking about is that FEMA would no longer have the delegated authority to be able to continue to do the extensions for this work.

So what we were talking about with this analysis, as well as what she's talking about at rightsizing, is the analysis associated with COREs to do the work that is statutorily required by FEMA.

Q.   Why didn't you want FEMA to have the authority to do the renewals to the nonMCO COREs, Ms. Evans?

MS. KIES:  Objection; foundation.

A.   I made the decision not to send that forward because we weren't in hurricane season.

And so, this was giving us enough opportunity to actually analyze the workforce.

Q.   Let's talk about that decision.

So the renewal authority that had been, in your view, delegated back to FEMA by DHS, that was

done in a May 14th memo from S1.  Is that right?

MS. KIES:  Object to form.

A.   That's my understanding --

Q.   Okay.

A.   -- yes.

MS. KIES:  Let's mark that as the next exhibit, which is No. 21.

(Whereupon, Plaintiffs Exhibit 21 was marked for identification.)

Q.   So, Ms. Evans, you've been handed Exhibit 21, which is a May 14th memo signed by Kristi Noem, Secretary of DHS, as approved, that, in your view, delegates back to FEMA the authority to extend certain CORE positions by 180 days.  Correct?

MS. KIES:  Object to form.

A.   Yes, except this memo is -- does not include the annex.  And so -- Annex A has specific background information that should be included.

Q.   There's an attachment that we don't have. Is that correct?

A.   I don't know whether you have it or not, but this specifically says:

See Annex A for additional

background.

And there is no Annex A associated with

Page 266

this memo.

Q.   Okay.  But the memo that you see before you, this -- in general terms, this extends to FEMA the delegated authority to renew certain CORE positions by 180 days only.  Correct?

A.   That's my understanding.  But also, I believe there is specific discussion and background about what that actually means in Annex A.

Q.   Without this delegation of authority, DHS required, as of May 2025, all decisions regarding CORE positions to be sent to DHS for S1 approval.  Correct?

MS. KIES:  Object to form, foundation.

A.   It's my understanding that the policy at that time, and continues to be the policy until rescinded by the current DHS Secretary, is hiring decisions are sent forward to DHS headquarters.

Q.   And you understand the extension of a CORE position to be a hiring decision?

MS. KIES:  Object to form.

A.   That is my interpretation of it, is that because it is a personnel action that cuts an SF-50, it counts as a hiring action.

Q.   And we'll get to that.

You had a little bit of a dispute internally within FEMA whether -- whether that was the case, did you not, at the end of 2025?

MS. KIES:  Object to form.

A.  I believe that the emails outlined that discussion that we had -- that I had with the FEMA CHCO office.

Q.  But with respect to the nonMCO CORE positions addressed by this memo, you understood that FEMA, for six months, until that authority expired, had the ability to renew and extend nonMCO CORE positions for up to 180 days.  Correct?

MS. KIES:  Object to form.

A.  Yes, that's what this says.

Q.  And the limit of 180 days, that was a limit that was imposed by DHS, by the secretary's decision.  Correct?

MS. KIES:  Object to form.

A.  That's what this memo states, yes.

Q.  And without that authority, all of those decisions had to go to the DHS front office for approval.  Correct?

MS. KIES:  Object to form.

A.  The renewals had to go forward to DHS without this authority.

Q.   Do you have any understanding of why this authority was granted to FEMA for roughly only a six-month period?

MS. KIES:  Object to form, foundation.

A.   This is when I arrived as the senior advisor to Mr. Richardson.  And I believe that this ability, as this states, was because we were coming up on hurricane season.

Q.   Hurricane season, which lasts, roughly, six months?

A.   It starts on June 1st.

Q.   And ends at the end of November?

A.   I believe it's --

MS. KIES:  Object to form.

A.   -- the end of November.

MS. LEONARD:  All right.  We're going to mark -- this is the next.  22.

(Whereupon, Plaintiffs Exhibit 22 was marked for identification.)

Q.   So, Ms. Evans, I've handed you what's been produced to us as an email with two attachments from the December 5th time frame.

The attachments appear to be a red-lined and a final FEMA CORE renewal S1 decision memo that

someone here is forwarding to FEMA ExecSec.

Let me know when you are ready for questions.

(Witness reading.)

Q.    Are you ready, Ms. Evans?

A.    Yes, ma'am.

Q.    Do you recognize the drafts of these memos, generally speaking?

MS. KIES:    Object to form.

A.    I do not.

Q.    Do you recall having a discussion with Ms. Dobitsch about the S1 approval memos that had been drafted extending the renewal authority?

A.    I know that I had discussions with Ms. Dobitsch about the recommendation that she was making from her team to do the extension of this delegated authority.

Q.    And did you give Ms. Dobitsch feedback on the memos?

A.    As you can clearly see on these emails, that I am not part of the review.  I'm not CC'd on these.

They were preparing this, based on what I'm reading, saying that it was going to come to me.

So I'm not -- I don't see myself on these.

I don't recall seeing this specific email.

I know that I had discussions with Ms. Dobitsch about the delegated authority.

Q.   Okay.  At the top of the third page, it says:

Based on feedback from SOPDA Evans provided to acting MS Associate Administrator Dobitsch, we have updated the memos --

Goes on a little further.

My understanding is that Ms. Evans is expecting the updated version of the memos.

But you don't recall having seen the actual memos before you had that conversation with Ms. Dobitsch?

A.   No.  I know that in the discussion with Ms. Dobitsch, she was recommending that I seek this approval.

And, apparently, from this series of emails, she was preparing the memo for my signature.

Q.   And then that was accompanied by a memo for DHS Secretary Noem's signature that would delegate that authority?

MS. KIES:  Object to form.

A.   The way that the process works is Ms. Dobitsch, as the head of OPPA, who was also performing duties dealing with mission support -- and so, in mission support, that's where the FEMA CHCO office resides -- that she was preparing this recommendation.

So she would send a memo to me, recommending that I seek this.  And then there would be a secondary memo that would then go forward to the secretary, if I agreed with the decision memo that Ms. Dobitsch would send forward.

Q.   And you're aware that these memos were sent to Kara Voorhies for her approval?

MS. KIES:  Object to form, foundation.

A.   I am not aware.  And this email chain does not show Ms. Voorhies receiving these memos.

MS. LEONARD:  Let's mark this as the next, 23.

(Whereupon, Plaintiffs Exhibit 23 was marked for identification.)

Q.   You've been handed what's been marked as Exhibit 23.  It's a December 25 [sic], 2025 email from someone named Andrew Clayton, referring to the

CORE renewal memo.

I'm going to ask you about the top email.

(Witness reading.)

A.    Okay.

Q.    So you see here that Mr. Clayton is sending an email to FEMA's ExecSec that says:

Please allow Kara

opportunity to review before

packaging for signature.

Do you see that?

A.    Yes, I do.

Q.    And you understand that that's a reference to Ms. Voorhies?

MS. KIES:    Object to form, foundation.

A.    I believe that's the case, yes.

Q.    And do you have any reason to believe that these memos were not sent to Ms. Voorhies to give her an opportunity to review before packaging for signature?

MS. KIES:    Object to form, foundation.

A.    I have no reason to believe that they were not sent to her.

Q.    And did you discuss these memos or the

renewal authority with Ms. Voorhies?

MS. KIES:  Object to form.

A.   I'm sure that I had discussions about the COREs, as we previously discussed, and then the authorities associated with hiring from the department and the delegated authorities.

Did I specifically talk about these memos? As you can see, again, I'm not on these emails.

Q.   Do you recall discussing the renewal authority with Ms. Voorhies in this early December time frame?

A.   I recall discussing that with her, but I also recall discussing it because, as I previously stated, I had weekly meetings with the deputy chief of staff, Joe Guy, and let him know that this was going to expire.

Q.   And did you discuss seeking renewal authority to extend that delegated authority with the DHS front office?

MS. KIES:  Object to form.

A.   I discussed with DCOS Guy that I was not going to seek the authority.

Q.   Who made the decision not to seek the Secretary of Homeland Security's approval to extend FEMA authority?

MS. KIES:  Object to form.

A.   I made the decision not to send these memos forward and seek the approval after December 31st.

Q.   And was that before or after the memos were sent to Kara Voorhies?

MS. KIES:  Object to form, foundation.

A.   I'm unsure of the timing of this.  I really don't know the timing of this.

Q.   But you discussed this issue with Ms. Voorhies before you made that decision. Correct?

MS. KIES:  Object to form.

A.   As my previous note showed, that I have been discussing issues of FEMA with DCOS Guy on a weekly basis.

And as I previously stated, Ms. Voorhies was present in those meetings.

Q.   Did DCOS Guy tell you not to seek approval to extend the FEMA authority?

MS. KIES:  Object to form.

A.   He did not.  I told him I was not going to do that.

Q.   Did you make that decision because you

understood that the DHS Secretary did not want to extend that authority?

MS. KIES:  Object to form.

A.   I made the decision because I felt that we didn't need the authority at this time period, because it was not -- we were not in hurricane season, and that this was going to give us the opportunity to actually analyze the workforce appropriately.

Q.   And you were frustrated with the FEMA CHCO's extension of CORE positions pursuant to this authority because it interfered with your plan to reduce the number of CORE staff at FEMA.  Correct?

MS. KIES:  Object to form, misstates testimony and evidence.

A.   I don't agree with the statement that you just made because I don't believe that that's the premise of why -- I know that's not the reason why I did not ask for this authority during this time period.

Q.   If you had received this delegated authority to extend for up to 180 days, and those 180-day extensions had been given, it would have made it more difficult to hit your 50% cut numbers. Correct?

MS. KIES:  Object to form.

A.    I, again, don't agree with the way that you're asking that question, because we would have done the analysis regardless of whether we had the authority to do the renewals for 180 days or not.

Q.    This was an impediment to your plan to reduce the number of CORE staff at FEMA, was it not?

MS. KIES:  Object to form, misstates testimony.

A.    Can you clarify the question?  Because I don't know what you mean by "this" is an impediment.

Q.    The idea of extending the authority to renew the CORE staff by up to 180 days would have been an impediment to your plan to cut the CORE staff.  Correct?

SP02:  Object to form, misstates evidence.

A.    I don't agree with that statement, because we were going to do the analysis.

And whether we had the authority or not, I viewed that authority as the ability for us to actually do the analysis and do meaningful analysis.

Q.    But you chose not to seek that authority from DHS because you didn't think it was necessary at the time?

Page 277

MS. KIES:  Object to form.

A.    Yes, that is correct.

Q.    And as a result of that decision, the authority reverted to DHS, and all action with respect to the CORE required S1 approval.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.    Actually, I don't agree with that statement.  The way that the authorities are set up is hiring decisions go to headquarters.

Q.    All action with respect to any CORE renewal had to be approved by S1 as a result of your decision not to seek the extension of that authority.  Right?

MS. KIES:  Object to form, foundation.

A.    So I'm going to restate what my understanding is, which is renewal of CORE appointments would go forward to headquarters if we were going to renew CORE appointments.

Q.    Let's look at another exchange regarding your conversation with Ms. Dobitsch in early December.

MS. LEONARD:  Mark this as the next, 24.

Page 278

(Whereupon, Plaintiffs Exhibit 24 was marked for identification.)

(Witness reading.)

Q.   Okay.  Ms. Evans, are you ready?

A.   Yes, ma'am.

Q.   Okay.  So the first email in the chain, which is on the back, is an email from you on December 4th to Ms. Dobitsch, CC'ing Kara Voorhies. And its subject line is "Follow Up on Items."

Do you see that?

A.   Yes.

Q.   And then Ms. Dobitsch responds, and she says:

Some notes below for expectation setting on timing and materials.

And I understand what she has done here is to annotate the list that you sent her.  Is that correct?

A.   Yes, that appears so.

Q.   So in that original email, there is information that you wrote, and then there is information that she annotated.  Correct?

A.   That's what it appears to be, yes.

Q.   Okay.  And then you wrote this list coming

out of the meeting that you had, so that you say:

                    Just so that we are

                 tracking the same list per our

                 discussion.

          And then you provide a list to her.

Correct?

     A.   Yes.

     Q.   And the first item on the list is:

                    Looking at all CORE dates.

          By "dates," you are referring to NTE

dates.  Correct?

     A.   Yes.  And this matches back to my

handwritten notes that you've already looked at.

     Q.   Right.

          And then under -- there's a crossed-out

item regarding the Katrina CORE dates.

          And does this refresh your recollection

that you were talking about -- Katrina CORE dates

referred to the people who were on administrative

leave, and you wanted to know what their NTE dates

were?

                    MS. KIES:  Object to form.

                 (Witness reading.)

     A.   Okay.  So, yes, that does appear that

that's what we were looking at, because we started

Page 280

to include the Office of Professional Responsibility in these meetings.

Q.   And then b. is a:

                    Proposed plan to reduce
               COREs by date.

So you discussed a proposed plan to reduce COREs by NTE date with Ms. Dobitsch on December 4th. Is that correct?

                    MS. KIES:  Object to form.

A.   That's what this note says, yes.

Q.   And you write accurate notes, don't you, Ms. Evans?

A.   I write --

                    MS. KIES:  Object to form.

A.   I write notes based on my understanding of what was discussed during the meeting.

Q.   And then you also refer, under No. -- sorry -- 4, there's a reference to:

                    Overall CHCO numbers are
                  being worked by you and Will
                  (number is 11,383) Karen will
                  send a follow up note to HQ.

That's a reference to the 11,383 overall FEMA staff in the FEMA staffing plan.  Correct?

                    MS. KIES:  Object to form.

Page 281

WITNESS:  Sorry.

A.    That is a reference to the spreadsheet that you already showed, because this is in the December 4th time period, based on the exercises that we were doing, sending forward to headquarters.

Q.    And you say "are being worked by you and Will."  You're referring to Stephanie Dobitsch and Will.

Who is Will?

A.    I never say his name right.  Up here, so Bilicic.

Q.    That's why I asked you to do it.

A.    Yeah.  I never -- I never say it right.

Q.    Okay.

A.    We joke around and call him Belichick, but it's Bilicic.

Q.    Got it.

So Stephanie and Dobitsch -- Stephanie Dobitsch and Will Bilicic, you had working the overall FEMA numbers --

MS. KIES:  Object --

Q.    -- to implement the annual staffing plan that reflected a 50% cut.  Is that fair?

MS. KIES:  Object to form.

A.    So as I previously stated, with this

number, we -- she had done the analysis on the mission essential functions, and there had been several different exercises within the Department to come up with what the staffing numbers would be at FEMA.

And in this particular case, this Item 4 was in the previous submissions. Both Stephanie and Will had worked on that analysis together and those numbers.

So that's why this -- it says specifically that the two of them would be working on that. Because those numbers, as we previously stated and you've seen in the emails, were not publicly released.

Q. You specifically asked Stephanie and Will to work on a plan for implementing the 50% cut, reflected in the 11,383 number that you included in the final plan. Correct?

MS. KIES: Object to form.

A. I asked them to look at those overall numbers, as I included here, because, as I previously stated, further analysis needed to be done, because on that spreadsheet, it's high-level numbers by the program offices. It's not down to the level of specificity for the tasks.

Q.    So I thought you told me the analysis was already done to justify those numbers.

And now you're saying that further analysis needed to be done to figure out how to get there?

MS. KIES:    Object to form.

A.    The high-level numbers that I stated were done by the mission essential tasks that got to the high-level numbers.

But to actually -- if you were going to actually implement that option, then you would have to go down, position by position, to actually analyze the positions and the functions that they were performing.

Q.    So you're -- have you told me everything that you considered in making the decision to approve the spreadsheet that included the 11,383 as the FEMA annual staffing plan, before sending that over to DHS?

MS. KIES:    Object to form.

A.    To my knowledge, I have answered your questions truthfully about the information that I reviewed to arrive at the 11,383 number.

Q.    And have you told me everything that you considered in approving that as the option that you

Page 284

put forward to DHS to include in that final plan?

MS. KIES:  Object to form.

A.   To my knowledge, everything that I have stated is true in the documents and the analysis that was done to get to the 11,383 number.

Q.   But you understand that there was no way, without further analysis, to actually implement that plan at FEMA, without looking further at the functions performed by each position.

Is that what you said?

MS. KIES:  Object to form.

A.   Yes.  That's why we were looking at all CORE dates.

And then I believe what you'll have, further on, is the specific process that we were going to go through to have the program offices do the analysis of the functions that they were performing and the CORE positions that they were using to execute those functions.

Q.   So you don't say to look at the COREs by date.  What you say here is the "proposed plan to reduce COREs by date."  Right?  That's what you wrote there?

A.   It says:

Step 1.  Looking at all

CORE dates.

And then it says:

b.   Proposed plan to

reduce COREs by date.

Q.   And whose idea was the proposed plan to reduce COREs by date?

MS. KIES:  Object to form, foundation.

A.   We had a discussion in the personnel meeting -- and when I say "we," it was Ms. Dobitsch, the FEMA CHCO.  Also that participated in these meetings would have been the Acting Chief Counsel.

And then we added, which we now -- I see the clarification here is the Office of Professional Responsibility.

Q.   And you also discussed the plan to reduce COREs by date with the DHS front office.  Correct?

MS. KIES:  Object to form.

A.   I don't recall having that specific discussion.

I did have discussions, as I previously mentioned, with DCOS Guy.  And I'm sure we'll -- we'll be discussing the process where I outlined the process to him and then the logic that I would be following as we were reviewing CORE renewals.

Q.   And you copied Kara Voorhies on this list and thereby informed the DHS front office?

MS. KIES:  Object to form.

A.   As I previously mentioned, it was my practice, as she was the senior advisor to the secretary on FEMA issues.

Q.   If you go to the next email, which is on December 12th from Stephanie Dobitsch to you, copying, again, Kara, Will, and Andrew Clayton, the second bullet down, it says:

On the plan to reduce COREs, I asked for 15 minutes with you this afternoon to discuss on my approach to develop the plan due to you in early January.

She's referring to her work developing the plan to implement the 50% cut.  Correct?

MS. KIES:  Object to form, foundation.

A.   I believe, if you look at it, that's part of the option here.

And then based on some of the other previous emails, Ms. Dobitsch would also describe this as rightsizing of the COREs.

MS. LEONARD:  Okay.  Let's mark this as the next, which I believe is Exhibit 25.

(Whereupon, Plaintiffs Exhibit 25 was marked for identification.)

Q.   Another document that is produced to us by Defendants.

(Witness reading.)

MS. KIES:  Do you know if this was an attachment as well?

MS. LEONARD:  You didn't give us this document attached to anything, and you did not --

MS. KIES:  Okay.

MS. LEONARD:  -- provide custodian or author information.

We're requesting that you provide custodian and author information.

Do you know who the custodian and author is?

MS. KIES:  I do not.

(Witness reading.)

Q.   Okay.  Ms. Evans, you've been handed a document that's been produced to us by Defendants.

The metadata designates that the date of

this document is December 11th.  That's electronic data that we are given when we are given the document.  I can represent that for the record, that the metadata showed that it was December 11th.

Do you know who authored -- who authored this document?

A.  I do not.

Q.  Did you task someone at FEMA with developing a strategy to cut the FEMA workforce by 50% over fiscal year 2026?

A.  As we previously discussed, in this email, I have it documented, and we discussed that that was one of the plans that Ms. Dobitsch would be looking at.

So it's in the previous exhibit that we just discussed.

Q.  And do you believe that this is a document that is potentially authored by Ms. Dobitsch?

MS. KIES:  Objection; foundation.

A.  I don't know if Ms. Dobitsch authored this document.

Q.  And this also refers to you -- your "specific intent on the cuts to the workforce by employee type."

And it lists cuts there:

                    PFT:  Cut 35% or 1,362

          positions.

                    Core:  Cut 68% or 10,843

          positions.

                    Reservist/Local Hire:  Cut

          76% or 7,039 positions.

          At any time in 2025, did you discuss cuts
of these levels with anyone at FEMA?

          MS. KIES:  Object to form.

     A.   As I previously stated, there were several
exercises.  I'm looking at these specific numbers,
and I don't recall talking about these specific
numbers, such as like the 76% to reservists and
local hires.

     Q.   You don't recall, sitting here today, but
it's possible that you informed someone at FEMA that
you had this specific intent on the cuts to the
workforce by the employee types listed here?

          MS. KIES:  Object to form.

     A.   I don't recall specifically giving
direction to this level of specificity to these
employee categories.

     Q.   But you -- so you talked about a mission
essential analysis previously.  And this refers to:

> Ms. Evans has also
> directed targets for the
> overall workforce by Mission
> Essential Task.

Is this consistent with your recollection of the mission essential tasks that had been provided to you by Ms. Dobitsch?

MS. KIES:  Object to form.

A.    So I see, in the second piece of this, it says:

> Ms. Evans also directed
> targets for the overall
> workforce by Mission Essential
> Task.

So, as I previously stated, I looked at the mission essential analysis that was done.

And Ms. Dobitsch is the one who also did this analysis and the numbers during Mr. Richardson's tenure.

And then as we just previously discussed in Exhibit 24, that's the reason why Item No. 4, "Overall CHCO numbers are being worked by you and Will" -- because it's related to the analysis that she has previously done based on mission essential tasks.

Q.   And at the bottom of the page, this refers to:

                    Ms. Evans' intent to halve
                the workforce.

Did you tell FEMA staff that you had an intent to halve the workforce in 2025?

          MS. KIES:  Object to form.

A.   As I previously stated, those numbers were not released.

And as you previously asked me, I did not distribute that agency workforce plan that we sent up to headquarters.

Q.   You kept it close because you didn't want that to be public.  Correct?

          MS. KIES:  Object to form, misstates testimony.

A.   I did not want the information to be public because it was still pre-decisional.

Q.   And -- but you did talk about the plan to cut the workforce in half with a limited number of FEMA staff.  Correct?

          MS. KIES:  Object to form.

A.   I talked about it specifically with Ms. Dobitsch because of the analysis that was previously done, and also because Mr. Bilicic was

involved.

And that's what they were going to work on.  That's clearly outlined in Exhibit 24.

Q.   And part of what they needed to do is figure out how to cut the positions in order to meet your 50% targets.  Right?

That's the task, at the highest level, that you gave Ms. Dobitsch and Mr. -- and Mr. Bilicic?

MS. KIES:  Object to form, misstates testimony.

A.   I believe, if you go back and look at Exhibit 24 again, it states that they're looking at the overall CHCO numbers and that the number that we previously talked about was 11,383.

And then the task is now to look to see, if there's a plan, what would the plan be to achieve that number to implement the 11,383 number.

Q.   If there's a plan --

A.   Well, we --

Q.   -- Ms. Evans?

A.   -- we -- it's clear, from this email, we didn't have a plan.  That's why I was tasking the plan.

Q.   Well, your plan was to cut the workforce

in half by 50%.  What you didn't have is an understanding of how to actually get there. Correct?

MS. KIES:  Object to form, misstates evidence.

A.   Actually, your -- I don't necessarily agree with that statement.

The -- I would rephrase that to say that there is an option with -- to cut the plan -- to cut FEMA's staff by 50% -- was -- there is not an implementation plan.

And that's what Exhibit 24 is about, with me talking with Ms. Dobitsch about developing a plan.

Q.   An implementation plan?

MS. KIES:  Object to form.

A.   I would say that, yes, it would be an implementation plan, based on the way that we outlined the tasks.

Q.   And Exhibit 25, these Talking Points for FY 2026 Staffing Strategy that refer to your specific intent on the cuts and your intent to cut the -- to halve the workforce, again, you don't know who drafted this?

MS. KIES:  Object to form.

A.   When I read the first piece, it says:

Ms. Evans has tasked me to

develop a strategy....

So the way that you're asking the question, I don't know for a fact, but it would seem to me that this was drafted by Stephanie Dobitsch.

Q.   Do you know whether Will Bilicic was involved?  Because you tasked the two of them to work together on this.  Right?

MS. KIES:  Object to form.

A.   According to my email, yes, from Exhibit 24, that the two of them were to work on this task.

Q.   And after Ms. Dobitsch was MDR'd out of FEMA, Mr. Bilicic continued to work on this task.  Right?

MS. KIES:  Object to form.

A.   Actually, no, that's not the case.

Because what ended up happening was, we had to look specifically at the process associated with the decisions that were made as it related to CORE renewals.  So this put on hold, this particular activity.

And then we focused on the actual process associated with reviewing CORE positions by function

and making sure that that process was in place and that there was an established process that the program offices were involved in, and that they signed off on the recommendations that they were making.

Q. And that happened in late January, that change that you're talking about. Right?

MS. KIES: Object to form.

A. I believe, if you look at the emails -- and I'm not a hundred percent sure -- is that the discussion started in the December time period.

Q. Well, what happened in the December time period is that you were talking with the DHS front office about the numbers of CORE that were coming up for renewal by NTE date. Correct?

MS. KIES: Object to form.

A. I would restate what you just said and said that I had been meeting with my deputy chief of staff, and I was discussing the process and the issues that are associated with FEMA.

I met with him as the chief of staff, and then I met with him as the SOPDA and discussed the process that I was going to implement as it related to the analysis of the CORE appointments.

Q. So the day after you and Ms. Dobitsch met

on December 4th and talked about a plan to cut the CORE by NTE date, do you have any -- do you have any understanding as to why all the CORE NTE dates were being collected to be sent to S1 on December 5th?

MS. KIES:  Object to form.

A.    Can you restate the question again?

Q.    Sure.

On December 4th, you have a meeting with Ms. Dobitsch where you discuss a plan to cut the CORE by NTE date.

And then, are you aware that on the very next day, December 5th, FEMA staff are collecting all the CORE by NTE date -- upcoming NTE dates and -- to send that data to S1?

MS. KIES:  Object to form and foundation.

A.    I believe, if you go back and look at Exhibit 24, when we are talking about the common understanding -- and I summarized it back to Ms. Dobitsch -- I did ask them, based on Item No. 1, to look at all the CORE dates.

Q.    Slightly different question.

Do you understand that the data on CORE by NTE date was being collected on December 5th for immediate transmission to S1?

MS. KIES:  Object to form and foundation.

A.   The way that you're currently asking the question, am I aware that on December 5th, were they collecting that data, I don't recall it.

But based on Exhibit 24, they were collecting CORE dates.

MS. LEONARD:  Okay.  Let's take a look at Exhibit 26.

(Whereupon, Plaintiffs Exhibit 26 was marked for identification.)

WITNESS:  Thank you.

Q.   And you've been handed Exhibit 26, which is a email chain that I believe occurred all on December 25th [sic].

Let me know when you're ready.

(Witness reading.)

A.   Okay.

Q.   Okay.  So the very first email in the chain is from the FEMA CHCO, La' Toya Prieur -- how do you pronounce her name?

A.   I have no idea.  So you can go ahead and pronounce it any way, because I don't -- I'd say Prieur, but I'm not a hundred percent sure.

MS. LEONARD:  Well, we've got 10

Page 298

people at the table.  Does anyone know how to pronounce Ms. Prieur's name?

A VOICE:  "Prieur."

MS. LEONARD:  "Prieur"?

Okay, that's what I'm going to go with.  Thank you.

MS. KIES:  Yeah, go with that.

Q.  All right.  So on Friday, December 5th, at 8:17 a.m.  So 8:17 a.m. on the day after you had this meeting with Ms. Dobitsch where you're talking about these plans, there is a message from the FEMA CHCO that says:

The Office of Administrator requests to track CORE expirations by month beginning with January 2026 data.  Please assign....

Please complete by 10am today   the OA will send this to S1 today.

Do you know who asked Ms. Prieur to collect that data and told her that your office would send this to S1 today?

MS. KIES:  Object to form.

A.  I do not know who gave her that direction.

Page 299

Q.   Did you?

MS. KIES:  Object to form.

A.   I did not specifically give her that direction.  And as you can see, I'm not on this email.

Q.   Were you aware that -- of the plan to send this data to S1 on December 5th?

MS. KIES:  Object to form.

A.   As I previously stated, in the Exhibit 24, I -- this is the day after the meeting that I had with Ms. Dobitsch, and I clearly did include looking at all CORE dates.

Q.   But Ms. Dobitsch was not in the Office of the Administrator, was she?

MS. KIES:  Object to form.

A.   No.  She reported to the Office of the Admin- -- she reported to the SOPDA.

Q.   So who would have asked Ms. Prieur before 9:00 a.m. on the following morning to have -- to make this request and ask for this data by 10:00 a.m. because it was going over to S1?

MS. KIES:  Objection; foundation.

A.   You're asking me to make assumptions of who would give her this direction, and you're -- I

don't know who gave her this specific direction that said:

> Please complete it by 10am
> today   the OA will send this
> to S1.

You know -- "will send this to S1 today."

Q.   Do you have any reason to believe someone from your office did not give her that direction?

MS. KIES:  Object to form, foundation.

A.   Again, I'm going to restate this:  I have no knowledge of who gave her this specific direction, especially as it relates to this sentence about:

> Please complete by 10am
> today   the OA will send this
> to S1 today.

Q.   Would someone from your office be sending CORE data over to S1 without your knowledge, Ms. Evans?

MS. KIES:  Object to form, foundation.

A.   I would have no knowledge of someone from my office sending information directly to the secretary.

Q.   You would have no knowledge of someone sending something directly to the -- it's possible that someone in your office was sending CORE NTE date data directly to the -- to Secretary Noem without your knowledge.

Is that what you're saying?

MS. KIES:   Object to form, foundation.

A.   That is not what I'm saying.

You specifically asked me if someone from my office would be sending data directly to the secretary without my knowledge.

And I answered I would have no knowledge of that, that someone from my office would be sending -- from the OA office would be sending something directly to the secretary that I am not aware of.

Q.   I think I understand, but just to -- so that the record is very clear, you don't have any reason to believe that someone from your office didn't ask Ms. Prieur to collect this data because it was going to be sent to the secretary that day?

MS. KIES:   Object to form, foundation.

A.   To my knowledge, I have no knowledge of

someone from my office giving this specific guidance of having it completed by 10:00 a.m. today, that OA will send this to S1.

Q. Why was the OA sending the CORE NTE date data urgently over to S1 on December 5th, Ms. Evans?

MS. KIES: Objection; foundation.

A. I can't speculate that answer, because I just stated to you that I have no knowledge of the direction that was given to Ms. Prieur, especially as it relates to this specific sentence.

So I can't answer that question.

Q. Do you know whether the CORE NTE date -- data was given over to S1 on December 5th?

MS. KIES: Object to form.

A. I don't recall that this data was given to S1.

Q. You don't know whether it was or it wasn't?

MS. KIES: Object to form.

A. I don't recall, based on this statement where it says:

OA will send this data to S1 today.

Q. I'm asking for you, based on your

understanding and your recollection of the items that you were responsible for as the SOPDA in December of 2025 -- whether the data on CORE NTE dates was sent over to S1 on December 5th.

MS. KIES:  Object to form.

A.   I don't recall that these date -- that this data, the way that this sentence is stated, was sent to S1 on December 5th.

Q.   Do you know whether it was ever sent to S1 in December?

MS. KIES:  Object to form.

A.   As I previously stated, I worked with my deputy chief of staff.

And so, when I talked about the COREs and CORE renewals and the CORE process, there was summary data that I would provide to the deputy chief of staff so that he would know the summary data's associated with these different positions.

Q.   So I'm asking a slightly different question, and this is a slightly different moment in time.

So this is early December, Ms. Evans, when you are making decisions about whether to seek extension authority to renew the COREs and whether -- and when you're discussing with

Ms. Dobitsch a plan to eliminate COREs by NTE date, and it appears that someone from your office is sending CORE NTE date data over to S1.

Do you know whether that happened?

MS. KIES:  Object to form.

A.   As I previously stated, I do not recall that someone from my office sent, on this day, CORE data to S1.

Q.   Do you know whether anyone sent that CORE data in December?

MS. KIES:  Object to form.

A.   I can only speak to what I did, and I gave summary CORE information to the deputy chief of staff, in summary numbers, based on what the affected population is that would be affected by me making the decision not to get the delegated authority back.

MS. LEONARD:  Okay.  Why don't we take the next break.  10 minutes?

MS. KIES:  Can we try to keep it to five, just in the interest of --

MS. LEONARD:  Sure.

MS. KIES:  Thank you.

VIDEOGRAPHER:  Off the record at 4:45.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 4:53.

MS. LEONARD:  Okay.  Ms. Evans, I'm going to hand you the next document in order, which is going to be Exhibit 27.

(Whereupon, Plaintiffs Exhibit 27 was marked for identification.)

BY MS. LEONARD:

Q.   It's another document from the mid-December time frame.

And the bottom of this chain, I will tell you, is, I believe, emails that we've already seen. And then the top one is an email that you sent to Kara Voorhies, Victoria Barton, Will Bilicic on December 18th.

Do you see that?

(Witness reading.)

A.   Okay.

Q.   Okay.  So my question for you is about this line in your email on December 18th where you say:

I raised this issue to the DCOS on December 10th.

Do you see that?

A.   Yes.

Q.   So this was in the context of talking about the CORE renewal NTE dates and the numbers of COREs who were up for renewal by particular months. Is that correct?

MS. KIES:  Object to form.

A.   Yes.  As I previously stated when we were -- when you asked questions about the numbers, I did report summary numbers.

Q.   And when you say, "I raised this issue to DCOS December 10th," what are you referring to there?

(Witness reading.)

A.   I would have to -- I don't recall exactly this specific issue.  I know, in my meetings with the DCOS, we talked about CORE renewals.

Q.   And the summary numbers that you referred to, those were the total number of CORE positions that had NTE dates in particular upcoming months. Correct?

A.   Yes.  That's what my email states.  It's 932 in January, February, and March.

Q.   So as of at least December 10th, you were discussing this issue with the DCOS?

MS. KIES:  Object to form.

A.    Yes, because my email states that I raised the issues about the COREs.

And this is also related to the delegated authority.

Q.    And were you asking for direction from the Department of Homeland Security headquarters regarding what to do with the COREs starting in January?

MS. KIES:  Object to form.

A.    No, that's not the case.

What I was talking with the DCOS about is how I was going to handle the analysis associated with CORE renewals.

Q.    Did you tell the DCOS that you were going to consider the total amount of spend on each of those CORE positions in that analysis?

MS. KIES:  Object to form.

A.    I don't recall a specific about the dollar amounts.

I know, in this time period, we were looking specifically about the number of renewals that would come up in this time period.

Q.    And you were also analyzing the amounts of money spent on their salaries and benefits. Correct?

Page 308

A.    That --

MS. KIES:  Object to form.

WITNESS:  I'm sorry.  I apologize.

A.    Yes.  We were also looking at the CORE issues all together.

Q.    And that includes the amount of money that the agency was spending on these positions?

MS. KIES:  Object to form.

A.    What was coming up in this time period was also the pay associated with these positions.

And so, the FEMA CHCO was raising issues about the pay for the COREs, as well as the CFO was -- also was doing analysis about the pay associated with CORE positions.

Q.    Actually, at your direction, they were collecting information so that you could understand the amount of money that was being spent on these positions.  Correct?

MS. KIES:  Object to form.

A.    At my direction, I was trying to understand the whole picture associated with COREs and the CORE salaries and then also the COREs' rights and privileges associated with their term appointments.

Q.   Did the 50% cut number come from a dollar amount of spend that you were aiming for?

MS. KIES:  Object to form, foundation.

A.   The estimates that were provided and the options that were provided were based on numbers, not dollars.

Q.   Was that analysis done so that you knew how much money would be cut by cutting the FEMA staff in half?

MS. KIES:  Object to form.

A.   As I previously stated, we were looking at the positions and then looking at, then, what would -- depending on where the positions were and how they were funded.

And so, I believe the previous exhibits also outline that, when it talks about the DRF and the DRS.

Q.   Did you ever provide information to the DHS front office that analyzed the amount of money spent on these positions in 2025?

MS. KIES:  Object to form.

A.   Can you restate that question again?

Q.   Sure.  Sorry.  It was a poorly worded question.

Did you ever send information to the DHS front office regarding the amount of money that was spent on the CORE positions that were coming up for renewal?

MS. KIES:  Object to form.

A.   In this time period of what you're looking at, from the time that I was the -- put in as the SOPDA, from December 1st to now, I had the analysis done about what it was costing us to have COREs, because, as you know, we're in a lapse.

Q.   Well, the lapse ended, did it not?

MS. KIES:  Object to form.

A.   I am going to restate what I said again, is that:  In this time period, based on the way you asked the question, through December through March, I did provide analysis associated with the salaries that were being paid to the COREs because we are in a lapse, and the lapse affects the DRF.

Q.   I think I understand what you're saying.

Ms. Evans, you understood that DHS, at the direction of OMB and OPM, was supposed to provide a quarterly report updating on the implementation of the annual staffing plan in early January 2026. Correct?

MS. KIES:  Objection;

foundation.

A.   Based on the documents that you presented today and that I've reviewed, I know we did it in December.

Q.   Can you look at Exhibit 16, which should be in your pile.

A.   Sure.

Q.   It started with the email on November 22nd from the DHS CHCO.  And then -- yes, that one, 16.

So the first email in the chain at the back is the November 22nd [sic] email about the staffing plan, and then next in line is a December 18 email about the quarterly update to the staffing plan.

Do you see that?

A.   Yes, I do.

Q.   Okay.  So, again, I will -- and sorry.

The DHS CHCO gave components a January 6th deadline.  Correct?

MS. KIES:  Object to form.

A.   The January 6th is the date of the email. And according to this email, it states the next update to OPM is due January 30th.

Q.   And if you look -- if you carry on to the next page, the CHCO is giving a deadline of

Page 312

January 6th to the components to provide their submissions. It's action, the action is due --

A. Oh, I see right above it, where it says "I'm sharing" -- Puneet, where she's sharing the Annual Staffing Plan and says DHS issued a tasker for the update of the Quarter 2 FY '26 with a suspense date of January 6th.

Q. And the email from DHS CHCO under "Subject" says:

Action Due: January 6.

Do you see that?

A. Yes. It's in the middle of the page.

Q. Yeah.

A. Yes.

Q. It's -- there are a bunch of dates in here, but the deadline that the DHS CHCO was giving was January 6th. Correct?

MS. KIES: Object to form.

A. That's what this email states, yes.

Q. And you decided, at the end of December, to ask the FEMA components to, again, engage in a bottom-up exercise to determine their staffing needs for fiscal year 2026.

But this time, you asked them to use your 50% cut target. Right?

MS. KIES:  Object to form.

A.   I'm not on this email.

And so, this is a tasker that is coming from the Department.

I believe you're referencing a tasker that is in line with the other discussions that we've had where then, because of the CORE renewals, we were -- I was specifically looking at the tasker associated with CORE renewals.

And that was also based on a process that we established between -- internally with the FEMA CHCO, that was reviewed by the Office of the Chief Counsel, in order for us to do the analysis.

And then I also requested from the principals -- which we've discussed it earlier what principles are, and they are the leads of the mission offices.

And I also discussed it with the regional administrators, who are direct reports to me, to work on a staffing plan that was due -- actually, it's due today.

Q.   Does that staffing plan continue to reflect a 50% cut?

A.   No, it does not.

That staffing plan, if you review the

directions that were sent out, it was a zero-based staffing plan so that they could look at the functions that they were performing and then look at the staff associated with that.

And that they were supposed to then, in conjunction with that -- because the CORE renewals were coming up -- to send and -- do the analysis and send memos in regarding their CORE renewal recommendations that they wanted, while they were taking into consideration the overall staffing plans that are due today.

Q.   We'll come back to that.

But going back to the quarterly -- the Q2 quarterly update that was going to be due in January to OMB and OPM.

What you decided to do was to send out another bottom-up exercise to the FEMA component offices, but this time with a 50% target cut. Correct?

MS. KIES:   Object to form.

A.   That's not correct.  The email says do a bottom-up analysis and do zero-based analysis.

And it's my understanding -- and I did not review the spreadsheet, but the spreadsheet template -- that, initially, they were going to send

Page 315

out -- or that they did send out -- that CHCO sent out did include a 50% option.

Q. It included a 50% target. Correct?

That was the word used on the spreadsheet. Correct?

MS. KIES: Object to form.

A. I did not review the specific spreadsheet, because it was a SharePoint spreadsheet, but -- so I don't know that it said "target," but it did consider a 50% option.

Q. And you understood that exercise that was sent out on December 23rd to be a bottom-up analysis done by all the FEMA components?

MS. KIES: Object to form.

A. Yes. That's what the -- that's what I directed them to do. That's what the email says.

Q. Okay. And attached -- included with that email, there is a spreadsheet that includes your 50% cut as a target for that bottom-up exercise. Correct?

MS. KIES: Object to form.

A. It's my understanding that the spreadsheet was attached.

Q. And just a month earlier, the FEMA components had just done a bottom-up analysis of the

staffing needs for fiscal year 2026.  Correct?

MS. KIES:  Object to form, foundation.

A.    That's what the documentation today proves, yes.

Q.    And that was in response to the annual staffing plan request from the DHS CHCO that we saw on November 26th [sic] on Exhibit 16, which you have in front of you.  He says:

The staffing plan takes a bottom-up approach to determine the appropriate staffing levels....

Do you see that, on the November 21st email?

A.    Yes.  That's what this says.

Q.    So just a month later, having received their bottom-up staffing plan from all the FEMA components that totaled over 24,000 positions, you asked them to do it again because you didn't like that result, but this time to aim for your 50% cut. Right?

MS. KIES:  Object to form, assumes facts not in evidence, misstates testimony.

A.    I don't agree with the statement that you just made.

I asked them to look at it again.  And I asked for them to look at it -- for the staffing plan based on the way that we were also looking at CORE appointments.

And then also asking them to look at the staffing plan based on the work that they could be doing, based on pre-decisional information that I was sharing with the principals and the regional administrators about some potential for changes based on improving processes within FEMA.

Q.    At the time that you asked the FEMA component offices to just, again, do a bottom-up analysis of the staffing plan using the 50% target, you were aware that they had done that analysis just a month before.  Correct?

MS. KIES:  Object to form.

A.    I....

Can you restate that one more time.

Q.    At the time that you directed the FEMA OCHCO to send out this work -- workforce analysis on December 23rd and asked the FEMA component parts to do a bottom-up -- bottoms-up analysis of their staffing needs, you were aware that that bottoms-up

Page 318

analysis had been done just a month before. Correct?

MS. KIES:  Object to form.

A.   I would answer the question this way.

At the time that I was giving the direction, I was not taking into consideration the previous analysis that was done as part of the annual staffing plan.

Q.   Because you didn't like the result of that analysis.

MS. KIES:  Object to form.

A.   I don't agree with the statement that you just made.

Q.   Because that analysis resulted in staffing needs of 24,000 people at FEMA?

MS. KIES:  Object to form.

A.   As I previously stated, I don't agree with your statement.

What I asked them to do was to specifically look at all the staffing again, especially as it related to the CORE workforce.

Q.   And the original email that was going to go out about this do-over staffing planning exercise that you were ordering the FEMA components to do, that was originally drafted by Stephanie Dobitsch.

Correct?

MS. KIES:  Objection; misstates testimony, foundation.

A.    Yes.  It's my understanding it was drafted by Ms. Dobitsch, and she sent it forward for review before it went out.

Q.    And that draft by Ms. Dobitsch referred expressly to the 50% target cuts.  Correct?

MS. KIES:  Object to form.

A.    I believe that that's the case.

Q.    And you were not happy with that draft because that information was not public.  Correct?

MS. KIES:  Object to form.

A.    Yes.  That was not publicly available information.

Q.    That was only information that you were using internally.  Correct?

MS. KIES:  Object to form.

A.    That information was pre-decisional, and there was no final decision made on the staffing levels associated with FEMA.

Q.    But you had provided it to OMB and OPM as the target, 50% cut for staffing.

MS. KIES:  Object to form.

Q.    Correct?

A.   As I previously testified, based on the emails, that number, the 11,383, did go forward as a proposed staffing level for FEMA.

Q.   And you were not happy with Stephanie Dobitsch putting that information in that draft email, were you?

MS. KIES:  Object to form, asked and answered.

A.   I would not characterize it emotionally as to whether I was happy or unhappy.

Q.   And you gave the assignment to Victoria Barton to edit that email?

MS. KIES:  Object to form.

A.   Ms. Barton is the associate administrator associated -- she runs external affairs, which includes communications.

And so, that's why Ms. Barton -- I forwarded it to her -- I believe it's in the emails -- to have her take another look at that message that Ms. Dobitsch wanted to send out.

Q.   And she edited that to remove the reference to the 50%, but it was still included in the spreadsheet.  Correct?

MS. KIES:  Object to form.

A.   It's my understanding that that's how the

email was edited.  And, yes, it was still in the spreadsheet.

Q.   And then after the press reported on that in early January, you and Ms. Barton decided to characterize that, in hindsight, as a mistake. Correct?

MS. KIES:  Object to form.

A.   I believe, in previous examples, exhibits here, we already discussed that.

And we said that that number was an internal number and it was pre-decisional, and that number had not been released because, as you pointed out, that number had been sent as part of the agency staffing plans to OMB and OPM through the exercise that you're also referencing that occurred starting in November.

Q.   And there was a reason that you didn't want to use the previous bottom-up staffing analysis that had been done by the FEMA components to show the need for 24,000 people at FEMA.  Right?

MS. KIES:  Object to form, foundation.

A.   Yes, I had my reasons as to the reason why I wanted them to go back and revalidate the numbers.

Q.   And it's because you didn't trust those

staff recommendations.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.    I think that that's an incorrect statement to say that I didn't trust the numbers.

What I just stated was I wanted to revalidate and look at the bottom-up approach and make sure that everyone was actually analyzing this.

Because I also believe that in your exhibits, you will find that some decisions were being made by the CHCO, the FEMA CHCO office, and that program offices weren't necessarily -- had visibility into all the decisions that were being made by the FEMA CHCO office.

Q.    And you believed, then and now, that the FEMA OCHCO and the FEMA components were overstating the number of staff that they actually needed, didn't you?

MS. KIES:  Object to form.

A.    I don't believe that that's what I stated.

What I said was that I wanted the program offices and the regional administrators to do the analysis as it relates to a zero-based budgeting, for lack of a better term; to go back and really look at their staffing as it relates to the work

that they were performing as we were in the transition period.

Q.   The only reason to redo the analysis that had just been done the month before was to direct the FEMA program offices and components to use the 50% target.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.   That is not correct, because that is not the guidance that I gave the program offices.

And that was not specifically stated that they needed to meet a 50% cut.

Q.   You just gave that to them in the spreadsheet that was attached.  Correct?

MS. KIES:  Object to form.

Q.   One of the reasons that you believe that the FEMA components are --

COURT REPORTER:  Excuse me.

MS. LEONARD:  Sorry.

COURT REPORTER:  Was there an answer?

MS. LEONARD:  Go ahead.

WITNESS:  She didn't allow me to answer.

MS. LEONARD:  Sorry.

Page 324

WITNESS:  She just went to the next question.

MS. LEONARD:  Go ahead.  You can reread the question to her.

(Whereupon, the court reporter read back from the record as follows:

"Q    You just gave that to them in the spreadsheet that was attached.  Correct?")

MS. KIES:  Object to form.

A.    The spreadsheet that was attached to the December 23rd email did have the 50% option included.  That's my understanding.

Q.    But is it your testimony today that you were not directing the components to aim for that 50% target, even though that is what was included in the final plan given to OMB and OPM, and even though the President had ordered the agency to submit quarterly reports explaining how they were implementing that plan?

MS. KIES:  Object to form, misstates testimony and evidence.

A.    The guidance that I gave the principals and the regional administrators, when that went out, was for them to, again, look at the zero-based

budgeting questions.

And again, this is pre-decisional, and deliberative discussions came up about the 50% target.

And I said to look at zero-based budgeting as it relates to the staffing, because I wanted to have the data to be able to understand what exactly the staffing levels would be needed based on potential recommendations that would come and be approved by the President as the FEMA Review Council would then determine.

Q.   And isn't it also true, Ms. Evans, that your staff, who were working on the plan to implement the 50% cut, which previously was Ms. Dobitsch with Will, but then it carried on with other people, could not figure out how to make the 50% cut work with the programs and offices that you actually had at FEMA?

MS. KIES:  Object to form, foundation.

A.   As I previously stated, we went to do this analysis by position, to look at the functions associated as it related also to the CORE positions.

And so, I don't agree with the way that you stated that question.

Q. And you were trying to force the programs and offices to give you that information of how to reach the 50% cut, just a month after they told you that their needs were for 24,000 people.

MS. KIES: Object to form, misstates testimony, argumentative.

You can answer.

WITNESS: Oh.

A. I don't agree with your statement, because I was not forcing the offices.

It was clear in my direction for them to look at it and to justify the positions.

Q. Do you believe that FEMA staff are paid to sit around and wait for disasters they barely respond to?

MS. KIES: Object to form, argumentative.

You can answer.

A. I'm not familiar with that particular email that you're looking at.

MS. LEONARD: Okay. Let's mark the next, 28.

(Whereupon, Plaintiffs Exhibit 28 was marked for identification.)

Q. Being handed an exchange that is between

you and someone named John Jaggers at OMB.

(Witness reading.)

Q.   Let me know when you're ready.

(Witness reading.)

A.   Okay.

Q.   Is Mr. Jaggers a friend of yours?

MS. KIES:  Object to form.

A.   Yes, Mr. Jaggers is a friend of mine.

Q.   Was this communication -- does he have any responsibility or role with respect to FEMA?

A.   No, he --

MS. KIES:  Object to form.

A.   -- does not.

Q.   Okay.  When -- the top email, he's referring to an exchange you have here.  And he says:

...bummer not getting paid
to sit around and wait around
for disasters that they then
barely respond to   CORE dump
needed.  Smiley face.

Do you see that?

A.   Yes, I see that.

Q.   Did you respond to Mr. Jaggers?

A.   I don't recall a response.

Q.   Did you respond saying you did not agree with that characterization?

MS. KIES:  Object to form.

A.   I don't recall a response.

Q.   The deadline for the Q2 quarterly report required by DHS was January 6th.  Correct?

A.   That's what is included in the previous exhibits that you showed me.

Q.   And do you recall that your staff "remended" -- recommended not providing an update on behalf of FEMA?

MS. KIES:  Object to form.

A.   I believe -- I -- I don't know, based on these emails.  I'd have to go....

Q.   Do you recall whether FEMA provided a update or plan for implementation to DHS to include with the Q2 quarterly report to OMB?

MS. KIES:  Object to form.

A.   I don't recall us submitting an update to the plan.

Q.   Do you recall that you didn't?

MS. KIES:  Object to form.

A.   I don't recall that we did, and I don't recall that we didn't.

Q.   Okay.  Do you recall that one -- the

reason that you could not submit an update to how you were implementing the plan is that the analysis at the Level 2 that was in the document provided to DHS for the annual staffing plan was impossible to reconcile with the information that the FEMA component programs had provided for their staffing needs?

MS. KIES:  Object to form.

A.  Can you restate that question again?  Can you say it again, please?

Q.  Sure.

Do you recall that your document that you sent on December 4th for the annual staffing plan was at a high level and was only the second level of the organization?

Do you recall that?

A.  Yes.

Q.  And that the information that the component program offices had given to you, both as part of that initial annual staffing plan and in response to the December 23rd exercise, was at a much more detailed Level 5.

MS. KIES:  Object to form.

Q.  Do you recall that?

A.  I recall that that's -- yes.  That's in

the emails.

Q.   And it was impossible to reconcile your plan at Level 2 with the staffing needs described by the FEMA programs and offices to the Level 5.

And so, therefore, your staff recommended not providing an update.

Do you recall that?

MS. KIES:  Object to form.

A.   I don't agree with the characterization of what you said.

And so, I do not recall anyone stating that it was impossible to submit a plan.

I do know that we submitted, like you said -- and we have established that there was a high-level plan and that much of this is pre-decisional.

Because as I previously stated, the FEMA Review Council report needed to be submitted to the President, and the President had to make final determinations of what recommendations he wanted implemented for the future of FEMA.

Q.   But did you communicate directly to DHS that FEMA would not be providing a Q2 report to include in the quarterly report on the annual staffing plan?

MS. KIES:  Object to form.

A.   I don't recall communicating directly to DHS headquarters stating that I was not going to provide an update.

Q.   Do you recall the reasons -- any reasons why no update was provided?

MS. KIES:  Object to form.

A.   I do not recall.

I know that during this time period, again, I had outlined for the deputy chief of staff the process that we were going to use to make sure that we were analyzing CORE renewals, which is directly related to the staffing plan.

And then I also let him know that we were supposed to get staffing plans from all the offices on March 31st.

Q.   Do you -- if you could take a look at Mr. Neurauter's email, which I believe is Exhibit 19.

At the very bottom of that email, he - under "Discussion."

Do you see the three paragraphs there?

A.   Yes, I do.

Q.   And we've already been over the way he describes the exercise that led to the original FEMA

program and office total of 24,812.

Do you see that reference there?

A.   Yes, I do.

Q.   And then there's -- then there's a reference to the annual staffing plan that was actually submitted with 11,383.

Do you see that?

A.   Yes, I do.

Q.   Okay.  The final sentence here says:

The data gathered through the Workforce Capacity Planning Exercise resulted in an end FY2026 staffing level of 23,146.

Ms. Evans, the workforce capacity planning exercise that he's referring -- referring to on January 5th is the result of the December 23rd email when you gave the FEMA component parts a deadline of December 31st.  Correct?

MS. KIES:  Object to form, foundation.

A.   Can you say the -- all those dates again, please?

Q.   Sure.  Well, we can break it down.

A.   Okay.

Q.    Do you recall that the workforce capacity planning exercise that was given to the FEMA components on December 23rd had a deadline of December 31st?

MS. KIES:  Object to form.

A.    I believe, and based on the dates that we've been talking about today, I'd have to go back and look at the exhibits.

And so, based on what you specifically said, that this is a result of the effort that the DHS CHCO gave that guidance for workforce planning.

Q.    Well, what Mr. Neurauter is saying here is that the original plan provided to you for review back in early December, from the FEMA OCHCO, for the annual staffing plan resulted in 24,812.

You provided the number 11,383 to DHS. And now he's talking about something different, which is the workforce capacity planning exercise.

That's the name of what you asked the components to do on December 23rd.  Correct?

MS. KIES:  Object to form.

A.    I would have to look specifically at the email that went out to the workforce on December 23rd.

Because this email says that it did say

that OCHCO, which is FEMA OCHCO, sent a workforce capacity planning exercise email to all program and regional office heads.

So I do not know if this data that he is saying here that is the 23,146 is a result of the workforce planning that happened on December 23rd.

Q.    Okay.  We can cut to it.

A.    Okay.

MS. LEONARD:  This is Exhibit 29.

(Whereupon, Plaintiffs Exhibit 29 was marked for identification.)

Q.    And if you look, it's titled "Workforce Capacity Planning Exercise."  This is the December 23rd email, Ms. Evans.

And if you see, there's a suspense for completion December 31, 2025.

(Witness reading.)

A.    Okay.

Q.    So does this refresh your recollection that the deadline that was given to the programs and offices for this new bottoms-up staffing planning exercise was December 31st?

MS. KIES:  Object to form.

A.    That's what this email says, yes.

Q.   Okay.  And if you go back to the Neurauter email on January 5th, he is saying:

> The data gathered through
> the Workforce Capacity Planning
> Exercise resulted in a staffing
> level of 23,146.

Do you have any reason to believe that the female -- FEMA component programs and offices, as a result of your December 23rd workforce capacity planning exercise, did not tell you that they needed 23,143 [sic] staff for fiscal year 2026?

MS. KIES:  Object to form.

A.   Can you state that again one more time, please?

Q.   Sure.

Do you have any reason to believe that what Mr. Neurauter says here at the bottom of this email is not true, that:

> The data gathered through
> the Workforce Capacity Planning
> Exercise resulted in an end of
> fiscal year 2026 staffing level
> of 23,146?

A.   I --

MS. KIES:  Object to form.

A.    I have no reason to believe that that's not what he stated here.

Q.    Do you have any reason to believe that that's not actually what the FEMA component programs and offices told you that they needed as a result of your workforce capacity planning exercise?

MS. KIES:  Object to form.

A.    I believe that this is the number, based on the way that you are presenting it, based on this email that went out and said that it was due on December 31st.

Q.    You believe that that is the number that the FEMA program offices came back with?

MS. KIES:  Object to form, foundation.

A.    I have no reason to believe that's not the number they came back with.

Q.    Do you know what the number is that they came back with?

A.    As you can see on this email, I was -- I'm not on this email.  So I do not recall the specific number that is in this email.

Q.    Do you recall the fact that after the second time that you've asked your FEMA components to do a bottoms-up analysis of their staffing needs,

they came back to you again and said that they needed far more than the 50% cut you were aiming at?

Do you recall anything about that?

MS. KIES: Object to form.

A. I have not had specific discussions with the program office heads as it relates to this number, because, as I previously testified, program office heads, as well as the regional administrators, are sending their staffing plans in, their proposed staffing plans, and they're due, today, March 31st.

Q. Because you had them do this exercise again after you received the 26,146 [sic] number. Correct?

MS. KIES: Object to form.

A. That's an incorrect statement, because I was having them analyze their workforce because, as I previously stated, there were several initiatives.

And one in particular was looking at the CORE renewal dates, based on how we had the staffing and what was happening with COREs, so that we could actually reconcile what would be the appropriate staffing levels, and should activities that are being charged to the Disaster Relief Fund really be COREs, or should they be converted to permanent,

Page 338

full-time employees.

Q.   Ms. Evans, you had the FEMA program offices do staffing analyses three times in a row because they told you, repeatedly, that they could not meet your 50% target.  Correct?

MS. KIES:  Object to form, misstates testimony, asked and answered.

A.   That's an incorrect statement.

And that is not the reason why I had them looking at the positions again and doing the staffing plan, because we didn't have all the recommendations coming from the FEMA Review Council.

And so, we were looking at functions, and there were things that we were looking at as it related to CORE renewals in conjunction with this activity that the Department was running; which, again, these are pre-decisional data points that are going forward to the Department.

Q.   We've discussed previously that at some point in time, the December 23rd email was leaked to the press.  Correct?

A.   We have not discussed that the December 23rd email was leaked to the press.

Q.   But you are aware of that, because the press reached out to DHS and FEMA to ask whether

there was a plan to cut 50% of the CORE.  Correct?

MS. KIES:  Object to form.

A.   We have discussed, in some of the other emails, I believe, that that was an internal number and not a -- and it was also included in the draft FEMA Review Council.

But that is not a publicly available number.

Q.   Okay.  But you became aware in January that the press was asking about the December 23rd email.  Correct?

A.   Yes, that is correct.

Q.   Okay.  And you worked on a response with individuals in the FEMA and DHS press offices?

MS. KIES:  Object to form.

A.   There was a response, or there was a discussion, as it related to the question that came as a result of the December 23rd email.

Q.   And Kara Voorhies was also included in the discussions of how to respond?

MS. KIES:  Object to form.

A.   As I previously stated, as a practice for myself, I would CC Ms. Voorhies on emails.

MS. LEONARD:  Okay.  Let's take a look at the next -- 30, I believe this

Page 340

is.

(Whereupon, Plaintiffs Exhibit 30 was marked for identification.)

(Witness reading.)

Q.   My question is going to be about the email from you on January 5th that appears on the second page with Bates number -364.

So let me know when you're ready.

(Witness reading.)

A.   Okay.  So you want to specifically talk about the January 5th email.

Q.   Yes.  And you say here:

For the record, the 50%
was NOT policy direction.
Stephanie was following
direction from Mr. Richardson
throughout his tenure where he
used the 50% for planning
purposes.

Do you see that?

A.   Yes, I do.

Q.   You don't mention here the fact that you sent a 50% cut to DHS and then OMB/OPM as part of the final FEMA annual staffing plan for fiscal year 2026, do you?

Page 341

MS. KIES:  Object to form,
misstates evidence.

A.    This email does not state that.

But as I previously testified today, is that that 50% cut was an option that was consistent with different options that Mr. Richardson was also looking at.

And I made sure that the numbers were consistent with options that we sent forward for a potential 50% cut.

Q.    You sent one document forward to DHS, and it contained a 50% cut as the final plan.  Right, Ms. Evans?  You didn't send forward options.

MS. KIES:  Object to form, asked and answered.

A.    As we talked about today, based on that assignment, I sent the one spreadsheet, which is an exhibit here, that shows the 11,383.

Q.    And, then when the press found out that you were asking the program components to aim for a 50% target cut and to tell you how they would achieve that cut through targets, you blamed Stephanie and former SOPDA Richardson.  Correct?

MS. KIES:  Object to form, misstates testimony, argumentative.

You can answer.

A.    I would not characterize this sentence as I am blaming Ms. Dobitsch or Mr. Richardson.

I am saying that that was sent forward. The 50%, that it's not a final policy decision.

As I have been stating, it was the recommended plan and it was pre-decisional as we established that that was the 11,383 that was sent forward.

But it's still pre-decisional, and that is not policy direction at this point.

Q.    In the directions that you gave for the third round of the zero-based, bottoms-up staffing analysis that you gave to the components for the Q3 update, which I believe you said was due today, in the directions that you gave to your components, did you auto-populate the target numbers in the template spreadsheets that you asked them to complete?

MS. KIES:  Object to form, foundation.

A.    Okay.  So I think there is a distinction that needs to be made, because the staffing plans that are due today are not the Q3 update, as you have stated.

Q.    When is the Q3 update due?

MS. KIES:  Object to form, foundation.

A.   I -- right now, to my knowledge, I do not have the due date.

Q.   It's upcoming.  Correct?

MS. KIES:  Object to form, foundation.

A.   I do not know the exact date.  I don't know if it's upcoming or not.

Q.   Have you approved a Q3 update from FEMA to go to the DHS leadership?

MS. KIES:  Object to form.

A.   To my knowledge, I have not approved a Q3 update to go to DHS CHCO.

Q.   But you asked the FEMA components to engage in another round of bottoms-up, zero-based staffing analysis recently.  Correct?

MS. KIES:  Object to form.

A.   As I stated, I asked them to submit a staffing plan that was also looking at the CORE appointments because, as I previously stated, we had CORE renewals and that needed to have a process in place.

And so, as part of that process, I asked for them to look at staffing plans.

So as I previously also stated as to what would be the right mix of the functions, and should they really be COREs or should they be permanent, full-time employees.

Q.   And did you give them a template to fill out that included auto-populated target numbers for the staff of their programs and offices?

MS. KIES:  Object to form.

A.   For the staffing plan that is due today, there was no template that was sent out, and there was no targets that were established; that they were to look at the functions that they were performing and that they were to put together a staffing plan that was also looking at the CORE renewals.

MS. LEONARD:  Okay.  Why don't we take another break?  10 minutes.

VIDEOGRAPHER:  Off the record at 5:45.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 5:59.

BY MS. LEONARD:

Q.   Ms. Evans, at some point in the month of December 2025, we've -- you testified previously that you made a decision not to ask for S1 approval

to extend the delegated authority to renew some of the COREs.  Correct?

A.   Yes.

Q.   And as a result of that decision, the materials that had been packaged to you for those COREs with NTE dates in January had to be redone by FEMA staff.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's my understanding.

Q.   Because they now needed to use the S1 verification form that DHS required for hiring decisions.  Correct?

MS. KIES:  Object to form.

A.   Yes, that's my understanding.

Q.   And FEMA staff worked very hard over the holidays to package and provide you with that information, did they not?

MS. KIES:  Object to form, foundation.

A.   I can't assess the level of effort that was put into putting together those packages.

Q.   During this same late December period, you were asking for information regarding the amount of money that these CORE employees cost FEMA.  Correct?

MS. KIES:  Object to form.

A.   I believe that what I previously testified was that, and also, issues that were being raised was about the pay associated with COREs.

MS. LEONARD:  Well, let's take a look at the next exhibit in line, which is 31.

(Whereupon, Plaintiffs Exhibit 31 was marked for identification.)

Q.   And it is an email from the FEMA CHCO to you, and it attaches some spreadsheets, but also a memorandum that she wrote.

And my question for you, Ms. Evans, is quite simple, which is:  Did you review this memorandum from La' Toya Prieur on or around December 17th?

(Witness reading.)

A.   Can you ask the question again?  I'm sorry.  I was reading the memo.

Q.   Sure.

Did you review the memo that Ms. -- the FEMA CHCO, Ms. Prieur, provided you about the mission effects of allowing the COREs to expire around December 17th?

A.   I would say I don't specifically recall reading all of this.

Q.   Do you -- did you take this into consideration in making your decisions with respect to the COREs?

MS. KIES:  Object to form.

A.   What I was doing at that time period was working with the FEMA CHCO to make sure that we were establishing a process so that the program office heads and the regional administrators were reviewing their CORE renewals and doing it based on the functions.

Q.   Do you recall that you were very expressive regarding not including the names of employees on the documents that were being sent to you regarding the upcoming COREs with NTE dates expiring?

MS. KIES:  Object to form.

A.   Yes.

Q.   And why was that?

A.   Because the review was about the functions that the COREs were performing for either the program office head or for the regional administrator.

And I wanted it to be a functional analysis.

Q.   And you did not want the names of

employees on there.

Did you believe you didn't have the right to see those names, for some reason?

MS. KIES:  Object to form.

A.   I wanted to make sure that I wasn't looking at names because this was a functional review based on what the program office head would say for the functions and the work that's being performed by that position.

Q.   But you knew that when the materials were repackaged to send over to DHS for approval, one -- after the -- once the authority to FEMA had expired, that they were going to have to have names on them. Correct?

MS. KIES:  Object to form, foundation.

A.   The FEMA CHCO reported to me a way -- the way that the form had to be completed.

And so, I did not want to see the names.

So she did the forms.  And then based on that, there was a process of how those forms were completed and then sent up to DHS CHCO.

Q.   And you delegated the authority, actually, to Will Bilicic to sign those forms because you did not want to see the names.  Correct?

MS. KIES:  Object to form.

A.   That's correct.

MS. LEONARD:  Let's take a look at next.

(Whereupon, Plaintiffs Exhibit 32 was marked for identification.)

Q.   This email is dated December 26th, Exhibit 32, and it forwards to you an email from La' Toya Prieur that was sent to Puneet Khan on Christmas, December 25th, attaching the materials for the CORE individuals who had expirations in January.

Do you see that?

A.   Yes.

Q.   And do you recall that your response was to ask for more money about what a fully loaded CORE is receiving in pay?

Sorry.  Let me rephrase that.

Do you recall that your response to this information, justifications for all the CORE individuals who were expiring in January, was to ask how much money they were costing FEMA?

MS. KIES:  Object to form.

A.   I don't recall that email.

Q.   Do you recall you say, "I want to know

what a fully loaded CORE is receiving in pay," in response to receiving this information?

MS. KIES:  Object to form.

A.  I recall asking about a fully loaded CORE pay because, as you showed in Exhibit 31, we were looking at what funding that they were coming from and what their pay base was, what they're -- a fully loaded CORE was being paid.

Q.  As consideration for part of the decision-making as to whether to seek approval to renewal these CORE -- renew the COREs that were expiring in January, you were considering that information?

MS. KIES:  Object to form.

A.  As I have previously stated, there was several different analyses that were happening at that time.

And also, as I believe I previously stated, the pay associated with COREs, that issue was being raised at the same time because there was other exercises that were happening with the DHS CHCO and the FEMA CHCO.

So there was issues of pay that had to be addressed as well.

Q.  And in this -- the packaging of the

Page 351

request for approval, justifications for the COREs, extensions for the NTEs that were coming in January, you see here Ms. -- in Exhibit 32, Ms. Prieur was also asking for a 30-day -- authority to extend their appointments by 30 days so that a decision could be made.

Do you see that?

A.    I see her recommendation about the 20% of the appointments will expire the first week in January, and that she was seeking SOPDA approval to extend the appointments for 30 days, pending the determination from FEMA and DHS leadership.

Q.    And on December 31st, the decision was made not to seek approval to renew these COREs and not to grant a 30-day extension.  Correct?

MS. KIES:  Object to form.

A.    I made a decision not to sign the documents under the existing authority because this was coming at the end of the delegation of authority.

And these were positions that were going to be in January, so I made the decision not to sign these.

Q.    And you waited until December 31st to make that decision, despite receiving the information on

the 26th of December?

MS. KIES:  Object to form.

A.   So I got this information.  It was during the holidays.  And I was reviewing the information, and I made the decision not to renew January CORE appointments because the delegation of authority was expiring.

Q.   Was that the only reason you made the decision not to renew them?

MS. KIES:  Object to form.

A.   The reason why I also did this was because I did not want to renew appointments for the first week in January, knowing that my authority was expiring on December 31st.

Because those January decisions, with the expiring of the authority, if they were going to be renewed, needed to be reviewed by headquarters.

Q.   So you understood that by application of the DHS policies, those CORE positions were going to be eliminated?

MS. KIES:  Object to form.

A.   I understood, the way that we were doing this, is that I made the decision not to renew these appointments that were coming due in the first week in January, as is outlined here.

Q.   And that was the result of your application of DHS policies that applied to these positions.  Is that correct?

MS. KIES:  Object to form.

A.   It's my determination based on the expiring authorities that FEMA had at the time, and then the DHS policy as it related to hiring.

Q.   When -- can you look at Exhibit 10, which is your notes.

And the entry on December 31st, which is -33536.

A.   Okay.  Hold on.  I don't have my notes yet.

Okay.  And then number, please?

Q.   -33536.  It's December 31st.

A.   Okay.

Q.   You have notes here:

Not going to approve the COREs (30 days extensions) and COREs in general.

Who was that meeting with?

MS. KIES:  Object to form.

A.   As I recall, this particular meeting, that was part of my meeting -- because this is on Wednesday -- with DCOS Guy.

Q.   And, together, you made the decision not to renew the COREs?

MS. KIES:   Object; misstates testimony.

A.   No.   What I told Mr. Guy in the meeting was that I was not going to approve the 30-day extension, as you outlined here in "Exhibit -9465," as it related to the COREs because the authority was expiring December 31st and that these were for appointments in January.

Q.   And you understood that you were implementing DHS's policies and directives with respect to those COREs.

MS. KIES:   Objection --

Q.   Correct?

MS. KIES:   -- misstates testimony.

A.   I understand that what I was doing as a component within DHS, that with the expiring authority that FEMA had, that I was implementing DHS policy as it related to hiring actions.

Q.   And do you know who DCOS Guy spoke with about the decision to begin eliminating COREs by NTE date on January 1st?

MS. KIES:   Objection;

Page 355

foundation, facts not in evidence.

You can answer.

A.    I do not know who he spoke to after I told him about my decision that I was doing based on the January nonrenewals.

Q.    Okay.  And at some point in January and then February, you set up a series of different processes for sending over the approvals of the CORE renewals to the DHS front office.  Correct?

MS. KIES:  Object to form.

A.    So in the time period when this issue was raised, in the -- as -- when I took over as the SOPDA, it was to establish a process that would have the program offices, as well as the regional administrators, to look at the CORE renewal dates by function and sign off on what they were recommending to go forward and what they were recommending on to --

VIDEOGRAPHER:  I'm sorry.

Careful.  You --

WITNESS:  Oh.  Sorry.

A.    Okay.  Sorry.

So that process included program office sign-off of their evaluation of the CORE renew- -- the CORE dates and the renewals based on function.

Q.    But you know that the individuals who were not renewed beginning on January 1, for the first two weeks of January, were recommended by their programs and offices for renewal.

And, in fact, you made the decision, based on DHS policy, to separate those people from employment.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.    What I did at the end of December was based on my understanding and my -- that FEMA is a component of DHS, and that my authority was expiring; that I made the decision not to send these CORE renewals forward to headquarters, DHS headquarters.

Q.    And after that, as you did send forward approvals in January and February, DHS made a policy decision that any extension of a CORE could only be for 90 days.  Correct?

MS. KIES:  Object to form, foundation.

A.    That is incorrect, because I'm the one who made the decision about the extensions for 90 days, because that relates to the period that we're in, in transition, right now.

And it also relates to the staffing plans. And then the 90-day extensions, we would take that into consideration with their staffing plans.

And the idea was to have all of this resolved before hurricane season.

Q.   And the idea being that the 90 days extensions were to hold over until you figured out how to implement the staffing plan.  Correct?

MS. KIES:  Object to form, misstates testimony.

A.   So the 90-day extensions were based on functional analysis that the program offices did, based on their workload, so that the staffing plans that they were turning in, which are due today -- so that we could look at those, along with other analysis that we're doing, to streamline some of the processes within FEMA prior to the final FEMA Review Council report being released and the President making his decisions as it relates to the future of FEMA.

Q.   You didn't have the authority to extend any CORE position beyond 90 days, per DHS policy. Correct?

MS. KIES:  Object to form.

A.   That's not what I stated.

What I stated was I made the decision that these were going to be 90-day renewals, and that we would do 90-day renewals on the COREs as they came up and as they were recommended from the program offices or the regional administrators.

Q.   In fact, headquarters had given you a policy that only allowed 90-day renewals, at the most, in -- after January of 2026.  Correct?

MS. KIES:  Object to form.

A.   I don't recall that.  I believe that if you look at the previous exhibits that we were talking about with the delegation of authority that you showed, that we had till December 31st.

I would have to -- as I pointed out, Annex A wasn't included.

And so, those specific authorities would have been outlined in Annex A.

So I don't recall specifically what you are saying.

Q.   You don't recall being given direction from DHS headquarters that you could not extend COREs longer than 90 days?

MS. KIES:  Object to form.

A.   I know I stated to DCOS Guy that I was going to extend them for 90 days.

Page 359

MS. LEONARD: Okay. Let's mark this as the next exhibit. Got it. 33.

(Whereupon, Plaintiffs Exhibit 33 was marked for identification.)

WITNESS: Thank you.

Q. So this is a very short email from you to the FEMA CHCO. And you say:

Hi La'Toya

Per our discussion, until further notice, please process CORE Renewals in accordance with HQ policy. Their renewal dates should NTE 90 days for consistency.

What are your HQ -- what HQ policy are you referring to there?

A. The HQ policy that I'm referring to is what you brought up previously, which is about the individual forms that need to be signed that have the names on them and that that authority for the signing was delegated to Will Bilicic.

Q. If -- okay. So it is your testimony that it was your decision, and your decision alone, that CORE renewals starting in January of 2026 would be limited to 90 days?

MS. KIES:  Object to form.

A.   That's my recollection, yes.

MS. LEONARD:  Okay.  Let's mark this as the next, which is the declaration that you submitted in this case, Exhibit 34.

(Whereupon, Plaintiffs Exhibit 34 was marked for identification.)

Q.   You're familiar with this document, Ms. Evans?

A.   Yes, ma'am.

Q.   At the time you signed this, did you review all of the information in the declaration?

A.   Yes, I did.

Q.   Did you draft it, or was it drafted for you?

A.   The --

MS. KIES:  Object to form.

A.   The --

WITNESS:  I apologize again.  Sorry.

A.   The -- it was drafted, and then I reviewed the draft.

Q.   Did you edit it?

A.   I don't recall if I did specific edits to

this particular declaration.

Q. And you intended for the information contained in this declaration to be true and accurate?

A. Yes, I did.

Q. And you state here in this declaration....

Give me one moment.

(Pause.)

On Page 6 -- apologies.

On Page 6, in Paragraph 25, you state here that "DHS decided not to reappoint" 192 COREs in January of 2026.

Do you see that statement?

A. Yes, I do.

Q. Is that statement accurate?

A. I think that -- I have reviewed this, and I can see where this statement would be confusing, based on the context of how I reviewed this.

So the way that I reviewed this document is that FEMA is a component of DHS, and I was reviewing this document as FEMA is a component of DHS, and that this document was going externally.

And so, I was talking about FEMA as a component of DHS.

Q. You refer to FEMA separately in this

Page 362

document in many places.  Correct?

A.  Yes, I do.

Q.  Including in all the surrounding paragraphs to this statement.  Correct?

MS. KIES:  Object to form.

A.  Yes, that's what it says.

Q.  And in Paragraph 28, you say:

...FEMA and DHS are considering non-renewals of COREs....

So you're referring to the entities separately throughout this declaration.  Correct?

MS. KIES:  Object to form.

A.  I did in this.  And I would agree that this statement in 25 -- I can see where it would lead to confusion.

Q.  The terminations that -- well, let's put it this way:  The separations of CORE individuals that happened in January were the direct result of DHS directives and orders that you were implementing.  Correct?

MS. KIES:  Objection, misstates testimony and evidence.

A.  As I previously stated, the ones in January were based on that time period of the

Page 363

expiration of the authorities and the decision that I made not to renew those appointments that were in the first two weeks, I believe, of January.

Q. DHS continues to control all authority for FEMA CORE renewals. Correct?

MS. KIES: Objection; legal conclusion, misstates testimony and evidence.

You can answer.

A. I think that, based on what you just said, that's a misstatement. That's not correct.

Q. Do you believe it's accurate that DHS made the high-level decisions that led to the elimination of these positions, even if they didn't individually renew [sic] and reject each person?

MS. KIES: Object to form.

A. Can you restate that again?

Q. Sure.

Do you believe it's true that DHS made the high-level decisions that led to the elimination of these positions, even if they did not individually review and reject each person?

MS. KIES: Object to form.

A. I do not believe that that's the case.

Q. You don't believe that these terminations

came from the decisions and authorities of DHS?

MS. KIES:  Objection; asked and answered.

A.   As I said, I could have clarified this statement, especially where it says "pursuant to the lawful authority," because I'm the one who made the decisions not to renew these COREs, their appointments.

And so, I viewed that particular statement as I'm a component of DHS and that the policies that are in place as a component of DHS, I'm also responsible for following DHS policies.

Q.   And you understand that it is your job to implement the DHS priorities that are given to you by the secretary.  Correct?

MS. KIES:  Object to form.

A.   It is my job to implement the President's executive orders, as well as the secretary's priorities, as it relates to FEMA as a component of DHS.

Q.   And that is what you believed you were doing when you made the decisions with respect to the COREs for January.  Correct?

MS. KIES:  Object to form, misstates evidence and testimony, asked

and answered.

A.   The decision that I made at that point was not to renew those COREs because they were in January, and my authority that was delegated to me from the secretary to the position expired December 31st.

And so, I did not make the recommendations, and it did not go through the hiring process, which is the policy of DHS.

The non-renewals decision was made at FEMA.

Q.   And you believed, in making those decisions, that you were implementing the policy priorities of the Secretary of DHS.  Correct?

MS. KIES:  Objection; misstates testimony, asked and answered.

A.   In making these specific decisions, they were specifically related to these CORE renewals based on the authority that was delegated that was expiring.

And so, because I made the decision not to renew these --

VIDEOGRAPHER:  Oh, sorry.  You pulled --

WITNESS:  Oh, sorry.  I'm sorry.

How about that?

VIDEOGRAPHER:  Okay.

WITNESS:  Sorry.

A.   Okay.  So I made the decision not to renew these appointments.

Q.   Let me ask the question again, Ms. Evans.

When you made these decisions, you believed you were implementing the policy priorities of the Secretary of DHS.  Correct?

MS. KIES:  Objection; asked and answered, misstates testimony.

A.   When I made this decision, as it related to potential renewals of these COREs, I was making the decision based on the authority that was delegated that was expiring on December 31st.

And the DHS policy at that point is:  Any hiring was to go forward to DHS headquarters.

Q.   I'm going to ask again, and it's a yes or no.

You believed, when you were making the decision with respect to the COREs in January, that you were implementing the DHS Secretary's policy priorities, didn't you, Ms. Evans?  Yes or no?

MS. KIES:  Objection; asked and answered, misstates testimony.

A.    I am telling you the context of how this decision was made.  And this decision was made based on the expiration of the authority that had been delegated to FEMA.

And I was making the decision because these were positions that would be renewed in January, based on the policy that DHS had in place as it relates to hiring.

That is the basis of my decision.

Q.    And you certainly didn't think you were acting contrary to the policy priorities of the Secretary of DHS in making these decisions.  Correct?

MS. KIES:  Object to form.

A.    Again, I'm going to restate the basis of this decision, which was it was based on the authorities that were delegated and the authorities that were expiring.

Q.    Ms. Evans, I'm asking you a different question, and you need to give me an answer.  And I'm going to ask you directly one more time, and it's a yes-or-no question.

When you made these decisions, you understood that you were implementing the policy priorities of the DHS Secretary, didn't you?

MS. KIES:  Objection --

Q.   Yes or no?

MS. KIES:  Objection; asked and answered, misstates testimony.

A.   The way that you're framing that question, I'm giving you the context of how I made this decision.

And I'm going to restate it again.

I made this decision based on the expiring authority that FEMA had and that these positions were in January.

And so, therefore, I made the decision, based on the policy that was in place, that hiring would have to go forward to headquarters.

And so, I did not send these forward.

Q.   And you understood, when you did that, that you were implementing the policy priorities of the Secretary of the Department of Homeland Security.  Correct?

MS. KIES:  Objection; asked and answered.

A.   I'm going to restate it again.

Q.   I'm going to -- I'm going to -- I'm going to ask you to give me a yes-or-no answer.  It's a yes-or-no question.

You're not answering the question, Ms. Evans, and I'm entitled to an answer to the question, which is:  Did you believe that you were implementing the DHS Secretary's policy priorities when you made that decision?  Yes or no?

MS. KIES:  Objection; asked and answered.

(Simultaneous speaking.)

A.   You're asking me the context of the decision, and I am giving you the context of the decision.

And the context of the decision was based on the expiration of the authorities, and it was based on when these positions were going to be renewed, which is in January.

So you can -- you're asking me a specific question, and that -- that particular way that you are phrasing the question is not in the context of how this decision was made.

Q.   So are you saying, no, that you didn't believe you were implementing the priorities of the DHS Secretary when you made the decision?

MS. KIES:  Object to form.

A.   I'm not saying yes or no.  I'm giving you the context of how I made this decision.

Q.   Okay.  So the record is very clear, you're refusing to answer the direct question that I am asking you.

I will give you one more time.

Yes or no:  Did you believe, when you made these decisions, that you were implementing the DHS Secretary's policy priorities?

MS. KIES:  Objection; asked and answered.

A.   You're specifically asking me about the policies, the priorities, and I'm answering you that -- what the context of this decision was made.

And the context of this decision was made based on the expiring authority and when these appointments would be in place in January.

So I am answering the question, and I'm answering the question around the context of how I made this decision, this specific decision.

Q.   Is there something about my question that you don't understand, Ms. Evans?

A.   I understand the question, but you're asking me about the context of this decision.

Q.   I'm asking whether you were implementing the DHS Secretary's policy priorities when you made the decision.

It's a yes-or-no question, and you're refusing to give me an answer.

I would like an answer.

Will you please answer the question, yes or no:  Were you implementing the DHS Secretary policy priorities?

MS. KIES:  Object to form.

A.   I'm going to answer it again, trying to answer your question -- okay? -- is that the secretary's policy at this time, as it relates to this particular decision -- okay? -- it's a personnel decision -- the policy was in place that hiring for components was to go up to headquarters.

So in this particular case, I made the specific decision not to send these hiring requests up.

You're asking specifically about the secretary's priorities.  So the answer would be yes, because the secretary's priorities were related to hiring decisions.

Q.   Thank you, Ms. Evans.

Have you told us all the reasons that you -- have you told us all the bases for your decision not to seek the renewal of the CORE employees in January?

MS. KIES:  Object to form.

A.   Can you clarify the question?

Q.   Sorry.  That was -- it's a long day, and that was a terrible question.

A.   Okay.

Q.   Have you given me here today all the reasons for your decision not to seek renewal or extension of the CORE appointments in January?

MS. KIES:  Object to form.

A.   I have stated the reason why I made the decision, yes, ma'am.

Q.   And that is a complete answer for all the reasons why you made that decision?

MS. KIES:  Object to form.

A.   Yes, ma'am.  As I have restated it several times today, through this discussion that we just had, that was the basis of the decision not to renew these particular positions in January.

MS. LEONARD:  Okay.  Well, we're going to take a very short break.  I believe there are probably about five minutes left of this, if my trusty colleague is correct.

We'll go off the record right now, and I'll see if we have any final

questions.

WITNESS:  Okay.  Thank you.

VIDEOGRAPHER:  Off the record at 6:35.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 6:45.

BY MS. LEONARD:

Q.    Ms. Evans, you testified earlier that you made the decision that renewals of CORE positions should be limited to 90 days only starting roughly in late January 2026.  Is that correct?

A.    I believe, based on this email, that was -- this is in February.  So I did make the decision about the nonrenewals.

But upon -- I would also like to clarify something, based on the last exchange that we just had.  Because you were asking the question in multiple different ways, and I clearly was saying that it had to do with the waiver expiring and that these appointments were in January.

So I just want to make sure that I clarify, the way that you asked the question, you were saying, if there were -- if that was the reason.

And I want to make sure that the record is clear that during that time period, as I previously mentioned, we had an agreed-upon process.

And there were process vals that were happening in this time period, because I told you that the office heads and the regional administrators were to be signing off on the memos.

And, initially, when these memos were coming up in the December time period, and you specifically talked about the email that's associated with December 26th, those memos were not prepared appropriately.

And so, there were process vals. And the main process val, to me, was that these memos were not signed off by the program office heads.

And so, those memos needed to be signed off, and they were not.

Q.   And what effort did you make between December 26th and December 31st to ensure that the program office heads would sign off on the recommendations that had been provided to you so that these people could keep their jobs, Ms. Evans?

A.   I sent --

MS. KIES:  Object to form.

WITNESS:  Oh, I apologize.

Page 375

A.    I sent the information back -- and I believe it's in the emails -- I sent it back and said that the memos had to be processed appropriately with the program office heads or the regional administrator signing off on the memos.

Q.    And you refused to allow the renewal of these CORE positions because of a paperwork flaw, Ms. Evans?

MS. KIES:    Object to form, misstates testimony.

A.    That's not what I'm saying.

What I'm saying is, is that the process was supposed to have the program office heads and the regional administrators to look at the functions and the work that was supposed to be performed by the COREs in these renewals.

Q.    And that is, indeed, how you justified your actions implementing the secretary's priorities and policies of eliminating the CORE.

You justified it by blaming the FEMA OCHCO staff for paperwork.  Right?

MS. KIES:    Objection; mistakes testimony, argumentative, form.

A.    I --

MS. KIES:    Asked and answered.

A.    I am not saying that I eliminated CORE positions.  What I'm stating is, is that the program office heads and the regional administrators were supposed to renew -- review and make the recommendations for the renewals of the COREs that would be in this time period.

Q.    Have you given us all the reasons for your decisions regarding the January CORE renewals now?

MS. KIES:  Object to form.

A.    Yes, ma'am.  I just wanted to make sure I clarified that I wanted to ensure that the program office heads and the regional administrators had reviewed what was being recommended for renewal.

Q.    And have you given us all the reasons here today for your decision that the CORE renewals starting in January and February could not be more than 90 days?

MS. KIES:  Object to form.

A.    Yes.  I'm the one -- I believe that my -- I have stated that I'm the one who made the decision as it relates to 90 days, and I gave you the circumstance of the reason why I said it was 90 days.

Q.    And some of those renewals that were made in January and February, they're -- they're coming

up on the new NTE date.

Are you going to extend them for another 90 days?

MS. KIES:  Object to form.

A.   We -- right now, I have not made that determination, because the staffing plans, as I previously testified, are due in to us today.

And so, the idea was to do the analysis based on what the regional administrators and what the program offices were saying so that I could put together a recommendation as it related to hiring associated within FEMA.

Q.   So the decision on whether you're going to extend these people for another 90 days, to give the review council time to make the recommendations and for the staffing plan process to be completed, you haven't made that decision yet?

MS. KIES:  Object to form.

A.   Can you restate that again?

Q.   Sure.  I can -- sorry.  That was a combined question.

You haven't made the decision yet as to whether you're going to renew the people that you previously extended for 90 days for another 90 days.  Correct?

Page 378

A.    Yes.   That decision has not been made because I'm waiting for the staffing plan so that we can make the analysis.

MS. LEONARD:  Okay.  I think that's all we have.

Those are all the questions that I have for you today.

MS. KIES:  Okay.

MS. LEONARD:  For the record, we want to say that we believe that the production of documents from Defendants has been incomplete, including the production of information from the telephones, as we've heard about during this deposition.

We will be in contact with counsel about this, but we are going to hold this deposition open, pending a complete and accurate production of documents in compliance with the Court's orders.

MS. KIES:  Okay.  We understand your position.  We reserve all rights.

I believe there are two minutes left on the record.  Is that right?

Page 379

VIDEOGRAPHER:  Yes.

MS. KIES:  Okay.  Thank you.

And, of course, Ms. Evans will read and sign.  Thank you.

MS. LEONARD:  Thank you, Ms. Evans.

WITNESS:  Thank you for having me.

VIDEOGRAPHER:  Off the record at 6:52, and this ends today's testimony.

(Whereupon the deposition concluded at 6:52 p.m.)

Page 380

DEPONENT'S SIGNATURE


        Please be advised I have read the

foregoing deposition, pages 1 through 379,

inclusive.  I hereby state there are:

            (Check one)

        _____ No corrections


        _____ Corrections per attached




_____

                KAREN STREHLE EVANS




    ( X ) Reading and signing was requested.

    (   ) Reading and signing was waived.

    (   ) Reading and signing was not requested.



        Should the signature of the witness not

be affixed to the deposition, the witness shall not

have availed herself of the opportunity to sign or

the signature has been waived.


                --oOo--

Page 381

ERRATA SHEET

NAME OF CASE:  American Federation of

Government Employees, et al. v.

Donald J. Trump, et al.

DATE OF DEPOSITION:  March 31, 2026

NAME OF WITNESS:  KAREN STREHLE EVANS

Reason Codes:

1:  To clarify the record.

2:  To conform to the facts.

3:  To correct transcription error.

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

_____        _____

KAREN STREHLE EVANS             DATE

Page 382

DECLARATION UNDER PENALTY OF PERJURY

I am the witness in the foregoing deposition.

I have read the foregoing deposition or have had read to me the foregoing deposition, and having made such changes and corrections as I desired, I certify that the same is true in my own knowledge.

I hereby declare under penalty of perjury that the foregoing is true and correct.

In witness whereof, I hereby subscribe my name this _____ day of _____, 2026.

_____
KAREN STREHLE EVANS

Page 383

CERTIFICATE

I, SUSAN ASHE, a Certified Electronic Reporter and Notary Public, hereby certify that the foregoing is a true and accurate transcript of the deposition of said witness, who was first duly sworn by me on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

Dated this 6th day of April 2026.


_____

Susan Ashe, Notary Public

of the District of Columbia


My commission expires:  May 14, 2028.

**A**

**a.m** 2:2,9 13:2,19 298:9,9 299:19,21 302:2
**ability** 22:9 71:16 198:25 217:19 267:11 268:8 276:21
**able** 142:22 153:5 173:8 249:2 264:8 325:7
**aboard** 163:16
**abolished** 47:9
**abuse** 39:23 66:2 68:1,12,18
**accept** 177:25
**accepted** 62:13
**access** 195:1,6,7,14
**accidentally** 92:2
**accompanied** 270:23
**accomplish** 70:20
**account** 108:5,6,10 108:14,18,21 109:14,15,16,24 156:9,23,24 157:2
**Accountability** 205:4 237:25
**accounting** 29:13
**accounts** 110:3
**accumulate** 83:20
**accuracy** 46:22
**accurate** 21:9 22:10,14 31:1,16 31:25 47:16 120:13 184:8 202:14 224:17 280:11 361:4,15 363:12 378:19 383:5
**achieve** 44:16 65:11,12,13 249:2 249:5 250:3,18 292:17 341:22
**achieving** 53:23
**acronyms** 42:10

111:22 118:20
**Act** 155:14 171:3 192:18 201:5
**acting** 106:5 167:16 270:7 285:12 367:11
**action** 95:3 199:11 266:23,24 277:4 277:11 312:2,2,10 383:10,13
**actions** 64:22 183:11 186:1 203:18 204:22 252:23 354:21 375:18
**active** 170:25
**actively** 191:3
**activities** 44:20 110:21 168:5,16 170:21 174:3,5,9 216:1 337:23
**activity** 206:20 294:23 338:16
**actual** 170:24 212:10 270:16 294:24
**added** 167:3 285:13
**adding** 185:23
**addition** 19:2 31:22 72:13 151:21
**additional** 29:11 265:23
**Additionally** 200:6
**address** 18:4,5 41:11 43:11 108:24 109:2,10 110:5,16 175:21
**addressed** 267:9 350:24
**addresses** 109:11 110:9
**addressing** 72:16
**Admin-** 299:17
**adminis-** 39:25
**administration** 31:4 33:21 35:23 44:21 55:23 60:12

61:15 185:24 246:21
**administration's** 39:25 186:14
**administrative** 182:11 279:19
**administrator** 17:8 17:10 32:9 56:21 74:16 78:22 105:13 106:6,18 111:9 124:4 132:12 134:4 183:8 209:23 211:8 239:13 241:10 270:8 298:14 299:14 320:14 347:22 375:5
**administrators** 313:19 317:11 322:22 324:24 337:9 347:8 355:15 358:5 374:7 375:14 376:3,12 377:9
**advice** 115:25
**advised** 380:3
**advisor** 34:25 35:3 35:18,25 36:9 45:25 46:6 74:16 75:10 78:22 80:23 81:7 86:9 94:3 96:1 97:19 98:20 99:7 102:3 104:20 104:21,25 105:9 105:16,18,25 108:23 113:25 115:16,22 116:7 120:24 128:16,21 128:22 129:3,12 203:16,19 204:17 232:18 236:6 268:7 286:5
**advisors** 57:25 106:16
**advisory** 78:5
**affairs** 177:19

320:15
**affect** 251:19
**affiliated** 40:11 114:25
**affixed** 380:21
**AFL-CIO** 13:8
**afternoon** 286:13
**agencies** 23:19 38:17 168:21 205:5,24 206:13
**agency** 4:17 9:7 35:1 68:4,24,25 69:9,18 70:4,14 72:21 75:21 76:5 79:20 80:2 93:6 97:15 181:6 193:15 207:4 291:11 308:8 321:13 324:18
**agency's** 71:16
**agenda** 70:9,11,13
**agree** 68:10 70:16 200:21 275:16 276:2,18 277:8 293:7 317:1 318:12,17 325:24 326:9 328:1 330:9 362:14
**agreed** 62:17 70:13 203:5 271:11
**agreed-upon** 374:3
**agrees** 202:1,21 204:16
**ahead** 41:13 155:20 297:22 323:22 324:3
**aim** 135:12 316:21 324:15 341:20
**aiming** 309:2 337:2
**al** 1:5,9 13:8,10 381:3,4
**Alaska** 8:6 119:11 119:15,19,25 120:9,14 121:3,19 121:25 124:10,18 135:21
**Alexandria** 5:15

**aligned** 59:21 69:15 234:15 250:13
**aligns** 208:8
**allow** 272:7 323:23 375:6
**allowed** 142:13 180:9 358:7
**allowing** 346:22
**allows** 17:21
**altered** 215:22
**Altshuler** 3:4 6:3 14:4,14,18
**America** 152:5,7,11 161:8
**American** 1:4 13:7 381:2
**amount** 307:15 308:7,18 309:2,20 310:2 345:23
**amounts** 119:3 307:19,23
**analyses** 338:3 350:16
**analysis** 42:8 64:22 80:21 118:25 130:2 216:9 221:18,21,22 232:19 234:6,11 234:12,13,22,24 243:8,21 244:5,18 244:20,22 245:3 245:10,11,17 246:15 247:3,7,10 247:13,14,16 248:7 249:9,21 250:10,12 251:18 262:8 264:11,12 276:4,19,22,22 282:1,8,22 283:1 283:4 284:4,7,17 289:25 290:16,18 290:23 291:24 295:24 307:12,16 308:14 309:8 310:8,16 313:13 314:7,22,22 315:12,25 317:15

317:16,22,24
318:1,7,10,14
321:18 322:23
323:3 325:22
329:2 336:25
342:14 343:17
347:24 357:12,16
377:8 378:3
**analyze** 39:6 45:15
69:24 243:11
245:25 246:1,7
249:15 259:2,17
262:25 264:22
275:8 283:13
337:17
**analyzed** 45:18
244:14 309:20
**analyzing** 307:23
322:8 331:12
**Andrew** 271:25
286:9
**annex** 265:17,17,23
265:25 266:8
358:15,17
**annotate** 278:18
**annotated** 278:23
**announced** 176:17
176:20 181:21
**annual** 205:6,19,24
207:5 210:2,7
211:16 212:2,22
214:17 215:9,17
217:22 220:14,20
222:22 224:7,22
227:16 232:13
233:7,21 234:1
235:6,13 236:16
238:5 239:11
240:11,16 241:8
241:23 242:9,22
243:3 244:17
251:10 258:15
281:22 283:18
310:23 312:5
316:6 318:8 329:4
329:13,20 330:24
332:5 333:15

340:24
**answer** 17:20,25
20:11 21:17 28:17
41:10,13 45:13
93:16 134:24
143:3 145:24
155:19 158:11,22
175:12 180:1
188:22 189:1
190:17,21 215:20
243:6 250:17
251:2,7,25 302:8
302:12 318:4
323:21,24 326:7
326:18 342:1
355:2 363:9
367:20 368:24
369:2 370:2 371:2
371:3,4,8,9,18
372:12
**answered** 69:21
134:13 186:22
196:21 202:9
217:10,17,25
226:1,14 227:9
250:8,23 251:16
251:24 262:22
283:21 301:13
320:8 338:7
341:15 364:3
365:1,16 366:11
366:25 368:4,21
369:7 370:9
375:25
**answering** 175:1
369:1 370:11,16
370:17
**answers** 19:4
128:25
**Antoine** 8:13
**anymore** 47:21
**apartment** 107:2
**apologies** 161:19
361:9
**apologize** 64:6,6
74:10 92:5 137:18
180:8 308:4

360:20 374:25
**app** 149:18,21,23
150:4,8,12 151:2
151:22 152:1,24
**apparently** 270:21
**appear** 268:24
279:24
**appearance** 3:1 4:1
5:1 15:6
**appeared** 61:5
**appears** 49:9 79:1
83:23,24 219:17
255:3 278:20,24
304:2 340:6
**application** 157:25
158:14 352:18
353:2
**applied** 201:18
253:17 254:2
353:2
**apply** 174:10,10
253:20
**appoint** 35:24
102:13
**appointed** 36:19
37:2 46:10 94:20
94:23 96:25
101:16 102:22
103:1 106:7
178:15
**appointee** 7:15
179:7
**appointees** 152:18
152:22 181:22
182:24 184:4,18
**appointment** 36:2
36:9,24 37:6 46:8
95:7,21 96:2
99:22 100:18,20
100:25 101:2
**appointments**
130:20 131:5
174:11 249:18,19
250:11 255:16
261:7 277:19,20
295:24 308:25
317:6 343:21

351:5,9,11 352:6
352:12,24 354:10
363:2 364:8 366:5
370:15 372:8
373:21
**appreciate** 82:2
**approach** 208:16
209:6 242:25
263:5 286:14
316:11 322:7
**appropriate** 72:19
156:8,18 208:17
209:6 262:25
316:12 337:22
**appropriately**
112:14 275:9
374:12 375:4
**appropriations**
168:18 173:25
174:3 248:1
**approval** 7:25 81:9
83:25 84:5 96:5,7
119:2 171:23
184:2 204:11,16
211:23 214:5,17
226:9,17 227:1
239:14 253:2
255:19 266:11
267:22 269:12
270:20 271:14
273:24 274:3,20
277:5 344:25
348:11 350:10
351:1,10,14
**approvals** 131:4
355:8 356:17
**approve** 210:23
250:14 283:17
353:18 354:6
**approved** 95:3,7,20
96:1 139:6 212:6
214:24 221:25
233:7 237:12
249:22 250:1
254:13 265:12
277:12 325:10
343:10,13

**approving** 210:19
283:25
**approximate**
225:14 227:25
**approximately**
13:19 33:9 34:4
38:5 43:25 44:1
61:17 67:14 90:12
94:18 176:7 192:2
192:7 196:10
216:13 220:8
222:14 229:6
**April** 383:15
**area** 138:12
**areas** 201:6 208:21
**argumentative**
326:6,17 341:25
375:23
**arrangements**
107:1,12
**arrive** 283:23
**arrived** 268:6
**art** 170:17
**article** 67:10,15
177:4,10,14,14
183:11,15,18
185:21 191:18
194:6
**articles** 184:5
**articulated** 69:16
**Ashe** 1:24 2:12
13:22 383:3,19
**Ashley** 4:19 16:1
**aside** 50:23 175:22
205:1 257:7
**asked** 45:12 55:1
55:12 58:19,22,25
63:1,6 69:20
87:23 99:19,25
100:16,19 102:20
103:6 121:8,11,14
121:18 128:24
134:12 143:12,23
144:7,10,18
161:19 180:11
186:21 196:20
198:16 199:3

202:8 207:3 209:5 217:9,16,24 225:25 226:14 227:9 230:8 250:7 250:22 251:15,23 259:5,6,8 262:22 263:17,21 281:12 282:15,20 286:12 291:10 298:21 299:18 301:10 306:8 310:15 312:24 316:20 317:3,4,13,23 318:19 320:7 333:19 336:24 338:7 341:14 342:18 343:15,19 343:24 364:2,25 365:16 366:10,24 368:3,20 369:6 370:8 373:23 375:25

**asking** 21:19 26:23 52:14 54:6,7,11 55:21 88:10,15 89:3 103:2 121:22 140:22 143:25 152:21 159:6 174:2 180:3,5 226:2 227:20 259:21 276:3 294:4 297:3 299:24 302:25 303:19 307:5 317:7 339:10 341:20 345:23 350:4 351:4 367:19 369:9,16 370:3,10,22,23 371:17 373:18

**asserting** 189:16

**assess** 9:6 193:14 345:20

**assign** 298:17

**assigned** 55:9,10 94:7 259:7,22 261:15

**assignment** 54:25 63:18 139:16 206:19 210:5 212:1,19 320:11 341:17

**assignments** 41:3 83:19 84:17 127:1 127:2 139:20 168:12 173:18

**assist** 53:22

**assistance** 118:21

**assistant** 6:5,8 33:4 33:6 35:4 36:16 45:5 97:1 177:18

**assistants** 15:8

**associate** 270:8 320:14

**associated** 45:20 64:23 69:3,13 71:12 87:11 102:3 110:2 152:10 164:15 166:12 170:14 171:11 173:13 201:5 216:2 243:8 244:9 246:15,17 247:17 247:22 261:17 263:18 264:12 265:25 273:5 294:20,25 295:20 303:18 307:12 308:11,15,22,24 310:16 313:8 314:4 319:21 320:15 325:23 346:3 350:19 374:11 377:12

**assume** 73:20

**assumed** 188:13,16

**assumes** 261:10 316:24

**assuming** 96:22 182:12

**assumptions** 299:24

**attached** 21:24 208:6,12 211:11

238:6 287:12 315:17,23 323:14 324:9,11 380:8

**attaches** 346:10

**attaching** 349:10

**attachment** 219:1 219:14 265:19 287:10

**attachments** 268:22,24

**attend** 75:11,13 90:25 91:3 121:9 121:11,15 175:16

**attendance** 121:8

**attended** 71:1 78:5 79:7 97:21 120:14

**attending** 29:7 90:20

**attention** 207:15 228:19 229:4

**attest** 99:24 113:1

**attorney** 17:21 19:18,24 20:3 23:20 42:22 43:3 383:9,12

**attorney-client** 174:25

**attorneys** 4:7 15:3 22:22,23 23:13,15 23:23 24:2 28:14 41:12

**author** 287:16,18 287:20

**authored** 288:5,5 288:18,21

**authorities** 17:6 39:19 131:23 253:7 273:5,6 277:9 353:6 358:16 363:1 364:1 367:17,17 369:13

**authority** 102:13 130:19 131:12,19 133:11,15,17,20 133:22 134:2,5 169:17,21 172:2,3

172:7 173:23 179:9 180:19 253:2 254:1,5 255:11 264:8,15 264:24 265:13 266:4,9 267:10,20 267:25 268:2 269:13,17 270:3 270:25 273:1,10 273:18,18,22,25 274:21 275:2,5,12 275:19,22 276:5 276:12,20,21,23 277:4,14 303:24 304:17 307:4 345:1 348:12,23 351:4,18,20 352:6 352:13,16 354:8 354:20 356:12 357:21 358:12 359:20 363:4 364:6 365:4,19 366:14 367:3 368:10 370:14

**authorized** 108:9 108:13

**auto-populate** 342:17

**auto-populated** 344:6

**automatically** 156:24

**available** 171:13,16 319:14 339:7

**availed** 380:22

**Avenue** 2:11 13:16

**average** 18:17

**awarded** 29:4

**awardees** 63:19

**aware** 21:2 27:16 43:24 44:3 47:7 47:12 58:23 60:24 65:24 96:15 107:1 112:25 113:19,24 114:19,21 121:7 121:21 127:11 128:23 136:10

157:17 159:13 161:4,6 163:20 164:9,13,14 182:9 184:17,21 185:7 190:24 191:10,14 191:16 194:6 195:7,10,24 196:17 203:19 204:9,22 206:21 214:2,7,8,11 235:20 236:7,14 236:23 242:23 248:21 271:13,17 296:11 297:4 299:6 301:17 317:16,25 338:24 339:9

**awhile** 124:16

---

**B**

**b** 260:22 261:25,25 280:3 285:3

**B.A** 29:14

**back** 31:3 32:17,25 41:18,20 44:18 45:3 68:15 82:4,6 86:15 110:1 135:20 137:21 139:5 147:21,24 159:22 166:22 167:6 174:12 192:10 201:2 213:10,14 226:20 226:21 241:20 244:20 254:1 257:7 264:25 265:13 278:7 279:12 292:12 296:17,19 304:17 311:11 314:12,13 321:24 322:24 324:5 333:7,14 335:1 336:13,17 336:19 337:1 375:1,2

**backed** 156:24

**background** 26:13

28:21 102:6 110:10 116:12,19 116:22,25 117:3,7 125:8 166:10 265:18,24 266:7
**Baltimore** 3:17 14:12
**barely** 326:14 327:20
**Barton** 305:15 320:12,14,17 321:4
**base** 350:7
**based** 25:14,25 39:7 42:14 52:12 70:1 85:5,23 93:5 118:17 173:22 175:14 180:3 206:25 216:9 221:7,17,21,23 234:7,11,12,14,22 234:25 235:1 237:4,9 242:24 244:11 246:12,25 247:3,3 248:6 249:21 258:19 259:19 262:14 269:23 270:6 280:15 281:4 286:23 290:24 293:18 296:20 297:6 302:21,25 304:14 309:6 310:14 311:2 313:10 317:5,8,9 317:12 320:1 325:8 328:13 333:6,9 336:8,9 337:20 341:16 347:9 348:7,20 353:5 355:4,25 356:5,11 357:11 357:13 361:18 362:25 363:10 365:19 366:14 367:2,7,16 368:9 368:13 369:12,14

370:14 373:13,17 377:9
**bases** 371:23
**basis** 89:3 99:17 109:1 198:22 199:8 274:17 367:9,15 372:17
**Bates** 165:13 170:8 210:25 218:20 219:13,16,16 223:11 340:7
**becoming** 90:24
**began** 26:8 53:25 169:16 178:19 262:18
**beginning** 2:8 37:22 60:11 94:19 94:21 118:10 177:21 187:14 298:16 356:2
**begins** 13:5
**behalf** 2:8 3:2,13 4:2 5:2,10 15:12 20:4 189:15 210:1 328:11
**Belichick** 281:15
**belief** 198:9,16
**believe** 28:4,9 30:10 31:23 36:5 36:23 44:18 53:8 53:21 65:6 67:6 68:14,20 73:5 83:10 87:7,23 95:23 98:7 107:2 114:12 120:2 124:7 146:24 148:5 150:19 151:20 158:15 161:9,11 165:7 168:17 171:20 175:23,23 176:11 179:8,12 197:12 201:2 206:3 211:15 220:12,16 239:3,7,17,22,23 240:4,7 241:1,4 242:5,16,19

245:22 253:5 266:7 267:5 268:7 268:14 272:16,17 272:23 275:17 284:14 286:21 287:2 288:17 292:12 295:9 296:17 297:14 300:7 301:20 305:13 309:16 313:5 319:10 320:18 321:8 322:9,20 323:16 326:13 328:13 331:18 333:6 335:7,16 336:1,3 336:8,12,16 339:4 339:25 342:15 346:1 348:2 350:18 358:10 363:3,12,19,24,25 369:3,21 370:5 372:21 373:13 375:2 376:19 378:10,24
**believed** 199:5 230:18,23 231:1 237:10 322:15 364:21 365:12 366:8,20
**believes** 76:3
**benefits** 307:24
**Berzon** 3:4 6:3 14:4 14:15,18
**best** 58:16,17
**better** 257:21 322:24
**beyond** 61:6,14 127:2 181:12 357:22
**Biden** 246:21
**big** 119:18
**Bilicic** 281:11,16 281:19 291:25 292:9 294:7,15 305:15 348:24 359:21

**Binnall** 5:12 15:19
**bit** 192:13 267:1
**blamed** 341:22
**blaming** 342:3 375:20
**board** 56:4 163:10 164:6 181:7
**Bock** 229:9
**book** 166:7,8,9
**books** 166:16
**bottom** 123:5 169:1 169:8 171:19 205:20 219:23 223:11,19 228:21 291:1 305:12 331:20 335:17
**bottom-up** 312:22 314:17,22 315:12 315:19,25 316:11 316:18 317:14,24 321:18 322:7
**bottoms-up** 208:16 209:6 242:24 263:4 317:24,25 334:22 336:25 342:13 343:16
**box** 3:21 84:24
**branch** 4:9 40:4 70:12 179:17
**break** 20:15,19,20 27:23 43:11,23 81:18 82:4,13 110:24 135:3,8,11 143:11 147:22 148:24 159:21 164:17 222:13,21 252:5,6 304:19 332:24 344:16 372:20
**breakout** 259:8
**breaks** 20:16,18 81:21
**Brian** 24:8
**BRIC** 64:1,3,9
**briefing** 166:7,8,9 166:15
**bring** 147:21

**bringing** 105:15
**BRINGS** 8:4
**broke** 146:5
**brought** 147:23 359:18
**budget** 32:14 42:6 92:12 127:8 139:21 168:14
**budgeting** 322:23 325:1,5
**building** 74:1 89:6
**built** 89:7
**bullet** 286:10
**bummer** 327:17
**bunch** 312:15
**bureaucracy** 71:15 71:20 72:2 77:2
**bureaucrats** 183:25 186:2,19
**business** 18:3,5 31:4,5,7 34:15 126:16 141:14,16 142:5 146:19 148:19 152:25 155:5
**bypassed** 200:6

---

### C

**C** 4:21 18:6
**calculated** 221:14
**calendar** 166:20
**California** 1:2 3:8 13:12
**call** 50:10 55:11,14 98:14 136:6,8 152:2 190:20 192:5 238:20 281:15
**called** 25:16 34:11 40:6,11 58:22 84:6 150:23 181:24 205:3,6 221:20
**calls** 155:16 189:12
**Cam** 47:5
**campus** 89:7
**cancel** 197:10,10

canceled 194:2 196:25 197:4,6,12 197:16
cancellation 197:19 197:24
capacity 1:8 5:11 13:9 15:20 144:11 144:12 145:19,20 149:4,5,5 158:21 189:11,19 332:11 332:15 333:1,18 334:2,14 335:4,9 335:20 336:6
capital 42:11,14,16 50:6,8 111:21 140:19,20 207:2
caps 151:14
captured 156:20 157:10
career 198:6
Careful 355:20
carried 325:15
carry 311:24
case 1:6 13:11,13 15:13 24:21 36:23 42:5 63:25 83:10 89:5 95:14 98:7 111:6 112:18 114:12 124:7 164:10 184:14 267:3 272:16 282:6 294:18 307:10 319:10 360:5 363:24 371:14 381:2 383:14
cases 164:14
categories 289:23
categorize 192:11
categorized 192:13
caution 188:20
Cavanaugh 24:8,18
CC 224:3,4 339:23
CC'd 128:11 130:7 269:21
CC'ing 278:8
cell 148:2,3,6,12,15

149:23 160:14 161:11
center 123:16,19
CER 1:24
certain 156:11 172:4 174:5,13 181:23 253:3 255:12 265:14 266:4
certainly 367:10
certificate 29:6,18 29:18 383:1
Certified 2:12 383:3
certify 382:7 383:4 383:8
CFO 116:10,15 308:13
chain 31:14 34:15 207:13 228:17,20 255:2 257:10 271:17 278:6 297:14,20 305:12 311:10
Chambers 31:6
chance 219:8
change 171:16 186:3,5,7,20,24 295:7
changes 186:20,24 187:5,7 317:11 382:6
changing 191:2
characterization 328:2 330:9
characterize 320:9 321:5 342:2
charge 131:8
charged 337:24
chart 7:13 9:18 49:10,16 50:15 248:5
chat 153:10,17,22 156:14 157:16,18 158:5,8,16 159:7
chats 152:23 154:15,17 155:1,2

155:8 156:2 157:5 163:21 164:2
CHCO 50:10,11 169:8 183:6 184:15 207:23 209:7 210:1 213:7 214:13,15,20,25 215:4,16,23 221:9 225:10,21 226:5,8 226:18 227:11 228:8 230:7 245:6 245:7 267:7 271:6 280:19 285:11 290:22 292:14 297:20 298:12 308:12 311:9,18 311:25 312:8,16 313:12 315:1 316:7 322:11,11 322:14 333:11 343:14 346:9,21 347:6 348:17,22 350:22,22 359:7
CHCO's 215:8 275:11
CHCOs 245:7
check 28:11 204:19 204:20 380:6
chemistry 29:3,15
Chicago 3:15 14:10
chief 4:20 8:12 15:24 16:2 17:5 25:16,23 26:3 32:6 33:13,19 42:9,10,13,16 49:18,19 50:5,8 55:12,13,16,25 57:24 80:23 86:9 91:3 94:4,7,13,16 94:18,23 95:8,21 95:25 96:2,22 97:13 98:1 105:12 111:7,21,23 112:11 113:15,21 118:5,8,9,18 127:18 129:3 132:2,2 133:5

136:25 140:9,12 140:19,20 151:10 162:9,18,24 163:3 163:9,19 164:1 167:17 177:19 178:5 182:14,16 182:19,23 189:24 204:24 207:2 235:19 273:14 285:12 295:18,21 303:13,17 304:13 313:12 331:10
chiefs 57:25 60:12 60:13,14 61:10,13
chose 172:24 243:12 276:23
Christmas 349:10
Christopher 4:6 15:21
christopher.r.hal... 4:15
circumstance 50:13 137:5 183:4 376:22
CISA 7:15 26:15 26:15,16,17 35:5 35:6,15,16,18 36:10,17 37:13 38:2,6 39:4,11,21 40:16,21 41:5,24 43:21,25 44:4,6 44:13,18,25 45:3 45:17,21,22 50:15 55:17 56:2,7 60:17 65:25 66:2 68:1,12,15,20 74:22 89:13 91:15 91:18 99:1 108:18 109:13
cities 119:17
city 3:15,16 14:9,12 16:24
civil 4:8 192:18
clarification 130:9 285:14
clarified 364:4 376:11

clarify 19:16 54:12 159:8 181:3 276:10 372:2 373:16,23 381:8
Clayton 271:25 272:5 286:9
clean 17:17
clear 43:7 113:18 144:21 183:7 201:8 292:22 301:19 326:11 370:1 374:2
clearance 7:24 84:5 96:6 113:1 114:3 114:6,10 137:20 137:24 138:22
clearances 86:8 96:13
clearly 269:20 292:3 299:11 373:19
clients 20:5
clock 222:12
close 291:13
closer 123:15
CNN 191:18 194:6
co-chair 79:8
co-chaired 187:9
coaching 251:5
codes 253:15,20 381:7
cognizant 56:17
coincided 201:19
coincidence 232:5
colleague 372:23
colleagues 20:16
collect 25:11 238:22 298:22 301:21
collected 296:4,24
collecting 296:12 297:5,7 308:17
College 31:6
color 122:5
Columbia 2:13 383:20
column 49:17

**combined** 377:21
**come** 35:17 82:4,6
    118:1 127:21
    138:14 139:20
    159:22 163:10,16
    164:6 171:22
    174:12 234:14
    269:24 282:4
    307:22 309:1
    314:12 325:9
**comes** 118:1 215:7
**coming** 64:25 65:7
    86:15 101:11,24
    121:3 125:8,22
    126:17 161:14
    164:8 173:21
    249:23 250:14
    254:8 255:25
    256:1 263:7 264:4
    268:8 278:25
    295:14 308:10
    310:3 313:3 314:7
    338:12 350:6
    351:2,19 352:24
    374:9 376:25
**comment** 187:23
**comments** 77:14,14
    79:13 190:23
**commercial** 124:12
**commission** 383:22
**commissioned**
    187:4
**common** 296:18
**communicate** 20:6
    129:22 132:5
    136:16 141:21
    146:18,23,25
    147:10 148:7
    149:25 150:4,8,13
    151:2 161:14,17
    162:3 330:22
**communicated**
    77:16 130:18,23
    131:3,7,14
**communicating**
    331:2
**communication**

156:12 162:17
163:19,20 164:3
327:9
**communications**
    77:23 129:2
    134:16 135:22,25
    136:2,5,11,14
    153:5,6 154:3,21
    157:12 159:16
    162:1,17 174:25
    175:10,13 320:16
**commute** 18:10,13
    18:17
**companies** 117:11
**company** 114:24
    116:10,16
**compensation**
    115:7,11
**compilation** 166:14
    166:17
**compile** 214:3
**compiled** 214:15
**compiling** 122:14
**complete** 17:25
    21:9 22:10,14
    35:12 175:20
    251:1 298:18
    300:3,15 342:18
    372:12 378:19
**completed** 64:23
    80:21 212:18
    302:2 348:18,22
    377:16
**completion** 334:17
**compliance** 378:20
**complied** 209:25
**comply** 245:12
**component** 56:14
    56:15 59:18 61:9
    61:12 65:17 84:15
    90:19,20,23,25
    91:7,19 97:21
    98:5 105:11,23,24
    106:3,20 109:12
    139:25 140:20
    179:10 180:4,18
    180:23 214:3

226:17 227:2
236:24,25 314:17
317:14,23 329:6
329:19 332:18
335:8 336:4
354:19 356:12
361:20,21,24
364:10,11,19
**components** 42:7
    56:5,6 60:6,9,15
    83:19,20 89:9
    139:1,17 180:19
    207:3 209:2,5,13
    216:12 222:5
    311:18 312:1,21
    315:13,25 316:19
    318:24 321:19
    322:16 323:5,17
    324:15 333:3,20
    336:24 341:20
    342:14,16 343:15
    371:13
**computer** 166:1,2
**concerned** 113:8
**concerns** 110:14,18
    110:25 186:13
**concluded** 379:11
**conclusion** 102:15
    102:18 133:14
    134:1,9,23 155:17
    178:24 179:5
    363:7
**concurrently** 213:8
**conditions** 115:15
**conduct** 185:25
    209:5 244:18
**conducted** 246:6
    247:5
**conducting** 39:15
**conference** 21:7
    91:16
**confirm** 31:24
**confirmation**
    177:17 182:5
**confirmed** 24:13
    36:5 37:3,4 48:6
    52:17 55:7 176:12

176:18
**conform** 381:9
**confusing** 361:17
**confusion** 74:10
    362:16
**Congress** 47:8,16
**conjunction** 182:22
    314:6 338:15
**consider** 44:11
    307:15 315:10
**consideration**
    239:14 314:10
    318:6 347:2 350:9
    357:3
**considered** 248:16
    283:16,25
**considering** 350:12
    362:9
**considers** 192:17
**consistency** 359:14
**consistent** 77:14
    216:7,24 220:23
    232:17 233:14,17
    241:17 244:23
    290:5 341:5,9
**consulting** 32:23
    34:3,8
**contact** 148:17
    151:21,25 378:16
**contacted** 203:1,3
**contain** 158:15
**contained** 196:18
    241:10 341:12
    361:3
**contains** 73:14
**content** 156:2
    157:5 189:21
    190:25 212:12
**CONTENTS** 7:1
**context** 117:15
    306:2 361:18
    367:1 368:6 369:9
    369:10,12,18,25
    370:12,13,17,22
**continue** 61:6,11
    126:21 145:21
    148:24 264:8

313:22
**continued** 4:1 5:1,3
    8:1 9:1 10:1 11:1
    12:1 172:16,17
    205:4 240:19
    294:15
**continues** 266:16
    363:4
**continuing** 171:14
**contract** 104:10,17
    104:18 107:9
    114:14,18,20,22
    114:23 115:3,8,13
    115:16 118:2
**contracting** 139:9
**contractor** 103:9
    103:15,18 104:3
    104:13 110:15,19
    111:2 121:2
    127:24 134:19
**contractors** 110:4,8
    110:23 111:4
**contracts** 113:20
    113:25 118:3
    137:7
**contrary** 198:10,15
    200:18 367:11
**contribute** 207:4
**contributing**
    233:25
**contribution** 210:2
    210:7 211:16
**control** 144:13
    363:4
**conversation** 35:10
    35:11 58:19 59:7
    62:11 101:19,22
    125:12 133:3
    148:25 270:16
    277:22
**conversations** 78:3
    125:1,7,13,17
    127:13,16,25
    178:8,12 213:15
    213:23,25 235:21
**converted** 337:25
**convey** 136:20

137:2 138:8 141:1
**copied** 128:7
136:12 224:9
286:1
**copies** 22:3 30:2,4
**copy** 22:1 199:24
224:21 242:8,12
**copying** 129:15
286:9
**Core** 26:3 130:19
131:5,16,16
169:16 171:21
172:4 173:7,16
174:11 192:19
248:2,14,19,23
249:2,4,13,16
250:6,11,20
251:13,19,21
252:1,18 253:3,8
254:1,6,7,13
255:12,16,24
256:24 258:5,10
258:21,25 259:2
259:17,17,25
260:5,7,12,17,24
261:1,4,7,7,13,17
262:19,24 263:8
263:22 265:14
266:4,11,19 267:8
267:12 268:25
272:1 275:11,13
276:7,13,14 277:5
277:11,18,20
279:9,16,18
284:13,18 285:1
285:25 289:4
294:22,25 295:14
295:24 296:2,3,10
296:13,21,23
297:7 298:15
299:12 300:19
301:3 302:4,13
303:3,15,15 304:3
304:7,9,13 306:3
306:16,18 307:13
307:16 308:5,15
308:23 310:3

313:7,9 314:6,8
317:6 318:21
325:23 327:20
331:12 337:20
338:15 339:1
343:20,22 344:14
345:24 347:9
349:11,16,20
350:1,4,8,11
352:5,19 355:8,15
355:24,25 356:14
356:18 357:22
359:11,24 362:18
363:5 365:18
371:24 372:8
373:10 375:7,19
376:1,8,15
**COREs** 130:24
167:20,22 168:8
168:25 169:8,12
170:1,5,13,24
171:2 175:18
248:12 249:9,17
258:24 259:10,11
259:22 261:15
264:5,12,15 273:4
280:5,7 284:20,22
285:4,6,17 286:12
286:25 303:14,24
304:1 306:4 307:2
307:7 308:13,22
310:9,17 337:21
337:25 344:3
345:2,6 346:3,22
347:3,14,20
350:11,19 351:1
351:14 353:19,20
354:2,8,13,23
358:3,22 361:11
362:10 364:7,23
365:3 366:13,21
375:16 376:5
**COREs'** 308:23
**Corey** 51:14,17
52:1 80:22 86:9
102:25 129:8
132:5 135:23

136:18 138:9
148:14 153:12,23
154:4 158:6
185:17
**correct** 24:14 30:18
31:16,20 33:11,17
33:22 34:23 36:25
37:13,25 39:4
40:16 44:6 46:4,8
47:17,25 48:7,18
49:21 50:2,16,19
50:25 52:25 53:1
57:15,19 58:1
59:22,25 60:9
61:22,24 62:14,23
63:9,11,12,15,22
64:18 65:19 66:20
69:9 70:14,23
71:22 72:17 74:13
76:13 77:5 78:7
80:3,11,24 85:9
90:10 94:4,20
96:18,23 97:3,8
98:9,11 99:10
103:9 104:24
105:5,20 106:3,5
106:7 108:5,7
110:5,11 113:5,21
114:20 116:20
117:4 118:6 119:7
119:11,14 129:4,6
129:16 130:12,25
131:5 132:6
133:18 134:21
147:2 148:8
153:13 155:6,10
157:25 167:17,20
169:17 171:4,7
172:4 176:1,5,21
178:15 179:3,10
179:19,20,23
180:15 182:7,14
183:1 185:9,11
187:9 191:7,12
192:19 193:1,22
194:2,4 196:15
198:11,18,21

199:6,12 201:11
201:17 202:14
210:8 211:8,24
212:7,14 213:11
214:9,18 215:2,17
220:9 222:7
224:12,18 225:15
230:20,24 231:5,8
233:22 234:2,8,10
235:24 236:3,9,16
236:18,20 237:2,7
238:14 241:18
242:2,4,17,20,25
243:13 244:1,5,18
246:3,21 248:24
249:5,13 250:21
251:14,21 253:17
254:2,9,14 256:1
258:17 261:3
262:1,5,11,20
263:23 265:14,20
266:5,12 267:12
267:17,22 274:13
275:13,25 276:15
277:2,5 278:19,23
279:6,11 280:8,24
282:18 285:17
286:18 291:14,21
293:3 295:15
306:5,20 307:25
308:19 310:24
311:19 312:17
314:19,21 315:3,5
315:20 316:1
317:17 318:2
319:1,8,12,17,25
320:23 321:6
322:1 323:6,9,14
324:9 328:6
332:19 333:20
337:14 338:5,21
339:1,11,12
341:23 343:5,17
345:2,7,12,24
348:14,25 349:2
351:15 353:3
354:15 355:9

356:7,19 357:8,23
358:8 362:1,4,12
362:21 363:5,11
364:15,23 365:14
366:9 367:13
368:19 372:23
373:12 377:25
381:10 382:10
**corrected** 53:7
**correcting** 60:14
**corrections** 380:7,8
382:6
**correctly** 105:22
198:2
**correspondence**
8:11 9:9,14,20,23
10:4,7,10,13,16
10:23 11:4,7,10
11:13,16,19,22
210:15
**cost** 247:16 345:24
**costing** 310:9
349:22
**coun-** 78:6
**council** 7:17,20 9:5
71:2,7,9,10,14
72:13 73:4,15
77:1,9 78:6,16
79:7,9 127:21
187:3,9,13,17
189:3,7,25 190:11
191:3 193:14
194:11 195:2,12
195:17 196:18,25
197:11 200:14
231:11 232:10
237:13 249:23
250:15 325:10
330:18 338:12
339:6 357:18
377:15
**counsel** 3:1,20 4:1
4:20 5:1 13:24
15:24 16:3 20:6
22:4,25 25:17,23
26:4 27:25 30:4
111:22,23 122:18

145:6 146:3,14
165:15 174:20
175:3,11,13 189:3
190:20 218:17
285:12 313:13
378:17 383:9,12
**counselor** 24:3,6
236:6
**Counter** 100:10
101:11
**Countering** 97:2
**counts** 266:24
**County** 3:16,16
14:11,11
**couple** 201:6
**course** 30:14 145:1
184:7 228:24
379:3
**court** 1:1 13:11,22
17:17 19:5,12
21:4,22 41:17,19
41:20 46:15,18,21
64:18,22 91:24
92:4 102:16,19
144:22 151:13
164:10,14 226:21
228:12 263:14
323:18,20 324:5
**Court's** 378:20
**courtroom** 21:8
**cover** 193:16
**create** 17:17 30:22
**created** 239:12
240:12,17 247:7
**critical** 253:12,14
253:16,19
**crossed** 174:14
**crossed-out** 279:15
**current** 18:3,5
39:15 77:2 177:19
220:3 237:4 245:5
245:8 266:17
**currently** 16:25
17:2 80:10 234:23
246:25 297:3
**custodian** 287:16
287:18,19

**custody** 144:13
**cut** 63:4,9 67:25
191:11,21,25
192:7,25 196:19
217:7,14,22 218:3
218:6,8 220:2,7
221:1 222:5
226:11 227:6
231:4 232:6,7,9
232:13,19,25
233:6 234:6 235:6
235:12,16 236:15
243:3,10,17,23
244:16 245:13,24
246:8 248:2,2
249:3,5 258:16,22
259:1 261:21
263:8,20 275:24
276:14 281:23
282:16 286:18
288:9 289:2,4,6
291:20 292:5,25
293:9,9,22 296:1
296:9 309:1,9
312:25 313:23
314:18 315:19
316:21 319:23
323:12 325:14,17
326:3 334:7 337:2
339:1 340:23
341:5,10,12,21,22
**cuts** 248:6 266:23
288:24 289:1,8,18
293:22 319:8
**cutting** 66:1 68:11
68:17 215:23
216:3 234:18
309:9
**Cyber** 34:11
**cybersecurity**
31:13 32:23 33:5
33:7 34:8,16,22
35:1,4 36:17 45:6
110:11 163:15

——————
**D**
——————
**D.C** 2:11 3:22 4:11

4:23 5:7 13:17
18:13 74:6 106:23
107:2
**Dan** 8:10
**Danielle** 3:5 14:3
16:16 218:19
**Darbo** 4:19 15:25
16:1
**data** 69:25 70:1
209:7 215:15
233:13,16 234:11
238:20 245:8
288:2 296:14,23
297:5 298:17,22
299:7,20 300:19
301:4,11,21 302:5
302:14,16,23
303:3,7,16 304:3
304:8,10 325:7
332:10 334:4
335:3,19 338:17
**data's** 303:18
**date** 13:17 36:22
37:19 73:16 84:18
84:25 94:10 114:9
130:24 132:24
166:20,24 167:6
172:12 193:15
206:6,16 211:20
217:12 218:1
223:13 259:12,25
261:8 262:19
280:5,7 284:21,22
285:4,6,17 287:25
295:15 296:2,10
296:13,24 301:4
302:4,13 303:6
304:1,3 311:21
312:7 343:4,8
354:24 377:1
381:5,25 383:7
**dated** 177:5 183:15
205:17 228:18
349:7 383:15
**dates** 29:1 152:10
164:14 170:13
188:10 215:12

254:8 256:24
258:20 260:7,13
260:17,24 261:1,4
261:14,16 262:24
263:23 264:4
279:9,10,11,16,18
279:20 284:13
285:1 296:3,13,21
297:7 299:12
303:4 306:3,19
312:15 332:22
333:6 337:20
345:6 347:14
355:15,25 359:13
**David** 46:1
**day** 18:13,17 43:8
74:25 164:10
165:21,23 166:3,6
166:12,15,18
167:3 168:1,4
178:18 182:3
211:17 258:14
295:25 296:12
298:9 299:10
301:22 304:7
372:3 382:12
383:15
**Daylight** 2:2 13:2
**days** 18:18 125:4
174:5 206:6 217:7
265:14 266:5
267:12,15 275:22
276:5,13 351:5,11
353:19 356:19,23
357:6,22 358:22
358:25 359:13,25
373:11 376:17,21
376:23 377:3,14
377:24,24
**DCOS** 131:8,14,17
133:6 151:9,10,14
160:23 161:20
184:25 185:2,8,12
185:16,18 189:24
190:8,12 236:8,13
236:15,19 273:21
274:16,20 285:22

305:24 306:11,16
306:24 307:11,14
353:25 354:22
358:24
**DCS** 236:8
**deadline** 206:4,13
206:22,24 209:19
209:22 311:19,25
312:16 328:5
332:18 333:3
334:21
**dealing** 271:4
**December** 9:8
105:11 118:11
131:13 132:11
171:21 172:8
177:21 178:20
181:21 183:16
187:14 189:22
193:16 194:1
196:24 198:8
199:23 206:13,18
209:19 211:1,17
212:5 213:11,17
217:21 220:20
223:14 224:8,23
228:18,22 229:5
230:13,19 235:23
241:22 242:10
252:22 254:6
255:5,9 256:4,13
257:11,16,22
259:12 268:23
271:24 273:10
274:4 277:23
278:8 280:7 281:4
286:8 288:1,4
295:11,12 296:1,4
296:8,12,24 297:4
297:15 298:8
299:7 302:5,14
303:3,4,8,10,22
304:10 305:16,21
305:24 306:11,23
310:8,15 311:4,13
312:20 315:12
317:23 324:12

329:13,21 332:17
332:19 333:3,4,14
333:20,24 334:6
334:15,17,23
335:9 336:11
338:20,23 339:10
339:18 344:24
345:22 346:15,23
349:7,10 351:13
351:24 352:1,14
353:10,15 354:9
356:10 358:13
365:6 366:15
374:9,11,19,19
**decided** 312:20
314:16 321:4
361:11
**decision** 134:18,25
182:17,22,25
183:5 184:18,22
185:3,5,8 202:16
202:17,18,19,25
203:3 204:6
243:21 244:15
245:12 264:19,23
266:20 267:17
268:25 271:11
273:23 274:2,12
274:25 275:4
277:3,13 283:16
304:16 319:20
342:5 344:25
345:4 351:5,13,17
351:22,25 352:5,9
352:23 354:1,23
355:4 356:5,13,18
356:23 358:1
359:23,23 363:1
365:2,10,21 366:4
366:12,14,21
367:2,2,5,9,16
368:7,9,12 369:5
369:10,11,12,19
369:22,25 370:12
370:13,18,18,22
370:25 371:11,12
371:15,24 372:7

372:11,13,17
373:10,15 376:15
376:20 377:13,17
377:22 378:1
**decision-making**
139:8 179:9,23
350:10
**decisions** 70:1
81:10,14 96:16
111:11,13,17,19
112:7 113:9,13,20
121:7 130:10
131:10 132:10
133:23 134:6
136:17,21,22
137:1,6,13,21
138:8,14 139:14
140:5,14 141:1
179:13,14,16,21
180:6,10,14 181:1
181:4,9,11,16,18
181:18,23 182:6
182:15 185:1,19
202:13 203:8,11
203:15,17 252:18
255:24 266:10,18
267:21 277:10
294:21 303:23
322:10,13 345:12
347:2 352:15
357:19 363:13,20
364:1,7,22 365:13
365:17 366:7
367:12,23 370:6
371:20 376:8
**declaration** 12:4
25:21 360:4,13
361:1,3,6 362:12
382:1
**declarations** 92:8
118:22,24 137:8
137:11,22 139:10
**declare** 382:9
**decs** 153:9
**Defendant** 189:10
**Defendants** 1:10
4:2 5:2 15:12,17

175:3 207:14
218:17 228:17
255:3 287:7,24
378:11
**Defendants'** 12:5
**Defenders** 6:9
14:22
**defending** 20:3
**Defense** 201:5
**deferred** 44:10
**definitely** 101:11
251:18
**definitively** 215:20
**degree** 29:3,4,5
31:5
**delaying** 43:8
**delegate** 270:25
**delegated** 17:6
131:11 253:6
254:5 255:11
264:8,25 266:4
269:17 270:3
273:6,18 275:21
304:16 307:3
345:1 348:23
359:21 365:4,19
366:15 367:4,17
**delegates** 265:13
**delegation** 169:21
172:1,6 173:23
253:25 266:9
351:19 352:6
358:12
**deliberative** 127:23
175:15 188:21
189:13,16 190:15
233:15 325:3
**delineation** 113:18
**deliver** 187:20
**deliverable** 213:14
213:21 214:1,21
216:2,10,11 217:4
217:13
**deliverables** 216:8
**delivered** 232:4
**delivering** 72:4
**delivery** 31:14

**demobilization**
169:6,13,14
**Democracy** 2:10
3:18 6:6,9 13:16
14:22 15:1
**denote** 12:24
**department** 4:3 5:4
15:11,16,22 16:5
24:9 26:13 32:7
33:1,10,11,17
48:17 49:8,10
52:17 53:22 54:9
56:10 66:6 67:20
73:13 83:1,13
85:21 88:23 90:10
90:14 91:9 95:5,8
96:17 116:7
119:20 141:8,12
149:14 161:15
162:6 164:8
170:22 177:17
181:6 184:2 189:9
199:1 215:13
216:5,19 222:23
230:7 233:18
273:6 282:3 307:6
313:4 338:16,18
368:18
**department's** 83:7
140:19 162:8
**departmental** 42:9
**departments**
168:21
**depend** 50:13 57:21
137:5 139:16
**depending** 56:16
111:6 140:8
309:14
**depends** 80:15 86:5
97:17 104:6
127:15 138:12
154:24 155:3
180:2 184:11
192:5,11,15,21
**depicted** 122:23
123:16
**DEPONENT'S**

380:1
**deposed** 18:20
21:21
**deposition** 1:15 2:7
13:5 17:14 20:4
22:18,21 23:23,25
24:2,19,25 25:4
25:20 27:3,13,25
28:14 42:23
144:22 145:9
378:15,18 379:11
380:4,21 381:5
382:3,4,5 383:6
383:11
**deputy** 48:25 50:1
50:19 51:22,24
52:8 55:11,13,16
55:25 57:25 60:13
60:14 61:10,13
95:16 105:10
132:2 151:10
178:5 189:24
235:19 273:14
295:18 303:13,16
304:13 331:10
**describe** 25:18
28:22 39:24 64:24
65:7 83:11 286:24
**described** 35:14
60:4,5 89:10 91:7
92:14 97:22
126:23 127:3
138:21 139:10
156:3 330:3
**describes** 31:10
331:25
**describing** 66:23
**description** 84:1
184:8 247:16
**designated** 209:16
**designates** 287:25
**designed** 166:10
**desired** 382:7
**despite** 351:25
**Destruction** 97:3
100:11,14 101:12
**detailed** 329:22

detailee 101:11
details 115:2
  129:20
determination
  85:22 156:17
  351:12 353:5
  377:6
determinations
  330:20
determine 208:17
  312:22 316:11
  325:11
determined 80:14
  156:7 158:4
determining 209:6
develop 286:15
  294:3
developing 286:17
  288:9 293:13
devices 149:8
DHS 7:13,17,20,24
  33:14,20 34:19
  35:2,15 36:4,4,25
  37:13 40:14 42:16
  47:24 48:7,10
  51:20,24 54:1
  65:17,25 67:14
  68:6,9 70:3 77:8
  82:14 83:22 84:11
  85:4,6,7 86:16
  87:2,6 91:21
  92:14 95:14,19
  96:7 98:23 99:1,4
  105:1,19 106:7,9
  106:11 107:15
  108:23 109:6,16
  110:23 112:18
  113:18 114:15,18
  114:23 119:1
  125:23 126:10,17
  127:6,17 128:3,15
  128:18 132:18
  138:15 139:3,23
  140:6 147:11,16
  148:7,11 150:15
  151:2,6 152:18
  153:11 156:10,25

161:18 162:17,25
163:3,20 164:2
168:12,20 172:21
172:23 176:12,19
176:19 177:24
178:22 179:2,8,10
179:19,22 180:4
180:12,13,18,19
180:23,24,25
181:4,9,10,21,22
182:5,25 183:23
184:17 185:19
186:19 189:22
195:1,21 197:10
198:11,15,17
200:7,19 201:9,10
207:2,3,4,23
209:5,7 210:1
211:16 212:11,25
213:2,10,16,20
215:9,17 217:15
217:22 220:13,19
221:9 222:1 224:8
224:22 225:5,10
225:21 226:5,7,15
226:18,24 227:3,5
227:11,15,21
228:8 232:11
233:1,20 235:5,12
236:2 238:12
241:9,24 242:10
243:13 244:1,17
245:13 246:9
258:15 261:19
262:10 264:25
265:12 266:9,11
266:17,18 267:16
267:21,24 270:24
273:19 275:1
276:24 277:4
283:19 284:1
285:17 286:2
295:13 309:20
310:1,20 311:9,18
312:5,8,16 316:7
328:6,16 329:4
330:22 331:3

333:11,16 338:25
339:14 340:23
341:11 343:11,14
345:11 348:11,22
350:21 351:12
352:19 353:2,7
354:19,20 355:9
356:6,12,14,17
357:22 358:21
361:11,20,22,24
362:8,20 363:4,12
363:19 364:1,10
364:11,12,14,20
365:9,14 366:9,16
366:17,22 367:7
367:12,25 369:4
369:22 370:6,24
371:5
DHS's 97:2 354:12
different 47:24
  59:10 62:12 82:25
  102:3 104:7
  110:20 123:4
  137:20 140:17,18
  140:23 158:2
  170:20 181:20
  188:6 192:14
  201:4 203:17
  210:16,17 231:25
  232:1,1 243:7
  244:9,12,13,22
  245:9,15 250:2
  282:3 296:22
  303:18,19,20
  333:17 341:6
  350:16 355:7
  367:19 373:19
differently 171:10
difficult 17:17
  275:24
dig 258:3
direct 49:25 50:18
  178:12 207:14
  228:19 229:4
  313:19 323:4
  362:19 370:2
directed 90:3

128:17,20 198:22
198:24 199:9,15
230:6 290:2,11
315:16 317:21
directing 236:7
  324:15
direction 38:18
  130:2 233:1,5
  235:5 289:22
  298:25 299:4,25
  300:1,8,13 302:10
  307:5 308:16,21
  310:21 318:6
  326:11 340:14,16
  342:11 358:20
directions 42:4
  314:1 342:12,16
directives 38:7 39:9
  43:22 354:12
  362:20
directly 21:17
  85:14 113:14
  118:18 127:7
  159:17 163:3
  178:8 179:19
  200:8,24 201:8
  213:3 226:3
  227:12 241:24
  300:24 301:2,4,11
  301:16 330:22
  331:2,13 367:21
director 32:2 34:10
  35:4 36:17 45:5
  237:25
directorate 49:15
  49:25 50:6 87:12
  109:20 198:17
  204:25
disagree 71:25 72:1
disappear 157:25
  158:8 159:17
disappearing 158:3
  159:2,4,6,15
disappointing
  53:15,17
disaster 71:15
  116:12,20,23,25

117:3 118:21
121:4 134:20
137:7,11,22 139:9
153:9 171:3,9,13
171:16 247:23
259:20 261:5
337:24
disasters 72:5
138:17 170:25
171:1 259:3,7,9
259:22 261:15
326:14 327:19
discovery 164:11
164:15
discuss 27:23 36:13
51:8,13,19,21
52:8 115:10,12,15
188:21 189:21
203:5,17 272:25
273:17 286:14
289:8 296:9
discussed 51:21,25
52:7,18 59:19
69:23 70:2,4,8
90:7 116:22 118:3
138:1 139:18
167:23 168:8
185:8,13,17,18
187:3 190:3
199:14 201:25
202:6,20 248:17
256:16 258:5
259:11,16,24
260:3 262:23
263:2,20 273:4,21
274:11 280:6,16
285:16 288:11,12
288:16 290:20
295:22 313:15,18
321:9 338:19,22
339:3
discussing 42:4
53:25 155:5 204:8
231:12 238:8
240:11 258:9
260:11 262:18
264:2 273:9,12,13

274:16 285:23 295:19 303:25 306:24

**discussion** 51:10,16 52:4 54:8 69:18 112:12 128:5 202:22 240:9 266:7 267:6 269:11 270:18 279:4 285:9,20 295:11 331:21 339:17 359:9 372:16

**discussions** 40:20 40:24 41:1 47:12 52:11,16,22 60:20 61:25 69:3,8,12 77:20 89:14,20 126:6 127:17,22 129:19,20 136:9 185:15 203:11 213:20 235:18 236:12 269:14 270:2 273:3 285:21 313:6 325:3 337:5 339:20

**dispute** 267:1
**distinction** 342:21
**distracted** 65:5
**distribute** 209:14 225:2 291:11
**distributing** 224:25
**District** 1:1,2 2:13 13:11,12 383:20
**Division** 1:3 4:8 13:13 32:3 238:1
**divulge** 188:24
**dleonard@altsh...** 3:10
**do-over** 318:23
**Dobitsch** 197:17 198:3,4,5,9,13 199:4,16 200:2 201:11,17 204:7 234:13 255:4,10 256:4 257:2,23

259:12,16 260:11 262:20,23 263:7 263:17 269:12,15 269:18 270:3,9,17 270:19 271:3,12 277:22 278:8,12 280:7 281:7,18,19 285:10 286:8,24 288:13,18,21 290:7,17 291:24 292:8 293:13 294:6,14 295:25 296:9,20 298:10 299:11,13 304:1 318:25 319:5,7 320:5,20 325:15 342:3

**doc-** 245:19
**doctor's** 31:5
**doctorate** 29:5
**document** 12:25 22:4 27:14,17,19 73:13 82:25 84:10 84:18 139:5 169:23 174:13,20 175:20 193:13 218:16 219:17,25 220:13,17,18 221:1 229:1 241:17 244:24 245:11,20 246:3 246:11,12,24 262:15 287:6,12 287:24 288:1,3,6 288:17,22 305:5 305:10 329:3,12 341:11 360:9 361:19,21,22 362:1

**documentation** 316:4
**documented** 288:12
**documents** 21:20 21:25 25:2,6,8,11 26:19,24 27:2 28:2 84:16 85:8

112:15 133:12,16 133:21 138:25 139:9 152:11,13 165:17 166:12 220:24 232:21 234:17,21 238:7 245:2,15 246:14 247:2 284:4 311:2 347:13 351:18 378:11,20

**DOGE** 40:7,11 62:5
**doing** 69:13 88:13 149:14 174:8 212:1 237:5,10 246:13 247:1,1 248:23 249:9,25 250:11 257:21 262:8 281:5 308:14 317:9 338:10 347:5,9 352:22 354:18 355:4 357:16 364:22

**DOJ** 20:3
**dollar** 307:18 309:1
**dollars** 247:20 309:7
**Donald** 1:8 13:8 381:4
**double-check** 204:19
**download** 161:25
**downsizing** 68:25 117:11 186:14
**draft** 9:4 187:12,18 187:21,24 188:7,9 188:11,15,17 190:3,13,25 191:6 191:12,21 193:13 195:1 196:6,18 231:11 232:6 252:25 253:5 254:5 255:11 319:7,11 320:5 339:5 360:15,23
**drafted** 269:13

293:24 294:6 318:25 319:4 360:15,22

**drafts** 269:7
**DRF** 309:17 310:18
**DRS** 309:18
**due** 29:1 206:16 215:12 255:25 286:15 311:23 312:2,10 313:20 313:21 314:11,14 336:10 337:10 342:15,23,25 343:4 344:9 352:24 357:14 377:7
**duly** 16:11 383:6
**dump** 327:20
**duties** 17:7,9 100:8 106:6,18,19 111:8 113:17 132:12 134:3 140:13 209:23 271:4

---

**E**

**E** 3:5 165:1,1
**earlier** 97:22 138:2 138:21 139:18 194:5 202:11 203:6,23 246:2 313:15 315:24 373:9
**early** 38:6,13 87:6 135:7 217:21 273:10 277:22 286:16 303:22 310:23 321:4 333:14
**Eastern** 2:2 13:2
**Economics** 31:7
**Edgar** 51:24
**edit** 320:12 360:24
**edited** 187:13 188:18 191:6 195:16,19,22 196:4 320:21 321:1

**editing** 195:25
**edits** 360:25
**education** 28:23 29:11
**educational** 28:20 30:20
**Edwards** 42:18 207:2,18,23
**eeshleman@alts...** 3:11
**effect** 77:4
**effects** 44:23 346:22
**effort** 333:10 345:20 374:18
**efforts** 38:6,19 43:21 44:11,24 52:9 62:22 186:14
**Eisenhower** 74:1
**either** 52:4 129:2 135:23 161:4 185:17 262:10 347:20
**elected** 34:19
**electronic** 2:12 8:14 32:10 288:1 383:3
**eliminate** 77:22 250:5,20 251:13 251:20 304:1
**eliminated** 75:19 79:18 352:20 376:1
**eliminating** 76:21 77:5,10,17 89:18 89:21 92:20 249:13 354:23 375:19
**elimination** 248:23 363:13,20
**Elizabeth** 3:6 14:14 89:7
**email** 8:11 9:9,14 9:20,23 10:4,10 10:13,16,23 11:4 11:7,10,13,16,19 11:22 108:4,6,10

108:14,18,21,24
109:2,10,11,14,15
109:16,23 110:5,9
110:15 130:7
134:16 136:7
137:10 156:9,23
156:24 157:1
183:23 199:22,25
200:23 203:2
207:13,15,18,22
208:3 211:3,21
219:1,8,11 224:15
228:16,18,19,22
229:5,14,16
230:22 231:2,3
237:19 238:4,12
245:23 248:10,10
254:24 255:2,9,24
256:2,8 257:6,8,8
257:10,22 259:4
261:12 264:3,6
268:22 270:1
271:17,24 272:2,6
278:6,7,21 286:7
288:11 292:22
294:11 297:14,19
299:5 305:14,21
306:21 307:1
311:8,10,11,13,21
311:22 312:8,19
313:2 314:21
315:16,18 316:15
318:22 320:6,12
321:1 324:12
326:20 327:14
331:18,20 332:17
333:23,25 334:2
334:15,25 335:2
335:18 336:10,20
336:21,22 338:20
338:23 339:11,18
340:5,11 341:3
346:9 349:7,8,24
359:6 373:13
374:10
**emails** 57:17
109:13 110:2

128:7 130:8
137:24 258:19
267:5 269:20
270:22 273:8
282:13 286:24
295:9 305:13
320:2,19 328:14
330:1 339:4,23
375:2
**emergency** 4:17 9:6
33:7 68:3,24 72:5
76:7 79:15,25
92:8 117:4,7
134:20 193:15
**emotionally** 320:9
**employed** 17:2
383:9,13
**employee** 99:9,15
100:24 101:4,14
103:17,19,25
104:2 108:24
109:2 184:15
218:20 219:1
249:19 288:25
289:19,23 383:12
**employees** 1:5 13:8
44:1 101:7 103:14
104:1 109:20
112:19 150:16
155:13 161:24
163:21 170:18,19
173:7,16 182:9,18
183:1 192:2,5,8
192:11,13,16,17
192:19 193:1
216:20 248:16,19
248:19 250:4
252:2 255:16
258:16 338:1
344:4 345:24
347:13 348:1
371:25 381:3
**employees'** 110:9
**employment** 356:7
**ended** 201:21
256:23 294:19
310:11

**ends** 223:12 268:13
379:10
**Energy** 32:7 33:1,7
33:10
**engage** 312:21
343:16
**engaged** 32:22
191:3
**ensure** 45:7 112:5
374:19 376:11
**ensured** 110:21
**Ensuring** 205:4
**entire** 44:9 193:18
**entirety** 18:8
**entities** 362:11
**entitled** 183:16
193:13 369:2
**entity** 40:6,11 45:4
**entrenched** 186:2
**entry** 256:15,18
353:10
**ERRATA** 381:1
**error** 381:10
**Eshleman** 3:6
14:13,14
**especially** 45:4
300:13 302:10
318:21 364:5
**Esq** 3:5,6 5:13 6:2
**essence** 263:4
**essential** 216:9
221:22,23 232:23
245:4,17 247:4
248:7 282:2 283:8
289:25 290:4,6,13
290:16,24
**establish** 77:1
355:13
**established** 109:10
109:11 139:7
140:18 214:22
295:2 313:11
330:14 342:8
344:11
**establishing** 347:7
**estimate** 90:17
103:21

**estimates** 238:24
240:2,3 309:5
**et** 1:5,9 13:8,10
381:3,4
**evaluate** 65:12
71:14
**evaluated** 63:18
**evaluation** 355:24
**Evans** 1:17 2:8
4:20 7:3,11,15
12:4 13:6 15:20
16:2,2,10,15,23
30:7,18 35:11
43:20,24 49:12
69:19 70:14 81:24
82:13 97:12
110:16 111:13
121:4 127:13
128:8 129:24
130:4 133:12,24
135:20 143:11
145:25 160:4
165:5,16 173:25
177:20 183:14
187:25 189:11
193:9 194:11
199:21 212:20
215:24 217:15,21
219:21 222:21
224:13,23 225:24
227:5 228:16
229:13 232:5
233:2,19 235:7
237:18 241:23
250:16 251:7
252:13 264:16
265:10 268:21
269:5 270:7,13
278:4 280:12
287:23 290:1,11
292:21 294:2
300:20 302:5
303:22 305:4
310:20 325:12
332:15 334:15
338:2 341:13
344:23 346:12

360:10 366:6,23
367:19 369:2
370:20 371:21
373:9 374:22
375:8 379:3,6
380:13 381:6,25
382:15
**Evans'** 27:22 291:3
**Evans's** 43:3
**eventually** 63:9
**everybody** 22:24
47:14
**evidence** 134:23
143:25 204:14
234:20 261:10
275:15 276:17
293:5 316:24
324:22 341:2
355:1 362:23
363:8 364:25
**exact** 12:24 36:22
87:15 94:10
101:21 103:16
114:9 152:10
169:19 220:6
224:15 343:8
**exactly** 74:25 99:5
152:20 181:15
259:9 306:14
325:7
**EXAMINATION**
16:13
**examined** 16:11
**example** 92:7
109:13 130:20
137:22 138:16
181:6 247:22
**examples** 321:8
**Excel** 218:22
**excepted** 170:19
**exception** 204:1
**exchange** 254:25
255:4 277:21
326:25 327:15
373:17
**excluded** 240:2
**excuse** 60:13 64:5

323:18
**ExecSec** 83:1,5,8,8
83:18 84:6,11
96:7 138:2,3,25
139:8,23 151:6
153:7 269:1 272:6
**execute** 262:17
284:19
**executive** 9:12
31:11 35:4 36:16
38:12 39:1,7,14
40:2,4 45:5,14
52:12,22 59:17
62:2 70:12 71:11
72:12,15,16 74:1
76:25 83:9,11,14
83:18 84:15,16
85:7,22 139:19
140:16 163:11,12
179:17 181:7
187:20 205:3,10
205:16,19 206:25
207:25 233:22
364:18
**executives** 181:7
**exempted** 170:18
**exercise** 230:6,12
230:16 312:22
314:17 315:11,19
318:23 321:14
329:21 331:25
332:12,16 333:2
333:18 334:2,14
334:23 335:5,10
335:21 336:6
337:12
**exercises** 216:25
221:5 231:24
233:14 244:8
245:18 263:3
281:4 282:3
289:12 350:21
**exhibit** 7:9,10,13
7:14,17,20,23,23
8:3,4,8,11,16,19
8:23 9:3,4,9,12,14
9:17,20,23 10:3,4

10:7,10,13,16,19
10:23 11:3,4,7,10
11:13,16,19,22
12:3,4 21:23
29:25,25 30:5,8
49:4,5,7 67:6,7,10
72:23,24 78:12,14
82:20,22 96:8
120:5,8 122:7,11
143:18 162:11,13
162:15,16 165:6,7
165:9 177:2
183:10,12,14
193:6,7,13 199:18
199:19,22 205:14
207:10,11 218:14
222:24 223:2,5
228:14 231:17
237:16 241:18
254:22,25 256:12
257:7 265:7,8,11
268:19 271:21,24
278:1 287:3,4
288:15 290:21
292:3,13 293:12
293:20 294:12
296:18 297:6,9,10
297:13 299:9
305:6,7 311:5
316:8 326:23
331:19 334:10,11
340:2 341:18
346:5,7 349:5,8
350:5 351:3 353:8
354:7 359:2,3
360:6,7
**exhibits** 7:7 8:1 9:1
10:1 11:1 12:1,22
309:16 321:8
322:10 328:8
333:8 358:11
**exist** 76:4
**existed** 153:17
**existing** 249:16
351:18
**exists** 75:20 76:22
79:18

**expectation** 278:15
**expecting** 270:13
**experience** 31:12
86:14 134:19
180:24
**expiration** 169:16
169:20 170:1,5,13
173:23 261:16
363:1 367:3
369:13
**expirations** 298:15
349:11
**expire** 171:6,10,21
172:7 261:7
273:16 346:22
351:9
**expired** 131:12
267:11 348:12
365:5
**expires** 383:22
**expiring** 254:6
347:15 349:21
350:12 352:7,14
352:16 353:6
354:9,19 356:13
365:20 366:15
367:18 368:9
370:14 373:20
**explain** 21:13 39:8
44:17 48:9 110:25
144:3 169:2
170:17 198:23
**explaining** 324:19
**explains** 208:14
**explanation** 170:24
**expressed** 116:9
186:13
**expressive** 347:12
**expressly** 319:8
**extend** 130:19
172:3 173:7,8
253:3 254:1
265:14 267:11
273:18,24 274:21
275:2,22 345:1
351:4,11 357:21
358:21,25 377:2

377:14
**extended** 377:24
**extending** 253:25
269:13 276:12
**extends** 266:3
**extension** 174:9
253:6 255:11,18
255:22 266:19
269:16 275:11
277:13 303:24
351:15 354:7
356:18 372:8
**extensions** 173:15
173:17 255:25
264:4,9 275:23
351:2 353:19
356:23 357:2,7,11
**extensive** 110:10
249:21 250:10
251:18
**extent** 117:23
188:22
**external** 320:15
**externally** 361:22
**extraordinarily**
17:16

---

**F**

**F** 4:4 165:1
**FACA-based** 71:10
**face** 327:21
**facilitate** 208:5,11
**fact** 185:2 212:6
225:9 227:11,23
235:11 294:5
336:23 340:22
356:5 358:6
**facts** 134:23 179:25
261:10 316:24
355:1 381:9
**fair** 56:25 84:1
97:14 252:17
281:23
**falls** 48:10
**familiar** 49:12 64:9
83:5,7 84:7,9
101:5 119:1

155:12,24 156:17
181:25 186:9
219:21 238:14
326:19 360:9
**far** 169:12 181:19
337:2
**faster** 21:16
**feature** 158:4
**February** 36:21
61:18 306:22
355:7 356:17
373:14 376:16,25
**federal** 4:8,17 8:5
8:15 9:6 32:19
33:1 38:23 44:9
45:11 68:3,24
72:8,17 79:15
99:9 101:6 120:18
120:21 121:3
155:14 162:1
193:15 199:2
205:4 253:20
**federally** 80:8,9
235:3
**Federation** 1:4
13:7 381:2
**feedback** 269:18
270:6
**feel** 204:10
**felt** 113:3 275:4
**FEMA** 7:16,17,20
8:20,24 15:24
16:1,3 17:6,8,10
18:5,8 25:17 26:8
26:20 27:10 37:13
37:25 45:23,24,25
47:9 50:16 54:1,8
54:13,22 55:4,10
55:12,17 56:2,7
56:19 58:6,12,20
58:23 59:1,5
60:20,23,25 62:14
62:21,22 63:1,15
63:21,22 64:13
65:1,8,17,25
66:20 68:16,21
69:3,8,13,16,18

70:4,13,16 71:1,6
71:7,9,12,12
72:13 73:4,15
74:16,22 75:18
76:3,12,18,19,21
77:1,9,11,18,22
77:25 78:4,5,16
78:22 79:7,17
80:2,9 81:14 83:8
85:8,13 87:20,25
88:3 89:13,15,18
89:21,23 90:1,7
91:4 92:9 93:12
93:19 94:3,4,18
94:23 95:7,21
96:2,17,22 97:8
98:8,21 99:1,8
100:4,4 102:4
103:19,25 104:1
105:13,16 106:1
107:9,23 108:1,4
108:6,10,18,18,20
108:24 109:2,15
109:24 110:15,21
111:13,17,20
112:14,14,19,21
112:22 113:5,9,18
113:20 114:15,20
114:21 115:19,22
116:1,8 117:17,20
118:12 121:19
124:3 125:9
126:22 127:9,13
127:15,19,21
128:4,7,11,12,23
129:4,9,13,14,23
130:12,15 131:12
131:20 133:6,12
133:21,23 134:6
134:21 136:17,20
137:1,15,23
138:10,22 139:14
139:17 141:2,14
141:16 146:19
150:1,5,9,13,16
152:18,22,25
154:22,25 155:5

156:3,13 157:13
163:10,16 164:6
167:17 169:17
170:13 172:20
176:5 177:25
178:10 179:9,13
179:21 180:4,7,15
180:21,23 181:1
181:11 182:6,13
182:16,19 183:6
183:16 184:15
186:15,25 187:3,7
187:17 189:3,7,10
189:25 190:1,10
191:3,12 192:1,13
192:17,23,24
194:10 195:2,12
196:8,24 197:11
198:7,15,18 199:4
199:6 200:2,14
201:11 202:13
203:8,18 204:18
204:18,22 209:2
209:23 210:1,16
210:19 211:1,16
211:23 212:4,12
212:22 213:7,9,16
214:3,5,13,15,17
214:20,21,25
215:4,5,8,15,16
215:23,23 216:4
216:12,14,20
217:7,8,20,22,22
218:2 219:24
220:3,14,20 221:2
221:15 222:5,22
224:7,21,22
226:10,11 227:6
227:16,22 228:1
229:25 230:1
231:4,10,25 232:7
232:10,12,13,20
233:7 234:7,7,16
234:18,23 235:6
236:6,16,25
237:13 238:1,19
240:1,12,20

241:11 242:7,10
242:21 244:10,16
245:6,7 246:6,16
247:17 248:3,16
249:23,25 250:4
250:14 251:12
252:1 253:2,17,23
254:1 258:11,16
260:4 261:20
262:10 263:3
264:7,13,14,25
265:13 266:3
267:2,6,10 268:2
268:25 269:1
271:5 273:25
274:16,21 275:10
275:13 276:7
280:24,24 281:20
282:5 283:18
284:8 285:11
286:6 288:8,9
289:9,17 291:5,21
294:15 295:20
296:12 297:20
298:11 308:12
309:9 312:21
313:11 314:17
315:13,24 316:18
317:12,13,21,23
318:15,24 319:21
320:3 321:19,20
322:11,14,16,16
323:5,17 325:10
325:18 326:13
327:10 328:11,15
329:5 330:4,17,21
330:23 331:25
332:18 333:2,14
334:1 335:8 336:4
336:13,24 338:2
338:12,25 339:6
339:14 340:24
343:10,15 345:7
345:15,24 346:9
346:21 347:6
348:12,17 349:22
350:22 351:12

353:6 354:20
356:11 357:17,17
357:20 359:7
361:20,21,23,25
362:8 363:5
364:19 365:11
367:4 368:10
375:20 377:12
**FEMA'** 92:20
**FEMA's** 71:14,22
  110:4 130:19
  177:19 182:25
  210:2,6 214:2
  218:6 227:7 234:7
  241:23 243:3,17
  246:1 252:14
  263:9 272:6
  293:10
**FEMA-related**
  81:10
**FEMA.dhs.gov**
  108:14 110:5
**female** 335:8
**Fern** 150:19
**fewer** 80:10
**field** 169:8,12
**figure** 283:4 292:5
  325:16
**figured** 101:3,13
  357:7
**filed** 13:11
**fill** 344:5
**filled** 21:7
**final** 9:4 193:14,22
  205:24 206:5
  207:4 214:23
  215:7 225:5,10
  228:7 230:1
  233:21 234:1
  235:23 237:11
  261:20 262:10
  268:25 282:18
  284:1 319:20
  324:17 330:19
  332:9 340:24
  341:12 342:5
  357:17 372:25

**finalized** 253:1
**financial** 49:19
  117:16,19,24
**financially** 383:13
**financing** 192:12
**find** 322:10
**fine** 82:1 135:8
  143:3
**finish** 17:20
**fired** 46:24 47:8,17
**firm** 34:3
**first** 16:11 18:22
  19:2 29:24 31:11
  33:16,21 37:24
  47:22 55:22 56:4
  61:7,7,14,15
  78:23 86:19 87:1
  87:4,7,24 94:11
  120:10 122:10
  145:3 152:5,8,11
  161:8 177:8
  183:21 188:8
  196:17 207:16
  220:25 232:17
  237:21 240:10
  241:20 255:10
  257:6,8,11,11
  278:6 279:8 294:1
  297:19 311:10
  351:9 352:12,24
  356:2 363:3 383:6
**firsthand** 95:1
**fiscal** 216:14,20
  221:14 222:7
  225:14,18 227:17
  228:2 229:25
  237:1 240:25
  243:17 249:11
  250:4,19 251:12
  288:10 312:23
  316:1 335:11,22
  340:24
**five** 18:18 81:21
  135:2 304:21
  372:21
**five-minute** 159:21
**flaw** 375:7

fleece 124:4
Fleischman 5:5
  16:4,5
flew 124:11
flight 124:18,24
flip 31:3 166:21
  167:10
Flood 247:25
floods 8:22
fly 124:12,14
FO 84:19,25
focus 41:2 76:17
focused 31:12 34:7
  34:14 44:19 45:3
  45:6,8 61:20
  68:14,21 76:17
  131:17 294:24
follow 40:3 49:24
  278:9 280:22
followed 157:7
  203:2
following 170:9
  232:16 238:18
  285:25 299:19
  340:15 364:12
follows 16:12 41:21
  226:22 324:6
force 27:9 246:1,6
  246:20 326:1
forcing 326:10
foregoing 380:4
  382:2,4,5,10
  383:5
form 18:12 20:2
  24:15 25:13 26:9
  27:11 28:16 35:19
  36:18 37:7 38:9
  38:15,20,25 39:5
  39:12 40:1,8,12
  40:17,23 41:8
  44:2,7,14 45:1,19
  46:13,17,25 48:12
  48:22 49:22 50:3
  50:20 51:4 52:2
  52:10,20 53:4,12
  53:16,20 54:4,24
  55:5 56:12 57:1

57:16,20 58:7,11
58:21 59:6,23
60:10,18,22 61:2
61:23 62:15,24
63:5,10,16,23
64:4,14,20 65:2,9
65:16,20 66:3,13
66:21 68:7,13,19
69:1,10 70:10,15
70:24 71:8,18
72:10,18 73:23
75:4,8 76:9,14,23
77:6,12,19 78:1
79:4,10 80:5,19
80:25 81:11 83:6
83:16 84:8,12,22
85:5,10,13,19
86:2,9,17 87:3,21
88:4,9,14 89:1,11
89:19,24 90:5,15
91:11,22 92:3,22
93:1,9 95:10,22
96:6,19 97:16
98:6,10,13 99:2,6
99:11 100:3 101:1
101:8 102:8,14,24
103:4,10 104:5,11
104:23 105:6,21
106:4,14,24 107:5
107:10 108:2,11
108:15,19,25
109:7,25 110:7,12
110:17 111:3
112:8,24 113:6,12
113:23 115:1,6,14
115:20 116:2,13
116:21 117:1,5
118:13 119:4,8,22
120:23 121:5,12
121:16,23 124:5
124:17 125:10,16
125:24 126:5,11
126:14,18,24
127:4,10,14 128:9
128:13,19 129:5
129:10,18,25
130:6,13,21 131:1

131:6,21,25 132:7
132:14,21 133:13
133:19,25 134:8
134:12 136:19
137:4,17 138:11
138:19,22 139:11
139:15 140:7
141:3,6,10,15,19
141:23 142:2,9
146:20 147:3,8,13
147:18,25 148:9
149:16 150:2,6,10
150:14 151:5,19
151:23 152:15,19
153:1,14,18 154:1
154:6,10,14,23
155:7 156:4,15
157:14,20 158:1,9
158:17,25 159:5
159:18 162:2
163:1,22 164:4,12
165:14 168:3
169:18 171:8
172:5 176:2,22
177:12 178:2,11
178:16,23 179:4
179:11,24 180:16
180:22 181:2,13
182:1,8,21 183:2
183:19 184:9,19
185:4,10 186:6,11
186:16 187:10,15
188:2,5,19 191:8
191:13,22 192:3,9
192:20 193:2,22
193:23 194:3,15
194:18,23 195:3,9
195:18,23 196:2
196:20 197:7,14
197:20 198:12,19
199:7,13 200:20
200:22 201:12
202:8,15,24
203:12,14,24
204:3,13 205:7
206:14,23 207:6
208:1 209:9 210:4

210:9,14,21
211:18,25 212:8
212:15,23 213:5
213:12,18,24
214:6,10,19 215:3
215:10,18,25
216:6,16,22
217:16 218:4,9
220:5,10,15,22
221:3,16 222:2,8
224:10,14,19,24
225:16,20,25
228:3 230:4,21,25
231:19 232:8,15
233:3,11,23 234:3
234:9,19 235:8,14
236:1,4,10,17,22
237:3,8 238:15
239:5,19 240:6
241:3 242:3,18
243:1,5,15,18
244:2,6,19 245:1
245:14 246:4,10
246:22 247:8,18
248:25 249:6,14
250:7,22 251:15
251:23 252:21
253:4,18 254:3,10
254:15 255:14
256:6 257:3
258:12,18,23
259:14 260:1,14
261:9,22 262:2,6
262:12 263:13,16
263:24 265:2,15
266:13,21 267:4
267:13,18,23
268:4,15 269:9
271:1,15 272:14
272:21 273:2,20
274:1,7,14,22
275:3,14 276:1,8
276:16 277:1,6,15
279:22 280:9,14
280:25 281:24
282:19 283:6,20
284:2,11 285:7,18

286:3,19 289:10
289:20 290:8
291:7,15,22
292:10 293:4,16
293:25 294:10,17
295:8,16 296:5,15
297:1 298:24
299:2,8,15 300:9
300:21 301:7,23
302:15,20 303:5
303:11 304:5,11
306:6,25 307:9,17
308:2,9,20 309:3
309:11,22 310:5
310:12 311:20
312:18 313:1
314:20 315:6,14
315:21 316:2,23
317:18 318:3,11
318:16 319:9,13
319:18,24 320:7
320:13,24 321:7
321:21 322:2,19
323:7,15 324:10
324:21 325:19
326:5,16 327:7,12
328:3,12,18,22
329:8,23 330:8
331:1,7 332:20
333:5,21 334:24
335:12,25 336:7
336:14 337:4,15
338:6 339:2,15,21
341:1,14,24
342:19 343:1,6,12
343:18 344:8
345:8,11,13,18,25
347:4,16 348:4,15
348:18 349:1,23
350:3,14 351:16
352:2,10,21 353:4
353:22 355:10
356:8,20 357:9,24
358:9,23 360:1,18
362:5,13 363:16
363:23 364:16,24
367:14 369:23

371:7 372:1,9,14 374:24 375:9,23 376:9,18 377:4,18
**format** 19:20 218:23 219:15
**formed** 198:9
**former** 36:4,8 37:5 46:11 51:2,8 75:25 76:11 77:10 80:1,24 95:20 96:15 135:23 150:9 178:9 194:13 252:16 341:23
**forms** 348:20,21,24 359:19
**forth** 383:7
**forward** 2:10 3:18 6:6 13:16 15:1 157:1 218:11 220:24,25 221:8 225:10,17 243:22 260:20 264:20 266:18 267:24 271:10,12 274:3 277:19 281:5 284:1 319:5 320:2 338:18 341:9,11 341:13 342:4,9 355:17 356:14,16 366:17 368:14,15
**forwarded** 239:12 241:23 320:18
**forwarding** 269:1
**forwards** 349:8
**found** 341:19
**foundation** 2:10 3:18 6:6 36:11 40:18 47:1,11,19 48:2 51:5 55:19 58:3 59:16 62:8 64:20 66:9 69:11 70:7 71:24 76:15 80:5,13 81:12 84:3,13 85:11,20 86:3 89:1 93:14 93:23 96:11 97:5

97:10 99:12 101:9 109:8 110:7 112:24 113:12,23 114:5,17 117:13 117:22 121:6 127:5 128:10 129:11 131:22 132:8 141:11 146:21 158:10,18 163:23 180:17 181:14 183:3 184:10,20,23 187:16 193:24 195:4 197:2,21 201:16 212:9,16 215:19 225:8 226:1,14 227:9,19 228:4 231:20 233:4 239:6,20 247:9,19 259:15 260:2,15 262:22 263:11 264:18 266:14 268:5 271:16 272:15,22 274:8 277:16 285:8 286:20 288:20 296:16 297:2 299:23 300:10,22 301:8 301:24 302:7 309:4 311:1 316:3 319:3 321:22 325:20 332:21 336:15 342:20 343:2,7 345:19 348:16 355:1 356:21
**four** 7:12 34:4 38:3 38:5 228:20
**fourth** 228:20
**frame** 176:10 268:23 273:11 305:11
**framing** 368:5
**Francisco** 1:3 3:8 13:13
**fraud** 39:23 66:2

67:25 68:11,17
**Friday** 298:8
**friend** 327:6,8
**front** 35:15 56:9,15 56:15,17,19,20,24 57:3,4,6 58:5,9 81:5 83:23 84:21 85:4,6 96:13 105:17 109:6 132:18 140:6 146:12 160:11 167:10 168:24 181:10 182:5 195:22 196:6 223:16 236:2 244:1 261:19 267:21 273:19 285:17 286:2 295:13 309:20 310:2 316:9 355:9
**frustrated** 275:10
**full** 16:21,23 22:10 22:14 54:8 171:15
**full-time** 248:18 252:2 338:1 344:4
**fully** 21:14 349:16 350:1,4,7
**function** 294:25 355:16,25
**functional** 347:23 348:6 357:12
**functions** 221:22 221:24 234:7,14 234:25 246:17 247:5 248:8 249:8 249:24 258:25 282:2 283:13 284:9,17,19 314:3 325:22 338:13 344:2,12 347:10 347:19 348:8 375:14
**Fund** 6:9 14:22 171:3,9,17 247:24 337:24
**funded** 170:15,16 170:18 171:2,9

247:23,24 248:1 309:15
**funding** 168:22,23 170:12,13,14,20 171:12,13,15,15 173:12 247:21 350:6
**further** 38:18 240:9 270:11 282:22 283:3 284:7,8,15 359:10 383:8,11
**future** 68:3,24 69:3 71:11 237:13 330:21 357:19
**FY** 293:21 312:6
**FY2026** 332:13
**FY26** 10:19

_____

**G**

**G-u-y** 151:16
**gathered** 332:10 335:3,19
**general** 28:19 92:17 110:8 127:23 155:2 190:4 201:15,19 266:3 353:20
**general's** 201:23
**generally** 20:10 31:10,16 38:22 165:19 168:1 200:16 224:17 269:8
**genesis** 121:17
**getting** 68:21 169:6 327:17
**give** 19:25 21:8 22:10,13 30:3 90:17 103:21 124:8 130:1 133:17,20 134:2 155:18 166:10 170:7 198:17 243:12 245:13 250:25 251:7 261:19 269:18 272:18 275:7

287:11 299:3,25 300:8 326:2 344:5 361:7 367:20 368:24 370:4 371:2 377:14
**given** 22:18 73:17 108:4,24 110:4,8 110:15 139:17 157:8,22 168:20 174:7 209:1 212:2 275:23 288:2,2 302:10,14,16 324:17 329:19 333:2 334:21 358:6,20 364:14 372:6 376:7,14
**gives** 209:19
**giving** 17:20 145:7 174:19 246:8 264:21 289:21 302:1 311:25 312:16 318:5 368:6 369:10,24
**glasses** 30:13
**global** 34:14 116:10 116:15
**go** 18:23 21:16 31:11 35:22 41:13 43:13 59:1 63:1 95:18 97:24,25 98:1,4 107:15 110:1 118:23 119:23 121:19,19 121:25 128:5 137:8,24 138:2,16 138:20,21 139:3,4 140:2,3,15,15 142:21,23,25 143:4 146:5 149:8 155:20 162:12 163:12 164:18 171:12 173:20 174:4 181:9 187:6 187:22 192:10 193:3 201:2 205:13 234:2 240:9 241:20

248:11 254:21 267:21,24 271:10 277:10,19 283:12 284:16 286:7 292:12 296:17 297:22 298:6,7 318:23 320:2 321:24 322:24 323:22 324:3 328:14 333:7 335:1 343:11,14 355:17 365:8 366:17 368:14 371:13 372:24

**goal** 93:12,20,21

**goals** 39:25 40:15 44:12 53:23 64:24 64:25 65:7,10,18 65:21 93:19,25 94:1 241:12

**goes** 22:2 36:2 181:7 270:11

**going** 17:15 20:16 20:17 21:18,19,25 22:1,3 28:1 29:10 29:23,25 31:23 35:7,11 41:9 42:22 43:10,11 54:3,18 68:17,25 69:4,4 72:22 81:16 82:19,20 87:18 89:6 93:2 93:18,24 96:12 109:21 118:6 120:1 130:2 135:1 135:6,20 137:7 148:22,24 149:2 158:19 165:6 167:14 171:6 173:22 174:24 175:7 192:10 193:17 205:9 207:14 228:18 229:4 237:21 238:6,9 249:20 250:9,20 251:13 251:17,18 254:20

254:24 260:20 268:18 269:24 272:2 273:16,22 274:23 275:7 276:19 277:17,20 283:10 284:16 292:2 295:23 298:5 299:21 300:11 301:22 305:5,6 307:12,14 310:13 314:13,14 314:25 318:22 331:3,11 338:18 340:5 348:13 351:21 352:16,19 353:18 354:6 358:2,25 361:22 366:18 367:15,21 368:8,22,23,23,23 369:14 371:8 372:20 377:2,13 377:23 378:17

**good** 14:2,6,13,17 14:21,25 15:10,25 16:15 65:10 81:17 164:17 222:11,12 252:5

**government** 1:5 13:7 32:10,19 44:10 45:11 72:8 72:17 99:21 101:4 101:14 103:9 110:9,15 111:1,4 121:2 124:11 127:24 134:19 155:13 199:2 253:20 381:3

**governmental** 144:25

**governments** 80:1

**grant** 63:2,3,6,8,13 63:17,20 64:9 351:15

**granted** 268:2

**Greaves** 5:13 15:18 15:18 23:2 41:8 42:24 43:2 145:17

149:2 158:19

**Greyson** 199:23 203:1 204:11,18 204:23,24

**group** 5:12 15:19 45:7 120:17 152:17,23 153:10 153:16,22 154:19 157:18 158:5,8,15 221:18

**guess** 25:15 119:17 142:17

**guidance** 39:13 42:7 156:6 157:7 157:21 162:4,6,8 163:24 174:6,23 184:25 200:7 206:15 209:10 221:7,10 302:1 323:10 324:23 333:11

**Guy** 55:25 89:10 131:8,14,17 132:1 132:22 133:7 151:9,15,16 152:4 160:23 161:20 178:5 184:25 185:2,8,12,16,18 189:24,24 190:12 235:19 236:8,13 236:15,19 273:15 273:21 274:16,20 285:22 353:25 354:5,22 358:24

**Guy's** 161:6

_____

**H**

**hac** 3:19

**half** 215:24 216:4 217:7,14,23 218:3 218:8 226:11 227:7 234:18 291:20 293:1 309:10

**halfway** 67:14

**Hall** 4:6 15:21,22 42:24 43:2 145:17

**Halong** 119:13

**halve** 291:3,6 293:23

**Hamilton** 46:24 47:5,8,16,20,21 59:9 61:5

**hand** 22:1,3 122:14 254:24 305:5

**handed** 30:7 67:9 78:14 120:7 183:14 193:12 199:21 228:16 237:18 255:2 265:10 268:21 271:23 287:23 297:13 326:25

**handle** 307:12

**handwritten** 8:16 26:5,6,14,18 166:24 279:13

**happen** 186:24

**happened** 52:12 74:6 150:17 185:15 214:9 235:18 295:6,12 304:4 334:6 362:19

**happening** 117:17 117:20 170:11 187:2 203:18 249:10 294:19 337:21 350:16,21 374:5

**happy** 19:15 135:7 144:2 149:9 319:11 320:4,10

**hard** 8:21 17:15 35:9 170:8 345:15

**harms** 71:15

**Harris** 3:16 14:11

**he'll** 43:5

**head** 8:20 19:4 21:10 90:19,20,23 90:25 91:7 97:21 98:5 105:11,23 106:3,20 180:7 271:3 347:21 348:7

**headquarters** 57:4 57:9,12 81:5 83:18,22 84:14 95:14,15 105:1 107:16 109:12,14 109:17,19,23 112:16,17,18 113:18 114:18 115:3 127:7,18 128:4,15,15,18 138:15 139:1,3 140:3 150:15,16 151:2 164:8 168:12 172:22,24 180:12 181:9 182:25 185:15,19 203:4 212:11,25 213:2,16,20 226:16,24 235:5 266:18 277:10,19 281:5 291:12 307:6 331:3 352:17 356:14,15 358:6,21 366:17 368:14 371:13

**headquarters'** 110:3

**heads** 91:19 105:24 334:3 337:6,8 347:8 374:6,15,20 375:4,13 376:3,12

**hear** 89:17 92:19 92:24 93:7 104:4 126:3

**heard** 75:15 77:10 77:17 103:14 194:17,21 378:14

**hearings** 92:11

**held** 31:19,24 32:1 52:24 74:19 80:23 94:17 100:1 101:6

**Hello** 15:23

**help** 20:17 59:1 63:1 76:17

**helped** 25:2 97:19

**helping** 25:10 67:25

**Hemenway** 55:15
55:16 58:8 59:4
89:10
**hereinbefore** 383:7
**Hi** 15:21 359:8
**hierarchy** 105:19
**high** 83:12 229:19
230:14 231:14,16
231:17 248:9,11
329:14
**high-level** 62:3
130:1,4 282:23
283:7,9 330:15
363:13,20
**higher** 237:1
**highest** 292:7
**hindsight** 321:5
**Hire** 289:6
**hired** 35:21
**hires** 169:14 289:15
**hiring** 140:15 181:5
181:12,15,19
205:5 238:23
240:1,2 266:17,20
266:24 273:5
277:10 345:11
353:7 354:21
365:9 366:17
367:8 368:13
371:13,15,20
377:11
**history** 29:7,19
30:20 238:5
**hit** 249:11 260:12
263:8 275:24
**hold** 52:17 53:18
63:14 229:10
294:22 353:12
357:7 378:18
**holidays** 345:16
352:4
**home** 107:15
**homeland** 5:4 16:5
24:4,7,9 26:14
33:11,17 48:17,21
49:9,11 52:18
53:24 56:10,25

57:14 65:15 66:6
67:20 73:14 83:2
83:13 88:24 90:10
90:14 91:9 95:6,8
96:18 116:1,7
119:20 120:25
141:8,13 149:14
161:15 162:7
177:18 189:9
216:5,19 222:24
273:24 307:6
368:18
**honest** 251:1
**honorary** 29:4
**hope** 55:3,6
**hoped** 47:23
**Hoshijima** 3:19
14:6,7
**host** 130:14
**hour** 81:16 135:2
**hours** 23:7 125:6
**House** 95:13,18
138:6 197:9,12,18
197:23 198:10,14
200:9,18,25
**Houston** 107:4,6
**HQ** 57:10,13,17
104:22 280:22
359:12,15,15,17
**human** 42:10,13,16
50:5,8 111:21
140:19,20 207:2
**hundred** 23:8 53:6
295:10 297:24
**hurricane** 264:20
268:9,10 275:6
357:5

—————
**I**
—————
**ice** 150:17
**ICYMI** 8:4
**idea** 109:4,5 243:4
243:16 261:6
276:12 285:5
297:22 357:4,6
377:8
**identification** 30:6

49:6 67:8 72:25
78:13 82:23 120:6
122:12 162:14
165:10 177:3
183:13 193:8
199:20 205:15
207:12 218:15
228:15 237:17
254:23 265:9
268:20 271:22
278:2 287:5
297:11 305:8
326:24 334:12
340:3 346:8 349:6
359:4 360:8
**identified** 23:16
253:16
**IL** 3:15
**Illinois** 14:10
**immediate** 296:25
**impact** 262:24
**impacts** 119:13
**impair** 22:9
**impediment** 276:6
276:11,14
**implement** 38:7
43:21 44:12 62:21
72:14 180:14
259:1 281:22
283:11 284:7
286:18 292:18
295:23 325:14
357:8 364:14,17
**implementation**
52:22 293:11,15
293:18 310:22
328:16
**implemented**
330:21
**implementing**
119:7 199:5
206:11,12 232:11
258:22 282:16
324:20 329:2
354:12,20 362:21
365:13 366:8,22
367:24 368:17

369:4,21 370:6,23
371:5 375:18
**important** 177:21
**impose** 243:16
**imposed** 267:16
**Imposing** 243:3
**impossible** 329:4
330:2,12
**improving** 317:12
**In-person** 112:2
**include** 56:6 61:25
70:23 128:15
166:14 181:19
192:18 215:1
218:19 235:6,12
235:15,16 236:8
236:15 243:25
247:16 248:14,15
265:17 280:1
284:1 299:11
315:2 328:16
330:24
**included** 30:25
62:2 69:17 139:9
201:4 212:6,13
213:7 216:19
226:10 240:1
258:16 261:20
265:18 282:17,21
283:17 315:3,17
320:22 324:13,16
328:7 339:5,19
344:6 355:23
358:15
**includes** 57:23
117:3 152:18
166:17 215:6
308:7 315:18
320:16
**including** 22:25
57:24 59:22,25
69:8 70:22 72:15
117:7 129:15
163:18 180:21
192:19 203:22
259:22 347:12
362:3 378:12

**inclusion** 234:1
**inclusive** 380:5
**incomplete** 378:12
**incorrect** 62:25
199:8 200:10,25
245:23 263:25
322:4 337:16
338:8 356:22
**independent** 234:5
**Indian** 74:1
**indicate** 167:19
**indicates** 224:11
**individual** 118:21
154:21 182:18
359:19
**individually** 154:19
363:14,21
**individuals** 40:6,10
57:23 102:13
180:25 181:23
242:25 339:14
349:11,21 356:1
362:18
**inform** 203:16
**information** 8:13
9:17 25:25 32:2,6
32:10 33:13,20
39:16 49:19 83:20
130:1,4 139:24
145:12 151:22,25
160:13 162:9,18
162:25 163:3,9,19
164:1 166:11
169:9 175:15,18
197:18,23 198:10
198:14 200:8,18
200:24 201:1,7
207:4 213:13
214:4,16 215:13
216:23,24 238:22
262:16 265:18
278:22,23 283:22
287:16,18 291:17
300:24 304:13
308:17 309:19
310:1 317:9
319:12,15,16,19

320:5 326:2 329:5 329:18 345:17,23 349:20 350:2,13 351:25 352:3,4 360:13 361:2 375:1 378:13
**informed** 132:9,17 132:19 134:14 137:14 202:18 203:18 286:2 289:17
**informing** 204:6
**Infrastructure** 35:1
**inherited** 252:14,19
**initial** 329:20
**initially** 45:24 99:13,14 103:14 314:25 374:8
**initiatives** 59:10,13 337:18
**Injunction** 12:8
**innovation** 31:14
**inserted** 191:11
**inspector** 201:15 201:18,23
**Institute** 34:11 152:5,8,12 161:8
**institutions** 28:23
**instruct** 161:24
**instructed** 157:11 157:15,18 163:21
**instructing** 206:12
**instruction** 190:14 209:1
**instructions** 164:1 198:11 207:23 238:18
**instrumental** 66:1 67:24 68:11
**Insurance** 247:25
**intend** 17:22
**intended** 30:25 63:4 65:13 80:2 361:2
**intent** 288:24 289:18 291:3,6

293:22,22
**intention** 54:21,25
**intentions** 72:11
**interacted** 87:2
**interacting** 87:5 88:7
**interaction** 87:7,16 87:24,25
**interactions** 87:23
**interest** 304:21
**interested** 383:14
**interfered** 275:12
**interject** 175:4
**internal** 228:21 232:2 233:15 234:21 321:11 339:4
**internally** 223:10 231:5 267:2 313:11 319:17
**interpose** 17:21 42:22 43:5,5
**interposing** 41:12
**interpret** 80:16,17
**interpretation** 266:22
**interview** 36:14 37:9
**interviewed** 36:1 36:12
**introduce** 13:25
**introduced** 16:15 82:25
**investigation** 104:9 104:12
**invitation** 62:13
**invoke** 20:4
**involve** 68:17,25 87:20 127:12 172:21,23
**involved** 36:8 37:6 38:6 88:23 96:16 110:22 111:10,13 111:16 112:6 113:24 117:18 118:24 119:6 127:25 131:20

133:4 134:11,25 140:4 152:17,24 152:24 153:11,11 179:12 186:10 197:18 202:12 203:7,10,21 261:1 292:1 294:8 295:3
**involves** 72:2
**involving** 77:24 85:8 127:16 158:6
**issue** 20:12 41:11 169:20 186:10 201:10 204:9 274:11 305:23 306:10,15,24 350:19 355:11
**issued** 38:12 141:9 205:3 206:11 312:5
**issues** 34:17 59:18 87:8,9,11,18,20 88:1,2,11,16 98:21 102:3 106:1 115:23 128:4,11 128:12,23 129:13 129:14 130:15 132:10 168:15,18 168:22 200:11 203:19 204:18 236:6 256:5 274:16 286:6 295:20 307:2 308:6,12 346:2 350:23
**item** 279:8,16 282:6 290:21 296:20
**items** 278:9 303:1

**J**

**J** 1:8 13:9 381:4
**Jaggers** 327:1,6,8 327:24
**James** 4:20 16:2
**January** 33:21,24 34:20 36:6 43:25 61:17 150:18 151:1 237:19

242:7 254:8 286:16 295:6 298:16 306:22 307:8 310:23 311:18,21,23 312:1,7,10,17 314:14 321:4 328:6 332:17 335:2 339:9 340:6 340:11 345:6 349:12,21 350:12 351:2,10,22 352:5 352:13,15,25 354:10,24 355:5,6 356:2,3,17 358:8 359:24 361:12 362:19,25 363:3 364:23 365:4 366:21 367:7 368:11 369:15 370:15 371:25 372:8,18 373:12 373:21 376:8,16 376:25
**Jason** 5:13 15:18
**jason@binnall.c...** 5:17
**Jeffrey** 237:20,22
**Jeremy** 4:5 15:15
**jeremy.s.newma...** 4:14
**Jessica** 6:2 14:18
**job** 1:25 65:11 69:24 129:12 201:18 257:21 364:13,17
**jobs** 31:19,22 97:7 374:22
**Joe** 55:25 56:1 132:1 235:19 236:8 273:15
**John** 31:6 327:1
**join** 145:17
**joined** 40:21
**joke** 281:15
**Jonathan** 6:11 13:20

**Jos-** 151:15
**Joseph** 151:15,16 160:23
**Jr** 3:16 5:6 14:10
**judge** 21:9,14
**July** 7:22 53:5,8 78:6,15,21 79:12 94:2
**June** 33:9 37:15 53:3 268:12
**Justice** 4:3 15:12 15:16,22 32:3
**justifications** 349:20 351:1
**justified** 375:17,20
**justify** 283:2 326:12

**K**

**Kara** 98:9,12,14,15 98:17,19,22 102:22 118:11 119:6 127:24 142:12 153:12,23 154:12,17,22 156:13 158:7 159:17 173:1 199:11,16,24 202:1,7,12,21 203:7 223:22 224:9 235:20 271:14 272:7 274:6 278:8 286:1 286:9 305:15 339:19
**Kara's** 204:11
**Kara.Voorhies@...** 108:7
**Karen** 1:17 2:7 7:3 7:11,15 12:4 13:6 15:20 16:10,23 177:20 280:21 380:13 381:6,25 382:15
**Katrina** 181:24 182:10 186:9,13 260:24,25 261:2,5

279:16,18
**KE&T** 34:4
**keep** 20:17 26:1
46:18 81:21
304:20 374:22
**kept** 25:14 97:7
291:13
**Kevin** 4:18 15:23
**kevin.yusman@f...**
4:24
**Khan** 349:9
**Kies** 4:4 15:10,11
18:12 19:18 20:2
24:15 25:13 26:9
27:11 28:4,7,10
28:16 35:19 36:11
36:18 37:7 38:9
38:15,20,25 39:5
39:12 40:1,8,12
40:17,23 42:24
44:2,7,14 45:1,12
45:19 46:13,17,20
46:25 47:10,18
48:1,12,22 49:22
50:3,20 51:4 52:2
52:10,20 53:4,12
53:16,20 54:4,24
55:5,18 56:12
57:1,16,20 58:2,7
58:11,21 59:6,16
59:23 60:10,18,22
61:2,23 62:7,15
62:24 63:5,10,16
63:23 64:4,14,19
65:2,9,16,20 66:3
66:8,13,21 68:7
68:13,19 69:1,10
69:20 70:6,10,15
70:24 71:8,18,23
72:10,18 73:23
75:4,8 76:9,14,23
77:6,12,19 78:1
79:4,10 80:4,12
80:19,25 81:11,19
81:23 83:6,16
84:2,8,12,22
85:10,19 86:2,17

87:3,21 88:4,9,14
88:25 89:11,19,24
90:5,15 91:11,22
92:1,22 93:1,9,13
93:16,22 95:10,22
96:10,19 97:4,9
97:16 98:6,10,13
99:2,6,11 100:3
101:1,8 102:8,14
102:18,24 103:4
103:10 104:5,11
104:23 105:4,6,21
106:4,14,24 107:5
107:10 108:2,11
108:15,19,25
109:7,25 110:6,12
110:17 111:3
112:8,23 113:6,11
113:22 114:4,16
115:1,6,14,20
116:2,13,21 117:1
117:5,12,21
118:13 119:4,8,22
120:23 121:5,12
121:16,23 122:8
124:5,17 125:10
125:16,24 126:5
126:11,14,18,24
127:4,10,14 128:9
128:13,19 129:5
129:10,18,25
130:6,13,21 131:1
131:6,21,25 132:7
132:14,21 133:13
133:19,25 134:8
134:12,22 135:1,9
136:19 137:4,17
138:11,19 139:11
139:15 140:7
141:3,6,10,15,19
141:23 142:2,9,21
143:15,21,24
144:8 146:20
147:3,8,13,18,25
148:9 149:16
150:2,6,10,14
151:5,19,23

152:15,19 153:1
153:14,18 154:1,6
154:10,14,23
155:7,16,21 156:4
156:15 157:14,20
158:1,9,17,25
159:5,18 162:2
163:1,22 164:4,12
168:3 169:18
170:7 171:8 172:5
176:2,22 177:12
178:2,11,16,23
179:4,11,24
180:16,22 181:2
181:13 182:1,8,21
183:2,19 184:9,19
184:23 185:4,10
186:6,11,16,21
187:10,15 188:2,5
188:19,24 189:4,8
189:18 190:14,17
191:8,13,22 192:3
192:9,20 193:2,23
194:3,15,18,23
195:3,9,18,23
196:2,20 197:1,7
197:14,20 198:12
198:19 199:7,13
200:20,22 201:12
201:16 202:8,15
202:24 203:12,14
203:24 204:3,13
205:7 206:14,23
207:6 208:1 209:9
210:4,9,14,21
211:18,25 212:8
212:15,23 213:5
213:12,18,24
214:6,10,19 215:3
215:10,25 216:6
216:16,22 217:9
217:16,24 218:4,9
218:18,24 219:4,7
219:19 220:5,10
220:15,22 221:3
221:16 222:2,8
224:10,14,19,24

225:7,16,20,25
226:13 227:8,18
228:3,24 230:4,21
230:25 231:19
232:8,15 233:3,11
233:23 234:3,9,19
235:8,14 236:1,4
236:10,17,22
237:3,8 238:15
239:5,19 240:6
241:3 242:3,18
243:1,5,15,18
244:2,6,19 245:1
245:14 246:4,10
246:22 247:8,18
248:25 249:6,14
250:7,22,25
251:15,23 252:21
253:4,18 254:3,10
254:15 256:6
257:3 258:12,18
258:23 259:14
260:1,14 261:9,22
262:2,6,12,21
263:10,13,16,24
264:17 265:2,6,15
266:13,21 267:4
267:13,18,23
268:4,15 269:9
271:1,15 272:14
272:21 273:2,20
274:1,7,14,22
275:3,14 276:1,8
277:1,6,15 279:22
280:9,14,25
281:21,24 282:19
283:6,20 284:2,11
285:7,18 286:3,19
287:9,14,21
288:19 289:10,20
290:8 291:7,15,22
292:10 293:4,16
293:25 294:10,17
295:8,16 296:5,15
297:1 298:7,24
299:2,8,15,22
300:9,21 301:7,23

302:6,15,20 303:5
303:11 304:5,11
304:20,23 306:6
306:25 307:9,17
308:2,9,20 309:3
309:11,22 310:5
310:12,25 311:20
312:18 313:1
314:20 315:6,14
315:21 316:2,23
317:18 318:3,11
318:16 319:2,9,13
319:18,24 320:7
320:13,24 321:7
321:21 322:2,19
323:7,15 324:10
324:21 325:19
326:5,16 327:7,12
328:3,12,18,22
329:8,23 330:8
331:1,7 332:20
333:5,21 334:24
335:12,25 336:7
336:14 337:4,15
338:6 339:2,15,21
341:1,14,24
342:19 343:1,6,12
343:18 344:8
345:8,13,18,25
347:4,16 348:4,15
349:1,23 350:3,14
351:16 352:2,10
352:21 353:4,22
354:3,14,16,25
355:10 356:8,20
357:9,24 358:9,23
360:1,18 362:5,13
362:22 363:6,16
363:23 364:2,16
364:24 365:15
366:10,24 367:14
368:1,3,20 369:6
369:23 370:8
371:7 372:1,9,14
374:24 375:9,22
375:25 376:9,18
377:4,18 378:8,22

379:2
**kind** 125:11
**King** 5:6,14 6:5
  14:10,25 15:1,4,7
**knew** 59:8 102:25
  125:19,22 126:9,9
  126:13 222:4
  249:12 250:4,18
  251:10,17 254:7
  309:8 348:10
**know** 18:25 19:15
  20:15 22:5 23:25
  24:5 25:15 27:14
  28:14,17 30:11
  37:8,23 44:4,8
  47:20,21 51:6
  54:1,16,19 55:1
  64:1 67:16 71:4
  72:3 73:8 83:3
  89:2 90:16,18
  95:2,3,25 96:3
  98:22 101:2,21
  103:16,25 107:15
  108:13 109:1,3,9
  113:13 114:23
  115:2,4,7 117:23
  121:8,24 123:18
  125:19 126:16,19
  129:20 141:12,16
  142:17,19 144:24
  147:19 148:18
  149:6 152:4
  168:19 172:15
  173:3 177:14
  183:22 185:2,5,12
  185:14,16,18
  186:7 187:17
  188:23 190:6,9
  191:5,9,20,24
  193:18 194:10,13
  194:25 195:5,13
  195:16,19,21,24
  196:3,13 197:3,15
  197:25 201:21
  202:2 207:19
  212:1,4,10,12,17
  212:18,21,25

213:1,6 215:12
216:7,23 217:2,11
217:14,18 225:4,9
225:13,17,22
226:2,7,9,15,23
227:5,11,15,20,23
227:25 228:5,7,23
230:9,10 235:2
236:19 237:22
247:21 249:1
250:9 253:9 254:5
255:6 256:7 259:9
265:21 269:2,14
270:2,18 273:15
274:10 275:18
276:11 279:20
287:9,19 288:5,21
293:23 294:5,7
297:16 298:1,21
298:25 300:1,6
302:13,18 303:9
303:17 304:4,9
306:15 307:20
310:10 311:3
315:9 327:3
328:13 330:13
331:9,14 334:4
336:18 340:8
343:8,9 349:25
354:22 355:3
356:1 358:24
**knowing** 95:23
  352:13
**knowledge** 81:13
  95:1 102:21
  108:20 134:7
  135:22 197:22
  198:13 211:19
  226:4 283:21
  284:3 300:12,19
  300:23 301:1,5,12
  301:13,25,25
  302:9 343:3,13
  382:8
**known** 17:10 50:9
**Kristi** 265:12

**L**

**L** 4:10
**La'** 297:20 346:14
  349:9
**La'Toya** 359:8
**lack** 322:24
**landing** 35:22
**language** 71:17
  196:13,15,16
**lapse** 168:18,22,22
  173:13,24 174:2
  310:10,11,18,18
**lapsed** 168:15
  171:12
**large** 116:16
**lasted** 62:3
**lasts** 268:10
**late** 114:7 176:8
  295:6 345:22
  373:12
**law** 5:12 15:19
  162:1
**lawful** 364:6
**lawsuit** 16:19
**lawyer** 145:11,14
**lawyers** 21:7 25:7,9
**lead** 197:23 249:7
  362:16
**leader** 198:6,7
**leaders** 184:3,3
**leadership** 54:1,9
  60:25 112:14,21
  113:5,10 136:21
  137:15 172:20
  177:24 198:11,15
  198:15 215:5
  220:13,20 224:23
  235:12 247:6
  343:11 351:12
**Leadership's**
  241:11
**leads** 313:16
**leaked** 191:15,17
  191:18 194:7,9,10
  194:14 196:22
  231:7,10 232:6

338:20,23
**leaking** 194:21
**learn** 103:12
**leave** 142:15
  182:11 279:20
**leaving** 176:13,19
**led** 79:17 80:7
  116:16 197:19
  235:2 331:25
  363:13,20
**left** 34:1 49:16,17
  123:25 372:22
  378:25
**legal** 6:5,8 15:7
  25:15 102:14,18
  111:22 133:13,25
  134:8,22 155:17
  178:23 179:4
  363:6
**legitimate** 88:19
**Leonard** 3:5 7:5
  14:2,3 15:2,5,9
  16:14,17 27:21
  28:6,8,12 29:23
  41:9,17 42:20
  43:10,19 49:3
  67:5 72:22 78:10
  81:15,20,25 82:3
  82:12,19 120:1
  122:6,9,13,20
  135:5,10,19
  142:24 143:2,10
  143:19,22 144:5
  145:2,23 148:22
  151:13 155:23
  159:20 160:3
  162:10 164:16
  165:5,11 170:10
  175:19 176:24
  183:9 189:2,6,15
  189:20 190:16,19
  193:5,10 199:17
  205:11 207:8
  215:18 218:12,21
  218:25 219:5,10
  219:20 222:10,20
  223:3,6 226:19

228:10,13 237:14
251:3 252:3,12
254:17 255:1,14
268:17 271:19
277:24 287:1,11
287:15 297:8,25
298:4 304:18,22
305:4,9 323:19,22
323:25 324:3
326:21 334:9
339:24 344:15,22
346:4 349:3 359:1
360:3 372:19
373:8 378:4,9
379:5
**let's** 28:19 29:14
  45:22 49:3 67:5
  78:10 82:3 95:5
  110:24 118:4
  122:6 123:4,15
  136:24 142:21,23
  143:4 162:10
  176:24 183:9
  199:17 205:9
  218:12 222:13
  228:10 237:14
  252:3,4,13 254:17
  264:23 265:6
  271:19 277:21
  287:1 297:8
  326:21 339:24
  346:4 349:3 359:1
  360:3 362:17
**letter** 182:10 186:9
  186:13 261:2
**letters** 184:16
**letting** 261:7
**level** 31:12 83:12
  163:14 209:15
  229:20 230:15
  231:14,16,17
  240:24 241:12,13
  242:24 248:9,11
  282:25 289:22
  292:7 320:3 329:3
  329:14,14,22
  330:3,4 332:13

335:6,22 345:20
**levels** 171:15
208:18 209:7
210:18 244:13
245:4,6,8,18
289:9 316:13
319:21 325:8
337:23
**Levy** 6:2 14:17,18
**Lewandowski**
51:15,17 52:1
80:23 81:6,9
86:10,15,20 87:2
87:5,24 88:10,22
89:8,14,17 90:9
90:13,21 91:1,8
91:20 92:15,19
93:7 96:1 101:18
102:7,22,25
121:18 125:15,18
125:22 126:7
129:3,8,14 132:5
135:23 136:2,12
136:18 138:9
149:13 150:5
151:3 153:12,23
154:4 158:7
160:17,20 185:17
194:20
**Lewandowski's**
81:4 82:14 88:7
93:12,19,20,25
148:14 160:5
**liaison** 95:13
**lifetime** 31:20
**limit** 267:15,16
**limited** 291:20
359:25 373:11
**line** 48:14 49:24
86:10 205:12
207:16 219:13
223:25 255:10
278:9 305:21
311:12 313:6
346:5 381:11,13
381:15,17,19,21
**link** 122:2

**Linked-In** 7:10
**LinkedIn** 30:1,10
30:22
**list** 31:23 85:16
278:18,25 279:3,5
279:8 286:1
**listed** 31:22 73:25
74:12,15,15 78:17
78:21 219:24
289:19
**lists** 49:18 289:1
**litigation** 25:12
82:25
**little** 65:5 123:15
192:13 267:1
270:11
**living** 106:25
**LLP** 3:4 6:3
**loaded** 349:16
350:1,4,8
**local** 79:25 169:14
289:15
**locally** 79:17 80:7
235:2
**located** 107:14
**location** 73:5,25
78:17
**lodge** 149:3
**logic** 285:24
**long** 23:6 124:18
372:3
**longer** 23:10 76:3
176:5 264:7
358:22
**look** 22:4 30:11
39:13,14,17 49:12
63:2,6,18 69:4,13
69:24 70:16,17,17
71:11 73:16 77:1
78:25 80:6 110:1
146:6 148:3
158:13 159:4,7
167:6 168:24
169:22 172:9
177:16 183:9,21
185:20 199:17
201:2 210:24

219:21,23 221:6
223:2 246:8,11,19
246:24 249:1,24
254:18 256:12
257:7,14 258:25
259:5,17,19
263:18,22 264:1
277:21 282:20
284:20 286:21
292:12,16 294:20
295:9 296:17,21
297:9 311:5,24
314:2,3 317:3,4,7
318:20 320:19
322:7,25 324:25
325:5,22 326:12
331:17 333:8,22
334:13 339:25
343:25 344:12
346:5 349:3 353:8
355:15 357:15
358:11 375:14
**looked** 25:22 59:24
96:7,8 122:21
147:22 156:16
216:9 221:9
238:13 244:9,20
244:25 245:11,17
245:19 246:14
247:2,21 279:13
290:15
**looking** 59:17,20
63:8 68:22 84:23
123:22 127:19
170:21,22,24
173:12,14,18,19
174:8 187:5
210:15 222:11
232:24 241:18
245:5 246:15
248:5 256:20,24
260:7,17,21,23
261:11,13,14,15
263:4 279:9,25
284:8,12,25
288:13 289:12
292:13 299:11

307:21 308:5
309:12,13 310:6
313:8 317:5
326:20 337:19
338:10,13,14
341:7 343:20
344:14 348:6
350:6
**looks** 169:1 174:13
228:8 257:4
258:20
**lost** 43:25
**lot** 21:16 52:11
101:24 118:25
130:8 167:3
**loud** 223:20
**love** 81:20
**lowest** 209:15
**lunch** 135:4,6,12
164:17,21
**Luther** 3:15 5:6
14:10

───── **M** ─────

**ma'am** 17:12 18:2
18:19,21 19:8,13
19:17,22 20:1,9
20:14,23 21:1,5
21:12,15 22:7
23:3,18,21 24:11
24:16,20 25:5
27:8,13 29:16,20
29:22 30:17,21,24
31:2,17,21 32:5,8
32:12,15,21,24
33:3,12,15 34:6,9
34:12 36:7,20
37:1,4,11,14 38:1
38:4 42:17,19
46:2,5,9,14 47:6
48:3,8,16,19,23
49:23 50:4,7,17
50:21 51:1 53:9
56:22 58:14 60:1
60:19 61:3,16,19
62:16,18 63:6
64:11 66:22 67:21

70:25 73:19,24
74:4,18,21 78:8
78:20 79:23 82:17
83:4 85:2 111:22
122:22 123:20
137:12 139:12
148:10 150:21
151:11 155:9,11
160:15,21 162:21
163:6 165:25
167:9 171:5
176:15 190:4
196:16 200:4
205:22 223:1
224:20 230:17
233:24 234:4
269:6 278:5
360:11 372:11,15
376:10
**main** 374:14
**majority** 137:6
251:25
**making** 15:3 41:5
41:23 59:20 69:8
69:14,18 70:4,13
89:25 111:21
112:13 113:9,14
113:19 131:11
132:11 145:12
182:6 233:12
245:6 269:16
283:16 295:1,5
303:23 304:16
347:2 357:19
365:12,17 366:13
366:20 367:5,12
**manage** 134:20
138:25
**managed** 80:8
235:2
**management** 4:17
9:7 23:25 31:12
31:15 32:2,3,14
34:15 42:5,6
47:25 48:6,10
49:2,15,20,25
50:6 51:12,14,18

68:4,24 79:16,25
87:8,9,12,17,19
88:2,11 109:20,22
117:4,7,16,19,24
127:8 134:20
139:21,22 162:5
162:17 163:13,14
168:13,14 193:15
198:17,22,24
199:9,15 204:25
**managing** 34:10
**manner** 12:23
**March** 1:19 2:1
13:1,18 48:4
50:25 162:16,22
163:18 164:3,9
306:22 310:15
331:16 337:11
381:5
**March~31** 2:9
**Marianne** 4:4
15:11
**marianne.f.kies...**
4:13
**mark** 21:22 29:24
29:25 49:3 67:5
72:22 78:11 82:20
120:1 122:6
162:11 165:6
176:24 193:5
205:11 207:9
218:12 228:10
237:14 254:20
265:6 268:18
271:19 277:24
287:1 326:21
359:1 360:3
**marked** 7:9 8:3 9:3
10:3 11:3 12:3
30:6,8 49:6 67:8,9
72:25 78:13 82:23
120:6,7 122:12
162:14 165:10
177:3 183:13
193:8,12 199:20
199:22 205:15
207:12 218:15

228:15 237:17
254:23 257:18
259:6 265:9
268:20 271:22,23
278:2 287:5
297:11 305:8
326:24 334:12
340:3 346:8 349:6
359:4 360:8
**marker** 174:14
**Martin** 3:15 5:6
14:10
**Martinsburg** 17:1
**Maryland** 14:12
**Mass** 97:2 100:10
100:14 101:12
**master's** 29:4,10,18
**match** 216:25
231:22
**matches** 279:12
**materials** 278:16
345:5 348:10
349:10
**matter** 13:6 85:23
86:5
**matters** 85:8
129:23 130:12
131:20 132:6,20
133:23 134:6
**Matthew** 5:5 16:4
**matthew.fleisch...**
5:8
**MBA** 29:21 31:4
**McCord** 8:14
**McGill** 199:23
204:11,23,24
**McLaughlin**
177:19 183:22,24
185:21
**MCO** 253:8,11
**MD** 3:17
**MDR** 198:17,23
199:12,14 200:2
201:10,20,25
202:7,20 203:4
204:7,12
**MDR'd** 199:4

200:17 294:14
**mean** 18:16 32:13
42:25 67:2 68:20
76:21,24 85:4
87:10,11 95:14
97:17 104:6
117:11 127:15
136:5 154:24
155:4 173:11
187:1 192:15
203:10 210:22
249:4 276:11
**meaning** 26:20
56:20 86:22
109:19
**meaningful** 276:22
**means** 56:15 73:21
85:17 223:23
249:7 253:11
266:8
**meant** 59:12 76:24
80:9 203:13,15
249:12,15
**measured** 65:18,21
**medication** 22:8
**meet** 210:5 292:5
323:12 338:5
**meeting** 7:18,21
61:4 71:1,3,4 73:4
73:20,22 74:6,9
75:2,7,9,15 76:1
77:9,15 78:6,15
79:12 91:14,18
111:20 167:22
172:20,25 173:2,4
187:21,22 194:2
196:24 197:3,10
197:11,13,16,19
197:24 204:5
256:4,8 257:2,5
279:1 280:16
285:10 295:18
296:8 298:10
299:10 353:21,23
353:24 354:5
**meetings** 59:9 60:3
60:7,11,16,21,23

61:1,6,9,12,20
62:3,6 73:15 79:7
89:9 90:6,8,11,12
90:19,20,22,25
91:6,7,13,17,18
92:6,10,13,16,17
97:22 98:5 107:12
107:17,20 111:18
112:1,2,4 128:3
133:5,6,9 134:15
166:11 168:2,6
173:5,22 175:16
189:23 190:2,5,8
190:10 195:11
203:22 258:3
273:14 274:19
280:2 285:12
306:15
**memo** 252:25 253:5
253:24 254:5
255:11,18,22
265:1,11,16 266:1
266:2 267:9,19
268:25 270:22,23
271:8,10,11 272:1
346:18,20
**memorandum**
206:12,12 346:11
346:14
**memos** 269:8,12,19
270:10,14,16
271:13,18 272:18
272:25 273:7
274:3,5 314:8
374:7,8,11,14,16
375:3,5
**mention** 340:22
**mentioned** 27:1
29:17 58:8 153:2
195:11 232:22
236:12 244:7
245:3,16 285:22
286:4 374:3
**message** 8:14 163:5
298:11 320:20
**messages** 147:9
157:24 158:3,8

159:2,3,7,15
**met** 56:4 86:19,20
295:21,22,25
**metadata** 287:25
288:4
**method** 157:4
**Micah** 229:9
**Microsoft** 107:19
107:21
**mid-December**
305:11
**middle** 228:19
312:12
**mine** 30:14 327:8
**minutes** 7:18,21
20:18 62:4 73:3
73:14,20 77:15
78:15 79:2 81:22
222:13 286:12
304:19 344:16
372:22 378:24
**mission** 39:19 41:3
44:19 53:23 59:20
59:21 68:15 69:14
216:9 221:22,23
232:22 245:4,16
247:4 248:7
253:12,16,19
271:4,5 282:2
283:8 289:24
290:3,6,13,16,24
313:17 346:22
**mission-critical**
208:20
**missions** 44:19 45:4
45:8,20 70:18
72:20 76:18
**misstatement**
363:11
**misstates** 179:25
198:20 204:4,14
225:8 234:20
246:23 275:15
276:9,16 277:7
291:16 292:11
293:5 316:24
319:2 322:3 323:8

324:22 326:6
338:7 341:2,25
354:3,16 356:9
357:10 362:22
363:7 364:25
365:15 366:11,25
368:4 375:10
**mistake** 321:5
**mistakes** 375:22
**mix** 344:2
**modernization**
117:16,19,25
**modifying** 216:11
217:4
**moment** 219:11
303:20 361:7
**money** 307:24
308:7,18 309:9,20
310:2 345:24
349:16,22
**month** 37:22,22
298:15 315:24
316:17 317:17
318:1 323:4 326:3
344:23
**months** 38:3,5
47:23 256:1
267:10 268:11
306:4,19
**morning** 14:2,6,13
14:17,21,25 15:10
15:25 16:15
299:19
**Motion** 12:7
**move** 45:22 54:19
54:22 55:10,12
58:19 62:13 153:9
198:25 201:10
**moved** 33:10 37:13
37:19 54:13,17
62:10 65:24 70:5
74:22 94:3 99:1
**moves** 7:16
**moving** 58:6,12
79:25 85:24 89:13
98:8
**Mullin** 24:10

**multiple** 41:11
217:11,18 221:5
231:24 373:19

——————————
**N**
——————————
**N** 165:1,1,1
**name** 13:20 16:21
16:23 24:8 120:11
120:11 150:20,22
150:24 198:1
281:10 297:21
298:2 333:19
381:2,6 382:12
**named** 47:5 98:9
197:17 199:23
211:5 237:20
271:25 327:1
**names** 85:16
347:12,25 348:3,6
348:13,19,25
359:20
**naming** 28:23
**national** 31:13
247:25
**native** 218:22
219:15
**NATO** 201:6
**nature** 104:10
127:23
**near** 124:22
**necessarily** 12:24
44:22 107:13
155:8 249:16
258:25 293:6
322:12
**necessary** 113:4
276:24
**need** 20:10,15,19
45:7 75:20 181:3
200:1 202:3
204:10 216:13
237:6 275:5
321:20 359:19
367:20
**needed** 70:20 143:2
162:4 208:18
222:6 237:1

242:24 282:22
283:4 292:4
322:17 323:12
325:8 327:21
330:18 335:10
336:5 337:2
343:22 345:10
352:17 374:16
**needs** 43:4 234:7
246:7 312:22
316:1 317:25
318:15 326:4
329:7 330:3
336:25 342:22
**neither** 383:8
**Neurauter** 237:20
237:22 238:4
333:12 335:1,17
**Neurauter's** 331:18
**never** 52:24 116:22
193:21 281:10,13
281:13
**new** 2:10 8:23
13:16 24:3,6,12
29:10 40:6 45:24
46:10 53:25 58:6
62:17 64:25 65:8
71:3 74:7,8 76:5
78:8,17 89:6,15
183:10,15 244:18
246:15 247:2
334:22 377:1
**Newman** 4:5 15:15
15:15
**news** 184:5
**newspaper** 47:13
**newspapers** 77:13
**nod** 19:10
**nodding** 19:5
**Noem** 36:5,8,12,14
37:6 40:15 41:7
42:2 46:11,24
47:7 51:2,9,11
52:1 63:3 70:4
75:16,25 76:12,20
77:10,17,24 79:1
79:8 80:1,24

95:20 96:15 129:3
129:8 132:4
135:23 136:11,18
138:9 150:9 151:4
153:11,23 154:8
158:6 178:9,14
185:13 187:8,13
188:18 191:5
194:13 196:1,3
213:10 236:20
265:12 301:4
**Noem's** 62:22
79:13 93:21,25
119:2 148:11
270:24
**nom-** 50:22
**nominated** 48:5
50:24 87:18
**nomination** 51:13
53:2,10,13 54:2
54:17 55:2
**nominee** 87:13
**non** 264:3
**non-career** 36:25
46:7
**Non-Profit** 3:2,13
**non-renewals**
130:24 362:9
365:10
**nonMCO** 253:8,13
254:2 264:15
267:8,11
**nonmission** 253:14
**nonprofit** 14:8
34:14
**nonrenewals**
131:16 263:22
264:1 355:5
373:15
**normal** 35:9,11
**normally** 57:11
**Northern** 1:2 13:12
**Northwest** 2:11
4:10 13:17
**Notary** 2:13 383:4
383:19
**notation** 170:1

172:13 223:18
**note** 12:22 173:6
274:15 280:10,22
**noted** 165:2
**notes** 8:16 25:22,22
25:24 26:1,5,6,6
26:15,18 27:22
165:7,21 166:17
167:3,19,20,25
168:1,4,17,25
169:4 223:4
224:16,18 235:21
256:8,10,21 257:1
257:5 260:6,9,16
278:14 279:13
280:11,15 353:9
353:12,17
**notice** 260:22
359:10
**noticed** 159:3
**notices** 184:1
**notification** 176:9
**notify** 182:18
**notwithstanding**
144:16
**November** 176:8,9
176:12 177:6,6
207:1,18,22
238:12 268:13,16
311:8,11 316:8,14
321:16
**Now's** 252:5
**NRDC** 3:14 14:9
**NTE** 130:24 254:7
259:12,25 260:13
261:7 262:19
263:23 279:10,20
280:7 295:15
296:2,3,10,13,13
296:24 301:3
302:4,13 303:3
304:1,3 306:3,19
345:6 347:14
354:23 359:13
377:1
**NTEs** 351:2
**number** 21:23 22:1

44:3,24 63:13,20 84:25 90:16 138:3 138:24 139:2 142:1,12 143:13 144:18,24 146:9 146:11,17,22 147:1,5,6,23 148:4,12,15,16,23 149:1 151:17 160:5,7,9,16,19 160:23,24 161:10 161:12,13,16,20 165:13 170:8 192:22,22,24 216:3,17 217:2 218:20 219:13,16 219:16 220:1 221:13 223:21,24 224:8 225:5,10,14 225:17,18,22,23 226:3,5,7 227:15 227:21,24,25 228:5,6 229:17,25 230:15,19 232:3,3 235:22,23 236:24 237:1 238:25 244:16 248:3,22 249:20 250:3,19 251:12 256:17 261:24 262:9,14 263:8 275:13 276:7 280:21 282:1,17 283:23 284:5 291:20 292:14,18,18 306:18 307:21 309:1 320:2 321:10,11,12,13 322:17 333:16 336:8,12,17,18,22 337:7,13 339:4,8 340:7 353:14

**numbered** 228:21

**numbers** 147:15,19 148:1 149:1 153:8 160:12 161:5 192:23,23 193:3

215:23 216:8 217:1,5 220:3 221:9,12 222:23 223:11 227:7 230:6,7,11 231:22 232:17 233:25 234:14,18 242:22 248:14,15 275:24 280:19 281:20 282:4,9,12,21,24 283:2,7,9 289:12 289:14 290:18,22 291:8 292:14 295:14 304:14 306:3,8,9,17 309:6 321:24 322:5 341:8 342:17 344:6

---

**O**

**O** 165:1,1,1

**o0o--** 13:3

**OA** 298:19 300:4 300:16 301:15 302:2,4,23

**object** 18:12 20:2 24:15 25:13 26:9 27:11 28:16 35:19 36:11,18 37:7 38:9,15,20,25 39:5,12 40:1,8,12 40:17,23 41:8 44:2,7,14 45:1,19 46:13,17,25 48:12 48:22 49:22 50:3 50:20 51:4 52:2 52:10,20 53:4,12 53:16,20 54:4,24 55:5 56:12 57:1 57:16,20 58:7,11 58:21 59:6,23 60:10,18,22 61:2 61:23 62:15,24 63:5,10,16,23 64:4,14 65:2,9,16 65:20 66:3,13,21 68:7,13,19 69:1

69:10 70:24 71:8 71:18 72:10,18 73:23 75:4,8 76:9 76:14,23 77:6,12 77:19 78:1 79:4 79:10 80:19,25 81:11 83:6,16 84:8,12,22 85:10 85:19 86:2,17 87:3,21 88:4,9 89:11,19,24 90:5 90:15 91:11,22 92:2,22 93:1,9 95:10,22 96:19 98:6,10,13 99:2,6 99:11 100:3 101:1 101:8 102:8,14,24 103:4,10 104:5,11 104:23 105:4,6,21 106:4,14,24 107:5 107:10 108:2,11 108:15,19,25 109:7,25 110:12 110:17 111:3 112:8 113:6 115:1 115:6,14,20 116:2 116:13,21 117:1,5 118:13 119:4,8,22 120:23 121:5,12 121:16,23 124:5 124:17 125:10,16 125:24 126:5,11 126:14,18,24 127:4,10,14 128:9 128:13,19 129:5 129:10,18,25 130:6,13,21 131:1 131:6,21,25 132:7 132:14,21 133:13 133:19,25 134:8 134:12 136:19 137:4,17 138:11 138:19 139:11,15 140:7 141:3,6,10 141:15,19,23 142:2,9 146:20 147:3,8,13,18,25

148:9 149:16 150:2,6,10,14 151:5,19,23 152:15,19 153:1 153:14,18 154:1,6 154:10,14,23 155:7,19 156:4,15 157:14,20 158:1,9 158:17,20,25 159:5,18 162:2 163:1,22 164:4,12 168:3 169:18 171:8 172:5 176:2 176:22 177:12 178:2,11,16,23 179:4,11,24 180:16,22 181:2 181:13 182:1,8,21 183:2,19 184:9,19 185:4,10 186:6,11 186:16 187:10,15 188:2,5,19 191:8 191:13,22 192:3,9 192:20 193:2,23 194:3,15,18,23 195:9,18,23 196:2 196:20 197:7,14 197:20 198:12,19 199:7,13 200:20 200:22 201:12,16 202:8,15,24 203:12,14,24 204:3,13 205:7 206:14,23 207:6 208:1 209:9 210:4 210:9,14,21 211:18,25 212:8 212:15,23 213:5 213:12,18,24 214:6,10,19 215:3 215:10,18,25 216:6,16,22 217:16 218:4,9 220:5,10,15,22 221:3,16 222:2,8 224:10,14,19,24 225:16,20,25

228:3 230:4,21,25 231:19 232:8,15 233:3,11,23 234:3 234:9,19 235:8,14 236:1,4,10,17,22 237:3,8 238:15 239:5,19 240:6 241:3 242:3,18 243:1,5,15,18 244:2,6,19 245:1 245:14 246:4,10 246:22 247:8,18 248:25 249:6,14 250:7,22 251:15 251:23 252:21 253:4,18 254:3,10 254:15 255:14 256:6 257:3 258:12,18,23 259:14 260:1,14 261:9,22 262:2,6 262:12 263:24 265:2,15 266:13 266:21 267:4,13 267:18,23 268:4 268:15 269:9 271:1,15 272:14 272:21 273:2,20 274:1,7,14,22 275:3,14 276:1,8 276:16 277:1,6,15 279:22 280:9,14 280:25 281:21,24 282:19 283:6,20 284:2,11 285:7,18 286:3,19 289:10 289:20 290:8 291:7,15,22 292:10 293:4,16 293:25 294:10,17 295:8,16 296:5,15 297:1 298:24 299:2,8,15 300:9 300:21 301:7,23 302:15,20 303:5 303:11 304:5,11 306:6,25 307:9,17

308:2,9,20 309:3
309:11,22 310:5
310:12 311:20
312:18 313:1
314:20 315:6,14
315:21 316:2,23
317:18 318:3,11
318:16 319:9,13
319:18,24 320:7
320:13,24 321:7
321:21 322:2,19
323:7,15 324:10
324:21 325:19
326:5,16 327:7,12
328:3,12,18,22
329:8,23 330:8
331:1,7 332:20
333:5,21 334:24
335:12,25 336:7
336:14 337:4,15
338:6 339:2,15,21
341:1,14,24
342:19 343:1,6,12
343:18 344:8
345:8,13,18,25
347:4,16 348:4,15
349:1,23 350:3,14
351:16 352:2,10
352:21 353:4,22
354:3 355:10
356:8,20 357:9,24
358:9,23 360:1,18
362:5,13 363:16
363:23 364:16,24
367:14 369:23
371:7 372:1,9,14
374:24 375:9
376:9,18 377:4,18
**objection** 19:24
43:4 45:12 47:10
47:18 48:1 55:18
58:2 62:7 64:19
66:8 69:20 70:6
70:10,15 71:23
80:4,12 84:2
88:14,25 93:13,22
96:10 97:4,9,16

110:6 112:23
113:11,22 114:4
114:16 117:12,21
134:22 143:20
144:2,6,9,9,15
145:12,15,18,22
149:3 155:16
186:21 195:3
197:1 217:9,24
225:7 226:13
227:8,18 251:4
262:21 263:10
264:17 288:19
299:22 302:6
310:25 319:2
354:14,25 362:22
363:6 364:2
365:15 366:10,24
368:1,3,20 369:6
370:8 375:22
**objections** 17:22
19:19 41:12 42:22
145:3,4 251:4
**objective** 45:2,2
**objectives** 44:15
**obligations** 155:13
208:22
**obstructing** 43:8
**obtained** 114:10
**obviously** 144:10
**occasionally** 19:19
**occupation** 253:15
253:19
**occupations** 253:12
253:14
**occur** 168:6 190:5
**occurred** 87:16
176:7 297:14
321:15
**OCHCO** 50:9
214:2 238:1,12,19
240:12,20 242:8
242:11 317:22
322:16 333:14
334:1,1 375:20
**OCHCO'S** 240:1
**OCHCO.'** 227:4

**October** 9:13 94:12
94:19 118:16,16
119:11 135:21
167:7,11 168:9,25
169:15,22 170:6
171:19 172:12
173:6 205:2,17
206:20
**offense** 107:21
**offered** 44:8,9
**office** 8:9 15:24
32:3,9,13 34:1
35:15 42:5,6 50:5
50:8,12 51:20
56:9,15,15,18,19
56:20,20,24,24
57:3,4,6,6,14,19
57:23 58:5,10
60:7 74:1 81:5
82:15 84:21 85:4
85:6 86:23 88:17
88:18,22 95:13,16
95:16 96:13 97:2
105:10,18 106:13
107:24 108:1
109:6 111:23
118:19 124:3
127:7 132:18
139:20,21 140:6
147:11,16 148:7
168:13,13 180:25
181:10 182:6
183:7,7 184:15
185:9 195:22
201:14,18,23
211:7 214:14,20
214:25 215:16
221:20 236:2
238:1 239:13
240:1 241:9 244:1
247:12,13 261:19
267:7,21 271:6
273:19 280:1
285:14,17 286:2
295:14 298:13,22
299:13,16 300:8
300:18,24 301:3

301:11,14,15,20
302:1 304:2,7
309:20 310:2
313:12 322:11,14
332:1 334:3 337:6
337:8 347:7,21
348:7 355:9,23
374:6,15,20 375:4
375:13 376:3,12
**office-level** 214:4
214:16
**officer** 8:13 32:7
33:13,20 42:11,14
42:16 49:19,19
50:6,9 111:21
140:19 162:9,19
162:25 163:3,9,19
164:1 207:2 215:4
**officers** 140:21
**offices** 2:10 13:15
209:15 214:3
215:6 236:25
238:21 242:23
245:9 246:18
248:9 282:24
284:16 295:3
313:17 314:18
317:14 322:12,22
323:5,10 325:17
326:2,10 329:19
330:4 331:15
334:22 335:8
336:5,13 338:3
339:14 344:7
355:14 356:4
357:12 358:5
377:10
**official** 1:8 13:9
17:7,9 21:24
100:8 106:6,17
111:8 113:17
120:22 132:12
134:3 140:13
144:11 149:4
150:22,24 158:20
189:11,19
**officially** 28:2

**officials** 8:5 120:18
121:1,4
**Oh** 73:2 85:1 206:9
208:13 240:18
312:3 326:8
355:21 365:23,25
374:25
**okay** 17:14 18:3
19:1,9,14,16,18
20:10,15 21:2,6
21:13,14,16 22:8
22:17 23:2,4,22
24:1,12,17,21
25:10 26:19 27:9
27:20 28:8,12
29:17,23 30:22
31:3,10,18,22
32:6,16,22,25
33:4,16,19,24
34:7,10,18,22,25
35:7,17 37:3,5,12
38:2,5 39:8 42:20
42:23 43:20 46:3
48:9 49:3,14 50:5
50:15,22 53:7
54:12 57:13,18
60:2 61:17 62:19
64:7,24 66:18
67:4,18,22 71:9
71:20 73:2,11,12
75:2 78:10,14
81:15 82:13,18
85:7 86:14 87:1
88:21 93:17 94:17
98:14,15 103:21
117:10 118:15
119:10,18 120:13
122:1,3,18,21
123:6,7,9,15,21
135:9 137:13
142:16,24 143:2
145:24 146:5,8,14
146:16 148:21
151:12 155:12
159:12,20 161:23
162:10 164:16
166:1,3,19 167:4

167:14,15 169:15
173:6 174:12
175:2,6,8,22,23
176:11,24 177:4
177:16,24 178:18
178:21 190:22
193:20 196:5
198:3 200:23
201:24 204:15
205:1,9,13,16
206:3,10 207:8,13
207:21 209:18,25
211:22 219:4,19
223:7,15 228:10
229:3,10,12
237:24 238:4
240:18 252:3,13
254:17,19 255:8
255:23 256:3
257:6,14,20 265:4
266:2 270:4 272:4
278:4,6,25 279:24
281:14 287:1,14
287:23 297:8,18
297:19 298:5
304:18 305:4,19
305:20 311:17
315:17 326:21
327:5,14 328:25
332:9,25 334:7,8
334:19 335:1
339:9,13,24
340:10 342:21
344:15 353:12,14
353:16 355:6,22
359:1,22 360:3
366:2,4 370:1
371:9,11 372:5,19
373:2 378:4,8,22
379:2
**Olivia** 6:5 14:25
**OMB** 32:11,13
38:17 42:4 174:7
205:25 206:10,22
208:8 212:7,13,18
212:21 213:4,8
220:24 221:1,8

225:5,12,13,19,23
226:4,6,11 227:6
227:12,16,22,24
228:1,9 229:19
230:14,20 231:15
233:21 234:2
262:11 310:21
314:15 319:22
321:14 324:17
327:1 328:17
**OMB/OPM** 340:23
**once** 98:7 348:12
**ones** 190:6 362:24
**ongoing** 260:4
**oOo--** 380:25
**open** 7:18,21 73:20
378:18
**operational** 56:5,6
59:8 60:3,5,8,15
61:9,12
**operations** 60:3
89:9
**OPM** 38:17 42:5
174:7 205:25
206:11,22 212:7
212:13,18,21
213:3,8 220:24,25
221:8 225:5,12,13
225:19,23 226:3,5
226:12 227:6,13
227:16,22,24
228:1,9 230:14,20
231:15 233:21
234:2 262:11
310:21 311:23
314:15 319:22
321:14 324:17
**OPM/OMB** 208:8
229:19 230:1
**OPPA** 221:20
234:13 247:11,13
248:8 271:3
**opportunity** 43:9
264:22 272:8,19
275:8 380:22
**opposing** 165:14
**Opposition** 12:6

**option** 235:15
236:9 245:23
261:25 263:19
283:11,25 286:22
293:9 315:2,10
324:12 341:5
**options** 218:10
243:7,10 244:1,9
244:10,13 260:20
261:11,18,19
262:16 263:18
309:6 341:6,9,13
**order** 9:12 39:2
45:7,15 71:11
72:12,14 76:25
85:16,18,24
164:15 167:5
187:20 205:3,10
205:16,19 206:6
206:25 207:25
233:22 243:8
245:12 249:2,5,11
249:23 250:3,18
292:5 305:6
313:13
**ordered** 71:14
164:10 205:23
324:18
**ordering** 318:24
**orders** 38:12 39:7
39:14 40:2 52:13
52:23 59:18 62:2
64:18 72:15,16
139:19 362:20
364:18 378:21
**organization** 3:3,14
9:17 14:8 67:12
100:6 241:12
329:15
**organizational**
7:13 14:5,16,19
14:23 48:11 49:10
**organizations**
109:12
**orientation** 163:16
163:17
**original** 278:21

318:22 331:25
333:13
**originally** 318:25
**Orleans** 71:3 74:7
74:8 78:9,18
**outcomes** 65:11,12
69:15 70:20
**outer** 88:17
**outline** 309:17
**outlined** 39:1 40:3
70:21 187:19
267:5 285:23
292:3 293:19
331:10 352:25
354:7 358:17
**outset** 233:20
**outside** 149:13
**overall** 170:12,23
186:25 191:12
196:9 235:1
280:19,23 281:20
282:20 290:3,12
290:22 292:14
314:10
**overruled** 182:25
**overstating** 322:16

---

**P**

**p.m** 164:22 165:2
229:6 257:23
379:12
**P.O** 3:21
**package** 83:25
345:16
**packaged** 345:5
**packages** 83:21
345:21
**packaging** 272:9,19
350:25
**page** 31:11 74:13
78:23,25 79:12
123:5 166:22
167:6,10 168:24
169:23 171:18
172:9 177:8,16
183:21 185:20
193:11 196:5

207:17 210:24
219:2 223:11,11
223:16,19 228:21
229:7 256:13
257:11,15,18
259:6 270:4 291:1
311:25 312:12
340:7 361:9,10
381:11,13,15,17
381:19,21
**Page/Line** 12:12,12
12:12
**pages** 7:12 166:14
166:19,21 380:4
**paid** 115:4 310:17
326:13 327:17
350:8
**paper** 146:12
160:12
**papers** 83:14
**paperwork** 375:7
375:21
**paragraph** 120:10
185:22 196:7
208:10 240:11,14
240:15 241:6,7,21
242:6 361:10
362:7
**paragraphs** 331:22
362:4
**paren** 218:19
**parentheses** 172:14
**part** 35:22 52:15
70:11 92:20
102:17 112:12
121:24 156:9,25
163:15 214:4
230:16 258:4,22
269:21 286:21
292:4 318:7
321:13 329:20
340:23 343:24
350:9 353:24
**partial** 30:19
**participant** 74:12
**participate** 25:10
66:18 111:25

112:3 128:3 133:8 172:24 173:1,5 213:15 236:11
**participated** 60:16 158:6 173:3 189:23 190:2 195:10 285:11
**participating** 91:15
**participation** 153:20
**particular** 45:7 71:13 89:5 111:9 169:4 170:11 173:4 174:4 177:14 183:4 184:14,24 217:4 245:20 282:6 294:23 306:4,19 326:19 337:19 353:23 361:1 364:9 369:17 371:11,14 372:18
**particulars** 185:14
**parties** 383:10
**Partners** 34:4
**parts** 88:23 247:17 317:23 332:18
**passed** 200:17 201:8
**pause** 42:21 229:11 361:8
**pay** 308:11,13,14 346:3 349:17 350:1,5,7,19,23
**penalty** 382:1,9
**pending** 20:11,21 164:13 252:18 351:11 378:18
**people** 56:23 57:3 69:22 70:2 72:5 100:5,9 106:13 150:23 157:21 159:12 172:23 261:1,5 279:19 298:1 318:15 321:20 325:16 326:4 356:6

374:22 377:14,23
**percent** 23:8 53:6 295:10 297:24
**percentage** 220:6 248:2
**perfectly** 68:2
**perform** 126:21 134:21
**performed** 284:9 348:9 375:15
**performing** 17:7,9 100:8 106:6,17,19 111:8 113:17 118:12 132:12 134:3 140:13 209:23 271:4 283:14 284:18 314:3 323:1 344:12 347:20
**period** 37:18 42:3 52:12 54:22 55:4 55:21 86:21,22,22 94:12 101:23 103:16 118:4,14 118:16 136:24 140:10,11 168:11 168:19 268:3 275:5,20 281:4 295:11,13 307:20 307:22 308:10 310:6,14 323:2 331:9 345:22 347:5 355:11 356:24 362:25 374:2,5,9 376:6
**periodically** 148:10 148:17 150:3,7,11 151:8
**perjury** 382:1,9
**permanent** 248:18 249:19 337:25 344:3
**permit** 134:19
**Perry** 6:11 13:20
**person** 45:25 50:12 58:9 85:25 95:2 95:13 106:22

107:23 108:9 163:17 178:14 183:6 224:7 363:15,22
**personal** 5:10 15:20 22:25 26:1 26:6 27:22 43:3 64:25 65:7,10 141:18,22,25 142:4,7,12 143:12 143:13 144:12,14 144:25 145:11,13 145:14,19 146:17 146:25 147:5,7,11 147:16 148:2,3,6 148:12,15,19 149:5,7,11,12,23 157:12,16,19,22 158:13,21 160:6 160:14 161:5,9,11 161:21 203:8
**personally** 66:24 77:16 129:22 134:18 161:23 162:3 210:6,10,12 213:6 215:11
**personnel** 36:3 42:6 83:22 94:24 94:25 95:4,12,17 96:14,16 111:10 111:13,16,19 112:6 129:23 130:10,11 131:20 133:12,16,21,23 134:6 139:21 168:13 181:1,11 181:17,18 182:6 185:8 202:13 203:11 252:23 266:23 285:9 371:12
**perspective** 175:17
**pertained** 39:10
**pertaining** 38:7,13
**petition** 181:24
**PFT** 289:2
**PFTs** 248:12

**phone** 55:11,14 82:5 130:16,17 142:1,4,5,11,19 142:20 143:1,13 143:13 144:14 145:13 146:2,6,8 146:9,11,17,18,25 147:7,11,15,16,21 147:23,23 148:2,3 148:6,11,12,14,15 148:16,19,23 149:1,11,24 151:17,18 157:12 157:16,22 158:13 160:5,6,7,12,14 160:16,19,20,23 160:24 161:5,5,9 161:11,13,16,20 161:21 204:2
**phones** 142:6 149:19,21 157:19
**photo** 123:2,10,11 123:12,14,17,18 123:20,23
**photos** 122:1,21,23 122:25
**phrasing** 369:18
**physical** 165:23,23 169:23
**picked** 244:16
**picture** 308:22
**pictures** 156:5,7,8 156:19 157:9
**piece** 146:12 160:11 290:9 294:1
**PII** 145:1
**pile** 311:6
**place** 29:10 42:15 71:10 95:24 98:1 98:2,4 112:13 113:2 130:10 131:15 295:1 343:23 364:11 367:7 368:13 370:15 371:12 383:7

**placed** 182:10 243:7
**places** 362:1
**Plaintiffs** 1:6 2:8 3:3,14,15 7:8 8:2 9:2 10:2 11:2 12:2 14:5,8,9,16 14:20,24 16:19 25:11 30:5 49:5 67:7 72:24 78:12 82:22 120:5 122:11 162:13 165:9 177:2 183:12 193:7 199:19 205:14 207:11 218:14 228:14 237:16 254:22 265:8 268:19 271:21 278:1 287:4 297:10 305:7 326:23 334:11 340:2 346:7 349:5 359:3 360:7
**Plaintiffs'** 12:6
**plan** 207:5 208:15 210:3,7 211:1,12 211:16,23 212:3,5 212:13,22 213:2 213:10,17 214:5 214:18 215:1,9,11 215:15,17,24 216:4,18 217:6,22 218:3,20 219:2 220:14,21 221:25 222:22 224:8,22 225:1,3,4,6 226:10,11 227:6 227:12,17 230:2 232:7,14 233:8,21 234:1 235:6,13 236:16 238:5 239:11 240:11,16 240:23 241:8,24 242:9,22 243:4,22 244:17 245:20 246:8 247:25

251:11 256:16 258:4,15,22 259:11,24 260:8 260:12,18 261:20 261:25 262:10,19 262:25 263:7 275:12 276:6,14 280:4,6,24 281:22 282:16,18 283:18 284:1,8,21 285:3 285:5,16 286:11 286:15,18 291:11 291:19 292:17,17 292:19,23,24,25 293:9,11,14,15,18 296:1,9 299:6 304:1 310:23 311:12,14 312:5 313:20,22,25 314:2 316:7,10,18 317:5,8,15 318:8 324:17,20 325:13 328:16,20 329:2,4 329:13,20 330:3 330:12,15,25 331:13 332:5 333:13,15 338:11 339:1 340:24 341:12 342:7 343:20 344:9,13 357:8 377:16 378:2

**plane** 124:11
**planned** 166:11
**planner** 165:22,24 166:6,15,18,25 167:1 168:1,4 223:4
**planners** 166:3
**planning** 221:21 237:25 247:12,13 258:2 318:23 332:11,15 333:2 333:11,18 334:2,6 334:14,22 335:4 335:10,20 336:6 340:18

**plans** 170:23 199:6 205:6,20,24 206:5 217:12,18 218:5 225:11 226:17 227:2 232:12 239:25 261:14 288:13 298:11 314:10 321:14 331:15 337:9,10 342:22 343:25 357:1,3,13 377:6
**played** 81:9 97:14 115:18,21
**playing** 118:8
**please** 13:24 16:8 16:22 19:15 28:11 39:8 46:18 48:9 83:11 142:11 143:14,18 152:25 155:19 160:8 161:2 198:23 202:2 223:20 226:20 251:6,7 272:7 298:17,18 300:3,15 329:10 332:23 335:14 353:14 359:10 371:4 380:3
**pleasure** 178:25
**point** 37:12 47:22 49:14 74:23 94:2 103:7 169:15 170:12 176:4 184:11 190:24 191:1,10 198:8 225:2,15 238:6 248:13 262:18 338:20 342:11 344:23 355:6 365:2 366:16
**pointed** 321:12 358:14
**points** 10:19 293:20 338:17
**policies** 42:14 110:23 181:8 201:4 352:19

353:2 354:12 364:10,12 370:11 375:19
**policy** 119:2,7 131:20 138:18 152:5,8,11 161:8 180:11,14 201:9 221:21,21 237:25 247:12,13 266:15 266:16 340:14 342:5,11 353:7 354:21 356:6,17 357:22 358:7 359:12,15,17 365:9,13 366:8,16 366:22 367:7,11 367:24 368:13,17 369:4 370:7,24 371:6,10,12
**political** 36:24 46:7 152:18,21 179:7 181:22 182:24 184:4,18
**POLITICO** 7:14 67:11
**poorly** 309:24
**population** 249:16 251:19 304:15
**portfolio** 131:9 132:3 190:1 201:4
**portfolios** 55:20
**portion** 73:21 144:21
**position** 17:4,5 24:13 32:1,16,18 33:16 35:14,16,18 35:24 36:1,9,20 36:25 37:2,6,10 37:24 45:24 46:6 46:11 47:21,24 51:3,9,12,18,19 51:22 52:1,6,8,16 52:24 53:19,22,25 54:2 55:7,8 65:8 74:15,19 80:23 81:1,2 87:14 94:8 94:15,17,22 96:23

99:25 104:22 133:6 176:21 178:15 188:13,13 188:16 252:15 266:20 283:12,12 284:9 325:22 348:9 357:22 365:5 378:23
**positions** 39:4 101:6 102:13 172:4 199:1 244:11 247:23,24 247:25 248:24 249:2,5,13,17 250:6,13,21 251:14,21 252:1,1 253:3,9 254:1,2,6 254:13 259:2,17 259:18,25 260:13 262:19 263:1 265:14 266:5,11 267:9,12 275:11 283:13 284:18 289:3,5,7 292:5 294:25 303:18 306:18 307:16 308:8,11,15,19 309:13,14,21 310:3 316:19 325:23 326:12 338:10 351:21 352:19 353:3 363:14,21 367:6 368:10 369:14 372:18 373:10 375:7 376:2
**possession** 144:13
**possibility** 21:3
**possible** 51:25 52:15,21 67:1 213:22 289:17 301:2
**Post** 3:7 8:19 177:5
**post-high** 28:22
**potential** 51:9 52:16 168:14 187:5 262:16

317:11 325:9 341:10 366:13
**potentially** 89:6 171:22 224:4 288:18
**PPO** 95:12
**practice** 26:7,10 32:17 128:14,21 286:5 339:22
**pre-brief** 92:7
**pre-briefs** 92:11
**pre-decisional** 225:1 262:15 291:18 317:9 319:19 321:11 325:2 330:16 338:17 342:7,10
**pre-established** 137:9
**precautions** 110:22 203:21
**precise** 99:23,25
**preexisting** 161:7
**prefer** 57:5
**Preliminary** 12:7
**premise** 275:18
**preparation** 27:12
**prepare** 22:20 25:3 27:1,2 28:13 83:21
**prepared** 27:10 187:12 253:1 374:12
**preparing** 269:23 270:22 271:6
**present** 6:1 13:24 23:13,16 60:23 61:1 62:5 75:7 89:8 90:2 91:1,8 91:20,20 92:15 274:19
**presented** 311:2
**presenting** 193:4 336:9
**preservation** 8:15 162:24 163:4,8
**preserve** 157:5

**President** 1:8 13:10 33:25 34:18 36:19 38:12 48:5 53:2 62:21 69:6,16 70:3,11,21 71:10 71:13,21 72:7 75:17 76:2 86:23 178:25 179:15 187:4,7 205:3,23 206:3 237:12 249:22 250:1,14 324:18 325:10 330:19,19 357:18
**president's** 9:5 38:7,23 39:9 43:22 44:12 45:9 52:19 61:21 62:1 65:22 72:15 193:14 207:24 208:19 233:22 364:17
**presidential** 36:3 94:24,25 95:4,12 96:14 118:23
**presidentially** 37:1
**press** 8:8 66:12,16 66:19 67:11 68:6 120:3,8 122:2 176:11 191:15,17 191:19 194:7,9,11 194:14,22 321:3 338:21,23,25 339:10,14 341:19
**presumably** 178:6
**previous** 44:20 112:20 216:24 220:23 233:17 248:10 262:14 274:15 282:7 286:24 288:15 309:16 318:7 321:8,18 328:7 358:11
**previously** 59:19 113:9 126:22 146:24 153:2 160:4,22 175:24

184:14 187:2 190:7 195:11 198:6 200:14 210:17 221:5,18 230:5 231:23 232:22 236:5 242:11 243:24 244:7,21 245:2,16 246:13 247:1,10 248:17,18 256:16 260:19 261:23 263:2,19 273:4,13 274:18 281:25 282:12,22 285:21 286:4 288:11 289:11,25 290:15 290:20,24 291:8 291:10,25 292:15 299:9 303:12 304:6 306:7 309:12 318:17 320:1 325:14,21 330:17 337:7,18 338:19 339:22 341:4 343:21 344:1,24 346:1 350:15,18 359:18 362:24 374:2 377:7,24
**Prieur** 297:20,24 298:3,4,21 299:18 301:21 302:10 346:14,21 349:9 351:3
**Prieur's** 298:2
**primarily** 136:7
**principal** 198:5
**principals** 172:13 172:16,18,19 173:2,4,5 313:15 317:10 324:23
**principles** 313:16
**print** 156:1
**printed** 30:9 49:8 67:11 73:13 122:4 177:5
**Printout** 7:10

**prior** 26:20 47:4 58:6 74:23 86:14 89:13 90:24 94:13 94:16 98:22 108:17 113:20 153:24 154:4,8,12 154:16,18 161:14 161:17 162:22 163:5,9 164:3 182:11,16 189:22 191:20,23 357:17
**priorities** 38:24 52:19 61:21 62:1 65:19,22,23 93:6 199:6 200:19 208:20 232:12 364:14,19 365:14 366:8,23 367:11 367:25 368:17 369:4,21 370:7,11 370:24 371:6,18 371:19 375:18
**priority** 44:21 45:10 72:7
**privacy** 163:15
**private** 32:17 33:25
**privilege** 20:4,6,12 188:21 189:13,17 190:15,20
**privileged** 28:15
**privileges** 308:24
**privy** 129:1,19
**pro** 3:19 7:14 67:11
**probably** 20:18 23:8 154:25 224:5 372:21
**problem** 155:21
**procedures** 18:24
**proceed** 67:16 138:5 145:8
**proceeding** 28:1
**process** 36:2 63:19 81:10 86:5,7 95:12,23,24 96:5 96:13 109:9,11 112:25 113:1 137:8,10,23,25

138:1,3,20 139:4 139:24 140:2,16 140:17,18 149:6,9 173:19,20 184:13 188:21 189:13,16 190:15 191:4 208:6,12 212:10 213:7 214:7,21 215:6 226:15,24 260:3,4 261:17 262:7 271:2 284:15 285:23,24 294:20,24 295:1,2 295:19,23 303:15 313:10 331:11 343:22,24 347:7 348:21 355:13,23 359:10 365:9 374:3,4,13,14 375:12 377:16
**processed** 375:3
**processes** 72:2,4 77:2,3 112:13 113:2 130:9 131:15 137:20 204:21 317:12 355:8 357:17
**processing** 83:14
**produce** 25:11 28:2
**produced** 25:16 27:22,24 28:9 165:8,14 175:20 207:14 218:16,22 219:14,15 228:17 234:22 268:22 287:6,24
**production** 12:11 28:10 201:5 378:11,13,19
**professional** 28:20 30:20 111:23 145:19 149:4 280:1 285:14
**profile** 30:1,10,23 31:10
**program** 29:10 44:10 64:1,10,15

64:23 65:11,12,13 65:19 214:4,15 242:23 245:9 282:24 284:16 295:3 322:12,21 323:5,10 329:19 332:1 334:2 336:13 337:6,7 338:2 341:20 347:7,21 348:7 355:14,23 357:12 358:4 374:15,20 375:4,13 376:2,11 377:10
**program/regional** 238:21
**programs** 4:8 32:4 63:2,3,7,8,14,17 63:21 80:7 222:6 236:25 325:17 326:1 329:6 330:4 334:21 335:8 336:4 344:7 356:4
**project** 118:1
**projected** 216:13 217:19 219:24 232:19,25 248:6
**projecting** 236:25
**projection** 221:14
**projects** 116:17 117:8
**pronounce** 197:25 297:21,23 298:2
**pronounced** 198:2
**proper** 110:22 162:5
**propose** 260:8,18
**proposed** 191:11 225:18 248:6 261:11 280:4,6 284:21 285:3,5 320:3 337:10
**proves** 316:5
**provide** 25:22 69:25 143:16 144:19 160:7 189:14 224:21

233:20 279:5
287:15,18 303:16
309:19 310:16,21
312:1 331:4
345:16
**provided** 25:6,9
38:17 198:9 214:5
214:16,20 215:16
216:15 217:21
225:22,23 229:18
230:1,12,14,19
231:15 234:11
235:5 238:19
239:25 245:8
255:3 258:19
270:7 290:7 309:5
309:6 319:22
328:15 329:3,6
331:6 333:13,16
346:21 374:21
**providing** 81:14
115:25 143:24
144:3 197:18,22
198:14 209:7
328:10 330:6,23
**public** 2:13 29:6,18
73:21,21 177:18
187:21,22 229:21
231:16 232:3
291:14,18 319:12
383:4,19
**publicly** 70:8
282:13 319:14
339:7
**published** 193:21
**pulled** 365:24
**Puneet** 211:5,7,10
312:4 349:9
**purposes** 340:19
**pursuant** 275:11
364:5
**push** 255:20
**put** 22:1 30:13 66:5
66:12,19 68:9
71:10 100:7
112:13 113:2
201:14,20 232:7

232:13 284:1
294:22 310:7
344:13 345:21
362:17 377:10
**putting** 68:6 130:9
131:15 320:5
345:21

---

**Q**

**Q2** 314:13 328:5,17
330:23
**Q3** 342:14,23,25
343:10,13
**qualifications**
115:25 116:6
**qualified** 53:21
**quarter** 212:3
312:6
**quarterly** 213:2
310:22 311:13
314:13,14 324:19
328:5,17 330:24
**question** 17:20
19:15 20:11,11,21
26:23 28:18 35:12
35:20 41:10,14,15
47:15 50:14 52:14
54:5,10 58:17
62:12 64:7 65:6
87:22 88:20
102:21 103:2
140:24 143:20
144:6,9,16,18
145:16,22,25
155:4,23 158:11
158:12,22 175:5
175:12 180:3,6
181:3 189:1,5,12
190:19,21 200:16
215:21 227:14
237:21 243:6
250:2,16 251:2,6
251:8 259:21
276:3,10 294:5
296:6,22 297:4
302:12 303:20
305:20 309:23,25

310:15 318:4
324:2,4 325:25
329:9 339:17
340:5 346:12,17
366:6 367:20,22
368:5,25 369:1,3
369:17,18 370:2
370:16,17,19,21
371:1,4,9 372:2,4
373:18,23 377:21
**questioning** 42:21
**questions** 18:25
19:20 20:5 21:17
21:20 22:17 28:19
88:11 89:3 118:6
128:24 145:5
175:1 193:17
269:3 283:22
306:8 325:1 373:1
378:6
**quickly** 18:23
36:16
**quite** 346:13
**quotations** 12:22
**quote** 12:25 66:1
67:19 185:21,23
186:8

---

**R**

**R** 4:6 165:1
**raised** 104:2 169:20
305:23 306:10
307:1 346:2
350:20 355:12
**raising** 308:12
**RAVAGED** 8:6
**reach** 8:21 248:22
249:20 326:3
**reached** 338:25
**read** 12:23 25:21
41:18,20 47:13
77:13 160:9,16
161:2 183:18
184:5 223:20
224:1 226:19,21
294:1 324:5 379:4
380:3 382:4,5

**read-ahead** 166:12
**Readiness** 34:11
**reading** 30:13,15
67:17 73:10
122:19 177:10,13
207:20 229:2
240:19 255:7
269:4,24 272:3
278:3 279:23
287:8,22 297:17
305:18 306:13
327:2,4 334:18
340:4,9 346:16,18
346:25 380:15,16
380:17
**reads** 199:25
**ready** 30:12,16
67:16 73:9 83:3
121:18 193:19
207:19 255:6
269:2,5 278:4
297:16 327:3
340:8
**really** 17:15 26:22
27:18 35:9 37:23
54:5 67:2 86:6
90:16 103:23,24
109:1 133:2
190:22 249:1,24
258:24 274:10
322:24 337:24
344:3
**reappoint** 361:11
**reason** 22:13 56:14
88:7,13 108:23
113:3 196:23
197:3 211:15
220:12,16 239:3,7
239:17,22,23
240:4,7 241:1,4
242:5,16,19
245:22 272:17,23
275:18 290:21
300:7 301:20
321:17,23 323:3
329:1 335:7,16
336:1,3,16 338:9

348:3 352:8,11
372:10 373:25
376:22 381:7,11
381:13,15,17,19
381:21
**reasons** 62:20
197:9 321:23
323:16 331:5,5
371:22 372:7,13
376:7,14
**reassignment**
198:22,24 199:10
199:15
**recall** 24:23,24
27:18 28:25 36:4
36:15,22 37:17,23
51:10,16 52:3,13
56:1,3 58:18,22
61:8 63:24 66:25
67:2 71:17 74:25
75:22 76:8 77:20
77:23 78:2 79:21
82:16 87:4,15
89:20,22,25 90:6
91:14,19 92:16,23
103:23,24 125:11
126:6,15 133:2
136:1,13,15 148:1
154:7 157:15
159:19 162:23
163:2,7,25 164:7
168:10 188:10
190:12,22 191:23
206:16,17,19
207:1,24 208:2
210:10,12,13,19
210:22 213:14,19
213:25 216:1,3,11
216:12,17 217:3,6
217:12 218:1,2,5
221:4,11,11
222:25 224:15,25
229:13 247:20
254:4 256:3
269:11 270:1,15
273:9,12,13
285:19 289:13,16

289:21 297:5
302:16,21 303:6
304:6 306:14
307:18 327:25
328:4,9,15,19,21
328:23,24,25
329:12,16,24,25
330:7,11 331:2,5
331:8 333:1
336:21,23 337:3
346:24 347:11
349:15,19,24,25
350:4 353:23
358:10,18,20
360:25
**recalling** 101:20
217:3
**receive** 213:9,13
**received** 55:11
162:4,8 168:11
175:10 209:10
237:11 242:8,12
275:21 316:17
337:13
**receiving** 162:23
163:2,7,25 271:18
349:17 350:1,2
351:25
**recess** 43:16 82:9
135:16 143:7
159:25 164:21
222:17 252:9
305:1 344:19
373:5
**recognize** 165:16
269:7
**recollection** 25:3
25:19 27:5 74:5
168:7 170:4
220:19 224:6
229:24 279:17
290:5 303:1
334:20 360:2
**recommend** 51:2
**recommendation**
269:15 271:7
351:8 377:11

**recommendations**
39:18,20 41:4,6
41:23 42:1,11
69:14 70:19 95:18
127:20 137:19
140:14 181:5
187:6 215:22
237:12 249:22
250:13 295:4
314:9 322:1 325:9
330:20 338:12
365:8 374:21
376:5 377:15
**recommended** 51:7
215:1,9 328:10
330:5 342:7 356:3
358:4 376:13
**recommending**
270:19 271:9
355:16,17
**reconcile** 329:5
330:2 337:22
**record** 7:24 12:24
13:5 16:22 17:5
17:18,22 19:19,24
21:24 41:21 43:12
43:13,14,17 82:7
82:10 84:5 94:22
96:6 135:14,17
142:22,23 143:1,4
143:5,8,16 144:19
145:4 146:16
158:15 159:22,23
160:1 164:18,19
165:3 222:15,18
226:22 252:7,10
288:3 301:19
304:24 305:2
324:6 340:13
344:17,20 370:1
372:24 373:3,6
374:1 378:9,25
379:9 381:8
**recorded** 19:12
**records** 8:15 25:14
25:16,18 149:7
155:14,14 156:8

156:10,18,20,21
156:25 157:10
162:5,24 163:4,8
163:13,14
**recounting** 30:19
238:5
**Recovery** 118:19
**red-lined** 268:24
**redacted** 8:16
175:15
**redactions** 175:14
**redo** 323:3
**redone** 345:6
**reduce** 80:2 196:8
217:19 261:6
275:13 276:7
280:4,6 284:22
285:4,6,16 286:11
**reducing** 38:22
45:10 72:8,16
76:12 77:25 78:4
249:4
**reduction** 36:13
38:8,13,19 39:10
40:16,22 43:23
44:5,12,24 52:9
52:19 61:21 62:1
62:22 238:23
240:2
**reductions** 40:25
41:6,25 260:8,19
**refer** 56:19,24
57:17 253:8
261:18 280:17
293:21 361:25
**reference** 26:2
67:13 123:3 169:7
171:19 172:1
183:22 184:12
186:18 205:20
210:25 231:14
258:14 260:25
272:12 280:18,23
281:2 320:22
332:2,5
**referenced** 91:1
194:5 253:25

**references** 211:3
**referencing** 169:3,5
169:5,11 172:2,6
181:16 186:8,20
255:10,15 313:5
321:15
**referred** 57:18 60:2
244:5 279:19
306:17 319:7
**referring** 50:11
57:4,14 59:4,15
67:22 71:21 76:12
76:21 144:17
172:18 186:5
231:4 238:11
271:25 279:10
281:7 286:17
306:11 327:15
332:16,16 359:16
359:17 362:11
**refers** 31:4 84:20
120:17 205:19
231:10 288:23
289:25 291:1
**reflect** 167:22
168:17 313:23
**reflected** 12:23
281:23 282:17
**reflecting** 168:1
**refresh** 25:3,19
27:5 74:5 170:4
220:18 224:6
229:24 279:17
334:20
**refused** 375:6
**refusing** 370:2
371:2
**regarding** 20:5
28:20 40:21 59:5
60:8 120:4 129:23
130:19 133:23
134:6 138:10
156:3,13 157:13
162:24 164:2
179:22 186:14
213:16 266:10
277:21 279:16

307:7 310:2 314:8
345:23 347:12,14
376:8
**regardless** 145:1
276:4
**regional** 313:18
317:10 322:22
324:24 334:3
337:8 347:8,21
355:14 358:5
374:6 375:5,14
376:3,12 377:9
**regular** 90:18,22
173:19 248:1
**reimagine** 75:21
**reimbursements**
118:22 138:16
**reinstate** 8:25
182:17 183:1,17
184:16
**reinstated** 64:17,21
**reinstatement**
184:6
**reiterated** 79:14
**reject** 363:15,22
**rejected** 213:9
**relate** 88:2
**related** 29:8 39:18
39:19 40:25 41:2
53:23 81:14 87:25
88:11,16 89:4,5
92:8,12 109:24
110:18,22 111:7
111:19 118:19,21
126:22 130:10
131:11 136:17
137:1,6 138:17
139:14 152:13
153:15,20 167:20
168:14,18,21,22
168:25 169:6,12
170:12 173:24
174:1 181:1
200:13 201:3
212:2 213:14
250:10 260:5,24
261:4 290:23

294:21 295:23 307:3 318:21 325:23 331:13 338:15 339:17 353:7 354:8,21 365:18 366:12 371:19 377:11 383:9

**relates** 29:12 34:15 72:20 76:18 78:3 87:22 93:25 116:23 118:22 130:8 138:15 157:22 169:13,13 169:14 179:13 181:4 187:7 197:11 226:16,25 231:24 300:13 302:11 322:23,25 325:6 337:6 356:24 357:1,19 364:19 367:8 371:10 376:21

**relationship** 125:14 126:7 149:12 161:7

**relationships** 125:18 126:17

**relative** 175:18 383:12

**relatively** 81:21

**release** 8:8 120:3,9 122:2 259:11,24 262:19

**released** 66:15 282:14 291:9 321:12 357:18

**releasing** 260:12

**relief** 116:12,20,23 116:25 117:3 134:20 171:3,9,17 247:23 337:24

**relooking** 249:8

**relying** 233:9

**remade** 79:19

**remember** 37:19 98:3 177:10,13

178:18

**remended** 328:10

**reminder** 8:12 162:4,18,23

**reminders** 168:5

**reminding** 189:14

**remotely** 18:10 106:23 107:8

**Removable** 106:9

**remove** 320:21

**removed** 178:22 179:1,2,6

**renew** 253:2 266:4 267:11 276:13 277:20 303:24 345:1 350:11 351:14 352:5,9,12 352:23 354:2 363:2,15 364:7 365:3,22 366:4 372:17 376:4 377:23

**renew-** 355:24

**renewal** 254:12 262:24 264:4,24 268:25 269:13 272:1 273:1,9,17 277:12,18 295:15 306:3,4 310:4 314:8 337:20 350:11 355:15 356:4 359:12 371:24 372:7 375:6 376:13

**renewals** 131:4,16 255:12 260:5 261:17 264:15 267:24 276:5 285:25 294:22 303:15 306:16 307:13,21 313:7,9 314:6 331:12 338:15 343:22 344:14 347:9 355:9,25 356:14 358:2,3,7 359:11 359:24 363:5

365:18 366:13 373:10 375:16 376:5,8,15,24

**renewed** 352:17 356:2 367:6 369:15

**renewing** 249:8,17

**repackaged** 348:11

**repeat** 64:7

**repeatedly** 338:4

**rephrase** 23:14 293:8 349:18

**replaced** 46:23

**report** 9:4 49:20,25 57:24 105:9,12,14 105:24 106:18 161:24 179:18,19 187:12,18,21,22 187:24 188:7,9,11 188:15,17 189:21 190:3,11,13,23,25 191:6,12,14,21,25 192:21,23 193:14 193:18,21 194:6,8 194:11,14,21 195:2,17,22,25 196:4,18,22 200:14 231:8,10 231:11,11 232:6 232:10 250:1 306:9 310:22 328:5,17 330:18 330:23,24 357:18

**reported** 1:24 65:15 105:3,15 176:12 299:16,17 321:3 348:17

**reporter** 2:12 13:22 16:8 17:17 19:5 19:12 21:22 41:18 41:19,20 46:15,18 46:21 91:24 92:4 102:16,19 144:22 151:14 226:21 228:12 263:14 323:18,20 324:5 383:4

**REPORTER'S** 12:22

**reporting** 106:11 208:9

**reports** 50:18 195:5 195:8,14,20 236:19 313:19 324:19

**represent** 14:1 16:18 30:8 49:8 67:10 73:1,12 82:24 120:8 136:22 165:12 189:2,6,8 248:4 288:3

**representative** 60:17

**representatives** 62:5 119:20

**representing** 13:21 14:4,7,15,19,23 15:16,19 90:23 100:24

**represents** 220:2

**request** 12:11 103:3 199:9 201:20 209:25 245:13 299:20 316:7 351:1

**requested** 101:17 148:4 199:12,14 203:4 313:14 380:15,17

**requesting** 26:1 253:6 261:12 287:17

**requests** 254:12 298:14 371:15

**required** 19:25 161:25 205:5 235:1 264:13 266:10 277:5 328:6 345:11

**requirements** 208:9 247:4 249:25

**requiring** 119:2

**reread** 25:21 324:4

**rescinded** 266:17

**reserve** 378:23

**Reservist/Local** 289:6

**reservists** 192:19 192:21 248:20 289:14

**reside** 16:25

**resided** 18:7

**resides** 271:6

**resigned** 175:24 176:3

**resigns** 8:20

**resistance** 186:7

**resisting** 186:3,19

**resolution** 171:14

**resolved** 357:5

**resources** 32:2 45:6 59:21,22,24,25 68:15 69:13,25 70:17,19,22 71:12 127:19 180:20

**respect** 38:18 41:5 41:24 43:22 111:1 113:20 115:19 118:12 127:9 141:2 150:25 168:8 172:2 181:23 190:15 252:14,18 255:12 267:8 277:5,11 327:10 347:2 354:13 364:22 366:21

**respond** 71:16 153:5 326:15 327:20,24 328:1 339:20

**responds** 278:12

**response** 19:25 33:8 71:15 72:5 76:7 118:19 316:6 327:25 328:4 329:21 339:13,16 349:15,19 350:2

**responsibilities**

68:22 76:19 111:5 234:16 246:16
**responsibility** 111:24 252:24 280:1 285:15 327:10
**responsible** 55:17 56:2 179:16 303:2 364:12
**responsive** 79:20
**rest** 231:3
**restate** 41:15 116:3 209:3 235:9 251:8 277:17 295:17 296:6 300:11 309:23 310:13 317:20 329:9 363:17 367:15 368:8,22 377:19
**restated** 372:15
**result** 127:20 198:16 277:3,12 316:21 318:9 332:17 333:10 334:5 335:9 336:5 339:18 345:4 353:1 362:19
**resulted** 234:6 318:14 332:12 333:15 335:5,21
**resume** 29:2 222:13
**retain** 155:13
**retired** 32:18,19 34:2
**retirement** 32:25 44:10
**retrieve** 146:8
**retrieved** 160:13
**returned** 33:25 34:3,19 77:8 90:9 90:13 91:9,21 92:14 96:17
**revalidate** 321:24 322:7
**reveal** 174:25
**revealing** 175:9,13
**Reversal** 8:24

183:16
**reverse** 185:1
**reversed** 184:6,18
**reverted** 277:4
**review** 7:17,20 25:2 25:7 26:19,23 27:9,10 28:13 71:1,7,9 72:13 73:4,15 77:1,9 78:6,16 79:7,8 83:21 85:15,18,23 85:24 118:2,3 127:21 139:4 173:20 181:7 187:3,17 189:3,7 189:25 190:11 191:3 194:10 195:12,17 196:24 197:11 200:14 214:17,22,23 215:6 228:25 231:11 232:10 237:13 245:25 246:1,7,20 249:23 250:15 269:21 272:8,19 313:25 314:24 315:7 319:5 325:10 330:18 333:13 338:12 339:6 346:13,20 347:19 348:7 357:17 360:13 363:22 376:4 377:15
**reviewed** 25:8 27:2 27:6,17 214:25 215:4 234:17 246:3 283:23 311:3 313:12 352:17 360:22 361:16,18,19 376:13
**reviewing** 27:19 66:19 113:25 249:17 285:25 294:25 347:8 352:4 361:21

**Richardson** 8:20 46:1,23 47:2 61:5 75:10,12 76:17 96:21 97:1,7,13 97:20 98:4 100:7 100:10,13 101:25 102:2 105:16,19 105:23 106:2 113:16 169:21 172:3 175:24 176:4,19 198:7 221:19,23 232:18 232:24 233:9 234:12 244:12 245:5 252:16,20 268:7 340:16 341:6,23 342:3
**Richardson's** 97:23 232:19 233:5 247:6 290:19
**right** 17:13 18:23 23:2 29:2,15,19 32:17 33:2 34:5 34:20 35:2 36:6 36:17 42:10 45:11 45:17 46:11 56:3 69:19 70:5,19 72:9 75:3 84:24 93:12,21 109:20 115:19 116:25 119:21 123:17,23 131:18 134:16 135:8,13 139:10 140:6 147:24 150:20 159:22 173:1 176:8,14,15 182:20 185:17 186:10 190:25 192:2,8 194:7 201:15 202:23 205:21 207:9 209:20,23 218:8 218:24 230:15 231:18 243:20 245:7 252:5 253:3 254:19 255:13 261:21 262:7

263:8 265:1 268:17 277:14 279:14 281:10,13 284:22 292:6 294:9,16 295:7 298:8 312:3,25 316:22 321:20 341:12 343:3 344:2 348:2 356:25 372:24 375:21 377:5 378:25
**rights** 308:24 378:23
**rightsizing** 258:6 258:10,21,24 264:12 286:25
**risk** 31:14 34:15
**rogue** 183:25 185:25
**Roland** 42:18 207:2 207:18,22
**role** 33:19 34:22 51:9 58:6,10 62:17 63:15,22 65:1 68:16,20 72:14 76:6 81:5,9 81:14 82:14 83:13 87:2 88:7 89:15 91:3 94:14 97:15 99:4 105:12 111:6 115:18,21 118:8 132:11 134:2 177:25 178:10 180:8 182:4,12 232:17 327:10
**role'** 177:21
**roles** 110:20 111:4 210:16 232:1
**room** 21:7 74:2 142:15 146:6 147:22,22
**root** 149:10
**rough** 103:21
**roughly** 37:15 38:3 192:4,6 193:1 216:20 222:5

227:16 268:2,10 373:11
**round** 342:13 343:16
**routing** 83:1,24 139:8
**row** 338:3
**RSA** 91:16
**rule** 20:20
**rules** 17:14 22:18 171:11 174:10
**run** 86:4,7 174:5
**running** 45:25 97:15 338:16
**runs** 215:5 320:15

---
**S**

**S** 7:11 12:4 165:1,1 165:1
**S1** 48:18,20 57:19 57:24 86:10 119:2 171:23 211:23 212:6 226:9 253:2 265:1 266:11 268:25 269:12 277:5,12 296:4,14 296:25 298:20,23 299:7,21 300:5,6 300:17,19 302:3,5 302:14,17,24 303:4,8,9 304:3,8 344:25 345:10
**S2** 48:24,25 52:8
**S3** 48:13 49:1
**salaries** 307:24 308:23 310:16
**San** 1:3 3:8 13:12
**Sana** 6:8 14:21
**sat** 80:17,21 124:23
**save** 148:1 156:1 161:25 163:21
**saved** 142:1,4,6 147:15,20 148:12 148:15 151:17,22 152:6 156:9 161:21
**saving** 164:2

235:21 316:7
saying 75:22 79:21
  92:23 155:3
  190:12 197:15
  230:14 269:24
  283:3 301:6,9
  310:19 328:1
  333:12 334:5
  335:2 342:4
  358:19 369:20,24
  373:19,24 375:11
  375:12 376:1
  377:10
says 48:20 67:23
  84:4,4,18,25
  121:1 171:20
  172:13,15,16
  173:6,9 177:6
  185:22 196:7
  200:23 202:20
  204:16 208:4
  209:12 211:10
  223:21 224:2,5
  237:24 238:17
  239:9 240:22
  241:7,21 243:2
  245:21 248:11
  255:17 258:1
  260:18 265:22
  267:14 270:5
  272:6 278:13
  280:10 282:10
  284:24 285:2
  286:10 290:10
  294:1 298:12
  302:22 312:3,5,9
  314:21 315:16
  316:9,16 327:16
  332:9 333:25
  334:25 335:17
  362:6 364:5
scenarios 218:6
  244:22
scheduled 194:1
school 28:23
screenshot 156:11
  156:12

screenshots 157:2
sealed 144:23
season 264:20
  268:9,10 275:7
  357:5
seated 123:25
  124:22
second 34:19 38:14
  48:14 74:13 79:12
  86:23 152:13
  155:18 177:16
  196:6 208:10
  210:24 212:3
  229:10 286:10
  290:9 329:14
  336:24 340:6
second-to-last
  79:13
secondary 271:10
secretariat 85:22
secretariats 84:16
secretary 24:4,7,10
  33:5,6 36:5,8,12
  36:14 37:5 40:14
  40:25 41:1,7 42:2
  46:11,24 47:7,24
  48:6,10,15,18,21
  48:25 49:2,20
  50:1,1,19,19 51:2
  51:9,11,11,14,17
  51:20,22,24 52:1
  52:5,5,7,25 54:2
  54:17 55:7 56:25
  57:7,14 60:8
  62:21 63:3 65:15
  70:3 75:15,25
  76:11,20 77:10,17
  77:21,24 78:3
  79:1,8,13 80:1,1
  80:24 81:7 82:15
  83:9,14,15,18
  84:15 85:7,14
  87:14,19 91:15
  92:8,11 93:21,24
  95:20 96:5,14,15
  97:1 98:20 99:8
  104:20,21,25

105:9,10,18,24
106:1,7,9,11,16
106:19 108:23
109:21 114:1
115:17,22 116:1,7
119:1 120:25
128:16,24 129:3,8
129:13,14 132:4
135:23 136:2,18
136:22,23 137:3
137:14 138:4,9
139:6 140:16
141:2 147:12,17
148:8,11 150:9
153:11,23 154:8
158:6 177:18
178:9,14,22 179:3
179:8,12,19
180:11,13,18,25
185:9,13 187:8
191:5 194:13
203:16 213:10
236:20 255:20
265:12 266:17
270:24 271:11
273:24 275:1
286:6 300:25
301:4,12,16,22
364:15 365:5,14
366:9 367:12,25
368:18 369:22
371:5
secretary's 65:19
  65:22 95:15,16
  105:10 199:6
  204:17 226:16
  227:1 232:11
  267:16 364:18
  366:22 369:4
  370:7,24 371:10
  371:18,19 375:18
Section 206:8
sector 33:25
security 5:4 16:6
  24:4,7,10 26:14
  31:13 33:7,11,17
  34:16 48:18,21

49:9,11 52:18
53:24 56:10,25
57:15 65:15 66:6
67:20 73:14 83:2
83:13 88:24 90:10
90:14 91:9 95:6,9
96:18 114:2,6,10
116:1 119:21
120:25 141:9,13
149:14 161:15
162:7 177:18
189:9 216:5,19
222:24 307:6
368:19
Security's 273:24
see 49:7 66:15
  67:19 73:18 74:3
  74:17 77:13 78:19
  78:23 79:3 85:1
  86:11,12 89:17
  107:23 120:10,16
  120:19 123:9,11
  130:7 133:11,16
  133:20 162:20
  167:8,12 169:9
  171:24 173:14
  174:15 177:8,22
  188:4,8 196:11
  200:3,12 202:4
  205:20,23 206:1,7
  208:4,13,23
  209:18 211:2,3,13
  223:18 229:7,22
  238:2 239:1,15
  240:13,21 241:15
  241:25 242:14
  255:21 256:18
  257:12,24 258:7
  260:9 265:23
  266:2 269:20,25
  272:5,10 273:8
  278:10 285:13
  290:9 292:16
  299:4 305:17,25
  311:15 312:3,11
  316:14 327:22,23
  331:22 332:2,7

334:16 336:20
340:20 348:3,19
348:25 349:13
351:3,7,8 361:13
361:17 362:15
372:25
seeing 66:25 67:2
  208:2 221:11
  270:1
seek 270:19 271:9
  273:22,23 274:3
  274:20 276:23
  277:13 303:23
  350:10 351:14
  371:24 372:7
seeking 273:17
  351:10
seen 66:24 188:6,11
  270:15 282:13
  305:13
selections 95:17
Senate 37:3,4 48:5
  50:24 53:3
Senator 8:9 119:23
  119:25 120:3,9,17
  121:20 122:4
send 42:8 139:24
  156:22 184:16
  220:25 221:8
  243:22 245:12
  264:19 271:8,12
  274:2 280:22
  296:14 298:19,23
  299:6 300:4,6,16
  302:3,23 310:1
  314:7,8,16,25
  315:1 317:22
  320:20 341:13
  348:11 356:13,16
  368:15 371:15
sending 85:14
  210:1,10 217:6
  272:6 281:5
  283:18 300:18,24
  301:2,3,11,15,15
  302:4 304:3 337:9
  355:8

senior 3:20 8:4 17:7,9 34:25 35:3 35:18,25 36:9 45:25 46:6 54:9 57:25 74:16 75:10 78:22 94:3 95:25 97:19 98:20 99:7 100:7 102:2 104:19,21,25 105:8,16,18,25 106:5,17 108:23 111:8 113:16,25 115:16,22 116:6 120:18,21,24 121:1,3 128:16,21 128:22 129:12 132:11 134:3 140:13 163:10,12 181:6 184:2 203:16 232:18 236:6 268:6 286:5

sense 18:1 19:7 20:22 21:11 22:6 144:1 219:6,9,18

sent 42:12,13 44:16 119:19,23 137:23 140:5 156:8,19,23 157:9,24 158:3 180:12 184:1 200:7,24 207:24 210:6 212:6 215:4 216:18 218:10 220:13,19,24 222:1,23 224:7,22 225:5,10,17 226:11 229:5 233:18 237:19 238:19 257:23 258:15 261:20 266:11,18 271:14 272:18,24 274:6 278:18 291:11 296:4 301:22 303:4,8,9 304:7,9 305:14 314:1 315:1,12 319:5 321:13 329:13

334:1 340:23 341:9,11,17 342:4 342:8 344:10 347:13 348:22 349:9 374:23 375:1,2

sentence 79:13 196:7 239:1 240:10 300:13 302:11 303:7 332:9 342:2

separate 356:6

separately 361:25 362:12

separations 362:18

September 94:11 94:19 118:5,10,15

series 163:11 270:21 355:7

serve 178:25

service 31:14 32:20 33:1 192:18

services 114:22 115:12

SES 198:25

SESs 198:25

session 23:8 135:13

sessions 22:22 23:4 23:5,6,7,17

set 50:22 68:2 122:16 157:25 158:8 159:12,16 175:22 205:1 257:7 277:9 355:7 383:7

setting 278:15

settings 159:1

SF-50 266:23

shaking 19:4

shared 40:15

SharePoint 315:8

sharing 312:4,4 317:10

sheet 83:1 112:19 381:1

sheets 167:2

Shepherd 29:12

short 54:22 55:4 81:18,21 135:7 359:6 372:20

shorter 23:10,11

show 82:19 205:9 271:18 321:19

showed 221:1 240:23 243:22 274:15 281:3 288:4 328:8 350:5 358:13

showing 22:5 238:22 241:13

shown 242:23

shows 50:15 73:5 123:2 341:18

shutting 88:23

sic 35:1 261:24 271:24 297:15 311:11 316:8 335:11 337:13 363:15

sign 138:5,23,24 348:24 351:17,22 355:16 374:20 379:4 380:22

sign-off 355:24

Signal 149:18,21 149:23,25 150:4,8 150:12 151:1,22 152:1,17,24 153:10,22 154:3 154:15,17,22 155:1 156:2,13 157:5,12,16,18,24 158:5,14 159:7,14 161:25 163:21 164:2

signature 237:24 270:22,24 272:9 272:20 380:1,20 380:23

signed 79:1 95:20 96:1 112:15,19 139:5 181:24 182:10 265:11 295:4 359:19

360:12 374:15,16

significant 97:15 97:18

signing 112:19,21 113:4 359:21 374:7 375:5 380:15,16,17

similar 76:25 85:8 85:13 216:25

simple 346:13

simply 233:8

Simultaneous 369:8

Sinha 6:8 14:21,22

sit 80:15,20 326:14 327:18

sitting 21:10,14 22:24 146:2 175:11 289:16

situation 58:23 59:5

six 47:22 267:10 268:11

six-month 268:3

size 38:22 45:10 71:22 72:8,16 76:12 77:25 78:4 80:2 89:23 90:1,7 261:6

skill 68:1

slightly 250:2 296:22 303:19,20

slip 83:24

small 34:14

smaller 69:8,18 70:4,14

Smiley 327:21

something,' 169:7

SOPDA 17:11 46:3 46:7,23,23 47:3,5 90:24 94:4,20 96:21,23,25 97:8 97:13 106:3 126:20 132:25 138:7 140:23,25 161:23 172:3 175:25 176:5,19

178:1,10,19,21 179:18 180:7,14 182:4,12 188:14 188:16 192:1,25 210:20 217:8 241:22 252:15,16 252:19,22 258:10 270:7 295:22 299:17 303:2 310:8 341:23 351:10 355:13

sorry 15:9 23:13 26:22 28:7 35:8 58:15 64:5,6 65:4 81:5 82:5 84:23 88:19 91:23 98:15 118:5 120:17 122:9,16 132:15 143:19 155:20 162:15 176:17 206:8 207:10 209:2 223:4 257:9 257:19 280:18 281:1 308:3 309:24 311:17 323:19,25 346:18 349:18 355:19,21 355:22 360:21 365:23,25,25 366:3 372:3 377:20

sound 36:6 54:7 176:14

sounds 176:15

source 170:14,20

sources 173:12 247:22

Southeast 5:6

Southwest 4:21 18:6

SP02 276:16

space 88:16,17,17 88:18,22 89:4

speak 24:1,17 42:25 135:25 232:9 304:12

speaking 38:22

145:2 165:19 251:4 269:8 369:8

**special** 100:24 101:3,13

**specific** 29:1 40:24 44:3 47:12 51:10 52:3,13 59:18 77:20 78:2 88:10 91:14 95:2 111:4 115:18 132:24 133:3 136:1,4 154:25 155:2,2 163:24 164:14 168:11 180:6 181:5 187:19 188:10 190:6,22 213:19 214:1 216:1,10,17 217:2 217:4,12 218:1 236:11 247:20 248:5 253:15,23 254:4 259:21 261:13 265:17 266:7 270:1 284:15 285:19 288:24 289:12,13 289:18 293:22 300:1,12 302:1,11 306:15 307:18 315:7 336:21 337:5 358:16 360:25 365:17 369:16 370:18 371:15

**specifically** 27:18 29:1 51:6 52:5 59:20 63:24 69:5 72:7 77:21 87:4 104:13 107:14 111:18 131:10 132:1 153:3,4 164:7 195:13,19 196:3 200:13,23 201:3 212:17 221:4,19 226:2 227:20,21 230:8 231:22 248:12

256:7 259:3,6 260:16,21,23 264:1,6 265:22 273:7 282:10,15 289:21 291:23 294:20 299:3 301:10 307:21 313:8 318:20 323:11 333:9,22 340:10 346:24 358:18 365:18 370:10 371:17 374:10

**specificity** 163:14 282:25 289:22

**specifics** 169:6

**specified** 164:5

**speculate** 93:2,18 93:24 96:12 197:9 302:8

**speculating** 197:16

**speculation** 93:14 93:23

**spend** 307:15 309:2

**spending** 308:8

**spent** 119:3 307:24 308:18 309:21 310:3

**spilled** 65:4

**spoke** 24:3,7 354:22 355:3

**spokesperson** 65:25 66:7 67:14 67:20 183:23 186:19

**spreadsheet** 218:22 219:3 281:2 282:23 283:17 314:24,24 315:4,7 315:8,18,22 320:23 321:2 323:14 324:8,11 341:17

**spreadsheets** 238:7 342:18 346:10

**St** 89:7

**staff** 17:6 44:24

55:12,13,17,25 57:24,25 60:13,13 60:14 61:10,13 71:22 77:5 80:10 91:4 94:4,7,13,16 94:18,23 95:8,21 96:2,22 97:14 98:1 101:24 105:12 111:7 112:12 113:15,21 118:5,8,9,18 127:18 132:2,2 133:5 136:25 140:10,12,16 151:10 167:17 177:20 178:5 182:14,16,20,23 189:24 191:12 204:24 210:2 215:23 216:4,14 217:14 218:3,7 220:3 221:15 229:25 231:4 232:25 233:6 234:7 235:19 243:17 247:17 263:9 273:15 275:13 276:7,13 276:15 280:24 291:5,21 293:10 295:19,21 296:12 303:13,17 304:14 309:10 314:4 322:1,17 325:13 326:13 328:9 330:5 331:10 335:11 344:7 345:7,15 375:21

**staffing** 10:20 59:22,25 70:23 127:9,13,16 128:8 139:14 141:2 168:15,22 179:22 196:9,18 205:6,19 205:24 207:5 208:15,18 209:7 210:2,7,18,25

211:11,16 212:3,4 212:22 213:1,10 213:17 214:17 215:9,17 216:18 217:6,11,18,20,22 217:23 218:2,5 219:24 220:14,21 221:1,6,10 222:22 224:7,22,25 225:3 225:4,6,11,14 226:10,10,17 227:2,6,12,17 228:2 230:1 231:25 232:7,14 233:8,21 234:1,22 235:6,13 236:16 238:5 239:11 240:11,16,24 241:8,11,13,24 242:9,22,24 243:4 243:9,22 244:9,10 244:13,13,17 245:4,6,8,18,20 246:7,17 248:3 251:11,11 252:14 252:18 256:16 258:15 261:20 262:10 263:5 280:24 281:22 282:4 283:18 293:21 310:23 311:12,14 312:5 312:22 313:20,22 313:25 314:2,10 316:1,7,10,12,18 317:4,8,15,25 318:8,14,20,23 319:20,23 320:3 321:14,18 322:25 325:6,8 329:4,6 329:13,20 330:3 330:25 331:13,15 332:5,13 333:15 334:22 335:5,22 336:25 337:9,10 337:20,23 338:3 338:11 340:24

342:13,22 343:17 343:20,25 344:9 344:13 357:1,3,8 357:13 377:6,16 378:2

**staffing-related** 140:5

**Stafford** 171:3 192:18

**stand** 53:7

**standard** 101:6

**standardized** 208:7

**standing** 172:19

**stands** 48:18 83:9 145:22 151:10

**star** 169:24

**start** 28:19 29:14 118:4 136:24 167:14

**started** 87:5 182:3 209:22 279:25 295:11 311:8

**starting** 105:11 255:9 307:7 321:15 359:24 373:11 376:16

**starts** 240:15 242:6 268:12

**state** 13:25 16:21 16:24 65:3 79:16 79:25 80:7 104:1 105:7,8 235:2 335:13 341:3 361:6,10 380:5

**stated** 65:25 72:7 94:21 103:15,17 104:2 105:22 156:16 184:14 190:7 200:15 210:17 221:5 230:5 231:23 236:5 247:10 260:19 273:14 274:18 281:25 282:12,22 283:7 284:4 289:11 290:15 291:8

299:9 302:9 303:7 303:12 304:6 306:7 309:12 318:17 322:6,20 323:11 325:21,25 330:17 336:2 337:18 339:22 342:24 343:19,21 344:1 350:15,19 357:25 358:1,24 362:24 372:10 376:20
**statement** 66:5,11 67:13 68:5,8 93:3 234:10 275:16 276:18 277:9 293:7 302:21 317:1 318:12,18 322:4 326:9 337:16 338:8 361:13,15,17 362:4,15 364:5,9
**statement's** 239:24 240:8 242:20
**statements** 66:19 89:22,25 90:3 235:1 238:10
**states** 1:1,9 4:3 13:10 118:23 120:25 179:16 208:3 230:22 256:2 267:19 268:8 292:13 306:21 307:1 311:22 312:19
**stating** 330:11 331:3 342:6 376:2
**status** 110:19
**statute** 44:22 48:13
**statutorily** 234:25 264:13
**statutory** 39:19 41:3 44:19 45:3,8 45:20 59:20,21 68:15,22 69:14 70:18 72:20 76:18 76:19 208:21

234:15 246:16 247:4 249:25
**stay** 95:5
**step** 112:5 177:20 284:25
**Stephanie** 197:17 198:3,4,5 199:15 200:1 204:7 234:13 257:13,23 281:7,18,18 282:7 282:15 286:8 294:6 318:25 320:4 340:15 341:23
**stepped** 178:10
**steps** 111:15 112:10
**stickers** 21:22
**stop** 174:24
**store** 148:25
**stored** 149:18
**storm** 84:6,9,24 138:3,24 150:17 150:17,19 151:1 153:3,8,15,17,21 153:24 154:4,9,13 154:16,18
**STORM-** 8:5
**storms** 150:23
**straight** 193:3
**strategy** 10:20 288:9 293:21 294:3
**streamline** 77:3 357:16
**streamlining** 77:4
**Street** 3:7 4:10,21 5:14 18:6
**Strehle** 1:17 2:7 7:3 16:10,23 380:13 381:6,25 382:15
**strike** 62:11 125:20
**structure** 27:10 48:11 246:1,6,20
**subject** 85:23 86:5 179:22 223:23 278:9 312:9
**submission** 206:4

210:20 214:24 215:7 228:8 242:13
**submissions** 140:1 233:17 282:7 312:2
**submit** 205:5,24 207:3 213:7 215:8 215:11,13,15 219:14 244:15 324:18 329:1 330:12 343:19
**submitted** 84:19,25 211:1,12,17,20 212:5,11,13,18,21 216:4,23,25 226:18 227:3,5,12 228:5,6,8 230:5 233:13 235:23 236:24 241:9 242:9,21 245:23 261:23 262:1,9,13 330:13,18 332:6 360:5
**submitting** 211:23 218:2,5 328:19
**subpoenaing** 149:7
**subscribe** 382:11
**subsequently** 206:11
**substance** 24:18
**substances** 22:9
**substantial** 44:4 63:13,20 248:23
**successful** 44:13
**successfully** 71:16
**succession** 48:14
**sued** 189:10
**sufficiently** 199:5
**suggesting** 248:8
**Suite** 3:7 4:22 5:14
**suited** 68:2
**Sullivan** 8:4,10 119:24,25 120:3,9 120:16,17 121:20 122:4
**summarized**

296:19
**summarizes** 31:18
**summary** 170:1 303:16,17 304:13 304:14 306:9,17
**summer** 80:22 81:4 92:25 93:7
**supplemental** 167:2
**supply** 31:14 34:15
**support** 12:5 63:2 70:11 121:19 208:19 209:8 271:4,5
**supported** 70:9 80:8,9 235:3 247:11,11
**supporting** 244:12
**supposed** 310:21 314:5 331:15 375:13,15 376:4
**sure** 19:3 23:9 26:3 27:1 41:16,19 42:9 46:20 53:6 55:20 59:21 64:9 81:19 86:4,6 106:25 107:11,13 110:2 111:9,12,15 111:21 112:13 113:4,14 116:4 130:5 142:22 152:20 153:8 158:2 159:1 160:10 169:19 181:15 202:12 203:7 204:20,21 232:16 233:5,13 233:16 235:10 244:22 245:7 250:12 251:9 254:18 256:8 273:3 285:22 295:1,10 296:7 297:24 304:22 309:24 311:7 322:8 329:11 331:11 332:24

335:15 341:8 346:19 347:6 348:5 363:18 373:22 374:1 376:10 377:20
**surprise** 92:24 93:6
**surprised** 93:3,10 104:4,7
**surrounding** 362:3
**Susan** 1:24 2:12 13:22 383:3,19
**Susan's** 82:5
**suspect** 109:5
**suspended** 8:25 64:16 183:17
**suspense** 312:7 334:16
**swear** 16:8
**sworn** 16:11 383:6
**system** 84:7,9,10,14 117:17,19 138:24 139:7,13

---

**T**

**T** 165:1
**table** 21:10 22:24 30:3 124:1 175:11 243:8 298:1
**take** 20:16,17,19,20 30:11 36:19 39:17 43:11 62:17 71:5 81:17 82:3 111:15 135:4,6,7,10 142:18 148:24 159:21 164:17 183:9 198:25 199:17 224:17 252:3,4 297:8 304:19 320:19 331:17 339:24 344:16 346:4 347:1 349:3 357:2 372:20
**taken** 2:8 13:6 43:16 82:9 95:24 96:4,6 135:16 143:7 159:25

164:21 222:17 252:9 305:1 344:19 373:5 383:11
**takes** 163:12 208:15 316:10
**talk** 17:15 23:22 45:22 58:5 73:8 77:10,17 89:18 115:9 124:19 129:13 130:14,17 147:4 252:13 260:16 264:23 273:7 291:19 340:10
**talked** 58:10 69:5 77:24 92:1 124:24 130:11,16 132:1 138:25 157:6 184:25 198:6 199:11 203:1 223:22 233:19 235:22 256:5 289:24 291:23 292:15 296:1 303:14 306:16 341:16 374:10
**talking** 10:19 19:2 26:25 43:20 48:21 56:16 61:14 82:14 117:15 129:8 138:13 140:9,11 169:16 170:5 184:13 204:1 214:13 222:22 231:17 245:10 253:9 255:23 264:6,10,11 279:18 289:13 293:13,20 295:7 295:13 296:18 298:10 306:2 307:11 333:7,17 358:12 361:23
**talks** 259:4 309:17
**target** 260:12 312:25 314:18

315:3,9,19 317:15 319:8,23 323:6 324:16 325:4 338:5 341:21 342:17 344:6
**targets** 290:2,12 292:6 341:22 344:11
**task** 83:19 216:9 245:17 248:7 288:8 290:4,14 292:7,16 294:13 294:15
**tasked** 139:23 215:13 263:6 294:2,8
**tasker** 312:5 313:3 313:5,8
**tasking** 168:11,20 292:23
**tasks** 232:23 245:4 282:25 283:8 290:6,25 293:19
**team** 35:22 107:19 121:25 190:10 195:12 269:16
**technology** 31:13 32:10,23 34:8
**telephone** 136:6,8 141:5,9,13,14,17 141:18,22,25 142:7,12 144:17 144:24 146:22 147:1,5 148:4
**telephones** 378:14
**tell** 24:21 53:18 124:6 142:11 143:12 146:16 152:23 166:20 167:4 169:2 175:9 204:10 221:13,17 236:8,15 251:2 274:20 291:5 305:12 307:14 335:10 341:21
**telling** 222:6 236:14 367:1

**template** 208:7 209:14,16 238:20 314:25 342:17 344:5,10
**temporary** 249:18
**tenure** 26:20 87:6 97:23 114:7 290:19 340:17
**term** 25:15 38:14 56:9,11,13,23 57:5 152:14 181:17 249:18 255:15,18,22 308:24 322:24
**terminated** 63:14 63:21 64:2,13
**terminations** 362:17 363:25
**terminology** 56:17 57:3,8
**terms** 85:18 115:15 170:17 255:24 266:3
**terrible** 372:4
**testified** 16:12 47:8 47:16,20 146:24 148:5 160:4,22 175:24 202:11 203:6,9 243:24 244:3 246:2 248:18 261:23 320:1 337:7 341:4 344:24 346:1 373:9 377:7
**testify** 176:3
**testifying** 235:11
**testimony** 21:8 22:10,14 145:7 153:16 198:20 202:13 203:20,23 204:4 212:20,24 212:24 222:25 225:8 231:23 233:8,12 235:4 246:23 251:1 275:15 276:9 277:7 291:16

292:11 316:25 319:3 322:3 323:8 324:14,22 326:6 338:7 341:25 354:4,17 356:9 357:10 359:22 362:23 363:7 364:25 365:16 366:11,25 368:4 375:10,23 379:10
**Texas** 8:22 14:11 107:4,7
**text** 147:6,9 254:4
**thank** 28:12 46:22 92:4 93:17 102:19 122:9 177:1 255:1 297:12 298:6 304:23 359:5 371:21 373:2 379:2,4,5,7
**Thanks** 162:15 223:6
**thing** 181:20 184:24 223:21
**things** 21:13,16 129:15 168:5 174:14 213:7 238:25 247:15 258:9 263:6 338:14
**think** 43:7 57:2 81:15,17 96:4 97:17 123:4 125:5 135:4 164:16 175:1 176:25 180:2 181:3 184:11 188:12 207:15 222:10,12 223:5 243:19 276:24 301:18 310:19 322:4 342:21 361:16 363:10 367:10 378:4
**third** 48:14 169:23 270:4 342:13
**thoshijima@dem...**

3:24
**thought** 53:5 59:12 104:8 109:19 200:17 283:1
**thousand** 44:1 216:13
**thousands** 249:4,13 250:5,20 251:13 251:20
**three** 23:5 122:7 228:20 239:10 331:22 338:3
**Thursday** 223:13
**tied** 44:22
**till** 358:13
**time** 2:2 13:2,18 18:8,22 20:17 22:3 34:19 35:10 37:17,24 38:2 39:3,10 40:15 42:3,15 43:21 44:5 46:1,3 51:22 52:12 54:8,16,19 54:21,23 55:2,4 55:21 59:7 60:15 62:19 68:23 69:2 69:7 70:5 72:6 79:6,24 80:14,21 81:4,17,22,23 86:19,24 87:1 88:2,8 94:2,12 97:12 100:7 101:23 102:6 103:7,16 105:15 105:24 112:20 118:4,14,16 120:24 121:21 122:10 135:5 136:12 140:10 151:4 152:4,7 164:17 165:2 166:4 168:10,19 170:8 174:4 176:10,16,18 177:11 178:22 179:1,6 182:14 183:18 187:14

191:10 192:1,25 198:4 201:19 209:1,4 211:22 214:11 216:7 222:4,11,12 235:9 236:23 242:21 248:16,21 249:9 249:12 250:5,9,18 251:10 252:4,6 253:1 262:3,4 266:16 268:23 273:11 275:5,19 276:25 281:4 289:8 295:11,12 303:21 305:11 307:20,22 308:10 310:6,7,14 312:24 314:18 316:21 317:13,20,21 318:5 331:9 335:13 336:24 338:20 347:5 350:17,20 353:6 355:11 360:12 362:25 367:21 370:4 371:10 374:2,5,9 376:6 377:15
**timelines** 187:19
**times** 8:23 56:23 75:18 98:3 107:8 107:18 123:5 183:11,15,23 227:10 338:3 372:16
**timing** 47:15 87:15 101:21 169:19 274:9,10 278:15
**tired** 257:9
**title** 27:16 219:2
**titled** 162:18 334:13
**today** 15:13 17:16 21:8,20 22:11,15 24:5 28:3 52:14 75:20 76:4 79:19 92:14 142:8 157:6

158:14 258:20 289:16 298:19,20 298:23 300:4,6,16 300:17 302:2,24 311:3 313:21 314:11 316:4 324:14 333:7 337:11 341:4,16 342:15,23 344:9 357:14 372:6,16 376:15 377:7 378:7
**today's** 379:10
**told** 24:24 31:8 101:17 102:25 107:6 131:10 132:13,15,18 225:13 235:12,15 235:17 243:25 244:4 274:23 283:1,15,24 298:22 326:3 336:5 338:4 354:5 355:3 371:22,23 374:5
**tolerate** 185:25
**tools** 44:8
**top** 7:15 73:6,16 78:17 84:24 167:7 172:13 185:22 223:13,25 228:18 238:11 257:15,18 270:4 272:2 305:14 327:14
**topic** 138:12
**total** 171:13 216:20 219:24 248:3 250:3 251:11 306:18 307:15 332:1
**totaled** 38:2 316:19
**tour** 119:13
**touring** 121:4
**Toya** 297:20 346:14 349:9
**track** 20:17 84:16 298:14

**tracked** 139:25
**tracking** 279:3
**training** 163:11 164:5
**trajectory** 26:13
**transcript** 21:3,24 383:5
**transcription** 381:10
**transferred** 62:20 66:7
**transferring** 108:17
**transformational** 116:16 117:8
**transition** 59:11 86:21,22 109:18 152:3,11,13 323:2 356:25
**transmission** 226:5 296:25
**transmit** 213:3
**transmitted** 212:25 213:1 226:3,7 227:24 228:1 230:9
**transmitting** 210:12
**TransPerfect** 13:21 13:23
**traveled** 119:10
**Treaty** 74:2
**Trial** 4:7
**Tricia** 177:19 183:22
**tried** 224:17
**trip** 119:21 120:4 120:14 121:3,17 121:18 124:25 125:2,8,14 135:20 135:24 136:3,13
**Troup** 55:15,16,24 56:1 58:8,19
**Troup's** 62:13
**Troy** 51:24
**true** 57:2 202:6 203:25 230:18,23

231:1,3 239:4,8 239:18,22,24 240:5,8 241:2,5 246:5 284:4 325:12 335:18 361:3 363:19 382:7,10 383:5
**Trump** 1:8 13:9 33:21,25 34:18 38:12 75:17 76:2 86:23 152:14 381:4
**Trump's** 70:11
**trust** 321:25 322:5
**trusty** 372:22
**truthfully** 283:22
**try** 17:15 170:17 304:20
**trying** 100:5 102:1 118:20 243:19 308:21 326:1 371:8
**Tsuki** 3:19 14:7
**Tuesday** 1:19 2:1,9 13:1
**turn** 171:18 196:5 223:10
**turned** 26:3
**turning** 357:14
**two** 15:2 23:7,7 30:4 60:12,14 61:10 166:3 169:23 228:20 240:2 268:22 282:11 294:8,12 356:3 363:3 378:24
**TX** 3:16
**type** 91:13 100:20 101:2 126:21 263:5 288:25
**typed** 26:5
**types** 34:16 59:13 92:17 127:1,2,20 136:7 174:9 181:9 289:19
**typhoon** 119:13,18

**typhoons** 119:15
**typically** 85:25 110:4

---

**U**

**U.S** 8:9 13:11 50:24 53:3
**Ueland** 124:23,24
**Uh-huh** 27:4
**ultimate** 179:9
**ultimately** 65:14 71:15 179:15,22
**Um** 263:12
**um-hum** 18:15 19:9 58:13,16
**unauthorized** 186:1
**unaware** 131:23 133:15 157:21 163:24
**under-** 103:12
**undergraduate** 28:25 29:9
**underneath** 156:6
**understand** 16:18 18:24 19:11,14,21 19:23 20:8,13,24 26:22,24 32:13 35:20,21 39:6 45:14 47:2,4 54:5 54:10 59:3,4 64:12,15 68:8 69:2,12,22 71:6 71:21 72:11 76:20 81:1 84:20 85:5 88:15,20 89:2 92:21 100:5,21,23 101:10 102:1 103:8 117:14 118:7 129:7 132:9 145:11 178:21 186:18,23 189:4 205:2,18 206:10 209:10 266:19 272:12 278:17 284:6 296:23 301:18 308:17,22

310:19 325:7 354:18 364:13 370:20,21 378:22

**understandable** 74:11

**understanding** 30:18 38:11 39:9 58:4 59:14 75:6 79:6 81:3,8 83:12 83:17 85:3,12,17 85:21 88:6,12 93:5,11 95:11,19 97:6,11 99:13,14 99:18 100:12,15 100:22 101:15 102:12 103:22 106:15,21 107:3 108:22 115:24 116:5,11,14,19,24 117:2,6,24 118:17 121:10,13,14 134:10 140:17 153:19 183:5 186:4 193:25 196:23 197:5 201:22 237:5 253:22,24 261:16 265:3 266:6,15 268:1 270:12 277:18 280:15 293:2 296:3,19 303:1 314:23 315:22 319:4 320:25 324:13 345:9,14 356:11

**understands** 76:6

**understood** 39:3 40:5,14 45:9 62:19 65:14 68:5 68:16,23 69:7,17 70:3 72:6,14 76:11,16,24 79:24 80:6 81:6 105:2 117:10 132:4,16 187:8 203:20 208:25 209:4 211:22 232:12

233:19 267:9 275:1 310:20 315:11 352:18,22 354:11 367:24 368:16

**unhappy** 320:10

**Union** 3:2,13 14:4,7 14:15,19,23

**United** 1:1,9 4:3 13:10 179:16

**University** 28:24 29:8,12 31:6

**unlawful** 64:18

**unnecessary** 72:3

**unsure** 158:11,23 158:24 274:9

**upcoming** 296:13 306:19 343:5,9 347:14

**update** 311:13,23 312:6 314:14 328:10,16,19 329:1 330:6 331:4 331:6 342:15,23 342:25 343:10,14

**updated** 177:6 181:8 262:14 270:9,14

**updates** 212:3 213:2

**updating** 310:22

**urgently** 302:5

**USA-AFGE-Exp...** 8:17

**USA-AFGE-Exp...** 11:14

**USA-AFGE-Exp...** 10:8

**USA-AFGE-Exp...** 11:23

**USA-AFGE-Exp...** 9:15

**USA-AFGE-Exp...** 11:11

**USA-AFGE-Exp...** 10:11

**USA-AFGE-Exp...**

11:17

**USA-AFGE-Exp...** 9:24

**USA-AFGE-Exp...** 9:19

**USA-AFGE-Exp...** 10:5

**USA-AFGE-Exp...** 10:17

**USA-AFGE-Exp...** 11:8

**USA-AFGE-Exp...** 9:10

**USA-AFGE-Exp...** 11:5

**USA-AFGE-Exp...** 9:21

**USA-AFGE-Exp...** 11:20

**USA-AFGE-Exp...** 10:14

**USA-AFGE-Exp...** 10:24

**USA-AFGE-Exp...** 10:21

**use** 42:10 56:9,11 56:13,23 57:3,6,8 84:6 85:12,13 98:15 102:2 109:23 118:20 146:18,22 148:16 149:25 150:4,8,12 151:6,8 157:11,15 157:18,23 159:13 166:6 184:12 312:24 321:18 323:5 331:11 345:10

**users** 158:4

**uses** 84:15 85:7

———————
**V**
———————

**v** 381:3

**vacant** 94:15

**val** 374:14

**vals** 374:4,13

**various** 134:15

207:3 209:5 214:3 218:5,6 247:17

**venture** 119:16

**verbal** 19:4 58:17

**verification** 345:11

**version** 188:8,15 191:1 195:8 270:14

**versions** 188:6 191:2 195:5,14 239:10

**versus** 13:8 44:20 248:12

**vet** 66:11

**vetted** 63:19

**vice** 3:19

**Victoria** 305:15 320:11

**video** 13:5

**videoconferencing** 107:22

**videographer** 6:11 13:4,21 16:7 43:14,17 82:7,10 135:14,17 143:5,8 144:23 159:23 160:1 164:19 165:3 222:15,18 252:7,10 304:24 305:2 344:17,20 355:19 365:23 366:2 373:3,6 379:1,9

**videotape** 21:4

**videotaped** 1:15 2:7 20:25

**view** 179:21 264:25 265:13

**viewed** 44:21 72:1 276:21 364:9

**VILLAGES** 8:7

**Virginia** 5:15 17:1 18:7,18 28:24 29:8 31:6

**virtual** 107:12

**virtually** 112:3

**visibility** 322:13

**voice** 46:19 298:3

**volunteer** 152:9

**Voorhies** 98:9,12 98:19,22,25 99:9 100:13 102:5,22 103:8 105:2,14,17 105:25 106:22 107:18 108:4,10 108:13 111:10,12 111:16 112:6,20 113:4,19,24 114:2 114:6,14,24 116:9 116:11,14 117:18 118:11 119:6,10 119:19 120:14,21 121:11,15,22 122:25 123:2,21 124:14,19 125:1 125:19,21 126:21 127:12,24 129:2 129:23 130:18,23 131:3,18,19 132:6 132:19 133:8,11 133:22 134:5 135:21 136:16 137:2,2,14 138:8 140:4,8,25 141:5 141:21 146:9,18 146:23 147:1 150:1 151:3 153:12,23 154:12 154:18,22 156:13 158:7 159:17 173:1,4 194:25 195:1,6,16 199:12 199:16,24 202:7 202:12,17 203:7 204:6 224:9 235:20 271:14,18 272:13,18 273:1 273:10 274:6,12 274:18 278:8 286:1 305:15 339:19,23

**Voorhies'** 99:4 104:10 115:25 116:6 120:11

125:8 142:12
143:13 146:17
**Voorhies's** 114:22
**vs** 1:7

---
**W**
---

**WA** 3:16
**wait** 17:19 326:14
327:18
**waited** 351:24
**waiting** 17:24
378:2
**waived** 380:16,23
**waiver** 169:20
373:20
**want** 19:3 42:9,10
61:7 102:2 123:3
135:4 149:8 160:9
257:14 264:14
275:1 291:13,17
321:18 340:10
347:25 348:19,25
349:25 352:12
373:22 374:1
378:10
**wanted** 53:18
113:14 132:5
144:19,20 177:25
233:16 279:20
314:9 320:20
321:24 322:6,21
325:6 330:20
347:23 348:5
376:10,11
**wants** 76:5 228:25
**Washington** 2:11
3:22 4:11,23 5:7
8:19 13:17 14:11
74:6 106:22 107:2
177:5
**wasn't** 90:23 101:5
134:11 175:18
203:10,23 241:2
243:16 258:25
261:25 302:19
348:5 358:15
**waste** 39:23 66:1

67:25 68:11,11,17
**water** 65:4
**way** 21:20 52:14
54:6,6,11 72:4
80:16,18 95:11
102:20 103:1
105:7 123:7,22
124:20 128:5
151:24,25 166:9
180:2,5 184:24
186:23 192:12
193:4 203:9
210:11 244:8
248:22 259:16
271:2 276:2 277:9
284:6 293:18
294:4 297:3,23
303:7 310:14
317:5 318:4
325:24 331:24
336:9 348:17,18
352:22 361:19
362:18 368:5
369:17 373:23
**ways** 180:3 263:21
373:19
**we'll** 26:12 27:21
27:23 29:24 35:13
41:11 82:4,6
122:14 131:17
135:12 145:8
148:25 159:22
174:12 175:19
207:9 266:25
285:22,23 314:12
372:24
**we're** 15:7 17:15
20:16,17 21:6
28:1 43:7,10,11
82:20 122:13
135:6 140:11
142:22 148:22,24
149:9,10 254:20
258:2 262:7
268:17 287:17
310:10 356:24
357:16 372:19

**we've** 81:16 118:2
135:1 231:11,15
233:19 238:12
241:18 297:25
305:13 313:6,15
331:24 333:7
338:19 344:24
378:14
**Weapons** 97:2
100:10,13 101:12
**wearing** 124:3
**webpage** 73:14
**website** 49:9
**Wednesday** 353:25
**week** 18:18 200:11
258:3 351:9
352:13,24
**weekly** 111:20
133:4,6 172:19
190:7,9 273:14
274:17
**weeks** 61:7,14,15
356:3 363:3
**went** 28:24 32:16
47:2 66:24 94:24
94:25 98:3 112:15
117:24 119:17
137:9 147:22
181:11 184:25
210:11 225:11,11
244:20 319:6
324:1,24 325:21
333:23 336:10
**weren't** 44:21
124:22 264:20
322:12
**West** 17:1 18:7,17
28:24 29:7 31:5
**WESTERN** 8:6
**whereof** 382:11
**White** 95:13,18
138:5 197:9,12,18
197:23 198:10,14
200:9,18,24
**widely** 225:2
**willing** 59:1
**winter** 150:19,23

150:25 153:3,15
153:17,20,24
154:4,9,13,18
**withdrawal** 53:5,8
**withdrawn** 53:11
53:14 54:3,18
55:2
**withdrew** 53:2
**withheld** 28:15
**witness** 4:2 5:2,10
7:2 15:14 16:8
30:15 41:10 64:5
67:17 73:10 82:2
91:23 92:5 93:17
122:19 137:18
142:25 144:10
145:6,6 155:20
188:20 189:14,18
207:20 228:25
229:2 251:5 255:7
269:4 272:3 278:3
279:23 281:1
287:8,22 297:12
297:17 305:18
306:13 308:3
323:23 324:1
326:8 327:2,4
334:18 340:4,9
346:16 355:21
359:5 360:20
365:25 366:3
373:2 374:25
379:7 380:20,21
381:6 382:2,11
383:6
**witness's** 144:14
**wondering** 27:6
**word** 71:5 243:20
315:4
**worded** 309:24
**words** 39:24 99:23
99:25 184:12
**work** 18:10 39:14
40:10 87:17 95:15
101:24 107:8
115:5 118:11
125:9,23 126:22

134:21 149:13
159:14 161:7
187:24 237:5,9,10
246:12,25 250:11
264:9,13 282:16
286:17 292:2
294:9,12,15
313:20 317:8,22
322:25 325:17
348:8 375:15
**workday** 18:14
**worked** 18:8 26:11
26:15 55:24 96:21
98:9 140:20 152:2
152:10 186:24
210:5,17 214:2
215:12 217:11
280:20 281:6
282:8 290:22
303:12 339:13
345:15
**Workers** 8:25
183:17
**workforce** 36:13
38:8,13,18,23
39:7,10,15 40:15
40:21,25 41:2,5
41:25 43:22 44:5
44:12 45:16 52:9
52:19 61:21 62:1
62:22 130:3
186:15,20 264:22
275:8 288:9,24
289:19 290:3,13
291:4,6,11,20
292:25 293:23
317:22 318:21
332:11,15 333:1
333:11,18,23
334:1,6,13 335:4
335:9,20 336:6
337:17
**working** 26:8 37:25
39:11 40:6 59:9
86:15 87:8 88:1
98:23,25 106:22
107:11 118:18

127:6,7 150:16 168:20 170:22,25 187:18 190:10 198:7 210:13 221:19 231:25 259:3,10,20 261:5 281:19 282:11 325:13 347:6
**workload** 357:13
**works** 21:21 95:12 151:24 211:7 271:2
**worksheet** 219:2
**wouldn't** 28:17 197:8 203:21
**write** 19:5 146:11 146:14 196:15,16 280:11,13,15
**writing** 224:1 229:14
**written** 21:3 160:12 160:17 244:24
**wrote** 196:13 230:24 231:1 278:22,25 284:23 346:11

**X**

**x** 1:4,10 380:15
**XXX** 146:23 160:18 161:3
**XXX-XXXX** 146:23 160:18 161:3

**Y**

**yeah** 15:4 35:9 46:12 63:12 73:3 94:25 123:24 126:25 136:15 151:25 152:1 281:13 298:7 312:13
**year** 18:16 216:14 216:20 221:14 222:7 225:15,18 227:17 228:2

229:25 237:1 240:25 243:17 249:11 250:4,19 251:12 288:10 312:23 316:1 335:11,22 340:24
**years** 28:23 31:11 34:5
**yes-or-no** 250:16 250:17 251:6,7 367:22 368:24,25 371:1
**York** 2:11 8:23 13:16 183:11,15
**Yusman** 4:18 15:23 15:24

**Z**

**zero-based** 263:5 314:1,22 322:23 324:25 325:5 342:13 343:16
**zone** 121:4
**Zoom** 107:17

**0**

**059** 11:18

**1**

**1** 7:10 29:25 30:5,8 183:16 256:24 284:25 296:20 356:2 380:4 381:8
**1,362** 289:2
**1:32** 165:2,4
**10** 8:16 81:25 82:2 162:22 165:7,9 222:13 223:2,3,5 256:12 297:25 304:19 344:16 353:8
**10-minute** 82:4 135:3,11
**10,843** 289:4
**10:00** 299:21 302:2
**10:10** 82:5,8
**10:20** 82:6

**10:25** 82:11
**100,000** 119:3 138:18
**10am** 298:18 300:3 300:15
**10th** 163:18 164:3 164:9 305:24 306:11,23
**11** 8:19 9:8 28:10 162:16 177:1,2 193:16
**11,383** 220:1,2 221:13 223:24 224:8 227:21,24 235:22 236:24 241:14 242:22 248:3,22 249:11 250:3,19 251:12 251:21 256:17 280:21,23 282:17 283:17,23 284:5 292:15,18 320:2 332:6 333:16 341:18 342:8
**11,500** 192:8 193:1 216:20 225:14 227:16 228:1 229:17
**11,883** 261:24
**11:24** 135:15
**11:41** 135:18
**11:49** 143:6
**1101** 4:10
**11973** 1:25
**11th** 288:1,4
**12** 8:23 183:10,12 183:14
**12/4** 211:12
**12:01** 143:9
**12:18** 159:24
**12:35** 160:2
**12:41** 164:20,22
**120** 8:7
**122** 8:10
**12th** 189:22 194:1 196:24 286:8
**13** 9:4 193:6,7,13

**14** 9:9 10:7 199:18 199:19,22 383:22
**14356** 9:12 205:16
**1445** 2:10 13:16
**14th** 265:1,11
**15** 9:12,13 205:12 205:14,17 207:10 286:12
**16** 7:5 9:14 167:7 168:9 207:10,11 223:3 311:5,9 316:8
**162** 8:15
**165** 8:18
**16th** 167:14
**17** 9:17 177:6 218:13,14 222:24 229:5 231:17 241:18
**175/19** 12:13
**177** 3:7 8:22
**17th** 167:11 168:25 176:12 199:23 228:22 230:13,19 346:15,23
**18** 9:20 228:12,13 228:14 311:13
**180** 265:14 266:5 267:12,15 275:22 276:5,13
**180-day** 275:23
**183** 8:25
**18th** 305:16,21
**19** 9:23 237:15,16 331:19
**192** 361:11
**193** 9:8
**199** 9:11
**1A** 260:23
**1B** 260:23
**1st** 105:11 132:11 178:20 181:21 206:13,18 268:12 310:8 354:24

**2**

**2** 7:13 49:4,5,7

241:12 312:6 329:3 330:3 381:9
**2-** 222:14
**2(c)(i)** 206:8
**2.0** 196:8
**2:37** 222:16
**2:47** 222:14
**2:49** 222:19
**20** 7:19 10:4 71:2 73:17 74:20,23 254:22,25,25 257:7
**20%** 351:8
**200** 5:14
**20005** 4:11
**20032** 5:7
**20043** 3:22
**2018** 33:2
**202** 3:23 4:12
**2020** 33:9,21
**2021** 33:24
**2024** 27:9 246:1,7 246:19,19
**2025** 7:19,22 9:8,13 10:7 26:21 27:7 34:20 36:6,21 37:12,16 38:6 43:25 47:23 48:4 50:25 53:3,8 54:14 61:18 71:2 73:17 74:20,23 77:8 78:6,15 80:22 81:4 86:16 90:14 91:10 92:25 93:8 94:2 98:8,23 99:1 118:11 119:11 135:21 154:22 167:7 168:9 171:7 175:25 176:8 177:7 181:11 183:16 187:14 193:16 205:2,17 213:11,17 223:14 224:23 229:5 238:12 241:22 242:7 255:5

266:10 267:3 271:24 289:8 291:6 303:3 309:21 334:17 344:24
**2026** 1:19 2:1,9 13:1,18 114:11,13 151:1 153:24 154:5,9,13 162:16 162:22 216:14,21 219:24 221:14 222:7 225:15,18 227:17 228:2 229:25 237:1,7,11 240:25 243:17 249:12 250:4,19 251:12 254:8 288:10 293:21 298:16 310:23 312:23 316:1 335:11,22 340:25 358:8 359:24 361:12 373:12 381:5 382:12 383:15
**2028** 383:22
**20472** 4:23
**205** 9:13
**207** 9:16
**20th** 73:4 169:22 170:6
**21** 10:7 33:21 238:12 265:7,8,11
**218** 9:19
**21st** 207:18,22 316:14
**22** 10:10 268:18,19
**22314** 5:15
**228** 9:22
**22nd** 311:8,11
**23** 10:13 271:20,21 271:24
**23,000** 192:2,24
**23,143** 335:11
**23,146** 332:14 334:5 335:6,23
**2354** 210:25

**237** 9:25
**23rd** 228:18 315:12 317:23 324:12 329:21 332:17 333:3,20,24 334:6 334:15 335:9 338:20,23 339:10 339:18
**24** 10:16 277:25 278:1 290:21 292:3,13 293:12 294:12 296:18 297:6 299:9
**24,000** 316:19 318:15 321:20 326:4
**24,812** 240:24 242:25 332:1 333:15
**24.8** 216:13
**241** 9:11
**25** 10:19 36:6 271:24 287:3,4 293:20 361:10 362:15
**254** 10:6
**25th** 297:15 349:10
**26** 10:23 297:9,10 297:13 312:6
**26,146** 337:13
**260** 11:6
**265** 10:9
**268** 10:12
**26th** 316:8 349:7 352:1 374:11,19
**27** 11:4 305:6,7
**27/21** 12:13
**2700** 5:6
**271** 10:15
**278** 10:18
**28** 11:7 326:22,23 362:7
**287** 10:22
**29** 11:10 334:10,11
**297** 10:25
**29th** 171:19 172:12 173:6

---
**3**
---
**3** 7:14 67:6,7,10 381:10
**3:24** 252:8
**3:25-cv-03698-SI** 1:7 13:14
**3:32** 257:23
**3:37** 252:11
**30** 7:12 11:13 31:11 62:4 174:5 339:25 340:2 351:5,11 353:19
**30-day** 351:4,15 354:6
**300** 3:7
**305** 11:6
**305-0693** 4:12
**30th** 311:23
**31** 1:19 2:1 11:16 13:1,18 334:17 346:6,7 350:5 381:5
**31st** 131:13 172:8 254:6 274:4 331:16 332:19 333:4 334:23 336:11 337:11 351:13,24 352:14 353:10,15 354:9 358:13 365:6 366:15 374:19
**32** 11:19 349:5,8 351:3
**326** 11:9
**33** 11:22 359:2,3
**334** 11:12
**33527** 165:13
**33529** 170:10
**33531** 172:10
**33534** 223:12 256:13,23
**33536** 353:11,15
**33544** 165:13
**34** 12:4 223:12 360:6,7
**340** 11:15

**342** 10:22
**343** 9:22
**34553** 3:21
**346** 11:18
**349** 11:21
**35%** 289:2
**357** 9:16
**359** 11:23
**360** 12:8
**364** 340:7
**367** 11:15
**379** 380:4
**3rd** 209:19

---
**4**
---
**4** 7:17,23 72:23,24 223:14 241:22 242:10 280:18 282:6 290:21
**4:45** 304:25
**4:53** 305:3
**406** 10:9
**415** 3:9
**421-7151** 3:9
**448-9090** 3:23
**45** 20:18
**466** 11:21
**48** 125:6
**49** 7:13
**4th** 211:1,17 212:5 220:20 224:8 235:23 255:5,9 256:4,13 259:12 278:8 280:7 281:4 296:1,8 329:13

---
**5**
---
**5** 7:20 78:11,12,14 242:7 329:22 330:4
**5:45** 344:18
**5:59** 344:21
**50%** 191:11,21,24 192:7,25 196:10 196:18 220:2,8 221:1 222:5 231:4 231:4,7 232:6,7,9

232:13,20,25 233:6 234:6 235:6 235:12,16 236:8 236:15 243:3,10 243:16,22,25 244:10,16 245:13 245:24 246:8 249:2,5 258:16,22 259:1 260:12 261:21 263:8,20 275:24 281:23 282:16 286:18 288:10 292:6 293:1,10 309:1 312:25 313:23 314:18 315:2,3,10 315:18 316:21 317:15 319:8,23 320:22 323:6,12 324:12,16 325:3 325:14,17 326:3 337:2 338:5 339:1 340:13,18,23 341:5,10,12,21 342:5
**500** 4:21 18:6
**520** 11:12
**521** 10:25
**538** 9:25
**544** 8:18
**582** 10:12
**5th** 237:19 255:5 257:11,16,22 268:23 296:4,12 296:24 297:4 298:8 299:7 302:5 302:14 303:4,8 332:17 335:2 340:6,11

---
**6**
---
**6** 7:23 82:21,22 96:8 312:10 361:9 361:10
**6:35** 373:4
**6:45** 373:7
**6:52** 379:10,12

**60** 206:6
**60-day** 206:4
**602** 123:8,9
**603** 123:8,11
**604** 123:8,13,15,17
**6686** 257:18,22
**6687** 259:6
**67** 7:16
**68%** 289:4
**688** 10:6,15
**6th** 311:18,21
  312:1,7,17 328:6
  383:15

---
**7**
---

**7** 8:4 120:2,5,8
  122:7 196:5
**7,039** 289:7
**703** 5:16
**717** 5:14
**72** 7:19
**720** 11:9
**7336** 228:21 229:7
  229:8
**76%** 289:7,14
**78** 7:22

---
**8**
---

**8** 8:8 122:8,9,11
**8:17** 298:9,9
**8:59** 2:2,9 13:2,19
**82** 7:25
**840** 4:22
**888-1943** 5:16

---
**9**
---

**9** 7:22 8:11 78:15
  162:11,13,15,16
**9:00** 299:19
**9:27** 43:15
**9:28** 43:18
**9:51** 229:6
**90** 356:19,23 357:6
  357:22 358:22,25
  359:13,25 373:11
  376:17,21,23
  377:3,14,24,24

**90-day** 131:4 357:2
  357:11 358:2,3,7
**932** 306:22
**94108** 3:8
**9465** 354:7
**998** 10:18
**9th** 78:21

Exhibit B

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

-------------------------------x
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,

     Plaintiffs,

        Case No.
   vs.
       3:25-cv-03698-SI

DONALD J. TRUMP, in his official
capacity as President of the
United States, et al.,

     Defendants.
-------------------------------x

VIDEOTAPED DEPOSITION OF

ROLAND EDWARDS

Thursday, April 2, 2026

Reported By:  SUSAN ASHE, CER

Job No.:  11974

Page 2

Thursday, April 2, 2026

8:58 a.m. Eastern Daylight Time

Videotaped deposition of ROLAND EDWARDS, taken on behalf of the Plaintiffs, beginning at 8:58 a.m., on Thursday, April~2, 2026, at the offices of Democracy Forward Foundation, 1445 New York Avenue, Northwest, Washington, D.C., before Susan Ashe, Certified Electronic Reporter and a Notary Public of the District of Columbia.

APPEARANCE OF COUNSEL:

On behalf of All Union and Non-Profit

Organization Plaintiffs

ALTSHULER BERZON LLP

BY:  DANIELLE E. LEONARD, ESQ.

BY:  ELIZABETH ESHLEMAN, ESQ.

177 Post Street, Suite 300

San Francisco, California  94108

(415) 421-7151

dleonard@altshulerberzon.com

eeshleman@altshulerberzon.com

On behalf of All Union and Non-Profit

Organization Plaintiffs (except NRDC) and for

Plaintiffs City of Chicago, IL; Martin Luther,

Jr. County, WA; Harris County, TX; and City of

Baltimore, MD

DEMOCRACY FORWARD FOUNDATION

BY:  TSUKI HOSHIJIMA (pro hac vice)

Senior Counsel

P.O. Box 34553

Washington, D.C.  20043

(202) 448-9090

thoshijima@democracyforward.org

Page 4

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

UNITED STATES DEPARTMENT OF JUSTICE

BY:  JEREMY NEWMAN, Trial Attorney

BY:  BRAD P. ROSENBERG, Special Counsel

1101 L Street, Northwest

Washington, D.C.  20005

(202) 305-0693

jeremy.s.newman@usdoj.gov

brad.rosenberg@usdoj.gov

- and -

FEDERAL EMERGENCY MANAGEMENT AGENCY

BY:  KEVIN YUSMAN

500 C Street, Southwest

Suite 840

Washington, D.C.  20472

kevin.yusman@fema.dhs.gov

- and -

DEPARTMENT OF HOMELAND SECURITY

BY:  MATTHEW FLEISCHMAN

BY:  OKWEDE OKOH

2700 Martin Luther King, Jr., Southeast

Washington, D.C.  20032

matthew.fleischman@hq.dhs.gov

okwede.okoh@hq.dhs.gov

ALSO PRESENT:

Jessica Levy, Esq.

Altshuler Berzon LLP


Shreya Wankhade, Legal Assistant

Democracy Defenders Fund


Jonathan Perry, Videographer

                        CONTENTS

THE WITNESS

Roland Edwards


  BY MR. HOSHIJIMA                                    15


                        EXHIBITS

PLAINTIFFS

Exhibit No.                                        Marked

Exhibit 35  Profile of Roland Edwards                22

Exhibit 36  Executive Order 14210

            February 11, 2025                        42

Exhibit 37  May 2023

            FEMA Disaster Workforce

            "Actions Needed to Improve

            Hiring Data and Address

            Staffing Gaps"                           87

Exhibit 38  January 20, 2025 Memorandum

            Re:  Federal Civilian

            Hiring Freeze Guidance                   90

Exhibit 39  Email Correspondence

            USA-AFGE-Exp.-0000435                    95

Page 7

                        EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Marked

Exhibit 40  March 14, 2025 Memorandum

            Subject:  DHS Hiring

            Verification Process            98

Exhibit 41  Email Correspondence

            USA-AFGE-Exp.-0000403

            and -404                        117

Exhibit 42  Executive Order 14356

            October 15, 2025                132

Exhibit 43  November 5, 2025 Memorandum

            Re:  Guidance on Executive

            Order 14356, Ensuring

            Continued Accountability

            in Federal Hiring              134

Exhibit 44  DHS STORM # 25-07536           141

Exhibit 45  Email Correspondence

            USA-AFGE-Exp.-0000400

            through -402                    199

Exhibit 46  Email Correspondence

            USA-AFGE-Exp.-0000415

            through -419                    204

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                        Marked

Exhibit 47  Email Correspondence

            USA-AFGE-Exp.-0000420

            through -427                           210

Exhibit 48  Email Correspondence

            USA-AFGE-Exp.-0000600

            through -607                           225

Exhibit 49  Email Correspondence

            USA-AFGE-Exp.-0000446

            through -454                           233

Exhibit 50  Email Correspondence

            USA-AFGE-Exp.-0000472                  238

Exhibit 51  Email Correspondence

            USA-AFGE-Exp.-0010027

            through -029                           244

Exhibit 52  Email Correspondence

            USA-AFGE-Exp.-0000608

            through -610                           248

Exhibit 53  Email Correspondence

            USA-AFGE-Exp-0000643

            and -644                               254

Page 9

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                        Marked

Exhibit 54  Email Correspondence

            USA-AFGE-Exp.-0000473

            through -501                           261

Exhibit 55  Email Correspondence

            USA-AFGE-Exp.-0000504                  269

Exhibit 56  Email Correspondence

            USA-AFGE-Exp.-0000539                  272

Exhibit 57  Email Correspondence

            USA-AFGE-Exp.-0000642                  273

Exhibit 58  Email Correspondence

            USA-AFGE-Exp.-0000839                  276

Exhibit 59  Email Correspondence

            USA-AFGE-Exp.-0000076

            and -077                               278

Exhibit 60  Email Correspondence

            USA-AFGE-Exp.-0005677                  286

Exhibit 61  Short Message Report

            USA-AFGE-Exp.-0009457

            and -458                               289

Exhibit 62  Email Correspondence

            USA-AFGE-Exp.-0015928                  293

                       EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                     Marked

Exhibit 63  Email Correspondence

            USA-AFGE-Exp.-0000707

            and -708                            294

Exhibit 64  Email Correspondence

            USA-AFGE-Exp.-0000713

            and -714                            296

Exhibit 65  Email Correspondence

            USA-AFGE-Exp.-0008661

            and -662                            299

Exhibit 66  Email Correspondence

            USA-AFGE-Exp.-0000160

            through -162                        304

Exhibit 67  Email Correspondence

            USA-AFGE-Exp.-0000180

            and -181                            305

Exhibit 68  Spreadsheet attached to

            Exhibit 67                          309

Exhibit 69  Email Correspondence

            USA-AFGE-Exp.-0000186

            through -188                        314

                      EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Marked

Exhibit 70  Email Correspondence

            USA-AFGE-Exp.-0000388

            and -389                            316




                PREVIOUSLY MARKED EXHIBITS

PLAINTIFFS

Exhibit No.                                 Introduced

Exhibit 2  Organizational Chart - DHS            47

Exhibit 17  Organization Information

            Chart

            USA-AFGE-Exp.-0006542               180

Exhibit 19  Email Correspondence

            USA-AFGE-Exp.-0006535

            through -538                        159

Exhibit 21  May 14, 2025 Memorandum

            Subject:  Reinstating FEMA's

            Ability to Renew Term

            Employees Based on Mission

            Requirements

            USA-AFGE-Exp.-0000405

            and -406                            125

PREVIOUSLY MARKED EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Introduced

Exhibit 26  Email Correspondence

USA-AFGE-Exp.-0014520

and -521                                        192

INSTRUCT THE WITNESS

| Page/Line | Page/Line | Page/Line |
| --- | --- | --- |
| 154/23 | 155/11 | 156/11 |
| 170/15 | 171/2 | 171/17 |
| 172/5 | | |

(REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.)

THURSDAY, APRIL 2, 2026;

8:58 A.M. EASTERN DAYLIGHT TIME

--o0o--

VIDEOGRAPHER:  We are now on the record.  This begins the video deposition of Roland Edwards, taken in the matter of the American Federation of Government Employees, et al., versus Donald J. Trump, in His Official Capacity as President of the United States, et al.  Case filed in the U.S. District Court for the Northern District of California, San Francisco Division, Case No. 3:25-cv-03698-SI.

We are at the offices of Democracy Forward, 1445 New York Avenue Northwest, in Washington, D.C.

The date is April 2, 2026.  Time is approximately 8:58 a.m.

My name is Jonathan Perry.  I am the videographer from TransPerfect.  The court reporter is Susan Ashe, also with TransPerfect.

And would counsel present please introduce themselves and state whom they represent.

MR. HOSHIJIMA:  Good morning. Tsuki Hoshijima from Democracy Forward.  I represent certain of the Plaintiffs in this matter.

MS. LEONARD:  Danielle Leonard, Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. ESHLEMAN:  Elizabeth Eshleman, Altshuler Berzon, also representing all Union and Organizational Plaintiffs.

MS. LEVY:  Jessica Levy, Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MR. NEWMAN:  Jeremy Newman, Department of Justice, representing the Defendants and the witness in his official capacity.

MR. ROSENBERG:  Brad Rosenberg from the Department of Justice.

MR. FLEISCHMAN:  Matthew Fleischman from the Department of Homeland Security.

MS. OKOH:  Okwede Okoh from the Department of Homeland Security.

Page 15

MR. YUSMAN:  And Kevin Yusman from FEMA.

VIDEOGRAPHER:  And would the reporter please swear in the witness.

(Witness sworn.)

Whereupon,

BENJAMIN ROLAND EDWARDS,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HOSHIJIMA:

Q.   Good morning.

A.   Good morning, sir.

Q.   Can you state and spell your name for the record.

A.   My full name is Benjamin Roland Edwards. So Benjamin, B-e-n-j-a-m-i-n.  Middle name Roland, R-o-l-a-n-d.  Last name Edwards, E-d-w-a-r-d-s.

Q.   Have you ever had your deposition taken before?

A.   Yes, I have.

Q.   How many times?

A.   Just once.

Q.   Just once.

How long ago was that?

A.   Within the last year.

Q.   Do you remember what case that was for?

A.   I do not.

Q.   Do you remember the subject matter of that case?

A.   So I apologize.  There've been a lot of conversations.

I don't remember the exact subject matter.

Q.   Was it a case against the Department of Homeland Security?

A.   Yes, it was.

Q.   You were testifying in your capacity as the chief human capital officer of Department of human -- of Homeland Security?

A.   Yes, sir, I was.

Q.   So I'll start by making sure we're on the same page about what we're doing here.  You may have heard some of these instructions before, but I want to make sure we get them on the record.

I'll be asking you a series of questions today that you will have to answer under oath.

Do you understand?

A.   I do.

Q.   If you don't understand any question I ask you, you should let me know, and I'll attempt to

clarify.

Do you understand?

A.    Thank you.  Yes.

Q.    Everything we say today will be transcribed by the court reporter.  For that reason, it's important that you give audible answers, like a yes or a no, instead of nodding or shaking your head.

Do you understand?

A.    I do.

Q.    To allow the court reporter to do their job, we shouldn't interrupt each other.  It's hard. We'll do our best.

But I'll try to make sure you've completed your answer before I ask a question.  And you should try to make sure that I've completed my question before you start answering.

Do you understand?

A.    I do.

Q.    Do you also understand that this deposition is being videotaped?

A.    I do.

Q.    Do you understand that the transcript or the video can be used in court, so that your testimony should be as complete and accurate as it

would be if a judge were sitting here in the room with us today?

A.    I understand.

Q.    Is there any reason that you're not capable of giving full and complete, truthful testimony today?

A.    No.

Q.    From time to time, your counsel may object.  After the objection, I'm going to ask you to answer the question, unless you're specifically instructed not to answer.

Do you understand?

A.    I do.

Q.    We will take some breaks throughout the day.  If you ever need a break, just let me know.

My only ask will be that if we have any question that's pending, that you answer it before we take the break.

Do you understand?

A.    Understood.

Q.    Any questions for me about any of those ground rules?

A.    No, no questions.

Q.    I'm going to ask you a bit about your preparation for today's deposition.  And to be

clear, I'm not asking you about the substance of anything you talked about with your lawyers.

What did you do to prepare for today's deposition?

A. I did meet with the attorneys, and that was pretty much the extent of the prep for the deposition.

Q. Which attorneys did you meet with?

A. The attorneys present in this room.

There was an additional attorney, but I can't remember her name at this time.

Q. Do you remember if the additional attorney was from the Department of Justice or the Department of Homeland Security?

A. Department of Justice.

Q. Was there anybody else at the meeting where you met with the lawyers to prepare for this deposition?

A. Besides attorneys?

Q. Besides the attorneys.

A. No.

Q. How many meetings did you have to prepare for this deposition?

A. Two.

Q. Do you remember when they were?

Page 20

A.    One was yesterday.  And the other one --
losing track of time -- was within the last week.

Q.    How long, would you say, were each of
those sessions?

A.    The one yesterday was roughly an hour.

The one before that was between an hour
and a half and two hours.

Q.    Did you review any documents in
preparation for this deposition?

A.    There was at least one document that was
shown, but I don't have that document, so....

Q.    Would that have been yesterday or during
the earlier prep session?

A.    The earlier prep session.

Q.    You didn't review any documents during
yesterday's prep session?

A.    Not that I recall, no.

Q.    Are you aware that there was a deposition
two days ago of Karen Evans, who is the FEMA Senior
Official Performing the Duties of Administrator, or
SOPDA?

A.    I am aware.

Q.    Did you review the rough transcript from
that deposition?

A.    I did not.

Page 21

Q.   Do you know anything about the deposition testimony that Karen Evans gave?

A.   Very little.

Q.   What do you know about the deposition testimony that she gave?

A.   I think the only thing that I know about it is perhaps that some of the questions were related to whether or not -- whether or not the Department directed the firing, I think, is about it.  I think that's about all I know.

Q.   The firing of who?

A.   The FEMA CORE employees.

Q.   Did you bring any documents with you today?

A.   I did not.

Q.   You currently work for the Department of Homeland Security.  Right?

A.   Yes, sir.

Q.   Your title is chief human capital officer?

A.   Yes.

Q.   Is that a career civil service position?

A.   It is.

Q.   You're not a political appointee?

A.   I am not.

Q.   Do you pronounce that as "CHCO"?

A.   It can be, yes.

Q.   It can be?

So if I say "CHCO," you'll understand that I'm referring to chief human capital officer?

A.   Absolutely.

MR. HOSHIJIMA:  I'm pulling up an exhibit which I'll introduce as Exhibit 35.

(Whereupon, Plaintiffs Exhibit 35 was marked for identification.)

MR. HOSHIJIMA:  I will represent that this is a profile that we downloaded from the DHS website.

Q.   Do you recognize this?

A.   It appears to be the accurate one, yes.

Q.   This is an accurate statement of your professional background?

MR. NEWMAN:  Object to form.

A.   Yes.

Q.   How long have you been DHS's CHCO?

A.   For the last two years.  Roughly three, going on.

Q.   Since about 2023?

A.   Correct.

Q.   The office that you oversee in that role

is called the Office of the Chief Human Capital
Officer?

A.    Yes, sir.

Q.    And do people tend to call that "OCHCO"?

A.    They do.

Q.    So if I say "OCHCO" today, you understand
what I'm talking about?

A.    I do.

Q.    And that's the DHS office?

A.    Yes, sir.

Q.    According to this biography on the
website, you've held some previous positions in
OCHCO.  Correct?

A.    Correct.

Q.    You were deputy CHCO at one point?

A.    Correct.

Q.    When was that?

A.    So immediately preceding, so up until
2023.

Q.    When did you become deputy CHCO at DHS?

A.    I actually don't remember my timeline.  It
all feels like one position at this point within
OCHCO.

Q.    Do you have an estimate of how many years
you were in the deputy role?

Page 24

A.   Roughly about five, I think.

Q.   Approximately 2018 to 2023?

A.   I believe so.

Q.   In total, because you held previous positions before that in DHS OCHCO, how long have you been in DHS OCHCO?

A.   So since 2012, I believe, is the year I started in OCHCO.

Q.   You've been with OCHCO, then, for close to 14 years?

A.   Correct.

Q.   Before you joined DHS OCHCO, you worked in the Office of Personnel Management?

A.   Correct.

Q.   How long were you there?

A.   I don't think I was there longer than two to three years, I believe.

Q.   Before that, you were in human resources at the Millennium Challenge Corporation?

A.   Correct.

Q.   That's an independent federal agency?

A.   Yes, sir.

Q.   So in total, how long have you been working in human resources?

A.   So I started at Millennium Challenge

Corporation. I was there for about five years. So four, six -- so roughly 16 -- between 16, 20 years.

Q. Is that ever since you finished your Bachelor's of Science and master's degrees at the University of Maryland?

A. No. I actually started working in human resources while I was finishing those.

Q. And since then, you've been involved in human resources in the federal government in some capacity?

A. Yes, sir.

Q. How would you describe your responsibilities as DHS CHCO?

A. And I'm sorry. In what way?

Q. Your job responsibilities in your current role, how would you describe those?

A. So my office is responsible for the overall coordination of human capital across the Department; ensuring that we're following laws, rules, regulations.

We do the coordination with the Office of Personnel Management. And we also run certain programs for the Department.

Q. What types of programs?

A. In the past, it has been joint hiring

events that we've coordinated across various components.

We had a surge hiring cadre, where we were able to support various components with their hiring initiatives.

So it could be, you know, any type of -- we do HRIT, so -- which is the human resources information technology.

And coordinate some of the vendor management across the departments.

So those are the types of things that we would coordinate.

Q.   I'll try to unpack some of those.

A.   Okay.

Q.   So you said that one of the programs that you're involved in is a joint hiring program?

A.   Yes, sir.

Q.   Is that when somebody is hired jointly between DHS and a DHS component?

A.   No.  So one of the ways that we're able to recruit is that we can create a hiring event for DHS positions.

So my office coordinates setting up that hiring event, and then components will all come together to hire.  And then they will then make the

offers for their specific organizations.

Q.   Somebody who comes in, though, through that program would work for a specific component?

A.   Correct.

Q.   So what's the joint part of it, I guess, is what I'm trying to understand.

A.   Got it.

Components can go out and do their own hiring event, where it's just that component that's at the hiring event.

It's the joint hiring event because we bring all of the components together in one place, and we advertise centrally so that every -- it's the DHS event, but then each component does their own individual hiring.

Q.   Is it fair to say that, typically, each component does its own hiring, unless there's some special joint hiring situation?

A.   That's correct.

Q.   You mentioned coordination with OPM?

A.   Yes, sir.

Q.   Are you also involved in coordination with OMB, the Office of Management and Budget?

A.   We do some coordination, but that normally happens outside of the human capital.

Page 28

Q.    Who, then, in DHS is primarily responsible for coordinating with OMB?

MR. NEWMAN:  Objection; foundation.

A.    For the most part, the chief financial officer handles the OMB coordination, at least from the perspective of my liaisons.

Q.    You mentioned vendor management?

A.    Yes, sir.

Q.    What kind of vendors are you talking about?

A.    For instance, we participate in shared services across the federal government for our payroll and processing.

So the National Finance Center services the Department of Homeland Security for payroll processing.  So we manage that relationship.

Q.    At the beginning of that answer about your job responsibilities, you talked about coordinating with components.  Right?

A.    Yes, sir.

Q.    Tell me a little bit more about how DHS OCHCO coordinates with DHS components.

A.    Sure.  For instance, at the start of this administration, we had executive orders.

Page 29

The Office of Personnel Management always issues guidance to departments. That guidance and those executive orders come to my office to coordinate.

From that point, we basically issue the implementing guidance that goes out to all of the components.

Q. Anything else you would say OCHCO does that kind of falls into that category of coordination with components?

A. Sure. If a component is seeking a new authority, for instance, they want to offer dual -- a dual comp waiver for their employees, or anything else that's approved at the Office of Personnel Management level, those would come through my office to then go to the Office of Personnel Management for approval.

Q. Anything else that comes to mind when we talk about DHS OCHCO coordination with components?

MR. NEWMAN: Object to form.

A. So I have overall responsibility for the human capital program.

Each of those human capital officers report directly to their leadership within their component.

But there is a dotted-line reporting relationship to me where I provide them some of the goals into their performance plans.

Q.  When you say a "dotted-line relationship," you're talking about a dotted-line relationship between DHS's OCHCO and a component OCHCO?

A.  Correct.

Q.  And anything else that comes to mind when we talk about coordination between DHS OCHCO and component offices?

A.  No, I think that's it.

Q.  Is DHS OCHCO involved in managing contractors who work for DHS?

A.  We are not.

Q.  Which part of DHS is involved in that?

MR. NEWMAN:  Objection; foundation.

A.  We have an officer, the chief procurement officer.

And so, in terms of vetting the contracts, that would be the office.

Q.  You mentioned part of your job as DHS CHCO is to work with OMB and OPM?

MR. NEWMAN:  Objection; misstates testimony.

A.    Certainly, with the Office of Personnel Management, to a lesser instance, that would be yes.

Q.    You're a member of the CHCO Council?

A.    I am.

Q.    CHCO Council is an interagency forum on personnel matters?

A.    It is.

Q.    And OPM is involved in the CHCO Council. Right?

A.    OPM manages the CHCO Council.

Q.    Is OMB involved in the CHCO Council?

A.    OMB serves as a co-chair of the CHCO Council.

Q.    Co-chair along with OPM?

A.    Correct.

Q.    So do you sometimes handle communications between DHS and OPM?

A.    Yes.

Q.    And do you yourself sometimes handle communications between DHS and OMB?

A.    I do, but rarely.

Q.    As part of your job as CHCO, you're the head of all of DHS OCHCO.  Right?

A.    Yes.

Q.    How many people are in DHS OCHCO?

A.   At my direct office?

Q.   Is there a direct office that's separate from DHS OCHCO, generally?

A.   I -- so just for clarity, I just want to make sure that I'm answering the question truthfully.

So you started it with kind of, do I manage the broader human capital enterprise across the Department, and then you asked about the DHS OCHCO directly.

So I just wanted to make sure that it's my direct office of people who report directly up to me.

Q.   How many people are in the direct office that report up to you?

A.   So our FTE count is roughly about 300 and -- 312 is the current FTE count.

But that's our authorized level.  We probably have about 200 or so on board at this time.

Q.   All these people are considered part of DHS OCHCO.  Right?

A.   Yes, sir.

Q.   And you're not counting the people who are in the component OCHCO?

A.   That's correct.

Q.   Who are the people, then, that direct -- that directly report to you?

A.   You want to know my -- literally, my first-line, direct reports?

Q.   Right.

A.   Okay.  I only have two first-line, direct reports.

So I have two deputies.  One is Dr. Mischell -- and it's M-i-s-c-h-e-l-l -- Navarro.

And then, Jason Nelson.

Q.   Jason Nelson?

A.   Yes, sir.

Q.   The two deputies, do they each have different portfolios encompassing different components of DHS?

A.   They -- well, they have different portfolios that encompass different functional responsibilities.

Q.   Is one of them assigned to FEMA, or would they both handle FEMA-related matters?

MR. NEWMAN:  Object to form.

A.   They would both handle FEMA matters.

Q.   We talked a bit about each of the DHS components having its own personnel office.  Right?

A.   Yes, sir.

Page 34

Q.   FEMA has its own OCHCO?

A.   Yes.

Q.   Is it called "OCHCO" in all of the components, by the way?

A.   It is not.

Q.   It's not.

But for FEMA, it's FEMA OCHCO?

A.   I am actually not sure.

Q.   Okay.  I'll try to distinguish between DHS OCHCO and FEMA OCHCO.

A.   Okay.

Q.   If I'm ever not clear about that distinction, you should let me know.

Does that make sense?

A.   It does.

Q.   How many people in DHS OCHCO handle matters related to FEMA personnel?

A.   I actually don't know.  It just depends on what the matter is.

So any number of my team members might handle a FEMA request.

Q.   You don't have specific people who are assigned to work on just FEMA matters?

A.   No.

Q.   So of the -- you said an FTE count about

312.

Do you have a sense of how many of those people might work on issues related to FEMA personnel?

MR. NEWMAN:  Objection; misstates testimony.

A.    I do not.  So the 312 is our FTE count. It's not our onboard.  So it would be, you know, more so in the 200 or so range of onboard.

At least half of those work on matters that are specifically headquarters related.

So there might be roughly around 100 of those employees who may have an opportunity to touch a FEMA matter.

Q.    What percentage of your own time in 2025 would you estimate was focused on issues related to FEMA personnel?

A.    That's really hard to try to -- I -- like, it's very difficult to quantify that one.  I am -- I am not sure.

Q.    Can you give me a ballpark percentage?

A.    So if we're talking the whole year, less than a day or two days' worth of my direct time.

Q.    Were there particular times in 2025, then, when you were more focused on FEMA than you were on

other components?

A. No.

Q. So your testimony is that over the course of 2025, you might have spent one working day out of 200-some on -- focused on FEMA matters?

MR. NEWMAN: Objection; misstates testimony.

A. That's correct.

Q. How much of your time so far in 2026 would you say you've spent focused on matters related to FEMA?

A. Directly, probably maybe half a day.

Q. So as a percentage-wise basis, a little bit more than 2025?

A. So 2025 was one to two days.

And so, I think we're probably on par.

Q. How would that compare to, again, the rough percentage of time you spent focused on FEMA matters in 2024?

A. In 2024? Honestly, I have no idea for 2024.

Q. Would you say you spent more time focused on FEMA matters under this administration than you did under prior administrations?

A. I don't think I can make that statement,

no.

Q.   You're saying it's about the same, or are you saying you don't know?

MR. NEWMAN:   Object to form.

A.   I would say it's about the same.

Q.   Overall, how would you say your job as DHS CHCO compares to what the job was like in 2024?

MR. NEWMAN:   Object to form.

A.   Would you repeat the question, please?

Q.   Overall, how would you say your job as DHS CHCO compares to what that job was like in 2024?

MR. NEWMAN:   Object to form.

A.   I'm honestly not sure how to respond to that.

So I handle the same portfolio.

I think that each administration has different Presidents' management agenda priorities, and that's roughly the change that I would say would be the difference in kind of my job.

Q.   You've been at DHS CHCO for multiple administrations?

A.   Yes.

Q.   So you've seen that change in priorities a few times?

A.   Not as the CHCO.  In my role as deputy

CHCO to CHCO, yes.

Q.   Would you say DHS OCHCO'S relationship to FEMA has changed at all in this administration?

MR. NEWMAN:  Object to form.

A.   Not from the CHCO role.

Q.   As in your personal role?

A.   Correct.

Q.   Would you say the Office of the Chief Human Capital Officers' role, as related to FEMA, has changed in this administration?

MR. NEWMAN:  Object to form.

A.   No, I don't think so.

Q.   You described the Presidents' management agenda and priorities?

A.   Yes, sir.

Q.   How would you describe those priorities under this administration?

A.   Understanding that I don't have them in front of me, they are very much focused on streamlining the workforce and ensuring that we are optimized across the organization.

Q.   Streamlining and optimizing, does that entail workforce reduction?

MR. NEWMAN:  Object to form.

A.   We have seen some workforce reductions.

Page 39

Q.    As part of the presidential priority?

A.    So it's not a part of the President's management agenda.

But I have seen them implemented.

Q.    Workforce reduction as a result of implementing the President's management agenda?

MR. NEWMAN:  Object to form.

A.    So I'm not directly involved in creating the President's management agenda or kind of the implementation -- or the -- what strategies typically are at the political level.

All I know is that from the OCHCO implementation side of it, we have done some workforce reductions, which do then help us optimize the workforce.

Q.    You testified that one of your roles as FEMA CHCO is coordinating with components on implementing executive orders and presidential priorities.  Right?

MR. NEWMAN:  Objection; misstates testimony.

A.    Yeah.  So when you -- to start off, so you said the FEMA CHCO.  So I'm the DHS CHCO.

Q.    Apologies.  So let me restate.

You testified earlier that as DHS CHCO,

one of your responsibilities is coordinating with

DHS components on implementation of executive orders

and presidential priorities.  Right?

MR. NEWMAN:  Objection;

misstates testimony.

A.    I don't think that I said it exactly like

that, but that is one of the roles.

It's ensuring that the components

understand the executive orders and are

implementing, yes.

Q.    And as part of helping components

understand and implement the President's executive

orders, have there been workforce reductions?

MR. NEWMAN:  Object to form.

A.    I think it's -- I'm not sure that the way

that the question was stated is correct.

So we certainly have made sure they've

understood them.

And when we've gotten direction to

implement workforce reductions, we have then made

sure the components know how to do that

appropriately.

Q.    Has the implementation of the President's

executive orders led to workforce reductions at DHS?

A.    So I don't know that I can do the cause

Page 41

and effect.  I can tell you that we have implemented workforce reductions.

Q.  You can't do the cause and effect?

A.  No.

Q.  You're saying that the workforce reductions at DHS this year, or over the last year, are not a result of implementing the President's executive orders?

MR. NEWMAN:  Objection; misstates testimony.  Object to form.

A.  That is what I'm saying, is that I cannot make that causal relationship.

Q.  Is that because you don't see your own role as drawing the causal link between those two things?

MR. NEWMAN:  Object to form.

A.  That is not what I'm saying.

Q.  You are the head human capital officer at DHS.  Right?

A.  Yes.

Q.  And you're saying you can't tell me what the link is between DHS workforce reductions and the President's agenda that you're responsible for helping to implement?

MR. NEWMAN:  Objection;

misstates testimony.  Object to form.

A.    What I am saying is that it's -- I implement.

The reasons for some of the programs that I'm asked to implement, I do not know the underlying reasons for why all of them are put together into a package of implementation or priorities.

Q.    I'm not asking for the reasons for the executive orders.

I'm saying, as a result of the executive orders, there are workforce reductions.  Correct?

MR. NEWMAN:  Object to form.

A.    To my knowledge, there is one executive order that has directly related to workforce reduction, which is the one on DEI.

And so, if you're asking me about that one, then the answer is yes.

Broadly, in terms of, is that the purpose of all of the implementation -- executive orders, then, no, I cannot give you the causal relationship.

MR. HOSHIJIMA:  Introducing Exhibit 36.

(Whereupon, Plaintiffs Exhibit 36 was marked for identification.)

Q.    This is Executive Order 14210 of

Page 43

February 11, 2025.

Do you recognize this executive order?

A.   I do.

Q.   And Section 1 talks about "a critical transformation of the Federal bureaucracy"?

MR. NEWMAN:   Object to form.

A.   I see that.

Q.   Section 3(c), on the second page, says that:

Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force...?

MR. NEWMAN:   Object to form.

A.   I see that.

Q.   You are responsible for implementing this executive order in DHS.   Right?

A.   I am.

Q.   What have you done in your role as DHS CHCO to achieve this critical transformation of the federal bureaucracy?

MR. NEWMAN:   Object to form.

A.   Within the Department, we have run a very, very limited reduction in force that was not DHS-wide.

Page 44

We did create a workforce transition program in alignment with the OPM. And we implemented the OPM -- the Fork program.

Those programs were to voluntarily allow employees to determine whether or not they wanted to continue working in the federal government.

Q. The programs that you used to implement this executive order led to a reduction in DHS's workforce. Right?

A. They did.

Q. The purpose of those programs was to reduce the size of the DHS workforce.

MR. NEWMAN: Objection --

Q. Right?

MR. NEWMAN: -- foundation.

A. That is not correct.

Q. The purpose of the Fork program wasn't to reduce the size of the DHS workforce?

MR. NEWMAN: Objection; foundation.

A. Correct.

Q. The purpose of giving people the option to take the force [sic] wasn't to reduce the total number of people working for DHS?

MR. NEWMAN: Objection;

foundation.  Objection; asked and answered.

A.   There are multiple reasons why you would run those types of programs, whether it's a workforce reshaping or whether it's a full reduction of the workforce.

And so, the programs could be run to do either of those.

Q.   And the programs that you ran to implement this executive order had, as one of its purposes, to reduce the number of people working for DHS.  Right?

MR. NEWMAN:  Object to form.

(Pause.)

A.   The answer is no, the way the question is currently asked.

Q.   Why is that?

A.   Even if you looked at the follow-on guidance from -- whether it's OMB or the Office of Personnel Management, the -- it's been very clear with the administration that we are not nor- -- it's not that we are trying to fully reduce.

We want to make sure that the individuals are aligned in their appropriate positions and that individuals are, basically, serving in federal service for the reason for serving in federal

service.

So, it's fully both.  And so....

Q.   Both those purposes you were talking about and the purpose of reducing the total head count at the agency?

MR. NEWMAN:  Object to form.

A.   No.  It's to make sure that you're able to take the head count that you have and align the head count to the programs most effectively across the organization.

Q.   And aligning the head count to the purposes of the agency has resulted in fewer people working for the agency.  Right?

A.   At this point in time, we do not have fewer people working for the Department than we did.

We actually have more people working for the Department than we did before.

Q.   Is that true at every component in DHS?

MR. NEWMAN:  Objection; foundation.

A.   I don't have the stats in front of me to share that.

Q.   FEMA has fewer people working for it now than it did at the start of the -- this administration.  Right?

MR. NEWMAN:  Objection; foundation.

A.    I don't have the stats in front of me to....

Q.    As DHS CHCO, who do you report to?

A.    The under secretary for management.

Q.    That's currently Benjamine Huffman?

A.    It is.

Q.    You also report to the deputy under secretary?

A.    Technically, my alignment is to -- in the statute is to the under secretary for management.

Q.    That's because DHS OCHCO is part of the DHS management directorate?

A.    That's correct.

MR. HOSHIJIMA:  I'm handing you what was previously introduced and marked as Exhibit 2.

(Whereupon, Plaintiffs Exhibit 2, previously marked, was introduced to the witness.)

Q.    This is an org chart of DHS that we pulled from the agency's website.

Do you recognize it?

A.    I don't.

Q.    Does this reflect the organization of DHS,

Page 48

as you understand it?

(Witness reading.)

A.   As of what time period was this pulled down?

Q.   Is there anything in here that's inaccurate as of the current time frame?

A.   There are ones that I am not sure if they are -- if they continue to be accurate.

For instance, the Countering Weapons of Mass Destruction may no longer be funded.

Q.   But you're saying that as the DHS chief human capital officer, you're not familiar with the version of the org chart that's on the DHS website?

MR. NEWMAN:  Objection.  Object to form.

A.   I don't manage the DHS website.

Q.   You see, on the left-hand column, if you go down halfway down the page, is the Management Directorate?

A.   I see that.

Q.   And I don't see OCHCO listed or shown in this org chart.  Right?

A.   Correct.

Q.   But if it were, would it be under the Management Directorate?

Page 49

A.   It would be.

Q.   Would it just be next to the Chief Financial Officer and Chief Information Officer, as shown in this chart?

                    MR. NEWMAN:  Object to form.

A.   Would likely be below those, in the same kind of going down.

Q.   But then reporting up to the Management Directorate?

A.   Yes.

Q.   Would there also be a line from the Office of the Chief Human Capital Officer up to the secretary's office?

                    MR. NEWMAN:  Object to form.

A.   There would not.

Q.   There's a line directly from the Chief Financial Officer and the Chief Information Officer up to the secretary's office.  Right?

                    MR. NEWMAN:  Object to form.

A.   There appears to be, yes.

Q.   But you're saying that if your office were on this chart, it would not have a direct line up to the secretary's office?

A.   It would not.

Q.   So if you have to elevate a personnel

question up the chain of command, you would raise that up to the under secretary of management?

A.    I would.

Q.    What are the types of personnel-related decisions that you might raise up to the under secretary of management?

MR. NEWMAN:  Object to form.

A.    I just want to make sure I clarify.

The "raise up," is it ones that require higher level approval anyway, or are you asking if it's....

Q.    What are the types of personnel issues that you would have to seek approval from a level above you, which is the Management directive -- or Directorate?

A.    Okay.  If we were creating a new directive for the Department, that would typically be approved at the Management Directorate level.

If we are doing kind of a Senior Executive Service review at the end of the year for the Performance Review Board, those are run above me.

If there is a request for the use of an authority by the Office of Personnel Management, depending on the authority, sometimes those will have to go above me for approval.

Q.   Do you recall any examples of when a FEMA-related personnel issue had to be brought up to the under secretary for management for approval?

A.   I don't recall, at this time, anything that -- that would be out of the normal routine course of business.

Q.   In the routine course of business, do you recall any FEMA-related personnel issues that you had to raise up for approval to the under secretary of management?

A.   Not definitively, no.

Q.   Are there any personnel-related decisions that you would raise for approval to the Management Directorate that would have to then go up even higher, to the Office of the Secretary?

            MR. NEWMAN:  Objection; foundation.

A.   Yes.

Q.   Can you think of any examples of those types of issues that would have to go up to the Office of the Secretary for approval?

A.   There are a number of routine approvals that would have to go up.

       So if FEMA wanted to appoint a new SES member, that would have to go up to the Office of

Page 52

the Secretary.

If they wanted to submit, you know, someone for a Presidential Rank Award, that would go to the Office of the Secretary.  But....

Q.   Any other examples of FEMA-related personnel issues that you would have to raise up eventually to the Office of the Secretary level?

MR. NEWMAN:  Object to form.

A.   If FEMA wanted to change their -- say they wanted to change their pay scale for their staff. Those would have to go up to the Office of the Secretary for approval; something like that.

Q.   In those situations where you have a personnel issue that needs to be decided at the Office of the Secretary level, would you communicate directly with the Office of the Secretary, or would you go through the under secretary of management?

MR. NEWMAN:  Object to form.

A.   I would go through the Office of -- I'm sorry, the Management Directorate.

Q.   Are there any situations in which you would raise a personnel issue directly to somebody in the Office of the Secretary?

MR. NEWMAN:  Object to form.

A.   If there's a process that we've

Page 53

established, that they have agreed that I have a direct communication channel, then, yes, I would do it, in that instance.

Q.   Are there any processes you've established where you've agreed that you have a direct line to the Office of the Secretary?

A.   When we implemented our hiring verification requests, we would send those directly to the Office of the Secretary.

Q.   No matter what component it came from in FEMA -- or in DHS?

            MR. NEWMAN:   Object to form.

A.   No matter what component.

Q.   So if any component in DHS sends a hiring verification request to DHS OCHCO, you are then able to raise that directly to the Office of the Secretary?

A.   Correct.

Q.   You don't have to go through the under secretary of management?

A.   Correct.

Q.   Are there any other personnel-related processes where you are raising issues directly to the Office of the Secretary, without going through the under secretary for management?

Page 54

A.   Not that I can think of at this time.

Q.   Looking back at this organizational chart in Exhibit 2, you mentioned earlier that issues related to contractors that work for DHS are handled by OCPO?

A.   That's correct.

Q.   Remind me what OCPO is?

A.   Sorry.  Office of the Chief Procurement Officer.

Q.   Where in this organizational chart would that office be?

A.   Similar to where you pointed out that the Office of the Chief Human Capital Officer is missing, it would be below the Management Directorate, in the same alignment that I would follow there.

Q.   The chief procurement officer would report to --

A.   The Management Directorate --

Q.   The Management --

A.   -- so the under secretary.

Q.   -- Directorate.

            COURT REPORTER:  I'm sorry.  One at a time.

            MR. HOSHIJIMA:  I'm sorry.

Page 55

Q. Are you familiar with a system called "STORM"?

A. Yes.

Q. What is STORM?

A. It's our internal document tracking system.

Q. When you say "our internal document tracking system," who are -- who do you refer to as "our"?

A. I am actually still trying to figure STORM out.

I -- it is certainly used in the headquarters.

Q. When you say "headquarters," what are you referring to?

(Pause.)

A. I'm sorry. I'm trying to figure out the best way to describe it.

There are headquarters offices and organizations that are not a part of the main operational components, all of those are aggregated into what we consider to be headquarters.

Q. Does DHS headquarters include the Office of the Secretary?

A. It does.

Q.   When you say "headquarters," are you referring to any offices that are not in the Office of the Secretary?

A.   I am.

Q.   What other offices?

A.   For the purposes of at least my office, we consider headquarters to include the Science and Technology Directorate; Office of Intelligence and Analysis; Office of Strategy, Policy and Plans; Office of the General Counsel, Office for State and Local Law Enforcement, Office of Homeland Security Situational Awareness, Office of Partnership and Engagement, Countering Weapons of Mass Destruction.

So, essentially, it would probably be -- it should have been -- it would have been easier for me just to tell you which ones are not.  Sorry.

Q.   Which of the offices listed in this organizational chart in Exhibit 2 would you not consider part of HQ?

A.   Got it.

Office of Inspector General.

And then if you go all the way down to the bottom, the last two rows.  So Customs and -- one, two, three, four, five, six, seven -- yeah.

Q.   The last two rows, including the row that

has ICE, CBT [sic], USCIS, and FEMA?

A.   Correct.

Q.   So FEMA is not considered part of HQ?

A.   Correct.

Q.   Is the Management Directorate part of HQ --

A.   It is.

Q.   -- when you use that term?

So when you say HQ uses STORM, you're saying many of these offices, including the Office of the Secretary, uses STORM?

MR. NEWMAN:  Object to form.

A.   I am actually not sure.  I think that there's another system.

But I do believe that we transmit them to the Office of the Secretary using STORM.

Q.   Does the Management Directorate use STORM?

A.   Yes.

Q.   Does the Management Directorate use STORM for anything related to personnel?

A.   Yes.

Q.   In those situations, then, would DHS OCHCO be providing documents that then go into STORM?

A.   Yes.

Q.   Who puts those documents into STORM?

Page 58

MR. NEWMAN:  Object to form.

Objection; foundation.

A.    I have an executive secretariat team that would be the ones who would review the documents that are in STORM.

But it could be put in by any number of the staff.

Q.    What are the types of DHS OCHCO personnel issues that would go into the STORM system?

A.    If there's a -- if there's anything that -- for the most part, if it requires a signature by the secretary or the under secretary for management, or if it is going outside of the Department and it needs higher level approval and review, those documents would go into STORM.

Q.    STORM is essentially a tracking system for making sure those kinds of decisions get the correct approvals?

MR. NEWMAN:  Object to form.

A.    That's my understanding, yes.

Q.    You said you're still figuring out STORM.

Is STORM relatively new?

A.    It's not that it's new.  It's -- actually, it is relatively new, but it replaced a former system similar to it.

Q.    When did DHS start using STORM?

A.    I don't recall, but it's -- I think it's been within the last two years.

Q.    Do you know if it was within the last year?

A.    I do not recall.

Q.    Does STORM involve hard copy paper records?

A.    It's an electronic system.

Q.    All of the approval packages that go in there, then, would be electronic?

A.    Correct.

Q.    Which part of DHS is responsible for managing the STORM system?

                    MR. NEWMAN:  Objection; foundation.

A.    I don't know.

Q.    So DHS OCHCO, then, would put requests into STORM if, for example, you have something that needs sign-off by S1?

                    MR. NEWMAN:  Object to form.

A.    Correct.

Q.    "S1" refers to the secretary?

A.    Yes, it does.

Q.    Can you think of a recent example of a

decision package that DHS OCHCO put into the STORM system for approval by S1?

A.   I think I mentioned before the Presidential Rank Awards.

So the secretary has to sign off on Presidential Rank Award nominees.  That package went into STORM.

Q.   That's the kind of decision that would go up to the Office of the Secretary through the Management Directorate.  Right?

A.   That's correct.

Q.   So would you put that kind of decision in STORM to be routed through the Management Directorate and then up to the Office of the Secretary?

MR. NEWMAN:  Object to form.

A.   That's correct.

Q.   Is there -- is there a, you know, tracking cover sheet that shows who the various people are along that chain of decision-making?

A.   There would be an electronic record of who had decision points.

Q.   And that electronic record would show each person along the chain of command that has to sign off on a decision?

Page 61

A.   Correct.

Q.   Have you ever communicated with former Secretary Kristi Noem?

A.   Communicated how?

Q.   Have you ever talked directly to former Secretary Kristi Noem?

A.   Once.

Q.   Do you recall when that was?

A.   On her first day.

Q.   What were you meeting with her about?

A.   A personal personnel.

Q.   "Personal personnel"?

A.   A personal personnel action for her specifically.

Q.   What do you mean by "personal personnel action" for Kristi Noem?

A.   She was onboarding.

Q.   You met with her on her first day to handle her onboarding to the Department?

A.   Correct.

Q.   As part of a routine onboarding process for high-level officials?

A.   Correct.

Q.   Have you ever been in meetings with Kristi Noem?

A.    I have not.

Q.    Since that first day, then, have you had any form of communication with Kristi Noem?

A.    Directly, no.

Q.    Have you had indirect communication with Kristi Noem?

A.    Just through the packages and submissions to the front office.  That's it.

Q.    So since Kristi Noem's first day, which would have been back in January 2025, you haven't had any direct contact with her?

A.    Correct.

Q.    Have you ever communicated with her about anything related to FEMA staffing?

A.    No.

Q.    Are you aware of the public comments that Kristi Noem has made that FEMA should be eliminated as it exists today?

A.    I am aware that there were public comments about it.  I don't ever recall personally reading her comments about that.

Q.    You recall, though, hearing about comments that she's made in public about eliminating FEMA?

A.    I guess I should say I've -- I recall that there were public comments made by political

leadership.

I actually -- I don't recall whether or not it was her or not.

Q. Do you recall any other statements that Secretary Noem has made about FEMA?

A. No.

Q. Any statements that Kristi Noem would make about FEMA would be considered the secretary's priorities for the Department, though. Right?

MR. NEWMAN: Object to form.

A. I think that there's a difference between public discourse and what's actually provided internally as the priorities that we then execute on.

So I've never gotten that from her as a priority.

Q. Your job is to implement the secretary's priorities?

A. As well as the administration, yes.

Q. Have you ever communicated with Troup Hemenway?

A. Yes.

Q. Who is Troup Hemenway?

A. Troup Hemenway was the principal -- principal deputy chief of staff.

Q. Principal deputy chief of staff to Kristi Noem. Right?

A. Yes.

Q. So on this organizational chart in Exhibit 2, would he be in that top box in the secretary's office?

A. So, organizationally, I am not sure between that office or the Chief of Staff office.

Q. The Chief of Staff office, which is the box to the right of the big box for the secretary?

A. Correct.

Q. You say he was principal deputy chief of staff. That's because he left recently?

A. Correct.

Q. Do you recall when he left?

A. I don't recall the exact day. I -- yeah.

Q. Do you know who he reports to?

MR. NEWMAN: Object to form.

A. Reports to now or then?

Q. Do you know who he reported to when he was principal deputy chief of staff?

A. I don't recall the reporting relationship. I don't know whether he reported directly to the secretary or not.

Q. You said you've communicated with Troup

Hemenway?

A.   Yes.

Q.   How often would you say you communicated with Troup Hemenway when he was at DHS?

A.   Typically, at least once or twice a week.

Q.   What types of matters would you communicate with Troup Hemenway about?

A.   It could have been anything in the human capital space, whether it was staffing, awards, policies, pay.  It could have been anything.

Q.   Do you remember communicating with Troup Hemenway about issues related to FEMA staff?

A.   The main, I think, issue -- or time that I would have communicated with him is when I mentioned our -- when we would receive personnel requests from the components, and I would send them to the front office.

He was on that front office group that I would send to.

Q.   Is that part of the hiring verification process we've talked about, with a separate process that bypasses the under secretary for management?

MR. NEWMAN:  Object to form.

A.   That is correct.

And I should also just clarify that the

under secretary for management's office was still included in that group, on the group email that I would send to.

Q.   But you would reach out directly to the Office of the Secretary, copying somebody from the Management Directorate?

A.   Correct.

Q.   So that's when you would communicate with Troup Hemenway?

A.   Correct.

Q.   What are the forms of communication you used to communicate with Troup Hemenway?

A.   Hmm.  Certainly, phone.  Certainly, Teams and email.

Q.   When you say "Teams," are you talking about text-based messaging via Teams, or are you talking about videoconferences?

MR. NEWMAN:  Object to form.

A.   It could have been both.

Q.   Other than phone, Teams, and email, do you recall other forms of communication you used with Troup Hemenway?

A.   Just occasionally in person, but that's it.

Q.   Did you ever use your personal phone to

communicate with Troup Hemenway?

A.   Never.

Q.   Do you know who Joe Guy is?

A.   I do.

Q.   He's deputy chief of staff?

MR. NEWMAN:   Object to form.

Q.   Or was deputy chief of staff?

A.   Was, correct.

Q.   He left recently as well.

A.   Correct.

Q.   He's no longer with DHS?

A.   That's correct.

Q.   When he was at DHS, who did he report to?

MR. NEWMAN:   Objection;
foundation.

A.   I do not know.

Q.   Do you know if he reported to Troup
Hemenway?

A.   I actually do not know how -- how that
reporting worked.

Q.   How often would you communicate with Joe
Guy?

A.   I didn't really communicate with him
routinely, so -- yeah.

So there wasn't, like, a regular cadence

Page 68

with him.

Q.   You said that you communicated with Troup Hemenway once or twice a week, but you communicated less frequently than that with Joe Guy?

A.   That's correct.

Q.   Is that because human capital issues were within Troup's portfolio but not Joe Guy's?

MR. NEWMAN:  Object to form.

A.   I knew that the Management Directorate was under Troup Hemenway's portfolio, so that might be the reason.

Q.   And the Management Directorate was not under Joe Guy's portfolio?

MR. NEWMAN:  Objection; foundation.

A.   Correct.

Q.   When you did communicate with Joe Guy, do you recall what forms of communication you would use?

A.   The same as for Troup Hemenway.  So it would be in person infrequently, Teams, phone.

Q.   Or email?

A.   Or email.

Q.   And when you say "phone," you mean your work phone?

A.    Yes.

Q.    Does your work phone have the Signal application on it?

A.    Not that I'm aware.  I haven't downloaded it or used it.

Q.    You haven't used Signal on your work phone?

A.    No.

Q.    You said you infrequently communicated with Joe Guy.

Do you recall what topics you would talk to Joe Guy about?

A.    Normally, it was a question or a -- about verification approval in his area of responsibility.

Q.    When you say "verification approval," are you referring to the same hiring verification process that you would communicate with Troup Hemenway about?

A.    Yes.

Q.    But you said Joe Guy has an area of responsibility as it relates to this hiring verification process.  Right?

MR. NEWMAN:  Object to form.

A.    That's my understanding.

Q.    What is Joe Guy's area of responsibility

Page 70

as it relates to that hiring verification process?

A.   So my understanding is that the deputy chiefs of staff had components within their areas of responsibility that sometimes they would weigh in on whether or not -- on what was happening within that component.

Q.   Which deputy chief of staff had FEMA within their area of responsibility?

MR. NEWMAN:   Objection; foundation.

A.   My understanding is that it was Joe Guy.

Q.   If there is a hiring verification process-related issue that had to do with FEMA, then you would communicate with Joe Guy?

A.   So I would communicate with the entire group.  And then I would receive responses back.

Q.   When you say "the entire group," who are you referring to?

A.   The hiring verification process, when my office would send the emails forward, they would go to Joseph Guy, Stephen Munoz, Troup Hemenway, and Greyson McGill.

Q.   You just listed four people.  Right?

A.   Yes, sir.

Q.   Guy, Hemenway, Stephen Munoz, and Greyson

McGill?

A.   Yes.

Q.   Greyson McGill was the chief of staff of the Management Directorate?

A.   That's correct.

Q.   Who is Stephen Munoz?

A.   He was also in the secretary's office as a -- I believe -- I'm not sure his official title.

Q.   Do you know if he was in the Chief of Staff office?

A.   I'm not sure, again, to whom he reported.

Q.   So Stephen Munoz was also part of the hiring verification process?

A.   That's correct.

Q.   Do you know if he was responsible for anything related to FEMA and hiring verification?

A.   I'm not sure.

Q.   Have you ever communicated with Corey Lewandowski?

A.   Yes.

Q.   How many times?

A.   I'm not a hundred percent sure, but I would tell you it's less than ten.

Q.   You've communicated with Corey Lewandowski less than ten times?

A.   Correct.

Q.   When was the most recent time you communicated with Corey Lewandowski?

A.   I don't recall.

Q.   Was it in 2026, or would it have been back in 2025?

A.   I don't recall.  It has not been in the last two months.

Q.   The most recent time you communicated with Corey Lewandowski, what was that communication about?

A.   It was about a specific employee personnel issue.

Q.   Did that specific personnel issue have to do with FEMA?

A.   It did not.

Q.   Have you ever communicated with Corey Lewandowski about anything related to FEMA?

A.   No.

Q.   When you communicated with Corey Lewandowski, which you said was less than ten times, what forms of communication did you use?

A.   They were either phone or email only.

Q.   Did you call his personal phone or work phone?

Page 73

A.    I'm not sure which number it was.

Q.    But you have a phone number for Corey Lewandowski?

A.    In my work phone, yes.

Q.    Do you recall who gave you that phone number?

A.    He called me.  I missed his phone call. And so, that's why it is in my phone now.

Q.    What did he call you about?

A.    So the most recent time was the person -- the personnel issue.

Q.    Was Corey Lewandowski an employee or a contractor of DHS?

             MR. NEWMAN:  Objection; foundation.

A.    Employee.

Q.    Do you know what type of employee?

A.    My understanding is he's a special -- he was a special government employee.

Q.    Special government employees are limited in the number of days of the year they're allowed to work?

             MR. NEWMAN:  Objection; calls for a legal conclusion.

A.    That's my understanding, under the

Page 74

authority.

Q.   Would FEMA -- or not FEMA.

Would DHS OCHCO have been involved in anything related to DHS's hiring of a special government employee?

A.   Yes.

Q.   Were you involved in approving the hiring of Corey Lewandowski as a special government employee?

A.   My office.

Q.   How would your office have been involved in that?

A.   To hire a special government employee, there are -- "special government employee" is an ethics designation.  It's not a hiring -- hiring authority.

So my office would have been involved in ensuring that we had an appropriate hiring authority and then issuing the onboarding documents for the employee.

Q.   Did you interact with Corey Lewandowski during that process?

A.   Once.

Q.   What do you recall about that time?

A.   I just recall meeting him.

Page 75

Q.   Meeting him for what?

A.   "Meeting."

Q.   "Meeting him"?

A.   Yeah.

Q.   In person?

A.   Yes.

Q.   But you've never communicated with Corey Lewandowski about anything related to FEMA?

A.   No.

Q.   Have you ever communicated with Kara Voorhies?

A.   Yes.

Q.   Who is Kara Voorhies?

A.   I don't know her title.

Q.   If Karen Evans had testified that Kara Voorhies was a senior advisor to the DHS secretary for FEMA issues, does that sound correct to you?

          MR. NEWMAN:   Object to form.

A.   I'm just not sure what her title is.

Q.   Do you know if Kara Voorhies worked for DHS or for FEMA?

          MR. NEWMAN:   Object to form.

A.   Not sure.

Q.   Do you know if Kara Voorhies was a federal employee?

Page 76

A.   I'm not sure.

Q.   Do you know if she was a contractor?

A.   I'm not sure.

Q.   Do you know when she first joined the federal government?

A.   I don't know.

Q.   Do you know what her responsibilities were?

A.   I don't know.

Q.   How often did you communicate with Kara Voorhies?

A.   There was no regular cadence for those communications.  It was infrequent.

Q.   "Infrequent," as in less than ten times, like Corey Lewandowski, or more frequently than that?

MR. NEWMAN:  Object to form.

A.   It was certainly fewer times than -- I'm sorry.

It was more times than my communications with Corey Lewandowski, but it's still negligible.

Q.   You're saying -- your testimony is that you only had negligible communications with Kara Voorhies?

MR. NEWMAN:  Object to form.

A.   That's correct.

So we are on a number of emails together, just because they're blast emails, and I know that she's listed on those.

But in terms of a direct communication, we've had very minimal direct communications.

Q.   How many times would you had -- would you have had direct communication with Kara Voorhies?

A.   It's really hard for me to put a number on it.  I don't know.

Q.   You have communicated directly with Kara Voorhies, though?

A.   Yes, I have.

Q.   More than once?

A.   Yes.

Q.   More than five times?

(Pause.)

A.   I don't know the answer to that.

Q.   Every communication you had with Kara Voorhies was about FEMA?

MR. NEWMAN:  Object to form.

A.   I don't -- I don't know.

Q.   Did you communicate with Kara Voorhies about FEMA?

A.   Yes.

Q.   Do you recall communicating with Kara Voorhies about anything other than FEMA?

A.   Not that I recall.

Q.   You mentioned you communicated with Kara Voorhies as part of email chains.  Right?

A.   Correct.

Q.   Any other forms of communication you used to communicate with Kara Voorhies?

(Pause.)

A.   I don't recall.

Q.   Do you recall if you ever spoke to her on the phone?

A.   So actual phone call, as opposed to Teams?

Q.   Either.

A.   I am not sure.  I would -- it would be Teams, as opposed to a direct phone call, if we did.

Q.   But you've spoken to Kara Voorhies either through phone or Teams?

A.   Yes.

Q.   Have you ever met her in person?

A.   I don't believe so.

Q.   So when you say you've directly communicated with her, what was the communication method you used for that direct communication?

A.   When I referenced it, I was referencing

email.

Q.   So you've directly emailed her?

A.   Yes.

Q.   And you've been in phone or Teams meetings with her?

(Pause.)

A.   I cannot say for a hundred percent certainty.

Q.   Have you ever communicated with Kara Voorhies by Signal?

A.   No.

Q.   Have you seen her contract with DHS?

MR. NEWMAN:  Objection; foundation.

A.   No.

Q.   Do you know how much she was paid under her contract?

MR. NEWMAN:  Objection; foundation.

A.   No.

Q.   Do you know who at DHS would know that?

MR. NEWMAN:  Objection; foundation.

A.   She would normally -- if she was a contractor, she would have a contracting officer's

Page 80

representative who managed her contract.

So someone in the procurement line of business should know.

Q.   Was your office involved in onboarding Kara Voorhies?

A.   I don't recall.

Q.   If your office were involved in onboarding Kara Voorhies, would you know?

A.   I likely would not know.

Q.   If she were a DHS employee, would you have known?

MR. NEWMAN:  Object to form.

A.   We have 260,000 employees.  So I may or may not know who's at DHS.

Q.   But your office is responsible for keeping employment records for DHS.  Right?

A.   That's only partially correct.

Q.   If Kara Voorhies were a DHS employee, would your office have had a record of that?

A.   Yes.

Q.   But you don't know whether your office has that record?

A.   Correct.

Q.   Have you asked?

A.   I have not.

Q.   Are there any other people in the Office of the Secretary that you would communicate with?

(Pause.)

A.   So the reason that I'm having a hard time answering that is that, oftentimes, I don't know who's listed in the Office of the Secretary.

I -- as far as I know, those are the main people that I would talk to about, like, work-related issues, are the ones who I've already named.

Q.   Going back to Kara Voorhies, then, you don't know if she was in the DHS Office of the Secretary?

A.   Correct; I do not know.

Q.   So when you saw her name on email chains where you were discussing personnel matters, did you ask who she was?

A.   My recollection of my first interactions with Ms. Voorhies was an introduction by Ms. Evans that this was someone who she needed me to work with on an issue.

Q.   When was that introduction?

A.   I do -- I don't recall.

Q.   Was that an introduction by email?

A.   I am -- I'm fairly certain it was email.

Q. You're fairly certain that Karen Evans sent you an email introducing you to Kara Voorhies?

A. Fairly certain, yeah.

Q. Do you recall when that was?

A. I don't.

Q. It would have been in 2025. Right?

A. It would have been in 2025.

Q. Do you recall if it was before or after the beginning of December, when Karen Evans became the Senior Official Performing the Duties of Administrator?

A. I don't recall.

Q. You said that Ms. Evans told you you needed to work with Kara Voorhies on an issue?

MR. NEWMAN: Object to form.

A. Correct.

Q. Do you recall what that issue was?

A. I don't recall.

Q. Was it a personnel-related issue?

MR. NEWMAN: Object to form.

Objection; foundation.

A. If I was involved, it would have been a personnel issue.

Q. It would have been Karen Evans introducing you to Kara Voorhies about a personnel-related issue

Page 83

and saying you had to work with Ms. Voorhies?

MR. NEWMAN:  Object to form.

Q.   Right?

A.   That -- that's what I believe, yes.

Q.   Do you remember anything else about this email?

A.   I do not.

Q.   Did you respond to the email?

A.   It was Ms. Evans, so I'm sure that I did.

Q.   Do you remember how you responded?

A.   I do not.

Q.   Do you remember if anybody else was copied on that email?

A.   I do not.

Q.   And when you say it was Ms. Evans, so you're sure you would have responded, what do you mean by that?

A.   Ms. Evans' introduction to the Department was, quite frankly, as senior advisor in the Management Directorate.

So with someone who was a part of the front office that I reported to, I absolutely would have been responsive.

Q.   But this communication introducing you to Kara Voorhies, would that have been after Karen

Evans had moved over to FEMA?

A.   I don't recall.

Q.   You're saying it could have been when Karen Evans was still at DHS?

MR. NEWMAN:  Object to form.

A.   It could have been, yes.

Q.   But you just don't remember?

A.   I just don't remember.

MR. HOSHIJIMA:  I think now may be a good time for a break.

VIDEOGRAPHER:  Off the record at 10:21.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 10:32.

BY MR. HOSHIJIMA:

Q.   Mr. Edwards, you're familiar with FEMA's CORE employees?

A.   Yes.

Q.   Does it stand for Cadre of On-Call Response/Recovery Employees?

A.   I always forget the acronym, but, yes.

Q.   When did you first become familiar with FEMA's COREs?

A.   When I became deputy CHCO was probably the

first time that I became familiar with the FEMA

COREs.

Q.    You're familiar with them being a significant part of FEMA's workforce?

A.    I am.

MR. NEWMAN:    Object to form.

Q.    Do you have a sense of what COREs do at FEMA?

A.    Just a broad general sense.

Q.    What's your broad general understanding of that?

A.    So, honestly, the name kind of implies -- so for disasters and for critical functions for FEMA, this workforce is brought on in order to help support those.

Q.    You know that COREs helped run FEMA's Hazard Mitigation Grant Program?

A.    I was not aware.

Q.    You're not aware of some of those details of what COREs do?

A.    Correct; or the functions that they're actually performing within FEMA.

Q.    Is that because, as DHS CHCO, that's not the kind of thing you would be aware of?

A.    That's correct.

Page 86

Q.   Why not?

A.   FEMA has its own CHCO who -- for personnel matters that directly impact the mission and the work of FEMA.

They manage their work and their cadre.

Q.   Before January 2025, did DHS have any procedures for determining which FEMA COREs would be renewed?

MR. NEWMAN:  Objection; foundation.

A.   And just to make sure, so we're talking about DHS, not FEMA?

Q.   Correct.

A.   Okay.

Not that came through my office, no.

Q.   Was there any process for determining which COREs should be renewed that went through some other office at DHS?

MR. NEWMAN:  Objection; foundation.

A.   Not that I'm aware of.

Q.   Would have been a FEMA decision.  Right?

A.   That's my understanding.

Q.   Before January 2025, did FEMA send any recommendations to DHS about what COREs it wanted to

renew?

MR. NEWMAN:  Objection;
foundation.

A.    Not through my office.

Q.    Or any other office in DHS?

MR. NEWMAN:  Objection;
foundation.

A.    I'm not aware.

Q.    Before January 2025, then, you had nothing
to do with which COREs would be renewed.  Right?

A.    I did not.

MR. HOSHIJIMA:  I'm handing you
what will be Exhibit 37.

(Whereupon, Plaintiffs Exhibit 37 was
marked for identification.)

Q.    This is a GAO report from May 2023 called
"FEMA Disaster Workforce:  Actions Needed to Improve
Hiring Data and Address Staffing Gaps."

Have you seen this before?

A.    I have.

Q.    What do you know about this document?

A.    It's been a long time.  So I'm....

Q.    So I'll direct your attention to Page 18.

The report says that FEMA, at the time of
this report, had an overall staffing gap of

Page 88

approximately 6,200 staff?

MR. NEWMAN:  Objection to form.

(Witness reading.)

A.    Okay.  I see that in the report.

Q.    And that means FEMA's actual staff was about 6,200 short of its target number?

MR. NEWMAN:  Objection to form.

A.    According to the report, I see that.

Q.    Let's turn to Page 9.

A.    Page 9?

Q.    Yes.

The first full paragraph, do you see where it says:

FEMA's Field Operations
Directorate is the lead entity
responsible for setting
incident management (disaster)
staffing targets....

A.    I see that.

Q.    Next paragraph, do you see where it says:

FEMA Human Capital works
with the Field Operations
Directorate to understand
FEMA's disaster requirements
and set staffing targets....

A.    I see that.

Q.    That's all referring to the FEMA OCHCO, not DHS OCHCO.  Right?

A.    That's correct.

Q.    Because FEMA OCHCO would have done these analyses about the staffing targets?

A.    That's --

MR. NEWMAN:  Objection; foundation.

A.    That's correct.

Q.    Turning to Page 17, near the bottom of the page, that -- top of the paragraph that says:

FEMA officials stated they conduct annual reviews of its disaster workforce to establish staffing targets....

A.    I see it.

Q.    That's also referring to FEMA officials, not people in DHS.  Right?

A.    So on that one, I'm not sure I can comment on that one.

Q.    DHS OCHCO wouldn't have been involved in coming up with the target numbers for this report.  Right?

MR. NEWMAN:  Objection;

Page 90

foundation.

A.   That's my understanding.

Q.   You can set that aside.

Turning to January 2025, do you recall the President issued a hiring freeze for all civilian positions when he took office on January 20, 2025?

A.   Yes.

MR. HOSHIJIMA:  I'm handing you Exhibit 38.

(Whereupon, Plaintiffs Exhibit 38 was marked for identification.)

Q.   This is an OMB/OPM memorandum dated January 20, 2025.  Bates number is -0428.

Do you recognize this document?

A.   I do.

Q.   And it's guidance from OMB and OPM on how to implement the President's hiring freeze.  Right?

A.   Yes.

Q.   Would your office, DHS OCHCO, have been involved in implementing this guidance?

A.   Yes.

Q.   And the President's hiring freeze.  Right?

A.   Yes.

Q.   So you're familiar with this document?

A.   Yes.

Page 91

Q.    Looking at the Mandatory Exemptions in Paragraph 3 that start at the bottom of the first page, if you turn to the next page, you see that the exemption in Paragraph 3b is for positions related to immigration enforcement, national security, or public safety?

A.    I see that.

Q.    Do you recall that exemption from the hiring freeze?

A.    I do.

Q.    Do you see that Paragraph 4 includes Other Exemptions?

A.    I do.

Q.    And if you turn to Page 3, the exemption in Paragraph 4m refers to:

                    Term and temporary
                appointments of existing
                Federal employees may be
                extended up to the maximum
                allowable time limit,
                consistent with the
                conditions/requirements of the
                legal authority originally used
                to appoint the employee.

A.    I see that.

Page 92

Q. So these are two different exemptions to the government-wide hiring freeze. Right?

A. Correct.

Q. This exemption in Paragraph 4m is an exemption that applies when you're extending the terms of existing term employees. Right?

A. Correct.

Q. That exemption, then, would apply to FEMA COREs. Right?

A. I believe that exemption would apply, but Section 4 also says "are permitted."

So it allowed for agencies to still make determinations.

Q. So DHS would have made the determination about whether the Paragraph 4m exception applied to FEMA COREs. Right?

MR. NEWMAN: Objection to form.

A. Correct; for all of these.

Q. That would have been your office in DHS OCHCO that made that decision?

A. No, that would have been someone in senior leadership.

Q. Someone at the DHS Office of the Secretary level?

A. Office of the Secretary, deputy secretary,

Page 93

or the under secretary for management, depending on who had the authority to make the decision.

Q.   But someone that you would describe as being in DHS HQ would have decided whether the Paragraph 4m exemption applied to FEMA COREs. Right?

MR. NEWMAN:   Objection; foundation.

A.   So it could have also been -- because the component heads were allowed quite a bit of latitude to make sure they could continue to manage their workforces.

So it is something that the component head might have also requested to implement as well.

Q.   Do you know who made the decision about whether Paragraph 4m's exemption applied to FEMA COREs?

A.   I do not know.

Q.   You don't know if it was DHS or FEMA?

A.   I do not know.

Q.   Do you know if the exemption in Paragraph 4m was applied to FEMA COREs?

A.   I don't know for sure.

Q.   You don't know, even though you're the head human capital officer for all of DHS?

MR. NEWMAN:  Objection; asked and answered.

A.   Correct; I don't know.

Q.   Is that because that's the kind of detail that FEMA OCHCO would have handled?

MR. NEWMAN:  Objection; foundation.

A.   It's two things.

One, it's that, yes, the FEMA CHCO and FEMA leadership would have made that determination.

And some decisions just didn't come through my office sometimes.

So it may have been direct conversations that I was not a part of.

Q.   But you agree that COREs are term and temporary appointments that are -- of existing -- for federal employees.  Right?

A.   That's my understanding.

Q.   I'm saying the Paragraph 4m exemption, do you know if that exemption was applied to FEMA COREs?

A.   I don't know for sure.

Q.   You said that FEMA would have made that determination?

MR. NEWMAN:  Objection;

misstates testimony.

A.    I said that I'm not sure who would have made it and said it could have been -- any of DHS senior leadership or FEMA leadership could have made, probably, that decision.

Q.    But you don't know who made that decision?

MR. NEWMAN:  Objection; asked --

Q.    And you don't know --

MR. NEWMAN:  -- and answered.

Q.    -- the outcome of that decision?

A.    I do not.

MR. HOSHIJIMA:  Introducing Exhibit 39.

(Whereupon, Plaintiffs Exhibit 39 was marked for identification.)

Q.    This is an email produced to us by the government with Bates stamp -0435.  It's an email from Amanda Scales to you and Mischell Navarro.

Do you recognize this email?

A.    I do.

Q.    Amanda Scales was OPM chief of staff at this time of this email, which is January 21st --

MR. NEWMAN:  Objection --

Q.    -- of 2025?

MR. NEWMAN:  Objection;

foundation.

A.   I'm sorry.  Say the question one more time?

Q.   At the time of this email, which is January 21, 2025, Amanda Scales was the OPM chief of staff.  Right?

A.   I don't recall her title, but I know she was at OPM.

Q.   Taking a look back at the hiring freeze memorandum, or guidance, in Exhibit -- in the Exhibit 38, if you look at Page 6, at the top, it says Amanda Scales is chief of staff at OPM?

A.   I see that.

Q.   So this email is the next day.  Right?

A.   Yes.

Q.   She's following up over email, saying that:

             Given clear relevance to
          the exemption criteria, DHS is
          not impacted by the hiring
          freeze.

       Do you see that?

A.   I see that.

Q.   So Amanda Scales is following up because you reached out to OPM to ask if the President's

hiring freeze applies to DHS.  Right?

A.   Correct.

MR. NEWMAN:  Object to form.

Q.   And she said, no, it doesn't?

A.   Correct.

Q.   It doesn't apply to any part of DHS?

A.   Her email was blanket for the Department writ large.

Q.   And that's because of the exemption in the OMB/OPM memorandum for positions that have to do with immigration enforcement, national security or public safety?

MR. NEWMAN:  Objection; calls for a legal conclusion.

A.   That's my understanding.

Q.   Is that what she's referring to by "clear relevance to the exemption criteria"?

MR. NEWMAN:  Objection; foundation.

A.   I am not sure.

Q.   But did you ask her about the application of that exemption to DHS?

A.   Correct.  I did.

Q.   So she's confirmed that all of DHS is exempted from the hiring freeze.  Right?

A.   That's what her email said, yes.

Q.   And did you ever hear otherwise from OPM?

(Pause.)

A.   Not that I'm aware.

MR. HOSHIJIMA:  I'm handing you what will be --

Is this 40?

COURT REPORTER:  Yes.

MR. HOSHIJIMA:  -- Exhibit 40.

(Whereupon, Plaintiffs Exhibit 40 was marked for identification.)

Q.   I'll represent that this is a document that was produced to us in this litigation with the Bates No. -0408.  It's a March 14, 2025 memorandum.

Do you recognize this?

(Witness reading.)

A.   I do.

Q.   It's a memorandum for all DHS components and office heads.  Right?

A.   Yes.

Q.   And it comes from Randolph --

And you can help me say his last name?

A.   Alles.

Q.   Randolph Alles, who is, at the time, the deputy under secretary for management.  Right?

A.    Correct.

Q.    And it's called "DHS Hiring Verification Process"?

A.    Correct.

Q.    The bottom half of the first page, it has your contact information for components to reach out -- reach out to about any questions or guidance about this memorandum?

A.    Correct.

Q.    Did you help draft this memo?

A.    Yes.

Q.    The memo says that:

                DHS is instituting a new hiring verification process.

           Do you see that?

A.    Yes.

Q.    Now, up until this point, there's a government-wide civilian -- civilian hiring freeze, but it doesn't apply to DHS.  Right?

A.    Correct.

Q.    So DHS has decided, on its own, to institute a new hiring verification process.  Is that right?

                MR. NEWMAN:  Objection; foundation.

A.   I don't know if there were conversations that were held that -- that precipitated this.

Q.   Conversations with whom?

A.   Whether it was leadership or outside of the Department.

Q.   This new hiring verification process says that:

No component or office may hire any individual without prior authorization from the Office of the Secretary.

Is that right?

A.   Correct.

Q.   That's new as of March 14, 2025?

A.   Correct.

Q.   And under this new process, FEMA can't hire anyone without approval from the Office of the Secretary.  Right?

A.   Correct.

Q.   Because FEMA's a component or office within the meaning of this memorandum?

A.   Correct.

Q.   So what's the new process that DHS is setting up here?

A.   So for this one in particular, you'll note

that there's a form on the back, at the last page of this exhibit.

Components were to complete the form.  My office would receive those forms, and we would send those forward -- batch those and send those forward to the group that we discussed earlier for review.

Q.    Is that the group of four people that you mentioned that includes Joe Guy, Troup Hemenway, Stephen Munoz, and...?

A.    Greyson McGill.

Q.    Greyson McGill?

A.    Correct.

Q.    So the process that is set up newly as of March 2025 is that, as a default, no component or office may hire any individual without authorization.  Right?

A.    Correct.

Q.    And the process is a process for getting that authorization?

A.    Correct.

Q.    That process involves your -- your office receiving forms from components that you send on to these four individuals?

A.    Correct.

Q.    You send those forms over to those

individuals by email?

A.   Correct.

Q.   Do you email the four of them individually?

A.   No; together.

Q.   So you put four individual email addresses in the "to" field?

A.   Correct.

Q.   Who from your office would send the email with the forms to those four people?

A.   And if I may, just on -- to -- a correction to the last one.

I don't recall if we actually ended up setting up a distro list for that group.

So I don't recall whether we did a distro list or if they actually put them in individually.

Q.   What do you mean by a "distro list"?

A.   Within Outlook, I'm not sure if we created a, like, one box, maybe, "Verification Review" or something, and all of them were included in there.

I don't recall whether we did that or if we actually just submitted to the actual email addresses of each person.

Q.   You're saying it's possible to set up like an email group with a single name, that, when you

email that group, the email will go to four people?

A.   Exactly.

Q.   But you're not sure whether that was set up as part of this process?

A.   Correct.

Q.   Going back to this memorandum set up by Randolph Alles, there are a set of exceptions that are listed in the second bullet point on the first page.  Right?

A.   Yes.

Q.   The exception applies to certain categories of federal employees?

A.   Correct.

Q.   And also other positions listed in Attachment 1.  Correct?

A.   Correct.

Q.   And Attachment 2 is the form that you would use to -- sorry.

Attachment 2 is the form that components or offices would use to request additional exceptions beyond those listed in these bullet points or in Attachment 1.  Correct?

A.   Correct.

Q.   Before March 2025, there's no process like that at all.  Correct?

A.    Correct.

Q.    Before 2025, FEMA could hire new people without running it past DHS?

A.    Without coming through my office. Correct.

Q.    Without going through any part of DHS headquarters.  Right?

A.    I'm not sure.

Q.    You think that there were times when FEMA would have to go to other parts of DHS headquarters, other than the chief human capital officer's office, to hire somebody into FEMA?

MR. NEWMAN:  Objection; form.

A.    There may have been budget negotiations.

There may have been conversations about, you know, one of the funds that they use to manage and pay the FEMA workforce.

Some of that, I'm not a part of, so....

Q.    Going back to this new process instituted in March 2025, do you know whose decision it was to institute this new process?

A.    I do not.

Q.    Do you know if it was Randolph Alles's decision?

A.    I do not.

Q. It's possible that it was somebody higher up in DHS than him?

A. It is possible.

Q. But you don't know?

A. I do not know.

Q. So you don't know why the person who instituted this process decided to do so?

A. I do not.

Q. So going to the exceptions on this first page, if a FEMA position falls into one of those exceptions, FEMA can hire for that position without going through an authorization process with the DHS Office of the Secretary. Right?

A. That is correct.

Q. Let's turn to the third page here, Bates No. -0410.

This is Attachment 1 to that memorandum. Right?

A. Correct.

Q. It's a list of other positions to which the hiring verification process does not apply?

A. Correct.

Q. It's a list of priority mission critical occupations and mission critical occupations. Right?

A.   Correct.

Q.   For FEMA, do you see that emergency management specialists are considered priority mission critical occupations?

A.   I do.

Q.   Who would have made that determination about which occupations are designated as mission critical?

A.   There was actually a validation done with the components and DHS leadership, and I don't recall who was a part of the process to do the validation.

This was done prior to this memo going out.

Q.   When you say a "validation" process, do you mean that components would designate what occupations are mission critical, and then somebody would validate that decision?

A.   Correct.  Components would request that certain positions were included as priority mission critical or mission critical, and then the Department would have done a validation of those and then set the final list.

Q.   So DHS would have validated the recommendations of DHS components as to which

occupations are mission critical.  Right?

A.   Correct.

Q.   You said that took place before this March 2025 memo?

A.   Yes.

Q.   Do you have any other estimate of when that validation process took place?

A.   So I've been CHCO for three years.

It was before my time as CHCO.  So it's awhile.

Q.   It was a number of years ago, then, that components recommended these occupations as mission critical and had that validated by DHS headquarters?

A.   Correct.

Q.   Do you know if OPM or OMB would have been involved in that validation process?

A.   I don't know.

Q.   Because this was before your time as DHS CHCO?

A.   It was before my time.

Q.   Looking at this Attachment 1 to the memo, what this means is that FEMA can hire emergency management specialists without seeking authorization from the DHS Office of the Secretary.  Right?

A.   Yes.

Q.   Some of the FEMA emergency management specialist positions are held by COREs.  Right?

A.   I'm not sure, but, okay.

Q.   You don't know?

A.   I don't know.

Q.   You don't know if COREs can be emergency management specialists?

MR. NEWMAN:  Object to form.

A.   Yeah.  So I'm not sure if there are any COREs currently serving as emergency management specialists in FEMA.

Q.   Do you know if COREs ever served as FEMA emergency management specialists?

A.   I do not know.

Q.   But if a CORE were a mission critical occupation, then FEMA could hire that CORE without going through the DHS hiring authorization process.  Right?

A.   That's my understanding.

Q.   If a CORE were not a mission critical occupation, then FEMA would have to go through this process to be able to hire them.  Right?

A.   That's my understanding.

Q.   Looking at this line for FEMA emergency management specialists, do you see the fiscal year

2025 target of 11,485?

A.   I do.

Q.   Do you know where that number comes from?

A.   I do not.

Q.   Do you know what process would have been used to determine that target number?

A.   I do not.

Q.   That process would have been carried out by FEMA.  Right?

A.   Correct.

Q.   Not by DHS headquarters?

A.   Correct.

Q.   The table shows that the number on board as of fiscal year 2025, pay period 3, is less than the target for fiscal year 2025.  Right?

A.   Correct.

Q.   So as of the time of this number, fiscal year 2025, pay period 3, FEMA doesn't have enough emergency management specialists to hit its staffing target.  Right?

A.   Correct.

Q.   Turning a couple pages to Bates -0412, you said earlier this is Attachment 2 to this hiring verification process memo.

A.   Yes, sir.

Q.   This is the form that components would use to request additional exceptions to the hiring prohibition.  Right?

MR. NEWMAN:  Objection; misstates evidence.

A.   To the -- yes.

Q.   Because, as a default, no component or office can hire somebody that's not on the list in Attachment 1?

A.   C- --

MR. NEWMAN:  Objection to form.

Q.   And Attachment 2 is the form that allows components to request additional exceptions?

A.   Correct.

Q.   The form is supposed to be submitted, according to the component instructions at the top, to an email address called hiringrequests@hq.dhs.gov?

A.   Yes.

Q.   Do you know where that email goes?

A.   My team.

Q.   In DHS OCHCO?

A.   Correct.

Q.   And approved forms, it says, will be sent back to the component, with a copy to DHS OCHCO.

Right?

A.    Correct.

Q.    So you would -- so your office would get the form, as submitted by the components, and also any approvals of the form?

A.    Correct.

Q.    But your office isn't the one that actually decides whether to approve the request. Right?

A.    Correct.

Q.    That decision is by the Office of the Secretary?

A.    Correct.

Q.    That's the DHS Office of the Secretary?

A.    Yes.

Q.    At the bottom, then, where it says "for the Office of the Secretary's use only," do you know who in the Office of the Secretary can authorize the hiring of somebody through this form?

A.    I do not.  So I know the group that it went to.  I don't know if there are any other authorizers.

Q.    And the group that it went to would have been that group of four people that you told me about earlier?

A.    Correct.

Q.    So you -- your office would have sent this form, as completed by a DHS component, and send it up to those four people?

A.    Correct.

Q.    But you don't know who in the Office of the Secretary is actually able to approve one of these verification requests?

A.    Correct.  We normally got them back from one of the people in the group.

And, actually, I think -- at least the ones that I directly saw always came back from someone from within that group.

Q.    Someone in that group of four would have emailed the approved form back to you?

A.    Or they would have emailed me back that it was approved.

Q.    And that would have been by email, not through the STORM system?

A.    Correct.

Q.    So when you saw the forms that came back approved, who had signed the Office of the Secretary's signature line?

A.    So most of the time, the actual form itself would not come back.  It would just be an

email saying that the action was approved to process.

Q.   So there may be a signed version with the approval signature in the Office of the Secretary, but it doesn't necessarily come back down to you?

MR. NEWMAN:  Objection; foundation.

A.   Correct.

Q.   Even though the instructions at the top say:

Approved forms will be sent back with a copy to DHS CHCO.

A.   Correct.

Q.   Did you see any approved forms with a signature in the Office of the Secretary's signature portion?

A.   Not that I personally recall, but the forms would have come -- if they went through the regular process, they would not have come back to me directly.  They would have gone to my team who was handling the process -- the hiring request box.

But the ones that came back to me, no, I did not.

Q.   But sometimes you sent a component's

Page 114

hiring verification process form to the four people that you mentioned earlier.  Right?

A.    Correct.

Q.    And in those cases, you would have gotten the approval decision?

A.    The decision -- correct.

Q.    But you don't recall ever seeing a form with a signature from the Office of the Secretary that indicates an approval?

A.    Not that I recall.

Q.    Do you know if Secretary Noem ever herself signed these forms to indicate approval?

A.    I do not.

Q.    Do you know if she delegated the authority to sign these to somebody else in the Office of the Secretary?

A.    I don't know.

Q.    The form, when the components sign it, would have been signed by somebody in the component. Right?

A.    Correct.

Q.    It's -- where it says "component or office head signature"?

A.    Correct.

Q.    That would have been, for FEMA, the FEMA

Senior Official Performing the Duties of the Administrator?

A.   Correct.

Q.   So what was DHS OCHCO'S role in deciding whether to approve one of these component requests?

A.   We did not have an approval role.

Q.   You just sent it up?

A.   Correct.

Q.   So DHS OCHCO received these forms from components, but you were just a link in the chain when you sent it up?

A.   Correct.

Q.   When you passed --

COURT REPORTER:  Excuse me.  Did you answer that question?

WITNESS:  I said, "Correct."

Q.   When you passed a component's form up the chain, DHS OCHCO didn't attach a recommendation about whether or not to approve it.  Right?

A.   That's correct.

Q.   You were just purely a conduit?

A.   Correct.

Q.   At the instructions up top, you saw where it says:

Disapproved forms will be

returned to the component or

office head.

A.   I see that.

Q.   Do you recall seeing disapprovals come back down the chain?

A.   No.

Q.   So when your office passed this form up to the four people we talked about, Joe Guy, Troup Hemenway, Greyson McGill, and Stephen Munoz, do you know what they did with the forms?

A.   I do not.

Q.   Do you know if those four people decided whether to make the approval?

A.   I don't know.

Q.   You don't know if they passed it up to people above them?

A.   I don't know.

Q.   You never asked?

A.   I did not.

Q.   You were never curious?

A.   No.

Q.   Why not?

A.   I needed the approval from someone who is in the leadership chain.

As far as I knew, the individuals that

were responding to me had the authority to approve, or had already gotten the approval that they needed.

So that's what I acted upon.

Q.   Who told you that those are the people you should reach out to for the approval?

A.   When we set the original process up, I believe we worked it through with Greyson McGill.

Q.   Who was the chief of staff of the Management Directorate?

A.   That's correct.  Who was.

MR. HOSHIJIMA:  We're up to Exhibit 41.

(Whereupon, Plaintiffs Exhibit 41 was marked for identification.)

COURT REPORTER:  Try to keep your voice up.  You're very soft-spoken.

WITNESS:  Okay.  Will do.

Q.   I'll represent this is a document produced to us by Defendants in this case with Bates No. -0403.

Do you recognize these emails?

(Witness reading.)

A.   I am -- I am familiar with the initial email that went out to the HCLC, which is the human leader -- Human Capital Leadership Council.

Q.   You're familiar with the email at the bottom of the chain from Roger Brown on March 14th. Right?

A.   Correct.

Q.   That's the email that is sending out the March 2025 DHS hiring verification process memorandum that we just talked about?

A.   Correct.

Q.   And it says, effective immediately, as of March 14th, DHS is implementing this new approval process.  Right?

A.   Yes.

Q.   And the attached guidance, signed by DUSM Alles, is the memo we just talked about?

A.   Yes.

Q.   Roger Brown is a deputy CHCO at DHS?

A.   He was.

Q.   So he's your deputy.  Right?

A.   He was.

Q.   He was one of your two deputies?

A.   Correct.

Q.   And that email is to the HCLC principals email list.  That's the email list for the Human Capital Leadership Council?

A.   That's correct.

Q.   Is that a list of human resources people at the various DHS components?

A.   It's specifically the heads of the human resources in the components.

Q.   So you see the La' Toya Prieur response to this email?

A.   I do.

Q.   Do you know if I'm pronouncing her name right?

A.   You are.

Q.   La' Toya Prieur is the FEMA CHCO?

A.   Correct.

Q.   So she would be on the HCLC principals list.  Right?

A.   Correct.

Q.   She emails back your deputy, Roger Brown, and asks whether extending a FEMA CORE is considering a hiring action.

Do you see that?

A.   I do.

Q.   And she says that:

For reference, CORE employees are generally on two-year appointments and extended in two-year increments

based upon agency needs.

Do you see that?

A.   I do.

Q.   And when she says "agency needs," she's referring to FEMA needs.  Right?

A.   That's what I'm assuming.

Q.   The reason she's asking is if that -- is that if a FEMA CORE extension is considering -- is considered a hiring action, then it would be subject to this new hiring verification process.  Right?

MR. NEWMAN:  Objection; calls for speculation.

A.   That's my understanding of the genesis of her question.

Q.   And do you agree with what she says, that CORE employees are generally placed on two-year appointments and extended in two-year increments?

MR. NEWMAN:  Objection; foundation.

A.   That's my understanding of how the CORE works, the appointments work.

Q.   Before March 2025, are you ever -- are you aware of any CORE being extended for less than two years?

MR. NEWMAN:  Objection;

foundation.

A.    I am -- I'm not aware.

Q.    Your deputy, Roger Brown, responds to Ms. Prieur's inquiry and says:

>             If it's not in the realm
>             of a PMCO or MCO, you would
>             need to ask for a waiver to
>             extend for two additional
>             years.

Do you see that?

A.    I see that.

Q.    So he's saying that if it's not in the realm of a PMCO or MCO -- referring to this Attachment 1 to the March 2025 memo?

A.    Correct.

Q.    And he's saying that if a CORE is not within the exception for mission critical occupations, then extending that CORE would require a waiver from the DHS Office of the Secretary. Right?

A.    I see that.

Q.    Because asking for a waiver is a reference to this hiring verification process form that we discussed?

A.    Correct.

Q.   So non-MCO COREs can be extended by FEMA only if FEMA requests permission to do so and receives that permission from the DHS Office of the Secretary.  Right?

A.   That's my understanding.

Q.   Roger Brown is not saying that FEMA has to submit that hiring verification form for COREs that are mission critical.  Correct?

A.   Correct.

Q.   So for COREs that are mission critical, their extensions would be exempted from this new process, under Attachment 1 to the March 2025 memo. Right?

A.   That's my understanding.

Q.   So MCO COREs can be extended without going through this process, but non-MCO COREs cannot be extended without DHS approval.

A.   That's my understanding.

Q.   This is all starting in March 2025. Right?

A.   Correct.

Q.   Before March 2025, FEMA doesn't have to request DHS approval to extend any COREs.  Correct?

A.   Not through our office, no.

Q.   Not through any office in DHS

headquarters.  Right?

MR. NEWMAN:  Objection;
foundation.

A.   I'm not sure.

Q.   You don't know if any part of DHS
headquarters had to approve a FEMA CORE extension
before March 2025?

MR. NEWMAN:  Objection; asked
and answered.

A.   I do not know.

Q.   Before March 2025, there was no process
for FEMA to request DHS's approval to extend a FEMA
CORE.  Correct?

A.   Not through my office.

Q.   Was there any process, through any part of
DHS headquarters, that required FEMA to ask that
permission before extending a CORE?

MR. NEWMAN:  Objection;
foundation.

A.   I don't know.

Q.   If there were a process by which FEMA had
to ask DHS's permission to extend one of FEMA's own
employees, you would have known about it.  Right?

A.   Not necessarily.

Q.   You're the head human capital officer for

all of DHS.  Right?

A.   That's correct.

Q.   So if FEMA wanted to extend one of its CORE employees and there were a process before March 2025 for FEMA to have to ask permission from DHS, you would have known about it?

MR. NEWMAN:  Objection; asked and answered.

A.   Not necessarily.

Q.   Why not?

A.   If it was a budget control, I would not know about -- if it was a budget control.

Q.   If it was a budget control, you would just not know because it was outside of your lane?

A.   That is correct.

Q.   But to your knowledge, before March 2025, FEMA does not have to ask DHS for approval to extend any COREs?

MR. NEWMAN:  Objection; asked and answered.

Q.   Correct?

A.   Would you repeat the question?

Q.   To your knowledge, before March 2025, FEMA does not have to ask for any DHS headquarters approval to extend a FEMA CORE?

MR. NEWMAN:  Objection; asked and answered.

Q.   Right?

A.   Not within the OCHCO space, no.

Q.   And not within your knowledge as the chief human capital officer of DHS?

A.   That is correct.

MR. HOSHIJIMA:  I am handing you a document that was previously marked as Exhibit 21.

(Whereupon, Plaintiffs Exhibit 21, previously marked, was introduced to the witness.)

Q.   This is a document that was produced to us with the Bates stamp -0405.  It is a memorandum titled "Reinstating FEMA's Ability to Renew Term Employees Based on Mission Requirements."

Do you recognize this document?

(Witness reading.)

A.   I do not.

Q.   You know David Richardson, who is in the "From" line of this memo?

A.   I do.

Q.   He was FEMA's Senior Official Performing the Duties of Administrator?

A.   Correct.

Q.   The memo is addressed to then DHS Secretary Kristi Noem.  Right?

A.   Correct.

Q.   And although the memo is dated May 14th at the top, do you see, on the second page, where it's signed on May 19, 2025?

A.   I see that.

Q.   Is that Kristi Noem's signature on the approval line?

MR. NEWMAN:  Objection; foundation.

A.   I don't know.  I don't know her signature.

Q.   You don't know what Kristi Noem's signature looks like?

A.   I don't.

Q.   Have you seen Kristi Noem's signature?

A.   I have seen it.  But to say that -- without seeing it directly in comparison, I would not be able to affirm it.

Q.   Does this look like it could be Kristi Noem's signature?

A.   I am not sure.

Q.   Going to the first page, it says that the purpose of the memorandum is FEMA requesting Kristi Noem's "approval to use an internal process to renew

Page 127

term-limited appointments for COREs."

Do you see that?

A.   I do.

Q.   "Internal process" is referring to a process that's internal to FEMA.  Right?

A.   I'm not sure.  I would assume so.

Q.   So FEMA is asking to renew COREs using a FEMA internal process without having to go and ask for DHS approval.  Right?

A.   Could you give me just one moment?

(Witness reading.)

A.   Got it.  All right.

So, my apologies; would you ask your question one more time?

Q.   FEMA is requesting that it be use -- it be allowed to use a FEMA internal process to renew COREs without seeking DHS approval.  Right?

A.   Correct.

Q.   And the title of the memo says it's "reinstating FEMA's ability to renew" its COREs. Right?

A.   I see that.

Q.   It uses the word "reinstating" because FEMA previously used to have its own authority to renew COREs.  Right?

A.    That's what it would suggest.

Q.    In fact, FEMA always had that authority up until the March 2025 hiring verification process?

MR. NEWMAN:  Objection; foundation.

A.    Through the human capital, I would say yes.

Q.    So to your knowledge, up until March 2025, FEMA could always use an internal process to renew COREs?

A.    To my knowledge, yes.

Q.    And after the March 2025 memo by DHS took away that authority, FEMA's now coming and asking for DHS to reinstate that authority.  Right?

A.    Correct.

Q.    The memo says, and this is in the second paragraph near the bottom, that:

This memo rescinds the memo dated May 12, 2025 on the same topic.

Do you see that?

A.    I see that.

Q.    Have you seen the May 12th memo?

A.    I'm not sure.

Q.    Do you know anything about that May 12th

memo?

A.   I'm not sure.

Q.   Do you know who it was by?

A.   I'm not sure.

Q.   So this is a memo that is about FEMA's process for renewing COREs.

And FEMA wants to renew COREs without going through a hiring verification process that went through your office.  Right?

MR. NEWMAN:  Object to form.

A.   That's my understanding.

Q.   So you would have known about FEMA asking for an exception from that process.  Right?

MR. NEWMAN:  Object to form.

A.   So you'll -- you'll notice on this one that it went directly from Mr. Richardson to Secretary Noem.

Sometimes I would not.  So sometimes they would handle it through senior leadership channels.

Q.   There's a hiring verification process that goes through your office, and FEMA's requesting an exception from it.

You're not surprised that you didn't hear about the exception request?

MR. NEWMAN:  Objection to form.

A.   I'm not surprised.

Q.   Why are you not surprised?

A.   There are different channels within an organization in order to get things accomplished. I'm just one of those channels.

Q.   In any case, Kristi Noem signs this memo and gives that approval.  Right?

MR. NEWMAN:  Objection; foundation.

A.   I see the signature, but -- so I see that it looks like it was signed on May 19th, granting the approval.

Q.   After Noem reinstates that authority, then, FEMA doesn't have to go through your office to renew COREs for a certain period of time.  Right?

MR. NEWMAN:  Objection; foundation.  Objection; misstates the document.

A.   It appears like it grants that through the end of December 2025.

Q.   But you're not aware of when FEMA requests to renew CORE employees stopped coming through your office between May and December?

MR. NEWMAN:  Objection; misstates the document.

A.   So there are hire requests that came in from all components that were managed by my team.

I didn't have direct oversight of what was coming in and what was going out.

Q.   Did you ever see hiring verification forms from FEMA?

A.   The only hiring verification forms from FEMA that I recall seeing are the ones that came through more recently, after this expired.

Q.   By "more recently," you mean in 2026?

A.   Correct.

Q.   So between May 2025 and December 2025, do you know anything about the process for FEMA's renewal of CORE employees?

A.   No, I do not.

Q.   You do know that this exception that Kristi Noem approved was allowing FEMA COREs to be renewed only for a period of 180 days?

A.   I see that in the memo.

Q.   And you testified earlier, when we looked at La' Toya Prieur's email to Roger Brown, that, generally, CORE employees are renewed for two-year terms.  Right?

A.   I did see that in the other memo.

Q.   And you're saying you're not aware that

this May 2025 memo was now allowing COREs to only be renewed for 180 days instead of two years?

A.    Correct.

MR. HOSHIJIMA:  We've been going for almost an hour.  Is now a good time for a short break?

MR. NEWMAN:  It's up to you.

MR. HOSHIJIMA:  Let's go off the record.

VIDEOGRAPHER:  Off the record at 11:28.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 11:41.

MR. HOSHIJIMA:  Mr. Edwards, I'm handing you a document that we'll mark as Exhibit 42.

(Whereupon, Plaintiffs Exhibit 42 was marked for identification.)

BY MR. HOSHIJIMA:

Q.    This is Executive Order 14356, of October 15, 2025, titled "Ensuring Continued Accountability in Federal Hiring."

Do you recognize this executive order?

A.    I do.

Q.   Do you see, in Section 1, where it says that the Trump administration:

> ...has dramatically
> reduced the size of the federal
> workforce....

A.   I do.

Q.   Do you see later in that paragraph when it says that these are historic improvements?

A.   I do.

Q.   And this paragraph is referring back to Executive Order 14210, which is the executive order we talked about earlier.  Right?

A.   Correct.

Q.   If you turn to Section 2(c), which is on the bottom of the first page, titled "Annual Staffing Plans and Quarterly Updates."

Do you see that?

A.   I do.

Q.   And do you see where each agency is directed to submit final annual staffing plans to OMB and -- to OPM and OMB?

A.   I do.

Q.   Your office at DHS would have been involved in implementing this executive order.  Right?

A.    That's correct.

Q.    Because your office is generally involved in implementing executive orders?

A.    Executive orders --

Q.    Related -- related to personnel.

A.    Correct.

MR. HOSHIJIMA:  I'm handing you what we will mark as Exhibit 43.

(Whereupon, Plaintiffs Exhibit 43 was marked for identification.)

Q.    This is a memorandum from OMB and OPM to the "Heads of Executive Departments and Agencies," dated November 5, 2025, titled "Guidance on Executive Order 14356."

Do you recognize this guidance?

A.    I do.

Q.    This is OMB and OPM's guidance for the executive order we just reviewed in Exhibit 42. Correct?

A.    Yes.

Q.    And it's giving guidance on submission of those final annual staffing plans that were described in the executive order?

A.    Correct.

Q.    Under these directions from OMB and OPM,

DHS's final annual staffing plan for fiscal year 2026 was due December 1, 2025.  Right?

A.   That's correct.

Q.   You were involved in transmitting DHS's final annual staffing plan for fiscal year 2026 to OMB and OPM?

A.   Correct.

Q.   Do you know how DHS sent that staffing plan to OMB and OPM?

A.   I am not aware.

I was involved in the preparation of it and putting it into clearance.  I do not have a final version of it.

Q.   You don't have a final version of DHS's annual staffing plan sent to OMB and OPM?

A.   I do not.

Q.   When you say you don't "have" it, you mean you never saw the final version of the staffing plan?

A.   I did not.

Q.   You said you were involved in the preparation and clearance?

A.   Correct.

Q.   What do you mean when you say you were involved in the preparation of that document?

Page 136

A.    So my office submit -- sent the template out to the components, received the template, aggregated them into the final plan, and then created the memos to send it forward in the STORM system up to the front office, through the clearance channels, for approval.

Q.    So that actually covers preparation and clearance, which is what I was going to ask about next.

A.    Okay.

Q.    So when you say "clearance," you mean that your office compiled everything you got from the various DHS components into a staffing plan and sent it up for approval through the STORM system. Correct?

A.    Correct.

Q.    Who did DHS OCHCO send that staffing plan to for clearance?

A.    So from my office, it would have gone then to the under secretary for management for clearance. So....

And then from there, it would go up the chain for the secretary's signature.

Q.    Do you know who else would have been along that chain?

A.   I do not know.

Q.   When your office put the compiled annual staffing plan into STORM, would there have been a routing sheet that identifies all of the decision-makers along the way?

A.   So I mentioned earlier, I'm not quite sure how STORM works.

So my understanding is we would have put the document in.  We would have said that it was identified for secretary's signature.

And then throughout the process, whether it's our management ExecSec or otherwise, they would add in who their appropriate reviewers were, once it reached the particular office.

So, for instance, if it got to the DHS ExecSec, which supports the secretary and deputy secretary's office, they would then determine who else it may have needed to go to for review and concurrence.

Q.   You do know, though, that the staffing plan that DHS OCHCO compiled went all the way up to former Secretary Noem.  Right?

A.   I do not know that.

Q.   I thought that's what you had told me just now.

A.    I said that we put it in clearance for routing to go to Secretary Noem.  I don't know that it made it to Secretary Noem.

Q.    Who would have made the decision about how far up that chain it went?

A.    Throughout the process, it could have been anybody, but it would have been in the DHS front office -- someone in, probably -- someone in the DHS front office -- the secretary or the deputy secretary's office.

MR. HOSHIJIMA:  I'm handing you an exhibit that was previously marked in this litigation as...let me double-check here...Exhibit 6.

Q.    This is a document that was produced in other litigation.

It appears to be a document called a "Department of Homeland Security Record of Clearance and Approval."  And it has a STORM number next to it.

Do you recognize this document?

A.    I have seen similar documents.

Q.    Similar documents related to personnel clearance -- related clearances that go into STORM?

A.    Correct.

MR. NEWMAN:  And excuse me.  The document looks like it's cut off at the end.  And I'm not certain, but I think that maybe the version that was used as an exhibit the other day had some more material on the bottom, although I'm not certain about that.

I just wanted to state that for the record.

MR. HOSHIJIMA:  Thank you.  I apologize.  I think you may be right.

This may be a printer issue.

BY MR. HOSHIJIMA:

Q.  But in any case, Mr. Edwards, do you see that this is a cover sheet for a clearance package that goes into STORM?

A.  Correct.

Q.  You said you've seen similar ones.  Right?

A.  Correct.

Q.  What kind of decisions are the similar routing sheets you've seen related to?

A.  So I don't know that....

When I clear the packages in STORM, this type of a cover sheet is not in there.

So I am not actually sure where this cover

Page 140

sheet is created or at what point it's -- it is actually used.

Q. So you see that the cover sheet involves like a list of people that are along the approval chain?

A. I do see that.

Q. And you're saying you don't see that list when you create a package in STORM?

A. Correct.

Q. So when have you seen a similar kind of sheet?

A. Sometimes, when a package is approved and signed off on, you will -- the signature approving the package will be on this type of a sheet, and that's what will come back.

Q. Do you know if a routing sheet like this was created when DHS OCHCO sent the compiled annual staffing plan up for clearance?

A. I do not know.

Q. You haven't seen that kind of routing sheet?

A. Not that I'm aware of.

Q. And you didn't see anything come back down through the STORM system indicating an approval?

A. Not that I recall, no.

MR. NEWMAN:  Tsuki, I don't want to make a big thing out of this, but since this document appears to be a slightly different version than the version that was used the other day, perhaps should we mark it as a new exhibit, just so the record is clear on that?

MR. HOSHIJIMA:  Sure.  We can mark this as 44.

I apologize.  That would be inadvertent.

MR. NEWMAN:  Of course.

(Whereupon, Plaintiffs Exhibit 44 was marked for identification.)

MR. HOSHIJIMA:  I will represent, which I think you can tell based on the ECF header at the top, that it was intended to be the same document.

MR. NEWMAN:  Of course.

BY MR. HOSHIJIMA:

Q.   Going back to, then, the annual staffing plan that the DHS OCHCO compiled in accordance with the executive order and the OMB/OPM memorandum.

You were telling me about the process for compiling it.  Right?

A.   Yes.

Q.   Now, that was the staffing plan for fiscal year 2026?

A.   Correct.

Q.   When does fiscal year 2026 start?

A.   It starts October 1 in 2025.

Q.   And fiscal year 2026 would run until the end of September 2026?

A.   That's correct.

Q.   So the staffing plan for that fiscal year was due to OMB and OPM on December 1, 2025.  Right?

A.   That's correct.

Q.   And DHS's submission to OMB and OPM to meet that deadline would have included staffing plans for each DHS component?

MR. NEWMAN:  Objection; foundation.

Q.   Right?

A.   That's correct.

Q.   Each DHS component didn't submit its own final annual staffing plan to OMB and OPM.  Correct?

A.   Correct.

Q.   So FEMA's submission would have been compiled into the DHS-wide final annual staffing plan?

MR. NEWMAN:  Objection; foundation.

A.   Correct.

Q.   Do you see, on Page 3 of the OMB/OPM guidance in Exhibit 43, that there's also a requirement for quarterly updates?

I'll point you specifically to the bottom paragraph on Page 3 of the guidance.

A.   I see that.

Q.   Do you see that (reading):

                Agencies shall submit
           updates to OMB and OPM each
           quarter, beginning with Q2 of
           Fiscal Year 2026, showing
           progress with respect to their
           Annual Staffing Plan....

A.   I see that.

Q.   So what are the dates of Q2?

A.   January 1st through the end of March, March 31st.

Q.   When was this first quarterly update for second quarter of fiscal year 2026 due to OMB and OPM?

A.   I don't recall the due date.

Q.   Has the Q2 update for DHS already been

Page 144

submitted to OMB and OPM?

MR. NEWMAN:  Objection; foundation.

A.    I don't recall, but I don't -- I don't recall.

Q.    Was DHS OCHCO involved in preparing the quarterly update for Q2?

A.    Yes.

Q.    Would that quarterly update have involved a similar type of process as the initial final annual staffing plan, where you gathered information from each DHS component?

A.    Yes.

Q.    And DHS OCHCO would have compiled the submissions from each DHS component and sent it up for clearance?

A.    Correct.

Q.    Do you recall that DHS OCHCO did compile Q2 updates and sent it up for clearance?

A.    We did.

Q.    Do you recall if you heard back from whoever was higher up in the chain about clearance of the Q2 update?

A.    I don't recall.

Q.    Do you know what DHS submitted to OMB and

OPM as its Q2 update?

A.   I do not.

Q.   You never saw what DHS submitted to OMB and OPM for its Q2 update?

A.   I'm not sure that there was a submission, and I am not sure -- and I don't recall seeing what it was.

Q.   Do you know when the Q3 update would be due to OMB and OPM?

A.   I don't know when it would be due, but it would be after -- after June closes.  So probably sometime after that.

Q.   You don't know if your office is working on the Q3 update?

A.   We wouldn't start working it, I don't believe, until....

I don't recall if they were requesting the staffing plans in advance of the quarter or at the close of the quarter so that you could report on it.

So I don't recall when the reporting was due.

Q.   But your office, DHS OCHCO, was the office in DHS that was responsible for preparing these updates.  Right?

A.   That's correct.

Page 146

Q.   But you just don't recall when that update was?

A.   Correct.

Q.   Going back to the initial submission, the final annual staffing plan due in December 2025, you testified that you have never seen the version that was sent over from DHS to OMB and OPM?

A.   That's correct.

Q.   Do you know who sent it over from DHS to OMB and OPM?

A.   I can't confirm that it actually was sent.

Q.   If it were sent, do you know who would have sent it?

A.   I do not know.

Q.   Do you have any suspicion about who would have sent it?

A.   I do.

Q.   Who do you suspect would have sent over the DHS annual plan to OMB and OPM?

A.   It would have been in our ExecSec.  They probably would have had the ExecSec team go ahead and send it on behalf of the Department.

Q.   Do you suspect that because that's the kind of thing that happens sometimes with DHS communications to OMB and OPM?

MR. NEWMAN:  Object to form, calls for speculation.

A.   I say it because I think that this went to a general mailbox at OPM.

If it had gone to, like, the director of OPM specifically, like that's who it needed to go to for approval, then it probably would have gone from a direct signatory.

If it was going to a general mailbox, like I believe this one went to, then it would have gone -- it wouldn't need to have gone from a specific person in the front office.

Q.   So you think this submission to OMB and OPM was going to a general mailbox at OMB and OPM?

MR. NEWMAN:  Objection; calls for speculation.

A.   I would need to go back and figure out, like, where we were supposed to send our actual submissions.

It should be in one of the memos, though.

Q.   You testified earlier that as DHS OCHCO, you're part of the CHCO Council?

A.   Yes, sir.

Q.   That's headed by OPM?

A.   Yes, sir.

Q.   Part of your job involves communicating regularly with OPM about DHS personnel matters?

A.   Correct.

Q.   Does it surprise you that the submission of a final annual staffing plan for DHS would not have come from you to OPM?

MR. NEWMAN:  Object to form.

A.   It doesn't surprise me.

If it was something that my office was clearing, then, absolutely, I would send it over.

If it's something that the secretary's office is clearing in order to expedite it going over to OPM, they might have just sent it and then perhaps copy me when they sent it, so....

Q.   Are you surprised that they didn't copy you when they sent a final annual staffing plan for DHS over to OMB and OPM?

MR. NEWMAN:  Object to form.

Objection; assumes facts not in evidence.

WITNESS:  Yeah.

A.   If it was sent, then I would be surprised that I don't have a final copy of it, yes.

Q.   Have you ever asked anybody to see the DHS final annual staffing plan?

A.   So I did ask my team to see if they could

find out the status of it.

The last time I checked, which is -- I can't tell you the date.  But the last time I checked, it was still in clearance.

I did not see a final signed version -- or the team reported that they didn't see a final signed version.

Q.   Do you know who your team asked about the status of clearance for the final annual staffing plan?

A.   So I am -- I know that they checked the STORM system to determine what notes were currently in the STORM system.

Because when a package is fully closed out in the STORM system, you will be able to see whether or not it's approved, and they upload the approval.

Q.   Do you have any estimate of when it was that your team would have checked?

A.   I don't recall the date.

Q.   Beyond checking the STORM system, do you know if anybody in DHS OCHCO has asked to see the final annual staffing plan for DHS?

A.   So I know I have asked the team to try to track it down for me.  I don't know what they did to try to track it down for me.

Q.   Have you asked anybody besides your team that you supervise whether you can see the final DHS annual staffing plan?

A.   I don't believe I have, no.

Q.   You've never asked anybody in the Management Directorate whether you could see the final annual staffing plan?

A.   So I recall pinging the front office, the management front office, to ask if they knew the status of it as well, or if they could give me an up- -- an update on it.

I don't recall what I got back from them.

Q.   Who did you ping for that update?

A.   Yeah.  That would have been Greyson McGill as the chief of staff.

Q.   Did you ever ask directly to anybody in the Office of the Secretary about the status of the final annual staffing plan?

A.   Not that I recall.

Q.   You never asked Joe Guy?

A.   No.

Q.   Never asked Troup Hemenway?

A.   I don't recall.

Q.   Your office is responsible for compiling the first quarterly update of the final annual

staffing plan.  Right?

A.    Yes.

Q.    But your office is doing so without having seen the final staffing plan that you're up- -- you're creating the update about?

A.    Correct.

Q.    How are you doing that?

A.    Components are still operating each and every day.

And so, what their needs are, while -- with a staffing plan and having the approved staffing plan would be great, they're operating each and every day.

And so, within the quarter, their -- they may know that their requirements have changed.

And so, my guidance to the components is, in the quarterly updates, assume that your staffing plan is approved, and then give me updates based on where you were when you submitted your original staffing plan.

Q.    So DHS components have asked you for updates about the status of the DHS staffing plan. Right?

A.    They have.

Q.    And you're telling them you just don't

know?

A.   Correct.

Q.   Your instructions to DHS components, then, has been to assume that what they submitted to DHS OCHCO previously has been approved?

A.   To assume that they need to operate -- that that's what they submitted, that's what their -- their requirements were, and they just need to update it based on what they originally submitted as their requirements.

Q.   Do you know if the DHS headquarters has disapproved any submission for the annual final staffing plan by a DHS component?

A.   Not that I'm aware.

Q.   So when you sent up the compiled version through the STORM system, you've heard nothing back?

A.   When we sent the original forward, it came back, at one point, with comments that we addressed the comments and then sent it back into the clearance process.

But I don't have a final version of it.

Q.   Would that have been in December 2025?

A.   I don't recall if it was December or if it was January.

Q.   Who were those comments from?

A.   I don't remember who exactly, but they were from outside of the Management Directorate.

Q.   So perhaps the Office of the Secretary?

A.   It's possible.

Q.   Or from the chief of staff's office?

A.   It's possible.

Q.   Your office addressed those comments?

A.   I believe we did.

Q.   When your office addressed those comments that came from above, did you consult with the DHS components that the comments related to?

A.   No.  The comments were not related to the actual content of each of the individual staffing plans themselves.

They were more related to the overarching process that we were using.

Q.   What were the comments about the overarching process?

A.   So I'm not sure if that's considered deliberative or not.  So I -- I'm just not sure if I need to have a consultation.

MR. NEWMAN:  Yeah.  Maybe -- maybe we should -- can we take a break just to discuss a privilege issue with the witness?

MR. HOSHIJIMA:  Sure.

VIDEOGRAPHER:  Off the record at 12:06.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 12:12.

BY MR. HOSHIJIMA:

Q.  Before the break, Mr. Edwards, I was asking you about the compiled annual staffing plan that you had sent up the chain through STORM for clearance.

Do you remember that?

A.  I do.

Q.  You had testified that you had gotten a set of comments back that DHS OCHCO addressed. Correct?

A.  Correct.

Q.  You said those comments didn't pertain to any individual component's submissions?

A.  Correct.

Q.  Those comments didn't relate at all to FEMA?

MR. NEWMAN:  So Defendants are asserting the deliberative process privilege over the substance of the

comments that Mr. Edwards received regarding the draft staffing plan, on the basis that they're pre-decisional and deliberative.

And so I instruct the witness not to answer that question.

Q. Are you not going to answer that question?

A. I am not.

Q. And the question, to be clear, is whether those comments related at all to FEMA.

MR. NEWMAN: Same instruction not to answer the question.

MR. HOSHIJIMA: Your position is that just the subject matter and whether it related to FEMA is a deliberative issue?

MR. NEWMAN: Our position is that the substance of the comments that he received regarding a draft staffing plan are pre-decisional and deliberative, and they're covered by the deliberative process privilege.

And so, on the basis of that privilege, I'm instructing the witness not to answer the question.

BY MR. HOSHIJIMA:

Q.    Mr. Edwards, without getting into the substance of what the comments told DHS OCHCO to change or not change about the compiled final annual staffing plan, I'm going to ask about the general subject matter of the comment, which you already told us was not related to any individual component submissions.

Did the comments you received back through this clearing process have to do with FEMA?

MR. NEWMAN:  I instruct the witness not to answer that question on the basis of deliberative process privilege.

MR. HOSHIJIMA:  I think I'll state for the record that we're going to object to that invocation of the privilege --

MR. NEWMAN:  Understood.

MR. HOSHIJIMA:  -- and reserve the right to reserve -- to raise this issue.

MR. NEWMAN:  Understood.

BY MR. HOSHIJIMA:

Q.    You said you don't recall exactly when your office addressed those comments.  Right?

A.    Correct.

Q.    But you did address those comments and send it back up through STORM?

A.    Correct.

Q.    Did you hear anything further, after that, about the status of the annual staffing plan for DHS?

A.    I did not.

Q.    You communicate pretty regularly with OPM. Right?

A.    I do.

Q.    Have you ever talked or had any communication with OPM about the status of DHS's annual staffing plan?

A.    Not that I recall.

Q.    You don't recall OPM saying, we never received DHS's final annual staffing plan due early December?

A.    Not that I can definitively say, no.

Q.    When you say you can't "definitively say," what do you mean?

A.    I think, to your point, I can't imagine OPM not sending a note out to all agencies saying, don't forget your annual staffing plans are due, or something like that.

But I don't recall like a direct email or call or anything from OPM to me specifically saying, you're overdue; get this thing in.

Q.   If -- based on your regular practice of communicating with OPM in your capacity as DHS CHCO, if OPM had never received the final annual staffing plan from DHS through December, do you think somebody from OPM would have asked you about it?

MR. NEWMAN:  Objection; calls for speculation.

A.   It depends on what OPM is doing with the staffing plans, in terms of whether or not -- or any data call that they issue, as to whether or not they kind of are on a regular cadence of pinging me until I get it in.

And so, I don't know what they're actually doing with the government-wide staffing plans.

And so, because of that, I don't know why I haven't seen a sense of urgency from them with kind of pinging me to get our staffing plan in.

Q.   So you've gotten no indication from OPM about whether or not DHS had submitted its final annual staffing plan?

A.   I have not.

MR. HOSHIJIMA:  I'm introducing

an exhibit that was previously introduced as Exhibit 19.

(Whereupon, Plaintiffs Exhibit 19, previously marked, was introduced to the witness.)

Q.   This is a document that was produced to us.  Bates No. -6535 on the first page.  And I will start by calling your attention to the bottom email in the chain, starting at -6537.

(Witness reading.)

A.   Okay.

Q.   This is a November 21st email that you sent to HCLC principals and HCLC deputies.  Right?

A.   Yes, sir.

Q.   HCLC principals, like we've talked about, includes some of the head human capital people at each of the DHS components?

A.   That's correct.

Q.   You are asking these components throughout DHS to submit data for DHS's annual staffing plan by December 3rd.  Correct?

A.   That's correct.

Q.   This is the compilation of data process that we were just discussing.  Right?

A.   That's correct.

Q.   So you provided a standardized template

that aligns with OPM/OMB reporting requirements and gave it to each DHS component.  Right?

A.   Correct.

Q.   That standardized template calls for each component to take a bottoms-up approach to determine appropriate staffing levels?

A.   That was the request.

Q.   You told components to distribute the template to their lowest level offices?

A.   Correct.

Q.   Now, was this template an attachment to this email?

A.   I would assume that it was.

Q.   Do you remember?

A.   I don't recall.

Q.   Do you know if the template was like an Excel spreadsheet?

A.   And, I'm sorry.  So it says attached is a standardized template.

So, yes, I would have -- I would have submitted it with the email.

Q.   The attachment would have been a spreadsheet?

A.   Correct.

Q.   Prefilled with certain types of data you

are requesting.  Right?

A.  For this particular spreadsheet, I don't believe we prefilled it.

I think, for this spreadsheet, it was the headers and the types of information, with some definitions, so that it would be -- we would get a consistent set of data back.

But the components, I believe, would have been responsible for filling the template out.

Q.  What kind of headers and types of information were you requesting through this template?

A.  So it would have been data aligned to, you know, what is the position title?  How many of that type of position are you looking to hire?  What grade levels?  Those types of information.

Q.  With some level of granularity, because you're asking for the template to be distributed to the lowest level offices in each component.  Right?

A.  Correct.

Q.  How are DHS components supposed to send in their response?

A.  By email.

Q.  Would they have responded to you by email?

A.  They would have maybe asked me if they had

questions about the template, but I don't -- I don't recall getting a lot of questions about -- or any questions, quite frankly, about the template.

And in terms of how they submitted them, my data analytics team -- so you'll notice the person's name on the last page, Huy Le.  That team has set up a -- like a Dropbox site where components can go and put their data.

So I'm not sure if they emailed them to Mr. Le or if they posted them in the Dropbox.

Q.   Which is a sort of cloud file-sharing type of platform?

A.   Correct.

Q.   Did components throughout DHS send any responses to you?

A.   I don't recall.

Q.   You said earlier you were involved in compiling the submissions from each DHS component. Right?

A.   Correct.

Q.   You recall seeing, then, the submissions from each component?

A.   Personally, I do not.

Q.   You don't recall reviewing the responses submitted by each DHS component?

A.    So the team that was tagged with putting together our DHS-wide submission would have received each of the component submissions and then aggregated them.

I would have seen the aggregated document.

Q.    And you would not have necessarily seen the submission as it came from a particular DHS component?

A.    Correct.

Q.    But you saw the aggregated version?

A.    Correct.

Q.    And the aggregated version would have included the data submitted by each DHS component?

A.    Correct.

Q.    You reviewed the aggregated version before sending it up for clearance?

A.    I did.

Q.    How closely did you review the aggregated set of submissions?

A.    Close enough to know whether or not we fully completed the assignment.  Close enough to be able to ensure that the cover memo -- that we clearly explained what the process was.

Not close enough to go back to components and engage them on whether or not there were any

Page 164

changes or modifications that I felt they needed to make to their staffing plan.

Q. But somebody on your team would have looked at the submissions enough to know whether they had to go back to DHS components?

A. Correct.

Q. But you did not review for that purpose?

A. Correct.

Q. Going to the next email in this chain, which is from Betelehem Idriss, on December 18th.

Do you see that?

A. Yes.

Q. And am I pronouncing that name correctly?

A. You are.

Q. She's sending this December 18th email on behalf of Mischell Navarro. Right?

A. Cor- -- yes.

Q. Who's one of your deputies?

A. Correct.

Q. This December 18th email is a follow-up to the initial staffing data call that you had made in November. Right?

A. Correct.

Q. It says:

The next update to OPM is

                    due January 30.

     A.    Yes.

     Q.    It instructs components to review and
refine their previously submitted plans, but not
necessarily to fully resubmit them.  Right?

     A.    Correct.

     Q.    Were you involved in the process of
reviewing the components' submissions in response to
this December 18th email?

     A.    Again, similar process to the first time.

           So the components submitted, the team
aggregated, and then I would review the final before
it was sent forward for front office review and
approval.

     Q.    But your testimony is that you don't know
whether the update was actually sent to OPM on the
January 30th deadline?

                    MR. NEWMAN:  Object to form.

     A.    Correct.

     Q.    Because, like with the initial final
annual staffing plan, you would have sent the
aggregated version up for clearance?

     A.    Correct.

     Q.    But not heard back about what happened as
a result of the clearance process?

A.    Correct.  And I may not have heard back directly.  It may also have just come back down through STORM to my team.

And the team may have just submitted it over to OPM without needing me to do it.

Q.    This email says:

...the initial consolidated staffing plan is under review by the proposed Strategic Hiring Committee.

Do you see that?

A.    Correct.

Q.    What is the Strategic Hiring Committee?

A.    In one of the OMB/OPM guidance, the November 5, 2025, you'll notice that it talks about the strategic hiring committees that need to be set up by each agency, in that -- and I'm sorry.  It's Exhibit 43.

Q.    You're referring to the November 5, 2025 memorandum from OMB and OPM?

A.    Correct.

Q.    And you're saying that there's a Strategic Hiring Committee described starting Page 1 of that memorandum that each agency was supposed to establish?

A.   That's correct.

Q.   Who was on that Strategic Hiring Committee for DHS?

A.   At the time, the Strategic Hiring Committee would have truly been comprised of the individuals we talked about before, which would have been the four; so Stephen Munoz, Joseph Guy, Troup Hemenway, Greyson McGill.

And the proposal, again, which is why it says "proposed," is whether or not the deputy secretary or the under secretary for management would be a part of that committee.

Q.   Let me make sure I got that right.

So as of this December 2025 email, the people that you know were on the Strategic Hiring Committee are Stephen Munoz, Joe Guy, Troup Hemenway, and Greyson McGill.  Correct?

A.   So what I would say is that those are the individuals that my office proposed should be on the Strategic Hiring Committee.

Q.   DHS OCHCO made a recommendation about who should be on that committee?

A.   We did.

Q.   And your office decided to recommend those four people?

A.   That is correct.

Q.   So you would have been involved in that recommendation.  Right?

A.   That is correct.

Q.   Why did you choose those four people?

A.   Those are the individuals who we work with closely on matters involving the component human capital issues.

So they made sense as the individuals that we should recommend to the front office to include.

Q.   Did anyone from the DHS Office of the Secretary tell you who should be on that committee?

A.   This goes to the deliberative process question above, that we referenced earlier.

MR. NEWMAN:  Do you -- do you want to -- could we just take a quick break to confer with the witness about this?

MR. HOSHIJIMA:  Sure.

VIDEOGRAPHER:  Off the record at 12:31.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 12:36.

BY MR. HOSHIJIMA:

Q.    Mr. Edwards, before the break, we were talking about the Strategic Hiring Committee that was reviewing the staffing plan for DHS.  Correct?

A.    Correct.

Q.    And you had told me that there were four members of that committee that you are aware of?

MR. NEWMAN:  Objection; misstates testimony.

A.    So there was a recommendation of who would serve on the Strategic Hiring Committee.

To my knowledge, I -- those are the individuals who, in the interim, were reviewing the packages.

Q.    These people were, in fact, reviewing the packages.  Right?

A.    That's my understanding.

Q.    So they were already performing the function of the Strategic Hiring Committee.  Right?

A.    I think that's a fair statement.

Q.    So why do you say this is a "proposed" committee?

It sounds like this committee exists and is actually functioning as a committee.

A.    From my standpoint, there was a recommendation that went forward in alignment with

the memo.

So I am pending a final decision on who the secretary would like as -- to clearly designate as being members of the Strategic Hiring Committee.

Q.   DHS OCHCO made a recommendation --

A.   Correct.

Q.   -- about who should be on the committee?

A.   Correct.

Q.   And those are the four people that we've talked about now?

A.   There are other recommendations that are still undecided.  So we're pending to find out who else will be a part of that committee.

Q.   Who are those people?

MR. NEWMAN:  So I'm going to assert the deliberative process privilege over the substance of any response that he may have received from headquarters over who should be involved in the Strategic Hiring Committee.

And on that basis, I instruct him not to answer that question.

MR. HOSHIJIMA:  I don't think that was my question.

Q.   My question is:  Who are the people that

DHS OCHCO recommended to be on this committee?

MR. NEWMAN:  And objection; asked and answered.

But, in addition, though, I -- to -- also to the -- if -- to the extent that it's asking for any further specifics regarding the discussions with the -- with DHS headquarters about who should be on the Strategic Hiring Committee, then Defendants assert the deliberative process privilege and instruct the witness not to answer.

MR. HOSHIJIMA:  I'm not asking about the discussions.

Q.   I'm asking:  Who did DHS OCHCO recommend to be on the Strategic Hiring Committee?

MR. NEWMAN:  The same -- same instruction not to answer, on the basis of the deliberative process privilege.

MR. HOSHIJIMA:  What's your basis?

MR. NEWMAN:  That the discussions about who should serve on this committee are pre-decisional and deliberative.

Q.   I'm not asking about the discussions, Mr. Edwards.

I'm asking:  Who did D- -- who did DHS OCHCO recommend to be on the committee?

MR. NEWMAN:  Same instruction not to answer on the basis of deliberative process privilege -- you know.

And when I -- when I say "discussions," I'm including whether those -- including any recommendations that may have been in those discussions.

And so, on the basis of deliberative process privilege, I instruct the witness not to answer the question.

Q.   Will you answer the question?

A.   I will not.

MR. HOSHIJIMA:  What's your basis for saying that the names of the people that DHS OCHCO recommended are deliberative in a way that justifies invocation of the deliberative process privilege?

MR. NEWMAN:  Because, to the extent that such discussions occurred, these are before any decision was made

about who would serve on this committee and are for the purpose of deliberating on who should be on the committee.

So they are pre-decisional and deliberative, which are the two requirements for the deliberative process privilege.

BY MR. HOSHIJIMA:

Q. You did give me four names of people who are serving on this committee. Right?

MR. NEWMAN: Objection; misstates testimony.

A. I gave you four names of individuals who, in the interim, are currently serving in -- doing some of the functions that a Strategic Hiring Committee would function as.

And so, they were also, then, a part of the full set of recommendations, but not all of the recommendations going forward.

Q. You're saying that the naming of those four individuals to the committee were approved by the DHS secretary?

MR. NEWMAN: Objection; misstates testimony.

A. I am not saying that. I am saying that

those were recommendations.

Q.   What's the distinction you're drawing between those four people whose names you can give me and the names of the other people you have similarly recommended to serve on this committee?

A.   The distinction, for me, would be those are four individuals who we knew were a part of the process.  There's both -- the secretary did not have an opportunity to weigh in on that.

The additional individuals that were recommended were also not vetted by the secretary.

And so, we are in a process now where I do not have a final decision from the front office on who would be a part of that.

And there is the back-and-forth about other parts of this process that we've already talked about as being part of the deliberative process.

Q.   But you're saying that the four people you did name have been vetted and approved by the secretary to be on this committee?

MR. NEWMAN:  Objection; misstates testimony.

A.   No, I'm not saying that.

Q.   So what is the difference in status

between those four people who you have named and the other people who you won't name?

A.    The other individuals that we named are not individuals who currently have any role in the process.

And so, that's the difference between who I did name, who are kind of serving in -- prior to the Strategic Hiring Committee memo and prior to it being officially stood up, those four folks have actually been a part of some type of the hiring review process.

The other individuals that would be recommended have not been.

Q.    Have the other people you've recommended been disapproved to be on this committee?

A.    No one has been disapproved.

It's been still a part of the deliberative process.

Q.    So you're telling me that four people have been approved as the partial committee?

MR. NEWMAN:  Objection; misstates his testimony.

A.    Yeah, that is not what I'm saying.

Q.    Because those four people haven't been approved either?

A.    Correct.

Q.    So you're saying four people who have been recommended by DHS OCHCO to serve on this committee, but who have not been approved to serve on this committee, are functioning as this committee?

A.    So the committee was originally set up with a review by the front office.

Those four individuals were conducting those reviews by the front office in advance of officially establishing the Strategic Hiring Committee.

Q.    So these people are not on the committee?

A.    I am still pending approval of the final list of names of who will be on the final committee.

Q.    Let's go back to the first page of this exhibit we have in front of us, which is Exhibit 19.

At the bottom of this first full paragraph in this email from Jeffrey Neurauter, it says that:

On December 4, 2025, SOPDA Evans forwarded FEMA's Annual Staffing Plan directly to DHS.

Do you see that?

A.    So my apologies.  I'm missing it.

Q.    Bottom of the first --

A.    Oh.

Q.    -- full paragraph.

A.    The bottom of the first full paragraph.

Okay.  Got it.

Q.    Did FEMA SOPDA Karen Evans forward FEMA's annual staffing plan directly to DHS on December 4, 2025?

A.    I am not sure.

Q.    You don't know if she submitted a staffing plan directly to DHS?

A.    I don't know, and I don't recall if she did copy me on the email on December 4th.  I just don't recall.

Q.    Do you know who else she would have sent it to at DHS?

A.    I don't know for sure.

Q.    You don't -- have you seen FEMA's submission to DHS for the annual staffing plan?

A.    I don't recall their specific submission.

Q.    Do you remember anything about FEMA's submission to the annual staffing plan?

A.    I do not.

Q.    Do you have any reason to believe that this email is incorrect that SOPDA Evans, on December 4, 2025, forwarded FEMA's plan directly to DHS?

A.    I don't have anything to indicate that it would be incorrect, no.

Q.    Near the bottom of this first page, where it says:

                    The Annual Staffing Plan
                submitted to DHS by the Office
                of the Administrator contained
                FEMA's Leadership's staffing
                goals, showing a staffing level
                of 11,383....

        Do you see that?

A.    I do.

Q.    Do you know if FEMA submitted a staffing level of 11,383 to DHS?

A.    I don't recall their specific number.

Q.    Do you recall that FEMA submitted a staffing plan to DHS that would cut FEMA's staffing level by about half?

A.    I don't recall.

Q.    Do you recall anything about FEMA's submission for the DHS staffing plan?

A.    I do not.

Q.    Going back to DHS's submission of the annual staffing plan to OMB and OPM, are you aware of whether anybody from DHS communicated with OMB

and OPM about the contents of the annual staffing plan?

A.   I am not aware, no.

Q.   Were you present when anyone communicated with OMB and OPM about the contents of DHS's staffing plan?

A.   No.

Q.   Do you have any reason to believe that the staffing level submitted by FEMA was not 11,383?

A.   I do not, no.

Q.   Because you don't know anything about what FEMA submitted as part of this data call?

A.   No.  Not off the top of my head for this deposition, no.

Q.   Do you know if FEMA submitted anything in response to your request for information to include in the annual staffing plan?

A.   I do know that, yes.

Q.   You know that FEMA submitted something?

A.   Correct.

Q.   Do you know when?

A.   I don't know when.

Q.   Was it December 4th?

A.   I do not know.

Q.   Was it sent by Karen Evans?

Page 180

A.    I do not know.

Q.    Did it contain a staffing level of 11,383?

A.    I do not know.

MR. HOSHIJIMA:  Turning to this document -- and I can finish out this series and get us to lunch, I think.

But before that, I will hand you what's been previously marked Exhibit 17.

(Whereupon, Plaintiffs Exhibit 17, previously marked, was introduced to the witness.)

Q.    I'll represent this is a sheet from a spreadsheet that was produced to us in native form under Bates No. -6542.

This email that we reviewed in Exhibit 19 says that this is what Karen Evans sent to DHS for FEMA's contribution to the staffing plan.

Do you recognize this?

A.    I do not.

Q.    Do you recognize any of these numbers?

(Witness reading.)

A.    I do not.

Q.    Do you see that this spreadsheet is providing projected staffing levels for FEMA Office of the Administrator, FEMA Office of External Affairs, and other offices?

A.    I do.

Q.    These are fairly high-level organizational components of FEMA.  Right?

A.    When you say "high-level"....

Q.    You instructed components to send a template for the data call to the lowest level offices in FEMA.  Right?

A.    Correct.

Q.    The offices listed here are not the lowest level offices in FEMA.  Right?

MR. NEWMAN:  Objection; foundation.

A.    I would perhaps say that some of them are, based on the numbers.

So, you know, in an organization of thousands, to have, you know, the Office of the Administrator, Office of External Affairs with 300 people, and Office of Professional Responsibility, those are -- there's a fairly low level.  So they may have been going down to, you know, a Level 1 or 2 within the organization.

And these may be -- further, they may be roll-up numbers from when they went out, and then this may be a roll-up of when they actually went out to their organization.

So they may have rolled that up to get to this chart that you have here.

Q.   Is a roll-up number like a total number?

A.   I'm so sorry.  Yes.  So like for -- let's just take Response and Recovery.  They may have gone separate from what we were requesting.  They may have gone out to the lowest level possible.

But for the sake of giving us a higher level roll-up number, they may have only included at the -- you know, more of a top line level.  But they may have done their work separately.

Q.   But your email did not ask for roll-up numbers.  Right?

A.   Correct.

Q.   The template you sent asked for numbers from each of the lowest level offices in the agency?

A.   So if I can just take another look at that.

Okay.  So this one --

Q.   Bates -6537.

A.   So again, with the team that conducted the actual review of the data call, you'll notice, on the mid -- towards the bottom, where there are the bullets, it says components should "submit a consolidated response."

I'm not sure how they interpreted the "consolidated response."

MR. HOSHIJIMA:  Let's take a break for lunch.

VIDEOGRAPHER:  Off the record at 12:53.

(Whereupon, a recess was taken for lunch at 12:53 p.m.)

- - -

Page 184

A F T E R N O O N   S E S S I O N

(Time noted:  1:55 p.m.)

VIDEOGRAPHER:  On the record at 1:55.

BY MR. HOSHIJIMA:

Q.   Mr. Edwards, do you remember when Karen Evans became the top official at FEMA in early December?

A.   I do recall that -- that happening.  I don't remember the exact date.

Q.   She became the SOPDA, I think people say, of FEMA after David Richardson left the position?

A.   Yes, sir.

Q.   Did you know Karen Evans before that?

A.   I did.

Q.   Did you know Karen Evans when she was at DHS during the first Trump administration?

A.   I did.

Q.   What was your relationship with her then?

A.   I believe she was the CIO, and I was the deputy CHCO.

Q.   Did you work with her much?

A.   Not that much.

Q.   So you knew Karen Evans when she came back to the government at the beginning of this

administration in the Cybersecurity and Infrastructure Security Agency?

A.   I didn't really interact with her much then.  I mainly interacted with her when she came back as -- I think she was detailed as the senior -- senior advisor in the Management Directorate.

Q.   Before that, though, she was in CISA?

A.   And I apolo- -- I don't remember the timing of whether or not she came to us first and then CISA, or CISA and then came to us.

Q.   When do you remember her coming over to you-all?

A.   Timing-wise -- and, in fact, she was at CISA.

I don't remember when she came to us, though.

Q.   So I'll represent she was at CISA at the beginning of --

A.   Right.

Q.   -- the second Trump administration.

Then your recollection is that she moved over to the under secretary for management role?

A.   She moved -- the -- right.  The senior advisor in the Management Directorate, yes.

Q.   Do you recall when she was nominated for

the DHS under secretary for management position?

A.   I don't recall the date of the nomination or the time frame.

Q.   Do you recall her being nominated?

A.   I do.

Q.   Do you recall that her nomination was withdrawn?

A.   I do.

Q.   Any idea why that nomination was withdrawn?

A.   I do not know.

Q.   Is that something DHS OCHCO would have been involved in?

A.   When you say "involved in"....

Q.   The nomination process.

A.   The nomination process.

The reason why I have a hesitation is my team -- I have an executive services team that handles all of our political appointees.

I am not -- I don't believe she had a role in the actual nomination process.  So I'm not sure what came through there.  But....

Q.   Going back to when Karen Evans was at CISA, did you ever interact with her related to CISA staffing?

A.    Yes.

Q.    What do you recall about your interactions with Karen Evans about CISA staffing?

A.    The real -- only -- the interactions that I have was that she had questions about how to -- some of the documents that we had sent out from the CHCO Council, she, I think, was reviewing them with her CHCO, who I think was also acting at that time.

And so, she would -- she just would call me about questions about their directions that I had sent out to the CHCO Council.

Q.    Did those questions relate to some of the President's executive orders that we discussed so far in this deposition?

A.    I don't recall for sure.

Q.    Do you recall CISA lost about 1,000 employees while Karen Evans was leading that agency?

A.    I am aware.

Q.    That's about a third of CISA.  Right?

A.    I can't remember their original staffing numbers, but that sounds right.

Q.    In your years of experience in the federal government, have you ever seen an agency lose a third of its people in that short of a period of

time?

A.    Personally, no.

Q.    So that was fairly extraordinary.  Right?

MR. NEWMAN:  Object to form.

A.    In my experience.

Q.    Did you ever hear Ms. Evans say that she wanted CISA to be the first DHS component to meet its staff reduction targets under this administration?

A.    I don't recall that conversation.

Q.    Would it surprise you to hear that she was saying that to people when she was at CISA?

A.    No, it would not.

Q.    Why not?

A.    Ms. Evans is a go-getter, and that's the hard charger.

And so, she is one of those folks that, when she's given a mandate, she's going to -- she's going to execute.

Q.    Do you know what mandate she was given?

A.    I'm sure her mandate was to make sure that CISA is rightsized.

And so, however she felt that was appropriate, I'm sure she would have worked to achieve it.

Q.    A mandate from the President?

MR. NEWMAN:  Objection; calls for speculation.

A.    I am not sure.

Q.    What do you mean by "rightsize"?

A.    When we talked a little bit before, we talked about whether or not workforce reshaping was in -- the initiatives have all been about just downsizing.

And some of them were really about making sure that people had a graceful off-ramp from federal service in order to then be able to build the organization back with the skills and talent; and, in particular, a cyber organization, where the skills and what's needed are just kind of ever-changing.  So....

Q.    Rightsizing at CISA while Karen Evans was in charge resulted in a third of the agency leaving?

MR. NEWMAN:  Objection to form.

A.    I believe so.

Q.    Did you interact with her -- and by "her," I mean Ms. Evans -- when she came over to take a role at FEMA?

A.    I did on a more limited basis at that point.

Q.   Do you recall she first came over to FEMA as senior advisor to David Richardson?

A.   I do recall.

Q.   Do you know why she came over to FEMA when she didn't have any disaster-related experience?

A.   I don't.

Q.   Do you know if it has anything to do with that mandate you talked about?

MR. NEWMAN:  Objection; calls for speculation.

A.   I don't know that.

Q.   So going back to last summer, summer 2025, when Karen Evans had moved over to FEMA, but before she became the Senior Official Performing the Duties of Administrator, what kinds of interactions would you have with Karen Evans during that time period?

A.   While she was a --

MR. NEWMAN:  Object to form.

A.   While she was senior advisor?

Q.   And then chief of staff.

A.   And then chief of staff.

And I'm sorry.  During what time frame?

Q.   Between -- I believe it's about May 2025 when she comes over to FEMA and December when she becomes SOPDA.

A.    I know that I had interactions with her. I do not recall the substance of the interactions.

And they weren't -- they weren't like that frequent.

Q.    Did you discuss FEMA's staffing with her?

A.    I don't recall if we discussed FEMA's staffing.

We would have discussed FEMA personnel issues, but not -- I don't know that it was staffing.

Q.    What's the distinction you're drawing here between FEMA staffing and FEMA personnel?

A.    When I consider staffing, I think of recruiting and hiring.

Personnel could be anything from performance management, awards, disciplinary actions.  It could be anything in that -- that full realm of managing a person.

Q.    What types of FEMA personnel issues do you remember talking to Ms. Evans about during this time period?

A.    I believe Ms. Evans was concerned -- during this time period.

I can't plug it directly to a time period.

Q.    You started to say that Ms. Evans was

concerned about something.

What was she concerned about?

A.   There was a concern in her information technology team, that I remember talking with her about managing the -- figuring out how to determine if there were any leaks or anything in her information technology team.

Q.   Any leaks from the FEMA information technology team?

A.   Correct.

MR. HOSHIJIMA:  I'm passing you an exhibit that was previously introduced as Exhibit 26.

(Whereupon, Plaintiffs Exhibit 26, previously marked, was introduced to the witness.)

Q.   This is a document that was produced to us, Bates number starting with -14520.

Looking at the bottom email in this chain, which is on the second page, which is an email from La' Toya Prieur to Daniel Peterson on December 5, 2025.

Let me know when you've found that.

A.   I see it.

Q.   Do you see this is just after Ms. Evans takes over as SOPDA at FEMA?

A.    I don't recall her exact date when she took over.

Q.    Do you recall, before lunch, we were looking at a document that said that on December 4, 2025, SOPDA Evans forwarded FEMA's annual staffing plan directly to DHS?

A.    I do recall.

Q.    So this would be the day after that. Right?

A.    Correct.

Q.    On this day, La' Toya Prieur, who is the FEMA CHCO, is asking somebody else at FEMA about information on "CORE expirations by month beginning with January 2026."

Do you see that?

A.    I do.

Q.    It says the Office of the Administrator, which I understand to be the FEMA Office of the Administrator, will send that information to S1 today.

Do you see that?

A.    I do.

Q.    Is that your understanding as well, this is referring to the FEMA Office of the Administrator sending information to the DHS secretary?

A.    I do believe that's what they were referencing.

Q.    And this is an 8:17 a.m. request for something to be completed by 10:00 a.m.  Right?

A.    Got it.  Yes.

Q.    So fairly urgent request for information to go over to the DHS secretary?

A.    I'm not sure if they would consider it urgent, but it is a limited amount of time to complete.

Q.    About CORE expirations, which is a FEMA personnel issue?

A.    Correct.

Q.    If FEMA's OCHCO were sending this kind of information over to S1, would your office at DHS OCHCO have known about that?

MR. NEWMAN:  Objection to form.

A.    If they were sending it directly to the secretary's office, we may not know about it.

Q.    How common would it be for, I guess here, FEMA Office of the Administrator to send information about FEMA personnel directly to S1?

MR. NEWMAN:  Objection; foundation.

A.    I am not sure how common that would be.

Q.   Uncommon?

A.   I am not --

MR. NEWMAN:  Objection; foundation.

A.   I'm not sure how uncommon it would be either.

Q.   Do you know if the FEMA Office of the Administrator sent this information over to DHS?

A.   To DHS?

Q.   Any part of DHS.

A.   So I am not sure about this specific data run and whether it was submitted.

Q.   If you go to the top email in this chain, La' Toya Prieur says, later that same day, that:

This is a monthly ask for the time being.

And that this is a report that should be generated monthly.

Do you see that?

A.   I do.

Q.   Do you know if FEMA has been sending over monthly information tracking CORE expirations to any part of DHS?

A.   I have received at least two such requests from FEMA.  But I don't know -- I can't say that it

is on a -- on a monthly schedule.

Q. When did you receive those two -- you said "requests," but this is information from FEMA. Right?

A. So the specific pull that they are referring to -- I don't believe we received this exact pull that they are just pulling from their system.

Q. Have you received something similar, maybe not exact, but relating to the tracking of CORE expirations by month?

MR. NEWMAN: Object to form.

A. So I don't know what was actually pulled in the actual report, in order to be able to answer your question.

Q. When you say you received "two such" types of transmissions from FEMA, what were you referring to?

A. As a part of the verification process that we talked about, the hiring verification process, there was something that resembled what this would have looked like in terms of pulling the data for the expiration dates.

There was something similar to that with those requests.

Q.   When would those two requests have been?

A.   I don't know the exact date.  I know that one was received in January.

And I'm not sure the date -- the month of the other one.

Q.   Was the other one before or after the one you recall being in January?

A.   I don't remember if there was one that somehow came in December, in preparation for January, or if it was -- I saw the one in January, then there was one in February.

So that's the problem.

So there were two that came somewhere in that, I think, December to February time frame.

Q.   Those two transmissions, did they come from FEMA to you?

A.   They did.

Q.   Did you ask for them?

A.   I did not.

Q.   Why did FEMA send you those two sets of data about CORE expiration dates?

MR. NEWMAN:  Objection; foundation.

A.   They were in alignment with the approval process that we had put in place for hiring.  And

so, my team handled the hiring.

Ms. Evans had worked out a expedited review for the CORE renewals to try to ensure that the CORE renewals that they were recommending for approval were -- made it through our process expeditiously.

So those would have come to me directly, since she had the conversation with me to make sure that I could actually push them up to the front office.

Q.   You're not sure if those were directly related, though, to the data pulls we're talking about in Exhibit 26?

A.   Correct.

Q.   Do you know who in the office of S1 would have been asking for this information?

A.   I don't.

Q.   No idea?

A.   No.  No idea.

Q.   So you're aware that in December, FEMA's authority to renew some COREs on its own was expiring.  Right?

A.   Correct.

Q.   And that was because the Kristi Noem approval that we saw earlier, reinstating FEMA's

authority to renew COREs, went only until the end of December?

A.   Correct.

Q.   Do you know if FEMA ever requested to extend that reinstatement of FEMA's authority by DHS beyond the end of December?

A.   I don't recall.

Q.   Do you remember any discussions that you had with anyone about FEMA requesting an extension of that authority from DHS?

A.   Not that I recall.

Q.   You just remember that FEMA's authority was going to expire?

A.   The only way that I remember that is because of the document that you showed earlier.

So FEMA typically tracks what authorities they have or don't have.  And then in alignment with that, once it expired, then they knew that they had an obligation to come back.

MR. HOSHIJIMA:  I'm marking this as Exhibit 45.

(Whereupon, Plaintiffs Exhibit 45 was marked for identification.)

Q.   This is a document that was produced to us with Bates number starting -0400.

Do you see that the top email in this chain is an email from Karen Evans to you?

A.  I do.

Q.  Do you remember this email?

(Witness reading.)

A.  Not specifically, no.

Q.  The emails lower down in the chain that Karen Evans is forwarding to you are emails about La' Toya Prieur, the FEMA CHCO, providing information to Karen Evans about CORE renewals. Right?

A.  I see that.

Q.  Do you know why Karen Evans was forwarding this information to you?

A.  I don't recall the context.

Q.  If you look at this middle email with the table in Ms. Prieur's email, do you see that it involves numbers about the numbers of COREs renewed and off-boarded in the second half of 2025?

A.  I see that.

Q.  And by "second half," I mean May 1st to November 30, 2025.

A.  I see that.

Q.  And there's also a discussion of a history of the delegation to renew COREs?

A.    I see it.

Q.    Do you see that box next to the delegation to renew COREs recounts some of this history we've discussed today, starting with the March 2025 hiring verification memo, Roger Brown's email about MCO COREs, and the Noem memo reinstating FEMA's authority to renew COREs?

MR. NEWMAN:  Object to form.

A.    And, I'm sorry, the last point?

Q.    That this history involves S1's approval of FEMA's authority to extend non-MCO CORE appointments.

A.    Got it.  Yes.

Q.    Did you ask Karen Evans for this information?

A.    I don't recall.

Q.    Did somebody ask you to ask her for this information?

A.    I don't recall.

Q.    When you received the information from her, did you pass it on to anybody else in DHS?

A.    Yeah, I don't -- I don't know if I forwarded it or not.

Q.    How common would you say it was that Karen Evans would directly send you some information about

FEMA personnel?

A.    It wasn't that common.  It was only if there was, like, some specific issue, like the one I mentioned earlier.  So....

Q.    But you don't recall if there was a specific issue that led to her sending you this information?

A.    No, I don't.

Q.    Do you recall anytime before December 19th that Karen Evans had ever sent you information about FEMA COREs?

A.    I don't recall it.

Q.    Do you have any recollection of having discussed FEMA COREs with Karen Evans at any point before December 19th?

A.    Not that I recall.

Q.    And were you in any meetings, where Karen Evans was also present, where there was discussion of FEMA COREs?

A.    Not that I recall.

Q.    Do you tend to take notes when you meet with people?

A.    I don't necessarily take notes.  I do due-outs or -- if I have taskers or actions.

Q.    In what form do you keep those records of

due-outs?

A.    Normally, they're -- during this time, they would have been handwritten.

Q.    Do you think you might have handwritten notes of what you might have discussed with Karen Evans that led to her forwarding you this email?

A.    Unlikely.

Q.    Why do you say that?

A.    Ms. Evans' communications and outreach to me aren't -- a lot of times, they are not scheduled meetings.  A lot of times, they were just kind of cold calls.

And so, when it's a cold call, I don't necessarily have my pad with me, in order to take notes on my pad, if there -- if there is, you know, something for me to take notes on.

So it's -- most of the time, when I talked to her, it was kind of on the fly.  I was moving somewhere, and it wasn't like there was a scheduled meeting when I -- when I know that I've got to have my notebook ready and to take notes in it.  So....

Q.    How common was it for Karen Evans to cold-call you?

A.    That was typically our communication style.  If she needed to reach out to me, she

just -- she would just call.

Q.   How common would that be?

A.   I would say, during the time frame, so maybe like the December to March time frame, maybe four or five times.

Q.   If you had any notes of your conversations with Karen Evans by phone, would they be handwritten?

A.   I believe they -- they should be, yeah.  I think so.

Q.   Do you know if you provided any of your handwritten notes for production in this case?

A.   I did not.

Q.   So nobody's come and collected your handwritten notes?

A.   No.

MR. HOSHIJIMA:  I am handing you what we'll mark as Exhibit 46.

(Whereupon, Plaintiffs Exhibit 46 was marked for identification.)

Q.   This is a document that was produced to us with Bates number starting -0415.

And the top email in the chain is an email from Karen Evans to you, Mr. Edwards.

Do you see that?

A.   I do.

Q.   This is nine minutes after the previous email we discussed in Exhibit 45.

A.   Okay.  I see that.

Q.   This one says:

                    Here is the other email.

A.   I see that.

Q.   Ms. Evans is forwarding you other back-and-forth she had with Ms. Prieur.

Do you see that?

A.   I see that.

Q.   So is it correct that Ms. Evans forwarded you these two emails as a result of the same conversation you had with Ms. Evans?

A.   I'm sorry.  Say that one more time.

Q.   Did Ms. Evans forward you these two emails as a result of the same conversation you had earlier that day?

A.   So I don't recall the conversation earlier that day or maybe a day before, but it does feel like these are emails in response to a conversation that we had.

Q.   But you don't recall what conversation you had that would have led to her forwarding you these two emails?

A.   Correct; I do not.

Q.   You don't know what you did with the information she gave you in the second email either?

A.   I don't, in terms of did I forward it.

Q.   Did you sometimes receive information from Ms. Evans about FEMA personnel that you would then pass on to others within DHS?

A.   Yes.  So -- yes.

Q.   Who are the other people at DHS that you have sometimes passed on information you received from FEMA?

A.   For instance, we talked about -- sometimes they would send me their requests for renewals directly, especially during the shutdown.

And so, I would make sure that I copied the team who was responsible for that review process.

So I would -- my internal team.

Q.   People internal to DHS OCHCO?

A.   Correct.

Q.   Anybody else you might have forwarded information or shared information with that you got from FEMA?

A.   Not that I recall.

Q.   Let's take a look at the email starting on

this first page of Exhibit 46 that Ms. Evans sent to Ms. Prieur at 12:38 a.m. on December 19th.

          Do you see that?

     A.   I do.

     Q.   Do you see where Ms. Evans is quoting some language about CORE extensions and a waiver required for CORE extensions that's from your deputy, Roger Brown's, email earlier in the year?

     A.   Correct.

     Q.   And that's Exhibit 41, if you want to take a look at Mr. Brown's email.

     A.   I recall it.

     Q.   This is the email, we discussed, that Mr. Brown sent about DHS's new hiring verification process.  Right?

     A.   Correct.

     Q.   And that's where he said that COREs that are MCOs don't need to go through the process, but that non-MCO CORE renewals would require going through the hiring verification process.  Right?

     A.   Correct.

     Q.   Ms. Evans, though, says that:

                    It appears you, FEMA

               OCHCO, have no authority to

               extend any MCO agreements for

two years.

Do you see that?

A.   I do.

Q.   But that's not consistent with what Mr. Brown had told Ms. Prieur when the hiring verification process memo came out.  Right?

MR. NEWMAN:  Objection to form.

A.   I would need to go back and....

Do you happen to remember which exhibit that was?

Q.   Exhibit 41 is Mr. Brown's email to Ms. Prieur.

(Witness reading.)

A.   Okay.  And I'm sorry.  Your question again?

Q.   We discussed earlier that MCOs, or mission critical occupations, are excepted from the new hiring verification process by DHS.  Right?

A.   Correct.

Q.   So any COREs that are MCOs did not have to go through a DHS approval process to be renewed by FEMA.  Right?

A.   Any COREs that were a PMCO or MCO. Correct.

Q.   Sorry.  Can you say that again?

A.    Any COREs that were a PMCO or MCO did not need to go through the approval process?  Is that what you asked?

Q.    Right.

A.    Correct.

Q.    So Ms. Evans is misreading Mr. Brown's email here when she says that it appears FEMA OCHCO has no authority to extend any MCO agreements for two years?

MR. NEWMAN:  Object to form.

A.    So I think that this is in conjunction with the other email for the -- from the secretary.

What's the timing on this?

Yeah, the other email from the secretary where the secretary said that they do not have the authority to go for two years, but they had the -- not the secretary -- yeah, from the secretary -- that they had the authority for a certain -- 180 days, I think, but not for two years.

Q.    You're referring to Secretary Noem's approval memo in Exhibit 21?

A.    Correct.

Q.    The memo that you said you had not recalled seeing before today?

A.    Correct.

Q.    We discussed how this was reinstating FEMA's authority to renew COREs that had been taken away by the March 2025 hiring verification process. Right?

MR. NEWMAN:  Object to form.

A.    Correct.

Q.    But as to MCO COREs, FEMA never had to go through the hiring verification process to renew those COREs' terms.  Correct?

MR. NEWMAN:  Object to form.

A.    For PMCO, MCO.

And I don't know if there was any other conversation that occurred with the front office that limited them even further than what was in the initial memo.

But based on the memos, that's correct. They would have had approval for the PMCOs and MCOs.

MR. HOSHIJIMA:  Let's take a look at what I will label as Exhibit 47, as soon as I find it.

(Whereupon, Plaintiffs Exhibit 47 was marked for identification.)

Q.    Exhibit 47 is a document produced to us under Bates number starting -0420.

Do you see that it's another email from

Ms. Evans to you on December 19th?

A.    I do.

Q.    It's later in the same day after these two previous email forwards that you had received from her?

A.    I do.

Q.    She's forwarding you three different email threads about COREs within the space of an hour. Right?

A.    Correct.

Q.    Do you recall why she was forwarding you three email threads related to CORE renewals on that day?

A.    I still don't recall the genesis of -- of the email strings.

Q.    Based on what you recall was happening in mid-December of 2025, do you know why Karen Evans would be sending you information on FEMA COREs?

A.    The only thing that I can think of is that there....

I don't know for sure.

Q.    Do you have any recollection of what was happening in mid-December 2025 about FEMA CORE renewals that might have prompted Ms. Evans to send you this information?

A.   So there are two things, and I'm just hazy on the timeline.

So one would have been the creation of the staffing plan, which would have identified the numbers and -- across the organization.

And then the other is just the tracking of how many employees were on the rolls and kind of seeing the increases or decreases of employees on the rolls across the Department.

Q.   Why would you and Ms. Evans have been talking about the number of FEMA employees on the rolls at this time in December 2025?

A.   So I don't know about at this time in 2025, because, again, I cannot recall if we had a specific conversation about that.

But again, we were just doing regular tracking.  I think she had just gotten to FEMA, and so she was trying to get a lay of the land for whether or not they were adhering to the hiring process.

And so, she probably looked at reporting to see where their -- where their numbers were.

Q.   Ms. Evans had been at FEMA since mid-summer.  Right?

A.   Right.

Q.   But you're saying that because Ms. Evans had recently taken the top role at FEMA, that you think she may have been looking into the number of FEMA COREs on the rolls?

A.   And again, this is one of those times when it's not good for me to speculate, because I'm not sure what she was doing.

But we were working on the staffing plan during that time, so....

Q.   You were working on the staffing plan with Ms. Evans?

A.   No.  The components were working on their staffing plans to be able to submit them.

Q.   But Ms. Evans was sending this directly to you.  Right?

A.   So as the staffing plans were coming in, Ms. Evans probably noticed that maybe there was some issue.

So I don't know -- I don't know if that's the reason or not.

Q.   Because you had testified earlier that DHS components' submissions for the DHS staffing plan came in through your data team.

A.   Correct.

Q.   Right?

And you have a whole data team of people that compiled that into a DHS staffing plan.  Right?

A.    Correct.

Q.    How many people are on that data team in DHS OCHCO?

A.    I don't know the full staffing.  I think it's between five and seven.

Q.    You have five to seven people working on your data team, collecting information from DHS components about staffing levels.

And yet, Karen Evans is sending some of this information about FEMA COREs directly to you. Right?

MR. NEWMAN:  Object to form.

A.    Correct.

Q.    And you don't have any recollection of why?

A.    I don't.

Q.    Would it have been unusual for Ms. Evans, as the head of a DHS component, to be sending you that kind of data about COREs when you have a data team that's receiving this kind of information through a process that's established for that purpose?

MR. NEWMAN:  Object to form.

A.    So I think that there are two parts of it.

So it is possible that the staffing plan helped spark what the issue was for Ms. Evans.

But if they were supposed to be underneath the hiring process and it created a rub for her where she thought that maybe they had not been compliant, that would be the reason why she would include me, not because of just the staffing plan.

So if she felt like the submissions -- they should have come through us, but they didn't get the right approval, that's when she probably would have come to me.

Q.    But you don't recall whether she actually had that concern?

A.    I don't recall.

Q.    Taking a look at Exhibit 47, which is our most recent exhibit, and turning to the second page, the email from Ms. Evans at 11:43 a.m. on December 19th, she says:

I need to know what has been done.  I have also discussed the situation with Roland Edwards.  He too is pulling the thread because he does not recall FEMA having the

authority to process two-year renewals.

Do you see that?

A.    I do.

Q.    What is she talking about there?

MR. NEWMAN:  Objection; calls for speculation.

A.    So I do think that this goes back to her question about whether or not there was potentially anything incorrect or inappropriate about FEMA internally processing approvals without going through the DHS process.

Q.    Internally processing which approvals?

A.    The CORE renewals for the two years.

Q.    Do you recall having discussed the situation with Ms. Evans, like she says in this email?

A.    I vaguely recall it.

Q.    What do you recall about that conversation?

A.    I literally vaguely recall her calling me and expressing a concern that perhaps they were not compliant with our process.  And she wanted to know if I knew if they had received an exception.

Q.    When you say "they" and "our" in that

answer --

A.    Sorry.

Q.    -- what do you mean by that?

A.    FEMA -- whether or not FEMA had received an exception from someone at DHS.

Q.    Whether FEMA had received an exception from someone at DHS, from the DHS hiring verification process?

A.    Correct; to allow them to process appointments for two years.

Q.    To process CORE renewals.

A.    CORE renewals.

Q.    Right.

Not new appointments, but renewals?

A.    Correct.

Q.    So you vaguely recall Karen Evans calling you with this concern?

A.    I do.

Q.    Do you recall what you might have said to her in response to her concern?

A.    I didn't know off the top of my head.

And so, I would have had to say I would get back to her on it.

Q.    Is that maybe what she means when she says "he," as in you, Mr. Edwards, "does not recall FEMA

having the authority"?

MR. NEWMAN:  Objection to form.

A.  I would assume that's where that came from.

Q.  Ms. Evans says:

He too is pulling the thread.

Do you see that?

A.  I do.

Q.  Does that mean that you were also going to investigate that question?

MR. NEWMAN:  Objection; calls for speculation.

A.  Just to see whether or not I had anything in my file showing that they received explicit authority to process the two-year renewals.

Q.  Did you look into that question?

A.  I'm sure that I did.

I don't know what I sent or what responses I sent as an outcome of my pulling the thread.

Q.  Do you recall if you sent any response to Ms. Evans after looking into the issue?

A.  I don't recall.

Q.  Was somebody at DHS headquarters raising this kind of concern with FEMA's authority to renew

COREs?

A.   Not that I recall.

Q.   You don't recall if somebody in the DHS Office of the Secretary was asking these questions?

A.   Not that I recall.

Q.   Do you recall talking to anybody in the DHS Office of the Secretary about this issue?

A.   Timed with this date or otherwise?

Q.   At any time.

A.   The only communication that I recall is the communication with Ms. Evans and Joe Guy where Ms. Evans looped him in to say that they had talked, and there was a process internal to FEMA that he was okay with, and that they would move out with their -- with the internal process that they had talked about.

Q.   Ms. Evans also talked to Ms. Guy [sic] about this issue?

          MR. NEWMAN:  Objection; form.

A.   Mr. Guy, yes.

Q.   Mr. Guy is at DHS headquarters?

A.   He is.

Q.   So he was involved in this issue of CORE renewals?

A.   He was.

Q.   Looking at the top email in this thread, do you see that when Ms. Evans forwards you this email, she copies Kara Voorhies?

A.   I see that.

Q.   Now, Ms. Voorhies was not part of the email thread before that.

Do you see that?

(Witness reading.)

A.   I do.  I see that.  She is not included.

Q.   Ms. Voorhies is at DHS.  Right?

MR. NEWMAN:  Objection to form.

A.   I do not know where Ms. Voorhies was at that time.

Q.   Do you know where Ms. Voorhies worked?

A.   I do not.

Q.   You don't know where she worked, even though you have been on multiple email chains with her?

A.   That is correct.

Q.   You told me earlier that you would -- you have been in a number of email chains with her. Right?

MR. NEWMAN:  Objection to form.

A.   Yes.

Q.   But you never knew who she was?

MR. NEWMAN:  Objection;

misstates testimony.

A.    So, Ms. Voorhies, again, I believe, was introduced by Ms. Evans, in terms of working an issue for her.

So, yes, I did trust that she had a need to know on the situ- -- on the issue, based on Ms. Evans including her.

Q.    Going to the email from Ms. Prieur to Ms. Evans at 11:48 a.m., which starts on Page 1 of this email.

A.    Okay.

Q.    Do you see Ms. Prieur providing a timeline and background information on the evolution of FEMA's CORE renewal process?

A.    I do.

Q.    Do you agree with this first bullet point, that before January 2025, FEMA followed the CORE manual and FEMA appointed and reappointed COREs for two- to four-year increments?

MR. NEWMAN:  Objection; foundation.

A.    I actually don't know how FEMA managed that internally, so I actually can't speak to that one directly.

Q.   DHS wasn't involved in reviewing FEMA's recommendations for CORE renewals at that time?

A.   My office was not.  That's correct.

Q.   No part of DHS was.  Right?

MR. NEWMAN:  Objection; foundation.

A.   I am not sure.

Q.   Turning to the next page of this email thread, the second bullet point is a reference to the Amanda Scales email that we discussed earlier that exempted DHS and FEMA from the hiring freeze due to the national security clause.

A.   I see that.

Q.   So do you agree that after that, FEMA continued to extend CORE appointments without having to seek approval from DHS?

MR. NEWMAN:  Objection; foundation.

A.   I agree.

Q.   Do you see that -- where it says:

March 2025, CORE renewal data was erroneously reported to S1 as new hires versus term renewals.

A.   I see that bullet.

Q.   Do you know if that report to S1 is something that DHS OCHCO would have also received?

A.   I'm not sure which report they're referencing.

Q.   Do you recall reporting of CORE renewal data to DHS?

A.   I don't recall.

And if this is -- if this statement is accurate, then it wouldn't have been broken out as CORE renewal data.

It would -- probably would have just been broken out as new hire.  So like a new hire number.

Q.   CORE renewals are extensions of existing federal employees.  Right?

A.   That is correct.  I think that what this is basically saying, though, is that this -- the CORE renewals were aggregated into the new hire column instead of the term renewals, is what they're saying here, though.

Q.   And there's a separate term renewals number from new hires?

A.   Correct.

Q.   Going to the top email on this chain, then, from Ms. Evans to you.  Do you see how Ms. Evans says:

                    Roland,

                    Here is additional

               information.  As you know, we

               were both working this from the

               other side.

     A.    I see that.

     Q.    Do you know what she's talking about there?

               MR. NEWMAN:  Objection; calls for speculation.

     A.    My assumption is because Ms. Evans was in the Management Directorate during the time that some of the hiring freeze guidance was issued out to component.

          So I'm assuming that's what she's referring to.

     Q.    When Ms. Evans was in the Management Directorate, did you work with her on any issues related to FEMA COREs?

     A.    I don't recall working with her directly on FEMA CORE issues when she was in the Management Directorate.

     Q.    Do you know what she means when "you" say you were both working this from the other side?

     A.    I believe she was referring to the overall

hiring freeze and the subsequent guidance that we issued to components, not necessarily the FEMA CORE renewal issue.

Q.   Well, the rest of this paragraph is talking about the reporting of FEMA CORE renewals to DHS.  Right?

A.   That is what the rest of the paragraph is talking about, yes.

Q.   And you don't recall working on that issue earlier in 2025?

A.   Not with Ms. Evans and not while she was in the Management Directorate, I do not.

Q.   Separately from Ms. Evans, do you remember, earlier in 2025, working on some issue that had to do with the reporting of CORE renewal data to DHS?

A.   I do not.

MR. HOSHIJIMA:  I'm handing you what we'll mark as Exhibit 48.

(Whereupon, Plaintiffs Exhibit 48 was marked for identification.)

Q.   Going back, actually, to the discussion about Ms. Evans when she was in the Management Directorate.

A.   Okay.

Q.    She was never confirmed to be under secretary of management at DHS.  Right?

A.    That's correct.

Q.    What was her role at that time in the Management Directorate?

A.    I believe her official title was senior advisor.

Q.    In her role as senior advisor in the Management Directorate, do you recall her working on any issues related to FEMA COREs?

A.    I do not.

Q.    Would it surprise you if she had?

A.    I don't know that it would or would not surprise me.

Q.    Would a senior advisor to the under secretary of management be involved in FEMA personnel issues?

A.    They could be.

Q.    If they did, would you know about it as DHS CHCO?

            MR. NEWMAN:  Objection; calls for speculation.

A.    I think, in most instances, I would.  But I can't say that it would be a hundred percent.

Q.    This issue, though, turning back to

Exhibit 47, of the reporting of CORE renewal data was in March 2025, according to Ms. Prieur.  Right?

MR. NEWMAN:  Objection; form.

A.   I see that.

Q.   Wasn't Ms. Evans in CISA still in March 2025?

A.   I don't recall.

Q.   If she were in CISA in March 2025, would it make any sense that she would have been involved in anything having to do with FEMA COREs?

MR. NEWMAN:  Objection to form.

A.   So I am not sure -- Ms. Evans was very active in the Department at that time, so I'm not sure if she was helping or assisting or if she was just fully at CISA and only handling CISA matters.

Q.   Did you say she was very active in the Department at the time?

A.   Correct.

Q.   When she was at CISA?

A.   Correct.

Q.   What do you mean, she was very active in DHS at the time?

A.   As a senior political appointee, Ms. Evans, from every indication I have, was very sought after for her opinion and her guidance.

Page 228

So....

Q.    Even when she was at CISA, then, she may have weighed in on personnel matters at other DHS components?

MR. NEWMAN:    Objection; calls for speculation.

A.    I am -- I'm honestly not sure.

Q.    So what did you mean when you said she was very active at DHS?

A.    Yeah.    So she's -- she was one of the senior politicals in the Department.

So if -- you know, as -- we had a lot of actings, etc., across the Department.

It's -- she may or may not have also been tapped to help support another component from where she was currently sitting.

So I'm just not -- I'm just not sure.

Q.    Because she was successfully cutting a third of CISA.    Right?

MR. NEWMAN:    Objection -- objection to form.

A.    I'm not sure if that's the reason or it's just because she's just a successful manager.

Q.    Successful in cutting a third of CISA. Right?

A.   I'm not sure if that's it or if she's just a successful manager.

Q.   Looking at Exhibit 48, which we just handed you.  This is a document produced to us with Bates number starting -0600.

Do you see the email on December 19th, 12 -- at 12:26 p.m., where you said that:

> La' Toya and I had a quick
> chat and will sync on the
> numbers and respond back to
> you.

A.   I do see that.

Q.   This is a response to the prior email we reviewed, where Ms. Evans had forwarded you information about which you were both working on from the other side?

A.   I see that.

Q.   What did you and Ms. Prieur chat about after this email from Ms. Evans?

A.   From what I recall of the chat, it was just that -- whether or not she had any information about -- to try to answer Mrs. Evans' question about whether or not we had any additional authorities that I wasn't aware of, was one.

And then I think the second one was just

to try to get an understanding of all the CORE counts to make sure that they were accurate based on the -- what she was pulling on her -- from her data side.

Q.  Why were you, as DHS CHCO, getting involved in confirming the numbers of FEMA COREs?

A.  From a -- from a component perspective, they have data systems to be able to pull their information directly.

As a Department, we also have the ability to go in and validate whether or not the numbers are correct, once they've gone through all of the pay processing rules.

So we would have access to the data.  They would also have access to the data.

So I think it was just a validation point.

Q.  Do you recall checking the data that DHS had on CORE renewals?

A.  I do recall pulling a report, or having the team pull a report.

I don't recall what the balance looked like between our report and with -- and the FEMA report.

Q.  If you look back at Exhibit 48, do you see that Ms. Prieur, later that afternoon, sends you an

email saying:

I have the following data

re: CORE employees.

A.   I see that.

Q.   That email is just to you.  Right?

A.   It is.

Q.   Not responding to Ms. Evans?

A.   I think this was the two of us thinking --
to make sure that we could go to Ms. Evans with a
consolidated response.

Q.   You forwarded these numbers to Huy Le?

A.   Huy Le?  Yes.

Q.   Why did you forward these numbers to Huy
Le?

A.   Huy is the head of the data analytics team
that we talked about.

And so, Huy would have then pulled the --
he would have been the person who could pull the
data for me to determine if our numbers matched with
what FEMA provided.

Q.   Who else would you have shared these
numbers with?

A.   At this stage?

Q.   Right.

A.   It would have just been Huy.

Q.   Are there other stages when you would have shared data about CORE renewals with somebody in DHS headquarters?

MR. NEWMAN:  Object to form.

A.   Not -- not as a part of this issue, I don't believe, no.

Q.   As a part of other issues?

A.   If there was an issue, like, I would certainly let my leadership know.  But there weren't any.

But in theory, if there were, I would let my leadership know if there was something I thought would raise to their level.

Q.   Do you see that the information that Ms. Prieur is sending you breaks out the number of CORE renewals for two different time periods, between January 1st and November 30th and January 20th and November 30th?

Do you see that?

A.   I see that.

Q.   Did you ask for her to break out those numbers between two different time frames?

A.   I don't recall specifically asking her for those time frames.

Q.   Who asked her to break those numbers down

in those time frames?

MR. NEWMAN:  Objection; foundation.

A.   I don't know.

MR. HOSHIJIMA:  Good time for a quick break?

WITNESS:  Works for me.

MR. HOSHIJIMA:  Let's go off the record.

VIDEOGRAPHER:  Off the record at 3:02.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 3:18.

MR. HOSHIJIMA:  Mr. Edwards, I'm handing you Exhibit 49.

(Whereupon, Plaintiffs Exhibit 49 was marked for identification.)

BY MR. HOSHIJIMA:

Q.   This is a document produced to us with Bates number starting -0446.  The top email is an email from Ms. Prieur to you and Ms. Evans, continuing on December 19, 2025.

That's the day we were talking about with the last few emails.  Right?

A.    Yes, sir.

Q.    This is a continuation of that last email thread we were discussing?

A.    I see that.

Q.    You and Ms. Prieur were going to sync on the numbers and respond back to Ms. Evans?

A.    Correct.

Q.    And this is Ms. Prieur sharing more data about CORE appointments with a lot of people who were originally on the thread?

A.    I see that.

Q.    Including Ms. Evans and Ms. Voorhies?

A.    I see that.

Q.    Do you see that the CORE renewals for different time periods are broken out by different mission critical occupations?

A.    I see that.

Q.    Did you ask for the data to be broken out that way?

A.    Not that I recall.

Q.    Did somebody at DHS ask for that data to be broken out that way?

A.    Not that I recall.

Q.    Do you see that the data shows that COREs perform various mission critical occupations,

including emergency management specialists, but also others?

A.    So I would have to go back and determine whether or not all of these are considered mission critical occupations.

So I would need to go back to that chart and just kind of do a crosswalk.

Q.    That would be the chart you said was attached to the March 2025 DHS hiring verification form?

A.    Yes, sir.

Is it 40?  I think it's 40.

(Witness reading.)

Yeah.  So a number of these positions would not be considered either pri- -- so there are three categories of mission critical occupations.

There are priority mission critical occupations, which are really the front line -- border patrol agents, those types.

There are the mission critical occupations, which are the occupations that typically support the front line directly.  So they're an enabling function.

And then there's the folks who are kind of the mission support that are on the government-wide

MCO list because they're just hard-to-fill positions, typically, government-wide.

And so, you'll see that that's how the three categories are broken out.

And a number of the positions that are here don't fall under either of -- any of those categories.

Q.   Ms. Prieur says these are CORE appointments with a breakout of MCOs, though. Right?

A.   That is what she says.

Q.   In December 2025, then, both you and Ms. Evans are asking for a lot of this data about CORE renewals.  Right?

A.   Yes.

Q.   You don't recall why?

A.   I still don't recall the specific issue that launched this string.  So....

Q.   You may not recall the specific issue, but you recall that FEMA's authority to renew non-MCO COREs without going through the DHS process was about to expire.  Right?

A.   I do.

Q.   And DHS OCHCO was asking for data, along with Ms. Evans, about CORE renewals.  Is that right?

A.    That is right, with a small caveat -- is that, our information request about CORE renewals is because of Ms. Evans' request to us.

Q.    You recall Ms. Evans requesting information about CORE renewals from DHS OCHCO?

A.    So in terms of the information and, again, making sure that La' Toya and I were synced on the data in terms for the CORE, the numbers that were approved, that type of information.

Q.    Do you recall that at some point a decision was made not to renew FEMA COREs that had NTE dates starting January 1st?

A.    Not that I recall.

Q.    You don't recall that there were a series of CORE nonrenewals in early January?

A.    Not that I recall, no; and certainly not that I was a part of.

Q.    You don't recall being involved in any discussions about whether to renew COREs with upcoming NTE dates in late December?

A.    Not that I recall, no.

Q.    Did you work between Christmas and New Year's?

A.    I did.

Q.    You weren't involved in any discussions

between Christmas and New Year's about FEMA CORE renewals?

A.   Not that I recall.

Q.   Do you know if anyone at DHS was involved in discussions during that time period about FEMA CORE renewals for people who had NTE dates coming up?

A.   Just to -- just to backtrack, are you asking the question about was FEMA internally taking a -- taking a look at COREs and making decisions?

Or are you asking me, was I a part of the process to determine whether or not COREs would or would not be renewed?

Q.   Let me rephrase.

A.   Okay.

Q.   In late December, do you know if anyone at DHS headquarters was involved in discussions about whether to renew COREs whose terms were expiring in January?

A.   I am not aware of any of those discussions, and I was not a part of discussions about specific CORE renewals.

                    MR. HOSHIJIMA:  I'm handing you Exhibit 50.

                    (Whereupon, Plaintiffs Exhibit 50 was

marked for identification.)

Q.   This is an email produced to us with Bates stamp -0472.  It's an email from Puneet Khan to you on January 8th.

Do you recognize this email?

(Witness reading.)

A.   I don't specifically remember the email.

Q.   Who is Puneet Khan?

A.   She's a deputy chief of staff for FEMA.

Q.   How often have you communicated with Ms. Khan?

A.   During the time period?

Q.   Sure.

A.   Okay.  Infrequently.  Like, I -- honestly, I don't recall, like, having any significant conversations with her during that time period.

Q.   During any time period, do you recall having regular communications with Ms. Khan?

A.   So I would have interacted with her a lot more frequently, because she used to be in the Management Directorate.

And so, I did interact with her then.  I did not interact with her as much when she went to FEMA.

Q.   When was she in the Management

Directorate?

A.    Earlier in 2025.

But I don't remember when she moved over to the FEMA front office.

Q.    Would Ms. Khan have been in the Management Directorate when Ms. Evans was in the Management Directorate?

A.    It is likely that they overlap, but I can't -- can't recall for sure.

Q.    Because you told me that Ms. Evans was, at one point, in the Management Directorate.  Right?

A.    I did.

Q.    In 2025?

A.    Correct.

Q.    But you don't know if Ms. Khan's time there overlapped?

A.    I don't recall when she left to go to FEMA.

Q.    But similar time frames?

A.    "Similar time frames"...?

Q.    That Ms. Khan and Ms. Evans were in the Management Directorate.

A.    Right.

MR. NEWMAN:  Object to form.

A.    I'm not sure.  I can't recall.

Q.   Do you know what Ms. Khan means when this email says:

                    Thank you for all your

                 help over the last few days.

A.   I don't recall.

Q.   This email is about FEMA CORE renewals, though.  Right?

A.   That's certainly what it looks like.

Q.   And you're aware that over the week before this email, between January 1st and January 8th, FEMA had been separating COREs whose NTE dates had come up?

A.   I'm not sure that I'm aware of that -- or that I was aware of that.

Q.   You're not aware that in early January, FEMA was letting go of COREs?

A.   Not -- not directly, no.

Q.   You don't know what Puneet Khan is referencing when this email says:

                    Thank you for your help

                 over those last few days.

A.   I don't recall.

Q.   Why is she reaching out for you -- for help in this email, then, about FEMA CORE renewals?

                    MR. NEWMAN:  Objection; calls

for speculation.

A.    I don't recall.

It -- I did manage the -- my team, at least, was responsible for the process to send approvals to the front office.

So I don't know if this was her request to me to make sure that I knew that FEMA would have a significant -- significant number, that they wanted to make sure that I had visibility on it, and that I would track through with my team.

Q.    This email says:

FEMA has a large volume of

CORE positions that are being

reviewed.

A.    Okay.

Q.    Is that referring to DHS's review of FEMA's requests to renew FEMA COREs?

MR. NEWMAN:  Objection;

foundation.

A.    I'm not sure.  I'm not sure if, there, she's referencing the -- any that may have been in the DHS process or ones that were still being reviewed at FEMA.

Q.    Starting the beginning of January, the DHS process was being used for DHS to approve FEMA CORE

renewals.  Right?

A.   That is correct.

Q.   You recall that starting at the beginning of January?

A.   I do.

Q.   Because FEMA's authority to renew its own COREs was taken away at the end of December?

A.   I'm assuming that that's the reason why, yes.

Q.   And DHS had to approve any CORE renewals?

A.   Correct.

Q.   Do you know why Puneet Khan is asking for expedited review here?

MR. NEWMAN:  Objection; calls for speculation.

A.   In conversations, it's because they wanted to ensure that the -- the CORE renewals could occur by the date if they were going to renew the COREs.

Q.   What does she mean at the end of the email, when she says:

...rather should go

through the standard process.

MR. NEWMAN:  Objection; calls for speculation.

A.   My understanding is that -- because of the

timing, that there were some that were coming up for renewal imminently, and they wanted to make sure that there wouldn't be a break for those employees.

Q.   Is the "standard process" referring to the S1 hiring verification process?

A.   That's my understanding.

MR. HOSHIJIMA:  I'm handing you Exhibit 51.

(Whereupon, Plaintiffs Exhibit 51 was marked for identification.)

Q.   This is a document produced to us with Bates number starting -10027.

If you take a look at the bottom email in the thread, on the third page, do you see that's an email from you to Ms. Prieur?

A.   I do.

Q.   And to Ms. Sanchez?

A.   Yes.

Q.   Blanca Sanchez also works in FEMA OCHCO with La' Toya Prieur?

A.   She did at that time.

Q.   Do you know where she is now?

A.   I do not.

Q.   This email that you write is about OCC hiring.  Right?

Page 245

A.   It's about hiring for attorneys.

Q.   OCC is FEMA's Office of Chief Counsel?

A.   Correct.

Q.   You say, to FEMA OCHCO:

> Just wanted to provide
> some guidance.  All appointment
> types for all attorney hires
> are exempt from the hiring
> verification process.  You may
> move out on them internally.

Do you see that?

A.   I do.

Q.   Do you recall issuing this guidance?

A.   I do.

Q.   Where did this guidance come from?

A.   The Office of General Counsel.

Q.   The DHS Office of General Counsel?

A.   Yes.

Q.   Decided to exempt all attorney hires in FEMA from the hiring verification process?

A.   Not just FEMA; across the Department.

Q.   Who at DHS OGC made that decision?

MR. NEWMAN:  Objection; foundation.

A.   I don't -- I don't recall who was a

signatory on that email.

Q.    But it would have been an email that somebody in OGC sent to you to communicate that exemption to DHS components?

A.    Correct.

Q.    Do you recall if anybody in DHS Office of the Secretary was involved in this decision to exempt attorneys from the hiring verification process?

A.    I am not sure.

Q.    But the regular hiring verification process, or the standard process, has to go to the Office of the Secretary for approval.  Right?

A.    That's correct.

Q.    Do you think an exemption from that process for approval from the Office of the Secretary would have to be approved by the Office of the Secretary?

A.    That would be my assumption.

Q.    But you don't know if someone in the DHS Office of the Secretary made that decision?

A.    I do not.

Q.    In this email, when you say "you can move out on them internally," do you mean that FEMA can hire attorneys within this exemption internally

within FEMA?

A.   Yes.

Q.   And what I mean is:  When you say "internally," you mean FEMA can hire those people without asking DHS for permission.  Right?

A.   That's correct.

Q.   Did DHS give FEMA exceptions from the hiring verification process for any other category of employees, other than attorneys?

MR. NEWMAN:  Objection; foundation.

A.   Not that I'm aware.

Q.   If there were any such exceptions, would you have been the one to provide that guidance, like you did here?

MR. NEWMAN:  Objection; calls for speculation.

A.   I'm not sure.  Typically, it would come through my office.

Q.   Did you give FEMA any guidance about any other categories of employees that are exempt from the hiring verification process?

A.   Not that I recall.

MR. HOSHIJIMA:  I'm handing you Exhibit 52.

(Whereupon, Plaintiffs Exhibit 52 was marked for identification.)

Q.   This is an email produced to us with Bates number starting -0608.

Do you see that?

A.   Yes.

Q.   Starting from the bottom of this thread, this is an email from Karen Evans to La' Toya Prieur, copying various people at FEMA, that says "Summary of Proposed CORE Actions"?

(Witness reading.)

A.   I -- my apologies.  Say that one more time.

Q.   Sure.

Turning to the email at 7:20 p.m. on January 13th, that's an email from Karen Evans to Ms. Prieur.  Right?

A.   Got it.

Q.   The email is titled "Summary of Proposed CORE Actions."

Do you see that?

A.   I do.

Q.   And it's an email about COREs whose not to exceed dates, or NTE dates, are between January 12th and 18th.  Is that right?

A.    That's what the memo says, yes.

Q.    It says that certain COREs whose terms are expiring during that period are "approved to proceed to HQ for approval."

A.    And I'm sorry.  In that same email?  I just don't see that language.

Q.    If you look, for example, at No. 2, Mission Support, it says "approve to proceed for -- to HQ for approval."

A.    I see that.

Q.    So is Ms. Evans approving some CORE renewal recommendations to proceed to HQ?

A.    From the email, that's what it appears.

Q.    If you look at the email above that from Ms. Evans to Joe Guy, Greyson McGill, and you, do you see that Ms. Evans is providing a summary of recommended hiring extensions for COREs?

A.    Yes.

Q.    So these are recommendations that she approved to proceed for HQ -- to HQ for approval that she's now sending to you.  Is that correct?

A.    Correct.

Q.    Why is she sending these recommendations to you, Joseph Guy, and Greyson McGill?

MR. NEWMAN:  Objection; calls

for speculation.

A.   I am not sure why she's sending them to the others.  I think, for me, it's to make sure that I know what's coming in the process for approval.

Q.   She tags you in the middle of this email to say that:

> The S1 hiring forms are
> being prepared for these CORE
> appointments.

A.   I see that.

Q.   Why is she tagging you for that update?

MR. NEWMAN:  Objection; calls for speculation.

A.   It's likely because my organization was managing the process.

And so, she just wanted to make sure that I knew that they would still be coming through the process for approval.

Q.   Your office, as in DHS OCHCO, was processing hiring verification forms submitted by FEMA to DHS.  Right?

A.   That's correct.

Q.   And these are the forms we reviewed previously where components would request hiring verification from the Office of the Secretary?

A.   Correct.

Q.   And it says "S1 Hiring Forms" because those forms go to a secretary, who was Kristi Noem at the time?

A.   It says that because they would go to the secretary's office.  Correct.

Q.   "S1" is the secretary herself, though?

A.   That is correct.

Q.   Why is Ms. Evans including Kara Voorhies on this email?

MR. NEWMAN:  Objection; calls for speculation.

A.   I don't know.

Q.   The process you described, though, doesn't involve FEMA submitting these verification requests to Joe Guy.  Right?

A.   Submitting them directly?

Q.   Correct.

A.   As a part of our -- our process, no, it would not.

Q.   Joe Guy is a deputy chief of staff at DHS?

A.   Correct; during that time.

Q.   So he's above the Management Directorate in terms of the chain of command in DHS?

MR. NEWMAN:  Object to form.

Page 252

A.   Technically, I don't know.

He's in the secretary's office, which is above the Management Directorate chain of command.

Q.   You don't know why Ms. Evans is directly contacting the Office of the Secretary at DHS about these recommended hiring extensions for COREs?

A.   My assumption would be in order to ensure that she could talk through the process that she wanted to implement, so that Joseph Guy, who oversaw her line of business, knew and understood the process that they were applying in terms of reviewing CORE renewals.

Q.   When you say Joseph Guy was overseeing her "line of business," do you mean that FEMA is part of Joseph Guy's portfolio?

A.   That was my understanding.

Q.   Do you know who William, or Will, Bilicic is?

A.   I do not.

Q.   Here, Mr. Bilicic is providing a signed delegation memo that allows him to sign the hiring verification forms in place of Ms. Evans?

A.   Okay.  I don't see it attached, but....

Q.   Do you see, in Ms. Evans's email, where she tags you, that she says that she'll send you a

copy of the delegation memo because Will Bilicic is going to be signing the S1 hiring forms?

A.   I do see that.

Q.   So Mr. Bilicic is assigned by Ms. Evans to sign the S1 verification forms for FEMA CORE renewals.  Right?

A.   That's what it would appear.

Q.   Why do you forward that delegation authority to Coann Glaze?

A.   I believe that the form required that the component head sign off on the forms.

And so, this was to ensure that Ms. Glaze, who's the executive over the group, the team that was reviewing the forms as they were coming in -- just to make sure that she knew that it was okay for the forms to come in with Mr. Bilicic's signature.

Q.   You said that Coann Glaze is the executive that oversees the team that receives the S1 verification forms?

A.   That's correct.

Q.   Where in the DHS hierarchy is Coann Glaze?

A.   So within the Office of the Chief Human Capital Officer -- so I'm -- I am the CHCO.

The deputy CHCO, Jason Nelson, has the operations portfolio.

And then Coann Glaze reports directly to Jason Nelson.

Q.   Coann Glaze is two levels of reporting below you in DHS OCHCO?

A.   That's correct.

Q.   Jason Nelson, who's also copied in this email, or who you also forward this email to, is your direct report?

A.   That's correct.

Q.   Coann Glaze reports to Jason Nelson?

A.   That's correct.

MR. HOSHIJIMA:  I'm handing you Exhibit 53.

(Whereupon, Plaintiffs Exhibit 53 was marked for identification.)

Q.   I am handing you an exhibit -- or a document that was produced to us by Defendants with Bates number starting -0643.

It's an email.  It says it's from DHS Personnel Actions to Personnel Verifications Actions Leadership, on January 15th.

A.   I see that.

Q.   And I'll represent that we redacted the individual CORE employee names in the employee name part of the table.

But, otherwise, this document is as it was produced to us by Defendants.

Do you see that this email is an expedited request for DHS personal -- personnel verification requests from FEMA?

MR. NEWMAN:  Object to form.

A.   I see that.

Q.   And the email says it's coming from DHS Personnel Actions, but it's signed, in the signature block at the end, by Ms. Coann Glaze.  Right?

A.   I see that.

Q.   So Ms. Coann Glaze is able to send emails from a DHS Personnel Actions email alias?

A.   I would have to confirm, but I believe she can.

Q.   What is the DHS Personnel Actions email account?

A.   I'm not sure.

Q.   You don't know what DHS Personnel Actions the email group is?

A.   So I'm not sure who's a part of it.

I'm pretty sure that this is a joint mailbox that was set up to ensure that Ms. Glaze and, when we're not in a shutdown, her team members can send these actions to the front office from a

consistent mailbox.

Q. Have you seen this DHS Personnel Actions mailbox before?

A. Yes.

And I'm sorry. Are you asking, have I seen it in an email exchange before?

Q. Right.

A. Yes.

Q. Was it created for the purpose of sending up S1 verification forms?

A. That's my understanding.

Q. So it was created fairly recently?

A. Within the last year and a half, for sure.

Q. Last year and a half.

The S1 verification process, though, only dates back to March 2025. Right?

A. Right. So I'm just saying, somewhere in -- I just don't remember when it was created.

Q. And you don't know exactly who has access to that mailbox?

A. I don't.

Q. Do you know who has access to the mailbox that's receiving this email, the mailbox called Personnel Verifications Actions Leadership?

A. I am not a hundred percent sure.

This is the group that I mentioned earlier that I believe would be included in that group, but I'm not sure.

Q. This email is copying you as well. Right?

A. I see that.

Q. It's sending an expedited request summary for FEMA and supporting documents?

A. I see that.

Q. Why is Ms. Glaze sending these approval requests from FEMA to Personnel Verifications Actions Leadership and to you?

A. For DHS approval.

Q. Approval by who at DHS?

A. So this would be someone in the front office, normally.

I believe it would be one of the four that we talked about previously.

Q. By "front office," are you referring to the DHS Office of the Secretary?

A. I am.

Q. This email from Ms. Glaze references previous coordination and discussion with Ms. Karen Evans and DCOS Joe Guy.

Do you see that?

A. I see that.

Page 258

Q.   Do you know what she's referring to when she talks about this previous coordination and discussion?

A.   The conversation that I mentioned where Ms. Evans and Mr. Guy talked about the process that they would employ within FEMA to review CORE renewals to determine which renewals -- which COREs would be renewed.

Q.   Were you part of that conversation?

A.   I was not.

Q.   Do you know who else was part of the conversation between Mr. Guy and Ms. Evans about which COREs would be renewed?

A.   I do not.

Q.   Do you know when that conversation took place?

A.   I do not.

Q.   It would have been before this January 15th email?

A.   It definitely would have been before that.

And I would say that Ms. Evans would not have talked to him about which COREs would be renewed.

She would just talk to him about the process that would have been used to renew them.

Q.   And why do you know that?

A.   Typically, that was what was in her email communication to me, is that they talked about the process.  So....

Q.   Did you hear from Mr. Guy about that conversation?

A.   There was an email exchange where Ms. Evans had Mr. Guy on there.

I don't remember if he responded back to say....

I don't remember him responding back.  I would have to go back and look and see.

Q.   What's the email chain that you're referencing where Ms. Evans emailed you and Mr. Guy?

A.   There is a -- there is a string -- I think it's when either she sent -- let me think.

I would have to go back and check.  I don't recall, like, what the exchange was, but there was an exchange where Ms. Evans said that she had a conversation with Joe Guy.

She included Joe Guy, I guess, so that we would know that he was -- he'd been a part of the conversation.

I just don't recall his response at this point.

Q.   And the email you recall from Ms. Evans was talking about what?

A.   Documenting that she and Mr. Guy had had a conversation about the process for CORE renewals that they would use internally within FEMA.

Q.   Going back to this email from Ms. Glaze.

This set of requests is coming from FEMA to DHS because, as of the end of December, FEMA has to ask DHS for permission to renew COREs.  Right?

A.   That's correct.

Q.   And this is using the process that would set up for hiring verification forms to go up to the Office of the Secretary?

A.   That's my understanding.

Q.   Do you know why that process was set up in a way where DHS OCHCO is directly sending up the request to the Office of the Secretary instead of going through the under secretary for management?

A.   I think, from my standpoint, it was because these are personnel requests, and some of them may or may not be -- have sensitive information in them.

And so, number one, you normally would not want those in a STORM system.

Two, it'd allow for us to review them and

then have an expedited way of getting them to the front office, the secretary's office, for review.

Q.   You said that ordinarily, when you are sending up decisions to the Office of the Secretary, it would go through the under secretary for management.  Right?

A.   Correct.

Q.   And you said this is the only process you know of where there's a different approach?

A.   Oh, I'm not sure that I'd say it is the only process, but it certainly is one of the approaches where we have a direct -- a direct route.

And historically, we've had a direct route, when it comes to personnel decisions, that we did not put them through the STORM system.

MR. HOSHIJIMA:  I'm handing you what will be Exhibit 54.

(Whereupon, Plaintiffs Exhibit 54 was marked for identification.)

Q.   This is an email produced to us with starting Bates No. -0473, from Ms. Prieur to you on January 21, 2026.

And I can represent that we went through and redacted individual FEMA CORE employee names in the attachment.  But, otherwise, this is the email

and attachment as it was produced to us.

Do you recognize this email?

A.    It looks familiar, but not specifically.

Q.    Ms. Prieur is sending you 28 personnel action requests for FEMA to renew COREs with NTE dates in January.  Right?

A.    Correct.

Q.    She's sending them just to you, copying some other people in DHS?

A.    Correct.

Q.    Why is she sending these requests to you?

MR. NEWMAN:  Objection; calls for speculation.

A.    So I think that it might be just a slight misrepresentation to say that she's sending them just to me.

Because on my team are the two individuals responsible for the process on the team with -- and I'm sure she's aware of that.

So Coann Glaze and Jason Nelson are copied.  But, for me, because it's expedited, she wanted to make sure that as the head of the organization, that I know that this needs to be expedited and I'm working with my team to make sure that that happens.

Q.    Did you tell Ms. Prieur to email you the CORE renewal requests?

A.    I don't know that I explicitly told Ms. Prieur to send them to me directly.

Q.    You had testified earlier that hiring verification forms from all over DHS tend to get sent to other people in DHS OCHCO, not to you. Right?

A.    Correct.

Q.    Because you're the person at the top of a 200-person office that handles this kind of thing. Right?

A.    Correct.

Q.    So why are you personally being sent these CORE renewal forms?

MR. NEWMAN:    Objection; calls for speculation.

WITNESS:    Yeah.

A.    So I can't speak definitively to the reason.

But again, if it's an expedited review and if it has some sensitivity to it, which obviously, from the exchanges, these do, I would -- I would expect for an office to send them to me to make sure that I was tracking them and that I was personally

Page 264

kind of responsible for making sure that they occurred in a timely manner, so....

Q. Up until January 2026, though, FEMA doesn't have to ask for DHS approval for this kind of CORE renewal. Right?

A. Prior to that, correct.

Q. And now you're getting personally involved in the decision whether to approve FEMA CORE renewals?

MR. NEWMAN: Object to form.

A. So this is not me involved in the decision. This is me involved in the process to obtain a decision.

Q. The actual decision-maker is someone higher up the chain that you'll pass these on to?

A. That's correct.

Q. If you look at the attachment to this email, do you see that these are forms that are called "Verification of Inter/Intracomponent Details and Personnel Actions Request Form"?

A. I see that.

Q. And it looks similar to the S1 verification form that was attachment to DHS's March 2025 hiring verification process memo.

A. Um-hum.

Q.    But it's not that same form.  Right?

A.    Correct.

Q.    Why is that?

A.    There were two processes that were put in place.

One was the -- and I -- to this day, I still get them confused.

One was the hiring verification, which is, if the position was vacant and you want to request to fill the position, then you had to request to be able to post the position to fill it.

The second one was the personnel verification, which I believe this is.  If you were an existing personnel member and there was something that you wanted to do with that person, or if you had a name request to fill a job.

So if it's the CHCO and I'm fired after -- and you want to replace the CHCO, you would need to send a personnel verification form.

Because if you knew that you wanted to put someone new in that job, the person, personnel, you would send that request, because you need that approval to fill the job with a specific person.

Q.    The forms that are attached to this email, you would call "personnel verification forms"?

A.    That's what they appear to be.

Q.    These are required to go up to the Office of the Secretary for approval as well, though. Right?

A.    That is correct.

Q.    Both of the forms you're talking about go from a DHS component to DHS OCHCO, and then up to the DHS Office of the Secretary?

A.    That's correct.

Q.    How long has DHS been using this form for personnel verification?

MR. NEWMAN:  Objection; foundation.

A.    I don't recall when we sent this form out for component use.

Q.    Was it within the last year?

A.    It is now March.

I don't know if it's within the last year or if it was since the beginning of 2025.

Q.    Going back to this email, the attachment says January 18th to 31, 2026 CORE renewal requests, FEMA OA approved.

Do you see that?

A.    Oh, on this -- up in the attachment name?

Q.    Yes.

Page 267

A.    Okay.  Yes.

Q.    That's referring to FEMA Office of the Administrator's approval.  Right?

A.    That's my understanding.

Q.    And that's because the FEMA Office of the Administrator would approve the requests, but the requests still have to be approved by the DHS Office of the Secretary.  Right?

A.    That's my understanding.

Q.    FEMA Office of the Administrator can't make its own call to renew these call -- these COREs.  Right?

A.    They are making the call of which ones to renew and then push them forward for concurrence.

Q.    You said "concurrence"?

A.    Correct.

Q.    That's the first time I've heard you use that term in the context of this process.

A.    Correct.

So the office that manages the process is responsible for determining qualifications, determining, you know, what's needed in order to manage the organization.

Once they make those determinations, they would then send it forward to the front office to

Page 268

make sure the front office agreed that they could then move out on them.

Q.    Ms. Prieur's email, though, is asking that these packages be expedited for approval.  Right?

A.    Correct.

Q.    And that's approval by the DHS Office of the Secretary?

A.    Yeah, that's correct.

Q.    Do you know if the FEMA Office of the Administrator actually considered the qualifications and need for CORE renewals before sending them up?

A.    Do I know -- I was not involved in the process.

It is my understanding that the FEMA administrator actually went through and reviewed submissions -- or the needs of the various organizations before determining which ones would be approved or not approved.

Q.    What's the basis for that understanding?

A.    Of me understanding that that's what she did?

Q.    Right.

A.    That was a conversation that I'm -- I don't recall if it was a conversation or an email, but that -- that's what I received from Ms. Evans in

terms of the process that she worked out with Mr. Guy, that that's what they would be doing.

Q.   Is this the email you referred to earlier as summarizing the conversation between Ms. Evans and Mr. Guy?

A.   That's correct.

Q.   So you don't personally know what process Ms. Evans is actually using when she's considering CORE renewal requests.  Right?

A.   That's correct.

MR. HOSHIJIMA:  Handing you Exhibit 55.

(Whereupon, Plaintiffs Exhibit 55 was marked for identification.)

Q.   This is an email produced to us with Bates stamp -0504.

Do you see that the bottom email is an email from Ms. Prieur to you on January 21st?

A.   I do.

Q.   And that's the email we reviewed just now with the 28 personnel action requests package for expedited approval?

A.   I see that.

Q.   So these are for the COREs with January 18th to 31st expiration dates.  Right?

Page 270

A.   Correct.

Q.   When you send this over to Ms. Glaze and you say, "Over to you, ma'am," what are you expecting her to do with that?

A.   So the process -- I'm putting it back into the process that we've described, which would go to her team in order to review the incoming requests and send it up the chain to the appropriate individuals for review and approval.

Q.   So who told you to send these over to Coann Glaze?

MR. NEWMAN:  Objection; foundation.

A.   No one told me to send them over to her. I just sent them over so they would go into the correct process.

Q.   And when you say "the correct process," what did you expect her to do with these requests after you sent them to her?

A.   There were a couple things.

One, we track them to make sure that we know what has come in, what has gone up, and then what comes back as approved.

And so, that's number one.

Number two, she would then send them

forward to the front office to make sure that they were reviewed and approved.

Q.   She would send them over to the front office, as in the DHS Office of the Secretary, by email?

A.   That is correct.

Q.   And you said she would also track the requests.  Right?

A.   That is correct.

Q.   What is this tracker that you're describing tracking?

A.   We have just a -- I think -- I don't know if it's SharePoint or Excel.

But we just have a -- when they come in, we just log them, that they've been received.

Q.   It's a spreadsheet?

A.   Correct.

Q.   That logs FEMA's CORE renewal requests?

A.   It logs all requests that are coming through that process.

Q.   When you say "that process," you mean the personnel verification process?

A.   Either process, the personnel verification or the hiring verification process.

Q.   And it's a tracker that is tracking

submissions of either of those types of forms from any DHS component?

A.   That's correct.

MR. HOSHIJIMA:  Turning to Exhibit 56.

(Whereupon, Plaintiffs Exhibit 56 was marked for identification.)

Q.   This is an email produced to us with Bates stamp -0539.

Do you see that the bottom email in this thread is that same email we've discussed before, where Ms. Prieur sends you a batch of 28 expedited personnel action requests?

A.   I see that.

Q.   This is the email you forwarded to Ms. Glaze in the previous email chain.  Right?

A.   I see that.

Q.   Ms. Glaze is sending that to DHS Personnel Actions?

A.   I see that.

Q.   Do you know why she's doing that?

A.   This is January.

Prior to -- prior to the shutdown -- so Ms. Glaze has a team.

And so, I am not sure whether or not

Page 273

that's just to make sure that it's tracked by the box that it would normally go to for approval, and then her team would then log it on her behalf.

So I'm just -- I'm not sure.

Q.   Because DHS personnel actions is not the set of people who are approving these requests. Right?

A.   I don't believe so.  I think there was another email address for those folks.

Q.   If you look at Exhibit 53, you're saying that Personnel Verifications Actions Leadership are the decision-makers?

A.   That's what I believe.

MR. HOSHIJIMA:  Turning to Exhibit 57.

(Whereupon, Plaintiffs Exhibit 57 was marked for identification.)

Q.   This is an email produced to us with Bates stamp -0642.  And it's an email from you to Ms. Prieur on January 22nd.

Do you see that?

A.   I do.

Q.   And do you see that you are attaching two files and saying:

These are all approved.

Do you see that?

A.   Yes.

Q.   If you pull up Exhibits 53 and 54, which were Ms. Glaze's email with an expedited summary -- request summary and Ms. Prieur's email to you with the 28 personnel action requests, do you see how those -- the subject lines of those emails are the attachments to your January 22nd email?

(Witness reading.)

A.   I do.

Q.   So are you saying that those two prior batches of FEMA requests have been approved?

MR. NEWMAN:   Object to form.

A.   I believe that's what I was saying.

Q.   And you're now communicating that approval back to FEMA.  Right?

A.   That's correct.

Q.   Who told you that these FEMA requests have been approved?

A.   I actually don't recall who gave me that approval.

Q.   You're not the person who made the approval decision.  Right?

A.   No, I'm not.

Q.   It's somebody higher up the chain of

command that you sent the requests to?

A.   That's correct.

Q.   Or that somebody on your team had sent the requests to?

A.   That's correct.

Q.   Do you know if it was somebody in the DHS Personnel Verifications Actions Leadership group?

A.   I don't recall who it came from.

Q.   Do you know if somebody in the DHS Personnel Verifications Actions Leadership group would have sought approval from someone above them?

A.   I'm not sure.

Q.   So you don't know who's actually making this approval decision.  Right?

A.   I do not.

Q.   When you send up these requests and you're told that they're approved, how do you usually find out about the approvals?

A.   Normally, the approvals come back by email.

Q.   Email from who?

A.   It just depends.  The large majority of them came to me from Troup Hemenway.

Q.   Troup Hemenway, the principal deputy chief of staff at --

A.   Correct.

Q.   -- DHS?

So in this email in Exhibit 57, where you're reporting to Ms. Prieur that all of these FEMA requests are approved, that approval came from somebody like Troup?

MR. NEWMAN:  Object to form.

A.   It would have come from someone in the DHS front office, yes.

MR. HOSHIJIMA:  Turning to Exhibit 58.

(Whereupon, Plaintiffs Exhibit 58 was marked for identification.)

Q.   This is a document produced to us with the Bates stamp -0839 and an email chain, where the bottom email in the thread is your email on January 22nd communicating approvals to FEMA.

Do you see that?

A.   I do.

Q.   And Ms. Glaze is forwarding the email to DHS Personnel Actions to say:

Annotate approval in the tracker.

A.   I see that.

Q.   Is that the tracker that we were

discussing that DHS OCHCO uses to track various approvals of personnel verification requests?

A.   That's my understanding.

Q.   Would it have been the normal course of DHS OCHCO processes that Ms. Glaze would ask for these approvals to be recorded in the tracker?

A.   It is.

Q.   And that's a spreadsheet, you said?

A.   Correct.

Q.   You said it was maybe kept in SharePoint, but you don't know?

A.   I can't recall if it's SharePoint or Excel.

Q.   Do you know who manages the tracker?

A.   Coann Glaze's team.

Q.   And is the tracker related in any way to the annual staffing plan that DHS prepared for OMB and OPM?

A.   It is not.

Q.   Then what's the purpose of the tracker?

A.   The tracker is to ensure that, if positions are requested, that we -- that we know that we've received it in house and that it's with the front office for review.

Q.   When you say "we," you're tracking whether

DHS OCHCO has received these requests?

A.    Correct.

Q.    And is staying on top of it?

A.    Correct.

MR. HOSHIJIMA:  Turning to Exhibit 60 -- 59, sorry.

(Whereupon, Plaintiffs Exhibit 59 was marked for identification.)

Q.    This is a document produced to us with the Bates stamp -0076.

And the top email in the chain is from you to Mr. Guy.

Do you see that?

A.    I do.

Q.    Let's start, though, with the email below that in the chain, which is from Ms. Evans to Mr. Guy, copying you, Ms. Voorhies, and a few other people.

Do you see that?

A.    I do.

Q.    Do you see that this is an email called "Process Summary COREs"?

A.    I do.

Q.    It's an email from Ms. Evans to Mr. Guy describing a summary of the process that FEMA is

using to determine recommendations for CORE agreements?

A.   Correct.

Q.   Is this the email that you were referring to earlier as the basis for your understanding of FEMA's process as it relates to CORE renewals?

A.   It is.

Q.   So this email is the basis for everything you know about what's happening within FEMA for purposes of CORE renewals?

A.   That's correct.

Q.   Other than the information in this email, have you received information from Ms. Evans about the process that FEMA is following to decide on CORE renewals?

A.   Not that I recall, no.

Q.   And other than this email thread, have you spoken to Mr. Guy about the process that FEMA is following to decide on CORE renewals?

A.   Not that I recall.

Q.   Ms. Evans's email, in the paragraph starting with B-L-U-F, or "Bottom Line Up Front," describes a staffing plan which is due no later than March 31, 2026.

Do you see that?

A.   I see that.

Q.   This is talking about a staffing plan that each FEMA program and region is developing, with an intended completion date of June 1, 2026?

A.   I see that.

Q.   Do you know what staffing plan Ms. Evans is referring to?

A.   I do not.

But just in the normal course of managing a workforce, having a staffing plan is just good business practices.

Q.   Is this FEMA staffing plan that Ms. Evans is talking about related to the annual staffing plan that DHS has to submit to OMB and OPM?

MR. NEWMAN:  Objection; foundation.

A.   I am not sure.

Q.   Do you know if it's related to any of the quarterly updates for the annual staffing plan due to OMB and OPM?

A.   I'm not sure.

Q.   March 31, 2026 was just a couple days ago. Right?

A.   Correct.

Q.   Do you know if FEMA programs and regions

have submitted staffing plans?

A.   I do not know.

Q.   Have you seen anything submitted on this deadline?

A.   I have not.

Q.   Has DHS requested any of the information that was submitted on that deadline?

A.   The team is somewhat running on autopilot in terms of the updates, the quarterly updates.

So what I don't know is whether or not the team put out a tasker that would have aligned with the March 31, 2026.

I'm just not sure, in terms of the annual staff- -- the staffing plan.

Q.   When you say "the team" is "running on autopilot" and may have put out a request, are you referring to your own team within DHS OCHCO?

MR. NEWMAN:   Object to form.

A.   My apologies.  The DHS OCHCO team.

So, if we have a deliverable to OMB, which is the quarterly staffing plan update, I'm not sure if they would have -- if they've already issued it and that's what this is in alignment to.

I'm just not sure.

Q.   You're not sure because you don't actually

know what process DHS OCHCO is using to prepare the quarterly update for OMB and OPM?

A.   Correct.

I'm not sure what timeline they were on to request updates from the components.

Q.   The top email in this thread is one where you are forwarding Ms. Evans's email to Mr. Guy and attaching a couple of new attachments.

Do you see that?

A.   I do.

Q.   And you say:

The attached requests were submitted by FEMA in alignment with this email.

A.   Correct.

Q.   Is that referring to a couple of the prior sets of FEMA approval requests that we saw?

A.   I apologize.  Could you ask that one more time?

Q.   Sure.

The attachments to your email to Mr. Guy, are those requests that FEMA had made to DHS OCHCO to seek approval of CORE renewals?

A.   Correct.

Q.   In fact, those attachments match the

attachments in Exhibit 57, where you're saying that information -- that these requests were approved. Right?

A.   That's correct.

Q.   So you're asking Mr. Guy if these requests have been approved?

A.   That is correct.

Q.   And why did you ask Mr. Guy about the status of those approvals?

A.   Mr. Guy was one of the individuals that we typically send these requests to for approval.

Ms. Evans also told me that she talked to him directly and laid out the process that he concurred with.

So I sent it back to him directly, assuming that he had concurred with the process and that he would be able to help me with an expedited review and approval of the request.

Q.   Are you asking him because you know that he's the decision-maker when it comes to the approval?

A.   No.

Q.   It's possible that it's somebody above him.  Right?

A.   It's possible.

Q.   You don't know who the decision-maker is when it comes to these CORE renewal requests?

A.   I do not.

Q.   But you know that Mr. Guy would be someone that may know about the status of the approvals. Right?

A.   That is correct.

Q.   You say that:

FEMA told us, I believe, the S1 visited FEMA today and was asked a question about these actions, and they believe she said they were approved.

Is that right?

A.   That's correct.

Q.   So this is you communicating to Mr. Guy that you heard Secretary Noem may have approved these CORE renewal requests. Right?

A.   Not necessarily that she approved them, just that she communicated back to everyone that they had been approved.

Q.   You're saying that Kristi Noem, even if she wasn't the one to approve it, knew about the approval status?

A.   That's what I believe FEMA was sharing

with me.

Q.   That Secretary Noem was able to communicate the approval status of CORE renewal requests to FEMA?

A.   To the workforce -- but, yes.

Q.   When you say "FEMA told us," is this something you heard from Ms. Evans?

A.   I don't remember if it was Ms. Evans or if it was La' Toya Prieur.

Q.   You think it was one of them, though, that told you that Kristi Noem visited FEMA that day?

A.   I believe it was one of the two.

Q.   And so, FEMA is hearing from Kristi Noem that these requests are approved, but they haven't heard back from you yet.  So they're checking in with you?

A.   That's correct.

Q.   And you're checking in with Mr. Guy?

A.   That's correct.

Q.   Do you know if Mr. Guy responded to you?

A.   Based on the approval, they -- yes.  I just don't recall how.

Q.   Would Mr. Guy have responded to this type of email from you by email or some other form of communication?

Page 286

A.   Typically, it would -- he would respond back to the actual email.

Q.   Are there other forms of communications you use to discuss FEMA CORE renewals with Mr. Guy?

A.   I don't recall.

MR. HOSHIJIMA:  Turning to Exhibit 60.

(Whereupon, Plaintiffs Exhibit 60 was marked for identification.)

Q.   This is a document produced to us with Bates stamp -5677.

Do you see that the bottom email in this chain is your email, which we've seen before today, communicating approval of CORE renewal requests to FEMA?

A.   I see that.

Q.   And do you see in that email after that, Ms. Prieur communicates to others that the attached hiring verification requests have been approved by S1?

A.   I see that.

Q.   So Ms. Prieur's understanding here is that they were approved by Kristi Noem.  Right?

A.   The components know that we have an S1 verification process.  I don't think that they know,

Page 287

just like I don't know, how the process works in the front office.

Q.   When people in DHS and DHS components refer to "S1," though, they're typically referring to the secretary herself.  Right?

A.   They are.

Q.   You don't usually use the term "S1" to refer to the whole Office of the Secretary?

A.   Not typically.

Q.   So did you tell Ms. Prieur that these requests have been approved by S1?

A.   No.

Q.   But she must have had some other reason for thinking they were approved by Secretary Noem herself?

MR. NEWMAN:  Objection; foundation.

A.   Yeah.  I'm not sure.  And I'm honestly not sure that that's what she believed.

Q.   That that's what who believed?

A.   La' Toya Prieur, that they were directly approved by the -- by the secretary.  I'm not sure.

Q.   But you didn't tell her whether they were approved by Kristi Noem herself, did you?

A.   I did not.

Q.   Because you don't actually know if these requests even went up to Kristi Noem?

A.   That's correct.

Q.   Mr. Guy didn't ever tell you where he was sending the requests that DHS OCHCO sent to him?

A.   No, he did not.

Q.   You never asked him?

A.   I did not.

Q.   Do you recall that on January 22nd, FEMA paused off-boarding COREs that they had been off-boarding based on their NTE dates?

MR. NEWMAN:  Object to form.

A.   Not that I recall.

Q.   Do you remember discussing in mid-January that there was a big winter storm that would require FEMA to stop separating COREs?

A.   That issue rings a bell.  I don't recall the conversation about it, though.

Q.   You recall having a conversation about that issue?

A.   It rings a bell.

Q.   Do you recall who you would have had that conversation with?

A.   I don't.

It would have likely been the FEMA CHCO.

Q.   Ms. Prieur?

A.   Ms. Prieur.

Q.   Do you remember anything else about that conversation?

A.   I don't.

MR. HOSHIJIMA:  Is now a good time for a quick break?

MR. NEWMAN:  Sure.

VIDEOGRAPHER:  Off the record at 4:28.

(Whereupon, a recess was taken.)

(Whereupon, Plaintiffs Exhibit 61 was marked for identification.)

VIDEOGRAPHER:  On the record at 4:39.

BY MR. HOSHIJIMA:

Q.   Mr. Edwards, I'm handing you Exhibit 61, which was produced to us as Bates -9457.

Do you see that this is a chat message from Ms. Prieur to you?

A.   Okay.

Q.   Do you think this is a Teams message?

A.   I've never seen this type of format before, so I am -- I'm just not -- not sure.

Q.   And the format may have been how it was

Page 290

collected, but do you recall this message from Ms. Prieur?

A.   I don't -- don't necessarily recall it, no.

Q.   Did you and Ms. Prieur ever communicate by Teams message?

A.   We did.

Q.   It's possible this is a Teams message?

A.   It's possible.

Q.   This says that the times are shown in GMT plus zero, which I will represent is five hours ahead of Eastern Standard Time.

So I'll say that this appears to be January 29th at 5:36 p.m. Eastern.

Does that sound right to you?

A.   I'm just not sure.

Q.   Ms. Prieur says that:

FEMA SOPDA -- which is Karen Evans -- is requesting S1 approval to reappoint 125 CORE employees for 90 days.

Do you see that?

A.   I see that.

Q.   Ms. Prieur says:

I believe this was

verbally cleared, but I'm

sending documentation to close

the loop.

Do you see that?

A.    I see that.

Q.    Do you know who would have given verbal clearance of CORE renewal requests before the documentation had even been sent over?

A.    I don't.

Q.    Do you know if it would have been S1?

A.    I'm not sure.

Q.    Do you know if it could have been Joe Guy?

A.    I'm not sure.

Q.    Do you know if there were other situations where somebody from DHS had cleared FEMA's requests for CORE renewal before the documentation had been sent over to you?

A.    Not that I recall.

Q.    Would it surprise you to know that there were verbal requests -- or verbal clearances being given out by somebody at DHS without going through this formal process?

MR. NEWMAN:    Objection; assumes

facts not in evidence.

A.    It would not surprise me, no.

Page 292

Q.   Why not?

A.   It just depends on when they were able to connect.

So I don't know if maybe they had a meeting; they talked about it.  I'm just not sure.

Q.   Ordinarily, the documentation that's sent over has information about the CORE's functions, their experiences, agency needs.  Right?

A.   Typically, yes.

Q.   It doesn't surprise you that somebody would be giving verbal clearances without actually reviewing the justifications in the paperwork?

A.   So this came after the communication between Ms. Evans and Mr. Guy saying that, you know, he approved of the process that she was implementing.

So I'm just not sure if he was, you know, basing it on that -- that kind of preclearance of the process.

Q.   But preclearance of the process doesn't mean that any particular renewal requests are cleared.  Right?

A.   As far as I would be concerned, no.

MR. HOSHIJIMA:  I'm handing you what's marked as Exhibit 62.

(Whereupon, Plaintiffs Exhibit 62 was marked for identification.)

Q.   This is a document produced to us as Bates -15928.  And it's an email from you -- sorry. It's an email to you on January 29th at 5:36 p.m.

Do you see that?

A.   I do.

Q.   And going back to the chat message in Exhibit 61, if that message in Eastern Time were 5:36 p.m., the email in Exhibit 62 would be right after the chat in Exhibit 61?

A.   Agreed.

Q.   The chat in Exhibit 61 says that La' Toya Prieur is sending documentation to close the loop about 125 CORE employees.

Do you see that?

A.   I do.

Q.   This email in Exhibit 62 is a request for DHS's approval of the reappointment of 125 COREs?

A.   Correct.

Q.   So do you think these requests that Ms. Prieur is sending over in an email is the paperwork for the requests that Ms. Prieur thought were already verbally cleared?

A.   That's what I assume, yes.

Q.   This set of requests is for COREs with expiration dates for their terms between January 19th and February 9th.  Right?

A.   Correct.

Q.   And these renewal requests are only for 90-day periods?

A.   Correct.

Q.   Which is consistent with the process that Ms. Evans had set up with Mr. Guy?

A.   Correct.

MR. HOSHIJIMA:  Now, if we turn to Exhibit 63 -- which I'll have marked right now.

(Whereupon, Plaintiffs Exhibit 63 was marked for identification.)

Q.   This is a document with Bates stamp -0707.

Do you see that?

A.   I do.

Q.   And this is an email, at the very bottom of the chain, that's from Ms. Prieur for approval of CORE employees with NTE dates between January 19th and February 9th.  Right?

A.   Correct.

Q.   And do you see that there's a spreadsheet attached to that original email?

(Witness reading.)

Q.   That the original email says that it had a spreadsheet attached to it?

A.   It says that, yes.

Q.   Yes.  We don't have it here.

A.   Okay.

Q.   And you respond and say:

          We will forward like last
     time and copy the appropriate
     deputy chief of staff.

     Do you see that?

A.   Correct.

Q.   And who did you send that over to when you say you'll send it forward like last time and copy the appropriate DCOS?

A.   So I didn't forward it because Ms. Glaze was already on the email.

     But I completely forgot that at that point in time, she was furloughed.

Q.   So you remember this exchange?

A.   Yes.

Q.   So on January 30th, you don't forward it.

     But on February 3rd, when Ms. Prieur follows up, you do send it forward.  Right?

A.   Yes.

Q.   And when you say you just sent it forward, who did you send that forward to?

A.   I would have -- I believe I would have sent it to Joe Guy, Troup Hemenway, Steve Munoz, and Grey McGill.

Q.   Those are the people that you send the verification requests to?

A.   Correct.

Q.   But you don't know if they're the ones making the decision.  Right?

A.   That's correct.

MR. HOSHIJIMA:  Are we up to Exhibit 64?

COURT REPORTER:  Um-hum.

(Whereupon, Plaintiffs Exhibit 64 was marked for identification.)

Q.   This is a document produced to us with Bates stamp -0713.

Do you see that?

A.   I do.

Q.   This is your response to Ms. Prieur saying:

These are clear to move out on.

Do you see that?

A.    I did.

Q.    And you're attaching an email, if you go to the second page, that was Ms. Prieur's request for renewal of 130 COREs with renewal dates between January 19th and February 9th?

A.    Yes.

Q.    So these are the requests that, because Ms. Glaze was out, you forwarded on, on February 3rd.  Right?

A.    Correct.

Q.    And a week later, you are communicating the approval to Ms. Prieur?

A.    Correct.

Q.    Do you know what happened between when you sent up the approval to Mr. Guy and the others and February 10th, when you're communicating the approval to FEMA?

A.    I do not.

Q.    Do you know who, over the course of the week, reviewed these requests?

A.    I do not.

Q.    When you say, "These are clear to move out on," who told you that these requests are approved?

A.    I don't remember.

Q.    Would it have been Mr. Guy?

A.   It could have been.

Q.   And you are still personally involved in this process, even though you have a whole big staff of 200-some people in DHS OCHCO.

Why is that?

MR. NEWMAN:  Object to form.

A.   In particular, during this period, we were furloughed.  So we have a skeleton crew right now.

So we are all doing double- and triple-duty at this time.

Q.   So you're personally involved in passing on the paperwork that you get from FEMA further up the chain?

A.   Yes, sir.

Q.   Without weighing in on the recommendations at all?

A.   Yes, sir.

Q.   Were you instructed by someone at DHS to send these approvals up the chain without weighing in on them?

A.   No.

Q.   Who was the one who instructed you to send these approval requests you got from FEMA to Mr. Guy?

MR. NEWMAN:  Object to form.

A.    So he would have been in the group anyway that I believe Grey McGill gave me that -- the group of -- like, the verification group anyway.

So he would have been in that group anyway.

What I did when I got them, because I knew that this was a topic that he had weighed in on, I just made sure that he specifically got it called out from me.

Because I didn't have access to the group box that the team was actually sending it to.

Q.    You knew that Joe Guy is the person that you're supposed to send these requests to?

A.    Because he handles the FEMA portfolio.

And that was the conversation that Ms. Evans had weighed in with me on and shared the email string.

MR. HOSHIJIMA:  Exhibit 65.

(Whereupon, Plaintiffs Exhibit 65 was marked for identification.)

Q.    These are emails produced with the starting Bates -8661.

And do you see that you're copied on this email thread?

A.    I do.

Q.   Do you see, if you look at the bottom email in the chain from Ms. Evans to Ms. Prieur, that Ms. Evans is telling La' Toya Prieur to:

                    Please process CORE
               renewals in accordance with HQ
               policy.

          Do you see that?

A.   I do.

Q.   Is "HQ" referring to the DHS Office of the Secretary?

A.   It's referring to headquarters.

Q.   DHS headquarters?

A.   Correct.

Q.   And is the HQ policy that FEMA has to request S1 approval for any renewal of a CORE?

                    MR. NEWMAN:  Objection;
          foundation.

A.   That is my understanding of how the process was after December.

Q.   That's your understanding of what DHS headquarters policy was --

A.   Correct.

Q.   -- in 2026?

A.   Correct.

Q.   And the policy from HQ is also that the

renewal date should be not more than 90 days?

MR. NEWMAN:  Objection; foundation.

WITNESS:  Yeah.

A.   That, I'm not as sure of.  So....

Q.   DHS is giving FEMA directions about how long the CORE renewals can be.  Right?

MR. NEWMAN:  Objection; foundation.

A.   I believe DHS gave -- I would have to go back and look, but I thought we said -- I would have to go back and check to see the actual time frame that we -- that was limited, that they were limited to.

Q.   All of these approval requests that DH- -- or that FEMA is sending up to DHS are limited to 90 days only.  Right?

A.   Per the FEMA email, yes.

Q.   And you've been receiving and sending up these requests in 2026.

You keep seeing 90-day requests.  Right?

A.   Yes.

Q.   And DHS is only approving 90-day extensions?

MR. NEWMAN:  Objection to form.

Page 302

A.    Yeah.  I don't know that that's all that they would approve.

Q.    That's all that they have approved.  Right?

MR. NEWMAN:  Objection to form.

A.    Per the component requests, yes.

Q.    Looking at the top email in this thread from Ms. Evans to Mr. Guy, Ms. Evans is writing to Mr. Guy to say:

Per our discussion, please see below.  La' Toya Prieur will work directly with Roland Edwards regarding securing HQ approval for these extensions.

Do you see that?

A.    Yes, I do.

Q.    Why is Ms. Prieur working directly with you regarding securing HQ approval for these extensions?

A.    Per the conversations that Ms. Evans had with Joe Guy, they still needed to come through the headquarters CHCO office to review and send forward through the process.

So this was to make sure that I knew that -- and I had visibility that they were coming,

that they were with my office to process.

Q.   Why are you agreeing to a process where you personally have to be the one to send up that documentation?

A.   Partially because, again, the team was furloughed.

And so, in this instance, to ensure that these could be processed appropriately, that's just one of the functions that I took on.

Q.   Is this process that Ms. Evans described in early February any different from the process that was being followed in January?

A.   In January, the team was on site.  So I believe they would have just sent them through the normal box in January.

Q.   In both January and February, though, DHS OCHCO is sending these requests up to the Personnel Verification Leadership.  Right?

A.   Correct.

Q.   And those are the same people?

A.   I'm sorry.  Say that -- what's the last point.

Q.   The people that you are sending these requests up to remain the same as they were earlier in this process?

Page 304

A.    Correct.

Q.    They're Joe Guy and a few other people that are part of that group?

A.    Correct.

MR. HOSHIJIMA:  Exhibit 66.

(Whereupon, Plaintiffs Exhibit 66 was marked for identification.)

Q.    This is a document produced to us with starting Bates -0160.

This is a continuation of the last email thread we saw.  Right?

(Witness reading.)

A.    Correct.

Q.    You are continuing that email thread by checking in with Mr. Guy about a FEMA request for CORE renewals.  Right?

A.    Correct.

Q.    And Mr. Guy responds to say that the renewal requests have been approved?

MR. NEWMAN:  Object --

A.    Correct.

MR. NEWMAN:  -- to the form.

Q.    And you say you'll let FEMA know.  Right?

A.    Correct.

Q.    Do you know what process Mr. Guy went

through to determine if these renewal requests are approved?

A.   I do not.

Q.   You don't know anything about what happens more than a level above you?

A.   I don't.

Q.   You're not curious about what happens up the chain of command?

MR. NEWMAN:  Objection to form.

A.   I am not.

Q.   You just keep your head down and don't ask questions?

MR. NEWMAN:  Objection;
argumentative.

A.   I ask questions when I need to.

Q.   And you didn't need to know what Joe Guy was doing with the requests you sent up to him?

A.   I did not.

MR. NEWMAN:  Let's go to a
document I'll have marked as Exhibit 67.
(Whereupon, Plaintiffs Exhibit 67 was
marked for identification.)

Q.   This is an email chain produced to us with Bates starting -0180.

And the top email in this chain is from

you, Mr. Edwards.

Do you recognize this email from February 26th?

(Witness reading.)

A.  I do.

Q.  You are sending a request from FEMA for the secretary to approve renewal of 188 CORE appointments for 90 days.  Right?

A.  Correct.

Q.  You're sending this to Mr. Guy, Mr. Hemenway, and Mr. McGill?

A.  Correct.

Q.  You're not sending this to the email group called DHS Personnel Verifications Leadership. Right?

A.  Correct.

Q.  You're not actually even sending it to all four people that you said were in that group. Right?

A.  Correct.

Q.  Why are you just sending this individually to Mr. Guy, Mr. Hemenway, and Mr. McGill?

A.  Mr. McGill, because he's in my leadership chain.

Mr. Hemenway, because that's normally who

handles my -- the Management Directorate.

And Mr. Guy, because he was in the original discussion group about the FEMA approvals.

Q.   Who instructed you to send these 188 CORE renewal requests to these people?

MR. NEWMAN:  Objection; foundation.

A.   So I sent them up as a part of the -- as a part of the verification process.

Given that the team was out, so I sent it based on kind of the best knowledge that I had of who I should send them to.

Q.   Where does that best knowledge of where to send these requests come from?

A.   So it's based on an understanding of who the team typically sends them to.

And for the expedited review and the conversations that have been held regarding this particular one, that's the reason for the group that it went to.

Q.   Your email says:

This is a request for the secretary to approve these renewals.

Do you see that?

Page 308

A.   I do see that.

Q.   You're saying that this is a request for Secretary Noem, and you're sending it to these three people.  Is that right?

A.   That is what the email states, yes.

Q.   So you expect one of these three people to send this set of requests up to Secretary Noem. Right?

A.   My expectation is that someone in the secretary's office will provide a response.

Q.   But you're saying "the secretary" here.

A.   That is what I put in the email.

Q.   So do you have reason to believe that Secretary Noem is the approving authority here?

A.   I am honestly not sure whether or not it's the direct secretary or if she's delegated that authority anywhere within the front office.

Q.   So when you say the request is for the secretary, you're saying you're just being imprecise here?

MR. NEWMAN:  Objection to form.

A.   It could be very imprecise.

But it really is just sending it forward to the people who need to vet it however they vet it at the front office level.

Q.   Which could go up to the former secretary, Noem?

A.   It could.

Q.   You just don't know?

A.   I just don't know.

MR. HOSHIJIMA:  I'm going to hand you a document marked as Exhibit 68.

(Whereupon, Plaintiffs Exhibit 68 was marked for identification.)

Q.   I will represent that this is part of a spreadsheet that was produced to us as a native attachment to the previous email in Exhibit 67.

We did redact the names in the employee name column, and this shrunk the columns to be able to print the page.  And we just printed the first page.

A.   Understood.

Q.   Otherwise, this is the spreadsheet that's attached to Exhibit 67 called "February 10th 28 SOPDA Approvals.xlsx" (verbatim).

Does this look like the kind of spreadsheet that you got from FEMA that you would then send to Mr. Guy, Mr. Hemenway, and Mr. McGill?

A.   It does.

Q.   And recognizing that the print came out

Page 310

very small when we had to shrink this down to printing size, do you see that there's a column called "S1 Decision"?

A.   I do.

Q.   And a column called "Date S1 Decision"?

A.   I do.

Q.   So you're taking a spreadsheet that has a column called "S1 Decision" and "Date S1 Decision" and sending it to Mr. Guy, Mr. Hemenway, and Mr. McGill, as a request for the secretary.  Is that right?

A.   That is the email and that is the -- what's in the document.

Q.   And you testified earlier that when you refer to "S1," you're usually referring to the secretary as a person, not the entire Office of the Secretary.  Right?

A.   That's correct.

Q.   And yet you're telling me you don't know if the request that you sent up ultimately went up to former Secretary Noem for approval?

A.   I do not.

Q.   Was your understanding that they may go up to that level?

A.   It was.

Page 311

Q. Did you suspect that it was going all the way up to former Secretary Noem?

A. I am not sure.

Q. At this point, you're sending up this spreadsheet, but in Exhibit 67, you're saying:

        Please let me know if
        you'd like more detail to
        support this request or if the
        attached spreadsheet is
        sufficient.

Do you see that?

A. I do.

Q. So you're no longer sending up these individual verification forms from FEMA. Right?

A. For this request, that's correct.

Q. You're sending a consolidated spreadsheet?

A. Correct.

Q. Whose decision was it to change the process so that this consolidated spreadsheet is what goes up the chain?

A. That's what FEMA started submitting.

And so, because of the large numbers of approvals that they had, and based on the process where, basically, the reviews, the individual reviews, would be conducted at FEMA, the spreadsheet

was deemed to be sufficient for the front office to make a determination.

Q.   Deemed by who to be sufficient?

A.   So I started sending just the spreadsheet and, again, asking whether or not they wanted more detail.

They did not come back and request additional detail as they were doing their review. So....

Q.   You don't know who instructed FEMA that the spreadsheet format would be acceptable to the decision-maker.  Right?

A.   I do not.

Q.   Because you don't even know who the decision-maker is?

A.   That is accurate.

Q.   So you're sending up the new format without actually knowing if that's going to suffice?

A.   For the front office to determine if the new format will work for them.

Q.   But you don't know who in the front office instructed FEMA that this new format would work for them.  Right?

A.   I do not know.

Q.   Is it possible that communication happened

without you knowing?

A.   It is possible.

Q.   Because there could be communications about this between the DHS Office of the Secretary and FEMA without you being looped in?

A.   That's correct.

MR. NEWMAN:  Mr. Edwards, do you want to take a quick break?

WITNESS:  If it's okay -- and I know that we're -- it's been a long day for everyone.  I just need to send a note so that I can let the car service know my whereabouts.  And, literally, it will take me 30 seconds.

MR. HOSHIJIMA:  Let's take a quick break.

WITNESS:  Okay.

VIDEOGRAPHER:  Off the record at 5:09.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 5:11.

BY MR. HOSHIJIMA:

Q.   Before the break, Mr. Edwards, we were talking about Exhibits 67 and 68, which were a set

Page 314

of 188 CORE renewal requests you received from FEMA.

Do you remember that?

A.   I do.

Q.   You sent those renewal requests to Mr. Guy, Mr. Hemenway, and Mr. McGill?

A.   Correct.

MR. HOSHIJIMA:  I am sending you -- not sending you -- handing you what we'll mark as Exhibit 69.

(Whereupon, Plaintiffs Exhibit 69 was marked for identification.)

Q.   This is a document that was produced to us with Bates number starting -0186.

And it's a continuation of that previous thread.

Do you recognize this email thread?

A.   It looks familiar.

Q.   If you look at the email that starts at the bottom of the first page, the 12:57 p.m. email on February 26th, that's the email you sent to Mr. Guy, Mr. Hemenway, and Mr. McGill with the request for 188 CORE renewals.  Right?

A.   Yes, sir.

Q.   Mr. Guy responds and says:

Unless Troup has

Page 315

objections, this is good with
me.

Do you see that?

A.   I do.

Q.   Mr. Hemenway responds to the thread to
say:

Send it.

Do you see that?

A.   I do.

Q.   And you understand that to be an approval?

A.   I do.

Q.   Which is why you respond to that thread
and say:

Thanks.  I will get it
back to FEMA now.

A.   Correct.

Q.   Is this typically how you would find out
when a renewal request from FEMA that you sent up
had been approved?

A.   Yes.

Q.   But you don't know if Mr. Guy or
Mr. Hemenway had shared this request with anybody
else to seek approval?

A.   I do not know.

Q.   You don't know if they had approved this

on the direction of former Secretary Noem, do you?

A.   I don't know.

Q.   Do you know if Mr. Lewandowski might have been involved in the decision-making process?

A.   I don't know.

Q.   If Mr. Guy or Mr. Hemenway had been running these requests past Mr. Lewandowski, would you know?

A.   I would not know.

Q.   It's possible that's been happening. Right?

A.   It's possible.

Q.   You just don't have visibility into that part of the process?

A.   I do not.

MR. HOSHIJIMA:  I'm turning to a document that we will mark as Exhibit 70.

(Whereupon, Plaintiffs Exhibit 70 was marked for identification.)

Q.   This is a document produced to us with a Bates start of -0388.

Mr. Edwards, do you see that the second email in the thread is your email to Mr. Guy, Mr. Hemenway, and Mr. McGill with the 188 CORE renewals that we have been discussing?

A.   I do.

Q.   Do you see, at the top of the thread, that Mr. Guy forwards that email to Ms. Voorhies?

A.   I see that.

Q.   Do you know why Mr. Guy forwards that email to Ms. Voorhies?

A.   I do not.

Q.   Do you know what Ms. Voorhies's role in this decision-making process is?

MR. NEWMAN:   Objection; calls for speculation.

A.   I do not.

Q.   Does it surprise you that Mr. Guy is sending this to Ms. Voorhies?

A.   I don't know that it surprises me.

Q.   Is it because you expected Ms. Voorhies might be involved in that process?

A.   No.   It's just that I don't know who they coordinate with, so I don't know that I would -- I don't know that I would be surprised that they coordinate with other people on the requests.

Q.   You testified earlier you're not actually sure what Ms. Voorhies's role in the agency is. Right?

A.   Correct.

Q.   You don't know what her responsibilities are.  Right?

A.   I do not.

MR. NEWMAN:  Object to form.

Q.   But you don't know that she's in a position that's superior to Joe Guy, do you?

MR. NEWMAN:  Object to form.

A.   I do not know that.

Q.   She may be, but you don't know?

MR. NEWMAN:  Object to form.

A.   I don't believe that she is.

Q.   You don't believe that she's in a position superior to Joe Guy?

A.   I don't believe that she is, no.

Q.   What's your basis for thinking that?

A.   Serving in the secretary's office with the -- in terms of the principal -- the chief of staff, principal deputy chief of staff, and the deputy chief of staff, I don't -- I don't believe, in the hierarchy, that -- that this was -- that Kara Voorhies, whatever position she has, would fall above that, unless she was maybe a component head or a deputy component head.

Q.   Because there aren't that many levels between Mr. Guy and Secretary Noem?

A.    That is correct.

Q.    And you're familiar with the people who are in that high level of the agency.  Right?

A.    Generally.

Q.    And you know that Mr. Guy is fairly high up in the agency, in the Office of the Secretary. Right?

A.    Correct.

Q.    And you don't think that Ms. Voorhies is someone you are aware of as being in that part of the hierarchy?

MR. NEWMAN:  Object to form.

A.    That is correct.

Q.    So why do you think that Mr. Guy would be sending this approval request to Ms. Voorhies?

MR. NEWMAN:  Objection; calls for speculation.

A.    I do not know.

Q.    If she's not in that top of the hierarchy at DHS, wouldn't it be surprising that Mr. Guy is sending this to Ms. Voorhies?

MR. NEWMAN:  Objection; asked and answered.

A.    I am -- I'm not sure that I would be surprised.  I know that they coordinate with people

on these requests.

Q.  You know that they coordinate on what?

A.  I would expect that they would do whatever coordination they feel is necessary.

I just -- I don't have visibility into what that process looks like.

Q.  Are you aware of other situations in which Mr. Guy has coordinated with Ms. Voorhies on issues related to FEMA CORE renewals?

A.  Not that I'm aware of.

Q.  Do you know anything about any other topics on which Mr. Guy and Ms. Voorhies would have communicated?

A.  I do not.

Q.  Do you know how often they communicated?

A.  I do not.

Q.  Do you know what kind of relationship the two of them had?

A.  I do not.

Q.  What is the most recent set of not to exceed dates for which DHS has approved FEMA's renewal requests?

A.  I don't know which -- the -- you mean the requests that are coming up for all of the -- the package requests for the CORE renewals?

Q.   For FEMA CORE renewals.

A.   I don't remember the last date that we got the package.

Q.   Do you recall seeing FEMA renewal requests coming up recently?

A.   I don't recall.

Q.   DHS, still today, has to approve the renewal of any FEMA CORE.  Right?

A.   As far as I know, yes.

Q.   And so, that would still be going up to DHS through the process that DHS set up.  Right?

A.   That is my understanding.

Q.   The process that never existed before March 2025?

MR. NEWMAN:  Object to form.

A.   That is my understanding.

MR. HOSHIJIMA:  Let's go off the record.

MR. NEWMAN:  Off the record at 5:19.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 5:27.

BY MR. HOSHIJIMA:

Q.   Mr. Edwards, as DHS CHCO, is part of your

job responsibility to be familiar with some of the legal requirements that relate to personnel issues?

A. Yes.

Q. So legal requirements that pertain, for example, to information about department personnel. Right?

MR. NEWMAN: Object to form.

A. Yes.

Q. Are you familiar with the Privacy Act?

A. I am.

Q. Looking to this email in Exhibit 70 that Mr. Guy sends to Ms. Voorhies, do you see that he's forwarding your email with the attachment that we saw in Exhibit 68, which was a spreadsheet containing individual justifications for CORE renewals?

MR. NEWMAN: Object to form.

A. I do.

Q. Because the email that Mr. Guy is forwarding is your email that is Exhibit 67.

Exhibit 68 was that attachment. Right?

A. Correct. I just wanted to just validate the attachment --

Q. Yes.

A. -- label, yeah.

Q.   Mr. Guy forwarding this information about FEMA personnel to Ms. Voorhies, with the attachment of all this information, is that concerning to you?

A.   It would just depend on the need to know, of why she was involved.  And I -- and I don't know that, so....

Q.   Ms. Voorhies is a contractor for DHS?

MR. NEWMAN:  Objection; foundation.

A.   I am not sure.

Q.   You don't know if she's an employee or a contractor?

A.   I do not.

Q.   Even though your job is to be overseeing DHS personnel?

MR. NEWMAN:  Objection; asked and answered.

A.   That is correct.

Q.   If she were a contractor, would you be concerned with Mr. Guy sending over some of these employee personal information?

MR. NEWMAN:  Object to form.

A.   It just depends on how her contract was structured and what her role was and responsibility was in terms of using the data that he sent.

Q.   You don't have any concerns about the Privacy Act implications of that?

MR. NEWMAN:  Objection; calls for a legal conclusion.

And also, I'll instruct the witness, you can give your understanding. But to the extent that you've had communications with counsel regarding the Privacy Act, please don't disclose the -- those communications.

WITNESS:  Understood.

A.   The question, one more time?

Q.   You don't have any Privacy Act concerns with Mr. Guy sending over employees' personally identifiable information to a contractor?

MR. NEWMAN:  Same objection.

A.   Again, it just depends on how the contractor is vetted and what their role is in the Department.

Q.   And you don't know what Ms. Voorhies' role in the Department is.  Right?

A.   I don't, at this time.

Q.   You don't know how she was vetted?

A.   I don't -- if she is on a contract, I am not sure.

I'm not sure what role she was serving and whether or not there was a need to know.

Q. You don't know if Ms. Voorhies had a need to know this information. Right?

A. I don't know, no.

Q. Because you have no idea why Mr. Guy's sending her this information?

A. That is correct.

Q. Do you know if Ms. Voorhies was contracted by DHS to maintain any personnel records databases?

A. I don't. I don't know.

Q. And if she were not contracted for that purpose, would there be concerns with sending some of this PII over to her?

MR. NEWMAN: Objection to the extent it calls for a legal conclusion.

A. And again, I would say that it would be the same answer as before, that I am not sure what her role was, whether -- if she is a contractor, what she is vetted to do on behalf of the Department, and what information she can be privy to.

Q. Do you know who in DHS would know what her contract is?

A. If she is a contractor, then the officer,

the chief procurement officer, would be able to let us know under which contract she -- she works.

Q.   And Mr. Guy would know, because she's -- he's sending this information over to her.  Right?

MR. NEWMAN:  Objection; foundation.

A.   I'm not sure if he actually knows what contract she is on.

Q.   If he doesn't know what the nature of her contract is and Mr. Guy is sending over some of this personally identifiable information of employees, would that be a concern to you?

MR. NEWMAN:  Objection; calls for a legal conclusion.

A.   I don't know that that would still be a concern, as long as she's been appropriately vetted within the Department.

Q.   If Mr. Guy were not aware of how Ms. Voorhies were vetted and he was sending this information over to her, would that be a concern to you?

A.   If Mr. Guy was not aware of Ms. Voorhies' role within the Department, that would be a concern for me.

MR. HOSHIJIMA:  I have no

Page 327

further questions.

MR. NEWMAN:  We'd like an opportunity to read and sign the transcript.  But, no further questions.

VIDEOGRAPHER:  Off the record at 5:33.  And this ends today's testimony.

(Whereupon the deposition concluded at 5:33 p.m.)

Page 328

DEPONENT'S SIGNATURE

Please be advised I have read the foregoing deposition, pages 1 through 327, inclusive.  I hereby state there are:

(Check one)

_____ No corrections

_____ Corrections per attached


_____

ROLAND EDWARDS


( X ) Reading and signing was requested.

(    ) Reading and signing was waived.

(    ) Reading and signing was not requested.


Should the signature of the witness not be affixed to the deposition, the witness shall not have availed himself of the opportunity to sign or the signature has been waived.

--oOo--

Page 329

ERRATA SHEET

NAME OF CASE:  American Federation of
                    Government Employees, et al. v.
                    Donald J. Trump, et al.

DATE OF DEPOSITION:  April 2, 2026

NAME OF WITNESS:  ROLAND EDWARDS

Reason Codes:

          1:  To clarify the record.

          2:  To conform to the facts.

          3:  To correct transcription error.

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

_____    _____
ROLAND EDWARDS                    DATE

Page 330

DECLARATION UNDER PENALTY OF PERJURY

I am the witness in the foregoing deposition.

I have read the foregoing deposition or have had read to me the foregoing deposition, and having made such changes and corrections as I desired, I certify that the same is true in my own knowledge.

I hereby declare under penalty of perjury that the foregoing is true and correct.

In witness whereof, I hereby subscribe my name this _____ day of _____, 2026.


_____

ROLAND EDWARDS

CERTIFICATE

I, SUSAN ASHE, a Certified Electronic Reporter and Notary Public, hereby certify that the foregoing is a true and accurate transcript of the deposition of said witness, who was first duly sworn by me on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

Dated this 6th day of April 2026.

_____

Susan Ashe, Notary Public

of the District of Columbia

My commission expires:  May 14, 2028.

**A**

**a.m** 2:2,9 13:2,18 194:3,4 207:2 215:18 221:10
**ability** 11:21 125:15 127:20 230:10
**able** 26:4,20 46:7 53:15 108:22 112:7 126:19 149:15 163:22 189:12 196:14 213:13 230:8 255:12 265:11 283:17 285:2 292:2 309:14 326:1
**absolutely** 22:5 83:22 148:10
**acceptable** 312:11
**access** 230:14,15 256:19,22 299:10
**accomplished** 130:4
**account** 255:17
**Accountability** 7:15 132:23
**accurate** 17:25 22:15,16 48:8 223:9 230:2 312:16 331:5
**achieve** 43:20 188:25
**acronym** 84:22
**Act** 322:9 324:2,9 324:13
**acted** 117:3
**acting** 187:8
**actings** 228:13
**action** 61:13,16 113:1 119:18 120:9 262:5 269:21 272:13 274:6 331:10,13
**actions** 6:15 87:17 191:17 202:24

248:10,20 254:20 254:20 255:9,13 255:16,19,25 256:2,24 257:11 264:20 272:19 273:5,11 275:7,10 276:21 284:12
**active** 227:13,16,21 228:9
**actual** 78:13 88:5 102:22 112:24 147:18 153:13 182:22 186:21 196:14 264:14 286:2 301:12
**add** 137:13
**addition** 171:4
**additional** 19:10,12 103:20 110:2,13 121:8 174:10 224:2 229:23 312:8
**address** 6:16 87:18 110:17 157:2 273:9
**addressed** 126:1 152:18 153:7,9 154:15 156:25
**addresses** 102:6,23
**adhering** 212:19
**administration** 28:25 36:23 37:16 38:3,10,17 45:20 46:25 63:19 133:2 184:17 185:1,20 188:9
**administrations** 36:24 37:21
**administrator** 20:20 82:11 115:2 125:24 178:7 180:24 181:17 190:15 193:17,19 193:24 194:21 195:8 267:6,10 268:10,15
**Administrator's**

267:3
**advance** 145:18 176:9
**advertise** 27:13
**advised** 328:3
**advisor** 75:16 83:19 185:6,24 190:2,19 226:7,8 226:15
**Affairs** 180:25 181:17
**affirm** 126:19
**affixed** 328:21
**afternoon** 230:25
**agencies** 92:12 134:12 143:11 157:23
**agency** 4:12 24:21 43:10 46:5,12,13 120:1,4 133:19 166:17,24 182:16 185:2 187:18,24 189:18 292:8 317:23 319:3,6
**agency's** 47:22
**agenda** 37:17 38:14 39:3,6,9 41:23
**agents** 235:19
**aggregated** 55:21 136:3 163:4,5,10 163:12,15,18 165:12,22 223:17
**ago** 15:25 20:19 107:11 280:22
**agree** 94:15 120:15 221:17 222:14,19
**agreed** 53:1,5 268:1 293:12
**agreeing** 303:2
**agreements** 207:25 209:8 279:2
**ahead** 146:21 290:12
**al** 1:5,9 13:8,10 329:3,4
**alias** 255:13
**align** 46:8

**aligned** 45:23 161:13 281:11
**aligning** 46:11
**alignment** 44:2 47:11 54:15 169:25 197:24 199:17 281:23 282:13
**aligns** 160:1
**Alles** 98:23,24 103:7 118:14
**Alles's** 104:23
**allow** 17:11 44:4 217:9 260:25
**allowable** 91:20
**allowed** 73:21 92:12 93:10 127:16
**allowing** 131:17 132:1
**allows** 110:12 252:21
**Altshuler** 3:4 5:3 14:6,9,13
**Amanda** 95:18,21 96:5,12,24 222:10
**American** 1:4 13:7 329:2
**amount** 194:9
**analyses** 89:6
**Analysis** 56:9
**analytics** 162:5 231:15
**Annotate** 276:22
**annual** 89:14 133:15,20 134:22 135:1,5,15 137:2 140:17 141:21 142:21,24 143:16 144:11 146:5,19 148:5,16,24 149:9 149:22 150:3,7,18 150:25 152:12 154:9 156:4 157:6 157:14,17,24 158:6,23 159:19 165:21 176:20

177:5,17,20 178:5 178:24 179:1,17 193:5 277:17 280:13,19 281:13
**answer** 16:21 17:15 18:10,11,17 28:18 42:17 45:14 77:18 115:15 155:6,7,12 155:25 156:12 170:22 171:12,18 172:6,14,15 196:14 217:1 229:22 325:18
**answered** 45:2 94:2 95:9 123:9 124:8 124:20 125:2 171:3 319:23 323:17
**answering** 17:17 32:5 81:5
**answers** 17:6
**anybody** 19:16 83:12 138:7 148:23 149:21 150:1,5,16 178:25 201:21 206:21 219:6 246:6 315:22
**anytime** 202:9
**anyway** 50:10 299:1,3,5
**apolo-** 185:8
**apologies** 39:24 127:13 176:23 248:12 281:19
**apologize** 16:6 139:11 141:10 282:18
**appear** 253:7 266:1
**APPEARANCE** 3:1 4:1
**appears** 22:15 49:20 130:19 138:17 141:3 207:23 209:7 249:13 290:13
**application** 69:3

97:21
**applied** 92:15 93:5
  93:16,22 94:20
**applies** 92:5 97:1
  103:11
**apply** 92:8,10 97:6
  99:19 105:21
**applying** 252:11
**appoint** 51:24
  91:24
**appointed** 221:19
**appointee** 21:23
  227:23
**appointees** 186:19
**appointment** 245:6
**appointments**
  91:17 94:16
  119:24 120:17,21
  127:1 201:12
  217:10,14 222:15
  234:9 236:9 250:9
  306:8
**approach** 160:5
  261:9
**approaches** 261:12
**appropriate** 45:23
  74:18 137:13
  160:6 188:24
  270:8 295:9,15
**appropriately**
  40:22 303:8
  326:16
**approval** 29:17
  50:10,13,25 51:3
  51:9,13,21 52:12
  58:14 59:10 60:2
  69:14,15 100:17
  113:4 114:5,9,12
  115:6 116:13,23
  117:2,5 118:10
  122:17,23 123:12
  124:17,25 126:9
  126:25 127:9,17
  130:7,12 136:6,14
  138:19 140:4,24
  147:7 149:16
  165:14 176:13

197:24 198:5,25
201:10 208:21
209:2,21 210:17
215:11 222:16
246:13,16 249:4,9
249:20 250:4,18
257:9,12,13 264:4
265:23 266:3
267:3 268:4,6
269:22 270:9
273:2 274:15,21
274:23 275:11,14
276:5,22 282:17
282:23 283:11,18
283:21 284:24
285:3,21 286:14
290:20 293:19
294:20 297:12,15
297:17 298:23
300:15 301:15
302:14,18 310:21
315:10,23 319:15
**approvals** 51:22
  58:18 111:5
  216:11,13 242:5
  275:18,19 276:17
  277:2,6 283:9
  284:5 298:19
  307:3 311:23
**Approvals.xlsx**
  309:20
**approve** 111:8
  112:7 115:5,19
  117:1 123:6
  242:25 243:10
  249:8 264:8 267:6
  284:23 302:2
  306:7 307:23
  321:7
**approved** 29:14
  50:17 110:24
  112:15,17,22
  113:1,11,15
  131:17 140:12
  149:16 151:11,18
  152:5 173:21
  174:20 175:20,25

176:4 237:9
246:17 249:3,20
266:22 267:7
268:18,18 270:23
271:2 273:25
274:12,19 275:17
276:5 283:2,6
284:13,17,19,21
285:14 286:19,23
287:11,14,22,24
292:15 297:23
302:3 304:19
305:2 315:19,25
320:21
**approving** 74:7
  140:13 249:11
  273:6 301:23
  308:14
**approximately**
  13:18 24:2 88:1
**April** 1:19 2:1 13:1
  13:17 329:5
  331:15
**April~2** 2:9
**area** 69:14,20,25
  70:8
**areas** 70:3
**argumentative**
  305:14
**Ashe** 1:24 2:12
  13:21 331:3,19
**aside** 90:3
**asked** 32:9 42:5
  45:1,15 80:24
  94:1 95:7 116:18
  123:8 124:7,19
  125:1 148:23
  149:8,21,23 150:1
  150:5,20,22
  151:21 158:8
  161:25 171:3
  182:15 209:3
  232:25 284:11
  288:7 319:22
  323:16
**asking** 16:20 19:1
  42:8,16 50:10

120:7 121:22
127:7 128:13
129:12 154:9
159:18 161:18
171:6,13,15 172:1
172:3 193:12
198:16 219:4
232:23 236:13,24
238:9,11 243:12
247:5 256:5 268:3
283:5,19 312:5
**asks** 119:17
**assert** 170:16
  171:10
**asserting** 154:24
**assigned** 33:19
  34:23 253:4
**assignment** 163:21
**Assistant** 5:5
**assisting** 227:14
**assume** 127:6
  151:17 152:4,6
  160:13 218:3
  293:25
**assumes** 148:19
  291:23
**assuming** 120:6
  224:15 243:8
  283:16
**assumption** 224:11
  246:19 252:7
**attach** 115:18
**attached** 10:19
  118:13 160:18
  235:9 252:23
  265:24 282:12
  286:18 294:25
  295:3 309:19
  311:9 328:8
**attaching** 273:23
  282:8 297:2
**attachment** 103:15
  103:17,19,22
  105:17 107:21
  109:23 110:9,12
  121:14 122:12
  160:11,22 261:25

262:1 264:17,23
266:20,24 309:12
322:13,21,23
323:2
**attachments** 274:8
  282:8,21,25 283:1
**attempt** 16:25
**attention** 87:23
  159:7
**attorney** 4:4 19:10
  19:12 245:7,19
  331:9,12
**attorneys** 19:5,8,9
  19:19,20 245:1
  246:8,25 247:9
**audible** 17:6
**authorities** 199:16
  229:23
**authority** 29:12
  50:23,24 74:1,16
  74:18 91:23 93:2
  114:14 117:1
  127:24 128:2,13
  128:14 130:13
  198:21 199:1,5,10
  199:12 201:7,11
  207:24 209:8,16
  209:18 210:2
  216:1 218:1,16,25
  236:20 243:6
  253:9 308:14,17
**authorization**
  100:10 101:16,19
  105:12 107:23
  108:17
**authorize** 111:18
**authorized** 32:18
**authorizers** 111:22
**autopilot** 281:8,16
**availed** 328:22
**Avenue** 2:11 13:15
**Award** 52:3 60:6
**awards** 60:4 65:9
  191:16
**aware** 20:18,22
  62:16,19 69:4
  85:18,19,24 86:21

87:8 98:4 120:23 121:2 130:21 131:25 135:10 140:22 152:14 169:6 178:24 179:3 187:19 198:20 229:24 238:20 241:9,13 241:14,15 247:12 262:19 319:10 320:7,10 326:18 326:22
**Awareness** 56:12
**awhile** 107:10

**B**

**B-e-n-j-a-m-i-n** 15:17
**B-L-U-F** 279:22
**Bachelor's** 25:4
**back** 54:2 62:10 70:16 72:5 81:11 96:9 101:1 103:6 104:19 110:25 112:9,12,15,16,21 112:25 113:5,12 113:20,23 116:5 119:16 133:10 140:15,23 141:21 144:21 146:4 147:17 150:12 152:16,18,19 154:15 156:9 157:3 161:7 163:24 164:5 165:24 166:1,2 176:15 178:23 184:24 185:5 186:23 189:13 190:12 199:19 208:8 216:8 217:23 225:22 226:25 229:10 230:24 234:6 235:3,6 256:16 259:9,11,12,17 260:6 266:20

270:5,23 274:16 275:19 283:15 284:20 285:15 286:2 293:8 301:11,12 312:7 315:15
**back-and-forth** 174:15 205:9
**background** 22:17 221:14
**backtrack** 238:8
**balance** 230:21
**ballpark** 35:21
**Baltimore** 3:17
**based** 11:22 120:1 125:16 141:17 151:18 152:9 158:4 181:14 210:16 211:16 221:7 230:2 285:21 288:11 307:11,15 311:23
**basically** 29:5 45:24 223:16 311:24
**basing** 292:18
**basis** 36:13 155:3 155:23 156:13 170:21 171:18,21 172:6,12,18 189:24 268:19 279:5,8 318:15
**batch** 101:5 272:12
**batches** 274:12
**Bates** 90:13 95:17 98:14 105:15 109:22 117:19 125:14 159:6 180:13 182:20 192:17 199:25 204:22 210:24 229:5 233:21 239:2 244:12 248:3 254:18 261:21 269:15 272:8 273:18 276:15 278:10

286:11 289:18 293:4 294:16 296:18 299:22 304:9 305:24 314:13 316:21
**beginning** 2:8 28:18 82:9 143:13 184:25 185:18 193:13 242:24 243:3 266:19
**begins** 13:5
**behalf** 2:8 3:2,13 4:2 146:22 164:16 273:3 325:20
**believe** 24:3,7,17 57:15 71:8 78:21 83:4 92:10 117:7 145:16 147:10 150:4 153:8 161:3 161:8 177:22 179:8 184:20 186:20 189:20 190:23 191:22 194:1 196:6 204:9 221:3 224:25 226:6 232:6 253:10 255:14 257:2,16 265:13 273:8,13 274:14 284:9,12,25 285:12 290:25 296:3 299:2 301:10 303:14 308:13 318:11,12 318:14,19
**believed** 287:19,20
**bell** 288:17,21
**Benjamin** 15:7,16 15:17
**Benjamine** 47:7
**Berzon** 3:4 5:3 14:6 14:9,13
**best** 17:13 55:18 307:11,13
**Betelehem** 164:10
**beyond** 103:21 149:20 199:6

**big** 64:10 141:2 288:15 298:3
**Bilicic** 252:17,20 253:1,4
**Bilicic's** 253:16
**biography** 23:11
**bit** 18:24 28:22 33:23 36:14 93:10 189:6
**Blanca** 244:19
**blanket** 97:7
**blast** 77:3
**block** 255:10
**board** 32:19 50:21 109:13
**border** 235:19
**bottom** 56:23 89:11 91:2 99:5 111:16 118:2 128:17 133:15 139:6 143:7 159:7 176:17,24 177:2 178:3 182:23 192:18 244:13 248:7 269:17 272:10 276:16 279:22 286:12 294:19 300:1 314:19
**bottoms-up** 160:5
**box** 3:21 64:5,10,10 102:19 113:22 201:2 273:2 299:11 303:15
**Brad** 4:5 14:19
**brad.rosenberg...** 4:10
**break** 18:15,18 84:10 132:6 153:23 154:8 168:17 169:1 183:4 232:21,25 233:6 244:3 289:7 313:8,16,24
**breakout** 236:9
**breaks** 18:14 232:15

**bring** 21:13 27:12
**broad** 85:9,10
**broader** 32:8
**Broadly** 42:18
**broken** 223:9,12 234:15,18,22 236:4
**brought** 51:2 85:14
**Brown** 118:2,16 119:16 121:3 122:6 131:21 207:14 208:5
**Brown's** 201:5 207:8,11 208:11 209:6
**budget** 27:23 104:14 124:11,12 124:13
**build** 189:12
**bullet** 103:8,21 221:17 222:9,25
**bullets** 182:24
**bureaucracy** 43:5 43:21
**business** 51:6,7 80:3 252:10,14 280:11
**bypasses** 65:22

**C**

**C** 4:14
**C-** 110:10
**cadence** 67:25 76:12 158:14
**cadre** 26:3 84:20 86:5
**California** 1:2 3:8 13:12
**call** 23:4 72:24 73:7 73:9 78:13,16 158:2,13 164:21 179:12 181:6 182:22 187:9 203:13 204:1 265:25 267:11,11 267:13
**called** 23:1 34:3

55:1 73:7 87:16 99:2 110:17 138:17 256:23 264:19 278:21 299:8 306:14 309:19 310:3,5,8
**calling** 159:7 216:21 217:16
**calls** 73:23 97:13 120:11 147:2,15 158:9 160:4 189:2 190:9 203:12 216:6 218:12 224:9 226:21 228:5 241:25 243:14,23 247:16 249:25 250:12 251:11 262:12 263:16 317:10 319:16 324:3 325:16 326:13
**capable** 18:5
**capacity** 1:8 13:9 14:18 16:12 25:10 158:5
**capital** 16:13 21:19 22:4 23:1 25:18 27:25 29:22,23 32:8 38:9 41:18 48:12 49:12 54:13 65:9 68:6 88:21 93:25 104:11 117:25 118:24 123:25 125:6 128:6 159:15 168:8 253:23
**car** 313:12
**career** 21:21
**carried** 109:8
**case** 1:6 13:10,13 16:2,5,9 117:19 130:6 139:14 204:12 329:2 331:14
**cases** 114:4
**categories** 103:12 235:16 236:4,7

247:21
**category** 29:9 247:8
**causal** 41:12,14 42:20
**cause** 40:25 41:3
**caveat** 237:1
**CBT** 57:1
**Center** 28:15
**centrally** 27:13
**CER** 1:24
**certain** 14:3 25:22 81:25 82:1,3 103:11 106:20 130:15 139:3,7 160:25 209:18 249:2
**certainly** 31:1 40:17 55:12 66:13 66:13 76:18 232:9 237:16 241:8 261:11
**certainty** 79:8
**CERTIFICATE** 331:1
**Certified** 2:12 331:3
**certify** 330:7 331:4 331:8
**chain** 50:1 60:20,24 115:10,18 116:5 116:24 118:2 136:23,25 138:5 140:5 144:22 154:10 159:8 164:9 192:18 195:13 200:2,7 204:23 223:23 251:24 252:3 259:13 264:15 270:8 272:16 274:25 276:15 278:11,16 286:13 294:20 298:13,19 300:2 305:8,23,25 306:24 311:20
**chains** 78:5 81:15

220:17,21
**Challenge** 24:19,25
**change** 37:18,23 52:9,10 156:4,4 311:18
**changed** 38:3,10 151:15
**changes** 164:1 330:6
**channel** 53:2
**channels** 129:19 130:3,5 136:6
**charge** 189:18
**charger** 188:16
**chart** 11:12,14 47:21 48:13,22 49:4,22 54:2,10 56:18 64:4 182:2 235:6,8
**chat** 229:9,18,20 289:19 293:8,11 293:13
**CHCO** 21:25 22:3 22:20 23:15,20 25:13 30:22 31:3 31:5,8,10,11,12 31:22 37:7,11,20 37:25 38:1,1,5 39:17,23,23,25 43:20 47:5 84:25 85:23 86:2 94:9 107:8,9,19 113:13 118:16 119:11 147:22 158:5 184:21 187:7,8,11 193:12 200:9 226:20 230:5 253:23,24 265:17 265:18 288:25 302:22 321:25
**check** 259:17 301:12 328:6
**checked** 149:2,4,11 149:18
**checking** 149:20 230:17 285:15,18 304:15

**Chicago** 3:15
**chief** 16:13 21:19 22:4 23:1 28:5 30:18 38:8 48:11 49:2,3,12,16,17 54:8,13,17 63:25 64:1,8,9,12,21 67:5,7 70:7 71:3,9 95:21 96:5,12 104:11 117:8 125:5 150:15 153:5 190:20,21 239:9 245:2 251:21 253:22 275:24 295:10 318:17,18,19 326:1
**chiefs** 70:3
**choose** 168:5
**Christmas** 237:22 238:1
**CIO** 184:20
**CISA** 185:7,10,10 185:14,17 186:24 186:24 187:3,16 187:20 188:7,12 188:22 189:17 227:5,8,15,15,19 228:2,19,24
**City** 3:15,16
**civil** 21:21
**civilian** 6:19 90:5 99:18,18
**clarify** 17:1 50:8 65:25 329:8
**clarity** 32:4
**clause** 222:12
**clear** 19:1 34:12 45:19 96:18 97:16 139:23 141:7 155:9 296:23 297:22
**clearance** 135:12 135:22 136:5,8,11 136:18,20 138:1 138:18,24 139:15 140:18 144:16,19

144:22 149:4,9 152:20 154:11 163:16 165:22,25 291:7
**clearances** 138:24 291:20 292:11
**cleared** 291:1,15 292:22 293:24
**clearing** 148:10,12 156:10
**clearly** 163:23 170:3
**close** 24:9 145:19 163:20,21,24 291:2 293:14
**closed** 149:14
**closely** 163:18 168:7
**closes** 145:11
**cloud** 162:11
**co-chair** 31:12,14
**Coann** 253:9,17,21 254:1,3,10 255:10 255:12 262:20 270:11 277:15
**Codes** 329:7
**cold** 203:12,13
**cold-call** 203:23
**collected** 204:14 290:1
**collecting** 214:9
**Columbia** 2:13 331:20
**column** 48:17 223:18 309:14 310:2,5,8
**columns** 309:14
**come** 26:24 29:3,15 94:11 112:25 113:5,19,20 116:4 140:15,23 148:6 166:2 197:15 198:7 199:19 204:14 215:10,12 241:12 245:15 247:18 253:16 270:22 271:14

275:19 276:8 302:21 307:14 312:7

**comes** 27:2 29:18 30:8 98:21 109:3 190:24 261:14 270:23 283:20 284:2

**coming** 89:23 104:4 128:13 130:22 131:4 185:11 213:16 238:6 244:1 250:4,17 253:14 255:8 260:7 271:19 302:25 320:24 321:5

**command** 50:1 60:24 251:24 252:3 275:1 305:8

**comment** 89:20 156:6

**comments** 62:16,19 62:21,22,25 152:18,19,25 153:7,9,11,12,17 154:15,18,21 155:1,10,18 156:3 156:9,25 157:2

**commission** 331:22

**committee** 166:10 166:13,23 167:2,5 167:12,16,20,22 168:12 169:2,6,10 169:18,21,22,23 170:4,7,13,20 171:1,9,16,24 172:4 173:1,3,10 173:16,21 174:5 174:21 175:8,15 175:20 176:3,5,5 176:6,11,12,14

**committees** 166:16

**common** 194:20,25 201:24 202:2 203:22 204:2

**communicate**

52:15 65:7 66:8 66:12 67:1,21,23 68:17 69:17 70:14 70:15 76:10 77:23 78:8 81:2 157:9 246:3 285:3 290:5

**communicated** 61:2,4 62:13 63:20 64:25 65:3 65:14 68:2,3 69:9 71:18,24 72:3,9 72:17,20 75:7,10 77:11 78:4,23 79:9 178:25 179:4 239:10 284:20 320:13,15

**communicates** 286:18

**communicating** 65:11 78:1 148:1 158:5 274:15 276:17 284:16 286:14 297:11,16

**communication** 53:2 62:3,5 66:11 66:21 68:18 72:10 72:22 77:5,8,19 78:7,23,24 83:24 157:13 203:24 219:10,11 259:3 285:25 292:13 312:25

**communications** 31:16,20 76:13,20 76:23 77:6 146:25 203:9 239:18 286:3 313:3 324:8 324:10

**comp** 29:13

**compare** 36:17

**compares** 37:7,11

**comparison** 126:18

**compilation** 159:22

**compile** 144:18

**compiled** 136:12 137:2,21 140:17 141:22 142:24

144:14 152:15 154:9 156:4 214:2

**compiling** 141:25 150:24 162:18

**complete** 17:25 18:5 101:3 194:10

**completed** 17:14,16 112:3 163:21 194:4

**completely** 295:18

**completion** 280:4

**compliant** 215:7 216:23

**component** 26:19 27:3,9,14,17 29:11,25 30:6,10 32:24 46:18 53:10 53:13,14 70:6 93:10,13 100:8,20 101:14 110:7,16 110:25 112:3 114:19,22 115:5 116:1 142:15,20 144:12,15 152:13 156:7 160:2,5 161:19 162:18,22 162:25 163:3,8,13 168:7 188:7 214:20 224:14 228:15 230:7 253:11 266:7,15 272:2 302:6 318:22,23

**component's** 113:25 115:17 154:19

**components** 26:2,4 26:24 27:8,12 28:20,23 29:7,10 29:19 33:15,24 34:4 36:1 39:17 40:2,8,11,21 55:21 65:16 70:3 98:18 99:6 101:3 101:22 103:19 106:10,16,19,25 107:12 110:1,13

111:4 114:18 115:10 119:2,4 131:2 136:2,13 151:8,16,21 152:3 153:11 159:16,18 160:8 161:8,21 162:7,14 163:24 164:5 165:3,11 181:3,5 182:24 213:12 214:10 225:2 228:4 246:4 250:24 282:5 286:24 287:3

**components'** 165:8 213:22

**comprised** 167:5

**concern** 192:3 215:14 216:22 217:17,20 218:25 326:12,16,20,23

**concerned** 191:22 192:1,2 292:23 323:20

**concerning** 323:3

**concerns** 324:1,13 325:13

**concluded** 327:7

**conclusion** 73:24 97:14 324:4 325:16 326:14

**concurred** 283:14 283:16

**concurrence** 137:19 267:14,15

**conditions/requi...** 91:22

**conduct** 89:14

**conducted** 182:21 311:25

**conducting** 176:8

**conduit** 115:21

**confer** 168:17

**confirm** 146:11 255:14

**confirmed** 97:24 226:1

**confirming** 230:6

**conform** 329:9

**confused** 265:7

**conjunction** 209:11

**connect** 292:3

**consider** 55:22 56:7 56:19 191:13 194:8

**considered** 32:20 57:3 63:8 106:3 120:9 153:19 235:4,15 268:10

**considering** 119:18 120:8 269:8

**consistent** 91:21 161:7 208:4 256:1 294:8

**consolidated** 166:8 182:25 183:2 231:10 311:16,19

**consult** 153:10

**consultation** 153:21

**contact** 62:11 99:6

**contacting** 252:5

**contain** 180:2

**contained** 178:7

**containing** 322:15

**content** 153:13

**contents** 6:1 179:1 179:5

**context** 200:15 267:18

**continuation** 234:2 304:10 314:14

**continue** 44:6 48:8 93:11

**continued** 4:1 7:1 7:15 8:1 9:1 10:1 11:1 12:1 132:22 222:15

**continuing** 233:23 304:14

**contract** 79:12,17 80:1 323:23 324:24 325:24 326:2,8,10

**contracted** 325:9

325:12
**contracting** 79:25
**contractor** 73:13
  76:2 79:25 323:7
  323:12,19 324:15
  324:18 325:19,25
**contractors** 30:13
  54:4
**contracts** 30:20
**contribution**
  180:16
**control** 124:11,12
  124:13
**conversation**
  188:10 198:8
  205:14,17,19,21
  205:23 210:13
  212:15 216:20
  258:4,9,12,15
  259:6,20,23 260:4
  268:23,24 269:4
  288:18,19,23
  289:4 299:15
**conversations** 16:7
  94:13 100:1,3
  104:15 204:6
  239:16 243:16
  302:20 307:18
**coordinate** 26:9,12
  29:4 317:19,21
  319:25 320:2
**coordinated** 26:1
  320:8
**coordinates** 26:23
  28:23
**coordinating** 28:2
  28:19 39:17 40:1
**coordination** 25:18
  25:21 27:20,22,24
  28:6 29:10,19
  30:9 257:22 258:2
  320:4
**copied** 83:12
  206:15 254:6
  262:21 299:23
**copies** 220:3
**copy** 59:7 110:25

113:12 148:14,15
  148:22 177:11
  253:1 295:9,14
**copying** 66:5 248:9
  257:4 262:8
  278:17
**Cor-** 164:17
**CORE** 21:12 84:18
  108:15,16,20
  119:17,22 120:8
  120:16,20,23
  121:16,18 123:6
  123:13,17 124:4
  124:25 130:22
  131:14,22 193:13
  194:11 195:22
  196:10 197:21
  198:3,4 200:10
  201:11 207:6,7,19
  211:12,23 216:14
  217:11,12 219:23
  221:15,18 222:2
  222:15,21 223:5
  223:10,13,17
  224:21 225:2,5,15
  227:1 230:1,18
  231:3 232:2,16
  234:9,14 236:8,14
  236:25 237:2,5,8
  237:15 238:1,6,22
  241:6,24 242:13
  242:25 243:10,17
  248:10,20 249:11
  250:8 252:12
  253:5 254:24
  258:6 260:4
  261:24 263:2,15
  264:5,8 266:21
  268:11 269:9
  271:18 279:1,6,10
  279:14,19 282:23
  284:2,18 285:3
  286:4,14 290:20
  291:7,16 293:15
  294:21 300:4,15
  301:7 304:16
  306:7 307:4 314:1

314:22 316:24
  320:9,25 321:1,8
  322:15
**CORE's** 292:7
**COREs** 84:24 85:2
  85:7,16,20 86:7
  86:17,25 87:10
  92:9,16 93:5,17
  93:22 94:15,21
  108:2,6,10,12
  122:1,7,10,15,16
  122:23 124:18
  127:1,7,17,20,25
  128:10 129:6,7
  130:15 131:17
  132:1 198:21
  199:1 200:18,25
  201:3,6,7 202:11
  202:14,19 207:17
  208:20,23 209:1
  210:2,7 211:8,18
  213:4 214:12,21
  219:1 221:19
  224:19 226:10
  227:10 230:6
  234:24 236:21
  237:11,19 238:10
  238:12,18 241:11
  241:16 242:17
  243:7,18 248:23
  249:2,17 252:6
  258:7,13,22 260:9
  262:5 267:12
  269:24 278:22
  288:10,16 293:19
  294:1 297:4
**COREs'** 210:9
**Corey** 71:18,24
  72:3,10,17,20
  73:2,12 74:8,21
  75:7 76:15,21
**Corporation** 24:19
  25:1
**correct** 22:24 23:13
  23:14,16 24:11,14
  24:20 27:4,19
  30:7 31:15 32:25

36:8 38:7 40:16
  42:11 44:16,21
  47:15 48:23 53:18
  53:21 54:6 57:2,4
  58:17 59:12,22
  60:11,17 61:1,20
  61:23 62:12 64:11
  64:14 65:24 66:7
  66:10 67:8,10,12
  68:5,16 71:5,14
  72:1 75:17 77:1
  78:6 80:17,23
  81:14 82:16 85:21
  85:25 86:13 89:4
  89:10 92:3,7,18
  94:3 97:2,5,23
  99:1,4,9,20
  100:13,15,19,22
  101:12,17,20,24
  102:2,8 103:5,13
  103:15,16,22,23
  103:25 104:1,5
  105:14,19,22
  106:1,19 107:2,14
  109:10,12,16,21
  110:14,23 111:2,6
  111:10,13 112:1,5
  112:9,20 113:8,14
  114:3,6,21,24
  115:3,8,12,16,20
  115:22 117:10
  118:4,8,21,25
  119:12,15 121:15
  121:25 122:8,9,21
  122:23 123:13
  124:2,15,21 125:7
  125:25 126:3
  127:18 128:15
  131:11 132:3
  133:13 134:1,6,19
  134:24 135:3,7,23
  136:15,16 138:25
  139:17,19 140:9
  142:4,9,12,19,21
  142:22 143:3
  144:17 145:25
  146:3,8 148:3

151:6 152:2
  154:16,17,20
  157:1,4 159:17,20
  159:21,24 160:3
  160:10,24 161:20
  162:13,20 163:9
  163:11,14 164:6,8
  164:19,23 165:6
  165:19,23 166:1
  166:12,21 167:1
  167:17 168:1,4
  169:3,4 170:6,8
  176:1 179:20
  181:8 182:14
  192:10 193:10
  194:13 198:14,23
  199:3 205:12
  206:1,20 207:9,16
  207:21 208:19,24
  209:5,22,25 210:6
  210:9,16 211:10
  213:24 214:3,15
  217:9,15 220:19
  222:3 223:15,22
  226:3 227:18,20
  230:12 234:7
  240:14 243:2,11
  245:3 246:5,14
  247:6 249:21,22
  250:22 251:1,6,8
  251:18,22 253:20
  254:5,9,11 260:10
  261:7 262:7,10
  263:9,13 264:6,16
  265:2 266:5,9
  267:16,19 268:5,8
  269:6,10 270:1,16
  270:17 271:6,9,17
  272:3 274:17
  275:2,5 276:1
  277:9 278:2,4
  279:3,11 280:24
  282:3,15,24 283:4
  283:7 284:7,15
  285:17,19 288:3
  293:20 294:4,7,10
  294:23 295:12

296:8,11 297:10
297:13 300:13,22
300:24 303:19
304:1,4,13,17,21
304:24 306:9,12
306:16,20 310:18
311:15,17 313:6
314:6 315:16
317:25 319:1,8,13
322:22 323:18
325:8 329:10
330:10
**correction** 102:12
**corrections** 328:7,8
330:6
**correctly** 164:13
**Correspondence**
6:21 7:7,18,21 8:4
8:7,10,13,15,18
8:21 9:4,7,9,11,13
9:15,18,23 10:4,7
10:10,13,16,21
11:4,16 12:4
**Council** 31:3,5,8,10
31:11,13 117:25
118:24 147:22
187:7,11
**counsel** 3:1,20 4:1
4:5 13:23 18:8
56:10 245:2,16,17
324:8 331:9,12
**count** 32:16,17
34:25 35:7 46:4,8
46:9,11
**Countering** 48:9
56:13
**counting** 32:23
**counts** 230:2
**County** 3:16,16
**couple** 109:22
270:20 280:22
282:8,16
**course** 36:3 51:6,7
141:12,19 277:4
280:9 297:19
**court** 1:1 13:11,21
17:5,11,24 54:23

98:8 115:14
117:15 296:14
**cover** 60:19 139:15
139:24,25 140:3
163:22
**covered** 155:21
**covers** 136:7
**create** 26:21 44:1
140:8
**created** 102:18
136:4 140:1,17
215:5 256:9,12,18
**creating** 39:8 50:16
151:5
**creation** 212:3
**crew** 298:8
**criteria** 96:19
97:17
**critical** 43:4,20
85:13 105:23,24
106:4,8,17,21,21
107:1,13 108:15
108:20 121:17
122:8,10 208:17
234:16,25 235:5
235:16,17,20
**crosswalk** 235:7
**curious** 116:20
305:7
**current** 25:15
32:17 48:6
**currently** 21:16
45:15 47:7 108:10
149:12 173:14
175:4 228:16
**Customs** 56:23
**cut** 139:2 178:17
**cutting** 228:18,24
**cyber** 189:14
**Cybersecurity**
185:1

_____
**D**
_____

**D-** 172:3
**D.C** 2:11 3:22 4:7
4:16,23 13:16
**Daniel** 192:20

**Danielle** 3:5 14:5
**data** 6:16 87:18
158:13 159:19,22
160:25 161:7,13
162:5,8 163:13
164:21 179:12
181:6 182:22
195:11 196:22
197:21 198:12
213:23 214:1,4,9
214:21,21 222:22
223:6,10 225:16
227:1 230:3,8,14
230:15,17 231:2
231:15,19 232:2
234:8,18,21,24
236:13,24 237:8
323:25
**databases** 325:10
**date** 13:17 143:24
149:3,19 184:10
186:2 193:1 197:2
197:4 219:8
243:18 280:4
301:1 310:5,8
321:2 329:5,25
331:7
**dated** 90:12 126:4
128:19 134:13
331:15
**dates** 143:18
196:23 197:21
237:12,20 238:6
241:11 248:24,24
256:16 262:6
269:25 288:11
294:2,21 297:4
320:21
**David** 125:20
184:12 190:2
**day** 18:15 35:23
36:4,12 61:9,18
62:2,9 64:16
96:14 139:5 141:5
151:9,13 193:8,11
195:14 205:18,20
205:20 211:3,13

233:24 265:6
285:11 313:10
330:12 331:15
**Daylight** 2:2 13:2
**days** 20:19 36:15
73:21 131:18
132:2 209:19
241:4,21 280:22
290:21 301:1,17
306:8
**days'** 35:23
**DCOS** 257:23
295:15
**deadline** 142:14
165:17 281:4,7
**December** 82:9
130:20,23 131:12
135:2 142:11
146:5 152:22,23
157:18 158:7
159:20 164:10,15
164:20 165:9
167:14 176:19
177:5,11,24
179:23 184:8
190:24 192:20
193:4 197:9,14
198:20 199:2,6
202:9,15 204:4
207:2 211:1
212:12 215:19
229:6 233:23
236:12 237:20
238:16 243:7
260:8 300:19
**decide** 279:14,19
**decided** 52:14 93:4
99:21 105:7
116:12 167:24
245:19
**decides** 111:8
**deciding** 115:4
**decision** 60:1,8,12
60:22,25 86:22
92:20 93:2,15
95:5,6,10 104:20
104:24 106:18

111:11 114:5,6
138:4 170:2
172:25 174:13
237:11 245:22
246:7,21 264:8,12
264:13 274:23
275:14 296:10
310:3,5,8,8
311:18
**decision-maker**
264:14 283:20
284:1 312:12,15
**decision-makers**
137:5 273:12
**decision-making**
60:20 316:4 317:9
**decisions** 50:5
51:12 58:17 94:11
139:20 238:10
261:4,14
**DECLARATION**
330:1
**declare** 330:9
**decreases** 212:8
**deemed** 312:1,3
**default** 101:14
110:7
**Defendants** 1:10
4:2 14:17 117:19
154:23 171:10
254:17 255:2
**Defenders** 5:6
**definitely** 258:20
**definitions** 161:6
**definitively** 51:11
157:19,20 263:19
**degrees** 25:4
**DEI** 42:15
**delegated** 114:14
308:16
**delegation** 200:25
201:2 252:21
253:1,8
**deliberating** 173:2
**deliberative** 153:20
154:24 155:4,15
155:20,21 156:13

168:13 170:16
171:10,19,25
172:6,13,20,21
173:5,6 174:17
175:17
**deliverable** 281:20
**Democracy** 2:10
3:18 5:6 13:15
14:2
**denote** 12:24
**department** 4:3,19
14:16,20,22,25
16:9,13 19:13,13
19:15 21:9,16
25:19,23 28:16
32:9 43:23 46:15
46:17 50:17 58:14
61:19 63:9 83:18
97:7 100:5 106:22
138:18 146:22
212:9 227:13,17
228:11,13 230:10
245:21 322:5
324:19,21 325:21
326:17,23
**departments** 26:10
29:2 134:12
**depend** 323:4
**depending** 50:24
93:1
**depends** 34:18
158:11 275:22
292:2 323:23
324:17
**DEPONENT'S**
328:1
**deposition** 1:15 2:7
13:5 15:19 17:21
18:25 19:4,7,18
19:23 20:9,18,24
21:1,4 179:14
187:14 327:7
328:4,21 329:5
330:3,4,5 331:6
331:11
**deputies** 33:8,13
118:20 159:12

164:18
**deputy** 23:15,20,25
37:25 47:9 63:25
64:1,12,21 67:5,7
70:2,7 84:25
92:25 98:25
118:16,18 119:16
121:3 137:16
138:9 167:10
184:21 207:7
239:9 251:21
253:24 275:24
295:10 318:18,19
318:23
**describe** 25:12,16
38:16 55:18 93:3
**described** 38:13
134:23 166:23
251:14 270:6
303:10
**describes** 279:23
**describing** 271:11
278:25
**designate** 106:16
170:3
**designated** 106:7
**designation** 74:15
**desired** 330:7
**Destruction** 48:10
56:13
**detail** 94:4 311:7
312:6,8
**detailed** 185:5
**details** 85:19
264:19
**determination**
92:14 94:10,24
106:6 312:2
**determinations**
92:13 267:24
**determine** 44:5
109:6 137:17
149:12 160:5
192:5 231:19
235:3 238:12
258:7 279:1 305:1
312:19

**determining** 86:7
86:16 267:21,22
268:17
**developing** 280:3
**DH-** 301:15
**DHS** 7:5,17 11:12
22:13 23:9,20
24:5,6,12 25:13
26:19,19,21 27:14
28:1,22,23 29:19
30:9,12,13,15,22
31:17,20,23,25
32:3,9,21 33:15
33:23 34:9,16
37:6,10,20 38:2
39:23,25 40:2,24
41:6,19,22 43:17
43:19 44:12,18,24
45:11 46:18 47:5
47:13,14,21,25
48:11,13,16 53:11
53:14,15 54:4
55:23 57:22 58:8
59:1,13,18 60:1
65:4 67:11,13
73:13 74:3 75:16
75:21 79:12,21
80:10,14,16,18
81:12 84:4 85:23
86:6,12,18,25
87:5 89:3,19,22
90:19 92:14,19,23
93:4,19,25 95:3
96:19 97:1,6,22
97:24 98:18 99:2
99:13,19,21
100:23 104:3,6,10
105:2,12 106:10
106:24,25 107:13
107:18,24 108:17
109:11 110:22,25
111:14 112:3
113:12 115:4,9,18
118:6,10,16 119:2
121:19 122:3,17
122:23,25 123:5
123:16 124:1,6,17

124:24 125:6
126:1 127:9,17
128:12,14 133:23
135:8 136:13,17
137:15,21 138:7,8
140:17 141:22
142:15,20 143:25
144:6,12,14,15,18
144:25 145:3,22
145:23 146:7,9,19
146:24 147:21
148:2,5,17,23
149:21,22 150:2
151:21,22 152:3,4
152:11,13 153:10
154:15 156:3
157:7 158:5,7,22
159:16,19 160:2
161:21 162:14,18
162:25 163:7,13
164:5 167:3,21
168:11 169:3
170:5 171:1,8,15
172:3,19 173:22
176:3,21 177:5,9
177:14,17,25
178:6,14,17,21,25
180:15 184:17
186:1,12 188:7
193:6,25 194:7,15
195:8,9,10,23
199:5,10 201:21
206:7,9,19 208:18
208:21 213:21,22
214:2,5,9,20
216:12 217:5,7,7
218:24 219:3,7,21
220:10 222:1,4,11
222:16 223:2,6
225:6,16 226:2,20
227:22 228:3,9
230:5,17 232:2
234:21 235:9
236:21,24 237:5
238:4,17 242:22
242:24,25 243:10
245:17,22 246:4,6

246:20 247:5,7
250:19,21 251:21
251:24 252:5
253:21 254:4,19
255:4,8,13,16,19
256:2 257:12,13
257:19 260:8,9,16
262:9 263:6,7
264:4 266:7,7,8
266:10 267:7
268:6 271:4 272:2
272:18 273:5
275:6,9 276:2,8
276:21 277:1,5,17
278:1 280:14
281:6,17,19 282:1
282:22 287:3,3
288:5 291:15,21
298:4,18 300:9,12
300:20 301:6,10
301:16,23 303:16
306:14 313:4
319:20 320:21
321:7,11,11,25
323:7,15 325:10
325:23
**DHS's** 22:20 30:6
44:8 74:4 123:12
123:22 135:1,4,14
142:13 157:13,17
159:19 178:23
179:5 207:14
242:16 264:23
293:19
**DHS-wide** 43:25
142:24 163:2
**difference** 37:19
63:11 174:25
175:6
**different** 33:14,14
33:16,17 37:17
92:1 130:3 141:4
211:7 232:16,22
234:15,15 261:9
303:11
**difficult** 35:19
**direct** 32:1,2,12,14

33:1,4,6 35:23
49:22 53:2,5
62:11 77:5,6,8
78:16,24 87:23
94:13 131:3 147:8
158:1 254:8
261:12,12,13
308:16
**directed** 21:9
133:20
**direction** 40:19
316:1
**directions** 134:25
187:10 301:6
**directive** 50:14,16
**directly** 29:24
32:10,12 33:2
36:12 39:8 42:14
49:16 52:16,22
53:8,16,23 61:5
62:4 64:23 66:4
77:11 78:22 79:2
86:3 112:12
113:21 126:18
129:16 150:16
166:2 176:21
177:5,9,24 191:24
193:6 194:18,22
198:7,11 201:25
206:14 213:14
214:12 221:25
224:20 230:9
235:22 241:17
251:17 252:4
254:1 260:16
263:4 283:13,15
287:21 302:12,17
**director** 147:5
**directorate** 47:14
48:19,25 49:9
50:15,18 51:14
52:20 54:15,19,22
56:8 57:5,17,19
60:10,14 66:6
68:9,12 71:4
83:20 88:15,23
117:9 150:6 153:2

185:6,24 224:12
224:18,22 225:12
225:24 226:5,9
239:21 240:1,6,7
240:11,22 251:23
252:3 307:1
**disapprovals** 116:4
**disapproved**
115:25 152:12
175:15,16
**disaster** 6:14 87:17
88:17,24 89:15
**disaster-related**
190:5
**disasters** 85:13
**disciplinary** 191:16
**disclose** 324:9
**discourse** 63:12
**discuss** 153:24
191:5 286:4
**discussed** 101:6
121:24 187:13
191:6,8 201:4
202:14 203:5
205:3 207:13
208:16 210:1
215:22 216:15
222:10 272:11
**discussing** 81:16
159:23 234:3
277:1 288:14
316:25
**discussion** 200:24
202:18 225:22
257:22 258:3
302:10 307:3
**discussions** 171:7
171:14,23 172:1,9
172:11,24 199:8
237:19,25 238:5
238:17,21,21
**distinction** 34:13
174:2,6 191:11
**distinguish** 34:9
**distribute** 160:8
**distributed** 161:18
**District** 1:1,2 2:13

13:11,12 331:20
**distro** 102:14,15,17
**Division** 1:3 13:13
**dleonard@altsh...**
3:10
**document** 12:25
20:10,11 55:5,7
87:21 90:14,24
98:12 117:18
125:9,13,17
130:18,25 132:16
135:25 137:9
138:15,17,21
139:2 141:3,18
159:5 163:5 180:5
192:16 193:4
199:15,24 204:21
210:23 229:4
233:20 244:11
254:17 255:1
276:14 278:9
286:10 293:3
294:16 296:17
304:8 305:20
309:7 310:13
314:12 316:17,20
**documentation**
291:2,8,16 292:6
293:14 303:4
**Documenting**
260:3
**documents** 20:8,15
21:13 57:23,25
58:4,15 74:19
138:22,23 187:6
257:7
**doing** 16:17 50:19
151:3,7 158:11,17
173:14 212:16
213:7 269:2
272:21 298:9
305:17 312:8
**Donald** 1:8 13:8
329:4
**dotted-line** 30:1,4,5
**double-** 298:9
**double-check**

138:13
**downloaded** 22:12
69:4
**downsizing** 189:9
**Dr** 33:9
**draft** 99:10 155:2
155:19
**dramatically** 133:3
**drawing** 41:14
174:2 191:11
**Dropbox** 162:7,10
**dual** 29:12,13
**due** 135:2 142:11
143:22,24 145:9
145:10,21 146:5
157:17,24 165:1
222:12 279:23
280:19
**due-outs** 202:24
203:1
**duly** 15:8 331:6
**DUSM** 118:13
**Duties** 20:20 82:10
115:1 125:24
190:14

---

**E**

**E** 3:5 184:1,1
**E-d-w-a-r-d-s**
15:18
**earlier** 20:13,14
39:25 54:3 101:6
109:23 111:25
114:2 131:20
133:12 137:6
147:21 162:17
168:14 198:25
199:15 202:4
205:17,19 207:8
208:16 213:21
220:20 222:10
225:10,14 240:2
257:1 263:5 269:3
279:5 303:24
310:14 317:22
**early** 157:17 184:7
237:15 241:15

303:11
**easier** 56:15
**Eastern** 2:2 13:2
290:12,14 293:9
**ECF** 141:17
**Edwards** 1:17 2:7
6:3,10 13:6 15:7
15:16,18 84:17
132:15 139:14
154:8 155:1 156:2
169:1 172:2 184:6
204:24 215:23
217:25 233:15
289:17 302:13
306:1 313:7,24
316:22 321:25
328:13 329:6,25
330:15
**eeshleman@alts...**
3:11
**effect** 41:1,3
**effective** 118:9
**effectively** 46:9
**either** 45:8 72:23
78:14,17 175:25
195:6 206:3
235:15 236:6
259:16 271:23
272:1
**electronic** 2:12
59:9,11 60:21,23
331:3
**elevate** 49:25
**eliminated** 62:17
**eliminating** 62:23
**Elizabeth** 3:6 14:8
**email** 6:21 7:7,18
7:21 8:4,7,10,13
8:15,18,21 9:4,7,9
9:11,13,15,18,23
10:4,7,10,13,16
10:21 11:4,16
12:4 66:2,14,20
68:22,23 72:23
78:5 79:1 81:15
81:24,25 82:2
83:6,8,13 95:16

95:17,19,22 96:4
96:14,16 97:7
98:1 102:1,3,6,9
102:22,25 103:1,1
110:17,20 112:18
113:1 117:24
118:1,5,22,23,23
119:6 131:21
158:1 159:7,11
160:12,21 161:23
161:24 164:9,15
164:20 165:9
166:6 167:14
176:18 177:11,23
180:14 182:12
192:18,19 195:13
200:1,2,4,16,17
201:5 203:6
204:23,23 205:3,6
206:3,25 207:8,11
207:13 208:11
209:7,12,14
210:25 211:4,7,12
211:15 215:18
216:17 220:1,3,6
220:17,21 221:9
221:11 222:8,10
223:23 229:6,13
229:19 231:1,5
233:21,22 234:2
239:2,3,5,7 241:2
241:6,10,19,24
242:11 243:20
244:13,15,24
246:1,2,23 248:3
248:8,15,16,19,23
249:5,13,14 250:5
251:10 252:24
254:7,7,19 255:3
255:8,13,16,20
256:6,23 257:4,21
258:19 259:2,7,13
260:1,6 261:20,25
262:2 263:1
264:18 265:24
266:20 268:3,24
269:3,15,17,18,20

271:5 272:8,10,11
272:15,16 273:9
273:18,19 274:4,5
274:8 275:20,21
276:3,15,16,16,20
278:11,15,21,24
279:4,8,12,17,21
282:6,7,14,21
285:24,24 286:2
286:12,13,17
293:4,5,10,18,22
294:19,25 295:2
295:17 297:2
299:17,24 300:2
301:18 302:7
304:10,14 305:23
305:25 306:2,13
307:21 308:5,12
309:12 310:12
314:16,18,19,20
316:23,23 317:3,6
322:11,13,19,20
**emailed** 79:2
112:15,16 162:9
259:14
**emails** 70:20 77:2,3
117:21 119:16
200:7,8 205:13,16
205:21,25 233:25
255:12 274:7
299:21
**emergency** 4:12
106:2 107:22
108:1,6,10,13,24
109:19 235:1
**employ** 258:6
**employed** 331:9,13
**employee** 72:12
73:12,16,17,19
74:5,9,13,14,20
75:25 80:10,18
91:24 254:24,24
261:24 309:13
323:11,21 331:12
**employees** 1:5
11:22 13:8 21:12
29:13 35:13 44:5

73:20 80:13 84:18
84:21 91:18 92:6
94:17 103:12
119:23 120:16
123:23 124:4
125:16 130:22
131:14,22 187:17
212:7,8,11 223:14
231:3 244:3 247:9
247:21 290:21
293:15 294:21
326:11 329:3
**employees'** 324:14
**employment** 80:16
**enabling** 235:23
**encompass** 33:17
**encompassing**
33:14
**ended** 102:13
**ends** 327:6
**enforcement** 56:11
91:5 97:11
**engage** 163:25
**Engagement** 56:13
**ensure** 163:22
198:3 243:17
252:7 253:12
255:23 277:21
303:7
**ensuring** 7:14
25:19 38:20 40:8
74:18 132:22
**entail** 38:23
**enterprise** 32:8
**entire** 70:15,17
310:16
**entity** 88:15
**ERRATA** 329:1
**erroneously** 222:22
**error** 329:10
**Eshleman** 3:6 14:8
14:9
**especially** 206:14
**Esq** 3:5,6 5:2
**essentially** 56:14
58:16
**establish** 89:15

166:25
**established** 53:1,4
214:23
**establishing** 176:10
**estimate** 23:24
35:16 107:6
149:17
**et** 1:5,9 13:8,10
329:3,4
**ethics** 74:15
**Evans** 20:19 21:2
75:15 81:19 82:1
82:9,13,24 83:9
83:15 84:1,4
176:20 177:4,23
179:25 180:15
184:7,14,16,24
186:23 187:3,17
188:6,15 189:17
189:22 190:13,16
191:20,22,25
192:24 193:5
198:2 200:2,8,10
200:13 201:14,25
202:10,14,18
203:6,22 204:7,24
205:8,12,14,16
206:6 207:1,5,22
209:6 211:1,17,24
212:10,23 213:1
213:11,14,17
214:11,19 215:3
215:18 216:16
217:16 218:5,22
219:11,12,17
220:2 221:4,8,10
223:24,25 224:11
224:17 225:11,13
225:23 227:5,12
227:24 229:14,19
231:7,9 233:22
234:6,12 236:13
236:25 237:4
240:6,10,21 248:8
248:16 249:11,15
249:16 251:9
252:4,22 253:4

257:23 258:5,12
258:21 259:8,14
259:19 260:1
268:25 269:4,8
278:16,24 279:13
280:6,12 283:12
285:7,8 290:19
292:14 294:9
299:16 300:2,3
302:8,8,20 303:10
**Evans'** 83:18 203:9
229:22 237:3
**Evans's** 252:24
279:21 282:7
**event** 26:21,24 27:9
27:10,11,14
**events** 26:1
**eventually** 52:7
**ever-changing**
189:16
**evidence** 110:5
148:19 291:24
**evolution** 221:14
**exact** 12:24 16:8
64:16 184:10
193:1 196:7,10
197:2
**exactly** 40:6 103:2
153:1 156:24
256:19
**EXAMINATION**
15:10
**examined** 15:8
**example** 59:19,25
249:7 322:5
**examples** 51:1,19
52:5
**exceed** 248:24
320:21
**Excel** 160:17
271:13 277:13
**excepted** 208:17
**exception** 92:15
103:11 121:17
129:13,22,24
131:16 216:24
217:5,6

exceptions 103:7 103:21 105:9,11 110:2,13 247:7,13
exchange 256:6 259:7,18,19 295:20
exchanges 263:23
excuse 115:14 139:1
ExecSec 137:12,16 146:20,21
execute 63:13 188:19
executive 6:11 7:10 7:13 28:25 29:3 39:18 40:2,9,12 40:24 41:8 42:9 42:10,13,19,25 43:2,17 44:8 45:10 50:19 58:3 132:21,24 133:11 133:11,24 134:3,4 134:12,14,18,23 141:23 186:18 187:13 253:13,17
exempt 245:8,19 246:8 247:21
exempted 97:25 122:11 222:11
exemption 91:4,8 91:14 92:4,5,8,10 93:5,16,21 94:19 94:20 96:19 97:9 97:17,22 246:4,15 246:25
exemptions 91:1,12 92:1
exhibit 6:9,10,11 6:13,18,21 7:3,4,7 7:10,12,17,18,21 8:3,4,7,10,13,15 8:18,21 9:3,4,7,9 9:11,13,15,18,20 9:23 10:3,4,7,10 10:13,16,19,20,21 11:3,4,11,12,13 11:16,19 12:3,4

22:7,8,9 42:22,23 47:18,19 54:3 56:18 64:5 87:13 87:14 90:9,10 95:13,14 96:10,11 98:9,10 101:2 117:12,13 125:10 125:11 132:17,18 134:8,9,18 138:12 138:14 139:5 141:6,13 143:5 159:1,2,3 166:18 176:16,16 180:8,9 180:14 192:12,13 192:14 198:13 199:21,22 204:18 204:19 205:3 207:1,10 208:9,11 209:21 210:19,21 210:23 215:16,17 225:19,20 227:1 229:3 230:24 233:16,17 238:24 238:25 244:8,9 247:25 248:1 254:13,14,16 261:17,18 269:12 269:13 272:5,6 273:10,15,16 276:3,11,12 278:6 278:7 283:1 286:7 286:8 289:12,17 292:25 293:1,9,10 293:11,13,18 294:12,14 296:13 296:15 299:18,19 304:5,6 305:20,21 309:7,8,12,19 311:5 314:9,10 316:17,18 322:11 322:14,20,21
exhibits 6:7 7:1 8:1 9:1 10:1 11:1,9 12:1,22 274:3 313:25
existed 321:13
existing 91:17 92:6

94:16 223:13 265:14
exists 62:18 169:22
expect 263:24 270:18 308:6 320:3
expectation 308:9
expected 317:16
expecting 270:4
expedite 148:12
expedited 198:2 243:13 255:3 257:6 261:1 262:21,24 263:21 268:4 269:22 272:12 274:4 283:17 307:17
expeditiously 198:6
experience 187:23 188:5 190:5
experiences 292:8
expiration 196:23 197:21 269:25 294:2
expirations 193:13 194:11 195:22 196:11
expire 199:13 236:22
expired 131:9 199:18
expires 331:22
expiring 198:22 238:18 249:3
explained 163:23
explicit 218:15
explicitly 263:3
expressing 216:22
extend 121:8 122:23 123:12,22 124:3,17,25 199:5 201:11 207:25 209:8 222:15
extended 91:19 119:25 120:17,23 122:1,15,17
extending 92:5

119:17 121:18 123:17
extension 120:8 123:6 199:9
extensions 122:11 207:6,7 223:13 249:17 252:6 301:24 302:14,19
extent 19:6 171:5 172:24 324:7 325:16
External 180:24 181:17
extraordinary 188:3

---

**F**

F 184:1
fact 128:2 169:14 185:13 282:25
facts 148:19 291:24 329:9
fair 27:16 169:19
fairly 81:25 82:1,3 181:2,19 188:3 194:6 256:12 319:5
fall 236:6 318:21
falls 29:9 105:10
familiar 48:12 55:1 84:17,23 85:1,3 90:24 117:23 118:1 262:3 314:17 319:2 322:1,9
far 36:9 81:7 116:25 138:5 187:14 292:23 321:9
February 6:12 43:1 197:11,14 294:3 294:22 295:23 297:5,9,16 303:11 303:16 306:3 309:19 314:20
federal 4:12 6:19 7:16 24:21 25:9

28:13 43:5,21 44:6 45:24,25 75:24 76:5 91:18 94:17 103:12 132:23 133:4 187:23 189:12 223:14
Federation 1:4 13:7 329:2
feel 205:20 320:4
feels 23:22
felt 164:1 188:23 215:9
FEMA 6:14 15:2 20:19 21:12 33:19 33:22 34:1,7,7,10 34:17,21,23 35:3 35:14,17,25 36:5 36:11,18,23 38:3 38:9 39:17,23 46:23 51:24 52:9 53:11 57:1,3 62:14,17,23 63:5 63:8 65:12 70:7 70:13 71:16 72:15 72:18 74:2,2 75:8 75:17,21 77:20,24 78:2 84:1 85:1,8 85:14,22 86:2,4,7 86:12,22,24 87:17 87:24 88:21 89:2 89:5,13,18 92:8 92:16 93:5,16,19 93:22 94:5,9,10 94:20,23 95:4 100:16 104:2,9,12 104:17 105:10,11 106:2 107:22 108:1,11,12,16,21 108:24 109:9,18 114:25,25 119:11 119:17 120:5,8 122:1,2,6,22 123:6,12,12,16,21 124:3,5,17,23,25 126:24 127:5,7,8 127:15,16,24

128:2,9 129:7,12
130:14,21 131:6,8
131:17 154:22
155:10,15 156:10
177:4 178:13,16
179:9,12,15,19
180:23,24 181:3,7
181:10 184:7,12
189:23 190:1,4,13
190:24 191:8,12
191:12,19 192:8
192:25 193:12,12
193:18,24 194:11
194:21,22 195:7
195:21,25 196:3
196:17 197:16,20
199:4,9,16 200:9
202:1,11,14,19
206:6,11,23
207:23 208:22
209:7 210:7
211:18,23 212:11
212:17,23 213:2,4
214:12 215:25
216:10 217:4,4,6
217:25 219:13
221:18,19,23
222:11,14 224:19
224:21 225:2,5
226:10,16 227:10
230:6,22 231:20
237:11 238:1,5,9
239:9,24 240:4,18
241:6,11,16,24
242:7,12,17,23,25
244:19 245:4,20
245:21 246:24
247:1,4,7,20
248:9 250:21
251:15 252:14
253:5 255:5 257:7
257:10 258:6
260:5,7,8 261:24
262:5 264:3,8
266:22 267:2,5,10
268:9,14 274:12
274:16,18 276:5

276:17 278:25
279:9,14,18 280:3
280:12,25 282:13
282:17,22 284:9
284:10,25 285:4,6
285:11,13 286:4
286:15 288:9,16
288:25 290:18
297:17 298:12,23
299:14 300:14
301:6,16,18
304:15,23 306:6
307:3 309:22
311:14,21,25
312:10,22 313:5
314:1 315:15,18
320:9 321:1,4,8
323:2
**FEMA's** 11:20
84:17,24 85:4,16
88:5,14,24 100:20
123:22 125:15,23
127:20 128:13
129:5,21 131:13
142:23 176:20
177:4,16,19,24
178:8,17,20
180:16 191:5,6
193:5 194:14
198:20,25 199:5
199:12 201:6,11
210:2 218:25
221:15 222:1
236:20 242:17
243:6 245:2
271:18 279:6
291:15 320:21
**FEMA-related**
33:20 51:2,8 52:5
**fewer** 46:12,15,23
76:18
**field** 88:14,22
102:7
**figure** 55:10,17
147:17
**figuring** 58:21
192:5

**file** 218:15
**file-sharing** 162:11
**filed** 13:10
**files** 273:24
**fill** 265:10,11,16,23
**filling** 161:9
**final** 106:23 133:20
134:22 135:1,5,13
135:14,18 136:3
142:21,24 144:10
146:5 148:5,16,22
148:24 149:5,6,9
149:22 150:2,7,18
150:25 151:4
152:12,21 156:4
157:17 158:6,22
165:12,20 170:2
174:13 176:13,14
**Finance** 28:15
**financial** 28:5 49:3
49:17
**financially** 331:13
**find** 149:1 170:12
210:20 275:17
315:17
**finish** 180:5
**finished** 25:3
**finishing** 25:7
**fired** 265:17
**firing** 21:9,11
**first** 15:8 61:9,18
62:2,9 76:4 81:18
84:23 85:1 88:12
91:2 99:5 103:8
105:9 126:23
133:15 143:21
150:25 159:6
165:10 176:15,17
176:24 177:2
178:3 184:17
185:9 188:7 190:1
207:1 221:17
267:17 309:15
314:19 331:6
**first-line** 33:4,6
**fiscal** 108:25
109:14,15,17

135:1,5 142:2,5,7
142:10 143:14,22
**five** 24:1 25:1 56:24
77:16 204:5 214:7
214:8 290:11
**Fleischman** 4:20
14:21,22
**fly** 203:18
**focused** 35:16,25
36:5,10,18,22
38:19
**folks** 175:9 188:17
235:24 273:9
**follow** 54:16
**follow-on** 45:17
**follow-up** 164:20
**followed** 221:18
303:12
**following** 25:19
96:16,24 231:2
279:14,19
**follows** 15:9 295:24
**force** 43:13,24
44:23
**foregoing** 328:4
330:2,4,5,10
331:5
**forget** 84:22 157:24
**forgot** 295:18
**Fork** 44:3,17
**form** 22:18 29:20
33:21 37:4,8,12
38:4,11,24 39:7
40:14 41:10,16
42:1,12 43:6,14
43:22 45:12 46:6
48:15 49:5,14,19
50:7 52:8,18,24
53:12 57:12 58:1
58:19 59:21 60:16
62:3 63:10 64:18
65:23 66:18 67:6
68:8 69:23 75:18
75:22 76:17,25
77:21 80:12 82:15
82:20 83:2 84:5
85:6 88:2,7 92:17

97:3 101:1,3
103:17,19 104:13
108:8 110:1,11,12
110:15 111:4,5,19
112:3,15,24 114:1
114:7,18 115:17
116:7 121:23
122:7 129:10,14
129:25 147:1
148:7,18 165:18
180:12 188:4
189:19 190:18
194:17 196:12
201:8 202:25
208:7 209:10
210:5,10 214:14
214:25 218:2
219:19 220:11,23
227:3,11 228:21
232:4 235:10
240:24 251:25
253:10 255:6
264:10,20,23
265:1,19 266:10
266:14 274:13
276:7 281:18
285:24 288:12
298:6,25 301:25
302:5 304:22
305:9 308:21
318:4,7,10 319:12
321:15 322:7,17
323:22
**formal** 291:22
**format** 289:23,25
312:11,17,20,22
**former** 58:24 61:2
61:5 137:22 309:1
310:21 311:2
316:1
**forms** 66:11,21
68:18 72:22 78:7
101:4,22,25
102:10 110:24
112:21 113:11,15
113:19 114:12
115:9,25 116:10

131:5,7 250:7,20 250:23 251:2,3 252:22 253:2,5,11 253:14,16,19 256:10 260:12 263:6,15 264:18 265:24,25 266:6 272:1 286:3 311:14
**forth** 331:7
**forum** 31:5
**forward** 2:10 3:18 13:15 14:2 70:20 101:5,5 136:4 152:17 165:13 169:25 173:19 177:4 205:16 206:4 231:13 253:8 254:7 267:14,25 271:1 295:8,14,16,22,24 296:1,2 302:22 308:23
**forwarded** 176:20 177:24 193:5 201:23 205:12 206:21 229:14 231:11 272:15 297:8
**forwarding** 200:8 200:13 203:6 205:8,24 211:7,11 276:20 282:7 322:13,20 323:1
**forwards** 211:4 220:2 317:3,5
**found** 192:22
**foundation** 2:10 3:18 28:4 30:17 44:15,20 45:1 46:20 47:2 51:17 58:2 59:16 67:15 68:15 70:10 73:15 79:14,19,23 82:21 86:10,20 87:3,7 89:9 90:1 93:8 94:7 96:1 97:19

99:25 113:7 120:19 121:1 123:3,19 126:11 128:5 130:9,17 142:17 143:2 144:3 181:12 194:24 195:4 197:23 221:22 222:6,18 233:3 242:19 245:24 247:11 266:13 270:13 280:16 287:17 300:17 301:3,9 307:7 323:9 326:6
**four** 25:2 56:24 70:23 101:7,23 102:3,6,10 103:1 111:24 112:4,14 114:1 116:8,12 167:7,25 168:5 169:5 170:9 173:9 173:13,21 174:3,7 174:19 175:1,9,19 175:24 176:2,8 204:5 257:16 306:18
**four-year** 221:20
**frame** 48:6 186:3 190:22 197:14 204:3,4 301:12
**frames** 232:22,24 233:1 240:19,20
**Francisco** 1:3 3:8 13:12
**frankly** 83:19 162:3
**freeze** 6:20 90:5,17 90:22 91:9 92:2 96:9,21 97:1,25 99:18 222:11 224:13 225:1
**frequent** 191:4
**frequently** 68:4 76:15 239:20
**front** 38:19 46:21 47:3 62:8 65:16

65:18 83:22 136:5 138:7,9 147:12 150:8,9 165:13 168:10 174:13 176:7,9,16 198:9 210:13 235:18,22 240:4 242:5 255:25 257:14,18 261:2 267:25 268:1 271:1,3 276:9 277:24 279:22 287:2 308:17,25 312:1 312:19,21
**FTE** 32:16,17 34:25 35:7
**full** 15:16 18:5 45:5 88:12 173:18 176:17 177:1,2 191:17 214:6
**fully** 45:21 46:2 149:14 163:21 165:5 227:15
**function** 169:18 173:16 235:23
**functional** 33:17
**functioning** 169:23 176:5
**functions** 85:13,21 173:15 292:7 303:9
**Fund** 5:6
**funded** 48:10
**funds** 104:16
**furloughed** 295:19 298:8 303:6
**further** 157:5 171:6 181:22 210:14 298:12 327:1,4 331:8,11

---

**G**

**GAO** 87:16
**gap** 87:25
**Gaps** 6:17 87:18
**gathered** 144:11
**general** 56:10,21

85:9,10 147:4,9 147:14 156:5 245:16,17
**generally** 32:3 119:23 120:16 131:22 134:2 319:4
**generated** 195:18
**genesis** 120:13 211:14
**getting** 101:18 156:2 162:2 230:5 261:1 264:7
**give** 17:6 35:21 42:20 127:10 150:10 151:18 173:9 174:3 247:7 247:20 324:6
**given** 96:18 188:18 188:20 291:6,21 307:10
**gives** 130:7
**giving** 18:5 44:22 134:21 182:8 292:11 301:6
**Glaze** 253:9,12,17 253:21 254:1,3,10 255:10,12,23 257:9,21 260:6 262:20 270:2,11 272:16,18,24 276:20 277:5 295:16 297:8
**Glaze's** 274:4 277:15
**GMT** 290:10
**go** 27:8 29:16 48:18 50:25 51:14,20,23 51:25 52:3,11,17 52:19 53:19 56:22 57:23 58:9,15 59:10 60:8 70:20 103:1 104:10 108:21 127:8 130:14 132:8 136:22 137:18 138:2,24 146:21

147:6,17 162:8 163:24 164:5 176:15 194:7 195:13 207:18 208:8,21 209:2,16 210:7 230:11 231:9 233:8 235:3 235:6 240:17 241:16 243:21 246:12 251:3,5 259:12,17 260:12 261:5 266:2,6 270:6,15 273:2 297:2 301:10,12 305:19 309:1 310:23 321:17
**go-getter** 188:15
**goals** 30:3 178:9
**goes** 29:6 110:20 129:21 139:16 168:13 216:8 311:20
**going** 18:9,24 22:22 49:7 53:24 58:13 81:11 103:6 104:6 104:19 105:9,12 106:13 108:17 122:15 126:23 129:8 131:4 132:4 136:8 141:21 146:4 147:9,14 148:12 155:7 156:5,15 164:9 170:15 173:19 178:23 181:20 186:23 188:18,19 190:12 199:13 207:19 216:11 218:10 221:9 223:23 225:22 234:5 236:21 243:18 253:2 260:6,18 266:20 291:21 293:8 309:6 311:1 312:18 321:10
**good** 14:1 15:12,13

84:10 132:5 213:6
233:5 280:10
289:6 315:1
**gotten** 40:19 63:15
114:4 117:2
154:14 158:21
212:17
**government** 1:5
13:7 25:9 28:13
44:6 73:19,20
74:5,8,13,14 76:5
95:17 184:25
187:24 329:3
**government-wide**
92:2 99:18 158:17
235:25 236:2
**graceful** 189:11
**grade** 161:16
**Grant** 85:17
**granting** 130:11
**grants** 130:19
**granularity** 161:17
**great** 151:12
**Grey** 296:5 299:2
**Greyson** 70:22,25
71:3 101:10,11
116:9 117:7
150:14 167:8,17
249:15,24
**ground** 18:22
**group** 65:18 66:2,2
70:16,17 101:6,7
102:14,25 103:1
111:20,23,24
112:10,13,14
253:13 255:20
257:1,2 275:7,10
299:1,2,3,4,10
304:3 306:13,18
307:3,19
**guess** 27:5 62:24
194:20 259:21
**guidance** 6:20 7:13
29:2,2,6 45:18
90:16,20 96:10
99:7 118:13
134:13,15,17,21

143:5,8 151:16
166:14 224:13
225:1 227:25
245:6,13,15
247:14,20
**Guy** 67:3,22 68:4
68:17 69:10,12,20
70:11,14,21,25
101:8 116:8
150:20 167:7,16
219:11,17,20,21
249:15,24 251:16
251:21 252:9,13
257:23 258:5,12
259:5,8,14,20,21
260:3 269:2,5
278:12,17,24
279:18 282:7,21
283:5,8,10 284:4
284:16 285:18,20
285:23 286:4
288:4 291:12
292:14 294:9
296:4 297:15,25
298:24 299:12
302:8,9,21 304:2
304:15,18,25
305:16 306:10,22
307:2 309:23
310:9 314:5,21,24
315:21 316:6,23
317:3,5,13 318:6
318:13,25 319:5
319:14,20 320:8
320:12 322:12,19
323:1,20 324:14
326:3,10,18,22
**Guy's** 68:7,13
69:25 252:15
325:6

_____

**H**

**hac** 3:19
**half** 20:7 35:10
36:12 99:5 178:18
200:19,21 256:13
256:14

**halfway** 48:18
**hand** 180:7 309:7
**handed** 229:4
**handing** 47:16
87:12 90:8 98:5
125:8 132:16
134:7 138:11
204:17 225:18
233:16 238:23
244:7 247:24
254:12,16 261:16
269:11 289:17
292:24 314:8
**handle** 31:16,19
33:20,22 34:16,21
37:15 61:19
129:19
**handled** 54:4 94:5
198:1
**handles** 28:6
186:19 263:11
299:14 307:1
**handling** 113:22
227:15
**handwritten** 203:3
203:4 204:8,12,15
**happen** 208:9
**happened** 165:24
297:14 312:25
**happening** 70:5
184:9 211:16,23
279:9 316:10
**happens** 27:25
146:24 262:25
305:4,7
**hard** 17:12 35:18
59:7 77:9 81:4
188:16
**hard-to-fill** 236:1
**Harris** 3:16
**Hazard** 85:17
**hazy** 212:1
**HCLC** 117:24
118:22 119:13
159:12,12,14
**head** 17:8 31:23
41:18 46:4,8,8,11

93:13,25 114:23
116:2 123:25
159:15 179:13
214:20 217:21
231:15 253:11
262:22 305:11
318:22,23
**headed** 147:24
**header** 141:17
**headers** 161:5,10
**headquarters**
35:11 55:13,14,19
55:22,23 56:1,7
104:7,10 107:13
109:11 123:1,6,16
124:24 152:11
170:18 171:8
218:24 219:21
232:3 238:17
300:11,12,21
302:22
**heads** 43:10 93:10
98:19 119:3
134:12
**hear** 98:2 129:23
157:5 188:6,11
259:5
**heard** 16:18 144:21
152:16 165:24
166:1 267:17
284:17 285:7,15
**hearing** 62:22
285:13
**held** 23:12 24:4
100:2 108:2
307:18
**help** 39:14 85:14
98:22 99:10
228:15 241:4,20
241:24 283:17
**helped** 85:16 215:3
**helping** 40:11
41:24 227:14
**Hemenway** 63:21
63:23,24 65:1,4,7
65:12 66:9,12,22
67:1,18 68:3,20

69:18 70:21,25
101:8 116:9
150:22 167:8,17
275:23,24 296:4
306:11,22,25
309:23 310:9
314:5,21 315:5,22
316:6,24
**Hemenway's** 68:10
**hereinbefore** 331:7
**hesitation** 186:17
**hierarchy** 253:21
318:20 319:11,19
**high** 319:3,5
**high-level** 61:22
181:2,4
**higher** 50:10 51:15
58:14 105:1
144:22 182:8
264:15 274:25
**hire** 26:25 74:13
100:9,17 101:15
104:2,12 105:11
107:22 108:16,22
110:8 131:1
161:15 223:12,12
223:17 246:25
247:4
**hired** 26:18
**hires** 222:23 223:21
245:7,19
**hiring** 6:16,20 7:5
7:16 25:25 26:3,4
26:16,21,24 27:9
27:10,11,15,17,18
53:7,14 65:20
69:16,21 70:1,12
70:19 71:13,16
74:4,7,15,15,18
87:18 90:5,17,22
91:9 92:2 96:9,20
97:1,25 99:2,14
99:18,22 100:6
105:21 108:17
109:23 110:2
111:19 113:22
114:1 118:6

119:18 120:9,10 121:23 122:7 128:3 129:8,20 131:5,7 132:23 166:10,13,16,23 167:2,4,15,20 169:2,10,18 170:4 170:20 171:9,16 173:15 175:8,10 176:10 191:14 196:20 197:25 198:1 201:4 207:14,20 208:5 208:18 210:3,8 212:19 215:5 217:7 222:11 224:13 225:1 235:9 244:5,25 245:1,8,20 246:8 246:11 247:8,22 249:17 250:7,20 250:24 251:2 252:6,21 253:2 260:12 263:5 264:24 265:8 271:24 286:19

**hiringrequests@...** 110:18

**historic** 133:8

**historically** 261:13

**history** 200:24 201:3,10

**hit** 109:19

**Hmm** 66:13

**Homeland** 4:19 14:22,25 16:10,14 19:14 21:17 28:16 56:11 138:18

**honestly** 36:20 37:13 85:12 228:7 239:14 287:18 308:15

**Hoshijima** 3:19 6:5 14:1,2 15:11 22:6 22:11 42:21 47:16 54:25 84:9,16 87:12 90:8 95:12

98:5,9 117:11 125:8 132:4,8,15 132:20 134:7 138:11 139:10,13 141:8,15,20 154:1 154:7 155:13 156:1,14,19,23 158:25 168:19,25 170:23 171:13,20 172:17 173:8 180:4 183:3 184:5 192:11 199:20 204:17 210:18 225:18 233:5,8,15 233:19 238:23 244:7 247:24 254:12 261:16 269:11 272:4 273:14 276:10 278:5 286:6 289:6 289:16 292:24 294:11 296:12 299:18 304:5 309:6 313:15,23 314:7 316:16 321:17,24 326:25

**hour** 20:5,6 132:5 211:8

**hours** 20:7 290:11

**house** 277:23

**HQ** 56:19 57:3,6,9 93:4 249:4,9,12 249:20,20 300:5,9 300:14,25 302:13 302:18

**HRIT** 26:7

**Huffman** 47:7

**human** 16:13,14 21:19 22:4 23:1 24:18,24 25:6,9 25:18 26:7 27:25 29:22,23 32:8 38:9 41:18 48:12 49:12 54:13 65:8 68:6 88:21 93:25 104:11 117:24,25 118:23 119:1,3

123:25 125:6 128:6 159:15 168:7 253:22

**hundred** 71:22 79:7 226:24 256:25

**Huy** 162:6 231:11 231:12,13,15,17 231:25

---

**I**

**ICE** 57:1

**idea** 36:20 186:9 198:18,19 325:6

**identifiable** 324:15 326:11

**identification** 22:10 42:24 87:15 90:11 95:15 98:11 117:14 132:19 134:10 141:14 199:23 204:20 210:22 225:21 233:18 239:1 244:10 248:2 254:15 261:19 269:14 272:7 273:17 276:13 278:8 286:9 289:13 293:2 294:15 296:16 299:20 304:7 305:22 309:9 314:11 316:19

**identified** 137:10 212:4

**identifies** 137:4

**Idriss** 164:10

**IL** 3:15

**imagine** 157:22

**immediately** 23:18 118:9

**immigration** 91:5 97:11

**imminently** 244:2

**impact** 86:3

**impacted** 96:20

**implement** 40:12 40:20 41:24 42:3 42:5 44:7 45:9 63:17 90:17 93:14 252:9

**implementation** 39:10,13 40:2,23 42:7,19

**implemented** 39:4 41:1 44:3 53:7

**implementing** 29:6 39:6,18 40:10 41:7 43:16 90:20 118:10 133:24 134:3 292:16

**implications** 324:2

**implies** 85:12

**important** 17:6

**imprecise** 308:19 308:22

**Improve** 6:15 87:17

**improvements** 133:8

**inaccurate** 48:6

**inadvertent** 141:11

**inappropriate** 216:10

**incident** 88:17

**include** 55:23 56:7 168:10 179:16 215:8

**included** 66:2 102:20 106:20 142:14 163:13 182:9 220:9 257:2 259:21

**includes** 91:11 101:8 159:15

**including** 56:25 57:10 172:9,10 221:8 234:12 235:1 251:9

**inclusive** 328:5

**incoming** 270:7

**incorrect** 177:23 178:2 216:10

**increases** 212:8

**increments** 119:25 120:17 221:20

**independent** 24:21

**indicate** 114:12 178:1

**indicates** 114:9

**indicating** 140:24

**indication** 158:21 227:24

**indirect** 62:5

**individual** 27:15 100:9 101:15 102:6 153:13 154:19 156:7 254:24 261:24 311:14,24 322:15

**individually** 102:4 102:16 306:21

**individuals** 45:22 45:24 101:23 102:1 116:25 167:6,19 168:6,9 169:12 173:13,21 174:7,10 175:3,4 175:12 176:8 262:17 270:9 283:10

**information** 11:13 26:8 49:3,17 99:6 144:11 161:5,11 161:16 179:16 192:3,7,8 193:13 193:19,25 194:6 194:15,21 195:8 195:22 196:3 198:16 200:10,14 201:15,18,20,25 202:7,10 206:3,5 206:10,22,22 211:18,25 214:9 214:12,22 221:14 224:3 229:15,21 230:9 232:14 237:2,5,6,9 260:21 279:12,13 281:6 283:2 292:7

322:5 323:1,3,21 324:15 325:4,7,21 326:4,11,20

**Infrastructure** 185:2

**infrequent** 76:13 76:14

**infrequently** 68:21 69:9 239:14

**initial** 117:23 144:10 146:4 164:21 165:20 166:7 210:15

**initiate** 43:12

**initiatives** 26:5 189:8

**inquiry** 121:4

**Inspector** 56:21

**instance** 28:12,24 29:12 31:2 48:9 53:3 137:15 206:12 303:7

**instances** 226:23

**institute** 99:22 104:21

**instituted** 104:19 105:7

**instituting** 99:13

**instruct** 12:10 155:5 156:11 170:21 171:11 172:13 324:5

**instructed** 18:11 181:5 298:18,22 307:4 312:10,22

**instructing** 155:24

**instruction** 155:11 171:18 172:5

**instructions** 16:18 110:16 113:9 115:23 152:3

**instructs** 165:3

**Intelligence** 56:8

**intended** 141:18 280:4

**Inter/Intracomp...** 264:19

**interact** 74:21 185:3 186:24 189:21 239:22,23

**interacted** 185:4 239:19

**interactions** 81:18 187:2,4 190:15 191:1,2

**interagency** 31:5

**interested** 331:14

**interim** 169:12 173:14

**internal** 55:5,7 126:25 127:4,5,8 127:16 128:9 206:18,19 219:13 219:15

**internally** 63:13 216:11,13 221:24 238:9 245:10 246:24,25 247:4 260:5

**interpreted** 183:1

**interrupt** 17:12

**introduce** 13:24 22:7

**introduced** 11:11 12:3 47:17,20 125:12 159:1,4 180:10 192:12,15 221:4

**introducing** 42:21 82:2,24 83:24 95:12 158:25

**introduction** 81:19 81:22,24 83:18

**investigate** 218:11

**invocation** 156:16 172:21

**involve** 59:7 251:15

**involved** 25:8 26:16 27:22 30:12,15 31:8,11 39:8 74:3 74:7,11,17 80:4,7 82:22 89:22 90:20 107:16 133:24 134:2 135:4,11,21

135:25 144:6,9 162:17 165:7 168:2 170:19 186:13,14 219:23 222:1 226:16 227:9 230:6 237:18,25 238:4 238:17 246:7 264:7,11,12 268:12 298:2,11 316:4 317:17 323:5

**involves** 101:21 140:3 148:1 200:18 201:10

**involving** 168:7

**issue** 29:5 51:2 52:14,22 65:13 70:13 72:13,14 73:11 81:21 82:14 82:17,19,23,25 139:12 153:24 155:16 156:21 158:13 194:12 202:3,6 213:18 215:3 218:22 219:7,18,23 221:5 221:7 225:3,9,14 226:25 232:5,8 236:17,19 288:17 288:20

**issued** 90:5 224:13 225:2 281:22

**issues** 29:2 35:3,16 50:12 51:8,20 52:6 53:23 54:3 58:9 65:12 68:6 75:17 81:9 168:8 191:9,19 224:18 224:21 226:10,17 232:7 320:8 322:2

**issuing** 74:19 245:13

**it'd** 260:25

_____

**J**

**J** 1:8 13:8 329:4

**January** 6:18 62:10 86:6,24 87:9 90:4 90:6,13 95:22 96:5 143:19 152:24 165:1,17 193:14 197:3,7,10 197:10 221:18 232:17,18 237:12 237:15 238:19 239:4 241:10,10 241:15 242:24 243:4 248:16,24 254:21 258:19 261:22 262:6 264:3 266:21 269:18,25 272:22 273:20 274:8 276:17 288:9 290:14 293:5 294:3,21 295:22 297:5 303:12,13 303:15,16

**Jason** 33:10,11 253:24 254:2,6,10 262:20

**Jeffrey** 176:18

**Jeremy** 4:4 14:15

**jeremy.s.newma...** 4:9

**Jessica** 5:2 14:12

**job** 1:25 17:12 25:15 28:19 30:22 31:22 37:6,7,10 37:11,19 63:17 148:1 265:16,21 265:23 322:1 323:14

**Joe** 67:3,21 68:4,7 68:13,17 69:10,12 69:20,25 70:11,14 101:8 116:8 150:20 167:16 219:11 249:15 251:16,21 257:23 259:20,21 291:12 296:4 299:12 302:21 304:2

305:16 318:6,13

**joined** 24:12 76:4

**joint** 25:25 26:16 27:5,11,18 255:22

**jointly** 26:18

**Jonathan** 5:8 13:19

**Joseph** 70:21 167:7 249:24 252:9,13 252:15

**Jr** 3:16 4:22

**judge** 18:1

**June** 145:11 280:4

**Justice** 4:3 14:16 14:20 19:13,15

**justifications** 292:12 322:15

**justifies** 172:20

_____

**K**

**Kara** 75:10,13,15 75:20,24 76:10,23 77:8,11,19,23 78:1,4,8,17 79:9 80:5,8,18 81:11 82:2,14,25 83:25 220:3 251:9 318:20

**Karen** 20:19 21:2 75:15 82:1,9,24 83:25 84:4 177:4 179:25 180:15 184:6,14,16,24 186:23 187:3,17 189:17 190:13,16 200:2,8,10,13 201:14,24 202:10 202:14,17 203:5 203:22 204:7,24 211:17 214:11 217:16 248:8,16 257:22 290:19

**keep** 117:15 202:25 301:21 305:11

**keeping** 80:15

**kept** 277:10

**Kevin** 4:13 15:1

**kevin.yusman@f...**

4:17
**Khan** 239:3,8,11,18
240:5,21 241:1,18
243:12
**Khan's** 240:15
**kind** 28:10 29:9
32:7 37:19 39:9
49:7 50:19 60:8
60:12 85:12,24
94:4 139:20
140:10,20 146:24
158:14,20 161:10
175:7 189:15
194:14 203:11,18
212:7 214:21,22
218:25 235:7,24
263:11 264:1,4
292:18 307:11
309:21 320:17
**kinds** 58:17 190:15
**King** 4:22
**knew** 68:9 116:25
150:9 174:7
184:24 199:18
216:24 220:25
242:7 250:17
252:10 253:15
265:20 284:23
299:6,12 302:24
**know** 16:25 18:15
21:1,4,6,10 26:6
33:3 34:13,18
35:8 37:3 39:12
40:21,25 42:5
52:2 59:4,17
60:18 64:17,20,23
67:3,16,17,19
71:9,15 73:17
75:14,20,24 76:2
76:4,6,7,9 77:3,10
77:18,22 79:16,21
79:21 80:3,8,9,14
80:21 81:5,7,12
81:14 85:16 87:21
93:15,18,19,20,21
93:23,24 94:3,20
94:22 95:6,8 96:7

100:1 104:16,20
104:23 105:4,5,6
107:15,17 108:4,5
108:6,12,14 109:3
109:5 110:20
111:17,20,21
112:6 114:11,14
114:17 116:10,12
116:14,15,17
119:8 123:5,10,20
124:12,14 125:20
126:12,12,13
128:25 129:3
131:13,16 135:8
136:24 137:1,20
137:23 138:2
139:22 140:16,19
144:25 145:8,10
145:13 146:9,12
146:14 149:8,11
149:21,23,24
151:15 152:1,11
158:16,18 160:16
161:14 163:20
164:4 165:15
167:15 172:7
177:8,10,13,15
178:13 179:11,15
179:18,19,21,22
179:24 180:1,3
181:15,16,21
182:10 184:14,16
186:11 188:20
190:4,7,11 191:1
191:9 192:22
194:19 195:7,21
195:25 196:13
197:2,2 198:15
199:4 200:13
201:22 203:15,20
204:11 206:2
210:12 211:17,21
212:13 213:19,19
214:6 215:20
216:23 217:21
218:19 220:12,14
220:16 221:7,23

223:1 224:3,7,23
226:13,19 228:12
232:9,12 233:4
238:4,16 240:15
241:1,18 242:6
243:12 244:22
246:20 250:4
251:13 252:1,4,17
255:19 256:19,22
258:1,11,15 259:1
259:22 260:15
261:9 262:23
263:3 266:18
267:22 268:9,12
269:7 270:22
271:12 272:21
275:6,9,13 277:11
277:14,22 279:9
280:6,18,25 281:2
281:10 282:1
283:19 284:1,4,5
285:20 286:24,25
287:1 288:1 291:6
291:10,12,14,19
292:4,14,17 296:9
297:14,19 302:1
304:23,25 305:4
305:16 309:4,5
310:19 311:6
312:10,14,21,24
313:10,12 315:21
315:24,25 316:2,3
316:5,8,9 317:5,8
317:15,18,19,20
318:1,5,8,9 319:5
319:18,25 320:2
320:11,15,17,23
321:9 323:4,5,11
324:20,23 325:2,3
325:4,5,9,11,23
325:23 326:2,3,9
326:15
**knowing** 312:18
313:1
**knowledge** 42:13
124:16,23 125:5
128:8,11 169:11

307:11,13 330:8
**known** 80:11
123:23 124:6
129:12 194:16
**knows** 326:7
**Kristi** 61:3,6,16,24
62:3,6,9,17 63:7
64:1 126:2,8,13
126:16,20,24
130:6 131:17
198:24 251:3
284:22 285:11,13
286:23 287:24
288:2

---

**L**

**L** 4:6
**La'** 119:5,11
131:21 192:20
193:11 195:14
200:9 229:8 237:7
244:20 248:8
285:9 287:21
293:13 300:3
302:11
**label** 210:19 322:25
**laid** 283:13
**land** 212:18
**lane** 124:14
**language** 207:6
249:6
**large** 97:8 242:12
275:22 311:22
**large-scale** 43:12
**late** 237:20 238:16
**latitude** 93:10
**launched** 236:18
**Law** 56:11
**laws** 25:19
**lawyers** 19:2,17
**lay** 212:18
**Le** 162:6,10 231:11
231:12,14
**lead** 88:15
**leader** 117:25
**leadership** 29:24
63:1 92:22 94:10

95:4,4 100:4
106:10 116:24
117:25 118:24
129:19 232:9,12
254:21 256:24
257:11 273:11
275:7,10 303:18
306:14,23
**Leadership's** 178:8
**leading** 187:17
**leaks** 192:6,8
**leaving** 189:18
**led** 40:24 44:8
202:6 203:6
205:24
**left** 64:13,15 67:9
184:12 240:17
**left-hand** 48:17
**legal** 5:5 73:24
91:23 97:14 322:2
322:4 324:4
325:16 326:14
**Leonard** 3:5 14:5,5
**lesser** 31:2
**let's** 88:9 105:15
132:8 176:15
182:4 183:3
206:25 210:18
233:8 278:15
305:19 313:15
321:17
**letting** 241:16
**level** 29:15 32:18
39:11 50:10,13,18
52:7,15 58:14
92:24 160:9
161:17,19 178:9
178:14,18 179:9
180:2 181:6,10,20
181:21 182:7,9,10
182:16 232:13
305:5 308:25
310:24 319:3
**levels** 160:6 161:16
180:23 214:10
254:3 318:24
**Levy** 5:2 14:12,12

**Lewandowski** 71:19,24 72:3,10 72:18,21 73:3,12 74:8,21 75:8 76:15,21 316:3,7
**liaisons** 28:7
**limit** 91:20
**limited** 43:24 73:20 189:24 194:9 210:14 301:13,13 301:16
**line** 49:11,16,22 53:5 80:2 108:24 112:23 125:21 126:9 182:10 235:18,22 252:10 252:14 279:22 329:11,13,15,17 329:19,21
**lines** 274:7
**link** 41:14,22 115:10
**list** 102:14,16,17 105:20,23 106:23 110:8 118:23,23 119:1,14 140:4,7 176:14 236:1
**listed** 48:21 56:17 70:23 77:4 81:6 103:8,14,21 181:9
**literally** 33:3 216:21 313:13
**litigation** 98:13 138:13,16
**little** 21:3 28:22 36:13 189:6
**LLP** 3:4 5:3
**Local** 56:11
**log** 271:15 273:3
**logs** 271:18,19
**long** 15:25 20:3 22:20 24:5,15,23 87:22 266:10 301:7 313:10 326:16
**longer** 24:16 48:10 67:11 311:13

**look** 96:9,11 126:20 182:17 200:16 206:25 207:11 210:19 215:16 218:17 230:24 238:10 244:13 249:7,14 259:12 264:17 273:10 300:1 301:11 309:21 314:18
**looked** 45:17 131:20 164:4 196:22 212:21 230:21
**looking** 54:2 91:1 107:21 108:24 161:15 192:18 193:4 213:3 218:22 220:1 229:3 302:7 322:11
**looks** 126:14 130:11 139:2 241:8 262:3 264:22 314:17 320:6
**loop** 291:3 293:14
**looped** 219:12 313:5
**lose** 187:24
**losing** 20:2
**lost** 187:16
**lot** 16:6 162:2 203:10,11 228:12 234:9 236:13 239:19
**low** 181:19
**lower** 200:7
**lowest** 160:9 161:19 181:6,9 182:7,16
**lunch** 180:6 183:4 183:7 193:3
**Luther** 3:15 4:22

**M**

**M-i-s-c-h-e-l-l** 33:9

**ma'am** 270:3
**mailbox** 147:4,9,14 255:23 256:1,3,20 256:22,23
**main** 55:20 65:13 81:7
**maintain** 325:10
**majority** 275:22
**making** 16:16 58:17 189:10 237:7 238:10 264:1 267:13 275:13 296:10
**manage** 28:17 32:8 48:16 86:5 93:11 104:16 242:3 267:23
**managed** 80:1 131:2 221:23
**management** 4:12 24:13 25:22 26:10 27:23 28:8 29:1 29:15,16 31:2 37:17 38:13 39:3 39:6,9 45:19 47:6 47:12,14 48:18,25 49:8 50:2,6,14,18 50:23 51:3,10,13 52:17,20 53:20,25 54:14,19,20 57:5 57:17,19 58:13 60:10,13 65:22 66:6 68:9,12 71:4 83:20 88:17 93:1 98:25 106:3 107:23 108:1,7,10 108:13,25 109:19 117:9 136:20 137:12 150:6,9 153:2 167:11 185:6,22,24 186:1 191:16 224:12,17 224:21 225:12,23 226:2,5,9,16 235:1 239:21,25 240:5,6,11,22 251:23 252:3

260:18 261:6 307:1
**management's** 66:1
**manager** 228:23 229:2
**manages** 31:10 267:20 277:14
**managing** 30:12 59:14 191:18 192:5 250:15 280:9
**mandate** 188:18,20 188:21 189:1 190:8
**Mandatory** 91:1
**manner** 12:23 264:2
**manual** 221:19
**March** 7:4 98:14 100:14 101:14 103:24 104:20 107:4 118:2,6,10 120:22 121:14 122:12,19,22 123:7,11 124:5,16 124:23 128:3,8,12 143:19,20 201:4 204:4 210:3 222:21 227:2,6,8 235:9 256:16 264:24 266:17 279:24 280:22 281:12 321:14
**mark** 132:16 134:8 141:6,9 204:18 225:19 314:9 316:17
**marked** 6:9 7:3 8:3 9:3 10:3 11:3,9 12:1 22:10 42:24 47:17,20 87:15 90:11 95:15 98:11 117:14 125:9,12 132:19 134:10 138:12 141:14 159:4 180:8,10 192:15 199:23

204:20 210:22 225:21 233:18 239:1 244:10 248:2 254:15 261:19 269:14 272:7 273:17 276:13 278:8 286:9 289:13 292:25 293:2 294:12,15 296:16 299:20 304:7 305:20,22 309:7,9 314:11 316:19
**marking** 199:20
**Martin** 3:15 4:22
**Maryland** 25:5
**Mass** 48:10 56:13
**master's** 25:4
**match** 282:25
**matched** 231:19
**material** 139:6
**matter** 13:6 14:4 16:4,8 34:19 35:14 53:10,13 155:14 156:6
**matters** 31:6 33:20 33:22 34:17,23 35:10 36:5,10,19 36:23 65:6 81:16 86:3 148:2 168:7 227:15 228:3
**Matthew** 4:20 14:21
**matthew.fleisch...** 4:24
**maximum** 91:19
**McGill** 70:22 71:1 71:3 101:10,11 116:9 117:7 150:14 167:8,17 249:15,24 296:5 299:2 306:11,22 306:23 309:23 310:10 314:5,21 316:24
**MCO** 121:6,13 122:15 201:5

207:25 208:23 209:1,8 210:7,11 236:1
**MCOs** 207:18 208:16,20 210:17 236:9
**MD** 3:17
**mean** 61:15 68:24 83:17 102:17 106:16 131:10 135:17,24 136:11 157:21 189:5,22 200:21 217:3 218:10 227:21 228:8 243:19 246:24 247:3,4 252:14 271:21 292:21 320:23
**meaning** 100:21
**means** 88:5 107:22 217:24 224:23 241:1
**meet** 19:5,8 142:14 188:7 202:21
**meeting** 19:16 61:10 74:25 75:1 75:2,3 203:20 292:5
**meetings** 19:22 61:24 79:4 202:17 203:11
**member** 31:3 51:25 265:14
**members** 34:20 169:6 170:4 255:24
**memo** 99:10,12 106:13 107:4,21 109:24 118:14 121:14 122:12 125:21 126:1,4 127:19 128:12,16 128:18,19,23 129:1,5 130:6 131:19,24 132:1 163:22 170:1 175:8 201:5,6

208:6 209:21,23 210:15 249:1 252:21 253:1 264:24
**memorandum** 6:18 7:4,12 11:19 90:12 96:10 97:10 98:14,18 99:8 100:21 103:6 105:17 118:7 125:14 126:24 134:11 141:23 166:20,24
**memos** 136:4 147:20 210:16
**mentioned** 27:20 28:8 30:22 54:3 60:3 65:14 78:4 101:8 114:2 137:6 202:4 257:1 258:4
**message** 9:20 289:19,22 290:1,6 290:8 293:8,9
**messaging** 66:16
**met** 19:17 61:18 78:20
**method** 78:24
**mid** 182:23
**mid-December** 211:17,23
**mid-January** 288:14
**mid-summer** 212:24
**middle** 15:17 200:16 250:5
**Millennium** 24:19 24:25
**mind** 29:18 30:8
**minimal** 77:6
**minutes** 205:2
**Mischell** 33:9 95:18 164:16
**misreading** 209:6
**misrepresentation** 262:15
**missed** 73:7

**missing** 54:14 176:23
**mission** 11:22 86:3 105:23,24 106:4,7 106:17,20,21 107:1,12 108:15 108:20 121:17 122:8,10 125:16 208:16 234:16,25 235:4,16,17,20,25 249:8
**misstates** 30:25 35:6 36:7 39:21 40:5 41:10 42:1 95:1 110:5 130:17 130:25 169:8 173:12,24 174:23 175:22 221:2
**Mitigation** 85:17
**modifications** 164:1
**moment** 127:10
**month** 193:13 196:11 197:4
**monthly** 195:15,18 195:22 196:1
**months** 72:8
**morning** 14:1 15:12,13
**move** 219:14 245:10 246:23 268:2 296:23 297:22
**moved** 84:1 185:21 185:23 190:13 240:3
**moving** 203:18
**multiple** 37:20 45:3 220:17
**Munoz** 70:21,25 71:6,12 101:9 116:9 167:7,16 296:4

---
**N**
---
**N** 184:1,1,1
**name** 13:19 15:14

15:16,17,18 19:11 81:15 85:12 98:22 102:25 119:8 162:6 164:13 174:20 175:2,7 254:24 265:16 266:24 309:14 329:2,6 330:12
**named** 81:10 175:1 175:3
**names** 172:18 173:9,13 174:3,4 176:14 254:24 261:24 309:13
**naming** 173:20
**national** 28:15 91:5 97:11 222:12
**native** 180:12 309:11
**nature** 326:9
**Navarro** 33:9 95:18 164:16
**near** 89:11 128:17 178:3
**necessarily** 12:24 113:5 123:24 124:9 163:6 165:5 202:23 203:14 225:2 284:19 290:3
**necessary** 320:4
**need** 18:15 121:7 147:11,17 152:6,8 153:21 166:16 207:18 208:8 209:2 215:20 221:6 235:6 265:18,22 268:11 305:15,16 308:24 313:11 323:4 325:2,3
**needed** 6:15 81:20 82:14 87:17 116:23 117:2 137:18 147:6 164:1 189:15 203:25 267:22

302:21
**needing** 166:5
**needs** 52:14 58:14 59:20 120:1,4,5 151:10 262:23 268:16 292:8
**negligible** 76:21,23
**negotiations** 104:14
**neither** 331:8
**Nelson** 33:10,11 253:24 254:2,6,10 262:20
**Neurauter** 176:18
**never** 63:15 67:2 75:7 116:18,20 135:18 145:3 146:6 150:5,20,22 157:16 158:6 210:7 220:25 226:1 288:7 289:23 321:13
**new** 2:10 13:15 29:11 50:16 51:24 58:22,23,24 99:13 99:22 100:6,14,16 100:23 104:2,19 104:21 118:10 120:10 122:11 141:6 207:14 208:17 217:14 222:23 223:12,12 223:17,21 237:22 238:1 265:21 282:8 312:17,20 312:22
**newly** 101:13
**Newman** 4:4 14:15 14:15 22:18 28:3 29:20 30:16,24 33:21 35:5 36:6 37:4,8,12 38:4,11 38:24 39:7,20 40:4,14 41:9,16 41:25 42:12 43:6 43:14,22 44:13,15 44:19,25 45:12

46:6,19 47:1
48:14 49:5,14,19
50:7 51:16 52:8
52:18,24 53:12
57:12 58:1,19
59:15,21 60:16
63:10 64:18 65:23
66:18 67:6,14
68:8,14 69:23
70:9 73:14,23
75:18,22 76:17,25
77:21 79:13,18,22
80:12 82:15,20
83:2 84:5 85:6
86:9,19 87:2,6
88:2,7 89:8,25
92:17 93:7 94:1,6
94:25 95:7,9,23
95:25 97:3,13,18
99:24 104:13
108:8 110:4,11
113:6 120:11,18
120:25 123:2,8,18
124:7,19 125:1
126:10 128:4
129:10,14,25
130:8,16,24 132:7
139:1 141:1,12,19
142:16 143:1
144:2 147:1,15
148:7,18 153:22
154:23 155:11,17
156:11,18,22
158:9 165:18
168:15 169:7
170:15 171:2,17
171:22 172:5,23
173:11,23 174:22
175:21 181:11
188:4 189:2,19
190:9,18 194:17
194:23 195:3
196:12 197:22
201:8 208:7
209:10 210:5,10
214:14,25 216:6
218:2,12 219:19

220:11,23 221:1
221:21 222:5,17
224:9 226:21
227:3,11 228:5,20
232:4 233:2
240:24 241:25
242:18 243:14,23
245:23 247:10,16
249:25 250:12
251:11,25 255:6
262:12 263:16
264:10 266:12
270:12 274:13
276:7 280:15
281:18 287:16
288:12 289:8
291:23 298:6,25
300:16 301:2,8,25
302:5 304:20,22
305:9,13,19 307:6
308:21 313:7
317:10 318:4,7,10
319:12,16,22
321:15,19 322:7
322:17 323:8,16
323:22 324:3,16
325:15 326:5,13
327:2
**nine** 205:2
**nobody's** 204:14
**nodding** 17:7
**Noem** 61:3,6,16,25
   62:3,6,17 63:5,7
   64:2 114:11 126:2
   129:17 130:6,13
   131:17 137:22
   138:2,3 198:24
   201:6 251:3
   284:17,22 285:2
   285:11,13 286:23
   287:14,24 288:2
   308:3,7,14 309:2
   310:21 311:2
   316:1 318:25
**Noem's** 62:9 126:8
   126:13,16,21,25
   209:20

**nominated** 185:25
   186:4
**nomination** 186:2,6
   186:9,15,16,21
**nominees** 60:6
**non-MCO** 122:1,16
   201:11 207:19
   236:20
**Non-Profit** 3:2,13
**nonrenewals**
   237:15
**nor-** 45:20
**normal** 51:5 277:4
   280:9 303:15
**normally** 27:24
   69:13 79:24 112:9
   203:2 257:15
   260:23 273:2
   275:19 306:25
**Northern** 1:2 13:11
**Northwest** 2:11 4:6
   13:16
**Notary** 2:13 331:4
   331:19
**note** 12:22 100:25
   157:23 313:11
**notebook** 203:21
**noted** 184:2
**notes** 149:12
   202:21,23 203:5
   203:15,16,21
   204:6,12,15
**notice** 129:15 162:5
   166:15 182:22
**noticed** 213:17
**November** 7:12
   134:13 159:11
   164:22 166:15,19
   200:22 232:17,18
**NRDC** 3:14
**NTE** 237:12,20
   238:6 241:11
   248:24 262:5
   288:11 294:21
**number** 34:20
   44:24 45:11 51:22
   58:6 73:1,2,6,21

77:2,9 88:6 90:13
107:11 109:3,6,13
109:17 138:19
178:15 182:3,3,9
192:17 199:25
204:22 210:24
212:11 213:3
220:21 223:12,21
229:5 232:15
233:21 235:14
236:5 242:8
244:12 248:4
254:18 260:23
270:24,25 314:13
**numbers** 89:23
   180:19 181:14,23
   182:13,15 187:22
   200:18,18 212:5
   212:22 229:10
   230:6,11 231:11
   231:13,19,22
   232:22,25 234:6
   237:8 311:22

---

**O**

**O** 184:1,1,1
**o0o--** 13:3
**OA** 266:22
**oath** 16:21
**object** 18:9 22:18
   29:20 33:21 37:4
   37:8,12 38:4,11
   38:24 39:7 40:14
   41:10,16 42:1,12
   43:6,14,22 45:12
   46:6 48:14 49:5
   49:14,19 50:7
   52:8,18,24 53:12
   57:12 58:1,19
   59:21 60:16 63:10
   64:18 65:23 66:18
   67:6 68:8 69:23
   75:18,22 76:17,25
   77:21 80:12 82:15
   82:20 83:2 84:5
   85:6 97:3 108:8
   129:10,14 147:1

148:7,18 156:16
165:18 188:4
190:18 196:12
201:8 209:10
210:5,10 214:14
214:25 232:4
240:24 251:25
255:6 264:10
274:13 276:7
281:18 288:12
298:6,25 304:20
318:4,7,10 319:12
321:15 322:7,17
323:22
**objection** 18:9 28:3
   30:16,24 35:5
   36:6 39:20 40:4
   41:9,25 44:13,19
   44:25 45:1 46:19
   47:1 48:14 51:16
   58:2 59:15 67:14
   68:14 70:9 73:14
   73:23 79:13,18,22
   82:21 86:9,19
   87:2,6 88:2,7 89:8
   89:25 92:17 93:7
   94:1,6,25 95:7,23
   95:25 97:13,18
   99:24 104:13
   110:4,11 113:6
   120:11,18,25
   123:2,8,18 124:7
   124:19 125:1
   126:10 128:4
   129:25 130:8,16
   130:17,24 142:16
   143:1 144:2
   147:15 148:19
   158:9 169:7 171:2
   173:11,23 174:22
   175:21 181:11
   189:2,19 190:9
   194:17,23 195:3
   197:22 208:7
   216:6 218:2,12
   219:19 220:11,23
   221:1,21 222:5,17

224:9 226:21 227:3,11 228:5,20 228:21 233:2 241:25 242:18 243:14,23 245:23 247:10,16 249:25 250:12 251:11 262:12 263:16 266:12 270:12 280:15 287:16 291:23 300:16 301:2,8,25 302:5 305:9,13 307:6 308:21 317:10 319:16,22 323:8 323:16 324:3,16 325:15 326:5,13

**objections** 315:1
**obligation** 199:19
**obtain** 264:13
**obviously** 263:22
**OCC** 244:24 245:2
**occasionally** 66:23
**occupation** 108:16 108:21
**occupations** 105:24 105:24 106:4,7,17 107:1,12 121:18 208:17 234:16,25 235:5,16,18,21,21
**occur** 243:17
**occurred** 172:24 210:13 264:2
**OCHCO** 23:4,6,13 23:23 24:5,6,8,9 24:12 28:23 29:8 29:19 30:6,6,9,12 31:23,25 32:3,10 32:21,24 34:1,3,7 34:10,10,16 39:12 47:13 48:21 53:15 57:22 58:8 59:18 60:1 74:3 89:2,3,5 89:22 90:19 92:20 94:5 110:22,25 115:9,18 125:4 136:17 137:21

140:17 141:22 144:6,14,18 145:22 147:21 149:21 152:5 154:15 156:3 167:21 170:5 171:1,15 172:4,19 176:3 186:12 194:14,16 206:19 207:24 209:7 214:5 223:2 236:24 237:5 244:19 245:4 250:19 254:4 260:16 263:7 266:7 277:1,5 278:1 281:17,19 282:1,22 288:5 298:4 303:17

**OCHCO'S** 38:2 115:4
**OCPO** 54:5,7
**October** 7:11 132:22 142:6
**off-boarded** 200:19
**off-boarding** 288:10,11
**off-ramp** 189:11
**offer** 29:12
**offers** 27:1
**office** 22:25 23:1,9 24:13 25:17,21 26:23 27:23 29:1 29:3,14,15,16 30:21 31:1 32:1,2 32:12,14 33:24 38:8 45:18 49:11 49:13,18,21,23 50:23 51:15,21,25 52:4,7,11,15,16 52:19,23 53:6,9 53:16,24 54:8,11 54:13 55:23 56:2 56:6,8,9,10,10,11 56:12,21 57:10,16 60:9,14 62:8 64:6 64:8,8,9 65:17,18

66:1,5 70:20 71:7 71:10 74:10,11,17 80:4,7,15,19,21 81:1,6,12 83:22 86:15,18 87:4,5 90:6,19 92:19,23 92:25 94:12 98:19 100:8,11,17,20 101:4,15,21 102:9 104:4,11 105:13 107:24 110:8 111:3,7,11,14,17 111:18 112:2,6,22 113:4,16 114:8,15 114:22 116:2,7 121:19 122:3,24 122:25 123:14 129:9,21 130:14 130:23 133:23 134:2 136:1,5,12 136:19 137:2,14 137:17 138:8,9,10 145:13,22,22 147:12 148:9,12 150:8,9,17,24 151:3 153:3,5,7,9 156:25 165:13 167:19,24 168:10 168:11 174:13 176:7,9 178:6 180:23,24 181:16 181:17,18 193:17 193:18,24 194:15 194:19,21 195:7 198:10,15 210:13 219:4,7 222:3 240:4 242:5 245:2 245:16,17 246:6 246:13,16,17,21 247:19 250:19,25 251:6 252:2,5 253:22 255:25 257:15,18,19 260:13,17 261:2,2 261:4 263:11,24 266:2,8 267:2,5,7 267:10,20,25

268:1,6,9 271:1,4 271:4 276:9 277:24 287:2,8 300:9 302:22 303:1 308:10,17 308:25 310:16 312:1,19,21 313:4 318:16 319:6
**officer** 16:13 21:19 22:4 23:2 28:6 30:18,19 41:18 48:12 49:3,3,12 49:17,17 54:9,13 54:17 93:25 123:25 125:6 253:23 325:25 326:1
**officer's** 79:25 104:11
**officers** 29:23
**Officers'** 38:9
**offices** 2:10 13:14 30:10 55:19 56:2 56:5,17 57:10 103:20 160:9 161:19 180:25 181:7,9,10 182:16
**official** 1:8 13:9 14:17 20:20 71:8 82:10 115:1 125:23 184:7 190:14 226:6
**officially** 175:9 176:10
**officials** 61:22 89:13,18
**oftentimes** 81:5
**OGC** 245:22 246:3
**Oh** 176:25 261:10 266:24
**okay** 26:14 33:6 34:9,11 50:16 86:14 88:4 108:3 117:17 136:10 159:10 177:3 182:19 205:4 208:14 219:14

221:12 225:25 238:15 239:14 242:15 252:23 253:15 267:1 289:21 295:6 313:9,17
**Okoh** 4:21 14:24 14:24
**Okwede** 4:21 14:24
**okwede.okoh@h...** 4:25
**OMB** 27:23 28:2,6 30:23 31:11,12,20 45:18 90:16 107:15 133:21,21 134:11,17,25 135:6,9,15 142:11 142:13,21 143:12 143:22 144:1,25 145:3,9 146:7,10 146:19,25 147:13 147:14 148:17 166:20 178:24,25 179:5 277:17 280:14,20 281:20 282:2
**OMB/OPM** 90:12 97:10 141:23 143:4 166:14
**On-Call** 84:20
**onboard** 35:8,9
**onboarding** 61:17 61:19,21 74:19 80:4,7
**once** 15:23,24 61:7 65:5 68:3 74:23 77:14 137:13 199:18 230:12 267:24
**ones** 48:7 50:9 56:16 58:4 81:9 112:12 113:23 131:8 139:18 242:22 267:13 268:17 296:9
**oOo--** 328:25
**operate** 152:6

operating 151:8,12
operational 55:21
operations 88:14
  88:22 253:25
opinion 227:25
OPM 27:20 30:23
  31:8,10,14,17
  44:2,3 90:16
  95:21 96:5,8,12
  96:25 98:2 107:15
  133:21 134:11,25
  135:6,9,15 142:11
  142:13,21 143:12
  143:23 144:1
  145:1,4,9 146:7
  146:10,19,25
  147:4,6,14,14,24
  148:2,6,13,17
  157:9,13,16,23
  158:2,5,6,8,11,21
  164:25 165:16
  166:5,20 178:24
  179:1,5 277:18
  280:14,20 282:2
OPM's 134:17
OPM/OMB 160:1
opportunity 35:13
  174:9 327:3
  328:22
opposed 78:13,16
optimize 39:14
optimized 38:21
optimizing 38:22
option 44:22
order 6:11 7:10,14
  42:14,25 43:2,17
  44:8 45:10 85:14
  130:4 132:21,24
  133:11,11,24
  134:14,18,23
  141:23 148:12
  189:12 196:14
  203:14 252:7
  267:22 270:7
orders 28:25 29:3
  39:18 40:2,9,13
  40:24 41:8 42:9

42:11,19 134:3,4
  187:13
ordinarily 261:3
  292:6
org 47:21 48:13,22
organization 3:3,14
  11:13 38:21 46:10
  47:25 130:4
  181:15,21,25
  189:13,14 212:5
  250:14 262:23
  267:23
organizational
  11:12 14:7,10,14
  54:2,10 56:18
  64:4 181:2
organizationally
  64:7
organizations 27:1
  55:20 268:17
original 117:6
  151:19 152:17
  187:21 294:25
  295:2 307:3
originally 91:23
  152:9 176:6
  234:10
outcome 95:10
  218:20
Outlook 102:18
outreach 203:9
outside 27:25 58:13
  100:4 124:14
  153:2
overall 25:18 29:21
  37:6,10 87:25
  224:25
overarching
  153:15,18
overdue 158:3
overlap 240:8
overlapped 240:16
oversaw 252:9
oversee 22:25
overseeing 252:13
  323:14
oversees 253:18

oversight 131:3

**P**

P 4:5
p.m 183:8 184:2
  229:7 248:15
  290:14 293:5,10
  314:19 327:8
P.O 3:21
package 42:7 60:1
  60:6 139:15 140:8
  140:12,14 149:14
  269:21 320:25
  321:3
packages 59:10
  62:7 139:23
  169:13,15 268:4
pad 203:14,15
page 16:17 43:8
  48:18 87:23 88:9
  88:10 89:11,12
  91:3,3,14 96:11
  99:5 101:1 103:9
  105:10,15 126:5
  126:23 133:15
  143:4,8 159:6
  162:6 166:23
  176:15 178:3
  192:19 207:1
  215:17 221:10
  222:8 244:14
  297:3 309:15,16
  314:19 329:11,13
  329:15,17,19,21
Page/Line 12:11,11
  12:11
pages 109:22 328:4
paid 79:16
paper 59:7
paperwork 292:12
  293:23 298:12
par 36:16
paragraph 88:12
  88:20 89:12 91:2
  91:4,11,15 92:4
  92:15 93:5,16,22
  94:19 128:17

133:7,10 143:8
  176:17 177:1,2
  225:4,7 279:21
part 27:5 28:5
  30:15,22 31:22
  32:20 39:1,2
  40:11 47:13 55:20
  56:19 57:3,5
  58:11 59:13 61:21
  65:20 71:12 78:5
  83:21 85:4 94:14
  97:6 103:4 104:6
  104:18 106:11
  123:5,15 147:22
  148:1 167:12
  170:13 173:17
  174:7,14,17
  175:10,17 179:12
  195:10,23 196:19
  220:5 222:4 232:5
  232:7 237:17
  238:11,21 251:19
  252:14 254:25
  255:21 258:9,11
  259:22 304:3
  307:8,9 309:10
  316:14 319:10
  321:25
partial 175:20
partially 80:17
  303:5
participate 28:12
particular 35:24
  100:25 137:14
  161:2 163:7
  189:14 292:21
  298:7 307:19
parties 331:10
Partnership 56:12
parts 104:10
  174:16 215:1
pass 201:21 206:7
  264:15
passed 115:13,17
  116:7,15 206:10
passing 192:11
  298:11

patrol 235:19
Pause 45:13 55:16
  77:17 78:9 79:6
  81:3 98:3
paused 288:10
pay 52:10 65:10
  104:17 109:14,18
  230:12
payroll 28:14,16
penalty 330:1,9
pending 18:17
  170:2,12 176:13
people 23:4 31:25
  32:12,14,20,23
  33:1 34:16,22
  35:3 44:22,24
  45:11 46:12,15,16
  46:23 60:19 70:23
  81:1,8 89:19
  101:7 102:10
  103:1 104:2
  111:24 112:4,10
  114:1 116:8,12,16
  117:4 119:1 140:4
  159:15 167:15,25
  168:5 169:14
  170:9,14,25
  172:19 173:9
  174:3,4,19 175:1
  175:2,14,19,24
  176:2,12 181:18
  184:11 187:25
  188:12 189:11
  202:22 206:9,19
  214:1,4,8 234:9
  238:6 247:4 248:9
  262:9 263:7 273:6
  278:18 287:3
  296:6 298:4
  303:20,23 304:2
  306:18 307:5
  308:4,6,24 317:21
  319:2,25
percent 71:22 79:7
  226:24 256:25
percentage 35:15
  35:21 36:18

**percentage-wise** 36:13
**perform** 234:25
**performance** 30:3 50:21 191:16
**performing** 20:20 82:10 85:22 115:1 125:23 169:17 190:14
**period** 48:3 109:14 109:18 130:15 131:18 187:25 190:16 191:21,23 191:24 238:5 239:12,16,17 249:3 298:7
**periods** 232:16 234:15 294:6
**perjury** 330:1,9
**permission** 122:2,3 123:17,22 124:5 247:5 260:9
**permitted** 92:11
**Perry** 5:8 13:19
**person** 60:24 66:23 68:21 73:10 75:5 78:20 102:23 105:6 147:12 191:18 231:18 263:10 265:15,21 265:23 274:22 299:12 310:16
**person's** 162:6
**personal** 38:6 61:11,12,13,15 66:25 72:24 255:4 323:21
**personally** 62:20 113:18 162:23 188:2 263:14,25 264:7 269:7 298:2 298:11 303:3 324:14 326:11
**personnel** 24:13 25:22 29:1,14,16 31:1,6 33:24 34:17 35:4,17

45:19 49:25 50:12 50:23 51:2,8 52:6 52:14,22 57:20 58:8 61:11,12,13 61:15 65:15 72:12 72:14 73:11 81:16 82:23 86:2 134:5 138:23 148:2 191:8,12,15,19 194:12,22 202:1 206:6 226:17 228:3 254:20,20 255:4,9,13,16,19 256:2,24 257:10 260:20 261:14 262:4 264:20 265:12,14,19,21 265:25 266:11 269:21 271:22,23 272:13,18 273:5 273:11 274:6 275:7,10 276:21 277:2 303:17 306:14 322:2,5 323:2,15 325:10
**personnel-related** 50:4 51:12 53:22 82:19,25
**perspective** 28:7 230:7
**pertain** 154:18 322:4
**Peterson** 192:20
**phone** 66:13,20,25 68:21,24,25 69:2 69:7 72:23,24,25 73:2,4,5,7,8 78:12 78:13,16,18 79:4 204:7
**PII** 325:14
**ping** 150:13
**pinging** 150:8 158:14,20
**place** 27:12 107:3,7 197:25 252:22 258:16 265:5 331:7

**placed** 120:16
**Plaintiffs** 1:6 2:8 3:3,14,15 6:8 7:2 8:2 9:2 10:2 11:2 11:10 12:2 14:3,7 14:11,14 22:9 42:23 47:19 87:14 90:10 95:14 98:10 117:13 125:11 132:18 134:9 141:13 159:3 180:9 192:14 199:22 204:19 210:21 225:20 233:17 238:25 244:9 248:1 254:14 261:18 269:13 272:6 273:16 276:12 278:7 286:8 289:12 293:1 294:14 296:15 299:19 304:6 305:21 309:8 314:10 316:18
**plan** 135:1,5,9,15 135:19 136:3,13 136:17 137:3,21 140:18 141:22 142:2,10,21,25 143:16 144:11 146:5,19 148:5,16 148:24 149:10,22 150:3,7,18 151:1 151:4,11,12,18,20 151:22 152:13 154:9 155:2,19 156:5 157:6,14,17 158:7,20,23 159:19 164:2 165:21 166:8 169:3 176:21 177:5,9,17,20,24 178:5,17,21,24 179:2,6,17 180:16 193:6 212:4 213:8 213:10,22 214:2

215:2,8 277:17 279:23 280:2,6,10 280:12,13,19 281:14,21
**plans** 30:3 56:9 133:16,20 134:22 142:15 145:18 153:14 157:24 158:12,17 165:4 213:13,16 281:1
**platform** 162:12
**please** 13:23 15:4 37:9 300:4 302:10 311:6 324:9 328:3
**plug** 191:24
**plus** 290:11
**PMCO** 121:6,13 208:23 209:1 210:11
**PMCOs** 210:17
**point** 23:15,22 29:5 46:14 99:17 103:8 140:1 143:7 152:18 157:22 189:25 201:9 202:14 221:17 222:9 230:16 237:10 240:11 259:25 295:18 303:22 311:4
**pointed** 54:12
**points** 60:22 103:22
**policies** 65:10
**policy** 56:9 300:6 300:14,21,25
**political** 21:23 39:11 62:25 186:19 227:23
**politicals** 228:11
**portfolio** 37:15 68:7,10,13 252:15 253:25 299:14
**portfolios** 33:14,17
**portion** 113:17
**position** 21:21 23:22 105:10,11 155:13,17 161:14

161:15 184:12 186:1 265:9,10,11 318:6,12,21
**positions** 23:12 24:5 26:22 45:23 90:6 91:4 97:10 103:14 105:20 106:20 108:2 235:14 236:2,5 242:13 277:22
**possible** 102:24 105:1,3 153:4,6 182:7 215:2 283:23,25 290:8,9 312:25 313:2 316:10,12
**post** 3:7 265:11
**posted** 162:10
**potentially** 216:9
**practice** 158:4
**practices** 280:11
**pre-decisional** 155:3,20 171:24 173:4
**preceding** 23:18
**precipitated** 100:2
**preclearance** 292:18,20
**prefilled** 160:25 161:3
**prep** 19:6 20:13,14 20:16
**preparation** 18:25 20:9 135:11,22,25 136:7 197:9
**preparations** 43:11
**prepare** 19:3,17,22 282:1
**prepared** 250:8 277:17
**preparing** 144:6 145:23
**present** 5:1 13:23 19:9 179:4 202:18
**President** 1:8 13:9 90:5 189:1
**President's** 39:2,6

39:9 40:12,23 41:7,23 90:17,22 96:25 187:13
**presidential** 39:1 39:18 40:3 52:3 60:4,6
**Presidents'** 37:17 38:13
**pretty** 19:6 157:9 255:22
**previous** 23:12 24:4 205:2 211:4 257:22 258:2 272:16 309:12 314:14
**previously** 11:9 12:1 47:17,20 125:9,12 127:24 138:12 152:5 159:1,4 165:4 180:8,10 192:12 192:15 250:24 257:17
**pri-** 235:15
**Prieur** 119:5,11 192:20 193:11 195:14 200:9 205:9 207:2 208:5 208:12 221:9,13 227:2 229:18 230:25 232:15 233:22 234:5,8 236:8 244:15,20 248:9,17 261:21 262:4 263:1,4 269:18 272:12 273:20 276:4 285:9 286:18 287:10,21 289:1,2 289:20 290:2,5,17 290:24 293:14,22 293:23 294:20 295:23 296:21 297:12 300:2,3 302:11,17
**Prieur's** 121:4 131:21 200:17

268:3 274:5 286:22 297:3
**primarily** 28:1
**principal** 63:24,25 64:1,12,21 275:24 318:17,18
**principals** 118:22 119:13 159:12,14
**print** 309:15,25
**printed** 309:15
**printer** 139:12
**printing** 310:2
**prior** 36:24 100:10 106:13 175:7,8 229:13 264:6 272:23,23 274:11 282:16
**priorities** 37:17,23 38:14,16 39:19 40:3 42:7 63:9,13 63:18
**priority** 39:1 63:16 105:23 106:3,20 235:17
**Privacy** 322:9 324:2,9,13
**privilege** 153:24 154:25 155:22,24 156:13,17 170:16 171:11,19 172:7 172:13,22 173:7
**privy** 325:21
**pro** 3:19
**probably** 32:19 36:12,16 56:14 84:25 95:5 138:8 145:11 146:21 147:7 212:21 213:17 215:11 223:11
**problem** 197:12
**procedures** 86:7
**proceed** 249:3,8,12 249:20
**process** 7:6 52:25 61:21 65:21,21 69:17,22 70:1,19

71:13 74:22 86:16 99:3,14,22 100:6 100:16,23 101:13 101:18,18,21 103:4,24 104:19 104:21 105:7,12 105:21 106:11,15 107:7,16 108:17 108:22 109:5,8,24 113:2,20,22 114:1 117:6 118:6,11 120:10 121:23 122:12,16 123:11 123:15,21 124:4 126:25 127:4,5,8 127:16 128:3,9 129:6,8,13,20 131:13 137:11 138:6 141:24 144:10 152:20 153:16,18 154:24 155:22 156:10,13 159:22 163:23 165:7,10,25 168:13 170:16 171:10,19 172:7 172:13,21 173:6 174:8,12,16,18 175:5,11,18 186:15,16,21 196:19,20 197:25 198:5 206:17 207:15,18,20 208:6,18,21 209:2 210:3,8 212:20 214:23 215:5 216:1,12,23 217:8 217:9,11 218:16 219:13,15 221:15 236:21 238:12 242:4,22,25 243:22 244:4,5 245:9,20 246:9,12 246:12,16 247:8 247:22 250:4,15 250:18 251:14,19 252:8,11 256:15

258:5,25 259:4 260:4,11,15 261:8 261:11 262:18 264:12,24 267:18 267:20 268:13 269:1,7 270:5,6 270:16,17 271:20 271:21,22,23,24 278:22,25 279:6 279:14,18 282:1 283:13,16 286:25 287:1 291:22 292:15,19,20 294:8 298:3 300:4 300:19 302:23 303:1,2,10,11,25 304:25 307:9 311:19,23 316:4 316:14 317:9,17 320:6 321:11,13
**process-related** 70:13
**processed** 303:8
**processes** 53:4,23 265:4 277:5
**processing** 28:14 28:17 216:11,13 230:13 250:20
**procurement** 30:18 54:8,17 80:2 326:1
**produced** 95:16 98:13 117:18 125:13 138:15 159:5 180:12 192:16 199:24 204:21 210:23 229:4 233:20 239:2 244:11 248:3 254:17 255:2 261:20 262:1 269:15 272:8 273:18 276:14 278:9 286:10 289:18 293:3 296:17 299:21 304:8

305:23 309:11 314:12 316:20
**production** 204:12
**professional** 22:17 181:18
**profile** 6:10 22:12
**program** 26:16 27:3 29:22 44:2,3 44:17 85:17 280:3
**programs** 25:23,24 26:15 42:4 44:4,7 44:11 45:4,7,9 46:9 280:25
**progress** 143:15
**prohibition** 110:3
**projected** 180:23
**prompted** 211:24
**promptly** 43:11
**pronounce** 21:25
**pronouncing** 119:8 164:13
**proposal** 167:9
**proposed** 166:9 167:10,19 169:20 248:10,19
**provide** 30:2 245:5 247:14 308:10
**provided** 63:12 159:25 204:11 231:20
**providing** 57:23 180:23 200:9 221:13 249:16 252:20
**public** 2:13 62:16 62:19,23,25 63:12 91:6 97:12 331:4 331:19
**pull** 196:5,7 230:8 230:20 231:18 274:3
**pulled** 47:21 48:3 196:13 231:17
**pulling** 22:6 196:7 196:22 215:24 218:6,20 230:3,19
**pulls** 198:12

Puneet 239:3,8
241:18 243:12
purely 115:21
purpose 42:18
44:11,17,22 46:4
126:24 164:7
173:2 214:24
256:9 277:20
325:13
purposes 45:10
46:3,12 56:6
279:10
push 198:9 267:14
put 42:6 58:6 59:18
60:1,12 77:9
102:6,16 137:2,8
138:1 162:8
197:25 261:15
265:4,20 281:11
281:16 308:12
puts 57:25
putting 135:12
163:1 270:5

**Q**

Q2 143:13,18,25
144:7,19,23 145:1
145:4
Q3 145:8,14
qualifications
267:21 268:10
quantify 35:19
quarter 143:13,22
145:18,19 151:14
quarterly 133:16
143:6,21 144:7,9
150:25 151:17
280:19 281:9,21
282:2
question 16:24
17:15,16 18:10,17
32:5 37:9 40:16
45:14 50:1 69:13
96:2 115:15
120:14 124:22
127:14 155:6,7,9
155:12,25 156:12

168:14 170:22,24
170:25 172:14,15
196:15 208:14
216:9 218:11,17
229:22 238:9
284:11 324:12
questions 16:20
18:21,23 21:7
99:7 162:1,2,3
187:5,10,12 219:4
305:12,15 327:1,4
quick 168:16 229:8
233:6 289:7 313:8
313:16
quite 83:19 93:10
137:6 162:3
quotations 12:22
quote 12:25
quoting 207:5

**R**

R 184:1
R-o-l-a-n-d 15:18
raise 50:1,5,9 51:9
51:13 52:6,22
53:16 156:20
232:13
raising 53:23
218:24
ran 45:9
Randolph 98:21,24
103:7 104:23
range 35:9
Rank 52:3 60:4,6
rarely 31:21
reach 66:4 99:6,7
117:5 203:25
reached 96:25
137:14
reaching 241:23
read 12:23 327:3
328:3 330:4,5
reading 48:2 62:20
88:3 98:16 117:22
125:18 127:11
143:10 159:9
180:20 200:5

208:13 220:8
235:13 239:6
248:11 274:9
295:1 304:12
306:4 328:15,16
328:17
ready 203:21
real 187:4
really 35:18 67:23
77:9 185:3 189:10
235:18 308:23
realm 121:5,13
191:18
reappoint 290:20
reappointed
221:19
reappointment
293:19
reason 17:5 18:4
45:25 68:11 81:4
120:7 177:22
179:8 186:17
213:20 215:7
228:22 243:8
263:20 287:13
307:19 308:13
329:7,11,13,15,17
329:19,21
reasons 42:4,6,8
45:3
recall 20:17 51:1,4
51:8 59:2,6 61:8
62:20,22,24 63:2
63:4 64:15,16,22
66:21 68:18 69:11
72:4,7 73:5 74:24
74:25 78:1,3,10
78:11 80:6 81:23
82:4,8,12,17,18
84:2 90:4 91:8
96:7 102:13,15,21
106:11 113:18
114:7,10 116:4
131:8 140:25
143:24 144:4,5,18
144:21,24 145:6
145:17,20 146:1

149:19 150:8,12
150:19,23 152:23
156:24 157:15,16
158:1 160:15
162:2,16,21,24
177:10,12,18
178:15,16,19,20
184:9 185:25
186:2,4,6 187:2
187:15,16 188:10
190:1,3 191:2,6
193:1,3,7 197:7
199:7,11 200:15
201:16,19 202:5,9
202:12,16,20
205:19,23 206:24
207:12 211:11,14
211:16 212:14
215:13,15,25
216:15,18,19,21
217:16,19,25
218:21,23 219:2,3
219:5,6,10 223:5
223:7 224:20
225:9 226:9 227:7
229:20 230:17,19
230:21 232:23
234:20,23 236:16
236:17,19,20
237:4,10,13,14,16
237:18,21 238:3
239:15,17 240:9
240:17,25 241:5
241:22 242:2
243:3 245:13,25
246:6 247:23
259:18,24 260:1
266:14 268:24
274:20 275:8
277:12 279:16,20
285:22 286:5
288:9,13,17,19,22
290:1,3 291:18
321:4,6
recalled 209:24
receive 65:15 70:16
101:4 196:2 206:5

received 115:9
136:2 155:1,19
156:9 157:17
158:6 163:2
170:18 195:24
196:6,9,16 197:3
201:20 206:10
211:4 216:24
217:4,6 218:15
223:2 268:25
271:15 277:23
278:1 279:13
314:1
receives 122:3
253:18
receiving 101:22
214:22 256:23
301:19
recess 84:13 132:12
154:4 168:22
183:7 233:12
289:11 313:20
321:21
recognize 22:14
43:2 47:23 90:14
95:19 98:15
117:21 125:17
132:24 134:15
138:21 180:17,19
239:5 262:2 306:2
314:16
recognizing 309:25
recollection 81:18
185:21 202:13
211:22 214:16
recommend 167:24
168:10 171:15
172:4
recommendation
115:18 167:21
168:3 169:9,25
170:5
recommendations
86:25 106:25
170:11 172:10
173:18,19 174:1
222:2 249:12,19

249:23 279:1 298:15
**recommended** 107:12 171:1 172:19 174:5,11 175:13,14 176:3 249:17 252:6
**recommending** 198:4
**record** 12:24 13:5 15:15 16:19 60:21 60:23 80:19,22 84:11,14 132:9,10 132:13 138:18 139:9 141:7 154:2 154:5 156:15 168:20,23 183:5 184:3 233:9,10,13 289:9,14 313:18 313:21 321:18,19 321:22 327:5 329:8
**recorded** 277:6
**records** 59:8 80:16 202:25 325:10
**recounts** 201:3
**Recovery** 182:5
**recruit** 26:21
**recruiting** 191:14
**redact** 309:13
**redacted** 254:23 261:24
**reduce** 44:12,18,23 45:11,21
**reduced** 133:4
**reducing** 46:4
**reduction** 38:23 39:5 42:15 43:24 44:8 45:5 188:8
**reductions** 38:25 39:14 40:13,20,24 41:2,6,22 42:11 43:13
**refer** 55:8 287:4,8 310:15
**reference** 119:22 121:22 222:9

**referenced** 78:25 168:14
**references** 257:21
**referencing** 78:25 194:2 223:4 241:19 242:21 259:14
**referred** 269:3
**referring** 22:4 55:15 56:2 69:16 70:18 89:2,18 97:16 120:5 121:13 127:4 133:10 166:19 193:24 196:6,17 209:20 224:16,25 242:16 244:4 257:18 258:1 267:2 279:4 280:7 281:17 282:16 287:4 300:9,11 310:15
**refers** 59:23 91:15
**refine** 165:4
**reflect** 47:25
**reflected** 12:23
**regarding** 155:2,19 171:7 302:13,18 307:18 324:8
**region** 280:3
**regions** 280:25
**regular** 67:25 76:12 113:20 158:4,14 212:16 239:18 246:11
**regularly** 148:2 157:9
**regulations** 25:20
**reinstate** 128:14
**reinstatement** 199:5
**reinstates** 130:13
**reinstating** 11:20 125:15 127:20,23 198:25 201:6 210:1
**relate** 154:21

187:12 322:2
**related** 21:8 34:17 35:3,11,16 36:10 38:9 42:14 54:4 57:20 62:14 65:12 71:16 72:18 74:4 75:8 91:4 134:5,5 138:23,24 139:21 153:11,12,15 155:10,15 156:7 186:24 198:12 211:12 224:19 226:10 277:16 280:13,18 320:9 331:9
**relates** 69:21 70:1 279:6
**relating** 196:10
**relationship** 28:17 30:2,4,5 38:2 41:12 42:20 64:22 184:19 320:17
**relative** 331:12
**relatively** 58:22,24
**relevance** 96:18 97:17
**remain** 303:24
**remember** 16:2,4,8 19:11,12,25 23:21 65:11 83:5,10,12 84:7,8 153:1 154:12 160:14 177:19 184:6,10 185:8,11,15 187:21 191:20 192:4 197:8 199:8 199:12,14 200:4 208:9 225:14 239:7 240:3 256:18 259:9,11 285:8 288:14 289:3 295:20 297:24 314:2 321:2
**Remind** 54:7
**renew** 11:21 87:1 125:15 126:25

127:7,16,20,25 128:9 129:7 130:15,22 198:21 199:1 200:25 201:3,7 210:2,8 218:25 236:20 237:11,19 238:18 242:17 243:6,18 258:25 260:9 262:5 267:11,14
**renewal** 131:14 221:15 222:21 223:5,10 225:3,15 227:1 244:2 249:12 263:2,15 264:5 266:21 269:9 271:18 284:2,18 285:3 286:14 291:7,16 292:21 294:5 297:4,4 300:15 301:1 304:19 305:1 306:7 307:5 314:1,4 315:18 320:22 321:4,8
**renewals** 198:3,4 200:10 206:13 207:19 211:12,24 216:2,14 217:11 217:12,14 218:16 219:24 222:2,24 223:13,17,18,20 225:5 230:18 232:2,16 234:14 236:14,25 237:2,5 238:2,6,22 241:6 241:24 243:1,10 243:17 252:12 253:6 258:7,7 260:4 264:9 268:11 279:6,10 279:15,19 282:23 286:4 300:5 301:7 304:16 307:24 314:22 316:25 320:9,25 321:1 322:16

**renewed** 86:8,17 87:10 131:18,22 132:2 200:18 208:21 238:13 258:8,13,23
**renewing** 129:6
**repeat** 37:9 124:22
**rephrase** 238:14
**replace** 265:18
**replaced** 58:24
**report** 9:20 29:24 32:12,15 33:2 47:5,9 54:17 67:13 87:16,24,25 88:4,8 89:23 145:19 195:17 196:14 223:1,3 230:19,20,22,23 254:8
**reported** 1:24 64:20,23 67:17 71:11 83:22 149:6 222:22
**reporter** 2:12 13:21 15:4 17:5,11 54:23 98:8 115:14 117:15 296:14 331:4
**REPORTER'S** 12:22
**reporting** 30:1 49:8 64:22 67:20 145:20 160:1 212:21 223:5 225:5,15 227:1 254:3 276:4
**reports** 33:4,7 64:17,19 254:1,10
**represent** 13:25 14:3 22:11 98:12 117:18 141:16 180:11 185:17 254:23 261:23 290:11 309:10
**representative** 80:1
**representing** 14:6 14:10,13,16

request 34:21
50:22 53:15
103:20 106:19
110:2,13 111:8
113:22 122:23
123:12 129:24
160:7 179:16
194:3,6 237:2,3
242:6 250:24
255:4 257:6
260:17 264:20
265:9,10,16,22
274:5 281:16
282:5 283:18
293:18 297:3
300:15 304:15
306:6 307:22
308:2,18 310:10
310:20 311:8,15
312:7 314:22
315:18,22 319:15
requested 93:14
199:4 277:22
281:6 328:15,17
requesting 126:24
127:15 129:21
145:17 161:1,11
182:6 199:9 237:4
290:19
requests 53:8 59:18
65:15 112:8 115:5
122:2 130:21
131:1 195:24
196:3,25 197:1
206:13 242:17
251:15 255:5
257:10 260:7,20
262:5,11 263:2
266:21 267:6,7
269:9,21 270:7,18
271:8,18,19
272:13 273:6
274:6,12,18 275:1
275:4,16 276:5
277:2 278:1
282:12,17,22
283:2,5,11 284:2

284:18 285:4,14
286:14,19 287:11
288:2,5 291:7,15
291:20 292:21
293:21,23 294:1,5
296:7 297:7,20,23
298:23 299:13
301:15,20,21
302:6 303:17,24
304:19 305:1,17
307:5,14 308:7
314:1,4 316:7
317:21 320:1,22
320:24,25 321:4
require 50:9
121:18 207:19
288:15
required 123:16
207:6 253:10
266:2
requirement 143:6
requirements
11:23 88:24
125:16 151:15
152:8,10 160:1
173:6 322:2,4
requires 58:11
rescinds 128:18
resembled 196:21
reserve 156:19,20
reshaping 45:5
189:7
resources 24:18,24
25:7,9 26:7 119:1
119:4
respect 143:15
respond 37:13 83:8
229:10 234:6
286:1 295:7
315:12
responded 83:10
83:16 161:24
259:9 285:20,23
responding 117:1
231:7 259:11
responds 121:3
304:18 314:24

315:5
response 119:5
161:22 165:8
170:17 179:16
182:5,25 183:2
205:21 217:20
218:21 229:13
231:10 259:24
296:21 308:10
Response/Recove...
84:21
responses 70:16
162:15,24 218:19
responsibilities
25:13,15 28:19
33:18 40:1 76:7
318:1
responsibility
29:21 69:14,21,25
70:4,8 181:19
322:1 323:24
responsible 25:17
28:1 41:23 43:16
59:13 71:15 80:15
88:16 145:23
150:24 161:9
206:16 242:4
262:18 264:1
267:21
responsive 83:23
rest 225:4,7
restate 39:24
resubmit 165:5
result 39:5 41:7
42:10 165:25
205:13,17
resulted 46:12
189:18
returned 116:1
review 20:8,15,23
50:20,21 58:4,15
101:6 102:19
137:18 163:18
164:7 165:3,12,13
166:9 175:11
176:7 182:22
198:3 206:16

242:16 243:13
258:6 260:25
261:2 263:21
270:7,9 277:24
283:18 302:22
307:17 312:8
reviewed 134:18
163:15 180:14
229:14 242:14,23
250:23 268:15
269:20 271:2
297:20
reviewers 137:13
reviewing 162:24
165:8 169:3,12,14
187:7 222:1
252:12 253:14
292:12
reviews 89:14
176:9 311:24,25
Richardson 125:20
129:16 184:12
190:2
right 21:17 28:20
31:9,23 32:21
33:5,24 39:19
40:3 41:19 43:17
44:9,14 45:11
46:13,25 48:22
49:18 60:10 63:9
64:2,10 69:22
70:23 78:5 80:16
82:6 83:3 86:22
87:10 89:3,19,24
90:17,22 92:2,6,9
92:16 93:6 94:17
96:6,14 97:1,25
98:19,25 99:19,23
100:12,18 101:16
103:9 104:7
105:13,18,25
107:1,24 108:2,18
108:22 109:9,15
109:20 110:3
111:1,9 114:2,20
115:19 118:3,11
118:18 119:9,14

120:5,10 121:20
122:4,13,20 123:1
123:23 124:1
125:3 126:2 127:5
127:9,12,17,21,25
128:14 129:9,13
130:7,15 131:23
133:12,25 135:2
137:22 139:11,18
141:25 142:11,18
145:24 151:1,23
156:20,25 157:10
159:12,23 160:2
161:1,19 162:19
164:16,22 165:5
167:13 168:3
169:15,18 173:10
181:3,7,10 182:13
185:19,23 187:20
187:22 188:3
193:9 194:4 196:4
198:22 200:11
207:15,20 208:6
208:18,22 209:4
210:4 211:9
212:24,25 213:15
213:25 214:2,13
215:11 217:13
220:10,22 222:4
223:14 225:6
226:2 227:2
228:19,25 231:5
231:24 233:25
236:10,14,22,25
237:1 240:11,23
241:7 243:1
244:25 246:13
247:5 248:17,25
250:21 251:16
253:6 255:10
256:7,16,17 257:4
260:9 261:6 262:6
263:8,12 264:5
265:1 266:4 267:3
267:8,12 268:4,22
269:9,25 271:8
272:16 273:7

274:16,23 275:14
280:23 283:3,24
284:6,14,18
286:23 287:5
290:15 292:8,22
293:10 294:3,13
294:22 295:24
296:10 297:9
298:8 301:7,17,21
302:4 303:18
304:11,16,23
306:8,15,19 308:4
308:8 310:11,17
311:14 312:12,23
314:22 316:11
317:24 318:2
319:3,7 321:8,11
322:6,21 324:21
325:4 326:4
**rightsize** 189:5
**rightsized** 188:22
**Rightsizing** 189:17
**rings** 288:17,21
**Roger** 118:2,16
119:16 121:3
122:6 131:21
201:5 207:7
**Roland** 1:17 2:7
6:3,10 13:6 15:7
15:16,17 215:23
224:1 302:12
328:13 329:6,25
330:15
**role** 22:25 23:25
25:16 37:25 38:5
38:6,9 41:14
43:19 115:4,6
175:4 185:22
186:20 189:23
213:2 226:4,8
317:8,23 323:24
324:18,20 325:1
325:19 326:23
**roles** 39:16 40:7
**roll-up** 181:23,24
182:3,9,12
**rolled** 182:1

**rolls** 212:7,9,12
213:4
**room** 18:1 19:9
**Rosenberg** 4:5
14:19,19
**rough** 20:23 36:18
**roughly** 20:5 22:21
24:1 25:2 32:16
35:12 37:18
**route** 261:12,14
**routed** 60:13
**routine** 51:5,7,22
61:21
**routinely** 67:24
**routing** 137:4
138:2 139:21
140:16,20
**row** 56:25
**rows** 56:23,25
**rub** 215:5
**rules** 18:22 25:20
230:13
**run** 25:22 43:23
45:4,7 50:21
85:16 142:7
195:12
**running** 104:3
281:8,15 316:7

_____
**S**
_____

**S** 184:1,1,1
**S1** 59:20,23 60:2
193:19 194:15,22
198:15 222:23
223:1 244:5 250:7
251:2,7 253:2,5
253:18 256:10,15
264:22 284:10
286:20,24 287:4,7
287:11 290:19
291:10 300:15
310:3,5,8,8,15
**S1's** 201:10
**safety** 91:6 97:12
**sake** 182:8
**San** 1:3 3:8 13:12
**Sanchez** 244:17,19

**saw** 81:15 112:12
112:21 115:23
135:18 145:3
163:10 197:10
198:25 282:17
304:11 322:14
**saying** 37:2,3 41:5
41:11,17,21 42:2
42:10 48:11 49:21
57:10 76:22 83:1
84:3 94:19 96:16
102:24 113:1
121:12,16 122:6
131:25 140:7
157:16,23 158:2
166:22 172:18
173:20,25,25
174:19,24 175:23
176:2 188:12
213:1 223:16,19
231:1 256:17
273:10,24 274:11
274:14 283:1
284:22 292:14
296:22 308:2,11
308:19 311:5
**says** 43:8 87:24
88:13,20 89:12
92:11 96:12 99:12
100:6 110:24
111:16 114:22
115:24 118:9
119:21 120:4,15
121:4 126:23
127:19 128:16
133:1,8 160:18
164:24 166:6
167:10 176:18
178:4 180:15
182:24 193:17
195:14 205:5
207:22 209:7
215:19 216:16
217:24 218:5
222:20 223:25
236:8,11 241:2,19
242:11 243:20

248:9 249:1,2,8
251:2,5 252:25
254:19 255:8
266:21 290:10,17
290:24 293:13
295:2,4 307:21
314:24
**scale** 52:10
**Scales** 95:18,21
96:5,12,24 222:10
**schedule** 196:1
**scheduled** 203:10
203:19
**Science** 25:4 56:7
**second** 43:8 103:8
126:5 128:16
143:22 185:20
192:19 200:19,21
206:3 215:17
222:9 229:25
265:12 297:3
316:22
**seconds** 313:14
**secretariat** 58:3
**secretary** 47:6,10
47:12 50:2,6 51:3
51:9,15,21 52:1,4
52:7,12,15,16,17
52:23 53:6,9,17
53:20,24,25 54:21
55:24 56:3 57:11
57:16 58:12,12
59:23 60:5,9,15
61:3,6 63:5 64:10
64:24 65:22 66:1
66:5 75:16 81:2,6
81:13 92:23,25,25
93:1 98:25 100:11
100:18 105:13
107:24 111:12,14
111:18 112:7
113:4 114:8,11,16
121:19 122:4
126:2 129:17
136:20 137:16,22
138:2,3,9 150:17
153:3 167:11,11

168:12 170:3
173:22 174:8,11
174:21 185:22
186:1 193:25
194:7 209:12,14
209:15,17,17,20
219:4,7 226:2,16
246:7,13,17,18,21
250:25 251:3,7
252:5 257:19
260:13,17,18
261:4,5 266:3,8
267:8 268:7 271:4
284:17 285:2
287:5,8,14,22
300:10 306:7
307:23 308:3,7,11
308:14,16,19
309:1 310:10,16
310:17,21 311:2
313:4 316:1
318:25 319:6
**secretary's** 49:13
49:18,23 63:8,17
64:6 71:7 111:17
112:23 113:16
136:23 137:10,17
138:10 148:11
194:19 251:6
252:2 261:2
308:10 318:16
**Section** 43:4,8
92:11 133:1,14
**securing** 302:13,18
**security** 4:19 14:23
14:25 16:10,14
19:14 21:17 28:16
56:11 91:5 97:11
138:18 185:2
222:12
**see** 41:13 43:7,15
48:17,20,21 88:4
88:8,12,19,20
89:1,17 91:3,7,11
91:25 96:13,22,23
99:15 106:2
108:25 113:15

116:3 119:5,19
120:2 121:10,11
121:21 126:5,7
127:2,22 128:21
128:22 130:10,10
131:5,19,24 133:1
133:7,17,19
139:14 140:3,6,7
140:23 143:4,9,10
143:17 148:23,25
149:5,6,15,21
150:2,6 164:11
166:11 176:22
178:11 180:22
192:23,24 193:15
193:21 195:19
200:1,12,17,20,23
201:1,2 204:25
205:4,7,10,11
207:3,5 208:2
210:25 212:22
216:3 218:8,14
220:2,4,7,9
221:13 222:13,20
222:25 223:24
224:6 227:4 229:6
229:12,17 230:24
231:4 232:14,19
232:20 234:4,11
234:13,14,17,24
236:3 244:14
245:11 248:5,21
249:6,10,16
250:10 252:23,24
253:3 254:22
255:3,7,11 257:5
257:8,24,25
259:12 264:18,21
266:23 269:17,23
272:10,14,17,20
273:21,23 274:1,6
276:18,24 278:13
278:19,21 279:25
280:1,5 282:9
286:12,16,17,21
289:19 290:22,23
291:4,5 293:6,16

294:17,24 295:11
296:19,25 299:23
300:1,7 301:12
302:11,15 307:25
308:1 310:2
311:11 315:3,8
316:22 317:2,4
322:12
**seeing** 114:7 116:4
126:18 131:8
145:6 162:21
209:24 212:8
301:21 321:4
**seek** 50:13 222:16
282:23 315:23
**seeking** 29:11
107:23 127:17
**seen** 37:23 38:25
39:4 79:12 87:19
126:16,17 128:23
138:22 139:18,21
140:10,20 146:6
151:4 158:19
163:5,6 177:16
187:24 256:2,6
281:3 286:13
289:23
**send** 53:8 65:16,19
66:3 70:20 86:24
101:4,5,22,25
102:9 112:3 136:4
136:17 146:22
147:18 148:10
157:3 161:21
162:14 181:5
193:19 194:21
197:20 201:25
206:13 211:24
242:4 252:25
255:12,25 263:4
263:24 265:19,22
267:25 270:2,8,10
270:14,25 271:3
275:16 283:11
295:13,14,24
296:2,6 298:19,22
299:13 302:22

303:3 307:4,12,14
308:7 309:23
313:11 315:7
**sending** 118:5
157:23 163:16
164:15 193:25
194:14,18 195:21
202:6 211:18
213:14 214:11,20
232:15 249:21,23
250:2 256:9 257:6
257:9 260:16
261:4 262:4,8,11
262:15 268:11
272:18 288:5
291:2 293:14,22
299:11 301:16,19
303:17,23 306:6
306:10,13,17,21
308:3,23 310:9
311:4,13,16 312:4
312:17 314:7,8
317:14 319:15,21
323:20 324:14
325:7,13 326:4,10
326:19
**sends** 53:14 230:25
272:12 307:16
322:12
**senior** 3:20 20:19
50:19 75:16 82:10
83:19 92:21 95:4
115:1 125:23
129:19 185:5,6,23
190:2,14,19 226:6
226:8,15 227:23
228:11
**sense** 34:14 35:2
85:7,9 158:19
168:9 227:9
**sensitive** 260:21
**sensitivity** 263:22
**sent** 82:2 110:24
112:2 113:12,25
115:7,11 135:8,15
136:1,13 140:17
144:15,19 146:7,9

146:11,12,13,16
146:18 148:13,14
148:16,21 152:15
152:17,19 154:10
159:12 165:13,16
165:21 177:13
179:25 180:15
182:15 187:6,11
195:8 202:10
207:1,14 218:19
218:20,21 246:3
259:16 263:7,14
266:14 270:15,19
275:1,3 283:15
288:5 291:8,17
292:6 296:1,4
297:15 303:14
305:17 307:8,10
310:20 314:4,20
315:18 323:25
**separate** 32:2 65:21
182:6 223:20
**separately** 182:11
225:13
**separating** 241:11
288:16
**September** 142:8
**series** 16:20 180:6
237:14
**serve** 169:10
171:23 173:1
174:5 176:3,4
**served** 108:12
**serves** 31:12
**service** 21:21 45:25
46:1 50:20 189:12
313:12
**services** 28:13,15
186:18
**serving** 45:24,25
108:10 173:10,14
175:7 318:16
325:1
**SES** 51:24
**session** 20:13,14,16
**sessions** 20:4
**set** 88:25 90:3

101:13 102:24
103:3,6,7 106:23
117:6 154:15
161:7 162:7
163:19 166:16
173:18 176:6
255:23 260:7,12
260:15 273:6
294:1,9 308:7
313:25 320:20
321:11 331:7
**sets** 197:20 282:17
**setting** 26:23 88:16
100:24 102:14
**seven** 56:24 214:7,8
**shaking** 17:7
**share** 46:22
**shared** 28:12
206:22 231:21
232:2 299:16
315:22
**SharePoint** 271:13
277:10,12
**sharing** 234:8
284:25
**she'll** 252:25
**sheet** 60:19 137:4
139:15,24 140:1,3
140:11,14,16,21
180:11 329:1
**sheets** 139:21
**short** 9:20 88:6
132:6 187:25
**show** 60:23
**showed** 199:15
**showing** 143:14
178:9 218:15
**shown** 20:11 48:21
49:4 290:10
**shows** 60:19 109:13
234:24
**Shreya** 5:5
**shrink** 310:1
**shrunk** 309:14
**shutdown** 206:14
255:24 272:23
**sic** 44:23 57:1

219:17
side 39:13 224:5,24 229:16 230:4
sign 60:5,24 114:15 114:18 252:21 253:5,11 327:3 328:22
sign-off 59:20
Signal 69:2,6 79:10
signatory 147:8 246:1
signature 58:12 112:23 113:4,16 113:16 114:8,23 126:8,12,14,16,21 130:10 136:23 137:10 140:13 253:16 255:9 328:1,20,23
signed 112:22 113:3 114:12,19 118:13 126:6 130:11 140:13 149:5,7 252:20 255:9
significant 85:4 239:15 242:8,8
signing 253:2 328:15,16,17
signs 130:6
similar 54:12 58:25 138:22,23 139:18 139:20 140:10 144:10 165:10 196:9,24 240:19 240:20 264:22
similarly 174:5
single 102:25
sir 15:13 16:15 21:18 23:3,10 24:22 25:11 26:17 27:21 28:9,21 32:22 33:12,25 38:15 70:24 109:25 147:23,25 159:13 184:13 234:1 235:11

298:14,17 314:23
site 162:7 303:13
sitting 18:1 228:16
situ- 221:7
situation 27:18 215:22 216:16
Situational 56:12
situations 52:13,21 57:22 291:14 320:7
six 25:2 56:24
size 44:12,18 133:4 310:2
skeleton 298:8
skills 189:13,15
slight 262:14
slightly 141:3
small 237:1 310:1
soft-spoken 117:16
somebody 26:18 27:2 52:22 66:5 104:12 105:1 106:17 110:8 111:19 114:15,19 158:8 164:3 193:12 201:17 218:24 219:3 232:2 234:21 246:3 274:25 275:3,6,9 276:6 283:23 291:15,21 292:10
somewhat 281:8
soon 210:20
SOPDA 20:21 176:19 177:4,23 184:11 190:25 192:25 193:5 290:18 309:20
sorry 25:14 52:20 54:8,23,25 55:17 56:16 76:19 96:2 103:18 160:18 166:17 182:4 190:22 201:9 205:15 208:14,25 217:2 249:5 256:5

278:6 293:4 303:21
sort 162:11
sought 227:25 275:11
sound 75:17 290:15
sounds 169:22 187:22
Southeast 4:22
Southwest 4:14
space 65:9 125:4 211:8
spark 215:3
speak 221:24 263:19
special 4:5 27:18 73:18,19,20 74:4 74:8,13,14
specialist 108:2
specialists 106:3 107:23 108:7,11 108:13,25 109:19 235:1
specific 27:1,3 34:22 72:12,14 147:12 177:18 178:15 195:11 196:5 202:3,6 212:15 236:17,19 238:22 265:23
specifically 18:10 35:11 61:14 119:3 143:7 147:6 158:2 200:6 232:23 239:7 262:3 299:8
specifics 171:6
speculate 213:6
speculation 120:12 147:2,16 158:10 189:3 190:10 216:7 218:13 224:10 226:22 228:6 242:1 243:15,24 247:17 250:1,13 251:12 262:13 263:17 317:11 319:17

spell 15:14
spent 36:4,10,18,22
spoke 78:11
spoken 78:17 279:18
spreadsheet 10:19 160:17,23 161:2,4 180:12,22 271:16 277:8 294:24 295:3 309:11,18 309:22 310:7 311:5,9,16,19,25 312:4,11 322:14
staff 52:10 58:7 63:25 64:1,8,9,13 64:21 65:12 67:5 67:7 70:3,7 71:3 71:10 88:1,5 95:21 96:6,12 117:8 150:15 188:8 190:20,21 239:9 251:21 275:25 295:10 298:3 318:18,18 318:19
staff's 153:5
staff- 281:14
staffing 6:17 62:14 65:9 87:18,25 88:18,25 89:6,16 109:19 133:16,20 134:22 135:1,5,8 135:15,18 136:13 136:17 137:3,20 140:18 141:21 142:2,10,14,21,24 143:16 144:11 145:18 146:5 148:5,16,24 149:9 149:22 150:3,7,18 151:1,4,11,12,17 151:20,22 152:13 153:13 154:9 155:2,19 156:5 157:6,14,17,24 158:6,12,17,20,23 159:19 160:6

164:2,21 165:21 166:8 169:3 176:21 177:5,8,17 177:20 178:5,8,9 178:13,17,17,21 178:24 179:1,6,9 179:17 180:2,16 180:23 186:25 187:3,21 191:5,7 191:10,12,13 193:5 212:4 213:8 213:10,13,16,22 214:2,6,10 215:2 215:8 277:17 279:23 280:2,6,10 280:12,13,19 281:1,14,21
stage 231:23
stages 232:1
stamp 95:17 125:14 239:3 269:16 272:9 273:19 276:15 278:10 286:11 294:16 296:18
stand 84:20
standard 243:22 244:4 246:12 290:12
standardized 159:25 160:4,19
standpoint 169:24 260:19
start 16:16 17:17 28:24 39:22 46:24 59:1 91:2 142:5 145:15 159:7 278:15 316:21
started 24:8,25 25:6 32:7 191:25 311:21 312:4
starting 122:19 159:8 166:23 192:17 199:25 201:4 204:22 206:25 210:24 229:5 233:21

237:12 242:24 243:3 244:12 248:4,7 254:18 261:21 279:22 299:22 304:9 305:24 314:13
**starts** 142:6 221:10 314:18
**state** 13:24 15:14 56:10 139:8 156:15 328:5
**stated** 40:16 89:13
**statement** 22:16 36:25 169:19 223:8
**statements** 63:4,7
**states** 1:1,9 4:3 13:10 308:5
**stats** 46:21 47:3
**status** 149:1,9 150:10,17 151:22 157:6,13 174:25 283:9 284:5,24 285:3
**statute** 47:12
**staying** 278:3
**Stephen** 70:21,25 71:6,12 101:9 116:9 167:7,16
**Steve** 296:4
**stood** 175:9
**stop** 288:16
**stopped** 130:22
**storm** 7:17 55:2,4 55:10 57:9,11,16 57:17,19,23,25 58:5,9,15,16,21 58:22 59:1,7,14 59:19 60:1,7,13 112:19 136:4,14 137:3,7 138:19,24 139:16,23 140:8 140:24 149:12,13 149:15,20 152:16 154:10 157:3 166:3 260:24 261:15 288:15

**strategic** 166:10,13 166:16,22 167:2,4 167:15,20 169:2 169:10,18 170:4 170:19 171:9,16 173:15 175:8 176:10
**strategies** 39:10
**Strategy** 56:9
**streamlining** 38:20 38:22
**Street** 3:7 4:6,14
**string** 236:18 259:15 299:17
**strings** 211:15
**structured** 323:24
**style** 203:25
**subject** 7:5 11:20 16:4,8 120:9 155:14 156:6 274:7
**submission** 134:21 142:13,23 145:5 146:4 147:13 148:4 152:12 163:2,7 177:17,18 177:20 178:21,23
**submissions** 62:7 144:15 147:19 154:19 156:8 162:18,21 163:3 163:19 164:4 165:8 213:22 215:9 268:16 272:1
**submit** 52:2 122:7 133:20 136:1 142:20 143:11 159:19 182:24 213:13 280:14
**submitted** 102:22 110:15 111:4 144:1,25 145:3 151:19 152:4,7,9 158:22 160:21 162:4,25 163:13 165:4,11 166:4

177:8 178:6,13,16 179:9,12,15,19 195:12 250:20 281:1,3,7 282:13
**submitting** 251:15 251:17 311:21
**subscribe** 330:11
**subsequent** 225:1
**substance** 19:1 154:25 155:18 156:3 170:17 191:2
**successful** 228:23 228:24 229:2
**successfully** 228:18
**suffice** 312:18
**sufficient** 311:10 312:1,3
**suggest** 128:1
**Suite** 3:7 4:15
**summarizing** 269:4
**summary** 248:10 248:19 249:16 257:6 274:4,5 278:22,25
**summer** 190:12,12
**superior** 318:6,13
**supervise** 150:2
**support** 26:4 85:15 228:15 235:22,25 249:8 311:8
**supporting** 257:7
**supports** 137:16
**supposed** 110:15 147:18 161:21 166:24 215:4 299:13
**sure** 16:16,19 17:14 17:16 28:24 29:11 32:5,11 34:8 35:20 37:13 40:15 40:17,21 45:22 46:7 48:7 50:8 57:13 58:17 64:7 71:8,11,17,22 73:1 75:19,23 76:1,3 78:15 83:9

83:16 86:11 89:20 93:11,23 94:22 95:2 97:20 102:18 103:3 104:8 108:3 108:9 123:4 126:22 127:6 128:24 129:2,4 137:6 139:25 141:8 145:5,6 153:19,20 154:1 162:9 167:13 168:19 177:7,15 183:1 186:21 187:15 188:21,21 188:24 189:4,11 194:8,25 195:5,11 197:4 198:8,11 206:15 211:21 213:7 218:18 222:7 223:3 227:12,14 228:7 228:17,22 229:1 230:2 231:9 237:7 239:13 240:9,25 241:13 242:7,9,20 242:20 244:2 246:10 247:18 248:14 250:2,3,16 253:15 255:18,21 255:22 256:13,25 257:3 261:10 262:19,22,24 263:24 264:1 268:1 270:21 271:1 272:25 273:1,4 275:12 280:17,21 281:13 281:21,24,25 282:4,20 287:18 287:19,22 289:8 289:24 290:16 291:11,13 292:5 292:17 299:8 301:5 302:24 308:15 311:3 317:23 319:24 323:10 324:25

325:1,18 326:7
**surge** 26:3
**surprise** 148:4,8 188:11 226:12,14 291:19,25 292:10 317:13
**surprised** 129:23 130:1,2 148:15,21 317:20 319:25
**surprises** 317:15
**surprising** 319:20
**Susan** 1:24 2:12 13:21 331:3,19
**suspect** 146:18,23 311:1
**suspicion** 146:15
**swear** 15:4
**sworn** 15:5,8 331:6
**sync** 229:9 234:5
**synced** 237:7
**system** 55:1,6,8 57:14 58:9,16,25 59:9,14 60:2 112:19 136:5,14 140:24 149:12,13 149:15,20 152:16 196:8 260:24 261:15
**systems** 230:8

---

**T**

**T** 184:1
**table** 109:13 200:17 254:25
**tagged** 163:1
**tagging** 250:11
**tags** 250:5 252:25
**take** 18:14,18 44:23 46:8 153:23 160:5 168:16 182:5,17 183:3 189:22 202:21,23 203:14 203:16,21 206:25 207:10 210:18 244:13 313:8,13 313:15
**taken** 2:8 13:6

15:19 84:13
132:12 154:4
168:22 183:7
210:2 213:2
233:12 243:7
289:11 313:20
321:21 331:11
**takes** 192:25
**talent** 189:13
**talk** 29:19 30:9
69:11 81:8 252:8
258:24
**talked** 19:2 28:19
33:23 61:5 65:21
116:8 118:7,14
133:12 157:12
159:14 167:6
170:10 174:17
189:6,7 190:8
196:20 203:17
206:12 219:12,16
219:17 231:16
257:17 258:5,22
259:3 283:12
292:5
**talking** 23:7 28:10
30:5 35:22 46:3
66:15,17 86:11
169:2 191:20
192:4 198:12
212:11 216:5
219:6 224:7 225:5
225:8 233:24
260:2 266:6 280:2
280:13 313:25
**talks** 43:4 166:15
258:2
**tapped** 228:15
**target** 88:6 89:23
109:1,6,15,20
**targets** 88:18,25
89:6,16 188:8
**tasker** 281:11
**taskers** 202:24
**team** 34:20 58:3
110:21 113:21
131:2 146:21

148:25 149:6,8,18
149:23 150:1
162:5,6 163:1
164:3 165:11
166:3,4 182:21
186:18,18 192:4,7
192:9 198:1
206:16,18 213:23
214:1,4,9,22
230:20 231:15
242:3,10 253:13
253:18 255:24
262:17,18,24
270:7 272:24
273:3 275:3
277:15 281:8,11
281:15,17,19
299:11 303:5,13
307:10,16
**Teams** 66:13,15,16
66:20 68:21 78:13
78:16,18 79:4
289:22 290:6,8
**Technically** 47:11
252:1
**technology** 26:8
56:8 192:4,7,9
**tell** 28:22 41:1,21
56:16 71:23
141:16 149:3
168:12 263:1
287:10,23 288:4
**telling** 141:24
151:25 175:19
300:3 310:19
**template** 136:1,2
159:25 160:4,9,11
160:16,19 161:9
161:12,18 162:1,3
181:6 182:15
**temporary** 91:16
94:16
**ten** 71:23,25 72:21
76:14
**tend** 23:4 202:21
263:6
**term** 11:21 57:8

91:16 92:6 94:15
125:15 222:23
223:18,20 267:18
287:7
**term-limited** 127:1
**terms** 30:20 42:18
77:5 92:6 131:23
158:12 162:4
196:22 206:4
210:9 221:4 237:6
237:8 238:18
249:2 251:24
252:11 269:1
281:9,13 294:2
318:17 323:25
**testified** 15:9 39:16
39:25 75:15
131:20 146:6
147:21 154:14
213:21 263:5
310:14 317:22
**testifying** 16:12
**testimony** 17:25
18:6 21:2,5 30:25
35:6 36:3,7 39:21
40:5 41:10 42:1
76:22 95:1 165:15
169:8 173:12,24
174:23 175:22
221:2 327:6
**text-based** 66:16
**Thank** 17:3 139:10
241:3,20
**Thanks** 315:14
**theory** 232:11
**thing** 21:6 85:24
141:2 146:24
158:3 211:19
263:11
**things** 26:11 41:15
94:8 130:4 212:1
270:20
**think** 21:6,9,10
24:1,16 30:11
36:16,25 37:16
38:12 40:6,15
51:19 54:1 57:13

59:2,25 60:3
63:11 65:13 84:9
104:9 112:11
139:3,11 141:16
147:3,13 156:14
157:22 158:7
161:4 169:19
170:23 180:6
184:11 185:5
187:7,8 191:13
197:14 203:4
204:10 209:11,19
211:19 212:17
213:3 214:6 215:1
216:8 223:15
226:23 229:25
230:16 231:8
235:12 246:15
250:3 259:15,16
260:19 262:14
271:12 273:8
285:10 286:25
289:22 293:21
319:9,14
**thinking** 231:8
287:14 318:15
**third** 105:15
187:20,25 189:18
228:19,24 244:14
**thoshijima@dem...**
3:24
**thought** 137:24
215:6 232:12
293:23 301:11
**thousands** 181:16
**thread** 215:24
218:7,20 220:1,6
222:9 234:3,10
244:14 248:7
272:11 276:16
279:17 282:6
299:24 302:7
304:11,14 314:15
314:16 315:5,12
316:23 317:2
**threads** 211:8,12
**three** 22:21 24:17

56:24 107:8 211:7
211:12 235:16
236:4 308:3,6
**Thursday** 1:19 2:1
2:9 13:1
**time** 2:2 13:2,17
18:8,8 19:11 20:2
32:19 35:15,23
36:9,18,22 46:14
48:3,6 51:4 54:1
54:24 65:13 72:2
72:9 73:10 74:24
81:4 84:10 85:1
87:22,24 91:20
95:22 96:3,4
98:24 107:9,18,20
109:17 112:24
127:14 130:15
132:5 149:2,3
165:10 167:4
184:2 186:3 187:8
188:1 190:16,22
191:20,23,24
194:9 195:16
197:14 203:2,17
204:3,4 205:15
212:12,13 213:9
219:9 220:13
222:2 224:12
226:4 227:13,17
227:22 232:16,22
232:24 233:1,5
234:15 238:5
239:12,16,17
240:15,19,20
244:21 248:13
251:4,22 267:17
282:19 289:7
290:12 293:9
295:9,14,19
298:10 301:12
324:12,22
**Timed** 219:8
**timeline** 23:21
212:2 221:13
282:4
**timely** 264:2

times 15:22 35:24 37:24 71:21,25 72:21 76:14,18,20 77:7,16 104:9 203:10,11 204:5 213:5 290:10
timing 185:9 209:13 244:1
Timing-wise 185:13
title 21:19 71:8 75:14,19 96:7 127:19 161:14 226:6
titled 125:15 132:22 133:15 134:13 248:19
today 16:21 17:4 18:2,6 21:14 23:6 62:18 193:20 201:4 209:24 284:10 286:13 321:7
today's 18:25 19:3 327:6
told 82:13 111:24 117:4 137:24 156:3,7 160:8 169:5 208:5 220:20 240:10 263:3 270:10,14 274:18 275:17 283:12 284:9 285:6,11 297:23
top 64:5 89:12 96:11 110:16 113:9 115:23 126:5 141:17 179:13 182:10 184:7 195:13 200:1 204:23 213:2 217:21 220:1 223:23 233:21 263:10 278:3,11 282:6 302:7 305:25 317:2 319:19

topic 128:20 299:7
topics 69:11 320:12
total 24:4,23 44:23 46:4 182:3
touch 35:13
Toya 119:5,11 131:21 192:20 193:11 195:14 200:9 229:8 237:7 244:20 248:8 285:9 287:21 293:13 300:3 302:11
track 20:2 149:24 149:25 242:10 270:21 271:7 277:1
tracked 273:1
tracker 271:10,25 276:23,25 277:6 277:14,16,20,21
tracking 55:5,8 58:16 60:18 195:22 196:10 212:6,17 263:25 271:11,25 277:25
tracks 199:16
transcribed 17:5
transcript 17:23 20:23 327:4 331:5
transcription 329:10
transformation 43:5,20
transition 44:1
transmissions 196:17 197:15
transmit 57:15
transmitting 135:4
TransPerfect 13:20 13:22
Trial 4:4
triple-duty 298:10
Troup 63:20,23,24 64:25 65:4,7,11 66:9,12,22 67:1 67:17 68:2,10,20

69:17 70:21 101:8 116:8 150:22 167:7,16 275:23 275:24 276:6 296:4 314:25
Troup's 68:7
true 46:18 330:7,10 331:5
truly 167:5
Trump 1:8 13:8 133:2 184:17 185:20 329:4
trust 221:6
truthful 18:5
truthfully 32:6
try 17:14,16 26:13 34:9 35:18 117:15 149:23,25 198:3 229:22 230:1
trying 27:6 45:21 55:10,17 212:18
Tsuki 3:19 14:2 141:1
turn 88:9 91:3,14 105:15 133:14 294:11
turning 89:11 90:4 109:22 180:4 215:17 222:8 226:25 248:15 272:4 273:14 276:10 278:5 286:6 316:16
twice 65:5 68:3
two 19:24 20:7,19 22:21 24:16 33:6 33:8,13 35:23 36:15 41:14 56:23 56:24,25 59:3 72:8 92:1 94:8 118:20 120:24 121:8 132:2 173:5 195:24 196:2,16 197:1,13,15,20 205:13,16,25 208:1 209:9,16,19 211:3 212:1 215:1

216:14 217:10 231:8 232:16,22 254:3 260:25 262:17 265:4 270:25 273:23 274:11 285:12 320:18
two- 221:20
two-year 119:24,25 120:16,17 131:22 216:1 218:16
TX 3:16
type 26:6 73:17 139:24 140:14 144:10 161:15 162:11 175:10 237:9 285:23 289:23
types 25:24 26:11 45:4 50:4,12 51:20 58:8 65:6 160:25 161:5,10 161:16 191:19 196:16 235:19 245:7 272:1
typically 27:16 39:11 50:17 65:5 199:16 203:24 235:22 236:2 247:18 259:2 283:11 286:1 287:4,9 292:9 307:16 315:17

_____

**U**

U.S 13:11
ultimately 310:20
Um-hum 264:25 296:14
uncommon 195:1,5
undecided 170:12
underlying 42:5
underneath 215:4
understand 16:22 16:24 17:2,9,18 17:20,23 18:3,12 18:19 22:3 23:6

27:6 40:9,12 48:1 88:23 193:18 315:10
understanding 38:18 58:20 69:24 70:2,11 73:18,25 85:10 86:23 90:2 94:18 97:15 108:19,23 120:13 120:20 122:5,14 122:18 129:11 137:8 169:16 193:23 230:1 243:25 244:6 252:16 256:11 260:14 267:4,9 268:14,19,20 277:3 279:5 286:22 300:18,20 307:15 310:23 321:12,16 324:6
understood 18:20 40:18 156:18,22 252:10 309:17 324:11
undertake 43:11
Union 3:2,13 14:6 14:10,13
United 1:1,9 4:3 13:10
University 25:5
unpack 26:13
unusual 214:19
up- 150:11 151:4
upcoming 237:20
update 143:21,25 144:7,9,23 145:1 145:4,8,14 146:1 150:11,13,25 151:5 152:9 164:25 165:16 250:11 281:21 282:2
updates 133:16 143:6,12 144:19 145:24 151:17,18 151:22 280:19

281:9,9 282:5
**upload** 149:16
**urgency** 158:19
**urgent** 194:6,9
**USA-AFGE-Exp...**
8:22
**USA-AFGE-Exp...**
9:16
**USA-AFGE-Exp...**
10:14
**USA-AFGE-Exp...**
10:17
**USA-AFGE-Exp...**
10:22
**USA-AFGE-Exp...**
11:5
**USA-AFGE-Exp...**
7:19
**USA-AFGE-Exp...**
7:8
**USA-AFGE-Exp...**
11:24
**USA-AFGE-Exp...**
7:22
**USA-AFGE-Exp...**
8:5
**USA-AFGE-Exp...**
6:22
**USA-AFGE-Exp...**
8:11
**USA-AFGE-Exp...**
8:14
**USA-AFGE-Exp...**
9:5
**USA-AFGE-Exp...**
9:8
**USA-AFGE-Exp...**
9:10
**USA-AFGE-Exp...**
8:8
**USA-AFGE-Exp...**
8:19
**USA-AFGE-Exp...**
9:12
**USA-AFGE-Exp...**
10:5
**USA-AFGE-Exp...**

10:8
**USA-AFGE-Exp...**
9:14
**USA-AFGE-Exp...**
9:19
**USA-AFGE-Exp...**
11:17
**USA-AFGE-Exp...**
11:15
**USA-AFGE-Exp...**
10:11
**USA-AFGE-Exp...**
9:21
**USA-AFGE-Exp...**
8:16
**USA-AFGE-Exp...**
12:5
**USA-AFGE-Exp...**
9:24
**USCIS** 57:1
**use** 50:22 57:8,17
57:19 66:25 68:19
72:22 103:18,20
104:16 110:1
111:17 126:25
127:15,16 128:9
260:5 266:15
267:17 286:4
287:7
**uses** 57:9,11 127:23
277:1
**usually** 275:17
287:7 310:15

_____
**V**
**v** 329:3
**vacant** 265:9
**vaguely** 216:18,21
217:16
**validate** 106:18
230:11 322:22
**validated** 106:24
107:13
**validation** 106:9,12
106:15,22 107:7
107:16 230:16
**various** 26:1,4

60:19 119:2
136:13 234:25
248:9 268:16
277:1
**vendor** 26:9 28:8
**vendors** 28:10
**verbal** 291:6,20,20
292:11
**verbally** 291:1
293:24
**verbatim** 309:20
**verification** 7:6
53:8,15 65:20
69:14,15,16,22
70:1,12,19 71:13
71:16 99:2,14,22
100:6 102:19
105:21 109:24
112:8 114:1 118:6
120:10 121:23
122:7 128:3 129:8
129:20 131:5,7
196:19,20 201:5
207:14,20 208:6
208:18 210:3,8
217:8 235:9 244:5
245:9,20 246:8,11
247:8,22 250:20
250:25 251:15
252:22 253:5,19
255:4 256:10,15
260:12 263:6
264:19,23,24
265:8,13,19,25
266:11 271:22,23
271:24 277:2
286:19,25 296:7
299:3 303:18
307:9 311:14
**Verifications**
254:20 256:24
257:10 273:11
275:7,10 306:14
**version** 48:13 113:3
135:13,14,18
139:4 141:4,4
146:6 149:5,7

152:15,21 163:10
163:12,15 165:22
**versus** 13:8 222:23
**vet** 308:24,24
**vetted** 174:11,20
324:18,23 325:20
326:16,19
**vetting** 30:20
**vice** 3:19
**video** 13:5 17:24
**videoconferences**
66:17
**videographer** 5:8
13:4,20 15:3
84:11,14 132:10
132:13 154:2,5
168:20,23 183:5
184:3 233:10,13
289:9,14 313:18
313:21 321:22
327:5
**videotaped** 1:15
2:7 17:21
**visibility** 242:9
302:25 316:13
320:5
**visited** 284:10
285:11
**voice** 117:16
**volume** 242:12
**voluntarily** 44:4
**Voorhies** 75:11,13
75:16,20,24 76:11
76:24 77:8,12,20
77:23 78:2,5,8,17
79:10 80:5,8,18
81:11,19 82:2,14
82:25 83:1,25
220:3,5,10,12,14
221:3 234:12
251:9 278:17
317:3,6,14,16
318:21 319:9,15
319:21 320:8,12
322:12 323:2,7
325:3,9 326:19
**Voorhies'** 324:20

326:22
**Voorhies's** 317:8
317:23
**vs** 1:7

_____
**W**
**WA** 3:16
**waived** 328:16,23
**waiver** 29:13 121:7
121:19,22 207:6
**Wankhade** 5:5
**want** 16:18 29:12
32:4 33:3 45:22
50:8 141:1 168:16
207:10 260:24
265:9,18 313:8
**wanted** 32:11 44:5
51:24 52:2,9,10
86:25 124:3 139:8
188:7 216:23
242:8 243:16
244:2 245:5
250:16 252:9
262:22 265:15,20
312:5 322:22
**wants** 129:7
**Washington** 2:11
3:22 4:7,16,23
13:16
**wasn't** 44:17,23
67:25 202:2
203:19 222:1
227:5 229:24
284:23
**way** 25:14 34:4
40:15 45:14 55:18
56:22 137:5,21
172:20 199:14
234:19,22 260:16
261:1 277:16
311:2
**ways** 26:20
**we'll** 17:13 132:16
204:18 225:19
314:9
**we're** 16:16,17
25:19 26:20 35:22

36:16 86:11 117:11 156:15 170:12 198:12 255:24 313:10

**we've** 26:1 40:19 52:25 65:21 77:6 132:4 159:14 170:9 174:16 201:3 261:13 270:6 272:11 277:23 286:13

**Weapons** 48:9 56:13

**website** 22:13 23:12 47:22 48:13 48:16

**week** 20:2 65:5 68:3 241:9 297:11 297:20

**weigh** 70:4 174:9

**weighed** 228:3 299:7,16

**weighing** 298:15,19

**went** 60:6 86:17 111:21,23 113:19 117:24 129:9,16 137:21 138:5 147:3,10 169:25 181:23,24 199:1 239:23 261:23 268:15 288:2 304:25 307:20 310:20

**weren't** 191:3,3 232:9 237:25

**whereabouts** 313:13

**whereof** 330:11

**William** 252:17

**winter** 288:15

**withdrawn** 186:7 186:10

**witness** 4:2 6:2 12:10 14:17 15:4 15:5 47:20 48:2 88:3 98:16 115:16 117:17,22 125:12

125:18 127:11 148:20 153:25 155:5,24 156:12 159:4,9 168:17 171:11 172:14 180:10,20 192:15 200:5 208:13 220:8 233:7 235:13 239:6 248:11 263:18 274:9 295:1 301:4 304:12 306:4 313:9,17 324:6,11 328:20,21 329:6 330:2,11 331:6

**word** 127:23

**work** 21:16 27:3 30:13,23 34:23 35:3,10 54:4 68:25 69:2,6 72:24 73:4,22 81:20 82:14 83:1 86:4,5 120:21 168:6 182:11 184:22 224:18 237:22 302:12 312:20,22

**work-related** 81:9

**worked** 24:12 67:20 75:20 117:7 188:24 198:2 220:14,16 269:1

**workforce** 6:14 38:20,23,25 39:5 39:14,15 40:13,20 40:24 41:2,5,22 42:11,14 44:1,9 44:12,18 45:5,6 85:4,14 87:17 89:15 104:17 133:5 189:7 280:10 285:5

**workforces** 93:12

**working** 24:24 25:6 36:4 44:6,24 45:11 46:13,15,16 46:23 145:13,15

213:8,10,12 214:8 221:4 224:4,20,24 225:9,14 226:9 229:15 262:24 302:17

**works** 88:21 120:21 137:7 233:7 244:19 287:1 326:2

**worth** 35:23

**wouldn't** 89:22 145:15 147:11 223:9 244:3 319:20

**writ** 97:8

**write** 244:24

**writing** 302:8

___

**X**

**x** 1:4,10 328:15

___

**Y**

**yeah** 39:22 56:24 64:16 67:24 75:4 82:3 108:9 148:20 150:14 153:22 175:23 201:22 204:9 209:14,17 228:10 235:14 263:18 268:8 287:18 301:4 302:1 322:25

**year** 16:1 24:7 35:22 41:6,6 50:20 59:5 73:21 108:25 109:14,15 109:18 135:1,5 142:3,5,7,10 143:14,22 207:8 256:13,14 266:16 266:18

**Year's** 237:23 238:1

**years** 22:21 23:24 24:10,17 25:1,2 59:3 107:8,11 120:24 121:9

132:2 187:23 208:1 209:9,16,19 216:14 217:10

**yesterday** 20:1,5,12

**yesterday's** 20:16

**York** 2:11 13:15

**you-all** 185:12

**Yusman** 4:13 15:1 15:1

___

**Z**

**zero** 290:11

___

**0**

**0076** 278:10

**0160** 304:9

**0180** 305:24

**0186** 314:13

**029** 8:17

**0388** 316:21

**0400** 199:25

**0403** 117:20

**0405** 125:14

**0408** 98:14

**0410** 105:16

**0412** 109:22

**0415** 204:22

**0420** 210:24

**0428** 90:13

**0435** 95:17

**0446** 233:21

**0472** 239:3

**0473** 261:21

**0504** 269:16

**0539** 272:9

**0600** 229:5

**0608** 248:4

**0642** 273:19

**0643** 254:18

**0707** 294:16

**0713** 296:18

**077** 9:17

**0839** 276:15

___

**1**

**1** 43:4 103:15,22 105:17 107:21

110:9 121:14 122:12 133:1 135:2 142:6,11 166:23 181:21 221:10 280:4 328:4 329:8

**1,000** 187:17

**1:55** 184:2,4

**10:00** 194:4

**10:21** 84:12

**10:32** 84:15

**100** 35:12

**10027** 244:12

**10th** 297:16 309:19

**11** 6:12 43:1

**11,383** 178:10,14 179:9 180:2

**11,485** 109:1

**11:28** 132:11

**11:41** 132:14

**11:43** 215:18

**11:48** 221:10

**1101** 4:6

**117** 7:9

**11974** 1:25

**12** 128:19 229:7

**12:06** 154:3

**12:12** 154:6

**12:26** 229:7

**12:31** 168:21

**12:36** 168:24

**12:38** 207:2

**12:53** 183:6,8

**12:57** 314:19

**125** 11:25 290:20 293:15,19

**12th** 128:23,25 248:24

**130** 297:4

**132** 7:11

**134** 7:16

**13th** 248:16

**14** 7:4 11:19 24:10 98:14 100:14 331:22

**141** 7:17

**14210** 6:11 42:25

133:11

**14356** 7:10,14
132:21 134:14
**1445** 2:10 13:15
**14520** 192:17
**14th** 118:2,10
126:4
**15** 6:5 7:11 132:22
**154/23** 12:12
**155/11** 12:12
**156/11** 12:12
**159** 11:18
**15928** 293:4
**15th** 254:21 258:19
**16** 25:2,2
**162** 10:15
**17** 11:13 89:11
180:8,9
**170/15** 12:13
**171/17** 12:13
**171/2** 12:13
**172/5** 12:14
**177** 3:7
**18** 87:23
**180** 11:15 131:18
132:2 209:19
**181** 10:18
**188** 10:23 306:7
307:4 314:1,22
316:24
**18th** 164:10,15,20
165:9 248:25
266:21 269:25
**19** 11:16 126:6
159:2,3 176:16
180:14 233:23
**192** 12:6
**199** 7:20
**19th** 130:11 202:9
202:15 207:2
211:1 215:19
229:6 294:3,21
297:5
**1st** 143:19 200:21
232:17 237:12
241:10

---
**2**
---

**2** 1:19 2:1 11:12
13:1,17 47:18,19
54:3 56:18 64:5
103:17,19 109:23
110:12 181:21
249:7 329:5,9
**2(c)** 133:14
**20** 6:18 25:2 90:6
90:13
**200** 32:19 35:9
**200-person** 263:11
**200-some** 36:5
298:4
**20005** 4:7
**20032** 4:23
**20043** 3:22
**2012** 24:7
**2018** 24:2
**202** 3:23 4:8
**2023** 6:13 22:23
23:19 24:2 87:16
**2024** 36:19,20,21
37:7,11
**2025** 6:12,18 7:4,11
7:12 11:19 35:15
35:24 36:4,14,15
43:1 62:10 72:6
82:6,7 86:6,24
87:9 90:4,6,13
95:24 96:5 98:14
100:14 101:14
103:24 104:2,20
107:4 109:1,14,15
109:18 118:6
120:22 121:14
122:12,19,22
123:7,11 124:5,16
124:23 126:6
128:3,8,12,19
130:20 131:12,12
132:1,22 134:13
135:2 142:6,11
146:5 152:22
166:15,19 167:14
176:19 177:6,24

190:12,23 192:21
193:5 200:19,22
201:4 210:3
211:17,23 212:12
212:14 221:18
222:21 225:10,14
227:2,6,8 233:23
235:9 236:12
240:2,13 256:16
264:24 266:19
321:14
**2026** 1:19 2:1,9
13:1,17 36:9 72:5
131:10 135:2,5
142:3,5,7,8
143:14,22 193:14
261:22 264:3
266:21 279:24
280:4,22 281:12
300:23 301:20
329:5 330:12
331:15
**2028** 331:22
**204** 7:23
**20472** 4:16
**20th** 232:18
**21** 11:19 96:5
125:10,11 209:21
261:22
**210** 8:6
**21st** 95:22 159:11
269:18
**22** 6:10
**225** 8:9
**22nd** 273:20 274:8
276:17 288:9
**233** 8:12
**238** 8:14
**244** 8:17
**248** 8:20
**25-07536** 7:17
**254** 8:23
**26** 12:4 192:13,14
198:13
**260,000** 80:13
**261** 9:6
**269** 9:8

**26th** 306:3 314:20
**2700** 4:22
**272** 9:10
**273** 9:12
**276** 9:14
**278** 9:17
**28** 262:4 269:21
272:12 274:6
309:19
**286** 9:19
**289** 9:22
**293** 9:24
**294** 10:6
**296** 10:9
**299** 10:12
**29th** 290:14 293:5

---
**3**
---

**3** 91:2,14 109:14,18
143:4,8 329:10
**3(c)** 43:8
**3:02** 233:11
**3:18** 233:14
**3:25-cv-03698-SI**
1:7 13:13
**30** 165:1 200:22
313:14
**300** 3:7 32:16
181:18
**304** 10:15
**305** 10:18
**305-0693** 4:8
**309** 10:20
**30th** 165:17 232:17
232:18 295:22
**31** 266:21 279:24
280:22 281:12
**312** 32:17 35:1,7
**314** 10:23
**316** 11:6
**31st** 143:20 269:25
**327** 328:4
**34553** 3:21
**35** 6:10 22:8,9
**36** 6:11 42:22,23
**37** 6:13 87:13,14
**38** 6:18 90:9,10

96:11
**389** 11:6
**39** 6:21 95:13,14
**3b** 91:4
**3rd** 159:20 295:23
297:9

---
**4**
---

**4** 91:11 92:11
176:19 177:5,24
193:4
**4:28** 289:10
**4:39** 289:15
**40** 7:4 98:7,9,10
235:12,12
**402** 7:20
**404** 7:9
**406** 11:25
**41** 7:7 117:12,13
207:10 208:11
**415** 3:9
**419** 7:23
**42** 6:12 7:10 132:17
132:18 134:18
**421-7151** 3:9
**427** 8:6
**43** 7:12 134:8,9
143:5 166:18
**44** 7:17 141:9,13
**448-9090** 3:23
**45** 7:18 199:21,22
205:3
**454** 8:12
**458** 9:22
**46** 7:21 204:18,19
207:1
**47** 8:4 11:12 210:19
210:21,23 215:16
227:1
**48** 8:7 225:19,20
229:3 230:24
**49** 8:10 233:16,17
**4m** 91:15 92:4,15
93:5,22 94:19
**4m's** 93:16
**4th** 177:11 179:23

**5**

**5** 7:12 134:13 166:15,19 192:20
**5:09** 313:19
**5:11** 313:22
**5:19** 321:20
**5:27** 321:23
**5:33** 327:6,8
**5:36** 290:14 293:5 293:10
**50** 8:13 238:24,25
**500** 4:14
**501** 9:6
**51** 8:15 244:8,9
**52** 8:18 247:25 248:1
**521** 12:6
**53** 8:21 254:13,14 273:10 274:3
**538** 11:18
**54** 9:4 261:17,18 274:3
**55** 9:7 269:12,13
**56** 9:9 272:5,6
**5677** 286:11
**57** 9:11 273:15,16 276:3 283:1
**58** 9:13 276:11,12
**59** 9:15 278:6,7

**6**

**6** 96:11 138:14
**6,200** 88:1,6
**60** 9:18 278:6 286:7 286:8
**607** 8:9
**61** 9:20 289:12,17 293:9,11,13
**610** 8:20
**62** 9:23 292:25 293:1,10,18
**63** 10:4 294:12,14
**64** 10:7 296:13,15
**644** 8:23
**65** 10:10 299:18,19
**6535** 159:6
**6537** 159:8 182:20

**6542** 180:13
**66** 10:13 304:5,6
**662** 10:12
**67** 10:16,20 305:20 305:21 309:12,19 311:5 313:25 322:20
**68** 10:19 309:7,8 313:25 322:14,21
**69** 10:21 314:9,10
**6th** 331:15

**7**

**7:20** 248:15
**70** 11:4 316:17,18 322:11
**708** 10:6
**714** 10:9

**8**

**8:17** 194:3
**8:58** 2:2,9 13:2,18
**840** 4:15
**8661** 299:22
**87** 6:17
**8th** 239:4 241:10

**9**

**9** 88:9,10
**90** 6:20 290:21 301:1,17 306:8
**90-day** 294:6 301:21,23
**94108** 3:8
**9457** 289:18
**95** 6:22
**98** 7:6
**9th** 294:3,22 297:5

# Exhibit C

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--------------------------------x
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,

     Plaintiffs,

                    Case No.

   vs.

                 3:25-cv-03698-SI

DONALD J. TRUMP, in his official
capacity as President of the
United States, et al.,

     Defendants.
--------------------------------x

VIDEOTAPED DEPOSITION OF

LA'TOYA MICHELLE PRIEUR

Friday, April 3, 2026

Reported By:  SUSAN ASHE, CER

Job No.:  11975

Friday, April 3, 2026

8:56 a.m. Eastern Daylight Time

Videotaped deposition of LA' TOYA MICHELLE PRIEUR, taken on behalf of the Plaintiffs, beginning at 8:56 a.m., on Friday, April~3, 2026, at the offices of Democracy Forward Foundation, 1445 New York Avenue, Northwest, Washington, D.C., before Susan Ashe, Certified Electronic Reporter and a Notary Public of the District of Columbia.

APPEARANCE OF COUNSEL:

On behalf of All Union and Non-Profit

Organization Plaintiffs

ALTSHULER BERZON LLP

BY:  DANIELLE E. LEONARD, ESQ.

BY:  ELIZABETH ESHLEMAN, ESQ.

177 Post Street, Suite 300

San Francisco, California  94108

(415) 421-7151

dleonard@altshulerberzon.com

eeshleman@altshulerberzon.com


On behalf of All Union and Non-Profit

Organization Plaintiffs (except NRDC) and for

Plaintiffs City of Chicago, IL; Martin Luther,

Jr. County, WA; Harris County, TX; and City of

Baltimore, MD

DEMOCRACY FORWARD FOUNDATION

BY:  TSUKI HOSHIJIMA (pro hac vice)

Senior Counsel

P.O. Box 34553

Washington, D.C.  20043

(202) 448-9090

thoshijima@democracyforward.org

(Via Teleconference)

Page 4

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

UNITED STATES DEPARTMENT OF JUSTICE

BY:  BRAD P. ROSENBERG, Special Counsel

BY:  ROBERT BOMBARD

1101 L Street, Northwest

Washington, D.C.  20005

(202) 305-0693

brad.rosenberg@usdoj.gov

robert.bombard2@usdoj.gov

- and -

FEDERAL EMERGENCY MANAGEMENT AGENCY

BY:  ASHLEY DARBO

500 C Street, Southwest

Suite 840

Washington, D.C.  20472

ashley.darbo@fema.dhs.gov

- and -

DEPARTMENT OF HOMELAND SECURITY

BY:  MATTHEW FLEISCHMAN

2700 Martin Luther King, Jr., Southeast

Washington, D.C.  20032

matthew.fleischman@hq.dhs.gov

ALSO PRESENT:

Jessica Levy, Esquire

Altshuler Berzon LLP


Melody Dodoo, Legal Assistant


Jonathan Perry, Videographer

CONTENTS

THE WITNESS

La' Toya Michelle Prieur


  BY MS. LEONARD                                    16


                      EXHIBITS

PLAINTIFFS

Exhibit No.                                   Marked

Exhibit 71   La' Toya Prieur

             LinkedIn Printout                     27

Exhibit 72   FEMA Manual 252-11-1                  77

Exhibit 73   Email Correspondence

             USA-AFGE-Exp.-0004693

             and -694                             110

Exhibit 74   Summary Table

             USA-AFGE-Exp.-0006539

             (Natively) Three Pages               153

Exhibit 75   Email Correspondence

             USA-AFGE-Exp.-0009729

             through -731                          173

Exhibit 76   Email Correspondence

             USA-AFGE-Exp.-0001244

             through -249                          193

Page 7

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                      Marked

Exhibit 77   Email Correspondence

USA-AFGE-Exp.-0004518

through -520                      201

Exhibit 78   Email Correspondence

USA-AFGE-Exp.-0004553

through -555                      212

Exhibit 79   Email Correspondence

USA-AFGE-Exp.-0004824            213

Exhibit 80   Email Correspondence

USA-AFGE-Exp.-0004961            225

Exhibit 81   Email Correspondence

USA-AFGE-Exp.-0016768

and -769                         226

Exhibit 82   Email Correspondence

USA-AFGE-Exp.-0004990            228

Exhibit 83   Email Correspondence

USA-AFGE-Exp.-0004594

through -4597                    232

Exhibit 84   Email Correspondence

USA-AFGE-Exp.-00024154

through -161                     233

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                          Marked

Exhibit 85   Email Correspondence

USA-AFGE-Exp.-0007228

and -229                                    236

Exhibit 86   Email Correspondence

USA-AFGE-Exp.-0031448

through -467                                238

Exhibit 87   Email Correspondence

USA-AFGE-Exp.-0007249

through -251                                239

Exhibit 88   Email Correspondence

USA-AFGE-Exp.-0007230

and -231                                    242

Exhibit 89   Email Correspondence

USA-AFGE-Exp.-0007242

through -245                                248

Exhibit 90   Email Correspondence

USA-AFGE-Exp.-0011844                       250

Exhibit 91   Email Correspondence

USA-AFGE-Exp.-0007265

through -269                                254

Page 9

                    EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Marked

Exhibit 92   Email Correspondence

             USA-AFGE-Exp.-0007374

             and -375                            269

Exhibit 93   Email Correspondence

             USA-AFGE-Exp.-0007350

             through -361                        282

Exhibit 94   Email Correspondence

             USA-AFGE-Exp.-0006441

             through -443                        285

Exhibit 95   Email Correspondence

             USA-AFGE-Exp.-0000141

             and -142                            306

Exhibit 96   Email Correspondence

             USA-AFGE-Exp.-0005428

             and -429                            310

Exhibit 97   Email Correspondence

             USA-AFGE-Exp.-0007095

             through -100                        313

Exhibit 98   Email Correspondence

             USA-AFGE-Exp.-0005639              319

Exhibit 99   Email Correspondence

             USA-AFGE-Exp.-0005748              329

Page 10

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Marked

Exhibit 100  Short Message Report

             USA-AFGE-Exp.-0020962

             and -963                            334


             PREVIOUSLY MARKED EXHIBITS

PLAINTIFFS

Exhibit No.                                 Introduced

Exhibit 17  Organization Information

            Chart

            USA-AFGE-Exp.-0006542              156

Exhibit 19  Email Correspondence

            USA-AFGE-Exp.-0006535

            through -538                        197

Exhibit 20  Email Correspondence

            USA-AFGE-Exp.-0006686

            through -688                        186

Exhibit 21  May 14, 2025 Correspondence

            USA-AFGE-Exp.-0000405

            and -406                            113

PREVIOUSLY MARKED EXHIBITS (Continued)

PLAINTIFFS

| Exhibit No. | | Introduced |
|---|---|---|
| Exhibit 24 | Email Correspondence | |
| | USA-AFGE-Exp.-0006997 | |
| | and -998 | 182 |
| Exhibit 25 | "Talking Points for FY26 | |
| | Staffing Strategy" | |
| | USA-AFGE-Exp.-0034341 | |
| | and -342 | 148 |
| Exhibit 26 | Email Correspondence | |
| | USA-AFGE-Exp.-0014520 | |
| | and -521 | 189 |
| Exhibit 31 | Email Correspondence | |
| | USA-AFGE-Exp.-0005054 | |
| | through -059 | 218 |
| Exhibit 32 | Email Correspondence | |
| | USA-AFGE-Exp.-0009465 | |
| | and -466 | 252 |
| Exhibit 37 | May 2023 | |
| | FEMA Disaster Workforce | |
| | "Actions Needed to Improve | |
| | Hiring Data and Address | |
| | Staffing Gaps" | 127 |

          PREVIOUSLY MARKED EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                  Introduced

Exhibit 38  January 20, 2025 Memorandum
            Re:  Federal Civilian
            Hiring Freeze Guidance                    92
Exhibit 39  Email Correspondence
            USA-AFGE-Exp.-0000435                      94
Exhibit 40  March 14, 2025 Memorandum
            Subject:  DHS Hiring
            Verification Process                       96
Exhibit 41  Email Correspondence
            USA-AFGE-Exp.-0000403
            and -404                                  103
Exhibit 49  Email Correspondence
            USA-AFGE-Exp.-0000446
            through -454                              262
Exhibit 59  Email Correspondence
            USA-AFGE-Exp.-0000076
            and -077                                  289
Exhibit 65  Email Correspondence
            USA-AFGE-Exp.-0008661
            and -662                                  301

(REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.)

Page 14

FRIDAY, APRIL 3, 2026;

8:56 A.M. EASTERN DAYLIGHT TIME

--o0o--

VIDEOGRAPHER:  We are now on the record.

This begins the video deposition of La' Toya Prieur, taken in the matter of the American Federation of Government Employees, et al. versus Donald J. Trump in His Official Capacity as President of the United States, et al., case filed in the U.S. District Court for the Northern District of California, San Francisco Division, Case No. 3:25-cv-03698-SI.

We are at the offices of Democracy Forward, 1445 New York Avenue, Northwest in Washington, D.C.

The date is April 3, 2026.  The time is approximately 8:56 a.m.

My name is Jonathan Perry.  I am the videographer from the firm of TransPerfect.  The court reporter is Susan Ashe, also with TransPerfect.

And would counsel present please introduce themselves and please state whom

they represent.

MS. LEONARD:  Good morning, everyone.  Danielle Leonard, Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. ESHLEMAN:  Elizabeth Eshleman, also Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. LEVY:  Jessica Levy, Altshuler Berzon, representing all Union and Organizational Plaintiffs.

MS. LEONARD:  And on the phone...Tsuki?

MR. HOSHIJIMA:  Good morning. Tsuki Hoshijima, from Democracy Forward, representing certain other Plaintiffs.

MR. ROSENBERG:  Brad Rosenberg, from the Department of Justice, Civil Division, Federal Programs Branch, on behalf of Defendants.

MR. BOMBARD:  Good morning, Robert Bombard, Department of Justice, Civil Division, Federal Programs Branch, on behalf of Defendants.

MS. DARBO:  Ashley Darbo, representing FEMA.

MR. FLEISCHMAN:  Matthew Fleischman, Department of Homeland Security.

MS. LEONARD:  And for Plaintiffs, we have staff from one of our co-counsel who are observing here today.

VIDEOGRAPHER:  And would the reporter please swear in the witness.

Whereupon,

LA' TOYA MICHELLE PRIEUR

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. LEONARD:

Q.  Good morning.  The first question I'm going to ask you is how to pronounce your last name prior.

A.  "Prieur."

Q.  "Prieur," okay.

A.  But "La' Toya" is fine.

Q.  I will go with "Ms. Prieur."

A.  Okay.

Q.  But I'm Danielle, Danielle Leonard.

I'm one of the counsel for the Plaintiffs in the litigation, which involves actions by DHS and FEMA involving, among other things, the CORE employees.

Ms. Prieur, could you please state your full name for the record.

A.    La' Toya Michelle Prieur.

Q.    And what is the city and state in which you currently reside?

A.    Upper Marlboro, Maryland.

Q.    Are you currently employed?

A.    Yes.

Q.    And what is your position?

A.    Chief Human Capital Officer.

Q.    And by which agency?

A.    The Federal Emergency Management Agency.

Q.    Okay.  So if we go with "FEMA" today --

A.    Yes.

Q.    -- would that -- you'll understand what I'm talking about?

A.    That's fine.

Q.    And for "Chief Human Capital Officer," can -- if I say "CHCO," will you understand what I'm referring to?

A.    I will.

Page 18

Q.   Okay.  Have you been deposed before, Ms. Prieur?

A.   Yes.

Q.   Approximately how many times?

A.   At least 15, less than 20.

Q.   Okay.  All in your official capacity working for the government?

A.   Yes.

Q.   Okay.  When was the last deposition?

A.   Spring or summer of 2025.

Q.   And do you remember what -- the general subject matter of the case?

A.   Yes.

Q.   Could you explain what it is.

A.   A termination.

Q.   I will go over some of the ground rules as I understand them, and then you can let me know whether these make sense to you or if you have any questions, even though you have been deposed several times before -- so, hopefully we can go pretty quickly.

You understand everything we say is being recorded by a court reporter?

A.   Yes.

Q.   And so, that means you need to provide a

verbal answer rather than saying "um-hum" or nodding your head?

A.   Correct.

Q.   Okay.  And we'll do our very best not to talk over each other.  That's, I always find, the hardest part.

So I will do everything I can to wait until you give me a complete answer before I start my question.  And I would ask that you do the same.

Does that make sense?

A.   It does.

Q.   It also gives your time -- your attorney, Mr. Rosenberg, time to interpose objections for the record.  Do you understand that?

A.   Yes.

Q.   Okay.  And if you don't understand one of my questions or would like some clarification, please let me know.

A.   Okay.

Q.   Your attorney may occasionally make objections.

You understand that, even if your attorney objects for the record, you need to provide me a response?

A.   Yes.

Q.   And the DOJ attorney defending your deposition may invoke privilege and instruct you not to answer.

If you have any questions regarding privilege, you may consult with your counsel.

Does that make sense?

A.   Yes.

Q.   Let me know if you need a break.  We will take breaks, usually, every 45 to 50 minutes or so.

The only rule, if you need a break, is --

I should say, we can take breaks more often if you need them.  Just let me know.

The only rule is:  If there's a question pending, you need to give me an answer.

Does that make sense?

A.   Yes.

Q.   You also understand this is being videotaped?

A.   Yes.

Q.   And you're aware there's a possibility that the written transcript or the videotape may be used in court?

A.   Yes.

Q.   And so, even though we're sitting here in a conference room and not a courtroom, the testimony

you should give here today should be as full, accurate, and complete as if the judge were sitting here at the head of the table.

A.   Yes.

Q.   Does that make sense?

A.   It does.

Q.   Okay.  I will be asking you some questions about documents.

The way this is going to work, although you've been -- been down this road before, is:  I will hand the document to the court reporter, who will give it an exhibit sticker and number.  And then that's the copy you will get.

I will also give copies to your lawyers.

And then the copy that you get becomes the official exhibit for the transcript.  So please don't make any markings, and you can give those to the court reporter at the end of the day.  Okay?

A.   Okay.

Q.   I will generally try to speed things along to direct you to portions of the document, if -- these are longer documents, so -- and give you an indication of that.  I find that helps to move us along.

Does that make sense?

A.    Yes.

Q.    Okay.  Are you taking any medication or other substances that would interfere with your ability to give me your full, accurate, and complete testimony here today?

A.    No.

Q.    Is there any other reason you can't give your full, accurate, and complete testimony here today?

A.    No.

Q.    Okay.  What did you do to prepare for this deposition?

A.    I talked with my attorneys.

Q.    Which attorneys?

A.    With Kevin Yusman, with Ashley Darbo, and with Jim Evans.

Q.    What agencies do they work for?

A.    FEMA.

Q.    Anyone else?

A.    Yes, a young lady from the Department of Justice.  I don't recall her name, but she's not here today.

Q.    Okay.  Anyone else?

A.    And...you.

                    (Laughter.)

Q. I believe the witness is indicating Mr. Rosenberg.

A. Mr. Rosenberg, yes.

Q. And Mr. Rosenberg is representing you for purposes of this deposition today, correct?

A. Yes.

Q. Okay. How many sessions did you have with the lawyers?

A. I believe, three.

Q. And can you tell me, roughly, when there were?

A. They were this week and the week prior.

Q. And for how long did you meet with the lawyers?

A. Approximately one to two hours for each meeting.

Q. And did you talk to anyone other than counsel regarding this deposition?

A. Yes.

Q. Who is that?

A. I talked to Roland Edwards.

Q. And when did you talk to Roland Edwards?

A. Last night.

Q. And what did you discuss with Mr. Edwards?

A. I asked him how long he was here.

Q.   Anything --

(Laughter.)

Q.   Anything -- and what did he tell you?

A.   "All day."

Q.   Okay.  Did he tell you anything else regarding this -- his deposition?

A.   No, he did not.

Q.   And you understood that -- you were talking to Mr. Edwards because he was deposed yesterday in this case?

A.   Correct.

Q.   Okay.  Did you talk -- did you talk to Mr. Edwards about anything else in that conversation?

A.   No.

Q.   So it was a very short conversation?

A.   Yes.

Q.   Okay.  He didn't tell you anything about how the deposition went?

A.   No.

Q.   Or what questions were asked?

A.   No.

Q.   Okay.  Did you -- have you reviewed a rough transcript of either the deposition of Mr. Edwards or Ms. Evans?

Page 25

A.   No.

Q.   You're aware that Karen Evans was also deposed earlier this week?

A.   Yes.

Q.   All right.  Did you review any documents when you were discuss- -- preparing -- well, let me try that one again.

Did you review any documents that refreshed your recollection in preparation for this deposition?

A.   Yes.

Q.   What type of documents?

A.   Email conversations and the letter that I signed indicating who was responsible for CORE reappointments.

Q.   Are you referring to a declaration that was submitted to the court in this case?

A.   Yes.

Q.   Okay.  And you say you signed it.

Is that because DOJ drafted it for you?

A.   I did sign it.  I don't know that DOJ drafted it.

Q.   It's possible other attorneys might have drafted it?

A.   Correct.

Q.   Okay.  Any other documents that you reviewed that refreshed your recollection?

A.   No, ma'am.

Q.   Okay.  So you said email correspondence and then the declaration?

A.   Correct.

Q.   All right.  Let's start with some general questions regarding your educational and professional background.

Can you just give me a brief synopsis of your post-high school education, naming the institutions and the years.

A.   Sure.  I'll start with the most recent.

My executive education was completed at the University of California, Berkeley.

My master's in business administration was completed in 2010 at the University of Phoenix.

My bachelor's degree in business management was completed in 2008 at the University of Phoenix.

MS. LEONARD:  Okay.  I am going to mark this as the next exhibit consecutively in these depositions.  It should be No. 7- -- she's not writing this down, so I don't need to be so formal --

it's No. 71.

(Whereupon, Plaintiffs Exhibit 71 was marked for identification.)

A.   Thank you.

Q.   Okay.  Ms. Prieur, you've been handed what's been marked as Exhibit 71.

I'll represent to you that this is a LinkedIn profile that we printed that we found that we believed to be yours.

Can you confirm that this appears to be a printout of your LinkedIn profile?

(Witness reading.)

A.   Yes.

Q.   And did you write this LinkedIn profile?

A.   Yes.

Q.   And did you intend for it to be generally accurate?

A.   Yes.

Q.   Okay.  And if you flip to the back, you see the education listed here is consistent with what you just told us?

A.   Yes.

Q.   Okay.  And does this LinkedIn profile summarize your various positions working for the federal government?

Page 28

A.    Most of them.

Q.    Okay.  Are there any positions that you don't see listed here that you've held at the -- in the federal government?

A.    It does not list my military service.

Q.    And what -- could you explain your military service?

A.    Sure.  I was active duty in the Army from 1998 to 2001, and then I served in the Ohio National Guard from 2001 to 2005.

Q.    Are you from Ohio?

A.    No, I am not.

Q.    Other than the -- your military service, does this LinkedIn profile accurately summarize your -- the jobs you've had for the federal government?

A.    Yes.

Q.    Okay.  Then we don't need to go through all of them.

A.    Okay.

Q.    But roughly speaking, you have approximately 17 years at...at the VA?

A.    Yes.

Q.    And then you moved over to FEMA.

A.    Correct.

Q.   And it is at FEMA that you're the Chief Human Capital Officer, correct?

A.   Correct.

Q.   Okay.  And FEMA is part of the Department of Homeland Security?

A.   Yes.

Q.   Okay.  So when it's listed here as "Chief Human Capital Officer at the Department of Homeland Security," that's not the CHCO for DHS, correct?

A.   Correct.

Q.   It's the CHCO for FEMA.

A.   Correct.

Q.   And Roland Edwards is the CHCO, currently, for DHS.

A.   Correct.

Q.   Okay.  Could you please explain for the judge what your responsibilities as the FEMA CHCO include?

A.   Sure.  At present, we have about 21,000 employees.

So my staff is responsible for the full cycle of employees -- from onboarding, benefits, pay, employee labor relations, training -- everything, start to finish.

Whether you leave voluntarily or

involuntarily -- so, terminations, resignations, retirements -- anything that requires human capital processing falls within my bandwidth.

Q. Do you have responsibilities beyond the individual employees?

A. I do.

Policy, human resources information systems -- training is a large one -- and then recruitment and staffing.

Q. What about staffing planning?

A. I do -- I am responsible for staffing planning.

Q. And what does staffing planning involve?

A. Can you be more specific?

Q. Sure. Just tell -- when I asked, does your -- do you have responsibilities in staffing planning, you indicated yes. What did -- what does that mean to you?

A. It can mean a number of things.

So we have a workforce planning staff, where, if an office is gaining employees, losing employees, they are responsible for working with the leadership to form an organizational chart to determine what positions are necessary for the successful -- the success of the mission of that

office, classifying those positions, making sure people qualify for those positions, and making sure that we liaise with the Office of the Chief Financial Officer and the lines of accounting are correct.

For the purposes of what we're doing now, the Office of Management and Budget has requested that FEMA provide a quarterly update to a staffing plan.

So on March 31, 2026, Ms. Evans, who is the acting administrator, required all program offices provide a staffing plan. And it was zero-based -- so, just for everyone to provide what they need to be successful.

Q. And that was in conjunction with the OMB direction to provide quarterly updates to something called the "annual staffing plan"?

A. That's correct.

Q. Okay. And the annual staffing plan, that was ordered by the President for all agencies to create in an executive order?

A. Correct.

Q. Okay. And Ms. Evans is not the acting administrator, is she? -- she is something called the "SOPDA"?

A.   She is the senior official performing the duties of administrator.

Q.   And that is distinct, under federal law, from someone who is an acting.  Correct?

A.   Correct.

Q.   Okay.  How many people work on the workforce planning staff?

A.   Approximately ten to fifteen.

Q.   And you supervise that work?

A.   I don't directly supervise the work.

I would say there are...I'm probably the fifth-level supervisor for that team.

Q.   How many people work in the FEMA's Office of the CHCO?

A.   We have 550 positions.

Right now, 450 of them are filled.

Q.   Okay.  And you supervise -- you're generally responsible as the CHCO for all of that.

A.   Correct.

Q.   And you said you're fifth -- five levels above the workforce planning staff.

Could you just give a high-level outline of the structure of the OCHCO.

A.   Of course.

I'm the executive director for the office.

I have two senior executive deputies.  And under those deputies, we have five -- excuse me, nine divisions.

So the HR operations deputy has five divisions that mainly consist of recruitment, staffing, talent acquisition, and benefits.

And then the strategic solutions deputy is responsible for more long-term things like human resources information systems.

The budget shop falls under there.

Policy and planning also fall under that office.

Q.   And I'm not going to ask you to go through all of the other --

A.   Okay.

Q.   -- subcomponents.  But, thank you.

A.   You're welcome.

Q.   That is helpful to lay that out.

Who do you report to?

A.   I report to Shila Cooch, who is the associate administrator for Mission Support.

Q.   Could you spell that person's name for the court reporter.

A.   Sure.

WITNESS:  Do you want me to

spell it phonetically -- or, just with the letters is fine?

COURT REPORTER:  With the letters.

A.  S-h-i-l-a.  Last name is Cooch, C-o-o-c-h.

COURT REPORTER:  Thank you.

WITNESS:  Um-hum.

Q.  Okay.  And I'm sorry, what position did you say Ms. Cooch holds?

A.  She is the associate administrator for Mission Support.

Q.  Is the OCHCO within Mission Support at FEMA?

A.  Yes.

Q.  Okay.  And does Mission Support report to whoever is performing the duties of the FEMA administrator?

A.  Yes.

Q.  Okay.  So currently, that position is held by a SOPDA as opposed to a confirmed administrator.  Correct?

A.  Correct.

Q.  And that has been true for all of 2025.  Correct?

A.  Correct.

Q.   Okay.  At the time that you became the FEMA CHCO, who was the FEMA administrator?

A.   It was Deanne, and her last name escapes me.

Q.   Is it Criswell?

A.   Yes.

Q.   And then after President Trump took office for the second time, he did not nominate a FEMA administrator for Senate confirmation, correct?

A.   Correct.

Q.   So who was running the agency?

A.   During which time frame?

Q.   Beginning in January 2025.

A.   Mr. Tony Robinson.

Q.   And for how long did -- was he a SOPDA?

A.   Probably.

Q.   Okay.  And for how long was Mr. Robinson the most senior official at FEMA?

A.   Maybe 60 days.

Q.   And then, was he replaced by someone?

A.   Yes.

Q.   And who was that?

A.   MaryAnn Tierney.

Q.   And how long was MaryAnn Tierney the most senior official at FEMA?

A.   Maybe 30 days.

Q.   And then, was she replaced by someone?

A.   Yes.

Q.   And who was that?

A.   Cameron Hamilton.

Q.   And how long did Mr. Hamilton last?

A.   Ninety days.

Q.   And was he replaced by someone?

A.   Yes.

Q.   And who was that?

A.   David Richardson.

Q.   Okay.  And how long did Mr. Richardson last?

A.   Six months?

Q.   Okay.  Going back to Cameron Hamilton, you under- -- he was a SOPDA, correct?

A.   Correct.

Q.   Okay.  So senior official performing the duties of FEMA -- of the administrator, correct?

A.   Correct.

Q.   Okay.  And do you -- you have an understanding that SOPDA Hamilton was appointed by the DHS secretary into that position, correct?

A.   Yes.

Q.   Okay.  Does your office maintain the

paperwork for those appointments?

A.   Yes.

Q.   And you generally understood that SOPDA Hamilton reported to the DHS secretary.

A.   Correct.

Q.   And at this time, the DHS secretary was Kristi Noem.

A.   Correct.

Q.   Okay.  And you understood that Mr. Hamilton could be removed by DHS Secretary Noem.

A.   Correct.

Q.   And in fact, Mr. Hamilton was removed by DHS Secretary Noem.

A.   Correct.

Q.   And he was removed the day after he testified to Congress that FEMA should not be eliminated.

A.   That's correct.

Q.   And then, Mr. Richardson came in.

A.   Yes.

Q.   And he was there for approximately six months, you said.  Correct?

A.   Yes.

Q.   And he started in roughly May of 2025?

A.   Correct.

Q.   Okay.  And he was also appointed by Secretary Noem.

A.   Yes.

Q.   Also removable by Secretary Noem.

A.   Yes.

Q.   Okay.  And Mr. Richardson started right at the start of the 2025 hurricane season.  Correct?

A.   Maybe a month before.

Q.   Okay.  But roughly around that time.

A.   Correct.

Q.   Is it fair to say that hurricane season can be a significant time period for FEMA?

A.   Yes.

Q.   Okay.  For disaster relief and recovery.

A.   Yes.

Q.   Okay.  And when does it run?

A.   Hurricane season officially begins June 1st, and I believe it runs through November -- I'm not sure of the date.

Q.   Roughly the same time period that Mr. Richardson was in the position of SOPDA.

A.   Yes.

Q.   He left roughly at the end of -- sometime around the end of November?

A.   Correct.

Q. And do you have any understanding of any connection between the end of hurricane season and Mr. Richardson leaving?

A. I do not.

Q. Okay. Do you know why Mr. Richardson left?

A. I don't.

Q. Okay. Were you privy to any conversations with DHS leadership about Mr. Richardson leaving?

A. No.

Q. Mr. Richardson was replaced by SOPDA Evans in, I believe -- well, Mr. Richardson was replaced by SOPDA Evans on December 1st. Correct?

A. Correct.

Q. Okay. She was also appointed by the DHS secretary.

A. Yes.

Q. Also Kristi Noem.

A. Yes.

Q. Also removable by the DHS secretary.

A. Yes.

Q. And you understand that she reported to the DHS secretary.

A. Yes.

Q. Okay. But she -- Ms. Evans had already

Page 40

been installed at FEMA since earlier in 2025. Correct?

A.  Correct.

Q.  She came in as a senior advisor to the SOPDA in May.  Does that sound right?

A.  She did come in, in the position.  I'm not clear on the time frame.

Q.  Let's go back in time, if we can, to roughly that period where there was a transition between SOPDA Hamilton and SOPDA Richardson.

Can you put me -- do you have any understanding of when Ms. Evans came to FEMA in that time -- timeline?

A.  I don't recall.

Q.  If it was before or after Mr. Richardson.

A.  She was there during Mr. Richardson's tenure.  I don't remember exactly when she came over.

Q.  Okay.  And at some point, Ms. Evans became the chief of staff of FEMA roughly around the end of September?

A.  Correct.

Q.  Okay.  And so, you were working with Ms. Evans prior to her becoming SOPDA.

A.  Yes.

Q.   Okay.  And I believe you mentioned, as CHCO, that you were familiar with some of the President's executive orders that pertain to human capital?

A.   Yes.

Q.   And particularly, President Trump's executive orders that pertain to workforce reduction?

A.   Yes.

Q.   When Ms. Evans was brought over to FEMA by DHS leadership, were you familiar with her role in the downsizing of CISA?

A.   No.

Q.   Okay.  Did you have any understanding of the work that she performed at CISA?

A.   No.

Q.   Did you ever talk to anyone about that?

A.   No.

Q.   Focusing on the summer time period, did you ever hear anyone in DHS leadership express anything regarding using Ms. Evans to reduce the size of FEMA?

A.   No.

Q.   Did you ever hear Ms. Evans referred to as "The Terminator"?

A.   Yes.

Q.   In what context?

A.   In the news.

Q.   By anyone at FEMA?

A.   No.

Q.   Okay.  Was it surprising to you to hear her referred to that way?

A.   No.

Q.   Why not?

A.   I would say, she is a no-nonsense leader.

Q.   Any other reason?

A.   No.

Q.   "Terminator" refers to eliminating things, doesn't it?

A.   It can.

Q.   Did you see Ms. Evans as prioritizing eliminating things at FEMA?

A.   No.

Q.   Did you ever hear her referred to as "The Enforcer"?

A.   No.

Q.   Okay.  When Ms. Evans was the chief of staff, did you participate in regular meetings with her?

A.   Yes.

Q.   Could you -- so that's roughly the Septem-~-- so let me clarify, because I believe she technically still holds the position of chief of staff.  Is that correct?

A.   That's correct.

Q.   So I'm going to say when she was only chief of staff.

So by that, I'm going to mean the time period of, roughly, the end of September through the end of November.  Okay?

A.   Okay.

Q.   So when Ms. Evans was only the chief of staff, did you participate in regular meetings with her?

A.   Yes.

Q.   And can you describe what those regular meetings were?

A.   I had weekly and biweekly meetings with Ms. Evans surrounding human capital topics.

Those would be, who needed to be detailed to centralized positions.  Those would be GS-15 positions and SES positions, because those required secretary approval.

So FEMA had a significant amount of turnover, and there were a lot of people acting in

Page 44

senior leadership positions.  That's what our weekly meetings surrounded.

And then I would meet with her once a month to provide information on terminations for the previous month and a list of employees on administrative leave.

Q.   Starting with the -- you said, weekly and biweekly on human capital topics.

A.   Yes.

Q.   Did those meetings have names?

A.   I believe the first meeting is the GS-15 and SES meeting.

Q.   And what is the second?

A.   I don't recall what the second meeting title is.

Q.   So there are calendar notifications for these -- or calendar reservations for these meetings that use those titles?

A.   Correct.

Q.   Okay.  Do you use Outlook?

A.   Yes.

Q.   And -- sorry, just make sure I understand -- the GS-15/SES meeting, was that on a particular day?

A.   I believe it's usually on a Thursday.

Q.   And is that one also biweekly?

A.   It fluctuated, depending on the amount of work.  So it could be weekly.  It could be biweekly.

Q.   Okay.  And then --

That's the meeting that you were referring to as being weekly or biweekly?

A.   Correct.

Q.   And then, you said once a month there were -- there was a meeting about terminations and leaves?

A.   Correct.

Q.   And was that regularly scheduled?

A.   It's not on a particular day.

Q.   But there should be calendar entries for that as well?

A.   Correct.

Q.   Who else participated in the GS-15/SES meeting?

A.   That was usually just with me.

And then when my supervisor came on board, Ms. Shila Cooch, she began to join the meetings as well.

Q.   And when was that?

A.   She came on board January 12, 2026.

Q.   Okay.  So in 2025 -- we're focused on the

Page 46

period -- so I'm going to focus on the period when Ms. Evans was only the chief of staff.

A. Okay.

Q. So were these weekly and biweekly meetings that you were having that you've just described -- did those also occur during that September to end of November time period?

A. Yes.

Q. Okay. And there was -- then they contin-~-- they carried on after she became the SOPDA?

A. Correct.

Q. Okay. And same for the monthly meetings regarding terminations?

A. Correct.

Q. Who participated in the monthly meetings regarding terminations?

A. Myself; someone from the Office of Chief Counsel; and usually Jessica Samuel, who is the acting director for the Office of Professional Responsibility.

Q. Other than these regularly scheduled meetings during the time period that Ms. Evans was only the chief of staff, did you have other meetings with Ms. Evans?

A.   Not regular meetings.

Q.   But occasional?

A.   She might need something on an impromptu basis, yes.

Q.   And did you ever participate in regular meetings that Ms. Evans was having with others?

A.   Not regularly.

Q.   But on occasion?

A.   Yes.

Q.   And can you tell me, in that time frame when she was chief of staff, what type of meetings you occasionally participated in with Ms. Evans?

A.   It would be a senior leadership meeting.

Q.   What is the "senior leadership meeting"?

A.   Where the associate administrators and front office leadership, which would be Ms. Evans, meet for mission purposes.

Q.   Front office of FEMA?

A.   Yes.

Q.   Okay.  Is that also sometimes called the "OA"?

A.   Yes.

Q.   So, "Office of the Administrator"?

A.   Yes.

Q.   And did -- in this time frame, September

to end of November of 2025, did anyone from DHS ever participate in those senior leadership meetings?

A.   Not that I was in.

Q.   Are you aware that there were participants from DHS in those meetings at times?

A.   No, I am not.

Q.   Were there any meetings that you participated in with Ms. Evans where there were representatives of DHS there -- in that time frame?

A.   Yes.

Q.   Could you explain to me what those were.

A.   It -- I believe Kara Voorhies worked with DHS, and she would sporadically be in some of the meetings that I attended with Ms. Evans.

Q.   Can you remember what types of meetings?

A.   GS-15 or the termination meetings.

Q.   And Kara Voorhies was a senior advisor to the secretary of Homeland Security?

A.   Yes.

Q.   Were you aware at the time of whether she was an employee or a contractor?

A.   I was not.

Q.   Did you ever talk to her about that?

A.   No.

Q.   What was your understanding of why she was

there?

A.   I understood her to be a liaison between FEMA and DHS.

Q.   Did you have any understanding of who directed her to be at those meetings?

A.   No.

Q.   Did you ever hear her reference communicating with other DHS leadership?

A.   No.

Q.   Did she talk much at those meetings?

A.   No.

Q.   Did you -- did she ever talk?

A.   Rarely.

Q.   Okay.  Do you recall anything in particular that Ms. Voorhies said at any of these GS-15/SES or termination meetings in the time period of September through the end of November?

A.   Nothing specific.

Q.   You understood -- I think you said you understood her to be a liaison?

A.   Correct.

Q.   What does that mean to you?

A.   Sharing information between entities.

Q.   Did anyone else from DHS, the DHS front office, ever participate in any of the meetings that

you've described from the end of September through the end of November?

A.   Not when I was present.

Q.   Okay.  So deputy chief of staff Joseph Guy, you're familiar with him?

A.   Yes.

Q.   So "DCOS Guy" -- if I say that, you'll understand who I'm talking about?

A.   I do.

Q.   Is that what you call him?

A.   Yes.

Q.   Okay.  So DCOS Guy, was he ever present in any meeting that you were in before the end of November?

A.   No.

Q.   Okay.  Had you ever met him?

A.   No.

Q.   Okay.  But you knew who he was?

A.   Yes.

Q.   Okay.  What was your understanding of his role with respect to FEMA?

A.   I understood that he did site visits in the regions to assess readiness for disasters.

Q.   DCOS Guy did site visits to assess readiness for disasters?

Page 51

A.   That is my understanding.

Q.   Do you have any understanding of why he was doing that?

A.   I do not.

Q.   Do you have any understanding of his qualification to do that?

A.   No.

Q.   Do you believe that DCOS Guy had any qualification to do that?

A.   I don't know.

Q.   No one ever explained to you that he was qualified to do that, correct?

A.   No.

Q.   Okay.  What about Ms. Voorhies; did you have any understanding of her qualifications to be involved with FEMA?

A.   No.

Q.   Okay.  Do you know what her background was?

A.   No.

Q.   Okay.  Do you have any understanding of the nature of her contract with DHS?

A.   No.

Q.   You came to understand that she's a government contractor, correct?

A.    Yes.

Q.    Okay.  Was that a surprise to you?

A.    No.

Q.    Why not?

A.    At some point -- it would have been in the third or fourth quarter of fiscal year 2025 -- I was asked to see if she was on my payroll.

Q.    The third or fourth quarter of fiscal 2025 -- who asked you, during that time frame, to see if Ms. Voorhies was on your payroll?

A.    Roland Edwards.

Q.    Was that by email?

A.    It may have been a Microsoft Teams call.

Q.    What else do you remember about that conversation with Mr. Edwards?

A.    I told him I would check.

Q.    Anything else?

A.    That was it.

Q.    Did he tell you why he was asking?

A.    He did not.

Q.    Did you have any understanding as to why he was asking?

A.    Yes.

Q.    And what was that understanding?

A.    Mr. Edwards wanted to know how she was

being paid and if FEMA was paying her.

Q. Did he express any concerns?

A. No.

Q. Did you have any concerns?

A. No.

Q. Did you investigate?

A. Yes.

Q. And what was the answer?

A. She was not on my payroll.

Q. Did you have any other communications with anyone from DHS, other than Mr. Edwards, regarding Ms. Voorhies?

A. No.

Q. What about Ms. Evans; did you ever talk to Ms. Evans about Ms. Voorhies?

A. No.

Q. Did Ms. Evans know that Mr. Edwards was asking whether Ms. Voorhies was on the FEMA payroll?

A. I don't know.

Q. She wasn't on that Teams call?

A. No.

Q. That was a Teams call between you and Mr. Edwards?

A. Correct.

Q. Okay. In this -- and you said quarter --

Page 54

third or fourth quarter of fiscal year 2025?

A.    Correct.

Q.    That is prior to October 1, 2025, correct?

A.    Correct.

Q.    Okay.  So this would have been sometime over the summer?

A.    Late -- late spring, early -- or summertime, yes.

Q.    And at that time, you had already begun to interact with Ms. Voorhies?

A.    Yes.

Q.    When did Ms. Voorhies first appear to be working with FEMA?

A.    Oh, I would estimate the third quarter of fiscal year 2025, which would be between April and June.

Q.    Okay.  Thank you for those of us who don't operate in the fiscal year --

(Simultaneous speaking.)

A.    No worries.  I saw you trying to calculate -- so, no problem clarifying.

Q.    I've got to work on my poker face -- you can see the wheels turning.

Okay.  So between April and June of 2025, thank you.

Page 55

And what -- what interactions were you -- did you have in roughly this time frame with -- what was the nature of your interactions with Ms. Voorhies during this time?

A.   My first interaction with her was over a Teams call.

And I don't remember the other gentleman on the call.  He was a staffer on the FEMA council.

And the nature of the call was about FEMA positions and performance management.

Q.   The "FEMA council," you're referring to the review council that was established by presidential executive order in 2025?

A.   Correct.

Q.   To evaluate the FEMA bureaucracy, among other things?

A.   Correct.

Q.   And you understood that the purpose of that council was to look at whether FEMA should become a smaller organization?

A.   That --

Q.   Among other things.

A.   Oh, yes.

Q.   Tell me what you remember about that call on which Ms. Voorhies participated.

A.   The purpose of that call was for me to share mission critical occupations and what -- what the performance of those duties were and how performance was evaluated.

Q.   And did you, at the time, have any understanding of who Ms. Voorhies was or why she was participating in that call?

A.   I did not.

Q.   You didn't ask?

A.   No.

Q.   Were you directed to participate in that call?

A.   I was sent a calendar invitation.

Q.   And generally, when the -- someone from DHS directs you to participate in a call, you participate in the call?

A.   I was invited, yes.

Q.   Okay.  Did you have any other meetings or communications about the FEMA Review Council between May and November of 2025?

A.   No.

Q.   Did you attend any of the FEMA Review Council meetings?

A.   No.

Q.   Did you read about them?

A. Yes.

Q. Okay. So you were aware that DHS Secretary Noem was talking about eliminating FEMA as it exists today at those meetings?

A. Yes.

Q. Okay. Those are statements that you had seen reported in the press.

A. Correct.

Q. Had you ever heard, directly, Secretary Noem make a statement like that?

A. No.

Q. Between -- have you ever been in a meeting with Secretary Noem?

A. No.

Q. Have you ever been in a Teams or video call with Secretary Noem?

A. No.

Q. Okay. Have you ever been in a Signal chat with Secretary Noem?

A. No.

Q. Okay. Going -- I think we've covered the regular meetings and occasional meetings that you had from the time frame while Ms. Evans was only this -- the chief of staff.

Let's move to after she became the SOPDA.

A.   Okay.

Q.   And you said that the GS-15 and SES meetings continued, as well as the monthly terminat- -- I'll call them "termination meetings."

Is that correct?

A.   That's correct.

Q.   Were there other regular meetings that you were having with Ms. Evans after December 1?

A.   No.

Q.   Were there other meetings that you participated in that Ms. Evans was having with others?

A.   Occasionally.

Q.   And what type of meetings were those?

A.   Will you state the time frame again, please.

Q.   After December 1.

A.   After December 1?  Yes, I did participate in some meetings regarding the renewal of CORE employees.

Q.   And who participated in those meetings that you're referring to -- generally?

A.   Myself; Stephanie Dobitsch, who was the acting associate administrator for Mission Support; Tami Franklin, who was the deputy associate

administrator for Mission Support.

Q.   Anyone else?

A.   Those were generally the main people.
Maybe some staffers from Ms. Evans' staff.

Q.   And from the Office of the Administrator?

A.   Correct.

Q.   And did you ever participate, after
December 1st, in any meetings at which any
representatives of DHS were present?

A.   No.

Q.   What about Ms. Voorhies?

A.   She may have been present, but I don't
recall specifically.

Q.   What about DCOS Guy?

A.   Never been in a meeting with him.

Q.   In person or by Zoom?

A.   Correct.

Q.   What about a telephone call with DCOS Guy?

A.   No.

Q.   What about a telephone call with
Ms. Voorhies?

A.   No.

Q.   Okay.  Have you ever been in a meeting
with DHS Management Directorate Chief of Staff
McGill?

Page 60

A.   Yes.

Q.   In what context?

A.   The first meeting we were in was probably in July of 2025, and it was about Management Directed Reassignments.

Q.   "MDRs"?

A.   Yes.

Q.   Sorry, you said July of 2025?

A.   I believe that was the time frame.

Q.   Specific to FEMA or just as a general...?

A.   Specific to FEMA.

Q.   Any other meetings with Mr. McGill?

A.   No other meetings.

Q.   We'll come back to that.

     Have you ever been in a meeting with DHS Chief Advisor Corey Lewandowski?

A.   No.

Q.   Have you ever met him?

A.   No.

Q.   Zoom call?

A.   No.

Q.   Telephone call?

A.   No.

Q.   Signal chat?

A.   No.

Q.   What about....

He's one of the "chief of staffs."

Do you know who Troup Hemenway is?

A.   I know the name.

Q.   And he's some form of chief of staff in the Office of the Secretary?

A.   Yes.

Q.   And have you ever been in a meeting with Troup Hemenway?

A.   No.

Q.   Okay.  Have you ever communicated with Troup Hemenway in any way?

A.   I believe some emails were shared.

Q.   But no telephone calls, Zoom calls, Signal chats with Troup Hemenway?

A.   No.

                    (Pause.)

Q.   Okay.  Just -- I was just doing a time check.

We will take a break roughly around 10 a.m.  So --

A.   Okay.

Q.   -- sort of every hour, to give the court reporter and videographer a break and all of us a little break -- so, just to give you a heads-up.

Let's see...does Ms. Evans have something called a "principals meeting"?

A.   I believe so.

Q.   Do you know what that is?

A.   I understand all of the principal executives attend that meeting.

Q.   What is -- what do -- what do you mean by "principal executives"?

A.   So, associate administrators and regional administrators.

Q.   And within FEMA, how many associate administrators are there?

A.   Without looking at the org chart, I would say ten to twelve.

Q.   I've asked you about regular meetings with Ms. Evans.

I don't believe I've asked you about regular meetings with other individuals in the Office of the Administrator.

Did you ever have any of those?

A.   What time frame?

Q.   At any point -- let's just put it end of September to the present.

A.   No.

Q.   And what about with your own staff?

Page 63

Since -- and we can keep it since December 1, 2025.

A. Do I have meetings with my own staff?

Q. Um-hum?

A. Yes, I do.

Q. What kind of regular meetings do you have?

A. I have a weekly call with my deputies and division directors, I believe, each Tuesday.

I have a monthly call with all supervisors.

And then, I have a biweekly call with the two deputies.

And I also have a biweekly one-on-one with the deputies. So if the group meeting is Week 1, Week 2 I meet with them one on one.

Q. Okay. That's a lot of meetings.

A. We have a lot of work.

Q. Understood.

The supervisors call, what do you -- who participates in that?

A. The one that I have monthly?

Q. Yes.

A. Every supervisory employee within the Office of the Chief Human Capital Officer.

Q. So supervisors within OCHCO, not within

Page 64

all of FEMA.

A.    Correct.

Q.    Who were your -- from December 1 to the present, can you give me a summary of who has performed the role of your deputies?

A.    From December 1st to present, my deputy of operations has been two people.

The first was Blanca Sanchez, and Ms. Sanchez was in that role from December to mid-January.

Mid-January to present is Ms. Tonneisha Peterson.

Q.    Blanca Sanchez left in mid-January?

A.    Correct.

Q.    Do you know where she -- is she still employed by the federal government?

A.    Yes.

Q.    Where?

A.    At DHS...somewhere in DHS.  I don't recall the exact office.

Q.    Was she transferred?

A.    Yes.

Q.    Was it an MDR?

A.    No.

Q.    Was it at her request?

Page 65

A.   No.

Q.   Was it....

Do you have an understanding that Ms. Evans asked for her to be transferred?

A.   Yes.

Q.   Do you understand why?

A.   Yes.

Q.   Can you tell me?

A.   Ms. Evans was not pleased with Ms. Sanchez's performance.

Q.   Specifically as it pertains to CORE employees?

A.   Correct.

Q.   Can you tell me why?

A.   Yes.

FEMA's delegation to reappoint CORE employees expired on December 31, 2025.  And in January 2026, FEMA had roughly 300 CORE employees with expiring appointments.

Q.   Um-hum.

A.   And Ms. Evans was not pleased with the way documentation was provided to her the first week of January.

Q.   Did you agree with Ms. Evans' request to transfer Ms. Sanchez?

Page 66

A.    I wouldn't say I agree.

Ms. Evans is the head of the agency.  And when she asks me to do something legal, I do it.

Q.    Did you -- understood.

But my question was whether -- would you have transferred Ms. Sanchez at that point in time?

A.    No.

Q.    Did you agree with Ms. Evans' assessment of Ms. Sanchez' performance?

A.    Yes.

Q.    Okay.  We'll come back to that.

Let's talk about the CORE.

A.    Okay.

Q.    What is the "CORE"?

A.    "Cadre of On-Call Response and Recovery Employee."

Q.    And what duties do CORE employees perform for FEMA?

A.    CORE employees provide a myriad of services in all of our mission critical, mission enabling, and mission support functions.

And they are term employees generally hired for a term of two years.

Q.    So you just referred to three categories: mission critical, mission enabling, and mission

support.

Are those terms you use within FEMA to organize some of the functions that FEMA performs?

A.   Yes.

Q.   Can you describe, at a high level, each of those?

We'll start with "Mission" -- "Mission Critical."

A.   Okay.  A "Mission Critical" occupation is something that is critical to the service of the agency that you cannot perform without.

Some of them are determined by FEMA, some are determined by DHS, others are determined by the Office of Personnel Management.

And for the purpose of this deposition, the main mission critical occupation in FEMA is the 0089 Emergency Manager Series.

Q.   And -- does that series include the mission -- Emergency Management Specialists?

A.   It does.

Q.   Okay.  And you said some of those are -- mission critical occupations have been determined by OPM.

Have some of those determinations been made since January of 2025?

A.    Yes.

Q.    So this administration has given direction to agencies about what mission critical occupations are?

A.    There have been some occupations added to the list.

Q.    Have there been occupations removed from the list by OPM?

A.    Not to my knowledge.

Q.    Okay.  What about DHS; DHS has directed FEMA which occupations are mission critical?

A.    Some.

Q.    And some were preexisting designations from prior to 2025.  Correct?

A.    Correct.

Q.    And those had been done by FEMA?

A.    FEMA, DHS, and OPM.

Q.    Okay.  What -- there are -- there are mission critical occupations at FEMA, other than the Emergency Management Specialists.  Correct?

A.    Correct.

Q.    Okay.  "Mission Enabling," what is that?

A.    "Mission Enabling" is a term to use -- or a term that classifies positions that support the emergency manner -- managers.

Page 69

So an example would be logisticians, because they need to preposition supplies during hurricanes, storms, fires, things of that nature.

You have telecommunications specialists. You have mechanics and engineers that are running generators. You also have public affairs folks.

So those are examples of mission enabling series.

Q.   And what about "Mission Support"?

A.   You would look at those as some of your management and program analysts that do data analytics.

An example would be:  In the call centers, if there's a fire and people are asking for individual assistance, we'll look at the call center data and see what the average time for someone to pick up the phone is, what's -- what the average time of a call is, and make sure that center is staffed appropriately to serve the needs of the people.

Q.   And these categories correspond to occupation codes.  Is that right?

A.   Correct.

Q.   And is every position at FEMA categorized according to one of -- an occupation code that falls

within one of these three categories?

A.   Yes.

Q.   Is there a list somewhere?

A.   I can provide a list.

Q.   Okay.  So a list exists?

A.   Yes.

(Pause.)

Q.   Is it...okay, good.  I'm -- I try to keep track in my head of the time, but....

So going back to the CORE, approximately how many CORE employees did FEMA employ as of the end of 2025?

A.   I would say 18,000, give or take.

Q.   Are you including reservists?

A.   I am.

Q.   Okay.  So when I'm -- I'm going to distinguish between CORE and reservists --

A.   Okay.

Q.   -- even though they're both under the Stafford Act.

Do you include reservists in CORE when you total the numbers, usually?

A.   I do, or I can break them out.

Q.   Okay.  Let's break them out, for purposes of this deposition.

A.    Okay.

Q.    But tell me why you include them in the CORE numbers.

A.    Because all of those employees are paid -- they're Stafford Act employees -- paid out of the Disaster Relief Fund.

Q.    So both CORE -- meaning, the Cadre of On-Call...

A.    Yes.

...Response and Recovery Employees, yes.

Q.    -- and the reservists --

Can you just explain, generally, the difference between those?

A.    Of course.

A CORE employee is a term employee hired for a term usually of two years, and they are a full-time employee in 99 cases out of 100.

A reservist employee is also hired for a term of two years, but they are hired on an intermittent basis.

They are required to be available at least 120 days a year, and that availability corresponds to presidentially declared disasters, where they would then deploy to the site of the disaster and provide individual and public assistance.

Page 72

Q.   And the reservists also have -- are term employees.   Correct?

A.   They are intermittent.

Q.   Intermittent, but they have a end date to their appointments?

A.   They do.

Q.   And are all the reservists at FEMA -- do they all have the same upcoming NTE date in May of 2026?

A.   Yes.

Q.   Okay.   Going back to the CORE, I believe you said there were 18,000 Stafford Act employees.

Do you know how many -- roughly, how many CORE employees there were at the end of 2025 at FEMA?

A.   11,000.

Q.   Okay.   Do you know how many CORE employees there were, roughly, at the beginning of 2025 at FEMA?

A.   I don't.

Q.   Okay.   Is it your understanding that FEMA has fewer employees now than it did at the beginning of 2025?

A.   Yes.

Q.   Okay.   Do you know, roughly, the overall

Page 73

number of employees FEMA had at the beginning of 2025?

A.   Yes.

Q.   What was it?

A.   26,000.

Q.   Okay.  And roughly, the -- I believe you said there are roughly 21,000 employees now?

A.   That is as of April 2026.

Q.   Is it fair to say that the procedures with respect to CORE appointments and renewals changed after the Trump Administration began in 2025?

A.   Yes.

Q.   Okay.  Let's foc- -- I'm going to focus just on what the practice was prior to the current administration.

Which FEMA supervisors were generally involved in the creation of a new CORE position prior to 2025?

A.   So those would be program and regional executives.

Q.   And what does the term "supervisor of record" mean in this context?

A.   That is a first-level supervisor, a direct supervisor.

Q.   And the program and regional supervisors

are above -- above those individuals.

A.   Correct.

Q.   Okay.  So the approval for the creation of a new CORE position would go through whoever the head of the program or the region is?

A.   That's correct.

Q.   Okay.  And what -- generally, what was FEMA's practice and procedure for assessing the information needed in order to create a CORE position?

A.   The program and regional executive would liaise with my workforce management team and show the need for the position.  So there has to be 80 hours' worth of work to complete.

And you need to show that, with your current staff, your workload exceeds the ability of your current staff.

Q.   And, presumably, that the functions that they were needed for fall within the mission of that particular component?

A.   Correct.

Q.   Okay.  What documentation was used, prior to 2025, with respect to CORE appointments?

A.   To -- are we speaking about establishing a new CORE?

Q.   Yes.

A.   So again, that would go through the workforce management team once the need was assessed.

There is a requirement to build a new position.  And in order to do that, you would need a classified position description, performance standards and, most of all, funding.

So that is where we would liaise with the Office of the Chief Financial Officer to say, Hey, they need this position, do we have the money to pay for it?

Q.   And that is for the creation of a new position.

What about filling a position if someone leaves?

A.   The same -- a similar process exists to backfill:  There has to be enough work and money to fill the position.

Q.   And what about the approvals for hiring into what you called "backfilled positions"?

A.   That is at the program and regional executives' level.

MS. LEONARD:  Okay.  And I'm going to ask you some questions about the

CORE manual.  But I think it's a good time to take a break.

And -- ten minutes? five minutes?  It's really your preference.

WITNESS:  I don't need one, so five minutes is good.

MS. LEONARD:  Okay.  That's good.  Yeah, okay -- five minutes is great.  We'll come back.

VIDEOGRAPHER:  Off the record at 10:00.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 10:07.

BY MS. LEONARD:

Q.  Okay.  Welcome back, Ms. Prieur.

You're familiar with something called the "CORE manual"?

A.  Yes.

Q.  Okay.  And can you tell me what that is?

A.  It is the manual that governs COREs' appointments, reappointments, and how they are managed within FEMA.

MS. LEONARD:  Okay.  We're going to mark this as Exhibit 72.

Page 77

And I will represent to you that this is the version of the CORE manual that Defendants filed in court.  And you can see that by the stamp across the top of the page, which is what we call an "ECF," electronic filing system stamp, which is where that came from.

(Whereupon, Plaintiffs Exhibit 72 was marked for identification.)

Q.   You have it in front of you?

A.   Yes.

Q.   Could you turn to page -- Section 2-2. It's on Page 25.

This is a document, Ms. Prieur, that you're familiar with at -- in your role as FEMA CHCO.  Correct?

A.   Yes.

Q.   Is your office responsible for creating this document?

A.   Yes.

Q.   Okay.  If you look to -- Section 2.2 is called what?

A.   "Staffing Plans."

Q.   And under Section 2.2, it says that:

The offices and

Page 78

directorates authorized to fill

CORE positions will conduct

workload analyses every three

years, or earlier, if needed.

Do you see that?

A. Yes.

Q. So the -- who are the "offices" and "directorates" referred to here?

A. Those are program and regional office administrators.

Q. Okay. And could you describe the workload analyses referred to here -- generally?

A. Sure.

So offices are responsible for looking at the work they have in the field. They would look at their ongoing work with response, recovery, mitigation -- things of that nature.

Also, if they have an exorbitant number of disasters, you may need to "plus-up" your staff. If you have closed disasters, you may need to pare down your staff.

Q. Does the -- does your office have any role with respect to these staffing plans created by the programs and regions?

A. Yes.

Page 79

Q.   And what is that?

A.   The Work- -- Workforce Analysis Team serves as a consultant and a liaison with each office.

Once the offices complete their staffing plans, then my team takes a look at it to make sure it's valid and justified.

Q.   Is this a -- this a practice at FEMA that happens annually?

A.   I can't say.

Q.   Okay.  When was....

Are the documents that are generated, are they called -- do they have a particular name?

A.   They would be "workforce staffing plans."

Q.   And are those maintained by your office?

A.   Yes.

Q.   So you should have copies of the final workforce staffing plans for all the programs and regions?

A.   Correct.

Q.   Okay.  Going back in time, presumably?

A.   We should.

Q.   And let's say as of the end of the last presidential administration -- so, coming -- you know, at the end of 2024 -- do you have any

understanding of the last time that a workforce staffing plan was created by the programs or regions?

MR. ROSENBERG: Objection; form.

Q. Go ahead.

A. For some offices.

Q. And is it on a particular time frame?

(Simultaneous speaking.)

Q. Sorry, that's a terrible question.

Was there a particular deadline given for the programs and offices to complete these plans?

A. This is during the Biden Administration?

Q. Yes.

A. For one office, yes.

But I came on in October of 2024, so I'm not able to speak to what occurred prior to that.

Q. Okay. And then going into 2025, have any of the programs or regions created the "workload analysis" referenced here in the CORE manual in 2025?

A. Not in 2025.

Q. So that practice was suspended in 2025?

MR. ROSENBERG: Objection; foundation.

A. I wouldn't say it was suspended.

Page 81

There were some significant changes going on with DOGE and workforce reshaping.

Q. And could you tell me what you mean by that?

A. There were contracts that -- well, the Department of Government Efficiency came in to FEMA and conducted some analyses and determined some contracts to be extraneous.

Q. And how did that affect the workload analysis?

A. I can tell you how it affected it within my office.

Q. Were positions eliminated as a result of the DOGE activity?

A. Not full-time positions, not CORE positions.

Q. But other positions?

A. Yes.

Q. And one of the things that DOGE worked on was something called the "Fork in the Road."

Is that right?

A. Yes.

Q. And were there positions lost at FEMA as a result of the "Fork in the Road"?

A. Yes.

Page 82

Q.   We'll come to this later, but there were other staffing planning exercises that were being conducted during 2025 at FEMA, correct?

A.   Correct.

Q.   But you view those as distinct from the regular workload analysis referred to here in the CORE manual?

A.   I was not present to establish the regular flow, because I started in October of 2024.

The workflow analysis that was completed in 2025 was a result of executive orders.

Q.   I believe you -- this "workforce analysis" referred to in the CORE manual is -- is talking about the workforce analysis that is linked to the justifications for the CORE positions.

Is that correct?

(Witness reading.)

A.   I'm just going to unclip this.

Q.   Sure.  That wasn't exactly the best question, but I'm just getting at the idea that the -- the programs and regions were generally supposed to be using the workforce analysis to help justify the creation of new CORE positions. Correct?

A.   That's correct.

Q.   Prior to 2025, is it your -- even though you were there, you know, just at the end of 2024, was it your understanding, generally, that FEMA was following the procedures in the CORE manual with respect to the appointments of COREs?

A.   Yes.

Q.   And those procedures do not include any FEMA administrator involvement in the decision to create CORE positions.  Correct?

A.   Not to my knowledge.

Q.   And those procedures don't include any involvement by anyone at DHS in the creation of CORE positions.  Correct?

A.   Not to my knowledge.

Q.   Okay.  And you are familiar with the procedures in the CORE manual, correct?

A.   Yes.

Q.   Okay.  The procedures, prior to '25, did not -- 2025 -- did not require FEMA to seek approval from the DHS secretary in order to hire a CORE employee, correct?

A.   Correct.

Q.   And those procedures also did not involve anyone from the DHS OCHCO?

A.   What are you meaning?

Page 84

Q. So in hiring a CORE employee, FEMA had the authority to do that without the involvement of anyone from the DHS OCHCO. Correct?

A. Oh, yes.

Q. Or anyone from the DHS Management Directorate. Correct?

A. Correct.

Q. Or anyone from the DHS Office of the Secretary. Correct?

A. That's correct.

Q. Okay. And prior to 2025, there were standard lengths of the terms to which CORE positions were appointed. Is that right?

A. Yes.

Q. Okay. And what were those?

A. Generally, two years.

Q. And when you say "generally," were there exceptions?

A. Yes.

Q. And what were those exceptions?

A. Some were up to four years.

Q. And were you aware of any term appointments that were less than two years?

A. Not to my knowledge.

Q. Okay. Now let's talk about renewal of

Page 85

CORE positions prior to 2025.

Could you please describe the general procedures that were used by FEMA, prior to 2025, to renew a CORE position?

A.   Yes.   The HR liaison assigned to a program or regional office was responsible for communicating with their leadership.

And I'll back up.

My staff would share a report and say, These are the COREs that will be expiring, let us know if you'll be renewing or releasing.

The HR liaison was then responsible on site, at that program or regional office, for sharing that information with leadership and liaising with leadership to make a decision on renewal or release.

If the renewal was approved, that would then be communicated to my staff electronically through FedHR, which is our HR system of record and processing for renewal.

And if the employee was to be released, it would also be communicated in FedHR to release that individual.

Q.   Prior to 2025, what's your understanding of how frequently CORE employees were released?

Page 86

A.   I'm not sure.  I generally do not get that far in the weeds.

Q.   But your understanding is, routinely, that CORE employees were renewed?

A.   I would say a lot of CORE employees were renewed.

Q.   But there are likely statistics somewhere on that, correct?

A.   Correct.

Q.   Would those be maintained by your office?

A.   Yes.

Q.   What was the approval process for renewal?

A.   It was what I just stated -- that we would share the expiration date, and then it was up to program and regional leadership to decide if a renewal would occur.

They would also communicate to my office how long the renewal would be.

And once that was communicated in FedHR, as long as all of the documentation was present my processing team would process a renewal action with a new Not To Exceed date.

Q.   And would -- what form would that be recorded on?

A.   On a Standard Form 52.

Page 87

Q. And how far in advance of the NTE dates was it the practice of the HR liaisons to give the leadership information about the upcoming NTE dates?

A. Generally, 60 days.

Q. And was there a practice -- or a best practice, in terms of how far in advance of the NTE dates to make the decisions?

A. I would say the decisions were generally made within a 30-day time frame to communicate back to my staff.

Q. And the intention was to make these decisions in advance of the NTE date. Correct?

A. That's correct.

Q. And to communicate that to the employees.

A. Correct.

Q. So that they could plan their lives.

A. Yes.

Q. Okay. If you look at your CORE manual on Page 16....

Well, Subsection D, it says:

Headquarters office or directorate chiefs or regional administrators are responsible for:

1. Approving the

Page 88

reassignment of a CORE based on
workload needs.

Continue -- conducting the
workload analysis to justify
the need for new or continued
use.

And then if you -- do you see No. 5 there?

A.    Yes.

Q.    (Continued reading:)

Renewing CORE appointments
based on workload needs and
subject to funding.

That's your understanding of the basis
that CORE appointments were renewed on pursuant to
the CORE manual.  Correct?

A.    Correct.

Q.    So pursu- -- if there's available funding
and agency need.  Correct?

A.    Correct.

Q.    Okay.  And generally speaking, in your
experience, since 2024, the Disaster Relief Fund has
had sufficient funding to fund the CORE positions
that FEMA has created?

A.    Yes.

Q.    Okay.  So generally speaking, in your

experience, prior to 2025, the CORE renewals were being evaluated on the basis of agency need.

MR. ROSENBERG:  Objection; misleading.

Q.   Is that right?

A.   Will you restate the question for me?

Q.   Sure.  So generally speaking, prior to 2025, the CORE renewals were being evaluated on the basis of agency need.

A.   And funding.

Q.   But the -- as we just covered, the funding was generally there, correct?

A.   Correct.

Q.   And so, all of the CORE positions that were up for renewal in 2025...they were originally created as justified by agency need.  Right?

MR. ROSENBERG:  Objection; foundation.

A.   State the question again, please.

Q.   So there were some number of CORE renewals that were up for renewal in 2025 at FEMA, correct?

A.   Correct.

Q.   Do you know, roughly, how many were up for renewal in 2025? -- it's in the thousands, right?

A.   Yes.

Page 90

Q.   Okay.  At the time those were originally created, if the procedures in the CORE manual were followed they would have been justified by agency need.  Correct?

MR. ROSENBERG:  Objection; misleading.

A.   I would say, one -- in 2025, there were more than 1000, less than 2000, COREs that were up for renewal.

There was not a agency workforce plan that was conducted to justify the need of the current COREs or if we needed more or less.

Q.   For -- in 2025.

A.   Correct.

Q.   But your understanding -- well, we'll get to the various points in time during 2025 and the procedures that were followed.

Prior to 2025, the FEMA procedures for renewing COREs did not involve seeking the FEMA administrator's approval.  Correct?

A.   I'm not sure.  It could have.

Q.   Prior to 2025.

A.   Prior to 2025, it could have.

Q.   The procedures for renewal set forth in the CORE manual don't involve the FEMA administrator

Page 91

giving the final level of approval, correct?

A.   Correct.

Q.   Okay.  You're just not aware of whether any particular CORE appointment made it up for discussion that high.

A.   Correct.

Q.   Okay.  The procedures, prior to 2025, for renewing the COREs did not involve seeking DHS secretary approval, correct?

A.   Correct.

Q.   And the procedures for renewing COREs did not involve anyone from the Office of the Secretary.

A.   Correct.

Q.   Or the DHS OCHCO.

A.   Correct.

Q.   Or the DHS Management Directorate.

A.   That's correct.

Q.   Okay.  After DHS Secretary Noem was confirmed in 2025, did the procedures that apply to CORE renewals change?

A.   Not initially.

Q.   But at some point?

A.   Yes.

MS. LEONARD:  Okay.  I'm going to hand you what has been previously

Page 92

marked as Deposition Exhibit 38.

And I'm attempting, Mr. Rosenberg, to use the prior numbers.

We'll see if I pull it off.

MR. ROSENBERG:  That's an environmentally friendly way to do it, efficient way to do it.

(Whereupon, Plaintiffs Exhibit 38, previously marked, was introduced to the witness.)

MS. LEONARD:  But in the event that we mark an existing "deposition" from the prior depositions with a new number, we will reconcile it and deal with that at some point after these depositions.

BY MS. LEONARD:

Q.   Okay.  Ms. Prieur, the -- you've been handed what's been marked as Exhibit 38.

Do you recognize this document?

A.   I do.

Q.   So this is a January 20, 2025 memorandum from OPM and OMB to the heads of executive departments and agencies regarding the President's hiring freeze.  Correct?

A.   Correct.

Q.   Okay.  And do you recall when that hiring

freeze happened?

A.    Yes.

Q.    Okay.  And were you wondering whether it was going to apply to FEMA?

A.    Yes.

Q.    Okay.  If you look at Paragraph 3 -- it's titled "Mandatory Exemptions."  Do you see that?

A.    I do.

Q.    And you see that there are exemptions listed there, including positions related to immigration enforcement, national security, or public safety.  Do you see that?

A.    Yes.

Q.    And then, you see there are other exemptions under No. 4.

A.    Um-hum.

Q.    And 4m refers to "term and temporary appointments of existing federal employees that may be extended up to the maximum allowable time limit."  Do you see that?

A.    I do.

Q.    That category, "term and temporary appointments of existing federal employees," would include CORE renewals at FEMA, correct?

A.    Yes.

Q.   It would also include reservists, correct?

A.   Yes.

Q.   Okay.  Did you read this at the time?

A.   Yes.

Q.   And did you understand that CORE renewals were potentially not going to be covered by the hiring freeze?

A.   That was not my interpretation.

Q.   At the time, in January?

A.   That -- correct.

Q.   And why is that?

A.   My understanding was that CORE renewals were exempted from the hiring freeze based on the exemption listed in 4m because COREs are term employees.

Q.   And then, if -- did you have any understanding as to whether DHS was going to be exempted under the required mandatory exemptions?

A.   Yes.  At some date not long after this was issued, DHS provided guidance that the entire agency was exempt under the National Security clause.

MS. LEONARD:  Okay.  Let's mark this as what's previously been marked as Exhibit 39.

(Whereupon, Plaintiffs Exhibit 39,

Page 95

previously marked, was introduced to the witness.)

Q. You've been handed what's previously been marked as Exhibit 39. It's a January 21st email from Amanda Scales at OPM to Roland Edwards; Subject: Clarification on hiring freeze for DHS.

Have you seen this email before?

(Witness reading.)

A. Yes, I have.

Q. Okay. And what's your understanding of what Ms. Scales is communicating here?

A. My understanding is that DHS was exempt from the hiring freeze.

Q. Okay. And was that information communicated to you in, roughly, January of 2025?

A. Yes.

Q. By whom?

A. By either Roland or Mischell.

Q. Who's Mischell?

A. Mischell was Roland's Deputy Chief Human Capital Officer.

Q. And what....

Was it your intention at that point in time, therefore, to continue applying the procedures in the CORE manual to the renewal of CORE employees?

A. Yes.

Q.    And did that change at some point in time?

A.    Yes.

Q.    And did that change at DHS direction?

A.    Initially?  No.

Q.    And why do you say that?

A.    Because the instructions I received were from MaryAnn Tierney, who was the SOPDA at the time.

Q.    And what instructions were you given?

A.    Sometime in mid-May -- or excuse me, in mid-March 2025, I was given instructions to stop all hiring and onboarding of new employees, as well as CORE reappointments.

Q.    And were you -- did you understand that that was a direction that was being provided by DHS to FEMA?

A.    I'm not sure.

Q.    It could have been.

A.    It could have been.

        MS. LEONARD:  Okay.  Let's take a look at what's been marked as -- previously as Exhibit 40.

        (Whereupon, Plaintiffs Exhibit 40, previously marked, was introduced to the witness.)

Q.    Okay.  Ms. Prieur, you've been handed what's previously marked as Exhibit 40.  It's a

March 14, 2025 memorandum by DHS, the deputy under secretary of management to all component and office heads.

Are you familiar with this document?

A.   Yes.

Q.   Okay.  And what's your understanding of what this document is requiring?

A.   I'll need a second to refresh my memory.

Q.   Sure, sure.

(Witness reading.)

A.   Okay.  I think I'm good.

Q.   So you see under "Key Provisions," it says:

No hiring without prior approval.

A.   Yes.

Q.   And comparing this memorandum with the OPM email, did you understand that DHS had decided to apply the hiring freeze to DHS, notwithstanding the fact that OPM had given it an exemption?

A.   Yes.

Q.   Okay.  So you understood, as a result of this memo, that FEMA could not hire without seeking approval from the secretary of Homeland Security through this new procedure?

Page 98

A.    Unless it was in one of the excepted positions, that's correct.

Q.    Okay.  And the excepted positions are PMCOs and MCOs.

A.    Correct.

Q.    Okay.  And some of those apply to FEMA.

A.    Correct.

Q.    And those are listed on Attachment 1?

A.    Yes.

Q.    And under the priority mission critical occupations, that includes FEMA Emergency Management Specialists 0089.

A.    Correct.

Q.    So your understanding at the time, with respect to FEMA's authority to hire with respect to those positions, was what?

A.    Was permission was required, unless one of the series listed....

There was an exemption for the series listed.  If hiring was for another series, then the hiring verification process applied.

Q.    So FEMA no longer had the authority to hire for any position other than the PMCOs and MCOs. Correct?

A.    Unless S1 verification was provided,

that's correct.

Q. But FEMA, on its own, did not have that authority under these new procedures and directive from DHS. Correct?

A. That is correct.

Q. Okay. So prior to this directive, FEMA could hire for career positions, correct?

A. Yes.

Q. And prior to this directive, FEMA could hire for CORE positions.

A. That's correct.

Q. And prior to this directive from DHS, FEMA could hire for reservists.

A. Correct.

Q. And this March memorandum removed the authority from -- for FEMA itself to hire into those positions, other than the MCO and PMCO.

A. That's correct.

Q. That was a very significant development, wasn't it?

A. It was different.

Q. It was significant for FEMA, wasn't it?

A. Yes.

Q. Okay. Did you know at the time whether you were going to be getting any secretary approval

for any positions?

A.   I did not.

Q.   Were you worried?

A.   No.

Q.   Why not?

A.   Because a process was outlined to continue hiring.  The process was just different than what was established previously.

Q.   But you had heard Ms. Noem's comments at the -- as of March, that FEMA should be eliminated, hadn't you?

A.   Yes.

Q.   And you weren't concerned about the secretary of Homeland Security taking authority for approvals when this is a secretary that's saying FEMA should be eliminated?

A.   No.

Q.   Okay.  FEMA was required to implement the directives given to it in this March 14th memo, correct?

A.   Yes.

Q.   Okay.  And going forward, FEMA had to seek secretary-level approval for hiring even a single employee who is not MCO.

A.   Correct.

Q.   This was not the only authority that DHS leadership removed from FEMA in 2025.  Correct?

A.   What other authorities are you referring to?

Q.   Well, you're familiar with the authority to approve contracts of greater than $100,000, that's received a lot of attention?

MR. ROSENBERG:  Objection; vague.

A.   I am familiar, but that's not my subject matter area of expertise.

Q.   Sure.  But as a -- as the FEMA CHCO, you have general understanding of DHS leadership decisions that affect FEMA.

A.   Correct.

Q.   Okay.  So -- and you're familiar with Secretary Noem's policy of requiring secretary approval for contracts over $100,000, correct?

A.   Yes.

Q.   And that removed some of FEMA's authority, correct?

A.   Yes.

Q.   Okay.  And you generally understand that FEMA manages grant programs that provide significant amounts of money to local governments, states,

tribal governments.

A.   Correct.

Q.   And DHS leadership terminated certain grant programs in 2025.  Correct?

A.   I believe so.

I'm not familiar with specifics.

Q.   You are familiar with DHS leadership making individual personnel decisions for FEMA in 2025, correct?

A.   What do you mean, "individual personnel decisions"?

Q.   Are you aware of any personnel action that was directed by DHS leadership with respect to anyone employed by FEMA in 2025?

A.   Yes.

Q.   Can you tell me what you remember.

A.   With management-directed reassignments, those would generally come to my office from the DHS CHCO.

Q.   You're also familiar with certain administrative leave orders that were given with respect to FEMA employees by DHS?

A.   Yes.

Q.   Including individuals who signed something called the "Katrina" letter?

A.   Yes.

Q.   And when FEMA reinstated those individuals, the DHS leadership reversed that position in late November 2025.  Correct?

A.   That's correct.

Q.   Is there any other authority that you're aware of that DHS leadership has taken away from FEMA in 2025?

A.   Not specifically.

Q.   Okay.  The March 14th memo did not specifically say whether those procedures applied to renewals of term -- existing term employees.  Right?

A.   That's correct.

Q.   Okay.  And at some point, did you ask for clarification of whether these procedures would apply to CORE renewals?

A.   I did.

             MS. LEONARD:  Okay.  Let's look
        at what's been previously marked...I think
        this is previous Exhibit 41.
        (Whereupon, Plaintiffs Exhibit 41,
previously marked, was introduced to the witness.)

Q.   Exhibit 41 is a email exchange that you are involved in, from March of 2025.

             Take a look and let me know when you're

ready.

(Witness reading.)

A.   Okay.

Q.   Starting at the bottom of the chain, there appears to be an email from Roger Brown.

Who was -- well, he's listed right here as the Deputy CHCO at DHS.

Did you know Mr. Brown?

A.   Yes.

Q.   Okay.  And what -- this is a message communicating the March 14th memorandum.  Correct?

A.   Correct.

Q.   Okay.  And then you write a response to Mr. Brown asking for confirmation of whether extending the appointment of an existing CORE employee is considered a hiring action.

A.   Correct.

Q.   And he responds.

A.   Yes.

Q.   And his response is:

If it is not in the realm of a PMCO or MCO, you would need to ask for a waiver to extend for two additional years.

A.    Correct.

Q.    What was your understanding of what Mr. Brown was communicating with regard to FEMA's ability to renew CORE appointments?

A.    Sure.  Previously, FEMA had the authority to renew without going through the hiring verification process.  And there was -- there were two different interpretations of CORE hires.

At the time, MaryAnn Tierney was the SOPDA.  And MaryAnn's...in having talks with MaryAnn, extending a CORE did not constitute a new hire, which is why I reachout out to the Department for clarification, because this was a Department directive.

And according to the Department, extending a CORE renewal was a new hire -- therefore, if it was not an MCO or a PMCO, approval would need to be requested and FEMA did not have the authority to automatically extend that employee.

Q.    Was the basis of the understanding by Ms. Tierney at the time, as far as you understood it, the exemption listed in the OMB memorandum for term?

A.    That is correct.

Q.    But you understood Mr. Brown to be

communicating on behalf of DHS that DHS took a different view on whether renewal constituted a new hire.

A.    Correct.

Q.    Did you have any understanding, based on any other statements or interactions with DHS leadership, about whether COREs constituted new -- renewing COREs constituted new hires at the time, or was it only this email?

A.    It was only in this email.

Q.    Did you have any understanding of an incident in March 2025 where information regarding the number of new hires at FEMA had been communicated to Secretary Noem that included CORE renewals?

A.    I am aware that DHS provided a report to the secretary, yes.

Q.    That included CORE renewals in the numbers of new hires?

A.    Correct.

Q.    How are you aware of that?

A.    In talks with Roland Edwards.

Q.    And did you understand how that came to be?

A.    Yes.

Q.   And how is that?

A.   All of DHS uses the same human resources information systems.

So headquarters is able to pull data from components -- in this case, FEMA -- and report up without asking FEMA to generate the information and explain the data.

Q.   So FEMA was not involved in the generation of this report that went to Secretary Noem that included the CORE renewals as new hires, correct?

A.   That's correct.

Q.   And do you know who at DHS was involved?

A.   I don't know.

Q.   Was -- it's possible it was -- do you think it was possible it was someone from the Office of the Secretary?

A.   I don't know.

Q.   Okay.  But at some point in March, you understood, by talking to Mr. Edwards, that a report had been run, given to the secretary, that included renewals in new hires.

And what else did Mr. Edwards tell you about the secretary's response to that report?

A.   That it appeared as if FEMA hired thousands of employees.

Q.   And was there a reaction to that?

MR. ROSENBERG:  Objection; form.

Q.   Communicated to you?

A.   The reaction was communicated to me that we were to stop.

Q.   Who communicated that?

A.   That was Ms. Tierney.

Q.   And did you understand that she was being told by DHS to stop as a result of this report that went to Secretary Noem?

A.   I was not clear that she was told by DHS.

But in our conversation, the -- what was communicated to me is it appeared that FEMA hired thousands of employees and I was to stop.

Q.   And she was referring to the report that was given to the secretary when she communicated that to you?

A.   Yes.

Q.   Okay.  You understood that at the time?

A.   Yes.

Q.   And had you talked to Mr. Edwards before that conversation with Mr. Tierney?

A.   No.

Q.   Okay.  And did that prompt you to try to find out what was going on?

A.    Yes, it did.

Q.    Okay.  And one of the things that you did was call.

A.    Correct.

Q.    Okay.  Sorry, I'll ask that completely.

One of the things that you did was call the DHS CHCO to understand what was going on with this report that had been given to the secretary.

A.    Correct.

Q.    Okay.  Was your email to Mr. Brown before or after that conversation with Ms. Tierney?

A.    I believe it was after.

Q.    And was it before or after your conversation with Mr. Edwards?

A.    Also after.

Q.    Is one of the reasons that you sent this email that you wanted official documentation of the instruction?

A.    Yes.

Q.    And you understood this to be official written confirmation of the instruction that you needed to use the new hiring process for non-MCO positions.

A.    Correct.

Q.    And what was your understanding with

respect to FEMA's authority with respect to PMCO or MCO positions?

A.    My understanding was, permission was not required.

MS. LEONARD:  Okay.  Let's look at the next.

And this one, I believe, is a new exhibit.  So we'll mark it 72 -- 73.

(Whereupon, Plaintiffs Exhibit 73 was marked for identification.)

Q.    Ms. Prieur, do you recognize this document?

A.    I do, but I need to read it.

Q.    Sure.

(Witness reading.)

A.    Okay.  I'm ready.

Q.    Did you approve this message, Ms. Prieur?

A.    Yes.

Q.    Okay.  And can you just generally say -- explain who this was from and to.

A.    This was -- this came from the Mission Support mailbox -- so, my supervisor at the time, Ms. Tami Franklin, and Mr. Eric Leckey.

And in this update, I summarized what the Department's new hiring verification process

required.

Q.   And that's your summ- -- key provisions; "firm" term -- FEMA term appointments; Cadre of On-Call Response Employees, CORE; reservists; local hires; and temporary full-time employees -- renewals and extensions must be submitted to the secretary of Homeland Security for decision unless they fall within an excepted position.

That was your understanding of what had been communicated to you by Mr. Brown, correct?

A.   That's correct.

Q.   Okay.  And you described this as a "change," correct?

A.   Correct.

Q.   Because it was a change, correct?

A.   Yes.

Q.   And you refer -- you drafted this.

A.   Yes.

Q.   Okay.  And you refer at the top to "Executive Order 14210."  Do you see that?

A.   I do.

Q.   And you understand that that is an executive order -- order that pertains to workforce reduction.  Correct?

A.   Workforce optimization.

Q.   Do you recall that the President said he wanted to engage in a transformation of the federal government?

A.   I do.

Q.   And that he ordered agencies to consider large-scale RIFs and reorganization?

A.   Yes.

Q.   Okay.  And you understood these actions to be in alignment with that executive order.

A.   That is correct.

Q.   Did someone instruct you to include that?

A.   No.

Q.   Okay.  The list here, we see Emergency Management Specialist again, 0089.

What percentage of the CORE, roughly, fall into that occupational category?

A.   If I had to estimate, I would say 40%.

Q.   So that's a -- that's a big one for the CORE?

A.   Correct.

Q.   Okay.  And these other ones on this list for MCOs, are those -- are any of those nearly as large as that?

A.   No.

Q.   Okay.  At some point in time, FEMA

obtained some approval from DHS to re-delegate authority back to it with respect to some CORE renewals.  Correct?

A.    That's correct.

Q.    Okay.  And that was a May 14th memo signed by Secretary Noem?

A.    That's correct.

MS. LEONARD:  Okay.  Let's take a look.

This has previously been marked as Exhibit 21.

(Whereupon, Plaintiffs Exhibit 21, previously marked, was introduced to the witness.)

Q.    Okay.  Ms. Prieur, you've been handed what's been previously marked as Exhibit 21.  It's a May 14, 2025 approval memorandum for Secretary Noem from SOPDA Richardson.

Are you familiar with this document?

A.    Yes, I am.

Q.    Okay.  What is your understanding of what authority was being delegated back to FEMA?

A.    Secretary Noem delegated authority to SOPDA Richardson to approve CORE renewals in 180-day increments through December 31, 2025.

Q.    And this is approving FEMA authority to

use an internal process to renew COREs.

A.   That's correct.

Q.   That's what it says.

So that means FEMA making its own decisions.

A.   Correct.

Q.   Without submitting those for approval to the DHS secretary.

A.   That's correct.

Q.   Okay.  And the title describes reinstatement, because FEMA previously had that authority before DHS removed it in March of 2025. Correct?

A.   Correct.

Q.   Did you work on this approval memo?

A.   I provided data regarding the number of CORE employees, but I did not draft the memo.

Q.   Do you know who did?

A.   I don't know.

Q.   Did you have an understanding of the reason for asking -- asking for this approval to be sent back -- approval of this authority to be sent back to FEMA?

A.   Yes.

Q.   And what was your understanding?

A. This was two weeks before the start of hurricane season. So the intent was to allow FEMA leadership to make decisions about staffing.

Q. And is that why the authority was limited only to the May-to-December period?

A. I'm not sure what the significance of the end date was.

Q. Is it possible that's because it was linked, roughly, to just after the end of hurricane season?

A. It could be.

Q. And then is that related to why the authority was delegated only to extend for 180 days?

A. I'm not sure why the 180-day time frame was provided.

Q. And do you recall any conversations about that within FEMA?

A. I do.

Q. And what do you recall?

A. I asked Mr. Richardson for authority to appoint for at least one year, because that allowed stability and it allowed FEMA to retain employees.

Q. And why was that important to FEMA at the time?

A. Retention is important because it costs

Page 116

several thousand dollars to recruit a single employee. And then, depending upon the series, it can cost tens of thousands of dollars to train a new employee to become a journey-level employee.

Q. And can it also -- a short retention term, can it also be disruptive for the services that FEMA is trying to provide?

A. Yes.

Q. Okay. And when you say "stability," is that important for the mission that FEMA and the services that FEMA's trying to provide?

A. Yes.

Q. So in your view, at least a year would be more helpful than 180 days in providing that stability.

A. That is my professional opinion.

Q. And if it had been up to you, would you have asked for more?

A. More than 180 days?

Q. More than a year.

A. No. My professional opinion was to ask for one year.

Q. Was that informed by what you thought you could possibly get approved?

A. No.

Q.   Are you aware of any prior restrictions imposed by DHS limiting FEMA's authority with respect to the length of CORE renewals?

A.   I'm not familiar with anything else.

Q.   So after this May memo, could you describe your understanding of FEMA's authority with respect to CORE renewals and non-MCO COREs.

A.   So after this memo was issued, my understanding was program and regional administrators had the authority to review their workload and an employee's level of competence, and make a decision on if the level of competence was acceptable and, two, if the workload existed to renew the employee.

Q.   And in practice, is it your understanding that that is what was done by -- by FEMA from the period of May through early December of '25 with respect to non-MCO COREs?

A.   I can confirm that was the process for all COREs.

Q.   And -- so that also applied to MCO and PMCO COREs.

A.   That is correct.

Q.   And was that the result of your communication with Mr. Brown to clarify the intent

Page 118

of the March DHS directive?

A.   Will you restate the question --

Q.   Sure.  Sorry.

A.   -- because I'm not....

Q.   Sure.  Yeah, I was....

     That -- the application of the process you just described to all COREs, including MCO and PMCOs, was that based on what you understood FEMA's authority to be under the directive given by DHS in March?

A.   Yes.

Q.   Because your understanding at the time was that DHS was authorizing FEMA to employ its regular practice with respect to MCO CORE renewals.

A.   That is correct.

Q.   And FEMA also understood that, absent a further approval memo like this from DHS, that FEMA's delegated authority to renew non-MCO positions would expire on December 31, 2025.

A.   That is correct.

Q.   Now, during this time period, is it your understanding that FEMA, generally, did extend CORE positions that were reaching their NTE date?

A.   They extended many.

Q.   Do you know what percentage?

A.   I don't.

Q.   Okay.  But there are statistics somewhere where you could look at the percentages that were recommended for approval and then actually approved at the program and regional level.

A.   Yes.

Q.   And it's your understanding that the vast majority were recommended for approval.  Correct?

A.   Correct.

Q.   Okay.  You just don't know the number that were actually not recommended because the person was leaving or because of performance issues.

A.   That's correct.

Q.   Okay.  But there's some percentage -- or some number of people who just don't want to continue to be employed.  Correct?

A.   That's correct.

Q.   Okay.  And those would be included in the numbers of COREs that were not renewed.

A.   Yes.

Q.   So if you were to have a number of CORE positions that were not renewed for 2025, that might include people who voluntarily -- voluntarily left?

A.   That's accurate.

Q.   At some point in December 2025, you were

directed to stop extending the MCO COREs without DHS approval. Correct?

A. I don't recall that.

Q. You don't -- do you recall an exchange with Ms. Evans where she took a different view on the interpretation of the March 14th memo as pertains to MCO COREs?

A. I would need to review the email because I'm not sure.

Q. Okay. And at some point in December 2025, a decision was made not to seek an extension of the delegated authority to extend non-MCO COREs. Right?

A. That is correct.

Q. You remember that?

A. Yes.

MS. LEONARD: Okay. Let's....

How are we doing on time?

Okay. Why don't we take another short break and we can go to the next series.

WITNESS: Okay.

MS. LEONARD: Five minutes again?

WITNESS: Yes.

VIDEOGRAPHER: Off the record at

Page 121

11:02.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at

11:10.

BY MS. LEONARD:

Q.   Okay.  Let's switch gears and talk about the work that your office performs, generally, to help FEMA understand its staffing needs.  You mentioned the workforce team that you have.

Is there work that's performed to evaluate existing staffing shortages?

A.   Yes.

Q.   And by "staffing shortages," what does that mean to you?

A.   We have something called the "position management tool" that records staffing authorizations.

It also interacts with the CFO to determine which positions are vacant and funded versus vacant and unfunded.

Q.   And for unfund- -- could you give me a little more detail on what you mean by "unfunded"?

A.   Sure.  So you may have 100 positions in your organization.  And in the previous fiscal year, you were funded at 100.

Page 122

But in the current fiscal year, you may only be funded for 90 of those.

So the positions don't go away, but they are marked as "unfunded" because that tells my staff, the CFO, and the program or regional office that you do not have money to fill these positions.

Q.   And is -- so that is a measure against the current fiscal year's appropriations?

A.   That's correct.

Q.   And does that generally apply to the career positions, as opposed to the Disaster Relief Fund?

A.   That applies to all positions.

Q.   Would the Disaster Relief Fund positions generally be funded?

A.   Yes.

Q.   Okay.  So if there were vacant CORE positions, for example, in 2025, becau- -- if there were to be enough money in the Disaster Relief Fund that carried over from the appropriations from the prior year or the appropriations for that year, those would be marked as "funded," correct?

A.   That's correct.

Q.   And do you have an understanding of whether there, in 2025, were any vacant CORE

positions that were marked as "unfunded"?

A.   Not to my knowledge.

Q.   Okay.  And in addition to evaluating existing staffing shortages, there is work done to project future need into upcoming fiscal years. Correct?

A.   Correct.

Q.   And does that work support both operational planning and budget work?

A.   Yes.

Q.   Anything else that that's used for?

A.   No.  Those are the main purposes.

Q.   Okay.  Do you have deadlines within the FEMA OCHCO with respect to projecting staffing needs for purposes of the budget cycle?

A.   There is a report due to OMB on a quarterly basis.  So timelines are driven at the DHS level, but we know it's a quarterly ask.

Q.   And is that something that FEMA reports through DHS to OMB or directly to OMB?

A.   Everything is reported to DHS, and DHS compiles a single report for OMB.

Q.   And that includes staffing projections?

A.   That's correct.

Q.   And what office at DHS compiles that

report?

A.    The Office of the Chief Human Capital Officer.

Q.    What is that report to OMB called?

A.    I'm not sure.  We just call it a "staffing report."

Q.    And that -- does that specifically refer to the staffing report that is compiled for budgetary purposes?

A.    Yes.

Q.    Do you recall....

That quarterly report, is it reporting on annual staffing needs?

A.    It does include annual staffing needs, and quarterly updates are made.

Q.    Is there an annual report, or is it just quarterly?

A.    I believe FEMA submitted an annual report.

I -- let me backtrack.

FEMA submitted an annual report.  I don't have it.  I did not submit it.

But I do gather quarterly data and submit it to the Office of the Administrator.

Q.    Do you recall...?  Okay.

Are you involved in supporting the annual

budget request for FEMA?

A. Yes.

Q. And does that budget request reflect calculations and projections as to staffing needs?

A. It does.

Q. Okay. And do you recall the fiscal year 2026 budget request for FEMA?

A. I'm familiar with it.

Q. And do you recall the staffing levels that are reflected in the fiscal year 2026 budget request?

A. I don't.

Q. Okay. That budget request didn't cut FEMA's staff in half, did it?

A. It did not.

Q. Are you familiar with something called the "force structure review"?

A. I am.

Q. And what is the "force structure review"?

A. I believe that was a review requested by SOPDA Richardson.

Q. Is there possi- -- is it possible that there was a 2024 force struc- -- staffing review?

A. It's possible.

Q. Okay. Have you reviewed that?

A.   I don't recall.

Q.   Sorry.  "Force structure review," I think is what it's called.

A.   I don't recall if I've seen it.

Q.   Okay.  Are there any other forms of analysis that you're aware of that look at the total number of staff FEMA needs to perform its functions?

A.   There are.

As an example, we have joint recovery offices.  Hermit's Peak and Calf Canyon are one where there were major fires.  And that work is paring down.  So the director has provided a staffing plan to eventually close that office because the work is complete.

Q.   So there can be staffing analysis done with respect to particular disaster recoveries?

A.   Correct.

Q.   What about at the all-FEMA level; are there any other forms of analysis of FEMA's staffing needs that you're aware of?

A.   Not outside of the staffing plan.

Q.   Let's focus on the time that -- the beginning of the most recent administration, January -- January 2025.

Do you have an understanding that FEMA was

short-staffed?

A.    I wouldn't say "short-staffed."

Q.    Particular components?

A.    Yes.

Q.    Okay.  And you've recounted here that FEMA has lost staff over the course of 2025 in the thousands.  Correct?

A.    That's correct.

Q.    Okay.  Are you familiar with something called a "GAO report" from 2023 called the "FEMA Disaster Workforce"?

A.    I might be.

MS. LEONARD:  Okay.  Let's take a look.

This has previously been marked as Deposition Exhibit 37.

(Whereupon, Plaintiffs Exhibit 37, previously marked, was introduced to the witness.)

Q.    And I am not going to ask you to read every page of this report --

A.    Thank you.

Q.    -- because it's long.

A.    Thank you.

Q.    We'll have some general questions.

Have you ever read this?

A.   I don't believe so.

Q.   Okay.  Are you aware that GAO periodically has been issuing reports that pertain to FEMA staffing?

A.   Yes, I am familiar.

Q.   And have you participated in the process of gathering information to support a GAO report?

A.   I have.

Q.   And can you just give me a very high-level description of what happens when the Government Accountability Office asks an agency to provide information because they're doing a report?

A.   The one that I was involved with, I believe GAO did a report on my office and there were some recommendations with payroll.

We complied with all of them, responded to the audit, and it was closed successfully.

Q.   And did they collect information from the agency as part of preparing that report --

A.   Yes --

Q.   -- presumably?

A.   -- they did.

Q.   One would hope.

A.   Yes.

Q.   Okay.  This is -- this is a report on the

"FEMA Disaster Workforce."  You can see -- you can see that.

A.   Um-hum.

Q.   And if we turn to....

If you turn to Page 18, there's a Figure 5 there.

And I know this is before your time, but this refers to Overall Staffing Gaps.

A.   Um-hum.

Q.   And in the text above, it -- this report states that:

> As of the beginning of fiscal year 2022, FEMA had a disaster force strength of approximately 11,400 employees, creating a staffing gap of 6,200 or 35%.

Is that surprising to you?

A.   Yes, it is.

Q.   Why is that?

A.   Just because I have not seen this -- and when I did come on board, it was right in the middle of two hurricanes that occurred back to back, and it seemed that enough employees from the permanent staff and the Cadre -- the CORE staff were pulled to

Page 130

support those disasters.

Q. Those disasters required deployment of almost the entirety of FEMA. Correct?

A. I believe so.

Q. From the permanent staff to management, to the disaster relief employees, to the reservists, to local hires -- all the way across the board. Right?

A. That's correct.

Q. And those were Hurricanes Helene and --

A. And Milton.

Q. -- Milton.

And the recovery is still going on.

A. Correct.

Q. What would have happened if there had been another hurricane that required a deployment of that level right after those?

There wouldn't have been enough staff --

A. I can't speculate.

Q. -- right?

If all of the staff of FEMA was deployed for those, there would not have been enough staff. Right?

MR. ROSENBERG: Objection; calls for speculation.

Q. Okay. It's -- it's possible that there

are multiple disasters that happen at the same time that require substantial deployment by FEMA, correct?

A. That's accurate.

Q. Okay. And that is one of the things that FEMA plans for.

A. Correct.

Q. Okay. And currently, you're aware that FEMA has individuals deployed at -- in recovery operations across the United States.

Is that fair?

A. That's correct.

Q. Do you know how many active recovery operations are currently -- currently have FEMA employees deployed?

A. I don't.

Q. Okay. Is it more than 50?

A. I would say so.

Q. Okay. Do you have any understanding of analysis of a staffing gap conducted in 2024?

A. No.

Q. Okay. What about 2025?

A. Maybe --

Q. Have you seen it calculated --

A. -- in 2025.

Q.   -- as a -- as a percentage?

A.   I don't recall.  I would have to review the docs.

Q.   Okay.  You can set that aside.

Do you know whether FEMA engaged in the force structure modification process for 2025?

A.   If you are referring to the tasker that SOPDA Richardson sent forth, then I would say yes.

Q.   And what tasker is that?

A.   That had to do with the staffing plan.

Q.   And when was that?

A.   Oh...I would say we began working on it in June of 2025.

Q.   And what were the instructions related to that tasker that you recall?

A.   The initial instructions were to complete a zero-based staffing plan to review FEMA's mission, FEMA's statutory requirements, and the number of personnel -- CORE, PFT, and reservists -- that would be required to successfully complete that mission.

Q.   When you say "zero-based," do you mean bottoms up?

A.   Yes.

Q.   And what does that mean?

A.   That means:  Take everything off of the

table and only add back those things that support the mission and are statutorily required by law.

Q.   And is that the analysis that the FEMA components engaged in in 2025?

A.   Yes.

Q.   And you were involved?

A.   I was.

Q.   And did you help compile that information?

A.   I did.

Q.   Okay.  You're familiar with a presidential executive order that required agencies to submit annual staffing plans?

A.   Yes.

Q.   If I said that was on October 15th, would that sound about right?

A.   Yes.

Q.   Okay.  And then, directions from OMB and OPM to agencies to submit final annual staffing plans by December 1?

A.   Yes.

Q.   Okay.  And how are you familiar with that?

A.   Because I read the executive orders; I have a team that stalks the White House website.

And anything related to human capital is documented, summarized, and then sent to me for my

review.

And then I task that to get ahead of whatever DHS may request.

Q.   And is it fair that you have a team that stalks the White House website because there have been a lot of executive orders from this administration that pertain to staffing?

A.   Yes.

Q.   Okay.  So it's through your role as CHCO that you became familiar with the annual staffing plan requirement.

And you recall that DHS gave directions to components to compile the information that DHS was putting into the staffing plan to send to OMB and OPM?

A.   That's correct.

Q.   And there was a November 21st email from DHS CHCO Edwards that provided a spreadsheet that was to be filled out.  Do you recall that?

A.   I do.

Q.   Okay.  And your office coordinated the effort at FEMA to compile the information from the programs and regions to respond to that request?

A.   Yes.

Q.   And that meant that you were collecting

the programs' and regions' assessments of their staffing needs to inform the FEMA annual staffing plan.  Correct?

A.    Correct.

Q.    Okay.  And that work started prior to Karen Evans becoming the SOPDA on December 1st, right?

A.    That's correct.

Q.    Was she involved, prior to that, as the chief of staff?

A.    She may have been.  I don't recall specifically.

Q.    Okay.  Outgoing SOPDA Richardson did not approve the FEMA annual staffing plan before he left.  Correct?

A.    That's correct.

Q.    Okay.  So SOPDA Evans is the one that approved that and sent it to DHS in December.

A.    Correct.

Q.    Okay.  Do you recall the total number of staff that the FEMA components and offices result of the bottoms-up exercise you just described?

A.    I believe that we had 23,000 employees at the end of fiscal year 2025 and no reduction was requested.

Q.    No -- no reduction was recommended.

A.    Was --

Q.    Right?

A.    Correct; by the program and regional offices.

Q.    After conducting the bottoms-up analysis of mission critical and mission-supporting functions that you just described?

A.    Yes.

Q.    Okay.  And statutorily required functions.

A.    Correct.

Q.    Okay.  In compliance with the DHS instructions for how to fill out that report -- sorry, in compliance with the DHS instructions for how to fill out the data that they were asking for.

A.    Correct.

Q.    And it's your understanding that the FEMA component offices did comply with the DHS instructions.

A.    Yes.

Q.    Do you recall the number -- the total staffing number that the FEMA CHCO presented to SOPDA Evans in its recommendation?

A.    I did not present to SOPDA Evans.

My direct supervisors at the time were

Tami Franklin and Stephanie Dobitsch.  And I believe the numbers that were presented were roughly 23,000 to remain flat.

Q.   Do you -- you compiled the recommended contribution for FEMA to the annual staffing plan, and you transmitted it to someone?

A.   Yes.

Q.   Okay.  Who was that?

A.   That was Tami Franklin and Stephanie Dobitsch.

Q.   And it's your understanding that that information that you had compiled was presented to SOPDA Evans.

A.   That's correct.

Q.   You were aware, as of early December 2025, that DHS leadership wanted to cut FEMA in half, weren't you?

A.   I did not have any direct communication with DHS that provided that data.

Q.   But...did you have an indirect understanding of that?

A.   I did.

Q.   And what was the basis of your indirect understanding?

A.   Under SOPDA Richardson, I believe there

was a request to see what the agency would look like if staffing was reduced by 50%.

Q.   And was there an effort made to comply with that request?

A.   There was data provided that showed what the agency could look like.

Q.   And who provided that data to DHS?

A.   I don't know that anyone provided it to DHS.

Q.   Okay.  You said there was a request to see what the agency would look like at -- with a 50% cut.

Who worked on that?

A.   So I worked on it, Stephanie Dobitsch worked on it, and Tami Franklin worked on it.

Q.   Anyone else?

A.   Not to my knowledge.

Q.   So you didn't involve the FEMA components' programs and regions in this exercise?

A.   No.

Q.   And was there a final document that was produced as a result of this exercise?

A.   I don't know that a final document was produced, because SOPDA Richardson left pretty quickly.

So I'm not sure if anything was provided to him.

Q. This exercise was in parallel with the response to the DHS request for FEMA's annual staffing plan.

A. That's correct.

Q. And tell me what you can recall about the analysis that was done.

A. For the reduction or for FEMA's staffing plan?

Q. For the reduction.

A. For the reduction, I was shown a document that listed the force structure at 11,500 employees and how that would be split in the different employee types.

Q. And what do you mean by "different employee types" for that -- for that document?

A. Would it be permanent full time? would it be COREs or reservists?

Q. And that document that you were shown just had those three total numbers?

A. It had those three total numbers, and there was some other data below it.

Q. Was this a short document?

A. That document was on a secure SharePoint,

and I'm not sure of the length.

Q.   But what you were looking at didn't go into, let's just say, Level 5 subcomponent detail for all the program and region offices.

A.   No, it did not.

Q.   So you were talking about breakdowns by employee type.

Who -- who -- what was your understanding of who created that document?

A.   When I went back and researched where it was created, it was created in the Office of Program and Policy Analysis.

Q.   And -- within FEMA?

A.   Correct.

Q.   Okay.  Did Stephanie Dobitsch create that document?

A.   I believe one of her staffers did.

Q.   And you said you were shown that document.

In what context?

A.   It was linked in an email to me on a secured SharePoint.  So I could review data that I provided, like how many employees we currently had and what the employee type was.

Q.   And did this document break down the staffing levels by component part of FEMA?

A.   I don't recall.

Q.   Okay.  And what -- what else -- when was this email that -- sent that showed you this document?

A.   It would have been in November 2025.

Q.   Okay.  And what were you asked to do with respect to this?

A.   I was asked to provide current data.

Q.   Meaning, current numbers?

A.   Yes.

Q.   Okay.  Were you asked to provide any analysis to contribute to this document, other than numbers?

A.   No.

Q.   Was there any analysis in this document, or was it just numbers?

A.   I'm not sure.

Q.   Do you recall there being extensive analysis of agency function and need in this document?

A.   I'm not sure.

Q.   Is that because you were looking at the -- what might have been the summary page and there was additional analysis, or you just don't remember what was on the page?

A.    I don't remember what was on the page.

I recall what I was asked to provide.

Q.    And was this -- did you have any understanding -- let me just ask a different way.

Were there meetings that were conducted about this request to see what the agency would look like if it was cut in half?

A.    Yes.

Q.    And who was in those meetings?

A.    Myself, Tami Franklin, Stephanie Dobitsch, and Michael Icardi.

Q.    Who was he?

A.    He was Stephanie's staff assistant.

Q.    Okay.  Anyone else?

A.    Claire Thomas may have been in the meeting, also one of Stephanie's staff assistants.

Q.    Karen Evans?

A.    No.

Q.    Anyone from DHS?

A.    No.

Q.    And was anything communicated about DHS direction for this project?

A.    No.

Q.    So you are unaware of whether DHS directed anyone at FEMA to conduct this analysis.

A.    That's correct.

Q.    Okay.  What happened to that document?

MR. ROSENBERG:  Objection; form, foundation.

A.    Nothing, to my knowledge.

Q.    Did you ever see it again?

A.    Yes.

Q.    When was that?

A.    When I was asked to provide documentation for this deposition.

Q.    You searched for and found that document?

A.    I found the email.

And the link to the document was embedded in the email I provided.

Q.    And you provided those to counsel?

A.    I did.

Q.    That -- tell me what else you remember about the exercise of looking at what the agency could look like if it were cut in half.

MR. ROSENBERG:  I'm going to object.

I think you can answer that question.  To the extent that the answer involves a discussion of the underlying analysis in the document, that may be

covered by the deliberative process privilege.

Can you -- can -- can -- actually, can the court reporter read back the question so that I make --

COURT REPORTER:  Sure.

MR. ROSENBERG:  -- I understand.

COURT REPORTER:  Are you ready?

MR. ROSENBERG:  Yep.

(Whereupon, the court reporter read back from the record as follows:

"Q    Tell me what else you remember about the exercise of looking at what the agency could look like if it were cut in half.")

MR. ROSENBERG:  Can we take a very short recess?

MS. LEONARD:  To discuss privilege?

MR. ROSENBERG:  Yes.

MS. LEONARD:  Yes.

MR. ROSENBERG:  Okay.

VIDEOGRAPHER:  Off the record at 11:40.

Page 145

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 11:42.

MS. LEONARD:  Could the court reporter read back the last question.

(Whereupon, the court reporter read back from the record as follows:

"Q    Tell me what else you remember about the exercise of looking at what the agency could look like if it were cut in half.")

BY MS. LEONARD:

Q.   Okay.  So I'm going to ask that question again.  So we have a clear transcript.

A.   Okay.

Q.   Ms. Prieur, tell me what you remember -- what else you remember about the exercise of looking at what the agency could look like if it were cut in half.

A.   What I recall is:  It was just an exercise; that, to my knowledge, there was no directive the agency would be cut in half.

The exercise was completed to see what could happen if a percentage was given to reduce by

"X" number of positions or "X" percentage.

Q. And to your knowledge, was there any analysis done of the impact that that would have on the functions of FEMA?

A. I believe there was.

Q. How do you know that?

A. Just the discussions with my leadership and the staff assistants in the room -- we just talked about, with a 50% reduction, what could realistically be completed in the agency.

Q. And you understood that a 50% cut would have a dramatic impact on FEMA's functions, correct?

A. That is correct.

Q. And it would not be possible to actually complete FEMA's statutorily mandated functions or mission if its staff were cut in half.

A. What I understood is: The President was looking and is still looking to reshape FEMA with the FEMA Review Council. And not knowing what will come out of that report, this was just pre-planning and looking at different scenarios in sort of a "what if."

Q. I understand, but that wasn't my question.

So my question is: You know, Ms. Prieur, that cutting FEMA's staff in half will make it

impossible for FEMA to perform its statutorily required mission.  Correct?

MR. ROSENBERG:  Objection; calls for speculation.

Q.   You can answer.

A.   What I understand is:  In FEMA's current form, it would be difficult to perform the mission and statutory requirements.

Q.   It would be impossible, wouldn't it?

A.   I'm not an expert in emergency and disaster management, so I can't answer specifically.

Q.   Okay.  But you do know it would be difficult.

A.   That's correct.

Q.   Particularly without the CORE, because they are central to performing FEMA's statutorily required mission.  Correct?

A.   When you say "without the CORE," are we talking about a reduction in COREs or something else?

Q.   Do you recall what percentage reduction in CORE was included on those categories of employees that you looked at in that document?

A.   Probably 50%.

Q.   Is it more than 50%?

Page 148

A.    I don't know that it was more.

MS. LEONARD:  Okay.  Thank you.

Let's take a look at -- thank you, Elle -- Exhibit 25.

(Whereupon, Plaintiffs Exhibit 25, previously marked, was introduced to the witness.)

WITNESS:  Thank you.

Q.    I'm showing you a document that's previously been marked as Exhibit 25.

Ms. Prieur, is this the document that you have been discussing as the exercise to show what the agency could look like if it were cut in half?

A.    I need to review this, because I don't know that I've ever seen this.

Q.    Okay. So this might be a different document?

A.    I did not develop these talking points, so I don't know what this is.

Q.    Okay.  Why don't you take a look at it.

A.    Okay.

(Witness reading.)

A.    Okay.

Q.    Okay. So, first question is:  Is this the document that you were previously discussing that you, were shown in conjunction with the work with

Ms. Dobitsch and Ms. Peterson [sic]?

A.   No.

Q.   This is a different document.

A.   Yes.

Q.   And you see at the top, the ask is:

> Ms. Evans has tasked me to
> develop a strategy to cut the
> FEMA workforce by 50% over
> fiscal year '26.

Do you see that?

A.   Yes.

Q.   So the work you were previously discussing you believe had been requested by SOPDA Richardson?

A.   Correct.

Q.   And are you aware of who Ms. Evans tasked with developing a strategy to cut the FEMA workforce by 50%?

A.   No.

Q.   Do you believe that Stephanie Dobitsch continued in performing that work for Ms. Evans?

A.   I do.

Q.   Okay.  So you don't know whether Ms. Dobitsch drafted this.

A.   Correct.

Q.   Do you -- the document you recall, did

it -- these are the same three categories of employees listed at the top here, correct?

A. That's correct.

Q. Did these percentages and numbers match what you recall in the document that was shown to you in that exercise in November?

A. They do not.

Q. These are higher or lower -- or different?

A. They're different across categories.

Q. Okay. And do you have any understanding as to why?

A. I don't.

Q. Okay. What do you recall -- how do you know that they're different?

A. Because I reviewed the spreadsheets. So what I saw was a spreadsheet, not a Word document.

And to my recollection, there weren't any PFT reductions. The reductions were largely across CORE, reservists, and local hires.

Q. So at the time, as of November 2025, approximately how many total FEMA employees were there?

A. In November? I would say, 23,000.

Q. So to get to a 50% cut, that would be roughly 11,500, correct?

Page 151

A.    Correct.

Q.    And of the 23,000, were there roughly 18- or 19,000 CORE and reservists?

A.    That -- 18,000 would be safe to say.

Q.    And you said that -- and about 5,000 PFTs?

A.    Correct.

Q.    Okay.  And none of the cuts that you saw came from the 5,000 in that document.

A.    I don't believe so.

Q.    Okay.  So if you're going to reduce the CORE and reservists by approximately 11,500, do you know how many that leaves?

A.    If there were 5,000 PFTs, then that would leave 6,500 COREs and reservists.

Q.    Total.

A.    Correct.

Q.    Of -- so it's a far higher than 50% reduction from the 18,000?

A.    Then, yes, it would be.

Q.    Right?  It would be...something like....

       I'm not going to do that percentage in my head -- sorry, I thought I could do it.

       All right.  It's going to be something --

A.    It would be two-thirds.

Q.    That's right.  Thank you.

You are probably better with numbers than I am, I have a guess, as a result of your job, probably -- definitely spreadsheets.

A.   Yes.

Q.   Okay.  So that leaves...that is roughly...that's a cut of 12,500?

A.   11,500.

Q.   11,500 from -- sorry, 11,500 from the 18,000 leaves 65- -- 6,500.

And you don't -- you don't recall what the breakdown was.

Was that wiping out the entire reservists?

MR. ROSENBERG:  Objection; form.

A.   I don't believe so.

Q.   Okay.  It left some space for reservists?

A.   Correct.

Q.   Okay.  Was that exercise --

You can set this aside for now.

A.   Okay.

Q.   Was that exercise that you recall in -- ever discussed in conjunction with eliminating COREs by NTE date?

A.   No.

Q.   Okay.  Let's go back to the staffing planning that was being done in parallel with that

discussion you were having --

A.   Um-hum.

Q.   -- to contribute to the final annual staffing plan.

You recall that the FEMA compon- -- program offices and regions compiled recommendations, and then the FEMA OCHCO compiled that and presented it up the chain for approval. Correct?

A.   That's correct.

Q.   Okay.  And I believe you said you recall that the number that was the result of that analysis of the program offices' needs was roughly 23,000?

A.   Correct.

MS. LEONARD:  Okay.  Let's take a look at what I'm going to mark as Exhibit 73 -- 74.

(Whereupon, Plaintiffs Exhibit 74 was marked for identification.)

Q.   And I'll represent to you that this is the summary table of a spreadsheet that was produced in native form with the Bates number by Defendants to us and it was attached to an email representing that this was the OCHCO recommendation for the fiscal year 2026 staffing plan.

Page 154

Does this look familiar to you?

MR. ROSENBERG:  Objection; form.

A.   It does not.

Q.   Okay.  Do you remember exactly what that spreadsheet looked like in all of its worksheets?

A.   Not exactly.

Q.   Okay.  Do you recall that it had a summary table?

A.   Yes.

Q.   Okay.  And we printed this, so the formatting might not be...

A.   Okay.

Q.   ...great.

But if you look at the last page, there's a grand total.

A.   Okay.

Q.   And if you look at the grand total under the first column there, which is -- it is "September 30, 2025 FTE Total."

There's a grand total of "23,146."

Do you see that?

A.   I do.

Q.   And then there's a "September 30, 2026 Projected FTE" column.  Do you see that?

A.   Yes.

Q.   And the total there is "24,804."

Is that the number that you recall the component programs and regions recommended?

A.   I do.

Q.   And then, did you present something slightly less than that to SOPDA Evans for approval?

A.   I did.

Q.   And do you rec- -- do you recall why?

A.   Based on the executive orders and the intent of the administration throughout 2025, the intent was to reduce.

And my professional opinion was:  Asking for "in addition to" would not be accepted, since we had reduced -- by over 3,000 -- positions.

And I need to caveat with the fact that some folks that took the Fork in the Road and deferred resignation would remain on the rolls through December 31st.

So it didn't account for all of the attrition -- that if I was going to present anything, it would be to remain flat.  But I was not going to ask for an increase.

Q.   Because you thought it would be rejected.

A.   Correct.

Q.   Consistent with the way DHS was

interpreting the President's priorities.

A.   That's correct.

Q.   Okay.  Was there a -- did there come to be a time when you learned that SOPDA Evans had sent FEMA -- a FEMA annual staffing plan to DHS that totaled 11,383 people?

A.   I am not aware of the staffing plan that was sent to DHS.

Q.   Did there come to be a time when you learned that SOPDA Evans had sent a staffing plan to DHS that cut FEMA in half?

A.   No.

Q.   You never saw that?

A.   I did not.

MS. LEONARD:  Okay.  Well, let's take a look.

Okay.  I'm going to show you what's previously been marked as Exhibit 17.

(Whereupon, Plaintiffs Exhibit 17, previously marked, was introduced to the witness.)

Q.   All right.  You've been handed what's previously been marked as Exhibit 17.

And I'll represent to you that this is a additional spreadsheet that was produced to us as an

attachment and described as the FEMA staffing plan that SOPDA Evans provided to DHS.

Ms. Prieur, would it surprise you to learn that Ms. Evans confirmed that this is the staffing plan that she provided to DHS on December 4th?

A.   I am not surprised.

Q.   And do you see the number "11,383" there?

A.   Yes.

Q.   Okay.  But you've -- have you ever seen this?

A.   I have not.

Q.   SOPDA Evans did not show you, as the FEMA CHCO, the annual staffing plan that she provided for FEMA to DHS?

A.   No, she did not.

Q.   Did you ask her for it?

A.   No.

Q.   Why not?

A.   Because, quite frankly, if she wanted me to have it, she would have sent it to me.

Q.   So your understanding is:  She didn't want you to have this.

A.   Correct.

Q.   Because it cut FEMA's staff in half.

A.   Well, this is the first time I've seen it.

So....

Q. That number, "11,383" -- that's roughly consistent with the 11,500 half-calculation we've been talking about. Right?

A. That's correct.

Q. Are you aware that SOPDA Evans had submitted a staffing plan to DHS for FEMA on December 4th?

A. I am aware that she submitted something. Unsure of the date.

Q. You did not provide SOPDA Evans with analysis -- any analysis that would support this as FEMA's annual staffing plan -- and by "this," I mean the spreadsheet in Exhibit 17. Correct?

A. That's correct.

MR. ROSENBERG: Objection.

WITNESS: Oh.

MR. ROSENBERG: Objection; lack of foundation.

Q. My -- yeah, my question was whether you provided any analysis to her that would support this -- this annual staffing plan.

A. I did not.

Q. Okay. Are you aware of who would have, if anyone?

A.    I am -- I don't know.

Q.    Do you believe that SOPDA Evans performed any analysis herself of FEMA's staffing needs to support the annual staffing plan that she provided to DHS?

A.    I do not know what SOPDA Evans did to come to this conclusion.

Q.    Do you have an understanding of how familiar SOPDA Evans was with the needs of FEMA's components?

A.    I am not.

Q.    Did she ask you any questions about the FEMA components' mission or functions as part of her decision-making with respect to the annual staffing plan?

A.    No.

Q.    Do you know if she asked anyone?

A.    I don't.

Q.    Would it surprise you to hear that SOPDA Evans testified that DHS leadership asked her to include a 50% option?

A.    Am I surprised?

Q.    Um-hum.

A.    No.

Q.    And specifically, that DCOS Guy asked her

to do that?

A.   I'm not surprised.

Q.   Did you have any understanding that DCOS Guy was asking for a staffing plan that included a 50% cut?

A.   No.

Q.   Okay.  Did you have any communications with Ms. Evans, prior to her submission of the December 4th staffing plan, that involved what she was going to do with that plan?

A.   Will you say that again, please.

Q.   Sorry.  Did you have any communications with Ms. Evans about the submission of the staffing plan?

A.   I did.

Q.   And can you tell me what you recall of those communications?

A.   I shared what you provided in Exhibit 74, something similar, that was just flat.  And I understood from her that she would make the final submission to DHS.

And that was the end of the conversation.

Q.   How did that conversation take place?

A.   Over Teams.

Q.   And were you in the same -- working out of

the same building?

A.   Yes.

Q.   And you were having a Teams communication?

A.   Yes.

Q.   Was that common?

A.   Yes.

Q.   Was that because someone who was not working in the building was participating in that Teams conversation?

A.   No.

Q.   Okay.  Who else was on that Teams conversation?

A.   Just she and I.

Q.   Okay.  Do you have any understanding of what role Kara Voorhies played in Ms. Evans' decision with respect to the FEMA annual staffing plan?

A.   No, I do not.

MR. ROSENBERG:  Objection; foundation.

Q.   Was Kara Voorhies ever involved in any communications that you saw with respect to the annual staffing plan?

A.   I don't recall.

Q.   Do you recall at the time that Ms. Evans

Page 162

was running everything by Kara Voorhies with respect to FEMA?

A. I am not aware of that.

Q. Are you aware of her running anything by Kara Voorhies?

A. I am aware that Kara was in some leadership meetings.

Q. And you saw that she was CC'd on emails pertaining to FEMA.

A. That is correct.

Q. And she was CC'd on emails pertaining to FEMA staffing.

A. That's likely.

Q. And she was CC'd on emails pertaining to FEMA personnel actions.

A. That's possible.

Q. Did you participate in a meeting between Ms. Evans and Stephanie Dobitsch on December 4th in which the plan to cut FEMA in half was discussed?

A. I don't recall being in any meetings with Ms. Evans where a percentage cut to the FEMA workforce was discussed.

Q. So she never discussed the annual staffing plan for FEMA with the FEMA CHCO?

A. She did discuss the annual staffing plan.

She never gave me any percentages that she was looking to cut.

Q.   She never told you that she had submitted an annual staffing plan for FEMA that cut FEMA staff in half.  Correct?

A.   That is correct.

Q.   Did she tell you this number, "11,383," was submitted as the annual staffing plan?

A.   No.

Q.   Okay.  Had you -- is this the first time you're seeing that number?

A.   I have seen a number similar, and that was in the "what if" scenario I worked with Stephanie Dobitsch.

I just know it was around 11,500.  I can't say specifically it was definitely 11,383.

Q.   You've also seen reference to "11,500."

A.   That's correct.

Q.   Okay.  And you've also seen reference to a target 50% cut for FEMA.

A.   Yes.

Q.   And did you ever hear anyone from DHS leadership ask questions regarding FEMA's actual staffing needs?

A.   No.

Q.   Did you ever hear anyone from DHS leadership ask questions regarding how much money would be saved by cutting FEMA staff?

A.   No.

Q.   What about how much money would be saved by cutting CORE staff?

A.   I have heard -- or been in conversations with FEMA leadership that discussed the Disaster Relief Fund, but not any specific numbers.

Q.   Were those conversations about eliminating CORE staff out of a desire to deplete the Disaster Relief Fund?

A.   No.

Q.   Were those conversations about eliminating CORE staff....

Were the -- the conversations about the Disaster Relief Fund that you recall, were they also related to eliminating CORE staff?

A.   No.

Q.   What do you recall about those conversations?

A.   Conversations were about the number of COREs we have on staff, that Ms. Evans believed COREs were used to circumvent PFTs going to high -- going to Congress and requesting additional funding

for permanent full-time employees.

She was under the belief that, because FEMA only received operational support funding for 5,000 PFTs, we needed more and COREs had been used to supplement staffing where funding for PFTs was not available.

Q.   Ms. Evans was under the belief that FEMA needed additional staff?

A.   Additional PFT staff.

Q.   Do you know how Ms. Evans' annual staffing plan that cut FEMA in half -- how she intended to implement that by increasing PFT staff?

MR. ROSENBERG:   Objection; form and misleading.

A.   I do not.

Q.   Do you think that would be possible?

A.   Will you restate?

Q.   I withdraw the question.

A.   Okay.

Q.   Did you ever hear SOPDA Evans express that FEMA could not possibly perform its duties by cutting its staff in half?

A.   No.

Q.   Did you ever hear SOPDA Evans express any surprise at being asked by DHS to cut its staff in

half?

A.    No.

Q.    Did you ever hear SOPDA Evans ask any questions regarding detail in the FEMA OCHCO's annual staffing plan submission?

A.    No.

Q.    Do you have any reason to believe that she didn't even read it?

A.    No.

Q.    You don't have reason to believe that?

A.    No.

Q.    You think she read it?

A.    I don't know.

Q.    Do you have any understanding as to why she subbed out a 50% cut, rejecting the recommendations of FEMA OCHCO and all of the program and regional offices?

MR. ROSENBERG:    Objection; calls for speculation.

A.    I don't know.

Q.    But you certainly don't know the analysis, if any, that was based on.  Right?

A.    I do not.

Q.    Okay.  And you are not aware of whether she was being -- she was discussing this annual

staffing plan with individuals in the DHS front office, such as DCOS Guy.  Correct?

A.  I don't.

Q.  But you are aware that she was discussing with Ms. Voorhies.  Is that right?

A.  Ms. Voorhies was in some of the meetings.

Q.  Where 50% cuts were discussed?

A.  Not where 50% cuts were discussed.

Where Ms. Evans -- the discussion surrounded COREs being used to supplement PFT staff.

Q.  And what did Ms. Voorhies say in these meetings, if anything?

A.  She rarely said anything.

Q.  Do you recall her saying anything?

A.  I don't.

Q.  Again, did you have any understanding as to why she was there?

A.  My understanding was:  She was a liaison between DHS leadership and FEMA leadership.

Q.  So it was your understanding that she was there to report back to DHS leadership regarding the subject matter of those meetings.

MR. ROSENBERG:  Objection.

A.  My understanding of Ms. Voorhies' role was to be a liaison and share information between DHS

and FEMA, and vice versa.

Q.   Did you ever hear that Ms. Voorhies had a preexisting relationship with Corey Lewandowski?

A.   Yes.

Q.   And where did you hear that?

A.   I heard that in the newspaper -- I want to say, when Secretary Noem was fired.

Q.   Did you ever hear it before that?

A.   No.

(Pause.)

A.   I'm so sorry.  My stomach just growled so loud.  My apologies.

Q.   Mine did as well, and we'll see if it shows up on the videotape.

I understand.  We'll break for lunch relatively soon, actually, given -- given that.

A.   So embarrassing.

Q.   We can mark that -- we can mark that confidential.

Okay.  You never came to -- there's no point in time at which you came to learn that DHS had rejected the annual staffing plan that Ms. Evans provided to it on December 4th.  Correct?

A.   I'm not aware of that.

Q.   Okay.  You never heard that?

A.   No.

MR. ROSENBERG:  Objection; lack of foundation.

Q.   Do you understand this to be consistent with DHS's policy priorities?

MR. ROSENBERG:  Objection; form.

Q.   "This" -- "this" being the staffing plan in Exhibit 17.

A.   I don't understand this at all.

Q.   What do you mean by that?

A.   This is the first time I have seen it, and there are no notes or analysis.  It's just numbers on a page.

Q.   If you were a DHS official receiving this, would it be possible to do -- to understand how this was compiled and what -- how this relates to FEMA's functions --

MR. ROSENBERG:  Objection --

Q.   -- on the face of this document?

MR. ROSENBERG:  Objection; form, lack of foundation, compound.

Q.   Go ahead.

A.   Not with the information in front of me.

Q.   And you don't have any understanding as to what information the DHS leadership was considering

when it approved FEMA's annual staffing plan to be included in what was sent to OMB.

MR. ROSENBERG:  Objection; lack foundation.

A.   No, I don't.

Q.   You were not on the communications between DHS and OMB that transmitted the annual staffing plans, right?

A.   That's correct.

Q.   But you've never heard that OMB rejected FEMA's annual staffing plan either, right?

A.   That's correct.

Q.   Are you aware of any communications with OMB about the plan -- strike that.

Are you aware of any communications with OMB or OPM about a plan for 11,500 employees for FEMA?

A.   No.

Q.   Okay.  Did you know that Ms. Evans communicated that to OMB and OPM?

A.   No.

MS. LEONARD:  Okay.  I think now is actually a good time to take a lunch break.  It's 12:15.

We can go off the record.

VIDEOGRAPHER:  Off the record at 12:15.

(Whereupon, a recess was taken for lunch at 12:15 p.m.)

- - -

A F T E R N O O N   S E S S I O N

(Time noted:  1:04 p.m.)

VIDEOGRAPHER:  On the record at 1:04.

BY MS. LEONARD:

Q.   Good afternoon --

A.   Good afternoon.

Q.   -- Ms. Prieur.

At some point in December, I believe we previously discussed, a decision was made not to extend FEMA's authority to renew the non-MCO COREs.

A.   Are you referring to the memo that Mr. Richardson had signed?

Q.   Correct.

A.   Okay.

Q.   So there was a decision that was made at some point in December of 2025 to not extend FEMA's authority beyond December 31, 2025 with respect to the extension of non-MCO COREs.  Correct?

A.   That's correct.

Q.   Okay.  You're aware that there was a draft approval memo for S1 approval that would have extended that authority, correct?

A.   Yes.

Q.   And did you participate in the preparation

of that draft?

A.   Yes.

MS. LEONARD:  Okay.  Let's mark the next as 75.

(Whereupon, Plaintiffs Exhibit 75 was marked for identification.)

Q.   Okay.  And I believe I'm mispronouncing your name.  Could you tell me again how you pronounce your last name.

A.   "Prieur."

Q.   "Prieur," okay.  I'm going to get it through my head.

Ms. Prieur, you've been handed what has been marked as Exhibit 75.  It's an email exchange from, roughly, early December -- I believe the date is December 4th.

And if you could take a look at this and let me know when you're done.

(Witness reading.)

A.   Okay.

Q.   And I don't believe you're copied on these emails, but there's a reference to you in the body.  So that's what I was going to ask you about.

Is that right?

A.   That is correct.

Q.   Okay.  And if you see this -- the top email on December 4th is an email to FEMA ExecSec.

Is "FEMA ExecSec" a part of FEMA that maintains and moves routing memos for approval?

A.   Yes.

Q.   Okay.  And here we have two attached items which are an AF1 action memo and a FEMA CORE renewal S1 decision memo.  Do you see that?

We did not include the attachments to this email -- but you see the description there, right?

A.   Yes.

Q.   Okay.  And is it your recollection that at the time there had been prepared a action memo for SOPDA Evans to sign off on sending the S1 renewal memo, decision memo, to the DHS leadership?

A.   Yes.

Q.   Okay.  And here in this email, it says that the memos have been cleared by the following....

And you are listed, along with Tami Franklin and Stephanie Dobitsch from Mission Support.  Do you see that?

A.   Yes.

Q.   Is that true, that you had cleared those memos?

A.    Yes.

Q.    Why did you approve those memos?

A.    This process started in September of 2025.

And I cleared those memos to ensure there would not be a break in the approval process and to ensure that FEMA would not revert back to the prior process where we went to the S1 for approval of non-mission critical occupations.

Q.    So let's break that down.

You say the process had started in September 20, 2025 [sic].

Is that -- do you mean by that the conversations around extending the approv- -- the delegated authority?

A.    Correct.

Q.    Okay.  And why did you want to ensure that there was no break in -- break in authority?

A.    Well, that was our first 40-some-odd-day furlough at the beginning of October.

So it was just a judicious use of my time and service not to wait until the last minute to request this authority.

Q.    And as of the time of this email, the S1 decision memo had obviously not been sent to the DHS leadership.  Correct?

A.    Correct.

Q.    And that required SOPDA Evans' approval.

A.    Correct.

Q.    Why is it that you wanted FEMA to extend this authority?

A.    To be quite frank, it would be less of an administrative burden on my team.

But it would also assist my customers in giving the employees they wanted to renew for business purposes an additional six months on the job.

Q.    Because it would have allowed FEMA to extend CORE appointments that were upcoming on NTE dates by 180 days --

A.    Correct.

Q.    -- if this had been approved.

A.    Correct.

Q.    Were you aware that the memo for S1 approval was sent to Kara Voorhies for review?

A.    No.

Q.    Were you aware that the memo was sent to Kara's -- Kara Voorhies for review before the decision was made not to seek S1 approval?

A.    No.

Q.    Does that give you concerns?

MR. ROSENBERG:  Objection.

A.   No.

Q.   Do you know who actually made the decision that FEMA's authority to extend non-MCO COREs should not be renewed?

A.   Yes.

Q.   Who do you believe made that decision?

A.   Karen Evans.

Q.   How do you know that Karen Evans made that decision?

A.   Because she told me when I was in a meeting with her.

Q.   She told you she had made that decision.

A.   She told me she was not going to seek S1 approval through a memo.

Q.   Did she tell you why?

A.   No.

Q.   Did you ask?

A.   I did not.

Q.   Did she reveal whether she had been instructed by anyone at DHS not to seek that authority?

A.   She did not.

Q.   Okay.  So you don't know, one way or another, whether Karen Evans was acting under

instruction from DHS when she decided not to seek that authority.

A. Correct.

Q. Okay. And do you know who Ms. Evans discussed the issue of seeking authority with at DHS?

A. No.

MR. ROSENBERG: Objection; foundation.

Q. Okay. Do you believe that she discussed it with Ms. Voorhies?

A. I don't know.

Q. What about DCOS Guy; do you know whether she discussed this with him?

A. I do not.

Q. During this period of time, is it fair to say that Ms. Evans was generally taking direction from DHS leadership?

MR. ROSENBERG: Objection; vague.

A. I don't know.

Q. Did you ever witness her implementing something you know had been directed by DHS?

A. No.

Q. Did she talk about the DHS secretary's

priority for -- priorities for the agency?

A.   No.

Q.   Did you ever hear Ms. Evans talk about the need to cut the agency by 50%?

A.   No.

Q.   Ms. Evans didn't frequently talk to staff about -- saying things like, "We need to cut 50%"?

MR. ROSENBERG:  Objection; lack of foundation.

A.   Ms. Evans never gave me a number that she intended to cut staff by.

Q.   Would it surprise you to hear other people at FEMA have heard Ms. Evans say, "We need to cut 50%"?

A.   No.

Q.   It wouldn't surprise you?

A.   No.

Q.   And why not?

A.    It would not surprise me because, in the FEMA council report that was leaked, there was a mention of a 50% reduction.

Q.   Ms. Evans doesn't take direction from the FEMA council.  She takes direction from the DHS secretary.  Correct?

MR. ROSENBERG:  Objection; lack

of foundation.

A.    From my understanding, yes.

Q.    And you were aware that DHS Secretary Noem was the co-chair of that counsel, correct?

A.    Yes.

Q.    So do you understand -- did you have an understanding of who added the 50% cut to the FEMA council report?

A.    No.

Q.    Okay.  You know it was reported that Kristi Noem added that 50% cut.

A.    I do not know that.

Q.    Did you have -- did you ever review the draft report that was leaked?

A.    No.

Q.    And you don't know who wrote the sentence saying, 50 -- FEMA should be cut in half?

A.    Correct.

Q.    So it's possible, all this time, that Ms. Evans has been taking direction from DHS leadership with respect to implementing this 50% cut, isn't it?

                    MR. ROSENBERG:  Objection; calls for speculation.

A.    I don't know.

Q.   It's possible.

A.   It could be.

Q.   And you know that she had been working with Stephanie Dobitsch on a plan to implement a 50% cut, right?

A.   No.  I know that the 50% was started under SOPDA Richardson.

Q.   And continued under Ms. Evans.

A.   I don't --

MR. ROSENBERG:  Objection; lack of foundation.

A.   I don't know what the end result of that was.

Q.   But the -- you know that the work on formulating a plan for how to implement a 50% cut continued under SOPDA Evans.

A.   I know that you showed me Exhibit 17, which is the staffing report Ms. Evans provided to DHS that has a 50% reduction.

Q.   And you know that she continued to work with Stephanie Dobitsch on work to implement a 50% cut.

A.   I do not know that.

Q.   You know that she was working with Stephanie Dobitsch on a plan to cut COREs by NTE

date.

A.    I do not know that.

Q.    Are you aware that Ms. Evans and Ms. Dobitsch had a meeting in early December to discuss plans to cut the COREs by NTE date?

A.    No.

MS. LEONARD:  Okay.  Well, let's take a look.

This is, previously, Exhibit 24.

(Whereupon, Plaintiffs Exhibit 24, previously marked, was introduced to the witness.)

WITNESS:  Thank you.

Q.    And if you could take a moment to read through the emails from early Decem- -- there's the top ones -- December 18th, but it is forwarding a December 12th, and which is responding to some emails from December 4th.

If you could take a moment to read through those.

(Witness reading.)

A.    Okay.

Q.    Ms. Prieur, have you ever seen this email before?

A.    No.

Q.    I'm going to focus on the December 4th

email between Karen Evans and Stephanie Dobitsch, which -- and copied to Kara Voorhies and Will "Bilicic"? --

A.   Yes.

Q.   -- which is on the back.

My understanding is that Ms. Evans wrote this email -- and then if you can see from the next email in the line, that Ms. Dobitsch did some annotations to the list.  That appeared how it reads.

You see the first item:

Looking at all CORE dates.

Were you aware, as of December 4th, that Ms. Evans and Ms. Dobitsch were working together to look at all CORE dates?

A.   I was aware.

Q.   And that there were upcoming CORE NTE dates?

A.   Yes.

Q.   And were you aware that they were discussing a proposed plan to reduce COREs by date?

A.   No.

Q.   That she had tasked Ms. Dobitsch to work on?

A.   No.

Q.   Are you surprised to hear that?

A.   Yes.

Q.   And...because you hadn't heard of it previously?

A.   Correct.

Q.   You see No. 4:

Overall, CHCO numbers are being worked by you and Will. Number is 11,383.  Karen will send a follow-up note to HQ.

A.   Okay.

Q.   "11,383" is the number from the FEMA annual staffing plan that Ms. Evans sent to DHS.

Does that look familiar?

A.   Yes.

Q.   Okay.  From the documents that we showed you earlier today.

A.   Correct.

Q.   Okay.  You had no understanding that Ms. Dobitsch and Will Bilicic were continuing the work of how to implement the 11,383 number across FEMA?

A.   No.

Q.   You weren't involved in that work?

A.   No.

Q.   Okay.  But you don't have any reason to believe that this isn't true.

A.   Correct.

Q.   Okay.  And you don't have any reason to believe that it isn't true that Ms. Dobitsch and Ms. Evans were talking about a plan to reduce COREs by date.

A.   Correct.

Q.   Okay.  And you don't know, other than Kara Voorhies, who is copied on this email -- you don't know who else at DHS leadership was involved in the plan to cut COREs by date.  Correct?

A.   Correct.

Q.   Okay.  But you understood that Kara Voorhies was acting as a liaison between FEMA and the DHS leadership.

A.   Correct.

Q.   You did understand that Ms. Voorhies and Ms. Evans were talking about right-sizing FEMA, right?

                    (Pause.)

Q.   And you can set that aside.

         Now I'm just asking for your general recollection.

         Around this period of time, do you

understand that Ms. Evans and Ms. Voorhies were talking about right-sizing FEMA?

A.   I was not in any meetings or emails when that was discussed between the two of them.

MS. LEONARD:  Okay.  Well, let's look at something that might refresh your recollection.

WITNESS:  Okay.

MS. LEONARD:  This has previously been marked as Exhibit 20.

(Whereupon, Plaintiffs Exhibit 20, previously marked, was introduced to the witness.)

Q.   Ms. Prieur, Exhibit 20 is a email exchange between Ms. Evans and Ms. Dobitsch that starts on December 4th --

A.   Um-hum.

Q.   -- and continues on to December 5th.

And the top email contains a spreadsheet attachment that is entitled "Copy of CORE Expirations (January 2026)."  Do you see that?

A.   I do.  I just need a moment to --

Q.   Sure.  Please.

A.   -- read and see.

(Witness reading.)

A.   Okay.

Q.   Okay.  Ms. Prieur, on the top email, December 5th -- you are copied on that email, correct?

A.   Yes.

Q.   And in the third paragraph, Stephanie says to Karen:

We're planning several meetings next week to dig in -- into -- to dig into this as part of the plan you and I discussed for CORE rightsizing.

Do you see that?

A.   Yes.

Q.   Does this refresh your recollection that you were --

A.   It does.

Q.   -- you were aware that Ms. Evans and Ms. Dobitsch were working on CORE right-sizing?

A.   Yes.

Q.   And that this was connected to CORE NTE dates -- do you see that?

A.   Yes.

Q.   Okay.  Did you participate in those meetings?

A.   I did not.

I provided a copy of the CORE expirations for January, that attachment.

Q.   And this is the day after Ms. Evans has sent the annual staffing plan to DHS that cuts FEMA in half.  Right?

A.   Yes.

Q.   You were asked, on the morning of December 5th, early, to obtain the list of CORE expirations by month.  Correct?

A.   Yes.

Q.   Do you recall that?

A.   Yes.

Q.   Who asked you to do that?

A.   Probably Stephanie.

Q.   Do you -- was it that morning, or was it late the prior night, do you remember?

A.   It could have been either.

        MS. LEONARD:  And let's take a look at that now.

Q.   First, before I show you the email, do you recall what she said about that request?

A.   She was probably asking, when I looked at the email, to see the number of all COREs who expired in Quarter 2, which would be January 1st to March 31st.

Page 189

Q.   Do you recall that she told you it was for S1 review?

A.   I don't, but it could be in here.

MS. LEONARD:  We'll take a look.

It's Exhibit 26.

(Whereupon, Plaintiffs Exhibit 26, previously marked, was introduced to the witness.)

(Witness reading.)

A.   Okay.

Q.   Okay.  So you've looked at the email exchange from December 5th in Exhibit 26.

Does this refresh your recollection that Ms. Dobitsch told you this was for S1 review?

A.   Yes.

Q.   And -- because that's what you told Daniel Peterson?

A.   Correct.

Q.   And I'm assuming, on this first-in-the-chain email sent at 8:17 a.m. by you, that these are individuals on your staff.

A.   That's correct.

Q.   Okay.  And you were saying that -- here, that the Office of the Administrator requests to track CORE expirations by month, beginning with the January data.

And at 8:17, you ask them to complete this by 10 a.m. that day because the OA would send it to S1.

That's an urgent request, right?

A. Yes.

Q. Okay. And did you have any understanding of why it was so urgent?

A. Yes.

Q. What was that?

A. I understood that we had less than 30 days before the first January CORE would expire. So we needed to provide information to FEMA leadership that would later be sent to DHS leadership on how we would approve renewal or non-renewal of CORE employees.

Q. You believed, at the time, that the request for this data was because of approval?

A. Yes.

Q. Did you have any understanding that this request for data was because of a plan to reduce COREs by date?

A. Not by date.

I knew at this point that we would be required to -- as an agency, to justify any CORE that we were requesting an extension for.

Q.   Does reviewing the email between -- exchange between Ms. Evans and Ms. Dobitsch that I showed you from December 4th --

A.   Um-hum.

Q.   -- at 4:05 p.m. shed any light on your understanding of why Ms. Dobitsch was asking you for this data early in the morning, urgently, on December 5th?

A.   Yes.

Q.   And is it possible that she was asking you for this data of tracking CORE expiration NTE dates by month because of a plan to reduce COREs by date?

A.   Yes.

Q.   And such a plan would not be in the interests of FEMA, would it?

MR. ROSENBERG:  Objection; calls for speculation, lack of foundation.

Q.   Let me ask it a different way.

A.   Um-hum.

Q.   Such a plan would interfere with FEMA's ability to perform its mission.  Correct?

MR. ROSENBERG:  Same objection.

A.   It could.

Q.   Eliminating FEMA CORE employees by NTE date would....

Page 192

Let me ask a different question.

Stephanie Dobitsch forwards the spreadsheet that you sent her on December 5th to Karen Evans on the afternoon of December 5th. Correct?

It's Exhibit 20.

A. Okay. Yes, she did.

Q. Okay. So that -- that is the spreadsheet that you were discussing in Exhibit 26.

A. Okay.

Q. Is that your recollection?

A. Yes.

Q. Okay. Kara Voorhies is copied on this email. Do you see that?

A. I did, yes.

Q. Part of your job as the FEMA CHCO is to understand the Privacy Act, correct?

A. Yes.

Q. If Kara Voorhies were a government contractor, does it give you concern that she was copied on a spreadsheet of -- that contains employees' PII?

A. It could.

Q. But you didn't know at the time whether she was a government employee or a government

contractor.

A.   I still don't.

Q.   Do you have any understanding as to why Stephanie Dobitsch would be copying Kara Voorhies on an email attaching a list of CORE expirations?

A.   Yes.

Q.   Why is that?

A.   Because Kara Voorhies was a liaison, again, between FEMA and DHS leadership.

So if the S1 was going to track CORE expirations, it would be appropriate for the liaison to have knowledge of that information.

Q.   So it's possible that Kara Voorhies provided this information to S1?

A.   She could have.

Q.   Okay.  And you understood, in fact, that her role was as a liaison to that office?

A.   Correct.

MS. LEONARD:  Let's look at another exhibit.

We'll mark this one 76.

(Whereupon, Plaintiffs Exhibit 76 was marked for identification.)

A.   Oh, this is a long one.

Q.   It is.

Page 194

I am actually going to ask you about the top email, but feel free to take a look at each page.

A.    Okay.  Let me just see --

Q.    Yes.

A.    -- what happened from the beginning.

(Witness reading.)

A.    Okay.

Q.    Okay.  You know who Mike Icardi is.

A.    Yes.

Q.    Who is he?

A.    He is Stephanie Dobitsch's senior advisor -- yes, that was his title.

Q.    Okay.  So you see, in this top email, he is referring to some meetings that he says you have participated in.

A.    Yes.

Q.    Do you see that reference?  Okay.

So what Mr. Icardi says here on December 12th is:

We're going to be working
with component leadership on
options to implement leadership
direction on strategic
opportunities for FEMA to

become a smaller organization.

La' Toya's been in these

conversations.

Is it true that you had been in conversations about strategic opportunities for FEMA to become a smaller organization?

A.   Yes.

Q.   Okay.  And to your recollection, did these conversations continue after SOPDA Evans took that position?

A.   Yes.

Q.   And does this refresh your recollection that you were talking with -- that you've been involved in conversations with SOPDA Evans about cutting FEMA's staff?

A.   The meetings that are referred to in this email were between Tami Franklin, Stephanie Dobitsch, Mike Icardi, and Claire Thomas -- and myself.

Q.   Involving "leadership direction on strategic opportunities for FEMA to become a smaller organization."

A.   Correct.

Q.   Days after SOPDA Evans submitted a plan that cut FEMA in half.

A.    Yes.

Q.    Consistent with Secretary Noem's public statements that FEMA should be eliminated as it exists today.

MR. ROSENBERG:  Objection; form.

A.    I'm not sure when the secretary made that statement.

Q.    Consistent with what you understand is a proposed 50% cut in the FEMA Review Council draft report.  Right?

A.    So I understand that was in the draft report.

I did not read it, and I did not receive any instructions to reduce the workforce by 50%.

Q.    Here, Mr. Icardi says:

One of the items we need
to get a handle on is CORE
expiration dates.

So CORE expiration dates were connected to strategic opportunities for FEMA to become a smaller organization.  Right?

MR. ROSENBERG:  Objection; lack
foundation.

A.    Right.

Q.    And -- so, one of the strategic

opportunities to downsize FEMA was by using CORE expiration dates?

A. That could have been an opportunity.

Q. And that's one of the opportunities that was being discussed.

A. Correct.

MS. LEONARD: Okay. Shifting gears, back to the staffing planning that was also happening in this period of time --

WITNESS: Um-hum.

MS. LEONARD: So we talked about the November 21st email from DHS CHCO Edwards that required a bottoms-up approach.

Let's take a look at it.

(Whereupon, Plaintiffs Exhibit 19, previously marked, was introduced to the witness.)

Q. This was previously marked as Exhibit 19, and it's an email chain that continues on.

I will represent the first one is the email. But please read through the whole thing.

A. Okay.

Q. Sorry. The first one is the November 21st email.

Page 198

(Witness reading.)

A. This is a long email. Okay.

Q. I am going to have some questions about Mr. -- how do you pronounce his name? "Neurauter"?

A. "Neurauter," yes.

Q. "Neurauter," Okay. Thank you.

I will have some questions about that.

My first questions will be about the email in the back, but feel free to --

A. Okay.

Q. -- read Mr. Neurauter's email.

(Witness reading.)

A. Okay.

Q. Okay. So let's go -- this is an email chain, obviously, that continues on and talks about some of the developments after the --

A. Um-hum.

Q. -- annual staffing plan.

But let's go back to the beginning.

So --

A. Okay.

Q. -- November 21st, Roland Edwards sends out an email asking for certain information from the DHS components, including FEMA. Correct?

A. Correct.

Q.   And he says:

The staffing plan takes a bottoms-up approach to determine the appropriate staffing levels needed to support Presidential priorities, mission-critical areas, and statutory obligations.

Do you see that?

A.   Yes.

Q.   And he gives a particular format that DHS wants that information in.  Correct?

A.   Correct.

Q.   And you previously testified that the FEMA components complied with that request to provide that information --

A.   That's correct.

Q.   -- in that format, to the level of detail Mr. Edwards was requesting.  Correct?

A.   That's correct.

Q.   And that's supported by the analysis that the components were performing to give you those numbers.  Right?

A.   Yes.

Q.   Okay.  And then -- I believe, less than a month later -- on December 23rd, FEMA sends out an email to its component parts, asking them to again perform a bottoms-up staffing analysis exercise.  Correct?

A.   DHS sent it to the components.

So, yes, I received it on the 23rd.

Q.   The email on the 23rd of December --

I'm not talking about the next in line here.

A.   Okay.

Q.   I'm talking about the email that FEMA sent out on December 23rd called "Workforce Capacity Planning Exercise."

Do you recall that?

A.   Yes.

Q.   So let me ask that question again.

Less than a month later, FEMA asked its program -- programs and offices to again conduct a bottoms-up staffing analysis.  Right?

A.   Correct.

Q.   Okay.  Just -- having just done it a month before, right?

A.   Correct.

MS. LEONARD:  Okay.  Let's look

at that.

We'll call this one 77.

(Whereupon, Plaintiffs Exhibit 77 was marked for identification.)

Q.   So you are familiar with this email, correct?

A.   Yes.  But I'm going to reread it to refresh --

Q.   Please.

A.   -- my memory.

(Witness reading.)

A.   Okay.

Q.   Okay.  So in this email --

Which is from you, correct?

A.   Yes.

Q.   -- FEMA leadership is asked to again conduct a bottoms-up staffing exercise.

This email was sent on December 23rd, correct?

A.   Yes.

Q.   Two days before Christmas.

A.   Yes.

Q.   And they were given a week deadline of December 2- -- 31st.  Correct?

A.   Correct.

Page 202

Q.   So, tasked to perform a staffing analysis, again, over the Christmas holiday.  Correct?

A.   Correct.

Q.   Who made the decision to do that?

A.   DHS provided instructions in Exhibit 19, I believe, asking for the update.

So, yes, on December 18th, DHS sent the annual staffing plan for the second quarter update call, and it was due to DHS on January 6th at noon.

So I did task my peers, again, with the 31st deadline, to allow FEMA leadership an opportunity to review and provide updates prior to the final report being submitted to DHS.

Q.   You were directed to do this by Ms. Evans?

A.   I don't recall if it was Ms. Evans or Ms. Dobitsch.

Q.   And you were directed to include a template?

A.   Correct.

Q.   Which was not attached, but there's a link to the draft workforce plan.

A.   Correct.

Q.   And that template included 50% target cuts.  Correct?

A.   I would have to look at it.

Q.   Do you recall that this email was eventually leaked to the press?

A.   I do remember -- but, I don't remember exactly what the template had in it.

Q.   Did you draft that template?

A.   I did not.

Q.   Who did?

A.   I believe when we traced it back, Claire Thomas was the originator.

Q.   Who is Claire Thomas?

A.   She was a staff assistant to Stephanie Dobitsch.

Q.   Okay.  Stephanie Dobitsch, who, as we have learned today, was participating in discussions regarding a plan to rightsize FEMA with Ms. Evans. Correct?

A.   That's correct.

Q.   And to use CORE expirations by NTE date to do so.  Correct?

A.   Yes.

Q.   And so, attached --

They gave you this draft workforce plan that you included in the email?

A.   Yes.

Q.   Did someone direct you to do that?

A.   Yes.

Q.   Who?

A.   Ms. Dobitsch.

Q.   Okay.  And that --

But you don't know whether Ms. Evans directed her?

A.   Correct.

Q.   And that included 50% targets, which match the annual staffing plan 50% cut that was sent to DHS in early December by Ms. Evans.  Correct?

A.   Correct.

Q.   Well, in response to this, FEMA's component programs and offices did not agree that FEMA's staffing should be cut in half, right?

A.   Correct.

MR. ROSENBERG:  Objection.

MS. LEONARD:  Can we have that clear for the record.

MR. ROSENBERG:  Yeah.

Objection; form, vague.

Q.   Can you give your answer again, please.

A.   "Correct."

Q.   The number that the FEMA components recommended to FEMA OCHCO as a result of the December 23rd exercise was roughly 23,000 staff for

FEMA for fiscal year 2026, correct?

A.   Yes.

Q.   Okay.  Can you look at Exhibit...Mr. Neurauter's email.

A.   Okay.  19?

Q.   Yes, 19 -- the top email.

So --

"Neurauter," is that right?

A.   "Neurauter."

Q.   "Neurauter."

A.   Yes.

Q.   Thank you.

Mr. Neurauter; here he is recounting some facts regarding the steps that have happened in this staffing plan -- "progression," I will call it.

And I'm going to ask you of certain things, whether you know if they're true.

He refers to -- under "Discussion" at the bottom, do you see he's --

A.   Okay.

Q.   -- he's got a discussion of the annual staffing plan created by FEMA CHCO that showed a level of 24,812 by the end of fiscal year 2026.

Do you see that?

A.   Yes.

Q.   That's consistent with your recollection of what the number was that you presented to -- up the chain for approval for the staffing plan. Correct?

A.   That --

Q.   Sorry.  Let me -- let ask that again --

A.   Okay.

Q.   -- because that's not correct.

That number, "24,812," is consistent with the number that was the result of the programs' and regional offices' compilation provided to the FEMA OCHCO as part of that annual staffing plan exercise. Correct?

A.   That's correct.

Q.   Correct, okay.

Then...you provided a staffing plan to....

Hold on one second.

(Pause.)

You provided a staffing plan that contained a number that -- to SOPDA Evans that contained the number we saw in an earlier exhibit that was roughly 23,000.

A.   That's correct.

And that's reflected on the last sentence of the first page.

Page 207

Q.   Well -- so that is a question that I had.

So the data gathered through the workforce capacity planning exercise; that's the name of the December 23rd exercise, correct? -- if you look at Exhibit 77.

A.   What did we name it...?

Yes.

Q.   So -- and that was given a -- the component parts were given a deadline of December 31st to complete that exercise, correct? -- as we -- as you recall.

A.   That was the second opportunity they had to work on that exercise.

Q.   The first one being the November -- as a result of the November 21st email?

A.   Correct.

So they might be called different names, but it's the same action.

Q.   Okay.  And then, do you understand that Mr. Neurauter here is talking about the results of the December 23rd exercise when he says that the data gathered was "23,146"?

A.   I believe that is the number that was provided in one of the exhibits -- yes.

We have so many now.

(Pause.)

Here we go, Exhibit 74.

Q.   Well, that is the number for the fiscal year 2025 totals.

A.   Correct.

And it's the same number, because what I recommended to SOPDA Evans was that we remain flat.

So that was the onboard at the end of 2025, and that is what I recommended.

The number that shows "24,812" is only eight numbers different than what our customers recommended in that same spreadsheet.

Q.   But do you understand -- so what is the number that was the result of the December 23rd workforce capacity planning exercise; do you know?

A.   "December 23rd" -- you're referring to the email that I sent to my colleagues?

Q.   With the December 31st deadline.

And Mr. Neurauter's email is on January 5th.  Do you see that?

A.   I do.

So if we are talking about the message that was sent out December 23rd that I sent from the Chief Human Capital Officer mailbox, that is a different spreadsheet.

That -- that link is to the one -- to the spreadsheet that was established by the Office of Policy and Program Analysis, which was run by Stephanie Dobitsch.

Q.   And it was called "Workforce Capacity Planning Exercise."  Correct?

A.   Yes.

Q.   If you look at Mr. Neurauter's email --

A.   Um-hum.

Q.   -- he describes that email, December 23rd:

FEMA OCHCO sent a Workforce Capacity Planning Exercise.

A.   Okay.

Q.   And then at the bottom, he says:

The data gathered through the Workforce Capacity Planning Exercise resulted in an end-of-fiscal-year 2026 staffing level of 23,146.

A.   Okay.

Q.   Do you understand that he is referencing the total number of staff that the components and programs recommended as a result of the December 23rd Workforce Capacity Planning Exercise?

A.    So the 23,000 is not what the customers recommended.  It was 24,000 and change.

This number is what I recommended to remain flat.

Q.    Okay.  Let's break it down by the two different -- because there are two different exercises.

One was in November to early December.

A.    Um-hum.

Q.    And then, was -- one was at the end of December.

A.    Correct.

Q.    So for the November to early December, you received from the component programs 24,812.

And you recall that you recommended....

You recommended a number that would remain flat.  Correct?

A.    Correct.

Q.    Then there was a -- another staffing planning exercise that the component parts were asked to do in -- on December 23rd, with the deadline of December 31st.

A.    Yes.

Q.    That was called the "Workforce Capacity Planning Exercise."  Correct?

A.    Yes.

Q.    And Mr. Neurauter is here saying that the result of that was a number of "23,146."

Do you see that?

A.    I do.

Q.    Okay.  Do you have any reason to believe that's not correct?

A.    No.

Q.    Okay.  So that, again, the second time around, the component programs and regions were saying that, based on their bottoms-up zero-based analysis, they need roughly 23,000 staff.

A.    Correct.

Q.    Okay.  Thank you.  Sorry.  I know it's --

A.    No worries.

Q.    Thank you for helping me navigate that.

The difference between the exercise that was done in late November and early December and the exercise that was done again in -- after the December 23rd email was a spreadsheet that was attached that contained 50% cuts.  Right?

A.    Yes.

Q.    It was not your decision to ask FEMA's components to redo their staffing plans with a 50% target cut, was it?

A.   No.

Q.   And are you aware that, as the component submissions came in in response to the December 23rd exercise, there were several that were asking to increase staff?

A.   That's possible.

MS. LEONARD:  Let's take a look at....

Q.   Do you recall telling them not to do that? -- not to -- to ask for more?

(Simultaneous speaking.)

A.   I could have had that conversation, but I don't remember who it may have been with.

MS. LEONARD:  Okay.  Let's mark this one as the next, which I believe is 78.

(Whereupon, Plaintiffs Exhibit 78 was marked for identification.)

Q.   Okay.  This is a Christmas Eve email exchange.

Let me know when you're ready.

(Witness reading.)

A.   Okay.

Q.   So this is someone from one of the regions asking if retaining more than their count is an

option in the December 23rd staffing planning exercise.  Correct?

A.   Yes.

Q.   And you respond that you don't recommend asking for that.  Right?

A.   Correct.

Q.   Okay.  And is this consistent with what you told me earlier regarding the reasons that you thought that the num- -- the total number should come in flat?

A.   When I review the executive orders that President Trump issued from January 20, 2025 to this date, the goal was to reduce the size of government and my responsibility is to carry that out.

So I provided a consultation to my customer that stated, If you need this, then put it in, but I recommend you reduce in an area that you don't need to remain flat or come in below what you currently have based on the priority of the administration.

MS. LEONARD:  Let's look at another email.

We can mark this 79.

(Whereupon, Plaintiffs Exhibit 79 was marked for identification.)

Page 214

(Witness reading.)

Q.   I'll represent this is a email that was produced to us by Defendants.

It appears to be an email that was sent on January 2nd from someone named Brian Applebee to Blanca Sanchez.

Let me know when you're ready.

A.   Okay.

Q.   So recognizing that you were not on this email, Blanca Sanchez is -- was, at the time, your deputy, correct?

A.   That's correct.

Q.   Okay.  And she -- who is Brian Applebee?

A.   Brian Applebee is the director of the Business Program Management division under CHCO.

Q.   And he says:

When I submitted --

Blanca,

When I submitted our

no-change staffing plan numbers

for the data call on Wednesday,

███ came back and said that

was not going to be acceptable

for MS Leadership.

Do you see that?

A.   I do.

Q.   So the "no-change staffing plan numbers" is a reference to the result of the December 23rd exercise, correct?

A.   Correct.

Q.   And so, that would be a compilation of the recommendations of the programs and regions for this bottoms-up, zero-based staffing exercise.  Correct?

A.   Are you asking what Brian was referring to or just in general?

Q.   In general.

A.   Yes.

Q.   And then, do you have an understanding that Brian is the one who submitted that?

A.   I know -- I understand that Brian submitted a response for FEMA OCHCO.

Q.   So Brian is referring here to the no-change staffing plan for your office?

A.   Correct.

Q.   Okay.  Who's "XXXXX" [sic]?

A.   XXXX XXXX-XXXXXXX is a staff assistant in Mission Support and reports to the associate administrator --

Q.   From --

A.   -- for Mission Support.

Q.   Sorry to interrupt.

And at the time, who was MS Leadership?

A.   That would have been Stephanie Dobitsch.

Q.   And this says:

We needed to get to 60%.

Do you have any understanding what was --
what that's referring to?

A.   Yes.

Q.   And what is that?

A.   60% of the current staffing level.

Q.   And did you have an understanding at the
time that FEMA OCHCO was being directed to use a 60%
staffing level target in its staffing plan?

A.   No.

Q.   Is this a surprise?

A.   No.

Q.   So why do you think -- do you have an
understanding as to why he was saying, "We needed to
get to 60%"?

A.   Yes.

Q.   And what is that?

A.   That it appears the request from this
email is to reduce our employees by 60%.

Q.   And do you understand he's -- that was
something communicated by "████"?

A.   Yes.

Q.   Had you heard that from MS Leadership previously?

A.   I had not.

Q.   Have you heard it since then?

A.   No.

Q.   Were you aware that MS Leadership was giving offices within FEMA targets?

A.   No.

Q.   But this would be -- a 60% cut -- or, sorry, a direction to get to a 60-cent -- 60% staffing level would be a target, correct?

A.   Correct.

Q.   You're not aware of any other targets, other than the target numbers in the email attached to the December 23rd staffing exercise, that were sent out to components?

A.   That's correct.

Q.   Okay.  But you're also not aware of all the communications that components had with MS Leadership about this, correct?

A.   That's accurate.

Q.   And it's possible that MS Leadership was also giving targets to other offices within FEMA.

A.   That's possible.

Page 218

Q. You are aware at this time -- at the time of the December 23rd staffing exercise, that -- I believe your testimony earlier would -- it would be difficult if FEMA -- for FEMA to perform its functions if its staff was cut in half, right?

A. As it exists, yes.

Q. As FEMA exists.

A. Correct.

Q. Meaning, with all of the responsibilities that have been given to FEMA by Congress.

A. Correct.

Q. In fact, in December you wrote a memo to SOPDA Evans discussing the mission impacts of certain cuts. Do you recall that?

A. I don't.

Q. Do you recall writing a memo about the mission impacts of cutting NTE -- COREs by NTE date?

A. I don't. I probably did, though.

MS. LEONARD: Let's take a look.

WITNESS: Thank you.

MS. LEONARD: This magic box!

Okay. This one we are going to mark as -- oops. It's already been marked as Exhibit 31.

(Whereupon, Plaintiffs Exhibit 31,

previously marked, was introduced to the witness.)

Q.   There you go.

Okay.  Ms. Prieur, you're being hand- -- handed what has been marked as Exhibit 31.

There's a cover email from you.  And then, you had attached several spreadsheets, as well as a December 17th --

A.   Okay.  Let me just --

Q.   -- memo.

Yep.

A.   -- run through this.

(Witness reading.)

A.   Okay.

Q.   Okay.  So earlier, we had seen, in Exhibits 20 and 26, that you had been asked for monthly reports of COREs by NTE date.

And I believe the information you provided on December 5th was January.  Is that right?

A.   That's correct.

Q.   Okay.  So at some point in time, Ms. Evans asked you for more information about the upcoming COREs by NTE date, is that correct?

A.   That's correct.

Q.   Okay.  And here, in the top email, you are providing to her information on the 950 COREs up for

Page 220

renewal by NTE date for the first three months of 2026. Correct?

A. Right.

Q. So January 1 through March 31st.

A. Correct.

Q. And there are 950 of them, and you break down in -- certain information.

Ms. Evans asked you for financial information about how much those employees cost?

A. She did.

Q. Okay. And you provide that information in this cover email.

A. I did.

Q. And then you attach a memo.

Could you turn to the memo, please.

A. Sure.

Q. So the document beginning on Bates number -5056 is a December 17, 2025 email -- memo that you wrote to Ms. Evans?

A. Yes.

Q. Why did you write this memo?

A. I wrote this memo at the request of Ms. Evans.

Q. And what does this -- what was -- the purpose of this memo was to describe the mission

Page 221

effects of not renewing the CORE appointments by NTE date, correct?

A. Correct.

Q. And you run through all the program effects that would happen if the CORE were not renewed by NTE date, correct?

A. That's correct.

Q. And there are a significant number of effects. Is that fair to say?

A. Yes.

Q. And you worked with staff to prepare this list?

A. I worked with my executive colleagues in the field and in headquarters to make sure that I accurately communicated the needs of their organization.

Q. And it says here:

Based on program feedback, the following effects of not renewing these employees would include....

So you were compiling information provided to you from the FEMA program offices that employ the COREs.

A. That's correct.

Q.   And your recommendation on the very last page is:  You recommend to SOPDA Evans to allow FEMA to review based on mission requirements and appropriately renewed term limited appointments.

Do you see that?

A.   Yes.

Q.   You were asking Ms. Evans to allow FEMA to do these renewals.

A.   The recommendation is to allow FEMA to look at each renewal on an individual basis and determine if that position is needed.

So it wasn't for a 100% request to renew, but to at least look at the position function and the employee's level of competence and renew based on that justification.

Q.   And you felt the need that you had to ask Ms. Evans to allow FEMA to do that?

MR. ROSENBERG:  Objection; mischaracterizes the document.

Q.   Go ahead.

A.   My professional opinion is that:  In the role of CHCO, it is my responsibility to consult with leadership and provide them a full picture of what may or may not occur based on the decision they may make.

Q.   Because leadership may not have that full picture already.  Right?

A.   Correct.

Q.   And Ms. Evans did not have that full picture when it came to the CORE.  Right?

MR. ROSENBERG:  Objection; lack of foundation.

A.   I can't say if she had the full picture.

But I wanted to ensure that I put in writing, with input from my colleagues, what the "input" would be of just cutting everyone versus looking at individuals and their functions.

Q.   And as we've discussed from the other documents here today, this was after Ms. Evans and Ms. Dobitsch were discussing a plan to cut COREs by NTE date.  Correct?

A.   Correct.

Q.   Thank you.  You can set that aside.

You were aware that FEMA was required to provide DHS with a Q2 quarterly report by January 6, 2026, correct?

A.   Correct.

Q.   Because OMB and OPM were requiring quarterly reporting on the annual staffing plans.

A.   Correct.

Page 224

MS. LEONARD:  Okay.  Let's take a look.

This was previously -- actually, you know what, we've been going for -- I think we've been going for over an hour.

Why don't we take a break, and I can get organized and we can go faster.

WITNESS:  Okay.

MR. ROSENBERG:  Sounds good.

VIDEOGRAPHER:  Off the record at 2:11.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 2:23.

BY MS. LEONARD:

Q.   Ms. Prieur, I'm going to walk you through some of the communications that occurred in December of 2025 regarding the upcoming renewal dates of COREs in January.  Okay?

A.   Okay.

Q.   You were preparing for approval renewals of COREs with upcoming NTE dates throughout December of 2025.  Correct?

A.   Correct.

Q.   Okay.  And you were trying to push those

Page 225

through for approval by SOPDA Evans.

A.    Correct.

MS. LEONARD:  Okay.  Let's look at what....

Let's look at what has been previously marked -- sorry, this is not a previous exhibit.

80.

(Whereupon, Plaintiffs Exhibit 80 was marked for identification.)

Q.    There you go.

Exhibit 80 is a December 8th email from you to others -- primarily, someone named -- "XXXXXX"?

A.    Yes.

Q.    -- "XXXXXX XXXXX."

And you see that you say here that the ability to renew COREs is going to expire on the 31st and that SOPDA's requesting program offices to provide a two- to three-sentence justification for each employee listed on the attached spreadsheet by name list.

Do you see that?

A.    Yes.

Q.    Okay.  And you gave a date for --

So "suspense for completion" means deadline?

A.    Correct.

Q.    Okay.

-- of December 9th.

And the program offices provided you the information by those deadlines.  Right?

A.    Correct.

Q.    Okay.  This is the first of many formats in which SOPDA Evans requested that justifications for these CORE renewals --

A.    Yes.

Q.    -- occur -- occur.  Correct?

A.    Yes.

Q.    Is that a fair statement?

A.    That is fair.

MS. LEONARD:  Okay.

Okay.  Let's mark this as 81.

(Whereupon, Plaintiffs Exhibit 81 was marked for identification.)

Q.    So the top email is on the 15th.  But I'm going to ask you first about the December 9th, the email that's on the back.

A.    Okay.  Let me read it.

(Witness reading.)

Page 227

A.    Okay.

Q.    The December 9th email is another request to components to fill out the spreadsheet that had been requested by the SOPDA.  Correct?

A.    That's correct.

Q.    Is this the same spreadsheet?

A.    Probably.

Q.    Okay.  And it was a two- to three-sentence justification for each of these employees?

A.    Correct.

Q.    That's what Ms. Evans requested.

A.    Yes.

I need to retract.  It's not the same spreadsheet.

When I look at this email -- Lilian Hutchinson is the regional administrator for Region 3 in Philadelphia.

So this email was giving her a list of Region 3 employees with January expiration dates.

Q.    So you had -- you had -- your office had done the work of breaking down the overall spreadsheet and giving subsets of that overall spreadsheet to the respective component parts?

A.    Yes.

Q.    But you are requesting the same

information that SOPDA Evans had wanted, the two- to three sentence justification.

A.    That's correct.

MS. LEONARD:  Okay.  We'll come back to the one on the 15th, but let's set that aside for right now.

Mark this as 81 -- -2.

(Whereupon, Plaintiffs Exhibit 82 was marked for identification.)

Q.    Okay.  Ms. Prieur, you're giving some information in this December 12th email to Stephanie Dobitsch and Tami Franklin.

A.    Yes.

Q.    Correct?

And you're talking about the set of COREs with upcoming NTE dates in January, correct?

A.    Yes.

Q.    And you have information, by this point in time, that the program and regional offices have requested 93% of the 303 positions be renewed, correct?

A.    Yes.

Q.    And then, of the MCOs, there's a request for 97% of those to be renewed, correct?

A.    Yes.

Q.    What -- what -- was that based on the existing CORE manual process whereby the program and regional directors were submitting the request for renewal to your office?

A.    This was not the normal process.

Q.    So how did you know those percentages -- how did you know that the program and regional office executives were, at this point, requesting 93% of the positions be renewed?

A.    The normal process would be to submit a personnel action in FedHR.  But we, FEMA, did not have authority to renew COREs after December 31st.

So this process was the program offices returning a list of employees with justifications, and the data provided to Stephanie and Tami is a compilation of all 325 COREs with January expiration dates, and what the program and regional executives recommended.

Q.    And that is the information that you request to be provided by December 9th to your office, correct?

A.    That's correct.

Q.    So they turned that around really quickly.

A.    Yes.

Q.    And then you turned it around really

Page 230

quickly.

A.   Yes.

Q.   Okay.  As a result of the decision not to seek approval of the extension of the delegated authority to FEMA to renew certain COREs, did the justifications for the COREs that were expiring in January have to be redone on different paperwork?

A.   Yes.

Q.   And Ms. Evans required you to submit all of the COREs, both MCO and non-MCO, for DHS approval at this point.

A.   Yes.

Q.   And you had to reach back out to the programs and collect all of the justification information using the DHS hiring verification form.

A.   Correct.

MS. LEONARD:  Can we go off the record for a minute?

VIDEOGRAPHER:  Going off the record as 2:32.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 2:33.

MS. LEONARD:  Thank you.

I apologize.

BY MS. LEONARD:

Q.   Exhibit 81, there's a December 13th -- 15th email.  We've already looked at the December 9th email.

In the December 15th email, you say....

Oh, sorry, that's --

Who is XXXXX XXXXXXXXXX?

A.   She is an HR specialist on the Stafford Act staffing division team.

Q.   And was she implementing the process by which you were trying to collect the new DHS hiring verification forms for these 303 COREs that were -- had NTE dates expiring in January?

A.   Yes.

Q.   Okay.  And is that what this email is?

A.   Yes.

Q.   Okay.  And it's due back two days later on the -- December 17th?

A.   Yes.

Q.   And did you instruct your staff to collect these forms from the region and program offices?

A.   Yes.

Q.   And at some point on December 17th, you were given more requirements for how to package this information.  Do you recall that?

Page 232

A.    I don't.

MS. LEONARD:  Okay.  Well, let's mark this as 82 -- 83.

(Whereupon, Plaintiffs Exhibit 83 was marked for identification.)

(Witness reading.)

A.    Okay.

Q.    Do you recognize this?

A.    No.  I have not -- I don't recall seeing this.

Let's see if I'm on here.

(Witness reading.)

A.    No, I'm not listed.

Q.    This is produced to us that -- we believe, from a "Sent" email box.  So it does not....

A.     This is from the Stafford Act staffing division mailbox, where XXXXXX XXXXX is the director.

Q.    Great.  Thank you.

That's what the "From" line is there?

A.    Yes.

Q.    Okay.  And that is someone who works for you?

A.    Yes.

Q.    Okay.  Do you have any understanding as to

Page 233

why she is sending out this message, that:

> To improve DHS review
> outcomes, each CORE term
> renewal justification must be
> rewritten to fit what the S1
> verification form is designed
> to capture.

A.   This was more than likely sent out because the justifications were all over the place, and the forms that were requested on December 15th by ███████ ████████ were returned and they were not complete.

Q.   So you were sending out requests for additional information?

A.   This would have been a supplemental email with specific instructions on how to complete that S1 hiring verification form.

MS. LEONARD:  Okay.  Let's mark this, actually -- I think this might shed some light -- as 84.

(Whereupon, Plaintiffs Exhibit 84 was marked for identification.)

(Witness reading.)

Q.   So this appears to be a email chain involving Region 5?

A.   Correct.

Q.   Responding to some of the requests for repackaging of the justification information for the expiring COREs?

A.   Yes.

Q.   And attached to this are some of the -- some of the forms.

And you can see they have the FEMA component head's signature included, as long -- as well as the justification?

A.   Yes.

Q.   How much work did it take to compile the completed S1 verification forms in such a short period of time by your office working in conjunction with the program offices?

A.   Are you asking me to estimate how many personnel worked and the number of hours they worked on these?

Q.   I think an overall description would be fine.

A.   This was a change-in-work process.

Ms. Evans was the new administrator, and this was a significant task.

I will say it took us several -- we went through several iterations to provide her with a work product that she liked to receive.

Q.   So she was rejecting some of the work product and telling you to redo it?

A.   Correct.

Q.   It was clear, from the work product that she was receiving, that the program offices and components were recommending renewal for these CORE positions.  Correct?

A.   For some of them, yes.

Q.   For almost all of them.  Correct?

A.   Correct.

Q.   And it was clear, from the work product she was receiving, that that decision and approval was being made by the heads of those component offices and regions.

A.   That's correct.

Q.   And it seems as though every time you provided Ms. Evans with information, she came back with requests for more information.

Is that how it felt?

MR. ROSENBERG:  Object --
objection; form, vague.

A.   We went back and forth several times before agreeing on a method.  That's accurate.

Q.   Also, the information you were providing about the COREs at the time, in terms of the numbers

and the finances, she was asking for more and more and more information about that.  Correct?

A.    There were several requests for additional information.

MS. LEONARD:  Okay.  Well, let's mark this as 85.

(Whereupon, Plaintiffs Exhibit 85 was marked for identification.)

Q.    This is one example of Ms. Evans responding to your provision of information about the expiring COREs, with a request for additional information.  Correct?

A.    Yes.

Q.    And she's saying to you, on December 17th:

I need to have the December 321 included in this analysis.

Do you know what she's referring to?

A.    Yes.

Q.    What is that?

A.    There were 321 FEMA CORE employees who had expiration dates in December 2025.

Q.    Why would she need the December 321 included in the analysis?

A.    She would --

MR. ROSENBERG: Objection; calls for speculation.

Q. I can ask that a different way.

A. Okay.

Q. Do you have any understanding as to why she would need the December 321 CORE employees included in the analysis that you're providing regarding the upcoming expiring CORE?

A. Yes.

Q. Why is that?

A. I believe the information I provided included the employee job series and the number of employees that were renewed.

Q. The information that she was asking for about December, she wanted to know how many had already been renewed.

A. Correct.

Q. Ms. Evans wasn't happy that FEMA had been renewing CORE employees in 2025. Correct?

A. I would phrase it differently.

Q. She had a reaction when she learned that FEMA had been extending CORE positions during 2025, did she not?

A. Ms. Evans' words to me were that she believed FEMA supplemented permanent full-time

employees with CORE employees.

Q.   Did Ms. Evans explain what knowledge of what FEMA employees actually do that she was basing that on?

A.   No.

Q.   She was looking at -- she wanted to know the numbers of FEMA CORE employees who had been -- already been extended.  Correct?

A.   Yes.

Q.   So this was not information she needed to analyze the upcoming NTE expirations.  Correct?

A.   It could have been used to analyze upcoming NTEs.

Q.   If she was going to use it to justify not renewing people.

A.   It could have been used for that purpose.

          MS. LEONARD:  I think this is another example of one of the responses, but why don't we mark it as 86.

          (Whereupon, Plaintiffs Exhibit 86 was marked for identification.)

Q.   This looks like FEMA Region 6.

          (Witness reading.)

A.   Yes.

Q.   And is this an example of some of the --

Page 239

well, of one of the regions turning around the DHS hiring verification forms, signed by the FEMA component or regional head, with the justifications that were requested?

A.   Yes, it is.

MS. LEONARD:  Okay.  You can set that aside.

Back to the requests for more information -- No. 87.

(Whereupon, Plaintiffs Exhibit 87 was marked for identification.)

Q.   Okay.  Let me know when you're ready.

(Witness reading.)

A.   I am ready.

Q.   Okay.  So just to follow this timeline, you had sent Ms. Evans, in response to a request she had made to you on December 17th at 6:46 p.m., a summary of information regarding the upcoming expiring COREs that we've looked at in previous exhibits.  Correct?

A.   Yes.

Q.   And then she responded saying she wanted December.  That's the next in line.  Correct?

(No audible response.)

Q.   And then she sends a response to you and

Page 240

Stephanie on December 18th, the following day, in which she is expressing disappointment with the spreadsheet, correct?

A.    Yes.

Q.    And she's saying this is a failure -- all caps, bold, and italics -- to follow directions and instructions.

A.    Yes.

Q.    And she did not want the names in anything that went to her.  Correct?

A.    That's correct.

Q.    She had the authority, as the FEMA SOPDA, to see the names of the employees who were being renewed, correct?

A.    Yes.

Q.    But she clearly did not want to do that. Correct?

A.    Correct.

Q.    So she was expressing that disappointment to you.

A.    Yes.

Q.    And she says:

            I'm not going to continue
          to work with these spreadsheets
          due to the failure of the staff

to follow directions.

Q.   Did you understand that to be direction that you needed to provide her information again in another format?

A.   Yes.

Q.   And there's a reference, at the bottom of the email on December 18th to Ms. Dobitsch, to transition any outstanding tasks that she was working on.

Did you have an understanding at that point that Ms. Evans had asked for Ms. Dobitsch to be MDR'd out of FEMA?

A.   I don't know if she was MDR'd at this point.

At this point, Stephanie held two roles.

She was the associate administrator for the Office of Program and Policy Analysis, and she was also the acting associate administrator for Mission Support.

What I understood from this email is that she would no longer be in the acting role for Mission Support and that would be transferred to Puneet Khan, who was the acting deputy chief of staff.

Q.   So at this point on December 18th, you

Page 242

hadn't been told that Ms. Evans was asking for Stephanie to be transferred yet.

A.   I don't remember what date she asked for the transfer.

Q.   Okay.  Would it surprise you to learn that on the evening of December 17th she asked Greyson McGill to transfer Stephanie Dobitsch out of FEMA?

A.   No.

MS. LEONARD:  Okay.  All right. Let's mark this as the next:  88.

(Whereupon, Plaintiffs Exhibit 88 was marked for identification.)

Q.   So on December 15th, Stephanie Dobitsch sent an email to Karen Evans describing the upcoming COREs that were up for renewal in January, with recommenda- -- with a description of recommendations that the programs are recommending 302 positions to be extended.

Do you see that?

A.   I do.

Q.   And then Karen Evans responds on the 17th, copying you, saying that she did not approve any extensions.

A.   Yes.

Q.   And she's reacting to a statement by

Page 243

Stephanie regarding some of the -- extension of some COREs who were actively deployed.  Correct?

A.   Yes.

Q.   And she's also saying that she's not saying that she's submitting 212 CORE positions through the verification process.

A.   Correct.

Q.   You were preparing 303 packets for her approval, correct?

A.   Yes.

Q.   Because the programs were recommending that 303 people be renewed.  Correct?

A.   Correct.

Q.   And she was resisting that.  Correct?

A.   I would not say she was resisting it.

She wanted to receive the information in a manner that was easily digestible.

Q.   After having instructed that the information be packaged twice already?

A.   That sounds right.

MS. LEONARD:  Okay.  Let's look -- mark the next as 89.

(Whereupon, Plaintiffs Exhibit 89 was marked for identification.)

(Witness reading.)

Page 244

A.   Okay.

Q.   Okay.  So again, December 17th -- it seems like a lot was happening the night of December 17th.

Do you have any recollection as to why so much was happening the night of December 17th?  Was something going to happen on December 18th?

A.   I don't recall.

Q.   Okay.  Do you know if Ms. Evans had any meetings planned regarding this subject on December 18th?

A.   I don't recall.

Q.   It's possible she had a meeting planned with DCOS Guy?

A.   I don't have access to her calendar, so I don't know.

Q.   So you don't know all the meetings that she had with DCOS Guy.

A.   Correct.

Q.   Okay.

A.   I don't know any of them.

Q.   Okay.  Did you -- remind me, did you ever participate in any meeting that include Ms. Evans and DCOS Guy?

A.   No.

Q.   Okay.  All right.  Looking at

December 17th, she is saying here:

                    Stop all action --

          I mean, now we're bold, all caps.  I guess she's -- well, bold, all caps:

                    Stop all actions, and it
               is clear we are not on the same
               page.  I did not request 303
               packages to be prepared.

          Had you understood Ms. Evans to previously request 303 packages to be prepared?

     A.   I previously understood Ms. Evans to have my customers provide a list of positions that would be recommended for renewal, and my customers provided 303 packages.

     Q.   Do you have any understanding as to why Ms. Evans was forwarding this email chain to Victoria Barton?

     A.   I do not.

     Q.   Do you know who Victoria Barton is?

     A.   Yes.

     Q.   Who is she?

     A.   She is the associate administrator for the Office of External Affairs.

     Q.   She's the press person?

     A.   Yes.

Page 246

Q.   Is she a political appointee?

A.   Yes.

Q.   And do you know whether Karen Evans was discussing CORE renewals with Victoria Barton?

A.   Victoria was in some of the meetings where CORE renewals were discussed.

Q.   What meetings?

A.   I believe I may have been in one of the principal meetings and, with Victoria being a principal, she was present.

MS. LEONARD:  Okay.  Let's mark the next as....

Q.   Sorry.  You said "one of the principal meetings."  When was that?

A.   It would have been in December 2025.

Q.   And the principal meetings are the -- that's the leadership of FEMA?

A.   Correct.

Q.   And what do you call -- recall about that meeting and the issue of CORE renewals?

A.   CORE renewals were discussed.

Q.   By whom?

A.   By me, by my customers, by Ms. Evans.

Q.   And what was discussed?

A.   How they would be renewed after

December 31st.

Q.   And do you recall when this meeting took place?

A.   I just know it was in the month of December.

Q.   Do you think it's before or after the emails that we've been looking at on December 17th, 18th?

A.   It's hard to say.

Q.   Well, Christmas was the foll- -- a week later.  So presumably it was before that.

Is that fair?

A.   That's fair.

Q.   And the decisions hadn't yet been made on the CORE renewals when you had this meeting, correct?

A.   That's correct.

Q.   And do you recall whether it was before or after the decision had been made not to seek extended renewal?

A.   It would have been after.

Q.   So now we're talking about a window maybe between December 15th and December 25th.  Correct?

A.   That could be, yes.

Q.   Okay.  And there was a meeting at which

Page 248

CORE renewals were discussed for January.

A.   Correct.

Q.   And was there any discussion of not renewing by NTE date?

A.   Not to my recollection.

Q.   There was a discussion of the need to seek S1 approval for these renewals.

A.   That's correct.

Q.   And to use the hiring verification process.

A.   Correct.

Q.   And that it was ultimately DHS's decision whether or not to renew these employees.

A.   Correct.

Q.   Did Ms. Evans, at this meeting, express anything else about DHS direction?

A.   No.

Q.   Was Ms. Voorhies there?

A.   She could have been.

Q.   The liaison to the DHS leadership.

A.   Correct.

Q.   Have you told me everything you remember about that meeting?

A.   Yes.

Q.   Were any decisions made at that meeting?

MR. ROSENBERG:  Objection; vague.

A.   I don't recall.

Q.   Do you recall what you did after that meeting with respect to CORE renewals?

MR. ROSENBERG:  Objection; vague.

A.   I continue working on packages for approval.

Q.   Did Ms. Evans express dissatisfaction with what she had been provided so far at that meeting?

MR. ROSENBERG:  Objection; vague.

A.   Possibly.

Q.   Did she give you deadlines for the materials that she needed?

A.   Possibly.

Q.   Do you remember what those were?

A.   I don't.

Q.   Did she ever tell you, If you don't provide the materials by a certain date, I'm not going to renew the COREs?

A.   No.

Q.   So you understood that if you got the materials to her in advance of the dates, that

Page 250

Ms. Evans would review them, make the approvals, and pass this information on to DHS?

MR. ROSENBERG:  Objection; mischaracterizes prior testimony.

Q.   You can answer.

A.   My understanding was:  I needed to provide Ms. Evans with renewal packages in an easily digestible format; she would make recommendations, and those recommendations would then be forwarded to DHS S1 for review, approval, or disapproval.

Q.   The "easily digestible format," that was for DHS, correct?

A.   That was for Ms. Evans.

Q.   And DHS?

MR. ROSENBERG:  Objection; calls for speculation.

A.   It could be for DHS.

Q.   Did you ever hear that S1 wanted things packaged for her review in an easily digestible format?

A.   No.

MS. LEONARD:  Okay.  Let's mark this as the next:  90.

(Whereupon, Plaintiffs Exhibit 90 was marked for identification.)

Page 251

Q.   Exhibit 90 appears to be an email that you sent on December 18th, summarizing some due-outs from a meeting that you had with Karen Evans.

Is that correct?

A.   Yes.

I'm just going to read this, quickly.

Q.   Please do.  Please do.

(Witness reading.)

A.   Okay.

Q.   Okay.  One of the meeting due-outs from this December 18th meeting was that the group hiring -- that you needed to group the hiring verification request for January, 303 total, by program regional office.

And then they are required to provide a signed justification prior to elevation to the SOPDA.

Do you see that?

A.   Yes.

Q.   Was that what Ms. Evans told you?

A.   Yes.

Q.   Okay.  And is that what you did?

A.   Yes.

Q.   You were working incredibly hard to prepare these DHS verification forms for Ms. Evans

because you understood that they would be passed on to DHS, correct?

A.   Yes.

Q.   You worked through Christmas, correct?

A.   I did.

Q.   Do you recall whether you worked Christmas Eve as well?

A.   I don't.

Q.   Okay.  You worked all day on Christmas.

A.   I did.

Q.   So that these 303 people could have a shot at being renewed.

MR. ROSENBERG:  Objection; form.

Q.   Is that correct?

A.   Yes.

MS. LEONARD:  All right.  Let's mark -- this has previously been marked as Exhibit 32.

(Whereupon, Plaintiffs Exhibit 32, previously marked, was introduced to the witness.)

Q.   Exhibit 32 starts with an email from you to Puneet Khan -- who is someone in the Office of the Administrator, correct?

A.   Yes.

Q.   Was she the deputy?

A.    No.    She was the acting deputy chief of staff.

Q.    Acting deputy chief of staff.

So she worked for Karen Evans.

A.    Correct.

Q.    And you understood that you were providing this information so that it could get to Karen Evans.

A.    Correct.

Q.    And can you describe what you were providing here.

A.    What I provided was electronic copies delineated by program office, with a justification.

So each program office had a cover sheet.

An example would say:  Region 1 has 20 CORE renewals for the month of January.  They are requesting 15 or "X" percent be renewed.

And then it listed the position title; the date that the appointment expired; and a check box, yes or no, for Karen to approve or disapprove or request additional information.

And then the attachments included justifications for each of the positions that were listed, along with the DHS hiring verification form required by the S1.

Page 254

Q.   Signed.

A.   Yes.

Q.   Let's take a look at....

This is -- that packet of information is what you understood Ms. Evans to be requesting that you provide in that meeting on December 18th, correct?

A.   Correct.

Q.   That's the easily digestible format that she asked for.

A.   Correct.

Q.   And you worked incredibly hard to get that to her.

A.   Yes.

Q.   For all 303.

A.   Yes.

Q.   At the same time, you were having a conversation by email with Ms. Evans about FEMA's prior authority to renew MCO petitions.

Do you recall that?

A.   Vaguely.

MS. LEONARD:   Okay.   We can mark this as 91.

(Whereupon, Plaintiffs Exhibit 91 was marked for identification.)

(Witness reading.)

A.   Okay.

Q.   So we'd previously discussed that your understanding, coming out of the March and May directives from DHS, was that FEMA had the authority to extend MCO and PMCO COREs by two years.

A.   Through December 31st, I believe.

I need to go back and look at the secretary's approval memo.

Q.   Well, the approval memo was for non-MCO COREs.  Correct?

A.   I'm going to go back and --

Q.   Okay.  Yeah, we can pull it.  I do not know what exhibit number it is, I'm sorry.  It's probably in the beginning.

I think it was 21.

A.   Okay -- oops.

(Pause.)

A.   Okay.  Here we are.

Q.   I am happy to hand you my copy.  It's --

A.   Okay, because it's not 21.  Thank you.

Q.   It's marked -- is it marked as new here?

A.   Thank you.

Q.   It's the -- it's the May 14th memo.

(Witness reading.)

A.    Okay.  Thank you so much.

Q.    Oh, you're welcome.

MR. ROSENBERG:  I can put this in front of the witness.

MS. LEONARD:  Okay.  And it is Exhibit -- is it Exhibit --

MR. ROSENBERG:  21.

MS. LEONARD:  -- 21, okay.

MR. ROSENBERG:  Yes.

BY MS. LEONARD:

Q.    All right.  So Exhibit 21 was the May 14th memo.

Does this refresh -- refresh your recollection --

A.    It does.  Thank you.

Q.    -- that the 180-day delegated authority back to FEMA was for non-PMCO COREs?

A.    Yes.

Q.    And that, as a result of the email exchange that you had with Mr. Brown at DHS CHCO, you understood that FEMA did have the authority to extend for up to two years any COREs that fell within the MCO.

A.    Correct.

Q.    But Ms. Evans disagreed.

A. Correct.

Q. And she told you that.

A. Yes.

Q. And that is why you were preparing the packets for all 303, whether they were MCO or not.

A. Correct.

Q. Okay. And here's an email exchange, No.~91.

A. Okay. I've got 91.

Q. Yeah, so we can -- you can set those aside, and we will organize them.

A. Okay.

Q. So here's -- here's No. 91.

So this is December 19th.

A. Um-hum.

Q. And it's an exchange between you and Ms. Evans about that authority issue in response to some things that you had provided to her.

And my understanding is: You were attempting here in these emails to explain to her and document the basis of your understanding as to why FEMA had the authority to extend the MCO COREs.

Is that fair?

A. That's correct.

Q. Okay. And then she disagrees.

Page 258

A.    That's correct.

But this isn't the end of the email string.  There's another, where I provided her with the documentation and we were all on the same page.

Q.    She understood that FEMA had the authority to extend by two years?

A.    She did.

Q.    She still made you provide the 303 packages for DHS approval.

A.    That's true.

Q.    Let's look at this email first.

A.    Okay.

Q.    So, because -- she's interpreting Mr. Brown's statement, "If it is not in the realm of a PMCO or MCO, you will need to ask for a waiver," incorrectly, in your opinion, correct?

A.    She does not have the full context.

Q.    The SOPDA of FEMA did not have the full context to understand this email from Mr. Brown as of December 19th?

A.    That email from Mr. Brown was sent to me in March 2025.

Q.    Um-hum.

A.    And Ms. Evans was not a FEMA employee then.

So when I say she didn't have the full context, that's what I mean, because she was not employed by FEMA.

What I provided her with after this was the OMB memo that we went over that was either issued on January 20th or 21st.

Because Ms. Evans believed that FEMA was renewing COREs for two years without authority, I went back, showed her that memo with the email from Mr. Brown, and everything was squared away and we were understood -- we understood one another after that.

Q.   Why do you believe that if she still made you prepare the packets for MDR approval for all 303 COREs for January?

A.   That was her request as the SOPDA.

Q.   Did she tell you she agree- -- like, did she tell you she agreed with you that FEMA had the authority to extend the MCO COREs by two years?

A.   She told me that she was going to leave that decision to the S1 and to follow the hiring verification process for all COREs with expiration dates after December 31, 2025.

Q.   Because she had been directed by DHS to do so?

Page 260

MR. ROSENBERG:  Objection.

A.    She did not tell me that she had been directed by DHS.

Q.    It's possible she had been directed by DHS to do so, isn't it?

MR. ROSENBERG:  Objection; calls for speculation.

A.    She -- I don't know.

Q.    But you're telling me that you thought she agreed with you that FEMA had authority, because you had showed her the OMB memo in Mr. Brown's email, and yet she still continued to require you to submit all COREs, including MCOs, for DHS approval.

A.    That's correct.

Q.    Are you aware of whether she communicated with anyone at DHS about this issue?

A.    I don't know.

Q.    She communicated with Roland Edwards about this issue.  Do you know that?

A.    I don't know that.

Q.    She asked him to back her up on her interpretation of FEMA's lack of authority.  Do you know that?

A.    I do not know that.

MS. LEONARD:  Okay.  Let's take

Page 261

a short break.

VIDEOGRAPHER:  Go off?

MS. LEONARD:  Yeah.

I believe --

VIDEOGRAPHER:  Off the record at 3:13.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 3:23.

BY MS. LEONARD:

Q.   Ms. Prieur, do you recall at some point in December of 2025 Ms. Evans expressing -- thank you -- Evans expressing concern that FEMA had been transferring COREs to MCO positions so that they could be extended for two years?

A.   She may have mentioned that.

Q.   She was upset about that.  Correct?

A.   I don't recall exactly.

Q.   She did not want FEMA COREs to have been transferred to MCO positions so that they could be extended for two years to provide service to FEMA.  Correct?

A.   I can't say that's correct.

Q.   She asked you to collect information on COREs that had been reassigned into MCO positions in

2025.  Do you recall that?

A.    Yes.

MS. LEONARD:  Okay.  Let's take a look.

So this should be 92 -- it's already in.  It's Exhibit 49.

(Whereupon, Plaintiffs Exhibit 49, previously marked, was introduced to the witness.)

Q.    And she not only --

Okay.  Please -- take a look, and please let me know when you are ready.

A.    Okay.

(Background noise.)

MS. LEONARD:  Sorry.

Q.    And my question is going to be about the top email.

(Witness reading.)

A.    Okay.

Q.    So the top email is you sending to Mr. Edwards, the DHS CHCO, the requested data regarding CORE appointments.

And you say:

The data team is generating a report to show the number of FEMA employees who

were reassigned to a MCO

January 20 to the present.

Do you see that?

A.    Yes.

Q.    Mr. Roland -- Mr. Edwards requested this data?

(Witness reading.)

A.    It was requested by Ms. Evans on the email dated December 19, 2025 at 11:58 a.m.

On Paragraph 3 --

This email was to Roland, but she copied me.

Q.    Um-hum.

A.    -- she asked me to pull SF-50s, which is a Notification of Personnel Action that had been processed by FEMA for the DHS 089 Series and government-wide series of MCOs, which are mission critical occupations.

Q.    But Ms. Evans is not forwarding the data to Mr. Edwards.  You are.  Correct?

A.    After that email was sent, Roland and I called one another to make sure we were pulling the same data and the information that we would provide to Ms. Evans separately would line up.

Q.    You are not providing the data to

Page 264

Ms. Evans. You are providing the data to Mr. Edwards here. Correct?

A. With a copy to Puneet Khan, who was my acting supervisor at the time.

Q. Understood.

Ms. Prieur, it appears that this data was requested by DHS.

Is that true?

A. Not to my knowledge.

MR. ROSENBERG: Objection.

Q. You don't recall that DHS requested you to provide this data?

A. This data was requested by Ms. Evans.

Q. Do you know whether Ms. Evans was discussing with DHS the issue of COREs that had been reassigned to MCO positions in 2025?

A. I do not know.

Q. But she was certainly discussing it with Mr. Edwards at DHS. Correct?

A. That's correct.

Q. And also, apparently, with Kara Voorhies, who is copied on emails. Correct?

A. Correct.

Q. And the data that was requested is a comparison between the renewals provided between

January 1 and November 30th and January 20th and November 30th.

A.   That's correct.

Q.   And the significance of those dates...?

A.   I gave year-to-date information in the first bullet point.

This was sent on December 19th.

And our payroll systems generally run a pay period behind.  So November 30th would have been the most up-to-date information I had for 2025 at that date.

So I gave year-to-date information in the first bullet.

The second bullet was data from the presidential transition to date.

Q.   So the comparison here that is being requested is the comparison between the year that includes the time period before the presidential transition and after the presidential transition.

A.   That's correct.

Q.   To see the difference between those numbers, presumably.

A.   Correct.

Q.   Okay.  And do you have any other information as to why Ms. Evans was asking you for a

Page 266

comparison that would reveal the number of MCO

positions that were reassigned prior to President

Trump taking office?

A.   Do I know why Ms. Evans asked for that

information?

Q.   Yes.

A.   Yes, I do.

Q.   And that's because she was concerned about

FEMA's reassignment of CORE positions to MCO

positions.  Correct?

A.   Correct.

Q.   And if they were assigned -- reassigned to

PMCO positions under the authorities we've been

discussing here today, FEMA could extend them for

two years.  Correct?

A.   She wanted information about the 0089

Emergency Management Series.

Q.   Because she believed that CORE employees

had been transferred into that Emergency Management

Series.  Correct?

A.   That was a theory of hers that she wanted

data on, correct.

Q.   Because she was concerned that they --

that FEMA then had the ability to extend their

renewals for two years.  Correct?

A.   That's --

MR. ROSENBERG:  Objection; lack of foundation.

Q.   Please answer.

A.   Will you restate, please?

MS. LEONARD:  Can you read back the question.

(Whereupon, the court reporter read back from the record as follows:

"Q   Because she was concerned that they -- that FEMA then had the ability to extend their renewals for two years.  Correct?")

A.   That is correct.

Q.   And that would undermine her goal of cutting FEMA in half.  Correct?

MR. ROSENBERG:  Objection; lack of foundation.

A.   I don't know what her thoughts were.

Q.   That would make it more difficult to reduce the number of COREs if COREs had been extended by two years.  Correct?

A.   Their expir- -- their term expirations would have been extended.  That is accurate.

Page 268

Q.    And some of them would have been --

Two years would have taken some of these out beyond fiscal year 2026, correct?

A.    Yes.

Q.    And the staffing planning that we've been talking about, including the 50% cut in the annual staffing plan, was for fiscal year 2026, correct?

A.    That is correct.

Q.    And the planning that Ms. Evans and Ms. Dobitsch were talking about, as we looked at the documents today, was for fiscal year 2026, correct?

A.    That is correct.

Q.    Okay.  Ms. Evans conveyed a decision, with respect to the CORE employees who were due for NTE dates in the first two weeks of January, on December 31st, correct?

A.    That could be correct.

I was out of the office, so I would have to go back to emails at that time.

Q.    So you were out of the office for the holidays during that time?

A.    I was out of the office, I want to say, beginning on Christmas.

And I came back January 12th.

Q.    But you did, at times, receive and send

Page 269

emails during this time period?

A.   I would have sent emails.

I don't have my calendar with me.

I think I flew out the Saturday after Christmas -- so that could have been the 27th, 28th. And then, I came back around January 9th or 10th.

So there were probably emails sent from my work email at that time, because I did not take any of my work devices with me.

Q.   And it's possible you were copied on emails that you then read after you came back.

A.   Yes, that's correct.

Q.   Okay.  And was it your practice, generally, to read all the work emails after you came back?

A.   Yes.

MS. LEONARD:  Okay.  Well, let's look at one of them.

This is 92.

(Whereupon, Plaintiffs Exhibit 92 was marked for identification.)

Q.   So this is an email, on which you are copied, from Ms. Evans on New Year's Eve.

A.   Yes.

Q.   And it responds to an email from your

deputy, Blanca Sanchez.

Was Ms. Sanchez covering your responsibilities, in part, while you were out?

A.   Yes.

Q.   And she is, in this email request -- it says:

OCHCO is requesting your approval of a 30-day NTE extension for CORE employees whose appointments expire this month.

Do you see that?

A.   Yes.

Q.   Because she is trying to allow those employees to stay employed while Ms. Evans, and perhaps others, complete the process for approval. Correct?

A.   That is correct.

Q.   And Ms. Evans conveys that the actions are not approved.  Do you see that?

A.   I do.

Q.   So Ms. Evans did not approve a extension, even for the MCO COREs who were subject to this decision, correct?

A.   Yes.

Q.   Notwithstanding what we discussed earlier about the authority that FEMA had with respect to those positions.  Correct?

A.   That's correct.

Q.   And as a result of the decision that's reflected by this statement, those individuals were separated from federal employment, correct?

A.   I believe so.

Q.   And you are not aware of who Ms. Evans communicated with before conveying this decision to FEMA, correct?

A.   Correct.

Q.   You don't know whether she was instructed to make this decision, correct?

A.   Correct.

Q.   You don't know whether DCOS Guy actually made this decision.  Correct?

A.   I don't know.

Q.   Do you know that Ms. Evans met with DCOS Guy before conveying this decision?

A.   No.

Q.   Are you aware that she had regularly scheduled meetings with DCOS Guy?

A.   No.

Q.   Are you aware of whether Ms. Evans

discussed this decision with Ms. Voorhies before conveying this decision?

A.   I am not.

Q.   Sitting here today, do you know who made the decision to allow these employees to be separated from federal employment?

A.   Based on the emails that I read when I returned, I believe Ms. Evans' words were:

Based on OCHCO's inability to manage their workload, these employees are not being renewed.

Q.   So you understood that Ms. Evans was blaming OCHCO for the employees being separated from service?

MR. ROSENBERG:  Objection; mischaracterizes testimony and also misleading.

Q.   You can answer.

A.   My understanding, having talked with Ms. Evans, is:  The packages were not received in a manner that she believed was professional and she did not have sufficient time to make a decision prior to the expiration of some of the term appointments.

Q.   You provided 303 packages to Ms. Evans in the format she requested after working through Christmas on December 25th?

A.   That's correct.

Q.   And the decision was made on....

Well, the decision was conveyed on December 31st? -- according to this e-mail.

A.   Yes, according to Exhibit 92.

Q.   Should Ms. Evans have had sufficient time to review those packages in the six days that she had them?

MR. ROSENBERG:  Objection; lack of foundation, calls for speculation.

A.   I do not know what Ms. Evans' calendar looked like, and what priorities and responsibilities she had.

Q.   So is six days enough time to review the packages that you prepared so quickly?

MR. ROSENBERG:  Same objection.

A.   Asked and answered.

Q.   Could you have reviewed those packages in six days, Ms. Prieur?

A.   I don't know what Ms. Evans had on her calendar.

So based on her responsibilities and

priorities, I do not know if I could have reviewed the packages in six days.

Q.   Well, how about:  We do know she was working on December 31st.  Do you think she could have reviewed them in one day, on December 31st, when she was working?

MR. ROSENBERG:  The same objection.

A.   I do not have access to Ms. Evans' calendar, nor do I have insight on her workload.

Q.   Well, she didn't prioritize that work to allow time to make this decision.  Correct?

A.   What I will share is:  Upon my return from vacation, Ms. Evans asked for a 30-day advance notice to review CORE renewals.

Q.   Had she ever told you that at any point in time in this process where she was requesting continuous revisions of the paperwork related to these renewals?

A.   No.

Q.   Had she ever expressed to you that she did not -- she was not aware of whether the program and regional officers had approved and requested these renewals?

A.   Will you say that one more time, please?

Page 275

Q.   Sure.   Had she ever expressed to you that she was -- she didn't understand whether the program and region officers -- offices had requested these renewals?

A.   We did have conversations in December, where I explained the renewal process.

There was a time that Ms. Evans was not aware if the program heads approved those renewals.

And I did go through the process and explained that the regional and program heads were respons- -- ultimately responsible for making those decisions.

Q.   Ms. Evans didn't understand the process that was in the CORE manual?

A.   I don't know if she didn't understand the process.

I did provide clarifying language.

Q.   And the information you had repeatedly provided to her in multiple formats indicated that the programs and regions had requested these renewals, correct?

A.   Yes.

Q.   Are you aware of any communication from Ms. Evans during the point in time where she was renewing -- reviewing the information you provided

her, where she asked for any information regarding the functions that these CORE employees actually performed for FEMA?

A.   She did ask, and that information was provided in the attachments exactly what the individual -- of course, the name was redacted -- but what that individual was responsible for accomplishing.

Q.   Ms. Evans repeatedly asked for information regarding how much these employees cost.  Correct?

A.   She did.

Q.   And she conveyed that information to DHS. Correct?

A.   I don't know --

If you consider Kara Voorhies DHS, then, yes.  But I don't know if it was conveyed outside of Kara.

Q.   And information regarding spending on these employees was conveyed to Mr. Edwards as well. Correct?

A.   I believe so.

Q.   While we look for that document, let's switch back to something I wanted to follow up on with respect to the annual staffing plan.

A.   Okay.

Page 277

Q. Which was: You recall that there was a due date of January 6th for the quarterly -- the Q2 quarterly report on implementation of the annual staffing plan that was required by DHS.

A. Correct.

Q. January 6th was while you were out.

A. Yes.

Q. And -- but did you look into, after you returned, what had happened with that quarterly report?

A. I probably did. I don't remember specifics.

Q. Okay. Thank you. If you look at Exhibit...something. It's the Neurauter email.

A. Okay.

Q. Exhibit...19.

A. Oh, right here.

Q. Mr. Neurauter is talking about how to comply with the Q2 quarterly report for FEMA, correct?

A. Yes.

Q. And his recommendation, on the second page, is that DHS OCHCO is told that FEMA has no update. Do you see that?

A. I do.

Q.   And he's explaining this history because the staffing plan that Ms. Evans provided to --

A.   Um-hum.

Q.   -- DHS was at a Level 2 level of detail, correct?

A.   Correct.

Q.   And the staffing plan and analysis that the programs and regions had done was down to a Level 5 level of analysis.  Correct?

A.   That is correct.

Q.   And there was no way to reconcile the two, based on the number of cuts that she had made.  Correct?

A.   Correct.

Q.   And so, that was the basis for the recommendation that FEMA not provide an update.  Correct?

A.   That's not what Jeff wrote.

He wrote that OCHCO be given permission to socialize Ms. Evans's staffing goals, because he obtained a copy of what was ultimately submitted for Quarter 1 that showed a staffing level of 11,383 employees and that was news to us.

Q.   What does "socialize the staffing goals" mean?

A.    That means to communicate it with our business partners.

Q.    So the program and regional offices who did not know either that SOPDA Evans had submitted a annual staffing plan for FEMA that cut it in half.

A.    That's correct.

Q.    And when those programs and offices were responding to the December 23rd exer- -- staffing exercise with the 50% target, they came back with around 23,000 staff, as we previously discussed.

A.    That's correct.

Q.    And there was no way to reconcile that with Ms. Evans' "11,383" number for purposes of this quarterly report, correct?

A.    Correct.

Q.    Do you know whether that information was conveyed to DHS?

A.    I don't know.

Q.    Do you know whether FEMA provided a Q2 quarterly report on implementation of Ms. Evans' annual staffing plan?

A.    I would have to go back and look at emails, because I don't remember what was submitted.

Q.    Do you know -- you don't know whether....

Had you -- at any point in time, did you

Page 280

come to learn that the Office of the Administrator orally conveyed that FEMA was not going to provide a Q2 update?

A.   That's possible.

Q.   But you don't specifically recall what you know about that.

A.   I don't.

Q.   Have you ever seen FEMA's Q2 update?

A.   I have not.

Q.   Have you ever seen what DHS provided to OPM and OMB as a Q2 update?

A.   I did not.

Q.   Have you ever talked to OPM or OMB regarding the FEMA Q2 update?

A.   No.

Q.   Have you ever talked to OMB and OPM regarding FEMA's annual staffing plan?

A.   No.

Q.   Has FEMA ever received any feedback from OMB or OPM on that staffing plan?

A.   No.

Q.   Were you aware that Ms. Evans told OPM and OMB the 11,500 number for fiscal year 2026 for FEMA?

A.   No.

Q.   Were you aware of anyone else at DHS

communicating with OPM and OMB regarding that staffing plan?

A. I understood that Roland Edwards would combine all of the responses and share the report with OPM and OMB.

Q. Have you ever learned that FEMA has provided any further amendment or modification to the annual staffing plan that was provided to OMB and OPM?

A. No.

Q. So, no, you don't -- you don't -- you've never learned that they have done that.

A. Correct.

Q. If FEMA were to provide a modification through one of these quarterly reports, your office, presumably, would be involved?

A. Yes.

Q. Do you know when the Q3 quarterly report is due?

A. I have not received any information on Q3, and that is because DHS is lapsed and staffing plans are not an excepted activity.

Q. DHS will, hopefully, soon not be lapsed.

A. Hopefully.

Q. And -- but you have yet to receive any

Page 282

further information on when the Q3 deadlines are going to be.

A.   That's correct.

Q.   Do you know what the Q3 deadlines were for other agencies?

A.   I don't.

Q.   Okay.  And....

(Pause.)

MS. LEONARD:  This is the document I was looking for.

All right.  Let's mark this as 93.

(Whereupon, Plaintiffs Exhibit 93 was marked for identification.)

(Witness reading.)

A.   Okay.

Q.   Ms. Prieur, was Ms. Evans aware that you were out of the office on December 31st?

A.   If she was not, she got a bounce-back.

Q.   Do you think she should have been aware that you were out of the office?

MR. ROSENBERG:  Objection; vague.

Q.   Do you think you had told her that you were going to be out of the office?

A.   I believe I shared that information.

Q.   Okay.  But she is responding to your email on Christmas -- on New Year's Eve, with a series of additional requests.  Correct?

A.   Correct.

Q.   Including, she wants to know what a fully loaded CORE is receiving in pay, correct?

A.   Yes.

Q.   And she wants the package -- packages being prepared to include the pay proposed, correct?

A.   Yes.

Q.   And then she asks for additional justifications for determinations for all COREs who were renewed the three and four years.

Do you see that?

A.   Yes.

Q.   So she is talking about previous renewals here --

A.   Correct.

Q.   -- that she believes were for the lengths of three or four years.  Correct?

A.   Correct.

Q.   And it -- had they been --

Are you aware of any COREs who were renewed for three years?

A.    Yes.

Q.    Okay.  Did you understand that she -- when you read this email, whether it was then on this day or when you returned, that Ms. Evans was asking, going forward, that the amount that the COREs cost the agency be included in the renewal packets?

A.    Yes.

Q.    Do you have any understanding as to whether Ms. Evans was asking for this information because someone at DHS wanted it?

A.    I don't know.

Q.    It's possible.  Right?

A.    Yes.

Q.    Because other information regarding the cost of COREs who were coming up for expiration had been conveyed to DHS by this point in time. Correct?

A.    I do not know that.

Q.    It was conveyed to Ms. Voorhies and Mr. Edwards, correct?

A.    Yes.

Q.    Had Ms. Evans at some point reversed course on whether an option of becoming a reservist would be conveyed to COREs who were being released from service in January?

Page 285

A.   What do you mean, "reversed course"?

Q.   There was a point in time where Ms. Evans was requesting that the option of becoming a reservist be included in the separation letter, correct?

A.   Yes.

Q.   And then, she decided that it should not be included in the separation letter.

Do you recall that?

A.   I don't recall it not -- her -- her taking that back.

I do recall her asking that it be included.

MS. LEONARD:  Okay.  Let's take a look at 94.

(Whereupon, Plaintiffs Exhibit 94 was marked for identification.)

(Witness reading.)

A.   Okay.

Q.   So if you put side by side Exhibit 90, which is a December 18th email from you with the meeting due-outs....

A.   Exhibit 9-0?

Q.   Yes, 9-0.

(Pause.)

Page 286

Q.   I can read you the line of it.

A.   Okay.

            MR. ROSENBERG:  I got it.

            WITNESS:  Thanks.

            MS. LEONARD:  Counsel has it.

            WITNESS:  Thank you, sir.

BY MS. LEONARD:

Q.   One of the bullet points here in 90 is:

            Update CORE non-renewal

         letters to include an option

         allowing employees to transfer

         to the Serv Reservists

         workforce.

A.   Yes.

Q.   Do you see that?  Okay.

     So that matches your recollection --

recollection --

A.   Thank you.

Q.   -- that at some point Ms. Evans was

advocating for that to be an option.

     Now, if you look at Exhibit 94, at the

beginning of the chain on January 2nd she's asking

you where the letter is.

     And -- and that looks like it's at about

2:14 p.m.

And by 6:13 p.m., she is saying:

No one should be placed

into a reservist position

because they are new hires.

Do you see that?

A.   I do.

Q.   Okay.  So that is what I was referring to by "reversing course" with respect to offering a reservist option.  Do you see that here?

A.   Yes.

Q.   Because Ms. Evans is concerned that that would be a new hire that would require S1 approval, correct?

A.   Yes.

MR. ROSENBERG:  Objection; foundation.

Q.   And do you have any information as to whether DHS -- anyone from DHS instructed her not to allow for this option?

A.   No, I don't.

Q.   Okay.  You returned, as you said, the week of January 12th?

A.   Yes.

Q.   So, earlier that weekend, but back to work on the 12th?

A.   Yes.

Q.   And are you aware that, as of January 12th, there was an additional batch of January COREs with imminent entry dates for Ms. Evans to review?

A.   Yes.

Q.   Do you know that those approval packages were sent to her on January 6th?

A.   I would have to review my email, because I am not sure of the date.

Q.   And she had not moved forward with those as of January 12th?

A.   If that's what the emails say.

Q.   And do you have any reason to believe she was waiting for her weekly meeting with DCOS Guy before moving forward with any approval packages?

A.   I'm not aware of a weekly meeting.

Q.   Are you aware of whether she met with DCOS Guy on January 13th?

A.   I am not.

Q.   And then the approvals move forward on January 13th?

A.   No, ma'am.

Q.   You did become aware at some point in time in January that Karen Evans and DCOS Guy had worked

out a new process for the renewal -- for the review of renewals of the CORE.

A.    I believe there may be an email.  I'll need to look at it to refresh my memory.

MS. LEONARD:  Okay.  Let's mark this as Exhibit 95 -- sorry, 59.  It's already in.  Thank you.

(Whereupon, Plaintiffs Exhibit 59, previously marked, was introduced to the witness.)

A.    Thank you.

(Witness reading.)

A.    Okay.

Q.    Does the email on January 14th at the bottom of Exhibit 59 refresh your recollection that there was a process that DCOS Guy and Ms. Evans had worked out regarding the CORE renewals?

A.    I don't believe I ever received this email, so this is my first opportunity to review.

Q.    Were you aware of some of the decisions that are reflected here?

A.    Yes.

Q.    So did you know that if there was a common position, such as Emergency Management Specialist, Ms. Evans was going to disapprove that unless there was a specific explanation?

A.   No.

Q.   Emergency Management Specialist, a -- was a common position because there were so many of them in the CORE, correct?

A.   Yes.

Q.   And they provide many important services for FEMA, correct?

A.   That's correct.

Q.   And disapproving those Emergency Management Specialists without a specific reason, would that lead to some of the effects that were discussed in your December 17th memo to Ms. Evans?

                    MR. ROSENBERG:  Objection; lack of foundation, calls for speculation.

Q.   You can answer.

A.   I believe Ms. Evans said that she disapproved unless there was a specific explanation.

     So if there was an explanation to provide a justification for the need of that Emergency Management Specialist, they were approved.

Q.   Do you know that to be true?

A.   I do.

Q.   But cutting Emergency Management Specialists would -- based on the fact that the position was common, would have a very significant

impact on FEMA's ability to perform its services, would it not?

MR. ROSENBERG:  Objection; misleading, calls for speculation.

Q.   You can answer.

A.   It could.

Q.   The impacts that you discussed in that December 17th memo...would those impacts still apply going forward in 2026 based on a decision to eliminate CORE positions?

A.   It depends on a few things:  what FEMA might look like in the future and what CORE positions could be eliminated.

Q.   Well, let's assume that Congress does not modify the statutory requirements for FEMA and the --

A.   Um-hum.

Q.   -- statutory missions and duties that it has given to FEMA.  So, those responsibilities remain the same.

Would cutting COREs in a substantial way still have those impacts?

A.   They could.

MR. ROSENBERG:  Objection; misleading and vague.

Page 292

Q.   Sorry, can I get a clear answer.

A.   "They could."

Q.   Would you be surprised if I told you that Ms. Evans confirmed in her testimony that she never completely read your memo?

A.   Yes.

Q.   As the FEMA SOPDA, she should have read your memo.  Right?

MR. ROSENBERG:  Objection; form.

A.   I am a consultant.  And what she reads is at her discretion.

Q.   If DHS had not imposed on FEMA a rule that they couldn't review -- renew the COREs without DHS's approval, would -- do you believe that FEMA would have renewed nearly all of the COREs up for renewal in January?

MR. ROSENBERG:  Objection; confusing and calls for speculation.

A.   Will you restate, please?

Q.   Sure.  If DHS had not imposed on FEMA a rule that they couldn't renew COREs without DHS's approval --

A.   Um-hum.

Q.   -- do you believe that FEMA would have renewed nearly all of the COREs up for renewal in

January?

MR. ROSENBERG:  Objection; calls for speculation.

Q.   You can answer.

A.   It has been FEMA's past practice to renew most expiring COREs.

Q.   So if FEMA and -- the FEMA program and regional offices -- the heads of those offices recommended 300 and -- all 303 COREs that you had put forward to Ms. Evans for -- that -- who were up for renewal in January.  Correct?

A.   Correct.

Q.   And if FEMA had followed its CORE manual, those program offices' and regional heads' approval would have allowed for the renewal of those COREs. Correct.

A.   Had not the process been in place?

Q.   Yes.

A.   Yes, that's correct.

Q.   So is it fair to say that the separations that occurred in January are the result of the DHS's secretary's priorities and policies being imposed on FEMA?

MR. ROSENBERG:  Objection; lack of foundation, misleading, calls for

speculation.

A.    It is fair to say that Ms. Evans did not request authority from DHS to renew and the process in place extended the amount of time it takes to receive approval to renew a CORE.

Q.    And as we've covered, you are not aware of whether someone at DHS instructed Ms. Evans to do that.  Correct?

A.    That is correct.

Q.    Does FEMA still need the employees who were released in January to perform important functions?

MR. ROSENBERG:  Objection; lack of foundation.

A.    I don't know.

Q.    It's possible that they do.  Right?

A.    It's possible.

Q.    The program heads and regional offices who recommended their renewal just months ago wanted these employees, right?

A.    They did.

Q.    They repeatedly provided the FEMA OCHCO over and over again, on very short notice, with justifications to keep these employees.  Correct?

A.    That's accurate.

Q.   And that process continued through February and March.  And to this date, they are still advocating for the renewal of their CORE. Right?

MR. ROSENBERG:  Objection; confusing, vague and compound.

Q.   You can answer.

A.   What time periods are we speaking of?

Q.   So let's talk about February.

There were -- there was a whole 'nother cohort of CORE -- CORE employees who were up for renewal.

And the -- my question is:  The program heads and regional heads were advocating for the renewal of those employees, correct?

A.   That's correct.

Q.   And the cohort in March, the program heads and regional heads were advocating for the renewal of those employees.  Correct?

A.   That's correct.

Q.   Okay.  And as of late January, there was another shift in practice with respect to what was going on with these renewals that was -- that coincided with the winter storm.

Do you recall that?

A.   That's correct.

Q.   So that was right after you came back?

A.   That was the week after I came back.

Q.   And there was a pause in the offboarding of COREs by NTE date.  Is that correct?

A.   I can testify that, unless a CORE had a performance or conduct related issue, no COREs have been released since January 19, 2025.

Q.   And the renewals that they have been given have uniformly been for 90 days.  Correct?

A.   With the exception of attorneys.

Attorneys are renewed for 180 days.

Q.   But DHS has indicated that it has approved the renewals for 90 days.

MR. ROSENBERG:  Objection.

A.   For all others.

MR. ROSENBERG:  Confusing.

COURT REPORTER:  Excuse me?

MR. ROSENBERG:  Objection; confusing.

You can answer, if you know.

MS. LEONARD:  I can unpack it.

I can -- I can ask a different question.

It's totally fine.

BY MS. LEONARD:

Page 297

Q.   DHS has -- for all of the CORE renewals that you just referenced after the winter storm in January of 2026, the renewals -- DHS has approved renewals uniformly for only 90 days.  Correct?

A.   With the exception of attorneys, that is correct.

Q.   S1 came to FEMA to do a press conference about the winter storm.  Correct?

A.   Correct.

Q.   Were you there?

A.   No.

Q.   After a year of stating that FEMA should be eliminated, DHS Secretary Noem was appearing at FEMA and holding press conferences.  Correct?

A.   Say that again, please.

Q.   After a year of advocating for the elimination of FEMA, DHS secretary came to FEMA and was holding press conferences about FEMA's activity around the winter storm.  Correct?

MR. ROSENBERG:  Objection; misleading, and to the extent -- it's plural or singular?

Q.   Go ahead.

A.   I would say that the secretary did not advocate for the elimination of FEMA for the entire

year.

That language was softened probably around May 2025.

Q.   Are you aware that she was still saying FEMA should be eliminated as it exists today, later in the year?

A.   Yes.

Q.   Okay.   What was the reaction among FEMA staff of Ms. Noem's attempt to gain positive press for herself using FEMA?

A.   I was not present, so I don't know.

Q.   Did you hear anything about it?

A.   No.

Q.   Mr. Lewandowski was also present at FEMA for the winter storm?

A.   I am not sure.   He could have been.

Q.   The batch of employees that Ms. Evans sent forward on January 13th was not approved by their actual NTE dates.   Correct?

A.   Say that one more time, please.

Q.   So there was a batch of employees that Ms. Evans had sent forward to DHS on January 13th for approval, but they were not approved by their actual NTE dates.   Do you recall that?

They had to be reinstated later.

A.    There was a group that needed to be reinstated, yes.

Q.    Do you know that the approval came through from DHS on January 22nd?

A.    That could be correct.

Q.    Do you know whether -- that DHS was planning to lift the instruction to pause the offboarding during the week of January 27th?

A.    Those are not the instructions I received.

Q.    Okay.  You're not aware of anything like that?

A.    No.

Q.    Okay.  You're -- you are aware that --

Was your office preparing separation notices at that time?

A.    On January 27th?

Q.    Um-hum.

A.    No, we were not.

Q.    You are aware that the Plaintiffs in this lawsuit had filed suit on January 27th, challenging the actions of DHS and FEMA with respect to the CORE?

A.    I am aware now.

Q.    Were you aware at the time?

A.    I don't believe so.

Q. At some point after Plaintiffs sued, DHS changed the procedures around CORE renewals again, correct?

A. Can you be more specific?

Q. Sure. There was an initial period of what I'll call "confusion" while the DHS approvals were waiting, and people were being separated and then having to be reinstated. Correct?

A. There -- yes, the process was not clearly defined.

Q. And then at some point, it was worked out that CORE -- the process was worked out so that the CORE renewals were happening for a maximum of 90 days. Correct?

A. Correct.

Q. And as we've seen from emails, certain categories were being rejected for renewal.

A. Please provide some additional specificity.

Q. Okay. You're not aware of categories that were being rejected?

A. No.

MS. LEONARD: Okay. Let's look at this one, actually.

This is -- this was previously

Page 301

marked as 65.

(Whereupon, Plaintiffs Exhibit 65,

previously marked, was introduced to the witness.)

(Witness reading.)

A.   Okay.

Q.   Okay.  So in Exhibit 65 there's an email

from Karen Evans to you on February 6th, where she

says:

Per our discussion, until

further notice please process

CORE renewals in accordance

with HQ policy.  Their renewal

dates should be NTE 90 days,

for consistency.

Do you see that?

A.   Yes.

Q.   And the HQ policy....

Were you privy to what the HQ policy was

that she worked out with DCOS Guy?

A.   That COREs would be extended for 90 days,

that were approved.

And what "approved" means is that

Ms. Evans approved the package that I sent her.

By this time, we had a rhythm going where,

I want to say, for February she got at least two

Page 302

weeks' advance notice and then 30 days for every month beyond.

So she would review the package, send me back her approvals and disapprovals. I would then package that and send it to DHS CHCO Edwards.

I don't know what CHCO Edwards did with the packages after he received them. But at some point, I would receive an approval memo back from him and then I would notify my customers.

Q. DHS CHCO Edwards is the CHCO of an agency that has approximately 200,000 employees. Correct?

A. 260,000.

Q. "260,000."

Why was he personally involved in the approval process for the FEMA COREs?

MR. ROSENBERG: Objection; calls for speculation, lack of foundation.

A. I wouldn't say that he was involved in the approval process, because the renewal of term employees is an HR action.

His office served as a correspondence analyst with DHS leadership.

Q. But why was Mr. Edwards the personal conduit for that information with respect to FEMA COREs?

Page 303

A.   Because he is my peer and I communicate with him.

Q.   Any other reason you're aware of?

A.   Not to my knowledge.

Q.   Do you believe someone in DHS leadership instructed him to do that?

A.   I don't know.

Q.   Are you aware of anyone, beyond Ms. Evans and DCOS Guy, who was involved in coming up with the policies that would apply in February 2026 to the CORE renewals?

A.   There is another name on the memo I signed.  I just don't remember who it is.

Q.   On the memo you signed....

A.   From....

So it was myself, Ms. Evans, Roland, I think DCOS Guy -- and there was one other individual.

There was a declaration that I signed --

Q.   Oh.

A.   -- in March.

So there's another person's name on there. I just don't recall who it is.

Q.   Did someone provide you that information?

A.   I received it in an email.

So, yes, Ms. Evans would have provided me with that information.

Q.   You didn't draft that declaration.

A.   I did not.

Q.   You were told what individuals to include in that declaration?

MR. ROSENBERG:  Objection --

A.   No.

MR. ROSENBERG:  --

mischaracterizes.

Q.   You received information from Ms. Evans regarding which individuals to include in that declaration.

A.   I searched my emails.  So Ms. Evans did not provide me with the email.

When the draft declaration came out, I went through my emails to see who in leadership was communicated with.  And I found one where two officials from DHS were involved, and that's why their names were listed.

Q.   But you don't actually know who at DHS was actually involved in the decision-making process for the CORE renewals.  Correct?

A.   There was a singular email from Ms. Evans, where I was -- I wasn't initially included.  She

forward- -- she forwarded the email to me, and it showed a discussion about CORE renewals with DHS senior officials.

Q.   She forwarded that email to you?

A.   Yes.

Q.   And are those the names you included in the declaration?

A.   Yes.

Q.   Okay.  There were no other individuals shown on that email?

A.   No, not to my knowledge.

Q.   You were aware that Ms. Voorhies was communicating with Ms. Evans regarding these issues, correct?

A.   I was aware that Ms. Voorhies was in meetings.

I do not recall receiving any specific requests for information from Ms. Voorhies.

Q.   Did Ms. Evans tell you not to include Ms. Voorhies' name on that declaration?

A.   Oh, no.  She did not.

Q.   Okay.  But you're not aware of -- that declaration was given to your knowledge, correct?

A.   Yes.

Q.   It was -- but you're not aware of all the

individuals in DHS leadership who were actually involved in the decision-making with respect to the CORE, correct?

A.   If there were additional officials involved, I do not have knowledge of that.

MS. LEONARD:  Sorry.  Give us one second.

WITNESS:  Um-hum.

(Pause.)

MS. LEONARD:  Okay.  Thanks.

Let's mark this as the next, which is 95.

(Whereupon, Plaintiffs Exhibit 95 was marked for identification.)

MS. LEONARD:  Is this the same email?  I think this is the same one we just marked.  Right?

WITNESS:  Yeah.

MS. LEONARD:  This is what happens at the end of the day -- look at that.  We've got -- we've got two of them. We're not all crazy.  Okay.

MR. ROSENBERG:  I was actually going to ask if you needed a break. But....

Page 307

MS. LEONARD:  Yeah, it is the same email, but I just didn't see the sentence.

WITNESS:  It's 59.

MS. LEONARD:  Yeah, so -- well, that's 95.

Let's just ignore --

WITNESS:  Okay.

MS. LEONARD:  -- ignore that. We're going to go back to -- is it 65?

MS. ESHLEMAN:  65.

MS. LEONARD:  65, okay.

BY MS. LEONARD:

Q.   The question that I was going to ask --

A.   Oh, okay.

Q.   -- about this email is:  Karen Evans in the first email is saying:

Any plan terminations due to the regular order, i.e. no longer needed, will be processed as well.

What do you understand her to be referring to by the "regular order, i.e. no longer needed"?

A.   The -- I understood this to mean any employee that was facing termination due to

performance or conduct.

Q.   What is the "regular order"?

MR. ROSENBERG:  Objection; asked and answered.

Q.   Go ahead.

A.   The same answer, that -- any employee that was going to be removed for performance or conduct.

Q.   Is there some "order" she is referring to there? -- like a actual document.

A.   No.  We would -- are you asking about HR processing?

Q.   I'm not understanding the term "due to the regular order."

A.   I understood that to mean the regular order of business; meaning, if anyone -- we had proposed termination for performance or conduct.

Q.   Okay.  So you understood her to be referring to the regular order of business; meaning, performance or conduct and not something else?

A.   Correct.

Q.   Okay.  She wasn't referring to a standing order to eliminate the CORE.

A.   That was not my understanding.

MS. LEONARD:  Okay.  Let's take another short break, and we can see how

much we have left.

WITNESS:  Okay.

VIDEOGRAPHER:  Off the record at 4:27.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 4:44.

BY MS. LEONARD:

Q.   Ms. Prieur, you're not aware of any prior time when FEMA was renewing CORE terms in only 90-day increments.  Correct?

A.   Correct.

Q.   And the 90-day extensions have similar concerns that you expressed previously with respect to the 180-day extensions with respect to stability and planning, correct?

A.   Correct.

Q.   And the reason for the 90-day-only policy right now is directly linked to FEMA's annual staffing plan.  Correct?

A.   Correct.

Q.   And these CORE individuals are being held in limbo, awaiting the results of that staffing planning exercise.  Correct?

MR. ROSENBERG:  Objection;

Page 310

misleading.

A.   I wouldn't call it "limbo."

I would say it's accurate, the 90-day time frame correlates with the due date of the staffing plan.

Q.   And it's true that the -- whether or not many of these CORE employees are going to be renewed again is contingent on the results of that staffing plan, correct?

A.   Among other things, yes.

MS. LEONARD:   Let's take a look at....

We'll mark this 96.

(Whereupon, Plaintiffs Exhibit 96 was marked for identification.)

(Witness reading.)

A.   Okay.

Q.   So Ms. Prieur, this is a January 13th email that you sent to Ms. Evans.  Is that -- right after you got back, right?

A.   Correct.

Q.   Okay.  And are you responding to a request for information that she had given you?

A.   Yes.

Q.   Okay.  And you're providing information to

her regarding the overall number of FEMA employees?

A.   Yes.

Q.   As well as a list of CORE expirations for the entire upcoming calendar year.  Correct?

A.   Correct.

Q.   Do you have any understanding as to the reasons why she asked you for that information?

A.   Yes.  It was for knowledge and for data points.

Also, it -- she asked me to develop a template for some staffing plans that would be due for -- I guess this is Quarter 2 -- yes, January through March 2026.

Q.   For the Q3 reporting.

A.   For -- right.

Q.   Q1 is October 1 through the end of the year, and then Q2 is January 1 through the end of March.  And then, Q3 would be after that?

A.   Correct.

Q.   Okay.  And we've discussed that there were internal -- there was an internal FEMA deadline for the components to provide the information for that -- that Q3 reporting?

A.   That's correct.

Q.   Of March 3st?

Page 312

A.   Correct.

Q.   Okay.  And then -- so at the bottom, you are talking about options for how to present that request to the programs and regions.  Is that right?

A.   That's accurate.

Q.   Okay.  And you're recommending that the -- that the request provide a template that provides a zero-based staffing approach for all functional areas based on the agency's mission.

Do you see that?

A.   Yes.

Q.   At this point in time that you had written this, you were still not aware that Ms. Evans had submitted an annual staffing plan that cut FEMA in half.  Correct?

A.   Correct.

Q.   You hadn't seen that?

A.   Correct.

Q.   Did she tell you?

A.   No.

Q.   Okay.  So after this email, you then drafted a proposed email to send out to the programs.

A.   That's correct.

                    MS. LEONARD:  Okay.

Page 313

All right.  This will be next, 97.

(Whereupon, Plaintiffs Exhibit 97 was marked for identification.)

(Witness reading.)

Q.   Okay.  So we're further along in the chain here.

A.   Yes.

Q.   Okay.  So am I correct in understanding that the subsequent emails reflected in 97 are also about this -- about -- you're discussing what is going to go out to the programs regarding the staffing planning?

A.   Correct.

Q.   Okay.  And then you have -- you have drafted an email with -- an email to customers and an "up late" -- updated template with instructions.

A.   Correct.

Q.   And the email document appears to be attached to the top --

A.   Yes.

Q.   Okay.

-- email.

A.   It's on the last page.

Q.   And the last page -- and you drafted this?

Page 314

A.   Yes.

Q.   Okay.  If you....

So this is talking, again, about a fiscal year 2026 annual staffing plan and FEMA's submissions to DHS, OPM, and OMB, as we've discussed.

And if you turn to....

Did you -- sorry, let me ask you a different question:  Did you include a draft template with this?

A.   It was linked, yes.

Q.   And was that a spreadsheet?

A.   Yes.

Q.   Okay.  And is that a spreadsheet that you created?

A.   Yes.

Q.   And it includes the fields that you have identified here.

A.   Correct.

Q.   And you've suggested populating some information.

A.   Correct.

Q.   And you've suggested prepopulating some information for the program offices and regions.  Correct?

Page 315

A. Correct.

Q. And if you go back to the last page, the FY 2026 projected -- projection, you have suggested to be auto-populated.

A. Correct.

Q. That means that the numbers for the projection for fiscal year 2026 will be provided to the program and region offices, as opposed to their providing them to you, correct?

A. No.

Q. What does that mean?

A. What that means is: My team populated existing data, like what the current staffing numbers were as of December 31st, which I believe was Pay Period 25.

We then had fields for reductions, fields for addition.

So the total field, the last field, would automatically summarize what was in the first three fields.

So the first one was where we were at the end of the calendar year, any proposed reductions, any proposed additions.

And I put a formula in the last tab so people didn't have to do the math.

Page 316

Q.    Okay.  That makes sense.  Thank you.

A.    You're welcome.

Q.    If you look at the email exchange --

A.    Um-hum.

Q.    -- there is an email on the second page from Karen Evans to you, where she says:

> I'm adding Cynthia as she has also been working the numbers.

Did Cynthia Radway --

Is that her name? -- "Radway."

A.    Yes.

Q.    Cynthia Radway, the chief financial officer, did she -- what "numbers" is Karen Evans referring to here?

A.    I believe she's referring to staffing numbers, as in what we can afford.

Q.    What you can afford based on the existing appropriations?

A.    Correct.

Q.    And Cynthia responds:

> La' Toya,
> For purposes of our analysis, we separated fee-funded positions which

Page 317

provide us more trade space.

We'll share our analysis with

you.

Do you know what -- can you explain what she's -- you understood her to be referring to?

A. So the fee-funded positions in FEMA are the National Flood Insurance Program, because they charge a fee for service, and the working capital fund at Mount Weather, where they also charge a fee for service to their federal partners.

I believe there's one or two other fee-fund- -- -funded streams in FEMA.

Q. And she says:

...which provided us more

trade space.

Do you know what that means?

A. Yes.

So when we're looking at full-time employees and the cost of those employees, Cynthia's analysis not only summarizes salary but also benefits, which is generally 33% on top of the individual's salary.

So "trade space" meaning: If we have 100 people in fee-funded positions, we need to exclude those from the analysis to see if we can perhaps add

Page 318

some additional people back in.

Q. Based on the set amount of money that you were looking at?

A. Correct.

Q. Okay. And the amount of money that you were analyzing here was the proposed appropriation for FEMA?

A. Yes.

Q. That has...okay.

And this was as of mid-January when there were ongoing discussions, I would say, in Congress regarding appropriations.

A. Correct.

Q. Is that fair? Okay. Got it.

Did you intend for this -- sorry, different question.

Were the instructions you were getting from Ms. Evans regarding the staffing planning exercise to -- intended to be yet another bottom-up, zero-based analysis?

A. Yes.

Q. So this is the third round in several months that programs and regions are going to be asked to conduct such an analysis.

A. Yes.

Q.   But no decision had been made, at this point in time, as to what -- how to instruct them yet.  Correct?

A.   Correct.

MS. LEONARD:  All right.  Let's mark this 98.

(Whereupon, Plaintiffs Exhibit 98 was marked for identification.)

Q.   There you go.

A.   Thank you.

Q.   And I can represent to you that we redacted the individual names that are on this document in the black box.

(Witness reading.)

A.   Okay.

Q.   So on January 20th, you are -- this is an email from you, on January 20th, to someone named Thomas Layou.

A.   Yes.

Q.   Who is that?

A.   He is the deputy chief financial officer.

Q.   And in this email on January 20th, you say:

At present, renewals are limited to 90 days to allow

Page 320

program and regional offices an
opportunity to submit an annual
staffing plan by March 31st.

Do you see that?

A.   Yes.

Q.   So that was correct.

A.   Yes.

Q.   And that was direction -- that was not a
decision that you made.  Correct?

A.   Correct.

Q.   That was direction that you were given.

A.   Correct.

Q.   And then you say:

I'm hopeful the staffing
plan template will be released
this week.

Was it?

A.   No.

Q.   Okay.  Has the staffing plan template been
released since this email at some point in time?

A.   Yes.

Q.   And when was that?

A.   I want to say late January, early
February.

Q.   And were instructions provided to the

regions and programs regarding how to complete that template?

A.   Yes.

Q.   They were not provided in an email similar to the December 23rd email.  Correct?

A.   That's correct.

Q.   Were you instructed to provide those instructions in a different format?

A.   I was instructed not to provide an email.

Q.   To FEMA leadership.

A.   Correct.

Q.   Because SOPDA Evans was concerned about leaks?

A.   That is correct.

Q.   Because the December 23rd email had been provided to the press, who had asked questions about the 50% cut plan.  Right?

A.   That is correct.

Q.   Okay.  So how were you instructed to provide the template instructions to the offices and programs, then?

A.   I was not instructed on how to provide.  I was instructed on what not to do.

Q.   But you were instructed to give -- to provide the template in some way.

A.    No.

Q.    Can you explain to me what Ms. Evans said to you about this.

A.    Ms. Evans told me she did not want an email being sent because emails were being leaked to the press.

Q.    But did she give you direction that you were to require programs and offices to engage in the staffing planning?

A.    I believe Ms. Evans gave those instructions at a principals meeting, where all of the principals and regional administrators were present.

Q.    And then at some point, did you make available the template in some way?

A.    What I then did was reached out to everyone individually and provided them with a link to a secure SharePoint where their data was housed.

And each principal or regional administrator then reached out and told me if a few members of their staff should be provided access.

Q.    And in doing so, you were implementing SOPDA Evans' desire not to send these instructions by email.

A.    Correct.

Q.    And you provided a link to the template.

Did you provide any instructions to the programs and regions regarding how to perform this analysis?

A.    The first page of the spreadsheet provided instructions.

But I also provided information to each one of the principals that:  This is what I used. If they had a better form or would like to come up with something else, they were free to do so.

Q.    And you did not include in this round of -- Round 3 of the staffing planning exercise, you did or did not include target numbers?

A.    I did not.

Q.    And that was also part of direction from Ms. Evans?

A.    That's correct.

Q.    Were....

Did you participate in communications that involved counsel regarding this issue?

That's a yes or no.

A.    I don't understand.

Q.    Did you participate in communi- -- discussions that involve FEMA's counsel surrounding the issue of what instructions to give on the

Page 324

staffing planning?

A.    As far as the Office of the Chief Counsel with attorneys?

Q.    Any attorneys.

A.    No.

Q.    Do you know whether Ms. Evans did?

A.    I don't.

Q.    And the information that you populated into the template was, I believe you said, existing staffing levels?

A.    Existing staffing levels.

I also provided data with deferred resignation in the Fork in the Road data, along with Voluntary Early Retirement Authority, Voluntary Separation Incentive Payments.

Because if an employee accepted a Voluntary Separation Incentive Payment, that information is required to be reported to OMB and that position must be eliminated.

So that was included in the staffing plan, because we did have a number of employees that accepted VSIP payments.

And then I included a list of vacancies and a list of existing employees so the customers did not need to locate that information themselves.

Page 325

Q.    And if you didn't give targets to the programs and regions, what information was conveyed by you regarding the analysis that they were supposed to conduct?

A.    Sure.  So that is included in Exhibit 97.

The draft email provided instructions on the template I provided, which they were free to use or they could have used something else.

Q.    So --

Sorry, you said Exhibit...?

A.    97.

Q.    Correct.

A.    And the last page is the draft email.

Q.    Um-hum.

A.    That was never sent.

Q.    And you orally conveyed this?

A.    I did not orally convey this.

The -- the last paragraph that starts with, "The plan template includes the following fields..." -- this was part of the instruction page in the template, and it was taken directly from the instruction page.

So for example, the organization that identifies the parent office under FEMA -- and it says, "Do not update" -- I locked that field so they

Page 326

couldn't update it and put another name in it.

Q.   Um-hum.

And so, in the template there were instructions with respect to reductions and hires, as written here on 71 -- sorry, on the last page of this?

A.   Correct.

If the program office had any anticipated reductions due to loss of a function or loss of work, they were to annotate that information.

Q.   Did you provide them with any information as to how they were supposed to evaluate what positions to eliminate or what they would need to add?

A.   I'm trying to think....

Yes.

And sometime in March, I met with all of the regional administrators and deputy regional administrators and had an open-door discussion -- and an example, Region 6 with Hermit's Peak and Calf Canyon.

Q.   Um-hum.

A.   Because that joint field operation is nearing a "closed" let me know that they would be sending information to rightsize that temporary

office, because the work was coming to a close.

Q.   Are you aware of all of the instructions that Ms. Evans provided to the heads of these programs and regions regarding how to complete this exercise?

A.   No, I'm not.

Q.   Were you -- did you participate in the principals meeting -- any principals meeting where she discussed this exercise with the heads of the programs and the regions?

A.   Yes.

Q.   And what did she tell them about this exercise at that meeting?

A.   She shared to build the staffing plan based on operational need and statutory requirements.

Q.   When was that?

A.   Oh, that was probably in January.

Q.   Did Ms. Evans reveal that she had submitted an annual staffing plan to DHS that included a 50% cut at that time?

A.   No.

Q.   Did she provide any explanation to the programs and regions regarding how to explain to OMB and OPM that they were implementing that plan?

A.    She asked for a brief description of the functions.

I'll give you an example from my staff.

I have a Stafford Act staffing division. So she wants to know what the Stafford Act is responsible for, and if that's something that is in statute and how does that further the mission of FEMA.

Q.    The decision with respect to the content of this plan in the quarterly update is a decision for, currently, SOPDA Evans.  Correct?

A.    Correct.

Q.    And that information would be conveyed for S1 approval.  Correct?

A.    Correct.

Q.    And that has not been done yet.  Correct?

A.    Correct.

Q.    So the current state of affairs is:  The program offices and regions have submitted the result of this Round 3 staffing plan exercise, but no final determination has been made?

A.    That's correct.

Q.    And....

MS. LEONARD:  Let's mark this as the next.  I think we are at 99.

Page 329

(Whereupon, Plaintiffs Exhibit 99 was marked for identification.)

Q. I will also represent that we redacted the individual names in this document.

(Witness reading.)

Q. Okay. So one of the bullets -- bullet points here says that the FEMA staffing plan guidance comms are pending Office of the Administrator approval to release.

This was sent on January 28th.

Was this prior to what you described as the instructions from SOPDA Evans with respect to how to communicate about the staffing plans?

A. Yes.

Q. And the FEMA staffing plan guidance comms that you had prepared and that were pending for approval were not approved. Correct?

A. Correct.

Q. And you are not aware of whether SOPDA Evans consulted with or was directed by anyone from DHS leadership with respect to the content of this round of staffing plans. Correct?

A. Correct.

Q. You do know that, as of January, Ms. Evans was asking you to run things by DHS comms as well as

Page 330

FEMA comms.  Correct?

A.    I was not asked to run anything by DHS comms.

Q.    Were you asked to copy Victoria Barton on the internal draft email that was being planned for the staffing?

A.    Yes.

Q.    Okay.  And then, did Ms. Barton run things by DHS comms?

A.    Yes.

Q.    And that was, again, because of the concern about leaks?

A.    I'm not sure why she was asked to run it by DHS comms.

Q.    Are you sure -- do you know why you were asked to copy her?

A.    Yes.

Q.    And that's because Ms. Evans was concerned about leaks.

A.    Correct.

Q.    So she wanted Victoria Barton, who was the press person, to take a look at the communications.

A.    That's correct.

Q.    And Ms. Barton had actually edited the December 23rd communication about the staffing

planning.

A. I believe so.

Q. Okay. And....

One of the things that you were asked to -- or directed to communicate to customers was that any appeals for CORE individuals who had been separated during January were put on hold pending resolution of the staffing plan, correct?

A. Correct.

Q. And also, one of the things that you were asked to -- directed to communicate was that the reason for the 90-day extensions was to allow the completion of the staffing planning.

A. Correct.

Q. Many of those 90-day extensions are coming due soon, correct? -- if they began in January.

A. If they began in January, next week I will give Ms. Evans May renewals.

Q. Isn't it possible that some of the April renewals were 90-day extensions from January?

A. Yes.

Q. And is the decision on those additional 90-day renewals pending completion of the staffing plan process, or have those been granted?

A. Those were already granted.

Q.   So anyone who had one 90-day renewal that came due in April has been granted another 90 days?

A.   I believe all April requests were approved.

Q.   And that -- if there were any individuals who had been given a 90-day renewal?

A.   Correct.

We lump them all into one group.

So if you originally had an April not-to-exceed date or if you were renewed in January and ended up with an April not-to-exceed date, all of those packages were provided to Ms. Evans and concurred upon.

Q.   But renewed again only for 90 days?

A.   Correct.

Q.   And you said the May packages are going next week?

A.   Correct.

Q.   Okay.  And the recommendation there, per this policy allowing only 90-day renewals, is for 90-day renewals?

A.   Correct.

Q.   But no decision has been made yet.

A.   Correct.

Q.   And when is -- do you know what the

timeline is, in terms of determining what the FEMA contribution for the Q3 quarterly report will be?

A.   I don't know, because we are still furloughed.

Q.   Because the DHS staff -- the DHS CHCO staff are furloughed who would be handling that.

A.   That's accurate.

Q.   Okay.  Is there an intention to implement whatever the result of the staffing planning is by June 30th?

MR. ROSENBERG:  Objection; vague.

A.   I'm not sure.

Q.   Have you ever heard Ms. Evans convey that she expects the programs and regions to implement the staffing plan by June 30th?

A.   I believe, in one of these exhibits, there was a June date for implementation.

Q.   And is that consistent with your understanding that Ms. Evans intends to have the staffing plan implemented by June 30th?

A.   I don't know what the date is in June, but I understand the intent was to implement by the month of June.

MS. LEONARD:  Okay.  I'm going

Page 334

to show you what I believe is a chat.

We'll mark that 100.

(Whereupon, Plaintiffs Exhibit 100 was marked for identification.)

Q.   So I'll represent that this is a document produced to us by Defendants that is entitled "Chat: EA & MS Leadership."

A.   Okay.

Q.   Do you see that?

A.   I do.

Q.   And it looks like it was on January 13th.

Do you know who the "EA" and "MS Leadership" is.

A.   I don't recognize Corey DeMuro, so I don't know...I don't know who he or she is or who this message was directed to.

But I'll need to review it.

(Witness reading.)

A.   Okay.

Q.   And there's a reference here to a discussion of staffing plan:

Staffing plan to run region:  Due March 31st, implemented by June "3rd" [sic].

Page 335

Do you see that?

A.   I do.

Q.   And:

Renewal timeline:  To be determined by need/staffing plan.

Do you see that?

A.   Yes.

Q.   Is this consistent with what you have heard SOPDA Evans describe with respect to the timeline for implementation of the staffing plan?

A.   Yes.

MS. LEONARD:  Okay.  Let's take a very short break, and then we may be done.

MR. ROSENBERG:  All right.

WITNESS:  Okay.

VIDEOGRAPHER:  Off the record at 5:19.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 5:23.

BY MS. LEONARD:

Q.   Ms Prieur, have you told me everything that Ms. Evans has instructed you to do with respect

Page 336

to the current round of the staffing planning process?

MR. ROSENBERG:  Objection; vague.

A.   Yes.

Q.   There are no instructions that you're aware of that Ms. Evans has given to any of the programs or regions that you have not discussed here today.

MR. ROSENBERG:  Same objection.

A.   Correct.

Q.   And you've told me everything you know about communications between DHS and Ms. Evans with respect to the staffing planning process.  Correct?

MR. ROSENBERG:  The same objection.

A.   Yes.

Q.   There's nothing that you haven't revealed regarding DHS instruction regarding the content of that plan.

MR. ROSENBERG:  The same objection and lack of foundation.

A.   No.

MS. LEONARD:  Okay.  We're done.

Thank you very much.  We have no

Page 337

further questions.

WITNESS:  Thank you.

MR. ROSENBERG:  And we don't have any questions for you today, but we'd like to thank you very much for your time.

And we reserve the right for the witness to read and sign.

MS. LEONARD:  Of course.

VIDEOGRAPHER:  Off the record at 5:24.  This ends today's testimony.

(Whereupon the deposition concluded at 5:24 p.m.)

DEPONENT'S SIGNATURE

Please be advised I have read the foregoing deposition, pages 1 through 337, inclusive.  I hereby state there are:

(Check one)

_____ No corrections

_____ Corrections per attached

_____
LA' TOYA MICHELLE PRIEUR

( X ) Reading and signing was requested.

(    ) Reading and signing was waived.

(    ) Reading and signing was not requested.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed herself of the opportunity to sign or the signature has been waived.

--oOo--

Page 339

                        ERRATA SHEET

        NAME OF CASE:  American Federation of

                       Government Employees, et al. v.

                       Donald J. Trump, et al.

        DATE OF DEPOSITION:  April 3, 2026

        NAME OF WITNESS:  LA' TOYA MICHELLE PRIEUR

        Reason Codes:

               1:  To clarify the record.

               2:  To conform to the facts.

               3:  To correct transcription error.

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____


_____  _____

LA' TOYA MICHELLE PRIEUR          DATE

Page 340

DECLARATION UNDER PENALTY OF PERJURY

I am the witness in the foregoing deposition.

I have read the foregoing deposition or have had read to me the foregoing deposition, and having made such changes and corrections as I desired, I certify that the same is true in my own knowledge.

I hereby declare under penalty of perjury that the foregoing is true and correct.

In witness whereof, I hereby subscribe my name this _____ day of _____, 2026.

_____
LA' TOYA MICHELLE PRIEUR

CERTIFICATE


I, SUSAN ASHE, a Certified Electronic Reporter and Notary Public, hereby certify that the foregoing is a true and accurate transcript of the deposition of said witness, who was first duly sworn by me on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

Dated this 6th day of April 2026.


_____

Susan Ashe, Notary Public

of the District of Columbia


My commission expires:  May 14, 2028.

**A**

**a.m** 2:2,9 14:2,19 61:21 189:19 190:2 263:9
**ability** 22:4 74:16 105:4 191:21 225:18 266:24 267:12 291:1
**able** 80:16 107:4
**absent** 118:16
**acceptable** 117:13 214:23
**accepted** 155:13 324:16,22
**access** 244:14 274:9 322:21
**accomplishing** 276:8
**account** 155:19
**Accountability** 128:11
**accounting** 31:4
**accurate** 21:2 22:4 22:8 27:17 119:24 131:4 217:22 235:23 267:25 294:25 310:3 312:5 333:7 341:5
**accurately** 28:14 221:15
**acquisition** 33:6
**Act** 70:20 71:5 72:12 192:17 231:9 232:16 328:4,5
**acting** 31:11,23 32:4 43:25 46:20 58:24 177:25 185:15 241:18,21 241:23 253:1,3 264:4
**action** 86:21 102:12 104:16 174:7,13 207:18 229:11 245:2 263:15 302:20 341:10,13

**actions** 11:22 17:2 112:8 162:15 245:5 270:19 299:21
**active** 28:8 131:13
**actively** 243:2
**activity** 81:14 281:22 297:18
**actual** 163:23 298:19,24 308:9
**add** 133:1 317:25 326:14
**added** 68:5 180:7 180:11
**adding** 316:7
**addition** 123:3 155:13 315:17
**additional** 104:24 141:24 156:25 164:25 165:8,9 176:10 233:13 236:3,11 253:21 283:4,12 288:3 300:18 306:4 318:1 331:22
**additions** 315:23
**Address** 11:23
**administration** 26:16 68:2 73:11 73:15 79:24 80:12 126:23 134:7 155:10 213:20
**administrative** 44:6 102:21 176:7
**administrator** 31:11,24 32:2 33:21 34:10,17,20 35:2,9 36:19 47:23 58:24 59:1 59:5 62:19 83:8 90:25 124:23 189:23 215:23 227:16 234:21 241:16,18 245:22 252:23 280:1 322:20 329:9
**administrator's**

90:20
**administrators** 47:15 62:9,10,12 78:10 87:23 117:10 322:12 326:18,19
**advance** 87:1,6,12 249:25 274:14 302:1
**advised** 338:3
**advisor** 40:4 48:17 60:16 194:13
**advocate** 297:25
**advocating** 286:20 295:3,14,18 297:16
**AF1** 174:7
**affairs** 69:6 245:23 328:18
**affect** 81:9 101:14
**affixed** 338:21
**afford** 316:17,18
**afternoon** 172:6,7 192:4
**agencies** 22:17 31:20 68:3 92:22 112:5 133:11,18 282:5
**agency** 4:12 17:15 17:16 35:11 66:2 67:11 88:18 89:2 89:9,16 90:3,10 94:20 128:11,19 138:1,6,11 141:19 142:6 143:18 144:14 145:10,19 145:23 146:10 148:12 179:1,4 190:24 284:6 302:10
**agency's** 312:9
**ago** 294:19
**agree** 65:24 66:1,8 204:13
**agree-** 259:17
**agreed** 259:18 260:10

**agreeing** 235:23
**ahead** 80:5 134:2 169:22 222:20 297:23 308:5
**al** 1:5,9 14:9,11 339:3,4
**alignment** 112:9
**all-FEMA** 126:18
**allow** 115:2 202:11 222:2,7,9,17 270:14 272:5 274:12 287:19 319:25 331:12
**allowable** 93:19
**allowed** 115:21,22 176:12 293:15
**allowing** 286:11 332:20
**Altshuler** 3:4 5:3 15:3,7,11
**Amanda** 95:4
**amendment** 281:7
**American** 1:4 14:8 339:2
**amount** 43:24 45:2 284:5 294:4 318:2 318:5
**amounts** 101:25
**analyses** 78:3,12 81:7
**analysis** 79:2 80:19 81:10 82:6,10,12 82:14,22 88:4 126:6,15,19 131:20 133:3 136:6 139:8 140:12 141:12,15 141:19,24 142:25 143:25 146:3 153:12 158:12,12 158:21 159:3 166:21 169:12 199:22 200:4,20 202:1 209:3 211:12 236:17,24 237:7 241:17 278:7,9 316:24

317:2,20,25 318:20,24 323:4 325:3
**analyst** 302:22
**analysts** 69:11
**analytics** 69:12
**analyze** 238:11,12
**analyzing** 318:6
**annotate** 326:10
**annotations** 183:9
**annual** 31:17,19 124:13,14,16,18 124:20,25 133:12 133:18 134:10 135:2,14 137:5 139:4 153:3 156:5 157:13 158:13,22 159:4,14 161:16 161:23 162:23,25 163:4,8 165:10 166:5,25 168:22 170:1,7,11 184:13 188:4 198:18 202:8 204:9 205:21 206:12 223:24 268:6 276:24 277:3 279:5,21 280:17 281:8 309:19 312:14 314:4 320:2 327:20
**annually** 79:9
**answer** 19:1,8 20:3 20:14 53:8 143:22 143:23 147:5,11 204:21 250:5 267:4 272:19 290:15 291:5 292:1 293:4 295:7 296:21 308:6
**answered** 273:20 308:4
**anticipated** 326:8
**apologies** 168:12
**apologize** 230:25
**apparently** 264:21
**appeals** 331:6

appear 54:12
APPEARANCE
  3:1 4:1
appeared 107:24
  108:13 183:9
appearing 297:13
appears 27:10
  104:5 214:4
  216:22 233:23
  251:1 264:6
  313:19
Applebee 214:5,13
  214:14
application 118:6
applied 98:21
  103:11 117:21
applies 122:13
apply 91:19 93:4
  97:19 98:6 103:16
  122:10 291:8
  303:10
applying 95:23
appoint 115:21
appointed 36:22
  38:1 39:15 84:13
appointee 246:1
appointment 91:4
  104:15 253:19
appointments 37:1
  65:19 72:5 73:10
  74:23 76:22 83:5
  84:23 88:10,14
  93:18,23 105:4
  111:3 176:13
  221:1 222:4
  262:21 270:10
  272:25
approach 197:15
  199:3 312:8
appropriate 193:11
  199:4
appropriately
  69:19 222:4
appropriation
  318:6
appropriations
  122:8,20,21

316:19 318:12
approv- 175:13
approval 43:23
  74:3 83:19 86:12
  90:20 91:1,9
  97:15,24 99:25
  100:23 101:18
  105:17 113:1,16
  114:7,15,21,22
  118:17 119:4,8
  120:2 153:8 155:6
  172:22,22 174:4
  175:5,7 176:2,19
  176:23 177:15
  190:17 206:3
  224:21 225:1
  230:4,10 235:12
  243:9 248:7 249:9
  250:10 255:9,10
  258:9 259:14
  260:13 270:8,16
  287:12 288:7,16
  292:14,22 293:14
  294:5 298:23
  299:3 302:8,15,19
  328:14 329:9,17
approvals 75:20
  100:15 250:1
  288:21 300:6
  302:4
approve 101:6
  110:17 113:23
  135:14 175:2
  190:14 242:22
  253:20 270:22
approved 85:17
  116:24 119:4
  135:18 170:1
  176:16 270:20
  274:23 275:8
  290:20 296:13
  297:3 298:18,23
  301:21,22,23
  329:17 332:4
approving 87:25
  113:25
approximately

14:19 18:4 23:15
  28:22 32:8 37:21
  70:10 129:15
  150:21 151:11
  302:11
April 1:18 2:1 14:1
  14:18 54:15,24
  73:8 331:19 332:2
  332:3,9,11 339:5
  341:15
April~3 2:9
area 101:11 213:17
areas 199:8 312:9
Army 28:8
Ashe 1:24 2:12
  14:23 341:3,19
Ashley 4:13 16:1
  22:15
ashley.darbo@fe...
  4:17
aside 132:4 152:18
  185:22 223:18
  228:6 239:7
  257:11
asked 23:25 24:21
  30:15 52:7,9
  62:15,17 65:4
  115:20 116:18
  141:6,8,11 142:2
  143:9 159:17,20
  159:25 165:25
  188:7,13 200:18
  201:16 210:21
  219:15,21 220:8
  241:11 242:3,6
  254:10 260:21
  261:24 263:14
  266:4 273:20
  274:14 276:1,9
  308:3 311:7,10
  318:24 321:16
  328:1 330:2,4,13
  330:16 331:4,11
asking 21:7 52:19
  52:22 53:18 69:14
  104:14 107:6
  114:21,21 136:15

155:12 160:4
  185:23 188:22
  191:6,10 198:23
  200:3 202:6 212:4
  212:25 213:5
  215:9 222:7
  234:15 236:1
  237:14 242:1
  265:25 284:4,9
  285:12 286:22
  308:10 329:25
asks 66:3 128:11
  283:12
assess 50:23,24
assessed 75:4
assessing 74:8
assessment 66:8
assessments 135:1
assigned 85:5
  266:12
assist 176:8
assistance 69:15
  71:25
assistant 5:5
  142:13 203:11
  215:21
assistants 142:16
  146:8
associate 33:21
  34:10 47:15 58:24
  58:25 62:9,11
  215:22 241:16,18
  245:22
assume 291:14
assuming 189:18
attach 220:14
attached 153:23
  174:6 202:20
  203:21 211:21
  217:15 219:6
  225:21 234:5
  313:20 338:8
attaching 193:5
attachment 98:8
  157:1 186:19
  188:2
attachments 174:9

253:22 276:5
attempt 298:9
attempting 92:2
  257:20
attend 56:22 62:6
attended 48:14
attention 101:7
attorney 19:12,20
  19:22 20:1 341:9
  341:12
attorneys 22:13,14
  25:23 296:11,12
  297:5 324:3,4
attrition 155:20
audible 239:24
audit 128:17
authorities 101:3
  266:13
authority 84:2
  98:15,22 99:3,16
  100:14 101:1,5,20
  103:6 105:5,18
  110:1 113:2,21,22
  113:25 114:12,22
  115:4,13,20 117:2
  117:6,10 118:9,18
  120:12 172:11,18
  172:23 175:14,17
  175:22 176:5
  177:4,22 178:2,5
  229:12 230:5
  240:12 254:19
  255:5 256:16,21
  257:17,22 258:5
  259:8,19 260:10
  260:22 271:2
  294:3 324:14
authorizations
  121:17
authorized 78:1
authorizing 118:13
auto-populated
  315:4
automatically
  105:19 315:19
availability 71:22
available 71:21

88:17 165:6
322:15
**availed** 338:22
**Avenue** 2:11 14:16
**average** 69:16,17
**awaiting** 309:23
**aware** 20:20 25:2
48:4,20 57:2
84:22 91:3 102:12
103:7 106:16,21
117:1 126:6,20
128:2 131:8
137:15 149:15
156:7 158:6,9,24
162:3,4,6 166:24
167:4 168:24
170:13,15 172:21
176:18,21 180:3
182:3 183:13,16
183:20 187:17
212:2 217:7,14,19
218:1 223:19
260:15 271:9,22
271:25 274:22
275:8,23 280:22
280:25 282:17,20
283:24 288:2,17
288:18,24 289:19
294:6 298:4
299:10,13,19,23
299:24 300:20
303:3,8 305:12,15
305:22,25 309:9
312:13 327:2
329:19 336:7

**B**
**bachelor's** 26:18
**back** 27:19 36:15
40:8 60:14 66:11
70:10 72:11 76:9
76:16 79:21 85:8
87:9 113:2,21
114:22,23 129:23
129:23 133:1
140:10 144:4,10
145:5,6 152:24

167:21 175:6
183:5 197:8 198:9
198:19 203:8
214:22 226:23
228:5 230:13
231:17 235:17,22
239:8 255:8,12
256:17 259:9
260:21 267:6,8
268:19,24 269:6
269:11,15 276:23
279:9,22 285:11
287:24 296:2,3
302:4,8 307:10
310:20 315:2
318:1
**backfill** 75:18
**backfilled** 75:21
**background** 26:9
51:18 262:13
**backtrack** 124:19
**Baltimore** 3:17
**bandwidth** 30:3
**Barton** 245:17,19
246:4 330:4,8,21
330:24
**based** 88:1,11
94:13 106:5 118:8
155:9 166:22
211:11 213:19
221:18 222:3,14
222:24 229:1
272:7,9 273:25
278:12 290:24
291:9 312:9
316:18 318:2
327:15
**basing** 238:3
**basis** 47:4 71:20
88:13 89:2,9
105:20 123:17
137:23 222:10
257:21 278:15
**batch** 288:3 298:17
298:21
**Bates** 153:22
220:17

**becau-** 122:18
**becoming** 40:24
135:6 284:23
285:3
**began** 45:21 73:11
132:12 331:16,17
**beginning** 2:8
35:13 72:18,22
73:1 126:23
129:12 175:19
189:24 194:6
198:19 220:17
255:15 268:23
286:22
**begins** 14:6 38:17
**begun** 54:9
**behalf** 2:8 3:2,13
4:2 15:21,25
106:1
**belief** 165:2,7
**believe** 23:1,9
38:18 39:12 41:1
43:2 44:11,25
48:12 51:8 60:9
61:13 62:3,17
63:8 72:11 73:6
82:12 102:5
109:12 110:7
124:18 125:20
128:1,14 130:4
135:23 137:1,25
140:17 146:5
149:13,19 151:9
152:14 153:11
159:2 166:7,10
172:9 173:7,15,21
177:7 178:10
185:2,5 200:1
202:6 203:8
207:23 211:6
212:15 218:3
219:17 232:14
237:11 246:8
255:7 259:13
261:4 271:8 272:8
276:21 283:1
288:14 289:3,17

290:16 292:14,24
299:25 303:5
315:14 316:16
317:11 322:10
324:9 331:2 332:3
333:17 334:1
**believed** 27:9
164:23 190:16
237:25 259:7
266:18 272:22
**believes** 283:20
**benefits** 29:22 33:6
317:21
**Berkeley** 26:15
**Berzon** 3:4 5:3 15:4
15:7,11
**best** 19:4 82:19
87:5
**better** 152:1 323:9
**beyond** 30:4 172:18
268:3 302:2 303:8
**Biden** 80:12
**big** 112:18
**Bilicic** 183:3
184:20
**biweekly** 43:18
44:8 45:1,3,6 46:4
63:11,13
**black** 319:13
**blaming** 272:14
**Blanca** 64:8,13
214:6,10,18 270:1
**board** 45:20,24
129:22 130:7
**body** 173:22
**bold** 240:6 245:3,4
**Bombard** 4:5 15:22
15:23
**bottom** 104:4
205:19 209:15
241:6 289:14
312:2
**bottom-up** 318:19
**bottoms** 132:22
**bottoms-up** 135:22
136:6 197:14
199:3 200:4,20

201:17 211:11
215:8
**bounce-back**
282:19
**box** 3:21 218:21
232:15 253:19
319:13
**Brad** 4:4 15:18
**brad.rosenberg...**
4:9
**Branch** 15:20,24
**break** 20:8,10
61:20,24,25 70:23
70:24 76:2 120:19
140:24 168:15
170:24 175:5,9,17
175:17 210:5
220:6 224:6 261:1
306:24 308:25
335:14
**breakdown** 152:11
**breakdowns** 140:6
**breaking** 227:21
**breaks** 20:9,11
**Brian** 214:5,13,14
215:9,14,15,17
**brief** 26:10 328:1
**brought** 41:10
**Brown** 104:5,8,14
105:3,25 109:10
111:10 117:25
256:20 258:19,21
259:10
**Brown's** 258:14
260:11
**budget** 31:7 33:10
123:9,15 125:1,3
125:7,10,13
**budgetary** 124:9
**build** 75:5 327:14
**building** 161:1,8
**bullet** 265:6,13,14
286:8 329:6
**bullets** 329:6
**burden** 176:7
**bureaucracy** 55:15
**business** 26:16,18

176:10 214:15 279:2 308:15,18

**C**

**C** 4:14
**C-o-o-c-h** 34:5
**Cadre** 66:15 71:7 111:3 129:25
**calculate** 54:21
**calculated** 131:24
**calculations** 125:4
**calendar** 44:16,17 45:14 56:13 244:14 269:3 273:14,24 274:10 311:4 315:22
**Calf** 126:10 326:20
**California** 1:2 3:8 14:13 26:15
**call** 50:10 52:13 53:20,22 55:6,8,9 55:24 56:1,7,12 56:15,16 57:16 58:4 59:18,20 60:20,22 63:7,9 63:11,19 69:13,15 69:18 77:5 109:3 109:6 124:5 201:2 202:9 205:15 214:21 246:19 300:6 310:2
**called** 31:17,24 47:20 62:2 75:21 76:17 77:22 79:13 81:20 102:25 121:15 124:4 125:16 126:3 127:10,10 200:13 207:17 209:5 210:24 263:22
**calls** 61:14,14 130:23 147:3 166:18 180:23 191:16 237:1 250:15 260:6 273:13 290:14 291:4 292:18

293:2,25 302:16
**Cameron** 36:5,15
**Canyon** 126:10 326:21
**capacity** 1:8 14:10 18:6 200:13 207:3 208:15 209:5,12 209:17,25 210:24
**capital** 17:14,22 29:2,8 30:2 41:4 43:19 44:8 63:24 95:20 124:2 133:24 208:24 317:8
**caps** 240:6 245:3,4
**capture** 233:7
**career** 99:7 122:11
**carried** 46:10 122:20
**carry** 213:14
**case** 1:6 14:11,14 18:12 24:10 25:17 107:5 339:2 341:14
**cases** 71:17
**categories** 66:24 69:21 70:1 147:22 150:1,9 300:17,20
**categorized** 69:24
**category** 93:22 112:16
**caveat** 155:15
**CC'd** 162:8,11,14
**center** 69:15,18
**centers** 69:13
**central** 147:16
**centralized** 43:21
**CER** 1:24
**certain** 15:17 102:3 102:20 198:23 205:16 218:14 220:7 230:5 249:21 300:16
**certainly** 166:21 264:18
**CERTIFICATE** 341:1

**Certified** 2:12 341:3
**certify** 340:7 341:4 341:8
**CFO** 121:18 122:5
**chain** 104:4 153:8 197:20 198:15 206:3 233:23 245:16 286:22 313:6
**challenging** 299:20
**change** 91:20 96:1 96:3 111:13,15 210:2
**change-in-work** 234:20
**changed** 73:10 300:2
**changes** 81:1 340:6
**charge** 317:8,9
**chart** 10:13 30:23 62:13
**chat** 57:18 60:24 334:1,6
**chats** 61:15
**CHCO** 17:23 29:9 29:11,13,17 32:14 32:18 35:2 41:2 77:16 101:12 102:19 104:7 109:7 134:9,18 136:22 157:13 162:24 184:7 192:16 197:13 205:22 214:15 222:22 256:20 262:20 302:5,6,10 302:10 333:5
**check** 52:16 61:19 253:19 338:6
**Chicago** 3:15
**chief** 17:14,22 29:1 29:7 31:3 40:20 42:22 43:3,7,12 46:2,18,24 47:11 50:4 57:24 59:24 60:16 61:2,5

63:24 75:10 95:19 124:2 135:10 208:24 241:23 253:1,3 316:13 319:21 324:2
**chiefs** 87:22
**Christmas** 201:21 202:2 212:19 247:10 252:4,6,9 268:23 269:5 273:3 283:3
**circumvent** 164:24
**CISA** 41:12,15
**city** 3:15,16 17:8
**Civil** 15:19,24
**Civilian** 12:5
**Claire** 142:15 195:18 203:8,10
**clarification** 19:17 95:5 103:15 105:13
**clarify** 43:2 117:25 339:8
**clarifying** 54:21 275:17
**classified** 75:7
**classifies** 68:24
**classifying** 31:1
**clause** 94:21
**clear** 40:7 108:11 145:15 204:18 235:4,11 245:6 292:1
**cleared** 174:18,24 175:4
**clearly** 240:16 300:9
**close** 126:13 327:1
**closed** 78:20 128:17 326:24
**co-chair** 180:4
**co-counsel** 16:8
**code** 69:25
**codes** 69:22 339:7
**cohort** 295:11,17
**coincided** 295:24
**colleagues** 208:17

221:13 223:10
**collect** 128:18 230:14 231:11,20 261:24
**collecting** 134:25
**Columbia** 2:13 341:20
**column** 154:18,24
**combine** 281:4
**come** 40:6 60:14 66:11 76:9 82:1 102:18 129:22 146:20 156:3,9 159:6 213:10,18 228:4 280:1 323:9
**coming** 79:24 255:4 284:15 303:9 327:1 331:15
**comments** 100:9
**commission** 341:22
**common** 161:5 289:22 290:3,25
**comms** 329:8,15,25 330:1,3,9,14
**communi-** 323:23
**communicate** 86:17 87:9,14 279:1 303:1 329:13 331:5,11
**communicated** 61:11 85:18,22 86:19 95:14 106:14 108:3,4,6 108:13,16 111:10 142:21 170:20 216:25 221:15 260:15,18 271:10 304:18
**communicating** 49:8 85:6 95:10 104:11 105:3 106:1 281:1 305:13
**communication** 117:25 137:18 161:3 275:23 330:25

communications 53:10 56:19 160:7 160:12,17 161:22 170:6,13,15 217:20 224:17 323:19 330:22 336:13
comparing 97:17
comparison 264:25 265:16,17 266:1
competence 117:11 117:12 222:14
compilation 206:11 215:6 229:16
compile 133:8 134:13,22 234:11
compiled 124:8 137:4,12 153:6,7 169:16
compiles 123:22,25
compiling 221:22
complete 19:8 21:2 22:4,8 74:14 79:5 80:11 126:14 132:16,20 146:15 190:1 207:10 233:11,15 270:16 321:1 327:4
completed 26:14,17 26:19 82:10 145:24 146:10 234:12
completely 109:5 292:5
completion 226:1 331:13,23
compliance 136:12 136:14
complied 128:16 199:16
comply 136:18 138:3 277:19
compon- 153:5
component 74:20 97:2 136:18 140:25 155:3 194:22 200:3

204:13 207:9 210:14,20 211:10 212:2 227:23 234:8 235:13 239:3
components 107:5 127:3 133:4 134:13 135:21 159:10 198:24 199:16,23 200:6 204:23 209:23 211:24 217:17,20 227:3 235:6 311:22
components' 138:18 159:13
compound 169:21 295:6
concern 192:20 261:13 330:12
concerned 100:13 266:8,23 267:11 287:11 321:12 330:18
concerns 53:2,4 176:25 309:14
concluded 337:11
conclusion 159:7
concurred 332:13
conduct 78:2 142:25 200:19 201:17 296:7 308:1,7,16,19 318:24 325:4
conducted 81:7 82:3 90:11 131:20 142:5
conducting 88:3 136:6
conduit 302:24
conference 20:25 297:7
conferences 297:14 297:18
confidential 168:19
confirm 27:10 117:19

confirmation 35:9 104:14 109:21
confirmed 34:20 91:19 157:4 292:4
conform 339:9
confusing 292:18 295:6 296:17,20
confusion 300:6
Congress 37:16 164:25 218:10 291:14 318:11
conjunction 31:15 148:25 152:21 234:13
connected 187:20 196:19
connection 39:2
consecutively 26:23
consider 112:5 276:15
considered 104:16
considering 169:25
consist 33:5
consistency 301:14
consistent 27:20 155:25 158:3 169:4 196:2,8 206:1,9 213:7 333:19 335:9
constitute 105:11
constituted 106:2,7 106:8
consult 20:5 222:22
consultant 79:3 292:10
consultation 213:15
consulted 329:20
contained 206:20 206:21 211:21
contains 186:18 192:21
content 328:9 329:21 336:19
CONTENTS 6:1
context 42:2 60:2

73:22 140:19 258:17,19 259:2
contin-~-- 46:10
contingent 310:8
continue 88:3 95:23 100:6 119:16 195:9 240:23 249:8
continued 4:1 7:1 8:1 9:1 10:1 11:1 12:1 58:3 88:5,9 149:20 181:8,16 181:20 260:12 295:1
continues 186:17 197:20 198:15
continuing 184:20
continuous 274:18
contract 51:22
contractor 48:21 51:25 192:20 193:1
contracts 81:5,8 101:6,18
contribute 141:12 153:3
contribution 137:5 333:2
conversation 24:14 24:16 52:15 108:12,22 109:11 109:14 160:22,23 161:9,12 212:12 254:18
conversations 25:13 39:8 115:16 164:7,10,14,16,21 164:22 175:13 195:3,5,9,14 275:5
convey 325:17 333:14
conveyed 268:13 273:6 276:12,16 276:19 279:17 280:2 284:16,19 284:24 325:2,16

328:13
conveying 271:10 271:20 272:2
conveys 270:19
Cooch 33:20 34:5,9 45:21
coordinated 134:21
copied 173:21 183:2 185:10 187:2 192:13,21 263:11 264:22 269:10,23
copies 21:14 79:17 253:12
copy 21:13,15 186:19 188:1 255:20 264:3 278:21 330:4,16
copying 193:4 242:22
CORE 17:3 25:14 58:19 65:11,16,18 66:12,14,17,19 70:10,11,17,21 71:3,7,15 72:11 72:14,17 73:10,17 74:4,9,23,25 76:1 76:18 77:2 78:2 80:19 81:15 82:7 82:13,15,23 83:4 83:9,12,16,20 84:1,12 85:1,4,25 86:4,5 87:18 88:1 88:10,14,15,22 89:1,8,14,20 90:2 90:25 91:4,20 93:24 94:5,12 95:24,24 96:12 99:10 103:16 104:15 105:4,8,11 105:16 106:14,18 107:10 111:4 112:15,19 113:2 113:23 114:17 117:3,7 118:14,22 119:21 122:17,25 129:25 132:19

147:15,18,22
150:19 151:3,11
164:6,11,15,18
174:7 176:13
183:12,15,17
186:19 187:11,18
187:20 188:1,8
189:24 190:11,14
190:24 191:11,24
193:5,10 196:17
196:19 197:1
203:18 221:1,5
223:5 226:11
229:2 233:3 235:6
236:21 237:6,8,19
237:22 238:1,7
243:5 246:4,6,20
246:21 247:15
248:1 249:5
253:16 262:21
266:9,18 268:14
270:9 274:15
275:14 276:2
283:7 286:9 289:2
289:16 290:4
291:10,12 293:13
294:5 295:3,11,11
296:6 297:1
299:22 300:2,12
300:13 301:11
303:11 304:23
305:2 306:3
308:22 309:10,22
310:7 311:3 331:6
**COREs** 83:5 85:10
90:8,12,19 91:8
91:11 94:14 106:7
106:8 114:1 117:7
117:18,20,22
118:7 119:19
120:1,7,12 139:19
147:19 151:14
152:21 164:23,24
165:4 167:10
172:11,19 177:4
181:25 182:5
183:21 185:6,12

188:23 190:21
191:12 218:17
219:16,22,25
221:24 223:15
224:19,22 225:18
228:15 229:12,16
230:5,6,10 231:12
234:3 235:25
236:11 239:19
242:15 243:2
249:22 255:6,11
256:17,22 257:22
259:8,15,19,22
260:13 261:14,19
261:25 264:15
267:22,22 270:23
283:13,24 284:5
284:15,24 288:4
291:21 292:13,15
292:21,25 293:6,9
293:15 296:5,7
301:20 302:15,25
**COREs'** 76:21
**Corey** 60:16 168:3
334:14
**correct** 19:3 23:5
24:11 25:25 26:6
28:25 29:2,3,9,10
29:12,15 31:5,18
31:22 32:4,5,19
34:21,22,24,25
35:9,10 36:16,17
36:19,20,23 37:5
37:8,11,14,18,22
37:25 38:7,10,25
39:13,14 40:2,3
40:22 43:4,5
44:19 45:7,11,16
46:12,15 49:21
51:12,25 53:24
54:2,3,4 55:14,17
57:8 58:5,6 59:6
59:17 64:2,14
65:13 68:14,15,20
68:21 69:23 72:2
74:2,6,21 77:16
79:20 82:3,4,16

82:24,25 83:9,13
83:16,21,22 84:3
84:6,7,9,10 86:8,9
87:12,13,15 88:15
88:16,18,19 89:12
89:13,21,22 90:4
90:14,20 91:1,2,6
91:9,10,13,15,17
92:23,24 93:24
94:1,10 98:2,5,7
98:13,24 99:1,4,5
99:7,11,14,18
100:20,25 101:2
101:15,18,21
102:2,4,9 103:4,5
103:13 104:11,12
104:17 105:1,24
106:4,20 107:10
107:11 109:4,9,24
111:10,11,13,14
111:15,24 112:10
112:20 113:3,4,7
114:2,6,9,13,14
117:23 118:15,20
119:8,9,13,16,17
120:2,13 122:9,22
122:23 123:6,7,24
126:17 127:7,8
130:3,8,13 131:3
131:7,12 134:16
135:3,4,8,15,16
135:19 136:4,11
136:16 137:14
139:6 140:14
143:1 146:12,13
147:2,14,17
149:14,24 150:2,3
150:25 151:1,6,16
152:16 153:9,10
153:14 155:24
156:2 157:23
158:5,14,15
162:10 163:5,6,18
167:2 168:23
170:9,12 172:14
172:19,20,23
173:25 175:15,25

176:1,3,15,17
178:3 179:24
180:4,18 184:5,18
185:3,8,12,13,17
187:3 188:9
189:17,21 191:21
192:5,17 193:18
195:23 197:6
198:24,25 199:13
199:14,18,20,21
200:5,21,24 201:6
201:14,19,24,25
202:2,3,19,22,24
203:16,17,19
204:7,10,11,15,22
205:1 206:4,8,13
206:14,15,23
207:4,10,16 208:5
209:6 210:12,17
210:18,25 211:7
211:13 213:2,6
214:11,12 215:4,5
215:8,19 217:12
217:13,18,21
218:8,11 219:19
219:22,23 220:2,5
221:2,3,6,7,25
223:3,16,17,21,22
223:25 224:23,24
225:2 226:3,8,13
227:4,5,10 228:3
228:14,16,21,24
229:21,22 230:16
233:25 235:3,7,9
235:10,15 236:2
236:12 237:17,19
238:8,11 239:20
239:23 240:3,10
240:11,14,17,18
243:2,7,9,12,13
243:14 244:18
246:18 247:16,17
247:23 248:2,8,11
248:14,21 250:12
251:4 252:2,4,14
252:23 253:5,9
254:7,8,11 255:11

256:24 257:1,6,24
258:1,16 260:14
261:17,22,23
263:20 264:2,19
264:20,22,23
265:3,20,23
266:10,11,15,20
266:22,25 267:14
267:15,17,23
268:3,7,8,11,12
268:16,17 269:12
270:17,18,24
271:3,4,7,11,12
271:14,15,17
273:4 274:12
275:21 276:10,13
276:20 277:5,20
278:5,6,9,10,13
278:14,17 279:6
279:11,14,15
281:13 282:3
283:4,5,7,10,19
283:21,22 284:17
284:20 285:5
287:13 290:4,7,8
293:11,12,16,19
294:8,9,24 295:15
295:16,19,20
296:1,5,10 297:4
297:6,8,9,14,19
298:19 299:5
300:3,8,14,15
302:11 304:23
305:14,23 306:3
308:20 309:11,12
309:16,17,20,21
309:24 310:9,21
311:4,5,19,24
312:1,15,16,18,24
313:9,14,18
314:19,22,25
315:1,5,9 316:20
318:4,13 319:3,4
320:6,9,10,12
321:5,6,11,14,18
322:25 323:17
325:12 326:7

328:11,12,14,15
328:16,17,22
329:17,18,22,23
330:1,20,23 331:8
331:9,14,16 332:7
332:15,18,22,24
336:11,14 339:10
340:10
**corrections** 338:7,8
340:6
**correlates** 310:4
**correspond** 69:21
**correspondence**
6:13,19,22 7:4,7
7:10,12,14,17,19
7:22 8:4,7,10,13
8:16,19,21 9:4,7
9:10,13,16,19,22
9:24 10:15,18,21
11:4,11,14,17
12:7,12,15,18,21
26:4 302:21
**corresponds** 71:22
**cost** 116:3 220:9
276:10 284:5,15
317:19
**costs** 115:25
**council** 55:8,11,12
55:19 56:19,23
146:19 179:20,23
180:8 196:9
**counsel** 3:1,20 4:1
4:4 14:24 17:1
20:5 23:18 46:19
143:15 180:4
286:5 323:20,24
324:2 341:9,12
**count** 212:25
**County** 3:16,16
**course** 32:24 71:14
127:6 276:6
284:23 285:1
287:8 337:8
**court** 1:1 14:12,22
18:23 20:22 21:11
21:18 25:17 33:23
34:3,6 61:23 77:3

144:4,6,8,10
145:4,6 267:8
296:18
**courtroom** 20:25
**cover** 219:5 220:12
253:14
**covered** 57:21
89:11 94:6 144:1
294:6
**covering** 270:2
**crazy** 306:22
**create** 31:21 74:9
83:9 140:15
**created** 78:23 80:2
80:18 88:23 89:16
90:2 140:9,11,11
205:22 314:15
**creating** 77:18
129:16
**creation** 73:17 74:3
75:13 82:23 83:12
**Criswell** 35:5
**critical** 56:2 66:20
66:25 67:8,9,10
67:16,22 68:3,11
68:19 98:10 136:7
175:8 263:18
**current** 73:14
74:16,17 90:11
122:1,8 141:8,9
147:6 216:10
315:13 328:18
336:1
**currently** 17:9,11
29:13 34:19 131:8
131:14,14 140:22
213:19 328:11
**customer** 213:16
**customers** 176:8
208:11 210:1
245:12,13 246:23
302:9 313:16
324:24 331:5
**cut** 125:13 137:16
138:12 142:7
143:19 144:15
145:11,19,23

146:11,16 148:12
149:7,16 150:24
152:6 156:11
157:24 160:5
162:19,21 163:2,4
163:20 165:11,25
166:15 179:4,7,11
179:13 180:7,11
180:17,22 181:5
181:15,22,25
182:5 185:12
195:25 196:9
204:9,14 211:25
217:10 218:5
223:15 268:6
279:5 312:14
321:17 327:21
**cuts** 151:7 167:7,8
188:4 202:24
211:21 218:14
278:12
**cutting** 146:25
164:3,6 165:22
195:15 218:17
223:11 267:17
290:23 291:21
**cycle** 29:22 123:15
**Cynthia** 316:7,10
316:13,21
**Cynthia's** 317:19

———————
**D**
———————
**D** 87:20
**D.C** 2:11 3:22 4:7
4:16,22 14:17
**Daniel** 189:15
**Danielle** 3:5 15:3
16:25,25
**Darbo** 4:13 16:1,1
22:15
**data** 11:23 69:11
69:16 107:4,7
114:16 124:22
136:15 137:19
138:5,7 139:23
140:21 141:8
189:25 190:17,20

191:7,11 207:2,22
209:16 214:21
229:15 262:20,23
263:6,19,23,25
264:1,6,12,13,24
265:14 266:22
311:8 315:13
322:18 324:12,13
**date** 14:18 38:19
72:4,8 86:14,22
87:12 94:19 115:7
118:23 152:22
158:10 173:15
182:1,5 183:21
185:7,12 190:21
190:22 191:12,25
203:18 213:13
218:17 219:16,22
220:1 221:2,6
223:16 225:25
242:3 248:4
249:21 253:19
265:11,15 277:2
288:10 295:2
296:5 310:4
332:10,11 333:18
333:22 339:5,25
341:7
**dated** 263:9 341:15
**dates** 87:1,3,7
176:14 183:12,15
183:18 187:21
191:11 196:18,19
197:2 224:18,22
227:19 228:16
229:17 231:13
236:22 249:25
259:23 265:4
268:15 288:4
298:19,24 301:13
**David** 36:11
**day** 21:18 24:4
37:15 44:24 45:13
188:3 190:2 240:1
252:9 274:5 284:3
306:20 340:12
341:15

**Daylight** 2:2 14:2
**days** 35:19 36:1,7
71:22 87:4 115:13
116:14,19 176:14
190:10 195:24
201:21 231:17
273:10,17,22
274:2 296:10,12
296:14 297:4
300:14 301:13,20
302:1 319:25
332:2,14
**DCOS** 50:7,12,24
51:8 59:14,18
159:25 160:3
167:2 178:13
244:13,17,23
271:16,19,23
288:15,18,25
289:15 301:19
303:9,17
**deadline** 80:10
201:23 202:11
207:9 208:18
210:22 226:2
311:21
**deadlines** 123:13
226:7 249:15
282:1,4
**deal** 92:13
**Deanne** 35:3
**Decem-** 182:14
**December** 39:13
58:8,17,18 59:8
63:2 64:3,6,9
65:17 113:24
117:17 118:19
119:25 120:10
133:19 135:6,18
137:15 155:18
157:5 158:8 160:9
162:18 168:23
172:9,17,18
173:15,16 174:2
182:4,15,16,17,25
183:13 186:15,17
187:2 188:8

189:11 191:3,8
192:3,4 194:20
200:2,8,13 201:18
201:24 202:7
204:10,25 207:4
207:10,21 208:14
208:16,18,23
209:10,25 210:8
210:11,13,21,22
211:18,20 212:3
213:1 215:3
217:16 218:2,12
219:7,18 220:18
224:17,22 225:12
226:5,22 227:2
228:11 229:12,20
231:2,4,5,18,23
233:10 236:14,16
236:22,23 237:6
237:15 239:17,23
240:1 241:7,25
242:6,13 244:2,3
244:5,6,10 245:1
246:15 247:1,5,7
247:23,23 251:2
251:11 254:6
255:7 257:14
258:20 259:23
261:12 263:9
265:7 268:16
273:3,7 274:4,5
275:5 279:8
282:18 285:21
290:12 291:8
315:14 321:5,15
330:25
**decide** 86:15
**decided** 97:18
  178:1 285:7
**decision** 83:8 85:15
  111:7 117:12
  120:11 161:16
  172:10,16 174:8
  174:15 175:24
  176:23 177:3,7,10
  177:13 202:4
  211:23 222:24

230:3 235:12
247:19 248:12
259:21 268:13
270:24 271:5,10
271:14,17,20
272:1,2,5,23
273:5,6 274:12
291:9 319:1 320:9
328:9,10 331:22
332:23
**decision-making**
  159:14 304:22
  306:2
**decisions** 87:7,8,12
  101:14 102:8,11
  114:5 115:3
  247:14 248:25
  275:12 289:19
**declaration** 25:16
  26:5 303:19 304:3
  304:6,13,16 305:7
  305:20,23 340:1
**declare** 340:9
**declared** 71:23
**Defendants** 1:10
  4:2 15:21,25 77:3
  153:22 214:3
  334:6
**defending** 20:1
**deferred** 155:17
  324:12
**defined** 300:10
**definitely** 152:3
  163:16
**degree** 26:18
**delegated** 113:21
  113:22 115:13
  118:18 120:12
  175:14 230:4
  256:16
**delegation** 65:16
**deliberative** 144:1
**delineated** 253:13
**Democracy** 2:10
  3:18 14:16 15:16
**DeMuro** 334:14
**denote** 13:3

**Department** 4:3,19
  15:19,23 16:4
  22:20 29:4,8 81:6
  105:12,13,15
**Department's**
  110:25
**departments** 92:22
**depending** 45:2
  116:2
**depends** 291:11
**deplete** 164:11
**deploy** 71:24
**deployed** 130:20
  131:9,15 243:2
**deployment** 130:2
  130:15 131:2
**DEPONENT'S**
  338:1
**deposed** 18:1,19
  24:9 25:3
**deposition** 1:15 2:7
  14:6 18:9 20:2
  22:12 23:5,18
  24:6,19,24 25:10
  67:15 70:25 92:1
  92:11 127:16
  143:10 337:11
  338:4,21 339:5
  340:3,4,5 341:6
  341:11
**depositions** 26:23
  92:12,14
**deputies** 33:1,2
  63:7,12,14 64:5
**deputy** 33:4,7 50:4
  58:25 64:6 95:19
  97:1 104:7 214:11
  241:23 252:25
  253:1,3 270:1
  319:21 326:18
**describe** 43:16 67:5
  78:11 85:2 117:5
  220:25 253:10
  335:10
**described** 46:5 50:1
  111:12 118:7
  135:22 136:8

157:1 329:11
**describes** 114:10
  209:10
**describing** 242:14
**description** 75:7
  128:10 174:10
  234:18 242:16
  328:1
**designations** 68:13
**designed** 233:6
**desire** 164:11
  322:23
**desired** 340:7
**detail** 121:22 140:3
  166:4 199:19
  278:4
**detailed** 43:20
**determination**
  328:21
**determinations**
  67:24 283:13
**determine** 30:24
  121:19 199:4
  222:11
**determined** 67:12
  67:13,13,22 81:7
  335:5
**determining** 333:1
**develop** 148:17
  149:7 311:10
**developing** 149:16
**development** 99:19
**developments**
  198:16
**devices** 269:9
**DHS** 12:10 17:2
  29:9,14 36:23
  37:4,6,10,13 39:9
  39:15,20,23 41:11
  41:20 48:1,5,9,13
  49:3,8,24,24
  51:22 53:11 56:15
  57:2 59:9,24
  60:15 64:19,19
  67:13 68:10,10,17
  83:12,20,24 84:3
  84:5,8 91:8,14,16

91:18 94:17,20
95:5,11 96:3,14
97:1,18,19 99:4
99:12 101:1,13
102:3,7,13,18,22
103:3,7 104:7
106:1,1,6,16
107:2,12 108:9,11
109:7 113:1 114:8
114:12 117:2
118:1,9,13,17
120:1 123:17,20
123:21,21,25
134:3,12,13,18
135:18 136:12,14
136:18 137:16,19
138:7,9 139:4
142:19,21,24
155:25 156:5,8,11
157:2,5,14 158:7
159:5,20 160:21
163:22 164:1
165:25 167:1,19
167:21,25 168:21
169:14,25 170:7
174:15 175:24
177:21 178:1,6,18
178:23,25 179:23
180:3,20 181:19
184:13 185:11,16
188:4 190:13
193:9 197:13
198:23 199:12
200:6 202:5,7,9
202:13 204:10
223:20 230:10,15
231:11 233:2
239:1 248:16,20
250:2,10,12,14,17
251:25 252:2
253:24 255:5
256:20 258:9
259:24 260:3,4,13
260:16 262:20
263:16 264:7,11
264:15,19 276:12
276:15 277:4,23

278:4 279:17 280:10,25 281:21 281:23 284:10,16 287:18,18 292:12 292:20 294:3,7 296:13 297:1,3,13 297:17 298:22 299:4,6,21 300:1 300:6 302:5,10,22 303:5 304:19,21 305:2 306:1 314:5 327:20 329:21,25 330:2,9,14 333:5 333:5 336:13,19

**DHS's** 169:5 248:12 292:14,21 293:21

**difference** 71:13 211:17 265:21

**different** 99:21 100:7 105:8 106:2 120:5 139:14,16 142:4 146:21 148:15 149:3 150:8,9,14 191:18 192:1 207:17 208:11,25 210:6,6 230:7 237:3 296:23 314:9 318:16 321:8

**differently** 237:20

**difficult** 147:7,13 218:4 267:21

**dig** 187:8,9

**digestible** 243:17 250:8,11,19 254:9

**direct** 21:21 73:23 136:25 137:18 203:25

**directed** 49:5 56:11 60:5 68:10 102:13 120:1 142:24 178:23 202:14,17 204:6 216:12 259:24 260:3,4 329:20 331:5,11 334:16

**direction** 31:16 68:2 96:3,14 142:22 178:17 179:22,23 180:20 194:24 195:20 217:11 241:2 248:16 320:8,11 322:7 323:15

**directions** 133:17 134:12 240:6 241:1

**directive** 99:3,6,9 99:12 105:14 118:1,9 145:23

**directives** 100:19 255:5

**directly** 32:10 57:9 123:20 309:19 325:21

**director** 32:25 46:20 126:12 214:14 232:18

**directorate** 59:24 84:6 87:22 91:16

**directorates** 78:1,8

**directors** 63:8 229:3

**directs** 56:15

**disagreed** 256:25

**disagrees** 257:25

**disappointment** 240:2,19

**disapproval** 250:10

**disapprovals** 302:4

**disapprove** 253:20 289:24

**disapproved** 290:17

**disapproving** 290:9

**disaster** 11:21 38:14 71:6,24 88:21 122:11,14 122:19 126:16 127:11 129:1,14 130:6 147:11 164:8,11,17

**disasters** 50:23,25

71:23 78:19,20 130:1,2 131:1

**discretion** 292:11

**discuss** 23:24 144:19 162:25 182:5

**discuss-** 25:6

**discussed** 152:21 162:19,22,23 164:8 167:7,8 172:10 178:5,10 178:14 186:4 187:11 197:5 223:13 246:6,21 246:24 248:1 255:3 271:1 272:1 279:10 290:12 291:7 311:20 314:6 327:9 336:8

**discussing** 148:11 148:24 149:12 166:25 167:4 183:21 192:9 218:13 223:15 246:4 264:15,18 266:14 313:11

**discussion** 91:5 143:24 153:1 167:9 205:18,21 248:3,6 301:9 305:2 326:19 334:21

**discussions** 146:7 203:14 318:11 323:24

**disruptive** 116:6

**dissatisfaction** 249:10

**distinct** 32:3 82:5

**distinguish** 70:17

**District** 1:1,2 2:13 14:12,13 341:20

**division** 1:3 14:14 15:20,24 63:8 214:15 231:9 232:17 328:4

**divisions** 33:3,5

**dleonard@altsh...** 3:10

**Dobitsch** 58:23 137:1,10 138:14 140:15 142:10 149:1,19,23 162:18 163:14 174:21 181:4,21 181:25 182:4 183:1,8,14,23 184:20 185:5 186:14 187:18 189:13 191:2,6 192:2 193:4 195:18 202:16 203:12,13 204:3 209:4 216:3 223:15 228:12 241:7,11 242:7,13 268:10

**Dobitsch's** 194:12

**docs** 132:3

**document** 13:4 21:11,21 77:14,19 92:18 97:4,7 110:12 113:18 138:21,23 139:12 139:17,20,24,25 140:9,16,18,24 141:4,12,15,20 143:2,11,13,25 147:23 148:8,10 148:16,24 149:3 149:25 150:5,16 151:8 169:19 220:17 222:19 257:21 276:22 282:10 308:9 313:19 319:13 329:4 334:5

**documentation** 65:22 74:22 86:20 109:17 143:9 258:4

**documented** 133:25

**documents** 21:8,22

25:5,8,12 26:1 79:12 184:16 223:14 268:11

**Dodoo** 5:5

**DOGE** 81:2,14,19

**doing** 31:6 51:3 61:18 120:17 128:12 322:22

**DOJ** 20:1 25:20,21

**dollars** 116:1,3

**Donald** 1:8 14:9 339:4

**downsize** 197:1

**downsizing** 41:12

**draft** 114:17 172:21 173:1 180:14 196:9,11 202:21 203:5,22 304:3,16 314:9 325:6,13 330:5

**drafted** 25:20,22 25:24 111:17 149:23 312:22 313:16,25

**dramatic** 146:12

**driven** 123:17

**due** 123:16 202:9 231:17 240:25 268:14 277:2 281:19 307:18,25 308:12 310:4 311:11 326:9 331:16 332:2 334:23

**due-outs** 251:2,10 285:22

**duly** 16:13 341:6

**duties** 32:2 34:16 36:19 56:3 66:17 165:21 291:18

**duty** 28:8

---

**E**

---

**E** 3:5 172:1,1

**e-mail** 273:7

**EA** 334:7,12

**earlier** 25:3 40:1

78:4 184:17 206:21 213:8 218:3 219:14 271:1 287:24
**early** 54:7 117:17 137:15 173:15 182:4,14 188:8 191:7 204:10 210:8,13 211:18 320:23 324:14
**easily** 243:17 250:7 250:11,19 254:9
**Eastern** 2:2 14:2
**ECF** 77:6
**edited** 330:24
**education** 26:11,14 27:20
**educational** 26:8
**Edwards** 23:21,22 23:24 24:9,13,25 29:13 52:11,15,25 53:11,17,23 95:4 106:22 107:19,22 108:21 109:14 134:18 197:14 198:22 199:20 260:18 262:20 263:5,20 264:2,19 276:19 281:3 284:20 302:5,6,10 302:23
**eeshleman@alts...** 3:11
**effects** 221:1,5,9,19 290:11
**Efficiency** 81:6
**efficient** 92:7
**effort** 134:22 138:3
**eight** 208:11
**either** 24:24 95:17 170:11 188:17 259:5 279:4
**electronic** 2:12 77:6 253:12 341:3
**electronically** 85:18
**elevation** 251:16

**eliminate** 291:10 308:22 326:13
**eliminated** 37:17 81:13 100:10,16 196:3 291:13 297:13 298:5 324:19
**eliminating** 42:13 42:17 57:3 152:21 164:10,14,18 191:24
**elimination** 297:17 297:25
**Elizabeth** 3:6 15:6
**Elle** 148:4
**email** 6:13,19,22 7:4,7,10,12,14,17 7:19,22 8:4,7,10 8:13,16,19,21 9:4 9:7,10,13,16,19 9:22,24 10:15,18 11:4,11,14,17 12:7,12,15,18,21 25:13 26:4 52:12 95:3,6 97:18 103:23 104:5 106:9,10 109:10 109:17 120:8 134:17 140:20 141:3 143:12,14 153:23 173:14 174:2,2,10,17 175:23 182:22 183:1,7,8 185:10 186:13,18 187:1,2 188:20,23 189:10 189:19 191:1 192:14 193:5 194:2,14 195:17 197:13,20,22,25 198:2,8,11,14,23 200:3,8,12 201:5 201:13,18 203:1 203:23 205:4,6 207:15 208:17,19 209:8,10 211:20 212:19 213:22

214:2,4,10 216:23 217:15 219:5,24 220:12,18 225:12 226:21,23 227:2 227:15,18 228:11 231:3,4,5,15 232:15 233:14,23 241:7,20 242:14 245:16 251:1 252:21 254:18 256:19 257:7 258:2,11,19,21 259:9 260:11 262:16,19 263:8 263:11,21 269:8 269:22,25 270:5 277:14 283:2 284:3 285:21 288:9 289:3,13,18 301:6 303:25 304:15,24 305:1,4 305:10 306:16 307:2,16,17 310:19 312:21,22 313:16,16,19,23 316:3,5 319:17,22 320:20 321:4,5,9 321:15 322:5,24 325:6,13 330:5
**emails** 61:13 162:8 162:11,14 173:22 182:14,17 186:3 247:7 257:20 264:22 268:19 269:1,2,7,11,14 272:7 279:23 288:13 300:16 304:14,17 313:10 322:5
**embarrassing** 168:17
**embedded** 143:13
**emergency** 4:12 17:16 67:17,19 68:20,25 98:11 112:13 147:10 266:17,19 289:23

290:2,9,19,23
**employ** 70:11 118:13 221:23
**employed** 17:11 64:16 102:14 119:16 259:3 270:15 341:9,13
**employee** 29:23 48:21 63:23 66:16 71:15,15,17,18 83:21 84:1 85:21 100:24 104:16 105:19 116:2,4,4 117:14 139:15,17 140:7,23 192:25 225:21 237:12 258:24 307:25 308:6 324:16 341:12
**employee's** 117:11 222:14
**employees** 1:5 14:9 17:4 29:20,22 30:5,21,22 44:5 58:20 65:12,17,18 66:17,19,22 70:11 71:4,5,10 72:2,12 72:14,17,22 73:1 73:7 85:25 86:4,5 87:14 93:18,23 94:15 95:24 96:11 102:22 103:12 107:25 108:14 111:4,5 114:17 115:22 129:15,24 130:6 131:15 135:23 139:13 140:22 147:22 150:2,21 165:1 170:16 176:9 190:15 191:24 216:23 220:9 221:20 227:9,19 229:14 236:21 237:6,13,19 238:1 238:1,3,7 240:13 248:13 262:25

266:18 268:14 270:9,15 272:5,11 272:14 276:2,10 276:19 278:23 286:11 294:10,20 294:24 295:11,15 295:19 298:17,21 302:11,20 310:7 311:1 317:19,19 324:21,24 339:3
**employees'** 192:22
**employment** 271:7 272:6
**enabling** 66:21,25 68:22,23 69:7
**end-of-fiscal-year** 209:19
**ended** 332:11
**ends** 337:10
**enforcement** 93:11
**Enforcer** 42:20
**engage** 112:2 322:8
**engaged** 132:5 133:4
**engineers** 69:5
**ensure** 175:4,6,16 223:9
**entire** 94:20 152:12 297:25 311:4
**entirety** 130:3
**entities** 49:23
**entitled** 186:19 334:6
**entries** 45:14
**entry** 288:4
**environmentally** 92:6
**Eric** 110:23
**ERRATA** 339:1
**error** 339:10
**escapes** 35:3
**Eshleman** 3:6 15:6 15:7 307:11
**ESQ** 3:5,6
**Esquire** 5:2
**establish** 82:8
**established** 55:12

100:8 209:2
**establishing** 74:24
**estimate** 54:14
  112:17 234:15
**et** 1:5,9 14:9,11
  339:3,4
**evaluate** 55:15
  121:10 326:12
**evaluated** 56:4 89:2
  89:8
**evaluating** 123:3
**Evans** 22:16 24:25
  25:2 31:10,23
  39:11,13,25 40:12
  40:19,24 41:10,21
  41:24 42:16,22
  43:12,19 46:2,23
  46:25 47:6,12,16
  48:8,14 53:14,15
  53:17 57:23 58:8
  58:11 62:1,16
  65:4,9,21 66:2
  120:5 135:6,17
  136:23,24 137:13
  142:17 149:6,15
  149:20 155:6
  156:4,10 157:2,4
  157:12 158:6,11
  159:2,6,9,20
  160:8,13 161:25
  162:18,21 164:23
  165:7,20,24 166:3
  167:9 168:22
  170:19 174:14
  177:8,9,25 178:4
  178:17 179:3,6,10
  179:13,22 180:20
  181:8,16,18 182:3
  183:1,6,14 184:13
  185:6,19 186:1,14
  187:17 188:3
  191:2 192:4 195:9
  195:14,24 202:14
  202:15 203:15
  204:5,10 206:20
  208:7 218:13
  219:20 220:8,19

220:23 222:2,7,17
223:4,14 225:1
226:10 227:11
228:1 230:9
234:21 235:17
236:9 237:18
238:2 239:16
241:11 242:1,14
242:21 244:8,22
245:9,11,16 246:3
246:23 248:15
249:10 250:1,7,13
251:3,20,25 253:4
253:8 254:5,18
256:25 257:17
258:24 259:7
261:12,13 263:8
263:19,24 264:1
264:13,14 265:25
266:4 268:9,13
269:23 270:15,19
270:22 271:9,19
271:25 272:13,21
273:1,9,23 274:14
275:7,13,24 276:9
278:2 279:4
280:22 282:17
284:4,9,22 285:2
286:19 287:11
288:5,25 289:15
289:24 290:12,16
292:4 293:10
294:2,7 298:17,22
301:7,23 303:8,16
304:1,11,14,24
305:13,19 307:16
310:19 312:13
316:6,14 318:18
321:12 322:2,4,10
323:16 324:6
327:3,19 328:11
329:12,20,24
330:18 331:18
332:12 333:14,20
335:10,25 336:7
336:13
**Evans'** 59:4 65:24

66:8 161:15
165:10 176:2
237:24 272:8
273:14 274:9
279:13,20 322:23
**Evans's** 278:20
**Eve** 212:19 252:7
269:23 283:3
**evening** 242:6
**event** 92:10
**eventually** 126:13
203:2
**exact** 13:3 64:20
**exactly** 40:17 82:19
154:4,6 203:4
261:18 276:5
**EXAMINATION**
16:15
**examined** 16:13
**example** 69:1,13
122:18 126:9
236:9 238:18,25
253:15 325:23
326:20 328:3
**examples** 69:7
**Exceed** 86:22
**exceeds** 74:16
**excepted** 98:1,3
111:8 281:22
**exception** 296:11
297:5
**exceptions** 84:18
84:20
**exchange** 103:23
120:4 173:14
186:13 189:11
191:2 212:20
256:20 257:7,16
316:3
**exclude** 317:24
**excuse** 33:2 96:9
296:18
**ExecSec** 174:2,3
**executive** 26:14
31:21 32:25 33:1
41:3,7 55:13
74:11 82:11 92:21

111:20,23 112:9
133:11,22 134:6
155:9 213:11
221:13
**executives** 62:6,8
73:20 229:8,17
**executives'** 75:23
**exempt** 94:21 95:11
**exempted** 94:13,18
**exemption** 94:14
97:20 98:19
105:22
**exemptions** 93:7,9
93:15 94:18
**exer-** 279:8
**exercise** 135:22
138:19,22 139:3
143:18 144:13
145:9,18,22,24
148:11 150:6
152:17,20 200:4
200:14 201:17
204:25 206:12
207:3,4,10,13,21
208:15 209:6,13
209:18,25 210:20
210:25 211:17,19
212:4 213:2 215:4
215:8 217:16
218:2 279:9
309:24 318:19
323:12 327:5,9,13
328:20
**exercises** 82:2
210:7
**exhibit** 6:9,10,12
6:13,16,19,22 7:3
7:4,7,10,12,14,17
7:19,22 8:3,4,7,10
8:13,16,19,21 9:3
9:4,7,10,13,16,19
9:22,24 10:3,4,11
10:12,15,18,21
11:3,4,7,11,14,17
11:20 12:3,4,7,9
12:12,15,18,21
21:12,16 26:22

27:2,6 76:25 77:8
92:1,8,17 94:24
94:25 95:3 96:21
96:22,25 103:20
103:21,23 110:8,9
113:11,12,15
127:16,17 148:4,5
148:9 153:17,18
156:19,20,23
158:14 160:18
169:8 173:5,14
181:17 182:9,10
186:10,11,13
189:5,6,11 192:6
192:9 193:20,22
197:17,19 201:3
202:5 205:4
206:21 207:5
208:2 212:17
213:24 218:24,25
219:4 225:7,9,12
226:19 228:8
231:2 232:4
233:20 236:7
238:20 239:10
242:11 243:23
250:24 251:1
252:18,19,21
254:24 255:14
256:6,6,11 262:6
262:7 269:20
273:8 277:14,16
282:13 285:16,20
285:23 286:21
289:6,8,14 301:2
301:6 306:13
310:14 313:3
319:7 325:5,10
329:1 334:3
**exhibits** 6:7 7:1 8:1
9:1 10:1,9 11:1
12:1 13:1 207:24
219:15 239:20
333:17
**existed** 117:13
**existing** 92:11
93:18,23 103:12

104:15 121:11 123:4 229:2 315:13 316:18 324:9,11,24
**exists** 57:4 70:5 75:17 196:4 218:6 218:7 298:5
**exorbitant** 78:18
**expects** 333:15
**experience** 88:21 89:1
**expert** 147:10
**expertise** 101:11
**expir-** 267:24
**expiration** 86:14 191:11 196:18,19 197:2 227:19 229:16 236:22 259:22 272:24 284:15
**expirations** 186:20 188:1,9 189:24 193:5,11 203:18 238:11 267:24 311:3
**expire** 118:19 190:11 225:18 270:10
**expired** 65:17 188:24 253:19
**expires** 341:22
**expiring** 65:19 85:10 230:6 231:13 234:3 236:11 237:8 239:19 293:6
**explain** 18:14 28:6 29:16 48:11 71:12 107:7 110:20 238:2 257:20 317:4 322:2 327:24
**explained** 51:11 275:6,10
**explaining** 278:1
**explanation** 289:25 290:17,18 327:23

**express** 41:20 53:2 165:20,24 248:15 249:10
**expressed** 274:21 275:1 309:14
**expressing** 240:2 240:19 261:12,13
**extend** 104:24 105:19 115:13 118:22 120:12 172:11,17 176:4 176:13 177:4 255:6 256:22 257:22 258:6 259:19 266:14,24 267:13
**extended** 93:19 118:24 172:23 238:8 242:18 247:20 261:15,21 267:23,25 294:4 301:20
**extending** 104:15 105:11,15 120:1 175:13 237:22
**extension** 120:11 172:19 190:25 230:4 243:1 270:9 270:22
**extensions** 111:6 242:23 309:13,15 331:12,15,20
**extensive** 141:18
**extent** 143:23 297:21
**External** 245:23
**extraneous** 81:8

_____

**F**

**F** 172:1
**face** 54:22 169:19
**facing** 307:25
**fact** 37:12 97:20 155:15 193:16 218:12 290:24
**facts** 205:14 339:9
**failure** 240:5,25

**fair** 38:11 73:9 131:11 134:4 178:16 221:9 226:15,16 247:12 247:13 257:23 293:20 294:2 318:14
**fall** 33:11 74:19 111:7 112:15
**falls** 30:3 33:10 69:25
**familiar** 41:2,11 50:5 76:17 77:15 83:15 97:4 101:5 101:10,16 102:6,7 102:20 113:18 117:4 125:8,16 127:9 128:5 133:10,21 134:10 154:1 159:9 184:14 201:5
**far** 86:2 87:1,6 105:21 151:17 249:11 324:2
**faster** 224:7
**February** 295:2,9 301:7,25 303:10 320:24
**federal** 4:12 12:5 15:20,24 17:16 27:25 28:4,15 32:3 64:16 93:18 93:23 112:2 271:7 272:6 317:10
**Federation** 1:4 14:8 339:2
**FedHR** 85:19,22 86:19 229:11
**fee** 317:8,9
**fee-fund-** 317:12
**fee-funded** 316:25 317:6,24
**feedback** 221:18 280:19
**feel** 194:2 198:9
**fell** 256:22
**felt** 222:16 235:19

**FEMA** 6:12 11:21 16:2 17:3,17 22:18 28:24 29:1 29:4,11,17 31:8 34:13,16 35:2,2,8 35:18,25 36:19 37:16 38:12 40:1 40:12,20 41:10,22 42:4,17 43:24 47:18 49:3 50:21 51:16 53:1,18 54:13 55:8,9,11 55:15,19 56:19,22 57:3 60:10,11 62:11 64:1 65:18 66:18 67:2,3,12 67:16 68:11,16,17 68:19 69:24 70:11 72:7,15,19,21 73:1,16 76:23 77:15 79:8 81:6 81:23 82:3 83:3,8 83:19 84:1 85:3 88:23 89:21 90:18 90:19,25 93:4,24 96:15 97:23 98:6 98:11,22 99:2,6,9 99:12,16,22 100:10,16,18,22 101:2,12,14,24 102:8,14,22 103:2 103:8 105:5,18 106:13 107:5,6,8 107:24 108:13 111:3 112:25 113:21,25 114:4 114:11,23 115:2 115:17,22,23 116:6,10 117:16 118:13,16,22 121:8 123:14,19 124:18,20 125:1,7 126:7,25 127:5,10 128:3 129:1,13 130:3,20 131:2,6 131:9,14 132:5 133:3 134:22

135:2,14,21 136:17,22 137:5 137:16 138:18 140:13,25 142:25 146:4,18,19 147:1 149:8,16 150:21 153:5,7 156:5,5 156:11 157:1,12 157:14 158:7 159:13 161:16 162:2,9,12,15,19 162:21,24,24 163:4,4,20 164:3 164:8 165:3,7,11 165:21 166:4,16 167:19 168:1 170:17 174:2,3,3 174:7 175:6 176:4 176:12 179:13,20 179:23 180:7,17 184:12,22 185:15 185:19 186:2 188:4 190:12 191:15,24 192:16 193:9 194:25 195:5,21,25 196:3 196:9,20 197:1 198:24 199:15 200:2,12,18 201:16 202:11 203:15 204:23,24 205:1,22 206:11 209:11 215:16 216:12 217:8,24 218:4,4,7,10 221:23 222:2,7,9 222:17 223:19 229:11 230:5 234:7 236:21 237:18,22,25 238:3,7,22 239:2 240:12 241:12 242:7 246:17 255:5 256:17,21 257:22 258:5,18 258:24 259:3,7,18 260:10 261:13,19

261:21 262:25 263:16 266:14,24 267:12,17 271:2 271:11 276:3 277:19,23 278:16 279:5,19 280:2,14 280:19,23 281:6 281:14 290:7 291:11,15,19 292:7,12,14,20,24 293:7,7,13,23 294:10,22 297:7 297:12,14,17,17 297:25 298:5,8,10 298:14 299:21 302:15,24 309:10 311:1,21 312:14 317:6,12 318:7 321:10 325:24 328:8 329:7,15 330:1 333:1

**FEMA's** 32:13 65:16 74:8 98:15 101:20 105:3 110:1 116:11 117:2,6 118:8,18 125:14 126:19 132:17,18 139:4,9 146:12,15,25 147:6,16 157:24 158:13 159:3,9 163:23 169:16 170:1,11 172:11 172:17 177:4 191:20 195:15 204:12,14 211:23 254:18 260:22 266:9 280:8,17 291:1 293:5 297:18 309:19 314:4 323:24

**fewer** 72:22
**field** 78:15 221:14 315:18,18 325:25 326:23
**fields** 314:17 315:16,16,20

325:20
**fifteen** 32:8
**fifth** 32:20
**fifth-level** 32:12
**Figure** 129:5
**filed** 14:11 77:3 299:20
**filing** 77:6
**fill** 75:19 78:1 122:6 136:13,15 227:3
**filled** 32:16 134:19
**filling** 75:15
**final** 79:17 91:1 133:18 138:21,23 153:3 160:20 202:13 328:21
**finances** 236:1
**financial** 31:4 75:10 220:8 316:13 319:21
**financially** 341:13
**find** 19:5 21:23 108:25
**fine** 16:22 17:21 34:2 234:19 296:24
**finish** 29:24
**fire** 69:14
**fired** 168:7
**fires** 69:3 126:11
**firm** 14:21 111:3
**first** 16:13,17 44:11 54:12 55:5 60:3 64:8 65:22 148:23 154:18 157:25 163:10 169:11 175:18 183:11 188:20 190:11 197:21,24 198:8 206:25 207:14 220:1 226:9,22 258:11 265:6,13 268:15 289:18 307:17 315:19,21 323:5 341:6
**first-in-the-chain**

189:19
**first-level** 73:23
**fiscal** 52:6,8 54:1 54:15,18 121:24 122:1,8 123:5 125:6,10 129:13 135:24 149:9 153:24 205:1,23 208:3 268:3,7,11 280:23 314:3 315:7
**fit** 233:5
**five** 32:20 33:2,4 76:3,6,8 120:22
**flat** 137:3 155:21 160:19 208:7 210:4,17 213:10 213:18
**Fleischman** 4:20 16:3,4
**flew** 269:4
**flip** 27:19
**Flood** 317:7
**flow** 82:9
**fluctuated** 45:2
**foc-** 73:13
**focus** 46:1 73:13 126:22 182:25
**focused** 45:25
**Focusing** 41:19
**folks** 69:6 155:16
**foll-** 247:10
**follow** 239:15 240:6 241:1 259:21 276:23
**follow-up** 184:10
**followed** 90:3,17 293:13
**following** 83:4 174:19 221:19 240:1 325:19
**follows** 16:14 144:11 145:7 267:9
**force** 125:17,19,23 126:2 129:14 132:6 139:13

**foregoing** 338:4 340:2,4,5,10 341:5
**Fork** 81:20,24 155:16 324:13
**form** 30:23 61:5 80:4 86:23,25 108:2 143:3 147:7 152:13 153:22 154:2 165:13 169:6,20 196:5 204:20 230:15 233:6,16 235:21 252:13 253:24 292:9 323:9
**formal** 26:25
**format** 199:12,19 241:4 250:8,11,20 254:9 273:2 321:8
**formats** 226:9 275:19
**formatting** 154:11
**forms** 126:5,19 231:12,21 233:10 234:6,12 239:2 251:25
**formula** 315:24
**formulating** 181:15
**forth** 90:24 132:8 235:22 341:7
**forward** 2:10 3:18 14:16 15:16 100:22 284:5 288:11,16,21 291:9 293:10 298:18,22
**forward-** 305:1
**forwarded** 250:9 305:1,4
**forwarding** 182:15 245:16 263:19
**forwards** 192:2
**found** 27:8 143:11 143:12 304:18
**foundation** 2:10 3:18 80:24 89:18 143:4 158:19

161:20 169:3,21 170:4 178:9 179:9 180:1 181:11 191:17 196:23 223:7 267:3,19 273:13 287:16 290:14 293:25 294:14 302:17 336:22
**four** 84:21 283:14 283:21
**fourth** 52:6,8 54:1
**frame** 35:12 40:7 47:10,25 48:9 52:9 55:2 57:23 58:15 60:9 62:21 80:7 87:9 115:14 310:4
**Francisco** 1:3 3:8 14:13
**frank** 176:6
**Franklin** 58:25 110:23 137:1,9 138:15 142:10 174:21 195:17 228:12
**frankly** 157:19
**free** 194:2 198:9 323:10 325:7
**freeze** 12:6 92:23 93:1 94:7,13 95:5 95:12 97:19
**frequently** 85:25 179:6
**Friday** 1:18 2:1,9 14:1
**friendly** 92:6
**front** 47:16,18 49:24 77:10 167:1 169:23 256:4
**FTE** 154:19,24
**full** 17:6 21:1 22:4 22:8 29:21 139:18 222:23 223:1,4,8 258:17,18 259:1
**full-time** 71:17 81:15 111:5 165:1

237:25 317:18
**fully** 283:6
**function** 141:19
  222:13 326:9
**functional** 312:8
**functions** 66:21
  67:3 74:18 126:7
  136:7,10 146:4,12
  146:15 159:13
  169:17 218:5
  223:12 276:2
  294:12 328:2
**fund** 71:6 88:21,22
  122:12,14,19
  164:9,12,17 317:9
**funded** 121:19,25
  122:2,15,22
  317:12
**funding** 75:8 88:12
  88:17,22 89:10,11
  164:25 165:3,5
**furlough** 175:19
**furloughed** 333:4,6
**further** 118:17
  281:7 282:1
  301:10 313:6
  328:7 337:1 341:8
  341:11
**future** 123:5
  291:12
**FY** 315:3
**FY26** 11:7

**G**

**gain** 298:9
**gaining** 30:21
**GAO** 127:10 128:2
  128:7,14
**gap** 129:16 131:20
**Gaps** 11:24 129:8
**gather** 124:22
**gathered** 207:2,22
  209:16
**gathering** 128:7
**gears** 121:6 197:8
**general** 18:11 26:7
  60:10 85:2 101:13

127:24 185:23
  215:10,11
**generally** 21:20
  27:16 32:18 37:3
  56:14 58:22 59:3
  66:22 71:12 73:16
  74:7 78:12 82:21
  83:3 84:16,17
  86:1 87:4,8 88:20
  88:25 89:7,12
  101:23 102:18
  110:19 118:22
  121:7 122:10,15
  178:17 265:8
  269:14 317:21
**generate** 107:6
**generated** 79:12
**generating** 262:24
**generation** 107:8
**generators** 69:6
**gentleman** 55:7
**getting** 82:20 99:25
  318:17
**give** 19:8 20:14
  21:1,12,14,17,22
  22:4,7 26:10
  32:22 61:23,25
  64:4 70:13 87:2
  121:21 128:9
  176:25 192:20
  199:23 204:21
  249:15 306:6
  321:24 322:7
  323:25 325:1
  328:3 331:18
**given** 68:2 80:10
  96:8,10 97:20
  100:19 102:21
  107:20 108:16
  109:8 118:9
  145:25 168:16,16
  201:23 207:8,9
  218:10 231:24
  278:19 291:19
  296:9 305:23
  310:23 320:11
  332:6 336:7

**gives** 19:12 199:12
**giving** 91:1 176:9
  217:8,24 227:18
  227:22 228:10
**go** 16:23 17:17
  18:16,20 28:18
  33:13 40:8 74:4
  75:2 80:5 120:19
  122:3 140:2
  152:24 169:22
  170:25 198:14,19
  208:2 219:2
  222:20 224:7
  225:11 230:17
  255:8,12 261:2
  268:19 275:9
  279:22 297:23
  307:10 308:5
  313:12 315:2
  319:9
**goal** 213:13 267:16
**goals** 278:20,24
**going** 16:18 21:9
  26:21 33:13 36:15
  43:6,8 46:1 57:21
  70:10,16 72:11
  73:13 75:25 76:24
  79:21 80:17 81:1
  82:18 91:24 93:4
  94:6,17 99:25
  100:22 105:6
  108:25 109:7
  127:19 130:12
  143:20 145:14
  151:10,21,23
  153:16 155:20,22
  156:17 160:10
  164:24,25 173:11
  173:23 177:14
  182:25 193:10
  194:1,21 198:3
  201:7 205:16
  214:23 218:22
  224:4,5,16 225:18
  226:22 230:19
  238:14 240:23
  244:6 249:22

251:6 255:12
  259:20 262:15
  280:2 282:2,25
  284:5 289:24
  291:9 295:23
  301:24 306:24
  307:10,14 308:7
  310:7 313:12
  318:23 332:16
  333:25
**good** 15:2,15,22
  16:17 70:8 76:1,6
  76:8 97:11 170:23
  172:6,7 224:9
**government** 1:5
  14:8 18:7 27:25
  28:4,16 51:25
  64:16 81:6 112:3
  128:10 192:19,25
  192:25 213:13
  339:3
**government-wide**
  263:17
**governments**
  101:25 102:1
**governs** 76:21
**grand** 154:15,17,20
**grant** 101:24 102:4
**granted** 331:24,25
  332:2
**great** 76:9 154:13
  232:19
**greater** 101:6
**Greyson** 242:6
**ground** 18:16
**group** 63:14 251:11
  251:12 299:1
  332:8
**growled** 168:11
**GS-15** 43:21 44:11
  48:16 58:2
**GS-15/SES** 44:23
  45:17 49:16
**Guard** 28:10
**guess** 152:2 245:3
  311:12
**guidance** 12:6

94:20 329:8,15
**Guy** 50:5,7,12,24
  51:8 59:14,18
  159:25 160:4
  167:2 178:13
  244:13,17,23
  271:16,20,23
  288:15,19,25
  289:15 301:19
  303:9,17

**H**

**hac** 3:19
**half** 125:14 137:16
  142:7 143:19
  144:16 145:12,20
  145:23 146:16,25
  148:12 156:11
  157:24 162:19
  163:5 165:11,22
  166:1 180:17
  188:5 195:25
  204:14 218:5
  267:17 279:5
  312:15
**half-calculation**
  158:3
**Hamilton** 36:5,6,15
  36:22 37:4,10,12
  40:10
**hand** 21:11 91:25
  255:20
**hand-** 219:3
**handed** 27:5 92:17
  95:2 96:24 113:14
  156:22 173:13
  219:4
**handle** 196:17
**handling** 333:6
**happen** 131:1
  145:25 221:5
  244:6
**happened** 93:1
  130:14 143:2
  194:6 205:14
  277:9
**happening** 197:9

244:3,5 300:13
**happens** 79:9
  128:10 306:20
**happy** 237:18
  255:20
**hard** 247:9 251:24
  254:12
**hardest** 19:6
**Harris** 3:16
**head** 19:2 21:3 66:2
  70:9 74:5 151:22
  173:12 239:3
**head's** 234:8
**headquarters**
  87:21 107:4
  221:14
**heads** 92:21 97:3
  235:13 275:8,10
  293:8 294:18
  295:14,14,17,18
  327:3,9
**heads'** 293:14
**heads-up** 61:25
**hear** 41:20,24 42:6
  42:19 49:7 159:19
  163:22 164:1
  165:20,24 166:3
  168:2,5,8 179:3
  179:12 184:1
  250:18 298:12
**heard** 57:9 100:9
  164:7 168:6,25
  170:10 179:13
  184:3 217:2,5
  333:14 335:10
**held** 28:3 34:19
  241:15 309:22
**Helene** 130:9
**help** 82:22 121:8
  133:8
**helpful** 33:18
  116:14
**helping** 211:16
**helps** 21:23
**Hemenway** 61:3,9
  61:12,15
**hereinbefore** 341:7

**Hermit's** 126:10
  326:20
**Hey** 75:10
**high** 67:5 91:5
  164:24
**high-level** 32:22
  128:9
**higher** 150:8
  151:17
**hire** 83:20 97:23
  98:15,23 99:7,10
  99:13,16 105:12
  105:16 106:3
  287:12
**hired** 66:23 71:15
  71:18,19 107:24
  108:13
**hires** 105:8 106:8
  106:13,19 107:10
  107:21 111:5
  130:7 150:19
  287:4 326:4
**hiring** 11:23 12:6
  12:10 75:20 84:1
  92:23,25 94:7,13
  95:5,12 96:11
  97:14,19 98:20,21
  100:7,23 104:16
  105:6 109:22
  110:25 230:15
  231:11 233:16
  239:2 248:9
  251:12,12 253:24
  259:21
**history** 278:1
**hold** 206:17 331:7
**holding** 297:14,18
**holds** 34:9 43:3
**holiday** 202:2
**holidays** 268:21
**Homeland** 4:19
  16:4 29:5,8 48:18
  97:24 100:14
  111:7
**hope** 128:23
**hopeful** 320:14
**hopefully** 18:20

281:23,24
**Hoshijima** 3:19
  15:15,16
**hour** 61:23 224:5
**hours** 23:15 234:16
**hours'** 74:14
**House** 133:23
  134:5
**housed** 322:18
**HQ** 184:10 301:12
  301:17,18
**HR** 33:4 85:5,12,19
  87:2 231:8 302:20
  308:10
**human** 17:14,22
  29:2,8 30:2,7 33:8
  41:3 43:19 44:8
  63:24 95:19 107:2
  124:2 133:24
  208:24
**hurricane** 38:7,11
  38:17 39:2 115:2
  115:9 130:15
**hurricanes** 69:3
  129:23 130:9
**Hutchinson** 227:16

———————
**I**
———————

**i.e** 307:19,23
**Icardi** 142:11 194:9
  194:19 195:18
  196:15
**idea** 82:20
**identification** 27:3
  77:9 110:10
  153:19 173:6
  193:23 201:4
  212:18 213:25
  225:10 226:20
  228:9 232:5
  233:21 236:8
  238:21 239:11
  242:12 243:24
  250:25 254:25
  269:21 282:14
  285:17 306:14
  310:15 313:4

319:8 329:2 334:4
**identified** 314:18
**identifies** 325:24
**ignore** 307:7,9
**IL** 3:15
**immigration** 93:11
**imminent** 288:4
**impact** 146:3,12
  291:1
**impacts** 218:13,17
  291:7,8,22
**implement** 100:18
  165:12 181:4,15
  181:21 184:21
  194:23 333:8,15
  333:23
**implementation**
  277:3 279:20
  333:18 335:11
**implemented**
  333:21 334:24
**implementing**
  178:22 180:21
  231:10 322:22
  327:25
**important** 115:23
  115:25 116:10
  290:6 294:11
**imposed** 117:2
  292:12,20 293:22
**impossible** 147:1,9
**impromptu** 47:3
**improve** 11:22
  233:2
**inability** 272:9
**Incentive** 324:15
  324:17
**incident** 106:12
**include** 29:18 67:18
  70:21 71:2 83:7
  83:11 93:24 94:1
  112:11 119:23
  124:14 159:21
  174:9 202:17
  221:21 244:22
  283:10 286:10
  304:5,12 305:19

314:9 323:11,13
**included** 106:14,18
  107:10,20 119:18
  147:22 160:4
  170:2 202:23
  203:23 204:8
  234:8 236:16,24
  237:7,12 253:22
  284:6 285:4,8,13
  304:25 305:6
  324:20,23 325:5
  327:21
**includes** 98:11
  123:23 265:18
  314:17 325:19
**including** 70:14
  93:10 102:24
  118:7 198:24
  260:13 268:6
  283:6
**inclusive** 338:5
**incorrectly** 258:16
**increase** 155:22
  212:5
**increasing** 165:12
**incredibly** 251:24
  254:12
**increments** 113:24
  309:11
**indicated** 30:17
  275:19 296:13
**indicating** 23:1
  25:14
**indication** 21:23
**indirect** 137:20,23
**individual** 30:5
  69:15 71:25 85:23
  102:8,10 222:10
  276:6,7 303:18
  319:12 329:4
**individual's** 317:22
**individually** 322:17
**individuals** 62:18
  74:1 102:24 103:3
  131:9 167:1
  189:20 223:12
  271:6 304:5,12

305:9 306:1 309:22 331:6 332:5
**inform** 135:2
**information** 10:12 30:7 33:9 44:4 49:23 74:9 85:14 87:3 95:13 106:12 107:3,6 128:7,12 128:18 133:8 134:13,22 137:12 167:25 169:23,25 190:12 193:12,14 198:23 199:13,17 219:17,21,25 220:7,9,11 221:22 226:7 228:1,11,18 229:19 230:15 231:25 233:13 234:2 235:17,18 235:24 236:2,4,10 236:12 237:11,14 238:10 239:9,18 241:3 243:16,19 250:2 253:7,21 254:4 261:24 263:23 265:5,10 265:12,25 266:5 266:16 275:18,25 276:1,4,9,12,18 279:16 281:20 282:1 283:1 284:9 284:14 287:17 302:24 303:24 304:2,11 305:18 310:23,25 311:7 311:22 314:21,24 323:7 324:8,18,25 325:2 326:10,11 326:25 328:13
**informed** 116:23
**initial** 132:16 300:5
**initially** 91:21 96:4 304:25
**input** 223:10,11
**insight** 274:10
**installed** 40:1

**institutions** 26:12
**instruct** 20:2 112:11 231:20 319:2
**instructed** 177:21 243:18 271:13 287:18 294:7 303:6 321:7,9,19 321:22,23,24 335:25
**instruction** 109:18 109:21 178:1 299:7 325:20,22 336:19
**instructions** 96:6,8 96:10 132:14,16 136:13,14,19 196:14 202:5 233:15 240:7 299:9 313:17 318:17 320:25 321:8,20 322:11 322:23 323:2,6,25 325:6 326:4 327:2 329:12 336:6
**Insurance** 317:7
**intend** 27:16 318:15
**intended** 165:11 179:11 318:19
**intends** 333:20
**intent** 115:2 117:25 155:10,11 333:23
**intention** 87:11 95:22 333:8
**interact** 54:10
**interaction** 55:5
**interactions** 55:1,3 106:6
**interacts** 121:18
**interested** 341:14
**interests** 191:15
**interfere** 22:3 191:20
**intermittent** 71:20 72:3,4
**internal** 114:1

311:21,21 330:5
**interpose** 19:13
**interpretation** 94:8 120:6 260:22
**interpretations** 105:8
**interpreting** 156:1 258:13
**interrupt** 216:1
**introduce** 14:25
**introduced** 10:11 11:3 12:3 92:9 95:1 96:23 103:22 113:13 127:18 148:6 156:21 182:11 186:12 189:7 197:18 219:1 252:20 262:8 289:9 301:3
**investigate** 53:6
**invitation** 56:13
**invited** 56:17
**invoke** 20:2
**involuntarily** 30:1
**involve** 30:13 83:23 90:19,25 91:8,12 138:18 323:24
**involved** 51:16 73:17 103:24 107:8,12 124:25 128:13 133:6 135:9 160:9 161:21 184:24 185:11 195:14 281:16 302:14,18 303:9 304:19,22 306:2,5 323:20
**involvement** 83:8 83:12 84:2
**involves** 17:2 143:24
**involving** 17:3 195:20 233:24
**issue** 178:5 246:20 257:17 260:16,19 264:15 296:7 323:20,25

**issued** 94:20 117:8 213:12 259:6
**issues** 119:12 305:13
**issuing** 128:3
**italics** 240:6
**item** 183:11
**items** 174:6 196:16
**iterations** 234:24

---

**J**

**J** 1:8 14:9 339:4
**January** 12:4 35:13 45:24 65:18,23 67:25 92:20 94:9 95:3,14 126:24,24 186:20 188:2,24 189:25 190:11 202:9 208:20 213:12 214:5 219:18 220:4 223:20 224:19 227:19 228:16 229:16 230:7 231:13 242:15 248:1 251:13 253:16 259:6,15 263:2 265:1,1 268:15,24 269:6 277:2,6 284:25 286:22 287:22 288:3,4,8,12,19 288:22,25 289:13 292:16 293:1,11 293:21 294:11 295:21 296:8 297:3 298:18,22 299:4,8,16,20 310:18 311:12,17 319:16,17,22 320:23 327:18 329:10,24 331:7 331:16,17,20 332:10 334:11
**Jeff** 278:18
**Jessica** 5:2 15:10 46:19

**Jim** 22:16
**job** 1:25 152:2 176:11 192:16 237:12
**jobs** 28:15
**join** 45:21
**joint** 126:9 326:23
**Jonathan** 5:7 14:20
**Joseph** 50:4
**journey-level** 116:4
**Jr** 3:16 4:21
**judge** 21:2 29:17
**judicious** 175:20
**July** 60:4,8
**June** 38:18 54:16 54:24 132:13 333:10,16,18,21 333:22,24 334:24
**Justice** 4:3 15:19 15:23 22:21
**justification** 222:15 225:20 227:9 228:2 230:14 233:4 234:2,9 251:16 253:13 290:19
**justifications** 82:15 226:10 229:14 230:6 233:9 239:3 253:23 283:13 294:24
**justified** 79:7 89:16 90:3
**justify** 82:23 88:4 90:11 190:24 238:14

---

**K**

**Kara** 48:12,17 161:15,21 162:1,5 162:6 176:19,22 183:2 185:9,14 192:13,19 193:4,8 193:13 264:21 276:15,17
**Kara's** 176:22
**Karen** 25:2 135:6

142:17 177:8,9,25
183:1 184:9 187:6
192:4 242:14,21
246:3 251:3 253:4
253:7,20 288:25
301:7 307:16
316:6,14
**Katrina** 102:25
**keep** 63:1 70:8
  294:24
**Kelly** 233:10
**Kevin** 22:15
**key** 97:12 111:2
**Khan** 241:23
  252:22 264:3
**kind** 63:6
**King** 4:21
**knew** 50:18 190:23
**know** 18:17 19:18
  20:8,12 25:21
  39:5 51:10,18
  52:25 53:17,19
  61:3,4 62:4 64:15
  72:13,17,25 79:25
  83:2 85:11 89:23
  99:24 103:25
  104:8 107:12,13
  107:17 114:18,19
  118:25 119:10
  123:18 129:7
  131:13 132:5
  138:8,23 146:6,24
  147:12 148:1,14
  148:18 149:22
  150:14 151:12
  159:1,6,17 163:15
  165:10 166:13,20
  166:21 170:19
  173:18 177:3,9,24
  178:4,12,13,21,23
  180:10,12,16,25
  181:3,6,12,14,17
  181:20,23,24
  182:2 185:9,11
  192:24 194:9
  204:5 205:17
  208:15 211:14

212:21 214:7
215:15 224:4
229:6,7 236:18
237:15 238:6
239:12 241:13
244:8,15,16,20
245:19 246:3
247:4 255:14
260:8,17,19,20,23
260:24 262:11
264:14,17 266:4
267:20 271:13,16
271:18,19 272:4
273:14,23 274:1,3
275:15 276:14,16
279:4,16,18,19,24
279:24 280:6
281:18 282:4
283:6 284:11,18
288:7 289:22
290:21 294:15
296:21 298:11
299:3,6 302:6
303:7 304:21
317:4,16 324:6
326:24 328:5
329:24 330:15
332:25 333:3,22
334:12,15,15
336:12
**knowing** 146:19
**knowledge** 68:9
  83:10,14 84:24
  123:2 138:17
  143:5 145:22
  146:2 193:12
  238:2 264:9 303:4
  305:11,23 306:5
  311:8 340:8
**Kristi** 37:7 39:18
  180:11

---
**L**
---

**L** 4:6
**La'** 2:7 6:3,10 14:7
  16:12,22 17:7
  195:2 316:22

338:13 339:6,25
340:15
**LA'TOYA** 1:16
**labor** 29:23
**lack** 158:18 169:2
  169:21 170:3
  179:8,25 181:10
  191:17 196:22
  223:6 260:22
  267:2,18 273:12
  290:13 293:24
  294:13 302:17
  336:22
**lady** 22:20
**language** 275:17
  298:2
**lapsed** 281:21,23
**large** 30:8 112:23
**large-scale** 112:6
**largely** 150:18
**late** 54:7,7 103:4
  188:16 211:18
  295:21 313:17
  320:23
**Laughter** 22:25
  24:2
**law** 32:3 133:2
**lawsuit** 299:20
**lawyers** 21:14 23:8
  23:14
**lay** 33:18
**Layou** 319:18
**lead** 290:11
**leader** 42:10
**leadership** 30:23
  39:9 41:11,20
  44:1 47:13,14,16
  48:2 49:8 85:7,14
  85:15 86:15 87:3
  101:2,13 102:3,7
  102:13 103:3,7
  106:7 115:3
  137:16 146:7
  159:20 162:7
  163:23 164:2,8
  167:19,19,21
  169:25 174:15

175:25 178:18
180:21 185:11,16
190:12,13 193:9
194:22,23 195:20
201:16 202:11
214:24 216:2
217:2,7,21,23
222:23 223:1
246:17 248:20
302:22 303:5
304:17 306:1
321:10 329:21
334:7,13
**leaked** 179:20
  180:14 203:2
  322:5
**leaks** 321:13
  330:12,19
**learn** 157:3 168:21
  242:5 280:1
**learned** 156:4,10
  203:14 237:21
  281:6,12
**leave** 29:25 44:6
  102:21 151:14
  259:20
**leaves** 45:10 75:16
  151:12 152:5,9
**leaving** 39:3,9
  119:12
**Leckey** 110:23
**left** 38:23 39:6
  64:13 119:23
  135:15 138:24
  152:15 309:1
**legal** 5:5 66:3
**length** 117:3 140:1
**lengths** 84:12
  283:20
**Leonard** 3:5 6:5
  15:2,3,13 16:6,16
  16:25 26:21 75:24
  76:7,15,24 91:24
  92:10,15 94:22
  96:19 103:18
  110:5 113:8
  120:16,22 121:5

127:13 144:19,22
145:4,13 148:2
153:15 156:15
170:22 172:5
173:3 182:7 186:5
186:9 188:18
189:4 193:19
197:7,12 200:25
204:17 212:7,14
213:21 218:19,21
224:1,15 225:3
226:17 228:4
230:17,24 231:1
232:2 233:17
236:5 238:17
239:6 242:9
243:21 246:11
250:22 252:16
254:22 256:5,8,10
260:25 261:3,10
262:3,14 267:6
269:17 282:9
285:14 286:5,7
289:5 296:22,25
300:23 306:6,10
306:15,19 307:1,5
307:9,12,13
308:24 309:8
310:11 312:25
319:5 328:24
333:25 335:13,23
336:24 337:8
**let's** 26:7 40:8
  57:25 62:1,22
  66:12 70:24 73:13
  79:23 84:25 94:22
  96:19 103:18
  110:5 113:8
  120:16 121:6
  126:22 127:13
  140:3 148:3
  152:24 153:15
  156:15 173:3
  175:9 182:7 186:5
  188:18 193:19
  197:16 198:14,19
  200:25 210:5

212:7,14 213:21
218:19 224:1
225:3,5 226:18
228:5 232:2,11
233:17 236:5
242:10 243:21
246:11 250:22
252:16 254:3
258:11 260:25
262:3 269:17
276:22 282:11
285:14 289:5
291:14 295:9
300:23 306:11
307:7 308:24
310:11 319:5
328:24 335:13
**letter** 25:13 102:25
285:4,8 286:23
**letters** 34:2,4
286:10
**level** 67:5 75:23
91:1 117:11,12
119:5 123:18
126:18 130:16
140:3 199:19
205:23 209:20
216:10,13 217:12
222:14 278:4,4,9
278:9,22
**levels** 32:20 125:9
140:25 199:5
324:10,11
**Levy** 5:2 15:10,10
**Lewandowski**
60:16 168:3
298:14
**liaise** 31:3 74:12
75:9
**liaising** 85:15
**liaison** 49:2,20 79:3
85:5,12 167:18,25
185:15 193:8,11
193:17 248:20
**liaisons** 87:2
**lift** 299:7
**light** 191:5 233:19

**liked** 234:25
**Lilian** 227:15
**Lily** 214:22 216:25
**limbo** 309:23 310:2
**limit** 93:19
**limited** 115:4 222:4
319:25
**limiting** 117:2
**line** 183:8 200:9
232:20 239:23
263:24 286:1
339:11,13,15,17
339:19,21
**lines** 31:4
**link** 143:13 202:20
209:1 322:17
323:1
**linked** 82:14 115:9
140:20 309:19
314:11
**LinkedIn** 6:11 27:8
27:11,14,23 28:14
**list** 28:5 44:5 68:6,8
70:3,4,5 112:13
112:21 183:9
188:8 193:5
221:12 225:22
227:18 229:14
245:12 311:3
324:23,24
**listed** 27:20 28:3
29:7 93:10 94:14
98:8,18,20 104:6
105:22 139:13
150:2 174:20
225:21 232:13
253:18,24 304:20
**litigation** 17:2
**little** 61:25 121:22
**lives** 87:16
**LLP** 3:4 5:3
**loaded** 283:7
**local** 101:25 111:4
130:7 150:19
**locate** 324:25
**locked** 325:25
**logisticians** 69:1

**long** 23:13,25 35:15
35:17,24 36:6,12
86:18,20 94:19
127:22 193:24
198:2 234:8
**long-term** 33:8
**longer** 21:22 98:22
241:21 307:20,23
**look** 55:19 69:10,15
77:21 78:15 79:6
87:18 93:6 96:20
103:18,25 110:5
113:9 119:3 126:6
127:14 138:1,6,11
142:6 143:19
144:15 145:11,19
148:3,12,19
153:16 154:1,14
154:17 156:16
173:17 182:8
183:15 184:14
186:6 188:19
189:4 193:19
194:2 197:16
200:25 202:25
205:3 207:4 209:8
212:7 213:21
218:19 222:10,13
224:2 225:3,5
227:15 243:22
254:3 255:8
258:11 262:4,10
269:18 276:22
277:8,13 279:22
285:15 286:21
289:4 291:12
300:23 306:20
310:11 316:3
330:22
**looked** 147:23
154:5 188:22
189:10 231:3
239:19 268:10
273:15
**looking** 62:13
78:14 140:2
141:22 143:18

144:14 145:10,18
146:18,18,21
163:2 183:12
223:12 238:6
244:25 247:7
282:10 317:18
318:3
**looks** 238:22
286:24 334:11
**losing** 30:21
**loss** 326:9,9
**lost** 81:23 127:6
**lot** 43:25 63:16,17
86:5 101:7 134:6
244:3
**loud** 168:12
**lower** 150:8
**lump** 332:8
**lunch** 168:15
170:23 171:3
**Luther** 3:15 4:21

— **M** —

**ma'am** 26:3 288:23
**magic** 218:21
**mailbox** 110:22
208:24 232:17
**main** 59:3 67:16
123:12
**maintain** 36:25
**maintained** 79:15
86:10
**maintains** 174:4
**major** 126:11
**majority** 119:8
**making** 31:1,2
102:8 114:4
275:11
**manage** 272:10
**managed** 76:23
**management** 4:12
17:16 26:19 31:7
55:10 59:24 60:4
67:14,19 68:20
69:11 74:12 75:3
84:5 91:16 97:2
98:11 112:14

121:16 130:5
147:11 214:15
266:17,19 289:23
290:2,10,20,23
**management-dir...**
102:17
**Manager** 67:17
**managers** 68:25
**manages** 101:24
**mandated** 146:15
**mandatory** 93:7
94:18
**manner** 13:2 68:25
243:17 272:22
**manual** 6:12 76:1
76:18,21 77:2
80:19 82:7,13
83:4,16 87:18
88:15 90:2,25
95:24 229:2
275:14 293:13
**March** 12:9 31:10
97:1 99:15 100:10
100:19 103:10,24
104:11 106:12
107:18 114:12
118:1,10 120:6
188:25 220:4
255:4 258:22
295:2,17 303:21
311:13,18,25
320:3 326:17
334:23
**mark** 26:22 76:25
92:11 94:22 110:8
153:16 168:18,18
173:3 193:21
212:14 213:23
218:23 226:18
228:7 232:3
233:17 236:6
238:19 242:10
243:22 246:11
250:22 252:17
254:22 282:11
289:5 306:11
310:13 319:6

328:24 334:2
**marked** 6:9 7:3 8:3
9:3 10:3,9 11:1
12:1 27:3,6 77:9
92:1,9,17 94:23
95:1,3 96:20,23
96:25 103:19,22
110:10 113:10,13
113:15 122:4,22
123:1 127:15,18
148:6,9 153:19
156:18,21,23
173:6,14 182:11
186:10,12 189:7
193:23 197:18,19
201:4 212:18
213:25 218:23
219:1,4 225:6,10
226:20 228:9
232:5 233:21
236:8 238:21
239:11 242:12
243:24 250:25
252:17,20 254:25
255:22,22 262:8
269:21 282:14
285:17 289:9
301:1,3 306:14,17
310:15 313:4
319:8 329:2 334:4
**markings** 21:17
**Marlboro** 17:10
**Martin** 3:15 4:21
**MaryAnn** 35:23,24
96:7 105:9,11
**MaryAnn's** 105:10
**Maryland** 17:10
**master's** 26:16
**match** 150:4 204:8
**matches** 286:16
**materials** 249:16
249:21,25
**math** 315:25
**matter** 14:7 18:12
101:11 167:22
**Matthew** 4:20 16:3
**matthew.fleisch...**

4:23
**maximum** 93:19
300:13
**May-to-December**
115:5
**McGill** 59:25 60:12
242:7
**MCO** 99:17 100:24
104:22 105:17
110:2 117:21
118:7,14 120:1,7
230:10 254:19
255:6 256:23
257:5,22 258:15
259:19 261:14,20
261:25 263:1
264:16 266:1,9
270:23
**MCOs** 98:4,23
112:22 228:23
260:13 263:17
**MD** 3:17
**MDR** 64:23 259:14
**MDR'd** 241:12,13
**MDRs** 60:6
**mean** 30:18,19 43:8
49:22 62:7 73:22
81:3 102:10
121:14,22 132:21
132:24 139:16
158:13 169:10
175:12 245:3
259:2 278:25
285:1 307:24
308:14 315:11
**meaning** 71:7
83:25 141:9 218:9
308:15,18 317:23
**means** 18:25 114:4
132:25 226:1
279:1 301:22
315:6,12 317:16
**meant** 134:25
**measure** 122:7
**mechanics** 69:5
**medication** 22:2
**meet** 23:13 44:3

47:17 63:15
**meeting** 23:16
44:11,12,14,23
45:5,9,18 47:13
47:14 50:13 57:12
59:15,23 60:3,15
61:8 62:2,6 63:14
142:16 162:17
177:12 182:4
244:12,22 246:20
247:2,15,25
248:15,23,25
249:5,11 251:3,10
251:11 254:6
285:22 288:15,17
322:11 327:8,8,13
**meetings** 42:23
43:13,17,18 44:2
44:10,17 45:21
46:4,13,16,23,24
47:1,6,11 48:2,5,7
48:14,15,16 49:5
49:10,16,25 56:18
56:23 57:4,22,22
58:3,4,7,10,14,19
58:21 59:8 60:12
60:13 62:15,18
63:3,6,16 142:5,9
162:7,20 167:6,12
167:22 186:3
187:8,24 194:15
195:16 244:9,16
246:5,7,9,14,16
271:23 305:16
**Melody** 5:5
**members** 322:21
**memo** 97:23 100:19
103:10 113:5
114:15,17 117:5,8
118:17 120:6
172:12,22 174:7,8
174:13,15,15
175:24 176:18,21
177:15 218:12,16
219:9 220:14,15
220:18,21,22,25
255:9,10,24

256:12 259:5,9
260:11 290:12
291:8 292:5,8
302:8 303:12,14
**memorandum** 12:4
12:9 92:20 97:1
97:17 99:15
104:11 105:22
113:16
**memory** 97:8
201:10 289:4
**memos** 174:4,18,25
175:2,4
**mention** 179:21
**mentioned** 41:1
121:9 261:16
**message** 10:4
104:10 110:17
208:22 233:1
334:16
**met** 50:16 60:18
271:19 288:18
326:17
**method** 235:23
**Michael** 142:11
**Michelle** 1:16 2:7
6:3 16:12 17:7
338:13 339:6,25
340:15
**Microsoft** 52:13
**mid-January** 64:10
64:11,13 318:10
**mid-March** 96:10
**mid-May** 96:9
**middle** 129:22
**Mike** 194:9 195:18
**military** 28:5,7,13
**Milton** 130:10,11
**Mine** 168:13
**minute** 175:21
230:18
**minutes** 20:9 76:3
76:4,6,8 120:22
**mischaracterizes**
222:19 250:4
272:17 304:10
**Mischell** 95:17,18

95:19
**misleading** 89:4
90:6 165:14
272:18 291:4,25
293:25 297:21
310:1
**mispronouncing**
173:7
**mission** 30:25
33:21 34:11,12,15
47:17 56:2 58:24
59:1 66:20,20,21
66:25,25,25 67:7
67:7,9,16,19,22
68:3,11,19,22,23
69:7,9 74:19
98:10 110:21
116:10 132:17,20
133:2 136:7
146:16 147:2,7,17
159:13 174:21
191:21 215:22,25
218:13,17 220:25
222:3 241:19,22
263:17 312:9
328:7
**mission-critical**
199:7
**mission-supporti...**
136:7
**missions** 291:18
**mitigation** 78:17
**modification** 132:6
281:7,14
**modify** 291:15
**moment** 182:13,18
186:21
**money** 75:11,18
101:25 122:6,19
164:2,5 318:2,5
**month** 38:8 44:4,5
45:8 188:9 189:24
191:12 200:2,18
200:22 247:4
253:16 270:11
302:2 333:24
**monthly** 46:13,16

58:3 63:9,21 219:16

**months** 36:14 37:22 176:10 220:1 294:19 318:23

**morning** 15:2,15 15:22 16:17 188:7 188:15 191:7

**Mount** 317:9

**move** 21:23 57:25 288:21

**moved** 28:24 288:11

**moves** 174:4

**moving** 288:16

**multiple** 131:1 275:19

**myriad** 66:19

---

**N**

**N** 172:1,1,1

**name** 14:20 16:18 17:6 22:21 33:22 34:5 35:3 61:4 79:13 173:8,9 198:4 207:3,6 225:22 276:6 303:12,22 305:20 316:11 326:1 339:2,6 340:12

**named** 214:5 225:13 319:17

**names** 44:10 207:17 240:9,13 304:20 305:6 319:12 329:4

**naming** 26:11

**national** 28:9 93:11 94:21 317:7

**native** 153:22

**Natively** 6:18

**nature** 51:22 55:3,9 69:3 78:17

**navigate** 211:16

**nearing** 326:24

**nearly** 112:22

292:15,25

**necessarily** 13:3

**necessary** 30:24

**need** 18:25 19:23 20:8,10,12,14 26:25 28:18 31:14 47:3 69:2 74:13 74:15 75:3,6,11 76:5 78:19,20 88:5,18 89:2,9,16 90:4,11 97:8 104:23 105:17 110:13 120:8 123:5 141:19 148:13 155:15 179:4,7,13 186:21 196:16 211:12 213:16,18 222:16 227:13 236:15,23 237:6 248:6 255:8 258:15 289:4 290:19 294:10 317:24 324:25 326:13 327:15 334:17

**need/staffing** 335:5

**needed** 11:22 43:20 74:9,19 78:4 90:12 109:22 165:4,8 190:12 199:5 216:5,18 222:11 238:10 241:3 249:16 250:6 251:12 299:1 306:24 307:20,23

**needs** 69:19 88:2 88:11 121:8 123:14 124:13,14 125:4 126:7,20 135:2 153:13 159:3,9 163:24 221:15

**neither** 341:8

**Neurauter** 198:4,5 198:6 205:8,9,10 205:13 207:20

211:2 277:14,18

**Neurauter's** 198:11 205:4 208:19 209:8

**never** 59:15 156:13 162:23 163:1,3 168:20,25 170:10 179:10 281:12 292:4 325:15

**new** 2:10 14:16 73:17 74:4,25 75:5,13 82:23 86:22 88:5 92:12 96:11 97:25 99:3 105:11,16 106:2,7 106:8,13,19 107:10,21 109:22 110:8,25 116:3 231:11 234:21 255:22 269:23 283:3 287:4,12 289:1

**news** 42:3 278:23

**newspaper** 168:6

**night** 23:23 188:16 244:3,5

**nine** 33:2

**Ninety** 36:7

**no-change** 214:20 215:2,18

**no-nonsense** 42:10

**nodding** 19:1

**Noem** 37:7,10,13 38:2,4 39:18 57:3 57:10,13,16,19 91:18 106:14 107:9 108:10 113:6,16,22 168:7 180:3,11 297:13

**Noem's** 100:9 101:17 196:2 298:9

**noise** 262:13

**nominate** 35:8

**non-MCO** 109:22 117:7,18 118:18 120:12 172:11,19

177:4 230:10 255:10

**non-mission** 175:8

**non-PMCO** 256:17

**Non-Profit** 3:2,13

**non-renewal** 190:14 286:9

**noon** 202:9

**normal** 229:5,10

**Northern** 1:2 14:12

**Northwest** 2:11 4:6 14:17

**not-to-exceed** 332:10,11

**Notary** 2:13 341:4 341:19

**note** 13:1 184:10

**noted** 172:2

**notes** 169:12

**nother** 295:10

**notice** 274:15 294:23 301:10 302:1

**notices** 299:15

**Notification** 263:15

**notifications** 44:16

**notify** 302:9

**notwithstanding** 97:19 271:1

**November** 38:18 38:24 43:10 46:7 48:1 49:17 50:2 50:14 56:20 103:4 134:17 141:5 150:6,20,23 197:13,24 198:22 207:14,15 210:8 210:13 211:18 265:1,2,9

**NRDC** 3:14

**NTE** 72:8 87:1,3,6 87:12 118:23 152:22 176:13 181:25 182:5 183:17 187:20 191:11,24 203:18 218:17,17 219:16

219:22 220:1 221:1,6 223:16 224:22 228:16 231:13 238:11 248:4 268:14 270:8 296:5 298:19,24 301:13

**NTEs** 238:13

**num-** 213:9

**number** 21:12 30:19 73:1 78:18 89:20 92:12 106:13 114:16 119:10,15,21 126:7 132:18 135:20 136:21,22 146:1 153:12,22 155:2 157:7 158:2 163:7,11,12 164:22 179:10 184:9,12,21 188:23 204:23 206:2,9,10,20,21 207:23 208:3,6,10 208:14 209:23 210:3,16 211:3 213:9 220:17 221:8 234:16 237:12 255:14 262:25 266:1 267:22 278:12 279:13 280:23 311:1 324:21

**numbers** 70:22 71:3 92:3 106:18 119:19 137:2 139:21,22 141:9 141:13,16 150:4 152:1 164:9 169:12 184:7 199:24 208:11 214:20 215:2 217:15 235:25 238:7 265:22 315:6,14 316:9,14 316:17 323:13

**O**

O 172:1,1,1
o0o-- 14:3
OA 47:21 190:2
object 143:21
  235:20
objection 80:4,23
  89:3,17 90:5
  101:8 108:2
  130:23 143:3
  147:3 152:13
  154:2 158:16,18
  161:19 165:13
  166:18 167:23
  169:2,6,18,20
  170:3 177:1 178:8
  178:19 179:8,25
  180:23 181:10
  191:16,22 196:5
  196:22 204:16,20
  222:18 223:6
  235:21 237:1
  249:1,6,12 250:3
  250:15 252:13
  260:1,6 264:10
  267:2,18 272:16
  273:12,19 274:8
  282:22 287:15
  290:13 291:3,24
  292:9,17 293:2,24
  294:13 295:5
  296:15,19 297:20
  302:16 304:7
  308:3 309:25
  333:11 336:3,10
  336:16,22
objections 19:13,21
objects 19:23
obligations 199:9
observing 16:8
obtain 188:8
obtained 113:1
  278:21
obviously 175:24
  198:15
occasion 47:8

occasional 47:2
  57:22
occasionally 19:20
  47:12 58:13
occupation 67:9,16
  69:22,25
occupational
  112:16
occupations 56:2
  67:22 68:3,5,7,11
  68:19 98:11 175:8
  263:18
occur 46:6 86:16
  222:24 226:13,13
occurred 80:16
  129:23 224:17
  293:21
OCHCO 32:23
  34:12 63:25 83:24
  84:3 91:14 123:14
  153:7,24 166:16
  204:24 206:12
  209:11 215:16
  216:12 270:7
  272:14 277:23
  278:19 294:22
OCHCO's 166:4
  272:9
October 54:3 80:15
  82:9 133:14
  175:19 311:16
offboarding 296:4
  299:8
offering 287:8
office 30:21 31:1,3
  31:7 32:13,25
  33:12 35:7 36:25
  46:18,20 47:16,18
  47:23 49:25 59:5
  61:6 62:19 63:24
  64:20 67:14 75:10
  77:18 78:9,22
  79:4,15 80:14
  81:12 84:8 85:6
  85:13 86:10,17
  87:21 91:12 97:2
  102:18 107:15

121:7 122:5
123:25 124:2,23
126:13 128:11,14
134:21 140:11
167:2 189:23
193:17 209:2
215:18 227:20
229:4,8,21 234:13
241:17 245:23
251:14 252:22
253:13,14 266:3
268:18,20,22
280:1 281:15
282:18,21,25
299:14 302:21
324:2 325:24
326:8 327:1 329:8
officer 17:14,22
  29:2,8 31:4 63:24
  75:10 95:20 124:3
  208:24 316:14
  319:21
officers 274:23
  275:3
offices 2:10 14:15
  31:12 77:25 78:7
  78:14 79:5 80:6
  80:11 126:10
  135:21 136:5,18
  140:4 153:6
  166:17 200:19
  204:13 217:8,24
  221:23 225:19
  226:6 228:19
  229:13 231:21
  234:14 235:5,14
  275:3 279:3,7
  293:8,8 294:18
  314:24 315:8
  320:1 321:20
  322:8 328:19
offices' 153:13
  206:11 293:14
official 1:8 14:10
  18:6 21:16 32:1
  35:18,25 36:18
  109:17,20 169:14

officially 38:17
officials 304:19
  305:3 306:4
Oh 54:14 55:23
  84:4 132:12
  158:17 193:24
  231:6 256:2
  277:17 303:20
  305:21 307:15
  327:18
Ohio 28:9,11
okay 16:21,24
  17:17 18:1,6,9
  19:4,16,19 21:7
  21:18,19 22:2,11
  22:23 23:7 24:5
  24:12,18,23 25:19
  26:1,4,21 27:5,19
  27:23 28:2,18,20
  29:4,7,16 31:19
  31:23 32:6,17
  33:15 34:8,15,19
  35:1,17 36:12,15
  36:18,21,25 37:9
  38:1,6,9,14,16
  39:5,8,15,25
  40:19,23 41:1,14
  42:6,22 43:10,11
  44:20 45:4,25
  46:3,9,13 47:20
  49:14 50:4,12,16
  50:18,20 51:14,18
  51:21 52:2 53:25
  54:5,17,24 56:18
  57:2,6,18,21 58:1
  59:23 61:11,18,22
  63:16 66:11,13
  67:9,21 68:10,18
  68:22 70:5,8,16
  70:18,24 71:1
  72:11,17,21,25
  73:6,13 74:3,7,22
  75:24 76:7,8,16
  76:20,24 77:21
  78:11 79:11,21
  80:17 83:15,18
  84:11,15,25 87:18

88:20,25 90:1
91:3,7,18,24
92:16,25 93:3,6
94:3,22 95:9,13
96:19,24 97:6,11
97:22 98:3,6 99:6
99:24 100:18,22
101:16,23 103:10
103:14,18 104:3
104:10,13 107:18
108:19,24 109:2,5
109:10 110:5,16
110:19 111:12,19
112:8,13,21,25
113:5,8,14,20
114:10 116:9
119:2,10,14,18
120:10,16,18,21
121:6 122:17
123:3,13 124:24
125:6,13,25 126:5
127:5,9,13 128:2
128:25 130:25
131:5,8,17,19,22
132:4 133:10,17
133:21 134:9,21
135:5,13,17,20
136:10,12 137:8
138:10 140:15
141:2,6,11 142:14
143:2 144:23
145:14,16 147:12
148:2,15,19,20,22
148:23 149:22
150:10,13 151:7
151:10 152:5,15
152:17,19,24
153:11,15 154:4,7
154:10,12,16
156:3,15,17 157:9
158:24 160:7
161:11,14 163:10
163:19 165:19
166:24 168:20,25
170:19,22 172:15
172:21 173:3,7,11
173:20 174:1,6,12

174:17 175:16 177:24 178:4,10 180:10 182:7,21 184:11,16,19 185:1,4,9,14 186:5,8,25 187:1 187:23 189:9,10 189:22 190:6 192:7,8,10,13 193:16 194:4,8,9 194:14,18 195:8 197:7,23 198:2,6 198:10,13,14,21 200:1,11,22,25 201:12,13 203:13 204:4 205:3,5,20 206:7,15 207:19 209:14,21 210:5 211:6,9,14 212:14 212:19,23 213:7 214:8,13 215:20 217:19 218:22 219:3,8,13,14,20 219:24 220:11 224:1,8,19,20,25 225:3,25 226:4,9 226:17,18,24 227:1,8 228:4,10 230:3 231:15,17 232:2,7,22,25 233:17 236:5 237:4 239:6,12,15 242:5,9 243:21 244:1,2,8,19,21 244:25 246:11 247:25 250:22 251:9,10,22 252:9 254:22 255:2,13 255:17,19,21 256:1,5,8 257:7,9 257:12,25 258:12 260:25 262:3,10 262:12,18 265:24 268:13 269:13,17 276:25 277:13,15 282:7,16 283:2 284:2 285:14,19

286:2,15 287:7,21 289:5,12 295:21 298:8 299:10,13 300:20,23 301:5,6 305:9,22 306:10 306:22 307:8,12 307:15 308:17,21 308:24 309:2 310:17,22,25 311:20 312:2,6,21 312:25 313:6,9,15 313:22 314:2,14 316:1 318:5,9,14 319:15 320:19 321:19 329:6 330:8 331:3 332:19 333:8,25 334:8,19 335:13 335:17 336:24
**OMB** 31:15 92:21 105:22 123:16,20 123:20,22 124:4 133:17 134:14 170:2,7,10,14,16 170:20 223:23 259:5 260:11 280:11,13,16,20 280:23 281:1,5,8 314:5 324:18 327:24
**On-Call** 66:15 71:8 111:4
**onboard** 208:8
**onboarding** 29:22 96:11
**once** 44:3 45:8 75:3 79:5 86:19
**one-on-one** 63:13
**ones** 112:21 182:15
**ongoing** 78:16 318:11
**oOo--** 338:25
**oops** 218:23 255:17
**open-door** 326:19
**operate** 54:18
**operation** 326:23
**operational** 123:9

165:3 327:15
**operations** 33:4 64:7 131:10,14
**opinion** 116:16,21 155:12 222:21 258:16
**OPM** 67:23 68:8,17 92:21 95:4 97:17 97:20 133:18 134:15 170:16,20 223:23 280:11,13 280:16,20,22 281:1,5,9 314:5 327:25
**opportunities** 194:25 195:5,21 196:20 197:1,4
**opportunity** 197:3 202:12 207:12 289:18 320:2 338:22
**opposed** 34:20 122:11 315:8
**optimization** 111:25
**option** 159:21 213:1 284:23 285:3 286:10,20 287:9,19
**options** 194:23 312:3
**orally** 280:2 325:16 325:17
**order** 31:21 55:13 74:9 75:6 83:20 111:20,23,23 112:9 133:11 307:19,23 308:2,8 308:13,15,18,22
**ordered** 31:20 112:5
**orders** 41:3,7 82:11 102:21 133:22 134:6 155:9 213:11
**org** 62:13
**organization** 3:3,14

10:12 55:20 121:24 195:1,6,22 196:21 221:16 325:23
**organizational** 15:5,8,12 30:23
**organize** 67:3 257:11
**organized** 224:7
**originally** 89:15 90:1 332:9
**originator** 203:9
**outcomes** 233:3
**Outgoing** 135:13
**outline** 32:22
**outlined** 100:6
**Outlook** 44:20
**outside** 126:21 276:16
**outstanding** 241:8
**overall** 72:25 129:8 184:7 227:21,22 234:18 311:1

**P**

**P** 4:4
**p.m** 171:4 172:2 191:5 239:17 286:25 287:1 337:12
**P.O** 3:21
**package** 231:24 283:9 301:23 302:3,5
**packaged** 243:19 250:19
**packages** 245:8,10 245:14 249:8 250:7 258:9 272:21 273:1,10 273:18,21 274:2 283:9 288:7,16 302:7 332:12,16
**packet** 254:4
**packets** 243:8 257:5 259:14 284:6

**page** 77:5,12,13 87:19 127:20 129:5 141:23,25 142:1 154:14 169:13 194:3 206:25 222:2 245:7 258:4 277:23 313:24,25 315:2 316:5 323:5 325:13,20,22 326:5 339:11,13 339:15,17,19,21
**pages** 6:18 338:4
**paid** 53:1 71:4,5
**paperwork** 37:1 230:7 274:18
**paragraph** 93:6 187:5 263:10 325:18
**parallel** 139:3 152:25
**pare** 78:20
**parent** 325:24
**paring** 126:12
**part** 19:6 29:4 128:19 140:25 159:13 174:3 187:10 192:16 206:12 270:3 323:15 325:20
**participants** 48:4
**participate** 42:23 43:13 47:5 48:2 49:25 56:11,15,16 58:18 59:7 162:17 172:25 187:23 244:22 323:19,23 327:7
**participated** 45:17 46:16 47:12 48:8 55:25 58:11,21 128:6 194:16
**participates** 63:20
**participating** 56:7 161:8 203:14
**particular** 44:24 45:13 49:15 74:20

79:13 80:7,10 91:4 126:16 127:3 199:12
**particularly** 41:6 147:15
**parties** 341:10
**partners** 279:2 317:10
**parts** 200:3 207:9 210:20 227:23
**pass** 250:2
**passed** 252:1
**pause** 61:17 70:7 168:10 185:21 206:18 208:1 255:18 282:8 285:25 296:4 299:7 306:9
**pay** 29:23 75:11 265:9 283:7,10 315:15
**paying** 53:1
**Payment** 324:17
**payments** 324:15 324:22
**payroll** 52:7,10 53:9,18 128:15 265:8
**Peak** 126:10 326:20
**peer** 303:1
**peers** 202:10
**penalty** 340:1,9
**pending** 20:14 329:8,16 331:7,23
**people** 31:2 32:6,13 43:25 59:3 64:7 69:14,20 119:15 119:23 156:6 179:12 238:15 243:12 252:11 300:7 315:25 317:24 318:1
**percent** 253:17
**percentage** 112:15 118:25 119:14 132:1 145:25 146:1 147:21

151:21 162:21
**percentages** 119:3 150:4 163:1 229:6
**perform** 66:17 67:11 126:7 147:1 147:7 165:21 191:21 200:4 202:1 218:4 291:1 294:11 323:3
**performance** 55:10 56:3,4 65:10 66:9 75:7 119:12 296:7 308:1,7,16,19
**performed** 41:15 64:5 121:10 159:2 276:3
**performing** 32:1 34:16 36:18 147:16 149:20 199:23
**performs** 67:3 121:7
**period** 38:12,20 40:9 41:19 43:9 46:1,1,7,23 49:16 115:5 117:17 118:21 178:16 185:25 197:9 234:13 265:9,18 269:1 300:5 315:15
**periodically** 128:2
**periods** 295:8
**perjury** 340:1,9
**permanent** 129:24 130:5 139:18 165:1 237:25
**permission** 98:17 110:3 278:19
**Perry** 5:7 14:20
**person** 59:16 119:11 245:24 330:22
**person's** 33:22 303:22
**personal** 302:23
**personally** 302:14

**personnel** 67:14 102:8,10,12 132:19 162:15 229:11 234:16 263:15
**pertain** 41:3,7 128:3 134:7
**pertaining** 162:9 162:11,14
**pertains** 65:11 111:23 120:7
**Peterson** 64:12 149:1 189:16
**petitions** 254:19
**PFT** 132:19 150:18 165:9,12 167:10
**PFTs** 151:5,13 164:24 165:4,5
**Philadelphia** 227:17
**Phoenix** 26:17,20
**phone** 15:14 69:17
**phonetically** 34:1
**phrase** 237:20
**pick** 69:17
**picture** 222:23 223:2,5,8
**PII** 192:22
**place** 160:23 233:9 247:3 293:17 294:4 341:7
**placed** 287:2
**Plaintiffs** 1:6 2:8 3:3,14,15 6:8 7:2 8:2 9:2 10:2,10 11:2 12:2 15:5,9 15:12,17 16:7 17:1 27:2 77:8 92:8 94:25 96:22 103:21 110:9 113:12 127:17 148:5 153:18 156:20 173:5 182:10 186:11 189:6 193:22 197:17 201:3 212:17 213:24

218:25 225:9 226:19 228:8 232:4 233:20 236:7 238:20 239:10 242:11 243:23 250:24 252:19 254:24 262:7 269:20 282:13 285:16 289:8 299:19 300:1 301:2 306:13 310:14 313:3 319:7 329:1 334:3
**plan** 31:9,12,17,19 80:2 87:16 90:10 126:13,21 132:10 132:17 134:11,14 135:3,14 137:5 139:5,10 153:4,25 156:5,7,10 157:1 157:5,13 158:7,13 158:22 159:4,15 160:4,9,10,14 161:17,23 162:19 162:24,25 163:4,8 165:11 166:5 167:1 168:22 169:7 170:1,11,14 170:16 181:4,15 181:25 183:21 184:13 185:6,12 187:10 188:4 190:20 191:12,14 191:20 195:24 198:18 199:2 202:8,21 203:15 203:22 204:9 205:15,22 206:3 206:12,16,19 214:20 215:2,18 216:13 223:15 268:7 276:24 277:4 278:2,7 279:5,21 280:17 280:20 281:2,8 307:18 309:20

310:5,9 312:14 314:4 320:3,15,19 321:17 324:20 325:19 327:14,20 327:25 328:10,20 329:7,15 331:8,24 333:16,21 334:21 334:22 335:6,11 336:20
**planned** 244:9,12 330:5
**planning** 30:10,12 30:13,17,20 32:7 32:21 33:11 82:2 123:9 152:25 187:7 197:8 200:14 207:3 208:15 209:6,12 209:17,25 210:20 210:25 213:1 268:5,9 299:7 309:16,24 313:13 318:18 322:9 323:12 324:1 331:1,13 333:9 336:1,14
**plans** 77:23 78:23 79:6,14,18 80:11 131:6 133:12,19 170:8 182:5 211:24 223:24 281:21 311:11 329:13,22
**played** 161:15
**please** 14:24,25 16:10 17:5 19:18 21:16 29:16 58:16 85:2 89:19 160:11 186:22 197:22 201:9 204:21 220:15 251:7,7 262:10,10 267:4,5 274:25 292:19 297:15 298:20 300:18 301:10 338:3
**pleased** 65:9,21

plural 297:22
plus-up 78:19
PMCO 99:17
  104:22 105:17
  110:1 117:22
  255:6 258:15
  266:13
PMCOs 98:4,23
  118:8
point 40:19 52:5
  62:22 66:6 91:22
  92:14 95:22 96:1
  103:14 107:18
  112:25 119:25
  120:10 168:21
  172:9,17 190:23
  219:20 228:18
  229:8 230:11
  231:23 241:11,14
  241:15,25 261:11
  265:6 274:16
  275:24 279:25
  284:16,22 285:2
  286:19 288:24
  300:1,11 302:8
  312:12 319:2
  320:20 322:14
points 11:7 90:16
  148:17 286:8
  311:9 329:7
poker 54:22
policies 293:22
  303:10
policy 30:7 33:11
  101:17 140:12
  169:5 209:3
  241:17 301:12,17
  301:18 309:18
  332:20
political 246:1
populated 315:12
  324:8
populating 314:20
portions 21:21
position 17:13 34:8
  34:19 36:23 38:21
  40:6 43:3 69:24

73:17 74:4,10,13
  75:6,7,11,14,15
  75:19 85:4 98:23
  103:4 111:8
  121:15 195:10
  222:11,13 253:18
  287:3 289:23
  290:3,25 324:19
positions 27:24
  28:2 30:24 31:1,2
  32:15 43:21,22,22
  44:1 55:10 68:24
  75:21 78:2 81:13
  81:15,16,17,23
  82:15,23 83:9,13
  84:13 85:1 88:22
  89:14 93:10 98:2
  98:3,16 99:7,10
  99:17 100:1
  109:23 110:2
  118:19,23 119:22
  121:19,23 122:3,6
  122:11,13,14,18
  123:1 146:1
  155:14 228:20
  229:9 235:7
  237:22 242:17
  243:5 245:12
  253:23 261:14,20
  261:25 264:16
  266:2,9,10,13
  271:3 291:10,13
  316:25 317:6,24
  326:13
positive 298:9
possi- 125:22
possibility 20:20
possible 25:23
  107:14,15 115:8
  125:22,24 130:25
  146:14 162:16
  165:16 169:15
  180:19 181:1
  191:10 193:13
  212:6 217:23,25
  244:12 260:4
  269:10 280:4

284:12 294:16,17
  331:19
possibly 116:24
  165:21 249:14,17
Post 3:7
post-high 26:11
potentially 94:6
practice 73:14 74:8
  79:8 80:22 87:2,5
  87:6 117:15
  118:14 269:13
  293:5 295:22
pre-planning
  146:20
preexisting 68:13
  168:3
preference 76:4
preparation 25:9
  172:25
prepare 22:11
  221:11 251:25
  259:14
prepared 174:13
  245:8,10 273:18
  283:10 329:16
preparing 25:6
  128:19 224:21
  243:8 257:4
  299:14
prepopulating
  314:23
preposition 69:2
present 5:1 14:24
  29:19 50:3,12
  59:9,12 62:23
  64:4,6,11 82:8
  86:20 136:24
  155:5,20 246:10
  263:2 298:11,14
  312:3 319:24
  322:13
presented 136:22
  137:2,12 153:8
  206:2
President 1:8 14:10
  31:20 35:7 41:6
  112:1 146:17

213:12 266:2
President's 41:3
  92:22 156:1
presidential 55:13
  79:24 133:10
  199:6 265:15,18
  265:19
presidentially
  71:23
press 57:7 203:2
  245:24 297:7,14
  297:18 298:9
  321:16 322:6
  330:22
presumably 74:18
  79:21 128:21
  247:11 265:22
  281:16
pretty 18:20 138:24
previous 44:5
  103:20 121:24
  225:7 239:19
  283:17
previously 10:9
  11:1 12:1 91:25
  92:9 94:23 95:1,2
  96:21,23,25 100:8
  103:19,22 105:5
  113:10,13,15
  114:11 127:15,18
  148:6,9,24 149:12
  156:18,21,23
  172:10 182:9,11
  184:4 186:10,12
  189:7 197:18,19
  199:15 217:3
  219:1 224:3 225:6
  245:9,11 252:17
  252:20 255:3
  262:8 279:10
  289:9 300:25
  301:3 309:14
Prieur 1:16 2:8 6:3
  6:10 14:7 16:12
  16:20,21,23 17:5
  17:7 18:2 27:5
  76:16 77:14 92:16

96:24 110:11,17
  113:14 145:17
  146:24 148:10
  157:3 172:8
  173:10,11,13
  182:22 186:13
  187:1 219:3
  224:16 228:10
  261:11 264:6
  273:22 282:17
  309:9 310:18
  335:24 338:13
  339:6,25 340:15
primarily 225:13
principal 62:5,8
  246:9,10,13,16
  322:19
principals 62:2
  322:11,12 323:8
  327:8,8
printed 27:8
  154:10
printout 6:11 27:11
prior 16:19 23:12
  40:24 54:3 68:14
  73:14,18 74:22
  80:16 83:1,18
  84:11 85:1,3,24
  89:1,7 90:18,22
  90:23 91:7 92:3
  92:12 97:14 99:6
  99:9,12 117:1
  122:21 135:5,9
  160:8 175:6
  188:16 202:12
  250:4 251:16
  254:19 266:2
  272:24 309:9
  329:11
priorities 156:1
  169:5 179:1 199:7
  273:15 274:1
  293:22
prioritize 274:11
prioritizing 42:16
priority 98:10
  179:1 213:19

**Privacy** 192:17
**privilege** 20:2,5
  144:2,20
**privy** 39:8 301:18
**pro** 3:19
**probably** 32:11
  35:16 60:3 147:24
  152:1,3 188:14,22
  218:18 227:7
  255:15 269:7
  277:11 298:2
  327:18
**problem** 54:21
**procedure** 74:8
  97:25
**procedures** 73:9
  83:4,7,11,16,18
  83:23 85:3 90:2
  90:17,18,24 91:7
  91:11,19 95:23
  99:3 103:11,15
  300:2
**process** 12:11
  75:17 86:12,21
  98:21 100:6,7
  105:7 109:22
  110:25 114:1
  117:19 118:6
  128:6 132:6 144:1
  175:3,5,7,10
  229:2,5,10,13
  231:10 234:20
  243:6 248:10
  259:22 270:16
  274:17 275:6,9,13
  275:16 289:1,15
  293:17 294:3
  295:1 300:9,12
  301:10 302:15,19
  304:22 331:24
  336:2,14
**processed** 263:16
  307:21
**processing** 30:3
  85:20 86:21
  308:11
**produced** 138:22

138:24 153:21
156:25 214:3
232:14 334:6
**product** 234:25
  235:2,4,11
**professional** 26:9
  46:20 116:16,21
  155:12 222:21
  272:22
**profile** 27:8,11,14
  27:23 28:14
**program** 31:11
  69:11 73:19,25
  74:5,11 75:22
  78:9 85:5,13
  86:15 117:9 119:5
  122:5 136:4 140:4
  140:11 153:6,13
  166:16 200:19
  209:3 214:15
  221:4,18,23
  225:19 226:6
  228:19 229:2,7,13
  229:17 231:21
  234:14 235:5
  241:17 251:14
  253:13,14 274:22
  275:2,8,10 279:3
  293:7,14 294:18
  295:13,17 314:24
  315:8 317:7 320:1
  326:8 328:19
**programs** 15:20,24
  78:24 79:18 80:2
  80:11,18 82:21
  101:24 102:4
  134:23 138:19
  155:3 200:19
  204:13 209:24
  210:14 211:10
  215:7 230:14
  242:17 243:11
  275:20 278:8
  279:7 312:4,23
  313:12 318:23
  321:1,21 322:8
  323:3 325:2 327:4

327:10,24 333:15
336:8
**programs'** 135:1
  206:10
**progression** 205:15
**project** 123:5
  142:22
**projected** 154:24
  315:3
**projecting** 123:14
**projection** 315:3,7
**projections** 123:23
  125:4
**prompt** 108:24
**pronounce** 16:18
  173:9 198:4
**proposed** 183:21
  196:9 283:10
  308:16 312:22
  315:22,23 318:6
**provide** 18:25
  19:23 31:8,12,13
  31:16 44:4 66:19
  70:4 71:25 101:24
  116:7,11 128:11
  141:8,11 142:2
  143:9 158:11
  190:12 199:16
  202:12 220:11
  222:23 223:20
  225:20 234:24
  241:3 245:12
  249:21 250:6
  251:15 254:6
  258:8 261:21
  263:23 264:12
  275:17 278:16
  280:2 281:14
  290:6,18 300:18
  303:24 304:15
  311:22 312:7
  317:1 321:7,9,20
  321:22,25 323:2
  326:11 327:23
**provided** 65:22
  94:20 96:14 98:25
  106:16 114:16

115:15 126:12
134:18 137:19
138:5,7,8 139:1
140:22 143:14,15
157:2,5,13 158:21
159:4 160:18
168:23 181:18
188:1 193:14
202:5 206:11,16
206:19 207:24
213:15 219:17
221:22 226:6
229:15,20 235:17
237:11 245:14
249:11 253:12
257:18 258:3
259:4 264:25
273:1 275:19,25
276:5 278:2
279:19 280:10
281:7,8 294:22
304:1 315:7
317:14 320:25
321:4,16 322:17
322:21 323:1,5,7
324:12 325:6,7
327:3 332:12
**provides** 312:7
**providing** 116:14
  219:25 235:24
  237:7 253:6,11
  263:25 264:1
  310:25 315:9
**provision** 236:10
**provisions** 97:12
  111:2
**public** 2:13 69:6
  71:25 93:12 196:2
  341:4,19
**pull** 92:4 107:4
  255:13 263:14
**pulled** 129:25
**pulling** 263:22
**Puneet** 241:23
  252:22 264:3
**purpose** 55:18 56:1
  67:15 220:25

238:16
**purposes** 23:5 31:6
  47:17 70:24
  123:12,15 124:9
  176:10 279:13
  316:23
**pursu-** 88:17
**pursuant** 88:14
**push** 224:25
**put** 40:11 62:22
  213:16 223:9
  256:3 285:20
  293:10 315:24
  326:1 331:7
**putting** 134:14

---

**Q**

**Q1** 311:16
**Q2** 223:20 277:2,19
  279:19 280:3,8,11
  280:14 311:17
**Q3** 281:18,20 282:1
  282:4 311:14,18
  311:23 333:2
**qualification** 51:6
  51:9
**qualifications**
  51:15
**qualified** 51:12
**qualify** 31:2
**quarter** 52:6,8
  53:25 54:1,14
  188:24 202:8
  278:22 311:12
**quarterly** 31:8,16
  123:17,18 124:12
  124:15,17,22
  223:20,24 277:2,3
  277:9,19 279:14
  279:20 281:15,18
  328:10 333:2
**question** 16:17 19:9
  20:13 66:5 80:9
  82:20 89:6,19
  118:2 143:23
  144:5 145:5,14
  146:23,24 148:23

158:20 165:18 192:1 200:17 207:1 262:15 267:7 295:13 296:23 307:14 314:9 318:16

**questions** 18:19 19:17 20:4 21:7 24:21 26:8 75:25 127:24 159:12 163:23 164:2 166:4 198:3,7,8 321:16 337:1,4

**quickly** 18:21 138:25 229:23 230:1 251:6 273:18

**quite** 157:19 176:6

**quotations** 13:1

**quote** 13:4

---

**R**

**R** 172:1

**Radway** 316:10,11 316:13

**rarely** 49:13 167:13

**re-delegate** 113:1

**reach** 230:13

**reached** 322:16,20

**reaching** 118:23

**reachout** 105:12

**reacting** 242:25

**reaction** 108:1,4 237:21 298:8

**read** 13:2 56:25 94:3 110:13 127:19,25 133:22 144:4,10 145:5,6 166:8,12 182:13 182:18 186:23 196:13 197:22 198:11 226:24 251:6 267:6,8 269:11,14 272:7 284:3 286:1 292:5 292:7 337:7 338:3 340:4,5

**readiness** 50:23,25

**reading** 27:12 82:17 88:9 95:7 97:10 104:2 110:15 148:21 173:19 182:20 186:24 189:8 194:7 198:1,12 201:11 212:22 214:1 219:12 226:25 232:6,12 233:22 238:23 239:13 243:25 251:8 255:1,25 262:17 263:7 282:15 285:18 289:11 301:4 310:16 313:5 319:14 329:5 334:18 338:15,16 338:17

**reads** 183:10 292:10

**ready** 104:1 110:16 144:8 212:21 214:7 239:12,14 262:11

**realistically** 146:10

**really** 76:4 229:23 229:25

**realm** 104:21 258:14

**reappoint** 65:16

**reappointments** 25:15 76:22 96:12

**reason** 22:7 42:11 114:21 166:7,10 185:1,4 211:6 288:14 290:10 303:3 309:18 331:12 339:7,11 339:13,15,17,19 339:21

**reasons** 109:16 213:8 311:7

**reassigned** 261:25 263:1 264:16

266:2,12

**reassignment** 88:1 266:9

**reassignments** 60:5 102:17

**rec-** 155:8

**recall** 22:21 40:14 44:14 49:14 59:13 64:19 92:25 112:1 115:16,19 120:3,4 124:11,24 125:6,9 126:1,4 132:2,15 134:12,19 135:11 135:20 136:21 139:7 141:1,18 142:2 145:21 147:21 149:25 150:5,13 152:10 152:20 153:5,11 154:7 155:2,8 160:16 161:24,25 162:20 164:17,20 167:14 188:11,21 189:1 200:15 202:15 203:1 207:11 210:15 212:9 218:14,16 231:25 232:9 244:7,11 246:19 247:2,18 249:3,4 252:6 254:20 261:11,18 262:1 264:11 277:1 280:5 285:9,10,12 295:25 298:24 303:23 305:17

**receive** 196:13 234:25 243:16 268:25 281:25 294:5 302:8

**received** 96:6 101:7 165:3 200:7 210:14 272:21 280:19 281:20 289:17 299:9 302:7 303:25 304:11

**receiving** 169:14 235:5,12 283:7 305:17

**recess** 76:12 121:2 144:18 145:1 171:3 224:12 230:21 261:7 309:5 335:20

**recognize** 92:18 110:11 232:8 334:14

**recognizing** 214:9

**recollection** 25:9 26:2 150:17 174:12 185:24 186:7 187:14 189:12 192:11 195:8,12 206:1 244:4 248:5 256:14 286:16,17 289:14

**recommend** 213:4 213:17 222:2

**recommenda-** 242:16

**recommendation** 136:23 153:24 222:1,9 277:22 278:16 332:19

**recommendations** 128:15 153:7 166:16 215:7 242:16 250:8,9

**recommended** 119:4,8,11 136:1 137:4 155:3 204:24 208:7,9,12 209:24 210:2,3,15 210:16 229:18 245:13 293:9 294:19

**recommending** 235:6 242:17 243:11 312:6

**reconcile** 92:13 278:11 279:12

**record** 13:3 14:5

17:6 19:14,23 73:22 76:10,13 85:19 120:25 121:3 144:11,24 145:2,7 170:25 171:1 172:3 204:18 224:10,13 230:18,20,22 261:5,8 267:9 309:3,6 335:18,21 337:9 339:8

**recorded** 18:23 86:24

**records** 121:16

**recounted** 127:5

**recounting** 205:13

**recoveries** 126:16

**recovery** 38:14 66:15 71:10 78:16 126:9 130:12 131:9,13

**recruit** 116:1

**recruitment** 30:9 33:5

**redacted** 276:6 319:12 329:3

**redo** 211:24 235:2

**redone** 230:7

**reduce** 41:21 145:25 151:10 155:11 183:21 185:6 190:20 191:12 196:14 213:13,17 216:23 267:22

**reduced** 138:2 155:14

**reduction** 41:8 111:24 135:24 136:1 139:9,11,12 146:9 147:19,21 151:18 179:21 181:19

**reductions** 150:18 150:18 315:16,22 326:4,9

**refer** 111:17,19

124:7
**reference** 49:7
163:17,19 173:22
194:18 215:3
241:6 334:20
**referenced** 80:19
297:2
**referencing** 209:22
**referred** 41:24 42:7
42:19 66:24 78:8
78:12 82:6,13
195:16
**referring** 17:24
25:16 45:5 55:11
58:22 101:3
108:15 132:7
172:12 194:15
208:16 215:9,17
216:7 236:18
287:7 307:22
308:8,18,21
316:15,16 317:5
**refers** 42:13 93:17
129:8 205:18
**reflect** 125:3
**reflected** 13:2
125:10 206:24
271:6 289:20
313:10
**refresh** 97:8 186:6
187:14 189:12
195:12 201:8
256:13,13 289:4
289:14
**refreshed** 25:9 26:2
**regard** 105:3
**regarding** 20:4
23:18 24:6 26:8
41:21 46:14,17
53:11 58:19 92:22
106:12 114:16
163:23 164:2
166:4 167:21
203:15 205:14
213:8 224:18
237:8 239:18
243:1 244:9

262:21 276:1,10
276:18 280:14,17
281:1 284:14
289:16 304:12
305:13 311:1
313:12 318:12,18
321:1 323:3,20
325:3 327:4,24
336:19,19
**region** 74:5 140:4
227:17,19 231:21
233:24 238:22
253:15 275:3
315:8 326:20
334:23
**regional** 62:9 73:19
73:25 74:11 75:22
78:9 85:6,13
86:15 87:22 117:9
119:5 122:5 136:4
166:17 206:11
227:16 228:19
229:3,7,17 239:3
251:14 274:23
275:10 279:3
293:8,14 294:18
295:14,18 320:1
322:12,19 326:18
326:18
**regions** 50:23 78:24
79:19 80:3,18
82:21 134:23
138:19 153:6
155:3 211:10
212:24 215:7
235:14 239:1
275:20 278:8
312:4 314:24
318:23 321:1
323:3 325:2 327:4
327:10,24 328:19
333:15 336:8
**regions'** 135:1
**regular** 42:23
43:13,16 47:1,5
57:22 58:7 62:15
62:18 63:6 82:6,8

118:13 307:19,23
308:2,13,14,18
**regularly** 45:12
46:22 47:7 271:22
**reinstated** 103:2
298:25 299:2
300:8
**reinstatement**
114:11
**rejected** 155:23
168:22 170:10
300:17,21
**rejecting** 166:15
235:1
**related** 93:10
115:12 132:14
133:24 164:18
274:18 296:7
341:9
**relates** 169:16
**relations** 29:23
**relationship** 168:3
**relative** 341:12
**relatively** 168:16
**release** 85:16,22
329:9
**released** 85:21,25
284:24 294:11
296:8 320:15,20
**releasing** 85:11
**relief** 38:14 71:6
88:21 122:11,14
122:19 130:6
164:9,12,17
**remain** 137:3
155:17,21 208:7
210:4,16 213:18
291:20
**remember** 18:11
40:17 48:15 52:14
55:7,24 102:16
120:14 141:24
142:1 143:17
144:13 145:9,17
145:18 154:4
188:16 203:3,3
212:13 242:3

248:22 249:18
277:11 279:23
303:13
**remind** 244:21
**removable** 38:4
39:20
**removed** 37:10,12
37:15 68:7 99:15
101:2,20 114:12
308:7
**renew** 85:4 105:4,6
114:1 117:14
118:18 172:11
176:9 222:12,14
225:18 229:12
230:5 248:13
249:22 254:19
292:13,21 293:5
294:3,5
**renewal** 58:19
84:25 85:16,17,20
86:12,16,18,21
89:15,21,24 90:9
90:24 95:24
105:16 106:2
174:7,14 190:14
220:1 222:10
224:18 229:4
233:4 235:6
242:15 245:13
247:20 250:7
275:6 284:6 289:1
292:16,25 293:11
293:15 294:19
295:3,12,15,18
300:17 301:12
302:19 332:1,6
335:4
**renewals** 73:10
89:1,8,20 91:20
93:24 94:5,12
103:12,16 106:15
106:18 107:10,21
111:5 113:3,23
117:3,7 118:14
222:8 224:21
226:11 246:4,6,20

246:21 247:15
248:1,7 249:5
253:16 264:25
266:25 267:13
274:15,19,24
275:4,8,21 283:17
289:2,16 295:23
296:9,14 297:1,3
297:4 300:2,13
301:11 303:11
304:23 305:2
319:24 331:18,20
331:23 332:20,21
**renewed** 86:4,6
88:14 119:19,22
177:5 221:6 222:4
228:20,24 229:9
237:13,16 240:14
243:12 246:25
252:12 253:17
272:12 283:14,25
292:15,25 296:12
310:7 332:10,14
**renewing** 85:11
88:10 90:19 91:8
91:11 106:8 221:1
221:20 237:19
238:15 248:4
259:8 275:25
309:10
**reorganization**
112:6
**repackaging** 234:2
**repeatedly** 275:18
276:9 294:22
**replaced** 35:20
36:2,8 39:11,12
**report** 10:4 33:19
33:20 34:15 85:9
106:16 107:5,9,19
107:23 108:9,15
109:8 123:16,22
124:1,4,6,8,12,16
124:18,20 127:10
127:20 128:7,12
128:14,19,25
129:10 136:13

146:20 167:21 179:20 180:8,14 181:18 196:10,12 202:13 223:20 262:24 277:3,10 277:19 279:14,20 281:4,18 333:2
**reported** 1:24 37:4 39:22 57:7 123:21 180:10 324:18
**reporter** 2:12 14:22 16:10 18:23 21:11 21:18 33:23 34:3 34:6 61:24 144:4 144:6,8,10 145:5 145:6 267:8 296:18 341:4
**REPORTER'S** 13:1
**reporting** 124:12 223:24 311:14,23
**reports** 123:19 128:3 215:22 219:16 281:15
**represent** 15:1 27:7 77:1 153:20 156:24 197:21 214:2 319:11 329:3 334:5
**representatives** 48:9 59:9
**representing** 15:4,8 15:11,17 16:2 23:4 153:23
**request** 64:25 65:24 125:1,3,7 125:11,13 134:3 134:23 138:1,4,10 139:4 142:6 175:22 188:21 190:4,17,20 199:16 216:22 220:22 222:12 227:2 228:23 229:3,20 236:11 239:16 245:7,10 251:13 253:21

259:16 270:5 294:3 310:22 312:4,7
**requested** 31:7 105:18 125:20 135:25 149:13 226:10 227:4,11 228:20 233:10 239:4 262:20 263:5,8 264:7,11 264:13,24 265:17 273:2 274:23 275:3,20 338:15 338:17
**requesting** 164:25 190:25 199:20 225:19 227:25 229:8 253:17 254:5 270:7 274:17 285:3
**requests** 189:23 233:12 234:1 235:18 236:3 239:8 283:4 305:18 332:3
**require** 83:19 131:2 260:12 287:12 322:8
**required** 31:11 43:22 71:21 94:18 98:17 100:18 110:4 111:1 130:2 130:15 132:20 133:2,11 136:10 147:2,17 176:2 190:24 197:14 223:19 230:9 251:15 253:25 277:4 324:18
**requirement** 75:5 134:11
**requirements** 132:18 147:8 222:3 231:24 291:15 327:16
**requires** 30:2
**requiring** 97:7

101:17 223:23
**reread** 201:7
**researched** 140:10
**reservations** 44:17
**reserve** 337:6
**reservist** 71:18 284:23 285:4 287:3,9
**reservists** 70:14,17 70:21 71:11 72:1 72:7 94:1 99:13 111:4 130:6 132:19 139:19 150:19 151:3,11 151:14 152:12,15 286:12
**reshape** 146:18
**reshaping** 81:2
**reside** 17:9
**resignation** 155:17 324:13
**resignations** 30:1
**resisting** 243:14,15
**resolution** 331:8
**resources** 30:7 33:9 107:2
**respect** 50:21 73:10 74:23 78:23 83:5 98:15,15 102:13 102:22 110:1,1 113:2 117:3,6,18 118:14 123:14 126:16 141:7 159:14 161:16,22 162:1 172:18 180:21 249:5 268:14 271:2 276:24 287:8 295:22 299:21 302:24 306:2 309:14,15 326:4 328:9 329:12,21 335:10,25 336:14
**respective** 227:23
**respond** 134:23 213:4
**responded** 128:16

239:22
**responding** 182:16 234:1 236:10 279:8 283:2 310:22
**responds** 104:18 242:21 269:25 316:21
**respons-** 275:11
**response** 19:24 66:15 71:10 78:16 104:13,20 107:23 111:4 139:4 204:12 212:3 215:16 239:16,24 239:25 257:17
**responses** 238:18 281:4
**responsibilities** 29:17 30:4,16 218:9 270:3 273:16,25 291:19
**responsibility** 46:21 213:14 222:22
**responsible** 25:14 29:21 30:11,22 32:18 33:8 77:18 78:14 85:6,12 87:23 275:11 276:7 328:6
**restate** 89:6 118:2 165:17 267:5 292:19
**restrictions** 117:1
**result** 81:13,24 82:11 97:22 108:9 117:24 135:21 138:22 152:2 153:12 181:12 204:24 206:10 207:15 208:14 209:24 211:3 215:3 230:3 256:19 271:5 293:21 328:20 333:9

**resulted** 209:18
**results** 207:20 309:23 310:8
**retain** 115:22
**retaining** 212:25
**retention** 115:25 116:5
**Retirement** 324:14
**retirements** 30:2
**retract** 227:13
**return** 274:13
**returned** 233:11 272:8 277:9 284:4 287:21
**returning** 229:14
**reveal** 177:20 266:1 327:19
**revealed** 336:18
**reversed** 103:3 284:22 285:1
**reversing** 287:8
**revert** 175:6
**review** 25:5,8 55:12 56:19,22 117:10 120:8 125:17,19 125:20,23 126:2 132:2,17 134:1 140:21 146:19 148:13 176:19,22 180:13 189:2,13 196:9 202:12 213:11 222:3 233:2 250:1,10,19 273:10,17 274:15 288:5,9 289:1,18 292:13 302:3 334:17
**reviewed** 24:23 26:2 125:25 150:15 273:21 274:1,5
**reviewing** 191:1 275:25
**revisions** 274:18
**rewritten** 233:5
**rhythm** 301:24
**Richardson** 36:11

36:12 37:19 38:6 38:21 39:3,5,9,11 39:12 40:10,15 113:17,23 115:20 125:21 132:8 135:13 137:25 138:24 149:13 172:13 181:7
**Richardson's** 40:16
**RIFs** 112:6
**right** 25:5 26:7 32:16 38:6 40:5 69:22 81:21 84:13 89:5,16,24 103:12 104:6 120:12 129:22 130:7,16 130:19,22 133:15 135:7 136:3 151:20,23,25 156:22 158:4 166:22 167:5 170:8,11 173:24 174:10 181:5 185:20 188:5 190:4 196:10,21 196:24 199:24 200:20,23 204:14 205:8 211:21 213:5 218:5 219:18 220:3 223:2,5 226:7 228:6 242:9 243:20 244:25 252:16 256:11 277:17 282:11 284:12 292:8 294:16,20 295:4 296:2 306:17 309:19 310:19,20 311:15 312:4 313:1 319:5 321:17 335:16 337:6
**right-sizing** 185:19 186:2 187:18
**rightsize** 203:15 326:25

**rightsizing** 187:11
**road** 21:10 81:20 81:24 155:16 324:13
**Robert** 4:5 15:23
**robert.bombard...** 4:10
**Robinson** 35:14,17
**Roger** 104:5
**Roland** 23:21,22 29:13 52:11 95:4 95:17 106:22 198:22 260:18 263:5,11,21 281:3 303:16
**Roland's** 95:19
**role** 41:11 50:21 64:5,9 77:15 78:22 134:9 161:15 167:24 193:17 222:22 241:21
**roles** 241:15
**rolls** 155:17
**room** 20:25 146:8
**Rosenberg** 4:4 15:18,18 19:13 23:2,3,4 80:4,23 89:3,17 90:5 92:3 92:5 101:8 108:2 130:23 143:3,20 144:7,9,17,21,23 147:3 152:13 154:2 158:16,18 161:19 165:13 166:18 167:23 169:2,6,18,20 170:3 177:1 178:8 178:19 179:8,25 180:23 181:10 191:16,22 196:5 196:22 204:16,19 222:18 223:6 224:9 235:20 237:1 249:1,6,12 250:3,15 252:13 256:3,7,9 260:1,6

264:10 267:2,18 272:16 273:12,19 274:7 282:22 286:3 287:15 290:13 291:3,24 292:9,17 293:2,24 294:13 295:5 296:15,17,19 297:20 302:16 304:7,9 306:23 308:3 309:25 333:11 335:16 336:3,10,15,21 337:3
**rough** 24:24
**roughly** 23:10 28:21 37:24 38:9 38:20,23 40:9,20 43:1,9 55:2 61:20 65:18 72:13,18,25 73:6,7 89:23 95:14 112:15 115:9 137:2 150:25 151:2 152:6 153:13 158:2 173:15 204:25 206:22 211:12
**round** 318:22 323:11,12 328:20 329:22 336:1
**routinely** 86:3
**routing** 174:4
**rule** 20:10,13 292:12,21
**rules** 18:16
**run** 38:16 107:20 209:3 219:11 221:4 265:8 329:25 330:2,8,13 334:22
**running** 35:11 69:5 162:1,4
**runs** 38:18
**Rutherford** 233:11

——————— **S** ———————

**S** 172:1,1,1
**S-h-i-l-a** 34:5
**S1** 98:25 172:22 174:8,14 175:7,23 176:18,23 177:14 189:2,13 190:3 193:10,14 233:5 233:16 234:12 248:7 250:10,18 253:25 259:21 287:12 297:7 328:14
**safe** 151:4
**safety** 93:12
**salary** 317:20,22
**Samuel** 46:19
**San** 1:3 3:8 14:13
**Sanchez** 64:8,9,13 65:25 66:6 214:6 214:10 270:1,2
**Sanchez'** 66:9
**Sanchez's** 65:10
**Saturday** 269:4
**saved** 164:3,5
**saw** 54:20 150:16 151:7 156:13 161:22 162:8 206:21
**saying** 19:1 100:15 167:14 179:7 180:17 189:22 211:2,11 216:18 236:14 239:22 240:5 242:22 243:4,5 245:1 287:1 298:4 307:17
**says** 77:24 87:20 97:13 114:3 174:17 187:5 194:15,19 196:15 199:1 207:21 209:15 214:16 216:4 221:17 240:22 270:6 301:8 316:6 317:13 325:25

329:7
**Scales** 95:4,10
**scenario** 163:13
**scenarios** 146:21
**scheduled** 45:12 46:22 271:23
**school** 26:11
**searched** 143:11 304:14
**season** 38:7,11,17 39:2 115:2,10
**second** 35:8 44:13 44:14 97:8 202:8 206:17 207:12 211:9 265:14 277:22 306:7 316:5
**secretary** 36:23 37:4,6,10,13 38:2 38:4 39:16,20,23 43:23 48:18 57:3 57:9,13,16,19 61:6 83:20 84:9 91:9,12,18 97:2 97:24 99:25 100:14,15 101:17 101:17 106:14,17 107:9,16,20 108:10,16 109:8 111:6 113:6,16,22 114:8 168:7 179:24 180:3 196:2,6 297:13,17 297:24
**secretary's** 107:23 178:25 255:9 293:22
**secretary-level** 100:23
**Section** 77:12,21,24
**secure** 139:25 322:18
**secured** 140:21
**security** 4:19 16:5 29:5,9 48:18 93:11 94:21 97:24 100:14 111:7

see 27:20 28:3
42:16 52:7,10
54:23 62:1 69:16
77:4 78:5 88:7
92:4 93:7,9,12,14
93:20 97:12
111:20 112:13
129:1,2 138:1,10
142:6 143:6
145:24 149:5,10
154:21,24 157:7
168:13 174:1,8,10
174:22 183:7,11
184:6 186:20,23
187:12,21 188:23
192:14 194:4,14
194:18 199:10
205:19,24 208:20
211:4 214:25
222:5 225:17,23
232:11 234:7
240:13 242:19
251:18 263:3
265:21 270:12,20
277:24 283:15
286:15 287:5,9
301:15 304:17
307:2 308:25
312:10 317:25
320:4 334:9 335:1
335:7
seeing 163:11 232:9
seek 83:19 100:22
120:11 176:23
177:14,21 178:1
230:4 247:19
248:6
seeking 90:19 91:8
97:23 178:5
seen 57:7 95:6
126:4 129:21
131:24 148:14
157:9,25 163:12
163:17,19 169:11
182:22 219:14
280:8,10 300:16
312:17

Senate 35:9
send 134:14 184:10
190:2 268:25
302:3,5 312:22
322:23
sending 174:14
233:1,12 262:19
326:25
sends 198:22 200:2
239:25
senior 3:20 32:1
33:1 35:18,25
36:18 40:4 44:1
47:13,14 48:2,17
194:12 305:3
sense 18:18 19:10
20:6,15 21:5,25
316:1
sent 56:13 109:16
114:22,22 132:8
133:25 135:18
141:3 156:4,8,10
157:20 170:2
175:24 176:19,21
184:13 188:4
189:19 190:13
192:3 200:6,12
201:18 202:7
204:9 208:17,23
208:23 209:11
214:4 217:17
232:15 233:8
239:16 242:14
251:2 258:21
263:21 265:7
269:2,7 288:8
298:17,22 301:23
310:19 322:5
325:15 329:10
sentence 180:16
206:24 228:2
307:3
separated 271:7
272:6,14 300:7
316:24 331:7
separately 263:24
separation 285:4,8

299:14 324:15,17
separations 293:20
Septem-~--- 43:2
September 40:21
43:9 46:6 47:25
49:17 50:1 62:23
154:19,23 175:3
175:11
series 67:17,18
69:8 98:18,19,20
116:2 120:20
237:12 263:16,17
266:17,20 283:3
Serv 286:12
serve 69:19
served 28:9 302:21
serves 79:3
service 28:5,7,13
67:10 175:21
261:21 272:15
284:25 317:8,10
services 66:20
116:6,11 290:6
291:1
SES 43:22 44:12
58:2
sessions 23:7
set 90:24 132:4
152:18 185:22
223:18 228:5,15
239:6 257:10
318:2 341:7
SF-50s 263:14
share 56:2 85:9
86:14 167:25
274:13 281:4
317:2
shared 61:13
160:18 283:1
327:14
SharePoint 139:25
140:21 322:18
sharing 49:23
85:14
shed 191:5 233:18
sheet 253:14 339:1
shift 295:22

Shifting 197:7
Shila 33:20 45:21
shop 33:10
short 10:4 24:16
116:5 120:19
139:24 144:18
234:12 261:1
294:23 308:25
335:14
short-staffed 127:1
127:2
shortages 121:11
121:13 123:4
shot 252:11
show 74:12,15
148:11 156:17
157:12 188:20
262:24 334:1
showed 138:5
141:3 181:17
184:16 191:3
205:22 259:9
260:11 278:22
305:2
showing 148:8
shown 139:12,20
140:18 148:25
150:5 305:10
shows 168:14
208:10
sic 149:1 175:11
215:20 334:25
side 285:20,20
sign 25:21 174:14
337:7 338:22
Signal 57:18 60:24
61:14
signature 234:8
338:1,20,23
signed 25:14,19
102:24 113:5
172:13 239:2
251:16 254:1
303:13,14,19
significance 115:6
265:4
significant 38:12

43:24 81:1 99:19
99:22 101:24
221:8 234:22
290:25
signing 338:15,16
338:17
similar 75:17
160:19 163:12
309:13 321:4
Simultaneous
54:19 80:8 212:11
single 100:23 116:1
123:22
singular 297:22
304:24
sir 286:6
site 50:22,24 71:24
85:13
sitting 20:24 21:2
272:4
six 36:14 37:22
176:10 273:10,17
273:22 274:2
size 41:22 213:13
slightly 155:6
smaller 55:20
195:1,6,21 196:20
socialize 278:20,24
softened 298:2
solutions 33:7
soon 168:16 281:23
331:16
SOPDA 31:25
34:20 35:15 36:16
36:22 37:3 38:21
39:11,13 40:5,10
40:10,24 46:11
57:25 96:7 105:10
113:17,23 125:21
132:8 135:6,13,17
136:23,24 137:13
137:25 138:24
149:13 155:6
156:4,10 157:2,12
158:6,11 159:2,6
159:9,19 165:20
165:24 166:3

174:14 176:2 181:7,16 195:9,14 195:24 206:20 208:7 218:13 222:2 225:1 226:10 227:4 228:1 240:12 251:17 258:18 259:16 279:4 292:7 321:12 322:23 328:11 329:12,19 335:10

**SOPDA's** 225:19

**sorry** 34:8 44:22 60:8 80:9 109:5 118:3 126:2 136:14 151:22 152:8 160:12 168:11 197:24 206:6 211:14 216:1 217:11 225:6 231:6 246:13 255:14 262:14 289:6 292:1 306:6 314:8 318:15 325:10 326:5

**sort** 61:23 146:21

**sound** 40:5 133:15

**sounds** 224:9 243:20

**Southeast** 4:21

**Southwest** 4:14

**space** 152:15 317:1 317:15,23

**speak** 80:16

**speaking** 28:21 54:19 74:24 80:8 88:20,25 89:7 212:11 295:8

**Special** 4:4

**specialist** 112:14 231:8 289:23 290:2,20

**specialists** 67:19 68:20 69:4 98:12 290:10,24

**specific** 30:14 49:18 60:10,11 164:9 233:15 289:25 290:10,17 300:4 305:17

**specifically** 59:13 65:11 103:9,11 124:7 135:12 147:11 159:25 163:16 280:5

**specificity** 300:19

**specifics** 102:6 277:12

**speculate** 130:18

**speculation** 130:24 147:4 166:19 180:24 191:17 237:2 250:16 260:7 273:13 290:14 291:4 292:18 293:3 294:1 302:17

**speed** 21:20

**spell** 33:22 34:1

**spending** 276:18

**split** 139:14

**sporadically** 48:13

**spreadsheet** 134:18 150:16 153:21 154:5 156:25 158:14 186:18 192:3,8,21 208:12 208:25 209:2 211:20 225:21 227:3,6,14,22,23 240:3 314:12,14 323:5

**spreadsheets** 150:15 152:3 219:6 240:24

**spring** 18:10 54:7

**squared** 259:10

**stability** 115:22 116:9,15 309:15

**staff** 16:7 29:21 30:20 32:7,21 40:20 42:23 43:4

43:7,13 46:2,24 47:11 50:4 57:24 59:4,24 61:5 62:25 63:3 74:16 74:17 78:19,21 85:9,18 87:10 122:5 125:14 126:7 127:6 129:25,25 130:5 130:17,20,21 135:10,21 142:13 142:16 146:8,16 146:25 157:24 163:4 164:3,6,11 164:15,18,23 165:8,9,12,22,25 167:10 179:6,11 189:20 195:15 203:11 204:25 209:23 211:12 212:5 215:21 218:5 221:11 231:20 240:25 241:24 253:2,3 279:10 298:9 322:21 328:3 333:5,6

**staffed** 69:19

**staffer** 55:8

**staffers** 59:4 140:17

**staffing** 11:8,24 30:9,10,11,13,16 31:8,12,17,19 33:6 77:23 78:23 79:5,14,18 80:2 82:2 115:3 121:8 121:11,13,16 123:4,14,23 124:5 124:8,13,14 125:4 125:9,23 126:13 126:15,19,21 128:4 129:8,16 131:20 132:10,17 133:12,18 134:7 134:10,14 135:2,2 135:14 136:22

137:5 138:2 139:5 139:9 140:25 152:24 153:4,25 156:5,7,10 157:1 157:4,13 158:7,13 158:22 159:3,4,14 160:4,9,13 161:16 161:23 162:12,23 162:25 163:4,8,24 165:5,10 166:5 167:1 168:22 169:7 170:1,7,11 181:18 184:13 188:4 197:8 198:18 199:2,5 200:4,20 201:17 202:1,8 204:9,14 205:15,22 206:3 206:12,16,19 209:20 210:19 211:24 213:1 214:20 215:2,8,18 216:10,13,13 217:12,16 218:2 223:24 231:9 232:16 268:5,7 276:24 277:4 278:2,7,20,22,24 279:5,8,21 280:17 280:20 281:2,8,21 309:20,23 310:4,8 311:11 312:8,14 313:13 314:4 315:13 316:16 318:18 320:3,14 320:19 322:9 323:12 324:1,10 324:11,20 327:14 327:20 328:4,20 329:7,13,15,22 330:6,25 331:8,13 331:23 333:9,16 333:21 334:21,22 335:11 336:1,14

**Stafford** 70:20 71:5 72:12 231:8 232:16 328:4,5

**staffs** 61:2

**stalks** 133:23 134:5

**stamp** 77:4,6

**standard** 84:12 86:25

**standards** 75:8

**standing** 308:21

**start** 19:8 26:7,13 29:24 38:7 67:7 115:1

**started** 37:24 38:6 82:9 135:5 175:3 175:10 181:6

**Starting** 44:7 104:4

**starts** 186:14 252:21 325:18

**state** 14:25 17:5,8 58:15 89:19 328:18 338:5

**stated** 86:13 213:16

**statement** 57:10 196:7 226:15 242:25 258:14 271:6

**statements** 57:6 106:6 196:3

**states** 1:1,9 4:3 14:11 101:25 129:11 131:10

**stating** 297:12

**statistics** 86:7 119:2

**statute** 328:7

**statutorily** 133:2 136:10 146:15 147:1,16

**statutory** 132:18 147:8 199:8 291:15,18 327:15

**stay** 270:15

**Stephanie** 58:23 137:1,9 138:14 140:15 142:10 149:19 162:18 163:13 174:21 181:4,21,25 183:1 187:5 188:14

192:2 193:4 194:12 195:17 203:11,13 209:4 216:3 228:11 229:15 240:1 241:15 242:2,7,13 243:1
**Stephanie's** 142:13 142:16
**steps** 205:14
**sticker** 21:12
**stomach** 168:11
**stop** 96:10 108:5,9 108:14 120:1 245:2,5
**storm** 295:24 297:2 297:8,19 298:15
**storms** 69:3
**strategic** 33:7 194:24 195:5,21 196:20,25
**strategy** 11:8 149:7 149:16
**streams** 317:12
**Street** 3:7 4:6,14
**strength** 129:14
**strike** 170:14
**string** 258:3
**struc-** 125:23
**structure** 32:23 125:17,19 126:2 132:6 139:13
**subbed** 166:15
**subcomponent** 140:3
**subcomponents** 33:16
**subject** 12:10 18:12 88:12 95:5 101:10 167:22 244:9 270:23
**submission** 160:8 160:13,21 166:5
**submissions** 212:3 314:5
**submit** 124:21,22 133:11,18 229:10

230:9 260:12 320:2
**submitted** 25:17 111:6 124:18,20 158:7,9 163:3,8 195:24 202:13 214:17,19 215:14 215:16 278:21 279:4,23 312:14 327:20 328:19
**submitting** 114:7 229:3 243:5
**subscribe** 340:11
**Subsection** 87:20
**subsequent** 313:10
**subsets** 227:22
**substances** 22:3
**substantial** 131:2 291:21
**success** 30:25
**successful** 30:25 31:14
**successfully** 128:17 132:20
**sued** 300:1
**sufficient** 88:22 272:23 273:9
**suggested** 314:20 314:23 315:3
**suit** 299:20
**Suite** 3:7 4:15
**summ-** 111:2
**summarize** 27:24 28:14 315:19
**summarized** 110:24 133:25
**summarizes** 317:20
**summarizing** 251:2
**summary** 6:16 64:4 141:23 153:21 154:7 239:18
**summer** 18:10 41:19 54:6
**summertime** 54:8
**supervise** 32:9,10 32:17
**supervisor** 32:12

45:20 73:21,23,24 110:22 264:4
**supervisors** 63:10 63:19,25 73:16,25 136:25
**supervisory** 63:23
**supplement** 165:5 167:10
**supplemental** 233:14
**supplemented** 237:25
**supplies** 69:2
**support** 33:21 34:11,12,15 58:24 59:1 66:21 67:1 68:24 69:9 110:22 123:8 128:7 130:1 133:1 158:12,21 159:4 165:3 174:22 199:6 215:22,25 241:19 241:22
**supported** 199:22
**supporting** 124:25
**supposed** 82:22 325:4 326:12
**sure** 26:13 28:8 29:19 30:15 31:1 31:2 33:24 38:19 44:22 69:18 78:13 79:6 82:19 86:1 89:7 90:21 96:16 97:9,9 101:12 105:5 110:14 115:6,14 118:3,5 120:9 121:23 124:5 139:1 140:1 141:17,21 144:6 186:22 196:6 220:16 221:14 263:22 275:1 288:10 292:20 298:16 300:5 325:5 330:13,15 333:13
**surprise** 52:2 157:3

159:19 165:25 179:12,16,19 216:15 242:5
**surprised** 157:6 159:22 160:2 184:1 292:3
**surprising** 42:6 129:18
**surrounded** 44:2 167:10
**surrounding** 43:19 323:24
**Susan** 1:24 2:12 14:22 341:3,19
**suspended** 80:22 80:25
**suspense** 226:1
**swear** 16:10
**switch** 121:6 276:23
**sworn** 16:13 341:6
**synopsis** 26:10
**system** 77:6 85:19
**systems** 30:8 33:9 107:3 265:8

---

**T**

**T** 172:1
**tab** 315:24
**table** 6:16 21:3 133:1 153:21 154:8
**take** 20:9,11 61:20 70:13 76:2 96:19 103:25 113:8 120:18 127:13 132:25 144:17 148:3,19 153:15 156:16 160:23 170:23 173:17 179:22 182:8,13 182:18 188:18 189:4 194:2 197:16 212:7 218:19 224:1,6 234:11 254:3 260:25 262:3,10

269:8 285:14 308:24 310:11 330:22 335:13
**taken** 2:8 14:7 76:12 103:7 121:2 145:1 171:3 224:12 230:21 261:7 268:2 309:5 325:21 335:20 341:11
**takes** 79:6 179:23 199:2 294:4
**talent** 33:6
**talk** 19:5 23:17,22 24:12,12 41:17 48:23 49:10,12 53:14 66:12 84:25 121:6 178:25 179:3,6 295:9
**talked** 22:13 23:21 108:21 146:9 197:12 272:20 280:13,16
**talking** 11:7 17:20 24:9 50:8 57:3 82:13 107:19 140:6 147:19 148:17 158:4 185:6,19 186:2 195:13 200:9,12 207:20 208:22 228:15 247:22 268:6,10 277:18 283:17 312:3 314:3
**talks** 105:10 106:22 198:15
**Tami** 58:25 110:23 137:1,9 138:15 142:10 174:20 195:17 228:12 229:15
**target** 163:20 202:23 211:25 216:13 217:12,15 279:9 323:13
**targets** 204:8 217:8

217:14,24 325:1
**task** 134:2 202:10 234:22
**tasked** 149:6,15 183:23 202:1
**tasker** 132:7,9,15
**tasks** 241:8
**team** 32:12 74:12 75:3 79:2,6 86:21 121:9 133:23 134:4 176:7 231:9 262:23 315:12
**Teams** 52:13 53:20 53:22 55:6 57:15 160:24 161:3,9,11
**technically** 43:3
**telecommunicati...** 69:4
**Teleconference** 3:25
**telephone** 59:18,20 60:22 61:14
**tell** 23:10 24:3,5,18 30:15 47:10 52:19 55:24 65:8,14 71:2 76:20 81:3 81:11 102:16 107:22 139:7 143:17 144:12 145:8,17 160:16 163:7 173:8 177:16 249:20 259:17,18 260:2 305:19 312:19 327:12
**telling** 212:9 235:2 260:9
**tells** 122:4
**template** 202:18,23 203:4,5 311:11 312:7 313:17 314:10 320:15,19 321:2,20,25 322:15 323:1 324:9 325:7,19,21 326:3
**temporary** 93:17

93:22 111:5 326:25
**ten** 32:8 62:14 76:3
**tens** 116:3
**tenure** 40:17
**term** 66:22,23 68:23,24 71:15,16 71:19 72:1 73:21 84:22 93:17,22 94:14 103:12,12 105:23 111:3,3 116:5 222:4 233:3 267:24 272:24 302:19 308:12
**terminat-** 58:4
**terminated** 102:3
**termination** 18:15 48:16 49:16 58:4 307:25 308:16
**terminations** 30:1 44:4 45:9 46:14 46:17 307:18
**Terminator** 41:25 42:13
**terms** 67:2 84:12 87:6 235:25 309:10 333:1
**terrible** 80:9
**testified** 16:14 37:16 159:20 199:15
**testify** 296:6
**testimony** 20:25 22:5,8 218:3 250:4 272:17 292:4 337:10
**text** 129:10
**thank** 27:4 33:16 34:6 54:17,25 127:21,23 148:2,3 148:7 151:25 182:12 198:6 205:12 211:14,16 218:20 223:18 230:24 232:19 255:21,23 256:1 256:15 261:12

277:13 286:6,18 289:7,10 316:1 319:10 336:25 337:2,5
**Thanks** 286:4 306:10
**theory** 266:21
**thing** 197:22
**things** 17:3 21:20 30:19 33:8 42:13 42:17 55:16,22 69:3 78:17 81:19 109:2,6 131:5 133:1 179:7 205:17 250:18 257:18 291:11 310:10 329:25 330:8 331:4,10
**think** 49:19 57:21 76:1 97:11 103:19 107:15 126:2 143:22 165:16 166:12 170:22 216:17 224:5 233:18 234:18 238:17 247:6 255:16 269:4 274:4 282:20,24 303:17 306:16 326:15 328:25
**third** 52:6,8 54:1 54:14 187:5 318:22
**Thomas** 142:15 195:18 203:9,10 319:18
**thoshijima@dem...** 3:24
**thought** 116:23 151:22 155:23 213:9 260:9
**thoughts** 267:20
**thousand** 116:1
**thousands** 89:24 107:25 108:14 116:3 127:7
**three** 6:18 23:9

66:24 70:1 78:3 139:21,22 150:1 220:1 228:2 283:14,21,25 315:19
**three-sentence** 225:20 227:8
**Thursday** 44:25
**Tierney** 35:23,24 96:7 105:9,21 108:7,22 109:11
**time** 2:2 14:2,19 19:12,13 35:1,8 35:12 37:6 38:9 38:12,20 40:7,8 40:13 41:19 43:8 46:7,23 47:10,25 48:9,20 49:16 52:9 54:9 55:2,4 56:5 57:23 58:15 60:9 61:18 62:21 66:6 69:16,18 70:9 76:1 79:21 80:1,7 87:9 90:1 90:16 93:19 94:3 94:9 95:23 96:1,7 98:14 99:24 105:9 105:21 106:8 108:19 110:22 112:25 115:14,24 118:12,21 120:17 126:22 129:7 131:1 136:25 139:18 150:20 156:4,9 157:25 161:25 163:10 168:21 169:11 170:23 172:2 174:13 175:20,23 178:16 180:19 185:25 190:16 192:24 197:10 211:9 214:10 216:2,12 218:1,1 219:20 228:19 234:13 235:16,25 254:17 264:4

265:18 268:19,21 269:1,8 272:23 273:9,17 274:12 274:17,25 275:7 275:24 279:25 284:16 285:2 288:24 294:4 295:8 298:20 299:15,24 301:24 309:10 310:3 312:12 319:2 320:20 327:21 337:5
**timeline** 40:13 239:15 333:1 335:4,11
**timelines** 123:17
**times** 18:4,20 48:5 235:22 268:25
**title** 44:15 114:10 194:13 253:18
**titled** 93:7
**titles** 44:18
**today** 16:8 17:17 21:1 22:5,9,22 23:5 57:4 184:17 196:4 203:14 223:14 266:14 268:11 272:4 298:5 336:9 337:4
**today's** 337:10
**told** 27:21 52:16 108:9,11 163:3 177:11,13,14 189:1,13,15 213:8 242:1 248:22 251:20 257:2 259:20 274:16 277:23 280:22 282:24 292:3 304:5 322:4,20 335:24 336:12
**Tonneisha** 64:11
**Tony** 35:14
**tool** 121:16
**top** 77:4 111:19 149:5 150:2 174:1

182:15 186:18 187:1 194:2,14 205:6 219:24 226:21 262:16,19 313:20 317:21
**topics** 43:19 44:8
**total** 70:22 126:6 135:20 136:21 139:21,22 150:21 151:15 154:15,17 154:19,20 155:1 209:23 213:9 251:13 315:18
**totaled** 156:6
**totally** 296:24
**totals** 208:4
**Toya** 2:7 6:3,10 14:7 16:12,22 17:7 316:22 338:13 339:6,25 340:15
**Toya's** 195:2
**traced** 203:8
**track** 70:9 189:24 193:10
**tracking** 191:11
**trade** 317:1,15,23
**train** 116:3
**training** 29:23 30:8
**transcript** 20:21 21:16 24:24 145:15 341:5
**transcription** 339:10
**transfer** 65:25 242:4,7 286:11
**transferred** 64:21 65:4 66:6 241:22 242:2 261:20 266:19
**transferring** 261:14
**transformation** 112:2
**transition** 40:9 241:8 265:15,19 265:19

**transmitted** 137:6 170:7
**TransPerfect** 14:22 14:23
**tribal** 102:1
**Troup** 61:3,9,12,15
**true** 34:23 174:24 185:2,5 195:4 205:17 258:10 264:8 290:21 310:6 340:7,10 341:5
**Trump** 1:8 14:9 35:7 73:11 213:12 266:3 339:4
**Trump's** 41:6
**try** 21:20 25:7 70:8 108:24
**trying** 54:20 116:7 116:11 224:25 231:11 270:14 326:15
**Tsuki** 3:19 15:14 15:16
**Tuesday** 63:8
**turn** 77:12 129:4,5 220:15 314:7
**turned** 229:23,25
**turning** 54:23 239:1
**turnover** 43:25
**twelve** 62:14
**twice** 243:19
**two** 23:15 33:1 63:12 64:7 66:23 71:16,19 84:16,23 104:24 105:8 115:1 117:13 129:23 174:6 186:4 201:21 210:5,6 231:17 241:15 255:6 256:22 258:6 259:8,19 261:15 261:21 266:15,25 267:14,23 268:2 268:15 278:11

301:25 304:18 306:21 317:11
**two-** 225:20 227:8 228:1
**two-thirds** 151:24
**TX** 3:16
**type** 25:12 47:11 58:14 140:7,23
**types** 48:15 139:15 139:17

---

### U

**U.S** 14:12
**ultimately** 248:12 275:11 278:21
**um-hum** 19:1 34:7 63:4 65:20 93:16 129:3,9 153:2 159:23 186:16 191:4,19 197:11 198:17 209:9 210:9 257:15 258:23 263:13 278:3 291:17 292:23 299:17 306:8 316:4 325:14 326:2,22
**unaware** 142:24
**unclip** 82:18
**under-** 36:16
**underlying** 143:24
**undermine** 267:16
**understand** 17:19 17:23 18:17,22 19:14,16,22 20:17 39:22 44:23 50:8 51:24 62:5 65:6 94:5 96:13 97:18 101:23 106:23 108:8 109:7 111:22 121:8 144:7 146:23 147:6 168:15 169:4,9,15 180:6 185:18 186:1 192:17 196:8,11 207:19 208:13

209:22 215:15 216:24 241:2 258:19 275:2,13 275:15 284:2 307:22 323:22 333:23
**understanding** 36:22 39:1 40:12 41:14 48:25 49:4 50:20 51:1,2,5,15 51:21 52:21,24 56:6 65:3 72:21 80:1 83:3 85:24 86:3 88:13 90:15 94:12,17 95:9,11 97:6 98:14 101:13 105:2,20 106:5,11 109:25 110:3 111:9 113:20 114:20,25 117:6,9 117:15 118:12,22 119:7 122:24 126:25 131:19 136:17 137:11,21 137:24 140:8 142:4 150:10 157:21 159:8 160:3 161:14 166:14 167:16,18 167:20,24 169:24 180:2,7 183:6 184:19 190:6,19 191:6 193:3 215:13 216:6,11 216:18 232:25 237:5 241:10 245:15 250:6 255:4 257:19,21 272:20 284:8 308:12,23 311:6 313:9 333:20
**understood** 24:8 37:3,9 49:2,19,20 50:22 55:18 63:18 66:4 97:22 105:21 105:25 107:19 108:19 109:20

112:8 118:8,16 146:11,17 160:20 185:14 190:10 193:16 241:20 245:9,11 249:24 252:1 253:6 254:5 256:21 258:5 259:11,11 264:5 272:13 281:3 307:24 308:14,17 317:5
**unfund-** 121:21
**unfunded** 121:20 121:22 122:4 123:1
**uniformly** 296:10 297:4
**Union** 3:2,13 15:4,8 15:11
**United** 1:1,9 4:3 14:11 131:10
**University** 26:15 26:17,19
**unpack** 296:22
**Unsure** 158:10
**up-to-date** 265:10
**upcoming** 72:8 87:3 123:5 176:13 183:17 219:21 224:18,22 228:16 237:8 238:11,13 239:18 242:14 311:4
**update** 31:8 110:24 202:6,8 277:24 278:16 280:3,8,11 280:14 286:9 325:25 326:1 328:10
**updated** 313:17
**updates** 31:16 124:15 202:12
**Upper** 17:10
**upset** 261:17
**urgent** 190:4,7
**urgently** 191:7
**USA-AFGE-Exp...**

12:19
USA-AFGE-Exp...
  9:14
USA-AFGE-Exp...
  12:13
USA-AFGE-Exp...
  10:22
USA-AFGE-Exp...
  12:8
USA-AFGE-Exp...
  12:16
USA-AFGE-Exp...
  6:23
USA-AFGE-Exp...
  7:23
USA-AFGE-Exp...
  7:5
USA-AFGE-Exp...
  7:8
USA-AFGE-Exp...
  7:20
USA-AFGE-Exp...
  6:14
USA-AFGE-Exp...
  7:11
USA-AFGE-Exp...
  7:13
USA-AFGE-Exp...
  7:18
USA-AFGE-Exp...
  11:15
USA-AFGE-Exp...
  9:17
USA-AFGE-Exp...
  9:23
USA-AFGE-Exp...
  9:25
USA-AFGE-Exp...
  9:11
USA-AFGE-Exp...
  10:16
USA-AFGE-Exp...
  6:17
USA-AFGE-Exp...
  10:14
USA-AFGE-Exp...
  10:19

USA-AFGE-Exp...
  11:5
USA-AFGE-Exp...
  9:20
USA-AFGE-Exp...
  8:5
USA-AFGE-Exp...
  8:14
USA-AFGE-Exp...
  8:17
USA-AFGE-Exp...
  8:11
USA-AFGE-Exp...
  8:22
USA-AFGE-Exp...
  9:8
USA-AFGE-Exp...
  9:5
USA-AFGE-Exp...
  12:22
USA-AFGE-Exp...
  11:18
USA-AFGE-Exp...
  6:20
USA-AFGE-Exp...
  8:20
USA-AFGE-Exp...
  11:12
USA-AFGE-Exp...
  7:15
USA-AFGE-Exp...
  10:5
USA-AFGE-Exp...
  8:8
USA-AFGE-Exp...
  11:9
use 44:18,20 67:2
  68:23 88:6 92:3
  109:22 114:1
  175:20 203:18
  216:12 238:14
  248:9 325:7
uses 107:2
usually 20:9 44:25
  45:19 46:19 70:22
  71:16

**V**

v 339:3
VA 28:22
vacancies 324:23
vacant 121:19,20
  122:17,25
vacation 274:14
vague 101:9 178:20
  204:20 235:21
  249:2,7,13 282:23
  291:25 295:6
  333:12 336:4
Vaguely 254:21
valid 79:7
various 27:24
  90:16
vast 119:7
verbal 19:1
verification 12:11
  98:21,25 105:7
  110:25 230:15
  231:12 233:6,16
  234:12 239:2
  243:6 248:9
  251:13,25 253:24
  259:22
versa 168:1
version 77:2
versus 14:9 121:20
  223:11
vice 3:19 168:1
Victoria 245:17,19
  246:4,5,9 330:4
  330:21
video 14:6 57:15
videographer 5:7
  14:4,21 16:9
  61:24 76:10,13
  120:25 121:3
  144:24 145:2
  171:1 172:3
  224:10,13 230:19
  230:22 261:2,5,8
  309:3,6 335:18,21
  337:9
videotape 20:21

168:14
videotaped 1:15
  2:7 20:18
view 82:5 106:2
  116:13 120:5
visits 50:22,24
voluntarily 29:25
  119:23,23
Voluntary 324:14
  324:14,17
Voorhies 48:12,17
  49:15 51:14 52:10
  53:12,15,18 54:10
  54:12 55:4,25
  56:6 59:11,21
  161:15,21 162:1,5
  167:5,6,11 168:2
  176:19,22 178:11
  183:2 185:10,15
  185:18 186:1
  192:13,19 193:4,8
  193:13 248:18
  264:21 272:1
  276:15 284:19
  305:12,15,18
Voorhies' 167:24
  305:20
vs 1:7
VSIP 324:22

**W**

WA 3:16
wait 19:7 175:21
waiting 288:15
  300:7
waived 338:16,23
waiver 104:23
  258:15
walk 224:16
want 33:25 119:15
  157:21 168:6
  175:16 240:9,16
  261:19 268:22
  301:25 320:23
  322:4
wanted 52:25
  109:17 112:2

137:16 157:19
  176:4,9 223:9
  228:1 237:15
  238:6 239:22
  243:16 250:18
  266:16,21 276:23
  284:10 294:19
  330:21
wants 199:13 283:6
  283:9 328:5
Washington 2:11
  3:22 4:7,16,22
  14:17
wasn't 53:20 82:19
  99:20,22 146:23
  222:12 237:18
  304:25 308:21
way 21:9 42:7
  61:12 65:21 92:6
  92:7 130:7 142:4
  155:25 177:24
  191:18 237:3
  278:11 279:12
  291:21 321:25
  322:15
we'll 19:4 60:14
  66:11 67:7 69:15
  76:9 82:1 90:15
  92:4 110:8 127:24
  168:13,15 189:4
  193:21 201:2
  228:4 310:13
  317:2 334:2
we're 20:24 31:6
  45:25 76:24 187:7
  194:21 245:3
  247:22 306:22
  307:10 313:6
  317:18 336:24
we've 57:21 158:3
  223:13 224:4,5
  231:3 239:19
  247:7 266:13
  268:5 294:6
  300:16 306:21,21
  311:20 314:5
Weather 317:9

**Wednesday** 214:21
**weeds** 86:2
**week** 23:12,12 25:3 63:14,15 65:22 187:8 201:23 247:10 287:21 296:3 299:8 320:16 331:17 332:17
**weekend** 287:24
**weekly** 43:18 44:1 44:7 45:3,6 46:4 63:7 288:15,17
**weeks** 115:1 268:15
**weeks'** 302:1
**welcome** 33:17 76:16 256:2 316:2
**went** 24:19 107:9 108:10 140:10 175:7 234:23 235:22 240:10 259:5,9 304:17
**weren't** 100:13 137:17 150:17 184:24
**wheels** 54:23
**whereof** 340:11
**White** 133:23 134:5
**window** 247:22
**winter** 295:24 297:2,8,19 298:15
**wiping** 152:12
**withdraw** 165:18
**witness** 4:2 6:2 16:10 23:1 27:12 33:25 34:7 76:5 82:17 92:9 95:1,7 96:23 97:10 103:22 104:2 110:15 113:13 120:21,24 127:18 148:6,7,21 156:21 158:17 173:19 178:22 182:11,12 182:20 186:8,12 186:24 189:7,8 194:7 197:11,18

198:1,12 201:11 212:22 214:1 218:20 219:1,12 224:8 226:25 232:6,12 233:22 238:23 239:13 243:25 251:8 252:20 255:1,25 256:4 262:8,17 263:7 282:15 285:18 286:4,6 289:9,11 301:3,4 306:8,18 307:4,8 309:2 310:16 313:5 319:14 329:5 334:18 335:17 337:2,7 338:20,21 339:6 340:2,11 341:6
**wondering** 93:3
**Word** 150:16
**words** 237:24 272:8
**work** 21:9 22:17 32:6,9,10,13 41:15 45:3 54:22 63:17 74:14 75:18 78:15,16 114:15 121:7,10 123:4,8 123:9 126:11,14 135:5 148:25 149:12,20 181:14 181:20,21 183:23 184:21,24 207:13 227:21 234:11,25 235:1,4,11 240:24 269:8,9,14 274:11 287:24 326:10 327:1
**Work-** 79:2
**worked** 48:12 81:19 138:13,14 138:15,15 163:13 184:8 221:11,13 234:16,16 252:4,6 252:9 253:4 254:12 288:25 289:16 300:11,12

301:19
**workflow** 82:10
**workforce** 11:21 30:20 32:7,21 41:7 74:12 75:3 79:2,14,18 80:1 81:2 82:12,14,22 90:10 111:23,25 121:9 127:11 129:1 149:8,16 162:22 196:14 200:13 202:21 203:22 207:2 208:15 209:5,12 209:17,25 210:24 286:13
**working** 18:7 27:24 30:22 40:23 54:13 132:12 160:25 161:8 181:3,24 183:14 187:18 194:21 234:13 241:9 249:8 251:24 273:2 274:4,6 316:8 317:8
**workload** 74:16 78:3,11 80:18 81:9 82:6 88:2,4 88:11 117:11,13 272:10 274:10
**works** 232:22
**worksheets** 154:5
**worried** 100:3
**worries** 54:20 211:15
**worth** 74:14
**wouldn't** 66:1 80:25 127:2 130:17 147:9 179:16 302:18 310:2
**write** 27:14 104:13 220:21
**writing** 26:24 218:16 223:10
**written** 20:21

109:21 312:12 326:5
**wrote** 180:16 183:6 218:12 220:19,22 278:18,19

_____
**X**
_____
**x** 1:4,10 146:1,1 253:17 338:15
**XXXX** 215:21
**XXXX-XXXXX...** 215:21
**XXXXX** 215:20 225:16 231:7 232:17
**XXXXXX** 225:14 225:16 232:17
**XXXXXXXXX** 231:7

_____
**Y**
_____
**yeah** 76:8 118:5 158:20 204:19 255:13 257:10 261:3 306:18 307:1,5
**year** 52:6 54:1,15 54:18 71:22 115:21 116:13,20 116:22 121:24 122:1,21,21 125:6 125:10 129:13 135:24 149:9 153:25 205:1,23 208:4 265:17 268:3,7,11 280:23 297:12,16 298:1,6 311:4,17 314:4 315:7,22
**year's** 122:8 269:23 283:3
**year-to-date** 265:5 265:12
**years** 26:12 28:22 66:23 71:16,19 78:4 84:16,21,23 104:25 123:5

255:6 256:22 258:6 259:8,19 261:15,21 266:15 266:25 267:14,23 268:2 283:14,21 283:25
**Yep** 144:9 219:10
**yesterday** 24:10
**York** 2:11 14:16
**young** 22:20
**Yusman** 22:15

_____
**Z**
_____
**zero-based** 31:13 132:17,21 211:11 215:8 312:8 318:20
**Zoom** 59:16 60:20 61:14

_____
**0**
_____
**0089** 67:17 98:12 112:14 266:16
**059** 11:16
**077** 12:20
**089** 263:16

_____
**1**
_____
**1** 54:3 58:8,17,18 63:2,14 64:3 87:25 98:8 133:19 220:4 253:15 265:1 278:22 311:16,17 338:4 339:8
**1:04** 172:2,4
**10** 61:21 190:2
**10:00** 76:11
**10:07** 76:14
**100** 9:21 10:4 71:17 121:23,25 317:23 334:2,3
**100%** 222:12
**100,000** 101:6,18
**1000** 90:8
**103** 12:14
**10th** 269:6

**11,000** 72:16
**11,383** 156:6 157:7 158:2 163:7,16 184:9,12,21 278:22 279:13
**11,400** 129:15
**11,500** 139:13 150:25 151:11 152:7,8,8 158:3 163:15,17 170:16 280:23
**11:02** 121:1
**11:10** 121:4
**11:40** 144:25
**11:42** 145:3
**11:58** 263:9
**110** 6:15
**1101** 4:6
**113** 10:23
**11975** 1:25
**12** 45:24
**12,500** 152:6
**12:15** 170:24 171:2 171:4
**120** 71:22
**127** 11:24
**12th** 182:16 194:20 228:11 268:24 287:22,25 288:3 288:12
**13th** 231:2 288:19 288:22 298:18,22 310:18 334:11
**14** 10:21 12:9 97:1 113:16 341:22
**142** 9:15
**14210** 111:20
**1445** 2:10 14:16
**148** 11:10
**14th** 100:19 103:10 104:11 113:5 120:6 255:24 256:11 289:13
**15** 18:5 253:17
**153** 6:18
**156** 10:14
**15th** 133:14 226:21

228:5 231:3,5 233:10 242:13 247:23
**16** 6:5 87:19
**161** 7:24
**17** 10:12 28:22 156:19,20,23 158:14 169:8 181:17 220:18
**173** 6:21
**177** 3:7
**17th** 219:7 231:18 231:23 236:14 239:17 242:6,21 244:2,3,5 245:1 247:7 290:12 291:8
**18** 129:5
**18-** 151:2
**18,000** 70:13 72:12 151:4,18 152:9
**180** 115:13 116:14 116:19 176:14 296:12
**180-day** 113:23 115:14 256:16 309:15
**182** 11:6
**186** 10:20
**189** 11:13
**18th** 182:15 202:7 240:1 241:7,25 244:6,10 247:8 251:2,11 254:6 285:21
**19** 10:15 197:17,19 202:5 205:5,6 263:9 277:16 296:8
**19,000** 151:3
**193** 6:24
**197** 10:17
**1998** 28:9
**19th** 257:14 258:20 265:7
**1st** 38:18 39:13 59:8 64:6 135:6

188:24

---

**2**

**2** 63:15 188:24 228:7 278:4 311:12 339:9
**2-** 201:24
**2-2** 77:12
**2.2** 77:21,24
**2:11** 224:11
**2:14** 286:25
**2:23** 224:14
**2:32** 230:20
**2:33** 230:23
**20** 10:18 12:4 18:5 92:20 175:11 186:10,11,13 192:6 213:12 219:15 253:15 263:2
**200,000** 302:11
**2000** 90:8
**20005** 4:7
**2001** 28:9,10
**20032** 4:22
**20043** 3:22
**2005** 28:10
**2008** 26:19
**201** 7:6
**2010** 26:17
**202** 3:23 4:8
**2022** 129:13
**2023** 11:20 127:10
**2024** 79:25 80:15 82:9 83:2 88:21 125:23 131:20
**2025** 10:21 12:4,9 18:10 34:23 35:13 37:24 38:7 40:1 45:25 48:1 52:6,9 54:1,3,15,24 55:13 56:20 60:4 60:8 63:2 65:17 67:25 68:14 70:12 72:14,18,23 73:2 73:11,18 74:23 80:17,20,21,22

82:3,11 83:1,19 84:11 85:1,3,24 89:1,8,15,21,24 90:7,13,16,18,22 90:23 91:7,19 92:20 95:14 96:10 97:1 101:2 102:4 102:9,14 103:4,8 103:24 106:12 113:16,24 114:12 118:19 119:22,25 120:10 122:18,25 126:24 127:6 131:22,25 132:6 132:13 133:4 135:24 137:15 141:5 150:20 154:19 155:10 172:17,18 175:3 175:11 208:4,9 213:12 220:18 224:18,23 236:22 237:19,22 246:15 258:22 259:23 261:12 262:1 263:9 264:16 265:10 296:8 298:3
**2026** 1:18 2:1,9 14:1,18 31:10 45:24 65:18 72:9 73:8 125:7,10 153:25 154:23 186:20 205:1,23 209:19 220:2 223:21 268:3,7,11 280:23 291:9 297:3 303:10 311:13 314:4 315:3,7 339:5 340:12 341:15
**2028** 341:22
**20472** 4:16
**20th** 259:6 265:1 319:16,17,22
**21** 10:21 113:11,12 113:15 255:16,21

256:7,8,11
**21,000** 29:19 73:7
**212** 7:9 243:5
**213** 7:11
**218** 11:16
**21st** 95:3 134:17 197:13,24 198:22 207:15 259:6
**225** 7:13
**226** 7:16
**228** 7:18
**229** 8:6
**22nd** 299:4
**23,000** 135:23 137:2 150:23 151:2 153:13 204:25 206:22 210:1 211:12 279:10
**23,146** 154:20 207:22 209:20 211:3
**231** 8:15
**232** 7:21
**233** 7:24
**236** 8:6
**238** 8:9
**239** 8:12
**23rd** 200:2,7,8,13 201:18 204:25 207:4,21 208:14 208:16,23 209:10 209:25 210:21 211:20 212:3 213:1 215:3 217:16 218:2 279:8 321:5,15 330:25
**24** 11:4 182:9,10
**24,000** 210:2
**24,804** 155:1
**24,812** 205:23 206:9 208:10 210:14
**242** 8:15
**245** 8:18
**248** 8:18

**249** 6:24
**25** 11:7 77:13 83:18 117:17 148:4,5,9 315:15
**250** 8:20
**251** 8:12
**252** 11:19
**252-11-1** 6:12
**254** 8:23
**25th** 247:23 273:3
**26** 11:11 149:9 189:5,6,11 192:9 219:15
**26,000** 73:5
**260,000** 302:12,13
**262** 12:17
**269** 8:23 9:6
**27** 6:11
**2700** 4:21
**27th** 269:5 299:8 299:16,20
**282** 9:9
**285** 9:12
**289** 12:20
**28th** 269:5 329:10
**2nd** 214:5 286:22

**3**

**3** 1:18 2:1 14:1,18 93:6 227:17,19 263:10 323:12 328:20 339:5,10
**3,000** 155:14
**3:13** 261:6
**3:23** 261:9
**3:25-cv-03698-SI** 1:7 14:14
**30** 36:1 154:19,23 190:10 302:1
**30-day** 87:9 270:8 274:14
**300** 3:7 65:18 293:9
**301** 12:23
**302** 242:17
**303** 228:20 231:12 243:8,12 245:7,10 245:14 251:13

**252:11** 254:15 257:5 258:8 259:14 273:1 293:9
**305-0693** 4:8
**306** 9:15
**30th** 265:1,2,9 333:10,16,21
**31** 11:14 31:10 65:17 113:24 118:19 172:18 218:24,25 219:4 259:23
**310** 9:18
**313** 9:21
**319** 9:23
**31st** 155:18 188:25 201:24 202:11 207:10 208:18 210:22 220:4 225:19 229:12 247:1 255:7 268:16 273:7 274:4,5 282:18 315:14 320:3 334:23
**32** 11:17 252:18,19 252:21
**321** 236:16,21,23 237:6
**325** 229:16
**329** 9:25
**33%** 317:21
**334** 10:6
**337** 338:4
**342** 11:10
**34553** 3:21
**35%** 129:17
**361** 9:9
**37** 11:20 127:16,17
**375** 9:6
**38** 12:4 92:1,8,17
**39** 12:7 94:24,25 95:3
**3rd** 334:24
**3st** 311:25

**4**

**4** 93:15 184:6
**4:05** 191:5
**4:27** 309:4
**4:44** 309:7
**40** 12:9 96:21,22,25
**40-some-odd-day** 175:18
**40%** 112:17
**404** 12:14
**406** 10:23
**41** 12:12 103:20,21 103:23
**415** 3:9
**421-7151** 3:9
**429** 9:18
**443** 9:12
**448-9090** 3:23
**45** 20:9
**450** 32:16
**454** 12:17
**4597** 7:21
**466** 11:19
**467** 8:9
**49** 12:15 262:6,7
**4m** 93:17 94:14
**4th** 157:5 158:8 160:9 162:18 168:23 173:16 174:2 182:17,25 183:13 186:15 191:3

**5**

**5** 88:7 129:5 140:3 233:24 278:9
**5,000** 151:5,8,13 165:4
**5:19** 335:19
**5:23** 335:22
**5:24** 337:10,12
**50** 20:9 131:17 180:17
**50%** 138:2,11 146:9,11 147:24 147:25 149:8,17 150:24 151:17

**159:21** 160:5 163:20 166:15 167:7,8 179:4,7 179:14,21 180:7 180:11,21 181:4,6 181:15,19,21 196:9,14 202:23 204:8,9 211:21,24 268:6 279:9 321:17 327:21
**500** 4:14
**5056** 220:18
**52** 86:25
**520** 7:6
**521** 11:13
**538** 10:17
**550** 32:15
**555** 7:9
**59** 12:18 289:6,8,14 307:4
**5th** 186:17 187:2 188:8 189:11 191:8 192:3,4 208:20 219:18

**6**

**6** 223:20 238:22 326:20
**6,200** 129:17
**6,500** 151:14 152:9
**6:13** 287:1
**6:46** 239:17
**60** 35:19 87:4
**60-cent** 217:11
**60%** 216:5,10,12 216:19,23 217:10 217:11
**65** 12:21 301:1,2,6 307:10,11,12
**65-** 152:9
**662** 12:23
**688** 10:20
**694** 6:15
**6th** 202:9 277:2,6 288:8 301:7 341:15

**7**

**7-** 26:24
**71** 6:10 27:1,2,6 326:5
**72** 6:12 76:25 77:8 110:8
**73** 6:13 110:8,9 153:17
**731** 6:21
**74** 6:16 153:17,18 160:18 208:2
**75** 6:19 173:4,5,14
**76** 6:22 193:21,22
**769** 7:16
**77** 6:12 7:4 201:2,3 207:5
**78** 7:7 212:16,17
**79** 7:10 213:23,24

**8**

**8:17** 189:19 190:1
**8:56** 2:2,9 14:2,19
**80** 7:12 74:13 225:8 225:9,12
**81** 7:14 226:18,19 228:7 231:2
**82** 7:17 228:8 232:3
**83** 7:19 232:3,4
**84** 7:22 233:19,20
**840** 4:15
**85** 8:4 236:6,7
**86** 8:7 238:19,20
**87** 8:10 239:9,10
**88** 8:13 242:10,11
**89** 8:16 243:22,23
**8th** 225:12

**9**

**9-0** 285:23,24
**90** 8:19 122:2 250:23,24 251:1 285:20 286:8 296:10,14 297:4 300:14 301:13,20 319:25 332:2,14
**90-day** 309:11,13 310:3 331:12,15

331:20,23 332:1,6
332:20,21
**90-day-only** 309:18
**91** 8:21 254:23,24
257:8,9,13
**92** 9:4 12:6 262:5
269:19,20 273:8
**93** 9:7 282:12,13
**93%** 228:20 229:9
**94** 9:10 12:8 285:15
285:16 286:21
**94108** 3:8
**95** 9:13 289:6
306:12,13 307:6
**950** 219:25 220:6
**96** 9:16 12:11
310:13,14
**963** 10:6
**97** 9:19 313:2,3,10
325:5,11
**97%** 228:24
**98** 9:22 319:6,7
**99** 9:24 71:17
328:25 329:1
**998** 11:6
**9th** 226:5,22 227:2
229:20 231:4
269:6

# Exhibit D

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

--------------------------------x
AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, et al.,

      Plaintiffs,

                               Case No.

   vs.

                       3:25-cv-03698-SI

DONALD J. TRUMP, in his official
capacity as President of the
United States, et al.,

      Defendants.
--------------------------------x


CONFIDENTIAL

PURSUANT TO THE PROTECTIVE ORDER


VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF


JOSEPH CARL GUY


Monday, May 4, 2026


Reported By:  SUSAN ASHE, CER

Job No.:  12141

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 2

Monday, May 4, 2026

9:08 a.m. Eastern Daylight Time

Videotaped videoconference deposition of JOSEPH CARL GUY, taken on behalf of the Plaintiffs, beginning at 9:08 a.m., on Monday, May~4, 2026, at the offices of Democracy Forward Foundation, 1445 New York Avenue, Northwest, Washington, D.C., before Susan Ashe, Certified Electronic Reporter and a Notary Public of the District of Columbia.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 3

APPEARANCE OF COUNSEL:

On behalf of All Union and Non-Profit

Organization Plaintiffs

    ALTSHULER BERZON LLP

    BY:  DANIELLE E. LEONARD, ESQ.

    BY:  ELIZABETH ESHLEMAN, ESQ.

    177 Post Street, Suite 300

    San Francisco, California  94108

    (415) 421-7151

    dleonard@altshulerberzon.com

    eeshleman@altshulerberzon.com


On behalf of All Union and Non-Profit

Organization Plaintiffs (except NRDC) and for

Plaintiffs City of Chicago, IL; Martin Luther,

Jr. County, WA; Harris County, TX; and City of

Baltimore, MD

    DEMOCRACY FORWARD FOUNDATION

    BY:  TSUKI HOSHIJIMA (pro hac vice)

    Senior Counsel

    P.O. Box 34553

    Washington, D.C.  20043

    (202) 448-9090

    thoshijima@democracyforward.org

    (Via Videoconference)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 4

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendants and the Witness

UNITED STATES DEPARTMENT OF JUSTICE

BY:  ROBERT BOMBARD, ESQ.

BY:  CHRISTOPHER HALL, ESQ.

1101 L Street, Northwest

Washington, D.C.  20005

(202) 305-0693

robert.bombard2@usdoj.gov

christopher.hall@usdoj.gov

- and -

DEPARTMENT OF HOMELAND SECURITY

BY:  MATTHEW FLEISCHMAN

2700 Martin Luther King, Jr., Southeast

Washington, D.C.  20032

matthew.fleischman@hq.dhs.gov

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 5

APPEARANCE OF COUNSEL (Continued):

On behalf of the Witness in His Personal

Capacity

BINNALL LAW GROUP

BY:  JASON GREAVES, ESQ.

717 King Street, Suite 200

Alexandria, Virginia  22314

(703) 888-1943

jason@binnall.com


ALSO PRESENT:

Jessica Levy, Esq.

Altshuler Berzon LLP


Jonathan Perry, Videographer

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 6

CONTENTS

THE WITNESS

Joseph Carl Guy


  BY MS. LEONARD                                            13


                        EXHIBITS

PLAINTIFFS

Exhibit No.                                         Marked

Exhibit 101  Subpoena                                      34

Exhibit 102  Declaration of Joseph Guy

             Regarding Records from

             Personal Telephone                            36

Exhibit 103  Screenshot of Chat Record

             USA-AFGE-Exp.-0424415                         69

Exhibit 104  Screenshot of Chat Record

             USA-AFGE-Exp.-0425307                         70

Exhibit 105  Screenshot of Chat Record

             USA-AFGE-Exp.-0425308                         77

Exhibit 106  Redacted Screenshot

             of Chat Record

             USA-AFGE-Exp.-0425306                         81

Exhibit 107  Screenshot of Chat Record

             USA-AFGE-Exp.-0425309                         85

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 7

EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                          Marked

Exhibit 108  Screenshot of Chat Records

             USA-AFGE-Exp.-0425310 and -311      110

Exhibit 109  Signal Support, "Backup and

             Restore Messages" Printout          147

Exhibit 110  Homeland Security Org. Chart        178

Exhibit 111  DHS Record of Clearance

             and Approval                        187

Exhibit 112  Email Correspondence

             January 22, 2026                    215

Exhibit 113  Screenshot of Chat Record

             USA-AFGE-Exp.-0424414               217

Exhibit 114  Handwritten Notes

             USA-AFGE-Exp.-0425282

             through -302                         243

Exhibit 115  Email Correspondence

             USA-AFGE-Exp.-0007445               287

Exhibit 116  Email Correspondence

             USA-AFGE-Exp.-0002064

             through -059                         289

Exhibit 117  Email Correspondence

             USA-AFGE-Exp.-0006291               306

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 8

EXHIBITS (Continued)

PLAINTIFFS

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 118 | Screenshot of Chat Record | |
| | USA-AFGE-Exp.-0425305 | 311 |
| Exhibit 119 | "FEMA Will Resume Staff | |
| | Reductions That Were Paused | |
| | During Winter Storm, | |
| | Managers Say" Printout | 313 |
| Exhibit 120 | Email Correspondence | |
| | USA-AFGE-Exp.-0000157 | |
| | through -159 | 318 |
| Exhibit 121 | Email Correspondence | |
| | USA-AFGE-Exp.-0000183 | |
| | through -185 | 319 |

PREVIOUSLY MARKED EXHIBITS

EVANS

| Exhibit No. | | Introduced |
|---|---|---|
| Exhibit 10 | Redacted Handwritten Notes | |
| | USA-AFGE-Exp-0033527 | |
| | through -544 | 279 |

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 9

PREVIOUSLY MARKED EXHIBITS (Continued)

EVANS

Exhibit No.                                    Introduced

Exhibit 13  Draft Final Report
            "The President's Council to
            Assess the Federal Emergency
            Management Agency"
            December 11, 2025                  239

Exhibit 18  Email Correspondence
            USA-AFGE-Exp.-0007333
            through -343                       301

Exhibit 26  Email Correspondence
            USA-AFGE-Exp.-0014520
            and -521                           267

Exhibit 27  Email Correspondence
            USA-AFGE-Exp.-0007258
            through -260                       276


PLAINTIFFS

Exhibit 45  Email Correspondence
            USA-AFGE-Exp.-0000400
            through -402                       269

Exhibit 46  Email Correspondence
            USA-AFGE-Exp.-0000415
            through -419                       272

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 10

PREVIOUSLY MARKED EXHIBITS (Continued)

PLAINTIFFS

Exhibit No.                                    Introduced

Exhibit 49  Email Correspondence

            USA-AFGE-Exp.-0000446

            through -454                              273

Exhibit 65  Email Correspondence

            USA-AFGE-Exp.-0008661

            and -662                                 315


                    INSTRUCT THE WITNESS

Page/Line              Page/Line              Page/Line

 106/22                 107/12


(REPORTER'S NOTE:  All quotations from exhibits are

reflected in the manner in which they were read into

the record and do not necessarily denote an exact

quote from the document.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

MONDAY, MAY 4, 2026;

9:08 A.M. EASTERN DAYLIGHT TIME

--o0o--

VIDEOGRAPHER:  We are now on the record.  This begins the video deposition of Joseph Guy, taken in the matter of the American Federation of Government Employees, et al., versus Donald J. Trump, in His Official Capacity as President of the United States, et al. Case filed in the U.S. District Court for the Northern District of California, San Francisco Division, No. 3:25-cv-03698-SI.

We are at Democracy Forward, 1445 New York Avenue Northwest, in Washington, D.C.

The date is May 4, 2026.  The time is 9:08 a.m.

The videographer is Jonathan Perry.  The court reporter is Susan Ashe, both here on behalf of TransPerfect.

And would counsel present please introduce themselves and state whom they represent.

MS. LEONARD:  Good morning.  We

Page 12

met before we went on the record, but I'm Danielle Leonard, Altshuler Berzon, representing the Union and Organizational Plaintiffs in this matter.

MS. ESHLEMAN:  Elizabeth Eshleman, also Altshuler Berzon, representing Union and Organizational Plaintiffs.

MS. LEVY:  Jessica Levy, Altshuler Berzon, representing Union and Organizational Plaintiffs.

MR. GREAVES:  Jason Greaves, the Binnall Law Group, representing Joe Guy.

MR. BOMBARD:  Robert Bombard, United States Department of Justice, representing Defendants.

MR. FLEISCHMAN:  Matthew Fleischman, Department of Homeland Security.

MR. HALL:  Hi.  Christopher Hall, Department of Justice, on behalf of the Defendants.

MS. LEONARD:  And on the phone, we have another Plaintiffs' counsel.

MR. HOSHIJIMA:  Good morning.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 13

Tsuki Hoshijima, from Democracy Forward, representing certain of the Plaintiffs.

VIDEOGRAPHER:  And would the reporter please swear in the witness.

Whereupon,

JOSEPH CARL GUY

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. LEONARD:

Q.   Thank you.

Once again, my name is Danielle Leonard. I represent the Plaintiffs in this matter.

Could you state your full name for the record.

A.   Joseph Carl Guy.

Q.   Okay.  And, Mr. Guy, you were able to produce some additional documents to us through counsel for this -- this morning, before this deposition.  Correct?

A.   I produced the same documents that came up in my self-search a few nights ago.

Q.   Okay.  So you are aware that counsel were given some additional documents this morning in response to the Court's order from Friday?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 14

MR. GREAVES:  Objection to form.

A.    Can you rephrase the question?

Q.    Sure.

Are you aware that counsel were given some additional documents this morning in response to the Court's order from Friday?

A.    It is my under- --

MR. GREAVES:  Object to form.

COURT REPORTER:  Who said that?

MR. GREAVES:  I said, "Object to form."

COURT REPORTER:  Thank you.

Q.    Okay.  And before we go any further, I'm going to -- we're going to try our very best not to speak over each other, because it's very difficult for the court reporter.  That's one of our ground rules in the deposition we'll get to.

I know you've been deposed before, so we don't have to go all -- over all of those.

But I will ask the question again so that the record's clear.

Are you aware that counsel were given some additional documents this morning, from your phone, in response to Friday's court order?

MR. GREAVES:  Object to form.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 15

A.   It is my understanding that they were given the same documents that I produced previously.

MS. LEONARD:  Okay.  So for the -- just so that the record is clear, Plaintiffs have received some -- one production this morning from Mr. Guy's phone in response to Friday's court order.

We have also received a notice of partial compliance with the order and regarding impossibility of full compliance with respect to documents from Ms. Evans. The government is taking the position that it is impossible to produce those documents.

Plaintiffs obviously object and disagree and intend to pursue full compliance, and will hold this deposition open until we receive full compliance.

We can discuss these matters further off the record.  But for purposes of this deposition, those documents were relevant, and we are going to have to keep this deposition open until we receive them.

So --

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 16



MR. GREAVES:  Understanding your position, it's objected to.

MS. LEONARD:  Great.

Q.  Okay.  Now we can continue.

Can you state your full name and current address for the record.

A.  My full name is Joseph Carl Guy.

And my address is

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 17

████████████

Q.   Okay.  And today's date is May 4.

A.   Yes.

Q.   Okay.  And May 1 -- so May 1 was last Friday.  Is that right?

Sorry.

MS. LEONARD:  Is May 1 last Friday or Thursday?

Friday.  Thank you.

A.   Yes.

Q.   Okay.  And until -- am I correct in understanding that until very recently, you were employed by the United States Department of State?

A.   Yes.

Q.   Okay.  And you are not still employed by the State Department.  Correct?

A.   I am not.

Q.   What date did you leave employment with the State Department?

A.   My last day was last Thursday.

Q.   So April 30?

A.   Yes.

████████████████████████████

████████████████████████████

██████████████████████

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 18



Q.   Prior to leaving the State Department, am I correct in understanding that your position was as chief of staff to the special envoy for the Western Shield?

A.   I was chief of staff to the special envoy for The Shield of the Americas.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 19

Q.   And the special envoy for The Shield of the Americas is the former DHS Secretary, Kristi Noem.  Is that correct?

A.   That is correct.

Q.   Is she currently still, to your knowledge, the special envoy?

A.   Yes.

Q.   And prior to holding the position at State, you were employed by DHS.  Correct?

A.   Yes, I was.

Q.   And if I say "DHS," you'll understand that I'm referring to the U.S. Department of Homeland Security?

A.   Yes.

Q.   What did you refer to that Department as, if you were using shorthand?

A.   "DHS."

Q.   And your position at DHS was deputy chief of staff to former Secretary Noem.  Is that correct?

A.   Yes.

Q.   What date did you leave DHS?

A.   I don't recall exactly.

Q.   Was it in March of 2026?

A.   Yes.  It would have been late March.

Q.   And who offered you the job at the State

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 20

Department?

A.    I think, technically, it would have been Personnel at the White House, PPO.

Q.    Recognizing that you were there for only a brief time, could you generally describe your job responsibilities as chief of staff to the special envoy?

A.    Coordinate operations between Shield of the Americas staff and the Bureau for Western Hemisphere Affairs at the State Department.

Q.    Presumably, you discussed this move to State with former Secretary Noem before you moved from DHS to State?

A.    I don't remember specifics, but, I think, yes, we did discuss that.

Q.    And you discussed this move to State with former chief advisor to Secretary Noem, Corey Lewandowski?

A.    Again, I don't remember specifics, but, yes, I may have said something to him about it.

Q.    And you left DHS at some point after President Trump terminated Kristi Noem as the DHS Secretary.  Correct?

A.    I'm sorry.  Can you repeat the question?

Q.    Sure.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 21

You left DHS at some point in time after President Trump terminated Kristi Noem as DHS Secretary?

A.   I don't know how to answer that, technically, because I think she was still technically the Secretary of Homeland Security until Secretary Mullin got sworn in.

So she may have still been Secretary when I left.

Q.   Do you recall that the President announced that he was terminating Kristi Noem as DHS Secretary on March 5, 2026?

A.   I did not recall that specifically, but....

Q.   But you know it was in early March?

A.   Now that you're saying that, I think that makes sense.

Q.   This was a significant event for you.  Is that fair?

A.   Yes.

Q.   Okay.  So you remember that the President terminated Kristi Noem?

MR. GREAVES:  Object to form.

A.   Can you restate the question in a different way?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 22

Q.   Do you not understand the question, Mr. Guy?

A.   Can you repeat the question?

Q.   Sure.

I -- you recall that the President terminated Kristi Noem as the DHS Secretary?

MR. GREAVES:  Object to form.

A.   Yes.

Q.   Okay.  And do you recall that she was giving a speech in Nashville that day?

A.   She moved around a lot.  I don't recall specifics of where she may have been when that happened.

Q.   Okay.  Were you there with her in Nashville when she got the news?

A.   I was not.

Q.   Do you recall that her original last day was announced as March 31, but she ended up moving over to State earlier than that?

A.   I don't remember that specifically.

Q.   Did you take leave, at some point, the end of March or early April, in between moving from DHS to State?

A.   I went on a pre-planned trip to Ireland.

Q.   And do you remember when that was?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 23

A.    Roughly, March 18th or 19th, for seven days.

Q.    And were you still employed by Department of Homeland Security at the time?

A.    When I left, I believe that I was, because I took my work phone with me.

And I think things happened very quickly and outside of my control.

And it may have been that during that time, I was -- I was off-boarded at DHS and then onboarded at State.  Right when I got back, I onboarded at State.

Q.    Why did you follow former Secretary Noem to the State Department?

A.    Because she asked me to.

Q.    When did you learn you were leaving DHS?

A.    I don't remember exactly.  I knew it would happen at some point, probably in late March or in April, but I did not know exactly when.

Q.    Why did you know that it would happen, meaning that you personally would have to leave DHS?

A.    Because when she asked me to go with her, I told her that I would.

Q.    Did she explain why she was asking you to go with her?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 24

A.    She told me that she was confident that I could help her set up the office and do a good job.

Q.    Did she tell you that you needed to leave DHS for any other reason?

A.    No.

Q.    Did anyone else from the government ever give you any other reason you needed to leave DHS?

A.    I don't think so.

Q.    What day did you start at the State Department?

A.    It must have been March -- I think I had a different effective start date than when I actually physically got in the building.

I think it was maybe March 23.  That was my effective start date.

I don't remember exactly.

Q.    Were you still on vacation in Ireland on March 23?

A.    Yes.

Q.    Okay.  And you started at State after you came back?

A.    Yes, that's right.

Q.    There were others from DHS who went over with Ms. Noem to her new office at the State Department.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 25

A.    Yes.

Q.    Can you tell me who else went over to DHS with Ms. Noem?

I'm sorry.  I said that wrong.

Can you tell me who else from DHS went over to the State Department with Ms. Noem?

A.    Let's see.  There was Mr. Mazzara, Joseph Mazzara; Zachary Watson; Jayden Bies; Joshua Sedore; Giovanna Cinelli; Octavian Miller; Joshua King; and Troup Hemenway.

Q.    Were all of those individuals still employed by State at the time you left on April 30, to your knowledge?

A.    I think so.

Q.    Troup Hemenway was placed on administrative leave by the State Department at some point after he came over from DHS.  Correct?

A.    I do recall that happening.

Q.    Do you have any understanding as to why?

A.    Not particularly.

Q.    How about generally?

A.    It seemed like special envoys typically have small staff allotted to them, and maybe someone at the State Department was not in agreement with or comfortable with nine staff being assigned to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 26

Special Envoy Noem.

Q.   Is Troup Hemenway under investigation by the Office of Inspector General at the Department of Homeland Security, to your knowledge?

A.   I don't know.

Q.   Are you under investigation by the Office of Inspector General at the Department of Homeland Security, to your knowledge?

A.   I don't know.

Q.   So you don't have any knowledge that you are?

A.   No.

Q.   Were you originally the chief of staff to the special envoy, or was that supposed to be Mr. Hemenway?

A.   No, it was -- it was me originally.

Q.   You've had several chief of staff type jobs over your career.  Is that fair to say?

A.   I think two.  Well, one actual -- one -- well, actually, now two with the actual title "chief of staff."

Q.   Okay.  Can you tell me, generally, what a chief of staff does?

A.   It's a lot of coordination work.  Making sure that the train runs on time, trains are running

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 27

on time, so to speak.

And making sure that the team has the resources that they need to get the job done that the principal needs done.

Q.   Are you a conduit between the principal and all of the people in the agency working for him or her?

MR. GREAVES:   Object to form.

A.   I think it's heavily dependent on the principal.

Q.   Sometimes they do that directly themselves?

A.   More or less.

I think some principals like to be more involved.  Some of them like having insulation from the rest of staff.

I think it really just depends on who you are.

Q.   Let's be specific about your time at DHS, then.

As the deputy chief of staff, can you generally describe to me what that job was?

A.   Yes.  I was an intermediary between the Secretary, the Office of the Secretary, and components that would have been in my DCOS

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 28

portfolio.

Q.   So "DCOS" is deputy chief of staff.

Is that how you referred to yourself?

A.   Yes, ma'am.

Q.   Okay.  And if you were talking to people, regular people, not D.C. insiders, let's say, from home, back home in Syracuse, how would you describe what your job was at DHS?

A.   I was an intermediary between Secretary Noem and component leadership.

And I also supported component leadership. It was a two-way conduit.

So I thought of myself as support to the components, helping them make sure that they had what they needed, but also support for the Secretary.

And helping make sure that both sides understood each other and that work was getting done according to, you know, the Secretary's directives and the President's directives.

Q.   And then when you went over to State, how would you describe the role as chief of staff to the special envoy?

A.   It was a much smaller role.  There was much less going on.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 29

It was more just getting into the State Department, learning the people in the Bureau of Western Hemisphere Affairs, and reporting to the Secretary, hey, kind of, you know, the staff is all on board. We all got our badges. The -- you know, I've talked to so-and-so, and they think that this policy direction is great or this policy direction isn't.

But it was -- the volume was very small.

Q. Why did you leave the State Department on April 30?

A. That's a good question.

I entered government after transition, really only wanting to do a year, because it's -- it's highly stressful work.

And during the time that I was at DHS, my wife and I had our first baby.

And it was a very demanding job, and I think I did more than I wanted to, and my -- what I agreed with my wife when I entered, that I only wanted to do a year.

And, you know, she was very flexible and kind and gracious, and she understood why I went to the State Department, but she didn't want me staying very long.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 30

And I just made a judgment call and decided that it was time to honor my promise and to get out and to explore other avenues for work.

Q. Congratulations. I also have a very small child and a demanding job, so I understand.

And the next job, we've discussed already, that you have lined up is with a consulting firm?

A. Yes, but I'm working on exactly what my next work is going to be.

You know, I could have one client. I could work on other clients.

I got to -- I got to figure out exactly how I'm going to arrange things.

Q. Okay. Let's shift gears and talk about this deposition.

I understand that you have been deposed before.

A. Yes, ma'am.

Q. On December 3, 2025?

A. Was that -- was it that long ago?

Yes, that -- that sounds right.

Q. And you've -- am I correct in understanding you've only been deposed once previously?

A. Yes, ma'am.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 31

Q.   And that was in another lawsuit against the Department of Homeland Security.  Correct?

A.   Yes.

Q.   And that one was called Robert F. Kennedy Human Rights, et al., versus DHS.

Does that sound right?

A.   Yes.

Q.   And do you recall the subject matter of that litigation?

A.   That had to do with the oversight offices at DHS.

Q.   In the prior deposition, you were represented by counsel from DOJ.  Correct?

A.   I believe that's right.

Q.   You didn't have private counsel.  Correct?

A.   No.

Q.   Not correct, or yes, correct?

A.   I did not have private counsel.

Q.   Okay.  But you are not being represented by DOJ here today.  You are being represented by your personal counsel.  Correct?

A.   Yes.

Q.   And that is Mr. Jason Greaves from the Binnall Law Group.  Correct?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 32

Q.   And that is the same lawyer who represented Karen Evans in her deposition in this case.  Correct?

A.   I believe so.

Q.   And has Mr. Greaves discussed the Karen Evans deposition with you?

A.   I don't recall discussing Karen's deposition.

Q.   Have you read her transcript of her deposition?

A.   I read an email that was sent to me by State Department bringing up some things that Karen said.

Q.   Was that email sent by counsel at the State Department?

A.   Yes.

Q.   You are aware that the federal court ordered you to appear here today?

A.   Yes.

Q.   And you're following that federal court order?

A.   Yes, ma'am.

Q.   And the federal court ordered you to bring your personal phone to this deposition.  Correct?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 33

Q.   And you're following that court order.
Correct?

A.   Yes.

Q.   So you have your personal phone here
today?

A.   It is here.

Q.   It's not in this room, is it?

A.   I think it is.

Q.   Oh, sorry.

Let me ask that in a better way:  Is your
phone in this room?

A.   I don't know.

Q.   Did you give it to counsel?

A.   Yes.

Q.   And you testified that you allowed
Defendants' counsel, meaning DOJ, to search that
phone?

A.   Yes.  They were over at my house
yesterday.

Q.   Okay.  Let's look -- periodically in this
deposition, I'm going to hand you some documents.

The way we're going to do this is I'm
going to hand it to the court reporter, who's going
to give it a number.

And I believe we are on --

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 34

MS. LEONARD:  100?

COURT REPORTER:  101.

Q.   We're on 101.  Amazing.

And she will -- she can't type while I'm talking, but she's going to put the number on and hand it to you.

(Whereupon, Plaintiffs Exhibit 101 was marked for identification.)

Q.   Okay.  Mr. Guy, you've been handed what the court reporter has marked as Exhibit 101, and I can represent to you this is a copy of the subpoena to appear at a deposition in the civil action that Plaintiffs served on Defendants and you in this matter.

Do you recognize this?

MR. GREAVES:  Object to form.

A.   Can I have a moment to look this over?

Q.   Sure.

(Witness reading.)

Q.   Mr. Guy, have you seen this before?

A.   I have not seen this document before.

Q.   You were not given this by counsel for the government last week?

A.   I don't remem- -- I remember discussing --

Q.   I'm not going to ask you -- sorry.  I'm

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 35

going to stop you, because I don't want you -- when you were employed by the State Department, I don't want to ask you about the substance of your conversations with counsel for DOJ.

I'm just asking whether you were given this document or not.

A.    I don't remember being given this document.

Q.    You may have been, but you don't recall?

A.    Yes.

Q.    You can set that aside.

You're also aware --

And as we go through this, the court reporter will keep the official record with the stickers, so we'll make a pile for her.

You're also aware that there was an earlier court order requiring you to provide a declaration regarding preservation efforts on your personal phone?

Does that sound familiar?

A.    Yes.

Q.    Okay.  And you provided a declaration?

A.    I did.

MS. LEONARD:  Okay.  Let's mark this as 102.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 36

(Whereupon, Plaintiffs Exhibit 102 was marked for identification.)

Q.   Mr. Guy, you've seen this before.  Is that correct?

A.   Yes, I have seen this before.

Q.   And you gave the court that -- this declaration last week on April 30?

A.   Yes.

Q.   Okay.  That's your signature on the second page of the declaration there?

A.   Yes, it is.

Q.   Government counsel worked with you on the declaration, or did your personal counsel?

A.   Government counsel.

Q.   Okay.  Did you write this, or did someone write it for you?

A.   It was a mix.  It was a -- I received a draft that I worked on with -- I think it was DOJ.

Q.   You provided edits.

(No audible response.)

Q.   That was just yes or no.  I'm not asking what the edits were.

A.   Yes.

Q.   Okay.  When did you retain your personal counsel?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 37

A.    I believe on this past Saturday.

Q.    May 2?

A.    Yes.

Q.    In your communications regarding this litigation prior to April 30, were you communicating directly with DOJ or were those done through counsel for DHS?

A.    Regarding this document?

Q.    Sure.  We can start with the declaration.

Regarding the declaration, were your communications through counsel for DHS or directly with DOJ?

A.    I believe it was with DOJ.

Q.    And other communications about this litigation, including about this deposition, were those with DOJ or through counsel at DHS?

A.    I think it was a mix.

Q.    Can you tell me how many times you have spoken with anyone at DHS about this deposition?

A.    I don't remember exactly.

Q.    Okay.  You've had conversations with counsel for DHS about this deposition?

A.    I've spoken with Jimmy Percival very briefly.

Q.    He's counsel at DHS?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 38

A.   Yes.

Q.   Okay.  Have you spoken with anyone at DHS who is not counsel about this deposition?

A.   Not that I recall.

Q.   Okay.  Have you spoken with Karen Evans about this deposition?

A.   No, not that I recall.

Q.   Would you recall that?

A.   I have -- I haven't spoken to Karen Evans about this.

Q.   Have you spoken to Karen Evans since you left the Department of Homeland Security?

A.   Perhaps once or twice.  I think I had to drop off a parking pass, which I coordinated everything for.

Q.   And anything else?

A.   I don't remember.

Q.   Did you speak to Karen Evans about the fact that you have the same counsel now?

A.   No, I did not.

Q.   Tell me what you did to prepare for this deposition.

A.   Well, there was a call on -- I think it was last Tuesday, with DOJ counsel and DHS counsel.

     I think that maybe lasted an hour,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 39

thereabouts.  Maybe less than that, actually.

And then I had another call with, I think, the same people on last Thursday.  And that call maybe lasted an hour.

And I've spoken with Jason for maybe an hour about the deposition.

Q.   And when was that?

A.   I -- since between Saturday, when I first met him, and right now.

Q.   Was it on Saturday?

A.   And he was also -- yeah, I spoke to him yesterday as well.

Q.   Okay.  But let me take those each step by step.

You spoke to Mr. Greaves on Saturday for about an hour about the deposition.  Is that right?

A.   It must have been less than that.

Q.   And then your personal counsel was also present yesterday, Sunday, May 3, when the lawyers from the Department of Justice were meeting with you regarding your phone.  Is that correct?

A.   That is correct.

Q.   Okay.  And tell me who was there yesterday, please.

A.   It would have been Jason, my counsel;

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 40

Mr. Hall, from the DOJ; and I think her name was Tracy, who was a technician from the DOJ that joined Mr. Hall.

Q.   Anyone else?

A.   No.

Q.   And did you discuss anything other than your -- the content of your personal phone?

MR. BOMBARD:  I'm going to object to anything that gets into the attorney-client privilege or attorney work product.

MS. LEONARD:  Sure.

Q.   The question is:  Did you discuss anything other than your personal phone?

And that's a yes or no.

MR. GREAVES:  Object to form.

And ask if you can clarify when you're talking about, when --

MS. LEONARD:  Sure.

MR. GREAVES:  -- when DOJ was searching his phone or after DOJ left?

Q.   Okay.  Did you meet with your counsel, Mr. Greaves, after Mr. Hall and the DOJ technician left your house?

A.   I think Mr. Greaves stuck around for maybe

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 41

10 minutes after they left.

Q.   Okay.  Before the DOJ counsel left, did you discuss, with DOJ counsel, anything other than the contents of your personal phone?

A.   I don't recall discussing anything other than what was going on.

Q.   Meaning, with the search of your personal phone?

A.   Yes.

Q.   So you didn't discuss the substance of this deposition here today?

A.   I don't think that I did.

Q.   Did you discuss this deposition with anyone else that you -- other than the counsel that you've described here today?

A.   I don't think that I did.

Q.   You knew Karen Evans from before your time at DHS.  Correct?

A.   Yes.

Q.   You both worked together on the America First Transition Project?

A.   So I was an action plan manager working on various different transition plans, and Karen was a volunteer that worked with me.

And yes, we -- she helped write -- she

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 42

helped with whatever action plans were being made on the transition.

Q. Okay. And at some point, you became aware that Karen Evans had been deposed in this case. Correct?

A. Yes.

Q. Did you learn that from her?

A. I don't think so.

Q. Do you remember who you learned it from?

A. No.

Q. At some point, you also learned that at her deposition, she testified that she preserved some Signal chats by taking pictures of her phone. Right?

MR. GREAVES: Object to form.

A. I don't know if I would say I learned that.

Q. You knew that before you submitted your declaration to the court last week on April 30. Correct?

MR. GREAVES: Object to form.

A. Can you repeat the question?

Q. Sure.

You knew that before you submitted your declaration that's Exhibit 102.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 43

A.    I meant, can you repeat the question before that?

Q.    Sure.

You learned that Karen Evans had testified in her deposition that she preserved some Signal chats by taking pictures of her phone?

A.    I don't know if it was by taking pictures of her phone.

Q.    Ah, I see.

But you learned that in her deposition, Karen Evans testified that she had preserved some of the Signal chats at DHS?

A.    Yes.

Q.    And you knew that before you submitted your declaration.  Correct?

A.    Yes.

Q.    And -- because you talk in your declaration about Karen Evans preserving Signal chats.

Do you recall that?

A.    That's what it says here.

Q.    In Paragraph 5?

A.    Um-hum.

Q.    But the statement in Paragraph 5, you didn't learn that from Karen Evans?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 44

A.   Learn what?

Q.   You say here:

              It was my understanding

          that Karen Evans was preserving

          any work-related Signal

          messages, including from the

          FEMA 2.0 chat.

     You didn't learn that from Karen Evans.
Correct?

A.   What are you saying that I learned?

Q.   That Karen Evans -- that your
understanding that Karen Evans was preserving some
of the Signal chats, you didn't learn that from
Karen Evans.  Correct?

A.   I may have.

Q.   Did you?

A.   At some point.

Q.   Or did you learn that from someone else
who told you about her deposition?

A.   I don't understand what you're trying to
ask me.

Q.   We'll come back to that.

     Did you review any documents that refresh
your recollection of events to prepare for this
deposition?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 45

A.   I'm sorry.  Can you repeat that?

Q.   Did you review any documents to refresh your recollection to prepare for this deposition?

A.   I don't think that I did.

Q.   In any of these meetings with counsel that we've been talking about, you don't recall looking at any documents?

A.   No.

Q.   Okay.  And then on your own, did you independently look at any documents?

A.   Nope.  I don't think so.

Q.   Okay.  Let's talk about your phones.

You had a DHS-issued work phone while you worked at DHS.  Correct?

A.   Yes.

Q.   And you also had a personal phone?

A.   Yes.

Q.   Did you have more than one personal phone during the time that you worked at DHS?

A.   No.

Q.   Did you have more than one DHS work -- -issued work phone?

A.   No.

Q.   Do you recall what type of phone your DHS-issued work phone was?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 46

A.    It was an iPhone.  I don't remember exactly what model.

Q.    Did DH- -- do you know whether you were the only one at DHS who was issued an iPhone, or is that something DHS typically bought for people?

A.    I think most people had iPhones.

Q.    Okay.  And what about your personal phone? What kind of phone is that?

A.    That is an iPhone.

Q.    Okay.  Let's start with your work phone.

You testified that after you left DHS, or at the end of your time at DHS, you went on a vacation to Ireland.  That's correct?

A.    Yes.

Q.    And you had your DHS work phone with you during that trip?

A.    Yes, because I was still employed at DHS.

Q.    You hadn't turned it in before you left?

A.    No.

Q.    And at some point in time, did someone from DHS ask you to search that work phones for communications regarding FEMA?

A.    I don't think so.

Q.    You don't recall being asked to do that?

A.    No.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 47

Q.   You didn't turn that phone in so that someone could perform a search?

A.   When?

Q.   After you got back from Ireland.

A.   I returned the phone after I got back from Ireland because it was DHS property.

Q.   And when did you do that?

A.   I think the day after I got back.

Q.   So that would have been roughly May 23 or 24, something like that?

A.   Not in May.

Q.   Sorry.  March.

     March 23 or 24?

A.   I think I got back on a Thursday, and I gave it back on a Friday.

Q.   But you never performed what we'll call a self-search for communications related to FEMA on your DHS-issued work phone?

A.   No.

Q.   At any point in time, did you ever delete communications that were on your DHS work phone?

A.   I don't recall ever deleting communications on my DHS work phone.

Q.   Did you use the DHS work phone to send text messages?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 48

A.    I think, occasionally, I did.

Q.    Were you generally using your personal phone more for your DHS work than your DHS-issued work phone?

A.    I used official devices to conduct official work, to the best of my recollection.

Q.    But you did use your personal phone to communicate about your work at DHS at times. Correct?

A.    I don't know if that's how I would characterize it.

Q.    You had communications about DHS work while using your personal phone.  Correct?

MR. GREAVES:  Objection; asked and answered.

A.    I don't know if that's how I would characterize it.

Q.    You had communications with other DHS officials and employees from your personal phone. Correct?

A.    My official work, to the best of my recollection, was done through official channels.

Q.    But you used your personal phone to communicate with others at DHS while you were employed by DHS.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 49

A.   I don't recall any work-related discussions taking place on my personal phone.

Q.   You don't recall, or you know that you didn't?

A.   I don't recall.

Q.   So it's possible that you had telephone calls from your personal phone with others at DHS about your DHS work.  Correct?

A.   It's possible.

Q.   And if we pulled your phone records, it's possible that your phone records would show communications with other DHS officials and employees from your personal phone.  Correct?

A.   It is possible.  However, I don't know to what extent that would have been considered work.

And I will repeat that anything that was done officially, to the best of my recollection, was effected and done through official channels.

Q.   When you say "officially" here, what do you mean?

A.   Work that was done officially.

Q.   What do you mean by "officially"?

A.   You know, executing policy.

Anything that was, you know, official work was done through official channels.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 50

Q.   So you're using "official" to mean something other than anything that was possibly work related.  Is that fair?

MR. GREAVES:  Objection; form.

A.   I don't know if that's how I would say it.

Q.   Okay.  There are conversations that you had that could be related to work that you would consider not to be, quote, official work.

Is that what you're testifying?

A.   I'm sorry.  Can you repeat that?

Q.   Sure.

Are you saying that there are conversations that you could have with others at DHS that are related to work, but that you would not consider official work?

A.   I don't know if I would say that.

Q.   Okay.  So everything that you did was related -- that was related to work at all, you would consider official work for DHS?

A.   I don't know if I would say that either.

Q.   Then define how you're using "official" with respect to these communications, please.

A.   What I can say is that if there was work being done between what would be regarded as personal, which, you know, I think a lot of what

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 51

took place on a personal phone would have been considered personal -- you know, workplace banter. Some logistical coordination could have been taking place.

But anything like, you know, planning or, you know, staffing decisions, any actual work decisions that affected work, I believe, were done through official channels.

Q.   And by "official channels," you mean not on personal phones?

A.   I mean through email and through -- through work email, through my DHS email, through my DHS phone, and through, you know, DHS time, meetings, memos.

Everything was actioned through memos, and you couldn't send a memo through your personal phone.  You action memos through your work phone --

(Simultaneous speaking.)

Q.   So you consider -- oh, sorry.  I didn't mean to interrupt.  Please go ahead.

A.   No, I'm done.  Go ahead.

Q.   So you consider decisions and thing -- memos, things like that, to be the official work that you needed to use work-related devices for?

A.   I wouldn't say that I would restrict that

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 52

to that.  I'm just....

Q.   What about conversations about renewals of CORE employees at FEMA; would you consider that official work?

A.   Yes.

Q.   Okay.  So those should not have taken place on your personal phone?

A.   If they did, I don't recall that they did.

And I don't recall at all having any conversations on my personal device about staffing decisions for CORE employees.

Q.   What about Signal?

You're familiar with that app.  Correct?

A.   Yes.

Q.   Did you have the Signal app on your DHS-issued work phone?

A.   I believe I did.

Q.   Do you know whether you did?

A.   I think that I did.

Q.   And what name was associated with your Signal account on that app?

A.   It probably would have been my name.

Q.   Was that account linked to your work phone number?

A.   On my work phone?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 53

Q.   Yes.

A.   I'm not an IT expert.  I don't know how they would have set it up.

I don't believe I set it up on my own.

Q.   Did someone at DHS set up the Signal app on your work phone?

A.   I don't remember exactly.

Q.   If you sent a message on Signal from your work phone, would it appear on the Signal app on your personal phone?

A.   I don't think so.

Q.   It was a different account.  Correct?

A.   I think that's right.

Q.   Okay.  What steps did you take to preserve communications on Signal on your DHS work phone?

A.   The CIO was in charge of preserving my documents.

Q.   What do you mean by, "The CIO was in charge of preserving my documents," as it pertains to the Signal app on your DHS work phone?

A.   I think it was my understanding that the CIO was in charge of preserving my documents.

I don't recall taking steps to preserve messages on my Signal on my work phone.

Q.   You didn't understand that DHS policy was

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 54

that if you communicated on Signal regarding work, you needed to download and save those messages?

MR. GREAVES:  Object to form.

A.    I did not do my own travel.  I did not file most of my HR paperwork, for the most part.  I did not do most of my own scheduling.  There was a lot going on.

I was under the impression that someone else would be taking care of that, just like most of the other administrative work was taken care of.

Q.    Do you recall whether any of the chats on Signal on your work phone were set to auto-delete after a particular point in time?

A.    On my -- I -- can you repeat that question?

Q.    Sure.

We're still just talking about your DHS-issued work phone, which you believe -- am I correct in understanding you believe there was the Signal application on your DHS work phone?

A.    I think there was.

Q.    Do you recall whether any of the chats related to your DHS work were set to auto-delete after a particular point in time?

A.    I do not recall that specifically.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 55

Q.   Do you recall whether you set any of the chats on your work phone to delete after a particular point in time?

A.   I don't recall that.

Q.   You know how to do that.  Right?  You understand what I'm talking about?

A.   I think so.

Q.   Okay.  You know that, on Signal, there's a option that you can set the point at time -- point in time for which a chat will -- the messages will delete?

A.   Yes, ma'am.

Q.   Okay.  Have you ever done that?

A.   I think that I have.

Q.   Okay.  But with respect to your DHS work phone, you don't know whether you ever set any of those chats to delete?

A.   I don't remember any -- doing that.

Q.   Do you recall whether any of the chats that you had on your DHS-issued work phone pertain to FEMA?

A.   I don't remember.

Q.   It's possible?

A.   Yes.

Q.   You said you don't -- you didn't do your

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 56

own scheduling when you were at DHS.

Who did your scheduling for you?

A.   I said most of my own scheduling.

I had -- I had a couple of administrative people who would help me.  And....

Q.   Who were the administrative people who were assigned to help you?

A.   Charmaine Sessoms, in the front office, helped with scheduling sometimes.

Kieran Schrock was a special assistant. He helped with my scheduling sometimes.

Q.   Did you have any other administrative assistants, other than Charmaine and Kieran, who helped you with anything?

A.   At varying points in time, I think, you know, the front office kind of had people who chipped in here and there to help with things.

Q.   Did you have an administrative assistant who was specifically assigned to you to be your administrative assistant?

A.   I had a special assistant.

Q.   Special assistant.

And was that Kieran?

A.   Yes.

Q.   And was Kieran assigned to anyone else or

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 57

just you?

A.   I think he was a floating special assistant.  He mostly helped me.

I don't know officially, exactly.

Q.   Did he keep your calendar?

A.   What do you mean by "keep" my calendar?

Q.   Did you have a calendar during the time that you were the DCOS at DHS?

A.   Yes.

Q.   And was that electronic or in hard copy?

A.   I think it was a mix, but it was electronic, for the most part.

Q.   Was -- were there, at times, also hard copy calendars?

A.   I don't -- I was handed a lot of documents.  It could have been that, you know, somebody put a calendar on my desk every once in a while.

Q.   Let me ask it a different way.

So at my law firm, there are some older attorneys who have spiral-bound physical calendars that they write all of their appointments and things like that.

Did you have one of those?

A.   No.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 58

Q.   There are also attorneys who keep things electronically, on an Outlook calendar or something like that.

Did you have an electronic calendar for all of your work-related appointments?

A.   Yes.

Q.   And did your special assistant have administrative access to that calendar, such that -- Kiernan?

A.   Kieran.

Q.   -- Kieran could add appointments and things like that to your calendar?

A.   Yes.

Q.   Okay.

A.   So -- Charmaine did too.

And I'm not sure who else did.  I think multiple people had access to my calendar.

Q.   Okay.  And you under- -- was it an Outlook-based --

A.   Yes.

Q.   And you don't know the full range of people who had administrative access, such that they could edit or add material to your calendar?

A.   I recall -- I think Charmaine and Kieran did for sure, but I'm not sure if more people had

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 59

access.

Q.   Are Charmaine and Kieran, to your knowledge, still working at DHS?

A.   I believe so.

Q.   You don't have any reason to believe that they've left?

A.   No.

Q.   They didn't follow you to State?

A.   No.

MS. LEONARD:  I think we've been going for about -- we've been going for about an hour.  I like to give the court reporter and the videographer short breaks.  So I think now is a good time.

Five minutes?  Is that sufficient?

VIDEOGRAPHER:  Off the record at 10:11.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 10:24.

BY MS. LEONARD:

Q.   Mr. Guy, before we broke, we were talking about your DHS-issued work phone.

I would now like to ask you some questions

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 60

about the personal phone that you had during the time that you worked at DHS.  Okay?

A.    Okay.

Q.    What was the phone number on that phone?

A.    On my personal phone?

Q.    Yes.

A.    ████████████████

Q.    And was that the same phone number the entire time you were at DHS?

A.    Yes, I believe it was.

Q.    And was it the same physical phone the entire time you were at DHS?

A.    I think so.  However, it's possible that early on at DHS, I may have switched.

I don't remember exactly.

Q.    If you changed physical phones during the time you were at DHS, was it prior to May 2025?

A.    I think so.

Q.    But you don't specifically recall upgrading or changing your phone?

A.    I don't remember exactly when, but I think that I did, shortly after I started at DHS.

Q.    Okay.  And it's shortly after you started at DHS in January 2025?

A.    Yes, ma'am.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 61

Q.   So it would have been well before, for example, December 1, 2025, if you had upgraded your phone?

A.   Yes.

Q.   And you did use your personal phone for communications that were related to DHS, at times. Correct?

A.   Yes.

Q.   Including the Signal app on your personal phone.  Correct?

A.   Yes.

Q.   Okay.  So you admit there were some -- at least some work-related Signal chats on your personal phone?

A.   I don't think that's how I would characterize them.

Q.   Why don't you look at your declaration, Exhibit 102.

In Paragraph 5, you say it was your understanding that Karen Evans was preserving any, quote, work-related Signal messages, including any from the FEMA 2.0 chat.

Let me ask again.

You would admit that there were work-related Signal chats on your personal phone.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 62

Correct?

A.   I wouldn't put it that way.  I would say that it's possible that there were work-related messages that could have been sent.

I don't think I would say that any one chat would be labeled as a work-related chat.

Q.   Even FEMA 2.0, you wouldn't consider that a work-related chat?

A.   I don't remember work that was discussed in FEMA 2.0.

Q.   FEMA 2.0 is a Signal chat that was on your personal phone.  Correct?

A.   Yes.

Q.   FEMA is a subagency of the Department of Homeland Security.  Correct?

A.   Yes.

Q.   "FEMA 2.0" is the name for the reorganized and reformed FEMA that was being proposed in the FEMA Review Council draft report.  Correct?

MR. GREAVES:  Object to form.

A.   I don't know that.

Q.   Do you know what "FEMA 2.0" stands for?

A.   It could have been a tongue-in-cheek term.

I don't want to speculate.  I don't --

Q.   Did you set up that Signal chat?

Page 63

A.   To the best of my knowledge, no, I did not.

Q.   Who did?

A.   I don't remember exactly.

Q.   Do you have any recollection?

A.   Of what?

Q.   Do you have any recollection of who set up the FEMA 2.0 Signal chat?

A.   I don't want to speculate as to who set up a chat that I don't know had how much to do with what work.

Q.   You were one of the participants in the FEMA 2.0 Signal chat that was on your personal phone.  Correct?

A.   Yes.  And there were many different communications and channels and emails and text messages and -- I -- it's difficult to remember the circumstances of one in particular.

Q.   And you had many other work-related Signal chats on your personal phone, so it's hard to remember this particular one?

                 MR. GREAVES:  Object to form.

A.   I did not say that.

Q.   I understand that there were many other modes of communication, but with respect to the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 64

FEMA 2.0 Signal chat, there were other participants beyond yourself on that Signal chat.  Correct?

A.    That's correct.

Q.    And it is your understanding that one of the participants would be the person who sets up the Signal chat.  Correct?

A.    I believe that's how it works.

Q.    Okay.  And who were the other participants in the FEMA 2.0 Signal chat?

A.    Karen Evans and Kara Voorhies.

Q.    So that's not that many people.  It's you, Karen Evans, and Kara Voorhies.

And you have an understanding that one of those three people set up that Signal chat.  Right?

A.    I suppose, but I don't recall exactly who.

Q.    And you believe that there are potentially messages on the FEMA 2.0 Signal chat that are not DHS and FEMA related?

MR. GREAVES:  Object to form.

A.    I don't remember.

Q.    The Signal app that you were using on your personal phone, your account listed you as "Joe Guy."  Correct?

A.    That sounds right.

Q.    And you communicated with Karen Evans on

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 65

Signal about FEMA-related matters using the Signal app. Correct?

A. I don't remember communicating about work-related items.

Q. You don't recall having one-on-one Signal chats with Karen Evans using your personal phone?

A. I may have. I don't remember if there was any work discussed.

Q. Karen Evans was not the only person at DHS who used Signal to communicate. Correct?

A. I don't think so.

Q. And Karen Evans is not the only person you were communicating with from your personal phone about FEMA?

MR. GREAVES: Object to form.

A. I don't recall.

Q. So this wasn't that long ago.

Is there a reason you can't recall who you were communicating with using Signal on your personal phone about FEMA?

MR. GREAVES: Object to form.

A. I just don't remember.

To be honest with you, FEMA wasn't the only thing I was working on. There were a lot of things that I was working on.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 66

And to remember particulars of these matters is not easy.

Q.   And you recently looked at your personal phone to see if you had communications about FEMA using the Signal chat, didn't you?

A.   Yes, I did.

Q.   Okay.  And that didn't help refresh your recollection as to whether you were using your personal phone to communicate on Signal about FEMA?

A.   There were no responsive documents that came up in a search of my Signal.

Q.   We'll come back to that.

On Signal, you can do individual, one-on-one communications or group chats.  Right?

A.   I think so.

Q.   You have used Signal for individual communications.  Correct?

A.   Yes.

Q.   Meaning, where you send a message to one person using their telephone number?

A.   Yes.

Q.   Okay.  You've also used it for group chats, like FEMA 2.0.  Correct?

A.   Yes.

Q.   Do you recall communicating with others at

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 67

DHS using Signal, individually, during the time you were at DHS?

A.   I am sure I did.

Q.   Corey Lewandowski, did you have his contact information in your Signal chat?

A.   Yes.

Q.   Kristi Noem, did you have her contact information in your Signal chat?

A.   Yes.

Q.   Kara Voorhies, did you have her contact information in your Signal chat?

A.   Yes.

Q.   What about Troup Hemenway; did you have his contact information in your Signal app?

A.   Yes.

Q.   Greyson McNeil, did you have his contact information in your Signal app?

A.   I don't know who Greyson McNeil is.

Q.   Do I have the name wrong?  Who's the chief of staff for the Management Directorate?  Greyson.

A.   You may be referencing "Greyson McGill."

Q.   "McGill," thank you.

Greyson McGill, did you have his information in your Signal app?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 68

Q.   Roland Edwards, did you have his information in your Signal app?

A.   I don't think so.

Q.   Okay.  You know Roland Edwards is the DHS CHCO?

A.   Yes.

Q.   Okay.  But you don't think you communicated with him using Signal?

A.   No.

Q.   What about Troy Edgar; did you communicate with him using Signal?

A.   Yes, probably.

Q.   Did you ever communicate with Troy Edgar about FEMA?

          MR. GREAVES:  Object to form.

A.   Troy was involved in a lot of different things.  As the deputy secretary, I'm sure that we discussed FEMA at some point.

Q.   Okay.  Group -- let's talk about group chats involving FEMA.

     So if I say "group chat," what I'm referring to is a message between more than two people.

     Does that make sense?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 69

Q.   Okay.  Is that how you use it, too?

Do you ever use the term "group chat"?

A.   Yes.

Q.   Okay.  So you -- we've talked about FEMA 2.0.

That was a group chat on Signal.  Correct?

A.   Yes.

Q.   And your testimony is the participants were Karen Evans, Kara Voorhies, and yourself?

A.   Yes.

Q.   Were there any other participants in FEMA 2.0?

A.   Not to the best of my recollection.

Q.   Okay.  You also participated in a group Signal chat called Winter Storm Team with respect to FEMA.

Do you recall that?

A.   Yes, but I don't remember who was in it.

Q.   Okay.  You anticipated my next question.

MS. LEONARD:  But let's mark some exhibits.

This is going to be 103.

(Whereupon, Plaintiffs Exhibit 103 was marked for identification.)

Q.   Okay.  Mr. Guy, you've been handed what

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 70

has been marked Exhibit 103.  I will represent to you that this is a document produced by Defendants to us, for which they have represented that this is a image taken of Karen Edwards' -- sorry, Karen Evans' personal phone, and it depicts a portion of FEMA 2.0 on Signal.

Do you see that?

A.   Yes.

Q.   Okay.  So this is the FEMA 2.0 group Signal chat that we've just been discussing?

A.   I think so.

Q.   Okay.  And this is only -- this -- what's depicted here in this image is only one part of a longer chat.  Correct?

A.   I think that's right.

MS. LEONARD:  Okay.  Let's mark this as the next, which will be 104.

(Whereupon, Plaintiffs Exhibit 104 was marked for identification.)

Q.   Mr. Guy, you've been handed what's been marked as 104.  This is another document that was produced to Plaintiffs by Defendants.

I will represent it is, again, an image taken of Ms. Evans' personal -- they represent it's an image taken of Ms. Evans' personal phone.

Page 71

This depicts a Signal chat called Winter Storm Team.

Do you see that?

A.   Yes.

Q.   And did you participate in the Winter Storm Team FEMA chat -- sorry -- group chat on the Signal app?

A.   I don't remember.

Q.   Okay.  If you were to look at your personal phone, would it contain the group chats that you participated in as -- during the time that you were at DHS?

A.   What do you mean by "participate"?

Q.   If you look at the top of this chat, there is a depiction of the two little icons for people. Right?

If you click on the group chat, it will show a list of participants, meaning individuals who have been either the recipient or a sender, I believe, of messages.

Does that make sense?

A.   Yes, but it could be passive participation or active participation in sending messages.

Q.   Sure.

Or have been -- I believe, on Signal, you

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 72

have to be added to a group chat through some mechanism.  Correct?

A.    I think that's right.

Q.    Okay.  Do you know whether you were ever added to the Winter Storm Team group chat on Signal?

A.    I have a vague recollection of being added to that chat.

Q.    Are you the person who always added your Signal account to group chats, or did someone ever do that for you?

A.    I don't remember exactly.

Q.    Did you give your special assistant, I believe is the term you used, the authority to take any actions on the Signal chat on your personal phone?

A.    No.

Q.    So if you were added to a group chat on your personal phone on Signal, you are the person who would have taken that action?

MR. GREAVES:  Object to form, foundation.

A.    Can you repeat the question?

Q.    Sure.  Let me ask it in a different way.

Do you understand that if you were going to be added to a group chat on Signal, you can

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 73

either request to be added or someone could request that you be added?

So you could either send the request or receive it.

Does that make sense?

A.   I think -- and again, I'm not an IT expert -- but I think anyone can be just added into any group at any point.

I don't think that it's always necessary to request that someone be added.

Q.   You have to confirm that you accept being added.  Correct?

A.   Again, I'm not an IT expert, but I don't think that that's true.

Q.   Either way, you don't recall whether or not you were a participant in the Winter Storm Team group chat?

A.   I think it's likely that I was.

Q.   And do you recall that within a group chat, you can see -- generally, there's a notation of the dates that people are added to the group chat?

A.   I don't know that.

Q.   I'll go back to my prior question about your personal phone.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 74

If you were to look at your personal phone, would that contain a record today of all of the group chats that you participated in while you were at DHS?

A.   I don't know that it would.

Q.   And why -- is there a reason it wouldn't?

A.   Because I did not maintain my Signal messages.  I did not preserve them on my personal phone.

Q.   Did you delete any messages yourself on your personal phone?

A.   I did not delete any -- do not recall deleting any work-related message on my personal phone.

Q.   Do you recall deleting any Signal messages on your personal phone, whether they were work related or not?

A.   I do not recall deleting any work-related messages on my personal phone.

Q.   I'll ask you the -- slightly different question.

Do you recall deleting any messages that were sent or received during the time you were at DHS on your personal phone?

A.   I don't recall specific instances where I

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 75

deleted anything.  I did not intentionally delete any work-related messages on my personal phone.

Q.    Do you recall whether you intentionally deleted any messages in the Signal app on your personal phone?

A.    I don't recall.

Signal is designed to be....

If you sneeze around Signal, you lose messages.  It's....

There's -- people set up weeklong disappearing messages.  They set up monthlong disappearing -- one-day.

If Signal gets updated, you lose your message.  If you get a new phone, you lose your messages.  If you reinstall Signal, you lose your messages.

I did not preserve my Signal messages on my personal phone.

Q.    Do you recall whether you actually deleted or archived any chats that you participated in, after you left DHS?

A.    I don't recall.

Q.    Do you believe that the Winter Storm Team group chat is still on your personal phone?

A.    I don't believe that it is.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 76

Q.    How -- if you participated in the Winter Storm chat back in -- at some point during your time around the winter storm, which was in January 2025 [sic], how would that chat have been deleted from your personal phone?

MR. GREAVES:    Object to form, foundation.

A.    I don't recall deleting any work-related message off of my personal device.

Q.    So I'm going to distinguish between messages, which are the individual messages within a chat, and the entire chat.    And I'm going to start with the entire chat.

Do you know what I'm talking about, when there are chats listed in your Signal app?

A.    Um-hum.

Q.    You can archive those chats.

A.    I did not schedule my own meetings, for the most part.    I did not do my own paperwork, for the most part.

If there was work being done, if there's any work-related archiving that needed to happen, I was -- it was my understanding that someone else would have archived it.

Q.    But you didn't give your personal phone to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 77

someone else to archive material on your personal phone.  Correct?

A.    No.

Q.    How did the Winter Storm Team Signal chat disappear from your personal phone?

A.    I don't remember exactly.

Q.    Okay.  You also were a participant in a group chat called the FEMA Rapid Response.

Do you recall that?

A.    Not particularly.

MS. LEONARD:  Okay.  Let's mark this as 105.

(Whereupon, Plaintiffs Exhibit 105 was marked for identification.)

Q.    Mr. Guy, you've been handed 105.

This is another image of Karen Evans' personal phone, as represented by counsel for the government.

You can see the top of this Signal group chat is called "FEMA Rapid Respon."  I'm going to assume that's "Response."

Do you recall what the actual name of this group chat was?

A.    I don't remember this particular group chat.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 78

Q.   Were you a participant in it?

A.   I don't remember.

Q.   If you were to click on the list at the top, the icons, that should show the participants. Correct?

A.   I think so.

Q.   Do you know whether your personal phone has FEMA Rapid Response as a group chat in your Signal app currently?

A.   I don't remember.

Q.   If you looked at your phone, would it show the group chats that are contained in your Signal app today?

A.   It might.

Q.   You still have the Signal app on your personal phone today?

A.   I believe I do.

Q.   And that was part of what was searched by counsel for Defendants pursuant to the court order?

A.   I believe it was.

Q.   And it was part of what you self-searched when you searched your own phone?

A.   Yes.

Q.   And were you looking for group chats that pertain to FEMA?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 79

A.   So when I searched my own phone, I searched the terms "CORE," c-o-r-e, "renew," and I think "staffing plan."

Q.   You didn't look at the names of the group chats listed in your Signal app to remember whether those pertain to FEMA or not?

A.   No, I didn't do that.

But I believe that when my phone was searched for nearly two hours, a couple of days ago, I think that they did a much more exhaustive term search while they were at my house.

They did much more than just "renew," "CORE," and "staffing plan."  And I believe that they included the term "FEMA" when they searched through all of the different apps that they searched through on my personal device.

Q.   Let's start with the search that you performed.

When did you first search your personal phone for any content related -- in response to this litigation?

A.   I don't remember.

I remember that I was asked to do a search, and I believe it was Thursday evening of last week that I sat down and searched these terms.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 80

And that's what I remember.

Q.   Okay.  If you look at your declaration --
it's Exhibit 102.

The declaration says the date that you
performed a self-search.

Do you see that?

A.   Yes.

Q.   Okay.  Was it April 29?

A.   Was that last Thursday?

Q.   April 29, I believe, was last Wednesday.

A.   Okay.  Then it was last Wednesday.

Q.   Okay.  So this was -- you intended for
your declaration to be accurate when you signed it.
Correct?

A.   Yes.

Q.   Okay.  So do you recall ever searching
your personal phone for communications related to
this litigation before that search on April 29?

A.   I don't remember.

Q.   It's possible you may have?

Or you don't believe that you did?

A.   It's possible that I may have.

Q.   You didn't -- do you recall finding any
responsive communications on your phone prior to
April 29?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 81

A.   Absolutely not.  And, in fact, I don't remember communicating about CORE employees on my personal device besides whatever the -- I didn't recall that when it came up, that -- whatever responsive document came up today.

I do not recall communicating about CORE employees at all on my personal device.

I recall communicating it -- about it on my official devices, which is where I did my work, but not on my personal device.

Q.   Do you recall searching for documents on your personal device at any point in time prior to April 29?

MR. GREAVES:  Asked and answered.

A.   Not particularly.

MS. LEONARD:  Okay.  Let's look at a couple more group chats.  This one will be 106.

(Whereupon, Plaintiffs Exhibit 106 was marked for identification.)

Q.   Okay.  This -- you've been handed 106. It's a group chat on Signal; again, an image of Karen Evans' phone that -- as represented by Defendants' counsel.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 82

This one is called "FEMA HQ."

Do you see that at the top?

A.   Yes.

Q.   Does that look familiar to you?

A.   I couldn't say.

Q.   Do you know whether you participated in this?

A.   I don't remember.

Q.   If -- you understand that if someone were to click on the icons there, it should show the participants in this FEMA chat.  Correct?  Sorry. In this group chat.

A.   Yes.

Q.   This one involves Micah Bock, Tricia --

I'm going to ask whether Tricia is a person who worked in the press office with Micah Bock at DHS.

Is there a Tricia?

A.   I'm assuming this is Micah Bock and Tricia McLaughlin.

Q.   Tricia McLaughlin was the DHS spokesman until relatively recently?

A.   I don't remember exactly when she left.

Q.   And Joseph Mazzara is also someone who is at DHS.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 83

A.   Yes, ma'am.

Q.   And if there were a group chat pertaining to issues between FEMA and headquarters involving Micah Bock and Tricia McLaughlin, is it likely that you would have been on that chat as well?

A.   Yes, I -- it's likely that....

I don't recall starting this chat.  I don't recall being added to it.  I don't recall anything that was discussed in it.

Q.   And if you look back at 105, which is FEMA Rapid Response -- you see that? -- do you know who Andrew Ott is?

A.   Can I read this really quick.

(Witness reading.)

A.   Andrew Ott was, at different points, a deputy assistant secretary in the Office of Legislative Affairs, covering the Senate, I believe.

And then he was or is, I don't know -- but at some point, he became the acting assistant secretary for legislative affairs.

Q.   For all of DHS, not just FEMA?

A.   Yes.

Q.   So this Rapid -- FEMA Rapid Response group chat includes individuals from DHS headquarters. Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 84

A.   It appears that way.

Q.   And at the bottom, it looks like the message that's cut off is addressed to Micah and Tricia.

Do you see that?

A.   Yes.

Q.   Okay.  So again, if there were group chats that involved individuals at DHS headquarters pertaining to FEMA and press coverage, for example, is it likely that you would have been included in those?

A.   I don't know.  I wasn't always -- I wasn't that involved with press stuff.  It's very possible, but....

Q.   There are times when you were involved with determining how to respond to the press with respect to questions about FEMA CORE employees. Correct?

A.   I think that they liked to just made -- make sure that I had eyes on things.  I don't think I was very substantively -- "substantively," sorry -- involved with things like that.

Q.   Sometimes you were asked to actually approve the responses?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 85

MS. LEONARD:  Okay.  Let's mark this the next.  This is 107.

(Whereupon, Plaintiffs Exhibit 107 was marked for identification.)

Q.  So, Mr. Guy, you've been handed Exhibit 107, which is another image of what Defendants have represented is Karen Evans' personal phone.  And this one depicts a Signal message to Joe Guy.

Do you see that?

A.  Yes.

Q.  And what is your understanding of what is depicted here?

A.  It's a chat with me and Karen.

Q.  Work related.  Correct?

A.  It appears that way.

Q.  So does this help refresh your recollection that you did have one-on-one communications on the Signal app on your personal phone with Karen Evans that were work related?

MR. GREAVES:  Object to form.

A.  It was my understanding that if there was anything to come up that was work related, that it would be archived, or whatever the official process is, by someone else.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 86

Q.   Not my question.

My question is:  Does this refresh your recollection that you did have communications with Karen Evans on your personal phone using the Signal app that were work related?

A.   I did not -- I did not deny that there is a possibility that work-related issues may have come up.

Q.   And do you see the message at the top that says "one week," the little clock?

A.   Yes.

Q.   What's your understanding of what that means?

A.   That expiring messages were probably set to one week.

Q.   So if I told you that Defendants have represented that this image was taken on April 29, the photo of her phone, and the messages that are depicted here are listed in January and February of 2025 [sic], would that indicate to you that someone changed the settings for this communication to delete after one week at some point after January and February?

MR. GREAVES:  Object to form, foundation.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 87

A.   I'm sorry.  Can you repeat the question?

Q.   Are you aware that, in Signal, if someone changes the auto-delete setting on a particular chat, that the messages from before that change are maintained?

A.   I suppose that I am.

Q.   And so, looking at this image, if I were to tell you that Defendants have represented that the photograph of Karen Evans' phone was taken on April 29 -- the messages depicted here, you see, are from January and February of 2026.

Do you see that?

A.   I can see that.

Q.   And so, would you understand, from looking at this, that the one-week auto-delete was a setting that must have been made at some point after January or February of 2026?

MR. GREAVES:  Object to form, foundation.

A.   It could have been turned on before.  It could have been turned off for a period of time.  It could have been turned on after.

I don't know.

Q.   This is a one-on-one communication between you and Karen Evans.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 88

A.   I believe it is.

Q.   And did you ever set the auto-delete function for those communications to any period of time?

A.   I don't remember.

Q.   Is it possible that you set the communication auto-delete for one week for these communications?

A.   It's possible.

Q.   Do you recall setting the deletion for these communications to one week at some point after February 9, 2026?

A.   I don't recall.

Q.   Is it possible?

A.   It's possible.

Q.   No one else was delegated, by you, the ability or authority to change the auto-delete settings on the Signal apps on your personal phone. Correct?

A.   No.

Q.   No, that is correct, no one else had that authority?

A.   No, they did not.

Q.   Do you know whether Karen Evans changed the setting after February 9?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 89

A.   I don't recall.

Q.   It must have been one of the two of you.
Correct?

MR. GREAVES:  Object to
foundation, form.

A.   Yes.  It must have been one of us.

Q.   Do you recall whether that was changed to
auto-delete after one week before or after you left
DHS?

MR. GREAVES:  Object to form,
foundation.

A.   I don't recall.

Q.   Do you know whether, on your personal
phone, sitting here today, you have record of any
one-on-one communications in Signal with Karen
Evans?

A.   I don't.

Q.   You don't have record of them, or you
don't know?

A.   I don't have record of them.
Again, if there was any work-related item
that came up on my Signal, it was my understanding
that someone other than myself would have been
keeping records.
And it appears that someone was keeping

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 90

records.

Q.  Is there any record of the chat at all on your personal phone?

A.  No.

Q.  Did you delete it at some point in time?

A.  I did not delete -- I do not recall deleting any work-related item on my personal phone.

Q.  Did you delete the chat between you and Karen Evans on your personal phone?

A.  I do not recall.

Q.  It's possible that you did.

MR. GREAVES:  Object to form.

A.  When Signal gets updated or reinstalled or anything like that, messages get lost.

And I did not think, because we did work through official channels, that I had to preserve personal Signal messages.

Q.  Do you believe that the entire chat with Karen Evans that was on your personal phone in Signal was deleted because Signal was updated?

A.  I don't know.

Q.  Do you believe that it was deleted because it was reinstalled?

A.  I know that it was deleted because it was reinstalled.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 91

Q.   When was Signal reinstalled on your personal phone that led to the deletion of the chat with Karen Evans, Mr. Guy?

MR. GREAVES:  Object to form.

A.   I, on Friday night, reinstalled Signal on my phone because I read that you could restore your messages.

And in an effort to show that I had nothing to hide, because there were no responsive documents in my phone, I tried to restore Signal, and I reinstalled it.

And I didn't have the 60- -- because I'm not an IT expert, I didn't have the 60-number key, or whatever it is, to restore the Signal messages. And it just wiped everything out again.

And I'm not -- again, I don't think -- it was my understanding that someone else would be archiving anything that came up work related on a Signal message.

Q.   What time on Friday did this happen?

A.   I don't remember exactly.

Q.   Friday night?

A.   I think so.

Q.   After you learned of the court's order?

A.   I had already self-searched my phone.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 92

Q.   After you learned of the court's order telling you to bring the phone to this deposition and to allow Defendants to search it.  Correct?

A.   It was before that.

Q.   You wiped out the entire content of your personal phone and the Signal chats before you received the court's order requiring you to bring the phone to this deposition?

MR. GREAVES:  Objection to form, foundation, facts not in evidence.

A.   That's not how -- I didn't -- I didn't have these messages before that, anyways.

Q.   Did you take this action to reinstall the Signal app before or after you knew about the court's order, Mr. Guy?

MR. GREAVES:  Objection; asked and answered.

A.   Before.

Q.   Why were you taking the action to reinstall the Signal app if you had already searched your phone, Mr. Guy?

A.   I wanted to restore my Signal so that I could show that there was not anything on my personal phone.

Q.   You had already given a declaration to the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 93

court.  Correct?

A.  Yes.

Q.  What evidence do you have -- what documentation do you have of the time at which you took these actions on your phone?

A.  I don't know.

Q.  Did you communicate with counsel?

A.  I let them know after the fact.

Q.  How soon after the fact?

A.  The next day.

Q.  You didn't immediately tell counsel you had wiped out the entire content of your phone?

MR. GREAVES:  Objection; form, foundation, facts not in evidence.

A.  I didn't -- I did not wipe out the entire content of my phone.

Q.  Sorry.

You didn't immediately tell counsel you had reinstalled the Signal app and deleted the content of your Signal chats on your personal phone?

MR. GREAVES:  Objection; form, foundation, facts --

A.  I did not --

COURT REPORTER:  Wait a minute.

Could you repeat your objection.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 94

MR. GREAVES:  Form, foundation, facts not in evidence.

A.    I did not -- I do not recall deleting any work-related message on my personal device.

Q.    Not my question, Mr. Guy.

You did not immediately tell counsel that you had reinstalled the Signal application on your phone on Friday, resulting in the deletion of some of the content within the Signal --

MR. GREAVES:  Objection to form.

MS. LEONARD:  I'm not done with my question.

MR. GREAVES:  Okay.  Finish your question.

Q.    Mr. Guy, you did not immediately -- is it your testimony that you did not tell counsel that you had taken this action to reinstall the Signal app on Friday until Saturday?

MR. GREAVES:  I'm going to just clarify, because you changed the question.

MS. LEONARD:  Is that an objection?  Is that an objection?

MR. GREAVES:  I'm going to object to form, foundation, facts not in evidence, and ask you to repeat the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 95

question.

Q.   Did you hear my question?

A.   Can you repeat the question?

Q.   Did you not tell counsel that you had taken this action with respect to the Signal app, to reinstall it and thereby delete content within the Signal app, until Saturday?

MR. GREAVES:  Objection to form, foundation, facts not in evidence.

A.   I did not intentionally delete any work-related message on my personal device.

Q.   That is not my question, Mr. Guy.

Did you not tell counsel about this until Saturday?

A.   I don't remember.

Q.   You just testified previously you told them Saturday.

That wasn't -- now you don't remember?

A.   Maybe it was Saturday.

Q.   Did counsel tell you on Friday about the order from the court requiring you to bring your personal phone to this deposition today?

A.   I got an email --

MR. GREAVES:  Object to any attorney-client privileged communications

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 96

between Mr. Guy and his DHS counsel.

A.   I got an email on Saturday letting me know that I was ordered to bring my phone.

Q.   That was the first you had learned of the court's order, was on Saturday?

A.   Yes.

Q.   And you had taken these actions to reinstall the Signal app after you provided a declaration to the court explaining that you had self-searched?

MR. GREAVES:  Object to form.

A.   Yes.

MS. LEONARD:  We're going to take a break.

VIDEOGRAPHER:  Off the record at 11:14.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 11:29.

BY MS. LEONARD:

Q.   Mr. Guy, do you have anything from your prior testimony that you need to correct?

A.   Do you have any ideas?

Q.   Is there anything that you told me before we took a break that was inaccurate, Mr. Guy?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 97

A.   I don't believe so.

Q.   I'm giving you the opportunity -- you're testifying here today under penalty of perjury.

Do you understand what that means?

A.   Yes.

Q.   Okay.  Let's go back in time and -- so I understand this timeline exactly.

You did a self-search of your personal phone on April 29, according to your declaration.  Correct?

A.   Yes.

Q.   And you used the terms "renewal," "CORE," and "staffing plan."  Correct?

A.   Yes.

Q.   And at that time, there was content in your Signal app that included chats with other individuals from your time at the Department of Homeland Security.  Correct?

MR. GREAVES:  Objection; foundation.

A.   There was nothing responsive that came up at that time.

Q.   Different question.

At the time on April 29, when you searched your personal phone, there were still chats in your

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 98

Signal app that included content from your time at the Department of Homeland Security.  Correct?

MR. GREAVES:  Objection; form and foundation.

A.   I don't think that there was.

Q.   When you reinstalled the Signal application on Friday, May 1, you previously testified that that resulted in some content in your Signal application being deleted.

MR. GREAVES:  Objection to form --

Q.   Do you recall that --

MS. LEONARD:  I am not finished with my question.

Q.   Do you recall that, Mr. Guy?

MR. GREAVES:  Objection to form and mischaracterizes testimony.

A.   I don't think that that's what I said.

Q.   We were talking about specific chats in your Signal app, including the chat that you had which recorded communications with Ms. Evans.

Do you recall that?

A.   Yes.

Q.   And including Exhibit 107, which contains work-related communications that you had with

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 99

Ms. Evans regarding the CORE.

Do you see that?

A.  Yes.

Q.  And you testified that you took some action on Friday, May 1, that resulted in content in your Signal application being deleted.

A.  I don't know --

MR. GREAVES:  Wait, wait, wait.

Are you done with your question?

MS. LEONARD:  Go ahead.

MR. GREAVES:  Objection to form, foundation, facts not in evidence, and mischaracterizes testimony.

Q.  Go ahead.

A.  There was not already on my phone -- as I said in my statement, I did not preserve my Signal messages.  They were not there when I did my self-search.

It did not change when I reinstalled the app.

Q.  There were no Signal messages -- there was no -- there were no chats depicted in your Signal app when you did your self-search?

A.  I don't know if there were no chats, but there were no responsive documents from any of the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 100

search terms that I used.

Q.   That is a different question.  That is --
I understand that you're saying there are no
responsive communications.

But were there actual messages in chats on
your phone when you did that search?

A.   Not from any of these groups.  The
messages were not there.

As I said in my statement, I did not
preserve those messages.

Q.   And you were attempting, on Friday, to
restore them from backups when --

MR. GREAVES:  Object --

Q.   -- you reinstalled the Signal application.

Is that your testimony?

MR. GREAVES:  Object to form.

A.   I read that you could restore messages.

And since there was nothing already there,
I didn't think that -- I did not intentionally
delete any work-related Signal message.

Q.   You read that you could restore messages.

So were you attempting to take some action
to restore messages on Friday?

A.   I think that was my intent.

Q.   Because there may have been FEMA-related

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 101

communications in those chats.  Correct?

A.    I am not an IT expert.  I don't recall.

Q.    And so, you -- the action you were describing earlier was an attempt to restore, from a backup on your iPhone, certain messages within the Signal application.  Is that correct?

A.    I'm not an IT expert.  I don't know how it works.  I had read that you could -- there was a way to restore messages.  And I thought I would try, and it didn't end up working.

Q.    And what happened as a result of the actions that you took on Friday with respect to the content in your Signal application?

A.    Nothing substantive, because I did not preserve my Signal messages.  As I have testified, they were not there.

Q.    Do you believe that something happened with respect to the backups?

A.    I don't know.  I'm not an IT expert.

Q.    So when you were testifying earlier that you reinstalled the Signal application and something happened that you told counsel about the next day, what was the "something"?

A.    I think I just told them that I attempted to reinstall it, and then all of, you know, the -- I

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 102

wasn't able to do it.

Q.   Explain to me more.

What exactly did you tell counsel on Saturday about what had happened to your phone?

MR. GREAVES:  Objection.

And you're not --

I'm not going to allow him to discuss attorney-client privileged communications.

Q.   What exactly did you tell counsel for the government on Saturday had happened with respect to the communications on your phone?

A.   I don't remember.

Q.   You don't remember what you told them?

A.   Counsel knew already that I did not preserve my Signal messages.

As it says in my statement, they were not there.  There was nothing there already.

Q.   You were attempting to restore some sort of backups of your Signal messages, correct, on Friday?

A.   That was the idea.

Q.   And the idea was because there may have been something in those backups that might have been responsive.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 103

A.   That is not the idea.

The idea was to show that there was not things that were responsive, to show you that I did not communicate about CORE employees on my personal device, that it was done on my official devices.

That is -- that was the intent.

Q.   That was the intent.

But you actually did communicate on your personal device, correct, as Exhibit 1- --

A.   And if --

Q.   -- as Exhibit 107 shows.  Correct?

MR. GREAVES:  Object to form, foundation.

A.   And as I have said, if there was work communications that came up on a personal device, it was my understanding that someone else would be the one who would document it.

And it is my understanding that they have and that you have it.

Q.   How do you know, if you deleted the backups, Mr. Guy, what was in your Signal chats, if you can't remember sitting here today?

MR. GREAVES:  Objection to form, foundation, facts not in evidence.

A.   I did not delete -- I do not recall

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 104

deleting any work-related message or item on my personal phone.

Q.   You reinstalled the Signal -- you attempted to reinstall the Signal application on Friday, and it's your testimony that you did that before receiving information about the court's order.  Correct?

A.   Yes.  And it is also my testimony that, as I said in my statement -- I believe it was Wednesday night -- I did not maintain my Signal messages.  I did not have them as records.

Q.   It's possible you had some backups on your iPhone that contained the content of those Signal chats.  Correct?

                    MR. GREAVES:  Objection to
          foundation.

A.   I don't think so.

Q.   But you did something on Friday that caused that material to be deleted from your phone. Correct?

                    MR. GREAVES:  Objection;
          foundation, facts not in evidence.

A.   I don't think that anything new was -- or relevant was deleted from my phone.

          And I do not recall deleting any

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 105

work-related item from my phone.

Q.   That's not my question, Mr. Guy.

You caused the backups somehow to be deleted from your phone.

Is that what you're saying?

MR. GREAVES:  Objection; form, foundation, facts not in evidence.

A.   I am not an IT expert.

I don't -- I didn't delete any backups.  I don't know that I had any backups.

That may be the issue.

Q.   But you reinstalled the Signal application on Friday, or you attempted to?

A.   Yes, but there was no Signal messages, prior to that, that I had saved, as I testified.

Q.   What happened -- what did it say on your phone when you took these actions on Friday with respect to the Signal application?

A.   I don't remember.  I'm not an IT expert.

Q.   And what did you tell the government on Saturday about what you had done?

A.   I don't remember exactly if it was Saturday or Sunday.  It could have been either day.

And I think I just mentioned, hey, you know, it's -- I tried to reinstall my device -- or

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 106

Signal on my device, and....

That's it.

Q.   And what did they tell you in response?

A.   Isn't that....

MR. GREAVES:  Objection.

Q.   No, it is not.  Your communications with government counsel are not attorney-client privileged over the weekend.

Please tell me everything government counsel or the IT person who was at your phone [sic] told you about what you had done to your phone.

A.   I don't think anyone said anything.

Because it didn't matter, because the messages were already not there.

Q.   Please tell me what they had said to you -- what they said to you about the actions you had taken with respect to attempting to install the Signal app on Friday.

MR. BOMBARD:  Objection --

MR. GREAVES:  Objection; asked and answered.

MR. BOMBARD:  Objection; asks for attorney-client -- or attorney work product.

Instruct the witness not to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 107

answer.

Q.   That is -- please tell me everything that government counsel told you about what -- the actions you had taken with respect to reinstalling the Signal app on your phone.

                    MR. GREAVES:  Asked and
          answered.

                    MR. BOMBARD:  Objection --

                    COURT REPORTER:  Wait a minute.
          One at a time to make your objections,
          please.

                    MR. BOMBARD:  Yes.  Objection;
          attorney work product doctrine.

                    Instruct the witness not to
          answer.

                    MS. LEONARD:  There is no basis
          for attorney work product with respect to
          your communications with this witness,
          with respect to his efforts to destroy
          evidence on his phone.

                    And that is a completely -- if
          you're going to insist on that
          instruction, we're going to call the judge
          right now.

                    Do you want Judge Illston to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 108

know about this?  Or are you going to withdraw the objections?

MR. HALL:  We're happy to confer with the witness regarding whether there is anything responsive that would be covered by the attorney work product doctrine, but I think we would need to have that conversation before anything further can happen.

MS. LEONARD:  That's not going to happen.  That's not a privileged communication either.

MR. GREAVES:  I'm also just going to object to your characterization of destroying evidence.  But, go ahead.

BY MS. LEONARD:

Q.   Please tell me everything that the government said to you about the actions that you took with respect to your phone on Friday.

A.   I don't remember them saying anything about it.

I don't think that they thought it was a big deal because there were already no Signal messages, as I attested.

Q.   Were you able to retrieve any of the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 109

backups?

A.    No.

MR. GREAVES:  Objection;
foundation.

Q.    And why is that?

A.    I don't know.  I'm not an IT expert.

Q.    But you were attempting to do that?

A.    Yes.

Q.    And as a result, something happened to the content of your Signal application.  You testified to that earlier.

MR. GREAVES:  Objection; form, foundation, mischaracterization of testimony.

A.    Can you repeat the question?

Q.    Something happened to the content of your Signal application after you attempted to reinstall it.  Is that correct?

MR. GREAVES:  Objection; form, foundation, mischaracterization of testimony.

A.    I wasn't able to recover and....

Again, I don't think that this -- there would have been nothing relevant on it anyway, as I testified on Wednesday, because I did not save my

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 110

Signal messages.

Q.    When you searched your phone on Wednesday, April 29, for the term "CORE," did you discover any texts that contained the word "CORE"?

A.    Yes.

MS. LEONARD:  Okay.  Let's mark this as the next.

(Whereupon, Plaintiffs Exhibit 108 was marked for identification.)

MS. LEONARD:  Which I believe is Exhibit 108.

Q.    You've been handed Exhibit 108, which is a document that was provided to us by counsel for the government.

As you can see, this appears to be a depiction of some texts that include the word "CORE" and "FEMA."

Do you see that, on the second page?

A.    Can I have a minute to read this, please?

Q.    Sure.

(Witness reading.)

A.    Okay.

Q.    This is a text -- well, Mr. Guy, why don't you tell me what this image is?

A.    This is a text between me and Ken, where

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 111

he reaches out to me and asks me if I discussed the existence of the fraud division.

And then I tell him that I checked in with Karen about it and that COREs are being extended for the next three months, I think, but we can discuss next week.

Q.   Who is Ken?

A.   Ken is a man that I've known for a few years.

I did not know that he worked at the agency, and someone, I guess, put me in touch with him, saying he wanted to talk to me, or he needed to talk to someone about an issue he was having.

And I think he called me and told me about the fraud division, which I had no idea existed.

And then I told him that I would talk to Karen about it.

And I think that was that.

Q.   I'm sorry.  Who is Ken, and where did he work at the time of these messages?

A.   It is my understanding that Ken was a career federal employee working in the fraud division at FEMA at the -- at that time.

Q.   And why were you saying to him:

COREs are being extended

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 112

for the next three months.  We can discuss that next week.

A.   I said, "I think."

Because he -- I think what he was concerned about was that there was a number of people in the fraud division that were COREs that could have been nonrenewed.

Q.   And you provided this -- did you take the picture of your phone that's depicted here?

A.   I don't think so.  I think that was taken by the technician.

Q.   On Sunday?

A.   On Sunday.

Q.   But you found this text when you ran the search for the word "CORE" on your personal phone on April 29?

A.   I did.

Q.   And did you provide it to government counsel?

A.   I did.

Q.   Did you do that by way of a screenshot?

A.   Yes.

Q.   So you took a picture using your -- when I say "screenshot," I mean -- and I'm not a technical expert either.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 113

I push the buttons that takes a picture using the same phone.  Is that correct?

A.    Yes.

Q.    And you sent that to government counsel?

A.    On -- I believe it was Wednesday night.

Q.    Did you send government counsel any other material you had found from your personal phone at that time?

A.    That was the only responsive document that came up.

Q.    When you searched for the word "CORE" on your personal phone?

A.    Or "renew" or "staffing plan."

Q.    And it came up -- this is a text.  Correct?

A.    Yes, ma'am.

Q.    And you also, at the time, searched the messages that were in your Signal chat?

A.    Yes.

Q.    And how did you do that, as a technical matter?  Did you search individual chats, or did you search the application somehow?

A.    I did it the same way that I did it in the text application.

I believe there's a search bar, and I

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 114

believe that I typed the words into the search bar and looked to see if there was anything responsive.

Q.   Did you come up with those words yourself, or did someone give them to you?

A.   Someone gave them to me.

Q.   And did you think, hmm, there may be other material related to FEMA in here that doesn't use those terms.

Did that occur to you?

A.   No.

Q.   Okay.  And you did not see, in response to your search, the communications that are depicted in, I believe it's Exhibit 107, which used the word "CORE" in your communications with Ms. Evans.  Is that correct?

A.   As I've previously stated, they did not come up because I did not have the messages.

And as I said in my statement on Wednesday, I did not preserve my Signal messages.

Q.   At any time on April 30, the day after you ran this self-search, did you provide your phone to anyone to run a search on it?

A.   I'm sorry.  Can you repeat that?

Q.   Sure.

At any time on April 30, after you

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 115

performed a self-search on April 29, did you provide your phone to run a search on it?

A.    On April 30?

Q.    Um-hum.

A.    I don't think so.

Q.    Okay.  At any time on May 1, did you provide your personal phone to anyone else to run a search on it?

A.    No.

Q.    At any time on May 1, which is the day after you ended your employment at the State Department, did you have any communications with government counsel?

A.    I don't remember.

Q.    On Friday, April -- sorry -- on Friday, May 1, you don't recall whether or not you had any communications with government counsel?

A.    I don't remember.

Q.    Did you tell them, you know, I'm going to try to find the backups on my phone?

MR. GREAVES:  Objection; form.

A.    No.

And again, it wouldn't have changed anything because I didn't preserve my Signal messages.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 116

Q.   If you didn't preserve your Signal messages, Mr. Guy, why were you looking for the backups?

MR. GREAVES:  Objection; form, foundation.

A.   In case I could have gotten them.

As I've already stated, I would have liked to have been able to search and to show you that I did not discuss COREs on my personal device.

Q.   And it's your testimony that you were doing this after giving this declaration to the court before you knew about the court's order that you appear here today with your personal phone?

A.   Absolutely.

Q.   Had you had any conversations with anyone about -- other than government counsel or your personal counsel -- about your deposition on May 1?

A.   I don't recall.

Q.   Did you talk to anyone on May 1 before -- about the fact that you were going to try to retrieve those backups before you did it?

A.   No, ma'am.  I remember getting an email on May 1 at some point -- it may have been early afternoon -- from counsel saying that this is what's been ordered.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 117

Q.   You got that email on May 1?

A.   No, I got that email on Saturday.

Q.   May 2?

A.   I think so.

Q.   And that was before you -- or after you had talked to personal counsel?

A.   That was before, because I got in touch with personal counsel immediately after I received that email.

Q.   Had you had any communications with government counsel from the morning of May 1 until you got that email on May 2?

A.   No, not to my recollection.

Not to my recollection.

Q.   DHS was not your first government position.  Correct?

A.   No, ma'am.

Q.   You're aware that government agencies and employees have obligations to preserve records under federal law.  Correct?

A.   Ma'am, I am not a lawyer.

And as I've stated previously, I didn't do any of my own -- or -- well, I'll say most of my administrative work.

I had people who did most of my paperwork.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 118

I had people who did most of my -- all of my travel documentation and arrangements.

I had people who did, you know, my scheduling; and, furthermore, people who maintained my records on my official devices.

To the extent that there was any work done on my personal devices, it was my understanding that someone else would be handling that.

Q.   Despite the fact that you did not give authorization or access to your personal phone to anyone else, as you've previously testified. Correct?

A.   Again, ma'am, I'm not a lawyer.  I don't know how these processes work.

Q.   You're a smart guy, Mr. -- Mr. Guy.

You're aware -- let me go back to the original question:  You're aware that government employees had obligations to preserve records under federal law.  Correct?

A.   Yes, ma'am.

Q.   So in every federal job you've had, someone -- when they onboard you, they give you information about your obligations to maintain personal -- to maintain records of your communications.  Right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 119

A.   I don't remember exactly, ma'am.  There's a lot that happens when you are onboarding.  It's grueling, hours and hours of materials and PowerPoints and....

I don't remember everything that has happened every time I've onboarded somewhere.

Q.   But you've heard of FOIA.  Right?

A.   Yes, ma'am.

Q.   And you've heard of the Federal Records Act?

A.   Yes, ma'am.

Q.   You've also heard of the Privacy Act. Right?

A.   I couldn't tell you what -- what's in it.

Q.   Okay.  During the time that you were at DHS, you were aware the DHS has policies about preserving federal records.  Correct?

A.   Yes.

Q.   Okay.  And you did not take any steps yourself to preserve any communications that were made on your personal phone.  Correct?

MR. GREAVES:  Object to form.

A.   I don't think that I did.

Q.   And in your declaration of April 30, you say that it was your understanding that Karen Evans

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 120

was preserving any work-related Signal messages, including from the FEMA 2.0 chat.

That's what you told the court.  Correct?

A.    Yes, ma'am.

Q.    That was your understanding at the time you signed this declaration on April 30?

A.    Yes, ma'am.

Q.    And at the time you signed the declaration, you were aware that Ms. Evans had been deposed on March 30?

A.    Yes, I believe I was.

Q.    And you learned, at some point after that deposition, that she had testified that she had preserved some screenshots of Signal chats.  Right?

A.    I don't remember particulars.

Q.    But you learned, at some point after that deposition and before you signed this declaration, that Karen Evans had said she was preserving Signal chats.  Right?

A.    I'm sorry.  Can you repeat the question?

Q.    Sure.

You learned, at some point after her deposition, which was the end of March, and before you signed this declaration, that Karen Evans had said that she was preserving Signal chats.  Right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 121

MR. GREAVES:  Object to form.

A.   I learned that she said that?

Q.   Um-hum.

A.   Between her deposition and when I made my statement?

Q.   Yes.

A.   I don't know if I agree with that.

Because, one, again, it was my understanding that someone other than myself, as the senior party in this arrangement, would have been handling that.

And two, I don't remember exactly when, but I do recall at some point hearing, whether it was from Karen herself or someone else, that she would be preserving any work-related messages that may come up.

Q.   Was it your understanding that it was the more junior person on any chat that had the responsibility of preserving the work-related communications?

A.   I don't know if I would say that.  I didn't really think about it.

Q.   But you just said, as the more senior person to Karen Evans, you would understand that she was preserving the chats.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 122

A.    I think that was just kind of an implicit understanding.  I don't....

Q.    You never specifically directed Karen Evans to preserve any of the content of the Signal chats that you had on your personal phone.  Correct?

A.    I did not.

Q.    And she never told you that she was preserving the content of any of the Signal chats on your personal phone.  Correct?

A.    As I said a couple of minutes ago, ma'am, I recall at some point hearing, whether it was from Karen herself or someone else, before her deposition that she was going to be documenting anything work related that may come up.

Q.    When was that communication?

A.    I don't remember.

Q.    If Ms. Evans testified that no one instructed her to preserve communications on her personal phone prior to a March 10 email from the DHS chief administrative -- or chief information officer, do you think that that's correct?

A.    I'm sorry.  Can you repeat that?

Q.    She testified that no one instructed her to preserve any communications on her personal phone prior to a March 10 email from DHS's chief

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 123

communication officer.

A.   But that doesn't mean that she would have been doing it anyway.

Q.   Do you recall ever getting any instructions about preserving messages on your phone?

A.   I don't remember.

I received a lot of emails, and I don't remember specifically looking at that.

Q.   And is it possible that this communication that you had, either with Ms. Evans or someone else, was around the time of this March 10 instruction from the DHS chief communication officer?

A.   I don't remember.

Q.   You had Signal chats related to DHS that Ms. Evans was not involved in.  Correct?

A.   I don't recall specific work-related chats that I had on my phone.

Q.   You had Signal chats that were related to DHS that Ms. Evans was not involved in.  Correct?

A.   I think that's likely.

Q.   So you're not asking the court to believe that somehow you expected Ms. Evans to preserve the communications in chats in which she was not involved.  Right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 124

A.    No.

Q.    You don't mean, by this statement, that Karen Evans was preserving your communications?

MR. GREAVES:  Objection to form.

A.    If it was in a chat with her, then that's -- would have been what I meant.

Q.    Did you write that sentence of your declaration, or was it provided to you by counsel?

A.    I recall writing that sentence.

Q.    But you can't tell the court when you came to have the understanding that Karen Evans was preserving the work-related Signal messages in which you were a participant?

A.    I can't.

Q.    And you can't recall whether or not you had adjusted the auto-delete timing of any particular Signal chat in which you were involved. Correct?

A.    No, ma'am.

Q.    Let's...who authorized you to use your personal phone for DHS-related communications?

A.    I don't understand your question.

Q.    What part of it don't you understand?

A.    Did you need -- I didn't -- can you repeat the question?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 125

Q.    Sure.

It was:  Who authorized you to use your personal phone for DHS-related communications?

MR. GREAVES:  Object to form.

A.    I don't think there was -- I don't recall a formal authorization.

Q.    So you decided to use your personal phone for DHS-related communications?

MR. GREAVES:  Object to form.

A.    I don't recall any specific instances of work on my personal phone.

I think that things were done through official channels.

Particularly as it concerns CORE employees, I don't -- I do not remember ever having discussions about CORE employees on my personal devices.

Q.    Mr. Guy, we have seen screenshots from your phone -- that's Exhibit 108 -- and several from Ms. Evans' phone, including a communication directly with you about CORE employees, in Exhibit 107. Correct?

MR. GREAVES:  Object to form, foundation.

A.    Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 126

Q.   We've seen group chats on Signal called "FEMA Rapid Response," "Winter Storm Team," and "FEMA 2.0."  Correct?

A.   Yes.

Q.   And you don't recall having work-related communications on your personal phone, notwithstanding all of these examples of work-related communications on the Signal chat on your personal phone that we've seen here today?

MR. GREAVES:  Object to form, foundation.

A.   I'm not saying that it didn't happen.

I'm just saying, particularly as it concerns COREs, I was not very heavily involved.

And I do not remember discussing COREs on my personal device, outside -- or -- on my personal device, outside of what we have in front of us, which are what were responsive in the searches.

Q.   But you do recall having work-related communications on your personal phones, frequently, Mr. Guy.  Correct?

MR. GREAVES:  Object to form, foundation.

A.   Again, I'm not a lawyer, and I don't know what's workplace banter versus --

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 127

And I already testified that, yes, maybe if something needed to be thrown together to coordinate, things did happen.

But everything ended up on official channels.

Q. How do you know that, Mr. Guy, if you were not the one doing the preservation?

A. To effect work at the department, you had to send emails with memos and get things signed and legitimized through the Secretary or whatever it may be.

Q. So Corey asked for an update in chat from Joe Guy to Karen Evans on Saturday, January 24.

That's Corey Lewandowski, chief advisor to the DHS former Secretary. Correct?

A. I think that's a reasonable thing to say.

Q. And on Wednesday, February 4, Karen Evans responds to you:

Here is my list.

Restarting CORE renewals.

Hermit's Peak. EO for

California. Action plans for

implementation at FEMA.

Personnel policy, etc., etc.

Is it your testimony here today that this

Page 128

is not a work-related communication, Mr. Guy?

A.   It seems that it is, but it also seems like it was documented and provided to you.

Q.   This is a work-related communication, and in fact, you frequently had work-related communications on your personal cell phone using the Signal app.

Isn't that true, Mr. Guy?

MR. GREAVES:  Objection; form, foundation.

A.   I don't recall particulars of work-related communications happening on my personal device.

Q.   Others at DHS had your personal phone number to contact you during your time at DHS. Correct?

A.   I'm sorry.  Can you repeat that?

Q.   Sure.

Others at DHS had your personal phone number to use to contact you during your time at DHS.  Correct?

A.   Yes.

Q.   You gave your personal phone number to people to contact you.  Correct?

A.   Many people at DHS ended up becoming friends, and, yes, I had -- people had my personal

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 129

phone.

Q. Karen Evans had your personal phone number?

A. Karen Evans and I knew each other for probably six months before we started at DHS.

Q. Troup Hemenway had your personal phone number. Correct?

A. Troup and I have been friends for five or six years.

Q. But he has your personal phone number to contact you during the time you were at DHS. Correct?

A. Yes, ma'am.

Q. Corey Lewandowski had your personal phone number?

A. Yes, ma'am.

Q. Kristi Noem had your personal phone number?

A. Yes, ma'am.

Q. Were you personal friends with Corey Lewandowski?

A. Corey and I met during transition, and, yes, I would say that he and I were friends who discussed all sorts of things together.

Q. Were you personal friends with Kristi

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 130

Noem?

A.   I would say that, yes, I was.

Q.   And when did you meet Kristi Noem?

A.   During transition.

Q.   And by "during transition," you mean the time before you came to work at DHS between the two Trump administrations?

A.   I mean during the formal transition period, which would have been -- I don't know -- a few months leading up to when the Secretary was sworn in at DHS.

Q.   And the individuals we just talked about continued to communicate with you using your personal phone during the time that you were at DHS. Correct?

A.   Yes.

Q.   And you continued to communicate with them using their personal phone numbers during the time you were at DHS.  Correct?

A.   Yes.  However, I don't remember ever discussing COREs with them or any particular work item.

Q.   You were using your personal phone to communicate about DHS work every day you were at DHS, weren't you, Mr. Guy?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 131

MR. GREAVES:  Objection; form and foundation.

A.   I don't recall particular work messages that came up in my personal phone.

I do know that I did official actions through official channels.

Q.   You were using your personal phone to communicate regarding your DHS work every day when you were at DHS.  Isn't that true, Mr. Guy?

MR. GREAVES:  Objection; asked and answered, foundation, argumentative.

A.   I don't know that that's true.

Q.   Do you want -- if we pulled your phone records, would they reveal that you were using your personal phone to communicate, during your time at DHS, about work every day?

A.   I don't know.

Q.   Is there anything that would help you remember?

A.   Official actions were done through official devices.

Q.   Did you think that the rules regarding document retention just didn't apply to you, Mr. Guy?

A.   No, ma'am.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 132

Q.   You were not taking any action to preserve communications yourself on your personal phone. Correct?

MR. GREAVES:  Objection to form.

A.   As I have said before, it was my understanding that there would be someone else -- just like the CIO maintains official records, I understood that someone else would have been doing that.

Q.   And you didn't take any action yourself to ensure that someone, in fact, did that.  Correct?

A.   I don't think that I did.

Q.   You didn't assign that to an assistant. You didn't communicate to anyone during these conversations.

You took no action at all to ensure that this understanding that you had would, in fact, be effectuated.  Right?

A.   Ma'am --

MR. GREAVES:  Object to form.

A.   Ma'am, I didn't do that for my official devices either.  I didn't do that for -- I didn't do that for, you know, people doing my paperwork.

I didn't necessarily tell them to do it. It was just people who did it.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 133

Q.   And in fact, Mr. Guy, you were using your personal device and communicating on Signal so that there would be no record --

MR. GREAVES:  Object --

Q.   -- officially of the actions you were taking at the Department of Homeland Security. Isn't that true?

MR. GREAVES:  Object to form, foundation, facts not in evidence, argumentative.

A.   I would not characterize it that way.

Q.   Did anyone ever tell you to use Signal on your personal phone for your communications about DHS?

A.   I don't recall that ever happening.

Q.   Corey Lewandowski didn't tell you to use your personal phone for Signal?

A.   I don't recall that ever happening.

Q.   It's possible it did?

A.   I don't recall that ever happening.

Q.   It's possible it did?

MR. GREAVES:  Objection; asked and answered.

A.   I don't recall that ever happening.

Q.   Is that a yes or no, Mr. Guy?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 134

It's possible that Mr. Lewandowski told you to use your personal phone?

MR. GREAVES:  Objection; asked and answered.

A.   I don't think that he did.

Q.   But you don't recall?

MR. GREAVES:  Objection; asked and answered.

(No audible response.)

Q.   Once this litigation was filed in January 2026, are you aware that your communications were also subject to something called a litigation hold?

A.   Ma'am, I'm not a lawyer.  I don't know what that is.

Q.   Did any lawyer ever tell you that your communications were subject to a litigation hold?

A.   I don't remember.

Q.   Did you ever take any efforts to ensure that evidence related to this litigation was actually preserved?

A.   I don't think that I did.

But, ma'am, again, I don't recall discussing anything pertinent to this litigation on my personal devices.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 135

Q.   If we were to look on your Signal application on your personal phone now, which DHS-related chats would appear there?

A.   I don't know.

Q.   Please get your phone.

MR. GREAVES:  I'm going to just ask that we go off the record.  If you want him to be on his phone -- we can go take a break.  But we're not -- he's not been ordered to provide his phone to you, to Plaintiffs' counsel.

So if there is something that you would like him to look for, I think we're willing to do that, but it's not going to be here on the record in front of Plaintiffs' counsel.

MS. LEONARD:  That's how we're going to do this.  He's going to look --

We have had significant issues that have occurred with respect to this phone, as we have already heard today.

And we need a very clear record, unfiltered through counsel, of what is on that phone.

And we are going to ask Mr. Guy

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 136

to look at his phone -- he doesn't have to show it to the camera or to us.

We're going to ask Mr. Guy to look at the phone and talk about the chats that appear on that phone and identify them.

That's what I'm going to ask him to do.

MR. GREAVES:  What you're asking him to do is a fishing expedition, which is not something that's been permitted by the court's order.

So if you'd like to go to the court and ask the court to order him to do that, then, you know, we can have that conversation.

But what we're not going to do is just a fishing expedition on camera, on the record.

MS. LEONARD:  We are going to ask him questions to identify the chats that remain on his phone, notwithstanding all the things we've heard about today.

Are you refusing to allow him to do that?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 137

MR. GREAVES:  I am refusing to allow him to do that.

MS. LEONARD:  You would prefer that Mr. Guy talk to counsel and then come back and answer the questions, not from his phone, but somehow answer the questions from memory?

MR. GREAVES:  No.  What I'm asking is, if you have specific things that you think are relevant to this case that you want him to look for, we're willing to go and look for those things.

But we're not going to do just a general fishing expedition right here at counsel -- at the table here.

MS. LEONARD:  We are asking for him to identify the chats that exist on his phone that pertain to his work at DHS and specifically to FEMA.

MR. GREAVES:  Okay.

MS. LEONARD:  Are you willing to do that?

MR. GREAVES:  I'm willing to do that.

MS. LEONARD:  Okay.  I would

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 138

like him to have his phone in this room and for him to identify those on -- so that we don't have to keep taking a break and going back and forth when I have a follow-up question.

Are you willing to do that?

MR. GREAVES:  I think we need to take a break to confer about this.

MS. LEONARD:  Okay.  We can take a break, but that's the ask.

MR. GREAVES:  Understood.

VIDEOGRAPHER:  Off the record at 12:18.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 12:23.

MS. LEONARD:  Mr. Greaves, did you have something you wanted to say on the record?

MR. GREAVES:  Yes.  So we are going to allow him to search his Signal app for groups related to DHS.  And if you want to ask follow-up questions about those groups, I think that's probably fair.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 139

But we're not going to go further than that without, you know, discussing any further potential looking through his device, his personal device.

MS. LEONARD:  Understood.

I don't want to spend all of our time here today reading all of the messages that are on this phone either, which is why we had requested them be produced earlier.

MR. GREAVES:  Okay.

BY MS. LEONARD:

Q.   So the first question for you, Mr. Guy, is:  Can you open the Signal application?

A.   I have it open.

Q.   And does it depict chats?

A.   Yes.

Q.   And are any of those chats with individuals who either work or previously worked for the Department of Homeland Security?

A.   Yes.

Q.   Are any of those individuals people who were, in any way, working on issues pertaining to FEMA?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 140

Q.   Are any of those chats, involving individuals who worked on issues pertaining to FEMA, group chats?

A.   Not pertaining to FEMA.

Q.   Are there group chats currently on your phone that involve individuals at DHS who worked on FEMA?

A.   Yes, but not pertaining to FEMA directly.

Q.   Do the group chats that appear on your phone pertain to work at DHS, as opposed to the State Department?

A.   I don't have any of these DHS-related chats that are on my phone here in front of me.

Q.   Can you identify for me -- you responded, yes, that there were chats on your -- currently on your phone that involve individuals from your time at DHS who did work on FEMA.

Can you identify what those chats are?

A.   That involve individuals?

Q.   Who had some responsibility or performed work related to FEMA during the time you were at DHS.

A.   I'm trying to understand what you're saying.

Q.   How many --

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 141

MR. GREAVES:  I guess --

Q.   How many distinct chats, would you say, currently appear on your -- I'm not asking you to show me your Signal application.

How many distinct chats appear on that right now?

A.   (Sotto voce.)

1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50 --

Q.   More than 50?

A.   Yes.

Q.   Far more than 50?  Like, if you keep going?

A.   Yes.  But they're not populated.

Q.   Some of those are older?

A.   Yeah.  They're not populated.

Q.   Meaning, there are no existing messages in them?

A.   Yes.

Q.   So for the ones that have existing messages, can you tell me which ones involve individuals who worked at DHS during the time you were there who had some involvement with FEMA?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 142

MR. GREAVES:  Just to clarify, are you asking him if he has current communications with people he previously worked with?

MS. LEONARD:  I'm asking for the current chats that appear there and involve those people, yes.

MR. GREAVES:  Okay.

BY MS. LEONARD:

Q.   Is it a significant number?

A.   No.  There is a chat from....

I'm still trying to understand what you're asking for.

Q.   Do any of the chats on your phone, that currently appear, involve Kristi Noem?

A.   No.

Q.   Do any of the chats that currently appear on your phone include Corey Lewandowski?

A.   Yes.

Q.   Is that an individual chat or a group chat, or both?

A.   I have a message from a group chat that Corey is in.

Q.   Does that group chat include messages that pertain to DHS?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 143

A. No.

Q. Do you -- does -- do any of the chats that appear on your phone involve Karen Evans?

A. No.

Q. Do any of the chats that appear on your phone involve Kara Voorhies?

A. There's an individual chat.

Q. With Kara Voorhies?

A. Yes.

Q. When was the most recent message in that chat?

A. Friday.

Q. How far back does that chat go?

A. To Friday.

Q. Just Friday?

(No audible response.)

Q. Did you previously have individual messages with Kara Voorhies on your phone, that you're aware of?

A. I don't recall.

Q. Does the chat FEMA HQ appear on your phone currently?

A. Do you want me to search it?

(Mr. Greaves speaks sotto voce, inaudible.)

Q. I want -- you can search it, or you can

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 144

tell me whether you're aware of whether that appear -- you can search for the word "FEMA," if that is the easiest way, because that will pull up "rapid response" as well.

A.   Okay.  I searched for the word "FEMA."

Q.   And does it pull up the title of any of these chats?

A.   I see "FEMA 2.0."

And what was the other one you wanted to know?

Q.   "FEMA Rapid Response."

A.   I don't see "Rapid Response."

Q.   Do you see any other FEMA-related chats?

A.   I see "FEMA Comms."

I see a group called "Good FEMA."

I see a group called "FEMA OR Awareness."

I see a group called "FEMA Sanity Club."

I see a group called "FEMA OPA."

"HQ FEMA."

"NC FEMA."

"FEMA Region 6."

"FEMA/DHS Leadership."

"FEMA II."

"Florida ICE FEMA Group."

"FEMA $$$."

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 145

"FEMA 2025 Disaster Plan."

"FEMA ESEC."

"FEMA IT."

"FEMA Messaging."

"MS FEMA Trip."

"FEMA Videos."

"FEMA Prep Team."

And I think I already said "FEMA OPE COORD."

Q. Sorry. What was the last one?

A. FEMA OPE C-o-o-r-d.

Q. OPE C-o-r-r-d?

A. C-o-o-r-d.

Q. What does "OPE" stand for?

A. "Office of Public Engagement," I'm assuming.

Q. Correspondence, "Coord"?

A. No. It was an office at DHS HQ. "Office of Public Engagement."

Q. How many of the chats you just identified by searching for the word "FEMA" on your personal phone are populated with messages?

A. None.

Q. Can you tell what the auto-delete setting is for these chats by looking at them?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 146

A.    Yes.

Q.    I'm going to ask you to do this over lunch so that we're not doing this on the record.

I would like to know whether all of them have auto-delete settings.  You gave us a pretty long list.  I would like to know whether they have auto-delete settings and what they are.

MR. GREAVES:  I think we could probably go through it pretty quickly.

Q.    I don't want to take the time on the record, so I'm going to ask you to do that over lunch.

If you can compile a list, and then we could just read it, that would be faster.  All right?

MR. GREAVES:  I'd rather we just did it now.

Q.    I'm going to ask you to do it over lunch.  Okay?

So I think I have one -- you can set that aside for right now.

Your understanding, Mr. Guy, is, when your phone was searched on Sunday, there were not any responsive messages found in any of these chats that appear on your phone because they're not populated

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 147

with messages currently.  Right?

A.   As I said in my statement, I did not maintain my Signal messages.

MS. LEONARD:  I'm going to introduce one final exhibit before lunch, and then we can take a break.  I think this is No. -- thank you -- 109.

(Whereupon, Plaintiffs Exhibit 109 was marked for identification.)

Q.   I will represent to you that this is something we pulled from Signal support, the help department of the Signal -- whoever runs the Signal application.

And I'm going to ask you, specifically, some questions about the information on the third page that starts with, "How do I restore from a backup file."

So let me know when you are ready.

(Witness reading.)

A.   Okay.

Q.   Okay.  So 109 is a segment of the Signal support that's entitled "Back up and restore messages."

Do you see that, on the first page?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 148

Q.   When you testified that on Friday you attempted to restore some backup messages on your phone, did you read information from the Signal support about how to do that?

MR. GREAVES:  Objection to form.

A.   I did not.

Q.   Where did you find the information as to how to restore backup messages?

A.   I don't remember.

Q.   Did you find it on the internet?

A.   I don't think so.

Q.   Did you talk to someone about how to do that?

A.   I had heard that it was possible to restore messages.

Q.   Did you read anywhere how to do that before you attempted to do this to your phone?

A.   No, I don't think so.  I don't recall.

Q.   You're not an IT person.  So do you....

Describe for me what you did to try to restore the backup messages.

A.   I had heard or read somewhere that if you reinstall your Signal, there's an opportunity to back it up, or draw through, or somehow get your messages.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 149

Q.   You didn't read the Signal support page on how to restore messages?

A.   No.

Q.   Or obtain backups?

A.   No, ma'am.

Q.   Okay.  If you go to the third page of this, you see a section, "How do I restore from a backup file?"

Do you see that?

A.   Yes.

Q.   It says -- the first item is:

On the phone that has your Signal message history, go to Signal settings backups and tap on device backups.

Did you do that on your Signal app?

A.   No, ma'am.

Q.   Did you look under Signal settings for "backups"?

A.   No.

Q.   It then tells you to record a 30-digit pass-phrase that you create.

Do you see that?

MR. GREAVES:  Objection to form, foundation.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 150

Q.    Do you see that?

A.    I can see that.

Q.    Did you record the 30-digit pass-phrase?

A.    I did not.

Q.    Okay.  And it says:

              Next --

      On the next page:

              -- manually move the

         Signal folder that contains the

         backup file.

      Do you see that?

A.    Yes.

Q.    And if, it says, you're using the same
phone, as opposed to transferring these to a
different phone, it says:

      Manually move the backup to a computer
before you reset this phone.

      Did you do that?

A.    No.

Q.    And then:

              On the new phone, install

         Signal.

      Do you see that?

      (No audible response.)

Q.    So were you aware, at the time that you

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 151

attempted to reinstall Signal, that all you had to do to retrieve the backups was move the backup folder to your computer?

MR. GREAVES:  Objection; form and foundation.

A.    I was not.

Q.    You never attempted to move a backup folder to your computer to save the messages there. Correct?

A.    I didn't really know what I was doing. I'm not an IT expert.

Q.    Okay.  And you didn't look at the information that Signal provides on exactly how to do that.  Correct?

MR. GREAVES:  Objection; form.

A.    No.

MS. LEONARD:  Okay.  We can now break for lunch.  Go off the record.

VIDEOGRAPHER:  Off the record at 12:39.

(Whereupon, a recess was taken for lunch at 12:39 p.m.)

- - -

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 152

A F T E R N O O N   S E S S I O N

(Time noted:  1:38 p.m.)

VIDEOGRAPHER:  On the record at 1:38.

BY MS. LEONARD:

Q.   Good afternoon, Mr. Guy.

Before we broke for lunch, we were discussing some of the group chats pertaining to FEMA that appeared on the Signal app on your personal phone.

Do you recall that conversation?

A.   Yes.

Q.   And I had asked you to look into the settings for auto-delete on those group chats.

Have you compiled that information?

A.   Yes, ma'am.

And I'd like to volunteer that there are a couple of group chats listed here that I did -- I missed when I was talking to you.

And also, when I was going through them, I noticed that Thursday was the date that every single one of them went back to; Thursday, the 30th of April.

Q.   April?

A.   So that must have been when I reinstalled

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 153

the app.

Q.    So when you say --

Thank you for that information.

When you say that is "the date that" they "went back to," what does that mean?

A.    It means that's as far as it says.  I got added to a group on Thursday, April 30, list of the group.

And that just must be what -- a function of what Signal does.

Q.    So when you look at the particular chat within the Signal app, there is no history within each of these chats before Thursday, April 30.  Is that correct?

A.    Yes.

Q.    And that refreshes your recollection as to when you reinstalled the Signal app on your personal phone?

A.    Yes, ma'am.

Q.    And can you tell the time that that occurred, from looking at the Signal app?

A.    The time is not listed.

Q.    Okay.  And do you -- now that you recall that it was Thursday, not Friday, does that help you remember when you did that?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 154

A.    It must have been Thursday evening.

Q.    Thursday, you were still employed at the State Department until some point in time.  Correct?

A.    At some point.

Q.    And Thursday evening is when -- at some point in time on Thursday, you signed your declaration that was submitted to the court Thursday evening?

A.    I think that was Wednesday evening.

Q.    Wednesday was the 29th.  Thursday was the 30th.  Your declaration was filed with the court on the 30th.

If you look at Exhibit -- I think it's 102 -- you'll see that you signed it on the 30th.

MS. LEONARD:  Thanks.  Do we have a copy of -- it's Exhibit 102?  It should be in the exhibit copies.

Q.    Okay.  So if you take a look at that, and you signed that -- do you see that you signed it on April 30?

A.    Yes.

Q.    Okay.  So April 30 was Thursday.

And then if you look at the top, what's called an "ECF stamp" is the court stamp that says "filed April 30."

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 155

Do you see that?

A.    Yes.

Q.    So this was also given to the court on April 30.

Did you reinstall the Signal app before or after you signed your declaration?

A.    After I signed the declaration.

Q.    Did you talk to counsel on April 30 before -- counsel for the government before you did that, before you reinstalled the Signal app?

A.    I don't believe that I did.

Q.    And you still believe your testimony is true, that you did not tell government counsel about that action until Saturday?

A.    It was either Saturday or Sunday.

Q.    That you informed counsel for DOJ, counsel for the government, that you had reinstalled the Signal app?

A.    I believe that's correct.

Q.    Okay.  Can you show the -- you have the list of information.  Can you read that into the record, please.

And just to be clear, these are -- this is the response to the question of:  What are the auto-delete settings for the FEMA-related Signal

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 156

chats that appear on your Signal app on your personal phone?

A.   Yes.

Do you want me to go through line by line and --

Q.   Yeah, if you can read -- yes.  Read the name of the app [sic] and then the setting.

A.   FEMA Comms, one week.

FEMA HQ, one week.

FEMA Comms, one week.

FEMA Data, or I believe it's FEMA Data Hunt, one week.

FEMA Grants, one week.

FEMA RIF, no expiration listed.

Good FEMA, one week.

DOGE-FEMA, one week.

FEMA ORR Awareness, one week.

FEMA Sanity Club, no expiration listed.

FEMA-OPA, no expiration listed.

HQ-FEMA, one week.

NC FEMA, one week.

FEMA Region 6, one week.

FEMA/DHS Leadership, one week.

FEMA II, no expiration listed.

Florida ICE FEMA Group, one week.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 157

FEMA $$$, one week.

FEMA 2025 Disaster Plan, no expiration listed.

FEMA ESEC, no expiration listed.

FEMA IT, one week.

FEMA Messaging, one week.

MS FEMA Trip, no expiration listed.

FEMA Prep Team, one week.

FEMA 2 -- the number 2 -- one week.

FEMA OPE Coord, C-o-o-r-d, no expiration listed.

FEMA 2.0, one week.

Q.   So for all of these FEMA-related chats on your Signal app on your personal phone, they all either have a one-week auto-delete setting that someone within that chat created or there's no expiration.  Is that correct?

A.   Yes, ma'am.

Q.   Are you the person who set any of these chats to expire after one week?

A.   I don't know.

Q.   It's possible you may have been.

A.   It's possible.

Q.   Do you recall setting chats to expire after one week?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 158

A.   No.

Q.   Was there a policy at DHS or FEMA for setting chats to expire after one week?

A.   No, ma'am.

Q.   Was there -- it sounds like there was a practice that's fairly widespread of setting chats to expire after one week.

MR. GREAVES:  Object to form, foundation.

A.   I don't -- I'm not aware of any directive or policy or anything like that.

Q.   Do you have any other information you could give the court as to how all of these FEMA-related Signal chats came to have an expira- -- auto-delete expiration of one week?

A.   No, ma'am.

Q.   And your testimony is also that the history of each of these chats was eliminated by the reins- -- from prior to April 30 was eliminated by the reinstallation of the Signal app on your phone that you performed?

MR. GREAVES:  Objection; form, foundation, mischaracterization of testimony.

A.   No, ma'am.  I think that none of this was

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 159

on my phone before April 30, anyways.  I did not keep the records on my phone.

Q.   The chats would show when an individual -- this is the way Signal works.

A chat would show when an individual joined the group or when the auto-delete settings were changed.  Correct?

MR. GREAVES:  Objection; foundation.

A.   I don't know.

Q.   If you -- have you ever noticed, when someone joins a group in Signal, there's a date and it says that they've joined?

A.   I suppose.

Q.   And the information on your phone currently shows that you joined these chats on April 30.  Is that correct?

A.   I believe so, yes.

Q.   That's not actually the date that you joined any of these chats.  Correct?

A.   No, they're -- they could be from the first month at DHS, for all I know.

Q.   So these were chats that you participated in, either as a recipient of messages or a sender, during your time at DHS.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 160

A.   I don't know, because some of them, it's possible that there was these chats during transition.

Q.   It's possible you had FEMA-related chats on your personal cell phone during the transition time?

A.   It's possible.

Q.   But you did not join any of these chats on April 30?

A.   No.

Q.   And because of the reinstallation, is it your testimony that the information regarding when the auto-delete settings were changed no longer appears in any of these chats?  Correct?

MR. GREAVES:  Object to foundation, form.

A.   I don't think that that's accurate, because I don't know -- I don't think that any of these chats were a record -- that the chats themselves were on my phone prior to April 30, anyways.

As I said in my statement, I didn't -- I didn't preserve any of these records.

Q.   Can you explain to me what you mean when you say these chats weren't on your phone prior to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 161

April 30?

A.   So when I did the cell search of my phone, nothing in here -- it's the same as it would have been right now, except, I think, now it says April -- or April 30.

Q.   Meaning, they didn't contain any messages because the auto-delete settings had resulted in those messages being deleted?

A.   Either they -- either that's the case, or they weren't on my phone because of a Signal update, or because -- you know, something else could have happened.  I don't remember.

Q.   Or they could have been deleted.

A.   I never deleted -- I don't recall deleting any work-related message on my personal phone.

Q.   Signal maintains records in the chat, not just of the actual messages, but also actions with respect to the chat of when people join and when auto-delete settings are changed.  Correct?

MR. GREAVES:  Object to foundation.

A.   I don't know.

Q.   So on these current chats, you cannot look and see a notation:

November 5, 2025, messages

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 162

will now delete after one week.

A. I can't, no.

Q. But some of these have no expiration. Correct?

A. That's correct.

Q. Including FEMA RIF?

A. Yes.

Q. If you look on your phone for any of these chats, you can tell who the participants are. Correct?

A. That's correct.

Q. Can you open your phone, please.

Who are the participants in FEMA 2.0?

A. FEMA 2.0 is myself, Karen Evans, and Kara Voorhies.

Q. Anyone else?

A. No.

Q. You also have a FEMA 2?

A. FEMA 2, yes, I do.

Q. Who are the participants?

A. Myself, Corey Lewandowski, and David Richardson.

Q. FEMA RIF?

A. FEMA RIF....

Karen Evans, Kara Voorhies, and myself.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 163

Q.   FEMA Sanity Club.

A.   FEMA Sanity Club, Victoria Barton, Kara Voorhies, and myself.

Q.   OPA?

A.   FEMA-OPA?

Q.   Yes.

A.   Micah Bock, Tricia McLaughlin, David Richard- -- David Richardson, and myself.

Q.   HQ FEMA?

A.   There's FEMA-HQ and there's HQ-FEMA -- is --

Q.   Let's do both.  Oh, yeah, sorry.  Go -- why don't we do both of them.

But go ahead.

A.   HQ-FEMA is myself, Victoria Barton, Troup Hemenway, Corey Lewandowski, David Richardson, and Joshua Whitehouse.

Q.   Was there FEMA HQ as well?

A.   And FEMA HQ is --

MR. GREAVES:  Just to clarify, because it's probably relevant, it's FEMA hyphen HQ, since there's other chat groups that you've referenced that included like --

MS. LEONARD:  Punctuation.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 164

MR. GREAVES:  -- other punctuation, yes.

MS. LEONARD:  Okay.  Thank you.

A.   David Richardson, Joshua Whitehouse, and myself.

Q.   FEMA DHS Leadership?

A.   FEMA DHS Leadership.

There are eight members in FEMA DHS Leadership.  It is myself, Kara Voorhies, Clark Barrow, Micah Bock, Troup Hemenway, Greyson McGill, Dillon McGregor, and Paul Stackhouse.

Q.   FEMA $$$.

A.   FEMA $$$ is myself, Troup Hemenway, and Kara Voorhies.

Q.   Good FEMA?

A.   Good FEMA is Troup Hemenway, Thomas DiNanno, and Kara Voorhies.

Q.   DOGE FEMA?

A.   There are ten members in DOGE FEMA.

It's myself, Antoine, William Bilicic, Edward, Gregg, an account that is listed as AH, Geoff Harbaugh, David Richardson, Kyle Schutt, and Ben Weinrib.

Q.   FEMA Florida ICE?

A.   That is myself, Clark Barrow, Karen Evans,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 165

Tim Kaiser, profile called Carrie Ann, Jason Killmeyer, James Percival, and Kara Voorhies.

Q.   FEMA -- I believe you said 2025 Disaster Plan?

A.   That is myself, David Richardson, and Tricia McLaughlin.

Q.   And then FEMA ExecSec?

A.   FEMA ESEC is --

Q.   Or ESEC.

A.   -- myself, Victoria Barton, Karen Evans, Kara Voorhies, and Andrew Whitaker.

Q.   Okay.  You have a chat with Kara Voorhies that you mentioned before we took a break for lunch.

A.   Yes.

Q.   And you said the most recent message was on Friday?

A.   It says, on Friday, Kara Voorhies set the disappearing message to -- time to one day, and there's nothing before that.

Q.   You -- there's nothing before that until April 30?

A.   I don't think it says in individual chats when it goes through.

Q.   Okay.  But there are no communications that appear, then.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 166

And so, the Friday message that you were referring to was Kara Voorhies setting the disappearing setting for her communications with you to one day?

A.   That's what it says.

Q.   Did you talk to Kara Voorhies on Friday?

A.   I don't think so.

Q.   Is it possible that you did?

A.   Maybe she shot me a note.  I don't remember.

Q.   Did Kara Voorhies -- have you talked to Kara Voorhies since you left the State Department?

A.   Yes.

Q.   When did you talk to Kara Voorhies?

A.   At some point last week.

Q.   Okay.  And what did you talk to Kara Voorhies about?

A.   I told her when my deposition was going to be.

Q.   And what did she tell you?

A.   I don't remember exactly.

Q.   What do you remember, generally, about that conversation?

A.   That she -- you know, I told her when my deposition was going to be.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 167

And, you know, she asked me about my family and about what was going on with, you know, my family and things like that.

And that's all I remember.

Q. Are you friends?

A. I would say that, yes, we are friends.

Q. And have you spoken with Kara Voorhies very much since you left DHS?

A. No. Probably -- I don't want to speculate.

But, no, I haven't.

Q. A few times?

A. Yes.

Q. Have you spoken with her about this litigation, other than talking about your deposition?

A. No.

Q. Have you talked to her about the inspector general investigation of her?

A. To the best of my recollection, no.

MS. LEONARD: Okay. We're going to take a break and go off the record to discuss some issues with respect to documents.

VIDEOGRAPHER: Off the record at

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 168

1:58.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 2:42.

BY MS. LEONARD:

Q.   Mr. Guy, I just want to make sure that we have the series of events clear for the record.

You provided a declaration that you signed on April 30 to the court that attested to your understanding of the preservation of evidence. Correct?

A.   Yes.

Q.   At some point after that, you talked to Ms. Voorhies, including about this deposition. Correct?

A.   No, I did not talk -- well, she may have sent me a message, but I don't remember talking to her after that point.

Q.   I thought you said that you had talked to Ms. Voorhies, and she asked you about your family.

A.   At some point last week.  I don't remember exactly at what point that was.

Q.   Okay.  But you did talk about the fact that this deposition was happening.  Correct?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 169

Q.   And then on April 30, you now testified that you reinstalled the Signal app, resulting in the Signal chats that we have been discussing here today showing no information prior to April 30. Correct?

MR. GREAVES:  Objection; foundation.

A.   Yes.

Q.   Ms. Voorhies communicated with you on May 1, the next day, and you revealed that communication was a change in the setting of your personal one-on-one Signal chat with her to delete material after one day.  Correct?

A.   That's what it said on Signal.

Q.   All right.  Let's go back in time a little bit, Mr. Guy, to discuss what you were doing right before you came to the Department of Homeland Security.

You had previously had a few federal jobs. Is that correct?

A.   Yes.

Q.   On the Hill.  You did some internships at OMB and also the White House.  Is that right?

A.   I think OMB and the White House are synonymous in this case.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 170

Q.   Okay.  And then you were at something called Personnel Policy Operations.  Is that right?

A.   Yes.

Q.   Okay.  And that is something that has -- is related in some way to something called Courage Under Fire Legal Defense Fund?

A.   Yes.

Q.   And that was from approximately March 2024 through the end of 2025.  Is that right?

A.   I would say roughly, yes, that's correct.

Q.   And the Courage Under Fire Legal Defense Fund, is that something that provided legal representation to individuals who had been prosecuted as a result of their involvement in the 2020 presidential election?

A.   I don't remember exactly.  That sounds right.

Q.   And your role was to raise money for those efforts as the director of development?

A.   Yeah.  You know, I tried to....

Q.   You were the director of development?

A.   That was my title at that organization.

Q.   And is that how you know Mr. Greaves?

A.   No.

Q.   Okay.  You were also at something called

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 171

the America First Transition Project.  Is that right?

A.   Yes.

Q.   And you worked there from -- also from approximately March 2024 through the end of 2025?

A.   No.  I would -- I think that I joined the America First Policy Institute sometime over the summer.

I don't remember if it was June or July.

Q.   And you were an action plan manager?

A.   Yes.

Q.   And you -- what transition plans did you work on at America First?

A.   I worked on a handful of them.

Let me see if I can remember any.

Q.   Anything related to DHS?

A.   I don't think so.

Q.   Anything related to FEMA?

A.   I don't think so.

Q.   Okay.  You also contributed to Project 2025 prior to coming to DHS.  Correct?

A.   Yes, very -- a very small amount.

Q.   You're listed as a contributor to Project 2025.  Right?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 172

Q.   Okay.  And the report actually says:

The contributors listed

below generously volunteered

their time and effort to assist

the authors in the development

and writing of this volume's

30 chapters.

Was that accurate?

A.   In -- sorry.  What does it say?

Q.   That you generously followed your -- volunteered your time and effort to assist the authors in development and writing.

A.   Yes, I think I helped a little bit.

Q.   And did the chapter you contribute to have anything to do with DHS or FEMA?

A.   No.

Q.   What did you work on?

A.   I think I helped with a portion of the USAID part, you know.

Q.   You had worked at USAID previously. Correct?

A.   That's correct.

Q.   As had your father, actually.  Correct?

A.   That's correct.

Q.   You were -- were you aware that Project

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 173

2025 advocated for reforming FEMA by shifting responsibility from the federal to state and local governments?

A.   No.  I actually did not read Project 2025.

Q.   So when you testified at your previous deposition that you hadn't read it, that was correct?

A.   I didn't read it.

Q.   But you contributed.

A.   Yes.

Q.   You were aware, after you came to DHS, that President Trump issued some FEMA-related executive orders.  Right?

A.   I'm sorry.  Can you repeat that?

Q.   Sure.

You are aware, after you came to DHS, that President Trump had issued some FEMA-related executive orders?

A.   I'm not aware of any specific ones that he may have issued.  I remember the FEMA Review Council executive order.

Q.   Right.

So one of them, he set up the FEMA Review Council --

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 174

Q.   -- to have a council that would look at -- I believe the words were "FEMA's bureaucracy."

Do you remember that?

A.   I don't remember that specifically.

Q.   And do you recall that there was also an executive order that discussed federal policy was shifting responsibility, FEMA's responsibility, to state and local governments?

A.   I'm sorry.  Can you repeat that?

Q.   Sure.

Do you recall any executive orders pertaining to federal policy being to shift FEMA's responsibilities to state and local governments?

A.   No.

Q.   You knew that was one of the President's priorities?

A.   I think I knew one of his priorities was government efficiency.

And if the vehicle to get that done were to be shifting things around, maybe that was -- maybe you could square that that way.

But I don't know that I ever thought of shifting to states as a priority.

Q.   You understood that one of your jobs as a political appointee was to effectuate and implement

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 175

the President's priorities?

A.   Yes.

Q.   And with respect to FEMA, what did you understand those to be?

A.   With respect to FEMA, after he signed the FEMA Review Council executive order, it would have been, hey, we're really not going to do too much at FEMA because the President just stood up this council to figure out what to do, with these experts.

So I think, at that point, it was, you know, support and, you know, wait and see how this thing plays out.

Q.   Wait and see before taking any action at FEMA.  That's what you thought you were doing?

MR. GREAVES:  Objection; mischaracterization of testimony.

A.   Any sweeping transformational action, I would say.

Q.   You were aware, roughly early 2025, of the President's statements that FEMA should be eliminated?

A.   Yes, I remember that.

Q.   And Secretary Noem also saying things like FEMA should be eliminated in its current form?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 176

A.    Yeah.  I remember saying it needed a change of form.

Q.    "Eliminated" was the word.

Do you recall that?

A.    I believe you.

Q.    At OP- -- O- -- OPP?  Office -- what is this?  Sorry.  The organization personal -- PPO. No, no; PP-.

Personnel Policy Operations.

In 2024, Troup Hemenway was the president. Right?

A.    Yes.

Q.    Okay.  So you worked with Troup before you came over to DHS, and then you both came over together?

A.    Yes.

Q.    And I believe you previously testified that you first met Kristi Noem and Corey Lewandowski during the transition period before coming to DHS. Is that right?

A.    Yes.

Q.    And Karen Evans, you knew, from America First.  Correct?

A.    That's correct.

Q.    What about Kara Voorhies; when was the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 177

first time you ever met her?

A.   I don't remember exactly when.

It would have been sometime at DHS.

Q.   You did not know Ms. Voorhies prior to coming to DHS?

A.   No.

Q.   Okay.  You began as deputy chief of staff in January 2025.

Do you remember what day?

A.   I believe it was January 20.

Q.   And how did you get that position?

A.   I interviewed with Secretary Noem, or then-incoming Secretary Noem, and she offered me the job.

Q.   Was anyone else there during that interview?

A.   I don't really remember.

Q.   Did you talk to Corey Lewandowski before taking the job?

A.   I may have.

Q.   As of December 2025, you testified you spent roughly 50 hours a week working as the deputy chief of staff.

Do you recall that testimony?

A.   Yeah.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 178

Q.   Do you think that was accurate at the time?

A.   It's hard to put a number of how much time per week I was working.

I mean, some weeks, it could have been 50 hours.  Some weeks, it could have been more. Some weeks could have been less.

It was kind of an around-the-clock job.

Q.   Could you describe for me your responsibilities as the deputy chief of staff at DHS?

A.   I think you asked me this earlier.

I was basically an intermediary between the Secretary and the front office and components. And that included supporting component heads, making sure they had everything they needed --

Q.   Hold on.  Let me make sure she's getting this.

Okay.  Keep going.

A.   -- and just making sure that the policy priorities were communicated to people in the components.

MS. LEONARD:  Okay.  We're going to mark this as the next, which is 110.

(Whereupon, Plaintiffs Exhibit 110 was

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 179

marked for identification.)

Q.   This is an org chart -- organizational chart from the DHS website.

And my question for you, Mr. Guy, is: Which DHS components reflected on this organizational chart did you have responsibility for as the deputy chief of staff?

A.   In my deputy chief of staff portfolio -- and it, I think, changed throughout the course of -- throughout the course of my employment there.

But I think, to the best of my knowledge and recollection, starting out, I had the Office of Strategy, Policy, and Plans, the Office of Legislative Affairs, Countering Weapons of Mass Destruction, Privacy Office.

At some point, I was made the acting immigration detention ombudsman.  USCIS.  The Office of Health Security.  I already said USCIS.  TSA and FEMA.

Q.   At what point did you begin to have responsibility for FEMA, or was that throughout?

A.   I think that was throughout.

And I don't -- at the beginning, this wasn't -- I don't remember at what point exactly these things were solidified and activated, as far

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 180

as my responsibilities go.

Q.   But was it some point early on in your tenure as the deputy chief of staff that you began to have responsibility for FEMA?

A.   I think it probably would have been within the first couple of months.

Q.   And there was another deputy chief of staff within the Office of the Secretary.  Correct?

A.   There were two more.

Q.   Two more.

And Troup Hemenway was the principal deputy chief of staff.  Correct?

A.   I think that was his title, yes.

Q.   And who was the other?

A.   Stephen Munoz.

Q.   Okay.  So there were three of you.

A.   Yes.

Q.   And together, did you cover different components?

A.   Yes.  So Troup and Stephen had their own components out of these on this -- on this org chart.

Q.   And did either Troup or Stephen have direct responsibility for FEMA the way that you did?

A.   No, not after the DCOS portfolio was

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 181

activated.

Q.   And the S2, for most of the time that you were there, was Troy Edgars.  Right?

A.   Troy Edgar.

Q.   Edgar?

A.   Yes.

Q.   And did -- as the S2, did he have responsibility for all of the components or a subset?

A.   Yeah, that's kind of hard to say.  I don't really know.  It seemed like he covered everything.

He may have had specific things that he focused on, but I -- I don't know exactly.

Q.   And you did have interactions with him with respect to FEMA at times?

A.   Yes.

Q.   Okay.  And in addition to the chiefs -- chief -- deputy chiefs of staff and the S2, there were also advisors within the Office of the Secretary?

A.   Advisors or senior counselors, yes.

Q.   Okay.  Including someone known as the chief advisor, Corey Lewandowski?

A.   Yes.

Q.   And senior advisor, Kara Voorhies?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 182

A.    Yes.

Q.    When did Kara Voorhies join DHS as a senior advisor to the DHS Secretary?

A.    I don't remember.

Q.    Was it some time after you began on January 20?

A.    Yes.

Q.    And were you involved in the decision to allow Kara Voorhies to become a senior advisor to the DHS Secretary?

A.    No.

Q.    Who made that decision?

A.    I don't know.

Q.    Were you involved in the decision to assign Kara Voorhies to FEMA?

A.    No.

Q.    Who made that decision?

A.    I don't know exactly.

Q.    Who communicated that decision to you?

A.    I don't remember exactly, but it's possible that I had a conversation with Corey.

Q.    Ms. Voorhies was a government contractor, not a DHS employee.  Correct?

A.    I'm not exactly sure about -- it may have been that she was at the beginning, and then she

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 183

wasn't.

I wasn't involved in any of that, so I don't really know.

Q.   Do you know anything about the contract between DHS and Ms. Voorhies?

A.   No.

Q.   You've never seen that contract?

A.   I have not.

Q.   You don't know whether it's with Ms. Voorhies or a business?

A.   I have no idea.

Q.   You don't know what her responsibilities were, as defined in that contract?

A.   Not as defined in that contract, no.

Q.   Do you know what she was paid?

A.   No.

Q.   Has she ever talked to you about that?

A.   No.

Q.   Do you know whether that contract went through an approval process within the Office of the Secretary?

A.   I don't know.

Q.   And you don't know who approved that contract?

A.   No.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 184

Q.   Even though you were the deputy chief of staff with responsibility for FEMA, and this was a person being assigned to work on FEMA, you don't have any information about the nature of her contract?

A.   To better explain my role -- as I've said, I was an intermediary.  I didn't have authoritarian control over FEMA at any point, and anything that I would have been doing would have been in concert with Secretary Noem.

I was just there, passing on information from Secretary Noem and gathering it from the component, and I wasn't commanding things to be done at FEMA.

Q.   Do you have any understanding as to how Ms. Voorhies came to work at DHS?

A.   I don't.

Q.   Do you know whether she knew Corey Lewandowski before coming to DHS?

A.   I don't recall -- no, I don't remember.

Q.   You never asked any questions about this person who came to work in the Office of the Secretary?

A.   There were a lot of people who came and -- in and out and worked, and there's constantly people

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 185

going in and out.

I didn't really ask questions.

Q.   There weren't constantly government contractors coming into the Office of the Secretary to work on FEMA, were there?

A.   I didn't know that she was a government contractor when she arrived there.

Q.   Okay.  But there also weren't other senior advisors specifically assigned to FEMA.  Correct?

A.   No, there were.

Q.   Who were they?

A.   Victoria Barton was counselor for FEMA.

Q.   And she, at some point, was then sent to work at FEMA in the Press Office?

A.   I think she is in charge of Press, "Public Engagement," and Legislative Affairs.

Q.   To your knowledge, Ms. Voorhies had no background in disaster relief.  Right?

A.   Not to my knowledge.

Q.   Or emergency management.  She didn't have any background in emergency management?

A.   Not to my knowledge.

Q.   What was your understanding of her background when she came to DHS?

A.   I heard that she was very good with

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 186

numbers and accounting and finance-type things.

Q.   Where did you hear that?

A.   I don't remember.

Q.   From Corey?

A.   It could have been.

Q.   Did you have any understanding of who Ms. Voorhies reported to?

A.   No, not really.

Q.   You worked alongside Ms. Voorhies with respect to FEMA for approximately a year.  Right?

A.   I think that sounds right.

Q.   And you didn't have any understanding as to who she was reporting to?

A.   It was just kind of vague.  You know, Kara -- I didn't supervise Kara.  I don't think Karen supervised Kara.

I wouldn't say that -- I don't know who, officially, she reported to.  Again, I haven't seen her contract or....

Q.   She reported to DHS Secretary Kristi Noem, ultimately.  Correct?

A.   I would say that that's right.

Q.   There weren't that many people between you and Secretary Noem, were there, in the hierarchy at DHS?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 187

A.   No, I don't think so.

MS. LEONARD:  Okay.  Let's take a look, actually.  We'll mark this 111.

(Whereupon, Plaintiffs Exhibit 111 was marked for identification.)

Q.   I'm going to show you something that was produced in different litigation.  So it pertains, not to FEMA, but to other action.

But this is a DHS ExecSec routing sheet.

Do you recognize this type of document?

A.   Yes.

Q.   Okay.  A record of clearance and approval.

Did you call this a routing sheet?

A.   I don't know.

Q.   And here, there's a list of people, which I believe the document was cut off at the bottom. And I will represent to you that's the S1 signature at the bottom.

But right before is Chief Advisor Corey Lewandowski, Senior Advisor Troy Edgar, Senior Advisor Troup Hemenway, and then you, listed as a senior advisor.

Do you see that?

A.   Yes.

Q.   And this looks like it's February 2025.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 188

So is this before the -- I think you called it the assignments with respect to the deputy chiefs of staff were sorted out?  Is it before or after?

A.   It was probably before, if I had to guess.

Q.   Okay.  But in the hierarchy, you're pretty close to the top of DHS, weren't you?

A.   Yes.

Q.   Okay.  So of the options for Kara Voorhies to report to, if she didn't report to you, and the other deputy chiefs of staff were not assigned responsibility for FEMA, there are only so many people between you and the Secretary.  Right?

A.   Yes.

Q.   So she either reported to the S2 -- do you think she reported to the S2?

A.   I don't officially know who she reported to.

Q.   And -- or Corey Lewandowski.  Right?

A.   I don't know, officially, who she reported to.

Q.   Okay.  Officially.

But you know that she was providing information about FEMA to Corey Lewandowski throughout her time at DHS?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 189

A.   It's very possible.

Q.   You actually know that, because you personally witnessed her provide information to Corey Lewandowski.  Correct?

A.   I have seen that.  I don't remember particulars, but....

Q.   And Ms. Voorhies was working, in particular, on some issues around FEMA grants and contracts?

A.   I remember that being -- because she was good with numbers and accounting and had -- had that sort of background, that she was tasked with making sure that -- or trying to work on waste, fraud, and abuse, and grants mostly, I think.

Q.   Did you work with Ms. Voorhies on approvals for FEMA grants?

A.   I think so.

Q.   Was Ms. Voorhies ever working on something with either Corey Lewandowski or Kristi Noem that didn't come through you for approval?

A.   Probably.

Q.   Did you work with Ms. Voorhies on any FEMA contracts, separate and apart from the grants?

A.   I'm sure that she reviewed, you know, contracts.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 190

Q.   So at some point in time during 2025, there was a policy put in place at DHS that any contract above $100,000 required S1 approval.

Do you recall that?

A.   I do remember that.

Q.   And was Ms. Voorhies involved in approvals within the Office of the Secretary pertaining to FEMA contracts?

A.   I think that she advised on them.  I'm not sure exactly how the authorities or clearance would have played out.

I don't really remember.

Q.   Were you involved in implementing that policy with respect to FEMA?

A.   I don't know what you mean.  Can you rephrase the question?

Q.   So if all contracts above $100,000 required S1 approvals, presumably there was a process for those approvals within the Office of the Secretary?

A.   Yes.

Q.   And were you involved in the approval -- chain of approval?

A.   Yes.

Q.   And so, if there were a routing sheet for

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 191

approval of a contract, you'd have a signature line?

A.    I think that is very likely, yes.

Q.    Okay.  Do you recall that?

A.    I do recall that.

Q.    And was Ms. Voorhies ever listed on an ExecSec routing sheet for FEMA contracts?

A.    I don't remember.

Q.    Do you -- did you have an understanding of whether she was responsible for reviewing everything coming out of FEMA?

A.    I don't -- that wasn't my understanding. I don't remember.

Q.    Can you just describe, in general terms, what you understood Ms. Voorhies to be doing with respect to FEMA?

A.    Yes, yes.  She was an advisor who provided her advice and input on grants and contracts.

Q.    Advice and input for decisions made by the Secretary?

A.    I think that's right.

Q.    Or Corey Lewandowski?

A.    I don't think Corey made decisions without the Secretary's input.  I think the Secretary made decisions.

Q.    But you were not privy to all

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 192

conversations between Kristi Noem and Corey Lewandowski during your time at DHS.  Correct?

A.   That's correct.

Q.   So you don't know, actually, if Corey Lewandowski made any decisions with respect to FEMA contracts or not?

A.   I guess I can't say with 100% certainty, but....

Q.   Who had the authority to direct the work of Ms. Voorhies?

A.   I think between myself, Karen, and Corey, we kind of worked -- I would say that those are mostly the people that Kara would have interacted or worked with.

I don't know exactly who had authority to ask her to do something.  I'm sure, if I had asked her to do something, she would probably do it.

Q.   Did you consider her roughly the same level of authority within the hierarchy as you, or were you above her?

A.   I think that I was above her.

Q.   Are you the person who gave her the authority to work on FEMA?

A.   No.

Q.   Okay.  Are you the person who directed her

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 193

to work on FEMA?

A.   No, I'm not.

Q.   Are you the person who authorized Ms. Voorhies to work without a security clearance?

A.   I don't believe that I am.

Q.   Are you the person who authorized Ms. Voorhies to have a FEMA email address?

A.   I don't recall.

Q.   Is it possible you were?

A.   I don't know.

Q.   Have you ever authorized another government contractor to represent themselves as a FEMA employee?

A.   I don't think so.

Q.   Are you the person who authorized Ms. Voorhies to represent herself as a senior government official?

A.   I don't believe that I am.

Q.   Okay.  Are you the person who sent her to Alaska to tour disaster areas with Senator Sullivan as a, quote, senior government official?

A.   I don't remember.

Q.   If it wasn't you, it would have been someone above you in the Office of the Secretary who authorized all of those things.  Is that right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 194

A.   If it wasn't me, then, yes.

Q.   Do you have any information regarding Kara Voorhies working with Corey Lewandowski in business prior to coming to DHS?

A.   No.

Q.   You don't know anything about their business relationships?

A.   I wasn't aware that they had a business relationship.

Q.   Do you have any information about Corey Lewan- -- Kara Voorhies helping Corey Lewandowski make business deals that profited off of FEMA grants or contracts?

A.   I have no knowledge of that.

Q.   Are you aware of whether Kara Voorhies herself was profiting off of FEMA grants or contracts?

A.   I have no knowledge of that.

Q.   Are you aware that Corey Lewandowski and Kara Voorhies were denying FEMA grant money to states run by Democrats?

A.   I don't know that or remember that.

Q.   Were you involved in that?

A.   Denying -- can you repeat what it was?

Q.   Sure.

Page 195

Denying FEMA grant money to states that were run by Democrats.

A.    I don't know if I would characterize it that way.

Q.    Were you involved in the denial of grant money to states that happened to have Democratic governors?

A.    I would have been in a clearance process for a decision, but it seems like those decisions came from either the White House or from OMB as well.

Q.    But you weren't personally involved in directing FEMA grant money based on the political party of state leadership?

A.    No.

Q.    But you think you were in the approval process for the grant decisions coming out of FEMA?

A.    I was.

Q.    Okay.  Can you describe for me what a typical workweek -- if you could even try -- looked like as the DCOS?

A.    Sure.  So I generally -- do you mean, like -- kind of like what the cadence was, or kind of like --

Q.    Sure.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 196

A.   -- were there regular meetings?

Q.   Yes.

A.   So Mondays and Tuesdays would be catch-up days, days where I went in and we had syncs.

I'd try to talk to all of my components in my portfolio, whether it be like the chief of staff or the component head themself, and just check in, see what was going on for the week, make sure they had everything they needed, if there was anything I could be doing.

That took up most of the day on Mondays and Tuesdays.

And then, Tuesday mornings, we had executive team calls with our executive team.

And Thursday mornings, we had executive team calls with our executive team at 8 a.m.

And then...the rest was all kind of just ad hoc after the pace for the week got set.  And, you know, it was -- the baseline was set, like, hey, here's what's going on this week.  It was, okay, let's drive it home to Friday.

And then it was all just calls and, you know, seeing what needed to happen to carry things out.

Q.   Let's start with the executive team calls.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 197

Are those teams the executive team within the Office of the Secretary?

A. Yes. We had an executive team. And we did calls every Tuesday and Thursday morning.

Q. And who participated in those calls, generally?

A. Well, the executive team kind of changed over time.

Q. Let's focus on roughly December of 2025 through the time that you left DHS. So you don't have to recount the whole way through.

A. Sure.

Q. But let's focus on that period of time.

Generally, who was involved in the executive team calls?

A. It would have been the three deputy chiefs of staff, the chief advisor, Jimmy Percival.

I don't recall exactly when Troy left, but Troy was on these calls.

I think the head of OPA, so Tricia or -- I'm not sure exactly when Tricia left either, but it would have been whoever was next after her would have taken her place.

Joseph Mazzara ended up on the executive team calls.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 198

And I think that's -- I think that's it.

Q.   Troy Edgar, as the S2, left in some time, maybe, early December.  Is that right?

A.   I don't remember exactly.

Q.   Was it in 2025?

A.   That sounds right.

Q.   Okay.  And then he recently came back to the Department, but after you had left for State. Right?

A.   Yes.

Q.   And Tricia McLaughlin is the DHS spokesperson.  That was later.  That was in 2026, at some point in time, when she left.  Right?

A.   I don't remember exactly, but that sounds right.

Q.   We saw her on some of the screenshots that were in January and February of 2026.

Do you remember?

A.   I believe you, yes.

Q.   Okay.  And you mentioned also syncs with your component agency.

Could you explain to me what a "sync" is?

A.   Sure.

Q.   And that's s-y-n-c.  Right?

A.   Yeah.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 199

Q.    For the court reporter's benefit.

A.    I mean, just say meeting, you know, updates.  Just like, hey, here's what's going on this week.  Can you help with this, this week?

Usually, it was me listening, and whoever from the component is talking, but there were sometimes things where I would ask, hey, what's the status on this?  Do you need any help?  You know, what do I need to do here?

Q.    And those components included FEMA, but it wasn't just FEMA.  Right?

A.    No.

Q.    Okay.  So you had many sync meetings every week?

A.    Yes.

Q.    Okay.  And who did you generally, if anyone, transmit the information you learned in those meetings with the components to?

A.    Sure.  So those calls on Tuesdays and Thursday mornings, during -- I liked to have my syncs, most of them, on Monday, so that by Tuesday morning, anything that had come up, I would be able to -- because the exec team call was basically a sync, just at the executive team level, in which we sent an agenda for, usually.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 200

And I liked to have items that I could discuss on Tuesday or Thursday morning from any of the syncs that I had with the components in my DCOS portfolio.

Q.   So there were times where there was information from the syncs with the components that you then brought to the executive team on your Tuesday or Thursday calls.  That's fair?

A.   Yes.

Q.   And then some of those things were things that required S1 approval?

A.   Yeah, certainly.

Q.   And did you use these syncs with components to sometimes convey decisions that had been made by the DHS executive team to the components?

A.   It's possible, but I don't think that that's really how we did that.

Because when decisions were made, it wasn't like -- typically, like, a memo was signed, and then we knew, oh, that decision's been made.

Q.   Or would you sometimes use these sync meetings to discuss how to implement decisions that had been made in this more formal way?

A.   I guess, but a lot of the discretion for

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 201

implementation was kind of left to the components.

So like if they had like a, hey, do you care about this, it would have been like -- because I didn't have like a huge staff.

So I think, generally, from the front office, we were kind of deferential with how things were implemented.

Q.   You had regular weekly meetings with Karen Evans regarding FEMA?

A.   Yes.

Q.   And those were on -- generally on Wednesday mornings.  Right?

A.   Yes.  Those were on Wednesdays.

Q.   So --

A.   It was one of the only ones that I did on Wednesdays.

Q.   So you did those Wednesday mornings, and then, if there was information or a decision that needed to be conveyed, the intention would be to convey it at the Thursday executive team meeting?

A.   Yes.  But --

Q.   Or more fre- --

A.   Yeah.

Q.   -- or as needed?

A.   Yeah, yeah.  As needed, for sure.  I

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 202

don't....

Q.   Right.  One size does not necessarily fit all.

A.   Yeah.

Q.   Okay.  Got it.

You met most Wednesdays with Karen Evans.  That was your practice?

A.   Yes.

Q.   Okay.  And you were meeting with Karen Evans about FEMA prior to her becoming the SOPDA on December 1, 2025?

A.   Yes.  Because, if I recall correctly, she was the chief of staff.  So I would have been talking to her then, too, because I didn't just talk to the component heads, you know.

I -- in fact, most of the time, component heads are so busy, and, you know, I don't want to disrupt their day.

So most of the time, I think, it was chiefs of staff or people below component heads that I talked to.

Q.   At the time -- when did you begin meeting with Karen Evans on a weekly basis on Wednesdays regarding FEMA, do you recall?

A.   I don't remember.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 203

Q.   Sometime in the fall of 2025?

A.   Probably.

Q.   Okay.  Did you ever meet with David Richardson during that time?

A.   Probably.

Q.   But your weekly meeting was generally with Karen Evans?

A.   Yeah.  I -- I don't really remember if me and Dave had a regular meeting.

Q.   Okay.  From roughly December 1, 2025, through the time that you left, were there other individuals who attended your component meeting with Karen Evans for FEMA?

A.   Sometimes Kara would be there.  Sometimes Victoria would be there.

Sometimes all three, sometimes just two, sometimes just one; I don't really remember.

Q.   Did you invite people?

A.   I don't remember who set it up.

Q.   Were there agendas created for these weekly meetings?

A.   I remember Karen emailing me agendas beforehand, things she wanted to discuss.

Q.   Did she ever send you agendas using the Signal chat?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 204

A.   Well, I mean, there's a screenshot of what looks like an agenda might be.

But, typically, I don't think that she did that.  I think, typically, there's probably a pretty good record of her sending me agendas on a official device.

Q.   Were there notes kept of those meetings?

A.   Yeah, I think Karen probably took notes.

Q.   Did you have an assistant or a staff person attend these meetings to take notes specifically for you?

A.   I don't think it was, you know, necessarily just, you know, take -- take notes.  But I did sometimes have someone in there.

Q.   Would that be your special assistant?

A.   It was either my special assistant or perhaps Christopher Schulenburg, who was another senior advisor who helped me with, you know, similar things.

Q.   When you say "helped me with similar things," do you mean taking notes or keeping track of some of these component meetings?

A.   Not necessarily keeping track of component meetings, but just, you know, helping me track what was going on.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 205

Q.   At FEMA specifically?

A.   No.  Generally, like, across all.

Q.   Okay.  But this person, Chris, and -- was it, sorry, Keenan?  Kieran?

A.   Kieran.

Q.   Kieran.

A.   Kieran.

Q.   Thank you.  I will get that.

Kieran or Chris, at times, did attend these meetings with Karen Evans?

A.   I think so.

Q.   Did you -- and you previously spoke about having an electronic calendar on the Outlook system, I believe?

A.   Um-hum.

Q.   These meetings would have been on that Outlook calendar.  Correct?

A.   I think so.

Q.   Were the meetings in person or by Zoom?

A.   It was probably a mix.

Q.   So sometimes....

A.   I think so.

Q.   If they were in person, where would they be?

A.   Usually, in my office.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 206

Q.   So they would come to you?

A.   I think so.

Q.   If we were to look for records of these meetings that you had regarding FEMA, where should we look?

A.   On my Outlook calendar or at emails between me and Karen when she sent the agenda.

Q.   Are you aware that Karen Evans was ordered by the federal court to turn over her notes of the meetings to us?

A.   I heard someone mention that.

Q.   And that she has not turned over all of those notes.

Are you aware of that?

A.   I wasn't tracking closely.

Q.   Did you ever direct Ms. Evans to send you a write-up of your meeting so that you had a record of what you discussed?

A.   I don't think so.

Q.   Did she ever do that?

A.   She may have.

Q.   Okay.  Do you think she ever did that by email?

A.   Yeah -- well, if she did, it probably would have been by email.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 207

Q.   Okay.  Let's take a look at Exhibit 107, which is the Signal chat with you.

So here we have Wednesday, February 4, and it's sent at 12 p.m.  There's a message that -- with her list there.

Do you see that?

(No audible response.)

Q.   Is it possible that this is a list she sent after your regular Wednesday meeting?

A.   It doesn't strike me as that.  It strikes me as something she would have sent before.

Q.   Did the time of your meeting sometimes change?

A.   Yeah.  Yeah, it did.

Q.   So do you recall what -- whether you had the meeting in the morning on Wednesday, February 4, or not?

A.   I don't remember.

I can tell you, generally, our meetings were somewhere in the window of 11:00 to 1:00, typically, but it could have been anytime.

I think this should be -- you should be able to see when this is on my Outlook calendar.

Q.   Are there any other documents you can think of, sitting here today, that would be a record

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 208

of what you discussed with Ms. Evans at any of these meetings?

A.   Can you ask that a different way?

Q.   Sorry.

Are there any other documents you could think of that would be a record of what you discussed at these meetings with Ms. Evans?

A.   I don't think so.

Q.   Did you ever send reports of things discussed in these meetings by email to anyone else?

A.   No.  And to be honest with you, I saw these meetings as kind of like a -- checking the box.

I didn't -- it was more, hey, what's going on, guys?  I'm being attentive.  What do you need?

And then, you know, every -- sometimes, I would use information from these meetings -- and not just FEMA, but I would -- if something really needed to have a decision made on it, I would bring it up to -- on an exec team call or, you know, ad hoc to the Secretary.

Q.   You mentioned that you, at some point, were appointed the acting ombudsman for the Office of Immigration Detention.

Do you recall that?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 209

A.    Yes.

Q.    That was roughly in May of 2025?

A.    That sounds right.

Q.    And is it fair to say that your appointment was part of the effort at DHS to reduce staff in those offices?

A.    No, I wouldn't say that.

Q.    Okay.  Do you -- are you aware that at the beginning of 2025, the ombudsman's office had 118 people?

A.    Yes, I recall -- I do recall that.

Q.    Do you recall how many it had when you left DHS?

A.    I don't know.  I hadn't looked at OIDO for a little bit, because someone took over.

Q.    When did someone take over from you as ombudsman?

A.    I don't remember.

Q.    Do you remember how many staff there were there when someone took over?

A.    Maybe five or six.

Q.    Total?

A.    Yeah.

Q.    Down from 118?

A.    Well, see, there were five or six FTEs at

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 210

OIDO, but there were about, you know, effectively 30 people who kind of, on and off, chipped in and worked on issues.

Q.   For all of ICE Detention.  Correct?

A.   Office of Immigration Detention Ombudsman. I don't know if -- I think ICE has its own detention people who work on that at ICE too.

So OIDO is like a headquarters thing.  I think ICE has its own, from what I remember.

Q.   You testified in your deposition in the other lawsuit that you spent approximately five hours a week in this ombudsman role.  Was that accurate?

A.   I guess depending on the week, give or take.

Q.   And you testified in December you had not heard of this office before you took over in that position.  Was that correct?

A.   I think so.

Q.   And that you had never reviewed the manual?

A.   I don't think I did.

Q.   It was not your decision to reduce that office, was it?

A.   No.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 211

Q.   Okay.  And it wasn't your decision to appoint you as the acting ombudsman either.  Right?

A.   I agreed to it, but it was not my -- you know, it wasn't my idea.

Q.   Secretary Noem appointed you to that position.  Right?

A.   I think her and PPO, it would have been.

Q.   Okay.  So from your prior deposition, we have roughly 50 hours a week as DCOS and five hours a week as the ombudsman.

On average, would you -- how much of that time would you say you spent on FEMA?

A.   Varies wildly, depending on the week.

Q.   Okay.  So within -- can you give me a range?

Because you had several other component parts you were responsible for.  Correct?

A.   Um-hum, yeah.

Q.   So can you give me a range?

A.   I don't really want to, because I just don't know how accurate it would be.

Q.   Over the time that you were at DHS, would it be fair to say that the majority of your time was not spent on FEMA?

A.   I don't know.  I don't know if that's fair

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 212

to say.  Probably.

Q.   Let's look at Exhibit 107 again.

All right.  So we've got a reference to Corey here, asking for update in chat.

Do you see that?

A.   Um-hum.

Q.   Do you know what chat you're referring to? That -- sorry.

That message is from you to Karen.

A.   Um-hum.

Q.   Correct?

Not from Karen to you.  Right?

A.   Um-hum.

MR. GREAVES:  Yes or no.

Q.   Oh, sorry.  Let's say yes or no.

A.   Oh, sorry.

Yes.

Q.   And the chat, presumably, is not this message between you and Karen.

You are referring to something else. Correct?

A.   Yes.

Q.   Do you know what chat you're referring to here?

A.   I don't remember.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 213

Q.   It could have been one of several FEMA-related chats that we heard about earlier today.  Correct?

A.   Yes.

Q.   In Signal.  Right?

A.   Yes.

Q.   Okay.

A.   Maybe.

Q.   Well, generally, if you're in Signal talking about a chat, are -- were you referring to -- likely referring to another Signal chat?

A.   Yeah, but there are Teams chats and other things like that too it could have been.

Q.   And you are not -- you don't remember what update you're referring to that Corey was asking for, do you?

A.   I have no idea, no.

Q.   Okay.  Do you see the date there? January 24?

A.   Yes.

Q.   Are you -- do you remember that this was right after a decision had been made to pause the CORE off-boarding because of a winter storm?

Does that sound familiar?

A.   I don't remember.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 214

Q.  Do you recall that that decision was announced on January 22?

A.  I'm sorry.  What was the decision?

Q.  To pause the off-boarding of the COREs because of the winter storm.

Do you recall that?

A.  No.

Q.  Do you recall that Kara Voorhies was not very happy about the off-boarding message being leaked to the press?

A.  I don't remember.

Q.  Okay.  Let's take a look.

MS. LEONARD:  Actually, you know what?  Maybe we should -- is it time for a break?  I can find this document.

Why don't we go off the record for a five-minute break, and I'll find the document.

VIDEOGRAPHER:  Off the record at 3:38.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 4:13.

BY MS. LEONARD:

Q.  Okay.  Before we broke, we were talking

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 215

about a Signal chat that included a message from you -- it's Exhibit 107; you have that in front of you -- where Corey Lewandowski asked for an update in some unidentified chat that you were communicating to Karen Evans.

And I was placing this on January 24, which was right after the pause in off-boarding.

So I'm going to show you another exhibit.

MS. LEONARD:  We'll call this 108.

COURT REPORTER:  We're up to 112.

MS. LEONARD:  Oh, I'm sorry, 112.

112.

(Whereupon, Plaintiffs Exhibit 112 was marked for identification.)

Q.   Okay.  Mr. Guy, you've been handed what's been marked as 112.  This is an email from someone named La' Toya Prieur, who's the FEMA CHCO.

You're familiar with Ms. Prieur?

A.   Can I read this, please?

Q.   Sure.

(Witness reading.)

A.   Okay.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 216

Q.   Do you see that this is an email from Ms. Prieur, sent out to leaders of FEMA on -- or who she describes as leaders on January 22.

Do you see that?

A.   Yes.

Q.   At 9 p.m.

A.   Yes.

Q.   Were you present with Secretary Noem when she was at FEMA on January 22?

Do you recall that?

A.   Yes, I was there while she was there.

Q.   Okay.  And that was pertaining to the winter storm, which I've heard called "Fern."  But it was a big winter storm in January.

Do you recall that?

A.   I remember that.

Q.   Okay.  And you see that there was this email sent out saying that there will be a ceasing in the off-boarding of Stafford Act employees with NTE dates of January 22 or later.

Do you see that?

A.   Yes.

Q.   Just refresh your recollection that the off-boarding of CORE employees was paused in light of the winter storm on January 22.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 217

A.    I wasn't tracking that, but this is what that says.

Q.    And do you recall that Kara Voorhies was not happy when this email was apparently leaked to the press?

A.    I don't remember.

MS. LEONARD:  Okay.  Well, let's take a look at what has been produced to us.  We'll call this --

COURT REPORTER:  113.

MS. LEONARD:  -- 113.

(Whereupon, Plaintiffs Exhibit 113 was marked for identification.)

Q.    This is the condition it was produced in, so I apologize for the orientation.

A.    That's all right.

Q.    You've been handed what's been marked as 113.

This is a image of a Signal chat.  It does not contain the name of the chat at the top.  This is how it was produced to us by Defendants.

It's been represented to us as being from Karen Evans' phone.  And counsel for Defendants represented that this was -- these messages were sent on January 23.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 218

Were you a participant in Signal chat communications about the winter storm with FEMA?

A.   I think that I was.

Q.   And do you see there's a reference to a CNN article here?

A.   Yes.

Q.   There's a link to "FEMA halts terminations...winter storm."

And you see what Kara Voorhies' response to that is?

A.   I can see it.

Q.   And she says:

Why the hell was that sent out?

Do you see that?

A.   Um-hum.

Q.   Do you have any recollection of why Kara Voorhies would have been upset that the message ceasing off-boarding of CORE employees was sent out?

A.   No.  To be honest with you, I recall during this time to be fully focused on the storm and running around like a turkey with my head cut off.

I don't recall even paying attention to this.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 219

Q.   At this time, there were also a lot of events happening in Minnesota.  Correct?

A.   Yes, ma'am.

Q.   And were you involved at all in work for DHS related to those events?

A.   No.

Q.   Okay.  But you were focused on FEMA?

A.   Yes, during this time.

Q.   And so, you recall that FEMA employees had been being released by NTE date prior to January 22?

A.   I don't remember.

Q.   And do you recall that there was a pause in the off-boarding in light of the winter storm?

A.   Now that you're saying it, that sounds right.

Q.   Okay.  Do you have any understanding as to why you were telling Karen Evans separately that Corey needed an update?

A.   Corey needed updates about many, many things.

I could not even begin to speculate about what that particular update was needed.

Q.   But you believe it pertained to FEMA?

A.   If I was talking to Karen, then that's safe to assume, I think.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 220

Q.   And it could have been about the CORE off-boarding?

A.   I think that is not a safe thing to assume.  I don't even know if Corey knew about the CORE off-boarding.

I have no recollection of ever having a conversation with him about it.

Q.   You weren't there, in person, on January 22 when Corey was given a briefing about the CORE off-boarding of employees?

A.   I'm not aware of what you're referencing.

Q.   You don't recall that?

A.   He was given a briefing about CORE off-boarding?

Q.   Um-hum.

A.   I don't know.

Q.   You weren't there for that?

A.   I don't remember.

Q.   Okay.  And you don't know what chat -- other chat you were referring to?

A.   No.

Q.   Or why you needed to tell Karen Evans about it?

A.   No.

Q.   If she was in that chat, presumably, she

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 221

would have seen it?

A.   I'm sorry.   Which chat?

Q.   Whatever chat Corey was asking for an update in.

A.   It may have been about the winter storm. It could have been something like that.

Q.   Okay.  But as we've now seen, we know that there were many FEMA-related chats that were occurring, so it could have been in any one of those.  Right?

(No audible response.)

MR. GREAVES:  Object to foundation.

Q.   Okay.  Can you explain for me what you understand FEMA's mission to be?

A.   To deliver relief to the American people.

Q.   Anything more specific than that?

A.   You know, you could say before, during, and after disasters.

Q.   As of the time you began working on FEMA issues at DHS, you did not have any experience in emergency response.  Correct?

A.   No.

Q.   And you had no previous experience in disaster relief either?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 222

A.   No.

Q.   Or response and recovery?

A.   No.

Q.   You had never previously worked at FEMA?

A.   No.

Q.   Or any state or local emergency response office?

A.   No.

Q.   Is it fair to say what you learned about FEMA operations, you learned on -- learned on the job?

A.   I think that's fair to say.

Q.   Okay.  Have you ever read the statutes in which Congress has set forth FEMA's missions and required responsibilities?

A.   I don't -- I may have.  I don't remember what's in them, really.

Q.   Can you tell me anything that's in any of the congressional directives to FEMA?

A.   I know there's -- Stafford Act.

Q.   And do you recall what it says?

A.   No.

Q.   Okay.  Let's talk about some of FEMA's responsibilities.

When there's an emergency or natural

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 223

disaster, do you know what the protocol is called that FEMA and other federal agencies use to respond?

A.   No.

Q.   Can you describe any of the documents that establish that protocol?

A.   I don't think so.

Q.   Have you ever heard of the National Response Framework?

A.   I may have.

Q.   Do you know what that is?

A.   I could -- based on the -- I don't want to speculate.

Q.   Okay.  Do you know what the National Response Framework says?

A.   I don't know what's in it.

Q.   Okay.  Have you ever read it?

A.   I don't recall.

Q.   Okay.  Do you know what agency is responsible for writing the National Response Framework?

A.   It could be FEMA.  It could also be DOW.

Q.   Do you know what an emergency support function is under the National Response Framework?

A.   That's a term I remember hearing, but I don't -- I don't -- I couldn't name them.  I don't

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 224

know.

Q.    Can you describe for me what those are?

A.    What was it, again?

Q.    Emergency support function.

A.    Are they functions that would kick in when an emergency happens?

Q.    Anything else?

(No audible response.)

Q.    Is that a no?

A.    Oh, sorry.  No.

Q.    And do you know what emergency support functions FEMA is responsible for under the National Response Framework?

A.    No.

Q.    Do you know whether FEMA has any legal obligations regarding the National Response Framework?

A.    I don't know about the National Response Framework.

Q.    Okay.  Do you know that FEMA has a statutory obligation to ensure that it is prepared to perform emergency support functions?

A.    I believe you.

Q.    Is that something you knew before I said it?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 225

A.   Ma'am, there were a lot of....

I don't -- it wasn't my role to understand all the minutiae and -- and rules surrounding every little thing.  I didn't -- I don't know what that was.

Q.   Okay.  Do you know what an incident management assistance team is?

A.   "IMAT" is an acronym that I recognize.

I think they helped on the ground when there was response activities.

Q.   Do you know how many IMAT teams FEMA has?

A.   No.

Q.   Do you know whether IMAT teams are comprised of permanent employees, CORE employees, or reservists?

A.   Could be a combi- -- I don't know, no.

Q.   Do you know what functions IMAT teams perform at FEMA?

A.   No.

Q.   And do you know whether FEMA has an obligation, imposed by Congress, to adequately staff IMAT teams?

A.   No.

Q.   Have you ever read a document called the CORE "Manual" for FEMA?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 226

A.   I have not.

Q.   Okay.  So you don't know what the CORE manual says about when CORE employees should be renewed?

A.   I don't know what "CORE" stands for.

Q.   Have you ever read the FEMA Publication No. 1?

A.   No.

Q.   Okay.  Have you ever read a FEMA Daily Operations Briefing?

A.   Maybe.

Q.   Have you ever read any of the GAO -- the Government Accounting Office -- reports about FEMA staffing?

A.   I don't think so.

Q.   Okay.  Were you aware that in 2023, GAO concluded that FEMA's disaster workforce had only two-thirds of the staff needed to perform its mission?

A.   No.

Q.   Have you ever heard of the FEMA cadres?

A.   Probably.

Q.   Okay.  Do you know what they are?

A.   In relation to this?  Likely has something to do with COREs.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 227

Q.   Okay.  But you can't name them, the different cadres?

A.   No.

Q.   Can you tell me any document that you read before becoming involved in the approval process for CORE renewals regarding what FEMA and CORE employees actually do?

MR. GREAVES:  Objection; foundation.

A.   I don't recall.

Q.   Okay.  Are you familiar with a report the White House commissioned following Hurricane Katrina titled "The Federal Response to Hurricane Katrina: Lessons Learned"?

A.   I don't recall.

Q.   Have you ever read "The Federal Response to Hurricane Katrina: Lessons Learned" report?

A.   I may have taken a look at it, but I don't remember.

Q.   Are you aware of one of the structural flaws that that report said led to the federal response was that DHS did not maintain the personnel and resources of FEMA's regional offices?

Did you know that?

A.   No.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 228

Q.   Okay.  Did you know that one of the things that that report concluded that led directly to increased deaths and property damage was decision-making by uninformed DHS officials?

Did you know that?

A.   I did not.

Q.   One of the lessons learned from Hurricane Katrina was that removal of FEMA's own authority to make decisions and placement of that authority at DHS directly led to death and property damage.

Were you aware of that?

A.   I'm sorry.  Can you repeat that?

Q.   Sure.

That one of the report's conclusions was that the removal of authority from FEMA to make decisions and placement of that authority at DHS led directly to death and property damage following Hurricane Katrina.

Did you know that?

A.   I was not aware of that.

Q.   What exactly were your qualifications to help make any decisions regarding FEMA staffing, Mr. Guy?

MR. GREAVES:  Object to foundation.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 229

A.    I couldn't tell you why I was chosen for that.

Q.    Do you have any qualifications to make those decisions?

A.    I don't know how to answer that.

Q.    Can you name a qualification that you would have to make decisions regarding FEMA staffing?  Any qualification.

A.    I didn't make independent decisions about FEMA staffing, ma'am.

Q.    You passed that on to others?

A.    No.  The Secretary made the decisions, and I would have, you know, yes, passed that on.

And then -- I was not making any independent decisions about anything -- as far as I remember.

Q.    Let's talk about some of the decisions.

There are three different time periods in 2025 at FEMA that pertain to three different SOPDAs.

Do you remember that?

A.    Yes.

Q.    First came Cam Hamilton.  Is that right?

A.    Yes.

Q.    Roughly January, I think, to May 2025.  Is that fair?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 230

(No audible response.)

Q. Do you remember when he started, by the way?

A. Cam?

Q. Was it January or February?

A. I don't remember.

Q. Okay. Early days in the Administration. Correct?

A. Yes.

Q. Okay. And then he left in -- sometime in May. Right?

A. That's -- yes, that sounds right.

Q. Okay. And do you recall that SOPDA Hamilton was asked to write something called the "Abolish FEMA" [sic] memo?

A. I don't remember that.

Q. Were you involved in that memo in any way?

A. I have no recollection of it.

Q. Okay. You're not -- you don't recall a memo called the "Abolish FEMA" memo?

A. No.

Q. Okay. That would have been a significant thing for you, working on FEMA?

A. Yes. I don't remember there ever being an "Abolish FEMA" memo, thus called, or -- no, I don't

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 231

remember anything like that.

Q.    Do you recall anything -- ever hearing anything about a memo written by Cam Hamilton that proposed renaming FEMA the National Office of Emergency Management?

A.    I might remember hearing something like that.

Q.    What is National -- what's the acronym for National Office of Emergency Management?

A.    N-O-E-M.

Q.    "NOEM"?

A.    Yes.

Q.    Now, as of early 2025, you probably, and everyone in the Administration, was aware that one of President Trump's priorities for the new Administration was workforce reduction.  Right?

A.    Yeah.  I don't know if I would characterize it like that, though.  I think it's for the end of government efficiency, would have to be -- what I would think of as more the priority than just reduction for the sake of reduction.

Q.    You remember an executive order -- I believe it was 14210 -- that the President issued that directed agencies to commence large-scale reductions in force?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 232

A.   Vaguely.

Q.   Okay.  And you remember DOGE?

A.   Yes.

Q.   That was the beginning of the -- Trump's second term in early 2025, is when DOGE was happening.  Right?

A.   I believe so.

Q.   Okay.  And you are -- you also recall that one of the things the President did was enact a hiring freeze?

A.   I think that's right.

Q.   And were you aware that OPM had given DHS a blanket exemption, for the entire department, to President Trump's hiring freeze?

A.   I don't remember.

Q.   But in March, Secretary Noem decided that the hiring freeze would apply to DHS anyway.

Do you remember that?

A.   No, I don't remember being involved in those discussions.

Q.   Okay.  You weren't -- as the DCOS at the time, you were not involved in discussions of the hiring freeze or whether DHS would recognize that OPM exemption or not?

A.   I don't remember.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 233

Q.   Do you recall that at some point in March, there was a new process put in place that required S1 approval for every hire?

A.   For every individual hire?  I don't remember that.

Q.   Okay.  And that there were some exceptions to that for what are known as "Mission Critical Occupations," or "MCOs."

Does that sound familiar?

A.   I recall some -- vaguely, some discussions like that.

Q.   But otherwise, everything had to be sent to the DHS front office for S1 approval?

A.   I think so.

Q.   Okay.  And were you involved in communications or conversations within the Office of the Secretary about whether FEMA COREs and CORE renewals would count as new hires or not during this, I would say, roughly, first six months of 2025 time frame?

A.   I don't remember.

Q.   Okay.  It's possible you were involved in those conversations?

A.   It's possible.

Q.   Okay.  Did you have an understanding as to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 234

whether FEMA renewal -- sorry.  Let me say that again.

Did you have an understanding as to whether CORE renewals had to be sent for S1 approval?

A.   I don't think that -- to the best of my recollection, I don't think that S1 would have been approving individual COREs.

No, I don't think so.

Q.   Were you familiar with a group of FEMA employees who publicly signed something called the "Katrina Petition" in the summer of 2025?

A.   I don't recall.

Q.   And that those individuals were placed on administrative leave?

A.   I don't really remember.

Q.   Were you involved in that decision?

A.   I may have been.

Q.   Okay.  Did you make that decision, to place them on administrative leave?

A.   I didn't make independent decisions, ma'am.

Q.   You do recall that the FEMA Review Council was having meetings in 2025.  Right?

A.   Yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 235

Q.   And that DHS Secretary Noem was the co-chair of the FEMA Review Council?

A.   Yes.

Q.   Okay.  And you were supporting DHS Secretary Noem in her role as the co-chair of the FEMA Review Council?

A.   Loosely, yes.

Q.   Okay.  You attended several meetings of the FEMA Review Council.

Do you recall that?

A.   I went to -- I think I went to the first one.  And then I may have went to maybe two others.

Q.   Okay.  And maybe the first one was in Washington, D.C., and then there was another one in New Orleans.

Do you remember that?

A.   Yes.

Q.   Okay.  And do you recall hearing Secretary Noem talk about eliminating FEMA in its current form at those meetings?

A.   I don't remember her saying that specifically, but the spirit of it would have been kind of high level:  We need to implement the President's intent.  This is great.  The FEMA Review Council is doing great.  We need to make FEMA work

Page 236

better for the American people.  It needs to be faster.  It needs to be something other than what it's been, the bloated bureaucracy.

You know, whatever -- something along those lines.

Q.   You've heard Secretary Noem say -- you're paraphrasing, but you've heard her say things like that?

A.   But -- not only Secretary Noem, but that's kind of like the messaging on -- that's the FEMA Review Council's ethos, if you will.

Q.   Okay.  There were other people at DHS working with Secretary Noem on work related to the FEMA Review Council?

A.   Yes.

Q.   And at some point, you knew that there was going to be a report that was going to come out of the Review Council.  Right?

A.   That was in the executive order, that a report needed to be produced.

Q.   And there were people working on drafting that report within DHS.  Right?

A.   Technically, they were located at DHS.

Q.   Were you one of the people working on the draft report for the FEMA Review Council?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 237

A.   Not substantively.

Yeah, no, not -- not substantively.

Q.   Can you tell me what your role was with respect to the draft report?

A.   As far as I remember, it was just checking in and making sure that there was actually a report being drafted.

Q.   And Kara Voorhies was one of the people working on that draft report.  Right?

A.   She may have.

Q.   Do you know?

A.   I think she probably did work on the report.  I --

Q.   And do you know if -- oh, sorry.  I didn't mean to cut you off.

A.   I don't think she was the main drafter of the -- the report was being written by members of the -- that's why there was the FEMA Review Council. They drafted the report.

MS. LEONARD:  One second.  I'm sorry.

(Pause.)

MS. LEONARD:  Okay.  Thank you.

Q.   Do you believe Kristi Noem was working on drafting the report?  She was the co-chair of that

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 238

council.

A.    Yeah, but I don't recall her being involved at a granular level.

Q.    Okay.  Do you know whether Karen Evans was working on the draft of that report?

A.    I don't think she was, really, at a gran- -- I think she had awareness of it, but I don't think she was really -- again, this was the FEMA Review Council's report.

So they had numerous practitioners.  There was a task force.

There was a lot of people working on the report.

Q.    But you did know that there were people within DHS who were supporting Secretary Noem and her work on that report?

A.    I just don't -- I don't know if I agree on that characteriza- -- because I don't know that Secretary Noem -- like, I don't know how heavy her hand was on the report, so....

Q.    Okay.  You did know that the FEMA -- the new FEMA was called "FEMA 2.0" in the draft report?

A.    I think that was a....

No, I didn't.  I don't remember reading that in the report.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 239

But I, again, think that was kind of a tongue-in-cheek thing.  I don't think that that was the -- I think it was a placeholder.

MS. LEONARD:  Give me one moment.  Something is missing here.

Ah, here it is.  Let's take a look.

So I'm going to hand you what was previously marked as Exhibit 13, which I think we can just keep as Exhibit 13, since we're using the same numbers in this deposition.

(Whereupon, Plaintiffs Exhibit 13, previously marked, was introduced to the witness.)

Q.    This is -- I'm not going to ask you to read this whole report.

It's a December 11 version, and I can represent to you that this was discussed with Ms. Evans, in her deposition, as a draft that had been leaked to the public, because that -- you're aware that that report has never been finalized.  Right?

A.    Yes.

Q.    Okay.  So can you look at Page 7, internal Page 7.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 240

Okay.  And you see here, it says:

FEMA 2.0 - A New Start.

A.   Yes.

Q.   Okay.  Were you aware that this draft report was referring to the reorganized FEMA as FEMA 2.0?

A.   Again, I think that that was a placeholder name.  I don't think that anyone intended to call it....

I don't even want to speculate.

Q.   And were you aware that the final report -- at some point in time, they were working towards issuing that final report by the December 12 Review Council meeting?

A.   I'm sorry.  Can you repeat that?

Q.   Sure.

Were you aware that people were working towards issuing a final report by the December 12 Review Council meeting?

A.   I don't recall that those were the specific dates, but I think, generally, yes, I was probably aware of the final review date.

Q.   Okay.  You can -- sorry -- apologies for the lack of a stapler.  You can put that back together and set it aside.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 241

Okay.  Now, in this roughly the same, I'm going to call it, late fall time frame, DHS was also working on something called an annual staffing plan.

Does that sound familiar?

A.   No.

Q.   Okay.  Were you familiar with an executive order from the President from October 15 that required agencies to put together their annual staffing plans?

A.   Vaguely, I remember that.

Q.   Okay.  Were you aware that DHS CHCO Roland Edwards had directed the various FEMA components to put together staffing plans?

A.   Again, vaguely.

Q.   And that he had given them a due date of early December to get that information back to headquarters?

A.   I don't remember exactly.

Q.   Were you involved in the approval process for DHS's annual staffing plan?

A.   I may have been.  I don't remember.

Q.   Do you remember that OMB and OPM eventually extended the deadline because of the government shutdown?  It became December 15.

Do you recall that?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 242

A.   I don't -- vaguely, yes.

Q.   And so, around the same time that this draft Review Council report is being worked on, DHS is also working on an annual staffing plan that includes FEMA.

A.   That sounds right.

Q.   Okay.  And then during the fall of 2025, you are also aware that the authority that had been delegated to Mr. Richardson with respect to extending certain CORE renewals, that authority was going to expire at the end of December.

Does that sound familiar?

A.   I didn't pay attention to any of that.

Q.   Okay.  Did you know that Secretary Noem had given a delegation to Mr. Richardson for six months to renew certain COREs for 180 days?

A.   I vaguely remember that, yes.

Q.   Okay.  And unless the Secretary approved another delegation of authority, FEMA's authority would expire.

Does that ring any bells?

A.   Not really.

Q.   You don't recall, in October of 2025, meeting with Ms. Evans to discuss this issue of the renewal of FEMA's authority to renew the COREs?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 243

A.   There were so many things going on.  This would not have been something that I was really paying very close attention to, I don't think.

MS. LEONARD:  Okay.  Let's mark this as the next.

COURT REPORTER:  114.

(Whereupon, Plaintiffs Exhibit 114 was marked for identification.)

MS. LEONARD:  114, thank you.

Q.   Here you go.

A.   Can I have time to read through this, please.

Q.   Sure.  I'm going to point you to one particular page, but feel free to take a look.

We're going to be looking at October 29.

(Witness reading.)

A.   Okay.

Q.   Do you see October 29, in the middle of the page, there's a notation that says "Joe," with an underline?

A.   Can I -- can I just read the whole --

Q.   Sure.

A.   -- page?

(Witness reading.)

A.   Okay.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 244

Q.   All right.  So this is Wednesday, which would have been the day of your sync meeting with Karen Evans regarding FEMA.  Right?

A.   Um-hum.

Q.   Do you think --

A.   Yes.

Q.   Okay.  So, "Joe," would you understand that that's notes from a meeting that she had with you?

A.   It could have been.

Q.   And it also says "with Victoria and Kara."

Do you see that?

A.   I see that.

Q.   And that could be Victoria Barton and Kara Voorhies?

A.   Yes.

Q.   And then what I read, it says:

Delegate authority,

centralize the authority,

project management, contract

process.

Then there's a lot of other stuff.

And then, at the very bottom, there's a note here that appears to refer to the expiration of authority.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 245

Do you see that, the very last thing at the bottom of the page?

A.   Yep, I can see it.

Q.   Okay.  So what I read is:

Expire in December --

something's crossed out -- CORE

has to come to Secretary

approval.

Do you see that?

A.   I can't really read her writing, but....

Q.   We'll do the best we can.

(Witness reading.)

A.   Um-hum.

Q.   Does this refresh your recollection that you were having discussions with Karen Evans in October, late October, about this issue around renewal of the authority for COREs?

A.   She probably brought it up to me.

But again, I don't know how much or how close attention I was paying to it.

Q.   Do you know why Kara Voorhies, a government contractor, was involved in discussions of the CORE renewal authority?

MR. GREAVES:  Object to foundation.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 246

A.   I don't know.

Q.   Did you authorize her to be there?

You, personally.

A.   I don't think so.

Q.   Do you know who did?

A.   No.

Q.   Did you have any understanding that without the delegation of additional authority from the DHS Secretary to FEMA, it was the Secretary's policy that FEMA could not renew the COREs?

A.   I'm sorry.  Can you repeat that?

Q.   Sure.

Did you have any understanding that without a delegation from the Secretary to FEMA of this authority, it was the Secretary's position that FEMA could not renew COREs?

A.   I guess I didn't really think about it.

Q.   Was there anyone else in the Office of the Secretary communicating with FEMA about whether or not they had authority to do certain things, other than you, at this point in time?

A.   I don't remember.  I mean...maybe.  I don't know.

Q.   So maybe Kara Voorhies?

A.   I don't know.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 247

Q.    She was in the Office of the Secretary.
Correct?

A.    For a certain period of time.  Honestly, I
don't know.

Q.    Were you involved in the decision to
replace Mr. Richardson with Ms. Evans?

A.    Maybe loosely.  I don't remember.

Q.    Do you recall that you continued to meet
with and discuss the issue of CORE renewals and
FEMA's authority with respect to the CORE after
Ms. Evans became the SOPDA on December 1?

A.    Honestly, I don't remember particulars
about the COREs.  I just was not paying that close
attention to them.

Q.    And the best place to look would be either
agendas that you said Ms. Evans had emailed to you
for your meetings, or maybe her handwritten notes to
see what --

A.    I think --

Q.    -- you talked about?

A.    Sorry.  I didn't mean to cut you off.

I think the best place to look would be on
our official emails.

Because for something like this that I
really wasn't paying close attention to, you would

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 248

find more of it if, say, there was a decision that needed to be made.

Yes, she could have brought it up in a meeting, but if she really wanted to get it done, if there's something that really had to be done, like fast, I think it would have been a decision that was shot over email and just -- because that's how things were routed up, to be turned into a memo, to then be signed.

But I just don't -- I don't recall a lot of that happening with COREs. Perhaps there was -- you know, it seems like Karen was very much more focused on it at the FEMA level than I was at -- or that the front office was.

Q. Were there ever things that you advised any of the components, "Maybe don't send that up for approval right now"?

A. Maybe, yeah.

Q. That that was part of your role as the conduit, to help them understand what was going on in the front office?

A. I think that's fair to say.

Q. Do you recall that there were, in fact, several discussions around the issue of CORE renewals and FEMA's authority in December of 2025,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 249

in particular?

A.    Where?

Q.    That you were involved in.

A.    That I was involved in.  At -- with Karen or...?

Q.    And others.

A.    I mean, she probably -- yeah, I mean, she brought it up to me.

I don't remember how close attention I paid to it, but there's -- you can see that she brought it up to me.

Q.    And do you recall that you were also talking to Karen about the FEMA annual staffing plan?

A.    To be honest, I don't think I really got that involved in that.

Q.    Okay.  Did you make the decision that the FEMA Review Council draft should state that FEMA should be cut in half?

MR. BOMBARD:  Object on deliberative privilege.

A.    Can you repeat that question?

Q.    Sure.

Did you make the decision that the FEMA Review Council draft should state that FEMA should

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 250

be cut in half?  Did you personally make that?

A.    No.

Q.    Okay.  Let's look at the draft, Page 7.

If you look in -- second paragraph down, there's a sentence.  I'm going to read it:

FEMA 2.0 should reduce
overall staffing by
approximately 50%....

Do you see that?

And then it goes on.

A.    Yes.

Q.    Okay.  Did you write that?

A.    I don't recall writing that.

Q.    Were you aware that the report was edited, at some point in time, to state that FEMA's staff should be cut in half?

A.    Not that I recall.

Q.    Do you know who made the decision to include the 50% cut?

A.    There was a whole team of writers that were appointed to this Review Council that -- I think, for the most part, we -- the attitude was, you know, just let them do the work.

Q.    Do you know whether that recommendation to cut FEMA staff in half came from the Review Council

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 251

or from DHS?

A.   I don't --

MR. BOMBARD:  Objection; deliberative privilege material.

Q.   You can answer the question.

The question is:  Do you know?

A.   No.

Q.   Around this same time in early December, you personally told SOPDA Evans that the FEMA annual staffing plan should include a 50% cut to the FEMA staff, didn't you?

MR. BOMBARD:  Object to foundation.

A.   I don't remember.

Q.   Is it possible that you did that?

A.   "Should include"?  I mean, it's possible.

But I don't think that I would have said to Karen, of my own volition, "You need to include a 50% and that's it."

The way we did things was, you know, it could have been include a 10%, 15%, 25%, 50%, include 75 -- I don't know.

But I don't remember having that conversation with her or saying that.

Q.   Did you personally make the decision that

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 252

the FEMA annual staffing plan should include a 50% cut?

A.   I don't remember.  I don't think that I would independently do that.

Q.   Would that direction have come from someone else?

A.   It could have came from OPM or OMB or....

I don't want to speculate.  I don't know.

Q.   Or someone else, like the Secretary of DHS?

A.   Perhaps.

Q.   Do you recall discussing this 50% cut with Secretary Noem?

A.   No, I don't recall discussing anything about a staffing plan like this with Secretary Noem.

Q.   What about with Corey Lewandowski; do you recall discussing cutting FEMA staff with Corey Lewandowski?

A.   I don't recall any particular instances that I discussed that with him.

Q.   What about generally; do you recall talking about cutting FEMA staff with Corey Lewandowski?

A.   No.

Q.   Do you recall that Corey Lewandowski would

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 253

say, "What part of abolish FEMA don't you understand?"

A.   I don't remember.

Q.   You knew that Corey Lewandowski was giving direction that FEMA should be cut, didn't you?

MR. GREAVES:  Object to foundation.

A.   I think that if....

I don't know.  Perhaps.

Q.   Are you aware that Karen Evans testified at her deposition, under oath, that you personally told her to include a 50% option in the FEMA annual staffing plan?

A.   I may have done that -- include an option. Like I said, it wasn't to execute, and it was, hey -- go.

And by the way, I don't recall this.

Q.   Do you -- how did you come up with 50%?

A.   I have no idea.

Q.   And are you aware that Karen Evans sent in a FEMA annual staffing plan to DHS that included a 50% cut to FEMA staff?

A.   Was it only a 50 --

MR. GREAVES:  Object to foundation.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 254

Q.   You can answer.

A.   I don't know.  I....

Q.   Were you aware that the only FEMA staffing plan that Karen Evans sent to DHS after she talked to you was a 50% cut to FEMA staff?

MR. GREAVES:  Object to form and foundation.

A.   I don't remember.

Q.   Okay.  Do you recall that SOPDA Evans started in the position on December 1?

A.   I don't remember specifically.

Q.   Around that time?

A.   Yeah.

Q.   Okay.  I'm going to tell you that was a Monday.

So if you had your regular meeting with her, that would have been December 3.  That would have been your Wednesday morning meeting.

Does that sound about right?

A.   Unless something disrupted the meeting that week.

Q.   Do you recall meeting with her soon after she became SOPDA?

A.   No.

Q.   Okay.  And do you know that the very next

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 255

day, December 4, is the day that Karen Evans submitted the annual staffing plan to DHS with a 50% cut?

MR. GREAVES:  Object to form, foundation.

A.   I don't remember the timeline.

Q.   Can you tell me any basis for including a 50% cut to FEMA's staff in the FEMA annual staffing plan?

MR. BOMBARD:  I'm going to object, just in -- don't want the witness to get into any kind of deliberative privilege -- deliberative process privileged material.

So you can speak at a very high level, but I wouldn't get into any specifics of discussions between you and the Secretary, things like that, on this plan.

WITNESS:  Sure --

MS. LEONARD:  So, first of all, we don't think this is covered by deliberative process privilege. Understand your objections.

If you are going to ask the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 256

witness not to provide testimony, we can do this one of two ways.

The first is we can go get a court order that the privilege, which is qualified, is overcome, and we will come back and do it all again.

Or we can take the testimony, you can mark it confidential on the record, and we can have the court resolve whether the deliberative process privilege applies.

Which would you rather do?

MR. BOMBARD:  We'll do Option~2.

MR. HALL:  Uh --

MS. LEONARD:  Okay.

MR. HALL:  -- let's confer, if we --

MR. BOMBARD:  Well --

MS. LEONARD:  Do you want to confer on that?

MR. BOMBARD:  -- let's confer on that, yeah.

MS. LEONARD:  Okay.  We can take a break and confer.

MR. GREAVES:  Actually -- sorry,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 257

before we go on break, just because it's top of my mind because you mentioned designation of materials confidential, there was earlier I mentioned -- you asked him about his personal cell phone number and his address.  I wanted to make sure that that's marked confidential.

And there's one other thing I wanted to make sure is marked confidential, as he discussed his employer, because he may have confidentiality issues with that employer.

So I don't know that for a fact, but he might.

MS. LEONARD:  Let's do -- we are happy to do all -- let's do that at the end.  When we wrap up, we can do -- we can make sure that we get those exact moments and anything else that you want to mark.  That's fine.

VIDEOGRAPHER:  Off the record at 5:03.

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 5:18.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 258

MS. LEONARD:  Okay.

MR. GREAVES:  Would you mind --

MS. LEONARD:  Oh, sorry.

MR. GREAVES:  -- repeating your question from before?

MS. LEONARD:  Oh.

MR. GREAVES:  Or we could have it read back.

MS. LEONARD:  I believe we will have to have the court reporter read back the question.

COURT REPORTER:  Okay.

(Whereupon, the court reporter read back from the record as follows:

"Q    Can you tell me any basis for including a 50% cut to FEMA's staff "and a" [sic] FEMA annual staffing plan?")

MR. GREAVES:  And object to form and foundation, calls for --

MS. LEONARD:  And --

MR. GREAVES:  -- calls for speculation.

MR. BOMBARD:  And we're going to maintain our objection.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 259

And instruct the witness that to the extent, you know, the answer is going to involve or elicit the substance of any privileged communications, not to answer that.

But we're trying to assert this in the most minimalist way possible, while preserving the general privilege.

MS. LEONARD:  Okay.  So you're choosing what I described previously as Option No. 1, not Option No. 2.

MR. GREAVES:  Why don't you hold off just a second and -- because I don't think we need -- I don't think it's an issue, basically.

So, go ahead -- to the extent that you can answer, subject to that objection, go ahead and answer.

BY MS. LEONARD:

Q.  Go ahead.

A.  I don't remember.

Q.  Okay.  So you don't remember anything regarding why a 50% cut to the entire FEMA staff would have been included in the annual staffing plan?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 260

A.    No.

And again, I think, generally, the way that we tried to do things was we tried to include a, you know, broad amount of options for what goes on.

And then you get it to the Secretary, and she signs it or she doesn't sign it, or likes it or doesn't like it.

I mean, just because an option was included didn't mean it was going to be executed.

Q.    When one of the options was cutting an entire subagency in half?  That would have been on the board?

A.    I don't know.  I don't remember really working on this.

Q.    Okay.  And you don't recall that the very next day after your weekly meeting, Karen Evans did submit an annual staffing plan with a 50% cut to the entire FEMA staff to DHS?

A.    No, I don't remember.

Q.    Can you point me to any communication from you that says, "Karen, we didn't ask you to cut FEMA's staff by 50%"?

A.    To be honest, my attitude, a lot of the time, with things was kind of, I could -- I could

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 261

imagine that, for this, I would have been like, "Sure, whatever.  Send it up.  I don't care."

Q.   Mr. Guy, Ms. Evans testified that you told her to include the 50% option in the staffing plan.

Do you think she was lying?

A.   I don't think she's lying, but there's a lot of different ways that that could have been done.

She could have asked me, proactively, "Joe, do you want me to include a 50% option?"

And I could have said something like, "Yeah, sure, I don't care."

Q.   And at this time, were you having communications with others in the Office of the Secretary regarding cuts to FEMA staffing?

A.   I don't remember.  I don't think so.

There was a lot -- if this was an agency-wide staffing plan, there would have been a lot of discussions about staffing going on.

And I generally wasn't really that involved with staffing.

Q.   So it wasn't your decision that the FEMA annual staffing plan should include a 50% cut?

A.   I didn't make any independent decisions.

Q.   And it wasn't your decision that the draft

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 262

report for the Review Council should just coincidentally contain a 50% cut to the FEMA staff?

MR. GREAVES:  Object to form.

A.    I don't think so.

Q.    Was it a coincidence that the FEMA annual staffing plan and the FEMA draft review -- FEMA review draft report both contained a 50% cut?

A.    I don't know.  I was not involved, at a granular level, with them.  I don't know.

Q.    But you are the person who communicated to Karen Evans that the 50% cut should be included in the FEMA annual staffing plan.

MR. GREAVES:  Object to form.

A.    But again, I don't know -- and I -- I highly doubt that I would have sat down and said something like, "You need to include a 50%" -- I think that it probably came in more of like a question, like, "Joe, you want me to include this?"

And I was probably -- because this has happened other times with people who wanted -- and I'm not saying Karen -- I'm speculating.  I don't want to speculate.

Q.    Or because someone in DHS leadership told you to tell Karen Evans that.  Right?  That's also possible?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 263

A.   I suppose, but I don't recall that.

Q.   But it's possible?

A.   I think that that's less likely than the other scenario, but, yes, I think that's possible.

Q.   Did you see the FEMA annual staffing plan in December?

A.   I don't remember.

I -- again, I don't think I would have been -- if I did look at it, it would have been more like pass it off to man- -- whatever, pass it off to management.

I don't really -- management was really more involved with any of the staffing, stuff like that.

Q.   Who's "management"?

(No audible response.)

Q.   When you said "management," who are you referring to?

A.   The CHCO.  That's where -- that's where like CH- -- human resources at headquarters is.  It's where, you know, the HR decisions get made, things like that.

Q.   Not at the Office of the Secretary level?

A.   It is at the Office of...well, they have the most input into being like, does this makes

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 264

sense, this is a staffing plan.

Q.   So staffing plans then went to the Office of the Secretary for S-1 review and approval?

A.   Yeah, but I don't remember the particulars of what that flow looked like.

Q.   And you don't recall whether you were involved in that flow or not?

A.   I may have been, but I don't know.

Q.   And it's likely, if it was an actual document, such as a staffing plan, that there would have been one of those ExecSec routing sheets for the approval process within the Office of the Secretary.  Is that right?

A.   For sure.

Q.   For sure there would have been.

A.   Yes.

Q.   So that's something we can look for.

(No audible response.)

Q.   Was that a yes?

MR. BOMBARD:  Object on that as well --

COURT REPORTER:  Pardon me, sir?

MR. BOMBARD:  Objection for deliberative process privilege for the routing sheet and any kind of internal

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 265

secretarial deliberations over this plan.

MS. LEONARD:  You're objection to -- objecting to the question of whether there was a routing sheet for approvals for --

MR. BOMBARD:  I think you asked for the routing sheet in your question.

MS. LEONARD:  I asked:  Is that something we can look for?

MR. BOMBARD:  That's -- well....

WITNESS:  Again, I don't even remember if it exists.  So....

MS. LEONARD:  Okay.

BY MS. LEONARD:

Q.  At the time that these discussions were going on -- so, let's just put it early December -- were you aware that the CORE positions that FEMA made up about half of total FEMA employees?

A.  I don't think so.

Q.  Were you aware that COREs were generally, under the Stafford Act, a term employee that had something called an "NTE date"?

A.  I was generally aware that COREs had renewals.

Q.  Okay.  Were you aware that -- well, let me

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 266

ask one more question about the staffing plan.

I'm going to assume that you did not review the staffing -- is it correct that you did not review the staffing analysis that was created by FEMA's programs and regions for the annual staffing plan?

A.   I don't remember.

Q.   Do you know if you ever looked at that?

A.   I don't remember.

Q.   Do you recall that the -- FEMA's programs and regions put together a staffing plan that would maintain existing numbers of staff at 23,000 for FEMA?

A.   No, I don't recall that.

Q.   And that's what they said they needed to perform their functions.  Did you --

A.   I don't recall that.

Q.   Okay.  So that's not something you considered in telling Karen Evans to cut FEMA staff in half?

MR. GREAVES:  Objection; foundation.

A.   I don't recall that.

Q.   Okay.  Immediately following your Wednesday, December 3, meeting and then Karen Evans'

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 267

submission of the annual staffing plan with a 50% cut on December 4, were you aware that S-1 requested data regarding the FEMA CORE employees from FEMA?

MR. GREAVES:  Object to form.

A.   No.

MS. LEONARD:  Okay.  Let's look at what has been previously marked as Exhibit 26.

(Whereupon, Plaintiffs Exhibit 26, previously marked, was introduced to the witness.)

Q.   So this was marked in the Evans deposition as Exhibit 26.  We don't need to remark it.

And you can read the whole thing -- it's a two-page document with a chain of emails.  The first in time starts on the back page.

A.   Can I just read this really fast?

Q.   Yes.

VIDEOGRAPHER:  I'm sorry -- can I just ask you to bind the clip the side.

MS. LEONARD:  Oh.

WITNESS:  Sorry, sorry, sorry, sorry.

(Witness reading.)

A.   Okay.

Q.   Okay.  So the first-in-time email at the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 268

bottom of this, which was sent by, on the backside, LaToya Prieur, who's the FEMA CHCO, on December 5 at 8:17 a.m., she is saying that:

> The FEMA Office of the
> Administrator wants to track
> CORE expirations by month
> beginning with January 2026,
> and that has to be completed by
> 10 a.m. because it's going to
> be sent to the -- to S-1.

Do you see that?

A.    Um-hum.

Q.    Do you have any recollection of this request from the Secretary's office to FEMA for this data?

A.    I don't -- but, also, it doesn't say that there was a request from S-1.  It just says that they're going to send it to S-1.

So they could have been doing that proactively.

Q.    Sending information about the COREs by NTE date to S-1, just so that S-1 would know?

A.    Yeah, maybe.

Q.    And would S-1, that office, include you -- or do you think this is a specific reference to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 269

Secretary Noem herself?

A.   I don't know exactly.  I don't know what the person who was writing the email was thinking.

Q.   And -- but you don't recall, on behalf of the Secretary, asking FEMA to send this data on COREs?

A.   I do not recall that.

Q.   Is it possible that you did ask when you were meeting with Karen Evans this week?

A.   It's possible, but I do not remember doing that.

Q.   Okay.  Do you recall that, throughout December 2025, FEMA was sending data on the CORE renewals by NTE date to DHS leadership?

A.   No.

Q.   Do you recall ever looking at that data in December 2025?

A.   Maybe I did, but I don't remember it.

MS. LEONARD:  Okay.  Let's look at what was marked as 45.

(Whereupon, Plaintiffs Exhibit 45, previously marked, was introduced to the witness.)

A.   Can I just look this one --

Q.   Sure.

A.   -- over too?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 270

(Witness reading.)

A.   Okay.

Q.   Okay.  This is an email chain within FEMA that then Karen Evans forwards to DHS CHCO Roland Edwards.  Do you see that?

A.   This is where the forward is?

Q.   Yes, at the top.

A.   Okay.

Q.   Do you see that?

A.   Yes.

Q.   And she's forwarding substantial information here about the COREs and the renewal dates and which were Mission Critical Occupations, which were not.  Do you see all of that?

A.   Is "MCO" mission critical occupation?

Q.   It is.

A.   Okay.

Q.   Do you know what the FEMA MCOs are?

A.   No.

Q.   Okay.  Did you receive this information as the DCOS at the time?

A.   I don't remember.

Q.   It's possible that Mr. Edwards forwarded it on to DHS leadership, including yourself?

A.   It's possible, yes.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 271

Q.   For consideration and discussions in whatever the DHS leadership was considering about the FEMA COREs at the time?

A.   I don't think that DHS leadership was having any conversations about this.

Q.   You were aware that DHS leadership would have to make a decision regarding renewal of FEMA authority to extend CORE positions, right?

A.   Yes, but I don't -- I don't think that any of this would have been something that would have been viewed by the Secretary or -- I mean, maybe I got an email that I --

I didn't -- I don't remember reading any of this.  I don't remember thinking about it, and I don't remember anyone talking about it in the front office.

Q.   Do you remember, in December 2025, having conversations about whether the COREs would be renewed in January?

A.   Again, I think that Karen brought that up. It was something that she added as an agenda item to a sync.  And she, you know, probably called me and said we had to talk about it.

But again, there was a lot going on.  I don't remember specifically paying much attention to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 272

this.

Q.   Okay.  But you don't know whether you received this information or not?

A.   No.

MS. LEONARD:  Okay.  Let's look at the next one.  This is -- I suspect I might know the answers to these as well -- No. 46.

(Whereupon, Plaintiffs Exhibit 46, previously marked, was introduced to the witness.)

Q.   This is another email chain, Karen Edwards forwarding to Roland Edwards.

A.   Can I just read this one quick too?

Q.   Sure.

A.   And what does P/MCO mean? -- mission critical document.  What is the "P"?

Q.   "Primary"?

We will look it up.

A.   Thank you.

Q.   There are two different levels of mission critical, and we will -- we'll find out what the "P" stands for.

(Witness reading.)

Q.   I stand corrected.  It's "Priority."

A.   All these acronyms.  It's just -- an

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 273

endless litany of acronyms.

(Witness reading.)

A.   Okay.

Q.   Do you recall receiving this information?

A.   No, I do not.

MS. LEONARD:  Okay.  You can set that aside.

Let's look at the next one.

This is 49.

(Whereupon, Plaintiffs Exhibit 49, previously marked, was introduced to the witness.)

(Witness reading.)

A.   Okay.

Q.   You see that this top email on Exhibit 49 is an email from LaToya Prieur to Roland Edwards, in which she copies a number of different people here -- do you see that?

A.   Yes.

Q.   And one of them is Kara Voorhies -- do you see that?

She's in the "CC" list.

A.   Oh, yeah.  Yep.

Q.   Yes?

A.   Yes.

Q.   And do you know whether you ever were

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 274

provided with this information?

A.   I don't remember.

Q.   Okay.  But Kara Voorhies was the senior advisor to the DHS Secretary at the time -- that was her title?

A.   I think so.

Q.   And -- but you don't specifically recall why data regarding CORE appointments and MCOs would be being reported up to anyone at DHS from FEMA at this time?

A.   No.

Q.   Okay.  Mr. Edwards testified in his deposition, as well, that he was not aware of who in the DHS leadership would have been reviewing this information or discussing CORE employees at FEMA.

If Mr. Edwards didn't know and you didn't know, who would we need to talk to find out that information?

A.   Who at the front office was...?

Q.   Talking about the COREs in December of 2025.

A.   I don't know.

But again, from my recollection, we weren't discussing COREs in the front office in December of 2025.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 275

Q.   You don't recall any conversations on any of your meetings about the issue of whether the COREs would be renewed or not?

A.   It's possible that as, an agenda item on an ESEC team call or something, I may have brought up and just said, hey, man, just -- by the way, Karen is trying to get a decision on this.

That's possible.

I don't remember whether or not that actually happened, but I think that would have been the extent.

Q.   Are you aware that Karen Evans was also forwarding to individuals, including Kara Voorhies, information regarding how much of each of -- that each of these CORE positions cost during the same time frame?

A.   I'm not aware of that.

Q.   You don't recall seeing that information?

A.   No.

Q.   And you don't recall whether anyone was considering the cost of the COREs in making any decisions regarding the COREs?

A.   I do not.

MS. LEONARD:  Okay.  Well, let's take a look at Evans No. 27, another

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 276

December 2025 email from Karen Evans.

(Whereupon, Plaintiffs Exhibit 27, previously marked, was presented to the witness.)

(Witness reading.)

A.   Okay.

Q.   Okay.  So the top email here from Karen Evans to Kara Voorhies and some others refers to Karen Evans raising "this issue to the DCOS on December 10."

"DCOS" was you, right?

A.   That is reasonable to say.

Q.   Okay.  And December 10, that would have been a Wednesday, I believe.

Let's look it up on a calendar.  Can we confirm?

Yes, December -- if the 3rd is the 10th and -- or the 3rd is a Wednesday, I'm going to assume the 10th is a Wednesday as well.

So do you have any recollection of Karen Evans, on December 10, raising the issue of the number of COREs who were up for renewal in December or January?

A.   She may have -- you know, vaguely, I remember her bringing it up.  But again, I don't think I paid very much attention.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 277

Q.    And at some point in December, a decision was made that the authority that FEMA had to renew COREs that was expiring on December 31 would not be extended.

Do you recall being involved in that decision?

A.    No.  If there was a -- and I don't remember if there was a memo that went up to the Secretary -- and -- I don't remember.

Q.    So it's possible you were involved in that decision?

A.    Not to re-extend the authority....

It's possible.

Q.    Okay.  So what we have thus far in November/December is a draft FEMA report that we've seen dated December 11.  That includes a 50% cut -- right, we've seen that exhibit?

A.    Yes.

Q.    We have a FEMA annual staffing plan that Ms. Evans testified you directed her to include a 50% option.

A.    Yes.

Q.    We have a decision that needed to be made with respect to expiring FEMA authority to renew the COREs.  Correct?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 278

A.   Yes.

Q.   And we have hundreds of FEMA employees who are in CORE positions with NTE dates coming in January, right?

A.   Yes.

Q.   And here it's looking like, at some point, Karen Evans may have said it was 932, total, for January -- I'm looking at Exhibit 27 -- but that's the total for January, February, and March.

Do you see that?

A.   Yes.

Q.   Okay -- but 900 people working for FEMA, whose NTE dates are coming up in January, February, and March.

And at some point, Mr. Guy, you're aware that there was a decision made to start not renewing the COREs at the beginning of January.  Right?

You're aware of that decision.

A.   Didn't the COREs get extended?

Q.   You're not aware that hundreds of COREs were released from federal employment beginning January 1?

MR. GREAVES:  Object to foundation.

A.   I don't -- I don't recall.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 279

Q.   You don't recall telling Karen Evans that the authority to renew those cores was not going to be approved.

A.   I don't know.  I don't remember telling her that.

MS. LEONARD:  Okay.  Let's look at what was previously marked as Evans~10.

(Whereupon, Plaintiffs Exhibit 10, previously marked, was introduced to the witness.)

Q.   These are the redacted notes we were provided from Ms. Evans, and I'm going to ask you about Wednesday, December 31.

(Witness reading.)

A.   Okay.

Q.   Okay.  So these are the notes that Karen Evans redacted herself, that we were produced before her deposition -- so, do you see the magic marker crossouts?  That's what she did.

So do you recall whether you met with Karen Evans on December 31?

A.   I doubt I did, because that was during Christmas break.

Q.   You don't recall having that meeting?

A.   I mean, is this notes from a meeting?

Q.   First, my question is about your

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 280

recollection.

Do you recall whether you met with Ms.~Evans or not?

A.    I think it would have been -- it's very unlikely that I met with her on December 31.

Q.    Do you recall having conversations with her leading up to December 31 about whether the COREs were going to be renewed or not?

A.    Yeah -- vaguely, yes.

Q.    In this time frame, end of December?

A.    Vaguely, yes.

Q.    Okay.  And here the note says:

Not going to approve the
course.

That's what I read.  Do you see that?

A.    Yeah.

Q.    (Continued reading:)

30 days' extensions and
COREs in general.

Do you see that?

A.    Okay.  Yeah.

Q.    And are you aware that beginning the very next day, January 1, anyone with an NTE date in January was not renewed?

A.    I don't recall.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 281

Q.   Who had the authority to approve the renewals in January -- it was DHS, not FEMA, right?

A.   I don't know.

Q.   Only DHS had the authority to approve CORE renewals under Secretary Noem's policy regarding hiring approvals that had to go to S-1.  Right?

A.   I'm sorry.  I still don't understand what's going on here.

So...when did the renewals get approved?

Q.   People were terminated from federal employment -- they were not renewed -- beginning January 1.  Do you recall that?

A.   Very vaguely.

Q.   And you, in fact, told Ms. Evans that DHS was not going to approve CORE renewals beginning in January.

MR. GREAVES:  Objection; foundation.

A.   I don't remember telling her that.

Q.   Okay.  It would be DHS that had the authority to approve CORE renewals in January. Right?

MR. GREAVES:  Objection; asked and answered.

A.   I don't know.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 282

Q.   Okay.  You communicated a decision that was made by DHS that the COREs were not going to be approved.  Do you recall that?

A.   I don't remember doing that.

Q.   Okay.  Let's --

MR. BOMBARD:  Counsel, can you clarify -- approved by whom?  The COREs approved by DHS or FEMA?

MS. LEONARD:  Are you -- do you have an objection?

MR. BOMBARD:  I just have an objection to the question as being vague.

MS. LEONARD:  Okay.  You can make an objection, but please don't attempt to coach the witness.  Thank you.

BY MS. LEONARD:

Q.   Okay.  Let's look at the unredacted notes that are in your exhibits.  Do we have the number?

MR. GREAVES:  114?

MS. LEONARD:  I think that's right.  Thank you.

Q.   Sorry, I didn't write down -- yes, let's look at -- it's 114.  So it should be somewhere in that pile, early on.  There we go.

And we're going to do a side-by-side of

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 283

December 31.

Now, Exhibit 114 are the copies of the unredacted notes that we were given after Ms. Evans' deposition.

Under the redaction at the top of the page, there was a note that says:

Joe --

-- what appears to be 10:45 a.m.

Do you see that?

A.   Yes.

Q.   So does this refresh your recollection that you met with Ms. Evans on December 31 for your Wednesday meeting?

A.   If she wrote that I did, I'm -- must have happened.

Q.   And so, these would be her notes from that meeting with you, correct?

MR. BOMBARD:  Object.

A.   Yes.

Q.   And one of the things she wrote here in her notes from that meeting with you is:

Not going to approve the COREs, 30 days' extensions and COREs in general.

A.   What is "30 days' extensions and COREs in

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 284

general?"

I don't remember communicating to her that COREs weren't going to be approved.  I don't remember communicating with the Secretary the COREs weren't going to be approved.

Q.   And you don't remember who within the Office of the Secretary made the decision that COREs weren't going to be approved.  Right?

MR. GREAVES:  Object to foundation.

A.   I don't remember.

Q.   Okay.  And you don't remember that COREs were, in fact, not renewed after December 31 at FEMA?

A.   I thought -- it was my understanding that they were extended.  I thought they were renewed.

Q.   Hundreds of people were separated from federal employment as a result of these decisions, Mr. Guy.  You don't recall that?

MR. GREAVES:  Is that a question?

Q.   You don't recall that?

A.   I don't remember.

Q.   So you can't tell me who directed you to tell FEMA that no COREs would be approved starting

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 285

in January.

MR. GREAVES:  Object to foundation.

Q.  Right?

A.  I don't even remember saying that to Karen.  But --

Q.  Okay.

A.  -- I don't remember the meeting.

Q.  And then you also don't remember that, between January 1 and January 22, there were no CORE renewals approved by DHS -- January 1, January 22?

A.  I don't remember.

Q.  Do you know what percentage of FEMA CORE positions were renewed in 2025?

A.  I don't.

Q.  Do you know what percentage of FEMA CORE positions were renewed in 2024?

A.  No.

MS. LEONARD:  Okay.  I think we've been going for about an hour.  So -- or 45 -- so let's take another break, and we can check the time on the record and see where we are.

VIDEOGRAPHER:  Off the record at 5:57.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 286

(Whereupon, a recess was taken.)

VIDEOGRAPHER:  On the record at 6:08.

BY MS. LEONARD:

Q.   Mr. Guy, do you recall whether you met with Karen Evans at your usual Wednesday meetings in January and February of 2026?

A.   I don't remember any of the specific meetings.  Probably.

Q.   So the Wednesdays in January, I'll represent, were January 7, 14, 21, and 28.

Do you recall any of those meetings?

A.   No.

Q.   Or what you discussed at those meetings?

A.   Certainly not.

Q.   The Wednesdays in February were February 4, 11, 18, and 25.

Do you recall any of those meetings?

A.   No.

Q.   Do you recall that in early January you were discussing with Ms. Evans the COREs that were being released by NTE date?

A.   No, I don't remember that.

Q.   And do you recall that between December 31 and January 7, you were talking to Karen Evans

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 287

outside of your regularly scheduled Wednesday

meetings?

A.   I don't remember.

Q.   It's possible, though?

A.   Yes, it's possible.

Q.   Okay.

MS. LEONARD:  Okay.  Let's mark

this as the next, 115.

(Whereupon, Plaintiffs Exhibit 115 was

marked for identification.)

(Witness reading.)

A.   Okay.

Q.   Okay.  So this is an email from Karen

Evans to you.  Do you recognize it?

A.   No.

Q.   Does this refresh your recollection that

Karen Evans was giving you information about COREs

who were being released by NTE date?

A.   No.

I generally remember that Karen was

talking about COREs -- vaguely.  I didn't pay

attention to NTE date or....

I believe that I received this email.

Q.   And do you know what any of the people who

are reflected here -- Region 2, Region 6, Region 8,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 288

these other offices -- do you have any idea of what they do?

A.   No.

Q.   And she says, "As I previously mentioned..." -- do you see that reference there?

A.   Yes.

Q.   And you don't recall the conversation in which she would have previously mentioned the COREs that were expiring?

A.   No.

Q.   Do you recall talking with Ms. Evans because there were news articles that were coming out, including CNN, Washington Post, and...maybe CNN and Washington Post, regarding FEMA not renewing the COREs?

COURT REPORTER:   Not what?

MS. LEONARD:   Not renewing the COREs.

A.   No.

Q.   Do you recall that the press also had obtained a December 23 email in which there was a staffing plan exercise that attached a 50% target cut for FEMA -- do you recall anything about that?

A.   No, I don't remember reading anything about that.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 289

Q.   Okay.  You don't recall participating in conversations and decisions about how to respond to the press inquiries?

A.   I believe that I did, but I don't remember.

Q.   Okay.  Well, let's look at that.

You don't remember the time frame?

A.   No, not exactly.

MS. LEONARD:  Okay.  Let's mark this one as 116.  There we go.

(Whereupon, Plaintiffs Exhibit 116 was marked for identification.)

(Witness reading.)

A.   Okay.

Q.   Okay.  This is a series of emails, including -- that you are copied on -- including this last one from Karen Evans, but it looks like the one just previous in time is something that you sent.  Do you see that?

Sorry -- at January 5, 4:58 p.m.

A.   Yep, it is.

Q.   And you say you agree with Micah.

And what you're referring to there is some options that were drafted regarding how to respond to CNN and The Washington Post about an email that

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 290

they were reporting on that showed a 50% cut in FEMA staff.

Do you see that?

A.   Was that an email that Micah sent?

Q.   So there's an email -- let's start at the beginning, actually.  It might work that better way -- it might work better that way.

So go to the back of the chain.  The first email that's forwarded here is from Brianna Sacks at The Washington Post.  Do you see that?

A.   The Washington Post had this email?

Q.   Yes.  The last email in the entire -- so first in line, first in time --

A.   Oh, okay.

Q.   -- is from Brianna Sacks at The Washington Post.

And she's sending an email to Victoria Barton and Micah Bock, do you see that? -- and Daniel Llargues.

I don't know how to say this name.  Do you know how to say his name?

A.   I didn't know him or know who he was, but --

Q.   Okay.

A.   -- "Llargues," maybe.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 291

Q.   "Llargues," okay.

So you see this email from Brianna Sacks at The Washington Post asking for a comment on emails and documents showing there are plans to drastically reduce FEMA's workforce?

(Witness reading.)

A.   Yes.

Q.   I think she says:

It would look to be a 50% cut in overall staff by the end of the year.

And then there's a series of emails, internal.  And Victoria Barton writes some options for how to respond.

(Witness reading.)

A.   What did Micah say was best?

Q.   Right below in the first page:

I'm of the opinion the first one is best.

A.   What was he referring to as "the first one"?

(Witness reading.)

Q.   Do you see Victoria -- I think it's Victoria Barton's email on the second page gives a couple of options for how to respond.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 292

A.   Oh, okay.  All right.

(Witness reading.)

A.   Yes.

Q.   Okay.  So you are agreeing with Micah Barton that -- sorry -- you are agreeing with Micah Bock that Victoria Barton's direct denial of the 50% claim is the best option?

A.   Yeah.  But to be honest, I don't even remember if I really read it.

This sort of thing happened all the time. And the more I could defer to someone like Micah, the better that would have been.  But....

Yeah -- yes.

Q.   Okay.  So you weren't deferring to Micah because you believed that there was no 50% plan -- but, for other reasons?

A.   It can be both.

It's true that there was no 50 -- I think that is a true statement.

Q.   What are you basing that statement on?

A.   That (reading:):

FEMA has not issued and is not implementing a percentage work-based workforce reduction.

COURT REPORTER:  I'm sorry?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 293

MR. GREAVES:  You've got to speak slower for the court reporter.

WITNESS:  Sorry, sorry, sorry.

A.   I don't know.  I don't really remember.

Q.   You don't remember whether the decision to start not renewing the COREs was a decision to implement the 50% reduction staffing plan, do you?

MR. GREAVES:  Object to form.

A.   I never remember having a discussion like that.

Q.   Okay.  But you don't remember whether it was or it wasn't?

MR. GREAVES:  Object to form.

A.   No.

Q.   You did know by this time that there was a proposed 50% cut in that draft FEMA review report, right?

A.   Perhaps.  I don't think I paid very close attention.

Q.   You were one of three people on something called the "FEMA 2.0 Signal Chat," right?

A.   Yes.

Q.   "FEMA 2.0," as we've seen, was the name for the proposed revision of FEMA that was coming out of this Review Council process.  Right?

Page 294

A.   As I've said before, I think that was kind of a placeholder name and like a tongue-in-cheek-type thing.  I don't remember.

Q.   For what FEMA -- the next version of FEMA would be; is that why it was tongue in cheek?

A.   I remember there being discussions or the notion that it was not going to be -- like there was going to be eventually a name chosen, but I don't remember what name or....

Q.   Why would you need to choose a new name for FEMA?

A.   I don't -- I wouldn't have chosen anything.

Q.   "FEMA" is perfectly fine, right?

It describes what the agency is.  It's also the name given to it by Congress.  Right?

A.   I suppose so.

Q.   In that chat, that Signal chat, can you remember ever discussing a plan to cut FEMA by 50%?

A.   I don't remember, no.

Q.   So it's possible that you did?

MR. GREAVES:  Objection; calls for speculation.

A.   I don't want to speculate about that.

Q.   Okay.  But it's possible, right?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 295

MR. GREAVES:  The same objection.

A.   I don't want to speculate about that.

Q.   Okay.  Because you cannot -- we cannot access FEMA 2.0 on your phone, there's no content to the FEMA 2.0 chat, although you can see that you were a participant.  Correct.

MR. GREAVES:  Object to foundation.

A.   I'm sorry.  What was the question?

Q.   We can't see on your personal phone, when we look at the FEMA 2.0 chat, any of the messages that you, Victoria -- sorry, Karen Evans and Kara Voorhies would have sent about FEMA 2.0.  Correct?

MR. GREAVES:  Object to form.

A.   I don't remember any specific work issue that was discussed in there.

Q.   On FEMA 2.0, you don't remember a work issue?

A.   No.  I think that, as you can see, we had a robust channel of communication on official channels.  And....

Q.   What I've seen today, Mr. Guy, is a robust work-related series of communications and chats on your personal phone on Signal, not on official

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 296

channels.

MR. GREAVES:  Object.

If there's a question coming out of that series....

MS. LEONARD:  It is, it is coming.

Q.   And I believe we have one of the FEMA 2.0 chats on here.  It's Exhibit 103.

You can take a look.

(Witness reading.)

Q.   And this FEMA 2.0 -- or the portion that we were given of the FEMA 2.0 chat -- is -- contains messages from Kara Voorhies, in which she says:

Karen, we need you to do a data call to find out how many contractors work at FEMA.

And then Karen very quickly responds:

How do you want the data?

Et cetera, et cetera.

And Kara responds:

We know we'll need it for the overall staffing plan as well.

This is work-related communication, is it not, Mr. Guy?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 297

A.    I suppose.

Q.    Talking about the overall staffing plan. Right?

A.    I suppose.

Q.    For FEMA.

Do you have an understanding of what Kara Voorhies is referring to here?

A.    Yeah, but I don't remember any of this.

Q.    So counsel has repre- -- for the government has represented to us that this series of communications took place on March 5.

Were you still at DHS?

A.    Yes, on March 5.

Q.    And that FEMA 2.0 was being used to discuss the FEMA staffing plan as of March 5.

Do you see that?

MR. GREAVES:    Object to form.

A.    I don't see that that's March 5.

Q.    Well, if we accept the government's representation that this was March 5, then these communications about the staffing plan would have been on that date.  Right?

A.    Yes.

Q.    And what we see here actually -- it says "today."

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 298

Do you see that?

A.   Yes.

Q.   So the way that Signal typically works, the date that it -- the actual date, the current date that corresponds with the date and time and calendar on someone's phone, that's what appears as "today."  Right?

A.   I'm not an IT expert.

Q.   Okay.  So we wouldn't have any reason to believe that this photograph was taken any day other than March 5, if that's what DOJ counsel is representing to us.  Right?

A.   I don't think so.

Q.   Okay.  You don't have any reason to believe that these messages were sent on any other date?

A.   I don't think so.

Q.   Okay.  So as of March 5, if government counsel is correct, FEMA 2.0 was set to auto-delete after four weeks.

Do you see that?

A.   Yes.

Q.   And I believe you told us -- can you pull out your handwritten sheet of your chats.

What does that sheet say that your phone

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 299

says FEMA 2.0 was set to auto-delete at?

A.   It says one week.

Q.   When was the FEMA 2.0 chat changed from a four-week auto-delete to a one-week auto-delete?

A.   I have no idea.

Q.   Sometime between March 5 and today?

A.   I have no idea.

Q.   Did you change the setting on the FEMA 2.0 chat auto-delete from four weeks to one week?

A.   I don't remember doing that.

Q.   Is it possible that you did that?

A.   I suppose it's possible.  I have no idea.

Q.   Do you remember going into your Signal chats and changing any of them to a one-week deletion period?

A.   No, I don't recall that.

Q.   But it's possible?

MR. GREAVES:  Objection; asked and answered.

Q.   Someone changed it from four -- it was four weeks in this picture.  Right?

And it's one week now.  Right?

A.   That's what I saw.

Q.   So someone changed it.

MR. GREAVES:  Object to form,

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 300

foundation.

A.   I suppose.

Q.   But you can't tell me who?

A.   No, I can't.

Q.   Okay.  It's also possible that you did discuss the 50% cut plan on FEMA 2.0.

You just can't remember whether you had any of those communications.  Right?

A.   I suppose.

Q.   Did you also discuss the plan to keep that information away from the public on your FEMA 2.0 chat with Kara Voorhies and Karen Evans?

A.   I --

MR. GREAVES:  Object to foundation.

A.   I have no idea.

Q.   You were aware that there was a plan to keep that away from the public?

MR. GREAVES:  Object to foundation, facts not in evidence.

A.   Keep what plan away from the public?

Q.   The plan to cut FEMA by 50%.

You did not want that information to become public.  Right?

MR. GREAVES:  Object to form,

Page 301

foundation.

A.   I don't remember ever seeing a plan, or knowing that there was a plan, or knowing that anyone knew there was a plan, to cut FEMA by 50%.

MS. LEONARD:  Okay.  Let's take a look at what was previously marked as Exhibit 18 from the Evans deposition.

(Whereupon, Plaintiffs Exhibit 18, previously marked, was introduced to the witness.)

Q.   And let me know when you're ready.  This is another long email chain.

There comes a point in this chain, I will tell you, where you are added by Ms. Evans.

(Witness reading.)

A.   Okay.

Q.   Okay.  So this is a email chain which starts back on December 15 with a draft email about a staffing planning exercise by Stephanie Dobitsch.

Do you recall who Stephanie Dobitsch is?

A.   Not really.

Q.   Okay.  She's someone who worked at FEMA.

A.   Okay.

Q.   Okay.  Do you recall that she was transferred out of FEMA, at Karen Evans' request, at the end of December?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 302

A.   No, I don't remember.

Q.   Okay.  So she drafts an email.  There are a series of conversations about it.  And then at some point, you get added by Karen Evans.

Do you see that email?

It's on December 17 at 9:51 p.m.

A.   Yes, I can see that.

Q.   Okay.  So she says:

I'm also adding Joe Guy and Kara Voorhies.  I took off Stephanie.

I believe that refers to Stephanie Dobitsch.

Do you know?

A.   I don't know.

Q.   Okay.  Do you have any understanding as to why Karen Evans was adding you to this email?

A.   No, I don't.

Q.   Okay.  And then she says here:

I want to highlight the 50 -- 50% is what has been used "internally"....

Do you see that?

A.   Um-hum.

Q.   (Reading:)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 303

That was in the leaked report.

Q. Do you understand she's referring to the FEMA Council report?

A. Okay.

Q. Do you know?

A. No, I don't know.

Q. Do you recall reading this?

A. No.

Q. Do you recall that as of December 17, there had been press reports about the draft FEMA Council report and the canceled Review Council meeting on December 12?

A. Generally, vaguely, yes, I remember.

Q. Do you recall that that meeting had been canceled by the White House?

A. Yeah. Yes.

Q. Okay. And then an extension was later granted for the Review Council's work, to give them more time to issue a report?

A. Yes.

Q. Okay. This email from Karen Evans also says:

The number of 11,500 is also what we have provided to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 304

OMB -- OPM/OMB at a high level,
but we haven't made that
public.

Do you see that?

A.    I can read that, yes.

Q.    So do you have an understanding of the number of total FEMA employees, roughly, at the end of December 2025?

A.    No.

Q.    Did you know it was 23,000?

A.    I did not.

Q.    Okay.  So 11,500 would represent roughly half of the current level of FEMA staffing.

Does that sound about right?

A.    Yes.

Q.    Do you know what Karen Evans was talking about here, with:

The number of 11,500 is
what we provided to OPM/OMB at
a high level, but we haven't
made that public.

A.    No.  I don't remember that.

Q.    Okay.  You don't remember a decision not to make that public?

A.    No.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 305

Q.   Are you aware of, at any point in time, when DHS decided to make public that they had provided the number of 11,500 for the total FEMA staffing to OPM and OMB?

A.   No.

Q.   All right.  You can set that aside.

At some point in January, you -- we have looked at documents that show that there was an announcement of a pause in the off-boarding of CORE employees because of the winter storm.

Do you recall those exhibits?

A.   Yes.

Q.   Okay.  Do you recall whether you discussed that decision with Karen Evans at your January 21 Wednesday meeting?

A.   Which decision?  Sorry.

Q.   The decision to pause the off-boarding of CORE employees.

A.   No, I don't remember.

Q.   Okay.  If January 21 was a Wednesday, is it possible you met with Karen Evans on that day?

A.   It's possible.

Q.   Okay.  And you don't recall whether or not you directed Karen Evans to halt the off-boarding of COREs?

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 306

A.   No.

Q.   Okay.  And we saw -- I'm not going to remember the exhibit number, but we saw the email that La' Toya Prieur had sent out to FEMA leadership saying that the off-boarding was going to be paused.

Do you recall that?

A.   Yes.

Q.   And then there was a Signal chat where Kara Voorhies had a reaction to that being leaked to the press.

You saw that?

A.   Yep, I remember that.

Q.   Okay.  That series of events coincided -- I believe you testified that you were at FEMA when S1 visited on the 22nd.  Is that right?

A.   I think I was.

MS. LEONARD:  Okay.  So let's mark this as the next, 117.

(Whereupon, Plaintiffs Exhibit 117 was marked for identification.)

Q.   So you see the top email from Kara Voorhies?  You're copied on it?

A.   Yes.

Q.   And she refers to touring the NRCC and S1 requesting something.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 307

Do you see that?

A.    I see that.

Q.    Okay.  So do you know what "NRCC" stands for?

A.    "National Recovery Coordination Center."

Q.    And was that something that was activated for the winter storm?

A.    I believe so.

Q.    And Secretary Noem toured that on January 22?

A.    I...that sounds right.

Q.    And you were there?

A.    I think so.

Q.    Okay.  Do you recall that after the press reporting on the pause in the off-boarding, there was another series of communications, internal to DHS and FEMA, about how to respond to the press?

A.    I don't -- there were a lot of emails from press.  I don't remember anything.

Q.    And some of those communications took place on the Winter Storm Team Signal chat that you had on your personal phone.

Does that sound right?

A.    I don't remember.  I mean....

Q.    Let's look at Exhibit 107.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 308

Is this 107 or 104?  Sorry.  My writing is terrible.  I think it might be 104.

It is the Signal image that is "Winter Storm Team."

MS. LEONARD:  What number do you have?  10- --

MR. GREAVES:  104.

MS. LEONARD:  104.  Thank you.  Sorry.

MR. BOMBARD:  What was the last exhibit number?

MS. LEONARD:  The last one was 117.

MR. BOMBARD:  Thank you.

A.   Okay.  104.

Q.   Yes.

So we have Winter Storm Team Signal chat, Micah Bock sending out a message here:

This is what we're saying to reporters.

Do you see that?

A.   Yes.

Q.   Okay.  Do you have any recollection of participating in the conversations about how to respond to the press's inquiries about the pause in

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 309

off-boarding of COREs?

A.   No.  I think I was generally pretty passive on that sort of thing.

Q.   Okay.  And you can set that aside.

You are aware that at some point after the winter storm, the Plaintiffs in this lawsuit filed a complaint challenging FEMA's plan to separate COREs?

A.   I don't remember that.

Q.   At some point, you became aware of the lawsuit.  Correct?

A.   Yes.

Q.   Did you know that the complaint, the supplemental complaint, was filed by the court on January 30, 2026?

A.   I don't recall that.

Q.   Do you recall having conversations around the supplemental complaint filing and the impact on decision-making with respect to the COREs?

A.   No.

Q.   You don't recall?

A.   No.

Q.   Okay.  If the complaint was filed on January 30 -- I'm going to look up that date.  It is a Friday -- your next Wednesday meeting would have been February 4.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 310

Do you recall whether you met with Karen Evans on Wednesday, February 4?

A.   No.

Q.   Do you recall that there was a conversation that you had with Karen Evans on February 4 about restarting the CORE renewals?

A.   No, I don't remember.

Q.   Well, let's look at what -- this one is 107.

107 is the screenshot of her Signal chat with you on February 4.

(Witness reading.)

A.   Okay.

Q.   So you see here Karen Evans' list.

And I believe you previously testified that you could not recall whether your meeting with her was before or after this list.  Is that right?

A.   Yeah, that's right.

Q.   Okay.  So this list reflects that one of the items for that discussion was restor- -- restarting CORE renewals.

Do you see that?

A.   Yes.

Q.   And do you recall that a decision was made, after the Plaintiffs filed this lawsuit, to

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 311

restart CORE renewals for 90 days at a time?

A.   I remember that being brought up.

I didn't -- I don't remember whether that was having anything to do with a lawsuit or if it was just something that was decided.

I don't remember the context.

Q.   Okay.  But you do recall that FEMA had the authority to renew CORE positions for 90 days only from this period in time forward?

A.   I think so, yeah.

MS. LEONARD:  All right.  Let's mark this as 118.

(Whereupon, Plaintiffs Exhibit 118 was marked for identification.)

MS. LEONARD:  Here you go.

(Witness reading.)

A.   Okay.

Q.   So this is a image of Karen -- according to Defendants' counsel, this is an image of Karen Evans' phone.

And it's a FEMA Rapid Response chat that is set to a one-week deletion.

Do you see that at the top?

A.   Yes.

Q.   This chat appears to be discussing an

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 312

article that is cut off at the top.

But below, you can see there's a 2/6/2006 [sic] U.S. News & World Report article that's in a link here?

A.    Yes.

Q.    Okay.  And in the message above that, Karen Evans is saying:

I mentioned this during a principals meeting on Tuesday. Victoria was there as a principal as well.  I discussed with Joe yesterday and sent guidance to the HR that renewals would proceed with the 90 days extensions until further notice.

Do you recall the conversation with Ms. Evans about renewals proceeding with the 90-day notice that she's referring to here?

A.    No, not specifically.

Q.    Generally speaking, if the FEMA Rapid Response chat is set to a one-week deletion, would you expect to see messages from back in February?

A.    I don't know.  I'm not an IT expert.  I don't know.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 313

Q.   You're familiar with, if there's a change in the auto-delete, the existing messages don't get deleted from that point in time.  It just changes how they delete going forward.  Right?

MR. GREAVES:  Object to foundation.

A.   I don't know.

Q.   So you don't know, if you look on your Signal chats, you could see the older material before someone changed the auto-delete settings?

(Pause.)

A.   I....

Q.   Okay.  If you -- you don't know?

A.   Oh, no.

MS. LEONARD:  Okay.  Let's mark this as 119.

(Whereupon, Plaintiffs Exhibit 119 was marked for identification.)

Q.   And I'll represent we believe this is the U.S. News...Report article that's in this link on Page -- sorry, on Exhibit 118.

(Witness reading.)

A.   Okay.

Q.   Okay.  So you see that this article is reporting on some FEMA managers who have told them

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 314

that the staff cuts are going to resume.

Do you see that?

A.   Yes.

Q.   Okay.  And in the other documents we were just looking at, you were discussing a decision to actually renew the COREs, but only for 90 days.

MR. GREAVES:  Object to form, foundation.

A.   I suppose so.

Q.   Okay.  The FEMA spokesperson, if you look on the second page of the article, in the second paragraph, it said there was:

...an emailed statement "from" FEMA spokesperson Daniel Llargues did not confirm or deny the planned staffing cuts....

Do you see that?

A.   Um-hum.

Q.   Did you --

A.   Yes.

Q.   Do you recall participating in the formulation of that statement?

A.   No.

Q.   And he says:

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 315

"We are confident that our staffing decisions are consistent with both the mission and the intended structure of the CORE program."

Do you see that statement?

A.    Yes.

Q.    Can you tell me how eliminating CORE positions in January 2026 is consistent with the mission of the CORE program?

A.    I have no idea.

Q.    Can you tell me how eliminating CORE positions was consistent with the intended structure of the CORE program?

A.    No.

MS. LEONARD:  Okay.  You can set that aside.

Okay.  Let's look at the next. I think this is going to be Number 120.

COURT REPORTER:  Um-hum.

MS. LEONARD:  Sorry?  Oh, it's already an exhibit.  All right.  Great. Plaintiffs 65.

(Whereupon, Plaintiffs Exhibit 65, previously marked, was introduced to the witness.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 316

(Witness reading.)

Q.   Do you -- let me know when you're ready.

A.   Yes.

Q.   Okay.  So the bottom email is an email from Karen Evans to La' Toya Prieur on February 6 at 4:31 p.m., and it says:

> Per our discussion, until further notice, please process CORE renewals in accordance with HQ policy.  Their renewal dates should NTE 90 days for consistency.

Do you see that?

A.   Yes.

Q.   And then Karen Evans sends this to you a little bit later on the same date, saying:

> Good afternoon, DCOS Guy.
> Per our discussion, see below.

Do you recall what discussion she's referring to?

A.   No.

Q.   The discussion regarding CORE renewals and extensions for 90 days, presumably.

Do you recall that?

A.   No.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 317

Q.   Okay.  And she says:

La' Toya will work directly with Roland regarding securing HQ approval for these extensions.

Do you recall, at this time in February 2026, even the approvals for the 90-day renewals of the CORE had to go through the Office of the Secretary of DHS?

A.   I don't remember them coming to the Office of the Secretary.  Did -- if they did -- they could have.  Yeah, maybe.

Q.   You don't remember being involved in giving approvals for the 90-day renewals?

A.   Maybe I was.

Q.   Okay.  And the HQ policy here that Karen Evans is referring to, that is that renewals can only be for 90 days.  Right?

A.   I don't remember.

Q.   At this point in time, DHS had not given FEMA any authority to renew anyone longer than 90 days.  Right?

A.   I don't remember.

Q.   And these 90-day renewals were resumed after Plaintiffs filed a lawsuit challenging the

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 318

off-boarding of the COREs?

A.   I don't remember.

Q.   And after this point in time, DHS, through your -- the Office of the Secretary, routinely began approving CORE renewals for 90-day renewals.

Do you recall that?

A.   I don't recall getting the emails.  Maybe I did.  I don't know.

MS. LEONARD:  Okay.  Let's take a look at one of them.  121.

COURT REPORTER:  120.

MS. LEONARD:  120.

(Whereupon, Plaintiffs Exhibit 120 was marked for identification.)

(Witness reading.)

A.   Okay.

Q.   Okay.  Does this refresh your recollection that following the February 6 email that we were just discussing, approvals of CORE renewals for 90 days were being processed through your office, and you were routinely approving them?

MR. GREAVES:  Object to form.

A.   I don't know if I was routinely approving them.  I can see here that I said "Good to renew," I assume.  Yeah.

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 319

Q.   Okay.  And it was pretty quickly after Mr. Rol- -- in the grand scheme of things, pretty quickly after Mr. Edwards had emailed you.  Right?

Just about an hour later?

A.   Yes.

MS. LEONARD:  Okay.  You can set that aside.  Let's take a look at the next, which will be 121.

(Whereupon, Plaintiffs Exhibit 121 was marked for identification.)

(Witness reading.)

Q.   Let me know when you're ready.

A.   Okay.

Q.   Okay.  This is another series of emails, and we have Mr. Edwards forwarding on to you, Troup Hemenway, and Greyson McGill a request for CORE renewal for 90-day extensions.

And on February 26 -- and once again, you pretty quickly respond, saying it's good.

Right?

A.   Yes.

Q.   Okay.  And Troup weighs in, saying he also agrees.  I assume that's what "Send it" means?

A.   I think so.

Q.   Okay.  In the approximately half an hour

Page 320

between getting this email from Mr. Edwards and sending your concurrence approving, did you do any sort of individualized examination of the CORE employees and their functions?

A.    I don't think so.

Q.    You approved it.

A.    I approved what?

Q.    The extensions.

A.    I think I did.

Q.    And you were -- you understood you were -- you had been directed to approve the 90-day extensions?

            MR. GREAVES:  Object to
        foundation.

A.    I don't remember.

Q.    That someone within DHS leadership had directed you to do that?

A.    I don't remember.

            MS. LEONARD:  Okay.  We're going
        to take a quick break, and we'll see how
        much we have left.  Okay?

            VIDEOGRAPHER:  Off the record at
        7 p.m.

        (Whereupon, a recess was taken.)

            (Witness excused.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 321

VIDEOGRAPHER:  On the record at 7:28.

MS. LEONARD:  Thank you.

During the -- during the break, counsel have conferred.  And given the hour of the day, and the court's order continuing the deposition, counsel for the Plaintiffs have agreed to allow the witness, Mr. Guy, to go home.

And Plaintiffs' counsel intends to file something further with the court regarding the timing of that deposition vis-a-vis the court hearing tomorrow.

MR. GREAVES:  Good.

MS. LEONARD:  Okay.  So I think we're done for today.

VIDEOGRAPHER:  All right.  Off the record at 7:29.

And this test- -- ends testimony from May 4, 2026.

(Whereupon, the deposition concluded at 7:29 p.m.)

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 322

DEPONENT'S SIGNATURE


        Please be advised I have read the
foregoing deposition, pages 1 through 321,
inclusive.  I hereby state there are:
            (Check one)

            _____ No corrections


            _____ Corrections per attached




        _____
                    JOSEPH CARL GUY



    (    ) Reading and signing was requested.

    (    ) Reading and signing was waived.

    ( X ) Reading and signing was not requested.


        Should the signature of the witness not
be affixed to the deposition, the witness shall not
have availed himself of the opportunity to sign or
the signature has been waived.

                    --oOo--

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 323

ERRATA SHEET

NAME OF CASE:  AFGE, et al. v. Donald J.

Trump, in his official capacity

as President of the United

States, et al.

DATE OF DEPOSITION:  May 4, 2026

NAME OF WITNESS:  JOSEPH CARL GUY

Reason Codes:

1:  To clarify the record.

2:  To conform to the facts.

3:  To correct transcription error.

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

Page _____  Line _____  Reason _____

From _____ to _____

_____    _____
JOSEPH CARL GUY                      DATE

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 324

DECLARATION UNDER PENALTY OF PERJURY

I am the witness in the foregoing deposition.

I have read the foregoing deposition or have had read to me the foregoing deposition, and having made such changes and corrections as I desired, I certify that the same is true in my own knowledge.

I hereby declare under penalty of perjury that the foregoing is true and correct.

In witness whereof, I hereby subscribe my name this _____ day of _____, 2026.

_____

JOSEPH CARL GUY

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 325

CERTIFICATE

I, SUSAN ASHE, a Certified Electronic Reporter and Notary Public, hereby certify that the foregoing is a true and accurate transcript of the deposition of said witness, who was first duly sworn by me on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

Dated this 6th day of May 2026.

_____

Susan Ashe, Notary Public

of the District of Columbia

My commission expires:  May 14, 2028.

## A

**a.m** 2:2,9 11:2,18 196:16 268:3,9 283:8
**ability** 88:17
**able** 13:17 102:1 108:25 109:22 116:8 199:22 207:23
**abolish** 230:15,20 230:25 253:1
**Absolutely** 81:1 116:14
**abuse** 189:14
**accept** 73:11 297:19
**access** 58:8,17,22 59:1 118:10 295:5
**account** 52:21,23 53:12 64:22 72:9 164:21
**accounting** 186:1 189:11 226:13
**accurate** 80:13 160:17 172:8 178:1 210:13 211:21 325:5
**acronym** 225:8 231:8
**acronyms** 272:25 273:1
**Act** 119:10,12 216:19 222:20 265:21
**acting** 83:19 179:16 208:23 211:2
**action** 34:12 41:22 42:1 51:17 72:19 92:13,19 94:17 95:5 99:5 100:22 101:3 127:22 132:1,10,16 155:14 171:10 175:14,18 187:8

325:10,13
**actioned** 51:15
**actions** 72:14 93:5 96:7 101:12 105:17 106:16 107:4 108:18 131:5,20 133:5 161:17
**activated** 179:25 181:1 307:6
**active** 71:23
**activities** 225:10
**actual** 26:19,20 51:6 77:22 100:5 161:17 264:9 298:4
**ad** 196:18 208:20
**add** 58:11,23
**added** 72:1,5,6,8,17 72:25 73:1,2,7,10 73:12,21 83:8 153:7 271:21 301:13 302:4
**adding** 302:9,17
**addition** 181:17
**additional** 13:18,24 14:5,23 246:8
**address** 16:6,8 193:7 257:6
**addressed** 84:3
**adequately** 225:21
**adjusted** 124:16
**Administration** 230:7 231:14,16
**administrations** 130:7
**administrative** 25:16 54:10 56:4 56:6,12,18,20 58:8,22 117:24 122:20 234:15,20
**Administrator** 268:5
**admit** 61:12,24

**advice** 191:17,18
**advised** 190:9 248:15 322:3
**advisor** 20:17 127:14 181:23,25 182:3,9 187:19,20 187:21,22 191:16 197:17 204:18 274:4
**advisors** 181:19,21 185:9
**advisory** 18:8
**advocated** 173:1
**affairs** 20:10 29:3 83:17,20 179:14 185:16
**affixed** 322:21
**AFGE** 323:2
**afternoon** 116:24 152:6 316:17
**agencies** 117:18 223:2 231:24 241:8
**agency** 9:7 27:6 111:11 198:21 223:18 294:15
**agency-wide** 261:18
**agenda** 199:25 204:2 206:7 271:21 275:4
**agendas** 203:20,22 203:24 204:5 247:16
**ago** 13:22 30:20 65:17 79:9 122:10
**agree** 121:7 238:17 289:22
**agreed** 29:20 211:3 321:8
**agreeing** 292:4,5
**agreement** 25:24
**agrees** 319:23
**Ah** 43:9 164:21

239:6
**ahead** 51:20,21 99:10,14 108:15 163:14 259:16,18 259:20
**al** 1:5,9 11:8,10 31:5 323:2,5
**Alaska** 193:20
**Alexandria** 5:7 16:9
**allotted** 25:23
**allow** 92:3 102:7 136:24 137:2 138:21 182:9 321:8
**allowed** 33:15
**alongside** 186:9
**Altshuler** 3:4 5:13 12:2,6,10
**Amazing** 34:3
**America** 41:20 171:1,7,13 176:22
**American** 1:4 11:7 221:16 236:1
**Americas** 18:25 19:2 20:9
**amount** 171:22 260:4
**analysis** 266:4
**Andrew** 83:12,15 165:11
**Ann** 165:1
**announced** 21:10 22:18 214:2
**announcement** 305:9
**annual** 241:3,8,20 242:4 249:13 251:9 252:1 253:12,21 255:2,8 258:18 259:24 260:18 261:23 262:5,12 263:5 266:5 267:1

277:19
**answer** 21:4 107:1 107:15 137:5,6 229:5 251:5 254:1 259:2,4,17,18
**answered** 48:15 81:15 92:17 106:21 107:7 131:11 133:23 134:4,8 281:24 299:19
**answers** 272:7
**anticipated** 69:19
**Antoine** 164:20
**anytime** 207:21
**anyway** 109:24 123:3 232:17
**anyways** 92:12 159:1 160:21
**apart** 189:23
**apologies** 240:23
**apologize** 217:15
**app** 52:13,15,21 53:5,9,20 61:9 64:21 65:2 67:14 67:17,24 68:2 71:7 75:4 76:15 78:9,13,15 79:5 85:19 86:5 92:14 92:20 93:19 94:18 95:5,7 96:8 97:16 98:1,20 99:20,23 106:18 107:5 128:7 138:22 149:16 152:9 153:1,12,17,21 155:5,10,18 156:1 156:7 157:14 158:20 169:2
**apparently** 217:4
**appear** 32:18 34:12 53:9 116:13 135:3 136:5 140:9 141:3 141:5 142:6,15,17

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 327

143:3,5,21 144:2 146:25 156:1 165:25
**APPEARANCE** 3:1 4:1 5:1
**appeared** 152:9
**appears** 84:1 85:16 89:25 110:15 160:14 244:24 283:8 298:6 311:25
**application** 54:20 94:7 98:7,9 99:6 100:14 101:6,13 101:21 104:4 105:12,18 109:10 109:17 113:22,24 135:2 139:14 141:4 147:13
**applies** 256:11
**apply** 131:23 232:17
**appoint** 211:2
**appointed** 208:23 211:5 250:21
**appointee** 174:25
**appointment** 209:5
**appointments** 57:22 58:5,11 274:8
**approval** 7:10 183:20 187:12 189:20 190:3,22 190:23 191:1 195:16 200:11 227:5 233:3,13 234:5 241:19 245:8 248:17 264:3,12 317:4
**approvals** 189:16 190:6,18,19 265:4 281:6 317:7,14 318:19
**approve** 84:24

280:13 281:1,4,15 281:21 283:22 320:11
**approved** 183:23 242:18 279:3 281:9 282:3,7,8 284:3,5,8,25 285:11 320:6,7
**approving** 234:8 318:5,21,23 320:2
**approximately** 170:8 171:5 186:10 210:11 250:8 319:25
**apps** 79:15 88:18
**April** 17:21 22:22 23:19 25:12 29:11 36:7 37:5 42:19 80:8,10,18,25 81:13 86:17 87:10 97:9,24 110:3 112:16 114:20,25 115:1,3,15 119:24 120:6 152:23,24 153:7,13 154:20 154:22,25 155:4,8 158:19 159:1,17 160:9,20 161:1,5 161:5 165:21 168:9 169:1,4
**archive** 76:17 77:1
**archived** 75:20 76:24 85:24
**archiving** 76:22 91:18
**areas** 193:20
**argumentative** 131:11 133:10
**around-the-clock** 178:8
**arrange** 30:13
**arrangement** 121:10
**arrangements**

118:2
**arrived** 185:7
**article** 218:5 312:1 312:3 313:20,24 314:11
**articles** 288:12
**Ashe** 1:24 2:12 11:20 325:3,19
**aside** 35:11 146:21 240:25 273:7 305:6 309:4 315:17 319:7
**asked** 23:15,22 46:24 48:14 79:23 81:14 84:23 92:16 106:20 107:6 127:12 131:10 133:22 134:3,7 152:13 167:1 168:20 178:12 184:21 192:16 215:3 230:14 257:4 261:9 265:6 265:8 281:23 299:18
**asking** 23:24 35:5 36:21 123:22 136:9 137:9,16 141:3 142:2,5,13 212:4 213:15 221:3 269:5 291:3
**asks** 106:22 111:1
**assert** 259:6
**Assess** 9:6
**assign** 132:13 182:15
**assigned** 25:25 56:7 56:19,25 184:3 185:9 188:11
**assignments** 188:2
**assist** 172:4,11
**assistance** 225:7
**assistant** 56:10,18 56:20,21,22 57:3

58:7 72:12 83:16 83:19 132:13 204:9,15,16
**assistants** 56:13
**associated** 52:20
**assume** 77:21 219:25 220:4 266:2 276:18 318:25 319:23
**assuming** 82:19 145:16
**attached** 288:22 322:8
**attempt** 101:4 282:15
**attempted** 101:24 104:4 105:13 109:17 148:2,17 151:1,7
**attempting** 100:11 100:22 102:19 106:17 109:7
**attend** 204:10 205:9
**attended** 203:12 235:8
**attention** 218:24 242:13 243:3 245:20 247:14,25 249:9 271:25 276:25 287:22 293:19
**attentive** 208:15
**attested** 108:24 168:9
**attitude** 250:22 260:24
**attorney** 40:10 106:23 107:13,17 108:6 325:9,12
**attorney-client** 40:10 95:25 102:8 106:7,23
**attorneys** 57:21

58:1
**audible** 36:20 134:9 143:16 150:24 207:7 221:11 224:8 230:1 263:16 264:18
**authoritarian** 184:7
**authorities** 190:10
**authority** 72:13 88:17,22 192:9,15 192:19,23 228:8,9 228:15,16 242:8 242:10,19,19,25 244:18,19,25 245:17,23 246:8 246:15,20 247:10 248:25 271:8 277:2,12,24 279:2 281:1,4,21 311:8 317:21
**authorization** 118:10 125:6
**authorize** 246:2
**authorized** 124:20 125:2 193:3,6,11 193:15,25
**authors** 172:5,12
**auto-delete** 54:12 54:23 87:3,15 88:2,7,17 89:8 124:16 145:24 146:5,7 152:14 155:25 157:15 158:15 159:6 160:13 161:7,19 298:19 299:1,4,4 299:9 313:2,10
**availed** 322:22
**Avenue** 2:11 11:15
**avenues** 30:3
**average** 211:11
**aware** 13:23 14:4

14:22 32:17 35:12
35:16 42:3 87:2
117:18 118:16,17
119:16 120:9
134:11 143:19
144:1 150:25
158:10 172:25
173:11,16,19
175:20 194:8,15
194:19 206:8,14
209:8 220:11
226:16 227:20
228:11,20 231:14
232:12 239:21
240:4,11,17,22
241:11 242:8
250:14 253:10,20
254:3 265:17,20
265:23,25 267:2
271:6 274:13
275:12,17 278:15
278:18,20 280:22
300:17 305:1
309:5,9
**awareness** 144:16
156:17 238:7

**B**

**baby** 29:17
**back** 23:11 24:21
28:7 44:22 47:4,5
47:8,14,15 66:12
73:24 76:2 83:10
97:6 118:16 137:5
138:4 143:13
147:22 148:24
152:22 153:5
169:15 198:7
240:24 241:16
256:6 258:8,10,13
267:15 290:8
301:17 312:23
**background**
185:18,21,24

189:12
**backside** 268:1
**backup** 7:6 101:5
147:17 148:2,8,21
149:8 150:10,16
151:2,7
**backups** 100:12
101:18 102:20,24
103:21 104:12
105:3,9,10 109:1
115:20 116:3,21
149:4,14,15,19
151:2
**badges** 29:5
**Baltimore** 3:17
**banter** 51:2 126:25
**bar** 113:25 114:1
**Barrow** 164:10,25
**Barton** 163:2,15
165:10 185:12
244:14 290:18
291:13 292:5
**Barton's** 291:24
292:6
**based** 195:13
223:11
**baseline** 196:19
**basically** 178:13
199:23 259:15
**basing** 292:20
**basis** 107:16 202:23
255:7 258:16
**becoming** 128:24
202:10 227:5
**began** 17:24 177:7
180:3 182:5
221:20 318:4
**beginning** 2:9
179:23 182:25
209:9 232:4 268:7
278:17,21 280:22
281:11,15 290:6
**begins** 11:5
**behalf** 2:8 3:2,13

4:2 5:2 11:21
12:21 269:4
**believe** 23:5 31:14
32:4 33:25 37:1
37:13 51:7 52:17
53:4 54:18,19
59:4,5 60:10 64:7
64:16 71:20,25
72:13 75:23,25
78:17,20 79:8,13
79:24 80:10,21
83:17 88:1 90:18
90:22 97:1 101:17
104:9 110:10
113:5,25 114:1,13
120:11 123:22
155:11,12,19
156:11 159:18
165:3 174:2 176:5
176:17 177:10
187:16 193:5,18
198:19 205:14
219:23 224:23
231:23 232:7
237:24 258:9
276:13 287:23
289:4 296:7
298:10,15,23
302:12 306:14
307:8 310:15
313:19
**believed** 292:15
**bells** 242:21
**Ben** 164:23
**benefit** 199:1
**Berzon** 3:4 5:13
12:2,6,10
**best** 14:14 48:6,21
49:17 63:1 69:13
167:20 179:11
234:6 245:11
247:15,22 291:16
291:19 292:7
**better** 33:10 184:6

236:1 290:6,7
292:12
**beyond** 64:2
**Bies** 25:8
**big** 108:23 216:14
**Bilicic** 164:20
**bind** 267:19
**Binnall** 5:4 12:13
31:24
**bit** 169:16 172:13
209:15 316:16
**blanket** 232:13
**bloated** 236:3
**board** 29:5 260:13
**Bock** 82:14,17,19
83:4 163:7 164:10
290:18 292:6
308:18
**Bombard** 4:4 12:14
12:14 40:8 106:19
106:22 107:8,12
249:20 251:3,12
255:10 256:13,18
256:21 258:24
264:20,23 265:6
265:10 282:6,11
283:18 308:10,14
**bottom** 84:2 187:16
187:18 244:23
245:2 268:1 316:4
**bought** 46:5
**box** 3:21 208:13
**break** 96:14,25
135:9 138:3,8,10
147:6 151:18
165:13 167:22
214:15,17 256:24
257:1 279:22
285:21 320:20
321:4
**breaks** 59:14
**Brianna** 290:9,15
291:2
**brief** 20:5

**briefing** 220:9,13
226:10
**briefly** 37:24
**bring** 32:23 92:2,7
95:21 96:3 208:19
**bringing** 32:12
276:24
**broad** 260:4
**broke** 59:23 152:7
214:25
**brought** 200:7
245:18 248:3
249:8,11 271:20
275:5 311:2
**building** 24:13
**Bureau** 20:9 29:2
**bureaucracy** 174:2
236:3
**business** 183:10
194:3,7,8,12
**busy** 202:17
**buttons** 113:1

**C**

**C-o-o-r-d** 145:11
145:13 157:10
**c-o-r-e** 79:2
**C-o-r-r-d** 145:12
**cadence** 195:23
**cadres** 226:21
227:2
**calendar** 57:5,6,7
57:17 58:2,4,8,12
58:17,23 205:13
205:17 206:6
207:23 276:14
298:6
**calendars** 57:14,21
**California** 1:2 3:8
11:12 127:22
**call** 30:1 38:23 39:2
39:3 47:16 107:23
187:13 199:23
208:20 215:9

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 329

217:9 240:8 241:2 275:5 296:15
called 31:4 69:15 71:1 77:8,20 82:1 111:14 126:1 134:12 144:15,16 144:17,18 154:24 165:1 170:2,5,25 188:2 216:13 223:1 225:24 230:14,20,25 234:11 238:22 241:3 265:22 271:22 293:21
calls 49:7 196:14 196:16,22,25 197:4,5,15,19,25 199:19 200:8 258:20,22 294:22
Cam 229:22 230:4 231:3
camera 136:2,18
canceled 303:12,16
capacity 1:8 5:3 11:9 323:3
care 54:9,10 201:3 261:2,12
career 26:18 111:22
Carl 1:17 2:8 6:3 13:6,16 16:7 322:13 323:7,25 324:15
Carrie 165:1
carry 196:23
case 1:6 11:11 32:3 42:4 116:6 137:10 161:9 169:25 323:2 325:14
catch-up 196:3
caused 104:19 105:3
CC 273:21
ceasing 216:18

218:19
cell 128:6 160:5 161:2 257:5
Center 307:5
centralize 244:19
CER 1:24
certain 13:2 101:5 242:10,16 246:20 247:3
certainly 200:12 286:15
certainty 192:7
CERTIFICATE 325:1
Certified 2:12 325:3
certify 324:7 325:4 325:8
cetera 296:19,19
CH- 263:20
chain 190:23 267:14 270:3 272:11 290:8 301:11,12,16
challenging 309:7 317:25
change 87:4 88:17 99:19 169:11 176:2 207:13 299:8 313:1
changed 60:16 86:21 88:24 89:7 94:20 115:23 159:7 160:13 161:19 179:9 197:7 299:3,20,24 313:10
changes 87:3 313:3 324:6
changing 60:20 299:14
channel 295:21
channels 48:22 49:18,25 51:8,9

63:16 90:16 125:13 127:5 131:6 295:22 296:1
chapter 172:14
chapters 172:7
characteriza- 238:18
characterization 108:14
characterize 48:11 48:17 61:16 133:11 195:3 231:18
charge 53:16,19,22 185:15
Charmaine 56:8,13 58:15,24 59:2
chart 7:8 179:2,3,6 180:22
chat 6:14,16,18,21 6:23 7:4,13 8:4 44:7 55:10 61:22 62:6,6,8,11,25 63:8,10,13 64:1,2 64:6,9,14,17 66:5 67:5,8,11 68:21 69:2,6,15 70:10 70:14 71:1,6,6,14 71:17 72:1,5,7,14 72:17,25 73:17,20 73:22 75:24 76:2 76:4,12,12,13 77:4,8,20,23,25 78:8 81:23 82:11 82:12 83:2,5,7,24 85:14 87:4 90:2,8 90:18 91:2 98:20 113:18 120:2 121:18 124:5,17 126:8 127:12 142:11,20,21,22 142:24 143:7,11 143:13,21 153:11

157:16 159:5 161:16,18 163:22 165:12 169:12 203:25 207:2 212:4,7,18,23 213:10,11 215:1,4 217:19,20 218:1 220:19,20,25 221:2,3 293:21 294:18,18 295:6 295:12 296:12 299:3,9 300:12 306:8 307:21 308:17 310:10 311:21,25 312:22
chats 42:13 43:6,12 43:19 44:13 54:11 54:22 55:2,17,19 61:13,25 63:20 65:6 66:14,23 68:20 71:10 72:9 74:3 75:20 76:15 76:17 78:12,24 79:5 81:18 84:7 92:6 93:20 97:16 97:25 98:19 99:22 99:24 100:5 101:1 103:21 104:14 113:21 120:14,19 120:25 121:25 122:5,8 123:15,17 123:19,24 126:1 135:3 136:4,21 137:17 139:16,18 140:1,3,5,9,13,15 140:18 141:2,5 142:6,14,17 143:2 143:5 144:7,13 145:20,25 146:24 152:8,14,18 153:13 156:1 157:13,20,24 158:3,6,14,18 159:3,16,20,23

160:2,4,8,14,19 160:19,25 161:23 162:9 165:22 169:3 213:2,12 221:8 295:24 296:8 298:24 299:14 313:9
CHCO 68:5 215:20 241:11 263:19 268:2 270:4
check 196:7 285:22 322:6
checked 111:3
checking 208:12 237:5
cheek 294:5
Chicago 3:15
chief 18:22,24 19:18 20:6,17 26:13,17,20,23 27:21 28:2,22 67:19 122:20,20 122:25 123:13 127:14 177:7,23 178:10 179:7,8 180:3,7,12 181:18 181:23 184:1 187:19 196:6 197:17 202:13
chiefs 181:17,18 188:3,11 197:16 202:20
child 30:5
chipped 56:17 210:2
choose 294:10
choosing 259:10
chosen 229:1 294:8 294:12
Chris 205:3,9
Christmas 279:22
Christopher 4:5 12:20 204:17
christopher.hall...

4:10
**Cinelli** 25:9
**CIO** 53:16,18,22
  132:7
**circumstances**
  63:18
**City** 3:15,16
**civil** 34:12
**claim** 292:7
**clarify** 40:17 94:20
  142:1 163:20
  282:7 323:9
**Clark** 164:9,25
**clear** 14:21 15:4
  135:22 155:23
  168:7
**clearance** 7:9
  187:12 190:10
  193:4 195:8
**click** 71:17 78:3
  82:10
**client** 30:10
**clients** 30:11
**clip** 267:19
**clock** 86:10
**close** 188:7 243:3
  245:20 247:13,25
  249:9 293:18
**closely** 206:15
**Club** 144:17 156:18
  163:1,2
**CNN** 218:5 288:13
  288:13 289:25
**co-chair** 235:2,5
  237:25
**coach** 282:15
**Codes** 323:8
**coincided** 306:13
**coincidence** 262:5
**coincidentally**
  262:2
**Columbia** 2:13
  325:20
**combi-** 225:16

**come** 44:22 66:12
  85:23 86:7 114:3
  114:17 121:16
  122:14 137:4
  189:20 199:22
  206:1 236:17
  245:7 252:5
  253:18 256:5
**comes** 301:12
**comfortable** 25:25
**coming** 171:21
  176:19 177:5
  184:19 185:4
  191:10 194:4
  195:17 278:3,13
  288:12 293:24
  296:3,6 317:10
**commanding**
  184:13
**commence** 231:24
**comment** 291:3
**commission** 325:22
**commissioned**
  227:12
**Comms** 144:14
  156:8,10
**communicate** 48:8
  48:24 65:10 66:9
  68:10,13 93:7
  103:4,8 130:13,17
  130:24 131:8,15
  132:14
**communicated**
  54:1 64:25 68:8
  169:9 178:21
  182:19 262:10
  282:1
**communicating**
  37:5 65:3,13,19
  66:25 81:2,6,8
  133:2 215:5
  246:19 284:2,4
**communication**
  63:25 86:21 87:24

88:7 108:12
  122:15 123:1,10
  123:13 125:20
  128:1,4 169:11
  260:21 295:21
  296:24
**communications**
  37:4,11,14 46:22
  47:17,21,23 48:12
  48:18 49:12 50:22
  53:15 61:6 63:16
  66:4,14,17 80:17
  80:24 85:19 86:3
  88:3,8,11 89:15
  95:25 98:21,25
  100:4 101:1 102:9
  102:12 103:15
  106:6 107:18
  114:12,14 115:12
  115:17 117:10
  118:25 119:20
  121:20 122:18,24
  123:24 124:3,21
  125:3,8 126:6,8
  126:20 128:6,12
  132:2 133:13
  134:11,17 142:3
  165:24 166:3
  218:2 233:16
  259:4 261:14
  295:24 297:11,21
  300:8 307:16,20
**compile** 146:13
**compiled** 152:15
**complaint** 309:7,12
  309:13,17,22
**completed** 268:8
**completely** 107:21
**compliance** 15:9,10
  15:17,18
**component** 28:10
  28:11 178:15
  184:13 196:7
  198:21 199:6

202:15,16,20
  203:12 204:22,23
  211:16
**components** 27:25
  28:14 178:14,22
  179:5 180:19,21
  181:8 196:5
  199:10,18 200:3,6
  200:14,16 201:1
  241:12 248:16
**comprised** 225:14
**computer** 150:16
  151:3,8
**concerned** 112:5
**concerns** 125:14
  126:14
**concert** 184:9
**concluded** 226:17
  228:2 321:21
**conclusions** 228:14
**concurrence** 320:2
**condition** 217:14
**conduct** 48:5
**conduit** 27:5 28:12
  248:20
**confer** 108:3 138:8
  256:16,20,21,24
**conferred** 321:5
**confident** 24:1
  315:1
**confidential** 1:12
  256:8 257:3,7,10
**confidentiality**
  257:12
**confirm** 73:11
  276:15 314:15
**conform** 323:10
**Congratulations**
  30:4
**Congress** 222:14
  225:21 294:16
**congressional**
  222:19
**consider** 50:8,15,19

51:19,22 52:3
  62:7 192:18
**consideration**
  271:1
**considered** 49:15
  51:2 266:19
**considering** 271:2
  275:21
**consistency** 316:12
**consistent** 315:3,9
  315:13
**constantly** 184:25
  185:3
**consultant** 17:24
  18:8
**consulting** 16:20,21
  18:2,13 30:7
**contact** 67:5,7,10
  67:14,16 128:14
  128:19,23 129:11
**contain** 71:10 74:2
  161:6 217:20
  262:2
**contained** 78:12
  104:13 110:4
  262:7
**contains** 98:24
  150:9 296:12
**content** 40:7 79:20
  92:5 93:12,16,20
  94:9 95:6 97:15
  98:1,8 99:5
  101:13 104:13
  109:10,16 122:4,8
  295:5
**contents** 6:1 41:4
**context** 311:6
**continue** 16:4
**continued** 4:1 5:1
  7:1 8:1 9:1 10:1
  130:13,17 247:8
  280:17
**continuing** 321:7
**contract** 18:13

183:4,7,13,14,19 183:24 184:5 186:19 190:3 191:1 244:20

**Contracting** 18:3

**contractor** 182:22 185:7 193:12 245:22

**contractors** 185:4 296:16

**contracts** 189:9,23 189:25 190:8,17 191:6,17 192:6 194:13,17

**contribute** 172:14

**contributed** 171:20 173:9

**contributor** 171:23

**contributors** 172:2

**control** 23:8 184:8

**conversation** 108:8 136:16 152:11 166:23 182:21 220:7 251:24 288:7 310:5 312:17

**conversations** 35:4 37:21 50:6,13 52:2,10 116:15 132:15 192:1 233:16,23 271:5 271:18 275:1 280:6 289:2 302:3 308:24 309:16

**convey** 200:14 201:20

**conveyed** 201:19

**Coord** 145:9,17 157:10

**coordinate** 20:8 127:3

**coordinated** 38:14

**coordination** 26:24 51:3 307:5

**copied** 289:16 306:22

**copies** 154:17 273:16 283:2

**copy** 34:11 57:10 57:14 154:16

**CORE** 52:3,11 79:2,13 81:2,6 84:17 97:12 99:1 103:4 110:3,4,16 112:15 113:11 114:14 125:14,16 125:21 127:20 213:23 216:24 218:19 220:1,5,10 220:13 225:14,25 226:2,3,5 227:6,6 233:17 234:4 242:10 245:6,23 247:9,10 248:24 265:17 267:3 268:6 269:13 271:8 274:8,15 275:15 278:3 281:4,15,21 285:10,13,16 305:9,18 310:6,21 311:1,8 315:5,8 315:10,12,14 316:9,22 317:8 318:5,19 319:16 320:3

**cores** 111:4,25 112:6 116:9 126:14,15 130:21 214:4 226:25 233:17 234:8 242:16,25 245:17 246:10,16 247:13 248:11 265:20,23 268:21 269:6 270:12 271:3,18 274:20,24 275:3 275:21,22 276:21

277:3,25 278:17 278:19,20 279:2 280:8,19 282:2,7 283:23,24,25 284:3,4,7,12,25 286:21 287:17,21 288:8,15,18 293:6 305:25 309:1,7,18 314:6 318:1

**Corey** 20:17 67:4 127:12,14 129:14 129:20,22 133:16 142:18,23 162:21 163:16 176:18 177:18 181:23 182:21 184:18 186:4 187:19 188:19,24 189:4 189:19 191:21,22 192:1,4,11 194:3 194:10,11,19 212:4 213:15 215:3 219:18,19 220:4,9 221:3 252:16,17,22,25 253:4

**correct** 13:20 17:11 17:16,25 18:21 19:3,4,9,19 20:23 24:25 25:17 30:22 31:2,13,15,17,17 31:21,24 32:3,24 33:2 36:4 39:21 39:22 41:18 42:5 42:20 43:15 44:9 44:14 45:14 46:13 48:9,13,20,25 49:8,13 52:13 53:12 54:19 61:7 61:10 62:1,12,15 62:19 63:14 64:2 64:3,6,23 65:2,10 66:17,23 69:6 70:14 72:2 73:12

77:2 78:5 80:14 82:11,25 83:25 84:18 85:15 87:25 88:19,21 89:3 92:3 93:1 96:22 97:10,13,18 98:2 101:1,6 102:20,25 103:9,11 104:7,14 104:20 109:18 113:2,15 114:15 117:16,20 118:12 118:19 119:17,21 120:3 122:5,9,21 123:16,20 124:18 125:22 126:3,21 127:15 128:15,20 128:23 129:7,12 130:15,19 132:3 132:11 151:9,14 153:14 154:3 155:19 157:17 159:7,17,20,25 160:14 161:19 162:4,5,10,11 168:11,15,24 169:5,13,20 170:10 171:21 172:21,22,23,24 173:7 176:23,24 180:8,12 182:23 185:9 186:21 189:4 192:2,3 205:17 210:4,18 211:17 212:11,21 213:3 219:2 221:22 230:8 247:2 266:3 277:25 283:17 295:7,14 298:19 309:10 323:11 324:10

**corrected** 272:24

**corrections** 322:7,8 324:6

**correctly** 202:12

**Correspondence** 7:11,18,20,23 8:10,13 9:9,12,15 9:20,23 10:4,7 145:17

**corresponds** 298:5

**cost** 275:15,21

**council** 9:5 62:19 173:20,24 174:1 175:6,9 234:23 235:2,6,9,25 236:14,18,25 237:18 238:1 240:14,19 242:3 249:18,25 250:21 250:25 262:1 293:25 303:4,12 303:12

**Council's** 236:11 238:9 303:19

**counsel** 3:1,20 4:1 5:1 11:22 12:24 13:19,23 14:4,22 31:13,15,18,21 32:14 33:13,16 34:22 35:4 36:12 36:13,14,25 37:6 37:11,16,22,25 38:3,19,24,24 39:18,25 40:22 41:2,3,14 45:5 77:17 78:19 81:25 93:7,11,18 94:6 94:16 95:4,13,20 96:1 101:22 102:3 102:10,15 106:7 106:10 107:3 110:13 112:19 113:4,6 115:13,17 116:16,17,24 117:6,8,11 124:8 135:11,16,23 137:4,15 155:8,9

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 332

155:13,16,16 217:23 282:6 297:9 298:11,19 311:19 321:5,7,10 325:9,12
**counselor** 185:12
**counselors** 181:21
**count** 233:18
**Countering** 179:14
**County** 3:16,16
**couple** 56:4 79:9 81:18 122:10 152:18 180:6 291:25
**Courage** 170:5,11
**course** 179:9,10 280:14
**court** 1:1 11:11,20 14:9,12,16,24 15:7 32:17,20,23 33:1,23 34:2,10 35:13,17 36:6 42:19 59:12 78:19 93:1,24 95:21 96:9 107:9 116:12 120:3 123:22 124:10 136:14,14 154:7,11,24 155:3 158:13 168:9 199:1 206:9 215:11 217:10 243:6 256:4,9 258:10,12,13 264:22 288:16 292:25 293:2 309:13 315:20 318:11 321:11,13
**court's** 13:25 14:6 91:24 92:1,7,15 96:5 104:6 116:12 136:12 321:6
**cover** 180:18
**coverage** 84:9
**covered** 108:6

181:11 255:22
**covering** 83:17
**create** 149:22
**created** 157:16 203:20 266:4
**critical** 233:7 270:13,15 272:16 272:21
**crossed** 245:6
**crossouts** 279:18
**current** 16:5 142:2 142:6 161:23 175:25 235:19 298:4 304:13
**currently** 16:10,11 19:5 78:9 140:5 140:15 141:3 142:15,17 143:22 147:1 159:16
**cut** 84:3 187:16 218:22 237:15 247:21 249:19 250:1,16,19,25 251:10 252:2,12 253:5,22 254:5 255:3,8 258:16 259:23 260:18,22 261:23 262:2,7,11 266:19 267:2 277:16 288:23 290:1 291:10 293:16 294:19 300:6,22 301:4 312:1
**cuts** 261:15 314:1 314:17
**cutting** 252:17,22 260:11

---

**D**

**D.C** 2:11 3:22 4:7 4:15 11:16 28:6 235:14
**Daily** 226:9

**damage** 228:3,10 228:17
**Daniel** 290:19 314:14
**Danielle** 3:5 12:2 13:12
**data** 156:11,11 267:3 268:15 269:5,13,16 274:8 296:15,18
**date** 11:17 17:2,18 19:21 24:12,15 80:4 152:21 153:4 159:12,19 213:18 219:10 240:22 241:15 265:22 268:22 269:14 280:23 286:22 287:18,22 297:22 298:4,4,5,5,16 309:23 316:16 323:6,25 325:7
**dated** 277:16 325:15
**dates** 73:21 216:20 240:21 270:13 278:3,13 316:11
**Dave** 203:9
**David** 162:21 163:7 163:8,16 164:4,22 165:5 203:3
**day** 17:20,23 22:10 22:17 24:9 47:8 93:10 101:22 105:23 114:20 115:10 130:24 131:8,16 165:18 166:4 169:10,13 177:9 196:11 202:18 244:2 255:1,1 260:17 280:23 298:10 305:21 321:6 324:12 325:15

**Daylight** 2:2 11:2
**days** 23:2 79:9 196:4,4 230:7 242:16 311:1,8 312:15 314:6 316:11,23 317:18 317:22 318:20
**days'** 280:18 283:23,25
**DCOS** 27:25 28:2 57:8 180:25 195:21 200:3 211:9 232:21 270:21 276:8,10 316:17
**deadline** 241:23
**deal** 108:23
**deals** 194:12
**death** 228:10,17
**deaths** 228:3
**December** 9:8 30:19 61:2 177:21 197:9 198:3 202:11 203:10 210:16 239:17 240:13,18 241:16 241:24 242:11 245:5 247:11 248:25 251:8 254:10,17 255:1 263:6 265:16 266:25 267:2 268:2 269:13,17 271:17 274:20,25 276:1,9,12,16,20 276:21 277:1,3,16 279:12,20 280:5,7 280:10 283:1,12 284:13 286:24 288:21 301:17,25 302:6 303:10,13 304:8
**decided** 30:2 125:7 232:16 305:2

311:5
**decision** 182:8,12 182:14,17,19 195:9 201:18 208:19 210:23 211:1 213:22 214:1,3 234:17,19 247:5 248:1,6 249:17,24 250:18 251:25 261:22,25 271:7 275:7 277:1 277:6,11,23 278:16,18 282:1 284:7 293:5,6 304:23 305:14,16 305:17 310:24 314:5
**decision's** 200:21
**decision-making** 228:4 309:18
**decisions** 51:6,7,22 52:11 191:18,22 191:24 192:5 195:9,17 200:14 200:19,23 228:9 228:16,22 229:4,7 229:9,12,15,17 234:21 261:24 263:21 275:22 284:18 289:2 315:2
**declaration** 6:11 35:18,22 36:7,10 36:13 37:9,10 42:19,25 43:15,18 61:17 80:2,4,13 92:25 96:9 97:9 116:11 119:24 120:6,9,17,24 124:8 154:7,11 155:6,7 168:8 324:1
**declare** 324:9
**Defendants** 1:10

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

4:2 12:16,22 34:13 70:2,22 78:19 85:7 86:16 87:8 92:3 217:21 217:23

**Defendants'** 33:16 81:25 311:19

**Defense** 170:6,11

**defer** 292:11

**deferential** 201:6

**deferring** 292:14

**define** 50:21

**defined** 183:13,14

**Delegate** 244:18

**delegated** 88:16 242:9

**delegation** 242:15 242:19 246:8,14

**delete** 47:20 55:2 55:11,17 74:10,12 75:1 86:22 90:5,6 90:8 95:6,10 100:20 103:25 105:9 162:1 169:12 313:4

**deleted** 75:1,4,19 76:4 90:20,22,24 93:19 98:9 99:6 103:20 104:19,24 105:4 161:8,13,14 313:3

**deleting** 47:22 74:13,15,18,22 76:8 90:7 94:3 104:1,25 161:14

**deletion** 88:10 91:2 94:8 299:15 311:22 312:22

**deliberations** 265:1

**deliberative** 249:21 251:4 255:12,13 255:23 256:10 264:24

**deliver** 221:16

**demanding** 29:18 30:5

**Democracy** 2:10 3:18 11:14 13:1

**Democratic** 195:6

**Democrats** 194:21 195:2

**denial** 195:5 292:6

**denote** 10:24

**deny** 86:6 314:16

**denying** 194:20,24 195:1

**department** 4:3,12 12:15,18,21 17:13 17:16,19 18:10,20 19:12,15 20:1,10 23:3,14 24:10,25 25:6,16,24 26:3,7 29:2,10,24 31:2 32:12,15 35:2 38:12 39:20 62:14 97:17 98:2 115:12 127:8 133:6 139:20 140:11 147:12 154:3 166:12 169:17 198:8 232:13

**dependent** 27:9

**depending** 210:14 211:13

**depends** 27:17

**depict** 139:16

**depicted** 70:13 85:13 86:19 87:10 99:22 112:9 114:12

**depiction** 71:15 110:16

**depicts** 70:5 71:1 85:8

**DEPONENT'S** 322:1

**deposed** 14:18 30:16,23 42:4

120:10

**deposition** 1:15 2:7 11:5 13:20 14:17 15:17,21,23 30:15 31:12 32:2,6,8,10 32:24 33:21 34:12 37:15,19,22 38:3 38:6,22 39:6,16 41:11,13 42:12 43:5,10 44:19,25 45:3 92:2,8 95:22 116:17 120:13,17 120:23 121:4 122:12 166:18,25 167:16 168:14,24 173:6 210:10 211:8 239:12,19 253:11 267:11 274:13 279:17 283:4 301:7 321:7 321:12,21 322:4 322:21 323:6 324:3,4,5 325:6 325:11

**deputy** 19:18 27:21 28:2 68:17 83:16 177:7,22 178:10 179:7,8 180:3,7 180:12 181:18 184:1 188:2,11 197:16

**describe** 20:5 27:22 28:7,22 148:20 178:9 191:13 195:19 223:4 224:2

**described** 41:15 259:10

**describes** 216:3 294:15

**describing** 101:4

**designation** 257:3

**designed** 75:7

**desired** 324:7

**desk** 57:17

**Despite** 118:9

**destroy** 107:19

**destroying** 108:15

**Destruction** 179:15

**detention** 179:17 208:24 210:4,5,6

**determining** 84:16

**development** 170:19,21 172:5 172:12

**device** 52:10 76:9 79:16 81:3,7,10 81:12 94:4 95:11 103:5,9,15 105:25 106:1 116:9 126:16,17 128:12 133:2 139:4,4 149:15 204:6

**devices** 48:5 51:24 81:9 103:5 118:5 118:7 125:17 131:21 132:22 134:25

**DH-** 46:3

**DHS** 7:9 19:2,9,11 19:17,18,21 20:13 20:21,22 21:1,2 21:11 22:6,22 23:10,16,21 24:4 24:7,23 25:2,5,17 27:19 28:8 29:16 31:5,11 37:7,11 37:16,19,22,25 38:2,24 41:18 43:12 45:14,19,21 46:4,5,11,12,15 46:17,21 47:6,21 47:23,24 48:3,8 48:12,18,24,25 49:7,8,12 50:13 50:19 51:12,13,13 53:5,15,20,25 54:20,23 55:15

56:1 57:8 59:3 60:2,9,12,14,17 60:22,24 61:6 64:18 65:9 67:1,2 68:4 71:12 74:4 74:24 75:21 82:17 82:21,25 83:21,24 84:8 89:9 96:1 117:15 119:16,16 122:20 123:13,15 123:20 127:15 128:13,14,18,20 128:24 129:5,11 130:6,11,14,19,24 130:25 131:8,9,16 133:14 137:18 138:22 140:6,10 140:17,22 141:24 142:25 145:18 158:2 159:22,25 164:6,7,8 167:8 171:16,21 172:15 173:11,16 176:14 176:19 177:3,5 178:11 179:3,5 182:2,3,10,23 183:5 184:16,19 185:24 186:20,25 187:9 188:7,25 190:2 192:2 194:4 197:10 198:11 200:15 209:5,13 211:22 219:5 221:21 227:22 228:4,10,16 232:12,17,23 233:13 235:1,4 236:12,22,23 238:15 241:2,11 242:3 246:9 251:1 252:10 253:21 254:4 255:2 260:19 262:23 269:14 270:4,24

271:2,4,6 274:4,9 274:14 281:2,4,14 281:20 282:2,8 285:11 297:12 305:2 307:17 317:9,20 318:3 320:16
**DHS's** 122:25 241:20
**DHS-issued** 45:13 45:25 47:18 48:3 52:16 54:18 55:20 59:24
**DHS-related** 124:21 125:3,8 135:3 140:12
**different** 21:25 24:12 41:23 53:12 57:19 63:15 68:16 72:23 74:20 79:15 83:15 97:23 100:2 150:15 180:18 187:7 208:3 227:2 229:18,19 261:7 272:20 273:16
**difficult** 14:15 63:17
**Dillon** 164:11
**DiNanno** 164:17
**direct** 180:24 192:9 206:16 292:6
**directed** 122:3 192:25 231:24 241:12 277:20 284:24 305:24 320:11,17
**directing** 195:13
**direction** 29:7,7 252:5 253:5
**directive** 158:10
**directives** 28:19,20 222:19
**directly** 27:11 37:6 37:11 125:20

140:8 228:2,10,17 317:3
**director** 170:19,21
**Directorate** 67:20
**disagree** 15:16
**disappear** 77:5
**disappearing** 75:11 75:12 165:18 166:3
**disaster** 145:1 157:2 165:3 185:18 193:20 221:25 223:1 226:17
**disasters** 221:19
**discover** 110:3
**discretion** 200:25
**discuss** 15:19 20:15 40:6,13 41:3,10 41:13 102:8 111:5 112:2 116:9 167:23 169:16 200:2,23 203:23 242:24 247:9 297:15 300:6,10
**discussed** 18:11 20:11,16 30:6 32:5 62:9 65:8 68:18 83:9 111:1 129:24 174:6 206:18 208:1,7,10 239:18 252:20 257:10 286:14 295:17 305:13 312:11
**discussing** 32:7 34:24 41:5 70:10 126:15 130:21 134:24 139:3 152:8 169:3 252:12,14,17 274:15,24 286:21 294:19 311:25 314:5 318:19

**discussion** 293:9 310:20 316:7,18 316:19,22
**discussions** 49:2 125:16 232:20,22 233:10 245:15,22 248:24 255:17 261:19 265:15 271:1 294:6
**disrupt** 202:18
**disrupted** 254:20
**distinct** 141:2,5
**distinguish** 76:10
**District** 1:1,2 2:13 11:11,12 325:20
**division** 1:3 11:13 111:2,15,23 112:6
**dleonard@altsh...** 3:10
**Dobitsch** 301:18,19 302:13
**doctrine** 107:13 108:7
**document** 10:25 34:21 35:6,8 37:8 70:2,21 81:5 103:17 110:13 113:9 131:23 187:10,16 214:15 214:18 225:24 227:4 264:10 267:14 272:16
**documentation** 93:4 118:2
**documented** 128:3
**documenting** 122:13
**documents** 13:18 13:21,24 14:5,23 15:2,11,14,21 33:21 44:23 45:2 45:7,10 53:17,19 53:22 57:16 66:10 81:11 91:10 99:25

167:24 207:24 208:5 223:4 291:4 305:8 314:4
**DOGE** 164:18,19 232:2,5
**DOGE-FEMA** 156:16
**doing** 55:18 116:11 123:3 127:7 132:8 132:23 146:3 151:10 169:16 175:15 184:9 191:14 196:10 235:25 268:19 269:10 282:4 299:10
**DOJ** 31:13,20 33:16 35:4 36:18 37:6,12,13,16 38:24 40:1,2,20 40:21,23 41:2,3 155:16 298:11
**Donald** 1:8 11:8 323:2
**doubt** 262:15 279:21
**DOW** 223:21
**download** 54:2
**draft** 9:4 36:18 62:19 236:25 237:4,9 238:5,22 239:19 240:4 242:3 249:18,25 250:3 261:25 262:6,7 277:15 293:16 301:17 303:11
**drafted** 237:7,19 289:24
**drafter** 237:16
**drafting** 236:21 237:25
**drafts** 302:2
**drastically** 291:5

**draw** 148:24
**drive** 196:21
**drop** 38:14
**due** 241:15
**duly** 13:7 325:6

─────────────
**E**
**E** 3:5 152:1,1
**earlier** 22:19 35:17 101:4,20 109:11 139:10 178:12 213:2 257:4
**early** 21:15 22:22 60:14 116:23 175:20 180:2 198:3 230:7 231:13 232:5 241:16 251:8 265:16 282:24 286:20
**easiest** 144:3
**Eastern** 2:2 11:2
**easy** 66:2
**ECF** 154:24
**Edgar** 68:10,13 181:4,5 187:20 198:2
**Edgars** 181:3
**edit** 58:23
**edited** 250:14
**edits** 36:19,22
**Edward** 164:21
**Edwards** 68:1,4 241:12 270:5,23 272:11,12 273:15 274:12,16 319:3 319:15 320:1
**Edwards'** 70:4
**eeshleman@alts...** 3:11
**effect** 127:8
**effected** 49:18
**effective** 24:12,15
**effectively** 210:1

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 335

**effectuate** 174:25
**effectuated** 132:18
**efficiency** 174:18
  231:19
**effort** 91:8 172:4
  172:11 209:5
**efforts** 35:18
  107:19 134:19
  170:19
**eight** 164:8
**either** 50:20 71:19
  73:1,3,15 105:23
  108:12 112:25
  123:11 132:22
  139:8,19 155:15
  157:15 159:24
  161:9,9 180:23
  188:15 189:19
  195:10 197:21
  204:16 211:2
  221:25 247:15
**election** 170:15
**electronic** 2:12
  57:10,12 58:4
  205:13 325:3
**electronically** 58:2
**elicit** 259:3
**eliminated** 158:18
  158:19 175:22,25
  176:3
**eliminating** 235:19
  315:8,12
**Elizabeth** 3:6 12:5
**email** 7:11,18,20,23
  8:10,13 9:9,12,15
  9:20,23 10:4,7
  32:11,14 51:11,12
  51:12 95:23 96:2
  116:22 117:1,2,9
  117:12 122:19,25
  193:7 206:23,25
  208:10 215:19
  216:1,18 217:4
  248:7 267:25

**269:3 270:3**
  271:12 272:11
  273:14,15 276:1,6
  287:13,23 288:21
  289:25 290:4,5,9
  290:11,12,17
  291:2,24 301:11
  301:16,17 302:2,5
  302:17 303:22
  306:3,21 316:4,4
  318:18 320:1
**emailed** 247:16
  314:13 319:3
**emailing** 203:22
**emails** 63:16 123:8
  127:9 206:6
  247:23 267:14
  289:15 291:4,12
  307:18 318:7
  319:14
**emergency** 9:6
  185:20,21 221:22
  222:6,25 223:22
  224:4,6,11,22
  231:5,9
**employed** 16:10,24
  17:13,15,24 19:9
  23:3 25:12 35:2
  46:17 48:25 154:2
  325:9,13
**employee** 111:22
  182:23 193:13
  265:21 325:12
**employees** 1:5 11:8
  48:19 49:13 52:3
  52:11 81:2,7
  84:17 103:4
  117:19 118:18
  125:15,16,21
  216:19,24 218:19
  219:9 220:10
  225:14,14 226:3
  227:6 234:11
  265:18 267:3

**274:15 278:2**
  304:7 305:10,18
  320:4
**employer** 257:11
  257:12
**employment** 17:18
  18:7,10 115:11
  179:10 278:21
  281:11 284:18
**enact** 232:9
**ended** 22:18 115:11
  127:4 128:24
  197:24
**endless** 273:1
**ends** 321:19
**Engagement**
  145:15,19 185:16
**ensure** 132:11,16
  134:19 224:21
**entered** 29:13,20
**entire** 60:9,12
  76:12,13 90:18
  92:5 93:12,15
  232:13 259:23
  260:12,19 290:12
**entitled** 147:22
**envoy** 18:22,24
  19:1,6 20:7 26:1
  26:14 28:23
**envoys** 25:22
**EO** 127:21
**ERRATA** 323:1
**error** 323:11
**ESEC** 145:2 157:4
  165:8,9 275:5
**Eshleman** 3:6 12:5
  12:6
**Esq** 3:5,6 4:4,5 5:5
  5:12
**establish** 223:5
**et** 1:5,9 11:8,10
  31:5 296:19,19
  323:2,5
**ethos** 236:11

**Evans** 8:18 9:2
  15:11 32:2,6 38:5
  38:9,11,18 41:17
  42:4 43:4,11,18
  43:25 44:4,8,11
  44:12,14 61:20
  64:10,12,25 65:6
  65:9,12 69:9
  85:20 86:4 87:25
  88:24 89:16 90:9
  90:19 91:3 98:21
  99:1 114:14
  119:25 120:9,18
  120:24 121:24
  122:4,17 123:11
  123:16,20,23
  124:3,11 127:13
  127:17 129:2,4
  143:3 162:14,25
  164:25 165:10
  176:22 201:9
  202:6,10,23 203:7
  203:13 205:10
  206:8,16 208:1,7
  215:5 219:17
  220:22 238:4
  239:19 242:24
  244:3 245:15
  247:6,11,16 251:9
  253:10,20 254:4,9
  255:1 260:17
  261:3 262:11,24
  266:19 267:11
  269:9 270:4
  275:12,25 276:1,7
  276:8,20 277:20
  278:7 279:1,11,16
  279:20 280:3
  281:14 283:12
  286:6,21,25
  287:14,17 288:11
  289:17 295:13
  300:12 301:7,13
  302:4,17 303:22

**304:16 305:14,21**
  305:24 310:2,5
  312:7,18 316:5,15
  317:17
**Evans'** 70:5,24,25
  77:16 81:24 85:7
  87:9 125:20
  217:23 266:25
  283:3 301:24
  310:14 311:20
**Evans~10** 279:7
**evening** 79:24
  154:1,5,8,9
**event** 21:18
**events** 44:24 168:7
  219:2,5 306:13
**eventually** 241:23
  294:8
**evidence** 92:10
  93:3,14 94:2,25
  95:9 99:12 103:24
  104:22 105:7
  107:20 108:15
  133:9 134:20
  168:10 300:20
**exact** 10:24 257:18
**exactly** 18:5,12
  19:22 23:17,19
  24:16 30:8,12
  37:20 46:2 53:7
  57:4 60:15,21
  63:4 64:15 72:11
  77:6 82:23 91:21
  97:7 102:3,10
  105:22 119:1
  121:12 151:13
  166:21 168:22
  170:16 177:2
  179:24 181:13
  182:18,20,24
  190:10 192:15
  197:18,21 198:4
  198:14 228:21
  241:18 269:2

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

289:8
**examination** 13:9
   320:3
**examined** 13:7
**example** 61:2 84:9
**examples** 126:7
**exceptions** 233:6
**excused** 320:25
**exec** 199:23 208:20
**ExecSec** 165:7
   187:9 191:6
   264:11
**execute** 253:15
**executed** 260:10
**executing** 49:23
**executive** 173:13
   173:18,21 174:6
   174:11 175:6
   196:14,14,15,16
   196:25 197:1,3,7
   197:15,24 199:24
   200:7,15 201:20
   231:22 236:19
   241:6
**exemption** 232:13
   232:24
**exercise** 288:22
   301:18
**exhaustive** 79:10
**exhibit** 6:9,10,11
   6:14,16,18,20,23
   7:3,4,6,8,9,11,13
   7:15,18,20,23 8:3
   8:4,6,10,13,19,20
   9:3,4,9,12,15,20
   9:23 10:3,4,7 34:7
   34:10 36:1 42:25
   61:18 69:23 70:1
   70:18 77:13 80:3
   81:20 85:3,6
   98:24 103:9,11
   110:8,11,12
   114:13 125:19,21
   147:5,8 154:13,16

154:17 178:25
187:4 207:1 212:2
215:2,8,16 217:12
239:9,10,13 243:7
267:8,9,12 269:21
272:9 273:10,14
276:2 277:17
278:8 279:8 283:2
287:9 289:11
296:8 301:7,8
306:3,19 307:25
308:11 311:13
313:17,21 315:22
315:24 318:13
319:9
**exhibits** 6:7 7:1 8:1
   8:17 9:1 10:1,22
   69:21 282:18
   305:11
**exist** 137:17
**existed** 111:15
**existence** 111:2
**existing** 141:19,22
   266:12 313:2
**exists** 265:12
**expect** 312:23
**expected** 123:23
**expedition** 136:10
   136:18 137:14
**experience** 221:21
   221:24
**expert** 53:2 73:7,13
   91:13 101:2,7,19
   105:8,19 109:6
   112:25 151:11
   298:8 312:24
**experts** 175:10
**expira-** 158:14
**expiration** 156:14
   156:18,19,24
   157:2,4,7,10,17
   158:15 162:3
   244:24
**expirations** 268:6

**expire** 157:20,24
   158:3,7 242:11,20
   245:5
**expires** 325:22
**expiring** 86:14
   277:3,24 288:9
**explain** 23:24 102:2
   160:24 184:6
   198:22 221:14
**explaining** 96:9
**explore** 30:3
**extend** 271:8
**extended** 111:4,25
   241:23 277:4
   278:19 284:16
**extending** 242:10
**extension** 303:18
**extensions** 280:18
   283:23,25 312:15
   316:23 317:5
   319:17 320:8,12
**extent** 49:15 118:6
   259:2,16 275:11
**eyes** 84:20

———————
**F**
———————
**F** 31:4 152:1
**fact** 38:19 81:1
   93:8,9 116:20
   118:9 128:5
   132:11,17 133:1
   168:23 202:16
   248:23 257:13
   281:14 284:13
**facts** 92:10 93:14
   93:22 94:2,24
   95:9 99:12 103:24
   104:22 105:7
   133:9 300:20
   323:10
**fair** 21:19 26:18
   50:3 138:25 200:8
   209:4 211:23,25
   222:9,12 229:25

248:22
**fairly** 158:6
**fall** 203:1 241:2
   242:7
**familiar** 35:20
   52:13 82:4 213:24
   215:21 227:11
   233:9 234:10
   241:4,6 242:12
   313:1
**family** 167:2,3
   168:20
**far** 141:14 143:13
   153:6 179:25
   229:15 237:5
   277:14
**fast** 248:6 267:16
**faster** 146:14 236:2
**father** 172:23
**February** 86:19,23
   87:11,17 88:12,25
   127:17 187:25
   198:17 207:3,16
   230:5 278:9,13
   286:7,16,17
   309:25 310:2,6,11
   312:23 316:5
   317:7 318:18
   319:18
**federal** 9:6 32:17
   32:20,23 111:22
   117:20 118:19,21
   119:9,17 169:19
   173:2 174:6,12
   206:9 223:2
   227:13,16,21
   278:21 281:10
   284:18
**Federation** 1:4
   11:7
**feel** 243:14
**FEMA** 8:6 44:7
   46:22 47:17 52:3
   55:21 61:22 62:7

62:10,11,14,17,18
62:19,22 63:8,13
64:1,9,17,18
65:14,20,23 66:4
66:9,23 68:14,18
68:20 69:5,12,16
70:6,9 71:6 77:8
77:20 78:8,25
79:6,14 82:1,11
83:3,10,21,23
84:9,17 110:17
111:23 114:7
120:2 126:2,3
127:23 137:19
139:24 140:2,4,7
140:8,17,21
141:25 143:21
144:2,5,8,11,14
144:15,16,17,18
144:19,20,21,23
144:24,25 145:1,2
145:3,4,5,6,7,8,11
145:21 152:9
156:8,9,10,11,11
156:13,14,15,17
156:18,21,22,24
156:25 157:1,2,4
157:5,6,7,8,9,10
157:12 158:2
162:6,13,14,18,19
162:23,24 163:1,2
163:9,18,19,21
164:6,7,8,12,13
164:15,16,18,19
164:24 165:3,7,8
171:18 172:15
173:1,20,23 175:3
175:5,6,8,15,21
175:25 179:19,21
180:4,24 181:15
182:15 184:2,3,8
184:14 185:5,9,12
185:14 186:10
187:8 188:12,24

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

189:8,16,22 190:8
190:14 191:6,10
191:15 192:5,23
193:1,7,13 194:12
194:16,20 195:1
195:13,17 199:10
199:11 201:9
202:10,24 203:13
205:1 206:4
208:18 211:12,24
215:20 216:2,9
218:2,7 219:7,9
219:23 221:20
222:4,10,19 223:2
223:21 224:12,15
224:20 225:11,18
225:20,25 226:6,9
226:13,21 227:6
228:15,22 229:7
229:10,19 230:15
230:20,23,25
231:4 233:17
234:1,10,23 235:2
235:6,9,19,24,25
236:10,14,25
237:18 238:9,21
238:22,22 240:2,5
240:6 241:12
242:5 244:3 246:9
246:10,14,16,19
248:13 249:13,18
249:18,24,25
250:6,25 251:9,10
252:1,17,22 253:1
253:5,12,21,22
254:3,5 255:8
258:18 259:23
260:19 261:15,22
262:2,5,6,6,12
263:5 265:17,18
266:13,19 267:3,3
268:2,4,14 269:5
269:13 270:3,18
271:3,7 274:9,15

277:2,15,19,24
278:2,12 281:2
282:8 284:14,25
285:13,16 288:14
288:23 290:1
292:22 293:16,21
293:23,24 294:4,4
294:11,14,19
295:5,6,12,14,18
296:7,11,12,16
297:5,14,15
298:19 299:1,3,8
300:6,11,22 301:4
301:21,24 303:4
303:11 304:7,13
305:3 306:4,14
307:17 311:7,21
312:21 313:25
314:10,14 317:21
**FEMA's** 174:2,7,12
221:15 222:14,23
226:17 227:23
228:8 242:19,25
247:10 248:25
250:15 255:8
258:17 260:23
266:5,10 291:5
309:7
**FEMA-HQ** 163:10
**FEMA-OPA**
156:19 163:5
**FEMA-related**
65:1 100:25
144:13 155:25
157:13 158:14
160:4 173:12,17
213:2 221:8
**FEMA/DHS**
144:22 156:23
**Fern** 216:13
**figure** 30:12 175:9
**file** 54:5 147:17
149:8 150:10
321:11

**filed** 11:11 134:10
154:11,25 309:6
309:13,22 310:25
317:25
**filing** 309:17
**final** 9:4 147:5
240:11,13,18,22
**finalized** 239:21
**finance-type** 186:1
**financially** 325:13
**find** 115:20 148:7
148:10 214:15,17
248:1 272:21
274:17 296:15
**finding** 80:23
**fine** 257:20 294:14
**Finish** 94:13
**finished** 98:13
**Fire** 170:6,11
**firm** 30:7 57:20
**first** 13:7 29:17
39:8 41:21 79:19
96:4 117:15
139:13 147:24
149:11 159:22
171:1,7,13 176:18
176:23 177:1
180:6 229:22
233:19 235:11,13
255:21 256:3
267:14 279:25
290:8,13,13
291:17,19,20
325:6
**first-in-time** 267:25
**fishing** 136:10,18
137:14
**fit** 202:2
**five** 59:15 129:8
209:21,25 210:11
211:9
**five-minute** 214:17
**flaws** 227:21
**Fleischman** 4:13

12:17,18
**flexible** 29:22
**floating** 57:2
**Florida** 144:24
156:25 164:24
**flow** 264:5,7
**focus** 197:9,13
**focused** 181:13
218:21 219:7
248:13
**FOIA** 119:7
**folder** 150:9 151:3
151:8
**follow** 23:13 59:8
**follow-up** 138:5,23
**followed** 172:10
**following** 32:20
33:1 227:12
228:17 266:24
318:18
**follows** 13:8 258:14
**force** 231:25
238:11
**foregoing** 322:4
324:2,4,5,10
325:5
**form** 14:1,8,11,25
21:23 22:7 27:8
34:16 40:16 42:15
42:21 50:4 54:3
62:20 63:22 64:19
65:15,21 68:15
72:20 76:6 85:21
86:24 87:18 89:5
89:10 90:12 91:4
92:9 93:13,21
94:1,10,24 95:8
96:11 98:3,11,16
99:11 100:16
103:12,23 105:6
109:12,19 115:21
116:4 119:22
121:1 124:4 125:4
125:9,23 126:10

126:22 128:9
131:1 132:4,20
133:8 148:5
149:24 151:4,15
158:8,22 160:16
175:25 176:2
235:19 254:6
255:4 258:19
262:3,13 267:4
293:8,13 295:15
297:17 299:25
300:25 314:7
318:22
**formal** 125:6 130:8
200:24
**former** 18:9 19:2
19:19 20:12,17
23:13 127:15
**formulation** 314:23
**forth** 138:4 222:14
325:7
**forward** 2:10 3:18
11:14 13:1 270:6
311:9 313:4
**forwarded** 270:23
290:9
**forwarding** 270:11
272:12 275:13
319:15
**forwards** 270:4
**found** 112:14 113:7
146:24
**foundation** 2:10
3:18 72:21 76:7
86:25 87:19 89:5
89:11 92:10 93:14
93:22 94:1,24
95:9 97:20 98:4
99:12 103:13,24
104:16,22 105:7
109:4,13,20 116:5
125:24 126:11,23
128:10 131:2,11
133:9 149:25

151:5 158:9,23 159:9 160:16 161:21 169:7 221:13 227:9 228:25 245:25 251:13 253:7,25 254:7 255:5 258:20 266:22 278:24 281:18 284:10 285:3 295:9 300:1,15,20 301:1 313:6 314:8 320:14

**four** 298:20 299:9 299:20,21

**four-week** 299:4

**frame** 233:20 241:2 275:16 280:10 289:7

**Framework** 223:8 223:14,20,23 224:13,17,19

**Francisco** 1:3 3:8 11:13

**fraud** 111:2,15,22 112:6 189:13

**fre-** 201:22

**free** 243:14

**freeze** 232:10,14,17 232:23

**frequently** 126:20 128:5

**Friday** 13:25 14:6 17:5,8,9 47:15 91:5,20,22 94:8 94:18 95:20 98:7 99:5 100:11,23 101:12 102:21 104:5,18 105:13 105:17 106:18 108:19 115:15,15 143:12,14,15 148:1 153:24 165:16,17 166:1,6

196:21 309:24

**Friday's** 14:24 15:7

**friends** 128:25 129:8,20,23,25 167:5,6

**front** 56:8,16 126:17 135:15 140:13 178:14 201:5 215:2 233:13 248:14,21 271:15 274:19,24

**FTEs** 209:25

**full** 13:14 15:10,16 15:18 16:5,7 58:21

**fully** 218:21

**function** 88:3 153:9 223:23 224:4

**functions** 224:5,12 224:22 225:17 266:16 320:4

**Fund** 170:6,12

**further** 14:13 15:20 108:9 139:2,3 312:16 316:8 321:11 325:8,11

**furthermore** 118:4

_____

**G**
_____

**GAO** 226:12,16

**gathering** 184:12

**gears** 30:14

**general** 26:3,7 137:14 167:19 191:13 259:8 280:19 283:24 284:1

**generally** 20:5 25:21 26:22 27:22 48:2 73:20 166:22 195:22 197:6,14 199:16 201:5,11 203:6 205:2 207:19 213:9

240:21 252:21 260:2 261:20 265:20,23 287:20 303:14 309:2 312:21

**generously** 172:3 172:10

**Geoff** 164:22

**getting** 28:18 29:1 116:22 123:4 178:17 318:7 320:1

**Giovanna** 25:9

**give** 24:7 33:13,24 59:12 72:12 76:25 114:4 118:9,22 158:13 210:14 211:14,19 239:4 303:19

**given** 13:24 14:4,22 15:2 34:22 35:5,7 92:25 155:3 220:9 220:13 232:12 241:15 242:15 283:3 294:16 296:12 317:20 321:5

**gives** 291:24

**giving** 22:10 97:2 116:11 253:4 287:17 317:14

**go** 14:13,19 23:22 23:25 35:13 51:20 51:21 73:24 97:6 99:10,14 108:15 118:16 135:7,8 136:13 137:12 139:1 143:13 146:9 149:6,13 151:18 156:4 163:12,14 167:22 169:15 180:1 214:16 243:10 253:16 256:3

257:1 259:16,18 259:20 281:6 282:24 289:10 290:8 311:15 317:8 321:9

**goes** 165:23 250:10 260:4

**going** 14:14,14 15:22 28:25 30:9 30:13 33:21,22,23 33:23 34:5,25 35:1 40:8 41:6 54:7 59:11,11 69:22 72:24 76:10 76:12 77:20 82:15 94:19,23 96:13 102:7 107:22,23 108:1,10,14 115:19 116:20 122:13 135:6,15 135:18,18,25 136:3,7,17,20 137:13 138:4,21 139:1 141:15 146:2,11,18 147:4 147:14 152:20 166:18,25 167:2 167:21 175:7 178:19,23 185:1 187:6 196:8,20 199:3 204:25 208:14 215:8 236:17,17 239:8 239:15 241:2 242:11 243:1,13 243:15 248:20 250:5 254:14 255:10,25 258:24 259:2 260:10 261:19 265:16 266:2 268:9,18 271:24 276:17 279:2,11 280:8,13 281:8,15 282:2,25

283:22 284:3,5,8 285:20 294:7,8 299:13 306:2,5 309:23 313:4 314:1 315:19 320:19

**good** 11:25 12:25 24:2 29:12 59:14 144:15 152:6 156:15 164:15,16 185:25 189:11 204:5 316:17 318:24 319:19 321:14

**gotten** 18:19 116:6

**government** 1:5 11:7 15:12 18:3 24:6 29:13 34:23 36:12,14 77:18 102:11 105:20 106:7,9 107:3 108:18 110:14 112:18 113:4,6 115:13,17 116:16 117:11,15,18 118:17 155:9,13 155:17 174:18 182:22 185:3,6 193:12,17,21 226:13 231:19 241:24 245:22 297:10 298:18

**government's** 297:19

**governments** 173:3 174:8,13

**governors** 195:7

**gracious** 29:23

**gran-** 238:7

**grand** 319:2

**grant** 194:20 195:1 195:5,13,17

**granted** 303:19

**grants** 156:13

189:8,14,16,23 191:17 194:12,16 **granular** 238:3 262:9 **great** 16:3 29:7 235:24,25 315:22 **Greaves** 5:5 12:12 12:12 14:1,8,10 14:25 16:1,18 18:17 21:23 22:7 27:8 31:23 32:5 34:16 39:15 40:16 40:20,23,25 42:15 42:21 48:14 50:4 54:3 62:20 63:22 64:19 65:15,21 68:15 72:20 76:6 81:14 85:21 86:24 87:18 89:4,10 90:12 91:4 92:9 92:16 93:13,21 94:1,10,13,19,23 95:8,24 96:11 97:19 98:3,10,16 99:8,11 100:13,16 102:5 103:12,23 104:15,21 105:6 106:5,20 107:6 108:13 109:3,12 109:19 115:21 116:4 119:22 121:1 124:4 125:4 125:9,23 126:10 126:22 128:9 131:1,10 132:4,20 133:4,8,22 134:3 134:7 135:6 136:9 137:1,8,20,23 138:7,11,17,20 139:11 141:1 142:1,8 143:24 146:8,16 148:5 149:24 151:4,15 158:8,22 159:8

160:15 161:20 163:20 164:1 169:6 170:23 175:16 212:14 221:12 227:8 228:24 245:24 253:6,24 254:6 255:4 256:25 258:2,4,7,19,22 259:12 262:3,13 266:21 267:4 278:23 281:17,23 282:19 284:9,20 285:2 293:1,8,13 294:22 295:1,8,15 296:2 297:17 299:18,25 300:14 300:19,25 308:7 313:5 314:7 318:22 320:13 321:14 **Gregg** 164:21 **Greyson** 67:16,18 67:20,21,23 164:10 319:16 **ground** 14:16 225:9 **group** 5:4 12:13 16:20,22 17:24 18:2,14 31:24 66:14,22 68:19,19 68:21 69:2,6,14 70:9 71:6,10,17 72:1,5,9,17,25 73:8,17,19,21 74:3 75:24 77:8 77:19,23,24 78:8 78:12,24 79:4 81:18,23 82:12 83:2,23 84:7 126:1 140:3,5,9 142:20,22,24 144:15,16,17,18 144:24 152:8,14 152:18 153:7,8

156:25 159:6,12 234:10 **groups** 100:7 138:22,24 163:22 **grueling** 119:3 **guess** 111:11 141:1 188:5 192:7 200:25 210:14 246:17 **guidance** 312:13 **guy** 1:17 2:8 6:3,11 11:6 12:13 13:6 13:16,17 16:7 22:2 34:9,20 36:3 59:23 64:23 69:25 70:20 77:15 85:5 85:9 91:3 92:15 92:21 94:5,15 95:12 96:1,21,25 98:15 103:21 105:2 110:23 116:2 118:15,15 125:18 126:21 127:6,13 128:1,8 130:25 131:9,24 133:1,25 135:25 136:3 137:4 139:13 146:22 152:6 168:6 169:16 179:4 215:18 228:23 261:3 278:15 284:19 286:5 295:23 296:25 302:9 316:17 321:9 322:13 323:7,25 324:15 **Guy's** 15:6 **guys** 208:15

---

**H**

**hac** 3:19 **half** 249:19 250:1 250:16,25 260:12

265:18 266:20 304:13 319:25 **Hall** 4:5 12:20,21 40:1,3,23 108:3 256:14,16 **halt** 305:24 **halts** 218:7 **Hamilton** 229:22 230:14 231:3 **hand** 33:21,23 34:6 238:20 239:8 **handed** 34:9 57:15 69:25 70:20 77:15 81:22 85:5 110:12 215:18 217:17 **handful** 171:14 **handling** 118:8 121:11 **handwritten** 7:15 8:20 247:17 298:24 **happen** 23:18,20 76:22 91:20 108:9 108:11 126:12 127:3 196:23 **happened** 22:13 23:7 101:11,17,22 102:4,11 105:16 109:9,16 119:6 161:12 195:6 262:20 275:10 283:15 292:10 **happening** 25:18 128:12 133:15,18 133:20,24 168:24 219:2 232:6 248:11 **happens** 119:2 224:6 **happy** 108:3 214:9 217:4 257:16 **Harbaugh** 164:22 **hard** 57:10,13 63:20 178:3

181:10 **Harris** 3:16 **head** 196:7 197:20 218:22 **headquarters** 83:3 83:24 84:8 210:8 241:17 263:20 **heads** 178:15 202:15,17,20 **Health** 179:18 **hear** 95:2 186:2 **heard** 119:7,9,12 135:21 136:23 148:14,22 185:25 206:11 210:17 213:2 216:13 223:7 226:21 236:6,7 **hearing** 121:13 122:11 223:24 231:2,6 235:18 321:13 **heavily** 27:9 126:14 **heavy** 238:19 **hell** 218:13 **help** 24:2 56:5,7,17 66:7 85:17 131:18 147:11 153:24 199:4,8 228:22 248:20 **helped** 41:25 42:1 56:9,11,14 57:3 172:13,18 204:18 204:20 225:9 **helping** 28:14,17 194:11 204:24 **Hemenway** 25:10 25:15 26:2,15 67:13 129:6 163:16 164:10,13 164:16 176:10 180:11 187:21 319:16 **Hemisphere** 20:10

29:3
hereinbefore 325:7
Hermit's 127:21
hey 29:4 105:24
    175:7 196:19
    199:3,7 201:2
    208:14 253:16
    275:6
Hi 12:20
hide 91:9
hierarchy 186:24
    188:6 192:19
high 235:23 255:15
    304:1,20
highlight 302:20
highly 29:15
    262:15
Hill 169:22
hire 233:3,4
hires 233:18
hiring 232:10,14,17
    232:23 281:6
history 149:13
    153:12 158:18
hmm 114:6
hoc 196:18 208:20
hold 15:17 134:13
    134:17 178:17
    259:12
holding 19:8
home 28:7,7 196:21
    321:9
Homeland 4:12 7:8
    12:18 18:10 19:12
    21:6 23:4 26:4,7
    31:2 38:12 62:15
    97:18 98:2 133:6
    139:20 169:17
honest 65:23
    208:11 218:20
    249:15 260:24
    292:8
Honestly 247:3,12
honor 30:2

Hoshijima 3:19
    12:25 13:1
hour 38:25 39:4,6
    39:16 59:12
    285:20 319:4,25
    321:6
hours 79:9 119:3,3
    177:22 178:6
    210:12 211:9,9
house 20:3 33:18
    40:24 79:11
    169:23,24 195:10
    227:12 303:16
HQ 82:1 143:21
    144:19 145:18
    156:9 163:9,18,19
    163:22 316:10
    317:4,16
HQ-FEMA 156:20
    163:10,15
HR 54:5 263:21
    312:13
huge 201:4
human 31:5 263:20
hundreds 278:2,20
    284:17
Hunt 156:12
Hurricane 227:12
    227:13,17 228:7
    228:18
hyphen 163:22

─────── I ───────

ICE 144:24 156:25
    164:24 210:4,6,7
    210:9
icons 71:15 78:4
    82:10
idea 102:22,23
    103:1,2 111:15
    183:11 211:4
    213:17 253:19
    288:1 299:5,7,12
    300:16 315:11

ideas 96:23
identification 34:8
    36:2 69:24 70:19
    77:14 81:21 85:4
    110:9 147:9 179:1
    187:5 215:17
    217:13 243:8
    287:10 289:12
    306:20 311:14
    313:18 318:14
    319:10
identified 145:20
identify 136:5,21
    137:17 138:2
    140:14,18
II 144:23 156:24
IL 3:15
Illston 107:25
image 70:4,13,23
    70:25 77:16 81:23
    85:6 86:17 87:7
    110:24 217:19
    308:3 311:18,19
imagine 261:1
IMAT 225:8,11,13
    225:17,22
immediately 93:11
    93:18 94:6,15
    117:8 266:24
immigration
    179:17 208:24
    210:5
impact 309:17
implement 174:25
    200:23 235:23
    293:7
implementation
    127:23 201:1
implemented 201:7
implementing
    190:13 292:23
implicit 122:1
imposed 225:21
impossibility 15:10

impossible 15:13
impression 54:8
inaccurate 96:25
inaudible 143:24
incident 225:6
include 110:16
    142:18,24 250:19
    251:10,16,18,21
    251:22 252:1
    253:12,14 260:3
    261:4,10,23
    262:16,18 268:24
    277:20
included 79:14
    84:10 97:16 98:1
    163:23 178:15
    199:10 215:1
    253:21 259:24
    260:10 262:11
includes 83:24
    242:5 277:16
including 37:15
    44:6 61:9,21
    98:20,24 120:2
    125:20 162:6
    168:14 181:22
    255:7 258:16
    270:24 275:13
    288:13 289:16,16
inclusive 322:5
increased 228:3
independent 229:9
    229:15 234:21
    261:24
independently
    45:10 252:4
indicate 86:20
individual 66:13,16
    76:11 113:21
    142:20 143:7,17
    159:3,5 165:22
    233:4 234:8
individualized
    320:3

individually 67:1
individuals 25:11
    71:18 83:24 84:8
    97:17 130:12
    139:19,22 140:2,6
    140:16,19 141:24
    170:13 203:12
    234:14 275:13
information 67:5,8
    67:11,14,17,24
    68:2 104:6 118:23
    122:20 147:15
    148:3,7 151:13
    152:15 153:3
    155:21 158:12
    159:15 160:12
    169:4 184:4,11
    188:24 189:3
    194:2,10 199:17
    200:6 201:18
    208:17 241:16
    268:21 270:12,20
    272:3 273:4 274:1
    274:15,18 275:14
    275:18 287:17
    300:11,23
informed 155:16
Innovation 16:23
    16:25
input 191:17,18,23
    263:25
inquiries 289:3
    308:25
insiders 28:6
insist 107:22
inspector 26:3,7
    167:18
install 106:17
    150:21
instances 74:25
    125:10 252:19
Institute 171:7
instruct 10:13
    106:25 107:14

259:1
**instructed** 122:18 122:23
**instruction** 107:23 123:12
**instructions** 123:5
**insulation** 27:15
**intend** 15:16
**intended** 80:12 240:8 315:4,13
**intends** 321:10
**intent** 100:24 103:6 103:7 235:24
**intention** 201:19
**intentionally** 75:1,3 95:10 100:19
**interacted** 192:13
**interactions** 181:14
**interested** 325:14
**intermediary** 27:23 28:9 178:13 184:7
**internal** 239:24 264:25 291:13 307:16
**internally** 302:22
**internet** 148:10
**internships** 169:22
**interrupt** 51:20
**interview** 177:16
**interviewed** 177:12
**introduce** 11:23 147:5
**introduced** 8:19 9:3 10:3 239:14 267:10 269:22 272:10 273:11 279:9 301:9 315:25
**investigation** 26:2 26:6 167:19
**invite** 203:18
**involve** 140:6,16,19 141:23 142:7,15 143:3,6 259:3

**involved** 27:15 68:16 84:8,13,15 84:22 123:16,20 123:25 124:17 126:14 182:8,14 183:2 190:6,13,22 194:23 195:5,12 197:14 219:4 227:5 230:17 232:19,22 233:15 233:22 234:17 238:3 241:19 245:22 247:5 249:3,4,16 261:21 262:8 263:13 264:7 277:5,10 317:13
**involvement** 141:25 170:14
**involves** 82:14
**involving** 68:20 83:3 140:1
**iPhone** 46:1,4,9 101:5 104:13
**iPhones** 46:6
**Ireland** 22:24 24:17 46:13 47:4 47:6
**issue** 105:11 111:13 242:24 245:16 247:9 248:24 259:15 275:2 276:8,20 295:16 295:19 303:20
**issued** 45:22 46:4 173:12,17,20 231:23 292:22
**issues** 83:3 86:7 135:19 139:23 140:2 167:23 189:8 210:3 221:21 257:12
**issuing** 240:13,18
**item** 89:21 90:7

104:1 105:1 130:22 149:11 271:21 275:4
**items** 65:4 200:1 310:20

**J**

**J** 1:8 11:8 323:2
**James** 165:2
**January** 7:12 60:24 76:3 86:19,22 87:11,16 127:13 134:11 177:8,10 182:6 198:17 213:19 214:2 215:6 216:3,9,14 216:20,25 217:25 219:10 220:9 229:24 230:5 268:7 271:19 276:22 278:4,8,9 278:13,17,22 280:23,24 281:2 281:12,16,21 285:1,10,10,11,11 286:7,10,11,20,25 289:20 305:7,14 305:20 307:10 309:14,23 315:9
**Jason** 5:5 12:12 31:23 39:5,25 165:1
**jason@binnall.c...** 5:9
**Jayden** 25:8
**Jessica** 5:12 12:9
**Jimmy** 37:23 197:17
**job** 1:25 19:25 20:5 24:2 27:3,22 28:8 29:18 30:5,6 118:21 177:14,19 178:8 222:11
**jobs** 26:18 169:19

174:24
**Joe** 12:13 64:22 85:8 127:13 243:19 244:7 261:10 262:18 283:7 302:9 312:12
**join** 160:8 161:18 182:2
**joined** 40:2 159:6 159:13,16,20 171:6
**joins** 159:12
**Jonathan** 5:15 11:19
**Joseph** 1:17 2:8 6:3 6:11 11:6 13:6,16 16:7 25:7 82:24 197:24 322:13 323:7,25 324:15
**Joshua** 25:8,9 163:17 164:4
**Jr** 3:16 4:14
**judge** 107:23,25
**judgment** 30:1
**July** 171:9
**June** 171:9
**junior** 121:18
**Justice** 4:3 12:15 12:21 39:20

**K**

**Kaiser** 165:1
**Kara** 64:10,12 67:10 69:9 143:6 143:8,18 162:14 162:25 163:2 164:9,14,17 165:2 165:11,12,17 166:2,6,11,12,14 166:16 167:7 176:25 181:25 182:2,9,15 186:15 186:15,16 188:9

192:13 194:2,11 194:15,20 203:14 214:8 217:3 218:9 218:17 237:8 244:11,14 245:21 246:24 273:19 274:3 275:13 276:7 295:13 296:13,20 297:6 300:12 302:10 306:9,21
**Karen** 32:2,5,12 38:5,9,11,18 41:17,23 42:4 43:4,11,18,25 44:4,8,11,12,14 61:20 64:10,12,25 65:6,9,12 69:9 70:4,4 77:16 81:24 85:7,14,20 86:4 87:9,25 88:24 89:15 90:9 90:19 91:3 111:4 111:17 119:25 120:18,24 121:14 121:24 122:3,12 124:3,11 127:13 127:17 129:2,4 143:3 162:14,25 164:25 165:10 176:22 186:16 192:11 201:8 202:6,9,23 203:7 203:13,22 204:8 205:10 206:7,8 212:9,12,19 215:5 217:23 219:17,24 220:22 238:4 244:3 245:15 248:12 249:4,13 251:18 253:10,20 254:4 255:1 260:17,22 262:11 262:21,24 266:19

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

266:25 269:9 270:4 271:20 272:11 275:7,12 276:1,6,8,19 278:7 279:1,15,20 285:6 286:6,25 287:13,17,20 289:17 295:13 296:14,17 300:12 301:24 302:4,17 303:22 304:16 305:14,21,24 310:1,5,14 311:18 311:19 312:7 316:5,15 317:16

**Karen's** 32:7

**Katrina** 227:12,13 227:17 228:8,18 234:12

**Keenan** 205:4

**keep** 15:22 35:14 57:5,6 58:1 138:3 141:14 159:2 178:19 239:10 300:10,18,21

**keeping** 89:24,25 204:21,23

**Ken** 110:25 111:7,8 111:19,21

**Kennedy** 31:4

**kept** 204:7

**key** 91:13

**kick** 224:5

**Kieran** 56:10,13,23 56:25 58:10,11,24 59:2 205:4,5,6,7,9

**Kiernan** 58:9

**Killmeyer** 165:2

**kind** 29:4,23 46:8 56:16 122:1 178:8 181:10 186:14 192:12 195:23,23 196:17 197:7 201:1,6 208:12

210:2 235:23 236:10 239:1 255:12 260:25 264:25 294:1

**King** 4:14 5:6 25:9

**knew** 23:17 41:17 42:18,24 43:14 92:14 102:15 116:12 129:4 174:15,17 176:22 184:18 200:21 220:4 224:24 236:16 253:4 301:4

**know** 14:18 18:5,6 21:4,15 23:19,20 26:5,9 28:19 29:4 29:5,22 30:10 33:12 42:16 43:7 46:3 48:10,16 49:3,14,23,24 50:5,16,20,25 51:2,5,6,13 52:18 53:2 55:5,8,16 56:16 57:4,16 58:21 62:21,22 63:10 67:18 68:4 72:4 73:23 74:5 76:14 78:7 82:6 83:11,18 84:12 87:23 88:24 89:13 89:19 90:21,24 93:6,8 96:2 99:7 99:24 101:7,19,25 103:20 105:10,25 108:1 109:6 111:10 115:19 118:3,14 121:7,21 126:24 127:6 130:9 131:5,12,17 132:23 134:14 135:4 136:15 139:2 144:10 146:4,6 147:18

151:10 157:21 159:10,22 160:1 160:18 161:11,22 166:24 167:1,2 170:20,23 172:19 174:22 175:12,12 177:4 181:11,13 182:13,18 183:3,4 183:9,12,15,19,22 183:23 184:18 185:6 186:14,17 187:14 188:17,20 188:23 189:2,24 190:15 192:4,15 193:10 194:6,22 195:3 196:19,23 199:2,8 202:15,17 204:12,13,18,24 208:16,20 209:14 210:1,6 211:4,21 211:25,25 212:7 212:23 214:13 220:4,16,19 221:7 221:18 222:20 223:1,10,13,15,18 223:22 224:1,11 224:15,18,20 225:4,6,11,13,16 225:17,20 226:2,5 226:23 227:24 228:1,5,19 229:5 229:13 231:17 236:4 237:11,14 238:4,14,17,18,19 238:21 242:14 245:19,21 246:1,5 246:23,25 247:4 248:12 250:18,23 250:24 251:6,20 251:22 252:8 253:9 254:2,25 257:13 259:2 260:4,14 262:8,9 262:14 263:21

264:8 266:8 268:22 269:2,2 270:18 271:22 272:2,7 273:25 274:16,17,22 276:23 279:4 281:3,25 285:13 285:16 287:24 290:20,21,22,22 293:4,15 296:21 301:10 302:14,15 303:6,7 304:10,16 307:3 309:12 312:24,25 313:7,8 313:13 316:2 318:8,23 319:12

**knowing** 301:3,3

**knowledge** 19:5 25:13 26:4,8,10 59:3 63:1 179:11 185:17,19,22 194:14,18 324:8

**known** 111:8 181:22 233:7

**Kristi** 19:2 20:22 21:2,11,22 22:6 67:7 129:17,25 130:3 142:15 176:18 186:20 189:19 192:1 237:24

**Kyle** 164:22

---

**L**

**L** 4:6

**La'** 215:20 306:4 316:5 317:2

**labeled** 62:6

**lack** 240:24

**large-scale** 231:24

**lasted** 38:25 39:4

**late** 19:24 23:18 241:2 245:16

**LaToya** 268:2

273:15

**law** 5:4 12:13 31:24 57:20 117:20 118:19

**lawsuit** 31:1 210:11 309:6,10 310:25 311:4 317:25

**lawyer** 32:1 117:21 118:13 126:24 134:14,16

**lawyers** 39:19

**leaders** 216:2,3

**leadership** 28:10 28:11 144:22 156:23 164:6,7,9 195:14 262:23 269:14 270:24 271:2,4,6 274:14 306:4 320:16

**leading** 130:10 280:7

**leaked** 214:10 217:4 239:20 303:1 306:9

**learn** 23:16 42:7 43:25 44:1,8,13 44:18

**learned** 42:9,11,16 43:4,10 44:10 91:24 92:1 96:4 120:12,16,22 121:2 199:17 222:9,10,10 227:14,17 228:7

**learning** 29:2

**leave** 17:18 19:21 22:21 23:21 24:3 24:7 25:16 29:10 234:15,20

**leaving** 18:20 23:16

**led** 91:2 227:21 228:2,10,16

**left** 20:21 21:1,9 23:5 25:12 38:12

40:21,24 41:1,2
46:11,18 59:6
75:21 82:23 89:8
166:12 167:8
197:10,18,21
198:2,8,13 201:1
203:11 209:13
230:10 320:21
**legal** 170:6,11,12
224:15
**legislative** 83:17,20
179:14 185:16
**legitimized** 127:10
**Leonard** 3:5 6:5
11:25 12:2,23
13:10,12 15:3
16:3 17:7 34:1
35:24 40:12,19
59:10,22 69:20
70:16 77:11 81:17
85:1 94:11,21
96:13,20 98:13
99:10 107:16
108:10,16 110:6
110:10 135:17
136:20 137:3,16
137:21,25 138:9
138:17 139:5,12
142:5,9 147:4
151:17 152:5
154:15 163:25
164:3 167:21
168:5 178:23
187:2 214:13,24
215:9,13 217:7,11
237:20,23 239:4
243:4,9 255:21
256:15,19,23
257:15 258:1,3,6
258:9,21 259:9,19
265:2,8,13,14
267:6,20 269:19
272:5 273:6
275:24 279:6

282:9,13,16,20
285:19 286:4
287:7 288:17
289:9 296:5 301:5
306:17 308:5,8,12
311:11,15 313:15
315:16,21 318:9
318:12 319:6
320:19 321:3,15
**lessons** 227:14,17
228:7
**let's** 25:7 27:19
28:6 30:14 33:20
35:24 45:12 46:10
68:19 69:20 70:16
77:11 79:17 81:17
85:1 97:6 110:6
124:20 163:12
169:15 187:2
196:21,25 197:9
197:13 207:1
212:2,15 214:12
217:7 222:23
229:17 239:6
243:4 250:3
256:16,21 257:15
257:16 265:16
267:6 269:19
272:5 273:8
275:24 276:14
279:6 282:5,17,22
285:21 287:7
289:6,9 290:5
301:5 306:17
307:25 310:8
311:11 313:15
315:18 318:9
319:7
**letting** 96:2
**level** 192:19 199:24
235:23 238:3
248:13 255:16
262:9 263:23
304:1,13,20

**levels** 272:20
**Levy** 5:12 12:9,9
**Lewan-** 194:11
**Lewandowski**
20:18 67:4 127:14
129:14,21 133:16
134:1 142:18
162:21 163:16
176:18 177:18
181:23 184:19
187:20 188:19,24
189:4,19 191:21
192:2,5 194:3,11
194:19 215:3
252:16,18,23,25
253:4
**light** 216:24 219:13
**liked** 84:19 116:7
199:20 200:1
**likes** 260:7
**line** 156:4,4 191:1
290:13 323:12,14
323:16,18,20,22
**lined** 30:7
**lines** 236:5
**link** 218:7 312:4
313:20
**linked** 52:23
**list** 71:18 78:3
127:19 146:6,13
153:7 155:21
187:15 207:5,8
273:21 310:14,17
310:19
**listed** 64:22 76:15
79:5 86:19 152:18
153:22 156:14,18
156:19,24 157:3,4
157:7,11 164:21
171:23 172:2
187:21 191:5
**listening** 199:5
**litany** 273:1
**litigation** 31:9 37:5

37:15 79:21 80:18
134:10,12,17,20
134:24 167:15
187:7
**little** 71:15 86:10
169:15 172:13
209:15 225:4
316:16
**Llargues** 290:19,25
291:1 314:15
**LLP** 3:4 5:13
**Lobbying** 18:4
**local** 173:2 174:8
174:13 222:6
**located** 236:23
**logistical** 51:3
**long** 29:25 30:20
65:17 146:6
301:11
**longer** 70:14
160:13 317:21
**look** 33:20 34:17
45:10 61:17 71:9
71:14 74:1 79:4
80:2 81:17 82:4
83:10 135:1,13,18
136:1,4 137:11,12
149:18 151:12
152:13 153:11
154:13,18,23
161:23 162:8
174:1 187:3 206:3
206:5 207:1 212:2
214:12 217:8
227:18 239:7,24
243:14 247:15,22
250:3,4 263:9
264:17 265:9
267:6 269:19,23
272:5,18 273:8
275:25 276:14
279:6 282:17,23
289:6 291:9
295:12 296:9

301:6 307:25
309:23 310:8
313:8 314:10
315:18 318:10
319:7
**looked** 66:3 78:11
114:2 195:20
209:14 264:5
266:8 305:8
**looking** 45:6 78:24
87:7,14 116:2
123:9 139:3
145:25 153:21
243:15 269:16
278:6,8 314:5
**looks** 84:2 187:25
204:2 289:17
**loosely** 235:7 247:7
**lose** 75:8,13,14,15
**lost** 90:14
**lot** 22:11 26:24
50:25 54:7 57:15
65:24 68:16 119:2
123:8 184:24
200:25 219:1
225:1 238:12
244:22 248:10
260:24 261:7,17
261:19 271:24
307:18
**lunch** 146:2,12,18
147:5 151:18,21
152:7 165:13
**Luther** 3:15 4:14
**lying** 261:5,6

———————

**M**
**ma'am** 28:4 30:18
30:25 32:22 55:12
60:25 83:1 113:16
116:22 117:17,21
118:13,20 119:1,8
119:11 120:4,7
122:10 124:19

129:13,16,19 131:25 132:19,21 134:14,23 149:5 149:17 152:16 153:19 157:18 158:4,16,25 219:3 225:1 229:10 234:22

**magic** 279:17

**main** 237:16

**maintain** 74:7 104:10 118:23,24 147:3 227:22 258:25 266:12

**maintained** 87:5 118:4

**maintains** 132:7 161:16

**majority** 211:23

**making** 26:24 27:2 178:15,20 189:12 229:14 237:6 275:21

**man** 111:8 275:6

**man-** 263:10

**management** 9:7 16:23,25 67:20 185:20,21 225:7 231:5,9 244:20 263:11,12,15,17

**manager** 41:22 171:10

**managers** 8:9 313:25

**manner** 10:23

**manual** 210:21 225:25 226:3

**manually** 150:8,16

**March** 19:23,24 21:12,15 22:18,22 23:1,18 24:11,14 24:18 47:12,13 120:10,23 122:19 122:25 123:12

170:8 171:5 232:16 233:1 278:9,14 297:11 297:13,15,18,20 298:11,18 299:6

**mark** 35:24 69:20 70:16 77:11 85:1 110:6 178:24 187:3 243:4 256:8 257:19 287:7 289:9 306:18 311:12 313:15

**marked** 6:9 7:3 8:3 8:17 9:1 10:1 34:8,10 36:2 69:24 70:1,19,21 77:14 81:21 85:4 110:9 147:9 179:1 187:5 215:17,19 217:13,17 239:9 239:14 243:8 257:7,9 267:7,10 267:11 269:20,22 272:10 273:11 276:3 279:7,9 287:10 289:12 301:6,9 306:20 311:14 313:18 315:25 318:14 319:10

**marker** 279:17

**Martin** 3:15 4:14

**Mass** 179:14

**material** 58:23 77:1 104:19 113:7 114:7 169:13 251:4 255:14 313:9

**materials** 119:3 257:3

**matter** 11:6 12:4 13:13 31:8 34:14 106:13 113:21

**matters** 15:19 65:1

66:2

**Matthew** 4:13 12:17

**matthew.fleisch...** 4:16

**May~4** 2:9

**Mazzara** 25:7,8 82:24 197:24

**McGill** 67:21,22,23 164:10 319:16

**McGregor** 164:11

**McLaughlin** 82:20 82:21 83:4 163:7 165:6 198:11

**McNeil** 67:16,18

**MCO** 270:15

**MCOs** 233:8 270:18 274:8

**MD** 3:17

**mean** 49:20,22 50:1 51:9,11,20 53:18 57:6 71:13 112:24 123:2 124:2 130:5 130:8 153:5 160:24 178:5 190:15 195:22 199:2 204:1,21 237:15 246:22 247:21 249:7,7 251:16 260:9,10 271:11 272:15 279:24 307:24

**meaning** 23:21 33:16 41:7 66:19 71:18 141:19 161:6

**means** 86:13 97:4 153:6 319:23

**meant** 43:1 124:6

**mechanism** 72:2

**meet** 40:22 130:3 203:3 247:8

**meeting** 39:20 199:2 201:20

202:9,22 203:6,9 203:12 206:17 207:9,12,16 240:14,19 242:24 244:2,8 248:4 254:16,18,20,22 260:17 266:25 269:9 279:23,24 283:13,17,21 285:8 303:13,15 305:15 309:24 310:16 312:9

**meetings** 45:5 51:14 76:18 196:1 199:13,18 200:23 201:8 203:21 204:7,10,22,24 205:10,16,19 206:4,10 207:19 208:2,7,10,12,17 234:24 235:8,20 247:17 275:2 286:6,9,12,14,18 287:2

**members** 164:8,19 237:17

**memo** 51:16 200:20 230:15,17,20,20 230:25 231:3 248:8 277:8

**memory** 137:7

**memos** 51:14,15,17 51:23 127:9

**mention** 206:11

**mentioned** 105:24 165:13 198:20 208:22 257:2,4 288:5,8 312:8

**message** 53:8 66:19 68:22 74:13 75:14 76:9 84:3 85:8 86:9 91:19 94:4 95:11 100:20 104:1 142:22

143:10 149:13 161:15 165:15,18 166:1 168:17 207:4 212:9,19 214:9 215:1 218:18 308:18 312:6

**messages** 7:7 44:6 47:25 53:24 54:2 55:10 61:21 62:4 63:17 64:17 71:20 71:23 74:8,10,15 74:19,22 75:2,4,9 75:11,15,16,17 76:11,11 86:14,18 87:4,10 90:14,17 91:7,14 92:12 99:17,21 100:5,8 100:10,17,21,23 101:5,9,15 102:16 102:20 104:10 105:14 106:14 108:24 110:1 111:20 113:18 114:17,19 115:25 116:2 120:1 121:15 123:5 124:12 131:3 139:8 141:19,23 142:24 143:18 145:22 146:24 147:1,3,23 148:2 148:8,15,21,25 149:2 151:8 159:24 161:6,8,17 161:25 217:24 295:12 296:13 298:15 312:23 313:2

**messaging** 145:4 157:6 236:10

**met** 12:1 39:9 129:22 176:18 177:1 202:6

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

279:19 280:2,5 283:12 286:5 305:21 310:1
**Micah** 82:14,16,19 83:4 84:3 163:7 164:10 289:22 290:4,18 291:16 292:4,5,11,14 308:18
**middle** 243:18
**Mill** 16:8
**Miller** 25:9
**mind** 257:2 258:2
**minimalist** 259:7
**Minnesota** 219:2
**minute** 93:24 107:9 110:19
**minutes** 41:1 59:15 122:10
**minutiae** 225:3
**mischaracterizat...** 109:13,20 158:23 175:17
**mischaracterizes** 98:17 99:13
**missed** 152:19
**missing** 239:5
**mission** 221:15 226:19 233:7 270:13,15 272:15 272:20 315:4,10
**missions** 222:14
**mix** 36:17 37:17 57:11 205:20
**model** 46:2
**modes** 63:25
**moment** 34:17 239:5
**moments** 257:18
**Monday** 1:19 2:1,9 11:1 199:21 254:15
**Mondays** 196:3,11
**money** 170:18

194:20 195:1,6,13
**month** 159:22 268:6
**monthlong** 75:11
**months** 111:5 112:1 129:5 130:10 180:6 233:19 242:16
**morning** 11:25 12:25 13:19,24 14:5,23 15:6 117:11 197:4 199:22 200:2 207:16 254:18
**mornings** 196:13 196:15 199:20 201:12,17
**move** 20:11,16 150:8,16 151:2,7
**moved** 20:12 22:11
**moving** 22:18,22
**Mullin** 21:7
**multiple** 58:17
**Munoz** 180:15

———— **N** ————

**N** 152:1,1,1
**N-O-E-M** 231:10
**name** 13:12,14 16:5 16:7,21 40:1 52:20,22 62:17 67:19 77:22 156:7 217:20 223:25 227:1 229:6 240:8 290:20,21 293:23 294:2,8,9,10,16 323:2,7 324:12
**named** 215:20
**names** 79:4
**Nashville** 22:10,15
**National** 223:7,13 223:19,23 224:12 224:16,18 231:4,8 231:9 307:5

**natural** 222:25
**nature** 184:4
**NC** 144:20 156:21
**nearly** 79:9
**necessarily** 10:24 16:14 132:24 202:2 204:13,23
**necessary** 73:9
**need** 27:3 96:22 108:7 124:24 135:22 138:7 199:8,9 208:15 235:23,25 251:18 259:14 262:16 267:12 274:17 294:10 296:14,21
**needed** 24:3,7 28:15 51:24 54:2 76:22 111:12 127:2 176:1 178:16 196:9,23 201:19,24,25 208:18 219:18,19 219:22 220:22 226:18 236:20 248:2 266:15 277:23
**needs** 27:4 236:1,2
**neither** 325:8
**never** 47:16 122:3 122:7 151:7 161:14 183:7 184:21 210:20 222:4 239:21 293:9
**new** 2:11 11:15 18:7 24:24 75:14 104:23 150:21 231:15 233:2,18 235:15 238:22 240:2 294:10
**news** 22:15 288:12 312:3 313:20
**night** 91:5,22

104:10 113:5
**nights** 13:22
**nine** 25:25
**Noem** 19:3,19 20:12,17,22 21:2 21:11,22 22:6 23:13 24:24 25:3 25:6 26:1 28:10 67:7 129:17 130:1 130:3 142:15 175:24 176:18 177:12,13 184:10 184:12 186:20,24 189:19 192:1 211:5 216:8 231:11 232:16 235:1,5,19 236:6 236:9,13 237:24 238:15,19 242:14 252:13,15 269:1 307:9
**Noem's** 281:5
**Non-Profit** 3:2,13
**nonrenewed** 112:7
**Nope** 45:11
**Northern** 1:2 11:12
**Northwest** 2:11 4:6 11:15
**Notary** 2:13 325:4 325:19
**notation** 73:20 161:24 243:19
**note** 10:22 166:9 244:24 280:12 283:6
**noted** 152:2
**notes** 7:15 8:20 204:7,8,10,13,21 206:9,13 244:8 247:17 279:10,15 279:24 282:17 283:3,16,21
**notice** 15:8 312:16 312:19 316:8

**noticed** 152:21 159:11
**notion** 294:7
**notwithstanding** 126:7 136:22
**November** 161:25
**November/Dece...** 277:15
**NRCC** 306:24 307:3
**NRDC** 3:14
**NTE** 216:20 219:10 265:22 268:21 269:14 278:3,13 280:23 286:22 287:18,22 316:11
**number** 33:24 34:5 52:24 60:4,8 66:20 112:5 128:14,19,22 129:3,7,10,15,18 142:10 157:9 178:3 257:5 273:16 276:21 282:18 303:24 304:7,18 305:3 306:3 308:5,11 315:19
**numbers** 130:18 186:1 189:11 239:11 266:12
**numerous** 238:10

———— **O** ————

**O** 152:1,1,1
**O-** 176:6
**o0o--** 11:3
**oath** 253:11
**object** 14:8,10,25 15:15 16:18 18:17 21:23 22:7 27:8 34:16 40:9,16 42:15,21 54:3 62:20 63:22 64:19

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 346

65:15,21 68:15
72:20 76:6 85:21
86:24 87:18 89:4
89:10 90:12 91:4
94:24 95:24 96:11
100:13,16 103:12
108:14 119:22
121:1 125:4,9,23
126:10,22 132:20
133:4,8 158:8
160:15 161:20
221:12 228:24
245:24 249:20
251:12 253:6,24
254:6 255:4,11
258:19 262:3,13
264:20 267:4
278:23 283:18
284:9 285:2 293:8
293:13 295:8,15
296:2 297:17
299:25 300:14,19
300:25 313:5
314:7 318:22
320:13
**objected** 16:2
**objecting** 265:3
**objection** 14:1
  48:14 50:4 92:9
  92:16 93:13,21,25
  94:10,22,22 95:8
  97:19 98:3,10,16
  99:11 102:5
  103:23 104:15,21
  105:6 106:5,19,20
  106:22 107:8,12
  109:3,12,19
  115:21 116:4
  124:4 128:9 131:1
  131:10 132:4
  133:22 134:3,7
  148:5 149:24
  151:4,15 158:22
  159:8 169:6

175:16 227:8
251:3 258:25
259:18 264:23
265:2 266:21
281:17,23 282:10
282:12,14 294:22
295:2 299:18
**objections** 107:10
  108:2 255:24
**obligation** 224:21
  225:21
**obligations** 117:19
  118:18,23 224:16
**obtain** 149:4
**obtained** 288:21
**obviously** 15:15
**occasionally** 48:1
**occupation** 270:15
**Occupations** 233:8
  270:13
**occur** 114:9
**occurred** 135:20
  153:21
**occurring** 221:9
**Octavian** 25:9
**October** 241:7
  242:23 243:15,18
  245:16,16
**off-boarded** 23:10
**off-boarding**
  213:23 214:4,9
  215:7 216:19,24
  218:19 219:13
  220:2,5,10,14
  305:9,17,24 306:5
  307:15 309:1
  318:1
**offered** 19:25
  177:13
**office** 24:2,24 26:3
  26:6 27:24 56:8
  56:16 82:16 83:16
  145:15,18,18
  176:6 178:14

179:12,13,15,17
180:8 181:19
183:20 184:22
185:4,14 190:7,19
193:24 197:2
201:6 205:25
208:23 209:9
210:5,17,24 222:7
226:13 231:4,9
233:13,16 246:18
247:1 248:14,21
261:14 263:23,24
264:2,12 268:4,14
268:24 271:16
274:19,24 284:7
317:8,10 318:4,20
**officer** 122:21
  123:1,13
**offices** 2:10 31:10
  209:6 227:23
  288:1
**official** 1:8 11:9
  35:14 48:5,6,21
  48:22 49:18,24,25
  50:1,8,15,19,21
  51:8,9,23 52:4
  81:9 85:24 90:16
  103:5 118:5
  125:13 127:4
  131:5,6,20,21
  132:7,21 193:17
  193:21 204:5
  247:23 295:21,25
  323:3
**officially** 49:17,19
  49:21,22 57:4
  133:5 186:18
  188:17,20,22
**officials** 48:19
  49:12 228:4
**oh** 33:9 51:19
  163:12 200:21
  212:15,16 215:13
  224:10 237:14

258:3,6 267:20
273:22 290:14
292:1 313:14
315:21
**OIDO** 209:14
  210:1,8
**okay** 13:17,23
  14:13 15:3 16:4
  16:21 17:2,4,11
  17:15 21:21 22:9
  22:14 24:20 26:22
  28:5 30:14 31:19
  33:20 34:9 35:22
  35:24 36:9,15,24
  37:21 38:2,5
  39:13,23 40:22
  41:2 42:3 45:9,12
  46:7,10 50:6,17
  52:6 53:14 55:8
  55:13,15 58:14,18
  60:2,3,23 61:12
  64:8 66:7,22 68:4
  68:7,19 69:1,4,14
  69:19,25 70:9,12
  70:16 71:9 72:4
  77:7,11 80:2,8,11
  80:12,16 81:17,22
  84:7 85:1 94:13
  97:6 110:6,22
  114:11 115:6
  119:15,19 137:20
  137:25 138:9
  139:11 142:8
  144:5 146:19
  147:20,21 149:6
  150:5 151:12,17
  153:23 154:18,22
  155:20 164:3
  165:12,24 166:16
  167:21 168:23
  170:1,4,25 171:20
  172:1 176:13
  177:7 178:19,23
  180:16 181:17,22

185:8 187:2,12
188:6,9,22 191:3
192:25 193:19
195:19 196:20
198:7,20 199:13
199:16 202:5,9
203:3,10 205:3
206:22 207:1
209:8 211:1,8,14
213:7,18 214:12
214:25 215:18,25
216:12,17 217:7
219:7,16 220:19
221:7,14 222:13
222:23 223:13,16
223:18 224:20
225:6 226:2,9,16
226:23 227:1,11
228:1 230:7,10,13
230:19,22 232:2,8
232:21 233:6,15
233:22,25 234:19
235:4,8,13,18
236:12 237:23
238:4,21 239:24
240:1,4,23 241:1
241:6,11 242:7,14
242:18 243:4,17
243:25 244:7
245:4 249:17
250:3,12 254:9,14
254:25 256:15,23
258:1,12 259:9,22
260:16 265:13,25
266:18,24 267:6
267:24,25 269:12
269:19 270:2,3,8
270:17,20 272:2,5
273:3,6,13 274:3
274:12 275:24
276:5,6,12 277:14
278:12 279:6,14
279:15 280:12,21
281:20 282:1,5,13

282:17 284:12 285:7,19 287:6,7 287:12,13 289:1,6 289:9,14,15 290:14,24 291:1 292:1,4,14 293:11 294:25 295:4 298:9,14,18 300:5 301:5,15,16,21,22 301:23 302:2,8,16 302:19 303:5,18 303:22 304:12,23 305:13,20,23 306:2,13,17 307:3 307:14 308:15,23 309:4,22 310:13 310:19 311:7,17 312:6 313:13,15 313:23,24 314:4 314:10 315:16,18 316:4 317:1,16 318:9,16,17 319:1 319:6,13,14,22,25 320:19,21 321:15

**Old** 16:8

**older** 57:20 141:17 313:9

**OMB** 169:23,24 195:10 241:22 252:7 304:1 305:4

**ombudsman** 179:17 208:23 209:17 210:5,12 211:2,10

**ombudsman's** 209:9

**onboard** 118:22

**onboarded** 23:11 23:12 119:6

**onboarding** 119:2

**once** 13:12 30:23 38:13 57:17 134:10 319:18

**one-day** 75:12

**one-on-one** 65:5 66:14 85:18 87:24 89:15 169:12

**one-week** 87:15 157:15 299:4,14 311:22 312:22

**ones** 141:22,23 173:19 201:15

**oOo--** 322:25

**OP-** 176:6

**OPA** 144:18 163:4 197:20

**OPE** 145:8,11,12 145:14 157:10

**open** 15:18,23 139:14,15 162:12

**operations** 20:8 170:2 176:9 222:10 226:10

**opinion** 291:18

**OPM** 232:12,24 241:22 252:7 305:4

**OPM/OMB** 304:1 304:19

**OPP** 176:6

**opportunity** 97:2 148:23 322:22

**opposed** 140:10 150:14

**option** 55:9 253:12 253:14 259:11,11 260:9 261:4,10 277:21 292:7

**Option~2** 256:13

**options** 188:9 260:4 260:11 289:24 291:13,25

**order** 1:13 13:25 14:6,24 15:7,9 32:21 33:1 35:17 78:19 91:24 92:1 92:7,15 95:21 96:5 104:7 116:12

136:12,14 173:21 174:6 175:6 231:22 236:19 241:7 256:4 321:6

**ordered** 32:18,23 96:3 116:25 135:10 206:8

**orders** 173:13,18 174:11

**org** 7:8 179:2 180:21

**organization** 3:3,14 170:22 176:7

**organizational** 12:3,7,11 179:2,6

**orientation** 217:15

**original** 22:17 118:17

**originally** 26:13,16

**Orleans** 235:15

**ORR** 156:17

**Ott** 83:12,15

**Outlook** 58:2 205:13,17 206:6 207:23

**Outlook-based** 58:19

**outside** 23:8 126:16 126:17 287:1

**overall** 250:7 291:10 296:22 297:2

**overcome** 256:5

**oversight** 31:10

---

**P**

**P** 272:16,21

**p.m** 151:22 152:2 207:4 216:6 289:20 302:6 316:6 320:23 321:22

**P.O** 3:21

**P/MCO** 272:15

**pace** 196:18

**page** 36:10 110:18 147:16,24 149:1,6 150:7 239:24,25 243:14,19,23 245:2 250:3 267:15 283:6 291:17,24 313:21 314:11 323:12,14 323:16,18,20,22

**Page/Line** 10:14,14 10:14

**pages** 322:4

**paid** 16:15 18:16 18:19 183:15 249:10 276:25 293:18

**paperwork** 54:5 76:19 117:25 132:23

**paragraph** 43:22 43:24 61:19 250:4 314:12

**paraphrasing** 236:7

**Pardon** 264:22

**parking** 38:14

**part** 54:5 57:12 70:13 76:19,20 78:18,21 124:23 172:19 209:5 248:19 250:22 253:1

**partial** 15:9

**participant** 73:16 77:7 78:1 124:13 218:1 295:7

**participants** 63:12 64:1,5,8 69:8,11 71:18 78:4 82:11 162:9,13,20

**participate** 71:5,13

**participated** 69:14 71:11 74:3 75:20

76:1 82:6 159:23 197:5

**participating** 289:1 308:24 314:22

**participation** 71:22 71:23

**particular** 54:13,24 55:3 63:18,21 77:24 87:3 124:17 130:21 131:3 153:11 189:8 219:22 243:14 249:1 252:19

**particularly** 25:20 77:10 81:16 125:14 126:13

**particulars** 66:1 120:15 128:11 189:6 247:12 264:4

**parties** 325:10

**parts** 211:17

**party** 121:10 195:14

**pass** 38:14 263:10 263:10

**pass-phrase** 149:22 150:3

**passed** 229:11,13

**passing** 184:11

**passive** 71:22 309:3

**Paul** 164:11

**pause** 213:22 214:4 215:7 219:12 237:22 305:9,17 307:15 308:25 313:11

**paused** 8:7 216:24 306:5

**pay** 242:13 287:21

**paying** 16:17 218:24 243:3 245:20 247:13,25 271:25

**Peak** 127:21
**penalty** 97:3 324:1
  324:9
**people** 27:6 28:5,6
  29:2 39:3 46:5,6
  56:5,6,16 58:17
  58:22,25 64:11,14
  68:23 71:15 73:21
  75:10 112:6
  117:25 118:1,3,4
  128:23,24,25
  132:23,25 139:22
  142:3,7 161:18
  178:21 184:24,25
  186:23 187:15
  188:13 192:13
  202:20 203:18
  209:10 210:2,7
  221:16 236:1,12
  236:21,24 237:8
  238:12,14 240:17
  262:20 273:16
  278:12 281:10
  284:17 287:24
  293:20
**percentage** 285:13
  285:16 292:23
**Percival** 37:23
  165:2 197:17
**perfectly** 294:14
**perform** 47:2
  224:22 225:18
  226:18 266:16
**performed** 47:16
  79:18 80:5 115:1
  140:20 158:21
**period** 87:21 88:3
  130:9 176:19
  197:13 247:3
  299:15 311:9
**periodically** 33:20
**periods** 229:18
**perjury** 97:3 324:1
  324:9

**permanent** 225:14
**permitted** 136:11
**Perry** 5:15 11:20
**person** 64:5 65:9
  65:12 66:20 72:8
  72:18 82:16
  106:10 121:18,24
  148:19 157:19
  184:3,22 192:22
  192:25 193:3,6,15
  193:19 204:10
  205:3,19,23 220:8
  262:10 269:3
**personal** 5:2 6:13
  31:21 32:24 33:4
  35:19 36:13,24
  39:18 40:7,14
  41:4,7 45:16,18
  46:7 48:2,7,13,19
  48:23 49:2,7,13
  50:25 51:1,2,10
  51:16 52:7,10
  53:10 60:1,5 61:5
  61:9,14,25 62:12
  63:13,20 64:22
  65:6,13,20 66:3,9
  70:5,24,25 71:10
  72:14,18 73:25
  74:1,8,11,13,16
  74:19,24 75:2,5
  75:18,24 76:5,9
  76:25 77:1,5,17
  78:7,16 79:16,19
  80:17 81:3,7,10
  81:12 85:7,19
  86:4 88:18 89:13
  90:3,7,9,17,19
  91:2 92:6,24
  93:20 94:4 95:11
  95:22 97:8,25
  103:4,9,15 104:2
  112:15 113:7,12
  115:7 116:9,13,17
  117:6,8 118:7,10

118:24 119:21
122:5,9,19,24
124:21 125:3,7,11
125:16 126:6,9,16
126:16,20 128:6
128:12,13,18,22
128:25 129:2,6,10
129:14,17,20,25
130:14,18,23
131:4,7,15 132:2
133:2,13,17 134:2
134:25 135:2
139:4 145:21
152:10 153:17
156:2 157:14
160:5 161:15
169:12 176:7
257:5 295:11,25
307:22
**personally** 23:21
  189:3 195:12
  246:3 250:1 251:9
  251:25 253:11
**personnel** 20:3
  127:24 170:2
  176:9 227:22
**pertain** 55:20 78:25
  79:6 137:18
  140:10 142:25
  229:19
**pertained** 219:23
**pertaining** 83:2
  84:9 139:23 140:2
  140:4,8 152:8
  174:12 190:7
  216:12
**pertains** 53:19
  187:7
**pertinent** 134:24
**Petition** 234:12
**phone** 12:23 14:23
  15:7 23:6 32:24
  33:4,11,17 35:19
  39:21 40:7,14,21

41:4,8 42:13 43:6
43:8 45:13,16,18
45:22,24,25 46:7
46:8,10,15 47:1,5
47:18,21,23,24
48:3,4,7,13,19,23
49:2,7,10,11,13
51:1,13,17,17
52:7,16,23,25
53:6,9,10,15,20
53:24 54:12,18,20
55:2,16,20 59:24
60:1,4,4,5,8,11,20
61:3,5,10,14,25
62:12 63:14,20
64:22 65:6,13,20
66:4,9 70:5,25
71:10 72:15,18
73:25 74:2,9,11
74:14,16,19,24
75:2,5,14,18,24
76:5,25 77:2,5,17
78:7,11,16,22
79:1,8,20 80:17
80:24 81:24 85:8
85:20 86:4,18
87:9 88:18 89:14
90:3,7,9,19 91:2,6
91:10,25 92:2,6,8
92:21,24 93:5,12
93:16,20 94:8
95:22 96:3 97:9
97:25 99:15 100:6
102:4,12 104:2,19
104:24 105:1,4,17
106:10,11 107:5
107:20 108:19
110:2 112:9,15
113:2,7,12 114:21
115:2,7,20 116:13
118:10 119:21
122:5,9,19,24
123:6,18 124:21
125:3,7,11,19,20

126:6,9 128:6,13
128:18,22 129:1,2
129:6,10,14,17
130:14,18,23
131:4,7,13,15
132:2 133:13,17
134:2 135:2,5,8
135:10,21,24
136:1,4,5,22
137:6,18 138:1
139:8 140:6,10,13
140:16 142:14,18
143:3,6,18,21
145:22 146:23,25
148:3,17 149:12
150:14,15,17,21
152:10 153:18
156:2 157:14
158:20 159:1,2,15
160:5,20,25 161:2
161:10,15 162:8
162:12 217:23
257:5 295:5,11,25
298:6,25 307:22
311:20
**phones** 45:12 46:21
  51:10 60:16
  126:20
**photo** 86:18
**photograph** 87:9
  298:10
**physical** 57:21
  60:11,16
**physically** 24:13
**picture** 112:9,23
  113:1 299:21
**pictures** 42:13 43:6
  43:7
**pile** 35:15 282:24
**place** 49:2 51:1,4
  52:7 190:2 197:23
  233:2 234:20
  247:15,22 297:11
  307:21 325:7

placed 25:15 234:14
placeholder 239:3 240:7 294:2
placement 228:9,16
placing 215:6
Plaintiffs 1:6 2:8 3:3,14,15 6:8 7:2 8:2 9:19 10:2 12:4,8,11 13:2,13 15:5,15 34:7,13 36:1 69:23 70:18 70:22 77:13 81:20 85:3 110:8 147:8 178:25 187:4 215:16 217:12 239:13 243:7 267:9 269:21 272:9 273:10 276:2 279:8 287:9 289:11 301:8 306:19 309:6 310:25 311:13 313:17 315:23,24 317:25 318:13 319:9 321:8
Plaintiffs' 12:24 135:11,16 321:10
plan 41:22 79:3,13 97:13 113:13 145:1 157:2 165:4 171:10 241:3,20 242:4 249:14 251:10 252:1,15 253:13,21 254:4 255:2,9,19 258:18 259:25 260:18 261:4,18,23 262:6 262:12 263:5 264:1,10 265:1 266:1,6,11 267:1 277:19 288:22 292:15 293:7 294:19 296:22

297:2,15,21 300:6 300:10,17,21,22 301:2,3,4 309:7
planned 314:16
planning 51:5 301:18
plans 41:23 42:1 127:22 171:12 179:13 241:9,13 264:2 291:4
played 190:11
plays 175:13
please 11:22 13:4 39:24 50:22 51:20 106:9,15 107:2,11 108:17 110:19 135:5 155:22 162:12 215:22 243:12 282:14 316:8 322:3
point 20:21 21:1 22:21 23:18 25:17 42:3,11 44:17 46:20 47:20 54:13 54:24 55:3,9,9 68:18 73:8 76:2 81:12 83:19 86:22 87:16 88:11 90:5 116:23 120:12,16 120:22 121:13 122:11 154:3,4,6 166:15 168:13,18 168:21,22 175:11 179:16,20,24 180:2 184:8 185:13 190:1 198:13 208:22 233:1 236:16 240:12 243:13 246:21 250:15 260:21 277:1 278:6,15 301:12 302:4 305:1,7 309:5,9 313:3

317:20 318:3
points 56:15 83:15
policies 119:16
policy 29:7,7 49:23 53:25 127:24 158:2,11 170:2 171:7 174:6,12 176:9 178:20 179:13 190:2,14 246:10 281:5 316:10 317:16
political 174:25 195:13
populated 141:16 141:18 145:22 146:25
portfolio 28:1 179:8 180:25 196:6 200:4
portion 70:5 172:18 296:11
position 15:12 16:2 18:21 19:8,18 117:16 177:11 210:18 211:6 246:15 254:10
positions 265:17 271:8 275:15 278:3 285:14,17 311:8 315:9,13
possibility 86:7
possible 49:6,9,11 49:14 55:23 60:13 62:3 80:20,22 84:13 88:6,9,14 88:15 90:11 104:12 123:10 133:19,21 134:1 148:14 157:22,23 160:2,4,7 166:8 182:21 189:1 193:9 200:17 207:8 233:22,24 251:15,16 259:7

262:25 263:2,4 269:8,10 270:23 270:25 275:4,8 277:10,13 287:4,5 294:21,25 299:11 299:12,17 300:5 305:21,22
possibly 50:2
Post 3:7 288:13,14 289:25 290:10,11 290:16 291:3
potential 139:3
potentially 64:16
PowerPoints 119:4
PP- 176:8
PPO 20:3 176:7 211:7
practice 158:6 202:7
practitioners 238:10
pre-planned 22:24
prefer 137:3
Prep 145:7 157:8
prepare 38:21 44:24 45:3
prepared 224:21
present 5:11 11:22 39:19 216:8
presented 276:3
preservation 35:18 127:7 168:10
preserve 53:14,23 74:8 75:17 90:16 99:16 100:10 101:15 102:16 114:19 115:24 116:1 117:19 118:18 119:20 122:4,18,24 123:23 132:1 160:23
preserved 42:12 43:5,11 120:14

134:21
preserving 43:18 44:4,12 53:16,19 53:22 61:20 119:17 120:1,18 120:25 121:15,19 121:25 122:8 123:5 124:3,12 259:8
president 1:8 11:10 20:22 21:2,10,21 22:5 173:12,17 175:8 176:10 231:15,23 232:9 232:14 241:7 323:4
President's 9:5 28:20 174:15 175:1,21 235:24
presidential 170:15
press 82:16 84:9,13 84:16 185:14,15 214:10 217:5 288:20 289:3 303:11 306:10 307:14,17,19
press's 308:25
presumably 20:11 190:18 212:18 220:25 316:23
pretty 146:5,9 188:6 204:4 309:2 319:1,2,19
previous 173:5 221:24 289:18
previously 8:17 9:1 10:1 15:2 30:24 95:16 98:7 114:16 117:22 118:11 139:19 142:3 143:17 169:19 172:20 176:17 205:12 222:4 239:9,14 259:10

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

267:7,10 269:22 272:10 273:11 276:3 279:7,9 288:4,8 301:6,9 310:15 315:25
**Prieur** 215:20,21 216:2 268:2 273:15 306:4 316:5
**Primary** 272:17
**principal** 27:4,5,10 180:11 312:11
**principals** 27:14 312:9
**Printout** 7:7 8:9
**prior** 18:20 19:8 31:12 37:5 60:17 73:24 80:24 81:12 96:22 105:15 122:19,25 158:19 160:20,25 169:4 171:21 177:4 194:4 202:10 211:8 219:10
**priorities** 174:16 174:17 175:1 178:21 231:15
**priority** 174:23 231:20 272:24
**Privacy** 119:12 179:15
**private** 31:15,18
**privilege** 40:10 249:21 251:4 255:13,23 256:4 256:10 259:8 264:24
**privileged** 95:25 102:8 106:8 108:11 255:14 259:4
**privy** 191:25
**pro** 3:19
**proactively** 261:9

268:20
**probably** 23:18 52:22 68:12 86:14 129:5 138:24 146:9 163:21 167:9 180:5 188:5 189:21 192:17 203:2,5 204:4,8 205:20 206:24 212:1 226:22 231:13 237:12 240:22 245:18 249:7 262:17,19 271:22 286:9
**proceed** 312:14
**proceeding** 312:18
**process** 85:24 183:20 190:19 195:8,17 227:5 233:2 241:19 244:21 255:13,23 256:10 264:12,24 293:25 316:8
**processed** 318:20
**processes** 118:14
**produce** 13:18 15:13
**produced** 13:21 15:2 70:2,22 139:10 187:7 217:8,14,21 236:20 279:16
**product** 40:11 106:24 107:13,17 108:6
**production** 15:6
**profile** 165:1
**profited** 194:12
**profiting** 194:16
**program** 315:5,10 315:14
**programs** 266:5,10
**project** 41:21 171:1 171:20,23 172:25

173:4 244:20
**promise** 30:2
**property** 47:6 228:3,10,17
**proposed** 62:18 231:4 293:16,24
**prosecuted** 170:14
**PROTECTIVE** 1:13
**protocol** 223:1,5
**provide** 35:17 112:18 114:21 115:1,7 135:10 189:3 256:1
**provided** 35:22 36:19 96:8 110:13 112:8 124:8 128:3 168:8 170:12 191:16 274:1 279:11 303:25 304:19 305:3
**provides** 151:13
**providing** 188:23
**public** 2:13 145:15 145:19 185:15 239:20 300:11,18 300:21,24 304:3 304:21,24 305:2 325:4,19
**Publication** 226:6
**publicly** 234:11
**pull** 144:3,6 298:23
**pulled** 49:10 131:13 147:11
**punctuation** 163:25 164:2
**purposes** 15:20
**pursuant** 1:13 78:19
**pursue** 15:16
**push** 113:1
**put** 34:5 57:17 62:2 111:11 178:3 190:2 233:2

240:24 241:8,13 265:16 266:11

─────────────
**Q**
─────────────

**qualification** 229:6 229:8
**qualifications** 228:21 229:3
**qualified** 256:5
**question** 14:2,20 20:24 21:24 22:1 22:3 29:12 40:13 42:22 43:1 54:15 69:19 72:22 73:24 74:21 86:1,2 87:1 94:5,12,14,20 95:1,2,3,12 97:23 98:14 99:9 100:2 105:2 109:15 118:17 120:20 124:22,25 138:5 139:13 155:24 179:4 190:16 249:22 251:5,6 258:5,11 262:18 265:3,7 266:1 279:25 282:12 284:21 295:10 296:3
**questions** 59:25 84:17 136:21 137:5,7 138:23 147:15 184:21 185:2
**quick** 83:13 272:13 320:20
**quickly** 23:7 146:9 296:17 319:1,3,19
**quotations** 10:22
**quote** 10:25 50:8 61:21 193:21

─────────────
**R**
─────────────

**R** 152:1

**raise** 170:18
**raising** 276:8,20
**ran** 112:14 114:21
**range** 58:21 211:15 211:19
**rapid** 77:8,20 78:8 83:11,23,23 126:2 144:4,11,12 311:21 312:21
**re-extend** 277:12
**reaches** 111:1
**reaction** 306:9
**read** 10:23 32:9,11 83:13 91:6 100:17 100:21 101:8 110:19 146:14 148:3,16,22 149:1 155:21 156:6,6 173:4,6,8 215:22 222:13 223:16 225:24 226:6,9,12 227:4,16 239:16 243:11,21 244:17 245:4,10 250:5 258:8,10,13 267:13,16 272:13 280:15 292:9 304:5 322:3 324:4 324:5
**reading** 34:19 83:14 110:21 139:7 147:19 215:24 238:24 243:16,24 245:12 267:23 270:1 271:13 272:23 273:2,12 276:4 279:13 280:17 287:11 288:24 289:13 291:6,15 291:22 292:2,21 296:10 301:14 302:25 303:8 310:12 311:16

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 351

313:22 316:1
318:15 319:11
322:15,16,17
ready 147:18
301:10 316:2
319:12
really 27:17 29:14
83:13 121:22
151:10 175:7
177:17 181:11
183:3 185:2 186:8
190:12 200:18
203:8,17 208:18
211:20 222:17
234:16 238:6,8
242:22 243:2
245:10 246:17
247:25 248:4,5
249:15 260:14
261:20 263:12,12
267:16 292:9
293:4 301:20
reason 24:4,7 59:5
65:18 74:6 298:9
298:14 323:8,12
323:14,16,18,20
323:22
reasonable 127:16
276:11
reasons 292:16
recall 19:22 21:10
21:13 22:5,9,11
22:17 25:18 31:8
32:7 35:9 38:4,7,8
41:5 43:20 45:6
45:24 46:24 47:22
49:1,3,5 52:8,9
53:23 54:11,22,25
55:1,4,19 58:24
60:19 64:15 65:5
65:16,18 66:25
69:17 73:15,19
74:12,15,18,22,25
75:3,6,19,22 76:8

77:9,22 80:16,23
81:4,6,8,11 83:7,8
83:8 88:10,13
89:1,7,12 90:6,10
94:3 98:12,15,22
101:2 103:25
104:25 115:16
116:18 121:13
122:11 123:4,17
124:9,15 125:5,10
126:5,19 128:11
131:3 133:15,18
133:20,24 134:6
134:23 143:20
148:18 152:11
153:23 157:24
161:14 174:5,11
176:4 177:24
184:20 190:4
191:3,4 193:8
197:18 202:12,24
207:15 208:25
209:11,11,12
214:1,6,8 216:10
216:15 217:3
218:20,24 219:9
219:12 220:12
222:21 223:17
227:10,15 230:13
230:19 231:2
232:8 233:1,10
234:13,23 235:10
235:18 238:2
240:20 241:25
242:23 247:8
248:10,23 249:12
250:13,17 252:12
252:14,17,19,21
252:25 253:17
254:9,22 260:16
263:1 264:6
266:10,14,17,23
269:4,7,12,16
273:4 274:7 275:1

275:18,20 277:5
278:25 279:1,19
279:23 280:2,6,25
281:12 282:3
284:19,22 286:5
286:12,18,20,24
288:7,11,20,23
289:1 299:16
301:19,23 303:8
303:10,15 305:11
305:13,23 306:6
307:14 309:15,16
309:20 310:1,4,16
310:24 311:7
312:17 314:22
316:19,24 317:6
318:6,7
receive 15:18,23
73:4 270:20
received 15:5,8
36:17 74:23 92:7
117:8 123:8 272:3
287:23
receiving 104:6
273:4
recess 59:19 96:17
138:14 151:21
168:2 214:21
257:23 286:1
320:24
recipient 71:19
159:24
recognize 34:15
187:10 225:8
232:23 287:14
Recognizing 20:4
recollection 44:24
45:3 48:6,22
49:17 63:5,7 66:8
69:13 72:6 85:18
86:3 117:13,14
153:16 167:20
179:12 216:23
218:17 220:6

230:18 234:7
245:14 268:13
274:23 276:19
280:1 283:11
287:16 308:23
318:17
recommendation
250:24
record 6:14,16,18
6:21,23 7:9,13 8:4
10:24 11:5 12:1
13:15 15:4,20
16:6 35:14 59:17
59:20 74:2 89:14
89:18,20 90:2
96:15,18 133:3
135:7,15,22
136:19 138:12,15
138:19 146:3,11
149:21 150:3
151:18,19 152:3
155:22 160:19
167:22,25 168:3,7
187:12 204:5
206:17 207:25
208:6 214:16,19
214:22 256:9
257:21,24 258:14
285:22,24 286:2
320:22 321:1,18
323:9
record's 14:21
recorded 98:21
records 6:12 7:4
49:10,11 89:24
90:1 104:11
117:19 118:5,18
118:24 119:9,17
131:14 132:7
159:2 160:23
161:16 206:3
recount 197:11
recover 109:22
recovery 222:2

307:5
redacted 6:20 8:20
279:10,16
redaction 283:5
reduce 209:5
210:23 250:6
291:5
reduction 231:16
231:21,21 292:24
293:7
reductions 8:7
231:25
refer 19:15 244:24
reference 212:3
218:4 268:25
288:5
referenced 163:23
referencing 67:21
220:11
referred 17:25 28:3
referring 19:12
68:22 166:2 212:7
212:20,23 213:10
213:11,15 220:20
240:5 263:18
289:23 291:20
297:7 303:3
312:19 316:20
317:17
refers 276:7 302:12
306:24
reflected 10:23
179:5 287:25
reflects 310:19
reformed 62:18
reforming 173:1
refresh 44:23 45:2
66:7 85:17 86:2
216:23 245:14
283:11 287:16
318:17
refreshes 153:16
refusing 136:24
137:1

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

regarded 50:24

regarding 6:12 15:10 35:18 37:4 37:8,10 39:21 46:22 54:1 99:1 108:4 131:8,22 160:12 194:2 201:9 202:24 206:4 224:16 227:6 228:22 229:7 244:3 259:23 261:15 267:3 271:7 274:8 275:14,22 281:5 288:14 289:24 316:22 317:3 321:12

Region 144:21 156:22 287:25,25 287:25

regional 227:23

regions 266:5,11

regular 28:6 196:1 201:8 203:9 207:9 254:16

regularly 287:1

reins- 158:19

reinstall 75:15 92:13,20 94:17 95:6 96:8 101:25 104:4 105:25 109:17 148:23 151:1 155:5

reinstallation 158:20 160:11

reinstalled 90:13 90:23,25 91:1,5 91:11 93:19 94:7 98:6 99:19 100:14 101:21 104:3 105:12 152:25 153:17 155:10,17 169:2

reinstalling 107:4

related 18:9 47:17 50:3,7,14,18,18 54:23 61:6 64:18 74:17 79:20 80:17 85:15,20,23 86:5 91:18 114:7 122:14 123:15,19 134:20 138:22 140:21 170:5 171:16,18 219:5 236:13 325:9

relation 226:24

relations 18:3

relationship 194:9

relationships 194:7

relative 325:12

relatively 82:22

released 219:10 278:21 286:22 287:18

relevance 16:19 18:18

relevant 15:22 104:24 109:24 137:10 163:21

relief 185:18 221:16,25

remain 136:22

remark 267:12

remem- 34:24

remember 20:14,19 21:21 22:20,25 23:17 24:16 34:24 35:7 37:20 38:17 42:9 46:1 53:7 55:18,22 60:15,21 62:9 63:4,17,21 64:20 65:3,7,22 66:1 69:18 71:8 72:11 77:6,24 78:2,10 79:5,22 79:23 80:1,19 81:2 82:8,23 88:5 91:21 95:15,18

102:13,14 103:22 105:19,22 108:20 115:14,18 116:22 119:1,5 120:15 121:12 122:16 123:7,9,14 125:15 126:15 130:20 131:19 134:18 148:9 153:25 161:12 166:10,21 166:22 167:4 168:17,21 170:16 171:9,15 173:20 174:3,4 175:23 176:1 177:2,9,17 179:24 182:4,20 184:20 186:3 189:5,10 190:5,12 191:7,12 193:22 194:22 198:4,14 198:18 202:25 203:8,17,19,22 207:18 209:18,19 210:9 212:25 213:14,21,25 214:11 216:16 217:6 219:11 220:18 222:16 223:24 227:19 229:16,20 230:2,6 230:16,24 231:1,6 231:22 232:2,15 232:18,19,25 233:5,21 234:16 235:16,21 237:5 238:24 241:10,18 241:21,22 242:17 246:22 247:7,12 249:9 251:14,23 252:3 253:3 254:8 254:11 255:6 259:21,22 260:14 260:20 261:16 263:7 264:4

265:12 266:7,9 269:10,18 270:22 271:13,14,15,17 271:25 274:2 275:9 276:24 277:8,9 279:4 281:19 282:4 284:2,4,6,11,12 284:23 285:5,8,9 285:12 286:8,23 287:3,20 288:24 289:5,7 292:9 293:4,5,9,11 294:3,6,9,19,20 295:16,18 297:8 299:10,13 300:7 301:2 302:1 303:14 304:22,23 305:19 306:3,12 307:19,24 309:8 310:7 311:2,3,6 317:10,13,19,23 318:2 320:15,18

removal 228:8,15

renaming 231:4

renew 79:2,12 113:13 242:16,25 246:10,16 277:2 277:24 279:2 311:8 314:6 317:21 318:24

renewal 97:12 234:1 242:25 245:17,23 270:12 271:7 276:21 316:10 319:17

renewals 52:2 127:20 227:6 233:18 234:4 242:10 247:9 248:25 265:24 269:14 281:2,5,9 281:15,21 285:11 310:6,21 311:1

312:14,18 316:9 316:22 317:8,14 317:17,24 318:5,5 318:19

renewed 226:4 271:19 275:3 280:8,24 281:11 284:13,16 285:14 285:17

renewing 278:16 288:14,17 293:6

reorganized 62:17 240:5

repeat 20:24 22:3 42:22 43:1 45:1 49:16 50:10 54:14 72:22 87:1 93:25 94:25 95:3 109:15 114:23 120:20 122:22 124:24 128:16 173:14 174:9 194:24 228:12 240:15 246:11 249:22

repeating 258:4

rephrase 14:2 190:16

replace 247:6

report 9:4 62:19 172:1 188:10,10 227:11,17,21 228:2 236:17,20 236:22,25 237:4,6 237:9,13,17,19,25 238:5,9,13,16,20 238:22,25 239:16 239:21 240:5,12 240:13,18 242:3 250:14 262:1,7 277:15 293:16 303:2,4,12,20 312:3 313:20

report's 228:14

reported 1:24

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 353

186:7,18,20
188:15,16,17,20
274:9
**reporter** 2:12 11:20
13:4 14:9,12,16
33:23 34:2,10
35:14 59:13 93:24
107:9 215:11
217:10 243:6
258:10,12,13
264:22 288:16
292:25 293:2
315:20 318:11
325:4
**reporter's** 10:22
199:1
**reporters** 308:20
**reporting** 29:3
186:13 290:1
307:15 313:25
**reports** 208:9
226:13 303:11
**repre-** 297:9
**represent** 11:24
13:13 34:11 70:1
70:23,24 147:10
187:17 193:12,16
239:18 286:11
304:12 313:19
**representation**
170:13 297:20
**represented** 31:13
31:19,20 32:2
70:3 77:17 81:24
85:7 86:17 87:8
217:22,24 297:10
**representing** 12:3,7
12:10,13,16 13:2
298:12
**request** 73:1,1,3,10
268:14,17 301:24
319:16
**requested** 139:9
267:2 322:15,17

**requesting** 306:25
**required** 190:3,18
200:11 222:15
233:2 241:8
**requiring** 35:17
92:7 95:21
**reservists** 225:15
**reset** 150:17
**resolve** 256:9
**resources** 27:3
227:23 263:20
**respect** 15:11 18:7
50:22 55:15 63:25
69:15 84:17 95:5
101:12,18 102:11
105:18 106:17
107:4,17,19
108:19 135:20
161:18 167:23
175:3,5 181:15
186:10 188:2
190:14 191:15
192:5 237:4 242:9
247:10 277:24
309:18
**Respon** 77:20
**respond** 84:16
223:2 289:2,24
291:14,25 307:17
308:25 319:19
**responded** 140:14
**responds** 127:18
296:17,20
**response** 13:25
14:5,24 15:7
36:20 77:8,21
78:8 79:20 83:11
83:23 106:3
114:11 126:2
134:9 143:16
144:4,11,12
150:24 155:24
207:7 218:9
221:11,22 222:2,6

223:8,14,19,23
224:8,13,16,18
225:10 227:13,16
227:22 230:1
263:16 264:18
311:21 312:22
**responses** 84:24
**responsibilities**
20:6 174:13
178:10 180:1
183:12 222:15,24
**responsibility**
121:19 140:20
173:2 174:7,7
179:6,21 180:4,24
181:8 184:2
188:12
**responsible** 191:9
211:17 223:19
224:12
**responsive** 66:10
80:24 81:5 91:9
97:21 99:25 100:4
102:25 103:3
108:5 113:9 114:2
126:18 146:24
**rest** 27:16 196:17
**restart** 311:1
**restarting** 127:20
310:6,21
**restate** 21:24
**restor-** 310:20
**restore** 7:7 91:6,10
91:14 92:22
100:12,17,21,23
101:4,9 102:19
147:16,22 148:2,8
148:15,21 149:2,7
**restrict** 51:25
**result** 101:11 109:9
170:14 284:18
**resulted** 98:8 99:5
161:7
**resulting** 94:8

169:2
**resume** 8:6 314:1
**resumed** 317:24
**retain** 36:24
**retention** 131:23
**retrieve** 108:25
116:21 151:2
**returned** 47:5
**reveal** 131:14
**revealed** 169:10
**review** 44:23 45:2
62:19 173:20,23
175:6 234:23
235:2,6,9,24
236:11,14,18,25
237:18 238:9
240:14,19,22
242:3 249:18,25
250:21,25 262:1,6
262:7 264:3 266:3
266:4 293:16,25
303:12,19
**reviewed** 189:24
210:20
**reviewing** 191:9
274:14
**revision** 293:24
**Richard-** 163:8
**Richardson** 162:22
163:8,16 164:4,22
165:5 203:4 242:9
242:15 247:6
**RIF** 156:14 162:6
162:23,24
**right** 17:5 23:11
24:22 30:21 31:6
31:14 39:9,16
42:14 53:13 55:5
64:14,24 66:14
70:15 71:16 72:3
107:24 118:25
119:7,13 120:14
120:19,25 123:25
132:18 137:14

141:6 146:15,21
147:1 161:4
169:15,16,23
170:2,9,17 171:2
171:24 173:13,22
176:11,20 181:3
185:18 186:10,11
186:22 187:19
188:13,19 191:20
193:25 198:3,6,9
198:13,15,24
199:11 201:12
202:2 209:3 211:2
211:6 212:3,12
213:5,22 215:7
217:16 219:15
221:10 229:22
230:11,12 231:16
232:6,11 234:24
236:18,22 237:9
239:22 242:6
244:1,3 248:17
254:19 262:24
264:13 271:8
276:10 277:17
278:4,17 281:2,6
281:22 282:21
284:8 285:4
291:17 292:1
293:17,21,25
294:14,16,25
297:3,22 298:7,12
299:21,22 300:8
300:24 304:14
305:6 306:15
307:11,23 310:17
310:18 311:11
313:4 315:22
317:18,22 319:3
319:20 321:17
**Rights** 31:5
**ring** 242:21
**Road** 16:8
**Robert** 4:4 12:14

31:4
**robert.bombard...**
4:9
**robust** 295:21,23
**Rol-** 319:2
**Roland** 68:1,4
241:11 270:4
272:12 273:15
317:3
**role** 18:6 28:22,24
170:18 184:6
210:12 225:2
235:5 237:3
248:19
**room** 33:7,11 138:1
**roughly** 23:1 47:9
170:10 175:20
177:22 192:18
197:9 203:10
209:2 211:9
229:24 233:19
241:1 304:7,12
**routed** 248:8
**routinely** 318:4,21
318:23
**routing** 187:9,13
190:25 191:6
264:11,25 265:4,7
**rules** 14:17 131:22
225:3
**run** 114:22 115:2,7
194:21 195:2
**running** 26:25
218:22
**runs** 26:25 147:12

---
**S**

**S** 152:1,1,1
**S-1** 264:3 267:2
268:10,17,18,22
268:22,24 281:6
**s-y-n-c** 198:24
**S1** 187:17 190:3,18
200:11 233:3,13

234:4,7 306:15,24
**S2** 181:2,7,18
188:15,16 198:2
**Sacks** 290:9,15
291:2
**safe** 219:25 220:3
**sake** 231:21
**San** 1:3 3:8 11:12
**Sanity** 144:17
156:18 163:1,2
**sat** 79:25 262:15
**Saturday** 37:1 39:8
39:10,15 94:18
95:7,14,17,19
96:2,5 102:4,11
105:21,23 117:2
127:13 155:14,15
**save** 54:2 109:25
151:8
**saved** 105:15
**saw** 198:16 208:11
299:23 306:2,3,11
**saying** 21:16 44:10
50:12 100:3 105:5
108:20 111:12,24
116:24 126:12,13
140:24 175:24
176:1 216:18
219:14 235:21
251:24 262:21
268:3 285:5 306:5
308:19 312:7
316:16 319:19,22
**says** 43:21 80:4
86:10 102:17
149:11 150:5,13
150:15 153:6
154:24 159:13
161:4 165:17,22
166:5 172:1 217:2
218:12 222:21
223:14 226:3
240:1 243:19
244:11,17 260:22

268:17 280:12
283:6 288:4 291:8
296:13 297:24
299:1,2 302:8,19
303:23 314:25
316:6 317:1
**scenario** 263:4
**schedule** 76:18
**scheduled** 287:1
**scheduling** 54:6
56:1,2,3,9,11
118:4
**scheme** 319:2
**Schrock** 56:10
**Schulenburg**
204:17
**Schutt** 164:22
**Sciences** 16:23,25
**screenshot** 6:14,16
6:18,20,23 7:4,13
8:4 112:21,24
204:1 310:10
**screenshots** 120:14
125:18 198:16
**search** 33:16 41:7
46:21 47:2 66:11
79:11,17,19,24
80:18 92:3 100:1
100:6 112:15
113:21,22,25
114:1,12,22 115:2
115:8 116:8
138:21 143:23,25
144:2 161:2
**searched** 78:18,22
79:1,2,9,14,15,25
92:20 97:24 110:2
113:11,17 144:5
146:23
**searches** 126:18
**searching** 40:21
80:16 81:11
145:21
**second** 36:9 110:18

232:5 237:20
250:4 259:13
291:24 314:11,11
**secretarial** 265:1
**secretary** 19:2,19
20:12,17,23 21:3
21:6,7,8,11 22:6
23:13 27:24,24
28:9,16 29:4
68:17 83:16,20
127:10,15 130:10
175:24 177:12,13
178:14 180:8
181:20 182:3,10
183:21 184:10,12
184:23 185:4
186:20,24 188:13
190:7,20 191:19
191:23 193:24
197:2 208:21
211:5 216:8
229:12 232:16
233:17 235:1,5,18
236:6,9,13 238:15
238:19 242:14,18
245:7 246:9,14,19
247:1 252:9,13,15
255:18 260:6
261:15 263:23
264:3,13 269:1,5
271:11 274:4
277:9 281:5 284:4
284:7 307:9 317:9
317:11 318:4
**Secretary's** 28:19
191:23 246:9,15
268:14
**section** 149:7
**securing** 317:4
**security** 4:12 7:8
12:19 18:10 19:13
21:6 23:4 26:4,8
31:2 38:12 62:15
97:18 98:2 133:6

139:20 169:18
179:18 193:4
**Sedore** 25:8
**see** 25:7 43:9 66:4
70:7 71:3 73:20
77:19 80:6 82:2
83:11 84:5 85:10
86:9 87:10,12,13
99:2 110:15,18
114:2,11 144:8,12
144:13,14,15,16
144:17,18 147:24
149:7,9,23 150:1
150:2,11,23
154:14,19 155:1
161:24 171:15
175:12,14 187:23
196:8 207:6,23
209:25 212:5
213:18 216:1,4,17
216:21 218:4,9,11
218:15 240:1
243:18 244:12,13
245:1,3,9 247:18
249:10 250:9
263:5 268:11
270:5,9,14 273:14
273:17,20 278:10
279:17 280:15,20
283:9 285:23
288:5 289:19
290:3,10,18 291:2
291:23 295:6,11
295:20 297:16,18
297:24 298:1,21
302:5,7,23 304:4
306:21 307:1,2
308:21 310:14,22
311:23 312:2,23
313:9,24 314:2,18
315:6 316:13,18
318:24 320:20
**seeing** 196:23
275:18 301:2

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

seen 34:20,21 36:3
  36:5 125:18 126:1
  126:9 183:7
  186:18 189:5
  221:1,7 277:16,17
  293:23 295:23
segment 147:21
self-search 13:22
  47:17 80:5 97:8
  99:18,23 114:21
  115:1
self-searched 78:21
  91:25 96:10
Senate 83:17
Senator 193:20
send 47:24 51:16
  66:19 73:3 113:6
  127:9 203:24
  206:16 208:9
  248:16 261:2
  268:18 269:5
  319:23
sender 71:19
  159:24
sending 71:23
  204:5 268:21
  269:13 290:17
  308:18 320:2
sends 316:15
senior 3:20 121:10
  121:23 181:21,25
  182:3,9 185:8
  187:20,20,22
  193:16,21 204:18
  274:3
sense 21:17 68:24
  71:21 73:5 264:1
sent 32:11,14 53:8
  62:4 74:23 113:4
  168:17 185:13
  193:19 199:25
  206:7 207:4,9,11
  216:2,18 217:25
  218:13,19 233:12

234:4 253:20
  254:4 268:1,10
  289:19 290:4
  295:14 298:15
  306:4 312:12
sentence 124:7,9
  250:5
separate 189:23
  309:7
separated 284:17
separately 219:17
series 168:7 289:15
  291:12 295:24
  296:4 297:10
  302:3 306:13
  307:16 319:14
served 34:13
Sessoms 56:8
set 24:2 35:11 53:3
  53:4,5 54:12,23
  55:1,9,16 62:25
  63:7,9 64:14
  75:10,11 86:14
  88:2,6 146:20
  157:19 165:17
  173:23 196:18,19
  203:19 222:14
  240:25 273:6
  298:19 299:1
  305:6 309:4
  311:22 312:22
  315:16 319:6
  325:7
sets 64:5
setting 87:3,15
  88:10,25 145:24
  156:7 157:15,24
  158:3,6 166:2,3
  169:11 299:8
settings 86:21
  88:18 146:5,7
  149:14,18 152:14
  155:25 159:6
  160:13 161:7,19

313:10
seven 23:1
sheet 187:9,13
  190:25 191:6
  264:25 265:4,7
  298:24,25 323:1
sheets 264:11
Shield 18:23,25
  19:1 20:8
shift 30:14 174:12
shifting 173:1
  174:7,20,23
short 59:13
shorthand 19:16
shortly 60:22,23
shot 166:9 248:7
show 49:11 71:18
  78:4,11 82:10
  91:8 92:23 103:2
  103:3 116:8 136:2
  141:4 155:20
  159:3,5 187:6
  215:8 305:8
showed 290:1
showing 169:4
  291:4
shows 103:11
  159:16
shutdown 241:24
sic 76:4 86:20
  106:10 156:7
  230:15 258:17
  312:3
side 267:19
side-by-side 282:25
sides 28:17
sign 260:7 322:22
Signal 7:6 42:13
  43:5,12,18 44:5
  44:13 52:12,15,21
  53:5,8,9,15,20,24
  54:1,12,20 55:8
  61:9,13,21,25
  62:11,25 63:8,13

63:19 64:1,2,6,9
  64:14,17,21 65:1
  65:1,5,10,19 66:5
  66:9,11,13,16
  67:1,5,8,11,14,17
  67:24 68:2,8,11
  69:6,15 70:6,10
  71:1,7,25 72:5,9
  72:14,18,25 74:7
  74:15 75:4,7,8,13
  75:15,17 76:15
  77:4,19 78:9,12
  78:15 79:5 81:23
  85:8,19 86:4 87:2
  88:18 89:15,22
  90:13,17,20,20
  91:1,5,10,14,19
  92:6,14,20,22
  93:19,20 94:7,9
  94:17 95:5,7 96:8
  97:16 98:1,6,9,20
  99:6,16,21,22
  100:14,20 101:6
  101:13,15,21
  102:16,20 103:21
  104:3,4,10,13
  105:12,14,18
  106:1,18 107:5
  108:23 109:10,17
  110:1 113:18
  114:19 115:24
  116:1 120:1,14,18
  120:25 122:4,8
  123:15,19 124:12
  124:17 126:1,8
  128:7 133:2,12,17
  135:1 138:21
  139:14 141:4
  147:3,11,12,12,21
  148:3,23 149:1,13
  149:14,16,18
  150:9,22 151:1,13
  152:9 153:10,12
  153:17,21 155:5

155:10,18,25
  156:1 157:14
  158:14,20 159:4
  159:12 161:10,16
  169:2,3,12,14
  203:25 207:2
  213:5,9,11 215:1
  217:19 218:1
  293:21 294:18
  295:25 298:3
  299:13 306:8
  307:21 308:3,17
  310:10 313:9
signature 36:9
  187:17 191:1
  322:1,20,23
signed 80:13 120:6
  120:8,17,24 127:9
  154:6,14,19,19
  155:6,7 168:8
  175:5 200:20
  234:11 248:9
significant 21:18
  135:19 142:10
  230:22
signing 322:15,16
  322:17
signs 260:7
similar 204:18,20
Simultaneous
  51:18
single 152:21
sir 264:22
sitting 89:14
  103:22 207:25
situation 16:12
six 129:5,9 209:21
  209:25 233:19
  242:15
size 202:2
slightly 74:20
slower 293:2
small 25:23 29:9
  30:4 171:22

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 356

smaller 28:24
smart 118:15
sneeze 75:8
so-and-so 29:6
solidified 179:25
somebody 57:17
someone's 298:6
something's 245:6
soon 93:9 254:22
SOPDA 202:10
  230:13 247:11
  251:9 254:9,23
SOPDAs 229:19
sorry 17:6 20:24
  25:4 33:9 34:25
  45:1 47:12 50:10
  51:19 70:4 71:6
  82:11 84:22 87:1
  93:17 111:19
  114:23 115:15
  120:20 122:22
  128:16 145:10
  163:12 172:9
  173:14 174:9
  176:7 205:4 208:4
  212:8,15,16 214:3
  215:13 221:2
  224:10 228:12
  234:1 237:14,21
  240:15,23 246:11
  247:21 256:25
  258:3 267:18,21
  267:21,21,22
  281:7 282:22
  289:20 292:5,25
  293:3,3,3 295:10
  295:13 305:16
  308:1,9 313:21
  315:21
sort 102:19 189:12
  292:10 309:3
  320:3
sorted 188:3
sorts 129:24

sotto 141:7 143:24
sound 31:6 35:20
  213:24 233:9
  241:4 242:12
  254:19 304:14
  307:23
sounds 30:21 64:24
  158:5 170:16
  186:11 198:6,14
  209:3 219:14
  230:12 242:6
  307:11
Southeast 4:14
speak 14:15 27:1
  38:18 255:15
  293:2
speaking 51:18
  312:21
speaks 143:24
special 18:22,24
  19:1,6 20:6 25:22
  26:1,14 28:23
  56:10,21,22 57:2
  58:7 72:12 204:15
  204:16
specific 27:19
  74:25 98:19
  123:17 125:10
  137:9 173:19
  181:12 221:17
  240:21 268:25
  286:8 295:16
specifically 21:13
  22:20 54:25 56:19
  60:19 122:3 123:9
  137:19 147:14
  174:4 185:9
  204:11 205:1
  235:22 254:11
  271:25 274:7
  312:20
specifics 20:14,19
  22:12 255:17
speculate 62:24

63:9 167:10
  219:21 223:12
  240:10 252:8
  262:22 294:24
  295:3
speculating 262:21
speculation 258:23
  294:23
speech 22:10
spend 139:6
spent 177:22
  210:11 211:12,24
spiral-bound 57:21
spirit 235:22
spoke 39:11,15
  205:12
spoken 37:19,23
  38:2,5,9,11 39:5
  167:7,14
spokesman 82:21
spokesperson
  198:12 314:10,14
square 174:21
Stackhouse 164:11
staff 8:6 18:22,24
  19:19 20:6,9
  25:23,25 26:13,17
  26:21,23 27:16,21
  28:2,22 29:4
  67:20 177:7,23
  178:10 179:7,8
  180:3,8,12 181:18
  184:2 188:3,11
  196:6 197:17
  201:4 202:13,20
  204:9 209:6,19
  225:21 226:18
  250:15,25 251:11
  252:17,22 253:22
  254:5 255:8
  258:17 259:23
  260:19,23 262:2
  266:12,19 290:2
  291:10 314:1

staffing 51:6 52:10
  79:3,13 97:13
  113:13 226:14
  228:22 229:8,10
  241:3,9,13,20
  242:4 249:13
  250:7 251:10
  252:1,15 253:13
  253:21 254:3
  255:2,8 258:18
  259:24 260:18
  261:4,15,18,19,21
  261:23 262:6,12
  263:5,13 264:1,2
  264:10 266:1,3,4
  266:5,11 267:1
  277:19 288:22
  293:7 296:22
  297:2,15,21
  301:18 304:13
  305:4 314:16
  315:2
Stafford 216:19
  222:20 265:21
stamp 154:24,24
stand 145:14
  272:24
stands 62:22 226:5
  272:22 307:3
stapler 240:24
start 24:9,12,15
  37:9 46:10 76:12
  79:17 196:25
  240:2 278:16
  290:5 293:6
started 24:20 60:22
  60:23 129:5 230:2
  254:10
starting 83:7
  179:12 284:25
starts 147:16
  267:15 301:17
state 11:23 13:14
  16:5 17:13,16,19

18:20 19:9,25
  20:10,12,13,16
  22:19,23 23:11,12
  23:14 24:9,20,24
  25:6,12,16,24
  28:21 29:1,10,24
  32:12,15 35:2
  59:8 115:11
  140:11 154:3
  166:12 173:2
  174:8,13 195:14
  198:8 222:6
  249:18,25 250:15
  322:5
stated 114:16 116:7
  117:22
statement 43:24
  99:16 100:9
  102:17 104:9
  114:18 121:5
  124:2 147:2
  160:22 292:19,20
  314:13,23 315:6
statements 175:21
states 1:1,9 4:3
  11:10 12:15 17:13
  174:23 194:21
  195:1,6 323:5
status 199:8
statutes 222:13
statutory 224:21
staying 29:24
step 39:13,14
Stephanie 301:18
  301:19 302:11,12
Stephen 180:15,20
  180:23
steps 53:14,23
  119:19
stickers 35:15
stood 175:8
stop 35:1
storm 8:8 69:15
  71:2,6 72:5 73:16

75:23 76:2,3 77:4 126:2 213:23 214:5 216:13,14 216:25 218:2,8,21 219:13 221:5 305:10 307:7,21 308:4,17 309:6
**Strategy** 179:13
**Street** 3:7 4:6 5:6
**stressful** 29:15
**strike** 207:10
**strikes** 207:10
**structural** 227:20
**structure** 315:5,13
**stuck** 40:25
**stuff** 84:13 244:22 263:13
**subagency** 62:14 260:12
**subject** 31:8 134:12 134:17 259:17
**submission** 267:1
**submit** 260:18
**submitted** 42:18,24 43:14 154:7 255:2
**subpoena** 6:10 34:11
**subscribe** 324:11
**subset** 181:9
**substance** 35:3 41:10 259:3
**substantial** 270:11
**substantive** 101:14
**substantively** 84:21 84:21 237:1,2
**sufficient** 59:16
**Suite** 3:7 5:6
**Sullivan** 193:20
**summer** 171:8 234:12
**Sunday** 39:19 105:23 112:12,13 146:23 155:15
**supervise** 186:15

**supervised** 186:16
**supplemental** 309:13,17
**support** 7:6 28:13 28:15 147:11,22 148:4 149:1 175:12 223:22 224:4,11,22
**supported** 28:11
**supporting** 178:15 235:4 238:15
**suppose** 64:15 87:6 159:14 263:1 294:17 297:1,4 299:12 300:2,9 314:9
**supposed** 26:14
**sure** 14:3 18:11 20:25 22:4 26:25 27:2 28:14,17 34:18 37:9 40:12 40:19 42:23 43:3 50:11 54:16 58:16 58:25,25 67:3 68:17 71:24 72:23 84:20 110:20 114:24 120:21 125:1 128:17 168:6 173:15 174:10 178:16,17 178:20 182:24 189:13,24 190:10 192:16 194:25 195:22,25 196:8 197:12,21 198:23 199:19 201:25 215:23 228:13 237:6 240:16 243:13,22 246:12 249:23 255:20 257:6,9,18 261:2 261:12 264:14,15 269:24 272:14
**surrounding** 225:3

**Susan** 1:24 2:12 11:20 325:3,19
**suspect** 272:6
**swear** 13:4
**sweeping** 175:18
**switched** 60:14
**sworn** 13:7 21:7 130:11 325:6
**sync** 198:22 199:13 199:24 200:22 244:2 271:22
**syncs** 196:4 198:20 199:21 200:3,6,13
**synonymous** 169:25
**Syracuse** 28:7
**system** 205:13

---

**T**

**T** 152:1
**table** 137:15
**take** 22:21 39:13 53:14 72:13 92:13 96:14 100:22 112:8 119:19 132:10 134:19 135:9 138:8,9 146:10 147:6 154:18 167:22 187:2 204:10,13 204:13 207:1 209:16 210:15 214:12 217:8 239:6 243:14 256:7,23 275:25 285:21 296:9 301:5 318:9 319:7 320:20
**taken** 2:8 11:6 52:6 54:10 59:19 70:4 70:24,25 72:19 86:17 87:9 94:17 95:5 96:7,17 106:17 107:4

112:10 138:14 151:21 168:2 197:23 214:21 227:18 257:23 286:1 298:10 320:24 325:11
**takes** 113:1
**talk** 30:14 43:17 45:12 68:19 111:12,13,16 116:19 136:4 137:4 148:12 155:8 166:6,14,16 168:16,23 177:18 196:5 202:14 222:23 229:17 235:19 271:23 274:17
**talked** 29:6 69:4 117:6 130:12 166:11 167:18 168:13,19 183:17 202:21 247:20 254:4
**talking** 28:5 34:5 40:18 45:6 54:17 55:6 59:23 76:14 98:19 152:19 167:15 168:17 199:6 202:14 213:10 214:25 219:24 249:13 252:22 271:15 274:20 286:25 287:21 288:11 297:2 304:16
**tap** 149:14
**target** 288:22
**task** 238:11
**tasked** 189:12
**team** 27:2 69:15 71:2,6 72:5 73:16 75:23 77:4 126:2 145:7 157:8

196:14,14,16,16 196:25 197:1,3,7 197:15,25 199:23 199:24 200:7,15 201:20 208:20 225:7 250:20 275:5 307:21 308:4,17
**teams** 197:1 213:12 225:11,13,17,22
**technical** 112:24 113:20
**technically** 20:2 21:5,6 236:23
**technician** 40:2,23 112:11
**telephone** 6:13 49:6 66:20
**tell** 24:3 25:2,5 26:22 37:18 38:21 39:23 87:8 93:11 93:18 94:6,16 95:4,13,20 102:3 102:10 105:20 106:3,9,15 107:2 108:17 110:24 111:3 115:19 119:14 124:10 132:24 133:12,16 134:16 141:23 144:1 145:24 153:20 155:13 162:9 166:20 207:19 220:22 222:18 227:4 229:1 237:3 254:14 255:7 258:15 262:24 284:24,25 300:3 301:13 315:8,12
**telling** 92:2 219:17 266:19 279:1,4 281:19
**tells** 149:21

ten 164:19
tenure 180:3
term 62:23 69:2
  72:13 79:10,14
  110:3 223:24
  232:5 265:21
terminated 20:22
  21:2,22 22:6
  281:10
terminating 21:11
terminations 218:8
terms 79:2,25
  97:12 100:1 114:8
  191:13
terrible 308:2
test- 321:19
testified 13:8 33:15
  42:12 43:4,11
  46:11 95:16 98:8
  99:4 101:15
  105:15 109:10,25
  118:11 120:13
  122:17,23 127:1
  148:1 169:1 173:5
  176:17 177:21
  210:10,16 253:10
  261:3 274:12
  277:20 306:14
  310:15
testifying 50:9 97:3
  101:20
testimony 69:8
  94:16 96:22 98:17
  99:13 100:15
  104:5,8 109:14,21
  116:10 127:25
  155:12 158:17,24
  160:12 175:17
  177:24 256:1,7
  321:19
text 47:25 63:16
  110:23,25 112:14
  113:14,24
texts 110:4,16

thank 13:11 14:12
  17:9 67:22 147:7
  153:3 164:3 205:8
  237:23 243:9
  272:19 282:15,21
  308:8,14 321:3
Thanks 154:15
themself 196:7
then-incoming
  177:13
thereabouts 39:1
thing 51:22 65:24
  127:16 175:13
  210:8 220:3 225:4
  230:23 239:2
  245:1 257:8
  267:13 292:10
  294:3 309:3
things 23:7 30:13
  32:12 51:23 56:17
  57:22 58:1,12
  65:25 68:17 84:20
  84:22 103:3
  125:12 127:3,9
  129:24 136:23
  137:9,12 167:3
  174:20 175:24
  179:25 181:12
  184:13 186:1
  193:25 196:23
  199:7 200:10,10
  201:6 203:23
  204:19,21 208:9
  213:13 219:20
  228:1 232:9 236:7
  243:1 246:20
  248:8,15 251:20
  255:18 260:3,25
  263:22 283:20
  319:2
think 20:2,14 21:5
  21:16 23:7 24:8
  24:11,14 25:14
  26:19 27:9,14,17

29:6,19 33:8
36:18 37:17 38:13
38:23,25 39:2
40:1,25 41:12,16
42:8 45:4,11 46:6
46:23 47:8,14
48:1 50:25 52:19
53:11,13,21 54:21
55:7,14 56:15
57:2,11 58:16,24
59:10,14 60:13,18
60:21 61:15 62:5
65:11 66:15 68:3
68:7 70:11,15
72:3 73:6,7,9,14
73:18 78:6 79:3
79:10 84:19,20
90:15 91:16,23
98:5,18 100:19,24
101:24 104:17,23
105:24 106:12
108:7,22 109:23
111:5,14,18 112:3
112:4,10,10 114:6
115:5 117:4
119:23 121:22
122:1,21 123:21
125:5,12 127:16
131:22 132:12
134:5,22 135:13
137:10 138:7,24
145:8 146:8,20
147:6 148:11,18
154:9,13 158:25
160:17,18 161:4
165:22 166:7
169:24 171:6,17
171:19 172:13,18
174:17 175:11
178:1,12 179:9,11
179:22 180:5,13
185:15 186:11,15
187:1 188:1,16
189:14,17 190:9

191:2,20,22,23
192:11,21 193:14
195:16 197:20
198:1,1 200:17
201:5 202:19
204:3,4,8,12
205:11,18,22
206:2,19,22
207:22,25 208:6,8
210:6,9,19,22
211:7 218:3
219:25 220:3
222:12 223:6
225:9 226:15
229:24 231:18,20
232:11 233:14
234:6,7,9 235:11
237:12,16 238:6,7
238:8,23 239:1,2
239:3,10 240:7,8
240:21 243:3
244:5 246:4,17
247:19,22 248:6
248:22 249:15
250:22 251:17
252:3 253:8
255:22 259:14,14
260:2 261:5,6,16
262:4,17 263:3,4
263:8 265:6,19
268:25 271:4,9,20
274:6 275:10
276:25 280:4
282:20 285:19
291:8,23 292:18
293:18 294:1
295:20 298:13,17
306:16 307:13
308:2 309:2
311:10 315:19
319:24 320:5,9
321:15
thinking 269:3
  271:14

third 147:15 149:6
Thomas 164:16
thoshijima@dem...
  3:24
thought 28:13
  101:9 108:22
  168:19 174:22
  175:15 284:15,16
three 64:14 111:5
  112:1 180:16
  197:16 203:16
  229:18,19 293:20
thrown 127:2
Thursday 17:8,20
  39:3 47:14 79:24
  80:9 152:21,22
  153:7,13,24 154:1
  154:2,5,6,7,10,22
  196:15 197:4
  199:20 200:2,8
  201:20
Tim 165:1
time 2:2 11:2,18
  20:5 21:1 23:4,10
  25:12 26:25 27:1
  27:19 29:16 30:2
  41:17 45:19 46:12
  46:20 47:20 51:13
  54:13,24 55:3,9
  55:10 56:15 57:7
  59:14 60:2,9,12
  60:17 67:1 71:11
  74:23 76:2 81:12
  87:21 88:4 90:5
  91:20 93:4 97:6
  97:15,17,22,24
  98:1 107:10
  111:20,23 113:8
  113:17 114:20,25
  115:6,10 119:6,15
  120:5,8 123:12
  128:14,19 129:11
  130:6,14,18
  131:15 139:7

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 359

140:16,21 141:24
146:10 150:25
152:2 153:20,22
154:3,6 159:25
160:6 165:18
169:15 172:4,11
177:1 178:2,3
181:2 182:5
188:25 190:1
192:2 197:8,10,13
198:2,13 202:16
202:19,22 203:4
203:11 207:12
211:12,22,23
214:14 218:21
219:1,8 221:20
229:18 232:22
233:20 240:12
241:2 242:2
243:11 246:21
247:3 250:15
251:8 254:12
260:25 261:13
265:15 267:15
270:21 271:3
274:4,10 275:16
280:10 285:22
289:7,18 290:13
292:10 293:15
298:5 303:20
305:1 311:1,9
313:3 317:6,20
318:3
**timeline** 97:7 255:6
**times** 37:18 48:8
57:13 61:6 84:15
167:12 181:15
200:5 205:9
262:20
**timing** 124:16
321:12
**title** 26:20 144:6
170:22 180:13
274:5

**titled** 227:13
**today** 16:15,17
31:20 32:18 33:5
41:11,15 74:2
78:13,16 81:5
89:14 95:22 97:3
103:22 116:13
126:9 127:25
135:21 136:23
139:7 169:4
207:25 213:3
295:23 297:25
298:7 299:6
321:16
**today's** 17:2
**told** 23:23 24:1
44:19 86:16 95:16
96:24 101:22,24
102:14 106:11
107:3 111:14,16
120:3 122:7 134:1
166:18,24 251:9
253:12 261:3
262:23 281:14
298:23 313:25
**tomorrow** 321:13
**tongue** 294:5
**tongue-in-cheek**
62:23 239:2
**tongue-in-cheek-...**
294:3
**top** 71:14 77:19
78:4 82:2 86:9
154:23 188:7
217:20 257:2
270:7 273:14
276:6 283:5
306:21 311:23
312:1
**total** 209:22 265:18
278:7,9 304:7
305:3
**touch** 111:11 117:7
**tour** 193:20

**toured** 307:9
**touring** 306:24
**Toya** 215:20 306:4
316:5 317:2
**track** 204:21,23,24
268:5
**tracking** 206:15
217:1
**Tracy** 40:2
**train** 26:25
**trains** 26:25
**transcript** 32:9
325:5
**transcription**
323:11
**transferred** 301:24
**transferring**
150:14
**transformational**
175:18
**transition** 29:13
41:21,23 42:2
129:22 130:4,5,8
160:3,5 171:1,12
176:19
**transmit** 199:17
**TransPerfect** 11:21
**travel** 54:4 118:1
**Tricia** 82:14,15,18
82:19,21 83:4
84:4 163:7 165:6
197:20,21 198:11
**tried** 91:10 105:25
170:20 260:3,3
**trip** 22:24 46:16
145:5 157:7
**Troup** 25:10,15
26:2 67:13 129:6
129:8 163:15
164:10,13,16
176:10,13 180:11
180:20,23 187:21
319:15,22
**Troy** 68:10,13,16

181:3,4 187:20
197:18,19 198:2
**true** 73:14 128:8
131:9,12 133:7
155:13 292:18,19
324:7,10 325:5
**Trump** 1:8 11:9
20:22 21:2 130:7
173:12,17 323:3
**Trump's** 231:15
232:4,14
**try** 14:14 101:9
115:20 116:20
148:20 195:20
196:5
**trying** 44:20 140:23
142:12 189:13
259:6 275:7
**TSA** 179:18
**Tsuki** 3:19 13:1
**Tuesday** 38:24
196:13 197:4
199:21 200:2,8
312:9
**Tuesdays** 196:3,12
199:19
**turkey** 218:22
**turn** 47:1 206:9
**turned** 46:18 87:20
87:21,22 206:12
248:8
**twice** 38:13
**two** 26:19,20 68:22
71:15 79:9 89:2
121:12 130:6
180:9,10 203:16
235:12 256:2
272:20
**two-page** 267:14
**two-thirds** 226:18
**two-way** 28:12
**TX** 3:16
**type** 26:17 34:4
45:24 187:10

**typed** 114:1
**typical** 195:20
**typically** 25:22
46:5 200:20 204:3
204:4 207:21
298:3

**U**

**U.S** 11:11 19:12
312:3 313:20
**Uh** 256:14
**ultimately** 186:21
**Um-hum** 43:23
76:16 115:4 121:3
205:15 211:18
212:6,10,13
218:16 220:15
244:4 245:13
268:12 302:24
314:19 315:20
**under-** 14:7 58:18
**underline** 243:20
**understand** 19:11
22:1 30:5,16
44:20 53:25 55:6
63:24 72:24 82:9
87:14 97:4,7
100:3 121:24
124:22,23 140:23
142:12 175:4
221:15 225:2
244:7 248:20
253:2 255:24
281:7 303:3
**understanding**
15:1 16:1 17:12
18:21 25:19 30:23
44:3,12 53:21
54:19 61:20 64:4
64:13 76:23 85:12
85:22 86:12 89:22
91:17 103:16,18
111:21 118:7
119:25 120:5

121:9,17 122:2 124:11 132:6,17 146:22 168:10 184:15 185:23 186:6,12 191:8,11 219:16 233:25 234:3 246:7,13 284:15 297:6 302:16 304:6
**understood** 28:18 29:23 132:8 138:11 139:5 174:24 191:14 320:10
**unfiltered** 135:23
**unidentified** 215:4
**uninformed** 228:4
**Union** 3:2,13 12:3,7 12:10
**United** 1:1,9 4:3 11:10 12:15 17:13 323:4
**unredacted** 282:17 283:3
**update** 127:12 161:10 212:4 213:15 215:3 219:18,22 221:4
**updated** 75:13 90:13,20
**updates** 199:3 219:19
**upgraded** 61:2
**upgrading** 60:20
**upset** 218:18
**USA-AFGE-Exp...** 8:21
**USA-AFGE-Exp...** 8:11
**USA-AFGE-Exp...** 8:14
**USA-AFGE-Exp...** 9:21
**USA-AFGE-Exp...**

9:24
**USA-AFGE-Exp...** 10:5
**USA-AFGE-Exp...** 7:21
**USA-AFGE-Exp...** 7:24
**USA-AFGE-Exp...** 9:16
**USA-AFGE-Exp...** 9:10
**USA-AFGE-Exp...** 7:19
**USA-AFGE-Exp...** 10:8
**USA-AFGE-Exp...** 9:13
**USA-AFGE-Exp...** 7:14
**USA-AFGE-Exp...** 6:15
**USA-AFGE-Exp...** 7:16
**USA-AFGE-Exp...** 8:5
**USA-AFGE-Exp...** 6:22
**USA-AFGE-Exp...** 6:17
**USA-AFGE-Exp...** 6:19
**USA-AFGE-Exp...** 6:24
**USA-AFGE-Exp...** 7:5
**USAID** 172:19,20
**USCIS** 179:17,18
**use** 47:24 48:7 51:24 61:5 69:1,2 114:7 124:20 125:2,7 128:19 133:12,16 134:2 200:13,22 208:17 223:2

**usual** 286:6
**usually** 199:5,25 205:25

---

**V**

**v** 323:2
**vacation** 24:17 46:13
**vague** 72:6 186:14 282:12
**vaguely** 232:1 233:10 241:10,14 242:1,17 276:23 280:9,11 281:13 287:21 303:14
**Varies** 211:13
**various** 41:23 241:12
**varying** 56:15
**vehicle** 174:19
**version** 239:17 294:4
**versus** 11:8 31:5 126:25
**vice** 3:19
**Victoria** 163:2,15 165:10 185:12 203:15 244:11,14 290:17 291:13,23 291:24 292:6 295:13 312:10
**video** 11:5
**videoconference** 1:15 2:7 3:25
**videographer** 5:15 11:4,19 13:3 59:13,17,20 96:15 96:18 138:12,15 151:19 152:3 167:25 168:3 214:19,22 257:21 257:24 267:18 285:24 286:2 320:22 321:1,17

**Videos** 145:6
**Videotaped** 1:15 2:7
**viewed** 271:11
**Virginia** 5:7 16:9
**vis-a-vis** 321:13
**visited** 306:15
**voce** 141:7 143:24
**volition** 251:18
**volume** 29:9
**volume's** 172:6
**volunteer** 41:24 152:17
**volunteered** 172:3 172:11
**Voorhies** 64:10,12 67:10 69:9 143:6 143:8,18 162:15 162:25 163:3 164:9,14,17 165:2 165:11,12,17 166:2,6,11,12,14 166:17 167:7 168:14,20 169:9 176:25 177:4 181:25 182:2,9,15 182:22 183:5,10 184:16 185:17 186:7,9 188:9 189:7,15,18,22 190:6 191:5,14 192:10 193:4,7,16 194:3,11,15,20 214:8 217:3 218:18 237:8 244:15 245:21 246:24 273:19 274:3 275:13 276:7 295:14 296:13 297:7 300:12 302:10 306:9,22
**Voorhies'** 218:9
**vs** 1:7

**W**

**WA** 3:16
**wait** 93:24 99:8,8,8 107:9 175:12,14
**waived** 322:16,23
**want** 29:24 35:1,3 62:24 63:9 107:25 131:13 135:8 137:11 138:23 139:6 143:23,25 146:10 156:4 167:9 168:6 202:17 211:20 223:11 240:10 252:8 255:11 256:19 257:19 261:10 262:18,22 294:24 295:3 296:18 300:23 302:20
**wanted** 29:19,21 92:22 111:12 138:18 144:9 203:23 248:4 257:6,9 262:20
**wanting** 29:14
**wants** 268:5
**Washington** 2:11 3:22 4:7,15 11:16 235:14 288:13,14 289:25 290:10,11 290:15 291:3
**wasn't** 65:17,23 84:12,12 95:18 102:1 109:22 179:24 183:1,2 184:13 191:11 193:23 194:1,8 199:11 200:20 206:15 211:1,4 217:1 225:2 247:25 253:15 261:20,22,25 293:12

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

waste 189:13
Watson 25:8
way 21:25 33:10,22
  57:19 62:2 72:23
  73:15 84:1 85:16
  101:8 112:21
  113:23 133:11
  139:23 144:3
  159:4 170:5
  174:21 180:24
  195:4 197:11
  200:24 208:3
  230:3,17 251:20
  253:17 259:7
  260:2 275:6 290:7
  290:7 298:3
ways 256:2 261:7
we'll 14:17 35:15
  44:22 47:16 66:12
  187:3 215:9 217:9
  245:11 256:13
  272:21 296:21
  320:20
we're 14:14 33:22
  34:3 54:17 96:13
  107:23 108:3
  135:9,14,17 136:3
  136:17 137:11,13
  139:1 146:3
  167:21 175:7
  178:23 215:11
  239:11 243:15
  258:24 259:6
  282:25 308:19
  320:19 321:16
we've 30:6 45:6
  59:10,11 69:4
  70:10 126:1,9
  136:23 212:3
  221:7 277:15,17
  285:20 293:23
Weapons 179:14
website 179:3
Wednesday 80:10

80:11 104:9
109:25 110:2
113:5 114:19
127:17 154:9,10
201:12,17 207:3,9
207:16 244:1
254:18 266:25
276:13,17,18
279:12 283:13
286:6 287:1
305:15,20 309:24
310:2
Wednesdays
  201:13,16 202:6
  202:23 286:10,16
week 34:23 36:7
  42:19 79:25 86:10
  86:15,22 88:7,11
  89:8 111:6 112:2
  156:8,9,10,12,13
  156:15,16,17,20
  156:21,22,23,25
  157:1,5,6,8,9,12
  157:20,25 158:3,7
  158:15 162:1
  166:15 168:21
  177:22 178:4
  196:8,18,20 199:4
  199:4,14 210:12
  210:14 211:9,10
  211:13 254:21
  269:9 299:2,9,22
weekend 106:8
weeklong 75:10
weekly 201:8
  202:23 203:6,21
  260:17
weeks 178:5,6,7
  298:20 299:9,21
weighs 319:22
Weinrib 164:23
went 12:1 22:24
  24:23 25:2,5
  28:21 29:23 46:12

152:22 153:5
183:19 196:4
235:11,11,12
264:2 277:8
weren't 130:25
  160:25 161:10
  185:3,8 186:23
  188:7 195:12
  220:8,17 232:21
  274:24 284:3,5,8
  292:14
Western 18:22 20:9
  29:3
whereof 324:11
Whitaker 165:11
White 20:3 169:23
  169:24 195:10
  227:12 303:16
Whitehouse 163:17
  164:4
widespread 158:6
wife 29:17,20
wildly 211:13
William 164:20
willing 135:14
  137:12,21,23
  138:6
window 207:20
winter 8:8 69:15
  71:1,5 72:5 73:16
  75:23 76:1,3 77:4
  126:2 213:23
  214:5 216:13,14
  216:25 218:2,8
  219:13 221:5
  305:10 307:7,21
  308:3,17 309:6
wipe 93:15
wiped 91:15 92:5
  93:12
withdraw 108:2
witness 4:2 5:2 6:2
  10:13 13:4 34:19
  83:14 106:25

107:14,18 108:4
110:21 147:19
215:24 239:14
243:16,24 245:12
255:11,20 256:1
259:1 265:11
267:10,21,23
269:22 270:1
272:10,23 273:2
273:11,12 276:3,4
279:9,13 282:15
287:11 289:13
291:6,15,22 292:2
293:3 296:10
301:9,14 310:12
311:16 313:22
315:25 316:1
318:15 319:11
320:25 321:9
322:20,21 323:7
324:2,11 325:6
witnessed 189:3
word 110:4,16
  112:15 113:11
  114:13 144:2,5
  145:21 176:3
words 114:1,3
  174:2
work 16:11 18:3,9
  23:6 26:24 28:18
  29:15 30:3,9,11
  40:10 45:13,21,22
  45:25 46:10,15,21
  47:18,21,23,24
  48:3,4,6,8,12,21
  49:8,15,21,24
  50:2,7,8,14,15,18
  50:19,23 51:6,7
  51:12,17,23 52:4
  52:16,23,25 53:6
  53:9,15,20,24
  54:1,10,12,18,20
  54:23 55:2,15,20
  59:24 62:9 63:11

65:8 74:16 76:21
81:9 85:15,20,23
86:5 90:15 91:18
103:14 106:23
107:13,17 108:6
111:20 117:24
118:6,14 122:13
125:11 127:8
130:6,21,24 131:3
131:8,16 137:18
139:19 140:10,17
140:21 171:13
172:17 184:3,16
184:22 185:5,14
189:13,15,22
192:9,23 193:1,4
210:7 219:4
235:25 236:13
237:12 238:16
250:23 290:6,7
295:16,18 296:16
303:19 317:2
work-based 292:24
work-related 44:5
  49:1 51:24 58:5
  61:13,21,25 62:3
  62:6,8 63:19 65:4
  74:13,18 75:2
  76:8,22 86:7
  89:21 90:7 94:4
  95:11 98:25
  100:20 104:1
  105:1 120:1
  121:15,19 123:17
  124:12 126:5,8,19
  128:1,4,5,11
  161:15 295:24
  296:24
worked 36:12,18
  41:20,24 45:14,19
  60:2 82:16 111:10
  139:19 140:2,6
  141:24 142:4
  171:4,14 172:20

176:13 184:25 186:9 192:12,14 210:3 222:4 242:3 301:21
**workforce** 226:17 231:16 291:5 292:24
**working** 16:11 27:6 30:8 41:22 59:3 65:24,25 101:10 111:22 139:23 177:22 178:4 189:7,18 194:3 221:20 230:23 236:13,21,24 237:9,24 238:5,12 240:12,17 241:3 242:4 260:15 278:12
**workplace** 51:2 126:25
**works** 64:7 101:8 159:4 298:3
**workweek** 195:20
**World** 312:3
**wouldn't** 51:25 62:2,7 74:6 115:23 186:17 209:7 255:16 294:12 298:9
**wrap** 257:17
**write** 36:15,16 41:25 57:22 124:7 230:14 250:12 282:22
**write-up** 206:17
**writers** 250:20
**writes** 291:13
**writing** 124:9 172:6 172:12 223:19 245:10 250:13 269:3 308:1
**written** 231:3 237:17

**wrong** 25:4 67:19
**wrote** 283:14,20

---

**X**

**x** 1:4,10 322:17

---

**Y**

**yeah** 39:11 141:18 156:6 163:12 170:20 176:1 177:25 181:10 198:25 200:12 201:23,25,25 202:4 203:8 204:8 206:24 207:14,14 209:23 211:18 213:12 231:17 237:2 238:2 248:18 249:7 254:13 256:22 261:12 264:4 268:23 273:22 280:9,16,21 292:8 292:13 297:8 303:17 310:18 311:10 317:12 318:25
**year** 29:14,21 186:10 291:11
**years** 111:9 129:9
**Yep** 245:3 273:22 289:21 306:12
**yesterday** 33:19 39:12,19,24 312:12
**York** 2:11 11:15

---

**Z**

**Zachary** 25:8
**Zoom** 205:19

---

**0**

**059** 7:22

---

**1**

**1** 17:1,4,4,7,23 61:2 98:7 99:5 115:6 115:10,16 116:17 116:19,23 117:1 117:11 141:8 169:10 202:11 203:10 226:7 247:11 254:10 259:11 278:22 280:23 281:12 285:10,11 322:4 323:9
**1-** 103:9
**1:00** 207:20
**1:38** 152:2,4
**1:58** 168:1
**10** 8:20 41:1 122:19 122:25 123:12 141:8 268:9 276:9 276:12,20 279:8
**10-** 308:6
**10%** 251:21
**10:11** 59:18
**10:24** 59:21
**10:45** 283:8
**100** 34:1
**100%** 192:7
**100,000** 190:3,17
**101** 6:10 34:2,3,7 34:10
**102** 6:11 35:25 36:1 42:25 61:18 80:3 154:14,16
**103** 6:14 69:22,23 70:1 296:8
**104** 6:16 70:17,18 70:21 308:1,2,7,8 308:15
**105** 6:18 77:12,13 77:15 83:10
**106** 6:20 81:19,20 81:22
**106/22** 10:15
**107** 6:23 85:2,3,6

98:24 103:11 114:13 125:21 207:1 212:2 215:2 307:25 308:1 310:9,10
**107/12** 10:15
**108** 7:4 110:8,11,12 125:19 215:10
**109** 7:6 147:7,8,21
**10th** 276:16,18
**11** 9:8 141:8 239:17 277:16 286:17
**11,500** 303:24 304:12,18 305:3
**11:00** 207:20
**11:14** 96:16
**11:29** 96:19
**110** 7:5,8 178:24,25
**1101** 4:6
**111** 7:9 187:3,4
**112** 7:11 215:12,14 215:15,16,19
**113** 7:13 217:10,11 217:12,18
**114** 7:15 243:6,7,9 282:19,23 283:2
**115** 7:18 287:8,9
**116** 7:20 289:10,11
**117** 7:23 306:18,19 308:13
**118** 8:4 209:10,24 311:12,13 313:21
**119** 8:6 313:16,17
**12** 141:8 207:4 240:13,18 303:13
**12:18** 138:13
**12:23** 138:16
**12:39** 151:20,22
**120** 8:10 315:19 318:11,12,13
**121** 8:13 318:10 319:8,9
**12141** 1:25
**13** 6:5 9:4 141:8

239:9,10,13
**14** 141:9 286:11 325:22
**14210** 231:23
**1445** 2:10 11:15
**147** 7:7
**15** 141:9 241:7,24 301:17
**15%** 251:21
**159** 8:12
**16** 141:9
**17** 141:9 302:6 303:10
**177** 3:7
**178** 7:8
**18** 9:9 141:9 286:17 301:7,8
**180** 242:16
**185** 8:15
**187** 7:10
**18th** 23:1
**19** 141:9
**19th** 23:1

---

**2**

**2** 37:2 117:3,12 141:8 157:9,9 162:18,19 259:11 287:25 323:10
**2.0** 44:7 61:22 62:7 62:10,11,17,22 63:8,13 64:1,9,17 66:23 69:5,12 70:6,9 120:2 126:3 144:8 157:12 162:13,14 238:22 240:2,6 250:6 293:21,23 295:5,6,12,14,18 296:7,11,12 297:14 298:19 299:1,3,8 300:6 300:11
**2/6/2006** 312:2

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 363

**2:42** 168:4
**20** 141:9 177:10
    182:6
**200** 5:6
**20005** 4:7
**20032** 4:15
**20043** 3:22
**202** 3:23 4:8
**2020** 170:15
**2023** 226:16
**2024** 170:8 171:5
    176:10 285:17
**2025** 9:8 30:19
    60:17,24 61:2
    76:3 86:20 145:1
    157:2 161:25
    165:3 170:9 171:5
    171:21,24 173:1,4
    175:20 177:8,21
    187:25 190:1
    197:9 198:5
    202:11 203:1,10
    209:2,9 229:19,24
    231:13 232:5
    233:19 234:12,24
    242:7,23 248:25
    269:13,17 271:17
    274:21,25 276:1
    285:14 304:8
**2026** 1:19 2:1,9
    7:12 11:1,17
    19:23 21:12 87:11
    87:17 88:12
    134:11 198:12,17
    268:7 286:7
    309:14 315:9
    317:7 321:20
    323:6 324:12
    325:15
**2028** 325:22
**21** 141:9 286:11
    305:14,20
**215** 7:12
**217** 7:14

**22** 7:12 141:9 214:2
    216:3,9,20,25
    219:10 220:9
    285:10,11 307:10
**22309** 16:9
**22314** 5:7
**22nd** 306:15
**23** 24:14,18 47:9,13
    141:9 217:25
    288:21
**23,000** 266:12
    304:10
**239** 9:8
**24** 47:10,13 127:13
    141:9 213:19
    215:6
**243** 7:17
**25** 141:9 286:17
**25%** 251:21
**254-7740** 60:7
**26** 9:12 141:9 267:8
    267:9,12 319:18
**260** 9:17
**267** 9:14
**269** 9:22
**27** 9:15 141:10
    275:25 276:2
    278:8
**2700** 4:14
**272** 9:25
**273** 10:6
**276** 9:17
**279** 8:22
**28** 141:10 286:11
**287** 7:19
**289** 7:22
**29** 80:8,10,18,25
    81:13 86:17 87:10
    97:9,24 110:3
    112:16 115:1
    141:10 243:15,18
**29th** 154:10

_____
        **3**
_____

**3** 30:19 39:19 141:8
    254:17 266:25
    323:11
**3:25-cv-03698-SI**
    1:7 11:13
**3:38** 214:20
**30** 17:21 25:12
    29:11 36:7 37:5
    42:19 114:20,25
    115:3 119:24
    120:6,10 141:10
    153:7,13 154:20
    154:22,25 155:4,8
    158:19 159:1,17
    160:9,20 161:1,5
    165:21 168:9
    169:1,4 172:7
    210:2 280:18
    283:23,25 309:14
    309:23
**30-digit** 149:21
    150:3
**300** 3:7
**301** 9:11
**302** 7:17
**305-0693** 4:8
**306** 7:24
**30th** 152:22 154:11
    154:12,14
**31** 22:18 141:10
    277:3 279:12,20
    280:5,7 283:1,12
    284:13 286:24
**311** 7:5 8:5
**313** 8:9
**315** 10:9 60:7
**318** 8:12
**319** 8:15
**32** 141:10
**321** 322:4
**33** 141:10
**34** 6:10 141:10
**343** 9:11
**34553** 3:21

**35** 141:10
**36** 6:13 141:10
**37** 141:10
**38** 141:10
**39** 141:10
**3rd** 276:16,17

_____
        **4**
_____

**4** 1:19 2:1 11:1,17
    17:2 127:17 141:8
    207:3,16 255:1
    267:2 286:17
    309:25 310:2,6,11
    321:20 323:6
**4:13** 214:23
**4:31** 316:6
**4:58** 289:20
**40** 141:11
**4007** 16:8
**402** 9:22
**41** 141:11
**415** 3:9
**419** 9:25
**42** 141:11
**421-7151** 3:9
**43** 141:11
**44** 141:11
**448-9090** 3:23
**45** 9:20 141:11
    269:20,21 285:21
**454** 10:6
**46** 9:23 141:11
    272:8,9
**47** 141:11
**48** 141:11
**49** 10:4 141:11
    273:9,10,14

_____
        **5**
_____

**5** 21:12 43:22,24
    61:19 141:8
    161:25 268:2
    289:20 297:11,13
    297:15,18,20

    298:11,18 299:6
**5:03** 257:22
**5:18** 257:25
**5:57** 285:25
**50** 141:11,12,14
    177:22 178:6
    211:9 253:23
    292:18 302:21
**50%** 250:8,19
    251:10,19,21
    252:1,12 253:12
    253:18,22 254:5
    255:2,8 258:16
    259:23 260:18,23
    261:4,10,23 262:2
    262:7,11,16 267:1
    277:16,21 288:22
    290:1 291:9 292:6
    292:15 293:7,16
    294:19 300:6,22
    301:4 302:21
**521** 9:14
**544** 8:22

_____
        **6**
_____

**6** 141:8 144:21
    156:22 287:25
    316:5 318:18
**6:08** 286:3
**60-** 91:12
**60-number** 91:13
**65** 10:7 315:23,24
**662** 10:9
**69** 6:15
**6th** 325:15

_____
        **7**
_____

**7** 141:8 239:24,25
    250:3 286:11,25
    320:23
**7:28** 321:2
**7:29** 321:18,22
**70** 6:17
**703** 5:8

CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER

Page 364

**717** 5:6
**75** 251:22
**77** 6:19

---
**8**
---

**8** 141:8 196:16
  287:25
**8:17** 268:3
**81** 6:22
**85** 6:24
**888-1943** 5:8

---
**9**
---

**9** 88:12,25 141:8
  216:6
**9:08** 2:2,9 11:2,18
**9:51** 302:6
**90** 311:1,8 312:15
  314:6 316:11,23
  317:18,22 318:20
**90-day** 312:18
  317:7,14,24 318:5
  319:17 320:11
**900** 278:12
**932** 278:7
**94108** 3:8

# Exhibit E

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF )
GOVERNMENT EMPLOYEES, )
AFL-CIO, et al., )
Plaintiffs, )
vs. ) Case No.
DONALD J. TRUMP, in his ) 3:25-cv-03698-SI
official capacity as )
President of the United )
States, et al., )
Defendants. )
_____)

VIDEOTAPED DEPOSITION OF KARA VOORHIES, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 11th day of May, 2026, from 9:48 a.m. to 5:46 p.m., before Vickie G. Hildebrandt, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Chamberlain Hrdlicka, 1200 Smith Street, Suite 1400, Houston, Texas. JOB No. 8159331

Page 1

APPEARANCES


FOR ALL UNION AND NON-PROFIT ORGANIZATION PLAINTIFFS:

    Danielle Leonard, Esq.

    Elizabeth Eshleman, Esq.

    Jessica Levy, Esq.  (via phone)

    ALTSHULER BERZON LLP

    177 Post Street, Suite 300

    San Francisco, California  94108

    E-mail: dleonard@altber.com

            eeshleman@altber.com

            jlevy@altber.com


FOR ALL UNION AND NON-PROFIT ORGANIZATION PLAINTIFFS
(EXCEPT NRDC) AND FOR PLAINTIFFS CITY OF CHICAGO, IL;
MARTIN LUTHER KING, JR. COUNTY, WA; HARRIS COUNTY,
TX; AND CITY OF BALTIMORE, MD:

    Tsuki Hoshijima, Esq.  (via phone)

    DEMOCRACY FORWARD FOUNDATION

    P.O. Box 34553

    Washington, D.C.  20043

    E-mail: thoshijima@democracyforward.org

Page 2

FOR THE DEPARTMENT OF JUSTICE:

    Christopher Hall, Esq.

    DEPARTMENT OF JUSTICE CIVIL DIVISION

    1100 L Street NW

    Washington, D.C.  20005

    E-mail: christopher.hall@usdoj.gov

FOR THE DEPARTMENT OF HOMELAND SECURITY:

    Laura Smith, Esq.

    DEPARTMENT OF HOMELAND SECURITY

    2707 Martin Luther King Drive Avenue SE

    Washington, D.C.  20528

    E-mail: laura.smith@hq.dhs.gov

FOR THE WITNESS KARA VOORHIES:

    Larry A. Campagna, Esq.

    Tori Harrigill, Esq.

    CHAMBERLAIN HRDLICKA

    1200 Smith Street, Suite 1400

    Houston, Texas  77002

    E-mail: larry.campagna@chamberlainlaw.com

          tori.harrigill@chamberlainlaw.com

ALSO PRESENT:

    Bobette Ellis, Videographer

Page 3

                              INDEX


KARA VOORHIES                                          PAGE

Examination by Ms. Leonard........................7




                          EXHIBITS

EXHIBIT                DESCRIPTION                    PAGE

Exhibit 5      (Previously marked.)                    93

Exhibit 13     (Previously marked.)                   118

Exhibit 17     (Previously marked.)                   167

Exhibit 18     (Previously marked.)                   190

Exhibit 20     (Previously marked.)                   179

Exhibit 24     (Previously marked.)                   182

Exhibit 25     (Previously marked.)                   185

Exhibit 23     (Previously marked.)                   196

Exhibit 27     (Previously marked.)                   214

Exhibit 29     (Previously marked.)                   188

Exhibit 47     (Previously marked.)                   217

Exhibit 87     (Previously marked.)                   226

Exhibit 103    (Previously marked.)                   130

Exhibit 130    Subpoena                                14

Exhibit 131    Revised Subpoena                        15

Exhibit 132    KLV_000001-000002 - WhatsApp            33

               Chat


                                          Page 4

Exhibit 133    KLV_000507-000512 -              41
               Subcontractor Agreement
Exhibit 134    KLV_000513 - Subcontractor        57
               Termination Letter
Exhibit 135    KLV_000003-000004 - WhatsApp      68
               Chat
Exhibit 136    KLV_000169-000170 - Screenshots   103
               from Phone of Signal Chat
Exhibit 137    Screenshots from Phone            134
Exhibit 138    KLV_000318-000323 - Signal Chat   138
Exhibit 139    KLV_000375-000426 - Signal Chat   143
Exhibit 140    KLV_000363-000368 - Signal Chat   151
Exhibit 141    KLV_000237-000303 - Signal Chat   156
Exhibit 142    USA-AFGE-Exp.-0425487-0425446 -   162
               Karen Evans Handwritten Notes
Exhibit 143    KLV_000027-000028 - WhatsApp      171
               Chat
Exhibit 144    KLV_000427-000448 - Signal Chat   202
Exhibit 145    Supplemental Signal Chat          203
Exhibit 146    USA-AFGE-Exp.-0017838-0017841 -   242
               December 2025 Email Chain
Exhibit 147    USA-AFGE-Exp.-0007451 - January   247
               6, 2026 - Email Chain
Exhibit 148    May 11, 2026 Letter               266

                                          Page 5

THE VIDEOGRAPHER:  We are now on the record.  My name is Bobette Ellis, videographer representing the firm Veritext.  Today's date is Monday, May 11th, 2026.  The time is 9:48 a.m.

This is the deposition of Kara Voorhies taken in the matter of American Federation of Government Employees, AFL-CIO, et al, versus Donald J. Trump, et al.

The court reporter today is Vickie Hildebrandt, representing the firm Veritext.

Will counsel please state their appearances, after which the court reporter will swear in the witness.

MS. LEONARD:  Good morning, everyone.  Danielle Leonard for the union and organizational plaintiffs.

MS. ESHLEMAN:  Elizabeth Eshleman also for the union and organizational plaintiffs.

MS. LEONARD:  And we have two additional counsel on the phone.

MR. HOSHIJIMA:  Good morning.  Tsuki Hoshijima from Democracy Forward for plaintiff.

MS. LEVY:  Jessica Levy, Altshuler Berzon, also for the union and organizational plaintiffs.

Page 6

MR. HALL:  Hi.  Christopher Hall with the Department of Justice on behalf of the defendants.

And -- and also, I have a short statement to make at the outset once we move to that step.

MS. SMITH:  Laura Smith, Department of Homeland Security.

MR. CAMPAGNA:  I'm Larry Campagna representing the witness.

KARA VOORHIES,

having been first duly sworn, testified as follows:

MS. LEONARD:  Counsel for DOJ has something to say.

MR. HALL:  Thank you, Ms. Leonard.

So, again, this is Christopher Hall with the Department of Justice here on behalf of the defendants.

Just want to flag that we were provided a courtesy copy of an indeterminate number of pages provided by Ms. Voorhies shortly after arriving this morning.  We understand it to be approximately 500 hard-copy pages, although we haven't verified that exact number.

We understand that the copy we have is

Page 7

a courtesy copy from Ms. Voorhies' counsel and the copy that was provided to government counsel -- or was intended to be provided to government's counsel is with plaintiffs' counsel.

At the outset, we are asserting a general objection to the production and any discussion of these materials to the extent they disclose information subject to the attorney-client privilege, the deliberative process privilege or the presidential communications privilege.

There appear to be numerous examples of such information throughout the approximately 500 pages we were provided this morning.

In addition, the production range includes messages created outside of the date range governing expedited discovery in this matter.

We will instruct the witness not to answer if and when any privileged information appears to be at issue and we reserve all rights to seek to claw back any messages that are subject to any privilege, including the attorney-client privilege, the deliberative process privilege or the presidential communications privilege.

MS. LEONARD:  Okay.  And we can -- we can discuss these matters off the record but the

Page 8

government and defense counsel has had the subpoena for quite some time and plenty of time to raise these issues prior to this morning.

So with that, we can proceed.

EXAMINATION

Q.  (BY MS. LEONARD) All right.  Good morning, Mrs. Voorhies.

Do you go by Mrs. Voorhies or Ms.?

A.   Doesn't matter.

Q.   Doesn't matter.  Okay.  I'll do my best to stick with one of those and not -- and not switch.

My name is Danielle Leonard.  We met before we started but let me introduce myself again. I'm one of the lawyers representing the plaintiffs and I will be the one asking questions today.

For the record, can you state your full name.

A.   Karalee Voorhies.

Q.   And what is your address?

A.   (Confidential - Answer in separate booklet.)

Q.   Are you currently employed?

A.   No, ma'am.

MR. CAMPAGNA:  Before we move on, may we have that address protected as confidential information, please.

Page 9

MS. LEONARD: Sure. No objection.

Q. You are not currently employed; is that right?

A. Correct.

Q. When was the last time you were employed?

A. By another party would have been October of '25.

Q. And is that when your employment started or when your employment by another party ended?

A. Ended.

Q. And what party was that?

A. I was a special government employee for Department of Homeland Security.

Q. And what date did that end?

A. In early October. I can't recall the exact date.

Q. Okay. Mrs. Voorhies, have you ever been deposed before?

A. No.

Q. Okay. So I'm going to quickly go over some of the procedures so that we're all on the same page.

You understand that everything we say is being recorded by a court reporter?

A. Yes, ma'am.

Q. Okay. And so as a result, you need to give verbal answers and nodding your head cannot be recorded

Page 10

by the court reporter so I'm going to ask you to say yes or no rather than uh-huh or nodding your head.

Does that make sense?

A.   Yes, ma'am.

Q.   And we are also going to do our very best not to talk over each other.  It is very common in normal conversation to do that but here, it makes it very difficult for the court reporter to get a clear record.

So does that make sense?

A.   Yes.

Q.   I will wait for you to finish your answer and if you wait for me to finish my question and also, your counsel may be interposing objections for the record so just -- let's all wait till everyone is finished before we start speaking.

Does that make sense?

A.   It does.

Q.   Okay.  If you don't understand a question that I ask, please let me know, okay?

A.   Yes.

Q.   And as I mentioned, your attorney may occasionally make objections for the record or mark things confidential, as he just did.

And do you understand that even if your counsel makes an objection for the record, you

Page 11

still need to give me an answer?

Does that make sense?

A.   It does.

Q.   Okay.  Your attorney or the government may invoke privilege on behalf of their clients.  If you have any question regarding privilege, you may consult your attorney.

Does that make sense?

A.   Yes.

Q.   Generally, if you need a break, please let me know.  We take breaks probably every hour or so.  The only rule is if there's a question pending, you can't take a break, you have to give me a response.

Does that make sense?

A.   Yes.

Q.   You also understand this is being videotaped?

A.   Yes.

Q.   And you're aware that there's a possibility that either the written transcript or the videotape may be used later in court?

A.   Yes.

Q.   Okay.  So even though we're in a conference room and not a courtroom, the testimony you give here today should be as full, complete and accurate as if the judge were sitting at the head of the table.

Page 12

Does that make sense?

A.   Yes.

Q.   Okay.  And I'll ask you to explain things as fully and completely as you would if the judge were sitting here today, okay?

A.   Yes.

Q.   Okay.  I am going to be asking you some questions about documents today.  I will explain how that works.

So there's an exhibit number.  I've got them, actually, so I'm going to put them on the official copy and give that to you.

I will also give copies to your attorney and attorneys for defendants and then once we are done with the deposition, the ones with the pink sticker go to the court reporter.

Does that make sense?

A.   Yes.

Q.   If you need any time to read a document, just let me know, okay?

A.   Okay.

Q.   And I will also try to help move things along by directing you to particular pages or portions of the document that I'm going to be asking questions about, okay?

Page 13

A.    Okay.

Q.    We can use your deposition subpoena as the first example.

(Exhibit Number 130 marked.)

Q.    (BY MS. LEONARD) So, Ms. Voorhies, I'm going to hand you what's been marked as Exhibit 130. This is the first version of the subpoena that you were provided.

Can you take a look at this document and let me know when you're ready?

A.    I'm ready.

Q.    Do you recognize this?

A.    Yes.

Q.    Ms. Voorhies, you were served with the subpoena to testify at a deposition and civil action that you see before you as Exhibit 130; is that right?

A.    Yes.

Q.    Okay.  And it originally had set the date as May 6th.

Do you see that there?

A.    Yes, I see it.

Q.    Okay.  And you -- you were served with this on Friday, April 24th?

A.    That sounds right.  It was a Friday.

Q.    Okay.  And the date on this is April 21st.

Page 14

Do you see that there?

A.   Yes, I see it.

Q.   Okay.  You can set that aside.

(Exhibit Number 131 marked.)

Q.   (BY MS. LEONARD) I'm going to hand you the next one, which has been marked as 131.

Ms. Voorhies, you've been handed 131, which is the revised deposition subpoena for today's date and location.

Do you see that?

A.   I see it.

Q.   And you are testifying here today pursuant to this subpoena, correct?

A.   Correct.

Q.   And it also, under -- about halfway down the page, you see the box marked Production?

A.   Yes.

Q.   And this had -- had requested that you produce certain documents here today.

Do you see that?

A.   I see that.

Q.   And you have done so; is that correct?

A.   Yes.

Q.   And you did that through your lawyer?

A.   Yes.

Page 15

Q.   Okay.  And you brought those or you had those produced to counsel for plaintiffs and the government also has a copy, correct?

A.   Correct.

Q.   And you did your very test to collect all the documents that you have that were responsive to these --

A.   Yes.

Q.   -- topics?

A.   Yes.

Q.   Okay.  Are you taking any medication or other substances that would interfere with your ability to give your full and truthful testimony here today?

A.   No.

Q.   Okay.  Is there any other reason you can't give your full and truthful testimony?

A.   No.

Q.   Okay.  Let's start with your education.

A.   Okay.

Q.   Would you please describe for me your post high school education, naming any institutions and years.

A.   Sure.  I went to the University of Texas Austin where I obtained a Bachelor of Business Administration.

Q.   What year was that?

A.   2003.

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

And then I obtained a master's degree from the University of Houston Victoria.  I'm trying to remember exactly what year.  I don't -- it might have been, I'll say, around 2011.

Q.    And what was the master's in?

A.    It was just an MBA, general MBA.

Q.    So business administration?

A.    Yes.

Q.    Any other postgraduate degrees?

A.    No.

Q.    Can you -- what did you do professionally between receiving your BA from UT Austin in 2003 and when you were obtaining your MBA?

A.    I worked for a public accounting firm.

Q.    And what firm was that?

A.    John Corbell & Associates.

Q.    Same firm the entire time?

A.    Yes.

Q.    And did you work while you obtained your MBA, was it an executive program?

A.    I worked while I obtained my MBA.  It was not technically an executive program but it did allow for online courses and I did it over a long period of time so, yes, I worked at the same time.

Q.    Approximately what years were you obtaining

Page 17

your MBA?

A.    I don't recall what year I started.  It took me several years, though.

Q.    And where were you working during that program?

A.    At Jon Corbell & Associates.

Q.    And then did you continue working at Jon Corbell & Associates after you obtained your MBA?

A.    For a short period of time and then I changed firms.

Q.    And where did you work next?

A.    PKF Texas.

Q.    And how long did you work at PKF Texas?

A.    I believe three or four years.

Q.    So that takes us to approximately 2015?

A.    20 -- late 2014, I believe, is when I left.

Q.    And then what was your next job after that?

A.    I worked for Crest Investment Company.

Q.    And what is Crest Investment Company?

A.    It's a family office.

Q.    What does that mean?

A.    A high net worth family, manage their assets, support them.

Q.    It's a firm that provides wealth management for a high net worth family; is that correct?

A.    Correct, yes.

Page 18

Q. And how long did you work at Crest Investment Company?

A. Eleven years.

Q. So can you give me the rough range?

A. November 2014 up until I joined DHS in April of 2025.

Q. And what was your role at Crest Investment Company during that time?

A. I held several positions. One was controller for a period of time. I don't remember exactly how many years. I was CFO for a period of time and then I was just on special projects for about a year.

Q. Was that the year immediately prior to becoming -- to go into the Department of Homeland --

A. Yes.

Q. -- Security?

Did at some point in time you have a LinkedIn profile?

A. I did.

Q. And did you delete that?

A. I did. I was not --

Q. I'm sorry. That was my fault.

Please finish.

A. I was not actively using it or looking for a

Page 19

job so I did delete it.

Q.   And do you recall when that was?

A.   Probably early 2025.

Q.   Did anyone tell you to delete that?

A.   No.

Q.   Are you aware of whether there's some other place online where your bio or CV is available?

A.   I'm not aware of any, no.

Q.   And so you've said at some point, you became involved with the Department of Homeland Security, correct?

A.   Correct.

Q.   And what day did you begin at the Department of Homeland Security?

A.   I don't recall the exact date.

Q.   A month?

A.   It would have been, I believe, April.

Q.   Of 2025?

A.   Correct.

Q.   Had you ever performed work for the Department of Homeland Security prior to April of 2025?

A.   I had not.

Q.   Had you ever performed work for FEMA prior to April of 2025?

A.   No.

Page 20

Q.   How did you come to play a role at DHS?

A.   I was asked to come up and help as a special government employee by Mr. Lewandowski, who played a role at DHS.

Q.   So you were asked to come up and become a special government employee.

When was that conversation?

A.   My recollection would have been it would have been in March.

Q.   How did you know Mr. Lewandowski?

A.   I did not personally know him.  My former employer made the connection for us.

Q.   Which former employer?

A.   Crest Investment Company.

Q.   And you were employed at Crest Investment Company at the time?

A.   I was.

Q.   And when you say, My former employer made the connection for us, did your former -- did Crest Investment Company have business with Corey Lewandowski?

A.   Not to my knowledge.

Q.   How did -- how was the connection made, then?

A.   I -- I believe just social friendship between the principal and Mr. Lewandowski.

Q.   So which principal?

Page 21

A.    The principal owner of Crest Investment Company.

Q.    Who is?

A.    Jamal Daniel.

Q.    And so Jamal Daniel, who is the principal owner of Crest Investment Company, you believe had a social relationship of some form with Mr. Lewandowski?

A.    That's my understanding, yes.

Q.    And had you met Mr. Lewandowski before you were introduced by Mr. Daniel?

A.    No.

Q.    Do you know how Mr. Daniel and Mr. Lewandowski knew each other?

A.    I do not.

Q.    Did Mr. Daniel ever explain that to you?

A.    No, not to my recollection.

Q.    So how -- tell me how, in a little more detail, how it came to be that Mr. Daniel recommended you for some -- something at the Department of Homeland Security.

A.    My -- the project that I was working on was wrapping up and I recall -- if I recall correctly, Mr. Daniel called and said, I've been asked if I have any -- anyone that could come up and help as their -- you know, need some assistance up there, I guess,

Page 22

I -- I don't remember what exact wording he used, but essentially they needed some help and he was asked if he had anybody intelligent that could come assist.

Q. Do you -- do you have an understanding of what they needed help with?

A. Not at that time.

Q. Were you interested in this?

A. My recollection was I was a little apprehensive at first because it's not something I've ever been involved in. You know, the government is not -- I have no experience in the government. I honestly didn't even know what DHS was so I was a little apprehensive but I said, I'm, you know, open to a challenge, sure.

Q. And is this something Mr. Daniel asked you to do?

A. He -- I don't know if he technically asked me to do it but it was floated by me and I said, okay, I'll -- I can -- I can try it, sure.

Q. So presumably, you had some conversations with someone before coming to the Department of Homeland Security. Were those conversations with Mr. Lewandowski?

A. Yes.

Q. Anyone else that you talked to at the

Page 23

Department of Homeland Security before you agreed to take on the job?

A.   No, not that I recall.

Q.   Okay.  When was your first conversation with Mr. Lewandowski?

A.   I don't recall the date.

Q.   Was it in 2025?

A.   Yes.  It would have been in 2025.

Q.   Do you believe he was already at the Department of Homeland Security when this conversation took place?

A.   My understanding was yes, he was.

Q.   Okay.  And what did he tell about his role?

A.   He didn't tell me much about his role, that I recall.

Q.   Did you know who he was?

A.   I did not actually know who he was, no.

Q.   Did you Google him?

A.   I don't recall Googling him but I may have. I -- I don't know.  I don't recall.

Q.   And Kristi -- Kristi Noem was already the Secretary of the Department of Homeland Security at the time of these conversations?

A.   I believe so, yes.

Q.   Okay.  And did you have more than one conversation with Mr. Lewandowski about this potential

Page 24

role?

A.  I don't recall how many conversations we had.

Q.  Can you tell me anything else that you remember about the conversation with Mr. Lewandowski?

A.  It was very, very short.  It was very short conversations but, no, I don't recall anything else.

Q.  And what information did he give you that convinced you to come perform this role?

A.  I -- I honestly don't recall much information being provided other than, we're going to need you to fill out some forms and you'll need to be in D.C.  That was pretty much it.

Q.  At the time, you lived in Houston; is that right?

A.  Yes.

Q.  Okay.

A.  In Katy.

Q.  In Katy -- sorry.  Katy, Texas; is that right?

A.  Yes.

Q.  Is that where you're from?

A.  Yes.

Q.  Is that a suburb of Houston?

A.  It is, yes, ma'am.

Q.  And so you had an understanding that this role

Page 25

would require you to be present in Washington, D.C.?

A.    Yes, ma'am.

Q.    Or were you intending to work remotely?

A.    I was intending to be present in D.C. three days a week and be working on wrapping up my former projects on the -- you know, and traveling Monday and Friday.

Q.    And when did your employment with Crest Investment Company end?

A.    I wrapped up my projects in that spring time frame.

Q.    You continued to do -- perform work for Crest Investment Company after you came to the Department of Homeland Security?

A.    Mostly if there was just information needed to be transferred, like institutional information but not significant work.

Q.    What paperwork did you sign or review when you onboarded at the Department of Homeland Security?

A.    I don't recall the particular forms.  I know there were several of them but mostly background information.

Q.    Okay.  So you've told me a little bit about these conversations with Corey Lewandowski.  I'm still not understanding what you understood your role to be

Page 26

coming in.

Can you tell me more about that?

A.   Sure.

I understand that they needed help improving efficiency at FEMA and that I would be -- you know, take some part in that and assist in working with FEMA and the department to improve the efficiency and responsiveness of FEMA.

Q.   Were you going to go working for DOGE?

A.   No.  No, ma'am.  Not that I recall.  There was -- no.

Q.   There was no conversation about you performing a role for --

A.   No, ma'am, not that I recall.

Q.   Oh, hold on.  Let me -- let me finish the question.

A.   Sorry.

Q.   Sure.

There was no conversation about you performing a role -- a role for the new Department of Governmental Efficiency?

A.   The New Department of Governmental Efficiency?

Q.   DOGE.

A.   Yeah, I -- no.  I was never going to be a

Page 27

DOGE employee, I don't believe.

Q.   But you were aware that there was a -- a thing called DOGE when you were coming onboard, right?

A.   Yes, ma'am.  I was aware of a group called DOGE.

Q.   Okay.  And that you would be working alongside of them?

A.   They were part of the efficiency efforts, yes, ma'am.

Q.   Was Mr. Daniel involved in DOGE in any way?

A.   Not to my knowledge, no.

Q.   Other than improving efficiency at FEMA, did you have any understanding of what your role would be?

A.   That was the -- no.  That was fundamentally what I understood I was coming in to do.

Q.   Okay.  And what did Corey Lewandowski tell you about improving efficiency at FEMA?

A.   I don't recall him telling me much other than that there was a lot going on there.  It had a lot of different aspects to it and that I'd have to just get in there and get an understanding of it.

Q.   Did you understand that your role would be assisting with the president's priorities for downsizing government?

A.   I don't believe that was relayed to me, no.

Page 28

Q. When you say efficiency, what do you mean?

A. Just improving the efficiency of the organization. Making sure they're operating maximum, you know, efficiency and responsiveness. I -- I don't know how else to explain that.

Q. Well, it sounds like that was your entire role so it would be helpful to have a little more information about what you understood improving efficiency to mean as it pertains to this government agency.

A. So are you asking about what I was, like, coming in, what I knew coming in or --

Q. Sure.

A. -- just generally, what I've learned while I was there?

Q. We'll start with what you knew coming in and then we'll move forward.

A. Okay. I really did not know anything about how FEMA worked coming in, so I have worked on projects when I was in public accounting improving the efficiency of organizations and helping them to, you know, get their accounting cleaned up, those kind of things, make sure that they are more accurate in what they're doing and more on point and making sure that they work better and, you know, liaise better with each other so I had experience in that and in

Page 29

866-299-5127          calendar-ca@veritext.com          www.veritext.com

that experience, my -- my approach has always been to come in and understand how the organization works first, right, so that's what I knew coming in, is that I would need to come in and get an understanding of how the organization works.

Q.   Okay.  But you did not have that understanding with respect to FEMA before coming aboard?

A.   No, I was not well versed on FEMA.

Q.   But you were told at some point by Mr. Lewandowski before coming to the Department of Homeland Security that your role would be with respect to FEMA specifically; is that right?

A.   Yes, ma'am.

Q.   Did he tell you why?

A.   I don't recall him having a -- like, explaining to me his reasoning, no.

Q.   Do you have an understanding who in -- within DHS leadership approved your position at DHS?

A.   No, ma'am, I do not.

Q.   Did you ask?

A.   I did not.

Q.   You have testified that you were a special government employee.

What is your understanding of what that means?

Page 30

A.    It's someone who is volunteering their time. Honestly, I have a very vague understanding of what it is.  Again, I'm not from the government so it was kind of a new term for me but it's essentially an employee who is not being paid by the government, volunteering their time.

Q.    So you were volunteering your time at the Department of Homeland Security?

A.    I was not being paid by the government, that's correct.

Q.    Until you became a contractor, correct?

A.    Until I became a contractor, at which time, I was no longer a special government employee.

Q.    Okay.  During -- what were the dates that you were a special government employee at DHS?

A.    It would have been April '25 through early October, at some point.

Q.    And you had an understanding that special government employees were limited in the amount of time that they could work in any calendar year for the government?

A.    Yes, ma'am, I was aware of that.

Q.    You were aware of that?

A.    Yes.

Q.    Okay.  And is that roughly the amount time that

Page 31

you worked as a special government employee?

A.   Yes, ma'am.

Q.   Did you have any understanding that Mr. Lewandowski is the one that approved your position?

A.   I do not recall or know who -- who approved my position, no.

Q.   But you knew that you would be working within the Office of the Secretary?

A.   Yes, ma'am.

Q.   Okay.  Did Mr. Lewandowski tell you what your title would be?

A.   I don't believe he gave me a title.  I don't recall that.

Q.   At some point you obtained a title at the Department of Homeland Security?

A.   I -- I think someone just told me what my title was eventually.  I don't recall who.

Q.   And your title was senior advisor to the Secretary of Homeland Security?

A.   Yes, ma'am.

Q.   Okay.  What were your qualifications for being senior advisor to the Secretary of Homeland Security?

A.   I have a financial background, executive level leadership and experience.

Q.   And how did that relate to the work you were

Page 32

going to be performing at FEMA?

A. I believe they needed people to liaise at an executive level so other than that, I don't know. I -- wasn't given a job posting, per se, to -- to be able to match those things out so I'm not aware.

Q. Were you ever given a job description?

A. Not that I recall -- not a formal one.

Q. Okay. Let's mark another one. This is 132.

(Exhibit Number 132 marked.)

Q. (BY MS. LEONARD) This is one of the documents that has been produced to us this morning and I only have two copies of those so I've handed one to -- actually, I'm going to need that copy.

MR. CAMPAGNA: I believe counsel has a Bates-stamped version as well so maybe you can refer to it by that number.

MS. LEONARD: Okay. And you also have a set.

MR. CAMPAGNA: I -- I don't have it with me because I gave them a copy.

MS. LEONARD: Gotcha. Okay.

Are you comfortable with me proceeding asking questions about the documents that --

MR. CAMPAGNA: Yes.

MS. LEONARD: -- Ms. Voorhies

Page 33

produced?

MR. CAMPAGNA:  Yes.

Q.   Okay.  So we are looking at Bates number 1.

Ms. Voorhies, let me know when you are ready.

A.   Okay.

Q.   Can you describe what this is?

A.   This was -- appears to be correspondence between Corey and myself in mid-April.

Q.   And how were you having this correspondence?

A.   This is from the WhatsApp chat.

Q.   So you were communicating with Mr. Lewandowski on WhatsApp?

A.   Yes, ma'am.

Q.   And using your personal phone?

A.   Yes, ma'am.

Q.   And was he -- do you know whether he was using his personal phone?

A.   I do not know what phone he was using.

Q.   This WhatsApp chat that you had with Mr. Lewandowski, was it always the same contact number that you used for him throughout your time at DHS?

A.   I believe so.

Q.   Okay.  And this chat starts with -- it starts on April 13th, 2025.

Page 34

Do you see that?

A.   Yes, I see that.

Q.   Okay.  And it appears that you're talking about moving forward on the apartment.

Is that an apartment in D.C.?

A.   Correct.

Q.   Is -- who is Steve?

A.   Steve was a colleague that was also being considered to come in to work with us but I don't recall what the circumstances were but it -- it ended up he did not go.

Q.   And was he a colleague at Crest?

A.   Yes.

Q.   And what was his last name?

A.   I don't recall his last name off the top of my head.

Q.   And was this something that Jamal Daniel -- Daniel also recommended --

A.   Yes.

Q.   -- to your knowledge?

A.   To my knowledge, yes.

Q.   Okay.  So -- and you see at the bottom of the chat on April 14th, you say, Steve is not going to work out, let's not proceed with him.

A.   Uh-huh.

Page 35

Q.    Please give Jamal a call whenever you have time, as I will be in the air.

A.    Uh-huh.

Q.    Did you have an understanding that Mr. Lewandowski and Jamal were continuing conversations about bringing people on to the Department of Homeland Security at this time?

A.    I don't know what their conversations were but I think this -- that's in reference to Steve not working out.  That was -- must have been pursuant to a conversation I had with Jamal and Jamal said Steve is not going to work out and then asked me to have Corey give him a call to talk about that, so I don't know what else they talked about.

Q.    Did you continue to have conversations with Jamal Daniel about your work at the Department of Homeland Security after starting there?

A.    Not about the work, no, ma'am.

Q.    But did you continue to talk to him?

A.    I have kept in touch with Mr. Daniel, yes.

Q.    And what is your understanding of -- you can set that aside.

What is your understanding of the social relationship between Mr. Daniel and Mr. Lewandowski?

Page 36

A.   I don't have an understanding of their social relationship.  I don't know anything about their relationship.

Q.   Do you know how long they've known each other?

A.   No, ma'am.

Q.   But you did know that they did know each other.

A.   I know that that's how I was introduced to Corey Lewandowski.

Q.   No information at all about how they knew each other?

A.   No.  I -- I don't believe I was ever given that story, no.

Q.   And he just said, I know Corey Lewandowski, he's at the Department of Homeland Security, they're looking for people?

A.   Yes, ma'am.

Q.   And you -- based on that, was there anything else that motivated you to go perform this work at the Department of Homeland Security?

A.   No.

Q.   Did you want to -- sorry.

Did you want to contribute to the new presidential administration?

A.   I was not very familiar with the new presidential administration so that was not a

Page 37

priority to me.

Q.    When you say you were not very familiar, you mean you were not familiar with the Trump administration?

A.    I -- I know of the Trump administration.  I am not a very political person so I wasn't aware of all of their, you know, initiatives or anything like that.  It wasn't -- that wasn't a factor in my taking on the project.

Q.    What were the factors in your taking on the project?

A.    Sounded like an interesting challenge and it would -- living in a different city, you know, part of the -- part of the week doing something different.  I like new challenges and so that was -- I'm always open to try new things.

Q.    And one of the things you were open to is coming to -- moving to Washington, D.C. to perform work for the new administration for free having never worked for the government before?

A.    Yes, that's correct.

Q.    Have you told me everything that motivated your decision to come perform this role at Department of Homeland Security?

A.    Yes, ma'am.  There were no other factors.

Page 38

Q.   None?

A.   No, not that I can think of.

Q.   Okay.  When you arrived at the Department of Homeland Security, you were given a position in the Office of the Secretary; is that right?

A.   Yes.

Q.   And when did you first meet Kristi Noem?

A.   Oh, I don't recall the exact date but I did not meet her in person probably for several months.

Q.   Did you meet her other than in person?

A.   She may have been on a phone call or something along those lines but I -- I didn't correspond directly with her for several months, no.

Q.   What about Zoom?

A.   No, I did not meet her through Zoom.

Q.   What about Signal chats?

A.   I was not in any Signal chats with her until January of 2026.

Q.   Who were you mostly -- who were you working with in the Office of the Secretary when you began?

A.   A -- a gentleman named Joseph Guy. Primarily, Joe Guy and Corey Lewandowski.

Q.   And what did you understand Corey Lewandowski's role to be at the Department of Homeland Security at the time?

Page 39

A.   Chief advisor.

Q.   And you called him Chief?

A.   Periodically, yes, ma'am.

Q.   Did he ask you to call him that?

A.   No, he never asked me to call him that.

Q.   How did you decide to call him Chief?

A.   I just heard other people refer to him in that way, so...

Q.   And did you have any -- what was your understanding of his role as chief advisor?

A.   To be the chief advisor to the secretary.

Q.   What did -- what did you understand that to mean?

A.   I don't have a detailed understanding of what that meant.

Q.   You reported to him?

A.   I reported to him and Joseph Guy.

Q.   At some point in time after your period as a special employee ended, you entered into a contract for your work related to the Department of Homeland Security; is that correct?

A.   Yes.

Q.   And that was in October?

A.   Yes.

Q.   We'll mark this as 133.

Page 40

(Exhibit Number 133 marked.)

Q.    (BY MS. LEONARD) And this is Bates number 507.

Ms. Voorhies, you've been handed what's been marked as Exhibit 133.

Can you let me know when you're ready?

A.    Okay.  Is there any particular part you'd like to point to?

Q.    Generally I'm going to ask you about this document starting with, what is it?

A.    This is my contract with IMGE, LLC.

Q.    IMGE, LLC, is that --

A.    Yes --

Q.    -- what you said?

A.    -- uh-huh.

Q.    Okay.  So --

A.    I'm sorry.  This is -- no.

IMGE, LLC was the prime contractor. This is my -- yeah, contract with AnchorCode Technologies.  I'm sorry.  I was reading and talking at the same time.

Q.    That's okay, and I'm going to ask you to slow down for the court reporter.  It's -- it's hard when we talk very quickly for her to -- to capture everything.

But is this document in Exhibit 133

Page 41

the contract related to the Department of Homeland

Security that you were just testifying about?

     A.   Yes, ma'am.

     Q.   Okay.  This is not a contract between you

directly with the Department of Homeland Security,

correct?

     A.   That is correct.

     Q.   Okay.  Let's walk through it.

               So it looks like the beginning date of

this -- this contract is October 1st, 2025; is that

correct?

     A.   That is correct.

     Q.   And you were a subcontractor, correct?

     A.   That is correct.

     Q.   But it's not a subcontract with you as a

individual it's a subcontract with an entity, correct?

     A.   It's actually AnchorCode is the

subcontractor.

     Q.   AnchorCode Technologies.

               And what is your relationship with

AnchorCode Technologies?

     A.   They were the contractor that I was

contracted with.

     Q.   And what -- and you were the subcontractor at

LV Consulting?

Page 42

A.   To AnchorCode.

Q.   And what is your relationship with LV Consulting?

A.   It is an LLC that I formed for this purpose.

Q.   And when did you form it?

A.   September, I believe, 2025.

Q.   Okay.  So you formed an LLC, LV Consulting, to enter into a subcontract pertaining to your work with the Department of Homeland Security; is that correct?

A.   Correct.

Q.   And the subcontract entity that you were with -- sorry.

Your subcontract was with AnchorCode, right?

A.   That is correct.

Q.   And AnchorCode Technologies is -- was owned by Kyle Schutt?

A.   That's correct, to my knowledge.

Q.   And if you look at the last page of this document, it is signed on behalf of AnchorCode Technologies by Kyle Schutt?

A.   Yes, I see that.

Q.   And AnchorCode Technologies had a contract with IMGE, LLC; is that correct?

A.   That's what it appears, yes.

Page 43

Q.    And then IMGE, LLC had a contract with the Department of Homeland Security; is that correct?

A.    That is my understanding.

Q.    So you were entering into an agreement where -- whereby you were the third level down of subcontract; is that right?

A.    That is the way it is structured, yes, ma'am.

Q.    Okay.  Tell me what you know about the contract between AnchorCode Technologies and IMGE, LLC.

A.    I don't know anything about that contract that I can recall other than that there was a contract between the two.

Q.    And who owned IMGE, LLC, to your knowledge?

A.    I do not know who owns IMGE, LLC.

Q.    Do you know who was involved with IMGE, LLC?

A.    Not that I recall, no, ma'am.

Q.    You knew that Kyle Schutt was the person you were contracting with, correct?

A.    That's correct.

Q.    But you do not know who Kyle Schutt was contracting with?

A.    That's correct.

Q.    And then who -- who was responsible for the IMGE, LLC contract with the Department of Homeland

Page 44

Security?

A.    No, correct.

Q.    Did you --

A.    I did not know that.

Q.    Did you ever ask?

A.    No.  I don't -- it didn't matter to me.

Q.    Why didn't you ask?

A.    Why would I ask?  That's a common structure in business, I didn't --

Q.    You were --

A.    -- need to know.

Q.    You were contracting with the government, were you not?

A.    I was contracting with Kyle Schutt.

Q.    To perform work for the government?

A.    Yes.

Q.    And you didn't ask who Kyle Schutt was contracting with?

A.    No, I didn't.  Not that I recall.

Q.    Not that you recall?

A.    Not that I recall, no.

Q.    Do you -- did you ever know?

A.    No, not that I recall, no.

Q.    You had no idea and you didn't want to know?

A.    I didn't need to know.

Page 45

Q.   What -- who paid you?

A.   AnchorCode Technologies.

Q.   And they paid you $325 an hour?

A.   Yes.

Q.   How did you report your time?

A.   Through an Excel spreadsheet.

Q.   And who did you send that to?

A.   Kyle Schutt.

Q.   Is there anyone other than Kyle Schutt that you ever communicated with with respect to this contract?

A.   No, ma'am.

Q.   And how did he pay?

A.   Via wire transfer to my personal bank account.

Q.   This contract started on October 1st and went through sometime in March of 2026, correct?

A.   Yes.

Q.   How much were you paid in total as a result of this contract?

A.   I don't know that -- I don't know that number.

Q.   Approximately?

A.   I don't know.  I'd have to go back and look at my bank account.

Q.   You're a -- you have a background in finance

Page 46

and accounting?

A.   I do, correct.

Q.   Can you give me a rough estimate of how much you were paid?

A.   I'd have to go back and look at my bank account.

Q.   So if we were going to estimate the length of this table, we could look it at and say approximately the number of feet.

You understand what an estimate is, right?

A.   Yes.  I understand what an estimate is.

Q.   Okay.  Can you give a rough estimate of how much you were paid --

A.   I cannot right now.

Q.   You cannot give me any estimate?

A.   I would have to go back to my bank account and look at my records.

Q.   Okay.  You don't have any idea of how much you were paid under this contract?

A.   I -- I do not, no.

Q.   Was it more than a million dollars?

A.   Absolutely not.

Q.   Was it more than $500,000?

A.   No.

Page 47

Q.   Was it --

A.   No.

Q.   -- more than $100,000?

A.   Likely, yes.

Q.   Okay.  So somewhere between 100,000 and $500,000?

A.   Okay.

Q.   Is it possible that it was more than $500,000?

A.   No, ma'am.

Q.   Okay.  So if it was more than 100,000 and not more than 500,000, it was somewhere between 100,000 and $500,000?

A.   Okay.  If you're looking for that rough of an estimate, I would say somewhere 100 and $200,000.

Q.   Was this subcontract put through any sort of public bidding process, to your knowledge?

A.   My subcontract?

Q.   Yes.

A.   Not to my knowledge.

Q.   Okay.  Were the contracts between AnchorCode Technologies and IMGE, LLC or IMGE, LLC and the Department of Homeland Security put through any sort of public bidding process, to your knowledge?

A.   I am unaware of the process they went through.

Page 48

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Q.   Okay.  Who approved your subcontract at the Department of Homeland Security?

A.   I do not know.  That's not something I was privy to.

Q.   Who did you discuss this contract with?

A.   I discussed the fact that I may become a contractor with Corey Lewandowski and then I discussed the contract itself with Kyle Schutt.

Q.   What was Kyle Shut's role at the Department of Homeland Security?

A.   I believe he was an advisor as well.

Q.   And you understood him to have the authority to enter into this subcontract with you?

A.   I did.

Q.   And what was the basis of that understanding?

A.   I spoke to him about it and he said, yeah, we could put you on as a subcontractor.

Q.   And did you raise the possibility of becoming a contractor or did someone raise that with you?

A.   I raised it.

Q.   And why did you do that?

A.   Because I knew that my time was -- as a special government -- special government employee was coming to an end and I wanted to stay on and continue the work that we were doing.

Page 49

Q.   And who did you raise it with?

A.   I believe I mentioned it to Corey Lewandowski and he offered the idea that I could either become a federal employee or -- and told me what the pay for that was and that did not work in my -- I -- I -- wasn't going to work for me so -- with the -- the travel and everything that I was continuing to incur and he said, well, the only other option is -- would be contractor but that's a long process and he suggested to talk about that process, that I contact Kyle because he knew something about that process, and so I contacted Kyle.  Kyle raised the idea that me just becoming a subcontractor under his.

Q.   Because that would be less amount of time than actually doing a government contract with the --

A.   I suppose --

Q.   -- Department of Homeland --

A.   -- yes.

Q.   -- Homeland Security?

          Is that right?

A.   I suppose, yes.  I don't know why.

Q.   You -- you understood that's why you were entering into a subcontract because it --

A.   The timeliness -- yes, ma'am.  I'm sorry.

Page 50

Q.   That's okay.  Let's make sure we have this clear.

You understood that the -- the -- the time frame issue was the reason you were entering into the subcontract is because it could go into place faster?

A.   Yes, ma'am.

Q.   And you desired that?

A.   Yes.

Q.   And when you say it wasn't going to work for you to become a federal employee, was that because of the amount of pay?

A.   Partially, but also the travel and living cost and everything.

Q.   And can you explain to me what that means as opposed to being a government contractor?

A.   Yes.  I mean, it -- it could -- one of the other factors was I did not need government benefits.

So as a contractor, I can put the money where I need to in order to cover my benefits through any husband's company and our copay that we'd have to pay through them and that made more sense for my tax structure.

Q.   You mentioned your husband and your husband's company.

Page 51

Did your husband know Corey Lewandowski before you went to work for the Department of Homeland Security?

A.    No, ma'am.

Q.    Were there any other individuals working under this subcontract?

A.    I'm not aware of any.

Q.    Okay.  Did you pay anyone?

A.    Oh, out of mine?  No.

Q.    But you don't know whether IMGE, LLC or AnchorCode Technologies had other individuals working?

A.    I'm not aware, no.

Q.    Are you aware that Kyle Schutts was -- Kyle Schutt was being paid through a subcontract?

A.    I'm not aware of how he was being paid.

Q.    And you don't know how much he was being paid?

A.    No, ma'am.

Q.    If you look at the last page, Mr. Schutt signed this as the owner of AnchorCode Technologies, correct?

A.    Yes, I see that.

Q.    No one signed on behalf of the Department of Homeland Security, correct?

A.    That -- that appears correct.

Q.    And you don't know who approved this?

A.    No, ma'am.

Page 52

Q. Do you believe that Corey Lewandowski approved it?

A. I do not -- I do not know who approved it.

Q. You understood that someone within the Department of Homeland Security would need to approve the arrangements by which you were working for the Department of Homeland Security, correct?

A. I -- I assume that they did that through the organizational structure they had in place.

Q. Okay. And who was above you in the organizational structure within the Department -- the Office of the Secretary who could have approved this contract?

A. I don't know that anybody above me would have approved the contract. I do not know who in the Department of Homeland Security approves contracts. I know they have an entire procurement division that handles contracts but I don't know who at DHS approves contracts.

Q. Who do you believe was authorizing you to work at the Department of Homeland Security?

A. Can you explain what you mean by authorizing me to work?

Q. Sure.

You were working for the Department of

Page 53

Homeland Security first as a special employee with the title senior advisor to the DHS secretary, correct.

A. Yes.

Q. And then you became a contractor and you carried on in that same title, senior advisor to the secretary, correct?

A. Uh-huh, yes.

Q. Who do you believe was authorizing you to perform that work?

A. I do not know who was authorizing me. I know who I spoke to and whether that was the person -- person authorizing me or not, I don't know.

Q. Do you believe that you were authorized by the secretary herself?

A. I imagine if that -- it was their -- the way that they arranged these things, that maybe she was the person authorizing. I don't know.

Q. Who told you you were authorized to work at the Department of Homeland Security?

A. I don't think anyone ever told me the words, You are authorized to work at the Department of Homeland Security.

Q. Okay. Do you understand the common meaning of "authorized to work"?

Page 54

A.    I -- I'm struggling to understand what you're asking.

Q.    Okay.  Who told you you could work at the Department of Homeland Security?

A.    Who told -- no one ever said, You may work at the Department of Homeland Security, I don't believe.

Q.    You just showed up?

A.    They said, we'd like you to come work at the Department of Homeland Security.  Whether or not that's the same person that authorized that, I don't know.

Q.    So no understanding of who was authorizing you to perform the role of senior advisor to the DHS secretary?

A.    I -- I would assume the secretary would have agreed to that but I do not know.  I never heard her say you are authorized to work at the Department of Homeland Security.

Q.    Did you have any understanding that anyone from outside the Department of Homeland Security had approved your position?

A.    I'm not aware of anybody from outside the Homeland -- Department of Homeland Security having any -- any involvement in my position.

Page 55

Q. Okay. You understood that you were a political appointee, not a career federal employee, correct?

A. I didn't quite know what the difference was between a political appointee or a career appointee when I came in.

Q. Do you know -- do you now know?

A. I know a little bit more now.

Q. You were a political appointee, correct?

A. I -- I believe so. I believe all SGs are but I'm -- I'm not really -- still, I'm not really sure how they all -- how it all works.

Q. But you don't know who gave you that appointment?

A. No.

Q. You didn't think it was important to ask?

A. Again, when I came in, I did not understand how the government worked. I did not understand the difference between a career and a political and it didn't really occur to me to ask more questions than what I -- what I understood the structure to be. That's not a common thing in the private industry. It's not something I need to ask.

Q. But you knew who had authority within the Department of Homeland Security with respect to the work that you were going, right?

Page 56

A.    I knew that I reported to Joe Guy and Corey Lewandowski.

Q.    Okay.  And do you recall the date that you left DHS?

A.    It was early March.  I think you had the date on the termination -- March 2026.

Q.    Let's mark this as 134.

(Exhibit Number 134 marked.)

Q.    (BY MS. LEONARD) Here you go, and this is Bates number 513.

Ms. Voorhies, can you tell me what this is?

A.    Yes.  This is the termination between AnchorCode Technology and LV Consulting.

Q.    And this terminated your subcontract between LV Consulting and AnchorCode Technologies, correct?

A.    That's correct.

Q.    And that's the same subcontract we were looking at in 130 -- Exhibit 133, correct?

A.    That is correct.

Q.    And you signed this on March 14th; is that correct?

A.    Yes, it's dated March 14th.

Q.    And it says, you shall stop work -- all work under the subcontract upon receipt of this notice.

Page 57

                    Do you see that?

A.    Yes, I see that.

Q.    When did you actually stop working for the Department of Homeland Security?

A.    Upon receipt of this notice.

Q.    On March 14th?

A.    That's when I signed it.  I believe they sent it to me on March 12th.

Q.    Okay.  So March 12th is the date that you --

A.    That is what it's dated.

Q.    -- stopped working for the Department of Homeland Security?

A.    I believe so, yes.

Q.    Okay.  Do you have any different recollection?

A.    No.  It was -- it was when I received the letter.

Q.    Okay.  And this was after the President had fired Kristi Noem as the Secretary of Homeland Security, correct?

A.    I believe so.

Q.    Okay.  Who made the decision that your contract should terminate?

A.    I was notified by Kyle Schutt.

Q.    And what was his role at the time?

A.    He was AnchorCode Technologies, the

Page 58

subcontractor.

Q. What was his role with respect to the Department of Homeland Security?

A. I -- I assume he was still an advisor. I don't know --

Q. And did anyone else --

A. -- any different.

Q. -- tell you that you were -- your contract was being terminated?

A. He told me initially and then I spoke with someone in the management office and they confirmed, yes, it was terminated.

Q. Did you talk to Corey Lewandowski?

A. I did -- I talked to him, yes.

Q. And what did you talk to Mr. Lewandowski about?

A. I don't recall the specific conversations we had that day.

Q. Were you aware prior to March 12th that your contract was going to be terminated?

A. No, I don't believe so.

Q. Were you working at the Department of Homeland Security up until that point in time?

A. Yes.

Q. Okay. And how did you first learn that your contract would be terminated?

Page 59

A.    Kyle Schutt called me.

Q.    And what did he say?

A.    He said that they were going to terminate the contract for convenience and that was pretty much it.  I don't recall the rest of the conversation.

Q.    And did you gain any other understanding as to why your contract was terminated other than for convenience --

A.    No.

Q.    -- or through any conversations with anyone?

A.    No.  Nothing other than it -- it did not need me -- did not need my services anymore.

Q.    And what did Mr. Lewandowski tell you?

A.    I don't recall him saying anything otherwise.

Q.    You knew at this time that Kristi Noem was no longer going to be at the Department of Homeland Security, correct?

A.    Yes.  Yes.

Q.    And you knew at this time that Mr. Lewandowski was no longer going to be at the Department of Homeland Security, correct?

A.    I assume so, yes.

Q.    Okay.  You assume so or did he tell you that?

A.    I -- I don't recall him telling me

Page 60

specifically what he was going to do.

Q. Did you talk to them -- either of them about the fact that they were leaving?

A. Not so much about the fact that they were leaving, no.

Q. Did you --

A. I don't believe so.

Q. Okay. What -- what did you talk to Mr. Lewandowski about?

A. I know I've had some conversation with him about there -- you know, the press around things were being -- that were being recorded about me that was very disturbing and misleading. Mostly that.

I -- I don't -- I'm not recalling any other specific conversations.

Q. What did you talk to Mr. Lewandowski about the press that you found disturbing and misleading?

A. I don't know that we've had disccisions about specifics, just that there was a lot of misinformation in the press about me.

Q. What did you think was misinformation in the press about you?

A. A lot of what was being published, so if you'd like to go through it point by point or if you have specific questions, we can answer those.

Page 61

Q.   I'm asking you what you thought was misleading about the press at the time around March of 2026.

A.   Generally, assertions that I was asserting some sort of control over things that I was not.

Q.   Anything else that you felt was misleading?

A.   There were quite a few specific -- very specific events, points that they were publishing or that I understood that they were going to publish.  I have not read any of it in the actual press so I don't know what they ended up publishing.

Q.   So you have not read any of these press reports that you just described as finding disturbing.

How did you learn of them?

A.   The press will reach out to you in advance of publishing a story and give you an opportunity to comment.

Q.   And it was through those conversations with reporters that you --

A.   I did not have any conversations with reporters.  I received text messages from them or -- or voicemails.

Q.   You received text messages or voicemails that you thought contained misinformation; is that correct?

A.   That is correct.

Q.   Did you have conversations with other people

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

about the press reporting?

A.   I don't remember any specifically, no.

Q.   Help me understand why you had this impression that there was something misleading being said about you if you hadn't read the press articles.

A.   Because I had read the bullet points that they sent over saying that they were going to publish them, which I felt were misleading.

Q.   And, in particular, you said it was something about control?

A.   Yeah, that I was exercising some outsized influence or something along those lines.

Q.   Over FEMA?

A.   Yes.

Q.   Okay.  Can you -- let's go back to when you first came onboard.

You understood that your role pertained to FEMA, correct?

A.   Correct.

Q.   And can you generally describe what you understood your work to involve at that time?

A.   At that time, I understood that my work would involve getting an understanding of FEMA and making some suggestions on how to improve their efficiency.

Page 63

Q.   What kind of suggestions?

A.   At that time, I did not know what those suggestions would look like.

Q.   You did not have a background in emergency management --

A.   No.

Q.   -- prior to coming to DHS, correct?

A.   Correct.

Q.   And you did not have any background in disaster relief prior to coming to DHS, correct?

A.   Correct.

Q.   You had never worked for a state or local emergency management office?

A.   That's correct.

Q.   Okay.  So how did you believe that you would be able to make improvements for FEMA's efficiencies?

A.   Many times organizations can improve their efficiency by simple administrative activities and work flow or technology.

Q.   So how did you go about performing your role with respect to those tasks?

A.   I spent a good amount of time understanding the organization and how it worked and all of the different components of the organization.

When there were initiatives that were

Page 64

being undertaken by FEMA that needed to be, you know, discussed or anything, I would offer to discuss those with them.

Ultimately, we were not given enough time to do much and make that many improvements due to the impending hurricane season. Everything stopped and waited until after hurricane season.

Q. Okay. So tell me a little bit more about that.

So you came in, I believe, in April of 2025.

Am I correct in understanding hurricane season begins in June?

A. Yes. I believe it's June 1st.

Q. Okay. And when you came onboard, the senior official performing the duties of the administrator or the SOPDA was -- was it Cameron --

A. I believe it was.

Q. -- Hamilton?

A. I believe it was.

Q. Okay. And then he was terminated by Kristi Noem at some point in time, correct?

A. That's my understanding.

Q. And replaced by David Richardson?

A. Yes, ma'am.

Q. Okay. So you were working with both of those

Page 65

individuals?

A.   I never worked with Cam Hamilton.

Q.   Did you come onboard after he had left?

A.   I came onboard, I believe, before but I never worked with him.  I was getting an understanding of, like, you know, the organizational structure and things like that from the DHS office so I never met Cam Hamilton.

Q.   Okay.  So you were getting an understanding of the structure of FEMA working within the DHS office with Corey Lewandowski and Joe Guy, correct?

A.   Yes, correct.

Q.   Okay.  And what information did Corey Lewandowski and Joe Guy give you about FEMA?

A.   I don't believe they handed me any particular information.  I recall Kyle Schutt having provided most of the information from things they had collected from DOGE.

Q.   All right.  So tell me things they had collected from DOGE.

A.   Financial statements -- I'm finance background.  Of course, I wanted to see what does the balance sheet look like, what are we dealing with here, various -- I don't even remember particularly what documents.

Page 66

I recall there being, like, again, organizational charts, how the agency was set up. Those were primarily the documents I recall looking at.

Q. Were you given information on contracting?

A. No, ma'am.

Q. Or grants?

A. Grants were part of looking at the agency and how it was structured, yes.

Q. And spending on staffing?

A. I don't recall if I looked at any spending on staffing. Possible.

Q. Kyle Schutt -- so when you said you were working within the -- at DHS, you were working with Corey Lewandowski, Joe Guy and Kyle Schutt; is that correct?

A. Yeah. He -- he was able to provide me information that they had previously collected.

Q. And when you say they had previously collected, who is that?

A. DOGE had previously collected.

Q. And Kyle Schutt was DOGE?

A. He was with DOGE. That's my understanding, yes.

Q. Who else at the Department of Homeland Security

Page 67

who played any role with respect to FEMA was on the DOGE team?

A.   The only other DOGE person that I recall the name of was Adam Hoffman.

MS. LEONARD:  Okay.  We've been going for a little bit, I think now is a good time for a break.

Why don't we go off the record.

THE VIDEOGRAPHER:  All parties in agreement with going off the record.  We're going off the record at 10:52 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are going back on the record 11:04 a.m.

(Exhibit Number 135 marked.)

Q.   (BY MS. LEONARD) Okay.  Ms. Voorhies, I'm going to show you another exhibit that you produced this morning.  This is Bates number 3 and it's marked Exhibit 135 -- sorry -- yes, 135, Bates number is 3.

Let me know when you're ready.

A.   Okay.

Q.   Okay.  So this is -- appears to be a WhatsApp chat between you and Corey Lewandowski on April 24th, 2025; is that correct?

A.   Yes.

Page 68

Q.   And --

A.   -- correct.

Q.   And that is near to the time that you began working at DHS; is that correct?

A.   Shortly thereafter, yes --

Q.   Okay.

A.   -- that's correct.

Q.   And in the middle, you have a -- you post a -- a message here that says, Joe Guy asked me to join a call with FEMA and DOGE to talk about some contract that he and Kyle have been trying to adjudicate with them.

Do you see that?

A.   I see that.

Q.   Okay.  That is contract, correct, the word that's cut off?

A.   It appears to be a typo, correct.

Q.   Okay.  And Kyle is Kyle Schutt?

A.   Yes.

Q.   Okay.  And he and Kyle, so Joe Guy and Kyle, have been trying to adjudicate with them.

Is the "them" FEMA?

A.   I don't recall who the "them" was.

Q.   Okay.  But Joe Guy, at this point in time, asked you to join a call with FEMA and DOGE, correct?

A.   That's what it appears.

Page 69

Q.   And do you have any recollection as to why?

A.   No, I don't recall and I don't recall having a call.

Q.   And you say, I'm not sure how I'm supposed to introduce myself, what are your thoughts?

Why were you asking that question?

A.   I think that's because I did not know what title I was to use.

Q.   Okay.  And did you get a response from Mr. Lewandowski?

A.   It doesn't look like I did here, no.

Q.   On this chat or otherwise?

A.   I -- I don't recall him actually responding to that, specifically.

Q.   And do you recall him, at some point, telling you, your -- you should introduce yourself as the senior advisor for the secretary?

A.   I don't recall him telling me that.

Q.   Who told you to use that title?

A.   I -- I would guess either Kyle or Joe Guy.

Q.   But you don't recall?

A.   I don't recall who.

It could have been -- I don't -- I don't know.

Q.   What's the basis for your understanding that it

Page 70

would have been Joe Guy or Kyle Schutt that would have told you to use the title senior advisor to the DHS secretary?

A.  I was speaking with them more frequently than Corey.  That's the only thing I can think of but.

Q.  Did you have an understanding that they were authorized to give out titles --

MS. LEONARD:  I'm sorry?

We need to go off the record.

THE VIDEOGRAPHER:  All parties in agreement going off the record, we're going off the record at 11:07 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are going back on the record at 11:09 a.m.

Q.  (BY MS. LEONARD) Ms. Voorhies, we were talking about how you got your title as senior advisor to the DHS secretary.

That's a -- it's very high ranking title, isn't it?

A.  I -- it's a advisory role, yes.

Q.  Senior advisor to the Secretary of the Department of Homeland Security which is a very large federal agency, correct?

Page 71

A.   Correct.

Q.   And you don't have any recollection as to who gave you that title?

A.   No, not specifically.

Q.   But you had an understanding that Corey Lewandowski and Kristi Noem approved of your having that title?

A.   I presume, yes.

Q.   No one ever told you, That's not your title?

A.   No one ever told me that's not my title, no.

Q.   Okay.  And they were aware you were using that title?

A.   Yes, they were aware I was using that title.

Q.   You can set that one aside.

At some point in time, you were given an office at FEMA, correct?

A.   Yes.

Q.   A physical office?

A.   Correct.

Q.   Did you have a physical office at -- at DHS?

A.   I did for a bit.

Q.   For -- for what period of time?

A.   I would say a couple of months.

Q.   So, roughly, April to June?

A.   No, I did not have an office there from

Page 72

April to June.  It would have been more like August and September/October, maybe that I was officing at the DHS campus.

Q.   And before that, where were you physically located when you worked in person?

A.   I had a cubicle at FEMA.

Q.   Before -- so let's start in April.

You came onboard in April of 2025. Where was your physical office space?

A.   I didn't have a physical office space until May, at which time I received -- or I sat at a cubicle at FEMA.

Q.   At FEMA headquarters?

A.   Yes.

Q.   And then at some point, you were given office space at DHS?

A.   At some point I was -- yes.  I was officing -- I was at DHS more often and so they gave me a -- a empty room to use.

Q.   And was that because you were meeting with people at DHS more often in the roles that -- that you were performing?

A.   Possibly, yeah.

Q.   Okay, including Corey Lewandowski and Joe Guy?

A.   Mostly Joe Guy, yeah.

Page 73

Q.   And Kyle Schutt?

A.   I didn't -- I wasn't working with Kyle very much during that time.

Q.   After what point in time did you work with Kyle Schutt less?

A.   Probably May.

Q.   And who else in the Office of the Secretary were you working with at this time when you weren't located at DHS?

A.   There's a girl named Victoria Barton, who was the counselor to the secretary.

Q.   Anyone else?

A.   Karen Evans.  She was not in the -- she may have been in the office.  She was in either management at DHS or -- but then she was transferred over to FEMA so, no, she wasn't in the Office of the Secretary.  I take that back.

Q.   You were aware that Karen Evans was nominated by the President to be in a role with respect to the management directorate?

A.   Yes, I was aware of that.

Q.   And then he withdrew her nomination?

A.   Yes, I had heard that.

Q.   Was Karen Evans performing a role in -- with respect to the management directorate at that time?

Page 74

A.   I'm not sure what role she was performing in.

Q.   Okay.  After you had your office space at DHS, did you then -- at some point were you then given an office at FEMA again?

A.   Yes.

Q.   And when was that?

A.   That would have been in November.

Q.   Of 2025?

A.   Of 2025, yes.

Q.   Who gave you that office?

A.   Karen Evans is chief of staff, I believe. I -- I don't recall exactly.

Q.   And, at some point in time, you were given a FEMA email address, correct?

A.   Yes, I was given a FEMA email address in either April or May of 2025.

Q.   Who give you that email address?

A.   The FEMA IT.

Q.   Who authorized your having a FEMA email address?

A.   I don't know.

Q.   You just were -- all of a sudden one day, you had a FEMA email address?

A.   I had a DHS laptop which did not connect to

Page 75

the FEMA servers and the technology there at FEMA and so they -- whoever handled the office technology said that they should give me a FEMA laptop and a FEMA phone and that's when they issued the FEMA email address, I believe.

Q.   You were given a FEMA laptop and a FEMA phone so that you could access the FEMA servers, correct?

A.   No, so that I could just connect to the network so that I could send emails and print.

Q.   And someone authorized you at that point in time to have a FEMA email address?

A.   I presume so, yes.

Q.   You were not a FEMA employee, correct?

A.   No, I was not a FEMA employee, that's correct.

Q.   You were at the time a special employee of the Department of Homeland Security, correct?

A.   That is correct.

Q.   Did you have a DHS email address?

A.   I did, yes, ma'am.

Q.   And for how long did you have a DHS email address?

A.   I believe until I left in March of 2026.

Q.   So you had both?

A.   I had both.  One was forwarded to the other

Page 76

so I only had to use one.

Q.   The DHS email address was forwarded to your FEMA address?

A.   That's my understanding, yes.

Q.   And when did you set up the auto forwarding?

A.   I did not set up the auto forwarding.  The IT department at -- as I recall, it was DHS set up the auto forwarding for me sometime over the summer. I don't recall what month.

Q.   So prior to that, it was not auto forwarded?

A.   No, I don't believe it was.

Q.   What was your DHS email address?

A.   I believe it was Kara.Voorhies@DHSHQ or whatever the extension is.  I don't -- I don't remember.

Q.   Okay.  Did you have any decision-making authority with respect to FEMA in your role as senior advisor?

A.   No, I did not have decision -- an authority to make decisions.

Q.   Did anyone ever delegate any of their own decision-making authority to you with respect to FEMA?

A.   No.

Q.   Did anyone ever ask you to make decisions with respect FEMA?

Page 77

A.   Not that I recall, no.

Q.   You don't recall ever being asked to make decisions with respect to FEMA?

A.   I don't recall being asked personally to make decisions.

Q.   Do you recall ever making decisions with respect to FEMA?

A.   No, not that I can recall.  Nothing significant.

Q.   How did you intend to perform your role of improving FEMA's efficiency if you couldn't make decisions?

A.   My job was to make recommendations or suggestions and allow the decision-makers to make those decisions.

Q.   And recommendations and suggestions to whom?

A.   Either Joe Guy, Corey Lewandowski, the administrator of FEMA, whomever the decision authority was with.

Q.   And all of those individuals had decision-making authority with respect to FEMA in different ways.  Is that fair?

A.   Possibly, yeah.  Yeah.  My job was just to liaise with them, so...

Q.   Your job was to liaise with the individuals who

Page 78

had decision-making authority --

A.   Yes.

Q.   -- for FEMA?

A.   Yes.

Q.   And provide -- sorry?

A.   And others.

Q.   And to provide recommendations, correct?

A.   Yes.

Q.   Okay.  And if I told you that individuals at FEMA understood you to be making decisions with respect to FEMA, would you be surprised?

A.   I would be surprised, yeah.

Q.   Did you ever give direction to people at FEMA to do things?

A.   Only if that direction had been provided to me.

Q.   By someone at the DHS?

A.   Or FEMA, yes.

Q.   Joe Guy, for example?

A.   At DHS, yeah, he would have been one of those to provide me steer.

Q.   Could you say that again.

A.   He would have been to provide steer, yes.

Q.   Steer -- when you say to provide steer --

A.   Direction.

Page 79

Q.   Direction.

And sometimes you passed that on to individuals at FEMA, correct?

A.   That is correct.

Q.   Okay.  I can tell you that in reviewing documents that have been produced by the defendants in this case, you are copied on a large number of emails pertaining to FEMA business.

Can you explain to me why, in your role as senior advisor to the DHS secretary, you were being copied on so much FEMA business?

A.   I was copied on a lot of emails.  The intent was to make sure that I was aware of what was going on so that I could liaise between the department and the agency to make sure that there was alignment.

Q.   Between the department's priorities and what the agency was doing?

A.   To make sure that the agency, if needed, could get a steer from DHS and that DHS was aware of what the agency was doing.

Q.   And that was your role?

A.   That was part of my role, yes.

Q.   And generally speaking, when you were looking to DHS leadership for this steer, you were discussing these matters with either Joe Guy or Corey Lewandowski?

Page 80

A.    Generally, yes.

Q.    Did you sometimes discuss direction for FEMA with Kristi Noem?

A.    Very rarely.

Q.    But on occasion?

A.    But on occasion, sure.

Q.    Could you describe for me, as someone coming in from outside the government into the office of the DHS secretary, how -- what was the decision-making hierarchy within that office when you arrived?

A.    I believe the secretary set the high level decision, made the high level decisions and those were communicated down.  That's -- yeah.  That's it. I mean, I think she ultimately made the decisions.

Q.    And DCOS Guy was the deputy with responsibility for FEMA, correct?

A.    Correct.

Q.    If you were working on an issue at FEMA that required S1 approval, how did that approval process work?

A.    What kind of issue would you be referring to?

Q.    Anything that required S1.

So when I say S1, I'm referring to the actual Secretary for the Department of Homeland

Page 81

Security so if there's something that required S1 approval, meaning Kristi Noem had to sign off on the approval, how would that process work?

A.    It would depend on what type of approval, like, what type of thing needed to be approved. There were different paths for different types of approvals.

Q.    Could you describe for me those different paths, please?

A.    Sure.

Is there one particular you'd like me to start with?

Q.    I would like to hear about all of them.

A.    Okay.

Q.    Anything that goes up to S1 for approval, the paths that you're aware of.

A.    Okay.  So I would know about a portion of the path once it got to a certain point, just generally, because I was not tracking it.

If it was -- if it was a policy steer, there would be a memo drafted at FEMA that would be then reviewed by FEMA's senior advisors, the administrator and the various levels of people at FEMA that were in that review flow which I could not recite for you.  I don't know.

Page 82

It would then be passed up to -- once signed by the administrator, it would then be passed up to DHS.  Different time periods, I looked at it either before it left FEMA or at the same time as the administrator.  Some time periods, I looked at it once it got to DHS, just depending on where I was physically located, so -- and then once I had looked at it, Counselor Barton had looked at it, then it would go to Joe Guy for his review.

Q.   And from Joe Guy, do you know where it went after that?

A.   I believe at some point it would go through general counsel, I don't know if that was before Joe Guy or after Joe Guy, and then I don't know if there were further reviews on it after that but ultimately, it would go to the secretary.

Q.   And some of these policy memos went through Corey Lewandowski, as well, as the chief advisor?

A.   Likely he would -- he would look at anything she was looking at would be my understanding.

Q.   And so that was a policy memo.

What other types of paths were there for approvals from the secretary?

A.   There would be -- there would be approval for spending over $100,000.  There were memos

Page 83

requesting approval to spend over $100,000.  Those would follow a similar path, originate from different people at FEMA but similar path.

Q.    And any other paths, that you're aware of, for decisions that would be made by the secretary?

A.    Not that I was involved in.

Q.    Were -- did you participate in Tuesday and Thursday meetings at DHS?

A.    Tuesday and Thursday meetings at DHS?

Q.    Of the DHS leadership?

A.    No, I did not.

Q.    Were there any other regular meetings that you participated in at DHS?

A.    I had regular meetings with Joe Guy for -- you know, different -- different time periods, there would be at different intervals but, no, not with the secretary.

Q.    What about with Corey Lewandowski, did you have regular meetings?

A.    No.

Q.    What about anyone else in the DHS leadership, regular meetings?

A.    Not -- no, not that I recall now.

Q.    Let's talk about the time frames because it sounds like there's some distinct time frames for your

Page 84

work.

So there's the initial time frame that you came onboard in April 2025 when Cameron -- Cameron Hampton was the SOPDA, correct?

A.   Correct.

Q.   Very briefly, and then he left, right?

A.   Uh-huh.

Q.   In May of 2025; is that correct?

A.   That sounds correct.

Q.   And then David Richardson was the SOPDA from roughly some point in May through November -- then to November of 2025?

A.   Yes, I believe that's correct.

Q.   Roughly corresponding with hurricane season, correct?

A.   Roughly.

Q.   And then Karen Evans became the SOPDA on December 1st, 2025?

A.   That's my understanding, yes.

Q.   Until -- and she was the SOPDA until the time you left, in March of 2026?

A.   Correct.

Q.   Let's focus on the time period when David Richardson was the SOPDA.

Am I correct in understanding that

Page 85

there was a brief period of time when you were housed at FEMA and then at some point during that summer, you were working out of the DHS headquarters?

A.    There were several months that I was sitting at FEMA, yes, and then I moved to DHS for a few months.

Q.    And do you roughly remember when you moved to DHS?

A.    I would say it was early fall, maybe August or September.

Q.    And the reason that you previously testified to was because you were -- you were meeting more with people at DHS, at that point in time?

A.    My -- my time was needed more at DHS.

Q.    During that first window when you were working out of FEMA, can you describe for me your responsibilities?

A.    They were the same responsibilities throughout which was to understand what was going on, make recommendations, advise the secretary as needed, as requested.

Q.    What specifically were you working on?

A.    All aspects of FEMA, just understanding any information that was needed to be understood.  Any requests that were made from DHS, I would find the

Page 86

right people to be able to provide information so that I could carry that back to DHS.

Q.   Could you describe for me some -- could you give me examples of types of things that you were working on during this time frame?

A.   During -- I can't remember them specifically.

Q.   You can't remember what you -- anything that you were working on when you were housed at FEMA during those first few months?

A.   There was a lot of information so, no, I can't.  There's -- a lot has happened since then.

I can't remember what I had for breakfast yesterday, so...

Q.   Sure.

But it's a pretty basic question.  I'm just trying to get an understanding of the types of things that you were actually working on in your role as special advisor.

Can you remember any issues that you were working on during that time?

A.   I remember there being a lot of meetings.  There were a lot of different issues that were ongoing at FEMA.  FEMA handles a lot of different aspects.

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

I -- I know there was discussion around, like, there was grants that needed to be drafted and things like that that the teams were working on.

There was hurricane preparedness. There were a lot of meetings about hurricane preparedness that I sat in.

Again, a lot at that time was just information collection for me.

Q.   And were you doing anything to implement your role in improving FEMA's efficiency during that time?

A.   I recall a lot of it being information collection, understand the agency.

Q.   Were you involved in meetings with DHS leadership that discussed downsizing FEMA's staff during those early months?

A.   With DHS leadership?  I don't recall any of those discussions, no.

Q.   Were you involved in discussions of FEMA's authority to extend CORE positions during that time?

A.   No, I don't recall any discussions around that.

Q.   Do you recall that the secretary delegated some authority to SOPDA Richardson with respect to extending CORE positions?

Page 88

A.    I became aware of that in, I believe, November or December of 2025.

Q.    So you weren't aware of that back in -- at the approval memo that was sent to the secretary in May of 2025?

A.    I don't recall ever seeing that, no.

Q.    Okay.  So that's not an approval policy -- approval memo that came through you?

A.    No.  I believe that was signed when he was initially appointed as SOPDA.  That is not something I reviewed.

Q.    But you were reviewing, I believe you said, everything else with respect to FEMA?

A.    As those processes were built which primarily occurred, like, over the summer.

Q.    You were reviewing contracts including contracts over $100,000?

A.    I was not reviewing contracts.  I was reviewing memos that were going to the secretary requesting approval to spend over $100,000.  I did not review any contracts themselves.

Q.    What about the decisions that were made to terminate grants over the summer of 2025, were you involved in those decisions?

A.    I was liaising with the secretary's office

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

on grants, generally, the decisions to terminate grants.  Can you tell me specifically which ones you're referring to?

Q.   Sure.  There were some very large grant programs that were terminated over the summer of 2025.

Are you familiar with that?

A.   Which -- which programs are you referring to?

Q.   So there -- one of them is the brick program.

A.   I believe that was not terminated is my understanding.

Q.   It was terminated during the summer of 2025 and then put back in place by a court order, correct?

A.   That -- my understanding was that it was just on pause.  It was not terminated.

Q.   Oh, I'm sorry.  It was suspended?

A.   I don't know if that's the correct term.  I wasn't doing brick.

Q.   Okay.  You were not involved in that?

A.   I was in meetings about it but I don't recall being heavily involved in brick.

Q.   Who made the decisions there?

A.   On the brick program, I believe the SOPDA.

Q.   As approved by DHS?

A.   I'm sure in conjunction with discussion with

Page 90

them.  I don't know if he sought particular approval.

Q.  So I'm trying to get a sense of your role with respect to these FEMA issues because I've heard two different things here today.  I've heard that you were reviewing everything coming out of FEMA and then if I've asked about specific things, you were not involved.

So can you give me a little more detail as to how it was decided what you were involved in during the summer of 2025?

A.  So as I mentioned before, the first several months that I was working there, I was just getting an understanding of the agency and what its activities were.

As the secretary -- as things evolved and the secretary's office requested that I be more involved and review more things, I would review more things.  More -- anything going to the secretary ultimately, I think it began -- maybe fully implemented in the fall.  Everything going to the secretary's office, I believe I looked at the memos that were going for secretary review.

There were likely other things going to DHS that I was unaware of or did not look at.

Q.  The DHS leadership was involved in decision-making that was more informal than just a

Page 91

formal memo that was sent to the S1 for approval, correct?

A.    Most things were communicated on formal memo.

Q.    But there were a lot of things that were communicated by Signal chat as well, correct?

A.    I don't know that there were decisions being made in those, per se.  Do you have an example you'd like me to respond to?

Q.    Well, I'm asking you.

In your -- in your experience, there were discussions and direction given, for example, of how to implement decisions.

A.    Possibly.

Q.    And those would occur not through a formal memo procedure, correct?

A.    Formal decisions made by the secretary would typically be on a memo.  Implementation discussions may happen in person, may happen on email, may happen in a chat.  Most of it would have been email, I believe.

Q.    There were a significant number of Signal chats pertaining to FEMA business that were being conducted involving individuals, including yourself, at the Department of Homeland Security, fair?

Page 92

A.   There was a lot of Signal chats, yes.

Q.   At some point in time, you became familiar with the FEMA Review Council that had been set up by the President --

A.   Uh-huh.

Q.   -- is that --

A.   That's correct.

Q.   Okay.  And you were aware that Kristi Noem was the cochair of that Review Council, correct?

A.   I believe, yes, along with -- yes.  She had a -- she had a co-chair.

Q.   Secretary Hegseth?

A.   That's right.

Q.   And you attended at least the July 2025 meeting of the Review Council, correct?

A.   I did.  It was a public meeting.

Q.   Let's mark this as 130 -- oh, sorry.  This one already has an exhibit number, so we have some exhibits that were previously given exhibit numbers in other depositions and I will -- of these, I have more copies, so this one is number 5.

(Exhibit Number 5 previously marked.)

Q.   (BY MS. LEONARD) Take a look at this. You've been handed what are from the DHS website.  We downloaded these.  These are the July 9th, 2025

Page 93

minutes of the meeting of the FEMA Review Council and if you take a look at the second page under the list of participants, do you see your name there?

A. Yes, I do.

Q. Okay. So you attended this meeting in New Orleans?

A. Yes.

Q. Okay. Did you -- were there other meetings of the Review Council that you recall attending?

A. Public meetings, no, I don't believe so.

Q. What about non-public meetings?

A. They had some sub councils that were -- they had a writing sub council that was meeting at DHS that I attended some sessions for.

Q. And who was on the writing sub council?

A. I couldn't name them. I -- I know a few names that were there but I don't know if they were on the council or just attending.

Q. Who do you recall participating in the writing of meetings?

A. Governor Phil Bryant was one of them. I think several others were representatives of other council members and I -- I don't recall their names.

Q. And were there DHS staff there as well?

A. There was Victoria Barton, the counselor to

Page 94

the secretary also attended alongside me.  Joe Guy may have attended for periods of time.  I don't recall any other staff.

Q.   Okay.  If you look at the public meeting on the second page of these minutes, there's reference here to Secretary Noem's remarks?

A.   Yes, I see that.

Q.   In the second-to-last sentence there, she reiterated that federal emergency management should be state and locally led which is why FEMA must be eliminated as it exists today and remade into a responsive agency.

Do you recall her saying something like that?

A.   I recall those words, yes.

Q.   And please explain to me your understanding at the time, as the senior advisor to the secretary working on FEMA, what Secretary Noem meant by eliminating FEMA as it exists today?

A.   I can't speak for Secretary Noem but I know that the concept that I understood was that it was not a functional agency, did not serve the American public the way that it was intended to and so it needed to be revitalized and rethought so that it could be more responsive to the American public.

Page 95

Q.    And part of your background that qualified you to be working on these issues was your experience in reforming other organizations, correct?

A.    Yes.  I had done some of that when I was in public accounting.

Q.    And this was not the only time in 2025 that you heard Kristi Noem use similar words to describe the priorities for FEMA, correct?

A.    That's correct.

Q.    Can you recall the first time you heard Kristi Noem say that FEMA needed to be eliminated as it exists today?

A.    I don't remember the date, no.

Q.    Was that something you heard frequently?

A.    I heard it in her public statements periodically, comments like, you know, notes like these to -- yeah, no, I did not hear it frequently but I do understand that that was the -- sentiment was as it exists today.

Q.    And what about from Corey Lewandowski, did you hear similar -- similar messaging from him with respect to FEMA?

A.    I believe the sentiment was the same.

Q.    And that part of eliminating FEMA as it exists today also included downsizing the agency, correct?

Page 96

A. I think -- I think that they understood that the workforce needed to be looked at in terms of how it could be more effective for the American public.

Q. The size of the workforce, correct?

A. I think that we did not understand the size of the workforce. I don't know how they felt about the workforce. I can't recall them saying the word "downsizing" to me.

Q. What do you recall Corey Lewandowski saying about the size of the FEMA workforce?

A. That it was 24, 26,000 or so, I don't recall the exact specific numbers, and I'm trying to recall that they wanted to understand where all those people were.

Q. And you understood at the time that one of the president's priorities was reducing the size of the federal government, right?

A. I -- yes, I do understand that now.

Q. And you understood that DOGE was playing a role in that, correct?

A. I do now, yes.

Q. And you did then?

A. I understood that DOGE was playing a role in looking for efficiencies in the federal government, yes.

Page 97

Q.   Did you ever hear Corey Lewandowski say that FEMA needed to be eliminated?

A.   I don't recall him saying that to me.

Q.   Or anything like that?

A.   I don't -- I don't recall.  I don't -- I can't specifically recollect that -- him saying that to me.

Q.   What do you recall Corey Lewandowski saying about FEMA in 2025?

A.   That it was an agency that needed to be -- it was a very large piece of DHS and the budget and that they didn't have -- they didn't know what it was doing.  There was a lot of -- you know, people they didn't know where they were.  They didn't seem to be communicating well with DHS and there didn't seem to be enough transparency for the secretary's liking.

Q.   Transparency as between FEMA and DHS?

A.   Communication, yes.

Q.   And how did you see your role in improving the communication between FEMA and DHS?

A.   In doing just that, being someone who could help communicate between the two.

Q.   Do you recall something -- you can set the minutes aside.

Do you recall something called the

Page 98

Katrina petition?

A.    Is that the same as the Katrina letter?

Q.    Yes.

A.    Yes.

Q.    And what was that?

A.    I believe it was a letter signed by former FEMA personnel that -- I -- I don't know that I ever read it.

Q.    Expressing concerns with the administration's effort at reducing the size of FEMA?

A.    Okay.  Sounds correct.

Q.    And were you involved in the decision of whether to place FEMA employees who signed the Katrina letter on administrative leave?

A.    Was I involved in the decision?  No.

Q.    Were you involved in discussions of that at DHS?

A.    I believe I was given instruction.

MR. HALL:  I'm going to object to the extent that any information in response to this question were disclosed communications subject to the deliberative process privilege.

I'll instruct the witness not to answer in any way that would disclose pre-decisional deliberative communications subject to that

Page 99

privilege.

But go ahead.

MS. LEONARD:  We obviously disagree with the assertion of privilege.

You can answer the question.

MR. CAMPAGNA:  Is that -- you have an instruction from counsel for the government not to discuss certain aspects of this.

THE WITNESS:  Okay.  I don't know what aspects those would be.

MR. CAMPAGNA:  Can you restate your --

MR. HALL:  Yeah.  So --

MS. LEONARD:  Well -- okay.  We're going to go off for a second about this because I think -- I don't want coaching of the witness happening here and we need to resolve how we're dealing with the deliberative process assertions.

So off the record.

THE VIDEOGRAPHER:  All parties in agreement with going off the record.  We're going off the record at 11:42 a.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are going back on record at 11:55 a.m.

MS. LEONARD:  So my understanding of

Page 100

what has transpired while we took a break is that the government -- counsel for defendants is asserting deliberative process privilege for certain material during this deposition.  We are going to object to the extent that the government is attempting to use this to block information from coming out in this deposition.  We will take it question by question and objection by objection but we'll make our record very clearly as to what defendants' counsel is preventing from coming onto the record here today.

MR. HILL:  For the record, the government disagrees with that characterization but counsel can proceed with the questions.

Q.    (BY MS. LEONARD) Okay.  So I believe we were talking about -- yeah.

I believe we were talking about something called the Katrina letter when we took the break.

Do you recall that?

A.    Yes.

Q.    Okay.  And I asked if you were involved in discussions of whether to place FEMA employees who signed the Katrina letter on leave.

Do you recall that question?

A.    I recall that question.

Page 101

Q.   Okay.  Were you involved in discussions of whether to place FEMA employees who signed the Katrina letter on leave?

A.   There were a number of discussions about the employees that signed the Katrina letter.

Q.   And some of those discussions were about whether to place them on leave?

A.   I recall there being discussions about whether to place them on leave.

Q.   And you were involved?

A.   I was either on emails or in the room.

Q.   Okay.  Well, let's take a look at -- actually, before -- when you say in the room, who was in the room with you when these discussions were happening?

A.   If there was in-person discussions, I -- I don't recall.

Q.   In-person discussions at Department of Homeland Security?

A.   Or at FEMA.

Q.   With whom?

A.   I -- I don't recall.

Q.   Corey Lewandowski?

A.   Possible Corey Lewandowski was in discussions.  I -- I don't recall.

Q.   Joe Guy?

Page 102

A.   Possible as well.  I don't recall.

Q.   Okay.  Let's take a look at a document that you produced to us today.  I'm marking it 136.  It is Bates number 169 and 170.

(Exhibit Number 136 marked.)

Q   (BY MS. LEONARD) Looks like two screenshots from a telephone.

Can you, Ms. Voorhies, explain to me what Exhibit 136 is?

A.   This looks to be a Signal chat where Joe Guy sends a link from the Washington Post regarding the Katrina -- I presume the Katrina letter.

I respond that a girl named Erin says that she recognized the names and -- but I said that I imagine that those people took the DRP.

Q.   The DRP stands for the Deferred Retirement Program?

A.   I believe so.

Q.   Okay.  Also known as the fork in the road?

A.   I believe so, yes.

Q.   Okay.  Well, let's -- let's start at the top, A, K and J.

Who -- who was involved in this Signal chat?

A.   I don't know who the A was.

Page 103

Q.   K is you?

A.   Right.

Q.   And Joe -- J is Joe?

A.   I would presume so, yes.

Q.   Okay.  And this was something that was produced from your phone?

A.   Yes.  This was collected by my counsel.

Q.   So just to be clear, before this deposition, in response to the subpoena, you worked with your counsel to capture content from your Signal chat that appears currently on your personal phone; is that correct?

A.   That's correct.

Q.   Okay.  And among that content was a chat with A, K and J.

A.   That's correct.

Q.   Okay.  And this is a portion of that?

A.   Yes, that's correct.

Q.   Okay.  And about halfway down the page, there's a link to a Washington Post article and then there is a -- a profile picture here.

That's Joe Guy, right?

A.   Yes.  It says Joe Guy Mobile at the top.

Q.   And the little picture icon next to the words, Let's find them, that was a message posted by Mr. Guy, correct?

Page 104

A.    That all appears to be posted by Mr. Guy.

Q.    Okay.  So he is saying, Let's find them, meaning?  What did you understand that to mean?

A.    I presume that would mean the people that signed this letter.

Q.    And you endeavored to help him find them?

A.    I said that I asked about them and the response I received from one person was that they were not there anymore.

Q.    Okay.  You can set that aside.

During the time period that David Richardson was the SOPDA at FEMA, you were also working with Karen Evans, who was the chief of staff?

A.    Yes, that's correct.

Q.    Okay.  And among other things, you traveled with Karen Evans to Alaska to tour a typhoon disaster zone?

A.    In -- yes, in the -- in the fall, uh-huh.

Q.    And sometime in October of 2025, correct?

A.    Yes, that's correct.

Q.    Why were you on that trip?

A.    Karen was asked to go to represent the secretary -- to represent FEMA and I was asked to accompany her to represent secretary.

Q.    Who asked you to accompany her?

Page 105

A.    Corey Lewandowski.

Q.    Okay.  And did you have an understanding that Corey Lewandowski was authorizing your travel?

A.    I had an understanding that the secretary's office authorized my travel.

Q.    Okay.  And did you talk to the secretary about it?

A.    I don't recall if I did or not.

Q.    Okay.  But you might have?

A.    It's possible.

Q.    Okay.  And you were presented publicly as a senior government official?  Do you recall that?

A.    I don't recall that.  I recall being represented as the advisor to the secretary.

Q.    And did you consider your position as a government contractor -- excuse me.

Did you consider your position as a government subcontractor a senior government official position?

A.    I considered my position to be an advisor to the secretary which is my recollection of how I was presented.

Q.    Did you tell people you were a government contractor after October 1st, not a government employee?

Page 106

A.    What people?

Q.    Did you reveal that?

A.    I did not hide it.

Q.    Were you told to keep that quiet?

A.    I don't -- I don't think anybody advised me to keep it quiet that I recall.

Q.    Corey Lewandowski didn't tell you to keep that quiet?

A.    He may have suggested that it was not something that was anybody else's business.

Q.    Your status as a government contractor, working for the Department of Homeland Security, is not anyone else's business?

A.    In the private sector, it wouldn't matter what your status was so that's -- to me, I don't think it is anybody else's business.

Q.    But you weren't working in the private sector were you, Ms. Voorhies?

A.    No.  That's my history, though.

Q.    You were working for the United States federal government.  It's all of our business what your status was; isn't that right?

A.    I wouldn't -- I don't know that I would agree with that.

Q.    You don't agree that it's the public's business

Page 107

how taxpayer dollars are spent for work at the Department of Homeland Security?

A.   I think it is the taxpayers' business, yes.

Q.   And taxpayer dollars were being spent on your contract, were they not?

A.   Mine and many others, sure.

Q.   Going back to the fall of 2025, you began having conversations with Karen Evans regarding FEMA's authority with respect to CORE positions.

Do you recall that?

A.   Yes.

Q.   And is that when you learned what the CORE was?

A.   No.  I had been informed that there were CORE employees before that.  I had been informed of the term.

Q.   And do you remember the context in which you were discussing -- discussing the COREs?

A.   I recall that in trying to understand the organizational structure and the various types of employees, which FEMA had several various types of employees, that COREs were one of them.

Q.   And you understood that COREs were a very large -- comprised a large part of the FEMA workforce, correct?

A.   I understood that there were a lot of them,

Page 108

uh-huh.

Q.   Did you understand that COREs were approximately half of the FEMA workforce?

A.   That sound right, yeah.

Q.   And that there were also a large number of reservists also paid by -- under the Stafford Act?

A.   There was a large number of reservists.  I think less than CORE, if I recall correctly.

Q.   But together, they were the majority of the FEMA employees, correct?

A.   There were very -- there was a very smaller, much smaller, percentage of full-time employees.

Q.   So full-time --

A.   Yes, as I recall.

Q.   Sorry.  Full-time civil service employees were a smaller percentage of the overall FEMA employees?

A.   Yes.

Q.   And do you recall the overall number of FEMA employees roughly around the fall of 2025?

A.   I recall being 20 -- over 20,000.

Q.   Somewhere around 23,000, does that sound about right?

A.   Could be.

Q.   Okay.  Hurricane season was ending at some point, November of 2025; is that right?

Page 109

A.    I believe so, yeah, end of November.

Q.    Okay.  And is that the reason that these conversations started happening again regarding the size of the FEMA workforce?

A.    I recall the conversations that were happening being related to the fact that there was going to be -- in December, I recall there being conversations about the delegation of authority memo expiring.

Q.    And the need under Department of Homeland Security policies for any CORE renewals to, therefore, get secretary approval, correct?

A.    I recall Karen Evans making the decision to remit those to the secretary for concurrence.

Q.    You were aware that, throughout 2025, the secretary had a policy that all new hires required S1 approval?

A.    I have never seen that policy but I had heard of it.

Q.    And are you aware that the secretary's policy included CORE renewals within the scope?

A.    I was not aware of the specifics of the policy.

Q.    And without the delegation of authority to FEMA being extended, then approvals had to come through the

Page 110

secretary's office, right?

A.   I understood that Karen Evans put them forward.

Q.   You understood that Karen Evans put them forward but you were not familiar with the DHS policies that she was implementing in doing that; is that right?

A.   I was not familiar with any requirement for her to do so.

Q.   You weren't aware of that?

A.   (Shakes head.)  No, I was not aware of that. I had never saw any specific requirement for her to do that.

Q.   You were talking about ways -- in the fall of 2025, you began talking about ways to downsize FEMA, correct?

A.   We were talking about ways to make the organization more efficient.

Q.   Have you ever heard the term "rightsizing"?

A.   I have heard the term.

Q.   And you were using the term "rightsizing" with respect to FEMA?

A.   I don't recall if I've ever used that term with respect to FEMA.

Q.   Do you know if others -- do you recall others using rightsizing with respect to FEMA?

Page 111

A.    Not specifically.  I don't recall that.

Q.    Okay.  Your meeting with Karen Evans throughout -- you had regular meetings with Karen Evans; is that correct?

A.    I worked with Karen Evans very closely, yes.

Q.    Okay.  Tell me about the schedule, and now we're talking about the period of time in the fall before she became the SOPDA.

Was there a regularly scheduled meeting with Karen Evans that you participated in?

A.    I'm sure there was several.  I'm sure there were.  I don't recall the exact calendarized schedules.

Q.    Do you recall that Karen Evans took handwritten notes of -- of -- of her meetings?

A.    Yes, I do.

Q.    Did you see her with her planner, taking notes?

A.    Yes.

Q.    Okay.  Did you take notes of your meetings with Karen Evans?

A.    Sometimes, yes.

Q.    How did you take those notes?

A.    I had a little notebook that I would take notes in periodically.

Q.    Physically handwriting notes yourself?

Page 112

A.    Yes.

Q.    Okay.  And was it a notebook -- what kind of notebook?

A.    Just small journal with pages in it.

Q.    Do you still have those journals?

A.    I do not have them in my possession.

Q.    What happened to them?

A.    They would have been in my office at FEMA.

Q.    And does someone else have possession of those journals?

A.    I do not know who has possession of anything that was in that office.

Q.    You left your journals in the office at FEMA when you -- when your contract was terminated; is that correct?

A.    That's correct.  I left everything there.

Q.    And did you come to have an understanding that the Office of Inspector General has taken possession of some of those materials?

A.    I've heard that through the press, that is it.

Q.    You've never been notified of that?

A.    Not from the Inspector General, no.

Q.    But you believe that the handwritten note -- did you have this practice of keeping a journal with

Page 113

handwritten notes throughout the time that you were working at DHS?

A. Sometimes more -- more often than others, yeah.

Q. But you recall -- do you recall keeping these notes in the fall of 2025?

A. Depending on the meetings, I would take notes if I felt that it was necessary for my memory, yes.

Q. Sitting here today, can you remember whether or not you took notes with respect to any issues pertaining to the CORE?

A. I can't -- I couldn't recall specifically.

Q. But sometimes, you were taking notes with respect to certain numbers so that you would remember?

A. Possibly.

Q. Okay. And you recall that Karen Evans became the SOPDA on December 1st?

A. Yes, that's my understanding.

Q. Okay. I believe you've testified previously that the nature of your work did not change measurably when the different SOPDAs came and went; is that correct?

A. Not measurably. I would say no.

Q. Okay. Was there anything different about your

Page 114

work after December 1st, when Karen became the SOPDA?

A.   I don't believe so.

Q.   Okay.  You continued to meet with her very frequently regarding FEMA?

A.   Yes.

Q.   And also with Joe Guy?

A.   Yes.

Q.   And you sometimes participated in meetings between Karen Evans and Joe Guy, correct?

A.   Yes, I did.

Q.   Okay.  She had a weekly -- he called it a sync meeting, I believe?

A.   Yes, ma'am.

Q.   Is that the term that people used?

And did you participate in that weekly sync meeting?

A.   I did, yes.

Q.   Were you always there?

A.   I was usually there.

Q.   And you recall being there in November and December 2025?

A.   Unless I was traveling or on -- you know, off for personal, then yes, I would have been there.

Q.   Can you remember -- going back, so this is just this past holiday season.  Can you remember whether you

Page 115

took time off for the holidays?

A.   I believe I took a few days here and there off.

Q.   Were you in Washington, D.C. during the end of 2025, beginning of 2026?

A.   I believe I was in Houston or Katy for New Year's.

Q.   What about for Christmas?

A.   I would have been -- I would have been in Katy.

Q.   Okay.  And did you go back to D.C. in between?

A.   I don't believe so.

Q.   Do you recall whether you were working remotely?

A.   Some days I did work remotely, yes.

Q.   Okay.  But you weren't out of the country or on leave for an extended period of time over those holidays?

A.   Over the holidays, no.

Q.   During the fall of 2025, did you play some role in supporting Secretary Noem's work on the FEMA Review Council?

A.   I would liaise with them when requested.  I didn't have a lot of involvement with them, no.

Q.   Were -- did you play any role with respect to

Page 116

the draft FEMA council report?

A.    I reviewed the draft -- several versions of the draft FEMA council report.

Q.    Who asked you to do that?

A.    Anything that was going to go to the secretary, I would take a look at.

Q.    Who asked you to do that?

A.    Probably Joe Guy or Corey Lewandowski.  I don't recall which.

Q.    And you recall looking at several versions of the draft council report?

A.    I do recall that, yes.

Q.    And do you recall when that was?

A.    I believe I saw some materials that were represented as a draft report over the summer that David Richardson had provided and then there were some drafts in, must have been early November.

Q.    Do you recall that there was a meeting scheduled for December 12th, 2025 that -- at which the final report was intended to be released, that was eventually canceled?

A.    I recall there being a -- yes, a canceled meeting sometime in early December.

Q.    Okay.  And do you recall that there was a draft report roughly end of November, early December that was

Page 117

being worked on.  Is that fair?

A.   Yes, yeah.  There was draft all the way up until it would have been published.

Q.   And do you recall that at some point a draft report was leaked to the press?

A.   I recall there being press reports that it was leaked.

Q.   Do you know who leaked it?

A.   I don't.

Q.   Do you have any understanding?

A.   I don't have any facts around who leaked it.

Q.   Did you review the report that was leaked?

A.   I don't know what version of the report was leaked, so...

Q.   Okay.  We can take a look.

(Exhibit Number 13 previously marked.)

Q.   (BY MS. LEONARD) This has been previously marked as Exhibit 13 in a prior deposition.

A.   Okay.

Q.   This is the December 11th draft -- FEMA draft final report and I am going to be specifically asking you some questions about page 7 but first, we can talk generally what you recall about a December 11th draft.

A.   Okay.  I don't know that I ever saw this version.

Page 118

Q. And what makes you say that?

A. I don't recall the picture specifically.

Q. Did the report -- the draft report that you saw didn't have pictures embedded in the covers yet?

A. I don't remember if it did or not. I don't -- they don't look familiar, but...

Q. So it's possible you saw this version or an earlier version, you just can't, sitting here today, say?

A. Yeah, couldn't tell you affirmatively.

Q. Okay. But you believe you saw several versions --

A. Yes.

Q. -- of the draft report? Okay.

A. Yes.

Q. Let's look at page 7 and this is within the -- actually, you can go back to page 5. Sorry.

Do you see the heading there, Guiding Principles and Key Recommendations?

A. Yes, I see it.

Q. Okay. So then we go to number 1 on page 7 and it's called FEMA 2.0, A New Start.

Do you see that?

A. Yes, I see that.

Q. Do you know who came up with the name FEMA 2.0?

Page 119

A.   I don't.

Q.   Was -- this appeared in the draft reports at some point?

A.   Yes.  I presume the writing council came up with that.  I don't know.

Q.   When you reviewed the versions of the draft, were you editing the drafts?

A.   I was making notes to them that could be considered for adjustments.  I don't know that they ever made any.

Q.   Did you edit the drafts?

A.   In the document?  No.

Q.   Did anyone else at DHS edit the drafts?

A.   I -- not that I'm aware of.

Q.   Okay.  But you don't know whether they did or not?

A.   I do not know whether they did or not.

Q.   Okay.  There were others at DHS working on the draft reports other than you?

A.   Yes.  I'm sure there were.

Q.   And there were others within the office of the secretary who were working on the draft report other than you?

A.   I -- I -- there may be, yes.

Q.   Do you know whether Kristi Noem and Corey

Page 120

Lewandowski were reviewing the draft report?

A.    I don't know at what time they saw the report.

Q.    But you believe that they did see the report at some point?

A.    Before it was intended to be published, I'm sure they did.

Q.    If you look at the second full paragraph on this page, there's a discussion here of FEMA 2.0 and there's a sentence about halfway through that paragraph that says, FEMA 2.0 should reduce overall staffing by approximately 50 percent.

Do you see that?

A.    I see that.

Q.    Do you know who decided to make the recommendation that FEMA's staffing should be reduced by 50 percent?

A.    I do not know who made that recommendation.

Q.    Did you edit the report to add that?

A.    I do not recall adding that to the report.

Q.    Did you -- were you aware that the draft report contained a 50 percent recommendation?

A.    I was aware that the council had discussed something along those lines.

Q.    Were you aware that the draft report contained

Page 121

a 50 percent cut recommendation?

A.    I don't recall if I read that.

Q.    Did you have conversations with DHS leadership about cutting FEMA's staff by 50 percent?

A.    I don't recall any of those conversations, no.

Q.    You don't recall having conversations?

A.    I don't recall having conversations about a 50 percent number, no.

Q.    Ever?

A.    Not that I recall.

Q.    Possible that you did have those conversations?

A.    It's possible that we have discussed that but I don't recall them.

Q.    So you were only working on FEMA during this time; is that correct?

A.    That is correct.

Q.    And you've testified that one of the things that DHS leadership was doing was trying to understand what all these people at FEMA did, correct?

A.    Yes, that's correct.

Q.    And this draft report recommends cutting the agency in half, correct?

A.    That's what it says.

Q.    And you cannot recall having any conversations

Page 122

about the recommendation to cut the agency you were working on in half?

A.   This was developed by the FEMA Review Council, not myself.

Q.   Do you know for a fact that that language was developed by the FEMA Review Council, Ms. Voorhies?

A.   I can't tell you for a fact where that language came from.

Q.   But you don't recall conversations about cutting FEMA in half with DHS leadership?

A.   I do not recall having a conversation with DHS leadership about a 50 percent cut.

Q.   And you are not aware of whether a 50 percent cut was grounded, for example, in any analysis of agency function or need, correct?

A.   I am not aware of any analysis.

Q.   And you -- you're not aware of what the basis was for recommending a 50 percent cut, correct?

A.   That is correct.

Q.   But this is consistent with your understanding of Kristi Noem's statements that FEMA should be eliminated in its current form, right?

A.   I don't know that I would say it's consistent.  I would say that its current form could mean very different things, so...

Page 123

Q. Had you ever heard -- before December of 2025, have you ever heard anyone at DHS talking about cutting FEMA in half?

A. At DHS, cutting it by 50 percent, not that I recall, no.

Q. Do you know who else within DHS was aware that the FEMA draft report contained a recommendation of cutting FEMA in half?

A. Whomever would have seen the draft that I saw would have read the same thing that I read.

Q. Do you know whether Joe Guy was aware of that?

A. I know Joe Guy had a copy of the report. I don't know that he read it.

Q. Do you know whether Karen Evans was aware of the recommendation to cut FEMA in half?

A. I don't know when she received a copy of the report so I don't know at what point she would have become aware of this language.

Q. How do you know that Joe Guy had a copy of the draft FEMA council report?

A. I believe he was provided a copy at the same time I was via email.

Q. Who provided you a copy of the draft report by email?

A. I believe the -- I don't know what his title

Page 124

is, Patrick Powers or someone on his team.  I don't remember exactly who.  It was on one of those other -- it was on one of these other -- designated federal officer.

Q.   So someone that you're -- the name -- you were looking at the FEMA council meeting minutes?

A.   Yes.

Q.   And someone from the Review Council provided to at least you and Joe Guy a copy of the draft report?

A.   That is my recollection, yes.

Q.   Was there anyone else on that email?

A.   I don't know.  I don't remember.

Q.   Do you remember anyone else at DHS who was reviewing the FEMA draft council report?

A.   I believe Victoria Barton would have received a copy at some point.

Q.   And she was still at DHS, not at FEMA, at this point in time, correct?

A.   I don't recall whether she was at DHS or whether she was at FEMA at the time.

Q.   Do you recall that at some point she moved from DHS to FEMA?

A.   I do recall that.

Q.   Okay.  But you don't recall when?

A.   I believe it was in November.

Page 125

Q.    So this report referred to the new recommended 50 percent smaller FEMA as FEMA 2.0, correct?

A.    Yes, that's what it says.

Q.    And that was a term you were familiar with, right?

A.    What term are you referring to?

Q.    FEMA 2.0.

A.    Not in the context of a 50 percent cut, no.

Q.    But you were familiar with the term "FEMA 2.0"?

A.    People used 2.0 as a common next-generation denotation.

Q.    So what did you understand FEMA 2.0 to be referring to at this time?

A.    The next version of FEMA.

Q.    And in fact, you were involved in a Signal chat called FEMA 2.0, correct?

A.    Unrelated, yes.

Q.    Excuse me?

A.    It was unrelated to anything published here.

Q.    The FEMA 2.0 Signal chat was unrelated to the FEMA 2.0 description in the draft FEMA council report?

A.    To my knowledge, there -- they -- there are no similarity.

Q.    And why do you say that?

A.    I just don't think that -- it had nothing to

Page 126

do with what they were writing in this report.

Q.   It had nothing to do with the next version of FEMA?

A.   It had nothing to do with what was written in this report.

Q.   But did it have something to do with the next version of FEMA?

A.   It was the next round of chat, like it was a new chat for FEMA.

Q.   The participants in FEMA 2.0 were yourself, Karen Evans and Joe Guy, correct?

A.   That is correct.

Q.   Was there anyone else?

A.   No.

Q.   Who set up that chat?

A.   I don't know -- I don't know.  I don't believe it was me.

Q.   Is it possible it was you?

A.   I'm fairly sure it was not me but --

Q.   Okay.  So it would -- it would --

A.   -- anything is possible.

Q.   -- have been either Karen Evans or Joe Guy?

A.   Yes.

Q.   And do you recall when FEMA 2.0 was created?

A.   I believe it was created in the fall.

Page 127

Q.   Of 2025?

A.   Of 2025.

Q.   And you said it was the new FEMA chat.

What -- what was the old FEMA chat?

A.   There were a number of old FEMA chats.

Q.   Can you describe some of them for me?

A.   I'm sure you have a list of them.  There were FEMA chats about just various coordination.

Q.   When you say this was the new FEMA chat, was -- what was -- was this replacing something else?

A.   Not directly.  I don't believe so.

Q.   Okay.  And -- and when this was set up, what did you understand FEMA 2.0, this chat, to be -- the purpose of this chat to be?

A.   Coordination amongst Karen Evans, Joe Guy and myself.

Q.   Coordination about what?

A.   About anything FEMA.

Q.   Anything FEMA.

So this is a -- this is a -- this chat was to be coordinated between you, Karen Evans, Joe Guy, for general purposes, anything specific to FEMA?

A.   Right, general purposes.

Q.   Okay.  But all FEMA-related, obviously?

A.   I believe so.

Page 128

Q.   And it -- what was your understanding of why it was called FEMA 2.0?

A.   I -- I never asked why it was called FEMA 2.0.

Q.   You're not the person who came up with that term?

A.   I am not.

Q.   That chat was used for communications regarding the FEMA staffing plan, correct?

A.   I don't recall any specifics about a staffing plan being discussed there but it was -- it was for general communications.

Q.   It was also used for specific communications, it was used for many things related to FEMA, correct?

A.   Generally, FEMA.  It was used for discussion about FEMA generally.

Q.   It was also used for discussion about specific issues with respect to FEMA?

A.   It was used for discussion about FEMA.  What is the specifics that you're requesting we talk about?

Q.   So when you say it was generally used for FEMA --

A.   There may have been other things discussed in the chat, personal things or along those lines.

Page 129

(Exhibit Number 103 previously marked.)

Q.    (BY MS. LEONARD) Let's take a look at -- this is previously marked as Exhibit 103.  I'll give it that number again.  This the same as Exhibit 103 from a prior deposition.

You've been handed what was previously marked as Exhibit 103.  This is a screen -- this is an image of a portion of the FEMA 2.0 Signal chat that I will tell you was provided to us and represented by defendants' counsel that this is an image of Karen Evans' telephone.

Do you see the FEMA 2.0 at the top?

A.    Yes.  I see the FEMA 2.0 at the top.

Q.    Okay.  And I can also tell you that the representation that we were given is the date of this is March 5th, 2026.

Do you see the notation with the clock set at four weeks?

A.    Yes, I see that.

Q.    And do you have an understanding that that meant that this chat was set for an auto-delete function after four weeks?

A.    Yes.  I believe that's what that means, yeah.

Page 130

Q. You're familiar that in Signal, with respect to the chats, that someone who participates in the chat can set the messages in that chat to auto delete after a particular length of time?

A. My understanding is if you are the person who created the chat, you can do that. I don't know if others can do that.

Q. But they may be able to?

A. They may be able to. I don't know.

Q. Okay. Did you set the FEMA 2.0 Signal chat to auto delete after four weeks?

A. I do not believe I did, no.

Q. Okay. Someone else did that?

A. I -- I would presume so.

Q. And as of March, if that's when this image was taken, the chat still had a four-week auto-delete function, correct?

A. That's what it looks like.

Q. Was that changed at some point in time?

A. I believe it was changed, apparently, after this image was taken to be one week.

Q. When did that happen?

A. I don't know the particular date.

Q. Could we look at the FEMA 2.0 Signal chat messages that you produced to see when in time the

Page 131

auto-delete function was changed?

A.   I presume that's somewhere.

Q.   And when --

A.   It was captured.

Q.   When -- in the Signal chat, there's usually a notation when a function -- a setting like that has been changed?

A.   Yes, there is.

Q.   Does it say who makes the change?

A.   It said Karen Evans made the change.

Q.   And that is something you looked at when you were collecting the documents to produce to us?

A.   That is something I recall having seen when it occurred.

Q.   And at some point after March 5th?

A.   It would appear so, yeah, if this -- if that's the date of this picture.

Q.   Do you recall when -- when you saw that change happen?

A.   No, I don't recall when exactly.

Q.   And it was changed to be a one-week auto delete?

A.   Yeah, that's my recollection.

Q.   But the messages that predated the change in the setting still appear in the Signal chat, correct?

Page 132

A.   I don't know.

Q.   So if you look at --

A.   I would have to look.

Q.   So you look at your phone -- you don't recall whether if you look at your phone and there's been a change in the auto-delete setting, it doesn't retroactively eliminate the messages, it eliminates them going forward?

A.   I don't think it does but I don't work for Signal so I don't know how their system works.

Q.   When you noticed Karen Evans changing the auto delete from four weeks to one week on the FEMA 2.0 Signal chat, were there other Signal chats that you noticed Karen Evans had changed the auto delete on?

A.   I don't recall any specifically.

Q.   But you noticed this one?

A.   I did notice this one.

Q.   Okay.  But you just can't recall whether there were others that were changed as well?

A.   That's correct.

Q.   Were you looking at other FEMA-related Signal chats at the time?

A.   No, not specifically, that I remember.

Q.   Do you recall if -- when you saw Karen Evans had changed the auto delete, was that after you had left

Page 133

the Department of Homeland Security on March 13th?

A.    I believe I saw it after I had left.

MS. LEONARD:  Okay.  It's 12:30.  I think this is actually a good stopping point for lunch, and we can go off the record.

THE VIDEOGRAPHER:  All parties in agreement going off the record.  We're going off the record at 12:34 p.m.

(Lunch break taken.)

THE VIDEOGRAPHER:  We are going back on the record at 2:02 p.m.

(Exhibit Number 137 marked.)

Q.    (BY MS. LEONARD) Ms. Voorhies, I am going to hand you the next exhibit, 137, which is a document that your counsel just produced to us after lunch that I believe is an image of your phone.  It does not have a Bates number, I'm sure we can take care of that after the deposition, and I am aware that you've also given a copy to counsel for the defendants.

Ms. Voorhies, can you explain --

MR. CAMPAGNA:  Excuse me, there were two pages.

MS. LEONARD:  Two pages of this document?

Page 134

MR. CAMPAGNA:  Yes.  Sorry.  Maybe you got two copies of --

MS. LEONARD:  I have two pages -- sure.

MR. CAMPAGNA:  I think -- I think you've got two identical pages when they were --

MS. LEONARD:  I have one copy of two pages.  That's fine.

MR. CAMPAGNA:  Okay.

MS. HARRIGILL:  It's two different pages.

MS. LEONARD:  Two different pages.  We'll put them together in the exhibit.  This is fine.

MR. CAMPAGNA:  Okay.  Okay.  Sorry.

MS. LEONARD:  Yes, this is fine.

Q.   I'm going to give you both pages of this and we'll call that Exhibit 137.  Easy solution.

If you look at the second page, I believe it shows the participants in the FEMA 2.0 chat; is that right?

A.   Yes, yes.

Q.   And is this a screenshot -- these are screenshots that were taken from your personal phone today?

Page 135

A.    Not today.  These were taken last -- on the -- on the -- what was the -- yes, last Thursday.

Q.    Okay.  So when you collected the information from your personal phone?

A.    That's correct.

Q.    Okay.  And the FEMA 2.0 participants listed there are?

A.    Karen Evans, Joe Guy and me.

Q.    And when you say last Thursday, you are referring to Thursday -- let's get the actual date on the record, the 7th of May?

A.    Yes.  If that's last Thursday, yes.

Q.    Okay.  And if you go down, there's no messages that appear in your FEMA 2.0 chat on your phone; is that correct?

A.    That is correct.

Q.    But there are settings -- indications that some of the settings have been changed and when.

Is that what you see?

A.    That's what it appears to say, yes.

Q.    And you testified before lunch that you believe that Karen Evans had changed the setting for the auto delete from four weeks to one week at some point in time after you left DHS, correct?

A.    I wasn't sure whether it was before or after

Page 136

I left.

Q. And can you tell the date from what's in front of you on Exhibit 137 as to when that setting was changed?

A. Yes. It appears that on November 15th, Karen Evans added me to the group and set the disappearing messages to four weeks and then on Wednesday, March 11th, Karen Evans set disappearing message time to one week.

Q. And there are subsequent actions on settings taken on this chat?

A. I don't know what these notices are, the safety number changing. I don't know what that -- if that's a setting change or what that is.

Q. The today listed on this document you see in front of you, do you believe that refers to Thursday, May 7th?

A. It would appear to.

Q. Okay.

A. It -- it was a new message as of that date. I don't know when that occurred.

Q. Thank you. You can set that aside.

I believe you testified prior to lunch that you don't recall having conversations with DHS leadership about plans to cut FEMA staff by

Page 137

50 percent.

Was that correct?

A.   Correct.  I don't recall the 50 percent number being discussed much.

Q.   Do you recall having conversations with cutting staff to something in the 11,000 person range?

A.   I don't recall a specific number ever being discussed.

Q.   Okay.  Let's mark this as next which is going to be 138.

MR. HALL:  Ms. Leonard, can I just ask, because I lost track, the prior exhibit, what exhibit number was that?

MS. LEONARD:  137.

MR. HALL:  That was 137?

MS. LEONARD:  Yeah.

(Exhibit Number 138 marked.)

Q.   (BY MS. LEONARD) There's 138 and this is a document that was produced to us today by your counsel, with Bates number starting 318 and the title of what appears to be another Signal chat is FEMA RIF.

Do you see this?

A.   Yes, I see this.

Q.   Okay.  And this is also material that was

Page 138

collected from your personal phone, correct?

A. It appears to be.

Q. And FEMA RIF is a Signal chat that you were one of the participants in, correct?

A. Yes. It says Joe Guy added me to the group.

Q. And Karen Evans, Joe Guy and you.

Do you see that?

A. Yes, I see that.

Q. Okay. So those are the participants in the FEMA RIF Signal chat?

A. That -- yes, that is what we're seeing.

Q. Okay. And here there's a conversation starting in September -- late September 2025. That's when this chat appears -- when you appeared to be added to the chat, correct?

A. Correct.

Q. If you go to -- actually, start on the first page. Joe Guy is saying, OMB is asking for our RIF submissions by COB today.

You understood what RIF stood for, correct?

A. I believe it is Reduction In Force.

Q. Yes.

And Karen Evans' Truth told me you were involved in the initial plan.

Page 139

So that's another post by Joe Guy, correct?

A.   Yes.  It appears to be.

Q.   And he's saying, We can be more aggressive here.

You don't have any reason to believe you didn't see these messages when they came in, right?

A.   I got a lot of messages, so...

Q.   Sure.

MR. HALL:  I'm sorry.  I'm going to object broadly to this chat -- of this Signal chat as a whole.  This appears to contain substantial material subject to the deliberative process privilege.

I'm going to instruct the witness not to answer to the extent the answer would disclose any information subject to the deliberative process privilege and we reserve all rights to claw back this document to the extent Exhibit 138, the pages between KLV000318 and KLV00323 are one document.  We reserve all rights to claw this back as deliberative.

MS. LEONARD:  We obviously disagree with that characterization.

Q.   Ms. Voorhies, if you turn to page 321, you see

Page 140

there's a reference here by Joe Guy -- 321 at the bottom, there's a reference here by Joe Guy on September 28thh, 2025 referring to a broader decision S1 memo that she will would go through and say yes or no in.

Do you see that?

A.   I see this, yeah.

Q.   Do you have any recollection as to being involved in conversations about a S1 approval memo for a plan for RIFs at FEMA?

MR. HALL:  Again, I'm going to -- excuse me, object on deliberative process privilege grounds to the extent that this question would elicit information subject to the deliberative process privilege.

To the extent this question would elicit such testimony, I would instruct the witness not to answer.

MS. LEONARD:  The question was a yes-or-no question.

A.   I'm sorry.  Can you repeat the question?

Q.   Sure.

Do you recall being involved in discussions about a S1 decision memo with respect to plans for RIFs at FEMA?

Page 141

A.   No, not specifically, no.

Q.   And Karen Evans responds here right below that message from Joe Guy with some numbers.

Do you see that?

A.   Yep.

Q.   A total of 11,426 remain from the August number of 2 -- 22,187.

Do you see that?

A.   Yes.

Q.   And 11,426 is approximately a 50 percent cut in the total number of FEMA staff, correct?

A.   Very approximate, yeah.

Q.   Is it correct?

A.   It's approximate.  Not 50 but it's approximate, yeah.

Q.   And that message appears to have been sent on September 28th 2025, correct?

A.   That's what it is dated.

Q.   If you turn to the next page, actually, there's a message that I believe you sent that appears here.

Do you see that?

A.   Yep.

Q.   And you say here, Please forward to me.

You're referring to the plan for the RIFs at FEMA, correct?

Page 142

(Loud noise.)

Q.   It appeared to be a cart behind the wall. Seems like everything is fine.

A.   Yep, that's what it sounds like.

Q.   And then you say, Joe, can you give Karen the instruction to copy me on anything that comes up like we did with grants.

What were you referring to there?

A.   Anything that was coming up that was going to the secretary with grants, I was looking at.

Q.   And so now you're talking about anything pertaining to RIFs to the FEMA staff, you want to see that as well, correct?

A.   That's the plan, uh-huh.

Q.   Is that yes?

A.   Yes.

Q.   All right.  We're going to mark this as the next which is 139.

(Exhibit Number 139 marked.)

Q.   (BY MS. LEONARD) This is the set of Signal chat that you -- that you produced to us today with Joe Guy starting on 375.  I am going to be asking you about communication that begins on page 407.

So first let me ask you, you corrected or you worked with your counsel to correct

Page 143

screenshots of Signal chats that you had with Joe Guy, correct?

A.   Yes, correct.

Q.   And these were the documents that were produced by your counsel from your personal phone?

A.   Okay.  I -- I didn't review them before they were produced to you so if you say so.

Q.   But you were aware, generally, that your counsel was collecting screenshots from your personal phone pertaining FEMA?

A.   Yes.

Q.   Okay.  All right.  If you can go to page 407, it's dated November 5th, 2025.

Do you see that?

A.   November 5th, 2025, yes.

Q.   And there is a message from Joe Guy that says, no pushback on the 20-page report.

Do you see that?

A.   I do.

Q.   Do you understand that he is referring to the FEMA -- the draft FEMA council report?

A.   I am not sure what he was referring to.

Q.   You respond, That's good.  This discussion is ridiculous.  The whole point is to make the states take the liability.  LOL.

Page 144

Do you see that?

A.   I do.

Q.   Does that refresh your recollection that this is referring to the FEMA council report?

A.   It does not.

Q.   You understood that one of the things discussed and one of the priorities for Secretary Noem was to move responsibility for disaster relief from the federal government to the states, correct?

A.   The responsibility, yes, to the states.

Q.   If you turn to the next page, there's a statement from Joe Guy that says, It will be 50 percent no matter what Youngkin says.

Do you see that?

A.   I do.

Q.   It's referring to the 50 percent cut to FEMA staffing, isn't he?

A.   I don't know what he was referring to.

Q.   It's possible that that's a reference to the 50 percent cut in FEMA staffing?

A.   There is a lot of possibility.

MR. HALL:  Objection.  Lack of authentication.  Lack of foundation.

Q.   It's possible that that is referring to the 50 percent cut in the draft FEMA report, correct?

Page 145

A.   I don't know what the 50 percent reference
is to.

Q.   And you say, The long one should not be
published so who cares.

Do you see that?

A.   I do see that.

Q.   The long one is a reference to the FEMA council
review -- the FEMA Review Council report, isn't it?

A.   I don't know what the long one -- could be.
I don't know.

Q.   You're aware that there was a much longer draft
of the FEMA council report than what Secretary Noem
wanted to be published, correct?

A.   I know that there was a very long version
with a lot of footnotes.  I don't know that Secretary
Noem had an opinion on that.  She did not tell me
that.

Q.   And Joe Guy is here saying, The only point to
this conversation was saying the 20-page report was
going to be the final one.

Do you see that?

A.   I see that.

Q.   He's talking about the FEMA Review Council
report, correct?

A.   I don't know.  It sounds like it.

Page 146

Q. Okay. I'm going to go back to my question before that, It will be 50 percent no matter what Youngkin says.

Joe Guy is talking about 50 percent cut to the FEMA staff in that report, isn't he?

A. I don't -- I don't know. I mean, I -- it sounds like it. I don't know what the 50 percent was reference to. He doesn't say.

Q. But you were involved in these discussions about whether there should be the longer one or the shorter one?

A. I was aware that there were discussions about there being a longer report and a shorter report, both.

Q. And if you turn the page, you have a comment here, Definitely too in the weeds for a report that's essentially done.

Do you see that?

A. I see that.

Q. You were referring to the FEMA council report?

A. Yes, I think so.

Q. And you say a little further down, Just waiting for Gov Y to talk about the 50 percent.

You're referring to the 50 percent cut to FEMA staff, correct?

Page 147

A.   Gov Y.  This must have been during a meeting.  This must have been during a meeting and I was waiting for him to bring up something.

Q.   You were waiting for him to bring up the 50 percent cut to the FEMA staff, correct?

A.   Yes, that's -- that appears to be what that is.

Q.   It wasn't your decision personally to recommend cutting FEMA staff by 50 percent, correct?

A.   It was not.

Q.   That was something that someone else had told you to do, correct?

A.   I believe that was the recommendation that was come up with by the FEMA Review Council.

Q.   That was a recommendation that was come up -- that -- that someone within DHS made, correct?

MR. HALL:  Objection, lack of foundation.

A.   I believe that was a recommendation made by the FEMA Review Council.  They were independent practitioners.

Q.   You don't know who made the recommendation to cut 50 percent of FEMA staff, do you, Ms. Voorhies?

A.   I do not.  I was not in the FEMA Review Council meetings, all of them.  I was in a few.

Page 148

Q.    And you don't know whether it was Kristi Noem, do you?

A.    I was not privy to any conversation from her -- any direction from her to cut 50 percent.

Q.    But you're aware that Joe Guy, DHS DCOS, was saying it's going to be 50 percent no matter what?

MR. HALL:  Objection, lack of foundation, vague, ambiguous.

Q.    You can answer the question.

A.    I'm reading the same stream of text messages that you are.

MS. LEONARD:  Counsel for defendants, I'm going to ask that you limit your objections. You're not defending this deposition.  You can make -- you can make objections based on privilege in the interest of your clients but it's not appropriate for you to be attempting to defend the deposition.

MR. HALL:  Respectfully disagree.

MS. LEONARD:  Okay.

Q.    In fact, Ms. Voorhies, you knew from the start that your job, the entire purpose of your job was to help DHS implement the downsizing of FEMA, didn't you?

A.    My job was to improve efficiency and effectiveness at FEMA.

Q.    Including making FEMA into a smaller

Page 149

organization.

You knew that from the start.

A.   Possibly, if that is what made it more efficient and effective.

Q.   You knew that that's what you were being told by Corey Lewandowski was the point of this -- this exercise?

A.   That was not -- I don't recall that ever specifically being stated by Corey Lewandowski.

Q.   And you knew that the President wanted to reduce the size of FEMA as well, didn't you?

A.   I, as you asked earlier, knew that one of his priorities was to reduce the size of the federal government.

Q.   Including FEMA?

A.   It is part of the federal government.

Q.   FEMA, specifically.

A.   I've never heard the President say that he wanted to reduce the size of FEMA to me.

Q.   You've heard him publically say he wanted to eliminate FEMA, haven't you?

A.   As it exists today which I believe is what Kristi Noem said.

Q.   Okay.  Let's mark this as the next.  This one is number 140.

Page 150

(Exhibit Number 140 marked.)

Q.   (BY MS. LEONARD) And this document is Bates number 363.  It's another screenshot of what I believe are Signal chats that you produced to us today.

MR. HALL:  While the witness is reviewing this document, I'm going to object on grounds of presidential communications privilege.

To the extent any questions regarding Exhibit 140 elicit or would elicit information subject to the presidential communication privilege, I would object and instruct the -- instruct the witness not to answer.

MS. LEONARD:  There is no basis for that instruction and I would ask that government counsel stop coaching the witness.

There is no --

MR. HALL:  Ms. Leonard -- Ms. Leonard, I --

MS. LEONARD:  There is no question pending.

MR. HALL:  -- but I have to respond to that.

I'm not coaching the witness.  I am instructing the witness not to answer any question to

Page 151

the extent that answer would reveal information subject to the presidential communications privilege.

That's not coaching. That is an instruction.

MS. LEONARD: There is -- there is no question pending. Please limit your speaking objections and instructions to the questions that are asked.

Q. Mrs. Voorhies, who is this a communication with?

A. I don't know.

Q. This was obtained from your phone?

This was produced by your counsel, Ms. Voorhies.

A. I'm not familiar. I don't recall this -- this string of messages.

Q. If you look at this -- it's a very long message, correct? It appears to be one continuous message for the first five pages.

A. Yeah. I don't know who this is from.

Q. Do you see the signature -- at the end of the message, there's a statement that says, Best, Steve.

A. I see that. I don't know if that -- this was something copied and sent or if this was him -- like, someone actually signing this message.

Page 152

I don't know why it would be in my phone under J.

Q.   Do you know who is listed in your Signal chat as J?

A.   No.

Q.   You don't know --

A.   Just listed as J?

Q.   Sure.  I -- I can see that but it did come -- according to your counsel, this came from your phone.

A.   I don't know who this is.

Q.   Okay.

MS. LEONARD:  Why don't we take a break and go off the record and we will find out.

THE VIDEOGRAPHER:  All parties in agreement with going off the record, we're going off the record at 2:25 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are going back on the record at 2:35 p.m.

Q.   (BY MS. LEONARD) Ms. Voorhies, before we took the break, you were looking at Exhibit 140 which appears to be a Signal chat screenshot involving someone named J.

Have you been able to investigate the information that was on your phone?

Page 153

A.    I looked on my phone and there is not a name other than J on it.

Q.    Do you have any understanding as to who sent this message?

A.    Based on reading the message, it appears Steve sent this message.

Q.    And this appears as a Signal chat that does appear on your personal phone?

A.    I did not look at my personal -- I did look at my personal phone just now, yes.

Q.    And do you -- you believe that J may be Jamal Daniel?

A.    I believe this is Steve Hanna.

Q.    Sending the message?

A.    Yes.

Q.    Do you know who J is as the recipient?

A.    No.  I believe that is Steve Hanna.

Q.    Got it.  Sorry.

That Steve Hanna would appear as J?

A.    I -- his -- it's not in my phone that way but that is the -- that is the only thing I can come up with here.

Q.    Okay.  And this would be a message that you received on or around April 4th, 2025?

A.    Yes, it appears so.

Page 154

Q. Okay. And in this message, Steve is talking about a call with CL.

Do you understand that to mean Corey Lewandowski?

A. Yes, that's what I would understand.

Q. And he's talking about the future of FEMA.

Do you see that?

A. I see that.

Q. And reducing from 20,000 employees?

A. I see that, uh-huh.

Q. And if you look on page 366, there's a reference to a potential look for a downsized organization.

Do you see that?

A. Yes, I see that.

Q. So if you received this on April 4th, 2025, that would have been before you went to the Department of Homeland Security, correct?

A. That is correct.

Q. So you were not a federal employee at the time of any form?

A. Correct.

Q. And so prior to your going to the Department of Homeland Security, you understand that Corey Lewandowski was talking about a downsized organization for FEMA?

Page 155

A.    It appears that he was speaking to someone about a downsized organization.  I do not recall having that conversation with him, as I've testified before.

Q.    But it is possible that you did?

A.    It's possible.  I do not recall.

Q.    Okay.  And here he is having that conversation with someone that you worked with, correct?

A.    This is a -- it appears to be what he had a conversation with with Steve.

Q.    And so it's possible that when you talked to Corey Lewandowski about what your role was going to be, he said similar things about a downsized organization for FEMA?

A.    It's possible.  I don't recall that.

Q.    Okay.  Let's pull up the next.  This one is going to be 141.

              (Exhibit Number 141 marked.)

Q.    (BY MS. LEONARD) This is Bates number 237 starting.  This is Exhibit 141, is a Signal chat with Erin Hoffman that was produced to us by your counsel and my questions -- oh, thank you -- are going to pertain to page 275, if you could turn to page 275.

              First of all, Erin Hoffman is someone that you worked with while you were at DHS?

Page 156

A.   Yes.

Q.   Who is Erin --

A.   That's correct.

Q.   -- Hoffman?

A.   She was in the resilience division at FEMA.

Q.   Was she a political appointee?

A.   No, she was a career.

Q.   Okay.  And is she someone that you -- there's a -- the length of this chat is long, I would say.

A.   Yes, uh-huh.

Q.   There are many pages here.

You spoke with her often?

A.   Yes, very frequently.

Q.   Okay.  Regarding work and not work?

A.   Correct.

Q.   Okay.  If you look at page 275, there's a message from her that says, Have I ever talked to you about Clean Slate?

Do you see that?

A.   Yes, I see that.

Q.   And do you know what she's referring to?

A.   I -- if I recall, there was a project they had done well before we were there.  I don't remember what year, I am not sure if she ever told me what year, about looking at FEMA from the bottom up.

Page 157

Q.    So evaluating the functions that FEMA performed from the bottom up?

A.    Yes, that is my understanding.

Q.    To assess what was necessary?

A.    Yes.

Q.    Okay.  And you say, Sounds like FEMA doing more than their statutory requirements right off the bat.

What were you referring to?

A.    I don't remember.

I don't know.  It doesn't seem to have any reference to that.

Q.    So you don't recall what that was referring to?

A.    I don't recall.

Q.    And on the next page, she's describing some of the findings of this earlier project and then there's this message here that says, But some are def in line I think where we're -- where we'd want to be, a much leaner FEMA.

Do you see that?

A.    Yes, I see that.

Q.    So you were discussing a much leaner FEMA with Erin Hoffman as of October 2025?

A.    I think that was as it pertained to the Clean Slate project.

Q.    As it pertained to FEMA, correct?

Page 158

A.   Yes, and the Clean Slate project that she mentioned, yeah.

Q.   Well, then you say in response, I feel like a focus group tasked with how to run FEMA with 200 people or less, like a dramatic difference, would tell you how to do this.  To me, it's not about reducing a few pins here or there or even closing out the dozens of, quote, office of, end quote, which are performing some minor function.  It's really a clean slate approach, like if no statute existed, how we would build it from scratch as a start-up.

Do you see that?

A.   I see that.

Q.   So that is something that you were discussing with Erin Hoffman as of October 2025?

A.   That was a discussion that she was referencing, the Clean Slate project that they had done, and I believe that this is a typo about the 200 people or less.

Q.   You think it should have been more?

A.   Yeah.  I don't recall what that -- what that number should have been but 200 seems unreasonable.

Q.   You can't perform FEMA's functions with 200 people, correct?

A.   No.  Agreed.

Page 159

Q.   Okay.  But here we are again talking about a much smaller FEMA organization so does this refresh your recollection that you understood one of your purposes of your job was to help implement the goal of downsizing FEMA?

A.   The purpose of my job was to help find some efficiencies in FEMA.

Q.   And yet, we have communications in which downsizing FEMA is being referenced repeatedly during 2025?

A.   In learning about FEMA, we found dramatic inefficiencies in FEMA.

Q.   That led you to believe that FEMA should be operated with a much smaller staff?

A.   I think it could have been.

Q.   And was it your idea to cut it in half?

A.   That was not my idea, no.

Q.   And you say it could have been operated with a much smaller staff based on your extensive experience in disaster relief?

A.   Based on what I learned while I was there.

Q.   Based on your extensive experience in emergency management?

A.   Based on what I learned while I was there.

Q.   That you believe FEMA could be operated with a

Page 160

smaller staff?

A.   I do believe it could be operated with a smaller staff.

Q.   And you communicated that to others in DHS leadership?

A.   I received communication from both careers and politicals that all felt the same.

Q.   And you communicated that to others in DHS leadership?

A.   That was communicated by everyone.

Q.   In --

A.   My -- my observations were communicated to both DHS and FEMA.

Q.   And in 2025, indeed, there was, in fact, a plan to dramatically downsize FEMA put in place by the DHS leadership, correct?

A.   I do not recall any plan being put in place by DHS leadership.

Q.   To cut FEMA in half, in fact?

A.   I recall that being a recommendation by the FEMA Review Council in their draft.

Q.   And you don't know who wrote it?

A.   I do not know who wrote that.

Q.   Okay.  In fact, you had conversations with Karen Evans about implementing a 50 percent cut to FEMA

Page 161

for fiscal year 2026.

Do you recall those conversations?

A.   I do not.

Do you have something to show me?

Q.   I do.  Mark this as the next.  Call this 142.

(Exhibit Number 142 previously

marked.)

Q.    (BY MS. LEONARD) 142 is a compilation of Karen Evans' handwritten notes that we were given by government counsel and I'm going to ask you about the conversation on December 4th.  I can give you the page number.  One minute.

It is last three digits 328.

A.   Mine starts on 487.

Q.   This is the compilation we were given so if you keep going, you'll see -- you can find December and the numbers are in there, 425328.

These might be assembled in a -- they might be assembled out of Bates order, but --

MR. CAMPAGNA:  The page with the December 4th --

MS. LEONARD:  Yes.

MR. CAMPAGNA:  -- calendar?

MS. LEONARD:  It's -- yes.  It's --

A.   Okay.  Is that this one?

Page 162

MR. CAMPAGNA:  Let me see.

A.   It's, like, stapled in there.  I can't see --

Q.   That is it.

A.   -- the pages in there.

Q.   That is it.  Thank you.

So this is December 4th.  These are the notes from Karen Evans' planner that we were given and if you see, in the middle of the left page, there's a political appointee meeting, 11:30.

Do you see that?

A.   Yes.

Q.   And underneath that, there's a Stephanie with an underline.

Do you see that?

A.   Yes.

Q.   Do you understand that Ms. Evans was working with someone named Stephanie Dobitsch at the time?

A.   Yes.

Q.   Okay.  And then under that, it says, Looking at all CORE dates.

Do you see that?

A.   Yes, I think so.

Q.   Okay.  And then below the numbered list, there is, Talked to Kara, re, the number is 11,383.

Page 163

Do you see that?

A.    I see that.

Is that in reference to this 11,176 up here?

Q.    Do you understand what 11,383 is --

A.    I do not --

Q.    -- reflecting?

A.    -- recall that number.

Q.    Do you have a recollection that that is the total number of staff that was recommended in the FEMA annual staffing plan?

A.    I do not recall that number --

Q.    And that is --

A.    -- from the staffing plan.

Q.    -- approximately a 50 percent cut in the total number of staff of FEMA at the time?

A.    Is that from the text message that you showed earlier?

Q.    I'm asking.  11,383 would be --

A.    Yeah.

Q.    -- roughly 50 percent?

A.    Okay.

Q.    Is that your understanding?

A.    I think that it was 22,000 so roughly.

Q.    Okay.  Do you have a recollection on

Page 164

December 4th of talking to Karen Evans about the FEMA annual staffing plan and the 50 percent cut?

A.   I do not have a recollection of that.

Q.   And it says, Will cc her, in parentheses.

Do you see that?

A.   I can't tell what that says.

Q.   So my read is, Talked to Kara, re, the number is 11,383.

And top line, Will cc her.

A.   Okay.

Q.   If I told you that Karen Evans testified that she copied you on the FEMA annual staffing plan that was submitted to DHS with a 50 percent cut to the staff, would you have any reason to believe she was not telling the truth?

A.   I don't recall that plan.

Q.   You don't recall receiving a plan to cut the agency that you were working on in half?

A.   I do not recall seeing a plan for that.

Q.   Let's take a look.

And you don't recall having this conversation with Karen Evans soon after she became the SOPDA?

A.   Not specifically, no.

Q.   You were aware at the time that there were

Page 165

plans being discussed to downsize FEMA, correct?

A. I was aware that the FEMA Review Council had published -- or not published but put in a recommendation for a 50 percent cut in their report.

Q. Ms. Voorhies, you were aware that within DHS there were plans being discussed to downsize FEMA at the time -- as of early December?

A. I do not recall any discussions within DHS.

Q. You don't recall discussions of dramatic downsizing to the agency that you were working on?

A. Not specifically that I recall.

Q. And you don't recall having conversations about using the CORE and the expiration of the NTE dates for the CORE to achieve those plans?

A. I recall that the CORE was a workforce that had certain time periods based on disaster needs. I recall that.

Q. And you were aware that approximately half the workforce at FEMA was comprised of the CORE funded by the Disaster Relief Fund, right?

A. I am aware that there were over 10,000 CORE.

Q. And so if you were going to reduce the size of FEMA in half, you would need to take action with respect to the CORE, right?

A. As their terms would come up, if there were

Page 166

no major response -- response needed from them, then I would imagine that they would -- they would be reduced.

Q.   And what percentage of CORE were generally extended when their NTE dates come up?

A.   I'm not -- I don't know.  I was not involved in the extensions.

Q.   You didn't -- you weren't aware that routinely, the CORE, over 90 percent were extended?

A.   I'm not aware of that figure, no.

Q.   And sitting here today, it's your testimony under oath that you don't recall conversations within DHS about plans to dramatically downsize FEMA at the end of 2025?

A.   I do not recall plans within DHS being discussed to dramatically downsize it.

Q.   But it's possible there were such conversations, you just don't remember, right?

A.   That is possible.

Q.   Okay.  Let's take a look at the annual -- FEMA's annual staffing plan.

(Exhibit Number 17 previously marked.)

Q.   (BY MS. LEONARD) So this is Exhibit 17 previously marked.  This is a document that Karen Evans sent to DHS on February -- sorry,

Page 167

December 4th, and it is -- do you recognize this?

A. I do not.

Q. Do you see the number at the bottom there, 11,383?

A. Yes, I see this.

Q. And do you see that's the same number that were -- that was in Karen Evans' notes following, Talked to Kara, re, the number is 11,383?

A. Yes, I see that.

Q. So does this refresh your recollection that there was -- that you talked to Karen Evans about the FEMA annual staffing plan which was going to total 11,383 positions at FEMA?

A. It -- it truly doesn't, no.

Q. And you don't recall whether you were copied on Karen Evans' transmission of this plan to DHS?

A. I do not recall being copied on it.

MR. CAMPAGNA: Excuse me, Ms. Leonard. You said Karen Evans sent this to whom?

MS. LEONARD: That is a very good question. We have not --

MR. CAMPAGNA: Oh, I thought --

MS. LEONARD: The emails have not been produced to us.

MR. CAMPAGNA: Okay.

Page 168

MS. LEONARD: She's -- she transmitted it to DHS.

MR. CAMPAGNA: To DHS. Okay. Thank you.

Q. Were you there when DCOS Guy told Karen to -- Karen Evans to include the 50 percent cut in the annual staffing plan?

A. I -- no, I don't believe I was privy to a conversation about that.

Q. You don't recall one of the sync meetings in which DCOS Guy instructed Karen Evans to do that?

A. I don't recall that.

Q. But you are aware that there were conversations about 50 percent cuts to FEMA staffing before this point in time?

A. I'm aware that there -- before what point in time?

Q. December 4th, 2025.

A. I'm aware that they had put it in the draft proposal -- or the draft recommendations from the FEMA Review Council.

Q. And there were also conversations about RIFs at FEMA that would total 50 percent cuts?

A. At -- based on the screenshots that you shared with me today, yes.

Page 169

Q.   Do you think it's a coincidence that the FEMA annual staffing plan included the same 50 percent cut as the draft report and the RIF plans?

A.   I have no idea.

Q.   That wasn't your decision?

A.   That was not my decision.

Q.   And still no recollection of who at DHS was ordering the 50 percent cut?

A.   I don't have any recollection of DHS ordering a 50 percent cut.

Q.   Or who was doing it?

A.   Anyone, whether it be FEMA or DHS, I have no recollection of anyone ordering a 50 percent cut.

Q.   But you knew that FEMA and the career staff were not happy with the proposed plan to downsize the disaster relief employees, didn't you?

A.   I knew that some people at FEMA actually suggested that we had too many employees there and others felt that -- I don't know what they felt. Seemed to express that they did not want to lose any people.

Q.   During this time in fall 2025, you were aware that people at FEMA were not happy with the plan to dramatically downsize FEMA?

MR. CAMPAGNA:  What people are you

Page 170

referring to?

MS. LEONARD:  Is that an objection?

MR. CAMPAGNA:  Yes.  I don't understand the question.

Q.    Do you understand the question?

A.    No.  What people are you referring to?

Q.    You are aware that there were individuals at FEMA in the career employees who were not happy with the plan to downsize FEMA, correct?

A.    I'm sure there were individuals, both career and political, that did want to downsize and did not want to downsize.

Q.    You were aware, Ms. Voorhies, that people were quote, freaking out about the plan to downsize the disaster employees, right?

A.    What quote is that from?

Q.    You.

A.    Possibly.

Q.    Okay.  Let's take a look.  We'll mark this one as -- actually, give me a second.  It is page 27 that I'm -- here we go.  We can mark this as 143.

(Exhibit Number 143 marked.)

Q.    (BY MS. LEONARD) There you go.

MR. HALL:  Counsel, what page -- what page and what document are we -- are we about to

Page 171

discuss?

MS. LEONARD:  Bates number 27.

Q.   Ms. Voorhies, I've handed you a document that you produced to us today.  It appears to be a WhatsApp chat with Corey Lewandowski.

Do you see that?

A.   Uh-huh.  Yes, I see this.

Q.   And the dates are all October 17th, 2025?

A.   Yes.

Q.   Okay.  So as of October 20, 2017 -- October 17th, 2025, you say here, FEMA is freaking out about the reduction in DRF-funded personnel.  Disaster recovery is 18,000-plus people.

Do you see that?

A.   This was during the shutdown.

Yes, I see this.

Q.   FEMA is freaking out about the reduction in DRF-funded personnel.  Disaster recovery is 18,000-plus people.

A.   That's correct.

Q.   You're referring to the plan to cut FEMA by 50 percent?

A.   I'm not.  This is in reference to the downsizing of the -- or not downsizing.  The reduction in the personnel that would be working

Page 172

during the government shutdown.

Q.    And the RIF that was planned during the government shutdown that you had discussed in the earlier screenshots, that would have cut 50 percent of the people?

A.    This was not related to any 50 percent cut.

Q.    If we are going to do this, I think we should push our narrative sooner rather than later so the press doesn't blame S1.  It is on Congress, not her.

Do you see that?

A.    That's correct, because of the government shutdown.

Q.    And the plan to RIF 50 percent of FEMA staff during the shutdown?

A.    That was not related to any RIF.

Q.    This was not related to RIF or to the plan to cut the disaster recovery staff?

A.    This is related to the government shutdown and the wind-down of the DRF because there were insufficient funds to continue operations.

Q.    What amount of money was in the DRF at the time?

A.    I don't recall the exact number in the DRF at the time.

Q.    Okay.  It was more than $9 billion?

Page 173

A.    Possibly.

Q.    Okay.  More than sufficient funds to fund disaster relief operations and the CORE staff at the time --

A.    If you --

Q.    -- correct?

A.    -- look at the first 30 days after an incident, you can spend up to 30 -- $3 billion in the first 30 days.  There were significant liabilities already outstanding to the states in excess of 9 billion.

Q.    And so a plan to cut FEMA's staff, including the CORE staff, by 50 percent would have meant that there was absolutely no way FEMA could have performed any of the functions that it needed to perform in -- even in the event of one disaster, right?

A.    This was not in reference to any cutting of staff.  This was reduction in DRF activities during --

Q.    But based on -- sorry.

A.    -- during the shutdown.

Q.    Based on what you just told me, you know that a 50 percent cut would have meant that it was impossible for FEMA to perform its functions even with one disaster, right?

Page 174

A.    The funds to support FEMA would not have been able to be funded -- or to fund the states during a disaster -- 30 days after a disaster.

The cost of the CORE personnel is factored into that Disaster Relief Fund.

Q.    It's funded by the Disaster Relief Fund --

A.    That's correct.

Q.    -- actually?

A.    Yes.

Q.    Not subject to the shutdown?

A.    The Disaster Relief Fund was -- is funded through an anomaly in the appropriation every year so there was no additional funds coming during the government shutdown.

Q.    The disaster relief-funded positions are not subject to the government shutdown, correct?

A.    I don't know what the positions are subject to.

I know that the Disaster Relief Fund is funded annually in the appropriation.  It also has -- it is able to continue year after year but it is funded by the annual appropriations.

Q.    And you don't know whether CORE employees at FEMA were exempted from the furlough or not?

A.    I don't know, exempted, accepted, I don't

Page 175

know what these terms are.  I don't recall.

Q.    You don't -- you don't know whether CORE employees at FEMA were actually working through the shutdown or not?

A.    I don't believe they could be furloughed. They were working through the shutdown and they were being paid and the Disaster Relief Fund was draining and that's what this is in reference to.

Q.    So the reduction in Disaster Relief-funded personnel --

A.    DRF-funded, correct.

Q.    They are freaking out about the reduction in Disaster Relief-funded personnel was not referring to any disaster relief-funded personnel who were not working during the shutdown because they were working, correct?

A.    I believe they were working.

Q.    And this point in time, October 2025, we've now seen multiple references to a plan to cut FEMA staff by 50 percent, correct?

A.    This is not related to a 50 percent cut in staff.  This is related to a wind-down in the DRF activities because there were insufficient funds in the DRF if you consider the liabilities outstanding.

Q.    If we are going to do this?

Page 176

A.    If we were going to wind down the DRF-funded personnel --

Q.    And that was on --

A.    -- and DRF activities.

Q.    That was on the table at that time?

A.    There was discussion about how long that they could continue and if money was to go to the states, what would be left to fund anything else.

MR. HALL:  Counsel, I'm sorry to do this.  Can I get clarification?  What was the exhibit number for that one?

MR. CAMPAGNA:  143.

MS. LEONARD:  143.

MR. HALL:  Thank you.

Q.    As of December 5th, the day after Karen Evans sent the FEMA annual staffing plan with a 50 percent cut, you were aware that there were conversations going on regarding rightsizing the CORE?

A.    I don't recall.  Do you have a document to show me?

Q.    I do.  You don't recall that?

This one is -- you don't recall?

A.    It's a very generic statement so I'd like to know what we're referring to.

Q.    Do you recall that there were conversations

Page 177

regarding downsizing the number of CORE employees happening at -- between DHS and FEMA at the end of December?

A.    I don't recall any specific conversations.

Q.    Do you recall any general conversations about the idea of downsizing the CORE?

A.    I recall the conversations about the CORE personnel terms running up.

Q.    But you don't recall any conversations about downsizing the CORE as part --

A.    I don't recall.  If you have something to show me, I'm happy to look at it, though, to help refresh my memory.

Q.    This wasn't that long ago, was it?

A.    What, four, five months, six months ago --

Q.    And --

A.    -- so, I mean, that's a pretty significant amount of time in my memory.

Q.    And this is the agency -- the only agency you were working on at -- at the Department of Homeland Security, that was FEMA, right?

A.    That was FEMA, yes.

Q.    And you were brought in as part of a plan as a subcontractor through DOGE to downsize FEMA, Ms. Voorhies?

Page 178

A.   I was not a subcontractor to DOGE.  I was not brought in to downsize anything.

Q.   That's your testimony under penalty of perjury here today, right?

A.   My recollection is I was not brought in to downsize anything and I was not brought in under DOGE.

Q.   You were not brought in to implement -- help implement the plan to downsize FEMA and convert it into a smaller organization?

A.   I was brought in to find efficiencies and improve FEMA.  That is my recollection.

(Exhibit Number 20 previously marked.)

Q.   (BY MS. LEONARD) Okay.  Let's look at Exhibit 20.

So this has previously been marked as Exhibit 20.  This is an email from Stephanie Dobitsch on December 5th to Karen Evans, the day after the notes that we saw where she had talked to you with the number being 11,383 for the total number of FEMA employees, and in this top email which you are copied on, Stephanie talks about, We are planning several meetings next week to dig into this as part of the plan you and I discussed for CORE rightsizing.

Do you see that?

Page 179

A.   I'm sorry.  May I read this for a moment?

Q.   Sure.

MR. HALL:  Ms. Leonard, while she's reviewing that -- okay.  Thank you.

A.   Okay.  Go ahead.

Q.   Okay.  So this -- you see this email from Stephanie Dobitsch to Karen Evans on December 5th, 2025?

A.   I see, yes, in a string of -- yes.

Q.   Right.

Following up on the first email, it looks like it was sent on December 4th --

A.   Uh-huh.  Yes.

Q.   -- at 5:00 p.m. which presumably is at some point after the meeting that we saw the notes reflect in Karen Evans' planners.

You recall those were on December 4th?

A.   Okay.

Q.   Okay.  And here, you're copied on this email from Stephanie Dobitsch, correct, the top one?

A.   Yes.

Q.   Are you copied on all of them, actually?

A.   Yes, I believe so.

Q.   Do you have any reason to believe you didn't

Page 180

receive these emails at the time?

A.   I -- I'm sure I did.  I received thousands of emails.

Q.   And it -- Stephanie says, We're planning several meetings next week to dig into this as part of the plan you and I discussed for CORE rightsizing.

Do you see that?

A.   Yes, I see that.

Q.   And so as of December 5th, the day after that, Karen Evans sent an annual staffing plan for FEMA to DHS cutting FEMA in half.

You see that there is a discussion about meetings for CORE rightsizing?

A.   It appears that Karen Evans and Stephanie Dobitsch had a discussion about rightsizing.

Q.   And you were aware of that because you were copied on this?

A.   I was copied on this.

Q.   Okay.  In fact, there was a point --

A.   I do not recall that email, for the record.

Q.   Sure.

In fact, there was a plan to reduce the COREs by NTE date after the expiration of FEMA's authority to extend those COREs.

Do you recall that?

Page 181

A.   I recall there being a review that Karen Evans set up to look at each CORE as they came through by NTE date.

Q.   Do you recall that there was a plan to reduce the COREs by NTE date?

A.   I don't recall a particular plan.

Q.   Were you involved in discussions between DHS leadership and Karen Evans of a plan to reduce the COREs by NTE date?

A.   I don't recall being involved in those discussions.

Q.   But it's possible that you were?

A.   Anything is possible.

Q.   Is anything possible or is the fact that there was a plan to cut FEMA by 50 percent followed by implementation by reducing the CORE by NTE date, that's possible, right, Ms. Voorhies?

A.   Anything is possible.

          (Exhibit Number 24 previously marked.)

Q.   (BY MS. LEONARD) Okay.  Let's look at Exhibit 24, and you can take a moment to read.  It's a two-side email chain.

A.   Okay.

Q.   Okay.  You've been handed previously marked 24. It starts with an email from Karen Evans to Stephanie

Page 182

Dobitsch on December 4th.

Do you see that, on the back?

A.   Yes.

Q.   And you're copied on this along with Will Bilicic?

A.   Yes.

Q.   Do you see that?

A.   Uh-huh.

Q.   And it's follow-up on items from a meeting that is referred to here.

Do you see that?

A.   Yes, I see that.

Q.   Okay.  And do you have any reason to believe you didn't receive this email when you were copied on it at the time?

A.   I received thousands of emails so I just don't recall this one particularly, but...

Q.   Okay.  So -- and what Karen Evans is writing to Stephanie Dobitsch here, you see that she says, Number 1, we're looking at all CORE dates.

Do you see that?

A.   I see that.

Q.   And then number -- as part of that, little part B, Proposed plan to reduce COREs by date.

Do you see that?

Page 183

A.   Yes, I see that.

Q.   And then, Meeting is being set up regarding the delegation for COREs.

Do you see that?

A.   Yes, I see that.

Q.   And so you are aware at the time that there was conversation regarding whether FEMA was going to receive a delegation of extended authority to renew COREs or not, right?

A.   I recall there being discussion about that toward the end of December.  I did not recall it being this early.

Q.   And at the bottom, Updates to -- number 7, Updates to CORE renewal memo to S1.

S1 is a reference to Secretary Noem, correct?

A.   Yes, uh-huh.

Q.   Okay.  Do you know what this is referring to, the CORE renewal memo to S1?

A.   I do not believe I ever saw a memo.  That was -- that was a structure that was put in place by Karen Evans so I don't -- I wasn't involved in that.

Q.   You were reviewing --

A.   I was not -- I was not reviewing CORE renewal memos.

Page 184

Q.    You don't know what this CORE renewal memo to S1 refers to?

A.    I don't believe I ever saw a copy of a CORE renewal memo.

Q.    But as of December 4th, you were copied on this email and were aware that there was a discussion of a proposed plan to reduce COREs by date?

A.    I am reading the same thing you are so I do not recall it but, yes, I do see that.

(Exhibit Number 25 previously marked.)

Q.    (BY MS. LEONARD) Okay.  Let's look at next. This was previously marked as 25.

I can tell you this is how this document was produced to us.

A.    Okay.

Q.    So this talking points document refers to someone being tasked to develop a strategy to cut the FEMA workforce by 50 percent over fiscal year 2025.

Do you see that?

A.    Yes, I see that.

Q.    And --

A.    Fiscal year '26, I believe.

Q.    Sorry.  Fiscal year '26, correct, and then some specific cuts by employee type.

Do you see that?

Page 185

A.   Yes, I see that.

Q.   Does this refresh your recollection --

A.   I've never --

Q.   -- that the --

A.   -- seen this document before.  I do not believe I've ever seen this document before.

Q.   But does this refresh your recollection that there were conversations regarding cutting the FEMA staff in half by -- over fiscal year 2026?

A.   I was not involved in conversations around this memo.  I don't know what this is.  I've never seen this before.

Q.   Did you have conversations with Karen Evans about cutting the FEMA staff in half over fiscal year 2026?

A.   The only conversations that I'm aware of are the ones that you've just shown me.

Q.   And you don't recall any others?

A.   I don't recall any others.  I don't recall this either.

Q.   Were you aware that the FEMA staff, the career staff, had recommended a very different annual staffing plan than the one Karen Evans forwarded to the Department of Homeland Security?

A.   I don't recall their staffing plan.

Page 186

Q. You don't recall that the FEMA career staff had recommended -- through the programs and the regions, had recommended a total of approximately 23,000 employees?

A. I don't recall.

Q. Did you review that before Karen Evans sent the plan cutting FEMA's staff in half to DHS?

A. I don't recall having seen the plan before she sent -- that you just showed me before she sent anything to DHS.

Q. And you recall that DHS had generally sent out a request through the CHCO DHS to all the components to compile these annual staffing plans. Does that sound familiar?

A. It does not. I was not involved with the CHCO communication between DHS and FEMA.

Q. You were involved in the annual staffing plan, though?

A. Not -- not this, no.

Q. The notes from Karen Evans show that she had a conversation with you about what the final number would be in that annual staffing plan on --

A. She may have --

Q. -- December 4TH?

A. She may have given me a number based on her notes, I don't know, I don't have record of that, but

Page 187

I was not involved in anything like this, no detail like that.

Q. But do you recall that the components were submitting annual staffing plans to DHS generally at the end of 2025?

A. I don't have specific recollection of there being staffing plans that -- particularly that I would have seen.

Q. And do you know where -- what other part of the government those staffing plans would have been sent to?

A. No, I don't.

Q. Okay. So you're not familiar with the requests by OMB and OPM for agencies to provide an annual staffing plan by December of 2025?

A. No, I'm not familiar with that requirement.

Q. And were you aware that after collecting the information from the FEMA programs and offices at the end of November, there was a second request that was sent out on December 23rd to engage in a further staffing analysis by FEMA?

A. I don't recall that.

Who sent the request?

(Exhibit Number 29 previously marked.)

Q. (BY MS. LEONARD) This is the December 23rd email that was subsequently -- well,

Page 188

we can start with Exhibit 29.

Were you aware that there was a December 23rd email sent out to the FEMA components to engage in a bottoms-up staffing analysis?

A.   I recall there being an email that was sent out inside FEMA on a staffing plan.  I don't appear to be copied on this.

Q.   But that sounds familiar around December 23rd, that there was an email that was sent out?

A.   I recall there being something leaked to the press from an email that was sent out within FEMA about a staffing plan.

Q.   And you were then involved in the discussions about how to respond to the press?

A.   I'm sure I was.

Q.   Do you also recall being involved in the conversations regarding what the December 23rd email should say?

A.   I recall there being drafts circulated amongst a group of people and I believe I saw a draft of the text.  I don't -- I recall that there was an attachment that I could not open.

Q.   And you don't recall that that attachment included a 50 percent target cut for the components?

Page 189

A.    I could not open the attachment.

Q.    But you recall that there was an attachment?

A.    I recall that there was an attachment, either intended to be attached or attached, but I could not open it.

(Exhibit Number 18 previously marked.)

Q.    (BY MS. LEONARD) Okay.  Let's take a look at what was previously marked as 18 and see if this helps refresh your recollection.

And this is a -- I will say a quite long email chain and the email I'm going to ask you about appears on the one -- fourth page.  It's 7336.

A.    Okay.

Q.    Exhibit 18 is an email chain discussing the text of what eventually became the December 23rd email that I just showed you.

Does that sound familiar?

A.    I'm sorry.  Can you say that again?

Q.    Sure.

This appears to be an email chain discussing the text of the December 23rd email that I just showed you?

A.    Okay.  Can I read through this?

Q.    Sure.

A.    Okay.  This appears to be, as I mentioned, a

Page 190

draft that was circulated prior to them sending it.

Q. And if you look on Bates number 7336, there's a Wednesday, December 17th email sent from Karen Evans at 9:51 p.m. on which you are copied.

Do you see that?

A. Yes, I see her adding in Joe Guy and myself.

Q. Correct.

So she took off Stephanie and added Joe Guy and added you.

Do you have any reason to believe you didn't receive this?

A. No.

Q. Okay. And Karen Evans says here, I want to highlight the 50 percent is what has been used internally.

Do you see that?

A. There is no guide -- document guidance requiring 50 percent, yes.

Q. Regarding the 50 percent?

A. Yeah, that was in the leaked report.

Q. That was in the leaked report.

So do you -- did you understand that that was a reference to the Review Council report?

A. Yes, that's what I would understand.

Q. Okay. And the number 11,500 is also what we

Page 191

have provided to OPM/OMB at a high level but we haven't made that public.

That was, in fact, true, correct?

A. I don't know what they provided to OPM/OMB.

Q. 11,500 would be a 50 percent cut to the -- roughly 50 percent cut to the FEMA staff, correct?

A. Okay. I don't know what they provided to OPM/OMB so if you're asking me if that's correct, I cannot tell you if that's correct or not.

Q. You're not aware of whether the 11,500 number for FEMA's total staff for fiscal year 2026 was provided to OPM or OMB?

A. I was not copied on any communication to OPM/OMB.

Q. Were you involved in conversations with OPM and OMB about FEMA staffing?

A. No, not that I recall.

Q. At any point in time?

A. I don't even know who OPM is so, no, I don't recall that.

Q. The Office of Personnel Management?

A. Right. I don't -- I did not have a contact there so, no, I was not involved with any conversations with OPM about FEMA personnel.

Q. Do you have any understanding as to why

Page 192

Ms. Evans was copying you on -- or adding you to this email?

A.    Must have been for awareness.

Q.    Do you recall discussing this December 23rd email with Joe Guy?

A.    Not -- not specifically, no.

Q.    What about the fact that FEMA was asking its staff to engage in a second round of staffing analysis having just done the same exercise in November of 2025? Do you -- were you aware of that?

A.    I was aware of this email as I was copied on it.

Q.    Were you aware that the prior staffing analysis resulted in a number of employees necessary to perform FEMA's functions of 23,000 people?

A.    I don't recall that specific analysis.

Q.    And then FEMA was requiring them to engage in the same staffing analysis again but this time attaching a spreadsheet that had a 50 percent target cut?

A.    This is -- what this appears to be is them requiring them to perform an analysis in December -- on December 23rd.

Q.    With a deadline of December 31st?

A.    I haven't read the deadline.

Q.    But you couldn't open the spreadsheet

Page 193

attachment so you weren't aware that that attachment included a 50 percent target cut?

A.   I was not aware that there was a 50 percent mention in that spreadsheet until the press reported on it.

Q.   So another mention of the 50 percent cut but you -- you still testify that you were not aware of a plan to reduce FEMA's staff by 50 percent, that's your testimony?

A.   I was not involved in this production of this plan or the writing of the FEMA Review Council report recommendation for a 50 percent cut.

Q.   You talked to Karen Evans about the FEMA annual staffing plan and the number 11,383 before she submitted it to DHS, correct?

A.   She told me a number of 11,383 based on her notes.  I don't recall that directly.

Q.   Around the same time, you were discussing whether authority that had previously been delegated to FEMA to extend the CORE position should be renewed.

You do recall that?

A.   I remember Karen Evans asking me if it made sense to have the -- that delegation of authority renewed or not.  Her instinct was it should not.

Q.   And what was your response?

Page 194

A.    I agreed.

Q.    Are you sure you didn't tell her?

A.    I do not recall instructing her of anything like that.

Q.    One way or the other but you may have?

A.    I really do not recall that.  I believe that was her suggestion, that she didn't feel the authority needed to be delegated.

Q.    And if the authority wasn't delegated, then everything had to be reviewed by S1, right?

A.    Everything had to be reviewed by Karen Evans.  Karen Evans then designed a process to remit it up to DHS for concurrence.

Q.    Under DHS policy, if FEMA didn't have renewed authority to extend the COREs, FEMA could not extend them without S1 approval, correct?

A.    I have never seen a policy saying that.

Q.    There was, in fact, a memorandum for S1 approval of the delegation of authority that had been prepared by early December 2025.

Do you recall that?

A.    I don't recall that.

Q.    And, in fact, you're the person who reviewed it within the Office of the Secretary.

Do you recall that?

Page 195

A.   I don't recall that.  Happy to look at a document, though.

(Exhibit Number 23 previously marked.)

Q.   (BY MS. LEONARD) This is Exhibit 23.

A.   Am I copied or included on this email somewhere?

Q.   I don't believe you are but you're referred to.  Do you see that?

A.   Yeah.  I believe this is the Deputy Chief of Staff at FEMA saying that he was clear and to make sure that I had an opportunity to review it for packaging -- before packaging for signature.  I don't recall reviewing it.

Q.   Okay.  Well, then you anticipated my next question which was so -- but let's just break that down because this is the memo that was drafted for S1 approval of the extended delegation of authority to FEMA to renew the COREs.

A.   Okay.

Q.   You don't recall reviewing that document?

A.   I do not.

Q.   It's possible that you did?

A.   I do not recall reviewing it.

Q.   But it's possible that you did?

A.   I do not recall reviewing it.  Anything is

Page 196

possible.  I don't know what else you want me to say.

Q.    Well, you are the person who was working at the Department of Homeland Security Office of the Secretary with response -- some responsibility for FEMA and you were reviewing materials that were prepared for S1 approval at the time, correct?

A.    Yes.

Q.    And this is a memo that would have gone to S1 for approval so is it a reasonable thing to understand that you would have reviewed that memo?

A.    It would be reasonable to assume I had reviewed it.

Q.    And this email, in fact, says, Please allow Kara opportunity to review before packaging for signature?

A.    My name is pronounced Kara.

Q.    Kara.  Sorry.

This says, Please allow Kara opportunity to review before packaging for signature?

A.    That is what it says.

Q.    But you don't have a recollection as to whether or not you did review it?

A.    That's true.

Q.    And you do have a recollection of having a conversation with Karen Evans about whether that

Page 197

delegation should be extended?

A.   I do recall having conversation with Karen Evans about that, yes.

Q.   Do you recall whether that conversation was before or after you looked at a memo discussing that delegation?

A.   I don't believe I looked at a memo discussing that delegation.

Q.   So you made a recommendation regarding whether FEMA should be extending CORE renewal without looking at the memo that had been prepared by FEMA on that topic?

A.   I made a recommendation based on a conversation and I don't even know that I would categorize it as a recommendation.  Karen Evans and I had a conversation where she said she didn't feel like she needed to put forth a delegation memo or request to delegate that activity.  I said I agree, seems like it's not necessary.

I don't recall ever having seen a memo, draft or otherwise or signed, and I don't recall -- yeah, I don't recall anything else about that.

Q.   So you don't recall -- you don't believe you looked at the memo that FEMA had prepared on this subject --

Page 198

A.   I do not recall.

Q.   -- before having that conversation with Karen Evans?

A.   No, because our conversation was based on concept and theory.

Q.   And you agreed that FEMA shouldn't have extended authority to renew the CORE?

A.   No.  I agreed that I did not believe a delegation memo was necessary.

Q.   Did you think FEMA should have the ability to extend COREs at the time?

A.   I did not have any feeling about that one way or the other.

Q.   And why did you believe that a delegation memo was not necessary?

A.   Because Karen Evans was in close contact with DHS and any discussion about that could just be communicated between the parties.

Q.   Without a memo?

A.   Without a formal memo, yeah.

Q.   And is that what -- in fact, what happened?

A.   I believe Karen Evans then designed a process to have that communication.

Q.   It's a slightly different question.

Is that -- is that what happened with

Page 199

respect to the question of whether the authority was going to be delegated to FEMA?  Was that a conversation that happened between Karen Evans and DHS leadership?

A.   I don't know.  I don't recall.

Q.   You don't know whether DHS leadership directed Karen Evans that the FEMA authority was not going to be extended?

A.   I don't -- I don't believe I recall any of that, no.

Q.   You don't know?

A.   I don't recall DHS leadership having directed Karen Evans, to my knowledge or in front of me, to -- to not put forth a delegation memo.

Q.   But you don't know whether that conversation was, just as you said, a conversation between Karen Evans and DHS -- DHS leadership since they were in communication about these things?

A.   I -- I don't know.

Q.   And you don't know when the decision was made that the authority would not be delegated to FEMA to extend the COREs?

A.   I believe Karen decided not to put forward the memo requesting such delegation.  I do not know when she decided to not put it forth.

Page 200

Q.   You don't know, Ms. Voorhies, whether someone directed Karen Evans that the FEMA authority was not going to be extended?

A.   I do not know.

Q.   Okay.  So when you say Karen Evans decided, you don't, in fact, know that she decided?  You don't know that she -- she might have been directed to do that?

A.   She may have been but she could have also put her name on a piece of paper and sent it forward if she wanted to.  She has free will.

Q.   But you agree with her that she should not do that?

A.   I did not think it was necessary.

Q.   And you don't recall whether or not that was after or before this email from Andrew Clayton that says, Please allow Kara -- Kara the opportunity to review before packaging for signature?

A.   I do not know, yeah.

MS. LEONARD:  Okay.  I think we've been going for about an hour since we came back so I think it's another time for a break.

THE VIDEOGRAPHER:  All parties in agreement going off the record.  We're going off the record at 3:33 p.m.

(Recess taken.)

Page 201

THE VIDEOGRAPHER:  We are going back on the record at 3:54 p.m.

Q.    (BY MS. LEONARD) Okay.  Ms. Voorhies, I'm going to show you another set of documents that you've produced to us today.  This one is going to be 144 and it starts at 427 Bates number.

(Exhibit Number 144 marked.)

Q    (BY MS. LEONARD) Can you tell us generally what this is?

MR. CAMPAGNA:  Perhaps while she's reading that, this is a good time for me to say on the record that we finished preparing this document production about 1:00 a.m. this morning and Ms. Voorhies hasn't had a chance to see any of these documents other than a handful that we asked her questions about, so...

MR. HALL:  Can I get confirmation? Are we -- is this document 000427?

MS. LEONARD:  Yes.  This is the set of Signal chats with Karen Evans that starts at 427. I'm going to mark as actually 145 the supplemental set that you gave us, Counsel, that was additional material from this Signal chat as well.  It does not have a Bates number at the bottom but it's the one that you gave us, I believe, after lunch.

Page 202

(Exhibit Number 145 marked.)

Q   (BY MS. LEONARD) So you can have 145 and 144 together.  These are --

A.   Okay.

Q.   That's more -- I believe more material from the same.  I just have some general questions about the Signal chat and then I'll ask you specific pages --

A.   Okay.

Q.   -- okay?

A.   Can I finish reading it, please?

Q.   Sure.

I am not going to ask questions about every page and if we're going to have the witness read all the documents that you produced today, we're going to have to go off the record.

A.   Okay.  Is there a particular page you would like to point me to?

Q.   Sure.  I'm going to ask you some generic -- general questions about the chat first.

A.   Okay.

Q.   So just generally speaking, the images that are in these two exhibits, 144 and 145, this is a Signal chat that you had with Karen Evans; is that correct?

A.   Yes, it's what it appears to be.

Q.   Okay.  And from your personal phone to her

Page 203

personal phone?

A.    I presume that is her personal phone, yes.

Q.    Okay.  And you -- if you look at these, the first date on 144 appears to be June 24th, 2025?

A.    Yes.

Q.    Okay.  But the -- above that, the chat began earlier than that date; is that fair?

A.    I can't tell --

Q.    That there's a message --

A.    -- where -- when it began.

Q.    -- there's a message here that was -- that was cut off?

A.    Yeah.  I can't tell when it began.  It looks like there is a message above that.

Q.    Do you recall when it began?

A.    No, I don't recall when we first initiated a chat.

Q.    At some point over the summer of 2025?

A.    Likely when I was introduced to her at some point over the summer of 2025.

Q.    Okay.  And presumably, in order to have a chat with her on her personal phone, she would have had to give you her personal contact information?

A.    Or I would have had to have given mine to her.

Page 204

Q.    Fair.  Or you would have had to given -- have given yours to her.

And then this chat continued on for many months, correct?

A.    Up and through, I'm sure, when I left in March.

Q.    Okay.  And I think if you look at the end of 144, our last exhibit -- or the last page, the message that we have is from February.  Our understanding is that your counsel has applied search terms to the material on your phone, we've gotten a letter about that, so it's fair to say this is not the complete content of the entire chat that's on your phone, correct?

A.    I assume not, yeah.  We've applied search terms.

Q.    And you say the -- the chat continued until you left in March?

A.    Likely.  I don't recall the last exchange I had with Karen directly.

Q.    Could it have been after you left?

A.    No, I haven't spoken to her after I left.

Q.    Either by Signal or any other form?

A.    I don't believe so, no.

Q.    Okay.  Did you ever text with Karen Evans?

Page 205

A.    I don't recall if we ever exchanged text messages.

Q.    Were you generally using Signal because it was encrypted rather than text messages for the communications regarding FEMA?

A.    I was using Signal because my client was DHS and that's what they preferred to use to communicate.

Q.    And did someone tell you that?

A.    That's just how all the chats got initiated.

Q.    On Signal?

A.    Yes, on Signal.

Q.    Okay.  You did have some communications with Corey Lewandowski on WhatsApp?

A.    That's correct.  That's the -- or that's the message app that he preferred to communicate on.

Q.    Corey Lewandowski preferred to communicate on WhatsApp?

A.    I believe he reached out to me initially on WhatsApp and that's just where our exchange lived.

Q.    And do you know whether Corey Lewandowski was communicating with others on WhatsApp?

A.    I do not know.

Q.    Okay.  You just saw the messages that he sent to you?

A.    That's correct.

Page 206

Q.    And messages you sent to him.

Were you involved with any -- in any group messages on WhatsApp with Corey Lewandowski?

A.    No, I don't believe so.

Q.    So the group messages that you were involved with pertaining to DHS and FEMA were generally on Signal?

A.    Correct.

Q.    Is there a reason you didn't -- you didn't speak to Karen Evans after you left?

A.    I didn't have anything to speak to her about.

Q.    You don't have a social relationship with Karen Evans?

A.    No, I do not.

Q.    Okay.  If you look at 145 which is the one that's -- October 17th is the top message.

A.    Okay.

Q.    It's not Bates numbered so bear with me. Apologies.

If you go through to the page that depicts December 2nd, I think we're going to do this the old-fashioned way by looking at the dates.

A.    Okay.

Q.    So you recall that Karen Evans became the SOPDA

Page 207

on December 1st?

A.    That's correct.

Q.    And then you're having some communications with her here on December 1st and then to December 2nd.

Do you see that?

A.    Yes.

Q.    And you're talking about some information that was provided to S2?

A.    Yes.

Q.    And who was S2 at the time?

A.    The Deputy Secretary, Troy Edgar.

Q.    Okay.  And then there's a message here that says, I know, so he wanted them before the S1 meeting so just a heads-up.

Do you know what S1 meeting that is referring to?

A.    I don't recall what S1 meeting.  Must have been a meeting he was having with S1.

Q.    Meaning the S2?

A.    Yes.

Q.    Okay.  So there was some information that the S2 wanted about FEMA before having a meeting with S1?

A.    Yes.

Q.    But you don't recall what it was?

A.    I don't -- it seems to be related to this

Page 208

249 agreement.

Q. Okay. During this period of time, were -- meaning December of 2025, were you involved in any meetings directly with Secretary Noem regarding FEMA?

A. Sure, I was.

Q. Do you recall when those were?

A. I don't recall exactly when those were.

Q. And when you say you're sure you -- you -- at this point in time that you were, tell me why.

A. I'm not. You're -- that's -- let me restate that.

It's possible that I was. I don't recall my particular schedule or her particular schedule.

Q. So at this point in time, your office was housed at FEMA, correct?

A. Correct.

Q. So you would have had to go over to DHS to have a meeting in person with Secretary Noem; is that right?

A. Yes, that's correct.

Q. And you recall doing that on occasion?

A. I recall doing that on occasion when she would request briefings, yes.

Q. And how would those requests for briefings be communicated to you?

Page 209

A.   I believe she had a team that requested those type of briefings to FEMA and to Joe Guy and they would be arranged and we would go.

Q.   And so Joe Guy -- DCOS Guy would be involved in -- if there were going to be a briefing of the secretary on a FEMA-related issue?

A.   Typically he would be involved, yes.

Q.   And do you recall whether there were such briefings in December of 2025?

A.   I don't recall specific briefings.  I don't recall.

Q.   Do you recall whether there were briefings that pertained to the renewal of CORE employees that were given to Secretary Noem in December of 2025?

A.   I don't recall attending such a briefing, no.

Q.   And do you recall whether there were briefings to Secretary Noem regarding the issue of renewing FEMA's authority to extend the CORE?

A.   I don't recall briefing her on that either, no.

Q.   Do you recall that there was not such a briefing?

A.   I don't recall that I briefed her on that.

Q.   Do you know whether anyone briefed her on that?

Page 210

A.   I do not know.

Q.   And do you know whether anyone met with her on the issue of CORE renewals in December of 2025?

A.   I do not know.

Q.   It's possible that there could have been a meeting that you were not involved in on those issues?

A.   That is correct.

Q.   Did you meet or talk with Corey Lewandowski in December 2025 about the issue of the renewal of FEMA's authority to extend the CORE?

A.   I don't recall having a particular discussion with him about that.  I -- I don't recall.

Q.   But it's possible that you did?

A.   It's possible.  I don't -- I don't remember one.

Q.   Okay.  And do you recall having a discussion with Corey Lewandowski about the issue of renewing the COREs?

A.   December 2025, no, I don't remember that.

Q.   It's possible you did?

A.   It's -- anything is possible.

Q.   You can set those aside for now.

Were you aware that, in December of 2025, FEMA was compiling information about COREs that were due for renewal by NTE date beginning in

Page 211

January 2026 and sending that information over to DHS?

A. I was not aware of that.

Q. You don't recall being copied on communications of that data?

A. I -- no, I don't. I don't recall seeing that data.

Q. Okay. So you don't recall seeing spreadsheets of COREs by NTE date beginning in January of 2026?

A. I don't recall that specifically, no.

Q. And you don't recall seeing information about the various disasters that the COREs were associated with?

A. I don't recall -- I don't recall that specifically. I know I saw a message there that you had provided that said that Karen was going to send that over but I don't recall what that looked like if I did see it.

Q. Okay. And do you recall that there was a request by S1 for information about COREs by NTE date in early December 2025?

A. No, I don't recall that.

Q. If that -- if there had been such a request from S1 to FEMA for that information, would you have known about that?

Page 212

A.   Possibly.  I really wasn't involved in a lot of these, the CORE renewal and the staffing, so I -- possibly, I might have heard about it, but I don't recall having heard anything.

Q.   You were copied on many emails about these issues, correct?

A.   I was copied on thousands of emails about many issues.

Q.   Okay.  But that --

A.   It doesn't mean I was involved in them.

Q.   Okay.  So from your perspective, if an email was copied to you and the information was being transmitted to you through that -- that copy, you may not have been involved in that issue?

A.   It would have been in -- in one ear and out the other, if at all.  It's not something I was focused on.

Q.   Despite your purpose and your role being to focus on increasing efficiencies at FEMA, you were not focused at the end of 2025 on the issues pertaining to FEMA staffing?

A.   Karen Evans primarily handled all of that.

Q.   But she kept you in the loop.  Is that --

A.   She kept --

Q.   -- fair to say?

Page 213

A.    -- me copied.

Q.    And you acted as a liaison between FEMA and the DHS leadership, correct?

A.    As long -- as well as Joe Guy, yes.

Q.    Okay.  So it's possible that there's information that you were transmitting to DHS leadership but it's also possible that Joe Guy was the one transmitting information?

A.    Karen Evans may have transmitted directly, too.  I don't -- I don't know.

(Exhibit Number 27 previously marked.)

Q.    (BY MS. LEONARD) Okay.  Let's take a look at what was previously marked as Exhibit 27.  You can read through this one.

MS. LEONARD:  There you go.

MR. CAMPAGNA:  Thank you.

Q.    And just to be help -- try to be helpful, I believe this is a continuation of the December 5th email from Karen Dobitsch [as spoken] we may have seen earlier before in another exhibit.

A.    Okay.

Q.    So you see the December -- on the front -- front page of Exhibit 27, there's a December 5th email from Karen -- from Stephanie Dobitsch to Karen Evans that you are copied on?

A.    Yes.

Q.    And then on the carryover to the next page, there's the sentence I read you earlier from another exhibit that refers to CORE rightsizing?

A.    This is the email we saw previously?

Q.    Yes.

A.    Yes.

Q.    Okay.  So planning several meetings next week to dig into this as part of the plan you and I discussed for CORE rightsizing, that was Stephanie to Karen on the 5th, and then the top of this chain is Karen Evans responding.

Do you see that?

A.    Yes, I see her response.

Q.    And so I apologize.  That's a misstatement. This is not a response.

This is Karen Evans to you and some others, correct?

A.    Okay.  To myself, Victoria Barton and Will Bilicic.

Q.    You see that?

A.    Yes.

Q.    And she says here, I found the email and see the highlights.  That is why I thought the number was 324 for December and then 932 for January.

Page 215

Do you recall having conversations with Karen Evans about the numbers of COREs that were up for renewal beginning in January 2026 in this time frame?

A.   I don't recall any particular conversations. It looks like she was just forwarding things to us.

Q.   She's explaining here that the number is 932 for January, February and March, right?

A.   Okay.

Q.   You don't recall what context she was sending this to you in?

A.   I don't recall what context she was sending, correct.

Q.   And that she said, I raised this issue to the DCOS on December 10th?

A.   I see -- I see that she's written that there, yes.

Q.   You -- you don't recall anything about that context?

A.   I don't.  I don't.  It seems like she raised an issue to the DCOS.  I'm not the DCOS.

Q.   You don't recall any context around the data and information about COREs by NTE renewal date that was being provided to DHS in this May-December time frame?

A.   I was on vacation mid-December, so...

Page 216

Q.   In mid-December?

A.   Uh-huh.  Yes.

Q.   You -- do you believe you were on vacation when this email came in?

A.   I -- I don't recall what day I left but I was -- what day did this come in?

Q.   December 18th.

A.   It's possible, or I would have been just back from vacation.

Q.   Is it possible that you had a conversation with Karen Evans that she was responding to you by giving you this information?

A.   It's possible.  I don't recall it.

(Exhibit Number 47 previously marked.)

Q    (BY MS. LEONARD) Okay.  Well, let's take a look at another one.  This is 47.

This is an email on December 19th at noon, approximately, from Karen Evans to Roland Edwards on which you are copied.

Do you see --

A.   Okay.

Q.   -- that at the top?

A.   I'm sorry.  I have not read this before so I need a minute to process what she's saying here, unless you have something specific you want to ask me

Page 217

about this.

Q.   It's actually just a general question.

Were you aware that information was being transmitted to DHS regarding the number of COREs and their NTE dates in the context of discussing FEMA's authority?

A.   During this period of time that they're referencing, no.

Q.   Okay.

A.   I believe I was informed of that by Karen Evans in, like, late November, early December.

Q.   Do you have any idea why information regarding the COREs and the upcoming NTE dates was being transmitted to DHS by FEMA at this time?

A.   No.  I wasn't involved in any such transmission.

Q.   You were copied on information that was being sent from FEMA to DHS, correct?

A.   I was not copied on this string of emails until the very last one.

Q.   But you were copied on December 19th on this email, correct?

A.   When she sent it on December 19th to DHS.

Q.   And you were a part of DHS, correct?

A.   Yes, I worked for DHS.

Page 218

Q.   And you were the senior advisor to the secretary who was responsible for, I believe you said earlier, all matters related to FEMA?

A.   That were going to the secretary.

Q.   And do you know whether the information on FEMA COREs and their NTE dates was provided to the secretary in December of 2025?

A.   Not that I'm aware of.

Q.   Do you know whether it was?

A.   I do not know for certainty because I'm not aware of any.

Q.   And you don't recall a briefing of the secretary that occurred in December of 2025 on this issue?

A.   I do not.

Q.   Is it possible that there was one?

A.   Anything is possible.  Again, I was out of the country for about a week so I don't know what happened while I was gone.

Q.   You were not out of the country on December 19th, correct?

A.   I don't recall what day I returned, but...

Q.   Do you recall that you were not out of the country on December 19th?

A.   I do not recall what day I returned.

Page 219

Q.   And you don't recall anything about a briefing for the secretary on the issue of CORE renewals?

A.   I don't.

Q.   Okay.  Would you have been there if there had been one?

A.   Possibly.

Q.   But based on your responsibilities and who you were reporting to in the secretary's office, would you have been at a briefing for the secretary if there had been one on CORE renewals?

A.   There were other briefings that took place that I was not in so its possible that I would have been there.  It's also possible I would have not been there.

Q.   Do you recall whether you were there at the briefing for the secretary that was given on December 19th on CORE renewals?

A.   As I mentioned earlier, I do not recall giving a briefing to the secretary about that topic.

Q.   And you just don't recall whether there was one?

A.   That's correct.

Q.   Can you look at the time on that email that is in front of you?

A.   Which email string?

Page 220

Q.   The top email.

A.   Okay.  It says 11:57:49 a.m.

Q.   Okay.  So this is information that is being transmitted at approximately noon to Mr. Edwards?

A.   Approximately noon, yes.

Q.   Okay.  You can set that aside.

And are you aware that Ms. Evans continued to transmit information to DHS about the COREs and their NTE dates?

A.   I'm aware that there were several email strings, like, similar to some of these where she was back and forth with Stephanie Dobitsch and I don't recall if there were more directly with Roland Edwards.

Q.   But you were copied on some of those?

A.   I -- I'm sure I was.  I was copied on thousands of emails.

Q.   And do you recall having meetings at the end of December that involved Joe Guy on these issues?

A.   I -- I recall that Karen Evans would update Joe Guy weekly at our syncs.

Q.   On Wednesdays, typically?

A.   On -- I believe it was Wednesdays, yes.

Q.   Okay.  And -- okay.  Can you take a look at the Karen Evans notes exhibit that is in front of you?

Page 221

A. Okay.

MR. HALL: What exhibit number is that?

MR. CAMPAGNA: 27. Oh, I'm sorry.

MS. LEONARD: No. It's a new one --

MR. CAMPAGNA: I'm sorry.

MS. LEONARD: -- and I believe it is --

A. Is it this one?

Q. Yes, it is.

A. 142 is what my copy says.

MR. CAMPAGNA: Yeah. Sorry.

Q. 142.

And if you turn to Bates numbered page 425364.

A. Is this the one that's all out of order?

Q. It is, but the December dates are generally in order so it's December 19th.

Do you see on page 4256 -- 364, there is a copy of Karen Evans' December 19th, 2025 Friday schedule?

A. Yes, I see that.

Q. And do you see at 12:30 there's a FEMA briefing at the S1's office with the secretary?

A. Yes, I see that.

Page 222

Q.   Does that refresh your recollection that there was a briefing of Secretary Noem on Friday, December 19th regarding the renewal of COREs?

A.   I don't -- I don't recall what was discussed at that briefing or if --

Q.   Do you --

A.   -- I was present.

Q.   Do you -- anticipates my next question.

Do you recall whether you were there?

A.   I don't recall.

Q.   But you recall that the time on the information regarding COREs and their NTE dates that Karen Evans was sending to Roland Edwards in Exhibit 47 was at noon, right before this meeting?

A.   Yes, I see that, uh-huh.

Q.   So it's possible that the information that Karen Evans was sending on to DHS the morning of December 19th regarding COREs and their NTE dates, that the purpose of that was to discuss at this briefing with S1?

A.   I would be surprised if she was sending something to FEMA CHCO that then she was going to brief the secretary on within half an hour.

Q.   But you don't know if the --

A.   I don't know.  You're asking me a question.

Page 223

I'm giving you I would be surprised if that was the case but it's possible.

Q. Okay. But you also don't know all the times that Karen Evans -- the dates and times that the information throughout December about COREs and their NTE dates was being --

A. That's correct. I don't.

Q. -- passed on to DHS, correct?

A. Correct.

Q. And you don't know whether it was for the purpose of discussing at this --

A. I do not know.

Q. -- at this briefing? Okay.

Because you just don't remember what this briefing was?

A. I -- I don't remember what this briefing was.

Q. And do you participate -- how many briefings a month for S1 did you participate in in this time frame?

A. In this time, in December, I -- again, I don't recall if or when we had briefings because I know that I was traveling. I know that she was traveling. Apparently she was here on that date. I don't know that I was here on that date. It -- our briefings typically centered around her White House

Page 224

visits regarding disaster declarations, that's when we would be called in to brief, so if she was going to do a briefing to the President, then we would speak to her just before that to give her an update on any disaster declarations that were pending.

Q.   It's possible that this briefing was about the COREs and the CORE renewals, correct?

A.   I have no idea what this briefing was about based on this.

Q.   Okay.  Let's look at your Karen Evans chat.  I believe it's Exhibit 145.

It's 145 --

MR. CAMPAGNA:  Second --

MS. LEONARD:  Sure, the second one.

THE WITNESS:  Okay.  Do I need to keep these in order for some reason?

MR. CAMPAGNA:  Yeah, it's easier.

THE WITNESS:  Okay.

Q.   If you can look at the last page in that document.

A.   Oh, yep, uh-huh.  I see it.

Q.   You -- you see on Friday, December 19th at 12:43 p.m., you sent Karen Evans a message that says, Are you going back to FEMA?

And she responds, Yes.

Page 225

A.    She does.

Q.    Does that help refresh your recollection as to whether possibly you were attending an S1 briefing on December 19th?

A.    It's possible I was.  It appears I might have been at DHS and I was trying to see if she was going back to FEMA or not.

Q.    But you don't recall?

A.    I don't recall specifically what that briefing was about if I was in it.

Q.    Okay.  You can set that aside.

A.    Can I set all of these aside or do I --

Q.    You can.

A.    -- need to keep them out?

Q.    You can.  You can.  That would be fine.

Did you ever hear Karen Evans express concern about the extent to which FOIA could be used to obtain official records?

A.    I don't recall specifically.  I don't recall any specific information or a discussion about that.

(Exhibit Number 87 previously marked.)

Q.    (BY MS. LEONARD) Let's take a look at 87, previously been marked.

This top email is the one I'm going to ask you a question about.  Let me know when you're

Page 226

ready.

A.   Okay.

Q.   Do you see the -- the first line has, Emails will certainly be FOIA?

A.   Yes, I do see that.

Q.   Okay.  Do you have any recollection of any other time which Ms. Evans expressed concern about emails being FOIA?

A.   Not specifically.

Q.   Okay.  Do you recall that there became -- there was a day in December where Karen Evans requested that Stephanie Dobitsch be moved out of FEMA?

A.   I don't recall when that -- when that was. I do recall that she desired to have her be moved but I don't recall what day that was or who she expressed it to.

Q.   Do you recall that you were copied on those communications?

A.   I don't -- I don't recall them specifically. Happy --

Q.   Do you --

A.   -- to look at them if you like.

Q.   Do you recall discussing -- discussing those issues with Ms. Evans?

A.   What issues?

Page 227

Q.   The need to move Stephanie Dobitsch out of FEMA.

A.   I recall that we were not -- I recall that I was not -- did not have a lot of trust or faith in Stephanie Dobitsch.

Q.   And why was that?

A.   I just didn't feel good about some of the communications and their style, I think.

Q.   You were in particular concerned about information she was providing to the White House?

A.   That may have been a concern at some point. I don't recall what that information was but I -- now that you say that, it kind of rings a bell.

Q.   But you don't recall what that information was?

A.   No.

Q.   Did it have anything to do with the cancellation of the FEMA Review Council meeting on December 12th?

A.   Not that I'm aware of.  I don't recall that having anything to do with it.

Q.   Give me one moment to find the note I'm looking for.

I'll come back to that.

Okay.  Were you involved in meetings between Karen Evans and DCOS Guy discussing the

Page 228

renewals of the COREs beginning in January?

A.    I was involved in our weekly syncs.  There may be ad hoc meetings here and there.  I don't recall specific topics from a particular meeting, no.

Q.    Okay.  Do you recall that, after December 31st, the authority for FEMA to extend the CORE renewals ended and a decision was made that COREs would not be renewed beginning January 1?

A.    I -- I don't recall being involved in a discussion about that decision or weighing in on that decision.

Q.    Do you recall whether you attended the meeting between Karen Evans and DCOS Guy at -- on December 31st in which that was discussed?

A.    On December 31st?

Q.    Yes.

A.    I don't recall a specific meeting on December 31st.  I would have been in Houston.

Q.    You would have not been in Washington, D.C. on that date?

A.    I would have physically not been in D.C., no.

Q.    So you don't recall being involved in that conversation?

A.    I don't specifically recall it, no.

Page 229

Q.   Do you recall any conversations about CORE renewals?

A.   Very generically.  Karen Evans would give us updates about what she was doing and what process she was undertaking but this -- the details of which I wasn't involved in.

Q.   Were you involved in the decision to pause the off-boarding of COREs in light of the winter storm in January of 2025?

A.   I was not.

Q.   '26?

A.   I was informed of that decision after it was made.

Q.   Okay.  And you don't know who actually made that decision?

A.   I believe Karen Evans made that decision.

Q.   You believe but do you know?

A.   I -- I know that I understand that Karen Evans made that decision.  I don't know otherwise.

Q.   I'm sorry.  Could you say --

A.   I believe Karen Evans made that decision.  I don't know otherwise.

Q.   But you don't know whether she was directed?

A.   I do not know if she was directed by someone else.

Page 230

Q. And you were not privy to her communications with DHS leadership about this?

A. Not -- not all of them, no, huh-uh.

Q. Did you have conversations with Corey Lewandowski about the pause in the off-boarding of COREs in light of the winter storm?

A. I don't recall any.

Q. Do you recall that Secretary Noem came to FEMA to tour the response center?

A. The National -- the NRCC? Yes, she came several days.

Q. She came several days during that winter storm?

A. That's correct. She wanted to be onsite.

Q. And the optics would not have been very good if the COREs had been walking out containing -- carrying boxes of their personal belongings when the secretary was onsite, right?

A. I believe it was -- I don't believe the COREs would have been walking out during that time because I believe it was, like, over the weekend or something. There -- the staff was not required to come in unless they were NRCC staff during a winter storm.

Q. Okay. You're aware that there were COREs that were terminated from federal employment on

Page 231

January 22nd?

A. I, again, wasn't privy to the terminations of them specifically so I don't know.

Q. And then they had to be re-called because of the reversal of that off-boarding?

A. That sounds familiar.

Q. But none of that went through you?

A. That would have not gone through me.

Q. Why were you being copied on so many emails related to FEMA if you were not involved in the decision-making?

A. For awareness.

Q. What does that mean?

A. Just in case there was something that came up that they needed to say, hey, can you find this or search it or find out who was handling it, I could go find anything in the email box.

Q. "They" being DHS leadership?

A. Yes.

Q. So you were being copied so that DHS leadership could be made aware of what was going on at FEMA if they needed to be?

A. If they had questions, I could generally find them.

Q. By looking through the emails that you had been

Page 232

copied on?

A.    Yeah, or sometimes, it would be something I was actually working on.  I mean, again, thousands of emails.  People just copied me.  There was nothing I could do to -- to control that.

Q.    And your understanding was that people had been directed to do that?

A.    In some cases.

Q.    And DHS leadership had directed them to copy you?

A.    In some cases.

Q.    Including with respect to the CORE renewal issues?

A.    I'm sure that that was something they wanted to make sure I was copied on.

Q.    Because they might have questions?

A.    FEMA wanted to make sure I was copied on.

Q.    Because DHS might have questions?

A.    Possibly, yeah.  If DHS had questions, they could ask me.

Q.    But you can't recall any specific questions that DHS leadership did ask you?

A.    No, not specifically.

Q.    Do you recall being concerned about leaks to the press in January 2025 coming from FEMA?

Page 233

A.   We had continued leaks from -- to the press from FEMA throughout the time I was there.

Q.   And that is something that you were not happy with?

A.   It made DHS very unhappy so it made me unhappy.

Q.   That was expressed to you by others within DHS --

A.   Absolutely.

Q.   -- is that fair to say?

And were you tasked with doing something about it?

A.   Typically I would be one of the people that would try to kind of figure out where the leaks were coming from so that we could acknowledge them or address -- have FEMA address them.  There were -- I mean, just depending on who was around that week would kind of try to figure it out.  Some people knew different people were talking to different...

Q.   And who in DHS leadership was expressing to you in this time frame of January 2026 concern about leaks coming out of FEMA?

A.   I don't remember anybody specifically addressing that to me.  Again, that's several months ago.  It could have been the external affairs

Page 234

personnel.  It could have been the secretary's office.  It could have been several parties.

Q.   It could have been Corey Lewandowski?

A.   Absolutely could have been, sure.

Q.   Did the secretary herself ever express concern about leaks coming out of FEMA?

A.   I don't know that I recall having that specific conversation with her, no.

Q.   You recall that there was a leak of the December 23rd staffing exercise email?

A.   I do recall that, uh-huh.

Q.   And you recall there was a leak of the instruction that FEMA halt the off-boarding of COREs?

A.   I do vaguely recall that.

Q.   And both of those were leaks that caused concern among DHS leadership, correct?

A.   And FEMA leadership, absolutely. Particularly Karen Evans was quite disturbed by that.

Q.   And then there was a process by which you engaged with the press -- the people responsible for the press to craft a response when there were press inquiries about these leaks, correct?

A.   Sure.

Q.   And you were involved in that?

A.   There is a long -- yeah, a long list of

Page 235

people that were involved in trying to address these
leaks --

Q.    And you --

A.    -- and responses --

Q.    You --

A.    -- inquiries.

Q.    Uh-huh.

And you were, in particular, involved
in a response to the December 23rd email that
denied that there was a plan to cut FEMA staff by
50 percent, right?

A.    I don't recall that specific engagement.
I'm happy to take a look at it if you have it,
though.

Q.    So you were involved in the press responses to
factual questions but you were not involved in the
decision-making regarding those issues.  Is that fair to
say?

A.    In some cases, I was involved in helping
provide the facts around the circumstance that was
being inquired about but I was not a decision-maker,
no.

Q.    Never the decision-maker?

A.    I don't -- I don't believe I ever made any
significant decisions at FEMA, no.

Page 236

Q.   Do you recall that, after January of 2026, there was another round of staffing planning that was being conducted at FEMA?

A.   I don't -- I don't recall a specific round.

What do you mean, round?

Q.   That there was another staffing exercise that was being conducted where the component parts of FEMA had -- had information that was due on March 31st.

A.   I do recall this.

Q.   And you were involved in working on that staffing plan?

A.   I was not working on any particular staffing plan.  I had not seen any staffing plans from any of the components of FEMA.  Karen Evans tasked that out to the components to develop their own staffing plans and they were due by March 31st which was obviously after my termination date.

Q.   Give me one moment.  I'm going to have to find a document.

A.   I've got a whole stack.

Q.   It's a different document, believe it or not, believe it or not.

Actually, maybe I have given you this document earlier today.

In your stack of documents, do you

Page 237

have a screenshot from FEMA 2.0 that we looked at earlier?

Again, apologies for not having -- it's Exhibit 103.  It would have been very early on.

This is the picture of Karen Evans' phone that the counsel for the defendants gave us that they represented was marked dated March 5th.

A.    Okay.

Q.    And it's an exchange involving you and Karen Evans in which you asked for certain information.

Do you see that?

A.    I see that, where I asked to do a data call to find out how many contractors work at FEMA.

Q.    Correct.

And then she asked you a question and you respond?

A.    I would say, All, we need -- we know we'll need it for the overall staffing plan as well.

Q.    Does this refresh your recollection that you were working on the overall FEMA staffing plan at the time?

A.    I was not working on a staffing plan.  There was going to be a staffing plan worked on.  I had not worked on it.

Q.    So when you say, We know we'll need it for the

Page 238

overall staffing plan as well, what did you mean?

A.   That was something that was going to have to be factored in once the data call that she had done to the components was all put together after March 31st.  It was not something I did work on because it was not due until March 31st but that was something that would need to be taken into account when you're considering all of the able hands that were available to FEMA.  They had thousands of contractors in addition to their 23,000 employees.

Q.   How did you know you would need that information for the overall staffing plan at the time?

A.   Because they -- many of the contractors functioned like staff at FEMA so it would need to be taken into account if you were doing an overall staffing review.

Q.   And what was your understanding of the staffing exercise that was being engaged in at the time?

A.   Is they were trying to put together staffing for 2027.

Q.   Not 2026?

A.   2026 was already well under way.

Q.   And we saw the staffing plan that Karen Evans had submitted to DHS already for --

A.   You provided me a copy of that for the

Page 239

first time.

Q.   For 2026.

And was your understanding at the time that they were -- FEMA was still intending to implement that plan?

A.   I was not aware of what that plan said until just now so I'm not sure what their intention was.

Q.   Did you have an understanding that FEMA was implementing the staffing plan for 2026?

A.   I did not see any evidence of them actually implementing what you showed me today.

Q.   You were aware that they were releasing the COREs by NT -- NTE date beginning January 1st, right?

A.   My understanding was that Karen Evans had instructed the -- the components to review their COREs as they became -- as they came up for renewal and decide whether or not they needed those COREs to continue the -- the workload that was in existence.

Q.   What was that understanding based on?

A.   What Karen Evans told me.

Q.   And when was that?

A.   It would have been sometime in January when she implemented her process, I believe.

Q.   You were not privy to the conversation -- all of the conversations between Joe Guy or other

Page 240

individuals in DHS leadership regarding the renewal of the COREs beginning in January of 2026, correct?

A. It's possible that I was not privy to all of them. I do not know for sure.

Q. And, in fact, the release of all COREs by NTE date was done over the rejection -- the recommendation and objection of the programs and regions.

Did you know that?

A. Those objections would have been made to Karen Evans so I wasn't tracking any or all of those.

Q. Some of them were made to you?

A. Possibly. They would have been formally made to Karen Evans because I was not controlling the COREs.

Q. But you were aware that the regions and the programs wanted those COREs to be renewed, in fact, had recommended that they be renewed? You were aware --

A. I'm sure they did want some of them to be renewed.

Q. Were you aware that they -- all of the people in January that had been released were recommended to be renewed by the programs and the regions?

A. I was not because those communications would not have come to me necessarily.

Q. And -- but you were aware of a number of

Page 241

appeals that were sent from the regions and the programs after the action was taken releasing their people?

A.   I was aware that they were appealing but I did not see those communications.

Q.   Okay.  Let's take a look at -- we'll mark this as the next, which -- find my stickers.  Okay.  146.

(Exhibit Number 146 marked.)

A.   I don't see a "from" in the signature -- or the --

Q    (BY MS. LEONARD) This --

A.   -- header here.

Q.   So my understanding is that when the emails were produced to us from someone's sent box by defense counsel, counsel for the defendants, it did not always show the individual whose account it was being sent from, so that's my understanding of this, is that this is a document that was produced from a sent box.

MS. LEONARD:  Perhaps counsel for defendants can illuminate.

MR. HALL:  I -- I cannot.

Q.   There is a GP who signs it.

Are you familiar with Gregg Phillips?

A.   Yes, I'm familiar with Gregg Phillips.

Q.   And he is someone who came on board at FEMA at some point in time maybe late in 2025; is that right?

Page 242

A.   I want to say December, is my recollection.

Q.   Okay.  And is -- he's responsible for the Office of Response and Recovery?

A.   Yes, that's correct.

Q.   And he has had some interesting reports in the press recently.

Are you familiar?

A.   I'm not.  I don't read the press.

Q.   You don't read the press?

A.   No.

Q.   Okay.  You're not familiar with Gregg Phillips repeatedly saying that he's been teleported to Waffle Houses?

A.   I have not heard that one, no.

Q.   This is 100 percent true.

A.   No, I've -- I've not heard that.

Q.   I'm not -- I would not make that up.

MR. HALL:  I -- I have read something to that affect.

MS. LEONARD:  Thank you.

MR. HALL:  I -- I -- I will -- I will concede that I have seen that report.

MS. LEONARD:  I -- I am --

THE WITNESS:  That's a new one.

MR. HALL:  Totally unreasonable.

Page 243

MS. LEONARD:  -- 100 percent not making this up.

Q.   So you were not aware of that?

A.   No, I was not aware of that.

Q.   Okay.  The -- the individual responsible for the entire FEMA Office of Response and Recovery has so stated on several occasions.

Okay.  So if this -- do you -- do you have any understanding of whether this email was sent by Mr. Phillips?

A.   I don't recall it.

Q.   Okay.  You don't recall it.

But it was to you and to --

A.   Karen Evans, yes.

Q.   -- Karen Evans?

And earlier in the chain, Gregg Phillips is on many of these emails regarding ORR.

Do you see that?

A.   Yes, it appears to be amongst ORR and CHCO.

Q.   And he's expressing concern here about COREs that were released from ORR --

A.   Okay.

Q.   -- is that fair?

You don't have any recollection of this?

Page 244

A.    No, not the specific email, no.

Q.    And did you take any action in response to this?

A.    No.  This wouldn't be something I would action upon because I was not involved in the CORE renewals.

Q.    And when you say you were not involved in the CORE renewals, you were copied on hundreds of emails about those issues?

A.    I was not involved in the decision-making on renewal of individual COREs.

Q.    You were involved in discussions of whether or not to extend FEMA's authority to renew COREs, correct?

A.    I was not involved in decision-making on any specific COREs.

Q.    Sure, individual COREs, but you were involved in the issue.

You were involved in discussions of whether to extend FEMA's authority to renew --

A.    Broadly.

Q.    -- COREs?

A.    Broadly, with Karen Evans, as we discussed earlier.

Q.    Okay.  And potentially with others in DHS leadership but you just don't remember, right?

Page 245

A.    Yeah.  I don't recall such discussions.

Q.    Okay.  Let's look at this.  We'll call this the next.

You -- do you recall that you were sent spreadsheets with individual information about COREs by NTE date on several occasions?

A.    I recall receiving a spreadsheet with staffing information, I believe, as a whole.  I don't recall specifically what was in it.  I do recall that there was more information that should have been in there and I did not request it in that form.

Q.    When was this?

A.    I don't recall when it was sent.

Q.    About FEMA staffing?

A.    It was a FEMA staffing set of data and it had far too much information in it.  That's all I remember.

Q.    Was it possibly the annual staffing plan that had been compiled by the FEMA components?

A.    I do not recall there being a staffing plan in it.  It was just a bunch of data in one spreadsheet, is what I recall.

Q.    Broken down to a subcomponent level?

A.    I don't recall if there was subcomponent level in there.

Page 246

Q.   Okay.  Let's mark this one 147.

(Exhibit Number 147 marked.)

Q.   (BY MS. LEONARD) This is an email from Karen Evans to you on January 6th in which she states, Oops, you will be on the rest...sorry.

A.   Do you have a copy of the attachments?

Q.   I do not have a copy of the attachments.  I just have a copy --

A.   Okay.

Q.   -- of this email.

Do you have any recollection as to receiving this email from Karen Evans?

A.   No.

Q.   Do you know why she was saying, Oops, you will be on the rest...sorry?

A.   Nope.

Q.   Do you see below there's an email in which you are not copied?

A.   I do see that.

Q.   And it does pertain to CORE renewals?

A.   Yes.  I see CHCO allowing these CORE agreements to expire, choosing not to follow the agreed process on your behalf as well as their inability to properly manage their workload.

Q.   So you see Karen Evans is blaming CHCO here and

Page 247

CHCO's paperwork for CORE individuals being separated in January 2026.

Do you see that?

A.   I see what I just read to you.

Q.   And then she has forgotten to copy you on that?

A.   Yes, that seems correct.

Q.   Okay.  Did you discuss with Ms. Evans a plan to blame the separation of COREs on the FEMA CHCO staff at any point in time?

A.   I don't believe I -- I certainly did not advise her to do that.

Q.   Do you recall discussing that with Ms. Evans?

A.   I recall that she was very frustrated with CHCO staff because she was not getting the information she needed from them.

Q.   That is what you believe she told you?

A.   I believe -- that's my -- that was the -- that was the understanding I had, was that she was very frustrated with the CHCO staff because she was not getting the information that she needed on time.

I think that is reiterating just what I said there.

Q.   This email was sent -- are you aware that this email was sent after the reports in the press regarding the actions taken by DHS to separate COREs?

Page 248

A.   I am not aware of that because I -- I don't track those specific dates.

Q.   But you were involved in conversations about responding to the press including the Washington Post and CNN when they began asking questions as to why the COREs were being separated from federal employment?

A.   Okay.  If you say so.  I don't have a copy of that.

Q.   Okay.  And you don't recall that this email blaming the FEMA CHCO for paperwork problems is the reason that individuals were being fired from federal employment was sent after those press inquiries?

A.   I did not discuss this email with Karen Evans before she sent it if that's what you're asking.

Q.   Did you discuss a plan to blame the FEMA CHCO for these separations with Karen Evans ever?

A.   I was not aware of such a plan.

Q.   Did you discuss that ever?

A.   Not that I recall, no.

Q.   You just don't recall?

A.   I recall that she was very frustrated with the CHCO staff for not getting her information on time.

Q.   That's what --

Page 249

A.    That's what I've said three times now.

Q.    Do you have any understanding as to why the COREs were being separated by NTE date beginning in January 2026?

A.    That is the process she must have put forward.  I don't know.

Q.    Were you --

A.    I was not involved in these decisions.

Q.    You were on hundreds of emails about it.

A.    Doesn't mean I was involved.  I was copied on emails.  Doesn't mean I made a decision.

Q.    No responsibility?

A.    I had responsibility for many other things.

Q.    What were -- what were --

A.    This particularly was not one of them.  This was Karen Evans' responsibility.

Q.    One of the -- the other things you were working on were contracts?

A.    No, I was not negotiating or working on contracts.  I reviewed memos that would go to the secretary for her review to approve spending.

Q.    Okay.  You can set that aside.

MS. LEONARD:  Okay.  Why don't we take a short break and we can get some of these documents organized.

Page 250

THE VIDEOGRAPHER:  All parties in agreement with going off the record.  We're going off the record at 4:55 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are going back on the record at 5:20 p.m.

Q.    (BY MS. LEONARD) Ms. Voorhies, you testified previously that you left the Department of Homeland Security on March 12th; is that correct?

A.    I would have to refer back to the termination date on the agreement.

Q.    It was the date that you had received that document --

A.    Okay.  March 12th --

Q.    -- dated March 12th --

A.    Yeah, that sounds right.

Q.    -- on the top.

A.    Is it on -- do you know -- do you recall which -- was it something produced today?

MR. CAMPAGNA:  Yeah.

Q.    Yes.

A.    I think she organized it from most recent to --

Q.    So it would be the very bottom.

Well, let's assume it's March 12th,

Page 251

we can confirm that with the document, but --

A.    Okay.

Q.    -- were you intending to leave?

A.    I was not necessarily intending to leave that date, no.

Q.    Were you intending to continue to work on the FEMA staffing plan after that material had been compiled from the components on March 31st?

A.    As of what date are you asking?

Q.    As of the time right before when you left.

A.    I did not have any immediate plans to leave on, say, March 1st.

Q.    After the President fired Kristi Noem as DHS secretary, is that when you began to think about leaving?

A.    Yes.  Yes.

Q.    Okay.

A.    Sure.

Q.    And you began to understand that there were others who were going to be leaving the Department of Homeland Security?

A.    I don't know that I had specific discussions about others leaving the Department of Homeland Security at that time.  I don't recall any of those.

Q.    You understood that Kristi Noem and Corey

Page 252

Lewandowski would be leaving?

A.    Yes.

Q.    And Corey Lewandowski is the person who brought you into the Department of Homeland Security?

A.    That's correct.

Q.    You also had concerns at the time about information that was being discussed about you in the press?

A.    At that time, no, I don't believe there was -- I don't recall any press in early March.

Q.    Do you recall that there were -- there was a question in one of Secretary Noem's congressional hearings about you?

A.    In her hearing itself, I don't recall the question being in the hearing.

Q.    Do you recall that there was a Congress person who had asked Secretary Noem questions about you?

A.    I think he asked them to the Senate floor. I don't know that he asked them directly to her.  I don't recall.

Q.    Sorry.  I will correct that then.

At some point, there was a public statement at Congress by someone that referred to your name; is that right?

A.    Yes, I believe there was.

Page 253

Q.   Okay.  And then there was press coverage inquiring as to who is Kara Voorhies?

A.   I believe so, yeah.

Q.   And you were concerned about this press coverage?

A.   I generally do not like to be mentioned in the press because I'm not a public person so, yes, that's concerning to me.

Q.   Okay.  Despite assuming the role of senior advisor to the DHS secretary which is a public position, correct?

A.   It is not a public figure position.  I don't know any other senior advisors that have been mentioned in the press.  Do you?

Q.   Absolutely, I do.

A.   Okay.

Q.   There are many at the Department of Homeland Security who have been repeatedly mentioned in the press.

A.   Okay.

Q.   The Department of Homeland Security has been incredibly busy in the Trump administration, wouldn't you say?

A.   I have not heard of any so I don't know.

Q.   Okay.  You don't read the press coverage of

Page 254

what's --

A.   I do not read the press coverage.

Q.   -- of what's going on with ICE?

A.   I don't know what's going on with ICE right now, no.

Q.   Okay.  I think it's fair to say that there has been a considerable amount of press coverage for other senior advisors to the Department of Homeland Security but you're not aware of any?

A.   I'm not aware of any.

Q.   Okay.  You were just -- became aware of the coverage that was aimed at you?

A.   Correct.

Q.   And you were concerned about that?

A.   Correct.

Q.   Okay.  And part of that coverage was an indication that there was an Office -- Office of the Inspector General investigation that was ongoing at the Department of Homeland Security?

A.   I don't believe that was reported that week. I don't recall that.

Q.   But at some point in time, the press began to report on an investigation?

A.   I have received inquiries from the press referencing an investigation by the OIG.

Page 255

Q.    Has anyone from DHS ever disclosed to you that you are the subject of an OIG investigation?

A.    I have -- nobody at DHS has confirmed to me that I'm the subject of an OIG investigation.

Q.    Why did you not remove materials from your office at FEMA when you left?

A.    I left my office and just did not go back because my contract was eventually terminated so I didn't see any need to go back.

Q.    What happened to your FEMA-issued phone when you left?

A.    My FEMA-issued phone, my DHS-issued phone, my FEMA-issued laptop and my DHS-issued laptop were all returned to DHS IT.

Q.    And did you have any understanding as to whether the Inspector General ever took possession of your laptops or your phones?

A.    I don't know about my laptops.  I believe someone may have referenced that they had my phone at some point but I -- I have no confirmation of that.

Q.    Okay.  Who told you that?

A.    I believe DHS Office of General Counsel.

Q.    After you left?

A.    Yes.  That's where they told me they got my phone from.

Page 256

Q.    "They" being the Office of General Counsel at DHS told you they had obtained your work phone?

A.    That's correct.

Q.    From the Inspector General?

A.    That's what I understand.

Q.    When did they tell you that?

A.    Several weeks ago when they notified me about this deposition.

Q.    And they also asked you to search your personal phone?

A.    They told me that the -- there was a -- they actually didn't tell me there was a subpoena.  They told me that the judge had ordered that I search my personal phone but did not give me any search terms or anything like that.

        MR. HALL:  I'm going to object now on grounds of attorney-client privilege and instruct the witness not to answer to the extent any responsive information would reveal information subject to that privilege.

Q.    The conversations we're discussing, they occurred after you left the Department of Homeland Security as a contractor, correct?

A.    Yes.

        MR. HALL:  Then, sorry.  Let me

Page 257

rephrase that or reframe it.

I am going to object on the grounds of attorney work product doctrine and likewise instruct the witness not to answer this question to the extent any of the responsive information would reveal information subject to the attorney work product doctrine but the witness can answer if she can answer it without doing so.

MS. LEONARD:  You are permitted to answer questions regarding your communications with DHS counsel.  That is not a proper --

MR. HALL:  That -- that is --

MS. LEONARD:  That is not --

MR. HALL:  That is --

MS. LEONARD:  That is not a proper objection.

MR. HALL:  Respectfully disagree. That is not accurate.

MS. LEONARD:  Are you instructing the witness not to answer questions regarding her communications with DHS counsel?

MR. HALL:  The witness can answer any question you ask about steps she has taken to comply. The witness is instructed not to answer anything that would reveal the subject of communications with a

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

government attorney that is subject to the attorney work product doctrine.

MS. LEONARD:  We adamantly disagree that any of those communications are subject to the attorney work product document -- doctrine and there is -- that is a frivolous instruction, Mr. Hall.

MR. HALL:  Disagree.

MS. LEONARD:  Okay.  We'll take that one -- we're happy to take that one up to the judge like we have so many of your prior objections.

MR. CAMPAGNA:  Is there a question pending?

Q.   The question, I believe, was whether DHS counsel had asked you to search your personal phone.

A.   They did not ask me to search it.  They asked if I had any documents on it and I told them I did not have any documents saved on it.

Q.   Did you understand from what DHS counsel had asked you to do that you should be looking at your Signal chats?

A.   For documents but not the content of the Signal chat.

Q.   You didn't understand that you should be searching for your Signal chats?

A.   I did not understand that they wanted me to

Page 259

search anything other than if there were any documents in my Signal chat.

Q.   Meaning attachments or something like that?

A.   Attachments pertaining to this case, yeah.

Q.   Okay.  They didn't clarify that you should be searching for communications?

MR. HALL:  Objection.  I'm going to again object on the grounds of attorney work product doctrine and I instruct the witness not to answer to the extent her answer would implicate information or communications subject to the attorney work -- attorney work product doctrine.

MS. LEONARD:  Disagree, and we'll take it up with the judge.

Q.   You can answer the question if you can answer it, notwithstanding defense counsel's instruction.

A.   I don't know --

MR. CAMPAGNA:  Can we re-read the pending question?

MS. LEONARD:  It's fine.  I will ask a different -- I will ask --

MR. CAMPAGNA:  Okay.

MS. LEONARD:  -- a different question because I think we know the answers to these questions.

Page 260

Q.   After discussing with counsel for the Department of Homeland Security with which you are no longer a subcontractor or employed at the time of these changes, correct?

A.   Correct.

Q.   You did not --

A.   Which communication?  I'm sorry.

Q.   The communications about the search of your phone, you were no longer a subcontractor --

A.   Correct.

Q.   -- and you were no longer employed, correct?

A.   Correct.

Q.   And you did not consider yourself to have an attorney-client relationship with the attorneys from the Department of Homeland Security at the time, correct?

MR. CAMPAGNA:  It is not uncommon for people who leave employment to still be represented by counsel for their prior employer so I'm not going to allow her to answer how she viewed her conversation with counsel for her previous employer.

MR. HALL:  I'm just going to amplify that and explain.  I'm going to reiterate that at no point was there ever an attorney-client relationship between DHS Office of General Counsel, FEMA Office of Chief Counsel or the Department of Justice Litigation

Page 261

Counsel and Ms. Voorhies.  However, the information that may or may not be responsive to this line of questioning is very possibly subject to the attorney work product doctrine and, again, I will reiterate my instruction that the witness not respond with information that would reveal communications subject to the attorney work product doctrine.

Q.   The searches that you conducted were the result of what you had been asked by DH -- DHS counsel to do, correct?

MR. HALL:  Reiterate the objection and instruction.

A.   I didn't do any searches.  Counsel did searches on my phone.

Q.   On your personal phone?

A.   Yes, my personal phone.

Q.   Your current counsel?

A.   That's correct.

Q.   Okay.  But previously -- previous to your current personal counsel doing searches on your personal phone in response to the subpoena, you understood that there had been a court order requiring disclosure of information from your personal phone?

A.   There had been a court order, I don't recall specifically what that court order said, but

Page 262

requiring DHS to produce some information.

Q.    From your personal phone?

A.    I didn't receive a court order or any court instruction until I received a subpoena.

Q.    The Court will be interested in hearing what DOJ has to say about this but I will not ask you any further questions.

You did allow counsel, your counsel, your personal counsel, to search your personal phone in response to the subpoena and produce a number of documents that we've seen today, correct?

A.    Yes, that's correct.

Q.    Okay.  And your personal -- your understanding is that your personal counsel used search terms to provide the information with some supplements that we've asked for during the deposition, correct?

A.    Correct.

Q.    Okay.  You did not personally search the content of your Signal chats for information regarding FEMA?

A.    What -- what information are you asking did I search for?

Q.    You didn't personally run the searches?

A.    Not last week, no.

Q.    Okay.  Did anyone, during the time that you

Page 263

were at the Department of Homeland Security, ever tell you that you were required to preserve the content of your Signal chats?

A.    I do not recall being told that, no.

Q.    Okay.  Do you think you were not told that?

A.    I do not think I was told that.

Q.    And you didn't take action to preserve the content of your Signal chats related to DHS or FEMA while you were at DHS, right?

A.    No, I did not.

MR. CAMPAGNA:  Oh, while at DHS?

MS. LEONARD:  Yeah.

MR. CAMPAGNA:  I'm sorry.

Q.    And no one told you that you should capture the content and email it to yourself, for example?

A.    No, I don't believe I ever received that instruction by anyone.

Q.    And no one ever told you from DHS that you should not set your Signal chats to auto delete?

A.    I do not recall ever -- anybody ever telling me that, no.

Q.    Same question for -- with respect to WhatsApp because we've seen WhatsApp communications between yourself and Mr. Lewandowski here today, correct?

A.    Yes.  Correct.

Page 264

Q.   Did anyone from DHS ever tell you that you should be preserving your WhatsApp communications with Mr. Lewandowski?

A.   No.

MR. CAMPAGNA:  Ever?

Q.   While you were at DHS.

MR. CAMPAGNA:  Okay.

A.   While I was at DHS, no, I don't believe anybody ever told me to preserve WhatsApp communications.

Q.   Okay.  So you did not take steps to preserve those communications?

A.   That is correct.

Q.   Some of them still appear on your phone which is why you were able to produce them, correct?

A.   Yes, that's correct.

Q.   Okay.  But is it fair to say not all of the communications that you had related to your work at DHS still appear on your phone?

A.   For various reasons, probably they do not.

MS. LEONARD:  Okay.  I think that is all the questions that we have for today.

MR. HALL:  Can we take a quick break and evaluate?

THE VIDEOGRAPHER:  All parties in

Page 265

agreement going off the record.  We're going off the record at 5:35 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  We are going back on the record at 5:44 p.m.

MR. HALL:  The government has no questions for Ms. Voorhies.

(Exhibit Number 148 marked.)

MR. CAMPAGNA:  Before we adjourn today, I would like to just make a statement for the record, and I've marked as an exhibit for this deposition Exhibit 148 which is a letter that was delivered by our office this morning to counsel for the parties, together with a jump drive with electronic copies of the document production that we made today.  We also had physical copies available for counsel today, and the letter reflects the searches that we conducted, the hits that we received and the method that we used to produce documents today.

Other than that, I have no further comments.

MS. LEONARD:  Thank you.

And we want to, on behalf of plaintiffs, thank Ms. Voorhies for her time today and

Page 266

counsel for your time and your facilities here today and for your cooperation in producing the documents with us.

MR. CAMPAGNA:  Thank you.

MS. LEONARD:  And with that, I think we can go off the record.

THE VIDEOGRAPHER:  All parties in agreement going off the record.  This concludes the deposition of Kara Voorhies on May 11th, 2026. We're going off the record at 5:46 p.m.

(Proceedings concluded at 5:46 p.m.)

Page 267

ACKNOWLEDGMENT OF DEPONENT


I, KARA VOORHIES, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted on the attached errata page.



KARA VOORHIES


SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, by the witness, KARA VOORHIES, on this the      day of                    ,      .



NOTARY PUBLIC IN AND FOR
THE STATE OF

My Commission Expires:

Page 268

REPORTER'S CERTIFICATE

VIDEOTAPED DEPOSITION OF KARA VOORHIES

May 11, 2026

I, Vickie G. Hildebrandt, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, KARA VOORHIES, was duly sworn and that the transcript of the deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

__X__ was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript.  If returned, the attached Changes and Signature Pages contain any change and the reason therefor:

____was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Page 269

Certified to by me on this 12th day of May, 2026.

Vickie G. Hildebrandt, CSR

Texas CSR 1363

Expiration:   06/30/26

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Larry A. Campagna, Esq.

larry.campagna@chamberlainlaw.com

May 12, 2026

RE: American Federation Of Government Employees, AFL-CIO, Et Al

v. Donald J., Trump, Et Al.

5/11/2026, Kara Voorhies, (#8159331).

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

to schedule a time to review the original transcript at

a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Code of Civil Procedure.

Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of

Counsel - Original transcript to be released for signature

as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

time of the deposition.

Page 271

xx Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 272

American Federation Of Government Employees, AFL-CIO, Et Al

v. Donald J., Trump, Et Al.

Kara Voorhies (#8159331)


E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____

(Kara Voorhies)                              Date

Page 273

**[& - 148]**

| & | 1 | | |
| --- | --- | --- | --- |

**&**  17:16 18:5,7
  271:24 272:10

**0**

**000001-0000...**
  4:24
**000003-0000...**
  5:5
**000027-0000...**
  5:16
**000169-0001...**
  5:7
**000237-0003...**
  5:13
**000318-0003...**
  5:10
**000363-0003...**
  5:12
**000375-0004...**
  5:11
**000427**  202:18
**000427-0004...**
  5:18
**000507-0005...**
  5:1
**000513**  5:3
**0007451**  5:22
**0017838-001...**
  5:20
**03698**  1:10
**0425487-042...**
  5:14
**06/30/26**  270:9

**1**  34:3 119:21
  183:20 229:8
  269:12 272:1
**10,000**  166:21
**100**  48:14
  243:15 244:1
**100,000**  48:3,5
  48:10,11 83:25
  84:1 89:17,20
**103**  4:21 5:7
  130:1,4,5,8
  238:4
**10:52**  68:11
**10th**  216:15
**11**  5:24 269:3
**11,000**  138:6
**11,176**  164:3
**11,383**  163:25
  164:5,19 165:8
  168:4,8,13
  179:20 194:14
  194:16
**11,426**  142:6,10
**11,500**  191:25
  192:5,10
**1100**  3:4
**118**  4:10
**11:04**  68:14
**11:07**  71:13
**11:09**  71:16
**11:30**  163:10
**11:42**  100:21
**11:55**  100:24

**11:57:49**  221:2
**11th**  1:19 6:4
  118:20,23
  137:8 267:9
**12**  271:2
**1200**  1:23 3:17
**12:30**  134:3
  222:23
**12:34**  134:8
**12:43**  225:23
**12th**  58:8,9
  59:18 117:19
  228:18 251:9
  251:14,15,25
  270:1
**13**  4:10 118:16
  118:18
**130**  4:21,22
  14:4,6,16
  57:19 93:17
**131**  4:23 15:4,6
  15:7
**132**  4:24 33:8,9
**133**  5:1 40:25
  41:1,5,25
  57:19
**134**  5:3,9 57:7
  57:8
**135**  5:5 68:15
  68:19,19
**136**  5:7 103:3,5
  103:9
**1363**  270:8
**137**  5:9 134:12
  134:14 135:18

137:3 138:14
  138:15
**138**  5:10,10
  138:10,17,18
  140:20
**139**  5:11
  143:18,19
**13th**  34:25
  134:1
**14**  4:22
**140**  5:12
  150:25 151:1
  151:10 153:21
**1400**  1:24 3:17
**141**  5:13
  156:17,18,20
**142**  5:14 162:5
  162:6,8 222:11
  222:13
**143**  5:11,16
  171:21,22
  177:12,13
**144**  5:18 202:6
  202:7 203:2,22
  204:4 205:8
**145**  5:19
  202:21 203:1,2
  203:22 207:16
  225:11,12
**146**  5:20 242:6
  242:7
**147**  5:22 247:1
  247:2
**148**  5:24 266:8
  266:12

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[14th - 22nd]**

**14th** 35:23 57:21,23 58:6
**15** 4:23
**151** 5:12
**156** 5:13
**15th** 137:5
**162** 5:14
**167** 4:11
**169** 103:4
**17** 4:11 167:22 167:23
**170** 103:4
**171** 5:16
**177** 2:8
**179** 4:13
**17th** 172:8,11 191:3 207:17
**18** 4:12 190:6,8 190:14
**18,000** 172:13 172:18
**182** 4:14
**185** 4:15
**188** 4:18
**18935** 270:6
**18th** 217:7
**190** 4:12
**196** 4:16
**19th** 217:17 218:21,23 219:21,24 220:17 222:18 222:20 223:3 223:18 225:22 226:4

**1:00** 202:13
**1st** 42:10 46:15 65:13 85:18 106:24 114:18 115:1 208:1,4 240:13 252:12

**2**

**2** 142:7
**2.0** 119:22,25 121:9,11 126:2 126:9,10,12,16 126:20,21 127:10,24 128:13 129:2 130:9,13,14 131:10,24 133:12 135:20 136:6,14 238:1
**2.0.** 126:7 129:4
**20** 4:13 18:15 109:20 144:17 146:19 172:10 179:13,15,17
**20,000** 109:20 155:9
**200** 159:4,19,22 159:24
**200,000** 48:14
**20005** 3:5
**2003** 16:25 17:12
**20043** 2:21
**2011** 17:4

**2014** 18:15 19:5
**2015** 18:14
**2017** 172:10
**202** 5:18
**2025** 5:21 19:6 20:3,18,21,24 24:7,8 34:25 42:10 43:6 65:10 68:24 73:8 75:9,10 75:17 85:3,8 85:12,18 89:2 89:5,23 90:5 90:12 91:9 93:14,25 96:6 98:9 105:19 108:7 109:19 109:25 110:15 111:14 114:6 115:21 116:5 116:20 117:19 124:1 128:1,2 139:13 141:3 142:17 144:13 144:15 154:24 155:16 158:22 159:15 160:10 161:14 167:14 169:18 170:22 172:8,11 176:18 180:8 185:18 188:5 188:14 193:9 195:20 204:4

204:18,20 209:3 210:9,14 211:3,9,19,24 212:21 213:20 219:7,13 222:20 230:9 233:25 242:25
**2025.520** 271:9 271:12
**2026** 1:19 5:23 5:24 6:4 39:18 46:16 57:6 62:2 76:23 85:21 116:5 130:17 162:1 186:9,15 192:11 212:1,9 216:3 234:21 237:1 239:21 239:22 240:2,9 241:2 248:2 250:4 267:9 269:3 270:2 271:2
**2027** 239:20
**203** 5:19
**20528** 3:11
**214** 4:17
**217** 4:19
**21st** 14:25
**22,000** 164:24
**22,187** 142:7
**226** 4:20
**22nd** 232:1

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[23 - 6th]**

**23** 4:16 196:3,4
**23,000** 109:21
  187:3 193:15
  239:10
**237** 156:19
**23rd** 188:19,25
  189:3,9,18
  190:15,21
  193:4,22
  235:10 236:9
**24** 4:14 97:11
  182:19,21,24
**242** 5:20
**247** 5:22
**249** 209:1
**24th** 14:23
  68:23 204:4
**25** 4:15 10:6
  31:16 185:10
  185:12
**26** 185:22,23
  230:11
**26,000** 97:11
**266** 5:24
**27** 4:17 171:20
  172:2 214:11
  214:13,23
  222:4
**2707** 3:10
**275** 156:23,23
  157:16
**28th** 142:17
**28thh** 141:3
**29** 4:18 188:23
  189:1

**2:02** 134:11
**2:25** 153:16
**2:35** 153:19
**2nd** 207:22
  208:4

**3**

**3** 68:18,19
  174:8
**30** 174:7,8,9
  175:3 269:12
  269:15 272:1
**300** 2:8
**318** 138:20
**31st** 193:23
  229:6,14,15,18
  237:8,16 239:5
  239:6 252:8
**321** 140:25
  141:1
**324** 215:25
**325** 46:3
**328** 162:13
**33** 4:24
**34553** 2:20
**363** 151:3
**364** 222:19
**366** 155:11
**375** 143:22
**3:25** 1:10
**3:33** 201:24
**3:54** 202:2

**4**

**407** 143:23
  144:12

**41** 5:1
**425328** 162:17
**425364** 222:15
**4256** 222:19
**427** 202:6,20
**47** 4:19 217:14
  217:16 223:13
**487** 162:14
**4:55** 251:3
**4th** 154:24
  155:16 162:11
  162:21 163:7
  165:1 168:1
  169:18 180:12
  180:18 183:1
  185:5 187:23

**5**

**5** 4:9 93:21,22
  119:17
**5/11/2026**
  271:5
**50** 121:12,17,22
  122:1,4,9
  123:12,13,18
  124:4 126:2,8
  138:1,3 142:10
  142:14 145:12
  145:16,20,25
  146:1 147:2,4
  147:7,23,24
  148:5,9,23
  149:4,6 161:25
  164:15,21
  165:2,13 166:4
  169:6,14,23

170:2,8,10,13
172:22 173:4,6
173:13 174:13
174:23 176:20
176:21 177:16
182:15 185:18
189:25 191:14
191:18,19
192:5,6 193:19
194:2,3,6,8,12
236:11
**500** 7:23 8:13
**500,000** 47:24
  48:6,8,11,12
**507** 41:3
**513** 57:10
**57** 5:3
**5:00** 180:14
**5:20** 251:6
**5:35** 266:2
**5:44** 266:5
**5:46** 1:20
  267:10,11
**5th** 130:17
  132:15 144:13
  144:15 177:15
  179:18 180:7
  181:9 214:18
  214:23 215:11
  238:7

**6**

**6** 5:23
**68** 5:5
**6th** 14:19 247:4

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[7 - advised]**

| 7 | | | |
|---|---|---|---|
| **7** 4:4 118:22 119:16,21 184:13 **7336** 190:12 191:2 **77002** 3:18 **7th** 136:11 137:17 | **able** 33:5 64:16 67:17 87:1 131:8,9 153:24 175:2,21 239:8 265:15 **aboard** 30:7 **above** 1:18 53:10,14 204:6 204:14 271:6 | **action** 14:15 166:23 242:2 245:2,5 264:7 269:23,25 **actions** 137:10 248:25 **actively** 19:25 **activities** 64:18 91:13 174:18 176:23 177:4 | **adding** 121:20 191:6 193:1 **addition** 8:14 239:10 **additional** 6:20 175:13 202:22 **address** 9:19,24 75:15,16,18,21 75:24 76:5,11 76:19,22 77:2 |

**7**

**7** 4:4 118:22 119:16,21 184:13
**7336** 190:12 191:2
**77002** 3:18
**7th** 136:11 137:17

**8**

**8159331** 1:25 271:5 273:3
**87** 4:20 226:21 226:22

**9**

**9** 173:25 174:11
**90** 167:9
**93** 4:9
**932** 215:25 216:7
**94108** 2:9
**9:48** 1:20 6:4
**9:51** 191:4
**9th** 93:25

**a**

**a.m.** 1:20 6:4 68:11,14 71:13 71:16 100:21 100:24 202:13 221:2
**ability** 16:11 199:10

**able** 33:5 64:16 67:17 87:1 131:8,9 153:24 175:2,21 239:8 265:15
**aboard** 30:7
**above** 1:18 53:10,14 204:6 204:14 271:6
**absolutely** 47:23 174:14 234:9 235:4,17 254:15
**accepted** 175:25
**access** 76:7
**accompany** 105:24,25
**account** 46:14 46:24 47:6,17 239:8,15 242:15
**accounting** 17:14 29:19,21 47:1 96:5
**accurate** 12:24 29:22 258:18
**achieve** 166:14
**acknowledge** 234:15
**acknowledg...** 268:1
**act** 109:6
**acted** 214:2

**action** 14:15 166:23 242:2 245:2,5 264:7 269:23,25
**actions** 137:10 248:25
**actively** 19:25
**activities** 64:18 91:13 174:18 176:23 177:4
**activity** 198:17
**actual** 62:9 81:25 136:10
**actually** 13:11 24:16 33:13 42:17 50:16 58:3 70:13 87:18 102:12 119:17 134:4 139:17 142:19 152:25 170:17 171:20 175:8 176:3 180:23 202:21 218:2 230:14 233:3 237:23 240:10 257:12
**ad** 229:3
**adam** 68:4
**adamantly** 259:3
**add** 121:19
**added** 137:6 139:5,14 191:8 191:9

**adding** 121:20 191:6 193:1
**addition** 8:14 239:10
**additional** 6:20 175:13 202:22
**address** 9:19,24 75:15,16,18,21 75:24 76:5,11 76:19,22 77:2 77:3,12 234:16 234:16 236:1
**addressing** 234:24
**adjourn** 266:9
**adjudicate** 69:11,20
**adjustments** 120:9
**administration** 16:23 17:7 37:23,25 38:4 38:5,19 254:22
**administratio...** 99:9
**administrative** 64:18 99:14
**administrator** 65:15 78:18 82:23 83:2,5
**advance** 62:14
**advise** 86:20 248:11
**advised** 107:5

Veritext Legal Solutions
866-299-5127                 calendar-ca@veritext.com                 www.veritext.com

**[advisor - anymore]**

**advisor** 32:18 32:22 40:1,10 40:11 49:11 54:2,6 55:14 59:4 70:17 71:2,19,23 77:18 80:10 83:18 87:19 95:17 106:14 106:20 219:1 254:10
**advisors** 82:22 254:13 255:8
**advisory** 71:22
**affairs** 234:25
**affect** 243:19
**affirmatively** 119:10
**afge** 5:14,20,22
**afl** 1:7 6:7 271:3 273:1
**agencies** 188:13
**agency** 29:9 67:2,8 71:25 80:15,17,18,20 88:13 91:12 95:12,22 96:25 98:10 122:23 123:1,14 165:18 166:10 178:19,19
**aggressive** 140:4

**ago** 178:14,15 234:25 257:7
**agree** 107:24 107:25 198:17 201:11
**agreed** 24:1 55:17 159:25 195:1 199:6,8 247:23
**agreement** 5:2 44:4 68:10 71:12 100:20 134:7 153:15 201:23 209:1 251:2,11 266:1 267:8
**agreements** 247:22
**ahead** 100:2 180:5
**aimed** 255:12
**air** 36:2
**al** 1:7,13 6:7,8 271:3,4 273:1 273:2
**alaska** 105:16
**alignment** 80:15
**allow** 17:22 78:14 197:13 197:18 201:16 261:19 263:8
**allowing** 247:21

**alongside** 28:6 95:1
**altber.com** 2:10,11,12
**altshuler** 2:7 6:23
**ambiguous** 149:8
**american** 1:5 6:6 95:22,25 97:3 271:3 273:1
**amount** 31:19 31:25 50:15 51:12 64:22 173:21 178:18 255:7
**amplify** 261:21
**analysis** 123:14 123:16 188:20 189:4 193:8,13 193:16,18,21
**anchorcode** 41:19 42:17,19 42:21 43:1,13 43:16,20,23 44:10 46:2 48:20 52:11,19 57:14,16 58:25
**andrew** 201:15
**annual** 164:11 165:2,12 167:20,21 168:12 169:6 170:2 175:22

177:16 181:10 186:22 187:12 187:16,21 188:4,13 194:13 246:18
**annually** 175:20
**anomaly** 175:12
**answer** 8:18 9:20 11:11 12:1 61:25 99:24 100:5 140:17,17 141:18 149:9 151:13,25 152:1 257:18 258:4,7,7,10,20 258:22,24 260:9,10,15,15 261:19
**answers** 10:25 260:24 268:5
**anticipated** 196:14
**anticipates** 223:8
**anybody** 23:3 53:14 55:23 107:5,10,16 234:23 264:20 265:9
**anymore** 60:12 105:9

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[apartment - asking]**

| | | | |
|---|---|---|---|
| **apartment** 35:4 35:5 | 156:1,9 172:4 181:14 190:12 190:20,25 193:20 203:24 204:4 226:5 244:19 | **approvals** 82:7 83:23 110:25 | **arrived** 39:3 81:10 |
| **apologies** 207:20 238:3 | | **approve** 53:5 250:21 | **arriving** 7:22 |
| **apologize** 215:15 | | **approved** 30:18 32:4,5 | **article** 104:19 |
| **app** 206:15 | **applied** 205:10 205:15 | 49:1 52:24 53:1,3,12,15 | **articles** 63:5 |
| **apparently** 131:20 224:23 | **appointed** 89:10 | 55:21 72:6 82:5 90:24 | **aside** 15:3 36:22 72:14 98:24 105:10 137:22 211:22 221:6 226:11 226:12 250:22 |
| **appealing** 242:3 | **appointee** 56:2 56:4,4,8 157:6 163:10 | **approves** 53:16 53:19 | |
| **appeals** 242:1 | | **approximate** 142:12,14,15 | **asked** 21:2,5 22:23 23:2,15 23:17 36:12 40:5 69:9,24 78:2,4 91:6 101:21 105:7 105:22,23,25 117:4,7 129:3 150:12 152:8 202:15 238:10 238:12,15 253:17,18,19 257:9 259:14 259:16,19 262:9 263:16 |
| **appear** 8:11 132:16,25 136:14 137:18 154:8,19 189:6 265:14,19 | **appointment** 56:13 | **approximately** 7:23 8:12 17:25 18:14 46:22 47:8 109:3 121:12 142:10 164:15 166:18 187:3 217:18 221:4,5 | |
| | **apprehensive** 23:9,13 | | |
| | **approach** 30:1 159:9 | | |
| **appearances** 2:1 6:12 | **appropriate** 149:16 | | |
| **appeared** 120:2 139:14 143:2 | **appropriation** 175:12,20 | **april** 14:23,25 19:5 20:17,21 20:24 31:16 34:9,25 35:23 65:9 68:23 72:24 73:1,7,8 75:17 85:3 154:24 155:16 | |
| **appearing** 271:18 272:7 | **appropriations** 175:22 | | **asking** 9:15 13:7,24 29:10 33:23 55:2 62:1 70:6 92:10 118:21 139:18 143:22 164:19 192:8 193:7 194:22 223:25 249:5 |
| **appears** 8:18 34:8 35:3 43:25 52:23 68:22 69:16,25 104:10 105:1 136:20 137:5 138:21 139:2 139:14 140:3 140:13 142:16 142:20 148:6 152:18 153:22 154:5,7,25 | **approval** 81:19 81:19 82:2,3,4 82:15 83:24 84:1 89:4,7,8 89:20 91:1 92:1 110:12,17 141:9 195:16 195:19 196:17 197:6,9 | **arranged** 54:17 210:3 | |
| | | **arrangements** 53:6 | |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[asking - awareness]**

249:15 252:9 263:21

**aspects** 28:20 86:23 87:25 100:8,10

**assembled** 162:18,19

**asserting** 8:5 62:3 101:2

**assertion** 100:4

**assertions** 62:3 100:17

**assess** 158:4

**assets** 18:22

**assist** 23:3 27:6

**assistance** 22:25

**assisting** 28:23

**associated** 212:12

**associates** 17:16 18:5,7

**assume** 53:8 55:16 59:4 60:23,24 197:11 205:15 251:25

**assuming** 254:9

**attached** 190:4 190:4 268:8 269:16

**attaching** 193:18

**attachment** 189:23,24

190:1,2,3 194:1,1

**attachments** 247:6,7 260:3 260:4

**attempting** 101:5 149:17

**attended** 93:14 94:5,14 95:1,2 229:12

**attending** 94:9 94:18 210:15 226:3

**attorney** 8:8,21 11:21 12:4,7 13:14 257:17 258:3,6 259:1 259:1,5 260:8 260:11,12 261:14,23 262:3,7

**attorneys** 13:14 261:14

**august** 73:1 86:9 142:6

**austin** 16:22 17:12

**authentication** 145:23

**authority** 49:12 56:23 77:17,19 77:22 78:19,21 79:1 88:20,24 108:9 110:8,24 181:24 184:8

194:19,23 195:8,9,15,19 196:17 199:7 200:1,7,21 201:2 210:19 211:10 218:6 229:6 245:13 245:19 268:16

**authorized** 54:14,19,22,25 55:11,18 71:8 75:20 76:10 106:5

**authorizing** 53:20,22 54:9 54:11,13,18 55:13 106:3

**auto** 77:5,6,8 77:10 130:22 131:3,11,16 132:1,21 133:6 133:11,14,25 136:22 264:19

**available** 20:7 239:9 266:16

**avenue** 3:10

**aware** 12:18 20:6,8 28:2,4 31:22,23 33:5 38:6 52:7,12 52:13,15 55:23 59:18 72:11,13 74:18,21 80:13 80:19 82:16 84:4 89:1,3

93:8 110:15,20 110:22 111:9 111:10 120:14 121:21,23,25 123:13,16,17 124:6,11,14,18 134:18 144:8 146:11 147:12 149:5 165:25 166:2,5,18,21 167:8,10 169:13,16,19 170:22 171:7 171:13 177:17 181:16 184:6 185:6 186:16 186:21 188:16 189:2 192:10 193:10,11,13 194:1,3,7 211:23 212:3 218:3 219:8,11 221:7,10 228:19 231:24 232:21 240:6 240:12 241:15 241:17,20,25 242:3 244:3,4 248:23 249:1 249:18 255:9 255:10,11

**awareness** 193:3 232:12

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[b - believe]**

| b | | | |
|---|---|---|---|
| **b**  183:24 272:1 | 160:24 166:16 | **begins**  65:12 | 121:4 124:21 |
| **ba**  17:12 | 169:24 174:20 | 143:23 | 124:25 125:15 |
| **bachelor**  16:22 | 174:22 187:24 | **behalf**  7:2,17 | 125:25 127:17 |
| **back**  8:20 | 194:16 198:12 | 12:5 43:20 | 127:25 128:11 |
| 46:23 47:5,17 | 199:4 220:7 | 52:21 247:23 | 128:25 130:24 |
| 63:15 68:13 | 225:9 240:19 | 266:24 | 131:12,20 |
| 71:15 74:17 | **basic**  87:16 | **believe**  18:13 | 134:2,16 |
| 87:2 89:3 | **basis**  49:15 | 18:15 20:17 | 135:20 136:21 |
| 90:13 100:23 | 70:25 123:17 | 21:23 22:6 | 137:16,23 |
| 108:7 115:24 | 151:14 | 24:9,23 28:1 | 139:22 140:6 |
| 116:11 119:17 | **bat**  158:7 | 28:25 32:12 | 142:20 148:13 |
| 134:10 140:19 | **bates**  33:15 | 33:2,14 34:23 | 148:19 150:22 |
| 140:22 147:1 | 34:3 41:2 | 37:11 43:6 | 151:4 154:11 |
| 153:18 183:2 | 57:10 68:18,19 | 49:11 50:2 | 154:13,17 |
| 201:20 202:1 | 103:3 134:17 | 53:1,20 54:9 | 159:18 160:13 |
| 217:9 221:12 | 138:20 151:2 | 54:14 55:7 | 160:25 161:2 |
| 225:24 226:7 | 156:19 162:19 | 56:9,9 58:7,13 | 165:14 169:8 |
| 228:23 251:5 | 172:2 191:2 | 58:20 59:20 | 176:5,17 |
| 251:10 256:7,9 | 202:6,24 | 61:7 64:15 | 180:24,25 |
| 266:4 | 207:19 222:14 | 65:9,13,17,19 | 183:13 184:20 |
| **background** | **bear**  207:19 | 66:4,15 75:12 | 185:3,22 186:6 |
| 26:21 32:23 | **becoming** | 76:5,23 77:11 | 189:21 191:10 |
| 46:25 64:4,9 | 19:15 49:18 | 77:13 81:11 | 195:6 196:7,9 |
| 66:22 96:1 | 50:13 | 83:12 85:13 | 198:7,23 199:8 |
| **balance**  66:23 | **began**  39:20 | 89:1,9,12 | 199:14,22 |
| **baltimore**  2:17 | 69:3 91:18 | 90:10,23 91:20 | 200:9,23 |
| **bank**  46:13,24 | 108:7 111:14 | 92:21 93:10 | 202:25 203:5 |
| 47:5,17 | 204:6,10,13,15 | 94:10 96:23 | 205:24 206:18 |
| **barton**  74:10 | 249:5 252:14 | 99:6,18 101:14 | 207:4 210:1 |
| 83:8 94:25 | 252:19 255:22 | 101:16 103:18 | 214:18 217:3 |
| 125:15 215:19 | **beginning**  42:9 | 103:20 110:1 | 218:10 219:2 |
| **based**  37:17 | 116:5 211:25 | 113:24 114:20 | 221:23 222:7 |
| 149:15 154:5 | 212:9 216:3 | 115:2,12 116:2 | 225:11 230:16 |
| 160:19,21,22 | 229:1,8 240:13 | 116:6,12 | 230:17,21 |
| | 241:2 250:3 | 117:14 119:11 | 231:18,18,20 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[believe - campagna]**

| | | | c |
|---|---|---|---|
| 236:24 237:21 237:22 240:23 246:8 248:10 248:16,17 253:9,25 254:3 255:20 256:18 256:22 259:13 264:16 265:8 | 235:13 **bobette** 3:23 6:2 **booklet** 9:20 **bottom** 35:22 141:2 157:25 158:2 168:3 184:13 202:24 251:24 | 224:15,16 225:3,6,8 226:3,10 **briefings** 209:23,24 210:2,9,10,12 210:17 220:11 224:18,21,25 | **ca** 271:9,12,21 **calendar** 31:20 162:23 **calendarized** 112:12 **california** 1:2 2:9 |

**bell** 228:13
**belongings** 231:16
**benefits** 51:18 51:20
**berzon** 2:7 6:24
**best** 9:10 11:5 152:22
**better** 29:24,24
**bidding** 48:16 48:23
**bilicic** 183:5 215:20
**billion** 173:25 174:8,11
**bio** 20:7
**bit** 26:23 56:7 65:8 68:6 72:21
**blame** 173:9 248:8 249:16
**blaming** 247:25 249:10
**block** 101:6
**board** 242:24
**boarding** 230:8 231:5 232:5

**bottoms** 189:4
**box** 2:20 15:16 232:17 242:13 242:17
**boxes** 231:16
**break** 12:10,13 68:7 101:1,18 134:9 153:13 153:21 196:15 201:21 250:24 265:23
**breakfast** 87:14
**breaks** 12:11
**brick** 90:9,18 90:21,23
**brief** 86:1 223:23 225:2
**briefed** 210:24 210:25
**briefing** 210:5 210:15,20,23 219:12 220:1,9 220:16,19 222:23 223:2,5 223:19 224:13

**briefly** 85:6
**bring** 148:3,4
**bringing** 36:6
**broader** 141:3
**broadly** 140:12 245:20,22
**broken** 246:23
**brought** 16:1 178:23 179:2,5 179:6,8,11 253:3
**bryant** 94:21
**budget** 98:11
**build** 159:10
**built** 89:14
**bullet** 63:6
**bunch** 246:21
**business** 16:22 17:7 21:20 45:9 80:8,11 92:23 107:10 107:13,16,21 107:25 108:3
**busy** 254:22

**call** 36:1,13 39:11 40:4,5,6 69:10,24 70:3 135:18 155:2 162:5 238:12 239:3 246:2
**called** 22:23 28:3,4 40:2 60:1 98:25 101:17 115:11 119:22 126:16 129:2,3 225:2 232:4
**cam** 66:2,8
**cameron** 65:16 85:3,4
**campagna** 3:14 7:9,9 9:23 33:14,19,24 34:2 100:6,11 134:22 135:1,5 135:9,15 162:20,23 163:1 168:18 168:22,25 169:3 170:25 171:3 177:12

Veritext Legal Solutions
866-299-5127                    calendar-ca@veritext.com                    www.veritext.com

**[campagna - chco]**

202:10 214:16 222:4,6,12 225:13,17 251:20 259:11 260:18,22 261:16 264:11 264:13 265:5,7 266:9 267:4 271:1

**campus** 73:3

**canceled** 117:21,22

**cancellation** 228:17

**capacity** 1:11

**capture** 41:24 104:10 264:14

**captured** 132:4

**care** 134:18

**career** 56:2,4 56:18 157:7 170:14 171:8 171:10 186:21 187:1

**careers** 161:6

**cares** 146:4

**carried** 54:6

**carry** 87:2

**carrying** 231:15

**carryover** 215:2

**cart** 143:2

**case** 1:9 80:7 224:2 232:14

260:4

**cases** 233:8,11 236:19

**categorize** 198:14

**cause** 1:19

**caused** 235:15

**cc** 165:4,9

**ccp** 271:9,12

**center** 231:9

**centered** 224:25

**certain** 15:19 82:18 100:8 101:3 114:15 166:16 238:10

**certainly** 227:4 248:10

**certainty** 219:10

**certificate** 269:1

**certified** 1:21 269:5 270:1

**certify** 268:3 269:7,11,21

**cfo** 19:11

**chain** 5:21,23 182:22 190:11 190:14,20 215:11 244:16

**chair** 93:11

**challenge** 23:14 38:12

**challenges** 38:15

**chamberlain** 1:23 3:16

**chamberlainl...** 3:19,20 271:2

**chance** 202:14

**change** 114:21 132:9,10,18,24 133:6 137:14 269:17 273:6,9 273:12,15,18 273:21

**changed** 18:9 131:19,20 132:1,7,21 133:14,19,25 136:18,22 137:4

**changes** 261:4 268:7 269:16

**changing** 133:11 137:13

**characterizati...** 101:12 140:24

**charts** 67:2

**chat** 4:25 5:6,8 5:10,11,12,13 5:17,18,19 34:11,20,24 35:23 68:23 70:12 92:6,20 103:10,24 104:10,13 126:15,20

127:8,9,15 128:3,4,9,13,14 128:20 129:8 129:25 130:9 130:22 131:2,3 131:6,10,16,24 132:5,25 133:13 135:21 136:14 137:11 138:21 139:3 139:10,14,15 140:12,12 143:21 153:3 153:22 154:7 156:20 157:9 172:5 202:23 203:7,19,23 204:6,17,21 205:3,13,17 225:10 259:22 260:2

**chats** 39:16,17 92:22 93:1 128:5,8 131:2 133:13,22 144:1 151:4 202:20 206:9 259:20,24 263:19 264:3,8 264:19

**chco** 187:11,15 223:22 244:19 247:21,25 248:8,14,19 249:10,16,23

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[chco's - company]**

| | | | |
|---|---|---|---|
| **chco's** 248:1 | **clean** 157:18 | 188:16 | 56:21 126:10 |
| **chicago** 2:15 | 158:24 159:1,9 | **collection** 88:9 | **communicate** |
| **chief** 40:1,2,6 | 159:17 | 88:13 | 98:22 206:7,15 |
| 40:10,11 75:12 | **cleaned** 29:21 | **come** 21:1,2,5 | 206:16 |
| 83:18 105:13 | **clear** 11:8 51:2 | 22:24 23:3 | **communicated** |
| 196:9 261:25 | 104:8 196:10 | 25:9 30:2,4 | 46:10 81:13 |
| **choosing** | **clearly** 101:9 | 35:9 38:23 | 92:3,6 161:4,8 |
| 247:22 | **client** 8:8,21 | 55:9 66:3 | 161:10,12 |
| **christmas** | 206:6 257:17 | 110:25 113:17 | 199:18 209:25 |
| 116:8 | 261:14,23 | 148:14,15 | **communicating** |
| **christopher** 3:2 | **clients** 12:5 | 153:8 154:21 | 34:12 98:15 |
| 7:1,16 | 149:16 | 166:25 167:5 | 206:21 |
| **christopher.h...** | **clock** 130:18 | 217:6 228:23 | **communication** |
| 3:5 | **close** 199:16 | 231:22 241:24 | 98:18,20 |
| **cio** 1:7 6:7 | **closely** 112:5 | **comes** 143:6 | 143:23 151:11 |
| 271:3 273:1 | **closing** 159:7 | **comfortable** | 152:9 161:6 |
| **circulated** | **cnn** 249:5 | 33:22 | 187:15 192:13 |
| 189:20 191:1 | **coaching** | **coming** 23:21 | 199:23 200:18 |
| **circumstance** | 100:15 151:16 | 27:1 28:3,15 | 261:7 |
| 236:20 | 151:24 152:3 | 29:11,11,15,18 | **communicati...** |
| **circumstances** | **cob** 139:19 | 30:3,7,10 | 8:10,23 99:21 |
| 35:10 | **cochair** 93:9 | 38:18 49:24 | 99:25 129:8,12 |
| **city** 2:15,17 | **code** 271:9,12 | 64:7,10 81:7 | 129:13 151:8 |
| 38:13 | 271:19,21 | 91:5 101:6,10 | 152:2 160:8 |
| **civil** 3:3 14:15 | **coincidence** | 143:9 175:13 | 206:5,12 208:3 |
| 109:15 271:19 | 170:1 | 233:25 234:15 | 212:4 227:18 |
| 271:21 | **colleague** 35:8 | 234:22 235:6 | 228:8 231:1 |
| **cl** 155:2 | 35:12 | **comment** 62:16 | 241:23 242:4 |
| **clarification** | **collect** 16:5 | 147:15 | 258:10,21,25 |
| 177:10 | **collected** 66:18 | **comments** | 259:4 260:6,11 |
| **clarify** 260:5 | 66:20 67:18,19 | 96:16 266:22 | 261:8 262:6 |
| **claw** 8:20 | 67:21 104:7 | **commission** | 264:23 265:2 |
| 140:19,22 | 136:3 139:1 | 268:23 | 265:10,12,18 |
| **clayton** 201:15 | **collecting** | **common** 11:6 | **company** 18:17 |
| | 132:12 144:9 | 45:8 54:24 | 18:18 19:2,8 |

Veritext Legal Solutions
866-299-5127        calendar-ca@veritext.com        www.veritext.com

**[company - contracted]**

21:14,16,20
22:2,6 26:9,13
51:21,25
**compilation**
162:8,15
**compile** 187:12
**compiled**
246:19 252:7
**compiling**
211:24
**complete** 12:24
205:12
**completed**
271:7,17 272:6
**completely**
13:4
**completion**
269:14,20
272:11
**comply** 258:23
**component**
237:7
**components**
64:24 187:11
188:3 189:3,25
237:14,15
239:4 240:15
246:19 252:8
**comprised**
108:23 166:19
**computerized**
1:22
**concede** 243:22
**concept** 95:21
199:5

**concern** 226:17
227:7 228:11
234:21 235:5
235:16 244:20
**concerned**
228:9 233:24
254:4 255:14
**concerning**
254:8
**concerns** 99:9
253:6
**concluded**
267:11
**concludes**
267:8
**concurrence**
110:14 195:13
**conducted**
92:23 237:3,7
262:8 266:18
**conference**
12:22
**confidential**
9:20,24 11:23
**confirm** 252:1
**confirmation**
202:17 256:20
**confirmed**
59:11 256:3
**congress** 173:9
253:16,23
**congressional**
253:12
**conjunction**
90:25

**connect** 75:25
76:8
**connection**
21:12,19,22
**consider**
106:15,17
176:24 261:13
**considerable**
255:7
**considered**
35:9 106:20
120:9
**considering**
239:8
**consistent**
123:20,24
**consult** 12:6
**consulting**
42:25 43:3,7
57:14,16
**contact** 34:21
50:11 192:22
199:16 204:23
271:9,20
**contacted**
50:12
**contain** 140:13
269:17
**contained**
62:23 121:22
121:25 124:7
**containing**
231:15
**content** 104:10
104:13 205:13

259:21 263:19
264:2,8,15
**context** 108:16
126:8 216:10
216:12,19,22
218:5
**continuation**
214:18
**continue** 18:6
36:15,19 49:24
173:20 175:21
177:7 240:18
252:6
**continued**
26:12 115:3
205:3,17 221:8
234:1
**continuing**
36:5 50:8
**continuous**
152:18
**contract** 40:19
41:11,19 42:1
42:4,10 43:23
44:1,9,11,13,25
46:10,15,19
47:20 49:5,8
50:16 53:13,15
58:21 59:8,19
59:25 60:4,7
69:10,14 108:5
113:14 256:8
**contracted**
42:23

**[contracting - core]**

| | | | |
|---|---|---|---|
| **contracting** | 169:9 184:7 | **coordinated** | 134:19 135:7 |
| 44:19,22 45:12 | 187:20 197:25 | 128:21 | 143:6 185:3 |
| 45:14,18 67:5 | 198:2,4,13,15 | **coordination** | 213:13 222:11 |
| **contractor** | 199:2,4 200:3 | 128:8,15,17 | 222:20 233:9 |
| 31:11,12 41:18 | 200:15,16 | **copay** 51:21 | 239:25 247:6,7 |
| 42:22 49:7,19 | 217:10 229:24 | **copied** 80:7,11 | 247:8 248:5 |
| 50:9 51:16,19 | 235:8 240:24 | 80:12 152:24 | 249:7 |
| 54:5 106:16,24 | 261:20 | 165:12 168:15 | **copying** 193:1 |
| 107:11 257:23 | **conversations** | 168:17 179:21 | **corbell** 17:16 |
| **contractors** | 23:20,22 24:22 | 180:20,23 | 18:5,7 |
| 238:13 239:10 | 25:2,7 26:24 | 181:17,18 | **core** 88:20,25 |
| 239:13 | 36:5,8,15 | 183:4,14 185:5 | 108:9,12,14 |
| **contracts** 48:20 | 59:16 60:10 | 189:7 191:4 | 109:8 110:11 |
| 53:16,18,19 | 61:15 62:17,19 | 192:13 193:11 | 110:21 114:12 |
| 89:16,17,18,21 | 62:25 108:8 | 196:5 212:4 | 163:21 166:13 |
| 250:18,20 | 110:3,5,8 | 213:5,7,12 | 166:14,15,19 |
| **contribute** | 122:3,5,7,8,12 | 214:1,25 | 166:21,24 |
| 37:22 | 122:25 123:9 | 217:19 218:17 | 167:4,9 174:3 |
| **control** 62:4 | 137:24 138:5 | 218:19,21 | 174:13 175:4 |
| 63:10 233:5 | 141:9 161:24 | 221:15,16 | 175:23 176:2 |
| **controller** | 162:2 166:12 | 227:17 232:9 | 177:18 178:1,6 |
| 19:10 | 167:12,18 | 232:20 233:1,4 | 178:7,10 |
| **controlling** | 169:13,22 | 233:15,17 | 179:24 181:6 |
| 241:13 | 177:17,25 | 245:8 247:18 | 181:13 182:2 |
| **convenience** | 178:4,5,7,9 | 250:10 | 182:16 183:20 |
| 60:4,8 | 186:8,10,13,16 | **copies** 13:13 | 184:14,19,24 |
| **conversation** | 189:18 192:15 | 33:12 93:20 | 185:1,3 194:20 |
| 11:7 21:7 24:4 | 192:24 216:1,5 | 135:2 266:15 | 198:10 199:7 |
| 24:10,25 25:5 | 230:1 231:4 | 266:16 | 210:13,19 |
| 27:12,19 36:11 | 240:25 249:3 | **copy** 7:20,23,25 | 211:3,10 213:2 |
| 60:5 61:10 | 257:21 | 8:1,2 13:12 | 215:4,10 220:2 |
| 123:11 139:12 | **convert** 179:9 | 16:3 33:13,20 | 220:10,17 |
| 146:19 149:3 | **convinced** 25:9 | 124:12,16,19 | 225:7 229:7 |
| 156:3,7,10 | **cooperation** | 124:21,23 | 230:1 233:12 |
| 162:11 165:22 | 267:2 | 125:9,16 | 245:6,8 247:20 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[core - correct]**

| | | | |
|---|---|---|---|
| 247:21 248:1 | 78:17 80:25 | 68:24 69:2,4,7 | 143:13,25 |
| **cores**   108:17,21 | 83:18 84:18 | 69:14,16,24 | 144:2,3 145:9 |
| 108:22 109:2 | 96:20 97:9 | 71:25 72:1,16 | 145:25 146:13 |
| 181:23,24 | 98:1,8 102:22 | 72:19 75:15 | 146:24 147:25 |
| 182:5,8 183:24 | 102:23 106:1,3 | 76:7,13,15,17 | 148:5,9,12,16 |
| 184:3,8 185:7 | 107:7 117:8 | 76:18 79:7 | 152:18 155:18 |
| 195:15 196:18 | 120:25 150:6,9 | 80:3,4 81:16 | 155:19,22 |
| 199:11 200:22 | 155:3,24 | 81:17 85:4,5,8 | 156:8 157:3,15 |
| 211:18,24 | 156:12 172:5 | 85:9,13,15,22 | 158:25 159:24 |
| 212:9,12,20 | 206:13,16,20 | 85:25 90:13,17 | 161:16 166:1 |
| 216:2,23 218:5 | 207:3 211:8,17 | 92:2,6,16 93:7 | 171:9 172:20 |
| 218:13 219:6 | 231:4 235:3 | 93:9,15 96:3,8 | 173:11 174:6 |
| 221:9 223:3,12 | 252:25 253:3 | 96:9,25 97:4 | 175:7,16 |
| 223:18 224:5 | **correct**   10:3 | 97:20 99:11 | 176:11,16,20 |
| 225:7 229:1,7 | 15:13,14,22 | 104:11,12,15 | 180:21 184:16 |
| 230:8 231:5,15 | 16:3,4 18:24 | 104:17,25 | 185:23 191:7 |
| 231:19,24 | 18:25 20:11,12 | 105:14,19,20 | 192:3,6,8,9 |
| 235:13 240:13 | 20:19 31:10,11 | 108:24 109:10 | 194:15 195:16 |
| 240:16,17 | 35:6 38:21 | 110:12 111:15 | 197:6 203:23 |
| 241:2,5,14,16 | 40:21 42:6,7 | 112:4 113:15 | 205:4,14 |
| 244:20 245:11 | 42:11,12,13,14 | 113:16 114:23 | 206:14,25 |
| 245:13,15,16 | 42:16 43:9,10 | 115:9 122:16 | 207:8 208:2 |
| 245:21 246:6 | 43:15,18,24 | 122:17,20,21 | 209:16,17,20 |
| 248:8,25 249:6 | 44:2,19,20,23 | 122:23 123:15 | 211:7 213:6 |
| 250:3 | 45:2 46:16 | 123:18,19 | 214:3 215:18 |
| **corey**   21:20 | 47:2 52:19,22 | 125:18 126:2 | 216:13 218:18 |
| 26:24 28:16 | 52:23 53:7 | 126:16 127:11 | 218:22,24 |
| 34:9 36:13 | 54:3,7 56:2,8 | 127:12 129:9 | 219:21 220:22 |
| 37:8,13 39:22 | 57:16,17,19,20 | 129:14 131:17 | 224:7,8,9 |
| 39:23 49:7 | 57:22 58:19 | 132:25 133:20 | 225:7 231:13 |
| 50:2 52:1 53:1 | 60:18,22 62:23 | 136:5,15,16,24 | 235:16,22 |
| 57:1 59:13 | 62:24 63:18,19 | 138:2,3 139:1 | 238:14 241:2 |
| 66:11,13 67:15 | 64:7,8,10,11,14 | 139:4,15,16,21 | 243:4 245:13 |
| 68:23 71:5 | 65:11,21 66:11 | 140:2 142:11 | 248:6 251:9 |
| 72:5 73:24 | 66:12 67:16 | 142:13,17,25 | 253:5,21 |

Page 14

**[correct - cutting]**

254:11 255:13 255:15 257:3 257:23 261:4,5 261:10,11,12 261:15 262:10 262:18 263:11 263:12,16,17 264:24,25 265:13,15,16 268:5

**corrected** 143:24

**corrections** 268:7 271:14 271:15 272:3,4

**correctly** 22:22 109:8

**correspond** 39:13

**corresponden...** 34:8,10

**corresponding** 85:14

**cost** 51:14 175:4

**council** 93:3,9 93:15 94:1,9 94:13,15,18,23 116:22 117:1,3 117:11 120:4 121:23 123:4,6 124:20 125:6,8 125:14 126:21 144:21 145:4 146:7,8,12,23

147:20 148:14 148:20,25 161:21 166:2 169:21 191:23 194:11 228:17

**councils** 94:12

**counsel** 6:11,20 7:13 8:1,2,3,4 9:1 11:13,25 16:2 33:14 83:13 100:7 101:2,9,13 104:7,9 130:11 134:15,19 138:20 143:25 144:5,9 149:12 151:16 152:13 153:9 156:21 162:10 171:24 177:9 202:22 205:10 238:6 242:14,14,18 256:22 257:1 258:11,21 259:14,18 261:1,18,20,24 261:25 262:1,9 262:13,17,20 263:8,8,9,14 266:13,17 267:1 269:21 271:18,22 272:7

**counsel's** 260:16

**counselor** 74:11 83:8 94:25

**country** 116:16 219:18,20,24

**county** 2:16,16

**couple** 72:23

**course** 66:22

**courses** 17:23

**court** 1:1 6:9 6:12 10:22 11:1,8 12:20 13:16 41:23 90:13 262:22 262:24,25 263:3,3,5

**courtesy** 7:20 8:1

**courtroom** 12:23

**cover** 51:20

**coverage** 254:1 254:5,25 255:2 255:7,12,16

**covers** 119:4

**craft** 235:21

**created** 8:15 127:24,25 131:6

**crest** 18:17,18 19:1,7 21:14 21:15,19 22:1 22:6 26:8,12 35:12

**csr** 270:7,8

**cubicle** 73:6,12

**current** 123:22 123:24 262:17 262:20

**currently** 9:21 10:2 104:11

**cut** 69:15 122:1 123:1,12,14,18 124:15 126:8 137:25 142:10 145:16,20,25 147:5,24 148:5 148:23 149:4 160:16 161:19 161:25 164:15 165:2,13,17 166:4 169:6 170:2,8,10,13 172:21 173:4,6 173:17 174:12 174:23 176:19 176:21 177:17 182:15 185:17 189:25 192:5,6 193:19 194:2,6 194:12 204:12 236:10

**cuts** 169:14,23 185:24

**cutting** 122:4 122:22 123:10 124:2,4,8 138:5 148:9 174:17 181:11

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[cutting - decision]**

186:8,14 187:6
**cv** 1:10 20:7

**d**

**d.c.** 2:21 3:5,11
25:13 26:1,4
35:5 38:18
116:4,11
229:19,21
**daniel** 22:4,5
22:10,12,15,18
22:23 23:15
28:10 35:17,18
36:16,20,24
154:12
**danielle** 2:4
6:15 9:12
**data** 212:5,7
216:22 238:12
239:3 246:15
246:21
**date** 6:3 8:15
10:13,15 14:18
14:25 15:9
20:15 24:6
39:8 42:9 57:3
57:6 58:9
96:13 130:16
131:23 132:17
136:10 137:2
137:20 181:23
182:3,5,9,16
183:24 185:7
204:4,7 211:25
212:9,20
216:23 224:23

224:24 229:20
237:17 240:13
241:6 246:6
250:3 251:11
251:12 252:5,9
269:15 271:16
272:5 273:25
**dated** 57:23
58:10 142:18
144:13 238:7
251:15
**dates** 31:14
163:21 166:13
167:5 172:8
183:20 207:23
218:5,13 219:6
221:9 222:17
223:12,18
224:4,6 249:2
**david** 65:23
85:10,23
105:11 117:16
**day** 1:19 20:13
59:17 75:23
177:15 179:18
181:9 217:5,6
219:22,25
227:11,15
268:17 270:1
**days** 26:5 116:2
116:15 174:7,9
175:3 231:11
231:12 269:15
**dcos** 81:15
149:5 169:5,11

210:4 216:15
216:21,21
228:25 229:13
**deadline**
193:23,24
**dealing** 66:23
100:17
**december** 5:21
85:18 89:2
110:7 114:18
115:1,21
117:19,23,25
118:20,23
124:1 162:11
162:16,21
163:7 165:1
166:7 168:1
169:18 177:15
178:3 179:18
180:7,12,18
181:9 183:1
184:11 185:5
187:23 188:14
188:19,25
189:3,9,18
190:15,21
191:3 193:4,21
193:22,23
195:20 207:22
208:1,4,4
209:3 210:9,14
211:3,9,19,23
212:21 214:18
214:22,23
215:25 216:15

216:24,25
217:1,7,17
218:11,21,23
219:7,13,21,24
220:17 221:19
222:17,18,20
223:3,18 224:5
224:20 225:22
226:4 227:11
228:18 229:6
229:14,15,18
235:10 236:9
243:1
**decide** 40:6
240:17
**decided** 91:8
121:15 200:23
200:25 201:5,6
**decision** 38:23
58:21 77:16,19
77:22 78:14,18
78:21 79:1
81:9,12 91:25
99:12,15
110:13 141:3
141:24 148:8
170:5,6 200:20
229:7,10,11
230:7,12,15,16
230:19,21
232:11 236:17
236:21,23
245:10,14
250:11

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[decisional - description]**

| | | | |
|---|---|---|---|
| **decisional** 99:24 | 195:8,9 200:2 200:21 | 24:1,9,21 26:13,19 27:7 | **depend** 82:4 |
| **decisions** 77:20 77:24 78:3,5,6 78:12,15 79:10 81:12,14 84:5 89:22,24 90:1 90:22 92:7,13 92:17 236:25 250:8 | **delegation** 110:8,24 184:3 184:8 194:23 195:19 196:17 198:1,6,8,16 199:9,14 200:14,24 | 27:20,22 30:10 31:8 32:15 36:6,16 37:14 37:19 38:23 39:3,24 40:20 42:1,5 43:9 44:2,25 48:22 49:2,9 50:18 | **depending** 83:6 114:7 234:17 **depicts** 207:22 **deponent** 268:1 269:12,13,19 **deposed** 10:17 **deposition** 1:16 6:5 13:15 14:2 |
| **declarations** 225:1,5 | **delete** 19:21 20:1,4 130:22 | 52:3,21 53:5,7 53:11,16,21,25 | 14:15 15:8 101:4,7 104:8 |
| **def** 158:16 | 131:3,11,16 | 54:20,22 55:4 | 118:18 130:6 |
| **defend** 149:17 | 132:1,22 133:6 | 55:6,10,18,21 | 134:18 149:14 |
| **defendants** 1:14 7:3,18 13:14 80:6 101:2,9 130:11 134:20 149:12 238:6 242:14 242:19 | 133:12,14,25 136:23 264:19 **deliberative** 8:9,22 99:22 99:25 100:17 101:3 140:14 140:18,22 141:12,14 | 55:24 56:24 58:4,11 59:3 59:21 60:17,21 67:25 71:24 76:17 77:7 80:14 81:25 92:25 102:17 107:12 108:2 | 149:17 257:8 263:16 266:12 267:9 269:2,9 269:14,20 271:19,23,25 272:8,11 **depositions** 93:20 |
| **defending** 149:14 | **delivered** 266:13 | 110:10 134:1 155:17,23 | **deputy** 81:15 196:9 208:11 |
| **defense** 9:1 242:13 260:16 | **democracy** 2:19 6:22 | 178:20 186:24 197:3 251:8 | **describe** 16:19 34:7 63:20 |
| **deferred** 103:16 | **democracyfo...** 2:22 | 252:20,23 253:4 254:17 | 81:7 82:8 86:16 87:3 |
| **definitely** 147:16 | **denied** 236:10 | 254:21 255:8 255:19 257:22 | 96:7 128:6 **described** |
| **degree** 17:1 | **denotation** 126:11 | 261:2,15,25 264:1 | 62:12 |
| **degrees** 17:9 | **department** 3:1 | **department's** | **describing** 158:14 |
| **delegate** 77:21 198:17 | 3:3,7,9 7:2,7,17 10:12 19:15 | 80:16 | **description** 4:8 33:6 126:21 |
| **delegated** 88:23 194:19 | 20:10,13,20 22:19 23:21 | | |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[designated - disaster]**

| | | | |
|---|---|---|---|
| **designated** 125:3 | 83:3,6 84:8,9 84:10,13,21 | 218:24,25 221:8 223:17 | **difficult** 11:8 |
| **designed** 195:12 199:22 | 86:3,5,8,13,14 86:25 87:2 | 224:8 226:6 231:2 232:18 | **dig** 179:23 181:5 215:9 |
| **desired** 51:8 227:14 | 88:14,17 90:24 91:23,24 93:24 | 232:20 233:9 233:18,19,22 | **digits** 162:13 |
| **despite** 213:18 254:9 | 94:13,24 98:11 98:15,17,20 | 234:5,8,20 235:16 239:24 | **directed** 200:6 200:13 201:2,7 230:23,24 233:7,9 |
| **detail** 22:17 91:8 188:1 | 99:17 111:5 114:2 120:13 | 241:1 245:24 248:25 252:13 | **directing** 13:23 |
| **detailed** 40:14 | 120:18 122:3 122:19 123:10 | 254:10 256:1,3 256:12,13,14 | **direction** 79:13 79:15,25 80:1 81:2 92:12 149:4 |
| **details** 230:5 | 123:12 124:2,4 124:6 125:13 | 256:22 257:2 258:11,21 | |
| **determined** 271:18,23 272:7 | 125:17,19,22 136:24 137:24 | 259:13,18 261:24 262:9 | **directly** 39:13 42:5 128:11 194:17 205:20 209:4 214:9 221:13 253:19 |
| **develop** 185:17 237:15 | 148:16 149:5 149:22 156:25 | 263:1 264:8,9 264:11,18 | |
| **developed** 123:3,6 | 161:4,8,13,15 161:18 165:13 | 265:1,6,8,18 | **directorate** 74:20,25 |
| **dh** 262:9 | 166:5,8 167:13 167:15,25 | **dhshq** 77:13 | **disagree** 100:3 140:23 149:18 258:17 259:3,7 260:13 |
| **dhs** 19:5 21:1,4 23:12 30:18,18 31:15 34:22 53:18 54:2 55:14 57:4 64:7,10 66:7 66:10 67:14 69:4 71:2,19 72:20 73:3,16 73:18,21 74:9 74:15 75:3,25 76:19,21 77:2 77:7,12 79:17 79:20 80:10,19 80:19,24 81:8 | 168:16 169:2,3 170:7,9,12 178:2 181:11 182:7 187:6,9 187:10,11,15 188:4 194:15 195:13,14 199:17 200:4,6 200:12,17,17 206:6 207:6 209:18 212:2 214:3,6 216:24 218:4,14,18,23 | **difference** 56:3 56:18 159:5 **different** 28:20 38:13,15 58:14 59:7 64:24 78:22 82:6,6,8 83:3 84:2,15 84:15,16 87:23 87:24 91:4 114:22,25 123:25 135:10 135:12 186:22 199:24 234:19 234:19 237:21 260:21,23 | **disagrees** 101:12 **disappearing** 137:7,8 **disaster** 64:9 105:16 145:8 160:20 166:16 166:20 170:16 171:15 172:12 172:18 173:17 174:3,16,25 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

[disaster - downsize]

175:3,3,5,6,11
175:15,19
176:7,9,13,14
225:1,5
**disasters**
212:12
**discissions**
61:18
**disclose** 8:8
99:24 140:17
**disclosed** 99:21
256:1
**disclosure**
262:22
**discovery** 8:16
**discuss** 8:25
49:5 65:2 81:2
100:8 172:1
223:19 248:7
249:13,16,19
**discussed** 49:6
49:8 65:2
88:15 121:23
122:13 129:11
129:24 138:4,8
145:6 166:1,6
167:16 173:3
179:24 181:6
215:9 223:4
229:14 245:22
253:7
**discussing**
80:24 108:17
108:17 158:21
159:14 190:14

190:21 193:4
194:18 198:5,8
218:6 224:11
227:23,23
228:25 248:12
257:21 261:1
**discussion** 8:7
88:1 90:25
121:9 129:15
129:17,19
144:23 159:16
177:6 181:12
181:15 184:10
185:6 199:17
211:12,16
226:20 229:10
**discussions**
88:18,19,21
92:12,18 99:16
101:22 102:1,4
102:6,8,14,15
102:17,24
141:24 147:9
147:12 166:8,9
182:7,11
189:14 245:12
245:18 246:1
252:22
**distinct** 84:25
**district** 1:1,2
**disturbed**
235:18
**disturbing**
61:13,17 62:12

**division** 1:3 3:3
53:17 157:5
**dleonard** 2:10
**dobitsch**
163:18 179:17
180:7,21
181:15 183:1
183:19 214:19
214:24 221:12
227:12 228:1,5
**doctrine** 258:3
258:7 259:2,5
260:9,12 262:4
262:7
**document**
13:19,24 14:9
41:10,25 43:20
103:2 120:12
134:15,25
137:15 138:19
140:20,21
151:2,7 167:24
171:25 172:3
177:19 185:14
185:16 186:5,6
191:17 196:2
196:20 202:12
202:18 225:20
237:19,21,24
242:17 251:13
252:1 259:5
266:15
**documents**
13:8 15:19
16:6 33:11,23

66:25 67:3
80:6 132:12
144:4 202:4,15
203:14 237:25
250:24 259:16
259:17,21
260:2 263:11
266:19 267:2
**doge** 27:9,24
28:1,3,5,10
66:18,20 67:21
67:22,23 68:1
68:3 69:10,24
97:19,23
178:24 179:1,7
**doing** 29:23
38:14 49:25
50:16 80:17,20
88:10 90:18
98:13,21 111:6
122:19 158:6
170:11 209:21
209:22 230:4
234:11 239:15
258:8 262:20
**doj** 7:13 263:6
**dollars** 47:22
108:1,4
**donald** 1:10 6:8
271:4 273:2
**downloaded**
93:25
**downsize**
111:14 161:15
166:1,6 167:13

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[downsize - else's]**

167:16 170:15 170:24 171:9 171:11,12,14 178:24 179:2,6 179:9

**downsized** 155:12,25 156:2,13

**downsizing** 28:23 88:15 96:25 97:8 149:22 160:4,9 166:10 172:24 172:24 178:1,6 178:10

**dozens** 159:7

**draft** 117:1,2,3 117:11,15,24 118:2,4,20,20 118:23 119:3 119:14 120:2,6 120:19,22 121:1,21,25 122:22 124:7,9 124:20,23 125:9,14 126:21 144:21 145:25 146:11 161:21 169:19 169:20 170:3 189:21 191:1 198:20

**drafted** 82:21 88:3 196:16

**drafts** 117:17 120:7,11,13 189:20

**draining** 176:7

**dramatic** 159:5 160:11 166:9

**dramatically** 161:15 167:13 167:16 170:24

**drf** 172:12,18 173:19,21,23 174:18 176:11 176:22,24 177:1,4

**drive** 3:10 266:14

**drp** 103:15,16

**due** 65:5 211:25 237:8 237:16 239:6

**duly** 1:18 7:12 269:8

**duties** 65:15

**e**

**e** 2:10,22 3:5,11 3:19 271:9,12 272:1 273:5,5 273:5

**ear** 213:15

**earlier** 119:8 150:12 158:15 164:18 173:4 204:7 214:20 215:3 219:3 220:18 237:24

238:2 244:16 245:23

**early** 10:14 20:3 31:16 57:5 86:9 88:16 117:17 117:23,25 166:7 184:12 195:20 212:21 218:11 238:4 253:10

**easier** 225:17

**easy** 135:18

**edgar** 208:11

**edit** 120:11,13 121:19

**editing** 120:7

**education** 16:17,20

**edwards** 217:19 221:4 221:14 223:13

**eeshleman** 2:11

**effective** 97:3 150:4

**effectiveness** 149:24

**efficiencies** 64:16 97:24 160:7 179:11 213:19

**efficiency** 27:5 27:8,21,23 28:8,12,17 29:1,2,4,8,20

63:25 64:18 78:11 88:11 149:23

**efficient** 111:17 150:4

**effort** 99:10

**efforts** 28:8

**either** 12:19 50:4 61:2 70:20 74:14 75:17 78:17 80:25 83:4 102:11 127:22 186:20 190:4 205:23 210:20

**electronic** 266:15

**eleven** 19:3

**elicit** 141:13,17 151:10,10

**eliminate** 133:7 150:21

**eliminated** 95:11 96:11 98:2 123:22

**eliminates** 133:7

**eliminating** 95:18 96:24

**elizabeth** 2:5 6:17

**ellis** 3:23 6:2

**else's** 107:10,13 107:16

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[email - evans]**

| email  5:21,23 | 218:19 221:17 | 179:21 187:3 | entity  42:16 |
|---|---|---|---|
| 75:15,16,18,20 | 227:3,8 232:9 | 193:14 210:13 | 43:11 |
| 75:24 76:4,11 | 232:25 233:4 | 239:10 271:3 | erin  103:13 |
| 76:19,21 77:2 | 242:12 244:17 | 273:1 | 156:21,24 |
| 77:12 92:19,20 | 245:8 250:9,11 | employer  21:12 | 157:2 158:22 |
| 124:22,24 | embedded | 21:13,18 | 159:15 |
| 125:11 179:17 | 119:4 | 261:18,20 | errata  268:8 |
| 179:21 180:6 | emergency | employment | 271:14,16 |
| 180:11,20 | 64:4,13 95:9 | 10:7,8 26:8 | 272:3,5 |
| 181:20 182:22 | 160:22 | 231:25 249:6 | eshleman  2:5 |
| 182:25 183:14 | employed  9:21 | 249:12 261:17 | 6:17,17 |
| 185:6 188:25 | 10:2,4 21:15 | empty  73:19 | esq  2:4,5,6,18 |
| 189:3,5,9,12,18 | 261:3,11 | encrypted | 3:2,8,14,15 |
| 190:11,11,14 | 269:22 | 206:4 | 271:1 |
| 190:15,20,21 | employee  10:11 | endeavored | essentially  23:2 |
| 191:3 193:2,5 | 21:3,6 28:1 | 105:6 | 31:4 147:17 |
| 193:11 196:5 | 30:23 31:5,13 | ended  10:8,9 | estimate  47:3,7 |
| 197:13 201:15 | 31:15 32:1 | 35:10 40:19 | 47:10,12,13,16 |
| 213:11 214:19 | 40:19 49:23 | 62:10 229:7 | 48:14 |
| 214:23 215:5 | 50:4 51:11 | engage  188:19 | et  1:7,13 6:7,8 |
| 215:23 217:4 | 54:1 56:2 | 189:4 193:8,17 | 271:3,4 273:1 |
| 217:17 218:22 | 76:13,14,16 | engaged  235:20 | 273:2 |
| 220:23,25 | 106:25 155:20 | 239:18 | evaluate |
| 221:1,10 | 185:24 | engagement | 265:24 |
| 226:24 232:17 | employees  1:6 | 236:12 | evaluating |
| 235:10 236:9 | 6:7 31:19 | enter  43:8 | 158:1 |
| 244:9 245:1 | 99:13 101:22 | 49:13 | evans  5:15 |
| 247:3,10,12,17 | 102:2,5 108:14 | entered  40:19 | 74:13,18,24 |
| 248:23,24 | 108:20,21 | entering  44:4 | 75:12 85:17 |
| 249:9,13 | 109:10,12,15 | 50:24 51:4 | 105:13,16 |
| 264:15 | 109:16,19 | entire  17:17 | 108:8 110:13 |
| emails  76:9 | 155:9 170:16 | 29:6 53:17 | 111:2,4 112:2 |
| 80:7,12 102:11 | 170:18 171:8 | 149:21 205:13 | 112:3,5,10,14 |
| 168:23 181:1,3 | 171:15 175:23 | 244:6 | 112:20 114:17 |
| 183:16 213:5,7 | 176:3 178:1 | | 115:9 124:14 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[evans - exhibit]**

| | | | |
|---|---|---|---|
| 127:11,22 | 222:20 223:12 | **examination** | 5:13,14,16,18 |
| 128:15,21 | 223:17 224:4 | 4:4 9:5 | 5:19,20,22,24 |
| 130:12 132:10 | 225:10,23 | **example**  14:3 | 13:10 14:4,6 |
| 133:11,14,24 | 226:16 227:7 | 79:19 92:8,12 | 14:16 15:4 |
| 136:8,22 137:6 | 227:11,24 | 123:14 264:15 | 33:9 41:1,5,25 |
| 137:8 139:6,24 | 228:25 229:13 | **examples**  8:11 | 57:8,19 68:15 |
| 142:2 161:25 | 230:3,16,19,21 | 87:4 | 68:17,18 93:18 |
| 162:9 163:8,17 | 235:18 237:14 | **excel**  46:6 | 93:19,22 103:5 |
| 165:1,11,22 | 238:5,10 | **except**  2:15 | 103:9 118:16 |
| 167:25 168:7 | 239:23 240:14 | 268:6 | 118:18 130:1,4 |
| 168:11,16,19 | 240:20 241:10 | **excess**  174:10 | 130:5,8 134:12 |
| 169:6,11 | 241:13 244:14 | **exchange** | 134:14 135:13 |
| 177:15 179:18 | 244:15 245:22 | 205:19 206:19 | 135:18 137:3 |
| 180:7,16 | 247:4,12,25 | 238:9 | 138:12,13,17 |
| 181:10,14 | 248:7,12 | **exchanged** | 140:20 143:19 |
| 182:2,8,25 | 249:14,17 | 206:1 | 151:1,10 |
| 183:18 184:22 | 250:16 | **excuse**  106:16 | 153:21 156:18 |
| 186:13,23 | **event**  174:16 | 126:18 134:22 | 156:20 162:6 |
| 187:5,19 191:3 | **events**  62:7 | 141:12 168:18 | 167:22,23 |
| 191:13 193:1 | **eventually** | **executive**  17:20 | 171:22 177:10 |
| 194:13,22 | 32:17 117:21 | 17:22 32:23 | 179:13,15,17 |
| 195:12,12 | 190:15 256:8 | 33:3 | 182:19,21 |
| 197:25 198:3 | **evidence** | **exempted** | 185:10 188:23 |
| 198:14 199:3 | 240:10 | 175:24,25 | 189:1 190:6,14 |
| 199:16,22 | **evolved**  91:14 | **exercise**  150:7 | 196:3,4 202:7 |
| 200:3,7,13,17 | **exact**  7:24 | 193:9 235:10 | 203:1 205:8 |
| 201:2,5 202:20 | 10:14 20:15 | 237:6 239:18 | 214:11,13,20 |
| 203:23 205:25 | 23:1 39:8 | **exercising** | 214:23 215:4 |
| 207:10,14,25 | 97:12 112:12 | 63:11 | 217:14 221:25 |
| 213:22 214:9 | 173:23 | **exhibit**  4:8,9,10 | 222:2 223:13 |
| 214:24 215:11 | **exactly**  17:3 | 4:11,12,13,14 | 225:11 226:21 |
| 215:17 216:2 | 19:11 75:13 | 4:15,16,17,18 | 238:4 242:7 |
| 217:11,18 | 125:2 132:20 | 4:19,20,21,22 | 247:2 266:8,11 |
| 218:11 221:7 | 209:7 | 4:23,24 5:1,3,5 | 266:12 |
| 221:20,25 | | 5:7,9,10,11,12 | |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[exhibits - felt]**

exhibits 4:7 93:18 203:22
existed 159:10
existence 240:18
exists 95:11,19 96:11,19,24 150:22
exp 5:14,20,22
expedited 8:16
experience 23:11 29:25 30:1 32:24 92:11 96:2 160:19,22
expiration 166:13 181:23 270:9
expire 247:22
expires 268:23
expiring 110:9
explain 13:3,8 22:15 29:5 51:15 53:22 80:9 95:16 103:8 134:21 261:22
explaining 30:16 216:7
express 170:20 226:16 235:5
expressed 227:7,15 234:7
expressing 99:9 234:20 244:20

extend 88:20 181:24 194:20 195:15,15 199:11 200:22 210:19 211:10 229:6 245:13 245:19
extended 110:25 116:17 167:5,9 184:8 196:17 198:1 199:7 200:8 201:3
extending 88:24 198:10
extension 77:14
extensions 167:7
extensive 160:19,22
extent 8:7 99:20 101:5 140:17,20 141:13,16 151:9 152:1 226:17 257:18 258:4 260:10
external 234:25

**f**

f 269:12
facilities 267:1
fact 49:6 61:3,4 110:6 123:5,7 126:15 149:20 161:14,19,24

181:19,22 182:14 192:3 193:7 195:18 195:23 197:13 199:21 201:6 241:5,16
factor 38:8
factored 175:5 239:3
factors 38:10 38:25 51:18
facts 118:11 236:20
factual 236:16
fair 78:22 92:25 118:1 204:7 205:1,12 213:25 234:10 236:17 244:23 255:6 265:17
fairly 127:19
faith 228:4
fall 86:9 91:19 105:18 108:7 109:19 111:13 112:7 114:6 116:20 127:25 170:22
familiar 37:24 38:2,3 90:6 93:2 111:5,7 119:6 126:4,9 131:1 152:15 187:13 188:12 188:15 189:8

190:17 232:6 242:22,23 243:7,11
family 18:19,21 18:24
far 246:16
fashioned 207:23
faster 51:6
fault 19:23
february 167:25 205:9 216:8
federal 50:4 51:11 56:2 71:25 95:9 97:17,24 107:20 125:4 145:8 150:13 150:16 155:20 231:25 249:6 249:11 272:1,8 272:10
federation 1:5 6:6 271:3 273:1
feel 159:3 195:7 198:15 228:7
feeling 199:12
feet 47:9
felt 62:5 63:8 97:6 114:8 161:7 170:19 170:19

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[fema - fema]**

**fema**   20:23
27:5,7,8 28:12
28:17 29:18
30:7,8,12 33:1
63:13,18,23
65:1 66:10,14
68:1 69:10,21
69:24 72:16
73:6,12,13
74:16 75:5,15
75:16,19,20,24
76:1,1,3,3,4,6,6
76:7,11,13,14
77:3,17,22,25
78:3,7,18,21
79:3,10,11,13
79:18 80:3,8
80:11 81:2,16
81:18 82:21,24
83:4 84:3 86:2
86:5,16,23
87:9,24,24
89:13 91:3,5
92:23 93:3
94:1 95:10,18
95:18 96:8,11
96:22,24 97:10
98:2,9,17,20
99:7,10,13
101:22 102:2
102:19 105:12
105:23 108:20
108:23 109:3
109:10,16,18
110:4,24

111:14,21,23
111:25 113:8
113:13 115:4
116:21 117:1,3
118:20 119:22
119:25 121:9
121:11 122:15
122:20 123:3,6
123:10,21
124:3,7,8,15,20
125:6,14,17,20
125:22 126:2,2
126:7,9,12,14
126:16,20,21
126:21 127:3,7
127:9,10,24
128:3,4,5,8,9
128:13,18,19
128:22,24
129:2,4,9,14,15
129:16,18,19
129:23 130:9
130:13,14
131:10,24
133:12,21
135:20 136:6
136:14 137:25
138:21 139:3
139:10 141:10
141:25 142:11
142:25 143:12
144:10,21,21
145:4,16,20,25
146:7,8,12,23
147:5,20,25

148:5,9,14,20
148:23,24
149:22,24,25
150:11,15,17
150:19,21
155:6,25
156:14 157:5
157:25 158:1,6
158:18,21,25
159:4 160:2,5
160:7,9,11,12
160:13,25
161:13,15,19
161:21,25
164:10,16
165:1,12 166:1
166:2,6,19,23
167:13 168:12
168:13 169:14
169:21,23
170:1,12,14,17
170:23,24
171:8,9 172:11
172:17,21
173:13 174:14
174:24 175:1
175:24 176:3
176:19 177:16
178:2,21,22,24
179:9,12,20
181:10,11
182:15 184:7
185:18 186:8
186:14,21
187:1,15

188:17,20
189:3,6,12
192:6,16,24
193:7,17
194:11,13,20
195:14,15
196:10,17
197:4 198:10
198:11,24
199:6,10 200:2
200:7,21 201:2
206:5 207:6
208:22 209:4
209:16 210:2,6
211:24 212:24
213:19,21
214:2 218:14
218:18 219:3,5
222:23 223:22
225:24 226:7
227:12 228:2
228:17 229:6
231:8 232:10
232:21 233:17
233:25 234:2
234:16,22
235:6,13,17
236:10,25
237:3,7,14
238:1,13,20
239:9,14 240:4
240:8 242:24
244:6 246:14
246:15,19
248:8 249:10

Page 24

**[fema - frame]**

249:16 252:7
256:6,10,12,13
261:24 263:20
264:8
**fema's** 64:16
78:11 82:22
88:11,15,19
108:8 121:16
122:4 159:23
167:21 174:12
181:23 187:6
192:11 193:15
194:8 210:18
211:9 218:6
245:13,19
**figure** 167:10
234:14,18
254:12
**fill** 25:12
**final** 117:20
118:21 146:20
187:20
**finance** 46:25
66:21
**financial** 32:23
66:21
**financially**
269:24
**find** 86:25
104:24 105:2,6
153:13 160:6
162:16 179:11
228:21 232:15
232:16,17,24
237:18 238:13

242:6
**finding** 62:12
**findings** 158:15
**fine** 135:8,14
135:16 143:3
226:15 260:20
**finish** 11:11,12
19:24 27:15
203:10
**finished** 11:14
202:12
**fired** 58:18
249:11 252:13
**firm** 6:3,10
17:14,15,17
18:23
**firms** 18:9
**first** 7:12 14:3
14:7 23:9 24:4
30:3 39:7 54:1
59:24 63:16
86:15 87:10
91:10 96:10
118:22 139:17
143:24 152:19
156:24 174:7,9
180:11 203:19
204:4,16 227:3
240:1
**fiscal** 162:1
185:18,22,23
186:9,14
192:11
**five** 152:19
178:15

**flag** 7:19
**floated** 23:18
**floor** 253:18
**flow** 64:19
82:24
**focus** 85:23
159:4 213:19
**focused** 213:17
213:20
**foia** 226:17
227:4,8
**follow** 84:2
183:9 247:22
**followed**
182:15
**following** 168:7
180:11 269:7
**follows** 7:12
271:8
**footnotes**
146:15
**force** 139:22
**foregoing**
268:4
**forgotten** 248:5
**fork** 103:19
**form** 22:7 43:5
123:22,24
155:21 205:23
246:11 268:7
**formal** 33:7
92:1,3,15,17
199:20
**formally**
241:12

**formed** 43:4,7
**former** 21:11
21:13,18,19
26:5 99:6
**forms** 25:12
26:20
**forth** 198:16
200:14,25
221:12
**forward** 2:19
6:22 29:16
35:4 111:3,5
133:8 142:23
200:23 201:9
250:6
**forwarded**
76:25 77:2,10
186:23
**forwarding**
77:5,6,8 216:6
**found** 61:17
160:11 215:23
**foundation**
2:19 145:23
148:18 149:8
**four** 18:13
130:19,23
131:11,16
133:12 136:23
137:7 178:15
**fourth** 190:12
**frame** 26:11
51:4 85:2 87:5
216:4,24
224:19 234:21

**[frames - given]**

**frames** 84:24 84:25
**francisco** 1:3 2:9
**frcp** 269:11 272:1
**freaking** 171:14 172:11 172:17 176:12
**free** 38:19 201:10
**frequently** 71:4 96:14,17 115:4 157:13
**friday** 14:23,24 26:7 222:21 223:2 225:22
**friendship** 21:23
**frivolous** 259:6
**front** 137:2,16 200:13 214:22 214:23 220:24 221:25
**frustrated** 248:13,19 249:22
**full** 9:17 12:24 16:12,15 109:12,13,15 121:8
**fully** 13:4 91:18
**function** 123:15 130:22 131:17 132:1,6

159:9
**functional** 95:22
**functioned** 239:14
**functions** 158:1 159:23 174:15 174:24 193:15
**fund** 166:20 174:2 175:2,5 175:6,11,19 176:7 177:8
**fundamentally** 28:14
**funded** 166:19 172:12,18 175:2,6,11,15 175:20,22 176:9,11,13,14 177:1
**funds** 173:20 174:2 175:1,13 176:23
**furlough** 175:24
**furloughed** 176:5
**further** 83:15 147:22 188:19 263:7 266:21 269:11,21,24
**future** 155:6

**g**

**g** 1:20 269:5 270:7
**gain** 60:6
**general** 8:6 17:6 83:13 113:18,23 128:22,23 129:12 178:5 203:6,19 218:2 255:18 256:16 256:22 257:1,4 261:24
**generally** 12:10 29:13 41:9 62:3 63:20 80:23 81:1 82:19 90:1 118:23 129:15 129:16,22 144:8 167:4 187:10 188:4 202:8 203:21 206:3 207:6 222:17 232:23 254:6
**generation** 126:10
**generic** 177:23 203:18
**generically** 230:3
**gentleman** 39:21

**getting** 63:23 66:5,9 91:11 248:14,20 249:23
**girl** 74:10 103:13
**give** 10:24 12:1 12:13,23 13:12 13:13 16:12,14 19:4 25:8 36:1 36:13 47:3,13 47:16 62:15 66:14 71:8 75:18 76:3 79:13 87:4 91:7 130:4 135:17 143:5 162:11 171:20 204:23 225:4 228:21 230:3 237:18 257:14
**given** 33:4,6 37:11 39:4 65:4 67:5 72:15 73:15 75:4,14,16 76:6 92:12 93:19 99:18 130:16 134:19 162:9,15 163:9 187:24 204:24 205:1,2 210:14 220:16 237:23 268:5 269:10

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[giving - group]**

| | | | |
|---|---|---|---|
| **giving** 217:11 | 51:10 56:25 | 225:2,24 226:7 | 101:12 106:12 |
| 220:19 224:1 | 59:19 60:3,17 | 226:24 232:21 | 106:16,18,18 |
| **go** 9:8 10:19 | 60:21 61:1 | 237:18 238:23 | 106:23,24 |
| 13:16 19:15 | 62:8 63:7 68:5 | 239:2 251:2,2 | 107:11,21 |
| 27:9 35:11 | 68:10,10,13,17 | 251:5 252:20 | 145:9 150:14 |
| 37:18 46:23 | 71:12,12,15 | 255:3,4 257:16 | 150:16 151:15 |
| 47:5,17 51:5 | 80:13 86:19 | 258:2 260:7 | 162:10 173:1,3 |
| 57:9 61:24 | 89:19 91:17,19 | 261:18,21,22 | 173:11,18 |
| 63:15 64:20 | 91:21,22 99:19 | 266:1,1,4 | 175:14,16 |
| 68:8 71:10 | 100:14,20,20 | 267:8,10 | 188:10 259:1 |
| 83:9,12,16 | 100:23 101:4 | **good** 6:14,21 | 266:6 271:3 |
| 100:2,14 | 108:7 110:7 | 9:6 64:22 68:6 | 273:1 |
| 105:22 116:11 | 115:24 117:5 | 134:4 144:23 | **government's** |
| 117:5 119:17 | 118:21 133:8 | 168:20 202:11 | 8:3 |
| 119:21 134:5 | 134:7,7,10,13 | 228:7 231:14 | **governmental** |
| 136:13 139:17 | 135:17 138:9 | **google** 24:17 | 27:21,22 |
| 141:4 144:12 | 140:11,16 | **googling** 24:18 | **governor** 94:21 |
| 147:1 153:13 | 141:11 143:9 | **gotcha** 33:21 | **gp** 242:21 |
| 171:21,23 | 143:17,22 | **gotten** 205:11 | **grant** 90:4 |
| 177:7 180:5 | 146:20 147:1 | **gov** 147:23 | **grants** 67:7,8 |
| 203:15 207:21 | 149:6,13 151:7 | 148:1 | 88:2 89:23 |
| 209:18 210:3 | 153:15,15,18 | **governing** 8:16 | 90:1,2 143:7 |
| 214:15 232:16 | 155:23 156:12 | **government** | 143:10 |
| 250:20 256:7,9 | 156:17,22 | 1:6 6:7 8:2 9:1 | **gregg** 242:22 |
| 267:6 | 162:10,16 | 10:11 12:4 | 242:23 243:11 |
| **goal** 160:4 | 166:22 168:12 | 16:2 21:3,6 | 244:16 |
| **goes** 82:15 | 173:7 176:25 | 23:10,11 28:24 | **grounded** |
| **going** 10:19 | 177:1,17 184:7 | 29:9 30:23 | 123:14 |
| 11:1,5 13:7,11 | 190:11 200:2,7 | 31:3,5,9,13,15 | **grounds** 141:13 |
| 13:24 14:6 | 201:3,20,23,23 | 31:19,21 32:1 | 151:8 257:17 |
| 15:5 25:11 | 202:1,4,5,21 | 38:20 45:12,15 | 258:2 260:8 |
| 27:9,25 28:19 | 203:12,13,15 | 49:23,23 50:16 | **group** 28:4 |
| 33:1,13 35:23 | 203:18 207:22 | 51:16,18 56:17 | 137:6 139:5 |
| 36:12 41:9,22 | 210:5 212:16 | 81:8 97:17,24 | 159:4 189:21 |
| 47:7 50:6 | 219:4 223:22 | 100:7 101:2,5 | 207:3,5 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[guess - heard]**

**guess** 22:25 70:20
**guidance** 191:17
**guide** 191:17
**guiding** 119:18
**guy** 39:21,22 40:17 57:1 66:11,14 67:15 69:9,19,23 70:20 71:1 73:24,25 78:17 79:19 80:25 81:15 83:9,10 83:14,14 84:14 95:1 102:25 103:10 104:21 104:22,24 105:1 115:6,9 117:8 124:11 124:12,19 125:9 127:11 127:22 128:15 128:22 136:8 139:5,6,18 140:1 141:1,2 142:3 143:22 144:2,16 145:12 146:18 147:4 149:5 169:5,11 191:6 191:9 193:5 210:2,4,4 214:4,7 221:19 221:21 228:25

229:13 240:25

**h**

**h** 273:5
**half** 109:3 122:23 123:2 123:10 124:3,8 124:15 160:16 161:19 165:18 166:18,23 181:11 186:9 186:14 187:6 223:23
**halfway** 15:15 104:18 121:10
**hall** 3:2 7:1,1 7:15,16 99:19 100:12 138:11 138:15 140:11 141:11 145:22 148:17 149:7 149:18 151:6 151:18,22 171:24 177:9 177:14 180:3 202:17 222:2 242:20 243:18 243:21,25 257:16,25 258:12,14,17 258:22 259:6,7 260:7 261:21 262:11 265:23 266:6
**halt** 235:13

**hamilton** 65:18 66:2,8
**hampton** 85:4
**hand** 14:6 15:5 134:14
**handed** 15:7 33:12 41:4 66:15 93:24 130:7 172:3 182:24
**handful** 202:15
**handled** 76:2 213:22 271:8
**handles** 53:18 87:24
**handling** 232:16
**hands** 239:8
**handwriting** 112:25
**handwritten** 5:15 112:14 113:24 114:1 162:9
**hanna** 154:13 154:17,19
**happen** 92:19 92:19,19 131:22 132:19
**happened** 87:12 113:7 199:21,25 200:3 219:19 256:10

**happening** 100:16 102:14 110:3,6 178:2
**happy** 170:15 170:23 171:8 178:12 196:1 227:20 234:3 236:13 259:9
**hard** 7:23 41:23
**harrigill** 3:15 135:10
**harris** 2:16
**head** 10:25 11:2 12:25 35:16 111:10
**header** 242:11
**heading** 119:18
**headquarters** 73:13 86:3
**heads** 208:14
**hear** 82:13 96:17,21 98:1 226:16
**heard** 40:7 55:17 74:23 91:3,4 96:7,10 96:14,15 110:19 111:18 111:19 113:20 124:1,2 150:18 150:20 213:3,4 243:14,16 254:24

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

## [hearing - imagine]

**hearing** 253:14 253:15 263:5
**hearings** 253:13
**heavily** 90:21
**hegseth** 93:12
**held** 19:9
**help** 13:22 21:2 22:24 23:2,5 27:4 63:3 98:22 105:6 149:22 160:4,6 178:12 179:8 214:17 226:2
**helpful** 29:7 214:17
**helping** 29:20 236:19
**helps** 190:9
**hey** 232:15
**hi** 7:1
**hide** 107:3
**hierarchy** 81:9
**high** 16:19 18:21,24 71:20 81:11,12 192:1
**highlight** 191:14
**highlights** 215:24
**hildebrandt** 1:20 6:10 269:5 270:7
**hill** 101:11

**hires** 110:16
**history** 107:19
**hits** 266:18
**hoc** 229:3
**hoffman** 68:4 156:21,24 157:4 158:22 159:15
**hold** 27:15
**holiday** 115:25
**holidays** 116:1 116:18,19
**homeland** 3:7,9 7:8 10:12 19:15 20:10,14 20:21 22:19 23:21 24:1,10 24:21 26:14,19 30:11 31:8 32:15,19,22 36:6,17 37:14 37:19 38:24 39:4,24 40:20 42:1,5 43:9 44:2,25 48:22 49:2,10 50:18 50:20 52:3,22 53:5,7,16,21 54:1,20,23 55:4,6,10,19,21 55:24,24 56:24 58:4,12,18 59:3,21 60:17 60:21 67:25 71:24 76:17

81:25 92:25 102:17 107:12 108:2 110:10 134:1 155:18 155:24 178:20 186:24 197:3 251:9 252:21 252:23 253:4 254:17,21 255:8,19 257:22 261:2 261:15 264:1
**honestly** 23:12 25:10 31:2
**hoshijima** 2:18 6:21,22
**hour** 12:11 46:3 201:20 223:23
**house** 224:25 228:10
**housed** 86:1 87:9 209:16
**houses** 243:13
**houston** 1:24 3:18 17:2 25:14,23 116:6 229:18
**hq.dhs.gov** 3:11
**hrdlicka** 1:23 3:16
**huh** 11:2 35:25 36:3 41:15 54:8 85:7 93:5

105:18 109:1 143:14 155:10 157:10 172:7 180:13 183:8 184:17 217:2 223:15 225:21 231:3 235:11 236:7
**hundreds** 245:8 250:9
**hurricane** 65:6 65:7,12 85:14 88:5,6 109:24
**husband** 51:24 52:1
**husband's** 51:21,24

**i**

**ice** 255:3,4
**icon** 104:23
**idea** 45:24 47:19 50:3,13 160:16,17 170:4 178:6 218:12 225:8
**identical** 135:6
**il** 2:15
**illuminate** 242:19
**image** 130:9,12 131:15,21 134:16
**images** 203:21
**imagine** 54:16 103:15 167:2

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[imge - institutional]**

**imge** 41:11,12 41:18 43:24 44:1,10,14,15 44:16,25 48:21 48:21 52:10
**immediate** 252:11
**immediately** 19:14
**impending** 65:6
**implement** 88:10 92:13 149:22 160:4 179:8,9 240:5
**implementati...** 92:18 182:16
**implemented** 91:19 240:23
**implementing** 111:6 161:25 240:9,11
**implicate** 260:10
**important** 56:15
**impossible** 174:23
**impression** 63:3
**improve** 27:7 63:24 64:17 149:23 179:12
**improvements** 64:16 65:5

**improving** 27:5 28:12,17 29:2 29:8,19 78:11 88:11 98:19
**inability** 247:24
**incident** 174:8
**include** 169:6
**included** 96:25 110:21 170:2 189:25 194:2 196:5 271:14 272:3
**includes** 8:15
**including** 8:21 73:24 89:16 92:24 149:25 150:15 174:12 233:12 249:4
**increasing** 213:19
**incredibly** 254:22
**incur** 50:8
**independent** 148:20
**indeterminate** 7:20
**index** 4:1
**indication** 255:17
**indications** 136:17
**individual** 42:16 242:15

244:5 245:11 245:16 246:5
**individuals** 52:5,11 66:1 78:20,25 79:9 80:3 92:24 171:7,10 241:1 248:1 249:11
**industry** 56:21
**inefficiencies** 160:12
**influence** 63:12
**informal** 91:25
**information** 8:8,12,18 9:25 25:8,11 26:15 26:16,22 29:7 37:9 66:13,16 66:17 67:5,18 86:24 87:1,11 88:9,12 99:20 101:6 136:3 140:18 141:14 151:10 152:1 153:25 188:17 204:23 208:7 208:21 211:24 212:1,11,20,24 213:12 214:6,8 216:23 217:12 218:3,12,17 219:5 221:3,8 223:11,16 224:5 226:20 228:10,12,14

237:8 238:10 239:12 246:5,8 246:10,16 248:15,20 249:23 253:7 257:19,19 258:5,6 260:10 262:1,6,23 263:1,15,19,21
**informed** 108:13,14 218:10 230:12
**initial** 85:2 139:25
**initially** 59:10 89:10 206:18
**initiated** 204:16 206:9
**initiatives** 38:7 64:25
**inquired** 236:21
**inquiries** 235:22 236:6 249:12 255:24
**inquiring** 254:2
**inside** 189:6
**inspector** 113:18,23 255:18 256:16 257:4
**instance** 1:17
**instinct** 194:24
**institutional** 26:16

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[institutions - jlevy]**

**institutions** 16:20

**instruct** 8:17 99:23 140:16 141:17 151:12 151:12 257:17 258:3 260:9

**instructed** 169:11 240:15 258:24

**instructing** 151:25 195:3 258:19

**instruction** 99:18 100:7 143:6 151:15 152:4 235:13 259:6 260:16 262:5,12 263:4 264:17

**instructions** 152:7

**insufficient** 173:20 176:23

**intelligent** 23:3

**intend** 78:10

**intended** 8:3 95:23 117:20 121:6 190:4

**intending** 26:3 26:4 240:4 252:3,4,6

**intent** 80:12

**intention** 240:7

**interest** 149:16

**interested** 23:7 263:5 269:25

**interesting** 38:12 243:5

**interfere** 16:11

**internally** 191:15

**interposing** 11:13

**intervals** 84:16

**introduce** 9:13 70:5,16

**introduced** 22:10 37:7 204:19

**investigate** 153:24

**investigation** 255:18,23,25 256:2,4

**investment** 18:17,18 19:1 19:7 21:14,15 21:20 22:1,6 26:9,13

**invoke** 12:5

**involve** 63:21 63:23

**involved** 20:10 23:10 28:10 44:16 84:6 88:14,19 89:24 90:19,21 91:6 91:9,16,24

99:12,15,16 101:21 102:1 102:10 103:23 126:15 139:25 141:9,23 147:9 167:6 182:7,10 184:22 186:10 187:14,16 188:1 189:14 189:17 192:15 192:23 194:10 207:2,5 209:3 210:4,7 211:6 213:1,10,14 218:15 221:19 228:24 229:2,9 229:23 230:6,7 232:10 235:24 236:1,8,15,16 236:19 237:10 245:5,7,10,12 245:14,16,18 249:3 250:8,10

**involvement** 55:25 116:24

**involving** 92:24 153:22 238:9

**issue** 8:19 51:4 81:18,21 210:6 210:18 211:3,9 211:17 213:14 216:14,21 219:14 220:2 245:17

**issued** 76:4 256:10,12,12 256:13,13

**issues** 9:3 87:20 87:23 91:3 96:2 114:11 129:18 211:6 213:6,8,20 221:19 227:24 227:25 233:13 236:17 245:9

**items** 183:9

**j**

**j** 1:10 6:8 103:22 104:3 104:14 153:2,4 153:7,23 154:2 154:11,16,19 271:4 273:2

**jamal** 22:4,5 35:17 36:1,5 36:11,11,16 154:11

**january** 5:22 39:18 212:1,9 215:25 216:3,8 229:1,8 230:9 232:1 233:25 234:21 237:1 240:13,22 241:2,21 247:4 248:2 250:4

**jessica** 2:6 6:23

**jlevy** 2:12

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[job - keeping]**

**job** 1:25 18:16 20:1 24:2 33:4 33:6 78:13,23 78:25 149:21 149:21,23 160:4,6

**joe** 39:22 57:1 66:11,14 67:15 69:9,19,23 70:20 71:1 73:24,25 78:17 79:19 80:25 83:9,10,14,14 84:14 95:1 102:25 103:10 104:3,3,21,22 115:6,9 117:8 124:11,12,19 125:9 127:11 127:22 128:15 128:21 136:8 139:5,6,18 140:1 141:1,2 142:3 143:5,22 144:2,16 145:12 146:18 147:4 149:5 191:6,9 193:5 210:2,4 214:4 214:7 221:19 221:21 240:25

**john** 17:16

**join** 69:9,24

**joined** 19:5

**jon** 18:5,7

**joseph** 39:21 40:17

**journal** 113:4 113:25

**journals** 113:5 113:10,13

**jr** 2:16

**judge** 12:25 13:4 257:13 259:9 260:14

**july** 93:14,25

**jump** 266:14

**june** 65:12,13 72:24 73:1 204:4

**justice** 3:1,3 7:2,17 261:25

**k**

**k** 103:22 104:1 104:14

**kara** 1:16 3:13 4:3 6:5 7:11 163:25 165:7 168:8 197:14 197:16,17,18 201:16,16 254:2 267:9 268:3,12,16 269:2,8 271:5 273:3,25

**kara.voorhies** 77:13

**karalee** 9:18

**karen** 5:15 74:13,18,24 75:12 85:17 105:13,16,22 108:8 110:13 111:2,4 112:2 112:3,5,10,14 112:20 114:17 115:1,9 124:14 127:11,22 128:15,21 130:12 132:10 133:11,14,24 136:8,22 137:6 137:8 139:6,24 142:2 143:5 161:25 162:9 163:8 165:1,11 165:22 167:24 168:7,11,16,19 169:5,6,11 177:15 179:18 180:7,16 181:10,14 182:1,8,25 183:18 184:22 186:13,23 187:5,19 191:3 191:13 194:13 194:22 195:11 195:12 197:25 198:2,14 199:2 199:16,22 200:3,7,13,16 200:23 201:2,5 202:20 203:23 205:20,25 207:10,13,25 212:16 213:22 214:9,19,24,24 215:10,11,17 216:2 217:11 217:18 218:10 221:20,25 222:20 223:12 223:17 224:4 225:10,23 226:16 227:11 228:25 229:13 230:3,16,18,21 235:18 237:14 238:5,9 239:23 240:14,20 241:10,13 244:14,15 245:22 247:4 247:12,25 249:13,17 250:16

**katrina** 99:1,2 99:13 101:17 101:23 102:2,5 103:12,12

**katy** 25:18,19 25:19 116:6,10

**keep** 107:4,6,7 162:16 225:15 226:14

**keeping** 113:25 114:5

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[kept - kyle]**

| | | | |
|---|---|---|---|
| **kept** 36:20 | 36:14 37:2,4,6 | 124:14,16,17 | 224:22,24 |
| 213:23,24 | 37:6,7,13 38:5 | 124:19,25 | 226:25 230:14 |
| **key** 119:19 | 38:7,13 41:6 | 125:12 127:16 | 230:17,18,19 |
| **kind** 29:21 31:4 | 44:9,11,15,16 | 127:16 131:6,9 | 230:22,23,24 |
| 64:1 81:21 | 44:21 45:4,11 | 131:23 133:1 | 232:3 235:7 |
| 113:2 228:13 | 45:22,24,25 | 133:10 137:12 | 238:17,25 |
| 234:14,18 | 46:20,20,23 | 137:13,21 | 239:11 241:4,8 |
| **king** 2:16 3:10 | 49:3 50:22 | 145:18 146:1,9 | 247:14 250:6 |
| **klv** 4:24 5:1,3,5 | 52:1,10,16,24 | 146:10,14,15 | 251:18 252:22 |
| 5:7,10,11,12,13 | 53:3,14,15,17 | 146:25 147:6,7 | 253:19 254:13 |
| 5:16,18 | 53:18 54:11,12 | 148:22 149:1 | 254:24 255:4 |
| **klv000318** | 54:13,18 55:12 | 152:11,20,23 | 256:18 260:17 |
| 140:21 | 55:17 56:3,6,6 | 153:1,3,6,10 | 260:24 |
| **klv00323** | 56:7,12 59:5 | 154:16 157:21 | **knowledge** |
| 140:21 | 61:10,11,18 | 158:10 161:22 | 21:21 28:11 |
| **knew** 22:13 | 62:10 64:2 | 161:23 167:6 | 35:20,21 43:18 |
| 29:11,15 30:3 | 65:1 66:6 | 170:19 174:22 | 44:14 48:16,19 |
| 32:7 37:9 | 68:20 70:7,24 | 175:17,19,23 | 48:23 126:22 |
| 44:18 49:22 | 75:22 82:17,25 | 175:25 176:1,2 | 200:13 |
| 50:11 56:23 | 83:10,13,14 | 177:24 184:18 | **known** 37:4 |
| 57:1 60:16,20 | 84:15 88:1 | 185:1 186:11 | 103:19 212:25 |
| 149:20 150:2,5 | 90:17 91:1 | 187:25 188:9 | **kristi** 24:20,20 |
| 150:10,12 | 92:7 94:16,17 | 192:4,7,19 | 39:7 58:18 |
| 170:14,17 | 95:20 96:16 | 197:1 198:13 | 60:16 65:20 |
| 234:18 | 97:6 98:12,13 | 200:5,6,11,15 | 72:6 81:3 82:2 |
| **know** 11:19 | 98:14 99:7 | 200:19,20,24 | 93:8 96:7,10 |
| 12:11 13:20 | 100:9 103:25 | 201:1,4,6,6,18 | 120:25 123:21 |
| 14:10 21:10,11 | 107:23 111:24 | 206:20,22 | 149:1 150:23 |
| 22:12,25 23:10 | 113:11 115:22 | 208:13,15 | 252:13,25 |
| 23:12,13,17 | 118:8,13,24 | 210:25 211:1,2 | **kyle** 43:17,21 |
| 24:15,16,19 | 119:25 120:5,9 | 211:4 212:15 | 44:18,21 45:14 |
| 26:6,20 27:6 | 120:15,17,25 | 214:10 219:5,9 | 45:17 46:8,9 |
| 29:4,5,17,21,24 | 121:2,15,18 | 219:10,18 | 49:8,9 50:11 |
| 32:5 33:3 34:4 | 123:5,23 124:6 | 223:24,25 | 50:12,12 52:13 |
| 34:17,19 36:8 | 124:11,12,13 | 224:3,10,12,22 | 52:13 58:23 |

Veritext Legal Solutions
866-299-5127   calendar-ca@veritext.com   www.veritext.com

**[kyle - letter]**

60:1 66:16 67:13,15,22 69:11,17,17,19 69:19 70:20 71:1 74:1,2,4

**l**

**l** 3:4
**lack** 145:22,23 148:17 149:7
**language** 123:5 123:8 124:18
**laptop** 75:25 76:3,6 256:13 256:13
**laptops** 256:17 256:18
**large** 71:24 80:7 90:4 98:11 108:23 108:23 109:5,7
**larry** 3:14 7:9 271:1
**larry.campagna** 3:19 271:2
**late** 18:15 139:13 218:11 242:25
**laura** 3:8 7:7
**laura.smith** 3:11
**lawyer** 15:24
**lawyers** 9:14
**leadership** 30:18 32:24 80:24 84:10,21

88:15,17 91:24 122:3,19 123:10,12 137:25 161:5,9 161:16,18 182:8 200:4,6 200:12,17 214:3,6 231:2 232:18,20 233:9,22 234:20 235:16 235:17 241:1 245:25
**leak** 235:9,12
**leaked** 118:5,7 118:8,11,12,14 189:11 191:20 191:21
**leaks** 233:24 234:1,14,21 235:6,15,22 236:2
**leaner** 158:18 158:21
**learn** 59:24 62:13
**learned** 29:13 108:12 160:21 160:24
**learning** 160:11
**leave** 99:14 101:23 102:3,7 102:9 116:17 252:3,4,11

261:17
**leaving** 61:3,5 252:15,20,23 253:1
**led** 95:10 160:13
**left** 18:15 57:3 66:3 76:23 83:4 85:6,21 113:13,16 133:25 134:2 136:24 137:1 163:9 177:8 205:5,18,21,22 207:10 217:5 251:8 252:10 256:6,7,11,23 257:22
**legal** 271:7
**length** 47:7 131:4 157:9
**leonard** 2:4 4:4 6:14,15,19 7:13,15 8:24 9:6,12 10:1 14:5 15:5 33:10,17,21,25 41:2 57:9 68:5 68:16 71:9,17 93:23 100:3,13 100:25 101:14 103:6 118:17 130:3 134:3,13 134:24 135:3,7 135:12,16

138:11,14,16 138:18 140:23 141:19 143:20 149:12,19 151:2,14,18,18 151:20 152:5 153:12,20 156:19 162:8 162:22,24 167:23 168:18 168:20,23 169:1 171:2,23 172:2 177:13 179:14 180:3 182:20 185:11 188:24 190:7 196:4 201:19 202:3,8,19 203:2 214:12 214:15 217:15 222:5,7 225:14 226:22 242:10 242:18 243:20 243:23 244:1 247:3 250:23 251:7 258:9,13 258:15,19 259:3,8 260:13 260:20,23 264:12 265:21 266:23 267:5
**letter** 5:4,24 58:16 99:2,6 99:14 101:17 101:23 102:3,5

**[letter - look]**

103:12 105:5 205:11 266:12 266:17
**level** 32:24 33:3 44:5 81:11,12 192:1 246:23 246:25
**levels** 82:23
**levy** 2:6 6:23,23
**lewandowski** 21:3,10,20,24 22:7,9,12 23:23 24:5,25 25:5 26:24 28:16 30:10 32:4,10 34:12 34:21 36:5,25 37:8,13 39:22 49:7 50:3 52:2 53:1 57:2 59:13,15 60:13 60:20 61:9,16 66:11,14 67:15 68:23 70:10 72:6 73:24 78:17 80:25 83:18 84:18 96:20 97:9 98:1,8 102:22 102:23 106:1,3 107:7 117:8 121:1 150:6,9 155:4,24 156:12 172:5 206:13,16,20

207:3 211:8,17 231:5 235:3 253:1,3 264:24 265:3
**lewandowski's** 39:23
**liabilities** 174:9 176:24
**liability** 144:25
**liaise** 29:24 33:2 78:24,25 80:14 116:23
**liaising** 89:25
**liaison** 214:2
**light** 230:8 231:6
**likely** 48:4 83:19 91:22 204:19 205:19
**likewise** 258:3
**liking** 98:16
**limit** 149:13 152:6
**limited** 31:19
**line** 158:16 165:9 227:3 262:2 271:15 272:4 273:6,9 273:12,15,18 273:21
**lines** 39:12 63:12 121:24 129:25
**link** 103:11 104:19

**linkedin** 19:19
**list** 94:2 128:7 163:24 235:25
**listed** 136:6 137:15 153:3,7
**litigation** 261:25
**little** 22:17 23:8 23:13 26:23 29:7 56:7 65:8 68:6 91:7 104:23 112:23 147:22 183:23
**lived** 25:14 206:19
**living** 38:13 51:13
**llc** 41:11,12,18 43:4,7,24 44:1 44:10,14,15,16 44:25 48:21,21 52:10
**llp** 2:7
**local** 64:12
**locally** 95:10
**located** 73:5 74:9 83:7
**location** 15:9
**locked** 271:12 272:1
**lol** 144:25
**long** 17:23 18:12 19:1 37:4 50:9 76:21 146:3,7

146:9,14 152:17 157:9 177:6 178:14 190:11 214:4 235:25,25
**longer** 31:13 60:17,21 146:11 147:10 147:13 261:3,9 261:11
**look** 14:9 43:19 46:23 47:5,8 47:18 52:18 64:3 66:23 70:11 83:19 91:23 93:23 94:2 95:4 102:12 103:2 117:6 118:15 119:6,16 121:8 130:3 131:24 133:2,3,4,5 135:19 152:17 154:9,9 155:11 155:12 157:16 165:20 167:20 171:19 174:7 178:12 179:14 182:2,20 185:11 190:7 191:2 196:1 204:3 205:7 207:16 214:12 217:16 220:23 221:24 225:10

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[look - mark]**

225:19 226:22 227:22 236:13 242:5 246:2

**looked** 67:11 83:3,5,7,8 91:20 97:2 132:11 154:1 198:5,7,24 212:17 238:1

**looking** 19:25 34:3 37:15 48:13 57:18 67:3,8 80:23 83:20 97:24 117:10 125:6 133:21 143:10 153:21 157:25 163:20 183:20 198:10 207:23 228:21 232:25 259:19

**looks** 42:9 103:6,10 131:18 180:12 204:13 216:6

**loop** 213:23

**lose** 170:20

**lost** 138:12

**lot** 28:19,20 61:19,23 80:12 87:11,12,22,23 87:24 88:6,8 88:12 92:5 93:1 98:13 108:25 116:24

140:9 145:21 146:15 213:1 228:4

**loud** 143:1

**lunch** 134:5,9 134:16 136:21 137:23 202:25

**luther** 2:16 3:10

**lv** 42:25 43:3,7 57:14,16

### m

**ma'am** 9:22 10:23 11:4 25:24 26:2 27:10,14 28:4 28:9 30:13,19 31:22 32:2,9 32:20 34:14,16 36:18 37:5,16 38:25 40:3 42:3 44:8,17 46:11 48:9 50:25 51:7 52:4,17,25 65:24 67:6 76:20 115:13

**machine** 1:22

**made** 21:12,18 21:22 51:22 58:21 81:12,14 84:5 86:25 89:22 90:22 92:8,17 120:10 121:18 132:10

148:16,19,22 150:3 192:2 194:22 198:9 198:12 200:20 229:7 230:13 230:14,16,19 230:21 232:21 234:5,5 236:24 241:9,11,13 250:11 266:16

**mail** 2:10,22 3:5,11,19

**major** 167:1

**majority** 109:9

**make** 7:5 11:3 11:9,16,22 12:2,8,14 13:1 13:17 29:22 51:1 64:16 65:5 77:20,24 78:2,5,11,13,14 80:13,15,18 86:20 101:8 111:16 121:15 144:24 149:15 149:15 196:10 233:15,17 243:17 266:10 271:14 272:3

**maker** 236:21 236:23

**makers** 78:14

**makes** 11:7,25 119:1 132:9

**making** 29:3,23 63:24 77:16,22 78:6,21 79:1 79:10 81:9 91:25 110:13 120:8 149:25 232:11 236:17 244:2 245:10 245:14

**manage** 18:21 247:24

**management** 18:23 59:11 64:5,13 74:15 74:20,25 95:9 160:23 192:21

**march** 21:9 46:16 57:5,6 57:21,23 58:6 58:8,9 59:18 62:2 76:23 85:21 130:17 131:15 132:15 134:1 137:8 205:6,18 216:8 237:8,16 238:7 239:5,6 251:9 251:14,15,25 252:8,12 253:10

**mark** 11:22 33:8 40:25 57:7 93:17 138:9 143:17 150:24 162:5

Veritext Legal Solutions
866-299-5127      calendar-ca@veritext.com      www.veritext.com

**[mark - message]**

171:19,21
202:21 242:5
247:1
**marked** 4:9,10
4:11,12,13,14
4:15,16,17,18
4:19,20,21
14:4,6 15:4,6
15:16 33:9
41:1,5 57:8
68:15,18 93:22
103:5 118:16
118:18 130:2,4
130:8 134:12
138:17 143:19
151:1 156:18
162:7 167:22
167:24 171:22
179:13,16
182:19,24
185:10,12
188:23 190:6,8
196:3 202:7
203:1 214:11
214:13 217:14
226:21,23
238:7 242:7
247:2 266:8,11
**marking** 103:3
**martin** 2:16
3:10
**master's** 17:1,5
**match** 33:5
**material** 101:3
138:25 140:14

202:23 203:5
205:11 252:7
**materials** 8:7
113:19 117:14
197:5 256:5
**matter** 6:6 8:16
9:9,10 45:6
107:14 145:13
147:2 149:6
**matters** 8:25
80:25 219:3
**maximum** 29:3
**mba** 17:6,6,13
17:19,21 18:1
18:7
**md** 2:17
**mean** 18:20
29:1,8 38:3
40:13 51:17
53:22 81:14
105:3,4 123:25
147:6 155:3
178:17 213:10
232:13 233:3
234:17 237:5
239:1 250:10
250:11
**meaning** 54:24
82:2 105:3
208:19 209:3
260:3
**means** 30:25
51:15 130:24
**meant** 40:15
95:18 130:22

174:13,23
**measurably**
114:21,24
**medication**
16:10
**meet** 39:7,9,10
39:15 115:3
211:8
**meeting** 73:20
86:12 93:14,16
94:1,5,13 95:4
112:2,10
115:12,16
117:18,23
125:6 148:2,2
163:10 180:15
183:9 184:2
208:13,15,17
208:18,22
209:19 211:6
223:14 228:17
229:4,12,17
**meetings** 84:8,9
84:12,14,19,22
87:22 88:6,14
90:20 94:8,10
94:11,20 112:3
112:15,19
114:7 115:8
148:25 169:10
179:23 181:5
181:13 209:4
215:8 221:18
228:24 229:3

**members** 94:23
**memo** 82:21
83:21 89:4,8
92:1,4,15,18
110:8 141:4,9
141:24 184:14
184:19,20
185:1,4 186:11
196:16 197:8
197:10 198:5,7
198:11,16,20
198:24 199:9
199:14,19,20
200:14,24
**memorandum**
195:18
**memory** 114:8
178:13,18
**memos** 83:17
83:25 89:19
91:20 184:25
250:20
**mention** 194:4
194:6
**mentioned**
11:21 50:2
51:24 91:10
159:2 190:25
220:18 254:6
254:14,18
**message** 69:9
104:24 137:9
137:20 142:3
142:16,20
144:16 152:18

Page 37

**[message - never]**

152:19,22,25 154:4,5,6,14,23 155:1 157:17 158:16 164:17 204:9,11,14 205:8 206:15 207:17 208:12 212:15 225:23

**messages** 8:15 8:20 62:20,22 131:3,25 132:24 133:7 136:13 137:7 140:7,9 149:10 152:16 206:2,4 206:23 207:1,3 207:5

**messaging** 96:21

**met** 9:12 22:9 66:8 211:2

**method** 266:19

**mid** 34:9 216:25 217:1

**middle** 69:8 163:9

**million** 47:22

**mine** 52:9 108:6 162:14 204:24

**minor** 159:8

**minute** 162:12 217:24

**minutes** 94:1 95:5 98:24

125:6

**misinformation** 61:20,21 62:23

**misleading** 61:13,17 62:1 62:5 63:4,8

**misstatement** 215:15

**mobile** 104:22

**moment** 180:1 182:21 228:21 237:18

**monday** 6:4 26:6

**money** 51:20 173:21 177:7

**month** 20:16 77:9 224:19

**months** 39:9,13 72:23 86:4,6 87:10 88:16 91:11 178:15 178:15 205:4 234:24

**morning** 6:14 6:21 7:22 8:13 9:3,6 33:11 68:18 202:13 223:17 266:13

**motivated** 37:18 38:22

**move** 7:5 9:23 13:22 29:16 145:7 228:1

**moved** 86:5,7 125:21 227:12 227:14

**moving** 35:4 38:18

**multiple** 176:19

**n**

**name** 6:2 9:12 9:17 35:14,15 68:4 94:3,16 119:25 125:5 154:1 197:16 201:9 253:24

**named** 39:21 74:10 103:13 153:23 163:18

**names** 94:17,23 103:14

**naming** 16:20

**narrative** 173:8

**national** 231:10

**nature** 114:21

**near** 69:3

**necessarily** 241:24 252:4

**necessary** 114:8 158:4 193:14 198:18 199:9,15 201:13 271:14 272:3

**need** 10:24 12:1 12:10 13:19 22:25 25:12,12

30:4 33:13 45:11,25 51:18 51:20 53:5 56:22 60:12,12 71:10 100:16 110:10 123:15 166:23 217:24 225:15 226:14 228:1 238:17 238:18,25 239:7,11,14 256:9

**needed** 23:2,5 26:15 27:4 33:2 65:1 80:18 82:5 86:14,20,24 88:2 95:24 96:11 97:2 98:2,10 167:1 174:15 195:8 198:16 232:15 232:22 240:17 248:15,20

**needs** 166:16

**negotiating** 250:19

**neither** 269:21

**net** 18:21,24

**network** 76:9

**never** 27:25 38:19 40:5 55:17 64:12 66:2,5,8 110:18 111:11

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[never - number]**

| | | | |
|---|---|---|---|
| 113:22 129:3 | **nomination** | **notified** 58:23 | 102:4 103:4,5 |
| 150:18 186:3 | 74:22 | 113:22 257:7 | 109:5,7,18 |
| 186:11 195:17 | **non** 2:3,14 | **notwithstandi...** | 118:16 119:21 |
| 236:23 | 94:11 | 260:16 | 122:9 128:5 |
| **new** 27:20,22 | **noon** 217:18 | **november** 19:5 | 130:1,5 134:12 |
| 31:4 37:22,24 | 221:4,5 223:13 | 75:8 85:11,12 | 134:17 137:13 |
| 38:15,16,19 | **nope** 247:16 | 89:2 109:25 | 138:4,7,13,17 |
| 94:6 110:16 | **normal** 11:6 | 110:1 115:20 | 138:20 142:6 |
| 116:7 119:22 | **northern** 1:2 | 117:17,25 | 142:11 143:19 |
| 126:1 127:9 | **notary** 268:20 | 125:25 137:5 | 150:25 151:1,3 |
| 128:3,9 137:20 | **notating** | 144:13,15 | 156:18,19 |
| 222:5 243:24 | 271:15 272:4 | 188:18 193:9 | 159:22 162:6 |
| **nodding** 10:25 | **notation** | 218:11 | 162:12 163:25 |
| 11:2 | 130:18 132:6 | **nrcc** 231:10,22 | 164:8,10,12,16 |
| **noem** 24:20 | **note** 113:24 | **nrdc** 2:15 | 165:7 167:22 |
| 39:7 58:18 | 228:21 | **nt** 240:13 | 168:3,6,8 |
| 60:16 65:21 | **notebook** | **nte** 166:13 | 171:22 172:2 |
| 72:6 81:3 82:2 | 112:23 113:2,3 | 167:5 181:23 | 173:23 177:11 |
| 93:8 95:18,20 | **noted** 268:8 | 182:3,5,9,16 | 178:1 179:13 |
| 96:7,11 120:25 | **notes** 5:15 | 211:25 212:9 | 179:20,20 |
| 145:7 146:12 | 96:16 112:15 | 212:20 216:23 | 182:19 183:20 |
| 146:16 149:1 | 112:17,19,22 | 218:5,13 219:6 | 183:23 184:13 |
| 150:23 184:15 | 112:24,25 | 221:9 223:12 | 185:10 187:20 |
| 209:4,19 | 114:1,6,8,11,14 | 223:18 224:6 | 187:24 188:23 |
| 210:14,18 | 120:8 162:9 | 240:13 241:5 | 190:6 191:2,25 |
| 223:2 231:8 | 163:8 168:7 | 246:6 250:3 | 192:10 193:14 |
| 252:13,25 | 179:19 180:15 | **number** 7:20 | 194:14,16 |
| 253:17 | 187:19,25 | 7:24 13:10 | 196:3 202:6,7 |
| **noem's** 95:6 | 194:17 221:25 | 14:4 15:4 33:9 | 202:24 203:1 |
| 116:21 123:21 | **notice** 57:25 | 33:16 34:3,21 | 214:11 215:24 |
| 253:12 | 58:5 133:17 | 41:1,2 46:21 | 216:7 217:14 |
| **noise** 143:1 | **noticed** 133:11 | 47:9 57:8,10 | 218:4 222:2 |
| **nominated** | 133:14,16 | 68:15,18,19 | 226:21 241:25 |
| 74:18 | **notices** 137:12 | 80:7 92:22 | 242:7 247:2 |
| | | 93:18,21,22 | 263:10 266:8 |

Veritext Legal Solutions
866-299-5127                    calendar-ca@veritext.com                    www.veritext.com

**[number - okay]**

271:15 272:4
**numbered** 1:19
163:24 207:19
222:14
**numbers** 93:19
97:12 114:15
142:3 162:17
216:2
**numerous** 8:11
**nw** 3:4

**o**

**oath** 167:12
**object** 99:19
101:4 140:12
141:12 151:7
151:12 257:16
258:2 260:8
**objection** 8:6
10:1 11:25
101:8,8 145:22
148:17 149:7
171:2 241:7
258:16 260:7
262:11
**objections**
11:13,22
149:13,15
152:7 241:9
259:10
**observations**
161:12
**obtain** 226:18
**obtained** 16:22
17:1,19,21
18:7 32:14

152:12 257:2
**obtaining**
17:13,25
**obviously**
100:3 128:24
140:23 237:16
**occasion** 81:5,6
209:21,22
**occasionally**
11:22
**occasions** 244:7
246:6
**occur** 56:19
92:15
**occurred** 89:15
132:14 137:21
219:13 257:22
**october** 10:5,14
31:17 40:23
42:10 46:15
73:2 105:19
106:24 158:22
159:15 172:8
172:10,11
176:18 207:17
**offer** 65:2
**offered** 50:3
**office** 18:19
32:8 39:5,20
53:12 59:11
64:13 66:7,10
72:16,18,20,25
73:9,10,15
74:7,14,16
75:3,5,11 76:2

81:8,10 89:25
91:15,20 106:5
111:1 113:8,12
113:13,18
120:21 159:8
192:21 195:24
197:3 209:15
220:8 222:24
235:2 243:3
244:6 255:17
255:17 256:6,7
256:22 257:1
261:24,24
266:13 271:11
**officer** 125:4
**offices** 1:23
188:17
**official** 1:11
13:12 65:15
106:12,18
226:18
**officing** 73:2,18
**oh** 27:15 39:8
52:9 90:16
93:17 156:22
168:22 222:4
225:21 264:11
**oig** 255:25
256:2,4
**okay** 8:24 9:10
10:16,19,24
11:18,19 12:4
12:22 13:3,5,7
13:20,21,25
14:1,18,22,25

15:3 16:1,10
16:14,17,18
23:19 24:4,12
24:24 25:17
26:23 28:6,16
29:17 30:6
31:14,25 32:10
32:21 33:8,17
33:21 34:3,6
34:24 35:3,22
39:3 41:7,16
41:22 42:4,8
43:7 44:9
47:13,19 48:5
48:7,10,13,20
49:1 51:1 52:8
53:10 54:24
55:3 56:1 57:3
58:9,14,17,21
59:24 60:24
61:8 63:15
64:15 65:8,14
65:20,25 66:9
66:13 68:5,16
68:21,22 69:6
69:14,17,19,23
70:9 72:11
73:24 75:3
77:16 79:9
80:5 82:14,17
89:7 90:19
93:8 94:5,8
95:4 99:11
100:9,13
101:14,21

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[okay - ordering]**

102:1,12 103:2 103:19,21 104:5,13,16,18 105:2,10,15 106:2,6,9,11 109:24 110:2 112:2,6,19 113:2 114:17 114:20,25 115:3,11 116:11,16 117:24 118:15 118:19,24 119:11,14,21 120:15,18 125:24 127:20 128:12,24 130:15 131:10 131:13 133:18 134:3 135:9,15 135:15 136:3,6 136:13 137:19 138:9,25 139:9 139:12 144:6 144:12 147:1 149:19 150:24 153:11 154:23 155:1 156:7,16 157:8,14,16 158:6 160:1 161:24 162:25 163:20,24 164:22,25 165:10 167:20 168:25 169:3

171:19 172:10 173:25 174:2 179:14 180:4,5 180:6,19,20 181:19 182:20 182:23,24 183:13,18 184:18 185:11 185:15 188:12 190:7,13,23,25 191:13,25 192:7 196:14 196:19 201:5 201:19 202:3 203:4,8,9,16,20 203:25 204:3,6 204:21 205:7 205:25 206:12 206:23 207:16 207:18,24 208:12,21 209:2 211:16 212:8,19 213:9 213:11 214:5 214:12,21 215:8,19 216:9 217:15,21 218:9 220:4 221:2,3,6,24,24 222:1 224:3,13 225:10,15,18 226:11 227:2,6 227:10 228:24 229:5 230:14 231:24 238:8

242:5,6 243:2 243:11 244:5,8 244:12,22 245:24 246:2 247:1,9 248:7 249:7,9 250:22 250:23 251:14 252:2,17 254:1 254:9,16,20,25 255:6,11,16 256:21 259:8 260:5,22 262:19 263:13 263:18,25 264:5 265:7,11 265:17,21

**old**  128:4,5 207:23

**omb**  139:18 188:13 192:1,4 192:8,12,14,16

**onboard**  28:3 63:16 65:14 66:3,4 73:8 85:3

**onboarded** 26:19

**once**  7:5 13:14 82:18 83:1,6,7 239:3

**ones**  13:15 90:2 186:17

**ongoing**  87:24 255:18

**online**  17:23 20:7

**onsite**  231:13 231:17

**oops**  247:5,14

**open**  23:13 38:16,17 189:23 190:1,5 193:25

**operated** 160:14,18,25 161:2

**operating**  29:3

**operations** 173:20 174:3

**opinion**  146:16

**opm**  188:13 192:1,4,8,12,14 192:15,19,24

**opportunity** 62:15 196:11 197:14,19 201:16

**opposed**  51:16

**optics**  231:14

**option**  50:9

**order**  51:20 90:13 162:19 204:21 222:16 222:18 225:16 262:22,24,25 263:3

**ordered**  257:13

**ordering**  170:8 170:10,13

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[organization - particular]**

**organization**
2:3,14 29:3
30:2,5 64:23
64:24 111:17
150:1 155:13
155:25 156:2
156:13 160:2
179:10
**organizational**
6:15,18,24
53:9,11 66:6
67:2 108:19
**organizations**
29:20 64:17
96:3
**organized**
250:25 251:22
**original**  271:10
271:20,22
**originally**
14:18
**originate**  84:2
**orleans**  94:6
**orr**  244:17,19
244:21
**outcome**
269:25
**outset**  7:5 8:5
**outside**  8:15
55:21,23 81:8
**outsized**  63:11
**outstanding**
174:10 176:24
**overall**  109:16
109:18 121:11

238:18,20
239:1,12,15
**own**  77:21
237:15
**owned**  43:16
44:14
**owner**  22:1,5
52:19
**owns**  44:15

**p**

**p.m.**  1:20 134:8
134:11 153:16
153:19 180:14
191:4 201:24
202:2 225:23
251:3,6 266:2
266:5 267:10
267:11
**p.o.**  2:20
**packaging**
196:12,12
197:14,19
201:17
**page**  4:3,8
10:20 15:16
43:19 52:18
94:2 95:5
104:18 118:22
119:16,17,21
121:9 135:19
139:18 140:25
142:19 143:23
144:12,17
145:11 146:19
147:15 155:11

156:23,23
157:16 158:14
162:12,20
163:9 171:20
171:24,25
190:12 203:13
203:16 205:8
207:21 214:23
215:2 222:15
222:19 225:19
268:8 271:15
272:4 273:6,9
273:12,15,18
273:21
**pages**  7:21,23
8:13 13:23
113:4 134:23
134:24 135:3,6
135:8,11,12,17
140:20 152:19
157:11 163:5
203:7 268:4
269:17 271:14
271:17,17
272:3,6,6
**paid**  31:5,9
46:1,3,18 47:4
47:14,20 52:14
52:15,16 109:6
176:7
**paper**  201:9
**paperwork**
26:18 248:1
249:10

**paragraph**
121:8,10
**parentheses**
165:4
**part**  27:6 28:8
38:14,14 41:7
67:8 80:22
96:1,24 108:23
150:16 178:10
178:23 179:23
181:5 183:23
183:24 188:9
215:9 218:24
255:16
**partially**  51:13
**participants**
94:3 127:10
135:20 136:6
139:4,9
**participate**
84:7 115:15
224:18,19
**participated**
84:13 112:10
115:8
**participates**
131:2
**participating**
94:19
**particular**
13:23 26:20
41:7 63:9
66:16 82:11
91:1 131:4,23
182:6 203:16

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

## [particular - personal]

209:13,13 211:11 216:5 228:9 229:4 236:8 237:12

**particularly** 66:24 183:17 188:7 235:18 250:15

**parties** 68:9 71:11 100:19 134:6 153:14 199:18 201:22 235:2 251:1 265:25 266:14 267:7 269:22

**parts** 237:7

**party** 10:5,8,10 269:13,19

**passed** 80:2 83:1,2 224:8

**past** 115:25

**path** 82:18 84:2 84:3

**paths** 82:6,9,16 83:22 84:4

**patrick** 125:1

**pause** 90:15 230:7 231:5

**pay** 46:12 50:5 51:12,22 52:8

**pdf** 271:12 272:1

**penalty** 179:3 271:16 272:5

**pending** 12:12 151:21 152:6 225:5 259:12 260:19

**people** 33:2 36:6 37:15 40:7 62:25 73:21 79:13 82:23 84:3 86:13 87:1 97:13 98:13 103:15 105:4 106:23 107:1 115:14 122:20 126:10 159:4 159:19,24 170:17,21,23 170:25 171:6 171:13 172:13 172:19 173:5 189:21 193:15 233:4,6 234:13 234:18,19 235:20 236:1 241:20 242:2 261:17

**percent** 121:12 121:17,22 122:1,4,9 123:12,13,18 124:4 126:2,8 138:1,3 142:10 145:12,16,20 145:25 146:1 147:2,4,7,23,24

148:5,9,23 149:4,6 161:25 164:15,21 165:2,13 166:4 167:9 169:6,14 169:23 170:2,8 170:10,13 172:22 173:4,6 173:13 174:13 174:23 176:20 176:21 177:16 182:15 185:18 189:25 191:14 191:18,19 192:5,6 193:19 194:2,3,6,8,12 236:11 243:15 244:1

**percentage** 109:12,16 167:4

**perform** 25:9 26:12 37:18 38:18,23 45:15 54:10 55:14 78:10 159:23 174:15,24 193:14,21

**performed** 20:20,23 158:1 174:14

**performing** 27:12,20 33:1 64:20 65:15 73:22 74:24

75:1 159:8

**period** 17:23 18:8 19:10,11 40:18 72:22 85:23 86:1 105:11 112:7 116:17 209:2 218:7 271:18 272:7

**periodically** 40:3 96:16 112:24

**periods** 83:3,5 84:15 95:2 166:16

**perjury** 179:3 271:17 272:6

**permitted** 258:9

**person** 38:6 39:9,10 44:18 54:13,13,18 55:11 68:3 73:5 92:19 102:15,17 105:8 129:5 131:5 138:6 195:23 197:2 209:19 253:3 253:16 254:7

**personal** 34:15 34:18 46:13 104:11 115:23 129:25 135:24 136:4 139:1

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[personal - plans]**

144:5,9 154:8 154:9,10 203:25 204:1,2 204:22,23 231:16 257:9 257:14 259:14 262:15,16,20 262:20,23 263:2,9,9,13,14

**personally** 21:11 78:4 148:8 263:18 263:23

**personnel** 99:7 172:12,18,25 175:4 176:10 176:13,14 177:2 178:8 192:21,24 235:1

**perspective** 213:11

**pertain** 156:23 247:20

**pertained** 63:18 158:23 158:25 210:13

**pertaining** 43:8 80:8 92:23 114:11 143:12 144:10 207:6 213:20 260:4

**pertains** 29:9

**petition** 99:1

**phil** 94:21

**phillips** 242:22 242:23 243:11 244:10,17

**phone** 2:6,18 5:8,9 6:20 34:15,18,19 39:11 76:4,6 104:6,11 133:4 133:5 134:16 135:24 136:4 136:14 139:1 144:5,10 152:12 153:2,9 153:25 154:1,8 154:10,20 203:25 204:1,2 204:22 205:11 205:13 238:6 256:10,12,12 256:19,25 257:2,10,14 259:14 261:9 262:14,15,16 262:21,23 263:2,9 265:14 265:19

**phones** 256:17

**physical** 72:18 72:20 73:9,10 266:16

**physically** 73:4 83:7 112:25 229:21

**picture** 104:20 104:23 119:2 132:17 238:5

**pictures** 119:4

**piece** 98:11 201:9

**pink** 13:16

**pins** 159:6

**pkf** 18:11,12

**place** 20:7 24:10 51:6 53:9 90:13 99:13 101:22 102:2,7,9 161:15,17 184:21 220:11

**plaintiff** 6:22

**plaintiffs** 1:8 1:17 2:3,14,15 6:16,18,25 8:4 9:14 16:2 266:25

**plan** 129:9,11 139:25 141:10 142:24 143:14 161:14,17 164:11,14 165:2,12,16,17 165:19 167:21 168:12,16 169:7 170:2,15 170:23 171:9 171:14 172:21 173:13,16 174:12 176:19

177:16 178:23 179:9,24 181:6 181:10,22 182:4,6,8,15 183:24 185:7 186:23,25 187:6,7,16,21 188:14 189:6 189:13 194:8 194:11,14 215:9 236:10 237:11,13 238:18,20,22 238:23 239:1 239:12,23 240:5,6,9 246:18,20 248:7 249:16 249:18 252:7

**planned** 173:2

**planner** 112:17 163:8

**planners** 180:16

**planning** 179:22 181:4 215:8 237:2

**plans** 137:25 141:25 166:1,6 166:14 167:13 167:15 170:3 187:12 188:4,7 188:10 237:13 237:15 252:11

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[play - presented]**

play 21:1
116:20,25
played 21:3
68:1
playing 97:19
97:23
please 6:11
9:25 11:19
12:10 16:19
19:24 36:1
82:9 95:16
142:23 152:6
197:13,18
201:16 203:10
plenty 9:2
plus 172:13,18
point 19:18
20:9 29:23
30:9 31:17
32:14 40:18
41:8 59:22
61:24,24 65:21
69:23 70:15
72:15 73:15,17
74:4 75:4,14
76:10 82:18
83:12 85:11
86:2,13 93:2
109:25 118:4
120:3 121:5
124:17 125:16
125:18,21
131:19 132:15
134:4 136:23
144:24 146:18

150:6 169:14
169:16 176:18
180:15 181:19
192:18 203:17
204:18,20
209:9,15
228:11 242:25
248:9 253:22
255:22 256:20
261:23
points 62:7
63:6 185:16
policies 110:11
111:5
policy 82:20
83:17,21 89:7
110:16,18,20
110:23 195:14
195:17
political 38:6
56:1,4,8,18
157:6 163:10
171:11
politicals 161:7
portion 82:17
104:16 130:9
portions 13:23
position 30:18
32:4,6 39:4
55:22,25
106:15,17,19
106:20 194:20
254:10,12
positions 19:9
88:20,25 108:9

168:13 175:15
175:17
possession
113:6,9,11,18
256:16
possibility
12:18 49:18
145:21
possible 48:8
67:12 102:23
103:1 106:10
119:7 122:12
122:13 127:18
127:21 145:19
145:24 156:5,6
156:11,15
167:17,19
182:12,13,14
182:17,18
196:22,24
197:1 209:12
211:5,13,14,20
211:21 214:5,7
217:8,10,13
219:16,17
220:12,13
223:16 224:2
225:6 226:5
241:3
possibly 73:23
78:23 92:14
114:16 150:3
171:18 174:1
213:1,3 220:6
226:3 233:19

241:12 246:18
262:3
post 2:8 16:19
69:8 103:11
104:19 140:1
249:4
posted 104:24
105:1
postgraduate
17:9
posting 33:4
potential 24:25
155:12
potentially
245:24
powers 125:1
practice 113:25
practitioners
148:21
pre 99:24
predated
132:24
preferred
206:7,15,16
prepared
195:20 197:5
198:11,24
preparedness
88:5,7
preparing
202:12
present 3:22
26:1,4 223:7
presented
106:11,22

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

## [preserve - produced]

**preserve** 264:2 264:7 265:9,11
**preserving** 265:2
**president** 1:12 58:17 74:19 93:4 150:10,18 225:3 252:13
**president's** 28:23 97:16
**presidential** 8:10,23 37:23 37:25 151:8,11 152:2
**press** 61:11,17 61:20,22 62:2 62:9,11,14 63:1,5 113:20 118:5,6 173:8 189:12,15 194:4 233:25 234:1 235:20 235:21,21 236:15 243:6,8 243:9 248:24 249:4,12 253:8 253:10 254:1,4 254:7,14,19,25 255:2,7,22,24
**presumably** 23:20 180:14 204:21
**presume** 72:8 76:12 103:12 104:4 105:4

120:4 131:14 132:2 204:2
**pretty** 25:13 60:4 87:16 178:17
**preventing** 101:9
**previous** 261:20 262:19
**previously** 4:9 4:10,11,12,13 4:14,15,16,17 4:18,19,20,21 67:18,19,21 86:11 93:19,22 114:20 118:16 118:17 130:1,4 130:7 162:6 167:22,24 179:13,16 182:19,24 185:10,12 188:23 190:6,8 194:19 196:3 214:11,13 215:5 217:14 226:21,23 251:8 262:19
**primarily** 39:22 67:3 89:15 213:22
**prime** 41:18
**principal** 21:24 21:25 22:1,5

**principles** 119:19
**print** 76:9
**prior** 9:3 19:14 20:21,23 59:18 64:7,10 77:10 118:18 130:5 137:23 138:12 155:23 191:1 193:13 259:10 261:18
**priorities** 28:23 80:16 96:8 97:16 145:7 150:13
**priority** 38:1
**private** 56:21 107:14,17
**privilege** 8:9,9 8:10,21,21,22 8:23 12:5,6 99:22 100:1,4 101:3 140:15 140:19 141:12 141:15 149:15 151:8,11 152:2 257:17,20
**privileged** 8:18
**privy** 49:4 149:3 169:8 231:1 232:2 240:24 241:3
**probably** 12:11 20:3 39:9 74:6 117:8 265:20

**problems** 249:10
**procedure** 92:16 271:19 271:21
**procedures** 10:20
**proceed** 9:4 35:24 101:13
**proceeding** 33:22 269:23
**proceedings** 267:11
**process** 8:9,22 48:16,23,24 50:10,10,12 81:19 82:3 99:22 100:17 101:3 140:14 140:18 141:12 141:14 195:12 199:23 217:24 230:4 235:19 240:23 247:23 250:5
**processes** 89:14
**procurement** 53:17
**produce** 15:18 132:12 263:1 263:10 265:15 266:19
**produced** 1:16 16:2 33:11 34:1 68:17

Veritext Legal Solutions
866-299-5127                    calendar-ca@veritext.com                    www.veritext.com

**[produced - question]**

80:6 103:3
104:5 131:25
134:15 138:19
143:21 144:4,7
151:4 152:13
156:21 168:24
172:4 185:14
202:5 203:14
242:13,17
251:19
**producing**
267:2
**product**  258:3
258:6 259:2,5
260:8,12 262:4
262:7
**production**  8:6
8:14 15:16
194:10 202:13
266:15
**professionally**
17:11
**profile**  19:19
104:20
**profit**  2:3,14
**program**  17:20
17:22 18:4
90:9,23 103:17
**programs**  90:5
90:7 187:2
188:17 241:7
241:16,22
242:1
**project**  22:21
38:9,11 157:22

158:15,24
159:1,17
**projects**  19:12
26:6,10 29:19
**pronounced**
197:16
**proper**  258:11
258:15
**properly**
247:24
**proposal**
169:20
**proposed**
170:15 183:24
185:7
**propounded**
268:6
**protected**  9:24
**provide**  67:17
79:5,7,21,23,24
87:1 188:13
236:20 263:15
**provided**  7:20
7:21 8:2,3,13
14:8 25:11
66:17 79:15
117:16 124:21
124:23 125:8
130:10 192:1,4
192:7,11 208:8
212:16 216:24
219:6 239:25
271:19 272:8
**provides**  18:23

**providing**
228:10
**public**  17:14
29:19 48:16,23
93:16 94:10,11
95:4,23,25
96:5,15 97:3
192:2 253:22
254:7,10,12
268:20
**public's**  107:25
**publically**
150:20
**publicly**  106:11
**publish**  62:8
63:7
**published**
61:23 118:3
121:6 126:19
146:4,13 166:3
166:3
**publishing**  62:7
62:10,15
**pull**  156:16
**purpose**  43:4
128:14 149:21
160:6 213:18
223:19 224:11
**purposes**
128:22,23
160:3
**pursuant**  15:12
36:10 269:11
**push**  173:8

**pushback**
144:17
**put**  13:11 48:15
48:22 49:17
51:19 90:13
111:2,4 135:13
161:15,17
166:3 169:19
184:21 198:16
200:14,23,25
201:9 239:4,19
250:5

**q**

**qualifications**
32:21
**qualified**  96:1
**question**  11:12
11:18 12:6,12
27:16 70:6
87:16 99:21
100:5 101:7,7
101:24,25
141:13,16,19
141:20,21
147:1 149:9
151:20,25
152:6 168:21
171:4,5 196:15
199:24 200:1
218:2 223:8,25
226:25 238:15
253:12,15
258:4,23
259:11,13
260:15,19,23

**[question - recall]**

264:22
**questioning**
262:3
**questions** 9:15
13:8,24 33:23
56:19 61:25
101:13 118:22
151:9 152:7
156:22 202:16
203:6,12,19
232:23 233:16
233:18,19,21
236:16 249:5
253:17 258:10
258:20 260:25
263:7 265:22
266:7 268:6
**quick** 265:23
**quickly** 10:19
41:24
**quiet** 107:4,6,8
**quite** 9:2 56:3
62:6 190:10
235:18
**quote** 159:7,8
171:14,16

**r**

**r** 273:5,5
**r&s** 272:1,10
**raise** 9:2 49:18
49:19 50:1
**raised** 49:20
50:12 216:14
216:20

**range** 8:14,15
19:4 138:6
**ranking** 71:20
**rarely** 81:4
**rather** 11:2
173:8 206:4
**reach** 62:14
**reached** 206:18
**read** 13:19 62:9
62:11 63:5,6
99:8 122:2
124:10,10,13
165:7 180:1
182:21 190:23
193:24 203:14
214:14 215:3
217:23 243:8,9
243:18 248:4
254:25 255:2
260:18 268:4
**reading** 41:20
149:10 154:5
185:8 202:11
203:10 271:24
272:10
**ready** 14:10,11
34:5 41:6
68:20 227:1
**really** 29:17
56:10,10,19
159:9 195:6
213:1
**reason** 16:14
51:4 86:11
110:2 140:6

165:14 180:25
183:13 191:10
207:9 225:16
249:11 269:17
273:8,11,14,17
273:20,23
**reasonable**
197:9,11
**reasoning**
30:16
**reasons** 265:20
**recall** 10:14
18:2 20:2,15
22:22,22 24:3
24:6,14,18,19
25:2,7,10
26:20 27:10,14
28:18 30:15
32:5,13,17
33:7 35:10,15
39:8 44:12,17
45:19,20,21,23
57:3 59:16
60:5,14,25
66:16 67:1,3
67:11 68:3
69:22 70:2,2
70:13,15,18,21
70:22 75:13
77:7,9 78:1,2,4
78:6,8 84:23
88:12,17,21,23
89:6 90:21
94:9,19,23
95:3,13,15

96:10 97:7,9
97:11,12 98:3
98:5,8,23,25
101:19,24,25
102:8,16,21,24
103:1 106:8,12
106:13,13
107:6 108:10
108:18 109:8
109:14,18,20
110:5,7,13
111:22,24
112:1,12,14
114:5,5,13,17
115:20 116:13
117:9,10,12,13
117:18,22,24
118:4,6,23
119:2 121:20
122:2,5,7,8,11
122:14,25
123:9,11 124:5
125:19,21,23
125:24 127:24
129:10 132:13
132:18,20
133:4,15,18,24
137:24 138:3,5
138:7 141:23
150:8 152:15
156:2,6,15
157:22 158:12
158:13 159:21
161:17,20
162:2 164:8,12

Veritext Legal Solutions
866-299-5127     calendar-ca@veritext.com     www.veritext.com

**[recall - recommendations]**

165:16,17,19
165:21 166:8,9
166:11,12,15
166:17 167:12
167:15 168:15
168:17 169:10
169:12 173:23
176:1 177:19
177:21,22,25
178:4,5,7,9,11
180:17 181:20
181:25 182:1,4
182:6,10
183:17 184:10
184:11 185:9
186:18,19,19
186:25 187:1,4
187:7,10 188:3
188:21 189:5
189:11,17,20
189:22,24
190:2,3 192:17
192:20 193:4
193:16 194:17
194:21 195:3,6
195:21,22,25
196:1,13,20,23
196:25 198:2,4
198:19,21,21
198:23 199:1
200:5,9,12
201:14 204:15
204:16 205:19
206:1 207:25
208:17,24

209:6,7,13,21
209:22 210:8
210:10,11,12
210:15,17,20
210:22,24
211:11,12,16
212:4,6,8,10,11
212:14,14,17
212:19,22
213:4 216:1,5
216:10,12,18
216:22 217:5
217:13 219:12
219:22,23,25
220:1,15,18,20
221:13,18,20
223:4,9,10,11
224:21 226:8,9
226:19,19
227:10,13,14
227:15,17,19
227:23 228:3,3
228:12,14,19
229:4,5,9,12,17
229:23,25
230:1 231:7,8
233:21,24
235:7,9,11,12
235:14 236:12
237:1,4,9
244:11,12
246:1,4,7,9,9
246:13,20,22
246:24 248:12
248:13 249:9

249:20,21,22
251:18 252:24
253:10,11,14
253:16,20
255:21 262:24
264:4,20
**recalling**  61:14
**receipt**  57:25
58:5 269:15
**receive**  181:1
183:14 184:7
191:11 263:3
**received**  58:15
62:20,22 73:11
105:8 124:16
125:16 154:24
155:16 161:6
181:2 183:16
251:12 255:24
263:4 264:16
266:18
**receiving**  17:12
165:17 246:7
247:12
**recent**  251:22
**recently**  243:6
**recess**  68:12
71:14 100:22
153:17 201:25
251:4 266:3
**recipient**
154:16
**recite**  82:25
**recognize**
14:12 168:1

**recognized**
103:14
**recollect**  98:6
**recollection**
21:8 22:16
23:8 58:14
70:1 72:2
106:21 125:10
132:23 141:8
145:3 160:3
164:9,25 165:3
168:10 170:7,9
170:13 179:5
179:12 186:2,7
188:6 190:9
197:21,24
223:1 226:2
227:6 238:19
243:1 244:24
247:11
**recommend**
148:8
**recommendat...**
121:16,18,22
122:1 123:1
124:7,15
148:13,15,19
148:22 161:20
166:4 194:12
198:9,12,14
241:6
**recommendat...**
78:13,16 79:7
86:20 119:19
169:20

Page 49

**[recommended - related]**

**recommended**
22:18 35:18
126:1 164:10
186:22 187:2,3
241:17,21
**recommending**
123:18
**recommends**
122:22
**record** 6:2 8:25
9:16 11:8,13
11:22,25 68:8
68:10,11,14
71:10,12,13,16
100:18,20,21
100:24 101:8
101:10,11
134:5,7,8,11
136:11 153:13
153:15,16,19
181:20 187:25
201:23,24
202:2,12
203:15 251:2,3
251:6 266:1,2
266:5,11 267:6
267:8,10
269:10
**recorded** 10:22
10:25 61:12
**records** 47:18
226:18
**recovery**
172:13,18
173:17 243:3

244:6
**reduce** 121:11
150:11,13,19
166:22 181:22
182:4,8 183:24
185:7 194:8
**reduced** 121:16
167:3
**reducing** 97:16
99:10 155:9
159:6 182:16
**reduction**
139:22 172:12
172:17,25
174:18 176:9
176:12
**refer** 33:15
40:7 251:10
**reference** 36:9
95:5 141:1,2
145:19 146:1,7
147:8 155:12
158:11 164:3
172:23 174:17
176:8 184:15
191:23
**referenced**
160:9 256:19
271:6
**references**
176:19
**referencing**
159:17 218:8
255:25

**referred** 126:1
183:10 196:7
253:23
**referring** 81:21
81:24 90:3,7
126:6,13
136:10 141:3
142:24 143:8
144:20,22
145:4,16,18,24
147:20,24
157:21 158:8
158:12 171:1,6
172:21 176:13
177:24 184:18
208:16
**refers** 137:16
185:2,16 215:4
**reflect** 180:15
**reflecting**
164:7
**reflects** 266:17
**reforming** 96:3
**reframe** 258:1
**refresh** 145:3
160:2 168:10
178:13 186:2,7
190:9 223:1
226:2 238:19
**regarding** 12:6
103:11 108:8
110:3 115:4
129:8 151:9
157:14 177:18
178:1 184:2,7

186:8 189:18
191:19 198:9
206:5 209:4
210:18 218:4
218:12 223:3
223:12,18
225:1 236:17
241:1 244:17
248:24 258:10
258:20 263:19
**regions** 187:2
241:7,15,22
242:1
**regular** 84:12
84:14,19,22
112:3
**regularly** 112:9
**reiterate**
261:22 262:4
262:11
**reiterated** 95:9
**reiterating**
248:21
**rejection** 241:6
**relate** 32:25
**related** 40:20
42:1 110:6
128:24 129:14
133:21 173:6
173:15,16,18
176:21,22
208:25 210:6
219:3 232:10
264:8 265:18
269:22

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[relationship - requesting]**

**relationship**
22:7 36:24
37:2,3 42:20
43:2 207:13
261:14,23
**relayed** 28:25
**release** 241:5
**released** 117:20
241:21 244:21
271:22
**releasing**
240:12 242:2
**relief** 64:10
145:8 160:20
166:20 170:16
174:3 175:5,6
175:11,15,19
176:7,9,13,14
**remade** 95:11
**remain** 142:6
**remarks** 95:6
**remember** 17:3
19:10 23:1
25:4 63:2
66:24 77:15
86:7 87:6,8,13
87:20,22 96:13
108:16 114:10
114:15 115:24
115:25 119:5
125:2,12,13
133:23 157:23
158:9 167:18
194:22 211:14
211:19 224:14

224:16 234:23
245:25 246:17
**remit** 110:14
195:12
**remotely** 26:3
116:14,15
**remove** 256:5
**renew** 184:8
196:18 199:7
245:13,19
**renewal** 184:14
184:19,25
185:1,4 198:10
210:13 211:9
211:25 213:2
216:3,23 223:3
233:12 240:16
241:1 245:11
**renewals**
110:11,21
211:3 220:2,10
220:17 225:7
229:1,7 230:2
245:6,8 247:20
**renewed**
194:20,24
195:14 229:8
241:16,17,19
241:22
**renewing**
210:18 211:17
**repeat** 141:21
**repeatedly**
160:9 243:12
254:18

**rephrase** 258:1
**replaced** 65:23
**replacing**
128:10
**report** 46:5
117:1,3,11,15
117:20,25
118:5,12,13,21
119:3,3,14
120:22 121:1,3
121:4,19,20,21
121:25 122:22
124:7,12,17,20
124:23 125:9
125:14 126:1
126:21 127:1,5
144:17,21
145:4,25 146:8
146:12,19,24
147:5,13,14,16
147:20 166:4
170:3 191:20
191:21,23
194:12 243:22
255:23
**reported** 1:22
40:16,17 57:1
194:4 255:20
**reporter** 1:21
6:9,12 10:22
11:1,8 13:16
41:23 269:6
**reporter's**
269:1

**reporters** 62:18
62:20
**reporting** 63:1
220:8
**reports** 62:11
118:6 120:2,19
243:5 248:24
**represent**
105:22,23,24
**representation**
130:16
**representatives**
94:22
**represented**
106:14 117:15
130:11 238:7
261:17
**representing**
6:3,10 7:10
9:14
**request** 187:11
188:18,22
198:17 209:23
212:20,23
246:11
**requested**
15:18 86:21
91:15 116:23
210:1 227:11
269:13,19
272:1,10,11
**requesting** 84:1
89:20 129:20
200:24

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[requests - richardson]**

requests 86:25
188:12 209:24
require 26:1
required 81:19
81:23 82:1
110:16 231:21
264:2 271:20
requirement
111:7,11
188:15
requirements
158:7
requiring
191:18 193:17
193:21 262:22
263:1
reserve 8:19
140:19,21
reservists
109:6,7
resilience 157:5
resolve 100:16
respect 30:7,11
46:10 56:24
59:2 64:21
68:1 74:19,25
77:17,22,25
78:3,7,21
79:10 88:24
89:13 91:3
96:21 108:9
111:21,23,25
114:11,15
116:25 129:18
131:1 141:24

166:23 200:1
233:12 264:22
respectfully
149:18 258:17
respond 92:9
103:13 144:23
151:22 189:15
238:16 262:5
responding
70:13 215:12
217:11 249:4
responds 142:2
225:25
response 12:13
70:9 99:20
104:9 105:8
159:3 167:1,1
194:25 197:4
215:14,16
231:9 235:21
236:9 243:3
244:6 245:2
262:21 263:10
responses
236:4,15
responsibilities
86:17,18 220:7
responsibility
81:15 145:8,10
197:4 250:12
250:13,16
responsible
44:24 219:2
235:20 243:2
244:5

responsive 16:6
95:12,25
257:18 258:5
262:2
responsiveness
27:8 29:4
rest 60:5 247:5
247:15
restate 100:11
209:10
result 10:24
46:18 262:8
resulted 193:14
rethought
95:24
retirement
103:16
retroactively
133:7
return 271:17
272:6
returned
219:22,25
256:14 269:15
269:16
reveal 107:2
152:1 257:19
258:5,25 262:6
reversal 232:5
review 26:18
82:24 83:9
89:21 91:16,16
91:21 93:3,9
93:15 94:1,9
116:21 118:12

123:3,6 125:8
144:6 146:8,8
146:23 148:14
148:20,24
161:21 166:2
169:21 182:1
187:5 191:23
194:11 196:11
197:14,19,22
201:17 228:17
239:16 240:15
250:21 271:8
271:10,13
272:2
reviewed 82:22
89:11 117:2
120:6 195:10
195:11,23
197:10,12
250:20
reviewing 80:5
89:12,16,18,19
91:5 121:1
125:14 151:7
180:4 184:23
184:24 196:13
196:20,23,25
197:5
reviews 83:15
revised 4:23
15:8
revitalized
95:24
richardson
65:23 85:10,24

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[richardson - says]**

88:24 105:12
117:16
**ridiculous**
144:24
**rif** 138:22
139:3,10,18,20
170:3 173:2,13
173:15,16
**rifs** 141:10,25
142:25 143:12
169:22
**right** 9:6 10:2
14:16,24 25:15
25:19 28:3
30:3,12 39:5
43:14 44:6
47:11,15 50:21
56:25 66:19
85:6 87:1
93:13 97:17
104:2,21
107:22 109:4
109:22,25
111:1,6 123:22
126:5 128:23
135:21 140:8
142:2 143:17
144:12 158:7
166:20,24
167:18 171:15
174:16,25
178:21 179:4
180:10 182:17
184:9 192:22
195:10 209:19

216:8 223:14
231:17 236:11
240:13 242:25
245:25 251:16
252:10 253:24
255:4 264:9
**rights** 8:19
140:19,22
**rightsizing**
111:18,20,25
177:18 179:24
181:6,13,15
215:4,10
**rings** 228:13
**road** 103:19
**roland** 217:18
221:13 223:13
**role** 19:7 21:1,4
24:12,13 25:1
25:9,25 26:25
27:13,20,20
28:13,22 29:6
30:11 38:23
39:24 40:10
49:9 55:14
58:24 59:2
63:17 64:20
68:1 71:22
74:19,24 75:1
77:17 78:10
80:10,21,22
87:18 88:11
91:2 97:19,23
98:19 116:20
116:25 156:12

213:18 254:9
**roles** 73:21
**room** 12:23
73:19 102:11
102:13,13
**rough** 19:4
47:3,13 48:13
**roughly** 31:25
72:24 85:11,14
85:16 86:7
109:19 117:25
164:21,24
192:6
**round** 127:8
193:8 237:2,4
237:5
**routinely** 167:8
**rule** 12:12
269:11
**rules** 272:8
**run** 159:4
263:23
**running** 178:8

| s |
| --- |

**s** 273:5
**s1** 81:19,23,24
82:1,15 92:1
110:16 141:4,9
141:24 173:9
184:14,15,19
185:2 195:10
195:16,18
196:16 197:5,8
208:13,15,17
208:18,22

212:20,24
223:20 224:19
226:3
**s1's** 222:24
**s2** 208:8,10,19
208:22
**safety** 137:13
**san** 1:3 2:9
**sat** 73:11 88:7
**saved** 259:17
**saw** 111:11
117:14 118:24
119:3,7,11
121:2 124:10
132:18 133:24
134:2 179:19
180:15 184:20
185:3 189:21
206:23 212:15
215:5 239:23
**saying** 60:14
63:7 95:13
97:7,9 98:3,6,8
105:2 139:18
140:4 146:18
146:19 149:6
195:17 196:10
217:24 243:12
247:14
**says** 57:24 69:9
103:13 104:22
121:11 122:24
126:3 139:5
144:16 145:12
145:13 147:3

Veritext Legal Solutions
866-299-5127
calendar-ca@veritext.com
www.veritext.com

**[says - see]**

| | | | |
|---|---|---|---|
| 152:22 157:17 | **se** 3:10 33:4 | 91:14,17,21 | 30:11 31:8 |
| 158:16 163:20 | 92:8 | 92:17 93:12 | 32:15,19,22 |
| 165:4,6 181:4 | **sealed** 271:20 | 95:1,6,17,18,20 | 36:7,17 37:14 |
| 183:19 191:13 | **search** 205:10 | 105:23,24 | 37:19 38:24 |
| 197:13,18,20 | 205:15 232:16 | 106:6,14,21 | 39:4,24 40:21 |
| 201:16 208:13 | 257:9,13,14 | 110:12,14,16 | 42:2,5 43:9 |
| 215:23 221:2 | 259:14,15 | 116:21 117:6 | 44:2 45:1 |
| 222:11 225:23 | 260:1 261:8 | 120:22 143:10 | 48:22 49:2,10 |
| **schedule** 112:6 | 263:9,14,18,22 | 145:7 146:12 | 50:20 52:3,22 |
| 209:13,14 | **searches** 262:8 | 146:15 184:15 | 53:5,7,16,21 |
| 222:21 271:10 | 262:13,14,20 | 195:24 197:3 | 54:1,20,23 |
| **scheduled** | 263:23 266:18 | 208:11 209:4 | 55:4,6,10,19,21 |
| 112:9 117:19 | **searching** | 209:19 210:6 | 55:24 56:24 |
| **schedules** | 259:24 260:6 | 210:14,18 | 58:4,12,18 |
| 112:13 | **season** 65:6,7 | 219:2,4,6,13 | 59:3,22 60:18 |
| **school** 16:20 | 65:12 85:14 | 220:2,9,16,19 | 60:22 67:25 |
| **schutt** 43:17,21 | 109:24 115:25 | 222:24 223:2 | 71:24 76:17 |
| 44:18,21 45:14 | **second** 94:2 | 223:23 231:8 | 82:1 92:25 |
| 45:17 46:8,9 | 95:5,8 100:14 | 231:16 235:5 | 102:18 107:12 |
| 49:8 52:14,18 | 121:8 135:19 | 250:21 252:14 | 108:2 110:11 |
| 58:23 60:1 | 171:20 188:18 | 253:12,17 | 134:1 155:18 |
| 66:16 67:13,15 | 193:8 225:13 | 254:10 | 155:24 178:21 |
| 67:22 69:17 | 225:14 | **secretary's** | 186:24 197:3 |
| 71:1 74:1,5 | **secretary** 24:21 | 89:25 91:15,20 | 251:9 252:21 |
| **schutts** 52:13 | 32:8,19,22 | 98:16 106:4 | 252:24 253:4 |
| **scope** 110:21 | 39:5,20 40:11 | 110:20 111:1 | 254:18,21 |
| **scratch** 159:10 | 53:12 54:2,7 | 220:8 235:1 | 255:8,19 |
| **screen** 130:8 | 54:15 55:15,16 | **sector** 107:14 | 257:23 261:2 |
| **screenshot** | 58:18 70:17 | 107:17 | 261:15 264:1 |
| 135:23 151:3 | 71:3,19,23 | **security** 3:7,9 | **see** 14:15,20,21 |
| 153:22 238:1 | 74:7,11,17 | 7:8 10:12 | 15:1,2,10,11,16 |
| **screenshots** 5:7 | 80:10 81:9,11 | 19:17 20:10,14 | 15:20,21 35:1 |
| 5:9 103:6 | 81:25 83:16,23 | 20:21 22:20 | 35:2,22 43:22 |
| 135:24 144:1,9 | 84:5,17 86:20 | 23:22 24:1,10 | 52:20 58:1,2 |
| 169:24 173:4 | 88:23 89:4,19 | 24:21 26:14,19 | 66:22 69:12,13 |

Veritext Legal Solutions
866-299-5127      calendar-ca@veritext.com      www.veritext.com

**[see - set]**

94:3 95:7
98:19 112:17
119:18,20,23
119:24 121:4
121:13,14
130:13,14,18
130:20 131:25
136:19 137:15
138:23,24
139:7,8 140:7
140:25 141:6,7
142:4,8,21
143:12 144:14
144:18 145:1
145:14 146:5,6
146:21,22
147:18,19
152:21,23
153:8 155:7,8
155:10,14,15
157:19,20
158:19,20
159:12,13
162:16 163:1,3
163:9,11,15,22
164:1,2 165:5
168:3,5,6,9
172:6,7,14,16
173:10 179:25
180:6,9 181:7
181:8,12 183:2
183:7,11,12,19
183:21,22,25
184:1,4,5
185:9,19,20,25

186:1 190:8
191:5,6,16
196:8 202:14
208:5 212:18
214:22 215:13
215:14,21,23
216:16,16
217:20 222:19
222:22,23,25
223:15 225:21
225:22 226:6
227:3,5 238:11
238:12 240:10
242:4,8 244:18
247:17,19,21
247:25 248:3,4
256:9
**seeing**  89:6
139:11 165:19
212:6,8,11
**seek**  8:19
**seem**  98:14,15
158:10
**seemed**  170:20
**seems**  143:3
159:22 198:18
208:25 216:20
248:6
**seen**  110:18
124:9 132:13
176:19 186:5,6
186:12 187:7
188:8 195:17
198:19 214:19
237:13 243:22

263:11 264:23
**senate**  253:18
**send**  46:7 76:9
212:16
**sending**  154:14
191:1 212:1
216:10,12
223:13,17,21
**sends**  103:11
**senior**  32:18,22
54:2,6 55:14
65:14 70:16
71:2,18,23
77:17 80:10
82:22 95:17
106:12,18
219:1 254:9,13
255:8
**sense**  11:3,9,16
12:2,8,14 13:1
13:17 51:22
91:2 194:23
**sent**  58:8 63:7
89:4 92:1
142:16,20
152:24 154:3,6
167:25 168:19
177:16 180:12
181:10 187:5,8
187:8,10
188:10,19,22
189:3,5,9,12
191:3 201:9
206:23 207:1
218:18,23

225:23 242:1
242:13,15,17
244:9 246:5,13
248:23,24
249:12,14
**sentence**  95:8
121:10 215:3
**sentiment**
96:18,23
**separate**  9:20
248:25
**separated**
248:1 249:6
250:3
**separation**
248:8
**separations**
249:17
**september**  43:6
73:2 86:10
139:13,13
141:3 142:17
**serve**  95:22
**served**  14:14,22
**servers**  76:1,7
**service**  109:15
**services**  60:12
**sessions**  94:14
**set**  14:18 15:3
33:18 36:22
67:2 72:14
77:5,6,7 81:11
93:3 98:23
105:10 127:15
128:12 130:19

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[set - someone's]**

130:22 131:3
131:10 137:6,8
137:22 143:20
182:2 184:2
202:4,19,22
211:22 221:6
226:11,12
246:15 250:22
264:19
**setting** 132:6
132:25 133:6
136:22 137:3
137:14
**settings** 136:17
136:18 137:10
**several** 18:3
19:9 26:21
39:9,13 86:4
91:10 94:22
108:20 112:11
117:2,10
119:11 179:22
181:5 215:8
221:10 231:11
231:12 234:24
235:2 244:7
246:6 257:7
**sgs** 56:9
**shakes** 111:10
**shared** 169:25
**sheet** 66:23
**short** 7:4 18:8
25:6,6 250:24
**shorter** 147:11
147:13

**shorthand** 1:21
269:5
**shortly** 7:21
69:5
**show** 68:17
162:4 177:20
178:12 187:19
202:4 242:15
**showed** 55:8
164:18 187:8
190:16,22
240:11
**shown** 186:17
**shows** 135:20
**shut's** 49:9
**shutdown**
172:15 173:1,3
173:12,14,18
174:21 175:10
175:14,16
176:4,6,15
**si** 1:10
**side** 182:22
**sign** 26:18 82:2
271:16 272:5
**signal** 5:8,10,11
5:12,13,18,19
39:16,17 92:6
92:22 93:1
103:10,23
104:10 126:15
126:20 130:9
131:1,10,24
132:5,25
133:10,13,13

133:21 138:21
139:3,10
140:12 143:20
144:1 151:4
153:3,22 154:7
156:20 202:20
202:23 203:7
203:22 205:23
206:3,6,10,11
207:7 259:20
259:22,24
260:2 263:19
264:3,8,19
**signature**
152:21 196:12
197:15,19
201:17 242:8
269:12,17
270:6 271:22
271:24,24
272:10
**signed** 43:20
52:18,21 57:21
58:7 83:2 89:9
99:6,13 101:23
102:2,5 105:5
198:20
**significant**
26:17 78:9
92:22 174:9
178:17 236:25
**signing** 152:25
**signs** 242:21
**similar** 84:2,3
96:7,21,21

156:13 221:11
**similarity**
126:23
**simple** 64:18
**sitting** 12:25
13:5 86:4
114:10 119:8
167:11
**six** 178:15
**size** 97:4,5,10
97:16 99:10
110:3 150:11
150:13,19
166:22
**slate** 157:18
158:24 159:1,9
159:17
**slightly** 199:24
**slow** 41:22
**small** 113:4
**smaller** 109:11
109:12,16
126:2 149:25
160:2,14,19
161:1,3 179:10
**smith** 1:23 3:8
3:17 7:7,7
**social** 21:23
22:6 36:24
37:2 207:13
**solution** 135:18
**solutions** 271:7
**someone's**
242:13

Veritext Legal Solutions
866-299-5127                    calendar-ca@veritext.com                    www.veritext.com

**[soon - staffing]**

| | | | |
|---|---|---|---|
| **soon** 165:22 | **sounded** 38:12 | 233:21 235:8 | **spoken** 205:22 |
| **sooner** 173:8 | **sounds** 14:24 | 236:12 237:4 | 214:19 |
| **sopda** 65:16 | 29:6 84:25 | 245:1,15 249:2 | **spreadsheet** |
| 85:4,10,17,20 | 85:9 99:11 | 252:22 | 46:6 193:19,25 |
| 85:24 88:24 | 143:4 146:25 | **specifically** | 194:4 246:7,22 |
| 89:10 90:23 | 147:7 158:6 | 30:12 61:1 | **spreadsheets** |
| 105:12 112:8 | 189:8 232:6 | 63:2 70:14 | 212:8 246:5 |
| 114:18 115:1 | 251:16 | 72:4 86:22 | **spring** 26:10 |
| 165:23 207:25 | **space** 73:9,10 | 87:7 90:2 98:6 | **stack** 237:20,25 |
| **sopdas** 114:22 | 73:16 75:3 | 112:1 114:13 | **staff** 75:12 |
| **sorry** 19:23 | **speak** 95:20 | 118:21 119:2 | 88:15 94:24 |
| 25:19 27:17 | 207:10,11 | 133:15,23 | 95:3 105:13 |
| 37:21 41:17,20 | 225:4 | 142:1 150:9,17 | 122:4 137:25 |
| 43:12 50:25 | **speaking** 11:15 | 165:24 166:11 | 138:6 142:11 |
| 68:19 71:9 | 71:4 80:23 | 193:6 212:10 | 143:12 147:5 |
| 79:5 90:16 | 152:6 156:1 | 212:15 226:9 | 147:25 148:5,9 |
| 93:17 109:15 | 203:21 | 226:19 227:9 | 148:23 160:14 |
| 119:17 135:1 | **special** 10:11 | 227:19 229:25 | 160:19 161:1,3 |
| 135:15 140:11 | 19:12 21:2,6 | 232:3 233:23 | 164:10,16 |
| 141:21 154:18 | 30:22 31:13,15 | 234:23 246:9 | 165:13 170:14 |
| 167:25 174:20 | 31:18 32:1 | 262:25 | 173:13,17 |
| 177:9 180:1 | 40:19 49:23,23 | **specifics** 61:19 | 174:3,12,13,18 |
| 185:23 190:18 | 54:1 76:16 | 110:22 129:10 | 176:19,22 |
| 197:17 217:23 | 87:19 | 129:20 | 186:9,14,21,22 |
| 222:4,6,12 | **specific** 59:16 | **spend** 84:1 | 187:1,6 192:6 |
| 230:20 247:5 | 61:15,25 62:6 | 89:20 174:8 | 192:11 193:8 |
| 247:15 253:21 | 62:7 91:6 | **spending** 67:10 | 194:8 196:10 |
| 257:25 261:7 | 97:12 111:11 | 67:11 83:25 | 231:21,22 |
| 264:13 | 128:22 129:13 | 250:21 | 236:10 239:14 |
| **sort** 48:15,22 | 129:17 138:7 | **spent** 64:22 | 248:8,14,19 |
| 62:4 | 178:4 185:24 | 108:1,4 | 249:23 |
| **sought** 91:1 | 188:6 193:16 | **spoke** 49:16 | **staffing** 67:10 |
| **sound** 109:4,21 | 203:7 210:10 | 54:12 59:10 | 67:12 121:11 |
| 187:12 190:17 | 217:25 226:20 | 157:12 | 121:16 129:9 |
| | 229:4,17 | | 129:11 145:17 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[staffing - subject]**

145:20 164:11 164:14 165:2 165:12 167:21 168:12 169:7 169:14 170:2 177:16 181:10 186:22,25 187:12,16,21 188:4,7,10,14 188:20 189:4,6 189:13 192:16 193:8,13,18 194:14 213:2 213:21 235:10 237:2,6,11,12 237:13,15 238:18,20,22 238:23 239:1 239:12,16,17 239:19,23 240:9 246:8,14 246:15,18,20 252:7

**stafford** 109:6
**stamped** 33:15
**stands** 103:16
**stapled** 163:2
**start** 11:15 16:17 29:15 73:7 82:12 103:21 119:22 139:17 149:20 150:2 159:11 189:1

**started** 9:13 10:7 18:2 46:15 110:3
**starting** 36:17 41:10 138:20 139:12 143:22 156:20
**starts** 34:24,24 162:14 182:25 202:6,20
**state** 1:21 6:11 9:16 64:12 95:10 268:21 269:6 271:9,12
**stated** 150:9 244:7
**statement** 7:5 145:12 152:22 177:23 253:23 266:10
**statements** 66:21 96:15 123:21
**states** 1:1,13 107:20 144:24 145:9,10 174:10 175:2 177:8 247:5
**status** 107:11 107:15,21
**statute** 159:10
**statutory** 158:7
**stay** 49:24
**steer** 79:21,23 79:24,24 80:19

80:24 82:20
**stenotype** 1:22
**step** 7:6
**stephanie** 163:13,18 179:17,22 180:7,21 181:4 181:14 182:25 183:19 191:8 214:24 215:10 221:12 227:12 228:1,5
**steps** 258:23 265:11
**steve** 35:7,8,23 36:9,11 152:22 154:6,13,17,19 155:1 156:10
**stick** 9:11
**sticker** 13:16
**stickers** 242:6
**stipulation** 271:21
**stood** 139:20
**stop** 57:24 58:3 151:16
**stopped** 58:11 65:7
**stopping** 134:4
**storm** 230:8 231:6,12,23
**story** 37:12 62:15
**strategy** 185:17

**stream** 149:10
**street** 1:24 2:8 3:4,17
**string** 152:16 180:9 218:19 220:25
**strings** 221:11
**structure** 45:8 51:23 53:9,11 56:20 66:7,10 108:19 184:21
**structured** 44:7 67:9
**struggling** 55:1
**style** 228:8
**styled** 1:18
**sub** 94:12,13,15
**subcomponent** 246:23,24
**subcontract** 42:15,16 43:8 43:11,13 44:5 48:15,17 49:1 49:13 50:24 51:5 52:6,14 57:15,18,25
**subcontractor** 5:2,3 42:13,18 42:24 49:17 50:13 59:1 106:18 178:24 179:1 261:3,9
**subject** 8:8,20 99:21,25 140:14,18

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[subject - taken]**

141:14 151:11 152:2 175:10 175:16,17 198:25 256:2,4 257:19 258:6 258:25 259:1,4 260:11 262:3,6
**submissions** 139:19
**submitted** 165:13 194:14 239:24
**submitting** 188:4
**subpoena** 4:22 4:23 9:1 14:2,7 14:14 15:8,13 104:9 257:12 262:21 263:4 263:10
**subscribed** 268:15
**subsequent** 137:10
**subsequently** 188:25
**substance** 268:7
**substances** 16:11
**substantial** 140:13
**suburb** 25:23
**sudden** 75:23

**sufficient** 174:2
**suggested** 50:10 107:9 170:18
**suggestion** 195:7
**suggestions** 63:24 64:1,3 78:14,16
**suite** 1:24 2:8 3:17
**summer** 77:8 86:2 89:15,23 90:5,12 91:9 117:15 204:18 204:20
**supplemental** 5:19 202:21
**supplements** 263:15
**support** 18:22 175:1
**supporting** 116:21
**suppose** 50:17 50:22
**supposed** 70:4
**sure** 10:1 16:21 23:14,19 27:3 27:18 29:3,12 29:22,23 51:1 53:24 56:11 70:4 75:1 80:13,15,18 81:6 82:10

87:15 90:4,25 108:6 112:11 112:11 120:20 121:7 127:19 128:7 134:17 135:4 136:25 140:10 141:22 144:22 153:8 157:24 171:10 180:2 181:2,21 189:16 190:19 190:24 195:2 196:11 203:11 203:18 205:5 209:5,8 221:16 225:14 233:14 233:15,17 235:4,23 240:7 241:4,18 245:16 252:18
**surprised** 79:11,12 223:21 224:1
**suspended** 90:16
**swear** 6:13
**switch** 9:11
**sworn** 1:18 7:12 268:15 269:8
**sync** 115:11,16 169:10
**syncs** 221:21 229:2

**system** 133:10

**t**

**t** 273:5,5
**table** 12:25 47:8 177:5
**take** 12:11,13 14:9 24:2 27:6 74:17 93:23 94:2 101:7 102:12 103:2 112:19,22,23 114:7 117:6 118:15 130:3 134:17 144:24 153:12 165:20 166:23 167:20 171:19 182:21 190:7 214:12 217:15 221:24 226:22 236:13 242:5 245:2 250:23 259:8,9 260:13 264:7 265:11,23
**taken** 1:18 6:6 68:12 71:14 100:22 113:18 131:16,21 134:9 135:24 136:1 137:11 153:17 201:25 239:7,15 242:2 248:25 251:4 258:23 266:3 269:23

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[takes - thing]**

takes   18:14
talk   11:6 36:13
    36:19 41:24
    50:10 59:13,15
    61:2,8,16
    69:10 84:24
    106:6 118:22
    129:20 147:23
    211:8
talked   23:25
    36:14 59:14
    156:11 157:17
    163:25 165:7
    168:7,11
    179:19 194:13
talking   35:3
    41:20 71:18
    101:15,16
    111:13,14,16
    112:7 124:2
    143:11 146:23
    147:4 155:1,6
    155:25 160:1
    165:1 185:16
    208:7 234:19
talks   179:22
target   189:25
    193:19 194:2
tasked   159:4
    185:17 234:11
    237:14
tasks   64:21
tax   51:23
taxpayer   108:1
    108:4

taxpayers
    108:3
team   68:2
    125:1 210:1
teams   88:3
technically
    17:22 23:17
technologies
    41:20 42:19,21
    43:16,21,23
    44:10 46:2
    48:21 52:11,19
    57:16 58:25
technology
    57:14 64:19
    76:1,2
telephone
    103:7 130:12
teleported
    243:12
tell   20:4 22:17
    24:12,13 25:4
    27:2 28:16
    30:14 32:10
    44:9 57:11
    59:8 60:13,24
    65:8 66:19
    80:5 90:2
    106:23 107:7
    112:6 119:10
    123:7 130:10
    130:15 137:2
    146:16 159:5
    165:6 185:13
    192:9 195:2

    202:8 204:8,13
    206:8 209:9
    257:6,12 264:1
    265:1
telling   28:18
    60:25 70:15,18
    165:14 264:20
term   31:4
    90:17 108:15
    111:18,19,20
    111:22 115:14
    126:4,6,9
    129:6
terminate
    58:22 60:3
    89:23 90:1
terminated
    57:15 59:9,12
    59:19,25 60:7
    65:20 90:5,10
    90:12,15
    113:14 231:25
    256:8
termination
    5:4 57:6,13
    237:17 251:11
terminations
    232:2
terms   97:2
    166:25 176:1
    178:8 205:10
    205:16 257:14
    263:14
test   16:5

testified   7:12
    30:22 86:11
    114:20 122:18
    136:21 137:23
    156:3 165:11
    251:8
testify   14:15
    194:7
testifying   15:12
    42:2
testimony
    12:23 16:12,15
    141:17 167:11
    179:3 194:9
    269:10
texas   1:22,24
    3:18 16:21
    18:11,12 25:19
    269:6 270:8
text   62:20,22
    149:10 164:17
    189:22 190:15
    190:21 205:25
    206:1,4
thank   7:15
    137:22 156:22
    163:6 169:3
    177:14 180:4
    214:16 243:20
    266:23,25
    267:4
theory   199:5
therefor   269:18
thing   28:2
    56:21 71:5

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[thing - title]**

82:5 124:10
154:21 185:8
197:9
**things** 11:23
13:3,22 29:22
33:5 38:16,17
54:17 61:11
62:4 66:7,17
66:19 79:14
87:4,18 88:3
91:4,6,14,16,17
91:22 92:3,5
105:15 122:18
123:25 129:14
129:24,25
145:6 156:13
200:18 216:6
250:13,17
**think** 32:16
36:9 39:2
54:21 56:15
57:5 61:21
68:6 70:7 71:5
81:14 91:18
94:22 97:1,1,5
100:15 107:5
107:16 108:3
109:8 126:25
133:9 134:4
135:5,5 147:21
158:17,23
159:20 160:15
163:23 164:24
170:1 173:7
199:10 201:13

201:19,21
205:7 207:22
228:8 248:21
251:22 252:14
253:18 255:6
260:24 264:5,6
265:21 267:5
**third** 44:5
**thoshijima**
2:22
**thought** 62:1
62:23 168:22
215:24
**thoughts** 70:5
**thousands**
181:2 183:16
213:7 221:17
233:3 239:9
**three** 18:13
26:4 162:13
250:1
**thursday** 84:8
84:9 136:2,9
136:10,12
137:16
**till** 11:14
**time** 6:4 9:2,2
10:4 13:19
17:17,24,24
18:8 19:8,10
19:12,18 21:16
23:6 24:22
25:14 26:10
31:1,6,7,12,19
31:25 34:22

36:2,7 39:25
40:18 41:21
46:5 49:22
50:15 51:4
58:24 59:22
60:16,20 62:2
63:21,22 64:2
64:22 65:5,21
68:6 69:3,23
72:15,22 73:11
74:3,4,8,25
75:14 76:11,16
83:3,4,5 84:15
84:24,25 85:2
85:20,23 86:1
86:13,14 87:5
87:21 88:8,11
88:20 93:2
95:2,17 96:6
96:10 97:15
105:11 109:12
109:13,15
112:7 114:1
116:1,17 121:2
122:16 124:22
125:18,20
126:13 131:4
131:19,25
133:22 136:23
137:9 155:20
163:18 164:16
165:25 166:7
166:16 169:15
169:17 170:22
173:22,24

174:4 176:18
177:5 178:18
181:1 183:15
184:6 192:18
193:18 194:18
197:6 199:11
201:21 202:11
208:10 209:2,9
209:15 216:4
216:24 218:7
218:14 220:23
223:11 224:19
224:20 227:7
231:19 234:2
234:21 238:21
239:12,18
240:1,3 242:25
248:9,20
249:24 252:10
252:24 253:6,9
255:22 261:3
261:15 263:25
266:25 267:1
271:10,18,25
272:7
**timeliness**
50:25
**times** 64:17
224:3,4 250:1
**title** 32:11,12
32:14,17,18
54:2,6 70:8,19
71:2,18,21
72:3,7,9,10,12
72:13 124:25

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

[title - turn]

138:20

**titles** 71:8

**today** 6:9 9:15 12:24 13:5,8 15:12,19 16:12 91:4 95:11,19 96:12,19,25 101:10 103:3 114:10 119:8 135:25 136:1 137:15 138:19 139:19 143:21 150:22 151:5 167:11 169:25 172:4 179:4 202:5 203:14 237:24 240:11 251:19 263:11 264:24 265:22 266:10,16,17 266:20,25 267:1

**today's** 6:3 15:8

**together** 109:9 135:13 203:3 239:4,19 266:14

**told** 26:23 30:9 32:16 38:22 50:4 54:19,21 55:3,5 59:10 70:19 71:2 72:9,10 79:9 107:4 139:24

148:11 150:5 157:24 165:11 169:5 174:22 194:16 240:20 248:16 256:21 256:24 257:2 257:11,13 259:16 264:4,5 264:6,14,18 265:9

**took** 18:2 24:10 101:1,17 103:15 112:14 114:11 116:1,2 153:21 191:8 220:11 256:16

**top** 35:15 103:21 104:22 130:13,14 165:9 179:21 180:21 207:17 215:11 217:22 221:1 226:24 251:17

**topic** 198:11 220:19

**topics** 16:8 229:4

**tori** 3:15

**tori.harrigill** 3:20

**total** 46:18 142:6,11 164:10,15 168:12 169:23

179:20 187:3 192:11

**totally** 243:25

**touch** 36:20

**tour** 105:16 231:9

**toward** 184:11

**track** 138:12 249:2

**tracking** 82:19 241:10

**transcript** 12:19 269:9,16 271:6,8,10,13 271:13,22 272:2,2

**transcription** 268:5

**transfer** 46:13

**transferred** 26:16 74:15

**transmission** 168:16 218:16

**transmit** 221:8

**transmitted** 169:1 213:13 214:9 218:4,14 221:4

**transmitting** 214:6,8

**transparency** 98:16,17

**transpired** 101:1

**travel** 50:7 51:13 106:3,5

**traveled** 105:15

**traveling** 26:6 115:22 224:22 224:23

**trip** 105:21

**troy** 208:11

**true** 192:3 197:23 243:15 269:9

**truly** 168:14

**trump** 1:10 6:8 38:3,5 254:22 271:4 273:2

**trust** 228:4

**truth** 139:24 165:15

**truthful** 16:12 16:15

**try** 13:22 23:19 38:16 214:17 234:14,18

**trying** 17:2 69:11,20 87:17 91:2 97:12 108:18 122:19 226:6 236:1 239:19

**tsuki** 2:18 6:21

**tuesday** 84:7,9

**turn** 140:25 142:19 145:11 147:15 156:23 222:14

Veritext Legal Solutions
866-299-5127     calendar-ca@veritext.com     www.veritext.com

**[two - update]**

| | | | |
|---|---|---|---|
| **two** 6:19 33:12 44:13 91:3 98:22 103:6 134:23,24 135:2,3,6,7,10 135:12 182:22 203:22 | **unaware** 48:24 91:23 | 191:24 197:9 230:18 252:19 257:5 259:18 259:23,25 | 263:13 |
| **tx** 2:17 | **uncommon** 261:16 | **understanding** 22:8 23:4 | **understood** 26:25 28:15 29:8 49:12 |
| **type** 82:4,5 185:24 210:2 | **under** 15:15 47:20 50:13 52:5 57:25 94:2 109:6 110:10 153:2 163:20 167:12 179:3,6 195:14 239:22 | 24:11 25:25 26:25 28:13,21 30:4,6,17,24 31:2,18 32:3 36:4,21,23 37:1 40:10,14 44:3 49:15 55:13,20 60:6 63:23 64:22 | 50:23 51:3 53:4 56:1,20 62:8 63:17,21 63:22 79:10 86:24 95:21 97:1,15,19,23 108:22,25 111:2,4 139:20 145:6 160:3 252:25 262:21 |
| **types** 82:6 83:22 87:4,17 108:19,20 | | | |
| **typhoon** 105:16 | **underline** 163:14 | 65:11,22 66:6 66:9 67:23 70:25 71:7 | **undertaken** 65:1 |
| **typically** 92:18 210:7 221:22 224:25 234:13 | **underneath** 163:13 | 72:5 77:4 83:20 85:19,25 86:23 87:17 90:11,14 91:12 95:16 100:25 106:2,4 113:17 114:19 118:10 123:20 129:1 130:21 131:5 154:3 158:3 164:23 192:25 205:9 233:6 239:17 240:3,8 240:14,19 242:12,16 244:9 248:18 250:2 256:15 | **undertaking** 230:5 |
| **typo** 69:16 159:18 | **undersigned** 268:16 | | **unhappy** 234:5 234:6 |
| **u** | **understand** 7:22,25 10:21 11:18,24 12:16 27:4 28:22 30:2 39:23 40:12 47:10,12 54:24 55:1 56:16,17 63:3 86:19 88:13 96:18 97:5,13 97:18 105:3 108:18 109:2 122:19 126:12 128:13 144:20 155:3,5,24 163:17 164:5 171:4,5 191:22 | | **union** 2:3,14 6:15,18,24 |
| **uh** 11:2 35:25 36:3 41:15 54:8 85:7 93:5 105:18 109:1 143:14 155:10 157:10 172:7 180:13 183:8 184:17 217:2 223:15 225:21 231:3 235:11 236:7 | | | **united** 1:1,12 107:20 |
| | | | **university** 16:21 17:2 |
| | | | **unreasonable** 159:22 243:25 |
| | | | **unrelated** 126:17,19,20 |
| **ultimately** 65:4 81:14 83:16 91:18 | | | **upcoming** 218:13 |
| | | | **update** 221:20 225:4 |

Veritext Legal Solutions
866-299-5127   calendar-ca@veritext.com   www.veritext.com

**[updates - way]**

| | | | |
|---|---|---|---|
| **updates** 184:13 184:14 230:4 | **verbal** 10:25 | **visits** 225:1 | **waiting** 147:22 148:3,4 |
| **usa** 5:14,20,22 | **verified** 7:24 | **voicemails** 62:21,22 | **waived** 271:24 271:24 |
| **usdoj.gov** 3:5 | **veritext** 6:3,10 271:7,9,11,20 | **volunteering** 31:1,6,7 | **waiving** 271:21 |
| **use** 14:2 70:8 70:19 71:2 73:19 77:1 96:7 101:5 206:7 | **versed** 30:8 | **voorhies** 1:16 3:13 4:3 6:6 7:11,21 8:1 9:7 9:8,18 10:16 14:5,14 15:7 33:25 34:4 41:4 57:11 68:16 71:17 103:8 107:18 123:6 134:13 134:21 140:25 148:23 149:20 152:9,14 153:20 166:5 171:13 172:3 178:25 182:17 201:1 202:3,14 251:7 254:2 262:1 266:7,25 267:9 268:3,12 268:16 269:2,8 271:5 273:3,25 | **walk** 42:8 |
| **used** 12:20 23:1 34:22 111:22 115:14 126:10 129:8,13,14,15 129:17,19,22 191:14 226:17 263:14 266:19 | **version** 14:7 33:15 118:13 118:25 119:7,8 126:14 127:2,7 146:14 | | **walking** 231:15 231:19 |
| | **versions** 117:2 117:10 119:12 120:6 | | **wall** 143:2 |
| | **versus** 6:7 | | **want** 7:19 37:21,22 45:24 100:15 143:12 158:17 170:20 171:11,12 191:13 197:1 217:25 241:18 243:1 266:24 |
| **using** 19:25 34:15,17,19 72:11,13 111:20,25 166:13 206:3,6 | **vickie** 1:20 6:10 269:5 270:7 | | |
| | **victoria** 17:2 74:10 94:25 125:15 215:19 | | **wanted** 49:24 66:22 97:13 146:13 150:10 150:19,20 201:10 208:13 208:22 231:13 233:14,17 241:16 259:25 |
| **usually** 115:19 132:5 | **videographer** 3:23 6:1,2 68:9 68:13 71:11,15 100:19,23 134:6,10 153:14,18 201:22 202:1 251:1,5 265:25 266:4 267:7 | | |
| **ut** 17:12 | | **vs** 1:9 | |
| **v** | | | **washington** 2:21 3:5,11 26:1 38:18 103:11 104:19 116:4 229:19 249:4 |
| **v** 271:4 273:2 | | **w** | |
| **vacation** 216:25 217:3,9 | **videotape** 12:19 | **wa** 2:16 | |
| **vague** 31:2 149:8 | **videotaped** 1:16 12:16 269:2 | **waffle** 243:13 | |
| **vaguely** 235:14 | | **wait** 11:11,12 11:14 | **way** 28:10 40:8 44:7 54:16 95:23 99:24 118:2 154:20 |
| **various** 66:24 82:23 108:19 108:20 128:8 212:12 265:20 | **viewed** 261:19 | **waited** 65:7 | |

Page 64

**[way - working]**

174:14 195:5
199:13 207:23
239:22
**ways** 78:22
111:13,14,16
**we've** 61:18
68:5 176:18
201:19 205:11
205:15 263:11
263:15 264:23
**wealth** 18:23
**website** 93:24
**wednesday**
137:8 191:3
**wednesdays**
221:22,23
**weeds** 147:16
**week** 26:5
38:14 131:16
131:21 132:21
133:12 136:23
137:9 179:23
181:5 215:8
219:18 234:17
255:20 263:24
**weekend**
231:20
**weekly** 115:11
115:15 221:21
229:2
**weeks** 130:19
130:23 131:11
133:12 136:23
137:7 257:7

**weighing**
229:10
**went** 16:21
46:15 48:24
52:2 83:10,17
114:22 155:17
232:7
**whatsapp** 4:24
5:5,16 34:11
34:13,20 68:22
172:4 206:13
206:17,19,21
207:3 264:22
264:23 265:2,9
**white** 224:25
228:10
**wind** 173:19
176:22 177:1
**window** 86:15
**winter** 230:8
231:6,12,22
**wire** 46:13
**withdrew**
74:22
**witness** 1:17
3:13 6:13 7:10
8:17 99:23
100:9,15
140:16 141:18
151:6,13,16,24
151:25 203:13
225:15,18
243:24 257:18
258:4,7,20,22
258:24 260:9

262:5 268:16
269:8,10
271:13,16
272:2,5
**word** 69:14
97:7
**wording** 23:1
**words** 54:21
95:15 96:7
104:23
**work** 17:19
18:10,12 19:1
20:20,23 26:3
26:12,17 29:24
31:20 32:25
35:9,24 36:12
36:16,18 37:18
38:18 40:20
43:8 45:15
49:25 50:5,6
51:10 52:2
53:20,23 54:10
54:19,22,25
55:3,5,9,18
56:24 57:24,24
63:21,22 64:19
74:4 81:20
82:3 85:1
108:1 114:21
115:1 116:15
116:21 133:9
157:14,14
238:13 239:5
252:6 257:2
258:3,6 259:2

259:5 260:8,11
260:12 262:4,7
265:18
**worked** 17:14
17:21,24 18:17
29:18,18 32:1
38:19 56:17
64:12,23 66:2
66:5 73:5
104:9 112:5
118:1 143:25
156:8,25
218:25 238:23
238:24
**workforce** 97:2
97:4,6,7,10
108:23 109:3
110:4 166:15
166:19 185:18
**working** 18:4,6
22:21 26:5
27:7,9 28:6
32:7 36:10
39:19 52:5,11
53:6,25 58:3
58:11 59:21
65:25 66:10
67:14,14 69:4
74:2,8 81:18
86:3,15,22
87:5,9,18,21
88:4 91:11
95:17 96:2
105:13 107:11
107:17,20

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[working - zoom]**

114:2 116:13
120:18,22
122:15 123:2
163:17 165:18
166:10 172:25
176:3,6,15,15
176:17 178:20
197:2 233:3
237:10,12
238:20,22
250:17,19
**workload**
240:18 247:24
**works** 13:9
30:2,5 56:11
133:10
**worth** 18:21,24
**wrapped** 26:10
**wrapping**
22:22 26:5
**writing** 94:13
94:15,19 120:4
127:1 183:18
194:11
**written** 12:19
127:4 216:16
**wrote** 161:22
161:23

---

**x**

**x** 269:13
**xx** 272:1

---

**y**

**y** 147:23 148:1

**yeah** 27:25
41:19 49:16
63:11 67:17
73:23,25 78:23
78:23 79:12,20
81:13 96:17
100:12 101:15
109:4 110:1
114:4 118:2
119:10 130:25
132:16,23
138:16 141:7
142:12,15
152:20 159:2
159:21 164:20
191:20 196:9
198:21 199:20
201:18 204:13
205:15 222:12
225:17 233:2
233:19 235:25
246:1 251:16
251:20 254:3
260:4 264:12
**year** 16:24 17:3
18:2 19:13,14
31:20 157:24
157:25 162:1
175:12,21,21
185:18,22,23
186:9,15
192:11
**year's** 116:7
**years** 16:20
17:25 18:3,13

19:3,11
**yep** 142:5,22
143:4 225:21
**yesterday**
87:14
**youngkin**
145:13 147:3

---

**z**

**zone** 105:17
**zoom** 39:14,15

Veritext Legal Solutions
866-299-5127      calendar-ca@veritext.com      www.veritext.com

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit F



UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF  GOVERNMENT EMPLOYEES,

AFL-CIO, et al.,

       Plaintiffs,

vs.                  Case No. 3:25-cv-03698-SI

DONALD J. TRUMP, in his official capacity as

President of the United States, et al.,

       Defendants.

_____

VIDEOTAPED DEPOSITION OF

JOSEPH GUY

TAKEN ON

FRIDAY, MAY 15, 2026

9:05 A.M.

DEMOCRACY FORWARD FOUNDATION

1445 NEW YORK AVENUE NORTHWEST

WASHINGTON, D.C. 20005

NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

THE PIONEER COURTHOUSE

Nationwide

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS


Powerful
LITIGATION SUPPORT

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

JOSEPH GUY                        May 15, 2026                              2
97408

APPEARANCES


Appearing on behalf of Plaintiffs

All Union and Non-Profit Organizations:

DANIELLE LEONARD, ESQUIRE

ELIZABETH ESHLEMAN, ESQUIRE (Via Zoom)

JESSICA LEVY, ESQUIRE (Via Zoom)

Altshuler Berzon LLP

177 Post Street, Suite 300

San Francisco, California 94108

(415) 421-7151

dleonard@altshulerberzon.com

eeshleman@altshulerberzon.com

levy@altber.com

JOSEPH GUY                    May 15, 2026                          3
97408

APPEARANCES CONTINUED

Appearing on behalf of Plaintiffs All Union and Non-Profit Organizations (except NRDC) and City of Chicago, IL; Martin Luther King, Jr. County, WA; Harris County, TX; and City of Baltimore, MD:

TSUKI HOSHIJIMA, ESQUIRE (Via Zoom)

Democracy Forward Foundation

1445 New York Avenue Northwest

Washington, D.C. 20005

(240) 530-0627

thoshijima@democracyforward.org

Appearing on behalf of the Defendants:

JASON GREAVES, ESQUIRE

Binnall Law Group PLLC

717 King Street, Suite 200

Alexandria, Virginia 22314

(571) 888-1943

jason@binnall.com

JOSEPH GUY                    May 15, 2026                    4
97408

APPEARANCES CONTINUED

Appearing on behalf of the Defendants:

CHRISTOPHER HALL, ESQUIRE

U.S. Department of Justice

950 Pennsylvania Avenue Northwest

Washington, D.C. 20530

(202) 514-2000

christopher.hall@usdoj.gov


-and-


MATTHEW FLEISCHMAN, ESQUIRE

United States Department of Homeland Security

2720 Martin Luther King Jr. Avenue Southeast

Washington, D.C. 20032

(202) 282-8000

matthew.fleischman@hq.dhs.gov


ALSO PRESENT:

Grayce Romeo, Legal Secretary, Democracy Forward

JOSEPH GUY                          May 15, 2026                                    5
97408

EXAMINATION INDEX

                                                            PAGE


EXAMINATION BY MS. LEONARD                                   10

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

JOSEPH GUY                       May 15, 2026                              6
97408

EXHIBIT INDEX

EXHIBIT                                                      PAGE

200    JOE GUY TEXT MESSAGE              18

201    DISCOVERY DISPUTES               22

202    SAFETY NUMBER SUPPORT            23

203    MOUNT WEATHER MESSAGE            26

204    JOE GUY CALLS                    30

205    FEMA 2.0 TEXT CHAIN              35

206    FEMA RAPID RESPONSE TEXTS        44

207    DISASTER RESPONSE TEXTS          48

208    MS FEMA TRIP TEXTS               49

209    CAEO TEXTS                       49

210    BILOXI TEXTS                     50

211    CONTRACT EGRE. TEXTS             50

212    KAREN GREGG TEXTS                50

213    KAREN GREGG TEXTS 2              51

214    DISASTER RESPONSE TEXTS 2        52

215    WINTER STORM TEAM TEXTS          52

216    FEMA ORR TEXTS                   53

217    DHS TEAM TEXTS                   53

218    FEMA ESEC TEXTS                  54

219    FEMA HQ TEXTS                    54

220    FEMA RAPID RES. TEXTS            55

221    FEMA SANITY CLUB TEXTS           55

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

JOSEPH GUY                    May 15, 2026                         7
97408

EXHIBIT INDEX CONTINUED

EXHIBIT                                                   PAGE

222    JOE GUY TEXTS 2                           56

223    JOE GUY TEXTS 3                           57

224    KAREN GREGG TEXTS 3                       59

225    KAREN GREGG TEXTS 4                       61

226    KAREN GREGG TEXTS 5                       62

227    KAREN GREGG TEXTS 6                       62

228    KARA VOORHIS TEXT                         63

229    JOE GUY TEXTS 4                           64

230    FEMA SANITY CLUB TEXTS 2                  67

231    JOE GUY TEXTS 5                           67

232    COREY LEWAND TEXTS                        69

233    FEMA SANITY CLUB TEXTS 3                  70

234    SHORT MESSAGE REPORT                      72

235    JOE GUY TEXTS 6                           73

236    DR ACTION GROUP                           77

237    JOE GUY TEXTS 7                           78

238    TEXTS                                     81

239    A K J TEXTS                               83

240    FEMA HQ TEXTS 2                           86

241    JOE GUY TEXTS 8                           89

242    JOE GUY TEXTS 9                           92

243    FEMA RIF TEXTS                            97

NAEGELI  | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

JOSEPH GUY                          May 15, 2026                              8
97408

EXHIBIT INDEX CONTINUED

EXHIBIT                                                    PAGE


   244     DAILY NOTES                                    106

   245     FEMA RAPID RESPONSE TEXTS                      112

   246     DAILY NOTES 2                                  113

   247     DAILY NOTES 3                                  119

   248     DAILY NOTES 4                                  126

   249     DAILY NOTES 5                                  128

VIDEOTAPED DEPOSITION OF

JOSEPH GUY

TAKEN ON

FRIDAY, MAY 15, 2026

9:05 A.M.

THE VIDEOGRAPHER:  The time is 9:05 a.m. We are on the record.

THE REPORTER:  Mr. Guy, would you please raise your right hand.  Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT:  Yes.

THE REPORTER:  Will each attorney please state their names and whom they represent.

MS. LEONARD:  Good morning.  Danielle Leonard, representing the All Union and Organizational plaintiffs, and with me on the phone, I believe we have a few others.

MR. HOSHIJIMA:  Good morning.  Tsuki Hoshijima, from Democracy Forward, representing certain plaintiffs.

MS. ESHLEMAN:  Elizabeth Eshleman, from Altshuler Berzon, representing Union and

Organizational plaintiffs.

MS. LEVY:  Jessica Levy, Altshuler Berzon, Union and Organizational plaintiffs.

MR. GREAVES:  Jason Greaves of Binnall Law Group, on behalf of the witness, Joe Guy.

MR. HALL:  Christopher Hall with the Department of Justice, representing the defendants.

MR. FLEISCHMAN:  Matthew Fleischman from the Department of Homeland Security.

MS. LEONARD:  All right.

THE REPORTER:  You may proceed.

MS. LEONARD:  Thank you.

JOSEPH GUY, having been first duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MS. LEONARD:

**Q.   Mr. Guy, has anything changed in your residence address since we last met on May 4th?**

A.   No.

**Q.   Has anything changed in your employment circumstances since what you described on the first day of your deposition?**

A.   No.

JOSEPH GUY                              May 15, 2026                                11
97408

████████████████████████████████████

████████████████████████████████████

███████████████████████████

███████████████████████████

█████████

█████████████████████████████████

█████████████████████████

██████████████████████████████

██████████

████████████████████████████████

███████████████████████████████████████

██████████████████████████████?

████████

████████████████████████████████████

█████████████████████?

█████████████████████

████████████████████████████████████

████████████████████████████████

████████

████████

███████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████

████████████████████████████

BY MS. LEONARD:

Q.    Between the end of your first day of deposition and today's continued deposition, have you discussed the deposition with anyone other than your counsel, Mr. Greaves?

A.    Not that I recall.

Q.    Not that you recall.  It's possible that you had conversations about the deposition other than with counsel?

A.    I may have discussed logistics; I didn't discuss anything of substance with anyone besides my counsel.

Q.    Okay.  Have you talked to Karen Evans since Monday, May 4th?

A.    I have not.

Q.    Okay.  Have you emailed with Karen Evans?

A.    No.

Q.    Have you texted with Karen Evans?

A.    No.

Q.    Have you messaged Karen Evans on Signal?

A.    No.

Q.    Okay.  Have you talked to Kara Voorhies since your deposition on Monday, May 4th?

A.    I have not.

Q.    Okay.  Have you exchanged any Signal messages with Kara Voorhies since Monday, May 4th?

A.    No.

Q.    She called you on Tuesday, May 5th, after your deposition, didn't she?

A.    May have been Tuesday at some point. Yeah, I recall her calling.

Q.    Did you take her call?

A.    I did not.

Q.    Okay.  Did you call her back?

A.    No.

Q.    Okay.  You're aware that Ms. Voorhies was also deposed on Monday of this week in Houston?

A.    Yes.

Q.    Okay.  Is that something you learned from Ms. Voorhies?

A.    No.

Q.    You didn't talk to her after her

deposition?

A.   I did not.

Q.   Did you talk to anyone else about Ms. Voorhies' deposition?

A.   I don't think so.

Q.   Okay.  Now, on the first day of your deposition, you did say that you had talked to Ms. Voorhies prior to that deposition.  Do you recall that?

A.   Yes.  At some point, I think I just told her when I was being deposed.

Q.   You testified that you had talked to Kara at some point during the prior week?

A.   Yeah.

Q.   Okay.  And I think your testimony was -- when I asked what did you talk to Kara Voorhies about, you said, "I told her when my deposition was going to be," and I asked, "What did she tell you?" And you said, "I don't remember exactly."  Is that still accurate?

A.   Yes.

Q.   Okay.  You also testified that you and Ms. Voorhies had a Signal chat on your personal phone, correct?

A.   Yes.

Q.    And that -- that -- that Signal chat, the communications included messages that were sent and received after you left DHS, correct?

A.    I think so.

Q.    And remind me when you left DHS.

A.    I don't remember exactly.  Sometime in late March.

Q.    Okay.  So just to situate this, there was a Signal chat with Kara Voorhies, and there were communications on that chat after late March, correct?

A.    There may have been.

Q.    You sometimes used Signal for telephone calls, correct?

A.    I think so.

Q.    So Signal, the application, includes a messaging function, right?

A.    Yes.

Q.    And it also allows telephone calls to be made through the application?

A.    I think that's right.

Q.    And in the record of a chat with a individual, it could show an incoming or outgoing telephone call with that individual?

A.    It might.

JOSEPH GUY                         May 15, 2026                              16
97408

Q.    Okay.  Is that something you're familiar with using?

A.    Phone calls on Signal?

Q.    Yes.

A.    I have made a phone call on Signal before.

Q.    Why did you make a phone call on Signal rather than on your regular line?

A.    I have no idea.

Q.    But you don't have a recollection as to why you would choose to do that?

A.    No.

Q.    Is there some sort of encryption of the information regarding that call that you're aware of?

A.    Regarding which call?

Q.    Regarding any call made through Signal.

A.    I have no idea.

Q.    Okay.  You testified the first day of your deposition that Ms. Voorhies had changed the auto-delete settings for the messages in your chat with her.  Do you recall that testimony?

MR. GREAVES:  I object to the extent that it mischaracterizes his testimony.  If there's a transcript of what he said, he should be able to see that.

JOSEPH GUY                        May 15, 2026                        17
97408

BY MS. LEONARD:

Q.   Do you recall that testimony?

A.   I don't know.

Q.   Okay.  So I'm going to read this:  "You have -- okay.  You have a chat with Kara Voorhies that you mentioned before we took the break?"  Answer:  "Yes."  Question:  "You said the most recent message was on Friday?"  Answer:  "It says on Friday, Kara Voorhies set the disappearing message to -- time to one day, and there's nothing before that."

And so the Friday -- question:  "The Friday message that you were referring to was Kara Voorhies setting the disappearing setting for her communications with you to one day?"  Answer:  "That's what it says."  Do you recall saying that?

A.   I mean, that's what it says, she must have set it.

Q.   Okay.  And that was your sworn testimony last Monday, correct?

A.   That's what my phone said.

Q.   In fact, Mr. Guy, you are the person who changed the auto-delete setting to one-day deletion in your chat with Ms. Voorhies, correct?

A.   I don't remember.

Q.   You did that on Tuesday, April 28th, right?

A.   I don't remember.

MS. LEONARD:  Let's mark this.  I believe we're doing consecutive numbering, and I don't remember what we're up to, but I think it's safe to say we can start at Exhibit 200.

THE REPORTER:  Exhibit 200?  Okay.  Exhibit 200 marked.

(WHEREUPON, Exhibit 200 was marked for identification.)

MS. LEONARD:  And I'm going to apologize --

MR. HALL:  Ms. Leonard, I'm advised that we are at Exhibit 149, if you wanted to --

MS. LEONARD:  It's fine.  Start with Exhibit 200.

MR. HALL:  Okay.  Totally fair.

BY MS. LEONARD:

Q.   Mr. Guy, I'll represent that this is a document that was produced to us in response to a subpoena by Kara Voorhies.  You can tell by the Bates number at the bottom.  This is a depiction of a Signal chat with you, correct?

A.   That's what it looks like.

Q.   That's your profile picture and name at the top?

A.   That's what it looks like.

Q.   And you see the message here, Tuesday, April 28th, you see the -- the words right underneath that?

A.   I can see that.

Q.   Can you read it, please, out loud?

MR. GREAVES:  Just going to object to the hearsay.

Go ahead.

THE DEPONENT:  It says, "Joe Guy Mobile set disappearing message time to one day."

BY MS. LEONARD:

Q.   Tuesday, April 28th was before you left federal employment, correct?

A.   I think so.

Q.   And Tuesday, April 28th was before you provided your declaration to the court on April 30th regarding preservation, correct?

A.   I think so.

Q.   And so on Tuesday, April 28th, you set the disappearing message time on your Signal chat with Kara Voorhies to one day, not Kara, right?

A.   That's what this says.

Q.    Now, during your first day of deposition, do you recall that you couldn't recall whether you had changed any of the auto-delete settings on any other chat?

A.    No, I can't recall that.

Q.    Do you recall that now?

A.    No.

Q.    Having looked at Exhibit 200, does it refresh your recollection that you have changed auto-delete settings on your Signal chats?

A.    I don't remember.

Q.    Is it possible that you have changed auto-delete settings on any other Signal chats?

A.    I mean, I've -- I haven't really touched my Signal since my first deposition.  I don't -- I don't remember.

Q.    Is it possible that you had changed auto-delete settings on your Signal chats before your first deposition, Mr. Guy?

A.    I don't know.

Q.    It's possible?

A.    Maybe.

Q.    Well, you changed the auto-delete setting on your chat with Ms. Voorhies on Tuesday, April 28th, right?

MR. GREAVES:  Objection.  Asked and answered.

THE DEPONENT:  That's what that says.

BY MS. LEONARD:

Q.    And then you testified on Monday, May 4th, that Ms. Voorhies did that, right?

A.    I don't think that's what I testified.  I think I read what it said in my Signal chat, and it said in my Signal chat that Kara Voorhies set disappearing message time.

Q.    Is that what you remember?

A.    I think that's what happened.

MR. GREAVES:  I -- we can proffer and show you his Signal app, if you would like to see it.

MS. LEONARD:  Oh, I will ask the questions.

BY MS. LEONARD:

Q.    Let's go over the timeframe of the court's orders to you again.  You were aware, prior to April 30th, that the court had issued an order requiring you to submit a declaration regarding preservation of documents, right, Mr. Guy?

A.    I don't remember.  I think I learned almost maybe on the same day that I had to do that.

Q.    And you submitted a declaration on April

30th?

A.    I think so.

Q.    And you're -- we looked at your declaration last time.  You recall you had described a self-search that you had done?

A.    Yes.

MS. LEONARD:  Okay.  And then there was another order from the court.  We can mark this as Exhibit 201.

THE REPORTER:  Exhibit 201 marked.

(WHEREUPON, Exhibit 201 was marked for identification.)

BY MS. LEONARD:

Q.    And Exhibit 201 is an order from the court that was issued on May 1st, 2026.  You can see that by the date on the back by the judge's signature. Do you see that?

A.    I can see that.

Q.    Okay.  And this is an order that required a search of your phone.  Do you see that?

A.    Yes, I can see that.

Q.    Okay.  And now, during the first day of your deposition, you testified that you had reinstalled your Signal application on your personal phone.  Do you recall that?

A.   Yes.

Q.   Okay.  And you initially testified that you did it on "Friday night."  Do you recall that testimony?

A.   Yes.

Q.   And then, after lunch, you came back and said that it was done on Thursday.  Do you recall that?

A.   Yes.

Q.   Okay.  Let's look at Exhibit 200 again, which is the chat with Kara Voorhies.  Do you see where it says, "Your safety number with Joe Guy Mobile has changed on Friday, May 1st"?  Do you see that?

A.   I can see that.

Q.   Mr. Guy, do you know the most common scenarios that result in a -- in Signal sending a message that a safety number has changed?

A.   I have no idea how that works.

MS. LEONARD:  Okay.  Let's take a look. Let's mark this as Exhibit 202.

THE REPORTER:  Exhibit 202 marked.

(WHEREUPON, Exhibit 202 was marked for identification.)

BY MS. LEONARD:

JOSEPH GUY                        May 15, 2026                        24
97408

Q.    I represent this is something we printed from the Signal support health center home -- help center homepage.

A.    Okay.

Q.    Okay.  So the title of this article is "What is a safety number and why do I see that it changed?"  Do you see that?

A.    I can see that.

Q.    And it says, "Why do I see a safety number change alert?"  Do you see that?

A.    Yes.

Q.    And it says, "The most common scenarios where a safety number advisory is displayed are when a contact switches to a new phone or re-installs Signal."  Do you see that?

A.    I can see that.

Q.    Mr. Guy, you didn't switch a phone on Friday, May 1st, correct?

A.    I don't think I did.

Q.    Mr. Guy, what time on Friday night did you install -- reinstall your Signal application?

A.    I have no idea.  I don't remember.

Q.    This Exhibit 200 does not say that the safety number changed on Thursday, April 30th, correct?

A.   Perhaps there was a delayed reaction or something like that.  I don't know how this works.

**Q.   You think Signal got the date wrong, Mr. Guy?**

A.   All I can tell you is that we looked at my other chats and it said on Thursday, you know, maybe it was late Thursday night, early Friday.  I -- I don't remember.

**Q.   You believe you looked at your other chats and it said the date that the safety number changed was on Thursday?**

A.   I don't think it said the safety number changed, but the app's history goes back to Thursday, April 30th, as I recall.

**Q.   Who else did you talk to about reinstalling Signal applications on May 1st?**

A.   I don't think I talked to anybody.

**Q.   Did you talk to Karen Evans?**

A.   Absolutely not.

**Q.   Did you talk to Troup Hemenway about reinstalling Signal?**

A.   No, I did not.

**Q.   Never?**

A.   No.

MS. LEONARD:  Let's mark this as Exhibit

204 -- sorry -- 203.

THE REPORTER:  Exhibit 203 marked.

(WHEREUPON, Exhibit 203 was marked for identification.)

BY MS. LEONARD:

Q.  I will represent that this is a document that was recently produced to us by defendants -- you can tell from the Bates number at the bottom -- as a Signal chat that was on Karen Evans' backups. It's entitled Mount Weather.

A.  Yes.  Yes.

Q.  This is -- do you remember what Mount Weather was?

A.  No.

Q.  So at the top there, it says that you, Kara Voorhies, Troup Hemenway, and one other are the participants in this chat.  Do you see that?

A.  Yes.

Q.  Do you recall being a participant in this chat?

A.  Not particularly.

Q.  This is something that related to FEMA, correct?

A.  I -- I don't know to what extent anything happened in this chat.

Q.    Sure.    But the Mount Weather issue is something that related to FEMA, correct?

A.    A lot more goes on at Mount Weather than just FEMA, but --

Q.    Yes?

A.    Okay.

Q.    Karen -- sorry.  This says on Wednesday, December 10th, "Joe Guy added you to the group."  Do you see that?

A.    Yes.

Q.    So you added Karen Evans to the group on Wednesday, December 10th?

A.    I have no idea.  I don't remember.

Q.    But that's possible?

A.    I suppose so.

Q.    Okay.  And we see here another safety number alert saying that the safety number for Joe Guy has changed.  Do you see that?

A.    I can see that.

Q.    And this one says today, but on the prior exhibit we saw that that was May 1st, right?

MR. GREAVES:  Objection.  Foundation.

THE DEPONENT:  I don't know.

BY MS. LEONARD:

Q.    Okay.  And here, there's also an alert

that the safety number for Troup Hemenway changed on the same day.  Do you see that?

A.  I can see that.

Q.  We've already covered, you worked with Troup prior to joining DHS, right?

A.  Yes.

Q.  You worked together as -- when he was the principal chief of staff, and you were the deputy chief of staff at DHS, correct?

A.  Yes.

Q.  You went over from DHS to State together, right?

A.  Yes.

Q.  As of April 30th, you were no longer at the State Department, correct?

A.  Sometime on April 30th.  I'm not sure exactly which time.  I think that was my last day.

Q.  And Troup Hemenway had been on administrative leave from the State Department at that point in time, right?

A.  I think so.

Q.  And this Signal chat shows that your safety numbers change on the same day.  That's what it says, right?

MR. GREAVES:  Objection to foundation.

Hearsay.

THE DEPONENT:  Again, I don't know how this works.  And I don't know that -- but that's what it says.

BY MS. LEONARD:

Q.   It's a coincidence that your safety number and Troup Hemenway's safety number changed on exactly the same day, Mr. Guy?

MR. GREAVES:  Objection to foundation. Hearsay.

THE DEPONENT:  I'm sorry, what are you asking?

BY MS. LEONARD:

Q.   This is just a coincidence that Mr. Hemenway's safety number and your safety number changed on exactly the same day?

MR. GREAVES:  Objection to foundation and hearsay.

THE DEPONENT:  Again, I have no idea how this works or how safety numbers change when.  I don't know.

BY MS. LEONARD:

Q.   In fact, Mr. Guy, you and Troup Hemenway both reinstalled your Signal chats -- your Signal applications in order to ensure that information

JOSEPH GUY                    May 15, 2026                    30
97408

would not be provided to the court, right?

A.    That's what you are saying.  I have no idea what Troup said or thought or did.  And I tried to reinstall it because I think -- I thought that it would help me recover messages.

Q.    I thought last time you said you thought -- you -- you tried to reinstall it because you wanted to show there was nothing there.

A.    Yes.

Q.    Okay.  So did Troup Hemenway reinstall his Signal application to show that there was nothing there also?

A.    I can't speak to what Troup Hemenway was doing.  I have no idea.

Q.    Okay.  You testified last Monday that you have not talked to Kara Voorhies since leaving DHS about this litigation.  Do you recall that?

A.    Yes.

MS. LEONARD:  Okay.  Let's mark this Exhibit 204.

THE REPORTER:  Exhibit 204 marked.

(WHEREUPON, Exhibit 204 was marked for identification.)

BY MS. LEONARD:

Q.    This is a screenshot that was provided to

us of your chat with Kara Voorhies.  Do you see that there's a message at the bottom of this chat?

A.    Yes.

Q.    It says, "Give me a call when you're done!" Do you see that?

A.    I can see that.

Q.    Is that a message that Kara Voorhies sent to you?

A.    She must have.

Q.    She sent it to you on May 5th?

MR. GREAVES:  Objection.  Document doesn't reflect a date other than May 1st, but you can answer.

THE DEPONENT:  I don't know.

BY MS. LEONARD:

Q.    It was after you set the disappearing message time to one day, correct?

A.    I don't know.  That's what it says.

Q.    Let's walk through this actually.  So April 23rd, at the top, it shows incoming and outgoing calls between you and Kara Voorhies.  Do you see those?

A.    Yes.

Q.    And then on April 28th, there's also an incoming voice call.  Do you see that?

A.   Yup, I can see that.

Q.   If -- if Kara Voorhies produced this from her phone, that's an incoming call from you to Kara Voorhies, correct?

A.   Must be.

Q.   And that's the same date that you changed the auto-delete functions, correct?

MR. GREAVES:  Objection.  Hearsay and foundation.

THE DEPONENT:  I don't know.  That's what it looks like.

BY MS. LEONARD:

Q.   And then on April 29th, there's a declined voice call and unanswered voice call and an incoming voice call.  Do you see that?

A.   Yeah.

Q.   So on April 29th, Kara declined a voice call, didn't answer a voice call, and then took a call from you, correct?

MR. GREAVES:  Objection.  Foundation.

THE DEPONENT:  Yeah.  I don't remember.

BY MS. LEONARD:

Q.   But that's what this says, right?

A.   I suppose that's what it says.

Q.   Okay.  And then at the very bottom, we see

a message from Kara Voorhies to you that says, "Give me a call when you're done."  You see that?

A.    Yeah.

Q.    You saw that message when it came in?

A.    I think so.  I don't -- I don't particularly remember.

Q.    I asked you last Monday what the most recent message was in your chat with Ms. Voorhies, and you responded that it was Friday when she set the disappearing messages.  Do you recall that?

A.    I recall that being what my phone reflected.

Q.    Okay.  It was not true that the last message with Kara Voorhies was on Friday.  It was Kara Voorhies asking you to call when you were done with your deposition.

MR. GREAVES:  Objection.  Foundation.

THE DEPONENT:  There's a chance that maybe she sent that message after you asked me that question.

BY MS. LEONARD:

Q.    Did you call her to talk about your deposition?

A.    I absolutely did not.

Q.    This shows a call with Kara Voorhies on

JOSEPH GUY                    May 15, 2026                           34
97408

Tuesday, April 28th that she took actually, right, the incoming voice call?

MR. GREAVES:  Objection.  Foundation.

THE DEPONENT:  I don't know.

BY MS. LEONARD:

Q.  Well, you see on April 29th, there's a distinction between unanswered voice call and incoming voice call.  You see those two different notations there?

A.  Yeah.  But who can say, you know, she picked it up, put it down.  I have no idea.  I don't remember.

Q.  Actually, you were the person who made the call, so I think you could say whether you talked to Kara Voorhies.

A.  I don't remember.

Q.  Do you remember that you previously testified that you met with counsel for the government on Tuesday, April 28th for about an hour to talk about your deposition?  Do you recall that?

A.  Perhaps.  Yes.

Q.  And then, Mr. Guy, you called Kara Voorhies and you talked to her at 2:28 p.m., right?

A.  That's what it says.

MS. LEONARD:  Let's talk about FEMA 2.0.

We will mark this as Exhibit 205.

THE REPORTER:  Exhibit 205 marked.

(WHEREUPON, Exhibit 205 was marked for identification.)

BY MS. LEONARD:

Q.    Mr. Guy, you've been handed a screenshot of a chat called FEMA 2.0 that we discussed during your last deposition.  This is a screenshot that was produced by Ms. Voorhies.

A.    Okay.

Q.    This shows that you, Karen Evans, and Kara Voorhies are the participants in FEMA 2.0, correct?

A.    That's what it says.

Q.    And this shows that Karen Evans added Kara Voorhies to the group.  Do you see that?

A.    I can see that.

Q.    On Saturday, November 15th?

A.    Yes.

Q.    Do you recall whether this chat existed prior to Saturday, November 15th, or do you think that's when Karen Evans created it?

A.    I have no idea.

Q.    Okay.  You don't -- you just don't recall?

A.    No.

Q.    Okay.  And do you recall whether she added

you to the group on Saturday, November 15th, or you don't recall?

A.    I don't recall.

Q.    Okay.  And the next entry says "Disappearing message time was set to four weeks." You see that?

A.    Yes, I can see that.

Q.    Is it your understanding that on November 15th, 2025, Karen Evans set the disappearing message time to four weeks for this chat?

A.    That's what this says.

Q.    And then on Wednesday, March 11th, Karen Evans changed the disappearing message time to one week.  Do you see that?

A.    I can see that it says that.

Q.    And so your understanding is that any new messages after March 11th would delete after one week, correct?

A.    I think that's what that implies.

Q.    Do you know why Karen Evans changed that setting on March 11th?

A.    I have no idea.

Q.    Did you talk to her about this?

A.    No.

Q.    Had you talked to Karen Evans -- oh,

sorry.  As of March 11th, you were still at DHS, correct?

A.  I think so.

Q.  And Karen Evans was still at FEMA, correct?

A.  I think that's right.

Q.  This one also shows your safety number -- the safety number with Joe Guy changing on Friday, May 1st.  Do you see that?

A.  I can see that.

Q.  And when you looked at your phone after you reinstalled Signal, there were no messages on this chat, right?

A.  No, there weren't.

Q.  And do -- is it your recollection that there were no messages on this chat before you reinstalled your Signal?

A.  I think so.  Yeah, I think that's right.

Q.  As a result of the operation of the auto-delete functions?

A.  It could have been that.  I remember Signal bugging out at several different points. Could have been -- meant multiple different things.

Q.  Well, let's go over this.  So there's this period of time between November 15th and March 10th,

that would've been a four-week auto-delete on this chat, right?

A. Maybe.

Q. Do you recall that the chat -- when you looked at the chat, you would've seen the auto-delete shows at the little top of the clock, right?

A. Yes.

Q. Okay. So on this screenshot, it shows at one week because of the March 11th setting, correct?

A. That's what it says.

Q. So prior to March 11th, that would've been a little four-week indication, right?

A. I guess so.

Q. And a message that would've been posted on, for example, November 16th, that would've been deleted four weeks later? That's how that works, right?

A. I think so.

Q. And if there was a message on March 9th, for example, that would've been deleted roughly four weeks later, like April 9th, that's how that works?

A. I had no idea how that works.

Q. Okay. You understood that the four-week auto-delete setting generally meant that messages would be deleted after four weeks, right?

JOSEPH GUY                        May 15, 2026                              39
97408

A.   But does that mean that after you change it to one week, that those messages only stay for a week?  I don't know.

Q.   You're not familiar with -- that if you change the settings, it only affects the messages prospectively?

A.   I -- I -- I don't know.

Q.   Okay.  As a participant, these messages regarding the settings on disappearing time, those appear in your Signal chat, right?

A.   I don't believe they do.

Q.   You don't believe that if you looked at FEMA 2.0, you would see disappearing message time settings?

A.   I -- I don't know.

Q.   If you looked at your chats, they would show -- if there was a auto-delete setting, it would show at the top, right?

A.   I think so.

Q.   Okay.  Because the messages in this chat were set to auto-delete, you can't tell me anything that you discussed in this FEMA 2.0 chat, right?

A.   As I recall, it was a lot of banter.

Q.   Banter?

A.   Workplace banter, sharing links, things

like that.

Q.    That's your recollection?

A.    There could have been some degree of coordination.  I don't remember.

Q.    The chat began on November 15th.  That was a little before Karen overtook -- Karen Evans took over as the SOPDA, right?

A.    I don't remember.

Q.    Do you recall that she began as SOPDA on December 1st, 2025?

A.    If you are saying that, I believe you, but I don't remember that.

Q.    Do you remember that it was roughly at the end of 2025?

A.    There was a lot going on, a lot of different components.  Doesn't stick out to me.

Q.    Are you aware -- well, we talked last time about the FEMA Review Council draft that was being worked on towards the end of 2025.  Do you recall that?

A.    I think that the FEMA Review Council draft had been being worked on for a long time, not just the end of 2025.

Q.    And that we looked at it last time, and it had a section called FEMA 2.0.  Do you remember

that?

A.   Yes.  Vaguely, I remember that.

Q.   **And around this time, at the end of 2025, FEMA was working on an annual staffing plan.  Do you remember that?**

A.   To be -- I -- I don't remember that.

Q.   **And around this time, at the end of 2025, there were discussions about whether FEMA's authority to renew COREs should continue.  Do you recall that?**

A.   Not really.

Q.   **And around the end of 2025, there were discussions of the renewal of COREs by NTE date starting in January.  Do you recall that?**

A.   I recall just from speaking to you about these things.  I -- I don't really remember.

Q.   **Mr. Guy, it's possible the FEMA 2.0 chat contained messages about FEMA staffing, isn't it?**

A.   I don't remember.

Q.   **It's possible?**

A.   I would say that anything that was actually effected and done was done through official channels.

Q.   **It's possible that the FEMA 2.0 chat contained messages about FEMA staffing, isn't it?**

A.   I have no idea.

Q.   It's possible?

MR. GREAVES:  Objection.  Asked and answered.

THE DEPONENT:  I -- I don't know.

BY MS. LEONARD:

Q.   It's possible the FEMA 2.0 chat contained messages about FEMA's CORE authority, isn't it?

A.   I don't remember ever discussing FEMA's CORE authority.

Q.   It's possible this contained messages about FEMA's CORE authority?

A.   I do not remember ever discussing FEMA's CORE authority on a personal device on Signal or anything like that.

Q.   Do you recall whether Karen Evans or Kara Voorhies ever posted a message about FEMA's CORE authority?

A.   I do not.

Q.   It's possible that this chat contained messages from Karen Evans and Kara Voorhies about renewing the CORE, isn't it?

A.   I don't think that's -- I don't even want say that's a possibility because I do not remember that.

JOSEPH GUY                    May 15, 2026                         43
97408

Q.    That's what you're basing that statement on that -- the fact that you don't remember?

A.    I remember having a discussion with Karen Evans on the phone about COREs a couple of times.

Q.    But you don't know whether the FEMA 2.0 chat contained any messages from Karen Evans, Kara Voorhies, or yourself about COREs, do you?

A.    No, I don't remember.

Q.    And it's possible that it contained messages about the COREs and their upcoming NTE dates, isn't it?

A.    I think it's highly unlikely.  I -- I don't know.

Q.    But you don't remember?

A.    I don't remember.

Q.    Okay.  You just testified that you believe that FEMA 2.0 chat was largely -- was banter?

A.    I think so.

Q.    And when we met last time, you -- I asked you repeatedly whether you conducted work-related communications on your personal phone.  Do you recall that?

A.    Yes.

Q.    I said, question:  "But did you use your personal phone to communicate about your work at DHS

at times?"   Answer:  "I don't know if that's how I would characterize it."  Do you recall saying that?

A.   I suppose so.

Q.   You said, "I don't recall any work-related discussions taking place on my personal phone."  Do you recall saying that?

A.   Yeah.

Q.   In fact, Mr. Guy, you were using Signal for work-related discussions every day at DHS, weren't you?

MR. GREAVES:  Objection.  Asked and answered.

THE DEPONENT:  I don't remember.

MS. LEONARD:  Let's look at that.  Since we last met, Ms. Voorhies and Ms. Evans were able to produce work-related Signal chats that you were involved in.  I am going to mark these as exhibits. Let's start with -- this is Exhibit 206.

THE REPORTER:  Exhibit 206 marked.

(WHEREUPON, Exhibit 206 was marked for identification)

THE DEPONENT:  May I have a moment to read through this?

MS. LEONARD:  I'm -- I can tell you what we're going to do with these.  I'm going to --

THE DEPONENT:  I would like to have full context for what is in this.

MS. LEONARD:  I'm going to ask that -- let me just explain, and we can -- we can take all the time in the world to do that.  But I'm going to ask you whether you are a participant in each of these, and that's the question.

MR. GREAVES:  If he's going to be asked questions about the document --

MS. LEONARD:  I'm not going to ask about the content of the documents right now.  When I ask questions about the content of the document, we'll go to specific pages.  But there's a lot of material here --

THE DEPONENT:  I'd like -- I'd like to have the full context --

MR. GREAVES:  Hold on.  Hold on.  My client has a right to read a document that's being placed in front of him.  If you -- if you want to ask him about content, he has the right to read the document.  If you want to ask him just about who's, you know, in the chats, then that's fine, you can ask that.  But the moment we start getting into the content, he needs to be able to read it.

MS. LEONARD:  Oh, 100 percent agree.  And

JOSEPH GUY                        May 15, 2026                        46
97408

as you can see, there are a lot of documents that have been produced.  I don't want to take -- if we were to sit here on the record all -- it would take all day.  We can go off the record, and I can give all the exhibits, and you can prep your witness on them.  But the question is going to be -- the question is going to be whether he is a participant in these.

MR. GREAVES:  Okay.  Like I said, that question is fine.

MS. LEONARD:  Okay.

MR. GREAVES:  But we're not going off the record for him to read documents.  This -- that's not, you know, something that we've agreed to.  We haven't been given time.  I've never even seen any of these documents before.  I haven't been provided them in advance.  So if you would like him to read them on the record, he can do that.  But just understand that's -- your -- you can make your choices about how you want to use your time on this deposition.

MS. LEONARD:  Okay.  What I'm going to do for this set -- and I think you can see where I'm going with this --

MR. GREAVES:  Oh yes.

MS. LEONARD: -- is to show that these are the -- the chats related to FEMA that you discussed in the last deposition when you read some of the --

THE DEPONENT: I was handed a very large document --

MR. GREAVES: Hold on. Let her finish.

MS. LEONARD: Sure. And I'm going to ask you whether you were a participant in these chats. That's going to be the question. And then if there are specific questions about specific pages that we come to later, we'll have plenty of time to read. Okay?

MR. GREAVES: And my objection is going to be that you're going to be characterizing these documents without him having the chance to read them for himself.

MS. LEONARD: The only question is whether he's a participant or not.

MR. GREAVES: Okay. Then ask that question.

BY MS. LEONARD:

Q. Okay. All right. Mr. Guy, you've been handed Exhibit 206, which is a chat titled FEMA Rapid, I believe the word is Response. Do you see that?

JOSEPH GUY                    May 15, 2026                          48
97408

A.   Yes.

Q.   Do you recall whether you were a participant in this?

A.   I can imagine that I was.

MS. LEONARD:  Okay.  You can set that one aside.  Let's mark the next as Exhibit 207.

THE REPORTER:  Exhibit 207 marked.

(WHEREUPON, Exhibit 207 was marked for identification.)

BY MS. LEONARD:

Q.   This is another chat produced from backups on Karen Evans' phone.  Mr. Guy, Exhibit 207 is Disaster Response.  Do you see that -- Disaster Response Updates.  Do you see that chat?

A.   I can see it.

Q.   And you were a participant in that, correct?

A.   It says that I was.

Q.   It looks like Joe Guy was added to the group on December 10th -- sorry -- Joe Guy added you to the group on December 10th and you added Kara Voorhies.  You see that right there?

A.   That's what it says.

MS. LEONARD:  Okay.  You can set that aside.  Mark this the next, Exhibit 208.

THE REPORTER:  Exhibit 208 marked.

(WHEREUPON, Exhibit 208 was marked for identification.)

BY MS. LEONARD:

Q.   This is another chat produced by Karen Evans.  This one is called MS FEMA Trip.  Do you see that?

A.   I can see that.

Q.   And you are a participant in this chat, correct?

A.   I can see that.

MS. LEONARD:  Okay.  Let's mark the next, Exhibit 209.

THE REPORTER:  Exhibit 209 marked.

(WHEREUPON, Exhibit 209 was marked for identification.)

BY MS. LEONARD:

Q.   This one is called CA EO.  Do you see that?

A.   I can see that.

Q.   This is another chat produced from Karen Evans' backups.  You were a participant in this chat, correct?

A.   That's what it says.

MS. LEONARD:  Okay.  Here's the next.

JOSEPH GUY                          May 15, 2026                          50
97408

This is Exhibit 210.

THE REPORTER:  Exhibit 210 marked.

(WHEREUPON, Exhibit 210 was marked for identification.)

BY MS. LEONARD:

**Q.    This one is called Biloxi.  You see that?**

A.    Yes.

**Q.    You are a participant in this chat, correct?**

A.    That's what it says.

MS. LEONARD:  Okay.  Exhibit 211.

THE REPORTER:  Exhibit 211 marked.

(WHEREUPON, Exhibit 211 was marked for identification.)

BY MS. LEONARD:

**Q.    You've been handed Exhibit 211, which is a FEMA chat from Karen Evans' backups.  That was called Contract Egregiousness.  Do you see that?**

A.    I can see it.

**Q.    And you were a participant in this chat, correct?**

A.    That's what it says.

MS. LEONARD:  Okay.  Exhibit 212.

THE REPORTER:  Exhibit 212 marked.

(WHEREUPON, Exhibit 212 was marked for

identification.)

BY MS. LEONARD:

Q.   Another chat produced from Karen Evans' backups.  This one is called -- well, I can see the beginning of it -- Karen, Gregg, Kara -- I'm not sure what else it -- we'll call it Karen, Gregg, Kara.  You are a participant in this chat, correct?

A.   I can see that I'm in the chat.

Q.   Do you think it might be Karen, Gregg, Kara, and Joe?

A.   No idea.

MS. LEONARD:  Just for completeness, let's do this one as Exhibit 213.

THE REPORTER:  Exhibit 213 marked.

(WHEREUPON, Exhibit 213 was marked for identification.)

BY MS. LEONARD:

Q.   This is another depiction of the Karen, Gregg, Kara, and Joe chat produced by Kara Voorhies.  Do you see that?

A.   I can see that.

Q.   Joe is you, correct?

A.   I can imagine that that would be correct.

MS. LEONARD:  All right.  Let's mark the next as Exhibit 214.  This is another chat produced

by Kara Voorhies.

THE REPORTER:  Exhibit 214 marked.

(WHEREUPON, Exhibit 214 was marked for identification.)

BY MS. LEONARD:

Q.    I believe this one is Disaster Response Updates.  Do you see that you are a participant in this chat, Mr. Guy?

A.    I can see that.

MS. LEONARD:  Let's mark the next as Exhibit 215.

THE REPORTER:  Exhibit 215 marked.

(WHEREUPON, Exhibit 215 was marked for identification.)

BY MS. LEONARD:

Q.    This one is called Winter Storm Team.  Do you see that?  This is an excerpt of a chat produced by Kara Voorhies.  Do you have a recollection as to whether you participated in this one?  I can help.  Page 312 with the Bates number at the bottom, if you look at page 312.

A.    Can I just read?

Q.    Sure.

A.    Okay.

Q.    All right.  You are a participant in this

chat, correct?

A.   That's what it says.

MS. LEONARD:  Okay.  Let's mark the next as Exhibit 216.

THE REPORTER:  Exhibit 216 marked.

(WHEREUPON, Exhibit 216 was marked for identification.)

BY MS. LEONARD:

Q.   This one is called FEMA ORR Awareness.  Do you see that?

A.   Yes.

Q.   And you were a participant in that chat, correct?

A.   Yes.

MS. LEONARD:  Let's mark the next, Exhibit 217.

THE REPORTER:  Exhibit 217 marked.

(WHEREUPON, Exhibit 217 was marked for identification.)

BY MS. LEONARD:

Q.   This one is called DHS Team.  Do you see that?

A.   Yes.

Q.   And you are a participant in this chat as well, correct?

A.    I can see my name on there.

MS. LEONARD:  And let's mark the next as Exhibit 218.

THE REPORTER:  Exhibit 218 marked.

(WHEREUPON, Exhibit 218 was marked for identification.)

BY MS. LEONARD:

**Q.    This one is called FEMA ESEC.  Do you see that?**

A.    Yes.

**Q.    And you are a participant in this Signal chat, correct?**

A.    That's what it says.

MS. LEONARD:  Mark the next, Exhibit 219.

THE REPORTER:  Exhibit 219 marked.

(WHEREUPON, Exhibit 219 was marked for identification.)

BY MS. LEONARD:

Q.    This one is FEMA >< HQ.  Do you see that?

A.    Yes.

**Q.    You are a participant in this chat, correct?**

A.    Yes.

MS. LEONARD:  All right.  Let's mark this Exhibit 220.  This is an excerpt from FEMA Rapid

Response produced to us by Kara Voorhies.

THE REPORTER:  Exhibit 220 marked.

(WHEREUPON, Exhibit 220 was marked for identification.)

BY MS. LEONARD:

Q.    Do you recall that you were a participant in FEMA Rapid Response, Mr. Guy?

A.    I can imagine that perhaps I was.

MS. LEONARD:  Okay.  Let's mark the next, Exhibit 221.

THE REPORTER:  Exhibit 221 marked.

(WHEREUPON, Exhibit 221 was marked for identification.)

BY MS. LEONARD:

Q.    Exhibit 221 is called FEMA Sanity Club. This is an excerpt produced by Kara Voorhies.  You participated in this as well, correct?

A.    I can see that I'm in there.

Q.    You -- you recall that you were a participant in the FEMA Sanity Club, Mr. Guy?

A.    I can see that I'm in there.

MR. HALL:  Just going to interpose an objection, generally.  Some, perhaps many, of these exhibits were withheld on grounds of attorney-client privilege, deliberative process privilege, and

perhaps other privileges in the government's production.  These were produced from third-party witness, Kara Voorhies.

I'm just going to object to the extent these documents, for example, Exhibit 219, perhaps others, contain information subject to the attorney-client privilege, the deliberative process privilege, or the -- any other executive privilege.

MS. LEONARD:  Okay.  I'm sure we can -- why don't we talk about that off the record, and I'm sure we can work that out.

Okay.  Let's mark the next as Exhibit 221.

MR. GREAVES:  It's Exhibit 222.

MS. LEONARD:  Exhibit 222.  I'm sorry.  Thank you.

THE REPORTER:  Exhibit 222 marked.

(WHEREUPON, Exhibit 222 was marked for identification.)

BY MS. LEONARD:

Q.   Mr. Guy, you've been handed what was produced to us by Kara Voorhies as excerpts from a Signal chat that she had with you.  You were a participant in this chat, correct?

A.   I can see that my name is on there.

MS. LEONARD:  Okay.  Let's mark the next

as Exhibit 223.

THE REPORTER:  Exhibit 223 marked.

(WHEREUPON, Exhibit 223 was marked for identification.)

BY MS. LEONARD:

Q.   **Mr. Guy, you've been handed what has been marked as Exhibit 223.  This is a Signal chat with you produced to us from the backups from Karen Evans' phone.  You also participated in a Signal chat with Ms. Evans, correct?**

A.   Yeah, I -- I believe that's probably correct.

MS. LEONARD:  Okay.  I think now is a great time for a short break.  Five minutes off the record.

MR. GREAVES:  Okay.

THE VIDEOGRAPHER:  The time is 10:01 a.m. We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  10:07 -- we are -- a.m. We are back on the record.

MS. LEONARD:  Mr. --

MR. GREAVES:  Actually, before you get started --

MS. LEONARD:  I'm sorry.  Go ahead.

MR. GREAVES:  -- I just wanted to proffer something real quick because I just double-checked his phone again.  And if you would like a screenshot of his FEMA groups to show that the dates do in fact go back to the 30th, we can provide those to you, as well as I would also like to proffer, I don't recall exactly if there was testimony about what it shows with his chat with Kara Voorhies, but the date on that goes back, for some reason, to May 1st.  It is different --

MS. LEONARD:  Sure.

MR. GREAVES:  -- from the FEMA -- from the -- from the group messages.  All the group chats show the 30th date, Voorhies' shows May 1st.

MS. LEONARD:  Sure.  Why don't we go off the record and talk about how to do that.  Okay?

MR. GREAVES:  Sure.

THE VIDEOGRAPHER:  Oh, okay.  We are off the record, it's 10:08 a.m.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  It's 10:12 a.m.  We are back on the record.

MS. LEONARD:  Okay.  Thank you.  During the break, Mr. Greaves was able to send us some screenshots.  Can you please describe?

JOSEPH GUY                    May 15, 2026                         59
97408

MR. GREAVES:  Yes.  So just as a sampling, I sent two FEMA group screenshots, the FEMA 2.0, and I forget the name of the other.  But -- and then also the screenshot of what the Signal chat history looks like for Kara Voorhies on his phone.

MS. LEONARD:  On Mr. Guy's personal phone, correct?

MR. GREAVES:  Correct.

MS. LEONARD:  Correct.  Okay.  And we'll take a look at that.  Thank you very much.

BY MS. LEONARD:

**Q.    Okay.  Mr. Guy, we can resume questioning. You referred earlier to chats containing banter, correct?**

A.    I think so.

MS. LEONARD:  Okay.  Let's take a look at some of the content of these chats.  We'll mark this as Exhibit 224.

THE REPORTER:  Exhibit 224 marked.

(WHEREUPON, Exhibit 224 was marked for identification.)

BY MS. LEONARD:

**Q.    Exhibit 224 is a screenshot from the Karen, Gregg, Kara, and Joe chat.  Do you see that?**

A.    Yes.

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

Q.   This was produced by defendants from Karen Evans' phone.  This one is an image.  Kara Voorhies says here, "I cleared as well.  Then I'll make a post to the group chat.  Are we still suggesting S1 consider recommending POTUS to hold the dec in abeyance?"  Gregg Phillips responds.  Do you see that?

A.   Yes.

Q.   Gregg Phillips was the head of the Office of Response and Recovery at some point in time, is that correct?

A.   I think that's right.

Q.   Karen Evans weighs in and says, "I think the answer is no on abeyance."  You see that?

A.   Yes.

Q.   S1 is Secretary Noem, correct?

A.   Yes.

Q.   POTUS is the President of the United States, correct?

A.   I think so.

Q.   This is not workplace banter, Mr. Guy, is it?

A.   I don't think that I said that exclusively workplace banter took place on these chats.

MS. LEONARD:  Okay.  Let's take a look at

another one, Exhibit 225.

THE REPORTER:  Exhibit 225 marked.

(WHEREUPON, Exhibit 225 was marked for identification.)

BY MS. LEONARD:

Q.    This is another image from Karen Evans' phone, Karen, Gregg, Kara, and Joe.  Do you see that?

A.    Yes.

Q.    And this is discussing lie detector tests and email scans.  Do you see that?

MR. GREAVES:  I'm going to object to the completeness here, that he's going to need to see the full chat before he can testify about the contents of what this represents.

BY MS. LEONARD:

Q.    Well, my question is going to be simple: this is not exactly workplace banter, right, Mr. Guy?

A.    I don't believe that I said that exclusively workplace banter took place in these chats.

MS. LEONARD:  Okay.  Let's look at another one, Exhibit 226.

THE REPORTER:  Exhibit 226 marked.

(WHEREUPON, Exhibit 226 was marked for identification.)

BY MS. LEONARD:

Q. **This is another excerpt from Karen, Gregg, Kara, and Joe chat.  There's a reference here to S1. Again, S1 is Kristi Noem, correct?**

A. Can I just read this?

Q. **Sure.**

A. Okay.

Q. **S1 is Kristi Noem, right?**

A. That's right.

Q. **And you're asking whether something will come up to HQ today, that means the DHS front office?**

A. Yes.

MS. LEONARD: Okay. You can set that aside. Mark the next Exhibit 227.

THE REPORTER: Exhibit 227 marked.

(WHEREUPON, Exhibit 227 was marked for identification.)

BY MS. LEONARD:

Q. **This is another excerpt from Karen, Gregg, Kara, and Joe that was produced to us by Karen Evans.  You are asking for a briefing memo here, right?**

MR. GREAVES:  Objection.  Foundation.

BY MS. LEONARD:

Q.   The -- the words on the page are, "We need a briefing memo for that ASAP."  Do you see that, Mr. Guy?

MR. GREAVES:  I'm just --

THE DEPONENT:  Yeah --

MR. GREAVES:  Sorry.  I -- I -- I was having trouble following who's -- who on this page, but go ahead.

THE DEPONENT:  I can see that.

BY MS. LEONARD:

Q.   And it says she's waiting for it, "she" is Kristi Noem, correct?

A.   I think so.

MS. LEONARD:  This one was produced to us. Let's -- well, let's mark this Exhibit 228.

THE REPORTER:  Exhibit 228 marked.

(WHEREUPON, Exhibit 228 was marked for identification.)

BY MS. LEONARD:

Q.   This was given to us by defendants with the representation that this is an image of Karen Evans' phone.  Obviously, the top of this chat was cut off.  But my question is just going to be about

the post at the bottom from Kara Voorhies.  You see that?

A.    I can see the post at the bottom.

Q.    And it says, "Chief wants it by 5:00, so Joe wants it by 4:00."  "Chief" refers to Corey Lewandowski, correct?

A.    I believe so.

Q.    And Joe, presumably, is you?

A.    Probably.

Q.    So there were things related to FEMA that at times came through you before they went to Corey Lewandowski.  Is that a fair statement?

A.    I don't know what she's saying here.  I -- I don't -- I don't know.

Q.    But it is true that there are things that some -- pertaining to FEMA that came to you before they went to  Corey Lewandowski, right?

A.    Yes.

MS. LEONARD:  Here is an image, Exhibit 229.  I'll wait for her to mark it.

THE REPORTER:  Exhibit 229 marked.

(WHEREUPON, Exhibit 229 was marked for identification.)

BY MS. LEONARD:

Q.    Exhibit 229 is a image of content from the

FEMA 2.0 chat that I will tell you the defendants gave to us as a picture taken of Ms. Evans' phone and represented to us that this was taken on March 5th.

A.   Okay.

Q.   If you can see at the top, this is back when the auto-delete setting was set to four weeks, correct?

A.   That's what it says.

Q.   And the top message is from you, and it says, "Corey also wants to make sure that any 'easy money' is pushed out."  Do you see that?

A.   I can see that.

Q.   And Kara Voorhies responds, "Just DRF." "DRF" is the Disaster Relief Fund, correct?

A.   I think so.

Q.   Do you have any recollection as to what this was about?

A.   No, I do not recall.

Q.   But you were conveying a direction from Corey Lewandowski to Kara Voorhies and Karen Evans, who were the two other participants in the FEMA 2.0 chat, right?

A.   That's what it says.

Q.   The DRF was set up by the Stafford Act.

Do you recall that?

A.   I don't know that.

Q.   The DRF pays for CORE employees, right?

A.   I think so.

Q.   Do you recall -- you can set that aside. Do you recall that last time we were together, I asked you whether Corey Lewandowski made any decisions at DHS?

A.   Now that you mention it, I remember you maybe asking me that.

Q.   What you said was, "I don't think Corey made decisions without the secretary's input.  I think the secretary made decisions."  Do you recall that testimony?

A.   Yes.

Q.   Corey Lewandowski made decisions at DHS, didn't he?

A.   I don't think that Corey did anything without the secretary's sanction or knowledge.

Q.   Corey was making decisions, wasn't he?

MR. GREAVES:  Objection.  Asked and answered.

THE DEPONENT:  I don't think he made any decisions without secretary's knowledge or sanction or understanding or he was her chief advisor.

MS. LEONARD:  Okay.  Let's mark the next as Exhibit 230.

THE REPORTER:  Exhibit 230 marked.

(WHEREUPON, Exhibit 230 was marked for identification.)

BY MS. LEONARD:

Q.   This is an excerpt from the chat called the FEMA Sanity Club that you previously testified you participated in.  Do you see the -- the -- the message from you at the top of the page that starts with "Okay"?

A.   Yes.

Q.   It says, "Okay - just have to tee up for Corey so we can answer any questions he has and then have him green light."  Do you see that?

A.   I can see that.

Q.   Green light means give the go ahead to something, doesn't it?

A.   The context there matters, I think.  You can take this to mean that he would talk to the secretary about it and get sign off.

MS. LEONARD:  Okay.  Let's look at the next, Exhibit 231.

THE REPORTER:  Exhibit 231 marked.

(WHEREUPON, Exhibit 231 was marked for

identification.)

BY MS. LEONARD:

Q.    This is an excerpt from the chat between you and Kara Voorhies that she produced to us in response to subpoena.  There's a message here that -- this is an exchange between you and Ms. Voorhies, correct?

A.    That's what it looks like.

Q.    There's a message here that says, "Corey wants us to shut down the DRF activities."  Do you see that?

A.    Yes, I can see that.

Q.    And that is a message from you, correct?

A.    No.

Q.    Is that a message from Kara to you or from you to Kara?

A.    It looks like it would be a message from Kara to me.

Q.    Okay.  How can you tell?

A.    Because senders -- it's consistent with these that senders appear coming to the right, and receivers appear to the left.

Q.    So this is something that Kara sent to you telling you that Corey wants to shut down the DRF activities, right?

MR. HALL:  I'm just going to object that this is pretty clearly deliberative process privilege information.  And this was obviously not produced by the government.  It was produced by a third party.  We reserve all rights as to this document.

MS. LEONARD:  You can set that aside. Let's take a look at this one, Exhibit 232.

THE REPORTER:  Exhibit 232 marked.

(WHEREUPON, Exhibit 232 was marked for identification.)

BY MS. LEONARD:

Q.    Now, Mr. Guy, I'm handing you an excerpt from an exchange between Corey Lewandowski and Kara Voorhies that she produced to us.  And in the center of the page, there is a message, "Why are all these FEMA grants in front of her for signature from Mr. Lewandowski?"  And a response from Ms. Voorhies, "ESEC must have -- must have delivered the packages to her.  They were supposed to be delivered to you."

A.    Okay.

Q.    Did Mr. Lewandowski generally review things before they went to the secretary?

A.    A -- a lot of the time.

Q.    Do you understand why Mr. Lewandowski was

reviewing the FEMA grants prior to the secretary?

A.    I don't know.  Have -- I don't have the context here.  She could have meant "you" as in HQ.  She could have meant "you" as in -- and even then, isn't it the secretary's prerogative who she has look at something before she looks at it?  I -- I don't know.

MS. LEONARD:  Okay.  Let's take a look at the next one.  This is Exhibit 233.

THE REPORTER:  Exhibit 233 marked.

(WHEREUPON, Exhibit 233 was marked for identification.)

BY MS. LEONARD:

Q.    This is an excerpt from the FEMA Sanity Club.

A.    Can I read it?

Q.    Yes.

A.    Okay.

Q.    Okay.  So this is an excerpt from the FEMA Sanity Club, a chat that you participated in and are sending messages on here.  And you see that first Kara Voorhies sends you a message that says, "It's becoming incredibly clear to me we have the wrong types of employees everywhere."  You see that?

A.    Uh-huh.

Q.   She's talking about FEMA, correct?

A.   It looks like that.

Q.   And then you say, "We'll talk to PPO about everything on Monday."  What's "PPO"?

A.   That's Presidential Personnel at the White House.

Q.   And then if you turn to the third page, 326, you refer to something here, you say, "We're going to print them all out for Corey."  You see that?

A.   Yes.

Q.   Are you talking about disaster declarations?

A.   Just based on what they're talking about here, there were slides created that, I believe, had to do with disaster declarations.  Yes, I think so.

Q.   Okay.  And then there's a discussion about what I'll call the process flow of who should be reviewing what.  And then, on page 328, you say, again, "We should discuss with Corey."  You see that?

A.   Yes, I can see that.

Q.   Okay.  Not the secretary, Corey, right?

A.   Yes.  And it's an important point to emphasize that Corey talked to the secretary about

everything.  So we would talk to Corey about things so that he could talk to the secretary about them.

MS. LEONARD:  Exhibit 234.

THE REPORTER:  Exhibit 234 marked.

(WHEREUPON, Exhibit 234 was marked for identification.)

BY MS. LEONARD:

Q.    **This is a WhatsApp chat that was produced to us by Kara Voorhies between her and Corey Lewandowski.  Do you see that?**

A.    Can I read it?

Q.    **Sure.  You're -- you're welcome to.**

A.    Okay.  So if I told you that Kara Voorhies produced a substantial number of WhatsApp chats with Corey Lewandowski, would you be surprised?

A.    I don't know.

Q.    **And that she testified that that was his preferred method of communication.  Does that sound right to you?**

A.    No.

Q.    **Did you ever communicate with Corey Lewandowski on WhatsApp?**

A.    Not once, to the best of my recollection.

Q.    **Right.  Did you look through -- do you have WhatsApp on your phone?**

A.    I do.

Q.    Did you look through your WhatsApp chats to see if there was anything related to FEMA?

A.    I think I did.  I don't have any messages in my WhatsApp.

Q.    You don't have any messages in your WhatsApp at all?

A.    I have no DHS-related messages in my WhatsApp.

Q.    Okay.  So whether Kara Voorhies was communicating all the time with Corey Lewandowski, that's not how you communicated with him?

A.    No.

Q.    Okay.  You communicated with him using Signal?

A.    Or in person or on the phone.

MS. LEONARD:  Okay.  Okay.  You can set that aside.  Let's take a look at this one.  Exhibit 235.

THE REPORTER:  Exhibit 235 marked.

(WHEREUPON, Exhibit 235 was marked for identification.)

BY MS. LEONARD:

Q.    You can take a moment to read this.  This is produced by Kara Voorhies.

A.    Okay.

Q.    Okay.  So this is in the June 2025 timeframe, correct?  Do you see that?

A.    Yes.

Q.    And so this is a chat between you and Kara Voorhies.  And over the summer of 2025, this is -- is it fair to say these -- this is sort of early days when you're getting Kara Voorhies situated in terms of her work at -- at FEMA?

A.    I don't remember.

Q.    Okay. You don't remember exactly when she started?

A.    No.

Q.    Okay.  There's an agenda here for Friday: staffing, grant discussion, et cetera, et cetera. Do you see that?

A.    Yes.

Q.    And it's not clear to me who's sending. It looks like the agenda's actually cut in half between messages there.  Do you have any understanding of what happened that -- with that?

A.    I mean, this looks like a full message.

Q.    Who usually set the agendas for your discussion with Kara?

A.    There really typically wasn't agendas set.

I mean, on an ad hoc basis, maybe for memory purposes, you would send something like that, but I don't think it was a routine thing.

Q.   Okay.  If you look at the second page, there's a message here that says, "Victoria keeps saying it's disrupting the work.  But so what?  That's not a good answer.  They have no other way to clear debris."  Then the message after that says, "DOGE cleared it.  So it'll go to them."  You see that?

MR. GREAVES:  Objection to exact wording, but go ahead and answer.

BY MS. LEONARD:

Q.   "DOGE cleared.  So it'll go to them."  Do you see that?

MR. GREAVES:  I also object to the completeness and --

THE DEPONENT:  I can see that it says that.

BY MS. LEONARD:

Q.   At this point in time in the summer of 2025, you were running things by DOGE at times?

A.   I think DOGE was part of a lot of different things that were going on at the department for a while.  They had their eyes on a

lot of different things.

Q.    Including FEMA staffing, right?

A.    FEMA staffing?

Q.    That's one of the things they had their eyes on?

A.    I recall them having their eyes more on wasteful spending than staffing that -- but I don't -- maybe.  Because, if I may, at -- at this point, I believe that the FEMA Review Council was stood up.

Q.    They were reviewing FEMA contracts?

A.    Yeah, they would've been reviewing FEMA contracts, I think.  I -- I don't know for how long they did that, or exactly when they started or ended.  I -- I don't know.

Q.    If you look back to the front page of that -- the agenda, it's talking about grant discussion. You see that?

A.    Yes.

Q.    And then one message below, the termination process update?

A.    Yes.

Q.    Termination of grants, correct?

A.    I don't know.

MS. LEONARD:  Okay.  Here's one, Exhibit 236.

THE REPORTER:  Exhibit 236 marked.

(WHEREUPON, Exhibit 236 was marked for identification.)

BY MS. LEONARD:

Q.    This is an excerpt from something called DR Action Group that was produced to us by Kara Voorhies.  It's a message -- a series of messages on June 4th, 2025.  And my question for you is about the final one.

A.    Okay.

Q.    It says, "I gave Anthony the DOGE trainings memo."  You see that?

A.    Yes, I can see that.

Q.    What are the "DOGE trainings memo"?

A.    I have no clue.

Q.    Do you -- is this something that you were familiar with when you were at DHS, that there were trainings memo -- trainings memos related to DOGE?

A.    I -- no, I don't know.

Q.    Do you recall ever reviewing a -- a DOGE training memo?

A.    No.

Q.    Okay.  You can set that aside.  Now, it's generally true that in 2025, there were discussions between DHS and OMB about FEMA, correct?

A.   Between when?

Q.   In 2025, there were discussions between DHS and OMB about FEMA?

A.   Yes.

MS. LEONARD:  Okay.  Look at this. Exhibit 237.

THE REPORTER:  Exhibit 237 marked.

(WHEREUPON, Exhibit 237 was marked for identification.)

BY MS. LEONARD:

Q.   This is excerpt from the chat that Kara Voorhies produced with you.

A.   Can I read this?

Q.   Yes, please.

A.   Okay.

Q.   Okay.  So this says, "The OMB call is off today.  Katie has a conflict."  Do you see that?

A.   Yes.

Q.   Who's Katie?

A.   Katie, I may have been referring to Katie Sullivan.

Q.   Who's that?

A.   She's the chief of staff at the Office of Management and Budget.

Q.   And is that a person that you had

communicated with on occasion in your role at DHS?

A.   Yes.

Q.   And at times about FEMA?

A.   Yes.  We had a -- we had a call with OMB fairly regularly, and sometimes FEMA was brought up, sometimes it was not.

Q.   You had a -- a regular -- when you say, "We had a call with OMB regularly," who -- who's the "we"?

A.   Typically, it was me and Troup Hemenway.

Q.   And sometimes Kara Voorhies participated?

A.   If there was something that being -- having subject matter expertise on or whatever Kara was good at to be able to explain, sometimes she would participate.

Q.   And was there a regular schedule for that call with OMB?

A.   I don't really remember if it was a regular call, but we would typically talk once a week.  Sometimes she would move -- it was -- I think it was a lot of ad hoc.

Q.   And was the person from OMB who participated typically Katie Sullivan?

A.   It varied.  Katie -- it varied.  Sometimes it would be Katie and two people that helped her or

three.  And then later on it turned into OMB wanting to have more calls with more people.  It just -- it -- it varied.

Q.    And to your recollection, were there people at OMB who were assigned or responsible in some way for FEMA?

A.    They have what's called Program Associate Directors or PADs at FEMA or at OMB.  And I think that DHS as a -- as a whole would've fallen under a Program Associate Director, if I'm not mistaken.

Q.    So there was a PAD for DHS?

A.    I think so.

Q.    And then any FEMA-related issues would somehow be handled by whoever was working for that PAD?

A.    Yeah, I'm not exactly sure what their structure looks like.  You know, some -- some PADs have deputies, some have two, some have a whole office of assistants.  Yeah.

Q.    Hold on one second.  You say on the next page, "We will have to brief Corey," do you see that?  And then there's further commentary about OMB here?

A.    Yes.

Q.    Are you talking about briefing him on

something about the interaction with OMB?

A.   That's what it seems like.  I don't remember this particular instance, but we did brief Corey on a lot of different things.

MS. LEONARD:  All right.  Let's take a look at Exhibit 238.

THE REPORTER:  Exhibit 238 marked.

(WHEREUPON, Exhibit 238 was marked for identification.)

BY MS. LEONARD:

Q.   Okay.  This is another excerpt from the chat between you and Kara Voorhies.  And here, it appears that she is asking you to send Katie's number?

A.   That's what it says.

Q.   And she says she is either emailing or messaging Corey.  Do you understand she's talking about Katie Sullivan emailing or messaging Corey?

A.   Yes.

Q.   And you say, "He's blowing me up about it."  You mean Corey?

A.   I think that sounds right.

Q.   Okay.  You can set that aside.  Do you recall that on your first day of deposition I asked you whether you knew that Kara Voorhies was a

contractor?

A.   I remember you asking me that.

Q.   And I believe you said you didn't know or you weren't sure.  Do you recall?

A.   I learned at some point.  I knew it -- definitely knew after some point.  I don't remember exactly when.  I know for she -- when she started, I think she was an SGE.  Yeah.

Q.   And then at some point that transitioned to being a government contractor?

A.   Yes, I think -- I think so.

Q.   But you don't recall when you learned that?

A.   No, I don't remember off the top of my head.

Q.   Okay.  All right.  I also asked you last time about something called the Katrina letter.  You were familiar with that, right?

A.   Not really.

Q.   You couldn't recall last time whether you were involved in personnel decisions regarding the FEMA personnel who signed the Katrina letter?

A.   I don't even remember what the Katrina letter is.

MS. LEONARD:  Okay.  Well, let's take a

look.  3 -- sorry -- Exhibit 239.

THE REPORTER:  Exhibit 239 marked.

THE DEPONENT:  Okay.

(WHEREUPON, Exhibit 239 was marked for identification.)

BY MS. LEONARD:

Q.    So you've been handed Exhibit 239, which is a screenshot of a Signal chat called A K and J. Do you see that?

A.    Yes.

Q.    And this is a chat that involves you and Kara Voorhies.  Do you know who the "A" is?

A.    No.

Q.    You don't recall?

A.    I don't recall.

Q.    Okay.  So there's a post from you on August 25th, 2025.  You see that here?

A.    Yes.

Q.    A message about a Washington Post article, "FEMA staff warn Trump officials' actions run (sic) a risk," et cetera, et cetera.  Do you see that?

A.    I can see that.

Q.    So you're sending -- sending to this chat a link to the article about the FEMA staff protest letter.  Do you see that link?

MR. GREAVES:  I'm going to object to the completeness and any characterization of the -- the Washington Post article would require him to actually read the article.

BY MS. LEONARD:

Q.    Well, you see the link is -- the link is https://www.washingtonpost.com/weather/2025/08/25/fema-staff-protest-letter.  Do you see that?

A.    I can see that it says that.

Q.    Okay.  Does this refresh your recollection that the -- regarding what the Katrina letter was?

A.    Not really.  There was stuff like this that happened all the time.

Q.    Okay.  There was -- there were letters signed by FEMA employees protesting the Trump administration's treatment of FEMA all the time?

A.    There were people signing letters at different components and, you know, complaining, and doing things like that a lot.  It wasn't just at FEMA.

Q.    And you respond, "Let's find them."  Do you see that?

A.    Okay.

Q.    And at some point, after DHS found them, the FEMA employees who signed this letter were

placed on administrative leave.  Do you recall that?

MR. GREAVES:  Object to foundation.

THE DEPONENT:  Not really.

BY MS. LEONARD:

Q.    You were giving direction to find the FEMA people who signed the letter, weren't you, Mr. Guy?

A.    I don't remember.

Q.    Do you have any other understanding of let's -- what "let's find them" means?  No?

A.    I -- I don't know.  I don't -- there would've been a deliberative process in this where I didn't have the authority to go and do something unilaterally like fire 150 people.  I would've had to go through ODC, and I would've had to been -- had a sign-off from the Secretary, and I would've had all these other things that went into it.

Q.    But you were involved in discussions regarding the FEMA employees who signed the Katrina letter, weren't you, Mr. Guy?

A.    Again, I don't even know what the Katrina letter says or what it is.

Q.    You directed others to go find them, didn't you, Mr. Guy?

A.    It says here that I sent a message that says, "Let's find them."  I don't know what else

that means.

MS. LEONARD:  Okay.  Let's take a look at the next.  We'll call this Exhibit 240.

THE REPORTER:  Exhibit 240 marked.

(WHEREUPON, Exhibit 240 was marked for identification.)

BY MS. LEONARD:

**Q.    You've been handed Exhibit 240.  This is a excerpt of the FEMA HQ chat in which you participated that was produced by Kara Voorhies on Monday, December 1st.  You sent a message that is depicted here.  Do you see that message, Mr. Guy?**

MR. HALL:  I'm just going to object before we get into this, that this appears to be subject to the deliberative process privilege and the attorney-client privilege.  I'm going to reiterate that this document was produced by a non-party to the litigation, not by the government.  We reserve all rights.

BY MS. LEONARD:

**Q.    Okay.  Mr. Guy, you see the message that says, "We need the list of people who have been reinstated, the emails that were sent reinstating them, and the people who sent the emails reinstating them"?  You sent that message, right?**

A.    I can see that.

Q.    The "we" is DHS, right?

A.    I see here.  Also, below that, someone is telling me that they're working with Joseph, who is, I think, DHS acting general counsel at the time.

Q.    In response to the message that you sent before you knew that, right?

A.    I may have talked to him too.  I don't know.

Q.    Okay.  You can set that aside.  Can you find Exhibit 220 in your packet?  It's the FEMA Rapid Response chat.

A.    Yes.  And can I just read this before we talk about it?

Q.    Sure.  I'm going to be asking you about page 146, but go ahead.  Let me know when you've had a chance to review page 146.

A.    Okay.  Which page?

Q.    Okay.  Page 146, please.  Do you see that on Monday, December 1st, there's a link that was sent to you by Tricia McLaughlin?  We previously talked last time about the fact that she was the DHS spokesperson?

A.    She was the assistant secretary for public affairs.

JOSEPH GUY                        May 15, 2026                          88
97408

Q.   Okay.  So she sends a link to a CNN article that the link says, "FEMA workers reinstated after suspension over letter criticizing Trump's agency overhaul."  Do you see that?

A.   I can see that.

Q.   And you respond, "Working on it.  They were not reinstated."  You see that?

A.   I can see that I said that.

Q.   Refresh your recollection that you were working on these FEMA personnel matters?

A.   Not particularly.  I could not do anything myself.  It would've had to have been done through the Office of the General Counsel.

Q.   Okay.  But that -- you understood that DHS was working on it, right?

A.   I suppose it says that.

Q.   Okay.  You can set that aside.  Now, I asked you last time about your work and involvement with the FEMA Review Council.  Do you recall?

A.   Yes.

Q.   Okay.  And you told me that with respect to the draft report, that you were not substantively working on it.  Do you recall that?

A.   I believe, yeah.

Q.   Okay.  And you said, "As far as I

remember, it was just checking in and making sure there was actually a report being drafted."  Does that sound about right?

A.    I think so.

MS. LEONARD:  Okay.  Let's take a look. We'll mark this as Exhibit 241.

THE REPORTER:  Exhibit 241 marked.

(WHEREUPON, Exhibit 241 was marked for identification.)

BY MS. LEONARD:

Q.    You've been handed Exhibit 241.  It's an excerpt from a longer chat between you and Kara Voorhies that starts approximately October 15th, 2025.  And -- well, it's all October 15th, 2025. You can take a moment to read through it.  Let me know when you're ready.

A.    Okay.

Q.    Okay.  So this is an exchange about the -- the draft FEMA Council report, isn't it?

A.    I don't know.  Could be a version of a draft report.  I don't know.

Q.    On page Bates number 400, there's a post that says, "I'll just tell him he can't share it with anyone else, including anyone in the FEMA front office."  You're referring to the FEMA draft report,

correct?

A.    I don't know.

Q.    You don't recall?

A.    No, I -- there could have been multiple versions.  I don't -- I don't know.

Q.    But this could be about one of those versions, right?

A.    Could have been.

Q.    And then on the next page, you say, "Corey wants me to meet with him too.  Corey also said we were good to share the report with Dave as long as we put a watermark on it."  Again, this is referring to the draft FEMA Council report, correct?

A.    I don't know that.

Q.    Do you know who Dave is?

A.    I know who Dave is.

Q.    Who's Dave?

A.    Dave Richardson, I assume.

Q.    So, this is coming after a statement on the prior page that he can't share it with anyone else, including anyone in the FEMA front office.  David Richardson at this time was in the FEMA front office, correct?

A.    I don't -- I don't remember.

Q.    He was the SOPDA of FEMA, correct?

A.   I -- I don't remember when he was, though.

Q.   If I told you that David Richardson was the SOPDA of FEMA from approximately late May 2025 to the end of November 2025, would that sound correct?

A.   I think so.

Q.   Okay.  And so you checked with Corey, and Corey said you could share the report with Dave Richardson as long as you put a watermark on it, right?

A.   That's what that says.

Q.   Okay.  And then Kara Voorhies responds, "Just got off the phone with Katie."  Katie Sullivan at OMB?

A.   Yeah.

Q.   Were you discussing the draft FEMA Council report with Katie Sullivan at OMB during this timeframe?

A.   I have no idea.  I -- I do recall that we didn't really discuss the FEMA Review Council report with them, not with OMB, really.  I don't -- I don't think.

Q.   But you don't recall?

A.   No.  She could have been talking to her about anything.

Q.   Okay.   But do you -- do you recall whether or not you were discussing the -- the draft FEMA Council Review report with OMB?

A.   No.

MS. LEONARD:   Okay.   We can set that aside.   Let's mark the next, Exhibit 242.

THE REPORTER:   Exhibit 242 marked.

(WHEREUPON, Exhibit 242 was marked for identification.)

BY MS. LEONARD:

Q.   All right.   Take a moment to look this over.   This is an excerpt from the Signal chat between you and Kara Voorhies.   It -- this excerpt begins November 5th, 2025, and it appears all the messages through the last page are through November 5th.

A.   Okay.

Q.   Okay.   Starting at the top here on November 5th, 2025, there's a message from -- from Kara to you that says, "Are we going to do our sync with Karen, or are you tied up at TSA?"   Do you see that?

A.   I can see that.

Q.   And the sync with Karen, that is a reference to the weekly sync meetings that you

described last time with Karen Evans, correct?

A. I can imagine that is the case.

Q. Okay. And you say, "I'm going to call in," right?

A. Mm-hmm.

Q. And then you say, "No pushback on the 20-page report." Do you see that?

A. Yes, I can see that.

Q. Okay. So there was a discussion happening around this time of how long the draft FEMA Council Review report was going to be. Do you recall that?

MR. HALL: I'm just going to -- I'm just going to object. As before, this excerpt from a Signal chat produced by non-party appears to include information that will be subject to the deliberative process privilege. Reiterate that this was produced not by the government, but by a non-party. And we reserve all rights under the deliberative process privilege.

MS. LEONARD: You can answer the question.

THE DEPONENT: What was the question?

BY MS. LEONARD:

Q. So do you recall around this time there was a discussion of how long the draft FEMA report was going to be?

A.    Generally, yes, I remember that.

**Q.    And there was a longer version and a**

**shorter version?**

A.    I remember there being discussions about

that.

**Q.    Okay.  And you say no pushback on the 20-**

**page report.  Who was giving no pushback?**

MR. HALL:  Objection.  I think this is

clearly within deliberative process privilege.  The

witness can answer to the extent his answer would

not implicate the privilege or to the extent he has

information responsive that would not implicate the

privilege.

But go ahead.

MS. LEONARD:  Do you represent the FEMA

Review Council, Mr. Hall?

MR. HALL:  We represent the defendants,

the United States.

MS. LEONARD:  You represent the

defendants?

MR. HALL:  Yeah.

MS. LEONARD:  And you understand that the

FEMA Review Council is not DHS?

MR. HALL:  It's a FACA.

MS. LEONARD:  Is it?

MR. HALL:  Yeah.  That's my understanding that the FEMA Review Council is a FACA.

MS. LEONARD:  Do you represent the FEMA Review Council?

MR. HALL:  We represent the United States. We are asserting all privileges that belong to the United States and to the Department of Homeland Security and to FEMA.

BY MS. LEONARD:

Q.    Are you going to follow that instruction?

A.    I'm sorry, what was the instruction?

Q.    Okay.  Let me ask again.  Who was giving you pushback on the 20-page report?

A.    I have no idea.

Q.    Who was not giving you pushback on the 20-page report, I should say?

MR. HALL:  Again, objection to the extent this document produced by a non-party of this litigation includes information that is subject to the deliberative process privilege within DHS and/or FEMA.  I think the question is asking this witness who the person that made such statements is, I think that is clearly subject to the deliberative process privilege.  You can find out if the witness knows who the -- who that person would be.

MS. LEONARD:  We obviously disagree -- we have a disagreement about the scope of that privilege and the applicability and whether it is overridden.

BY MS. LEONARD:

Q.    But do you have a recollection as to who was giving no pushback?

A.    It could have been Governor Bryant.  I don't really know.

MS. LEONARD:  Okay.  You can set that aside.  Why don't we take another short break for -- I think we've been going for about 50 minutes, so why don't we take another -- we're going to take five minutes this time.

MR. GREAVES:  Okay.

THE VIDEOGRAPHER:  Okay.  Time is 11:15 a.m.  We're off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  Time is 11:21 a.m.  We are back on the record.

BY MS. LEONARD:

Q.    Mr. Guy, at the time of the discussions of the draft FEMA Council Review report that we saw in Exhibit 242, this is roughly November 5th, 2025, you were aware that there had been a plan to

substantially reduce the number of FEMA staff during the shutdown?

A.    I have no recollection of that.

Q.    You're aware that DHS gave that plan to OMB, aren't you?

A.    I don't know.

Q.    And you knew that the -- that RIF plan was to cut over 50 percent of the agency?

A.    I don't know that.

MS. LEONARD:  Okay.  Let's take a look. Exhibit 243.

THE REPORTER:  Exhibit 243 marked.

(WHEREUPON, Exhibit 243 was marked for identification.)

BY MS. LEONARD:

Q.    You've been handed what's been marked as Exhibit 243.  This is a chat called FEMA RIF that involves Karen Evans, Joe Guy, and Kara Voorhies. Do you see that on the top page -- the first page?

A.    Can I read this?

Q.    Sure.  But let me just ask, you were involved in this FEMA RIF Signal chat, correct?

A.    It says my name on it.

MR. HALL:  Just before we get into this one, I'm going to object.  Again, this is a

production from a non-party.  It's not a production from the government or from DHS or from FEMA.  This Signal chat appears to include substantial material that would be subject to the deliberative process privilege and potentially material subject to the presidential communications privilege.  We assert that objection and reserve all rights.

Go ahead.

MS. LEONARD:  Can you put the name of the high-ranking official at the agency that is -- that has reviewed and is asserting that privilege?

MR. HALL:  We are preserving the privilege today in the deposition.  We are doing exactly what we are required to do to assert the deliberative process privilege in this context.

MS. LEONARD:  Okay.  So you don't have the name of a high-ranking official that's reviewed and is asserting that privilege?

MR. HALL:  We are asserting the deliberative process privilege in the context as permitted to do so.

MS. LEONARD:  Okay.

THE DEPONENT:  Okay.

BY MS. LEONARD:

Q.    Okay.  So the dates of the communications

that are reflected in this FEMA RIF chat, they start on September 26th, 2025.  You see that?

A.   I can see that.

Q.   When you, Joe Guy, added Kara Voorhies to the group, right?

A.   Yes, I can see that.  It says that.

Q.   And then you are stating here that OMB was asking for RIF submissions by close of business today.  You see that?

A.   Yes.

Q.   You say, "We can be more aggressive here." Do you see that?

A.   Where did I say that?

Q.   Right underneath that.

A.   Okay.

Q.   And you were referring to an initial plan that Karen Evans was involved in, right?

MR. HALL:  Objection.  I reiterate my assertion of the deliberative process privilege. This Signal chat, again, produced by a non-party to this case, not by the government, not by defendants, again, appears to be subject to the deliberative process privilege.

If you can answer the question without -- if the witness can answer the question without

JOSEPH GUY                        May 15, 2026                           100
97408

disclosing information subject to the deliberative

process privilege or the presidential communications

privilege, go ahead and do so.

THE DEPONENT:  Yeah.  Sorry, what was the

question?

BY MS. LEONARD:

Q.   You were referring to an initial plan in

which Karen Evans was involved?

A.   I have no idea that that's true.

Q.   That's what you said here.

A.   Okay.

Q.   And turn to page 321, please.  You were

involved in the review of the FEMA RIF plan during

the shutdown, right?

A.   I don't remember.

Q.   You say, "I can review anytime this

morning."  Do you see that?

A.   I can see that I said that.

Q.   And then you talk about a broader decision

memo going to S1.  Do you see that?

A.   Yup, I can see that.

Q.   And Karen Evans is talking about a total

of 11,426 FEMA staff remaining after the FEMA RIF

during shutdown.  Do you see that?

MR. HALL:  Objection.  I'm going to

reiterate my prior objection on grounds of deliberative process privilege, if I can say that. This is obviously pre-decisional as no RIF occurred --

MS. LEONARD:  Counsel -- Counsel --

MR. HALL:  So I'm --

MS. LEONARD:  -- I'm going to ask that you do not testify --

MR. HALL:  I'm not testifying.

MS. LEONARD:  -- and assert facts and -- and -- and attempt to coach the witness.

MR. HALL:  I'm not coaching.

MS. LEONARD:  That is totally inappropriate.

MR. HALL:  I'm not coaching anybody.

MS. LEONARD:  That is totally inappropriate, Mr. Hall.

MR. HALL:  I am reiterating an objection. This is obviously pre-decisional.  It's subject to the deliberative process privilege.  The witness can answer if he can do so without disclosing information subject to that privilege.

BY MS. LEONARD:

**Q.    Let me explore the question.  Mr. Guy, you were involved in discussions of the FEMA RIF plan**

during the shutdown, correct?

A.   Discussions?

Q.   Yes.

A.   Yes, I was involved in discussions.

Q.   And you're aware that there was a decision-making process with respect to the FEMA RIF plan, correct?

A.   I'm also aware that they never went from a discussion into action.

Q.   How are you aware of that?

A.   Was -- are there 11,000 people at FEMA right now?

Q.   How are you aware that the plan was never agreed upon and sent over to OMB?  Are you aware of that?

A.   I'm sorry, what are you asking?

Q.   Was the plan agreed upon and sent over to OMB?

A.   I don't remember.

Q.   So you -- you -- you don't know?

A.   Even if a plan had gone from DHS to OMB, it still would've needed to be signed off on at OMB and effected, which did not happen.

Q.   OMB had approval authority for RIFs at the Department of Homeland Security, Mr. Guy?

A.   I don't know what I'm allowed to say and not say, so...

Q.   Do you -- do you know that the plan was sent over to OMB, Mr. Guy?

A.   I don't remember.

Q.   Okay.  But it might have been, right?

A.   I don't remember.

Q.   Okay.  And you know it was approved by Secretary Noem?

A.   I have no idea what plan was approved by Secretary Noem.

Q.   You were involved, weren't you?

A.   I was involved in very, very many different things.  It's difficult for me to remember a particular plan when I was involved with eight or nine different components that all had plans, and I was trying to move paper from one place to another. I didn't really pay very close attention to substance in a lot of cases.

Q.   And this is now the third incident that we have seen of plans to cut FEMA in half in late 2025, isn't it?  We've got the draft Council report that has a 50 percent cut.  We've got the FEMA staffing plan that has a 50 percent cut, and now a FEMA shut down RIF plan with a 50 percent cut.  Isn't that

right, Mr. Guy?

MR. GREAVES:  Objection.  Foundation.

THE DEPONENT:  I don't know.

BY MS. LEONARD:

Q.    Sounds right, doesn't it, Mr. Guy?

A.    You're saying that, not me.

Q.    You recall that the draft Council report had a 50 percent cut to FEMA in it, don't you?

A.    Not really.

Q.    You recall that the FEMA annual staffing plan had a 50 percent cut?

A.    Is this that -- is this what that's talking about?

Q.    And you recall that the FEMA RIF plan also had a 50 percent cut?

A.    I don't know what the difference is between all of those things, or even recall individually what they are.

Q.    11,500 people at FEMA was roughly half of the then current 23,000 FEMA staff, right?

A.    I don't know.

Q.    But you knew then when you were involved in these discussions, didn't you, Mr. Guy?

A.    I very likely didn't.

Q.    Okay.  You can set that aside.  In your

deposition last week -- last week, I think -- the last time we were here, I asked you about Wednesday meetings that you had with SOPDA Evans.  Do you recall that?

A.    I remember you asking me about that.

Q.    And then I showed you some of the notes from the meetings, including notes from Wednesday, December 31st.  Do you recall?

A.    I had a lot of meetings.  It is difficult for me to remember one meeting of probably 10 to 15 regular meetings that I would have on a weekly basis.

Q.    Okay.  Since we last met, defendants have found more of Ms. Evans' notes.  So I'm going to mark this as -- I'm going to ask you about specific pages.  This -- this is a -- this is a compilation of all of the December notes from Ms. Evans that they produced.  They are handwritten.  It is very hard to read.  But we will go to specific pages that I will ask you about.

A.    I would like to attempt to read it so that I have the context for what I'm being asked.

Q.    If you're going to read all of the December notes, we can go off the record to do that, but it's going to take too long.

MR. GREAVES:  I mean, I'm -- I'm not going to have him read documents off the record.  If you want to give him a specific page from her notes.

MS. LEONARD:  Okay.  We can do it that way.  I can pull it apart, and we can do specific pages rather than the entire thing.  That is fine.  Just give me one -- why don't we go off the record.  I'm going to dissemble (sic) these notes, and I'll be right back.

THE VIDEOGRAPHER:  Time is 11:34 a.m.  We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is 11:40 a.m. We are back on the record.

MS. LEONARD:  Okay.  Mr. Guy, last time we were here, we looked at some notes from Karen Evans from December 25th.  I'm going to show you -- I'm going to mark this excerpt as Exhibit 244, I believe --

THE REPORTER:  Exhibit 244 marked.

MS. LEONARD:  Actually, here's the other copy.

(WHEREUPON, Exhibit 244 was marked for identification.)

BY MS. LEONARD:

Q.    You've been handed an excerpt from Ms. Evans' handwritten notes.  This one is Bates number 425379.  And it is dated December 31st.  And we looked at these last time.  Do you recall that, Mr. Guy?

A.    I think so.

Q.    There's a discussion or there's a notation that says Joe, and I think it says 10:43 or 10:45 a.m.  I can't quite read her writing there.  You see that?

A.    I can see that.

Q.    And then there's a number here, number three, "Not going to approve the COREs."  You see that?

A.    I can see that.

Q.    And I asked you last time if you recall discussions of CORE employees at FEMA -- between FEMA and DHS leading up to this December 31st meeting, and you said vaguely.  Does that sound right?

A.    Yeah.  I don't really remember talking about COREs.  I don't think I was really that involved.

Q.    Okay.  Mr. Guy, could you look at Exhibit 220?  It's the FEMA Rapid Response chat that we

looked at previously.  You previously had -- it should be in front of you.  This is the one that you read through.

A.    Okay.

Q.    Okay.  Do you recall reading through this whole thing?

A.    Read a lot of things today.

Q.    Okay.  Well, we -- we all sat here while you read through this whole thing.  So I'm going to ask you to turn to page 148, which are messages starting on Friday, January 2nd.

A.    Okay.

Q.    So Tricia McLaughlin is sending a link to a CNN article, "DHS cutting FEMA disaster response staff."  Do you see that?

A.    I can see that.

Q.    And this is referring to information that had been leaked to the or provided to the press regarding the COREs that were being released by NTE dates starting in early January.  Do you recall that?

MR. GREAVES:  Object to foundation.

THE DEPONENT:  I'm sorry, do I recall what?

BY MS. LEONARD:

Q.    That COREs were being released by NTE date beginning in January 2026?

A.    What does "NTE" stand for?

Q.    Not to exceed.

A.    I don't know what that means.

Q.    Okay.  Do you recall that COREs were being separated from federal employment beginning in January of 2026?

A.    Vaguely.

Q.    Okay.  And you respond here, "These were contract employees who knew their terms were up. We're finally enforcing accountability."  You said that, right?

A.    Sounds like a messaging suggestion.

Q.    "We're finally enforcing accountability." You said that, right?

        MR. GREAVES:  Objection.  Asked and answered.

        THE DEPONENT:  Sounds like a messaging suggestion to Tricia.

BY MS. LEONARD:

Q.    You posted that, Mr. Guy, correct?

        MR. GREAVES:  Asked and answered.

        THE DEPONENT:  It says that I did.

BY MS. LEONARD:

JOSEPH GUY                    May 15, 2026                    110
97408

Q.    The "we" is DHS, correct?

A.    Maybe.

Q.    You are DHS, right?

A.    Maybe it could be DHS writ large, including all the components, DHS as a -- as a whole thing.

Q.    You were paying enough attention to the CORE separations as of January 2nd to make messaging suggestions, right?

A.    Maybe Karen had just called me or something, has often happened.

Q.    You posted this, right, Mr. Guy?

A.    Yeah.

        MR. GREAVES:   Asked and answered.

BY MS. LEONARD:

Q.    In fact, as of this time, you thought the COREs were just on a gravy train, didn't you, Mr. Guy?

A.    What does that mean?

Q.    You've never heard the term "gravy train" before?

A.    I just don't understand the question.

Q.    Sure.  And that the COREs were just a piggy bank?

A.    What?

Q.    Those terms that you've ever heard?

A.    I don't understand what you're asking me.

Q.    Okay.  Why don't you look as this chat continues, and if you look on page 151, you see at the top of the page here, there's a chat -- there's a post here that says, "Not because they care about taxpayer dollars, but because they're terrified of losing control of the gravy train.  A start on the narrative."  You respond, "I like it."  You see that?

A.    Yes, I can see that.

Q.    "Victoria Barton:  Basically, of course, they all want to protect their piggy bank."  You see that?

A.    I can see that.

Q.    At one point you also thought that you could blame the CORE terminations on the Democrats because of the government shutdown, didn't you, Mr. Guy?

A.    I have no idea.

MS. LEONARD:  Let's take a look.  We'll mark this as the next exhibit --

THE REPORTER:  Exhibit 245 marked.

MS. LEONARD:  -- 245.

THE DEPONENT:  Okay.

(WHEREUPON, Exhibit 245 was marked for identification.)

BY MS. LEONARD:

Q.   Okay.  So you look on the first page of the FEMA Rapid Response chat, and you see there's a message from you that says, "The only thing I would add for narrower distribution are specifics on what's happening to COREs and disaster response professionals due to the Dems shutdown."  You posted that, right?

A.   Says I did.

Q.   And that was on February 25th, 2025?

A.   That's what the date says.

Q.   You know that the CORE separations were not caused by the government shutdown, don't you, Mr. Guy?

A.   I have no idea.

Q.   You know that CORE employees were funded by the Disaster Relief Fund?

A.   This seems like a suggestion.  I don't know what else to tell you.  I don't particularly remember this.

Q.   Just a suggestion to blame what's happening in the COREs and the disaster response professionals on the Democrats?

A.    I don't know.

Q.    That's what it says, right?

MR. GREAVES:  Objection.  Asked and answered.

THE DEPONENT:  That's what it says.

MS. LEONARD:  Okay.  Let's look at some additional notes from Ms. Evans regarding discussions involving the CORE.  Try to do this as correctly as possible.  We'll get a stapler to put these together.  Oh, here we go.  We can mark this as the next, and the beginning Bates number of this is 320.  We mark this as Exhibit 246.

MR. GREAVES:  Which part is first?

MS. LEONARD:  I'm going to keep them in Bates order.  This is the way they were produced to us.  So it's -- we're working with what we have.

THE REPORTER:  Exhibit 246 marked.

(WHEREUPON, Exhibit 246 was marked for identification.)

BY MS. LEONARD:

Q.    So we'll start with the Bates -- the Bates number I said was, I believe, was 320.

A.    Okay.

Q.    And it is the first of the notes on December 2nd that we received.  And it's -- you take

your time, if you want to take a look.  I'm going to

ask you about something that appears on page 321.

A.    Okay.

Q.    Okay.  Do you -- were you aware or

involved -- well, let me ask it this way.  Sorry.

Were you involved in meetings between Karen Evans

and S2 in early December?

A.    Was S2 there in early December?

Q.    Yes.

A.    A lot of those, to be honest, I did not go

to.  I know S2 had a standing meeting every day that

I maybe went to twice.  I know Karen liked to go.

So I suppose it's possible that I attended a

meeting, but I don't recall.

Q.    Okay.  And if you look at the first page,

320 of this, the first Bates number page is the one

that's got a lot of -- at the very top, there's a --

there's an S2 notation.  You see that?  Above the

redaction.

A.    S2.  What does that say?

Q.    Good as -- your guess is as good as mine

on that one, but you see the S2, right?

A.    I see S2.

Q.    Okay.  And then if you turn the page, her

notes continue and there's a -- a notation "Do-

outs."  You see that?

A.   Yes.

Q.   And you see number three it says, "Updated staff plans," and then it says "Minimize something CORE."  You see that?

A.   Yes.

Q.   And then number four says "Memo S1 Jeff." Do you see that?

A.   Yes.

Q.   Were you -- do you -- does this refresh your recollection at all whether you -- or not you were involved in a meeting with S2 and Karen Evans?

A.   No.

Q.   Does this refresh your recollection at all whether or not you were involved in a conversation on December 2nd with Karen Evans about the CORE?

A.   No.

Q.   Okay.  Do you know what S1 memo she's talking about there?

A.   I could not even begin to guess.  There were a lot of memos.

Q.   Okay.  If you look at the -- do you have 322 there?

A.   Yes.

Q.   Notes continue.  We've got another note --

you said there was a daily S2 meeting, is that right?

A.   As far as I remember, he had morning meetings.  Maybe it wasn't every day, but I seem to recall that it was at least fairly often.

Q.   Okay.  And then here there's a notation that says something like, "Madison, all the CORE document."  You see that?

A.   I can see that.

Q.   And then on the side it says -- I read this to say "Clark, perhaps, and Joe Guy, before we send the document."  You see that?

A.   I can see that.

Q.   Is that -- do you think that's Clark or is it another name?

A.   I think it looks closest to Clark, but to be honest, I -- I don't -- couldn't tell you.

Q.   Did you work with a Clark?

A.   Yes.

Q.   Who was Clark?

A.   Clark was S2's chief of staff.

Q.   Okay.  So, "Clark/Joe Guy, before we send the document," does this refresh your recollection that there was -- you were involved in conversations with Ms. Evans about the CORE and documents

pertaining to the CORE in early December?

A.    No.

Q.    Okay.  Do you know what document she was talking about sending to you and Clark?

A.    I have no idea.

Q.    Do you recall receiving any documents regarding CORE employees from Ms. Evans in early December?

A.    No.  The only documents I remember receiving from Karen Evans on COREs were her sending me approval requests.

Q.    Do you recall seeing the FEMA staffing plan --

A.    No.

Q.    -- that Karen Evans sent to DHS leadership on December 4th --

A.    No.

Q.    -- two days after this notation about the document that she needs to send to Clark and Joe Guy?

A.    Nope.  I do not remember.

Q.    But it's possible she sent you that, right?

A.    I suppose it's possible.

Q.    And then there's a further notation down,

"S2/Jimmy, 9:30, with Kara, Madison and Joe," do you see that?

A.   Yeah.  I'm trying to imagine who Madison would be in this context.

Q.   Well, you anticipated my next question. So you -- you don't remember who Madison would be?

A.   There was a Madison Sheahan who was, for a time, the deputy director of ICE.

Q.   Jimmy is an attorney.  Is that right?

A.   I am assuming that that's Jimmy Percival.

Q.   Who was one of the counsel for DHS?

A.   He is the general counsel.

Q.   Okay.  Do you have any recollection of participating in this meeting?

A.   No.

MS. LEONARD:  Okay.  Let's mark another one as Exhibit 246.

MR. HALL:  I think it should be Exhibit 247.

THE REPORTER:  Exhibit 247.

MS. LEONARD:  Thank you.  Exhibit 247.

MR. HALL:  I only say that because I'm looking at Exhibit 246 --

MS. LEONARD:  It's -- it's too -- it's tough to keep track.  Thank you.

THE REPORTER:  Exhibit 247 marked.

(WHEREUPON, Exhibit 247 was marked for identification.)

BY MS. LEONARD:

**Q.    Mr. Guy, you've been handed Exhibit 247. This is the cover sheet of Ms. Evans' 2020 -- December 2025 notes.  We had not received an unredacted version of this at the time of your prior deposition.  I can represent to you that we received this after.  And if you look at the bottom --**

A.    Can I just interrupt for one second?

**Q.    Sure.**

A.    I'm remembering something.  If this meeting had S2, Jimmy, Kara, Madison, and myself, it very likely would've been talking about something to do with detention space.

**Q.    Not FEMA?**

A.    You know, in some -- in -- in some sort of roundabout way, it could have had something to do with FEMA just because of the way funding worked. But I don't imagine that with that group of people it would've had anything to do with COREs.

**Q.    Thank you for that clarification.  If you look at what you have in front of you, the -- the index to Ms. Evans notes, you see the 29th?**

A.   Yes.

Q.   And 30th?

A.   Yes.

Q.   So her notes indicate that she had calls with you, Joe Guy, on December 29th and December 30th.  Do you see that?

A.   She wanted to call me on my birthday.  Yes, I can see that.

Q.   Is one of those dates your birthday?

A.   The 29th is my birthday.

Q.   Okay.  Ms. Evans' notes indicates that she had calls with you on December 29th and December 30th, and we've already seen that you had a meeting with her on December 31st, correct?

MR. GREAVES:  Object to foundation.

THE DEPONENT:  So I don't know if this was -- and I wouldn't imagine that any of this would've been planned on my part if this is her notes for what she should be doing.

BY MS. LEONARD:

Q.   Do you have any reason to believe that you didn't have -- do you have any reason to believe that you did not have calls with Ms. Evans on December 29th and 30th?

A.   I don't know.  I don't remember.

Q.   Okay.  I'm going to look at one more page of these notes.  Actually, that's okay.  You can set that -- you can set that aside.  Do you recall that on December 18th, 2025, there was a FEMA briefing for S1?

A.   No.  Was there a disaster declaration meeting somewhere around that time?

Q.   Do you recall that there was a FEMA briefing for S1 on December 19th?

A.   Maybe vaguely.

Q.   And were you at that briefing?

A.   I don't know.  I think it depends on what it -- when it -- when it was.  I do somewhat vaguely remember that there was a disaster declaration meeting somewhere around that time.  And that's really the only time that S1 got together with anyone from FEMA in a group, was to prepare for disaster declaration meetings with the president.

Q.   Do you have any recollection of whether CORE separations were discussed at that meeting?

A.   No, I don't -- again, I don't think that S1 ever really discussed it.

Q.   You don't think?

A.   No, I don't think so.  I don't remember discussing it with her.  I don't think she ever

JOSEPH GUY                         May 15, 2026                              122
97408

discussed it with Karen.  Meetings with S1 were not the sort of thing where you sat down and you rifled through a bunch of different things.  They had an agenda, and you were there for the amount of time you were there, and then you were out.

And if I remember correctly, which I think I do in this case, this was a -- a meeting about disaster declarations, which we had to have with the president.  I don't know if it was the next day, maybe two days later, but it was prepped for that, which is really the only time she ever got in a room with these people.

Q.   And just prior to that meeting with S1, FEMA was sending all kinds of information about COREs by NTE date over to DHS.  Do you recall that?

A.   No.

Q.   Including you discussing the CORE issue with Ms. Evans, do you recall that?

A.   I think a lot of the times those were one-way discussions.  I remember her saying things about COREs.  I don't remember being very engaged.

Q.   Do you recall that on December 19th, you and Roland Edwards had a meeting with Ms. Evans right before the S1 briefing at which you discussed COREs?

MR. GREAVES:  Objection.  Foundation.  Mischaracterization of testimony.

THE DEPONENT:  Again, I don't recall ever discussing COREs with S1 ever, really.  And if we did, I -- there's probably a way that you can figure out what that meeting with S1 is about because I'm 99 percent sure it would've been about disaster declarations, and no, I don't remember meeting with Roland.

BY MS. LEONARD:

Q.    Okay.  But right before the meeting with S1, which was at 12:30, on December 19th, you had a meeting with Karen Evans at 10:59 a.m. and Roland Edwards to talk about the CORE.  Do you recall that?

MR. GREAVES:  Objection to form.  Foundation.

THE DEPONENT:  No, I don't remember talking to Roland about COREs ever.

BY MS. LEONARD:

Q.    So it's possible that you did have that conversation, you just don't remember?

A.    I think it's highly unlikely.

Q.    Okay.  If Ms. Evans' notes indicate that you were talking about mission critical occupations and priority mission critical occupations with

respect to the CORE on December 19th, does that ring any bells?

A.    No.

Q.    You just don't remember having that meeting, right?

A.    Sometimes I sat in on meetings because someone wanted me in a meeting and didn't really pay too close attention to what was going on.  It could have been a case like that, or I don't -- I don't remember talking to Roland about COREs.

Q.    You just don't remember.  Let's look at information that was being provided from FEMA to DHS right before this meeting.  Here's what's been previously marked as Exhibit 27.  This is dated December 18th, 2025, 5:30.  This is information that Karen Evans was providing to, among other people, Kara Voorhies, who was the senior advisor to DHS working on FEMA, correct?

A.    Yes.  Can I read this?

Q.    Sure.  I'm not going to ask you any questions other than the date and time and who got it.

A.    Okay.  But I got -- I don't know what it's about.

Q.    Sure.

THE REPORTER:  Is this being submitted as an exhibit?

MS. LEONARD:  Previously.

THE REPORTER:  Previously.  Okay.

THE DEPONENT:  Okay.

BY MS. LEONARD:

Q.    Kara Voorhies was the senior advisor to the secretary working on FEMA, correct?

A.    I think that's her title.

Q.    And this is information that was being provided by Karen Evans to Kara Voorhies on December 18th, at 5:30 p.m., correct?

A.    Yeah, that's what it says.

Q.    Okay.  Let's look at another one.  This has previously been marked as Exhibit 45.  So additional information being sent by Karen Evans to Roland Edwards at DHS regarding the COREs at -- well, let me know when you're ready.

A.    Thank you.  Okay.

Q.    So what's the date and time on that one?

A.    It says December 19th, 2025, 11:20 a.m.

Q.    11:20 a.m.?

A.    Yes.

Q.    Okay.  Let's take a look at a final one.  This has previously been marked as Exhibit 46.

A.    Okay.

Q.    And what's the date and time on that one?

A.    December 19th, 2025, at 11:29 a.m.

MS. LEONARD:  Okay.  Let's mark this as the next exhibit.

THE REPORTER:  Exhibit 248 marked.

(WHEREUPON, Exhibit 248 was marked for identification.)

BY MS. LEONARD:

Q.    Exhibit 248 is a page from Karen Evans' notes.  It's Bates number ending 363.  It's notes from Friday, December 19th, the same day as those emails we were just looking at.  And do you see there's a reference to you here?

A.    "Joe Guy, agreement, January 31st, 2026, duty station" --

Q.    And "Roland, DHS."  Do you see that right below?

A.    "Got with at least two years."

Q.    Do you see there's a reference to "MCO-089"?

A.    Yes, I don't know what that is.

Q.    Do you know that that's mission critical occupation and that's the code for the CORE employees who have a mission critical occupation,

089.  Did you know that?

A.    No.

Q.    Do you recall discussing that with Ms. Evans on December 19th?

A.    No.

Q.    Do you know whether you did or not or you just don't remember?

A.    I don't think I did --

Q.    Okay.  And then you --

A.    It could have been that she put me on a meeting or scheduled me on a meeting with Roland.  I don't -- I do not remember discussing this with Roland.

Q.    And there's a -- there's a indication here, "No new" right next to the MCO.  Do you see that?

A.    Yes.

Q.    Remember discussing no new COREs with Ms. Evans on December 19th?

A.    I don't remember.

Q.    Remember discussing that right before an S1 briefing on FEMA, Mr. Guy?

A.    I think it would be very easy to see what that briefing with S1 was about.  If it was on her calendar, she would've had a whole briefing book

about it.

Q.   And do you recall discussing no new COREs with Ms. Evans on Friday, December 2025, right before an S1 briefing, Mr. Guy?

A.   No.

MR. GREAVES:  Objection.  Asked and answered.

THE DEPONENT:  I don't -- I don't remember.

MS. LEONARD:  Okay.  Let's mark this as the next.

THE REPORTER:  Exhibit 249 marked.

(WHEREUPON, Exhibit 249 was marked for identification.)

BY MS. LEONARD:

Q.   Okay.  Exhibit 249, this is Ms. Evans' calendar from December 19th.  Do you see the notation for FEMA briefing S1's office?

A.   Mm-hmm.

Q.   What time was that meeting, Mr. Guy?

A.   12:30.

Q.   12:30 p.m.?

A.   That's what it says.

Q.   After your meeting with Ms. Evans on December 19th, correct?

JOSEPH GUY                     May 15, 2026                              129
97408

MR. GREAVES:  Objection to foundation.

THE DEPONENT:  That's what it says.

That's the narrative being built.

BY MS. LEONARD:

**Q.    And after the emails where Karen Evans is**

**sending information to DHS about the COREs and NTE**

**dates, correct?**

MR. GREAVES:  Objection.  Form.

Foundation.

THE DEPONENT:  Yes.

MS. LEONARD:  Okay.  We are going to take

a break and I'll see if I have anything else.

MR. GREAVES:  Okay.

MS. LEONARD:  Okay.  And I believe we have

received your --

MR. GREAVES:  Yes.

MS. LEONARD:  -- your email by this point.

Thanks.

THE VIDEOGRAPHER:  The time is 12:15 p.m.

We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is 12:22 p.m.

We are back on the record.

MS. LEONARD:  I can confirm that

plaintiffs have no further questions for Mr. Guy.

MR. GREAVES:  I have no follow-up questions.

MR. HALL:  No questions from the government.

MS. LEONARD:  Okay.  Are we ready to go off the record?

THE REPORTER:  Prior to going off the record, I do have to follow up.  Attorney Leonard, would you like to order the original transcript?

MS. LEONARD:  Yeah, we -- we can talk about -- we can talk about this off the record and the -- the -- the company will -- staff will communicate with you guys.  Okay?

THE REPORTER:  Okay.

MR. GREAVES:  And he'll read and sign.

MS. LEONARD:  Yeah.  We'll --

THE REPORTER:  Read and sign?  Okay.

MS. LEONARD:  As always.  Yeah.

THE REPORTER:  All right.  Attorney Hall, if they order the original transcript, would you like to have a copy -- would you like to order a copy?

MR. HALL:  Yes.  Yes.

MS. LEONARD:  I mean, I believe the answer's yes, but we'll -- we'll -- we can deal with

these logistics.

THE REPORTER:  Well, they always ask me to have them on record.

MS. LEONARD:  Oh, okay.  That's fine.

THE REPORTER:  Attorney Fleischman, would you like to order a copy?

MR. FLEISCHMAN:  No.

THE REPORTER:  All right.

MR. HALL:  Yeah, we'll -- we'll handle -- DOJ will handle any orders for the government.

THE REPORTER:  Okay.  Understood.

THE VIDEOGRAPHER:  Is this the same for the video also?

MS. LEONARD:  Yes.  And we'll be in touch regarding the details.

THE VIDEOGRAPHER:  Okay.

MS. LEONARD:  Great.

THE VIDEOGRAPHER:  The time is 12:23 p.m. We are off the record.

(WHEREUPON, the deposition of JOSEPH GUY was concluded at 12:23 p.m.)

JOSEPH GUY                        May 15, 2026                        132
97408

CERTIFICATE

     I, the undersigned Maurice Jackson, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the videorecording of the deposition of Joseph Guy, in the above captioned matter on the 15th day of May, 2026 taken at the location of 1445 New York Avenue NW in Washington, DC 20005.

     No alterations, additions, or deletions were made thereto.

     I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

*MAURICE JACKSON*

                    Maurice Jackson

CERTIFICATE

I, Sheila Hidalgo, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 22nd day of May, 2026.

Sheila Hidalgo

Date:        05/15/2026         Assignment #: 97408

Deponent:  Joseph Guy

Case:        AFGE; AFL-CIO, et al vs. Trump, et al.

DEPONENT:

It has been requested that your read and sign your transcript. This is to be read only by you.  Please make any corrections necessary on the Correction Sheet ONLY.  You are to sign the Correction Sheet ONLY, and ONLY where indicated. After signing the Correction Sheet, do the following:

1. The ORIGINAL executed Correction Sheet needs to be returned to our corporation.

2. Forward a COPY of the executed Correction Sheet directly to the attorney(s) listed below. (The address(es) can be found on the Appearance Page of your deposition.)

3. Retain a copy for your records.

CC:  Naegeli Deposition and Trial
     Tsuki Hoshijima, Esquire
     Christopher Hall, Esquire

JOSEPH GUY                     May 15, 2026                          135
97408

CORRECTION SHEET

Deposition of: Joseph Guy          Date: 05/15/2026

Regarding: AFGE; AFL-CIO, et al vs. Trump, et al.

Reporter: Hidalgo/Adoyo

_____

Please make all corrections, changes or

clarifications to your testimony on this sheet,

showing page and line number.  If there are no

changes, write "none" across the page.  Sign this

sheet on the line provided.

Page   Line   Reason for Change

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

          Signature: _____

                    Joseph Guy

Email to: Production@NaegeliUSA.com

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

JOSEPH GUY                      May 15, 2026                      136
97408

DECLARATION

Deposition of: Joseph Guy     Date: 05/15/2026

Regarding: AFGE, AFL-CIO, et al. vs DONALD TRUMP, et al.

Reporter:  Sheila Hidalgo

_____

I declare under penalty of perjury the following to be

true:

I have read my deposition and the same is true and

accurate save and except for any corrections as made

by me on the Correction Sheet herein.

Signed at _____, _____

on the _____ day of _____, 20____.

                    Signature: _____

                              Joseph Guy

Email to: Production@NaegeliUSA.com

## Exhibits

**EX200 JOE GUY TEXT MESSAGE** 18:7,8,9,10,17 20:8 23:10 24:23

**EX201 DISCOVERY DISPUTES** 22:9,10,11,14

**EX202 SAFETY NUMBER SUPPORT** 23:21,22,23

**EX203 MOUNT WEATHER MESSAGE** 26:2,3

**EX204 JOE GUY CALLS** 25:25 26:1 30:20,21,22

**EX205 FEMA 2.0 TEXT CHAIN** 35:1,2,3

**EX206 FEMA RAPID RESPONSE TEXTS** 44:18,19,20 47:23

**EX207 DISASTER RESPONSE TEXTS** 48:6,7,8,12

**EX208 MS FEMA TRIP TEXTS** 48:25 49:1,2

**EX209 CAEO TEXTS** 49:13,14,15

**EX210 BILOXI TEXTS** 50:1,2,3

**EX211 CONTRACT EGRE. TEXTS** 50:11,12,13,16

**EX212 KAREN G REGG TEXTS** 50:23,24,25

**EX213 KAREN G REGG TEXTS 2** 51:13,14,15

**EX214 DISASTER RESPONSE TEXTS 2** 51:25 52:2,3

**EX215 WINTER STORM TEAM TEXTS** 52:11,12,13

**EX216 FEMA ORR TEXTS** 53:4,5,6

**EX217 DHS TEAM TEXTS** 53:15,16, 17,18

**EX218 FEMA ESEC TEXTS** 54:3,4,5

**EX219 FEMA HQ TEXTS** 54:14,15, 16 56:5

**EX220 FEMA RAPID RES. TEXTS** 54:25 55:2,3 87:11 107:24,25

**EX221 FEMA SANITY CLUB TEXTS** 55:10,11,12,15 56:12

**EX222 JOE GUY TEXTS 2** 56:13, 14,16,17

**EX223 JOE GUY TEXTS 3** 57:1,2,3, 7

**EX224 KAREN G REGG TEXTS 3** 59:18,19,20,23

**EX225 KAREN G REGG TEXTS 4** 61:1,2,3

**EX226 KAREN G REGG TEXTS 5** 61:24,25 62:1

**EX227 KAREN G REGG TEXTS 6** 62:17,18,19

**EX228 KARA VOORHIS TEXT** 63:17,18,19

**EX229 JOE GUY TEXTS 4** 64:19, 20,21,22,25

**EX230 FEMA SANITY CLUB TEXTS 2** 67:2,3,4

**EX231 JOE GUY TEXTS 5** 67:23, 24,25

**EX232 COREY LEWAND TEXTS** 69:8,9,10

**EX233 FEMA SANITY CLUB TEXTS 3** 70:9,10,11

**EX234 SHORT MESSAGE REPORT** 72:3,4,5

**EX235 JOE GUY TEXTS 6** 73:18, 19,20,21

**EX236 DR ACTION GROUP** 76:24, 25 77:1,2

**EX237 JOE GUY TEXTS 7** 78:6,7,8

**EX238 TEXTS** 81:6,7,8

**EX239 A K J TEXTS** 83:1,2,4,7

**EX240 FEMA HQ TEXTS 2** 86:3,4,5, 8

**EX241 JOE GUY TEXTS 8** 89:6,7,8, 11

**EX242 JOE GUY TEXTS 9** 92:6,7,8 96:24

**EX243 FEMA RIF TEXTS** 97:11,12, 13,17

**EX244 DAILY NOTES** 106:18,20,23

**EX245 FEMA RAPID RESPONSE TEXTS** 111:23 112:1

**EX246 DAILY NOTES 2** 113:12,17, 18 118:17,23

**EX247 DAILY NOTES 3** 118:18,19, 20,21 119:1,2,5

**EX248 DAILY NOTES 4** 126:6,7,10

**EX249 DAILY NOTES 5** 128:12,13, 16

### 0

**089** 126:21 127:1

**1**

**10**  105:10

**100**  45:25

**10:01**  57:17

**10:07**  57:20

**10:08**  58:19

**10:12**  58:21

**10:43**  107:8

**10:45**  107:8

**10:59**  123:13

**10th**  27:8,12 37:25 48:20,21

**11,000**  102:11

**11,426**  100:23

**11,500**  104:19

**11:15**  96:16

**11:20**  125:21,22

**11:21**  96:19

**11:29**  126:3

**11:34**  106:10

**11:40**  106:13

**11th**  36:12,17,21 37:1 38:9,11

**12:15**  129:19

**12:22**  129:22

**12:23**  131:18

**12:30**  123:12 128:21,22

**146**  87:16,17,19

**148**  108:10

**149**  18:15

**15**  105:10

**150**  85:13

**151**  111:4

**15th**  35:17,20 36:1,9 37:25 40:5 89:13,14

**16th**  38:15

**18th**  121:4 124:15 125:12

**19th**  121:9 122:22 123:12 124:1 125:21 126:3,12 127:4,19 128:17, 25

**1st**  22:15 23:13 24:18 25:16 27:21 31:12 37:9 40:10 58:9,14 86:11 87:20

**2**

**2.0**  34:25 35:7,12 39:13,22 40:25 41:17,24 42:7 43:5,17 59:2 65:1,22

**20-**  93:6 94:6 95:15

**20-page**  95:13

**200**  18:7,8,9,10, 17 20:8 23:10 24:23

**201**  22:9,10,11,14

**202**  23:21,22,23

**2020**  119:6

**2025**  36:9 40:10, 14,19,23 41:3,7,

**12**  74:2,6 75:22 77:8,24 78:2 83:17 89:14 91:3, 4 92:14,19 96:24 99:2 103:21 112:12 119:7 121:4 124:15 125:21 126:3 128:3

**2026**  22:15 109:2, 8 126:15

**203**  26:1,2,3

**204**  26:1 30:20, 21,22

**205**  35:1,2,3

**206**  44:18,19,20 47:23

**207**  48:6,7,8,12

**208**  48:25 49:1,2

**209**  49:13,14,15

**210**  50:1,2,3

**211**  50:11,12,13, 16

**212**  50:23,24,25

**213**  51:13,14,15

**214**  51:25 52:2,3

**215**  52:11,12,13

**216**  53:4,5,6

**217**  53:16,17,18

**218**  54:3,4,5

**219**  54:14,15,16 56:5

**220**  54:25 55:2,3 87:11 107:25

**221**  55:10,11,12, 15 56:12

**222**  56:13,14,16, 17

**223**  57:1,2,3,7

**224**  59:18,19,20, 23

**225**  61:1,2,3

**226**  61:24,25 62:1

**227**  62:17,18,19

**228**  63:17,18,19

**229**  64:20,21,22, 25

**23,000**  104:20

**230**  67:2,3,4

**231**  67:23,24,25

**232**  69:8,9,10

**233**  70:9,10,11

**234**  72:3,4,5

**235**  73:19,20,21

**236**  76:25 77:1,2

**237**  78:6,7,8

**238**  81:6,7,8

**239**  83:1,2,4,7

**23rd**  31:20

**240**  86:3,4,5,8

**241**  89:6,7,8,11

**242**  92:6,7,8 96:24

**243**  97:11,12,13, 17

**244**  106:18,20,23

**245**  111:23,24 112:1

**246**  113:12,17,18

118:17,23

**247** 118:19,20,21
119:1,2,5

**248** 126:6,7,10

**249** 128:12,13,16

**25th** 83:17 106:17
112:12

**26th** 99:2

**27** 124:14

**28th** 18:1 19:5,15,
18,22 20:25
31:24 34:1,19

**29th** 32:13,17
34:6 119:25
120:5,10,12,24

**2:28** 34:23

**2nd** 108:11 110:8
113:25 115:16

---

**3**

**3** 83:1

**30th** 19:19 21:20
22:1 24:24 25:14
28:14,16 58:5,14
120:2,6,13,24

**312** 52:20,21

**31st** 105:8 107:3,
18 120:14 126:15

**320** 113:12,22
114:16

**321** 100:12 114:2

**322** 115:23

**326** 71:8

**328** 71:19

**363** 126:11

---

**4**

**400** 89:22

**425379** 107:3

**45** 125:15

**46** 125:25

**4:00** 64:5

**4th** 10:18 12:22
13:6,9 21:5 77:8
117:16

---

**5**

**50** 96:12 97:8
103:23,24,25
104:8,11,15

**5:00** 64:4

**5:30** 124:15
125:12

**5th** 13:11 31:10
65:4 92:14,16,19
96:24

---

**9**

**99** 123:7

**9:05** 9:7

**9:30** 118:1

**9th** 38:19,21

---

**A**

**a.m.** 9:7 57:17,20
58:19,21 96:17,
19 106:10,13
107:9 123:13

125:21,22 126:3

**abeyance** 60:6,14

**absolutely** 25:19
33:24

**acceptable** 12:4

**accountability**
109:12,15

**accurate** 14:20

**Act** 65:25

**acting** 87:5

**action** 77:6 102:9

**actions** 83:20

**activities** 68:10,
25

**ad** 75:1 79:21

**add** 112:7

**added** 27:8,11
35:14,25 48:19,
20,21 99:4

**additional** 113:7
125:16

**address** 10:18

**administration's**
84:16

**administrative**
28:19 85:1

**advance** 46:17

**advised** 18:14

**advisor** 66:25
124:17 125:7

**advisory** 24:13

**affairs** 87:25

**affects** 39:5

**affirm** 9:10

**affirmed** 10:13

**agency** 88:4 97:8
98:10

**agenda** 74:14
76:16 122:4

**agenda's** 74:19

**agendas** 74:23,25

**aggressive** 99:11

**agree** 45:25

**agreed** 46:14
102:14,17

**agreement**
126:15

**agreements**
11:23

**ahead** 19:11
57:25 63:10
67:17 75:12
87:16 94:14 98:8
100:3

**alert** 24:10 27:17,
25

**allowed** 103:1

**Altshuler** 9:25
10:2

**amount** 122:4

**and/or** 95:20

**annual** 41:4
104:10

**answer's** 130:25

**Anthony** 77:11

**anticipated** 118:5

**anytime** 100:16

**apologize** 18:12

**app** 21:14

**app's** 25:13

**appears** 81:13 86:14 92:14 93:14 98:3 99:22 114:2

**applicability** 96:3

**application** 15:16,20 22:24 24:21 30:11

**applications** 25:16 29:25

**approval** 102:24 117:11

**approve** 107:13

**approved** 103:8, 10

**approximately** 89:13 91:3

**April** 18:1 19:5, 15,18,19,22 20:24 21:19,25 24:24 25:14 28:14,16 31:20, 24 32:13,17 34:1, 6,19 38:21

**arrangement** 11:7

**article** 24:5 83:19, 24 84:3,4 88:2 108:14

**ASAP** 63:4

**assert** 98:6,14 101:10

**asserting** 95:6 98:11,18,19

**assertion** 99:19

**assigned** 80:5

**assistant** 87:24

**assistants** 80:19

**Associate** 80:7, 10

**assume** 90:18

**assuming** 118:10

**attempt** 101:11 105:21

**attended** 114:13

**attention** 103:18 110:7 124:8

**attorney** 9:15 118:9 130:8,19 131:5

**attorney-** 56:6 86:15

**attorney-client** 55:24

**August** 83:17

**authority** 41:9 42:8,10,12,14,18 85:12 102:24

**auto-** 16:19 20:12,17 37:19 38:5

**auto-delete** 17:23 20:3,10,23 32:7 38:1,24 39:17,21 65:7

**aware** 11:8 13:19 16:13 21:19 40:17 96:25 97:4 102:5,8,10,13,14 114:4

**Awareness** 53:9

---

**B**

**back** 13:17 22:16 23:6 25:13 57:21 58:5,9,22 65:6 76:15 96:20 106:9,14 129:23

**backups** 26:9 48:11 49:22 50:17 51:4 57:8

**bank** 110:24 111:13

**banter** 39:23,24, 25 43:17 59:13 60:21,24 61:18, 21

**Barton** 111:12

**based** 71:14

**Basically** 111:12

**basing** 43:1

**basis** 75:1 105:12

**Bates** 18:23 26:8 52:20 89:22 107:2 113:11,15, 21 114:16 126:11

**began** 40:5,9

**begin** 115:20

**beginning** 51:5 109:2,7 113:11

**begins** 92:14

**behalf** 10:5

**bells** 124:2

**belong** 95:6

**Berzon** 9:25 10:2

**Biloxi** 50:6

**Binnall** 10:4

**birthday** 120:7,9, 10

**blame** 111:17 112:23

**blowing** 81:20

**book** 127:25

**bottom** 18:23 26:8 31:2 32:25 52:20 64:1,3 119:10

**break** 17:6 57:14 58:24 96:11 129:12

**briefing** 62:24 63:4 80:25 121:4, 9,11 122:24 127:22,24,25 128:4,18

**broader** 100:19

**brought** 79:5

**Bryant** 96:8

**Budget** 78:24

**bugging** 37:22

**built** 129:3

**bunch** 122:3

**business** 99:8

---

**C**

**CA** 49:18

**calendar** 127:25 128:17

**call** 13:15,17 15:24 16:5,6,13, 15,16 31:4,25 32:3,14,15,18,19

**NAEGELI**
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

33:2,15,22,25 34:2,7,8,14 51:6 71:18 78:16 79:4,8,17,19 86:3 93:3 120:7

**called** 13:11 34:22 35:7 40:25 49:6,18 50:6,18 51:4 52:16 53:9,21 54:8 55:15 67:7 77:5 80:7 82:17 83:8 97:17 110:10

**calling** 13:14

**calls** 15:14,19 16:3 31:21 80:2 120:4,12,23

**care** 111:6

**case** 11:22 93:2 99:21 122:7 124:9

**cases** 103:19

**caused** 112:15

**center** 24:2,3 69:15

**cetera** 74:15 83:21

**chance** 33:18 47:15 87:17

**change** 24:10 28:23 29:20 39:1,5

**changed** 10:17,20 16:19 17:23 20:3,9,12,17,23 23:13,18 24:7,24 25:10,13 27:18 28:1 29:7,16 32:6 36:13,20

**changing** 37:8

**channels** 41:23

**characterization** 84:2

**characterize** 44:2

**characterizing** 47:14

**chat** 14:23 15:1,9,10,22 16:20 17:5,24 18:24 19:23 20:4,24 21:8,9 23:11 26:9,17,20,25 28:22 31:1,2 33:8 35:7,19 36:10 37:13,16 38:2,4,5 39:10,20,22 40:5 41:17,24 42:7,20 43:6,17 47:23 48:11,14 49:5,9,21,23 50:8,17,20 51:3,7,8,19,25 52:8,17 53:1,12,24 54:12,21 56:22,23 57:7,10 58:8 59:4,24 60:4 61:14 62:5 63:24 65:1,23 67:7 68:3 70:20 72:8 74:5 78:11 81:12 83:8,11,23 86:9 87:12 89:12 92:12 93:14 97:17,22 98:3 99:1,20 107:25 111:3,5 112:5

**chats** 20:10,13,18 25:6,9 29:24 39:16 44:16 45:22 47:2,8 58:13 59:13,17 60:24 61:22

72:14 73:2

**checked** 91:7

**checking** 89:1

**chief** 11:11 28:8,9 64:4,5 66:25 78:23 116:21

**choices** 46:20

**choose** 16:10

**Christopher** 10:6

**circumstances** 10:21

**clarification** 119:23

**Clark** 116:11,14,16,18,20,21 117:4,19

**Clark/joe** 116:22

**clear** 70:23 74:18 75:8

**cleared** 60:3 75:9,14

**client** 45:18 56:7 86:16

**clock** 38:6

**close** 99:8 103:18 124:8

**closest** 116:16

**Club** 55:15,20 67:8 70:15,20

**clue** 77:15

**CNN** 88:1 108:14

**coach** 101:11

**coaching** 101:12,15

**code** 126:24

**coincidence** 29:6,14

**commentary** 80:22

**common** 23:16 24:12

**communicate** 43:25 72:21 130:13

**communicated** 73:12,14 79:1

**communicating** 73:11

**communication** 72:18

**communications** 15:2,10 17:15 43:21 98:6,25 100:2

**company** 130:12

**compilation** 105:16

**complaining** 84:18

**completeness** 51:12 61:13 75:17 84:2

**components** 40:16 84:18 103:16 110:5

**concluded** 12:8

**conducted** 43:20

**confidential** 10:25 11:22 12:4,7

**confidentiality** 11:23

**confirm** 129:24

**conflict** 78:17

**consecutive** 18:5

**consistent** 68:20

**consulting** 11:2 12:2

**contact** 24:14

**contained** 41:18, 25 42:7,11,20 43:6,9

**content** 45:11,12, 20,24 59:17 64:25

**contents** 61:15

**context** 45:2,16 67:19 70:3 98:15, 20 105:22 118:4

**continue** 41:9 114:25 115:25

**continued** 12:11

**continues** 111:4

**contract** 50:18 109:11

**contractor** 82:1, 10

**contracts** 76:10, 12

**control** 111:8

**conversation** 12:3 115:15 123:21

**conversations** 12:16 116:24

**conveying** 65:20

**coordination** 40:4

**copy** 106:22 130:21,22 131:6

**CORE** 42:8,10,12, 14,17,22 66:3 107:17 110:8 111:17 112:14,18 113:8 115:5,16 116:7,25 117:1,7 121:20 122:17 123:14 124:1 126:24

**CORES** 41:9,13 43:4,7,10 107:13, 22 108:19 109:1, 6 110:17,23 112:8,24 117:10 119:22 122:15, 21,25 123:4,18 124:10 125:17 127:18 128:2 129:6

**Corey** 64:5,11,17 65:11,21 66:7,11, 16,18,20 67:14 68:9,24 69:14 71:9,20,23,25 72:1,9,15,21 73:11 80:21 81:4, 17,18,21 90:9,10 91:7,8

**correct** 11:15,18 14:24 15:3,11,14 17:20,24 18:24 19:16,20 24:18, 25 26:23 27:2 28:9,15 31:17 32:4,7,19 35:12 36:18 37:2,5 38:9

48:17 49:10,23 50:9,21 51:7,22, 23 53:1,13,25 54:12,22 55:17 56:23 57:10,12 59:7,8,9,14 60:11,16,19 62:6 63:14 64:6 65:8, 15 68:7,13 71:1 74:3 76:22 77:25 90:1,13,23,25 91:5 93:1 97:22 102:1,7 109:22 110:1 120:14 124:18 125:8,12 128:25 129:7

**correctly** 113:9 122:6

**Council** 40:18,21 76:9 88:19 89:19 90:13 91:16,20 92:3 93:10 94:16, 23 95:2,4 96:23 103:22 104:7

**counsel** 12:13,17, 20 34:18 87:5 88:13 101:5 118:11,12

**couple** 43:4

**court** 19:19 21:20 22:8,14 30:1

**court's** 21:18

**cover** 119:6

**covered** 28:4

**created** 35:21 71:15

**critical** 123:24,25 126:23,25

**criticizing** 88:3

**current** 104:20

**cut** 63:25 74:19 97:8 103:21,23, 24,25 104:8,11, 15

**cutting** 108:14

___

**D**

___

**daily** 116:1

**Danielle** 9:17

**date** 22:16 25:3, 10 31:12 32:6 41:13 58:8,14 109:1 112:13 122:15 124:21 125:20 126:2

**dated** 107:3 124:14

**dates** 43:11 58:4 98:25 108:20 120:9 129:7

**Dave** 90:11,15,16, 17,18 91:8

**David** 90:22 91:2

**day** 10:22 12:10 14:6 16:18 17:10, 15 19:13,24 20:1 21:24 22:22 28:2, 17,23 29:8,16 31:17 44:9 46:4 81:24 114:11 116:4 122:9 126:12

**days** 74:8 117:18 122:10

**deal** 130:25

**debris** 75:8

JOSEPH GUY
97408

May 15, 2026

143
Index: dec..discussion

**dec** 60:5

**December** 27:8, 12 40:10 48:20, 21 86:11 87:20 105:8,17,24 106:17 107:3,18 113:25 114:7,8 115:16 117:1,8, 16 119:7 120:5, 12,14,24 121:4,9 122:22 123:12 124:1,15 125:11, 21 126:3,12 127:4,19 128:3, 17,25

**decision** 100:19

**decision-making** 102:6

**decisions** 66:8, 12,13,16,20,24 82:21

**declaration** 19:19 21:21,25 22:4 121:6,14,18

**declarations** 71:13,16 122:8 123:8

**declined** 32:13,17

**defendants** 10:7 26:7 60:1 63:22 65:1 94:17,20 99:21 105:13

**degree** 40:3

**delayed** 25:1

**delete** 16:20 20:13,18 36:17 37:20 38:6

**deleted** 38:16,20, 25

**deletion** 17:23

**deliberative** 55:25 56:7 69:2 85:11 86:15 93:15,18 94:9 95:20,23 98:4,14, 20 99:19,22 100:1 101:2,20

**delivered** 69:19, 20

**Democracy** 9:22

**Democrats** 111:17 112:25

**Dems** 112:9

**department** 10:7, 9 11:18 28:15,19 75:25 95:7 102:25

**depends** 121:12

**depicted** 86:12

**depiction** 18:23 51:18

**DEPONENT** 9:14 19:12 21:3 27:23 29:2,11,19 31:14 32:10,21 33:18 34:4 42:5 44:13, 22 45:1,15 47:4 63:7,11 66:23 75:18 83:3 85:3 93:21 98:23 100:4 104:3 108:23 109:19,24 111:25 113:5 120:16 123:3,17 125:5 128:8 129:2,10

**deposed** 13:20 14:11

**deposition** 10:22 12:11,12,16 13:6, 12 14:1,4,7,8,17 16:19 20:1,15,19 22:23 33:16,23 34:20 35:8 46:21 47:3 81:24 98:13 105:1 119:9

**deputies** 80:18

**deputy** 11:11 28:8 118:8

**describe** 58:25

**designate** 11:22, 25 12:3

**designated** 10:25

**details** 131:15

**detector** 61:10

**detention** 119:16

**device** 42:14

**DHS** 11:2,4,12,15, 18 12:2 15:3,5 28:5,9,11 30:16 37:1 43:25 44:9 53:21 62:13 66:8, 16 77:17,25 78:3 79:1 80:9,11 84:24 87:2,5,22 88:14 94:23 95:20 97:4 98:2 102:21 107:18 108:14 110:1,3,4, 5 117:15 118:11 122:15 124:12,17 125:17 126:17 129:6

**DHS-RELATED** 73:8

**difference** 104:16

**difficult** 103:14 105:9

**directed** 85:22

**direction** 65:20 85:5

**director** 80:10 118:8

**Directors** 80:8

**disagree** 96:1

**disagreement** 96:2

**disappearing** 17:9,14 19:13,23 21:10 31:16 33:10 36:5,9,13 39:9,13

**disaster** 48:13 52:6 65:15 71:12, 16 108:14 112:8, 19,24 121:6,14, 18 122:8 123:7

**disclosing** 100:1 101:21

**discuss** 12:19 71:20 91:20

**discussed** 12:12, 18 35:7 39:22 47:2 121:20,22 122:1,24

**discussing** 42:9, 13 61:10 91:16 92:2 121:25 122:17 123:4 127:3,12,18,21 128:2

**discussion** 43:3 71:17 74:15,24 76:16 93:9,24

102:9 107:7

**discussions** 41:8,13 44:5,9 77:24 78:2 85:17 94:4 96:22 101:25 102:2,4 104:23 107:17 113:8 122:20

**displayed** 24:13

**disrupting** 75:6

**dissemble** 106:8

**distinction** 34:7

**distribution** 112:7

**Do-** 114:25

**document** 18:21 26:6 31:11 45:9, 12,18,21 47:5 69:6 86:17 95:18 116:8,12,23 117:3,19

**documents** 21:22 45:11 46:1,13,16 47:15 56:5 106:2 116:25 117:6,9

**DOGE** 75:9,14,22, 23 77:11,14,18, 20

**DOJ** 131:10

**dollars** 111:7

**double-checked** 58:2

**draft** 40:18,21 88:22 89:19,21, 25 90:13 91:16 92:2 93:10,24 96:23 103:22 104:7

**drafted** 89:2

**DRF** 65:14,15,25 66:3 68:10,24

**due** 112:9

**duly** 10:13

**duty** 126:16

---

### E

**earlier** 59:13

**early** 25:7 74:7 108:20 114:7,8 117:1,7

**easy** 65:11 127:23

**Edwards** 122:23 123:14 125:17

**effected** 41:22 102:23

**Egregiousness** 50:18

**Elizabeth** 9:24

**email** 61:11 129:17

**emailed** 12:24

**emailing** 81:16,18

**emails** 86:23,24 126:13 129:5

**emphasize** 71:25

**employed** 11:3

**employees** 66:3 70:24 84:15,25 85:18 107:17 109:11 112:18 117:7 126:25

**employers** 11:24

**employment** 10:20 19:16 109:7

**encryption** 16:12

**end** 12:10 40:14, 19,23 41:3,7,12 91:4

**ended** 76:14

**ending** 126:11

**enforcing** 109:12, 15

**engaged** 122:21

**ensure** 29:25

**entire** 106:6

**entitled** 26:10

**entry** 36:4

**EO** 49:18

**ESEC** 54:8 69:19

**Eshleman** 9:24

**Evans** 12:21,24 13:1,3 25:18 27:11 35:11,14, 21 36:9,13,20,25 37:4 40:6 42:16, 21 43:4,6 44:15 49:6 57:10 60:13 62:24 65:21 93:1 97:18 99:17 100:8,22 105:3, 17 106:16 113:7 114:6 115:12,16 116:25 117:7,10, 15 119:25 120:23 122:18,23 123:13 124:16 125:11,16 127:4,19 128:3, 24 129:5

**Evans'** 26:9 48:12 49:22 50:17 51:3 57:9 60:2 61:6 63:24 65:2 105:14 107:2 119:6 120:11 123:23 126:10 128:16

**exact** 75:11

**EXAMINATION** 10:15

**examined** 10:14

**exceed** 109:4

**excerpt** 52:17 54:25 55:16 62:4, 22 67:7 68:3 69:13 70:14,19 77:5 78:11 81:11 86:9 89:12 92:12, 13 93:13 106:18 107:1

**excerpts** 56:21

**exchange** 68:6 69:14 89:18

**exchanged** 13:8

**exclusively** 60:23 61:21

**executive** 56:8

**exhibit** 18:7,8,9, 10,15,17 20:8 22:9,10,11,14 23:10,21,22,23 24:23 25:25 26:2, 3 27:21 30:20,21, 22 35:1,2,3 44:18,19,20 47:23 48:6,7,8, 12,25 49:1,2,13, 14,15 50:1,2,3,

11,12,13,16,23, 24,25 51:13,14, 15,25 52:2,3,11, 12,13 53:4,5,6, 15,17,18 54:3,4, 5,14,15,16,25 55:2,3,10,11,12, 15 56:5,12,13,14, 16,17 57:1,2,3,7 59:18,19,20,23 61:1,2,3,24,25 62:1,17,18,19 63:17,18,19 64:19,21,22,25 67:2,3,4,23,24,25 69:8,9,10 70:9, 10,11 72:3,4,5 73:18,20,21 76:24 77:1,2 78:6,7,8 81:6,7,8 83:1,2,4,7 86:3,4, 5,8 87:11 89:6,7, 8,11 92:6,7,8 96:24 97:11,12, 13,17 106:18,20, 23 107:24 111:22,23 112:1 113:12,17,18 118:17,18,20,21, 23 119:1,2,5 124:14 125:2,15, 25 126:5,6,7,10 128:12,13,16

**exhibits** 44:17 46:5 55:24

**existed** 35:19

**expertise** 79:13

**explain** 45:4 79:14

**explore** 101:24

**extent** 11:16

16:22 26:24 56:4 94:10,11 95:17

**eyes** 75:25 76:5,6

---

**F**

---

**FACA** 94:24 95:2

**fact** 17:22 29:23 43:2 44:8 58:4 87:22 110:16

**facts** 101:10

**fair** 18:18 64:12 74:7

**fairly** 79:5 116:5

**fallen** 80:9

**familiar** 16:1 39:4 77:17 82:18

**February** 112:12

**federal** 19:16 109:7

**FEMA** 26:22 27:2, 4 34:25 35:7,12 37:4 39:13,22 40:18,21,25 41:4, 17,18,24,25 42:7 43:5,17 47:2,23 49:6 50:17 53:9 54:8,19,25 55:7, 15,20 58:4,12 59:2 64:10,16 65:1,22 67:8 69:17 70:1,14,19 71:1 73:3 74:9 76:2,3,9,10,11 77:25 78:3 79:3,5 80:6,8 82:22 83:20,24 84:15, 16,20,25 85:5,18 86:9 87:11 88:2,

10,19 89:19,24, 25 90:13,21,22, 25 91:3,16,20 92:2 93:10,24 94:15,23 95:2,3, 8,21 96:23 97:1, 17,22 98:2 99:1 100:13,23 101:25 102:6,11 103:21, 23,24 104:8,10, 14,19,20 107:17, 18,25 108:14 112:5 117:12 119:17,20 121:4, 8,17 122:14 124:12,18 125:8 127:22 128:18

**FEMA's** 41:8 42:8,9,12,13,17

**FEMA-RELATED** 80:13

**figure** 123:5

**final** 77:9 125:24

**finally** 109:12,15

**find** 84:21 85:5,9, 22,25 87:11 95:24

**fine** 18:16 45:22 46:10 106:6 131:4

**finish** 47:6

**fire** 85:13

**firm** 11:2 12:2

**Fleischman** 10:8 131:5,7

**flow** 71:18

**follow** 95:10 130:8

**follow-up** 130:1

**forget** 59:3

**form** 123:15 129:8

**Forward** 9:22

**found** 84:24 105:14

**foundation** 27:22 28:25 29:9,17 32:9,20 33:17 34:3 63:1 85:2 104:2 108:22 120:15 123:1,16 129:1,9

**four-week** 38:1, 12,23

**Friday** 17:8,9,12, 13 23:3,13 24:18, 20 25:7 33:9,14 37:8 74:14 108:11 126:12 128:3

**front** 45:19 62:13 69:17 76:15 89:24 90:21,22 108:2 119:24

**full** 45:1,16 61:14 74:22

**function** 15:17

**functions** 32:7 37:20

**Fund** 65:15 112:19

**funded** 112:18

**funding** 119:20

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

## G

**gave** 65:2 77:11 97:4

**general** 87:5 88:13 118:12

**generally** 38:24 55:23 69:22 77:24 94:1

**give** 9:11 31:4 33:1 46:4 67:17 106:3,7

**giving** 85:5 94:7 95:12,15 96:7

**good** 9:17,21 75:7 79:14 90:11 114:21

**government** 34:19 69:4 82:10 86:18 93:17 98:2 99:21 111:18 112:15 130:4 131:10

**government's** 56:1

**Governor** 96:8

**grant** 74:15 76:16

**grants** 69:17 70:1 76:22

**gravy** 110:17,20 111:8

**great** 11:25 12:6 57:14 131:17

**Greaves** 10:4 11:21 12:5,13 16:22 19:9 21:1, 13 27:22 28:25 29:9,17 31:11

32:8,20 33:17 34:3 42:3 44:11 45:8,17 46:9,12, 25 47:6,13,19 56:13 57:16,23 58:1,12,17,24 59:1,8 61:12 63:1,6,8 66:21 75:11,16 84:1 85:2 96:15 104:2 106:1 108:22 109:17,23 110:14 113:3,13 120:15 123:1,15 128:6 129:1,8,13,16 130:1,15

**green** 67:15,17

**Gregg** 51:5,6,9,19 59:24 60:6,9 61:7 62:4,22

**grounds** 55:24 101:1

**group** 10:5 27:8, 11 35:15 36:1 48:20,21 58:13 59:2 60:4 77:6 99:5 119:21 121:17

**groups** 58:4

**guess** 38:13 114:21 115:20

**Guy** 9:9 10:5,13, 17 17:22 18:20 19:12 20:19 21:22 23:12,16 24:17,20 25:4 27:8,18 29:8,23 34:22 35:6 37:8 41:17 44:8 47:22 48:12,19,20 52:8 55:7,20 56:20

57:6 59:12 60:21 61:19 63:5 69:13 85:6,19,23 86:12, 21 96:22 97:18 99:4 101:24 102:25 103:4 104:1,5,23 106:15 107:5,24 109:22 110:12,18 111:19 112:16 116:11,22 117:20 119:5 120:5 126:15 127:22 128:4,20 129:25

**Guy's** 59:6

**guys** 130:13

## H

**half** 74:19 103:21 104:19

**Hall** 10:6 18:14,18 55:22 69:1 86:13 93:12 94:8,16,17, 21,24 95:1,5,17 97:24 98:12,19 99:18 100:25 101:6,9,12,15,17, 18 118:18,22 130:3,19,23 131:9

**hand** 9:10

**handed** 35:6 47:4,23 50:16 56:20 57:6 83:7 86:8 89:11 97:16 107:1 119:5

**handing** 69:13

**handle** 131:9,10

**handled** 80:14

**handwritten** 105:18 107:2

**happen** 102:23

**happened** 21:12 26:25 74:21 84:13 110:11

**happening** 93:9 112:8,24

**hard** 105:19

**he'll** 130:15

**head** 60:9 82:15

**health** 24:2

**heard** 110:20 111:1

**hearsay** 19:10 29:1,10,18 32:8

**helped** 79:25

**Hemenway** 11:6, 10,12 25:20 26:16 28:1,18 29:23 30:10,13 79:10

**Hemenway's** 29:7,15

**high-ranking** 98:10,17

**highly** 43:12 123:22

**history** 25:13 59:4

**hoc** 75:1 79:21

**hold** 45:17 47:6 60:5 80:20

**home** 24:2

**Homeland** 10:9 95:7 102:25

homepage 24:3

honest 114:10 116:17

Hoshijima 9:21, 22

hour 34:19

House 71:6

Houston 13:20

HQ 54:19 62:13 70:3 86:9

https://www. washingtonpost. com/weather/ 2025/08/25/fe 84:7

**I**

ICE 118:8

idea 16:8,17 23:19 24:22 27:13 29:19 30:3, 14 34:11 35:22 36:22 38:22 42:1 51:11 91:19 95:14 100:9 103:10 111:20 112:17 117:5

identification 18:11 22:12 23:24 26:4 30:23 35:4 44:21 48:9 49:3,16 50:4,14 51:1,16 52:4,14 53:7,19 54:6,17 55:4,13 56:18 57:4 59:21 61:4 62:2,20 63:20 64:23 67:5 68:1 69:11 70:12 72:6

73:22 77:3 78:9 81:9 83:5 86:6 89:9 92:9 97:14 106:24 112:2 113:19 119:3 126:8 128:14

image 60:2 61:6 63:23 64:19,25

imagine 48:4 51:23 55:8 93:2 118:3 119:21 120:17

implicate 94:11, 12

implies 36:19

important 71:24

inappropriate 101:14,17

incident 103:20

include 93:14 98:3

included 15:2

includes 15:16 95:19

including 76:2 89:24 90:21 105:7 110:5 122:17

incoming 15:23 31:20,25 32:3,14 34:2,8

incredibly 70:23

index 119:25

indication 38:12 127:14

individual 15:23, 24

individually 104:18

individuals 11:1 12:1

information 16:13 29:25 56:6 69:3 93:15 94:12 95:19 100:1 101:22 108:17 122:14 124:12,15 125:10,16 129:6

initial 99:16 100:7

initially 23:2

input 66:12

install 24:21

instance 81:3

instruction 95:10, 11

interaction 81:1

interpose 55:22

interrupt 119:11

involved 44:17 82:21 85:17 97:22 99:17 100:8,13 101:25 102:4 103:12,13, 15 104:22 107:23 114:5,6 115:12, 15 116:24

involvement 88:18

involves 83:11 97:18

involving 113:8

issue 27:1 122:17

issued 21:20 22:15

issues 80:13

**J**

January 41:14 108:11,20 109:2, 8 110:8 126:15

Jason 10:4

Jeff 115:7

Jessica 10:2

Jimmy 118:9,10 119:14

Joe 10:5 19:12 23:12 27:8,17 37:8 48:19,20 51:10,19,22 59:24 61:7 62:5, 23 64:5,8 97:18 99:4 107:8 116:11 117:19 118:1 120:5 126:15

joining 28:5

Joseph 10:13 87:4

judge's 22:16

June 74:2 77:8

Justice 10:7

**K**

Kara 13:5,9 14:12,16 15:9 17:5,9,13 18:22 19:24 21:9 23:11 26:16 30:16 31:1, 7,21 32:2,3,17 33:1,14,15,25 34:15,22 35:11,

14 42:16,21 43:6 48:21 51:5,7,10, 19 52:1,18 55:1, 16 56:3,21 58:8 59:5,24 60:2 61:7 62:5,23 64:1 65:14,21 68:4,15, 16,18,23 69:14 70:22 72:9,13 73:10,25 74:5,8, 24 77:6 78:11 79:11,13 81:12, 25 83:12 86:10 89:12 91:12 92:13,20 97:18 99:4 118:1 119:14 124:17 125:7,11

**Karen** 12:21,24 13:1,3 25:18 26:9 27:7,11 35:11,14, 21 36:9,12,20,25 37:4 40:6 42:16, 21 43:3,6 48:12 49:5,21 50:17 51:3,5,6,9,18 57:8 59:24 60:1, 13 61:6,7 62:4, 22,23 63:23 65:21 92:21,24 93:1 97:18 99:17 100:8,22 106:16 110:10 114:6,12 115:12,16 117:10,15 122:1 123:13 124:16 125:11,16 126:10 129:5

**Katie** 78:17,19,20 79:23,24,25 81:18 91:13,17

**Katie's** 81:13

**Katrina** 82:17,22, 23 84:11 85:18, 20

**kinds** 122:14

**knew** 81:25 82:5, 6 87:7 97:7 104:22 109:11

**knowledge** 66:19, 24

**Kristi** 62:6,10 63:14

---

**L**

**large** 47:4 110:4

**largely** 43:17

**late** 15:7,10 25:7 91:3 103:21

**Law** 10:4

**leadership** 117:15

**leading** 107:18

**leaked** 108:18

**learned** 13:22 21:23 82:5,12

**leave** 28:19 85:1

**leaving** 11:18 30:16

**left** 15:3,5 19:15 68:22

**Leonard** 9:17,18 10:10,12,16 11:25 12:6,9 17:1 18:4,12,14,16,19 19:14 21:4,15,17 22:7,13 23:20,25 25:25 26:5 27:24

29:5,13,22 30:19, 24 31:15 32:12, 22 33:21 34:5,25 35:5 42:6 44:14, 24 45:3,10,25 46:11,22 47:1,7, 17,21 48:5,10,24 49:4,12,17,25 50:5,11,15,23 51:2,12,17,24 52:5,10,15 53:3, 8,15,20 54:2,7, 14,18,24 55:5,9, 14 56:9,14,19,25 57:5,13,22,25 58:11,15,23 59:6, 9,11,16,22 60:25 61:5,16,23 62:3, 16,21 63:2,12,16, 21 64:19,24 67:1, 6,22 68:2 69:7,12 70:8,13 72:3,7 73:17,23 75:13, 20 76:24 77:4 78:5,10 81:5,10 82:25 83:6 84:5 85:4 86:2,7,20 89:5,10 92:5,10 93:20,22 94:15, 19,22,25 95:3,9 96:1,5,10,21 97:10,15 98:9,16, 22,24 100:6 101:5,7,10,13,16, 23 104:4 106:4, 15,21,25 108:25 109:21,25 110:15 111:21,24 112:3 113:6,14,20 118:16,21,24 119:4 120:20 123:10,19 125:3, 6 126:4,9 128:10, 15 129:4,11,14,

17,24 130:5,8,10, 16,18,24 131:4, 14,17

**letter** 82:17,22,24 83:25 84:11,25 85:6,19,21 88:3

**letters** 84:14,17

**Levy** 10:2

**Lewandowski** 64:6,12,17 65:21 66:7,16 69:14,18, 22,25 72:10,15, 22 73:11

**lie** 61:10

**light** 67:15,17

**link** 83:24,25 84:6 87:20 88:1,2 108:13

**links** 39:25

**list** 86:22

**litigation** 30:17 86:18 95:19

**logistics** 12:18 131:1

**long** 40:22 76:12 90:11 91:9 93:10, 24 105:25

**longer** 28:14 89:12 94:2

**looked** 20:8 22:3 25:5,9 37:11 38:5 39:12,16 40:24 106:16 107:4 108:1

**losing** 111:8

**lot** 27:3 39:23 40:15 45:13 46:1

69:24 75:23 76:1 79:21 81:4 84:19 103:19 105:9 108:7 114:10,17 115:21 122:19

**loud** 19:8

**lunch** 23:6

---

**M**

**ma-staff-protest-letter** 84:8

**made** 15:20 16:5, 16 34:13 66:7,12, 13,16,23 95:22

**Madison** 116:7 118:1,3,6,7 119:14

**make** 16:6 46:19 60:3 65:11 110:8

**making** 66:20 89:1

**Management** 78:24

**March** 15:7,10 36:12,17,21 37:1, 25 38:9,11,19 65:3

**mark** 18:4 22:8 23:21 25:25 30:19 35:1 44:17 48:6,25 49:12 51:24 52:10 53:3, 15 54:2,14,24 55:9 56:12,25 59:17 62:17 63:17 64:20 67:1 89:6 92:6 105:15 106:18 111:22 113:10,12 118:16

126:4 128:10

**marked** 18:9,10 22:10,11 23:22, 23 26:2,3 30:21, 22 35:2,3 44:19, 20 48:7,8 49:1,2, 14,15 50:2,3,12, 13,24,25 51:14, 15 52:2,3,12,13 53:5,6,17,18 54:4,5,15,16 55:2,3,11,12 56:16,17 57:2,3,7 59:19,20 61:2,3, 25 62:1,18,19 63:18,19 64:21, 22 67:3,4,24,25 69:9,10 70:10,11 72:4,5 73:20,21 77:1,2 78:7,8 81:7,8 83:2,4 86:4,5 89:7,8 92:7,8 97:12,13, 16 106:20,23 111:23 112:1 113:17,18 119:1, 2 124:14 125:15, 25 126:6,7 128:12,13

**material** 45:13 98:3,5

**matter** 79:13

**matters** 67:19 88:10

**Matthew** 10:8

**Mclaughlin** 87:21 108:13

**MCO** 127:15

**MCO-** 126:20

**means** 62:13

67:17 85:9 86:1 109:5

**meant** 37:23 38:24 70:3,4

**meet** 90:10

**meeting** 105:10 107:19 114:11,14 115:12 116:1 118:14 119:14 120:13 121:7,15, 20 122:7,13,23 123:6,8,11,13 124:5,7,13 127:11 128:20,24

**meetings** 92:25 105:3,7,9,11 114:6 116:4 121:18 122:1 124:6

**memo** 62:24 63:4 77:12,14,18,21 100:20 115:7,18

**memory** 75:1

**memos** 77:18 115:21

**mention** 66:9

**mentioned** 17:6

**message** 17:8,9, 13 19:4,13,23 21:10 23:18 31:2, 7,17 33:1,4,8,14, 19 36:5,9,13 38:14,19 39:13 42:17 65:10 67:10 68:5,9,13, 15,17 69:16 70:22 74:22 75:5, 8 76:19 77:7 83:19 85:24 86:11,12,21,25

87:6 92:19 112:6

**messaged** 13:3

**messages** 13:9 15:2 16:20 30:5 33:10 36:17 37:12,16 38:24 39:2,5,8,20 41:18,25 42:8,11, 21 43:6,10 58:13 70:21 73:4,6,8 74:20 77:7 92:15 108:10

**messaging** 15:17 81:17,18 109:14, 19 110:8

**met** 10:18 34:18 43:19 44:15 105:13

**method** 72:18

**mine** 114:21

**Minimize** 115:4

**minutes** 57:14 96:12,14

**Mischaracterization** 123:2

**mischaracterizes** 16:23

**mission** 123:24, 25 126:23,25

**mistaken** 80:10

**Mm-hmm** 93:5 128:19

**Mobile** 19:12 23:13

**moment** 44:22 45:23 73:24 89:15 92:11

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**Monday** 12:22 13:6,9,20 17:20 21:5 30:15 33:7 71:4 86:11 87:20

**money'** 65:12

**morning** 9:17,21 100:17 116:3

**Mount** 26:10,12 27:1,3

**move** 79:20 103:17

**multiple** 37:23 90:4

## N

**names** 9:16

**narrative** 111:9 129:3

**narrower** 112:7

**needed** 102:22

**night** 23:3 24:20 25:7

**Noem** 60:16 62:6, 10 63:14 103:9, 11

**non-party** 86:17 93:14,17 95:18 98:1 99:20

**notation** 107:7 114:18,25 116:6 117:18,25 128:18

**notations** 34:9

**note** 115:25

**notes** 105:6,7,14, 17,24 106:3,8,16 107:2 113:7,24

114:25 115:25 119:7,25 120:4, 11,18 121:2 123:23 126:11

**November** 35:17, 20 36:1,8 37:25 38:15 40:5 91:4 92:14,15,19 96:24

**NTE** 41:13 43:10 108:19 109:1,3 122:15 129:6

**number** 18:23 23:12,18 24:6,9, 13,24 25:10,12 26:8 27:17 28:1 29:6,7,15 37:7,8 52:20 72:14 81:14 89:22 97:1 107:2,12 113:11, 22 114:16 115:3, 7 126:11

**numbering** 18:5

**numbers** 28:23 29:20

## O

**object** 16:22 19:9 56:4 61:12 69:1 75:16 84:1 85:2 86:13 93:13 97:25 108:22 120:15

**objection** 21:1 27:22 28:25 29:9, 17 31:11 32:8,20 33:17 34:3 42:3 44:11 47:13 55:23 63:1 66:21 75:11 94:8 95:17

98:7 99:18 100:25 101:1,18 104:2 109:17 113:3 123:1,15 128:6 129:1,8

**occasion** 79:1

**occupation** 126:24,25

**occupations** 123:24,25

**occurred** 101:3

**October** 89:13,14

**ODC** 85:14

**office** 60:9 62:14 78:23 80:19 88:13 89:25 90:21,23 128:18

**official** 41:22 98:10,17

**officials'** 83:20

**OMB** 77:25 78:3, 16 79:4,8,17,22 80:1,5,8,22 81:1 91:14,17,21 92:3 97:5 99:7 102:14, 18,21,22,24 103:4

**one-** 122:19

**one-day** 17:23

**operation** 37:19

**order** 21:20 22:8, 14,19 29:25 113:15 130:9,20, 21 131:6

**orders** 21:19 131:10

**Organizational**

9:19 10:1,3

**original** 130:9,20

**ORR** 53:9

**outgoing** 15:23 31:21

**outs** 115:1

**overhaul** 88:4

**overridden** 96:4

**overtook** 40:6

## P

**p.m.** 34:23 125:12 128:22 129:19,22 131:18

**packages** 69:19

**packet** 87:11

**PAD** 80:11,15

**PADS** 80:8,17

**pages** 45:13 47:10 105:16,19 106:6

**paper** 103:17

**part** 75:23 113:13 120:18

**participant** 26:19 39:8 45:6 46:7 47:8,18 48:3,16 49:9,22 50:8,20 51:7 52:7,25 53:12,24 54:11, 21 55:6,20 56:23

**participants** 26:17 35:12 65:22

**participate** 79:15

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**participated** 52:19 55:17 57:9 67:9 70:20 79:11, 23 86:10

**participating** 118:14

**party** 69:5

**pay** 103:18 124:7

**paying** 110:7

**pays** 66:3

**penalty** 9:10

**people** 11:4 79:25 80:2,5 84:17 85:6,13 86:22,24 102:11 104:19 119:21 122:12 124:16

**percent** 45:25 97:8 103:23,24, 25 104:8,11,15 123:7

**Percival** 118:10

**period** 37:25

**perjury** 9:11

**permitted** 98:21

**person** 17:22 34:13 73:16 78:25 79:22 95:22,25

**personal** 14:23 22:24 42:14 43:21,25 44:5 59:6

**personnel** 71:5 82:21,22 88:10

**pertaining** 64:16 117:1

**Phillips** 60:6,9

**phone** 9:19 14:23 16:3,5,6 17:21 22:20,25 24:14, 17 32:3 33:11 37:11 43:4,21,25 44:5 48:12 57:9 58:3 59:5,6 60:2 61:7 63:24 65:2 72:25 73:16 91:13

**picked** 34:11

**picture** 19:1 65:2

**piggy** 110:24 111:13

**place** 44:5 60:24 61:21 103:17

**plaintiffs** 9:19,23 10:1,3 129:25

**plan** 41:4 96:25 97:4,7 99:16 100:7,13 101:25 102:7,13,17,21 103:3,10,15,24, 25 104:11,14 117:13

**planned** 120:18

**plans** 103:16,21 115:4

**play** 11:23

**plenty** 47:11

**point** 13:13 14:10,13 28:20 60:10 71:24 75:21 76:8 82:5, 6,9 84:24 111:16 129:17

**points** 37:22

**portion** 10:24 11:22 12:7

**possibility** 42:24

**post** 60:4 64:1,3 83:16,19 84:3 89:22 111:6

**posted** 38:14 42:17 109:22 110:12 112:9

**potentially** 98:5

**POTUS** 60:5,18

**PPO** 71:3,4

**pre-decisional** 101:3,19

**preferred** 72:18

**prep** 46:5

**prepare** 121:17

**prepped** 122:10

**prerogative** 70:5

**preservation** 19:20 21:21

**preserving** 98:12

**president** 60:18 121:18 122:9

**presidential** 71:5 98:6 100:2

**press** 108:18

**pretty** 69:2

**previously** 34:17 67:8 87:21 108:1 124:14 125:3,4, 15,25

**principal** 11:11 28:8

**print** 71:9

**printed** 24:1

**prior** 11:14 14:8, 13 21:19 27:20 28:5 35:20 38:11 70:1 90:20 101:1 119:8 122:13 130:7

**priority** 123:25

**privilege** 55:25 56:7,8 69:3 86:15,16 93:16, 19 94:9,11,13 95:20,24 96:3 98:5,6,11,12,15, 18,20 99:19,23 100:2,3 101:2,20, 22

**privileges** 56:1 95:6

**proceed** 10:11

**process** 55:25 56:7 69:2 71:18 76:20 85:11 86:15 93:16,18 94:9 95:20,23 98:4,15,20 99:19, 23 100:2 101:2, 20 102:6

**produce** 44:16

**produced** 18:21 26:7 32:2 35:9 46:2 48:11 49:5, 21 51:3,19,25 52:17 55:1,16 56:2,21 57:8 60:1 62:23 63:16 68:4 69:4,15 72:8,14 73:25 77:6 78:12 86:10,17 93:14, 16 95:18 99:20 105:18 113:15

**production** 56:2
98:1

**professionals**
112:9,25

**proffer** 21:13
58:1,6

**profile** 19:1

**Program** 80:7,10

**prospectively**
39:6

**protect** 111:13

**protest** 83:24

**protesting** 84:15

**provide** 58:5

**provided** 19:19
30:1,25 46:16
108:18 124:12
125:11

**providing** 124:16

**public** 87:24

**pull** 106:5

**purposes** 75:2

**pushback** 93:6
94:6,7 95:13,15
96:7

**pushed** 65:12

**put** 34:11 90:12
91:9 98:9 113:9
127:10

**Q**

**question** 12:1
17:7,12 33:20
43:24 45:7 46:6,
7,10 47:9,17,20
61:17 63:25 77:8

93:20,21 95:21
99:24,25 100:5
101:24 110:22
118:5

**questioning**
59:12

**questions** 21:16
45:9,12 47:10
67:14 124:21
129:25 130:2,3

**quick** 58:2

**R**

**raise** 9:10

**Rapid** 47:24
54:25 55:7 87:12
107:25 112:5

**re-installs** 24:14

**reaction** 25:1

**read** 17:4 19:8
21:8 44:22 45:18,
20,24 46:13,17
47:3,11,15 52:22
62:7 70:16 72:11
73:24 78:13 84:4
87:13 89:15
97:20 105:19,21,
23 106:2 107:9
108:3,7,9 116:10
124:19 130:15,17

**reading** 108:5

**ready** 89:16
125:18 130:5

**real** 58:2

**reason** 58:9
120:21,22

**recall** 12:14,15
13:14 14:8 16:21

17:2,16 20:2,5,6
22:4,25 23:3,7
25:14 26:19
30:17 33:10,11
34:20 35:19,23,
25 36:2,3 38:4
39:23 40:9,19
41:10,14,15
42:16 43:22 44:2,
4,6 48:2 55:6,19
58:6 65:19 66:1,
5,6,13 76:6 77:20
81:24 82:4,12,20
83:14,15 85:1
88:19,23 90:3
91:19,23 92:1
93:11,23 104:7,
10,14,17 105:4,8
107:4,16 108:5,
20,23 109:6
114:14 116:5
117:6,12 121:3,8
122:15,18,22
123:3,14 127:3
128:2

**received** 15:3
113:25 119:7,9
129:15

**receivers** 68:22

**receiving** 117:6,
10

**recent** 17:8 33:8

**recently** 26:7

**recess** 57:19
58:20 96:18
106:12 129:21

**recollection** 16:9
20:9 37:15 40:2
52:18 65:17
72:23 80:4 84:10
88:9 96:6 97:3

115:11,14 116:23
118:13 121:19

**recommending**
60:5

**record** 9:8 15:22
46:3,4,13,18
56:10 57:15,18,
21 58:16,19,22
96:17,20 105:24
106:2,7,11,14
129:20,23 130:6,
8,11 131:3,19

**recover** 30:5

**Recovery** 60:10

**redaction** 114:19

**reduce** 97:1

**refer** 71:8

**reference** 62:5
92:25 126:14,20

**referred** 59:13

**referring** 11:11
17:13 78:20
89:25 90:12
99:16 100:7
108:17

**refers** 64:5

**reflect** 31:12

**reflected** 33:12
99:1

**refresh** 20:9
84:10 88:9
115:10,14 116:23

**regular** 16:7 79:7,
16,19 105:11

**regularly** 79:5,8

**reinstall** 24:21
30:4,7,10

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

JOSEPH GUY
97408

May 15, 2026                                          153
Index: reinstalled..routine

**reinstalled** 22:24 29:24 37:12,17

**reinstalling** 25:16,21

**reinstated** 86:23 88:2,7

**reinstating** 86:23, 24

**reiterate** 86:16 93:16 99:18 101:1

**reiterating** 101:18

**related** 26:22 27:2 47:2 64:10 73:3 77:18

**released** 108:19 109:1

**Relief** 65:15 112:19

**remaining** 100:23

**remember** 14:19 15:6 17:25 18:3,6 20:11,16 21:11, 23 24:22 25:8 26:12 27:13 32:21 33:6 34:12, 16,17 37:21 40:4, 8,12,13,25 41:2, 5,6,16,19 42:9, 13,24 43:2,3,8, 14,15 44:13 66:9 74:10,11 79:18 81:3 82:2,6,14,23 85:7 89:1 90:24 91:1 94:1,4 100:15 102:19 103:5,7,14 105:5, 10 107:21 112:22 116:3 117:9,21 118:6 120:25

121:14,24 122:6, 20,21 123:8,17, 21 124:4,10,11 127:7,12,18,20, 21 128:9

**remembering** 119:13

**remind** 15:5

**renew** 41:9

**renewal** 41:13

**renewing** 42:22

**repeatedly** 43:20

**report** 88:22 89:2, 19,21,25 90:11, 13 91:8,17,20 92:3 93:7,11,24 94:7 95:13,16 96:23 103:22 104:7

**REPORTER** 9:9, 15 10:11 18:8 22:10 23:22 26:2 30:21 35:2 44:19 48:7 49:1,14 50:2,12,24 51:14 52:2,12 53:5,17 54:4,15 55:2,11 56:16 57:2 59:19 61:2,25 62:18 63:18 64:21 67:3, 24 69:9 70:10 72:4 73:20 77:1 78:7 81:7 83:2 86:4 89:7 92:7 97:12 106:20 111:23 113:17 118:20 119:1 125:1,4 126:6 128:12 130:7,14, 17,19 131:2,5,8, 11

**represent** 9:16 18:20 24:1 26:6 94:15,17,19 95:3, 5 119:9

**representation** 63:23

**represented** 65:3

**representing** 9:18,22,25 10:7

**represents** 61:15

**requests** 117:11

**require** 84:3

**required** 22:19 98:14

**requiring** 21:20

**reserve** 69:5 86:18 93:18 98:7

**residence** 10:18

**respect** 88:21 102:6 124:1

**respond** 84:21 88:6 109:10 111:9

**responded** 33:9

**responds** 60:6 65:14 91:12

**response** 18:21 47:24 48:13,14 52:6 55:1,7 60:10 68:5 69:18 87:6, 12 107:25 108:14 112:5,8,24

**responsible** 80:5

**responsive** 94:12

**result** 23:17 37:19

**resume** 59:12

**review** 40:18,21 69:22 76:9 87:17 88:19 91:20 92:3 93:11 94:16,23 95:2,4 96:23 100:13,16

**reviewed** 98:11, 17

**reviewing** 70:1 71:19 76:10,11 77:20

**Richardson** 90:18,22 91:2,9

**RIF** 97:7,17,22 99:1,8 100:13,23 101:3,25 102:6 103:25 104:14

**rifled** 122:2

**RIFS** 102:24

**rights** 69:5 86:19 93:18 98:7

**ring** 124:1

**risk** 83:21

**Roland** 122:23 123:9,13,18 124:10 125:17 126:17 127:11,13

**role** 79:1

**room** 122:11

**roughly** 38:20 40:13 96:24 104:19

**roundabout** 119:19

**routine** 75:3

**run** 83:20

**running** 75:22

---

**S**

**S1** 60:4,16 62:5,6, 10 100:20 115:7, 18 121:5,9,16,22 122:1,13,24 123:4,6,12 127:22,24 128:4

**S1's** 128:18

**S2** 114:7,8,11,18, 20,22,23 115:12 116:1 119:14

**S2's** 116:21

**S2/jimmy** 118:1

**safe** 18:6

**safety** 23:12,18 24:6,9,13,24 25:10,12 27:16, 17 28:1,23 29:6, 7,15,20 37:7,8

**sampling** 59:1

**sanction** 66:19, 24

**Sanity** 55:15,20 67:8 70:14,20

**sat** 108:8 122:2 124:6

**Saturday** 35:17, 20 36:1

**scans** 61:11

**scenarios** 23:17 24:12

**schedule** 79:16

**scheduled** 127:11

**scope** 96:2

**screenshot** 30:25 35:6,8 38:8 58:3 59:4,23 83:8

**screenshots** 58:25 59:2

**search** 22:20

**secretary** 60:16 66:13 67:21 69:23 70:1 71:23, 25 72:2 85:15 87:24 103:9,11 125:8

**secretary's** 66:12,19,24 70:5

**section** 40:25

**Security** 10:9 95:8 102:25

**self-search** 22:5

**send** 58:24 75:2 81:13 116:12,22 117:19

**senders** 68:20,21

**sending** 23:17 70:21 74:18 83:23 108:13 117:4,10 122:14 129:6

**sends** 70:22 88:1

**senior** 124:17 125:7

**separated** 109:7

**separations** 110:8 112:14 121:20

**September** 99:2

**series** 77:7

**set** 17:9,18 19:13, 22 21:9 31:16 33:9 36:5,9 39:21 46:23 48:5,24 62:16 65:7,25 66:5 69:7 73:17 74:23,25 77:23 81:23 87:10 88:17 92:5 96:10 104:25 121:2,3

**setting** 17:14,23 20:23 36:21 38:9, 24 39:17 65:7

**settings** 16:20 20:3,10,13,18 39:5,9,14

**SGE** 82:8

**share** 89:23 90:11,20 91:8

**sharing** 39:25

**Sheahan** 118:7

**sheet** 119:6

**short** 57:14 96:11

**shorter** 94:3

**show** 15:23 21:13 30:8,11 39:17,18 47:1 58:4,14 106:17

**showed** 105:6

**shows** 28:22 31:20 33:25 35:11,14 37:7 38:6,8 58:7,14

**shut** 68:10,24 103:24

**shutdown** 97:2 100:14,24 102:1 111:18 112:9,15

**sic** 83:20 106:8

**side** 116:10

**sign** 67:21 130:15,17

**sign-off** 85:15

**Signal** 13:3,8 14:23 15:1,9,13, 16 16:3,5,6,16 18:24 19:23 20:10,13,15,18 21:8,9,14 22:24 23:17 24:2,15,21 25:3,16,21 26:9 28:22 29:24 30:11 37:12,17, 22 39:10 42:14 44:8,16 54:11 56:22 57:7,9 59:4 73:15 83:8 92:12 93:14 97:22 98:3 99:20

**signature** 22:16 69:17

**signed** 82:22 84:15,25 85:6,18 102:22

**signing** 84:17

**simple** 61:17

**sit** 46:3

**situate** 15:8

**situated** 74:8

**slides** 71:15

**SOPDA** 40:7,9 90:25 91:3 105:3

**sort** 16:12 74:7 119:18 122:2

**sound** 72:18 89:3 91:4 107:19

**sounds** 81:22 104:5 109:14,19

**space** 119:16

**speak** 30:13

**speaking** 41:15

**specific** 45:13 47:10 105:15,19 106:3,5

**specifics** 112:7

**spending** 76:7

**spokesperson** 87:23

**staff** 11:12 28:8,9 78:23 83:20,24 97:1 100:23 104:20 108:15 115:4 116:21 130:12

**staffing** 41:4,18, 25 74:15 76:2,3,7 103:23 104:10 117:12

**Stafford** 65:25

**stand** 109:3

**standing** 114:11

**stapler** 113:9

**start** 18:7,16 44:18 45:23 99:1 111:8 113:21

**started** 57:24 74:12 76:13 82:7

**starting** 41:14

**starts** 67:10 89:13

**state** 9:16 11:17 28:11,15,19

**statement** 43:1 64:12 90:19

**statements** 95:22

**States** 60:19 94:18 95:5,7

**stating** 99:7

**station** 126:16

**stay** 39:2

**stick** 40:16

**stood** 76:9

**Storm** 52:16

**structure** 80:17

**stuff** 84:12

**subject** 56:6 79:13 86:14 93:15 95:19,23 98:4,5 99:22 100:1 101:19,22

**submissions** 99:8

**submit** 21:21

**submitted** 21:25 125:1

**subpoena** 18:22 68:5

**substance** 12:19 103:19

**substantial** 72:14 98:3

**substantially**

92:18 108:11,20

**substantively** 88:22

**suggesting** 60:4

**suggestion** 109:14,20 112:20,23

**suggestions** 110:9

**Sullivan** 78:21 79:23 81:18 91:13,17

**summer** 74:6 75:21

**support** 24:2

**suppose** 27:15 32:24 44:3 88:16 114:13 117:24

**supposed** 69:20

**surprised** 72:15

**suspension** 88:3

**switch** 24:17

**switches** 24:14

**sworn** 17:19

**sync** 92:20,24,25

---

**T**

**taking** 44:5

**talk** 13:25 14:3,16 25:15,18,20 33:22 34:20,25 36:23 56:10 58:16 67:20 71:3 72:1,2 79:19 87:14 100:19 123:14 130:10,11

**talked** 12:21 13:5 14:7,12 25:17 30:16 34:14,23 36:25 40:17 71:25 87:8,22

**talking** 71:1,12,14 76:16 80:25 81:17 91:24 100:22 104:13 107:21 115:19 117:4 119:15 123:18,24 124:10

**taxpayer** 111:7

**Team** 52:16 53:21

**tee** 67:13

**telephone** 15:13, 19,24

**telling** 68:24 87:4

**term** 110:20

**termination** 76:20,22

**terminations** 111:17

**terms** 74:9 109:11 111:1

**terrified** 111:7

**testified** 10:14 14:12,22 16:18 21:5,7 22:23 23:2 30:15 34:18 43:16 67:8 72:17

**testify** 61:14 101:8

**testifying** 101:9

**testimony** 9:11 14:15 16:21,23 17:2,19 23:4 58:7 66:14 123:2

**NAEGELI**
DEPOSITION & TRIAL   |   (800) 528-3335
                         NAEGELIUSA.COM

**tests** 61:10

**texted** 13:1

**thing** 75:3 106:6 108:6,9 110:6 112:6 122:2

**things** 37:23 39:25 41:16 64:10,15 69:23 72:1 75:22,24 76:1,4 81:4 84:19 85:16 103:14 104:17 108:7 122:3,20

**third-party** 56:2

**thought** 30:3,4,6 110:16 111:16

**Thursday** 23:7 24:24 25:6,7,11, 14

**tied** 92:21

**time** 9:7 17:10 19:13,23 21:10 22:4 24:20 28:17, 20 30:6 31:17 36:5,10,13 37:25 39:9,13 40:17,22, 24 41:3,7 43:19 45:5 46:15,20 47:11 57:14,17 60:10 66:6 69:24 73:11 75:21 82:17,20 84:13, 16 87:5,22 88:18 90:22 93:1,10,23 96:14,16,19,22 105:2 106:10,13, 15 107:4,16 110:16 114:1 118:8 119:8 121:7,15,16 122:4,11 124:21

125:20 126:2 128:20 129:19,22 131:18

**timeframe** 21:18 74:3 91:18

**times** 43:4 44:1 64:11 75:22 79:3 122:19

**title** 24:5 125:9

**titled** 47:23

**today** 27:20 62:13 78:17 98:13 99:9 108:7

**today's** 12:11

**told** 14:10,17 72:13 88:21 91:2

**top** 19:2 26:15 31:20 38:6 39:18 63:24 65:6,10 67:10 82:14 92:18 97:19 111:5 114:17

**total** 100:22

**totally** 18:18 101:13,16

**touch** 131:14

**touched** 20:14

**tough** 118:25

**track** 118:25

**train** 110:17,20 111:8

**training** 77:21

**trainings** 77:12, 14,18

**transcript** 10:25 12:8 16:24 130:9,

20

**transitioned** 82:9

**treatment** 84:16

**Tricia** 87:21 108:13 109:20

**Trip** 49:6

**trouble** 63:9

**Troup** 11:12 25:20 26:16 28:1, 5,18 29:7,23 30:3,10,13 79:10

**true** 33:13 64:15 77:24 100:9

**Trump** 83:20 84:15

**Trump's** 88:3

**truth** 9:12,13 10:14

**TSA** 92:21

**Tsuki** 9:21

**Tuesday** 13:11,13 18:1 19:4,15,18, 22 20:24 34:1,19

**turn** 71:7 100:12 108:10 114:24

**turned** 80:1

**types** 70:24

**typically** 74:25 79:10,19,23

---

### U

**Uh-huh** 70:25

**unanswered** 32:14 34:7

**underneath** 19:6 99:14

**understand** 46:19 69:25 81:17 94:22 110:22 111:2

**understanding** 36:8,16 66:25 74:21 85:8 95:1

**understood** 38:23 88:14 131:11

**unilaterally** 85:13

**Union** 9:18,25 10:3

**United** 60:18 94:18 95:5,7

**unredacted** 119:8

**upcoming** 43:10

**update** 76:20

**Updated** 115:3

**Updates** 48:14 52:7

---

### V

**vaguely** 41:2 107:19 109:9 121:10,13

**varied** 79:24 80:3

**version** 89:20 94:2,3 119:8

**versions** 90:5,7

**Victoria** 75:5 111:12

**video** 131:13

**NAEGELI**
DEPOSITION & TRIAL     (800) 528-3335
                       NAEGELIUSA.COM

**voice** 31:25 32:14,15,17,18 34:2,7,8

**Voorhies** 13:5,9, 19,23 14:8,16,23 15:9 16:19 17:5, 9,14,24 18:22 19:24 20:24 21:6, 9 23:11 26:16 30:16 31:1,7,21 32:2,4 33:1,8,14, 15,25 34:15,23 35:9,12,15 42:17, 21 43:7 44:15 48:22 51:19 52:1, 18 55:1,16 56:3, 21 58:8 59:5 60:2 64:1 65:14,21 68:4,6 69:15,18 70:22 72:9,13 73:10,25 74:6,8 77:7 78:12 79:11 81:12,25 83:12 86:10 89:13 91:12 92:13 97:18 99:4 124:17 125:7,11

**Voorhies'** 14:4 58:14

### W

**wait** 64:20

**waiting** 63:13

**walk** 31:19

**wanted** 18:15 30:8 58:1 120:7 124:7

**wanting** 80:1

**warn** 83:20

**Washington** 83:19 84:3

**wasteful** 76:7

**watermark** 90:12 91:9

**Weather** 26:10,13 27:1,3

**Wednesday** 27:7, 12 36:12 105:2,7

**week** 13:20 14:13 36:14,18 38:9 39:2,3 79:20 105:1

**weekly** 92:25 105:11

**weeks** 36:5,10 38:16,21,25 65:7

**weighs** 60:13

**Whatsapp** 72:8, 14,22,25 73:2,5, 7,9

**White** 71:5

**Winter** 52:16

**withheld** 55:24

**word** 47:24

**wording** 75:11

**words** 19:5 63:3

**work** 43:25 56:11 74:9 75:6 88:18 116:18

**work-related** 43:20 44:4,9,16

**worked** 11:1,4,14 12:1 28:4,7 40:19,22 119:20

**workers** 88:2

**working** 11:2,6 41:4 80:14 87:4 88:6,10,15,23 113:16 124:18 125:8

**workplace** 39:25 60:21,24 61:18, 21

**works** 23:19 25:2 29:3,20 38:16,21, 22

**world** 45:5

**would've** 38:1,5, 11,14,15,20 76:11 80:9 85:11, 13,14,15 88:12 102:22 119:15,22 120:17 123:7 127:25

**writ** 110:4

**writing** 107:9

**wrong** 25:3 70:23

### Y

**years** 126:19

**Yup** 32:1 100:21

# Exhibit G

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

-------------------------------------

AMERICAN FEDERATION OF GOVERNMENT    )

EMPLOYEES, AFL-CIO, et al.,          )    Case No.

                                     )    3:25-cv-03698-SI

            Plaintiffs,              )

                                     )

      vs.                            )    Volume 2

                                     )

DONALD J. TRUMP, in his official     )

capacity as President of the         )

United States, et al.,               )

                                     )

            Defendants.              )

-------------------------------------

VIDEOTAPED DEPOSITION OF KAREN EVANS

Taken on behalf of the Plaintiffs via online video conference, commencing at 11:18 a.m. on May 26, 2026, pursuant to Notice.

BEFORE:  SANDRA J. GRAN, HI CSR NO. 424

Registered Professional Reporter

Page 1

APPEARANCES:

For the Plaintiff AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.:

DANIELLE LEONARD, ESQ.
ELIZABETH ESHLEMAN, ESQ.
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone (415) 421-7151
Email bchisholm@altber.com
Email dleonard@altber.com
Email eeshleman@altber.com

TSUKI HOSHIJIMA, ESQ.  (Pro hac vice)
Democracy Forward Foundation
PO Box 34553
Washington, DC 20043
Telephone (202) 448-9090
Email thoshijima@democracyforward.org

For the Defendant DONALD J. TRUMP, in his official capacity as President of the United States, et al.:
ROBERT BOMBARD, ESQ.
CHRISTOPHER HALL, ESQ.
ASHLEY DARBO, ESQ.
Trial Attorneys
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone (202) 353-7203
Email robert.bombard2@usdoj.gov

For the Department of Homeland Security:

MATTHEW FLEISCHMAN, ESQ.
US Department of Homeland Security
4530 Wisconsin Avenue NW, Suite 5
Washington, DC 20016-4627

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

For the Witness:

JASON C. GREAVES, ESQ.

Binnall Law Group, PLLC

717 King Street, Suite 200

Alexandria, Virginia 22314

Telephone 703-888-1943

Email jason@binnall.com

Video Technician:  Sean Grant

Also Present:  Eric Vavrasek, Veritext

Page 3

```
                          I N D E X

EXAMINATION BY:                                        PAGE
     MS. LEONARD...................................     8


                       E X H I B I T S


NO.                 DESCRIPTION                         PAGE


Exhibit 300   Karen Evans production - FEMA 2.0,         12
              USA-AFGE-Exp-0425848
Exhibit 301   Voorhis, KLV_000514-KLV_000515            25
Exhibit 302   FEMA 2.0 image, USA-AFGE-Exp-0424415      26
Exhibit 303   USA-AFGE-Exp-0425461                      31
Exhibit 304   FEMA Rapid Response, USA-AFGE-Exp-0425666 32
              & USA-AFGE-Exp-0425738

Exhibit 305   Joe Guy image, USA-AFGE-Exp-0425309       36

Exhibit 306   Troup H, USA-AFGE-Exp-0425962 - 0425964   39

Exhibit 307   Contract Egregiousness, USA-AFGE-Exp-     39
              0425580 - 0425582
Exhibit 308   FEMA - CISA Linkup, USA-AFGE-Exp-0425585  40
Exhibit 309   Not Used
Exhibit 310   Grey, USA-AFGE-Exp-0425828 - 0425831      40
Exhibit 311   DHS Team, USA-AFGE-Exp-0426028 - 0426032  41
Exhibit 312   Victoria Barton, USA-AFGE-Exp-0425965 -   42
              0426011

Exhibit 313   Extracted Pages FEMA Queens, USA-AFGE-    53
              Exp-0425702 & USA-AFGE-Exp-0425664
Exhibit 314   Not Used
Exhibit 315   Common Risks Impeding Adequate Protection 61
              of Government Info, 11 Pages

```

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Exhibit 316    060707 Statement of Evans, 9 Pages          62

Exhibit 317    Phone Preservation Declaration,              66

USA-AFGE-Exp-0425303 - 0425304

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

P R O C E E D I N G S:

VIDEO TECH:  Good morning.  We're going on the record.  The time is 11:18 a.m., and the date is May 26, 2026.  Please note that this deposition is being conducted virtually.  The quality of recording depends on the quality of camera and internet connection of participants.  What is seen from the witness and heard on the screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.  This is Media Unit 1 of the video-recorded of Karen Evans taken by counsel for plaintiffs in the matter of American Federation of Government Employees, AFL-CIO, et al. vs. Donald J. Trump, in his official capacity as President of the United States, et al., filed in the United States District Court for California, San Francisco Division, Case No. 3:25-cv-03698-SI, and is being conducted remotely using virtual technology.

My name is Sean Grant from the firm Veritext.  I am the videographer.  I am not related to any parties in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.  Counsel, all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MS. LEONARD:  Good morning or afternoon, depending

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

on your location.  This is Danielle Leonard, representing the union and organizational plaintiffs.

VIDEO TECH:  Tsuki Hoshijima.

MR. HOSHIJIMA:  Tsuki Hoshijima from the Democracy Forward Foundation, representing certain plaintiffs in this matter.

VIDEO TECH:  Christopher Hall.

MR. HALL:  Hi.  Christopher Hall with the Department of Justice on behalf of the defendants.

VIDEO TECH:  Thank you.

Elle Eshleman.

MS. ESHLEMAN:  Elizabeth Eshleman from Altshuler Berzon, representing all union organizational plaintiffs in this matter.

VIDEO TECH:  A. Darbo.

MS. DARBO:  Ashley Darbo representing FEMA.

VIDEO TECH:  Thank you.

And in the conference room, if one would introduce all.

MR. GREAVES:  We'll just take turns.  Jason Greaves from the Binnall Law Group on behalf of the witness, Karen Evans.

MR. BOMBARD:  Robert Bombard, United States Department of Justice, on behalf of defendants.

MR. FLEISCHMAN:  Matthew Fleischman for the

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

Department of Homeland Security.

VIDEO TECH:  Thank you.

Will the certified court reporter please herself and administer the oath to the witness?  And then counsel may proceed.

THE REPORTER:  Good morning.  I'm Sandra Gran.

KAREN EVANS

Having been first duly sworn, testified as follows:

EXAMINATION:  KAREN EVANS

BY MS. LEONARD:

Q.   Good afternoon, Ms. Evans.  The first day of your deposition took place on Tuesday, March 31st, 2026.  Do you recall that?

A.   Yes.

Q.   And since then, I understand that you have a new role at DHS.  Is that right?

A.   I'm in transition into the new role, yes, ma'am.

Q.   Okay.  Can you tell me, are you still employed as the FEMA chief of staff and SOPDA as of today?

A.   I'm on the FEMA rolls, but I have -- I'm in transition to headquarters, and I am no longer the SOPDA of FEMA.

Q.   Okay.  So, you were replaced as the SOPDA by someone on what date?

A.   I don't have the exact date, but -- and so I was

Page 8

replaced shortly after Ken Hamilton was nominated by the president to be the FEMA administrator.

Q.   In May of 2026?

A.   Yes, ma'am.

Q.   Okay.  And what is your new role at DHS?

A.   I'm going to be working on waste, fraud, and abuse, and we are establishing a position that would be the director for the Waste, Fraud, and Abuse Task Force.

Q.   Is the Waste, Fraud, and Abuse Task Force something within DHS or interagency?

A.   It's the one for within DHS, and then I also am going to be a working member of the VP's Waste, Fraud, and Abuse Working Group Task Force from the executive order.

Q.   The Executive Order 14395?

A.   I don't have the exact number memorized, but it's on the waste elimination.  The -- he is the chair, and the SCC commissioner is the vice chair.

Q.   And do you know where your new position will fall within the DHS organizational structure?

A.   I believe right now I'll be in the management directorate.

Q.   And are the -- are FEMA funds one of the federal benefits programs within the purview of this Waste, Fraud, and Abuse Task Force?

A.   FEMA has been designated, I believe, within DHS to

Page 9

respond to the deliverables and work with all the components within DHS.

Q.    Are the -- Is FEMA involved in your new work at the task force?

A.    FEMA will be involved in that work.  I will be working closely with FEMA.

Q.    And do you know who at FEMA you'll be working closely with?

A.    Right now, I believe that it is going to be with the group that's the chief security officer because that's where the fraud team resides.

Q.    Okay.  We are going to use some exhibits during this deposition, and the way this is going to work is I am going to introduce them through the Exhibit Share program, and they should appear in your Marked Exhibits folder.  The first one I introduced is Exhibit 9, which was previously marked at your last deposition.  Let me know when you are able to open that up.

A.    Do you have to download it?

Q.    You should be able to click on it in the Marked Exhibits folder.

MR. BOMBARD:  There's currently nothing in the Marked Exhibits.

THE WITNESS:  I have nothing in the Marked Exhibits folder.

Page 10

MS. LEONARD:  If you hit refresh, it should appear.

THE WITNESS:  Okay.

MS. LEONARD:  Is it there?

THE WITNESS:  Yes.

MS. LEONARD:  Great.  If you click on it, it should just open up.

THE WITNESS:  Okay.

BY MS. LEONARD:

Q.  Okay.  So, do you have in front of you Exhibit 9 from your previous deposition?

A.  Yes.

Q.  And this is the March 10th reminder from Chief Information Officer Antoine McCord on electronic message federal records preservation.  Do you see that?

A.  Yes, ma'am.

Q.  And you testified at your prior deposition that you recall seeing this March 10th message, correct?

A.  Yes, ma'am.

Q.  Now, Ms. Evans, after receiving this reminder regarding --

MR. GREAVES:  I'm giving her instruction on how to zoom in.  I'm just telling her she can zoom in on the document.  It's very, very small.  There's a zoom function.

THE WITNESS:  I've got it.

MR. GREAVES:  And you can scroll and --

Page 11

THE WITNESS:  Okay.

MS. LEONARD:  All right.  Are we all set?

THE WITNESS:  Yes, ma'am.

BY MS. LEONARD:

Q.   Okay.  Ms. Evans, after receiving this reminder on March 10th regarding electronic message federal records preservation, on the very next day, March 11th, you changed some of the auto-delete settings on your Signal chats, correct?

A.   Yes.

Q.   In particular, after receiving this March 10th reminder from the DHS CIO, you changed the auto-delete settings on the FEMA 2.0 Signal chat, correct?

A.   Yes.

Q.   You reduced that setting from deleting after four weeks to deleting after one week on March 11th, correct?

A.   Yes, I did.

Q.   Okay.  Let's take a look.  I will introduce the next -- Exhibit 300 should appear in the Marked Exhibits folder.  Let me know when you have it.

(Exhibit 300 marked for identification)

A.   I have it.

Q.   Okay.  Do you recognize this?

A.   Well, I have to open it.  Hold on.  Hold on.  Yes.

Q.   Exhibit 300 is an image of the FEMA 2.0 Signal chat

Page 12

that was produced to plaintiffs by defendants from your backups.  Is that correct?

A.   Yes, because I took pictures of the chats that were from this and I sent them into my email, as I previously testified.

Q.   You believe that this was a document that you sent into your email?

A.   No.  I did not send this particular -- I sent the actual chats in accordance with reference management into my email; that's what I testified previously.  And things that I thought were records, I took pictures of, and then based on the policy, we're supposed to remove them from our personal devices, which is what I did.

Q.   You did not take pictures of every message in all of your FEMA-related Signal chats, correct?

A.   I took pictures of what I determined were records, and I sent them in.

Q.   You did not take pictures of every message that was in your FEMA-related Signal chats, correct?

A.   I did not take pictures of what I determined were not records.

Q.   Okay.  This image that you see in front of you, this is an image that was obtained from the backups that you created that were saved on your desktop, correct?

A.   I don't -- I'm not sure what this is produced from

Page 13

because Justice produced those records, so I'm not sure.

Q.   Do you recall that someone came to your house in West Virginia and collected backups that you had saved on your desktop on May 7th?

A.   Yes.  That happened, yes, ma'am.

Q.   Okay.  This image of FEMA 2.0, if you look at Exhibit 300, this is an image from your Signal account, correct?

A.   Yes.

Q.   So the "you" here refers to you, Karen Evans, correct?

A.   Yes, ma'am.

Q.   And this depicts the FEMA 2.0 Signal chat as it existed in your backups, correct?

A.   Yes.  Yes, ma'am.

Q.   And you, Joe Guy, and Kara Voorhis were the participants in this, in this Signal chat, correct?

A.   Yes, ma'am.

Q.   You created it on Saturday, November 15th, 2025.  Do you see that?

A.   Yes, ma'am.

Q.   And this says that you created the group, correct?

A.   Yes, ma'am.

Q.   You chose the name FEMA 2.0?

A.   Yes, ma'am.

Page 14

Q.   And then on Wednesday, March 11th, the day after getting the March 10th reminder from the CIO, you set the disappearing message timer to one week, correct?

A.   Yes, after I copied out and deleted the -- the messages that I determined as a record, yes, ma'am.

Q.   You deleted messages from your Signal application on your personal phone from the FEMA 2.0 group?

A.   Yes.  Because that's what we're supposed to do in accordance with records management.

Q.   When did you delete those messages?

A.   I don't know exactly because I took the pictures of them and I sent them in, and then I deleted those messages that I took pictures of.

Q.   What else did you delete at that time?

A.   The messages that I took pictures of.

Q.   Do you recall when those -- you said you sent them in, by that you mean you emailed them to yourself?

A.   Yes, ma'am.

Q.   And do you have those emails?

A.   FEMA has those emails.

Q.   But you, sitting here today, cannot recall the date that you sent those emails?

A.   I don't have the exact dates of when I actually sent the emails in, but those emails were then -- after the last deposition, when we discussed this, those emails with the

Page 15

pictures were all sent to the FEMA attorneys, all of them.

Q.   You personally collected those emails and sent them to the attorneys?

A.   I forwarded them from my FEMA account to the FEMA attorneys.

Q.   And when you are talking about pictures that you took of the FEMA 2.0 Signal chat that you then deleted the messages on your phone, was that all at once in one -- on one day or did you do that on a series of days?

A.   I can't recall, but I believe I did it all at the same time to make sure that I was following the process appropriately.

Q.   Okay.  And this was roughly in -- sometime in March 2025.  Is that correct?

A.   I believe so, yes, ma'am.

Q.   Okay.  And at no time prior to March 2025 had you taken photographs of the FEMA 2.0 Signal chat and sent those to yourself, correct?

A.   I -- I don't recall because I was taking pictures of chats the way that we're supposed to.  I just do -- I do not recall the exact dates of when I sent them to myself through email.

Q.   You were taking pictures of the content of some of your FEMA-related Signal chats and emailing them to yourself, other than the FEMA 2.0?

Page 16

A.   Because that's the policy, yes, ma'am.

Q.   And when you did take those pictures and emailed them to yourself, you then deleted the content from your personal phone?

A.   Yes, ma'am.  I should have.  Yes, ma'am, I believe so.

Q.   And did you just delete the messages that you took the pictures of, or did you delete the content of the chat to that point in time?

A.   I would delete -- I'm not an expert on Signal, and so I would delete the ones that I took pictures of, so I -- I'm not sure how the deletion function works all the way through Signal.

Q.   But messages in general on this FEMA 2.0 chat prior to March 11th, you know that they were set to delete after four weeks, correct?

A.   Yes, ma'am.

Q.   So all of the content of the chat would be deleted after four weeks from the date of the message, correct?

A.   It should be, yes.  That's how it should work, yes, ma'am.

Q.   And from March 11th forward, any messages that were posted in this chat were deleted within -- by one week later, correct?

A.   If they were posted, they would have been deleted.

Page 17

Q.   That's what changes in the auto-delete settings does is it sets the amount of time that the messages remain, and then they will be automatically deleted after that amount of time, correct?

A.   Yes.  When you set the disappearing messages, it goes -- it's not retroactive, it's forward, so anything going forward would be deleted within a week.

Q.   And that is why, when we look at this FEMA 2.0 image from your backups created in May, there is no -- there are no messages in the content, correct?

A.   No.

MR. BOMBARD:  Objection:  Form, foundational.

BY MS. LEONARD:

Q.   If there are -- sorry.  There are no messages in the content of your FEMA 2.0 chat because the auto-delete settings resulted in all of those messages being deleted, correct?

A.   No.  I disagree with the premise of that question. The reason why there isn't any messages in my backups from March 11th going forward is because I no longer used FEMA 2.0.

Q.   There is no messages from November 15th, 2025, through the date that this backup was created, correct?

A.   You have the messages that I took as pictures from FEMA 2.0 that were related to what I determined were records, so you have -- the messages were produced.

Q.   Are those the only messages that you believe were

Page 18

ever sent in the FEMA 2.0 chat between September -- sorry, Saturday, November 15th, and May 7th?

A.    I believe that what I sent in were the relevant messages in accordance with the records management process that I sent forward.  And I did the records retention in accordance to policy when the work was being -- work was being done on a personal device.

Q.    Ms. Evans, those are not the only messages that were contained in the FEMA 2.0 chat between November 15th and May 7th, correct?

A.    I had -- I don't recall.

Q.    You don't recall whether there were any other messages other than the two screenshots that you emailed to yourself?

MR. BOMBARD:  Objection:  Foundation.

THE WITNESS:  I really don't recall how much we used FEMA 2.0.

BY MS. LEONARD:

Q.    Ms. Evans, you know that there were additional messages in FEMA 2.0 other than the ones that you took an image of and emailed to yourself, correct?

MR. BOMBARD:  Objection:  Asked and answered.

THE WITNESS:  I -- like I said, what I did was I copied the ones that I thought were records and I sent them in, and then I deleted the messages.  And as you stated, I set

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

disappearing messages.  And I never used FEMA 2.0 after the March 11th date; that's why there's nothing else in the backups.

BY MS. LEONARD:

Q.   There's nothing in the backups before the March 11th date either because you set the auto-delete at four weeks from November 15th through March 10th, correct?

MR. BOMBARD:  Objection:  Foundation.

THE WITNESS:  There's nothing -- the way that -- it's my understanding that the way that it works is the auto-delete was set at four weeks, and so if there were messages in there that were four weeks or older, they would have auto-deleted.

BY MS. LEONARD:

Q.   And Ms. Evans, you know that there were messages that the auto-delete function deleted in the FEMA 2.0 chat, correct?

MR. BOMBARD:  Objection:  Foundation.

THE WITNESS:  They -- I guess, except as I stated, I determined what were records from this chat and I sent them in, the ones that were appropriate.

BY MS. LEONARD:

Q.   When you say "appropriate," that was your determination of what was work-related?

A.   Yes, ma'am, and what is in accordance with the

Page 20

records management policy for the department.

Q.   And you were making -- you were making the assessment that some subset of the discussions in FEMA 2.0 were appropriate to preserve and other messages were not, correct?

A.   That -- yes, ma'am, that's how the policy works.

Q.   That's how you understood the policy to work?

A.   Yeah, that's how the policy is stated.  There is -- there are levels of review that you do, and then it's up to the individual to make the determination of whether the information exists in other places or if it's original information.  And if you determine that it's a record, then you take the picture, and you send it in, and then you remove it from your personal device.

Q.   Actually, if you look back -- Can you open up Exhibit No. 9, please?

A.   Hold on a second.  Oh, wait.  Hold on one second, please.  Yes, ma'am, it's up.

Q.   Okay.  So if you look at the first page of Exhibit 9, this is what the chief information officer of DHS is sending out to employees, and it says, "This is a reminder that all DHS employees must preserve their electronic messaging records."  Do you see that?

A.   Yes, ma'am.

Q.   And it also says that -- hold on one second.  "If

Page 21

employees send work-related messages using a phone SMS or iMessage app or an approved encrypted app such as Signal or WhatsApp, those messages must be archived."  Do you see that?

A.    Yes.

Q.    "If employees send work-related messages," do you see that?

A.    Yes.

Q.    And then it says, "All work-related communications and records are considered official government records and must be preserved regardless of format."  Do you see that?  The first bullet point.

A.    Okay.

Q.    "All," do you see the word "all"?

A.    Yes, ma'am.

Q.    "All work-related communications and records are considered official government records."  Do you see that?

A.    I see that's what he wrote, yes, ma'am.

Q.    And it doesn't say individual employees can determine in their own personal understanding what a work-related record is, does it?

A.    Actually, this is a complement to this document, that's a worksheet that we get when we leave, that actually asks us to go through and do the determination on those records.  And the reason why I know that is because I'm in transition, and I have the worksheet that I'm going through

Page 22

again on the records.

Q.   Ms. Evans, this says all work-related communications and records must be preserved, does it not?

A.   Yes, and I did do work-related.  Just because it's on FEMA 2.0 doesn't mean that the discussion was work-related.

Q.   Your testimony under penalty of perjury to the court is that you preserved all work-related communications on FEMA 2.0, Ms. Evans?

A.   Yes.

MR. BOMBARD:  Objection to form.

THE WITNESS:  I was going to say that's not what my testimony has been, and that's not what I'm saying now.  I think that I've been pretty clear about how I was preserving records off of FEMA 2.0.

BY MS. LEONARD:

Q.   You were not preserving all work-related communications on your Signal chat, were you, Ms. Evans?

MR. BOMBARD:  Objection to form.

THE WITNESS:  I don't recall -- to your point about the communications that were on FEMA 2.0, all of them, and as I previously stated, I took the pictures of what I thought were work-related records that were records and sent them into my email.

BY MS. LEONARD:

Q.   Do you see this says "all work-related

Page 23

communications and records"?  Do you see that?

A.    Yes, ma'am, I do see that.

Q.    You're the former chief information officer for DHS, right?

A.    Yes, ma'am.

Q.    You understand what your obligations were with respect to preserving work-related communications, don't you?

A.    Yes, ma'am.

Q.    You were required to preserve all work-related communications, and you did not do that, correct, Ms. Evans?

MR. BOMBARD:  Objection to form.

THE WITNESS:  I believe that I did preserve all the records and the communications.

BY MS. LEONARD:

Q.    By emailing them to yourself?

A.    Or with the subsequent stuff based on the additional court orders and I did backups and I did backups on Signal.

Q.    For chats for which you set the auto-delete function to delete messages after a certain amount of time, correct?

A.    Yes, ma'am.

Q.    If you look at the third bullet point here in this policy, it says, "DHS policy requires employees to use work devices for all work-related activities."  You did not comply with that policy, did you, Ms. Evans?

MR. BOMBARD:  Object to form.

Page 24

THE WITNESS:  The way that it's written, no.  People wrote to me on my personal device.

BY MS. LEONARD:

Q.   And you wrote to them on your -- using your personal phone, correct?

A.   Yes.

Q.   And you used your personal phone for phone calls as well, correct?

A.   I used my personal phone for some phone calls, yes.

Q.   That were work-related?

A.   They may have been work-related.  I also did it for safety purposes because my phone was connected to my car, and so if people called me, you have to have hands-free, and so my personal phone is connected to my car; that's why people would reach out to me if I was driving home or driving to work.

Q.   Ms. Evans, your car has the capability of connecting more than one phone using Bluetooth, correct?

A.   I didn't do that because I didn't want all the contacts and things like that to be uploaded into my car.

Q.   Okay.  Let's look at another version of the FEMA 2.0 chat.  Give me one second.  You should see Exhibit 3 point -- 301.

(Exhibit 301 marked for identification)

A.   Okay.

Q.   I'll represent to you that this is the FEMA 2.0

Page 25

content that Kara Voorhis was able to produce to us in response to a subpoena, and she produced this on May 11th. And you see also that her chat also does not contain any messages as a result of the auto-delete settings.  Do you see that?

MR. BOMBARD:  Object to form.

THE WITNESS:  Yes.

BY MS. LEONARD:

Q.    And this says you added Kara Voorhis to the group on Saturday, November 15th, correct?

A.    That's what it says, yes.

Q.    And it says that the disappearing message time was set to four weeks from the outset.  Do you see that?

A.    Yes, ma'am.

Q.    And you did that when you created the group, correct?

A.    Yes, ma'am.

Q.    Okay.  Let's look at the next.  It should be 302.

(Exhibit 302 marked for identification)

A.    Okay.

Q.    302 is one of the images of the FEMA 2.0 chat that was produced to us by defendants from your phone.  Do you see that?

A.    Yes, ma'am.

Q.    Okay.  And we received this after your deposition.

Page 26

Do you understand that?

A.   I -- okay.  I don't know when you received it, but yes, ma'am.

Q.   Do you recognize this?

A.   Yes, ma'am.

Q.   Who took this picture?

A.   I took the picture.

Q.   And what phone did you use to take the picture?

A.   I have a backup phone that I took the picture on.

Q.   Is it a personal phone or was it a FEMA-issued phone?

A.   It's not a FEMA-issued phone.  It was a personal phone.

Q.   So you used one personal phone to take a picture of another personal phone, correct?

A.   Yes.  And then I sent this in, and it's deleted off of the personal phone, yes.

Q.   Do you -- do you know how to take a screenshot using their phone?

A.   Actually, on this new phone, I have a new Android phone, so I did not take a screenshot of that; I took an actual picture.

Q.   All right.  But do you know how to do it?

A.   I haven't tried to do a screenshot, so I would have to say, for the record, right now I do not know how to do a

Page 27

screenshot off of my Android phone.

Q.   Where were you when this photo was taken?

A.   I really don't know, probably at my house.

Q.   And you don't recall what day you took this and emailed it to yourself?

A.   No, ma'am.  I mean, but you can probably look at the actual stuff on the picture, but no, I don't recall when I actually took it.

Q.   Well, defendants represented to us that the messages in this chat that are depicted here took place on March 5th. Does that sound correct?

A.   I really don't know.

Q.   Looking at the content of this, you don't recall?

A.   I recall her asking about it, but I don't recall the actual date, no, ma'am.

Q.   And you see that there's a message that's above that that's cut off there?

A.   Yes, I do.

Q.   And do you believe that's not work-related?

A.   I don't know what the message -- I don't remember.

Q.   You did not take a picture and capture the previous messages in the chat when you took this screenshot, correct?

MR. BOMBARD:  Objection:  Form and foundation.

THE WITNESS:  I don't recall all the pictures that I took in the FEMA 2.0 chat.  Like I said, I took the pictures,

Page 28

and then I sent them into my email.

BY MS. LEONARD:

Q.    And your understanding is that all of those pictures have been produced -- that you actually took have been produced to the plaintiffs?

A.    I don't know what DOJ has produced to you or not.

Q.    On the date this picture was taken, the auto-delete setting was still four weeks, not one week, correct?

A.    Yes.

Q.    So it appears that this was taken prior to March 11th, correct?

A.    Yes.

Q.    And the messages that were depicted here would have been deleted by the time you created your backup of FEMA 2.0 because of the auto-delete settings, correct?

A.    I'm not really sure when I actually started initiating the backups on Signal.  A lot of it had to do with the different court orders and the statements that I had made about preserving records, so I'm not exactly sure of the exact date of when I started using the Signal backup function.

Q.    Well, the backup image that we got, we just looked at, that was Exhibit 300, and it contains no messages, correct?

A.    Yes.  It contained no messages, yes, ma'am.

Q.    So the messages on the FEMA 2.0 chat that were

Page 29

depicted in Exhibit 302 had been depleted by that time, correct?

A.    That's what it appears to be, yes, ma'am.

Q.    Along with all the other messages in FEMA 2.0, correct?

A.    That -- okay.  So, again, I'm not a Signal expert, but deleting messages are not retroactive, that deleting message feature is not retroactive.  It's only going forward; it's not retroactive.

Q.    But you set the auto-delete from the start for four weeks, correct?

A.    Yes.

Q.    So any messages that were posted in this chat between November 15th and March 11th, when you changed the auto-delete setting, would have been deleted four weeks after they were posted, correct?

A.    Can you -- can you restate that question again?

Q.    Sure.  Any messages in the FEMA 2.0 chat from November 15th through March 11th when you changed the auto-delete settings would have been deleted four weeks after they were posted, correct?

A.    Yes.

Q.    The images you see here, these are work-related communications, correct?

A.    Yes.

Page 30

Q.   Kara Voorhis is talking to you about staffing plans?

A.   She's talking to me about contractor data.

Q.   The overall staffing plan.  Do you see that in the middle of the page?  She's talking about the overall staffing plan.  Do you see that?

A.   Yes.

Q.   Okay.  Let's take another look at another image we received from FEMA 2.0.

(Exhibit 303 marked for identification)

A.   Is this the 303?

Q.   Yes.

A.   Okay.

Q.   Okay.  So this is another document that was produced to us.  I will represent to you that this was given to us on May 4th by counsel.  This is an image from FEMA 2.0.  Do you -- do you recall when you took this picture, Ms. Evans?

A.   No, I don't recall when I took this picture.

Q.   Does that look like the same setup as the last one?

A.   Yes, ma'am.

Q.   Okay.  Do you have any idea what the date of these conversations was?

A.   No.  Right offhand, no, I don't recall the date.

Q.   Okay.  The auto-delete setting is four weeks at the top, so it is likely this was before March 11th, correct?

A.   Yes, ma'am.

Page 31

Q.   Do you recall when you gave this to counsel?

A.   I gave all the emails as a result of our last time that we talked, the last deposition, because when I was talking about taking pictures from the different Signal chats and sending the records in, I don't believe that you had them; that was the discussion.  So I'm not really sure how all of that was produced, I just know that when I went back, I had -- I forwarded all the emails that had all the pictures to the FEMA counsel.

Q.   At some point in time after your deposition?

A.   As -- yes, ma'am, as they requested.

Q.   Okay.  Ms. Evans, the FEMA 2.0 Signal chat is not the only Signal chat on which you changed the auto-delete settings on March 11th, correct?

A.   I don't recall all of the ones that I changed the settings on.

Q.   Okay.  Let's take a look at Exhibit 304.  This is an excerpt.  This was a longer chat.  I will represent to you that we've given you the first page and the last page that were produced to us from the backups of the FEMA Rapid Response.  Do you see that?

(Exhibit 304 marked for identification)

A.   Yes.

Q.   Okay.  So, FEMA Rapid Response, that's the Signal chat that was on your personal phone, correct?

Page 32

A.    Yes.

Q.    And this is FEMA-related, correct?

A.    Yes.

Q.    And the other participants included Victoria Barton, someone named Lauren, Micah Bock, and three others, including yourself, correct?

A.    That's what it says, yes.

Q.    Okay.  And if you scroll to the second page, there's a notation here, at the very top, it says, Wednesday, March 11th, and it says you set the disappearing message timer to one week.  Do you see that?

A.    Yes.

Q.    So on March 11th, you also set the auto-delete function on the FEMA Rapid Response Signal chat to delete after one week, correct?

A.    Yes.

Q.    How many other chats did you shorten the auto-delete settings for on March 11th, Ms. Evans?

A.    I don't recall.  And this one -- like I said, I don't recall the ones that I set to one week.

Q.    Are there others?

A.    There may be.  I don't recall.

Q.    You had many other Signal chats that did have auto-delete settings on them on your personal phone, correct?

A.    I had other Signal chats that are not FEMA-related

Page 33

that also have auto-delete.

Q.   You had FEMA-related Signal chats that had auto-delete settings, did you not?

A.   Yes, there are Signal chats that had -- that are FEMA Signal chats that were set on auto-delete, but I believe at this point is when I also backed up what was -- the Signal chats, because there were backups, Signal offered backups, and so I was backing up my Signal chats.

Q.   When do you believe you began backing up your Signal chats?

A.   I don't know exactly, and like I said, I'm not a FEMA -- I mean, I'm not a Signal application expert, but I started doing backups of the Signal chats through the backup feature that was newly offered by Signal.

Q.   You did a backup in April 2026, correct?

A.   I did that backup on April 25th because of the declaration that I needed to do, and I backed that up and stored it offline so that I would have the backup that was associated with my declaration.

Q.   Do you believe that you created backups of your Signal chats on your personal phone prior to April 25th?

MR. BOMBARD:  Object to form.

THE WITNESS:  I'm not sure.  I don't recall.  But I know I did it on the April 25th one because of the declaration, and I stored it offline so that I would have it

Page 34

because it said that, you know, as of this date, I had preserved the records that I had.

BY MS. LEONARD:

Q.    We'll get to that.  Do you believe that you ever created a backup of any Signal chat related to your work at DHS or FEMA prior to April 25th, Ms. Evans?

A.    I don't recall.  I'm not -- I don't know.

Q.    What new backup option were you talking about when you just referred to that?

A.    In my research and looking at stuff with Signal, Signal offered backup capabilities, I believe, starting in February of 2026.

Q.    Do you believe that you backed up any of your Signal chats starting in February of 2026?

A.    I'm not a hundred -- I don't know.  I don't recall.

Q.    You just participated in an exercise to collect all of your FEMA-related Signal chats that you had backed up, correct?

A.    Yes, ma'am.

Q.    And you can't tell me whether you created any backups of any FEMA-related Signal chats prior to April 25?

MR. BOMBARD:  Object to form.

THE WITNESS:  I did the offline backup on April 2025 to make sure that I had it for that point in time because of the way that I understand Signal would work, and so that time

Page 35

period had the messages that were present in Signal at the time that I signed a declaration for the time period of December 1st through March the 6th, I believe.

BY MS. LEONARD:

Q.   Other than the ones that had been deleted because of the many auto-delete settings in your Signal chats, correct, Ms. Evans?

MR. BOMBARD:  Object to form.

THE WITNESS:  That's my understanding, yes, ma'am.

BY MS. LEONARD:

Q.   Okay.  Take a look at Exhibit 305.

(Exhibit 305 marked for identification)

A.   Okay.

Q.   Sorry, my -- my Exhibit Share just got hung up. Hold on.

MR. GREAVES:  You can do the two-finger scroll (inaudible).

THE REPORTER:  I'm sorry.  I didn't hear that.

THE WITNESS:  He's telling me how to scroll so that I can read the message.

THE REPORTER:  Thank you.

BY MS. LEONARD:

Q.   Okay.  I will represent to you that this is an image of a Signal chat between you and Joe Guy that was produced to us by defendants' counsel.  We received this one on April --

Page 36

April 29th.  Do you recognize this?

A.   Yes.

Q.   There's a message from you on Wednesday, February 4th, to Mr. Guy discussing restarting CORE renewals.  Do you see that?

A.   Yes, ma'am.

Q.   Okay.  And what is the auto-delete setting for this chat between you and Joe Guy at the time of these messages?

A.   It looks like it's set for one week.

Q.   Okay.  It was set for one week, that appears to be the auto-delete setting at the time that you took a picture of the chat, correct?

A.   That's what it looks like, yes.

Q.   And if you took that picture in March, that was considerably more than one week after the conversations with Joe Guy in January and February, correct?

A.   Yes.

Q.   Do you know when the auto-delete setting was changed to be one week after February 9th?

A.   No, I don't.  I don't recall.

Q.   Did you do that?

A.   I don't recall.  I don't -- I really don't recall.

Q.   But someone did it, right?

A.   Yes, 'cause it's set to one week.

Q.   And so, as the former chief information officer at

Page 37

DHS, what did you do to ensure that all of the work-related communications in the chat with Joe Guy were being preserved, Ms. Evans?

A.   Well, I took a picture of this one, and I took the work-related ones, and I sent them in as I previously stated.

Q.   All the work-related communications?  That's your testimony that you took images of every work-related communication in the Signal chats on your personal phone?

MR. BOMBARD:  Objection:  Form.

THE WITNESS:  Sorry.  Can you state that again?

BY MS. LEONARD:

Q.   Ms. Evans, you did not take an image and send it in of every work-related communication on all of the Signal chats on your personal phone, did you?

MR. BOMBARD:  Object to form.

THE WITNESS:  I -- as I previously stated, I took pictures of what I had determined to be records that were original content that needed to be sent in, and I did.

BY MS. LEONARD:

Q.   But that did not include all work-related communications, correct?

MR. BOMBARD:  Object to form.

THE WITNESS:  I really don't recall because, as I previously stated, I had a relationship with Mr. Guy before we started working at DHS together.

Page 38

BY MS. LEONARD:

Q.    Okay.  Let's take a look at the next exhibit, 306.
Ms. Evans, this is an image of a Signal chat from your
personal phone that you had with Troup Hemmingway that was
produced to us from the backups.  Do you see that?

(Exhibit 306 marked for identification)

A.    Yes, ma'am.

Q.    And what is the auto-delete setting that appears
here?

A.    It says one week.

Q.    So your Signal chat with Troup Hemmingway was set to
disappear after one week, correct?

A.    That's what it says, yes.

Q.    Okay.  Let's take a look at the next.  Exhibit 307
should appear.

(Exhibit 307 marked for identification)

A.    Okay.

Q.    Exhibit 307 is a FEMA-related Signal chat that you
produced to us on May 12th.  The title, I believe, is Contract
Egregiousness.  What is the auto-delete setting on this chat,
Ms. Evans?

A.    It says one week.

Q.    Okay.  Let's look at the next.  You should see
Exhibit 308.  308 is another Signal chat produced to us on May
12th from your backups.  It's entitled FEMA - CISA linkup.

Page 39

What is the auto-delete setting on this chat, Ms. Evans?

(Exhibit 308 marked for identification)

A.    It's -- it looks like one week.

Q.    Okay.  You will see Exhibit 310.  310 is a Signal chat between you and someone named Grey.  Do you see that?

(Exhibit 310 marked for identification)

A.    Yes.

Q.    Is that -- Who is Grey?

A.    Grey was the chief of staff for the management directorate.

Q.    What is his full name?

A.    Greyson McGill.

Q.    Greyson McGill.  So this is a Signal chat between yourself and Greyson McGill that also has an auto-delete setting of one week, correct?

A.    Yes, that's what it looks like he set it to.

Q.    And he set that right after a message that says, "Did management send out the guidance on COREs at FEMA?"  Do you see that?

A.    I do see where I asked him the question about COREs, yes.

Q.    And then Grey set the disappearing message timer to one week after that.  Do you see that?

A.    Yes, I do see that.

Q.    So in your backups, there was no more contact after

Page 40

Grey set the disappearing messages to delete after one week, correct?

MR. BOMBARD:  Object to foundation.

THE WITNESS:  That appears to be the case.

BY MS. LEONARD:

Q.   Okay.  You also had other Signal chats related to DHS and FEMA that were set to delete after one day, didn't you?

A.   I don't recall.

Q.   Okay.  Let's take a look.  You will see Exhibit 311.

(Exhibit 311 marked for identification)

A.   Hold on.  I'm sorry.  I'm now in that.  Okay.

Q.   Okay.  So, Exhibit 311 is a Signal chat that was produced to us on May 12th from your backups that is entitled DHS team.  Do you see that?

A.   Yes.

Q.   And it involves Joe Guy, Grey, 23 others, that's what it says.

A.   Yes.

Q.   And the auto-delete setting for this chat is one day, correct?

A.   Yes.

Q.   And this document that was produced to us has no messages in it because of the auto-delete setting of one day, correct?

Page 41

866-299-5127          calendar-ca@veritext.com          www.veritext.com

MR. BOMBARD:  Object to foundation.

THE WITNESS:  And this is all before we even came into the administration, so this is not in an official capacity.

BY MS. LEONARD:

Q.  August 30th, 2025, is before you came into the administration?

A.  This is the date that they have it, but this group was set up for transition.

Q.  And it was deleted after one day through 2025, correct?

A.  I believe that's the case, yes, ma'am.

Q.  And it was still on your phone at the time you created your backups on April 25th, 2026, correct?

A.  Yes.

Q.  Okay.  Let's take a look at the next.  Hold on one second.  My Exhibit Share is being a little slow.  Okay.  You should see Exhibit 312.

(Exhibit 312 marked for identification)

A.  Hold on.  I'm trying to get the computer to go down.

Q.  This is a -- this is a bigger one, so it might take a second to load.

A.  Okay, it's here.

Q.  This is a Signal chat that was produced to us from your backups with Victoria Barton.  Do you see that?

Page 42

A.   Yes.

Q.   Victoria Barton was the press person for FEMA in -- at the end of 2025 into 2026, correct?

A.   Yes.

Q.   And you spoke with Ms. Barton about such things as the CORE renewals at times, correct?

A.   If it related to the press, yes, ma'am.

Q.   And what is the auto-delete setting on your chat in Signal with Ms. Barton?

A.   I -- it looks a little blurry.  It looks like it's one day.

Q.   Okay.  And if you -- so we included the whole chat that was produced, 61 pages produced to us.

A.   Okay.

Q.   If you scroll to the last page that was produced to us, the very last page of the document -- let me know when you're there.

A.   Hold on.  I don't think I'm there yet.  Yes, I am there.

Q.   The date of the last messages that appear here is Friday, March 6th, correct?

A.   I believe that's the case.

Q.   And it's a message from you that says I put the information in the Rapid Response.  That's a reference to a different FEMA-related Signal chat, correct?

Page 43

A.    Yes.

Q.    And it must be that the one-day auto-delete was set at some point after March 6th, correct?

A.    That would be the case, yes, because it's going forward, not retroactive.

Q.    Who set the auto-delete to one day, Ms. Evans?

A.    I don't recall.  I don't -- I don't know.

Q.    Could it have been you?

A.    I don't think so, but I don't know.  I can't recall.

Q.    This is just a chat between you and Ms. Barton, right?

A.    Yes, ma'am, I believe that's the case.

Q.    And so it would have had to have been one of the two of you who set the auto-delete function to one day after March 6th, correct?

A.    Yes, ma'am.

Q.    Okay.  Do you recall that I asked you at your first day of deposition about Signal settings for disappearing messages?

A.    No, I don't recall you asking me about that.

Q.    Okay.  I can read you the deposition testimony. It's on page 158 of your deposition.  The question was, "If we were to look at your personal phone here today and the Signal application, do you believe it would contain a record of the group chat?"

Page 44

And you said, "I'm unsure."

And I said, "Why are you unsure?"

And you said, quote, "Because I am not sure of the settings for the disappearing messages."

Do you see that?  That's what you said.

A.   Okay.

MR. BOMBARD:  Objection:  We don't have that transcript in front of us.

BY MS. LEONARD:

Q.   Okay.  You testified you were not sure of the settings for your disappearing messages.

A.   Okay.

Q.   That was --

A.   Yes.

Q.   -- weeks after you had changed the auto-delete settings on at least two of your FEMA-related chats, correct?

A.   Okay.  So the deposition was March 31st, right?

Q.   Correct.

A.   And so what are you asking me, that -- I'm sorry, I'm not following your question.

Q.   On March 31st, you testified that you were not sure of the settings for disappearing messages.

A.   Yes.

Q.   That was just a few weeks after you had personally changed the auto-delete settings on at least two FEMA-related

Page 45

chats on March 11th, correct?

A.   Yes.

Q.   And you appear to have dozens of FEMA-related chats that have auto-delete settings, at least that's what you produced in your backup, correct?

A.   That's what it appears, yes, ma'am.

Q.   And some of those, you set the auto-delete settings yourself from the outset, like FEMA 2.0, correct?

A.   FEMA 2.0, yes, that's what it shows, that I set the auto-delete.

Q.   And you have over 30 years of experience in cybersecurity, right?

A.   I don't have over 30 years.  I've worked over 30 years, but go ahead.

Q.   Your -- you have an extensive background in cyber security, correct?

A.   Yes, ma'am.

Q.   You are the former chief information officer of both the Department of Energy and Homeland Security, correct?

A.   Yes, ma'am.

Q.   You know how auto-delete settings work, right?

A.   Yes.

Q.   At the time you changed the auto-delete settings on March 11th for these Signal chats, you knew that the court in this case had already held a hearing on the injunction asking

Page 46

the court to halt a plan to dismantle FEMA, right?

MR. BOMBARD:  Objection:  Form.

THE WITNESS:  Okay.  I'm not sure of the question the way that you're asking the question about --

BY MS. LEONARD:

Q.  Okay.  Let me ask it again.  On March 11th, you knew that the court had already held a hearing on plaintiffs' request for an injunction to halt the plan to dismantle FEMA. You knew about that, right?

A.  Yes.

Q.  Because you had provided a declaration for the court.

A.  Yes.

Q.  Okay.  Let's take a look.  This is going to pop up as 34, which is the previous exhibit number given, so it should be at the top of the list.  Do you see --

A.  Okay.

Q.  -- Exhibit 34?

A.  Yes, ma'am.

Q.  You signed that declaration on February 19th, right?

A.  Yes, ma'am.

Q.  You signed your declaration before you changed auto-delete settings on some of your Signal chats, correct?

A.  Yes, ma'am.

Q.  Okay.  So you also had had an email exchange with a

Page 47

friend at OMB about that hearing.  We talked about that last time.  Do you recall that?

A.  Yes, ma'am.

Q.  And that email exchange was -- here, let's mark it. Give me one moment.  I'll give it the same exhibit number. This is going to make it 28; that's the previous exhibit number.  So if you pull up 28, that email exchange was on March 3rd.

A.  Okay.

Q.  Talking about the -- talking about the hearing before the court in this case, correct?

A.  Yes.

Q.  And just roughly a week before you changed the auto-delete settings on some of your Signal chats, correct?

A.  It's dated March the 3rd, yes, ma'am.

Q.  And after the hearing, you helped defendants collect some documents to produce to plaintiffs because you knew that the court had ordered defendants to produce documents, correct?

A.  Yes, ma'am.

Q.  Do you recall that the date of that order was March 3rd, also, the day of the hearing?

A.  No, I don't recall that that's the date.

Q.  But you recall helping to collect documents after that?

Page 48

A.    We received a preservation order, yes, ma'am, and then -- yes.

Q.    You did things like collect your handwritten notes, correct?

A.    Yes.  I produced my handwritten notes, yes.

Q.    But you didn't collect and produce your Signal chats right away, did you?

MR. BOMBARD:  Object to form.

THE WITNESS:  As I previously stated, I had taken pictures of the Signal chats, and I had sent them into my email.  And I said that at the -- at our previous session as well.

BY MS. LEONARD:

Q.    Had you given those emails and the Signal chats to your lawyers before your deposition?

A.    I did not because I thought that they were in the emails.  So they were doing the discovery, and so they were all in the email.  It was after the deposition that they specifically asked me to forward those emails directly to the FEMA chief counsel and his staff, which I did.

Q.    You also were involved in helping to create a declaration for Latoya Prea regarding the individuals involved in CORE renewals.  Do you remember that?

A.    No, I don't remember being involved in preparing a deposition for Latoya Prea.

Page 49

Q.   You don't remember helping her identify the individuals to include on the declaration to the court?

A.   I don't recall that, no, ma'am.

Q.   You don't recall telling her to include Joe Guy and Troup Hemmingway?

A.   I don't recall it.

Q.   And you don't recall that the date of that declaration was March 5th?

A.   Of Latoya's declaration?

Q.   Yes.

A.   I don't recall her specific dates of her declaration, no, ma'am.

Q.   Okay.  So, after your deposition and after further court orders, you recently collected or helped defendants' counsel collect the contents of the backups you have referred to that were stored on your desktop at home, correct?

A.   Yes, ma'am.

Q.   You produced a total of 47 FEMA-related Signal chats from the backups for your personal phone, correct?

MR. BOMBARD:  Objection to foundation.

THE WITNESS:  I don't know the exact number of the chats.

BY MS. LEONARD:

Q.   So -- you know it was a large number, correct?

MR. BOMBARD:  Object to form.

Page 50

THE WITNESS:  I really don't know the number.  I know that we produced them.

BY MS. LEONARD:

Q.  So here's the list, Ms. Evans, and I want to tell me if any of these don't sound right.  Adam Stahl, Advisor Counselor Coordinator, Andrew Ott, Andrew Whitacre, Antoine, Biloxi, CA EO, CISA Team, Caroline Miller, Contract Egregiousness, DHS Team, David Bibo, Disaster Response Updates, EL Support, FEMA - CISA linkup, FEMA 2.0, FEMA ESEC, FEMA HQ, FEMA ORR Awareness, FEMA QUEENS, FEMA Rapid Response, FEMA, Fred Doucette, Gregg Phillips, Grey, IGA OPE, Jason Killmeyer, Joe Guy, Joshua D Whitehouse, Kara Voorhis, Karen Bis, Karen Gregg Kara + Joe, Keith Turi, MS FEMA Trip, Micah Bock, Mike Kangior, Mount Weather, OK, Octavian Miller, Quick Turn, Sean Thrush, Sean Plankey, Shila Cooch, Tristan Thorgersen, Troup Hemmingway, Victoria Barton, and Winter Storm Team.  All of those FEMA-related chats were in your Signal application as of May 7th, correct?

MR. BOMBARD:  Object to form.

THE WITNESS:  I also talked with the Justice attorneys that day, and some that you've listed off that list are not FEMA-related, but they produced them anyway.

BY MS. LEONARD:

Q.  There were a substantial number of FEMA-related Signal chats that you collected on May 7th from your personal

Page 51

phone, correct?

A.    Yes, ma'am.

Q.    And those Signal chats spanned twenty -- some of them going all the way into 2025 into 2026, correct?

A.    I believe that's the case, yes, ma'am.

Q.    Do you recall at your deposition I asked you if you used Signal for FEMA-related communications?

A.    Yes, ma'am.

Q.    And I asked you specifically, this is a quote, "Tell me all of the group chats that you were involved with on your Signal application that involved FEMA business, please."  Do you recall that?

A.    No, I don't.

Q.    Do you recall how many you told us about in responding to that question?

A.    No, I don't.

Q.    You identified three, Ms. Evans.  You participated in far more than three FEMA-related Signal chats on your personal phone, correct?

A.    That -- yes, ma'am, that appears to be the case.

Q.    Some of the Signal chats on your phone that were FEMA-related did not have auto-delete settings, right?

A.    I don't recall all the settings on the -- on the Signal chats, as I previously stated.

Q.    Okay.  I'm going to show you another one.  This one

Page 52

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

is going to come up as 313.

(Exhibit 313 marked for identification)

A.    I'm sorry.  I'm trying to scroll down.

Q.    313, yes.

A.    Okay.  Hold on.  Okay.

Q.    This Signal chat is named FEMA Queens.  Did you see that?

A.    Yes.

Q.    The FEMA Queens were yourself, Victoria Barton, and Kara Voorhis, right?

A.    Yes.

Q.    And I can tell you that this is an excerpt of the longer chat, and we gave you the first page and the last page that was produced to us.  Okay?

A.    Okay.

Q.    If you look at the title at the top, it does not appear to have a disappearing message setting, correct?

A.    Yes, it doesn't appear to have a message setting.

Q.    And if you look at the last page, as of the backup, it says you can't send messages to this group because you are no longer a member.  Do you see that?

A.    Yes.

Q.    You became -- you exited the FEMA Queens group at some point after February 26?

A.    I withdrew from the group, and I backed up this

Page 53

chat.  This chat is archived.

Q.   When did you withdraw from the group?

A.   I don't know exactly when I withdrew from the group.

Q.   But it was sometime after February 26?

A.   Yes, yes.

Q.   And not having an auto-delete setting on this chat means that the backup of the chat should include all messages that someone didn't individually delete.  Is that fair?

A.   Yes, ma'am, it should, yes.

Q.   And that chat was on your phone at the time that you helped defendants collect documents in this litigation, correct?

A.   Actually, it's not on my phone because it's archived.  It was in the backup because it's archived.

Q.   Do you recall when you archived it?

A.   When I -- when you withdraw from the group, then it archives the chat, so I don't -- I don't know the exact date when I withdrew from the group.

Q.   You can access your archived chats on your Signal application, can't you, Ms. Evans?

A.   I'm not a hundred percent sure, but I know they're backed up because we -- we accessed them.  Yes, the archived chats -- I'm recalling how it works.  Yes, the archived chats are set in an archive directory that you can then access those.

Page 54

Q.   So, at the time that you collected the screenshots and gave them to your counsel after your deposition, you didn't collect any screenshots from FEMA Queens, did you?

MR. BOMBARD:  Objection:  Form.

THE WITNESS:  No, I didn't.

BY MS. LEONARD:

Q.   Even though this message on February 26th refers to the COREs.  Do you see that?

A.   Yes, I do see that.

Q.   "Victoria, I have to verify a number on the COREs, and then I will send something for you."  Do you see that?

A.   Yes.

Q.   That is a work-related communication, is it not, Ms. Evans?

MR. BOMBARD:  Object to form:  Foundation.

THE WITNESS:  Yes, and I would have sent it through email, so based on my interpretation, there was another content -- there was other content related to the question that she had asked.

BY MS. LEONARD:

Q.   Ms. Evans, you did not take an image of this chat and send it via email, did you?

A.   No, ma'am, not prior to me making the backup.

MS. LEONARD:  Why don't we -- I think now is a good time for a break.  We'll take a very short break, and then we

Page 55

will resume again.  How much time would you like?

MR. BOMBARD:  Five minutes is fine for us.

MS. LEONARD:  Okay.  Five minutes is great.

VIDEO TECH:  Going off the record.  The time is 12:32 p.m.

(Pause in Proceedings:  12:32 p.m.-12:39 p.m.)

VIDEO TECH:  Back on the record.  The time is 12:39 p.m.

BY MS. LEONARD:

Q.   Okay.  Ms. Evans, could you pull up Exhibit 313 again?  It's the images -- the excerpts from the FEMA Queens chat.

A.   Hold on a second.  Okay.

Q.   Okay.  And turn to the second page with the message from February 26th regarding the COREs.  Do you see that?

A.   Yes.

Q.   You did not find and produce this document when you were helping counsel collect documents pertaining to the COREs, correct?

A.   Yes.

Q.   Yes, you did not find it, right?

A.   Yeah.  I'm answering yes to where you said correct, and I said yes.

Q.   And that is because you never actually searched your personal phone Signal chats for the word CORE, correct?

Page 56

MR. BOMBARD:  Objection:  Form.

THE WITNESS:  I don't recall if I actually searched the phone, no, ma'am.

BY MS. LEONARD:

Q.   Because if you had searched for the word CORE, this chat should've appeared, right?

A.   Actually, I'm not a hundred percent sure.  Like I said, I am not a Signal expert, but as part of this effort, both FEMA chief counsel as well as the Justice lawyers and my personal lawyer came to my office and searched my phone, and they did search on the word CORE, and I don't believe that this came up, either, 'cause they searched my phone and they --

Q.   That is -- I'm sorry.

A.   They searched my personal phone.

Q.   On April 29th, correct?

A.   I'm not -- I don't recall the exact date.  They came to my office, and they searched my phone, and they searched on the same terms that they used through email and all the other document searches.  And I gave them my personal phone, so they searched my phone at that time.

Q.   And this document that contained the word CORE did not come up, right?

A.   It must not have, no, ma'am.

Q.   Okay.  This backup was created on the same day that

Page 57

all the other backups that you produced was created, right?

A. This is from the April 25th backup that was stored on my personal computer, is my understanding.

Q. And you did not send those backups to anyone at DHS or FEMA for preservation, correct?

MR. BOMBARD: Object to form.

THE WITNESS: I did not. I told them and told the chief counsel what I had done, and I believe the declaration said that I had to take measures to back stuff up, and I showed them on that day that I had done the backups and that the backup was being stored on my personal computer at that point.

BY MS. LEONARD:

Q. On April 25th?

A. I'm not sure of the exact date of when I met with the Justice lawyers, the FEMA chief counsel, and my personal lawyer in my office.

Q. Your office at FEMA?

A. Yes. I'm not sure of the date, but I did do a backup when -- and it's dated April 25th, because I had to do that declaration that said I had taken all measures to make sure all FEMA communications is backed up. That was in that second declaration. Then they had to come and look at my personal cell phone in my office, and then they came to my house to get the backup.

Page 58

Q.   So, can you look back at Exhibit 9 for me?  That's the reminder from the chief information officer.

A.   Okay.

Q.   Exhibit 9 does not say that you can store government work-related communications on your desktop at your house, does it?

MR. BOMBARD:  Objection to form.

THE WITNESS:  It doesn't specifically say that I can store backups on my -- at my personal computer at my house.

BY MS. LEONARD:

Q.   It says you must transfer them to a work device, correct?

A.   I -- yes, ma'am.

MR. BOMBARD:  Object to form.

THE WITNESS:  It does say that.

BY MS. LEONARD:

Q.   You did not do that for the 47 work-related FEMA chats that we have been discussing from your backups, correct?

MR. BOMBARD:  Object to form.

THE WITNESS:  I talked with the FEMA chief counsel and the Justice lawyers and told them that I had done the backup and where the backup was being stored.

BY MS. LEONARD:

Q.   But you did not transfer the 47 FEMA-related work chats to a work device for preservation, correct?

Page 59

MR. BOMBARD:  Object to form.

THE WITNESS:  I did not transfer the Signal backup because you cannot selectively just backup chats.  It was a complete backup of my personal Signal and work devices, so that's why I told -- and the work chats, and so I told them where I had it preserved.

BY MS. LEONARD:

Q.  Did you refuse to transfer it, Ms. Evans?

A.  No, no one asked me.

MR. BOMBARD:  Object to form.

THE WITNESS:  -- to transfer it.

BY MS. LEONARD:

Q.  Exhibit 9 was sent out by the chief information officer.  We've covered that you previously were the chief -- chief information officer for DHS, right?

A.  Yes, ma'am.

Q.  Also, for the energy department, right?

A.  Yes, ma'am.

Q.  And you held a position at OMB in the Bush administration that was the chief information officer essentially for the entire federal government, right?

A.  Yes, ma'am.

Q.  In that position, you directed the activities of the Chief Information Officer Council, correct?

A.  Yes, ma'am.

Page 60

Q.   Do you recall that when you were at OMB, you wrote a memo to all federal agencies that was called "The top ten risks impeding the adequate protection of government information"?

A.   I do not recall the memo.

Q.   Okay.  Well, let's take a look.  We'll mark this 315.  Do you see this memorandum for chief information officers from Karen Evans?

(Exhibit 315 marked for identification)

A.   Not yet.  Hold on.  I'm not down there yet.  Okay.

Q.   This is -- the subject of this memo is "The top ten risks impeding the adequate protection of government information."  Does this refresh your recollection that you created this memorandum for all of the agencies?

A.   I see it.  I don't remember everything in it.

Q.   Sure.  I mean, this is dated July 2007.  Do you see that?

A.   Yes.

Q.   And so you've been working on protecting government information since at least July 2007?

A.   Okay, yes, that's what the memo -- that's what it's dated, the copy that you have.

Q.   Okay.  You also testified before Congress on many occasions regarding information technology and cybersecurity and topics like that, right?

Page 61

A.   Yes.

Q.   Let's take a look.  This is going to be marked 316. This is from the time you were at OMB.

(Exhibit 316 marked for identification)

A.   Hold on.

Q.   Sure.

A.   Okay.

Q.   Okay.  So on June 7, 2007, you gave some congressional testimony.  These are your written remarks, right?

A.   That appears to be the case, yes.

Q.   Okay.  And you were testifying about the federal government's efforts to safeguard our information and information systems.  Do you see that in the first paragraph?

A.   Yes.

Q.   And then in the second paragraph, there's a sentence that starts, "In addition to agency responsibility..."  Do you see that?  About midway down.

A.   No, I don't see it.  I'm sorry.  Where is it?

Q.   Okay.  In the second full paragraph that starts, "Good security and privacy are a shared responsibility."

A.   Yes.

Q.   There's a sentence that says, "In addition," do you see that?

A.   Yes.

Page 62

Q.   Okay.  I'm just going to read it.  It says, "In addition to agency responsibility, each agency employee, from rank and file employees and their supervisors to independent evaluators and overseers, must be held accountable for performing their assigned responsibilities, which include the protection of information security and privacy."  Do you see that?

A.   Yes, ma'am.

Q.   Do you still agree with that statement?

A.   Yes.

Q.   Among your responsibilities as a federal official is compliance with federal laws regarding document retention, right?

A.   Yes.

Q.   And as the CIO of DHS, you actually had another specific position with respect to document retention.  Do you recall what that was?

A.   I believe it is the records management function.

Q.   The SAORM, you've heard that acronym before?

A.   I believe that's the senior official performing -- it's records management.

Q.   The senior agency official for records management is the CIO of DHS, right?

A.   Yes.

Q.   You, Ms. Evans, were the senior official at DHS

Page 63

responsible for records management, correct?

A.   Yes.

Q.   You were well aware of the requirements for maintaining work-related communications even when communicating electronically, correct?

A.   Yes.

Q.   And you did not follow those requirements by preserving your Signal chats, Ms. Evans, did you?

MR. BOMBARD:  Object to form.

THE WITNESS:  I don't agree with the way that you stated that because I do believe that I have protected and preserved the records from my Signal chats in accordance with records management procedures.

BY MS. LEONARD:

Q.   You cannot point me to a backup that you made of the Signal chats on your personal phone prior to April 25th, can you?

MR. BOMBARD:  Object to form.  Mischaracterization of testimony.

THE WITNESS:  I can point to the records, the pictures that I took, that I followed the records management process and sent them into my emails, the way that I determined that those correspondence were records and that they needed to be managed in accordance with records management processes.

Page 64

BY MS. LEONARD:

Q.   And other than the pictures that you took of a few messages on Signal, you did not take any steps prior to creating the backup on April 25th to preserve any of the Signal chats, correct?

MR. BOMBARD:  Objection:  Form, foundation, mischaracterization of testimony.

THE WITNESS:  As I previously stated, I took the precautions in accordance with the records process of when I determined that the correspondence that was happening on my personal device was a record, I took the pictures, and I sent them into my email.

BY MS. LEONARD:

Q.   And as a matter of fact, Ms. Evans, you were the person who set the auto-delete function for some of those chats, resulting in the deletion of work-related government communications, correct?

MR. BOMBARD:  Objection:  Form, foundation, mischaracterization of testimony.

THE WITNESS:  I did set some of the auto-delete functions as previously stated today.

BY MS. LEONARD:

Q.   Let's introduce the next exhibit.  Actually, before I introduce, let me ask a question.  You referred to a declaration that you provided to the court on April 29th.  Do

Page 65

you recall that?

A.   I don't recall the exact date, but I do recall that declaration, yes, ma'am.

Q.   And you understood at the time that you were ordered to provide a declaration regarding preservations of -- preservation of the records on your personal phone, right?

A.   Yes, and it said all my -- yes, and it said all FEMA-related Signal chats.

Q.   Okay.  Let's look at the declaration.  Exhibit 317 should come up.  Let me know when you have it.

(Exhibit 317 marked for identification)

A.   Okay.

Q.   So this is -- so this is dated April 29th.  That's your signature at the bottom, right?

A.   Yes, ma'am.

Q.   And tell me where in this declaration you told the court that you created a backup of all of your Signal chats on April 25th.

MR. BOMBARD:  Objection to form.

THE WITNESS:  It doesn't say that.  The statement says I preserved all FEMA-related communications on my personal cell phone.

BY MS. LEONARD:

Q.   And then the next sentence you say, "Specifically, as to FEMA-related Signal messages on my personal cell phone,

Page 66

because the Signal app auto-deletes messages after a period of time, I took appropriate screenshots of such messages before deletion."  That's how you explained that, right?

MR. BOMBARD:  Object to form.

THE WITNESS:  For the ones that -- for example, on the FEMA 2.0, that's what I was explaining there.  I did take pictures of those and sent those in.  And anything else that I had determined to be a record, if they were deleted, and so that's what that is referencing.

BY MS. LEONARD:

Q.  And you did not tell the court that you had created backups of all of the content of your Signal application just days before.  You didn't, right?

MR. BOMBARD:  Object to form.

THE WITNESS:  So it could have been clearer, but what I said was I preserved all the FEMA-related communications on my personal cell phone.

BY MS. LEONARD:

Q.  And then you continued, "specifically as to FEMA-related Signal messages," you talk about screenshots, right?

MR. BOMBARD:  Objection:  Asked and answered.

THE WITNESS:  Yes, because of the ones of FEMA 2.0 that were -- where some of the auto-delete messages were there, I had taken pictures of those, and so those would not show up in the backup.  Just as you demonstrated today, they

Page 67

didn't show up in the backup, but you have screenshots of them.

BY MS. LEONARD:

Q.   And you also didn't produce the backups that you had created just days before this declaration on April 29th, along with the declaration, right?

MR. BOMBARD:   Objection to form.

THE WITNESS:   As I previously stated, I went over the process with the FEMA chief counsel as well as the Justice attorneys and showed them and told them that I had the backups enabled on the Signal chat, and that I also did a backup on April 25th, so that that statement about I preserved all FEMA-related communications on my personal cell phone so that they could see it, and then they searched through my personal cell phone.

BY MS. LEONARD:

Q.   And you didn't think that in a declaration to the court about preservation of documents that you should tell the court that you had created a backup?   That didn't occur to you?

MR. BOMBARD:   Objection:   Form, relevance, foundation.

THE WITNESS:   As I mentioned, I discussed it with the attorneys and let them know how I had preserved the records and why that statement was there, and that I could

Page 68

attest that I had preserved the FEMA-related communications on my personal cell phone on the backup.

BY MS. LEONARD:

Q.   You also didn't mention in this declaration about preservation of documents that you had changed auto-delete settings on any of the Signal chats, right?  That's not in here, either.

MR. BOMBARD:  Objection to form.

THE WITNESS:  No, that's not in here.  The statement and the way that this order was, was to preserve the FEMA-related communications, and I did.

BY MS. LEONARD:

Q.   Other than the ones that had been deleted because of the auto-delete settings that you had been using on your Signal chat since 2025, right?

MR. BOMBARD:  Objection:  Form, foundation, mischaracterization of testimony.

THE WITNESS:  That's why these statements here, I did the backups, I -- as I previously stated, I enabled backups.  And then the fourth statement is related to the ones where I deleted them off the phone because I had sent pictures of those into the email.  And then, before this was done, again, my personal cell phone was searched by the Justice lawyers as well as the FEMA chief counsel for all the terms -- the searchable terms that are required for this, this case.

Page 69

BY MS. LEONARD:

Q.   And at the time that those lawyers searched your phone on April 29th or thereabouts, had you deleted any material from your phone since creating the backup?

A.   Can you restate that again?

Q.   Sure.  At the time that the lawyers searched your phone for content, had you deleted any of the content of your Signal chat since creating the backup?

A.   No, ma'am.

Q.   And then the lawyers came again on May 7th to your house in West Virginia to research and find the backups, correct?

A.   They came to get the backups and to look at the Signal chats to produce all the Signal chats.

Q.   As of May 7th, did the Signal application on your personal phone contain the content of your chats?

MR. BOMBARD:  Object to form.

THE WITNESS:  Again, I'd like to preface that I am not a Signal expert, but those -- if you have auto-delete set up, then it would produce the chats as of May 7th.

BY MS. LEONARD:

Q.   When you created the backup, you didn't remove any of the auto-delete settings on your chats to prevent the deletion of further information, correct?

MR. BOMBARD:  Object to form.

Page 70

THE WITNESS:  When I created the backup, I did the backup -- like I said, I did the backup because I wanted to make sure that this statement that I was making was correct, that I preserved all FEMA-related communications on my personal cell phone.  So I'm -- if you could clarify the question about are you -- 'cause I'm not sure what you're asking me about May 7th.

BY MS. LEONARD:

Q.   So when you -- not May 7th.  April 25th, when you created the backup of the Signal chats, of the 47 Signal chats, you didn't change any of the auto-delete settings to remove them and prevent material from being deleted, correct?

MR. BOMBARD:  Object to form.

THE WITNESS:  As far as I recall, I did nothing to Signal chats after I made the backup, but I'm not a hundred percent -- people still sent me Signal chats.

BY MS. LEONARD:

Q.   Ms. Evans, you did not remove the auto-delete settings on any of those chats when you created the backup, correct?

MR. BOMBARD:  Object to form.

THE WITNESS:  As far -- as far as I recall, no, ma'am, I -- I don't believe I changed anything.  I created the backup as of that date.

/////

Page 71

BY MS. LEONARD:

Q.   FEMA 2.0, for example, you were the person who originally set it to auto-delete after four weeks, and then on March 11th, you changed it to auto-delete after one week, correct?

A.   Yes, that's what the screenshots that you showed today showed, yes, ma'am.

Q.   And when you created a backup on April 25th, you could have eliminated the auto-delete setting, right?

A.   On FEMA 2.0, are you saying -- I don't understand the question that you're asking me.

Q.   Signal does not require that you include an auto-delete setting; that is something the participants of the group can choose to do, correct?

A.   Yes, ma'am.

Q.   You had the ability to remove the auto-delete settings that had been imposed on some of your chats when you created a backup, preventing future deletion, right?

A.   Yes, I could have done that, yes.

Q.   And you did not do that on April 25th or any time thereafter, correct?

MR. BOMBARD:  Objection:  Asked and answered.

THE WITNESS:  I preserved my phone the way that it was on that date of the Signal chats.  I did not change anything.  However, we received a subsequent court order, and

Page 72

we had changed everything because we set everything back to non-disappearing messages.

BY MS. LEONARD:

Q. When did you do that?

A. I don't know the exact date. We got a court order, and so we set it to non-disappearing messages. Then on May 7th, because we restored the messages back to April 25th, I believe I had -- We got the court order -- it was around my husband's birthday, and his birthday is May the 5th, so this was when I was in Idaho. So I would have changed everything to non-disappearing messages to be in compliance with the court order. So May 7th, when we restored everything, we went back to April 25th, so I had to go back to all of those chats that I'm on, FEMA-related chats, and reset everything back to non-disappearing messages so that I could be in compliance with the court order. Because when you restored it back to the 25th, it would put the previous disappearing messages on there, so I had to go back in and reset everything back to non-disappearing messages. So, like if you look at the Signal chats, it'll show, you know, that stuff changed on May 7th, and then it'll then show that -- and I guess everybody else did, too -- that I set mine to non-disappearing messages so that I was in compliance with the subsequent court order.

Q. You went to Idaho with your family sometime around the beginning of May. Is that right?

Page 73

A.    Yes.

Q.    And there were still FEMA-related Signal chats on your personal phone at the time, correct?

MR. BOMBARD:  Object to form.

THE WITNESS:  Yes.

BY MS. LEONARD:

Q.    You brought your personal phone with you, correct?

A.    Yes.

Q.    And you could have taken screenshots of the content of your personal phone while in Idaho, correct?

A.    As we previously established that I really didn't know on my Android phone to do screenshots.  And I talked with the counsel as well as my personal attorney, and because of the way the backup was and what I was being requested to do, that's -- that's why we didn't do the screenshots, no, because it was -- there was a lot of screenshots.

Q.    And Ms. Evans, are you sure you didn't delete any content from your personal phone and your Signal application, and that's why you didn't take screenshots?

MR. BOMBARD:  Object to form.

THE WITNESS:  Are you -- can you clarify that?  Are you asking me if I'm deleting stuff after this declaration on the 29th, between May 7th and the 29th?  Is that what you're asking?  I'm not sure what you're asking.

/////

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

BY MS. LEONARD:

Q.   I will ask that question.  Did you delete any content on your Signal application on your personal phone between April 29th and May 7th?

A.   No, ma'am.

Q.   And when the attorneys came to your house in West Virginia on May 7th, you didn't take pictures or screenshots of the content of your personal phone on that day, correct?

A.   So what happened on that day was they looked at the phone -- because my phone had already been looked at, we looked at the court order, and the information that was determined was I had to produce the Signal chats between December 1st and March the 6th.  And the only way to actually produce all those FEMA-related Signal chats was to go back to the April 25th backup when I signed this declaration in order to be able to produce what I had from December 1st through March the 6th.

Q.   There was still FEMA-related content in the Signal application on your phone at that time, correct?

A.   And yes, those were being backed up because I enabled, as I previously stated, the Signal backup into the app, so the backup is in the application itself, and it backs up everything that's in the Signal chat on a daily basis.

Q.   Other than the backups, the Signal chats, did they still appear on your phone on May 7th, Ms. Evans?

Page 75

A.    What Signal chats?  I'm -- I'm sorry, I'm not following the discussion.  I'm trying to answer the question. The -- the Signal chats from December 1st to March 6th, the way that those were done -- those are in the backup.  If you went to my phone on May 7th at that time, okay, it would not be -- it would not necessarily be everything from December 1st through March 6th.

Q.    Was there any -- sure.  For those 47 Signal chats that you backed up, was there anything on your phone in the Signal chats for those chats on May 7th?

MR. BOMBARD:  Object to form.

THE WITNESS:  Yeah, there probably were some things still in there on May 7th.

BY MS. LEONARD:

Q.    Probably?  Do you know whether there was?

A.    I didn't specifically search on May 7th.  The attorney searched my phone, I believe, on this date in April, and they searched my phone, and they went through, and they used the search terms, and they searched my personal phone for all of the FEMA-related chats that contained the search terms. So I'm not sure I really understand the way that you're asking the question, and I don't want to say anything that is going to be misconstrued.

Q.    Ms. Evans, when you created the backup, did you delete the content of your Signal chats on your personal

Page 76

phone?

A.   I did not at that point because this says that I preserved all FEMA-related communications on my personal cell phone.  So I had it on my personal cell phone as well as the backup, but I didn't trust the personal cell phone because, as I stated, I'm not a Signal expert, so I wanted to make sure that I would be able to produce the Signal chats at -- during the time period from December 1st through March the 6th as they were on my cell phone.

Q.   Ms. Evans, you just testified that you did not, at that point, delete the content of your Signal chats.  At any point in time after signing this April 29th declaration, did you delete the content of your Signal chats on your personal phone?

A.   No.  As far as I can remember, no, ma'am, I haven't deleted stuff because of this court order.

Q.   Did you reinstall the Signal application on your phone on May 7th?

A.   Yes, I did.

Q.   Did that result in the deletion of the content of the chats that were on your phone on May 7th?

MR. BOMBARD:  Object to form.

THE WITNESS:  The way that it worked -- and I did all of this under the -- you know, the Justice lawyers were there, the FEMA lawyer was there, and my personal attorney was

Page 77

also there.  And what we had to do was produce the records from December 1st through March the 6th.  The Justice technical guys came, and they tried to use the backup, and so we didn't do anything on the personal cell phone at that point because they wanted to try their tools.  When they tried their tools, it didn't work; they couldn't read the backup; they couldn't restore the backup.  Then, what we tried at one point was to use an older phone to restore the Signal backup because it was from another -- because it was on the personal computer.  That didn't work because of the operating system. We could see that the backup was restored, but we couldn't bring them up in order to be able to produce them.  So the only way to do this, and this is what we all discussed, and then the Justice attorneys okayed this because the time period was from December 1st through March 6th, we restored my phone back to the April 25th backup date.  And then we kept it offline, and then we produced all the chats, and then when it comes back online, it would then sync my phone from April 25th to the May 7th date.

BY MS. LEONARD:

Q.   Ms. Evans, you did not attempt to produce the material that existed on your personal phone on May 7th, correct?  You only produced from backups.

MR. BOMBARD:  Object to form, foundation.

THE WITNESS:  So the -- again, the discussion was

Page 78

the time period, and the attorneys reviewed the court order, and everybody told me it had to be from December 1st through March the 6th. The only way to produce the communications from December 1st through March the 6th was to use the April 25th backup.

BY MS. LEONARD:

Q. Because some of those communications had been deleted after April 25th, correct?

MR. BOMBARD: Object to form.

THE WITNESS: I don't know what they all would have been, but yes, ma'am, because of the disappearing messages, yes, ma'am.

BY MS. LEONARD:

Q. And because you reinstalled the Signal application on your phone and that deleted content on May 7th, didn't it, Ms. Evans?

MR. BOMBARD: Object to form. Object to form, foundation, mischaracterization of testimony.

THE WITNESS: Again, I'm going to restate that the attorneys told me to produce the Signal chats from December 1st through March the 6th. The way to do that and to restore the backup, after discussion with the Justice technical people that were there, and their tools didn't work, was to reinstall the Signal app on my personal phone, and then to restore the backup, and it restored my phone to April 25th. We kept it

Page 79

offline so that no syncs would happen, and then the technician used my phone to produce all the Signal chats and reviewed everything that was on my phone, and did videos of all the chats so that they could then take it back.

BY MS. LEONARD:

Q.    I'm going to ask the direct question again, Ms. Evans.  The reinstallation of the Signal application on your personal phone on May 7th deleted the content that was on your personal phone at that time, didn't it?

MR. BOMBARD:  Objection to form, foundation, mischaracterization of testimony, asked and answered.

THE WITNESS:  It didn't -- it -- when we reinstalled the application, we restored the backup, so it restored my personal phone back to the Signal chats that were present on April 25th.  And the Justice lawyers told me I needed to produce the Signal chats from December 1st through March the 6th.  So I was able to do that, they were able to take my personal phone and produce all the Signal chats that were FEMA-related from December 1st through March the 6th.

BY MS. LEONARD:

Q.    And anything that had been added to any of those chats after March the 6th, between April 25th and May 7th, would have been deleted by that reinstallation, correct?

MR. BOMBARD:  Objection:  Form, foundation, calls for speculation.

Page 80

THE WITNESS:  As I said, I'm not a Signal expert, but as I also previously stated that I was also doing backups onto the Signal cloud, and so those messages from that particular time period would have been in the Signal backup that's in the cloud from the application.

BY MS. LEONARD:

Q.   You believe that any content created between April 25th and May 7th in any of the 47 Signal chats that you produced would be backed up in the cloud?

MR. BOMBARD:  Objection:  Form, foundation, calls for speculation.

THE WITNESS:  I am not sure exactly how their backup works in Signal, but as I previously stated, I back up using the Signal backup capability, and so I know that it backs up on a daily basis.  The Signal application does.  So the backup is up there with the Signal application itself.  But again, as I previously stated, the Justice attorney said that I needed to produce the FEMA messages as it relates to this declaration between the December 1st and March 6th date.  And because their technical tools didn't work on the backup, their technician agreed that we had to restore my phone back to the April 25th backup, and that's what we did.  And they did it, they worked on it, they copied all the Signal chats and everything else like that, and took them with them.

/////

Page 81

BY MS. LEONARD:

Q.   Are you aware of any other reason than what we've talked about sitting here today that any of the messages on your FEMA-related Signal chats would have been deleted at any time other than what you've been -- what you've already told me?

MR. BOMBARD:  Objection to form.

THE WITNESS:  I -- I know what I've done as it relates to my backups and what I said here.  I can't attest to anything anybody else has done in any of the other groups of what they may have done with their Signal chats.  I don't know the answer to that question, ma'am.  I can only attest to what I've done related to my Signal chats.

BY MS. LEONARD:

Q.   And you have told us everything that you've done to take action to preserve the content of your FEMA-related Signal chats here today, correct?

MR. BOMBARD:  Object to form.

THE WITNESS:  Yes, ma'am, I believe that, yes, ma'am.

MS. LEONARD:  Okay.  Let's take a very short break, and we'll see if we have anything else.  So, five minutes?

MR. BOMBARD:  What's the time on the record?

VIDEO TECH:  Off the record?

MR. BOMBARD:  What's the time on the record?

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

VIDEO TECH:  One fourteen for the first one.  41, 156, 455.

MR. BOMBARD:  Okay.  Yeah, five minutes.  Five minutes, thanks.

VIDEO TECH:  Going off the record.  The time is 1:20 p.m.

(Pause in Proceedings:  1:20 p.m.-1:23 p.m.)

VIDEO TECH:  Back on the record.  The time is 1:23 p.m.

MS. LEONARD:  Thank you, Ms. Evans.  We don't have anything further for you today.  Thank you very much for your time.

THE WITNESS:  Thank you.  I appreciate it.

MR. BOMBARD:  No follow-up from me.  I assume none from you.

MR. FLEISCHMAN:  No follow-up.

MR. BOMBARD:  Okay, all right.

MS. LEONARD:  We can go off the record.

VIDEO TECH:  This concludes Volume 2 of the video-record deposition of Karen Evans.  We're off the record at 1:23 p.m.  The number of media is two and will be retained by Veritext.  Thank you.

MR. GREAVES:  We will read and sign.

(The proceedings were adjourned at 1:23 p.m.)

Page 83

W I T N E S S   C E R T I F I C A T E

I, KAREN EVANS, hereby certify that I have read the foregoing typewritten pages 1 through 83, inclusive, and corrections, if any, were noted by me, and the same is a true and correct transcript of my testimony.

Dated this _____ day of _____, 2026.

_____

KAREN EVANS

Signed before me this _____ day of _____, 2026.

_____

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.

V. DONALD J. TRUMP, in his official capacity

as President of the United States, et al., Case No.

-cv-03698-SI                                              3:25

May 26, 2026, S. Gran

Page 84

                        C E R T I F I C A T E

STATE OF HAWAII                )
                               )    SS.
COUNTY OF MAUI                 )

          I, SANDRA J. GRAN, do hereby certify:

          That on May 26, 2026, at 11:18 a.m., appeared before me KAREN EVANS, the witness whose deposition is contained herein; that prior to being examined, she was by me duly sworn or affirmed pursuant to Act 110 of the 2010 Session of the Hawaii State Legislature.

          That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewritten form under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

          That pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to the transcript:

          X    Was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

               Was not made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

               Was waived.

          I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

          DATED this 28th day of May, 2026, in Maui, Hawaii.


          SANDRA J. GRAN, RPR, HI CSR 424

Page 85

JASON C. GREAVES, ESQ.

jason@binnall.com

May 28, 2026

RE: American Federation Of Government Employees,

AFL-CIO, Et Al. v. Donald J. Trump, Et Al.

5/26/2026, Karen Evans,Volume II (#8233050).

The above-referenced transcript has been

completed by Veritext Legal Solutions and

review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext

to schedule a time to review the original transcript at

a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Code of Civil Procedure.

Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of

Counsel - Original transcript to be released for signature

as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the

time of the deposition.

Page 86

_X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

Transcript - The witness should review the transcript and

make any necessary corrections on the errata pages included

below, notating the page and line number of the corrections.

The witness should then sign and date the errata and penalty

of perjury pages and return the completed pages to all

appearing counsel within the period of time determined at

the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not

requested before the completion of the deposition.

Page 87

American Federation Of Government Employees,

AFL-CIO, Et Al. v. Donald J. Trump, Et Al.

Karen Evans, Volume II  (#8233050)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

Karen Evans,Volume II )              Date

Page 88

**[& - 29th]**

**&**

**&** 4:11,22 86:24 87:9

**0**

000514 4:8
000515 4:8
03698 1:6 6:15 84:22
0424415 4:9
0425303 5:2
0425304 5:2
0425309 4:12
0425461 4:10
0425580 4:15
0425582 4:15
0425585 4:16
0425664 4:22
0425666 4:11
0425702 4:22
0425738 4:11
0425828 4:18
0425831 4:18
0425848 4:7
0425962 4:13
0425964 4:13
0425965 4:20
0426011 4:20
0426028 4:19
0426032 4:19
060707 5:1

**1**

1 6:9 84:4 87:1
10th 11:12,17 12:6,11 15:2
20:7
11 4:24
110 85:6
1100 2:16
11:18 1:15 6:3 85:5
11th 12:7,16 15:1 17:15,22 18:19 20:2,5 26:2 29:11 30:14,19 31:24 32:14 33:10,13 33:18 46:1,24 47:6 72:4
12 4:6
12:32 56:5,6
12:39 56:6,8
12th 39:19,25 41:14
14395 9:14
156 83:2
158 44:22
15th 14:19 18:20 19:2,9 20:7 26:10 30:14,19
177 2:5
19th 47:20
1:20 83:6,7
1:23 83:7,9,21 83:24
1st 36:3 75:13 75:16 76:3,6 77:8 78:2,15 79:2,4,21

80:16,19 81:19

**2**

2 1:8 83:19
2.0 4:6,9 12:13 12:25 14:6,13 14:24 15:7 16:7,17,25 17:14 18:8,15 18:23 19:1,9 19:20 20:1,16 21:3 23:5,8,20 25:20,25 26:21 28:25 29:14,25 30:4,18 32:12 46:8,9 51:9 67:6,22 72:2 72:10
2.0. 18:19 19:17 23:14 31:8,15
200 3:3
20005 2:17
20016-4627 2:22
20043 2:10
2007 61:16,20 62:8
2010 85:6
202 2:10,17
2025 14:19 16:14,16 18:20 35:23 42:6,10 43:3 52:4 69:15

2025.520 86:9 86:12
2026 1:15 6:3 8:12 9:3 34:15 35:12,14 42:14 43:3 52:4 84:8 84:13,23 85:5 85:19 86:3
22314 3:3
23 41:17
24 85:23
25 4:8 35:21
25th 34:16,21 34:24 35:6 42:14 58:2,14 58:20 64:16 65:4 66:18 68:12 71:9 72:8,20 73:7 73:13,17 75:15 78:16,18 79:5 79:8,25 80:15 80:22 81:8,22
26 1:15 4:9 6:3 53:24 54:4 84:23 85:5
26th 55:7 56:15
28 48:6,7 86:3
28th 85:19
29th 37:1 57:16 65:25 66:13 68:5 70:3 74:23,23 75:4 77:12

Veritext Legal Solutions
866-299-5127     calendar-ca@veritext.com     www.veritext.com

**[3 - activities]**

| 3 | 315  4:24 61:7,9 | 6 | 9 |
|---|---|---|---|
| **3**  25:21 | **316**  5:1 62:2,4 | **61**  4:24 43:13 | **9**  5:1 10:16 |
| **30**  46:11,13,13 | **317**  5:2 66:9,11 | **62**  5:1 |     11:9 21:16,20 |
|     85:11 87:1 | **31st**  8:12 45:17 | **66**  5:2 |     59:1,4 60:13 |
| **300**  2:5 4:6 |     45:21 | **6th**  36:3 43:21 | **94108**  2:5 |
|     12:19,21,25 | **32**  4:11 |     44:3,15 75:13 | **9th**  37:19 |
|     14:7 29:22 | **34**  47:15,18 |     75:17 76:3,7 | **a** |
| **301**  4:8 25:22 | **34553**  2:9 |     77:8 78:2,15 | **a.m.**  1:15 6:3 |
|     25:23 | **353-7203**  2:17 |     79:3,4,21 |     85:5 |
| **302**  4:9 26:18 | **36**  4:12 |     80:17,19,22 | **ability**  72:16 |
|     26:19,21 30:1 | **39**  4:13,14 |     81:19 |     85:9 |
| **303**  4:10 31:9 | **3rd**  48:8,15,22 | 7 | **able**  10:17,20 |
|     31:10 | 4 | **7**  62:8 |     26:1 75:16 |
| **304**  4:11 32:17 | **40**  4:16,18 | **703-888-1943** |     77:7 78:12 |
|     32:22 | **41**  4:19 83:1 |     3:4 |     80:17,17 |
| **305**  4:12 36:11 | **415**  2:6 | **717**  3:3 | **above**  28:16 |
|     36:12 | **42**  4:20 | **7th**  14:4 19:2 |     86:6 |
| **306**  4:13 39:2,6 | **421-7151**  2:6 |     19:10 51:18,25 | **abuse**  9:6,8,9 |
| **307**  4:14 39:14 | **424**  1:17 85:24 |     70:10,15,20 |     9:13,24 |
|     39:16,18 | **448-9090**  2:10 |     71:7,9 73:7,12 | **access**  54:19,24 |
| **308**  4:16 39:24 | **4530**  2:21 |     73:20 74:23 | **accessed**  54:22 |
|     39:24 40:2 | **455**  83:2 |     75:4,7,25 76:5 | **accordance** |
| **309**  4:17 | **47**  50:18 59:17 |     76:10,13,16 |     13:9 15:9 19:4 |
| **30th**  42:6 |     59:24 71:10 |     77:18,21 78:19 |     19:6 20:25 |
| **31**  4:10 |     76:8 81:8 |     78:22 79:15 |     64:12,24 65:9 |
| **310**  4:18 40:4,4 | **4th**  31:15 37:4 |     80:8,22 81:8 | **account**  14:7 |
|     40:6 | 5 | 8 |     16:4 |
| **311**  4:19 41:10 | **5**  2:21 | **8**  4:3 | **accountable** |
|     41:11,13 | **5/26/2026**  86:5 | **8233050**  86:5 |     63:4 |
| **312**  4:20 42:18 | **53**  4:21 |     88:2 | **acronym**  63:19 |
|     42:19 | **5th**  28:10 50:8 | **83**  84:4 | **act**  85:6 |
| **313**  4:21 53:1,2 |     73:9 | | **action**  6:19 |
|     53:4 56:10 | | |     82:16 |
| **314**  4:23 | | | **activities**  24:23 |
| | | |     60:23 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[actual - asked]**

| | | | |
|---|---|---|---|
| **actual** 13:9 27:22 28:7,15 | 88:1 | **antoine** 11:13 51:6 | **appropriate** 20:21,23 21:4 67:2 |
| **actually** 15:23 21:15 22:21,22 27:20 28:8 29:4,16 54:13 56:24 57:2,7 63:15 65:23 75:13 | **afternoon** 6:25 8:11 | **anybody** 82:10 | **appropriately** 16:12 |
| | **agencies** 61:2 61:14 | **anyway** 51:22 | **approved** 22:2 |
| | **agency** 62:17 63:2,2,22 | **app** 22:2,2 67:1 75:22 79:24 | **april** 34:15,16 34:21,24 35:6 35:21,23 36:25 37:1 42:14 57:16 58:2,14 58:20 64:16 65:4,25 66:13 66:18 68:5,12 70:3 71:9 72:8 72:20 73:7,13 75:4,15 76:17 77:12 78:16,18 79:4,8,25 80:15,22 81:7 81:22 |
| | **agree** 6:9 63:9 64:10 | **appear** 10:15 11:1 12:19 39:15 43:20 46:3 53:17,18 75:25 | |
| **adam** 51:5 | **agreed** 81:21 | | |
| **added** 26:9 80:21 | **ahead** 46:14 | **appearance** 6:21 | |
| **addition** 62:17 62:23 63:2 | **al** 1:6,10 2:2,13 6:12,13 84:21 84:22 86:4,4 88:1,1 | **appearances** 2:1 6:22 | |
| **additional** 19:19 24:16 | | **appeared** 57:6 85:5 | |
| **adequate** 4:24 61:3,12 | **alexandria** 3:3 | **appearing** 86:18 87:7 | **archive** 54:24 |
| | **altber.com** 2:6 2:7,7 | | **archived** 22:3 54:1,14,14,15 54:19,22,23 |
| **adjourned** 83:24 | **altshuler** 2:4 7:12 | **appears** 29:10 30:3 37:10 39:8 41:4 46:6 52:20 62:11 | |
| **administer** 8:4 | **american** 1:5 2:2 6:11 84:21 86:4 88:1 | | **archives** 54:17 |
| **administration** 42:3,7 60:20 | | **application** 15:6 34:12 44:24 51:18 52:11 54:20 67:12 70:15 74:18 75:3,19 75:22 77:17 79:14 80:7,13 81:5,15,16 | **ashley** 2:15 7:16 |
| **administrator** 9:2 | **amount** 18:2,3 24:19 | | **asked** 19:22 40:20 44:17 49:19 52:6,9 55:19 60:9 67:21 72:22 80:11 |
| **advisor** 51:5 | **andrew** 51:6,6 | | |
| **affiliations** 6:23 | **android** 27:20 28:1 74:12 | | |
| **affirmed** 85:6 | **answer** 76:2 82:12 | **appreciate** 83:13 | |
| **afge** 4:7,9,10,11 4:11,12,13,14 4:16,18,19,20 4:21,22 5:2 | **answered** 19:22 67:21 72:22 80:11 | | |
| **afl** 1:6 2:2 6:12 84:21 86:4 | **answering** 56:22 | | |

Veritext Legal Solutions
866-299-5127                calendar-ca@veritext.com                www.veritext.com

**[asking - believe]**

| | | | |
|---|---|---|---|
| **asking** 28:14 | 37:18 39:8,20 | **background** | 39:5,25 40:25 |
| 44:20 45:19 | 40:1,14 41:20 | 46:15 | 41:14 42:14,25 |
| 46:25 47:4 | 41:24 43:8 | **backing** 34:8,9 | 50:15,19 58:1 |
| 71:7 72:11 | 44:2,6,14 | **backs** 75:22 | 58:4,10 59:9 |
| 74:22,24,24 | 45:15,25 46:4 | 81:14 | 59:18 67:12 |
| 76:21 | 46:7,10,21,23 | **backup** 18:21 | 68:4,10 69:19 |
| **asks** 22:23 | 47:22 48:14 | 27:9 29:14,20 | 69:20 70:11,13 |
| **assessment** | 52:22 54:6 | 29:21 34:13,15 | 75:24 78:23 |
| 21:3 | 65:15,20 67:1 | 34:16,18 35:5 | 81:2 82:9 |
| **assigned** 63:5 | 67:23 69:5,14 | 35:8,11,23 | **barton** 4:20 |
| **associated** | 70:19,23 71:11 | 46:5 53:19 | 33:4 42:25 |
| 34:19 | 71:18 72:3,4,9 | 54:7,14 55:23 | 43:2,5,9 44:10 |
| **assume** 83:14 | 72:13,16 | 57:25 58:2,11 | 51:16 53:9 |
| **attempt** 78:21 | **automatically** | 58:20,25 59:22 | **based** 13:11 |
| **attest** 69:1 82:9 | 18:3 | 59:22 60:2,3,4 | 24:16 55:17 |
| 82:12 | **avenue** 2:21 | 64:15 65:4 | **basis** 75:23 |
| **attorney** 6:24 | **aware** 64:3 | 66:17 67:25 | 81:15 |
| 74:13 76:17 | 82:2 | 68:1,11,19 | **bchisholm** 2:6 |
| 77:25 81:17 | **awareness** | 69:2 70:4,8,22 | **began** 34:9 |
| 85:13,15,17 | 51:10 | 71:1,2,2,10,15 | **beginning** 6:23 |
| **attorneys** 2:15 | | 71:19,24 72:8 | 73:25 |
| 16:1,3,5 51:21 | **b** | 72:18 74:14 | **behalf** 1:14 7:9 |
| 68:10,24 75:6 | **b** 4:4 87:1 | 75:15,21,22 | 7:21,24 |
| 78:14 79:1,20 | **back** 21:15 | 76:4,24 77:5 | **believe** 9:20,25 |
| **audio** 6:8 | 32:7 56:7 58:9 | 78:3,6,7,8,11 | 10:9 13:6 |
| **august** 42:6 | 59:1 73:1,7,13 | 78:16 79:5,22 | 16:10,15 17:5 |
| **auto** 12:8,12 | 73:13,14,16,18 | 79:25 80:13 | 18:25 19:3 |
| 18:1,15 20:6 | 73:18 75:14 | 81:4,12,14,15 | 24:12 28:19 |
| 20:10,12,16 | 78:16,18 80:4 | 81:20,22 | 32:5 34:5,9,20 |
| 24:18 26:4 | 80:14 81:13,21 | **backups** 13:2 | 35:4,11,13 |
| 29:7,15 30:10 | 83:8 | 13:23 14:3,14 | 36:3 39:19 |
| 30:15,20 31:23 | **backed** 34:6,17 | 18:9,18 20:3,5 | 42:12 43:22 |
| 32:13 33:13,17 | 35:13,17 53:25 | 24:17,17 29:17 | 44:12,24 52:5 |
| 33:23 34:1,2,5 | 54:22 58:22 | 32:20 34:7,7 | 57:11 58:8 |
| 36:6 37:7,11 | 75:20 76:9 | 34:13,20 35:21 | 63:18,20 64:11 |
| | 81:9 | | |

Veritext Legal Solutions
866-299-5127     calendar-ca@veritext.com     www.veritext.com

**[believe - chat]**

71:23 73:8
76:17 81:7
82:19
**benefits** 9:23
**berzon** 2:4 7:13
**best** 85:9
**bibo** 51:8
**bigger** 42:21
**biloxi** 51:7
**binnall** 3:2
7:21
**binnall.com** 3:4
86:2
**birthday** 73:9,9
**bis** 51:13
**bluetooth**
25:17
**blurry** 43:10
**bock** 33:5
51:14
**bombard** 2:14
7:23,23 10:22
18:12 19:15,22
20:8,18 23:10
23:18 24:11,25
26:6 28:23
34:22 35:22
36:8 38:9,15
38:22 41:3
42:1 45:7 47:2
49:8 50:20,25
51:19 55:4,15
56:2 57:1 58:6
59:7,14,19
60:1,10 64:9

64:18 65:6,18
66:19 67:4,14
67:21 68:7,21
69:8,16 70:17
70:25 71:13,21
72:22 74:4,20
76:11 77:22
78:24 79:9,17
80:10,24 81:10
82:7,18,23,25
83:3,14,17
**bottom** 66:14
**box** 2:9
**branch** 2:16
**break** 55:25,25
82:21
**bring** 78:12
**brought** 74:7
**bullet** 22:11
24:21
**bush** 60:19
**business** 52:11

**c**

**c** 3:2 6:1 84:1,1
85:1,1 86:1
**ca** 2:5 51:7 86:9
86:12,21
**california** 1:2
6:14
**called** 25:13
61:2
**calls** 25:7,9
80:24 81:10
**camera** 6:5

**capabilities**
35:11
**capability**
25:16 81:14
**capacity** 1:9
2:12 6:13 42:4
84:21
**capture** 28:21
**car** 25:12,14,16
25:19
**caroline** 51:7
**case** 1:6 6:15
41:4 42:12
43:22 44:4,12
46:25 48:11
52:5,20 62:11
69:25 84:22
**cause** 37:24
57:12 71:6
85:18
**ccp** 86:9,12
**cell** 58:24 66:22
66:25 67:17
68:13,14 69:2
69:23 71:5
77:3,4,5,9 78:4
**certain** 7:5
24:19
**certified** 8:3
**certify** 84:3
85:4,17
**chair** 9:16,17
**change** 71:11
72:24 88:4,7
88:10,13,16,19

**changed** 12:7
12:12 30:14,19
32:13,15 37:18
45:15,25 46:23
47:22 48:13
69:5 71:23
72:4 73:1,10
73:20
**changes** 18:1
85:12
**chat** 12:13,25
14:13,17 16:7
16:17 17:8,14
17:18,23 18:15
19:1,9 20:16
20:20 23:17
25:21 26:3,21
28:10,22,25
29:25 30:13,18
32:12,13,18,25
33:14 35:5
36:24 37:8,12
38:2 39:3,11
39:18,20,24
40:1,5,13
41:13,20 42:24
43:8,12,25
44:10,25 53:6
53:13 54:1,1,6
54:7,10,17
55:21 56:12
57:6 68:11
69:15 70:8
75:23

Veritext Legal Solutions
866-299-5127                  calendar-ca@veritext.com                  www.veritext.com

**[chats - contain]**

| | | | |
|---|---|---|---|
| **chats** 12:8 13:3 13:9,15,19 16:20,24 24:18 32:4 33:17,23 33:25 34:2,4,5 34:7,8,10,13,21 35:14,17,21 36:6 38:8,13 41:6 45:16 46:1,3,24 47:23 48:14 49:6,10,14 50:18,22 51:17 51:25 52:3,10 52:18,21,24 54:19,23,23 56:25 59:18,25 60:3,5 64:8,12 64:16 65:5,16 66:8,17 69:6 70:14,14,16,20 70:23 71:10,11 71:15,16,19 72:17,24 73:13 73:14,20 74:2 75:12,14,24 76:1,3,8,10,10 76:20,25 77:7 77:11,13,21 78:17 79:20 80:2,4,14,16,18 80:22 81:8,23 82:4,11,13,17 **chief** 8:19 10:10 11:12 | 21:20 24:3 37:25 40:9 46:18 49:20 57:9 58:8,16 59:2,20 60:13 60:14,15,20,24 61:7 68:9 69:24 **choose** 72:14 **chose** 14:24 **christopher** 2:14 7:7,8 **cio** 1:6 2:2 6:12 12:12 15:2 63:15,23 84:21 86:4 88:1 **cisa** 4:16 39:25 51:7,9 **civil** 2:16 85:11 86:19,21 **clarify** 71:5 74:21 **clear** 23:13 **clearer** 67:15 **click** 10:20 11:5 **closely** 10:6,8 **cloud** 81:3,5,9 **code** 86:9,12,19 86:21 **collect** 35:16 48:16,24 49:3 49:6 50:15 54:11 55:3 56:18 | **collected** 14:3 16:2 50:14 51:25 55:1 **come** 53:1 57:23 58:23 66:10 **comes** 78:18 **commencing** 1:15 **commissioner** 9:17 **common** 4:24 **communicating** 64:5 **communication** 38:8,13 55:13 **communicati...** 22:8,15 23:2,7 23:17,20 24:1 24:7,10,13 30:24 38:2,6 38:21 52:7 58:22 59:5 64:4 65:17 66:21 67:17 68:13 69:1,11 71:4 77:3 79:3 79:7 **complement** 22:21 **complete** 60:4 **completed** 86:7 86:17 87:6 **completion** 85:13,15 87:10 | **compliance** 63:12 73:11,15 73:23 **comply** 24:23 **components** 10:1 **computer** 42:20 58:3,11 59:9 78:10 **concerned** 85:17 **concludes** 83:19 **conducted** 6:4 6:16 **conference** 1:15 7:18 **congress** 61:23 **congressional** 62:9 **connected** 25:12,14 **connecting** 25:16 **connection** 6:6 **considerably** 37:15 **considered** 22:9,16 **contact** 40:25 86:9,20 **contacts** 25:19 **contain** 26:3 44:24 70:16 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

[contained - darbo]

| | | | |
|---|---|---|---|
| contained 19:9 | 56:19 | 57:16 58:5 | 68:18,19 72:25 |
| 29:24 57:22 | correct 11:17 | 59:12,18,25 | 73:5,8,12,16,23 |
| 76:20 85:5 | 12:9,13,16 | 60:24 64:1,5 | 75:11 77:16 |
| contains 29:22 | 13:2,15,19,24 | 65:5,17 70:12 | 79:1 |
| content 16:23 | 14:8,11,14,17 | 70:24 71:3,12 | covered 60:14 |
| 17:3,8,18 | 14:22 15:3 | 71:20 72:5,14 | create 49:21 |
| 18:10,15 26:1 | 16:14,18 17:16 | 72:21 74:3,7 | created 13:24 |
| 28:13 38:18 | 17:19,24 18:4 | 74:10 75:8,19 | 14:19,22 18:9 |
| 55:18,18 67:12 | 18:10,16,21 | 78:23 79:8 | 18:21 26:15 |
| 70:7,7,16 74:9 | 19:10,21 20:7 | 80:23 82:17 | 29:14 34:20 |
| 74:18 75:3,8 | 20:17 21:5 | 84:6 85:9 | 35:5,20 42:14 |
| 75:18 76:25 | 24:10,19 25:5 | corrections | 57:25 58:1 |
| 77:11,13,20 | 25:8,17 26:10 | 84:5 86:14,15 | 61:14 66:17 |
| 79:15 80:8 | 26:16 27:15 | 87:3,4 | 67:11 68:5,19 |
| 81:7 82:16 | 28:11,22 29:8 | corresponden... | 70:22 71:1,10 |
| contents 50:15 | 29:11,15,23 | 64:23 65:10 | 71:19,23 72:8 |
| continue 6:8 | 30:2,5,11,16,21 | council 60:24 | 72:18 76:24 |
| continued | 30:24 31:24 | counsel 6:10,21 | 81:7 |
| 67:19 | 32:14,25 33:2 | 8:4 31:15 32:1 | creating 65:4 |
| contract 4:14 | 33:6,15,24 | 32:9 36:25 | 70:4,8 |
| 39:19 51:7 | 34:15 35:18 | 49:20 50:15 | csr 1:17 85:24 |
| contractor 31:2 | 36:6 37:12,16 | 55:2 56:18 | currently 10:22 |
| conversations | 38:21 39:12 | 57:9 58:8,16 | cut 28:17 |
| 31:21 37:15 | 40:15 41:2,21 | 59:20 68:9 | cv 1:6 6:15 |
| cooch 51:15 | 41:25 42:11,14 | 69:24 74:13 | 84:22 |
| coordinator | 43:3,6,21,25 | 86:18,22 87:7 | cyber 46:15 |
| 51:6 | 44:3,15 45:16 | counselor 51:6 | cybersecurity |
| copied 15:4 | 45:18 46:1,5,8 | county 85:3 | 46:12 61:24 |
| 19:24 81:23 | 46:16,19 47:23 | court 1:1 6:14 | |
| copy 61:22 | 48:11,14,19 | 8:3 23:6 24:17 | **d** |
| core 37:4 43:6 | 49:4 50:16,19 | 29:18 46:24 | d 4:1 6:1 51:12 |
| 49:23 56:25 | 50:24 51:18 | 47:1,7,12 | daily 75:23 |
| 57:5,11,22 | 52:1,4,19 | 48:11,18 50:2 | 81:15 |
| cores 40:18,20 | 53:17 54:12 | 50:14 65:25 | danielle 2:3 7:1 |
| 55:8,10 56:15 | 56:19,22,25 | 66:17 67:11 | darbo 2:15 |
| | | | 7:15,16,16 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[data - description]**

| | | | |
|---|---|---|---|
| **data**  31:2 | **dc**  2:10,17,22 | 34:3,5 36:6 | 77:20 |
| **date**  6:3 8:24 | **december**  36:3 | 37:7,11,18 | **deliverables** |
| 8:25 15:21 | 75:13,16 76:3 | 39:8,20 40:1 | 10:1 |
| 17:19 18:21 | 76:6 77:8 78:2 | 40:14 41:1,7 | **democracy**  2:9 |
| 20:2,6 28:15 | 78:15 79:2,4 | 41:20,24 43:8 | 7:4 |
| 29:7,20 31:20 | 79:20 80:16,19 | 44:2,6,14 | **democracyfo...** |
| 31:22 35:1 | 81:19 | 45:15,25 46:4 | 2:11 |
| 42:8 43:20 | **declaration**  5:2 | 46:7,10,21,23 | **demonstrated** |
| 48:21,23 50:7 | 34:17,19,25 | 47:23 48:14 | 67:25 |
| 54:17 57:17 | 36:2 47:11,20 | 52:22 54:6,8 | **department** |
| 58:15,19 66:2 | 47:22 49:22 | 65:15,20 67:23 | 2:19,21 7:8,24 |
| 71:24 72:24 | 50:2,8,9,12 | 69:5,14 70:19 | 8:1 21:1 46:19 |
| 73:5 76:17 | 58:8,21,23 | 70:23 71:11,18 | 60:17 |
| 78:16,19 81:19 | 65:25 66:3,5,9 | 72:3,4,9,13,16 | **depending**  6:25 |
| 86:16 87:5 | 66:16 68:5,6 | 74:17 75:2 | **depends**  6:5 |
| 88:24 | 68:17 69:4 | 76:25 77:11,13 | **depicted**  28:10 |
| **dated**  48:15 | 74:22 75:15 | **deleted**  15:4,6 | 29:13 30:1 |
| 58:20 61:16,22 | 77:12 81:18 | 15:12 16:7 | **depicts**  14:13 |
| 66:13 84:8 | **defendant**  2:12 | 17:3,18,23,25 | **depleted**  30:1 |
| 85:19 | **defendants** | 18:3,7,16 | **deponent**  85:13 |
| **dates**  15:23 | 1:11 7:9,24 | 19:25 20:13,16 | 85:14 |
| 16:21 50:11 | 13:1 26:22 | 27:16 29:14 | **deposition**  1:13 |
| **david**  51:8 | 28:9 36:25 | 30:15,20 36:5 | 6:4 8:12 10:13 |
| **day**  8:11 12:7 | 48:16,18 50:14 | 42:10 67:8 | 10:17 11:10,16 |
| 15:1 16:9 28:4 | 54:11 | 69:13,21 70:3 | 15:25 26:25 |
| 41:7,21,24 | **delete**  12:8,12 | 70:7 71:12 | 32:3,10 44:18 |
| 42:10 43:11 | 15:10,14 17:7 | 77:16 79:8,15 | 44:21,22 45:17 |
| 44:2,6,14,18 | 17:8,10,11,15 | 80:8,23 82:4 | 49:15,18,25 |
| 48:22 51:21 | 18:1,15 20:6 | **deletes**  67:1 | 50:13 52:6 |
| 57:25 58:10 | 20:11,16 24:18 | **deleting**  12:15 | 55:2 83:20 |
| 75:8,9 84:8,13 | 24:19 26:4 | 12:16 30:7,7 | 85:5,8,14,15 |
| 85:19 | 29:7,15 30:10 | 74:22 | 86:19,23,25 |
| **days**  16:9 67:13 | 30:15,20 31:23 | **deletion**  17:12 | 87:8,10 |
| 68:5 | 32:13 33:13,14 | 65:16 67:3 | **description**  4:5 |
| | 33:17,24 34:1 | 70:24 72:18 | |

Veritext Legal Solutions
866-299-5127                     calendar-ca@veritext.com                     www.veritext.com

**[designated - employed]**

designated 9:25
desktop 13:24 14:4 50:16 59:5
determination 20:24 21:10 22:23
determine 21:12 22:19
determined 13:16,20 15:5 18:23 20:20 38:17 64:23 65:10 67:8 75:12 86:18,23 87:7
device 19:7 21:14 25:2 59:11,25 65:11
devices 13:13 24:23 60:4
dhs 4:19 8:16 9:5,10,11,19,25 10:2 12:12 21:20,22 24:3 24:22 35:6 38:1,25 41:7 41:15 51:8 58:4 60:15 63:15,23,25
different 29:18 32:4 43:25
direct 80:6

directed 60:23
directly 49:19
director 9:7
directorate 9:21 40:10
directory 54:24
disagree 18:17
disappear 39:12
disappearing 15:3 18:5 20:1 26:12 33:10 40:22 41:1 44:18 45:4,11 45:22 53:17 73:2,6,11,15,17 73:19,22 79:11
disaster 51:8
discovery 49:17
discussed 15:25 68:23 78:13
discussing 37:4 59:18
discussion 23:5 32:6 76:2 78:25 79:22
discussions 21:3
dismantle 47:1 47:8
district 1:1,2 6:14
division 1:3 2:16 6:15

dleonard 2:7
document 11:23 13:6 22:21 31:13 41:23 43:16 56:17 57:20,22 63:12,16
documents 48:17,18,24 54:11 56:18 68:18 69:5
doing 34:13 49:17 81:2
doj 29:6
donald 1:9 2:12 6:12 84:21 86:4 88:1
doucette 51:11
download 10:19
dozens 46:3
driving 25:15 25:15
duly 8:8 85:6

**e**

e 4:1,4 6:1,1 84:1,1,1 85:1,1 85:11 86:9,12 87:1 88:3,3,3
eeshleman 2:7
effort 57:8
efforts 62:13
egregiousness 4:14 39:20 51:8

either 20:6 57:12 69:7
el 51:9
electronic 11:13 12:6 21:22
electronically 64:5
eliminated 72:9
elimination 9:16
elizabeth 2:4 7:12
elle 7:11
email 2:6,7,7 2:11,18 3:4 13:4,7,10 16:22 23:23 29:1 47:25 48:4,7 49:11 49:18 55:17,22 57:19 65:12 69:22
emailed 15:17 17:2 19:13,21 28:5
emailing 16:24 24:15
emails 15:19,20 15:22,24,24,25 16:2 32:2,8 49:14,17,19 64:22
employed 8:18

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[employee - february]**

| | | | |
|---|---|---|---|
| **employee** 63:2 | 88:1,1 | 54:3 81:12 | 62:4 65:23 |
| **employees** 1:6 | **evaluators** 63:4 | **examination** | 66:9,11 |
| 2:2 6:12 21:21 | **evans** 1:13 4:6 | 4:2 8:9 | **exhibits** 10:12 |
| 21:22 22:1,5 | 5:1 6:10 7:22 | **examined** 85:6 | 10:15,21,23,24 |
| 22:18 24:22 | 8:7,9,11 11:19 | **example** 67:5 | 12:19 |
| 63:3 84:21 | 12:5 14:10 | 72:2 | **existed** 14:14 |
| 86:4 88:1 | 19:8,19 20:15 | **except** 20:19 | 78:22 |
| **enabled** 68:11 | 23:2,8,17 | **excerpt** 32:18 | **exists** 21:11 |
| 69:19 75:21 | 24:10,24 25:16 | 53:12 | **exited** 53:23 |
| **encrypted** 22:2 | 31:16 32:12 | **excerpts** 56:11 | **exp** 4:7,9,10,11 |
| **energy** 46:19 | 33:18 35:6 | **exchange** 47:25 | 4:11,12,13,14 |
| 60:17 | 36:7 38:3,12 | 48:4,7 | 4:16,18,19,20 |
| **ensure** 38:1 | 39:3,21 40:1 | **executive** 9:13 | 4:22,22 5:2 |
| **entire** 60:21 | 44:6 51:4 | 9:14 | **experience** |
| **entitled** 39:25 | 52:17 54:20 | **exercise** 35:16 | 46:11 |
| 41:14 | 55:14,21 56:10 | **exhibit** 4:6,8,9 | **expert** 17:10 |
| **eo** 51:7 | 60:8 61:8 | 4:10,11,12,13 | 30:6 34:12 |
| **eric** 3:6 | 63:25 64:8 | 4:14,16,17,18 | 57:8 70:19 |
| **errata** 86:14,16 | 65:14 71:18 | 4:19,20,21,23 | 77:6 81:1 |
| 87:3,5 | 74:17 75:25 | 4:24 5:1,2 | **explained** 67:3 |
| **esec** 51:9 | 76:24 77:10 | 10:14,16 11:9 | **explaining** 67:6 |
| **eshleman** 2:4 | 78:21 79:16 | 12:19,21,25 | **extensive** 46:15 |
| 7:11,12,12 | 80:7 83:10,20 | 14:7 21:16,20 | **extracted** 4:21 |
| **esq** 2:3,4,8,14 | 84:3,11 85:5 | 25:21,23 26:19 | |
| 2:14,15,20 3:2 | 86:5 88:2,24 | 29:22 30:1 | **f** |
| 86:1 | **everybody** | 31:9 32:17,22 | |
| **essentially** | 73:21 79:2 | 36:11,12,14 | **f** 84:1 85:1 |
| 60:21 | **exact** 8:25 9:15 | 39:2,6,14,16,18 | **fact** 65:14 |
| **established** | 15:23 16:21 | 39:24 40:2,4,6 | **fair** 54:8 |
| 74:11 | 29:19 50:21 | 41:10,11,13 | **fall** 9:18 |
| **establishing** | 54:17 57:17 | 42:17,18,19 | **family** 73:24 |
| 9:7 | 58:15 66:2 | 47:15,18 48:5 | **far** 52:18 71:14 |
| **et** 1:6,10 2:2,13 | 73:5 | 48:7 53:2 | 71:22,22 77:15 |
| 6:12,13 84:21 | **exactly** 15:11 | 56:10 59:1,4 | **feature** 30:8 |
| 84:22 86:4,4 | 29:19 34:11 | 60:13 61:9 | 34:14 |
| | | | **february** 35:12 |
| | | | 35:14 37:3,16 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[february - fourth]**

37:19 47:20 53:24 54:4 55:7 56:15

**federal** 2:16 9:22 11:14 12:6 60:21 61:2 62:12 63:11,12 87:1 87:8,9

**federation** 1:5 2:2 6:11 84:21 86:4 88:1

**fema** 4:6,9,11 4:16,21 7:16 8:19,20,22 9:2 9:22,25 10:3,5 10:6,7 12:13 12:25 13:15,19 14:6,13,24 15:7,20 16:1,4 16:4,7,17,24,25 17:14 18:8,15 18:19,23 19:1 19:9,17,20 20:1,16 21:3 23:5,7,14,20 25:20,25 26:21 27:10,12 28:25 29:14,25 30:4 30:18 31:8,15 32:9,12,20,24 33:2,14,25 34:2,5,12 35:6 35:17,21 39:18 39:25 40:18

41:7 43:2,25 45:16,25 46:3 46:8,9 47:1,8 49:20 50:18 51:9,9,9,10,10 51:10,10,11,13 51:17,22,24 52:7,11,18,22 53:6,9,23 55:3 56:11 57:9 58:5,16,18,22 59:17,20,24 66:8,21,25 67:6,16,19,22 68:9,12 69:1 69:10,24 71:4 72:2,10 73:14 74:2 75:14,18 76:20 77:3,25 80:19 81:18 82:4,16

**file** 63:3

**filed** 6:14

**financially** 6:19

**find** 56:17,21 70:11

**fine** 56:2

**finger** 36:16

**firm** 6:17

**first** 8:8,11 10:15 21:19 22:11 32:19 44:17 53:13 62:14 83:1

**five** 56:2,3 82:22 83:3,3

**fleischman** 2:20 7:25,25 83:16

**folder** 10:15,21 10:25 12:20

**follow** 64:7 83:14,16

**followed** 64:21

**following** 16:11 45:20 76:2

**follows** 8:8 86:8

**force** 9:8,9,13 9:24 10:4

**foregoing** 84:4 85:9,10

**form** 18:12 23:10,18 24:11 24:25 26:6 28:23 34:22 35:22 36:8 38:9,15,22 47:2 49:8 50:25 51:19 55:4,15 57:1 58:6 59:7,14 59:19 60:1,10 64:9,18 65:6 65:18 66:19 67:4,14 68:7 68:21 69:8,16 70:17,25 71:13 71:21 74:4,20

76:11 77:22 78:24 79:9,17 79:17 80:10,24 81:10 82:7,18 85:8

**format** 22:10

**former** 24:3 37:25 46:18

**forward** 2:9 7:5 17:22 18:6 18:7,19 19:5 30:8 44:5 49:19

**forwarded** 16:4 32:8

**foundation** 2:9 7:5 19:15 20:8 20:18 28:23 41:3 42:1 50:20 55:15 65:6,18 68:22 69:16 78:24 79:18 80:10,24 81:10

**foundational** 18:12

**four** 12:15 17:16,19 20:6 20:11,12 26:13 29:8 30:10,15 30:20 31:23 72:3

**fourteen** 83:1

**fourth** 69:20

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[francisco - hold]**

| | | | |
|---|---|---|---|
| **francisco** 1:3 2:5 6:15 | 73:13,18 75:14 83:18 | **gregg** 51:11,13 | **happen** 80:1 |
| **fraud** 9:6,8,9 9:12,23 10:11 | **goes** 18:6 | **grey** 4:18 40:5 40:8,9,22 41:1 41:17 51:11 | **happened** 14:5 75:9 |
| **frcp** 87:1 | **going** 6:2 9:6 9:12 10:9,12 10:13,13 18:6 | **greyson** 40:12 40:13,14 | **happening** 65:10 |
| **fred** 51:11 | 18:19 22:25 23:11 30:8 | **group** 3:2 7:21 9:13 10:10 | **hawaii** 85:2,7 85:11,19 |
| **free** 25:13 | 44:4 47:14 48:6 52:4,25 | 14:22 15:7 26:9,15 42:8 | **headquarters** 8:21 |
| **friday** 43:21 | 53:1 56:4 62:2 63:1 76:22 | 44:25 52:10 53:20,23,25 | **hear** 36:18 |
| **friend** 48:1 | 79:19 80:6 83:5 | 54:2,3,16,18 72:14 | **heard** 6:7 63:19 |
| **front** 11:9 13:22 45:8 | **good** 6:2,25 8:6 8:11 55:24 | **groups** 82:10 | **hearing** 46:25 47:7 48:1,10 48:16,22 |
| **full** 40:11 62:20 | 62:21 | **guess** 20:19 73:21 | **held** 46:25 47:7 60:19 63:4 |
| **function** 11:23 17:12 20:16 | **government** 1:5 2:2 4:24 | **guidance** 40:18 | **helped** 48:16 50:14 54:11 |
| 24:18 29:20 33:14 44:14 | 6:11 22:9,16 59:4 60:21 | **guy** 4:12 14:16 36:24 37:4,8 | **helping** 48:24 49:21 50:1 |
| 63:18 65:15 | 61:3,12,19 65:16 84:21 | 37:16 38:2,24 41:17 50:4 | 56:18 |
| **functions** 65:21 | 86:4 88:1 | 51:12 | **hemmingway** 39:4,11 50:5 |
| **funds** 9:22 | **government's** 62:13 | **guys** 78:3 | 51:16 |
| **further** 50:13 70:24 83:11 | **gran** 1:17 8:6 84:23 85:4,24 | **h** | **hereto** 85:17 |
| 85:17 | **grant** 3:5 6:17 | **h** 4:4,13 88:3 | **hi** 1:17 7:8 85:24 |
| **future** 72:18 | **great** 11:5 56:3 | **hac** 2:8 | **hit** 11:1 |
| **g** | **greaves** 3:2 7:20,20 11:21 | **hall** 2:14 7:7,8 7:8 | **hold** 12:24,24 21:17,17,25 |
| **g** 6:1 | 11:25 36:16 83:23 86:1 | **halt** 47:1,8 | 36:15 41:12 42:16,20 43:18 |
| **general** 17:14 | | **hamilton** 9:1 | 53:5 56:13 61:10 62:5 |
| **getting** 15:2 | | **handled** 86:8 | |
| **give** 25:21 48:5 48:5 | | **hands** 25:13 | |
| **given** 31:14 32:19 47:15 49:14 | | **handwritten** 49:3,5 | |
| **giving** 11:21 | | | |
| **go** 6:9 22:23 42:20 46:14 | | | |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[home - knew]**

| | | | |
|---|---|---|---|
| **home** 25:15 50:16 | 19:21 29:21 31:7,15 36:23 38:12 39:3 55:21 | 60:13,15,20,24 61:4,7,13,20,24 62:13,14 63:6 70:24 75:11 | **joe** 4:12 14:16 36:24 37:8,16 38:2 41:17 50:4 51:12,13 |
| **homeland** 2:19 2:21 8:1 46:19 | **images** 26:21 30:23 38:7 56:11 | **initiating** 29:17 | **joshua** 51:12 |
| **hoshijima** 2:8 7:3,4,4 | **imessage** 22:2 | **injunction** 46:25 47:8 | **july** 61:16,20 |
| **house** 14:2 28:3 58:25 59:5,9 70:11 75:6 | **impeding** 4:24 61:3,12 | **instruction** 11:21 | **june** 62:8 |
| **hq** 51:10 | **imposed** 72:17 | **interagency** 9:10 | **justice** 7:9,24 14:1 51:20 57:9 58:16 59:21 68:9 69:23 77:24 78:2,14 79:22 80:15 81:17 |
| **hundred** 35:15 54:21 57:7 71:15 | **inaudible** 36:17 | **interested** 6:19 | |
| **hung** 36:14 | **include** 38:20 50:2,4 54:7 63:5 72:12 | **internet** 6:6 | |
| **husband's** 73:9 | **included** 33:4 43:12 86:14 87:3 | **interpretation** 55:17 | |
| **i** | | **introduce** 7:18 10:14 12:18 65:23,24 | **k** |
| **idaho** 73:10,24 74:10 | **including** 6:22 33:5 | **introduced** 10:16 | **kangior** 51:14 |
| **idea** 31:20 | **inclusive** 84:4 | **involved** 10:3,5 49:21,22,24 52:10,11 | **kara** 14:16 26:1 26:9 31:1 51:12,13 53:10 |
| **identification** 12:21 25:23 26:19 31:9 32:22 36:12 39:6,16 40:2,6 41:11 42:19 53:2 61:9 62:4 66:11 | **independent** 63:3 | **involves** 41:17 | **karen** 1:13 4:6 6:10 7:21 8:7,9 14:10 51:12,13 61:8 83:20 84:3,11 85:5 86:5 88:2,24 |
| | **individual** 21:10 22:18 | **issued** 27:10,12 | |
| | **individually** 54:8 | **it'll** 73:20,21 | |
| | **individuals** 49:22 50:2 | **j** | **keith** 51:13 |
| **identified** 52:17 | **info** 4:24 | **j** 1:9,17 2:12 6:12 84:21 85:4,24 86:4 88:1 | **ken** 9:1 |
| **identify** 50:1 | **information** 11:13 21:11,12 21:20 24:3 37:25 43:24 46:18 59:2 | **january** 37:16 | **kept** 78:16 79:25 |
| **iga** 51:11 | | **jason** 3:2,4 7:20 51:11 86:1,2 | **killmeyer** 51:12 |
| **ii** 86:5 88:2,24 | | | **king** 3:3 |
| **image** 4:9,12 12:25 13:22,23 14:6,7 18:8 | | | **klv** 4:8,8 |
| | | | **knew** 46:24 47:6,9 48:17 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[know - machine]**

| | | | |
|---|---|---|---|
| **know** 9:18 10:7 10:17 12:20 15:11 17:15 19:19 20:15 22:24 27:2,18 27:23,25 28:3 28:12,20 29:6 32:7 34:11,24 35:1,7,15 37:18 43:16 44:7,9 46:21 50:21,24 51:1 51:2 54:3,17 54:21 66:10 68:24 73:5,20 74:12 76:15 77:24 79:10 81:14 82:8,11 | **legal** 86:7 **legislature** 85:7 **leonard** 2:3 4:3 6:25 7:1 8:10 11:1,3,5,8 12:2 12:4 18:13 19:18 20:4,14 20:22 23:15,24 24:14 25:3 26:8 29:2 35:3 36:4,10,22 38:11,19 39:1 41:5 42:5 45:9 47:5 49:13 50:23 51:3,23 55:6,20,24 56:3,9 57:4 58:13 59:10,16 59:23 60:7,12 64:14 65:1,13 65:22 66:23 67:10,18 68:3 68:16 69:3,12 70:1,21 71:8 71:17 72:1 73:3 74:6 75:1 76:14 78:20 79:6,13 80:5 80:20 81:6 82:1,14,21 83:10,18 | 88:19 **linkup** 4:16 39:25 51:9 **list** 47:16 51:4 51:21 **listed** 51:21 **litigation** 54:11 **little** 42:17 43:10 **llp** 2:4 **load** 42:22 **location** 7:1 **locked** 86:12 87:1 **longer** 8:21 18:19 32:18 53:13,21 **look** 12:18 14:6 18:8 21:15,19 24:21 25:20 26:18 28:6 31:7,18 32:17 36:11 39:2,14 39:23 41:10 42:16 44:23 47:14 53:16,19 58:23 59:1 61:6 62:2 66:9 70:13 73:19 | 43:10 **lot** 29:17 74:16 |
| **l** | | | **m** |
| **l** 2:16 **large** 50:24 **latoya** 49:22,25 **latoya's** 50:9 **lauren** 33:5 **law** 3:2 7:21 **laws** 63:12 **lawyer** 57:10 58:17 77:25 **lawyers** 49:15 57:9 58:16 59:21 69:24 70:2,6,10 77:24 80:15 **leave** 22:22 | **levels** 21:9 **likely** 31:24 **line** 86:15 87:4 88:4,7,10,13,16 | **looked** 29:21 75:9,10,11 **looking** 28:13 35:10 **looks** 37:9,13 40:3,16 43:10 | **ma'am** 8:17 9:4 11:15,18 12:3 14:5,12,15,18 14:21,23,25 15:5,18 16:15 17:1,5,5,17,21 20:25 21:6,18 21:24 22:14,17 24:2,5,8,20 26:14,17,24 27:3,5 28:6,15 29:24 30:3 31:19,25 32:11 35:19 36:9 37:6 39:7 42:12 43:7 44:12,16 46:6 46:17,20 47:19 47:21,24 48:3 48:15,20 49:1 50:3,12,17 52:2,5,8,20 54:9 55:23 57:3,24 59:13 60:16,18,22,25 63:8 66:3,15 70:9 71:23 72:7,15 75:5 77:15 79:11,12 82:12,19,20 **machine** 85:8 |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[made - name]**

| | | | |
|---|---|---|---|
| **made** 29:18 64:15 71:15 85:13,14 | 72:4 75:13,17 76:3,7 77:8 78:2,15 79:3,4 79:21 80:16,19 80:22 81:19 | **member** 9:12 53:21 | 44:19 45:4,11 45:22 53:20 54:7 65:3 66:25 67:1,2 |
| **maintaining** 64:4 | | **memo** 61:2,5 61:11,21 | 67:20,23 73:2 73:6,7,11,15,17 |
| **make** 16:11 21:10 35:24 48:6 58:21 71:3 77:6 85:12 86:14 87:3 | **mark** 48:4 61:6 **marked** 10:15 10:16,20,23,24 12:19,21 25:23 26:19 31:9 32:22 36:12 39:6,16 40:2,6 | **memorandum** 61:7,14 **memorized** 9:15 **mention** 69:4 **mentioned** 68:23 | 73:19,22 79:11 81:3,18 82:3 **messaging** 21:23 **met** 58:15 **micah** 33:5 51:13 |
| **making** 21:2,2 55:23 71:3 | 41:11 42:19 53:2 61:9 62:2 | **message** 11:13 11:17 12:6 | **middle** 31:4 **midway** 62:18 |
| **managed** 64:24 | 62:4 66:11 | 13:14,18 15:3 17:19 26:12 | **mike** 51:14 |
| **management** 9:20 13:9 15:9 19:4 21:1 40:9 40:18 63:18,21 63:22 64:1,13 64:21,25 | **material** 70:4 71:12 78:22 **matter** 6:11 7:6 7:14 65:14 85:10 | 28:16,20 30:8 33:10 36:20 37:3 40:17,22 43:23 53:17,18 55:7 56:14 | **miller** 51:7,14 **mine** 73:22 **minutes** 56:2,3 82:22 83:3,4 **mischaracteri...** 64:18 65:7,19 |
| **march** 8:12 11:12,17 12:6 12:7,11,16 15:1,2 16:13 16:16 17:15,22 18:19 20:2,5,7 28:10 29:10 30:14,19 31:24 32:14 33:9,13 33:18 36:3 37:14 43:21 44:3,14 45:17 45:21 46:1,24 47:6 48:8,15 48:21 50:8 | **matthew** 2:20 7:25 **maui** 85:3,19 **mccord** 11:13 **mcgill** 40:12,13 40:14 **mean** 15:17 23:5 28:6 34:12 61:16 **means** 54:7 **measures** 58:9 58:21 **media** 6:9 83:21 | **messages** 15:5 15:6,10,12,15 16:8 17:7,14 17:22 18:2,5 18:10,14,16,18 18:20,22,24,25 19:4,8,13,20,25 20:1,11,15 21:4 22:1,3,5 24:19 26:4 28:9,22 29:13 29:22,24,25 30:4,7,13,18 36:1 37:8 41:1 41:24 43:20 | 69:17 79:18 80:11 **misconstrued** 76:23 **moment** 48:5 **morning** 6:2,25 8:6 **mount** 51:14 |
| | | | **n** |
| | | | **n** 4:1 6:1 84:1 **name** 6:17 14:24 40:11 |

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[named - online]**

named  33:5 40:5 53:6
necessarily  76:6
necessary  86:14 87:3
needed  34:17 38:18 64:24 80:15 81:17
never  20:1 56:24
new  8:15,17 9:5 9:18 10:3 27:20,20 35:8
newly  34:14
nominated  9:1
non  73:2,6,11 73:15,19,22
northern  1:2
notating  86:15 87:4
notation  33:9
note  6:4
noted  84:5
notes  49:3,5
notice  1:16
noticing  6:23
november  14:19 18:20 19:2,9 20:7 26:10 30:14,19
number  9:15 47:15 48:5,7 50:21,24 51:1 51:24 55:10

83:21 86:15 87:4
nw  2:16,21

**o**

o  6:1
oath  8:4
object  24:25 26:6 34:22 35:22 36:8 38:15,22 41:3 42:1 49:8 50:25 51:19 55:15 58:6 59:14,19 60:1 60:10 64:9,18 67:4,14 70:17 70:25 71:13,21 74:4,20 76:11 77:22 78:24 79:9,17,17 82:18
objection  18:12 19:15,22 20:8 20:18 23:10,18 24:11 28:23 38:9 45:7 47:2 50:20 55:4 57:1 59:7 65:6 65:18 66:19 67:21 68:7,21 69:8,16 72:22 80:10,24 81:10 82:7
objections  6:20

obligations  24:6
obtained  13:23
occasions  61:24
occur  68:19
octavian  51:14
offered  34:7,14 35:11
offhand  31:22
office  57:10,18 58:17,18,24 86:11
officer  10:10 11:13 21:20 24:3 37:25 46:18 59:2 60:14,15,20,24
officers  61:8
official  1:9 2:12 6:13 22:9,16 42:3 63:11,20 63:22,25 84:21
offline  34:18,25 35:23 78:17 80:1
oh  21:17
ok  51:14
okay  8:18,23 9:5 10:12 11:2 11:7,9 12:1,5 12:18,23 13:22 14:6 16:13,16 21:19 22:12 25:20,24 26:18 26:20,25 27:2

30:6 31:7,12 31:13,20,23 32:12,17,24 33:8 36:11,13 36:23 37:7,10 39:2,14,17,23 40:4 41:6,10 41:12,13 42:16 42:17,23 43:12 43:14 44:17,21 45:6,10,12,17 47:3,6,14,17,25 48:9 50:13 52:25 53:5,5 53:14,15 56:3 56:10,13,14 57:25 59:3 61:6,10,21,23 62:7,8,12,20 63:1 66:9,12 76:5 82:21 83:3,17
okayed  78:14
older  20:12 78:8
omb  48:1 60:19 61:1 62:3
once  16:8
ones  17:11 19:20,24 20:21 32:15 33:20 36:5 38:5 67:5 67:22 69:13,20
online  1:14 78:18

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[ope - phone]**

| | | | |
|---|---|---|---|
| **ope** 51:11 | **p** | **people** 25:1,13 | 74:13,18 75:3 |
| **open** 10:17 | | 25:14 71:16 | 75:8 76:19,25 |
| 11:6 12:24 | **p** 6:1 | 79:22 | 77:3,4,5,13,25 |
| 21:15 | **p.m.** 56:5,6,6,8 | **percent** 54:21 | 78:4,9,22 |
| **operating** | 83:6,7,7,9,21 | 57:7 71:16 | 79:24 80:8,9 |
| 78:10 | 83:24 | **performing** | 80:14,18 |
| **opportunity** | **page** 4:2,5 | 63:5,20 | **personally** 16:2 |
| 85:11 | 21:19 31:4 | **period** 36:1,2 | 45:24 |
| **option** 35:8 | 32:19,19 33:8 | 67:1 77:8 | **pertaining** |
| **order** 9:13,14 | 43:15,16 44:22 | 78:14 79:1 | 56:18 |
| 48:21 49:1 | 53:13,13,19 | 81:4 86:18 | **phillips** 51:11 |
| 69:10 72:25 | 56:14 86:15 | 87:7 | **phone** 5:2 15:7 |
| 73:5,8,12,16,23 | 87:4 88:4,7,10 | **perjury** 23:6 | 16:8 17:4 22:1 |
| 75:11,15 77:16 | 88:13,16,19 | 86:17 87:6 | 25:5,7,7,9,9,12 |
| 78:12 79:1 | **pages** 4:21,24 | **person** 43:2 | 25:14,17 26:22 |
| **ordered** 48:18 | 5:1 43:13 84:4 | 65:15 72:2 | 27:8,9,10,11,12 |
| 66:4 | 86:14,17,17 | **personal** 13:12 | 27:13,14,15,17 |
| **orders** 24:17 | 87:3,6,6 | 15:7 17:4 19:7 | 27:19,20,21 |
| 29:18 50:14 | **paragraph** | 21:14 22:19 | 28:1 32:25 |
| **organizational** | 62:14,16,20 | 25:2,4,7,9,14 | 33:24 34:21 |
| 7:2,13 9:19 | **part** 57:8 | 27:10,12,14,15 | 38:8,14 39:4 |
| **original** 21:11 | **participants** | 27:17 32:25 | 42:13 44:23 |
| 38:18 86:10,20 | 6:6 14:17 33:4 | 33:24 34:21 | 50:19 52:1,19 |
| 86:22 | 72:13 | 38:8,14 39:4 | 52:21 54:10,13 |
| **originally** 72:3 | **participated** | 44:23 50:19 | 56:25 57:3,10 |
| **orr** 51:10 | 35:16 52:17 | 51:25 52:19 | 57:12,15,18,20 |
| **ott** 51:6 | **particular** | 56:25 57:10,15 | 57:21 58:24 |
| **outcome** 6:19 | 12:11 13:8 | 57:20 58:3,11 | 64:16 66:6,22 |
| **outset** 26:13 | 81:4 | 58:16,24 59:9 | 66:25 67:17 |
| 46:8 | **parties** 6:9,18 | 60:4 64:16 | 68:13,15 69:2 |
| **overall** 31:3,4 | 85:17 | 65:11 66:6,22 | 69:21,23 70:3 |
| **overseers** 63:4 | **party** 85:13,14 | 66:25 67:17 | 70:4,7,16 71:5 |
| **own** 22:19 | **pause** 56:6 83:7 | 68:13,14 69:2 | 72:23 74:3,7 |
| | **pdf** 86:12 87:1 | 69:23 70:16 | 74:10,12,18 |
| | **penalty** 23:6 | 71:5 74:3,7,10 | 75:3,8,10,10,19 |
| | 86:16 87:5 | | |

Veritext Legal Solutions
866-299-5127     calendar-ca@veritext.com     www.veritext.com

**[phone - proceedings]**

75:25 76:5,9
76:17,18,19
77:1,4,4,5,9,14
77:18,21 78:4
78:8,15,18,22
79:15,24,25
80:2,3,8,9,14
80:18 81:21
**photo** 28:2
**photographs**
16:17
**picture** 21:13
27:6,7,8,9,14
27:22 28:7,21
29:7 31:16,17
37:11,14 38:4
**pictures** 13:3
13:11,14,16,18
13:20 15:11,13
15:15 16:1,6
16:19,23 17:2
17:8,11 18:22
23:21 28:24,25
29:3 32:4,8
38:17 49:10
64:21 65:2,11
67:7,24 69:21
75:7
**place** 6:8 8:12
28:10
**places** 21:11
**plaintiff** 2:2
**plaintiffs** 1:7
1:14 6:11 7:2,5
7:13 13:1 29:5

47:7 48:17
**plan** 31:3,5
47:1,8
**plankey** 51:15
**plans** 31:1
**please** 6:4,20
8:3 21:16,18
52:11
**pllc** 3:2
**po** 2:9
**point** 17:9
22:11 23:19
24:21 25:21
32:10 34:6
35:24 44:3
53:24 58:12
64:15,20 77:2
77:11,12 78:4
78:7
**policy** 13:12
17:1 19:6 21:1
21:6,7,8 24:22
24:22,24
**pop** 47:14
**position** 9:7,18
60:19,23 63:16
**post** 2:5
**posted** 17:23
17:25 30:13,16
30:21
**prea** 49:22,25
**precautions**
65:9
**preface** 70:18

**premise** 18:17
**preparing**
49:24
**present** 3:6
6:22 36:1
80:14
**preservation**
5:2 11:14 12:7
49:1 58:5
59:25 66:6
68:18 69:5
**preservations**
66:5
**preserve** 21:4
21:22 24:9,12
65:4 69:10
82:16
**preserved**
22:10 23:3,7
35:2 38:2 60:6
64:12 66:21
67:16 68:12,24
69:1 71:4
72:23 77:3
**preserving**
23:13,16 24:7
29:19 64:8
**president** 1:9
2:13 6:13 9:2
84:22
**press** 43:2,7
**pretty** 23:13
**prevent** 70:23
71:12

**preventing**
72:18
**previous** 11:10
28:21 47:15
48:6 49:11
73:17
**previously**
10:16 13:4,10
23:21 38:5,16
38:24 49:9
52:24 60:14
65:8,21 68:8
69:19 74:11
75:21 81:2,13
81:17
**prior** 11:16
16:16 17:14
29:10 34:21
35:6,21 55:23
64:16 65:3
85:6,13,15
**privacy** 62:21
63:6
**pro** 2:8
**probably** 28:3
28:6 76:12,15
**procedure**
85:11 86:19,21
**procedures**
64:13
**proceed** 8:5
**proceeding**
6:20
**proceedings**
56:6 83:7,24

Page 18

**[proceedings - records]**

85:9
**process**  16:11
19:4 64:22
65:9 68:9
**processes**  64:25
**produce**  26:1
48:17,18 49:6
56:17 68:4
70:14,20 75:12
75:14,16 77:7
78:1,12,21
79:3,20 80:2
80:16,18 81:18
**produced**  13:1
13:25 14:1
18:24 26:2,22
29:4,5,6 31:13
32:7,20 36:24
39:5,19,24
41:14,23 42:24
43:13,13,15
46:5 49:5
50:18 51:2,22
53:14 58:1
78:17,23 81:9
**production**  4:6
**professional**
1:18
**program**  10:14
**programs**  2:16
9:23
**protected**
64:11
**protecting**
61:19

**protection**  4:24
61:3,12 63:6
**provide**  66:5
**provided**  47:11
65:25 86:19
87:8
**pull**  48:7 56:10
**purposes**  25:12
**pursuant**  1:15
85:6,11
**purview**  9:23
**put**  43:23 73:17

**q**

**quality**  6:5,5
**queens**  4:21
51:10 53:6,9
53:23 55:3
56:11
**question**  18:17
30:17 40:20
44:22 45:20
47:3,4 52:15
55:18 65:24
71:6 72:11
75:2 76:2,22
80:6 82:12
**quick**  51:14
**quote**  45:3 52:9

**r**

**r**  6:1 84:1 85:1
88:3,3
**r&s**  87:1,9
**rank**  63:3

**rapid**  4:11
32:20,24 33:14
43:24 51:10
**reach**  25:15
**read**  36:20
44:21 63:1
78:6 83:23
84:3
**reading**  86:24
87:9
**really**  19:16
28:3,12 29:16
32:6 37:22
38:23 51:1
74:11 76:21
**reason**  18:18
22:24 82:2
88:6,9,12,15,18
88:21
**recall**  8:13
11:17 14:2
15:16,21 16:10
16:19,21 19:11
19:12,16 23:19
28:4,7,13,14,14
28:24 31:16,17
31:22 32:1,15
33:19,20,22
34:23 35:7,15
37:20,22,22
38:23 41:9
44:7,9,17,20
48:2,21,23,24
50:3,4,6,7,11
52:6,12,14,23

54:15 57:2,17
61:1,5 63:17
66:1,2,2 71:14
71:22
**recalling**  54:23
**received**  26:25
27:2 31:8
36:25 49:1
72:25
**receiving**  11:19
12:5,11
**recently**  50:14
**recognize**
12:23 27:4
37:1
**recollection**
61:13
**record**  6:3,9,23
15:5 21:12
22:20 27:25
44:24 56:4,7
65:11 67:8
82:23,24,25
83:5,8,18,20,20
**recorded**  6:7
6:10
**recording**  6:5,8
**records**  11:14
12:6 13:11,16
13:21 14:1
15:9 18:23
19:4,5,24
20:20 21:1,23
22:9,9,15,16,24
23:1,3,14,22,22

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[records - restored]**

24:1,13 29:19
32:5 35:2
38:17 63:18,21
63:22 64:1,12
64:13,20,21,23
64:24 65:9
66:6 68:25
78:1
**reduced**  12:15
85:8
**reference**  13:9
43:24
**referenced**  86:6
**referencing**
67:9
**referred**  35:9
50:15 65:24
**refers**  14:10
55:7
**refresh**  11:1
61:13
**refuse**  60:8
**regarding**
11:20 12:6
49:22 56:15
61:24 63:12
66:5
**regardless**
22:10
**registered**  1:18
**reinstall**  77:17
79:23
**reinstallation**
80:7,23

**reinstalled**
79:14 80:12
**related**  6:18
13:15,19 16:24
18:23 20:24
22:1,5,8,15,20
23:2,4,5,7,16
23:22,25 24:7
24:9,23 25:10
25:11 28:19
30:23 33:2,25
34:2 35:5,17
35:21 38:1,5,6
38:7,13,20
39:18 41:6
43:7,25 45:16
45:25 46:3
50:18 51:17,22
51:24 52:7,18
52:22 55:13,18
59:5,17,24
64:4 65:16
66:8,21,25
67:16,20 68:13
69:1,11,20
71:4 73:14
74:2 75:14,18
76:20 77:3
80:19 82:4,13
82:16
**relates**  81:18
82:9
**relationship**
38:24

**released**  86:22
**relevance**
68:21
**relevant**  19:3
**remain**  18:2
**remarks**  62:9
**remember**
28:20 49:23,24
50:1 61:15
77:15
**reminder**  11:12
11:19 12:5,12
15:2 21:21
59:2
**remotely**  6:16
6:22
**remove**  13:12
21:13 70:22
71:12,18 72:16
**renewals**  37:4
43:6 49:23
**replaced**  8:23
9:1
**reporter**  1:18
8:3,6 36:18,21
**represent**
25:25 31:14
32:18 36:23
**represented**
28:9
**representing**
7:1,5,13,16
**represents**  85:9
**request**  47:8
85:11

**requested**
32:11 74:14
87:1,9,10
**require**  72:12
**required**  24:9
69:25 86:20
**requirements**
64:3,7
**requires**  24:22
**research**  35:10
70:11
**reset**  73:14,18
**resides**  10:11
**respect**  24:7
63:16
**respond**  10:1
**responding**
52:15
**response**  4:11
26:2 32:21,24
33:14 43:24
51:8,10
**responsibilities**
63:5,11
**responsibility**
62:17,21 63:2
**responsible**
64:1
**restarting**  37:4
**restate**  30:17
70:5 79:19
**restore**  78:7,8
79:21,24 81:21
**restored**  73:7
73:12,16 78:11

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[restored - see]**

78:15 79:25 80:13,13
**result** 26:4 32:2 77:20
**resulted** 18:16
**resulting** 65:16
**resume** 56:1
**retained** 83:21
**retention** 19:5 63:12,16
**retroactive** 18:6 30:7,8,9 44:5
**return** 86:17 87:6
**review** 21:9 85:11 86:8,10 86:13 87:2
**reviewed** 79:1 80:2
**right** 8:16 9:20 10:9 12:2 24:4 27:23,25 31:22 37:23 40:17 44:11 45:17 46:12,21 47:1 47:9,20 49:7 51:5 52:22 53:10 56:21 57:6,23 58:1 60:15,17,21 61:25 62:10 63:13,23 66:6 66:14 67:3,13 67:20 68:6

69:6,15 72:9 72:18 73:25 83:17
**risks** 4:24 61:3 61:12
**robert** 2:14 7:23
**robert.bomba...** 2:18
**role** 8:16,17 9:5
**rolls** 8:20
**room** 7:18
**roughly** 16:13 48:13
**rpr** 85:24
**rule** 85:11
**rules** 85:11 87:8

**s**

**s** 4:4 6:1 84:1,1 84:23 88:3
**safeguard** 62:13
**safety** 25:12
**san** 1:3 2:5 6:14
**sandra** 1:17 8:6 85:4,24
**saorm** 63:19
**saturday** 14:19 19:2 26:10
**saved** 13:24 14:3
**saying** 23:12 72:10

**says** 14:22 21:21,25 22:8 23:2,25 24:22 26:9,11,12 33:7,9,10 39:10,13,22 40:17 41:18 43:23 53:20 59:11 62:23 63:1 66:21 77:2
**scc** 9:16
**schedule** 86:10
**screen** 6:7
**screenshot** 27:18,21,24 28:1,22
**screenshots** 19:13 55:1,3 67:2,20 68:1 72:6 74:9,12 74:15,16,19 75:7
**scroll** 11:25 33:8 36:16,19 43:15 53:3
**sealed** 86:20
**sean** 3:5 6:17 51:15,15
**search** 57:11 76:16,19,20
**searchable** 69:25
**searched** 56:24 57:2,5,10,12,15

57:18,18,21 68:14 69:23 70:2,6 76:17 76:18,19
**searches** 57:20
**second** 21:17 21:17,25 25:21 33:8 42:17,22 56:13,14 58:23 62:16,20
**security** 2:19 2:21 8:1 10:10 46:16,19 62:21 63:6
**see** 11:14 13:22 14:20 21:23 22:3,6,10,13,16 22:17 23:25 24:1,2 25:21 26:3,4,13,22 28:16 30:23 31:3,5 32:21 33:11 37:5 39:5,23 40:4,5 40:19,20,23,24 41:10,15 42:18 42:25 45:5 47:16 53:6,21 55:8,9,11 56:15 61:7,15 61:16 62:14,18 62:19,24 63:6 68:14 78:11 82:22

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

**[seeing - sitting]**

| | | | |
|---|---|---|---|
| **seeing** 11:17 | 39:11 40:16,17 | **shorten** 33:17 | 49:6,10,14 |
| **seen** 6:6 | 40:22 41:1,7 | **shorthand** 85:8 | 50:18 51:18,25 |
| **selectively** 60:3 | 42:9 44:2,6,14 | **shortly** 9:1 | 52:3,7,11,18,21 |
| **send** 13:8 21:13 | 46:7,9 54:24 | **should've** 57:6 | 52:24 53:6 |
| 22:1,5 38:12 | 65:15,20 70:19 | **show** 52:25 | 54:19 56:25 |
| 40:18 53:20 | 72:3 73:1,6,22 | 67:25 68:1 | 57:8 60:2,4 |
| 55:11,22 58:4 | **sets** 18:2 | 73:20,21 | 64:8,12,16 |
| **sending** 21:21 | **setting** 12:15 | **showed** 58:10 | 65:3,5 66:8,17 |
| 32:5 | 29:8 30:15 | 68:10 72:6,7 | 66:25 67:1,12 |
| **senior** 63:20,22 | 31:23 37:7,11 | **shows** 46:9 | 67:20 68:11 |
| 63:25 | 37:18 39:8,20 | **si** 1:6 6:15 | 69:6,15 70:8 |
| **sent** 13:4,6,8,17 | 40:1,15 41:20 | 84:22 | 70:14,14,15,19 |
| 15:12,16,22,23 | 41:24 43:8 | **sign** 83:23 | 71:10,10,15,16 |
| 16:1,2,17,21 | 53:17,18 54:6 | 86:16 87:5 | 72:12,24 73:19 |
| 19:1,3,5,24 | 72:9,13 | **signal** 12:8,13 | 74:2,18 75:3 |
| 20:20 23:22 | **settings** 12:8,13 | 12:25 13:15,19 | 75:12,14,18,21 |
| 27:16 29:1 | 18:1,15 26:4 | 14:7,13,17 | 75:23,24 76:1 |
| 38:5,18 49:10 | 29:15 30:20 | 15:6 16:7,17 | 76:3,8,10,25 |
| 55:16 60:13 | 32:14,16 33:18 | 16:24 17:10,13 | 77:6,7,11,13,17 |
| 64:22 65:11 | 33:24 34:3 | 22:2 23:17 | 78:8 79:14,20 |
| 67:7 69:21 | 36:6 44:18 | 24:17 29:17,20 | 79:24 80:2,7 |
| 71:16 | 45:4,11,16,22 | 30:6 32:4,12 | 80:14,16,18 |
| **sentence** 62:16 | 45:25 46:4,7 | 32:13,24 33:14 | 81:1,3,4,8,13 |
| 62:23 66:24 | 46:21,23 47:23 | 33:23,25 34:2 | 81:14,15,16,23 |
| **september** 19:1 | 48:14 52:22,23 | 34:4,5,6,7,8,9 | 82:4,11,13,17 |
| **series** 16:9 | 69:6,14 70:23 | 34:12,13,14,21 | **signature** 66:14 |
| **session** 49:11 | 71:11,19 72:17 | 35:5,10,11,13 | 85:23 86:22,24 |
| 85:6 | **setup** 31:18 | 35:17,21,25 | 86:24 87:9 |
| **set** 12:2 15:2 | **share** 10:14 | 36:1,6,24 38:8 | **signed** 36:2 |
| 17:15 18:5 | 36:14 42:17 | 38:13 39:3,11 | 47:20,22 75:15 |
| 19:25 20:6,11 | **shared** 62:21 | 39:18,24 40:4 | 84:13 |
| 24:18 26:13 | **shila** 51:15 | 40:13 41:6,13 | **signing** 77:12 |
| 30:10 33:10,13 | **short** 55:25 | 42:24 43:9,25 | **sitting** 15:21 |
| 33:20 34:5 | 82:21 | 44:18,23 46:24 | 82:3 |
| 37:9,10,24 | | 47:23 48:14 | |

Veritext Legal Solutions
866-299-5127     calendar-ca@veritext.com     www.veritext.com

**[slow - talking]**

slow   42:17
small   11:23
sms   22:1
solutions   86:7
sopda   8:19,21 8:23
sorry   18:14 19:1 36:14,18 38:10 41:12 45:19 53:3 57:14 62:19 76:1
sound   28:11 51:5
spanned   52:3
specific   50:11 63:16
specifically 49:19 52:9 59:8 66:24 67:19 76:16
speculation 80:25 81:11
spoke   43:5
ss   85:2
staff   8:19 40:9 49:20
staffing   31:1,3 31:4
stahl   51:5
start   30:10
started   29:16 29:20 34:13 38:25

starting   35:11 35:14
starts   62:17,20
state   6:21,22 38:10 85:2,7 86:9,12
stated   19:25 20:19 21:8 23:21 38:5,16 38:24 49:9 52:24 64:11 65:8,21 68:8 69:19 75:21 77:6 81:2,13 81:17
statement   5:1 63:9 66:20 68:12,25 69:9 69:20 71:3
statements 29:18 69:18
states   1:1,10 2:13 6:13,14 7:23 84:22
steps   65:3
stipulation 86:21
store   59:4,9
stored   34:18,25 50:16 58:2,11 59:22
storm   51:17
street   2:5,16 3:3

structure   9:19
stuff   24:16 28:7 35:10 58:9 73:20 74:22 77:16
subject   61:11
subpoena   26:2
subsequent 24:16 72:25 73:23
subset   21:3
substantial 51:24
suite   2:5,21 3:3
supervision 85:9
supervisors 63:3
support   51:9
supposed   13:12 15:8 16:20
sure   13:25 14:1 16:11 17:12 29:16,19 30:18 32:6 34:23 35:24 45:3,10 45:21 47:3 54:21 57:7 58:15,19,22 61:16 62:6 70:6 71:3,6 74:17,24 76:8 76:21 77:6 81:12

sworn   8:8 85:6
sync   78:18
syncs   80:1
system   78:10
systems   62:14

**t**

t   4:4 84:1,1,1 85:1,1 88:3,3
take   6:8 7:20 12:18 13:14,18 13:20 17:2 21:13 27:8,14 27:18,21 28:21 31:7 32:17 36:11 38:12 39:2,14 41:10 42:16,21 47:14 55:21,25 58:9 61:6 62:2 65:3 67:6 74:19 75:7 80:4,17 82:16,21
taken   1:14 6:10 16:17 28:2 29:7,10 49:9 58:21 67:24 74:9 85:8
talk   67:20
talked   32:3 48:1 51:20 59:20 74:12 82:3
talking   16:6 31:1,2,4 32:4 35:8 48:10,10

Page 23

**[task - trump]**

**task** 9:8,9,13,24
  10:4
**team** 4:19
  10:11 41:15
  51:7,8,17
**tech** 6:2 7:3,7
  7:10,15,17 8:2
  56:4,7 82:24
  83:1,5,8,19
**technical** 78:3
  79:22 81:20
**technician** 3:5
  80:1 81:21
**technology**
  6:16 61:24
**telephone** 2:6
  2:10,17 3:4
**tell** 8:18 35:20
  51:4 52:9
  53:12 66:16
  67:11 68:18
**telling** 11:22
  36:19 50:4
**ten** 61:2,11
**terms** 57:19
  69:24,25 76:19
  76:20
**testified** 8:8
  11:16 13:5,10
  45:10,21 61:23
  77:10
**testifying** 62:12
**testimony** 23:6
  23:12 38:7
  44:21 62:9

  64:19 65:7,19
  69:17 79:18
  80:11 84:6
**thank** 7:10,17
  8:2 36:21
  83:10,11,13,22
**thanks** 83:4
**thereabouts**
  70:3
**things** 13:10
  25:19 43:5
  49:3 76:12
**think** 23:13
  43:18 44:9
  55:24 68:17
**third** 24:21
**thorgersen**
  51:16
**thoshijima**
  2:11
**thought** 13:11
  19:24 23:21
  49:16
**three** 33:5
  52:17,18
**thrush** 51:15
**time** 6:3,21
  15:14 16:11,16
  17:9 18:2,4
  24:19 26:12
  29:14 30:1
  32:2,10 35:24
  35:25 36:2,2
  37:8,11 42:13
  46:23 48:2

  54:10 55:1,25
  56:1,4,7 57:21
  62:3 66:4 67:2
  70:2,6 72:20
  74:3 75:19
  76:5 77:8,12
  78:14 79:1
  80:9 81:4 82:5
  82:23,25 83:5
  83:8,12 86:10
  86:18,25 87:7
**timer** 15:3
  33:10 40:22
**times** 43:6
**title** 39:19
  53:16
**today** 8:19
  15:21 44:23
  65:21 67:25
  72:7 82:3,17
  83:11
**together** 38:25
**told** 52:14 58:7
  58:7 59:21
  60:5,5 66:16
  68:10 79:2,20
  80:15 82:5,15
**took** 8:12 13:3
  13:11,16 15:11
  15:13,15 16:7
  17:7,11 18:22
  19:20 23:21
  27:6,7,9,21
  28:4,8,10,22,25
  28:25 29:4

  31:16,17 37:11
  37:14 38:4,4,7
  38:16 64:21
  65:2,8,11 67:2
  81:24
**tools** 78:5,6
  79:23 81:20
**top** 31:24 33:9
  47:16 53:16
  61:2,11
**topics** 61:25
**total** 50:18
**transcript** 45:8
  84:6 85:9,12
  86:6,8,10,13,13
  86:22 87:2,2
**transfer** 59:11
  59:24 60:2,8
  60:11
**transition** 8:17
  8:21 22:25
  42:9
**trial** 2:15
**tried** 27:24
  78:3,5,7
**trip** 51:13
**tristan** 51:15
**troup** 4:13 39:4
  39:11 50:5
  51:16
**true** 84:5 85:9
**trump** 1:9 2:12
  6:12 84:21
  86:4 88:1

Veritext Legal Solutions
866-299-5127          calendar-ca@veritext.com          www.veritext.com

**[trust - weeks]**

| | | | |
|---|---|---|---|
| **trust**  77:5 | **updates**  51:9 | **video**  1:14 3:5 | **washington** |
| **try**  78:5 | **uploaded**  25:19 | 6:2,8,10 7:3,7 | 2:10,17,22 |
| **trying**  42:20 | **usa**  4:7,9,10,11 | 7:10,15,17 8:2 | **waste**  9:6,8,9 |
| 53:3 76:2 | 4:11,12,13,14 | 56:4,7 82:24 | 9:12,16,23 |
| **tsuki**  2:8 7:3,4 | 4:16,18,19,20 | 83:1,5,8,19,20 | **way**  10:13 |
| **tuesday**  8:12 | 4:21,22 5:2 | **videographer** | 16:20 17:12 |
| **turi**  51:13 | **usdoj.gov**  2:18 | 6:18 | 20:9,10 25:1 |
| **turn**  51:15 | **use**  10:12 24:22 | **videos**  80:3 | 35:25 47:4 |
| 56:14 | 27:8 78:3,8 | **videotaped** | 52:4 64:10,22 |
| **turns**  7:20 | 79:4 | 1:13 | 69:10 72:23 |
| **twenty**  52:3 | **used**  4:17,23 | **virginia**  3:3 | 74:14 75:13 |
| **two**  19:13 | 18:19 19:16 | 14:3 70:11 | 76:4,21 77:23 |
| 36:16 44:13 | 20:1 25:7,9 | 75:7 | 78:13 79:3,21 |
| 45:16,25 83:21 | 27:14 52:7 | **virtual**  6:16 | 85:17 |
| **typewritten** | 57:19 76:19 | **virtually**  6:4 | **we've**  32:19 |
| 84:4 85:8 | 80:2 | **volume**  1:8 | 60:14 82:2 |
| **u** | **using**  6:16 22:1 | 83:19 86:5 | **weather**  51:14 |
| | 25:4,17 27:18 | 88:2,24 | **wednesday** |
| **under**  23:6 | 29:20 69:14 | **voorhis**  4:8 | 15:1 33:9 37:3 |
| 77:24 85:8 | 81:13 | 14:16 26:1,9 | **week**  12:16 |
| **understand** | **v** | 31:1 51:12 | 15:3 17:23 |
| 8:15 24:6 27:1 | | 53:10 | 18:7 29:8 |
| 35:25 72:10 | **v**  84:21 86:4 | **vp's**  9:12 | 33:11,15,20 |
| 76:21 | 88:1 | **vs**  1:8 6:12 | 37:9,10,15,19 |
| **understanding** | **vavrasek**  3:6 | **w** | 37:24 39:10,12 |
| 20:10 22:19 | **verify**  55:10 | | 39:22 40:3,15 |
| 29:3 36:9 58:3 | **veritext**  3:6 | **w**  84:1 | 40:23 41:1 |
| **understood** | 6:17 83:22 | **wait**  21:17 | 48:13 72:4 |
| 21:7 66:4 | 86:7,9,11,20 | **waived**  85:16 | **weeks**  12:16 |
| **union**  7:2,13 | **version**  25:20 | 86:24,24 | 17:16,19 20:6 |
| **unit**  6:9 | **vice**  2:8 9:17 | **waiving**  86:21 | 20:11,12 26:13 |
| **united**  1:1,10 | **victoria**  4:20 | **want**  25:18 | 29:8 30:11,15 |
| 2:13 6:13,14 | 33:4 42:25 | 51:4 76:22 | 30:20 31:23 |
| 7:23 84:22 | 43:2 51:16 | **wanted**  71:2 | 45:15,24 72:3 |
| **unsure**  45:1,2 | 53:9 55:10 | 77:6 78:5 | |

Veritext Legal Solutions
866-299-5127                    calendar-ca@veritext.com                    www.veritext.com

**[went - zoom]**

| | | |
|---|---|---|
| **went** 32:7 68:8 73:12,24 76:5 76:18 | 69:18 70:18 71:1,14,22 72:23 74:5,21 76:12 77:23 78:25 79:10,19 80:12 81:1,12 82:8,19 83:13 85:5 86:13,16 87:2,5 | **works** 17:12 20:10 21:6 54:23 81:13 |
| **west** 14:3 70:11 75:6 | | **worksheet** 22:22,25 |
| **whatsapp** 22:3 | | **written** 25:1 62:9 |
| **whitacre** 51:6 | | **wrote** 22:17 25:2,4 61:1 |
| **whitehouse** 51:12 | **word** 22:13 56:25 57:5,11 57:22 | **x** |
| **winter** 51:16 | | **x** 4:1,4 85:13 87:1 |
| **wisconsin** 2:21 | **work** 10:1,3,5 10:13 17:20 | **y** |
| **withdraw** 54:2 54:16 | 19:6,6 20:24 21:7 22:1,5,8 | **yeah** 21:8 56:22 76:12 83:3 |
| **withdrew** 53:25 54:3,18 | 22:15,19 23:2 23:4,5,7,16,22 | **years** 46:11,13 46:14 |
| **witness** 3:1 6:7 7:21 8:4 10:24 11:2,4,7,24 12:1,3 19:16 19:23 20:9,19 23:11,19 24:12 25:1 26:7 28:24 34:23 35:23 36:9,19 38:10,16,23 41:4 42:2 47:3 49:9 50:21 51:1,20 55:5 55:16 57:2 58:7 59:8,15 59:20 60:2,11 64:10,20 65:8 65:20 66:20 67:5,15,22 68:8,23 69:9 | 23:25 24:7,9 24:22,23 25:10 25:11,15 28:19 30:23 35:5,25 38:1,5,6,7,13 38:20 46:21 55:13 59:5,11 59:17,24,25 60:4,5 64:4 65:16 78:6,10 79:23 81:20 | **z** |
| | | **zoom** 11:22,22 11:23 |
| | **worked** 46:13 77:23 81:23 | |
| | **working** 9:6,12 9:13 10:6,7 38:25 61:19 | |

Veritext Legal Solutions
866-299-5127    calendar-ca@veritext.com    www.veritext.com

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.