Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION RE: USDA REORGANIZATION** <br><br> Date: August 21, 2026 <br> Time: 10:00 a.m. <br> Location: Courtroom 1, 17th Floor <br><br> **REDACTED VERSION FOR PUBLIC FILING** |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND .....................................................................................................................2

I.    Litigation and Congressional Action Halted or Delayed Any Efforts to Unlawfully Restructure and Downsize USDA Throughout 2025 and into 2026 ...................................................................................................................2

II.   USDA's Plan Seeks to Downsize USDA to Reflect the President's Priorities .........................................................................................................5

      A.    USDA's ARRP ...................................................................................6

      B.    USDA Public Statements Regarding the Reorganization Plan .......8

III.  USDA's Delayed and Now Impending Implementation of its Reorganization Plan...........................................................................................9

      A.    Food and Nutrition Administration ................................................10

            1. Statutes, functions, and workforce. ........................................10

            2. Reorganization Plan restructuring. .........................................12

            3. Reorganization Plan impacts. .................................................13

      B.    Agricultural Research Agencies .....................................................15

            1. Statutes, functions, and workforce .........................................15

            2. Reorganization Plan restructuring. .........................................16

            3. Restructuring Plan impacts.....................................................17

      C.    United States Forest Service...........................................................19

            1. Statutes, functions, and workforce. ........................................19

            2. Reorganization Plan restructuring. .........................................21

            3. Reorganization Plan impacts. .................................................22

      D.    Foreign Agricultural Service ..........................................................24

            1. Statutes, functions, and workforce. ........................................24

            2. Reorganization Plan restructuring. .........................................24

            3. Reorganization Plan impacts. .................................................25

      E.    Farm and Rural Development Mission Areas ...........................................25

            1. Statutes, functions, and workforce. ........................................25

2. Reorganization Plan restructuring. ...........................................................26

3. Reorganization Plan impacts. ..................................................................26

ARGUMENT ............................................................................................................27

    I.    Plaintiffs' APA and Ultra Vires Claims Are Likely to Succeed ...............................27

        A.    USDA's Actions Exceed Authority and Are Contrary to Law. ...................27

            1.    USDA Lacks Statutory Authority to Restructure the Department to Effectuate a Large-Scale Downsizing of USDA Employees. ..........................................................28

            2. USDA's Actions Directly Conflict with Recent Congressional Direction .............................................................30

                a.    Congress prohibited the use of USDA funds to reorganize. ...............................................30

                b.    USDA's *Chadha* objection does not create Congressional authorization. .............................32

            3. The Reorganization Plan Interferes with USDA's Mandated Functions. .....................................................33

        B.    USDA's Actions Are Arbitrary and Capricious. ...........................................34

            1.    USDA's Public Justifications Contradict Its Actual Goals and the Evidence Before It. ..................................35

            2. USDA Failed to Assess Any Impacts of Attrition on Agency Function ..................................................37

            3. USDA Did Not Grapple With Feasibility or Costs of Relocating Research. ...........................................38

            4. USDA Failed to Consider Important Reliance Interests .........................39

            5. The Reorganization Is Substantively Unreasonable ..............................40

        C.    USDA's Actions Are Final for Purposes of the APA. ...............................40

    II.    USDA Is Causing, and Will Continue to Cause, Plaintiffs Irreparable Harm ........................................................41

    III.    The Balance of Equities and Public Interest Support a Preliminary Injunction. ...........................................................44

    IV.    The Court Should Order Relief Sufficient to Protect Plaintiffs and their Members During the Pendency of this Lawsuit. ....................................44

CONCLUSION .........................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abramowitz v. Lake*,
   2026 WL 746989 (D.D.C. Mar. 17, 2026) ...............................................................................39

*AFGE v. OMB*,
   806 F.Supp.3d 1093 (N.D. Cal. 2025)......................................................................................42

*AFGE v. OMB*,
   807 F.Supp.3d 1004 (N.D. Cal. 2025)........................................................................38, 39, 45

*AFGE v. OMB*,
   813 F.Supp.3d 944 (N.D. Cal. 2025)..........................................................................38, 39, 45

*AFGE* v. *OPM*,
   2025 WL 660053 (N.D. Cal. Feb. 28, 2025) ............................................................................37

*AFGE v. Trump*,
   139 F.4th 1020 (9th Cir. 2025)..........................................................................................*passim*

*AFGE v. Trump*,
   155 F.4th 1082 (9th Cir. 2025)....................................................................................................3

*AFGE v. Trump*,
   163 F.4th 1226 (9th Cir. 2026)....................................................................................................3

*Alaska Airlines, Inc. v. Brock*,
   480 U.S. 678 (1987) ..................................................................................................................32

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ..................................................................................................43

*Assoc. of Am. Univ. v. Dep't of Defense*,
   792 F.Supp.3d 143 (D. Mass. 2025).........................................................................................44

*Bennett v. Spear*,
   520 U.S. 154 (1997) ..................................................................................................................41

*Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*,
   67 F.4th 1027 (9th Cir. 2023)..............................................................................................35, 37

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) ..................................................................................................................29

*Colorado v. U.S. Dep't of Health and Human Servs.*,
   783 F.Supp.3d 641 (D.R.I. 2025) .............................................................................................40

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) ...................................................................... 35, 36, 37, 38

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......................................................................................... 34, 39

*Doctors for Am. v. OPM*,
793 F.Supp.3d 112 (D.D.C. 2025) ............................................................................ 41

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ................................................................................. 44

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .................................................................................... 34, 39

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*,
82 F.4th 664 (9th Cir. 2023) (en banc) ...................................................................... 45

*Immigrant Defs. L. Ctr. v. Noem*,
145 F.4th 972 (9th Cir. 2025) ................................................................................. 41

*Immigration and Naturalization Service v. Chadha*,
462 U.S. 919 (1983) ............................................................................................ 32

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ................................................................................. 43

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ................................................................................... 44

*Massachusetts v. Nat'l Inst. of Health*,
770 F.Supp.3d 277 (D. Mass. 2025) .......................................................................... 40

*Missouri Pub. Serv. Comm'n v. FERC*,
337 F.3d 1066 (D.C. Cir. 2003) ............................................................................... 35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...................................................................................... 34, 35, 36

*Mt. Diablo Hosp. v. Shalala*,
3 F.3d 1226 (9th Cir. 1993) ................................................................................... 34

*Multicultural Media, Telecom & Internet Council v. FCC*,
873 F.3d 932 (D.C. Cir. 2017) ................................................................................ 40

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
595 U.S. 109 (2022) ........................................................................................... 28

*Nat'l Urban League v. Ross*,
977 F.3d 770 (9th Cir. 2020) ................................................................................. 39

*New York v. Dep't of Justice*,
   804 F.Supp.3d 294 (D.R.I. 2025) ................................................................................... 39, 40

*New York v. Kennedy*,
   789 F.Supp.3d 174 (D.R.I. 2025) ................................................................................... 34, 44

*New York v. Trump*,
   133 F.4th 51 (1st Cir. 2025) ............................................................................................... 41

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
   465 F.3d 977 (9th Cir. 2006) .............................................................................................. 40

*Regents of the Univ. of Cal. v. Am. Broad. Cos.*,
   747 F.2d 511 (9th Cir. 1984) .............................................................................................. 45

*Rhode Island v. Trump*,
   781 F.Supp.3d 25 (D.R.I. 2025) ......................................................................................... 43

*Sackett v. E.P.A.*,
   566 U.S. 120 (2012) ........................................................................................................... 41

*San Francisco Unified Schl. Dist. v. AmeriCorps*,
   789 F.Supp.3d 716 (N.D. Cal. 2025) ................................................................................. 39

*Trump v. AFGE*,
   145 S.Ct. 2635 (July 9, 2025) .............................................................................................. 4

*Trump v. CASA*,
   606 U.S. 831 (2025) ........................................................................................................... 45

*Widakuswara v. Lake*,
   779 F.Supp.3d 10 (D.D.C. 2025) ....................................................................................... 42

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................................... 27

*Woonasquatucket River Watershed Council v. USDA*,
   778 F.Supp.3d 440 (D.R.I. 2025) ................................................................................. 37, 38

**Federal Statutes**

5 U.S.C.
   § 301 ................................................................................................................................... 29
   § 704 ................................................................................................................................... 40
   § 705 .......................................................................................................................... 2, 27, 45
   § 6901 ................................................................................................................................. 30

7 U.S.C.
   § 361 ................................................................................................................................... 16

§ 450 ............................................................................................................................16
§ 1441 ..........................................................................................................................16
§ 1501. .........................................................................................................................26
§ 1636 ..........................................................................................................................16
§ 2011 ..........................................................................................................................10
§ 2013 ...............................................................................................................10, 11, 33
§ 2014 ..........................................................................................................................11
§ 2016 ..........................................................................................................................11
§ 2018 ..........................................................................................................................11
§ 2025 ..........................................................................................................................11
§ 2025 ..........................................................................................................................33
§ 2026 ..........................................................................................................................11
§ 2028 ..........................................................................................................................11
§ 2036 ..........................................................................................................................11
§ 2201 ....................................................................................................................28, 29
§ 2204 ..........................................................................................................................16
§ 3003 ..........................................................................................................................16
§ 3007 ..........................................................................................................................11
§ 3104 ..........................................................................................................................16
§ 5313 ..........................................................................................................................16
§ 5693 ....................................................................................................................24, 34
§ 5841 ..........................................................................................................................16
§ 5925 ..........................................................................................................................16
§ 6912 ..........................................................................................................................30
§ 6915 ..........................................................................................................................30
§ 6971 ....................................................................................................................15, 16
§ 7014 ..........................................................................................................................29
§ 7508 ..........................................................................................................................11
§ 7632 ..........................................................................................................................16
§ 7998 ..........................................................................................................................16

16 U.S.C.
§ 485 ............................................................................................................................20
§ 497 ............................................................................................................................19
§ 515 ............................................................................................................................20
§ 528 ............................................................................................................................19
§§532-35 ......................................................................................................................20
§ 551 ......................................................................................................................20, 33
§ 590 ............................................................................................................................26
§ 1131 ..........................................................................................................................19
§ 1333 ..........................................................................................................................20
§§1601-02 ....................................................................................................................20
§ 1604 ..........................................................................................................................19
§ 1609 ..........................................................................................................................19
§§1641-46 ....................................................................................................................20
§ 1642 ..............................................................................................................20, 33, 34
§ 1643 ..........................................................................................................................20

§ 1644 ..........................................................................................................................20
§ 2101 ..........................................................................................................................20
§ 2102 ..........................................................................................................................20
§ 2103 ..........................................................................................................................20
§ 2104 ..........................................................................................................................20
§ 2105 ..........................................................................................................................20
§ 2106 ..........................................................................................................................20
§ 2109 ..........................................................................................................................20
§§ 2111-2114 ...............................................................................................................19
§ 6512 ..........................................................................................................................20
§ 6592 ..........................................................................................................................20
§ 6802 ..........................................................................................................................20

30 U.S.C.
§ 226 ............................................................................................................................20

42 U.S.C.
§ 1751. .........................................................................................................................11
§ 1758 ..........................................................................................................................11
§ 1759 ..........................................................................................................................11
§ 1760 ..........................................................................................................................11
§ 1761 ..........................................................................................................................11
§ 1762 ..........................................................................................................................11
§ 1766 .....................................................................................................................11, 12
§ 1769 .....................................................................................................................11, 12
§ 1772 ..........................................................................................................................11
§ 1773 ..........................................................................................................................11
§ 1776 ..........................................................................................................................12
§ 1779 ..........................................................................................................................11
§ 1786 .............................................................................................................10, 11, 12
§ 5179 ..........................................................................................................................11

43 U.S.C.
§ 1748 ..........................................................................................................................20
§ 1752 ..........................................................................................................................19

**Other Authorities**

7 C.F.R. § 2.67...............................................................................................................16

Department of Agriculture Reorganization Act of 1994 (Pub. L. No. 103-354) (Oct.
13, 1994)...................................................................................................................29

H.R. Rep. 103-714 (Aug. 23, 1994) .............................................................................30

Organic Act of June 4, 1897, Chapter 2, 30 Stat. 34....................................................19

Pub. L. No. 100-202, 101 Stat. 1329 (1987) ................................................................31

Pub. L. No. 119-37, 139 Stat. 495 (2025) ......................................................................4, 5, 31

Pub. L. No. 119-74, 140 Stat. 5 (2026) ..............................................................................5, 31

Pub. L. No. 119-75, 140 Stat 173 (2026) ................................................................................5

Pub. L. No. 119-86, 140 Stat. 733 (2026) ...............................................................................5

S. Rep. 103-241 (Mar. 23, 1994).........................................................................................30

**INTRODUCTION**

To comply with mandates from Defendants President Donald J. Trump, the Office of Management and Budget ("OMB"), and the Office of Personnel Management ("OPM"), Defendant Department of Agriculture ("USDA") created an Agency RIF and Reorganization Plan ("ARRP") that imposed a large-scale restructuring and downsizing of the agency (the "Reorganization Plan"). That Reorganization Plan took aim at programs the Administration does not value because they conflict with its political priorities, like those that provide food to low-income women and children, conduct scientific research, and protect national forests. In July 2025, USDA released a public Secretary Memorandum regarding the Reorganization Plan, stating that the agency intended to reorganize by relocating many programs and offices out of its Washington D.C. headquarters and by consolidating and moving programs and offices across the country—while obscuring the real purpose of its reorganization and keeping the ARRP hidden from the public. USDA's actual goal is to radically downsize the agency's workforce, achieving at least an agency-wide "23% overall reduction and a 31% overall reduction when considering the public safety and inspection workforce." Levy Decl. Ex. A at 7748.[1] USDA intends to achieve this goal through forced relocations of agency workers because "*USDA is anticipating that a significant number of employees will decline geographic reassignments.*" *Id.* at 7749 (emphasis added).

USDA did not begin implementing the Reorganization Plan in 2025. Instead, it initially sought authorization for its restructuring and downsizing goals through the appropriations process. But Congress expressly rejected USDA's requests during the fiscal year 2026 appropriations process. *Infra* at 4. Throughout 2025 and well into the spring of 2026, USDA was further prevented from downsizing, initially by litigation (including this case and related cases) and then by Congress's prohibition on federal workforce reductions through April 30, 2026. *Infra* at 4.

In late spring 2026, USDA began taking action to implement this Reorganization Plan. Since then, USDA has rolled out actions incrementally across the agencies' various mission areas, including the Food and Nutrition Administration ("FNA"), Agricultural Research Service ("ARS"),

---

[1] On July 1, 2026, Defendants consented to filing the ARRP on the public record. Johnson Decl. ¶7.

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

1

Forest Service ("USFS"), Foreign Agricultural Service ("FAS"), and others.  Implementing the ARRP, the reorganization largely takes the form of moving offices and programs out of national offices in the Washington D.C. area and consolidating or closing other offices, forcing employees to choose between moving around the country or leaving the agency.  These actions, as USDA has internally admitted, will cause dramatic attrition, impair critical services, and interrupt important research.  USDA also aims to move programs, offices, and research far from the local communities and environments they are intended to serve.  Yet USDA has never grappled with or addressed these overwhelmingly negative impacts; instead, it has denied any attrition and deliberately ignored the impact of attrition on the agency, its employees, and the functions and services Congress intends it to perform.

USDA's implementing actions have now reached a critical mass, as employees are beginning to receive management directed reassignment ("MDR") letters directing them to report to new locations by specific deadlines, thus far by dates in September and October.  With those actions and deadlines comes corresponding actual and imminent harm to Plaintiffs.  USDA's actions will force many of the experienced and dedicated employees who run the agency's programs to leave, thereby gutting programs, interrupting and eliminating the delivery of important services, and harming the employees and their families.  USDA's actions will also eliminate locally based services and research.  The harms are as certain and as widespread as if USDA had imposed a large-scale reduction-in-force and cut program staff directly.  Plaintiffs seek an injunction to halt this unlawful attempt to restructure and downsize USDA without congressional authorization, in contravention of Congress' express instructions, and in an arbitrary and capricious manner.

All factors weigh heavily in favor of an injunction and stay of the Reorganization Plan under 5 U.S.C. §705 to preserve the status quo and prevent the harm that will otherwise result from this ill-advised, politically driven scheme to dismantle an important Cabinet department.

## BACKGROUND

**I.    Litigation and Congressional Action Halted or Delayed Any Efforts to Unlawfully Restructure and Downsize USDA Throughout 2025 and into 2026**

As this Court and the Ninth Circuit have previously recognized, shortly after he took office

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

for the second time, President Trump launched an unprecedented effort to restructure and downsize the federal government, without obtaining congressional authorization.  ECF 85 at 1; ECF 124 at 1; *see also AFGE v. Trump*, 139 F.4th 1020, 1028 (9th Cir. 2025).  This began with Executive Order ("EO") 14210 ordering a "critical transformation of the Federal bureaucracy" (ECF 37-1, App. A at §1), through plans for reorganizations and "large-scale reductions in force (RIFs)" at every agency (including USDA).  *Id.* §3(c).  OMB and OPM swiftly implemented the EO through a February 26 Memorandum requiring every agency to submit for approval "Agency RIF and Reorganization Plans" in two phases, in March and April 2025.  ECF 37-1, App. B at 3-6.  That Memorandum directed that ARRPs should use RIFs and other tools to engage in workforce reduction, eliminate non-statutorily required functions, consolidate management layers, reduce non-critical components and positions, reduce property holdings, and close regional field offices.  *Id.* at 2; *see also* Levy Decl. Exs. T, U (OMB/OPM written instructions for ARRPs).

USDA created and submitted the required ARRP to OMB/OPM for approval.  Levy Decl. Ex. A at 7733, 7742.  As the Court is aware, Defendants did not make those ARRPs public at the time and resisted disclosure in this Court and the Ninth Circuit.  ECF 88, 139, 210, 214, 263, 267, 286; *AFGE v. Trump*, 155 F.4th 1082 (9th Cir. 2025); *AFGE v. Trump*, 163 F.4th 1226 (9th Cir. 2026).[2]  Plaintiffs thus had to rely on public information to prove that Defendants were implementing these workforce reduction and transformation directives.  For example, USDA announced in April 2025 that a reorganization and large-scale RIFs terminating thousands of employees were forthcoming.  ECF 37-31 ¶13; *see* ECF 37-1 at 14-15; ECF 70-1 Ex. A (quoting USDA Secretary Rollins: "The ultimate planning and reorganization should be finished in terms of at least the announcement by early to mid-May.  So, we're getting really close to sort of the final plans.").[3]  From May 9 through July 8, 2025, however, implementation of USDA's ARRP was

---

[2]  Plaintiffs did not obtain the USDA ARRP until after the Ninth Circuit rejected Defendants' en banc petition in 2026.  ECF 293 at 2.

[3]  USDA officials confirmed at the time that the President's advisors in OMB and DOGE were directing the cuts.  ECF 37-1 at 15; ECF 70-1 at 2 (USDA Secretary Rollins: "the four years Trump was out of office allowed his advisers to plan the government downsizing.").  USDA also began to pressure employees to quit by threatening RIFs and then offering early retirement ("VERA"), separation incentive payments ("VSIP"), and/or deferred resignation ("DRP") options with better severance benefits than if employees waited to be RIF'd.

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

3

enjoined.  ECF 85, 124; *AFGE*, 139 F.4th at 1028; *Trump v. AFGE*, 145 S.Ct. 2635 (July 9, 2025).

While the preliminary injunction was in effect, the Administration (including USDA) attempted to achieve agency workforce and function reductions through the congressional appropriations process.  OMB and USDA presented Congress with a 2026 budget designed to drastically reduce agency operations.  Levy Decl. Ex. Q (proposing a $6.7 billion cut from 2025).

While the Administration urged Congress to enact its proposed budget cuts, in July 2025 USDA publicly announced plans to engage in a large-scale reorganization (consistent with its budget proposals and ARRP).  Levy Decl. Ex. B.  This Secretary Memorandum, titled "Department of Agriculture Reorganization Plan," described at a high level the plans to restructure USDA, including by transferring employees away from Washington, D.C. and enacting other significant transformations of mission areas.  *See infra* at 9.  USDA revealed no implementation timeframe and invited public comment while it continued work on appropriations.  *Id*.

Congress did not enact the requested cuts for USDA for fiscal year 2026, and after September 30, 2025, a government shutdown ensued.  During the shutdown, federal agencies, at OMB's direction, unlawfully began RIFing thousands of employees.  *See AFGE v. OMB*, Case No. 25-cv-08302-SI, ECF 94, 139.  In a related case, this Court enjoined those RIFs.  *Id*.

Congress ended the shutdown in November 2025.  Pub. L. No. 119-37, 139 Stat. 495 (2025) (the "Continuing Resolution" or "CR").  The CR included a provision expressly prohibiting agencies (including USDA) from imposing RIFs or "any similar reduction of positions at any department, agency, or office of the Federal Government" through January 31, 2026.  *Id.* §120.

The CR also unambiguously rejected USDA's proposed cuts to staffing and functions and funded the agencies above or near 2025 levels.  *Id.* Div. B (USDA); Levy Decl. Ex. C at 8 ($335 million total increase from FY2025).  And Congress went further, forbidding USDA from downsizing or restructuring without Congressional approval, by providing that "[n]one of the funds" appropriated by the act or previously appropriated "shall be available for obligation or expenditure through a reprogramming, transfer of funds, or reimbursements" that "*eliminates a program, project, or activity*;" "*relocates an office or employees*;" or "*reorganizes offices, programs, or activities*;" amongst other things, "unless the Secretary of Agriculture … notifies in

writing and receives approval from the Committees on Appropriations of both Houses of Congress at least 30 days in advance of the reprogramming." Pub. L. No. 119-37, §716(a), 139 Stat. 495, 544 (2025) (emphasis added). Congress enacted similar appropriations conditions for the Forest Service in January 2026. Pub. L. No. 119-74, §421, 140 Stat. 5, 163 (2026) ("None of the funds made available in this Act, in this and prior fiscal years, may be reprogrammed without the advance notification and approval of the House and Senate Committees on Appropriations").[4]

In the January appropriations, Congress also required that "[t]he Forest Service shall maintain staffing levels" to fulfill the mission of its authorizing statutes. *Id.* Congress identified that mission as:

> [I]ncluding to protect natural and cultural resources, provide and maintain appropriate access and recreation for visitors, provide safety precautions for visitors and staff, maintain physical and natural infrastructure, provide information and respond to stakeholders and the general public, conduct tribal consultation, provide for administrative support, administer forestry assistance programs, provide technical assistance to states, tribes and private landowners, manage energy and minerals resources, and carry out other activities in support of effectively operating the National Forest System and carrying out programs administered by the Forest Service in a timely manner. (*Id.*)

Congress subsequently twice extended the prohibitions on downsizing by extending the CR's effective date—first to February 13, 2026, and then to April 30, 2026. Pub. L. No. 119-75, Div. H, §101, 140 Stat 173; Pub. L. No. 119-86, Div. B, §§101-102, 104 Stat. 773, 809 (2026).

## II.    USDA's Plan Seeks to Downsize USDA to Reflect the President's Priorities

Defendants finally produced USDA's ARRP and related communications to Plaintiffs' counsel in February 2026. Those documents confirm USDA's plans, in conjunction with OMB and OPM, to restructure and downsize USDA arbitrarily and without congressional authorization. Significantly, while USDA's public Secretary Memorandum professes that the reorganization is not intended to engage in large workforce reductions, the non-public ARRP ███████████ ███████████ prove that USDA's efforts to force employees to relocate were crafted with the

---

[4] Congress defined "reprogramming" as "all proposed reorganizations or other workforce actions detailed below which affect a total of 10 staff members or 10 percent of the staffing of an affected program or office, whichever is less" and applies "to proposed reorganizations, workforce restructure, reshaping, transfer of functions, or bureau-wide downsizing and include closures, consolidations, and relocations of offices, facilities, and laboratories." Levy Decl. Ex D at 8.

express intent to compel employees to quit and thereby achieve large workforce reduction targets without having to engage in RIFs.

### A. USDA's ARRP

USDA's ARRP is clear that its purpose is to downsize the agency by eliminating thousands of positions. The ARRP states it is the "first step in the plan to unwind the excesses of the Biden Administration and prioritize an efficient workforce structure and level." Levy Decl. Ex. A at 7733. To accomplish that, the ARRP sets an *express goal* of reducing the agency's workforce *by at least 23%* (or a *31% reduction* other than public safety and inspection). *Id*. at 7748. The ARRP sets specific target reductions of *at least* 46% of FNA (previously named the Food and Nutrition Service), with similar targets for agricultural research agencies (43% of ARS and the Economic Research Service ("ERS"), 39% of the National Institute of Food and Agriculture ("NIFA")) and the Rural Development mission area (47%), along with 15% of the Forest Service (22% if a public safety carve-out is excluded), 28% of the Foreign Agricultural Service, and 34% of the Natural Resources Conservation Service, among others. *Id.* These reductions were included in a specific chart euphemistically called "USDA's plan for workforce optimization." *Id.*

At the same time, the ARRP reflects decisions to transfer large portions of component agencies to new locations throughout the country—the same components that OMB and USDA targeted for reductions: FNA, the research services, NIFA, Forest Service, FAS, and Farm/Rural Development, among others. *Id*. at 7751-53. Thus, USDA will "relocate much of its Agency headquarters and … staff out of the Washington, D.C. area to five hub locations" and two administrative support centers around the country. *Id.* at 7746. The many regional offices of component agencies will "be eliminated or consolidated into one of five hub locations." *Id.* USDA will also consolidate business and administrative functions (such as contracting, procurement, and human resources) into only a few USDA-wide offices. *Id.* at 7737-39, 7746, 7750. USDA identifies at least 21 offices or functions "that can be eliminated at this time," including 10 at the Forest Service. *Id.* at 7738-39. USDA's ARRP identifies this restructuring as an integral part of achieving workforce reduction, "*to achieve the optimal structure and level needed to deliver on the President's priorities*." *Id*. at 7737 (emphasis added).

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

The ARRP confirms that USDA intends to achieve these reductions by forced attrition caused by relocation. It explains that employees will be forced to either accept transfers to other parts of the country or quit. *Id.* at 7749. When discussing how to "realize" these target reductions, the ARRP explains: "USDA is anticipating that *a significant number of employees will decline geographic reassignments* out of the [national capital region] or existing regional or state offices to the five target hub locations." *Id.* (emphasis added). USDA also states that it will "aggressively" offer voluntary retirement incentives to encourage employees to quit. *Id.* at 7739, 7749. And USDA confirms it "does not plan to backfill most of these positions." *Id.* at 7739. USDA will use RIFs only as needed after these other reduction actions. *Id.* at 7739, 7749, 7758.

USDA's ARRP also discusses particular programs that will be relocated (and thereby reduced) consistent with the President's "priorities." For example, USDA states that it intends to "deemphasize the food stamp program." *Id.* at 7753. The "food stamp program" refers to the Supplemental Nutrition Assistance Program ("SNAP"), which, along with the Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC"), is administered by FNA to serve low-income Americans, including women and children, in need of basic food assistance. *See infra* at 10.[5] While USDA, to advance one of the President's "priorities," aims to cut FNA staff *by nearly 50%*, the ARRP does not provide any program or function-based justifications for those cuts. Levy Decl. Ex. A at 7748, 7753-54.

USDA deploys the same forced relocation plan across the Department to achieve targeted reductions: the ARRP calls for ARS to close nine labs, relocate its office outside of the capital area, "eliminate … all Climate Hubs," and close the Beltsville Agricultural Research Center ("BARC") and relocate the remaining researchers. *Id.* at 7747, 7751-52. The Forest Service is slated to relocate its headquarters from D.C. to Salt Lake City, Utah, "[e]liminate the Forest Service Regional Offices," and "[e]liminate the Southern, Northern, Pacific Northwest and Pacific Southwest Research Stations," such that "[o]verall research locations will be reduced from 130

---

[5] These two programs serve individuals in need in the lowest income brackets and disproportionately help people of color. Levy Decl. Ex. F (38% of Black children in the U.S. receive SNAP); Long Decl. ¶5 n.5 (29% of SNAP recipients are Black; 30% are Hispanic); Long Decl. ¶5 n.5 (40% of WIC recipients are Latino; 22% are Black).

locations to 20." *Id.* at 7752-53. ERS and the National Agricultural Statistics Service will merge and will relocate and consolidate divisions. *Id.* at 7752, 7755. The Rural Development and Farm Production and Conservation mission areas, including Natural Resources Conservation Service, will eliminate State or regional offices and relocate their staff to one of five "service centers." *Id.* at 7744, 7751, 7753.

In EO 14210, the President required agencies to submit their plans to OMB and OPM for approval, and USDA did just that. Levy Decl. Exs. V, W, X. OMB ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Johnson Decl. Ex. A; *see also id.* ████████████████████ ████████████████████ (emphasis added). OMB asked USDA ████████████████████ ████████████████████████████████████████████████████ *Id.* Ex. B at 916; *see also id.* at 917 (████████████████████████ ████████████████████████████); Levy Decl. Exs. Y, Z.

OMB/OPM ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Johnson Decl. Ex. C (████████████████████████████████). ████████████████ ████████████████████████████ *id.* Ex. A, there is no indication (or document) in which OMB or OPM denied approval, and all evidence is that agencies could not move forward without that approval. ECF 85 at 35-36, ECF 124 at 36-37.

**B.      USDA Public Statements Regarding the Reorganization Plan**

The July 2025 Secretary Memorandum announced USDA's Reorganization Plan at a high level, without revealing the ARRP or USDA's goal of reducing the workforce through forced

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

relocation.  Levy Decl. Ex B.  While generally admitting that the Reorganization Plan is intended to "ensure the size of USDA's workforce aligns with financial resources and priorities," *id.* at 2, the Secretary claims that USDA "is not conducting a large-scale workforce reduction." *Id.*[6]

The Memorandum offered limited implementation details, including about timing. *Id.*  It confirmed (as provided by the ARRP) that USDA will "relocate much of its Agency headquarters and … staff from the Washington, D.C. area," "reduce or eliminate stand-alone regional offices," and move regional and D.C. functions and positions to several new "hub locations." *Id.* at 2-3.  As also provided by the ARRP, the Memorandum provides for, among other agency relocations and consolidations, consolidation of FNA's widespread regional staff into five hub locations, ARS decommissioning BARC, and the Forest Service "phas[ing] out [its] nine Regional Offices" and consolidating and relocating its five "stand-alone Research Stations" into a "single location in Fort Collins, Colorado." *Id.* at 3.  The Secretary Memorandum says nothing about USDA's targets for as much of half of its staff to quit due to forced relocation.

USDA solicited public comments on the Memorandum in August and September 2025.  Levy Decl. Ex G at 1.  It received 46,845 comments, the "overwhelming majority" (82%) of which "expressed negative sentiment." *Id.* (describing comments from agency alumni, employees, unions, former chiefs, Congress, tribes, local governments, academics, and citizens).  Key themes included that reorganization would lead to workforce attrition and "reduced operational capacity," such as "erod[ing] the Forest Service's capacity to manage public lands and resources," "stifl[ing] scientific progress," and ignoring the "profound ecological and scientific consequences that would result from BARC's … shutdown." *Id.*  USDA issued a December 2025 report summarizing the comments without responding to them. *Id.*  But until recently, USDA did not take any public steps to implement the Reorganization Plan or to explain the timing of implementation.

**III.    USDA's Delayed and Now Impending Implementation of its Reorganization Plan**

In late spring and summer 2026, USDA issued a series of announcements disclosing that it was beginning to implement the same drastic restructuring of several of its component agencies

---

[6] The Memorandum also confirms that USDA will continue to "fully leverage" voluntary retirement programs to continue to reduce the workforce.  Levy Decl. Ex. B at 2.

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

that was reflected in the Secretary's Memorandum and the ARRP. USDA is not implementing its Reorganization Plan for all components at the same time, but has been slowly rolling out its implementing actions to date. For each mission area or component, USDA is requiring the forced relocation of substantial numbers of staff as it closes, consolidates, and moves offices around the country—exactly as called for by the ARRP. For each of the main components of USDA currently impacted (the food programs, research agencies, forest service, foreign service, and farm/rural assistance), Plaintiffs describe the agency and authorizing statutes; the restructuring including the status and deadlines;[7] and the impacts that will result from that restructuring.

### A.    Food and Nutrition Administration

#### 1. Statutes, functions, and workforce.

The FNA administers 16 statutory nutrition assistance programs that help millions of people. Rosenthal Decl. ¶6; Salvatore Decl. ¶6; Garrett Decl. ¶6; Long Decl. ¶5. The largest, SNAP, provides federal food benefits to 40 million low-income Americans monthly.[8] Rosenthal Decl. Ex. A at 4; Salvatore Decl. ¶6. Another main program, WIC, provides nutrition support, breastfeeding resources, referrals to health care, and food assistance to low-income pregnant and postpartum women, infants, and children up to age five. Garrett Decl. ¶3; Long Decl. ¶5; Machell Decl. ¶¶8-11; *see* 42 U.S.C. §1786(c) (establishing WIC). WIC serves more than 40% of the infants in the United States, and WIC benefits are distributed to nearly 7 million people each month. Garrett Decl. ¶3; Long Decl. ¶5; Machell Decl. ¶8. The National School Lunch Program provides nutritionally balanced, free or low-cost lunches every school day to more than 30 million children. Rosenthal Decl. ¶12; Long Decl. ¶5; 42 U.S.C. §1751 *et seq*. FNA also administers food

---

[7] USDA has generally provided information to some of the unions representing its employees (including some of Plaintiffs' locals) as it has announced plans publicly, *e.g.*, Mitchell Decl. ¶15, and has engaged in impact bargaining (not addressing the reorganization decisions themselves) with some locals as well. Some unions have been told the distribution of management reassignment letters to union-represented employees will generally occur after that bargaining, although for some programs USDA has sent management directed reassignment letters to non-bargaining unit staff already. Millner Decl. ¶13; Lamas Decl. ¶16.

[8] *See* 7 U.S.C. §2011 (establishing SNAP: "a supplemental nutrition assistance program is herein authorized which will permit low-income households to obtain a more nutritious diet"), §2013 ("eligible households within the State shall be provided an opportunity to obtain a more nutritious diet through the issuance to them of an allotment").

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

distribution programs, including the Emergency Food Assistance Program, 7 U.S.C. §§2036, 7508, and the Food Distribution Program on Indian Reservations, 7 U.S.C. §2013, which serve low-income individuals, food banks, tribal nations, and schools.  Rosenthal Decl. ¶¶6, Mei Decl. ¶¶8, 39; Long Decl. ¶6.[9]

FNA staff work closely with a wide range of stakeholders including states, local governments, clinics, schools, food banks, and tribal nations, to successfully implement these statutory programs.  For instance, FNA staff allocate funding and provide oversight and support, technical assistance, quality control, legal compliance, evaluations, and policy expertise for the state and local agencies that administer SNAP and Child Nutrition Programs.  Rosenthal Decl. ¶¶7-8; Mei Decl. ¶¶7, 20, 22; Salvatore Decl. ¶¶6-7; Long Decl. ¶¶17-18.  FNA actively administers WIC in close connection with state and local agencies, including allocating and distributing quarterly WIC funding (a highly technical and time-sensitive process) and conducting reviews, on-site clinic visits, and vendor oversight.  Garrett Decl. ¶¶7-8, 10-12, 16; Machell Decl. ¶¶12-22.[10]

FNA currently consists of a National Office in the D.C. area, seven Regional Offices, and the Retailer Operations and Compliance Office.  Rosenthal Decl. ¶4.  Each Regional Office has

---

[9] FNA also administers the WIC Farmers' Market Nutrition Program, 42 U.S.C. §1786(m); the Senior Farmers' Market Nutrition Program, 7 U.S.C. §3007; the Nutrition Assistance Program for Territories (Puerto Rico, American Samoa), 7 U.S.C. §2028; the School Breakfast Program, 42 U.S.C. §1773; the Child and Adult Care Food Program, 42 U.S.C. §1766; the Summer Food Service Program, 42 U.S.C. §1761; the Summer EBT Program, 42 U.S.C. §1762; the Fresh Fruit and Vegetable Program, 42 U.S.C. §1769a; the Special Milk Program, 42 U.S.C. §1772; and Disaster Assistance, 42 U.S.C. §5179; 7 U.S.C. §2014(h).

[10] Congress has specified many requirements for how these programs are implemented, including but not limited to 7 U.S.C. §2026(c) (annual SNAP efficacy evaluation and pilot programs report), §2025(h) (SNAP training programs), §2018(h)(3) (annual evaluation of EBT-authorized facilities), §2025(c)(6)(A) (annual publication of national SNAP error rate), §2016(a)(1) (guidance for SNAP fraud reduction), § 2020(d) (SNAP technical assistance for tribal organizations), §2020(g) (investigations of state SNAP compliance), §2020(o)(3) (periodic updates on SNAP automated data processing), 42 U.S.C. §1779(b)(1)(D) (school nutrition standards update), §1769(g) (farm to school grants), §§1758(a)(1)(B), 1758(k)(B), 1758b(d), 1761(a)(2), 1761(a)(12), 1766(u)(3), 1766(q)(1), 1769(g)(7), 1769b-1, 1769f(c)(1), 1773(e)(B), 1786(g)(5) (technical assistance for various CNP initiatives), §1758(h)(4) (annual audits of school lunch safety reports), §1760(l)(4)-(6) (assessment, review, and annual report of CNP waiver requests), §1759a(a)(3) (annual calculation of payment rates for school lunches and breakfasts), §1758(f)(2) (school meal recipe and menu development), §1766(r) (annual handbook for afterschool meals), §1769c(c) (management evaluations of state CNP compliance), §1776 (annual grants for various CNP initiatives), §1786(g)(5) (research, participant reports, and pilot projects for WIC), §1786(f)(11)(C) (10-year scientific review of WIC supplemental foods).

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

staff located throughout the several states that comprise the region, so that they can easily interface with nearby state, local, and tribal governments and other stakeholders. Mei Decl. ¶¶5, 19-20; Garrett Decl. ¶¶ 7-8, 10-12; Long Decl. ¶¶11-12. National Office staff work on overarching rulemakings, guidance documents, policy decisions, and annual funding determinations, and Retailer Operations and Compliance staff oversee retailers. Rosenthal Decl. ¶7; Mei Decl. ¶9.

FNA is already severely short-staffed. Mei Decl. ¶29; Salvatore Decl. ¶8; Garrett Decl. ¶14; Long Decl. ¶25; Machell Decl. ¶¶27-31. It has long been an extremely lean organization, with 1,800 employees as of January 2025 managing over $160 billion annually in taxpayer dollars for essential public services. Rosenthal Decl. ¶13. But the agency lost approximately one-third of its workforce in 2025 due to the deferred resignation program, voluntary early retirement, and threats of RIFs. *Id.* ¶14. This staffing shortfall is already impeding FNA's ability to administer its programs. For instance, last summer, WIC programs experienced funding delays, with some programs within a week of running out of money because there were not enough Regional Office staff to orchestrate the necessary transfers of funds. *Id.* ¶40; Machell Decl. ¶30.

### 2. Reorganization Plan restructuring.

On April 30, 2026, USDA publicly announced that it would begin restructuring the FNA. Rosenthal Decl. ¶18. Since then, USDA has slowly released more information about these actions. *Id.* ¶¶19-22. USDA is closing all seven Regional Offices and relocating and consolidating regional employees and most D.C. area staff into five "hub" cities.[11] *Id.* ¶¶18-19; Levy Decl. Ex. A at 7746, 7749, 7753, Ex. B at 2; Salvatore Decl. ¶9; Garrett Decl. ¶9. The new hub cities are, for the most part, located far away from where most regional employees and offices are currently distributed (and the states and local communities they serve). Mei Decl. ¶¶16, 18; Salvatore Decl. ¶21; Garrett Decl. ¶¶10-12; Long Decl. ¶¶26-29.[12]

---

[11] Retailer Operations and Compliance employees will need to relocate to within commuting distance of four "regional operations and program support" locations. Rosenthal Decl. ¶18.

[12] In addition, although each new hub is nominally associated with a specific program—e.g., WIC and other supplemental programs in Kansas City, MO, Child Nutrition Programs in Dallas, TX, SNAP in Indianapolis, IN, research operations in Raleigh, NC, and emergency management in Denver, CO—regional employees are permitted relocate to any hub, regardless of their specialty, Mei Decl. ¶¶14-15; Rosenthal Decl. ¶19; Garrett Decl. ¶9, *further confirming that USDA does not expect these employees to actually move.*

USDA has said it wants FNA's D.C. area building vacated by September 2026 and also wants Regional Employees relocated in August.  Rosenthal Decl. ¶16; Mei Decl. ¶13.  As of now, USDA has not yet sent MDR letters—which officially notify employees they are being reassigned to a new location and give them 30 days to accept or decline the reassignment—to relocating FNA workers, but these are expected this summer.  Rosenthal Decl. ¶21.  USDA has said that employees who decline reassignment *will* be involuntarily separated. *Id.* ¶22; Levy Decl. Ex. R at 3.

### 3. Reorganization Plan impacts.

Staff attrition due to upcoming forced relocations will be very high.  A non-plaintiff labor organization surveyed all current FNA employees in May 2026.  Rosenthal Decl. ¶24.  81% of all respondents stated that they are unlikely to relocate.  *Id.* ¶26.  This includes 90% of respondents who work on WIC, 81% of SNAP respondents, 81% of Child Nutrition Services respondents, and 83% of National Office respondents.  *Id.* ¶¶27-29.  Staff losses at this level will immediately and drastically degrade the already understaffed FNA's ability to administer nutrition assistance programs.  *Id.* ¶¶31-46; Mei Decl. ¶¶26-37; Salvatore Decl. ¶¶12-13; Garrett Decl. ¶¶ 15-17; Machell Decl. ¶¶27-31.

Even if FNA were to backfill vacated positions—which it does not intend to do, *see supra* at 7—that would be ineffective.  Rosenthal Decl. ¶33; Mei Decl. ¶¶34-35.  FNA has an experienced workforce operating in positions that require unique skillsets, and many employees must train for years to develop the expertise necessary to be proficient.  Mei Decl. ¶¶34-35; Garrett Decl. ¶17; Salvatore Decl. ¶19.  FNA's forced relocations will also stymie productivity.  Individual states have specific methods of administering these sixteen federal programs.  Rosenthal Decl.¶47; Salvatore Decl. ¶22; Machell Decl. ¶¶38-39, 45-46, 48, 51-52.  FNA staff who have spent years learning those idiosyncrasies and developing trusted relationships with certain states are being relocated to programmatic hubs far away, and state administrators calling into their new hubs will be unable to reach experts familiar with their state-specific practices.  Mei Decl. ¶¶20-23, 28; Salvatore Decl. ¶19; Garrett Decl. ¶¶ 7-8, 10-12; Machell Decl. ¶¶38-39, 45-46, 48, 51-52.

Critically, for the WIC program, understaffing and the loss of institutional knowledge will likely impair FNA's ability to timely allocate funds to WIC agencies every quarter—leaving states

and local clinics with insufficient funds to distribute support to beneficiaries or to continue operating. Garrett Decl. ¶16; Machell Decl. ¶¶30, 33, 37-39, 44-46. A diminished FNA will also be slower to respond to supply chain shortages or other emergencies. Rosenthal Decl. ¶¶41, 43; Long Decl. ¶13-14, 21-24; Machell Decl. ¶¶23-26, 40-43. Some specialized teams will lose all or almost all their staff, such that they can no longer function at all. Rosenthal Decl. ¶¶38-39, 42; Mei Decl. ¶30. FNA will also face other backlogs and delays, which will jeopardize and disrupt the distribution of benefits. Rosenthal Decl. ¶¶35-46 & Ex. A Mei Decl. ¶¶33, 36-37, 39; *see also infra* at 33; Salvatore Decl. ¶¶13-14; Garrett Decl. ¶¶10-17; Long Decl. ¶¶15-20.

FNA's inability to successfully administer food benefits programs will be devastating to state partners, local governments, and beneficiaries that rely on those programs. Local government Plaintiffs Baltimore, King County, Santa Clara County, and Harris County each have many thousands of residents who rely on food benefits administered by FNA. Leach Decl. ¶¶11-24 (145,000 SNAP beneficiaries; 27,000 WIC women and children; numerous beneficiaries of other FNA programs); Rubardt Decl. ¶¶7-10 (over 1.1 million client visits at county agency distributing nutrition program benefits in 2025); Williams Decl. ¶14 (130,000 SNAP beneficiaries); Brown Decl. ¶¶6-15 (more than 47,000 WIC beneficiaries, including roughly 37,000 infants and children). Delays or disruption in these programs due to understaffing will cause a dramatic increase in demand for local government services and programs such as food pantries and other emergency assistance programs, which will drain local governments' resources. Leach Decl. ¶¶21-24; Rubardt Decl. ¶¶9-10; Williams Decl. ¶15; Brown Decl. ¶¶12-14.

The FNA relocation directly impacts AFGE and the FNA employees it represents in FNA's Mid-Atlantic Regional Office. Salvatore Decl. ¶4. AFGE expects high attrition, with adverse impacts on employees and the union. Salvatore Decl. ¶¶11, 24. Additionally, Proposed Plaintiff National WIC Association[13] represents more than 10,000 WIC professional members who are employed by state and local WIC agencies and clinics. Machell Decl. ¶¶3-7. Insufficient staffing at FNA will significantly increase the level and difficulty of those members' workloads in

---

[13] If the Court grants leave to file the Second Supplemental Complaint, three new Plaintiffs impacted by the Reorganization Plan, including National WIC Association, will join this motion.

delivering benefits to families and—given that quarterly WIC funding covers not only benefits but also the costs of administration—will also put them personally at risk of furloughs, layoffs, or reduced work hours when funding is delayed.  Machell Decl. ¶¶ 27-52.

### B.    Agricultural Research Agencies

USDA houses several agencies that conduct important agricultural, economic and scientific research, which are slated for reorganization and forced relocation this summer, including ARS (which includes BARC), ERS, and NIFA.  Mitchell Decl. ¶¶14-19; Dodson Decl. ¶¶7-12.

### 1. Statutes, functions, and workforce

**Agricultural Research Service:** USDA is required to conduct and publicize agricultural research.  7 U.S.C. §6971 (d)(2) (USDA "shall … identify, address, and prioritize current and emerging agricultural research,"; "ensure the delivery of agricultural research … knowledge," including "to the public"); *id.* §3104 ("[USDA] directed to conduct and to stimulate research into the laws and principles underlying the basic problems of agriculture in its broadest aspects[.]"); *id.* §5841(a) (National Genetic Resources Program).  ARS is USDA's chief scientific in-house research agency, employing approximately 5,500 scientists and support staff.  Levy Decl. Ex. H. One of its main components is BARC, located in Beltsville, Maryland.

BARC is the nation's premier agricultural research facility, and among the world's largest and most diversified agricultural research complexes, with around 330 scientists and other research staff.  Mitchell Decl. ¶¶5-6.  It spans over 6,000 acres and functions like a self-contained small city, with over 400 research laboratories, greenhouses, crop fields, barns, and administrative buildings. *Id.*  BARC has hundreds of ongoing research projects in its 17 laboratories, which include, among others, the Sustainable Agricultural Systems Lab, Environmental Microbial and Food Safety Lab, Bee Research Lab, Animal Parasitic Diseases Lab, and Food Quality Lab.  Mitchell Decl. ¶8. BARC labs publish hundreds of scientific papers each year.  Mitchell Decl. ¶9.

**Economic Research Service:** ERS is USDA's principal social science research agency.  7 C.F.R. §2.67(a); Dodson Decl. ¶2.[14]  Its economists and staff work on a broad range of economic

---

[14] Economic Research Service data collection and analysis fulfills or supports several USDA

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

15

and policy topics, with a focus on rural America, including agricultural market analysis, data, and projections, farm sector performance, food safety, nutrition assistance, food retailing, marketing, and prices, and global market and trade.  Dodson Decl. ¶3.  ERS is already operating under a staffing shortage, having lost about 29% of its staff in 2025.  Levy Decl. Ex. H.  The remaining 200 employees are located in the D.C. area, Kansas City, or work remotely.  Dodson Decl. ¶6.

**National Institute of Food and Agriculture:** NIFA funds and oversees USDA's external agricultural research, including research conducted by land-grant universities.  7 U.S.C. §6971(f)(2) (establishing NIFA); Soriano Decl. ¶¶3, 21.  NIFA staff administer USDA's grant programs.  Soriano Decl. ¶¶3, 6.  Currently, roughly 320 NIFA employees are responsible for managing approximately $1.3 billion in annual grant funding.  *Id.* ¶¶5-6.[15]  These employees are located across 46 states, with about 30 workers in the D.C. area and 70 in Kansas City.  *Id.* ¶5.  The agency is severely short-staffed, having lost about 35% of its workers in 2025.  *Id.* ¶16.  The remaining staff are near their breaking point, working under constant pressure, widespread burnout, and severe stress to meet their mission.  *Id*. ¶24.

### 2. Reorganization Plan restructuring.

On April 23, 2026, USDA announced that it would move forward with reorganizing these agencies this summer.  Mitchell Decl. ¶14, Dodson Decl. ¶7.  Although USDA's initial announcement provided few details, it has since released more information.  Mitchell Decl. ¶¶17-19; Dodson Decl. ¶¶8-11.

**Agricultural Research Service**.  USDA's restructuring of this agency is commencing with the closure of BARC.  Mitchell Decl. ¶¶14-15; Levy Decl. Ex. A at 7747, 7752; Millner Decl.

---

statutory mandates including, for instance, 7 U.S.C. §1441a (annual cost of production report), §7998 (farm income statistics), §1636f (monthly report on retail prices for farm animal products), §3003 (annual survey of direct marketing methods from farmers to consumers), §5925c (data collection and reports on production of organic agricultural products), §2204h (data collection on production and marketing of locally produced agricultural food products); §5313 (assess, analyze, and report on the dietary and nutritional status of U.S. consumers), §2204i(b) (triennial report on farmland ownership of "socially disadvantaged farmers").

[15] NIFA's primary mandates are 7 U.S.C. §361a et. seq. (state agricultural experiment stations grants) and §450i (competitive grant program), as well as specific grant programs, *e.g. id.* §5925b(f)(1) (organic agriculture research), §7632(k)(1)(B) (specialty crops); *see* https://www.congress.gov/crs-product/R48918 (Title VII: FY 2026 grant appropriations)

¶¶10-13. USDA says that most BARC research projects will be relocated elsewhere, and provided a list of 20 "possible" locations, almost all of which are hundreds or thousands of miles from Beltsville. Mitchell Decl. ¶16. Meanwhile, BARC's research laboratories are scheduled to be vacated, and staff relocated, by end of September or early October 2026. *Id.* ¶19; Millner ¶12.

BARC staff received either initial relocation notices in April (location pending) or notice that they will assist with the decommissioning (and will later be relocated). Mitchell Decl. ¶¶17-18. USDA will send MDR letters to individual staff over the course of the summer. *Id.* ¶20. On June 29, many BARC researchers received MDRs instructing them to report to new locations by October 5, 2026 and giving them 30 days to decide whether to move or resign. Millner Decl. ¶13.

**Economic Research Service and NIFA**. USDA is relocating any ERS and NIFA employees who do not currently work in Kansas City, Missouri to that location. Dodson Decl. ¶7; Levy Decl. Ex. B; Soriano Decl. ¶¶8, 9, 11. Most staff received MDR letters in June instructing them to report to Kansas City by either September 21 or October 5, 2026. Dodson Decl. ¶¶10-13; Soriano Decl. ¶¶9, 15.

### 3. Restructuring Plan impacts.

The restructuring directly impacts AFGE and the employees it represents at BARC, ERS, and NIFA. Mitchell Decl. ¶23; Soriano Decl. ¶4. Many AFGE-represented employees will be forced to leave their jobs because their personal circumstances make them unable to relocate.[16] Mitchell Decl. ¶¶22-25; Dodson Decl. ¶15; Soriano Decl. ¶18. Additionally, physical or environmental reasons mean many BARC projects cannot be successfully relocated to a different geography, and BARC researchers will not relocate without the ability to continue their research. Mitchell Decl. ¶¶23-27; Millner Decl. ¶¶13-27; Lamas Decl. ¶¶14-23; Lunney Decl. ¶¶15-23. Those employees who do relocate will face crushing workloads at what will be acutely understaffed agencies. Mitchell Decl. ¶30.

The relocation is expected to result in high levels of attrition. AFGE surveys found that

---

[16] For instance, employees are unable to relocate due to elder care responsibilities, childcare responsibilities, having military spouses who cannot move, reasonable accommodations, and, for veterans, the difficulty in transferring medical care within the VA system. Soriano Decl. ¶18.

approximately *70%* of ERS workers and *55-75%* of NIFA workers will not relocate. Dodson Decl. ¶15; Soriano Decl. ¶17. This exodus is consistent with events in 2019 when USDA tried to relocate ERS and NIFA to Kansas City: 75% of the transferred workers left the agencies rather than relocate. Soriano Decl. ¶19, Ex. B; Dodson Decl. ¶16. Many BARC employees also do not intend to relocate. Mitchell Decl. ¶23. This level of attrition will have profound consequences for the agencies' research functions. Many researchers at BARC and ERS are extremely specialized and perform unique work. Dodson Decl. ¶25; Millner Decl. ¶¶2-6, 26-27; Lunney Decl. ¶¶5-10; Lamas Decl. ¶¶5-6, 15, 17. As researchers leave these agencies, their projects will lack teams to execute them, which will be devastating to research in that field.[17] Dodson Decl. ¶¶22-26; Mitchell Decl. ¶¶24-25, 28-29, 31; Millner Decl. ¶¶13-14; Lunney Decl. ¶¶15-18. For instance, BARC's Bee Lab is the leading generator of research on Colony Collapse Disorder, an existential threat to American honeybees. Lamas Decl. ¶5.

With such a drastic decrease in experienced staff, the agencies' productivity will plummet. Dodson Decl. ¶¶22-26; Soriano Decl. ¶21. History confirms this: After the 2019 relocation, ERS research reports and articles declined markedly due to workforce decreases. Dodson Decl. ¶23 & Ex. B at 19. NIFA funded the lowest number of competitive grants, and at markedly slower rates, than in prior years. Dodson Decl. Ex. B at 20. And it fell two quarters behind on grant payments that constituted 20% of the budget for state agricultural experiment stations. Soriano Decl. ¶21.

Agency staff predict similar harms from the 2026 forced relocation. Dodson Decl. ¶¶24, 30, 32-41; Mitchell Decl. ¶¶28-32; Soriano Decl. ¶¶21-22. The decline will harm scientists, policy advocates, and others who rely on these agencies' research and funding, including Plaintiff NRDC, scientist members of Proposed Plaintiff Alliance of Crop, Soil, and Environmental Science Societies ("Alliance") and Plaintiff America Geophysical Union, and local government Plaintiffs. Rath Decl. ¶¶3-13 (NRDC soil nitrogen advocacy relies on BARC long-term agroecosystem

---

[17] The Economic Research Service's outputs will also suffer due to expected attrition at the National Agricultural Statistics Service ("NASS"), which is being relocated to St. Louis. Dodson Decl. ¶¶35-37. NASS is the USDA agency responsible for providing official statistics on U.S. agriculture, and the economists rely on the surveys and data sets that NASS produces, as does Plaintiff Natural Resources Defense Council ("NRDC"). *Id.*; Rath Decl. ¶13.

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

18

research network); Cudahy Decl. ¶¶9-11 (members rely on NIFA funding and collaborate with USDA researchers); Schulz Decl. ¶¶8-11; Lamas Decl. ¶¶8-14; Funkhouser Decl. ¶¶9, 11-14 (beekeepers nationwide rely on BARC diagnostic services to manage hive health); Williams Decl. ¶¶11-13 (research to support farmers and respond to agricultural threats like New World screwworm); Leach Decl. ¶¶39-40 (Food Access Research Atlas used by city officials to improve food access and distribution); Rubardt Decl. ¶¶11-16, 19-20 (research for agricultural development, food access, regional food-system planning, and conservation practices).  BARC's closure will also economically harm Proposed Plaintiff Prince George's County, Maryland, where BARC is located (and which relies on BARC's environmental remediation).  Fair Decl. ¶¶6-12; Moki Decl. ¶¶9-12.

### C.    United States Forest Service

#### 1. Statutes, functions, and workforce.

The USFS, which was established in 1897 to "improve and protect" the nation's forests, today manages 193 million acres of national forests and grasslands.  Organic Act of June 4, 1897, ch. 2, 30 Stat. 34; Kotyk Decl. ¶¶5-6.  USFS administers its 154 national forests for "the long-term benefit for present and future generations," 16 U.S.C. §1609, according to five statutory purposes: outdoor recreation, livestock grazing, timber harvesting, watershed protection, and wildlife and fish habitats, *id.* §528.  USFS's responsibilities include, among others, preparing forest management plans, 16 U.S.C. §1604; Ehrman Decl. ¶¶4, 10; Iverson Decl. ¶¶6, 12; protecting ecosystems, watersheds, and wilderness areas, 16 U.S.C. §§528, 1131; conducting timber sales, *id.* §472a; Medley Decl. ¶5; issuing livestock grazing permits, 43 U.S.C. §1752(a); Molvar Decl. ¶¶10-11; coordinating with local, private, and tribal partners, 16 U.S.C. §§2111-2114; Wormstead Decl. ¶¶4, 6-7; and facilitating public recreation, including maintaining more than 150,000 miles of trails that receive more than 164 million annual recreation visits, *id.* §§1641-46, Kotyk Decl. ¶¶5, 10.  USFS also has a statutory mandate to "make provisions" to protect national forests "against destruction from fire."  16 U.S.C. §551; *see also id.* §6512; *id.* §6592(b); 43 U.S.C. §1748b-1; Prendeville Decl. ¶17.  Further, USFS must conduct research into "protecting, managing, and utilizing forest and rangeland renewable resources."  16 U.S.C. §1642(a), §1643; Prendeville Decl. ¶¶23, 25.  This includes the Forest Inventory and Analysis Program, which collects annual data on forest resources

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

in order to assess ecological trends over time. *Id*. §1642(e); Prendeville Decl. ¶23.[18]

The Forest Service is currently organized into nine Regional Offices and a D.C. headquarters. Ehrman Decl. ¶4, 8; Iverson Decl. ¶4; Kotyk Decl. ¶¶7-8. Each Regional Office oversees the national forests located within its region, providing specialized expertise and technical assistance for the forest- and district-level staff it supports. Ehrman Decl. ¶¶4-7; Iverson Decl. ¶¶4, 6; Medley ¶5; Kotyk Decl. ¶¶8, 10, 44, 49; Smith Decl. ¶¶12–22. Regional Office teams are comprised of many highly technical and specialized positions, including engineers; Fire and Aviation Management teams; and recreation, lands, heritage, and mineral specialists, with expertise that often does not exist at the forest- or district-level offices. Ehrman Decl.¶¶4-7; Iverson Decl. ¶¶4, 6; Kotyk Decl. ¶¶8, 10, 44, 49; Smith Decl. ¶21. Regional Offices handle and coordinate region-wide policies and projects that cut across states and national forests and provide oversight, assistance, reviews, and support for the most complicated forest-level projects, including fire management and fuel reduction, bridge design and inspection, and wildfire response. Ehrman Decl.¶¶4-7, 13-15; Iverson Decl. ¶¶4, 6, 10-11; Medley Decl. ¶5; Smith Decl. ¶¶17-22. Many Regional Office staff are certified to be part of incident command teams that respond to the largest wildfires. Ehrman Decl.¶13; Iverson Decl. ¶¶10-11.

The Forest Service maintains five Research Stations covering the following areas: Northern, Pacific Northwest, Pacific Southwest, Rocky Mountain, and Southern. Koytk Decl. ¶¶11-12. Under the umbrella of those stations are a variety of research offices, labs, institutes, and experimental forests. *Id.* ¶12. Researchers conduct location-specific research, including studies of wildfire, invasive species, climate change, weather patterns, and vegetation, used by USFS in

---

[18] The Forest Service has many other statutorily required and authorized functions. *See, e.g.*, 16 U.S.C. §485 (land exchange program), §515 (land acquisition program), §§532-35 (maintain roads), §§1601-02 (10-year nationwide renewable resource report to Congress), §1601(e)(1) (annual reforestation report to Congress), §1644 (forestry research grants), §2101 (cooperative program for state forest lands, §2102 (technical assistance to state foresters), §2101a (review and approve state forestry plans), §2103a (Forest Stewardship Program), §2103c (Forest Legacy Program), §2103d (Community Forest and Open Space Conservation Program), §2104 (Forest Health Protection Program), §2105 (urban and community forest assistance), §2106 (cooperation with states on fire prevention and control), §2106a (emergency reforestation assistance), §2106c(b) (Community and Private Land Fire Assistance Program), §2109a (Landscape Scale Restoration Program), §6802(h) (recreation permits), §497b (ski permits), §1333 (managing wild horses and burros); 30 U.S.C. §226(g) (oil and gas leases).

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

20

making land management decisions.  Prendeville Decl. ¶¶5-6, 12-17; 23, 25; Smith Decl. ¶¶24-32.

USFS is already severely understaffed.  It lost almost 6,000 employees in 2025 due to deferred resignations and other staff reduction efforts.  Levy Decl. Ex. H at 4.  The understaffing is impacting the agency's ability to perform its land management and fire protection functions.  Ehrman Decl. ¶¶13-15; Wormstead Decl. ¶¶10-13.  For instance, USFS treated 35% (1.4 million) fewer acres for hazardous fuels in 2025 than in 2024.  Neubacher Decl. Ex. A at 1.  This "sharp decline … leaves communities across the West and Southeast more exposed to the risk of catastrophic wildfire." *Id.*  The preparedness of wildfire Incident Management Teams has suffered, as overworked members deal with increased regional responsibilities.  Ehrman Decl. ¶¶13-14.

### 2. Reorganization Plan restructuring.

On March 31, 2026, USDA publicly announced its intent to restructure the Forest Service and sent preliminary notices to affected employees.  Ehrman Decl. ¶8 & Ex. A; Wormstead Decl. ¶8 & Ex. A; Kotyk Decl. ¶¶14-18.  While USDA has not revealed the full scope and timing, the following is known: the Forest Service will move its D.C. headquarters to Salt Lake City and close all Regional Offices.  Ehrman Decl. ¶8 & Ex. A; Wormstead Decl. ¶8 & Ex. A; Kotyk Decl. ¶14; Levy Decl. Ex. A at 7752-53.  Some regional positions will be relocated to new, significantly smaller "state-based" offices; other functions will be consolidated into a few new, nationwide "service centers."  Ehrman Decl. ¶8 & Ex. A; Kotyk Decl. ¶14; Levy Decl. Ex. A at 7752-53.

USFS originally sent a letter alerting approximately 6,500 employees that they *might* be affected by the reorganization.  Kotyk Decl. ¶¶16-18; Prendeville Decl. ¶18.  USDA subsequently stated that it does not currently intend to relocate all of those employees.  Kotyk Decl. ¶19.  To date, the Forest Service has stated that around 500 employees in Regions 6 (Pacific Northwest), 8 (Southern), and 9 (Eastern, Great Lakes area) and D.C. headquarters offices are being mandatorily relocated.  Kotyk Decl. ¶¶14, 18.  Those employees are being moved primarily to distant locations like Salt Lake City and service centers in Albuquerque and Fort Collins, among others.  Ehrman Decl. ¶8 & Ex. A; Wormstead Decl. ¶8 & Ex. A; Kotyk Decl. ¶¶14, 18.

USFS has stated that employees in the other six Regional Offices currently "will generally not be expected to relocate outside of the commuting area."  Kotyk Decl. ¶18.  However, the new

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

21

state offices and larger service centers are located outside any reasonable commuting area of many of those Regional Offices. *Compare* Kotyk Decl. ¶8 *with* Levy Decl. Ex. I (Fact Sheet); *e.g.*, (Region 2 – Rocky Mountain: Lakewood, CO to Fort Collins).

USFS is also closing Research Stations and consolidating research operations in Fort Collins, CO. Prendeville Decl. ¶¶18-19; Kotyk Decl. ¶¶14, 21; Levy Decl. Ex. A at 7753. USFS has identified 57 research facilities (200 workers) "for possible closure" and listed only 20 other facilities as currently safe from closure. Prendeville Decl. ¶19; Kotyk Decl. ¶21; Levy Decl. Ex. O.

Although USFS claims that the restructuring is not intended to force employees to quit or leave, on June 1, 2026, USDA Deputy Secretary Steve Vaden sent a letter to Congress that confirms that the purpose of the forced relocations is to reduce the agency's workforce. Levy Decl. Ex. J (contending "[t]he previous administration" conducted "hiring that was unsustainable" and so "[t]he Trump Administration is reorganizing the Forest Service to align its workforce size with available resources").

The Forest Service has stated that MDR letters will be issued starting this summer. Levy Decl. Ex. J at 2. For workers relocating outside more than 50 miles, the letters will provide only 10 days to accept or decline a transfer, and will issue 60 days in advance of reporting dates. Kotyk Decl. ¶¶22-27. Employees who decline will be involuntarily separated. *Id.* No timeline has yet been announced for specific MDRs or the closure of offices, but the Forest Service has indicated that it intends to issue the directives in summer 2026. Kotyk Decl. ¶27.

### 3. Reorganization Plan impacts.

The forced relocations will result in high attrition. Ehrman Decl. ¶11; Prendeville Decl. ¶22; Wormstead Decl. ¶10; Medley Decl. ¶9. A non-plaintiff labor organization conducted a survey of Forest Service employees. Kotyk Decl. ¶¶28-47. More than 57% of respondents stated that they were unlikely to relocate.[19] *Id.* ¶30. Loss of Washington and other staff will disrupt crucial nationwide projects, such as aerial retardant maps and forest analysis. Kotyk Decl. ¶¶49-51.

---

[19] That level of attrition is consistent with a prior attempted relocation at a similar public lands agency. *See, e.g.*, Levy Decl. Ex. K at 15-16 (GAO Report: 2019 relocation of Bureau of Land Management headquarters from D.C. to Grand Junction, CO, resulted in 77% attrition).

The expected attrition will result in a significant loss of institutional knowledge from the affected Regional Offices, because regional staff have specialized expertise and extensive experience that is outside the day-to-day knowledge of many forest- and district-level staff. Ehrman Decl. ¶¶4-7, 10; Wormstead Decl. ¶10; Medley Decl. ¶5; Iverson Decl. ¶¶4, 6-9; Smith Decl. ¶¶15-23. Their loss will impede many of the agency's primary functions in those regions, including, for instance, its ability to undertake land management projects requiring permitting and specialized assistance from regional offices (such as prescribed burning or fuel reduction) and engage in bridge inspections and repairs. Ehrman Decl. ¶¶5-6, 15; Iverson Decl. ¶¶6, 9; Smith Decl. ¶¶16–17. In Region 6, the loss of regional staff supporting implementation of the Northwest Forest Plan will harm the national forests that rely on their region- and ecosystem-specific expertise. Ehrman Decl. ¶¶5, 10; Iverson Decl. ¶¶6-7, 12. And in Region 9, many of the understaffed programs overseen by the State, Private, and Tribal Forestry program will cease to function as Congress directed. Wormstead Decl. ¶¶4-7, 9-15. USFS staff are already overburdened with staffing shortages; any further regional losses will reverberate throughout the agency, hindering forest- and district-level projects if those staff are called on to fill regional gaps. Medley Decl. ¶¶6-9; Ehrman Decl. ¶¶11, 13-15; Iverson Decl. ¶¶8-9; Wormstead Decl. ¶10-11. Regional Office staff losses will also impact the agency's fire prevention and response capacity: Critical regional members of Incident Management Teams will be lost, along with employees who assist with fuel reduction projects and assist states in fire prevention. Ehrman Decl. ¶¶5, 13-15; Wormstead Decl. ¶¶4, 14-15; Iverson Decl. ¶¶10-11.

The closure of Research Stations and resultant staff attrition will halt applied science that is critical to the Forest Service making informed land management decisions to sustainably use and protect forest ecosystems; to engage in effective fire prevention, response, and recovery; and to satisfy statutory mandates. Prendeville Decl. ¶¶21-25, 28. For example, eliminating the Pacific Northwest Research Station will move regional experts further from the 3,000 plots they examine annually and disrupt the statutory Forest Inventory and Analysis program, which derives its value from continuity and accuracy. *Id.* ¶¶23-24; *see also id.* ¶¶ 21-25, 28; Smith Decl. ¶32.

A decrease in USFS's ability to prevent and respond to wildfires impacts thousands of

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

23

members of Plaintiffs Western Watersheds Project, Coalition to Protect America's National Parks, and NRDC, who live near and regularly recreate on national forest land or adjacent areas and are harmed when wildfires destroy the areas they use or prevent them from visiting.  Neubacher Decl. ¶¶5, 6, 9, 25; Molvar Decl. ¶¶6, 24-28; Iverson Decl. ¶¶15-17; Trujillo Decl. ¶7; Lovitt Decl. ¶¶6-10; 14-15; Weatherly Decl. ¶¶3, 5-9.  Reductions in Forest Service research capacity harm Plaintiff organizations and their members who rely on that research, funding, or collaboration for their own scientific and advocacy work.  Molvar Decl. ¶¶20-22; Neubacher Decl. ¶22; Woodard Decl. ¶¶12-23, 33-34; Cudahy Decl. ¶¶8-12; Shultz Decl. ¶8-9.  Plaintiff local governments will face increased firefighting costs and burdens when the Forest Service's ability to respond to and prevent wildfires on national forest land is diminished.  Williams Decl. ¶¶3-10; Crispen Decl. ¶¶2-3.  And closure of the Baltimore research office will interfere with the city and Forest Service's collaboration to increase tree canopy and regenerate urban forests.  Leach Decl. ¶¶25-38.

### D.   Foreign Agricultural Service

On June 17, 2026, USDA announced that it was implementing the reorganization of FAS by moving the Service away from its Washington, D.C. location.

#### 1. Statutes, functions, and workforce.

FAS is USDA's foreign affairs and trade arm, fulfilling a number of statutory missions, 7 U.S.C. §5693, and has been based in Washington, D.C. since its inception.  Bradley Decl. ¶¶8, 11, 39-41.  Its primary mission is to enhance export opportunities for U.S. farmers and producers and global food security.  *Id.* ¶39.  Under the Agricultural Trade Act of 1978, FAS "shall assist the Secretary" in carrying out agricultural trade and international cooperation policy through a variety of specified mandatory functions.  *Id.*

#### 2. Reorganization Plan restructuring.

USDA is restructuring FAS by establishing an "operational support hub in Kansas City, Missouri" and will require "much of its Washington, D.C.-based workforce" to relocate.  Bradley Decl. ¶¶16-17.  Thus, USDA is moving a program focused on diplomatic relations, foreign affairs, and trade far away from D.C. and the other federal agencies with similar missions.  USDA has not provided clarification on timing, nor have employees yet received reassignments.  *Id.* ¶¶18-25.

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

### 3. Reorganization Plan impacts.

These actions directly impact Plaintiff AFSCME and the employees it represents in this program.  Bradley Decl. ¶¶4, 42.  AFSCME-represented employees have lived in the D.C. area for decades, with deep family and community roots.  *Id*. ¶28.  ("Their families are here, their kids' schools, their doctors, their houses of faith, their community groups, their friends—the list goes on.").  They are part of the foreign service community and will lose professional development opportunities by moving to Kansas City.  *Id*.  Their work will suffer, because it focuses on international relations and trade, and they will have more difficulty coordinating with other federal agencies and stakeholders based in D.C. and with staff stationed in more than 80 U.S. embassies around the world.  *Id*. ¶¶8-11, 35-41.  Relocation out of Washington D.C. will also make it more difficult for remaining employees to do their jobs.  *Id*. ¶¶9-11, Ex. 1 at 3-4.  The *vast majority* of these employees will leave rather than relocate.  *Id*. ¶¶28-29, 36 (71% of survey respondents would rather leave the agency than relocate).  Losing these experienced, knowledgeable expert employees will be "catastrophic to the work of [FAS]" *id*. ¶37, and to the many stakeholders who rely on this important work, *id*. ¶41, and will harm AFSCME, *id*. ¶42.

### E.    Farm and Rural Development Mission Areas

On June 17, 2026, the USDA announced that it was implementing the reorganization of the Rural Development and Farm Production and Conservation mission areas.

### 1. Statutes, functions, and workforce.

USDA's Rural Development mission area works to improve the economy and quality of life in rural America.  Vaughn Decl. ¶7.  Rural Development's various programs provide financing to rural communities designed to support businesses, single- and multi-family housing, and utility systems.  *Id*. ¶8; Kelley Decl. ¶13.

The Farm Production and Conservation mission area includes the Farm Service Agency, Risk Management Agency, Natural Resources Conservation Service, and a Business Center that coordinates administrative operations for all mission area agencies.  Hoekema Decl. ¶8.  The Farm Service Agency administers programs that provide income support, loans, and disaster response to farmers and ranchers.  *Id*.  The Risk Management Agency administers the Federal Crop Insurance

Program (established by Congress in 1938). *See* 7 U.S.C. §1501 *et seq.*  The Natural Resources Conservation Service was originally authorized by Congress in 1935 as the Soil Conservation Service in the midst of the Dust Bowl era, "to provide permanently for the control and prevention of soil erosion to preserve soil, water, and related resources.," 16 U.S.C. §590a-590f, and now administers programs to address natural resources, wetlands restoration, and farmland protection.

### 2. Reorganization Plan restructuring.

On June 17, USDA announced, in broad terms, its intentions to reorganize these agencies, explaining that the restructuring was "in accordance with USDA's broader reorganization effort" and "[a]ligning [w]ith Executive Orders."  Levy Decl. Ex. L.  Those releases announced only general overviews; some Plaintiff unions have received more specific information consistent with the Reorganization Plan.  The planned actions follow the same pattern: forced relocation to far away hubs.  The Rural Development mission area will establish two "primary National Office Centers" in St. Louis, Missouri, and Dallas-Fort Worth, Texas, and will reassign 60% of D.C. area staff to those offices.  Vaughn Decl. ¶15; *see* Levy Decl. Ex. A at 7753; Kelley Decl. ¶14.[20] Likewise, Natural Resources Conservation Service staff working in the national headquarters will relocate to new field and regional hub locations.  Kelley Decl. ¶17; Levy Decl. Ex. A at 7751. USDA will shift the Business Center's "footprint" from the D.C. area to "hubs" in Raleigh, Fort Worth, Kansas City, and Salt Lake City.  Hoekema Decl. ¶¶18-19.[21]  USDA also intends to fully eliminate some offices (including "the Equity Team, Climate Team, Center for Sustainable Commodities, and the Office of Regional Conservationists").  Kelley Decl. ¶17; Levy Decl. Ex. A at 7739.  The Agency has not told employees where they are going, only that those being reassigned should "anticipate" receiving MDR letters in July and August.  Kelley Decl. ¶17.

### 3. Reorganization Plan impacts.

These actions directly impact Plaintiffs AFSCME, AFGE, and the employees they represent in the Farm Production and Conservation and Rural Development mission areas, as well as

---

[20] USDA is also centralizing Rural Development loan functions currently performed at the State level to the new national office centers.  Kelley Decl. ¶16.

[21] Business Centers employees have been told that the restructuring will occur through "VERA/VSIP and attrition." Hoekema ¶19.

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

Proposed Plaintiff Alliance's members employed there. Vaughn Decl. ¶¶20-30; Kelley Decl. ¶¶13-17; Hoekema Decl. ¶¶24-26; Cudahy Decl. ¶¶8-10. Many employees will be forced to leave their jobs because their personal circumstances make them unable to relocate. Vaughn Decl. ¶23 (serious health conditions that prevent leaving health care providers or family); Kelley Decl. ¶15 (employees cannot relocate due to child and elder care responsibilities). Attrition will have corresponding impacts on the work of these agencies, adversely impacting those who rely on it. Cudahy Decl. ¶¶8-12; Vaughn ¶¶25-26.[22]

## ARGUMENT

Plaintiffs are likely to succeed on the merits and have shown likely irreparable harm and that the balance of equities and public interest support a stay and injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also* 5. U.S.C. §705.

## I.    Plaintiffs' APA and Ultra Vires Claims Are Likely to Succeed

### A.    USDA's Actions Exceed Authority and Are Contrary to Law.

The USDA Reorganization Plan and recently announced implementing actions exceed USDA's statutory authority and are contrary to law, and so violate APA Sections 706(2)(A) and (C) and are *ultra vires,* for at least three reasons: first, USDA lacks statutory authority to reduce its workforce size through reorganization; second, USDA's actions directly conflict with statutes that prohibit USDA's reorganization without congressional approval; and third, USDA's actions will interfere with statutory requirements and authorizations for USDA subagencies and programs.[23]

---

[22] USDA is also restructuring and relocating employees in agency-wide offices, including by combining all civil rights offices under the Office of the Assistant Secretary for Civil Rights and closing and consolidating regions and offices of the Office of General Counsel, consistent with the ARRP. Hoekema Decl. ¶20; Kelley Decl. ¶¶18-23. This restructuring harms AFGE and AFSCME bargaining unit members at those agencies, many of whom are being ordered to relocate to Raleigh, North Carolina or Fort Collins, Colorado (for civil rights) and Davis, California or Kansas City, Missouri (for general counsel). Hoekema Decl. ¶¶20, 26; Kelley Decl. ¶¶18-23.

[23] While Defendants' actions also violate Article I and separation of powers, and are unlawful because they implement unlawful directives from the President, OMB, and OPM, as challenged in Counts I-III of the Second Amended Complaint, in light of the Supreme Court's July 9, 2025 stay of Plaintiffs' prior preliminary injunction Plaintiffs do not rest the present motion for injunctive relief on Counts I-III of the Second Amended Complaint. Counts VI and VII are untouched by that July 9 order, as are the claims in the Second Supplemental Complaint. *See* ECF 259 at 8-9; accompanying Motion for Leave to File Second Supplemental Complaint.

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

### 1. USDA Lacks Statutory Authority to Restructure the Department to Effectuate a Large-Scale Downsizing of USDA Employees.

As discussed *supra* at 5-8, the primary purpose of USDA's Reorganization Plan and the recently announced implementing actions is workforce reduction. The ARRP explicitly states that large-scale workforce reduction is the purpose of this Reorganization Plan, sets forth specific targets, and plans to use forced relocation to hit those targets through attrition. *Supra* at 6-8. At a high level, the public Secretary Memorandum (while denying large-scale downsizing and hiding the use of forced relocation to hit reduction targets) admits that "this reorganization is another step of the Department's process of reducing its workforce." Levy Decl. Ex. B at 2. Any remaining doubt regarding ██████████████████████████████████████████████ is dispelled by the communications between OMB, OPM, DOGE, and USDA about the USDA ARRPs. *Supra* at 8 (████████████████████████████).[24] USDA intends for large numbers of employees forced to relocate to leave and does not intend to backfill the positions of those who do not move. *Supra* at 7; Levy Decl. Ex. A at 7739, 7748-49.

This kind of "workforce reduction through restructuring" is no more within USDA's authority than would be a unilateral decision to fire 20 to 30% percent of its workforce. USDA, like all federal agencies, is a "creature[] of statute" and "possess[es] only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022). The Secretary's Memorandum cites two statutes that purportedly authorize its actions: the Reorganization Plan No. 2 of 1953 (codified at 7 U.S.C. §2201, Notes) and Department of Agriculture Reorganization Act of 1994 (Pub. L. No. 103-354, 108 Stat. 3178 (1994)). Levy Decl. Ex. B at 1. But the plain text of these statutes does not extend to imposing large-scale reductions of positions otherwise authorized and funded by Congress.

---

[24] *See also* Johnson Decl. Ex. C at 5642 (████████████████████████████ ████). There can be no real dispute that throughout 2025 OMB, OPM, and DOGE were directing federal agencies to use ARRPs to reduce their workforces. That goal remains among this Administration's highest priorities. ECF 417 at 7-8 (quoting President's 2026 Management Agenda priority for downsizing); ECF 400 at 2 n.2 (OMB official confirming in March 2026 that workforce reduction remains "Priority Number One" for the Trump Administration).

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

First, Congress *terminated* the 1994 reorganization authority on October 13, 1996; it thus gives the agency no authority for its actions now. 7 U.S.C. §7014(a) & n.4. And although the authority created in 1953 Plan survives that termination, *id.* §7014(b)(2), the 1953 Plan provides no authority either. 7 U.S.C. §2201, Notes. That 1953 Plan provided the Secretary with certain authority to manage the internal organization of the Department: "The Secretary of Agriculture may from time to time make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the Department of Agriculture of any function of the Secretary, including any function transferred to the Secretary by the provisions of this reorganization plan." *Id.* This provision's plain text authorizes the Secretary to delegate the work of the Department *among* its existing employees, including by deciding which employee should perform any given function. It does not authorize the Secretary to *reduce* or *alter* otherwise authorized functions (in light of the President's "priorities" or for any other reason) or to engage in the large-scale elimination of positions within the Department.[25]

No other provision of the 1953 Plan authorizes USDA to reorganize and reduce staff by 20 to 30% (or to impose workforce reduction via forced relocation). *See id.* §4(b), (c) (addressing transfers of functions, not workforce reductions, and cabined to the authority conveyed in subsection (a)). Read together, the Secretary is authorized to simplify management structures and achieve efficiencies through the organization of the Department, but not to unilaterally downsize or eliminate capacity to perform functions. But the ARRP ███████████████████ ████████████ are clear that the purpose of the current USDA Reorganization Plan is not to "simplify" management structures or make the Department "efficient" through work assignments: It is to severely reduce USDA's size and capacity to perform those functions, offices, and positions deemed inconsistent with the President's priorities. *Supra* at 7. These actions therefore exceed the scope of USDA's existing statutory authority.

---

[25] This type of "housekeeping" statute generally authorizes "rules of agency organization procedure or practice" and not "substantive" changes to authority. *Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979) (discussing 5 U.S.C. §301).

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

The expired 1994 statute's text further reinforces that Congress did not view the retention of the limited 1953 Plan authority as sufficient to effectuate a large-scale reorganization for the purpose of workforce reduction.  Congress authorized the USDA to "streamline and reorganize the Department of Agriculture" (5 U.S.C. §6901); to "alter, or discontinue any agency, office, or other administrative unit of the Department" (7 U.S.C. §6912(a)(1)); and to "combine field offices of agencies within the Department to reduce personnel and duplicative overhead expenses" (7 U.S.C. §6915(a)).  And it expressly authorized the Secretary to "reorganize USDA around six basic missions, improve the Department's accountability and service to customers, reform its field structure, and *reduce personnel and costs*."  7 U.S.C. §6915(a)(1) (emphasis added).  But that authority has not since been reauthorized.  Instead, each year, Congress approves and enacts the annual budget (signed by the President) that sets forth the authorized amounts of USDA spending, including on existing staff.  *E.g.*, Levy Decl. Ex. C.

The 1994 Act's legislative history reinforces that Congress did not view the retention of the limited 1953 Plan authority as sufficient to effectuate a large-scale reorganization for the purpose of workforce reduction.  The House Committee on Agriculture Report explained that the 1994 Act's purpose was "to remove *constraints* and *limitations* on the Secretary's management authority."  H.R. Rep. 103-714 at 16 (Aug. 23, 1994) (emphasis added); *see also id.* (explaining the 1994 Act was intended to "provide *additional* legislative authority to make more fundamental reform in the management of the Department of Agriculture.") (emphasis added); *see also* S. Rep. 103-241 at 2 (March 23, 1994) (referencing the "discretion to fundamentally restructure" the agency); H.R. Rep. 103-714 at 21 (contrasting the 1994 Act with the narrower authority conferred in the 1953 Plan).  Congress thus understood the now-terminated 1994 authority to be much broader than that conferred in 1953.

### 2. USDA's Actions Directly Conflict with Recent Congressional Direction

#### a.   Congress prohibited the use of USDA funds to reorganize.

In November 2025 and January 2026, Congress enacted and the President signed the fiscal year 2026 appropriations for the USDA and Forest Service.  *Supra* at 4-5.  Both acts prohibit USDA and USFS from using funds to relocate offices or employees, reorganize offices, programs,

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

or activities, and eliminate programs, projects, or activities of the USDA or USFS without further congressional approval.  Pub. L. No. 119-37, Div. B, §716, 139 Stat. 495, 544-45 (2025) (hereinafter, "§716"); Pub. L. No. 119-74, Div. C, §421, 140 Stat. 5, 163 (2026) (hereinafter, "§421"); Levy Decl. Ex. D at 7-9 (Explanatory Statement).  In addition, in direct response to this Administration's 2025 efforts to cut Forest Service staffing levels, Congress also specifically directed that the "Forest Service shall maintain staffing levels in order to fulfill [its] mission" and defined that mission.  Pub. L. 119-74, Div. C Tit. III, 140 Stat. 5, 137-46 (2026); *supra* at 5.

These statutes were enacted after the USDA's public announcement of the Reorganization Plan and unsuccessful efforts to obtain approval for its reorganization through Fiscal Year 2026 appropriations.  The FY26 Agricultural Appropriation Act "rejects research terminations and laboratory closures proposed in the President's budget request" for ARS and "supports the continued operation of [BARC],"[26] Congress plainly rejected the Administration's request to authorize USDA's plans and, in broad and detailed language, directed the Department *not* to take these actions without further approval.[27]

USDA is defying these direct instructions.  Its Reorganization Plan "relocates an office or employees" (§716(a)(4)) and "reorganizes offices, programs, or activities" (§716(a)(5)) by relocating the agencies, offices, and positions discussed above.  *Supra* at 10-27.  The Forest Service's reorganization provides for "closures, consolidations, and relocations of offices, facilities, and laboratories" affecting more than 10 staff members (§421; Levy Decl. Ex. D at 8 (Explanatory Statement)).  And USDA's actions causing attrition through forced relocations further defy the clear instruction to maintain Forest Service staffing needed to fulfill the agency's mission. *Supra* at 19-24.  Neither the USDA nor USFS has obtained further congressional authorization to proceed with the Reorganization Plan since these laws were enacted.

---

[26] Levy Decl. Ex. E.  Congress also earmarked $3 million for BARC maintenance. *Id.*
[27] In addition, Congress has also prohibited USDA from selling or otherwise disposing of the BARC site without Congressional approval.  Pub. L. No. 100-202, Tit. V §523, 101 Stat. 1329, 1417 (1987) ("none of the funds appropriated by this Act *or any other Act in any fiscal year* may be obligated or expended in any way for the purpose of the sale, lease, rental, excessing, surplusing, or disposal of any portion of land on which the Beltsville Agricultural Research Center is located at Beltsville, Maryland, without the specific approval of Congress"); Levy Decl. Ex. A at 7747 (listing BARC under sites agency seeks to "dispose" of).

**b. USDA's *Chadha* objection does not create Congressional authorization.**

In June 2026, USDA explained that it considers itself authorized to proceed with the Reorganization Plan despite those Congressional restrictions because, in its view, the FY2026 Appropriations Acts' requirement of committee approval is an unconstitutional legislative veto under *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919 (1983).[28]  But USDA cannot invoke *Chadha* to convert a clear Congressional *prohibition* into affirmative authorization.

It would, of course, be unconstitutional to purport to *authorize* spending for a reorganization, relocation, or restructuring plan without requiring "passage by a majority of both Houses and presentment to the President."  *Chadha*, 462 U.S. at 958.  But that is not what these statutes do: rather, in laws that *were* bicamerally enacted and then signed by the President, Congress *prohibited* the agency from using funds appropriated for fiscal year 2026 for reorganization or staffing reductions unless affirmatively approved by Congress.

Even if the future committee approval condition did raise a *Chadha* concern, that provision would be severable, consistent with Congressional intent—which would leave intact Congress' prohibition on the use of funds to reorganize.  Severability is a two-part test that asks whether the remainder would be fully operative and consistent with the intent of Congress.  *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987).  First, the *prohibition* on the use of funds to reorganize (drafted as a prohibition with a conditional exception) is legally operative whether or not the notice-and-approval clause is ever invoked.  Second, severing the statute to leave the prohibitions intact ensures "the statute will function in a manner consistent with the intent of Congress," *id.* at 685, which, by the plain text, prohibits reorganization.

Defendants' position—that the prohibition would be lifted and the actions therefore affirmatively authorized if the Administration merely *notifies* the Congressional committee—is untenable given this prohibitory statutory language and legislative history, and would invert the balance of power Congress set up.  Congress knew of, and repeatedly rejected, USDA's view that

---

[28] On June 5, 2026, USDA Deputy Secretary Vaden wrote to Senator Van Hollen justifying the USDA Reorganization on this ground.

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

32

notification alone, without further congressional approval, should be sufficient to permit the use of funds to carry out a reorganization, elimination of programs, or downsizing of staff.[29]  The legislative record is also replete with evidence that Congress rejected the executive branch's requests to use fiscal year 2026 appropriations to downsize the federal government in general and these agencies in particular.  *Supra* at 4-5.  This Court should reject the proposition that Congress authorized USDA to act by way of laws that prohibit the very actions USDA is now taking.

### 3. The Reorganization Plan Interferes with USDA's Mandated Functions.

USDA's actions to implement the Reorganization Plan will necessarily degrade USDA components' capacity to the functions required and authorized by Congress described above. *Supra* at 10-27.  To give just a few examples: expected 80% attrition at FNA will gut the agency's ability to timely and accurately administer SNAP, WIC, and 14 other statutory nutrition assistance programs, *see supra* at 13, including putting it at immediate risk of being unable to calculate state SNAP contributions, 7 U.S.C §2013(a)(2)-(3), §2025(c)(1)(A)(i), (8)(C), or to establish mandatory disaster waivers and emergency response, *id.* §2014(h)(1).  *See* Rosenthal Decl. ¶¶34-46; Long Decl. ¶¶13-24.  Attrition expected at the research agencies will significantly impair a wide variety of congressionally mandated and funded research.  *See supra* at 18.  And the loss of key personnel at Forest Service Regional Offices will hamstring the agency's capacity to fulfill its statutory mandates to "make provisions" to protect national forests "against destruction by fire," 16 U.S.C. §551, and carry out the National Forest Inventory and Analysis Program, *id.* §1642(e); *supra* at 22-23.  Attrition within FAS will mean that the agency cannot fulfill its statutory mandate, which requires 1) acquiring information pertaining to trade; 2) carrying out market promotion and development activities; 3) providing technical assistance; and 4) carrying out other authorized programs like Food for Peace. 7 U.S.C. § 5693; Bradley Decl. ¶¶39.

The Ninth Circuit and this Court previously recognized the "serious questions going to the

---

[29] USDA has previously proposed that Congress delete §716 to provide the Secretary greater "flexibility," with the Department merely "informing the Congress in sufficient time of any reprograming plans," Levy Decl. Ex. M at 7, and again proposed a FY2026 budget without §716's language, *id.* Ex. N.  Congress rejected that approach and enacted §716; *see also* S. Rep. 119-46 at 13 ("remind[ing agencies] that no reprogramming shall be implemented without [] advance approval").

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

merits" as to whether federal agencies will be "prevented from fulfilling their statutory duties" by workforce reductions. *AFGE*, 139 F.4th at 1034–35; ECF 85 at 10; ECF 124 at 11. The attrition that will be caused by USDA's forced relocations is on par with the RIFs that were being implemented following OMB/OPM's original approval of ARRPs in spring 2025. Indeed, EO 14210 and the USDA ARRP *are being implemented through* these actions, as USDA admits, despite USDA's delays in implementation.[30] Such restructuring and workforce reduction that impedes or eliminates agencies' performance of their mandatory duties is contrary to law under the APA. *See, e.g.*, *New York v. Kennedy*, 789 F.Supp.3d 174, 209 (D.R.I. 2025) (directive "dismantling critical, statutorily mandated functions of the Agency" is "contrary to law").

### B.   USDA's Actions Are Arbitrary and Capricious.

USDA's Reorganization Plan and implementation of that plan are arbitrary and capricious for several independently dispositive reasons. USDA's actions: (1) rest on pretextual justifications that conflict with both USDA's own internal justifications and the evidence before the agency regarding widespread attrition; (2) fail to acknowledge or analyze the negative impacts on agency functions caused by these actions; (3) fail to consider known costs or less drastic alternatives; (4) fail to consider significant reliance interests; and (5) fail to consider the agency's statutory mandates.

The APA requires federal agencies to engage in "reasoned decisionmaking," *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020), which means that agency action must be both "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must "adequately consider[] all relevant factors," *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1232 (9th Cir. 1993) (citation omitted), and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, "[a]gency action is arbitrary and capricious when the agency 'relies on factors which Congress has not intended it to consider, entirely fails to consider an important aspect of the

---

[30] *See* Levy Decl. Ex. L (Rural Development press release, explaining restructuring is to further President's "Executive Orders" including on "workforce optimization").

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

34

problem, or offers an explanation for its decision that runs counter to the evidence before the agency.'" *Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 67 F.4th 1027, 1035 (9th Cir. 2023) (quoting *State Farm*, 463 U.S. at 43).

### 1. USDA's Public Justifications Contradict Its Actual Goals and the Evidence Before It.

USDA's reorganization is patently arbitrary because its public explanations regarding its reorganization are pretextual, and do not match either the agency's internal admissions or the evidence that its actions will cause widespread employee attrition. *See Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019) (agency cannot offer "explanation for [] action that is incongruent with what the record reveals about the agency's priorities and decision-making process."); *State Farm*, 463 U.S. at 43 (agency rule is arbitrary and capricious if agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency"); *Missouri Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003) ("Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking.").

USDA asserts that its Reorganization Plan "is not [] a large-scale workforce reduction." Levy Decl. Ex. B (Secretary Memorandum). And USDA publicly contends that any suggestion the reorganization is intended to "force employees to quit or leave" is a "myth." Levy Decl. Exs. O, P. But USDA's *internal* version of the Reorganization Plan reveals the opposite: USDA not only acknowledges that a high percentage of workers will resign, but uses that attrition to meet its reduction goals. *See supra* at 6-7 (ARRP acknowledging forced relocations will cause attrition and stating USDA will not backfill those positions on the way to achieving the agency's targeted workforce cuts); *see also supra* at 8 (███████████████████████).

An agency that provides a public explanation that contradicts its own internal rationale runs afoul of the APA's requirement to provide a reasoned explanation. *Dep't of Commerce*, 588 U.S. at 785 (holding agency action arbitrary and capricious because "we cannot ignore the disconnect between the decision made and the explanation given"). As the Supreme Court explained, "[t]he reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the

interested public.  Accepting contrived reasons would defeat the purpose of the enterprise." *Id*. The disjunction between USDA's private rationale and public explanation alone renders the Reorganization Plan arbitrary and capricious.

USDA's proffered explanation also runs "counter to the evidence before the agency" that the reorganization will lead to significant and widespread attrition.  *State Farm*, 463 U.S. at 43. USDA was aware at the time it created the ARRP and when the Secretary announced the Reorganization Plan that the Plan *is* structured to force employees to choose to leave.  *Supra* at 7. Moreover, mass attrition resulted the last time USDA tried to relocate agency workers en masse. *See supra* at 18 (2019 relocation of Economic Research Service and NIFA led to 75% attrition in relocated workers); *see also* Levy Decl. Ex. K at 15 (2019 BLM relocation led to 77% attrition). And unions and others presented significant evidence of likely attrition during the "public comment" period on the Plan following the public announcement of the Secretary's Memorandum. For example, AFGE and AFSCME (and others) explained that the Reorganization Plan would trigger "high anticipated rates of attrition" amounting to "a large-scale gutting of the department." Bradley Decl. Ex. A at 2; *supra* at 9; *see also* Kelley Decl. ¶8.

USDA also claims that its office relocations are justified by bringing "USDA closer to its customers."  Levy Decl. Ex. B. at 2.  But this too contradicts evidence before the agency and basic geography.  Many of these forced relocations take staff *farther* from the communities that they serve.  For instance, consolidating regional FNA employees who administer important food programs like SNAP and WIC into a handful of "hub" cities moves them away from their state and local government partners.  Garrett Decl. ¶¶10-13; Long Decl. ¶¶26-29; Salvatore Decl. ¶21. Closing on-site Forest Service research stations transfers researchers away from the unique ecosystems that they are studying or managing, as does sending Regional Office employees to distant "service centers."  Ehrman Decl. ¶¶ 9-10; Prendeville Decl. ¶¶8-11, 22.  Moving much of the Foreign Agricultural Service to Kansas City, Missouri, will make it harder for the agency to work with other federal agencies, national trade groups and associations, embassy representatives,

and international trade partners, all of which have a presence in D.C.  Bradley Decl. ¶¶8-11.[31] Bradley Decl. ¶¶8-11.

In light of USDA's internal goal of forced attrition and the evidence plainly before the agency, the proffered justifications for the Reorganization Plan appear to be no more than pretext. *See Dep't of Commerce*, 588 U.S. at 786 (rejecting "pretextual" rationale that "seems to have been contrived"); *see also AFGE* v. *OPM*, 2025 WL 660053, at *5 (N.D. Cal. Feb. 28, 2025) (pretextual letters purportedly discharging probationary employees for performance issues were arbitrary and capricious).  Accordingly, the Reorganization Plan is arbitrary and capricious.

### 2. USDA Failed to Assess Any Impacts of Attrition on Agency Function

Because USDA denies the significant workforce attrition that will result from its actions, it has also provided no coherent analysis of the consequences of that attrition on agency functions— either when USDA finalized the Reorganization Plan in 2025 or by the time it began implementing that Plan in 2026.  *See Woonasquatucket River Watershed Council v. USDA*, 778 F.Supp.3d 440, 471 (D.R.I. 2025) (agency action was arbitrary and capricious where "[n]othing from … [the agency] shows that they considered the consequences of their [actions]").  USDA has thus unlawfully failed to address an important aspect of the problem before it.  *Center for Biological Diversity*, 67 F.4th at 1035.

USDA is well aware of the impact that the attrition caused by the Reorganization Plan will have by reducing capacity for agency services and functions.  The 2019 relocation resulted in decreased research output and caused delays in grant funding.  *See supra* at 18.  AFGE and AFSCME's comments explained how the Reorganization Plan "threatens to permanently degrade USDA's ability to deliver science-based solutions to the climate crisis, global food insecurity, farm resiliency and economic development in rural America."  Bradley Decl. Ex. A at 3-8.  Other unions likewise submitted survey evidence and information showing that the reorganization would impair

---

[31] AFGE and AFSCME's comments explained the work of FAS and why it made no sense to relocate, yet USDA did not mention FAS once, in either the Secretary Memorandum or summary of the comments submitted in response, before announcing the reorganization of FAS on June 17.  Bradley Decl. ¶¶14-15.  The same is true for the other agencies represented by AFSCME. Hoekema Decl. ¶¶14-16; Vaughn Decl. ¶¶12-13.

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

USDA programs, including that the FNA relocation will "destroy FNS' capacity to fulfill its mission to ensure the nation has access to nutritious food."  Rosenthal Decl. ¶46; *see also* Mei Decl. ¶37.  And USDA's summary of public comments shows that it was inundated with similar evidence that staff loss would destroy its ability to function.[32]

But at no point has USDA ever acknowledged, let alone grappled with, this evidence. USDA did not analyze or address the reorganization's likely impact on agency functions in its ARRP or public Secretary Memorandum in 2025.  *Dep't of Commerce*, 588 U.S. at 785; *Woonasquatucket*, 778 F.Supp.3d at 471.  Nor did USDA conduct any reasoned analysis of the impact of attrition in response to the overwhelmingly negative comments it received about these plans in 2025.  Indeed, USDA's summary of the public comments did not engage with the negative comments at all; it simply recited them verbatim for 31 pages.  Levy Decl. Ex. G.  More recently, USDA has baldly continued to insist that there will be "no disruptions to benefits or service" and that "frontline services … will continue uninterrupted."  Levy Decl. Exs. P, I.

USDA's "vague and limited articulations do not justify agency defendants' drastic, out of the ordinary actions."  *AFGE v. OMB*, 807 F.Supp.3d 1004, 1035 (N.D. Cal. 2025).  USDA has not explained how services and functions will continue unimpacted, or how any impacts will be addressed.  Its failure to address or account for impact on agency functions that will be caused by the staggering workforce reduction that it expects to (and hopes will) occur is neither reasonable nor reasonably explained.  *FCC*, 592 U.S. at 423; *see Abramowitz v. Lake*, 2026 WL 746989, at *11 (D.D.C. Mar. 17, 2026) (staffing reductions arbitrary where agency decision "d[id] not mention, let alone analyze, whether [] staffing would permit the agency to comply with the [] standards and principles set by Congress").

### 3. USDA Did Not Grapple With Feasibility or Costs of Relocating Research.

USDA has also entirely failed to address the feasibility or impacts of trying to relocate research projects.  USDA claims that "[m]any BARC research projects will be moved closer to the

---

[32] Commenters expressed "concerns about the USDA's plan to retain skilled staff ... and ensure no lapse in mission-critical operations," Levy Decl. Ex. G at 7; and explained that "relocation and consolidation could lead to a significant loss of invaluable institutional knowledge and expertise, impacting long-term planning and program quality," *id*. at 17.

stakeholders they serve." Levy Decl. Ex. S. But the agency has not explained, nor even appeared to consider, whether potential relocation sites have the capacity to absorb BARC's research or the facilities and equipment needed to complete it. *See* Millner Decl. ¶¶17-23; Lamas Decl. ¶¶18-24; Lunney Decl. ¶19-23. USDA has also ignored the significant costs of shuttering BARC, both in wasting tens of millions of dollars of congressionally directed investments and in disrupting research, nor did it appear to consider less drastic measures such as consolidating research functions within a subset of the existing campus. Millner Decl. ¶¶24-27; Lunney Decl. ¶24-30. And USFS has also identified many research offices for potential closure without offering any analysis of whether research can be moved to other locations or conducted via more geographically dispersed employees, or the costs of doing so. In sum, USDA has not explained that it evaluated a range of measures or explained why it landed on the chosen course of action. *See San Francisco Unified Schl. Dist. v. AmeriCorps*, 789 F.Supp.3d 716, 754 (N.D. Cal. 2025) (reasonable decisionmaking requires "evaluat[ing] alternatives").

### 4. USDA Failed to Consider Important Reliance Interests

USDA cannot simply ignore reliance interests. *Dep't of Homeland Sec.*, 591 U.S. at 30; *Nat'l Urban League v. Ross*, 977 F.3d 770, 778 (9th Cir. 2020). An agency is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec.*, 591 U.S. at 33.

USDA did none of this. Despite public comments on the Reorganization Plan raising concerns, the agency did not "grapple with reliance interests at all." *New York*, 804 F.Supp.3d at 320; *see also Abramowitz*, 2026 WL 746989 at *12 (workforce reductions arbitrary where agency "does not account for reliance interests of the employees, the … public, or anyone else"). The thousands of federal employees facing relocation have weighty and cognizable reliance interests in their jobs, careers, paychecks, benefits, and research projects, as do their families. *See AFGE v. OMB*, 807 F.Supp.3d at 1037 (finding arbitrary agency's "failure to account for reliance interests of federal employees subject to RIFs"). Similarly, communities across the country rely on USDA programs and services impacted by this Reorganization Plan. For example, state and local agencies rely on FNA staff to allocate operating funds and help implement food assistance programs, and

low-income beneficiaries rely on the food benefits provided.  *See supra* at 11; *New York v. Dep't of Justice*, 804 F.Supp.3d 294, 319 (D.R.I. 2025) (recognizing need to assess expectations of those receiving public benefits).  Local governments, agricultural stakeholders and American consumers rely on USDA agricultural research, including to improve food safety.  Millner Decl. ¶¶4-7.  Local governments and visitors to national forests and parks rely on USFS's fire prevention and response capacity.  *See supra* at 24; *see Massachusetts v. Nat'l Inst. of Health*, 770 F.Supp.3d 277, 308 (D. Mass. 2025) (impact on how universities formulate policy in expectation of consistent federal action was factor agency was required to assess).  Yet USDA addressed none of these interests.

### 5. The Reorganization Is Substantively Unreasonable

Finally, USDA's Reorganization Plan is substantively arbitrary and capricious because it impairs the agency's statutory mandates as set forth in Section I.A.3, *supra*.  *See, e.g.*, *Colorado v. U.S. Dep't of Health and Human Servs.*, 783 F.Supp.3d 641, 648 (D.R.I. 2025) (finding agency's action substantively unreasonable when it contradicted Congressional appropriation); *see also Multicultural Media, Telecom & Internet Council v. FCC,* 873 F.3d 932, 936 (D.C. Cir. 2017).

### C.  USDA's Actions Are Final for Purposes of the APA.

The USDA Reorganization Plan is a final agency action that is reviewable under the APA.  5 U.S.C. §704.[33]  To be final, an "action must (1) 'mark the consummation of the agency's decisionmaking process' and (2) 'be one by which rights or obligations have been determined, or from which legal consequences will flow.'"  *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997))*.*  USDA's Reorganization Plan is the culmination of USDA's decision-making.  USDA submitted and obtained OMB/OPM approval of its Reorganization Plan in the ARRP.  *See AFGE*, 139 F.4th at 1038-39 (holding that approved ARRPs are final agency action).  USDA then publicly announced that Reorganization Plan.  *Supra* at 8.  There is nothing "merely tentative or interlocutory" about the Plan.  *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 990-91 (9th Cir. 2025).

[33] Plaintiffs' *ultra vires* claims, of course, do not require final agency action. ECF 434 at 15 n.9.

The Ninth Circuit already found that "legal consequences … flow" from ARRPs.  *AFGE*, 139 F.4th at 1039.  That finding remains correct:  USDA's Reorganization Plan imposes the mandatory relocation or discharge of thousands of federal workers.  The Reorganization Plan also determines the rights and obligations of USDA's component agencies, including "authoriz[ing] and direct[ing] the actions necessary to effectuate the" reorganization.  Levy Decl. Ex. B at 1.  Even if there were previously any doubt as to the finality of the Reorganization Plan, USDA is now implementing the specific actions set forth in the Memorandum and ARRP.  *See supra* at 10-27.[34]

Each of the recent agency-specific USDA actions implementing the Reorganization Plan is also a final agency action.  *Supra* at 10-27; *see New York v. Trump*, 133 F.4th 51, 62-63, 67-68 (1st Cir. 2025) (OMB memorandum *and* agency implementing action were both "final agency action" under the APA).  This implementation is having real world, present effects on the agency, its programs, and its employees, and therefore is final agency action as well.

**II.    USDA Is Causing, and Will Continue to Cause, Plaintiffs Irreparable Harm**

Plaintiffs bringing this motion include labor organizations that represent affected employees at the various USDA agencies, local governments, and non-profit organizations, which face the same type of imminent threat of irreparable harm now that this Court previously recognized would result from the RIFs and reorganization actions in 2025.  ECF 85 at 37-38; ECF 124 at 44-45.  By causing workforce reduction and attendant impacts on agency functions and services, the irreparable injuries to Plaintiffs are akin to those previously recognized as irreparable by this Court—USDA simply waited until 2026 to begin its implementation of its ARRP.  *Supra* at 10.  And, given the scale of USDA's actions dismantling and moving programs and forced attrition, the harm is particularly irreparable, because it will likely be impossible to return the agency to its current state at end of this case.  ECF 124 at 24.

---

[34] That USDA held a public comment period after the Reorganization Plan's announcement does not render the Plan non-final.  Even at the time of the comments, the "possibility that an agency might reconsider … [would] not suffice to make an otherwise final agency action nonfinal."  *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012).  In any event, USDA *did not* reconsider, and the Reorganization Plan is surely final now, as corroborated both by USDA's failure to respond to comments on the Reorganization Plan and its agencies' implementation of exactly the same Plan. *Supra* at 38; *see, e.g.*, *Doctors for Am. v. OPM*, 793 F.Supp.3d 112, 139 (D.D.C. 2025) ("behavior" of "recipient agencies" indicated memo was final agency action (citation omitted)).

USDA's Reorganization Plan will harm Plaintiffs AFGE and AFSCME and the employees they represent at USDA and its component agencies. *Supra* at 10-27; Kelley Decl. ¶¶13-27; Vaughn Decl. ¶¶20-29; Bradley Decl. ¶¶20-26; Hoekema Decl. ¶¶18, 26-36; Dodson Decl. ¶¶15-18, 31, 40-41; Mitchell Decl. ¶¶22-26; Soriano Decl. ¶¶18-19, 24-25; Salvatore Decl. ¶¶10, 18, 23-24. USDA's actions will force these employees to choose between losing their employment or relocating (often substantial distances) away from their current residence, homes, communities (and potentially family members). Kelley Decl. ¶¶15, 23, 26-27; Vaughn Decl. ¶¶21-24; Bradley Decl. ¶¶28-29, 33; Dodson Decl. ¶31; Mitchell Decl. ¶22 (relocation means higher housing costs, infeasible custody arrangements, disrupting elder care). Many USDA employees, including AFGE and AFSCME members, will lose their jobs. Kelley Decl. ¶¶15, 23, 26-27; Vaughn Decl. ¶¶28-29; Bradley Decl. ¶¶35-36; Hoekema Decl. ¶25; Mitchell Decl. ¶22; Soriano Decl. ¶18. This loss of career, income, and benefits irreparably harms employees and the unions that represent them. ECF 124 at 45 ("widespread termination of salaries and benefits for individuals, families, and communities" rises to level of irreparable harm); *AFGE v. OMB*, 806 F.Supp.3d 1093, 1098 (N.D. Cal. 2025) ("Plaintiffs face loss of income, loss of healthcare, and possible relocation from their homes, all constituting irreparable harm"). As the Ninth Circuit recognized, "[b]ack pay does not reinstate entire agency offices and functions. It cannot account for harms resulting from loss of income in the interim or for gaps in health- and childcare that accompany job loss." *AFGE*, 139 F.4th at 1040; *Widakuswara v. Lake*, 779 F.Supp.3d 10, 37 (D.D.C. 2025).

The degradation of critical services that will follow from attrition will also irreparably harm the local government Plaintiffs. *Supra* at 10-27. For example, delays or disruptions in food benefits caused by attrition at FNA will increase demands on local government Plaintiffs and could result in delayed grants or funding. Leach Decl. ¶¶22-24; Rubardt Decl. ¶¶9-10; Williams Decl. ¶¶14-15; Brown ¶¶12-14. Local governments also face additional cost burdens and direct risks from fires and smoke if the Forest Service's firefighting capacity is diminished, as well as from the loss of ongoing land management partnerships. Williams Decl. ¶¶3-10; Crispen Decl. ¶¶2-3; Leach Decl. ¶¶25-38; Rubardt Decl. ¶¶17-18 (degradation of 350,000 acres of Baker-Snoqualmie National Forest lands within county); *see also* Williams Decl. ¶¶12-13 (local governments rely on

urgent USDA research on invasive species, including screwworm outbreak).  These harms are irreparable.  *See, e.g.*, *Rhode Island v. Trump*, 781 F.Supp.3d 25, 54 (D.R.I. 2025) (irreparable harm to states where federal action "disrupted ... services and programs" and "curtailed … technical assistance").

The non-profit Plaintiffs Western Watersheds, Coalition for National Parks, NRDC, AGU, Proposed Plaintiff Alliance, and their members will also suffer irreparable harm.  For instance, Plaintiff organizations have many members who live near and recreate in national forests and who will be harmed by the degradation in fire management and response capacities at USFS if the Reorganization Plan is implemented.  Molvar Decl. ¶¶6, 24-28; Iverson Decl. ¶¶15-17; Neubacher Decl. ¶¶5, 6, 9; Trujillo Decl. ¶7.  "[E]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014); *accord All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding irreparable harm where project would harm members' ability to "view, experience, and utilize" a National Forest).  Plaintiffs and their members also rely on research provided by USDA programs that are being reorganized and will lose significant numbers of expert scientists. Molvar Decl. ¶¶20-22; Neubacher Decl. ¶¶16-18, 22; Woodard Decl. ¶¶12-23, 33-34; Funkhouser Decl. ¶¶8-14; Rath Decl. ¶¶3-13.[35]  These harms are irreparable; the impacts on research caused by lost time and expertise and interruptions to long-running projects cannot be restored even if staff are eventually rehired.  Prendeville Decl. ¶¶10-11, 22-25 Woodard Decl. ¶¶31-34; *cf. Kennedy*, 789 F.Supp.3d at 211-12 (finding irreparable harm to states when laboratories they rely on are shuttered).

USDA's actions will also irreparably harm proposed Plaintiff National WIC Association's members, who face increased workloads and furloughs, layoffs, or reduced work hours when funding is delayed by understaffing at the federal level.  Machell Decl. ¶¶29-32.  The association also risks its own funding shortage if FNA staff do not timely fund a cooperative agreement (that

---

[35] Alliance and AGU also have members who are USDA employees and subject to irreparable harm in that capacity.  Cudahy Decl. ¶8; Shultz Decl. ¶7.

is, a funding grant) on which it relies. *Id.* ¶33-34. *Cf. Assoc. of Am. Univ. v. Dep't of Defense*, 792 F.Supp.3d 143, 177 (D. Mass. 2025) (reduction in federal grants is irreparable harm).

**III.    The Balance of Equities and Public Interest Support a Preliminary Injunction.**

The equities and public interest, which merge when the government is a party, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014), strongly favor Plaintiffs.  "There is generally no public interest in the perpetuation of unlawful agency action.  To the contrary, there is substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *AFGE v. OPM*, 813 F.Supp.3d. 944, 967 (N.D. Cal. 2025) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see AFGE*, 139 F.4th at 1030 ("[T]he government does not 'suffer by a temporary preservation of the status quo.'") (quoting ECF 85 at 39).  A further stay of these actions implementing these plans will not prejudice USDA, as the lawful business of these agencies can continue in its current form with the staffing Congress intended.  Nor are any of USDA's recent actions to implement this Reorganization irreversible, as agencies have just begun to send management directed reassignment notices to employees and created timelines for deadlines and implementation that span the rest of this year. *Supra* at 13, 14, 22, 27.

Moreover, in addition to the harm caused to Plaintiffs, USDA's actions are poised to cause considerable public harm as the forced attrition depletes its agencies' capacity to conduct important research, protect our forests, and, critically, help ensure that low-income women and children across the nation can eat. *Supra* at 10-27.  From research on bees that helps the entire country to fire prevention in the Pacific Northwest, the USDA's actions, secretly motivated by this Administration's holy grail of workforce reduction, are poised to have terrible, cascading effects. The public interest is entirely against this ill-considered and, indeed, disingenuous plan.

**IV.    The Court Should Order Relief Sufficient to Protect Plaintiffs and their Members During the Pendency of this Lawsuit.**

Plaintiffs seek a stay under 5 U.S.C. §705 and a preliminary injunction halting USDA from further implementation of the Reorganization Plan.  Plaintiffs have demonstrated harms across the full breadth of this Reorganization Plan, including the component agencies for which USDA has

initiated major reorganizations to date: FNA, ARS, ERS, NIFA, NASS, USFS, FAS, Rural Development, and the Farm Production and Conservation agencies. *Supra* at 10-27. Plaintiffs also represent employees impacted by remaining parts of the Reorganization Plan that USDA has not rolled out yet. Kelley Decl. ¶6; ECF 37-6 ¶¶25-37; ECF 37-46 ¶¶10-12; ECF 37-58 ¶¶25-26. A preliminary injunction and stay of further implementation of the Reorganization Plan are necessary to ensure "complete relief" to Plaintiffs. *See AFSCME*, 807 F.Supp.3d at 1043 (citing *Trump v. CASA*, 606 U.S. 831, 847 n.10, 851-52 (2025), and noting that the APA supports broad relief).

Such an injunction is prohibitory, which seeks to "maintain the status quo." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023) (en banc). The status quo is the "last, uncontested status which preceded the pending controversy," *Regents of the Univ. of Cal. v. Am. Broad. Cos.,* 747 F.2d 511, 514 (9th Cir. 1984) (quotations omitted), or, in other words, "the legally relevant relationship between the parties before the controversy arose," *FCA*, 82 F.4th at 684-85 (quotation omitted).

Because the status quo is measured at the time of the defendant's challenged action—not at the time that suit is filed, *see id.* at 685-86—the status quo here is before the implementation of USDA's Reorganization Plan began. But even if the latter measure were used, Plaintiffs' requested injunction would be prohibitory. The vast majority of MDR notices have not yet gone out, and even as to those that have, employees are not required to report to their new place of duty or be separated until at least late September. *Supra* at 13, 17, 22, 27. The movement, consolidation, and closure of offices have not yet taken effect. *Id*. Thus, the Court may enjoin implementation of the USDA reorganization under the standards applicable to prohibitory, not mandatory, injunctions.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion.

DATED: July 1, 2026                     Respectfully submitted,

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Corinne F. Johnson
Robin S. Tholin
Elizabeth Eshleman

Jessica Levy
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Corinne F. Johnson*

*Attorneys for All Union and Non-Profit Organization Plaintiffs*

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
Andrea Matthews (pro hac vice)
George M. Cumming (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org
amatthews@democracyforward.org
gcumming@democracyforward.org

By: */s/ Andrea Matthews*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC) and for Plaintiffs City of Chicago, IL; Martin Luther King, Jr. County, WA; Harris County, TX; and City of Baltimore, MD*

Jules Torti (pro hac vice)
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038

Erica J. Newland (pro hac vice)
Jacek Pruski (pro hac vice)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Tel: 202-579-4582

jules.torti@protectdemocracy.org
erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

By: */s/ Jules Torti*
_____

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*

Norman L. Eisen (pro hac vice)
Spencer W. Klein (pro hac vice)
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

By: */s/ Norman L. Eisen*
_____

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC)*

Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, D.C. 20001
Tel: (202) 639-6426
Sanghr@afge.org

By: */s/ Rushab Sanghvi*
_____

*Attorneys for Plaintiffs American Federation of Government Employees, AFL-CIO (AFGE) and AFGE locals*

Teague Paterson (SBN 226659)
Matthew Blumin  (pro hac vice)
AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C.  20036
Tel: (202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org

By: */s/ Teague Paterson*
_____

*Attorneys for Plaintiff American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL
UNION, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel: (202) 730-7428
steven.ury@seiu.org

By: */s/ Steven K. Ury*

*Attorneys for Plaintiff Service Employees International Union, AFL-CIO (SEIU)*

David Chiu (SBN 189542)
City Attorney
Yvonne R. Meré (SBN 175394)
Chief Deputy City Attorney
Mollie M. Lee (SBN 251404)
Chief of Strategic Advocacy
Sara J. Eisenberg (SBN 269303)
Chief of Complex and Affirmative Litigation
Molly J. Alarcon (SBN 315244)
Alexander J. Holtzman (SBN 311813)
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY FOR THE
CITY AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

By:  */s/ David Chiu*

*Attorneys for Plaintiff City and County of San Francisco*

Tony LoPresti (SBN 289269)
COUNTY COUNSEL
Kavita Narayan (SBN 264191)
Meredith A. Johnson (SBN 291018)
Raphael N. Rajendra (SBN 255096)
Hannah M. Godbey (SBN 334475)
OFFICE OF THE COUNTY COUNSEL

COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110
Tel: (408) 299-5900
Kavita.Narayan@cco.sccgov.org
Meredith.Johnson@cco.sccgov.org
Raphael.Rajendra@cco.sccgov.org
Hannah.Godbey@cco.sccgov.org

By: */s/ Tony LoPresti*

*Attorneys for Plaintiff County of Santa Clara, Calif.*

Christopher Sanders (pro hac vice)
General Counsel
Erin King-Clancy (SBN 249197)
Senior Deputy Prosecuting Attorney
OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
chrsanders@kingcounty.gov
eclancy@kingcounty.gov

By: */s/ Erin King-Clancy*

*Attorneys for Plaintiff Martin Luther King, Jr. County*

Sharanya Mohan (SBN 350675)
Eliana Greenberg (SBN 366319)
Toby Merrill (pro hac vice)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
sai@publicrightsproject.org
eliana@publicrightsproject.org
toby@publicrightsproject.org

By: */s/ Eliana Greenberg*

*Attorney for Plaintiffs Baltimore, MD, Chicago, IL,
Harris County, TX, Martin Luther King, Jr. County,
WA*

ABBIE KAMIN
Harris County Attorney
NEAL SARKAR
First Assistant County Attorney

PLFS. MEM. ISO PRELIMINARY INJUNCTION RE: USDA, No. 3:25-cv-03698-SI

SARAH J. UTLEY
Managing Counsel,
Affirmative and Special Litigation and Environmental
BETHANY DWYER
Deputy Division Director, Environmental
R. CHAN TYSOR (pro hac vice)
Senior Assistant County Attorney
Environmental Division
1010 Lamar, 11th Floor
Houston, Texas 77002
Tel: (713) 274 - 5150
chan.tysor@harriscountytx.gov

By: */s/ R. Chan Tysor*

*Attorneys for Plaintiff Harris County, Texas*

Ebony M. Thompson
Baltimore City Solicitor
Christopher Sousa (SBN 264874)
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel: (443) 610-8859
christopher.sousa@baltimorecity.gov

By: */s/ Christopher Sousa*

*Attorneys for Plaintiff City of Baltimore*