Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DECLARATION OF COLLIN BRADLEY** |

Declaration of Collin Bradley, No. 3:25-cv-03698-SI

## DECLARATION OF COLLIN BRADLEY

I, Collin Bradley, declare as follows:

1. I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am the President and a dues-paying member of the Foreign Agricultural Service Employees, Local 3976 of the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME Local 3976" or the "Union"). AFSCME Local 3976 is the exclusive bargaining representative for all non-supervisory civil service employees of the U.S. Department of Agriculture's ("USDA") Foreign Agricultural Service. I have served as the elected President of Local 3976 since March 5, 2026, taking over from Liliana Caetano Bachelder.

3. AFSCME Local 3976 is affiliated with District of Columbia District Council 20 of the American Federation of State, County and Municipal Employees ("AFSCME District Council 20"). District Council 20, through its constituent local unions like Local 3976, represents federal civilian employees in agencies and departments across the federal government. Both AFSCME Local 3976 and AFSCME District Council 20 are subordinate bodies of the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME International").  Membership in the Union is voluntary, and all members of AFSCME Local 3976 are also members of AFSCME District Council 20 and AFSCME International. All Union members pay voluntary membership dues, a portion of which are remitted to AFSCME International.

4. AFSCME Local 3976 represents a bargaining unit of approximately 275 employees at the Foreign Agricultural Service . These employees include Agricultural Economists, International Trade Specialists, Nutritionists, Trade Policy Analysts, International Science Advisors, Technical Assistance Specialists, International Market Specialists, and others.

5. AFSCME Local 3976 has represented bargaining unit employees at the Foreign Agricultural Service as their exclusive collective bargaining representative under federal law since 1994.

6. As President of AFSCME Local 3976, I serve as a primary point of contact between Foreign Agricultural Service management and the Union. I regularly monitor communications put out

by the Foreign Agricultural Service and USDA to understand potential impacts to bargaining unit employees. I am also in regular communication with bargaining unit employees so that I can stay abreast of any issues in the workplace.

7.    Both before and since becoming President of Local 3976, I have been employed by the Foreign Agricultural Service as an International Trade Specialist within the Credit Programs division. I have been employed at Foreign Agricultural Service for six years.

8.    The Foreign Agricultural Service is the foreign affairs arm of the USDA. The primary mission of the Foreign Agricultural Service is to enhance export opportunities for farmers and producers in the Unites States and to enhance global food security.  Foreign Agricultural Service employees work to advance opportunities for U.S. agriculture across the globe. The Foreign Agricultural Service is structured into four major program areas: 1) Trade Policy and Geographic Affairs; 2) Global Market Analysis; 3) Global Programs; and 4) Foreign Affairs. Additionally, the Foreign Agricultural Service maintains a Business Operations program area and offices under the Foreign Agricultural Service Administrator. Summaries of these different work divisions and the work of our bargaining unit employees are provided below:

    a.  **Trade Policy and Geographic Affairs**. This unit is focused on expanding and maintaining access to foreign markets by removing trade barriers and enforcing the rights of the United States. The Foreign Agricultural Service represents the United States diplomatically in a number of multilateral engagements with other countries and coordinates with other U.S. federal agencies. The Foreign Agricultural Service employees in this unit oversee export programs for dairy and sugar products and support trust funds aimed at allocating payments to domestic manufacturers of certain materials.

    b.  **Global Market Analysis.** This unit produces international market intelligence for U.S. policymakers and stakeholders, publishing public reports and maintaining databases. The core products that Foreign Agricultural Service employees contribute to include the World Agricultural Supply and Demand Estimates; the Production, Supply, and Distribution Online; the World Agricultural Production

Report and World Markets and Trade Report; and the Global Agricultural Trade System, among others. These reports are critical for preparing accurate forecasts that many stakeholders rely on.

c. **Global Programs.** This unit administers market development programs to expand markets for U.S. products overseas. This includes implementing a number of market development programs, export credit guarantees, and facilitating trade missions and shows. In addition, the Foreign Agricultural Service assists the Secretary of Agriculture in implementing technical and food assistance programs in developing countries. This includes overseeing programs such as Food for Peace (recently transferred to the Foreign Agricultural Service from USAID), the McGovern-Dole International Food for Education and Child Nutrition Program, and the Food for Progress Program. Employees in this area also oversee fellowship and exchange programs that facilitate technical assistance.

d. **Foreign Affairs.** This unit is focused on maintaining relationships with our foreign trade partners (i.e., other countries), and Foreign Agricultural Service employees in this division work closely with the State Department and embassy personnel.

e. **Business Operations and Office of the Administrator**: The Business Operations unit covers different program areas that relate to mission support and financial services including general services; human capital management; information technology; acquisition & program management; budget & planning division; and financial management. There are also teams housed under the Foreign Agricultural Service Administrator, which include the offices of: civil rights; compliance & security; customer engagement; communications & executive support; and legislative affairs.

9. My position falls under the Global Programs in the Credit Programs Division. Specifically, I work to support the Export Credit Guarantee Program and the Facility Guarantee Program which encourage commercial financing of exports of U.S. agricultural products by reducing financial risk. In my work, I interface with U.S. exporters, foreign importers, financial institutions,

and other federal agencies (e.g., the Department of Commerce, Export Import Bank of the United States, and the Small Business Administration). The majority of my contacts are located abroad or have a presence in DC.

10.    My position is not unique in this regard. Given that DC is the primary hub for diplomatic relations, it is the hub for a majority of our work. Although the primary goal of the Foreign Agricultural Service is to support U.S. farmers and producers, Foreign Agricultural Service employees do not tend to interface directly with these constituents, because our work contacts are abroad or here in DC as we work to advance diplomatic relations and strengthen markets for the U.S. agricultural industry internationally. For example, our funding and cost sharing programs are not to individual farmers, but to national trade groups, state agencies, and U.S. commodity cooperators. Many of these organizations maintain a footprint in DC. We also interface with large agricultural businesses and commodity trade associations, which similarly maintain a presence in DC. Another aspect of our work is working directly with our foreign service colleagues stationed in more than 80 U.S. embassies across the world. We also work with embassy representatives in DC and other international trade partners.

11.    As such, it makes sense that, historically, the Foreign Agricultural Service has been located in the National Capital Region since its inception. The Foreign Agricultural Service is currently headquartered at the South Building, located in downtown DC. With the exception of some bargaining unit employees who are working remotely pursuant to telework agreements or reasonable accommodations, the vast majority of bargaining unit employees work out of the South Building and live within the National Capital Region.

12.    On July 24, 2025, Secretary of Agriculture Brooke Rollins issued Secretary Memorandum 1078-015 entitled "Department of Agriculture Reorganization Plan," (herein "USDA Reorganization Memo"). The USDA Reorganization Memo announced a plan to consolidate and optimize functions within the USDA. Among the operational changes is a stated goal to retain no more than 2,000 USDA employees within the National Capital Region, an over 50% reduction of the USDA workforce in the National Capital Region. Pursuant to this goal, the Memo stated that the

Declaration of Collin Bradley, No. 3:25-cv-03698-SI                                                    4

USDA plans to relocate some employees from the National Capital Region to one of five regional hub locations across the country.

13. The USDA Reorganization Memo does not mention the Foreign Agricultural Service by name, nor does the Memo mention any areas of work specific to the Foreign Agricultural Service. The Union did not receive any communication from Foreign Agricultural Service leadership indicating that employees would be impacted by the announced reorganization until last week. In fact, given the nature of our work, which is focused on diplomacy and foreign affairs, we had expected we would not be.

14. On August 26, 2025, in response to USDA's requests for comments about the reorganization plan, AFSCME International submitted a joint comment with the American Federation of American Employees that, among other concerns, raised the fact that it would make little sense to move the Foreign Agricultural Service from the National Capital Region given the Foreign Agricultural Service's core functions. The letter also emphasized that relocation would lead to significant staff attrition. I have attached a copy of this letter here as **Exhibit A**.

15. On December 8, 2025, the USDA published a summary and analysis of feedback it received on its reorganization plan. Nowhere in the document does the USDA respond to concerns about the negative impact that relocation would have on the Foreign Agricultural Service. The USDA summary does not mention the Foreign Agricultural Service at all.

16. The Union did not receive any information about the Foreign Agricultural Service relocation until June 17, 2026, when the Foreign Agricultural Service circulated a News Release via email announcing a "reorganization of the Foreign Agricultural Service (FAS) to streamline operations, consolidate support functions, and bring employees and programs closer to America's agricultural heartland." The News Release was also posted to USDA's website at https://www.fas.usda.gov/newsroom/usda-announces-modernization-foreign-agricultural-service-strengthen-market-access-and.

17. The News Release states that "FAS [Foreign Agricultural Service] will establish an operational support hub in Kansas City, Missouri, and will begin a phased relocation of much of its

Washington, D.C.-based workforce to this new duty station and to USDA's George Washington Carver Center in Beltsville, Maryland, while a smaller Washington-based contingent will remain in Washington, D.C." This "smaller Washington-based contingent" would include "agency leadership, trade policy, market access negotiations, cooperator programs, and congressional and interagency engagement."

18.    Shortly after the News Release was circulated, the Union was informed of the reorganization via email. The email states that "FAS [Foreign Agricultural Service] will establish an operational support hub in Kansas City, Missouri, to bring select Washington, D.C.-based support roles and programs closer to the people and communities we serve in America's agricultural heartland." The email also states that initial steps will begin in Fiscal Year 2026 and continue into 2027.  The email did not indicate any specifics as to the employees or programs that will be relocated. The email also did not mention anything about employees being relocated to the George Washington Carver Center, which was referenced in the press release. Thus, it remains unclear whether any bargaining unit employees will be relocated to the George Washington Carver Center. What *is* clear is that some of us will be relocated to Kansas City.

19.    Later that day, Foreign Agricultural Service Administrator Whitley and Under Secretary Lindberg held an all-staff meeting to discuss the reorganization via Microsoft Teams. The meeting was short and no additional information was shared beyond what was communicated in the News Release.

20.    On Thursday, June 18, 2026, Foreign Agricultural Service management held "listening sessions" open to both bargaining unit employees and supervisors. I attended the majority of these listening sessions so that I could understand bargaining unit member concerns and learn any additional information about the reorganization.

21.    At these sessions, the Foreign Agricultural Service Administrator and Deputy Undersecretary responded to questions from employees about the reorganization. However, very few new details emerged, and instead, bargaining unit members grew even more confused and worried. For example, management indicated that program areas and divisions may be split between different geographies. Some employees had initially assumed that if they worked within one of the functions

named in the News Release as part of the "smaller Washington-based contingent," such as trade policy, they were less likely to be directed to relocate to Kansas City. The message received at the Listening Sessions contradicted that assumption.

22.    At the listening session, Foreign Agricultural Service management also informed employees that, if directed to relocate, individuals that work on a permanent remote basis pursuant to a reasonable accommodation will be required to move and then re-apply for their reasonable accommodation.

23.    When asked whether bargaining unit members would be eligible to obtain Voluntary Early Retirement or Voluntary Separation Incentive Payment in lieu of being relocated, management responded that they did not know.

24.    When asked whether employees would be able to voluntarily relocate, management responded that they did not know.

25.    When asked what the timeline for the reorganization would be, management responded that they could not share additional details.

26.    The result has been extreme confusion and stress. Immediately after the announcement of the Foreign Agricultural Service reorganization, I and other Union leaders began fielding questions and concerns from bargaining unit employees. Employees have expressed concern to me that that they will be directed to relocate as early as this summer, which would cause significant disruption to their work and their lives. They have also expressed numerous additional concerns, detailed below.

27.    Employees represented by the Union have expressed that the lack of any firm details about the reorganization makes it impossible to mitigate the disruption that such a quick turnaround move would cause. Employees expressed concerns about finding care for family members. Multiple employees mentioned that they are worried about finding schools and childcare options in a new city, with two employees specifically worried about finding educational opportunities for their children with cognitive disabilities. Other employees are worried about elder care; one person came to the Union explaining that their father has progressively worsening dementia and they are the only one able to take care of them; relocating an elder with dementia can be devastating for the elder, causing

Declaration of Collin Bradley, No. 3:25-cv-03698-SI    7

confusion. Not knowing where they will be directed to work is making these employees' decisions impossible, right now.

28. The majority of our bargaining unit is firmly rooted in DC. We have bargaining unit employees who have lived in the DC-area for decades. We also have bargaining unit employees who relocated to the DC-area specifically for their current job. Employees in both categories have built their lives in DC. Their families are here, their kids' schools, their doctors, their houses of faith, their community groups, their friends—the list goes on. Employees have made significant investments, such as purchasing homes in the DC area, based on the assumption that working for the Foreign Agricultural Service would require them to stay in the National Capital Region in the long-term. Now this expectation has been upended.

29. As a couple of illustrative examples of why moving is not feasible for bargaining unit members:

    a. One member shared that relocating across the country is not possible given the fact that they have joint custody of their child and the other parent is located in DC. The same member relies on a medical specialist in the DC area. As a result, this member has already started looking for new job opportunities outside of the Foreign Agricultural Service.

    b. Another bargaining unit member has a spouse that also works for the federal government and must stay in the DC area because the spouse's job is not eligible for relocation. They also have children in college here who pay the lower tuition available to state residents, and moving to another state would change their enrollment status to out-of-state, tripling the cost of tuition.

    c. Another bargaining unit member is expecting a new baby this year and is concerned that moving across the country would remove critical supports. Their spouse has an in-person job here in DC and cannot relocate to Kansas City for work, and they cannot afford to move and sacrifice that salary once the baby is born. They also are very concerned about housing, noting that they purchased their home with a 2.75% mortgage interest rate. Although housing prices might be

lower in Kansas City, given the current market rates, their monthly housing costs could increase significantly, creating financial strain.

d.  Another bargaining unit member expressed that they want to start planning a family but cannot make long term decisions without certainty about their career. They are concerned about being forced to leave the agency, which would mean losing their current insurance benefits and paid parental leave policy, which are essential to their plan to one day have children.

e.  Another bargaining unit member has a farm in Virgina. When asked about the impact of a potential relocation order, they emphasized the irony of being directed to relocate to be closer to farmers when a relocation order for them would mean leaving their farm.

30.  Although some bargaining unit members within the National Capital Region might be willing to relocate to the George Washington Carver Center if this ends up being an option, other employees have expressed to me that such a reassignment would introduce a prohibitively long commute. For example, for a bargaining unit member living in Virgina, it could take over three hours to get to that office, and given that the 2025 reorganization plan stated that the George Washington Carver Center is intended to be a temporary work site during the reorganization process and sold or transferred after, bargaining unit employees have expressed concern to me that they would be asked to make significant life changes so that they can report to the George Washington Carver Center only to get redirected to a new worksite shortly after.

31.  Bargaining unit employees who work remotely pursuant to a reasonable accommodation have also expressed to me that they are extremely concerned about relocation. These employees do not report to a physical office because of their covered disability. Now, however, they have been informed that they may nonetheless be directed to move, even if they won't end up reporting to that new office. Further, because individuals will be forced to reapply, their reasonable accommodation may be delayed or withheld. The reapplication process would be happening at the same time that employees would need to find new care providers in an unfamiliar geography. Some

employees in this category have expressed to me that they would therefore opt to leave the Foreign Agricultural Service rather than relocate, and I feel confident that is true for most such employees.

32.    Directing employees to relocate will also negatively impact professional development opportunities for bargaining unit employees. There is a strong culture at the Foreign Agricultural Service of being able to rotate within the agency and complete assignments within different Foreign Agricultural Service divisions. For example, one of the positions included in the bargaining unit is Foreign Service Trainee. Foreign Service Trainees complete rotations throughout the different areas of the Foreign Agricultural Service in order to prepare them to become foreign service officers. However, if these employees are directed to relocate to Kansas City, they will not have the same ability to work across Foreign Agricultural Service programs. Even if they are not ordered to relocate, the fact that functions at the Foreign Agricultural Service will now be split between different geographies also means that they will not have the same opportunities to work with all facets of the agency, inhibiting their training by limiting the programs they are exposed to.

33.    The relocation announcement impacts me personally outside my capacity as Union President. I work in the Credit Programs Division, which notably was not listed among the divisions that may stay in DC in the News Release. I am therefore forced to assume that my position will be relocated to Kansas City. However, if I receive such a relocation order, I will be forced to leave the Foreign Agricultural Service. My life is in Washington, DC. My husband works in the DC-area for a major defense contractor and cannot relocate. It would not make financial sense for our family to move for my position, especially because I would likely see a drop in compensation due to the corresponding change in locality pay.

34.    Leaving the Foreign Agricultural Service would break my heart because I love my job. I am committed to working in the public service and want to continue building my career at the Foreign Agricultural Service. I have dedicated significant resources to becoming an expert in my program area. However, it is simply not feasible for me to relocate to Kansas City. At the same time, I know the best place for me to be located to do my job well is within the National Capital Region, not Kansas City, which makes the prospect of being relocated even more frustrating.

35. I know that I am not unique in this regard, and that many bargaining unit members face similar dilemmas—they have shared this with me in the months since the initial Reorganization Memo. Be it needing to care for a sick parent, prioritizing having their children remain at the same school, or needing to stay in proximity to certain health or child care providers, there are a host of reasons that make it extremely difficult to leave DC. Bargaining unit members are understandably frustrated that they may be asked to make sacrifices in their personal lives when it is clear that being located in Kansas City would not improve the work of the Foreign Agricultural Service, and in fact would negatively impact their work. In addition to the mismatch between our constituencies and the office location, I am also concerned that fragmenting the agency across different geographies will make it more difficult for employees who do make the difficult decision to relocate to collaborate and get our work done.

36. Based on a survey we sent to bargaining unit members, the vast majority of employees would opt to leave the agency rather than accept a relocation assignment. Only 5% stated that they would definitely relocate to Kansas City, with 71% indicating that they would rather leave than relocate. I also know a number of bargaining unit employees have started looking for new jobs outside of the Foreign Agricultural Service.

37. Losing a majority of employees via attrition would be catastrophic to the work of the Foreign Agricultural Service. A decrease in staff capacity would be concerning in its own right, but it is especially concerning in light of the fact that our agency has already shrunk significantly. Over 100 employees have left the agency since the start of the second Trump Administration, availing themselves of the Deferred Resignation Program, Voluntary Early Retirement, or Voluntary Separation Incentive Payment. As a result, many programs are already understaffed. Any new attrition stemming from relocation orders will only exacerbate this staffing gap.

38. The staffing gap is especially concerning where we are in our funding cycle. Currently, the Foreign Agricultural Service is accepting applications for a number of our flagship programs including Food for Progress, McGovern-Dole, the Borlaug and Cochran Fellowship Programs, and our Fiscal Year 2027 trade promotion programs. These applications will be processed over the summer and then recipients will be announced in the fall, which is precisely the window

during which the Foreign Agricultural Service may begin relocating employees. The Foreign Agricultural Service has already had to recruit detailed employees from elsewhere in USDA to increase staff capacity to administer the application processes. I do not see a way for the Foreign Agricultural Service to continue to administer these programs if we see more drops in the number of employees at the agency. This puts billions of taxpayer dollars at risk of being misused due to lack of sufficient oversight.

39.    Under the Agricultural Trade Act of 1978, as amended, the Foreign Agricultural Service "shall assist the Secretary" in carrying out agricultural trade and international cooperation policy by: 1) acquiring information pertaining to agricultural trade; 2) carrying out market promotion and development activities; 3) providing agricultural technical assistance and training; and 4) carrying out the programs authorized under this chapter, the Food for Peace Act, and other laws.  I do not believe that the Foreign Agricultural Service will be able to carry out this mission once there is the significant attrition I am sure would result from implementation of the existing reorganization plan. Even if the agency hires replacements, there will be a tremendous loss in institutional knowledge about the complex programs we administer. The Foreign Agricultural Service employees have specialized subject matter expertise that will be difficult to replace, especially in geographies outside of DC that do not have the same pool of qualified candidates specializing in international affairs and trade.

40.    Attrition and the resulting loss of institutional knowledge will negatively impact Congressionally authorized grant and cost share programs, which account for billions of dollars in funding. These programs are critical, both in terms of promoting U.S. agricultural exports and enhancing global food security. One example is the Supplemental Agricultural Trade Promotion Program, which was authorized under the One Big Beautiful Bill Act. This program provides mandatory funding to strengthen U.S. agricultural export competitiveness and includes $285 million in mandatory funding per year beginning in Fiscal Year 2027. I do not know how the Foreign Agricultural Service will be able to administer a new program if there is significant attrition due to the reorganization.

41.    Attrition will also negatively impact the many stakeholders that rely on the Foreign Agricultural Service not just for funding, but for data and predictive analysis. As noted, bargaining unit employees contribute to reports that have a massive economic impact, such as the World Agricultural Supply and Demand Estimates, which is essential to farmers, agribusinesses, financial analysts, commodity research groups, brokerage firms, and a variety of other stakeholders. The report is downloaded millions of times each month, and is considered one of the most reliable resources on agricultural markets. Without adequate staffing at the Foreign Agricultural Service, I do not see how the agency can continue to produce the timely and accurate estimates that Americans rely on.

42.    Attrition will also negatively impact the Union. Members of our bargaining unit pay voluntary membership dues to the Union, which is the Union's overwhelming source of operational funding.  If the affected employees ultimately decide they must leave their positions because they cannot relocate, the Union's budget will be negatively impacted because of the loss of dues, and its bargaining power will be diminished because of the loss of members.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed June 29, 2026 in Washington, DC.

_Collin Bradley_

Collin Bradley

# Exhibit A



Lee Saunders
*President*

Elissa McBride
*Secretary-Treasurer*

**Vice Presidents**

Michael Avant Jr.
*Oakland, CA*

Jody Barr
*New Britain, CT*

Mark Bernard
*Boston, MA*

Ron Briggs
*Latham, NY*

Lester Crockett
*New York, NY*

Connie Derr
*Albuquerque, NM*

Shannon S. Douvier
*St. Cloud, MN*

Craig A. Ford
*Newark, NJ*

Henry A. Garrido
*New York, NY*

R. Sean Grayson
*Worthington, OH*

Veronica L. Gunn
*Vernon, CA*

Johanna Puno Hester
*San Diego, CA*

Kelly Indish
*Flint, MI*

Corey Hope Leaffer
*Portland, OR*

Roberta Lynch
*Chicago, IL*

Christopher Mabe
*Westerville, OH*

Jessica Martinez Santos
*San Juan, PR*

Sue McCormick
*Duncansville, PA*

Douglas Moore Jr.
*San Diego, CA*

Charmaine S. Morales
*San Dimas, CA*

Patrick Moran
*Baltimore, MD*

Michael Newman
*Chicago, IL*

Jeff Ormsby
*Lexington, TX*

Debbie Parks
*Hamilton, NJ*

Lloyd Permaul
*Baton Rouge, LA*

Randy Perreira
*Honolulu, HI*

Michael Rivera
*Rochester, NY*

Joseph P. Rugola
*Columbus, OH*

Paul Spink
*Milwaukee, WI*

Mary E. Sullivan
*Albany, NY*

Tom Tosti
*Plymouth Meeting, PA*

Anthony Wells
*New York, NY*

Mike Yestramski
*Olympia, WA*

August 26, 2025

The Honorable Brook L. Rollins
Secretary
U.S. Department of Agriculture
1400 Independence Ave., SW
Washington, DC  20250

*Submitted via email to* [reorganization@usda.gov](mailto:reorganization@usda.gov).

**Re: Request for Comment on Department of Agriculture Reorganization Plan, Secretary Memorandum: SM 1078-015**

Dear Secretary Rollins:

The American Federation of State, County & Municipal Employees (AFSCME) and the American Federation of Government Employees (AFGE) are pleased to respond to the U.S. Department of Agriculture (USDA) request for comments on the USDA Reorganization Plan. As AFL-CIO affiliate unions representing thousands of USDA workers, we strongly oppose the reorganization plan and urge the administration not to relocate units and their staff, especially those units and their workforces described below whose presence at USDA headquarters is already maximally effective and efficient. If the department continues with a reorganization, we urge USDA to immediately halt the plan and reassess any reorganization only after completing a transparent process that includes consultation with Congress, state agencies, national and local partners, the USDA workforce (including AFSCME and AFGE) and the communities they serve. Ultimately, the law requires that reorganization of the USDA receive affirmative congressional authorization, and, in the absence of such authorization, the reorganization should not move forward. But to the extent the USDA is determined to proceed in the absence of congressional authorization, it should consider the specific concerns expressed below.

AFSCME members provide the vital services that make America happen. With 1.4 million members in communities across the nation, serving in hundreds of different occupations — from nurses to corrections officers, child care providers to sanitation

**American Federation of State, County and Municipal Employees, AFL-CIO**

TEL (202) 429-1000    FAX (202) 429-1293    TDD (202) 659-0446    WEB www.afscme.org    1625 L Street, NW, Washington, DC 20036-5687

workers — AFSCME advocates for fairness in the workplace, excellence in public services and freedom and opportunity for all working families. AFGE represents more than 800,000 federal and District of Columbia employees who work in almost every federal agency and every function of government. Combined, AFSCME and AFGE represent thousands of public servants who work every day on behalf of the American people as employees of USDA.

The work of USDA employees is essential for ensuring that American farmers, ranchers, foresters and others in the agriculture industry have access to the resources and programs they require; helping rural communities improve access to broadband; providing states and localities with the additional resources needed to fight wildfires and maintain forestland; maintaining a safe food supply; and administering essential nutrition programs to seniors, families, disabled Americans, veterans, students and young children in child care programs. Coordination among well-staffed D.C.-based headquarters office and field staff is crucial for advancing the agency's mission effectively and efficiently. This sudden reorganization plan imperils these vital services by threatening to upend the lives of thousands of workers who make them possible — which will result in the loss of extraordinary experience and expertise due to high anticipated rates of attrition — and also by eviscerating essential connections between USDA political appointees at D.C. headquarters and agency staff at field offices around the country.

Overall, USDA's reorganization plan does not appear to be based on a well-reasoned and substantiated analysis. For example, to justify the reorganization and resulting staff cuts, USDA has suggested that the agency's workforce and salary growth, of 8% and 14%, respectively, over the last four years was excessive — but this growth lags behind that of the private sector over the same period. From January 2021 to January 2025, private sector jobs grew 11.83% and average hourly earnings in the sector grew 19.75%.[1] Furthermore, the memo states that more than 15,000 USDA employees have "voluntarily elected deferred resignation" as a result of prior steps this year in "the Department's process of reducing its workforce." And the memo contemplates relocating about 2,600 positions. Yet the memo argues, "USDA is not conducting a large-scale workforce reduction" through this reorganization. That is not true. In light of USDA's relatively smaller workforce and wage growth over the long term compared with the private sector, its 15% workforce reduction as a result of department initiatives already undertaken this year, and anticipated attrition of staff who do not accept a geographic reassignment, any rational analysis of the plan would conclude that it is a large-scale gutting of the department.

USDA's assumptions about the attrition that will result from the mass relocation of positions are unrealistic and irrational. In commenting on the expected attrition during testimony before the U.S. Senate Committee on Agriculture, Nutrition and Forestry, USDA Deputy Secretary Stephen Vaden stated that he thought "a significant percent more than a majority [of affected

---

[1] AFSCME analysis of U.S. Bureau of Labor Statistics data retrieved Aug. 20, 2025, at https://data.bls.gov/multi-screen?survey=ce.

USDA employees] will come" when their positions are relocated outside the NCR.[2] This is contradicted by USDA's actual recent experience with relocating the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA) in 2019, which is discussed in more detail below. Internally, USDA itself assumed an attrition rate of 65% to 75% if ERS were to move outside the NCR — far more than what Deputy Secretary Vaden stated in his testimony — and indeed those forced position relocations resulted in both ERS and NIFA losing more than half its staff. This upheaval came with a significant, harmful loss of staff experience and, as a result, of research critical to the nation's agricultural industry.[3]

The memo is also wrong in arguing that the plan will save money. The administration argues that it will achieve cost savings by relocating staff from the National Capital Region (NCR) to five hub locations in North Carolina, Missouri, Indiana, Colorado and Utah. As the U.S. continues to experience record high vacancy rates of office buildings,[4] the memo fails to show how it is going to ensure that it can achieve this savings by selling federal NCR buildings in this high-vacancy area — and use that savings to add space in other geographic areas that are also experiencing high vacancy rates.

**The relocation and reorganization plan threatens the effectiveness of USDA programs benefiting farmers, ranchers and foresters.**

AFSCME members in the NCR are already positioned in the ideal location to maximize the effectiveness and efficiency of their job duties. It is critical that the agency not relocate their positions so that they can continue to serve the American people efficiently and effectively. It is also crucial for the agency to confirm which employees will remain in the NCR as soon as possible to reduce uncertainty over their future job locations. Such uncertainty could lead to unnecessary and harmful attrition for the agency as workers justifiably look for stability for their families by exploring alternate employment outside the agency.

AFSCME members employed in the Foreign Agricultural Service (FAS) help advance the administration's policies to expand U.S. agricultural and international markets for the benefit of American farmers, ranchers and producers. There is no reason for FAS workers based in the U.S. to work outside of the NCR, where they can more easily coordinate with other federal agencies

---

[2] "USDA says reorg disfavors layoffs, predicts most employees will accept relocations: A significant percent more than a majority will come" to new locations, Agriculture Department official says," Government Executive, July 30, 2025, https://www.govexec.com/workforce/2025/07/usda-says-reorg-disfavors-layoffs-predicts-most-employees-will-accept-relocations/407100/.

[3] "Agency Relocations: Following Leading Practices Will Better Position USDA to Mitigate the Ongoing Impacts on Its Workforce," Government Accountability Office, December 2022, Publicly Released January 13, 2023, https://www.gao.gov/assets/gao-23-104709.pdf.

[4] "A new working order: Reimagining offices in a hybrid world: US vacancy rate of office buildings sits at a historic high four years after COVID-19 upended the industry," Moody's, Sept. 10, 2024, https://www.moodys.com/web/en/us/insights/data-stories/us-commercial-real-estate-vacancies-downtown-vs-suburbs.html.

whose work, like that of FAS, focuses on international relations and continue to collaborate with FAS staff stationed in more than 80 U.S. embassies around the world. Moving FAS employees out of the NCR "to be closer to the people it serves" would directly harm U.S. farmers by moving these employees away from the actual locus of their core work. This is especially irrational at a time when America's greatly unsettled trading relationships are disrupting agricultural exports[5] FAS is not currently mentioned in the reorganization plan, and we urge USDA to maintain all FAS operations in the NCR so that these public servants can most effectively promote international markets for U.S. farmers.

AFSCME also represents NCR employees of the Farm Service Agency (FSA), Risk Management Agency (RMA), and Farm Production and Conservation (FPAC) Business Center. NCR-based AFSCME members employed by the FSA and RMA help establish and implement policies for the nationwide programs administered by these agencies; field staff, not these NCR-based staff, are responsible for engaging directly with the farmers, ranchers and others served by these programs. The FPAC Business Center is the operations center for political appointees and FPAC mission area staff, including the FSA, RMA and Natural Resources Conservation Service. These workers deliver core infrastructure services, such as budget, IT and financial management, and are a critical link, providing expert advice and services, between political appointees — who are required to remain in the NCR — and FPAC mission area offices and employees around the country, including county offices that by statute must remain in the counties. It would make no sense to move these USDA staff to five hubs scattered nationwide where they can be of limited use to political appointees who rely on them to be successful in their jobs supporting farmers, ranchers and foresters by helping coordinate nationwide activities. The attrition of these FPAC staff resulting from relocation would undermine the FPAC mission area nationwide. Farmers currently experience long wait times at understaffed USDA offices and often go months waiting for loan approvals or other FPAC benefits. Staff attrition and the attendant loss of expertise resulting from relocations would exacerbate these already long delays. Congress authorizes funds and other FPAC benefits for farmers to cope with ongoing natural and market challenges. However, without expert and efficient staff — like AFSCME members currently based in the NCR — to coordinate the programs and support delivery of the funds in close consultation with political appointees, many farmers may needlessly suffer.[6]  Neither FPAC, RMA nor FSA is currently mentioned in the reorganization plan, and we urge USDA to keep their current staff here in the

---

[5] "Ask an Economist: Why key agricultural trade partners are important for the farm sector and food prices: Associate Economist Ty Kreitman explores how major changes to trade relationships could lead to reduced agricultural revenue and higher prices for consumers.," TEN Magazine, Federal Reserve Bank of Kansas City, July 15, 2025, https://www.kansascityfed.org/ten/ask-an-economist-why-key-agricultural-trade-partners-are-important-for-the-farm-sector-and-food-prices/.

[6] "When USDA Cuts Staff, Farmers Pay the Price: Lessons from the ERS and NIFA Relocations," National Sustainable Agriculture Coalition, May 12, 2025, https://sustainableagriculture.net/blog/when-usda-cuts-staff-farmers-pay-the-price-lessons-from-the-ers-and-nifa-relocations/.

NCR so that they can continue to offer their considerable expertise to USDA, helping the agency to most efficiently and effectively serve U.S. farmers.

AFSCME members working in USDA Rural Development (RD) help improve the economy and quality of life in rural America. Those employed by the RD within the NCR work in the Rural Utilities Service (RUS), Rural Business Cooperative Service (RBCS), Office of External Affairs (OEA), Innovation Center (IC) and the Office of the Chief Risk Officer (OCRO). NCR-based employees of the RUS and RBCS process program applications, a function that is appropriately centralized and does not include interaction with public clients. Notably, RUS and RBCS already employ field staff located throughout the U.S. whose responsibilities include working directly with the public. NCR-based AFSCME members employed by the OEA, IC and OCRO similarly perform specialized jobs that are not public facing or do not require engagement with clients who would benefit from relocating these staff outside the NCR. Although the reorganization plan does not mention RD, if its NCR-based staff are required to relocate, it would come at a high cost due to the loss of many staff with specialized knowledge acquired through many years of service. We urge USDA to confirm that RD operations and positions currently in the NCR will remain there.

AFSCME also represents USDA employees who work in the Office of Hearings and Appeals (OHA), including the National Appeals Division (NAD) and the Office of Administrative Law Judges (OALJ). None of these offices are mentioned in the reorganization memo, and they provide quintessential headquarters functions that would suffer if positions are relocated outside the NCR. In particular, OHA/NAD brings to bear extensive experience and independence administering a fair, transparent and impartial mechanism to resolve challenges to benefits decisions made by administrative law judges from around the country, without direct interaction with local participants in the process. There is no reason to relocate these employees, given the nature of their work — which is based on impartiality, not closeness to particular constituencies — and every reason not to risk attrition of such a specialized and important workforce. We thus urge USDA to confirm that all OHA, NAD and OALJ operations currently in the NCR will remain here.

AFSCME members employed in the Office of Operations (OO) of the Headquarters Office provide centralized services to the USDA Headquarters and the George Washington Carver Center in the NCR, such as mail management, printing and internal customer service. These internal services are rationally and appropriately located in the NCR. Neither OO nor any of the functions it comprises are mentioned in the reorganization memo. We urge USDA to confirm that OO's operations in the NCR will remain there.

AFGE represents thousands of USDA employees around the nation at multiple USDA agencies and components, including, but not limited to, D.C.-based employees of the ERS, the NIFA and the Food Safety and Inspection Service (FSIS). ERS and NIFA are currently in the NCR

after a botched relocation in 2019.[7] The new threat of a relocation of ERS, NIFA and FSIS employees would pose a direct and catastrophic threat to our nation's food supply and to the farmers, ranchers and other agricultural interests who rely on USDA for a multitude of services. The ERS and NIFA are essential scientific agencies that conduct vital agricultural, climate and economic research. FSIS safeguards the safety of our meat and poultry supply. Forcing these employees to relocate under threat of job loss will destroy service delivery.

In his recent testimony to the Senate Agriculture, Nutrition and Forestry Committee, Deputy Secretary Vaden claimed that the department estimates attrition of less than half of the employees, but history teaches us that this is false.[8] USDA's 2019 relocation of ERS and NIFA to Kansas City resulted in a mass exodus of experienced scientists. It did not follow best practices for evaluating the relocation, underestimated costs and failed to account for massive attrition and disruptions to agency operations.[9] The GAO report shows that, before the relocation, USDA itself internally assumed an attrition rate of 65% to 75% if ERS were to move outside the NCR. Both ERS and NIFA lost more than half of their staff, taking years to recover and leaving years of research projects abandoned.

The relocation caused tenured staff losses that continue to have reverberating effects. Before the relocation, at the end of fiscal year (FY) 2018, the majority of ERS (84%) and NIFA (82%) permanent full-time staff had been there for more than two years.[10] However, because of staff departures and hiring in FY 2019 and FY 2020, by the end of FY 2021, the majority of ERS (66%) and NIFA (79%) permanent full-time staff had worked there for two years or less. The loss of experienced staff translated to declines in productivity and performance. As a result, both divisions cancelled or delayed vital reports on which the agricultural industry relies. In the immediate wake of the move, one USDA researcher described the impact: "It's a gap that we can't fill. We can't hire fresh Ph.D.s and fill that gap."[11]

---

[7] Bob Ortega, Kyung Lah, Allison Gordon and Nelli Black, "What Trump's war on the 'Deep State' could mean: 'An army of suck-ups'," CNN, April 27, 2024, https://www.cnn.com/2024/04/27/politics/trump-federal-workers-2nd-term-invs/index.html. "Evidence-Based Policy Making: USDA's Decision to Relocate Research Agencies to Kansas City Was Not Fully Consistent with an Evidence-Based Approach, GAO-22-104540," Government Accountability Office, April 21, 2022, https://www.gao.gov/assets/gao-22-104540.pdf.

[8] "USDA says reorg disfavors layoffs, predicts most employees will accept relocations: A significant percent more than a majority will come" to new locations, Agriculture Department official says," Government Executive, July 30, 2025. https://www.govexec.com/workforce/2025/07/usda-says-reorg-disfavors-layoffs-predicts-most-employees-will-accept-relocations/407100/.

[9] "Agency Relocations: Following Leading Practices Will Better Position USDA to Mitigate the Ongoing Impacts on Its Workforce," Government Accountability Office, December 2022, Publicly Released January 13, 2023, https://www.gao.gov/assets/gao-23-104709.pdf. Data in the remainder of this paragraph are from this report.

[10] "Agency Relocations: Following Leading Practices Will Better Position USDA to Mitigate the Ongoing Impacts on Its Workforce," Government Accountability Office, December 2022, Publicly Released January 13, 2023, https://www.gao.gov/assets/gao-23-104709.pdf. Data in the remainder of this paragraph are from this report.

[11] Jesse Naranjo, "200 ERS vacancies after Kansas City move," Politico, Feb. 27, 2020, https://www.politico.com/news/2020/02/27/200-ers-vacancies-after-kansas-city-move-117764.

-7-

The overall results of the relocation were devastating: The agency never fully recovered its full capacity. As of September 2024, ERS staffing levels remained 15% below pre-relocation levels.[12] This new relocation effort — far broader in scope — could repeat and amplify that damage, not just for ERS and NIFA, but also for FSIS and other critical mission areas, including those where AFSCME members are employed.

Across the agency, the reorganization plan threatens a repeat of the 2019 relocation upheaval — compounding the loss of irreplaceable expertise[13] that the department has already experienced this year. Federal scientists, economists, and public health experts will not simply pick up and move at the snap of a finger. Affected federal employees will consider the needs of their families and their community roots. Losing the deep knowledge that staff developed over the course of time while participating in longstanding institutional teams and systems will be enormously costly in terms of dollars and ability to carry out USDA's mission. This relocation plan will not "reposition" these employees, it will drive them out of public service altogether.

Many USDA workers facing relocation are nearing retirement or have spent decades building their expertise. Others are mid-career scientists who will be forced to abandon the federal mission entirely for private or academic jobs rather than uproot their families for lower pay in unfamiliar locations. Once lost, that talent cannot be replaced overnight — if ever.

The hollowing out of USDA's workforce is not a theoretical risk. It is a documented outcome, backed by workforce attrition data from the department's last relocation attempt. This plan threatens to permanently degrade USDA's ability to deliver science-based solutions to the climate crisis, global food insecurity, farm resiliency and economic development in rural America.

The memo's proposed closure of the Beltsville Agricultural Research Center (BARC) would be especially irrational. BARC is already a highly efficient and productive operation. According to USDA, BARC is the department's largest research facility, a world leader as a diversified center for agricultural research and the only research center in the Mid-Atlantic and Northeast.[14] Its closure will leave this large geographic area without a research center and will translate to the loss of decades of important long-term field studies and the potential shutdown of

---

[12] "When USDA Cuts Staff, Farmers Pay the Price: Lessons from the ERS and NIFA Relocations," National Sustainable Agriculture Coalition, May 12, 2025, https://sustainableagriculture.net/blog/when-usda-cuts-staff-farmers-pay-the-price-lessons-from-the-ers-and-nifa-relocations/. Data from FedScope, U.S. Office of Personnel Management, https://www.fedscope.opm.gov/.

[13] Andrea Hsu, "After paying people to leave, one federal agency is scrambling to fill positions," All Things Considered, National Public Radio, May 3, 2025, https://www.npr.org/2025/05/03/nx-s1-5384961/usda-deferred-resignation-federal-workers-aphis.

[14] "Celebrating 100 Years of Agricultural Research," USDA Ag Research Magazine, April 2010, https://agresearchmag.ars.usda.gov/2010/apr/research/.

the National Agricultural Library. Further, relocating other scientific research, e.g., the electron and confocal microscope facility, will be difficult and costly.[15]

The proposed closure of BARC is representative of another fundamental flaw in the proposed reorganization: It will not necessarily "bring USDA closer to its customers" since it will move thousands of USDA staff far away from the Northeast, Mid-Atlantic and West Coast states, which have abundant agriculture. Farmers' associations in these regions have raised the alarm that "there are only three regions being represented in this reorganization, meaning many regions of the country, including the Northeast, will very likely be less well served by USDA staff."[16] Moreover, as the largest agricultural producer in the nation, California, which has 11%[17] of U.S. receipts for all commodities, especially stands to lose USDA services. Mid-Atlantic states also produce a meaningful share of U.S. commodities: Combined, New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia and West Virginia have 5.4% of all commodities receipts. Without a regional office, they will also be left scrambling for USDA services.[18]

**The reorganization threatens the effectiveness of the USDA's food and nutrition programs and millions of individuals and families they serve.**

AFSCME members in state and county governments also serve millions of individuals and families in need of food assistance provided through USDA programs. They play critical roles in administering SNAP, school meals and the Special Supplemental Nutrition Assistance Program for Women, Infants, and Children (WIC). AFSCME also represents K-12 school food service workers who prepare and serve meals funded by the national school meal programs and home-based child care providers who, in order to feed children in their care, rely on Child and Adult Care Food Program (CACFP) funds tied to school meal programs. Further, many AFSCME members' families include individuals who are enrolled in these programs.

Effective and efficient administration of food assistance programs depends in part on timely, accurate support from USDA staff to the agencies that administer these programs across the country. For example, seven Food and Nutrition Service (FNS) offices provide the first line of technical support and guidance to state and local agencies regarding complex SNAP administrative provisions. In the coming years, there will be increased need for their support as state and local agencies implement changes in SNAP rules that were enacted in the One Big Beautiful Bill Act

---

[15] Eric Stokstad, "USDA reorganization will cut agricultural and forest research," Science Insider, July 25, 2025, https://www.science.org/content/article/usda-reorganization-will-cut-agricultural-and-forest-research.

[16] Maddie Kempner, "USDA Plans Major Reorganization: What's at Stake and How to Speak Out," Northeast Organic Farming Association of Vermont, NOFA-VT, Aug. 18, 2025, https://www.nofavt.org/about/blog/usda-plans-major-reorganization-whats-stake-and-how-speak-out#:~:text=Combined%20with%20recent%20staffing%20cuts,emailing%20reorganization@usda.gov.

[17] "Farm Income and Wealth Statistics - Cash receipts by commodity State ranking," Economic Research Service, U.S. Department of Agriculture, Feb. 6, 2025, https://data.ers.usda.gov/reports.aspx?ID=4058.

[18] "Farm Income and Wealth Statistics - Cash receipts by commodity State ranking," Economic Research Service, U.S. Department of Agriculture, Feb. 6, 2025, https://data.ers.usda.gov/reports.aspx?ID=4058.

-9-

and work diligently to lower their error rates to avoid having the federal government shift SNAP benefit costs onto them.

The reorganization plan, however, could weaken the nation's food assistance infrastructure if it disrupts the skilled, knowledgeable workforce that provides these support services. Relocating thousands of federal employees from the NCR and consolidating regional offices will result in an outsized loss of expertise and capacity. Delays in critical services and gaps in oversight are more likely when experienced staff with specialized knowledge resign or retire rather than move, and when critical offices needed for technical support are dismantled. Such losses also will likely delay the review and approval of key waivers or program management plans.

Struggling WIC state agencies that have already suffered staff losses will also feel the brunt of the reorganization. The National WIC Association reports that the administration's actions had already undermined the agency's capacity to deliver timely support to state WIC agencies, including the distribution of congressionally appropriated funds.[19] The plan will result in significant harm to the struggling WIC program and the low-income mothers and children it serves.

**The reorganization plan could jeopardize access to the information necessary to achieve robust agricultural, food and nutrition systems.**

The reorganization also requires the consolidation of Freedom of Information Act (FOIA) and "related information management functions" within the office of General Counsel. The FOIA program plays an important role in ensuring program integrity by allowing the public to stay informed about the federal government's operations, something that will take on greater importance if the USDA implements the proposed reorganization. While the memo does not address specific impacts to FOIA program staffing, we urge USDA to maintain staffing levels sufficient to efficiently and effectively serve the public. The proposed reorganization itself increases the need for a robust FOIA program to ensure the effectiveness of USDA operations.

**Conclusion**

AFSCME and AFGE urge USDA to revoke the reorganization. In the absence of such a revocation, we urge USDA to halt reorganization and call for:

1.      An immediate pause on all forced relocations and Reductions-In Force (RIFs) until comprehensive employee impact assessments and cost-benefit analyses are completed and reviewed by the relevant committees in Congress, and the legally required Congressional authorization for any relocation is provided. Specifically, we request that the administration halt all forced relocations and plans for any RIFs

---

[19] "National WIC Association Sounds Alarm on USDA Reorganization Plan, Warns of Harm to WIC and Nutrition Programs," National WIC Association, July 24, 2025, https://www.nwica.org/press-releases/national-wic-association-sounds-alarm-on-usda-reorganization-plan-warns-of-harm-to-wic-and-nutrition-programs.

-10-

for all of USDA, including the sub-agencies with the largest number of AFSCME- and AFGE-represented employees: the Foreign Agricultural Service, Farm Service Agency, Risk Management Agency, Farm Production and Conservation Business Center, Office of Operations, Office of Hearings and Appeals, including the National Appeals Division and Office of Administrative Law Judges, Rural Development Agency, the Economic Research Service, the National Institute of Food and Agriculture and the Food Safety and Inspection Service.

2.  Providing full transparency and bargaining with employee unions under federal labor law.

3.  Increasing agency investment in teleworking, flexible work arrangements and retention incentives, instead of mass relocations, to ensure the most efficient and effective possible USDA workforce.

Sincerely,

/s/ Dalia R. Thornton
Dalia R. Thornton
Director
Department of Research and
Collective Bargaining Services
American Federation of State,
County and Municipal Employees

/s/ Rushab Sanghvi
Rushab Sanghvi
General Counsel
American Federation of Government
Employees