Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchishom@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*
[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **DECLARATION OF LAURA DODSON** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

## DECLARATION OF LAURA DODSON

I, Laura Dodson, declare as follows:

1.     I am over 18 years old and competent to give this declaration.  This declaration is based on my personal knowledge, information, and belief.

2.     I am an Agricultural Economist at the Economic Research Service ("ERS"), which is an agency within the United States Department of Agriculture ("USDA").  ERS is USDA's principal social science research agency.  The economists at ERS work to predict trends and track emerging issues in agriculture, food, and the environment, with a particular focus on rural America.  We produce high quality research and economic analysis on consumer-side food products (including food safety and nutrition topics), commodities markets (domestically and globally), and farmer-side production (including rural population research and farm forecasts).

3.     As explained on the ERS website:[1]

**ERS research and analysis covers a broad range of economic and policy topics:**

**Agricultural Economy** – farm sector performance and farm households' well-being; farm size and concentration; market analysis, data, and projections on commodity supply, demand, and prices; and Federal farm policies

**Food and Nutrition** – U.S. food security, food and nutrition assistance programs, food choices and health outcomes, food access and store proximity, food retailing and marketing, and food prices

**Food Safety** – societal benefits associated with reducing food safety risks, economic impacts of food hazards, and potential results of regulation versus industry decisions

**Global Markets and Trade** – major markets and competitors, economic impacts of exports and imports, trade barriers, and potential trade agreements

**Resources and Environment** – economic impacts of conservation programs, efficacy of policies designed to protect the environment, and enhancing agricultural competitiveness through technology

**Rural Economy** – investments in rural communities and drivers of rural economic performance, demographic change and its impact on rural communities

---

[1] *About ERS*, U.S. Department of Agriculture: Economic Research Service (last accessed June 19, 2026), available at https://www.ers.usda.gov/about-ers.

The key clientele for the Service include, in addition to federal actors like Congress and other federal agencies, "State and local government officials; and organizations, including farm and industry groups."[2]

4.    I have worked as an Agricultural Economist at ERS since 2017.  I work on survey management and design as well as research on crop production, pesticides, and genetically modified organisms.  This includes research on the adoption of herbicide-tolerant and insect-resistant corn, cotton, and soybeans.

5.    I also serve as the Vice President of the American Federation of Government Employees Local 3403 ("AFGE Local 3403" or the "Union").  The American Federation of Government Employees, AFL-CIO ("AFGE"), is a labor organization and unincorporated association that represents approximately 800,000 federal civilian employees through its affiliated councils and locals nationwide.  AFGE Local 3403 represents researchers, scientists, and administrative employees across multiple agencies, including at USDA.

6.    Within USDA, AFGE Local 3403 represents employees at ERS and at the National Institute of Food and Agriculture ("NIFA").  I run the ERS unit of the Union, which represents Agricultural Economists, Research Economists, and other mission-enabling staff including publishers, social scientists, human resources and budget analysts, web technicians, and IT professionals.  As of June 4, 2026, we represent 147 ERS employees.  That number used to be higher, but 81 bargaining unit members left ERS over the past year through the Deferred Resignation Program and similar initiatives.  As of June 4, 2026, 43 bargaining unit ERS employees work in the National Capital Region, 60 bargaining unit ERS employees work in Kansas City, Missouri, and 44 bargaining unit ERS employees work remotely across the country.

**USDA Reorganization**

7.    On April 23, 2026, the ERS Administrator, Dr. Kelly Maguire, informed the Union that:

- ERS is restructuring from four divisions to three offices.

---

[2] *Id.*

- All positions that are currently outside of the National Capital Region will relocate to Kansas City.  Certain positions in the National Capital Region will relocate from Washington, DC to Kansas City.

- Specifically, for AFGE Local 3403, 22 ERS bargaining unit employees will remain in the National Capital Region, 23 ERS bargaining unit employees will be required to relocate from the National Capital Region to Kansas City, and 44 ERS bargaining unit employees will be required to relocate from their remote working location to Kansas City.

8.    On April 27, 2026, ERS Administrator Maguire sent ERS employees in the National Capital Region letters of intent announcing that as part of the USDA Reorganization Plan for the Research, Education and Economics ("REE") Mission Area, their position had been identified for relocation from their current duty station to Kansas City.  A true and correct copy of the letter of intent that I received informing me that my position was identified for relocation is attached as **Exhibit A.**

9.    The letters of intent that I and other colleagues received informed us that we will be subsequently sent a Management Directed Reassignment Letter, which will include additional details including the timeline to accept or decline the reassignment and the report date to the new location.

10.    On June 8, 2026, USDA began sending Management Directed Reassignment letters to non-Union ERS employees instructing them to report to Kansas City by September 21, 2026.  I am aware of these letters from conversations that non-Union staff have had with me and with other Union members (and have reviewed examples).  Those letters instruct the recipients to inform the agency within thirty days of receipt whether the recipients are accepting or declining the directed reassignment.  These non-Union ERS employees include certain HR employees and mid-level supervisory staff.  The SES staff in the Office of the Administrator are exempt from relocation.

11.    On June 18, 2026, USDA confirmed with the Union that employees will be provided a minimum of 30 days to respond to Management Directed Reassignment letters communicating a decision to accept or decline the reassignment.  Employees retain the right to

change their decision to accept or decline the reassignment at any time prior to the Friday before their report date.  The Mandatory Directed Reassignment letters will offer Voluntary Early Retirement Authority (VERA) and Voluntary Separation Incentive Program (VSIP) to those eligible.

12.	Employees who accept the reassignment will be required to report to Kansas City by the later of October 5, 2026, or 90 days after they receive the Management Directed Reassignment letter.  Employees who decline the reassignment will be involuntarily separated.

13.	On June 29, 2026, USDA sent affected ERS employees, including myself, Management Directed Reassignment letters.  USDA informed the Union that the letters were sent out to all affected ERS staff, and I have confirmed with other Union members that they also received a Management Directed Reassignment letter.  A true and correct copy of the Management Directed Reassignment letter I received is attached as **Exhibit B.**  It has been redacted to exclude my salary and personnel information.  The letter states that my position is being reassigned to Kansas City, Missouri, and that I will need to report there no later than October 5, 2026, if I accept the reassignment.  The letter states that if I decline the reassignment, I will be involuntarily separated.  The letter offers Voluntary Early Retirement Authority (VERA) (early out) and Voluntary Separation Incentive Payments (VSIP) (buyout) to all impacted employees, both retirement and non-retirement eligible.

14.	I predict 50-80% attrition from our bargaining unit employees who are required to relocate.

15.	The Union conducted a survey of the ERS bargaining unit in May 2026 (after receiving the letters of intent and learning from USDA that implementation was forthcoming at some point this summer).  I drafted the survey, and I sent it out to employees in the ERS bargaining unit.  In that survey, the Union asked what employees would likely do if they were issued a directed reassignment letter requiring them to relocate.  I analyzed the ERS responses, removing from my analysis respondents who were already in Kansas City.  Only 6% of the remaining survey respondents said they would relocate if required.  About 25% of respondents were unsure, and the other 69% of respondents would leave their ERS job rather than relocate.

DODSON DECLARATION, NO. 3:25-CV-03698-SI

16.    Recent history informs my understanding that this relocation will produce massive attrition. I worked at ERS in 2019, when the prior Trump Administration attempted to relocate the ERS and NIFA headquarters from the D.C. area to Kansas City. I was not directed to relocate, as the relocation plan was not as extensive as the current plan and it was deemed critical for my job to be in the National Capital Region to liaise with my colleagues in other parts of USDA. At that time, 76 positions (including economists, IT specialists, statisticians, dieticians, and social scientists) were allowed to stay in D.C. I knew many colleagues, however, who were directed to relocate to Kansas City and chose to leave their jobs instead. According to the Union's records, which I have reviewed, there were 325 budgeted positions filled at ERS at the time, with 76 slated to stay in the National Capital region, and only 18 employees (*only 7%* of those directed) ultimately moved to Kansas City as of September 30, 2019 (the report date for the relocated employees).

17.    After the forced relocation directive in 2019 left the agency depleted, USDA was forced to fill those positions. Some of those jobs were hired with employees in Kansas City but many were not. Indeed, the only reason why ERS was eventually able to hire sufficient numbers of qualified staff again was because in 2020 and 2021 the agency switched to permitting remote work due to the COVID-19 pandemic. Since 2020, the agency has relied on employees successfully working remotely from all over the country. The agency is not offering that option now. The administration already instituted a return to office policy and under the Reorganization Plan, rather than reporting to any USDA duty station across the country, ERS employees must relocate to Kansas City. Without a doubt, most people will leave USDA rather than relocate. Given the in-person work policy, unlike last time, ERS will suffer from being unable able to hire the same quantity and caliber of qualified individuals to replace those who leave. And even when the pandemic drove ERS to implement location flexibilities when it was hiring new staff in 2020 and 2021, recovery of ERS's productivity took years.

18.    In my experience working through that time period, even with the ability to hire remote workers, the substantial turnover caused by the 2019 relocation directive meant that the new ERS staff was less experienced. I knew dozens of highly experienced staff that left the

agency instead of relocating in 2019. In their place, the agency had to hire many individuals recently out of graduate school and invest substantial resources over the past five years to train them.

19. My experience was consistent with the results of December 2022 GAO report that conducted a performance audit of ERS from January 2021 to December 2022 to assess the impact of the 2019 ERS and NIFA Relocation. A true and correct copy of the U.S. Government Accountability Office's report, entitled *Agency Relocations: Following Leading Practices Will Better Position USDA to Mitigate the Ongoing Impacts on Its Workforce* (No. GAO-23-104709), which was published December 2022 and is available at https://www.gao.gov/assets/gao-23-104709.pdf, is attached as **Exhibit C.**

20. GAO found that ERS lost 121 permanent full-time staff members—over half its total staff—because of the relocation. Exhibit B at 13-14. GAO also found that 84% of ERS employees had over two years of service prior to the relocation, and even two years after the relocation, in 2021, only 34% had at least two years of service. *Id.* at 15-16.

21. Now that will happen again: the agency will lose experienced employees who are unwilling or unable to uproot their lives and will have to invest additional resources into training new hires.

22. Based on my experience and observations from my colleagues, the reduction in workforce in 2019 caused a decline in productivity. Fewer employees meant fewer surveys, fewer reports, slower responses to Congressional inquiries, less data available to state, local, and private stakeholders. For instance, there were many projects where the research had already been completed, but the researcher left ERS. A new ERS employee was then added, without any prior experience with the project, in order to be able to publish the research. Members of AFGE Local 3403 have shared with me how they were added as the only currently employed ERS author on a publication for which they had no prior experience, and for which they had to go back and validate the data, in order to shepherd the project through publication and ensure that the research would be shared with stakeholders. Moreover, the publication process itself was backlogged because our entire publishing staff except one woman left ERS rather than moving to Kansas City.

23.     My experience was consistent with the results of the GAO performance audit.  The GAO found "the number of ERS research reports issued and journal articles authored by ERS staff declined during fiscal years 2019 and 2020," and "[a]ccording to agency officials, ERS's decreased productivity was due to workforce decreases associated with the relocation."  Exhibit B at 19.

24.     I believe the same loss of productivity, or even worse, will occur as a result of this Reorganization Plan.  Because so few employees agreed to relocate in 2019 and because most new hires were remote, most of our workforce is not in Kansas City and would have to move to relocate there.  The likely high rates of attrition, as predicted by our survey, will once again mean the loss of substantial numbers of experienced economists.  Based on the letters of intent and directed reassignment letters that the agency sent out and other information they shared with the Union, I know that a smaller number of economists are being permitted to remain in the D.C. area relative to the 76 employees, like myself, who remained under the 2019 plan.  Thus, those experienced individuals who avoided relocation last time are very likely to leave, which will be a huge loss of expertise and institutional knowledge.

25.     Many of the economists at ERS are extremely specialized and perform unique work.  In production economics, a field vital for our agricultural economy, there are only a handful of researchers nationwide who work on farm productivity (i.e., assessing how much farm output changes with technological improvements and changes in management).  Total factor productivity is among the most important measures in agricultural economics, and it is only through measurements of total factor production that we can track the efficacy of research and development, which is particularly crucial to avoid catastrophic food supply issues in the coming decades due to climate change.  Of the six researchers who worked on this subject at ERS, three already left in the past year, two are directed to relocate, and only one is already in Kansas City.  If the two at ERS leave rather than relocate, their projects will end, and that loss of ongoing research on top of the earlier three departures will devastate the field.

26.     The relocation of ERS employees to Kansas City will hurt rather than help the agency.  I am aware of the April 2022 GAO report that analyzed the 2019 ERS and NIFA

Relocation and concluded that USDA's decision to relocate these agencies to Kansas City was not supported by an evidence-based approach. A true and correct copy of the U.S. Government Accountability Office's report, entitled *Evidence-Based Policy Making: USDA's Decision to Relocate Research Agencies to Kansas City Was Not Fully Consistent with an Evidence-Based Approach* (No. GAO-22-104540), which was published in April 2022 and is available at https://www.gao.gov/assets/gao-22-104540.pdf, is attached as **Exhibit D.**

27. GAO concluded that USDA's analytical process justifying the relocation to Kansas City was not consistent with its stated objectives of improving the agency's ability to attract and retain highly qualified staff, placing USDA resources closer to agency stakeholders, and reduce cost. *Id.* According to the GAO report, "USDA's economic analysis did not fully align with its stated objectives and excluded critical costs in its estimate of taxpayer savings." *Id.* at 12.

28. For instance, the GAO report found that "USDA may have limited its ability to achieve the relocation objective of attracting and retaining highly qualified staff and may have instead excluded MSAs with characteristics that would have made ERS and NIFA more appealing to existing and potential employees." *Id.* at 15. Notably, in analyzing the "workforce characteristics directly related to attracting and retaining highly-qualified staff," the GAO found that "the Washington-Arlington-Alexandria, DC-VA MD-WV MSA performed the same or better than the Kansas City, MO-KS MSA – the MSA ultimately selected — on each one of these three characteristics (percentage of population with a bachelor's degree, proximity to a land grant university, and university graduates with agricultural degrees)." *Id.* I am not aware of any indication that the agency has considered or accounted for those criteria during this reorganization.

29. Additionally, GAO found that in planning the 2019 relocation, USDA had overlooked the ERS employees estimated rates of up to 75% attrition from moving outside the national capital region. *Id.* at 15-16. In evaluating the purported cost savings of the relocation, GAO found that USDA failed to account for the costs and economic effects of expected employee attrition, including "losses of human capital and institutional knowledge when new employees replace experienced employees; hiring and training costs of new employees to replace old

employees; reduced productivity due to loss of experienced employees; and costs of disruptions to agency operations while full employment levels are reestablished." *Id.* at 18-19. I have seen no indication that the agency has accounted for the similarly high likely attrition losses of which our Union has warned. I believe USDA is failing to account for these factors once again in again directing ERS employees, and this time sweeping in even more employees than last time, to relocate to Kansas City.

30. The loss of experienced economists and their institutional knowledge will be substantial. For instance, over the past eight years, I have been the sole coordinator at ERS for a national survey run by USDA on farm production practices that supports the Cost of Production output that ERS is statutorily mandated to produce. Coordinating the survey requires significant technical knowledge about how farms operate as well as institutional knowledge about the interests of different stakeholders and researchers. The success of the survey also relies in substantial part on the relationships that I have built over the better part of a decade with all the disparate groups that contribute to, promote, and facilitate the survey. I am not aware of anyone else at ERS with the technical or institutional knowledge to run this project if I do not relocate to Kansas City. I am familiar with my colleagues' research projects at ERS, and the same thing is true of many of their projects as well.

31. Although I would like to keep doing my research, moving across the country to a new city would put a huge burden on my life. My current housing lease extends months past the October 1, 2026, relocation report day, and it would be a cost prohibitive expense to continue paying the remainder of the lease while also paying for a new lease in Kansas City. Moving also comes with significant challenges, not only in finding new housing, but also in finding medical care for my consistent oncology treatment.

32. A sampling of the research products that Union employees have told me are likely to be lost, delayed, or degraded as result of attrition from the relocation directive include: the farming sector annual reports, the farm income forecast, the weekly food price report, the regional food price index, the U.S. agricultural productivity data series, the food access research atlas, food safety research, research on the nutrition of food acquisitions, rural poverty and small businesses

development research, research on access to credit in rural areas, critical food demand data, conservation practices research, and cost of production data for major commodities.

33.     The research products serve a wide range of beneficiaries, including state and local governments and individuals and organizations in the agricultural/farming communities.  Land-grant universities, the extension stations (scientific research and outreach centers for translating a state's land grant university research to practical, everyday use) that are in most rural counties, commodities organizations (*e.g.,* corn, soy, wheat, cotton), commodity traders, other federal agencies, Congressmembers responding to constituent requests, and the House and Senate Agricultural Committees all rely on ERS research, but that research cannot get done without an ERS researcher to do the work.

34.     Some of the ERS reports have been specifically mandated by Congress and all of them are congressionally authorized.  For instance, ERS produces the Cost of Production report, which USDA is required to produce annually with information about what it will cost producers to make different commodities, *e.g.* corn, rice, cotton.  As required by statute, ERS also gathers and three times a year releases the Farm Income statistics, which reflects farm household wealth/debt and projections.  Those are just a few examples of the statutorily required reports and information that ERS produces.

35.     The research outputs will also be hurt by attrition at other USDA component agencies that are being forced to relocate as a result of the USDA Reorganization.  For instance, a reduced workforce at the National Agricultural Statistics Service will severely limit the data that ERS economists rely on for our analyses.  NASS conducts hundreds of surveys every year and prepares reports covering virtually every aspect of U.S. agriculture, which are then used by other USDA subcomponents.  For example, the Agricultural Resources Management Survey is created by NASS, which ERS uses for two Congressionally mandated research products: the Cost of Production (what it will cost producers to make different commodities, e.g. corn, rice, cotton) and Farm Income (monitors farm household wealth and debt with projections through the year).

36.     NASS also produces the Congressionally mandated Census of Agriculture, which is complete count of every farm, ranch, and operator in the United States, down to the number of

livestock animals and acres of crops harvested.  Congress, program agencies, state departments, land-grant universities, researchers, consultants and third parties all rely on this Census as a snapshot of where agricultural production is and for long-term analysis (as it has been collected since 1840).

37.    Throughout the growing season, NASS produces monthly Crop Production reports to forecast the nation's final yield (*e.g.*, how many bushels of soybeans we will get this year). They have a workforce that in the past has regional hubs working with biological sampling to get the estimates, but in the Reorg those hubs are getting shut down and moved around.  From my conversations with NASS employees at the regional hubs, they do not want to relocate and so anticipate their regions will have high attrition.  The NASS employees are responsible for creating the surveys, getting the results from the field, and working with the results to turn them into usable accurate statistics.  The likely high rates of attrition will impede all these steps with fewer people to design surveys, fewer people to collect results, fewer people to convert those results into usable data, and fewer people to check for accuracy.  ERS uses these estimates, for example, in our calculations of how productive farms are as well as for understanding genetic engineering adoption across the country.

38.    ERS employees have told me how the reorganization will disrupt existing in-person interagency collaboration that is already occurring within USDA locations.  One economist described to me how relocating experienced staff away from established research and policy networks risks weakening coordination, institutional knowledge, and the quality of policy-relevant research.  Another expressed that it will decimate USDA's ability to make evidence-based decisions because data quality will suffer, subject matter experts will be gone, and the remaining staff will not have the bandwidth to perform all the critical functions that are heaped on them.

39.    Losing the mission-enabling support staff will also have major consequences.  If these employees choose not to relocate, website operations could be significantly disrupted due to the loss of key personnel with specialized knowledge and responsibilities.  These employees support the posting of mission-critical reports, data products, and publications to the agency's

DODSON DECLARATION, NO. 3:25-CV-03698-SI

website; therefore, their departure would significantly hinder ERS's ability to disseminate these products in a timely manner and get information to the stakeholders that rely on it.

40.    As discussed, the relocation will force many Union employees to leave their jobs because their personal circumstances make them unable to relocate to Kansas City.

41.    For those who remain, their job will get significantly more difficult with substantially fewer people available to finish the ongoing projects and produce economic reports – some of which are Congressionally required and others which are vital for our nation.  Those who relocate will bear significant personal impacts, uprooting themselves and their families, and financial costs.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed June 30, 2026, in Bangor, Maine.

Laura Dodson

# Exhibit A

**USDA**
**United States Department of Agriculture**

Research, Education, and Economics
Economic Research Service

April 27, 2026

Dear Colleague,

USDA's Research, Education and Economics (REE) Mission Area has announced a comprehensive reorganization as part of the USDA Reorganization Plan. The Economic Research Service (ERS) is preparing to implement this reorganization to best position the ERS organization for continued long-term success. As part of this process, your position has been identified for relocation from your current duty station to Kansas City, Missouri. This letter reflects intention for your position to be relocated, what the reorganization means for you, information on what to expect moving forward, and resources available during this transition.

**Position Relocation Overview**
This reorganization includes changes in organizational structure and physical relocation of positions to improve coordination across agency operations and research programs and aligns the ERS workforce where it can have the greatest impact, long-term stability and success. Your expertise remains critical, and your continued contributions are essential to ERS and its mission.

**Key Information**
Your position will continue with ERS. This reorganization is a structural realignment, not a reduction in force.

You will receive Management Directed Reassignment (MDR) Letter.
The MDR will provide detailed information to include, but not limited to:

- Relocation destination
- Pay based on new locality
- Timeline to accept/decline the MDR
- Report date to the new location
- Relocation benefits
- Options if declining the MDR
- Specific work agreements will continue to be reviewed in accordance with agency policy and mission needs.

**Next Steps**

Expected next steps are as follows:

USDA is an equal opportunity provider, employer, and lender.

- Organizational structures, reorganization timelines and position assignments will be shared. You will be informed where your position will reside in the new structure.
- Employee specific management directed reassignment letters will be issued, and supervisors will discuss any impacts regarding reporting structures, duties, or workflows.
- Additional resources and guidance will be provided to employees to support smooth transitions into the new structure.

**Employee Support Resources**

These resources are available to you immediately:

- **Employee Assistance Program (EAP):** REE partners with Federal Occupational Health (FOH) for confidential support services. Visit the Employee Assistance AXON page or call (800) 222-0364. This resource is also available to your family.
- **Your Current Supervisor:** Your current supervisor is your primary point of contact and is available to discuss your questions. If your supervisor changes, your newly assigned supervisor will assume this role.
- **Reorganization Information:** REE Reorganization and Restructuring Information will provide updated FAQs, organizational details, and timelines.

This reorganization represents a significant transition for ERS. The work you do is fundamental to the agency's mission to anticipate trends and emerging issues in agriculture, food, the environment, and rural America.  Every position contributes to the strength and credibility of ERS.  To produce this important work, we need a strong team. Your experience, commitment, and expertise remain vital to our success, and your contributions will continue to shape the agency's ability to meet the needs of American agriculture now and in the future. ERS' organizational structure and the location of some of our activities may change, but our commitment to producing timely, accurate and useful information does not waiver.

I recognize that ERS has gone through a major transition before and many of you were instrumental in the rebuilding of the agency. Relocation is a personal decision. We honor your service and whatever path you choose, you will be treated with fairness, respect, and transparency throughout this process.

For general questions about the ERS reorganization. Submit your questions to ERS Ask a Question.

Thank you for your professionalism and your continued commitment to the ERS mission.

*Kelly Maguire*

Kelly Maguire
Administrator, ERS

# Exhibit B

**United States Department of Agriculture**
Research, Education, and Economics

June 29, 2026

<u>FOR OFFICIAL USE ONLY</u>

Laura Dodson
U.S. Department of Agriculture
Economic Research Service (ERS)
1400 Independence Ave, SW
Washington, D.C.  20250-2201

laura.dodson@usda.gov

Dear Laura:

The United States Department of Agriculture (USDA), Economic Research Service (ERS) maintains a policy of effective, efficient and balanced utilization of human and other resources to achieve program goals. Based on the USDA reorganization, your current position is being reassigned from Orono, Maine, to the following location:

**Position Title/Series/Grade**: AGRL ECONMST, ███████████
Salary:                                      ██████████████
Location:                              ERS
                                             805 Pennsylvania Ave
                                             Kansas City, Missouri 64105

*Salary is based on OPM's Locality Pay Table for the proposed position and location.*

This reassignment action does not affect your current appointment type or tenure. If you elect to accept this reassignment, your report date to the new location must be no later than **Monday, October 5, 2026**. If you'd like to voluntarily report sooner than the report date, please coordinate with your supervisor and with agency leadership after submitting your acceptance of the reassignment. You may obtain further details about the position from your point of contact, Brent Hueth, by email at Brent.Hueth@usda.gov or phone at 816-589-4702.

REE will be offering a choice to impacted employees regarding their moving or relocation expenses incurred in connection with this reassignment.  Employees will be able to select between the Traditional Relocation Method, or the Lump Sum Relocation Method, both with a 1-year service agreement. With the lump sum method, you may also elect an additional relocation incentive which requires a 2-year service agreement. Exact entitlement is determined on a case-by-case basis. Questions concerning relocation expenses may be directed to the Travel Policy and Systems Branch, Financial Management and Agreements Division, at FMADRelosupport@usda.gov.

REE has obtained approval to offer Voluntary Early Retirement Authority (VERA) (early out) and Voluntary Separation Incentive Payments VSIP (buyout) to all impacted employees both

2

DODSON, LAURA L

FOR OFFICIAL USE ONLY

retirement and non-retirement eligible.  The application to apply for both/either VERA or VSIP can be found on the eHRApps employee portal https://ehrapps.usda.gov/performance . This VERA/VSIP application should be submitted through eHRApps with the acceptance/declination of your directed reassignment.

**If you accept** this reassignment, your leadership will be notified, and you will receive information regarding relocation orders from the Travel Policy and Systems Branch of the Financial Management and Agreements Division. You will be asked to sign a one (1) year Service Agreement before any relocation benefits are paid.

**If your intention is to decline** this reassignment, I must inform you of the consequences of your declination.

- If you decline this reassignment, the agency may initiate an adverse action proposing your separation based on your declination. A separation based on failure to accept a directed reassignment, would be considered an involuntary separation for entitlements that may be available to you.

- If you are not retirement eligible (early or optional retirement), you may be eligible to receive severance pay based on your time in federal service and if you resigned after receiving the final removal letter.  Please contact the Human Resources Division with any questions at REE.Reorganization@usda.gov.

- If you are eligible for retirement and decline the directed reassignment and choose not to retire after receiving a final notice of removal, the Agency will separate you under Discontinued Service Retirement (DSR). Information about DSR can be found at https://www.opm.gov/retirement-services/publications-forms/csrsfers-handbook/c044.pdf. Please contact Retirement and Benefits, Human Resources Division at REE.Reorganization@usda.gov for questions regarding retirement.

You can calculate your approximate annuity using the Federal Retirement Benefits (FRB) Calculator at:  https://usdaree.connecthr.com/Login.aspx?ReturnUrl=%2f or request a calculation by contacting the Human Resources Division at REE.Reorganization@usda.gov.

If you accept this reassignment, but subsequently decline to report, the Agency will initiate an adverse action proposing your separation based on your declination. You may also be carried in an Absence Without Leave (AWOL) status beginning with the effective date of your directed reassignment until any decision to remove you from the Federal Service.

Depending upon the laws of your state, you may or may not be eligible for unemployment compensation. Please contact your local state unemployment office to determine your eligibility.

If you are a military spouse or believe you are eligible for an exception to the Return to In-person Work mandate issued by the President, you should indicate the need for consideration of your individual circumstances in eHRApps employee portal: https://ehrapps.usda.gov/performance or

DODSON, LAURA L

FOR OFFICIAL USE ONLY

by sending an email to REE.Reorganization@usda.gov. These cases will be considered on a case-by-case basis.

Should you decline this reassignment, you are eligible to participate in the Agency's Career Transition Assistance Program (CTAP). This program assists displaced and surplus employees to receive selection priority consideration for positions within USDA. Additionally, you may be eligible to participate in the Interagency Career Transition Assistance Program (ICTAP). This program assists displaced or surplus employees to receive selection priority consideration in other Federal agencies.

Please certify your decision to accept or decline this directed reassignment opportunity by visiting the employee portal in eHRApps: https://ehrapps.usda.gov/performance no later than **11:59 p.m. Eastern Daylight Time (EDT) on Wednesday, July 29, 2026.** If you accept the directed reassignment, further action to affect this reassignment will be coordinated through the Human Resources Division.

Failure to respond by **11:59 p.m. EDT on Wednesday, July 29, 2026** will be considered a declination of this reassignment opportunity.

If you have any questions concerning this reassignment, retirement eligibility, benefits, CTAP/ICTAP or your appeal rights, please contact the Human Resources Division, at REE.Reorganization@usda.gov.

We are looking forward to your continued contributions to the Agency and USDA Mission.

Sincerely,

Lorna Drennen
Chief Operating Officer
Research, Education, and Economics Mission Area

cc:

Brent Hueth
REE-Reorganization@usda.gov

# Exhibit C



**United States Government Accountability Office**

## Report to Congressional Requesters

**December 2022**

# AGENCY RELOCATIONS

# Following Leading Practices Will Better Position USDA to Mitigate the Ongoing Impacts on Its Workforce

GAO-23-104709



# Highlights

Highlights of GAO-23-104709, a report to congressional requesters

**December 2022**

# AGENCY RELOCATIONS

## Following Leading Practices Will Better Position USDA to Mitigate the Ongoing Impacts on Its Workforce

## Why GAO Did This Study

In response to a presidential initiative to move federal agency headquarters outside of Washington, D.C., in August 2018, the Secretary of Agriculture announced his decision to relocate ERS and NIFA. The agencies moved to Kansas City, Missouri, in September 2019. USDA's stated objectives for relocating the agencies included attracting and retaining highly qualified staff, but various stakeholders raised questions about the ability of ERS and NIFA to continue their missions after relocation.

GAO was asked to review USDA's relocation of ERS and NIFA. This report examines (1) the authorities and requirements that USDA identified for relocating ERS and NIFA, (2) the effect of relocation on the agencies' human resources and productivity, and (3) the extent to which the agencies followed selected leading practices for agency reforms and strategic human capital management.

GAO collected responses from USDA on legal requirements; reviewed a prior GAO report on this relocation; analyzed trends in the agencies' human resources, ERS's publications, and NIFA's grant timeliness; and compared USDA and agency actions to relevant leading practices for effective agency reforms and strategic human capital management.

## What GAO Recommends

GAO is making eight recommendations to USDA to more fully follow selected leading practices related to agency reforms and strategic human capital management. USDA generally agreed with these recommendations.

View GAO-23-104709. For more information, contact Steve Morris at (202) 512-3841 or morriss@gao.gov.

## What GAO Found

The U.S. Department of Agriculture (USDA) identified numerous legal authorities and requirements and took various actions in relocating two of USDA's research agencies—the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA). For example, USDA identified legal authority for the Secretary of Agriculture to relocate the offices and relied on certain regulations to select an appropriate site.

ERS's and NIFA's workforce size and productivity temporarily declined following the agencies' 2019 relocation from offices in Washington, D.C., to Kansas City, Missouri. Coinciding with the loss of staff in fiscal years 2019 and 2020, ERS produced fewer key reports, and NIFA took longer to process grants. By the end of fiscal year 2021, however, agencies' workforce size and productivity had largely recovered. Two years after the relocation, the agencies' workforce was composed mostly of new employees with less experience at ERS and NIFA than the prior workforce. In addition, a decline in the number of employees in certain protected groups persisted. For example, the proportion of Black or African American staff at NIFA declined from 47 percent to 19 percent (see fig.).

**Number of Permanent Full-Time Staff at NIFA, by Race and Ethnicity, at the End of Fiscal Years 2018 and 2021**



NIFA permanent full-time staff – end of fiscal year 2018

- 2 – American Indian or Alaska Native
- 5 – Multirace
- 10 – Hispanic or Latino
- 28 – Other races
- 109 – White
- 134 – Black or African American
- **288 – Total workforce**



NIFA permanent full-time staff – end of fiscal year 2021

- 3 – American Indian or Alaska Native
- 6 – Hispanic or Latino
- 11 – Multirace
- 18 – Other races
- 47 – Black or African American
- 161 – White
- **246 – Total workforce**

NIFA = National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data.  |  GAO-23-104709

Overall, USDA's actions leading up to and during the relocation of ERS and NIFA followed some, but not all, selected leading practices for effective agency reforms and strategic human capital management. For example, USDA minimally involved employees, Congress, and other key stakeholders in relocating the agencies. In addition, both agencies partially followed, or did not generally follow, many of the leading practices related to strategic workforce planning, training and development, and diversity management—practices that can help agencies meet their missions and strategic goals. By more fully following these leading practices as the agencies continue to rebuild their workforces, ERS and NIFA will be better positioned to address the impact of the recent relocation and any future relocations. Following these practices will also help agencies support workforce training needs and strategically plan for changes in their workforce composition.

_____ **United States Government Accountability Office**

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 5 |
| | USDA Identified Authorities Allowing the Relocation of ERS and NIFA and Requirements It Needed to Follow in Relocating the Agencies | 8 |
| | For 2 Years Following the Relocation, Agency Staff Levels and Productivity Declined and Then Rebounded, but Changes to Staff Composition Persisted | 13 |
| | USDA Followed Some, but Not All, Selected Leading Practices for Agency Reforms and Strategic Human Capital Management in Relocating and Rebuilding ERS and NIFA | 22 |
| | Conclusions | 37 |
| | Recommendations for Executive Action | 38 |
| | Agency Comments and Our Evaluation | 39 |
| Appendix I | Objectives, Scope, and Methodology | 42 |
| Appendix II | Key Tools Available to Congress to Oversee Proposed Agency Relocations | 48 |
| Appendix III | Additional Human Resources-Related Data | 56 |
| Appendix IV | Selected Leading Practices for Agency Reforms and Strategic Human Capital Management | 63 |
| Appendix V | Comments from the U.S. Department of Agriculture | 69 |
| Appendix VI | GAO Contact and Staff Acknowledgments | 71 |

Tables

Table 1: List of Legal and Other Authorities Identified by USDA Governing Relocation of ERS and NIFA    9

Table 2: List of Legal and Other Requirements Identified by USDA Governing Relocation of ERS and NIFA    10

Table 3: Extent the U.S. Department of Agriculture (USDA) Followed Selected Leading Practices for Agency Reforms in Relocating the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)    23

Table 4: Extent to Which USDA Research Agencies, the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA), Followed Selected Leading Strategic Human Capital Management Practices Before and After Relocation    30

Table 5: Processes and Actions Available to Congress That It Could Use to Oversee Proposed Agency Relocations (Summarized from the Congressional Research Service's *Congressional Oversight Manual*)    49

Table 6: ERS and NIFA New Hires and Estimated Departures of Permanent Full-Time Staff, for Fiscal Years 2018 through 2021    57

Table 7: ERS and NIFA Permanent Full-Time Staff, by Key Positions, Fiscal Years 2015 through 2021    57

Table 8: ERS and NIFA Permanent Full-Time Staff, by Permanent Duty Station, Fiscal Years 2018 through 2021    58

Table 9: ERS and NIFA Permanent Full-Time Staff, by Years of Service at ERS or NIFA, Fiscal Years 2015 through 2021    58

Table 10: ERS and NIFA Permanent Full-Time Staff, by Gender, Fiscal Years 2015 through 2021    60

Table 11: ERS and NIFA Permanent Full-Time Staff, by Age, Fiscal Years 2015 through 2021    60

Table 12: ERS and NIFA Permanent Full-Time Staff, by Veterans' Preference, Fiscal Years 2015 through 2021    60

Table 13: ERS and NIFA Permanent Full-Time Staff, by Self-Identified Disability, Fiscal Years 2015 through 2021    61

Table 14: Number and Percent of Competitive Grants Funded, by Four Dates, for the Fiscal Year Following the Grant Year for Fiscal Years 2015 through 2020 Grants    61

Table 15: Number of Capacity Grants Whose Appropriation Was Funded in Fiscal Years 2017 through 2021 That Received at Least One Payment, by Four Dates in the Same Year    62

**GAO-23-104709 USDA Workforce Relocation Impacts**

Table 16: Selected Leading Practices for Agency Reforms and Extent These Leading Practices Were Followed by the U.S. Department of Agriculture (USDA) in Its Relocation of the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)    63

Table 17: Selected Leading Practices for Strategic Human Capital Management and Extent These Leading Practices Were Followed by the U.S. Department of Agriculture (USDA) in Its Relocation, Before and After, of the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)    65

Figures

Figure 1: Timeline of Events Leading to the Relocation of ERS and NIFA from Washington, D.C., to Kansas City, Missouri    6

Figure 2: Number of Permanent Full-Time Staff at ERS and NIFA, as of the End of Fiscal Years 2015 through 2021    14

Figure 3: Number of Permanent Full-Time Staff, by Years of Service at ERS, as of the End of Fiscal Years 2018 and 2021    16

Figure 4: Number of Permanent Full-Time Staff, by Years of Service at NIFA, as of the End of Fiscal Years 2018 and 2021    16

Figure 5: Number of Permanent Full-Time Staff at ERS, by Race and Ethnicity, as of the End of Fiscal Years 2018 and 2021    17

Figure 6: Number of Permanent Full-Time Staff at NIFA, by Race and Ethnicity, as of the End of Fiscal Years 2018 and 2021    18

Figure 7: Number of ERS Products Issued, by Type of Product, Fiscal Years 2015 through 2021    19

Figure 8: Median Number of Days for NIFA to Process and Fund Competitive Grants for Grant Proposals Submitted in Fiscal Years 2015 through 2020    21

Figure 9: Number of Permanent Full-Time Staff at ERS and NIFA, by Race and Ethnicity, end of Fiscal Years 2015 through 2021    59

**Abbreviations**

| | |
|---|---|
| CBO | Congressional Budget Office |
| CREEMS | Cooperative Research, Education, and Extension Management System |
| CRS | Congressional Research Service |
| DEIA | Diversity, Equity, Inclusion, and Accessibility |
| EOI | Expression of Interest |
| ERS | Economic Research Service |
| GSA | General Services Administration |
| HR | Human Resources |
| NIFA | National Institute of Food and Agriculture |
| OIG | Office of Inspector General |
| OMB | Office of Management and Budget |
| OPM | Office of Personnel Management |
| USDA | U.S. Department of Agriculture |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**441 G St. N.W.**
**Washington, DC 20548**

December 14, 2022

Congressional Requesters

In June 2019, the U.S. Department of Agriculture (USDA) announced that it would relocate most staff positions at two of its research agencies—the National Institute of Food and Agriculture (NIFA) and the Economic Research Service (ERS)—from Washington, D.C., to the Kansas City region.[1] Once the announcement was made, affected ERS and NIFA staff had until the effective date of the relocation on September 30, 2019—approximately 4 months—to decide whether they would relocate to Kansas City or leave the agencies.

ERS and NIFA play key roles in USDA's mission to provide leadership on food, agriculture, rural development, and other issues while assisting farmers across the U.S. These research agencies supply information to farmers, ranchers, consumers, researchers, and communities and award grants to states, universities, and institutions. The mission of ERS is to anticipate trends and emerging issues in agriculture, food, the environment, and rural America and to conduct high-quality, objective economic research to inform and enhance public and private decision-making. ERS conducts research and analysis that covers topics such as food safety and nutrition, global markets and trade, and the rural economy for public and private decision makers, including USDA leadership. ERS employs mostly economists, who provide a variety of products that inform public and private decision-making in the agricultural sector.

NIFA's mission includes investing in and advancing agricultural research and education. In fiscal years 2021 and 2022, NIFA awarded approximately $2 billion annually to states, universities, and other institutions to conduct research and to fund educational programs for agriculture, the environment, human health and well-being, youth, and communities, according to USDA officials. NIFA employs scientists and management specialists who process grants for the land-grant university system and other organizations that work at the state and local level.

---

[1]According to this announcement, USDA anticipated that 294 of NIFA's 315 positions would relocate and that 253 of ERS's 329 positions would relocate, and the remainder would stay in the National Capital Region. The National Capital Region consists of the District of Columbia, the surrounding counties within the states of Maryland and Virginia (Montgomery and Prince George's counties in Maryland; Arlington, Fairfax, Loudon, and Prince William counties in Virginia) and the incorporated cities therein.

USDA first announced plans to relocate ERS and NIFA outside of the National Capital Region in August 2018. Soon thereafter, stakeholders raised questions about the ability of ERS and NIFA to continue their missions during and after a relocation. Some also questioned whether USDA's actions to relocate ERS and NIFA complied with legal requirements related to relocations. Similarly, some Members of Congress raised questions about the relocation's process and potential impacts and requested reviews of the proposed relocation by GAO and others.[2] Leading practices for agency reforms and strategic workforce planning are intended to help agencies effectively implement reforms and reorganizations.[3]

You asked us to review USDA's relocation of two of its research agencies, ERS and NIFA. This report (1) describes the legal and regulatory authorities and requirements that USDA identified for relocation of ERS and NIFA and what actions the department took in response; (2) describes how the relocation of ERS and NIFA affected the agencies' human resources and productivity; and (3) evaluates the extent to which USDA's relocation of ERS and NIFA, and these agencies' efforts since the relocation, follow relevant leading practices for agency reforms and strategic human capital management. We also describe key tools available for congressional oversight of relocations in appendix II.

To describe the authorities and requirements that USDA identified and what actions the department took in response, we collected written

[2]In April 2022, GAO reported on how USDA selected Kansas City, Missouri, as the new location for ERS and NIFA, including the analysis used to support this decision; see GAO, *Evidence-Based Policy Making: USDA's Decision to Relocate Research Agencies to Kansas City Was Not Fully Consistent with an Evidence-Based Approach*, GAO-22-104540 (Washington, D.C.: Apr. 19, 2022). As of December 2022, GAO has ongoing work on two legal decisions related to issues arising from the relocation. In 2019 and 2020, the USDA Office of Inspector General published two reports on the relocation: U.S. Department of Agriculture Office of Inspector General, *USDA's Proposal to Reorganize and Relocate the Economic Research Service and National Institute of Food and Agriculture*, Inspection Report 91801-0001-23 (Washington, D.C.: Aug.1, 2019); and *USDA Research Integrity and Capacity*, Inspection Report 84801-0001-22 (Washington, D.C.: Dec. 8, 2020).

[3]In this report, the term "reform" broadly includes any organizational changes—such as relocations, major transformations, mergers, consolidations, and other reorganizations—and efforts to streamline and improve the efficiency and effectiveness of government operations. See GAO, *Government Reorganization: Key Questions to Assess Agency Reform Efforts*, GAO-18-427 (Washington, D.C.: June 13, 2018); *Human Capital: Opportunities to Improve Executive Agencies' Hiring Processes,* GAO-03-450 (Washington, D.C.: May 30, 2003); and *Human Capital: Key Principles for Effective Strategic Workforce Planning*, GAO-04-39 (Washington, D.C.: Dec. 11, 2003).

responses from USDA's Office of General Counsel on their understanding of what authorities the department had and what legal and regulatory requirements USDA was subject to in relocating offices, and actions taken in response to these requirements. In addition, as of December 2022, GAO has ongoing work on two legal decisions related to issues arising from the relocation.[4] For this report, we did not independently review or verify the list of authorities and requirements that USDA identified nor did we review whether the department's actions satisfied the requirements identified.

To describe how the relocation affected the agencies' human resources, we analyzed trends in ERS's and NIFA's human resources data, including groups that are considered "protected" under federal laws.[5] To assess the impact of the relocation on ERS's productivity, we analyzed publications listed on the ERS website, data provided by the agency, and the number of journal articles to describe annual trends in products before and after the relocation. To assess the impact on NIFA's productivity, we analyzed the length of time between key steps in NIFA's process for funding grants before and after the relocation.

To determine the extent to which USDA actions followed leading practices, we assessed USDA's actions to relocate ERS and NIFA against leading practices for effective agency reforms and for strategic human capital management. To do this, we first selected specific leading practices relevant to relocations from the list of leading practices for effective agency reforms; we then assessed USDA's actions in relocating ERS and NIFA against those selected leading practices.[6] We also selected specific leading practices relevant to relocations from strategic workforce planning principles identified in our prior work, and we assessed ERS's and NIFA's human capital planning process and practices during and after the relocation against those selected leading

---

[4]These issues include whether USDA complied with notification requirements when it sent notice of its intent to relocate offices and whether any incentives received by USDA in the course of relocating ERS and NIFA to Kansas City, Missouri, were consistent with the general requirement that agencies deposit money received for the government into the general fund of the Treasury.

[5]These laws define protected groups and classes based on race, color, religion, sex, national origin, age, and disability.

[6]GAO-18-427.

practices.[7] (Since both sets of leading practices include strategic workforce planning, we provide a high-level assessment in our discussion of agency reforms and an in-depth assessment as part of our discussion of strategic human capital management.)

Leading practices for effective agency reforms and for strategic human capital management are organized by categories and subcategories. In this report, we use the term "generally followed" to indicate that USDA actions followed all, or most, aspects of the selected leading practices in a subcategory; the term "partially followed" to indicate that USDA actions followed some, but not most, aspects of the selected leading practices in a subcategory; and the term "generally did not follow" to indicate that USDA actions followed few to no aspects of the selected leading practices in a subcategory. We assessed USDA's actions—and those of ERS and NIFA, as appropriate—at the individual practice level and at the subcategory level.

For all objectives, we reviewed agency documentation and interviewed department and agency officials, as well as union representatives. We also summarized tools for congressional oversight identified in a prior report[8] and the Congressional Research Service's *Congressional Oversight Manual.*[9] (See app. II.) Our full scope and methodology is described in appendix I.

We conducted this performance audit from January 2021 to December 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[7]GAO-03-450; GAO-04-39; GAO, *Human Capital: A Guide for Assessing Strategic Training and Development Efforts in the Federal Government*, GAO-04-546G (Washington, D.C.: March 2004); and *Human Capital: Additional Collaboration Between OPM and Agencies Is Key to Improved Federal Hiring*, GAO-04-797 (Washington, D.C.: June 7, 2004).

[8]GAO, *21st Century Challenges: Reexamining the Base of the Federal Government*, GAO-05-325SP (Washington, D.C.: February 2005).

[9]Congressional Research Service, *Congressional Oversight Manual*, RL 30240 (Updated Mar. 31, 2021).

# Background

## Key Events of the Relocation

According to USDA, in response to a presidential initiative to move federal agency headquarters outside of Washington, D.C.,[10] the Secretary of Agriculture announced in August 2018 his decision to relocate NIFA and ERS. According to USDA's August 2018 press release announcing this relocation, the department's goals for relocating ERS and NIFA outside of the National Capital Region were to

(1) improve USDA's ability to attract and retain highly qualified staff with training and interests in agriculture, many of whom come from land-grant universities;

(2) place important USDA resources closer to many of the agency's stakeholders; and

(3) benefit the American taxpayers by significantly reducing employment costs and rent.

In June 2019, the Secretary announced that he had chosen the Kansas City region, as the new location for ERS and NIFA. On September 30, 2019, portions of ERS and NIFA relocated to Kansas City, Missouri (see fig. 1).[11]

---

[10]Additional information on the initiative to merge and relocate federal agencies can be found in Office of Management and Budget, *Comprehensive Plan for Reforming the Federal Government and Reducing the Federal Civilian Workforce*, OMB Memorandum M-17-22 (Washington, D.C.: Apr. 12, 2017). We previously reported on a related June 2018 government-wide reform plan, *Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations*, in GAO, *Federal Management: Selected Reforms Could Be Strengthened By Following Additional Planning, Communication, and Leadership Practices*, GAO-20-322 (Washington, D.C.: Apr. 23, 2020).

[11]USDA signed a lease for permanent office space in Kansas City, Missouri, in October 2019.

**Figure 1: Timeline of Events Leading to the Relocation of ERS and NIFA from Washington, D.C., to Kansas City, Missouri**



Source: GAO analysis of U.S. Department of Agriculture (USDA) documents.  |  GAO-23-104709

As we reported in April 2022,[12] USDA released a memorandum in June 2019[13] that summarized its economic analysis and described several benefits and costs of relocating to the selected location. USDA officials said that the agency was not required to conduct a formal cost-benefit analysis as part of its decision to relocate NIFA and ERS. In April 2022, we issued a report examining the analysis that USDA used to support its decision to relocate ERS and NIFA to the Kansas City region. This report reviewed how USDA made its relocation decision, the underlying analyses, and the use of evidence in USDA's decision-making. We reported that USDA's economic analysis did not fully align with its stated

[12]GAO-22-104540.

[13]U.S. Department of Agriculture, *NIFA and ERS Relocation: Cost Benefit Analysis* (June 13, 2019). This publicly released document produced by USDA is the agency's summary of the analysis completed by USDA with input from Ernst & Young. Ernst & Young did not complete a separate cost-benefit analysis.

objectives for relocating ERS and NIFA and that USDA's development and usage of evidence underlying its decision had significant limitations.[14]

## ERS Products

ERS digitally publishes its research and analysis in economic research reports, articles in its Amber Waves magazine, data visualizations, and data products throughout the year. ERS's data products encompass estimates, forecasts, and economic and statistical indicators. In addition, the ERS commodity outlook program delivers outlook reports and data, which are among the most widely accessed ERS products. ERS's products include

- research reports, which take up to 2 years to complete and provide in-depth economic analyses that may have implications for public and private decision-makers. Of the two main types— Economic Research Reports and Economic Information Bulletins—Economic Research Reports are the most in depth;

- journal articles, which are peer-reviewed through the individual journal processes and can take up to 2 years to complete and be issued; and

- outlook reports, which take about 4 weeks to prepare, complement the release of USDA's World Agricultural Supply and Demand Estimates by providing analyses and data on the short-term outlook for specific U.S. and global commodity markets and are required by statute.

## NIFA Grant Types

NIFA awards research funding through a combination of competitive grants and funds allocated to states and institutions under statutory formulas, known as "capacity grants." Specifically:

- Competitive grants support research, education, and extension activities for land-grant institutions, State Agricultural Experiment Stations, and other organizations. Grants are funded from annual, multiyear, or no-year funding. NIFA generally conducts peer review of these grant proposals with panels of external scientists.

- Capacity grants support research, education, and extension activities at land-grant institutions and schools of forestry and veterinary medicine. Capacity grants ensure that the land-grant university system and other partners maintain the "capacity" to conduct research and extension activities. Capacity grants are

[14]We did not make any recommendations in GAO-22-104540 because, among other reasons, the relocation had already taken place, and the Office of Management and Budget had since circulated comprehensive guidance on how to build and use quality evidence that, if effectively implemented, should address the weaknesses highlighted in our report.

funded through annual appropriations. Recipient institutions have either 2 years or 5 years to draw down these funds and complete their work.

## USDA Identified Authorities Allowing the Relocation of ERS and NIFA and Requirements It Needed to Follow in Relocating the Agencies

We found that USDA identified authorities that allowed for the relocation of ERS and NIFA and requirements that USDA needed to address to conduct the relocation, both of which informed the department's actions to plan and conduct the agencies' relocations.[15] USDA officials said that they identified 16 statutes, regulations, agency directives, guidance, and policies relevant to planning and conducting the relocation of ERS and NIFA.[16] USDA officials said that they identified these authorities and requirements in a number of ways, including relying on already-known requirements and consulting with the General Services Administration (GSA).

Among the sources identified, USDA officials cited several sources of USDA's authority to take actions. For example, officials from USDA identified section 4 of the department's Reorganization Plan No. 2 of 1953 as providing the legal authority for the Secretary of USDA to relocate ERS and NIFA offices.[17] In addition, USDA officials identified Departmental Regulation 1010-001 as expressing the Secretary of Agriculture's authority to move a mission area, agency, or staff office to another location.[18] Table 1 shows the authorities identified by USDA as applicable

[15]For the purpose of this report, we mean a "legal authority" to be a provision of law, regulation, or policy that authorizes an agency or official to take a particular action. Further, we mean a "legal requirement" to be a provision of law, regulation, or policy that constrains an agency or official from taking a particular action.

[16]In August 2019, the USDA Office of Inspector General (OIG), in its review and evaluation of the relocation, also reported relevant authorities and requirements that USDA relied on; see USDA Office of Inspector General, *USDA's Proposal to Reorganize and Relocate the Economic Research Service and National Institute of Food and Agriculture*, Inspection Report 91801-0001-23 (Washington, D.C.: August 2019). GAO found that USDA identified additional authorities and requirements for purposes of our review because our research objective included a broader scope compared to the USDA OIG. For example, we asked USDA officials to identify authorities and requirements relied on both (1) at the time the USDA made a decision, and (2) during implementation of the relocation, whereas USDA OIG asked for authorities relied on only at the time USDA made the decision to relocate.

[17]Reorganization Plan No. 2 of 1953, Act of March 25, 1953, § 4, 67 Stat. 633 (codified as amended at 7 U.S.C. § 2201 note).

[18]U.S. Department of Agriculture Departmental Regulation 1010-001, Organization Planning, Review, and Approval (Jan. 4, 2018). The document states that the authority to approve the creation, elimination, or transfer of an entire mission area, agency, or staff office is reserved to the Secretary, pursuant to 5 U.S.C. § 301 and Reorganization Plan No. 2 of 1953.

to the relocation of ERS and NIFA, reasons that USDA cited for relying on these authorities, and actions that USDA cited taking in response to these authorities.

**Table 1: List of Legal and Other Authorities Identified by USDA Governing Relocation of ERS and NIFA**

| Legal and other authority | Reason cited by USDA for relying on the authority | Reported action(s) taken in response to identified authority |
|---|---|---|
| Section 4 of the Reorganization Plan No. 2 of 1953 (codified at 7 U.S.C. § 2201 note). | USDA officials said that this authority generally permits the Secretary to reorganize the functions of the department and provided additional support for the Secretary's authority to relocate functions of the department. | USDA officials said that this authority was used for an initial proposal to realign the Economic Research Service (ERS) under another office, which was later dropped from the overall relocation initiative. |
| USDA, Organization Planning, Review and Approval, Departmental Regulation 1010-001 (Jan. 4, 2018). | USDA officials said that they were aware of this policy that applies to organizational changes in the department. | USDA officials said that the relocation falls ultimately within the authority of the Secretary; a decision by the Secretary is not limited by the regulation and, in this case, the Secretary personally authorized any changes necessitated by the regulation. |
| Under Secretary for Research, Education, and Economics, 7 U.S.C. § 6971. | USDA officials said that this statute authorized the establishment of the National Institute of Food and Agriculture (NIFA). | USDA officials said that this authority does not address the location of the agency, so no actions were needed. |
| Erection of buildings and other structures on nonfederal lands; duration of use of such lands; removal of structures after termination of use; availability of funds for expenses of acquiring long-term leases or other agreements, 7 U.S.C. § 2250a. | USDA officials said that USDA was aware of this authority as potentially applicable, depending upon the Expressions of Interest (EOI) received. (USDA requested EOIs from state and local governments, industry, and other interested parties, and USDA received proposals for 139 EOIs across 308 potential sites in 35 states.) | USDA officials said that the EOI selected did not require use of this authority. |
| Consolidated Appropriations Act, 2018. Pub. L. No. 115-141, div. A, tit. VII, § 753, 132 Stat. 348, 394. | USDA officials said that the department was aware of this provision that provided $6 million related to the relocation of NIFA. | USDA officials said that these funds were expended to support buy-out and relocation expenses. |

Source: GAO summary of U.S. Department of Agriculture (USDA) Office of General Counsel statements. | GAO-23-104709

Note: EOIs are summaries from a potential supplier that show they are interested in, and capable of, delivering particular goods or services.

USDA officials also identified sources that could impose requirements or limitations on the department if it were to relocate ERS and NIFA. For example, federal law requires that offices attached to the seat of government be in the District of Columbia, except as otherwise expressly provided by law.[19] Table 2 shows the legal and other requirements identified by USDA as governing the relocation of ERS and NIFA,

---

[19]4 U.S.C. § 72.

reasons that USDA cited for relying on these requirements, and actions that USDA cited taking in response to these requirements.

**Table 2: List of Legal and Other Requirements Identified by USDA Governing Relocation of ERS and NIFA**

| Legal and other requirements | Reason cited by USDA for relying on requirement | Reported action(s) taken in response to identified requirement |
|---|---|---|
| Public Offices; at seat of Government, 4 U.S.C. § 72. | USDA officials said that this statute requires "the offices attached to the seat of government shall be exercised in the District of Columbia," unless otherwise provided for by law. | USDA officials said that the heads of the agencies and senior management staff for the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA) remained in Washington, D.C. |
| Congressional approval of proposed projects, 40 U.S.C. § 3307. | USDA officials said that this statute requires a submission of a prospectus for a proposed facility for approval of an appropriation, if above a certain threshold. | USDA reported that no action was necessary. |
| Prohibition on closure or relocation of county offices for the Farm Service Agency, 7 U.S.C. § 6932a. | USDA officials said that the department was aware of this as the only permanent statutory prohibition concerning the relocation of USDA agency offices. | USDA officials said that this statutory prohibition is limited to the Farm Service Agency, so no actions were needed with respect to the relocation of NIFA and ERS. |
| Confidential Information Protection and Statistical Efficiency Act of 2002, (codified at 44 U.S.C. § 3501 note), repealed by Pub. L. No. 115-435, § 302(c), 132 Stat. 5529, 5552 (2019), and related implementation guidance from the Office of Management and Budget (OMB). | USDA officials said that this requirement was cited in the Federal Register "Notice of Request for Expression of Interest for Potential Sites for Headquarters Office Locations" in the context of Information Technology infrastructure requirements for the ERS at the new location. 83 Fed. Reg. 40, 499, 40, 500 (Aug. 15, 2018). | USDA officials said that the availability of space for Information Technology infrastructure was considered in the site selection process, in order to meet legal requirements. |
| Consolidated Appropriations Act, 2018. Pub. L. No. 115-141, div. A, tit. VII, § 717, 132 Stat. 348, 385. | USDA officials said that the department was aware that this provision could require notice to the Committees on Appropriations of both Houses of Congress before taking certain funding actions in order to relocate an office or employees. | USDA officials said that on August 9, 2018, the department notified Congress of its plan to realign ERS under the Office of the Chief Economist, which reports to the Office of the Secretary, and to explore options to relocate most ERS and NIFA employees outside of the National Capital Region. |
| Federal Space Management, Exec. Order No. 12,072, 43 Fed. Reg. 36,869 (Aug. 18, 1978) amended by Targeting Opportunity Zones and Other Distressed Communities for Federal Site Locations, Exec. Order No. 13,946, 85 Fed. Reg. 52,879 (Aug. 24, 2020). | USDA officials said that this executive order applies to federal space needs in urban areas. | USDA officials said that the department verified that the site selected met the requirements of the executive order. |

**GAO-23-104709 USDA Workforce Relocation Impacts**

| General Services Administration, Federal Property Management Regulations System, Federal Management Regulation, Real Property, including leasing and relocation policies and procedures. 41 C.F.R. pts. 102-73, 102-83. | USDA officials said that the department was aware that although the department's acquisition of real property for office space is generally subject to the regulations of the General Services Administration (GSA), the Secretary has the authority to select the geographic location of the offices.<br><br>As stated in GSA's Federal Management Regulation, "Each Federal agency is responsible for identifying its geographic service area and the delineated area within which it wishes to locate specific activities, consistent with its mission and program requirements, and in accordance with all applicable statutes, regulations, and policies." 41 C.F.R. § 102-83.10. | USDA officials said that the department selected a site and delineated an area to conduct specific activities, as permitted by the General Services Administration (GSA) Federal Management Regulation. |
| --- | --- | --- |
| Office of Personnel Management (OPM) and Equal Employment Opportunity Commission regulations and guidance regarding various personnel matters, including directed reassignments, reasonable accommodations, Voluntary Early Retirement Authority/Voluntary Separation Incentive Payment, and removal procedures. | USDA officials said that the department knew that the site selection could impact the employment status of employees and, thus, relied on the applicable regulations bearing on the subject. | USDA officials said that relevant reassignments, reasonable accommodations, Voluntary Early Retirement Authority/Voluntary Separation Incentive Payment, and removal procedures were implemented in accordance with OPM regulations. |
| USDA, Civil Rights Impact Analysis, Departmental Regulation 4300-004 (Oct. 17, 2016). | USDA officials said that they produced a Civil Rights Impact Analysis for the relocation, though officials said that USDA was not required to do so. | USDA officials said that ERS and NIFA each produced a Civil Rights Impact Analysis. |
| USDA, Gift Acceptance Policy, Departmental Regulation 5200-3 (Apr. 18, 2003). | USDA officials said that they were aware of this policy implementing the Secretary's gift authority at 7 U.S.C. § 2269 as potentially applicable to reviewing incentives included in the Expressions of Interest. | USDA officials said that on November 13, 2019, USDA entered into a Memorandum of Agreement with the State of Missouri and local agencies regarding incentives, mostly provided to the landlord, with respect to the USDA lease. According to USDA, it considered the incentives involved to be gifts to USDA under its gift acceptance authority (7 U.S.C. § 2269), provided to the landlords and not USDA, or, for employees and cleared by the USDA Office of Ethics. |
| Agricultural Property Management Regulations, Real Estate Acquisitions, Chapter 110-73 Real Estate Acquisition Supplementing Federal Management Regulation, General Services Administration, Federal Property Management Regulations System, Federal Management Regulation, Real Property, Real Acquisition, 41 C.F.R. pt. 102-73. | USDA officials said that they were aware of these supplemental regulations generally applicable to the acquisition of real property. | USDA officials said that the department submitted its space requirements to GSA on June 14, 2019. |

Source: GAO summary of U.S. Department of Agriculture (USDA) Office of General Counsel statements. | GAO-23-104709

To respond to the requirements that it identified, USDA officials said that the department took a number of actions, including

- notifying Congress in August 2018 of USDA's intent to relocate ERS and NIFA;

- publishing a notice in the *Federal Register* on August 15, 2018, requesting expressions of interest from state and local governments, as well as industry and academia, for potential sites to relocate ERS and NIFA;[20]

- selecting an appropriate site, in accordance with regulations from GSA, for ERS and NIFA in Kansas City, Missouri, in 2019;[21] and

- submitting requirements for office space for the Kansas City, Missouri, site in 2019.

For this review, we did not independently review or verify the list of authorities and requirements that USDA identified nor did we review whether the department's actions satisfied the requirements identified.[22]

---

[20]83 Fed. Reg. 40,499 (Aug. 15, 2018).

[21]For more information about USDA's site selection process, GAO conducted a review of the process that USDA used to make the relocation decision. See GAO-22-104540.

[22]GAO reviewed all relevant legal and regulatory requirements identified by USDA but did not perform a comprehensive review to identify all potential relevant requirements. As of December 2022, GAO had ongoing work on two legal decisions related to issues arising from the relocation, including whether USDA complied with notification requirements when it sent a notice of its intent to relocate offices and whether any incentives received by USDA in the course of relocating ERS and NIFA to Kansas City, Missouri, were consistent with the general requirement that agencies deposit money received for the government into the General Fund of the Treasury.

## For 2 Years Following the Relocation, Agency Staff Levels and Productivity Declined and Then Rebounded, but Changes to Staff Composition Persisted

ERS and NIFA workforce size and productivity temporarily declined following the agencies' September 2019 relocation from offices in Washington, D.C., to Kansas City, Missouri, but had largely recovered by September 2021.[23] However, 2 years after the relocation, the agencies' workforce was composed mostly of new employees with less experience at ERS and NIFA than the workforce prior to the relocation. In addition, a decline in the number of employees in certain protected groups persisted, as of the end of fiscal year 2021.

### Agencies' Staff Levels Initially Declined but Largely Recovered

Following the relocation, the agencies lost over half of their staff, with vacancies in key positions such as managers and economists. Each agency experienced substantial loss of staff during fiscal year 2019, with an estimated 121 permanent full-time staff leaving ERS and 157 permanent full-time staff leaving NIFA.[24] As of July 2020, both agencies had about 150 permanent full-time staff on board, down from over 300 as recently as the end of fiscal year 2016 (see fig. 2). The agencies also experienced a loss of staff in key positions. For example, from the end of fiscal year 2018 to the end of fiscal year 2019, the number of economists at ERS fell from 165 to 131, and the numbers of managers and supervisors at both agencies declined from 32 to 27 (ERS) and 38 to 28 (NIFA).[25] According to agency officials, the decline in managers impacted their hiring because they did not have a sufficient number of managers to help make decisions on hiring.

---

[23]We use the term "productivity" here to refer to the number of ERS reports and the processing time for NIFA grants.

[24]See app. III, table 6, for additional data on ERS and NIFA estimated departures of permanent full-time staff and new hires, for fiscal years 2018 through 2021. Figures for departures are estimates because we were unable to determine the exact fiscal year during which some staff transferred to another USDA agency. Specifically, because of delays in data entry in USDA's human resources system, the exact date when some ERS and NIFA staff's internal transfers took effect is unclear and could have taken place in the subsequent fiscal year.

[25]See app. III, table 7, for additional data on ERS and NIFA permanent full-time staff, by key positions, fiscal years 2015 through 2021.



**Figure 2: Number of Permanent Full-Time Staff at ERS and NIFA, as of the End of Fiscal Years 2015 through 2021**

Source: GAO analysis of U.S. Department of Agriculture (USDA) data.  |  GAO-23-104709

With increased hiring and reduced departures, the agencies' workforces increased during fiscal years 2021 and 2022. According to agency hiring plans, as of June 2022, the number of permanent full-time staff was 285 at ERS and 323 at NIFA, comparable to, or higher than, staff levels at the end of fiscal year 2018.[26] Additionally, the agencies had hired enough staff in key positions such that, by the end of fiscal year 2021, they had reached or exceeded the levels of staff that they had in key positions as of the end of fiscal year 2018. For example, the number of economists at ERS rebounded to 168 by the end of fiscal year 2021, slightly higher than at the end of fiscal year 2018. Similarly, the number of staff in some key positions at NIFA, such as grants management specialists, was greater at the end of fiscal year 2021 than it was at the end of fiscal year 2018.

Following the relocation, Kansas City, Missouri, was the duty station for the majority of permanent full-time staff. By the end of fiscal year 2021—2 years after the effective date of the relocation—almost all of NIFA's staff

---

[26]The agencies' hiring goals for fiscal year 2022 were 310 at ERS and 423 at NIFA.

positions and about two-thirds of ERS's were located in Kansas City, Missouri.[27] However, in March 2020, as a result of the outbreak of the COVID-19 pandemic, USDA authorized its employees to evoke maximized telework during the COVID-19 emergency. In addition, in November 2021, USDA implemented a new policy allowing some positions to be recruited with a negotiable duty station.

ERS and NIFA officials said that they analyzed each position to determine if it was eligible for a remote designation. Under this policy, employees in certain ERS and NIFA positions can work from an approved alternate worksite, typically the employee's residence. The remote worksite may be within or outside of the local commuting area of the mission area, agency, or staff office's worksite and, therefore, employees involved are not required to work in Kansas City, Missouri, or Washington, D.C.[28] In March 2022, USDA officials noted that remote work and location flexibility had helped with recruiting and, in June 2022, NIFA officials said that recruiting for positions with permanent remote duty stations seemed to have increased the candidate pool for hiring. Between August 2021 and May 2022, NIFA hired 71 employees into positions with a permanent remote duty station. ERS hired five employees into permanent remote duty stations in April 2022.

## Majority of Employees at ERS and NIFA Are Recent Hires

As of the end of fiscal year 2021, large proportions of the workforce at both ERS and NIFA were relatively new to USDA. Prior to the relocation, at the end of fiscal year 2018, the majority of ERS (84 percent) and NIFA (82 percent) permanent full-time staff had been there for more than 2 years. However, because of staff departures and hiring in fiscal years 2019 and 2020, by the end of fiscal year 2021 the majority of ERS (66 percent) and NIFA (79 percent) permanent full-time staff had worked there for 2 years or less (see figs. 3 and 4).[29]

[27]See app. III, table 8, for additional data on ERS and NIFA permanent full-time staff, by permanent duty station, fiscal years 2018 through 2021.

[28]U.S. Department of Agriculture, *Telework and Remote Work Programs,* Departmental Regulation 4080-811-002 (Nov. 22, 2021).

[29]See app. III, table 9, for additional data on ERS and NIFA permanent full-time staff, by years of service at ERS and NIFA, fiscal years 2015 through 2021.

**Figure 3: Number of Permanent Full-Time Staff, by Years of Service at ERS, as of the End of Fiscal Years 2018 and 2021**

Permanent full-time staff at ERS,
by years of service, end of fiscal year 2018



**44**
Two years or less

**229**
More than 2 years

Permanent full-time staff at ERS,
by years of service, end of fiscal year 2021



**163**
Two years or less

**83**
More than 2 years

ERS = Economic Research Service

Source: GAO analysis of U.S. Department of Agriculture data.  |  GAO-23-104709

**Figure 4: Number of Permanent Full-Time Staff, by Years of Service at NIFA, as of the End of Fiscal Years 2018 and 2021**

Permanent full-time staff at NIFA,
by years of service, end of fiscal year 2018



**52**
Two years or less

**236**
More than 2 years

Permanent full-time staff at NIFA,
by years of service, end of fiscal year 2021



**195**
Two years or less

**51**
More than 2 years

NIFA = National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data.  |  GAO-23-104709

## Declines in Certain Protected Groups Persisted

While the overall size of the workforce had mostly recovered by the end of fiscal year 2021, certain changes to the composition of the ERS and NIFA workforce persisted 2 years after the relocation. Specifically, we found that the number and proportion of Black or African American staff declined sharply at both ERS and NIFA and did not return to prerelocation levels (see figs. 5 and 6). Between the end of fiscal year 2018 and the end of fiscal year 2021, the proportion of Black or African American staff decreased from 22 percent (60 out of 273) to 9 percent (21 out of 246) at ERS, and from 47 percent (134 out of 288) to 19 percent (47 out of 246) at NIFA. At the same time, the number and proportion of White employees increased from 63 percent to 75 percent at ERS, and from 38 percent to 65 percent at NIFA.[30]

**Figure 5: Number of Permanent Full-Time Staff at ERS, by Race and Ethnicity, as of the End of Fiscal Years 2018 and 2021**



ERS permanent full-time staff – end of fiscal year 2018

2 – Multirace
9 – Hispanic or Latino
29 – Other races[a]
60 – Black or African American
173 – White
273 – Total workforce

ERS permanent full-time staff – end of fiscal year 2021

7 – Hispanic or Latino
10 – Multirace
21 – Black or African American
23 – Other races[a]
185 – White
246 – Total workforce

ERS = Economic Research Service

Source: GAO analysis of U.S. Department of Agriculture (USDA) data.  |  GAO-23-104709

[a]"Other races" category includes the categories of Asian and Native Hawaiian or Other Pacific Islander. USDA's race and ethnicity data combine the categories of Asian, Native Hawaiian, and Pacific Islander.

---

[30]See app. III, fig. 9, for additional data on the number of permanent full-time staff at ERS and NIFA, by race and ethnicity, fiscal years 2015 through 2021.

**Figure 6: Number of Permanent Full-Time Staff at NIFA, by Race and Ethnicity, as of the End of Fiscal Years 2018 and 2021**



NIFA permanent full-time staff – end of fiscal year 2018

**2** – American Indian or Alaska Native
**5** – Multirace
**10** – Hispanic or Latino
**28** – Other races[a]
**109** – White
**134** – Black or African American
**288 – Total workforce**



NIFA permanent full-time staff – end of fiscal year 2021

**3** – American Indian or Alaska Native
**6** – Hispanic or Latino
**11** – Multirace
**18** – Other races[a]
**47** – Black or African American
**161** – White
**246 – Total workforce**

NIFA = National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture (USDA) data.  |  GAO-23-104709

[a]"Other races" category includes the categories of Asian and Native Hawaiian or Other Pacific Islander. USDA's race and ethnicity data combine the categories of Asian, Native Hawaiian, and Pacific Islander.

In addition, the composition of the workforce at ERS and NIFA has also shifted in terms of other protected groups as a result of the relocation. Specifically, between the end of fiscal year 2018 and the end of fiscal year 2021, the proportion of permanent full-time employees

- who identified as female decreased slightly, from 61 percent to 60 percent at ERS and from 47 percent to 39 percent at NIFA;

- age 40 years and older decreased from 81 percent to 67 percent at ERS and from 75 percent to 58 percent at NIFA;

- with veterans' preference increased from 5 percent to 12 percent at ERS and from 9 percent to 16 percent at NIFA; and

- with a self-identified disability decreased from 10 percent to 8 percent at NIFA and remained constant at 7 percent at ERS.[31]

---

[31]See app. III, tables 10-13, for additional data on ERS and NIFA permanent full-time staff by gender, age, veterans' preference, and self-identified disability status from fiscal years 2015 through 2021.

USDA's actions to monitor underrepresented groups and assess the composition of ERS's and NIFA's workforces in comparison to the civilian labor force is discussed later in this report.

## Following the Relocation, ERS Produced Fewer Key Reports, and NIFA Took Longer to Process Grants, but Productivity Has Since Recovered

In fiscal years 2019 and 2020, ERS produced fewer research reports and journal articles than in previous years, and NIFA experienced delays in processing grants in fiscal year 2020. Specifically, the number of ERS research reports issued and journal articles authored by ERS staff declined during fiscal years 2019 and 2020 (see fig. 7). According to agency officials, ERS's decreased productivity was due to workforce decreases associated with the relocation. As staffing increased in 2021— 2 years after the relocation—the number of research reports and journal articles also increased substantially, with research report numbers similar to numbers for the few years prior to the relocation. However, the number of outlook reports that ERS produced held steady; ERS officials explained that these reports are required by statute and were prioritized over other products.



**Figure 7: Number of ERS Products Issued, by Type of Product, Fiscal Years 2015 through 2021**

Number of products issued

- On August 9, 2018, USDA announced its intention to relocate ERS and National Institute of Food and Agriculture.
- At the end of fiscal year 2019, USDA made the relocation to Kansas City, Missouri, effective.

Fiscal year

— Journal articles authored or co-authored by Economic Research Service (ERS) staff
— Outlook reports
— Research reports

Source: GAO analysis of U.S. Department of Agriculture (USDA) data and data from Scopus, a citation database.  |  GAO-23-104709

Note: USDA data on the number of journal articles published before fiscal year 2018 were deemed not sufficiently reliable to present.

Following the relocation, the median number of days to process and fund competitive grants that had proposals submitted in fiscal year 2019 was 235 days; this was a 30-day increase from fiscal year 2018 (205 days).[32] (See fig. 8.) In addition, our analysis of NIFA grant data showed that, as of March 31, 2020, 649 fiscal year 2019 competitive grants (53 percent) of 1,235 had been funded, the lowest number and percentage for any fiscal year since fiscal year 2015.[33] This slower processing time coincided with the loss of staff that occurred in fiscal years 2019 and 2020, as we previously described.

[32]We measured the timeliness of NIFA competitive grant funding by the length of time from the date that staff input grant proposal information into the agency's data system to the date that the grant was funded. This process includes acknowledging applications, conducting peer review, and authorizing funds. According to agency officials, since it takes about 6 or 7 months to complete the competitive grant funding process, NIFA may fund competitive grant proposals that are due during one fiscal year during the following fiscal year.

[33]See app. III, table 14, for additional data on the number and percent of competitive grants funded.

**Figure 8: Median Number of Days for NIFA to Process and Fund Competitive Grants for Grant Proposals Submitted in Fiscal Years 2015 through 2020**



Median number of days from agency data input to grant funding

- On August 9, 2018, USDA announced its intention to relocate the Economic Research Service and National Institute of Food and Agriculture (NIFA).
- At the end of fiscal year 2019, USDA made the relocation to Kansas City, Missouri, effective.

Fiscal year grant proposal was submitted

Source: GAO analysis of U.S. Department of Agriculture (USDA) data. | GAO-23-104709

Notes: We calculated grant processing time based on the time difference from the day that staff input the grant proposal into the NIFA system to the day that the agency funded the grant. We used the date that NIFA officials input the grant proposal data into its information system as the "start" date for the grant funding process because officials said that this was within a few days of when they started processing the grant. The grant funding date represents the date that funds were first available to the grant recipient to draw down. For competitive grant proposals, grant processing and funding often occurs in the fiscal year after the proposal due date.

In contrast, competitive grant proposals that were due in fiscal year 2020—and processed mostly in fiscal year 2021—were processed faster than grant proposals in any of the previous 5 fiscal years. NIFA officials explained that there are a variety of factors affecting the processing time for grants from one year to the next, such as different regulations and procedures, along with other factors.[34]

For NIFA's capacity grants, we similarly found delays in processing in fiscal year 2020.[35] Specifically, we found that no fiscal year 2020 grants

---

[34]Other factors include staffing levels, staff training and knowledge, contractor support, individual program timelines, and delays in budget appropriations.

[35]Capacity grants ensure that the land-grant university system and other partners maintain the "capacity" to conduct research and extension activities. Capacity grants are funded from annual funding. Recipient institutions have either 2 years or 5 years to draw down these funds and complete their work.

had received a payment by March 31, 2020. In previous years, 33 percent to 100 percent of capacity grants received a first payment by March 31 of the same fiscal year. By May 31, 2020, nearly all fiscal year 2020 grants were funded—about a 2 month delay.[36] NIFA lost seven of its eight budget staff in fiscal year 2019; four replacements were hired from September through December 2019, and three more from February through March 2020, according to a NIFA official. Also, five budget staff from USDA's Agricultural Research Service helped NIFA with budget issues intermittently because of the losses in staff, according to agency officials.[37] By fiscal year 2021, NIFA's processing timeliness for capacity grants had recovered to previous fiscal years' levels.

## USDA Followed Some, but Not All, Selected Leading Practices for Agency Reforms and Strategic Human Capital Management in Relocating and Rebuilding ERS and NIFA

As discussed above, ERS and NIFA lost over half of their workforces as a result of relocating and have been rebuilding their agencies. Leading practices for agency reforms and strategic human capital management can help agencies navigate potential challenges in such situations. Overall, USDA's actions taken since 2018 to relocate ERS and NIFA followed some, but not all, selected leading practices for effective agency reforms. In addition, ERS's and NIFA's actions before and after the relocation followed some, but not all, selected leading practices for strategic human capital management. Given the impacts of the relocation on ERS's and NIFA's workforce—including the large proportion of relatively new staff at each agency and other changes in staff composition—following such leading practices can better position the agencies to address human capital challenges as they rebuild and during any future relocations.

## USDA Followed Some, but Not All, Selected Leading Practices for Effective Agency Reforms

Overall, USDA's actions taken since 2018 to relocate ERS and NIFA offices to a new location outside the National Capital Region followed some, but not all, selected leading practices for effective agency reforms. These leading practices help agencies undergoing various reforms—including relocations—navigate the potential benefits and challenges in

---

[36]See app. III, table 15, for additional data on the number of capacity grants whose appropriation was funded in fiscal year 2017 to fiscal year 2021 that received at least one payment, by four dates in the same year.

[37]USDA officials also reported using other staffing options to deal with decreases in staff, such as the use of reemployed annuitants and contractors.

developing and implementing such agency reforms.[38] These practices also provide Congress and the executive branch with the tools and information needed to help evaluate reform proposals and ensure that such reforms are effectively implemented. Examining USDA's actions against these leading practices can provide insights into the benefits and challenges presented by this and any future relocations. Lessons learned from prior federal reform and reorganization efforts suggest that reforming government is an immensely complex activity that requires agreement on both the goals to be achieved and the means for achieving them.[39]

In relocating ERS and NIFA, USDA generally followed selected leading practices related to the subcategory "Leadership Focus and Attention," but it partially followed or generally did not follow the other subcategories of the leading practices. Table 3 summarizes our analysis of USDA's actions for relocating ERS and NIFA against these selected leading practices (see app. IV for a description of each leading practice selected).

**Table 3: Extent the U.S. Department of Agriculture (USDA) Followed Selected Leading Practices for Agency Reforms in Relocating the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)**

| Leading practice category | Subcategory | Extent followed | Summary of analysis |
|---|---|---|---|
| Goals and Outcomes | Establishing Goals and Outcomes | ◑ | In developing its proposal to relocate ERS and NIFA, USDA established clear goals.<br><br>However, the agencies did not establish performance measures to guide the relocation or assess the relocation's effectiveness in achieving USDA's stated goals. |
| Process for Developing Reforms | Involving Employees and Key Stakeholders | ○ | USDA did not engage employees in developing the relocation.<br><br>USDA did not consult with Congress ahead of its decision to relocate. USDA subsequently notified Congress of its decision and held some meetings with Members of Congress and other stakeholders about concerns raised related to potential attrition and loss of critical expertise after the decision to relocate was made. |

[38]The leading practices for agency reforms are key questions that Congress, the Office of Management and Budget, and agencies should consider for the development and implementation of agency reforms, according to our prior work. GAO-18-427.

[39]GAO-18-427.

| | Using Data and Evidence | ◑ | USDA conducted an economic analysis to support its decision to relocate ERS and NIFA.<br><br>However, as we previously reported, this analysis<br>• was not based on all available evidence;<br>• excluded potential critical costs, such as those associated with employee attrition; and<br>• did not transparently discuss its implicit assumption that ERS and NIFA would experience no attrition from the relocation.[b] |
|---|---|---|---|
| Implementing the Reforms | Leadership Focus and Attention | ● | USDA articulated a succinct rationale for relocation and identified a group of leaders responsible for developing and implementing the relocation. |
| | Managing and Monitoring | ◑ | Continuity of service delivery was delayed, as productivity levels declined during the relocation.<br><br>However, the number of ERS reports and the timeliness of NIFA grant processing both rebounded to prerelocation levels by 2021. |
| Strategically Managing a Federal Workforce | Employee Engagement | ○ | USDA did not develop a plan and took few, if any, steps to engage employees in implementing the relocation (i.e., to sustain or strengthen their acceptance for relocating). |
| | Strategic Workforce Planning[a] | ◑ | USDA took steps to strategically recruit for critical positions and to monitor the impacts of the relocation. USDA also conducted some activities related to strategic workforce and succession planning.<br><br>However, it did not formally document a process to strategically plan for long-term staffing needs and goals. USDA also did not consider potential staff attrition or how the choice of location might affect current and future staff levels. |

● Generally followed – USDA's actions followed all, or most, aspects of the leading practices in this subcategory.

◑ Partially followed – USDA's actions followed some, but not most, aspects of the leading practices in this subcategory.

○ Generally did not follow – USDA's actions followed few to no aspects of the leading practices in this subcategory.

Source: GAO analysis of information provided by USDA officials. | GAO-23-104709

[a]Leading practices for effective agency reforms and strategic human capital management both include "Strategic Workforce Planning" questions.

[b]For more information, see GAO, *Evidence-Based Policy Making: USDA's Decision to Relocate Research Agencies to Kansas City Was Not Fully Consistent with an Evidence-Based Approach*, GAO-22-104540 (Washington, D.C.: April 2022).

USDA generally followed selected leading practices for "Leadership Focus and Attention" by articulating a succinct rationale for the relocation in the Secretary's August 2018 announcement, which stated that the proposed relocation was intended to improve customer satisfaction and save taxpayers money. Additionally, consistent with leading practices, the department identified a group of leaders—including the Secretary, as well as a cadre of largely political staff—responsible for developing and implementing the relocation.

Examples of areas where USDA's actions partially followed, or did not generally follow, leading practices for effective agency reforms are described below.

- **"Establishing Goals and Outcomes."** We found that USDA partially followed leading practices related to "Establishing Goals and Outcomes." As previously noted, the Secretary established three goals for the relocation of ERS and NIFA in the August 2018 announcement of the proposed relocation.[40] However, we found that USDA did not establish performance measures for these goals—in contrast to leading practices.[41] Without such metrics, USDA did not have information critical to understanding whether the relocation was progressing in line with its stated objectives and whether adjustments might be needed while the relocation was under way or after it was complete.[42] Moreover, without transparent performance measures, information critical to understanding the effectiveness and impacts of the relocation was missing.

- **"Using Data and Evidence."** We found that USDA partially followed leading practices related to "Using Data and Evidence" in developing, justifying, and supporting its case for relocating ERS and NIFA. Leading practices for effective agency reforms state that agencies are better equipped to address management and performance challenges when managers effectively use data and evidence.[43] In April 2022, we reported that USDA's economic analysis justifying the relocation to Kansas City, Missouri, excluded critical costs and economic effects, such as those

---

[40]As noted earlier, the Secretary's August 2018 announcement to relocate ERS and NIFA away from Washington, D.C., stated three reasons for relocating: (1) improve USDA's ability to attract and retain highly qualified staff with training and interests in agriculture, many of whom come from land-grant universities; (2) place important USDA resources closer to many of the agency's stakeholders; and (3) benefit the American taxpayers by significantly reducing employment costs and rent.

[41]Establishing a mission-driven strategy and identifying specific desired outcomes to guide that strategy are critical steps to achieving intended results, according to our prior work on effective agency reforms. GAO-18-427.

[42]In April 2022, GAO reported that USDA's economic analysis supporting the relocation was not consistent with these three stated objectives of (1) improving its ability to attract and retain highly qualified staff, (2) placing its resources closer to stakeholders, and (3) reducing costs to taxpayers. GAO-22-104540.

[43]Similarly, Office of Management and Budget guidance on implementing the Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435, 132 Stat. 5529, (2019), states that "federal evidence-building activities must be transparent in the planning, implementation, and completion phases to preserve accountability and help ensure that it is not tailored to generate specific findings." Office of Management and Budget, *Evidence-Based Policymaking: Learning Agendas and Annual Evaluation Plans*, OMB Memorandum M-21-27 (Washington, D.C.: June 30, 2021).

associated with expected employee attrition, from its estimate of taxpayer savings[44]—exclusions that likely resulted in an unreliable estimate of savings.[45]

We also reported that USDA was aware of such potential relocation-related attrition prior to selecting Kansas City, Missouri, as the new location for ERS and NIFA.[46] Specifically, prerelocation briefing documents estimated employee attrition rates between 65 and 75 percent if ERS were to move outside of the National Capital Region, according to discussions with employees and experience with past relocations; and expected employee attrition at NIFA would be dependent on the site selected. However, USDA did not incorporate such data into its economic analysis and site-selection decision-making—in contrast to leading practices. Such shortcomings in its economic analysis and use of data and evidence limited the ability of USDA leadership to ensure that it was making an appropriately informed decision on relocating ERS and NIFA. This may have resulted in avoidable adverse effects on ERS and NIFA and its workforce in the years immediately following relocation.[47]

- **"Employee Engagement" and "Involving Employees and Key Stakeholders."** We found that USDA did not generally follow selected leading practices for "Employee Engagement" and "Involving Employees and Key Stakeholders." For example, we found that USDA did not engage employees to gain their buy-in or acceptance prior to relocating—in contrast to leading practices. Furthermore, we found that USDA did not develop a plan and took

---

[44]These attrition-related costs include (1) losses of human capital and institutional knowledge when new employees replace experienced employees, (2) hiring and training costs of new employees to replace former employees, (3) reduced productivity because of loss of experienced employees, and (4) costs of disruptions to agency operations while full employment levels are reestablished. GAO-22-104540.

[45]USDA estimated savings to taxpayers using existing employment levels at USDA at the time of relocation, with the implicit assumption of zero relocation-related attrition. USDA noted that it was not required to conduct a formal cost-benefit analysis as part of its decision to relocate ERS and NIFA and, instead, conducted a more limited economic analysis. GAO-22-104540.

[46]GAO-22-104540.

[47]GAO-22-104540. We did not make recommendations in that report, in part because of guidance subsequently released by the Office of Management and Budget on evidence-based policymaking, which, if effectively implemented, would help address the shortcomings identified in USDA's decision-making.

few, if any, steps to sustain or strengthen employee engagement during or after its decision to relocate and its selection of Kansas City, Missouri. Similarly, we found that USDA notified Congress and key stakeholders after deciding to relocate and after selecting Kansas City, but USDA officials acknowledge that they did not consult with Congress or involve stakeholders in developing plans for the relocation—in contrast to leading practices.[48] Leading practices state that it is important for agencies to directly and continuously involve employees, Congress, and other key stakeholders in the development of any major reform, as such involvement helps incorporate insights from the frontline and increases acceptance of the changes.

The Secretary met with the agencies' workforces on multiple occasions to notify ERS and NIFA staff about the relocation, but officials could not demonstrate to us how, if at all, USDA leadership incorporated employee input and feedback from these meetings into its site selection process. In addition, USDA officials acknowledged that they did not conduct polls or surveys to systematically collect employee input on the relocation. They also could not provide documentation of employee focus groups or notes from employee listening sessions on the relocation. Over half of the employees from each agency chose to leave their positions instead of relocating to Kansas City.[49] In addition, ERS and NIFA employees subsequently unionized to help ensure that they had a voice and a mechanism for input into future reorganizations, according to union officials.[50]

[48]USDA held several briefings with congressional committees and staff between September 2018 and May 2019 notifying them of the Secretary's decision to relocate and the status of the relocation. According to USDA officials, NIFA reached out to some stakeholders during the relocation to keep them informed of the transition and, in 2020, solicited their input on the transition; however, this was after the relocation decision was made and after the selection of Kansas City, Missouri, as the new location for ERS and NIFA.

[49]According to USDA officials, individual employees' decisions to relocate or not were informed by multiple factors, including family, spousal career, and home obligations.

[50]According to the Best Places to Work in the Federal Government rankings, which analyzes data from the Federal Employee Viewpoint Survey, NIFA's and ERS's scores for employee engagement and satisfaction decreased sharply in 2019. Specifically, ERS's score dropped from 67 in 2018 to 37 in 2019. Similarly, NIFA's score dropped from 45 in 2018 to 20 in 2019. Scores for ERS and NIFA in 2021 increased to 79 and 70, respectively.

USDA has developed internal guidance in the form of a departmental regulation specifically for managing departmental reorganizations, but we found that this departmental regulation does not fully reflect leading practices for agency reforms.[51] Prior to the Secretary's August 2018 announcement to relocate ERS and NIFA, USDA updated its departmental regulation for reorganizations. This updated document is intended to streamline and simplify the process of organizational change and facilitate optimal organizational structures. However, this document does not indicate, for example, that agencies should develop performance measures in support of goals or clearly describe whether or how to involve and engage employees impacted by potential reorganizations, including relocations, in developing and implementing those reorganizations. Without internal guidance that reflects leading practices for agency reforms, the department may miss critical steps—such as taking into account the input from all impacted employees—that would help it successfully navigate challenges and help ensure that reforms are implemented effectively, going forward.[52]

According to USDA officials, USDA leadership told ERS and NIFA managers not to collect employee input as they developed the relocation and that leadership would not consider recommendations from the agencies' employee advisory groups on the relocation or site selection. Such employee input, along with considering the potential loss of employees as a factor in relocating, could have informed decisions about where and when to relocate, which might have helped USDA mitigate some attrition from this relocation. For example, according to union officials we spoke with, they told USDA management that selecting a site closer in proximity and demographics to the National Capital Region—such as Raleigh, North Carolina—would enable some employees to remain with ERS and NIFA, albeit with longer or weekend commutes.

---

[51]USDA Departmental Regulation 1010-001 (Jan. 4, 2018). Departmental regulations are internal guidance documents. In contrast to federal regulations, departmental regulations have not gone through the public notice and comment rulemaking process and, as such, are not binding.

[52]The departmental regulation does instruct the mission areas, agencies, and staff offices within USDA to consult with existing unions and assist on collective bargaining agreements, but ERS and NIFA employees were not part of a union at the time the relocation was developed in 2018 and 2019. Consequently, the departmental regulation did not specify whether or how the agencies were to involve or engage ERS and NIFA employees in developing and implementing this relocation. (ERS and NIFA employees subsequently unionized under the American Federation of Government Employees, signing memorandums of understanding with ERS and NIFA in August 2019 after the relocation was underway, and signing a collective bargaining agreement with the agencies in 2021.)

Changing its departmental regulation for reorganizations to more fully reflect leading practices for agency reforms—such as articulating performance measures aligned with goals and working with employees to incorporate their input into change efforts—may better position USDA to make informed decisions that support its workforce and its strategic goals during future agency reorganizations.

Moreover, USDA officials told us that the decision to relocate ERS and NIFA away from the National Capital Region was the sole decision of the Secretary and that existing department guidance does not apply to such Secretary-initiated agency reforms. Consequently, according to USDA officials, they were not required to follow the departmental regulation on reorganizations in relocating ERS and NIFA. USDA officials acknowledged that they chose to implement certain parts of this departmental regulation—such as consulting relevant staff offices on recruitment—as they deemed appropriate; however, they did not implement other parts of the regulation, as we described earlier. Expanding the scope of the departmental regulation on reorganizations to apply to all reorganizations, including those initiated by the Secretary, would further improve USDA decision-making during future agency reorganizations. It would also increase employee acceptance of such efforts and help USDA better assess its reform proposals to ensure that they are implemented effectively. Requiring USDA to document reasons for any deviation from the departmental regulation would help Congress and the public hold USDA accountable for such decisions, going forward.

## USDA Research Agencies Followed Some, but Not All, Selected Leading Practices for Strategic Human Capital Management

We found that ERS's and NIFA's actions followed some, but not all, selected leading practices for strategic human capital management before and after the relocation from the National Capital Region to Kansas City, Missouri. These leading practices can help an agency attain its mission and strategic goals by[53]

- developing long-term strategies for acquiring, developing, and retaining staff;

- aligning an organization's human capital program with its mission and programmatic goals;

- ensuring that agencies' training investments are targeted strategically and are not wasted on efforts that are irrelevant or ineffective; and

[53]Leading practices are derived from the following GAO reports: GAO-04-39; GAO-04-546G; and GAO, *Diversity Management, Expert-Identified Leading Practices and Agency Examples,* GAO-05-90 (Washington, D.C.: January 2005).

**GAO-23-104709 USDA Workforce Relocation Impacts**

- creating a positive work environment, where the similarities and differences of individuals are valued, so that staff can reach their potential and maximize their contributions.

In some cases, ERS and NIFA took actions during development and implementation of the relocation that generally followed some of these leading practices. Specifically, ERS and NIFA generally followed leading practices related to recruiting and hiring. However, both agencies partially followed leading practices for strategic workforce planning and training and development. They generally did not follow leading practices for diversity management before and after the relocation, which could have lessened the impacts on ERS's and NIFA's workforce, as described above, and could help address future workforce challenges. Table 4 summarizes our analysis of ERS's and NIFA's actions before and after relocation against the leading practices. (See table 17 in app. IV for additional details about ERS's and NIFA's actions for all leading practices within each subcategory.)

**Table 4: Extent to Which USDA Research Agencies, the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA), Followed Selected Leading Strategic Human Capital Management Practices Before and After Relocation**

| Leading practice category | Extent followed | | Summary of analysis |
|---|---|---|---|
| | Before relocation[a] | After relocation[b] | |
| Recruitment and Hiring | | | |
| ERS | ● | ● | Both ERS and NIFA generally followed leading practices, such as developing customized strategies to recruit for highly skilled positions before the relocation. |
| NIFA | ● | ● | |
| Strategic Workforce Planning | | | |
| ERS | ◑ | ◑ | ERS and NIFA generally followed many leading practices, such as establishing a process to address skills gaps before the relocation, but the agencies did not generally follow leading practices related to succession or strategic workforce plans before and after the relocation. |
| NIFA | ◑ | ◑ | |
| Training and Development | | | |
| ERS | ◑ | ◑ | Both ERS and NIFA generally followed some leading practices, such as having training goals and associated performance measures, but partially followed other leading practices, such as having formal processes in place to select or design agency training programs before and after the relocation. |
| NIFA | ◑ | ◑ | |

| Diversity Management | | | |
|---|---|---|---|
| ERS | ○ | ○ | The agencies did not have formal diversity plans or strategies in place, nor have the agencies adequately documented succession planning and recruiting processes for diverse candidates before or after the relocation. |
| NIFA | ○ | ○ | |

● Generally followed – Agencies' actions followed all, or most, aspects of the leading practices in this subcategory.

◑ Partially followed – Agencies' actions followed some, but not most, aspects of the leading practices in this subcategory.

○ Generally did not follow – Agencies' actions followed few to no aspects of the leading practices in this subcategory.

Source: GAO analysis of information provided by U.S. Department of Agriculture (USDA) officials. | GAO-23-104709

Note: We analyzed the extent to which ERS and NIFA followed selected leading practices for strategic human capital management before the relocation to determine what practices were in place at that time, and after the relocation to determine what practices have been in place since the relocation.

[a]Extent followed as of September 2019.

[b]Extent followed after September 2019 through April 2022.

### ERS and NIFA Generally Followed Leading Practices for Recruitment and Hiring

ERS and NIFA generally followed leading practices for recruitment and hiring for three leading practices in the areas of customizing recruiting strategies for highly skilled positions, using clear and succinct vacancy announcements, and having an automated hiring process using computerized systems. For example, in 2018, ERS and NIFA identified severe shortages and critical needs in their respective workforces. To customize their recruiting strategies, the agencies subsequently applied for, and were granted by OPM, use of Direct Hire Authority—a tool to help the agency expedite hiring by eliminating certain constraints. According to agency officials, this authority enabled both agencies to hire qualified applicants for certain positions that were deemed critical by the agencies, such as biological scientists, without traditional hiring constraints, such as the use of competitive rating and ranking.[54]

In addition, the agencies partially implemented a fourth leading practice related to conducting regular surveys that gauge applicant and manager satisfaction with the hiring process. For example, ERS and NIFA officials said that, prior to the relocation, the agencies did not consistently conduct satisfaction surveys for new employees to assess training programs, though these officials said that the agencies conducted regular satisfaction surveys after the relocation.

---

[54]A Direct-Hire Authority enables an agency to hire, after public notice is given, any qualified applicant without regard to competitive rating and ranking, veterans' preference, and "rule of three" procedures. See 5 C.F.R. § 3304(a)(3); 5 C.F.R. §§ 211.101-211.103, 302.401, 337.201-337.206.

**ERS and NIFA Partially Followed Leading Practices for Strategic Workforce Planning and Training and Development**

*Strategic Workforce Planning*

Overall, ERS and NIFA partially followed leading practices for strategic workforce planning before and after the relocation. We found that ERS and NIFA generally followed many individual leading practices for strategic workforce planning before and after the relocation. For example, we found that both agencies identified the critical skills and competencies that its workforce needed to achieve agency goals.

However, both agencies partially followed other individual leading practices for strategic workforce planning. For example, both agencies could not show linkages between a strategic workforce plan and the agency's overall strategic plan—as called for by the leading practice for Workforce Planning—in part because each agency did not have a formal, documented process for strategically planning for long-term staffing needs and goals.[55] ERS and NIFA officials said that existing plans, such as informal staffing and hiring plans, and other planning efforts, were sufficient for implementing workforce planning activities. These officials said that ERS and NIFA rely on the USDA's *Strategic Plan Fiscal Years 2022-2026* and each agency's strategic plans, to think through long-term needs, but conduct planning on an annual basis, which allows the agencies flexibility to react to changing priorities and requirements.[56]

We have previously reported that key attributes of strategic workforce planning include (1) aligning the agency's human capital program with its current and emerging mission and programmatic goals; and (2) developing long-term strategies for acquiring, developing, and retaining staff to achieve programmatic goals.[57] As of August 2022, officials from both agencies said they do not currently have strategic workforce plans, nor do they intend to develop or document long-term strategies. ERS and NIFA officials said that, in previous years, the agencies had developed

---

[55]We found that ERS and NIFA did not have strategic workforce plans as of August 2022. As a result, we were unable to find linkages between strategic workforce plans and ERS's and NIFA's strategic plans or the department-level strategic plan.

[56]U.S. Department of Agriculture, *Strategic Plan Fiscal Years 2022-2026* (Washington, D.C.: March 2022); Economic Research Service, *Strategic Plan Fiscal Years 2021-2025* (Washington, D.C.); and National Institute of Food and Agriculture, *Strategic Plan Fiscal Years 2014-2018* (Washington, D.C.).

[57]GAO-04-39. These attributes differ from the leading practices we used to assess ERS's and NIFA's actions. The attributes provide additional information on effective strategic workforce planning.

detailed written plans to guide their strategic efforts for workforce planning, but department-level officials requested in May 2017 that agencies refrain from developing detailed written plans that could be documented into a long-range strategic workforce plan. ERS and NIFA officials did not provide an explanation for this request. By more fully following leading practices for workforce planning—and documenting these plans—to connect the research agencies' efforts with USDA's overall goals and long-term vision, the agencies may be better positioned to address future workforce gaps, achieve human capital management and mission goals, and address future staffing challenges.

In addition, both agencies conducted some succession planning activities, such as having a succession planning checklist for staff managers to ensure that activities were conducted. For example, the checklist calls for agency managers to ensure that the agency's succession plan is aligned with the department's succession strategies. ERS and NIFA officials said that these succession activities helped the agency replenish staff lost because of the relocation and guided the agencies to ramp up hiring after relocation.

However, the agencies did not document formal succession activities for leadership and other critical positions in a plan, before or after the relocation, as called for by the leading practice. As described above, the relocation led to a loss of over half the agencies' staff, with vacancies in key positions, such as managers and economists. According to agency officials, in May 2020, the decline in managers impacted their hiring because they did not have sufficient managers to help make decisions on hiring. According to *Standards for Internal Control*, effective documentation assists in management's design of internal control by establishing and communicating means to retain organizational knowledge and mitigate the risk of having that knowledge limited to a few personnel.[58] Despite the agencies' return to overall staff numbers comparable to prerelocation levels, given the high staff turnover that each agency experienced because of the relocation, retaining knowledge of succession planning and processes by documenting them is especially important, moving forward.

ERS and NIFA acknowledged that having documented plans could help the agencies' future planning for staffing changes, especially if there is management turnover. ERS officials said that the agency is developing a succession plan but does not have a specific timeline for its completion

---

[58]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

because of a shortage in staff and competing priorities. NIFA officials said that they expect to develop and issue a formal succession plan by the beginning of fiscal year 2023. By more fully following the leading practices for succession planning—and documenting these plans—to connect the research agencies' efforts with USDA's overall goals and long-term vision, the agencies may be better positioned to address future workforce gaps, achieve human capital management and mission goals, and address future staffing challenges.

### *Training and Development*

ERS and NIFA partially followed the leading practices for training and developing their workforce before and after the relocation. More specifically, we found that ERS and NIFA generally followed three of 12 leading practices within training and development after the relocation but partially followed the other nine leading practices after the relocation. For example, ERS and NIFA officials reported that they incorporate measures of effectiveness with clear links to organizational goals into some of the training courses they design, as called for by one of the leading practices. However, ERS and NIFA officials acknowledged that they partially followed other aspects of training and development leading practices. For example, ERS and NIFA officials said that the agencies partially followed the leading practice involving having a systematic process to evaluate the effectiveness of their training and development programs.

According to our leading practices, effective training and development programs are an integral part of a learning environment that can enhance agencies' ability to attract and retain employees with the skills and competencies needed to achieve results. Training and developing new staff to fill new roles and work in different ways is a crucial part of agencies' endeavors to meet their challenges. As we reported earlier, 66 percent of ERS staff and 79 percent of NIFA staff had been at their respective agencies for 2 years or less as of the end of fiscal year 2021. By more fully following the leading practices for training and development, ERS and NIFA can better prepare for, and execute, training that supports the needs of their workforce.

### ERS and NIFA Generally Did Not Follow Diversity Management Leading Practices

ERS and NIFA generally did not follow the leading practices for Diversity Management before and after the relocation. Specifically, we found that ERS and NIFA generally followed one of four leading practices within diversity management, partially followed two other leading practices, and generally did not follow one leading practice.

ERS and NIFA generally followed the leading practice for using a set of quantitative and qualitative measures to assess the impact of a diversity program. These measures are listed in program status reports, known as "MD-715 reports." These program status reports are an agency-specific document that outlines all demographic trends within ERS and NIFA, on a quarterly basis. These reports also outline specific Diversity, Equity, Inclusion, and Accessibility (DEIA)-related policy, procedures, and training requirements for the agency.

According to agency officials, ERS and NIFA rely on their annual and quarterly program status reports to plan workforce efforts related to DEIA. These officials also said that the reports are designed to help them address underrepresentation of specific groups in agency demographics, when compared to the civilian labor force. For example, in their 2020 annual program status report, NIFA identified a focus on hiring Hispanic or Latino personnel into its workforce and planned to conduct an in-depth analysis of the issue.[59] According to the report, NIFA's civil rights team planned to develop and implement an action plan in fiscal year 2022 to address this concern.

However, before the relocation, neither of the agencies had a diversity strategy or plan, as indicated in the leading practice for diversity planning. As stated previously, we found changes in the composition of the workforce of ERS and NIFA as a result of the relocation. These included declines in certain protected groups, including a sharp decline in Black or African American staff after the relocation and a more modest decline in employees 40 years and older. Officials from ERS and NIFA said that they did not specifically address these declines in workforce composition because the program status reports they rely on did not identify these groups as underrepresented compared to the civilian labor force. In addition, according to officials, because staff were allowed to wait until the effective date of the relocation to decide on whether to leave the agency if they did not want to relocate to Kansas City, Missouri, USDA had not planned for or anticipated such changes in its workforce when planning the relocations.

Officials from both agencies told us that they contributed to USDA's overall DEIA strategic plan, which was published in September 2022, and

---

[59]To assess changes in workforce as a result of the relocation, we analyzed data provided by ERS and NIFA before and after the relocation. ERS and NIFA officials said that the agencies compare their workforce composition to the civilian labor force, then address any underrepresentation shown by that process. We did not analyze workforce composition at ERS and NIFA compared to the civilian labor force.

will work on the agencies' diversity action plans based on the USDA plan.[60] Agency officials told us that the DEIA strategic plan will help guide USDA's efforts at recruiting diverse candidates, moving forward. ERS and NIFA officials also said that USDA hired a Chief Diversity and Inclusion Officer in fiscal year 2022.

However, ERS and NIFA officials acknowledged that they have not yet established formal diversity strategies or plans. In ERS's case, this is because they did not have a leadership committee in place to establish a strategy before and after the relocation. In NIFA's case, this is because the agency anticipates creating action plans—rather than a strategy—to avoid redundancy with USDA's DEIA strategic plan.

According to USDA's *Strategic Plan Fiscal Years 2022-2026*, USDA agency executives and managers are expected to implement initiatives and workforce strategies that account for diversity. NIFA officials said that they established a formal DEIA team that guides the agency's strategy in five areas, two of which pertain to workforce issues such as recruitment and accessibility. Officials from ERS and NIFA said that each agency will continue to monitor and recruit from groups within the agencies that are underrepresented, such as people of Hispanic or Latino ethnicity, compared to the civilian labor force.

In addition, as part of our assessment of each agency's actions against leading practices, we also found that ERS and NIFA did not adequately document their ongoing succession planning and recruiting process for attaining diverse candidates, which can help agencies acquire, develop, and retain staff. As described above, while the overall size of the workforce had mostly recovered by the end of fiscal year 2021, certain changes to the composition of the ERS and NIFA workforce persisted after the relocation.

While ERS and NIFA officials said that the agencies document succession planning and recruiting processes in their program status reports, we found that these reports did not provide adequate detail of succession planning and recruiting processes in place. For example, these reports did not include a detailed description of the agencies' recruiting processes, including plans for how the agencies will recruit diverse candidates. As stated above, according to *Standards for Internal Control*, effective documentation assists in management's design of internal control by establishing and communicating means to retain

---

[60]U.S. Department of Agriculture, *Diversity, Equity, Inclusion, and Accessibility Strategic Plan Fiscal Year 2022-2026* (Washington, D.C.: September 2022).

organizational knowledge and mitigate the risk of having that knowledge limited to a few personnel. By more fully following leading practices for Diversity Management, such as developing a strategy for sustaining diversity and documenting ongoing succession and recruiting planning processes, ERS and NIFA may be better positioned to strategically plan for changes in their workforce composition and to address staffing gaps in the future.

## Conclusions

USDA has taken steps to rebuild ERS and NIFA after losing substantial numbers of employees—as well as their institutional knowledge and critical expertise—in the wake of relocating the agencies from Washington, D.C., to Kansas City, Missouri. Since relocating in 2019, ERS and NIFA have leveraged various recruiting and hiring strategies, including the use of expanded telework and remote work capabilities, to quickly replace those who left and fill deficits in critical and hard-to-fill positions at both agencies. However, the workforces of ERS and NIFA look different than they did prior to the relocation. In particular, both agencies have experienced sharp declines in the number of certain protected groups, such as Black or African American staff. The agencies also have a workforce composed of mostly recent hires with significantly less experience at the agencies than the previous workforce.

Going forward, USDA could better position itself and its two research agencies to continue rebuilding and to navigate future organizational changes by taking actions that leverage leading practices for agency reforms. For example, USDA leadership made key decisions in 2018 and 2019 about how and where to relocate ERS and NIFA without articulating clear performance measures against which to assess progress and without incorporating the perspectives of impacted employees. By expanding the existing departmental regulation on reorganizations to more fully reflect leading practices for effective agency reforms—such as establishing performance measures and engaging employees to obtain their input—USDA would be better positioned to mitigate the impacts of future reorganizations on its employees.

In addition, the Secretary's decision not to follow the directives laid out in this departmental regulation meant that USDA was more vulnerable to the workforce turnover and disruptions in productivity caused by relocating ERS and NIFA. Expanding the scope of the departmental regulation on reorganizations to apply the guidance to all departmental reorganizations—and requiring the Secretary to explicitly document any reasons for diverging from such guidance—would improve decision-making and accountability for future agency reforms, including relocations.

Moreover, by more fully following leading practices related to strategic human capital management as they continue to rebuild their workforces, ERS and NIFA can better position themselves to address future workforce gaps, achieve human capital management and mission goals, and address future staffing challenges. For example, by more fully following leading practices, such as documenting a strategic workforce plan and agencies' succession plans, planning for and evaluating training and development efforts, and documenting recruiting processes for hiring diverse candidates, ERS and NIFA can be better positioned to carry over knowledge of these plans and processes and hire, develop, and retain staff, going forward.

## Recommendations for Executive Action

We are making a total of eight recommendations to USDA:

The Secretary of Agriculture should expand the departmental regulation on reorganizations to more fully reflect leading practices on agency reforms, such as documenting performance measures and enhancing employee engagement. (Recommendation 1)

The Secretary of Agriculture should expand the departmental regulation on reorganizations to apply its guidance to all departmental reorganizations and require documentation of the reasons for any deviation from the departmental regulation, including for decisions by the Secretary to do so. (Recommendation 2)

The Research, Education, and Economics Under Secretary should require ERS to more fully follow leading practices for strategic workforce planning, such as documenting a strategic workforce plan and agency succession plans. (Recommendation 3)

The Research, Education, and Economics Under Secretary should require NIFA to more fully follow leading practices for strategic workforce planning, such as documenting a strategic workforce plan and agency succession plans. (Recommendation 4)

The Research, Education, and Economics Under Secretary should require ERS to more fully follow leading practices for training and development, such as planning for, designing, implementing, and evaluating training and development programs and efforts. (Recommendation 5)

The Research, Education, and Economics Under Secretary should require NIFA to more fully follow leading practices for training and development, such as planning for, designing, implementing, and evaluating training and development programs and efforts. (Recommendation 6)

The Research, Education, and Economics Under Secretary should require ERS to more fully follow leading practices for diversity management, such as developing a strategy for sustaining diversity and inclusion and documenting ongoing succession and recruiting planning processes. (Recommendation 7)

The Research, Education, and Economics Under Secretary should require NIFA to more fully follow leading practices for diversity management, such as developing a strategy for sustaining diversity and inclusion and documenting ongoing succession and recruiting planning processes. (Recommendation 8)

## Agency Comments and Our Evaluation

We provided a draft of this report to USDA for review and comment. USDA generally agreed with our recommendations. In its comments, reproduced in appendix V, USDA stated that both ERS and NIFA have been proactively addressing the recommendations outlined in the report related to strategic workforce planning. USDA also noted that we did not fully define or reference the leading practices around which the report is centered in the body of the report. We listed the numerous individual leading practices in appendix IV, and provided citations to the original GAO reports, which describe the leading practices, in the body of the report. The information in appendix IV shows the individual leading practices within these categories, as well as the extent to which the agencies have followed each individual leading practice. We believe this should be sufficient for USDA officials to identify all of the relevant leading practices.

USDA also requested that we include information on how these leading practices are communicated to departments and agencies and what the expectations are for following them. We are recommending that ERS and NIFA more fully follow leading practices for strategic workforce planning, training and development, and diversity management. We believe it is up to USDA management to determine how to communicate this information to its agencies, as well as to set expectations for the agencies to more fully follow these leading practices. USDA also provided technical comments, which we incorporated as appropriate.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to the appropriate congressional committees, the Secretary of Agriculture, and other interested parties. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-3841 or morriss@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix VI.

Steve D. Morris
Director, Natural Resources and Environment

*List of Requesters*

The Honorable Debbie Stabenow
Chairwoman
Committee on Agriculture, Nutrition, and Forestry
United States Senate

The Honorable Gerald E. Connolly
Chairman
Subcommittee on Government Operations
Committee on Oversight and Reform
House of Representatives

The Honorable Donald S. Beyer, Jr.
House of Representatives

The Honorable Suzanne Bonamici
House of Representatives

The Honorable Mikie Sherrill
House of Representatives

The Honorable Paul Tonko
House of Representatives

The Honorable Jennifer Wexton
House of Representatives

# Appendix I: Objectives, Scope, and Methodology

Appendix I: Objectives, Scope, and Methodology

You asked us to review the U.S, Department of Agriculture's (USDA) relocation of two of its research agencies, the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA). This report (1) describes the legal and regulatory authorities and requirements that USDA identified for relocation of ERS and NIFA and what actions the department took in response; (2) describes how the relocation of ERS and NIFA affected the agencies' human resources and productivity; and (3) evaluates the extent to which USDA's relocation of ERS and NIFA, and these agencies' efforts since the relocation, follow relevant leading practices for agency reforms and strategic human capital management. We also describe key tools available for congressional oversight of relocations in appendix II.

To describe the authorities and requirements that USDA identified and the actions that the department took in response, we collected written responses from USDA's Office of General Counsel on their understanding of the authorities that the department had and what legal and regulatory requirements USDA was subject to in relocating offices at the time of the relocation, and actions taken in response to these requirements. As of December 2022, GAO has ongoing work on two legal decisions related to issues arising from the relocation. For this review, we did not independently review or verify the list of authorities and requirements that USDA identified, nor did we review whether the department's actions satisfied the requirements identified.

To describe how the relocation affected the agencies' human resources, we analyzed trends in ERS's and NIFA's human resources data taken from the EmpowHR data system for fiscal years 2015 through 2021. These data included employees' work status, position title, and duty station, as well as demographical characteristics such as race, age, gender, and disability status. Some of these data were for groups that are identified as "protected classes" under federal law. Protected classes include race, color, religion, sex, national origin, age, and disability.

To describe how the relocation affected the agencies' productivity, we analyzed trends in ERS's and NIFA's primary activities. Specifically, to identify trends in the number of ERS products before and after the relocation, we analyzed the number of ERS outlook and research reports issued from fiscal years 2015 through 2021. We collected data on these reports from the agency's website. In addition, we collected data provided by the agency on the number of journal articles and conducted a search of peer-reviewed literature to identify possible missing articles and added missing articles. We reported on fiscal years 2018 through 2021 because

Appendix I: Objectives, Scope, and
Methodology

we considered these reliable, while data for prior years appeared not to be reliable. We discuss the reliability of the data below.

To identify trends in processing time for NIFA competitive grant funding, we analyzed data on the number of days from the date that staff input proposal data into NIFA's grant system to the date that the grant was funded. We analyzed these data for grants for which proposals were due from fiscal years 2015 through 2020. We used the date that NIFA staff input the proposal data into the agency's grant system as the "start" date for the grant funding process because officials said this was within a few days of when they started processing the grant. The "funding" date represents the date that funds were first available to the grant recipient.

We collected data on NIFA competitive grants for fiscal years 2015 through 2020 from NIFA's grants management legacy system, the Cooperative Research, Education, and Extension Management System (CREEMS). We also analyzed NIFA data to calculate the number and percentage of grants that received funding, by four dates (i.e., the end of March, April, May, and June) in the following year.

We also conducted this analysis for capacity grants for fiscal years 2017 through 2021, the years for which data were available from USDA's ezFedGrants system. However, we were unable to identify trends in processing time in days for capacity grants because the data system used for capacity grants did not have the data needed to conduct this analysis.

We assessed the reliability of all of these data (EmpowHR, ERS website, CREEMS, ezFedGrants) by reviewing documentation; interviewing agency officials; and performing electronic testing, such as looking for missing data. For these data sources, we determined that the data we reported were sufficiently reliable for responding to this objective.

To determine the extent to which USDA actions followed leading practices, we assessed USDA's actions to relocate ERS and NIFA against leading practices for effective agency reforms and for strategic human capital management. To do this, we first selected specific leading practices relevant to relocations from the list of leading practices for effective agency reforms and then assessed USDA's actions in relocating

ERS and NIFA against those selected leading practices.[1] Similarly, we selected specific leading practices relevant to relocations from strategic workforce planning principles identified in relevant GAO reports, and assessed ERS's and NIFA's human capital planning process and practices during and after the relocation against those selected leading practices.[2]

For these assessments of leading practices, we used the terms "generally followed," "partially followed," and "generally did not follow" to reflect our determination of the extent to which USDA's, or ERS's and NIFA's, actions were consistent with each of the selected practices.[3] A determination of "generally followed" means that evidence provided by USDA, or ERS and NIFA, indicates that their actions followed all or most aspects of the leading practice; a determination of "partially followed" means that evidence provided by USDA, or ERS and NIFA, indicates that their actions followed some, but not most, aspects of the leading practice; and a determination of "generally did not follow" means that evidence provided by USDA, or ERS and NIFA, indicates that their actions followed few to no aspects of the selected leading practice. (See app. IV for tables summarizing the results of these assessments.)

For the agency reforms assessment, we had two separate analysts independently assess USDA's actions against each selected leading practice for effective agency reforms. These analysts reconciled their

---

[1]GAO, *Government Reorganization: Key Questions to Assess Agency Reform Efforts,* GAO-18-427 (Washington, D.C.: June 13, 2018). This *Government Reorganization: Key Questions to Assess Agency Reform Efforts* report included numerous leading practices for effective agency reforms and grouped those practices by category and subcategory. From these, we identified as relevant 15 leading practices from the following seven subcategories: (1) Establishing Goals and Outcomes, (2) Involving Employees and Key Stakeholders; (3) Using Data and Evidence; (4) Leadership Focus and Attention, (5) Managing and Monitoring, (6) Employee Engagement, and (7) Strategic Workforce Planning. We conducted our assessment at the individual leading practice and subcategory levels.

[2]GAO, *Human Capital: Additional Collaboration Between OPM and Agencies Is Key to Improved Federal Hiring*, GAO-04-797 (Washington, D.C.: June 7, 2004); *Human Capital: A Guide for Assessing Strategic Training and Development Efforts in the Federal Government*, GAO-04-546G (Washington, D.C.: March 2004); *Human Capital: Key Principles for Effective Strategic Workforce Planning*, GAO-04-39 (Washington, D.C.: Dec. 11, 2003; and *Human Capital: Opportunities to Improve Executive Agencies' Hiring Processes,* GAO-03-450 (Washington, D.C.: May 30, 2003).

[3]Since both sets of leading practices include strategic workforce planning, we provide a high-level assessment in the agency reforms section and provide an in-depth discussion as part of the strategic human capital management section.

**Appendix I: Objectives, Scope, and Methodology**

independent assessments—including flagging and discussing any differences, as well as obtaining clarification from agency officials and internal stakeholders, as needed, as part of their reconciliation process—and agreed upon final determinations as to the extent to which USDA actions followed selected leading practices. We followed a similar methodology to assess USDA's actions at the subcategory level.[4] The evidence on which these assessments were based included departmental guidance, press releases, and other documents; interviews with department and agency officials; interviews with union representatives to understand the context for unionizing; and USDA's written responses to two questionnaires—our initial questionnaire distributed in August 2021 and a follow-up questionnaire distributed in December 2021—that asked for descriptions of, and evidentiary support for, the actions that USDA took in relation to each of the selected leading practices. We also incorporated evidence and findings from our April 2022 report examining the evidence used by USDA in its decision to relocate ERS and NIFA to the Kansas City region.[5]

For the strategic human capital management assessment, to determine the extent to which ERS's and NIFA's actions followed leading practices before and after relocation, we assessed ERS's and NIFA's actions to relocate these agencies against leading practices for strategic human capital management. To do this, we selected specific leading practices relevant to relocations from strategic workforce planning principles identified in relevant GAO reports and assessed ERS's and NIFA's human capital planning process and practices, including strategic workforce planning, recruiting and hiring, training, and diversity management, during and after the relocation against those selected

---

[4]Given that GAO-18-427 organizes the leading practices it articulates into subcategories, we applied a similar methodology in assessing USDA's actions at the subcategory level. See table 16 in app. IV for our assessment of USDA's actions by subcategory as well as by selected individual leading practice.

[5]GAO, *Evidence-Based Policy Making: USDA's Decision to Relocate Research Agencies to Kansas City Was Not Fully Consistent with an Evidence-Based Approach,* GAO-22-104540 (Washington, D.C.: Apr. 19, 2022.)

Appendix I: Objectives, Scope, and
Methodology

leading practices.[6] We assessed ERS's and NIFA's actions at the individual practice level and at the subcategory level.[7]

To collect responses from and conduct this analysis, we developed and administered, from February 2021 to February 2022, questionnaires about strategic human capital management—including strategic workforce planning, recruiting and hiring, training and development, and diversity management—to officials from USDA, ERS, and NIFA. We then analyzed and compared information provided by these officials to relevant criteria from leading practices and other sources. For example, we compared ERS's and NIFA's documentation related to strategic workforce planning, to (1) GAO's management tool on strategic workforce planning, (2) our reports on key principles for effective strategic workforce planning, and (3) standards for internal controls related to effective documentation.[8] We reviewed documentation from these questionnaires and conducted follow-up semistructured interviews with officials from ERS, NIFA, and the Human Capital Office.

We collected and analyzed responses and self-assessments from ERS and NIFA, including documentation that these agencies sent to us, which served as the basis for ERS's and NIFA's supporting evidence to demonstrate whether ERS or NIFA believed that they followed leading practices for strategic human capital management. We assessed ERS and NIFA actions, respectively, against a total of 37 leading practices (17 in strategic workforce planning, four in recruitment and hiring, 12 in training, and four in diversity management).

Two of our analysts independently reviewed agency documentation, if available, from ERS and NIFA on strategic human capital management leading practices, as well as responses from these officials to our semistructured interview questions and came to full agreement on all assessments. In cases where the two analysts differed in their conclusion about whether the leading practice was followed, a third analyst assessed

---

[6]GAO-03-450; GAO-04-39; GAO-04-546G; GAO-04-797; and GAO, *Diversity Management: Expert-Identified Leading Practices and Agency Examples,* GAO-05-90 (Washington, D.C.: Jan. 14, 2005).

[7]We assessed ERS's and NIFA's actions by individual leading practices and groups for strategic workforce planning and training, and at the subcategory levels for recruitment and hiring and diversity management. This is because for recruitment and hiring and diversity management, there were only four leading practices in each areas. Therefore, we evaluated each individual practice and provided an assessment overall at the subcategory level for these areas.

[8]GAO, *Standards for Internal Controls in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

agency actions against leading practices and provided an independent assessment.

USDA officials had the opportunity to review these initial assessments and provide additional information about their strategic human capital management processes, which we incorporated, as appropriate. We also reviewed agency documentation outside of those obtained through the questionnaires and interviewed department and agency officials, as well as union representatives, to obtain broader perspectives on ERS and NIFA strategic human capital management issues.

For all objectives, we reviewed agency documentation and interviewed department and agency officials about the relocation of ERS and NIFA. We also summarized tools for congressional oversight identified in GAO-05-325SP[9] and the Congressional Research Service's *Congressional Oversight Manual.*[10] (See app. II.)

We conducted this performance audit from January 2021 to December 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[9]GAO, *21st Century Challenges: Reexamining the Base of the Federal Government*, GAO-05-325SP (Washington, D.C.: February 2005).

[10]Congressional Research Service, *Congressional Oversight Manual*, RL 30240 (Updated Mar. 31, 2021).

# Appendix II: Key Tools Available to Congress to Oversee Proposed Agency Relocations

Appendix II: Key Tools Available to Congress to Oversee Proposed Agency Relocations

Oversight occurs through a wide variety of congressional activities. In 1993, the Joint Committee on the Organization of Congress defined congressional oversight as the "review, monitoring, and supervision of the executive and the implementation of public policy."[1]

To identify key tools—processes and actions—available to Congress to oversee proposed agency relocations, we reviewed our 2005 report on reexamining the base of the federal government[2] and the Congressional Research Service's (CRS) *Congressional Oversight Manual*.[3] We did not attempt to determine how Congress could have applied oversight tools to the 2019 relocations of the U.S. Department of Agriculture's Economic Research Service and the National Institute of Food and Agriculture from the National Capital Region to Kansas City, Missouri.

Our 2005 report on reexamining the base of the federal government discussed congressional processes that facilitate oversight, including the budget, reauthorization, and appropriations processes. That report also described the separate oversight process available outside of the budget, reauthorization, and appropriations processes. This separate oversight process includes work done by oversight committees, as well as audits by GAO and agencies' inspectors general. In addition, the report identified special temporary commissions as a supplement to the existing congressional processes and entities.

CRS's *Congressional Oversight Manual* provides extensive information on the legislative, budget, reauthorization, appropriations, and investigatory processes that are available for congressional oversight.[4] Summarized from the *Congressional Oversight Manual*, table 5 shows the processes and the examples of actions available to Congress that it could use to oversee proposed agency relocations.

---

[1]Joint Committee on the Organization of Congress, Organization of Congress: Final Report, 103rd Cong. (Comm. Print 1993), S. Rept. 103-215; H.R. Rept. 103-413, p. 150.

[2]GAO, *21st Century Challenges: Reexamining the Base of the Federal Government*, GAO-05-325SP (Washington, D.C.: February 2005).

[3]Congressional Research Service, *Congressional Oversight Manual*, RL 30240 (Mar. 31, 2021).

[4]Congressional Research Service, *Congressional Oversight Manual*.

**Table 5: Processes and Actions Available to Congress That It Could Use to Oversee Proposed Agency Relocations (Summarized from the Congressional Research Service's *Congressional Oversight Manual*)**

| Legislative process |
|---|
| While oversight is frequently considered to be a separate track of congressional activity running adjacent to the body's exercise of legislative authority, there are important ways in which the two activities overlap. In some cases, Congress establishes reporting and study requirements for GAO, inspectors general, and agencies that generate recommendations for agency or congressional action, which, in turn, provide both oversight information and ideas for potential legislation. As Congress has expanded its use of statutory tools that facilitate oversight, it has devoted more attention to developing such legislation, overseeing its implementation, and evaluating its effectiveness.[5] In turn, these additional data flowing toward Congress and the public on an ongoing basis can be used to inform work on legislation. Legislative actions include the following: <ul><li>**Reporting requirements.** Statutory provisions for reporting vary in terms of the specificity, detail, and type of information that Congress demands. Reports may be required at periodic intervals, such as semiannually or at the end of a fiscal year, or submitted only if and when a specific event, activity, or set of conditions exists. For example, the statutory provisions may call upon agencies to (1) alert Congress or particular committees and subcommittees about a proposed or planned activity or operation; or (2) provide information about specific ongoing or just-completed operations, projects, or programs.</li><li>**Notice and prior consultation.** Congress sometimes includes provisions in law or in committee report language that require or direct agencies to consult with Congress or nonfederal stakeholders before taking certain actions. Provisions such as these may inform Congress and the public about agencies' plans and activities. The provisions may create opportunities for Congress and nonfederal stakeholders to influence an agency's decision-making.</li></ul> |

[5]An example of such legislation is the Government Performance and Results Act Modernization Act of 2010, which updated the system for Congress and the executive branch to identify and consider the elimination of reporting requirements that are no longer useful. Pub. L. No. 111-352, § 11, 124 Stat. 3866, 3881 (2011).

| Budget process |
| --- |
| The budget process permits Congress to determine budget policy as a whole; relate revenue and spending decisions; determine priorities among competing national programs; and ensure that revenue, spending, and debt legislation are consistent with the overall budget policy.<br><br>The budget process has the potential to strengthen oversight by enabling Congress to better relate program priorities to financial claims on the national budget. Each committee, knowing that it will receive a fixed amount of the total to be included in a budget resolution, has an incentive to scrutinize existing programs to make room for new programs or expanded funding of ongoing projects or to assess whether programs have outlived their usefulness.<br><br>The House and Senate Budget Committees, in preparing to report the annual concurrent budget resolution, conduct hearings on overall federal budget policy. These hearings, and other fiscal analyses made by these panels, address various aspects of federal programs and funding levels that can be useful sources of information. |
| **Authorization-reauthorization process** |
| Through its authorization power, Congress exercises significant control over government agencies. The entire authorization process may involve a host of oversight tools—hearings, studies, and reports—but the key to the process is the authorization statute. An authorization statute creates and shapes government programs and agencies, and it contains the statement of legislative policy for the agency. Authorization is the first lever in congressional exercise of the power of the purse. It usually allows an agency to be funded, but it does not guarantee financing of agencies and programs. Frequently, authorizations establish dollar ceilings on the amounts that can be appropriated.<br><br>In addition to formal amendment of the agency's authorizing statute, the authorization process gives committees an opportunity to exercise informal, nonstatutory controls over the agency. Nonstatutory controls used by committees to exercise direction over the administration of laws include statements made in committee hearings, committee reports accompanying legislation, floor debate, and contacts and correspondence with the agency. |

---

**Appropriations process**

Each year, the House and Senate Committees on Appropriations review the financial practices and needs of federal agencies. The appropriations process allows Congress to exercise extensive control over the activities of executive agencies. Congress can define the precise purposes for which money may be spent, adjust funding levels, and prohibit expenditures for certain purposes.

The oversight function of the Committees on Appropriations derives from their responsibility to examine the budget requests of the agencies as contained in the President's budget. The decisions of the committees are conditioned on their assessment of the agencies' need for their budget requests as indicated by past performance. In practice, the entire record of an agency is fair game for the required assessment. This comprehensive overview and the "carrot and stick" of appropriations recommendations (i.e., the authority of the committees to withhold or reduce appropriations to uncooperative agencies) make the committees significant focal points of congressional oversight and are a key source of their power in Congress and in the federal government generally.

**Statutory controls in appropriations:** Enacted appropriations legislation frequently contains at least five types of statutory controls on agencies:

1. It specifies the purpose for which funds may be used.

2. It defines the specified funding level for the agency as a whole, as well as for programs and divisions within the agency.

3. It sets time limits on the availability of funds for obligation.

4. It may contain limitation provisions. For example, in appropriating $79,500,000, for certain activities of the U.S. Trade and Development Agency, Congress added this condition: "Provided, That of the funds appropriated under this heading, not more than $5,000 may be available for representation and entertainment expenses."[6]

5. It may stipulate how an agency's budget can be reprogrammed (shifting funds within an appropriations account) or transferred (shifted between appropriations accounts).

---

[6]Pub. L. No. 116-6, 133 Stat. 13, 293 (2019).

**Nonstatutory controls in appropriations:** Nonstatutory controls are a major form of oversight. Language in committee reports and in hearings, letters to agency heads, and other communications give detailed instructions to agencies regarding committee expectations and desires. Agencies are not legally obligated to abide by nonstatutory recommendations, but failure to do so may result in a loss of funds and flexibility the following year.

**Limitations and riders on appropriations:** Congress generally uses a two-step legislative procedure: (1) authorization of programs in bills reported by legislative committees, (2) followed by the funding of those programs in bills reported by the Committees on Appropriations. Congressional rules generally encourage these two steps to be distinct and sequential. Authorizations should not be in general appropriation bills or appropriations in authorization measures. However, there are various exceptions to the general principle that Congress should not make policy through the appropriations process. One exception is the practice of permitting "limitations" in an appropriations bill. So-called riders (language extraneous to the subject of the bill) are also sometimes added to control agency actions.

- **Limitations:** Although House rules forbid in any general appropriations bill a provision "changing existing law," certain "limitations" may be admitted. "Just as the House under its rules may decline to appropriate for a purpose authorized by law, so it may by limitation prohibit the use of the money for part of the purpose while appropriating for the remainder of it."[7] Limitations can be an effective device in oversight by strengthening Congress's ability to exercise control over federal spending and to reduce unnecessary or undesired expenditures. Under House Rule XXI, no provision changing existing law can be reported in any general appropriation bill "except germane provisions that retrench expenditures by the reduction of amounts of money covered by the bill" (the so-called "Holman rule," rarely used in modern practice).
- **Riders:** Unlike limitations, legislative "riders" are extraneous to the subject matter of the bill to which they are added. Riders appear in both authorization bills and appropriations bills. In the latter case, such provisions would be subject to a point of order in the House on the grounds that they are attempts to place legislation in an appropriations bill, although in

---

[7] *Constitution, Jefferson's Manual, and the Rules of the House of Representatives*, H. Doc. No. 115-177, 115th Cong., 2nd sess.

almost every case, Members' ability to lodge a point of order may be restricted by the procedure used to consider the legislation. In the Senate, Rule XVI prohibits the addition to general appropriations bills of amendments that are legislative or nongermane. Both chambers have procedures to waive these prohibitions.

**Advance notification or report-and-wait:** Statutory provisions may stipulate that before a particular activity can be undertaken by the executive branch or funds obligated, Congress must first be advised or informed, ordinarily through a full written statement, of what is being proposed. These statutory provisions usually provide for a period during which action by the executive branch must be deferred, giving Congress an opportunity to pass legislation prohibiting the pending action or using political pressure to cause executive officials to retract or modify the proposed action.

**Investigatory process**

The House Committee on Oversight and Reform and the Senate Committee on Homeland Security and Governmental Affairs have broad oversight jurisdiction over virtually the entire federal government. They have been vested with broad investigatory powers over government-wide activities.

In addition, Congress uses a variety of sources for information and analysis to support its oversight activities. Most of this assistance is provided by legislative support agencies: the Congressional Budget Office (CBO), the Congressional Research Service (CRS), and the Government Accountability Office (GAO). In addition to the legislative support agencies, various support offices established in the House and Senate may have a role in oversight through the legal, legislative, administrative, financial, and ceremonial functions they perform.

Specific investigatory tools include the following:
- The professional staff of House and Senate committees can provide the expertise required to conduct effective oversight and investigations. Committees frequently rely on informal tools to gather the information necessary to accomplish the committee's investigative goals, such as staff-level communication and contacts and voluntary compliance with document and briefing requests.
- Committees may hire consultants, "borrow" staff from federal departments, or employ academics and others with specialized expertise.

- Offices of Inspector General conduct and publish audits and investigations, among other duties.

- The CBO Director is authorized to "secure information, data, estimates, and statistics directly from the various departments, agencies, and establishments" of the government. CBO provides an objective, impartial, and nonpartisan source of budgetary and economic information to support the congressional budget process in the House and Senate. Economists and policy analysts at CBO generate a variety of products in support of Congress and the budget process, including dozens of reports and hundreds of cost estimates each year.

- CRS is the public policy research arm of Congress. CRS analysts, attorneys, and information specialists provide nonpartisan, confidential analysis on current and emerging issues of national policy.

- GAO is an independent auditor of government agencies and has statutory authority to gather information from and investigate agencies. GAO's mission is to support Congress in meeting its constitutional responsibilities and to help improve the performance and ensure the accountability of the federal government.

- The Offices of Senate Legal Counsel and House General Counsel perform functions important to committee oversight, including representing the committees of their respective chambers in certain judicial proceedings.

- The House and Senate can establish select or special committees to probe issues and agencies, promote public understanding of national concerns, and coordinate oversight of issues that span the jurisdiction of more than one standing committee.

**Appendix II: Key Tools Available to Congress
to Oversee Proposed Agency Relocations**

---

| Other oversight actions |
|---|
| Other actions that may assist congressional oversight of proposed agency relocations include the following:<br><br>• **Study commissions.** Congress has convened study commissions to review and evaluate programs, policies, and operations of the government.<br><br>• **Office of Management and Budget (OMB).** OMB is a potential source of information for investigative and oversight committees because of its role as central coordinator and overseer for executive agencies. OMB functions in many ways as the President's agent for the management and implementation of policy, including the federal budget. In addition, Congress may, through legislation, assign duties to OMB in order to establish oversight mechanisms and advance congressional oversight objectives.<br><br>• **Nonfederal stakeholders.** Committees and Members can acquire useful information about executive branch programs and performance from nonfederal stakeholders. Think tanks and good government organizations are research entities that periodically conduct studies of public policy issues that may inform Members and committees on how well federal agencies and programs are working. In addition, nongovernmental organizations, entities that are independent of government involvement or control, might provide assistance to congressional overseers in navigating a broad range of policy issues.<br><br>• **Resolutions of inquiry.** The House of Representatives can call upon the executive branch for factual information through resolutions of inquiry (House Rule XIII, clause 7). This is a simple resolution considered in, and approved by, only the House. Resolutions of inquiry are addressed to either the President or heads of Cabinet-level agencies to supply specific factual information to the chamber. Such resolutions are to ask for facts, documents, or specific information. |

Source: GAO summary of information from the Congressional Research Service's *Congressional Oversight Manual*. RL 30240 (Mar. 31, 2021). | GAO-23-104709

# Appendix III: Additional Human Resources-Related Data

This appendix contains several tables that show additional human resources data obtained from the U.S. Department of Agriculture (USDA). The following tables, figure, and information are included in this appendix:

- Table 6: ERS and NIFA New Hires and Estimated Departures of Permanent Full-Time Staff, for Fiscal Years 2018 through 2021

- Table 7: ERS and NIFA Permanent Full-Time Staff, by Key Positions, Fiscal Years 2015 through 2021

- Table 8: ERS and NIFA Permanent Full-Time Staff, by Permanent Duty Station, Fiscal Years 2018 through 2021

- Table 9: ERS and NIFA Permanent Full-Time Staff, by Years of Service at ERS or NIFA, Fiscal Years 2015 through 2021

- Figure 9: ERS and NIFA Permanent Full-Time Staff, by Race and Ethnicity, at end of Fiscal Years 2015 through 2021

- Table 10: ERS and NIFA Permanent Full-Time Staff, by Gender, Fiscal Years 2015 through 2021

- Table 11: ERS and NIFA Permanent Full-Time Staff, by Age, Fiscal Years 2015 through 2021

- Table 12: ERS and NIFA Permanent Full-Time Staff, by Veterans' Preference, Fiscal Years 2015 through 2021

- Table 13: ERS and NIFA Permanent Full-Time Staff, by Self-Identified Disability, Fiscal Years 2015 through 2021

- Table 14: Competitive Grants Funded, by Four Dates, for the Fiscal Year Following the Grant Year for Fiscal Years 2015 through 2020 Grants

- Table 15: Capacity Grants Whose Appropriation Was Funded in Fiscal Years 2017 through 2021 That Received at Least One Payment, by Four Dates in the Same Year

**Appendix III: Additional Human Resources-Related Data**

**Table 6: ERS and NIFA New Hires and Estimated Departures of Permanent Full-Time Staff, for Fiscal Years 2018 through 2021**

| Agency | Status | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 | Fiscal year 2021 |
|---|---|---|---|---|---|
| ERS | Hired | +9 | +18 | +71 | +66 |
| | Estimated departures[a] | -34 | -121 | -27 | -17 |
| NIFA | Hired | +10 | +13 | +108 | +78 |
| | Estimated departures[a] | -29 | -157 | -31 | -24 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture (USDA) data. | GAO-23-104709

[a]These are estimated totals because we were unable to determine the exact fiscal year during which some staff transferred to another USDA agency. Specifically, some ERS and NIFA staff who departed from those agencies transferred to other agencies within USDA. Because of the delays in data entry into the human resources system, the exact date when internal staff transfers took effect is unclear and could have taken place in the subsequent fiscal year.

**Table 7: ERS and NIFA Permanent Full-Time Staff, by Key Positions, Fiscal Years 2015 through 2021**

| Agency | Position | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | Economists | 194 | 189 | 181 | 165 | 131 | 129 | 168 |
| | Managers and supervisors | 33 | 36 | 36 | 32 | 27 | 20 | 31 |
| NIFA | Biological science specialists | 71 | 72 | 76 | 70 | 58 | 63 | 82 |
| | Grants management specialists | 27 | 21 | 17 | 17 | 11 | 30 | 29 |
| | Managers and supervisors | 38 | 41 | 43 | 38 | 28 | 25 | 27 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

**Table 8: ERS and NIFA Permanent Full-Time Staff, by Permanent Duty Station, Fiscal Years 2018 through 2021**

| Agency | Duty station | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|
| ERS | Kansas City, MO | 0 | 14 | 109 | 168 |
| | Washington, D.C. | 270 | 194 | 82 | 77 |
| | Other locations[a] | 3 | 2 | 2 | 1 |
| NIFA | Kansas City, MO | 0 | 10 | 164 | 215 |
| | Washington, D.C. | 288 | 186 | 19 | 20 |
| | Other locations[a] | 0 | 1 | 0 | 11 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

[a]Some staff were located in places other than Kansas City, MO, and Washington, D.C., such as Colorado and Georgia.

**Table 9: ERS and NIFA Permanent Full-Time Staff, by Years of Service at ERS or NIFA, Fiscal Years 2015 through 2021**

| Agency | Years of service at ERS or NIFA | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | Two years or less | 67 | 75 | 66 | 44 | 33 | 105 | 163 |
| | More than 2 years | 250 | 233 | 231 | 229 | 177 | 88 | 83 |
| NIFA | Two years or less | 46 | 62 | 72 | 52 | 32 | 127 | 195 |
| | More than 2 years | 275 | 252 | 235 | 236 | 165 | 56 | 51 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

Appendix III: Additional Human Resources-
Related Data

**Figure 9: Number of Permanent Full-Time Staff at ERS and NIFA, by Race and Ethnicity, end of Fiscal Years 2015 through 2021**





Source: GAO analysis of U.S. Department of Agriculture (USDA) data.  |  GAO-23-104709

[a]Other races includes Asian, Native Hawaiian, and Pacific Islander. These are grouped together because USDA's race and ethnicity data combine the categories of Asian, Native Hawaiian, and Pacific Islander.

**Table 10: ERS and NIFA Permanent Full-Time Staff, by Gender, Fiscal Years 2015 through 2021**

| Agency | Gender[a] | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | Female | 144 | 145 | 134 | 128 | 94 | 73 | 97 |
|  | Male | 173 | 163 | 163 | 145 | 116 | 120 | 149 |
| NIFA | Female | 206 | 192 | 185 | 175 | 122 | 108 | 148 |
|  | Male | 115 | 122 | 122 | 113 | 75 | 75 | 98 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

[a]Although the terms "male" and "female" are not inclusive of all gender identities, we use these terms here to encompass all employees. Because of the definitions used in the agency's employee data, we were unable to analyze gender beyond the binary categories of male and female.

**Table 11: ERS and NIFA Permanent Full-Time Staff, by Age, Fiscal Years 2015 through 2021**

| Agency | Age | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | 39 and under | 85 | 84 | 78 | 67 | 47 | 75 | 104 |
|  | 40 and over | 232 | 224 | 219 | 206 | 163 | 118 | 142 |
| NIFA | 39 and under | 75 | 73 | 66 | 55 | 34 | 53 | 82 |
|  | 40 and over | 246 | 241 | 241 | 233 | 163 | 130 | 164 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

**Table 12: ERS and NIFA Permanent Full-Time Staff, by Veterans' Preference, Fiscal Years 2015 through 2021**

| Agency | Veterans' preference | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | Has a veterans' preference | 14 | 13 | 13 | 14 | 13 | 24 | 29 |
|  | Does not have a veterans' preference | 303 | 295 | 284 | 259 | 197 | 169 | 217 |
| NIFA | Has a veterans' preference | 31 | 30 | 29 | 25 | 12 | 25 | 39 |
|  | Does not have a veterans' preference | 290 | 284 | 278 | 263 | 185 | 158 | 207 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

**Table 13: ERS and NIFA Permanent Full-Time Staff, by Self-Identified Disability, Fiscal Years 2015 through 2021**

| Agency | Disability | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | Identified disability | 17 | 18 | 18 | 18 | 15 | 16 | 17 |
| | No disability identified | 294 | 283 | 273 | 249 | 192 | 161 | 195 |
| | Did not identify | 6 | 7 | 6 | 6 | 3 | 16 | 34 |
| NIFA | Identified disability | 29 | 31 | 33 | 30 | 23 | 12 | 19 |
| | No disability identified | 283 | 274 | 265 | 250 | 165 | 144 | 187 |
| | Did not identify | 9 | 9 | 9 | 8 | 9 | 27 | 40 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

**Table 14: Number and Percent of Competitive Grants Funded, by Four Dates, for the Fiscal Year Following the Grant Year for Fiscal Years 2015 through 2020 Grants**

| Fiscal year of grant | Total number of competitive grants | Number of competitive grants funded by this date the following year | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | March 31 Number | Percent of total | April 30 Number | Percent of total | May 31 Number | Percent of total | June 30 Number | Percent of total |
| 2015 | 1,128 | 1,060 | 94 | 1,074 | 95 | 1,095 | 97 | 1,112 | 99 |
| 2016 | 1,238 | 925 | 75 | 1,027 | 83 | 1,165 | 94 | 1,210 | 98 |
| 2017 | 1,348 | 1,112 | 83 | 1,239 | 92 | 1,275 | 95 | 1,302 | 97 |
| 2018 | 1,460 | 949 | 65 | 1,092 | 75 | 1,263 | 87 | 1,322 | 91 |
| 2019 | 1,235 | 649 | 53 | 870 | 70 | 1,062 | 86 | 1,209 | 98 |
| 2020 | 1,517 | 1,298 | 86 | 1,366 | 90 | 1,437 | 95 | 1,510 | 100 |

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

**Table 15: Number of Capacity Grants Whose Appropriation Was Funded in Fiscal Years 2017 through 2021 That Received at Least One Payment, by Four Dates in the Same Year**

| Fiscal year of grant | Total number of capacity grants | Number of capacity grants that received at least one payment by date listed | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | March 31 | | April 30 | | May 31 | | June 30 | |
| | | Number | Percent of total | Number | Percent of total | Number | Percent of total | Number | Percent of total |
| 2017 | 455 | 152 | 33 | 267 | 59 | 365 | 80 | 435 | 96 |
| 2018 | 454 | 351 | 77 | 448 | 99 | 449 | 99 | 450 | 99 |
| 2019 | 456 | 452 | 99 | 454 | 100 | 454 | 100 | 454 | 100 |
| 2020 | 454 | 0 | 0 | 195 | 43 | 446 | 98 | 453 | 99 |
| 2021 | 456 | 456 | 100 | 456 | 100 | 456 | 100 | 456 | 100 |

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

Note: GAO omitted all capacity grants for animal health and disease research because these grants are on a different funding schedule, and the National Institute of Food and Agriculture (NIFA) does not send out a request for applications until the agency has a full appropriation, according to a NIFA official.

# Appendix IV: Selected Leading Practices for Agency Reforms and Strategic Human Capital Management

Appendix IV: Selected Leading Practices for Agency Reforms and Strategic Human Capital Management

This appendix contains two sets of tables used to assess the U.S. Department of Agriculture's (USDA) actions against leading practices. Table 16 below delineates the selected leading practices for effective agency reforms[1] that we identified as relevant to agency relocations and against which we assessed the actions of the USDA in relocating two of its research agencies—the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA). This table also shows the extent to which USDA followed each selected leading practice and each subcategory of leading practices. Table 17 below delineates the selected leading practices for strategic human capital management[2] that we identified as relevant for human capital management, including strategic workforce planning, recruitment and hiring, training, and diversity management. We compared these leading practices against the actions of both research agencies.

**Table 16: Selected Leading Practices for Agency Reforms and Extent These Leading Practices Were Followed by the U.S. Department of Agriculture (USDA) in Its Relocation of the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)**

| Leading practice category | Leading practice subcategory and extent followed | Selected leading practices | Extent followed leading practice |
|---|---|---|---|
| **Goals and Outcomes** | Establishing Goals and Outcomes ◑ | To what extent has the agency established clear outcome-oriented goals and performance measures for the proposed reforms? | ◑ |
| | | To what extent has the agency considered the likely costs and benefits of the proposed reforms? If so, what are they? | ◑ |

[1]The leading practices for agency reforms are key questions that Congress, the Office of Management and Budget, and agencies should consider for the development and implementation of agency reforms, according to our prior work. In this report, we use the term "reforms" to broadly include any organizational changes—including relocations, as well as major transformations, mergers, consolidations, and other reorganizations—and efforts to streamline and improve the efficiency and effectiveness of government operations. GAO, *Government Reorganization: Key Questions to Assess Agency Reform Efforts*, GAO-18-427 (Washington, D.C.: June 13, 2018).

[2]The leading practices for strategic human capital management include strategic workforce planning tools and models with certain principles that workforce planning processes should address, irrespective of the context in which planning is done. Strategic human capital management addresses various aspects of managing a workforce, including long-term strategies for acquiring, developing, and retaining staff; aligning human capital program with its mission and programmatic goals; ensuring that agencies' training investments are targeted strategically and are not wasted on efforts that are irrelevant or ineffective; and creating a positive work environment, where the similarities and differences of individuals are valued, so that staff can reach their potential and maximize their contributions.

**Appendix IV: Selected Leading Practices for Agency Reforms and Strategic Human Capital Management**

| Category | Subcategory | Question | Rating |
|---|---|---|---|
| **Process for Developing Reforms** | Involving Employees and Key Stakeholders ○ | How and to what extent has the agency consulted with Congress, and other key stakeholders, to develop its proposed reforms? | ○ |
| | | How and to what extent has the agency engaged employees and employee unions in developing the reforms (e.g., through surveys or focus groups) to gain their ownership for the proposed changes? | ○ |
| | Using Data and Evidence ◑ | What data and evidence has the agency used to develop and justify its proposed reforms? | ◑ |
| | | How has the agency determined that the evidence contained sufficiently reliable data to support a business case or cost-benefit analysis of the reforms? | ◑ |
| **Implementing the Reforms** | Leadership Focus and Attention ● | Has the agency designated a leader, or leaders, to be responsible for the implementation of the proposed reforms? | ◑ |
| | | Has the agency leadership defined and articulated a succinct and compelling reason for the reforms (i.e., a case for change)?[a] | ● |
| | Managing and Monitoring ◑ | Has the agency ensured its continued delivery of services during reform implementation? | ◑ |
| **Strategically Managing a Federal Workforce** | Employee Engagement ○ | How does the agency plan to sustain and strengthen employee engagement during and after the reforms? | ○ |
| | Strategic Workforce Planning ◑ | To what extent has the agency conducted strategic workforce planning to determine whether it will have the needed resources and capacity, including the skills and competencies, in place for the proposed reforms or reorganization? | ◑ |
| | | How has the agency assessed the effects of the proposed agency reforms on the current (i.e., at the time of the relocation) and future workforce? If so, what does that assessment show? | ◑ |
| | | What succession planning has the agency developed and implemented for leadership and other key positions in areas critical to reforms and mission accomplishment? | ◑ |
| | | To what extent have the reforms included important practices for effective recruitment and hiring, such as customized strategies to recruit highly specialized and hard-to-fill positions? | ● |
| | | What employment- and mission-related data has the agency identified to monitor the progress of reform efforts and to ensure no adverse impact on agency mission, and how is it using those data? | ● |

● Generally followed – USDA actions followed all, or most, aspects of the leading practices in this subcategory.

◑ Partially followed – USDA actions followed some, but not most, aspects of the leading practices in this subcategory.

○ Generally did not follow – USDA actions followed few to no aspects of the leading practices in this subcategory.

Source: GAO analysis of USDA documents | GAO-23-104709

[a]GAO did not assess whether USDA's rationale was "compelling."

**Table 17: Selected Leading Practices for Strategic Human Capital Management and Extent These Leading Practices Were Followed by the U.S. Department of Agriculture (USDA) in Its Relocation, Before and After, of the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)**

**ERS**

| Leading workforce planning practice | Extent followed | |
|---|---|---|
| | Before relocation | After relocation |
| *Strategic Workforce Planning* | | |
| 1. Involve Human Resources (HR) professionals and key strategic stakeholders in strategic and workforce planning efforts | ◑ | ● |
| 2. HR staff with competencies and resources to proactively partner and consult with line managers | ● | ● |
| 3. HR staff responsible for reaching out to other organizational functions and components through facilitation, coordination, and counseling to provide integrated mission support | ● | ● |
| 4. Involve the HR office or HR staff to handle any agency-wide restructuring efforts | ○ | ◑ |
| 5. Identify external resources, or consult with others, when developing human capital strategies | ◑ | ◑ |
| 6. Systems in place to continually assess and improve human capital planning and investment and to assess their impact on mission accomplishment | ● | ● |
| 7. Hold managers accountable for implementation of human capital plans and overall human capital management | ● | ● |
| 8. Determine critical skills and competencies that its workforce needs to achieve current and future agency goals and mission, and identify gaps, including those that training and development strategies can help address | ● | ● |
| 9. Establish and maintain an inventory of employee skills and competencies (skills and supporting behaviors) | ◑ | ● |
| 10. Process to address skill/competency gaps | ● | ● |
| 11. Succession plans for leadership and other critical positions | ◑ | ◑ |
| 12. Approach workforce planning strategically, basing decisions on mission needs, customer expectations, workload, and workforce | ● | ● |
| 13. Workforce strategies based on identified current and future human capital needs, including size and deployment of the workforce and the competencies needed to carry out the mission | ● | ● |
| 14. Conduct assessments of current and future workforce needs | ● | ● |
| 15. Linkages between the strategic workforce plan and the agency's strategic plan | ◑ | ◑ |
| 16. Human capital strategies to avoid excess organizational layers and redundant operations | ● | ● |
| 17. Human capital strategies regarding the balance of supervisory and nonsupervisory positions | ● | ● |
| | | |
| *Recruitment and Hiring* | | |
| 1. Develop customized strategies to recruit highly specialized and hard-to-fill positions | ● | ● |
| 2. Use vacancy announcements and web postings that are clear, user friendly, and comprehensive | ● | ● |
| 3. Automated hiring process that uses computerized systems to prescreen, rate, and rank applicants | ● | ● |

GAO-23-104709 USDA Workforce Relocation Impacts

**Appendix IV: Selected Leading Practices for Agency Reforms and Strategic Human Capital Management**

| | | |
|---|---|---|
| 4. Conduct regular surveys to gauge applicant and hiring manager satisfaction levels with the hiring process and its results | ◐ | ◐ |
| *Training and Development* | | |
| 1. Training goals and related performance measures that are consistent with overall mission, goals, and culture | ● | ● |
| 2. Incorporate the results of its workforce planning efforts into its planning and front-end analysis of training and development strategies | ◐ | ◐ |
| 3. Develop measures to assess the contributions that training and development efforts make toward individual mastery of learning and achieving agency goals | ◐ | ● |
| 4. Conduct formal analysis to choose between centralized and decentralized management of training programs | ◐ | ◐ |
| 5. Conduct formal analysis to choose between designing training programs internally and using an external source | ◐ | ◐ |
| 6. Conduct formal analysis to choose among different mixes of training delivery mechanisms (e.g., classroom, computer-based, on the job, etc.) | ◐ | ◐ |
| 7. Incorporate measures of effectiveness, with clear links to organizational goals, into the training courses it designs | ◐ | ◐ |
| 8. Leaders who communicate the importance of training and encourage employees to participate in training activities | ● | ● |
| 9. Have a training and development unit that is held accountable, along with the line executives, for the enhanced performance of the workforce | ◐ | ◐ |
| 10. Have a systematic process to evaluate the effectiveness of training and development programs | ◐ | ◐ |
| 11. Use quantitative and qualitative performance data to assess the results achieved through training and development efforts | ◐ | ◐ |
| 12. Track cost, benefit, delivery, and performance data for its training programs consistently across the organization | ◐ | ◐ |
| *Diversity Management* | | |
| 1. Have a diversity strategy and plan that are developed and aligned with the organization's strategic plan | ○ | ○ |
| 2. Quantitative and qualitative measures to assess the impact of various aspects of an overall diversity program | ● | ● |
| 3. Ongoing succession planning processes for identifying and developing a diverse pool of talent for an organization's potential future leaders | ◐ | ◐ |
| 4. Recruitment process for attracting a supply of qualified, diverse applicants for employment | ◐ | ◐ |

● Generally followed – Agency actions followed all, or most, aspects of the leading practice.

◐ Partially followed – Agency actions followed some, but not most, aspects of the leading practice.

○ Generally did not follow – Agency actions followed few to no aspects of the leading practice.

Source: GAO analysis of information provided by ERS officials. | GAO-23-104709

**Appendix IV: Selected Leading Practices for Agency Reforms and Strategic Human Capital Management**

**NIFA**

| Leading workforce planning practice | Extent followed | |
|---|---|---|
| | Before relocation | After relocation |
| *Strategic Workforce Planning* | | |
| 1. Involve Human Resources (HR) professionals and key strategic stakeholders in strategic and workforce planning efforts | ◑ | ● |
| 2. Have HR staff with competencies and resources to proactively partner and consult with line managers | ● | ● |
| 3. Have HR staff responsible for reaching out to other organizational functions and components through facilitation, coordination, and counseling to provide integrated mission support | ● | ● |
| 4. Involve the HR office or HR staff to handle any agency-wide restructuring efforts | ○ | ◑ |
| 5. Identify external resources or consult with others when developing human capital strategies | ◑ | ◑ |
| 6. Have a system in place to continually assess and improve human capital planning and investment and assess its impact on mission accomplishment | ● | ● |
| 7. Hold managers accountable for implementation of human capital plans and overall human capital management | ● | ● |
| 8. Determine critical skills and competencies that its workforce needs to achieve current and future agency goals and mission; and identify gaps, including those that training and development strategies can help address | ● | ● |
| 9. Establish and maintain an inventory of employee skills and competencies (skills and supporting behaviors) | ● | ● |
| 10. Have a process to address skill/competency gaps | ● | ● |
| 11. Succession plans for leadership and other critical positions | ◑ | ◑ |
| 12. Approach workforce planning strategically, basing decisions on mission needs, customer expectations, workload, and workforce | ● | ◑ |
| 13. Workforce strategies based on identified current and future human capital needs, including size and deployment of the workforce and the competencies needed to carry out the mission | ● | ◑ |
| 14. Conduct assessments of current and future workforce needs | ● | ◑ |
| 15. Linkages between the strategic workforce plan and the agency's strategic plan | ◑ | ◑ |
| 16. Human capital strategies to avoid excess organizational layers and redundant operations | ● | ● |
| 17. Human capital strategies regarding the balance of supervisory and nonsupervisory positions | ● | ● |
| *Recruitment and Hiring* | | |
| 1. Develop customized strategies to recruit highly specialized and hard-to-fill positions | ● | ● |
| 2. Use vacancy announcements and web postings that are clear, user friendly, and comprehensive | ● | ● |
| 3. Have an automated hiring process that uses computerized systems to prescreen, rate, and rank applicants | ● | ● |
| 4. Conduct regular surveys to gauge applicant and hiring manager satisfaction levels with the hiring process and its results | ◑ | ◑ |

**Appendix IV: Selected Leading Practices for Agency Reforms and Strategic Human Capital Management**

| | | |
|---|:---:|:---:|
| *Training and Development* | | |
| 1. Training goals and related performance measures that are consistent with its overall mission, goals, and culture | ● | ● |
| 2. Incorporate the results of its workforce planning efforts into its planning and front-end analysis of training and development strategies | ◐ | ◐ |
| 3. Develop measures to assess the contributions that training and development efforts make toward individual mastery of learning and achieving agency goals | ● | ● |
| 4. Conduct formal analysis to choose between centralized and decentralized management of training programs | ◐ | ◐ |
| 5. Conduct formal analysis to choose between designing training programs internally and using an external source | ◐ | ◐ |
| 6. Conduct formal analysis to choose among different mixes of training delivery mechanisms (e.g., classroom, computer-based, on the job, etc.) | ◐ | ◐ |
| 7. Incorporate measures of effectiveness, with clear links to organizational goals, into the training courses it designs | ◐ | ◐ |
| 8. Leaders who communicate the importance of training and encourage employees to participate in training activities | ● | ● |
| 9. Training and development unit that is held accountable, along with the line executives, for the enhanced performance of the workforce | ○ | ◐ |
| 10. Systematic process to evaluate the effectiveness of its training and development programs | ◐ | ◐ |
| 11. Use quantitative and qualitative performance data to assess the results achieved through training and development efforts | ◐ | ◐ |
| 12. Track cost, benefit, delivery, and performance data for its training programs consistently across the organization | ◐ | ◐ |
| | | |
| *Diversity Management* | | |
| 1. Have a diversity strategy and plan that are developed and aligned with the organization's strategic plan | ○ | ○ |
| 2. Quantitative and qualitative measures to assess the impact of various aspects of an overall diversity program | ● | ● |
| 3. Ongoing succession planning processes for identifying and developing a diverse pool of talent for an organization's potential future leaders | ◐ | ◐ |
| 4. Recruitment process for attracting a supply of qualified, diverse applicants for employment | ◐ | ◐ |

● Generally followed – Agency actions followed all, or most, aspects of the leading practice.

◐ Partially followed – Agency actions followed some, but not most, aspects of the leading practice.

○ Generally did not follow – Agency actions followed few to no aspects of the leading practice.

Source: GAO analysis of information provided by NIFA officials. | GAO-23-104709

# Appendix V: Comments from the U.S. Department of Agriculture

Appendix V: Comments from the U.S. Department of Agriculture



| | | | |
|---|---|---|---|
| United States | Research | Office | Room 216W |
| Department of | Education | of the Under | Jamie L. Whitten Building |
| Agriculture | Economics | Secretary | Washington, DC  20250-0110 |

November 18, 2022

Steven D. Morris
Director
United States Government Accountability Office
441 G St. N.W.
Washington, DC 20548

SUBJECT:  Draft report, entitled "AGENCY RELOCATIONS: Following Leading Practices Will Better Position USDA to Mitigate the Ongoing Impacts on Its Workforce (GAO-23-104709)"

Dear Mr. Morris:

This is in response to your request of October 21, 2022, for Department of Agriculture (USDA) review and comment on the above-referenced proposed Government Accountability Office (GAO) performance audit report ("GAO draft report") on the June 2019 USDA decision to relocate the National Institute of Food and Agriculture (NIFA) and the Economic Research Service (ERS) to Kansas City. We appreciate the opportunity to provide comments and demonstrate our ongoing commitment to positioning both agencies to successfully deliver on their critical missions.

USDA generally agrees with GAO's findings.

We would like to provide the following comments, in addition to some minor comments/edits provided in the PDF attachment.

USDA appreciates the positive recognition on the progress both ERS and NIFA have made toward regaining normal operations after the relocation, particularly the acknowledgment that both agencies had largely recovered in terms of size and productivity by the end of FY 2021.

Since then, under Secretary Vilsack's leadership, we've continued to make strides to ensure that we have reached or exceeded staffing levels at both agencies as compared to pre-relocation. As noted in the report, this is largely a result of leveraging Direct Hire Authority, allowing negotiable duty stations and shifting toward fully remote worksites for many NIFA and ERS staff. Both agencies have also been proactively addressing the recommendations outlined in the report related to strategic workforce planning, with many strategies already being implemented.

We are also pleased that the productivity of both agencies match, and in many cases exceed, pre-relocation levels. As highlighted in the report, NIFA processed competitive grant proposals in FY 2021 faster than in any of the previous five fiscal years and its timeliness for processing capacity grants had also recovered. Similarly, the number of ERS' research reports have returned

*USDA is an equal opportunity provider, employer, and lender.*

Mr. Steven D. Morris
Page 2

to pre-relocation levels while their outlook report publications were not impacted during relocation.

We note that this report is centered around "following leading practices," though these practices are never fully defined or referenced, other than in footnote 6 and in the Appendix. Since the report is based on leading practices, it seems appropriate to document these explicitly in the body of the report and include information on how these leading practices are communicated to Departments and agencies and what the expectations are for following them.

USDA provisionally agrees with GAO's recommendations but will endeavor to implement Departmental-wide guidance in such a way as to allow the greatest level of flexibility and agility to meet changing priorities, consistent with applicable laws and regulations.

Thank you for providing us with the opportunity to comment.

Sincerely,

Chavonda Jacobs-Young
USDA Research, Education and Economics Under Secretary

# Appendix VI: GAO Contact and Staff Acknowledgments

Appendix VI: GAO Contact and Staff Acknowledgments

| GAO Contact | Steve D. Morris, (202) 512-3841 or morriss@gao.gov |
| --- | --- |
| Staff Acknowledgments | In addition to the above contact, Nico Sloss (Assistant Director), Angela Miles (Analyst in Charge), David Bennett, Namita Bhatia-Sabharwal, Bonnie Binggeli, Kevin Bray, Gary Brown, Colleen Candrl, Clifton G. Douglas Jr., Gina Hoover, Gwen Kirby, Courtney L. LaFountain, Steven Lozano, Beverly Peterson, Dan Royer, Jerome Sandau, Sarah Veale, Rajneesh Verma, and Tama Weinberg made key contributions to this report. |

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact FraudNet: |
| | Website: https://www.gao.gov/about/what-gao-does/fraudnet |
| | Automated answering system: (800) 424-5454 or (202) 512-7700 |
| Congressional Relations | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| Strategic Planning and External Liaison | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

# Exhibit D



**United States Government Accountability Office**

Report to Congressional Requesters

**April 2022**

# EVIDENCE-BASED POLICY MAKING

# USDA's Decision to Relocate Research Agencies to Kansas City Was Not Fully Consistent with an Evidence-Based Approach

GAO-22-104540



# GAO Highlights

Highlights of GAO-22-104540, a report to congressional requesters

**April 2022**

# EVIDENCE-BASED POLICY MAKING

## USDA's Decision to Relocate Research Agencies to Kansas City Was Not Fully Consistent with an Evidence-Based Approach

## Why GAO Did This Study

USDA is made up of several agencies, including the research agencies, ERS and NIFA. ERS reviews trends and emerging issues in food, agriculture, the environment, and rural America, while NIFA administers federal funding through formula and competitive grants, among other things.

In October 2019, USDA relocated most staff positions at ERS and NIFA from their headquarters in Washington, D.C. to Kansas City, Missouri. This decision was based on USDA's economic analysis. USDA stated the move would save taxpayers more than $300 million over 15 years compared to remaining in the Washington, D.C. region.

GAO was asked to assess the analysis USDA used to support its decision to relocate ERS and NIFA to the Kansas City region. This report reviewed how USDA made its relocation decision, the underlying analyses, and the use of evidence in its decision-making.

GAO reviewed USDA's contracting documents and the deliverables provided by the contractor, interviewed USDA officials and contractor staff, and evaluated the economic analysis using criteria in GAO-18-151SP.

GAO is not making any recommendations at this time because, among other reasons, the relocation has already taken place and OMB has since circulated comprehensive guidance on how to build and use quality evidence that, if effectively implemented, should address the weaknesses highlighted. USDA neither agreed nor disagreed with our findings but disagreed with the criteria we used to evaluate the agency's economic analysis. We stand by our analysis as discussed in the report.

View GAO-22-104540. For more information, contact Lawrance L. Evans Jr., evansl@gao.gov or at 202-512-4802.

## What GAO Found

An economic analysis conducted by the U.S Department of Agriculture (USDA) with assistance from Ernst and Young was critical to informing USDA leadership about potential sites for relocating the National Institute of Food and Agriculture (NIFA) and the Economic Research Service (ERS) (see figure).

**Key Steps in USDA's Economic Analysis of Potential Relocation Sites**

State and local governments and others submitted EOIs identifying potential sites to USDA. — 139 EOIs

USDA and EY screened sites based on USDA criteria and dropped 72 EOIs. — 67

USDA and EY mapped sites from remaining EOIs to 40 metropolitan statistical areas (MSA). — 40 MSAs

EY ranked MSAs based on multiple USDA criteria and USDA dropped 14 lowest-ranked MSAs. — 26

USDA dropped five MSAs with highest cost of living. — 21

USDA dropped 14 MSAs with insufficient building space to co-locate ERS and NIFA. — 7

USDA selected four locations for site visits, comparison of savings, and presentation to the former Secretary of Agriculture. — 4

The former Secretary of Agriculture selected the Kansas City region as the new location of ERS and NIFA.

EOI: Expression of interest
ERS: Economic Research Service
EY: Ernst & Young
NIFA: National Institute of Food and Agriculture
USDA: United States Department of Agriculture

Kansas     Missouri

Source: GAO analysis based on USDA documents.  |  GAO-22-104540

USDA's stated objectives for relocation were to improve its ability to attract and retain highly-qualified staff; place its resources closer to stakeholders and consumers; and reduce costs to taxpayers. However, GAO found that the economic analysis did not fully align with those objectives. For example, USDA used cost of living to screen out locations and then eliminated sites that did not have sufficient space to co-locate NIFA and ERS. However, some of the sites eliminated ranked highly in terms of USDA's stakeholder proximity and staff recruitment and retention objectives. In addition, USDA omitted critical costs and economic effects from its analysis of taxpayer savings, such as costs related to potential attrition or disruption of activities for a period of time, which may have contributed to an unreliable estimate of savings from relocation.

Overall, GAO found that USDA's development and usage of evidence had significant limitations. In addition to the methodological concerns highlighted above, key characteristics of a high-quality analysis were absent, including transparency around key methodological decisions and sensitivity analysis to assess the reasonableness of critical assumptions. According to Office of Management and Budget guidance on implementing the Foundations for Evidence-Based Policymaking Act of 2018, agencies should use evidence when making decisions related to agency operations. This evidence should be good quality and should be collected and analyzed in a transparent manner that involves stakeholders to maintain accountability and ensure that it is not tailored to generate specific findings. As a result of the weaknesses GAO found, USDA leadership may have made a relocation decision that was not the best choice to accomplish its stated objectives.

**United States Government Accountability Office**

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 4 |
| | USDA Made Key Decisions and Conducted the Economic Analysis with the Help of Ernst & Young | 6 |
| | USDA's Economic Analysis Did Not Fully Align with Its Stated Objectives and Excluded Critical Costs in its Estimate of Taxpayer Savings | 12 |
| | USDA's Relocation Decision Was Based on an Evidence-Building Approach that had Significant Limitations | 21 |
| | Agency Comments and Our Evaluation | 26 |

| Appendix I | Objectives, Scope, and Methodology | 29 |
|---|---|---|

| Appendix II | Description of Deliverables Ernst & Young Provided to U.S. Department of Agriculture | 32 |
|---|---|---|

| Appendix III | Characteristics Used to Rank Metropolitan Statistical Areas | 33 |
|---|---|---|

| Appendix IV | Comments from the Department of Agriculture | 35 |
|---|---|---|

| Appendix V | GAO Contact and Staff Acknowledgments | 37 |
|---|---|---|

Tables

| Table 1: USDA's Selection of Metropolitan Statistical Areas: Elimination Steps | 14 |
|---|---|
| Table 2: List and Description of Ernst & Young Deliverables Agreed to Provide Under Its Contract with USDA | 32 |
| Table 3: Characteristics and Weights for the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA) Provided by USDA to Ernst & Young to Rank Metropolitan Statistical Areas | 33 |

Figure

Figure 1: Key Steps in USDA's Economic Analysis of Potential
Relocation Sites                                                           9

**Abbreviations**

| | |
|---|---|
| ASA | American Statistical Association |
| CBA | cost-benefit analysis |
| COLA | cost of living adjustment |
| EOI | expression of interest |
| ERS | Economic Research Service |
| MSA | metropolitan statistical area |
| NCR | National Capital Region |
| NIFA | National Institute of Food and Agriculture |
| OMB | Office of Management and Budget |
| OPM | Office of Personnel Management |
| USDA | U.S. Department of Agriculture |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**441 G St. N.W.**
**Washington, DC 20548**

April 19, 2022

Congressional Requesters

In October 2019, the U.S. Department of Agriculture (USDA) relocated most staff positions at the National Institute of Food and Agriculture (NIFA) and the Economic Research Service (ERS) from their headquarters in Washington, D.C. to Kansas City, MO.[1] To identify a relocation site, USDA solicited expressions of interest (EOIs) from state and local governments, industry, and other interested parties, and received proposals for 139 EOIs across 308 potential sites in 35 states. Between October 2018 and June 2019, USDA, with the assistance of Ernst & Young, evaluated and narrowed down potential locations for the new site.

According to USDA, the relocation is expected to save taxpayers more than $300 million over the next 15 years. However, some USDA employees, several members of Congress, and others questioned how the relocation would affect the ability of the agencies to perform their functions and carry out their missions.

In light of the potential issues raised by ERS and NIFA's relocation, you asked us to review how USDA selected the Kansas City region as the new location for ERS and NIFA, including the analysis used to support this decision. In this report, we (1) describe the process USDA used to make the relocation decision, including the use of Ernst & Young as a contractor; (2) assess the analysis performed by USDA and Ernst & Young to inform USDA's decision of where to relocate NIFA and ERS; and (3) assess USDA's use of evidence to support the relocation decision.

To describe the process USDA used to make the relocation decision, including USDA and Ernst & Young's roles and responsibilities, the deliverables Ernst & Young agreed to provide, and USDA's process for ensuring that the contract requirements were met, we interviewed officials from USDA and Ernst & Young. We also reviewed the notice USDA

---

[1]The Economic Research Service conducts economic research looking at trends and emerging issues in agriculture, food, the environment, and rural America to inform and enhance public and private decision-making. The National Institute of Food and Agriculture provides leadership and funding for programs that advance agriculture-related sciences.

GAO-22-104540  Evidence-Based Policy Making

published in the Federal Register soliciting expressions of interest for the firm to award the contract; USDA's combined synopsis/solicitation for a contractor; USDA's press releases with updates on the relocation site selection process; internal USDA memoranda detailing various relocation scenarios for ERS and NIFA; the contract between USDA and Ernst & Young; and the corresponding deliverables.

To assess the analysis performed by USDA and Ernst & Young, we interviewed officials from USDA and Ernst & Young. We also reviewed the analysis presented in USDA's June 2019 memorandum and all the underlying deliverables USDA received from Ernst & Young.[2] For the purposes of this report, we refer to the collection of analyses performed by Ernst & Young and the relevant underlying decisions made by USDA to narrow down potential sites and to compare costs at the four final locations to the status quo site as USDA's "economic analysis." To determine if these analyses fit the description of an "economic analysis," we used the definition stated in GAO's *Assessment Methodology for Economic Analysis*.[3] We determined that the analysis performed by USDA was an economic analysis because it informed decision-makers (USDA leadership and the former Secretary of Agriculture) about the economic effects (costs and benefits) of an action (relocating ERS and NIFA to a new location). We evaluated USDA's economic analysis

---

[2]In this report, we refer to the publically released cost-benefit analysis as the June 2019 memorandum. See USDA, *NIFA and ERS Relocation: Cost Benefit Analysis*, June 13, 2019.

[3]An economic analysis is defined as an analysis that is intended to inform decision-makers and stakeholders about the economic effects of an action. Economic effects (hereafter also called "effects") commonly include costs, benefits, and/or economic transfers (for example, transfer payments). Action is defined to include a government law, rule, regulation, project, policy, or program. An action may be examined in the context of legislation, regulation, advocacy, agency operations, or in response to certain events (such as a natural disaster, for example). An economic analysis may be prospective, examining an action that could be taken, or retrospective, examining the outcome of an action that has already been taken. See GAO, *Assessment Methodology for Economic Analysis*, GAO-18-151SP (Washington, D.C.: Apr. 10, 2018).

according to the five key elements identified in GAO's assessment methodology.[4]

To assess USDA's use of evidence to support the relocation decision, we interviewed USDA officials. We also analyzed USDA documents to examine the extent to which USDA's economic analysis properly dealt with each of the five key elements included in GAO's *Assessment Methodology for Economic Analysis*. In addition, we reviewed our prior reports on government reorganization and evidence-based policymaking to assess the quality of evidence USDA used for its relocation decision.[5] Finally, we used the principles laid out in Office of Management and Budget (OMB) guidance on evidence-based policymaking to evaluate the extent to which USDA's relocation decision reflected evidence-based policymaking.[6] See app. I for additional information on our scope and methodology.

We conducted this performance audit from September 2020 to April 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[4]GAO-18-151SP. We developed this methodology by synthesizing economic concepts identified by consulting with experts on economic analysis and in federal and international agency guidance. Each key element consists of economic concepts that represent best practices. These key methodological elements are not intended to be exhaustive and to supplant or alter relevant federal and agency requirements for economic analysis. Our assessment methodology provides a framework for assessing the sufficiency of economic analyses.

[5]GAO, *Government Reorganization: Key Questions to Assess Agency Reform Efforts,* GAO-18-427 (Washington, D.C.: June 13, 2018) and *Evidence-Based Policymaking: Selected Agencies Coordinate Activities, but Could Enhance Collaboration,* GAO-20-119 (Washington, D.C.: Dec. 4, 2019).

[6]Office of Management and Budget, *Phase I Implementation of the Foundations for Evidence-Based Policymaking Act of 2018: Learning Agendas, Personnel, and Planning Guidance*, OMB Memorandum M-19-23 (Washington, D.C.: July 10, 2019) and *Evidence-Based Policymaking: Learning Agendas and Annual Evaluation Plans*, OMB Memorandum M-21-27 (Washington, D.C.: June 30, 2021).

# Background

| | |
|---|---|
| ERS and NIFA | ERS is a USDA research agency that reviews trends and emerging issues in food, agriculture, the environment, and rural America. ERS has an annual budget of about $85 million and conducts economic and statistical analyses on agricultural commodities, trade and international agriculture, rural demography, agricultural marketing, food price forecasting, surveys of farm and crop production practices, farm and rural labor and income analysis, food safety and nutrition, natural resources, and the environment. NIFA is a USDA agency that administers approximately $1.5 billion in federal funding annually through formula and competitive grants. NIFA also oversees a wide range of cooperative extension and education functions conducted in partnership with land-grant colleges and universities, and other institutions and organizations. |
| USDA's Relocation Decision | In response to former President Trump's initiative to move federal agency headquarters outside of Washington, D.C., in August 2018, the former Secretary of Agriculture announced his decision to relocate NIFA and ERS headquarters.[7] According to USDA officials, after the former Secretary of Agriculture decided to relocate ERS and NIFA, the agency decided to conduct an analysis to help with site selection and also evaluate the costs and benefits of relocating to a new location outside the National Capital Region (NCR).[8] USDA enlisted the help of a consultant to help with the analysis. After receiving bids for a contract, USDA chose the consulting firm of Ernst & Young to assist with some research and analysis as it worked to identify appropriate new sites. According to USDA officials, in an effort to be transparent about the decision making process, USDA summarized its economic analysis and described several benefits and costs of relocating to the selected location in its June 2019 |

[7]Additional information on the initiative to move federal agency headquarters outside of Washington, D.C. can be found in Office of Management and Budget, *Comprehensive Plan for Reforming the Federal Government and Reducing the Federal Civilian Workforce*, OMB Memorandum M-17-22 (Washington, D.C.: April 12, 2017). At the time of the former Secretary's announcement in August 2018, USDA had not yet determined which staff, if any, at NIFA and ERS might remain in Washington, D.C. When USDA announced in June 2019 that ERS and NIFA would relocate to the Kansas City region, they indicated that 294 of NIFA's 315 positions would relocate and 253 of ERS's 329 positions would relocate, and the remainder would stay in the National Capital Region (NCR).

[8]The NCR consists of the District of Columbia, the surrounding counties within the states of Maryland and Virginia (Montgomery and Prince George's counties in Maryland; Arlington, Fairfax, Loudon, and Price William counties in Virginia) and the incorporated cities therein.

memorandum. USDA officials said that the agency was not required to conduct a formal cost-benefit analysis as part of its decision to relocate NIFA and ERS.[9]

According to its June 2019 memorandum and to press releases, USDA stated that the objectives for relocating ERS and NIFA outside of the NCR were the following:[10]

- To improve USDA's ability to attract and retain highly qualified staff, such as scientists and economists with training and interests in agriculture, many of whom come from land-grant universities. According to USDA officials, ERS and NIFA have experienced significant turnover in these positions and have faced challenges recruiting employees to the Washington, D.C. area, particularly given the high cost of living and long commutes.

- To place important USDA resources, such as staff, closer to many of the agency's stakeholders, most of whom do not live and work near the Washington, D.C. area.

- To benefit the American taxpayers. USDA officials said relocating ERS and NIFA would significantly reduce employment costs and rent, which would help them retain more employees over time, even in the face of tightening budgets.

Some agency employees, trade and research organizations, and others have questioned USDA's stated objectives, saying that the agency's rationale needed to be examined more closely. For example, the American Statistical Association (ASA), a professional association of statisticians, argued that it was unclear what problems USDA was looking to address through a relocation. ASA further stated in a public letter in

---

[9]Cost-benefit analysis (CBA) in the federal rulemaking process is the systematic examination, estimation, and comparison of the potential economic costs and benefits resulting from the promulgation of a new rule. CBA is an important analysis, as comparing costs and benefits can be useful in determining whether or not a regulation is beneficial. Most federal regulatory agencies are directed by Executive Order 12866, as supplemented by Executive Order 13563, and Office of Management and Budget Circular A-4 in their performance of CBAs. See Exec. Order No. 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993); Exec. Order No. 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011); and Office of Management and Budget, *Regulatory Analysis*, OMB Circular No. A-4 (Washington, D.C.: Sept. 17, 2003).

[10]USDA, *NIFA and ERS Relocation: Cost Benefit Analysis*, June 13, 2019. This publicly released document produced by USDA is the agency's summary of the analysis completed by USDA with input from Ernst & Young. Ernst & Young did not complete a separate cost-benefit analysis.

response to USDA's relocation decision that USDA did not cite problems with ERS being located in Washington, D.C., or with the extensive system in place to reach its wide array of audiences, many located in the D.C. area. Other stakeholders raised concerns about employee attrition and the abilities of ERS and NIFA to continue to meet their missions after leaving the D.C. area.[11]

# USDA Made Key Decisions and Conducted the Economic Analysis with the Help of Ernst & Young

## USDA Used a Competitive Process to Select a Contractor

USDA used a competitive process when it selected a contractor to assist it with identifying a new site for ERS and NIFA. Before consulting with a contractor, USDA published a notice in the Federal Register on August 15, 2018 requesting expressions of interest from state and local governments, as well as industry and academia, for potential sites to relocate ERS and NIFA. Following the request, USDA received 139 expressions of interest identifying 308 potential sites in 35 states.

In mid-September 2018, USDA issued a combined synopsis/solicitation for a contractor via Federal Business Opportunities.[12] The solicitation asked vendors to submit quotes no later than October 4, 2018. According to an internal memo provided to us by USDA, the agency received multiple quotes. USDA's Contracting Officer forwarded the quotes that met USDA's requirements to USDA's Senior Procurement Executive for further review and evaluation. According to USDA officials, USDA's Senior Procurement Executive and Assistant Secretary for Administration evaluated the proposals. Based on USDA's evaluation, USDA determined

---

[11]GAO has ongoing work looking at the effects of the relocation on the missions of ERS and NIFA.

[12]Federal Business Opportunities is now part of the federal government website SAM.gov and is available under the section titled Contract Opportunities.

that the firm Ernst & Young submitted an acceptable quote and offered the best value and price for the requirements listed in the solicitation.

USDA invited Ernst & Young to provide an oral briefing to senior leadership to address the major issues that the vendor expected USDA to encounter during the site selection effort and to discuss how Ernst & Young would address those issues. Subsequently, USDA selected Ernst & Young for the site selection services contract.[13]

## Ernst & Young Conducted Market Research and Provided Other Services to Carry Out Parts of USDA's Analysis

Under the terms of the contract, Ernst & Young was expected to conduct market research and other analysis to support USDA's economic analysis of potential new locations. As part of its work, Ernst & Young agreed to provide USDA 11 deliverables (see appendix II for a full list of documents provided). These included

- planning documents detailing the timeframes and specific deliverables;

- documentation containing information on the different MSAs under consideration;

- status report updates with monthly and periodic updates on the information Ernst & Young was gathering; and

- a communications strategy with details on how information about the site selection process would be communicated to various stakeholders.

According to USDA, Ernst & Young provided all deliverables on time and met USDA expectations as laid out in the contract.

## USDA Monitored Ernst & Young's Progress during Regular Meetings and Provided Input and Feedback on Contract Deliverables

Over the course of the contract, from October 2018 through June 2019, members or representatives of USDA's leadership advisory group met regularly with Ernst & Young and provided input and feedback on their analysis. USDA's leadership advisory group included the USDA Project Manager; Deputy Undersecretary for Research, Education, and Economics; Chief Economist; NIFA Director; ERS Administrator; Senior Advisors to the Secretary; Chief of Staff for the Under Secretary; Assistant Secretary for Administration; and OGC Counsel. According to Ernst & Young consultants, discussions and information gathering between USDA leadership and Ernst & Young consultants took place through six major avenues, including weekly project meetings, regular working sessions with USDA leadership, meetings to develop a

---

[13]Under the terms of the contract, USDA paid Ernst & Young more than $330,000 in fees.

communication strategy, at town hall listening sessions with employees, during site visits, and other briefings to USDA leadership. During these exchanges, Ernst & Young consultants updated USDA senior staff on the progress of the work and final deliverables.

## USDA Made Principal Decisions and Designed the Economic Analysis, While Ernst & Young Executed Specific Parts of the Analysis

USDA's leadership advisory group made the principal decisions about the process for narrowing down the number of potential locations to compare to ERS and NIFA's status quo sites in Washington, D.C., with substantial input from Ernst & Young. According to USDA officials, USDA's leadership advisory group, with the help of Ernst & Young consultants, first evaluated the 139 EOIs, identifying 308 potential sites that state and local governments and others submitted. USDA narrowed down the number of sites by considering multiple factors, such as characteristics of the local labor force and whether the sites were located within two time zones of Washington, D.C. USDA excluded potential sites associated with 72 EOIs from further consideration and then mapped the potential sites associated with the remaining 67 EOIs to 40 metropolitan statistical areas (MSAs) (see figure 1).[14]

[14]Metropolitan and micropolitan statistical areas (metro and micro areas) are geographic entities delineated by OMB for use by federal statistical agencies in collecting, tabulating, and publishing Federal statistics. A metro area contains a core urban area of 50,000 or more population, and a micro area contains an urban core of at least 10,000 (but less than 50,000) population. Each metro or micro area consists of one or more counties and includes the counties containing the core urban area, as well as any adjacent counties that have a high degree of social and economic integration (as measured by commuting to work) with the urban core). See 2020 Standards for Delineating Core Based Statistical Areas, 86 Fed. Reg. 37770 (July 16, 2021); 2010 Standards for Delineating Metropolitan and Micropolitan Statistical Areas, 75 Fed. Reg. 37246 (June 28, 2010).

**Figure 1: Key Steps in USDA's Economic Analysis of Potential Relocation Sites**



State and local governments, industry, and academic institutions submitted 139 expressions of interest (EOI) identifying 308 potential sites in 35 states.

139 EOIs

Ernst & Young helped USDA leadership screen potential sites based on location and labor force characteristics. USDA dropped potential sites associated with 72 EOIs from consideration, leaving sites associated with 67 EOIs.

67

Ernst & Young helped USDA leadership map the potential sites associated with 67 EOIs to 40 metropolitan statistical areas (MSA).

40 MSAs

Ernst & Young ranked MSAs based on USDA's criteria and weights. USDA leadership dropped the 14 lowest-ranked MSAs from consideration, leaving 26 MSAs.

26

USDA leadership dropped five MSAs with the highest cost of living adjustment value, leaving 21 MSAs.

21

USDA leadership dropped 14 MSAs due to lack of availability of sufficient space to co-locate the two agencies, leaving seven MSAs.

7

USDA selected four locations and, with Ernst & Young's assistance, conducted site visits, gathered additional information, and estimated taxpayer savings. USDA's leadership advisory committee presented the four locations to the former Secretary of Agriculture.

4

The former Secretary of Agriculture selected the Kansas City region as the new location of ERS and NIFA.

Kansas    Missouri

ERS: Economic Research Service
NIFA: National Institute of Food and Agriculture
USDA: United States Department of Agriculture
Source:: GAO analysis based on USDA documents.  |  GAO-22-104540

USDA then asked Ernst & Young to further narrow down the set of MSAs using three main steps.

- USDA asked Ernst & Young to rank the 40 MSAs according to their capital and operating costs, workforce, logistics and information technology infrastructure, and community and quality of life

characteristics.[15] Ernst & Young identified specific indicators to measure each of these characteristics (see app. III). They scored the MSAs based on each indicator and then combined the scores to create an overall weighted average ranking. To calculate this overall ranking, Ernst & Young weighted these scores using weights that USDA leadership developed with input from ERS and NIFA employees, ERS and NIFA Site Selection Advisory Committees, and USDA leadership to indicate the importance of each indicator.[16] USDA leadership then eliminated the 14 lowest ranked MSAs from further consideration.

- USDA's leadership advisory group asked Ernst & Young to place the remaining 26 MSAs from their ranking model into three groups based on their cost-of-living adjustment (COLA) values.[17] USDA's leadership advisory group then eliminated the five MSAs with the highest COLA values from further consideration.

- USDA decided to co-locate ERS and NIFA and asked Ernst & Young to determine which of the top 21 MSAs had sites that offered sufficient commercial office space to accommodate staff from both NIFA and ERS.

---

[15]Ernst & Young identified a number of indicators to measure each of these characteristics. For example, cost indicators included the cost-of-living adjustment (COLA), wage rate growth, and average flight costs. Workforce indicators included the percentage of population with a bachelor's degree, unemployment rate, and land-grant university proximity. Logistics and information technology infrastructure indicators included commercial real estate vacancy rate, quality of technology infrastructure, and access to a census research data center. Lastly, quality of life indicators included state public school rankings, average commute time, diversity index, and residential housing costs.

[16]The ERS and NIFA Site Selection Advisory Committees were composed of 5-10 employees from each of the agencies and included a combination of supervisors and staff representing different perspectives from across the agencies. Participation in the committees was voluntary and based upon self-nomination or nomination by other employees, with final selections made by agency leadership. The committees were charged to identify issues and concerns and propose solutions, which they would bring forward to the agency and Departmental leadership.

[17]Ernst & Young measured COLAs using data on the pay adjustment from the Office of Personnel Management's (OPM) 2019 General Schedule Locality Pay Map, which allows the General Schedule pay scale to be adjusted for the varying costs of living across different parts of the United States. USDA provided Ernst & Young with the following cut-off COLA values for this grouping: low-priority-MSAs with COLA values greater than 21.5 percent; medium-priority-MSAs with a COLA values between 15.5 percent and 21.5 percent; and high-priority-MSAs with COLA values less than 15.5 percent.

**GAO-22-104540  Evidence-Based Policy Making**

Ernst & Young performed these steps and produced a list of seven MSAs that had existing commercial buildings with sufficient space to house both agencies according to USDA requirements.

Finally, USDA asked Ernst & Young to assemble information on multiple characteristics of these seven MSAs, including their COLA values; unemployment rates and other labor market characteristics; housing costs and housing availability; proximity to airports; and other characteristics. They also asked Ernst & Young to assemble information on features of potential commercial building sites in these MSAs based on original EOI submissions and follow-up discussions. Based on this information, USDA selected four locations for site visits and additional analysis: the Indianapolis, IN; Lafayette-West Lafayette, IN; and Kansas City, KS-MO MSAs, as well as Research Triangle, NC.

USDA's leadership advisory group also made the principal decisions about the process for comparing the four locations to ERS and NIFA's status quo sites in Washington, D.C., with substantial input from Ernst & Young.

- Staff from USDA, the General Services Administration, and Ernst & Young visited 16 commercial building sites across the four locations and examined several characteristics related to USDA's stated objectives, including proximity to key stakeholders, such as farmers and agricultural researchers; dual career services; diversity; and education.[18]

- In addition, USDA asked Ernst & Young to calculate the rental and staffing costs at each of the four locations based on ERS and NIFA's current employment levels. Ernst & Young estimated the net present values of savings on rental and staffing costs to USDA from the relocation over a period of 15 years.

- Finally, USDA asked Ernst & Young to analyze potential incentive packages for commercial building owners, such as property tax abatement and job creation credits, at each of the four locations.

The leadership advisory group presented information on all four locations to the former Secretary for consideration. Based on the maximum savings, the incentives offered to the property owners, and other factors listed above, the former Secretary of Agriculture made the final decision

---

[18]Other factors considered included transportation and accessibility, hiring needs, relocation services and resources, and the opportunity for partnerships.

for relocating to the Kansas City region as the new headquarters for NIFA and ERS.

The former Secretary of Agriculture announced the decision to relocate ERS and NIFA to the Kansas City region in June 2019. At the same time, USDA released its June 2019 memorandum describing the benefits and costs of moving ERS and NIFA to the Kansas City region, including the results of its economic analysis, which was the basis of the former Secretary's selection.[19]

## USDA's Economic Analysis Did Not Fully Align with Its Stated Objectives and Excluded Critical Costs in its Estimate of Taxpayer Savings

### USDA's Approach to Narrowing Down Potential MSAs for Relocation Did Not Fully Align with Its Stated Objectives

USDA's analytical steps for narrowing down MSAs to a final set of four alternatives were not consistent with its stated objectives of improving its ability to attract and retain highly-qualified staff; placing its resources closer to stakeholders; and reducing costs to taxpayers. USDA's approach hinged largely on cost-related factors, which limited its ability to balance all three of its relocation objectives. According to GAO's *Assessment Methodology for Economic Analysis*, an economic analysis should, among other things, have a scope designed to address its stated objectives, should justify all analytical choices, and should consider all relevant alternatives, including that of no action.[20] As discussed earlier, USDA used a three-step process to narrow down the list of MSAs from 40 to seven. The first step considered multiple characteristics intended to reflect USDA's stated objectives, but the second step relied solely on COLA values and the third step relied solely on the availability of commercial space to co-locate ERS and NIFA. To reiterate:

[19]USDA, *NIFA and ERS Relocation: Cost Benefit Analysis*, June 13, 2019.

[20]GAO-18-151SP.

- First, USDA leadership eliminated 14 MSAs with the lowest weighted average rankings from Ernst & Young's model, which was developed using criteria selected by USDA to reflect and balance all of their stated objectives.

- Second, USDA leadership asked Ernst & Young to use only COLA values to divide the remaining 26 MSAs into groups based on cut-offs specified by USDA.[21] Based on these groups, USDA leadership excluded the five MSAs with the highest COLA values from further consideration. The COLA indicator, as well as other cost-related factors, had already been incorporated and given a weight of almost 42 percent in Ernst & Young's ranking model to align with its objective of reducing costs (see app. II).[22]

- Third, from the remaining MSAs, USDA eliminated all but seven based on the availability of commercial office space large enough to co-locate ERS and NIFA. According to USDA officials, USDA was initially open to locating the two agencies at different locations and to considering locations without existing office space. However, USDA officials explained that at this point in the process, USDA decided that co-locating ERS and NIFA would be beneficial because sharing certain spaces, such as support facilities and conference space, would reduce costs. In addition, using existing office space would reduce the need for temporary space.[23]

Table 1 shows the MSAs eliminated in each step and the short list of seven MSAs.

---

[21]Ernst & Young measured COLA using data on pay adjustment from OPM's 2019 General Schedule Locality Pay Map that allows the General Schedule Pay scale to be adjusted for the varying cost-of-living across different parts of the United States.

[22]USDA selected a weight of 30 percent for the capital and operating cost category, which Ernst & Young measured using indicators such as real estate costs, COLA values, consumer price index, and other indicators of costs. In addition, three other cost-related indicators, embedded within the overall "community and quality of life category," were given a weight of about 4 percent each. These were the cost-of-living index, residential leasing costs, and a quality of life index (that in turn depended on purchasing power, affordability of housing, among other factors). For COLA values, Ernst & Young used data on pay adjustment from OPM's 2019 General Schedule Locality Pay Map that allows the General Schedule Pay scale to be adjusted for the varying costs of living across different parts of the United States.

[23]USDA did not provide any additional analysis to demonstrate how the costs of co-locating the agencies compared to the costs of locating them in two separate buildings, either in the same MSA or in two different MSAs.

**Table 1: USDA's Selection of Metropolitan Statistical Areas: Elimination Steps**

| Metropolitan Statistical Area (MSA) | MSA excluded based on cost-of-living adjustment (COLA) value | MSA excluded based on commercial space availability | MSA on short list |
|---|---|---|---|
| Ames, IA | - | X | - |
| Atlanta-Sandy Springs-Roswell, GA | - | X | - |
| Austin-Round Rock, TX | - | X | - |
| Charlotte-Concord-Gastonia, NC-SC | - | X | - |
| Charlottesville, VA | - | X | - |
| Chicago-Naperville-Elgin, IL-IN-WI | X | - | - |
| Cleveland-Elyria, OH | - | X | - |
| College Station-Bryan, TX | - | - | X |
| Dallas-Fort Worth-Arlington, TX | X | - | - |
| Des Moines-West Des Moines, IA | - | X | - |
| Durham-Chapel Hill, NC | - | - | X |
| Indianapolis-Carmel-Anderson, IN | - | - | X |
| Kansas City, MO-KS | - | - | X |
| Lafayette-West Lafayette, IN | - | - | X |
| Lansing-East Lansing, MI | - | X | - |
| Lincoln, NE | - | X | - |
| Madison, WI | - | - | X |
| Minneapolis-St. Paul-Bloomington, MN-WI | X | - | - |
| Omaha-Council Bluffs, NE-IA | - | X | - |
| Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | X | - | - |
| Phoenix-Mesa-Scottsdale, AZ | - | X | - |
| Richmond, VA | - | X | - |
| Roanoke, VA | - | X | - |
| Scranton--Wilkes-Barre--Hazleton, PA | - | X | - |
| St. Louis, MO-IL | - | - | X |
| Washington-Arlington-Alexandria, DC-VA-MD-WV | X | - | - |

Legend: X = yes; - = no.

Source: U.S. Department of Agriculture (USDA). | GAO-22-104540.

According to our discussions with USDA officials and our review of Ernst & Young's deliverables, USDA did not assess how prioritizing MSAs with lower COLA values and available commercial space to co-locate ERS and NIFA affected its ability to balance all of its objectives. USDA officials told us that their approach was designed to produce a manageable number of MSAs for site visits and more in-depth analysis. However, this

approach was not consistent with achieving and balancing all of its stated objectives and may have resulted in some relevant alternative MSAs being eliminated without adequate consideration. For example, our analysis found that:

- The top five MSAs based on balancing all of USDA's objectives were excluded when USDA filtered MSAs based on their COLA values and availability of space.

- The MSAs that were excluded based solely on their COLA values had ranks ranging from two to 23.5 and had comparable ranks to the seven MSAs on USDA's short list. In particular, the MSA that ranked second based on all combined MSA characteristics that balanced all of USDA's stated objectives was eliminated due to its COLA value.

- Similarly, the MSAs excluded because they lacked sufficient space had ranks that ranged from one to 25.5 and had comparable ranks to the seven MSAs on USDA's short list. The MSA that had the highest rank based on all of the combined MSA characteristics was excluded from further consideration because it lacked available space to co-locate ERS and NIFA.

By prioritizing MSAs with lower COLA values and sufficient commercial space to co-locate ERS and NIFA, USDA may have limited its ability to achieve the relocation objective of attracting and retaining highly qualified staff and may have instead excluded MSAs with characteristics that would have made ERS and NIFA more appealing to existing and potential employees. Our analysis of USDA documents showed that the five MSAs that USDA excluded from further consideration based on higher COLA values performed relatively well on the workforce characteristics directly related to attracting and retaining highly-qualified staff, another key objective. For example, the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA performed the same or better than the Kansas City, MO-KS MSA – the MSA ultimately selected — on each one of these three characteristics (percentage of population with a bachelor's degree, proximity to a land grant university, and university graduates with agricultural degrees). In addition, according to the pre-relocation briefing documents that USDA provided to us, ERS employees discussed the risk of employees leaving the agency in response to a relocation based on past experience, among other things.[24] They estimated employee attrition

---

[24]These documents contained an overview of various scenarios and associated factors of concern.

rates between 65 and 75 percent at ERS if the agency moved outside commuting distance to the NCR.[25] USDA could have considered potential sites within the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA that were in commuting distance to the NCR had it not been eliminated based on its COLA value.[26]

Academic studies we reviewed suggest that costs of living in MSAs reflect to some degree their desirability and peoples' willingness to pay to live in places with certain amenities.[27] They also suggest that cost-of-living differences across MSAs reflect differences in local labor demand and availability of jobs for high skill workers.[28] It follows that COLA values in the MSAs that USDA excluded may be high because an increasing number of people want to live in these MSAs due to their desirable amenities or more employment opportunities, among other things. In addition, our analysis of the indicators Ernst & Young used to construct the overall ranks of the MSAs suggests that COLA values are positively correlated with the annual number of university graduates and with labor force participation rates, as well as with the diversity index, quality of

---

[25]The National Capital Region (NCR) is a collection of sovereign jurisdictions, including cities, counties, states, and the District of Columbia. It encompasses not only Washington, D.C., but also the surrounding counties within the states of Maryland and Virginia (Montgomery and Prince George's counties in Maryland; Arlington, Fairfax, Loudon, and Price William counties in Virginia) and the incorporated cities therein.

[26]The Washington-Arlington-Alexandria, DC-VA-MD-WV MSA contains the NCR in addition to several other counties, such as Calvert and Charles Counties in Maryland; Clarke, Culpeper, Fauquier, Rappahannock County, Stafford, and Warren Counties in Virginia; and Jefferson County in West Virginia.

[27]For example, two studies we reviewed suggest that people are willing to pay more to live in locations with milder winters, cooler summers, more sunshine, closer proximity to a coast, more hilliness, and cleaner air, and that costs of living are higher in locations with more of these amenities. See David Albouy and Bert Lue, "Driving to Opportunity: Local Rents, Wages, Commuting, and Sub-Metropolitan Quality-of-Life Measures," *Journal of Urban Economics*, vol. 89 (2015): 74–92; and David Albouy, Gabriel Ehrlich, and Yingyi Liu, "Housing Demand, Cost-of-Living Inequality, and the Affordability Crisis," National Bureau of Economic Research Working Paper 22816, November 2016; accessed from http://www.nber.org/papers/w22816 on September 19, 2021. The second study also suggests that costs of living are higher in dense locations because those locations have more of the amenities that people value.

[28]See Rebecca Diamond, "The Determinants and Welfare Implications of US Workers' Diverging Location Choices by Skill: 1980-2000," *American Economic Review*, vol. 106, no. 3 (2016): 479-524; and Enrico Moretti, "Real Wage Inequality," *American Economic Journal: Applied Economics*, vol. 5, no. 1 (2013): 65-103.

technology infrastructure, and information technology security and access to broadband indicators.[29]

Similarly, USDA's focus on MSAs with lower COLA values and sufficient space to co-locate ERS and NIFA may not have aligned with its objective of placing important resources closer to USDA stakeholders. According to USDA, these stakeholders included agricultural producers and others in the agriculture industry, rural Americans, and land grant universities. While some of the characteristics USDA used to rank MSAs in the first step of its approach reflected proximity to some stakeholders, the second and third steps excluded MSAs based on their COLA values and lack of commercial space for co-location, and therefore were not designed to take this characteristic into account.[30] This approach may have led USDA to exclude MSAs that ranked highly in terms of USDA's stakeholder objective. For example, the MSA with the second highest overall ranking, which was excluded due to its COLA value, also had the highest score on the indicator of proximity to customers in farming, fishing, and agriculture. Another MSA with the highest score for proximity to USDA stakeholders was eliminated by the motivation to co-locate ERS and NIFA.

Moreover, USDA's focus on MSAs with lower COLA values and sufficient space co-locate ERS and NIFA may not have been beneficial in enhancing many of ERS and NIFA's strategic interagency partnerships. According to pre-relocation briefing documents that described various scenarios and their associated strengths, weaknesses, opportunities and threats, NIFA employees pointed out that relocation could lead to less effective engagement with partners and stakeholders when key expertise is not immediately available at agency headquarters, and when there are limited opportunities for face to face interactions with stakeholders in

[29]According to documents Ernst & Young provided to USDA, the diversity index measures the likelihood that two people chosen at random from the same area belong to different race or ethnic groups; the quality of technology infrastructure indicator provides a benchmark for states to assess their science and technology capabilities, as well as the broader ecosystem that contributes to job and wealth creation; and the information technology security and access to broadband indicator is the percentage of non-tribal residents that have access to three or more residential broadband internet providers with speeds greater than or equal to 25/3 Mbps for a given location.

[30]For example, the overall rankings accounted for agricultural engagement, research university location, and civilian federal workforce. While the Kansas City, MO-KS MSA scored high relative to the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA on agricultural engagement, it scored lower on the other two indicators.

Washington, D.C.[31] More specifically, the employees mentioned that keeping science leadership at NIFA headquarters instead of at the new location would have helped them maintain a strong science presence and engage with federal agencies, Congress, D.C.-based stakeholders, and customers.[32] Even if USDA decided to move ERS and NIFA outside the NCR, it could have explored other potential sites within the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA that could have allowed more opportunities for such partnerships. However, USDA dropped the Washington-Arlington-Alexandria, DC-VA-MD-WV MSA from further consideration based on its COLA value.

## USDA Excluded Critical Costs and Economic Effects from Its Estimates of Savings to Taxpayers

USDA excluded several relocation costs from its analysis of taxpayer savings, which likely resulted in an unreliable estimate of savings from relocation. USDA estimated that moving ERS and NIFA to the Kansas City region would save American taxpayers 11.33 percent, or nearly $300 million nominally, over a 15-year period in real estate and staffing costs compared to remaining in their status quo locations in Washington, D.C.[33]

To estimate savings at each of the four alternative locations, USDA compared the real estate and staffing costs at each of these locations with those at the status quo site based on the existing employment levels. However, USDA's estimates did not include certain critical costs and economic effects associated with a relocation. Specifically, USDA's

---

[31]USDA said that choosing a location based on sufficient space for co-location was based on cost-efficiencies, but USDA did not provide any documentation on underlying analysis or discussion on how those these cost efficiencies were evaluated against the objective of enhancing interagency partnerships.

[32]NIFA employees also pointed out the advantage of having the Office of Grant and Financial Management in D.C. to continue effectively processing grants with fewer interruptions and also to maintain strong relationships with the Office of the General Counsel, the Office of Budget & Program Analysis, the Office of Management & Budget, and other offices related to compliance and legislative implementation.

[33]See USDA, *NIFA and ERS Relocation: Cost Benefit Analysis*, June 13, 2019. They estimated the net present value of these savings to be about $194 million dollars. The net present value of savings at the three alternate locations ranged from $149 to $193 million dollars. USDA and Ernst & Young estimated real estate costs using the average annual gross market asking rents per square foot based on the expressions of interest or as modified during the site visits, multiplied by the required square footage of 120,000 for both agencies. They estimated staffing costs for the status quo and locations using average NIFA and ERS FY2019 government salaries in accordance with FY2019 Office of Personnel Management (OPM) government salaries.

estimates did not include costs associated with expected employee attrition.[34] Such costs include the following:

- losses of human capital and institutional knowledge when new employees replace experienced employees;

- hiring and training costs of new employees to replace old employees;

- reduced productivity due to loss of experienced employees; and

- costs of disruptions to agency operations while full employment levels are reestablished.[35]

USDA officials told us that while they expected some employee attrition, they based their savings estimates on full-employment levels for both ERS and NIFA to produce conservative estimates of physical relocation costs. For example, in pre-relocation briefing documents, ERS employees estimated employee attrition rates between 65 and 75 percent based on discussions with employees and experience with past relocations. However, USDA officials told us that USDA excluded attrition-related costs from their estimates of taxpayer savings because they assumed that employee attrition would be about the same for all four alternative locations, and thus attrition-related costs would be about the same. Based on that assumption, accounting for attrition-related costs would not have helped them select a new location for ERS and NIFA.

According to GAO's *Assessment Methodology for Economic Analysis*, an economic analysis is intended to inform decision-makers and stakeholders about the economic effects of an action, such as costs, benefits, or economic transfers.[36] While excluding attrition-related costs may not have changed how estimated taxpayer savings at the four alternative locations compared to each other, doing so may have affected the magnitude of all of the estimates. Specifically, USDA's estimates of the net present value of taxpayer savings over 15 years at the four alternative locations ranged from $149 million to $194 million. Accounting

---

[34]USDA was alerted to these costs by employees. For example, NIFA employees stated the threat of loss of institutional knowledge and also explained that that additional money will be needed for training of new staff/hires outside the NCR. They also mentioned the adverse effects on productivity for possibly two years due to loss of science personnel.

[35]Even without attrition, relocating ERS and NIFA may have disrupted activities or reduced productivity as employees adjusted to their new location.

[36]GAO-18-151SP.

for attrition-related costs may have changed these estimates for all four locations and may have led to the reconsideration of alternative locations.

In addition, in pre-relocation briefing documents, NIFA employees pointed out that employee retention is usually location-dependent and would likely vary depending on the new location. According to GAO's *Assessment Methodology for Economic Analysis*, an economic analysis should justify that the scenario specified under each alternative considered represents the best assessment of what the state of the world would be like under that alternative.[37] However, USDA officials told us that USDA did not conduct any surveys to assess the extent to which ERS and NIFA employees would stay or leave the agencies based on where they were relocated. Without assessing the extent to which employee attrition would vary across the four alternative locations, USDA could not ensure that its baseline estimates of taxpayer savings reliably reflected relative taxpayer savings at the four locations.

USDA also did not discuss other potential economic effects that are more difficult to quantify but are nonetheless important to consider. For example, neither USDA's June 2019 memorandum nor any of the deliverables compiled by Ernst & Young mention the following:

- potential secondary effects from disruption of activities and lower productivity, such as the effects of research not being published or grants not being processed in a timely manner;

- personal monetary and non-monetary effects of relocating on employees and their families;[38]

- differences in potential effects on USDA employees who were allowed to stay in Washington, D.C., and others who were asked to relocate; and

- differences in potential effects on USDA employees who were able to relocate and others who could not due to personal commitments.

GAO's *Assessment Methodology for Economic Analysis* states that an economic analysis should quantify the important economic effects and where important economic effects cannot be quantified, the analysis

---

[37]GAO-18-151SP.

[38]Personal monetary costs refer to costs potentially borne by the employees themselves because they were over and above the relocation expenses paid for by USDA.

should explain how they affect the comparison of alternatives. It should also consider important equity and distributional impacts.[39] However, USDA's analysis of taxpayer savings did not incorporate or discuss these economic effects of the relocation.

## USDA's Relocation Decision Was Based on an Evidence-Building Approach that had Significant Limitations

We found that the evidence USDA used to support its decision to relocate ERS and NIFA to the Kansas City region was characterized by several limitations.[40] According to USDA's June 2019 memorandum, USDA used its economic analysis as evidence to support the decision to relocate ERS and NIFA to Kansas City.[41] As described above, this analysis had several deficiencies, according to the criteria laid out in GAO's *Assessment Methodology for Economic Analysis*.[42] Specifically, USDA excluded critical costs and economic effects from its analysis of savings to taxpayers and therefore did not fully inform decision-makers about all of the potential effects of the relocation.

In addition, USDA's economic analysis and evidence building lacked several elements of transparency that are critical for accountability. According to GAO's *Assessment Methodology for Economic Analysis*, for an analysis to be transparent, certain elements are required:[43]

- A transparent analysis should include descriptions and justifications of the analytical choices and assumptions. However, USDA did not

---

[39]GAO-18-151SP.

[40]According to OMB, evidence can include quantitative or qualitative information and may be derived from a variety of sources. Evidence-building consists of a range of activities such as assessing existing evidence and identifying any need for additional evidence; determining which new evidence to generate, when, and how; generating that evidence; and using evidence in decision-making. See Office of Management and Budget, *Preparation, Submission, and Execution of the Budget*, OMB Circular No. A-11 (Washington, D.C.: August 2021) and *Phase I Implementation of the Foundations for Evidence-Based Policymaking Act of 2018: Learning Agendas, Personnel, and Planning Guidance*, OMB Memorandum M-19-23 (Washington, D.C.: July 10, 2019).

[41]USDA, *NIFA and ERS Relocation: Cost Benefit Analysis*, June 13, 2019. In this memo, USDA also mentioned that one of the benefits of moving to Kansas City was that the city offered the largest and most robust incentives package of the final four MSAs. The incentives package provided an additional potential savings of more than $26 million dollars. USDA officials explained that this benefit accrued to the commercial building owners, but the owners of the building site that USDA ultimately leased have not received anything to date. However, USDA officials reported that the agency had not paid rent for two years at this site due to these potential incentives available to their lessor.

[42]GAO-18-151SP.

[43]GAO-18-151SP.

explain why it decided to narrow down MSAs based on COLA values and on availability of space, while at the same time discounting the rankings that were developed to balance all of USDA's stated objectives.

- A transparent analysis should entail an assessment of how plausible adjustments to each important analytical choice and assumption affect the estimates of the economic effects and the results of the comparison of alternatives. USDA assumed that relocating ERS and NIFA to any of the four alternative locations would lead to similar employee attrition. However, based on our review of documents as well as discussions with USDA officials and Ernst & Young consultants, we found that USDA did not consider other plausible scenarios with different rates of employee attrition at each of the alternative locations. Had it done so, USDA could have made a more thorough comparison of alternative locations and therefore, a more informed assessment about which location better met its stated objectives.

- A transparent analysis should explain the implications of the key limitations in the data used and attempt to adequately quantify the impact of statistical variability of the key data elements underlying the estimates. However, USDA estimated the savings to taxpayers using the existing employment levels at USDA with the implicit assumption of zero move-related attrition. Though USDA was aware of potential move-related attrition, it did not perform any analysis to demonstrate how sensitive its estimate of savings was to different levels of attrition.[44]

According to OMB guidance issued in 2021, federal evidence-building activities should be transparent in the planning, implementation, and completion phases to preserve accountability and help ensure that they are not tailored to generate specific findings.[45] OMB guidelines also highlight that an important benefit of transparency is that the public is able

---

[44]USDA officials told us that they did not know the final decisions of all of the ERS and NIFA employees who were asked to relocate at the time USDA conducted its analysis. USDA had intended to update its analysis when it had more information. However, USDA did not update its analysis before deciding where to relocate ERS and NIFA.

[45]See Office of Management and Budget, *Evidence-Based Policymaking: Learning Agendas and Annual Evaluation Plans,* OMB Memorandum M-21-27 (Washington, D.C.: June 30, 2021).

to assess the extent to which an agency's analytic results hinge on its specific analytic choices.[46]

Lastly, USDA's evidence-building process did not effectively involve critical stakeholders. According to OMB, evidence-based decision-making should use high-quality evidence that incorporates stakeholder involvement.[47] Our prior work on agency reform practices has shown that it is important for agencies to directly and continuously involve their employees and employee unions in the decision-making process and develop a two-way communications strategy, and that doing so helps incorporate insights from a frontline perspective, as well as increases collaboration.[48]

After USDA decided to relocate, ERS and NIFA each established a Site Selection Advisory Committee that coordinated employee input into the selection process. These committees were charged with identifying issues and concerns and with proposing solutions to bring to ERS, NIFA, and USDA leadership's attention. Each of the agencies held monthly meetings where information on the relocation process was presented to employees and questions were addressed by the agency leadership. The agencies also held smaller informal sessions where employees had the opportunity to ask questions, share ideas, and provide input to leadership. USDA officials told us that USDA's leadership was responsible for ensuring that employee input was incorporated into the decision-making process. However, USDA did not conduct any surveys to systematically collect employee input and information on how likely they were to relocate to one location versus another, and neither did the leadership compile any notes from the listening and discussion sessions. Moreover, USDA did not explain or demonstrate how it incorporated employee input and feedback into its site selection process.

Weaknesses in USDA's use of evidence and evidence-building approach, including insufficient transparency and stakeholder involvement, limited

---

[46]Office of Management and Budget, *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity of Information Disseminated by Federal Agencies*, 67 Fed. Reg. 8451 (Feb. 22, 2002).

[47]See Office of Management and Budget, *Evidence-Based Policymaking: Learning Agendas and Annual Evaluation Plans* OMB Memorandum M-21-27 (Washington, D.C.: June 30, 2021).

[48]GAO-18-427.

the ability of USDA leadership to ensure it was making an appropriately informed decision on relocating the two research agencies. As a result, this decision may have had avoidable adverse effects on ERS and NIFA's operations in the years immediately following relocation.[49]

We are not making any recommendations to USDA at this time to improve evidence building and usage for relocation decisions for three principal reasons. First, the action based on the decision-making process–the relocation—has already taken place. Second, according to USDA, the former Secretary of Agriculture was not required to conduct an analysis at the time he initiated and made the decision to relocate ERS and NIFA. Finally, OMB guidance circulated since then, if effectively implemented, should address the weaknesses we identified.

According to USDA, portions of ERS and NIFA relocated to the Kansas City region in September 2019 and USDA signed a lease for permanent office space in October 2019.[50] Furthermore, at the time the former Secretary of Agriculture initiated and made the decision to relocate ERS and NIFA, he was not required to conduct an analysis and base his relocation decision on such an analysis, according to USDA. While USDA had established policies and procedures for relocations and other organizational changes that require USDA to examine the rationale for such changes, as well as certain related costs, USDA officials told us that USDA determined that those policies and procedures were not applicable

---

[49]Assessing the effects of the relocation on agency operations is outside the scope of this report and is being covered in a separate ongoing GAO engagement. Data shared by USDA showed that the two agencies lost a significant number of their staff following the relocation, potentially resulting in a loss of institutional knowledge and expertise. Nine months after the effective date of the relocation, ERS and NIFA each had about half the full-time permanent staff compared to prior to the announcement of the relocation. These outcomes demonstrate the potential for risks stemming from weaknesses in the evidence used for decision-making.

[50]USDA, "Secretary Perdue Announces Lease for ERS and NIFA in Kansas City, MO," Press Release No. 0168.19, October 31, 2019, accessed December 8, 2021, https://www.usda.gov/media/press-releases/2019/10/31/secretary-perdue-announces-lease-ers-and-nifa-kansas-city-mo.

because the Office of the Secretary initiated the relocation of ERS and NIFA.[51]

However, after USDA completed its analysis, OMB circulated comprehensive guidance on how to use and build quality evidence in accordance with the Foundations for Evidence-Based Policymaking Act of 2018 (Evidence Act).[52] OMB guidance to agencies on implementing the Evidence Act reiterates the need to make evidence-based decisions that are guided by the best available science and data, and to build and use this evidence in a way that upholds scientific integrity and is free from political considerations.[53] It also states that the Evidence Act provides a statutory framework to advance reliance on evidence and data to make decisions at all levels of government. Finally, it states that OMB expects heads of agencies, including Secretaries, Deputy Secretaries, and other senior leaders to engage in creating a culture of evidence in their agencies where all available evidence is used to make better program, operational, and other decisions, building of evidence where it is lacking, and explains that this is a key value proposition of the Evidence Act. Going forward, if effectively implemented, this guidance would help address the weaknesses we identified in USDA's decision-making.

[51]For USDA policies and procedures for organizational changes, see USDA Departmental Regulation DR 1010-001, Organization Planning, Review, and Approval (Jan. 4, 2018). According to USDA officials, the Office of the Secretary initiated the relocation pursuant to authorities granted under 5 U.S.C. § 301 and Reorganization Plan No. 2 of 1953. See Reorganization Plan No. 2 of 1953, 18 Fed. Reg. 3219 (June 5, 1953), *reprinted as amended* in 5 U.S.C. app. 1. In a USDA Inspector General report, USDA was reported as stating that (1) the Secretary initiated the relocation of ERS and NIFA based on OMB's comprehensive plan to reorganize Executive Branch departments and agencies and (2) Departmental Regulation 1010-001, which requires USDA to examine costs and benefits as part of a relocation decision, does not apply to an organizational change initiated by the Office of the Secretary. See USDA, Office of Inspector General, *USDA's Proposal to Reorganize and Relocate the Economic Research Service and the National Institute of Food and Agriculture,* Inspection Report 91801-0001-23 (Washington, D.C.: August 2019) for the USDA Inspector General report and Office Of Management and Budget M-17-22, *Comprehensive Plan for Reforming the Federal Government and Reducing the Federal Civilian Workforce*, OMB Memorandum M-17-22 (Washington, D.C.: April 12, 2017) for OMB's comprehensive plan to reorganize Executive Branch departments and agencies.

[52]Pub. L. No. 115-435, 132 Stat. 5529 (2019).

[53]See Office of Management and Budget, *Evidence-Based Policymaking: Learning Agendas and Annual Evaluation Plans,* OMB Memorandum M-21-27 (Washington, D.C.: June 30, 2021).

## Agency Comments and Our Evaluation

We provided a draft of this report for review and comment to the Secretary of Agriculture. In its comments, reproduced in appendix IV, USDA neither agreed nor disagreed with our findings but disagreed with the criteria we used to evaluate the agency's economic analysis.

USDA objected to our use of the Evidence Act and OMB guidance for implementing the Evidence Act as criteria for assessing USDA's use of evidence in its relocation decision. USDA explained that the former Secretary made the relocation decision prior to the publication of OMB memoranda containing guidance for implementing the Evidence Act and expressed concerns that our findings could imply that USDA failed to comply with relevant guidance at the time the relocation decision was made. We agree that USDA was not required to comply with OMB guidance published after the relocation decision. However, we continue to believe that OMB guidance on implementing the Evidence Act is reasonable criteria for assessing the extent to which USDA's relocation decision was consistent with an evidence-based approach.

We reaffirm our position that weaknesses in USDA's use of evidence and evidence-building approach limited the ability of USDA leadership to ensure it was making an appropriately informed relocation decision and that this decision may have had avoidable adverse effects on ERS and NIFA's operations in the years immediately following relocation. We also reiterate that we are not making any recommendations, in part because the OMB circulated comprehensive guidance on how to use and build quality evidence in accordance with the Evidence Act after USDA completed its analysis and the former Secretary made the relocation decision.

In addition, USDA objected to the definition of "cost-benefit analysis" that we provided. USDA explained that providing the definition of "cost-benefit analysis" as used in the federal rule-making process may imply that USDA was required to conduct a cost-benefit analysis. However, we included this definition to provide additional information to readers who are not familiar with the concept of "cost-benefit analysis" and to clarify for those readers what USDA meant when it said that it was not required to conduct a formal cost-benefit analysis to decide where to relocate ERS and NIFA.

Finally, USDA objected to our use of GAO's Assessment Methodology for Economic Analysis as criteria for assessing their economic analysis. USDA expressed concerns that doing so implies that, as an executive branch agency, it must target its process to meet a legislative branch

agency's standards for an economic analysis, which may not be in accord with the agency's authorities, policies, and other applicable government-wide guidance. We clarified that we developed our assessment methodology by synthesizing economic concepts identified through consulting with experts on economic analysis and reviewing federal and international agency guidance. Each key element consists of economic concepts that represent best practices. These key methodological elements are not intended to be exhaustive and to supplant or alter relevant federal and agency requirements for economic analysis. Our assessment methodology provides a framework for assessing the sufficiency of economic analyses, and as such, we believe that it is reasonable criteria for assessing USDA's economic analysis. Moreover, we do not believe that the lack of a statutory or regulatory requirement for USDA to conduct an economic analysis precludes the agency from following best practices when such an analysis is conducted.

USDA also provided technical comments, which we incorporated as appropriate.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until two days from the report date. At that time, we will send copies to the appropriate congressional committees, the Secretary of Agriculture, and other interested parties. In addition, the report is available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-4802 or Evansl@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix V.

Lawrance L. Evans, Jr.
Managing Director, Applied Research and Methods

*List of Requesters*

The Honorable Gerald E. Connolly
Chairman
Subcommittee on Government Operations
Committee on Oversight and Reform
House of Representatives

The Honorable Donald S. Beyer
House of Representatives

The Honorable Suzanne Bonamici
House of Representatives

The Honorable Mikie Sherrill
House of Representatives

The Honorable Paul D. Tonko
House of Representatives

The Honorable Jennifer Wexton
House of Representatives

# Appendix I: Objectives, Scope, and Methodology

Appendix I: Objectives, Scope, and Methodology

This report (1) describes the roles and responsibilities of the U.S. Department of Agriculture (USDA) and Ernst & Young in conducting the economic analysis, the deliverables Ernst & Young agreed to provide under the contract, and USDA's process for ensuring the contract requirements were met; (2) assesses the economic analysis performed by USDA and Ernst & Young to inform USDA's decision of where to relocate NIFA and ERS; and (3) assesses USDA's use of evidence to support the relocation decision.

To address the first objective, we reviewed the notice USDA published in the Federal Register soliciting expressions of interest for a contractor to assist with the economic analysis, as well as its award decision memo recommending the selection of Ernst & Young. To understand the roles and responsibilities of USDA and Ernst & Young in conducting the economic analysis, we reviewed the synopsis/solicitation for a contractor, reviewed USDA press releases that provided updates on the site selection process, obtained and reviewed internal USDA memoranda that detailed different relocation scenarios for ERS and NIFA, and interviewed officials from USDA and Ernst & Young. To describe the deliverables required under the contract and USDA's process for ensuring that the contract requirements were met, we reviewed the contract between USDA and Ernst & Young. We also obtained and reviewed the deliverables Ernst & Young provided to USDA. These included project plans, monthly briefing slides, presentations and analysis of the different MSAs under consideration and communication strategies. We compared the deliverables required under the contract to the documents Ernst & Young prepared for USDA over the course of the contract.

To address the second objective, we reviewed the analysis described in the June 2019 memo publicly released by USDA and all the deliverables Ernst & Young provided to USDA. We also reviewed other USDA memoranda and interviewed officials from USDA and Ernst & Young. We compared USDA's analysis to the description of an "economic analysis" as stated in GAO's *Assessment Methodology for Economic Analysis*.[1] GAO defines an economic analysis as an analysis that is intended to

---

[1]GAO-18-151SP. We developed this methodology by synthesizing economic concepts identified by consulting with experts on economic analysis and in federal and international agency guidance. Each key element consists of economic concepts that represent best practices. These key methodological elements are not intended to be exhaustive and to supplant or alter relevant federal and agency requirements for economic analysis. Our assessment methodology provides a framework for assessing the sufficiency of economic analyses.

**Appendix I: Objectives, Scope, and Methodology**

inform decision-makers and stakeholders about the economic effects such as costs, benefits, and/or economic transfers of an action.[2] We determined that the analysis performed by USDA was an economic analysis because its analysis informed decision-makers (USDA leadership and the former Secretary of Agriculture) about the economic effects (costs and benefits) of an action (relocating ERS and NIFA to a new location).

We evaluated the economic analysis performed by USDA according to the five key elements identified in our assessment methodology. These five key elements are:

1.  Objective and scope. The analysis states its objective and its scope is designed to address this objective.

2.  Methodology. The analysis examines the effects of the action by comparing all relevant alternatives and identifies the important economic effects for each alternative considered.

3.  Analysis of effects. The analysis quantifies and discusses the important economic effects across alternatives and the important equity and distributional impacts.

4.  Transparency. The analysis describes and justifies the analytical choices, assumptions, and data used, as well as key limitations and how the statistical variability of the key data elements impacts the estimates.

5.  Documentation. The analysis is clearly written and has a conclusion that is consistent with these results and cites all sources used and documents that it is based on the best available economic information.

In addition, we reviewed academic literature to explore the relationship between cost of living and desirability of different locations. Finally, we also examined the extent to which the indicator for cost of living was correlated with other indicators used to rank MSAs.

To address the third objective, we analyzed the documents provided by USDA to examine the extent to which USDA's economic analysis properly dealt with each of the five key elements included in GAO's *Assessment Methodology for Economic Analysis*.[3] We also interviewed officials from

---

[2]GAO-18-151SP.

[3]GAO-18-151SP.

USDA and consultants from Ernst & Young to learn about any other analyses they may have used but did not document. In addition, we reviewed past GAO reports on government reorganization and evidence-based policymaking to serve as criteria for assessing the quality of evidence used by USDA for its relocation decision.[4] Finally, to evaluate whether USDA's relocation decision reflected evidence-based policymaking, we used the principles laid out in OMB guidance on evidence-based policymaking.[5]

We conducted this performance audit from September 2020 to April 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[4]GAO-18-427 and GAO-20-119.

[5]Office of Management and Budget, *Phase I Implementation of the Foundations for Evidence-Based Policymaking Act of 2018: Learning Agendas, Personnel, and Planning Guidance,* OMB Memorandum M-19-23 (Washington, D.C.: July 10, 2019) and *Evidence-Based Policymaking: Learning Agendas and Annual Evaluation Plans*, OMB Memorandum M-21-27 (Washington, D.C.: June 30, 2021).

# Appendix II: Description of Deliverables Ernst & Young Provided to U.S. Department of Agriculture

Appendix II: Description of Deliverables Ernst
& Young Provided to U.S. Department of
Agriculture

**Table 2: List and Description of Ernst & Young Deliverables Agreed to Provide Under Its Contract with USDA**

| | Deliverable | Description |
|---|---|---|
| 1. | Project Management Plan | Describes detailed timeline with milestones and deliverables, and project team structure for tasks, activities, and resources involved in the planning, analyzing, and stakeholder communication of the site selection process.<br><br>Defines project team structure and governance, including the required USDA stakeholders, and USDA tasks and responsibilities in supporting the project. |
| 2. | Risk Management Plan | Identifies and addresses potential risk areas associated with the management and execution of the project. Uses a risk register to compile risks, probability and impact ratings, triggering events, mitigation strategies, and accountable owners to capture and manage risks. Addresses the risk register during regular meetings with USDA leadership and escalates risks requiring action. |
| 3. | Weekly and Monthly Status Reports | Captures progress toward the timeline and deliverables and issues and risks that need to be discussed with USDA leadership. Includes a status of funds section to validate the number of hours invoiced for payment will not exceed the number of hours worked performing the PWS. |
| 4. | Kick Off Meeting | Conducts a formal kick off meeting to initiate the project and mobilize the project team. |
| 5. | Site Selection Requirements Document | Describes overall site selection strategy, approach, goals, and objectives.<br><br>Describes key decision-makers and stakeholders, both of whom will be part of the process.<br><br>Includes complete list of location considerations (e.g., economic) and critical needs (e.g. proximity to public transportation) for inclusion in the site selection criteria.<br><br>Lists of potential geographies/cities to be included as part of the analysis. |
| 6. | Location Selection Criteria | Outlines the five criteria and identifies their weight and importance levels. |
| 7. | Location Short List Assessment | Evaluates the long list of potential sites against criteria.<br><br>Determines the short list of sites. |
| 8. | City Location Analysis Report | Details the analysis of each of the cities from the short list locations. |
| 9. | Location Study Report | Details the location assessment and methodology, results, and final recommendations on the short list location. |
| 10. | Executive Summary Recommendations Presentation | Includes the approach, results of the analysis and final recommendations. |
| 11. | Communication Plan | Describes plan to communicate the transition to new locations for NIFA and ERS. |

Source: GAO analysis of U.S. Department of Agriculture (USDA) documents. | GAO-22-104540

# Appendix III: Characteristics Used to Rank Metropolitan Statistical Areas

Appendix III: Characteristics Used to Rank
Metropolitan Statistical Areas

**Table 3: Characteristics and Weights for the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA) Provided by USDA to Ernst & Young to Rank Metropolitan Statistical Areas**

| Metropolitan Area Characteristics | Weight (percentage) | |
|---|---|---|
| | ERS | NIFA |
| Average gross cost for commercial real estate | 6.82 | 6.52 |
| Cost-of-living adjustment | 6.82 | 6.52 |
| Consumer Price Index | 4.09 | 3.91 |
| Wage rate growth | 4.09 | 3.91 |
| Average airline flight costs | 5.45 | 6.52 |
| Telecommunications costs | 1.36 | 1.30 |
| Average fit-out cost for commercial space | 1.36 | 1.30 |
| **Subtotal – capital and operating costs** | **30** | **30** |
| Percent of population with bachelor's degree | 1.69 | 1.69 |
| Labor force | 2.25 | 2.25 |
| Labor force growth rate | 2.81 | 2.81 |
| Unemployment rate | 2.81 | 2.81 |
| Proximity to land grant university | 1.69 | 1.69 |
| University graduates | 2.81 | 2.81 |
| University graduates with agricultural degrees by state | 1.69 | 1.69 |
| Percentage of jobs in relevant occupations[a] | 2.25 | 2.25 |
| Civilian federal workers by state | 2.00 | 2.00 |
| **Subtotal – workforce** | **20** | **20** |
| Airport hub status and passenger traffic | 2.44 | 2.68 |
| Commercial real estate vacancy rate | 0.70 | 0.54 |
| Business friendliness | 1.05 | 1.07 |
| Quality of technology infrastructure | 2.44 | 2.68 |
| Proximity to customers in farming, fishing, and agriculture | 2.44 | 2.68 |
| Information technology security and broadband access | 2.44 | 2.68 |
| Lodging availability | 1.57 | 2.68 |
| Census Research Data Center location | 1.92 | 0.00 |
| **Subtotal – logistics and information technology infrastructure** | **15** | **15** |
| Cost-of-living index | 3.57 | 3.57 |
| Quality of life index | 3.57 | 3.57 |
| State public school ranking | 3.57 | 3.57 |
| Average commute time | 2.86 | 2.86 |
| Diversity index | 3.57 | 3.57 |
| Residential real estate market availability | 3.57 | 3.57 |
| Residential housing cost | 3.57 | 3.57 |

**Appendix III: Characteristics Used to Rank
Metropolitan Statistical Areas**

|  | Weight (percentage) | |
|---|---|---|
| **Metropolitan Area Characteristics** | **ERS** | **NIFA** |
| Home and community safety ranking | 2.14 | 2.14 |
| Research university location | 2.14 | 2.14 |
| Agricultural engagement | 2.86 | 2.86 |
| Access to healthcare | 3.57 | 3.57 |
| **Subtotal – quality of life** | **35** | **35** |
| **Total – all characteristics** | **100** | **100** |

Source: GAO analysis of information from the U.S. Department of Agriculture (USDA) and Ernst & Young. | GAO-22-104540

Notes: USDA provided Ernst & Young with four main categories of characteristics: capital and operating costs, workforce, logistics and information technology infrastructure, and community and quality of life characteristics. Ernst & Young identified specific indicators to measure each of these characteristics. USDA specified the overall weights for each of these four characteristics and also indicated the importance of each of the indicators underlying these characteristics to Ernst &Young. Ernst & Young used this information and the overall category weight provided by USDA to assign the weight for each of these indicators as shown in the table.

[a]The Bureau of Labor Statistics occupation code determined relevant by USDA include the following; Computer and Mathematical Occupations; Life, Physical, and Social Science Occupations; Community and Social Service Occupations; Education, Training, and Library Occupations; and Office and Administrative Support Occupations.

# Appendix IV: Comments from the Department of Agriculture

Appendix IV: Comments from the Department of Agriculture

 United States Department of Agriculture | Research Education Economics | Office of the Under Secretary | Room 216W Jamie L. Whitten Building Washington, DC 20250-0110

March 18, 2022

Mr. Lawrance L. Evans, Jr
Managing Director, Applied Research & Methods
U.S. Government Accountability Office
441 G Street, NW
Washington, D.C. 20548

SUBJECT:    Draft Report "Evidence-Based Policymaking: USDA's Decision to Relocate Research Agencies to Kansas City was not Fully Consistent with an Evidence Based Approach (GAO-22-104540SU)"

Dear Mr. Evans:

This letter responds to your request of February 7, 2022, for Department of Agriculture (USDA) review and comments on the above-referenced proposed Government Accountability Office (GAO) performance audit report ("GAO draft report") on the June 2019 USDA decision to relocate portions of the National Institute of Food and Agriculture (NIFA) and the Economic Research Service (ERS) to Kansas City. We appreciate the opportunity to provide comments given that because the relocation is complete and other factors, GAO is not making any recommendations in the GAO draft report.

GAO chooses to review this decision from the perspective of USDA's "economic analysis" of the decision and its compliance with of the Foundations of Evidence-Based Policymaking Act of 2018, Pub. L. 115-435 (which addresses use of evidence for policymaking and nowhere addresses office relocations) ("the Act"); Office of Management and Budget (OMB) guidance on implementation of the Act, OMB Memoranda M-19-23 (**July 10, 2019**) and M-21-27 **June 30, 2021**); and GAO's methodology for "economic analysis," GAO, *Assessment Methodology for Economic Analysis,* GAO-18-151SP (Washington, D.C. April 10, 2018).

First, as noted in the draft report, Secretary Sonny Perdue made the Kansas City location decision on **June 13, 2019**, and the decision reflected the authority of the Secretary to make internal management decisions related to the organization of USDA. This was an operational decision of Secretary Perdue, and neither a rule nor subject to any rulemaking process.

Accordingly, the GAO report reflects at best an inapplicable frame of analysis or at worst the *ex post facto* application of OMB guidance on the Act as a kind of "test case," guidance that GAO notes could address the weaknesses it finds in the USDA relocation decision in future such

**Appendix IV: Comments from the Department of Agriculture**

Mr. Lawrance L. Evans, Jr
Page 2

decisions. Despite GAO's acknowledgment of its retrospective "test case," we object to the implication left to the reader that USDA failed to comply with extant, applicable guidance at the time the June 13, 2019, decision was made.[1]

Further, as this decision does not involve a "rule" whatsoever, the citation to the definition of a "cost-benefit analysis" for purposes of the rulemaking process in footnote 8 is irrelevant to the relocation decision. However, it is inserted as if to contradict USDA's contention stated at the end of page 4 that USDA was not required to do a cost-benefit analysis for the relocation decision.

In any event, as the draft report notes, USDA did choose to conduct an assessment, with the assistance of Ernst & Young. *See* page 12, footnote 18 of GAO draft report. Your report finds that economic analysis did not follow GAO, *Assessment Methodology for Economic Analysis,* GAO-18-151SP (Washington, D.C. April 10, 2018).

GAO subjects USDA's relocation decision to its methods for conducting an "economic analysis" as if that is the standard that must be met for a positive GAO audit review outcome. As an Executive Branch agency, USDA objects to the implication that an agency, in making evidence-based decisions, must implicitly target its process to jump through the hoops of a Legislative Branch agency's mode of "economic analysis" that may not be in accord with agency authorities, policy, and other applicable governmentwide guidance.

Finally, USDA notes that although you include the time frame of events in your report, sentences or sections may be taken out of context. For that reason, USDA would prefer the report specify "Secretary Perdue" when the phrase "the Secretary" or "the Secretary of Agriculture" is used to refer to the former Secretary.

Thank you for allowing us to comment.

Sincerely,

Shefali Mehta
Deputy Under Secretary

---

[1]We note that footnote 6 appears to have a typo in referring to August 2019 instead of August 2018.

# Appendix V: GAO Contact and Staff Acknowledgments

Appendix V: GAO Contact and Staff Acknowledgments

| GAO Contact | Lawrance L. Evans, Jr.at (202) 512-4802 or evansl@gao.gov |
| --- | --- |
| Staff Acknowledgments | In addition to the above contact, Courtney L. LaFountain (Assistant Director), Rachel Siegel (Analyst-in Charge), Namita Bhatia-Sabharwal, Dani Greene, Patrick Harner, and Marc Molino made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet for UNCLASSIFIED Reporting: <br><br> Website: https://www.gao.gov/about/what-gao-does/fraudnet <br><br> Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.