Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchishom@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*
[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **DECLARATION OF JESUS SORIANO** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**DECLARATION OF JESUS SORIANO**

I, Jesus Soriano, declare as follows:

1.    I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.    I am the President of the American Federation of Government Employees ("AFGE") Local 3403 ("Local 3403" or "Union"). I have been involved in Union leadership for 10 years.

3.    Local 3403 is the union that represents employees of the U.S. Department of Agriculture's ("USDA") National Institute of Food and Agriculture ("NIFA"). NIFA is the USDA agency responsible for administering almost all federally funded agricultural research, which includes more than 70 grant programs. NIFA directs federal funding to scientific work that meets the needs of farmers, ranchers, the forestry sector, and consumers. This includes not only research related to agricultural production but also related to nutrition and food safety.

4.    Local 3403 represents employees at NIFA as well as employees at other USDA programs; each represented program has its own Unit Vice President in Local 3403. Local 3403 is the only union representing NIFA employees. As a result of my work at AFGE, I am very familiar with the functions performed by NIFA and the structure of this agency.

5.    The NIFA bargaining unit consists of approximately 274 employees. Approximately 30 of these employees are stationed in the National Capital Region, 74 are stationed in the existing Kansas City office, and the remainder are spread out at remote duty stations across 46 states. These employees include: program specialists, who prepare notices of funding opportunity and review applications; national program leaders, who coordinate the review process, recruit outside scientists for reviews, and develop funding recommendations; and grant management specialists, who work to ensure compliance with grant requirements. There are also approximately 40 additional NIFA employees who are not part of the bargaining unit.

6.    NIFA administers two principal types of programs. The first are competitive grant-making programs, under which NIFA awards funding to selected applicants. The second are "formula" programs, under which funding is delivered to states. Under the formula programs each

1

state gets a certain amount of money to use for research and extension, which involves bringing research discoveries to the public and training members of the public such as farmers on how to implement them. The states are responsible for proposing projects to NIFA for the use of that money. NIFA then ensures that these proposed state projects comply with applicable federal regulations – such as the requirement that they not involve alcohol or tobacco – before approving them. In all, NIFA awarded approximately $1.3 billion in grants in 2025.

7. While USDA announced generally that it intended to reorganize back in 2025, the Union only recently received more specific information regarding the manner and timing of implementation.

8. On April 27, 2026, USDA sent letters to Local 3403 members who work at NIFA informing them that their positions had been identified for relocation from their current locations to Kansas City, Missouri. The letter explained that they would receive a Management Direct Reassignment Letter at some point in the future.

9. On June 29, 2026, USDA sent affected NIFA employees Management Directed Reassignment letters. USDA informed the Union that the letters were sent out to all affected NIFA staff. A true and correct copy of a Management Directed Reassignment letter sent to a Local 3403 member at NIFA is attached as **Exhibit A**. It has been redacted to exclude salary and personal information. The letter states that the member's position is being reassigned to Kansas City, Missouri, and that they will need to report there no later than October 5, 2026, if they accept the reassignment. The letter states that if they decline the reassignment, they will be involuntarily separated. The letter offers Voluntary Early Retirement Authority (VERA) (early out) and Voluntary Separation Incentive Payments (VSIP) (buyout) to all impacted employees, both retirement and non-retirement eligible.

10. The Union is aware of information about the planned reorganization that has been explained to its members through town hall meetings led by the NIFA associate directors for programs and for administrative operations.

11. From the information provided by USDA at these meetings, and from a notification regarding the relocation provided to Local 3403, the Union understands that the USDA

reorganization will relocate almost all NIFA employees to Kansas City, Missouri. At NIFA there are 123 bargaining unit members, and approximately 150 total employees including non-bargaining unit members, who received an initial letter notifying them that their position had been identified for relocation and that they would receive a directed reassignment letter at some point in the future.

12.     Additionally, approximately 45 employees will be transferred out of NIFA to the Agricultural Research Service. These are the awards-management employees who examine recommended awards to ensure that expenditures are allowed under statute and who oversee grants after funding is awarded. The employees who remain at NIFA and are subject to relocation are concentrated on the program side. This means they are responsible for ensuring that grant programs run efficiently, including the posting of funding opportunities, review of grant proposals, and awards of funding.

13.     The Union is aware that the reorganization will also restructure NIFA internally, converting its current institute structure into branches. Currently, the agency is organized into institutes based on discipline (such as plant systems production). The Union understands that the agency intends to eliminate organization by discipline and instead create one branch for competitive programs and a separate branch for formula programs. The agency has also announced a new leadership position, the Senior Associate Director, who has been described as the agency's "eyes and ears" in Kansas City.

14.     The Agency says that these changes, including the relocation of staff to Kansas City, will be in place by October 5, 2026.

15.     The Union is aware that some NIFA employees who are not members of the Local 3403 bargaining unit received Directed Reassignment letters on June 8, 2026. Those letters stated that the workers were reassigned to Kansas City, and must report there no later than Monday, September 21, 2026. The employees were given 30 days to decide whether to accept the reassignment. If they decline the reassignment, they will be involuntarily discharged.  The Directed Reassignment letters offered VERA and VSIP to the relocated workers.

16. The Union is aware that NIFA is already operating under a significant staffing shortage due to staffing reductions that occurred during 2025. According to a report by the USDA Office of Inspector General, 169 employees representing 35% of NIFA's workforce left the agency between December 2024 and December 2025.[1] The Union is aware that Local 3403 members at NIFA often feel as though the remaining employees are effectively performing the work of three people each. The agency has continued to meet its mission, but at a serious cost: the workload has produced constant pressure, widespread burnout, and severe stress among staff. Employees have come to Local 3403 leadership in tears, explaining that they cannot manage the situation. NIFA was previously regarded as one of the best places to work in the federal government. Now, the agency no longer bothers to distribute the survey asking about NIFA employee workplace satisfaction.

17. The forced relocation to Kansas City will cause substantial attrition among the NIFA employees in Local 3403, which will in turn cause serious harm to those employees and to the agency's ability to perform its functions. AFGE Local 3403 conducted a survey of NIFA employee Union members regarding the relocation. The survey was sent to all Union members. Only 14% of respondents indicated that they were willing and able to move to Kansas City by the end of August 2026. 32% indicated that they would "maybe" be willing and able to move to Kansas City if they were provided reporting date flexibility. 54% indicated that they would not move to Kansas City even if reporting date flexibility were provided.

18. The Union is aware that many NIFA employees cannot relocate for personal reasons. For example, according to the survey, approximately 16% of NIFA Union members operate farms or ranches from which they work remotely and therefore cannot relocate. In addition, based on the Union's knowledge of the workforce, it is estimated that approximately 45% have a reasonable accommodation and would need additional time to relocate, if they can

---

[1] Office of Inspector General, U.S. Department of Agriculture Staffing Levels, at 4 (Dec. 17, 2025), https://usdaoig.oversight.gov/sites/default/files/reports/2025-12/USDA%20Staffing%20Levels%20Final%20Report%20-%20Dec%2017_508-signed.pdf (last accessed June 24, 2026).

relocate at all. And approximately 10% are veterans, for whom relocation is especially difficult given the challenges of transferring care within the Department of Veterans Affairs system, which can create lengthy gaps in care.

19.    NIFA staff believe that the loss of experienced staff caused by the relocation will severely degrade NIFA's ability to carry out its mission. NIFA underwent a similar relocation to Kansas City in 2019, during which the agency more than half of its employees. According to a Congressional Research Service report published in 2020, 75% of employees at NIFA and the USDA's Economic Research Service declined to relocate and left the agency.[2]

20.    The Union is aware that immediately after the relocation to Kansas City, NIFA tried to start hiring in Kansas City to fill the gaps created by this mass exodus, but was only able to hire at a rate of a few new employees per month. This was not nearly enough and left the agency massively understaffed for approximately one and a half to two years until the agency expanded hiring to remote duty stations in December 2021, after which the agency eventually returned to sufficient staffing.

21.    NIFA members personally experienced how the staffing reductions caused by the 2019 relocation negatively affected the agency's ability to perform its functions. For instance, during the 2019 relocation, NIFA fell approximately two quarters behind on grant payments to states, including to land-grant universities. Those payments represent approximately 20% of the operating budget for state agricultural experiment stations, which are primarily housed at universities. The delay placed a substantial burden on the universities and seriously strained NIFA's relationships with them. Current NIFA staffers are very concerned that the current relocation would cause such a significant crisis in staffing and expertise at NIFA that it would effectively end these partnerships.

22.    The Union understands that the employees who accepted relocation in 2019 had, on average, about 15 years of experience. This relatively high level of experience among remaining

_____

[2] A true and correct copy of the Congressional Research Service report, entitled Relocation of the USDA Research Agencies: NIFA and ERS, which was published on May 1, 2020 and is available at https://www.congress.gov/crs-product/IF11527 is attached as **Exhibit B**.

employees helped the agency to continue operations, albeit at a significantly reduced level, despite the heavy losses in staff. The slowdown in operations is evidenced by a U.S. Government Accountability Office ("GAO") report which found that as of March 31, 2020, only 53% of fiscal year 2019 competitive grants had been funded, the lowest percentage of any year from 2015 to 2020 (and the GAO report did not include data for years prior to 2015). A true and correct copy of the U.S. Government Accountability Office's report, entitled *Agency Relocations: Following Leading Practices Will Better Position USDA to Mitigate the Ongoing Impacts on Its Workforce* (No. GAO-23-104709), which was published in December 2022 and is available at https://www.gao.gov/assets/gao-23-104709.pdf, is attached as **Exhibit C**.   Today, after the 2025 staff reductions, the average experience level of NIFA staff is only approximately 5 years, so the agency will be even less able to function after comparable losses in staff (especially given that the agency is already severely understaffed). As a result, grant programs will not be implemented, and appropriated funds will revert to the Treasury unused. The research that those grants would have funded will not proceed.

23.    The Union understands from its NIFA members that the disruption in grant administration will harm the scientific work that NIFA funds. A principal focus of NIFA's competitive grants is crop improvement, which involves funding research to develop crops adapted to different regions and climates, resilient to climate variability and environmental stress, and resistant to insects and disease. Genetic improvement of this kind requires continuous, long-term research. Because farmers' profit margins are narrow, they depend on advances in research areas such as pest-resistant crops. This research is critical to maintaining American agriculture. NIFA also funds research into automation and sensor technology to help address rising agricultural labor costs. If competitive grants go unexecuted because of staffing losses, this research will not occur and, and producers and the public will not benefit from it.

24.    The Union understands from its NIFA members that the relocation and resulting attrition will also harm the NIFA employees who remain. As experienced staff depart, the workload on remaining employees, who are already severely overworked and performing the work

of multiple people, will increase further. This will exacerbate the burnout and stress described above and make it still harder for the agency to meet its obligations.

25.    The relocation directly threatens the NIFA employees Local 3403 represents and the agency's ability to serve the public. Local 3403 members at NIFA are anxious about whether they must uproot their families, whether they can obtain accommodations, and whether they can afford to move.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed July 1, 2026, in Alexandria, Virginia.

_____
Jesus Soriano

# Exhibit A

**United States Department of Agriculture**
Research, Education, and Economics

June 29, 2026

<u>FOR OFFICIAL USE ONLY</u>

███████████

U.S. Department of Agriculture
National Institute of Food and Agriculture (NIFA)
1400 Independence Ave, SW
Washington, D.C.  20250-2201

███████████████████

Dear ███████

The United States Department of Agriculture (USDA), National Institute of Food and Agriculture (NIFA) maintains a policy of effective, efficient and balanced utilization of human and other resources to achieve program goals. Based on the USDA reorganization, your current position is being reassigned from ███████████████ to the following location:

**Position Title/Series/Grade**: ███████████████████████, ███████████████
Salary:                            ███████████████
Location:                          NIFA
                                   805 Pennsylvania Ave.
                                   Kansas City, Missouri 64105

*Salary is based on OPM's Locality Pay Table for the proposed position and location.*

This reassignment action does not affect your current appointment type or tenure. If you elect to accept this reassignment, your report date to the new location must be no later than **Monday, October 5, 2026**. If you'd like to voluntarily report sooner than the report date, please coordinate with your supervisor and with agency leadership after submitting your acceptance of the reassignment. You may obtain further details about the position from your point of contact, Venu Kalvacharla, by email at Venu.Kalavacharla@usda.gov or phone at 816-848-4912.

REE will be offering a choice to impacted employees regarding their moving or relocation expenses incurred in connection with this reassignment.  Employees will be able to select between the Traditional Relocation Method, or the Lump Sum Relocation Method, both with a 1-year service agreement. With the lump sum method, you may also elect an additional relocation incentive which requires a 2-year service agreement. Exact entitlement is determined on a case-by-case basis. Questions concerning relocation expenses may be directed to the Travel Policy and Systems Branch, Financial Management and Agreements Division, at FMADRelosupport@usda.gov.

REE has obtained approval to offer Voluntary Early Retirement Authority (VERA) (early out) and Voluntary Separation Incentive Payments VSIP (buyout) to all impacted employees both

<u>FOR OFFICIAL USE ONLY</u>

retirement and non-retirement eligible.  The application to apply for both/either VERA or VSIP can be found on the eHRApps employee portal https://ehrapps.usda.gov/performance . This VERA/VSIP application should be submitted through eHRApps with the acceptance/declination of your directed reassignment.

**If you accept** this reassignment, your leadership will be notified, and you will receive information regarding relocation orders from the Travel Policy and Systems Branch of the Financial Management and Agreements Division. You will be asked to sign a one (1) year Service Agreement before any relocation benefits are paid.

**If your intention is to decline** this reassignment, I must inform you of the consequences of your declination.

- If you decline this reassignment, the agency may initiate an adverse action proposing your separation based on your declination. A separation based on failure to accept a directed reassignment, would be considered an involuntary separation for entitlements that may be available to you.

- If you are not retirement eligible (early or optional retirement), you may be eligible to receive severance pay based on your time in federal service and if you resigned after receiving the final removal letter.  Please contact the Human Resources Division with any questions at REE.Reorganization@usda.gov.

- If you are eligible for retirement and decline the directed reassignment and choose not to retire after receiving a final notice of removal, the Agency will separate you under Discontinued Service Retirement (DSR). Information about DSR can be found at https://www.opm.gov/retirement-services/publications-forms/csrsfers-handbook/c044.pdf. Please contact Retirement and Benefits, Human Resources Division at REE.Reorganization@usda.gov for questions regarding retirement.

You can calculate your approximate annuity using the Federal Retirement Benefits (FRB) Calculator at:  https://usdaree.connecthr.com/Login.aspx?ReturnUrl=%2f or request a calculation by contacting the Human Resources Division at REE.Reorganization@usda.gov.

If you accept this reassignment, but subsequently decline to report, the Agency will initiate an adverse action proposing your separation based on your declination. You may also be carried in an Absence Without Leave (AWOL) status beginning with the effective date of your directed reassignment until any decision to remove you from the Federal Service.

Depending upon the laws of your state, you may or may not be eligible for unemployment compensation. Please contact your local state unemployment office to determine your eligibility.

If you are a military spouse or believe you are eligible for an exception to the Return to In-person Work mandate issued by the President, you should indicate the need for consideration of your individual circumstances in eHRApps employee portal: https://ehrapps.usda.gov/performance or

FOR OFFICIAL USE ONLY

by sending an email to REE.Reorganization@usda.gov. These cases will be considered on a case-by-case basis.

Should you decline this reassignment, you are eligible to participate in the Agency's Career Transition Assistance Program (CTAP). This program assists displaced and surplus employees to receive selection priority consideration for positions within USDA. Additionally, you may be eligible to participate in the Interagency Career Transition Assistance Program (ICTAP). This program assists displaced or surplus employees to receive selection priority consideration in other Federal agencies.

Please certify your decision to accept or decline this directed reassignment opportunity by visiting the employee portal in eHRApps: https://ehrapps.usda.gov/performance no later than **11:59 p.m. Eastern Daylight Time (EDT) on Wednesday, July 29, 2026.** If you accept the directed reassignment, further action to affect this reassignment will be coordinated through the Human Resources Division.

Failure to respond by **11:59 p.m. EDT on Wednesday, July 29, 2026** will be considered a declination of this reassignment opportunity.

If you have any questions concerning this reassignment, retirement eligibility, benefits, CTAP/ICTAP or your appeal rights, please contact the Human Resources Division, at REE.Reorganization@usda.gov.

We are looking forward to your continued contributions to the Agency and USDA Mission.

Sincerely,

Lorna Drennen
Chief Operating Officer
Research, Education, and Economics Mission Area


cc:

Venu Kalvacharla
REE-Reorganization@usda.gov

# Exhibit B

Congressional Research Service
*Informing the legislative debate since 1914*



May 1, 2020

# Relocation of the USDA Research Agencies: NIFA and ERS

In October 2019, the U.S. Department of Agriculture (USDA) relocated most staff positions at two of its research agencies—the National Institute of Food and Agriculture (NIFA) and the Economic Research Service (ERS)—from their long-term location in Washington, DC, to Kansas City, MO. About 75% of affected employees declined to relocate and left the agencies. While ERS and NIFA have prioritized hiring new staff, some agency activities have been reduced or delayed. The USDA budget request for FY2021 proposes an ERS staff level that is 41% lower than in FY2018—before the relocation.

## Agency Background

NIFA is USDA's principal extramural research agency (awarding grants to non-federal entities). It administers approximately $1.5 billion in federal funding annually. NIFA supports research, education, and extension projects conducted in partnership with land-grant colleges and universities, other institutions and organizations, and individuals. NIFA awards include capacity (formula-based) and competitive grants.

ERS is a USDA intramural research agency (employing federal researchers). It has an annual budget of about $85 million. ERS conducts economic and statistical analyses on topics of interest to Congress, agricultural producers, and stakeholders. Topics include agricultural commodities, trade, marketing, food price forecasting, farm and rural income, food safety, and nutrition.

## Relocation and Realignment Proposal

In August 2018, USDA Secretary Sonny Perdue announced the intention to relocate ERS and NIFA from Washington, DC, to a location outside of the Washington, DC, area. Among the stated reasons were (1) improving USDA's ability to attract and retain qualified staff without the burden of a high cost of living, (2) placing USDA resources closer to stakeholders, and (3) lowering agency employment costs and rent.

Concurrent with the relocation proposal, the Secretary proposed an organizational realignment: moving ERS from within the USDA Research, Education, and Economics (REE) mission area to the Office of the Chief Economist (OCE). REE consists of four research agencies. OCE is a staff office within the USDA Office of the Secretary.

## External Response

Criticism of USDA's relocation and realignment proposals began almost immediately. In November 2018, the American Statistical Association and 59 other organizations sent a letter to congressional appropriations committees requesting that Congress not provide funding for relocation. In March 2019, 99 academic, statistical, research, and producer groups sent a letter to congressional appropriations committees requesting that they prohibit

USDA's use of funds to implement the proposed relocation and realignment and that they deny related reprogramming requests. These groups asserted that USDA's proposal would "undermine the quality and breadth of the work these agencies support and perform" and "result in a major negative impact on U.S. farmers, ranchers, consumers, and researchers."

The primary external supporters of the relocation were advocates for smaller government or those supporting regional interests in hosting the agencies. The Acting White House Chief of Staff referred to the relocations as "a wonderful way to streamline government."

## Congressional Response

Members of Congress expressed various views on USDA's proposals, as exemplified by letters in 2018 and 2019. In 2018, the chair and ranking member of the Senate Committee on Agriculture, Nutrition, and Forestry asked Secretary Perdue to provide data and plans for implementing the proposals. In 2019, some Members on the House Agriculture Committee supported relocation in a letter to the House agriculture appropriations subcommittee. In 2019, chairs of two subcommittees of the House Agriculture Committee opposed relocation in a letter to Secretary Perdue.

Some Members of Congress attempted to block or delay USDA's proposals through legislation, such as the proposed Agriculture Research Integrity Act (115th Congress: H.R. 7330; 116th Congress: H.R. 1221 and S. 1637).

Other legislative attempts included provisions in two years of annual appropriations bills. The explanatory statement accompanying the Consolidated Appropriations Act, 2019 (P.L. 116-6), supported an "indefinite delay" of ERS realignment and directed USDA to include in the FY2020 President's budget request cost estimates and an analysis of expected research benefits. The Further Consolidated Appropriations Act, 2020 (P.L. 116-94), did not address the proposals, and the relocation had already occurred. The report accompanying the earlier House bill (H.R. 3164) stated that USDA "flatly refused numerous requests … to provide the initial cost benefit analysis that preceded the decision to go ahead with the proposal."

## OIG and GAO Reviews

In 2018, two Members of Congress requested that the USDA Office of the Inspector General (OIG) review USDA's legal and budget authority for the proposals and the sufficiency of a cost-benefit analysis (CBA) used to justify them. The August 5, 2019, OIG report found that USDA had legal authority. It also found that USDA had not complied with approval and reporting requirements specified in the FY2018 appropriations act (P.L. 115-141). USDA asserted that its actions complied with all applicable laws and that the provisions in P.L. 115-141 were

unconstitutional. OIG asserted that USDA's position on constitutionality was inconsistent with its prior positions.

In December 2019, members of the House Committee on Science, Space, and Technology requested that the Government Accountability Office (GAO) audit USDA decisions related to these relocations. As of April 2020, GAO has not released a report.

## USDA Proposal Updates and Analysis

After announcing its proposals in August 2018, USDA proceeded with site selection. It solicited expressions of interest for siting ERS and NIFA, and in October 2018 it announced receipt of 136 proposals in 35 states. In May 2019, USDA announced three finalist regions: Greater Indianapolis (Indiana), Kansas City (Kansas and Missouri), and Research Triangle (North Carolina).

On June 13, 2019, USDA released a CBA at the time of its site decision. USDA selected the Kansas City Region for relocation and noted that some staff positions would remain in Washington, DC: 76 for ERS and 21 for NIFA. USDA also announced that it would not realign ERS under OCE.

The CBA compared the Washington, DC, area to the three finalist regions and concluded that relocating to Kansas City would save $300 million over 15 years. In response, the Agricultural and Applied Economics Association released a report concluding that USDA overstated the costs of not relocating and that USDA "failed to follow federal guidelines" for the CBA. The report estimated the move would cost between $83 million and $182 million when accounting for the lost value of research from employees who would resign rather than move.

## Leadership and Staffing Levels

Since the relocation, leadership positions at NIFA and ERS have been staffed primarily by acting officials.

Staffing levels have declined at ERS and NIFA since USDA announced its proposals (see **Figure 1**). The CBA showed that USDA would require 294 of 315 government employees at NIFA, and 253 of 329 employees at ERS, to relocate. The annual *Explanatory Notes* for the President's budget requests identify 412 permanent full-time positions

at NIFA from FY2016 to FY2020. Staffing of 315 at the time of the CBA suggests an initial vacancy rate of 25%.

By September 30, 2019—the effective date of the relocation—NIFA had 250 permanent full-time employees and ERS had 239, according to the FY2021 President's budget request. As of February 1, 2020—four months after relocation—NIFA had 105 and ERS had 106. Compared with full staffing levels cited in the CBA, NIFA and ERS are operating with approximately 33% of their staff.

In March 2020, USDA reported that over 150 active recruitments are in process for ERS and NIFA and that it is using additional tools to help ensure mission continuity: using re-employed annuitants, short-term contractors, and employees on detail from other agencies. USDA conducted a virtual career fair in April 2020.

## Mission Delivery

Since the relocation, NIFA grantees have experienced delays in receiving awarded funds, which are typically released one to two months after the start of the next fiscal year. A notice to grantees of March 12, 2020, advises that FY2019 capacity and competitive awards may be released by the end of March 2020 and April 2020, respectively (three to five months later than is typical). This notice stated that NIFA did not yet have a timeline for issuing FY2020 awards.

Media reports citing USDA internal memos suggest that ERS has delayed or discontinued numerous reports. Senator Debbie Stabenow sent a letter to USDA in September 2019 raising concerns about ERS report delays and discontinuations and USDA's transparency regarding impacts of the relocation on mission delivery.

## Congressional Interest

Congress may be interested in how NIFA and ERS are meeting their responsibilities with reduced workforces, and in the future, as new staff are hired. In addition to the GAO and OIG reviews, Congress may consider exercising oversight of USDA implementation of the relocations and any benefits as anticipated by the CBA.

**Figure 1. Permanent Staff Positions at ERS and NIFA**



**Source:** Annual President's budget request, FY2019, FY2020, FY2021; CRS communication from USDA on March 5, 2020; annual appropriations acts, FY2019, FY2020.

**Notes:** *FY2020 "actuals" are employment data as of February 1. Other "actuals" are employment data as of September 30 of each fiscal year.

**Genevieve K. Croft**, Analyst in Agricultural Policy

IF11527

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

# Exhibit C



**United States Government Accountability Office**

## Report to Congressional Requesters

**December 2022**

# AGENCY RELOCATIONS

# Following Leading Practices Will Better Position USDA to Mitigate the Ongoing Impacts on Its Workforce

GAO-23-104709



# Highlights

Highlights of GAO-23-104709, a report to congressional requesters

December 2022

# AGENCY RELOCATIONS

## Following Leading Practices Will Better Position USDA to Mitigate the Ongoing Impacts on Its Workforce

## Why GAO Did This Study

In response to a presidential initiative to move federal agency headquarters outside of Washington, D.C., in August 2018, the Secretary of Agriculture announced his decision to relocate ERS and NIFA. The agencies moved to Kansas City, Missouri, in September 2019. USDA's stated objectives for relocating the agencies included attracting and retaining highly qualified staff, but various stakeholders raised questions about the ability of ERS and NIFA to continue their missions after relocation.

GAO was asked to review USDA's relocation of ERS and NIFA. This report examines (1) the authorities and requirements that USDA identified for relocating ERS and NIFA, (2) the effect of relocation on the agencies' human resources and productivity, and (3) the extent to which the agencies followed selected leading practices for agency reforms and strategic human capital management.

GAO collected responses from USDA on legal requirements; reviewed a prior GAO report on this relocation; analyzed trends in the agencies' human resources, ERS's publications, and NIFA's grant timeliness; and compared USDA and agency actions to relevant leading practices for effective agency reforms and strategic human capital management.

## What GAO Recommends

GAO is making eight recommendations to USDA to more fully follow selected leading practices related to agency reforms and strategic human capital management. USDA generally agreed with these recommendations.

View GAO-23-104709. For more information, contact Steve Morris at (202) 512-3841 or morriss@gao.gov.

## What GAO Found

The U.S. Department of Agriculture (USDA) identified numerous legal authorities and requirements and took various actions in relocating two of USDA's research agencies—the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA). For example, USDA identified legal authority for the Secretary of Agriculture to relocate the offices and relied on certain regulations to select an appropriate site.

ERS's and NIFA's workforce size and productivity temporarily declined following the agencies' 2019 relocation from offices in Washington, D.C., to Kansas City, Missouri. Coinciding with the loss of staff in fiscal years 2019 and 2020, ERS produced fewer key reports, and NIFA took longer to process grants. By the end of fiscal year 2021, however, agencies' workforce size and productivity had largely recovered. Two years after the relocation, the agencies' workforce was composed mostly of new employees with less experience at ERS and NIFA than the prior workforce. In addition, a decline in the number of employees in certain protected groups persisted. For example, the proportion of Black or African American staff at NIFA declined from 47 percent to 19 percent (see fig.).

**Number of Permanent Full-Time Staff at NIFA, by Race and Ethnicity, at the End of Fiscal Years 2018 and 2021**




NIFA permanent full-time staff – end of fiscal year 2018

- **2** – American Indian or Alaska Native
- **5** – Multirace
- **10** – Hispanic or Latino
- **28** – Other races
- **109** – White
- **134** – Black or African American
- **288 – Total workforce**

NIFA permanent full-time staff – end of fiscal year 2021

- **3** – American Indian or Alaska Native
- **6** – Hispanic or Latino
- **11** – Multirace
- **18** – Other races
- **47** – Black or African American
- **161** – White
- **246 – Total workforce**

NIFA = National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

Overall, USDA's actions leading up to and during the relocation of ERS and NIFA followed some, but not all, selected leading practices for effective agency reforms and strategic human capital management. For example, USDA minimally involved employees, Congress, and other key stakeholders in relocating the agencies. In addition, both agencies partially followed, or did not generally follow, many of the leading practices related to strategic workforce planning, training and development, and diversity management—practices that can help agencies meet their missions and strategic goals. By more fully following these leading practices as the agencies continue to rebuild their workforces, ERS and NIFA will be better positioned to address the impact of the recent relocation and any future relocations. Following these practices will also help agencies support workforce training needs and strategically plan for changes in their workforce composition.

**United States Government Accountability Office**

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 5 |
| | USDA Identified Authorities Allowing the Relocation of ERS and NIFA and Requirements It Needed to Follow in Relocating the Agencies | 8 |
| | For 2 Years Following the Relocation, Agency Staff Levels and Productivity Declined and Then Rebounded, but Changes to Staff Composition Persisted | 13 |
| | USDA Followed Some, but Not All, Selected Leading Practices for Agency Reforms and Strategic Human Capital Management in Relocating and Rebuilding ERS and NIFA | 22 |
| | Conclusions | 37 |
| | Recommendations for Executive Action | 38 |
| | Agency Comments and Our Evaluation | 39 |
| Appendix I | Objectives, Scope, and Methodology | 42 |
| Appendix II | Key Tools Available to Congress to Oversee Proposed Agency Relocations | 48 |
| Appendix III | Additional Human Resources-Related Data | 56 |
| Appendix IV | Selected Leading Practices for Agency Reforms and Strategic Human Capital Management | 63 |
| Appendix V | Comments from the U.S. Department of Agriculture | 69 |
| Appendix VI | GAO Contact and Staff Acknowledgments | 71 |

Tables

Table 1: List of Legal and Other Authorities Identified by USDA Governing Relocation of ERS and NIFA    9

Table 2: List of Legal and Other Requirements Identified by USDA Governing Relocation of ERS and NIFA    10

Table 3: Extent the U.S. Department of Agriculture (USDA) Followed Selected Leading Practices for Agency Reforms in Relocating the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)    23

Table 4: Extent to Which USDA Research Agencies, the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA), Followed Selected Leading Strategic Human Capital Management Practices Before and After Relocation    30

Table 5: Processes and Actions Available to Congress That It Could Use to Oversee Proposed Agency Relocations (Summarized from the Congressional Research Service's *Congressional Oversight Manual*)    49

Table 6: ERS and NIFA New Hires and Estimated Departures of Permanent Full-Time Staff, for Fiscal Years 2018 through 2021    57

Table 7: ERS and NIFA Permanent Full-Time Staff, by Key Positions, Fiscal Years 2015 through 2021    57

Table 8: ERS and NIFA Permanent Full-Time Staff, by Permanent Duty Station, Fiscal Years 2018 through 2021    58

Table 9: ERS and NIFA Permanent Full-Time Staff, by Years of Service at ERS or NIFA, Fiscal Years 2015 through 2021    58

Table 10: ERS and NIFA Permanent Full-Time Staff, by Gender, Fiscal Years 2015 through 2021    60

Table 11: ERS and NIFA Permanent Full-Time Staff, by Age, Fiscal Years 2015 through 2021    60

Table 12: ERS and NIFA Permanent Full-Time Staff, by Veterans' Preference, Fiscal Years 2015 through 2021    60

Table 13: ERS and NIFA Permanent Full-Time Staff, by Self-Identified Disability, Fiscal Years 2015 through 2021    61

Table 14: Number and Percent of Competitive Grants Funded, by Four Dates, for the Fiscal Year Following the Grant Year for Fiscal Years 2015 through 2020 Grants    61

Table 15: Number of Capacity Grants Whose Appropriation Was Funded in Fiscal Years 2017 through 2021 That Received at Least One Payment, by Four Dates in the Same Year    62

Table 16: Selected Leading Practices for Agency Reforms and Extent These Leading Practices Were Followed by the U.S. Department of Agriculture (USDA) in Its Relocation of the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)    63

Table 17: Selected Leading Practices for Strategic Human Capital Management and Extent These Leading Practices Were Followed by the U.S. Department of Agriculture (USDA) in Its Relocation, Before and After, of the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)    65

Figures

Figure 1: Timeline of Events Leading to the Relocation of ERS and NIFA from Washington, D.C., to Kansas City, Missouri    6

Figure 2: Number of Permanent Full-Time Staff at ERS and NIFA, as of the End of Fiscal Years 2015 through 2021    14

Figure 3: Number of Permanent Full-Time Staff, by Years of Service at ERS, as of the End of Fiscal Years 2018 and 2021    16

Figure 4: Number of Permanent Full-Time Staff, by Years of Service at NIFA, as of the End of Fiscal Years 2018 and 2021    16

Figure 5: Number of Permanent Full-Time Staff at ERS, by Race and Ethnicity, as of the End of Fiscal Years 2018 and 2021    17

Figure 6: Number of Permanent Full-Time Staff at NIFA, by Race and Ethnicity, as of the End of Fiscal Years 2018 and 2021    18

Figure 7: Number of ERS Products Issued, by Type of Product, Fiscal Years 2015 through 2021    19

Figure 8: Median Number of Days for NIFA to Process and Fund Competitive Grants for Grant Proposals Submitted in Fiscal Years 2015 through 2020    21

Figure 9: Number of Permanent Full-Time Staff at ERS and NIFA, by Race and Ethnicity, end of Fiscal Years 2015 through 2021    59

## Abbreviations

| | |
|---|---|
| CBO | Congressional Budget Office |
| CREEMS | Cooperative Research, Education, and Extension Management System |
| CRS | Congressional Research Service |
| DEIA | Diversity, Equity, Inclusion, and Accessibility |
| EOI | Expression of Interest |
| ERS | Economic Research Service |
| GSA | General Services Administration |
| HR | Human Resources |
| NIFA | National Institute of Food and Agriculture |
| OIG | Office of Inspector General |
| OMB | Office of Management and Budget |
| OPM | Office of Personnel Management |
| USDA | U.S. Department of Agriculture |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

December 14, 2022

Congressional Requesters

In June 2019, the U.S. Department of Agriculture (USDA) announced that it would relocate most staff positions at two of its research agencies—the National Institute of Food and Agriculture (NIFA) and the Economic Research Service (ERS)—from Washington, D.C., to the Kansas City region.[1] Once the announcement was made, affected ERS and NIFA staff had until the effective date of the relocation on September 30, 2019—approximately 4 months—to decide whether they would relocate to Kansas City or leave the agencies.

ERS and NIFA play key roles in USDA's mission to provide leadership on food, agriculture, rural development, and other issues while assisting farmers across the U.S. These research agencies supply information to farmers, ranchers, consumers, researchers, and communities and award grants to states, universities, and institutions. The mission of ERS is to anticipate trends and emerging issues in agriculture, food, the environment, and rural America and to conduct high-quality, objective economic research to inform and enhance public and private decision-making. ERS conducts research and analysis that covers topics such as food safety and nutrition, global markets and trade, and the rural economy for public and private decision makers, including USDA leadership. ERS employs mostly economists, who provide a variety of products that inform public and private decision-making in the agricultural sector.

NIFA's mission includes investing in and advancing agricultural research and education. In fiscal years 2021 and 2022, NIFA awarded approximately $2 billion annually to states, universities, and other institutions to conduct research and to fund educational programs for agriculture, the environment, human health and well-being, youth, and communities, according to USDA officials. NIFA employs scientists and management specialists who process grants for the land-grant university system and other organizations that work at the state and local level.

---

[1]According to this announcement, USDA anticipated that 294 of NIFA's 315 positions would relocate and that 253 of ERS's 329 positions would relocate, and the remainder would stay in the National Capital Region. The National Capital Region consists of the District of Columbia, the surrounding counties within the states of Maryland and Virginia (Montgomery and Prince George's counties in Maryland; Arlington, Fairfax, Loudon, and Prince William counties in Virginia) and the incorporated cities therein.

USDA first announced plans to relocate ERS and NIFA outside of the National Capital Region in August 2018. Soon thereafter, stakeholders raised questions about the ability of ERS and NIFA to continue their missions during and after a relocation. Some also questioned whether USDA's actions to relocate ERS and NIFA complied with legal requirements related to relocations. Similarly, some Members of Congress raised questions about the relocation's process and potential impacts and requested reviews of the proposed relocation by GAO and others.[2] Leading practices for agency reforms and strategic workforce planning are intended to help agencies effectively implement reforms and reorganizations.[3]

You asked us to review USDA's relocation of two of its research agencies, ERS and NIFA. This report (1) describes the legal and regulatory authorities and requirements that USDA identified for relocation of ERS and NIFA and what actions the department took in response; (2) describes how the relocation of ERS and NIFA affected the agencies' human resources and productivity; and (3) evaluates the extent to which USDA's relocation of ERS and NIFA, and these agencies' efforts since the relocation, follow relevant leading practices for agency reforms and strategic human capital management. We also describe key tools available for congressional oversight of relocations in appendix II.

To describe the authorities and requirements that USDA identified and what actions the department took in response, we collected written

---

[2]In April 2022, GAO reported on how USDA selected Kansas City, Missouri, as the new location for ERS and NIFA, including the analysis used to support this decision; see GAO, *Evidence-Based Policy Making: USDA's Decision to Relocate Research Agencies to Kansas City Was Not Fully Consistent with an Evidence-Based Approach*, GAO-22-104540 (Washington, D.C.: Apr. 19, 2022). As of December 2022, GAO has ongoing work on two legal decisions related to issues arising from the relocation. In 2019 and 2020, the USDA Office of Inspector General published two reports on the relocation: U.S. Department of Agriculture Office of Inspector General, *USDA's Proposal to Reorganize and Relocate the Economic Research Service and National Institute of Food and Agriculture*, Inspection Report 91801-0001-23 (Washington, D.C.: Aug.1, 2019); and *USDA Research Integrity and Capacity*, Inspection Report 84801-0001-22 (Washington, D.C.: Dec. 8, 2020).

[3]In this report, the term "reform" broadly includes any organizational changes—such as relocations, major transformations, mergers, consolidations, and other reorganizations—and efforts to streamline and improve the efficiency and effectiveness of government operations. See GAO, *Government Reorganization: Key Questions to Assess Agency Reform Efforts*, GAO-18-427 (Washington, D.C.: June 13, 2018); *Human Capital: Opportunities to Improve Executive Agencies' Hiring Processes*, GAO-03-450 (Washington, D.C.: May 30, 2003); and *Human Capital: Key Principles for Effective Strategic Workforce Planning*, GAO-04-39 (Washington, D.C.: Dec. 11, 2003).

responses from USDA's Office of General Counsel on their understanding of what authorities the department had and what legal and regulatory requirements USDA was subject to in relocating offices, and actions taken in response to these requirements. In addition, as of December 2022, GAO has ongoing work on two legal decisions related to issues arising from the relocation.[4] For this report, we did not independently review or verify the list of authorities and requirements that USDA identified nor did we review whether the department's actions satisfied the requirements identified.

To describe how the relocation affected the agencies' human resources, we analyzed trends in ERS's and NIFA's human resources data, including groups that are considered "protected" under federal laws.[5] To assess the impact of the relocation on ERS's productivity, we analyzed publications listed on the ERS website, data provided by the agency, and the number of journal articles to describe annual trends in products before and after the relocation. To assess the impact on NIFA's productivity, we analyzed the length of time between key steps in NIFA's process for funding grants before and after the relocation.

To determine the extent to which USDA actions followed leading practices, we assessed USDA's actions to relocate ERS and NIFA against leading practices for effective agency reforms and for strategic human capital management. To do this, we first selected specific leading practices relevant to relocations from the list of leading practices for effective agency reforms; we then assessed USDA's actions in relocating ERS and NIFA against those selected leading practices.[6] We also selected specific leading practices relevant to relocations from strategic workforce planning principles identified in our prior work, and we assessed ERS's and NIFA's human capital planning process and practices during and after the relocation against those selected leading

---

[4]These issues include whether USDA complied with notification requirements when it sent notice of its intent to relocate offices and whether any incentives received by USDA in the course of relocating ERS and NIFA to Kansas City, Missouri, were consistent with the general requirement that agencies deposit money received for the government into the general fund of the Treasury.

[5]These laws define protected groups and classes based on race, color, religion, sex, national origin, age, and disability.

[6]GAO-18-427.

practices.[7] (Since both sets of leading practices include strategic workforce planning, we provide a high-level assessment in our discussion of agency reforms and an in-depth assessment as part of our discussion of strategic human capital management.)

Leading practices for effective agency reforms and for strategic human capital management are organized by categories and subcategories. In this report, we use the term "generally followed" to indicate that USDA actions followed all, or most, aspects of the selected leading practices in a subcategory; the term "partially followed" to indicate that USDA actions followed some, but not most, aspects of the selected leading practices in a subcategory; and the term "generally did not follow" to indicate that USDA actions followed few to no aspects of the selected leading practices in a subcategory. We assessed USDA's actions—and those of ERS and NIFA, as appropriate—at the individual practice level and at the subcategory level.

For all objectives, we reviewed agency documentation and interviewed department and agency officials, as well as union representatives. We also summarized tools for congressional oversight identified in a prior report[8] and the Congressional Research Service's *Congressional Oversight Manual*.[9] (See app. II.) Our full scope and methodology is described in appendix I.

We conducted this performance audit from January 2021 to December 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[7]GAO-03-450; GAO-04-39; GAO, *Human Capital: A Guide for Assessing Strategic Training and Development Efforts in the Federal Government*, GAO-04-546G (Washington, D.C.: March 2004); and *Human Capital: Additional Collaboration Between OPM and Agencies Is Key to Improved Federal Hiring*, GAO-04-797 (Washington, D.C.: June 7, 2004).

[8]GAO, *21st Century Challenges: Reexamining the Base of the Federal Government*, GAO-05-325SP (Washington, D.C.: February 2005).

[9]Congressional Research Service, *Congressional Oversight Manual*, RL 30240 (Updated Mar. 31, 2021).

## Background

### Key Events of the Relocation

According to USDA, in response to a presidential initiative to move federal agency headquarters outside of Washington, D.C.,[10] the Secretary of Agriculture announced in August 2018 his decision to relocate NIFA and ERS. According to USDA's August 2018 press release announcing this relocation, the department's goals for relocating ERS and NIFA outside of the National Capital Region were to

(1) improve USDA's ability to attract and retain highly qualified staff with training and interests in agriculture, many of whom come from land-grant universities;

(2) place important USDA resources closer to many of the agency's stakeholders; and

(3) benefit the American taxpayers by significantly reducing employment costs and rent.

In June 2019, the Secretary announced that he had chosen the Kansas City region, as the new location for ERS and NIFA. On September 30, 2019, portions of ERS and NIFA relocated to Kansas City, Missouri (see fig. 1).[11]

---

[10]Additional information on the initiative to merge and relocate federal agencies can be found in Office of Management and Budget, *Comprehensive Plan for Reforming the Federal Government and Reducing the Federal Civilian Workforce*, OMB Memorandum M-17-22 (Washington, D.C.: Apr. 12, 2017). We previously reported on a related June 2018 government-wide reform plan, *Delivering Government Solutions in the 21st Century: Reform Plan and Reorganization Recommendations*, in GAO, *Federal Management: Selected Reforms Could Be Strengthened By Following Additional Planning, Communication, and Leadership Practices*, GAO-20-322 (Washington, D.C.: Apr. 23, 2020).

[11]USDA signed a lease for permanent office space in Kansas City, Missouri, in October 2019.

**Figure 1: Timeline of Events Leading to the Relocation of ERS and NIFA from Washington, D.C., to Kansas City, Missouri**



Source: GAO analysis of U.S. Department of Agriculture (USDA) documents.  |  GAO-23-104709

As we reported in April 2022,[12] USDA released a memorandum in June 2019[13] that summarized its economic analysis and described several benefits and costs of relocating to the selected location. USDA officials said that the agency was not required to conduct a formal cost-benefit analysis as part of its decision to relocate NIFA and ERS. In April 2022, we issued a report examining the analysis that USDA used to support its decision to relocate ERS and NIFA to the Kansas City region. This report reviewed how USDA made its relocation decision, the underlying analyses, and the use of evidence in USDA's decision-making. We reported that USDA's economic analysis did not fully align with its stated

---

[12]GAO-22-104540.

[13]U.S. Department of Agriculture, *NIFA and ERS Relocation: Cost Benefit Analysis* (June 13, 2019). This publicly released document produced by USDA is the agency's summary of the analysis completed by USDA with input from Ernst & Young. Ernst & Young did not complete a separate cost-benefit analysis.

objectives for relocating ERS and NIFA and that USDA's development and usage of evidence underlying its decision had significant limitations.[14]

| ERS Products | ERS digitally publishes its research and analysis in economic research reports, articles in its Amber Waves magazine, data visualizations, and data products throughout the year. ERS's data products encompass estimates, forecasts, and economic and statistical indicators. In addition, the ERS commodity outlook program delivers outlook reports and data, which are among the most widely accessed ERS products. ERS's products include |

- research reports, which take up to 2 years to complete and provide in-depth economic analyses that may have implications for public and private decision-makers. Of the two main types—Economic Research Reports and Economic Information Bulletins—Economic Research Reports are the most in depth;

- journal articles, which are peer-reviewed through the individual journal processes and can take up to 2 years to complete and be issued; and

- outlook reports, which take about 4 weeks to prepare, complement the release of USDA's World Agricultural Supply and Demand Estimates by providing analyses and data on the short-term outlook for specific U.S. and global commodity markets and are required by statute.

**NIFA Grant Types**

NIFA awards research funding through a combination of competitive grants and funds allocated to states and institutions under statutory formulas, known as "capacity grants." Specifically:

- Competitive grants support research, education, and extension activities for land-grant institutions, State Agricultural Experiment Stations, and other organizations. Grants are funded from annual, multiyear, or no-year funding. NIFA generally conducts peer review of these grant proposals with panels of external scientists.

- Capacity grants support research, education, and extension activities at land-grant institutions and schools of forestry and veterinary medicine. Capacity grants ensure that the land-grant university system and other partners maintain the "capacity" to conduct research and extension activities. Capacity grants are

[14]We did not make any recommendations in GAO-22-104540 because, among other reasons, the relocation had already taken place, and the Office of Management and Budget had since circulated comprehensive guidance on how to build and use quality evidence that, if effectively implemented, should address the weaknesses highlighted in our report.

funded through annual appropriations. Recipient institutions have either 2 years or 5 years to draw down these funds and complete their work.

## USDA Identified Authorities Allowing the Relocation of ERS and NIFA and Requirements It Needed to Follow in Relocating the Agencies

We found that USDA identified authorities that allowed for the relocation of ERS and NIFA and requirements that USDA needed to address to conduct the relocation, both of which informed the department's actions to plan and conduct the agencies' relocations.[15] USDA officials said that they identified 16 statutes, regulations, agency directives, guidance, and policies relevant to planning and conducting the relocation of ERS and NIFA.[16] USDA officials said that they identified these authorities and requirements in a number of ways, including relying on already-known requirements and consulting with the General Services Administration (GSA).

Among the sources identified, USDA officials cited several sources of USDA's authority to take actions. For example, officials from USDA identified section 4 of the department's Reorganization Plan No. 2 of 1953 as providing the legal authority for the Secretary of USDA to relocate ERS and NIFA offices.[17] In addition, USDA officials identified Departmental Regulation 1010-001 as expressing the Secretary of Agriculture's authority to move a mission area, agency, or staff office to another location.[18] Table 1 shows the authorities identified by USDA as applicable

[15]For the purpose of this report, we mean a "legal authority" to be a provision of law, regulation, or policy that authorizes an agency or official to take a particular action. Further, we mean a "legal requirement" to be a provision of law, regulation, or policy that constrains an agency or official from taking a particular action.

[16]In August 2019, the USDA Office of Inspector General (OIG), in its review and evaluation of the relocation, also reported relevant authorities and requirements that USDA relied on; see USDA Office of Inspector General, *USDA's Proposal to Reorganize and Relocate the Economic Research Service and National Institute of Food and Agriculture*, Inspection Report 91801-0001-23 (Washington, D.C.: August 2019). GAO found that USDA identified additional authorities and requirements for purposes of our review because our research objective included a broader scope compared to the USDA OIG. For example, we asked USDA officials to identify authorities and requirements relied on both (1) at the time the USDA made a decision, and (2) during implementation of the relocation, whereas USDA OIG asked for authorities relied on only at the time USDA made the decision to relocate.

[17]Reorganization Plan No. 2 of 1953, Act of March 25, 1953, § 4, 67 Stat. 633 (codified as amended at 7 U.S.C. § 2201 note).

[18]U.S. Department of Agriculture Departmental Regulation 1010-001, Organization Planning, Review, and Approval (Jan. 4, 2018). The document states that the authority to approve the creation, elimination, or transfer of an entire mission area, agency, or staff office is reserved to the Secretary, pursuant to 5 U.S.C. § 301 and Reorganization Plan No. 2 of 1953.

to the relocation of ERS and NIFA, reasons that USDA cited for relying on these authorities, and actions that USDA cited taking in response to these authorities.

**Table 1: List of Legal and Other Authorities Identified by USDA Governing Relocation of ERS and NIFA**

| Legal and other authority | Reason cited by USDA for relying on the authority | Reported action(s) taken in response to identified authority |
|---|---|---|
| Section 4 of the Reorganization Plan No. 2 of 1953 (codified at 7 U.S.C. § 2201 note). | USDA officials said that this authority generally permits the Secretary to reorganize the functions of the department and provided additional support for the Secretary's authority to relocate functions of the department. | USDA officials said that this authority was used for an initial proposal to realign the Economic Research Service (ERS) under another office, which was later dropped from the overall relocation initiative. |
| USDA, Organization Planning, Review and Approval, Departmental Regulation 1010-001 (Jan. 4, 2018). | USDA officials said that they were aware of this policy that applies to organizational changes in the department. | USDA officials said that the relocation falls ultimately within the authority of the Secretary; a decision by the Secretary is not limited by the regulation and, in this case, the Secretary personally authorized any changes necessitated by the regulation. |
| Under Secretary for Research, Education, and Economics, 7 U.S.C. § 6971. | USDA officials said that this statute authorized the establishment of the National Institute of Food and Agriculture (NIFA). | USDA officials said that this authority does not address the location of the agency, so no actions were needed. |
| Erection of buildings and other structures on nonfederal lands; duration of use of such lands; removal of structures after termination of use; availability of funds for expenses of acquiring long-term leases or other agreements, 7 U.S.C. § 2250a. | USDA officials said that USDA was aware of this authority as potentially applicable, depending upon the Expressions of Interest (EOI) received. (USDA requested EOIs from state and local governments, industry, and other interested parties, and USDA received proposals for 139 EOIs across 308 potential sites in 35 states.) | USDA officials said that the EOI selected did not require use of this authority. |
| Consolidated Appropriations Act, 2018. Pub. L. No. 115-141, div. A, tit. VII, § 753, 132 Stat. 348, 394. | USDA officials said that the department was aware of this provision that provided $6 million related to the relocation of NIFA. | USDA officials said that these funds were expended to support buy-out and relocation expenses. |

Source: GAO summary of U.S. Department of Agriculture (USDA) Office of General Counsel statements. | GAO-23-104709

Note: EOIs are summaries from a potential supplier that show they are interested in, and capable of, delivering particular goods or services.

USDA officials also identified sources that could impose requirements or limitations on the department if it were to relocate ERS and NIFA. For example, federal law requires that offices attached to the seat of government be in the District of Columbia, except as otherwise expressly provided by law.[19] Table 2 shows the legal and other requirements identified by USDA as governing the relocation of ERS and NIFA,

---

[19]4 U.S.C. § 72.

reasons that USDA cited for relying on these requirements, and actions that USDA cited taking in response to these requirements.

**Table 2: List of Legal and Other Requirements Identified by USDA Governing Relocation of ERS and NIFA**

| Legal and other requirements | Reason cited by USDA for relying on requirement | Reported action(s) taken in response to identified requirement |
| --- | --- | --- |
| Public Offices; at seat of Government, 4 U.S.C. § 72. | USDA officials said that this statute requires "the offices attached to the seat of government shall be exercised in the District of Columbia," unless otherwise provided for by law. | USDA officials said that the heads of the agencies and senior management staff for the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA) remained in Washington, D.C. |
| Congressional approval of proposed projects, 40 U.S.C. § 3307. | USDA officials said that this statute requires a submission of a prospectus for a proposed facility for approval of an appropriation, if above a certain threshold. | USDA reported that no action was necessary. |
| Prohibition on closure or relocation of county offices for the Farm Service Agency, 7 U.S.C. § 6932a. | USDA officials said that the department was aware of this as the only permanent statutory prohibition concerning the relocation of USDA agency offices. | USDA officials said that this statutory prohibition is limited to the Farm Service Agency, so no actions were needed with respect to the relocation of NIFA and ERS. |
| Confidential Information Protection and Statistical Efficiency Act of 2002, (codified at 44 U.S.C. § 3501 note), repealed by Pub. L. No. 115-435, § 302(c), 132 Stat. 5529, 5552 (2019), and related implementation guidance from the Office of Management and Budget (OMB). | USDA officials said that this requirement was cited in the Federal Register "Notice of Request for Expression of Interest for Potential Sites for Headquarters Office Locations" in the context of Information Technology infrastructure requirements for the ERS at the new location. 83 Fed. Reg. 40, 499, 40, 500 (Aug. 15, 2018). | USDA officials said that the availability of space for Information Technology infrastructure was considered in the site selection process, in order to meet legal requirements. |
| Consolidated Appropriations Act, 2018. Pub. L. No. 115-141, div. A, tit. VII, § 717, 132 Stat. 348, 385. | USDA officials said that the department was aware that this provision could require notice to the Committees on Appropriations of both Houses of Congress before taking certain funding actions in order to relocate an office or employees. | USDA officials said that on August 9, 2018, the department notified Congress of its plan to realign ERS under the Office of the Chief Economist, which reports to the Office of the Secretary, and to explore options to relocate most ERS and NIFA employees outside of the National Capital Region. |
| Federal Space Management, Exec. Order No. 12,072, 43 Fed. Reg. 36,869 (Aug. 18, 1978) amended by Targeting Opportunity Zones and Other Distressed Communities for Federal Site Locations, Exec. Order No. 13,946, 85 Fed. Reg. 52,879 (Aug. 24, 2020). | USDA officials said that this executive order applies to federal space needs in urban areas. | USDA officials said that the department verified that the site selected met the requirements of the executive order. |

| General Services Administration, Federal Property Management Regulations System, Federal Management Regulation, Real Property, including leasing and relocation policies and procedures. 41 C.F.R. pts. 102-73, 102-83. | USDA officials said that the department was aware that although the department's acquisition of real property for office space is generally subject to the regulations of the General Services Administration (GSA), the Secretary has the authority to select the geographic location of the offices.<br><br>As stated in GSA's Federal Management Regulation, "Each Federal agency is responsible for identifying its geographic service area and the delineated area within which it wishes to locate specific activities, consistent with its mission and program requirements, and in accordance with all applicable statutes, regulations, and policies." 41 C.F.R. § 102-83.10. | USDA officials said that the department selected a site and delineated an area to conduct specific activities, as permitted by the General Services Administration (GSA) Federal Management Regulation. |
| --- | --- | --- |
| Office of Personnel Management (OPM) and Equal Employment Opportunity Commission regulations and guidance regarding various personnel matters, including directed reassignments, reasonable accommodations, Voluntary Early Retirement Authority/Voluntary Separation Incentive Payment, and removal procedures. | USDA officials said that the department knew that the site selection could impact the employment status of employees and, thus, relied on the applicable regulations bearing on the subject. | USDA officials said that relevant reassignments, reasonable accommodations, Voluntary Early Retirement Authority/Voluntary Separation Incentive Payment, and removal procedures were implemented in accordance with OPM regulations. |
| USDA, Civil Rights Impact Analysis, Departmental Regulation 4300-004 (Oct. 17, 2016). | USDA officials said that they produced a Civil Rights Impact Analysis for the relocation, though officials said that USDA was not required to do so. | USDA officials said that ERS and NIFA each produced a Civil Rights Impact Analysis. |
| USDA, Gift Acceptance Policy, Departmental Regulation 5200-3 (Apr. 18, 2003). | USDA officials said that they were aware of this policy implementing the Secretary's gift authority at 7 U.S.C. § 2269 as potentially applicable to reviewing incentives included in the Expressions of Interest. | USDA officials said that on November 13, 2019, USDA entered into a Memorandum of Agreement with the State of Missouri and local agencies regarding incentives, mostly provided to the landlord, with respect to the USDA lease. According to USDA, it considered the incentives involved to be gifts to USDA under its gift acceptance authority (7 U.S.C. § 2269), provided to the landlords and not USDA, or, for employees and cleared by the USDA Office of Ethics. |
| Agricultural Property Management Regulations, Real Estate Acquisitions, Chapter 110-73 Real Estate Acquisition Supplementing Federal Management Regulation, General Services Administration, Federal Property Management Regulations System, Federal Management Regulation, Real Property, Real Acquisition, 41 C.F.R. pt. 102-73. | USDA officials said that they were aware of these supplemental regulations generally applicable to the acquisition of real property. | USDA officials said that the department submitted its space requirements to GSA on June 14, 2019. |

Source: GAO summary of U.S. Department of Agriculture (USDA) Office of General Counsel statements. | GAO-23-104709

To respond to the requirements that it identified, USDA officials said that the department took a number of actions, including

- notifying Congress in August 2018 of USDA's intent to relocate ERS and NIFA;

- publishing a notice in the *Federal Register* on August 15, 2018, requesting expressions of interest from state and local governments, as well as industry and academia, for potential sites to relocate ERS and NIFA;[20]

- selecting an appropriate site, in accordance with regulations from GSA, for ERS and NIFA in Kansas City, Missouri, in 2019;[21] and

- submitting requirements for office space for the Kansas City, Missouri, site in 2019.

For this review, we did not independently review or verify the list of authorities and requirements that USDA identified nor did we review whether the department's actions satisfied the requirements identified.[22]

---

[20]83 Fed. Reg. 40,499 (Aug. 15, 2018).

[21]For more information about USDA's site selection process, GAO conducted a review of the process that USDA used to make the relocation decision. See GAO-22-104540.

[22]GAO reviewed all relevant legal and regulatory requirements identified by USDA but did not perform a comprehensive review to identify all potential relevant requirements. As of December 2022, GAO had ongoing work on two legal decisions related to issues arising from the relocation, including whether USDA complied with notification requirements when it sent a notice of its intent to relocate offices and whether any incentives received by USDA in the course of relocating ERS and NIFA to Kansas City, Missouri, were consistent with the general requirement that agencies deposit money received for the government into the General Fund of the Treasury.

## For 2 Years Following the Relocation, Agency Staff Levels and Productivity Declined and Then Rebounded, but Changes to Staff Composition Persisted

ERS and NIFA workforce size and productivity temporarily declined following the agencies' September 2019 relocation from offices in Washington, D.C., to Kansas City, Missouri, but had largely recovered by September 2021.[23] However, 2 years after the relocation, the agencies' workforce was composed mostly of new employees with less experience at ERS and NIFA than the workforce prior to the relocation. In addition, a decline in the number of employees in certain protected groups persisted, as of the end of fiscal year 2021.

### Agencies' Staff Levels Initially Declined but Largely Recovered

Following the relocation, the agencies lost over half of their staff, with vacancies in key positions such as managers and economists. Each agency experienced substantial loss of staff during fiscal year 2019, with an estimated 121 permanent full-time staff leaving ERS and 157 permanent full-time staff leaving NIFA.[24] As of July 2020, both agencies had about 150 permanent full-time staff on board, down from over 300 as recently as the end of fiscal year 2016 (see fig. 2). The agencies also experienced a loss of staff in key positions. For example, from the end of fiscal year 2018 to the end of fiscal year 2019, the number of economists at ERS fell from 165 to 131, and the numbers of managers and supervisors at both agencies declined from 32 to 27 (ERS) and 38 to 28 (NIFA).[25] According to agency officials, the decline in managers impacted their hiring because they did not have a sufficient number of managers to help make decisions on hiring.

[23]We use the term "productivity" here to refer to the number of ERS reports and the processing time for NIFA grants.

[24]See app. III, table 6, for additional data on ERS and NIFA estimated departures of permanent full-time staff and new hires, for fiscal years 2018 through 2021. Figures for departures are estimates because we were unable to determine the exact fiscal year during which some staff transferred to another USDA agency. Specifically, because of delays in data entry in USDA's human resources system, the exact date when some ERS and NIFA staff's internal transfers took effect is unclear and could have taken place in the subsequent fiscal year.

[25]See app. III, table 7, for additional data on ERS and NIFA permanent full-time staff, by key positions, fiscal years 2015 through 2021.



**Figure 2: Number of Permanent Full-Time Staff at ERS and NIFA, as of the End of Fiscal Years 2015 through 2021**

Source: GAO analysis of U.S. Department of Agriculture (USDA) data.  |  GAO-23-104709

With increased hiring and reduced departures, the agencies' workforces increased during fiscal years 2021 and 2022. According to agency hiring plans, as of June 2022, the number of permanent full-time staff was 285 at ERS and 323 at NIFA, comparable to, or higher than, staff levels at the end of fiscal year 2018.[26] Additionally, the agencies had hired enough staff in key positions such that, by the end of fiscal year 2021, they had reached or exceeded the levels of staff that they had in key positions as of the end of fiscal year 2018. For example, the number of economists at ERS rebounded to 168 by the end of fiscal year 2021, slightly higher than at the end of fiscal year 2018. Similarly, the number of staff in some key positions at NIFA, such as grants management specialists, was greater at the end of fiscal year 2021 than it was at the end of fiscal year 2018.

Following the relocation, Kansas City, Missouri, was the duty station for the majority of permanent full-time staff. By the end of fiscal year 2021—2 years after the effective date of the relocation—almost all of NIFA's staff

---

[26]The agencies' hiring goals for fiscal year 2022 were 310 at ERS and 423 at NIFA.

positions and about two-thirds of ERS's were located in Kansas City, Missouri.[27] However, in March 2020, as a result of the outbreak of the COVID-19 pandemic, USDA authorized its employees to evoke maximized telework during the COVID-19 emergency. In addition, in November 2021, USDA implemented a new policy allowing some positions to be recruited with a negotiable duty station.

ERS and NIFA officials said that they analyzed each position to determine if it was eligible for a remote designation. Under this policy, employees in certain ERS and NIFA positions can work from an approved alternate worksite, typically the employee's residence. The remote worksite may be within or outside of the local commuting area of the mission area, agency, or staff office's worksite and, therefore, employees involved are not required to work in Kansas City, Missouri, or Washington, D.C.[28] In March 2022, USDA officials noted that remote work and location flexibility had helped with recruiting and, in June 2022, NIFA officials said that recruiting for positions with permanent remote duty stations seemed to have increased the candidate pool for hiring. Between August 2021 and May 2022, NIFA hired 71 employees into positions with a permanent remote duty station. ERS hired five employees into permanent remote duty stations in April 2022.

## Majority of Employees at ERS and NIFA Are Recent Hires

As of the end of fiscal year 2021, large proportions of the workforce at both ERS and NIFA were relatively new to USDA. Prior to the relocation, at the end of fiscal year 2018, the majority of ERS (84 percent) and NIFA (82 percent) permanent full-time staff had been there for more than 2 years. However, because of staff departures and hiring in fiscal years 2019 and 2020, by the end of fiscal year 2021 the majority of ERS (66 percent) and NIFA (79 percent) permanent full-time staff had worked there for 2 years or less (see figs. 3 and 4).[29]

---

[27]See app. III, table 8, for additional data on ERS and NIFA permanent full-time staff, by permanent duty station, fiscal years 2018 through 2021.

[28]U.S. Department of Agriculture, *Telework and Remote Work Programs,* Departmental Regulation 4080-811-002 (Nov. 22, 2021).

[29]See app. III, table 9, for additional data on ERS and NIFA permanent full-time staff, by years of service at ERS and NIFA, fiscal years 2015 through 2021.

**Figure 3: Number of Permanent Full-Time Staff, by Years of Service at ERS, as of the End of Fiscal Years 2018 and 2021**

Permanent full-time staff at ERS,
by years of service, end of fiscal year 2018



44
Two years or less

229
More than 2 years

Permanent full-time staff at ERS,
by years of service, end of fiscal year 2021



163
Two years or less

83
More than 2 years

ERS = Economic Research Service

Source: GAO analysis of U.S. Department of Agriculture data.  |  GAO-23-104709

**Figure 4: Number of Permanent Full-Time Staff, by Years of Service at NIFA, as of the End of Fiscal Years 2018 and 2021**

Permanent full-time staff at NIFA,
by years of service, end of fiscal year 2018



52
Two years or less

236
More than 2 years

Permanent full-time staff at NIFA,
by years of service, end of fiscal year 2021



195
Two years or less

51
More than 2 years

NIFA = National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data.  |  GAO-23-104709

## Declines in Certain Protected Groups Persisted

While the overall size of the workforce had mostly recovered by the end of fiscal year 2021, certain changes to the composition of the ERS and NIFA workforce persisted 2 years after the relocation. Specifically, we found that the number and proportion of Black or African American staff declined sharply at both ERS and NIFA and did not return to prerelocation levels (see figs. 5 and 6). Between the end of fiscal year 2018 and the end of fiscal year 2021, the proportion of Black or African American staff decreased from 22 percent (60 out of 273) to 9 percent (21 out of 246) at ERS, and from 47 percent (134 out of 288) to 19 percent (47 out of 246) at NIFA. At the same time, the number and proportion of White employees increased from 63 percent to 75 percent at ERS, and from 38 percent to 65 percent at NIFA.[30]

**Figure 5: Number of Permanent Full-Time Staff at ERS, by Race and Ethnicity, as of the End of Fiscal Years 2018 and 2021**



ERS permanent full-time staff – end of fiscal year 2018

- 2 – Multirace
- 9 – Hispanic or Latino
- 29 – Other races[a]
- 60 – Black or African American
- 173 – White
- 273 – Total workforce

ERS permanent full-time staff – end of fiscal year 2021

- 7 – Hispanic or Latino
- 10 – Multirace
- 21 – Black or African American
- 23 – Other races[a]
- 185 – White
- 246 – Total workforce

ERS = Economic Research Service

Source: GAO analysis of U.S. Department of Agriculture (USDA) data.  |  GAO-23-104709

[a]"Other races" category includes the categories of Asian and Native Hawaiian or Other Pacific Islander. USDA's race and ethnicity data combine the categories of Asian, Native Hawaiian, and Pacific Islander.

[30]See app. III, fig. 9, for additional data on the number of permanent full-time staff at ERS and NIFA, by race and ethnicity, fiscal years 2015 through 2021.

**Figure 6: Number of Permanent Full-Time Staff at NIFA, by Race and Ethnicity, as of the End of Fiscal Years 2018 and 2021**



NIFA permanent full-time staff – end of fiscal year 2018

- **2** – American Indian or Alaska Native
- **5** – Multirace
- **10** – Hispanic or Latino
- **28** – Other races[a]
- **109** – White
- **134** – Black or African American
- **288** – Total workforce



NIFA permanent full-time staff – end of fiscal year 2021

- **3** – American Indian or Alaska Native
- **6** – Hispanic or Latino
- **11** – Multirace
- **18** – Other races[a]
- **47** – Black or African American
- **161** – White
- **246** – Total workforce

NIFA = National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture (USDA) data.  |  GAO-23-104709

[a]"Other races" category includes the categories of Asian and Native Hawaiian or Other Pacific Islander. USDA's race and ethnicity data combine the categories of Asian, Native Hawaiian, and Pacific Islander.

In addition, the composition of the workforce at ERS and NIFA has also shifted in terms of other protected groups as a result of the relocation. Specifically, between the end of fiscal year 2018 and the end of fiscal year 2021, the proportion of permanent full-time employees

- who identified as female decreased slightly, from 61 percent to 60 percent at ERS and from 47 percent to 39 percent at NIFA;

- age 40 years and older decreased from 81 percent to 67 percent at ERS and from 75 percent to 58 percent at NIFA;

- with veterans' preference increased from 5 percent to 12 percent at ERS and from 9 percent to 16 percent at NIFA; and

- with a self-identified disability decreased from 10 percent to 8 percent at NIFA and remained constant at 7 percent at ERS.[31]

[31]See app. III, tables 10-13, for additional data on ERS and NIFA permanent full-time staff by gender, age, veterans' preference, and self-identified disability status from fiscal years 2015 through 2021.

USDA's actions to monitor underrepresented groups and assess the composition of ERS's and NIFA's workforces in comparison to the civilian labor force is discussed later in this report.

## Following the Relocation, ERS Produced Fewer Key Reports, and NIFA Took Longer to Process Grants, but Productivity Has Since Recovered

In fiscal years 2019 and 2020, ERS produced fewer research reports and journal articles than in previous years, and NIFA experienced delays in processing grants in fiscal year 2020. Specifically, the number of ERS research reports issued and journal articles authored by ERS staff declined during fiscal years 2019 and 2020 (see fig. 7). According to agency officials, ERS's decreased productivity was due to workforce decreases associated with the relocation. As staffing increased in 2021—2 years after the relocation—the number of research reports and journal articles also increased substantially, with research report numbers similar to numbers for the few years prior to the relocation. However, the number of outlook reports that ERS produced held steady; ERS officials explained that these reports are required by statute and were prioritized over other products.

**Figure 7: Number of ERS Products Issued, by Type of Product, Fiscal Years 2015 through 2021**



Number of products issued

- On August 9, 2018, USDA announced its intention to relocate ERS and National Institute of Food and Agriculture.
- At the end of fiscal year 2019, USDA made the relocation to Kansas City, Missouri, effective.

Fiscal year

— Journal articles authored or co-authored by Economic Research Service (ERS) staff
— Outlook reports
— Research reports

Source: GAO analysis of U.S. Department of Agriculture (USDA) data and data from Scopus, a citation database.  |  GAO-23-104709

Note: USDA data on the number of journal articles published before fiscal year 2018 were deemed not sufficiently reliable to present.

Following the relocation, the median number of days to process and fund competitive grants that had proposals submitted in fiscal year 2019 was 235 days; this was a 30-day increase from fiscal year 2018 (205 days).[32] (See fig. 8.) In addition, our analysis of NIFA grant data showed that, as of March 31, 2020, 649 fiscal year 2019 competitive grants (53 percent) of 1,235 had been funded, the lowest number and percentage for any fiscal year since fiscal year 2015.[33] This slower processing time coincided with the loss of staff that occurred in fiscal years 2019 and 2020, as we previously described.

[32]We measured the timeliness of NIFA competitive grant funding by the length of time from the date that staff input grant proposal information into the agency's data system to the date that the grant was funded. This process includes acknowledging applications, conducting peer review, and authorizing funds. According to agency officials, since it takes about 6 or 7 months to complete the competitive grant funding process, NIFA may fund competitive grant proposals that are due during one fiscal year during the following fiscal year.

[33]See app. III, table 14, for additional data on the number and percent of competitive grants funded.

**Figure 8: Median Number of Days for NIFA to Process and Fund Competitive Grants for Grant Proposals Submitted in Fiscal Years 2015 through 2020**



Median number of days from agency data input to grant funding

- On August 9, 2018, USDA announced its intention to relocate the Economic Research Service and National Institute of Food and Agriculture (NIFA).
- At the end of fiscal year 2019, USDA made the relocation to Kansas City, Missouri, effective.

Fiscal year grant proposal was submitted

Source: GAO analysis of U.S. Department of Agriculture (USDA) data.  |  GAO-23-104709

Notes: We calculated grant processing time based on the time difference from the day that staff input the grant proposal into the NIFA system to the day that the agency funded the grant. We used the date that NIFA officials input the grant proposal data into its information system as the "start" date for the grant funding process because officials said that this was within a few days of when they started processing the grant. The grant funding date represents the date that funds were first available to the grant recipient to draw down. For competitive grant proposals, grant processing and funding often occurs in the fiscal year after the proposal due date.

In contrast, competitive grant proposals that were due in fiscal year 2020—and processed mostly in fiscal year 2021—were processed faster than grant proposals in any of the previous 5 fiscal years. NIFA officials explained that there are a variety of factors affecting the processing time for grants from one year to the next, such as different regulations and procedures, along with other factors.[34]

For NIFA's capacity grants, we similarly found delays in processing in fiscal year 2020.[35] Specifically, we found that no fiscal year 2020 grants

---

[34]Other factors include staffing levels, staff training and knowledge, contractor support, individual program timelines, and delays in budget appropriations.

[35]Capacity grants ensure that the land-grant university system and other partners maintain the "capacity" to conduct research and extension activities. Capacity grants are funded from annual funding. Recipient institutions have either 2 years or 5 years to draw down these funds and complete their work.

had received a payment by March 31, 2020. In previous years, 33 percent to 100 percent of capacity grants received a first payment by March 31 of the same fiscal year. By May 31, 2020, nearly all fiscal year 2020 grants were funded—about a 2 month delay.[36] NIFA lost seven of its eight budget staff in fiscal year 2019; four replacements were hired from September through December 2019, and three more from February through March 2020, according to a NIFA official. Also, five budget staff from USDA's Agricultural Research Service helped NIFA with budget issues intermittently because of the losses in staff, according to agency officials.[37] By fiscal year 2021, NIFA's processing timeliness for capacity grants had recovered to previous fiscal years' levels.

## USDA Followed Some, but Not All, Selected Leading Practices for Agency Reforms and Strategic Human Capital Management in Relocating and Rebuilding ERS and NIFA

As discussed above, ERS and NIFA lost over half of their workforces as a result of relocating and have been rebuilding their agencies. Leading practices for agency reforms and strategic human capital management can help agencies navigate potential challenges in such situations. Overall, USDA's actions taken since 2018 to relocate ERS and NIFA followed some, but not all, selected leading practices for effective agency reforms. In addition, ERS's and NIFA's actions before and after the relocation followed some, but not all, selected leading practices for strategic human capital management. Given the impacts of the relocation on ERS's and NIFA's workforce—including the large proportion of relatively new staff at each agency and other changes in staff composition—following such leading practices can better position the agencies to address human capital challenges as they rebuild and during any future relocations.

### USDA Followed Some, but Not All, Selected Leading Practices for Effective Agency Reforms

Overall, USDA's actions taken since 2018 to relocate ERS and NIFA offices to a new location outside the National Capital Region followed some, but not all, selected leading practices for effective agency reforms. These leading practices help agencies undergoing various reforms— including relocations—navigate the potential benefits and challenges in

---

[36]See app. III, table 15, for additional data on the number of capacity grants whose appropriation was funded in fiscal year 2017 to fiscal year 2021 that received at least one payment, by four dates in the same year.

[37]USDA officials also reported using other staffing options to deal with decreases in staff, such as the use of reemployed annuitants and contractors.

developing and implementing such agency reforms.[38] These practices also provide Congress and the executive branch with the tools and information needed to help evaluate reform proposals and ensure that such reforms are effectively implemented. Examining USDA's actions against these leading practices can provide insights into the benefits and challenges presented by this and any future relocations. Lessons learned from prior federal reform and reorganization efforts suggest that reforming government is an immensely complex activity that requires agreement on both the goals to be achieved and the means for achieving them.[39]

In relocating ERS and NIFA, USDA generally followed selected leading practices related to the subcategory "Leadership Focus and Attention," but it partially followed or generally did not follow the other subcategories of the leading practices. Table 3 summarizes our analysis of USDA's actions for relocating ERS and NIFA against these selected leading practices (see app. IV for a description of each leading practice selected).

**Table 3: Extent the U.S. Department of Agriculture (USDA) Followed Selected Leading Practices for Agency Reforms in Relocating the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)**

| Leading practice category | Subcategory | Extent followed | Summary of analysis |
|---|---|---|---|
| Goals and Outcomes | Establishing Goals and Outcomes | ◐ | In developing its proposal to relocate ERS and NIFA, USDA established clear goals. |
| | | | However, the agencies did not establish performance measures to guide the relocation or assess the relocation's effectiveness in achieving USDA's stated goals. |
| Process for Developing Reforms | Involving Employees and Key Stakeholders | ○ | USDA did not engage employees in developing the relocation. |
| | | | USDA did not consult with Congress ahead of its decision to relocate. USDA subsequently notified Congress of its decision and held some meetings with Members of Congress and other stakeholders about concerns raised related to potential attrition and loss of critical expertise after the decision to relocate was made. |

[38]The leading practices for agency reforms are key questions that Congress, the Office of Management and Budget, and agencies should consider for the development and implementation of agency reforms, according to our prior work. GAO-18-427.

[39]GAO-18-427.

| | Using Data and Evidence | ◑ | USDA conducted an economic analysis to support its decision to relocate ERS and NIFA. <br><br> However, as we previously reported, this analysis <br> • was not based on all available evidence; <br> • excluded potential critical costs, such as those associated with employee attrition; and <br> • did not transparently discuss its implicit assumption that ERS and NIFA would experience no attrition from the relocation.[b] |
|---|---|---|---|
| Implementing the Reforms | Leadership Focus and Attention | ● | USDA articulated a succinct rationale for relocation and identified a group of leaders responsible for developing and implementing the relocation. |
| | Managing and Monitoring | ◑ | Continuity of service delivery was delayed, as productivity levels declined during the relocation. <br><br> However, the number of ERS reports and the timeliness of NIFA grant processing both rebounded to prerelocation levels by 2021. |
| Strategically Managing a Federal Workforce | Employee Engagement | ○ | USDA did not develop a plan and took few, if any, steps to engage employees in implementing the relocation (i.e., to sustain or strengthen their acceptance for relocating). |
| | Strategic Workforce Planning[a] | ◑ | USDA took steps to strategically recruit for critical positions and to monitor the impacts of the relocation. USDA also conducted some activities related to strategic workforce and succession planning. <br><br> However, it did not formally document a process to strategically plan for long-term staffing needs and goals. USDA also did not consider potential staff attrition or how the choice of location might affect current and future staff levels. |

● Generally followed – USDA's actions followed all, or most, aspects of the leading practices in this subcategory.

◑ Partially followed – USDA's actions followed some, but not most, aspects of the leading practices in this subcategory.

○ Generally did not follow – USDA's actions followed few to no aspects of the leading practices in this subcategory.

Source: GAO analysis of information provided by USDA officials. | GAO-23-104709

[a]Leading practices for effective agency reforms and strategic human capital management both include "Strategic Workforce Planning" questions.

[b]For more information, see GAO, *Evidence-Based Policy Making: USDA's Decision to Relocate Research Agencies to Kansas City Was Not Fully Consistent with an Evidence-Based Approach*, GAO-22-104540 (Washington, D.C.: April 2022).

USDA generally followed selected leading practices for "Leadership Focus and Attention" by articulating a succinct rationale for the relocation in the Secretary's August 2018 announcement, which stated that the proposed relocation was intended to improve customer satisfaction and save taxpayers money. Additionally, consistent with leading practices, the department identified a group of leaders—including the Secretary, as well as a cadre of largely political staff—responsible for developing and implementing the relocation.

Examples of areas where USDA's actions partially followed, or did not generally follow, leading practices for effective agency reforms are described below.

- **"Establishing Goals and Outcomes."** We found that USDA partially followed leading practices related to "Establishing Goals and Outcomes." As previously noted, the Secretary established three goals for the relocation of ERS and NIFA in the August 2018 announcement of the proposed relocation.[40] However, we found that USDA did not establish performance measures for these goals—in contrast to leading practices.[41] Without such metrics, USDA did not have information critical to understanding whether the relocation was progressing in line with its stated objectives and whether adjustments might be needed while the relocation was under way or after it was complete.[42] Moreover, without transparent performance measures, information critical to understanding the effectiveness and impacts of the relocation was missing.

- **"Using Data and Evidence."** We found that USDA partially followed leading practices related to "Using Data and Evidence" in developing, justifying, and supporting its case for relocating ERS and NIFA. Leading practices for effective agency reforms state that agencies are better equipped to address management and performance challenges when managers effectively use data and evidence.[43] In April 2022, we reported that USDA's economic analysis justifying the relocation to Kansas City, Missouri, excluded critical costs and economic effects, such as those

---

[40]As noted earlier, the Secretary's August 2018 announcement to relocate ERS and NIFA away from Washington, D.C., stated three reasons for relocating: (1) improve USDA's ability to attract and retain highly qualified staff with training and interests in agriculture, many of whom come from land-grant universities; (2) place important USDA resources closer to many of the agency's stakeholders; and (3) benefit the American taxpayers by significantly reducing employment costs and rent.

[41]Establishing a mission-driven strategy and identifying specific desired outcomes to guide that strategy are critical steps to achieving intended results, according to our prior work on effective agency reforms. GAO-18-427.

[42]In April 2022, GAO reported that USDA's economic analysis supporting the relocation was not consistent with these three stated objectives of (1) improving its ability to attract and retain highly qualified staff, (2) placing its resources closer to stakeholders, and (3) reducing costs to taxpayers. GAO-22-104540.

[43]Similarly, Office of Management and Budget guidance on implementing the Foundations for Evidence-Based Policymaking Act of 2018, Pub. L. No. 115-435, 132 Stat. 5529, (2019), states that "federal evidence-building activities must be transparent in the planning, implementation, and completion phases to preserve accountability and help ensure that it is not tailored to generate specific findings." Office of Management and Budget, *Evidence-Based Policymaking: Learning Agendas and Annual Evaluation Plans*, OMB Memorandum M-21-27 (Washington, D.C.: June 30, 2021).

associated with expected employee attrition, from its estimate of taxpayer savings[44]—exclusions that likely resulted in an unreliable estimate of savings.[45]

We also reported that USDA was aware of such potential relocation-related attrition prior to selecting Kansas City, Missouri, as the new location for ERS and NIFA.[46] Specifically, prerelocation briefing documents estimated employee attrition rates between 65 and 75 percent if ERS were to move outside of the National Capital Region, according to discussions with employees and experience with past relocations; and expected employee attrition at NIFA would be dependent on the site selected. However, USDA did not incorporate such data into its economic analysis and site-selection decision-making—in contrast to leading practices. Such shortcomings in its economic analysis and use of data and evidence limited the ability of USDA leadership to ensure that it was making an appropriately informed decision on relocating ERS and NIFA. This may have resulted in avoidable adverse effects on ERS and NIFA and its workforce in the years immediately following relocation.[47]

- **"Employee Engagement" and "Involving Employees and Key Stakeholders."** We found that USDA did not generally follow selected leading practices for "Employee Engagement" and "Involving Employees and Key Stakeholders." For example, we found that USDA did not engage employees to gain their buy-in or acceptance prior to relocating—in contrast to leading practices. Furthermore, we found that USDA did not develop a plan and took

---

[44]These attrition-related costs include (1) losses of human capital and institutional knowledge when new employees replace experienced employees, (2) hiring and training costs of new employees to replace former employees, (3) reduced productivity because of loss of experienced employees, and (4) costs of disruptions to agency operations while full employment levels are reestablished. GAO-22-104540.

[45]USDA estimated savings to taxpayers using existing employment levels at USDA at the time of relocation, with the implicit assumption of zero relocation-related attrition. USDA noted that it was not required to conduct a formal cost-benefit analysis as part of its decision to relocate ERS and NIFA and, instead, conducted a more limited economic analysis. GAO-22-104540.

[46]GAO-22-104540.

[47]GAO-22-104540. We did not make recommendations in that report, in part because of guidance subsequently released by the Office of Management and Budget on evidence-based policymaking, which, if effectively implemented, would help address the shortcomings identified in USDA's decision-making.

few, if any, steps to sustain or strengthen employee engagement during or after its decision to relocate and its selection of Kansas City, Missouri. Similarly, we found that USDA notified Congress and key stakeholders after deciding to relocate and after selecting Kansas City, but USDA officials acknowledge that they did not consult with Congress or involve stakeholders in developing plans for the relocation—in contrast to leading practices.[48] Leading practices state that it is important for agencies to directly and continuously involve employees, Congress, and other key stakeholders in the development of any major reform, as such involvement helps incorporate insights from the frontline and increases acceptance of the changes.

The Secretary met with the agencies' workforces on multiple occasions to notify ERS and NIFA staff about the relocation, but officials could not demonstrate to us how, if at all, USDA leadership incorporated employee input and feedback from these meetings into its site selection process. In addition, USDA officials acknowledged that they did not conduct polls or surveys to systematically collect employee input on the relocation. They also could not provide documentation of employee focus groups or notes from employee listening sessions on the relocation. Over half of the employees from each agency chose to leave their positions instead of relocating to Kansas City.[49] In addition, ERS and NIFA employees subsequently unionized to help ensure that they had a voice and a mechanism for input into future reorganizations, according to union officials.[50]

---

[48]USDA held several briefings with congressional committees and staff between September 2018 and May 2019 notifying them of the Secretary's decision to relocate and the status of the relocation. According to USDA officials, NIFA reached out to some stakeholders during the relocation to keep them informed of the transition and, in 2020, solicited their input on the transition; however, this was after the relocation decision was made and after the selection of Kansas City, Missouri, as the new location for ERS and NIFA.

[49]According to USDA officials, individual employees' decisions to relocate or not were informed by multiple factors, including family, spousal career, and home obligations.

[50]According to the Best Places to Work in the Federal Government rankings, which analyzes data from the Federal Employee Viewpoint Survey, NIFA's and ERS's scores for employee engagement and satisfaction decreased sharply in 2019. Specifically, ERS's score dropped from 67 in 2018 to 37 in 2019. Similarly, NIFA's score dropped from 45 in 2018 to 20 in 2019. Scores for ERS and NIFA in 2021 increased to 79 and 70, respectively.

USDA has developed internal guidance in the form of a departmental regulation specifically for managing departmental reorganizations, but we found that this departmental regulation does not fully reflect leading practices for agency reforms.[51] Prior to the Secretary's August 2018 announcement to relocate ERS and NIFA, USDA updated its departmental regulation for reorganizations. This updated document is intended to streamline and simplify the process of organizational change and facilitate optimal organizational structures. However, this document does not indicate, for example, that agencies should develop performance measures in support of goals or clearly describe whether or how to involve and engage employees impacted by potential reorganizations, including relocations, in developing and implementing those reorganizations. Without internal guidance that reflects leading practices for agency reforms, the department may miss critical steps—such as taking into account the input from all impacted employees—that would help it successfully navigate challenges and help ensure that reforms are implemented effectively, going forward.[52]

According to USDA officials, USDA leadership told ERS and NIFA managers not to collect employee input as they developed the relocation and that leadership would not consider recommendations from the agencies' employee advisory groups on the relocation or site selection. Such employee input, along with considering the potential loss of employees as a factor in relocating, could have informed decisions about where and when to relocate, which might have helped USDA mitigate some attrition from this relocation. For example, according to union officials we spoke with, they told USDA management that selecting a site closer in proximity and demographics to the National Capital Region—such as Raleigh, North Carolina—would enable some employees to remain with ERS and NIFA, albeit with longer or weekend commutes.

---

[51]USDA Departmental Regulation 1010-001 (Jan. 4, 2018). Departmental regulations are internal guidance documents. In contrast to federal regulations, departmental regulations have not gone through the public notice and comment rulemaking process and, as such, are not binding.

[52]The departmental regulation does instruct the mission areas, agencies, and staff offices within USDA to consult with existing unions and assist on collective bargaining agreements, but ERS and NIFA employees were not part of a union at the time the relocation was developed in 2018 and 2019. Consequently, the departmental regulation did not specify whether or how the agencies were to involve or engage ERS and NIFA employees in developing and implementing this relocation. (ERS and NIFA employees subsequently unionized under the American Federation of Government Employees, signing memorandums of understanding with ERS and NIFA in August 2019 after the relocation was underway, and signing a collective bargaining agreement with the agencies in 2021.)

Changing its departmental regulation for reorganizations to more fully reflect leading practices for agency reforms—such as articulating performance measures aligned with goals and working with employees to incorporate their input into change efforts—may better position USDA to make informed decisions that support its workforce and its strategic goals during future agency reorganizations.

Moreover, USDA officials told us that the decision to relocate ERS and NIFA away from the National Capital Region was the sole decision of the Secretary and that existing department guidance does not apply to such Secretary-initiated agency reforms. Consequently, according to USDA officials, they were not required to follow the departmental regulation on reorganizations in relocating ERS and NIFA. USDA officials acknowledged that they chose to implement certain parts of this departmental regulation—such as consulting relevant staff offices on recruitment—as they deemed appropriate; however, they did not implement other parts of the regulation, as we described earlier. Expanding the scope of the departmental regulation on reorganizations to apply to all reorganizations, including those initiated by the Secretary, would further improve USDA decision-making during future agency reorganizations. It would also increase employee acceptance of such efforts and help USDA better assess its reform proposals to ensure that they are implemented effectively. Requiring USDA to document reasons for any deviation from the departmental regulation would help Congress and the public hold USDA accountable for such decisions, going forward.

## USDA Research Agencies Followed Some, but Not All, Selected Leading Practices for Strategic Human Capital Management

We found that ERS's and NIFA's actions followed some, but not all, selected leading practices for strategic human capital management before and after the relocation from the National Capital Region to Kansas City, Missouri. These leading practices can help an agency attain its mission and strategic goals by[53]

- developing long-term strategies for acquiring, developing, and retaining staff;

- aligning an organization's human capital program with its mission and programmatic goals;

- ensuring that agencies' training investments are targeted strategically and are not wasted on efforts that are irrelevant or ineffective; and

---

[53]Leading practices are derived from the following GAO reports: GAO-04-39; GAO-04-546G; and GAO, *Diversity Management, Expert-Identified Leading Practices and Agency Examples,* GAO-05-90 (Washington, D.C.: January 2005).

- creating a positive work environment, where the similarities and differences of individuals are valued, so that staff can reach their potential and maximize their contributions.

In some cases, ERS and NIFA took actions during development and implementation of the relocation that generally followed some of these leading practices. Specifically, ERS and NIFA generally followed leading practices related to recruiting and hiring. However, both agencies partially followed leading practices for strategic workforce planning and training and development. They generally did not follow leading practices for diversity management before and after the relocation, which could have lessened the impacts on ERS's and NIFA's workforce, as described above, and could help address future workforce challenges. Table 4 summarizes our analysis of ERS's and NIFA's actions before and after relocation against the leading practices. (See table 17 in app. IV for additional details about ERS's and NIFA's actions for all leading practices within each subcategory.)

**Table 4: Extent to Which USDA Research Agencies, the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA), Followed Selected Leading Strategic Human Capital Management Practices Before and After Relocation**

| Leading practice category | Extent followed | | Summary of analysis |
|---|---|---|---|
| | Before relocation[a] | After relocation[b] | |
| Recruitment and Hiring | | | |
| ERS | ● | ● | Both ERS and NIFA generally followed leading practices, such as developing customized strategies to recruit for highly skilled positions before the relocation. |
| NIFA | ● | ● | |
| Strategic Workforce Planning | | | |
| ERS | ◑ | ◑ | ERS and NIFA generally followed many leading practices, such as establishing a process to address skills gaps before the relocation, but the agencies did not generally follow leading practices related to succession or strategic workforce plans before and after the relocation. |
| NIFA | ◑ | ◑ | |
| Training and Development | | | |
| ERS | ◑ | ◑ | Both ERS and NIFA generally followed some leading practices, such as having training goals and associated performance measures, but partially followed other leading practices, such as having formal processes in place to select or design agency training programs before and after the relocation. |
| NIFA | ◑ | ◑ | |

| Diversity Management | | | |
|---|---|---|---|
| ERS | ○ | ○ | The agencies did not have formal diversity plans or strategies in place, nor have the agencies adequately documented succession planning and recruiting processes for diverse candidates before or after the relocation. |
| NIFA | ○ | ○ | |

● Generally followed – Agencies' actions followed all, or most, aspects of the leading practices in this subcategory.

◑ Partially followed – Agencies' actions followed some, but not most, aspects of the leading practices in this subcategory.

○ Generally did not follow – Agencies' actions followed few to no aspects of the leading practices in this subcategory.

Source: GAO analysis of information provided by U.S. Department of Agriculture (USDA) officials. | GAO-23-104709

Note: We analyzed the extent to which ERS and NIFA followed selected leading practices for strategic human capital management before the relocation to determine what practices were in place at that time, and after the relocation to determine what practices have been in place since the relocation.

[a]Extent followed as of September 2019.

[b]Extent followed after September 2019 through April 2022.

### ERS and NIFA Generally Followed Leading Practices for Recruitment and Hiring

ERS and NIFA generally followed leading practices for recruitment and hiring for three leading practices in the areas of customizing recruiting strategies for highly skilled positions, using clear and succinct vacancy announcements, and having an automated hiring process using computerized systems. For example, in 2018, ERS and NIFA identified severe shortages and critical needs in their respective workforces. To customize their recruiting strategies, the agencies subsequently applied for, and were granted by OPM, use of Direct Hire Authority—a tool to help the agency expedite hiring by eliminating certain constraints. According to agency officials, this authority enabled both agencies to hire qualified applicants for certain positions that were deemed critical by the agencies, such as biological scientists, without traditional hiring constraints, such as the use of competitive rating and ranking.[54]

In addition, the agencies partially implemented a fourth leading practice related to conducting regular surveys that gauge applicant and manager satisfaction with the hiring process. For example, ERS and NIFA officials said that, prior to the relocation, the agencies did not consistently conduct satisfaction surveys for new employees to assess training programs, though these officials said that the agencies conducted regular satisfaction surveys after the relocation.

---

[54]A Direct-Hire Authority enables an agency to hire, after public notice is given, any qualified applicant without regard to competitive rating and ranking, veterans' preference, and "rule of three" procedures. See 5 C.F.R. § 3304(a)(3); 5 C.F.R. §§ 211.101-211.103, 302.401, 337.201-337.206.

### ERS and NIFA Partially Followed Leading Practices for Strategic Workforce Planning and Training and Development

*Strategic Workforce Planning*

Overall, ERS and NIFA partially followed leading practices for strategic workforce planning before and after the relocation. We found that ERS and NIFA generally followed many individual leading practices for strategic workforce planning before and after the relocation. For example, we found that both agencies identified the critical skills and competencies that its workforce needed to achieve agency goals.

However, both agencies partially followed other individual leading practices for strategic workforce planning. For example, both agencies could not show linkages between a strategic workforce plan and the agency's overall strategic plan—as called for by the leading practice for Workforce Planning—in part because each agency did not have a formal, documented process for strategically planning for long-term staffing needs and goals.[55] ERS and NIFA officials said that existing plans, such as informal staffing and hiring plans, and other planning efforts, were sufficient for implementing workforce planning activities. These officials said that ERS and NIFA rely on the USDA's *Strategic Plan Fiscal Years 2022-2026* and each agency's strategic plans, to think through long-term needs, but conduct planning on an annual basis, which allows the agencies flexibility to react to changing priorities and requirements.[56]

We have previously reported that key attributes of strategic workforce planning include (1) aligning the agency's human capital program with its current and emerging mission and programmatic goals; and (2) developing long-term strategies for acquiring, developing, and retaining staff to achieve programmatic goals.[57] As of August 2022, officials from both agencies said they do not currently have strategic workforce plans, nor do they intend to develop or document long-term strategies. ERS and NIFA officials said that, in previous years, the agencies had developed

---

[55]We found that ERS and NIFA did not have strategic workforce plans as of August 2022. As a result, we were unable to find linkages between strategic workforce plans and ERS's and NIFA's strategic plans or the department-level strategic plan.

[56]U.S. Department of Agriculture, *Strategic Plan Fiscal Years 2022-2026* (Washington, D.C.: March 2022); Economic Research Service, *Strategic Plan Fiscal Years 2021-2025* (Washington, D.C.); and National Institute of Food and Agriculture, *Strategic Plan Fiscal Years 2014-2018* (Washington, D.C.).

[57]GAO-04-39. These attributes differ from the leading practices we used to assess ERS's and NIFA's actions. The attributes provide additional information on effective strategic workforce planning.

detailed written plans to guide their strategic efforts for workforce planning, but department-level officials requested in May 2017 that agencies refrain from developing detailed written plans that could be documented into a long-range strategic workforce plan. ERS and NIFA officials did not provide an explanation for this request. By more fully following leading practices for workforce planning—and documenting these plans—to connect the research agencies' efforts with USDA's overall goals and long-term vision, the agencies may be better positioned to address future workforce gaps, achieve human capital management and mission goals, and address future staffing challenges.

In addition, both agencies conducted some succession planning activities, such as having a succession planning checklist for staff managers to ensure that activities were conducted. For example, the checklist calls for agency managers to ensure that the agency's succession plan is aligned with the department's succession strategies. ERS and NIFA officials said that these succession activities helped the agency replenish staff lost because of the relocation and guided the agencies to ramp up hiring after relocation.

However, the agencies did not document formal succession activities for leadership and other critical positions in a plan, before or after the relocation, as called for by the leading practice. As described above, the relocation led to a loss of over half the agencies' staff, with vacancies in key positions, such as managers and economists. According to agency officials, in May 2020, the decline in managers impacted their hiring because they did not have sufficient managers to help make decisions on hiring. According to *Standards for Internal Control*, effective documentation assists in management's design of internal control by establishing and communicating means to retain organizational knowledge and mitigate the risk of having that knowledge limited to a few personnel.[58] Despite the agencies' return to overall staff numbers comparable to prerelocation levels, given the high staff turnover that each agency experienced because of the relocation, retaining knowledge of succession planning and processes by documenting them is especially important, moving forward.

ERS and NIFA acknowledged that having documented plans could help the agencies' future planning for staffing changes, especially if there is management turnover. ERS officials said that the agency is developing a succession plan but does not have a specific timeline for its completion

---

[58]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

because of a shortage in staff and competing priorities. NIFA officials said that they expect to develop and issue a formal succession plan by the beginning of fiscal year 2023. By more fully following the leading practices for succession planning—and documenting these plans—to connect the research agencies' efforts with USDA's overall goals and long-term vision, the agencies may be better positioned to address future workforce gaps, achieve human capital management and mission goals, and address future staffing challenges.

### *Training and Development*

ERS and NIFA partially followed the leading practices for training and developing their workforce before and after the relocation. More specifically, we found that ERS and NIFA generally followed three of 12 leading practices within training and development after the relocation but partially followed the other nine leading practices after the relocation. For example, ERS and NIFA officials reported that they incorporate measures of effectiveness with clear links to organizational goals into some of the training courses they design, as called for by one of the leading practices. However, ERS and NIFA officials acknowledged that they partially followed other aspects of training and development leading practices. For example, ERS and NIFA officials said that the agencies partially followed the leading practice involving having a systematic process to evaluate the effectiveness of their training and development programs.

According to our leading practices, effective training and development programs are an integral part of a learning environment that can enhance agencies' ability to attract and retain employees with the skills and competencies needed to achieve results. Training and developing new staff to fill new roles and work in different ways is a crucial part of agencies' endeavors to meet their challenges. As we reported earlier, 66 percent of ERS staff and 79 percent of NIFA staff had been at their respective agencies for 2 years or less as of the end of fiscal year 2021. By more fully following the leading practices for training and development, ERS and NIFA can better prepare for, and execute, training that supports the needs of their workforce.

### ERS and NIFA Generally Did Not Follow Diversity Management Leading Practices

ERS and NIFA generally did not follow the leading practices for Diversity Management before and after the relocation. Specifically, we found that ERS and NIFA generally followed one of four leading practices within diversity management, partially followed two other leading practices, and generally did not follow one leading practice.

ERS and NIFA generally followed the leading practice for using a set of quantitative and qualitative measures to assess the impact of a diversity program. These measures are listed in program status reports, known as "MD-715 reports." These program status reports are an agency-specific document that outlines all demographic trends within ERS and NIFA, on a quarterly basis. These reports also outline specific Diversity, Equity, Inclusion, and Accessibility (DEIA)-related policy, procedures, and training requirements for the agency.

According to agency officials, ERS and NIFA rely on their annual and quarterly program status reports to plan workforce efforts related to DEIA. These officials also said that the reports are designed to help them address underrepresentation of specific groups in agency demographics, when compared to the civilian labor force. For example, in their 2020 annual program status report, NIFA identified a focus on hiring Hispanic or Latino personnel into its workforce and planned to conduct an in-depth analysis of the issue.[59] According to the report, NIFA's civil rights team planned to develop and implement an action plan in fiscal year 2022 to address this concern.

However, before the relocation, neither of the agencies had a diversity strategy or plan, as indicated in the leading practice for diversity planning. As stated previously, we found changes in the composition of the workforce of ERS and NIFA as a result of the relocation. These included declines in certain protected groups, including a sharp decline in Black or African American staff after the relocation and a more modest decline in employees 40 years and older. Officials from ERS and NIFA said that they did not specifically address these declines in workforce composition because the program status reports they rely on did not identify these groups as underrepresented compared to the civilian labor force. In addition, according to officials, because staff were allowed to wait until the effective date of the relocation to decide on whether to leave the agency if they did not want to relocate to Kansas City, Missouri, USDA had not planned for or anticipated such changes in its workforce when planning the relocations.

Officials from both agencies told us that they contributed to USDA's overall DEIA strategic plan, which was published in September 2022, and

---

[59]To assess changes in workforce as a result of the relocation, we analyzed data provided by ERS and NIFA before and after the relocation. ERS and NIFA officials said that the agencies compare their workforce composition to the civilian labor force, then address any underrepresentation shown by that process. We did not analyze workforce composition at ERS and NIFA compared to the civilian labor force.

will work on the agencies' diversity action plans based on the USDA plan.[60] Agency officials told us that the DEIA strategic plan will help guide USDA's efforts at recruiting diverse candidates, moving forward. ERS and NIFA officials also said that USDA hired a Chief Diversity and Inclusion Officer in fiscal year 2022.

However, ERS and NIFA officials acknowledged that they have not yet established formal diversity strategies or plans. In ERS's case, this is because they did not have a leadership committee in place to establish a strategy before and after the relocation. In NIFA's case, this is because the agency anticipates creating action plans—rather than a strategy—to avoid redundancy with USDA's DEIA strategic plan.

According to USDA's *Strategic Plan Fiscal Years 2022-2026*, USDA agency executives and managers are expected to implement initiatives and workforce strategies that account for diversity. NIFA officials said that they established a formal DEIA team that guides the agency's strategy in five areas, two of which pertain to workforce issues such as recruitment and accessibility. Officials from ERS and NIFA said that each agency will continue to monitor and recruit from groups within the agencies that are underrepresented, such as people of Hispanic or Latino ethnicity, compared to the civilian labor force.

In addition, as part of our assessment of each agency's actions against leading practices, we also found that ERS and NIFA did not adequately document their ongoing succession planning and recruiting process for attaining diverse candidates, which can help agencies acquire, develop, and retain staff. As described above, while the overall size of the workforce had mostly recovered by the end of fiscal year 2021, certain changes to the composition of the ERS and NIFA workforce persisted after the relocation.

While ERS and NIFA officials said that the agencies document succession planning and recruiting processes in their program status reports, we found that these reports did not provide adequate detail of succession planning and recruiting processes in place. For example, these reports did not include a detailed description of the agencies' recruiting processes, including plans for how the agencies will recruit diverse candidates. As stated above, according to *Standards for Internal Control*, effective documentation assists in management's design of internal control by establishing and communicating means to retain

---

[60]U.S. Department of Agriculture, *Diversity, Equity, Inclusion, and Accessibility Strategic Plan Fiscal Year 2022-2026* (Washington, D.C.: September 2022).

organizational knowledge and mitigate the risk of having that knowledge limited to a few personnel. By more fully following leading practices for Diversity Management, such as developing a strategy for sustaining diversity and documenting ongoing succession and recruiting planning processes, ERS and NIFA may be better positioned to strategically plan for changes in their workforce composition and to address staffing gaps in the future.

## Conclusions

USDA has taken steps to rebuild ERS and NIFA after losing substantial numbers of employees—as well as their institutional knowledge and critical expertise—in the wake of relocating the agencies from Washington, D.C., to Kansas City, Missouri. Since relocating in 2019, ERS and NIFA have leveraged various recruiting and hiring strategies, including the use of expanded telework and remote work capabilities, to quickly replace those who left and fill deficits in critical and hard-to-fill positions at both agencies. However, the workforces of ERS and NIFA look different than they did prior to the relocation. In particular, both agencies have experienced sharp declines in the number of certain protected groups, such as Black or African American staff. The agencies also have a workforce composed of mostly recent hires with significantly less experience at the agencies than the previous workforce.

Going forward, USDA could better position itself and its two research agencies to continue rebuilding and to navigate future organizational changes by taking actions that leverage leading practices for agency reforms. For example, USDA leadership made key decisions in 2018 and 2019 about how and where to relocate ERS and NIFA without articulating clear performance measures against which to assess progress and without incorporating the perspectives of impacted employees. By expanding the existing departmental regulation on reorganizations to more fully reflect leading practices for effective agency reforms—such as establishing performance measures and engaging employees to obtain their input—USDA would be better positioned to mitigate the impacts of future reorganizations on its employees.

In addition, the Secretary's decision not to follow the directives laid out in this departmental regulation meant that USDA was more vulnerable to the workforce turnover and disruptions in productivity caused by relocating ERS and NIFA. Expanding the scope of the departmental regulation on reorganizations to apply the guidance to all departmental reorganizations—and requiring the Secretary to explicitly document any reasons for diverging from such guidance—would improve decision-making and accountability for future agency reforms, including relocations.

Moreover, by more fully following leading practices related to strategic human capital management as they continue to rebuild their workforces, ERS and NIFA can better position themselves to address future workforce gaps, achieve human capital management and mission goals, and address future staffing challenges. For example, by more fully following leading practices, such as documenting a strategic workforce plan and agencies' succession plans, planning for and evaluating training and development efforts, and documenting recruiting processes for hiring diverse candidates, ERS and NIFA can be better positioned to carry over knowledge of these plans and processes and hire, develop, and retain staff, going forward.

## Recommendations for Executive Action

We are making a total of eight recommendations to USDA:

The Secretary of Agriculture should expand the departmental regulation on reorganizations to more fully reflect leading practices on agency reforms, such as documenting performance measures and enhancing employee engagement. (Recommendation 1)

The Secretary of Agriculture should expand the departmental regulation on reorganizations to apply its guidance to all departmental reorganizations and require documentation of the reasons for any deviation from the departmental regulation, including for decisions by the Secretary to do so. (Recommendation 2)

The Research, Education, and Economics Under Secretary should require ERS to more fully follow leading practices for strategic workforce planning, such as documenting a strategic workforce plan and agency succession plans. (Recommendation 3)

The Research, Education, and Economics Under Secretary should require NIFA to more fully follow leading practices for strategic workforce planning, such as documenting a strategic workforce plan and agency succession plans. (Recommendation 4)

The Research, Education, and Economics Under Secretary should require ERS to more fully follow leading practices for training and development, such as planning for, designing, implementing, and evaluating training and development programs and efforts. (Recommendation 5)

The Research, Education, and Economics Under Secretary should require NIFA to more fully follow leading practices for training and development, such as planning for, designing, implementing, and evaluating training and development programs and efforts. (Recommendation 6)

The Research, Education, and Economics Under Secretary should require ERS to more fully follow leading practices for diversity management, such as developing a strategy for sustaining diversity and inclusion and documenting ongoing succession and recruiting planning processes. (Recommendation 7)

The Research, Education, and Economics Under Secretary should require NIFA to more fully follow leading practices for diversity management, such as developing a strategy for sustaining diversity and inclusion and documenting ongoing succession and recruiting planning processes. (Recommendation 8)

## Agency Comments and Our Evaluation

We provided a draft of this report to USDA for review and comment. USDA generally agreed with our recommendations. In its comments, reproduced in appendix V, USDA stated that both ERS and NIFA have been proactively addressing the recommendations outlined in the report related to strategic workforce planning. USDA also noted that we did not fully define or reference the leading practices around which the report is centered in the body of the report. We listed the numerous individual leading practices in appendix IV, and provided citations to the original GAO reports, which describe the leading practices, in the body of the report. The information in appendix IV shows the individual leading practices within these categories, as well as the extent to which the agencies have followed each individual leading practice. We believe this should be sufficient for USDA officials to identify all of the relevant leading practices.

USDA also requested that we include information on how these leading practices are communicated to departments and agencies and what the expectations are for following them. We are recommending that ERS and NIFA more fully follow leading practices for strategic workforce planning, training and development, and diversity management. We believe it is up to USDA management to determine how to communicate this information to its agencies, as well as to set expectations for the agencies to more fully follow these leading practices. USDA also provided technical comments, which we incorporated as appropriate.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to the appropriate congressional committees, the Secretary of Agriculture, and other interested parties. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-3841 or morriss@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix VI.

Steve D. Morris
Director, Natural Resources and Environment

**GAO-23-104709 USDA Workforce Relocation Impacts**

*List of Requesters*

The Honorable Debbie Stabenow
Chairwoman
Committee on Agriculture, Nutrition, and Forestry
United States Senate

The Honorable Gerald E. Connolly
Chairman
Subcommittee on Government Operations
Committee on Oversight and Reform
House of Representatives

The Honorable Donald S. Beyer, Jr.
House of Representatives

The Honorable Suzanne Bonamici
House of Representatives

The Honorable Mikie Sherrill
House of Representatives

The Honorable Paul Tonko
House of Representatives

The Honorable Jennifer Wexton
House of Representatives

# Appendix I: Objectives, Scope, and Methodology

Appendix I: Objectives, Scope, and Methodology

You asked us to review the U.S, Department of Agriculture's (USDA) relocation of two of its research agencies, the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA). This report (1) describes the legal and regulatory authorities and requirements that USDA identified for relocation of ERS and NIFA and what actions the department took in response; (2) describes how the relocation of ERS and NIFA affected the agencies' human resources and productivity; and (3) evaluates the extent to which USDA's relocation of ERS and NIFA, and these agencies' efforts since the relocation, follow relevant leading practices for agency reforms and strategic human capital management. We also describe key tools available for congressional oversight of relocations in appendix II.

To describe the authorities and requirements that USDA identified and the actions that the department took in response, we collected written responses from USDA's Office of General Counsel on their understanding of the authorities that the department had and what legal and regulatory requirements USDA was subject to in relocating offices at the time of the relocation, and actions taken in response to these requirements. As of December 2022, GAO has ongoing work on two legal decisions related to issues arising from the relocation. For this review, we did not independently review or verify the list of authorities and requirements that USDA identified, nor did we review whether the department's actions satisfied the requirements identified.

To describe how the relocation affected the agencies' human resources, we analyzed trends in ERS's and NIFA's human resources data taken from the EmpowHR data system for fiscal years 2015 through 2021. These data included employees' work status, position title, and duty station, as well as demographical characteristics such as race, age, gender, and disability status. Some of these data were for groups that are identified as "protected classes" under federal law. Protected classes include race, color, religion, sex, national origin, age, and disability.

To describe how the relocation affected the agencies' productivity, we analyzed trends in ERS's and NIFA's primary activities. Specifically, to identify trends in the number of ERS products before and after the relocation, we analyzed the number of ERS outlook and research reports issued from fiscal years 2015 through 2021. We collected data on these reports from the agency's website. In addition, we collected data provided by the agency on the number of journal articles and conducted a search of peer-reviewed literature to identify possible missing articles and added missing articles. We reported on fiscal years 2018 through 2021 because

we considered these reliable, while data for prior years appeared not to be reliable. We discuss the reliability of the data below.

To identify trends in processing time for NIFA competitive grant funding, we analyzed data on the number of days from the date that staff input proposal data into NIFA's grant system to the date that the grant was funded. We analyzed these data for grants for which proposals were due from fiscal years 2015 through 2020. We used the date that NIFA staff input the proposal data into the agency's grant system as the "start" date for the grant funding process because officials said this was within a few days of when they started processing the grant. The "funding" date represents the date that funds were first available to the grant recipient.

We collected data on NIFA competitive grants for fiscal years 2015 through 2020 from NIFA's grants management legacy system, the Cooperative Research, Education, and Extension Management System (CREEMS). We also analyzed NIFA data to calculate the number and percentage of grants that received funding, by four dates (i.e., the end of March, April, May, and June) in the following year.

We also conducted this analysis for capacity grants for fiscal years 2017 through 2021, the years for which data were available from USDA's ezFedGrants system. However, we were unable to identify trends in processing time in days for capacity grants because the data system used for capacity grants did not have the data needed to conduct this analysis.

We assessed the reliability of all of these data (EmpowHR, ERS website, CREEMS, ezFedGrants) by reviewing documentation; interviewing agency officials; and performing electronic testing, such as looking for missing data. For these data sources, we determined that the data we reported were sufficiently reliable for responding to this objective.

To determine the extent to which USDA actions followed leading practices, we assessed USDA's actions to relocate ERS and NIFA against leading practices for effective agency reforms and for strategic human capital management. To do this, we first selected specific leading practices relevant to relocations from the list of leading practices for effective agency reforms and then assessed USDA's actions in relocating

Appendix I: Objectives, Scope, and
Methodology

ERS and NIFA against those selected leading practices.[1] Similarly, we selected specific leading practices relevant to relocations from strategic workforce planning principles identified in relevant GAO reports, and assessed ERS's and NIFA's human capital planning process and practices during and after the relocation against those selected leading practices.[2]

For these assessments of leading practices, we used the terms "generally followed," "partially followed," and "generally did not follow" to reflect our determination of the extent to which USDA's, or ERS's and NIFA's, actions were consistent with each of the selected practices.[3] A determination of "generally followed" means that evidence provided by USDA, or ERS and NIFA, indicates that their actions followed all or most aspects of the leading practice; a determination of "partially followed" means that evidence provided by USDA, or ERS and NIFA, indicates that their actions followed some, but not most, aspects of the leading practice; and a determination of "generally did not follow" means that evidence provided by USDA, or ERS and NIFA, indicates that their actions followed few to no aspects of the selected leading practice. (See app. IV for tables summarizing the results of these assessments.)

For the agency reforms assessment, we had two separate analysts independently assess USDA's actions against each selected leading practice for effective agency reforms. These analysts reconciled their

---

[1]GAO, *Government Reorganization: Key Questions to Assess Agency Reform Efforts,* GAO-18-427 (Washington, D.C.: June 13, 2018). This *Government Reorganization: Key Questions to Assess Agency Reform Efforts* report included numerous leading practices for effective agency reforms and grouped those practices by category and subcategory. From these, we identified as relevant 15 leading practices from the following seven subcategories: (1) Establishing Goals and Outcomes, (2) Involving Employees and Key Stakeholders; (3) Using Data and Evidence; (4) Leadership Focus and Attention, (5) Managing and Monitoring, (6) Employee Engagement, and (7) Strategic Workforce Planning. We conducted our assessment at the individual leading practice and subcategory levels.

[2]GAO, *Human Capital: Additional Collaboration Between OPM and Agencies Is Key to Improved Federal Hiring*, GAO-04-797 (Washington, D.C.: June 7, 2004); *Human Capital: A Guide for Assessing Strategic Training and Development Efforts in the Federal Government*, GAO-04-546G (Washington, D.C.: March 2004); *Human Capital: Key Principles for Effective Strategic Workforce Planning*, GAO-04-39 (Washington, D.C.: Dec. 11, 2003; and *Human Capital: Opportunities to Improve Executive Agencies' Hiring Processes,* GAO-03-450 (Washington, D.C.: May 30, 2003).

[3]Since both sets of leading practices include strategic workforce planning, we provide a high-level assessment in the agency reforms section and provide an in-depth discussion as part of the strategic human capital management section.

independent assessments—including flagging and discussing any differences, as well as obtaining clarification from agency officials and internal stakeholders, as needed, as part of their reconciliation process—and agreed upon final determinations as to the extent to which USDA actions followed selected leading practices. We followed a similar methodology to assess USDA's actions at the subcategory level.[4] The evidence on which these assessments were based included departmental guidance, press releases, and other documents; interviews with department and agency officials; interviews with union representatives to understand the context for unionizing; and USDA's written responses to two questionnaires—our initial questionnaire distributed in August 2021 and a follow-up questionnaire distributed in December 2021—that asked for descriptions of, and evidentiary support for, the actions that USDA took in relation to each of the selected leading practices. We also incorporated evidence and findings from our April 2022 report examining the evidence used by USDA in its decision to relocate ERS and NIFA to the Kansas City region.[5]

For the strategic human capital management assessment, to determine the extent to which ERS's and NIFA's actions followed leading practices before and after relocation, we assessed ERS's and NIFA's actions to relocate these agencies against leading practices for strategic human capital management. To do this, we selected specific leading practices relevant to relocations from strategic workforce planning principles identified in relevant GAO reports and assessed ERS's and NIFA's human capital planning process and practices, including strategic workforce planning, recruiting and hiring, training, and diversity management, during and after the relocation against those selected

---

[4]Given that GAO-18-427 organizes the leading practices it articulates into subcategories, we applied a similar methodology in assessing USDA's actions at the subcategory level. See table 16 in app. IV for our assessment of USDA's actions by subcategory as well as by selected individual leading practice.

[5]GAO, *Evidence-Based Policy Making: USDA's Decision to Relocate Research Agencies to Kansas City Was Not Fully Consistent with an Evidence-Based Approach,* GAO-22-104540 (Washington, D.C.: Apr. 19, 2022.)

leading practices.[6] We assessed ERS's and NIFA's actions at the individual practice level and at the subcategory level.[7]

To collect responses from and conduct this analysis, we developed and administered, from February 2021 to February 2022, questionnaires about strategic human capital management—including strategic workforce planning, recruiting and hiring, training and development, and diversity management—to officials from USDA, ERS, and NIFA. We then analyzed and compared information provided by these officials to relevant criteria from leading practices and other sources. For example, we compared ERS's and NIFA's documentation related to strategic workforce planning, to (1) GAO's management tool on strategic workforce planning, (2) our reports on key principles for effective strategic workforce planning, and (3) standards for internal controls related to effective documentation.[8] We reviewed documentation from these questionnaires and conducted follow-up semistructured interviews with officials from ERS, NIFA, and the Human Capital Office.

We collected and analyzed responses and self-assessments from ERS and NIFA, including documentation that these agencies sent to us, which served as the basis for ERS's and NIFA's supporting evidence to demonstrate whether ERS or NIFA believed that they followed leading practices for strategic human capital management. We assessed ERS and NIFA actions, respectively, against a total of 37 leading practices (17 in strategic workforce planning, four in recruitment and hiring, 12 in training, and four in diversity management).

Two of our analysts independently reviewed agency documentation, if available, from ERS and NIFA on strategic human capital management leading practices, as well as responses from these officials to our semistructured interview questions and came to full agreement on all assessments. In cases where the two analysts differed in their conclusion about whether the leading practice was followed, a third analyst assessed

[6]GAO-03-450; GAO-04-39; GAO-04-546G; GAO-04-797; and GAO, *Diversity Management: Expert-Identified Leading Practices and Agency Examples,* GAO-05-90 (Washington, D.C.: Jan. 14, 2005).

[7]We assessed ERS's and NIFA's actions by individual leading practices and groups for strategic workforce planning and training, and at the subcategory levels for recruitment and hiring and diversity management. This is because for recruitment and hiring and diversity management, there were only four leading practices in each areas. Therefore, we evaluated each individual practice and provided an assessment overall at the subcategory level for these areas.

[8]GAO, *Standards for Internal Controls in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

agency actions against leading practices and provided an independent assessment.

USDA officials had the opportunity to review these initial assessments and provide additional information about their strategic human capital management processes, which we incorporated, as appropriate. We also reviewed agency documentation outside of those obtained through the questionnaires and interviewed department and agency officials, as well as union representatives, to obtain broader perspectives on ERS and NIFA strategic human capital management issues.

For all objectives, we reviewed agency documentation and interviewed department and agency officials about the relocation of ERS and NIFA. We also summarized tools for congressional oversight identified in GAO-05-325SP[9] and the Congressional Research Service's *Congressional Oversight Manual.*[10] (See app. II.)

We conducted this performance audit from January 2021 to December 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[9]GAO, *21st Century Challenges: Reexamining the Base of the Federal Government*, GAO-05-325SP (Washington, D.C.: February 2005).

[10]Congressional Research Service, *Congressional Oversight Manual*, RL 30240 (Updated Mar. 31, 2021).

# Appendix II: Key Tools Available to Congress to Oversee Proposed Agency Relocations

Appendix II: Key Tools Available to Congress to Oversee Proposed Agency Relocations

Oversight occurs through a wide variety of congressional activities. In 1993, the Joint Committee on the Organization of Congress defined congressional oversight as the "review, monitoring, and supervision of the executive and the implementation of public policy."[1]

To identify key tools—processes and actions—available to Congress to oversee proposed agency relocations, we reviewed our 2005 report on reexamining the base of the federal government[2] and the Congressional Research Service's (CRS) *Congressional Oversight Manual*.[3] We did not attempt to determine how Congress could have applied oversight tools to the 2019 relocations of the U.S. Department of Agriculture's Economic Research Service and the National Institute of Food and Agriculture from the National Capital Region to Kansas City, Missouri.

Our 2005 report on reexamining the base of the federal government discussed congressional processes that facilitate oversight, including the budget, reauthorization, and appropriations processes. That report also described the separate oversight process available outside of the budget, reauthorization, and appropriations processes. This separate oversight process includes work done by oversight committees, as well as audits by GAO and agencies' inspectors general. In addition, the report identified special temporary commissions as a supplement to the existing congressional processes and entities.

CRS's *Congressional Oversight Manual* provides extensive information on the legislative, budget, reauthorization, appropriations, and investigatory processes that are available for congressional oversight.[4] Summarized from the *Congressional Oversight Manual*, table 5 shows the processes and the examples of actions available to Congress that it could use to oversee proposed agency relocations.

---

[1]Joint Committee on the Organization of Congress, Organization of Congress: Final Report, 103rd Cong. (Comm. Print 1993), S. Rept. 103-215; H.R. Rept. 103-413, p. 150.

[2]GAO, *21st Century Challenges: Reexamining the Base of the Federal Government*, GAO-05-325SP (Washington, D.C.: February 2005).

[3]Congressional Research Service, *Congressional Oversight Manual*, RL 30240 (Mar. 31, 2021).

[4]Congressional Research Service, *Congressional Oversight Manual*.

**Table 5: Processes and Actions Available to Congress That It Could Use to Oversee Proposed Agency Relocations (Summarized from the Congressional Research Service's *Congressional Oversight Manual*)**

| Legislative process |
| --- |
| While oversight is frequently considered to be a separate track of congressional activity running adjacent to the body's exercise of legislative authority, there are important ways in which the two activities overlap. In some cases, Congress establishes reporting and study requirements for GAO, inspectors general, and agencies that generate recommendations for agency or congressional action, which, in turn, provide both oversight information and ideas for potential legislation. As Congress has expanded its use of statutory tools that facilitate oversight, it has devoted more attention to developing such legislation, overseeing its implementation, and evaluating its effectiveness.[5] In turn, these additional data flowing toward Congress and the public on an ongoing basis can be used to inform work on legislation. Legislative actions include the following: <ul><li>**Reporting requirements.** Statutory provisions for reporting vary in terms of the specificity, detail, and type of information that Congress demands. Reports may be required at periodic intervals, such as semiannually or at the end of a fiscal year, or submitted only if and when a specific event, activity, or set of conditions exists. For example, the statutory provisions may call upon agencies to (1) alert Congress or particular committees and subcommittees about a proposed or planned activity or operation; or (2) provide information about specific ongoing or just-completed operations, projects, or programs.</li><li>**Notice and prior consultation.** Congress sometimes includes provisions in law or in committee report language that require or direct agencies to consult with Congress or nonfederal stakeholders before taking certain actions. Provisions such as these may inform Congress and the public about agencies' plans and activities. The provisions may create opportunities for Congress and nonfederal stakeholders to influence an agency's decision-making.</li></ul> |

[5]An example of such legislation is the Government Performance and Results Act Modernization Act of 2010, which updated the system for Congress and the executive branch to identify and consider the elimination of reporting requirements that are no longer useful. Pub. L. No. 111-352, § 11, 124 Stat. 3866, 3881 (2011).

| **Budget process** |
| --- |
| The budget process permits Congress to determine budget policy as a whole; relate revenue and spending decisions; determine priorities among competing national programs; and ensure that revenue, spending, and debt legislation are consistent with the overall budget policy.<br><br>The budget process has the potential to strengthen oversight by enabling Congress to better relate program priorities to financial claims on the national budget. Each committee, knowing that it will receive a fixed amount of the total to be included in a budget resolution, has an incentive to scrutinize existing programs to make room for new programs or expanded funding of ongoing projects or to assess whether programs have outlived their usefulness.<br><br>The House and Senate Budget Committees, in preparing to report the annual concurrent budget resolution, conduct hearings on overall federal budget policy. These hearings, and other fiscal analyses made by these panels, address various aspects of federal programs and funding levels that can be useful sources of information. |
| **Authorization-reauthorization process** |
| Through its authorization power, Congress exercises significant control over government agencies. The entire authorization process may involve a host of oversight tools—hearings, studies, and reports—but the key to the process is the authorization statute. An authorization statute creates and shapes government programs and agencies, and it contains the statement of legislative policy for the agency. Authorization is the first lever in congressional exercise of the power of the purse. It usually allows an agency to be funded, but it does not guarantee financing of agencies and programs. Frequently, authorizations establish dollar ceilings on the amounts that can be appropriated.<br><br>In addition to formal amendment of the agency's authorizing statute, the authorization process gives committees an opportunity to exercise informal, nonstatutory controls over the agency. Nonstatutory controls used by committees to exercise direction over the administration of laws include statements made in committee hearings, committee reports accompanying legislation, floor debate, and contacts and correspondence with the agency. |

**Appropriations process**

Each year, the House and Senate Committees on Appropriations review the financial practices and needs of federal agencies. The appropriations process allows Congress to exercise extensive control over the activities of executive agencies. Congress can define the precise purposes for which money may be spent, adjust funding levels, and prohibit expenditures for certain purposes.

The oversight function of the Committees on Appropriations derives from their responsibility to examine the budget requests of the agencies as contained in the President's budget. The decisions of the committees are conditioned on their assessment of the agencies' need for their budget requests as indicated by past performance. In practice, the entire record of an agency is fair game for the required assessment. This comprehensive overview and the "carrot and stick" of appropriations recommendations (i.e., the authority of the committees to withhold or reduce appropriations to uncooperative agencies) make the committees significant focal points of congressional oversight and are a key source of their power in Congress and in the federal government generally.

**Statutory controls in appropriations:** Enacted appropriations legislation frequently contains at least five types of statutory controls on agencies:

1. It specifies the purpose for which funds may be used.

2. It defines the specified funding level for the agency as a whole, as well as for programs and divisions within the agency.

3. It sets time limits on the availability of funds for obligation.

4. It may contain limitation provisions. For example, in appropriating $79,500,000, for certain activities of the U.S. Trade and Development Agency, Congress added this condition: "Provided, That of the funds appropriated under this heading, not more than $5,000 may be available for representation and entertainment expenses."[6]

5. It may stipulate how an agency's budget can be reprogrammed (shifting funds within an appropriations account) or transferred (shifted between appropriations accounts).

[6]Pub. L. No. 116-6, 133 Stat. 13, 293 (2019).

**Nonstatutory controls in appropriations:** Nonstatutory controls are a major form of oversight. Language in committee reports and in hearings, letters to agency heads, and other communications give detailed instructions to agencies regarding committee expectations and desires. Agencies are not legally obligated to abide by nonstatutory recommendations, but failure to do so may result in a loss of funds and flexibility the following year.

**Limitations and riders on appropriations:** Congress generally uses a two-step legislative procedure: (1) authorization of programs in bills reported by legislative committees, (2) followed by the funding of those programs in bills reported by the Committees on Appropriations. Congressional rules generally encourage these two steps to be distinct and sequential. Authorizations should not be in general appropriation bills or appropriations in authorization measures. However, there are various exceptions to the general principle that Congress should not make policy through the appropriations process. One exception is the practice of permitting "limitations" in an appropriations bill. So-called riders (language extraneous to the subject of the bill) are also sometimes added to control agency actions.

- **Limitations:** Although House rules forbid in any general appropriations bill a provision "changing existing law," certain "limitations" may be admitted. "Just as the House under its rules may decline to appropriate for a purpose authorized by law, so it may by limitation prohibit the use of the money for part of the purpose while appropriating for the remainder of it."[7] Limitations can be an effective device in oversight by strengthening Congress's ability to exercise control over federal spending and to reduce unnecessary or undesired expenditures. Under House Rule XXI, no provision changing existing law can be reported in any general appropriation bill "except germane provisions that retrench expenditures by the reduction of amounts of money covered by the bill" (the so-called "Holman rule," rarely used in modern practice).

- **Riders:** Unlike limitations, legislative "riders" are extraneous to the subject matter of the bill to which they are added. Riders appear in both authorization bills and appropriations bills. In the latter case, such provisions would be subject to a point of order in the House on the grounds that they are attempts to place legislation in an appropriations bill, although in

---

[7]*Constitution, Jefferson's Manual, and the Rules of the House of Representatives*, H. Doc. No. 115-177, 115th Cong., 2nd sess.

almost every case, Members' ability to lodge a point of order may be restricted by the procedure used to consider the legislation. In the Senate, Rule XVI prohibits the addition to general appropriations bills of amendments that are legislative or nongermane. Both chambers have procedures to waive these prohibitions.

**Advance notification or report-and-wait:** Statutory provisions may stipulate that before a particular activity can be undertaken by the executive branch or funds obligated, Congress must first be advised or informed, ordinarily through a full written statement, of what is being proposed. These statutory provisions usually provide for a period during which action by the executive branch must be deferred, giving Congress an opportunity to pass legislation prohibiting the pending action or using political pressure to cause executive officials to retract or modify the proposed action.

**Investigatory process**

The House Committee on Oversight and Reform and the Senate Committee on Homeland Security and Governmental Affairs have broad oversight jurisdiction over virtually the entire federal government. They have been vested with broad investigatory powers over government-wide activities.

In addition, Congress uses a variety of sources for information and analysis to support its oversight activities. Most of this assistance is provided by legislative support agencies: the Congressional Budget Office (CBO), the Congressional Research Service (CRS), and the Government Accountability Office (GAO). In addition to the legislative support agencies, various support offices established in the House and Senate may have a role in oversight through the legal, legislative, administrative, financial, and ceremonial functions they perform.

Specific investigatory tools include the following:
- The professional staff of House and Senate committees can provide the expertise required to conduct effective oversight and investigations. Committees frequently rely on informal tools to gather the information necessary to accomplish the committee's investigative goals, such as staff-level communication and contacts and voluntary compliance with document and briefing requests.
- Committees may hire consultants, "borrow" staff from federal departments, or employ academics and others with specialized expertise.

- Offices of Inspector General conduct and publish audits and investigations, among other duties.

- The CBO Director is authorized to "secure information, data, estimates, and statistics directly from the various departments, agencies, and establishments" of the government. CBO provides an objective, impartial, and nonpartisan source of budgetary and economic information to support the congressional budget process in the House and Senate. Economists and policy analysts at CBO generate a variety of products in support of Congress and the budget process, including dozens of reports and hundreds of cost estimates each year.

- CRS is the public policy research arm of Congress. CRS analysts, attorneys, and information specialists provide nonpartisan, confidential analysis on current and emerging issues of national policy.

- GAO is an independent auditor of government agencies and has statutory authority to gather information from and investigate agencies. GAO's mission is to support Congress in meeting its constitutional responsibilities and to help improve the performance and ensure the accountability of the federal government.

- The Offices of Senate Legal Counsel and House General Counsel perform functions important to committee oversight, including representing the committees of their respective chambers in certain judicial proceedings.

- The House and Senate can establish select or special committees to probe issues and agencies, promote public understanding of national concerns, and coordinate oversight of issues that span the jurisdiction of more than one standing committee.

| Other oversight actions |
| --- |
| Other actions that may assist congressional oversight of proposed agency relocations include the following:<br><br>• **Study commissions.** Congress has convened study commissions to review and evaluate programs, policies, and operations of the government.<br><br>• **Office of Management and Budget (OMB).** OMB is a potential source of information for investigative and oversight committees because of its role as central coordinator and overseer for executive agencies. OMB functions in many ways as the President's agent for the management and implementation of policy, including the federal budget. In addition, Congress may, through legislation, assign duties to OMB in order to establish oversight mechanisms and advance congressional oversight objectives.<br><br>• **Nonfederal stakeholders.** Committees and Members can acquire useful information about executive branch programs and performance from nonfederal stakeholders. Think tanks and good government organizations are research entities that periodically conduct studies of public policy issues that may inform Members and committees on how well federal agencies and programs are working. In addition, nongovernmental organizations, entities that are independent of government involvement or control, might provide assistance to congressional overseers in navigating a broad range of policy issues.<br><br>• **Resolutions of inquiry.** The House of Representatives can call upon the executive branch for factual information through resolutions of inquiry (House Rule XIII, clause 7). This is a simple resolution considered in, and approved by, only the House. Resolutions of inquiry are addressed to either the President or heads of Cabinet-level agencies to supply specific factual information to the chamber. Such resolutions are to ask for facts, documents, or specific information. |

Source: GAO summary of information from the Congressional Research Service's *Congressional Oversight Manual*. RL 30240 (Mar. 31, 2021). | GAO-23-104709

# Appendix III: Additional Human Resources-Related Data

Appendix III: Additional Human Resources-Related Data

This appendix contains several tables that show additional human resources data obtained from the U.S. Department of Agriculture (USDA). The following tables, figure, and information are included in this appendix:

- Table 6: ERS and NIFA New Hires and Estimated Departures of Permanent Full-Time Staff, for Fiscal Years 2018 through 2021

- Table 7: ERS and NIFA Permanent Full-Time Staff, by Key Positions, Fiscal Years 2015 through 2021

- Table 8: ERS and NIFA Permanent Full-Time Staff, by Permanent Duty Station, Fiscal Years 2018 through 2021

- Table 9: ERS and NIFA Permanent Full-Time Staff, by Years of Service at ERS or NIFA, Fiscal Years 2015 through 2021

- Figure 9: ERS and NIFA Permanent Full-Time Staff, by Race and Ethnicity, at end of Fiscal Years 2015 through 2021

- Table 10: ERS and NIFA Permanent Full-Time Staff, by Gender, Fiscal Years 2015 through 2021

- Table 11: ERS and NIFA Permanent Full-Time Staff, by Age, Fiscal Years 2015 through 2021

- Table 12: ERS and NIFA Permanent Full-Time Staff, by Veterans' Preference, Fiscal Years 2015 through 2021

- Table 13: ERS and NIFA Permanent Full-Time Staff, by Self-Identified Disability, Fiscal Years 2015 through 2021

- Table 14: Competitive Grants Funded, by Four Dates, for the Fiscal Year Following the Grant Year for Fiscal Years 2015 through 2020 Grants

- Table 15: Capacity Grants Whose Appropriation Was Funded in Fiscal Years 2017 through 2021 That Received at Least One Payment, by Four Dates in the Same Year

**Table 6: ERS and NIFA New Hires and Estimated Departures of Permanent Full-Time Staff, for Fiscal Years 2018 through 2021**

| Agency | Status | Fiscal year 2018 | Fiscal year 2019 | Fiscal year 2020 | Fiscal year 2021 |
|---|---|---|---|---|---|
| ERS | Hired | +9 | +18 | +71 | +66 |
| | Estimated departures[a] | -34 | -121 | -27 | -17 |
| NIFA | Hired | +10 | +13 | +108 | +78 |
| | Estimated departures[a] | -29 | -157 | -31 | -24 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture (USDA) data. | GAO-23-104709

[a]These are estimated totals because we were unable to determine the exact fiscal year during which some staff transferred to another USDA agency. Specifically, some ERS and NIFA staff who departed from those agencies transferred to other agencies within USDA. Because of the delays in data entry into the human resources system, the exact date when internal staff transfers took effect is unclear and could have taken place in the subsequent fiscal year.

**Table 7: ERS and NIFA Permanent Full-Time Staff, by Key Positions, Fiscal Years 2015 through 2021**

| Agency | Position | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | Economists | 194 | 189 | 181 | 165 | 131 | 129 | 168 |
| | Managers and supervisors | 33 | 36 | 36 | 32 | 27 | 20 | 31 |
| NIFA | Biological science specialists | 71 | 72 | 76 | 70 | 58 | 63 | 82 |
| | Grants management specialists | 27 | 21 | 17 | 17 | 11 | 30 | 29 |
| | Managers and supervisors | 38 | 41 | 43 | 38 | 28 | 25 | 27 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

**Table 8: ERS and NIFA Permanent Full-Time Staff, by Permanent Duty Station, Fiscal Years 2018 through 2021**

| Agency | Duty station | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|
| ERS | Kansas City, MO | 0 | 14 | 109 | 168 |
| | Washington, D.C. | 270 | 194 | 82 | 77 |
| | Other locations[a] | 3 | 2 | 2 | 1 |
| NIFA | Kansas City, MO | 0 | 10 | 164 | 215 |
| | Washington, D.C. | 288 | 186 | 19 | 20 |
| | Other locations[a] | 0 | 1 | 0 | 11 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

[a]Some staff were located in places other than Kansas City, MO, and Washington, D.C., such as Colorado and Georgia.

**Table 9: ERS and NIFA Permanent Full-Time Staff, by Years of Service at ERS or NIFA, Fiscal Years 2015 through 2021**

| Agency | Years of service at ERS or NIFA | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | Two years or less | 67 | 75 | 66 | 44 | 33 | 105 | 163 |
| | More than 2 years | 250 | 233 | 231 | 229 | 177 | 88 | 83 |
| NIFA | Two years or less | 46 | 62 | 72 | 52 | 32 | 127 | 195 |
| | More than 2 years | 275 | 252 | 235 | 236 | 165 | 56 | 51 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

Appendix III: Additional Human Resources-
Related Data

**Figure 9: Number of Permanent Full-Time Staff at ERS and NIFA, by Race and Ethnicity, end of Fiscal Years 2015 through 2021**



Economic Research Service (ERS) permanent full-time staff



National Institute of Food and Agriculture (NIFA) permanent full-time staff

Source: GAO analysis of U.S. Department of Agriculture (USDA) data.  |  GAO-23-104709

[a]Other races includes Asian, Native Hawaiian, and Pacific Islander. These are grouped together because USDA's race and ethnicity data combine the categories of Asian, Native Hawaiian, and Pacific Islander.

Appendix III: Additional Human Resources-
Related Data

**Table 10: ERS and NIFA Permanent Full-Time Staff, by Gender, Fiscal Years 2015 through 2021**

| Agency | Gender[a] | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | Female | 144 | 145 | 134 | 128 | 94 | 73 | 97 |
| | Male | 173 | 163 | 163 | 145 | 116 | 120 | 149 |
| NIFA | Female | 206 | 192 | 185 | 175 | 122 | 108 | 148 |
| | Male | 115 | 122 | 122 | 113 | 75 | 75 | 98 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

[a]Although the terms "male" and "female" are not inclusive of all gender identities, we use these terms here to encompass all employees. Because of the definitions used in the agency's employee data, we were unable to analyze gender beyond the binary categories of male and female.

**Table 11: ERS and NIFA Permanent Full-Time Staff, by Age, Fiscal Years 2015 through 2021**

| Agency | Age | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | 39 and under | 85 | 84 | 78 | 67 | 47 | 75 | 104 |
| | 40 and over | 232 | 224 | 219 | 206 | 163 | 118 | 142 |
| NIFA | 39 and under | 75 | 73 | 66 | 55 | 34 | 53 | 82 |
| | 40 and over | 246 | 241 | 241 | 233 | 163 | 130 | 164 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

**Table 12: ERS and NIFA Permanent Full-Time Staff, by Veterans' Preference, Fiscal Years 2015 through 2021**

| Agency | Veterans' preference | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | Has a veterans' preference | 14 | 13 | 13 | 14 | 13 | 24 | 29 |
| | Does not have a veterans' preference | 303 | 295 | 284 | 259 | 197 | 169 | 217 |
| NIFA | Has a veterans' preference | 31 | 30 | 29 | 25 | 12 | 25 | 39 |
| | Does not have a veterans' preference | 290 | 284 | 278 | 263 | 185 | 158 | 207 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

Appendix III: Additional Human Resources-
Related Data

**Table 13: ERS and NIFA Permanent Full-Time Staff, by Self-Identified Disability, Fiscal Years 2015 through 2021**

| Agency | Disability | End of fiscal year 2015 | End of fiscal year 2016 | End of fiscal year 2017 | End of fiscal year 2018 | End of fiscal year 2019 | End of fiscal year 2020 | End of fiscal year 2021 |
|---|---|---|---|---|---|---|---|---|
| ERS | Identified disability | 17 | 18 | 18 | 18 | 15 | 16 | 17 |
|  | No disability identified | 294 | 283 | 273 | 249 | 192 | 161 | 195 |
|  | Did not identify | 6 | 7 | 6 | 6 | 3 | 16 | 34 |
| NIFA | Identified disability | 29 | 31 | 33 | 30 | 23 | 12 | 19 |
|  | No disability identified | 283 | 274 | 265 | 250 | 165 | 144 | 187 |
|  | Did not identify | 9 | 9 | 9 | 8 | 9 | 27 | 40 |

Legend: ERS=Economic Research Service NIFA=National Institute of Food and Agriculture
Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

**Table 14: Number and Percent of Competitive Grants Funded, by Four Dates, for the Fiscal Year Following the Grant Year for Fiscal Years 2015 through 2020 Grants**

| Fiscal year of grant | Total number of competitive grants | Number of competitive grants funded by this date the following year | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  |  | March 31 Number | Percent of total | April 30 Number | Percent of total | May 31 Number | Percent of total | June 30 Number | Percent of total |
| 2015 | 1,128 | 1,060 | 94 | 1,074 | 95 | 1,095 | 97 | 1,112 | 99 |
| 2016 | 1,238 | 925 | 75 | 1,027 | 83 | 1,165 | 94 | 1,210 | 98 |
| 2017 | 1,348 | 1,112 | 83 | 1,239 | 92 | 1,275 | 95 | 1,302 | 97 |
| 2018 | 1,460 | 949 | 65 | 1,092 | 75 | 1,263 | 87 | 1,322 | 91 |
| 2019 | 1,235 | 649 | 53 | 870 | 70 | 1,062 | 86 | 1,209 | 98 |
| 2020 | 1,517 | 1,298 | 86 | 1,366 | 90 | 1,437 | 95 | 1,510 | 100 |

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

**Table 15: Number of Capacity Grants Whose Appropriation Was Funded in Fiscal Years 2017 through 2021 That Received at Least One Payment, by Four Dates in the Same Year**

| Fiscal year of grant | Total number of capacity grants | Number of capacity grants that received at least one payment by date listed | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | March 31 | | April 30 | | May 31 | | June 30 | |
| | | Number | Percent of total | Number | Percent of total | Number | Percent of total | Number | Percent of total |
| 2017 | 455 | 152 | 33 | 267 | 59 | 365 | 80 | 435 | 96 |
| 2018 | 454 | 351 | 77 | 448 | 99 | 449 | 99 | 450 | 99 |
| 2019 | 456 | 452 | 99 | 454 | 100 | 454 | 100 | 454 | 100 |
| 2020 | 454 | 0 | 0 | 195 | 43 | 446 | 98 | 453 | 99 |
| 2021 | 456 | 456 | 100 | 456 | 100 | 456 | 100 | 456 | 100 |

Source: GAO analysis of U.S. Department of Agriculture data. | GAO-23-104709

Note: GAO omitted all capacity grants for animal health and disease research because these grants are on a different funding schedule, and the National Institute of Food and Agriculture (NIFA) does not send out a request for applications until the agency has a full appropriation, according to a NIFA official.

# Appendix IV: Selected Leading Practices for Agency Reforms and Strategic Human Capital Management

Appendix IV: Selected Leading Practices for Agency Reforms and Strategic Human Capital Management

This appendix contains two sets of tables used to assess the U.S. Department of Agriculture's (USDA) actions against leading practices. Table 16 below delineates the selected leading practices for effective agency reforms[1] that we identified as relevant to agency relocations and against which we assessed the actions of the USDA in relocating two of its research agencies—the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA). This table also shows the extent to which USDA followed each selected leading practice and each subcategory of leading practices. Table 17 below delineates the selected leading practices for strategic human capital management[2] that we identified as relevant for human capital management, including strategic workforce planning, recruitment and hiring, training, and diversity management. We compared these leading practices against the actions of both research agencies.

**Table 16: Selected Leading Practices for Agency Reforms and Extent These Leading Practices Were Followed by the U.S. Department of Agriculture (USDA) in Its Relocation of the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)**

| Leading practice category | Leading practice subcategory and extent followed | Selected leading practices | Extent followed leading practice |
|---|---|---|---|
| **Goals and Outcomes** | Establishing Goals and Outcomes ◑ | To what extent has the agency established clear outcome-oriented goals and performance measures for the proposed reforms? | ◑ |
| | | To what extent has the agency considered the likely costs and benefits of the proposed reforms? If so, what are they? | ◑ |

---

[1]The leading practices for agency reforms are key questions that Congress, the Office of Management and Budget, and agencies should consider for the development and implementation of agency reforms, according to our prior work. In this report, we use the term "reforms" to broadly include any organizational changes—including relocations, as well as major transformations, mergers, consolidations, and other reorganizations—and efforts to streamline and improve the efficiency and effectiveness of government operations. GAO, *Government Reorganization: Key Questions to Assess Agency Reform Efforts*, GAO-18-427 (Washington, D.C.: June 13, 2018).

[2]The leading practices for strategic human capital management include strategic workforce planning tools and models with certain principles that workforce planning processes should address, irrespective of the context in which planning is done. Strategic human capital management addresses various aspects of managing a workforce, including long-term strategies for acquiring, developing, and retaining staff; aligning human capital program with its mission and programmatic goals; ensuring that agencies' training investments are targeted strategically and are not wasted on efforts that are irrelevant or ineffective; and creating a positive work environment, where the similarities and differences of individuals are valued, so that staff can reach their potential and maximize their contributions.

Appendix IV: Selected Leading Practices for
Agency Reforms and Strategic Human Capital
Management

| Process for Developing Reforms | Involving Employees and Key Stakeholders ○ | How and to what extent has the agency consulted with Congress, and other key stakeholders, to develop its proposed reforms? | ○ |
|---|---|---|---|
| | | How and to what extent has the agency engaged employees and employee unions in developing the reforms (e.g., through surveys or focus groups) to gain their ownership for the proposed changes? | ○ |
| | Using Data and Evidence ◑ | What data and evidence has the agency used to develop and justify its proposed reforms? | ◑ |
| | | How has the agency determined that the evidence contained sufficiently reliable data to support a business case or cost-benefit analysis of the reforms? | ◑ |
| Implementing the Reforms | Leadership Focus and Attention ● | Has the agency designated a leader, or leaders, to be responsible for the implementation of the proposed reforms? | ◑ |
| | | Has the agency leadership defined and articulated a succinct and compelling reason for the reforms (i.e., a case for change)?[a] | ● |
| | Managing and Monitoring ◑ | Has the agency ensured its continued delivery of services during reform implementation? | ◑ |
| Strategically Managing a Federal Workforce | Employee Engagement ○ | How does the agency plan to sustain and strengthen employee engagement during and after the reforms? | ○ |
| | Strategic Workforce Planning ◑ | To what extent has the agency conducted strategic workforce planning to determine whether it will have the needed resources and capacity, including the skills and competencies, in place for the proposed reforms or reorganization? | ◑ |
| | | How has the agency assessed the effects of the proposed agency reforms on the current (i.e., at the time of the relocation) and future workforce? If so, what does that assessment show? | ◑ |
| | | What succession planning has the agency developed and implemented for leadership and other key positions in areas critical to reforms and mission accomplishment? | ◑ |
| | | To what extent have the reforms included important practices for effective recruitment and hiring, such as customized strategies to recruit highly specialized and hard-to-fill positions? | ● |
| | | What employment- and mission-related data has the agency identified to monitor the progress of reform efforts and to ensure no adverse impact on agency mission, and how is it using those data? | ● |

● Generally followed – USDA actions followed all, or most, aspects of the leading practices in this subcategory.

◑ Partially followed – USDA actions followed some, but not most, aspects of the leading practices in this subcategory.

○ Generally did not follow – USDA actions followed few to no aspects of the leading practices in this subcategory.

Source: GAO analysis of USDA documents | GAO-23-104709

[a]GAO did not assess whether USDA's rationale was "compelling."

**Table 17: Selected Leading Practices for Strategic Human Capital Management and Extent These Leading Practices Were Followed by the U.S. Department of Agriculture (USDA) in Its Relocation, Before and After, of the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA)**

**ERS**

| Leading workforce planning practice | Extent followed | |
|---|---|---|
| | **Before relocation** | **After relocation** |
| *Strategic Workforce Planning* | | |
| 1. Involve Human Resources (HR) professionals and key strategic stakeholders in strategic and workforce planning efforts | ◑ | ● |
| 2. HR staff with competencies and resources to proactively partner and consult with line managers | ● | ● |
| 3. HR staff responsible for reaching out to other organizational functions and components through facilitation, coordination, and counseling to provide integrated mission support | ● | ● |
| 4. Involve the HR office or HR staff to handle any agency-wide restructuring efforts | ○ | ◑ |
| 5. Identify external resources, or consult with others, when developing human capital strategies | ◑ | ◑ |
| 6. Systems in place to continually assess and improve human capital planning and investment and to assess their impact on mission accomplishment | ● | ● |
| 7. Hold managers accountable for implementation of human capital plans and overall human capital management | ● | ● |
| 8. Determine critical skills and competencies that its workforce needs to achieve current and future agency goals and mission, and identify gaps, including those that training and development strategies can help address | ● | ● |
| 9. Establish and maintain an inventory of employee skills and competencies (skills and supporting behaviors) | ◑ | ● |
| 10. Process to address skill/competency gaps | ● | ● |
| 11. Succession plans for leadership and other critical positions | ◑ | ◑ |
| 12. Approach workforce planning strategically, basing decisions on mission needs, customer expectations, workload, and workforce | ● | ● |
| 13. Workforce strategies based on identified current and future human capital needs, including size and deployment of the workforce and the competencies needed to carry out the mission | ● | ● |
| 14. Conduct assessments of current and future workforce needs | ● | ● |
| 15. Linkages between the strategic workforce plan and the agency's strategic plan | ◑ | ◑ |
| 16. Human capital strategies to avoid excess organizational layers and redundant operations | ● | ● |
| 17. Human capital strategies regarding the balance of supervisory and nonsupervisory positions | ● | ● |
| *Recruitment and Hiring* | | |
| 1. Develop customized strategies to recruit highly specialized and hard-to-fill positions | ● | ● |
| 2. Use vacancy announcements and web postings that are clear, user friendly, and comprehensive | ● | ● |
| 3. Automated hiring process that uses computerized systems to prescreen, rate, and rank applicants | ● | ● |

**Appendix IV: Selected Leading Practices for Agency Reforms and Strategic Human Capital Management**

| | | |
|---|:---:|:---:|
| 4. Conduct regular surveys to gauge applicant and hiring manager satisfaction levels with the hiring process and its results | ◐ | ◐ |
| *Training and Development* | | |
| 1. Training goals and related performance measures that are consistent with overall mission, goals, and culture | ● | ● |
| 2. Incorporate the results of its workforce planning efforts into its planning and front-end analysis of training and development strategies | ◐ | ◐ |
| 3. Develop measures to assess the contributions that training and development efforts make toward individual mastery of learning and achieving agency goals | ◐ | ● |
| 4. Conduct formal analysis to choose between centralized and decentralized management of training programs | ◐ | ◐ |
| 5. Conduct formal analysis to choose between designing training programs internally and using an external source | ◐ | ◐ |
| 6. Conduct formal analysis to choose among different mixes of training delivery mechanisms (e.g., classroom, computer-based, on the job, etc.) | ◐ | ◐ |
| 7. Incorporate measures of effectiveness, with clear links to organizational goals, into the training courses it designs | ◐ | ◐ |
| 8. Leaders who communicate the importance of training and encourage employees to participate in training activities | ● | ● |
| 9. Have a training and development unit that is held accountable, along with the line executives, for the enhanced performance of the workforce | ◐ | ◐ |
| 10. Have a systematic process to evaluate the effectiveness of training and development programs | ◐ | ◐ |
| 11. Use quantitative and qualitative performance data to assess the results achieved through training and development efforts | ◐ | ◐ |
| 12. Track cost, benefit, delivery, and performance data for its training programs consistently across the organization | ◐ | ◐ |
| *Diversity Management* | | |
| 1. Have a diversity strategy and plan that are developed and aligned with the organization's strategic plan | ○ | ○ |
| 2. Quantitative and qualitative measures to assess the impact of various aspects of an overall diversity program | ● | ● |
| 3. Ongoing succession planning processes for identifying and developing a diverse pool of talent for an organization's potential future leaders | ◐ | ◐ |
| 4. Recruitment process for attracting a supply of qualified, diverse applicants for employment | ◐ | ◐ |

● Generally followed – Agency actions followed all, or most, aspects of the leading practice.

◐ Partially followed – Agency actions followed some, but not most, aspects of the leading practice.

○ Generally did not follow – Agency actions followed few to no aspects of the leading practice.

Source: GAO analysis of information provided by ERS officials. | GAO-23-104709

Appendix IV: Selected Leading Practices for
Agency Reforms and Strategic Human Capital
Management

**NIFA**

| Leading workforce planning practice | Extent followed | |
|---|---|---|
| | Before relocation | After relocation |
| *Strategic Workforce Planning* | | |
| 1. Involve Human Resources (HR) professionals and key strategic stakeholders in strategic and workforce planning efforts | ◐ | ● |
| 2. Have HR staff with competencies and resources to proactively partner and consult with line managers | ● | ● |
| 3. Have HR staff responsible for reaching out to other organizational functions and components through facilitation, coordination, and counseling to provide integrated mission support | ● | ● |
| 4. Involve the HR office or HR staff to handle any agency-wide restructuring efforts | ○ | ◐ |
| 5. Identify external resources or consult with others when developing human capital strategies | ◐ | ◐ |
| 6. Have a system in place to continually assess and improve human capital planning and investment and assess its impact on mission accomplishment | ● | ● |
| 7. Hold managers accountable for implementation of human capital plans and overall human capital management | ● | ● |
| 8. Determine critical skills and competencies that its workforce needs to achieve current and future agency goals and mission; and identify gaps, including those that training and development strategies can help address | ● | ● |
| 9. Establish and maintain an inventory of employee skills and competencies (skills and supporting behaviors) | ● | ● |
| 10. Have a process to address skill/competency gaps | ● | ● |
| 11. Succession plans for leadership and other critical positions | ◐ | ◐ |
| 12. Approach workforce planning strategically, basing decisions on mission needs, customer expectations, workload, and workforce | ● | ◐ |
| 13. Workforce strategies based on identified current and future human capital needs, including size and deployment of the workforce and the competencies needed to carry out the mission | ● | ◐ |
| 14. Conduct assessments of current and future workforce needs | ● | ◐ |
| 15. Linkages between the strategic workforce plan and the agency's strategic plan | ◐ | ◐ |
| 16. Human capital strategies to avoid excess organizational layers and redundant operations | ● | ● |
| 17. Human capital strategies regarding the balance of supervisory and nonsupervisory positions | ● | ● |
| *Recruitment and Hiring* | | |
| 1. Develop customized strategies to recruit highly specialized and hard-to-fill positions | ● | ● |
| 2. Use vacancy announcements and web postings that are clear, user friendly, and comprehensive | ● | ● |
| 3. Have an automated hiring process that uses computerized systems to prescreen, rate, and rank applicants | ● | ● |
| 4. Conduct regular surveys to gauge applicant and hiring manager satisfaction levels with the hiring process and its results | ◐ | ◐ |

GAO-23-104709 USDA Workforce Relocation Impacts

**Appendix IV: Selected Leading Practices for Agency Reforms and Strategic Human Capital Management**

| | | |
|---|---|---|
| *Training and Development* | | |
| 1. Training goals and related performance measures that are consistent with its overall mission, goals, and culture | ● | ● |
| 2. Incorporate the results of its workforce planning efforts into its planning and front-end analysis of training and development strategies | ◑ | ◑ |
| 3. Develop measures to assess the contributions that training and development efforts make toward individual mastery of learning and achieving agency goals | ● | ● |
| 4. Conduct formal analysis to choose between centralized and decentralized management of training programs | ◑ | ◑ |
| 5. Conduct formal analysis to choose between designing training programs internally and using an external source | ◑ | ◑ |
| 6. Conduct formal analysis to choose among different mixes of training delivery mechanisms (e.g., classroom, computer-based, on the job, etc.) | ◑ | ◑ |
| 7. Incorporate measures of effectiveness, with clear links to organizational goals, into the training courses it designs | ◑ | ◑ |
| 8. Leaders who communicate the importance of training and encourage employees to participate in training activities | ● | ● |
| 9. Training and development unit that is held accountable, along with the line executives, for the enhanced performance of the workforce | ○ | ◑ |
| 10. Systematic process to evaluate the effectiveness of its training and development programs | ◑ | ◑ |
| 11. Use quantitative and qualitative performance data to assess the results achieved through training and development efforts | ◑ | ◑ |
| 12. Track cost, benefit, delivery, and performance data for its training programs consistently across the organization | ◑ | ◑ |
| | | |
| *Diversity Management* | | |
| 1. Have a diversity strategy and plan that are developed and aligned with the organization's strategic plan | ○ | ○ |
| 2. Quantitative and qualitative measures to assess the impact of various aspects of an overall diversity program | ● | ● |
| 3. Ongoing succession planning processes for identifying and developing a diverse pool of talent for an organization's potential future leaders | ◑ | ◑ |
| 4. Recruitment process for attracting a supply of qualified, diverse applicants for employment | ◑ | ◑ |

● Generally followed – Agency actions followed all, or most, aspects of the leading practice.

◑ Partially followed – Agency actions followed some, but not most, aspects of the leading practice.

○ Generally did not follow – Agency actions followed few to no aspects of the leading practice.

Source: GAO analysis of information provided by NIFA officials. | GAO-23-104709

# Appendix V: Comments from the U.S. Department of Agriculture

Appendix V: Comments from the U.S. Department of Agriculture



| United States Department of Agriculture | Research Education Economics | Office of the Under Secretary | Room 216W Jamie L. Whitten Building Washington, DC 20250-0110 |
|---|---|---|---|

November 18, 2022

Steven D. Morris
Director
United States Government Accountability Office
441 G St. N.W.
Washington, DC 20548

SUBJECT:    Draft report, entitled "AGENCY RELOCATIONS: Following Leading Practices Will Better Position USDA to Mitigate the Ongoing Impacts on Its Workforce (GAO-23-104709)"

Dear Mr. Morris:

This is in response to your request of October 21, 2022, for Department of Agriculture (USDA) review and comment on the above-referenced proposed Government Accountability Office (GAO) performance audit report ("GAO draft report") on the June 2019 USDA decision to relocate the National Institute of Food and Agriculture (NIFA) and the Economic Research Service (ERS) to Kansas City. We appreciate the opportunity to provide comments and demonstrate our ongoing commitment to positioning both agencies to successfully deliver on their critical missions.

USDA generally agrees with GAO's findings.

We would like to provide the following comments, in addition to some minor comments/edits provided in the PDF attachment.

USDA appreciates the positive recognition on the progress both ERS and NIFA have made toward regaining normal operations after the relocation, particularly the acknowledgment that both agencies had largely recovered in terms of size and productivity by the end of FY 2021.

Since then, under Secretary Vilsack's leadership, we've continued to make strides to ensure that we have reached or exceeded staffing levels at both agencies as compared to pre-relocation. As noted in the report, this is largely a result of leveraging Direct Hire Authority, allowing negotiable duty stations and shifting toward fully remote worksites for many NIFA and ERS staff. Both agencies have also been proactively addressing the recommendations outlined in the report related to strategic workforce planning, with many strategies already being implemented.

We are also pleased that the productivity of both agencies match, and in many cases exceed, pre-relocation levels. As highlighted in the report, NIFA processed competitive grant proposals in FY 2021 faster than in any of the previous five fiscal years and its timeliness for processing capacity grants had also recovered. Similarly, the number of ERS' research reports have returned

*USDA is an equal opportunity provider, employer, and lender.*

Mr. Steven D. Morris
Page 2

to pre-relocation levels while their outlook report publications were not impacted during relocation.

We note that this report is centered around "following leading practices," though these practices are never fully defined or referenced, other than in footnote 6 and in the Appendix. Since the report is based on leading practices, it seems appropriate to document these explicitly in the body of the report and include information on how these leading practices are communicated to Departments and agencies and what the expectations are for following them.

USDA provisionally agrees with GAO's recommendations but will endeavor to implement Departmental-wide guidance in such a way as to allow the greatest level of flexibility and agility to meet changing priorities, consistent with applicable laws and regulations.

Thank you for providing us with the opportunity to comment.

Sincerely,

Chavonda Jacobs-Young
USDA Research, Education and Economics Under Secretary

# Appendix VI: GAO Contact and Staff Acknowledgments

Appendix VI: GAO Contact and Staff Acknowledgments

| GAO Contact | Steve D. Morris, (202) 512-3841 or morriss@gao.gov |
|---|---|
| Staff Acknowledgments | In addition to the above contact, Nico Sloss (Assistant Director), Angela Miles (Analyst in Charge), David Bennett, Namita Bhatia-Sabharwal, Bonnie Binggeli, Kevin Bray, Gary Brown, Colleen Candrl, Clifton G. Douglas Jr., Gina Hoover, Gwen Kirby, Courtney L. LaFountain, Steven Lozano, Beverly Peterson, Dan Royer, Jerome Sandau, Sarah Veale, Rajneesh Verma, and Tama Weinberg made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: <br><br> Website: https://www.gao.gov/about/what-gao-does/fraudnet <br><br> Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.