Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchishom@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*
[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Case No. 3:25-cv-03698-SI<br><br>**DECLARATION OF MATTHEW EHRMAN** |

# DECLARATION OF MATTHEW EHRMAN

I, Matthew Ehrman, declare as follows:

1.      I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2.      I work as a Regional Planner and Monitoring Coordinator in the Pacific Northwest Region (Region 6) of the United States Forest Service ("USFS"). My work involves supporting and monitoring the implementation of the Northwest Forest Plan at both the forest and regional level, ensuring that all projects in forests covered by the plan are compliant and providing guidance and review of projects for forests. I also support the Northwest Forest Plan interagency monitoring programs, which are vital to demonstrating the effectiveness of the Northwest Forest Plan. Those include the Aquatic and Riparian Effectiveness Monitoring Program, the Northern Spotted Owl Monitoring Program, the Late-Successional/Old-Growth Monitoring Program, and the Marbled Murrelet Effectiveness Monitoring Program.

3.      I am also the President of the National Federation of Federal Employees Local 1968 ("Local 1968" or the "Union"), a role I have held since January 2023. I separately serve as the Chief Steward of the Union for the Pacific Northwest Regional Office and the Gifford Pinchot National Forest. Prior to being President, I was a steward for Region 6. I have been involved with the National Federation of Federal Employees national negotiating team surrounding the impact and implementation of the USFS reorganization. I am very familiar with the Pacific Northwest Regional Office and our constituent national forests by virtue of my job duties and role in the Union.

4.      Under the current USFS organizational structure, the regional offices serve as a crucial intermediary between the national headquarters and the forests and districts. Our employees provide additional support, expertise, and policy coordination that forests and districts lack the necessary staff or specialization to host in-house. Additionally, when new policy directives are set by USFS leadership, the regional offices help operationalize those policy plans by working closely with forests to amend their forest plans, implement new projects, and otherwise comply with federal law and USFS policy goals.

5.    Regional office employees are subject matter specialists that provide a critical additional layer of expertise and support to the forests and districts they work with. For example, regional resource planners and monitors like me provide project planning support to forests as they engage in new initiatives, ensuring compliance with the National Environmental Protection Act ("NEPA") and other federal laws and regulations. We also support large scale, regional planning projects under the National Forest Management Act, gathering information and providing guidance on where to place new hiking trails, harvest timber, or engage in fuel reduction projects to mitigate fire risk. Many individual forests either lack the personnel or specialized expertise hosted in the regional office, and we provide support to all of the forests within our region on these issue areas.

6.    There are some regional office job functions that simply do not exist at the forest or district level, and are housed in the regional office to allow for efficient allocation of resources when specific needs arise. As an example, our regional office engineers work on everything from facilities-related projects to road and bridge design and inspection, lending their expertise to all of the forests within the region. There are thousands of bridges on national forest lands, including on open system roads, which are used by personal vehicles as well as trucks hauling timber and specialized recreational vehicles. The engineers in our regional office help design new bridges and inspect and repair existing ones based on the needs that arise in different forests across the region.

7.    The other employees in the regional office similarly serve as critical support systems and specialists for the forests they serve. Some job functions, like budget implementation and grants and agreements, may also exist in smaller numbers at the sub-regional levels, but at the regional level they provide essential support and guidance to their forest- and district-level counterparts on complex or multi-forest issues. Others, like our Fire and Aviation Management staff and employees working on recreation, lands, heritage, and minerals, have no direct equivalent at the forest or district level and play a key role in coordinating fire response or maintaining land records across forests and regions.

8.    The planned reorganization will close all of the nine existing regional offices, replacing them with a mixture of state offices and "operations service centers" and requiring many

EHRMAN DECLARATION, CASE NO. 3:25-CV-03698-SI

regional office staff to relocate. USFS leadership has told the approximately 150 employees working out of our Portland, OR facility, including Region 6 staff, that the office location will be closing and we will be forced to relocate under the reorganization. Based on the initial relocation letter I received and subsequent town hall meetings, I understand that regional office employees will be matched to new positions based on job functions, which could result in being moved to a new operations service center, state office, or the new national headquarters in Salt Lake City, UT. A true and correct copy of the letter I received is attached as **Exhibit A**.

9.      The closure of the regional offices and relocation of many regional staff will result in a tremendous loss of geographically specific expertise and skills. As currently announced, the new state offices will be operating with small staffs of just six to eight people, nowhere near the more than 200 we currently have across Region 6 supporting Oregon and Washington. That means that many of the current regional office employees in our region will likely be relocated far from the forests and ecosystems they currently specialize in, and will be asked to support forests across the nation that they have never worked with before.

10.      For example, I work on the Northwest Forest Plan with a focus on the forests in Oregon, Washington, and California. If I am moved to a national "operations service center" or the new headquarters, I may be asked to support forest plan revisions in vastly different parts of the country for which I have no special knowledge and expertise. Even if there were no loss in personnel under the reorganization, the reshuffling of subject matter and location-specific experts to different regions of the country makes little sense and will undermine the support that our national forests and their constituent districts need.

11.      This irrational decision to splinter the combined knowledge currently hosted in our regional office will be made worse by the high rates of attrition among staff in regional offices, like Region 6, that are slated for closure. Based on my conversations with colleagues, many employees in our regional office will leave the agency rather than be forced to relocate. These losses will be on top of the institutional knowledge and specialized expertise we have already lost in the past year due to the Deferred Resignation Program and Voluntary Early Retirement Authority rolled out across the federal government last year. Forcing out regional office experts

with decades of combined experience, and sending the few who remain far away from the forests and ecosystems they have spent their careers studying and supporting, will weaken USFS as a whole and degrade the quality of decision-making at the forest and district level.

12. I previously served as a Forest Planner with the White River National Forest, and have perspective on what the forests will lose if the regional offices are gone. For several years I was the only forest planner or dedicated NEPA practitioner on our forest. I relied heavily on regional office staff for advice, assistance completing administrative reviews, and training for forest staff to understand how to comply with NEPA and other regulations. The loss of experts in the regional offices will increase the burden on sub-regional employees and eliminate a critical resource for these forest and district workers.

13. The loss of experienced, long-tenured USFS regional office employees will harm not only support for our forests, but also fire readiness and public safety. I work on one of the USFS Incident Management Teams ("IMTs"), which are mobilized to respond to complex emergencies like wildfires. The IMT structure helps create clear lines of command when serious wildfires begin, and the teams are comprised of certified fire response personnel, including regional office staff. Whenever a major fire cannot be handled by forest-level fire personnel, the IMTs are mobilized to coordinate resources and engage in fire response planning for these complex and multi-forest fires (known as Type 1, Type 2, and Type 3 fires). Attrition in our regional office and any other regional offices impacted by the reorganization and forced relocations will result in the departure of many experienced IMT staff and Incident Commanders who have experience with managing complex fire response. Based on conversations with my colleagues, the most likely departures under the reorganization will be more senior staff who are close to retirement age and may take the voluntary early retirement or separation offers. The loss of experienced IMT personnel will degrade USFS capacity when severe wildfires inevitably arise in the future.

14. Additionally, many IMT personnel (including me) are not full-time fire employees and also have demanding jobs with our regional offices. Morale is low and burnout is high among regional office staff due to departures of our colleagues, requiring us to take on additional job

4

EHRMAN DECLARATION, CASE NO. 3:25-CV-03698-SI

responsibilities to cover for departing staff. Sometimes this extra work is so overwhelming that it can interfere with IMT staff's ability to respond or report when Type 1, 2, or 3 incidents arise. This has already affected our preparedness level, and impacts the IMT's ability to function effectively when called on during an incident. These issues are only likely to get worse as total USFS regional staffing declines following the reorganization, with fewer experienced IMT personnel available and many IMT workers facing increased demands in their ordinary jobs. And the reorganization takes place amidst already low morale in the federal fire response workforce, with 74% of the wildland fire workforce reporting in a May 2026 survey that they are considering leaving their jobs. A true and correct copy of the Grassroots Wildland Firefighter's survey results, entitled *2026 Federal Wildland Fire Workforce Survey — Key Findings*, which was published May 2026 and is available at https://static1.squarespace.com/static/682782f2a74ed97f7aa5152e/t/ 6a13c50e402a0268b33e9e27/1779680526154/FGWF_Policy_Memo_2026+FINAL.pdf, is attached as **Exhibit B**. As a result, any attrition caused by the reorganization will make our national forests and the communities near them even more vulnerable to devastating wildfires.

15.    There are other public safety risks from the reorganization that are deeply concerning to me. As mentioned above, regional office engineers engage in bridge inspections, identify aging bridges in need of repair, and then execute those repairs. A geographic presence is needed in every area of the country to inspect and repair the thousands of open access bridges that exist on USFS lands. We already have insufficient resources in this area—to give just one example among many, Alaska only has a single engineer conducting bridge inspections and working with state workers and contractors to keep infrastructure safe for the entire state. If engineers are relocated to the national headquarters or an operations service center, they will be further from the bridges they need to go inspect on-site in regions across the country. The reorganization is likely to compound existing vulnerabilities in the bridge inspection and repair process, both by inducing attrition among these specialists in regional offices that close and require relocation, and in consolidating these engineers into a small number of national offices that are far from the bridges they inspect.

16.     Ultimately, this reorganization will transform a system currently grounded in location- and subject-specific expertise into a national organization that is less responsive to the needs of the forests and districts they support. Regional office employees have built decades of experience working with a specific set of forests under their purview, applying their specialized knowledge to a unique set of ecosystems that they have become experts in over time. Wiping out these years of accumulated learning in favor of state offices with less than 10 staff members apiece and national "operations service centers" that are further from the forests they support and may not have location-specific knowledge makes little sense and will weaken USFS. When combined with the likely loss of hundreds of dedicated staff in Region 6 and other locations slated for closure and forced relocation of employees, the harms to fire readiness, public safety, and the health and conservation of these ecosystems will be profound.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 29th day of June, in Portland, Oregon.

_____
Matthew Ehrman

Exhibit A

 **Forest Service**            **Washington Office**            **1400 Independence Avenue, SW**
                                                                          **Washington, D.C. 20250**

---

| | | | |
|---|---|---|---|
| **File Code:** | 1200 | **Date:** | March 31, 2026 |
| **Route To:** | | | |

**Subject:**    Preliminary Notice to Regional Office (R.O.) Employees and Those Co-located With an R.O)

**To:**    All Employees Who Work for the Regional Offices of R9-Milwaukee, WI, R8-Atlanta, GA, and R6-Portland, OR, or Any F.S. Employee Who Has a Duty Station in One of These Physical Locations.

Today, the Forest Service announced a comprehensive reorganization of the agency. I am writing to you directly because you deserve to hear clearly what this means for your office and your position.

**What Is Happening.** The Forest Service is eliminating all Regional Offices as part of a nationwide restructuring. Your Regional Office will be affected by this change. The following is what we know right now.

For R6-Portland: Employees in the Portland office will be relocated. Employees may be moved to national headquarters in Salt Lake City, UT; a new Operational Service Centers in Albuquerque, NM, or Fort Collins, CO; or any national forest unit. Additionally, small technical service centers are being established on the Mt. Hood and Willamette National Forests.   The State Director will collocate with Oregon Department of Forestry in Salem, OR.

For R8-Atlanta: Employees in the Atlanta office will be relocated. Employees may be moved to national headquarters in Salt Lake City, UT; a new Operational Service Center in Albuquerque, NM, or Fort Collins, CO; or any national forest unit. In addition, we will be establishing a geographic service center in the current research and development facility in Athens GA.

For R9-Milwaukee: Employees in the Milwaukee office will be relocated.  Employees may be moved to national headquarters in Salt Lake City, UT; a new Operational Service Centers in Albuquerque, NM, or Fort Collins, CO; or any national forest unit.  In addition, we will be establishing a geographic service center Madison, WI, at the current Forest Products Laboratory.

**What This Means for You.** Your position is subject to reorganization, and your duty station will change. You will be relocated to a new duty station to one of the locations identified above. The specific details, exactly where, when, and into what position, have not yet been determined and will depend on the restructured organization that is currently being developed.

**For bargaining unit employees:** The processes and procedures for this relocation are subject to negotiation with National Federation of Federal Employees (NFFE), Forest Service Council under the

 America's Working Forests – Caring Every Day in Every Way    Printed on Recycled Paper

All Employees Who Work for the Regional Offices of R9-Milwaukee, WI, R8-Atlanta, GA, and R6-Portland, OR, or Any F.S. Employee Who Has a Duty Station in One of These Physical Locations.    2

Master Agreement. A formal bargaining process will begin in April 2026. No changes to your duty station or position will be implemented until bargaining obligations are satisfied. You will receive further individual notification as the process proceeds.

**For management employees:** The specific process for your individual reassignment is being developed and will be communicated to you in the coming months. You will receive an individual letter with your specific new duty station, position, timeline, and relocation benefits before any change takes effect.

**For employees who work in a regional office as remote or detached location:** Your position is subject to reorganization, and your duty station may or may not change.

- If your current duty station is currently impacted, or later becomes impacted, then you will be relocated to a new duty station on a Forest, at a Service Center, at a Geographic Area Coordination Center, or at a Headquarters location.  The specific details, exactly where, when, and into what position, have not yet been determined and will depend on the restructured organization that is currently being developed.
- If your current duty station will persist, even though your position is subject to reorganization, your duty station will most likely remain in your local commuting area.

**What We Can Tell You Today.** While the specific details of individual assignments are still being worked out, here is what we know:

- There is a position in the restructured Forest Service for every permanent employee willing to accept reassignment.
- Employees required to relocate over 50 miles from their current duty station, are eligible to receive relocation assistance.  Further detail will be provided in individual notices.

- The restructuring will unfold over the coming year. We do not expect anyone to move overnight. We understand that relocating a household, a family, and a life takes time.
- VERA/VSIP. You may be eligible to participate in the Voluntary Early Retirement Authority (VERA) or Voluntary Separation Incentive Payment (VSIP) programs in lieu of relocating. Information on those programs will be forthcoming.

**What Happens Next.** Over the coming months:

- April–Summer 2026: More information will be shared about the new organizational structures as they are finalized. Informational sessions will be held at this office so you can ask questions directly.
- Summer–Fall 2026: The restructuring placement process will be negotiated (for BUE) and implemented. Employees will have the opportunity to express preferences for positions and locations. Voluntary placements will be prioritized before any directed reassignments.
- Summer 2026–Summer 2027: Employees will transition to new positions and duty stations. Relocation benefits will be provided.

**I Know This Is Hard.** An announcement that your office is closing and you will need to relocate is among the most difficult messages a leader can deliver. I am not going to pretend otherwise. Many of you have built careers in these cities, bought homes, put your children in school, and established lives that are

All Employees Who Work for the Regional Offices of R9-Milwaukee, WI, R8-Atlanta, GA, and R6-Portland, OR, or Any F.S. Employee Who Has a Duty Station in One of These Physical Locations.        3

rooted here. Being asked to uproot all of that is a profound disruption, and I respect the weight of what we are asking.

What I can promise you is this: the process will be fair and transparent. You will not be left in the dark. Your personal circumstances will be considered. And the skills, knowledge, and dedication you have built in your careers are exactly what the restructured Forest Service needs. This reorganization is not about replacing people, it is about repositioning the agency, and you are the agency.

**Support Available.** The following resources are available to you and your family:

- The Forest Service partners with Federal Occupational Health (FOH) to provide contracted Employee Assistance Program services. Information on services offered by FOH and internal employee support specialists can be found on the Employee Support Hub, or by calling FOH directly at 800-222-0364. Refer to the employee support and development calendar for all upcoming webinars and trainings, which will be tailored to supporting employees through the reorganization process.
- Your Supervisor: is available to discuss how the reorganization affects your day-to-day work
- Union Representatives: Contact your Local Lodge or NFFE-FSC representative with questions about your rights and the bargaining process
- Reorganization Information: The Forest Service intranet site Reorganization tab (*https://fsweb.wo.fs.fed.us/)* and the Forest Service Reorganization website (*https://www.fs.usda.gov/about-agency/reorganization*) contain the most current information.

**Point of Contact.** If you have questions about this letter, please contact: F.S. Reorganization Inquiry Portal.

I will communicate with you again as more details become available. In the meantime, the most important thing you can do is continue the work that the American public depends on.

Thank you for your continued service to the Forest Service and to the American public. I know this is a time of uncertainty, and I appreciate your patience and professionalism as we work through this transition.

THOMAS M. SCHULTZ, JR
Chief

# Exhibit B



# Federal Wildland Fire Workforce
## 2026 Survey Findings

---

| | |
|---|---|
| **TO:** | Interested Parties |
| **FROM:** | Grassroots Wildland Firefighters |
| **RE:** | 2026 Federal Wildland Fire Workforce Survey — Key Findings |
| **DATE:** | May 2026 |

---

**WILDLAND FIRE WORKFORCE: AT A GLANCE**

| **74%** | **48%** | **62%** | **4.88** |
|---|---|---|---|
| considered leaving (past 12 mo.) | dissatisfied with their agency | units below full authorized strength | Mean trust in agency leadership (0-10 scale) |

## Overview

In March 2026, Grassroots Wildland Firefighters (GWF), in partnership with the National Federation of Federal Employees (NFFE), developed and disseminated a survey for the federal wildland fire workforce. We wanted to check in and see how people were feeling about their jobs, their agencies and units, and the upcoming fire season.

We were quite surprised to receive responses from 825 people. These respondents represent active fire personnel across five federal agencies: the U.S. Forest Service (USDA), and the Bureau of Land Management, National Park Service, Fish and Wildlife Service, and Bureau of Indian Affairs (which now comprise the US Wildland Fire Service in DOI).

The high volume of interest tells us that the wildland fire workforce has things to say and wants to be heard. And, frankly, what they have to say is more concerning than we expected. The survey paints a stark picture heading into the 2026 fire season: units are understaffed, morale is fractured, and three out of four firefighters have considered leaving the profession in the past year.

The data illustrates a structural breakdown across the federal wildland firefighter workforce that has been building for years — one sharpened over the past year by workforce reductions and organizational uncertainty. These factors have left units with fewer people, less clarity, and limited confidence in the leadership. Heading into the 2026 fire season, this combination creates risk for communities and firefighters alike.



## Staffing Shortages Are Impacting Operations

As of March 2026, 23.9% of units report being fully staffed at 90-100% of authorized strength. Nearly two-thirds (62.2%) are operating below full strength, and one in four (25.2%) is below 75% of authorized strength.

Only when engaging in initial attack, the short period when crews work to contain and suppress new/emerging wildfires, do a majority of units report adequate staffing levels. Other consequential fire management mission types fall below that threshold. More than half of units report inadequate staffing for extended attack (52.4%) and mitigation actions (52.5%). 43.2% report inadequate staffing to conduct prescribed fire treatments, while 57.6% of respondents report that their unit had to "cancel or postpone prescribed fire projects due to staffing."

Nearly one in three respondents (30.6%) reports that their unit sometimes or more keeps crews beyond safe operational limits. One in five (21.0%) often or very often fills positions with underexperienced personnel.



*Figure 1. Percentage of units reporting adequate vs. inadequate staffing by mission type (n = 810-821).*

> *"Upper management expecting burn targets like we had 10-15 years ago but with 75% less employees on the district. We had 8 burn bosses, 10 dozer operators, 30 red-carded employees — and now we have 1 burn boss, 2 operators, and 9 red-carded employees."* — USFS, 20+ years

> *"Uncertainty, very thin, everyone is doing so many jobs. We are spread very thin across a (large geographic area). We cannot honor commitments we made to our own people or to our partners."* — NPS, 20+ years



## Morale Is at a Breaking Point

Just 36.6% of respondents say crew morale is strong — while nearly the same share, 36.2%, disagreed or strongly disagreed with the statement that "morale of wildfire crews is strong."

Agency satisfaction is worse. Nearly half of all respondents (47.8%) are dissatisfied with their agency, against just 19.7% who are satisfied — a ratio of roughly 2.5 to 1. Trust in agency leadership, measured on a 0-10 scale, averages just 4.88. Complete distrust (score of 0) outnumbers complete trust (score of 10) by more than four to one.

The USFS drives much of this gap. USFS respondents are dramatically more dissatisfied (52.8%) than their DOI counterparts (32.1%), reporting notably lower average trust in leadership than their counterparts in other agencies (4.66 vs. 5.57). This disparity exists even though DOI units are more frequently understaffed — suggesting the USFS morale crisis has an institutional dimension beyond staffing alone.

> *"Distrust is at an all-time high, leading everyone to an every-person-for-themselves mentality."*  — USFS, 20+ years
>
> *"Cowardice from leadership — failing to meet the moment and instead taking the path of least resistance on every issue."* — USFS, 11-15 years
>
> *"I trust my district but I don't trust above that."* — BLM, 6-10 years

## Overtime Has Become the Foundation, Not the Exception

82% of respondents reported working more than 500 hours of overtime in the past year. Nearly one in four (24.1%) exceeded 1,000 hours — the equivalent of 25 additional full work weeks. This is not seasonal surge capacity; overtime is the financial and operational baseline on which the federal wildland fire system now runs.

Personnel describe an impossible choice: work unsustainable hours to make ends meet or leave. The top reason cited for considering departure was work-life balance and excessive overtime (67.2%), followed closely by pay (56.7%), and burnout (55.0%).



*Figure 2. Top reasons cited for considering leaving federal wildland fire (n = 607, up to 3 reasons selected).*

> *"The only thing keeping my family afloat is overtime."* — USFS, 20+ years
>
> *"The USFS continues to take an extremely skilled, dedicated workforce for granted and treat wildland firefighters as though we will always be able to accomplish our mission, no matter how under-equipped or poorly treated we are."* — USFS, 20+ years

## Retention Is Failing

74.4% of respondents — three out of four — have considered leaving federal wildland fire in the past 12 months. Just 25.6% say they are not considering leaving at all. Among those contemplating departure, 15.3% are actively job-searching, and 5.5% say they have already decided to leave or have left.

Only 11% of respondents would recommend a career in federal wildland fire without reservation. More than one in five (22.2%) would not recommend it at all.

The workforce that remains is experienced — 71.5% of respondents have six or more years of service. But experienced firefighters who leave are being replaced, when positions are filled at all, by personnel who have not had time to build equivalent expertise. Respondents frequently describe positions being filled out of necessity with personnel who lack the experience the role requires.





*Fig. 3. Agency satisfaction (n = 822)*    *Fig. 4. Attrition risk — consideration of leaving (n = 823)*

> *"There will be a significant exodus of talent, skill, and knowledge over the next few years as those who got their first career job in 2001 with the National Fire Plan retire when eligible."  — USFS, 20+ years*
>
> *"We don't have as many experienced qualified individuals as we used to because staying in fire doesn't make sense anymore. If you value time with your family, you have to leave." — USFS, 6-10 years*

## Bottom Line

This survey does not describe a workforce that has lost its commitment to the work or agencies that are beyond repair. It describes a workforce committed enough to stay — and to speak — while being systematically under-resourced. We want to make it clear: these numbers did not emerge overnight. They reflect years of deferred investment in pay, staffing, and workforce stability — pressures that have intensified over the past year as federal workforce reductions, agency reorganizations, and budget uncertainty have compounded long-standing structural problems on top of the climate crisis. The top drivers of attrition are compensation, workload, and institutional trust, all of which are within reach of policy action.

What the data makes clear is that the current trajectory — declining unit preparedness, expanding overtime dependency, deteriorating morale, and accelerating attrition — is not sustainable heading into the fire year that is already shaping up to be severe. The question is not *whether* action is needed. It is whether it will come before or after the workforce crisis becomes a public safety crisis.



## Methodology

As a voluntary survey conducted by an advocacy organization, we acknowledge these findings may be influenced by some degree of self-selection bias, potentially over-representing individuals with the strongest grievances or those seeking a rare outlet to voice their frustrations. Furthermore, this survey was fully anonymized to protect participants. While we are confident that the respondents spoke honestly, we recognize the inherent limitations of an anonymous survey. To ensure data integrity, the 825 final responses from 860 submissions were filtered through dual quality checks, including an attention filter and specific knowledge verification to confirm professional expertise. Acknowledging these limitations underscores our commitment to transparency and ensures this data is viewed not as an effort to chastise government agencies, but as a catalyst for working closely with leadership to encourage positive, sustainable change. Sample is majority USFS (75.1%) with meaningful representation across BLM, NPS, FWS, and BIA. Survey conducted by Grassroots Wildland Firefighters, 2026.

This memorandum contains aggregate data and anonymized short form responses only. To protect participant privacy, individual-level data is strictly confidential, as is any information that could be used to identify a specific respondent. Any requests for supplemental aggregate data must be submitted to the Grassroots Wildland Firefighters Board of Directors, where they are reviewed and approved on a case-by-case basis.