Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchishom@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*
[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DECLARATION OF ELLEN MEI** |

**DECLARATION OF ELLEN MEI**

I, Ellen Mei, declare as follows:

1.    I am over 18 years old and competent to give this declaration.  This declaration is based on my personal knowledge, information, and belief.

2.    I am a Lead Program Specialist at the Food and Nutrition Administration ("FNA") within the United States Department of Agriculture ("USDA").  I work in the Technology, Nutrition and Integrity branch of the SNAP division at FNA's Northeast Regional Office.  I have worked in this role for the past three years, and I have worked as a Program Specialist in SNAP since May 2020.

3.    I serve as President of Chapter 255 of the National Treasury Employees Union ("NTEU Chapter 255" or the "Union"), which represents USDA employees at the Northeast Regional Office ("Regional Office"), where I work, and in the Retail Operations and Compliance Office as well.

4.    The NTEU Chapter 255 bargaining unit at USDA represents Regional Office and Retail Operations and Compliance Office employees, and includes the following positions: Program Specialist, Senior Program Specialist, Lead Program Specialist, Grants Management Specialist, Lead Grant Management Specialist, Office Clerk, Administrative Support Specialist, Nutritionist, Data Analyst, and Statistician.

5.    Other non-bargaining unit staff work at the Regional Office, which includes the Branch Chiefs, Division Directors, Regional Administrator, Management Analysts, and SNAP Employee and Training Analyst.  The employees in this Regional Office are geographically located throughout the Northeast.  About half are in Boston, MA, and the rest are spread across New York, New Hampshire, Maine, Connecticut, and New Jersey. The Union's Retail Operations and Compliance Office employees are all in New York except one in Massachusetts.

6.    By virtue of my job duties and role at the Union, I am very familiar with the job functions and the organizational structure of both the Northeast Regional Office and the Retail Operations and Compliance Office.

7.     FNA administers sixteen different food and nutrition programs, including the Supplemental Nutrition Assistance Program ("SNAP") and Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC").  Northeast Regional Office employees work on program oversight for all sixteen programs across Maine, Vermont, New Hampshire, Massachusetts, Connecticut, Rhode Island, New York, and the U.S. Virgin Islands.  This includes providing technical assistance to states as the states implement federal legal and policy changes to these programs, performing reviews of states in the Northeast region to evaluate the management of the program, and reviewing state funding requests to ensure that money is transferred to and used by the states in accordance with approved funding allocations.

8.     In addition to the states listed, the Northeast Regional Office works with tribal nations – particularly for the Food Distribution Program on Indian Reservations – as well as school authorities and food banks – particularly for FNA's school meals programs.

9.     Retail Operations and Compliance Office employees process applications from retailers who want to accept SNAP and WIC benefits.  They also oversee the retailers to ensure consistent compliance with program requirements and investigate retailer fraud.

**USDA Reorganization and Relocation Plan**

10.     Currently, FNA has seven Regional Offices located in the Northeast, Midwest, Mid-Atlantic, Southeast, Southwest, Western, and Mountain Plains.

11.     On April 30, 2026, USDA publicly announced details of the Reorganization Plan for the Food and Nutrition Administration.  The USDA explained that its Reorganization Plan will eliminate the current regional structure and replace the seven regions with five "central program management and oversight" hubs.  These new "hub" locations will be in Dallas, TX, Denver, CO, Indianapolis, IN, Kansas City, MO, and Raleigh, NC.  The Indianapolis, Kansas City, and Raleigh locations are not currently regional office headquarters, and even for Denver and Dallas, the new locations will require substantial relocation of employees because they are not only cutting the headquarter office locations from seven to five, they are also requiring consolidation to these five offices rather than allowing FNA regional employees to work throughout the states in their regions as they currently do.

12. Additionally, under the Reorganization Plan, Retail Operations and Compliance Office employees, who are currently all remote, will need to relocate to within commuting distance of a "regional operations and program support" hub, which will be in Atlanta, GA, Dallas, TX, Los Angeles, CA, and New York, NY.

13. On June 22, 2026, USDA told the Union that USDA wants the relocations to be implemented by August 1, 2026.

14. FNA describes its new hubs as programmatic hubs, such that National Office staff working on SNAP will be relocated to Indianapolis, Child Nutrition Programs to Dallas, Supplemental Nutrition and Safety Programs (including WIC) to Kansas City, research programs to Raleigh, and Emergency Management and Continuity of Operations to Denver.

15. But FNA is not requiring Regional Office employees to relocate based on their program or type of work. USDA has instructed that Regional Office employees must relocate to within commuting distance of one of these hubs, but that they may choose the hub irrespective of their program or type of work. Accordingly, there will not actually be a unification of program area staff within those hubs.

16. To my understanding, FNA's restructuring to "hubs" will require the relocations of hundreds of USDA employees, including myself. None of the new "hubs" is located anywhere in New England, or within any of the states that the Northeast Regional Office currently serves.

17. Additionally, the rationales articulated by FNA for these locations do not make sense. For instance, FNA has publicly stated that it chose Kansas City as a hub due to its proximity to warehouses used for the food distribution programs.[1] But a member of the Union who works in Food Distribution informed me that FNA stopped contracting with the warehouse in Kansas City two years ago.

18. Instead, the relocations will just move staff further from their stakeholders. According to a chart of the "FNA Hub and State Assignments" on the FNA's website,[2] most of the

---

[1] *Reorganization: Frequently Asked Questions–How did you choose the hubs?*, Food and Nutrition Administration, https://www.fna.usda.gov/about/reorganization (last accessed June 28, 2026).
[2] *Reorganization*, Food and Nutrition Administration, https://www.fna.usda.gov/about/reorganization (last accessed June 28, 2026).

states currently in the Northeast Region – Maine, Vermont, New Hampshire, Massachusetts, Rhode Island, the United States Virgin Islands, and Connecticut – will be considered a part of the new Raleigh, North Carolina "hub." The last state, New York, will be considered a part of the new Indianapolis, Indiana "hub." It remains unclear exactly what that will entail.

19.    As an employee of the Northeast Regional Office, I live among the people I serve: the recipients of the public assistance benefits that we administer and the state agencies who give the benefits out. I live close enough to the people of New England and New York (being just a three hours drive away from even the state agency offices of Maine, New Hampshire, and upstate New York), that I can visit all of those state offices easily and make it back home that same night.

20.    The state partners who I work with to administer SNAP rely on the close contact we have with their offices to ensure that they remain in compliance with our regulations, bring down their payment error rates, and modernize their eligibility systems. In other words, they rely on us being a quick office visit or phone call away to make sure we can work together to reduce fraud, waste, and abuse. Especially now that Congress has passed new rules in the One Big, Beautiful Bill (*e.g.*, changing eligibility requirements for immigrant groups and parents, extending work requirements for certain able-bodied adults), our state partners are asking us FNA employees more questions than ever about how to implement the new rules.

21.    USDA claims that any state will be able to call into any "hub" and get answers, but that reflects a fundamental misunderstanding about how states work with program staff in the Regional Offices. States are very specific in how they administer these sixteen federal programs, and the staff in my Regional Office have spent years learning those idiosyncrasies. For instance, I have spent many years working with New York, Vermont, and the United States Virgin Islands, and I have unique knowledge about how the states' and territory's SNAP program runs that an employee currently working on SNAP in a different regional office (such as an employee in the current Chicago office who may relocate to the Indianapolis office that will supposedly be a SNAP "hub") does not have. USDA's view of a call center model does not remotely match the reality of the expertise needed to adequately address a state's needs. This mismatch will

inevitably lead to mistakes, problems, and delays in service to recipients of the public assistance benefits that we administer and the state agencies who give the benefits out.

22.    Moreover, reducing the number of regions and making it more difficult to reach all of our States will decrease FNA efficiency.  Traveling to state offices, where we can talk to state officials who implement our policies and meet directly with eligibility workers who enforce our program rules, is essential to maintaining the integrity of our programs.  For instance, when Regional Office staff conduct management evaluations of programs, it is best practice to be in-person at state offices.  Reducing the regions from seven to five and moving FNA employees away from states they service drastically increases the number of miles needed to travel from the "hubs" to the states, which will make it harder for FNA employees to visit states and build the necessary connections with state staff.

23.    It will be significantly more expensive to travel from Raleigh or Indianapolis, or any other hub, to perform work in any of the Northeast states, as compared to the current low travel costs from where our employees are located in Massachusetts, New York, and other northeast states.  Travel to those states will either be eliminated (interfering with services to the recipients of the public assistance benefits that we administer and the state agencies who give the benefits out) or greatly decreased (again, interfering with services to recipients of the public assistance benefits that we administer and the state agencies who give the benefits out.).

24.    FNA refuses to tell our Union whether it performed a cost-benefit analysis of the relocation.

**Relocation Requirements Will Yield High Attrition**

25.    In May 2026, after FNA had publicly announced its planned reorganization on April 30, NTEU Chapter 226 created a survey for current FNA employees, including Regional Office and Retail Operations and Compliance Office employees.  I helped to disseminate this survey to the members of the Chapter 255 bargaining unit.

26.    The results of the survey show that the proposed reorganization will trigger a mass departure of experienced staff.  According to the survey, 81% of all FNA respondents (including bargaining and non-bargaining employees at regional offices, National Office, and Retail

Operations and Compliance Office) are not likely to relocate. And 78% of the Northeast Regional Office respondents are not likely to relocate.

27. From knowing our Chapter, I know that the majority of the workers who are under the age of 45 or 50 will be leaving the agency. This is because a lot of these individuals have young children and have spouses with independent jobs that do not make relocation feasible.

28. USDA's mission relies heavily on employees with decades of policy, program, and research expertise. In my experience, the employees most likely to leave rather than move are long-tenured staff with deep program knowledge, critical relationships with local communities, and specialized expertise which will disrupt continuity and efficiency. The predictable result of requiring employees who have established families, homes, and support networks throughout the Northeast to either relocate or leave the agency will be a loss of experienced staff, and thus a weakening of USDA's institutional capacity for years to come.

29. Across the Northeast Regional Office, the loss of staff precipitated by the reorganization will cause projects to stall. Since January 2025, we have already lost half of our workforce through the deferred resignation program and earlier than planned retirements. Across our program divisions, we have ten branches (for example, I am part of the Technology, Nutrition and Integrity branch of SNAP). Due to the staffing losses caused by the administration's DRP, VERA, and VSIP programs, five branches are already working with a skeleton crew, working with two or fewer people left, not including managers. That unprecedented reduction in staffing has already strained our ability to meet mission requirements. The foreseeable attrition that will result from the Reorganization Plan's implementation will further deplete the branches, to the point that continued program work is untenable.

30. From conversations I have had with FNA staff, I know the Reorganization will mean that eight of the branches will lose the majority or all their remaining staff because employees will choose to leave federal service rather than relocate. For the other two branches, the majority of the employees remain uncertain whether they would relocate.

31. Based on conversations in our Union about who will not relocate, I know, for example, that branches where employees are primarily working with children or food banks will

lose the majority or all of their staff. This means losing the expertise of their staff along with relationships the staff built with school agencies, food banks, tribal nations, and school districts.

32. The federal hiring process is slow. When I was hired, I was already part of the competitive service from serving in the Peace Corps, and it took two months from applying to the job posting to my start date. It is not nearly that fast for most people. I have colleagues for whom it took significantly longer. It was pretty standard for it to take four to six months for them to be offered the job.

33. If there is no one in a branch for four to six months, any questions that states ask us will go into a void. Questions that would normally be a phone call away or only a week's worth of research on past practice will take so much longer because the entire trail of knowledge will have to be recreated. This lack of coverage will inevitably lead to mistakes, problems, and delays in service to recipients of the public assistance benefits that we administer and the state agencies who give the benefits out.

34. If or when a replacement is hired, it will take two years to train a Program Specialist. That is two years of learning about, for example, how a school's program operates or the specifics of a state's system, as well as rebuilding trust with the food banks, schools, and state agencies that administer our programs.

35. It will take even longer than two years for a new Program Specialist to earn the state's trust. A lot of the work regional staff does to oversee states' implementation of the federal programs relies on the ability to identify problems with a state's program and work with the state to change. Without trust, states are not forthcoming about their problems and resistant to change, which impedes our ability to do our oversight and assistance work.

36. The loss of staff and the disruptions to the current regional system will cause projects to halt or get rolled out without adequate safeguards. For instance, I have been working with one of our states on building out a new SNAP eligibility system. I and another colleague have been meeting with them biweekly, working with them to move through contracting, vendor requirements, and compliance. With our years of experience and the trust we have built with the state, we are able to ensure that the new system is able to handle fringe cases and that the systems'

technical requirements and design accurately reflect federal regulations, and we already have the understanding (built over years of experience) of how their state specific policies relate to federal requirements.

37.    For this new system, testing and approval by our office is set to occur starting next year.  These approval processes are crucial.  I know this because a state that implemented its program without successfully going through our process incorrectly caused thousands of beneficiaries to lose access to SNAP and caused thousands of other beneficiaries to be overpaid (an estimated $36 million in overpayments).  If both myself and the other colleague who have long been on the project choose to leave FNA rather than relocate, the progress we have made will be lost and the state will not be able to get sufficient testing and approval before it rolls out the new system – thereby threatening a similar massive loss of SNAP access or massive overpayment of SNAP benefits.

38.    It is highly unlikely that I relocate to one of the new hubs.  I am geographically constrained to the Massachusetts area given my fiancé's job.  If I were to have to relocate, they would have to quit their job, which is not a professional choice we want our family to make.  We also own the condo in which we live, so moving would require selling our home, another financial and life choice that we do not want to make.  I am not the only one who faces these challenges.  I have had many conversations with other NTEU Chapter 255 members who describe the same difficulties and others.  For example, multiple bargaining unit members have told me about how they are responsible for the medical care of other family members, sometimes aging parents and other times spouses.  They have shared how difficult it was to get connected to medical providers in Massachusetts, how disruptive or impossible it would be to move their loved ones to a new location, and why that makes them very unlikely to relocate to a new "hub."  Others have described the financial impact that they would suffer if they relocated and were forced to sell their homes, abandoning extremely low interest rates on their mortgage, which makes them unlikely to relocate out of their commuting area.  Like me, many NTEU Chapter 255 bargaining unit members have partners with professions that tie them to the communities in which they currently live, which makes relocation not an option for their family.

39. The impacts of the attrition caused by the reorganization will be felt across FNA's programs. Although I work on SNAP, my colleagues in the Union have shared similar impacts for their programs. For example, one colleague works directly with food producers and operators of The Emergency Food Assistance Program ("TEFAP") program, which distributes nutritious foods purchased from American farmers to people with low incomes. Because of the trust and the relationships their team built with partners in the states and food producers, they can maximize the TEFAP program and have little to no loss of food. Because the team is immediately available when there is a Section 32 bonus offering (a federal initiative under Sec. 32 of a 1935 Act authorizing certain agricultural commodity purchases at times with low prices), the team is able to maximally utilize those offerings, which not only supports families in need but also supports American agriculture and farmers who have surplus food. The Reorganization will likely result in significant attrition to that team. A predictable outcome of the Reorganization is that the team will lose their experienced staff and entrenched relationships, which will mean losing that up-to-the-minute open communication and institutional knowledge that allows FNA to maximize Section 32 bonuses. It will result in fewer offerings utilized, meaning fewer trucks distributing food to the states and fewer commodities sold by farmers.

40. Last fall, USDA held a public comment period with respect to its general announcement of an intent to reorganize the Department. Although NTEU Chapter 255 had not yet been provided the additional details about the reorganization that were announced this spring, the Union submitted a comment explaining how a reorganization would have serious and lasting consequences for program delivery, employees, and the farmers whose products we get to consumers and the rural and urban communities we serve. The Union explained that since January 2025, we had already lost half of our workforce, so if the remaining employees are forced to relocate — or resign — due to a reorganization, communities will face even further delays, disruptions, and diminished program delivery. This will directly harm families, farmers, and local economies that depend on FNA to get farm fresh food into schools, ensure seniors and low income people can buy fresh produce and dairy at farmers markets, and feed expecting mothers and

newborns. The agency did not respond or otherwise address our concerns, and proceeded to implement the reorganization anyway.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed June 29, 2026, in Boston, Massachusetts.

Ellen Mei