Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*
[Additional counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br><br> **DECLARATION OF DR. PATRICIA MILLNER** |

## DECLARATION OF DR. PATRICIA MILLNER

I, Patricia Millner, Ph.D., declare as follows:

1. I am over 18 years old and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I hold a bachelor's degree in Microbiology from the University of Maryland-College Park, a Master's Degree in Botany from the University of Maryland-College Park, and a Ph.D. in Marine, Estuarine, and Environmental Science from University of Maryland-College Park. For the last 56 years, I have dedicated my life to scientific research at the U.S. Department of Agriculture–Agricultural Research Service (USDA-ARS). For about 40 of those years, I have worked as a Research Microbiologist at the Beltsville Agricultural Research Center (BARC) in Beltsville, Maryland. About 60% of my time is spent in the Environmental Microbial and Food Safety Laboratory (EMFSL) focusing on food safety research while the other 40% of my time is working with the Sustainable Agricultural Systems Laboratory developing more sustainable and effective management of agricultural production processes addressing soil health, biocontrol of plant diseases, and pre- and post-harvest food safety practices focusing on preventing pathogen contamination of large and small-farm operations producing/marketing fresh produce from a variety of  different types of open fields and controlled environment agricultural systems.

3. In addition, along with a team of scientists from BARC and University of Maryland-College Park and University of Maryland Eastern Shore, I also am working on evaluating the benefits of a novel, sustainable broiler (chicken) production practice in collaboration with a team of people and institutions, including a foremost USA commercial poultry integrator/processor/exporter whose enterprise would benefit if this new production practice is a success. This research effort is in progress and is especially well suited to this region (known as the DelMarVa or Delaware, Maryland, Virginia region) because of the types of farming systems, markets, and scientific expertise available at BARC. This project requires frequent on-farm visits by staff for sample collection and sensor instrument functioning. These projects are planned and approved to be conducted by a team with the necessary training, expertise, and analytical equipment to accomplish the goals, as is the case for many projects at BARC. Teams of scientists

1

and support staff with the experience, expertise, and equipment from more than one science discipline are typically needed when dealing with on-farm projects. The reason for this is that no two farms are alike; physical conditions (soil, water, air, layout, equipment) vary widely and need to be taken into account for analysis of results in most studies.

***BARC's Important Role and Value to American Food Safety***

4. It is important to give context on some of my recent research to illustrate the stakes of BARC's work and its relationship to food safety and food supply in the United States.

5. For the last several years, my colleagues and I have been working on developing better sanitizing treatment solutions for produce, especially leafy greens like lettuce and spinach as well as apples and tomatoes. These sanitizing solutions are vital to the food supply because they are the main line of defense against hazardous and potentially deadly pathogens like *E. coli*, *Salmonella*, and *Listeria* from spreading from the grocery store shelves to the American consumer's dinner table.

6. Millions of pounds of commodities (vegetables, fruit, other fresh produce grown on farms) pass through sanitation systems before being packaged and transported to consumer-facing stores, and those systems must be fine-tuned to target and wash away or be treated to inactivate each of these types of pathogens as they pass through various conveyances and packaging systems. Different types of commodities are at risk of exposure to different types of pathogens. Many crops, for example, are grown in the open fields where wildlife can leave contaminants on the produce. Much of our research has focused on improving food sanitation systems so that they are better equipped to target the wide variety of incoming pathogens depending on which commodity is being handled. For example, following deadly outbreaks of *E. coli*, we successfully developed an additive that stabilizes the wash solution sanitizer used by commercial processors during flume washing of cut, raw leafy greens thereby improving sanitizer efficacy in the cleaning/packaging of raw leafy greens destined for grocery stores.

7. One cutting-edge issue that the labs at BARC are currently contending with is leveraging new applications of technology to identify and prevent pathogen development in produce that travels on trucks across the country. When produce sits on trucks taking commodities

from Florida across the country or from California over the Rocky Mountains to the East Coast, there is a risk of pathogen development even though that travel happens over only a few days in refrigerated containers. With millions of pounds being sanitized and shipped nationwide, identifying and preventing contamination is like trying to find a needle in a haystack. The food safety group at EMFSL includes engineers who are developing hyperspectral imaging technologies to detect contaminants during food safety inspections to ensure these latent-developing pathogens are caught before crops like lettuce, tomatoes, or apples get packaged and trucked across the country to land on grocery store shelves.

***BARC's Scientists Were Not Consulted Before USDA Announced BARC's Closure***

8.      BARC's researchers and staff are a small community that continuously consults informally across BARC's 17 Laboratories to share information, expertise, and analytical equipment; and work collaboratively to solve analytical issues that develop during experiments, so project investigators confer with experts from sister laboratories to address analytical issues with experts who have the equipment and expertise required to address an issue. For the past 18 months, the scientific community at BARC has struggled to obtain information from USDA about its consideration of BARC's operations or its future. BARC employees have continued to speak with one another during this time in order to compare information and share with each other what we know. In the absence of clear, timely information from USDA leadership, it is the best we can do.

9.      Given the public health and safety impacts of BARC's work, as well as the monetary value of BARC's work for private firms across the American agricultural sector, I would have expected USDA leadership would consult with BARC's scientists in advance of deciding to end BARC's operations. My expectation was incorrect.

10.      USDA announced its intent to decommission BARC in July 2025.[1] At that time, USDA's Secretary Memorandum said that BARC would be "vacated over multiple years to avoid

---

[1] U.S. Dep't of Agric., *Secretary Rollins Announces USDA Reorganization, Restoring the Department's Core Mission of Supporting American Agriculture* [Press Release] (July 24, 2025), https://perma.cc/9PEV-RJ4G.

disruption of critical USDA research activities."[2] I am not aware of any consultation with the research staff at BARC before USDA leadership announced that it intended to close the site.

11.     In April 2026, USDA publicly announced that it would proceed with closing BARC as a part of a reorganization affecting the whole Research, Education, and Economics (REE) mission area. USDA's press release announcing that reorganization says that USDA "has thoughtfully considered many ARS sites to determine the best ARS locations to assume [BARC's] work."[3] But between July 2025 and April 2026, I am not aware of any information gathering about either of the two labs in which I do work about what equipment, physical spaces, field space, staff support, or other resources my labs would need to do their work at a new location in order to inform USDA's April 2026 announcement.

12.     In early May, 2026, BARC workers were told for the first time at a BARC all-staff call that USDA plans for all BARC labs to be shut down before the end of September 2026. USDA has not made any commitment to keeping all BARC research projects active; only some scientists have been told that they can expect their projects to continue with funding.

13.     This afternoon, I received a Management Directed Reassignment notice telling me that I have 30 days to decide whether I will move to Wyndmoor, Pennsylvania, or whether I will resign. Some of my colleagues received Management Directed Reassignment notices specifying the same location, while others are being sent to California and Iowa. As a result, the team is not being kept together, and is instead being spread across multiple states. Further, I am not confident that all of my colleagues will be able to make the move due to personal circumstances. So while we now know what locations our team would go to if they decided to relocate, I do not know who in fact will be able to go.

14.     It is extraordinarily difficult to deliberate whether or not I will relocate, especially when I know that our team is not being kept together, and I am uncertain whether the new location

---

[2] U.S. Dep't of Argic, Secretary's Memorandum No. SM 1078-015, Department of Agriculture Reorganization Plan, at 3, July 24, 2025, https://perma.cc/K8AR-YKVM.

[3] U.S. Dep't of Argic, *REE Organization Restructuring*, (last visited June 29, 2026), https://perma.cc/FCR8-9859.

4

will be equipped to support the work that I do. I have devoted my life to my work, and continuing it means the world to me. But my family is here in Maryland, and I have lived here for my entire life. Whether or not to uproot my life is a daunting and painful decision, and it is all the more difficult to consider when it does not appear that the relocation is being guided by a desire to set us up for success. My team is being fragmented, and I do not see how hiring additional people to replace the ones we're losing is a realistic option—both because it's hard for me to believe that ARS will authorize hiring, and because even if we could, the turmoil from this reorganization will make it exceptionally difficult to recruit scientific talent. In addition, I do not have all of the facts regarding whether the new research location in Pennsylvania will be equipped to allow me to actually succeed in continuing my research and on-farm collaboration work. In the best-case scenario, I think this relocation will severely damage my lab's capacity and productivity for years. In the worst-case scenario, the damage could be permanent.

***USDA Has Not Properly Thought Through Its Plan***

15.     Because USDA did not consult BARC's scientists about crucial factors ahead of making its decision to shutter BARC, as far as I am aware, I do not understand how USDA could have considered any of the information necessary to determine whether research can continue in new locations. USDA leadership's contacts with staff since the closure announcement suggest to me that they have not invested necessary time or energy into understanding what it would take logistically and financially to move and split up BARC's operations among other locations across the country.

16.     There are myriad factors that bear on whether a research project can be moved—at all, let alone over a short period of time. I understand that USDA accepted public comments in response to its July 2025 Secretary Memorandum. But that Memorandum said that BARC would be vacated over the course of years, suggesting that the process had the potential to be orderly and considered. The May 2026 announcement that we would all need to be moved out of BARC and relocated in new places by September 30, 2026 came as a shock. If I had been able to speak with USDA leadership about the specific needs of my lab and my research projects, I would have explained several factors that are crucial to consider in planning and executing a relocation—at

least one in which research projects are intended to survive the move.

17.    *Equipment and samples*: My laboratories rely on expensive, sensitive, highly specialized equipment in order for our research teams to do their work. Some of this equipment costs tens to hundreds of thousands of dollars to purchase in the first place, and must be very carefully maintained in order to avoid voiding the equipment's warrantees. Moving these machines poses significant logistical and financial risks: Three years ago, we had to move a sequencer, which cost approximately $100,000 when it was purchased, only 1.3 miles from Building 173 to Building 307 on BARC's campus. It cost $50,000 to move the sequencer 1.3 miles without voiding its warrantee. I do not know how much more it would cost to move the sequencer today, much less move it hundreds or thousands of miles to a new location. And I am not aware of USDA contacting anyone at BARC to figure out how much it would cost to move that sequencer or any of the other equipment BARC's facilities currently utilize. If this administration plans to move multiple sequencers across thousands of miles, not only would that likely be quite costly but also the machines could break and lose their warranty to be fixed.

18.    If USDA's plan is to move us to research facilities that already have some of the equipment we use, they do not seem to have accounted for the fact that the preexisting equipment is already in use. It can take days for a sample to be analyzed by this equipment, and often laboratories tightly schedule their testing timelines in order to maximize the amount of analysis the equipment runs. One cannot simply shoehorn an entire laboratory's work into an existing schedule for equipment that's already spoken for—there are only so many hours in a day. In short, moving us to facilities that have at least some of the equipment we currently use, without adding additional equipment to account for the increased research at that location, will still damage our ability to carry out our research mission. It will also likely damage the efficacy of the researchers whose space we are moved into.

19.    Finally, there are certain pieces of equipment that do not exist anywhere outside of BARC. Some BARC engineers conduct work so specific that they are not served sufficiently by any of the equipment available on the market. As a result, they have developed their own. But I am not aware of any plan to move that equipment, or any consideration of how much that would cost.

MILLNER DECLARATION, NO. 3:25-CV-03698-SI

20.     Another issue that no one from USDA has seemed to consider: The transport of samples that require storage in -80-degree Celsius freezers. These cultures are very important to our research and can result from years upon years of sampling. They are not replaceable if they are damaged or destroyed due to poor transport. And yet, USDA has not provided any information about any plans to preserve, maintain, or transport these collections. I do not know of any reason to believe they have considered it.

21.     *Physical infrastructure*: My research relies on access to fields, greenhouses, and laboratory space. And within my laboratory space, I have access to two growth chambers and multiple greenhouses that we use to conduct our research. These physical features are uncommon among Agricultural Research Service locations; I am not aware of any other ARS location that provides the same number of greenhouses and growth chambers that I currently utilize in my work.

22.     Even if other locations have a growth chamber (again, I use two) or a greenhouse (we use multiple), and need field sites as well, those facilities are likely already spoken for. No one has engaged me in any conversation about what alternative location possesses the same infrastructure that I use now. And if my work is moved into a facility that has a diminished physical infrastructure that is already in use, I do not know how my laboratories' operations will fit. This is not just an issue of cramped working space; fields that have been planted are already full. If new scientists are just injected into the established workflow of other labs, cross contamination of samples becomes huge concern because is almost impossible to prevent cross contamination if multiple labs doing different research are crammed into one lab using the same equipment at the same time.

23.     Finally, if USDA's intent is to try to replicate BARC's conditions for those of us whose research is moving, I do not understand where we will get funds to build new greenhouses, lease or purchase new fields, or purchase new growth chambers.

24.     *Existing requirements under contracts, cooperative agreements, or similar agreements*: Our team has a lengthy history of excellent collaborations with local partners like the University of Maryland and Maryland farmers. At present, I am one of several scientists who are engaged in ongoing collaboration with the University of Maryland (UMD) and other local research

7

partners. The scope of my research collaboration includes physical, field-based experimentation that is located in Maryland. Even if I am physically moved to Pennsylvania, that field-based experimentation cannot move because UMD is not going to move with me. The cooperative agreement BARC entered with UMD contemplates physical collaboration in Maryland, and I do not know how we will honor our obligations under the agreement if I am physically located elsewhere. I am confident that no one at USDA considered BARC's obligations under that agreement, or any of the others BARC has with local research partners: After the announcement of BARC's closure, a member of USDA leadership came to speak with staff. I asked that person how I was supposed to uphold the requirements of our agreement if my lab was moved elsewhere. He responded with a laugh and said he guessed that I was going to be doing a lot of travel. It was evident to me from this response that he had not considered existing agreements and long-term studies being conducted with local partners before that moment when I questioned him.

25. *Cost*: Because USDA did not consult with its scientists before deciding to shutter BARC, I do not see how USDA could have considered the costs involved in moving even some of BARC's research to other locations. Whether it is the cost involved in moving equipment, preserving and moving samples, or potentially building out the physical capacity of other locations, I do not understand how BARC's research could be packed up and moved without millions of dollars in expenditure. But, I do not see how USDA could have factored those costs in, because it never asked those of us who would have informed leadership about those costs before USDA announced BARC's closure.

**BARC's Unique Advantages Cannot be Replicated Under the Relocation Plan**

26. Appropriate space and equipment are necessary for my lab to do its work, but they are not sufficiently taking into consideration what the space is needed to the research projects that I do. BARC's greatest asset is the depth and breadth of talent and experience that is consolidated on a single campus, where researchers can collaborate and cross-pollinate work within and across labs. Even for researchers who USDA is willing to move, relocation is going to fragment these teams because USDA is sending personnel to different locations; I do not foresee that the full staff of entire labs will be able to move to whatever locations are designated. My lab, the EMFSL, is the

only one of its kind in the country: EMFSL scientists bring a variety of disciplines to our work, including parasitology, molecular biology, bacteriology, animal science, soil science, hydrology, spectroscopy, spectral imaging, and engineering—all working in synergy in a space tailored to our needs in order to better protect Americans from foodborne pathogens. Now that Management Directed Reassignment notices have gone out, we can see that USDA is not even trying to keep us all together. And for those of us who are being sent to the same location in Pennsylvania, I cannot imagine that everyone will be able to uproot their lives and families in order to relocate. Keeping a working, highly productive team together for a relocation would have required a significantly greater amount of planning and consultation with those scientists involved in such a move in order to preserve the essential elements and personnel needed to accomplish the mission research. None of that has happened here, and EMFSL as we know it is being broken apart.

27.     BARC's physical location also provides unique advantages that cannot be replicated elsewhere. From Beltsville, we have access to a great diversity of topography, from mountain ranges, to farmland, riverways, and the Chesapeake Bay, all of which create unique environments and soil types that we leverage in the experiments that we do at BARC, including in the Sustainable Agriculture Systems Lab where I work. BARC's location is also unique in terms of its human-driven environment: While Beltsville's land is fertile and exposed to true seasonal changes, which provides great utility to agricultural research, it is not crowded by nearby commercial agricultural operations, which allows us to conduct our experiments with low risk of contamination from neighboring agricultural work. The BARC property has 7 different soil types which is a unique feature when considering long-term field cropping system studies that are being conducted within the nationwide LTAR (Long-Term Agricultural Research) mission project, which was designed to test a large range of agricultural practices across multiple locations throughout the nation, precisely because different regions have different environments, including different soils and climates that support different crops. Those differences are why there aren't orange farmers in North Dakota; they're in Florida. The inclusion of LTAR sites at BARC and on the Eastern Shore of Maryland are part of this long-term national study. But to my knowledge, none of this was considered in this relocation plan. The reason I believe it was not considered is because, as far as I

am aware, no one at USDA asked anyone in my lab whether abandoning the BARC and Eastern Shore sites would affect that project, or why.

28.    Again, these are all characteristics that I would have gladly articulated to USDA if anyone had asked me or my colleagues whether shuttering BARC was logistically feasible, or how its closure would impact the research that is ongoing. As far as I am aware, USDA leadership has made no attempt to understand the damage that shuttering BARC between now and the end of September will have on the laboratories we have built, the research mission teams we have assembled, or the food safety and sustainable agriculture mission research we conduct.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed June 29, 2026, in Burtonsville, Maryland.

_Patricia D. Millner_

_____

Patricia Millner, Ph.D.