Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
sleyton@altber.com
dleonard@altber.com
bchishom@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*
[Additional Counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **DECLARATION OF AMY ROSENTHAL** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**DECLARATION OF AMY ROSENTHAL**

I, Amy Rosenthal, declare as follows:

1.    I am over 18 years old and competent to give this declaration.  This declaration is based on my personal knowledge, information, and belief.

2.    I am a Social Science Research Analyst at the Food and Nutrition Administration ("FNA") within the United States Department of Agriculture ("USDA").  I have worked in this role for the past six years.

3.    I also serve as President of Chapter 226 of the National Treasury Employees Union ("NTEU Chapter 226," or the "Union").  Prior to serving as President, I served as the Chapter's Secretary, and prior to that, I served as a Steward.  By virtue of my job duties, I am very familiar with the job functions of the bargaining unit employees within Chapter 226, and the organizational structure of FNA.

4.    Currently, FNA is divided between a National Office, seven Regional Offices (Northeast, Midwest, Mid-Atlantic, Southeast, Southwest, Western, and Mountain Plains), and the Retailer Operations and Compliance Office.  NTEU Chapter 226 currently represents approximately 329 National Office staff members and 22 Retailer Operations and Compliance Office employees.  The workers NTEU Chapter 226 represents include Research Analysts, Program Analysts, Budget Analysts, Management Analysts, IT Project Managers, Public Affairs Specialists, Accountants, Nutritionists, and Senior Technical Advisors, among others.

5.    Most of the National Office employees currently reside near Northern Virginia and work out of the current Headquarters building on Braddock Place in Alexandria, Virginia.  Some of the employees, however, were hired remotely and now report to nearby regional offices or other USDA offices under the department's return to office policy.  The National Office and the Alexandria Office also include non-bargaining unit employees in supervisory positions including Senior Technical Advisors, Branch Chiefs, Directors, and Associate Administrators, among others.

6.    FNA has responsibility for sixteen different Congressionally authorized nutrition assistance programs, which seek to reduce hunger, increase food security, and boost access to

1

healthy, safe, and affordable foods.  These programs are generally divided into three operational areas at FNA:

  a. Supplemental Nutrition Assistance

    ● Supplemental Nutrition Assistance Program ("SNAP")

    ● Disaster Assistance

    ● Nutrition Assistance Program for Territories

  b. Supplemental Nutrition and Safety

    ● Special Supplemental Nutrition Program for Women, Infants, and Children ("WIC")

    ● WIC Farmers' Market Nutrition Program

    ● Senior Farmers' Market Nutrition Program

    ● Commodity Supplemental Food Program

    ● The Emergency Food Assistance Program

    ● Food Distribution Program on Indian Reservations

  c. Child Nutrition

    ● National School Lunch Program

    ● School Breakfast Program

    ● Child and Adult Care Food Program

    ● Fresh Fruit and Vegetable Program

    ● Special Milk Program

    ● Summer Food Service Program

    ● Summer EBT

7. Most employees in the National Office are devoted to policy and programmatic work on one of these sixteen programs.  Their work ensures the legal and effective implementation of the programs, from overseeing the transfer of funding to states and program operators, to performing regulatory work related to the program, to providing accountability to minimize fraud, waste and abuse.  For instance, many National Office staff for these programs work on rulemakings, guidance documents, policy decisions, and annual funding determinations for each

ROSENTHAL DECLARATION, NO. 3:25-CV-03698-SI

of the programs. The regional office staff are in the most direct contact with our state, territory, and tribe stakeholders, but when the regional offices have questions, they reach out to the National Office.

8. The National Office also includes employees in the Center for Nutrition Policy and Promotion, which is a subcomponent of FNA that works with the Department of Health and Human Services to produce the dietary guidelines for Americans every five years. There are also National Office employees who work on communications, human resources, facilities, financial management, and procurement. And there are employees, like myself, who work in the Office of Evidence, Analysis and Regulatory Affairs, which supports the work my colleagues are doing on FNA's programs by doing detailed research and in-depth data analysis to evaluate programs and provide information about them, as a matter of course and in response to specific questions, regulations, or legislation.

9. The Office of Evidence, Analysis and Regulatory Affairs responds directly to Congressional inquiries – including producing Congressionally mandated reports – in addition to providing quality information to the general public. I have worked on many such reports. For instance, as part of the 2021 appropriations, Congress requested that USDA create a report on added sugars in food served in public schools. H. Rept. 116-446, at 69 (July 13, 2020). I utilized previously collected FNA data, analyzed it, and produced a report that was subsequently submitted to Congress on July 14, 2022. The research also subsequently contributed to a USDA rulemaking limiting sugars in food served in schools.

10. For that Congressionally requested report, I specifically relied on data from FNA's flagship School Nutrition and Meal Cost Study, which my office orchestrates every few years to collect details of foods served to students in schools, along with a large amount of other information about the operation of the school meals programs.

11. Additionally, National Office employees in the Office of Evidence, Analysis and Regulatory Affairs produce many Congressionally required reports evaluating programs and pilot projects funded by Congress. For instance, the Healthy Hunger-Free Kids Act of 2010, Pub. L. 111-296, created a program that allowed schools to certify students for free and reduced meals

ROSENTHAL DECLARATION, NO. 3:25-CV-03698-SI

using information about their eligibility for Medicaid.  I worked on multiple evaluations of this program in order to satisfy USDA's evaluation reporting requirements under the Act.  I have also worked on three iterations of reports to fulfill reporting requirements related to the Farm to School Program (42 U.S.C. §1769(g)).

12.    My office also produces data for use in Congressionally mandated reporting led by other National Office staff.  For example, for the last six years, I have managed the fourth iteration of the Access, Participation, Eligibility, and Certification Study, which produces estimates of the rates of improper payments in the National School Lunch Program and School Breakfast Program, used for reporting required under the Payment Integrity Information Act of 2019, Pub. L. 116-117, and handled by the Child Nutrition Program staff.  The National School Lunch Program provides nutritionally balanced, free or low-cost lunches to children every school day, and the School Breakfast Program provides reimbursement for state-run and locally operated nonprofit breakfast programs in schools and residential childcare institutions.

13.    Many FNA employees train for years and have specialized expertise in FNA programs, nutrition research, quality control, financial management, and more.  I have a Ph.D. in Public Policy and Planning, with a focus on food policy and the National School Lunch program. It generally takes at least two years for newly hired FNA National Office employees to be trained to successfully do their full job function.  Currently, the average tenure of the FNA National Office staff is over a decade of service with the federal government.  FNA has long been an extremely lean organization, with 1,800 employees as of January 2025 managing over $160 billion annually in taxpayer dollars for essential public services.

14.    Due to the deferred resignation program, voluntary early retirement, and threats of reduction in force, FNA has already lost approximately a third of its entire workforce since January 2025.  As of May 2, 2026, FNA as a whole had less than 1,200 employees.

**FNA Reorganization**

15.    In July 2025, Secretary of Agriculture Brooke Rollins issued a memorandum entitled, "Department of Agriculture Reorganization Plan."  The announcement offered limited information about FNA, other than to state that FNA would "reduce its number of regions from

seven to five and align locations with the USDA Hubs and Service Centers," and that the current FNA Headquarters building in Alexandria, VA, would be "vacated."[1]

16.    In early 2026, we learned through press reports that USDA was announcing the disposal of buildings in the National Capital Region, including the Braddock Place office out of which National Office employees work.[2]  FNA management subsequently told our Union that the building will be relinquished to GSA by the end of the 2026 fiscal year (September), even though publicly available documents show that the current lease with GSA lasts through 2034.

17.    USDA announced its intention to begin implementing its Reorganization Plan in late April 2026.  Although USDA provided a little more information about the reorganization at that time, USDA has largely held off on providing specific notice to employees and offices regarding how they will be affected.

18.    On April 30, 2026, USDA released a press advisory about FNA that announced "a reorganization and relocation, all to move program leadership and staff from Washington, D.C. to hub and program compliance locations across the U.S."[3]  At approximately the same time, FNA employees received an email from the Acting Administrator Patrick Penn announcing the reorganization of the Food and Nutrition Service into the Food and Nutrition Administration.  That email announced:[4]

> As part of this effort, the Food and Nutrition Administration will restructure into four programmatic branches: Nutrition Research and Regulations, Benefits and Integrity, State Support and Evaluation, and Retailer Operations and Compliance. The FNA Administrator will remain in Washington, D.C., along with a small footprint to be responsive to Congress, interagency needs, regulatory work, and policy coordination. As part of the

[1] Secretary Memorandum No. 1078-015 (Jul. 25, 2025), https://www.usda.gov/sites/default/files/documents/sm-1078-015.pdf.
[2] *Rollins, Vaden, and Forst Announce Disposal of Dilapidated USDA Facilities*, U.S. Department of Agriculture, Press Release No. 0037.26 (Feb. 25, 2025), https://www.usda.gov/about-usda/news/press-releases/2026/02/25/rollins-vaden-and-forst-announce-disposal-dilapidated-usda-facilities.
[3] *USDA Announces Actions to Better Serve States, Nutrition Program Recipients, and the American Taxpayer*, U.S. Department of Agriculture, Press Release No. 0062.26 (last accessed Jun. 19, 2026), https://www.usda.gov/about-usda/news/press-releases/2026/04/30/usda-announces-actions-better-serve-states-nutrition-program-recipients-and-american-taxpayer.
[4] That email announcement included a map of the United States marking the new office locations. I can only assume that map was produced with AI without human review as it included additional "states" north of West Virginia and north of New Jersey, and it made Long Island part of Massachusetts.

restructuring, the agency will move program and regional offices to state Hubs that will be established in Dallas, TX; Denver, CO; Indianapolis, IN; Kansas City, MO; and Raleigh, NC. Additionally, retailer operations and compliance will occur out of offices in Atlanta, GA; Los Angeles, CA; Dallas, TX; and New York, NY.

Program leadership and staff positions that are currently housed in the National Capital Region (NCR) will be relocated to one of five Hub locations. Specifically, the Supplemental Nutrition Assistance Program will be relocated to Indianapolis, IN; the Child Nutrition Programs will be relocated to Dallas, TX; the Supplemental Nutrition and Safety Programs will be relocated to Kansas City, MO; and research programs will be relocated to Raleigh, NC. The fifth Hub in Denver, CO, will serve as the Emergency Management and Continuity of Operations location.

19.    USDA later informed the Union that regional office employees will be permitted to choose the hub to which they relocate (Dallas, Denver, Indianapolis, Kansas City, or Raleigh).  In contrast, according to the information on USDA's website, the National Office staff that will be required to relocate will be *assigned* to a new hub.[5]  The Union believes most of the National Office will be required to relocate as USDA states publicly on its website that only a "small team of policy and regulatory employees" will remain in the National Capital Region.

20.    I am aware that on or around April 1, 2026, approximately 20 non-bargaining unit employees received initial letters of intent stating that they could expect to be relocated from the Braddock office to the Yates office building in downtown D.C. as part of the Reorganization.

21.    As of the date of this declaration, I am not aware of any other National Office employees who have received letters of intent or Mandatory Directed Reassignment letters informing them of where they will be relocated or if they will remain in the National Capital Region.  We are still missing a lot of information about how this reorganization will be executed. USDA has told us they want to close the Braddock Road office by August 1, 2026, so I expect reassignment letters to be issued soon.

22.    USDA has informed the Union that if an employee declines their Mandatory Directed Reassignment, then they will be involuntarily separated.

---

[5] *Reorganization*, Food and Nutrition Administration (last accessed Jun. 19, 2026), available at https://www.fna.usda.gov/about/reorganization.

**Attrition, Relocation, and Mission Disruption**

23.    When Secretary Rollins first announced USDA's intent to reorganize in July 2025, NTEU Chapter 226 surveyed our members about the impacts.  Approximately 69% of respondents said they would not move to any of the proposed "hub'" locations (which were somewhat different from the hub locations that were later announced in May 2026).  Many FNA employees shared how they would not be able to relocate given family (children and elders) that depended on them, spouses who were geographically tied to their jobs, and/or homes that they would have to sell at great financial loss.

24.    In May 2026, after FNA employees received the April 30 announcement of some further implementation details, NTEU Chapter 226 conducted a new survey.  This survey was not limited to NTEU members; it was open to all current FNA employees, including National Office, Regional Office, and Retailer Operations and Compliance Office employees.  I helped to craft the May 2026 survey and assisted with its dissemination, including sharing it with the other chapter presidents so that we could get responses from the regional offices.  I monitored responses and reviewed the analysis of the results to double-check the numbers.

25.    The results of the survey show that the proposed reorganization will trigger a large-scale departure of experienced staff.

26.    81% of all FNA respondents are likely not to relocate.

27.    90% of respondents who work on Supplemental Nutrition and Safety Programs (including WIC, the Emergency Food Assistance Program, the Food Distribution Program on Indian Reservations, and others) are likely not to relocate.

28.    81% of respondents who work on SNAP are likely not to relocate.

29.    78% of respondents who work on Child Nutrition (school meals, summer meals, CACFP) are likely not to relocate.

30.    83% of respondents who are part of the National Office are likely not to relocate.

31.    The responses revealed that the departure of staff will rapidly degrade FNA's ability to administer nutrition assistance programs.  Due to the significant attrition that already

occurred since January 2025, FNA is already significantly understaffed, and the reorganization will further reduce staff capacity at a time when the agency is not equipped to absorb the loss.

32. The existing staffing shortfall is already causing service disruptions. For example, for one grant program, the office had to reconsider the grants they will be able to provide given the decreased staffing capacity. Another Union employee who does financial management work (much of which is statutorily required) shared with me how his group has already lost 40% of its employees since January 2025, including many mid-level employees that were already trained and highly proficient in positions such accounting, budget, grants management, internal controls, audits, and investigation, and many senior level employees who were subject matter experts and who had a wealth of historical knowledge about specific programs.

33. The result of the vast majority of employees who will be terminated because they cannot or do not relocate will be a huge loss of capacity, knowledge and expertise, decimating the Agency's ability to carry out its mission. Finding an adequate number of qualified employees to fill vacant positions and training them in a timely manner would be nearly impossible, even if the government-wide hiring freeze were to be lifted, given the lack of staff available to train them, the length of time it takes to train FNA employees, and the specialized expertise they must develop. For the limited few that will consider relocating, these employees have shared their concerns that their workload will become untenable if so many of their co-workers leave, producing massive operational gaps and rendering it impossible to do their jobs.

34. FNA's planned reorganization will gut the agency at a time when employees are already fighting to keep programs operational. The further large-scale departures that are very likely to occur (as reflected in our surveys) as a result of this reorganization will further interfere with the ability of this agency and these programs to function and exacerbate these already extant staffing shortages. There is no possibility that this reorganization will not directly degrade and disrupt the services provided by these programs.

35. This is apparent from the answers that survey respondents provided to the qualitative questions about the impact the relocation and reorganization plan would have on their job functions. NTEU Chapter 226 analyzed the qualitative descriptions of program impacts that

8

were reported on the May 2026 survey.  Several union members created a document outlining some of the risks to the Agency's mission and obligations presented by the reorganization.  A true and correct copy of the analysis that our Union produced, and which I reviewed for correctness to the best of my knowledge, is attached as **Exhibit A.**  Staff across every major program area report that the combination of required relocation and organizational disruption will result in the loss of irreplaceable institutional knowledge, the breakdown of state and partner relationships, and the suspension or delay of agency functions, including management evaluation, transfer of funds, technical assistance, rulemaking, and fraud prevention.

36.     Expected attrition of National and Regional Office staff puts critical, statutorily mandated oversight work at immediate risk of severe delays, if not outright suspension.  This includes management evaluations of state agency operations, oversight of waivers both for emergencies and regular program operations (for example, waiving program regulations during disasters, allowing meals to be served during unanticipated school closures, or allowing non-compliance with particular nutrition requirements), and review of state agency annual plans. These types of oversight work require significant training, experience with complicated rules, a knowledge of programs that vary by state, and in some cases certifications, none of which cannot be easily or quickly replaced.

37.     FNA employees oversee the procurement, storage, and delivery of foods purchased with taxpayer dollars and provided to program operators (e.g., schools, food pantries) via the Emergency Food Assistance Program, the Food Distribution Program on Indian Reservations, the Commodity Supplemental Food Program, and USDA Foods in Schools.  The reorganization would force out the remaining four staff managing the quality of foods in these programs, and fifty percent of the remaining staff who manage the operational elements of these programs have indicated they will quit rather than relocate.  The current team managing these processes is already small and has expressed concerns about the potential inability to manage orders and oversee delivery should they lose more staff (which is anticipated if forced to relocate).

38.     Similarly, Regional Child Nutrition program staff will suffer massive attrition.  One Regional Office anticipates a loss of approximately 90% of remaining Child Nutrition Program

staff, which was already operating at roughly 50% of pre-2025 capacity following earlier reductions.

39.    Additionally, staffing levels for Grant Management employees are already so low in some Regional Offices (for example, only four of eight original employees currently remain) that remaining staff have indicated even the departure of one more staff member will make it impossible to maintain current functions.

40.    WIC operations are also at risk of experiencing gaps in funding or stalling without program guidance from staff.  WIC provides nutrition support, breastfeeding resources, referrals to health care, and food assistance to low-income pregnant and postpartum women, infants, and children up to age five.  Survey respondents reported anticipated harms to specific maternal health and mortality sub-grants that FNA provides to state and local WIC agencies that fund nutrition support for pregnant and postpartum women.  WIC financial management is complex, involving time-sensitive funding allocations, grant closeouts, carryover calculations, and compliance activities across a large number of State and Tribal programs.  These functions are highly dependent on institutional knowledge and established relationships with Regional Offices.  WIC staff managing financial functions are already at high workload capacity.  Last summer, WIC was already dealing with funding delays, with some programs operating within a week of running out of money, because there were not enough regional office staff to orchestrate the actual transfer of funds.  Attrition from the Reorganization will further undercut the already limited staffing capacity and changes to the Regional Office structure will create confusion and disrupt existing relationships with state and local partners, jeopardizing the ability for FNA to successfully provide funds to these WIC programs.

41.    As another example, survey respondents explained that staff attrition in the WIC program will severely hamper the ability of FNA to provide crucial technical information, such as sharing information about infant formula recalls with state staff and program operators. Staff attrition at FNA will undercut rapid information dissemination and hurt the ability of WIC providers to respond timely and fully during this kind of emergency, leaving babies at risk.

42.     Multiple managers and senior policy staff working on SNAP (the largest nutrition assistance program) reported that the majority or entirety of their teams will not relocate.  That attrition poses severe and immediate risks to SNAP program integrity, oversight, legal compliance, and benefit delivery.  For example, federal law mandates that USDA collect, re-review, and analyze SNAP Quality Control data from State agencies and calculate payment error rates (7 U.S.C. §2025).  Under the One Big Beautiful Bill, states are liable to pay a share of the federal benefit rate up to 15% of total benefit dollars starting October 1, 2026.  This is expected to be as much as $800 million to $1 billion per state each year.  Quality Control staff in the regions perform the error rate calculations, and the Quality Control team in the National Office reviews and validates those figures.  The teams are already suffering staffing losses and feeling the effects of those losses.  Earlier in June, the national team (which is already at less than half its fully staffed level) had to redo the numbers for SNAP payment error rates because the data quality was poor because of how understaffed and stretched thin the regional QC teams already were.  With the further reductions in staff likely to arise from attrition, the teams will not be able to ensure the accuracy of the calculations made.

43.     As another example, the Disaster SNAP team is already severely understaffed and would be almost entirely vacant if the reorganization proceeds.  In the wake of a natural disaster, there may be no one at FNS with the knowledge to develop and authorize an effective response and fulfill our statutory obligations to review and approve disaster-related waivers or to provide technical assistance to State agencies facing disasters (7 U.S.C. §2014(h)).

44.     Of the Retailer Operations and Compliance Office employees who responded to the survey, they overwhelmingly indicated they and their colleagues are likely to leave rather than relocate, leaving fewer staff to process applications and compliance cases, which will mean untimely processing and applicants that are not fully vetted, increasing the risk of SNAP retailer fraud.

45.     Other statutory obligations are at immediate risk of not being fulfilled due to the reorganization include: FNA's scientific review and update of the WIC food packages (a multi-year process that requires close coordination among FNS nutritionists, food policy specialists,

11

regulatory writers, and research staff that will be interrupted by the attrition of expert nutrition researchers); legal compliance work with SNAP retailers (nine out of ten of the remaining employees in the division reported that they  would not consider relocating to Indianapolis, which will exacerbate the severe backlogs of cases with delays meaning fraudulent retailers continue accepting SNAP benefits).

46.     Additionally, expected attrition from members of the National Office not relocating to the hubs will put ongoing rulemaking at immediate risk of suspension.  This includes the following rules that are currently in the middle of rulemaking: the retailer sanctions rule; the EBT card security rule; the broad-based categorical eligibility rule; updates to school meals nutrition regulations; and all rules implementing provisions of OBBB.  Regulatory writing is a highly specialized skill built on years of program expertise and legal knowledge.  Rulemaking also requires regulatory impact analyses that the research staff, with similar highly specialized skills, produces.  Displacing and reducing the team mid-process jeopardizes both the timelines and the legal defensibility of the rules.  In addition, recently published rules (like the retailer stocking standards rules) will suffer from lack of staff to assist with roll-out and implementation.

47.     Reduced and relocated hub locations are farther from many of the State agencies, territories, and constituencies FNA serves and collaborates with, directly contradicting the stated rationale for the reorganization.  National Office staff work with Congress, other federal agencies in the National Capital Region, and engage with state agencies and tribal organizations at a higher level of authority.  Regional Office staff do on-the-ground work with the states, territories, tribes, and state subcomponents that are delegated implementation tasks.  The regional employees currently live and work throughout the regions they serve but will be moved to hub cities that are farther from many of their state agency partners.  Region-specific knowledge will also be lost.  For example, each Regional Office has two farm-to-school specialists who liaise closely with National Office farm-to-school team but have specialized knowledge of the farm-to-school landscape in their region overall and in each state.  They travel regularly to provide technical assistance and information to schools, state agencies, nonprofits and Tribal partners as required in 42 U.S. Code § 1769(g).  The likely attrition of the staff currently in these positions will mean the loss of

longstanding relationships and years of expertise. The proposed structural changes would also severely hamper the efficient provision of farm-to-school technical assistance by removing these individuals from the regions in which they currently work, putting them farther away from their constituents, and potentially giving them an impossibly large region to cover (e.g., the 13 states covering half the country served by the proposed Denver hub).

48.     Moreover, distributing different components of the same program, such as putting SNAP policy in one hub, Quality Control in another, and research in a third, will create communication barriers and slow coordination on issues that currently require close, real-time collaboration among teams.

**Union Comment**

49.     I worked with other NTEU Chapter 226 leadership to submit a comment on the Reorganization Plan after USDA provided notice of the general parameters of this plan in July 2025 and opened a window for public comment. In our comment, we expressed how the planned reorganization will predictably lead most employees to leave the agency, compound existing staffing shortages, and destroy FNS' capacity to fulfill its mission to ensure the nation has access to nutritious food. We hoped that USDA would listen and take advice from the comments, but they did not. When USDA subsequently began to roll out implementation of the plan in late spring 2026, it was very clear they were moving forward notwithstanding these comments and, in particular, the concerns about attrition. USDA was aware of the rate of predicted attrition from the plans because of our comments, and is moving forward anyway. I am not aware of any explanation from USDA leadership to staff explaining how the department will avoid massive disruptions in its programs resulting from staff attrition.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed June 29, 2026, in Washington, D.C.

Amy Rosenthal

ROSENTHAL DECLARATION, NO. 3:25-CV-03698-SI

# Exhibit A

# Union Survey Results: FNS Reorganization Mission Impacts and Risks

National Treasury Employees Union (NTEU) Chapter 226  |  June 2026

This is a running list of current and potential impacts of the pending Food and Nutrition Service (FNS) reorganization. This is based on responses from over a third of current FNS employees to a survey conducted in May 2026 by the Chapter 226 of the National Treasury Employee Union. Responses are organized by program and mission area, with similar responses consolidated into general findings.

## Executive Summary

Survey responses reflect a consistent and urgent concern: the proposed reorganization will trigger a mass departure of experienced staff, rapidly degrading FNS's ability to administer nutrition assistance programs that collectively serve one in four Americans. Staff across every major program area report that the combination of required relocation and organizational disruption will result in the loss of irreplaceable institutional knowledge, the breakdown of State and partner relationships, and the suspension or delay of statutorily required functions.

Several themes emerge across all program areas:

- FNS is already significantly understaffed, with one-third fewer staff than in January 2025. The reorganization will eliminate additional staff capacity at a time when the agency is least equipped to absorb the loss.

- Many employees hold unique, specialized roles. In some cases, there are only a few people or even one person at FNS performing a critical function. Their departure will not result in a staffing gap; it will result in the complete suspension of that function.

- Relocated hub locations are farther from many of the State agencies and territories FNS serves, directly contradicting the stated rationale for the reorganization.

- Several statutory obligations, including payment error rate reporting, management evaluations, food package scientific reviews, and grant oversight, are at immediate risk of not being fulfilled.

1

# Cross-Cutting Concerns Affecting All Program Areas

## Inability to Uphold Statutory Requirements

The reorganization will impede FNS' ability to fulfill its statutory obligations.

- As SNAP loses more Quality Control (QC) staff, FNS will be unable to accurately determine a household's eligibility and benefits and issue payment error rates as required by statute.

- Additional staff losses will make it impossible to provide guidance and technical assistance to State agencies to implement changes in federal law, such as the One Big Beautiful Bill (OBBB).

- SNAP will fall behind on processing administrative reviews and judicial litigation for retailers, increasing the backlog of cases for a branch that is statutorily mandated.

- SNAP will be unable to continue to review and approval disaster-related waivers or provide technical assistance to State agencies facing disasters.

- Certain programs have already had to hire consultants and contractors to ensure statutory obligations are met.

- Staff losses will interrupt the review and update of WIC food packages, which is a statutory requirement.

## Implications for Fraud, Waste, and Abuse

The reorganization will impact not only service quality but also program integrity and fiscal stewardship. The loss of oversight capacity directly increases the risk of fraud, improper payments, and noncompliance.

- Without QC staff to calculate and verify State payment error rates, State agencies face no accountability mechanism for SNAP payment accuracy under OBBB.

- Without SNAP retailer oversight staff, the backlog of retailer compliance cases will grow, increasing the duration in which fraudulent retailers remain authorized to accept SNAP benefits.

- Without management evaluation staff to conduct required reviews of State SNAP and Child Nutrition operations, State agencies will operate without federal oversight for extended periods, with no mechanism for identifying and correcting

2

systemic problems impacting payment accuracy, program access, timely service, fraud prevention, and more.

- Without WIC vendor oversight expertise, State agencies will be left to manage vendor integrity without federal guidance, increasing the risk of vendor fraud.

## Staffing and Institutional Knowledge

Across all program areas, the reorganization raises concerns over the irreversible loss of institutional knowledge.

- FNS is already significantly understaffed as a result of earlier reductions, including the Deferred Resignation Program (DRP). Respondents describe their teams as "already less than a skeleton crew". The reorganization will remove additional layers of capacity at a time when the agency is least able to absorb it.

- New staff hired to replace departing employees typically require approximately 2-3 years of training and experience before they can perform core functions independently, during which the workload of remaining staff will increase substantially. There are many questions about who will train such staff.

- In many cases, specific policy areas, technology systems, or oversight functions are managed by a single individual. There is no institutional backup for these roles; their departure could risk the function ceasing entirely, not merely slowing down.

- Much of the current FNS staff are subject matter experts in their respective fields with an average length of service of almost 10 years that would be lost with this reorganization and take just as long to replace.

## Cost and Taxpayer Stewardship

- USDA leadership has not provided a cost-benefit analysis of the reorganization. The costs of relocating thousands of federal employees, including relocation allowances, broken leases, disrupted mortgages, and the cost of training replacement staff, have not been publicly disclosed or justified.

- FNS and USDA leadership have made no attempt to gather information or feedback on what FNS employees actually do day-to-day, the implications of the reorganization, whether they would move and how to onboard new staff, or existing recommendations for improving services.

- Research and evaluation contracts funded with congressional appropriations, some worth tens of millions of dollars, are at risk of being abandoned mid-stream, resulting in the loss of the public investment in that work.

3

- Even administrative changes, such as renaming the agency from FNS to FNA, will require updating thousands of documents, forms, and systems at taxpayer expense, with no identified programmatic benefit.

### Organizational Fragmentation and Silos

- Distributing different components of the same program, such as putting SNAP policy in one hub, QC in another, and research in a third, will create communication barriers and slow coordination on issues that currently require close, real-time collaboration among teams.

- FNS has been actively working to reduce internal silos in recent years. The proposed reorganization will re-entrench them instead of fixing them.

### Geographic Rationality of the Reorganization

- The stated rationale for the reorganization (i.e., bringing FNS closer to the people it serves) is factually inaccurate. National Office policy staff work with State agencies, Tribal organizations, and Congress, not directly with program participants. Regional Office staff, who currently live and work within the regions they serve, will be moved to hub cities that are farther from many of their State agency partners.

- Program operations that previously required a quick conversation between neighboring offices will now require scheduled meetings across time zones, reducing the agility FNS needs to respond quickly to emerging program issues.

- Moving FNS operations to Central or Eastern hubs and away from the West Coast will nearly eliminate the working-hour overlap currently available for direct communication with Pacific territories (Guam, American Samoa, CNMI, Republic of the Marshall Islands).

- The creation of these hubs also dismantles a structure with seven regional offices and replaces it with five hubs, resulting in a higher regional office to state oversight ratio. With a reduced staff and a larger workload from more States to oversee, delays in program administration are inevitable.

## Supplemental Nutrition Assistance Program (SNAP)

SNAP is the nation's largest nutrition assistance program, providing food benefits to approximately 40 million Americans monthly. Multiple managers and senior policy staff report that the majority or entirety of their teams will not relocate, and in our workforce survey, 81% of SNAP employees also said they will not move. In some cases, employees are the sole specialists for a policy area at the national level, including SNAP employment and training policy, noncitizen eligibility, and disaster response. The

4

proposed reorganization poses severe and immediate risks to program integrity, State agency oversight, legal compliance, and benefit delivery. The loss of staff will impact SNAP's ability to meet its statutory obligations, including, but not limited to:

- Calculating QC error rates;
- Conducting administrative and judicial reviews of retailers;
- Reviewing and approving disaster related waivers;
- Overseeing State agency operations in alignment with federal laws;
- Performing rulemaking obligations and implementing changes to federal laws; and
- Administering funding to State agencies.

## Quality Control (QC) and Payment Accuracy

Federal law mandates that FNS collect, re-review, and analyze SNAP Quality Control (QC) data from State agencies and calculate payment error rates. Under the OBBB, FNS will now use those error rates to determine State agency financial liability for benefit overpayments. Multiple FNS QC employees report that they are unable to relocate and thus expect to leave the agency and that no one with comparable expertise would remain to perform their functions.

- ⚠ **IMMEDIATE RISK: QC statutory functions at risk of suspension.** Nationwide QC is already operating at greatly reduced capacity. Several respondents report that if the reorganization proceeds, FNS may be unable to issue payment error rates as required by statute, unable to implement OBBB's new payment accuracy provisions, and unable to issue QC policy or regulation.

- QC work does not require physical colocation. Employees already connect to systems electronically, and relocating to a hub would not change that workflow, but would result in employees departing from the agency.

- Regional Office QC teams have already been severely depleted by the DRP, with staff members from other regions on loan to cover the gap. Further losses will make error rate reporting and oversight impossible in multiple regions.

- The OBBB, which made the most sweeping changes to SNAP in decades, ties State agencies' financial obligations to payment accuracy data produced by QC. Without sufficient QC staff to conduct reviews and management evaluations, State agencies will be highly incentivized to misrepresent or misreport the data, with no FNS capacity to catch or correct it.

- Existing approved waivers will expire without anyone to process extensions, meaning State agencies may continue to operate under expired waiver authority and then face QC errors for non-compliance.

5

## Policy, Technical Assistance, and State Agency Support

SNAP policy staff serve as the primary point of contact between the federal government and the 53 State agencies that administer SNAP. They interpret federal law, process waiver requests, issue guidance, and provide technical assistance on everything from eligibility rules to benefit issuance to disaster response. Staff losses raise serious concerns that this function will be effectively eliminated.

- ⚠ **IMMEDIATE RISK: Active regulatory work will stop.** Specific rulemaking at immediate risk of suspension includes: the retailer stocking standards rule; the retailer sanctions rule; the EBT card security rule; the broad-based categorical eligibility rule; and all rules implementing provisions of OBBB. Regulatory writing is a highly specialized skill built on years of program expertise and legal knowledge. Displacing the team mid-process jeopardizes both the timelines and the legal defensibility of the rules.

- ⚠ **IMMEDIATE RISK: Current oversight work will stop.** Specific oversight work at immediate risk of suspension includes: management evaluations of State agency operations; oversight and review of waivers and demonstration projects, including food restriction waivers and disaster waivers; review of State agency annual plans; and oversight of contracts, such as the administrative review backlog contract. These types of oversight work require significant training, and in some cases certifications, that cannot be easily or quickly replaced.

- ⚠ **IMMEDIATE RISK: Providing timely guidance and technical assistance will be impossible.** State agencies will be left without guidance during the OBBB implementation period, creating a high risk of inconsistent, incorrect, or noncompliant State agency actions. This raises concerns about the ability for SNAP to respond to future changes in federal law and meet its statutory obligations.

- ⚠ **IMMEDIATE RISK: SNAP disaster response capacity will be eliminated.** The SNAP disaster response team is already severely understaffed and would be almost entirely vacant if the reorganization proceeds. In the wake of a natural disaster, there may be no one at FNS with the knowledge to develop and authorize an effective response and fulfill our statutory obligations.

- The silos created by splitting SNAP staff across multiple hub locations may further reduce collaboration and slow the agency's response to emerging issues. For instance, potentially splitting those who work on eligibility and benefit policy from those who assess payment accuracy, or those who oversee on work requirement policy from those who oversee employment and training programs, will create additional silos rather than solve them.

6

- The 160+ demonstration projects and administrative waivers managed by FNS policy staff will lapse without anyone to process renewals. State agencies will face compliance uncertainty, and some projects improving access for elderly and disabled households will expire without renewal.

## Retailer Oversight, Integrity, and Compliance

SNAP employees working on retailer policy maintain responsibility for all SNAP retailer legislation, regulations, policy, and administrative/judicial reviews. These employees also provide guidance for the operational oversight of SNAP retailer activities, including management of a SNAP retailer system called the Store Tracking and Redemption System (STARS). Additionally, FNS includes the Retailer Operations and Compliance (ROC) office, which authorizes and monitors SNAP retailers, including the processing of retailer applications, compliance investigations, and disqualification actions.

- ⚠ **IMMEDIATE RISK: SNAP judicial case backlog will grow unchecked.** SNAP processes hundreds of appeals of SNAP administrative reviews annually.. This work is congressionally mandated and outside consultants have already been hired to address a growing backlog of reviews. FNS departures will leave harmful legal precedent unaddressed and create backlogs affecting the Department of Justice, the Office of General Counsel and the agency's Retailer Operations and Compliance division.

- ⚠ **IMMEDIATE RISK: The ROC backlog will worsen significantly.** The DRP created a substantial backlog in retailer case processing. The reorganization is likely to force out more employees than the DRP did. Many ROC employees do not live near any of the four proposed ROC hub locations and are likely to leave rather than relocate, creating significant staffing gaps. With fewer staff to process applications and compliance cases, untimely processing will increase, and applicants will not be fully vetted, increasing the risk of SNAP retailer fraud.

- SNAP retailer authorization and oversight, including support for farmers' markets and direct marketing farmers would be adversely impacted by the reorganization, ending federal oversight of these authorized retailers due to staffing loss.

- ROC handles cases nationwide. Current ROC employees handle cases nationwide, not based on specific geographic locations. Geographic hub assignments provide no benefit to the retailers being investigated and create no operational efficiencies. Staff cite annual performance data showing they have "been exceeding and outperforming year over year" as evidence that physical hub locations provide no operational benefit.

- ROC staff make enforcement decisions, including disqualifications, that directly affect the livelihoods of store owners. Historically, ROC has operated with limited public visibility for this reason. Moving ROC into hub office buildings where its

7

location is publicly known puts staff at personal safety risk from retailers who feel aggrieved.

### EBT and Technology Improvement

Electronic Benefit Transfer (EBT) is the technical infrastructure through which SNAP benefits are delivered to participants.

- Employees' EBT expertise is irreplaceable, raising the risk of benefit issuance disruptions if key staff depart. This expertise and knowledge to manage this system differs significantly from private-sector technology experience and is not easily replaced.

- Current work on card skimming and benefit theft will be interrupted, increasing the risk of fraud and harming program access.

- Experts on the specific technology infrastructure of SNAP, including systems used by State agencies to administer benefits, are expected to weaken technical assistance and oversight.

## Child Nutrition Programs (CNP)

The Child Nutrition Programs (CNP) include the National School Lunch Program (NSLP), School Breakfast Program (SBP), the Child and Adult Care Food Program (CACFP), the Summer Food Service Program (SFSP), Summer EBT, and others. FNS staff develop policy, provide oversight, conduct management evaluations of State agencies, and provide technical assistance to thousands of State and local operators.

### Staffing Collapse and Oversight Failure

Across both National and Regional Offices, the proposed relocation will result in near-total staff loss in many divisions, effectively ending functional program oversight.

- ⚠ **IMMEDIATE RISK: Regional Child Nutrition oversight risks complete collapse.** One Regional Office anticipates a loss of approximately 90% of remaining CNP staff, which was already operating at roughly 50% of pre-2025 capacity following earlier reductions.

- ⚠ **IMMEDIATE RISK: Regional Offices will be unable to perform Management Evaluations (MEs).** MEs, federally required reviews ensuring that State agencies administer Child Nutrition programs in compliance with regulations, will either not take place or will be significantly curtailed. Some Regional Offices are already conducting MEs for programs outside their assigned branch due to staffing constraints.

8

- The Summer EBT program would be decimated due to staffing loss creating a gap in technical assistance and program oversight for this critical program.

- Employees currently perform program oversight for multiple State agencies and Territories across time zones. Any further reduction in staff will leave State agencies without a knowledgeable federal contact, increasing the risk of noncompliance, fraud, and unaddressed program deficiencies.

## Rulemaking and Policy

National Office CNP policy staff are responsible for developing regulations, issuing guidance, and ensuring consistent implementation of federal child nutrition law. Multiple employees are mid-stream on priority regulatory work that cannot simply be handed off.

- ⚠ IMMEDIATE RISK: **Mid-stream rulemaking will be disrupted or abandoned.** The Child Nutrition meal pattern rule, which aligns CNP regulations with the 2025-2030 Dietary Guidelines for Americans (DGAs), is a congressionally mandated priority. With the reorganization, the agency risks publishing rules that are legally indefensible due to the loss of the institutional expertise required to ensure they account for all extenuating factors and adhere to all relevant legislative requirements.

- Grant oversight, including cooperative agreements and program-specific awards, will be severely curtailed. One team estimates its capacity will fall to approximately 25% of current levels.

## Funding

- Loss of staff to manage grants and provide support to grantees has already led to fewer dollars in statutorily mandated Farm to School Grants being awarded and further staff loss jeopardize the future flow of these resources to State agencies, school districts, producers and partners.

## Customer Service and State Agency Support

CNP staff at both the National and Regional levels provide direct technical assistance to State agencies, school food authorities, Tribal organizations, and other program operators.

- ⚠ IMMEDIATE RISK: **Technical assistance will be interrupted and reduced.** Technical assistance functions, such as training, guidance, and resource development, are already significantly reduced due to earlier staff losses. Any further reduction will eliminate them in some Regions entirely. Additionally, sponsoring organizations of programs would not receive critical monitoring guidance and training, leaving the door open for fraud, waste, and abuse.

9

- Moving staff to central hub locations moves them farther from the States and Territories they serve, directly contradicting the stated rationale for the reorganization. The geographic consolidation of FNS into a smaller number of hubs will increase the number of State agencies each remaining employee must support, while reducing the familiarity and responsiveness that makes federal oversight effective. For State agencies in the Pacific, this reorganization creates potentially insurmountable communication barriers.

- The loss of longstanding relationships with State agencies poses a major risk. Training new staff members takes time, as does building trust with our partners. State agencies are sometimes impatient when dealing with a new staff member. With this reorganization, State agencies will have to deal with entirely new points of contact with people who may be unfamiliar with that respective State agency and related policy as each State agency administers FNS programs differently. This loss of trust and continuity will slow FNS' ability to identify and address emerging compliance issues.

- Farm to school Regional Specialists, housed in the Regional Offices, hold longstanding, place-based relationships with schools, support organizations, producers, and State agencies. FNS's position as a key player in farm to school coordination, learning, and funding will be extinguished with the loss of these relationships.

## Women, Infants, and Children (WIC)

WIC provides nutrition support, breastfeeding resources, referrals to health care, and food assistance to low-income pregnant and postpartum women, infants, and children up to age five. FNS administers WIC through State and local agencies. Employees describe a program already under strain, with the reorganization threatening several of its core statutory and operational functions.

### Research and Scientific Reviews

- ⚠ **IMMEDIATE RISK: Statutorily mandated 10-year review of WIC food package will stall or be abandoned.** By law, FNS must conduct a scientific review and update the WIC food packages every 10 years. This multi-year process requires close coordination among FNS nutritionists, food policy specialists, regulatory writers, and EAR (Evidence, Analysis, and Regulatory Affairs) staff. Reorganization attrition would negatively impact the agency's ability to conduct scientific reviews.

- Completed research products are at risk of not being published, even though they are finished and were funded with taxpayer dollars, including the Cash Value

10

Benefit (CVB) redemption final report and multiple journal articles authored by FNS staff.

- Maternal health and mortality sub-grants to State and local WIC agencies, which fund nutrition support for pregnant and postpartum women, are at risk of stalling or proceeding without project officer oversight.

### Program Integrity and Vendor Oversight

- State agencies rely on Regional FNS staff to guide vendor oversight and fraud prevention. If this expertise is lost, State agencies will be left without guidance on how to maintain WIC program integrity, increasing the risk of vendor fraud and improper payments.

- Ongoing plans to modernize WIC program integrity functions will be abandoned. Current employees have the subject matter expertise and knowledge of current plans and historic programs. Without them, WIC will be unable to bring program integrity efforts into the 21st century.

### Financial Management and Grants

WIC financial management is complex, involving time-sensitive funding allocations, grant closeouts, carryover calculations, and compliance activities across a large number of State and Tribal programs. These functions are highly dependent on institutional knowledge and established relationships with Regional Offices.

- Reducing seven Regional Offices to five "hubs" will disrupt existing communication channels and working relationships, create confusion around oversight responsibilities, and require extensive revision of spreadsheets, formulas, databases, and reporting formats, all while existing staff are managing current high-priority workloads.

- WIC staff managing financial functions are already at high workload capacity. There is currently not sufficient staffing capacity or operational support to implement changes of this scale while also maintaining ongoing program and funding responsibilities.

## Food Distribution Programs

The Emergency Food Assistance Program (TEFAP), the Food Distribution Program on Indian Reservations (FDPIR), and other related USDA Foods programs provide commodity food products to low-income individuals, food banks, Tribal nations, and schools. FNS manages procurement, quality assurance, distribution logistics, and oversight of these programs.

11

- ⚠ **IMMEDIATE RISK: USDA Foods program risks becoming non-functional.** The team managing the quality and availability of USDA Foods provided to FDPIR, TEFAP, the Commodity Supplemental Food Program (CSFP), and USDA Foods in Schools is already severely understaffed. The reorganization would force out most remaining staff and make the USDA Foods program non-functional. Additionally, a singular employee is largely responsible for managing a technology system used by State agencies for ordering USDA Foods. This would like compromise management of the technology system State agencies use for ordering USDA foods.

- Several employees working on food distribution programs serve large and complex portfolios of Tribal organizations and State agencies. The trust and institutional knowledge built over years or decades with these partners cannot be quickly transferred to new staff.

- Specific FNS Regional Office teams liaise with Indian Tribal Organizations (ITOs) as well as Guam and 20 State-level agencies. Tribal partners have expressed strong support for the current Regional Office structure and are deeply concerned about the loss of established relationships.

- Food distribution operations require real-time responsiveness across multiple time zones, including programs in Alaska, Hawaii, Guam, American Samoa, and CNMI. Moving all FNS food distribution staff to mountain or central time zones will create significant communication gaps with Pacific-region partners.

## Research, Evidence, and Nutrition Policy (EAR / CNPP)

The Office of Evidence, Analysis, and Regulatory Affairs (EAR) and the Center for Nutrition Policy and Promotion (CNPP) conduct research, regulatory impact analyses, and evidence synthesis that underpin federal nutrition policy. Their work supports the Dietary Guidelines for Americans (DGAs), federal regulatory rulemaking, and program evaluation across all FNS programs.

- ⚠ **IMMEDIATE RISK: Multi-million dollar research contracts at risk.** There would likely be no Level III Contracting Officer's Representative (COR-III) on a $35 million research contract. If they leave, there will be no one to take over the contract, and the work, upon which future regulations and the DGAs depend, will stop.

- EAR staff conduct Regulatory Impact Analyses (RIAs) required for all significant proposed and final rules. If these staff leave, rulemaking will slow dramatically,

12

and the public and Congress will no longer have accurate, independent analyses of how regulatory changes affect program participation and household benefits.

- CNPP is responsible for evidence synthesis supporting the Dietary Guidelines for Americans. Staff describe the team as already operating with approximately two-thirds of its members outside the National Capital Region. Any relocation will further reduce capacity to the point where this essential work may no longer function.

- The scientific and research expertise required for these roles is unusually difficult to recruit into government, and has historically required allowing employees to work remotely from locations across the country. Requiring hub-based relocation eliminates the flexibility that makes this workforce possible.

- Completed research products, including published journal articles authored by FNS staff and research paid for with taxpayer dollars, may never be released if the responsible staff depart before publication.

- The ability of FNS to produce basic information on the nutrition programs (e.g., costs, nutritional content) has already been severely curtailed by the cancellation of research contracts and the loss of staff will further jeopardize this ability. Longitudinal research projects may end or severely suffer from the abrupt departure of staff with institutional knowledge of specific research projects and historical research practices.

## Financial Management and Data Analytics

FNS financial management staff are responsible for allocating and disbursing federal funds to State agencies, Tribal partners, and territories; processing grant awards and closeouts; conducting financial oversight; and providing technical assistance to grantees. These functions are time-sensitive, legally required, and heavily dependent on institutional knowledge.

### Grants Management

- ⚠ **IMMEDIATE RISK: Grant management at risk in multiple offices.** In some cases, staffing levels are already so low that even the departure of one more staff member will make it impossible to maintain current functions.

- Delays in grant disbursements will have downstream effects on State agencies and local program operators who depend on timely federal funding to pay staff, purchase food, and operate programs.

13

- The transition from seven Regional Offices to five hubs will require rebuilding financial management workflows, allocation models, and reporting structures that are currently organized around the existing Regional Office framework. This is a major undertaking that current staff lack the capacity to absorb while maintaining ongoing financial responsibilities.

- A significant body of institutional knowledge about individual State agency financial histories, recurring issues, and grant performance currently resides with experienced staff who will not relocate. Once lost, this knowledge cannot be quickly rebuilt.

### Financial Management Reviews

- Financial Management Reviews rely on multi year program familiarity, state specific context, and historical findings. Losing over 80% of staff eliminates the continuity needed to identify repeat deficiencies, assess corrective action progress, and maintain audit integrity.

- Federal law and regulations require periodic reviews. With the staffing losses, the agency cannot meet required review cycles, exposing programs to compliance gaps and potential funding risks.

- Financial Management Reviews require months of pre-work and follow up. Understaffing means corrective actions will go unverified or delayed, weakening program integrity.

### Data Analytics

- With only a handful of analysts already supporting national reporting, financial management review sampling, corrective-action tracking, and program integrity dashboards, losing even one or two eliminates the ability to produce required analytics products on time.

- Annual reports to Congress, improper-payment estimates, and performance metrics rely on analyst-built datasets. Without analysts, the agency cannot meet statutory reporting deadlines or quality standards.

- Financial management reviews depend on analysts to build sampling frames, risk models, and data pulls. If analysts leave, reviewers cannot generate statistically valid samples, undermining the entire review process.

- The Office of the Inspector General and Government Accountability Office reviews depend on accurate, timely data. Analyst loss leads to incomplete datasets, errors in submissions, and heightened audit findings.

14

15