CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Fax: (415) 436-6748

ERIC J. HAMILTON
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
BRAD P. ROSENBERG
JEREMY S.B. NEWMAN
Chief Litigation Counsel
CHRISTOPHER HALL
Assistant Branch Director
ROBERT C. BOMBARD
TAYLOR PITZ (CABN 332080)
Trial Attorney
Civil Division, Federal Programs Branch

1100 L Street, NW
Washington, DC 20005
Telephone: (202) 305-5200
Taylor.N.Pitz@usdoj.gov

Counsel for Defendants

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERN-MENT EMPLOYEES, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMI-NARY INJUNCTION** <br><br> Hearing Date: September 1, 2026 <br> Time: 1:30 pm PT <br> Judge: Hon. Susan Illston <br> Place: San Francisco Courthouse <br> Courtroom 1 |

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................................1

BACKGROUND ...................................................................................................................................1

     A.     The Department of Agriculture...............................................................................1

     B.     Reorganization Efforts...........................................................................................2

STANDARD OF REVIEW ...................................................................................................................8

ARGUMENT.........................................................................................................................................8

I.     Plaintiffs' Claims Are Unlikely to Succeed on the Merits. ..............................................8

     A.     Plaintiffs' claims fail for threshold reasons. ........................................................9

     B.     Plaintiffs cannot prevail on their *ultra vires* challenge......................................17

     C.     USDA's reorganization efforts comport with the agency's statutory authority. .........17

     D.     USDA's reorganization has been reasonable and reasonably explained. .....................29

II.     Plaintiffs Also Cannot Establish Irreparable Harm. .......................................................38

     A.     Plaintiffs' claims of irreparable harm are entirely speculative. ........................38

     B.     Plaintiffs' delay in filing their motion negates any claim of irreparable harm. ...........40

III.     An Injunction Is Contrary to the Public Interest and the Balance of the Equities. ................40

IV.     Plaintiffs' Requested Relief Is Overbroad. ....................................................................43

V.     Defendants Request a Stay of Relief. .............................................................................45

VI.     Plaintiffs Should Be Ordered to Post Security In Connection With Any Relief. ....................45

CONCLUSION....................................................................................................................................45

# TABLE OF AUTHORITIES

**CASES**

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) ................................................................................................ 20

*AFGE v. Ezell,*
    2025 WL 470459 (D. Mass. Feb. 12, 2025) ........................................................... 15

*AFGE v. OPM,*
    771 F. Supp. 3d 1127 (N.D. Cal. 2025) .................................................................. 15

*AFGE v. Trump,*
    929 F.3d 748 (D.C. Cir. 2019) ................................................................... 14, 15, 16

*Alaska Airlines, Inc. v. Brock,*
    480 U.S. 678 (1987) ........................................................................................ 25, 27

*Am. Bioscience, Inc. v. Thompson,*
    269 F.3d 1077 (D.C. Cir. 2001) .............................................................................. 10

*Am. Forest Serv. Ass'n v. Trump,*
    2025 WL 573762 (D.D.C. Feb. 21, 2025) .............................................................. 15

*Antitrust Litig.,*
    2008 WL 2219837 (N.D. Cal. May 27, 2008) ........................................................ 38

*Axon Enters., Inc. v. FTC,*
    598 U.S. 175 (2023) ................................................................................................ 14

*Bennett v. Spear,*
    520 U.S. 154 (1997) ......................................................................................... 11, 13

*Block v. Community Nutrition Inst.,*
    467 U.S. 340 (1984) ................................................................................................ 24

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) .................................................................................. 38

*City of Angoon v. Hodel,*
    803 F.2d 1016 (9th Cir. 1986) ................................................................................ 33

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,

   251 F.3d 1252 (9th Cir. 2001) ................................................................................ 27-28

*Cobell v. Kempthorne*,

   455 F.3d 301 (D.C. Cir. 2006) ...................................................................................... 9

*Cousins v. Sec'y of DOT*,

   880 F.2d 603 ................................................................................................................ 10

*Ctr. for Food Safety v. EPA*,

   757 F. Supp. 3d 997 (N.D. Cal. 2024) ......................................................... 13, 29, 33

*DaimlerChrysler Corp. v. Cuno*,

   547 U.S. 332 (2006) .................................................................................................... 45

*DCH Regional Med. Ctr. v. Azar*,

   925 F.3d 503 (D.C. Cir. 2019) .................................................................................... 17

*Department of Commerce v. New York*,

   588 U.S. 752 (2019) .................................................................................................... 32

*DHS v. Regents of Univ. of Cal.*,

   591 U.S. 1 (2020) ........................................................................................................ 36

*Elgin v. DOT*,

   567 U.S. 1 (2012) ........................................................................................................ 14

*Env't Prot. Info. Ctr. v. Carlson*,

   968 F.3d 985 (9th Cir. 2020) ........................................................................................ 8

*FCC v. Prometheus Radio Project*,

   592 U.S. 414 (2021) .............................................................................................. 29, 33

*Fed Express Corp. v. U.S. Dep't of Commerce*,

   39 F.4th 756 (D.C. Cir. 2022) .................................................................................... 17

*Feldman v. Bowser*,

   315 F. Supp. 3d 299 (D.D.C. 2018) ........................................................................... 24

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,

   98 F.4th 1180 (9th Cir. 2024) .................................................................................... 45

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

*Fleming v. Mohawk Wrecking & Lumber Co.*,

    331 U.S. 111 (1947) ................................................................................................ 20

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,

    618 F.3d 1025 (9th Cir. 2010) ............................................................................... 28

*Freeman v. Fid.-Phila. Tr. Co.*,

    248 F. Supp. 487 (E.D. Pa. 1965) ................................................................... 19-20

*Garcia v. Google, Inc.*,

    786 F.3d 733 (9th Cir. 2015) ................................................................................... 8

*Gill v. Whitford*,

    585 U.S. 48 (2018) ................................................................................................. 45

*Giving Back Fund Inc. v. Mia. Mktg. Grp.*,

    2011 WL 13217774 (C.D. Cal. Jan. 20, 2011) ..................................................... 40

*Greater Bos. Legal Servs. v. DHS*,

    2022 WL 138629 (D. Mass. Jan. 14, 2022) ........................................................... 9

*Hansen v. Nat'l Comm'n on Observance of Int'l Women's Year*,

    628 F.2d 533 (9th Cir. 1980) ................................................................................. 24

*Heckler v. Chaney*,

    470 U.S. 821 (1985) ............................................................................................... 16

*Immigrant Defs. L. Ctr. v. Noem*,

    145 F.4th 972 (9th Cir. 2025) ................................................................................. 8

*In re Excel Innovations, Inc.*,

    502 F.3d 1086 (9th Cir. 2007) ............................................................................... 38

*INS v. Chadha*,

    462 U.S. 919 (1983) ......................................................................................... 23, 26

*Jones v. U.S. Secret Serv.*,

    701 F. Supp. 3d 4 (D.D.C. 2023)............................................................................ 9

*Jorgensen v. Cassiday*,

    320 F.3d 906 (9th Cir. 2003) ................................................................................ 45

*Lincoln v. Vigil,*

 508 U.S. 182 (1993) ............................................................................................................ 16-17

*Lujan v. Defs. of Wildlife,*

 504 U.S. 555 (1992) ................................................................................................................. 24

*Lujan v. Nat'l Wildlife Fed'n,*

 497 U.S. 871 (1990) ............................................................................................................. 9, 10

*Madsen v. Women's Health Ctr., Inc.,*

 512 U.S. 753 (1994) ................................................................................................................. 44

*Manis v. USDA,*

 796 F. Supp. 3d 178 (M.D.N.C. 2025) ................................................................................... 20

*Maryland v. USDA,*

 2025 WL 1073657 (4th Cir. Apr. 9, 2025) ............................................................................ 15

*McMahon v. New York,*

 145 S. Ct. 2643 (2025) (Mem.) ......................................................................................... 10, 39

*Myers v. United States,*

 272 U.S. 52 (1926) ................................................................................................................... 23

*N.Y. Republican State Comm. v. SEC,*

 799 F.3d 1126 (D.C. Cir. 2015) .............................................................................................. 14

*Nken v. Holder,*

 556 U.S. 418 (2009) ................................................................................................................... 8

*Norton v. S. Utah Wilderness All.,*

 542 U.S. 55 (2004) ................................................................................................ 9, 10, 10-11

*NTEU v. Trump,*

 770 F. Supp. 3d 1 (D.D.C. 2025) ........................................................................................... 15

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.,*

 762 F.2d 1374 (9th Cir. 1985) ................................................................................................. 40

*OPM v. AFGE,*

 145 S. Ct. 1914 (2025) (Mem.) ............................................................................................... 39

*Or. Nat. Desert Ass'n v. Bushue*,

  594 F. Supp. 3d 1259 (D. Or. 2022) ................................................................................ 40

*Playboy Enters., Inc. v. Netscape Commc'ns. Corp.*,

  55 F. Supp. 2d 1070 (C.D. Cal. 1999) ........................................................................... 40

*Pom Wonderful LLC v. Hubbard*,

  775 F.3d 1118 (9th Cir. 2014) ....................................................................................... 38

*Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*,

  87 F.3d 1242 (11th Cir. 1996) ....................................................................................... 10

*Sampson v. Murray*,

  415 U.S. 61 (1974) .................................................................................................... 21, 39

*Starbucks Corp. v. McKinney*,

  602 U.S. 339 (2024) ......................................................................................................... 8

*Thunder Basin Coal Co. v. Reich*,

  510 U.S. 200 (1994) ....................................................................................................... 14

*Trump v. AFGE*,

  145 S. Ct. 2635 (2025) ............................................................................................... 8, 10

*Trump v. CASA, Inc.*,

  606 U.S. 831 (2025) ....................................................................................................... 44

*United States v. Fausto*,

  484 U.S. 439 (1988) ....................................................................................................... 14

*United States v. Marshall Durbin & Co. of Haleyville*,

  363 F.2d 1 (5th Cir. 1966) ............................................................................................. 19

*USFWS v. Sierra Club, Inc.*,

  592 U.S. 261 (2021) ................................................................................................... 12, 13

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,

  259 F.2d 921 (D.C. Cir. 1958) ....................................................................................... 39

*Valeo Intell. Prop., Inc. v. Data Depth Corp.*,

  368 F. Supp. 2d 1121 (W.D. Wash. 2005) .................................................................... 40

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

*Weinberger v. Romero-Barcelo*,

    456 U.S. 305 (1982) .................................................................................................................. 44

*Widakuswara v. Lake*,

    2025 WL 1288817 (D.C. Cir. May 3, 2025) ................................................................. 15-16

*Winter v. NRDC*,

    555 U.S. 7 (2008) ............................................................................................. 8, 38, 40, 41

*Wunderwerks, Inc. v. Dual Beverage Co.*,

    2021 WL 5771138 (N.D. Cal. Dec. 6, 2021) ................................................................. 8, 28

*Zepeda v. INS*,

    753 F.2d 719 (9th Cir. 1983) .................................................................................................. 44

**CONSTITUTIONS**

U.S. Const. art. I, § 2 .................................................................................................................. 23

U.S. Const. art. II, § 2, cl. 2 ...................................................................................................... 23

**STATUTES**

5 U.S.C. § 551 ............................................................................................................................. 11

5 U.S.C. § 701 ............................................................................................................................. 16

5 U.S.C. § 704 ...................................................................................................................... 10, 12

5 U.S.C. § 706 ............................................................................................................................. 10

5 U.S.C. § 3502 ........................................................................................................................... 21

5 U.S.C. § 7105 ..................................................................................................................... 14, 15

5 U.S.C. § 7123 ........................................................................................................................... 14

5 U.S.C. § 7701 ........................................................................................................................... 14

5 U.S.C. §§ 7101-7135 ............................................................................................................... 14

5 U.S.C. §§ 7512, 7514 .............................................................................................................. 14

7 U.S.C. § 4 ..................................................................................................................... 18, 30, 31

7 U.S.C. § 296(b) ........................................................................................................................ 21

7 U.S.C. § 2201 ...................................................................................................................... 17-18

28 U.S.C. § 1331 ......................................................................................................................... 14

31 U.S.C. § 1341 ............................................................................................................... 24

40 U.S.C. § 584 ................................................................................................................. 30

Pub. L. No. 119-37, Div. B, § 716, 139 Stat. 495 (2025) ("§ 716") .................................. 22, 23, 26, 28

Pub. L. No. 119-74, Div. C, §421, 140 Stat. 5 (2026) ("§ 421") ........................................ 22, 23, 26, 28

**FEDERAL RULES**

Fed. R. Civ. P. 65 ............................................................................................................. 45

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

5 C.F.R. § 302.102 ............................................................................................................ 36

5 C.F.R. § 335.102 ............................................................................................................ 36

Exec. Order 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ..................................................... 2

**OTHER AUTHORITIES**

H.R. Doc. No. 83-59 (1953)...............................................................................................19

Secretary Memorandum: SM 1078-015, Department of Agriculture Reorganization Plan at 1 (July 24, 2025) ("Sec. Mem.")  ......................................................................................*passim*

Cong. Research Serv., Organizing Executive Branch Agencies: Structure and Delegations of Authority (May 2, 2025) ("Organizing Agencies") ..................................................... 19, 21

Congressional Research Service, *U.S. Department of Agriculture (USDA): Structure and Proposed Changes* (Apr. 14, 2026), https://perma.cc/LY3P-GGBY ............................................................................. 20

CBS News, *Why did the government shutdown? Here's what's behind the funding lapse* (Oct. 1, 2025), https://perma.cc/86Y8-4GY7 ...............................................................................26

GSA, *Agriculture South Building, Washington DC,* https://perma.cc/4F4P-HRC2 .................................................................................41

GAO, Matter of: Department of Agriculture—Application of Statutory Notification Requirement, File: B-334306, Decision (Aug. 15, 2023).................................................................... 21, 22

GAO, Matter of: United States Department of Agriculture and General Services Administration—Consistency of Lease Incentives with the Miscellaneous Receipts Statute, File: B-334307, Decision (Aug. 15, 2023)....................................................................................... 21

USDA, *Rollins, Vaden, and Forst Announce Disposal of Dilapidated USDA Facilities* (Feb. 25, 2026)

("South Building Announcement"),

https://perma.cc/2FW7-38D9 ................................................................................................ 41

USDA, *USDA Reorganization*,

https://perma.cc/87WQ-J7PV ............................................................................................... 31

USDA, *General Information*,

https://perma.cc/7CQR-RHF5 ................................................................................................ 2

USDA, *REE Organizational Restructuring*,

https://www.usda.gov/ree/reorganization ............................................................................. 7

USDA, Reorganization Summary and Analysis of Feedback (Dec. 8, 2025)

("Comment Analysis") ....................................................................................................... 5, 38

USDA, *Secretary Rollins Announces USDA Reorganization, Restoring the Department's Core Mission of Supporting American Agriculture* (July 24, 2025) ("Reorganization Announcement"),

https://perma.cc/SB9Z-2HWL ................................................................................................. 4

OSC Letter (June 25, 2025),

https://perma.cc/7GST-JU55 ................................................................................................ 36

**INTRODUCTION**

The U.S. Department of Agriculture ("USDA" or "the Department") is in the process of implementing a comprehensive reorganization to modernize the Department, optimize its resources, and improve its delivery of services to communities across the nation. Plaintiffs oppose the Department's reorganization and have invoked Administrative Procedure Act ("APA") and *ultra vires* theories of relief, asking this Court to effectively superintend the internal organization of a Cabinet department—from where its offices sit, to which regional structures it maintains, to where its employees report for duty. But neither the APA nor principles of equity contemplate such sprawling relief.

To start, Plaintiffs have failed to show a likelihood of success on the merits. Their claims are unreviewable because Plaintiffs have brought a prototypical programmatic challenge that fails to satisfy the APA's final agency action requirement. Further, because Plaintiffs' motion concerns federal employee and labor-management relations, district court jurisdiction is precluded by the Civil Service Reform Act ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSLMRS"), and Plaintiffs' claims should be channeled through those review schemes. Plaintiffs' claims also fail on the merits. The Department has broad statutory authority to reorganize its internal structure, the appropriations act restrictions that Plaintiffs cite are unconstitutional and without legal effect, and the Department's reorganization efforts are both reasonable and reasonably explained.

Merits aside, the equitable factors bar preliminary relief. Many of Plaintiffs' claims of irreparable harm are entirely speculative, but worse, Plaintiffs' year-long delay in seeking relief both undermines those claims and renders an injunction contrary to the public interest. To enjoin the Department's reorganization efforts now would require the agency to unwind the many steps it has already taken at considerable expense to the American taxpayer.

For all these reasons, the Court should deny Plaintiffs' motion for preliminary injunction.

**BACKGROUND**

**I.    Factual Background**

A.    The Department of Agriculture

Since it was established in 1862, USDA has been known as "The People's Department," a title

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

reflecting its mission to serve farmers, ranchers, landowners, and rural communities. Secretary Memorandum: SM 1078-015, *Department of Agriculture Reorganization Plan* at 1 (July 24, 2025) ("Sec. Mem."). The Department is made up of 29 component agencies and offices with nearly 100,000 employees who serve the American people across the country and abroad. USDA, *General Information*, https://perma.cc/7CQR-RHF5.

B.    Reorganization Efforts

Over the course of the past year, USDA has begun taking the steps to plan and implement "a major organizational realignment that will reshape how the Department is structured and improve how it provides services to the public." Decl. of Mary Pletcher Rice ¶ 7 ("Rice Decl."). While the Department has been transparent that these efforts will include right-sizing its workforce, *see, e.g.*, Sec. Mem. at 2 (explaining reorganization will ensure the size of USDA's workforce aligns with financial resources and priorities), the majority of Plaintiffs' arguments stem from a pre-decisional, deliberative plan that the agency did not ultimately adopt. Based on the specifics of that pre-decisional plan, Plaintiffs frame USDA's reorganization—and, in particular, the agency's shift to a five hub-city organizational framework—as a backdoor Reduction in Force ("RIF") that is a continuation of the other workforce reductions challenged in this lawsuit. But the Department is doing something different here, and the pre-decisional plan Plaintiffs cite is "not the Department's reorganization plan," and "does not reflect USDA's current plans." Rice Decl. ¶ 4.

i.    *Initial Steps*

Beginning in February 2025, the President directed all federal agencies to prepare plans to improve efficiency and optimize the size of the federal workforce. Exec. Order 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025). Consistent with that directive, USDA prepared a pre-decisional planning document that it submitted to the Office of Management and Budget ("OMB") and the Office of Personnel Management ("OPM")—the Agency RIF and Reorganization Plan ("ARRP"). The ARRP was submitted in two phases: ARRP I and ARRP II. *See* Ex. A to Levy Decl., USDA ARRP (Mar. 13, 2025) ("ARRP I"); USDA ARRP (Apr. 14, 2025) ("ARRP II"), ECF No. 440-3. But the ARRP is "not the Department's reorganization plan," and "does not reflect USDA's current plans." Rice Decl. ¶ 4.

ARRP I, finalized March 13, 2025, represented the "first step in the plan to . . . prioritize an

efficient workforce structure and level" at USDA. ARRP I at 1. ARRP I examined several questions, including "the extent to which statutes require a particular organization to perform a function or require that the organization be established with a particular size, scope, or location," *id.* at 3. It also identified several steps that would need to be taken to formulate a reorganization plan, including "requesting [Voluntary Separation Incentive Payment ("VSIP")] authority for Mission Areas and Staff Offices," *id.* at 7; and "engag[ing] Congress" and "work[ing] with the authorizing and appropriating committees to provide briefings as well as provide timely notices on changes in staffing and planned reorganization," *id.* at 8. And ARRP I proposed a timeline by which much of the reorganization would be completed by the end of March 2025. *Id.* at 8-9.

ARRP II, finalized on April 14, 2025, "builds upon USDA's Phase I ARRP submission." ARRP II at 1. ARRP II proposed restructuring plans, including the relocation of much of the "Agency headquarters and National Capital Region (NCR) staff out of the Washington, DC area to five hub locations." *Id.* at 5. ARRP II also set forth "plans" for the Department's NCR buildings, which included retaining the Whitten Building and South Building, and disposing of the George Washington Carver Center ("GWCC"). *Id.* at 5-6. It planned to "aggressively consolidate support functions." *Id.* at 9. ARRP II included a "workforce optimization plan," that set forth "anticipated reductions," through the Deferred Resignation Program ("DRP"), Voluntary Early Retirement Authority ("VERA"), and VSIPs, as well as USDA's "anticipat[ion] that a significant number of employees will decline geographic reassignments out of the NCR or existing regional or state offices to the five target hub cities." *Id.* at 7-8. It specified, however, that any RIFs would "be surgical in nature and focused on downsizing specific locations, programs or divisions that are no longer priorities," and other options would be exhausted "[p]rior to conducting any RIFs." *Id.* ARRP II identified Congressional notification requirements, *see id.* at 15-16, and proposed an updated timeline for implementation, *id.*at 17, which contemplated wrapping up most of the reorganization by September 2025. *Id.*

### ii. USDA Planning

Months after submitting these documents to OMB and OPM, in July 2025, the Secretary of Agriculture ("Secretary") publicly announced the Department's intent to undertake a reorganization.

*See* USDA, *Secretary Rollins Announces USDA Reorganization, Restoring the Department's Core Mission of Supporting American Agriculture* (July 24, 2025), https://perma.cc/SB9Z-2HWL ("Reorganization Announcement"). Her announcement proposed "a phased plan to relocate much of its Agency headquarters and NCR staff out of the Washington, D.C. area to five hub locations," including Raleigh, North Carolina; Kansas City, Missouri; Indianapolis, Indiana; Fort Collins, Colorado; and Salt Lake City, Utah. *Id.* "In selecting its hub locations, USDA considered where existing concentrations of USDA employees are located and factored in the cost of living." *Id.* It also specified that "[t]o make certain USDA can afford its workforce, this reorganization is another step of the Department's process of reducing its workforce." *Id.*; *see also id.* (explaining reorganization intended to "[e]nsure the size of USDA's workforce aligns with available financial resources and agricultural priorities"). But the announcement clarified that "all critical functions of the Department will continue uninterrupted." *Id.* "For example, we are at the height of fire season, and to date, have not only exceeded hiring goals, but have preserved the ability to continue to hire." *Id.* Still, the announcement was "only the first phase of a multi-month process." *Id.*

Concurrent with the public announcement, the Secretary issued Secretary Memorandum: SM 1078-015, *Department of Agriculture Reorganization Plan* (July 24, 2025). The memorandum "serves as a framework for the Department's reorganization, rather than a detailed implementation plan." Rice Decl. ¶ 13; *see also id.* ¶ 7 ("The Secretary's Memorandum establishes a broad structural framework for modernizing the Department."). Instead, the Memorandum "authorize[d] and direct[ed] the actions necessary to effectuate the consolidation, unification, and optimization of functions within the [Department] to achieve improved effectiveness and accountability, enhanced services, reduced bureaucracy and cost savings for the American people." Sec. Mem. The Memorandum invoked specific statutory authority: "[t]his Memorandum is issued under the authority of Reorganization Plan No. 2 of 1953 (5 U.S.C. app.; 7 U.S.C. 2201 note) and The Department of Agriculture Reorganization Act of 1994 (Pub. L. 103-354)." *Id.* And it explained that four main principles should animate the Department's reorganization efforts: (1) ensuring the size of USDA's workforce aligns with financial resources and priorities; (2) bringing USDA closer to its customers by relocating resources outside of the NCR; (3) eliminating management layers and bureaucracy; and (4) consolidating support functions.

*Id.* at 2-4. The Memorandum specifies that the "Deputy Secretary will lead the implementation of the USDA Reorganization Plan and may make changes or adjustments to the plan as needed." *Id.* at 4.

On August 29, 2025, USDA issued National Consultation Right memos to Dr. Everett Kelley, National President of the American Federation of Government Employees ("AFGE") and Randy Erwin, National President of the National Federation of Federal Employees ("NFFE"), requesting their review and comment on the Secretary Memorandum. *See* Rice Decl. ¶ 105; Exs. 1-2 to Rice Decl. AFGE provided a response on September 26, 2025. Rice Decl. ¶ 105; Ex. 3 to Rice Decl. USDA also accepted public comments on the proposed reorganization from August 1 through September 30, 2025. *See* USDA, *Reorganization Summary and Analysis of Feedback* (Dec. 8, 2025) ("Comment Analysis"). The Department received over 46,845 comments from groups including employees, Congress, tribes, state and local governments, unions, non-profit organizations, educational institutions, and citizens. *See id.* The agency summarized and analyzed the comments provided and published that summary December 8, 2025. *See id.*

In December 2025, the Department developed a draft Annual Staffing Plan for Fiscal Year 2026 ("ASP"). Ex. 10 to Walker Decl. The ASP "does not align with or reflect the implementation of the ARRP[]." Rice Decl. ¶ 5. Instead, it "demonstrates that USDA is pursuing staffing changes that are independent of, and inconsistent with, the ARRP[] and reiterates that USDA is not attempting to carry out the ARRP[] through its current reorganization efforts." *Id.* The ASP "forecasts a modest increase in staffing, with 15,923 employees to be hired in FY 2026 as opposed to any further decreases in staffing." *Id.* ¶ 6. Its "[h]iring projections are aligned to support USDA's statutory obligations, mission-critical functions, and address emerging priorities." *Id.* And "almost 3,000 of the total 15,923 anticipated hires were allocated as 'to be determined' to ensure USDA had the flexibility to acquire the workforce needed" to successfully undertake a major reorganization. *Id.*; *see also* Ex. 11 to Walker Decl. at 2 (February 2026 update).

### iii.    Further Planning and Implementation

Beginning in spring 2026, USDA commenced its phased, component-level implementation of the reorganization. *See id.* ¶ 11. "The development of the component agency and staff office reorganization plans has been a deliberate and iterative process, and those plans have been refined over time

in response to operational assessments and feedback from internal and external stakeholders including public comments received." *Id.* ¶ 13. "As implementation planning has progressed, several adjustments have been made to ensure the reorganization aligns with mission needs and operational realities, considers attrition, and accords with the Department's NCR space strategy," reflecting "a thoughtful and evolving approach rather than a static directive." *Id.* ¶ 14. For example, although the Department originally contemplated disposing of the GWCC, it subsequently determined that it should be retained "to better support long-term operational requirements in the NCR." *Id.* ¶ 15; *see also id.* (determination not to consolidate all support functions).

As USDA components have begun implementing reorganization plans, they have provided Congress with multiple reorganization-related notifications. As relevant to Plaintiffs' claims, Congressional notifications to date include those involving the Food and Nutrition Administration ("FNA"); the Research, Education, and Economics ("REE") Mission Area, which includes the Agricultural Research Service ("ARS"), Economic Research Service ("ERS"), National Agricultural Statistics Service ("NASS"), and National Institute of Food and Agriculture ("NIFA"); the Foreign Agricultural Service ("FAS"); the Farm Production and Conservation Mission Area, which includes the Farm Service Agency ("FSA"), Natural Resources Conservation Service ("NRCS"), Risk Management Agency ("RMA"), and Farm Production and Conservation Business Center ("FPAC"). *See* Exs. 1-2 to Decl. of Timisha Fitzgerald Walker ("Walker Decl."), Congressional Notifications. The Department also provided an oral notification regarding Forest Service reorganization plans. These notifications reflect the "most accurate and up to date reorganization plans" for each component agency. Rice Decl. ¶ 4; *see also id.* ¶¶ 26-102 (describing notifications).

And following Congressional notification, where required, USDA has been fulfilling its bargaining obligations with the applicable unions. That process remains ongoing, but agreements have been reached between the FNA and NTEU Ch. 226 as well as FNS and AFGE 2735 for NCR relocation issues; between ARS and AFGE 3147; and the Forest Service and NFFE-FSC. *See* Exs. 3-7 to Walker Decl., Union Agreements. Other negotiations remain in progress including FNA Mid-Atlantic Region and AFGE 2735 and FNA and NTEU. *See* Rice Decl. ¶ 108. With respect to the Congressional notifications made on June 17, 2026, the Department intends to initiate negotiations for those agencies

after July 20, 2026. *Id.* ¶ 109. *See also id.* ¶¶ 103-109 (outlining bargaining activities to date).

To facilitate its reorganization efforts and comply with its obligations under the Utilizing Space Efficiently and Improving Technologies Act (the "USE IT Act"), the Department has taken steps to right-size its real property footprint. The General Services Administration ("GSA") and USDA jointly announced the planned disposal of the South Building in February 2026. At the same time, USDA is actively working to maximize occupancy of the Whitten Building, Yates Building, and GWCC. Rice Decl. ¶ 23. Not only had occupancy levels of those buildings plummeted in recent years, necessitating consolidation, but the South Building requires "extensive deferred maintenance and modernization costs . . . totaling $1.322 billion" to address "deficiencies present[ing] material risks to life, safety, operational continuity, and compliance with federal standards." *Id.* ¶ 20.

USDA also intends to close its Beltsville Agricultural Research Center ("BARC"). The "facility has become financially untenable to sustain due to extensive deferred maintenance, severely deteriorated infrastructure, escalating costs required merely to keep the facility operational, and insufficient appropriations." *Id.* ¶ 25. "Nearly half of all structures [at BARC] are in advanced states of disrepair and already slated for demolition." *Id.* All told, the site carries "approximately $300 million in deferred maintenance." *Id.* USDA has not made final decisions about where and when research conducted at BARC will be relocated, but has identified locations for BARC research projects. *See* USDA, *REE Organizational Restructuring*, https://perma.cc/35CT-R9TQ; Rice Decl. ¶¶ 79(B)(v), (vi).

The agency has terminated several leases of its other properties. *See* Rice Decl. ¶ 114. And to transition to its hub-city model, the Department has also expanded its existing leases, executed new leases, completed renovations of existing leased space, submitted requests for new leases, and transferred funds to construct and purchase new office space in the hub cities. *See id.* ¶ 115.

The agency has begun employee relocation notifications. *See id.* ¶ 110-112. To date, USDA has sent at least 716 employees Management Directed Reassignment Letters. *Id.* Those letters included required decision dates beginning June 30, 2026. *Id.* The Department has also begun hiring under the new hub-based structure. *Id.* ¶ 116. "To date, 71 positions have been filled at hub locations, and an additional 972 positions are in various stages of the hiring process." *Id.*

## II.     Procedural History

On April 28, 2025, Plaintiffs—a collection of unions, advocacy groups, and local governments—filed the present lawsuit against 26 agency defendants. *See* Compl., ECF No. 1. As relevant here, this Court initially enjoined implementation of Executive Order 14210 and the ARRPs prepared at its direction. On July 9, 2025, the Supreme Court stayed the injunction pending appeal, concluding the Government was "likely to succeed on its argument that the Executive Order and [OMB/OPM] Memorandum are lawful." *Trump v. AFGE*, 145 S. Ct. 2635, 2635 (2025). The same planning documents—and the stayed injunction against them—form some of the backdrop for the present motion.

On July 2, 2026, Plaintiffs filed a motion to again supplement their complaint and a motion for preliminary injunction regarding USDA's reorganization nearly 15 months after filing their complaint, and nearly a year after the Secretary announced the Department's reorganization. Plaintiffs seek a preliminary injunction or § 705 stay halting all reorganization efforts across the entire Department.

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008). Thus, "[a] preliminary injunction should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Wunderwerks, Inc. v. Dual Beverage Co.*, 2021 WL 5771138, at *3 (N.D. Cal. Dec. 6, 2021) (Illston, J.) (citation omitted). To prevail, Plaintiffs must make a clear showing that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted). The final two factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 997 (9th Cir. 2025). And because Plaintiffs ask the Court to unwind steps already taken, *see infra* pp. 40-43, much of their requested injunction is mandatory and subject to a "doubly demanding" heightened standard. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

## ARGUMENT

### I.    Plaintiffs' Claims Are Unlikely to Succeed on the Merits.

Likelihood of success "is a threshold inquiry and is the most important factor." *Env't Prot. Info.*

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

*Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). For following reasons, Plaintiffs have not demonstrated a likelihood of success on their claims.

A.    Plaintiffs' claims fail for threshold reasons.

i.    *Plaintiffs have not challenged reviewable final agency action.*

Plaintiffs' claims fail out the gate because they are not seeking judicial review of circumscribed and discrete agency action, and instead, seek review of the comprehensive restructuring of the entire Department.[1] "Under the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). That action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Consistent with these principles, the APA does not permit Plaintiffs to "seek wholesale improvement" of agency management "by court decree." *Lujan*, 497 U.S. at 891. "Because an on-going program or policy is not, in itself, a final agency action under the APA, [] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation modified). "[A] broad programmatic attack" is not a valid APA claim. *Greater Bos. Legal Servs. v. DHS*, 2022 WL 138629, at *7 (D. Mass. Jan. 14, 2022). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Cobell*, 455 F.3d at 307; *see also Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4, 17 (D.D.C. 2023) (explaining APA does not authorize "judicial review over everything done by an administrative agency" (citation modified)).

Plaintiffs' motion presents *precisely* the type of wholesale challenge that the APA forbids. For example, they seek to enjoin "Defendants from taking any action to implement, carry out, or effectuate the USDA Reorganization Plan, or any aspect thereof, as set forth in USDA's [ARRP] and [Secretary Memorandum], including but not limited to" a list of thirteen prohibitions constraining the agency from managing its component agencies, offices, functions, and buildings. *See* Pls.' Mot. for Prelim. Inj. at 1-3, ECF No. 440. Thus, Plaintiffs are not seeking judicial review of a discrete agency action—they are asking the Court to turn over management of the entire agency.

In *Lujan*, the Supreme Court dispelled any notion that the APA affords such relief, explaining

---

[1] Plaintiffs also bring an *ultra vires* challenge, but as explained, *infra* p. 17, there is no basis for that challenge.

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

that it is "entirely certain" that challenges to "flaws in the entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA," even if "one of them that is ripe for review adversely affects [a plaintiff]." 497 U.S. at 892-93. Similarly, in *Norton*, the Supreme Court explained that the purpose of the agency action requirement is "to *protect agencies* from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." 542 U.S. at 66-67 (emphasis added). "If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved," thus improperly "injecting the judge into day-to-day agency management." *Id.* The Court was unequivocal: "The prospect of pervasive oversight by federal courts . . . is not contemplated by the APA." *Id.* The Supreme Court has also stayed injunctions halting similar comprehensive reorganization efforts. *See AFGE*, 145 S. Ct. at 2635; *McMahon v. New York*, 145 S. Ct. 2643 (Mem.) (2025) (staying injunction halting Department of Education's reorganization). Thus, there is no legal basis for Plaintiffs' sweeping claims or requested relief.

Even on a practical level, a wholesale challenge like Plaintiffs' is impossible to litigate pursuant to the mechanics of APA review. "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Accordingly, "APA review typically takes place on the basis of a record compiled by the agency" consisting of the materials it considered "in making the challenged decision." *Cousins v. Sec'y of DOT*, 880 F.2d 603 F.2d 603, 610 (1st Cir. 1989). Wholesale challenges to programmatic decision-making make it impossible for the agency to "compil[e] and organiz[e] the complete administrative record" for the agency action, *see Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.2 (11th Cir. 1996), because when no discrete, final decision has been made (or challenged), no record can be compiled to explain that decision. Nor is it possible to apply the applicable standard of review, *see* 5 U.S.C. § 706.

Considering Plaintiffs' motion through the prototypical final agency action analysis only confirms that they have brought an unreviewable programmatic challenge. Under the APA only "final

agency action" is reviewable, which requires that plaintiffs challenge (1) "agency action," and (2) that action is "final." *Id.* § 704. As to the first, the APA defines "agency action" as a "rule, order, license, sanction, relief, or the equivalent," *id.* § 551(13), that must be a "discrete" act, *Norton*, 542 U.S. at 64. As to the second, agency action must be "final," meaning it must (1) "mark the consummation of the agency's decisionmaking process," rather than be "of a merely tentative or interlocutory nature," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

Plaintiffs' claims fail under this analysis too. Throughout, their motion refers to "USDA's Reorganization Plan"—a term for which they provide no citation and little explanation. *See, e.g.*, Pls.' Mem. in Supp. of Mot. for Prelim. Inj. at 1, ECF No. 440-1 ("Pls.' Mot."). Plaintiffs cite no "rule, order, license, sanction, relief, or the equivalent," 5 U.S.C. § 551(13), that they purport to challenge as the Reorganization Plan. Nor do they explain how any such action determines rights or obligations. Instead, Plaintiffs claim that USDA "created an [ARRP] that imposed a large-scale restructuring and downsizing of the agency (the "Reorganization Plan")." Pls.' Mot. at 1. Elsewhere, they seek to enjoin "the USDA Reorganization Plan, or any aspect thereof, as set forth in USDA's [ARRP] and [Secretary Memorandum]." ECF No. 440 at 1. So, then, Plaintiffs view the Reorganization Plan as something separate from the ARRP and Secretary Memorandum, but they do not explain if or how it is different, and what, exactly, the Reorganization Plan is. Plaintiffs' motion thus fails to challenge any discrete agency "action" at all, and instead, challenges Plaintiffs' vague, sprawling conception of USDA's entire reorganization program. That plainly is not final agency action.

To be clear, even if Plaintiffs were challenging the ARRP or the Secretary's Memorandum directly, they are not final agency actions. *See* Mot. at 40-41. Cursory review of ARRP I & II illustrates that they are not the types of actions the APA identifies as "agency action": they are neither rules, nor orders, licenses, sanctions, relief, or the equivalent. Further, specific language makes clear that they are not final, much less documents that determine legal rights or obligations. For instance, ARRP I describes itself as "the first step" in the reorganization process. ARRP I at 1. And language throughout the document indicates that the agency was working through the initial steps of formulating reorgan-

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

ization proposals. *See, e.g., id.* at 7 ("USDA is currently assessing . . . and will provide additional information in its comprehensive Phase II plan."); *id.* at 8 ("The Department plans to engage Congress as it develops and implements its optimization efforts."). ARRP II is more comprehensive but still recognizes it is subject to change. It repeatedly refers to what the Department "plans" to do; it nowhere represents that the ARRP itself accomplishes those ends. *See, e.g., id.* at 5 ("USDA plans the following for the National Capital Region"); *id.* at 8 ("Plans to Realize Workforce Optimization Considering Deferred Resignation Programs"). It also recognizes multiple steps requiring legislative approval. *See id.* at 15-16. And lest there be any doubt, all of ARRP II's proposed deadlines were slated for 2025. *See id.* at 17. Those clearly were not final.

Further, "[t]o decide whether a document communicates the agency's settled position, courts must consider whether the agency treats the document as its final view on the matter." *USFWS v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021). The Department has clarified that the ARRP is "not the Department's reorganization plan and does not reflect USDA's current plans." Rice Decl. ¶ 4; *see Sierra Club*, 592 U.S. at 268 ("Sometimes a proposal dies on the vine. That happens in deliberations—some ideas are discarded or simply languish. Yet documents discussing such dead-end ideas can hardly be described as reflecting the agency's chosen course." (citations omitted)). Just because Plaintiffs were able to overcome the deliberative process privilege to obtain agency ARRPs in this litigation does not change that USDA's ARRP is, in fact, pre-decisional and deliberative, nor does it render USDA's ARRP final agency action. *See, e.g.*, Order at 7, ECF No. 214 ("[T]he Court assumes without deciding that at least some ARRPs may include pre-decisional and deliberative materials."). And the core of the privilege acknowledges that deliberative materials often may not be final. *See Sierra Club, Inc.*, 592 U.S. 261, 268 (2021) (explaining the privilege itself distinguishes "between predecisional, deliberative documents" and "documents reflecting a final agency decision and the reasons supporting it"). Accordingly, the ARRP is not final agency action, and is, at most, "preliminary . . . or intermediate agency action" that is "not directly reviewable." 5 U.S.C. § 704.

The same is true of the Secretary Memorandum. That memorandum itself is not final agency action: instead, it "authorizes and directs the actions necessary to effectuate the consolidation, unification, and optimization of functions within the Department," and merely sets out principles to guide

the Department's actions. *See* Sec. Mem. Indeed, the memorandum makes clear that the "Deputy Secretary will lead the implementation of the USDA Reorganization Plan and may make changes or adjustments to the plan as needed." *Id.* at 4; *see Sierra Club*, 592 U.S. at 269 ("[A] document that leaves agency decisionmakers free to change their minds does not reflect the agency's final decision." (citation omitted)). The memorandum also notes that "[t]his Secretary Memorandum and any resulting actions do not confer any right or benefit (substantive or procedural) to any party." *Id.* at 5; *cf. Bennett*, 520 U.S. at 177-78 (final agency action is one from "which rights or obligations have been determined, or from which legal consequences will flow"). All of these details undercut any indications of finality. *See also* Rice Decl. ¶ 13 ("The Secretary's Memorandum serves as a framework for the Department's reorganization, rather than a detailed implementation plan.").

Lastly, Plaintiffs claim that "[e]ach of the recent agency-specific USDA actions implementing the Reorganization Plan" are "final agency action." Pls.' Mot. at 41. As an initial matter, many of the implementing actions that Plaintiffs identify have not been finalized and remain speculative. *See, e.g.*, Pls.' Mot. at 13 ("USDA has said it wants FNA's D.C. area building vacated by September 2026. . . . [but] [a]s of now, USDA has not yet sent MDR letters"); *id.* at 21 ("USDA has not revealed the full scope and timing" of Forest Service changes, and although "USFS originally sent a letter alerting approximately 6,500 employees that they might be affected by the reorganization," "USDA subsequently stated that it does not currently intend to relocate all of these employees"); *id.* at 24 ("USDA has not provided clarification on timing, nor have employees yet received reassignments."). Such actions are plainly not "final agency action" suitable for judicial review. But even setting that aside, challenging *every single implementing action* (or at least every action outlined in 17 pages of briefing) is not a proper basis for an APA claim, and only confirms that Plaintiffs have brought an impermissible programmatic challenge. As explained above, it would be virtually impossible to compile administrative records for every implementing action, *see supra* p. 10, such that the Court could "review[] the full administrative record," as required for proper APA review. *Ctr. for Food Safety v. EPA*, 757 F. Supp. 3d 997, 1021 (N.D. Cal. 2024) (Illston, J.). And even if individual implementing actions constituted final agency action, that would not render reviewable Plaintiffs' sweeping challenge to USDA's Reorganization Plan writ large. Instead, they would, at most, be reviewable individually, and if found contrary

to law or arbitrary and capricious, could be individually vacated.

At bottom, Plaintiffs' claims are incompatible with APA review, and Plaintiffs seek relief that the APA does not provide.

> ii.    *Plaintiffs' claims are precluded.*

Even if Plaintiffs had challenged final agency action, the Court still lacks jurisdiction over Plaintiffs' claims because they are precluded. Congress has empowered the judiciary to hear "claims 'arising under' federal law" "by way of 28 U.S.C. § 1331's grant of jurisdiction," but nonetheless, "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enters., Inc. v. FTC*, 598 U.S. 175, 185 (2023). When a statute provides "a particular procedure and time period" for challenging agency actions, a plaintiff may be precluded from relying on a district court suit. *See N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135-36 (D.C. Cir. 2015). Where Congress has done so implicitly, courts determine whether it intended to preclude particular claims by assessing whether (1) such intent is "fairly discernible in the statutory scheme," and (2) the claims are "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994).

Here, the Civil Service Reform Act ("CSRA") "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988). It provides that "[a]n employee . . . may submit an appeal to the Merit Systems Protection Board [("MSPB")] from any action which is appealable to the Board under any law, rule, or regulation." 5 U.S.C. § 7701(a). Generally, an employee who is removed from their position may appeal that decision to the MSPB. *See id.* §§ 7512, 7514. The CSRA also includes the Federal Service Labor-Management Relations Statute ("FSLMRS"), which governs labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135; *AFGE v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019). The Federal Labor Relations Authority ("FLRA") is charged with adjudicating federal labor disputes. 5 U.S.C. § 7105(a)(2). Congress has authorized only courts of appeals review of FLRA decisions. 5 U.S.C. § 7123(a).

This statutory framework precludes jurisdiction. Plaintiffs' motion concerns "employee relations in the federal sector" and "federal labor-management relations." *AFGE*, 929 F.3d at 755 (citation

modified). Congress would not have enacted the "elaborate framework" of the CSRA and FSLMRS for reviewing federal-employee terminations and labor disputes, *Elgin v. DOT*, 567 U.S. 1, 11 (2012), while permitting an end-run around those procedures in the form of a preemptive district-court suit like this one. These schemes preclude jurisdiction here.

Defendants have already presented several variations of this argument to the Court, and so rather than belabor those same arguments, Defendants respectfully refer the Court to their prior briefs. *See, e.g.*, Defs.' Opp to Pls.' Mot for TRO at 23-31, ECF No. 60; Defs.' Prelim. Inj. Opp. at 6-11, ECF No. 117. As Defendants have emphasized, the weight of authority has concluded that preclusion principles have applied in similar federal-employment suits. *See, e.g.*, *AFGE*, 929 F.3d at 753, 761; *Maryland v. USDA*, 2025 WL 1073657 (4th Cir. Apr. 9, 2025); *Am. Forest Serv. Ass'n v. Trump*, 2025 WL 573762, at *8-*11 (D.D.C. Feb. 21, 2025); *NTEU v. Trump*, 770 F. Supp. 3d 1 (D.D.C. 2025); *AFGE v. Ezell*, 2025 WL 470459 (D. Mass. Feb. 12, 2025). And federal labor disputes must be heard through the FLRA review scheme, with judicial review in a federal court of appeals following administrative proceedings before the FLRA. *See AFGE*, 929 F.3d at 754-61; *but see AFGE v. OPM*, 771 F. Supp. 3d 1127 (N.D. Cal. 2025).

Moreover, the posture of this motion is different than those previously decided. *Compare* Defs.' Opp to Pls.' Mot for TRO at 23-31; Order Granting TRO at 22, ECF No. 85 ("Here, the claims are far afield from the central concerns of the Federal Labor Relations Authority, *see* 5 U.S.C. § 7105(a)(2), instead touching on fundamental questions of executive authority and separation of powers."). In contrast to previous motions, which dealt with claims involving Presidential authority and the separation of powers, these claims focus on whether USDA has statutory reorganization authority and whether its reorganization is arbitrary and capricious. *See* Pls.' Mot. at 28-40. Thus, the questions here—whether the agency is relocating personnel without authority, unreasonably, or without adequately assessing the impact of doing so, *see id.*—relate closely to the central concerns of the FLRA. *See*, e.g., 5 U.S.C. § 7105(a)(2)(G) ("The Authority shall . . . resolve complaints of unfair labor practices[.]"). If anything, that the Department has been bargaining with the applicable unions as it formulates its reorganization plans demonstrates that Plaintiffs' claims are exactly the type that should be resolved through these statutory schemes. The bottom line is that the "claims here are brought by a

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

union representing federal employees against their federal employers—thus, they are federal labor-management relations claims," and the FSLMRS's "scheme is exclusive with respect to such claims." *NTEU,* 770 F. Supp. 3d. at 8; *see also Widakuswara v. Lake*, 2025 WL 1288817, at *2 (D.C. Cir. May 3, 2025) ("[F]ederal employees may not use the [APA] to challenge agency employment actions" as "Congress has instead established comprehensive statutory schemes for adjudicating employment disputes with the federal government" and "[t]hese remedial schemes provide[] the exclusive procedures by which federal employees may pursue employment-. . . related claims." (citations omitted)).

Finally, if consideration of the *Thunder Basin* factors is required, those factors reinforce that Plaintiffs must channel their federal employment and labor disputes. *See* Defs.' PI Opp. at 10-11. Congress plainly intended to preclude district court review here for the reasons set forth above. Both statutory schemes provide meaningful judicial review over Plaintiffs' claims; affected employees or organizations representing them can bring Plaintiffs' statutory and arbitrary and capricious claims within the administrative scheme where they are eventually subject to judicial review. Plaintiffs' claims are not "wholly collateral" to the CSRA and FSLMRS scheme. The wholly collateral inquiry asks whether the subject of Plaintiffs' challenge is covered by the CSRA and FSLMRS schemes. Here, the subject of Plaintiffs' motion is the relocation of employees and related federal employment and labor matters—subjects covered by the CSRA and FSLMRS. Because Plaintiffs ask "for the same relief that they could ultimately obtain through the statutory scheme," "[t]heir challenge is not wholly collateral to the statutory scheme." *AFGE*, 929 F.3d at 760. Finally, the application of employment regulations and statutes governing agency operations are matters on which administrative agencies have expertise.

For these reasons, the Court lacks jurisdiction over Plaintiffs' claims, and they must be channeled through the CSRA and FSLMRS's review schemes.

*iii.    USDA's internal organizational decisions are committed to agency discretion by law.*

Review of Plaintiffs' claims is independently unavailable because decisions about the Department's internal structure—where to locate offices, how to allocate personnel among duty stations, and which administrative layers to consolidate—are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Judicial review under the APA requires a "meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). No statute prescribes the

number of USDA regional offices, the location of the Forest Service's headquarters, or the duty station of any particular employee. And the Supreme Court has held that an agency's allocation of resources from lump-sum appropriations among permissible objects is the paradigm of unreviewable discretion, because such judgments "require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether its resources are best spent on one program or another." *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (citation modified). USDA's choice of organizational design represents exactly that type of judgment. The program-specific statutes Plaintiffs invoke—directives to administer nutrition programs, conduct research, and protect forests—speak to *what* the Department must do, not *where* or through what internal structure it must do it, and therefore supply no standard for reviewing the decisions actually challenged.

        B.        <u>Plaintiffs cannot prevail on their *ultra vires* challenge.</u>

Although Plaintiffs bring their claims under the APA and as *ultra vires* claims, they cannot mount an *ultra vires* challenge here. "An *ultra vires* challenge . . . is essentially a Hail Mary pass." *Fed Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 765 (D.C. Cir. 2022) (citation modified). "The agency overstep must be plain on the record and on the face of the statute." *Id.* (citation modified). "That demanding standard is necessary because *ultra vires* review seeks the intervention of an equity court where Congress has not authorized statutory judicial review, on the assumption that Congress has not barred judicial comparison of agency action with plain statutory commands." *Id.*

As explained, *infra,* the agency invoked specific statutory reorganization authority, and its arguments as to why any limitations on that authority are invalid are premised on bedrock constitutional law principles. Any dispute regarding whether that authority adequately supports the Department's reorganization efforts is therefore not so plain on the face of the relevant statutes that *ultra vires* review is warranted, and the matter is properly considered as an APA contrary to law claim. *See DCH Regional Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (*ultra vires* review "covers only extreme agency error, not merely garden-variety errors of law or fact" (citation modified)).

        C.        <u>USDA's reorganization efforts comport with the agency's statutory authority</u>.

                *i.*        *Reorganization Plan No. 2 of 1953 authorizes the Department's efforts.*

The Department has properly invoked its longstanding statutory authority to support its reorganization. Accordingly, USDA's actions are consistent with that authority, are not contrary to law, and are certainly not *ultra vires*.

All of USDA's reorganization measures (no matter how Plaintiffs frame them) are authorized by Reorganization Plan No. 2 of 1953. *See* 7 U.S.C. § 2201 note ("Reorganization Plan"). The Plan provides the Secretary with authority to reorganize the Department, and in particular, "to simplify and make efficient the operation of the Department . . . to place administration of farm programs close to the State and local levels, and to adapt the administration of the programs of the Department to regional, State, and local conditions," *id.* § 4(c)—precisely what USDA intends to do here.

Subject to enumerated exceptions, *see* § 1(b), the statute "transfer[s] to the Secretary . . . all functions not now vested in him of all other officers, and of all agencies and employees, of the Department of Agriculture," *id.* § 1(a), and also provides that the Secretary "may from time to time make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the [Department] of any function of the Secretary, including any function transferred to the Secretary by the provisions of this reorganization plan." *Id.* § 4(a). This language permits the Secretary to reorganize the performance of the functions of the agency as the Secretary "deems appropriate." *Id.* Ordinarily, performance of an agency function necessarily includes determining who, what, when, where, and how that function is performed. *See Function*, Merriam-Webster ("the action for which a person or thing is *specifically fitted* or used or for which a thing exists" (emphasis added)). That understanding is confirmed by other sections of the statute. *See* § 5 (Secretary "may from time to time effect such transfers within the [Department] of any of the . . . personnel affected[.]"); *see also* Cong. Research Serv., *Organizing Executive Branch Agencies: Structure and Delegations of Authority* at 10 (May 2, 2025) ("*Organizing Agencies*") ("Just as laws may provide agencies with a degree of discretion in organizing their internal structures, agencies may also enjoy discretion with regard to assigning statutory functions within the agency."); *id.* at 12 ("[A]gencies often enjoy at least some discretion over their internal organization and management of functions."). Nothing in the statute indicates that any aspect of performance should be excluded from the Secretary's general reorganization authority.

Nor does the Reorganization Plan constrain the scale of the functions that the Secretary may

transfer or reassign; rather, the statute recognizes the Secretary may "assign[] . . . major functions or major groups of functions to major constituent organizational units of the Department[.]" *Id.* § 4(b). Such assignment is authorized by law, so long as "to the extent deemed practicable by the Secretary," the Secretary shall "give appropriate advance public notice of delegations of functions proposed" and "shall afford appropriate opportunity for interested persons and groups to place before the [Department] their views with respect to such proposed delegations."[2]

The Reorganization Plan's legislative history tracks this understanding. President Eisenhower issued a Special Message to Congress when he transmitted the plan. In that message, he "directed" the Secretary to "utilize this delegation authority in such a way as to further certain objectives set forth in the reorganization plan." H.R. Doc. No. 83-59 at 2305 (1953). "Those objectives are to simplify and make effective the operation of the Department of Agriculture, to place the administration of farm programs close to the State and local levels, and to adapt the administration of the programs of the Department to regional, State, and local conditions," *id.*—again, exactly what the Department seeks to do here. Further, he stated that the Reorganization Plan "will permit the establishment of a clearer line of responsibility and authority from the President through the Secretary of Agriculture down to the lowest level of operations in the Department." *Id.* "It will make the Secretary responsible under law for activities within his Department for which he is now in fact held accountable by the President, the Congress, and the public." *Id.* And he specified the Reorganization Plan "will enable the Secretary, from time to time, to adjust the organization of the Department in order to achieve continuous improvement in operations to meet changing conditions." *Id.* These statements underscore that the authority conferred by the statute is broad and intended to give the Secretary extensive control over the operations and functions of the Department, and confirm that Plaintiffs' cramped reading is incompatible with the statute itself. *See* Pls.' Mot. at 29.

Courts interpreting this statute have recognized this more expansive reading. For instance, the Fifth Circuit has explained that the "Reorganization Plan 2 of 1953 . . . placed the *entire administration* of the Department of Agriculture in the Secretary and specifically provided that the Secretary might

---

[2] The Department has complied with these obligations through its Congressional notifications, its communication of reorganization developments on its website, and by soliciting public comment. *See supra* pp. 3-7.

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

delegate any duty to any other officer or employee of the Department." *United States v. Marshall Durbin & Co. of Haleyville*, 363 F.2d 1, 6-7 (5th Cir. 1966) (emphasis added); *see also Freeman v. Fid.-Phila. Tr. Co.*, 248 F. Supp. 487, 490 (E.D. Pa. 1965) (explaining "Reorganization Plan No. 2 of 1953 . . . vested all the functions of the Department . . . in the Secretary . . . [and] authorized him to make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee of the [Department] of any function of the Secretary" and authorized the head of any component agency "to take any action . . . required by law or deemed by him to be necessary and proper to the discharge of the functions assigned to his agency" (citation omitted)). Courts have rejected attempts by plaintiffs to impose constraints that do not appear in the statute's text. *See, e.g., Manis v. USDA*, 796 F. Supp. 3d 178, 198-200 (M.D.N.C. 2025) (rejecting plaintiff's proposed limitation of assignment to existing officers, not officers later appointed). And courts have rejected attempts by plaintiffs challenging similar statutes to impose constraints that do not appear in their text. *See, e.g., Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 117 (1947) (rejecting argument that the "President['s] authority to transfer functions" was limited where statute authorized the President "to make such redistribution of functions among executive agencies as he may deem necessary"); *see also Organizing Agencies* at 6 ("Although the executive branch cannot *contravene a statute* establishing an agency's organizational structure, Congress often provides agency heads with a degree of discretion concerning how they structure their offices internally." (emphasis added)).

The Department's past use of the Reorganization Plan further confirms its broad scope, and indeed, Plaintiffs ignore the Department's use of its authority over the past 73 years. Plaintiffs argue that authority does not allow, for example, the relocation of FNA offices. If that is true, the Court must address whether the use of that authority to establish the Food and Nutrition Service in 1969 was permitted (Secretary's Memorandum 1659, supplement 1, August 8, 1969). *See* Congressional Research Service, *U.S. Department of Agriculture (USDA): Structure and Proposed Changes* at 1 n.7, n.8, 4 n.22, 12 n.77 (Apr. 14, 2026) https://perma.cc/LY3P-GGBY; *see also* Secretary's Memorandum No. 1446, Supplement 1 (Apr. 3, 1961) (establishing Economic Research Service ("ERS") and the Statistical Reporting Service, known today as the National Agricultural Statistics Service ("NASS") under Reorganization Plan authority). The establishment of an entire agency at the sole discretion of the Secretary

without Congressional direction is an exercise of authority beyond modification of the operations of that agency. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 511 (1996) ("[W]e do not dispute the proposition that greater powers include lesser ones."). Plaintiffs cite no case finding the scope of this 73-year-old authority as limited as they suggest.

The Department also previously invoked the Reorganization Plan for purposes similar to those here. In 2018, USDA proposed to realign and relocate the ERS and NIFA outside of the NCR area, and it cited the Reorganization Plan as the legal authority for doing so. *See, e.g.*, USDA Office of Inspector General, *USDA's Proposal to Realign and Relocate the Economic Research Service and National Institute of Food and Agriculture* (Aug. 1, 2019) ("OIG Report"). In response to a Congressional request, the Office of the Inspector General initiated an inspection of the Department's legal and budgetary authority to execute those actions, and among other things, it concluded that the Reorganization Plan provided the Department with the legal authority to move most ERS and NIF offices and employees outside of the D.C. metro region. *Id.* at 1, 3, 5.[3]

As to the other statute the Department has invoked, the Department of Agriculture Reorganization Act of 1994, Pub. L. 103-354 (1994), that statute is relevant only insofar as it left intact the Reorganization Plan authority, as even Plaintiffs acknowledge. *See* 7 U.S.C. § 296(b) ("Subsection (a) shall not affect . . . The authority delegated to the Secretary under Reorganization Plan No. 2 of 1953 (5 U.S.C. App.; 7 U.S.C. 2201 note)."); Pls.' Mot. at 29.

Accordingly, the Reorganization Plan provides the Secretary with the authority to reorganize the Department. But even if it did not, or even if the Court accepted Plaintiffs' framing that the reorganization is a backdoor RIF, the Department would have legal authority for its actions based on the arguments advanced in Defendants' prior briefing. *See* Defs.' TRO Opp. at 38-45; Defs' PI Opp. at 14-19; *Sampson v. Murray*, 415 U.S. 61, 83 (1974) ("[T]he Government has traditionally been granted the widest latitude" in personnel matters and "the dispatch of its own internal affairs."); 5 U.S.C. § 3502 (Congressional authorization of RIFs pursuant to OPM regulations).

---

[3] Two Government Accountability Office ("GAO") reports analyzing this same relocation assumed without deciding that the relocation itself was lawful, and analyzed only the fiscal-law consequences. *See* GAO, Matter of: Department of Agriculture—Application of Statutory Notification Requirement, File: B-334306, Decision (Aug. 15, 2023); GAO, Matter of: United States Department of Agriculture and General Services Administration—Consistency of Lease Incentives with the Miscellaneous Receipts Statute, File: B-334307, Decision (Aug. 15, 2023).

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

21

*ii.    Plaintiffs' cited appropriations act restrictions are invalid.*

Perhaps implicitly acknowledging the Department's statutory authority here, Plaintiffs' arguments instead rely primarily on restrictions contained in the fiscal year 2026 appropriations acts for USDA and the Forest Service.[4] *See* Pls.' Mot. at 30-33. But those restrictions do not preclude the Secretary from taking any of the actions at issue.

As relevant, the FY 2026 USDA appropriations act provides that

> None of the funds provided by this Act . . . shall be available for obligation or expenditure through a reprogramming, transfer of funds, or reimbursements as authorized by the Economy Act, or in the case of the Department of Agriculture, through the use of the authority provided by section 702(b) of the Department of Agriculture Organic Act of 1944 (7 U.S.C. 2257) or section 8 of Public Law 89-106 (7 U.S.C. 2263), that—
> (1) creates new programs;
> (2) eliminates a program, project, or activity;
> (3) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted;
> (4) relocates an office or employees;
> (5) reorganizes offices, programs, or activities; or
> (6) contracts out or privatizes any functions or activities presently performed by Federal employees;
> unless the Secretary of Agriculture or the Secretary of Health and Human Services (as the case may be) notifies in writing and receives approval from the Committees on Appropriations on both Houses of Congress at least 30 days in advance of the reprogramming of such funds or the use of such authority.

Pub. L. No. 119-37, Div. B, § 716, 139 Stat. 495, 544-45 (2025) ("§716"). The same section provides that "[a]s described in this section, no funds may be used for any activities unless the Secretary of Agriculture . . . receives from the Committee on Appropriations of both Houses of Congress written or electronic email confirmation of receipt of the notifications as required in this section." *Id.* The Forest Service appropriations act contains similar language, though it is more limited. It provides that "[n]one of the funds made available in this Act . . . may be reprogrammed without the advance notification and approval of the House and Senate Committees on Appropriations" in accordance with certain reprogramming procedures. Pub. L. No. 119-74, Div. C, §421, 140 Stat. 5, 163 (2026) ("§ 421").

To start, USDA has fully complied with the acts' Congressional notice requirement by providing Congress with notifications throughout the reorganization process. *Supra* p. 6.

---

[4] Plaintiffs focus on FY 2026 appropriations acts restrictions, but FY 2026 ends on September 30, 2026. So, even if Plaintiffs' arguments had any merit, they would expire within a month of the hearing on this motion.

The Congressional approval requirement contained in § 716[5] and § 421,[6] however, is unconstitutional and cannot be enforced. The requirement gives one house of Congress the ability to "veto" the other house, or even the President, by requiring a second approval by a single committee. The Supreme Court ruled that such provisions are unconstitutional and without legal effect in *INS v. Chadha*, 462 U.S. 919 (1983). There, the Court considered a challenge to a provision authorizing one house of Congress, by resolution, to invalidate a decision of the Executive Branch—a mechanism known as a legislative veto. The Court held the provision unconstitutional because it allowed one house of Congress to veto an Executive Branch decision without satisfying the constitutional requirement of bicameral passage and presentment to the President. *Id.* at 951-59. *Chadha* thus stands for the well-established principle of constitutional law that Congress may only bind through legislation—if Congress disagrees with an Executive Branch action, its only remedy is to pass a law. *Id.*; *see also* 5 U.S.C. §§ 801, *et seq.* (Congress may disapprove administrative rules by passing joint resolution of disapproval signed by the President or overriding Presidential veto). *Chadha* also emphasized that where one house is authorized to perform certain functions, the Constitution so states. *Compare* U.S. Const. art. II, § 2, cl. 2 (requiring advice and consent of Senate for ratification of treaties and certain Presidential appointments); *id.* art. I, § 2, cl. 5 (providing House of Representatives with sole power of impeachment). If anything, the legislative veto here is even more problematic than the one in *Chadha* because only a single committee of either house of Congress may block the Department from taking otherwise authorized action. *See* § 716; § 421. This is unconstitutional, and the Executive Branch need not follow unconstitutional laws. *See Myers v. United States*, 272 U.S. 52 (1926).

Other government actors share USDA's position on this issue. For instance, following the Department's 2018 relocation efforts, the GAO independently considered whether an analogous committee approval requirement was enforceable. GAO, Decision, Matter of: Department of Agriculture—Application of Statutory Notification Requirement, File B-334306 at 10 (Aug. 15, 2023). The

---

[5] Section 716's restriction does not apply to the actions Plaintiffs challenge because none of these actions were taken pursuant to the authority provided by section 702(b) of the Department of Agriculture Organic Act of 1944 (7 U.S.C. § 2257) or section 8 of Public Law 89-106 (7 U.S.C. § 2263).

[6] Defendants' same arguments apply to the legislative veto provision Plaintiffs cite regarding the disposal of BARC. *See* Pls.' Mot. at 31 n.27.

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

GAO cited *Chadha*, and "consistent with precedent," "conclude[d] that [the appropriation act's] requirement for the approval of the Appropriations Committees is not legally binding and without effect." *Id.* The GAO further concluded that "the requirement for advance written notice from the Secretary of Agriculture" was a "valid oversight mechanism . . . well within Congress's power to employ." *Id.* Accordingly, "USDA was required to notify the Appropriations Committees before making the transfers at issue, but not to obtain their approval." *Id.* That is what USDA has done regarding its current reorganization efforts. *See supra* p. 6.

Two further points confirm that the appropriations act restrictions cannot carry Plaintiffs' argument. *First*, Plaintiffs identify no suitable cause of action to enforce conditions of this kind. Sections 716 and 421 regulate the relationship between the Executive Branch and the appropriations committees, and Congress polices compliance through the appropriations process itself and through the procedures set forth in the Anti-Deficiency Act—not through private litigation by parties who are neither the object nor the intended beneficiary of reprogramming procedures. For this reason, Plaintiffs' APA claim is impliedly precluded by the Anti-Deficiency Act's scheme. *See* 31 U.S.C. § 1341(a)(1)(A); *Block v. Community Nutrition Inst.*, 467 U.S. 340, 346 (1984). Congress has never suggested that actions taken in violation of the Act are void, nor has it authorized judicial orders barring the expenditure of funds or providing other forms of prospective equitable relief. *See Feldman v. Bowser*, 315 F. Supp. 3d 299, 305 (D.D.C. 2018). Moreover, at bottom, Plaintiffs challenge unauthorized expenditures from the Treasury—a generalized grievance not suitable for APA review and incompatible with Article III jurisdiction. *See, e.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573-76 (1992) (discussing line of cases dismissing taxpayer suits on basis that they implicated only generalized grievances that are incompatible with Article III); *Hansen v. Nat'l Comm'n on Observance of Int'l Women's Year*, 628 F.2d 533, 534 (9th Cir. 1980) (explaining even members of Congress have no "direct interest in having monies appropriated by the Congress used for no other purpose than those authorized by law"). *And second*, the FY 2026 riders expire with the fiscal year on September 30, 2026. *See supra* note 4. Whatever their effect through that date, provisions that lapse within weeks of the hearing on this motion cannot support the indefinite, forward-looking injunction Plaintiffs seek.

As to the remaining restriction Plaintiffs cite—that the "Forest Service shall maintain staffing

levels in order to fulfill [its] mission" and defined that mission, Pub. L. 119-74, Div. C Tit. III, 140 Stat. 5, 137-46 (2026)—Plaintiffs have cited no USDA action that runs contrary to this directive. As explained above, USDA has not conducted RIFs nor plans to RIF Forest Service employees, and has continued hiring at the pace of attrition. *Supra* p. 5; Rice Decl. ¶ 9. As explained below, Plaintiffs have failed to establish that their survey evidence demonstrating likely attrition is even admissible, much that the Forest Service is likely to become so understaffed that it cannot fulfill its mission. *Infra* pp. 27-28; Reorganization Announcement ("For example, we are at the height of fire season, and to date, have not only exceeded hiring goals, but have preserved the ability to continue to hire.").

                *iii.*     *Plaintiffs propose severing too much.*

Even if the legislative vetoes on which they rely are invalid under *Chadha*, Plaintiffs claim that the FY 2026 appropriations acts still bar the Department's reorganization efforts. *See* Pls.' Mot. at 32-33. They claim that under severability principles, the Court should sever both the legislative vetoes and the Congressional notice requirements paired with them, such that the acts' prohibitions on the use of funds to reorganize function as absolute. *Id.* Plaintiffs' arguments are contrary to the Supreme Court caselaw they cite and otherwise unpersuasive. The Court should reject Plaintiffs' approach and should sever only the legislative vetoes themselves.

The Supreme Court has made clear that "[a] court should refrain from invalidating more of the statute than necessary," and "[w]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of [the] court to so declare, and maintain the act in so far as it is valid." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987). "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Id.* Further, courts consider "whether the statute will function in a manner consistent with the intent of Congress," and in the "context of a legislative veto," "it is not only appropriate to evaluate the importance of the veto in the original legislative bargain, but also to consider the nature of the delegated authority that Congress made subject to a veto." *Id.* This is because "[s]ome delegations of power to the Executive . . . may [be] so controversial or so broad that Congress would have been unwilling to make the delegation without a strong oversight mechanism." *Id.*

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

25

Plaintiffs' severability arguments fail for a host of reasons. First, Plaintiffs propose invalidating more of the statute than necessary, contrary to *Alaska Airlines*. Plaintiffs' position is that, if the legislative veto is invalid, § 716 and § 421's limitation on the use of funds functions as an absolute prohibition. But that reading severs too much. Congress did not include just one oversight mechanism here, it included two—it required notice *and* approval. Simply because one mechanism is unconstitutional does not mean the other should be invalidated, particularly when the statute remains completely "[]capable of functioning independently" and "fully operative as [] law." *Id. Chadha* itself recognized that "report and wait" provisions like the notice provisions here should ordinarily "survive[] as a workable administrative mechanism," that "preserve" "Congress' oversight." *Chadha*, 462 U.S. at 935. Such provisions "g[i]ve Congress the opportunity to review" agency actions before they are finalized "and to pass legislation barring their effectiveness if . . . found objectionable." *Id.* at 935 n.9.

Second, Plaintiffs overstate Congressional intent by reading too much into the legislative history. That Congress did not enact OMB and USDA's requested budget cuts says little about Congress's view of USDA's relocation of personnel. *See* Pls.' Mot. at 4. And although Plaintiffs cite the government shutdown and the fact other federal agencies conducted RIFs, Plaintiffs provide no evidence that the government shutdown resulted from the Department's reorganization plans. *See id.*; *see also* CBS News, *Why did the government shutdown? Here's what's behind the funding lapse* (Oct. 1, 2025), https://perma.cc/86Y8-4GY7 (identifying expiring "health insurance subsidies" as the center of the shutdown debate). And unlike other agencies, USDA has not conducted large-scale RIFs, nor plans to conduct RIFs as part of its reorganization. Rice Decl. ¶ 9. That Congress rebuffed USDA's suggestion to remove the Congressional notice and approval requirements in the FY 2026 appropriations act and previous acts does not demonstrate that, absent inclusion of those requirements, Congress contemplated refusing to fund the Department at all. *See* Pls.' Mot. at 33 n.29. Simply put, the legislative history fails to demonstrate that the legislative veto over USDA reorganization efforts was so important to "the original legislative bargain" of the Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, a 160-page piece of legislation that funds not only USDA, but also the Food and Drug Administration, the Legislative Branch, Veterans Affairs, and Military Construction, that the statute would not "function in a manner

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

consistent with the intent of Congress," and "in its absence," "Congress would not have enacted" it. *Brock*, 480 U.S. at 685.

And third, the delegation subject to the legislative veto only confirms that this is the case. The appropriations acts at issue delegate no additional authority to the agency (as relevant here)—they simply appropriate funds. There is no delegation of power "so controversial or so broad that Congress would have been unwilling to make the delegation without a strong oversight mechanism." *Id.* Congress already granted USDA the statutory authority it is exercising, and if Congress wanted to limit that authority, it could repeal the Reorganization Plan. Congress could also preempt by statute any of the Department's reorganization plans upon receiving notifications. Accordingly, the Court should reject Plaintiffs' severability analysis and sever only the Congressional approval provisions.

> *iv.    Plaintiffs' claims about USDA's performance of mandated functions are entirely speculative.*

Plaintiffs next claim that the Department's reorganization efforts will degrade its components' capacity to perform functions mandated by Congress. *See* Pls.' Mot. at 33. There are a number of flaws with Plaintiffs' arguments.

First, to estimate the expected attrition of USDA employees, Plaintiffs rely primarily on survey evidence compiled by employee unions.[7] But though Plaintiffs have filed hundreds of pages of declarations and exhibits in support of their motion, they have not provided any of that survey evidence itself, nor provided details about the methodology used to conduct the surveys they cite, how many employees responded, where respondents were located, or any information to provide context to demonstrate the surveys' usefulness. *See, e.g.*, Rosenthal Decl. ¶¶ 24-31, ECF No. 440-41 (providing only percentages of respondents not "likely" to relocate). The percentages Plaintiffs' declarations provide are entirely conclusory. *See, e.g.*, *id.* ¶¶ 26-30; *see also* Ex. A to Rosenthal Decl. (discussing themes and concerns arising from the survey results but providing no information about survey itself); Dodson Decl. ¶¶ 14-15, ECF No. 440-5 (offering conclusory figures and summary of survey); Soriano Decl. ¶ 17, ECF No. 440-10 (same); Kotyk Decl. ¶¶ 29-36, ECF No. 440-3 (same). Plaintiffs have provided no information demonstrating whether these surveys are the product of reliable methodology such that they may be admissible. *See Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263

---

[7] Plaintiffs also rely on statements in declarations, but those too are conclusory or based on hearsay.

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

(9th Cir. 2001) (for a survey to be admissible, there must be a "proper foundation for admissibility," and the survey must be "conducted according to accepted principles"); *see also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010). For all Defendants know, Plaintiffs' estimated attrition rates could be based on a handful of people. And regardless, the manner in which surveys are crafted and distributed can significantly impact their accuracy, and understanding that information is even more important when surveys are being administered by interested parties to this lawsuit. Without this context, it's impossible to know whether any survey would constitute admissible evidence, and so even given the lower evidentiary standard on a preliminary injunction, the Court should not find that this evidence has persuasive value. Accordingly, Plaintiffs have not made "*a clear showing*," or "carrie[d] the burden of persuasion" when their attrition arguments are premised on conclusory statistics. *Wunderwerks*, 2021 WL 5771138, at *3.

Plus, attrition is only one half of the staffing equation: Plaintiffs have not considered agency hiring. The Department's FY 2026 Staffing Plan estimated that USDA would hire an additional *15,923 employees* in FY 2026. *See* Rice Decl. ¶¶ 5-6; ASP at 8. Nearly 1,500 of those employees would be hired to ensure the agency could "fulfill [its] statutory obligations," and another 3,312 employees were hired for "other mission-critical areas." ASP at 8. USDA actually "project[ed] a nominal *net gain* to the workforce associated with increased capacity required to carry out Presidential priorities targeted at protecting Americans and our food supply and delivering support to rural communities." *Id.* at 7 (emphasis added). "Hiring in most agencies [was] expected to . . . focus[] on maintaining capacity by hiring at the rate of expected attrition and realigning the workforce to address the most critical priorities." *Id.* The agency's staffing plans thus undercut any argument that, even assuming some attrition, the agency's workforce will be so depleted that it cannot perform its statutorily mandated functions.

\*\*\*

For all of these reasons, the Department has exercised valid statutory authority, the Congressional approval requirements in § 716 and § 421 are unconstitutional and lack legal effect, the Congressional notice requirements in those statutes remain, and USDA has provided notice consistent with those requirements. USDA's reorganization efforts have been, and continue to be, lawful.

D.    USDA's reorganization has been reasonable and reasonably explained.

Plaintiffs have brought several arbitrary and capricious claims under the APA. *See* Pls.' Mot. at 34-40. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.* "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* "An agency must examine the relevant data and its decision is arbitrary and capricious if it entirely failed to consider an important aspect of the problem." *Ctr. for Food Safety*, 757 F. Supp. 3d at 1021 (citation omitted). "In evaluating these claims, the Court reviews the full administrative record." *Id.*

USDA's reorganization efforts are both reasonable and reasonably explained. As the Secretary's Memorandum explains, four commonsense principles animate the Department's reorganization: (1) ensuring the size of USDA's workforce aligns with financial resources and priorities; (2) bringing USDA closer to its customers by relocating resources outside of the national capital region; (3) eliminating management layers and bureaucracy; and (4) consolidating support functions. *See* Sec. Mem. at 2-4. These goals serve as the foundation for reasonable agency action.

As to the first, the Secretary explained that, in recent years, the Department's workforce expanded by 8%, but was funded largely through temporary funding. *Id.* at 2; *see also* Rice Decl. ¶ 8 ("Because many positions added in prior years were funded through temporary, nonrecurring sources—primarily the Inflation Reduction Act and the Infrastructure Investment and Jobs Act—USDA could not sustain those staffing levels once that supplemental funding diminished."). Therefore, "[t]o make certain USDA can afford its workforce," USDA is reorganizing in part to "reduc[e] its workforce." Sec. Mem. at 2. Still USDA avoided RIFs by "leverage[ing] voluntary programs such as the [DRP], [VERA], and [VSIPs]," *id.*, and has no "plans to conduct any [RIFs]," Rice Decl. ¶ 9.

As to the second, the Secretary explained that although the Department employs thousands of employees "that work within the National Capital Region (NCR)," that region "has one of the highest costs of living in the country, with a federal salary locality rate of 33.94%." Sec. Mem. at 2. "To ensure that USDA is located closer to the people it serves while achieving savings to the American

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

taxpayer," USDA intends to relocate some of its NCR staff to "five hub locations." *Id.* To start, the relocation proposal seeks to "strengthen USDA's presence in key agricultural regions across the country," and locate USDA employees closer to the public they serve. USDA, *Frequently Asked Questions USDA Reorganization* (Oct. 29, 2025) ("FAQs"); *see also* Review of the USDA Reorganization Proposal, Hearing Before the Committee on Agriculture, Nutrition, and Forestry United States Senate, S. Hrg. 119-32 at 11 (July 30, 2025) ("Dep. Sec. Test.") ("It makes more sense for the Forest Service to be located actually close to the forests it is in charge of managing."). This is not only reasonable, but consistent with the statute the Department has invoked. *See* Reorganization Plan § 4. Further, the selection of hub locations considered "existing concentration of USDA employees and the cost of living for USDA employees." *Id.* Relocation not only helps USDA reduce costs, but facilitates its ability to develop and retain talent. As USDA's Deputy Secretary explained during his Congressional testimony, the reorganization will allow the Department "to build the next generation of USDA leadership." *See* Dep. Sec. Test. at 6. He explained the "cost of living here in Washington, DC, is prohibitive," and the Department "want[s] people to come to USDA for a career, to start a family, and to stay with us," but "[u]nfortunately, given the cost of living in the [NCR]," career civil servants "can no longer do that in the District of Columbia." *Id.* at 7; *see id.* at 8 ("Because on a government salary, government employees cannot afford to start a quality life in Washington, DC, but they most certainly can in Indianapolis, Indiana.").

And to the extent that the Department's reorganization efforts and obligations under the USE IT Act require the closure of existing facilities, USDA has notified GSA that it did not meet occupancy requirements for six facilities and is relinquishing control to GSA or terminating leases as appropriate. Per the USE IT Act, "[a]ll buildings, leased or owned by a government agency, should be at least 60 percent occupied." *Id.* at 5. If an agency fails to meet that threshold, it "should choose to consolidate and vacate to get into a footprint that does meet the 60 percent threshold." *Id.*; *see also* 40 U.S.C. § 584 (d)(B)(3) (explaining that if an "agency fails to meet the 60 percent target [for occupancy] . . . [t]he Administrator shall, in consultation with the Director, take steps to reduce the space of the tenant agency, including consolidating the tenant agency with another agency, selling or disposing of excess capacity space, and adjusting space requirements, as appropriate, for any replacement space"). That is

exactly what USDA is doing here because not "one of USDA's buildings in the [NCR] meets this congressionally mandated 60 percent occupancy." Dep. Sec. Test. at 5. And as explained, the buildings the Department has selected for disposal would otherwise cost the Department millions of dollars to retain due to deferred maintenance costs, and otherwise present significant operational challenges. *See supra* p. 7; *infra* pp. 35-36; Ex. 1 to Walker Decl., Letter to Chairman Hoeven at 3.

The reorganization is also intended to reduce or eliminate bureaucratic management layers, reduce duplication, and consolidate support functions. To promote coordination across USDA, regional offices and other similar management layers will be co-located in the hub locations to the greatest extent possible, and mission area and agency resources will be realigned to consolidated functions. Sec. Mem. at 3-4; Rice Decl. ¶¶ 26-102. This is not only reasonable, but consistent with statutory authority. *See* Reorganization Plan § 4 (permitting reorganization "to simplify and make efficient the operation of the Department").

The Department has made significant efforts to explain its reorganization proposals. *See, e.g.*, Reorganization Announcement; Sec. Mem.; FAQs; Dep. Sec. Test.; Congressional Notifications; USDA, *USDA Reorganization* https://perma.cc/87WQ-J7PV. For these reasons, each of Plaintiffs' arbitrary and capricious claims fail. Defendants respond to Plaintiffs specific arguments as follows.

> *i.*      *USDA's reorganization is not pretextual.*

Plaintiffs' first claim is that USDA's reorganization is arbitrary because the agency's public explanations are pretextual and do not align with the Department's internal rationale, *see* Pls.' Mot. at 35-36, but Plaintiffs' argument is contradicted by the evidence.

USDA has consistently represented, in both its public-facing statements and its internal, deliberative materials, that its reorganization plans include workforce optimization measures, including downsizing. *See* Reorganization Announcement ("To make certain USDA can afford its workforce, this reorganization is another step of the Department's process of reducing its workforce."); Sec. Mem. at 2 ("USDA has and will continue to fully leverage voluntary programs such as the [DRP], [VERA], and [VSIPs]," and RIFs "will be implemented only if needed and only after approval by USDA's Deputy Secretary."); FAQS at 2 ("If given a directed reassignment outlined in an offer letter, a choice to decline reassignment will result in termination."). Still, the fact remains that relocating employees—

even if some voluntarily resign instead—is not the same as implementing large-scale RIFs as Plaintiffs suggest. USDA has reiterated time and again that it is relying heavily on completely voluntary tools to reduce its workforce. And regardless, the Deputy Secretary has also openly acknowledged that he did not "think 100 percent" of employees would "relocate." *Id.* at 26.

Plaintiffs' reliance on *Department of Commerce v. New York*, 588 U.S. 752 (2019), is misplaced. There, the Court confronted a rationale that "seem[ed] to have been contrived" and that was adopted to conceal the actual basis for the decision. *Id.* at 784-85. Nothing of the kind occurred here. As explained, the Secretary announced publicly that the reorganization "is another step of the Department's process of reducing its workforce." Reorganization Announcement. A pretext theory cannot rest on an agency's candid public statement of the very objective Plaintiffs say was concealed. And judicial inquiry into pretext is available only upon a "strong showing of bad faith or improper behavior" sufficient to overcome the presumption of regularity that attaches to agency action. *Dep't of Commerce*, 588 U.S. at 781 (citation omitted). Plaintiffs' contrary narrative—built on a planning document the Department never adopted, *see* Rice Decl. ¶ 4—does not come close to making that showing.

But most importantly, Plaintiffs rely on the ARRP as the basis for the Department's supposed "goals." *See* Pls.' Mot. at 35-37. As explained above, the ARRP is "not the Department's reorganization plan," and "does not reflect USDA's current plans." Rice Decl. ¶ 4. Therefore, whatever the ARRP's goals may have been, they are irrelevant to the reasonableness of the Department's current plans. And although Plaintiffs claim that the relocation is designed to force attrition, *see* Pls.' Mot. at 36-37, these arguments are belied by the Department's staffing plans, which contemplate substantial hiring to support the reorganization, *see* ASP, as well as the Deputy Secretary's testimony that the agency does not expect attrition rates as high as past relocations, *see* Dep. Sec. Test. at 26. Likewise, as explained in the next section, USDA reasonably declined to let the attrition figures from the 2018 ERS/NIFA relocation dictate the present reorganization. *See infra.*

    *ii.  USDA was not required to assess any impacts of attrition.*

Plaintiffs next contend that USDA's reorganization efforts are arbitrary because the agency failed to analyze employee attrition's impact on agency functions. *See* Pls.' Mot. at 37-38. Not so.

To reiterate, Plaintiffs challenge the "USDA Reorganization Plan" as the final agency action

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

here, citing the ARRP and the Secretary's Memorandum as the documents supposedly evidencing that plan. *See* Pls. Mot. at 40-41. Both documents were created in 2025; at that time, USDA was not required to provide comprehensive attrition analysis because, under the APA, an agency must examine only "the relevant data," and its decision is arbitrary and capricious only if it "entirely failed to consider an important aspect of the problem." *Ctr. for Food Safety*, 757 F. Supp. 3d at 1021 (citation omitted). But because the Department intends to proceed on an agency-by-agency basis, and these initial planning documents made no final decisions regarding when, where, or how many offices or employees would be relocated, any large-scale attrition analysis would have been entirely speculative and hypothetical. Simply put, that would not be relevant data, and hypothetical attrition was not an "important aspect" of the problem. *See, e.g. City of Angoon v. Hodel*, 803 F.2d 1016, 1020 (9th Cir. 1986) (explaining an agency "need not consider 'remote and speculative'" possibilities "whose effects cannot be readily ascertained" (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978))). It was thus reasonable to forego attempting that large-scale analysis. *See Prometheus Radio Project*, 592 U.S. at 427 ("The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies."). Nor was there any existing evidence the agency failed to consider.

Plaintiffs identify no later discrete implementing action for which the agency was required to perform an attrition analysis. Nonetheless, the Department will conduct attrition analyses in conjunction with hiring and facilities planning at relocation sites as it finalizes relocation plans on an agency-by-agency basis, demonstrating that it has not entirely failed to consider this issue. *See* Rice Decl. ¶ 119-120. This approach is reasonable because attrition rates may vary substantially between different agencies based on all sorts of factors, such as relocation destination and consolidation of functions. And attrition estimated closer in time to actual relocation—when details have been finalized and employees are presented an actual choice, rather than a hypothetical possibility—will be much more accurate and useful to the agency. Further, the best information currently available to the agency indicates that, as a result of the current job market, attrition will be less than during prior reorganizations. *Id.*

At any rate, Plaintiffs are focused on how attrition will impact the Department's ability to function, *see* Pls.' Mot. at 38, but as explained, Plaintiffs have not carried the burden of persuasion to demonstrate that attrition will be as significant as they fear. *See supra* pp. 27-28. Further, in formulating

their reorganization plans, each agency has considered the functions it is responsible for, and formulated its reorganization plans to *improve* its ability to perform those functions and deliver services to the public. For instance, FNA has proposed "changes . . . designed to simplify the chain of command, strengthen local partnerships, and enhance customer service, all while administering more effective evaluation of nutrition systems." Ex. 2 to Walker Decl., FNA Notice at 1; *see also id.* at 2 ("This model supports fair distribution of workload, increases collaboration among program specialists within their program areas, and expands nationwide program consistency—ultimately improving support provided to States. The structure will reinforce consistency in methods, and support knowledge transfer."). Likewise, RMA has "implemented a workforce realignment strategy to place personnel where they provide the greatest value – closer to agricultural producers, Approved Insurance Providers (AIPs), and regional partners," in order to "strengthen[] program delivery, improve[] responsiveness," and align[] staffing with field based operation needs." Ex. 2 to Walker Decl., RD Cong. Notice at 3. Or the FSA's changes "include integrating and expanding executive level oversight and leadership at the appropriate levels . . . to support rapid decision-making and implementation of statutorily mandated programs." *Id.* at 2. This list goes on. *See generally* Rice Decl. ¶¶ 26-102. The Department's subagencies are not ignoring the reorganization's impact on agency functions; they are tailoring the reorganization to improve those functions.

Further, as explained above, *see supra* pp. 5, in its FY 2026 Staffing Plan, the agency estimated that it would hire an additional 15,923 employees in FY 2026, including 1,500 employees to ensure the agency could "fulfill [its] statutory obligations." Rice Decl. ¶ 6; ASP at 8. USDA actually "project[ed] a nominal *net gain* to the workforce associated with *increased capacity* required to . . . protect[] Americans and our food supply and deliver[] support to rural communities." ASP at 7 (emphasis added). "Hiring in most agencies [was] expected to . . . maintain[] capacity by hiring at the rate of expected attrition and realigning the workforce to address the most critical priorities." *Id.* The agency's staffing plans thus demonstrate that the agency has not "entirely failed" to consider how its staffing impacts its functions and services.

Lastly, Plaintiffs rely heavily on the attrition resulting from USDA's 2018 relocation of ERS and NIFA headquarters from Washington, D.C. to Kansas City as evidence that the Department is

discounting the expected attrition here. *See* Mot. at 37-38. But it is not reasonable to assume that relocation is comparable to the present reorganization. While that relocation affected the headquarters of only two component agencies, the current reorganization contemplates a comprehensive relocation of most agencies to several different cities. Further, the workforce (generally and of the federal government) has changed substantially since 2018, particularly in the wake of the COVID-19 pandemic. Washington, D.C. has changed a great deal. *See, e.g.*, Wall Street Journal, *D.C.'s Economy Is Stuck. Will Trump's Return-to-Office Mandate Bring It Back* (Jan. 25, 2025) (describing D.C.'s "downtown economy" as "a shadow of its prepandemic self"). The job market has changed substantially. *See* Wall Street Journal, *Unemployed Office Workers Are Having A Harder Time Finding New Jobs* (Jan. 5, 2025) ("[M]ore people who are out of work are having a hard time getting back in."). Changes at other federal agencies have made that even more true in D.C. Rice Decl. ¶ 119 ("[T]he [NCR] job market—particularly in the Federal sector—is not as strong as it was during that previous reorganization."). And USDA's workforce has changed following a year of voluntary departures. All of this shows that the agency reasonably did not view 2018 Kansas City relocation attrition as a reliable predictor of how employees would respond to the agency's relocation to five cities, eight years later.

> ### iii.    *USDA did not unreasonably fail to consider the feasibility or costs of relocating research.*

Plaintiffs next claim that USDA failed to address the "feasibility or costs" of relocating research projects at BARC. Pls.' Mot. at 38. But as the exhibit Plaintiffs cite notes, "[n]o decisions have been made on final locations for BARC research projects." Ex. S to Levy Decl. at 3, ECF No. 440-3. In other words, there has been no final agency action here, and it is entirely reasonable that the agency has not yet analyzed the proposed sites' capacity, facilities, and equipment.

Further, Plaintiffs omit a major concern driving the relocation of these projects: the BARC facility is not suitable for continued use. *See supra* pp. 7; Rice Decl. ¶ 25 (explaining "facility has become financially untenable to sustain due to extensive deferred maintenance, severely deteriorated infrastructure, escalating costs required merely to keep the facility operational, and insufficient appropriations."). "Nearly half of all structures [at BARC] are in advanced states of disrepair and are already slated for demolition, including facilities damaged by flooding, long-abandoned research buildings, and structures overtaken by vegetation." *Id.* There was even an Office of Special Counsel ("OSC")

investigation into issues with the BARC facility. In a letter from OSC to the President, OSC explained that it received whistleblower complaints alleging that the "unsafe and deteriorating conditions at BARC have resulted in the loss and improper handling of scientific equipment, research, and data." OSC Letter at 1 (June 25, 2025), https://perma.cc/7GST-JU55. "The agency investigation largely substantiated the whistleblowers' allegations, finding pervasive safety deficiencies in many of the facilities and structures at BARC, including a general lack of housekeeping; excessive dirt and grime; flaking and peeling paint; damaged flooring; active and post flooding and other water intrusions; mold; and a lack of potable water," and that "the condition of the facilities damaged scientific equipment, derailed and delayed research studies, and resulted in increased costs to research operations at BARC." *Id.* at 2. In other words, it is entirely reasonable for the Department to plan to move research projects out of BARC's substandard facilities, even if the agency is still figuring out where and how those relocations will take place. And even if there may be relocation costs, given the steep costs associated with retaining the facility, the Department has not acted unreasonably in planning to close BARC. *See also* Rice Decl. ¶ 25 (explaining BARC carries "approximately $300 million in deferred maintenance").

### iv.    *USDA has not unreasonably failed to account for reliance interests.*

Agencies, generally, must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns," *DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020), but USDA submits that there are no reliance interests here.

With respect to the impact on the agency's federal employees, even under the preexisting agency structure, federal employees had no guarantee of employment in a permanent location and were still subject to reassignment within the federal government. *See, e.g.*, 5 C.F.R. § 335.102 ("[A]n agency may: (a) Promote, demote, or reassign a career or career-conditional employee."); 5 C.F.R. § 302.102(a). And all USDA employees subject to relocation have been or will be offered jobs. *See* Rice Decl. ¶ 9. Therefore, the interests Plaintiffs cite—"jobs, careers, paychecks, benefits, and research projects," *see* Pls.' Mot. at 39—have not been directly affected, and the Department's proposed change in employment conditions does not rise to the level of a reliance interest. In contrast to many reliance interest cases, which consider how a change to a longstanding policy impacts regulated parties who

ordered their affairs based on that policy, decisions about where federal offices sit and where employees report implicate no comparable interest—mobility is a condition of federal employment, and no statute or policy confers a protected expectation in a permanent duty station or organizational chart.

Regardless, the agency has still taken all possible measures to minimize the impacts of reorganization on employees. Throughout the reorganization process, the Department has relied on voluntary options provided to employees in achieving its workforce goals. *See, e.g.*, Sec. Mem. at 2; Dep. Sec. Test. at 5 ("USDA's entire focus of its reorganization efforts have been on voluntary decisions by employees."); Rice Decl. ¶ 8. "The Secretary has been frank with our employees about what our budgetary numbers require and what the Administration's expectations are so that those employees can make the best decisions for themselves and their families." Dep. Sec. Test. at 5. But the Deputy Secretary also made clear that USDA has "made a commitment that if employees go with us to these new locations, they have got a job, and we are planning to have an office for them there. That is what we are planning for." *Id.* at 26; Rice Decl. ¶ 9. USDA has committed to helping its employees manage these changes as best as possible. For instance, USDA's Relocation FAQs explain that employees offered relocations will be given relocation assistance, including paid or reimbursed transportation and per diem, moving expenses, residence transaction expenses, storage expenses, and on a case-by-case basis, the agency may also provide house hunting per diem, temporary quarters subsistence expense, and shipment of privately owned vehicles, and home marketing incentives. FAQs at 5. Employees that decline relocation will be eligible for the Career Transition Assistance Plan and Interagency Career Transition Assistance Plan and may be eligible for severance or early retirement. *Id.* at 6. Additionally, USDA's Employee Assistance Program offers free, confidential counseling services to any employee or their immediate family member as additional support during reorganization.

Plaintiffs have also not invoked cognizable reliance interests regarding those "across the country" who "rely on USDA programs and services impacted by this Reorganization." Pls.' Mot. at 39. As explained, the Department's reorganization is focused on improving how its services are delivered. *See supra* p. 33-34; *see also* Sec. Mem. at 1 (seeking "to achieve improved effectiveness and accountability, enhanced services, reduced bureaucracy and cost savings for the American people."). The agency therefore does not expect that services will be disrupted by the reorganization process. *See* Rice Decl.

¶ 11. Accordingly, no reliance interest analysis is required.

Still, USDA considered feedback from over 46,845 emails across a variety of stakeholder groups in formulating its reorganization plans, and made changes based on the comments it received. *See* Comment Analysis at 1. For instance, in light of the comments, rather than proceed with a single reorganization plan, the Department developed individualized reorganization plans by mission areas and staff offices to ensure mission continuity could be factored into those plans. And USDA considered stakeholder input in formulating those plans. For example, USDA decided to retain the GWCC and Dallas-Fort Worth facilities because comments raised concerns about attrition.

For all of these reasons, USDA's reorganization has been reasonable and reasonably explained, and Plaintiffs cannot prevail on their arbitrary and capricious claims. They therefore have not demonstrated a likelihood of success on the merits.

## II.    Plaintiffs Also Cannot Establish Irreparable Harm.

Plaintiffs' failure to demonstrate irreparable harm independently defeats their motion.

### A.    Plaintiffs' claims of irreparable harm are entirely speculative.

Plaintiffs must establish a "likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm."). A "possibility" of irreparable harm is also insufficient; "irreparable injury [must be] *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2008 WL 2219837, at *2 (N.D. Cal. May 27, 2008) (Illston, J.) ("[I]n any situation, the Court must find "that there exists a significant threat of irreparable injury.").

To the extent that Plaintiffs' alleged harms are premised on the degradation of agency programs, they are entirely speculative. USDA is not conducting RIFs. Rice Decl. ¶ 9. USDA does not expect attrition at the rates experienced during previous geographic reorganizations. *Id.* ¶ 119. USDA is hiring "at the rate of expected attrition" in order "to maintain[] capacity." ASP at 7. Plaintiffs' evidence of attrition is conclusory. *See supra* pp. 27-28. And although the Court previously concluded

Plaintiffs had satisfied the irreparable harm prong in motions involving RIFs, it did so based on the loss of jobs and federal funds, not the degradation of services. *See, e.g.*, ECF No. 85 at 38; ECF No. 124 at 44-45. Notably, the Supreme Court has recently granted multiple requests to stay injunctions halting agency reorganizations premised on the theories of harm to downstream users of government services. *See OPM v. AFGE*, 145 S. Ct. 1914 (Mem.) (2025) (granting government's application for stay of preliminary injunction on grounds that district court's "injunction was based solely on the allegations of the nine non-profit-organization plaintiffs," but "under established law, those allegations are presently insufficient to support the organizations' standing," citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)); *McMahon*, 145 S. Ct. at 2643 (staying injunction halting Department of Education's reorganization on theory of harm to downstream users of government services). These decisions indicate the Supreme Court has concluded that, ordinarily, agencies should be free to proceed with restructurings and reorganizations pending litigation (regardless of the potential impacts on consumers of government services), and district courts should not engage in the type of day-to-day oversight of agencies that Plaintiffs seek here.

To the extent that Plaintiffs argue that Department employees represented by the Union Plaintiffs will suffer irreparable harm from declining relocation, those harms are not irreparable. The MSPB may make whole wrongly removed employees through reinstatement, retroactive benefits, backpay, and attorney's fees, 5 U.S.C. §§ 1204(a)(2), 7701(g), and given these remedies, the Supreme Court has expressly held that the loss of government employment does not ordinarily qualify as irreparable harm, *Sampson*, 415 U.S. at 90; *see also Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). This Court previously rejected these arguments applied to RIFs, finding those circumstances distinguishable from *Sampson*. *See* Order at 45, ECF No. 124. But the circumstances of this motion, where relocations, not large-scale RIFs, are at issue, are distinguishable from the previous motions, and instead, fall within the ordinary *Sampson* rule.

And to the extent that Plaintiffs prevail on any of their arbitrary and capricious claims on the theory that the Department has not "reasonably explained" its decisions, such harm is not irreparable.

The Department can easily remedy any such harm by publishing a further explanation.

B.    <u>Plaintiffs' delay in filing their motion negates any claim of irreparable harm.</u>

Plaintiffs' substantial delay in seeking preliminary relief only confirms that the injuries they allege are speculative and they face no threat of imminent, irreparable injury. The agency actions Plaintiffs purport to challenge occurred in early to mid-2025. *See* ARRP I; ARRP II; Sec. Mem. And on August 29, 2025, USDA issued National Consultation Right memorandums to Dr. Everett Kelley, the National President of Plaintiff AFGE and Randy Erwin, National President of the NFFE, requesting their review and comment on the Secretary's Memorandum. Rice Decl. ¶ 105. Still, Plaintiffs did not file the present preliminary injunction motion until July 2, 2026.

"Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). Indeed, many district courts in the Ninth Circuit have concluded a delay of even two months counsels against a finding of irreparable harm. *See, e.g., Or. Nat. Desert Ass'n v. Bushue*, 594 F. Supp. 3d 1259, 1266 (D. Or. 2022) (concluding two-month delay "counsels against a finding of likely irreparable harm"); *Giving Back Fund Inc. v. Mia. Mktg. Grp.*, 2011 WL 13217774, at *4 (C.D. Cal. Jan. 20, 2011) (stating plaintiffs' two-month delay in filing their motion "certainly implies a lack of urgency and accordingly counsels against finding a likelihood of irreparable harm"); *see also Playboy Enters., Inc. v. Netscape Commc'ns. Corp.*, 55 F. Supp. 2d 1070, 1080, 1090 (C.D. Cal. 1999) (concluding five-month delay "in seeking injunctive relief further demonstrates the lack of any irreparable harm"); *Valeo Intell. Prop., Inc. v. Data Depth Corp.*, 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) ("A three-month delay in seeking injunctive relief is inconsistent with [the plaintiff's] insistence that it faces irreparable harm."). The Court should conclude the same here.

## III.    An Injunction Is Contrary to the Public Interest and the Balance of the Equities.

Plaintiffs' request for relief fails for all the reasons previously stated, but this is the rare case in which the public interest at stake here, alone, is sufficient to deny their motion. In each case requesting preliminary relief, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. And "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

consequences in employing the extraordinary remedy of injunction." *Id.*

The public consequences of injunctive relief require the Court to deny Plaintiffs' motion. Plaintiffs challenge the agency's reorganization plans as set forth in the ARRP and Secretary Memorandum—documents issued over one year ago—but in the interim, the Department began taking steps to implement its plans. To unwind those steps now, mid-way through, when the Department has already terminated the leases applicable to much of its NCR office space and new office spaces are set to open in the hub cities, would result not only in the disruption of the very services that Plaintiffs seek to prevent, but in astronomical expenses incurred on behalf of the American taxpayer. The public interest cannot tolerate such an injunction.

To be more specific, given USDA's plans to relocate many of its agencies outside the NCR, the agency has returned to GSA control of the South Building in Washington, D.C. and Braddock Place building in Alexandria, VA. *See* USDA, *Rollins, Vaden, and Forst Announce Disposal of Dilapidated USDA Facilities* (Feb. 25, 2026), https://perma.cc/2FW7-38D9 ("South Building Announcement"). As of June 2026, only 2,832 Department employees remained in Washington, D.C., Rice Decl. ¶ 17, and the South Building alone has "4,500 rooms, seven miles of corridors, 12 million bricks, and 11,000 miles of structural steel." GSA, *Agriculture South Building, Washington DC*, https://perma.cc/4F4P-HRC2. USDA has submitted lease terminations for several other office spaces, including those at 700 West Capitol Avenue, Little Rock, AR; 630 Sansome Street, San Francisco, CA; 101 South Main Street, Temple, TX, and 1220 SW 3rd Avenue, Portland, OR. Rice Decl. ¶ 114.

On the other hand, the Department has incurred new lease actions and facilities-related work. Those include amending a lease to expand occupancy on the 7th floor of the Bennett Building in Salt Lake City to establish USDA's new hub location; executing a new lease at 2300 Main in Kansas City to expand USDA's Kansas City office presence, with estimated annual rent of $1,032,000; completing the $295,199 renovation of the 5th floor of the Yates Building in Washington D.C., and relocating FNA staff from the Braddock building; transferring the lease on the 4th floor of the Bennett Building in Salt Lake City from NRCS to the Forest Service to establish the new Forest Service headquarters office; submitting requests for new leases in Kansas City, New York, and Los Angeles; initiating the

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

renovation of four floors of the Yates Building in Washington D.C. to accommodate personnel affected by the closure of the South Building at the estimated cost of $3,624,738; submitting a request to renovate FSIS office space in Urbandale, Iowa to add to the FSIS footprint and install furniture—FSIS has already spent $1.32 million on furniture to date; planning $500,000 in work to prepare additional space in the ARS Athens, Georgia location for NASS; entering final negotiations for new space for the NRCS in Fort Worth, Texas—the initial estimated cost of the space is $4,400,000 with $1,773,787.52 in annual rent; transferring approximately $500,000 to GSA to build offices for the Office of General Counsel in Davis, California; and planning to transfer approximately $1 million to GSA to build offices for the Office of General Counsel in Kansas City. Rice Decl. ¶ 115.

So, were the Court to enjoin the Department's reorganization efforts as Plaintiffs have requested, the Department would either have to locate and lease another new office space in Washington D.C., paying a last-minute premium, or it would have to re-acquire South Building office space, notwithstanding a $1.3 billion backlog in deferred maintenance and modernization. It would also have to accept losses for the time and expense of procuring new facilities in the hub cities. These outcomes are contrary to the public interest, as the agency would be forced to spend millions of dollars, when USDA may ultimately prevail on its claims.

But the price of injunctive relief is not limited to property costs. As explained above, the Department has remained committed to meeting its bargaining obligations with the relevant unions, and to that end, the Department has reached agreements with several unions and negotiations are in progress for several others. *See supra* 6-7. Halting the reorganization will adversely affect USDA's already-completed bargaining agreements by jeopardizing the Department's ability to comply with their terms. All told, those agreements have the potential to impact thousands of bargaining unit employees. Rice Decl. ¶ 107. An injunction would also jeopardize the negotiations that remain in progress.

Further, because the Department has already begun implementing reorganizational efforts, some employees have already made decisions regarding the future of their employment. *See id.* ¶¶ 110-111 (approximately 384 employees have provided the agency with their relocation decisions as of the time of this filing). Some may have resigned and found alternate employment. And others may have accepted their relocation offers, and in turn, may have sold their houses, made arrangements to move

their possessions, or purchased homes or signed leases in the cities where they are being relocated. Were the Court to halt the agency's plans now, those employees' lives would be disrupted based on the uncertainty of a court-issued preliminary injunction—a temporary measure but one that will have real-world impacts on USDA's employees.

Not to mention the employees that the Department has hired to start in the new hub city locations: Were the Court to enjoin "USDA's Reorganization Plan," USDA may be required to lay off those new hires and otherwise freeze the hiring of new mission-critical employees. USDA has already begun hiring under the new hub-based structure, and a pause in that hiring would undermine organizational continuity. Rice Decl. ¶ 116-118. To date, 71 positions have been filled at hub locations, and another 972 positions are in various stages of the hiring process, including 435 quarantine facility positions. *Id.* ¶ 116. The Department's research, economics, and statistical agencies are likewise engaged in hiring aligned with their future organizational models to maintain continuity in scientific research, economic analysis, and production of required data products. *Id.* ¶ 117. Interrupting this process would create extended vacancies in key functions, concentrate workloads, and jeopardize execution of statutory obligations. Because the reorganization is already underway and agencies have structured hiring, placement, and operational planning around the new organizational model, any delay would cause significant operational disruption and impede USDA's ability to meet its mission.

The bottom line is that Plaintiffs' belated attempt to enjoin the reorganization process is far too late, and jeopardizes millions in public funds to unwind a reorganization that is already well under way and may, in the course of litigation, ultimately move forward. Such an injunction would be sharply against the public interest.

## IV.    Plaintiffs' Requested Relief Is Overbroad.

The Court should deny Plaintiffs' motion in its entirety, but even if the Court determines that a preliminary injunction is appropriate, the injunction Plaintiffs have requested is overbroad.

To start, Plaintiffs seek an order that enjoins the Department across the board "from taking any action to implement, carry out, or effectuate the USDA Reorganization Plan, or any aspect thereof," ECF No. 440 at 1, a universal injunction without any reference to the parties before the Court. But the Supreme Court has explained that universal injunctions that do not merely "prohibit[]

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit," but "prohibit enforcement of a law or policy against *anyone*," "likely exceed the equitable authority that Congress has granted to federal courts" *Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025); *see id.* at 841 ("A universal injunction can be justified only as an exercise of equitable authority, yet Congress has granted federal courts no such power."). "[P]arty-specific principles" therefore must inform any relief granted here. *Id.* at 844; *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). The Supreme Court left open the question of whether *CASA* applies to APA cases, but at any rate, Plaintiffs have not brought a proper APA case, and *CASA* would at least apply to any relief granted on an *ultra vires* theory.

This is all the more important because, although the Union Plaintiffs represent *some* of the Department's employees, different unions represent many others. Many unions have either reached agreements or are in the process of negotiating with the Department. *See supra* pp. 6-7; Rice Decl. ¶¶ 103-109. For the Court to bind (or at least substantially impact) unions and employees who have taken a different approach—structured negotiation over the course of many months rather than last-minute litigation—would be contrary to principles of equity. "A federal court . . . may not attempt to determine the rights of persons not before the court," and "must, therefore, tailor the injunction to affect only those persons over which it has power." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983). "[T]he traditional function of equity has been to arrive at a 'nice adjustment and reconciliation' between the competing claims," and it is the Court's role to "balance[] the conveniences of the parties and possible injuries," from the issuance of an injunction, and the Court "should pay particular regard for the public consequences in employing the extraordinary remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). This is particularly the case given that USDA notified the National Presidents of AFGE and NFFE about the reorganization a year ago, and they could have taken steps to govern their locals' bargaining, but did not. *See, e.g.,* AFGE Const. art. XIII, § 6 ("The [National Executive Council] shall have power to make rules to govern matters not in conflict with this Constitution."); *Id.* art. IX, § 1 ("It shall be the duty of the National President . . . to plan and pursue policies which will promote the welfare of the organization[.]").

And even if Plaintiffs prevailed on an arbitrary and capricious claim, any relief "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Just because a plaintiff has "demonstrated harm from one particular inadequacy in government administration," does not mean "the court [is] authorized to remedy *all* inadequacies in that administration." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006). Therefore, even if the Court held USDA failed to grapple with the costs of relocating research projects from BARC, for instance, at most, the Court could enjoin relocation of BARC projects. Prevailing on this narrow claim would be no basis for enjoining every aspect of USDA's relocation efforts. *See Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir. 2024) ("[I]njunctive relief must be tailored to remedy the specific harm alleged.").

## V.    Defendants Request a Stay of Relief.

In light of the extraordinary breadth of Plaintiffs' requested injunction or § 705 stay, the United States respectfully requests that any relief granted be stayed pending the disposition of any authorized appeal, or at a minimum, stayed for a period of fourteen days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal and stay is authorized.

## VI.    Plaintiffs Should Be Ordered to Post Security In Connection With Any Relief.

If the Court orders injunctive relief, it should also order security. The Court may issue an injunction "only if the movant gives security" for the "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). While the amount of security rests in the Court's discretion, the Rule's text presumes that security will be given. *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Here, an appropriate bond would be commensurate with the costs the Department would have to expend to unwind its reorganization efforts, as set forth in the Rice declaration. *See* Rice Decl. ¶¶ 103-118.

## CONCLUSION

For the reasons above, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated: July 24, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

ERIC J. HAMILTON
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

BRAD P. ROSENBERG
JEREMY S.B. NEWMAN
Chief Litigation Counsel

CHRISTOPHER HALL
Assistant Branch Director

/s/ Taylor Pitz
ROBERT C. BOMBARD
TAYLOR PITZ (CABN 332080)
Trial Attorneys
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Telephone: (202) 305-5200
Taylor.N.Pitz@usdoj.gov

*Counsel for Defendants*

Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction
3:25-cv-3698-SI

46