CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Fax: (415) 436-6748

ERIC J. HAMILTON
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
BRAD P. ROSENBERG
JEREMY S.B. NEWMAN
Chief Litigation Counsel
CHRISTOPHER HALL
Assistant Branch Director
ROBERT C. BOMBARD
TAYLOR PITZ (CABN 332080)
Trial Attorneys
Civil Division, Federal Programs Branch

1100 L Street, NW
Washington, DC 20005
Telephone: (202) 305-5200
Taylor.N.Pitz@usdoj.gov

Counsel for Defendants

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DECLARATION OF TIMISHA D. FITZGERALD WALKER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

**DECLARATION**

I, Timisha D. Fitzgerald Walker, declare as follows:

1. I am a paralegal in the U.S. Department of Agriculture's Office of General Counsel. I work in the Civil Rights, Labor & Employment Law Division. This declaration is based on my personal knowledge and information that I have obtained in the course of my official duties, and is made in support of Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction regarding the U.S. Department of Agriculture's Reorganization Plan.

2. **Exhibit 1** is a true and correct copy of the notification letter sent by Deputy Secretary of Agriculture Stephen Alexander Vaden to Senator John Hoeven on July 17, 2026, regarding USDA's reorganization process.

3. **Exhibit 2** is a compilation of the true and correct copies of the relevant notification letters sent by Deputy Secretary of Agriculture Stephen Alexander Vaden to members of Congress on USDA's reorganization.

4. **Exhibit 3** is a true and correct copy of the "Memorandum of Understanding on Relocation Negotiations Between: The American Federation of Government Employees (AFGE) Local 3403) and Economic Research Service (ERS) & National Institute of Food and Agriculture (NIFA), United States Department of Agriculture (USDA)," dated June 18, 2026.

5. **Exhibit 4** is a true and correct copy of the "Memorandum of Understanding USDA Forest Service Reorganization" between "the United States Department of Agriculture, Forest Service (Management), and the National Federation of Federal Employees, Forest Service Council (Union)," dated June 12, 2026.

6. **Exhibit 5** is a true and correct copy of the "Memorandum of Understanding Between the U.S. Department of Agriculture, Food and Nutrition Administration and the National Treasury Employees Union Concerning the Office Move from 1320 Braddock Place to the Yates Building and the George Washinton Carver Center (GWCC)," dated June 30, 2026.

7. **Exhibit 6** is a true and correct copy of the "Braddock Place Office Move, Memorandum of Understanding (MOU) Between Food and Nutrition Service, Mid-Atlantic Regional Office, USDA and American Federation of Government Employees (AFGE) Local #2735," dated

DECLARATION OF TIMISHA D. FITZGERALD WALKER
3:25-cv-03698-SI

1

April 3, 2026. This document is a true and correct copy, but Defendants have subsequently redacted the individual employees' name to maintain their privacy, as their name is not relevant to any issues in this case.

8. **Exhibit 7** is a true and correct copy of the "Memorandum of Understanding Between the American Federation of Government Employees (AFGE) Local 3147 and the Beltsville Agricultural Research Center (BARC) & U.S. National Arboretum (USNA), Agricultural Research Service (ARS), United States Department of Agriculture (USDA) dated July 2, 2026.

9. **Exhibit 8** is a true and correct copy of the "Article 30 Bargaining Notice – Office of Operations Reorganization," between "Department of Agriculture, Office of Operations and AFSCME, Council 20, Local 2846," dated April 30, 2026.

10. **Exhibit 10** is a true and correct copy of the "United States Department of Agriculture FY 2026 Staffing Plan," dated December 21, 2025. This copy was produced by USDA to Plaintiffs with Bates numbers USA-AFGE-Exp.-0428551–USA-AFGE-Exp.-0428580.

11. **Exhibit 11** is a true and correct copy of USDA's "Updated Staffing Plans for FY 2026," dated February 27, 2026. This copy was produced by USDA to Plaintiffs with Bates numbers USA-AFGE-Exp.-0428754–USA-AFGE-Exp.-0428756.

12. **Exhibit 12** is a true and correct copy the Secretary of Agriculture's, "Secretary's Memorandum 1078-008, Exemption of National Security and Public Safety Positions from the Federal Civil Hiring Freeze," dated April 22, 2025. This copy was produced by USDA to Plaintiffs with Bates numbers USA-AFGE-Exp.-0428581–USA-AFGE-Exp.-0428586.

DECLARATION OF TIMISHA D. FITZGERALD WALKER
3:25-cv-03698-SI

2

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed July 24, 2026, in Washington, D.C.

TIMISHA WALKER  Digitally signed by TIMISHA WALKER
Date: 2026.07.24 18:49:06 -04'00'

TIMISHA D. FITZGERALD WALKER

DECLARATION OF TIMISHA D. FITZGERALD WALKER
3:25-cv-03698-SI

3

# EXHIBIT 1



OFFICE OF THE DEPUTY SECRETARY OF AGRICULTURE
WASHINGTON, D.C.  20250

July 17, 2026

THE HONORABLE JOHN HOEVEN
Chairman
Subcommittee on Agriculture, Rural Development,
   Food and Drug Administration, and Related Agencies
Committee on Appropriations
United States Senate
129 Dirksen Senate Office Building
Washington, D.C.  20510

Dear Chairman Hoeven,

The United States Department of Agriculture (USDA) reorganization process began with Secretary's Memorandum 1078-015, which authorized and directed the actions necessary to effectuate the consolidation, unification, and optimization of functions within USDA.  I have committed to keep Congress apprised of our reorganization activities.  To that end, I am sending this letter as a summary of actions USDA has taken toward achieving improved effectiveness and accountability, enhanced services, reduced bureaucracy, and cost savings for the American people.

As we have noted from the outset, this is an iterative, multi-faceted process; and the Department is implementing its reorganization efforts on a mission area and office-specific basis.  USDA has provided Congress with the following reorganization-related written notifications to date:

- Food Safety and Inspection Service (FSIS) – April 23, 2026;
- Research, Education and Economics (REE) and the Office of Partnerships and Public Engagement (OPPE) – April 23, 2026;
- Departmental Administration and Staff Offices – April 30, 2026, and May 5, 2026;
- Food and Nutrition Administration (FNA) – April 30, 2026;
- Foreign Agricultural Service (FAS) – June 17, 2026;
- Farm Production and Conservation (FPAC) – June 17, 2026;
- Rural Development (RD) – June 17, 2026;
- Agricultural Marketing Service (AMS) – June 17, 2026;
- Office of the Chief Information Officers (OCIO) – June 17, 2026; and
- Office of the Assistant Secretary for Civil Rights (OASCR) – June 17, 2026.

On March 31 and April 2, 2026, oral notification of reorganization plans for the Forest Service were provided in an open meeting to all staff members of the House of Representatives Appropriations Subcommittee on Interior, Environment, and Related Agencies; the Senate Subcommittee on Interior, Environment and Related Agencies; the Senate Committee on Agriculture, Nutrition and Forestry; and the House of Representatives Committee on Agriculture. As part of the Department's process to implement its reorganization, USDA is committed to meeting its collective bargaining obligations. The responsible agencies and mission areas within USDA have provided the required union notifications. USDA has completed the following reorganization-related bargaining obligations to date:

- Forest Service and NFFE-FSC – agreement dated June 12, 2026;
- Economic Research Service (ERS)/National Institute for Food and Agriculture (NIFA) and AFGE 3403 – agreement dated June 18, 2026;
- Agricultural Research Service (ARS) and AFGE 3147 (BARC) – agreement dated July 2, 2026;
- Office of Operations (OO) and AFSCME 2846 – obligation met on May 15, 2026;
- FNA and NTEU Chapter 226 for National Capital Region (NCR) relocations – agreement dated June 30, 2026;
- FNA and AFGE 2735 for NCR relocations – agreement dated April 3, 2026; and
- Office of Hearings and Appeals (OHA) and AFSCME 3020 for NCR relocations – obligation completed.

These bargaining activities account for over 755 impacted USDA personnel, excluding the Forest Service. There are approximately 29,000 Forest Service employees. Approximately 500 employees received a letter that they may be subject to relocation. As of July 17, the Forest Service estimates that approximately 250 employees would be relocated; however, that number may change as the reorganization effort moves forward.

In addition to the completed labor negotiations noted above, the following negotiations remain in progress:

- FNA Mid-Atlantic Region and AFGE 2735;
- FNA and NTEU regarding employees in six regional offices and the Retailer Operations and Compliance offices;
- OASCR and AFGE 3147; and
- Rural Development and various AFGE and AFSCME units.

For the remaining reorganization announcements made on June 17, the Department intends to initiate union negotiations on or after July 20.

As part of USDA's implementation of its reorganization plan, the Department is also right-sizing its real estate footprint to increase operational efficiencies. As required by the *Utilizing Space Efficiently and Improving Technologies* (USE IT) *Act*, USDA has notified the General Services Administration (GSA) where the Department did not meet its statutory occupancy requirements and is relinquishing control of these facilities to GSA or terminating leases as appropriate. The

2

Department has taken actions to reduce leased space in underutilized locations and has worked with GSA to occupy available space in our new hub locations.

Lease Terminations and Disposals:

- The General Services Administration announced the disposal of the South Building, located at 1400 Independence Avenue SW, Washington, D.C., on February 25, 2026.
- FNA submitted a lease termination request for its facility at 1340 Braddock Place, Alexandria, Virginia, on March 6, 2026.
- The Office of General Counsel (OGC) submitted a lease termination request for its facility located at 700 West Capitol Avenue, Little Rock, Arkansas, on April 6, 2026.
- OGC submitted a lease termination request for its facility located at 630 Sansome Street, Suite 1040, San Francisco, California, on May 8, 2026.
- OGC submitted a lease termination request for its facility located at 101 South Main Street, Temple, Texas, on May 14, 2026.
- OGC submitted a lease termination request for its facility located at 1220 SW 3rd Ave., Portland, Oregon, on July 15, 2026.

New Lease Actions and Facilities-related work:

- Expanded lease on the 7th floor of the Bennett Building in Salt Lake City, Utah, to establish USDA's hub location (December 2025).
- Executed a new lease at 2300 Main in Kansas City, Missouri, to establish USDA's hub location (December 15, 2025).
- Submitted a request to GSA for a new lease in the Bannister Building in Kansas City, Missouri, to support USDA's hub location (July 2026).
- Completed renovation of the 5th floor of the Yates Building in Washington, D.C. – including paint, carpet, and new cubicles – in April 2026 and subsequently relocated FNA staff from Braddock Place (May 2026).
- Transferred lease on the 4th floor of the Bennett Building in Salt Lake City, Utah, from NRCS to establish the new headquarters office of the Forest Service (June 2026).
- Submitted a request to GSA for a new lease in New York, New York, for FNA (June 2026).
- Submitted a request to GSA for a new lease in Los Angeles, California, for FNA (June 2026).
- Initiated renovation of floors one through four of the Yates Building in Washington, D.C., to accommodate personnel affected by the closure of the South Building and to support compliance with *USE IT Act* requirements (July 2026).
- Entered final negotiations for new space for the Natural Resources and Conservation Service (NRCS) in Fort Worth, Texas (July 2026).

Throughout this reorganization, USDA has maintained its focus on fulfilling its mission of serving America's farmers, ranchers, producers, and consumers. There will be no disruption to ongoing projects at any Agricultural Research Service facilities. With respect to the Beltsville

3

Agricultural Research Center, the only projects that have been terminated are those that were specifically defunded by Congress.

If you have any questions related to this notification, please have your staff contact USDA's Office of Congressional Relations at (202) 720-7095 or ocr@usda.gov.

Sincerely,

Stephen Alexander Vaden
Deputy Secretary
U.S. Department of Agriculture

Enclosures

CC: The Honorable Jeanne Shaheen

4

# EXHIBIT 2



OFFICE OF THE DEPUTY SECRETARY OF AGRICULTURE
WASHINGTON, D.C.  20250

April 23, 2026

THE HONORABLE JOHN HOEVEN
Chairman
Committee on Appropriations
Subcommittee on Agriculture, Rural Development,
 Food and Drug Administration, and Related Agencies
United States Senate
129 Dirksen Senate Office Building
Washington, D.C.  20510

Dear Chairman Hoeven,

I am writing to inform the Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies of organizational realignments that are being planned for the United States Department of Agriculture's (USDA) Food Safety and Inspection Service (FSIS).  The organizational realignments involve the following FSIS offices:

- Office of Investigation, Enforcement and Audit (OIEA);
- Office of Field Operations (OFO);
- Office of the Chief Financial Officer (OCFO);
- Office of Employee Experience and Development (OEED);
- Office of Public Affairs and Consumer Education (OPACE);
- Office of the Chief Information Officer (OCIO);
- Office of Policy and Program Development (OPPD);
- Office of International Coordination (OIC);
- Office of Management (OM); and
- Internal Affairs (IA).

The proposed changes are essential to enhance organizational performance in support of FSIS' future vision and modernization efforts in food safety.  The proposed changes include the following:

Office of Investigation, Enforcement and Audit (OIEA)

FSIS is proposing to abolish OIEA's Compliance and Investigations Division (CID) headquarters office and reorganize the four regional offices by streamlining their management structure.  Specifically, investigative resources in the four existing regions will be combined into

two regions and renamed Compliance and Investigations Region – West and Compliance and Investigations Region – East. This will be accomplished by:

- Incorporating the CID – Southwest Region into the CID – West Region and renaming it the Compliance and Investigations Region – West.
- Combining the CID – Northeast Region with the CID – Southeast Region and renaming it the Compliance and Investigations Region – East.

The combining of regions will eliminate two GS-15 Regional Director and two GS-14 Deputy Regional Director positions through attrition. Additionally, the vacant GS-15 CID Director position that oversaw the four Regional Directors will be abolished, and the two remaining Regional Directors will report directly to the Deputy Assistant Administrator for OIEA. The Senior Compliance Specialists that were overseen by the CID Director will be realigned to report to the Regional Directors (East or West). In addition, the six employees in the Resource Management Staff will be realigned to OFO's Resource Management and Financial Planning Staff. The Litigation Enforcement Program Staff (LEPS) will be eliminated. The four attorneys assigned to LEPS will be realigned to the Department and the remaining five employees will be realigned to the Enforcement Operations Staff.

Office of Field Operations (OFO)

OFO accounts for approximately 85 percent of FSIS employees. The proposed changes in OFO are key to Agency efforts to enhance organizational performance and support FSIS' future vision and food safety modernization efforts. As inspection continues to modernize and become more scientific, the number and complexity of food safety tasks has steadily grown.

To enhance food safety efforts in this evolving work environment, FSIS seeks to restructure OFO to allow managers and supervisors to work more closely with their direct reports. In response to these needs, OFO will convert all current GS-14 Deputy District Manager positions to mobile managerial positions and distribute them near their areas of geographic responsibility. Additionally, OFO will reassign nine GS-14 positions from headquarters to the nine district offices.

Employee separations resulting from the Deferred Resignation Program required management to assign Jackson District responsibilities to surrounding districts. FSIS plans to make those work assignments permanent. The Jackson District Office will be closed. No moves or reassignments will be necessitated by this change.

The Resource Management and Financial Planning Staff will gain six employees from OIEA and be renamed the Field Operations Resource Management (FORM) Staff. FORM will service both OFO and OIEA and will report to the Assistant Administrator, OFO.

One training specialist will be realigned to OPACE.

2

Office of International Coordination (OIC)

OIC will consolidate Region 1 Staff and Region 2 Staff under the new name of Global Operations Staff.  Combining the two regions eliminates one GS-15 supervisory position.  OIC will also rename the Import/Export Infrastructure and Resource Management Staff to the Global Systems Staff.

Office of the Chief Financial Officer (OCFO)

The reporting lines will be updated so the CFO will report directly to the Chief Operating Officer.

Office of Employee Experience and Development (OEED)

FSIS plans to abolish OEED.  All staff members were realigned to OPPD, OCIO, and OFO previously.  The Assistant Administrator will be realigned to OFO.

Office of Public Affairs and Consumer Education (OPACE)

OPACE will be renamed the Office of Public Affairs and Training (OPAT) and will consist of three divisions – the Training Division; the FOIA, Privacy, and Records Management Division; and the Communications Division.  FSIS will dissolve the Congressional and Public Affairs Staff as all positions are vacant.  The remaining OPAT staff will be realigned into one of the three newly defined divisions.  The training function and 23 employees will be realigned from OPPD, OCIO, and OFO, and will be placed into the new Training Division.

Office of the Chief Information Officer (OCIO)

One Audio Visual Production Specialist will be realigned to the new Training Division in OPACE (OPAT).

Office of Policy and Program Development (OPPD)

FSIS will realign the training function and 20 employees to OPACE (OPAT).

Office of Management (OM)

The Office of Management will be renamed Administrative Operations (AO).  The Significant Incident Preparedness and Response Staff will be realigned to the Resource Management Staff which will be renamed the Resource Management and Liaison Division.

Conclusion

Overall, this restructuring will reduce the total number of positions and will be a cost savings to FSIS.  The proposed organizational changes will not require any reprogramming of funds, nor

3

are they expected to result in increased salary or other costs.  The nature of the proposed changes is such that we do not anticipate any adverse civil rights impact.

Should you have questions, please have a member of your staff contact the Office of Congressional Relations at (202) 720-7095 or ocr@usda.gov.  A similar letter is being sent to your colleague Ranking Member Jeanne Shaheen.

Sincerely,

Stephen Alexander Vaden
Deputy Secretary
U.S. Department of Agriculture

Enclosures

P.S. Thank you for the kind note this morning.  SAV

4

| FOOD SAFETY AND INSPECTION SERVICE FUNDING AND STAFFING OVERVIEW | | | | | | |
|---|---|---|---|---|---|---|
| | Funding | | | Staffing | | |
| | Annual Funding | | | Staff Years | | |
| | As - Is | To - Be | Change | As - Is | To -Be | Change |
| OEED | $ 314,332 | $ - | $ (314,332) | 1 | - | (1) |
| OIEA | $ 24,990,916 | $ 23,888,194 | $ (1,102,722) | 133 | 127 | (6) |
| OCFO | $ 10,452,851 | $ 10,452,851 | $ - | 51 | 51 | - |
| OCIO | $ 20,411,535 | $ 20,197,608 | $ (213,927) | 94 | 93 | (1) |
| OPACE (OPAT) | $ 6,505,661 | $ 11,461,195 | $ 4,955,533 | 32 | 58 | 26 |
| OFO | $ 842,461,216 | $ 843,487,141 | $ 1,025,925 | 7,327 | 7,331 | 4 |
| OM (AO) | $ 31,505,454 | $ 31,505,454 | $ - | 194 | 194 | - |
| OA | $ 2,030,219 | $ 2,030,219 | $ - | 8 | 8 | - |
| OIC | $ 5,809,690 | $ 5,809,690 | $ - | 25 | 25 | - |
| OPARM | $ 5,545,712 | $ 5,545,712 | $ - | 28 | 28 | - |
| IA | $ 1,466,616 | $ 1,466,616 | $ - | 8 | 8 | - |
| CRS | $ 2,452,264 | $ 2,452,264 | $ - | 11 | 11 | - |
| OPPD | $ 21,286,180 | $ 16,935,703 | $ (4,350,477) | 110 | 88 | (22) |
| OPHS | $ 42,237,951 | $ 42,237,951 | $ - | 249 | 249 | - |
| Grand Tota | $ 1,017,470,598 | $ 1,017,470,597 | (0) | 8,271 | 8,271 | - |



U.S. DEPARTMENT OF AGRICULTURE
FOOD SAFETY AND INSPECTION SERVICE
(37)

RECOMMENDED: _____    9/9/2024 DATE

APPROVED: _____    9/24/24 DATE

FSIS ensures that the nation's commercial supply of meat, poultry, egg products is safe, wholesome, and properly labeled as required by the Federal Meat Inspection Act, the Poultry Products Inspection Act, and the Egg Products Inspection Act. Supersedes Chart approved 05/19/2023.

FSIS (1)

U.S. DEPARTMENT OF AGRICULTURE
FOOD SAFETY AND INSPECTION SERVICE
(37)

RECOMMENDED: _____  _____
DATE

APPROVED: _____  _____
DATE

**OFFICE OF THE ADMINISTRATOR**

ADMINISTRATOR

DEPUTY ADMINISTRATOR

DEPUTY ADMINISTRATOR

CHIEF OPERATING OFFICER

INTERNAL AFFAIRS (IA)

**OFFICE OF INVESTIGATION, ENFORCEMENT & AUDIT (OIEA)**
- STATE AND INTERNATIONAL AUDIT STAFF
- ENFORCEMENT OPERATIONS STAFF
- COMPLIANCE AND INVESTIGATIONS REGION EAST
- COMPLIANCE AND INVESTIGATIONS REGION WEST

**OFFICE OF FIELD OPERATIONS (OFO)**
- FIELD OPERATIONS RESOURCE MANAGEMENT STAFF
- REGULATORY OPERATIONS
- RECALL MANAGEMENT AND TECHNICAL ANALYSIS STAFF
- DISTRICT OFFICES (9)

**OFFICE OF PUBLIC HEALTH SCIENCE (OPHS)**
- MICROBIOLOGICAL AND CHEMICAL HAZARDS STAFF
- RISK ASSESSMENT & ANALYTICS STAFF
- APPLIED EPIDEMIOLOGY STAFF
- LABORATORY REGULATORY OPERATIONS
- LABORATORY QUALITY ASSURANCE, RESPONSE, AND COORDINATION STAFF
- LABORATORIES

**OFFICE OF POLICY AND PROGRAM DEVELOPMENT (OPPD)**
- RESOURCE AND ADMINISTRATIVE MANAGEMENT STAFF
- RISK MANAGEMENT AND INNOVATION STAFF
- POLICY DEVELOPMENT STAFF
- REGULATIONS DEVELOPMENT STAFF
- POLICY ANALYSIS STAFF
- LABELING AND PROGRAM DELIVERY STAFF
- STATE AND INTERNATIONAL EQUIVALENCE STAFF

**OFFICE OF INTERNATIONAL COORDINATION (OIC)**
- GLOBAL OPERATIONS STAFF
- GLOBAL SYSTEMS STAFF

**OFFICE OF THE CHIEF FINANCIAL OFFICER (OCFO)**
- BUDGET DIVISION
- FINANCIAL MANAGEMENT DIVISION
- AUDIT LIAISON AND FINANCIAL ANALYSIS DIVISION

**OFFICE OF THE CHIEF INFORMATION OFFICER (OCIO)**
- SECURITY COMPLIANCE OPERATIONS AND CUSTOMER SUPPORT CENTER
- OFFICE OF THE CHIEF TECHNOLOGY OFFICER
- BUSINESS SOLUTIONS CENTER
- PORTFOLIO GOVERNANCE CENTER

**OFFICE OF PUBLIC AFFAIRS AND TRAINING (OPAT)**
- TRAINING DIVISION
- FOIA, PRIVACY, AND RECORDS MANAGEMENT DIVISION
- COMMUNICATIONS DIVISION

**ADMINISTRATIVE OPERATIONS (AO)**
- RESOURCE MANAGEMENT AND LIAISON DIVISION
- ADMINISTRATIVE SERVICES DIVISION

**OFFICE OF PLANNING ANALYSIS AND RISK MANAGEMENT (OPARM)**
- DATA ANALYTICS AND INNOVATION STAFF

FSIS ensures that the nation's commercial supply of meat, poultry, egg products is safe, wholesome, and correctly labeled and packaged as required by the Federal Meat Inspection Act, the Poultry Products Inspection Act, and the Egg Products Inspection Act. Supersedes Chart approved 09/04/2024.

FSIS (1)



OFFICE OF THE DEPUTY SECRETARY OF AGRICULTURE
WASHINGTON, D.C.  20250

April 23, 2026

THE HONORABLE JOHN HOEVEN
Chairman
Subcommittee on Agriculture, Rural Development,
 Food and Drug Administration, and Related Agencies
Committee on Appropriations
United States Senate
338 Russell Senate Office Building
Washington, D.C.  20510

Dear Chairman Hoeven,

This letter is to notify the Committee that the United States Department of Agriculture's (USDA) Research, Education, and Economics (REE) Mission Area intends to reorganize the Agricultural Research Service (ARS), Economic Research Service (ERS), National Agricultural Statistics Service (NASS), and National Institute of Food and Agriculture (NIFA).  In addition, ARS intends to decommission the Beltsville Agricultural Research Center (BARC).

This letter also provides notification of planned changes affecting the Office of Partnerships and Public Engagement (OPPE).

As described below, the reorganizations will establish offices of five or more personnel, result in office closures, relocate employees, and require reprogramming and transferring certain appropriations to do so.  Accordingly, this notice is provided pursuant to Sections 716 and 771 of the *Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2026*, Pub. L. 119-37, Div. B (Nov. 12, 2025).

This restructuring removes bureaucracy, reduces organizational complexity and strengthens leadership accountability.  Certain employees may be affected by changes in their direct management or title designations.

ARS is updating its organizational structure by consolidating two separate matrix aligned organizations, the Office of National Programs, and the Area Offices, into four new mission aligned Research Offices.  The new Research Offices will combine research program management and operational line management.  ARS research support will be coordinated out of the new Research Services Office and the Business Services Office.  ARS Administrative and Financial Management will reside in the new Business Services Office.  The Business Services Office will assume Grants Management Services positions from NIFA, as well as USDA Student Engagement positions from USDA's OPPE.  Further, ARS intends to close the Beltsville

Agricultural Research Center. USDA ARS has thoughtfully considered many ARS sites to determine the best locations to assume BARC research projects, selecting sites based on access to enhanced research infrastructure and alignment with complementary research projects. While no decisions are final, ARS has slated the following locations to receive BARC research projects and their associated positions:

Fayetteville, AR; Albany, CA; Ft. Collins, CO; Ft. Pierce, FL; Miami, FL; Athens, GA; Tifton, GA; Ames, IA; Aberdeen, ID; West Lafayette, IN; St. Paul, MN; Columbia, MO; Starkville, MS; Stoneville, MS; Raleigh, NC; Fargo, ND; Grand Forks, ND; Clay Center, NE; Chatsworth, NJ; University Park, PA; Wyndmoor, PA; Charleston, SC; Kerrville, TX; Logan, UT; Wenatchee, WA; Madison, WI; and Kearneysville, WV.

ERS is restructuring from four divisions to three branches. The Food Economics Division, Markets and Trade Economics Division, and Resource and Rural Economics Division will transition to the Office of Food Markets, the Office of Commodities and Trade, and the Office of Productions and Rural Communities.

NASS is restructuring from eight divisions to three branches. The three NASS branches will be Survey Design and Methodology, Data Acquisition and Processing, and Analysis and Estimation.

NIFA is retaining its Operations and Programs Branches and restructuring from five to three scientific programs offices within the Programs Branch. Grants Management Services positions currently within NIFA are moving to the centralized Business Services Office.

As part of the organizational changes, the liaison responsibilities with the 1890s and Hispanic Serving Institutions (HSIs) currently housed in OPPE will be realigned into ARS. This realignment will enhance the Department's partnerships with the higher education institutions by combining similar functions in ARS. In addition, the Center for Faith will be realigned into OPPE from the Office of External and Inter-governmental Affairs. This realignment will support improvements in the Department's engagement with the faith community which is a priority of this Administration.

If you have any questions related to this notification, please have your staff contact the Office of Congressional Relations at 202–720–7095 or ocr@usda.gov. Ranking Member Jeanne Shaheen has received a similar letter.

Sincerely,

Stephen Alexander Vaden
Deputy Secretary
U.S. Department of Agriculture

Enclosures

2

## Previous ARS Structure



## New ARS Structure



## Previous ERS Structure



## New ERS Structure



## Previous NASS Structure



## New NASS Structure



## Previous NIFA Structure



## New NIFA Structure



**Office of Partnerships and Public Engagement**

As-is Organizational Chart



April 2026

**Office of Partnerships and Public Engagement**

To-be Organizational Chart



April 2026



OFFICE OF THE DEPUTY SECRETARY OF AGRICULTURE
WASHINGTON, D.C. 20250

April 30, 2026

THE HONORABLE JOHN HOEVEN
Chairman
Subcommittee on Agriculture, Rural Development,
  Food and Drug Administration, and Related Agencies
Committee on Appropriations
United States Senate
338 Russell Senate Office Building
Washington, D.C. 20510


Dear Chairman Hoeven,

Consistent with the Department's efforts to keep Congress informed of actions that streamline and improve operations, this letter is intended to notify you of planned organizational changes at the United States Department of Agriculture (USDA). As highlighted in the Department's prior notifications regarding the planned reorganization, USDA is focused on improving and consolidating support functions to enhance the efficiency of Departmental operations. This notification provides further details of planned changes in USDA's back-office functions that will streamline operations and increase the consistency of service delivery across the Department. As described below, USDA expects these reorganizations will establish offices of five or more personnel, result in office closures, relocate employees, and require reprogramming and/or transferring certain appropriations to do so.

One area of change that is part of this plan is the shifting of functional responsibilities within and between the Office of the Chief Financial Officer (OCFO) and the Office of Budget and Program Analysis (OBPA). Those changes are intended to improve the Department's financial management capabilities and to enhance the coordination of budget functions at the enterprise level. Other areas of change include the consolidation of functions into and within Departmental Administration and the Office of the General Counsel (OGC).

**Budget**

Ensuring USDA leadership's visibility into budgetary resources is critically important for the successful operation of USDA. This visibility promotes better-informed decision making on all aspects of Departmental programs and supporting functions. One planned organizational change will continue that commitment to visibility through the realignment of the budget responsibilities for some Departmental offices from OCFO to OBPA. As a result of this change, OBPA will realign its own organizational structure to ensure that its enterprise responsibilities in budget formulation, budget execution, and performance management are maintained and enhanced with the additional responsibilities of budget for the staff offices.

**Financial Management**

The other planned change associated with the Department's financial management capabilities is the realignment of the Department's Working Capital Fund (WCF) and Financial Management Division from within the OCFO's Financial Policy and Planning (FPP) division to the OCFO Chief Operating Officer. This shift will improve the operational capabilities of OCFO in its WCF authority, which maintains the Department's shared service capabilities and provides for a significant portion of USDA's information technology, financial management, and other administrative support functions. This realignment will also enable FPP to focus on critical, enterprise level fiscal policies, consolidated financial reporting requirements, and internal controls. Together, these changes will enhance OCFO's ability to set and oversee consistent Departmental policies while also ensuring management and oversight of WCF resources.

**Real Property**

The Department is also planning actions to improve the overall management and oversight of its real property portfolio. One such action is the merger of the current Office of Property and Environmental Management (OPEM) and the Office of Operations (OO). As OPEM oversees enterprise real property policy and strategy and OO manages the Department's real property footprint in the National Capital Region, the merger of the two organizations will support the Department's strategic utilization of real property assets. This consolidation of functions into the new Office of Leasing, Operations, and Property Management (OLOPM) simplifies Departmental Administration's current organization structure and consolidates real property management activities into a single office.

The other action planned to increase strategic management of USDA's real property portfolio is the consolidation of leasing functions and staff from across the Department into OLOPM. Currently, each mission area manages their leasing activities separately, which prevents the Department from effectively managing leased assets as enterprise assets. Many mission areas are struggling with managing their leased portfolio. USDA's *Utilizing Space Efficiently and Improving Technologies* (USE IT) *Act* reporting and low facility utilization percentages demonstrate the challenges with the Department's current approach. Through a phased consolidation of leasing functions, the Department will be better equipped to ensure the leases of front-line locations, such as county offices, match the operational needs and are used efficiently.

The first phase of consolidation will incorporate into OLOPM the leasing activities for the Farm Production and Conservation; Food, Nutrition, and Consumer Services; Food Safety; Rural Development; and Trade and Foreign Agricultural Affairs mission areas and the staff offices. The second phase of consolidation will incorporate the Marketing and Regulatory Programs; Research, Education, and Economics; and Natural Resources and Environment mission areas and will commence upon the completion of the first phase. The phases for leasing consolidation have been developed in conjunction with the mission areas and staff offices and ensure that real property management (such as maintenance of labs or other facilities) is not disrupted. Following consolidation, the Department will be better equipped to manage the leases for thousands of locations across the Nation in an enterprise approach that enables the Department to not only reduce costs but also better serve the farmers, ranchers, rural communities, and other customers supported from those locations.

2

**Procurement**

USDA is also planning to consolidate the procurement and contracting functions for the Department, which collectively spend over $10 billion annually in support of mission delivery. Through a phased consolidation, the Department will not only realign functions and staff but will also ensure consistency and alignment to Federal procurement rules and procedures. At present, there are ten distinct organizations that provide procurement support across the Department. Such a disaggregated structure results in inconsistencies in the services provided to agencies and offices of the Department and an inability to share contracting resources across USDA.

To address these challenges and to create a procurement framework and organization that better meets mission needs, all procurement activities for the Department will be consolidated into the Office of Contracting and Procurement (OCP) within Departmental Administration. The first phase of consolidation will focus on common procurement activities shared by mission areas. The second phase will focus on the unique, mission critical procurement related to (1) the Forest Service's fire incidents and (2) the food commodity purchases predominantly managed by the Agricultural Marketing Service. USDA will not undertake the second phase until phase one is fully completed and operational. As a result of these consolidation actions, the Department's procurement activities will be streamlined and better equipped to support USDA's mission delivery across the world.

**Human Resources**

Another planned reorganization action is the consolidation of a subset of human resources (HR) functions within the Departmental Office of Human Resources Management (OHRM). The HR functions that will be consolidated and support the entire Department are: HR policy, employee relations, labor relations, litigation, reasonable accommodation, misconduct investigation, and drug testing. Mission areas and staff offices have been extensively engaged in identifying the HR functions that would benefit from being consolidated into OHRM from current organizational locations across the Department. This is in alignment with the government-wide HR consolidation effort, led by the Office of Personnel Management's Core Human Capital Management initiative.

Through the consolidation of these functions, the Department will ensure these services are delivered consistently, which will improve the support provided to USDA employees and supervisors. As part of the consolidated organization, the employees that deliver these functions will receive consistent training and support. The majority of other HR services (e.g., classification, staffing/hiring, benefits, personnel action processing) will remain with the mission areas and agencies to ensure those critical workforce management capabilities are closely aligned with mission delivery. OHRM will service mission areas and offices that request consolidation of their other HR services into OHRM.

**General Counsel**

The final organizational change included in this notification is the planned restructuring of the OGC field structure and the consolidation of the Department's *Freedom of Information Act* (FOIA) activities under OGC. Currently, OGC's field-based staff are organized into four regions with 12 offices across the country. The Department is planning to consolidate OGC's field operations into two regions – Western and Eastern – and close five offices in Temple, Texas; Little Rock, Arkansas; Albuquerque, New Mexico; Portland, Oregon; and San Francisco, California. Affected staff will be relocated to remaining OGC locations, as well as a new office in Davis, California. There are no current staff in the Little Rock, Arkansas office.

3

This restructuring of OGC's field operations will create efficiencies for the office through the reduction in lease costs while enhancing the services provided to OGC's client agencies. One example of these enhancements will be found in Kansas City where all field matters related to the service center agencies (i.e., RD, FSA, NRCS) will be handled under the direction of the Associate General Counsel for Commercial Operations, a newly created office consisting of five or more employees. These improvements will enable OGC to continue to be a trusted advisor that supports the Department's through legal analyses, guidance, and counsel.

The Office of Information Affairs (OIA) in OGC provides Departmental direction on USDA's FOIA activities and provides operational FOIA capabilities for staff offices and some agencies. Currently, several agencies also maintain their own FOIA processing capabilities; this decentralized approach results in inconsistencies in the processing of FOIA requests. The planned consolidation of the FOIA activities will increase the effectiveness, consistency, and responsiveness of USDA's FOIA activities. This consolidation will also increase the efficiency of the Department's FOIA operations because the current decentralized model includes several staff that perform related duties on a collateral basis. The planned future state for FOIA operations will be an enterprise FOIA capability that leverages a staff structure built upon full-time FOIA staff. Such a FOIA function will meet statutory requirements and be more responsive to Departmental stakeholders.

These organizational changes together will greatly improve the efficiency of Departmental operations and will enhance the mission support capabilities of back-office functions across the enterprise. Such improvements are critical to ensuring USDA can most effectively serve the communities, organizations, and individuals that rely on the Department for critical services and support.

If you have any questions related to this notification, please have your staff contact the Office of Congressional Relations at 202–720–7095 or ocr@usda.gov. Ranking Member Jeanne Shaheen has received a similar letter.

Sincerely,

Stephen Alexander Vaden
Deputy Secretary
U.S. Department of Agriculture

Enclosures

4

USDA
Departmental Administration (DA)
**CURRENT ORGANIZATION CHART**



USDA
Departmental Administration (DA)
**PROPOSED ORGANIZATION CHART**



USDA
Departmental Administration (DA)
Office of Contracting and Procurement (OCP)
**CURRENT ORGANIZATION CHART**

89 FTE



Office of the
Assistant Secretary for
Administration
USDA, DA

Director / SPE
Office of Contracting &
Procurement

Deputy Director
OCP

Procurement
Operations Division

Procurement Systems
Division

Acquisition Program
Management Office

Business Management
Office

USDA
Departmental Administration (DA)
Office of Contracting and Procurement (OCP)
**PROPOSED ORGANIZATION CHART**

OCP FTEs After Phase 1: 575*
OCP FTEs After Phase 2: 703*



*The number of acquisition professionals necessary to execute the procurement function will vary based on acquisition workload.

USDA
Departmental Administration (DA)
Office of Property and Environmental Management (OPEM)
**CURRENT ORGANIZATION CHART**

25 FTE



USDA
Departmental Administration (DA)
Office of Operations (OO)
**CURRENT ORGANIZATION CHART**

109 FTE



USDA
Departmental Administration (DA)
Office of Leasing, Operations, and Property Management (OLOPM)
**PROPOSED ORGANIZATION CHART**

| OLOPM FTEs After Phase 1: 182 |
|---|
| OLOPM FTEs After Phase 2: 225 |



USDA
Departmental Administration (DA)
Office of Human Resources Management
**CURRENT ORGANIZATION CHART**

76 FTE



USDA
Departmental Administration (DA)
Office of Human Resources Management
**PROPOSED ORGANIZATION CHART**

OHRM FTEs After Phase 1: 277
OHRM FTEs After Phase 2: 364
OHRM FTEs After Phase 3: TBD



**United States Department of Agriculture**
**Office of Budget and Program Analysis**
**"As-Is"**



**United States Department of Agriculture**
**Office of Budget and Program Analysis**
**"To-Be"**



# Office of the Chief Financial Officer (OCFO)
# As-Is Organizational Structure

Office of the Chief Financial Officer

Civil Rights and Conflict Management

**ACFO for Financial Policy and Planning**
- Fiscal Policy Division
- Administrative Management Division (Headquarters)
- Working Capital Fund Division
- Budget Division
- Financial Management Division
- Internal Controls Division

**ACFO for Shared Services**
- Financial Management Services
- Transparency Accountability and Reporting Division
- Accounting Policy and Consolidated Reporting Division
- Program Management Office (PMO)

**National Finance Center**
- Government Employees Services Division
- Human Resources Management Staff
- Risk Management Staff
- Administrative Management Staff

1



# Office of the Chief Financial Officer (OCFO)
# To-Be Organizational Structure

Office of the Chief Financial Officer

Civil Rights and Conflict Management

**ACFO for Financial Policy and Planning**
- Fiscal Policy Division
- Internal Controls Division
- Accounting Policy and Consolidated Reporting Division

**ACFO for Shared Services**
- Financial Management Services
- Transparency Accountability and Reporting Division
- Program Management Office (PMO)

**Chief Operating Officer**
- Administrative Management Division (Headquarters)
- Financial Data Analytics Division
- Financial Management Division
- Working Capital Fund Division

**National Finance Center**
- Government Employees Services Division
- Administrative Management Staff
- Human Resources Management Staff
- Risk Management Staff

**Office of Budget and Program Analysis (OBPA)**
- Budget Division

Represents Change



2

**United States Department of Agriculture**
**Office of the General Counsel**
**"As-Is"**



**United States Department of Agriculture**
**Office of the General Counsel**
**"To-Be"**





OFFICE OF THE DEPUTY SECRETARY OF AGRICULTURE
WASHINGTON, D.C.  20250

April 30, 2026

THE HONORABLE JOHN HOEVEN
Chairman
Committee on Appropriations
Subcommittee on Agriculture, Rural Development,
    Food and Drug Administration, and Related Agencies
United States Senate
190 Dirksen Senate Office Building
Washington, D.C.  20510

Dear Chairman Hoeven,

This communication is to notify the Committee that the United States Department of Agriculture's (USDA) Food, Nutrition, and Consumer Services (FNCS) Mission Area intends to restructure as the Food and Nutrition Administration (FNA).  While the current national office and regional structure addressed the Department's needs, we now recognize and embrace the need to shift resources and authority closer to where our work happens: on the ground, alongside States, Tribes, partners, and neighboring communities.  The challenges we face today call for a model that is more responsive, accountable, and locally connected.  These changes are designed to simplify the chain of command, strengthen local partnerships, and enhance customer service, all while administering more effective evaluation of nutrition programs.

As described below, the restructuring and reorganization will establish offices of five or more personnel, result in office closures, relocate employees, and require reprogramming and transferring certain appropriations to do so.  Under the restructuring, USDA intends to transfer funds appropriated to the Office of the Under Secretary for Food, Nutrition, and Consumer Services to the Nutrition Program Administration.

The Food and Nutrition Service, now the Food and Nutrition Administration, is restructuring the organization by opening five new office hubs to hold department support staff, requiring Retailer Operations and Compliance staff to report to an office, and placing senior staff in the Washington D.C. headquarters.  The new organizational charts are enclosed.

FNA's Research staff will report to Raleigh, North Carolina, Supplemental Nutrition Assistance Program (SNAP) staff will report to Indianapolis, Indiana, and Supplemental Nutrition and

Safety Program (SNAS) staff will be in Kansas City, Missouri. Dallas, Texas will hold Child Nutrition staff, along with Retailer Operations and Compliance (ROC) staff.

The Retailer Operations and Compliance Unit, formerly stationed remotely nationwide, now will report to four new locations, New York, New York; Los Angeles, California; Atlanta, Georgia; and Dallas, Texas. These four locations were selected based on the number of SNAP-authorized retailers and participant rates.

The Food and Nutrition Administration will restructure into four programmatic branches: Nutrition Research and Regulations, Benefits and Integrity, State Support and Evaluation, and Retailer Operations and Compliance.

The Nutrition Research and Regulations division includes six departments: Child Nutrition Policy and Regulations; SNAP Policy and Regulations; Special Supplemental Nutrition Program for Women, Infants, and Children (WIC) Policy and Regulations; Dietary Guidelines for Americans Research and Policy; Retailer Policy and Regulations; and the Research Center. These departments will be in the National Capital Region, except for the Research Center, which will be in Raleigh, North Carolina. These branches will report to the Nutrition Research and Regulations team in Washington, D.C.

The Benefits and Integrity division includes Child Nutrition Implementation and Oversight in Dallas, Texas, Supplemental Nutrition and Safety Implementation and Oversight in Kansas City, Missouri, Supplemental Nutrition Assistance Program Implementation and Oversight in Indianapolis, Indiana, and Integrity Program Data Analytics in Washington, D.C.

The Office of State Support and Evaluations will be a program-based leadership structure with five support and evaluation administrators for Grants Management and Administrative Services, Supplemental Nutrition Assistance Program, Supplemental Nutrition and Safety Programs, Child Nutrition, and Technology and Modernization Integrity, with staff located in the five Hubs dedicated to providing customer service to States by enabling any program specialist, assigned to any Hub, to assist any State nationwide. This model supports fair distribution of workload, increases collaboration among program specialists within their program areas, and expands nationwide program consistency – ultimately improving support provided to States. The structure will reinforce consistency in methods, and support knowledge transfer.

The Regional Operations and Compliance division will include Retailer Operations, Fraud Analytics, Retailer Compliance, and Retailer Investigations, which will located in Hubs in New York, New York; Los Angeles, California; Dallas, Texas; and Washington, D.C.

In February, the Food and Nutrition Service announced its closure of the National Office located in Alexandria, Virginia. Those remaining Food and Nutrition Service employees are relocating to the Yates Building in Washington, D.C., and the George Washington Carver Center (GWCC) in Beltsville, Maryland.

2

If you have any questions related to this notification, please have your staff contact the Office of Congressional Relations at 202–720–7095 or ocr@usda.gov.  Ranking Member Jeanne Shaheen has received a similar letter.

Sincerely,

Stephen Alexander Vaden
Deputy Secretary
U.S. Department of Agriculture

Enclosures

3

# FOOD AND NUTRITION ADMINISTRATION

**Political Appointees**
**Career Service Employees**

USDA

**Administrator (D.C.)**

Sr. Policy Advisor (D.C.)

Chief of Staff (D.C.)

Executive Administrative Assistant (D.C.)

Office of Partnerships and Budget (D.C.)

Special Assistant (D.C.)

Deputy Administrator of State Support & Evaluations (Regional – Hub)

Chief Operating Officer (D.C.)

Senior Advisor (Hub)

Confidential Assistant (Hub)

Deputy Administrator of Nutrition Research & Regulations (D.C.)

Deputy Administrator of Benefits & Integrity (D.C.)

Senior Advisor (Hub)

Confidential Assistant (Hub)

Deputy Administrator of Retailer Operations & Compliance

Assistant Chief Information Officer

Chief Financial Officer

CN Policy & Regs (D.C.)

SNAP Policy & Regs (D.C.)

WIC Policy & Regs (D.C.)

Retailer Policy & Regs (D.C.)

DGA Research & Policy (D.C.)

Research (Raleigh)

Integrity Program Data Analytics (D.C./Hub)

SNAP Implementation & Oversight (Indianapolis)

CN Implementation & Oversight (Dallas)

SNAS Implementation & Oversight (Kansas City)

Chief Staff Officer

Senior Advisor (Hub)

Management Analyst

Chief Staff Officer

Assistant Deputy Administrator of State Support and Evaluations

Assistant Deputy Administrator

Senior Technical Advisor

State Systems Office Director

Fraud Analytics Division - Director

Retailer Operations Division - Director

Retailer Compliance Division – Director

Retailer Investigations Division - Director

State Support Public Affairs Director

Office of Emergency Management Director

GMAS Support & Evaluation Administrator

SNAP Support & Evaluation Administrator

SNAS Support & Evaluation Program Administrator

Child Nutrition Support & Evaluation Administrator

Technology & Modernization Integrity Administrator

Grants Management Director

Management Services Director

Quality Control Director

Operations Director

WIC Director

Food Distribution Director

Schools Director

Community Director

Tech & Modernization Integrity Director

Programs Integrity Director

PRELIMINARY

## STATE SUPPORT AND EVALUATION STRUCTURE

Indianapolis, IN
Dallas, TX
Raleigh, NC
Kansas City, MO
Denver, CO

## RETAILER OPERATIONS AND COMPLIANCE STRUCTURE

New York, NY
Atlanta, GA
Dallas, TX
Los Angeles, CA







OFFICE OF THE DEPUTY SECRETARY OF AGRICULTURE
WASHINGTON, D.C.  20250

June 17, 2026

THE HONORABLE JOHN HOEVEN
Chairman
Subcommittee on Agriculture, Rural Development,
    Food and Drug Administration, and Related Agencies
Committee on Appropriations
United States Senate
129 Dirksen Senate Office Building
Washington, D.C.  20510

Dear Chairman Hoeven,

I am writing to inform you of organizational updates planned for the United States Department of Agriculture's (USDA) Foreign Agricultural Service (FAS).  These updates are part of USDA's broader modernization effort, first announced in July 2025, to align agency structures with available resources, eliminate unnecessary duplication, and strengthen mission support across the Department.

## Overview of Planned Action

FAS will be updating its organizational structure to ensure the agency is best positioned to efficiently and effectively deliver on its global trade, export market development and international food assistance missions.  As part of this effort, FAS will establish an operational support hub in Kansas City, Missouri, to bring select Washington, D.C.-based support roles and programs closer to the people and communities we serve in America's agricultural heartland.  This modernization effort only applies to U.S.-based headquarters functions; all overseas posts and staff are completely unaffected.  No positions will be eliminated as part of this realignment.

## Establishing a FAS Hub in the Heartland

Kansas City is in America's agricultural heartland, and shifting the FAS program support workforce to the region brings it closer to the farmers, ranchers, producers who are at the heart of our mission. This hub will centralize specific program operations, including commodity procurement, export credit guarantee programs, and logistics coordination for international food assistance.  Consolidating these functions in one location will streamline operations and better align related program activities.

## Realigning Selected Headquarters-based Functions

Certain mission support and program functions currently located in the National Capital Region (NCR) will transition to Kansas City.  Additionally, approximately 115 positions will relocate to the George Washington Carver Center (GWCC) in Beltsville, Maryland, to streamline operations and better align staff with Department-wide service platforms.

**Retaining a Core Washington, D.C.-based Headquarters Staff**

FAS will maintain a smaller Washington, D.C.-based headquarters staff – totaling fewer than 200 positions – stationed within the USDA headquarters complex for leadership, policy, congressional engagement, interagency coordination, and other functions requiring close proximity to Federal partners.

In total, the future FAS workforce footprint within the broader NCR will see a substantial reduction as core administrative and program support functions shift to Kansas City and GWCC. All programs and activities will continue without interruption throughout the transition.

The updates support USDA's modernization initiative by:

- eliminating duplicative structures across headquarters operations;
- consolidating mission-support functions for international food assistance and resiliency activities;
- strengthening support for FAS' global workforce;
- aligning staffing and facilities with available resources; and
- consolidating related functions to improve efficiency and service delivery.

These changes reflect the Department's long-term efforts to modernize agency structures, support employees, and enhance the delivery of programs that benefit U.S. agriculture and feed vulnerable populations overseas.

**Employee Impact**

All FAS employees will retain positions within the agency.  Employees affected by relocation will receive individual notification, and the Department will fulfill its collective bargaining obligations.

**Budgetary Impact**

The planned updates are not expected to result in increased salary or operating costs, and facility and administrative services consolidations are expected to support future cost savings and mission delivery efficiencies.

If you have any questions regarding this notification, please have a member of your staff contact the Office of Congressional Relations at (202) 720-7095 or ocr@usda.gov.  A similar letter has been sent to Ranking Member Jeanne Shaheen.

Sincerely,

Stephen Alexander Vaden
Deputy Secretary
U.S. Department of Agriculture

2



OFFICE OF THE DEPUTY SECRETARY OF AGRICULTURE
WASHINGTON, D.C.  20250

June 17, 2026

THE HONORABLE JOHN HOEVEN
Chairman
Subcommittee on Agriculture, Rural Development,
    Food and Drug Administration, and Related Agencies
Committee on Appropriations
United States Senate
129 Dirksen Senate Office Building
Washington, D.C.  20510

Dear Chairman Hoeven,

I am writing to inform the Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies of organizational realignments that are being planned for the United States Department of Agriculture's (USDA) Farm Production and Conservation (FPAC) mission area.  The organizational realignments involve the following FPAC agencies:

- FPAC Business Center (FBC)
- Farm Service Agency (FSA)
- Natural Resources Conservation Service (NRCS)
- Risk Management Agency (RMA)

These changes are essential to enhance organizational performance in support of FPAC's future vision and modernization efforts in serving American producers and include the following:

## FPAC Business Center (FBC)

The primary objective of the FBC realignment is to ensure mission area administrative and operations functions are provided in an efficient and effective way, maximizing financial resources, personnel, and technology to respond to challenges and deliver exceptional customer service and support to the FPAC Mission Area.

This organizational and functional realignment effort will result in a more efficient distribution of staff and administrative functions within the Business Center, the Mission Area, and the Department by reducing the FBC lines of business from fifteen to nine and realigning services to a combination of USDA staff offices, and other FPAC agencies, to more efficiently serve customers and partners.

Remaining staff, following realignment, will continue to provide services from one of the established five regional hubs (Raleigh, North Carolina; Kansas City, Missouri; Indianapolis, Indiana; Fort Collins, Colorado; and Salt Lake City, Utah) and other FPAC office locations. A small staff will remain in the National Capital Region (NCR) to provide direct support in the Whitten Building and George Washington Carver Center (GWCC).

**Farm Service Agency (FSA)**

FSA will be realigned to gain greater efficiencies in the development, implementation, and delivery of program benefits and services to the customers and communities they serve. The organizational changes support workforce maximization that will allow FSA leadership to align and leverage current IT modernization initiatives to increase efficiency and productivity by scaling, or "right-sizing", in organizational areas such as farm loans to provide consistency in policy implementation and streamlined processes.

Additional changes include integrating and expanding executive level oversight and leadership at the appropriate levels within the organizational structure to support rapid decision-making and implementation of statutorily mandated programs.

The county office staff, which represent most of FSA's employees across the country, is not affected by these changes.

**Natural Resources Conservation Service (NRCS)**

NRCS intends to move forward with a new organizational structure designed to strengthen the agency's mission, advance conservation priorities, and better serve farmers, ranchers, foresters, and all conservationists across the country. Most of the proposed restructuring will take place at the National Headquarters (NHQ) level, where organizational adjustments are being implemented to align NRCS with the broader FPAC reorganization plan and to strengthen the agency's ability to deliver conservation programs effectively at the field level. NRCS plans to maintain core staff within the NCR to support leadership and to assist with interagency coordination and Congressional activities.

Specific proposed changes include:

- Consolidating the four Deputy Areas into three: Conservation Implementation, Resource Information, and Management;
- Relocating National Headquarters career staff into regional hubs in Fort Collins, CO; Indianapolis, IN; Raleigh, NC; Lincoln, NE and Fort Worth, TX;
- Relocating technical centers and the National Water Management Center staff and functions to Fort Worth, TX;
- Eliminating the Equity Team, Climate Team, Center for Sustainable Commodities, and the Office of the Regional Conservationists; and
- Refocusing and strengthening core technical soil services and national cooperative soil survey functions.

NRCS has 2,412 Service Centers that provide direct technical and financial assistance. States will optimize staffing levels to focus on farmer first direct services. No NRCS field offices will be closed, and no field-based employees will be relocated during the proposed reorganization.

2

**Risk Management Agency (RMA)**

RMA administers the Federal Crop Insurance Program, the second largest USDA program by financial outlays. Although the program is substantial, RMA remains a relatively small agency with 346 permanent full-time employees.

As part of ongoing workforce adjustments and reorganization, RMA will eliminate the Risk Management Education Division, formerly under the Deputy Administrator for Insurance Services. The functions of that division will be integrated into existing program operations, and remaining employees will be reassigned to non-supervisory roles that support core agency responsibilities.

RMA has also implemented a workforce realignment strategy to place personnel where they provide the greatest value – closer to agricultural producers, Approved Insurance Providers (AIPs), and regional partners. This strengthens program delivery, improves responsiveness, and aligns staffing with field based operational needs.

Today, RMA staff are located across 37 states, with only about four percent remaining in the NCR. This wider distribution improves the agency's ability to respond quickly, build stronger partner relationships, and support the integrity of the Federal Crop Insurance Program. The model reduces reliance on costly, underutilized metropolitan office space and places staff in agricultural communities where they are most effective.

Nationwide placement of personnel enhances RMA's capacity for timely site visits, stakeholder engagement, program reviews, and investigations – activities essential to program integrity and to the public private partnership that supports federal crop insurance. This approach also aligns RMA with the national footprint of AIPs and crop insurance agents, who operate across 48 states and nearly 4,000 ZIP codes, enabling field engagement in hours rather than days.

**Conclusion**

Overall, this restructuring will result in cost savings to FPAC. The proposed organizational changes will not require any reprogramming or transfers of funds, nor are they expected to result in increased salary or other costs.

Should you have questions, please have a member of your staff contact the Office of Congressional Relations at (202) 720-7095 or ocr@usda.gov. A similar letter is being sent to Ranking Member Jeanne Shaheen.

Sincerely,

Stephen Alexander Vaden
Deputy Secretary
U.S. Department of Agriculture

3



OFFICE OF THE DEPUTY SECRETARY OF AGRICULTURE
WASHINGTON, D.C.  20250

June 17, 2026

THE HONORABLE JOHN HOEVEN
Chairman
Subcommittee on Agriculture, Rural Development,
  Food and Drug Administration, and Related Agencies
Committee on Appropriations
United States Senate
338 Russell Senate Office Building
Washington, D.C.  20510

Dear Chairman Hoeven,

Consistent with efforts to inform Congress of planned actions to improve Departmental operations, I am writing to formally notify the Subcommittee of an organizational restructuring planned for the United States Department of Agriculture's (USDA) Rural Development (RD) mission area.  This strategic reorganization is designed to increase operational efficiency, eliminate bureaucratic redundancies, and maximize fiscal stewardship, thereby ensuring taxpayer resources are deployed with maximum impact across rural America.

By centralizing our loan and grant apparatus, RD will strengthen oversight, enhance program integrity, and advance efforts to eliminate waste, fraud, and abuse.  As described below, the reorganization will streamline communication and management layers and elevate key executive reporting lines to strengthen leadership accountability.  To better support its core mission, RD is also implementing targeted structural changes across its program agencies.

**Rural Development Agencies**

RD is reorganizing the Rural Business-Cooperative Service (RBCS), Rural Housing Service (RHS), and Rural Utilities Service (RUS) to improve operational efficiency.  This restructuring will improve consistency in loan origination by localizing loan prequalification and management, while centralizing loan processing, underwriting, funding, and servicing.

- *Rural Business-Cooperative Service (RBCS)*

Streamlining RBCS' management structure, with an operational framework consolidating three divisions to two, will permit a more effective focus on core activities.  Additionally, all RBCS processing, underwriting, funding, and servicing functions currently performed at the State-level

will be centralized within the RBCS national office. This transition will not result in any State employees losing their positions or require relocation; instead, some RBCS employees located in the States will be reporting to RBCS' national office. This restructuring will relocate some RBCS national office employees. National office employees that are relocated will retain a position within the agency.

- *Rural Housing Service (RHS)*

In furtherance of streamlining RHS' management structure to effectively focus on core activities, RHS will centralize processing, underwriting, funding, and servicing functions currently performed at the State-level to the national office for Single Family Housing Direct and Community Facilities loans. Additionally, RHS will realign its Program Support Staff to Community Facilities. This transition will not result in any State employees losing their positions or require relocation; instead, some RHS employees located in the States will be reporting to RHS national office. This restructuring will relocate some RHS national office employees. National office employees that are relocated will retain a position within the agency. The agency will continue to perform Single Family Housing Guaranteed and Multi-Family Housing (MFH) programs centrally.

- *Rural Utilities Service (RUS)*

RUS will centralize the Water and Environmental Program's (WEP) processing, underwriting, funding, and servicing functions from the State-level to the national office, consistent with Telecommunication and Electric programs. This also will streamline RUS' management structure with a focus on core activities. Alongside this change, any engineering and environmental work currently overseen by the States will move to the national office. This transition will not result in any State employees losing their positions or require relocation; instead, some RUS employees located in the States will be reporting to RUS national office. This restructuring will relocate some RUS national office employees. National office employees that are relocated will retain a position within the agency.

**State Offices**

The State Operations Office (SOO) will continue to report directly to the RD Office of the Under Secretary. To maintain a robust and responsive field presence, the RD SOO will retain dedicated State-level personnel across all 47 State offices and area offices. The SOO will retain full operational responsibility for executing facility disaster recovery and emergency response duties across these locations. Under the direct leadership of the 47 State Directors, State employees will optimize Agency impact by focusing core efforts on constituent engagement, relationship management, stakeholder outreach, technical assistance, and marketing of RD programs. To streamline operations and maximize public awareness of Agency resources, the functions of the Community Development Program Office will be absorbed into the SOO immediate office and individual State offices. This structural realignment ensures a unified, consistent approach to programmatic outreach and marketing of RD programs.

2

- *Area Offices*

RD is closing select field office locations to improve efficiency, reduce taxpayer costs, and ensure responsible management of USDA resources. Many of these locations have been vacant for years, face health or safety concerns, or were previously slated for closure. All program work from these offices has already been absorbed by nearby staffed locations, and no employee movement is required. This effort will eliminate up to 77,000 square feet of unused space and save taxpayers $1.9 million annually.

**Program Support**

The Business Center's Enterprise, Human Resources, and Procurement Management Offices, along with the Civil Rights Office and Risk Office headquarters units, will be formally eliminated as those functions are incorporated into Department-level consolidation. Their functions and personnel will transfer to centralized Departmental offices or to other RD offices to achieve economies of scale and integration with USDA's enterprise-wide shared services. To sharpen internal governance, four critical operational components noted below will be repositioned to report directly to the Office of the Under Secretary.

- *Business Center Operations Office*

The Operations Office will be renamed the Department Liaison Office. The office will serve as a bridge between the Under Secretary's office and USDA leadership and staff offices. While the Operations Office was heavily focused on internal logistics, business processes, and back-office management, as USDA moves to a more centralized operational structure, the Department Liaison Office will make a shift to support the Under Secretary in providing high-level strategic alignment by focusing on interagency policy coordination and special projects to help advance mission area goals.

- *Finance Office (FO)*

The Finance Office is being renamed the RD Office of the Chief Financial Officer (RD-OCFO). Along with this name change, the RD-OCFO will structurally transition to report directly to the Office of the Under Secretary. By streamlining functions through staff realignment, the office will continue to perform all current functions and stand up a centralized guaranteed lending reviews program. Additionally, RD-OCFO will absorb the following functions and personnel: all travel duties and staff from the Enterprise Office's Travel and Transportation Branch; conference reporting functions performed by the Procurement Management Office; and audit, inspection, hotline, and investigation functions from the Risk Office's Enterprise Risk Management Unit.

- *Technology Office (TO)*

The Technology Office is being renamed the RD Office of the Chief Information Officer. Concurrently, organizational reporting authority for this office will transfer directly to the Office of the Under Secretary. This office will continue all current functions and optimize the workforce through division level realignment. This realignment will help accelerate digital

3

modernization by allowing for more agile leadership, streamlined decision-making, and more seamless cross-department collaboration.

- *Servicing Office (SO)*

The Servicing Office (SO) will directly report to the Office of the Under Secretary providing greater oversight and allowing the Under Secretary to work more directly with SO's leadership to improve default management and property liquidation. Loss claim payments; lender oversight; and management of reporting activities related to the development, maintenance, and operations for Single Family Housing Guaranteed Loans will now be administered by the RHS.

Transitioning these responsibilities to RHS eliminates operational silos. The Risk Office Special Assets Unit's functions will transfer to the SO to strengthen and consolidate loan servicing activities related to RD's commercial portfolio. SO will continue to perform life-cycle loan servicing actions for RHS, RBCS, RUS, and the Farm Service Agency's Farm Loan Programs. This streamlined approach enhances program integrity, improves risk management, and ensures a more efficient, seamless experience for lenders and rural homeowners.

The following operational support offices will continue to report to the Office of the Under Secretary while implementing the respective structural changes.

- *Office of External Affairs (OEA)*

The Office of External Affairs (OEA) will eliminate its distinct Public Affairs and Legislative Affairs divisions. These changes will remove unnecessary management layers and allow this small, highly-focused office to make decisions more quickly and exchange ideas freely with leadership and across teams, creating a more responsive communications structure.

- *Innovation Center (IC)*

The Innovation Center (IC) will continue to provide all current functions and gain efficiencies through staff realignment. The IC will assume the responsibilities carried out by the Enterprise Office's (EO) Solutions Management and Initiatives Division with the focus on business process improvements. Disaster assistance funds functions performed by the EO will be transferred to IC. To help us centralize enterprise-wide data and data-driven tasks under a unified office, responsibilities of the Chief Risk Officer role will transition to the IC to lead the newly established Credit Risk Management Division.

**Rural Development National Office Centers**

RD will establish two primary National Office Centers located in St. Louis, Missouri, and Dallas-Fort Worth, Texas. This strategic geographic realignment will optimize Agency operations, improve fiscal management, and tap into deep grant and loan regional talent pools to better serve rural America.

- *St. Louis, Missouri, National Office Center*

St. Louis has served as one of the largest and most reliable RD infrastructure footprints for several decades. Under this realignment, St. Louis will serve as the Agency's primary office for core national office functions such as rural housing, loan servicing, financial operations, information technology, and administrative services.

- *Dallas-Fort Worth, Texas, National Office Center*

The Dallas–Fort Worth metroplex will serve as the primary national hub for RD's Business Programs and Utilities Programs loan and grant functions. As a premier, national-scale finance corridor, the region offers a vast concentration of highly skilled financial service workers. This hub is strategically positioned in a centrally located time zone, offers broad geographic accessibility as a major national transportation center, and benefits from a comparatively lower cost of living and tax structure. This location will directly increase the Agency's pool of qualified candidates possessing strong finance and banking experience.

- *Personnel and Workforce Transition*

To support this operational shift, select positions currently assigned to the National Capital Region duty stations will be strategically relocated to either St. Louis or Dallas-Fort Worth centers.

**Conclusion**

This comprehensive reorganization helps RD to realize its commitment to structural modernization without introducing increased salary or operational costs. It will ensure RD remains a lean, performance-driven mission area focused entirely on driving economic opportunity in rural America. RD is committed to supporting our workforce throughout this transition while ensuring uninterrupted service delivery.

If you have any questions regarding this notification, please have a member of your staff contact the Office of Congressional Relations at (202) 720-7095 or ocr@usda.gov. A similar letter has been sent to Ranking Member Jeanne Shaheen.

Sincerely,

Stephen Alexander Vaden
Deputy Secretary
U.S. Department of Agriculture



OFFICE OF THE DEPUTY SECRETARY OF AGRICULTURE
WASHINGTON, D.C. 20250

June 17, 2026

THE HONORABLE JOHN HOEVEN
Chairman
Subcommittee on Agriculture, Rural Development,
  Food and Drug Administration, and Related Agencies
Committee on Appropriations
United States Senate
338 Russell Senate Office Building
Washington, D.C. 20510

Dear Chairman Hoeven,

I am writing to inform you of an organizational realignment that is being planned for the United States Department of Agriculture's (USDA) Agricultural Marketing Service (AMS). The organizational realignment involves the AMS Fair Trade Practices Program (FTPP) and its underlying Divisions.

Specifically, AMS will reorganize FTPP through the following actions: (1) repositioning the Perishable Agricultural Commodities Act (PACA) Division within the Specialty Crops Program (SCP); (2) shifting the Packers and Stockyards Division into the Livestock and Poultry Program (LP); (3) moving the Warehouse and Commodity Management Division to the renamed Cotton and Warehouse Program; and (4) consolidating the Food Disclosure and Labeling Division (Bioengineered Foods and Country of Origin Labeling) functions into the Science and Technology Program, as part of an existing but renamed Labeling and Compliance Division, which includes similar functions.

The changes are essential to realign each function and reassign staff to the appropriate AMS commodity program or service provider. With this reorganization, when the produce, livestock, or cotton industries reach out on issues, industry will have a single, streamlined communication channel, which supports USDA's goals to reduce bureaucracy and improve efficiency, program execution, and accountability.

This reorganization meets the Secretary's direction of consolidating, unifying, and optimizing functions and will reduce AMS Program areas from ten to nine. The structural realignment also meets USDA's reorganizational goal of strengthening leadership accountability and reducing organizational complexity by streamlining reporting structures. In addition, AMS plans to continue to realign certain administrative functions and streamline internal operations and

structures to further improve service delivery and enhance operational efficiencies for our user-fee customers.

Overall, this effort will align AMS services to improve effectiveness and meet customer needs. The proposed organizational changes will not require any reprogramming or transfer of funds, nor are they expected to result in increased salary or other costs.

Should you have any questions, please have a member of your staff contact the Office of Congressional Relations at (202) 720-7095 or ocr@usda.gov.  A similar letter is being sent to Ranking Member Jeanne Shaheen.

Sincerely,

Stephen Alexander Vaden
Deputy Secretary
U.S. Department of Agriculture

Enclosures

2

**U.S. DEPARTMENT OF AGRICULTURE**
**AGRICULTURAL MARKETING SERVICE**



AMS administers programs that create domestic and international marketing opportunities for U.S. producers of food, fiber, and specialty crops. AMS also provides the agriculture industry with valuable services to ensure the quality and availability of wholesome food for consumers across the country.

Case 3:25-cv-03698-SI   Document 457-2   Filed 07/24/26   Page 61 of 166

**U.S. DEPARTMENT OF AGRICULTURE**
**AGRICULTURAL MARKETING SERVICE**



AMS administers programs that create domestic and international marketing opportunities for U.S. producers of food, fiber, and specialty crops. AMS also provides the agriculture industry with valuable services to ensure the quality and availability of wholesome food for consumers across the country.

Case 3:25-cv-03698-SI    Document 457-2    Filed 07/24/26    Page 62 of 166

| AGRICULTURAL MARKETING SERVICE<br>FUNDING AND STAFFING OVERVIEW* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Funding | | | | Staffing | | |
| | Annual Funding | | | | Staff Years | | |
| | As - Is | | To - Be | | Change | As - Is | To -Be | Change |
| FAIR TRADE PRACTICES PROGRAM | $ | 48,782,000 | $ | - | $ (48,782,000) | 121 | - | (121) |
| LIVESTOCK & POULTRY PROGRAM | $ | 21,463,605 | $ | 54,094,605 | $ 32,631,000 | 81 | 156 | 75 |
| SCIENCE & TECHNOLOGY | $ | 16,701,495 | $ | 22,988,495 | $ 6,287,000 | 12 | 24 | 12 |
| COTTON PROGRAM | $ | 4,610,296 | $ | 14,474,296 | $ 9,864,000 | 18 | 52 | 34 |
| Grand Total | $ | 91,557,396 | $ | 91,557,396 | - | 232 | 232 | - |

*FTPP's annual funding consists of the following PPAs from the FY26 budget: Packers and Stockyards ($32,631,000; 75 FTE), Country of Origin Labeling ($4,431,000; 8 FTE), National Bioengineered Food Disclosure ($1,856,000; 4 FTE; and U.S. Warehouse Activities ($9,864,000; 34 FTE). For each Program area, this overview aggregates their share of funding and staff years (FTE) "To-Be"(i.e., from FTPP) from these PPAs. For example, the Packers and Stockyards annual funding is added to Livestock and Poultry's existing share of FY26 annual funding.



OFFICE OF THE DEPUTY SECRETARY OF AGRICULTURE
WASHINGTON, D.C. 20250

June 17, 2026

THE HONORABLE JOHN HOEVEN
Chairman
Subcommittee on Agriculture, Rural Development,
    Food and Drug Administration, and Related Agencies
Committee on Appropriations
United States Senate
338 Russell Senate Office Building
Washington, D.C. 20510

Dear Chairman Hoeven,

In the interest of ongoing transparency and communication with the Committee, this letter provides formal notice to the Committee of the United States Department of Agriculture's (USDA) planned realignment of specific functions within and into the Office of the Chief Information Officer (OCIO). The proposed changes are intended to improve operational efficiency, strengthen service delivery, and better align resources with the Department's strategic priorities, supporting the services on which Americans rely. Expected benefits include more efficient budgeting, streamlined financial reporting, reduced duplication, and enhanced oversight of compliance activities, resulting in improved stewardship of Federal resources.

**Consolidating Information Technology (IT) Administrative Operations**

Historically, OCIO's budget, contracting, and administrative operations have been fragmented across multiple Centers, creating inefficiencies and delays. The new structure consolidates these functions into a single unit, streamlining processes, enhancing integration, and enabling faster, more informed decision-making. This alignment reduces redundancy, increases organizational agility, and delivers more cost-effective, accountable operations in support of USDA's mission.

**Unifying Cyber, Network, and Telecommunications Services**

To strengthen USDA's customer experience, the Department proposes centralizing end user support and network operations within OCIO. This includes consolidating cyber and network functions currently housed in the Client Experience Center (CEC), the Cybersecurity and Privacy Operations Center (CPOC), the Digital Infrastructure Services Center (DISC) and the USDA Mission Areas. Unifying these capabilities will strengthen operational performance, reduce costs, and enhance the Department's cybersecurity posture. This integration addresses longstanding inefficiencies, eliminates duplicative processes, and enables more agile, coordinated responses to both customer needs and security risks. This step completes the Department's efforts to integrate IT personnel under OCIO and will support a center-based structure that improves strategic decision-making and financial planning for network services.

The reorganization will bring all USDA network oversight—domestic and international—under OCIO, including telecommunications planning, firewall management, and voice and unified communications services.

**Elevating Artificial Intelligence (AI) and Data Management**

The reorganization establishes two new Offices within OCIO, the Office of the Chief AI Officer (CAIO), and the Office of the Chief Data Officer (CDO).

The CAIO will lead USDA's AI strategy, set priorities, coordinate adoption across the Department, guide workforce development, and ensure alignment with Federal requirements.

Under the CDO, OCIO will also strengthen the Department's enterprise data ecosystem. This includes strategic planning, development, and governance of data platforms and infrastructure, ensuring compliance with the *Foundations for Evidence-Based Policymaking Act of 2018* and other data policies. The realignment enables USDA to manage the full data lifecycle and enhance enterprise data governance.

**Realignment of Mission Area Functions**

Mission Area resources, including those in the Forest Service, that currently support several duplicated or decentralized functions will be realigned to OCIO. These functions include End User Services; Network and Telecommunications; Laboratory Technical Support Services; and Cybersecurity functions related to Application Code Scanning, Privacy Program Support, and Assessment and Authorization (A&A) services.

These changes reflect the Department's continued efforts to optimize IT operations. Approximately 175 Mission Areas positions will be realigned to the OCIO. No positions will be eliminated as part of this reorganization, which will remain budget neutral. Instead, the adjustments enable more efficient use of resources and improve OCIO's ability to meet mission needs and deliver better customer experience.

I remain committed to working with Congress, stakeholders, and employees to identify opportunities to further improve USDA operations. Our goal is to ensure USDA remains a well-managed, customer-focused Federal agency. If you have any questions related to this notification, please have your staff contact the Office of Congressional Relations at 202-720-7095 or ocr@usda.gov. A similar letter has been provided to Ranking Member Jeanne Shaheen.

Sincerely,

Stephen Alexander Vaden
Deputy Secretary
U.S. Department of Agriculture

Enclosure

2







OFFICE OF THE DEPUTY SECRETARY OF AGRICULTURE
WASHINGTON, D.C.  20250

June 17, 2026

THE HONORABLE JOHN HOEVEN
Chairman
Subcommittee on Agriculture, Rural Development,
   Food and Drug Administration, and Related Agencies
Committee on Appropriations
United States Senate
129 Dirksen Senate Office Building
Washington, D.C.  20510

Dear Chairman Hoeven,

Consistent with efforts to keep Congress informed of improvements at the United States Department of Agriculture (USDA), this letter notifies you of planned organizational changes consistent with the Departmental plan announced in July 2025.  USDA will be consolidating all civil rights functions into one organization at the Department level to make service delivery more consistent and efficient.  The consolidation will include reorganizing the Office of the Assistant Secretary for Civil Rights (OASCR) and realigning existing staff from across the Mission Areas and agencies, including the Forest Service.

### *Office of the Assistant Secretary for Civil Rights*

Civil rights enforcement at USDA has long been carried out through separate Mission Area and staff offices, each with its own processing timelines and procedural practices.  This decentralized structure caused substantial variance in civil rights enforcement across mission areas, agencies, and field locations and led to an inconsistent customer experience.  The planned organizational changes achieve the uniformity that Federal civil rights laws require.

### *Consolidation of Civil Rights Functions*

The Department will consolidate civil rights functions into a single, unified organization under OASCR.  This consolidated structure will provide one entry point, one standard, and one accountable authority for civil rights across the Department.  The unified model will strengthen compliance oversight, improve complaint processing performance, and ensure consistent application of civil rights policy throughout USDA.  To preserve critical subject-matter expertise, OASCR will establish a Mission Area Support function within the consolidated organization.  This function will maintain field-based experience and established relationships while conducting compliance reviews and other mission-aligned activities under the direction of the Assistant Secretary.

### *Operational Footprint*

OASCR will reduce its footprint in the National Capital Region (NCR) and move operations closer to the producers, program participants, and communities USDA serves. OASCR's reduced headquarters function in the NCR will focus on congressional engagement, policy, regulatory, and interagency coordination. Outside the NCR, OASCR will establish two hubs: one focused on end-to-end processing of employment complaints and the other on program complaints. The hubs will be located in Raleigh, North Carolina, and Fort Collins, Colorado. OASCR will build consolidated informal complaint processing teams within USDA hub locations.

### *Workforce and Resource Implications*

As part of the transition, USDA will relocate certain OASCR employees from the NCR to the two primary hubs and will work to consolidate mission area civil rights personnel into OASCR. Consolidated informal complaint processing teams will support USDA hubs. USDA will offer relocation benefits and make Employee Assistance Program services available throughout the transition.

These organizational changes will significantly improve the consistency, timeliness, and quality of civil rights services delivered across USDA, all without disrupting service. They will also strengthen enterprise alignment, modernize service delivery, and ensure that civil rights functions meet the standard required by Federal law. These improvements are essential to supporting every American who interacts with USDA programs.

If you have any questions related to this notification, please have your staff contact the Office of Congressional Relations at 202-720-7095 or ocr@usda.gov. A similar letter is being sent to Ranking Member Jeanne Shaheen.

Sincerely,

Stephen Alexander Vaden
Deputy Secretary
U.S. Department of Agriculture

2

# EXHIBIT 3

# MEMORANDUM OF UNDERSTANDING ON

# RELOCATION NEGOTIATIONS

# BETWEEN:

# THE AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES (AFGE) LOCAL 3403
# AND
# ECONOMIC RESEARCH SERVICE (ERS) &
# NATIONAL INSTITUTE OF FOOD AND AGRICULTURE (NIFA),
# UNITED STATES DEPARTMENT OF AGRICULTURE (USDA)

This Memorandum of Understanding (MOU) is entered into between the Economic Research Service (ERS) and the National Institute of Food and Agriculture (NIFA), United States Department of Agriculture (collectively, the "Agency" or "Management"), and the American Federation of Government Employees, Local 3403 (Union), collectively referred to as "the Parties."

This MOU constitutes the agreement between the Parties regarding the relocation of bargaining unit employees (BUEs) to Kansas City, Missouri. It supplements but does not supersede the Parties' Collective Bargaining Agreement (CBA) effective September 5, 2023.

## Section 1.  Scope and Application

This MOU applies to all BUEs subject to a Management Directed Reassignment (MDR) to Kansas City, Missouri, as a result of the Agency's relocation decision. This MOU supplements the CBA and shall remain in effect from the date of Agency Head approval through the resolution of all matters arising from the relocation.

## Section 2.  General Protections

A.  The Agency does not anticipate a Reduction in Force (RIF) as a result of the relocation to Kansas City, Missouri. In the event that a RIF subsequently becomes necessary, the Agency will fulfill all bargaining obligations under Article 37 of the CBA prior to implementation.

B.  Existing reasonable accommodation (RA) determinations will not be uniformly rescinded as a result of the relocation. Any reevaluation of existing accommodations will proceed

through the interactive process in accordance with applicable law and USDA Departmental Regulation 4300-008.

    a.  An employee who submits an RA request related to their ability to relocate shall not be required to report to Kansas City prior to the later of: (i) the report date; or (ii) 60 days after the employee receives a final written RA determination (approved or denied). During the period a reasonable accommodation request remains pending, the employee shall not be subject to AWOL designation or adverse action solely on the basis of not reporting to a new duty station in Kansas City.

    b.  An employee with an existing or pending RA request related to their ability to report to an office, which is not based on a particular geographic location, must relocate. Existing RAs will remain in place at the new duty station until reevaluated in accordance with the DR to consider need for and effectiveness of the accommodation at the new location. During the review process, employees will be given sufficient time as determined by the Management RA officer to find medical care and provide the required documentation for the re-review process.

**C.** Existing Flexible Work Schedules (FWS), including Maxiflex, as outlined in CBA Article 14, Section 5, will not be uniformly rescinded as a result of the relocation. Individual agreements remain in effect unless modified through the procedures set forth in the CBA.

## Section 3. Reorganization

**A.** The Agency confirms that the duties, essential functions, and reporting relationships for BUEs have not changed and will not change upon issuance of an MDR to relocate to Kansas City. A change in duty station location alone does not constitute a change in duties, essential functions, or reporting relationships for the purposes of this MOU.

**B.** The Agency will provide written notification to the Union prior to any changes in BUE duties, essential functions, and reporting relationships.

**C.** Changes to position descriptions and work reassignments will be conducted in accordance with Articles 13, 16, and 21 of the Parties' existing CBA.

    (a)  Under the ERS Research Position Classification System (RPCS), employees whose position descriptions, work assignments, or subject matter expertise change may elect to request a delayed review of their promotion package in accordance with the process outlined in the ERS RPCS Handbook.

    (b)  As outlined in Article 21 Performance Management of the Parties' existing CBA, any changes to performance management standards must be communicated to bargaining unit employees formally by the rating officials before they are applied to the employee. For ERS employees subject to RPCS, this provision encompasses RPCS promotion package reviews.

    (c)  The Agency recognizes that relocation may affect an employee's ability to meet established performance expectations. Accordingly, rating officials will document

and account for adjustments to newly assigned duties when evaluating performance during the transition period.

## Section 4.  MDR Letter and Decision Period

**A.** Upon issuance of the MDR letter, employees will be provided with a minimum of 30 days to respond with a decision to accept or decline the reassignment.

**B.** Each MDR letter will include, at minimum:

    (a) Information regarding the Voluntary Early Retirement Authority (VERA) and the Voluntary Separation Incentive Program (VSIP) (eligibility will be determined on a case-by-case basis);

    (b) Contact information in order to be assigned a relocation coordinator;

    (c) Contact information in order to be assigned a retirement and benefits counselor;

    (d) A description of the personal hardship request process; and

    (e) Contact information for the Union will be included in the email accompanying the MDR letter.

**C.** Employees retain the right to change their decision to accept or decline the MDR at any time prior to the Friday before the report date.

**D.** Employees may utilize the hardship request process to request an extension of the decision period in writing. These requests will be considered on a case-by-case basis under the Department hardship process.

**E.** If an employee has a Reasonable Accommodation or Hardship Request, they may request an application by sending an email to the REE Reorganization email address and they will be provided with a link to the application.

## Section 5.  Employees Who Decline the Relocation

**A.** Employees may select a separation or retirement effective date before the report date for the purposes of severance or retirement.

**B.** An employee who declines the relocation will remain in duty status and receive pay from MDR issuance through: (i) the Saturday preceding the report date, or (ii) the employee's selected termination or retirement date, whichever is earlier.

**C.** Nothing in this MOU prevents the Agency from initiating adverse action proceedings prior to the report date; however, an employee shall not be removed from service before the report date unless the employee authorizes it.

**D.** If removal proceedings have not been concluded by the report date, the employee will be placed in an Absent Without Leave (AWOL) status until the adverse action removal has concluded. The employee's FEHB enrollment may continue during this period; the employee will be responsible for paying both the employee and employer premium shares.

**E.** The Agency retains the authority and discretion to assess mission-critical workload requirements and may extend the termination date of declining employees when

necessary to ensure continuity of operations. The Agency will determine which positions qualify, as well as the duration and end date of any such extensions.

## Section 6.  Workspace

### *805 Pennsylvania Avenue, Kansas City*

A. The Agency will provide adequate individual workspace for BUEs subject to MDR that is at least equivalent to the existing workspaces for bargaining unit positions housed in the 805 Pennsylvania Avenue facility, Kansas City, MO.

B. The Agency will ensure that all newly assigned workspaces are appropriately furnished, to include, but not limited to; standing desk, two (2) functioning monitors, office chair, mouse and keyboard, laptop docking station, locking cabinet with keys, and office supplies.

C. BUEs are responsible for ensuring that any government-issued equipment, including laptops, monitors, keyboards, and docking stations, is either transported to the new duty station as part of their relocation package or returned to USDA through the existing surplus process at their local USDA building management prior to the report date.

D. The Agency will ensure that new workspaces are appropriately sanitized and cleaned prior to assignment.

E. New workspaces will be assigned in accordance with Article 11 of the Parties existing CBA.

F. Requests for workspace accommodations for employees working in the 805 Pennsylvania Avenue facility will be administered consistently with current Departmental practices.

G. Employees for whom a Kansas City workstation is not available by the report date will be authorized to telework until their workstation is ready.

H. The Agency will ensure that all employees assigned to the 805 Pennsylvania Avenue, Kansas City facility have access to the paid public parking garage adjacent to the building. Employees will be notified of the cost and process of obtaining a monthly parking agreement at the rate provided to all USDA employees. Parking information will be communicated to the employee no later than 30 days before the report date.

## Section 7.  Personal Hardship

### A. Personal Hardship Scope and Definition

(a) In accordance with the Parties' current CBA and the statute, Management will establish a process under which Management will consider employee requests for relief from personal hardship arising from the directed relocation to Kansas City.

(b) Management reserves the right to determine whether a personal hardship exists and what action, if any, should be taken.

(c) Management will consider hardship requests in good faith, consistent with Article 12, Section 2(E) of the Collective Bargaining Agreement, but Management may not be able to satisfy every request.

(d) The provisions of this MOU are separate from and do not apply to requests for Reasonable Accommodation under the Rehabilitation Act or the Pregnant Workers Fairness Act, which are processed through the Reasonable Accommodation program.

(e) A personal hardship is a situation outside of the employee's reasonable ability to control that affects the health and/or welfare of the employee and/or a family member as defined in 5 C.F.R. § 630.201.

## B. Requests for a Personal Hardship Consideration

(a) Any bargaining unit employee who receives an MDR letter may submit a written personal hardship request via the process outlined by Management.

(b) When Management receives a personal hardship request, Management will determine whether a hardship exists. If needed before making a final determination, Management may request additional information from the employee, and the employee may submit additional information voluntarily.

(c) Management will notify the employee in writing normally within 30 calendar days of receipt of a complete submission. The written decision will include a determination of whether a hardship exists and, if so, what accommodation Management will provide.

(d) Where a hardship is approved or denied, the employee will be provided with a revised report date: the later of: (i) the report date provided in the MDR letter; or (ii) 60 days after the employee receives a final written hardship determination. During the period a hardship request remains pending, the employee shall not be subject to AWOL designation or adverse action solely on the basis of not reporting to a new duty station in Kansas City.

(e) Confidentiality regarding an employee's hardship situation will be maintained to the extent possible. Information shared in connection with a hardship request will not be disclosed beyond those Management officials with a need to know for purposes of processing the request.

(f) Upon the employee's request, a Union representative will be included in any meeting that may be held in connection with the hardship determination.

(g) A Union representative may accompany the employee at any meeting held in connection with any appeal that may be filed. Nothing in any appeal limits the right of the Union or any employee to file a grievance under Section 11 of this MOU.

(h) An employee must submit a hardship request within 30 calendar days of receipt of the MDR letter to be considered under this MOU during the initial decision period. Requests submitted after that deadline may be considered at Management's discretion where circumstances have changed or could not reasonably have been identified earlier.

## Section 8.  Relocation Financial Support

## A.  Election of Relocation Package

(a) Within 30 days of MDR issuance, each accepting employee will elect either: (i) the traditional Federal Travel Regulation (FTR) relocation package, or (ii) the USDA Lump Sum Relocation Program.

(b) There will be case by case counseling services and tools available prior to the election deadline to assist employees with the decision-making process.

(c) The election is binding once the employee's relocation authorization payment is received.

(d) Employees who accept the relocation and receive relocation payment under the FTR or lump sum program shall serve a 12-month service agreement. Employees may serve the agreement with any USDA agency in any duty station or with any other Federal Government Agency. If an employee leaves the Agency before the end of their service agreement, the authorizing official will determine whether repayment is required, considering whether circumstances were outside the employee's control. During the service agreement period, employees who accept the lump sum will be responsible for attesting that they have moved to the new duty station.

## B. Traditional FTR Package

(a) Employees who select the traditional FTR package are entitled to the following:

1. En route travel expenses, including per diem for the employee and accompanying family members as defined in 5 C.F.R. § 300.103, during travel to the new duty station;

2. Miscellaneous moving expenses;
    i. $905 (no dependents) or the equivalent of one week's basic gross pay, whichever is the lesser amount, or;
    ii. $1,810 (with dependents) or the equivalent of two weeks' basic gross pay, whichever is the lesser amount.

3. Household goods shipment of up to 18,000 lbs.;

4. Storage in transit (SIT) of household goods, for up to 90 days

5. One (1) house hunting trip not to exceed 10 days, including rental car;

6. Sell and buy residence transaction expenses or lease termination expenses;
    i. Up to 10 percent of the actual sales price for the sale of a residence at the old official duty station;
    ii. Up to 5 percent of the actual purchase price for the purchase of a residence at the new official duty station;
    iii. Reimbursement for lease-termination expenses at actual cost, with proper documentation;

7. Property management services for up to 12 months;

8. Shipment of one (1) privately owned vehicle (POV);

9. Withholding Tax Allowance (WTA) and Relocation Income Tax Allowance (RITA) payments to offset actual tax liability;

10. 60 days of approved Temporary Quarters Subsistence Expenses (TQSE), with extensions authorized by the Agency up to a maximum of 120 days; extensions beyond 60 days are authorized at the Agency level and will be determined on a case-by-case basis.

## C. Relocation Incentive

(a) The Agency will offer a $20,000 relocation incentive to employees who select the lump sum relocation program because the vacancy rate in Kansas City, MO is above the 5% threshold for the lump sum authorization for temporary quarters.

(b) The service agreement for the relocation incentive shall be 24 months, served concurrently with any other applicable service agreement. The service agreement is transferable to any USDA agency regardless of duty station location. Employees who voluntarily separate or transfer from USDA service prior to completion of the service agreement shall be required to repay the relocation incentive on a pro-rated basis.

**D. Situational Telework and Leave for Relocation Purposes**

(a) Employees may request situational telework to address operational circumstances arising from the relocation transition when telework is more practicable than reporting in person. Situational telework may be appropriate during periods such as temporary housing arrangements or reduced access to the employee's permanent duty workspace. However, situational telework hours are not automatically approved. All situational telework must be specifically requested by the employee and approved.

(b) Employees must submit situational telework requests through their agency's established process. For NIFA, requests are submitted via a Decision Memo routed through the supervisory chain. For ERS, employees may submit situational telework requests to their first-line supervisor for consideration.

(c) Accepting employees will be credited with 80 hours of administrative leave, available for use from MDR issuance through 60 days after the report date. The 80-hour time allotment may be used to perform any relocation purposes to include but not limited to house hunting purposes, packing, supervising movers, and similar activities. Administrative leave under  Section 8D(c) is separate from, and in addition to, any Leave Without Pay authorized under Section 8D(d).

(d) Employees may request leave with or without pay in excess of the 80-hour administrative leave allotment defined in this Section for relocation purposes at any point after MDR issuance. An accepting employee may also request annual leave or Leave Without Pay (LWOP) for a period of up to 30 days after the report date to allow additional time for the physical relocation These requests should be approved unless there is a mission critical need to decline them.

**E. Report Date and Personnel Action Protections**

(a) The report date shall not be earlier than October 5th or 90 days from the date of MDR issuance, whichever is later.

(b) Personnel actions reflecting the Kansas City duty station shall not be processed before the report date or the employee begins reporting to Kansas City, whichever is sooner.

(c) Employees will remain in their current locality pay area through the day before the report date, or the day before beginning to report to Kansas City, whichever is sooner.

**F. Equivalent Relocation Support**

(a) BUEs subject to an MDR who accept a different position within the bargaining unit that is also located in Kansas City will receive equivalent relocation support, subject to applicable personnel regulations.

(b) The Agency confirms that funding for FTR and Lump Sum relocation entitlements will be available for employees whose relocation occurs after October 5th, 2026, including those whose relocation is delayed due to an approved hardship accommodation or pending reasonable accommodation determination. The availability of funding shall not limit any employees' entitlement to relocation benefits under this MOU.

## Section 9.  Separation and Retirement Support

### A.  VERA/VSIP

(a) In accordance with the OPM and OMB approval, the Agency will open an election window for 30 calendar days starting from the date of MDR issuance.

(b) The maximum VSIP amount is $25,000, pursuant to 5 U.S.C. § 3523(b)(2)(B).

### B.  Career Transition Assistance Plan (CTAP)

(a) Employees who decline the relocation and receive a notice of proposed removal for declining a directed reassignment to another local commuting area, are entitled to Career Transition Assistance Plan (CTAP) selection priority if they satisfy CTAP candidate requirements and are deemed "well qualified" for the job. Management agrees that open positions advertised by ERS and NIFA will be open to CTAP candidates resulting from this reorganization beyond the local commuting area for their respective employees.

(b) The Agency will provide each declining employee with written documentation supporting involuntary separation status at or before the effective date of separation.

(c) Employees who decline the relocation and are separated as a result will be eligible for Interagency Career Transition Assistance Plan (ICTAP) selection priority in accordance with applicable law and regulation.

### C.  Career Transition Services

(a) The Agency will provide group information sessions covering CTAP, ICTAP, VSIP, resume writing, and retirement planning. These sessions will occur on duty time. Employees will reasonably be excused from regular duties to attend training sessions.

(b) Consistent with the parties' existing agreement in CBA Article 37, Section 12, and as an appropriate arrangement under 5 U.S.C. § 7106(b)(3) for employees adversely affected by an MDR, employees may use up to twenty (20) hours of duty time for career transition activities — including preparing and updating resumes and job applications, attending employment interviews, contacting potential employers, and reviewing vacancy announcements — beginning at MDR issuance. Duty time for career transition activities is not subject to prior supervisory approval; employees shall provide reasonable advance notice of their intent to use such time.

### D.  Retirement Processing

(a) Retirement counseling contacts will be made available to employees at the time of MDR issuance.

(b) The Agency agrees to provide a retirement processing timeline on the REE AXON page for the portions of the process that are within USDA control.

(c) Employees with outstanding Thrift Savings Plan (TSP) loans will receive written notice of the implications of separation prior to their separation effective date.

(d) Employees may submit a hardship request to delay the report or separation date to meet the minimum service and age requirements for an immediate annuity under Federal Employees Retirement System (FERS) or Civil Service Retirement Service (CSRS), including Discontinued Service Retirement under 5 U.S.C. § 8414(b) or § 8336(d). Upon request, employees will receive an individualized written retirement readiness assessment from the Agency's benefits counselor within 15 days of the request.

**E. Severance Pay.**

(a) Employees serving under qualifying appointments, meeting all eligibility requirements who decline the relocation and are separated as a result shall be entitled to severance pay in accordance with 5 U.S.C. § 5595 and 5 CFR Part 550, Subpart G. For purposes of this MOU, the Agency confirms that an employee's declination of a directed reassignment to a different commuting area does not constitute a declination of a reasonable offer under 5 CFR § 550.707(a), and no employee shall be disqualified from severance pay on that basis.

(b) An employee who elects an earlier separation date pursuant to Section 5(a) of this MOU retains full eligibility for severance pay. Any such separation date must fall after the employee declines the MDR and receives their final decision letter. The election of a separation date shall not be construed as a voluntary separation for purposes of severance pay eligibility.

## Section 10.  Union Communications

**A.** To the extent practicable, the Agency agrees to provide the Union with advance notice of any all-hands sessions, town halls, or agency-wide communications to bargaining unit employees regarding the reorganization, relocation, or individual duty station changes, with an opportunity for the Union to submit questions or responses before those communications are issued.

**B.** The Agency will provide the Union with written notice of any new bargaining unit positions created as a result of the relocation before the external recruitment period closes.

## Section 11.  Grievance and Enforcement

**A.** All provisions of this MOU constitute enforceable terms and conditions of employment. Any alleged violation of this MOU by the Agency shall be subject to the grievance and arbitration procedure set forth in Article 7 of the Collective Bargaining Agreement. Time limits for filing a grievance under Article 7 shall begin from the date the Union or the affected employee knew or reasonably should have known of the alleged violation.

**B.** Nothing in this MOU waives or limits any right of the Union or any BUE under applicable law, including rights under 5 U.S.C. Chapter 71, the Rehabilitation Act, or any other law governing federal employment.

**C.** This MOU may not be modified, waived, or superseded except by a written agreement signed by the authorized representatives of both Parties. No verbal agreement, informal understanding, or past practice shall constitute a modification of this MOU.

**D.** If any provision of this MOU is determined to be invalid or unenforceable under applicable law or regulation, that provision shall be severed, and the remaining provisions shall remain in full force and effect. Upon severance, the Parties agree to bargain in good faith over a lawful replacement provision.

## Effective Date and Duration

**A.** This MOU becomes effective upon Agency Head approval and shall remain in effect through the resolution of all matters arising from the relocation of bargaining unit employees covered by this agreement, unless terminated earlier or extended by mutual written agreement of the Parties.

**B.** Upon approval of this MOU, the Parties will provide a joint training session on the provisions of this agreement which will be recorded for staff who are unavailable. The training will be conducted at a mutually agreed date and time.

**The Parties Agreed to this MOU on June 18, 2026**

For the Agency:

CHRISTOPHER GRONDALSKI
Digitally signed by CHRISTOPHER GRONDALSKI
Date: 2026.06.18 15:26:22 -04'00'

Chris Grondalski
Agency Chief Negotiator
Labor Relations Officer, REE

For the Union:

LAURA DODSON
Digitally signed by LAURA DODSON
Date: 2026.06.18 15:17:20 -04'00'

Laura Dodson
Union Co-Chief Negotiator
Vice President, ERS, AFGE Local 3403

THOMAS BEWICK
Digitally signed by THOMAS BEWICK
Date: 2026.06.18 15:19:51 -04'00'

Thomas Bewick
Union Co-Chief Negotiator
Vice President, NIFA, AFGE Local 3403

# EXHIBIT 4

## MEMORANDUM OF UNDERSTANDING
## USDA FOREST SERVICE REORGANIZATION

This MEMORANDUM OF UNDERSTANDING (MOU) between the United States Department of Agriculture, Forest Service (Management), and the National Federation of Federal Employees, Forest Service Council (Union), hereafter referred to collectively as "the Parties," is their agreement on the comprehensive nationwide reorganization of bargaining unit employees (BUEs) of the Forest Service.

### Introduction

On March 31, 2026, Management notified the Union of the decision to reorganize the Forest Service, including the National Capital Region (NCR), and the Union invoked its right to bargain on all the topics.  The Parties agree that this MOU covers both of the Article 11 notices.

**Management's Description of Proposed Change**

The Forest Service is implementing a comprehensive nationwide reorganization that will fundamentally restructure the top two levels of the agency's organizational framework. The reorganization involves the following actions:

• **Elimination of Regional Offices**. All nine Regional Offices will be closed. Functions currently performed at the regional office level will be consolidated into new national-level organizational structures or redistributed to field units.

• **Consolidation of Research Stations**. Research stations will be consolidated into a single research organization located in Fort Collins, CO, and led by one research director. Where necessary, some current station and related research facilities will be reduced and collocated to create a more integrated and efficient national research footprint. These changes are designed to unify research priorities, accelerate the application of science to Management decisions, and reduce administrative duplication.

• **Realignment of NCR Employees.** Some NCR-based employees, as well as additional Washington Office positions will be affected by the broader restructuring, and may be placed into new positions within the restructured organization. This may involve changes to position title, series, grade, duty station, and/or organizational assignment.

• **New Organizational Structures.** New organizational units and supervisory chains will be established to replace the current regional and station framework. Position descriptions for the new structure are under development.

• **No Reduction in Force (RIF) Anticipated.** Management has determined that there is a position available for every permanent employee who is willing to accept reassignment to a new position and/or duty station. Reduction in Force under Article 35 is not anticipated at this time. However, employees who decline a Management Directed Reassignment during the placement process will need to separate from the agency.

1 of 16

As of the date of the signing, the most current information on the scope of the planned reorganization can be found at https://fsweb.wo.fs.fed.us and the current snapshot of the website is included here as Attachment A.

Management does not anticipate the use of RIF, Workforce Restructuring and Placement System (WRAPS), Furloughs, Transfer of Function, or Contracting Work Out for this reorganization. If any of these subsequently become part of the Forest Service reorganization plan, Management will issue a new Article 11 notice to the Union and provide opportunity to bargain to the extent required by law and the Master Agreement.

Management recognizes its obligations under existing MOUs for office moves, office space design, and other space requirements and will notify the Union at the appropriate level and meet its bargaining obligations in accordance with Article 11 regarding any proposed changes related to the reorganization.

## Scope and Coverage

All Forest Service units are covered under this MOU.

## Goals

The goals of the plan set forth in this MOU are:

1. **Maximizing Retention:** We are committed to minimizing involuntary separations.  We will work together to identify placement opportunities and remove barriers that prevent employees from staying with the Agency.

2. **Protecting People:** We recognize that workforce transitions carry real personal and professional costs. Reducing those impacts on employees and their families is a shared obligation. We do that by ensuring that employee rights and legal obligations are honored.

3. **Mission Continuity:**  A well-supported workforce delivers better outcomes for the land and communities we serve. Employee wellbeing and mission delivery are not competing interests, they are the same interest.

4. **Fair and Transparent Process:** We are committed to establishing and using a fair and transparent process when filling positions in the Forest Service, using a combination of Non-Competitive Placement through Pre-WRAPS and merit promotion procedures.

5. **Informed Decision Making:** The Parties are working together to provide employees with the best available information to make their decisions.  We have committed to open VERA/VSIP windows at points when significant information is released.

## Definitions

The following terms are defined as used in this MOU:

1. **Appropriate Position –** A permanent, unencumbered position at the same grade level, tour of duty, and type of appointment.

2. **Available Positions** – All unencumbered (vacant or newly created), permanent positions identified by Management as available to be filled and submitted to the Pre-WRAPS Clearinghouse (PWC).

3. **Commuting Area(s)** – The area within 50 miles of the duty station (not the employee's residence) using the shortest of commonly traveled routes. The National Parties, by mutual agreement, may develop a different definition of a particular Commuting Area to resolve problems arising from local geography or other unique conditions.

4. **Competitive Placement** – Procedures for Competitive Placement are described in the Agency Merit Promotion Plan.

5. **Direct Match** – Realignment or reassignment of an employee from their current position to another identical or substantially similar Appropriate Position in the existing or new USDA Forest Service organization, in the same Commuting Area.

6. **Employee** – See Master Agreement, Article 3.

7. **Management Directed Reassignment** – An involuntary placement of an employee into an Appropriate Position outside the Commuting Area.

8. **Non-Competitive Placement** – Actions are those outlined in Article 32.2, and Forest Service Handbook (FSH) 6109.12.20.21.43 that include: lateral reassignment, repromotion, voluntary changes to a lower grade (with grade and pay retention, as appropriate under agency policy and federal regulations), and voluntary tour reduction.

9. **Organization** – For the purposes of this agreement, "organization" means only Forest Service organization.

10. **Other Impacted Employees** – The approximately 6500 employees who received a preliminary notice letter pertaining to the reorganization on or about March 31, 2026 but will not have to relocate outside of their Commuting Area. These employees may have other impacts, such as change of organizational structure, change of supervisor, and Non-Competitive Placement in an Appropriate Position.

11. **Potentially Affected Employees** – All employees who may be required to move outside of their Commuting Area because of the Forest Service reorganization. At present, this primarily includes employees with a duty station in the National Capital Region; Region 6, 8, and 9 Regional Offices; and Research and Development facilities that are closing.

## Roles and Responsibilities

**Management**

- Notifies and/or works with Union, as appropriate.

- Ensures that the "to be" organization has been approved.

- Identifies Potentially Affected Employees, Available Positions, and suitable locations before implementation.

- Finalizes, signs, and delivers letters.

- Meets with employees and keeps them informed.

3 of 16

- Ensures that selecting officials on units give first consideration to potentially affected employees.
- Approves placements and personnel actions.
- Serves on the Pre-Wraps Clearinghouse (PWC).
- Serves as a point of contact regarding this plan.
- Validates employee/position data, including but not limited to classification of position descriptions, service computation date for leave, and bargaining unit status.
- Determines the qualifications of employees. If qualifications are modified, a training plan will be established.
- Reviews matches/placements for consistency with controlling regulations.
- Processes personnel actions.
- Maintains the records for each selection

## Union

- Has representation on the PWC to provide oversight of the process to ensure compliance with the plan but will not participate in any selections or other decision-making on any personnel actions.
- Promptly brings concerns regarding data issues to Management.
- Serves as a point of contact regarding this MOU.

## Employees

- Review their own personnel data including service computation date for leave, bargaining unit status, tour of duty, duty station, and pay plan, series, and grade.
- Initiate a request for correction when errors are found in personnel records.
- Be aware of critical deadlines and response requirements outlined in the MOU and in employee notices.
- Provide alternate contact information if their availability will be limited.

  Ensure their resume (not subject to the 2-page limit) includes their most current work experience, education, certifications, etc.

## Pre-WRAPS Clearinghouse (PWC)

Management will determine the members of the PWC and the Union will designate its representative.

- Consider the preferences of employees in making Non-Competitive Placements.
- Match employees into Available Positions.
- Generate documentation of its decisions.

- Verify there are no further Non-Competitive Placements possible under this MOU.

- Resolve disputed data issues during any phase of the process.

## VERA/VSIP

Management will provide opportunities for employees to participate in voluntary retirement or separation under the Voluntary Early Retirement Authority (VERA) or the Voluntary Separation Incentive Payment (VSIP). There will be multiple rounds of Voluntary Early Retirement Authority (VERA)/Voluntary Separation Incentive Payment (VSIP) offered as part of the reorganization in accordance with the VERA/VSIP Memorandum of Understanding. The intent is to open VERA/VSIP windows at points when significant information is released to inform an employee's decision. Potentially Affected Employees will be offered VERA/VSIP when they are identified as entering the Pre-WRAPS process and again if they are issued a Management Directed Reassignment. Management may determine eligibility criteria for Other Impacted Employees to be offered VERA/VSIP.

## Use of Pre-WRAPS Procedures

Management will use the Pre-Workforce Restructuring and Placement System (Pre-WRAPS) procedures in this MOU, as jointly developed by the Parties in accordance with Article 32.1 of the current Master Agreement, for the Non-Competitive Placement of BUEs as part of the Forest Service reorganization.

## General Provisions for Union Engagement

- Management will provide the Union with notice and description of purpose and charter for each team Management creates in the implementation of this reorganization. The Union will have a member on the Places Team in accordance with the Space MOU.

- Management will invite Union participation, normally one seat/one person, on all committees, sprint teams, working groups, or similar endeavors related to this reorganization that include one or more bargaining unit employees.

- Management will give the Union opportunity to view and test the PWC tool prior to implementation. Management will fix issues or address concerns found or raised by the Union during the testing process to the extent practicable prior to implementing use of the tool.

- Management will invite the Union on all walkthroughs of current or prospective workspace for bargaining unit employees in accordance with the Master Agreement, Article 5.

## Prerequisites for Pre-WRAPS Procedures

Management will not implement Pre-WRAPS procedures before the following four requirements are met. Management will notify the Union upon completion of each requirement and then notify Potentially Affected Employees of their Pre-WRAPS status.

1) Management will provide the Union with the organizational structures showing positions and locations available for placement and it will be made available at https://fsweb.wo.fs.fed.us/.

2) Management will provide the Union with a listing of available workspaces including alternate location sharing arrangements with other agencies or organizations (if applicable).

3) Management will provide the Union with an employee/organizational listing to include: name of organization (division, branch, section), name of employees, position of record title, series, and grade, bargaining unit status, and position description (PD) numbers.

4) The Parties will negotiate the language of all letters or emails that will be sent to employees regarding this reorganization prior to distribution.

If any of the following documents are generated, Management will provide them to the Union:

a) justification and reason for the change,

b) cost/benefit analysis and impact statement on the organization, employees, the public and other Federal and State agencies,

c) current and proposed organizational charts,

d) current and proposed mission/functional statements.

### **General Provisions for Placement of Employees**

The Parties agree to follow all applicable laws, rules and regulations in implementing the reorganization.

There will be no blanket cancellation of Alternative Works Schedules (AWS) as a result of this reorganization. Employee work schedules will be administered in accordance with the Master Agreement, Article 18.

All Available Positions will be reviewed by the PWC. When the PWC finds no eligible potentially affected employees for placement in Available Positions, then those Available Positions may be filled outside of the Pre-WRAPS process.

Involuntary reassignments through Direct Matches or Non-Competitive Placement inside the Commuting Area will be made. Management Directed Reassignments outside of the Commuting Area will be made.

If a Potentially Affected Employee voluntarily accepts a change to a lower graded position, grade and pay retention will be granted in accordance with agency policy and federal regulations, and automatic repromotion priority consideration under the Forest Service Repromotion Plan.

If a Potentially Affected Employee moves from a special rate to a non-special rate, and is otherwise eligible, they will be entitled to mandatory pay retention.

Potentially Affected Employees are automatically eligible for placement under this MOU regardless of whether the employee chooses to submit an interest in any Available Position.

6 of 16

Employees in career ladder positions (example, GS-0801-07/09/11) participate within Pre-WRAPS at their current grade level and not the target grade of the position. However, after Non-Competitive Placement, they will retain their full career ladder progression.

An employee's type of appointment will not change as a result of Non-Competitive Placement under Pre-WRAPS. For example, a permanent employee will not be placed into a temporary or term appointment. Similarly, an employee on a career/career-conditional appointment will not be converted to an excepted service appointment.

Management cannot direct an employee to a lower grade or a reduced tour in Pre-WRAPS. However, these may be extended to employees as voluntary offers of placement.

A Potentially Affected Employee in a special retirement covered position can be involuntarily placed into another special retirement covered position. However, a Non-Competitive Placement of an employee in a special retirement covered position to a non-covered position will only be extended as a voluntary offer.

BUEs in duty stations that are not closing will not be involuntarily relocated outside of their Commuting Area as part of the non-competitive Pre-WRAPS placement process.

During the non-competitive Pre-WRAPS placement process, Management may consider retraining the employee or modifying qualification standards, excluding positive education requirements, to allow the employee to meet the qualifications of a vacant position within a specified period up to 365 days of occupying the position.

Employees who have declined a directed reassignment outside the Commuting Area may participate in the processes under this MOU up to the effective date of their separation notice. Employees who have accepted a directed reassignment outside the Commuting Area may participate in the processes under this MOU up to 30 days prior to the reporting date.

Employees with local knowledge are encouraged to share information through the Reorganization Employee Engagement Portal to identify low or no cost alternative office space arrangements for consideration in impacted cities or offices. This information will be provided to the Places Team for further evaluation. Management will acknowledge receipt of the employee's suggestion, consider the suggestion, and provide a written response to the employee regarding the outcome.

Personally Identifiable Information and employee privacy generally will be protected throughout the reorganization and implementation of this MOU.

Disputes over position descriptions and classification that arise in connection with this reorganization will be resolved in accordance with Article 14 of the Master Agreement.

Management recognizes this reorganization may result in situations where employees are assigned duties that are higher-graded due to vacancies, following procedures in Article 15. Management will engage early with the Union to take action on specific instances of where a temporary promotion is warranted. Management will not impose any caps on temporary promotions.

## Telework

This reorganization will not be the cause of a blanket cancellation of existing telework agreements. Telework may be granted to employees in connection with this reorganization when it serves a compelling Agency need. Multiple scenarios could occur in this reorganization where a compelling Agency need arises, such as when office space is unavailable, an office is going through physical modifications, or when other factors threaten mission continuity. Telework will be granted when other options are not available. A written agreement between Management and an Employee that outlines the specific telework arrangement, mutually agreed to, is required. Nothing in this MOU modifies or limits the application of the Master Agreement, Article 31.

## Transfer of Station (TOS)/Relocation Payments

Employees relocating outside of their Commuting Area will be entitled to receive their selection of:

1. TOS with the discretionary allowances of a house-hunting trip and shipment of a POV; or

2. Pilot lump sum TOS program (if available); or

3. One-time relocation incentive up to 25% with a 1-year service agreement.

4. For GS-11 and below:

    a. Pilot lump sum TOS program (if available); and one-time relocation incentive up to 25% with a 1-year service agreement; or

    b. One-time relocation incentive up to 25% each year with up to 4-year service agreement up to a maximum of $50,000 in aggregate; or

    c. TOS with the discretionary allowances of a house-hunting trip and shipment of a POV.

Relocation incentives will be completed efficiently using the procedures under 5 CFR 575.208.

## Reasonable Accommodation (RA)

Management will follow law, rules, regulations, and USDA Departmental Regulation (DR) 4300-008 issued October 27, 2020 (Attachment B). This version of the DR will be applied to the Forest Service reorganization MOU for its duration, regardless whether it is otherwise superseded or rescinded.

Any reevaluation of an existing reasonable accommodation will be in accordance with Attachment 1. There will not be a blanket cancellation of existing reasonable accommodations as a result of the planned reorganization and all existing reasonable accommodations will remain in effect unless reviewed and modified through the interactive process and in accordance with Attachment 1. An employee's existing reasonable accommodation, including the disability determination, will not be subject to reevaluation:

8 of 16

- Solely on the basis that they are identified as a Potentially Affected Employee or Other Impacted Employee.
- When there are no changes in the employee's essential job functions, medical condition, or RA's effectiveness.

The placement letters will provide information on the procedures for requesting new or modified reasonable accommodations.

## Bargaining Unit Eligibility

Employees will not be reassigned into positions unless there is a classified position description and the bargaining unit eligibility has been determined and stated in the position description. All bargaining unit determinations will be completed prior to making Direct Match or Non-Competitive Placements. Current bargaining unit eligible positions that are realigning to a new organizational unit will retain their bargaining unit eligibility. The PWC tool will include the position's bargaining unit status code for employees to view when expressing interest.

The Parties will seek to resolve disputes regarding non-bargaining unit designations for new positions prior to implementing the Direct Match phase of this reorganization.

## Personal Hardships

There will not be a blanket cancellation of existing hardships as a result of the planned reorganization. Management will engage in a fair process with affected employees to identify feasible solutions to mitigate hardships, see Master Agreement, Article 42. For hardship requests where an employee does not receive a determination within the time period specified in Article 42, then the time periods of the employee's required action will be extended for the same number of days as the delay.

In connection with this reorganization, additional examples of hardships (not already listed in Article 42) may include but are not limited to; childcare access, dual career considerations, child custody, time-bound circumstances (e.g., school, spouse/kids in school, retirement pending, other job pending), and religious reasons.

Employees may request hardship assistance such as, but not limited to:

• Exploring alternate official duty locations

• Telework arrangements

• Hoteling, alternate work sites, or other flexible workplace solutions

• Temporary duty assignments (TDY)

• Allowing delays to complete required relocation

**Data Validation of Employee Records**

All Potentially Affected Employees, Other Impacted Employees, and their Union representatives will have the right to review the data Management will rely upon to make a Non-Competitive Placement determination. These data include organizational unit codes, position description number, position series and grade, duty station, locality pay area, bargaining unit status code, position target grade, service computation date for leave, work schedule, and any other data fields used to generate placement matches or reassignment offers. Any employee or the Union on the employee's behalf may request review and correction of any apparent errors in the data. Management will not implement the employee's Non-Competitive Placement until the correction has been made or the data has been validated.

Upon receiving notice, the employee will have 10 business days to review the data and request correction using a data validation tool. For good cause shown (e.g., fire assignment, extended leave) employees may request a data correction after the window has closed.  Required elements for the data correction request:

- Identify the specific data element(s) believed to be inaccurate.

- State the correct information and provide supporting documentation (e.g., current position description, Official Personnel Folder records, telework agreement, SF-50).

Management will provide a written response within 10 business days of receipt of the Data Correction Request.  Management will validate the data or make the necessary correction in the data validation tool, and explain the basis for the determination.

If Management's response to a Data Correction Request does not resolve the dispute, or if no response is received within the required timeframe, the employee and/or the Union PWC designee may escalate the matter to the Management PWC designee and the designated Subject Matter Expert (SME) with access and authority to make corrections.  An expedited review will be completed and a decision will be communicated in writing within 5 business days. Denials will include the reasons for the decision and receipt of the decision will start the timeline for filing a grievance under Article 9 of the Master Agreement.

**Filling Forest Level Vacancies Prior to Pre-WRAPS Implementation**

When Management fills vacancies on the National Forests consistent with the Merit Promotion Plan prior to Pre-WRAPS implementation, Potentially Affected Employees and Other Impacted Employees may compete for those vacancies, and if selected for a lower graded position, will be granted grade and pay retention, and repromotion rights in accordance with law, rule, and regulation. National Forest vacancies not filled through Competitive Placement will become Available Positions to be used for Pre-WRAPS Non-Competitive Placement.

**<u>Impact of Voluntary Changes of Duty Station Before Pre-WRAPS</u>**

Upon receipt of an employee's request for a voluntary change of duty station, Management will consider the limitations on workspace at the relevant facility and its potential impact on subsequent Non-Competitive Placements under this MOU.

**<u>Direct Match Procedures</u>**

The PWC will make Direct Matches of employees (both Potentially Affected Employees and Other Impacted Employees) to Available Positions in the new or existing organization, in the same Commuting Area.  This may include existing positions in the current organization that are simply carried forward into the new organization with the incumbent.

The following order of placement will be used in the Direct Match phase:

    a.  Matching pay plan, series, grade and competitive level.
    b.  Matching pay plan, series and grade.
    c.  Matching grade when qualified.

    When there is more than one employee for Direct Match to a particular Available Position, preference will be given to employee(s) according to leave service computation date (SCD) (most service prevails). If multiple employees have the same SCD for leave, ties will be broken using the sum of the last four digits of the Employee ID number (highest sum prevails).

When an employee would be a Direct Match at more than one location in their Commuting Area, the PWC will consider the employee's preference.

**<u>Pre-WRAPS Non-Competitive Placement Procedures</u>**

When the PWC determines that the Direct Match phase is completed, the following procedures will be followed for Potentially Affected Employees.

**Identifying Available Positions for Non-Competitive Placement**

Remaining vacant positions in the new or existing organization will be available for Non-Competitive Placement opportunities.  As other vacancies occur (e.g., retirement, resignation, transfer, etc.), they will be added to the Available Positions.  The following positions will <u>not</u> be made available for Non-Competitive Placement under Pre-WRAPS:

- GS-14 and above non-bargaining unit positions; and
- Any primary firefighter retirement or primary law enforcement retirement covered positions; and
- Temporary or term positions.

In the following situations, where a position needs to be utilized to meet statutory requirements, filling that position will <u>not</u> be part of the Pre-WRAPS process.

- Forest Service employees with statutory return rights from military furlough, workers compensation, or international assignment.
- Individuals awarded a position as a result of a complaint or other dispute or granted a position as a settlement depending upon the authority of the deciding official override OPM regulations, USDA guidance, or Forest Service policy AKA: "non-discretionary action directed by a qualified legal or administrative body."
- A reassignment or placement granted through the reasonable accommodation process.

Available Positions will be listed in the PWC tool, and will remain in the tool until they are filled through this Pre-WRAPS process or until the PWC has determined there is no Potentially Affected Employee to fill the position.

Potentially Affected Employees will use the PWC tool to identify positions, locations, or voluntary actions for which they want to be considered.  Employees may submit a resume (not subject to the 2-page limit) showing their qualifications for the positions in which they are interested.  Using the PWC tool, employees will be able to express their interest in priority order for up to five (5) specific positions with associated locations for which they qualify for lateral reassignment, re-promotion, or voluntary change to a lower grade or tour.

**Matching to Available Positions**

Management will review an employee's qualifications in accordance with the Office of Personnel Management Qualification Standards and identify tentative matches in accordance with the order of placement outlined below.

Employees will be qualified using official personnel records (e.g., SF-50, resume, etc.) and any other additional information submitted by the employee in the PWC tool.

Decisions regarding a match and a subsequent non-competitive offer of placement will be made on an individual basis and after consideration of the following: the order placement, qualifications of the employee, the work of the position, organizational needs, employee preferences, and the placement is in the overall best interest of the government and mission.  Management retains the right to make the final decision on placements, assignments and locations.

After Direct Matches have been made, the following order of placement and subgroups will be used when non-competitively placing employees into Available Positions first within the Commuting Area and then outside the Commuting Area:

1. A Potentially Affected Employee in the same Commuting Area as the Available Position.

2. A Potentially Affected Employee in the same Commuting Area as the Available Position who does not meet the qualifications for the position, but management has agreed to modify qualifications for this position.  Modification of qualifications may only be considered when there is no qualified employee for the position.

3. A Potentially Affected Employee outside the Commuting Area of the Available Position.

Within subgroup 1., 2., or 3. above, offers will be made in the following sequence:

a. An involuntary offer of placement will be made to a PAE who is currently in the same grade (may include competitive level) and same tour as the Available Position (i.e., lateral reassignment);

b. A voluntary offer of placement will be made to a PAE who is currently in the same grade and same tour as the Available Position with modification of qualifications;

c. A voluntary offer of placement will be made to a PAE who is repromotion eligible;

d. A voluntary offer of placement will be made to a PAE who is in the same grade, but is willing to take a reduced tour;

e. A voluntary offer of placement will be made to a PAE who is willing to take a voluntary change to lower grade (with grade and pay retention).

When there is more than one employee for placement to a particular Available Position, preference will be given to employee(s) according to leave service computation date (SCD) (most service prevails). If multiple employees have the same SCD for leave, ties will be broken using the sum of the last four digits of the Employee ID number (highest sum prevails).

Employees will receive only one involuntary offer of placement, represented by a., above. Employees who receive a voluntary offer of placement in b., c., d., or e., above may decline the offer of placement and will continue to receive other offers. Employees may receive multiple offers of voluntary placement. An employee who declines a repromotion offer of placement will forfeit their right to grade and pay retention. An employee who declines a Management Directed Reassignment and does not otherwise resign or retire will be involuntarily separated from Federal service.

## Non-Competitive Offers of Placement

Non-competitive offers of placement will be made formally and in writing.

- Specific details regarding an offered position will include proposed effective date, rate of pay, new supervisor, position description, etc.

- It is the employee's responsibility to provide alternate contact information to receive offers of placement if the employee anticipates not having access to their government email during this process.

- If the employee with the most service refuses the offer of placement, then the offer will be made to the next employee in the order of placement outlined above.

- Employees have 3 business days to respond to their offer of placement inside the Commuting Area. For good cause shown (e.g., fire assignment, extended leave), employees may request an extension. A failure to respond will be treated as a declination.

  o If the new position is in the same Commuting Area, the reporting date may be less than 60 calendar days.

- Employees have 10 business days to respond to their offer of placement outside the Commuting Area. For good cause shown (e.g., fire assignment, extended leave),

13 of 16

employees may request an extension. A failure to respond will be treated as a declination.

- o The reporting date for directed reassignments will not be less than 60 calendar days from the notification date unless agreed to by the employee.

- Employees who have been given a Management Directed Reassignment outside the Commuting Area to another position within the Forest Service will be given priority placement consideration for a 2-year period following the effective date of their directed reassignment according to the following conditions:

  1) Their former or like position has been reestablished and is announced.

  2) The employee applies to the vacancy announcement of their former or like position.

  3) In accordance with the Order of Consideration as identified in the Merit Promotion Plan, there is no one with greater placement rights to the vacancy.

  4) Priority consideration applicants will inform HRM in writing of their entitlement to their priority consideration.

- If an employee declines a Management Directed Reassignment outside the Commuting Area, Management will offer the employee enrollment in and an explanation of placement assistance programs operated by other agencies for which they are qualified, including:

  1) The USDA Reemployment Priority List (RPL) and Career Transition Assistance Plan (CTAP);

  2) The Interagency Career Transition Plan (ICTAP); and

  3) Workforce Innovation and Opportunity Act (WIOA).

## Performance, Training, and Awards

Performance management and training will be exercised in accordance with existing Departmental Regulation (DR) 4040-430, Employee Performance and Awards, and Articles 21 and 30 of the NFFE Master Agreement.

Within the first 30 days of placement in a new position or assignment of a significant change of duties, Management and employee(s) will discuss training needs as part of performance planning. Identified training will be incorporated in the Individual Development Plans (IDP).

Rating Officials must formally communicate expectations before holding employees accountable for them. When evaluating performance against established standards and measures, Management will consider as mitigating factors the adjustment to newly assigned duties and any IDP training that was not provided or available.

14 of 16

Non-Competitive Placement made pursuant to this MOU, in and of itself, will not affect an employee's eligibility for awards, bonuses, promotions, and/or any other such employment related recognition.

## Communication

Updated information about the reorganization plan and implementation will be available to all employees at the Forest Service Reorganization website on an ongoing basis. This MOU will be posted on the Forest Service Labor Relations website. Direct communications with individual employees about their Non-Competitive Placement will utilize the letters agreed to by the Parties.

## Effective Date, Termination, and Severability

This MOU shall become effective upon Agency head review or the 31st day after execution, whichever occurs first, and shall terminate 365 days after the effective date of the last Non-Competitive Placement of Potentially Affected Employees under this MOU have been completed unless terminated earlier or extended by mutual agreement of the Parties in writing.

In the event that an arbitrator, the Federal Labor Relations Authority, or a court of competent jurisdiction determines that any provision or portion of a provision of this MOU is, in whole or in part, unenforceable for any reason, the remainder of that provision and of the entire MOU shall be severable and remain in effect.

The respective Parties will designate a representative with authority to act on their behalf under the provisions of this MOU. These Representatives will jointly monitor implementation of this MOU, examine any system problems, including those attributable to MOU provisions, and will determine appropriate corrective action and initiate needed changes through early engagement discussions. Corrective action may take the form of system enhancements, refinement of functionality, or changes to process or procedure not inconsistent with provisions of this MOU. Once early engagement discussions have been exhausted, either Party may reopen this MOU utilizing Article 11 procedures to address unanticipated issues, significant problems, and/or management determined modifications the reorganization that are not clearly covered by this MOU. If either Party elects to reopen this MOU under these circumstances, management agrees to maintain the status quo of the MOU and complete bargaining obligations prior to implementation.

The MOU shall terminate when the parties agree all provisions of this MOU, and any successor or modified MOU, have been completed and the Parties have reached full and final resolution to any disputes that may arise from this MOU.  For example, the parties anticipate that termination may be appropriate when all non-competitive placements made and all relocation benefits paid to employees and disputes have been resolved.

15 of 16

**APPROVED BY**:

CHRISTOPHER FEUTRIER
Digitally signed by CHRISTOPHER FEUTRIER
Date: 2026.06.12 12:13:36 -07'00'

CARL HOUTMAN
Digitally signed by CARL HOUTMAN
Date: 2026.06.12 14:07:13 -05'00'

CHRIS FEUTRIER                                        CARL HOUTMAN

Management Chief Negotiator                           NFFE Chief Negotiator

Attachment A – Snapshot of reorganization as of 6/12/2026

Attachment B - USDA Departmental Regulation (DR) 4300-008

16 of 16

# EXHIBIT 5

**Memorandum of Understanding between the U. S.
Department of Agriculture, Food and Nutrition Administration
and the National Treasury Employees Union Concerning the
Office Move from 1320 Braddock Place to the Yates Building
and the George Washington Carver Center (GWCC)**

**Introduction:**

The U. S. Department of Agriculture, Food and Nutrition Administration ("FNA" or "Employer") and the National Treasury Employees Union (NTEU or "Union") hereby enter this Memorandum of Understanding (MOU) concerning the involuntary relocation of FNA employees and equipment from 1320 Braddock Place in Alexandria, Virginia to the Yates Building, located in Washington, DC, and/or the George Washington Carver Center ("GWCC") in Beltsville, Maryland

This MOU addresses the physical move and space issues as part of the relocation of bargaining unit employees, including those in Chapter 226, who are being directed to change their official duty stations from 1320 Braddock Place to either the Yates Building or GWCC.

FNA agrees that the provisions of this MOU apply only to FNA employees whose current official duty station is located at 1320 Braddock Place.  Any substantive changes to office space and/or the relocation of FNA employees to any other duty stations are not addressed by the parties in these negotiations and will be noticed and bargained in accordance with the parties' Collective Bargaining Agreement and law. The office space and relocation actions and activities addressed by this MOU must conform with the parties' 2025 Collective Bargaining Agreement and all legal requirements, including the Rehabilitation Act of 1973. The parties will continue to communicate openly with one another to address issues that may arise concerning the implementation of this MOU. In accordance with the above, the parties agree on the following:

1. **Move Specialist.**  Not less than fifty-five (55) calendar days prior to the move date, the Agency will designate a "move specialist" who will serve as the primary contact and liaison for NTEU in addressing physical move logistics.  NTEU will, similarly, designate a "move specialist" who will be granted additional official time to coordinate the Union's duties concerning the move as well as assist employees with the workstation selection process and understanding this MOU. Upon designating these move specialists, the parties will inform the other party of the identity and contact information of the move specialist within five (5) calendar days.

2. **Assignments.**

   A. The Employer will email all impacted employees notifying them of their assigned location (Yates or GWCC). The notice will include the date on which employees will be expected to move, information about the move, and other information pertaining to the change in duty station, such as how to gain access to the buildings and space; floor plans of the spaces; type and availability of public transportation; availability of parking; etc.

   B. The Employer agrees to provide employees with a virtual tour, of both the Yates Building and GWCC in advance of the employee's report date and with sufficient time that employees may see the space before making workstation selections pursuant to Section 12.

1

**Memorandum of Understanding between the U. S.
Department of Agriculture, Food and Nutrition Administration
and the National Treasury Employees Union Concerning the
Office Move from 1320 Braddock Place to the Yates Building
and the George Washington Carver Center (GWCC)**

3. **Union Notice.** The Employer will notify NTEU at least five (5) calendar days before formally notifying bargaining unit employees (BUEs) of the move.

4. **Employee Communication.** Prior to the above BUE notification, Management will schedule a formal, in-person meeting with a virtual/hybrid option available and discuss implementation and the process for workstation selections. Agency leadership will be available in-person to answer questions at the meeting. This will be followed by a question-and-answer period. Any unanswered questions will be responded to within 15 calendar days. In addition, the agency shall provide each employee with a copy of this agreement no later than three (3) days following Agency Head Review approval.

5. **Workload.** This office move is not anticipated to increase employee workload. If an employee has concerns that the relocation is increasing their workload, employees may schedule a discussion with their direct supervisor to outline the specific concerns and suggest possible solutions. The supervisor will promptly respond to any suggested solutions (e.g. standing approval for credit hours in accordance with the Collective Bargaining Agreement, workload adjustment, etc.).

6. **Adjustment Period.** The Employer understands that these office moves may result in employees having to commute for significantly longer periods of time than they currently commute. For this reason, the employer agrees as follows:

    a. <u>Grace Period.</u> Employees will receive a 45-day grace period, commencing from the date of the office move, during which management will consider the difficulty of the office move, additional commuting time, additional strain on the employee's daily life, and childcare constraints, when evaluating employees. This grace period does not apply to employees hired after the office move.

    b. <u>Performance.</u> Deficiencies in an employee's performance will be communicated to the employee as soon as reasonably practicable, pursuant to Article 9.01(7), 9.04(1), 9.04(3), and Article 10. FNA will counsel employees in relation to their overall performance on an as-needed basis.

    c. <u>Shuttle.</u> If an employee is late for the employee's workday, due to insufficient USDA shuttle space or shuttles that are not on time, supervisors may grant administrative leave for the period of time in which they were late in reporting for duty. The parties agree to meet every three (3) months to assess the frequency of the shuttles. If either party identifies that there is not sufficient shuttle space or frequency for the new employees, FNA shall request that the shuttle frequency increase by at least 20% between 6:00am and 9:00am and between 4:00pm and 6:00pm within 90 days of becoming aware of the insufficient shuttle space. If both parties agree that a meeting regarding the shuttle is not necessary, the meeting may be cancelled.

    d. <u>Parking.</u> If an employee is late for the employee's workday during the grace period, due to insufficient parking at GWCC, supervisors may grant administrative leave for the period of time in which they were late in reporting for duty.

2

**Memorandum of Understanding between the U. S.
Department of Agriculture, Food and Nutrition Administration
and the National Treasury Employees Union Concerning the
Office Move from 1320 Braddock Place to the Yates Building
and the George Washington Carver Center (GWCC)**

7. **Moving.** The Employer will support the moving process of all bargaining unit employees. The Employer will notify all impacted employees in writing of their change in duty station at least fifty (50) calendar days in advance of the day they are required to report to either Yates or GWCC indicating their new duty station and provide:

    a. Storage Boxes. Employees who will be moving offices will be provided boxes sufficient enough in quantity and size to move all items to their new duty station. Employees may request additional boxes as needed.
    b. Assistance. Employees needing physical assistance with packing/unpacking boxes should request assistance as soon as possible. This request may be made with their supervisor or Office Manager. Employees will not be responsible for carrying or moving boxes to the new office location or their individual workstations.
    c. Administrative Time for Packing. Subject to workload and staffing needs, employees will be granted not less than two (2) hours of administrative time to pack and take other actions for the relocation, e.g., prepare their offices to move and pack and/or purge files as necessary; and three (3) hours to unpack and prepare their storage after the move, as necessary.

8. **Floor Plans and Move Schedule Changes.** If changes occur after the official BUE move notification, the Agency will provide BUEs with updates to the move schedule as needed until the move from 1320 Braddock Place to Yates and to GWCC are all completed. The move specialists of both FNA and the Union will meet as needed and agree to discuss any concerns or issues related to the relocation. The Agency agrees to keep BUEs informed about the move, including the move schedule. The Agency also agrees to make up-to-date floorplans for Yates and GWCC available to BUEs on an as needed basis.

9. **Parking and Transit.** The Employer recognizes that the change in office could potentially result in increased commuting times and costs. As such, the Employer agrees to:

    a. Provide free parking for all employees at GWCC.
    b. To fully maximize the available Department of Transportation transit subsidy benefit for all bargaining unit employees whose public transit or commuting costs increase as a result of transferring to the Yates Building or GWCC, up to the maximum statutory limit allowed by federal law. FNA will provide NTEU the name of the person(s) responsible for processing transit subsidy applications.

10. **Equipment.** Employer will request that newly provided workspaces will be equipped with the same or better office equipment (i.e. standing/sitting desk, ergonomic chair, docking stations or compatible connection cord, computer or laptop, keyboard, mouse, access to data and communications, furniture, lockable file cabinets that are adequate in size for employees to store work papers, etc.) than were provided at 1320 Braddock Place, including two monitors for each cubicle and/or office.

3

**Memorandum of Understanding between the U. S.
Department of Agriculture, Food and Nutrition Administration
and the National Treasury Employees Union Concerning the
Office Move from 1320 Braddock Place to the Yates Building
and the George Washington Carver Center (GWCC)**

    a. <u>Filing Cabinet Keys.</u> The Employer will request filing cabinet keys from Facilities Management for all new cabinets that require keys, in sufficient time for the keys to be available before employees move into the new workspaces.

    b. <u>Storage Space.</u> Each employee will be provided with sufficient file cabinet storage to hold their files.

11. **Room Reservations.** The Employer will utilize a room reservation system for employees to view and reserve certain workspaces. The following workspaces will be available for advance reservation:

    a. Large Conference Rooms;

    b. Small Conference Rooms; and

    c. Huddle Rooms.

In the event a workspace is no longer needed, employees should cancel the reservation as soon as practicable after becoming aware that the space is not needed.

12. **Workstation Selection.** The Agency will schedule meetings for employees and NTEU for individual workstation selections at Yates and GWCC. If an employee cannot attend the meeting, they may designate someone to select a workspace on their behalf. If an employee cannot attend the meeting and is not able to arrange someone to attend on their behalf, the Agency will assign them a workspace after all other selections have been made. A final list of workspace selections will be sent to NTEU in an excel document or equivalent no later than ten (10) calendar days after selections are made.

All workspaces available to FNA will be included in the selection process, aside from private offices. Selection of workspaces shall be made in order of FNCS seniority, defined by the employee's earliest entry-on-duty date for Federal service. Tiebreakers shall be first Federal government seniority and second based on a coin flip.

13. **Privacy.** The Employer understands the need for employees to have a degree of privacy and the agency will make every good faith effort to maintain the privacy and/or confidentiality of employee records or conversations with supervisors.

    a. <u>Personal Storage.</u> Each employee, in addition to storage for their work files, will be provided a lockable personal locker, located at or near the employee's workstation.

    b. <u>Conference Rooms.</u> Each conference room with glass walls will be equipped with a frosted glass covering or similar that affords occupants some level of privacy.

    c. <u>Focus Rooms.</u> Employees will have access to focus rooms to have individual meetings with other staff or supervisors as needed.

4

**Memorandum of Understanding between the U. S.
Department of Agriculture, Food and Nutrition Administration
and the National Treasury Employees Union Concerning the
Office Move from 1320 Braddock Place to the Yates Building
and the George Washington Carver Center (GWCC)**

14. **Space.** The Employer understands that the safety and comfort of employees is important to their productivity. With that in mind, the Employer agrees that:

    a. <u>Cleaning Services.</u> The Agency shall maintain regular cleaning services of the Yates Building and GWCC, to include emptying of trash cans, cleaning and resupplying of bathrooms, and cleaning and resupplying of kitchens or common areas. Vacuuming of the common areas will be done daily.  Additional vacuuming may be requested by the employee.

    b. <u>Building Maintenance Issues.</u> Any employee may report, by phone or by email, issues regarding building components that are not functioning properly through Agency facilities management Customer Support helpdesk or archibus. Whenever such a report is made, Agency facilities management will ensure the repair of the building component as soon as practicable.  If the repair is of a minor nature that is only relevant to the reporting employee (e.g., repairing an employee's chair), then Agency facilities management will notify only that affected employee when the repair is complete. If the repair is of a significant nature that could affect many Agency employees (e.g., repairing an elevator), then Agency facilities management will notify all Agency employees when the repair is complete. Such notification will inform affected employees of the status of the repair and, if the issue cannot be fixed within 24 hours (e.g., a new part must be ordered), then the notification will provide an update and timetable for the repair. Issues to be reported through Agency facilities management Customer Support helpdesk or archibus include, but are not limited to, uncomfortable temperatures ( e.g., workspace temperatures under 68 degrees or over 76 degrees F, per OSHA guidance), broken appliances, insufficient ventilation, air quality concerns, and any issue adversely affecting the safety or comfort of the workplace environment.

    c. <u>Bike Storage.</u> Secure bike racks will be available for employee usage. If covered bike storage is not available at a facility, the Agency agrees to find a space in which employees may store their bikes in the event of anticipated inclement weather.

    d. <u>Feminine Hygiene Products.</u> Feminine hygiene products will be available in all women's and unisex restrooms on the FNA floors, at all times, and at no cost to employees.

    e. <u>Water Fountains.</u> Each floor of the FNA office space at Yates and GWCC will be equipped with at least one (1) water filtration system which includes a water bottle filler station.

    f. <u>Fitness Center.</u> Access to any fitness area located within GWCC or Yates will be free to all employees. These fitness centers shall include bathroom facilities, showers with hot and cold water, lockers that may be reserved during fitness center usage, and changing areas. In the case of the Yates Building, if no fitness center is located in the building, employees are permitted to use a USDA fitness area within walking distance of the building, free of charge.

5

**Memorandum of Understanding between the U. S.
Department of Agriculture, Food and Nutrition Administration
and the National Treasury Employees Union Concerning the
Office Move from 1320 Braddock Place to the Yates Building
and the George Washington Carver Center (GWCC)**

g.  <u>Sunlight Access.</u> Employees may request full spectrum daylight lamps (so-called "happy lamps") from their supervisors. These lamps will be provided within 60 calendar days of the request.

h.  <u>Wi-Fi Access.</u> Wi-Fi internet access will always be available in all areas of the building. The Agency will ensure sufficient access. Any instances of insufficient Wi-Fi connectivity may be reported to the CEC help desk. In the event that sufficient internet is not available for an employee to complete their job duties, employees with an executed telework agreement will be permitted to telework until the issue is resolved  If the issue in question is likely to be resolved in less than one (1) hour, then the employee's manager may elect whether the employee leaves to telework or remains in the office.

i.  <u>USB Charging Station.</u> Every workstation will include a USB charging station.

j.  <u>Restroom Access.</u> Restrooms will not require LincPass for access and will allow for unrestricted access.

k.  <u>Lunch or Break Area.</u>  The Employer will provide a common area that may be used by employees for the purpose of eating and taking breaks.  The common area  will be equipped with at least one "K-cup" style coffee machine, at least two large refrigerators that produce ice, and at least two microwave ovens for employees to use within the common area. The Agency is responsible for the maintenance, repair, and replacement of any broken or unusable lunch or break area equipment or appliances. Maintenance also includes providing paper towels, hand soap, and hot and cold water.

l.  <u>Lactation Rooms.</u>  A sufficient amount of lactation rooms will be provided for use by employees.  This includes a refrigerator to accommodate employee needs. FNA employees are free to use any one of the four lactation rooms on the GWCC campus. FNA will endeavor to use the existing Braddock equipment if possible.  The Agency agrees to maximize use of each lactation room by endeavoring to ensure an employee can pump in private while another employee enters the room to access the refrigerator and by maximizing the number of pumping stations in each lactation room.

m.  <u>Copiers.</u> At all times, the FNA will maintain no fewer than three (3) working copiers/scanners on each floor for the use of employees.  Each of these copiers will have the ability to print and scan. The Agency is responsible for the maintenance, repair, and replacement of any damaged or broken copiers and must maintain the supply of toner, ink, and paper.

**Memorandum of Understanding between the U. S.
Department of Agriculture, Food and Nutrition Administration
and the National Treasury Employees Union Concerning the
Office Move from 1320 Braddock Place to the Yates Building
and the George Washington Carver Center (GWCC)**

n.  Auditory Dampener.  The Employer will install a sufficient number of auditory dampener (white noise) devices, to increase privacy and foster a quieter work environment.

o.  Cleaning Supplies. Management will provide cleaning supplies including, but not limited to paper towels, disinfectant, hand wipes, hand sanitizer to disinfect shared workstations and work tables and keep work stations clean.  The supplies will be located at a place of management's choosing.

p.  Onsite Food Vending. At minimum, the Agency shall provide onsite vending of food and drinks for employees to purchase. The Agency will ensure that these vending machines are regularly stocked and maintained.

q.  IT Assistance. The Agency shall ensure adequate information technology (IT) service desk support so that employees' IT needs will be met.  If an employee cannot reasonably perform their duties due to an IT issue, employees with executed telework agreements will be permitted to telework while the IT issue can be resolved.   If the issue in question is likely to be resolved in less than one (1) hours, then the employee's manager may elect whether the employee leaves to telework or remains in the office.  If the IT issue prevents the employee from also teleworking, the Employer will be provided administrative leave until the issue is resolved.

r.  Building Access. The Yates building and GWCC and all employee areas within (such as restrooms and fitness centers) shall be accessible to employees 24 hours a day, seven days a week. The Agency may require employees to use specific entrances depending on the time of day.

15. **Shuttle.**  USDA provides a shuttle for employees that will travel between the Greenbelt Metro Station and the GWCC building. The shuttle will operate regularly and during all work hours. The Agency agrees that it will not store or use data collected by an employee's use of the shuttle service to track employee attendance, location, or work hours.

16. **Pests.**  The Agency must maintain a safe, clean, and professional work environment free from vermin, insects, and other pests. This proposal covers all Agency-controlled facilities, including office spaces, break rooms, storage areas, and parking structures.

   A.  Management Responsibilities.  The Agency agrees to take immediate, proactive measures to eliminate and prevent pest infestations:

   B.  Employee Accommodations and Workplace Flexibilities.  When pest remediation impacts active workspaces, the Agency must protect employee health.

   C.  Alternative Workspaces: Relocate affected employees to a pest-free area or alternative facility during and immediately following chemical treatments or known infestations.

7

**Memorandum of Understanding between the U. S.
Department of Agriculture, Food and Nutrition Administration
and the National Treasury Employees Union Concerning the
Office Move from 1320 Braddock Place to the Yates Building
and the George Washington Carver Center (GWCC)**

D.  Weather and Safety Leave Telework: Grant immediate ad-hoc telework, situational telework, or safety leave to any employee assigned to an infested location or any employee with documented respiratory issues, chemical sensitivities, or allergies during chemical applications.

E.  Mitigation and Resolution Timeline.  The Agency will adhere to strict timelines upon a reported pest sighting.

F.  Urgent Hazards: Respond within 4 hours for hazards like bedbugs, stinging insects, or aggressive rodents in immediate work zones.

G.  Standard Infestations: Schedule professional extermination services within 48 hours for standard insect or minor rodent sightings.

H.  Verification.  In the event of an infestation, the Agency will verify the building's fitness for occupancy through a bona fide third-party before requiring employees to return to their office.  The Agency agrees to provide Chapter 226's President, and their designated Field Rep, with any report made by the third party, if available, which reflects the fitness of a building for occupancy.  If no report is generated, the Agency will provide a written update, via e-mail, reflecting that the building is fit for occupancy.  The report, or written update, will reflect any testing done, and be provided at least one day prior to any employees returning to the worksite.

17. **Reasonable Accommodations.**  Any employee with a Reasonable Accommodation ("RA") who changes duty stations shall have the same or similar equipment in the new location and will have their workspace equipped and/or altered in accordance with Article 35, Section 8 of the parties' Collective Bargaining Agreement.

18. **Attrition.** In the interest of maintaining workforce stability during periods of attrition, Management has determined that any employee covered by this MOU shall not be subject to involuntary reassignment to a duty station located outside of the National Capital Region (NCR). This protection remains in effect for thirty (30) months following the employee's move to the Yates Building or GWCC.

19. **Significant and Unanticipated Problems.**  If either FNA or NTEU becomes aware of significant unanticipated problems that arise following implementation of this initiative, the FNA or NTEU will inform the other party, and the parties will meet to discuss and attempt to resolve the problem as soon as possible.

**Memorandum of Understanding between the U. S.
Department of Agriculture, Food and Nutrition Administration
and the National Treasury Employees Union Concerning the
Office Move from 1320 Braddock Place to the Yates Building
and the George Washington Carver Center (GWCC)**

**Waiver.**  Nothing in this MOU is intended, nor should it be interpreted, as a waiver or withdrawal of any grievances filed by the Union or of its rights in said grievances or bargaining.  Nothing in this MOU is intended to limit an employee's rights provided for in the parties' CBA.

**Effective Date, Effect and Termination.**  This MOU will take effect upon Agency head approval or on the thirty-first (31st) day following execution, whichever is earlier. This MOU will run concurrently with the parties' 2025 CBA.

Digitally signed by
MATTHEW EPPERSON
Date: 2026.06.30
08:57:49 -05'00'

Digitally signed by
John (Jake) DiMarzio
Date: 2026.06.30
23:28:02 -04'00'

_____

_____

Matt Epperson
Chief Negotiator on behalf of FNA

Jake DiMarzio
Chief Negotiator & Assistant Counsel
NTEU

9

# EXHIBIT 6

**Braddock Place Office Move**

**Memorandum of Understanding (MOU)**
**Between**
**Food and Nutrition Service, Mid-Atlantic Regional Office, USDA**
**and**
**American Federation of Government Employees (AFGE) Local #2735**

1.  At the request of the Union, the Agency shall assign Mrs. ████████, Program Specialist, to the Sidney R. Yates Federal Building, Washington D.C. It is understood this agreement does not preclude the Agency from additional office moves in the future if needed. The Agency understands any future office moves would require appropriate notice and impact & implementation bargaining prior to effecting any change(s).

2.  If requested, the Agency shall afford Mrs. ████████ a reasonable amount of time during duty hours to move her work/personal effects from Braddock Place, Alexandria, VA to the Sidney R. Yates Federal Building, Washington, D.C.

MARY
SALVATORE

Digitally signed by MARY
SALVATORE
Date: 2026.04.03 11:48:53
-04'00'

_____
**Mary Ann Salvatore              Date**
**President, AFGE Local #2735**

Digitally signed by MATTHEW
EPPERSON
Date: 2026.04.03 08:35:45
-05'00'

_____
**Matt Epperson              Date**
**Chief Negotiator, on behalf of FNS**

Page 1 of 1

# EXHIBIT 7

**MEMORANDUM OF UNDERSTANDING**
**IMPACTS OF THE REORGANIZATION ON THE BELTSVILLE AGRICULTURAL RESEARCH**
**CENTER AND U.S. NATIONAL ARBORETUM**

BETWEEN:

THE AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES (AFGE) LOCAL 3147

AND

THE BELTSVILLE AGRICULTURAL RESEARCH CENTER (BARC) & US NATIONAL ARBORETUM (USNA), AGRICULTURAL RESEARCH SERVICE (ARS), UNITED STATES DEPARTMENT OF AGRI-CULTURE (USDA)

I. **General**

    A. This Memorandum of Understanding (MOU) is entered into between the Beltsville Agricultural Research Center (BARC) and the U.S. National Arboretum (USNA), United States Department of Agriculture (collectively, the "Agency"), and the American Federation of Government Employees (AFGE) Local 3147 (the "Union"), collectively referred to as "the Parties."

    B. This MOU constitutes the agreement between the Parties regarding the relocation of bargaining unit employees (BUE or employee(s)) to their Management Directed Reassignment Location (MDRL) within and outside the National Capital Region (NCR). This MOU supplements but does not supersede the Parties' Collective Bargaining Agreement (CBA) effective March 21, 2025.

II. **Scope and Application**

    A. This MOU applies to all BUE of BARC and USNA covered under the CBA and who are impacted by the relocation due to the USDA Reorganization. This MOU supplements the CBA and shall remain in effect from the date of Agency Head Approval (AHA) through the resolution of all matters arising from the reorganization.

III. **General Protections**

    A. The Agency does not anticipate a Reduction in Force (RIF) as a result of the relocation and reorganization. In the event that a RIF subsequently occurs, the Agency will fulfill all bargaining obligations under the CBA prior to implementation.

    B. Existing reasonable accommodation determinations will not be uniformly rescinded as a result of the relocation. Any reevaluation of existing accommodations will proceed through the interactive process in accordance with applicable law and regulations.

    C. Existing Flexible Work Schedules (FWS), which include Maxiflex as outlined in the CBA will not be uniformly rescinded as a result of the relocation. Individual agreements remain in effect unless modified through the procedures set forth in the CBA.

D. In the event of a lapse in fiscal year 2027 appropriations, all funding associated with the relocation is fiscal year 2026 and relocation support will continue.

### IV. <u>Reorganization</u>

A. The Agency confirms that the duties, essential functions, and reporting relationships for bargaining unit employees have not changed and will not change with issuance of a management directed reassignment (MDR) to relocate to the MDRL. A change in duty station location alone does not constitute a change in duties, essential functions, or reporting relationships for the purposes of this MOU.

B. The Agency will provide written notification to the Union prior to any changes in BUE duties, essential functions, and reporting relationships.

C. Changes to position descriptions and work reassignments will be conducted in accordance with applicable articles in the Parties' existing CBA.

1. Any modifications to Performance Plans must adhere to applicable articles in the Parties' existing CBA.

2. The Agency recognizes that simultaneous work and/or home relocation can affect an employee's ability to meet established performance expectations. Accordingly, rating officials will document and account for adjustments to newly assigned and/or modified duties, logistical challenges, and delays in access to necessary resources when evaluating performance during the transition period.

3. The Agency recognizes that employees may require schedule flexibilities in order to reestablish a functioning home and work environment.

4. The supervisor may authorize situational telework on a case-by-case basis.

### V. <u>MDR Letter and Decision Period</u>

A. Upon issuance of the MDR letter, employees will be provided with a minimum of 30 calendar days to respond with a decision to accept or decline the reassignment.

B. Each MDR letter will include, at minimum:

1. The specific location of the reassignment, including street address, city, and state;

2. The REE Reorganization email, and/or all applicable email addresses, for inquiries and relevant links (general questions related to HR, relocation, etc.);

3. Information regarding the Voluntary Early Retirement Authority (VERA) and the Voluntary Separation Incentive Program (VSIP) (eligibility will be determined on a case-by-case basis);

4. An email address in order to be assigned a relocation coordinator;

5. An email address in order to be assigned a retirement and benefits specialist;

6. An email address for the Union (afge.local3147@gmail.com) will be included in the email accompanying the MDR letter.

C. Employees retain the right to change their decision to accept or decline the MDR at any time prior to the Friday before the report date.

D. Employees may utilize the hardship request process to request an extension of the decision period in writing. These requests will be considered on a case-by-case basis under the Department hardship process.

E. If an employee has a Reasonable Accommodation or Hardship Request, they may request an application by sending an email to the REE Reorganization email address and they will be provided with a link to the application.

## VI.    Employees Who Decline the Relocation

A. Employees may select a separation or retirement effective date before the report date for the purposes of severance or retirement.

B. An employee who declines the relocation will remain in duty status and receive their regular salary from MDR issuance through: (i) the report date, or (ii) the employee's selected termination or retirement date, whichever is earlier.

C. Nothing in this MOU prevents the Agency from initiating adverse action proceedings prior to the report date in accordance with law, regulation, and the Parties' existing CBA; however, an employee shall not be separated from service before the report date unless the employee authorizes it. Under most circumstances, the SF-50 will reflect voluntary separation.

D. If removal proceedings have not been concluded by the report date, the employee will be placed in an Absent Without Leave (AWOL) status until the adverse action removal has concluded. The employee's FEHB enrollment may continue during this period and the employee will be responsible for paying both the employee and employer premiums.

## VII.    Personal Hardship due to MDR

### A. Personal Hardship Scope and Definition

1. A personal hardship is a situation or condition(s) outside of the employee's reasonable ability to control that affects the employee and/or family members as defined in 5 C.F.R. § 630.201.

2. Any employee may request a personal hardship consideration. Personal hardships are situations outside of the employee's reasonable ability to control that affect the employee and/or family member as defined in 5 CFR § 630.201.

3. The provisions of this MOU will not interfere with the rights of employees under any statutes, laws, or regulations as it relates to requests for a Reasonable Accommodation. Unlike a Personal Hardship, Reasonable Accommodations are modifications to a job or existing work environment that enables a qualified person with a disability to perform the duties of their job.

4. Management will provide CTAP and ICTAP information and any relevant documentation to eligible employees.

5. In accordance with the Parties' current CBA, Management will establish a process under which BUE can submit requests for relief from personal hardship arising from their MDR and the Department reorganization.

6. Confidentiality (HIPAA, Privacy Rights, etc.) regarding an employee's hardship situation, application, and documentation will be maintained to the fullest extent possible throughout the entire process. Information shared in connection with a hardship request will not be disclosed beyond individuals required for the purpose of processing the request.

7. After accepting their MDR, employees may submit hardship requests within 30 calendar days of receiving their specific MDR. Until a decision is rendered on the hardship relief, the employee will remain at the current duty station.

8. The Parties agree that every Personal Hardship Request may not be satisfied, however, Management will ensure that every employee is given due consideration of their specific circumstances and how impactful these may be on their ability to perform their duties.

9. If a meeting concerning Personal Hardship or Reasonable Accommodation should occur, employees retain the right to request the presence of a Union representative. The Union may submit written authorization to Management from the employee to request the employee's Personal Hardship and/or Reasonable Accommodation status and any other authorized reorganization related information that would be provided to the employee.

10. Requests submitted after the deadline may be considered at Management's discretion where circumstances have changed or could not reasonably have been identified earlier.

11. Employees may send in a Personal Hardship request for a delayed relocation due to an employee's upcoming retirement.

## B. Requests for a Personal Hardship Consideration

1. Any BUE who receives an MDR letter may submit a request via REE.reorganization@usda.gov for information on how to submit a Personal Hardship.

2. Personal Hardships will be reviewed through the Department's hardship process and additional documentation from the employee may be requested during the hardship review process.

3. Management will notify the employee in writing normally within 30 calendar days of receipt of their submission. If a hardship decision is not made within the 30-calendar day decision window, Management will adjust the report timeline accordingly.

4. The written initial decision from Management will include:
   a. determination of whether a hardship exists (approval or denial);
      i. if approved, what accommodation(s) will be afforded to the BUE;
   b. the Union email: afge.local3147@gmail.com (located in email body);
   c. Programs for which the employee may qualify (i.e. CTAP, ICTAP, etc.) (located in email body);

5. Employees will remain at their current duty station (BARC) until a final decision is rendered.

6. Whether a Personal Hardship request or Reasonable Accommodation that could delay or prevent relocation is approved or denied, the employee will be provided with a revised report date. The revised date will be the later of either:
   a. the report date provided in the MDR letter; or

Page **4** of **11**

b. 60 calendar days after the employee receives a final written hardship determination. During the period a hardship request remains pending, the employee shall not be subject to an AWOL designation or separation (reflected on the SF-50 as an adverse action) solely on the basis of not-reporting to the duty station stated in the MDR.

7. Employees retain the right to submit a Reasonable Accommodation request at the MDRL.

## VIII. Relocation Financial Support

A. Employees are encouraged to work with a relocation specialist prior to making any decisions regarding a relocation package.

B. **Election of Relocation Package**

1. Generally, within 30 calendar days of MDR issuance, each accepting employee will elect either:

   a. the traditional Federal Travel Regulation (FTR) relocation package, **OR**
   b. the USDA Lump Sum Relocation Program (LSRP)

2. There will be case-by-case counseling services and tools available, generally prior to the election deadline, to assist employees with the decision-making process.

3. The election is binding once the employee's relocation authorization payment is received.

4. Employees who accept the relocation and receive relocation payment under the FTR or lump sum program shall serve a 12-month service agreement. Employees may serve the agreement with any USDA agency in any duty station or with any other Federal Government Agency. If an employee leaves the Agency before the end of their service agreement, the authorizing official will determine whether repayment is required, taking into account whether circumstances were outside the employee's control. During the service agreement period, employees who accept the lump sum will be responsible for providing proof that they have moved to the new duty station.

C. **Traditional FTR Package (12-month service agreement)**

1. Employees who select the traditional FTR package are entitled to the following:

   a. En route travel expenses, including per diem for the employee and accompanying family members as defined in 41 C.F.R. § 300.103, during travel to the new duty station;

   b. Miscellaneous moving expenses;

      i. $905 (no dependents) or the equivalent of one week's basic gross pay, whichever is the lesser amount, or;

      ii. $1,810 (with dependents) or the equivalent of two weeks' basic gross pay, whichever is the lesser amount.

   c. Household goods shipment of up to 18,000 lbs.;
   d. Storage in transit (SIT) of household goods, for up to 90 calendar days;
   e. One (1) house hunting trip not to exceed 10 calendar days, including rental car;
   f. Sell and buy residence transaction expenses or lease termination expenses;
   g. Up to 10 percent of the actual sales price for the sale of a residence at the old official duty station;

h.  Up to 5 percent of the actual purchase price for the purchase of a residence at the new official duty station;

i.  Reimbursement for lease-termination expenses at actual cost, with proper documentation;

j.  Property management services for up to 12 months;

k.  Shipment of one (1) privately owned vehicle (POV);

l.  Withholding Tax Allowance (WTA) and Relocation Income Tax Allowance (RITA) payments to offset actual tax liability;

m.  60 calendar days of approved Temporary Quarters Subsistence Expenses (TQSE), with extensions authorized by the Agency up to a maximum of 120 calendar days; extensions beyond 60 calendar days are authorized at the Agency level and will be determined on a case-by-case basis.

## D.  Lump Sum Relocation Program (LSRP) and Incentive

1.  The USDA Lump Sum Relocation Test is a four-year program that provides eligible employees with one upfront relocation payment, followed, where applicable, by subsequent payment(s) for residence transactions.

a.  The total lump-sum amount will be calculated with a relocation specialist using the employee's situational information.

2.  With no relocation incentive there is a 12-month service agreement;

3.  With a relocation incentive there is a 24-month service agreement;

a.  The Agency will offer a $20,000 or $15,000 (depending on the state to which the employee is relocated) relocation incentive to employees who select the lump sum relocation program. If the vacancy rate in the MDRL is above the 5% housing vacancy rate threshold for the lump sum authorization, then the employee is not eligible for 60 calendar days of temporary housing and the increased incentive payment will help offset that difference.

b.  Should the employee decline their MDR after receiving incentive funds, the incentive must be paid back to the Agency on a timeline determined on a needs-based basis.

4.  The service agreement is transferable to any USDA agency regardless of duty station location. Employees who voluntarily separate or transfer from USDA service prior to completion of their service agreement shall be required to repay the relocation incentive on a pro-rated basis.

## E.  Lump Sum Versus Traditional Relocation Allowances

| Lump Sum Method | Traditional Method |
|---|---|
| En Route Travel | |
| Paid using standard per diem rates; no lodging receipts required | Reimbursed for actual lodging costs (with receipts), up to the CONUS rate |
| Miscellaneous Moving Expenses | |

Page **6** of **11**

| Flat payment - 905 (single) or 1,810 (with dependents) | Same lump sum or a higher reimbursable amount with documentation (up to one week of salary for singles / two weeks with family) |
|---|---|
| **Household Goods (HHG) Shipment** | |
| Payment is based on USDA's historical averages and scaled by distance and home size; no receipts required | Employee chooses between commuted rate reimbursement or agency-arranged actual expense method |
| **Residence Transactions (Sale, Purchase, Lease Break)** | |
| -Sale: 8% of prior year assessed property value.<br>– Purchase: 3% of the median home price at the new duty station.<br>– Lease Break: 80% of two months' fair market rent.<br>*Documentation required for all.* | - Sale: Up to 10% of actual sale price (allowable expenses).<br>– Purchase: Up to 5% of actual purchase price.<br>– Lease Break: Reimbursement based on itemized, documented expenses |
| **Taxes** | |
| Tax impacts are built in using fixed federal (24%) and state (5%) rates | Employees receive Withholding Tax Allowance (WTA) and Relocation Income Tax Allowance (RITA) payments to offset actual tax liability |
| **Temporary Quarters Subsistence Expense (TQSE)** | |
| Allowed only in housing-constrained markets (vacancy < 5%); 60-day fixed; no receipts required | Reimbursable for up to 120 calendar days; lodging receipts required. Actual expenses reimbursed |
| **Storage of Household Goods (SIT)** | |
| Provided only if TQSE is authorized; amount based on historical averages | Up to 60 calendar days initially, extendable to 150 calendar days with approval |

**F. Situational Telework and Leave for Relocation Purposes**

1. Employees may request situational telework to address operational circumstances arising from the relocation transition when telework is more practicable than reporting in person. Situational telework may be appropriate during periods such as temporary housing arrangements or reduced access to the employee's permanent duty workspace. However, situational telework hours are not automatically approved. All situational telework must be specifically requested by the employee and approved by the supervisor's designee.

2. Employees must submit situational telework requests through their agency's established process as per the Parties' existing CBA.

3. Accepting employees will be credited with 80 hours of administrative leave, available for use from the MDR issuance through 60 calendar days after the report date. The 80-hour time allotment may be used to perform any relocation purposes to include but not limited to house hunting purposes, packing, supervising movers, and similar activities. Administrative leave under this Section (Relocation and Financial Support) is separate from, and in addition to, any Leave Without Pay authorized under the reorganization.

Page **7** of **11**

4. Employees may request leave with or without pay in excess of the 80-hour administrative leave allotment defined in this Section for relocation purposes at any point after MDR issuance.

5. An accepting employee may also request annual leave or Leave Without Pay (LWOP) for a period of up to 30 calendar days after the report date to allow additional time for any relocation impacts. These requests should be approved unless there is a mission-critical need to decline them.

## G. Report Date and Personnel Action Protections

1. The report date shall not be earlier than October 5th, 2026 or 90 calendar days from the date of the MDR issuance, whichever is later. The effective date shall not be earlier than October 4th, 2026 unless an employee requests this date to be sooner.

2. Personnel actions reflecting the MDRL shall not be processed before the report date, or the employee begins reporting to MDRL, whichever is sooner.

3. The Employee's SF-50 will reflect their current locality pay through the day before the report date, or the day before beginning to report to MDRL whichever is sooner.

## H. Equivalent Relocation Support

1. BUE subject to an MDR who accept a different position within the bargaining unit that is also located in MDRL will receive equivalent relocation support, subject to applicable personnel regulations.

2. The Agency confirms that funding for FTR and LSRP entitlements will be available for employees whose relocation occurs after October 5th, 2026, including those whose relocation is delayed due to an approved Personal Hardship request or pending Reasonable Accommodation determination. The availability of funding shall not limit any employees' entitlement to relocation benefits under this MOU.

## IX. Separation and Retirement Support

### A. VERA/VSIP

1. The Agency will open an election window for the impacted employee from the date of MDR issuance through 30 calendar days after MDR issuance.
2. The maximum Voluntary Separation Incentive Payment (VSIP) is $25,000, pursuant to 5 U.S.C. § 3523(b)(2)(B).

### B. Career Transition Assistance Plan (CTAP)

1. Employees who decline the relocation and receive a notice of proposed removal for declining a directed reassignment to another local commuting area, are entitled to Career Transition Assistance Plan (CTAP) selection priority if they satisfy CTAP candidate requirements and are deemed "well qualified" for the job. Management agrees that open positions advertised by ARS will be open to CTAP candidates resulting from this reorganization beyond the local commuting area.

2. The Agency will provide each declining employee with written documentation supporting involuntary separation status at or before the effective date of separation.

3. Employees who decline the relocation and are separated as a result will be eligible for Interagency Career Transition Assistance Plan (ICTAP) selection priority in accordance with applicable law and regulation.

## C. Career Transition Services

1. The Agency will provide group information sessions covering CTAP, ICTAP, VSIP, VERA, resume writing, and retirement planning. These sessions will occur on duty time. Employees will reasonably be excused from regular duties to attend training sessions.

2. Consistent with the Parties' existing CBA, and as an appropriate arrangement under 5 U.S.C. § 7106(b)(3) for employees adversely affected by an MDR, employees may use up to eighty (80) hours of duty time for career transition activities — including preparing and updating resumes and job applications, attending employment interviews, contacting potential employers, and reviewing vacancy announcements, beginning at the MDR issuance. Duty time for career transition activities is not subject to prior supervisory approval; employees shall provide reasonable advance notice of their intent to use such time.

## D. Retirement Processing

1. Retirement counseling contacts will be made available to employees at the time of the MDR issuance.

2. The Agency agrees to provide a retirement processing timeline on the REE AXON page for the portions of the process that are within USDA control.

3. Employees with outstanding Thrift Savings Plan (TSP) loans will receive written notice of the implications of separation prior to their separation effective date.

4. Employees may submit a Personal Hardship request to delay the report or separation date to meet the minimum service and age requirements for an immediate annuity under Federal Employees Retirement System (FERS) or Civil Service Retirement Service (CSRS), including Discontinued Service Retirement under 5 U.S.C. § 8414(b) or § 8336(d). Upon request to the REE.reorganization@usda.gov contact, employees will receive an individualized written retirement readiness assessment from the Agency's benefits specialist within 15 calendar days of the request.

## E. Severance Pay

1. Employees serving under qualifying appointments, meeting all eligibility requirements who decline the relocation and are separated as a result shall be entitled to severance pay in accordance with 5 U.S.C. § 5595 and 5 CFR Part 550, Subpart G. For purposes of this MOU, the Agency confirms that an employee's declination of a directed reassignment outside of the National Capital Region (NCR) does not constitute a declination of a reasonable offer under 5 CFR § 550.707(a), and no employee shall be disqualified from severance pay on that basis.

2. An employee who elects an earlier separation date (must be after receiving their final decision letter) pursuant to Section 5(a) of this MOU retains full eligibility for severance pay. The election of a separation date shall not be construed as a voluntary separation for purposes of severance pay eligibility.

3. Employees should meet with a benefits specialist concerning their eligibility for severance pay.

**X.  Union Access and Communications**

  A.  Union representatives will be allowed to maintain access to employees who remain on campus, facilities, and CBA-granted resources for representational purposes.

  B.  To the extent practicable, the Agency agrees to provide the Union with advance notice of any and all town halls,  all-hands sessions, or agency-wide communications to bargaining unit employees regarding the reorganization, relocation, or individual duty station changes, with an opportunity for the Union to submit questions or responses before those communications are issued.

  C.  The Agency will provide the Union with written notice of any new bargaining unit positions created as a result of the relocation before the external recruitment period closes.

  D.  The Union has the right to determine who represents any and all BUE who remain at BARC and USNA for representational functions.

  E.  The Union may request Official Time for non-BARC/USNA employees to perform representational functions related to the BARC Reorganization.

**XI.  Grievance and Enforcement**

  A.  All provisions of this MOU constitute enforceable terms and conditions of employment. Any alleged violation of this MOU by the Agency shall be subject to the grievance and arbitration    procedure set forth in the Parties' existing CBA. Time limits for filing a grievance under the Parties' existing CBA shall begin from the date the Union or the affected employee knew or reasonably should have known of the alleged violation.

  B.  Nothing in this MOU waives or limits any right of the Union or any BUE under applicable  law,  including rights under 5 U.S.C. Chapter 71, the Rehabilitation Act, or any other law governing federal employment.

  C.  This MOU may not be modified, waived, or superseded except by a written agreement signed by the authorized representatives of both Parties. No verbal agreement, informal understanding, or past practice shall constitute a modification of this MOU.

  D.  If any provision of this MOU is determined to be invalid or unenforceable under applicable law or regulation, that provision shall be severed, and the remaining provisions shall remain in full force and effect. Upon severance, the Parties agree to bargain in good faith over a lawful replacement provision.

**XII.  Effective Date and Duration**

  A.  This MOU becomes effective upon Agency Head Approval (AHA) and shall remain in effect through the resolution of all matters arising from the relocation of bargaining unit employees covered by this agreement, unless terminated earlier by mutual written agreement or extended by mutual written agreement of the Parties.

  B.  Upon approval of this MOU, the Parties will provide a joint training session on the provisions of this agreement which will be recorded for staff who are unavailable. The  training  will  be conducted at a mutually agreed date and time.

**XIII.  Access and Security**

  A.  The Parties agree Management retains the right and responsibility to determine the internal security practices of the Agency during this reorganization process. To this end, Management will continue to

provide appropriate and adequate access to the campus, security and safety infrastructure and resources to employees remaining at BARC until all USDA employees have vacated the campus. Management may require employees to move to alternative buildings on the BARC campus in accordance with appropriate laws, regulations, and the Parties' existing CBA in order to provide adequate safety and security.

XIV.    **Decommissioning**

A.  If assigned duties are substantially changed, Position Descriptions (PD) must be modified and properly classified to reflect the duties and tasks performed by Bargaining Unit Employees remaining at BARC.

B.  Employees affected by this relocation and are selected to remain at BARC for decommissioning are covered by all protections in the CBA and this MOU.

C.  Decommissioning employees will receive current, relevant, and timely training, access to required tools, equipment, technology, and safety resources necessary for their assigned duties.

D.  The Parties agree that it is essential for employees in a decommissioning status to properly perform the functions of their positions and the duties necessary for the safe and lawful shutting down of the BARC campus. The Parties will therefore bargain in good faith over the impact and implementation of any and all aspects of the decommissioning of BARC. If changes are made prior to the completion of pre-impact and implementation bargaining, the Parties will engage in post-impact and implementation bargaining in accordance with the Statute unless the Union does not submit a demand to bargain as per the Parties' existing CBA.

E.  The Union will be provided electronically with any and all policies and procedures as it relates to the decommissioning of BARC within 10 calendar days of issuance. The Union may request Position Descriptions consistent with the Parties' existing CBA.

F.  All impacted BUEs retain the right to request a desk audit consistent with Article 27, Section 3 of the CBA.

**For the Agency:**

BRYCE ONNEN
Digitally signed by BRYCE ONNEN
Date: 2026.07.02 16:11:01 -04'00'

**Bryce R. Onnen**

**Agency Chief Negotiator**

**LMER Specialist, APHIS**

**For the Union:**

ASHAKI MITCHELL
Digitally signed by ASHAKI MITCHELL
Date: 2026.07.02 16:21:38 -04'00'

**A. Teddi Mitchell**

**Union Chief Negotiator**

**Vice President, AFGE Local 3147**

**Date of Agreement: July 2, 2026**

# EXHIBIT 8



April 30, 2026

United States
Department of
Agriculture

Departmental
Administration

Office of Operations

1400 Independence
Avenue SW
Washington, DC
20250

Ricardo Raynor
President
American Federation of State, County, and Municipal Employees (AFSCME)
Council 20, Local 2846

**Re: Article 30 Bargaining Notice — Office of Operations Reorganization**

President Raynor -

This letter constitutes a formal bargaining notice under Article 30 of the Collective Bargaining Agreement between Department of Agriculture, Office of Operations and AFSCME, Council 20, Local 2846.  This notice is transmitted to you in your capacity as the designated receiving official.

1. **Description of Proposed Change.** As part of a reorganization of the Office of Operations (OO), Management proposes to consolidate the Offices of Property and Environmental Management (OPEM) and OO into the Office of Leasing, Operations, and Property Management (OLOPM).

   As part of the reorganization, current OPEM and OO functions will remain within the National Capital Region (NCR) and not be relocated outside of the Washington, DC area.  USDA management will relocate program and policy personnel who hold positions that do not directly support the Whitten/South Buildings Headquarters Complex or the Secretary of Agriculture to the George Washington Carver Center (GWCC), located in Beltsville, MD.

   The affected population includes approximately 124 bargaining unit positions across OO business units.

2. **Scope of Anticipated Negotiations.** USDA management acknowledges the proposed office moves and reorganization may constitute a change in conditions of employment which may result in Impact and Implementation (I&I) bargaining.  USDA management anticipates negotiations over:

   - Timeline and phasing of office moves.
   - Communication and notification process of bargaining unit employees.

3. **Background and Rationale.** OO is undertaking a reorganization to address longstanding challenges related to fragmented service delivery, inconsistent

business processes, and inefficiencies caused by distributed administrative structures. Therefore, OO seeks to ensure core support functions – leasing/operations/property management – are aligned to enterprise offices capable of providing consistent, accountable, and scalable service to Mission Areas and Agencies.  The reorganization will streamline business processes, reduce administrative burden, and improve accountability by centralizing decision-making authority within the unified office.

4. **Potential Impacts to Bargaining Unit Employees.** USDA management identified the following potential impacts to bargaining unit employees:

   - Changes to team structures.
   - Changes to office space for employees.
   - Changes to onsite parking access.

5. **Proposed Implementation Date.**  USDA management's target is to complete I&I negotiations and begin implementation Friday, May 22, 2026, with the office moves completed by Friday, June 26, 2026.

6. **Lead Negotiator and Contacts.** Management's lead negotiator for this matter is:

   Scott Davis
   Director
   Office of Operations
   Scott.Davis4@usda.gov
   (202) 720-4765

I look forward to productive engagement with AFSCME on this matter.

Sincerely,

W. Scott Davis        WILLIE        Digitally signed by
Director                DAVIS         WILLIE DAVIS
USDA                                  Date: 2026.04.29
                                      16:11:14 -04'00'
Office of Operations
Office of Property and Environmental Management

Cc:
D'Ann Clayton
Craig Vanderpool
Derrick Robinson, OO Local 2846 Vice-President

# EXHIBIT 10

PRE-DECISIONAL/DELIBERATIVE
USDA Staffing Plan



# United States Department of Agriculture

# FY 2026 Staffing Plan

## As of December 21, 2025

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428551

PRE-DECISIONAL/DELIBERATIVE
USDA Staffing Plan

# SECTION 1: STRATEGIC HIRING COMMITTEE

In accordance with Executive Order 14356, the United States Department of Agriculture (USDA) is committed to implementing strategic hiring practices that enhance accountability, reduce inefficiencies, and ensure that staffing decisions directly support mission-critical functions that directly align with the priorities of the Administration. Through our Strategic Hiring Committee, USDA will prioritize roles that advance national security, public safety, and agricultural resilience, while maintaining compliance with the Merit Hiring Plan

### Table A: Strategic Hiring Committee

| Name | Title | Political? (Yes/No) | Email |
|---|---|---|---|
| Stephen Vaden (Chair) | Deputy Secretary | Y | Stephen.Vaden@usda.gov |
| Kailee Buller | Chief of Staff | Y | Kailee.Buller@usda.gov |
| Jennifer Tiller | Chief of Staff to the Deputy Secretary | Y | Jennifer.Tiller@usda.gov |
| Brian Mizoguchi | Deputy General Counsel | Y | Brian.Mizoguchi@usda.gov |
| Devon Westhill | Assistant Secretary for Civil Rights | Y | Devon.Westhill@usda.gov |
| Scott Hutchins | Undersecretary, REE | Y | Scott.Hutchins@usda.gov |
| Mary Pletcher Rice | Acting Principal Deputy Assistant Secretary for Administration | N | Mary.PletcherRice@usda.gov |
| (Designated NRE Political) | Deputy Undersecretary, NRE | Y | (TBD) |
| Michael Watson | Administrator, APHIS | N | Michael.T.Watson@usda.gov |
| Christopher Nelson | Acting Director, OBPA | N | Christopher.Nelson@usda.gov |
| *Executive Secretariat* Deedra Fogle | Acting CHCO | N | Deedra.Fogle@usda.gov |

Page **2** of 30

CONFIDENTIAL – ATTORNEY'S EYES ONLY

PRE-DECISIONAL/DELIBERATIVE
USDA Staffing Plan

## SECTION 2: EXECUTIVE SUMMARY

USDA is a large agency comprised of eight mission areas and fourteen staff offices. With employees located throughout the United States and territories, and countries across the globe, USDA plays a vital role in safeguarding the nation's food supply, supporting rural economies, promoting sustainable agriculture, and ensuring nutrition and food security for all Americans. USDA's workforce mirrors the breadth of USDA's mission and is comprised of highly skilled occupations such as veterinarians and animal and plant researchers to lower-graded technician positions.

At the start of FY 2026, USDA had over 93,000 employees onboard, following the significant loss of over 15,000 employees to the Deferred Resignation Program and other workforce optimization initiatives. The workforce is comprised of 76.9% permanent employees, 6.4% non-permanent/temporary employees, 9.2% FSA County employees and 7.5% FSA State and County Committee members. USDA historically onboards a heavy seasonal workforce associated with activities performed primarily from the Spring to Fall, including wildland firefighters, commodity grading, forest trails and campground maintenance, timber harvesting and wildlife monitoring. The average number of temporary hires to meet the seasonal workload demands is approximately 11,000 employees. The seasonal workforce is a critical component of USDA's successful mission delivery and encompasses roles foundational to achieving Presidential priorities and statutory obligations for public safety and economic security. Significant offboarding of the temporary workforce begins in mid-July, varying across the US; therefore, September 30 onboard counts do not provide the full picture of USDA workforce requirements.

Throughout FY 2026, USDA will continue to focus large-scale hiring around positions that directly support our public safety and national security requirements-similar to hiring in FY 2025. Additional hiring will occur at a much smaller scale to support current and emerging Presidential priorities and statutory requirements, such as the $12 billion Farmer's Bridge Payment Program and the $700 million Regenerative Pilot Program aligned to the Make America Healthy Again (MAHA) priority. Other existing gaps in the workforce will be addressed through small-scare hiring to fill critical skills and through reorganization and consolidation to achieve the goals of workforce optimization. As we implement the reorganization, we may need to backfill positions currently occupied by employees who choose not to relocate. We anticipate gaining efficiencies through consolidation of some common and business functions, such as civil rights, Freedom of Information Act (FOIA), information technology, human resources, contracting, and leasing. USDA anticipates a significant level of hiring targeted toward current USDA employees to support efforts to effectively realign our workforce to the most critical needs. Vacancy announcements will clearly note the area of consideration as open to USDA employees.

Page **3** of 30

CONFIDENTIAL – ATTORNEY'S EYES ONLY

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**



Page **4** of **30**

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428554

PRE-DECISIONAL/DELIBERATIVE
USDA Staffing Plan

## Staffing and Services Contract Projections Summary

### Table B: Staffing Plan by Office

| Office | 9/30/25 | | | 9/30/26 | | | | % Change vs. 9/30/25 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Pro Forma FTE[1] | CTR[2] | CTR Spend[3] ($) | FTE | CTR | CTR Spend[4] ($) | FY26 Enacted Budget Headcount*** | FTE | CTR | CTR Spend |
| Departmental Administration | 381 | 662 | 108.7M | 381 | 662 | 108.7M | 381 | 0% | NC | NC |
| Staff Offices | 3,033 | 2,453 | 748.6M* | 3,061** | 2,451 | 748.6M* | 3,061 | 0.9% | 0% | 0% |
| OASCR | 101 | 14 | 4.7M | 101 | 14 | 4.8M | 101 | 0% | NC | NC |
| OBPA | 37 | 0 | 3.2M | 37 | 0 | 3.3M | 37 | 0% | NC | NC |
| OC | 30 | 0 | 4.7M | 30 | 0 | 4.7M | 30 | 0% | NC | NC |
| OCE | 50 | 0 | 6.5M | 50 | 0 | 6.5M | 50 | 0% | NC | NC |
| OCFO | 760 | 233 | 40M | 760 | 231 | 40.0M | 760 | 0% | NC | NC |
| OCIO | 1,268 | 2,005 | 660.6M | 1,268 | 2,005 | 660.6M | 1,268 | 0% | NC | NC |
| OGC | 218 | 89 | 15.2M | 246 | 89 | 15.2M | 246 | 13% | NC | NC |
| OHA | 53 | - | - | 53 | - | - | 53 | 0% | NC | NC |
| OIG | 373 | 110 | 9.2M | 373 | 110 | 9.2M | 373 | 0% | NC | NC |
| OPPE | 28 | - | - | 28 | - | - | 28 | 0% | NC | NC |
| OSEC | 115 | 2 | 3.1M | 115 | 2 | 3.2M | 115 | 0% | NC | NC |
| FNCS | 1,250 | 773 | 90.2M | 1,250 | 773 | 90.2M | 1,250 | 0% | NC | NC |

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428555

PRE-DECISIONAL/DELIBERATIVE
## USDA Staffing Plan

| Office | 9/30/25 | | | 9/30/26 | | | | % Change vs. 9/30/25 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Pro Forma FTE[1] | CTR[2] | CTR Spend[3] ($) | FTE | CTR | CTR Spend[4] ($) | FY26 Enacted Budget Headcount*** | FTE | CTR | CTR Spend |
| Food Safety | 7,621 | 123 | 15.9M | 7,971 | 89 | 13.1M | 7,971 | 4.6% | -27.6% | -17.7% |
| FPAC | 29,045 | 1,785 | 276.6M | 30,087 | 1,785 | 276.6M | 30,087 | 3.6% | NC | NC |
| FBC | 1,083 | 1,364 | 208.4M | 1,083 | 1,364 | 208.4M | 1,083 | 0% | NC | NC |
| FSA | 2,651 | 36 | 11.8M | 3,033 | 36 | 11.8M | 3,033 | 14% | NC | NC |
| FSA County | 15,518 | - | - | 16,163 | - | - | 16,163 | 4% | NC | NC |
| NRCS | 9,431 | 357 | 55.3M | 9,431 | 357 | 55.3M | 9,431 | 0% | NC | NC |
| RMA | 362 | 28 | 1.1M | 377 | 28 | 1.1M | 377 | 4% | NC | NC |
| MRP | 10,448 | 2,333 | 189.4M | 11,448 | 2,333 | 189.4M | 11,448 | 9.6% | NC | NC |
| AMS | 3,690 | 891 | 15.4M | 3,690 | 891 | 15.4M | 3,690 | 0% | NC | NC |
| APHIS | 6,758 | 1,442 | 174M | 7,758 | 1,442 | 1734M | 7,758 | 14.8% | NC | NC |
| NRE – Forest Service | 31,853 | 1,183 | 3,168.6M | 29,853 | 1,183 | 3,168.6M | 29,583 | -6% | NC | NC |
| RD | 3,180 | 1,067 | 203.3M | 3,500 | 1,262 | 231.2M | 3,500 | 10% | 18.3% | 13.7% |
| REE | 6,201 | 3,125 | 311.5M | 6,501 | 3,142 | 280.9M | 6,501 | 4.8% | 0% | -9.8% |
| ARS | 5,175 | 2,752 | 301M | 5,475 | 2,752 | 270M | 5,475 | 5.8% | NC | NC |
| ERS | 209 | 10 | 679K | 209 | 10 | 700K | 209 | 0% | NC | NC |
| NASS | 517 | 310 | 9.2M | 517 | 310 | 9.5M | 517 | 0% | NC | NC |
| NIFA | 300 | 53 | 656K | 300 | 70 | 11.5M | 300 | 0% | NC | NC |

Page **6** of **30**

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428556

## PRE-DECISIONAL/DELIBERATIVE
## USDA Staffing Plan

| Office | 9/30/25 | | | 9/30/26 | | | | % Change vs. 9/30/25 | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Pro Forma FTE[1] | CTR[2] | CTR Spend[3] ($) | FTE | CTR | CTR Spend[4] ($) | FY26 Enacted Budget Headcount*** | FTE | CTR | CTR Spend |
| TFAA-FAS | 561 | 70 | 11.5M | 561 | 70 | 8.9M | 561 | 0% | 0% | -22.9% |
| Agency Total | 93,573 | 13,574 | 5,124.3M | 94,613 | 13,739 | 5,116.1M | 94,613 | 1.1% | 1.2% | -0.2% |

*Includes $1.4M and $1.5M, respectively, of small contracts covering sub-units from multiple staff offices
**Includes funding through reimbursable agreements.
***Includes projection for NRE/Forest Service. Also includes reimbursable/fee-based employees.
[1] Number of employees after accounting for pending departures such as DRP participants who are still on payroll today. This is the number of filled positions today – budgeted, vacant positions would be excluded. Pro Forma FTE is PP19-2025 ending 10/4/25
[2] Reflects the number of contractors with building or computer system access.  USDA does not have a mechanism to track all active contractors on every USDA contract and is not required to do so by the Federal Acquisition Regulation.  Reflects the number of contracts, as partial versus full-time contractor employees are not tracked in any USDA systems.
[3] Total annual spend on service contracts at USDA, based on product service codes (PSCs).  USDA systems do not separately track contractor employee costs from other service contract costs, such as materials, travel, etc.
[4] USDA completed an extensive exercise in FY 2025 to right-size its contracting portfolio.  Therefore, few additional decreases are anticipated in FY 2026 as the remaining contracts have been deemed mission essential.

## Employee Hiring and Attrition Summary

In FY 2026, Quarter 1, USDA onboarded 432 new hires. The primary focus of these hiring actions has been on job series related to national security and public safety to ensure sufficient personnel are available to carry out those functions critical to the safety and security of the American people, our National Forests, the inspection and safety of the Nation's agriculture, and the food supply system. The annual hiring projections are captured immediately below.  USDA projects a nominal net gain to the workforce associated with increased capacity required to carry out Presidential priorities targeted at protecting Americans and our food supply and delivering support to rural communities.  Hiring in most agencies is expected to result in no net gains to the workforce by the end of FY 2026, focusing on maintaining capacity by hiring at the rate of expected attrition and realigning the workforce to address the most critical priorities.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

PRE-DECISIONAL/DELIBERATIVE
USDA Staffing Plan

Table C: Employee Plan

| Employee Plan | Number | % Change vs. 9/30/25 PF |
|---|---|---|
| 9/30/25 FTE | 108,082 | |
| (-) Pending departures (DRP or RIF) | 14,509 | |
| 9/30/25 Pro Forma (PF) FTE* | 93,573 | |
| (+) New Hires related to Presidential priorities and focus areas (as indicated by EOs)** | 9,590 | |
| (+) New Hires to fulfill statutory obligations | 1,491 | |
| (+) New Hires in technology/STEM areas | 84 | |
| (+) New Hires in other mission-critical areas | 3,312 | |
| (+) New Hires in non-Presidential/non-statutory/non-technology/STEM/non-mission critical areas | 1,241 | |
| (+) Hires to replace contractors | 5 | |
| *Subtotal: Planned FTE Additions* | 15,723 | |
| (-) Regular attrition (i.e., left the agency, retired) *** | (11,353) | |
| (-) Performance Management (involuntary attrition for reasons including performance, misconduct, and mini-DRPs and other negotiated departures) | (930) | |
| (-) Attrition from RIF | - | |
| (-) Attrition from DRP | - | |
| (-) Other reductions** | (2,400) | |
| *Subtotal: Planned FTE Reductions* | (14,683) | |
| 9/30/26 FTE | 94,613 | 1.1% |
| *Includes 6,941 FSA State and County committee members | | |
| **Includes an estimate of 2,000 positions related to implementation of USDA's reorganization. | | |
| ***Regular attrition = 5,935 permanent losses and 5,418 non-permanent losses which are typically rehired and attritted annually | | |

CONFIDENTIAL – ATTORNEY'S EYES ONLY

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

## Services Contracts Forecast

Working with the Department of Government Efficiency (DOGE), USDA reviewed all existing contracts and cancelled or reduced spending on a significant number. Those remaining were determined as essential to program and service delivery as an efficient and effective use of government resources.  USDA plans only a nominal reduction in current services contracts throughout FY 2026 but continues to explore options for further reduction through automation and/or process re-engineering.

### Table D: Contractor Plan (Number and Spend)

| Contractors (Services) Plan | Number[1] | % Change vs. 9/30/25 | Spend[2] | % Change vs. 9/30/25 |
|---|---|---|---|---|
| 9/30/25 full-time equivalent contractors | 13,574 | | $5,124.3M | |
| (+) New contractors | Not Available / Submission of this data is not contractually required | | | |
| (-) Contractors eliminated | Not Available / Submission of this data is not contractually required | | | |
| (-) Contractors where function moved in-house | Not Available / Submission of this data is not contractually required | | | |
| 9/30/26E CTR | 13,739 | +1.2% | $5,116.1M | -0.2% |

[1] Reflects the number of contractors with building or computer system access.  USDA does not have a mechanism to track all active contractors on every USDA contract and is not required to do so by the Federal Acquisition Regulation.  Reflects the number of contracts, as partial versus full-time contractor employees are not tracked in any USDA systems.
[2] Total annual spend on service contracts at USDA, based on product service codes (PSCs).  USDA systems do not separately track contractor employee costs from other service contract costs, such as materials, travel, etc.

### Table E: Contractor Spend Detail

| Contract (Services) Plan | PSC | FY 25 Spend | FY 26 Forecast |
|---|---|---|---|
| Support (Professional/Management/Administrative) | R | $588.7M | $612.0M |
| IT and Telecommunication Services | D | $1,086.0M | $1,077.5M |
| Social | G | $1.1M | $1.1M |

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428559

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

| Contract (Services) Plan | PSC | FY 25 Spend | FY 26 Forecast |
|---|---|---|---|
| Special Studies/Analysis Not R&D | B | $38.2M | $37.9M |
| Natural Resources Management | F | $2,114.6M | $2,100.1M |
| Technical Representative | L | $0.3M | $0.3M |
| Education/Training | U | $19.9M | $18.9M |
| All Other Services Contracts | | $1,275.5M | $1,268.1M |
| **Total Services Contracts** | | **$5,124.3M** | **$5,116.0M** |

## NATIONAL SECURITY AND PUBLIC SAFETY HIRING

USDA has thousands of positions supporting national security and public safety. These responsibilities are predominantly carried out by the Department's front-line workforce to include over 11,000 firefighters and incident support personnel. In addition, there are thousands of food and consumer safety inspectors, employees performing response operations to combat Highly Pathogenic Avian Influenza (HPAI), New World Screwworm, and other pest and disease research and eradication efforts that protect Americans and our food supply on a daily basis. USDA's national security and public safety positions were articulated in the Secretary's Memorandum 1078-008, dated April 22, 2025. The memorandum is included as an attachment (Attachment 1). USDA will continue hiring in FY 2026 at the same or slightly elevated levels to those seen in FY 2025 with the exception of APHIS where hiring is expected to increase at a greater level. During        FY 2026, the Forest Service will complete transition to the new Wildland Fire Management occupational series, which will result in a shift from hiring almost exclusively in the GS-0462 series to hiring positions in the GS-0456 series. Although not specifically highlighted in the Secretary Memorandum, USDA also considers positions supporting the National Bio and Agro-defense Facility (NBAF) critical to national security and public safety.

**Table F: National Security, Immigration Enforcement, and Public Safety Positions**

| Office | Position | Occupational Series |
|---|---|---|
| APHIS, ARS, FS, FSIS | Safety and Occupational Health Specialist | 0018 |
| APHIS | Environmental Protection Specialist | 0028 |
| APHIS, ARS, DA | Security Specialist | 0080 |
| APHIS, DA, FS | Emergency Management (All Titles) | 0089 |

Page **10** of **30**

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428560

## PRE-DECISIONAL/DELIBERATIVE
## USDA Staffing Plan

| Office | Position | Occupational Series |
|---|---|---|
| DA | Intelligence Analyst | 0132 |
| APHIS | Geographic Information Specialist | 0150 |
| APHIS | Document/Permit Examiner, Import and Export | 0301 |
| FS | Fire Chemicals Program Manager | 0301 |
| FS | Fire Training Specialist | 0301 |
| FS | All Firefighter Retirement Covered Positions | 0301 |
| FS | Incident Business Management Specialist | 0301 |
| APHIS | Natural Resources Mgmt & Biological Sciences (Public Safety/Inspection Function Positions) | 0401 |
| FS | All Firefighter Retirement Covered Positions | 0401 |
| APHIS | Biological Science Technician (Public Safety/Inspection Positions) | 0404 |
| APHIS | Zoologist | 0410 |
| APHIS | Entomologist | 0414 |
| APHIS | Plant Protection & Health (All Titles) | 0421 |
| APHIS | Botanist | 0430 |
| APHIS | Plant Pathologist | 0434 |
| FS | Wildland Firefighter | 0456 |
| FS | Wildland Firefighter, Forestry Technician {All Firefighter Retirement Covered Positions) | 0462 |
| APHIS | Wildlife Biologist | 0486 |
| APHIS, FSIS | Industrial Hygiene and Safety | 0690 |
| APHIS, FSIS | Veterinarian (All Titles) | 0701 |
| APHIS | Animal Health Technician (All Titles) | 0704 |
| FS | Electronics Technicians | 0856 |
| APHIS, FS, FSIS | Contract Specialists (Food and Emergency Response) | 1102 |
| AMS | Agriculture Commodity Series | 1147 |
| ARS, APHIS, FS | Physical Scientist | 1301 |
| APHIS, FS | Equipment Specialist, Aircraft and Fire | 1670 |
| APHIS | Training Specialist (Agriculture Inspections and Canine Trainers) | 1712 |
| AMS, APHIS, FSIS, DA | Inspection, Investigation, Enforcement and Compliance (All Titles) | 1801 |
| APHIS, FSIS | Investigator/Inspector | 1810 |

Page **11** of **30**

USA-AFGE-Exp.-0428561

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

| Office | Position | Occupational Series |
|---|---|---|
| FS, OIG | Criminal Investigator, Supervisory Criminal Investigator | 1811 |
| APHIS, FS | Aviation Safety Inspector -Airworthiness and Avionics | 1825 |
| AMS | Warehouse Examiners | 1850 |
| FSIS | Consumer Safety Inspector | 1862 |
| FSIS | Food Safety Inspector | 1863 |
| AMS, ARS, APHIS, FS | Supply Management Specialist | 2003 |
| APHIS, FS | Aviation Officer (All Titles) | 2101 |
| FS | Dispatcher | 2151 |
| APHIS, FS | Aircraft Operations (All Titles) | 2181 |
| APHIS, OCIO, FSIS | IT Specialist (Cybersecurity) | 2210 |
| AMS, ARS, APHIS, FS | Laborer | 3502 |
| APHIS | Laboratory Worker | 3511 |
| APHIS | Tree Climber | 5001 |
| FS | Animal Packer | 5001 |
| APHIS | Insects Production Worker | 5031 |
| APHIS | Animal Caretaker | 5048 |
| FS | Fire Engineering Equipment Operator | 5716 |
| FS | Packer | 7002 |
| APHIS, FS | Aircraft Mechanic | 8852 |
| APHIS, ARS, FS, FSIS | Safety and Occupational Health Specialist | 0018 |
| APHIS | Environmental Protection Specialist | 0028 |
| APHIS, ARS, DA | Security Specialist | 0080 |

Page **12** of **30**

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428562

PRE-DECISIONAL/DELIBERATIVE
USDA Staffing Plan

## SECTION 3: WORKFORCE PLANNING FACTORS

## HIRING PROJECTIONS AND ALIGNMENT

USDA agencies exist and support the American public in alignment with a host of statutory enactments and Presidential priorities. In addition to ongoing hiring of positions that deliver on national security and public safety commitments, USDA plans some level of external hiring for the agencies identified below. The majority of hiring across USDA is expected to result in no net gain, and is targeted to offset expected attrition and necessary to maintain and bolster existing capacity and capability.  USDA expects significant internal hiring to effectively realign and reallocate the existing workforce to the most critical priorities, however, the exact roles and volume will be determined as USDA finalizes its reorganization plans. Where hiring is targeted toward the current internal workforce, USDA will strive to ensure vacancy announcement language is clear regarding the area of consideration. As additional priorities and requirements emerge, USDA will update our hiring plan.

USDA uses a robust suite of human capital analytics tools and dashboards to assess workforce demographics, retirement eligibility, turnover rates, and vacancy trends. These tools enable predictive modeling of future staffing gaps based on attrition, retirements, and evolving skill requirements.  Each Mission Area incorporates environmental factors — such as program demand, geographic service needs, and statutory changes — into its staffing plans.  In coordination with the Secretary's Office, USDA Staff Offices and the eight Mission Areas reviewed historical staffing data and funding allocations to develop and approve FY 2026 organizational structures and staffing plans.

### USDA Departmental Administration and Staff Offices

Hiring in these areas will result in nominal to no net gains. In fact, through workforce optimization initiatives, these organizations may end FY 2026 with reduced employee counts where attrition outpaces gains. USDA must advance several executive leadership positions lost to separations, as well as restaff critical attorney positions in the **Office of General Counsel** to support increased policy making, strategy development and litigation requirements.  Some positions will be hired to bolster significant gaps in the contracting and leasing workforce; however, most will be addressed through internal USDA movement.  Nominal hiring for IT specialists and IT-focused program and project management will occur in the **Office of the Chief Information Officer** (OCIO) to advance the President's Management Agency and the Executive Order (EO): Accelerating Federal Use of AI through Innovation, Governance, and Public Trust.  Nominal hiring will also occur within the **National Finance Center** (NFC) to ensure ongoing payroll, personnel, benefits and insurance processing for 150+ federal agencies, including DOJ and DHS, serving over 600,000 employees.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428563

PRE-DECISIONAL/DELIBERATIVE
USDA Staffing Plan

## Food, Nutrition and Consumer Services (FNCS) – Food and Nutrition Service (FNS)

**FNS** does not anticipate hiring in FY2026 unless mission critical vacancies occur.

## Food Safety – Food Safety Inspection Service (FSIS)

The **FSIS** mission aligns with the Presidential priorities for public health and food safety, and the following statutes: Federal Meat Inspection Act, Poultry Products Inspection Act, and the Egg Products Inspection Act, which mandate inspection and regulation to ensure meat, poultry, and egg products are safe, wholesome, and accurately labeled. The Humane Methods of Slaughter Act requires humane handling and slaughter of livestock. These laws give FSIS authority for plant sanitation, record-keeping, and enforcement against adulterated/misbranded products, preventing unsafe food from reaching consumers. FSIS must inspect every carcass and facility shift in over 7,000 establishments, with increasing demand. FSIS will continue large-scale hiring to maintain essential staffing levels for food inspection. Staffing ensures compliance, consumer safety, and uninterrupted food supply chains.

FSIS staffing is directly tied to industry activity. When facilities open or expand, FSIS must respond with appropriate inspection personnel. Conversely, staffing is reduced when facilities close or modernize. Inspectors and in-plant public health veterinarians are essential to maintaining inspection coverage across over 7,000 federally regulated establishments. FSIS uses multiple factors to determine staffing needs, including type of establishment, species and volume of animals, slaughter line speed and number, geographic location, and export certification requirements. A slaughter establishment may require 1–15 inspectors per line, per shift, while processing-only establishments may be covered by one inspector. A veterinarian must be assigned to every slaughter plant.

FSIS has been able to reduce its need for food inspectors for slaughter establishments that are able to opt into modernized inspection systems developed by the agency, including the New Poultry Inspection System, New Swine Slaughter Inspection System and Beef Modernization. Modernized systems require less food inspectors to provide coverage on a slaughter line. An establishment determines whether it can opt into a modernized system based on its facility's configuration, business need and capital available for upgrades. Not all slaughter establishments are able to modernize, especially small and very small establishments, which make up 90 percent of the establishments FSIS inspects.

## Farm Production and Conservation (FPAC) – FPAC Business Center (FBC), Farm Service Agency (FSA)/FSA County (FSACO), Natural Resource Conservation Service (NRCS), Risk Management Agency (RMA)

**FPAC** provides farmers, ranchers, and landowners with risk management, conservation, and farm safety net programs, including crop insurance, conservation, lending, and disaster assistance, working to support all producers.  The Business Center (FBC) established in President Trump's first term enhances the efficiency and effectiveness of FPAC programs and services by providing

Page **14** of **30**

USA-AFGE-Exp.-0428564

# PRE-DECISIONAL/DELIBERATIVE
## USDA Staffing Plan

centralized administrative and financial management support. Hiring for the **FBC** will be nominal, primarily internal to USDA and focused on filling service delivery gaps.

**FSA** is anticipated to grow by 1,027 employees overall with FSA federal employees growing by 382 and **FSA County** employees growing by 645. FSA is critical to implementation of farmer support and disaster relief.  Managing $20 billion in loans and $15 billion in disaster relief annually, skilled personnel, including field agents and loan officers, are crucial. An additional 3,000 temporary employees are needed for the $12 billion Farmer's Bridge Payment Program, starting in February 2026. The One Big Beautiful Bill Act (OBBBA) will increase reference prices for major commodities by 10-21% effective October 1, 2026.  FSACO operates in alignment with the Farm Bill (H.R.2 - Agriculture Improvement Act of 2018), annual appropriations (H.R.5371 - Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026) and various ad hoc disaster legislation (American Relief Act and the OBBBA - H.R.1 - An act to provide for reconciliation pursuant to title II of H. Con. Res. 14.)

FSA staffing levels must grow to address the increased workload forecast, especially the projected increases in direct and guarantee loans disbursements, supplemental disaster and economic assistance programs and a new Farm Bill.  FSA subject matter experts provided average processing/cycle times to implement new legislation based on current ceiling levels as well as what areas and organizations may need the most assistance based on what is being projected in terms of the types of programs that are expected to continue and any new programs that may be needed to support farmers, ranchers and producers.

**NRCS** initially anticipates nominal hiring, but newly released initiatives will likely require a reassessment.  NRCS supports farmers and landowners via field offices. With $15 billion in conservation funding annually, NRCS focuses on conservation planning and technical assistance. The NRCS Regenerative Pilot Program, launched in December 2025 with a $700 million investment, supports regenerative agriculture and aligns with the MAHA initiative.

**RMA** anticipates hiring to support the OBBBA Program Integrity provisions and other nominal hiring to cover mission critical positions. RMA was established under 7 U.S.C., overseeing the Federal Crop Insurance Corporation.

RMA hiring is focused on compliance.  On average, an investigator spends approximately 500 hours performing statutorily required improper payment rate reviews, 800 hours of regulatory program integrity reviews, and 200 hours in support of mission critical investigations prompted by official hotline inquiries and other leadership directed lines of inquiry. The aggregate case load for national execution of all mission essential compliance operational functions represents a staff load of 68 compliance investigators at the journeyman level.  RMA currently has 56 journeyman level compliance investigators (82%) on board and will begin to accrue a backlog if no additional personnel are added back to the current workforce.  For Insurance Services (Regional Office work), one FTE completes 1,860 hours of work (10 paid holidays and 2 weeks' vacation average are subtracted from the yearly total).

Page **15** of **30**

USA-AFGE-Exp.-0428565

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

Insurance Services Regional offices have multiple functions required by statute (The Crop Insurance Act). The staff of each office have more responsibilities than those required by the Act but, for this purpose, only most statutory functions are captured:

- Underwriting—Crop insurance policy exception requests (Written Agreements, Determined Yields, etc.) For this function we estimate need for at least 38.5 FTEs
- WA 2025 (including MY's)—5,600 requests=50,000 hours = 27 FTE
- DY 1,500 -1,700 requests=7,500 hours=4 FTE
- Underwriting Reviews—45 policy reviews—10,000 hours=5.5 FTE
- Hybrid Seed reviews—4,000 hours; 2 FTE
- Good Farming Practices 508(a)(3)(B)—20 requests average= 4,000 hours = 2 FTE
- Crop Program Maintenance (Program Performance Review) 508(a),(i)–RMA reviews each crop program at least once every 6 years; in 2025, 27 crops reviewed; includes data analysis and producer engagement for recommendations for improvement and expansion; implementation of nearly 100 recommended improvements and 10 expansions into 11 states and 44 counties—all backed by data analysis =42,000 hours = 23 FTE
- Actuarial Mapping (T-Yield, rates, etc.)( 508(d)(1); 508(i)(2)—nearly all 2,000 actuarial rate maps are reviewed for accuracy, updated and refiled once every six years. In 2025, 300 maps were reviewed and updated. 291x45hrs/each=11,640hrs = 6.5 FTE
- Stakeholder engagement/outreach (including Beginning Farmer Rancher and Veteran Farmer Rancher) 524(a)(3); 33,000 hours = 18 FTE

### Marketing and Regulatory Programs (MRP) – Agricultural Management Service (AMS), Animal and Plant Health Inspection Service (APHIS)

**AMS** hiring will focus on ongoing commodity and market related mission delivery.  AMS identified the need to recruit 4 to 5 data analysts based on growing business demands across multiple program areas. For example, the Agency's use of AI technology in evaluating live cattle generates numerous data points that require advanced analytical support. AMS also administers several grant programs that collect substantial performance data, much of which is currently received in raw form. Enhanced analytical capacity will allow AMS to transform this information into actionable insights, tailor programs for greater effectiveness, and assess the outcomes of its investments. Additionally, AMS grades 100% of U.S. cotton, which also generates multiple data points. The ability to convert raw data points into meaningful, user-friendly visualizations is essential. Together, these needs substantiate the requirement for expanded data analytics staffing. AMS also identified the need for auditors and marketing specialists for the Federal Milk Marketing Order administration (MA Pay Plan). These positions are funded entirely by the dairy industry.

Page **16** of **30**

USA-AFGE-Exp.-0428566

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

The **APHIS** mission is codified in 7 USC 116. APHIS expects to end FY 2026 with approximately 1,000 additional employees. This is due to five critical priorities: 1) Combating Highly Pathogenic Avian Influenza (HPAI); 2) Combating New World Screwworm; 3) Supporting airport safety; 4) Supporting agriculture quarantine inspections; and 5) Standing up the National Bio and Agro-Defense Facility (NBAF) in Manhattan, Kansas. The commissioning of NBAF is a high USDA priority as this state-of-the-art facility is a national asset that will help protect the nation's agriculture, farmers and citizens against the threat and potential impact of serious animal diseases. NBAF is the first facility in the United States with biosafety level (BSL)-4, or BSL-4, containment capable of housing large livestock. NBAF's BSL-4 containment laboratories require the highest level of safety protocols and equipment so scientists can safely study and diagnose a variety of high-consequence animal pathogens. ARS and APHIS will transfer their research and diagnostic missions from the Plum Island Animal Disease Center (PDAIC) to NBAF and will operate the facility jointly.

The comprehensive evaluation of skills and positions needed for the work in areas of emergency response to combat Highly Pathogenic Avian Influenza, New World Screwworm, and other plant and animal diseases is not easily quantifiable; however, given hours of historical workload and seasonal variations of work the numbers provided represent the agency's need in response to the public demand and statutory obligations for services, which has remained consistent or increased in specific response situations. In addition, APHIS is provided funding via cooperative service agreements and agricultural quarantine inspections which are demand-based services.

## Natural Resources and Environment (NRE) – Forest Service

The **Forest Service** expects to reduce the number of onboard employees by the end of FY 2026. Hiring will be focused on implementing the Executive Orders "Empowering Commonsense Wildfire Prevention and Response," "Immediate Measures to Increase American Mineral Production," and "Immediate Expansion of American Timber Production." To support implementation, Forest Service will hire approximately 2,000 seasonal temporary employees focused on non-fire Timber and Recreation requirements.

In addition, Forest Service to meet its public safety mission with ongoing hiring in Wildland Fire Fighting, Law Enforcement and Investigations, Avalanche Safety, Land Mobile Radio (Electronics Technician) and the associated support functions. Historically, the Forest Service requires approximately 11,300 primary Wildland Firefighters (WLFFs) each year to meet national readiness levels by June and July. This workforce is composed of both permanent and temporary employees at GS/GW grades 09 and below, and WG-10 and below. New accessions account for 4,500-5,000 positions annually depending on forecasted needs.

Forest Service staffing levels for areas identified to hire throughout FY 2026 are based on regular and recurring annual workload reports and reviews, and quarterly gap analysis that identify non-Fire Support positions required to support the Administration's

Page **17** of **30**

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428567

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

priorities. Hiring to fill identified gaps in Timber and Recreation were identified due to attrition over the past few years, impacting the need to provide presence within the forests for trail maintenance, education, research, timber sales, including sale preparation, surveying, and more. Once full year budgetary resources are known, the Forest Service may hire 1,000 temporary 0462, Forestry Technicians in Recreation during the 2nd quarter of FY 2026 to meet national demands; and another 1,000 temporary Timber positions in the 3rd or 4th quarter supporting emergency Timber production.

**Rural Development (RD)**

**RD**'s mission is foundational to the federal government's commitment to improving the economy and quality of life in rural America and directly aligns with the President's "America First" priorities. Through the delivery of essential programs spanning housing, community facilities, utilities, and business development, RD drives rural prosperity by investing in critical infrastructure, fostering economic growth, and promoting a high quality of life for the nearly one in five Americans who reside in rural areas. RD has wide-ranging statutory and delegated authorities required to carry out under the Consolidated Farm and Rural Development Act and the Department of Agriculture Reorganization Act of 1994, and support Executive Orders on Unleashing American Energy and Bringing Down Costs for Consumers. Services include loans, loan guarantees, and grants, administered largely by field staff working across the US. As part of the commitment to support the objective to "Leverage Technology to Deliver Faster, More Secure Services", RD is focused on finding the right balance of utilizing significant investments in technology services to consolidate and standardize systems while giving RD customers the service they deserve. RD anticipates a small increase to the overall workforce by the end of FY 2026 to address key Presidential priorities.

**Research, Education and Economics (REE) – Agricultural Research Service (ARS), Economic Research Service (ERS), National Agricultural Statistics Service (NASS), and National Institutes of Food and Agriculture (NIFA)**

**ARS** must fill key operational staff, facilities staff, scientific staff, scientific technicians, and in some cases Veterinarians and animal caretaker positions. The number and combination of employees at these locations varies based on the size and type of research being conducted. ARS research is authorized by the Department of Agriculture Organic Act of 1862 (7 U.S.C. 2201 note); Act of June 29, 1935 (7 U.S.C. 427); Agricultural Marketing Act of 1946, as amended (7 U.S.C. 1621 note); Food and Agriculture Act of 1977 (P.L. 95-113), as amended (7 U.S.C. 1281 note); Food Security Act of 1985 (P.L. 99-198) (7 U.S.C. 1281 note); Food, Agriculture, Conservation, and Trade Act of 1990 (P.L. 101-624) (7 U.S.C. 1421 note); Federal Agriculture Improvement and Reform Act of 1996 (FAIR) (P.L. 104-127); and Agricultural Research, Extension, and Education Reform Act of 1998 (P.L. 105-185). ARS derived most of its objectives from statutory language, specifically the "Purposes of Agricultural Research, Extension, and Education" set forth in Section 801 of FAIR. To support that obligation, ARS manages 90+ research locations across the country which conduct mission critical research in areas such as biological threats to U.S. agriculture via animal and plant pests and disease, genetics and product optimization, and technological advancements.

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428568

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

A significant staffing increase is required to stand up NBAF. NBAF is key as a replacement facility for the work being done at the Plum Island Animal Disease Center (PIADC). ARS and APHIS will transfer their research and diagnostic missions from the PDAIC to NBAF and will operate the facility jointly.

ARS' research locations vary greatly in size, scope, and complexity. staffing needs are based on the programs they support, which define how the agency provides agricultural solutions to American farmers. Staffing needs were determined for the following program areas: 1) Nutrition, Food Safety/Quality: Human Nutrition, Food Safety (animal and plant products), Product Quality and New Uses; 2) Animal Production and Protection: Food Animal Production, Animal Health, Veterinary, Medical, and Urban Entomology, Aquaculture; 3) Crop Production and Protection: Plant Genetic, Plant Diseases, Crop Protection and Quarantine, and Crop Production; 4) Natural Resources and Sustainable Agricultural Systems: Water Availability and Watershed Management, Soil and Air, Gras, Forage, and Rangeland Agroecosystems, and Sustainable Agricultural Systems Research.

There is great variation in location staffing based on the type of work and nature of the facilities needed to support the research programs. Generally, a research Management Unit is comprised of a Supervisory Research Leader, one scientific support technician for each researcher, and 3 operational support staff that oversee budget, local purchase card purchasing, property, and extramural and interagency agreements. Locations that are comprised of a single, smaller research Management Unit may share research operations support staff and therefore have lower operational support staffing levels. As locations increase in size and complexity, they require additional operational support. This may include additional staff to support the functions. Locations in ARS-owned facilities require facilities management staff involved with maintaining and managing those facilities. This includes any plant or farm operations, and plant and animal care and management. The larger ARS centers are led by a Center Director who oversees four or more research Management Units. Many operational support functions are consolidated into the Center Director's office for the purpose of efficiency. The largest centers may also have dedicated facilities units and animal care units. Typical positions encompass occupations covering many specialties.

**ERS** expects nominal hiring. It operates in alignment with 7 CFR 3700.1 and was originally established in 1961 under the authority of the Agricultural Marketing Act of 1946 (7 U.S.C. 1621-1627), was reestablished as an agency of the U.S. Department of Agriculture of September 30, 1981 (46 FR 47747), in response to Secretary's Memorandum 1000-1 of June 17, 1981, entitled "Reorganization of Department." The mission of ERS is to provide economic and other social science information and analysis for public and private decisions on agriculture, food, natural resources, and rural America. Its primary customers are USDA policy officials and program administrators, the Office of the White House, Congress, and environmental, consumer, and rural public interest groups, including farm groups and industry. ERS Administrator is delegated authorities at 7 CFR § 2.67 pursuant to 7 CFR 2.21.

Page **19** of **30**

USA-AFGE-Exp.-0428569

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

**NASS** hires are essential to maintain baseline operational capacity and ensure continued delivery of high-quality agricultural statistics in support of U.S. agriculture and federal policy priorities in public safety, economic resilience, and environmental monitoring. NASS fulfills statutory obligations under the Agricultural Marketing Act of 1946 and the Census of Agriculture Act of 1997, which mandate the collection and dissemination of agricultural data to inform public and private decision-making. NASS supports a mission-critical function of the U.S. Department of Agriculture: to provide timely, accurate, and useful statistics in service to U.S. agriculture. Identified hiring is focused on strengthening NASS's data products, including over 450 annual statistical releases covering more than 120 crops, 45 livestock items, and 12 major economic and environmental categories. These are foundational to national food security, economic planning, and environmental stewardship. These outputs also include the Census of Agriculture and numerous reimbursable surveys that support other federal and state agencies.

NASS staffing needs were determined by conducting a workload-based analysis aligned with the guidance in Executive Order 14356. This analysis considered: the volume and complexity of data products produced annually (over 450 statistical releases and the Census of Agriculture); the number of surveys conducted (over 400 annually); the time and expertise required for data collection, analysis, and publication; and the need to maintain data quality, timeliness, and coverage across all agricultural sectors. The result of this analysis showed that, current staffing is insufficient to sustain the existing data production schedule. The projected hires are essential to restore baseline operational capacity and ensure continued delivery of high-quality agricultural statistics in support of U.S. agriculture and federal policy priorities.

**NIFA** anticipates nominal hiring. NIFA is codified in section 7511(f)(2) of the Food, Conservation, and Energy Act of 2008 (FCEA) amended the Department of Agriculture Reorganization Act of 1994 (7 U.S.C. 6971) by establishing the National Institute of Food and Agriculture (NIFA). In compliance with the act, on October 1, 2009, all authorities administered by the Administrator of the Cooperative State Research, Education, and Extension Service were transferred to the NIFA Director. The Act specifies Capacity and infrastructure programs, certain Competitive programs, and other programs related to scientific research that NIFA must administer. Through three main federal-funding mechanisms, NIFA supports programs that address key national challenges. NIFA has a statutory obligation to invest in and advance agricultural research, education, and extension to solve agricultural challenges.

**Trade and Foreign Agricultural Affairs (TFAA) – Foreign Agricultural Service (FAS)**

**FAS** hiring is aligned with the USDA Secretary's five-point trade plan and three-point plan to support American agricultural producers and exporters. Focus areas of the five-point trade plan include: 1) expanding market access; 2) supporting American farmers; 3) promoting international trade; 4) restoring rural prosperity; and 5) providing financial relief. Initiatives included in the three-point plan to support American producers and exporters include: 1) launching the America First Trade Promotion Program; 2) deploying Trade Reciprocity for US Manufacturers and Producers (T.R.U.M.P); and 3) revitalizing export finance opportunities.

Page **20** of **30**

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428570

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

USDA anticipates net neutral hiring within FAS in FY 2026, with intention to grow by 50% in several job series (e.g., International Trade Specialist) into FY 2027 associated with mission transfer originally aligned with USAID.



Page **21** of **30**

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428571

PRE-DECISIONAL/DELIBERATIVE
USDA Staffing Plan

## SECTION 4: WORKFORCE OPTIMIZATION PLANS

## REORGANIZATION, EFFICIENCY AND MODERNIZATION

USDA conducted a thorough review of programs, contracts and agreements to modify or eliminate those not aligned with statutory mandates and Presidential priorities. The review was guided by issued Executive Orders as well as FY 2026 and FY 2027 budget priorities and forecasts, and informed decisions about organizational restructuring, resource allocation, and staffing prioritization. Between January and November 2025, USDA reduced its workforce by 17% through regular attrition and major workforce shaping initiatives, such as DRP.  The strategic reduction of the workforce and contracts aligns with USDA's larger goals to streamline operations, capitalize on efficiencies and ensure existing staff are realigned to support the most critical mission priorities and Presidential goals. The attached Secretary Memorandum 1078-015, titled, "Department of Agriculture Reorganization Plan" (Attachment 2), was signed by Secretary Brooke Rollins on July 24, 2025, and provides the overarching intentions of USDA to effect workforce optimization goals through reorganization. The reorganization plan is founded on the following four principles: 1) Ensure the Size of USDA's Workforce Aligns with Financial Resources and Priorities; 2) Bring USDA Closer to Its Customers by Relocating Resources Outside of the National Capital Region; 3) Eliminating Management Layers and Bureaucracy; and 4) Consolidate Support Functions.

USDA's extensive contracting review highlighted a surprising degree of reliance on non-Federal employees to get work done. Following the contract reviews, many contracts for "services" were cancelled, ensuring those that remain fulfill a critical need for USDA. For example, some work is better performed by a contractor where the work is seasonal and consists of high-volume, repetitive activities; a determination was made a contract is more cost-effective than hiring to the level needed to support the seasonal work. USDA continues to look for opportunities to reduce our reliance on an extensive contracting workforce and increase the capability and productivity of employees through other mechanisms.

USDA also identified substantial potential to continue work to identify opportunities and capitalize on modern technology to improve employee effectiveness and efficiency and reduce the overall resource needs required of USDA to deliver on expectations across a highly diverse and complex mission. Key focus areas are improving integration for currently disparate systems, migrating to cloud-based infrastructure, deploying collaboration tools, leveraging data analytics, and streamlining IT service management—all to provide opportunity to reduce the burden on the workforce for more effective distribution of resources and improve service delivery to the American public.  The Office of the Chief Information Officer is charged with developing a strategic vision and leading implementation for IT modernization across USDA.

Page **22** of **30**

USA-AFGE-Exp.-0428572

PRE-DECISIONAL/DELIBERATIVE
USDA Staffing Plan

## PERFORMANCE MANAGEMENT

USDA currently operates on a two-level performance management system for its General Schedule and Wage Grade employees (non-executive employees).  USDA was previously under a five-level system. The decision to move to a two-level system was made during President Trump's first term and was in direct response to inflated performance ratings. As a result, USDA employees already have adjusted to a "fully successful" as an acceptable rating.  USDA employees do not receive performance awards and any awards are tied to individual achievements.

USDA is currently developing a plan to move to a three-level performance management system and will implement the system concurrently with USDA's implementation of USAPerformance. USDA is already engaged with OPM on its implementation plan.  The three-level performance management system will be in effect for FY 2027.  In alignment with Executive Order 14284 on transforming federal performance management and accountability, USDA is implementing a structured, multi-faceted strategy to improve the management of low-performing employees. This approach emphasizes accountability, fairness, and support, and includes the following key components:

- Agencies are enhancing supervisor authority and providing targeted training on disciplinary and adverse actions.
- Supervisors will receive annual refreshers and new training modules, including OPM's "Performance Management for Supervisors," to help them identify issues early, deliver feedback, and take timely action.
- Agencies have transitioned to utilizing the 30-day demonstration opportunities to assess improvement, with removal or demotion as a consequence if performance does not improve.

## SECTION 5: HIRING AND RECRUITMENT PLANNING

**EARLY CAREER HIRING**

USDA is committed to leveraging early-career programs to build a robust and capable workforce across its various agencies. Below are key highlights of these efforts:
- Set goals to meet early career hires and utilization of available programs
- The Malak Scholars program targets veterinarian students before graduation, ensuring a commitment to serve FSIS post-graduation

Page **23** of 30

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428573

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

- Development of a recruitment "toolbox" to assist hiring managers.
- Use of Pathways programs, 1890 Scholars, and university partnerships to recruit early-career hires. Leverage of various internships and recent graduate programs to attract candidates with STEM skills. These positions would include County Executive Directors in Training (CEDT) and Farm Loan Officer Trainees (FLOTS), commodity graders, agricultural statisticians and mathematical statisticians,
- Partner with Land Grant Universities, associations, and tribal communities with the goal of expanding talent in agriculture. Our student programs will focus on STEM roles, such as Veterinarians, Scientists, and Engineers, with plans to introduce high school and higher education students to USDA careers
- Limited Forest Service funding in FY 2026 may decrease, if not halt, the use of Pathways and other Intern hiring avenues; however, Forest Service will fill temporary technician roles in timber, recreation, wildland fire, and related program areas, at the GS-03, 04, and 05 grades.  Technicians come with a variety of education, training, and experiences, but practical forest level experience and ongoing evaluation are critical.

## HIRING ASSESSMENTS

USDA is implementing a comprehensive assessment strategy to ensure merit-based hiring for new employees at the GS-5 level and above. This strategy emphasizes the use of technical and alternative assessments to improve hiring quality, speed, and alignment with mission-critical competencies.

### Enterprise-Wide Use of USA Hire

- USDA acquired USA Hire at the enterprise level to deploy standardized technical assessments across mission areas
- USA Hire will be used for high-volume positions, with plans to expand its use where appropriate and available for other positions

### Technical and Behavioral Assessments

- FSIS utilizes OPM occupational assessments and the Federal Supervisory Assessment (FSA) for leadership roles. It also developed a Consumer Safety Inspector behavioral assessment tailored to the demands of inspection work.
- ARS employs a multi-stage assessment process including structured resume reviews, HR and technical interviews, and behavioral panels to evaluate job-specific skills and mission alignment.
- MRP is establishing a technical SME assessment process (structured interviews, resume reviews, accomplishment validations) to fill gaps in mid-level and supervisory hiring.

### Specialized and Custom Assessments

- NIFA has developed Competency Models for all occupational series and grade levels, aligned with OPM's MOSAIC competencies. These models are particularly effective for early-career hires, guiding onboarding and career development.

Page **24** of **30**

USA-AFGE-Exp.-0428574

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

- Statistical positions (e.g., agricultural and mathematical statisticians) require specific educational qualifications and are assessed on technical competencies such as statistics, survey methodology, and internal controls.

**Planned Enhancements and Resource Needs**
- Exploring easily accessible assessment tools for use during recruitment and hiring events, especially in hard-to-fill geographic areas near USDA labs and inspection sites.
- Exploring opportunities to secure resources and identify experienced staff to develop new assessments, given the large volume and diversity of job series.
- Conduct a Qualtrics survey to analyze hiring trends by occupational series and better understand leadership needs for entry-level assessment tools.

**Oversight and Continuous Improvement**
- USDA is implementing reporting and internal audit procedures to ensure assessments are used consistently and appropriately.
- Training for HR specialists and hiring managers is being developed to support assessment design and execution.
- USDA will continue to evaluate positions with low applicant volume and may exempt them from assessments when justified, in accordance with departmental policy.

**SKILLS GAPS**

USDA identified significant skill gaps across its mission areas, particularly in technical, scientific, leadership, and administrative domains. These gaps are driven by evolving mission needs, workforce attrition, and increased operational demands. The agency is implementing a comprehensive strategy to close these gaps through targeted hiring, training, mentoring, developmental assignments, organizational restructuring, and innovative career pathways, with most efforts expected to show measurable progress by FY 2027.

**Key Skill Gaps**
- Information Technology: Machine learning, AI, cloud-native development, data engineering, systems analysis, application software, web apps, and IT project management
- Financial and Administrative Functions: SAP/Oracle development, grants policy, financial management, payroll operations, debt management, claims processing, and supervisory roles
- Legal and Contracting: Attorneys, leasing and contract management
- Scientific and Technical Fields:
  - Inspection and laboratory methods
  - Forestry, engineering, rangeland management, minerals examination, land mobile radio
  - STEM disciplines including engineering, soil conservation, biology, economics, and archaeology

Page **25** of **30**

CONFIDENTIAL – ATTORNEY'S EYES ONLY    USA-AFGE-Exp.-0428575

PRE-DECISIONAL/DELIBERATIVE
USDA Staffing Plan

- o Plant pathologists, mycologists, entomologists, and veterinary medical officers (APHIS).
- o Agricultural and mathematical statisticians
- o Publishing, modeling, demography, and cross-commodity expertise

**Strategies to Close Skill Gaps (Examples of Current Strategies)**
- Targeted Hiring and Talent Realignment:
  - o Immediate reassignment of internal talent, acting appointments, and temporary promotions
  - o Recruitment from private industry and academia for specialized roles
  - o Onboarding of 50+ new statisticians to address critical vacancies
  - o Use of HR flexibilities and authorities to attract talent in STEM and mission-critical roles
- Training, Upskilling, and Mentorship:
  - o Cross-training, mentoring, and knowledge transfer programs
  - o Structured onboarding, technical training, and mentorship for new hires
  - o Leadership development programs such as AMS's LEAD (GS-11–13) and LEAP (GS-7–9) to build strategic and interpersonal competencies
  - o Rotational assignments and tailored upskilling for early-career employees and current staff
- Developmental Assignments and Career Pathways:
  - o Developmental assignments to provide hands-on experience and broaden strategic perspectives
  - o Upward mobility programs to help long-tenured technicians transition into professional series through structured internal training and educational support
  - o DOL apprenticeship programs for technician roles with emphasis on mentorship and career projection for early-career professionals
- Organizational Restructuring and Process Improvements:
  - o Consolidation of sections and supervisory roles to maximize expertise
  - o Automation to reduce manual workload and redirect staff to higher-value tasks
- Contract Support:
  - o Use contractors for specialized IT and processing tasks where internal capacity is limited

**Timeframe for Closing Skill Gaps**
Some skills gaps will be closed over the next few years through training available either in-house or through external sources. However, skills requiring long-term development through experience and mentorship will take years of intentional progression.

Page **26** of **30**

CONFIDENTIAL – ATTORNEY'S EYES ONLY

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

USDA is committed to providing the resources needed to our entry-level employees to grow a highly capable workforce needed for long-term mission delivery.

**HR AND RECRUITMENT CONTRACTS**

**Staffing Contracts:** USDA cancelled most staffing contracts in FY 2025; however, USDA does maintain access to contracts to ensure efficacy across the Department to address mass hiring and onboarding employees.  A staffing contract remains for the Forest Service to assist with specific high-volume portions of the hiring process associated with mass seasonal hiring volumes where applicant counts and hiring volumes are high (firefighter and temporary seasonal hiring).  Staffing contracts provide the ability to meet surge resources demands and achieve specific required onboarding dates associated with ensuring wildland fire incident response readiness and the ability to achieve mission goals on the forest and grasslands that are entirely seasonally dependent bodies of work.  Absent contractor availability, meeting the seasonal deadlines would be impossible without temporarily standing down other HR work to reallocate personnel to do the staffing work. The annual spend for the contractor work is estimated to be $6.5M- 6.8M; however, as USDA works throughout FY 2026 to realign and retrain existing workforce members and identify increased mechanisms to capitalize on automation, we anticipate future spending will be reduced.

**Recruitment Contracts:** USDA cancelled all recruitment contracts to include LinkedIn and Handshake in FY 2025.

**I/O Psychologist Contracts:** USDA does not currently have contracts with an industrial/organizational (I/O) psychology firm, nor does it employ an I/O psychologist dedicated to developing assessments.

**POSITION DESCRIPTIONS**

Currently USDA has over 11,000 active Position Descriptions associated with over 68,000 position titles. We estimate approximately 5,000 position descriptions require recertification, updates or reclassification, particularly in light of plans for consolidation in some program areas.  USDA is currently completing an inventory of all position descriptions and titles across the Department. After completion, a review will address duplication, expired and unused position descriptions and titles for deactivation.

Page **27** of **30**

USA-AFGE-Exp.-0428577

PRE-DECISIONAL/DELIBERATIVE
USDA Staffing Plan

## SECTION 6: KEY PERSONNEL METRICS (KPI)

Table F: Personnel KPIs

| Metric | Sep-25 | Sep-26 Forecast | Details, including when and how we will implement |
|---|---|---|---|
| **Merit Hiring** | | | |
| % of new hires using skills-based assessments | <10% (estimated 100k positions/FSIS 8k =8%) | >80% | Not currently used for DHA, seasonal, temporary and below GS-5. USDA acquired USAHIRE and is developing an assessment toolbox for USDA subagencies with training for HR and hiring managers. USDA employs many seasonal workers for fire and commodity grading through direct hire authorities. For some of these positions it is not required or beneficial to utilize assessments. |
| % of new hiring actions using shared certificates | Less than 1% | >35% | USDA will concentrate on utilizing shared certificates for business services and student positions and developing hiring panels to assist in streamlining absent an automated system. |
| % of FTE who qualify as "Early Career" (less than 5 years' experience, Pathways, interns, students, or trainees) | 11% | 11% | |
| Time to hire (average days between hiring needing validation and offer made) | 48 days | 48 days | USDA expects to maintain current T2H days due to the new assessment requirement and the need to train. USAHIRE has been acquired and an assessment team formed. The team has analyzed current assessments, prioritized developing specific occupation assessments, and currently developing communication and training for all involved in the hiring process. |
| Time to onboard (average days between offer made and employee onboarded) | 23 days | 23 days | USDA expects to have significant changes to the T2H in FY27. The improvement of automation and more visualization of the process will allow more analysis to find efficacy |
| % of GS-5 or above job postings that include the optional four questions | 80% | 100% | Guidelines have been shared across USDA requiring that the 4 questions be on all advertised positions to include Merit and Competitive hiring. |
| **Ratings & Awards** | | | |
| % of SES employees with each rating level (i.e., % rated level 1, % level 2, etc.) | *Level 5 – 72% Level 4 – 25% Level 3 – 2% Level 2 – 1% Level 1 - 0% | 5=10% 4=20% 3=65% 2=4% 1=1% | *FY24 data; FY25 will be available in early CY26 |

Page **28** of **30**

USA-AFGE-Exp.-0428578

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

| Metric | Sep-25 | Sep-26 Forecast | Details, including when and how we will implement |
|---|---|---|---|
| % of non-SES employees with each performance rating in prior year. Show each rating scale (5 point, 4, 3, pass/fail). | *Pass/Fail:<br>Pass – 99%<br>Fail – 1% | Pass/Fail:<br>Pass - 95%<br>Fail – 5% | *FY24; FY25 will be available in early CY26. Nearly all USDA employees are on a two-level performance system. There is one small subunit within USDA that is not on a two-level performance system as well as the Office of Inspector General. USDA will be moving to three-level performance system for FY 27 concurrent with implementation of USAPerformance. |
| Average SES performance award as % of base salary. | *12% (FY24 data) | TBD | |
| Average non-SES performance award as % of base salary. Show each rating scale (5 point, 4, 3, pass/fail). | *N/A | *N/A | In the pass/fail performance system, performance awards are not authorized. |
| Distribution of SES awards – what % of award pool goes to each rating? i.e., what % of the award pool for SES on a 5-rating scale went to 5's, 4's, 3's, 2's, and 1's? | *Level 5 – 81.5%<br>Level 4 – 18.5%<br>Level 3 – 0%<br>Level 2 – 0%<br>Level 1 – 0% | TBD | *FY24; FY25 will be available in early CY26. |
| Distribution of non-SES awards – what % of award pool goes to each rating? Show each rating scale (5 point, 4, pass/fail) i.e., what % of the award pool for non-SES on a 5-rating scale went to 5, 4, 3, 2, and 1? | *N/A | *N/A | Pass/fail performance system; performance awards are not authorized. USDA does not use an enterprise awards pool. |
| **Performance Management** | | | |
| % of Probationary employees up for certification who were certified | 91% | 85% | |
| % of all probationary employees terminated (not just those up for certification) | 9% | 15% | |
| % involuntary turnover due to performance management or misconduct (e.g., Chapter 43 terminations, Chapter 75, mini-DRP). Show as % of beginning FTE. *Note that this is a metric for the full fiscal year.* | 0.4% | 0.5% | 102,025 employees starting FY25 |
| Average PIP length (days) | 41.75 days | 30 days | USDA issued advisory guidance on 2/27/25 to Agency CHCOs on EO 14171's revocation of EO 14003's recission of 3 previous EOs from the first Trump Administration. This charged agencies to initiate necessary |

Page **29** of 30

CONFIDENTIAL – ATTORNEY'S EYES ONLY

USA-AFGE-Exp.-0428579

**PRE-DECISIONAL/DELIBERATIVE**
**USDA Staffing Plan**

| Metric | Sep-25 | Sep-26 Forecast | Details, including when and how we will implement |
|---|---|---|---|
| | | | steps to comply/reverse policies on Discipline and Unacceptable Performance, including PIP lengths not to exceed 30 days. |
| % of employees on PIP who were terminated | 21% | 30% | Anticipating increased performance accountability resulting from new supervisory performance standards and mandatory training in FY26 in accord with OPM policy. |
| % of low performers receiving adverse action during the fiscal year (e.g., removal, suspension, reduction in grade, reduction in pay, etc.). *Low performers defined as receiving lowest rating on performance scale. Note that this is a metric for the full fiscal year.* | 28% | 40% | Anticipating increased performance accountability resulting from new supervisory performance standards and mandatory training in FY26 in accord with OPM policy. |
| % of top performers receiving promotion. *Top performers are defined as highest two ratings on 4 or 5 point scale and highest rating on 3 point scale. Note that this is a metric for the full fiscal year.* | *15.6% | 16% | *FY 24 Pass/Fail performance |
| % of top performers that departed agency for reasons other than retirement. Note that this is a metric for the full fiscal year. | *14.2% | 10% | *FY24 Pass/Fail performance |
| **Return to Office** | | | |
| FTEs classified as fully in office as % of employees who are expected to be in office | 85% | 95% | Note: All USDA positions classified as fully in office are expected to be in the office. |
| % of FTEs with RTO exemptions (excluding DRP) | 15% | 5% | |
| How is RTO tracked? Badge data, network login location, self-reporting, etc. | Badge swipe, self/supervisor reporting | No change | USDA is exploring other opportunities to enhance RTO reporting through use of time and attendance and network log-ins |
| **DEIA** | | | |
| DEIA employees on admin leave with unknown termination date | 35 | 0 | Final determinations will be made on the status of the remaining DEIA employees on Admin leave. |

Page **30** of **30**

USA-AFGE-Exp.-0428580

# EXHIBIT 11



**United States Department of Agriculture**

Departmental
Administration

Office of the
Assistant Secretary
for Administration

Office of Human
Resources
Management

1400 Independence
Avenue, SW
Washington, DC
20250-9600

**DATE:**      February 27, 2026

**TO:**        Office of Personnel Management

**FROM:**      Deedra Fogle                                    DEEDRA      Digitally signed by
               Acting Chief Human Capital Officer  FOGLE       DEEDRA FOGLE
               Office of Human Resources Management            Date: 2026.02.27 10:36:48
                                                               -05'00'

**SUBJECT:**   Updated Staffing Plans for FY 2026

The purpose of this memorandum is to share updated information of the staffing plan
of the United States Department of Agriculture (USDA) for Fiscal Year (FY) 2026, and
to reflect our planned early career hires, appointment programs utilized, and
recruitment events.

**Updated Strategic Hiring Committee**

USDA has updated the Strategic Hiring Committee membership is included below
which accounts for personnel changes since our original submission.  USDA's
Executive Review Board members also serve as the Strategic Hiring Committee which
ensures a comprehensive approach to the direction of the mission and the hiring needed
to support mission accomplishment.

| Name | Title | Political (Y/N) | Email |
|---|---|---|---|
| Stephen Vaden (Chair) | Deputy Secretary | Y | Stephen.Vaden@usda.gov |
| Tate Bennett | Chief of Staff | Y | Tate.Bennett@usda.gov |
| Jennifer Tiller | Chief of Staff to the Deputy Secretary | Y | Jennifer.Tiller@usda.gov |
| Brian Mizoguchi | Deputy General Counsel | Y | Brian.Mizoguchi@usda.gov |
| Devon Westhill | Assistant Secretary for Civil Rights | Y | Devon.Westhill@usda.gov |
| Scott Hutchins | Undersecretary, REE | Y | Scott.Hutchins@usda.gov |
| Mary Pletcher Rice | Acting Principal Deputy Assistant Secretary for Administration | N | Mary.PletcherRice@usda.gov |
| Courtney Stevens | Acting Deputy Under Secretary, NRE | Y | Courtney.Stevens@udsa.gov |
| Kelly Moore | Acting Administrator, APHIS | N | Kelly.Moore@usda.gov |
| Christopher Nelson | Acting Director, OBPA | N | Christopher.Nelson@usda.gov |
| Deedra Fogle | Acting CHCO (*Executive Secretariat*) | N | Deedra.Fogle@usda.gov |

AN EQUAL OPPORTUNITY EMPLOYER

CONFIDENTIAL – ATTORNEY'S EYES ONLY

**Forecasted Early Career Hires for FY 2026**

USDA projected a total of 1,669 positions representing 15,923 employees to be hired in FY 2026; USDA has made no changes to the originally approved hiring projections, at this time, but will provide updates with the quarterly hiring review deliverables. The hiring initiative is crucial to support our mission-critical functions, address emerging priorities, and comply with statutory requirements. There are approximately 2,873 hires in our total of 15,923 hires allocated as "to be determined" to ensure USDA has the flexibility to acquire the workforce needed as a major reorganization and relocation of employees to new duty location is executed in FY 2026. USDA expects that many of these positions will be filled through the various programs listed in the attached USDA Early Career Hiring Authority Chart, which includes Pathways programs, USDA Fellow Experience Programs, and other special programs and authorities. Of the total currently projected hires, 3,043 are allocated to be early career, representing 31% of the permanent hires after removing the temporary, seasonal, internal movement and reorganization related "to be determined" hires from the denominator. We will continue to identify other opportunities to support early career hiring goals throughout the year.

**Updated Hiring Summary**

| New Hire Type | Number of Positions | Number of New Hires |
|---|---|---|
| Permanent | 1,325 | 6,747 |
| Internal | 212 | 823 |
| Temporary | 9 | 197 |
| Seasonal (temporary/permanent) | 22 | 2,240 |
| Early Career | 99 | 3,043 |
| TBD Reorganization Hires | 2 | 2,873 |
| | | |
| **Total** | **1,669** | **15,923** |

**Programs and Hiring Authorities Early Career Hiring**

USDA will utilize the following programs to hire early career individuals:
- Pathways Program: Provides paid opportunities for students and recent graduates to work in federal agencies while completing their education. Includes Interns and Recent Graduates.
- USDA 1890 National Scholars Program: Targets students from 1890 land-grant universities, offering scholarships and work experience related to agriculture, food, and natural resource sciences.
- USDA Wallace-Carver Fellowship: Offers college and graduate students the opportunity to collaborate with USDA scientists and policymakers.
- Individuals with Disabilities Hiring Authorities: Includes Schedule A appointments and the Workforce Recruitment Program for students and recent graduates with disabilities.
- Veterans Hiring Authorities: Includes the 30 Percent or More Disabled Veteran Hiring Authority, the Hiring Authority for College Graduates, and the Post-Secondary Student Hiring Authority.

CONFIDENTIAL – ATTORNEY'S EYES ONLY                     USA-AFGE-Exp.-0428755

- Public Lands Corps and Resource Assistant hiring authorities specifically authorized or Forest Service use.
- Tech Force and Cyber Corps programs via OPM. USDA is currently evaluating skill sets and funding to gain insight of the positions and numbers needed.

**Recruitment Events and Timeframes**

USDA has developed a comprehensive recruitment roadmap for FY 2026, which includes participation in 61 planned recruitment and outreach events. These events will target various talent pools, including veterans, military spouses, early career talent, and students. Key events include:
- Outreach at Land Grant Universities
- Veteran and Military Spouse Recruitment Fairs
- Early Career Networking Events
- Industry-Specific Conferences and Expos

**Shared Certificates**

1. USDA's Shared Certificate point of contact is Barry Culbreath, Supervisory Human Resources Specialist, Barry.Culreath@usda.gov. The role of this position will require strategic leadership to lead the planning and execution of shared certificates across USDA.
2. USDA plans to participate in OPM's cross-government shared certificate programs for the following occupations and grade levels:
   - Early Career
     - Contract Specialist (1102-07, 09)
     - IT Specialist (2210-09, 11)
     - Financial Management Specialist (0501-09, 11)
   - U.S. Tech Force
   - Project Management (0343-13)
   - Data Scientist (1560-13, 14)
   - Contract Specialist (1102-13)
   - IT Project Manager (2210-13)

**Conclusion**

The USDA is committed to implementing strategic hiring practices that align with our mission-critical functions and Administration priorities. The outlined staffing plans for FY 2026, including the focus on early career hires and targeted recruitment events, will ensure that we build a robust and capable workforce to serve the American public.

**Attachments**

- USDA Staffing Plan 2025-12-21_Submission.docx
- USDA Early Career Hiring Authority Chart.docx
- Recruitment Roadmap.docx

CONFIDENTIAL – ATTORNEY'S EYES ONLY

# EXHIBIT 12



*Secretary Brooke L. Rollins*

# UNITED STATES DEPARTMENT OF AGRICULTURE
## OFFICE OF THE SECRETARY
### WASHINGTON, D.C. 20250

### SECRETARY'S MEMORANDUM 1078-008

### April 22, 2025

## EXEMPTION OF NATIONAL SECURITY AND PUBLIC SAFETY POSITIONS FROM THE FEDERAL CIVILIAN HIRING FREEZE

1.  PURPOSE

    This Secretary Memorandum (Memo) establishes categorial exemptions from the Federal civilian hiring freeze for positions in job series related to national security and public safety to ensure sufficient personnel are available to carry out those functions that are critical to the safety and security of the American people, our National Forests, the inspection and safety of the Nation's agriculture, and food supply system. *Food Security is National Security.*

2.  AUTHORITY

    This Memo is issued under the authority of P.L.103-358 Title II (7 USC 6901); Executive Order 14210, *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative* (February 11, 2025); Presidential Memoranda of April 17, 2025; and other relevant statues.

3.  BACKGROUND

    On January 20, 2025, President Trump ordered a freeze on Federal civilian hiring, while authorizing the Director of the Office of Personnel Management (OPM) to grant exemptions from this freeze where necessary. The Office of Management and Budget (OMB) and OPM subsequently issued guidance on January 20, 2025, that implemented the freeze and identified mandatory exemptions for positions related to national security and public safety. Such exemptions recognize these positions' vital importance to the safety and security of the American people and will critically assist the Department of Agriculture (Department) in fulfilling its national security and public safety responsibilities across the Nation.

CONFIDENTIAL – ATTORNEY'S EYES ONLY                 USA-AFGE-Exp.-0428581

These responsibilities are predominantly carried out by the Department's front-line workforce to include over 11,000 firefighters and incident support personnel. In addition, there are thousands of food and consumer safety inspectors, employees performing response operations to combat Highly Pathogenic Avian Influenza (HPAI), New World Screwworm, and other pest and disease research and eradication efforts that protect Americans and our food supply on a daily basis.

Wildland fire management represents one of the Department's most visible and resource-intensive public safety functions, with significant implications for communities nationwide. In 2024, the Department employed over 11,000 wildland fire personnel to protect communities, critical infrastructure, and local economies from wildfires that burned more than 8.9 million acres across the United States. The firefighting capabilities include professionals in aviation programs, which provides critical aircraft resources, pilot training, and technical expertise. These operations implement fuel treatments, respond to active fires, and rehabilitate damaged lands.

The Department's law enforcement officers, as well as the Department's homeland security, intelligence, and emergency management personnel, likewise help ensure operational readiness and rapid response capacity during incidents of national significance and coordinate response efforts with the Federal Interagency and the White House National Security Council.

4.  EXEMPT NATIONAL SECURITY AND PUBLIC SAFETY POSITIONS

To ensure the Department has sufficient personnel in critical national security and public safety positions, the job series identified in the attachment to this Memo are hereby exempted from the hiring freeze, enabling the Department to fulfill its national security and public safety obligations without interruption. In addition, those positions funded by user fees or other than appropriated funding will be evaluated on a case-by-case basis.

5.  IMPLEMENTATION

a.  **Mission Area and Office of the Secretary (OSEC) Leadership**: Mission Area and OSEC leadership with responsibility for national security and public safety programs carried out by personnel in the exempt series are directed to immediately take all available steps to ensure the appropriate identification and prompt hiring of necessary personnel.

b.  **Assistant Secretary for Administration (ASA):** The Office of the ASA is directed to take all necessary steps to support hiring actions for the relevant positions, coordinating as necessary with OPM and OMB.

2

CONFIDENTIAL – ATTORNEY'S EYES ONLY    USA-AFGE-Exp.-0428582

## 6. EFFECT OF THE MEMORANDUM

This Memo is intended to improve the internal management of the Department. Additionally, this Memo and any resulting reports or recommendations are not intended to, and do not create any right or benefit, substantive or procedural, enforceable by law or equity by a party against the United States, its Departments, Agencies, Instrumentalities, or entities, its officers or employees, or any other person. To the extent there is any inconsistency between the provisions of this Secretarial Order and any Federal laws or regulations, the laws or regulations will supersede.

## 7. EXPIRATION DATE

This Memo is effective immediately and will remain in effect until it is amended, superseded, or revoked, whichever occurs first.

/s/ Brooke L. Rollins
Secretary
U.S. Department of Agriculture

3

CONFIDENTIAL – ATTORNEY'S EYES ONLY                    USA-AFGE-Exp.-0428583

## ATTACHMENT: HIRING EXEMPTIONS

| Sub-Category of Exemption | Job Series | Position Title |
|---|---|---|
| National Security/Law Enforcement/Investigation | 1801 | Inspection, Investigation, Enforcement and Compliance (All Titles) |
| National Security/Law Enforcement/Investigation | 1810 | Investigator/Inspector |
| National Security/Law Enforcement/Investigation | 1811 | Criminal Investigator, Supervisory Criminal Investigator |
| National Security/Law Enforcement/Investigation | 0089 | Emergency Management (All Titles) |
| National Security/Law Enforcement/Investigation | 0080 | Security Specialist |
| National Security/Law Enforcement/Investigation | 0132 | Intelligence Analyst |
| National Security/Law Enforcement/Investigation | 2210 | IT Specialist (Cybersecurity) |
| Public Safety and Inspection (Multiple Agencies) | 0018 | Safety and Occupational Health Specialist |
| Public Safety and Inspection (Multiple Agencies) | 0690 | Industrial Hygiene and Safety |
| Public Safety and Inspection (Multiple Agencies) | 0701 | Veterinarian (All Titles) |
| Public Safety and Inspection (Multiple Agencies) | 1102 | Contract Specialists (Food and Emergency Response) |
| Public Safety and Inspection (Multiple Agencies) | 1301 | Physical Scientist |
| Public Safety and Inspection (AMS) | 1147 | Agriculture Commodity Series |
| Public Safety and Inspection (AMS) | 1850 | Warehouse Examiners |
| Public Safety and Inspection (FSIS) | 1862 | Consumer Safety Inspector |
| Public Safety and Inspection (FSIS) | 1863 | Food Safety Inspector |

CONFIDENTIAL – ATTORNEY'S EYES ONLY

| | | |
|---|---|---|
| Public Safety and Inspection (APHIS) | 0028 | Environmental Protection Specialist |
| Public Safety and Inspection (APHIS) | 0150 | Geographic Information Specialist |
| Public Safety and Inspection (APHIS) | 0301 | Document/Permit Examiner, Import and Export |
| Public Safety and Inspection (APHIS) | 0401 | Natural Resources Mgmt & Biological Sciences (Public Safety/Inspection Function Positions Only) |
| Public Safety and Inspection (APHIS) | 0404 | Biological Science Technician (Public Safety/Inspection Positions Only) |
| Public Safety and Inspection (APHIS) | 0410 | Zoologist |
| Public Safety and Inspection (APHIS) | 0414 | Entomologist |
| Public Safety and Inspection (APHIS) | 0421 | Plant Protection & Health (All Titles) |
| Public Safety and Inspection (APHIS) | 0430 | Botanist |
| Public Safety and Inspection (APHIS) | 0434 | Plant Pathologist |
| Public Safety and Inspection (APHIS) | 0486 | Wildlife Biologist |
| Public Safety and Inspection (APHIS) | 0704 | Animal Health Technician (All Titles) |
| Public Safety and Inspection (APHIS) | 1712 | Training Specialist (Agriculture Inspections and Canine Trainers) |
| Public Safety and Inspection (APHIS) | 3511 | Laboratory Worker |
| Public Safety and Inspection (APHIS) | 5001 | Tree Climber |
| Public Safety and Inspection (APHIS) | 5031 | Insects Production Worker |
| Public Safety and Inspection (APHIS) | 5048 | Animal Caretaker |
| Aviation (Public Safety) | 1825 | Aviation Safety Inspector - Airworthiness and Avionics |
| Aviation (Public Safety) | 2101 | Aviation Officer (All Titles) |
| Aviation (Public Safety) | 2181 | Aircraft Operations (All Titles) |
| Aviation (Public Safety) | 8852 | Aircraft Mechanic |
| Aviation (Public Safety) | 1670 | Equipment Specialist, Aircraft and Fire |
| Wildland Fire | 0301 | Fire Chemicals Program Manager |
| Wildland Fire | 0301 | Fire Training Specialist |

CONFIDENTIAL – ATTORNEY'S EYES ONLY    USA-AFGE-Exp.-0428585

| | | |
|---|---|---|
| Wildland Fire | 0301 | All Firefighter Retirement Covered Positions in this Series |
| Wildland Fire | 0401 | All Firefighter Retirement Covered Positions in this Series |
| Wildland Fire | 0456 | Wildland Firefighter |
| Wildland Fire | 0462 | Wildland Firefighter, Forestry Technician (All Firefighter Retirement Covered Positions) |
| Wildland Fire | 5716 | Fire Engineering Equipment Operator |
| Wildland Fire Critical Support Position | 0301 | Incident Business Management Specialist |
| Wildland Fire Critical Support Position | 0856 | Electronics Technicians |
| Wildland Fire Critical Support Position | 2151 | Dispatcher |
| Wildland Fire Critical Support Position | 5001 | Animal Packer |
| Wildland Fire Critical Support Position | 7002 | Packer |
| Fire Support, Emergencies and Animal Health | 3502 | Laborer |
| Fire Support, Emergencies and Animal Health | 2003 | Supply Management Specialist |

CONFIDENTIAL – ATTORNEY'S EYES ONLY    USA-AFGE-Exp.-0428586