Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **DECLARATION OF BENJAMIN BOCIAN** |

Declaration of Benjamin Bocian, No. 3:25-cv-03698-SI

**DECLARATION OF BENJAMIN BOCIAN**

I, Benjamin Bocian, declare as follows:

1. I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

2. I am a dues-paying member of the Foreign Agricultural Service Employees, Local 3976 of the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME Local 3976" or the "Union"). AFSCME Local 3976 is the exclusive bargaining representative for all non-supervisory civil service employees of the U.S. Department of Agriculture's ("USDA") Foreign Agricultural Service. I have been a member of the Union since 2016.

3. I have dedicated my career to pursuing international relations. After graduating with a Bachelor of Arts in Political Science and History from Coastal Carolina University in 2006, I made the decision to move to the Washington, DC area to enroll in American University's Master of Arts in International Peace and Conflict Resolution. I chose this graduate program in large part because I knew that international relations jobs are concentrated in the DC area, be it for a federal agency or non-governmental organizations.

4. I graduated with my Master's in 2007 and applied for the Peace Corps. I served as a Peace Corps volunteer in Senegal between 2008 and 2010, working on a number of important international aid projects. This experience solidified my commitment to working in international relations and after my service finished, I decided to start looking for positions in that field in the Washington, DC area.

5. In 2010, I applied for an administrative assistant position with the Foreign Agricultural Service. The position was located in the Washington, DC office. I was hired and began working for the Foreign Agricultural Service in August of 2010. I left the Foreign Agricultural Service from 2014-2016 to work at Customs and Border Protection, but in total, I have been at the Foreign Agricultural Service for 14 years, working across several different program areas.

6. My current position is as an International Trade Specialist for European Operations, which is housed within the Foreign Affairs program area. In this role, I support our US embassies and US offices in Europe, providing technical guidance on policy issues and operations. I also do a lot of

work to support Locally Employed Staff, which refers to foreign nationals that work for US embassies abroad. I also work on clearing, reviewing, and editing reports submitted by our over 100 offices across the globe. The majority of my work contacts are in the Washington, DC area or abroad.

7. During my time at the Foreign Agricultural Service (outside of the period during the COVID-19 pandemic when individuals were authorized to work from home), I have worked out of the South Building in Washington, DC. I currently work out of the South Building four days a week.

8. I have lived in the Washington, DC area since returning from the Peace Corps in 2010. I currently live in Baltimore, Maryland, where I have lived for the past 12 years.

9. Given the focus of my work, I have anticipated staying in the DC area for the foreseeable future and have built a family here. I am married and my wife is an attorney for a non-profit organization in Washington, DC. We have an infant daughter who is cared for at a child care center in the Baltimore area while we both pursue our professional careers.

10. I also have an eight-year old child from a previous marriage, and my ex-wife also lives in the Baltimore area with her other step-children. We have joint custody of our eight-year old, and our marriage settlement agreement is predicated on both parents being in the Baltimore/Washington DC area.

11. On June 17, 2026, I received a Department-wide email announcing that the Foreign Agricultural Service would be establishing an operational support hub in Kansas City, Missouri. The accompanying materials did not include any reference to my specific division, and therefore it was unclear if I would be directly impacted. Although I tried to get more information in the weeks that followed, I could not learn anything more. This caused extreme stress and uncertainty for me and my family.

12. Then, on July 17, 2026, I received a letter from the Agency informing me that my position is one of the positions that will be relocated to Kansas City, Missouri.

13. To my knowledge, my position is the only position on my team of 4 that is being relocated to Kansas City, Missouri. My supervisor and colleagues will stay in the National Capital Region (NCR). I was not informed of any reason why my position is being relocated. I do not see any reason for my position to be in Kansas City as opposed to the NCR. As noted, nearly every single one

Declaration of Benjamin Bocian, No. 3:25-cv-03698-SI                                                         2

of my work contacts are in the NCR or abroad. Now, I will also be the only member of my team in a different time zone.

14. Ultimately, is not possible for my family to move to Kansas City.

15. One of the primary reasons I cannot move is because we must maintain access to my youngest daughter's medical care team. Last year, my wife and I welcomed a daughter. She was born without a heartbeat. Luckily, we had access to outstanding medical care and she was successfully resuscitated. However, due to the circumstances surrounding her birth, she has had to have extensive follow-up care and monitoring, requiring visits to a number of specialists. Babies like my daughter that experience a loss of oxygen to the brain and other organs during birth go through a cooling process in the first few days of life where their body temperature is kept low to mitigate any potential damage to the brain caused by the oxygen loss. Because of the risk that this oxygen loss may cause impacts on muscular and neurological development that emerge later, my daughter's birth injury necessitates consistent monitoring and early intervention in her early years. For example, during her first six months, she needed occupational and physical therapy to improve her motor skill development.

16. In addition, as part of this follow up care, we were connected to the Kennedy Krieger Institute, located in Baltimore, Maryland, an internationally recognized leader in infant neurodevelopment. We return every three months for assessments of her development. Sometimes, these assessments have triggered additional more specialized visits and assessments, including an auditory assessment and speech therapist visit. We will continue this monitoring for the foreseeable future to ensure her key milestones are on track and intervene appropriately.

17. It is important to my wife and I to maintain her continuity of care with the providers that we know and trust. Her care team, who have worked with her since her birth, are best positioned to understand any changes because they are familiar with her medical history and development to date. Moreover, the Kennedy Krieger Institute is a leader in the field, and we want to maintain access to such a well-regarded team of experts and specialists.

18. My daughter was also born with a rare genetic syndrome that causes, among other things, droopy eyelids, which severely impaired her vision. To ensure that her vision develops

properly, we consulted with doctors at Johns Hopkins University and Eye Doctors of Washington who ultimately referred us to a pediatric ocular plastic surgeon at the Children's Hospital of Philadelphia (CHOP). She had her first surgery on her eyelids in February, 2026, and have needed to return multiple times since then for follow-up appointments, and have more scheduled (the next one is in September). Therefore, my family needs to be within driving distance of Philadelphia. She will also need follow-up surgery when she is 3 or 4 years old as her face shape changes. It is important to us that she returns to the same team. Pediatric ocular surgery is a highly specialized field and specialists in the field are few and far between. Now that we are connected to our surgeon at CHOP, we want to maintain our relationship so that our daughter can continue to obtain the best care possible. In addition, in the event there is ever a medical complication or an issue with her surgery, being close to her care team is important to us. Not only can we get to CHOP, but we are proximate to Johns Hopkins University, another leader in pediatric care.

19.    Because of my daughter's medical conditions and need to maintain her existing care teams locally and regionally, moving to Kansas City is simply not an option for my family. We need to prioritize the health of our daughter. We have been incredibly lucky to have access to world-class medical care so close to our home. We do not feel comfortable moving to an entirely new region and losing access to the specialists she relies on, especially at such a critical juncture in her development.

20.    Even if it were not for maintaining access to our daughter's medical care, however, moving would still not be feasible for my family. As noted, I have an eight-year-old child from a previous marriage. My ex-wife lives in the Baltimore area and we share joint custody. She currently lives with me 50% of the time. My ex-wife cannot move herself and her other family members to Kansas City. Under the terms of our agreement, if I were to relocate to Kansas City, there would be major changes in how often I see my older daughter. I would lose out on my ability to be involved in her day-to-day life, and it would be incredibly disruptive to our relationship. As such, moving is simply out of the question.

21.    For all these reasons, it is not possible for me to relocate. As such, when my position is officially directed to report to Kansas City, I will be forced to decline the reassignment and leave the Foreign Agricultural Service. I have already started looking at other positions in case this happens,

Declaration of Benjamin Bocian, No. 3:25-cv-03698-SI    4

monitoring positions at sister federal agencies. However, I may not be able to find a position right away if I am forced to resign.

22.    Being unemployed would create significant hardship for my family. Being on a single income would strain our budget, likely forcing tough decisions on dropping child care, adjusting grocery budgets, private school enrollment, housing and car payments.

23.    Leaving the Foreign Agricultural Service would be incredibly sad. I have spent over fourteen years at this agency, learning the ins and outs of our programs, and I can honestly say that the work of USDA is the professional mission of my life. I care deeply about my work and want to continue helping our FAS posts expand access to U.S. exports abroad. I also know I want to stay in the public service. However, I have no choice but to prioritize the wellbeing and stability of my family.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed August 6, 2026 in Baltimore, MD.

_____
Benjamin Bocian