Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional counsel not listed]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., | Case No. 3:25-cv-03698-SI |
| Plaintiffs, | **REPLY DECLARATION OF COLLIN BRADLEY** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, et al., Defendants. | |

**REPLY DECLARATION OF COLLIN BRADLEY**

I, Collin Bradley, declare as follows:

1.    I am over 18 years of age and competent to provide this declaration. This declaration is based on my personal knowledge, information, and belief.

2.    This declaration supplements the declaration that I previously submitted in support of Plaintiffs' Motion for Preliminary Injunction with respect to the United States Department of Agriculture ("USDA") Reorganization Plan.

3.    I am the President and a dues-paying member of the Foreign Agricultural Service Employees, Local 3976 of the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME Local 3976" or the "Union"). AFSCME Local 3976 is the exclusive bargaining representative for all non-supervisory civil service employees of the U.S. Department of Agriculture's ("USDA") Foreign Agricultural Service ("FAS" or "Agency").

4.    I am a civil service employee of the Foreign Agricultural Service. Both before and since becoming President of AFSCME Local 3976, I have worked as an International Trade Specialist within the Credit Programs division of the Agency. I have been employed at the Foreign Agricultural Service for six years. During this time, my duty station has been Washington, DC. Specifically, I work in the South Building, which is where the Foreign Agricultural Service headquarters are located.

5.    AFSCME Local 3976 and the Foreign Agricultural Service are parties to a collective bargaining agreement (CBA) that memorializes negotiated terms and conditions of employment, benefits, rules, a grievance procedure and other procedures of the workplace. The current CBA became effective on January 8, 2025, and will remain in effect until January 8, 2030, at which point it will automatically renew unless either party indicates they would like to renegotiate.

6.    Article 36 of the CBA is entitled "Reorganizations and Other Workplace Changes." This article requires Foreign Agricultural Service Management to provide notification to the Union concerning any reorganizations, defined as the planned elimination, addition, or redistribution of functions or duties, or workplace changes, defined as changes that have a greater than de minimus

Reply Declaration of Collin Bradley, No. 3:25-cv-03698-SI                                    1

impact on conditions of employment.  Article 36 provides for impact and implementation ("I&I") bargaining over these agency actions.

7.    Under both federal law and this CBA, I&I bargaining does not permit the Union to challenge either the fact or legality of an underlying management action.  Instead, the CBA requires notification of that action, and then the Union can bargain regarding the effects on bargaining unit employees.  The Union's rights to bring issues pertaining to this I&I bargaining before the Federal Labor Relations Authority ("FLRA"), either through an unfair labor practice charge or grievance and arbitration procedures, are all circumscribed by the subjects of bargaining.

8.    On July 24, 2025, Secretary of Agriculture Brook Rollins issued Secretary Memorandum 1078-015 entitled "Department of Agriculture Reorganization Plan," (herein "Reorganization Memo"). The Reorganization Memo announced, among other measures, a plan to relocate over fifty percent of the USDA workforce within the National Capital Region (NCR) to one of five regional hub locations across the country. It also included a plan for specific facilities located within the NCR. Specifically, it noted that the Whitten Building and Yates Building would be retained, but that the South Building and Braddock Place would be vacated. It further stated that the George Washington Carver Center (GWCC) would be sold or transferred upon conclusion of its use as a temporary location for USDA employees during the reorganization process.

9.    As discussed in my initial declaration, AFSCME provided comments opposing this Reorganization Plan, and in particular objected to the use of relocations to impose workforce reductions, and the related impacts on the functions of the employees and component agencies that we represent, including FAS.

10.    The Reorganization Memo refers generally to moving employees out of the NCR, but did not reveal USDA's plans with respect to the Foreign Agricultural Service in particular.

11.    Nevertheless, given the stated plans to move employees in general and to close the South Building, bargaining unit employees grew concerned over potential impacts to their working conditions. On July 30, 2025, the Union submitted a request for information regarding the announced reorganization to understand any impact to bargaining unit employees.   USDA responded by refusing

to provide any information at all to the Union, and said it would do so only upon commencement of impact bargaining.

12.    Accordingly, the Union awaited notification from USDA regarding the decision to implement this Reorganization Plan, how it would impact FAS and bargaining unit employees, and any request to engage in I&I bargaining.  From July 2025 through June 16, 2026, the Union received no further information from USDA regarding the timing of implementing this plan, or the impact on FAS.

13.    In the meantime, on February 25, 2026, the Secretary of Agriculture issued a press release announcing the disposal of the South Building and Braddock place.   The Union had not received any further information, either prior to that announcement, or at the time, about relocation or information about where employees would be directed to work moving forward.

14.    We became increasingly concerned about the amount of time since the announced reorganization, and USDA's failure to share information on its plans or timing of any implementation. Therefore, on April 16, 2026, the Union once again submitted a request for information to learn more about the impact of the closure of the South Building on bargaining unit employees.  USDA responded May 4, 2026, and again refused to provide any information at all to the Union, and said it would do so only upon commencement of impact bargaining.

15.    On April 22, 2026, the childcare service provider KinderCare announced it was not renewing its contract with USDA. This impacts the childcare facility that had been operating out of the Yates building in downtown Washington, DC, which is relied on by multiple bargaining unit members.

16.    In a meeting on April 28, 2026 the Agency informed the Union that it did not have an obligation to bargain over the USDA's decision not to renew the Agency's contract with its childcare service provider. On May 11, 2026, the Union invoked its right to request to bargain over the resulting impact of the USDA daycare closure that was slated to become effective on July 10, 2026.

17.    On June 17, 2026, the Agency reiterated its position from the April 28 meeting, claimed that the decision was "Department level" and stated  "[i]n accordance with Management's rights as described in 5 USC 7106, Management is declining to negotiate further on this matter."

Reply Declaration of Collin Bradley, No. 3:25-cv-03698-SI                                3

18. As of the time of these communications, the Union was still awaiting any information from USDA regarding its decisions with respect to this Reorganization Plan and how they would impact our bargaining unit employees. USDA was not forthcoming in explaining those decisions, including with respect to the employees in the buildings within the NCR and the childcare facility they were closing.

19. Between July 2025 and June 2026, the Union received no correspondence at all from the Agency indicating that bargaining unit employees would be relocated outside of the NCR.

20. On June 17, 2026, the Union received for the first time an email from the Agency with the subject line "AFSCME - Notification of FAS Reorganization and Meeting." This email was received on the same day that the Agency publicly announced the plan to reorganize the Foreign Agricultural Service and establish an operational support hub in Kansas City, Missouri.

21. This June 17, 2026 email was the first time that USDA told the Union that bargaining unit employees would be relocated outside of the NCR. USDA did not reveal to the Union at this time its plans for the number of employees that it would move to Kansas City.

22. The Union immediately responded to the June 17, 2026 email, stating that we intended to bargain to the fullest extent possible.

23. USDA did not provide notice of bargaining until a month later, on July 17, 2026. On that date, the Union received an email with the subject line "Notice of FAS Reorganization," and indicated that the communication was the formal notice sent to the Union in accordance with Article 36 of the CBA. The email also stated that the Agency would begin issuing individualized Letters of Intent (LOIs) to employees indicating whether that employee would be directed to relocate or stay in their current location.

24. The July 17 email indicated USDA would send employees one of five template letters based on their position's categorization: 1) "Staying in the NCR and Maybe Org Change;" 2) "Moving Out of NCR and Maybe Org Change;" 3) "Future Org Change to Department;" 4) "Position Not Determined at this time;" and 5) "Moving to NCR and Maybe Org Change." The email included these template letters as separate attachments in addition to a new organizational chart. Additionally, the email included a spreadsheet providing the categorization for each bargaining

Reply Declaration of Collin Bradley, No. 3:25-cv-03698-SI                                            4

unit employee, by name. At no point does the email state that the Agency agreed to bargain over the decision to reorganize or which positions will be impacted.

25. The email and the accompanying template letters note that the LOIs are not the official reassignment letters. Instead, the email states that employees will receive an official Management Directed Reassignment (MDR) letter on August 31, 2026. According to the template letter for employees directed to move outside of the NCR, employees will have 30 days after receipt of the MDR to decide whether to accept the reassignment. It is my understanding that any bargaining unit employee that does not accept their MDR will be separated from the agency.

26. The spreadsheet attached to the email provides the status for each current bargaining unit employee as of July 16, 2026, totaling 272 employees. Of these employees, 105 (39%) will be directed to relocate to Kansas City, MO, with 15 employees (6%) being informed that their position status is not yet determined. This means that up to 45% of bargaining unit employees may be directed to relocate to Kansas City.

27. However, within certain divisions of the Foreign Agricultural Service, the percentage impacted by the forced relocation is much higher.

28. At the Program Name level, the spreadsheet indicates that 72% of bargaining unit employees within the Global Programs division will be directed to relocate out of the NCR, with an additional 10% of bargaining unit employees within Global Programs being informed that their position status is not yet determined. This means that up to 82% of the Global Programs division will be directed to relocate to Kansas City.

29. Within certain subunits of the Global Programs division, the percentage of bargaining unit employees being relocated to Kansas City is even higher. Three subdivisions are listed as having 100% of bargaining unit employees directed to relocate: Credit Programs, which is the division where I am assigned, Program Operations, and Trade Missions and Shows. Other teams will now be split between different office locations, with the majority of bargaining unit employees directed to relocate outside of the NCR while other employees will stay. According to the email spreadsheet, 88% of bargaining unit employees within the Fellowship Programs division will be relocated, over 80% of bargaining unit employees within International Food Assistance will be relocated, over 80% of

Reply Declaration of Collin Bradley, No. 3:25-cv-03698-SI                                                     5

bargaining unit employees within the Trade and Regulatory Capacity Building will be relocated, and 70% of bargaining unit employees within Global Services will be relocated.

30. On July 17, 2026, individual employees were also sent their own LOI notices informing them of their position status. The sending of these letters, further confirms the Agency's position that it will not  bargain over the decision to relocate specific positions or individuals.

31. On July 21, 2026, the Union confirmed that it would bargain over the impacts and implementation of the reorganization and relocation plan. The same day, the Agency acknowledged receipt and stated that the Agency would follow up with proposed ground rules for negotiations.

32. Therefore, the statement in the Rice Declaration, dated July 24, 2026, that FAS was "awaiting Union demand to bargain" was not true at the time it was sworn by the declarant.

33. On July 22, 2026, I sent a renewed request for information to the Agency. As of the signing of this statement, the Union has not received a response to this request. Further, bargaining unit employees whose positions were marked as "undecided" have not received any additional communication about the status of their position.

34. On July 22, 2026, the Union received an email from Management with proposed ground rules for I&I negotiations. The parties subsequently executed a Memorandum of Understanding (MOU) outlining the ground rules for the I&I negotiations on July 28, 2026.

35. The ground rules MOU includes a section on the scope of bargaining, and states as follows:

"A. The Parties recognize that the scope of bargaining for these negotiations is the following:
1. The Impact and Implementation bargaining over the procedures and appropriate arrangements of the reorganization and closure of the USDA South Building for the AFSCME Local 3976 bargaining unit. The Parties agree bargaining topics may include but are not limited to:
i. The procedures and appropriate arrangements of relocation, reassignments, and/or realignments of positions and personnel within FAS.
ii. The changes in working conditions/conditions of all BUEs.
2. This scope does not waive the Union's right to bargain additional procedures and appropriate arrangements that arise from later phases or material changes."

36.    USDA has not permitted the Union to bargain over the underlying management decisions at issue, including the decision to relocate employees, or whether and where it will open a new regional office.

37.    Our first I&I bargaining session occurred on August 5, 2026 and we are currently in the process of bargaining.

38.    Parallel to communicating with the Agency about impact bargaining, the Union immediately began communicating with bargaining unit employees to understand the impact of the relocation directives and how the employees planned to respond.

39.    The Union conducted an anonymous survey of bargaining unit employees, gathering responses between June 23 and June 29. 156 bargaining unit employees filled out the survey, representing over 57% of bargaining unit employees. Among the questions on the survey, it asked "if you were issued a directed reassignment letter requiring to Kansas City, MO, what would you most likely do?" The three response options were 1) Leave FAS (resign/get fired/retire); 2) Relocate; or 3) Unsure—I am still weighing my options. Of the employees that filled out the survey, 111 stated that they would leave the Foreign Agricultural Service if they receive a directed reassignment to Kansas City, MO, with 36 stating that they are unsure. Only 6 stated that they would relocate.

40.    This means that, of the bargaining unit employees that filled out the survey, 94% stated they plan to leave or may plan to leave if they were to receive a relocation order to Kansas City, MO. And given the survey response rate of 57%, that constitutes a majority of the bargaining unit, even assuming all employees who did not respond were willing to relocate.

41.    As part of the survey, we asked participants to list their program area. Within Global Programs, which as noted above is the area where the highest percentage of employees that will be directed to relocate, we had 78 respondents, which accounts for 59% of bargaining unit employees within that program. Of the employees within Global Programs that filled out the survey, 51 indicated they would leave the agency if directed to relocate with Kansas City, with 23 stating that they were unsure. This means that, of the bargaining unit employees that filled out the survey, 94% of bargaining unit employees within Global Programs stated that they plan to leave or may leave the Agency if they receive a relocation order to Kansas City, MO.

Reply Declaration of Collin Bradley, No. 3:25-cv-03698-SI                                    7

42.     Of the 51 employees that indicated they will leave the Agency within Global Programs, the majority have at least 10 years of experience within FAS, representing a huge potential loss in agency expertise and institutional knowledge. Collectively, the employees who indicated they will leave represent hundreds of years of service at the Foreign Agricultural Service.

43.     Since bargaining unit employees started receiving their LOIs, had bargaining unit employees have reached out to me in person and via text to discuss the relocation orders. Based on those conversations, it is my understanding that it is still the case that the vast majority of bargaining unit employees that have been directed to relocate will opt to leave the agency if they are required to move to Kansas City. As a result, I am certain there will be significant attrition if the relocation orders proceed. We have shared the results of our survey with the Agency and we have communicated our concerns about attrition.

44.     For many bargaining unit employees, it makes little financial sense to move to Kansas City. Agency management has stated that because geographies like Kansas City have a lower cost of living than the NCR, employees' purchasing power will increase. However, this assertion does not hold water because employees will also see a cut in their compensation due to the change in locality pay. At the same time, moving to Kansas City would create new financial strain for many employees--to take just two examples employees have told me, by requiring their spouse to leave their job, or by requiring them to sell their homes in a poor housing market. Bargaining unit employees have told me they would rather risk a period of being unemployed in the NCR while they look for new work, even given the condition of the current labor market, than take a pay cut and move to a city where they have few connections.

45.     Many bargaining unit employees who have been directed to relocate have also made very clear to me that moving to Kansas City would create enormous strain on their families or otherwise be impossible in a myriad of other ways. For example, I spoke with a bargaining employee with a new baby who is trying to decide if relocating is feasible for their family. They started researching daycare options in Kansas City. After calling fourteen different facilities, they learned that there is not currently any availability until March of 2027. Thus, for them, accepting a relocation assignment means risking access to a critical service that their family relies on.

Reply Declaration of Collin Bradley, No. 3:25-cv-03698-SI                                      8

46. Bargaining unit employees have also told me they are not able to uproot their families' lives. We have bargaining unit employees that are married to other federal workers who are required to stay in DC. The relocation order means that these employees must choose to prioritize one spouse's career over the other and risk becoming single income households.

47. We also have bargaining unit employees with children that have lived in this area their entire lives. These bargaining unit employees must choose whether they want to allow their children to finish high school at the same school or bring them to a new city, where they will have no connections.

48. Another bargaining unit member explained to me they have child custody arrangements that require them to stay within the NCR. It is simply not possible for many bargaining unit employees to move away from the NCR, and bargaining unit employees are frustrated that they are being asked to make enormous sacrifices when it is all clear that relocating will not improve their work.

49. Moving to Kansas City is counterproductive from a career development perspective for our members. The NCR has a high concentration of jobs available that relate to our unique skillsets and expertise in international economics and diplomatic trade programming. Bargaining unit employees have expressed that they are concerned there are no similar employers in Kansas City, which decreases their career mobility. Given that we do not even know the full extent of the Agency's reorganization, bargaining unit employees are hesitant to take the risk of moving for one employer when they do not know if the programs that they administer will continue, or if their work will be made obsolete by later reorganizations.

50. The fact that DC is the primary job market for our areas of work—not Kansas City— also makes me skeptical of any claim that USDA will be able to backfill positions that will be vacated due to attrition.

51. At the Foreign Agricultural Service, bargaining unit employees have very specialized skillsets, requiring a unique hiring pool. Take the example of our International Food Assistance Division. To fill positions for these programs, we need candidates with experience in international aid and development, who have administered complicated programs on a global basis. The NCR has a

much higher concentration of job seekers with those skills, especially given the fact there are former employees of the United States Agency for International Development (USAID) seeking work here in the NCR. The same is not true of Kansas City, which to my knowledge, is not known for having a robust international development community. This means it will be harder to fill vacant positions with qualified candidates in Kansas City, which is concerning given that our programs are already understaffed. One datapoint that illustrates this is the fact that right now, the Agency is relying on three- or four-month details from other USDA agencies to staff our programs. Relocating to Kansas City will mean that the Agency won't have the same experts readily available, which could lead to critical staffing gaps.

52. The significant level of attrition that will occur if the Foreign Agricultural Service relocations progress will lead to tremendous loss of institutional knowledge and expertise, particularly within the Global Programs division where a majority of employees have been directed to relocate. The programs that bargaining unit employees work on are complex and take a long time to learn. For example, I work on the team that administers the GSM-102 Export Credit Guarantee Program, which insures up to five billion dollars a year in exports. The system we use is somewhat antiquated and requires specialized knowledge. There are only three employees that are experts in using it. If they all end up leaving the Foreign Agricultural Service because of the relocation, it means there will be no one left that understands the ins and outs of that system, and no external candidates who will have that knowledge. Realistically, it would take years for someone new to get up to speed, and all the while, export programs would be at risk.

53. This is true across our different programs—it takes years to learn the relevant regulations, understand how our programs are administered, and to build the necessary relationships. What is more, the relocation program will make it harder for new employees to learn these necessary skills and gain the expertise they need. In my experience, the most effective form of onboarding is in-person collaboration. Now, the supervisors and coworkers that can train them will be a thousand miles away, and many of the coworkers that would have been most primed to teach them will have been forced out of the agency.

54. I do not believe it will be possible for the Agency to continue its work with attrition levels that this reorganization is going to cause. Any employees who remain (including any bargaining unit members) either in the NCR or Kansas City will be dramatically affected and are going to have to do far more work to help the Agency even attempt to perform any of its functions.

55. Agency management is well aware of the level of experience reflected among the FAS staff being relocated to Kansas City, and the years of training and on the job experience it would require to replace staff who will not make this move. Given this, the Agency *must* be aware that attrition is going to have an immediate and large impact on agency function. This fact reinforces my belief that the Agency intends this forced relocation to reduce the workforce and the services that we perform.

56. In sum, as when the relocation was first announced, I am convinced that relocating components of the Foreign Agricultural Service will have devastating effects on our work. It will also have a host of negative effects on bargaining unit employees. I know this because I am one of the bargaining unit employees that is now forced to choose between a job that I love and my family.

57. On the same day that the Union received the email discussed above, I received a LOI specifying that my position will be relocated to Kansas City, which is consistent with the spreadsheet that the Union received. A true and correct copy of this letter is included as **Exhibit A**.

58. If this relocation order is not paused for me personally, I will be forced to leave Foreign Agricultural Service. My life is in Washington, DC. My husband works in the DC-area for a major defense contractor and cannot relocate. It does not make financial sense for our family to move for my position, especially because I would likely see a drop in compensation due to the corresponding change in locality pay. It makes no sense for me to move to Kansas City when moving there would severely limit my career development opportunities. For example, one day, I had hoped to apply to become a division director. If I move to Kansas City, it appears that this would be off the table there (as division directors are remaining in the NCR), and there are no comparable employers that I could transition to advance my career. In short, Kansas City would be a dead end from a career development perspective, which means that the personal and financial sacrifices I would need to make to relocate are simply not worth it.

59.    I know that others are in the same position and will look for other jobs in earnest prior to their relocation dates. Many will take the gamble of leaving the Foreign Agricultural Service even without a new job in place rather than uproot their families and lives in the NCR, including me. Such attrition would be a huge loss not only to these employees, who care deeply about their work and public service, as do I, but also the Agency, which will lose an irreplaceable level of expertise and knowledge.

60.    I am particularly concerned about the programs where the vast majority of bargaining unit employees have been directed to relocate, like my own. Our staffing capacity is already stretched thin, and with any more attrition, I do not know how the Foreign Agricultural Service will be able to administer the critical programs that American farmers rely on. This fact is especially frustrating given that the relocation does nothing to help employees get our work done.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed August 6, 2026, in Washington, DC.

Collin Bradley
Collin Bradley

Reply Declaration of Collin Bradley, No. 3:25-cv-03698-SI                                    12

# Exhibit A



U.S. DEPARTMENT OF AGRICULTURE

**Foreign Agricultural Service**
**1400 Independence Avenue, SW**
**Washington, DC 20250**

July 17, 2026

TO:   COLLIN PATRICK BRADLEY
     INTERNATIONAL TRADE SPECIALIST
     CREDIT PROGRAMS
     GLOBAL PROGRAMS
     OFFICE OF DEPUTY ADMINISTRATOR
     collin.bradley@usda.gov

FROM:  M. Lynn Matherly
     Chief Human Capital Officer
     Business Operations
     USDA/FAS

SUBJECT: FAS Reorganization – Your Position in the National Capital Region (NCR)

As you are aware, on June 17, the U.S. Department of Agriculture announced a reorganization of the Foreign Agricultural Service (FAS). I am writing to let you know specifically how upcoming organizational changes will affect your position. Your position has been identified as one that will be relocated from the NCR as part of this restructuring. I want to be straightforward with you about what we know, what is still being worked out, and what support is available to you.

**What Is Happening.** FAS is restructuring to move positions and resources closer to the establishments and public we serve. As part of this effort, a significant number of positions currently based in the NCR are being relocated. Your position is among those identified for relocation. **Your new duty station will be Kansas City, MO.**

In accordance with Article 36 of the American Federation of State, City, and Municipal Employees (AFSMCE) Local 3976 Collective Bargaining Agreement (CBA), this notice serves as a communication to employees on the status of the FAS reorganization. **This is not the official letter reassigning you to your new location.** Management is in the process of engaging with the Union in accordance with the CBA. As bargaining continues, more information may be communicated. **You will receive an official letter confirming your new duty station, reporting date, and relocation benefits before any change takes effect.** We are providing this letter to you today to give you time to plan. **Once you receive your official letter you will have 30 days to make your decision.**

In addition to the move, the organizational structure of your position may be changing. The specifics of the new organizational structure are still being worked out. You will be provided with further information once it is finalized.

**USDA is an equal opportunity provider, employer, and lender.**

While the specifics are still being worked out, there are things I can tell you today:

- There is a position for you. This reorganization is about repositioning the Agency, not reducing it. Your skills and experience are needed, and FAS has a place for you.

- You will receive relocation benefits. Employees who are required to relocate will be authorized benefits in accordance with the Federal Travel Regulations, which may include house-hunting trips, temporary quarters, transportation of household goods, real estate transaction assistance, and the relocation income tax allowance.

- Your locality pay may change. If your new duty station is in a different locality pay area than the NCR, your locality rate will adjust to reflect the new location. We will provide specific pay information when your individual assignment is finalized.

- We understand that relocating a household, a family, and a life takes time. We hope this advance notice helps as you consider the circumstances.

- Telework and remote work arrangements will be addressed. If you currently have a telework or remote work agreement, it will need to be reviewed in the context of your new duty station.

**Support Available.** The following resources are available to you and your family:

- Support, guidance, and referrals to helpful resources are available from the Employee Assistance Program online and at 1-800-222-0364 (1-888-262-7848 TTY), and the Federal Occupational Health's WorkLife4You Program. These resources may help you effectively manage life's milestones, transitions and responsibilities at work and at home.

- Reorganization information, including regularly updated Frequently Asked Questions (FAQs), timelines, and organizational details, will be posted at FAS Reorganization Information. In addition, updates will continue to be shared directly by Agency officials and through supervisory channels on a regular basis.

**Points of Contact.** Here are some key points of contact for you:

- Benefits counseling is available from your program's benefits team, fas.benefits@usda.gov. One topic of interest that you may want to explore with your benefits specialist is Voluntary Early Retirement Authority (VERA). VERA allows USDA to temporarily lower the age and service requirements for retirement, under certain circumstances. You also may want to ask if you will be eligible for Discontinued Service Retirement. Please note that if you are eligible for retirement, you will not be entitled to severance pay.

- Staffing guidance is available from your program's staffing team, FAS.Reorganization@usda.gov. If an employee declines a formal offer of reassignment

outside his/her local commuting area, the individual is considered displaced under the Career Transition Assistance Program (CTAP) and the Interagency Career Transition Assistance Program (ICTAP). Employees who resign involuntarily and those who retire in lieu of being involuntarily separated are eligible for career transition assistance. Eligibility for CTAP and ICTAP typically lasts for up to one year, unless the employee no longer meets the eligibility conditions.

- General questions about this memo may be directed to FAS.Reorganization@usda.gov.

Thank you for your continued service to FAS and to the American public. I know this is a time of uncertainty, and I appreciate your patience and professionalism as we work through this transition.