CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
Fax: (415) 436-6748

ERIC J. HAMILTON
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
BRAD P. ROSENBERG
JEREMY S.B. NEWMAN
Chief Litigation Counsel
CHRISTOPHER HALL
Assistant Branch Director
ROBERT C. BOMBARD
TAYLOR PITZ (CABN 332080)
Trial Attorney
Civil Division, Federal Programs Branch

1100 L Street, NW
Washington, DC 20005
Telephone: (202) 305-5200
Taylor.N.Pitz@usdoj.gov

Counsel for Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, *et al.*

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

Defendants.

Case No. 3:25-cv-03698-SI

**DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date: September 1, 2026
Time: 11:30 am PT
Judge: Hon. Susan Illston
Place: San Francisco Courthouse
Courtroom 1

Per the Court's August 21, 2026, Order Directing Supplemental Briefing, ECF No. 473, Defendants provide the following responses to the Court's directed supplemental briefing.

## I. Case law and other authorities confirm that Congressional approval clauses in the appropriations context are not legally binding or enforceable.

### A. <u>Case law</u>

Case law addressing Congressional approval clauses in the appropriations context is limited, but *American Federation of Government Employees, AFL-CIO v. Pierce*, 697 F.2d 303 (D.C. Cir. 1982), is directly on point, and the Court should follow its instructive analysis.

There, the D.C. Circuit considered a challenge to a Department of Housing and Urban Development ("HUD") reorganization that included a proposed Reduction in Force ("RIF"). *Id.* at 304. Plaintiffs had challenged the RIF as "a 'reorganization of the Department' of the type Congress meant to block through a provision in the HUD Appropriation Act precluding use of funds 'prior to January 1, 1983, to plan, design, implement, or administer any reorganization without the prior approval of the Committees on Appropriations'"—an approval clause closely resembling the one at issue here. *Id.* (citing Department of Housing and Urban Development—Independent Agencies Appropriations Act, Pub. L. No. 97-272, 96 Stat. 1160 (1982)).

The court held that the clause was unconstitutional, no matter how it was construed. If the provision was "regarded as creating a power in either Appropriations Committee to prevent otherwise-authorized expenditures of funds," then "the provision[] [was] a legislative veto in the usual sense, [and] in this case a veto power placed by law in a single committee of the House or the Senate." *Id.* at 306. "[A] one-house veto of otherwise permitted executive action is an act of legislative power" and "violates the Constitution in three respects": (1) "[l]egislative power may be exercised only as provided in article I, section 7 of the Constitution"; (2) a "one-house veto impermissibly makes law without a vote by both Houses of Congress and circumvents the President's power to veto"; and (3) "[l]egislative vetoes also violate the principle of separation of powers" because they "provide a means for Congress to control the executive without going through the full lawmaking process, thus unconstitutionally enhancing congressional power at the expense of executive power." *Id.* Accordingly, the court concluded that "[a]s a one-house veto, the power contained in the HUD Appropriations Act [was] thus

violative of the Constitution and void." *Id.* "That conclusion is only reinforced by the fact that the Act does not even provide a one-house veto but a one-committee veto." *Id.*

Alternatively, the court explained that, if the provision was instead viewed as "prohibiting HUD from using appropriated funds for certain purposes but empowering both Appropriations Committees, acting together, to lift the prohibition and authorize HUD to make such use of the funds," then it was still an impermissible "grant of legislative power to two congressional committees," in violation of article I, section 7 of the Constitution. *Id.* That section "prescribes the only method through which legislation may be enacted" and "restricts the operation of the legislative power to those policies which meet the approval of three constituencies, or a supermajority of two." *Id.* (citation modified). The court explained that committee approval was not equivalent to bicameralism "since neither house itself is fully involved in the legislative act," but that in any case, "the lack of presentment of the 'legislation' to the President [was] enough to invalidate the provision." *Id.* Accordingly, "[s]eparation-of-powers principles [were] offended because Congress ha[d] attempted to enlarge its powers in relation to the President's by making him subject to committee lawmaking." *Id.*

In addition to holding the clause itself unconstitutional, the court also explained that the clause should not be severed to create an "absolute ban on all HUD reorganization-directed activity." *Id.* at 307. The court held that "[i]n the absence of indicators that Congress would have opted for an absolute prohibition on HUD reorganization," it would "conclude that the proviso is not divisible" and "must fall in its entirety." *Id.* It explained that because "the legislative history casts grave doubt on any supposition that the Senate would have agreed to an absolute prohibition," it declined to create "a ban which would have precluded HUD from making personnel decisions that ordinarily accompany an agency's programmatic authority." *Id.*

*Pierce* is directly on point here. The committee-approval provisions in the FY 2026 appropriations acts closely mirror the one challenged in *Pierce* and thus are unconstitutional exercises of the legislative power, no matter how Plaintiffs frame them. The Supreme Court's decision in *INS v. Chadha*, 462 U.S. 919, 952-59 (1983), issued just months after *Pierce*, confirms that analysis and compels that conclusion here: congressional action that alters the legal rights and duties of persons outside the

Legislative Branch must conform to the Constitution's requirements of bicameralism and presentment. And, as in *Pierce*, there is no legislative history here indicating that, in the absence of the committee approval provisions, Congress would have enacted an absolute ban on all USDA reorganization-directed activity. *See* Defs.' Opp. to Pls.' Mot. for Prelim. Inj. at 26-27, ECF No. 457 ("Defs.' Opp."). Plaintiffs' motion cites the circumstances around the FY 2026 appropriations process to argue that the Court should creatively sever the statute to create one. *See, e.g.*, Pls.' Mem. in Supp. of Mot. for Prelim. Inj. at 31, ECF No. 440-1 ("Pls.' Mot."). The reality is, however, that there is nothing unique about USDA's FY 2026 appropriations restrictions. As explained below, similar restrictions have been included in USDA's appropriations acts since 2015, and their inclusion in the 2026 acts does not demonstrate specific Congressional opposition to the present reorganization. Plus, for decades the Executive Branch has stated clearly that it views Congressional approval clauses as unconstitutional and without legal effect. *See infra* Section I.B. So, if Congress intended to impose an absolute ban against the expenditure of funds in the alternative, it would have said so explicitly. It didn't, and therefore, as in *Pierce*, the Court should not impose a judicially created ban on reorganization where Congress itself declined to impose one. To hold otherwise would have sweeping consequences. As explained below, in the appropriations context, Congress regularly continues to enact unconstitutional legislative vetoes, and under Plaintiffs' proposed severance analysis, every one of them should be interpreted as a ban on the underlying activity. Further, if anything, the Court's decision here is even easier than the one the D.C. Circuit faced in *Pierce*. There, the court had to nullify the entire Congressional oversight mechanism, but here, the Court can leave in place a constitutionally valid oversight mechanism: the notification requirement. Accordingly, *Pierce* strongly supports Defendants' argument that the Court should invalidate and sever only the unconstitutional congressional approval requirement. *See* Defs.' Opp. at 22-27.[1]

B. <u>Legislative and Executive Branch Authorities</u>

Though judicial case law is limited, legislative opinions from the Government Accountability Office ("GAO") and Congressional Research Service ("CRS") both track *Pierce*. *See* GAO, *About*, https://www.gao.gov/about ("GAO, often called the 'congressional watchdog,' is an independent,

[1] Alternatively, the Court should sever the entire sections at issue, as the D.C. Circuit did in *Pierce*.

non-partisan agency that works for Congress."); CRS, *About Congressional Research Service (CRS) Products*, https://www.congress.gov/help/crs-products ("By law, CRS works exclusively for Congress, providing timely, objective, and authoritative research and analysis to committees and Members of both the House and Senate.").

For instance, GAO's Principles of Federal Appropriations Law publication states repeatedly that appropriations act "requirements for approval by one or more congressional committees" are "'legislative veto' provisions [that] are no longer valid" or "legally binding" following *Chadha*. GAO, *Principles of Federal Appropriations Law*, 4th ed., ch. 2, 2-43, 2-46, GAO-16-464SP (Mar. 2016), https://www.gao.gov/assets/gao-16-464sp.pdf.

Similarly, a 1984 GAO report recognized that "[a] statutory requirement to accomplish the same purpose, that is, committee approval of or a committee veto over reprogramming of lump sum appropriations, would not be permissible under *Chadha*." GAO, *Impact of Chadha on the Appropriation Process* at 8-9 (Mar. 1, 1984), https://www.gao.gov/assets/123542.pdf. "Such a statutory requirement would amount to an attempt to reserve to the Congress the authority to overturn an executive action[,] a reprogramming decision—pursuant to an implied delegation of authority in the lump sum appropriation, without use of the constitutionally-mandated legislative procedure." *Id.* at 9.

A more recent GAO decision considered the Congressional approval clause in USDA's FY 2018 appropriations act in the context of evaluating USDA's relocation of the National Institute of Food and Agriculture ("NIFA") and the Economic Research Service ("ERS"). *See* GAO Decision B-334306 at 9 (Aug. 15, 2023), https://www.gao.gov/assets/830/828269.pdf (citing Pub. L. No. 115-141's provision requiring USDA to receive the Appropriations Committees' "approval . . . at least 30 days in advance" of taking a particular action). The GAO explained that this "provision reserves within the Appropriations Committees the power to approve executive action made pursuant to authority Congress has already delegated to the executive branch," and noted that *Chadha* held "that such provisions are inconsistent with the Constitution's procedures of bicameralism and presentment of legislation." *Id.* Accordingly, "consistent with precedent, [GAO] conclude[d] that [the statute's] requirement for the approval of the Appropriations Committees [was] not legally binding and without effect." *Id.* at 10. And after "excising the approval proviso," but leaving in place "the requirement for advance

written notice," GAO determined that "USDA was required to notify the Appropriations Committees before making the transfers at issue, but not to obtain their approval." *Id.*

GAO reached a similar conclusion in a decision considering the Office of Personnel Management's restructuring and reorganization. *See also* GAO Decision B-332704 at 8, 10, 12 (June 30, 2022), https://www.gao.gov/assets/730/721417.pdf ("[r]ecogniz[ing] that the approval requirement raises issues with constitutional precedent," and accordingly finding that "the approval provision under section 608 is not legally binding" and determining "not [to] apply section 608's approval requirement to OPM's reprogramming").

CRS has similarly stated that approval clauses in appropriations acts are unconstitutional and unenforceable. For example, in its recent review of the current USDA reorganization, CRS explained that "Courts generally have upheld congressional notification requirements, sometimes called 'report and wait' provisions (*see INS v. Chadha*, 462 U.S. 919, 935 n.9 (1983))"; "however, the requirement to obtain committee approval prior to completing a reorganization raises legal issues concerning Congress's use of a 'legislative veto.'" *See* CRS, *U.S. Department of Agriculture (USDA): Structure and Proposed Changes* at 2 n.13, 22, 23 n.171 (Apr. 14, 2026), https://www.congress.gov/crs-product/R48905#ifn13. Separately, CRS has stated "[i]n the appropriations context, for example, executive agencies reliant on annual appropriations may have future financial incentives to cooperate with congressional committees that require approval of certain actions, despite those approval requirements likely violating *Chadha*." CRS, *Statutory Mechanisms for Agency Oversight after* INS v. Chadha, at 15 (June 2, 2026), https://www.congress.gov/crs-product/R48965.

Likewise, the Executive Branch has long objected to congressional approval provisions as unconstitutional, often citing *Pierce* and *Chadha*. For instance, in 1996, the Department of Justice's Office of Legal Counsel ("OLC") confirmed its view that *Chadha* bars Congressional attempts to "bind the actions of executive or administrative officials that have not been approved by both houses and presented to the President," including provisions prohibiting "the expenditure of funds for some purpose, but allowing a future expression of approval by committee action to remove the prohibition." *See* OLC, *The Constitutional Separation of Powers Between the President and Congress*, 20 U.S. Op. Off. Legal

Counsel 124, 1996 WL 876050, at *8-9 (May 7, 1996); *see also id.* at *8 n.39 (citing *Pierce*, 697 F.2d at 306).

And in an opinion from 2007, OLC noted that although "[m]ore than 20 years" had passed since the Supreme Court's "clearly controlling" decision in *Chadha*, "a surprising number of newly enacted statutes seek to require the approval of a congressional committee before execution of a law." OLC, *Presidential Signing Statements*, 31 U.S. Op. Off. Legal Counsel 23, 24, 2007 WL 5964723, at *2 (2007). In fact, at that point "unconstitutional legislative veto provisions remain[ed] so common that President Bush [] had to raise the issue in approximately 55 of his 126 constitutional signing statements." *Id.* For instance, in President Bush's Statement on Signing the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 41 Weekly Comp. Pres. Doc. 1701, 17 (Nov. 10, 2005), President Bush specified that "[t]he executive branch shall construe certain provisions of the Act that purport to require congressional committee approval for the execution of a law as calling solely for notification, as any other construction would be inconsistent with the principles enunciated by the Supreme Court of the United States in *INS v. Chadha*." *Id. See also* Official Opinions of the Attorneys General of the United States: Advising the President and Heads of Departments In Relation to Their Official Duties at 56-67 (1936), https://hdl.handle.net/2027/mdp.39015051148545 (advising that a committee approval requirement regarding a lump-sum appropriation for refunding taxes illegally or erroneously collected was unconstitutional).

And as particularly relevant here, when USDA's Office of General Counsel ("OGC") issued a legal opinion regarding USDA's proposal to realign and relocate ERS and NIFA, it similarly explained that the Congressional approval requirement contained in the FY 2018 appropriations act was unconstitutional, noting that "[i]n the nearly forty years since *Chadha*, the Executive Branch has consistently found that all such legislative veto provisions are null and void, including appropriations acts provisions." USDA OGC, *Memorandum re: USDA's Proposal to Realign and Relocate the Economic Research Service and National Institute of Food and Agriculture* at 6-8 & n.9 (July 19, 2019) (citing *Pierce*, 697 F.2d at 306). USDA also noted that "[t]he unconstitutionality of approval provisions is such an accepted fact that, despite its repeated passage of these unconstitutional laws, Congress itself has acknowledged that approval provisions are invalid," citing the GAO publication cited above. *Id.* at 7. Accordingly, the

memorandum "reach[ed] the same conclusion as the Supreme Court, the Office of Legal Counsel, and Congress's GAO have: The [approval] provision is unconstitutional and of no effect." *Id.* at 8.

***

Accordingly, all three branches of government have held or opined that Congressional approval requirements in the appropriations context are unconstitutional and unenforceable. For the reasons stated above and those in Defendants' opposition brief, the Congressional approval requirements contained in § 716 and § 421 of the relevant 2026 appropriations acts have no legal effect because they are unconstitutional legislative vetoes. *See* Defs.' Opp. at 23-25. The Court should therefore sever the approval requirement from those appropriations acts.

## II. Case law and other authorities confirm that Congressional notification clauses in the appropriations context are constitutionally valid oversight mechanisms.

In contrast to Congressional approval clauses, there is a consensus that Congressional notification requirements are constitutionally valid oversight mechanisms. *See, e.g.*, *Chadha*, 462 U.S. at 934-35 (leaving in place Congressional reporting requirement); *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 689-90 n.12 (1987); CRS, *Statutory Mechanisms for Agency Oversight After INS v. Chadha* at 15-18 (citing Congressional reporting requirements and report-and-wait requirements as permissible alternatives to legislative vetoes); GAO Decision B-334306 at 8-10 (discussing Congressional notification as an "exercise[]" of Congress's "power of the purse," explaining "Congress has a clear interest in being informed of how agencies will obligate the amounts Congress appropriates," and "excising the approval proviso" as constitutionally invalid but leaving in place "the requirement for advance written notice" as "a valid oversight provision that is fully operative and binding on USDA").

Defendants have not argued that Congressional notice clauses are unconstitutional, and USDA has been diligently providing notifications to Congress throughout the reorganization process. *See* Exs. 1 & 2 to Walker Decl., ECF No. 457-2 (Congressional notifications). Therefore, the Court should decline to sever the Congressional notification requirement from the FY 2026 appropriations acts consistent with the Supreme Court's directive to "refrain from invalidating more of the statute than is necessary." *Alaska Airlines*, 480 U.S. at 684.

**III. Appropriations act restrictions—constitutionally valid or not—are not enforceable by third parties like Plaintiffs.**

Regardless of whether a particular Congressional appropriations act restriction on the Executive Branch is constitutionally permissible (like a notification requirement) or not (like an approval requirement), third parties like Plaintiffs lack a cause of action to enforce them in court. Instead, disputes regarding those provisions are matters for resolution between the political branches, and can be addressed under the Anti-Deficiency Act.

As Defendants have argued, no cause of action permits Plaintiffs here (or third parties in general) to sue to enforce appropriations act restrictions. Defs.' Opp. at 24. No Administrative Procedure Act ("APA") cause of action is available because the Anti-Deficiency Act's comprehensive and exclusive set of remedies for allegedly unlawful Executive Branch expenditures impliedly precludes any such claim. *See* 31 U.S.C. § 1341(a)(1)(A); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). The Anti-Deficiency Act carefully regulates funding deficiencies and requires notification of violations to Congress, the President, and the Comptroller General. 31 U.S.C. §§ 1349, 1350, 1351.

The Supreme Court has determined, on a stay application, that the Impoundment Control Act—the Anti-Deficiency Act's corollary governing when the Executive Branch may withhold funding authorized by Congress—"preclude[d] respondents' suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue" in that case. *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 146 S. Ct. 19 (2025) (Mem.). Other courts have reached the same conclusion. *See Glob. Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025) (holding plaintiffs had no cause of action to challenge an alleged violation of the Impoundment Control Act because the Act's "complex scheme" precluded APA review); *see also Gen. Land Office v. Biden*, 722 F. Supp. 3d 710 (S.D. Tex. 2024) (explaining that "APA review for ICA violations is improper"). The same rationale for concluding that the Impoundment Control Act precludes APA review supports that the Anti-Deficiency Act does so too.

Similarly, the D.C. Circuit and other courts have long held that statutes requiring the Executive Branch to report information to Congress do not create judicially enforceable rights in third parties. In *NRDC v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988), for instance, the D.C. Circuit held that a challenge invoking a Congressional reporting requirement was not subject to judicial review. The court

explained that "[g]enerally, congressional reporting requirements are, and heretofore have been, a management tool employed by Congress for its own purposes." *Id.* at 319. The court therefore "de-cline[d] to take the remarkable step, rife with the danger of flooding an already over-burdened judicial system with failure-to-report cases" of reviewing the plaintiffs' reporting claim "when Congress has not provided for judicial scrutiny of this aspect of the interbranch relationship." *Id.* The Ninth Circuit has held the same, explaining that "[h]aving requested the report, Congress, not the judiciary, is in the best position to decide whether it's gotten what it wants." *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998). And, as the D.C. Circuit noted, "[i]t scarcely bears more than passing mention that the most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives." *Hodel*, 865 F.2d at 319; *see id.* ("[I]n the absence of a congressional directive for judicial review of claims by non-congressional parties, this issue seems to us quintessentially within the province of the political powers to resolve as part of their ongoing relationships.").

This rationale tracks with basic principles of APA review, as neither making a report of information to Congress, nor receiving Congressional approval even if it were given, bear the hallmarks of reviewable final agency action. *See Hodel*, 865 F.2d at 318 (describing "the nature of the 'agency action'" for agency reporting as "quite distinct from the prototypical exercise of agency power" because rather than exercising "governmental power," the agency is "simply reporting back to the source of its delegated power"); *Guerrero*, 157 F.3d at 1195 (explaining that agency reporting "is not agency action of the sort that is typically subject to judicial review" "[b]ecause it triggers no legal consequences and determines no rights or obligations").

For these reasons, Congressional "notice and approval clauses" are not enforceable by third parties like Plaintiffs in federal court.

**IV. Whether Congressional notice and approval clauses are commonly included in appropriations bills, including USDA appropriations.**

Congressional notification and approval clauses are commonly and routinely included in appropriations acts, including those for USDA. Similar clauses have consistently been included in USDA's appropriations acts since 2015. *See, e.g.*, Consolidated and Further Continuing Appropriations Act, Pub. L. No. 113-235, div. A, § 719(a), 128 Stat. 2130 (2014) ("None of the funds provided by this

Act . . . shall be available for obligation or expenditure. . . through use of [] authority . . . that— (1) creates new programs; (2) eliminates a program, project, or activity; (3) increases funds or personnel by any means for any project or activity for which funds have been denied or restricted; (4) relocates an office or employees; (5) reorganizes offices, programs, or activities; or (6) contracts out or privatizes any functions or activities presently performed by Federal employees; unless the Secretary of Agriculture . . . notifies in writing and receives approval from the Committees on Appropriations of both Houses of Congress at least 30 days in advance of the reprogramming of such funds or the use of such authority."); Consolidated Appropriations Act, Pub. L. No. 114-113, div. A, § 717(a), 129 Stat. 2242 (2015) (similar); Consolidated Appropriations Act, Pub. L. No. 115-31, div. A, § 717(a), 131 Stat. 135 (2017) (similar); Consolidated Appropriations Act, Pub. L. No. 115-141, div. A, § 717, 132 Stat. 348 (2018) (similar); Consolidated Appropriations Act, Pub. L. No. 116-6, div. B, § 716, 133 Stat. 13 (2019) (similar); Further Consolidated Appropriations Act, Pub. L. No. 116-94, div. B, § 716, 133 Stat. 2534 (2019) (similar); Consolidated Appropriations Act, Pub. L. No. 116-260, div. D, § 716, 134 Stat. 1182 (2020) (similar); Consolidated Appropriations Act, Pub. L. No. 117-103, div. A, § 716, 136 Stat. 49 (2022) (similar); Consolidated Appropriations Act, Pub. L. No. 117-328, div. A, § 716, 136 Stat. 4459 (2022) (similar); Further Consolidated Appropriations Act, Pub. L. No. 118-42, div. A, § 716, 138 Stat. 105 (2024) (similar); Full-Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, div. A, § 1105, 139 Stat. 9 (2025) (continuing limitations from FY 2024 appropriations acts).

Similar provisions commonly appear in appropriations acts for other agencies as well. *See, e.g.*, Energy and Water Development Appropriations Act, Pub. L. No. 109-103, § 101(a)(7), 119 Stat. 2247 (2005) ("None of the funds provided . . . shall be available for obligation or expenditure through a reprogramming of funds that—. . . creates, reorganizes, or restructures a branch, division, offices, bureau, board, commission, agency, administration, or department different from the budget justifications submitted to the Committees on Appropriations . . . unless prior approval is received from the House and Senate Committees on Appropriations."); Consolidated and Further Continuing Appropriations Act, Pub. L. No. 113-235, § 101, 128 Stat. 2139 (2014) ("None of the funds provided . . . shall be available for obligation or expenditure through a reprogramming of funds that: (1) creates or initiates a new program, project, or activity; (2) eliminates a program, project, or activity; (3) increases

funds or personnel for any program, project, or activity for which funds have been denied or restricted by this Act, unless prior approval is received from the House and Senate Committees on Appropriations; (4) proposes to use funds directed for a specific activity for a different purpose, unless prior approval is received from the House and Senate Committees on Appropriations; (5) augments or reduces existing programs, projects, or activities in excess of the amounts contained in paragraphs 6 through 10, unless prior approval is received from the House and Senate Committees on appropriations"); Financial Services and General Government Appropriations Act, Pub. L. No. 115-31, div. E, § 608(7), 131 Stat. 135 (2017) ("[N]one of the funds provided in this Act . . . shall be available for obligation or expenditure through a reprogramming of funds that . . . creates or reorganizes offices, programs, or activities unless prior approval is received from the Committees on Appropriations of the House of Representatives and the Senate."); Further Consolidated Appropriations Act, Pub. L. No. 116-94, § 201(a), 133 Stat. 2534 (2019) ("None of the funds provided . . . shall be available for obligation or expenditure through a reprogramming of funds that—(1) initiates or creates a new program, project, or activity; (2) eliminates a program, project, or activity; (3) increases funds for any program, project, or activity for which funds have been denied or restricted by this Act, unless prior approval is received from the Committees on Appropriations of both Houses of Congress; (4) restarts or resumes any program, project, or activity for which funds are not provided in this Act, unless prior approval is received from the Committees on Appropriations of both Houses of Congress.").

This is consistent with Congress's continued use of legislative vetoes, even following the Supreme Court's decision in *Chadha*. CRS has explained that "[i]n response to [*Chadha*], Congress amended or eliminated some existing legislative veto provisions, but others remain on the books." CRS, *Statutory Mechanisms for Agency Oversight after* INS v. Chadha, at 15. And "[d]espite *Chadha*, Congress continues to enact legislative vetoes of varying kinds." *Id.* "According to one survey, between the *Chadha* decision on June 23, 1983, and the end of 2013, Congress enacted nearly 1,000 additional legislative vetoes." *Id.* "Congress's reasons for these continued enactments vary and potentially include attempting to create the conditions to challenge *Chadha* and other judicial precedent," while "[o]ther commentators posit that certain types of legislative vetoes may have informal effects—that is, the executive branch may choose to comply with the provisions, even though they may not be legally

enforceable." *Id.* "In the appropriations context, for example, executive agencies reliant on annual appropriations may have future financial incentives to cooperate with congressional committees that require approval of certain actions, despite those approval requirements likely violating *Chadha*." *Id.* As explained above, *see supra* pp. 5-7, the Executive Branch has long objected to approval provisions, but Congress has continued to include them in legislation anyway. *See* OLC, *The Constitutional Separation of Powers Between the President and Congress*, 1996 WL 876050, at *8-9 (confirming view *Chadha* bars provisions prohibiting "the expenditure of funds for some purposes, but allowing a future expression of approval by committee action to remove the prohibition.").

Congressional notification provisions are also common. *See, e.g.*, Consolidated Appropriations Act, Pub. L. No. 119-75, § 514, 140 Stat. 173 (2026); FY 2026 Consolidated CJS, Energy & Water Development, Interior and Environment Appropriations Act, Pub. L. No. 119-74, § 505, 140 Stat. 5 (2026); Consolidated Appropriations Act, Pub. L. No. 116-6, § 7015(a), (b), 133 Stat. 13 (2019).

**V. Whether USDA has taken the position that approval clauses are binding on the agency.**

Though the Court cites USDA's position in *Bread for the City v. USDA*, No. 1:15-cv-1591 (D.D.C.), regarding whether approval clauses are binding on the agency, the parties did not litigate the validity of approval clauses in that case, nor did the court's decision rely on or even refer to USDA's position on this issue. *See Bread for the City, Inc. v. USDA*, 211 F. Supp. 3d 327 (D.D.C. 2016). At any rate, USDA disavows that position now. USDA notes that it is exceptionally difficult to obtain estoppel against the government. *See, e.g., Heckler v. Community Health Servs, of Crawford Cty., Inc,*, 467 U.S. 51, 60 (1984) (noting the "heavy . . . burden . . . when estoppel is asserted against the Government"); *United States v. Mendoza*, 464 U.S. 154, 157-64 (1984); *United States v. Kim*, 806 F.3d 1161 (9th Cir. 2015). Stray asides in decade-old briefs provide no basis to estop the Government from faithfully applying the Supreme Court's decision in *Chadha* now.

USDA is not aware of having taken the position that Congressional approval clauses are binding on the agency in any other legal case, and to the extent that it ever has, disavows that position now. To demonstrate that USDA does not view and has not viewed Congressional approval clauses as binding and enforceable, Defendants have attached an exhibit illustrating USDA's ordinary practice when faced with such clauses. Consistent with suggested Executive Branch practice, *see supra* p. 6,

where USDA is faced with a Congressional approval requirement (such as the one contained in Section 716 of Continuing Appropriations, Agriculture, Legislative Branch, Military Construction, and Veterans Affairs, and Extensions Act, Pub. L. No. 119-37, 139 Stat. 495 (2025)), USDA typically provides notice to the relevant Congressional committees, but does not seek approval. *See* Suppl. Rice Decl. USDA notes that, in the case of these notifications, Congress took no further action to approve or disapprove, as is typical.

Dated: August 27, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

ERIC J. HAMILTON
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

BRAD P. ROSENBERG
JEREMY S.B. NEWMAN
Chief Litigation Counsel

CHRISTOPHER HALL
Assistant Branch Director

*/s/ Taylor Pitz*
ROBERT C. BOMBARD
TAYLOR PITZ (CABN 332080)
Trial Attorneys
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Telephone: (202) 305-5200
Taylor.N.Pitz@usdoj.gov

*Counsel for Defendants*