UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO (AFGE), et al.,

Plaintiffs,

v.

DONALD J. TRUMP, et al.,

Defendants.

Case No. 25-cv-03698-SI

**ORDER RE: CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON DHS/FEMA CLAIMS**

Re: Dkt. Nos. 411, 451

Both parties in this action move for partial summary judgment regarding plaintiffs' claims that the Department of Homeland Security ("DHS") unlawfully usurped the authority of the Federal Emergency Management Agency ("FEMA") to make its own personnel decisions and that DHS unlawfully ordered FEMA to cut its staffing in half. Plaintiffs state that in 2025 and early 2026, DHS "leadership created and began implementing a plan to cut the staff of Defendant [FEMA] in half by the end of the 2026 fiscal year—from roughly 23,000 to 11,500 employees, starting with the elimination of" certain "CORE" employee positions beginning January 1, 2026. Dkt. No. 411 ("Pls.' Br.") at 1.

After plaintiffs moved for emergency relief, the Court ordered expedited discovery in early March 2026. The parties now agree that the record on the DHS/FEMA claims is largely complete. The parties' cross-motions for partial summary judgment on the DHS/FEMA claims (Claims VIII through XIII of the Supplemental Complaint) have been fully briefed. *See* Dkt. Nos. 411, 414, 450, 451, 461, 465.

Following oral argument held on September 1, 2026, and for the reasons set forth below, the Court GRANTS plaintiffs' motion for partial summary judgment on their supplemental

Administrative Procedure Act claims, declines to reach their supplemental *ultra vires* claims, and DENIES defendants' cross-motion for partial summary judgment. The Court ORDERS the parties to meet and confer as to the scope of relief.

**BACKGROUND**

**I. Factual Background**

**A. History of FEMA**

At issue in this case is the structure of FEMA and who has authority over FEMA personnel decisions. FEMA was created in 1979. As chronicled by defendants in their papers filed in opposition to a preliminary injunction, FEMA was created against the backdrop that, "[f]or much of American history, a lack of comprehensive [disaster relief] legislation led to a 'cumbersome system' that required Congress to pass a law following each disaster to provide support to the affected communities." Dkt. No. 312 ("PI Opp'n") at 2 (citing Dkt. No. 303 ("Jackson Decl."), Ex. S, Fed. Emergency Mgmt. Agency, *We Are FEMA: Publication 1* 16). "By 1978, more than 100 separate federal agencies had jurisdiction over aspects of emergency management." *Id.* (citing Jackson Decl., Ex. S at 17). That year, President Carter submitted a proposal to Congress to "consolidate emergency preparedness, mitigation, and response activities into one Federal emergency management agency." *Id.* (citing Jackson Decl., Ex. S at 17). Following a partial meltdown at the Three Mile Island Nuclear Generating Station in Harrisburg, Pennsylvania, President Carter signed Executive Order 12127, establishing FEMA effective April 1, 1979. Jackson Decl., Ex. S at 17; *see also* 44 Fed. Reg. 19367 (Apr. 3, 1979).

Over the years, Congress has further defined the agency's functions. Of most relevance to this lawsuit, in 1988, Congress amended the Disaster Relief Act of 1974, renaming it the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). Pub. L. No. 100-707, 102 Stat. 4689 (1988) (codified as amended at 42 U.S.C. §§ 5121 et seq.). The Stafford Act "provided clear direction for emergency management and established the current statutory framework for disaster response and recovery through presidential disaster declarations." Fed. Emergency Mgmt. Agency, *History of FEMA*, *Timeline of Events*, https://www.fema.gov/about/history.

United States District Court
Northern District of California

**B. Creation of DHS and Legislation Post-Hurricane Katrina**

Following the September 11, 2001 terrorist attacks—the 25th anniversary of which we remember today—Congress passed legislation creating the Department of Homeland of Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296 § 101, 116 Stat. 2135, 2142 (2002). The Homeland Security Act of 2002 also transferred FEMA functions into DHS. *Id.* § 503, 116 Stat. 2135, 2213.

In August 2005, Hurricane Katrina devastated the Gulf Coast of Mississippi, Louisiana, and Alabama, killing over 1300 people, causing almost $100 billion of property damage, and becoming "the most destructive natural disaster in American history" up to that point. Jackson Decl., Ex. Q (The White House, *The Federal Response to Hurricane Katrina—Lessons Learned* 1, 7 (Feb. 2006)). Following Hurricane Katrina, a White House report on "Lessons Learned," prepared at President George W. Bush's direction, found that DHS processes were "far too bureaucratic to support the response to a catastrophe" and that DHS had spread FEMA's "planning and coordination capabilities and responsibilities among DHS's other offices and bureaus." *Id.* at 52-53. The report noted that "DHS also did not maintain the personnel and resources of FEMA's regional offices." *Id.* at 53.

On February 21, 2006, Congress passed the Post-Katrina Emergency Management Reform Act of 2006 ("The Post-Katrina Act"). Pub. L. No. 109-295, 120 Stat. 1355. In doing so, Congress cited repeatedly to the "Lessons Learned" report issued after Hurricane Katrina. *See* H.R. Rep. No. 109-476, at 5, 75-76, 94-95 (2006). The Post-Katrina Act was signed into law by President George W. Bush on October 4, 2006. Among other things, the Post-Katrina Act established FEMA as a "distinct entity" within DHS, transferred all "functions" of FEMA—including its personnel—to FEMA, limited the DHS Secretary's ability to reorganize FEMA, and prohibited the DHS Secretary from substantially or significantly reducing "the authorities, responsibilities, or functions" of FEMA. 6 U.S.C. §§ 315(a)(1), 316(a)-(c)(1).

The sections relevant to the present motion provide, in full:

///

United States District Court
Northern District of California

**§ 315. Functions transferred**

**(a) In general**

Except as provided in subsection (b), there are transferred to the Agency[[1]] the following:

**(1)** All functions of the Federal Emergency Management Agency, including existing responsibilities for emergency alert systems and continuity of operations and continuity of government plans and programs as constituted on June 1, 2006, including all of its personnel, assets, components, authorities, grant programs, and liabilities, and including the functions of the Under Secretary for Federal Emergency Management relating thereto.

**(2)** The Directorate of Preparedness, as constituted on June 1, 2006, including all of its functions, personnel, assets, components, authorities, grant programs, and liabilities, and including the functions of the Under Secretary for Preparedness relating thereto.

**(b) Exceptions**

The following within the Preparedness Directorate shall not be transferred:

(1) The Office of Infrastructure Protection.

(2) The National Communications System.

(3) The National Cybersecurity Division.

(4) The functions, personnel, assets, components, authorities, and liabilities of each component described under paragraphs (1) through (3).

**§ 316. Preserving the Federal Emergency Management Agency**

**(a) Distinct entity**

The Agency shall be maintained as a distinct entity within the Department.

**(b) Reorganization**

Section 452 of this title shall not apply to the Agency, including any function or organizational unit of the Agency.[[2]]

[1] "Agency" in this Act means FEMA. Pub. L. No. 109-295 § 602(2), 120 Stat. 1394. "Department" refers to DHS. *Id.* § 602(5), 120 Stat. 1394. "Secretary" refers to the Secretary of DHS. *Id.* § 602(14), 120 Stat. 1395.

[2] 6 U.S.C. § 452 governs how the DHS Secretary may conduct a reorganization.

United States District Court
Northern District of California

> **(c) Prohibition on changes to missions**
>
> **(1) In general**
>
> The Secretary may not substantially or significantly reduce, including through a Joint Task Force established under section 348 of this title, the authorities, responsibilities, or functions of the Agency or the capability of the Agency to perform those missions, authorities, responsibilities, except as otherwise specifically provided in an Act enacted after October 4, 2006.
>
> **(2) Certain transfers prohibited**
>
> No asset, function, or mission of the Agency may be diverted to the principal and continuing use of any other organization, unit, or entity of the Department, including a Joint Task Force established under section 348 of this title, except for details or assignments that do not reduce the capability of the Agency to perform its missions.
>
> **(d) Reprogramming and transfer of funds**
> In reprogramming or transferring funds, the Secretary shall comply with any applicable provisions of any Act making appropriations for the Department for fiscal year 2007, or any succeeding fiscal year, relating to the reprogramming or transfer of funds.

6 U.S.C. §§ 315, 316.

### C. CORE Staffing[3]

FEMA employs both permanent civil service workers protected under Title 5 and temporary employees hired under the Stafford Act who are not covered by Title 5. FEMA's Stafford Act employees include COREs and reservists. Jackson Decl., Ex. H (U.S. Gov't Accountability Off., GAO Rep. No. GAO-23-105663, *FEMA Disaster Workforce—Actions Needed to Improve Hiring Data and Address Staffing Gaps* 11 (2023)). CORE employees are full-time employees hired for two- to four-year terms to work across disasters rather than being hired for a particular disaster. Jackson Decl. ¶ 12; Dkt. No. 303-1 ("Coen Decl.") ¶¶ 5, 17; Dkt. No. 303-2 ("Tierney Decl.") ¶ 11.[4] CORE employees "are a type of temporary full-time employee hired to directly support response

[3] "CORE" stands for the "Cadre of On-Call Response/Recovery Employees."

[4] Michael A. Coen, Jr. worked at FEMA for a total of about fifteen years since 1997 and most recently served as FEMA Chief of Staff from 2021 to 2025. Coen Decl. ¶¶ 2-3. Coen explains that "[i]n the past, CORE employees were generally hired to two-year terms. But because almost all CORE employees were being renewed, FEMA started offering four-year terms to many CORE employees starting in about 2023." *Id.* ¶ 17.

and recovery efforts related to disasters." Jackson Decl., Ex. H at 6. Reservists are on-call employees who are activated to respond to a particular emergency. *Id.* (reservists "work intermittently as required during incident management operations and must be available to deploy as needed"); Tierney Decl. ¶¶ 22-23. At the start of fiscal year 2022, FEMA employed nearly 5,000 Title 5 employees; nearly 9,000 Stafford Act CORE employees; nearly 8,000 Stafford Act reservists; and 1,000 other assorted employees. Jackson Decl., Ex. H at 6.

Because CORE positions are "temporary" positions, these employees are given not-to-exceed ("NTE") dates when hired. Jackson Decl. ¶ 19. Plaintiffs describe FEMA's typical renewal process for COREs: the employee and supervisor submit renewal paperwork to FEMA leadership that includes the supervisor's approval. *Id.* ("As an NTE approached, FEMA supervisors typically completed the required paperwork to extend these terms."). Historically, that process did not involve the Department of Homeland Security. Coen Decl. ¶¶ 17-18; Tierney Decl. ¶ 26; Dkt. No. 414-1, Ex. C ("Prieur Dep.") at 103:23-105:8 ("Previously, FEMA had the authority to renew without going through the hiring verification process."), 292:20-293:19. As described in detail below, the process for renewing CORE employees changed in 2025, when "DHS began requiring FEMA to send over justifications for any CORE employees that FEMA wanted to renew (which generally is all of them)." Jackson Decl. ¶ 20. Beginning January 1 to 22, 2026, CORE employees whose NTE dates were up were not renewed, regardless of their supervisors' recommendations and contrary to the historical practice at FEMA.

## II. Procedural Background

The claims at issue in this motion are part of a larger lawsuit against dozens of federal agency defendants. Plaintiffs are a collection of unions, non-profit organizations, and local governments. They originally filed this lawsuit on April 28, 2025, to challenge the executive branch's implementation of large-scale reductions in force (RIFs) and reorganizations of federal agencies without the participation of Congress. Dkt. No. 1. The Court does not recite in full the factual and procedural background of this case except as needed to resolve the present motions.

Of relevance here, on January 27, 2026, plaintiffs filed an unopposed motion for leave to

file a supplemental complaint. Dkt. No. 290. The Court granted the motion on January 30, 2026, and plaintiffs filed the supplemental complaint that day. Dkt. Nos. 295, 298 ("Suppl. Compl."). Plaintiffs supplement their existing claims with allegations related to the President's October 15, 2025 Executive Order 14356 and its requirement that agencies create, implement, and comply with "Annual Staffing Plans." Suppl. Compl. ¶¶ 435-437, 441-455, 569-574.

The supplemental complaint adds new defendants FEMA and then-Senior Official Performing the Duties of FEMA Administrator ("SOPDA"), Karen Evans. *Id.* ¶¶ 439-440. In addition, plaintiffs bring three new claims against existing defendants DHS and (now former) Secretary Kristi Noem. The new claims against DHS and Noem challenge the alleged revocation of FEMA's authority to renew COREs and the order that FEMA cut its staffing in half, asserting that these are agency actions not in accordance with law and exceeding statutory authority under the Administrative Procedure Act ("APA") (Claim VIII); *ultra vires* and unconstitutional government action (Claim IX); and arbitrary and capricious agency action under the APA (Claim X). *Id.* ¶¶ 575-589. Plaintiffs bring similar claims against FEMA and Evans, alleging that FEMA and Evans have violated the law and exceeded statutory authority under the APA (Claims XI); that FEMA and Evans acted *ultra vires* (Claim XII); and that FEMA and Evans's actions were arbitrary and capricious agency action under the APA (Claim XIII). *Id.* ¶¶ 596-604.

On February 10, 2026, plaintiffs filed a motion for a temporary restraining order related to the non-renewals of CORE employees taking place at FEMA since January 1. Dkt. No. 301. The Court converted plaintiffs' motion for a temporary restraining order into a motion for preliminary injunction and set a briefing schedule. Dkt. No. 304. The Court heard argument on the matter on March 3, 2026.

Following the hearing, the Court issued an order authorizing expedited discovery on certain matters related to the FEMA/CORE issues due to a "significant factual dispute" that arose at the hearing and "the changing position of defendants[.]" *See* Dkt. No. 321. Several months of expedited discovery and further discovery orders followed.[5]

[5] This discovery history is chronicled in detail in the Court's concurrently filed order granting plaintiffs' request for remedies under Federal Rule of Civil Procedure 37(e), due to

United States District Court
Northern District of California

On June 26, 2026, the Court denied plaintiffs' motion for a preliminary injunction, finding:

> While the facts on the ground are in flux, and plaintiffs' concerns are well founded, it appears undisputed that any blanket policy of not renewing CORE employees is not currently in effect. CORE employees with upcoming NTE dates may be eligible for one-year renewal, and those let go in January have received offers to be rehired, even if the precise details and terms are unsatisfactory. In short, the present circumstances no longer appear to warrant "preliminary" injunctive relief, especially the "disfavored" mandatory relief, *see Marlyn Nutraceuticals*, 571 F.3d at 879, of rescinding nonrenewal notices that have issued since January 1. *See* Dkt. No. 411-1 ¶ 2.

Dkt. No. 433 at 5-6. At the same time, the Court granted plaintiffs' request to move immediately to partial summary judgment on the DHS/FEMA claims (Claims VIII through XIII of the Supplemental Complaint) and to treat plaintiffs' supplemental preliminary injunction brief, Dkt. No. 411, as their opening partial summary judgment motion. *Id.* at 6. The Court also denied defendants' motion to dismiss the supplemental complaint. Dkt. No. 434.

## III. Factual Findings

Unless otherwise noted, the following facts are undisputed. At the hearing, defendants emphasized that they do not oppose plaintiffs' motion for partial summary judgment on factual grounds but rather on the legal grounds addressed in the Discussion Section, Part I, below.

### A. Rule 37(e) Spoliation Sanctions

The factual findings at this stage must be viewed against the backdrop that plaintiffs have been hamstrung in their ability to prove their claims, and the Court in its ability to evaluate the claims, by defendants' intentional deletion of relevant Signal messages, as detailed further in the Court's Order granting remedies under Federal Rule of Civil Procedure 37(e). To briefly summarize, the Court has found that high-level officials at FEMA and DHS communicated regarding FEMA and CORE staffing over the Signal messaging app, on their personal cell phones, using auto-delete timers that the officials themselves set, often deleting messages within one to four weeks. As a result, Signal messages from the time period most relevant to the DHS/FEMA claims

---

defendants' prejudicial and intentional destruction of relevant Signal messages.

(mid-November 2025 through January 2026) have been deleted and cannot be recovered. The Court has found that the deleted messages were relevant to this litigation, that plaintiffs have been prejudiced by the irrecoverable loss of these messages, and that defendants (through Karen Evans) acted with the intent to deprive plaintiffs of the use of the Signal chat messages in this litigation.

As a result, the Court has ordered:

> 1. Defendants may not rely on any hindsight testimony that denies Defendants' plan to substantially reduce Federal Emergency Management Agency (FEMA) staffing, denies the Department of Homeland Security's (DHS's) direction over that plan, or denies implementation of that plan through indiscriminate separation of Cadre of On-Call Response/Recovery (CORE) employees.
>
> 2. In any future proceedings in this case, the Court will presume that the lost Signal messages would have been unfavorable to Defendants because they would have been further evidence of Defendants' plan, DHS's control, and Defendants' implementing actions.
>
> 3. Plaintiffs are entitled to fees incurred in uncovering and addressing Defendants' spoliation.

### B. DHS Removed FEMA's Authority to Renew CORE Employees.

It is undisputed that FEMA no longer has the authority to renew CORE employees without first obtaining DHS approval. Defendants explain that the requirement for DHS approval stems from the federal hiring freeze ordered by the President on January 20, 2025. Dkt. No. 450 ("Defs.' Opp'n") at 4 (citing Dkt. No. 312-1 ("Evans Decl.") ¶¶ 29-30); *see also Hiring Freeze*, 90 Fed. Reg. 8247 (Jan. 28, 2025). However, DHS was exempted from the hiring freeze. Dkt. No. 414-1, Ex. B ("Edwards Dep.") at 99:17-20. The day after the President issued his Hiring Freeze memorandum, Amanda Scales at the Office of Personnel Management emailed DHS's Chief Human Capital Officer ("CHCO") Roland Edwards and Mischell Navarro (one of Edwards's deputies) to clarify:

> Hi Roland and Mischell,
>
> I wanted to follow up here over email that given clear relevance to the exemption criteria, DHS is not impacted by the hiring freeze. You do not need to work with your agency head to remove job postings or cancel offers in flight. If the team wishes to take this opportunity to inventory your open roles and offers, feel free to do so, but not required. If the team ends up removing or canceling any, please let me know. Thank you!

Thanks,
Amanda

Dep. Ex. 39 (Jan. 21, 2025 e-mail from Amanda D. Scales); Edwards Dep. at 33:1-9, 97:24-98:1.[6]

On March 14, 2025, DHS imposed a hiring freeze on FEMA via a DHS memorandum issued to all component and office heads. Dep. Ex. 40 ("DHS Hiring Verification Process" memo); *see also* Edwards Dep. at 100:16-19 (agreeing that "under this new process, FEMA can't hire anyone without approval from the Office of the Secretary" [of DHS]). FEMA CHCO La' Toya Prieur then reached out to DHS "to confirm if extending the appointment of a FEMA Cadre of On-Call Response Employee (CORE) is considered a hiring action" requiring DHS approval under the March 14, 2025 memorandum. *See* Dep. Ex. 41 (Mar. 18, 2025 e-mail from La' Toya Prieur). DHS confirmed that, yes, if the position was not on DHS's lists of "priority mission critical occupations" or "mission critical occupations" then FEMA would need to seek a waiver to extend CORE employees for their typical two-year appointments. *See id.*; Prieur Dep. at 104:4-106:10. Evans's later-filed declaration also confirms her understanding that, beginning in March 2025, FEMA's ability to renew CORE appointments was based on DHS permission/approval. *See* Evans Decl. ¶ 30.

On May 14, 2025, due to the upcoming hurricane season, then-FEMA SOPDA David Richardson reached out to then-Secretary Noem regarding "Reinstating FEMA's Ability to Renew Term Employees Based on Mission Requirements." Dep. Ex. 21. Richardson sought Noem's approval for FEMA to use "an internal process" to renew CORE employees for 180-day terms. *Id.* Richardson cautioned, "If terms are allowed to expire, it may impact FEMA's ability to conduct its mission during the 2025 hurricane season." *Id.* DHS signed off on the request on May 19, 2025. Dep. Ex. 21 at 2. However, FEMA's renewal authority would not extend to COREs with NTE dates after December 31, 2025. *See id.* at 1; Prieur Dep. at 113:14-114:9.

[6] References in this Order to "Dep. Ex." are to the deposition exhibits attached to the Leonard Declarations at Dkt. No. 414-2 et seq.

**C. As of December 2025, There Was a Plan to Cut FEMA Staffing in Half.**

In early December 2025, Karen Evans became SOPDA of FEMA.[7] On December 4, 2025, Evans sent an annual staffing plan for fiscal year 2026 to DHS. That staffing plan contained a roughly 50% cut to FEMA's workforce: the projected number for FEMA staffing for fiscal year 2026 would be 11,383. Dep. Ex. 17; 3/31 Evans Dep. at 218:12-220:24; *see also* Dep. Ex. 18 at USA-AFGE-Exp.-0007336 (Dec. 17, 2025 email from Evans that "[t]he number of 11,500 is also what we have provided to OPM/OMB at a high level but we haven't made that public"). A week later, news of a plan to cut FEMA got out when a draft report from the FEMA Review Council leaked to the public.[8] The draft showed a recommendation to create a new "FEMA 2.0" by cutting FEMA's staffing roughly in half and pushing more of FEMA's functions out to states and local governments. Dep. Ex. 13 at 24, 27.

**D. The Order to Cut FEMA Staffing in Half Came from DHS.**

Supervisors within FEMA, and FEMA's Chief Human Capital Officer at the time, did not agree with the 50% staffing cut. Two different staffing level exercises in late 2025, based on data submitted by FEMA's program/regional offices, showed a need for 24,812 and 23,146 staff for fiscal year 2026. Dep. Ex. 19 (Jan. 5, 2026 e-mail from Jeffrey Neurauter). In other words, FEMA components and program heads recommended maintaining or even increasing current staffing levels. *See id.*; Prieur Dep. at 134:9-137:14, 210:5-211:13; Evans Dep. at 238:4-243:2.

The record reflects that Evans did not tell FEMA's Chief Human Capital Officer that Evans was submitting a 50% proposed cut to DHS. CHCO Prieur did not find out about the proposed cut until January and did not actually see the staffing plan document until her April 2026 deposition.

---

[7] There is some conflict as to Evans's precise start date as FEMA SOPDA. Evans's declaration states she began the role on December 3, 2025. *See* Evans Decl. ¶ 1. However, at her deposition, Evans testified that she became SOPDA on December 1. Dkt. No. 414-1, Ex. A ("3/31 Evans Dep.") at 178:18-20.

[8] President Trump created the FEMA Review Council in January 2025, with the direction that the Council would advise the President "on the existing ability of FEMA to capably and impartially address disasters occurring within the United States . . . ." Exec. Order 14180, § 3(a), 90 Fed. Reg. 8743 (Jan. 24, 2025). The DHS Secretary was named as Council Co-Chair. *Id.* § 2(c).



United States District Court
Northern District of California

United States District Court
Northern District of California

Dep. Ex. 19; 3/31 Evans Dep. at 241:20-242:20; Prieur Dep. at 156:3-157:25. Prieur had recommended to Evans that staffing levels remain flat. Prieur Dep. at 208:2-12.

This begs the question: if FEMA supervisors and the FEMA CHCO did not recommend a 50% staffing cut, where did that number come from? The evidence shows it came from DHS—likely from Joseph Guy and Kara Voorhies, whose Signal communications with Evans are the subject of the Rule 37(e) sanctions motion. During the events at issue here, Joseph Guy held the role of Deputy Chief of Staff at DHS, while Evans understood Kara Voorhies to be the Senior Advisor to the DHS Secretary on FEMA issues. Dkt. No. 359-1 ("Guy Decl.") ¶ 1; 3/31 Evans Dep. at 98:19-21. Guy and Voorhies also instructed Evans to include Voorhies on anything related to reductions in force at FEMA. Dkt. No. 414-1, Ex. E ("Voorhies Dep.") at 143:5-16. Evans testified at her deposition that Joseph Guy told Evans "to include an option that would include a 50% cut" in FEMA's annual staffing plan. 3/31 Evans Dep. at 235:11-19. Evans's contemporaneous planner notes show she spoke with Guy and Voorhies about FEMA staffing multiple times in the days before she submitted the staffing plan.[9] FEMA's Chief Human Capital Officer did not participate in any of the meetings between Evans and Guy. Prieur Dep. at 244:21-24. On December 2, 2025, Evans wrote that she "talked w/Joe/Kara" about "personnel issues." *See* Dep. Ex. 142 at USA-AFGE-Exp.-0425318; *see also id.* at -0425321 (notes from that day showing "Sync" involving "Kara" and "Staffing Plan #'s".) On December 3, she wrote under "Joe Guy": "the # for personnel." *Id.* at -0425324. And on December 4, 2025, the very day that Evans submitted the 50% cut staffing plan to DHS, Evans noted: "talked to Kara re: the number is 11,383" and that Evans would "cc her." *See id.* at -0425328; *see also* 3/31 Evans Dep. at 223:13-224:11.

In sum, evidence indicates that Guy and Voorhies directed Evans to submit a FEMA annual staffing plan that included a 50% cut, over the objections and analyses of FEMA's own supervisors. As stated at the hearing, defendants do not dispute any of these facts for purposes of this motion.

///

[9] Evans testified that her daily planner notes are "reminders of me [sic] for activities or things that did occur in meetings." 3/31 Evans Dep. at 167:25-168:6.

United States District Court
Northern District of California

**E. Cutting CORE Staff Was Key to Implementing the Plan that DHS Ordered.**

Given that CORE staff comprise nearly half of the FEMA workforce, Evans knew "that we had to really look at the CORE positions in order to be able to achieve a 50% cut." 3/31 Evans Dep. at 248:21-249:3. On December 4, 2025, the day that Evans submitted the annual staffing plan to DHS, Evans tasked her staff with "Looking at all CORE dates" and creating a "Proposed plan to reduce COREs by date." Dep. Ex. 24 at USA-AFGE-Exp.-0006998; *see also* Dep. Ex. 142 at -0425328; 3/31 Evans Dep. at 279:8-280:16. She also requested staff provide her with a list of the 312 "term employees" who would be offboarded in January 2026 if the Secretary did not extend FEMA's authority to renew term appointments. Dep. Ex. 20 at -0006687 (Dec. 4, 2025 e-mail from Karen Evans). On December 5, 2025, FEMA CHCO Prieur began collecting data regarding "CORE expirations by month beginning with January 2026[,]" to be sent "to S1 today."[10] Dep. Ex. 26 at -0014521 (Dec. 5, 2025 e-mail from La' Toya Prieur).

In the meantime, FEMA's "authority" to approve CORE renewals without DHS approval was set to expire December 31, 2025. Dep. Ex. 21; Prieur Dep. at 113:20-24. The record indicates that FEMA supervisors wanted the COREs whose NTE dates were approaching in early January to be renewed. *See* Dep. Ex. 82 (Dec. 12, 2025 e-mail from La' Toya Prieur). On December 17, 2025, Prieur sent Evans an informational memo detailing "the mission effects of not renewing FEMA term appointments that expire" in the beginning of 2026. Dep. Ex. 31 at -0005056.

Also in December, FEMA staff prepared "decision memos" for the FEMA SOPDA and for the DHS Secretary "requesting the authority to extend full-time disaster employees on 180-day increments through March 2026." Dep. Ex. 23 at -0010685 (Dec. 5, 2025 e-mail from Kimberly C. Smith). FEMA staff were instructed to "[p]lease allow Kara opportunity to review before packaging for signature." *Id.* at -0010683 (Dec. 5, 2025 e-mail from Andrew D. Clayton). Evans ultimately did not send the memo, which would have tried to persuade DHS to extend FEMA's authority to renew the COREs. 3/31 Evans Dep. at 271:23-274:4.

Without the authority to renew CORE employees without DHS approval, FEMA staff

[10] "S1"is shorthand for the DHS Secretary. 3/31 Evans Dep. at 48:17-23.

worked through December to prepare all the paperwork to submit to DHS to renew the 303 COREs whose terms would expire in January and for whom FEMA supervisors were seeking renewal. Prieur Dep. at 230:3-231:22, 242:13-243:13, 253:10-254:16. Prieur worked all day on Christmas to get the paperwork ready for the 303 COREs. *Id.* at 251:24-252:12. Evans did not submit the paperwork. *Id.* at 272:4-273:8. Instead, on December 31, 2025, Evans met with DHS Deputy Chief of Staff Joseph Guy. Evans's notes from that meeting reflect: "Not going to approve the CORES (30 day extensions) and CORES in general." Dep. Ex. 142 at -0425379; Evans Dep. at 353:17-25.

Pointing to Evans's deposition testimony, defendants argue that Evans herself made the decision not to renew CORE staffing and that the direction did not come from DHS. Defs.' Opp'n at 5. However, at the hearing, defendants conceded they were "not meaningfully disputing the facts." Dkt. No. 487 ("Sept. 1, 2026 Tr.") at 33:24-34:12. Moreover, as plaintiffs point out, the reason Evans gave at her deposition for not renewing the COREs was that *DHS* had revoked FEMA's authority to continue the renewals. *See* 3/31 Evans Dep. at 351:13-352:7. Finally, as outlined in the Court's Rule 37(e) Order, in light of the destruction of the contemporaneous Signal messages, the Court does not credit Evans's hindsight testimony denying DHS's direction over a plan to substantially reduce FEMA.[11]

On or around December 31, 2025, FEMA Employee Relations began sending non-renewal emails to about 65 individual CORE employees whose NTE dates fell in early January. Dkt. No. 303-4 ("Young Decl."), Ex. A; Jackson Decl. ¶¶ 36-37. Employees generally received these emails the day of or the day before their renewal dates and then immediately lost systems access. Jackson

---

[11] Evans's testimony regarding who made the decision not to renew the COREs cannot be credited for the additional reason that she has taken multiple, conflicting stances on this matter before this Court and before Congress. On February 19, 2026, she filed a declaration that, "*DHS decided* not to reappoint" the CORE employees whose terms were up in January. Evans Decl. ¶ 25 (emphasis added). At her March 31 deposition, she testified that "I made the decision not to renew January CORE appointments because the delegation of authority was expiring." 3/31 Evans Dep. at 351:13-352:7. A few weeks later, Evans testified to Congress that the non-renewal decisions were "made by the supervisor or program office head" and were "based on function and whether the work is still there for them to do[.]" Pls.' Br. at 32 & n.28 (citing House Appropriations Committee, Budget Hearing—Department of Homeland Security: CISA, TSA, U.S. Coast Guard, U.S. Secret Service, and FEMA, at 1:05:14-57, 1:06:45-58 (Apr. 16, 2026), https://democrats-appropriations.house.gov/events/hearings/budget-hearing-department-homeland-security-cisa-tsa-us-coast-guard-us-secret.

Decl. ¶ 36; Dkt. No. 303-11 (“Prell Decl.”) ¶ 11.

The parties do not dispute that on January 22, 2026, FEMA paused non-renewals of CORE employees due to winter storm warnings. Defendants' later-filed evidence indicates that between January 1 and 21, 2026, “FEMA had 178 COREs whose terms of employment were set to expire” and that thirty of those “resigned or retired from employment before their term of employment expired, leaving a balance of 148 COREs whose terms of employment expired in January 2026.” Dkt. No. 383-1 (“Neurauter Decl.”) ¶ 4.

### F. Post-Lawsuit Events

As noted above, on January 30, 2026, plaintiffs supplemented their complaint to add claims specific to DHS and FEMA. On February 10, 2026, plaintiffs moved for a temporary restraining order. Around that same time, DHS began approving 90-day extensions for those CORE employees with upcoming NTE dates. *See* Dep. Ex. 66 (E-mail thread with Joseph Guy, Greyson McGill, and Roland Edwards of DHS regarding a CORE renewal request from Evans).

On April 28, 2026, the FEMA Administrator's Office sent an all-staff email that:

> - CORE staff with initial not-to-exceed (NTE) dates between January through May 2026 who were previously extended for 90 days **may** be reappointed for up to one year, depending on performance, availability of work, and funding.
>
> - CORE staff with expiring appointments in June 2026 and beyond will undergo a functional review with supervisors, which will follow the prescribed assessment requirements and mission analysis. These CORE staff **may** have the opportunity for a one-year appointment.

Dkt. No. 414 (“2d Suppl. Jackson Decl.”) ¶ 17 & Ex. F.

Since early March 2026, Noem has no longer served as DHS Secretary. *See id.* ¶¶ 5-6. Evans has no longer served as FEMA SOPDA since May 2026, prior to her May 26 deposition. *See* Dkt. No. 414-1, Ex. G (“5/26 Evans Dep.”) at 8:23-9:4.

On May 7, 2026, the FEMA Review Council released its final report. 2d Suppl. Jackson Decl. ¶ 11. That report no longer contains the sentence in the leaked draft from December 2025 regarding a 50% staffing cut. *See id.* ¶¶ 12-13 & Ex. C. The Review Council's final report

recommends, in part:

> It is time to close the chapter on FEMA. "FEMA" as a brand and as an agency was irreparably damaged by the previous Administration's proclivity to mission creep and endemic program failures. A transformed agency should be established that retains the core missions of FEMA, while highlighting the renewed emphasis on locally executed, state or tribally managed, and federally supported emergency management.

*Id.*, Ex. C at 13.

On May 1, 2026, defendants filed a statement in this case to inform the Court "that FEMA has initiated contact to offer new appointments to CORE employees whose appointment expired during the first three weeks in January[.]" Dkt. No. 361. Defendants followed up on May 7 with a declaration from Jeff M. Neurauter, now Acting Chief Human Capital Officer of FEMA. Dkt. No. 383-1 ¶ 1. Neurauter declares that, of the COREs whose terms were set to end between January 1 and January 21, 2026, and who did not otherwise resign or retire, "FEMA decided to offer the 148 COREs new terms of appointment as COREs with terms of employment of six months or one year, based on the needs of the program or regional offices these COREs supported." *Id.* ¶ 6.

On May 19, 2026, FEMA held its first all-staff meeting in a year. 2d Suppl. Jackson Decl. ¶ 19. According to Khaalis Jackson, President of AFGE Local 4060 and an Emergency Management Specialist at FEMA, Dkt. No. 303 ¶ 2, at the meeting FEMA leadership "described decisions to renew CORE positions going forward, and that they were 'working with the department' to establish the renewal periods." 2d Suppl. Jackson Decl. ¶ 20. Jackson continues:

> FEMA leadership stated that COREs renewed between now and June would be renewed for one year, and that COREs renewed after June would be on a 'case by case' basis. They stated that DHS had to approve these plans, which were being 'worked out' with the department. FEMA leadership also explained that DHS had yet to approve the most recent staffing plan for FEMA.

*Id.*

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant

is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment. . . ." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c).

When considering cross-motions for summary judgment, the Court must review each motion "on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation marks and citation omitted). The Court must consider the evidence presented in support of each motion "to determine whether it present[s] a disputed issue of material fact precluding summary judgment" on the other motion. *Id.* at 1135. In other words, the Court collectively considers all of the evidence presented, then decides each motion for summary judgment separately based on the sum of the evidence.

## DISCUSSION

### I. Jurisdiction

Defendants argue that the Court lacks subject matter jurisdiction over the supplemental claims for the following reasons: that the Civil Service Reform Act of 1978 ("CSRA") precludes jurisdiction over FEMA's personnel decisions; that plaintiffs lack standing to challenge CORE non-reappointments; and that plaintiffs' supplemental claims are moot because the COREs whose terms were not renewed in January have since been offered new appointments.

#### A. CSRA Preclusion

The Court has visited this argument numerous times over the course of this lawsuit and in the related action.[12] Most recently, the Court considered and rejected defendants' CSRA preclusion arguments raised specifically with regard to FEMA and the COREs in the context of denying defendants' motion to dismiss the supplemental complaint. *See* Dkt. No. 434 at 8-10. The Court herein incorporates its analysis from that prior Order, which in turn incorporates the Court's earlier analysis in the original preliminary injunction Order. *See id.*; *Am. Fed'n of Gov't Emps. v. Trump*, 784 F. Supp. 3d 1316, 1337-42 (N.D. Cal. 2025), *emergency motion for stay pending appeal denied*, 139 F.4th 1020 (9th Cir. 2025), *stayed pending appeal*, 145 S. Ct. 2635, *vacated and remanded on other grounds*, 155 F.4th 1082 (9th Cir. 2025). Defendants state that they repeat their argument here in order to preserve it for appeal. Defs.' Opp'n at 10 n.11. For the same reasons previously given, the Court rejects defendants' argument that the CSRA precludes district court review of the supplemental claims at issue here.

#### B. Article III Standing

Defendants further argue there is no jurisdiction because plaintiffs have not met the requirements for Article III standing. Federal courts may only hear a case if plaintiffs can show they have standing to sue. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016, revised May 24, 2016).

[12] *See Am. Fed'n of Gov't Emps. v. U.S. Off. of Mgmt. & Budget*, No. 25-cv-8302 SI (N.D. Cal., filed Sept. 30, 2025).

"As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) (citing *Preminger v. Peake*, 552 F.3d 757, 764 (9th Cir. 2008)).

To establish standing to sue, plaintiffs must show an injury, trace that injury to the defendants' conduct, and prove that courts can provide adequate redress for the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). The injury "must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks and citation omitted). To be imminent, a threatened injury must be "certainly impending"—"allegations of possible future injury are not sufficient." *Id.* (internal quotation marks, brackets, and citations omitted).

Organizational plaintiffs such as trade unions or membership-based non-profit organizations have two paths to establish standing: standing where the organization has suffered injury in its own right, and representational/associational standing where the organization brings suit on behalf of its members. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 398 (2024) (Thomas, J., concurring). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Organizations without formal members may achieve associational standing if they are "the functional equivalent of a membership organization." *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002) (citing *Hunt*, 432 U.S. at 342-45).

In its Order denying the motion to dismiss the supplemental complaint, the Court found plaintiffs had sufficiently established standing at least as to plaintiff union AFGE. The Court incorporates its prior reasoning here. *See* Dkt. No. 434 at 10-14. At summary judgment, defendants now focus in particular on the associational standing of plaintiff AFGE Local 4060, on the grounds

that "last year, FEMA terminated its collective bargaining agreement with AFGE Local 4060 pursuant to EO 14,251, terminating the union's representation of all FEMA Core employees." Defs.' Opp'n at 12. Defendants also raised a new argument at the hearing: that plaintiff AFGE may not claim associational standing due to the statutory scheme set forth in the Federal Service Labor Management Relations Statute. In their reply, plaintiffs note that "AFGE still has dues-paying *members* who work for FEMA, including CORE employees impacted by the challenged actions" and that Executive Order 14251 "cannot eliminate *membership* in a union." Dkt. No. 461 ("Pls.' Reply") at 12.

The Court rejects defendants' arguments for the same reasons previously stated. In particular, plaintiff AFGE Local 4060 has filed a declaration that as of late February, AFGE had identified "multiple current dues-paying members of AFGE who were employed as FEMA CORE employees, whose NTE dates fell on or after January 1, 2026, and who were non-renewed, resulting in their separation from employment." Dkt. No. 314-3 ("Schwarz Decl.") ¶ 5. AFGE also identified dues-paying members with upcoming NTE dates impacted by the uncertainty of their term renewals. *Id.* ¶ 6. Defendants argue both that AFGE lacks standing because the federal government terminated its collective bargaining agreement with AFGE, thereby (in defendants' view) making AFGE's members not really "members" for standing purposes. And they also argue that plaintiffs cannot achieve standing under the line of cases finding that organizations without "members in the traditional sense" may assert associational standing if they are "the functional equivalent of a traditional membership organization." *See Fund Democracy*, 278 F.3d at 25 (citing *Hunt*, 432 U.S. at 342-45; *Am. Legal Found. v. F.C.C.*, 808 F2d 84, 89-90 (D.C. Cir. 1987)); *see also Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1112 (9th Cir. 2003) (likewise applying a "functional equivalent" membership test derived from *Hunt*). The Ninth Circuit has explained "the purposes that undergird the concept of associational standing" as follows: "that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Mink*, 322 F.3d at 1111 (quoting *Vill. of Arlington Heights v. Metro. Hous. Devel. Corp.*, 429 U.S. 252, 261 (1977)). Following this line of cases, the Court finds that plaintiff AFGE has adequately demonstrated its personal stake in the outcome of the FEMA staffing

and renewal decisions at issue here.

Defendants additionally argue that plaintiffs must have standing "for each form of relief that they seek[.]" Defs.' Opp'n at 14 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). Because current dues-paying members of AFGE include COREs whose past and future employment have been impacted by defendants' unlawful actions, as explained further below, the Court finds plaintiffs have standing to pursue injunctive and equitable relief.

**C. Mootness**

Defendants argue that "subsequent developments have mooted the Supplemental Claims." Defs.' Opp'n at 2, 14-18. In particular, they point to the new term appointments that have since been offered to COREs who were not renewed in January and to the change of leadership at both DHS and FEMA.

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). Thus, a claim is moot if it has lost its character as a present, live controversy, and if no effective relief can be granted: ". . . no justiciable controversy is presented . . . when the question sought to be adjudicated has been mooted by subsequent developments . . . ." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). "The court must be able to grant effective relief, or it lacks jurisdiction and must dismiss the [case]." *Pub. Utils. Comm'n of California v. F.E.R.C.*, 100 F.3d 1451, 1458 (9th Cir. 1996) (citations omitted). The party asserting mootness bears the "heavy" burden of establishing that there is no effective relief that the court can provide. *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) (citation omitted).

Plaintiffs' claims are not moot. Plaintiffs have put forth evidence, uncontradicted by defendants, that FEMA's authority to renew CORE terms without DHS approval, as FEMA had done for years before March 2025, has not been restored. *See* 2d Suppl. Jackson Decl. ¶ 20 (describing May 19, 2026 FEMA all-staff meeting, that DHS still had to approve CORE renewals). Additionally, at the hearing, defense counsel stated that, while COREs were historically renewed for terms of two years in length, the current CORE term renewals are for six months or one year.

Sept. 1, 2026 Tr. at 23:3-24:10; *see also* 2d Suppl. Jackson Decl. ¶ 17 & Ex. F (April 28, 2026 FEMA all-staff email that COREs may be eligible for up to one-year renewal). Among other things, plaintiffs seek a declaration that DHS's usurping of FEMA authority to renew CORE contracts is unlawful and seek an injunction barring DHS from continuing to do so in the future. These claims are still at issue, and defendants have not met their burden of showing that there is no effective relief the Court can provide. *See Forest Guardians*, 450 F.3d at 461.

## II. Supplemental Claims

Defendants' arguments in opposition are procedural rather than substantive; they do not argue plaintiffs are wrong on the facts. Having rejected defendants' jurisdictional arguments, the Court finds plaintiffs have shown there is no genuine dispute as to any material fact. Under the record here, bolstered by the Rule 37(e)(2) finding that the deleted Signal messages would have been unfavorable to defendants, plaintiffs are entitled to judgment as a matter of law on their supplemental APA claims.[13] The Court need not and does not reach the *ultra vires* claims.

### A. APA Claims

The APA provides, in relevant part, that

> The reviewing court shall—
>
> . . . **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—
> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> . . .
> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; . . . .

5 U.S.C. § 706(2); *see also E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1271 (9th Cir. 2020) (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-34 (9th Cir. 2011)).

Plaintiffs' supplemental claims assert that defendants have acted in excess of statutory

[13] The Court afforded defendants the opportunity to identify documents that should be included or excluded from the administrative record, Dkt. No. 433 at 6, but defendants did not do so.

authority and contrary to law, and that their actions were arbitrary and capricious, all in violation of the APA, 5 U.S.C. § 706(2)(A), (B), (C).

**1. Final Agency Action**

Defendants do not argue that "final agency action" under the APA is lacking here. Nevertheless, if there is no "final agency action," then the Court is without subject matter jurisdiction to decide the APA claims. *See San Francisco Herring Ass'n v. U.S. Dep't of Interior*, 683 F. App'x 579, 580 (9th Cir. 2017). For an agency action to be reviewable under the APA, the "action must (1) 'mark the consummation of the agency's decisionmaking process' and (2) 'be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F. 3d 977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). The Supreme Court has "long taken" a "pragmatic approach" to the question of what constitutes final agency action. *San Francisco Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 577-78 (9th Cir. 2019) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016)).

Previously, the Court found final agency action sufficiently stated by the allegations in the supplemental complaint. The Court highlighted plaintiffs' allegations that "the DHS Annual Staffing Plan includes the plan to cut FEMA staff in half[,]" that the direction to do this unlawfully came as a directive from DHS, and that FEMA and DHS had engaged in final agency action by "implementing unlawful DHS directives to cede decision-making authority to DHS with respect to the reduction in FEMA positions and in particular the renewals of CORE positions." Dkt. No. 434 at 15 (quoting Suppl. Compl. ¶¶ 472-481, 578, 593). At this point, the evidence bears out what plaintiffs previously alleged. In particular, the Court notes the undisputed, and still ongoing, removal of FEMA's decision-making authority over CORE renewals. That final agency action is both "one by which 'rights or obligations have been determined'" and is one from which legal consequences have flowed, such as the cessation of CORE renewals in January and the renewals of COREs for shorter than their historical multi-year terms. *See Bennett*, 520 U.S. at 178 (citation omitted). Thus, for the same reasons stated in the Court's Order denying the motion to dismiss the

supplemental claims, the Court finds final agency action present here. Dkt. No. 434 at 14-16.

**2. In Excess of Statutory Authority, Contrary to Law**

Under the APA, the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A), (C). "In matters of statutory construction, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires," and determine the "best reading" of the statute. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, No. 24-CV-04651-JST, 2026 WL 898264, at *10 (N.D. Cal. Mar. 30, 2026) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400, 412 (2024)).

Here, the Court finds plaintiffs are entitled to judgment on their APA claims that DHS and FEMA have acted in excess of statutory authority and contrary to law, based on the defendant agencies' actions that violate both the Post-Katrina Act and the appropriations act that ended the recent government shutdown. *See* Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, 139 Stat. 495 (2025) (hereinafter, "Continuing Resolution").

Defendants argue that the Post-Katrina Act "did not render FEMA wholly independent from DHS oversight" and that the broad relief plaintiffs seek stretches FEMA's independence too far. Defs.' Opp'n at 21. But the statutory language is clear. In the wake of the catastrophe of Hurricane Katrina, Congress provided that:

- "All functions of the Federal Emergency Management Agency, . . . including all of its personnel . . . [and] authorities" were now transferred to FEMA;
- the DHS Secretary "may not substantially or significantly reduce . . . the authorities, responsibilities, or functions of" FEMA.

6 U.S.C. §§ 315(a)(1), 316(c)(1).

The actions described in plaintiffs' supplemental complaint and in this Order violate these provisions. The undisputed evidence shows that defendants violated the Post-Katrina Act when

DHS (1) revoked FEMA's authority to renew COREs (and then granted it back, but only for a limited time and for term lengths that DHS prescribed) and (2) ordered that FEMA submit a staffing plan to DHS with a 50% FEMA staffing cut. DHS acted unlawfully in usurping FEMA's authority over its personnel, and FEMA—through former SODPA Evans—acted unlawfully in acquiescing to DHS's exertion of authority over FEMA's CORE renewals and staffing numbers.

Judgment in favor of plaintiffs is further appropriate because of defendants' clear violations of Section 120 of the Continuing Resolution that ended the government shutdown on November 12, 2025.

Section 120 provides in full:

> SEC. 120. (a) PROHIBITION.—Notwithstanding section 106(1), during the period between the date of enactment of this Act and the date specified in section 106(3) of this Act,[14] no federal funds may be used to initiate, carry out, implement, or otherwise notice a reduction in force to reduce the number of employees within any department, agency, or office of the Federal Government.
>
> (b) APPLICABILITY.—The prohibition under subsection (a) shall apply to all civilian positions, whether permanent, temporary, fulltime, part-time, or intermittent, and without regard to the source of funding for such positions.
>
> (c) EXCEPTION.—The prohibition under subsection (a) shall not apply to—
>
> (1) voluntary separations or retirements;
>
> (2) actions necessary to comply with a court order; or
>
> (3) actions taken, beginning only on the first day of a lapse in appropriations, necessary to implement or maintain an orderly shutdown of government operations.
>
> (d) DEFINITIONS.—For purposes of this section, the term "reduction in force" means actions taken by an agency pursuant to section 3501 through 3504 of title 5, United States Code or section 3595 of such title, or any similar reduction of positions at any department, agency, or office of the Federal Government, unless such reduction has been provided for in this Act.

[14] The date specified in Section 106(3) of the Continuing Resolution was January 30, 2026. That date was later extended to February 13, 2026, and then to April 30, 2026, to include the lapse in appropriations at DHS. *See* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, Div. H, § 101, 140 Stat. 628 (2026); Homeland Security and Further Additional Continuing Appropriations Act, 2026, Pub. L. No. 119-86, Div. B, §§ 101-102, 140 Stat. 809 (2026).



United States District Court
Northern District of California

> (e) Notwithstanding section 106(1), any reduction in force proposed, noticed, initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1, 2025, and the date of enactment, shall have no force or effect.
>
> (1) Any employee who received notice of being subject to such a reduction in force shall have that notice rescinded and be returned to employment status as of September 30, 2025, without interruption. Such employees shall receive all pay to which they otherwise would have been entitled in the absence of receiving such notice, including backpay in accordance with section 116 of this Act.
>
> (2) Within 5 days of date of enactment of this Act, each Federal agency shall send notice to all affected employees and the chairs and ranking members of the Appropriations Committees of the Senate and House of Representatives of the withdrawal of the reduction in force notice and the affected employee's reinstatement, if applicable.
>
> (3) Notices must include reinstatement date and the amount of back pay determined in paragraph (1), if applicable.

Pub. L. No. 119-37, § 120, 139 Stat. 500 (2025).

In short, Section 120 prohibited the use of federal funds through at least January 30, 2026, "to initiate, carry out, implement, or otherwise notice a reduction in force to reduce the number of employees within any department, agency, or office of the Federal Government." *Id.* § 120(a). The prohibition applied not just to formal reductions in force but also to "any similar reduction of positions at any department, agency, or office of the Federal Government[.]" *Id.* § 120(d). And the prohibition applied to FEMA COREs, even if they are categorically considered "temporary" employees under the Stafford Act. *See id.* § 120(b). Defendants have not argued otherwise.

No one disputes that defendants began systematically non-renewing CORE employees beginning January 1 until January 22, 2026. And though plaintiffs raise Section 120(b) as a basis for their supplemental APA claims, defendants' responsive brief does not address this argument at all. *See* Suppl. Compl. ¶¶ 449-451, 579(c), 583(c), 594(c), 598(c); Pls.' Br. at 35-36. The Court finds defendants violated the Continuing Resolution through steps DHS and FEMA took after November 12, 2025, and continuing through January 2026 to cut FEMA's staffing in half, beginning with the elimination of COREs whose NTE dates were up in January. DHS and FEMA therefore exceeded their statutory authority and acted contrary to law under the APA.

Although plaintiffs' claims are bolstered by the Court's Rule 37(e)(2) inference that the

Signal messages DHS and FEMA officials deleted would have been unfavorable to defendants, the claims do not entirely depend on the Rule 37(e) finding. There is no dispute that since March 2025 DHS has been determining whether FEMA could renew CORE terms and for what term length, and that FEMA has gone along with DHS's newly asserted "authority." These violations of the Post-Katrina Act and of the Continuing Resolution do not depend on the outcome of the Rule 37(e) motion.[15]

**3. Arbitrary and Capricious**

"[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned decisionmaking.'" *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 53 (1983)). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Agency action is also arbitrary and capricious if, "[w]hen an agency changes course," it fails to take into account "that longstanding policies may have engendered serious reliance interests[.]" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (internal quotation marks and citations omitted). Although an agency is not required to "consider all policy alternatives in reaching [its] decision[,]" where the agency is "not writing on a blank slate, . . . it [is] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 33 (internal quotation marks and citations omitted). "The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and

---

[15] This Order does not reach plaintiffs' alternative bases for liability on Supplemental Claims VIII and XI, such as whether the actions described here are an unlawful reorganization under the Post-Katrina Act, 6 U.S.C. § 316(b), or whether a 50% staffing cut to FEMA would leave FEMA unable to fulfill its statutory mandates.

articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks and citation omitted).

Plaintiffs succeed on their supplemental claims that defendants' actions were arbitrary and capricious, for several reasons. First, DHS acted arbitrarily and capriciously when it revoked FEMA's long-standing authority to renew CORE appointments. There is no evidence in the record reflecting reasoned decisionmaking for this about-face or for the subsequent conditions DHS placed on FEMA's renewal authority. The record instead reflects that DHS was exempt from the President's hiring freeze but then interpreted "new hires" under the hiring freeze to include FEMA CORE term renewals. *See* Dep. Exs. 39-41; Edwards Dep. at 99:17-20. The record also reflects that revoking FEMA's CORE renewal authority impeded FEMA's ability to perform its functions. In May 2025, then-SOPDA Richardson requested that authority to renew COREs be given back to FEMA in light of the upcoming hurricane season. *See* Dep. Ex. 21. When DHS gave FEMA the authority to renew COREs, for 180-day terms, it then effectively imposed an arbitrary expiration date on that authority of December 31, 2025. *See id.*; Prieur Dep. at 113:14-24.

FEMA and DHS also acted arbitrarily and capriciously in not nonrenewing COREs based on NTE date, beginning January 1, 2026. The nonrenewals were not based on any assessment of agency need or of individual performance but targeted those particular employees simply because those were the ones whose NTE dates came up first when FEMA's authority to renew COREs purportedly "expired." Rather than reasoned decisionmaking, the decision to nonrenew COREs ran counter to internal FEMA analyses, such as the recommendation of the FEMA CHCO and the request by FEMA managers that 303 COREs with NTE dates in January be renewed. *See* Dep. Ex. 31; Dep. Ex. 23 at -0010685.

The arbitrary nature of not renewing the COREs is perhaps best highlighted by the fact that defendants stopped offboarding COREs on January 22, 2026, due to a pending severe winter storm impacting a significant portion of the country. In other words, it is clear that the January 1 non-renewals began because there happened not to have been a winter storm on that date; but if the winter storm had arrived earlier or later, then the CORE nonrenewals would have halted on a

United States District Court
Northern District of California

different date and different employees would have been separated.

Finally, the December 4, 2025 annual staffing plan that Evans submitted to DHS—and which has not been revoked, as far as the record reflects—was arbitrary and capricious. *See* Dep. Ex. 17 (projecting FY26 personnel at 11,383, or approximately half of prior levels). Frankly, the FEMA staffing plan number appears as if pulled from thin air.[16] Joseph Guy, who told Evans to include an option for a 50% cut, could not explain where the number came from or recall anything about his conversation with Evans. *See* Dkt. No. 414-1, Ex. D ("5/4 Guy Dep.") at 251:25-252:11; 3/31 Evans Dep. at 235:10-19. The DHS CHCO could not remember anything about FEMA submitting this number to DHS. Edwards Dep. at 178:13-180:3. Voorhies was not aware of any analysis of agency need supporting a 50% cut. Voorhies Dep. at 123:13-19. The FEMA CHCO learned that Evans had submitted a plan for a 50% cut one month after the fact. *See* Dep. Ex. 19; 3/31 Evans Dep. at 241:20-242:20; Prieur Dep. at 156:3-157:25. The FEMA CHCO herself had recommended to Evans that staffing remain at current levels. Prieur Dep. at 208:2-12. And the plan was contrary to two contemporaneous staffing analyses submitted by FEMA's program/regional offices. *See* Dep. Ex. 19; Prieur Dep. at 134:9-137:14, 210:5-211:13; Evans Dep. at 238:4-243:2.

The only contemporaneous reference in the record to the staffing number that Evans submitted on December 4, 2025, is Evans's handwritten note from her daily planner, following a call with Kara Voorhies on December 4: "talked to Kara re: the number is 11,383[.]" *See* Dep. Ex. 142 at -0425328. There is also evidence that Evans gave the 11,383 number to DHS first, and then told staff to figure out how they were going to reach that number. Defendants produced a Word document titled, "Talking Points for FY26 Staffing Strategy" drafted on December 11, 2025. It states: "Ms. Evans has tasked me to develop a strategy to cut the FEMA workforce by 50% over FY26." Dep. Ex. 25. In other words, rather than reflecting reasoned decisionmaking to reach the 11,383 annual staffing plan figure submitted to DHS, the record indicates that Evans submitted the 11,383 figure first and then worked backwards to figure out how to support it.

Plaintiffs are entitled to judgment on their supplemental claims X and XIII.

[16] It is possible the deleted Signal messages would have shed light on how this number came about.

United States District Court
Northern District of California

**B. *Ultra Vires***

Plaintiffs' *ultra vires* claims overlap with their APA claims, both on the substance and in terms of the relief sought. Court must already "hold unlawful and set aside agency action, findings, and conclusions found to be" in violation of the APA. *See* 5 U.S.C. § 706(2). Having found plaintiffs entitled to relief on their supplemental claims under the APA, the Court need not and does not reach the supplemental *ultra vires* claims (Claims IX and XII). *See Am. Fed'n of Gov't Emps. v. U.S. Off. of Pers. Mgmt.*, 799 F. Supp. 3d 967, 994 (N.D. Cal. 2025) (in case challenging agency-wide terminations of probationary employees, declining to reach *ultra vires* claims where plaintiffs succeeded on APA claims and agreed that "the record, analysis, and relief of the *ultra vires* claim overlap with that of their APA claims").

**III. Remedy**

Plaintiffs seek a declaration that defendants' actions were contrary to law, exceeded their authority, and were arbitrary and capricious. Plaintiffs also ask the Court to permanently enjoin defendants DHS and FEMA from taking any action to implement, carry out, or effectuate DHS directives that remove FEMA authority over personnel decisions with respect to FEMA employees and from taking any action to reduce the size of FEMA or otherwise implement the FEMA Annual Staffing Plan. Plaintiffs also ask that the Court order the rescission of all notices of non-renewal separating CORE employees from FEMA since January 1, 2026, and order defendants to return separated employees to the position they would have been in were it not for the unlawful terminations.

Defendants argue that the relief plaintiffs seek is overbroad, improperly constrains DHS's ability to exercise oversight of FEMA, and fails to show irreparable harm. Plaintiffs counter that they have sufficiently shown irreparable harm but that, in any event, vacatur is the presumptive remedy for an APA violation and does not require a showing of irreparable harm. Defendants concede that vacatur is the presumptive remedy for a violation of the APA.

The parties also dispute whether the back pay plaintiffs seek on behalf of COREs who were separated in January is barred by sovereign immunity. Defs.' Opp'n at 3 (citing *Hubbard v. E.P.A.*,

982 F.2d 531 (D.C. Cir. 1992) (en banc)). Plaintiffs argue that *Hubbard* is inapplicable on the facts, because *Hubbard* involved an applicant who was unlawfully denied employment, and so there was no backpay to award. Plaintiffs point instead to the Supreme Court's statement in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), where, in construing what constitutes "money damages" under the APA § 702, the Court highlighted "the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee *with backpay* . . . ." *Id.* at 893 (emphasis added).

The Court agrees with defendants that some of the relief plaintiffs seek is quite broad and no longer seems to fit with the facts as they have unfolded over the months of this litigation. In particular, since January 22, 2026, FEMA is no longer systematically non-renewing the COREs and there is no indication at present that FEMA is otherwise taking action on the annual staffing plan Evans submitted to DHS on December 4, 2025. At the same time, the record reflects that DHS continues to usurp FEMA's authority to renew CORE terms and that COREs are currently being renewed for shorter terms (six months to one year) than the historical two-year, or more recent four-year, terms.

Under these circumstances, the Court finds it appropriate to ORDER the parties to meet and confer as to the scope of relief, in light of today's ruling in favor of plaintiffs on their supplemental APA claims. Should the parties be unable to reach agreement, they shall file a joint statement on what relief remains outstanding, no later than October 9, 2026. The Court will then issue a ruling on relief forthwith.

**CONCLUSION**

For the reasons set forth above, the Court GRANTS plaintiffs' motion for partial summary judgment on Claims VIII, X, XI, and XIII (APA claims against DHS and FEMA) of the Supplemental Complaint. The Court declines to reach Claims IX and XII (*ultra vires* claims). Defendants' cross-motion for partial summary judgment, Dkt. No. 451, is DENIED.

The Court ORDERS that the parties meet and confer as to the scope of relief. Should the

United States District Court
Northern District of California

parties be unable to reach agreement, they shall file a joint statement on what relief issues remain outstanding, no later than October 9, 2026.

**IT IS SO ORDERED**.

Dated: September 11, 2026

Susan Illston

SUSAN ILLSTON
United States District Judge